# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,          :
                                    :
        Plaintiff,                  :
                                    :
    v.                              :
                                    :
COLONEL L. AARON CHAFFINCH,         :          C.A.No.04-1394-GMS
individually and in his official capacity as the   :
Superintendent, Delaware State Police;   :
LIEUTENANT COLONEL THOMAS F.        :
MACLEISH, individually and in his official   :
capacity as the Deputy Superintendent,   :
Delaware State Police; DAVID B. MITCHELL,   :
individually and in his official capacity as   :
Secretary of the Department of Safety and   :
Homeland Security, State of Delaware; and   :
DIVISION OF STATE POLICE,           :
DEPARTMENT OF SAFETY AND            :
HOMELAND SECURITY, STATE OF         :
DELAWARE,                           :
                                    :
        Defendants.                 :


**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER MOTION TO BIFURCATE
THE TRIAL OF COUNT ONE FROM COUNTS TWO AND THREE OR IN THE
ALTERNATIVE TO SEVER COUNT ONE FROM COUNTS
TWO AND THREE**


THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: September 16, 2005          Attorneys for Plaintiffs

## <u>TABLE OF CONTENTS</u>

NATURE AND STAGE OF THE PROCEEDING.........................................................................1

SUMMARY OF THE ARGUMENT............................................................................................2

STATEMENT OF FACTS.............................................................................................................3

     I.     Count One - Gender Discrimination in the Denial of Two Promotions to Major.............................................................................................................................3

          A.     The Prima Facie Case.................................................................................3

          B.     The Legitimate Non-Discriminatory Reason.............................................3

          C.     Fuentes Prong 2 in a Pretext Case - The Weight of the Evidence Proves Gender Discrimination........................................................................3

          D.     Fuentes Prong 1 in a Pretext Case - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions in the Defense Case.............................................................................................................8

     II.     Counts Two and Three - Retaliation for the Filing of This Lawsuit.....................10

          A.     Plaintiff's Protected Speech and Petition Clause Activity........................10

          B.     The First Act of Retaliation - A Confidential and Internal DSP Document About Plaintiff is Leaked to the Delaware Media...................10

          C.     The Second Act of Retaliation - Defendants Refused to Investigate This Release.............................................................................................10

          D.     The Third Act of Retaliation - Defendants Then Confirmed and Discussed the Nature of the IA Charges With the Delaware Media..........11

               1.     Aviola Was "Surprised" by This Order........................................12

               2.     The Prejudicial Content of This Release.......................................12

          E.     Substantial or Motivating Factor...............................................................12

               1.     Defendants' Friendship Created a Motive to Retaliate Against the Person Who Sued Chaffinch and Caused Him to Be Suspended.............................................................................13

2.      Demonstrated Antagonism Towards Plaintiff and Her Protected Activity.............................................................13

      a.      Chaffinch Demands Blind Personal Loyalty.....................13

      b.      Chaffinch's Hostile Feelings.............................................14

      c.      MacLeish's Hostile Feelings.............................................14

      d.      Mitchell's Hostile Feelings...............................................15

3.      Unusually Suggestive One or Two Day Temporal Proximity.......15

4.      Numerous Violations of Statutes, Policies, Procedures, Practices, Rules and Regulations....................................................16

      a.      The Express and Unequivocal Confidentiality Protections of the LEOBOR.............................................16

      b.      DSP Rules, Regulations and Policies...............................17

            (i).      Rule 10............................................................17

            (ii).      Rule 18(b).......................................................17

            (iii).     Rule 19(a).......................................................17

            (iv).     The DSP Code of Ethics...................................17

      c.      An Order to Violate Any of These Statutes or Rules is an "Unlawful Order".....................................................18

      d.      Actual DSP Policies, Practices and Procedures................18

            (i).      Current Policy and Practice...................................18

            (ii).     Long Time Historical Policy and Practice.............19

      e.      No Internal Affairs Investigation Resulted From These Numerous Violations.............................................19

5.      Disparate Treatment.......................................................................20

ARGUMENT.................................................................................................................20

I.  THERE IS ABUNDANT RECORD EVIDENCE OF ALL THE
    ELEMENTS OF A GENDER DISCRIMINATION PROMOTIONS
    CASE............................................................................................................20

    A.  A Prima Facie Case Has Been Proven........................................................20

        1.  Prima Facie Case.......................................................................21

        2.  Defendant's Burden....................................................................21

    B.  Plaintiff's Ultimate Burden.......................................................................21

        1.  Prong 1 - The Abundant Weaknesses, Implausibilities,
            Inconsistencies, Incoherencies and Contradictions in
            Defendant's Case.......................................................................22

        2.  Prong 2 - The Weight of the Evidence Demonstrates Gender
            is the Reason Plaintiff Was Not Promoted...................................22

II. THERE IS ABUNDANT RECORD EVIDENCE OF ALL THE
    ELEMENTS OF A FREE SPEECH AND PETITION CLAUSE
    RETALIATION CASE...................................................................................22

    A.  Protected Activity.....................................................................................22

    B.  Substantial or Motivating Factor..............................................................23

        1.  Temporal Proximity...................................................................23

        2.  Demonstrated Anger, Hostility and Antagonism..........................23

        3.  Violations of Law, Policies and Procedures.................................24

        4.  Disparate Treatment...................................................................24

        5.  The Big Picture..........................................................................24

    C.  Same Decision Anyway Affirmative Defense.............................................25

III. THE COURT SHOULD EXERCISE ITS SOUND DISCRETION AND
     BIFURCATE THE TRIAL OR, IN THE ALTERNATIVE, SEVER THE
     COUNTS...................................................................................................25

    A.  Introduction.............................................................................................25

    B.     Rule 42(b) Separate Trials or Bifurcation....................................................26

        1.     The Factors.........................................................................................26

            a.     Overlap of Issues...................................................................26

                (i).     Common Questions of Law or Fact.......................27

                (ii).     Same Transaction or Occurrence...........................27

                (iii).     Witnesses and Other Evidence..............................27

            b.     Confusion or Complexity.......................................................28

            c.     Judicial Economy...................................................................29

                (i).     This Motion is Timely...........................................29

                (ii).     No Delay is Caused...............................................29

                (iii).     The Evidentiary Conundrum That Will Be Avoided..................................................................29

            d.     Prejudice to the Non-moving Party......................................30

            e.     Prejudice to the Moving Party..............................................31

            f.     Overall Equities.....................................................................31

    C.     Rule 21 Severance........................................................................................32

        1.     The Factors.........................................................................................32

CONCLUSION............................................................................................................33

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page**

Akzona Inc. v. E.I. Du Pont de Nemours & Co., 607 F.Supp. 227 (D.Del. 1984).........26,28,30-31

Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917 (9th Cir. 2004)..............................................23

Andrews v. City of Phila., 895 F.2d 1469 (3d Cir. 1990)................................................................24

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc)......................................23

Bancmortgage Financial Corp. v. The Guarantee Title & Trust Co., 2000
        WL 1521600 (E.D.Pa. Oct. 6, 2000).........................................................................26,33

Blasband v. Rales, 971 F.2d 1034 (3d Cir. 1992)..........................................................................31

Bowtyz v. Skolnick, 113 F.R.D. 635 (D.Del. 1987)..................................................................29,31

Bray v. Marriott Hotels, 110 F.3d 986 (3d Cir. 1997)..............................................................21,24

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)..........................................................................24

Chrysler Credit Corp. v. County Chrysler, Inc., 928 F.2d 1509 (10th Cir. 1991)..........................25

Conn. General Life Ins. Co. v. Punia, 884 F.Supp. 148 (D.N.J. 1995).........................................31

Faerber v. Newport, 51 F.Supp.2d 115 (D.R.I. 1999)..............................................................26,31

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005).........................................................................23-24

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994).......................................................................21-22

Green v. Phila. Hous. Auth., 105 F.3d 882 (3d Cir. 1997)...........................................................23

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005)...................................................................22

In re Brand-Name Prescription Drugs Antitrust Litig., 264 F.Supp.2d 1372
        (J.P.M.L. 2003)................................................................................................................26

Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989)........................................................................23

Konits v. Valley Stream Central High Sch. Dist., 394 F.3d 121 (2d Cir. 2005)...........................23

Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)..................................................23

Lis v. Robert Packer Hosp., 579 F.2d 819 (3d Cir. 1978)..............................................26

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)............................................20

Morris v. Northrop Grumman Corp., 37 F.Supp.2d 556 (E.D.N.Y. 1999)...............26-27,29,31,33

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)...................................23

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000)...........................................25

Pergine v. Penmark Management Co., Inc., 314 F.Supp.2d 486  (E.D.Pa. 2004).........................26

Philips Electronics North Amer. Corp. v. Contec Corp., 220 F.R.D. 415
     (D.Del. 2004).................................................................................29

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996)......................................................23

Procter & Gamble Co. v. Nabisco Brands, Inc., 604 F.Supp. 1485 (D.Del. 1985).......................29

Robinson v. SEPTA, 982 F.2d 892 (3d Cir. 1993).....................................................23

Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield of Pa., Inc.,
     49 F.Supp.2d 709 (D.N.J. 1999)............................................................25-26,29,31,33

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994).............................................24

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir.
     1996) (en banc)..............................................................................21

Showalter v. Allison Reed Group, Inc., 767 F.Supp. 1205 (D.R.I. 1991)..............................31

Stewart v. Rutgers, The State Univ., 120 F.3d 426 (3d Cir. 1997)................................20,24

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000).....................................................23

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002)..............................................23

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)....................................20-21

Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S.
     252 (1977)...................................................................................24

Walsh v. Miehle-Goss-Dexter, Inc., 378 F.2d 409 (3d Cir. 1967).....................................32

Webb v. Hyman, 861 F.Supp. 1094 (D.D.C. 1994)......................................................26

*vi*

Willemijn Houdstermaatchaapij BV v. Apollo Comp. Inc., 707 F.Supp. 1429
(D.Del. 1989)...........................................................................................................26-27,31

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997)........................................................23

**Constitutions, Statutes and Rules**

U.S. Constitution, Amendment I.................................................................................passim

U.S. Constitution, Amendment XIV.............................................................................passim

42 U.S.C. § 1983........................................................................................................20

11 Del.C. § 9200(b)................................................................................................16-17

11 Del.C. § 9200(c)....................................................................................................16

11 Del.C. § 9200(c)(12).............................................................................................16

Fed.R.Civ.P. 21.....................................................................................................passim

Fed.R.Civ.P. 42(b)..................................................................................................passim

Fed.R.Evid. 401.........................................................................................................30

Fed.R.Evid. 402.........................................................................................................30

Fed.R.Evid. 403.........................................................................................................30

22 Wright & Graham, Federal Practice and Procedure: Evidence § 5164 (1978)........................30

## NATURE AND STAGE OF THE PROCEEDING

The original one count Complaint alleged purposeful gender discrimination in the denial of two promotions to the rank of Major in March and July of 2003. (D.I. 1). On December 6, 2004, two additional counts were added arising from free speech and petition clause retaliation because of the filing of the original action on October 27, 2004. (D.I. 7).

On March 4, 2005 the Court denied a defense motion to limit pretrial publicity. (D.I. 42).

A ten day jury trial is scheduled to begin on May 31, 2006. (D.I. 53).

Because of the prejudice and confusion of the issues which would accrue to the trial of count one jointly with counts two and three, plaintiff has moved to sever counts two and three and to conduct two consecutive jury trials of six and four day duration before different juries. This is her opening brief and appendix in support of her motion.

Deposition discovery has not been as witness fact intensive as anticipated on the issues surrounding count one and appears to be virtually complete, with the exception of the two comparators (Majors Hughes and Eckrich). Depositions appear to be complete on the two counts of retaliation.

The record on count one consists of the depositions of defendant Ret. Col. L. Aaron Chaffinch, Captain Glenn Dixon, Ret. Major David Baylor, Ret. Col. Gerry Pepper, Ret. Lt. Col. Thomas Marcin, Captain Harry Downes, Ret. Major Joseph Swiski and the interrogatory answers of plaintiff.

The record on counts two and three includes the depositions of Public Information Officer (PIO) Lt. Joseph Aviola, Ret. Major David Baylor, who once had responsibility

for the PIO function, and defendants, now Col. Thomas MacLeish, and Secretary David

Mitchell. The record also includes the Amended Complaint and Answer. (Hereinafter

"Compl. & Ans.").

## SUMMARY OF THE ARGUMENT

Initially this was a basic gender discrimination promotion case. However, upon

the filing of the Complaint, in derogation of state law, as well as written standing Orders,

Policies, and long standing Practices, defendant MacLeish with the concurrence of

defendant Mitchell authorized and directed the PIO to confirm and answer media

inquiries about whether plaintiff was facing a separate confidential inflammatory internal

affairs proceeding. This unprecedented action denied plaintiff her statutory

confidentiality and privacy rights and it is the basis for counts two and three alleging

retaliation.

The nature of those IA charges involving alleged sexual harassment and conduct

unbecoming an officer is neither material nor relevant to the trial of plaintiff's plain

vanilla promotion case which arose long before. But the presentation of evidence relating

to several confidential disciplinary charges plaintiff was facing, which were not in the

record when the two promotions were made, raises the specter of substantial prejudice

and confusion of the issues before the jury on the promotion claim. It injects evidence

and questions about plaintiff's performance which were not before the decisionmaker

when the two promotions were made but will be before the jury when it reexamines the

promotion decisions as it contrasts plaintiff's record with that of her two comparators. In

such circumstances, where the unclean hands of a defendant has endangered the fair trial

right of a plaintiff, the courts have the power under the Rules to bifurcate the trial of these

counts, especially where the two trials will be successive and within the original ten days allotted to try the entire case.

## STATEMENT OF FACTS

**I. Count One - Gender Discrimination in the Denial of Two Promotions to Major.**

    **A. The Prima Facie Case.** At his deposition defendant Chaffinch admitted the elements of the prima facie case. Two vacancies for promotion to Major existed in March and July of 2003. Plaintiff and all captains were considered and found to be "qualified" for these spots. But the promotions went to two males over plaintiff, a female. (Chaffinch 144-145, 183, 184-185; Dixon 93-95; Compl. & Ans. ¶¶ 89,58,61; A12,16,36-38,117,127,155-156). Plaintiff was even more qualified for the position than the two comparators. (Dixon 93-95; see Marcin 39, 49-51; Baylor 55; Pepper 57-59, 61, 65, 73-74; A57-59,61-62,76,78-79,155-156,178).

    **B. The Legitimate Non-Discriminatory Reason.** Chaffinch claims he promoted the most qualified person using five or six discretionary factors: education, background, experience, tenure, compatibility and personal loyalty to him. (Chaffinch 148-149, 179; A118,126). There were no written Orders, policies, restrictions or guidelines whatsoever on the exercise of his discretion regarding these newly created factors. (Chaffinch 145-146, 168-169; A117-118,123). But as Lt. Col. Thomas Marcin testified, the process followed by the Colonel violated mandatory procedural requirements imposed on the DSP by Governor Minner and State Personnel Director Lisa Blunt-Bradley. (Marcin 38, 40, 29-37; A73-75).

    **C. Fuentes Prong 2 in a Pretext Case - The Weight of the Evidence Proves Gender Discrimination.** Through Chaffinch's own admissions and testimony of those

who worked closely with him over the years, the record contains abundant evidence

which a reasonable jury can accept to conclude that the denial of these two promotions

was gender based.   Both circumstantial and direct evidence of illicit intent exists.

These categories of evidence follow.

1.    The two promotions at issue were procedurally irregular.  Governor
      Minner and her agent State Director of Personnel Lisa Blunt-Bradley in
      December 2001 imposed mandatory procedural requirements on all DSP
      promotions, including to Major.  (Marcin 43-44, 39, 29-38, A73-77).
      Chaffinch defied these obligations which are designed to ensure
      procedural regularity in the process.  (Marcin 41; Chaffinch 172; Conley
      44-46; Chaffinch 127-128, 132; A76,113-114,124,444-446).[1]

2.    Former Superintendent Gerald Pepper explained that numerous instances
      of Chaffinch's misconduct violate written Policies, Standing Orders and
      training by the DSP and that such conduct by Chaffinch was impermissible
      both on and off duty.  (Pepper 30-40; A53-55).  As present Col. MacLeish
      also admitted, police officers are "expected to conform to a higher
      standard of conduct than an ordinary citizen is expected to."  (MacLeish
      21-22; PX15; A196-197,374).  Troopers "should conduct [their] private
      life above reproach," (MacLeish 25; A197), and regardless of whether they
      are on or off duty, they are to conduct themselves in a manner which will
      reflect favorably on the DSP.  (MacLeish 38; Pepper 38-39; A55,201).[2]

3.    Chaffinch has verbally stated more than once that he does not believe that
      females in general should even serve as troopers, (Dixon 99-100; A57), let
      alone as a Major.

4.    While on duty, he tells people that "women are nothing but trouble" and
      "women are a pain in the ass."   (Dixon 77-78; <u>see</u> Pepper 28-31; A52-

---

[1]  Chaffinch believes he can get away with anything because, as he openly brags, his close
relationship with Delaware State Senator Thurman Adams will protect him.  (Dixon 64-65;
A148).  "Uncle Thurman ... would take care of him no matter what."  (Dixon 64-65; A148).  "[I]f
he needed anything done, he would just go to ... the Thurmanator, and it would be done."  (Dixon
65; A148).

[2]  Rule 4 of the DSP Rules and Regulations requires the same.  (PX16; A381).  Article 6
of the DSP Code of Ethics requires that an officer "lead the life of a decent and honorable person.
... [H]e will so conduct his private life that the public will regard him as an example of stability,
fidelity, and morality."  (PX15; A378).

53,151-152).

5.      Chaffinch also admits that he publically recites a long stereotypical song
        or poem (PX 2; A357) which indicates that all the problems of society are
        the fault of the Biblical person "Eve," and that it is men, symbolized by
        "Adam," who have to bear the penalty for women's mistakes. (Chaffinch
        25-33; Conley 11-13; Downes 15; Dixon 16-18; see Pepper 35; A87-89,
        136-137,186,411-413).

6.      Chaffinch also has voiced the sexual stereotype to plaintiff and others that
        two women cannot work together in the same office. (Conley 13-15;
        Baylor 29; A171,413-415). He denies this. (Chaffinch 68; A98).[3]

7.      Chaffinch also has allowed another trooper, in his presence and when he
        had operational authority over the trooper, to disrespect plaintiff by
        applying the sexually offensive nickname "Puss" to her. (Conley 31-32;
        Dixon 48-50; Chaffinch 86; A103,144-145,431-432).

8.      He also publically refers to plaintiff by the sexually offensive and
        stereotypical nickname "Puss." (Dixon 49; see Pepper 29-30; A52-53,
        144). Chaffinch denies this. (Chaffinch 83; A102).[4]

9.      He also calls her "a bitch." (Baylor 31; see Pepper 29; A52,172).

10.     Chaffinch has allowed other troopers in the headquarters complex to
        disrespect plaintiff, who had the rank of captain, and to direct wolf
        whistles towards her. (Conley 32-34; Dixon 51-53, 112; A145,160,432-
        434). He denies this. (Chaffinch 84; A102).

11.     He also has disrespected the first female captain in the Division (plaintiff
        was the second) by publically nicknaming her "Norman," the name of a
        most wanted fugitive. (Conley 35-36; Dixon 55-56, see Pepper 32; A53,
        146,435-436). Chaffinch denies this. (Chaffinch 92, 94; A104-105).

12.     Chaffinch even has asked plaintiff private details of her sex life. (Conley
        34-35; Dixon 53; A145,434-435). He denies this. (Chaffinch 92; A104).

13.     He also repeatedly has told plaintiff over the years about how she looks in
        a black bathing suit and that he wants to move in on her, implying have

---

[3] But as now retired Major Joseph Swiski, who was a member of Chaffinch's own inner
circle Executive Staff, has testified, Col. Chaffinch "has a reputation for not being very truthful."
(Swiski 57; A498).

[4] Unlike Chaffinch, Captain Dixon has a reputation as being truthful. (Marcin 16; A70).

sexual relations with her.   (Conley 46-47; A446-447).

14.     One day Chaffinch saw plaintiff in a red dress and said he "would do" her. (Dixon 60-61; A147).

15.     Chaffinch also has purchased presents, such as gold earrings with little hearts on them, for plaintiff, and applies "cutesy" nicknames to her. (Conley  46-47; A446-447).

16.     The record also contains five gender based and patently offensive sexually charged limericks which reveal a demeaning attitude towards women on the part of Chaffinch.  (PX 3,4; see Pepper 35-37; A54,357-358).[5]

17.     Chaffinch also admitted he belongs to a private membership organization which denies membership to women and blacks.  (Chaffinch 14; see Conley  7-11; Dixon 13-15; Baylor 27; A85,171,135-136,407-411).

18.     Chaffinch also tells jokes all the time.  (Downes 21; see Chaffinch 64, A97,169).  Plaintiff testified that 50% of his jokes are "inappropriate or demeaning to some group be it women, or blacks."  (Conley 13; A413). Captain Dixon testified it is more like 70% of the time that his jokes are offensive.  (Dixon 36; A141).[6]

19.     Chaffinch himself also admitted that he was officially disciplined as a major for telling a sexually explicit joke about masturbation during a co-ed sensitivity training session.  (Chaffinch 34-37; Conley 16-18; Dixon 29-30; Pepper 13-17; A48-49,90,139-140,416-418).

20.     He also was forewarned that he would be held accountable for his off duty conduct when he was disciplined earlier in his career for being the senior

---

[5]  Chaffinch admits he frequently recounts these limericks in mixed company but claimed he does not do so at work, in an attempt to claim they reveal nothing of his mind set at work. (Chaffinch 41-59; A91-96).   But various witnesses have testified in detail that he does recite them, even in the workplace.  (Conley 18-23; Dixon 18-26; Downes 16-18; Baylor 29-30; A137-139,171-172,186-187,418-423).  As other officers also testified, Chaffinch also told these sexually explicit limericks while representing the DSP at national conferences for Operation CARE.  (Baylor 39-42; Dixon 75; A151,174-175).

[6]  In Capt. Dixon's words, "any time you would have contact with [Chaffinch], it seems like he would have a new joke, and more times than not, they were dirty jokes." (Dixon 24-25; A138).  Defendant MacLeish testified that offensive jokes or other conduct of a sexual nature should have no place in the workplace.  (MacLeish 50; A204).  Such inappropriate joking and improper workplace behavior also violates the plain terms of the DSP's Sexual Harassment Policy.  (PX16; A391).

officer present when a female trooper disrobed and removed her blouse while dancing on a table at a private party. (Chaffinch 69-71; Dixon 38-40; <u>see</u> Pepper 7-13, 25; A48-49,51,98-99,142).

21. Chaffinch also publically and in mixed company uses a nickname for his penis and brags that he has "something extra," referring to his penis. (Conley 26-30; Dixon 41-44, 80-81; A142-143,152,426-430). He denies this. (Chaffinch 72-73, 80; A99,101). But he does admit that earlier in his career he also publically named the patrol shift which he headed the "cocksters." (Conley 29-30; Dixon 57; Chaffinch 102-104; A107,146,429-430).

22. When he was the commander of Troop 5, Chaffinch installed mirrors in his office and in the bathroom so he could watch himself masturbate. (Dixon 79; A152). He denies this. (Chaffinch 65; A97).

23. Chaffinch has publically nicknamed a female employee of the Office of Highway Safety "Trish the Dish," meaning "Trish the delicacy. You know what the connotation is there." (Conley 36-37; <u>see</u> Dixon 57-58; Baylor 32; Chaffinch 97-99; A105-106,146-147,172,436-437).

24. Chaffinch also has commented publically about various women in the headquarters building, stating "oohh she tears me up" or he "would love to do her." (Dixon 60; Conley 38; Baylor 32-33; A147,172,438). He denies this. (Chaffinch 100; A106).

25. He has publically discussed how he would like to watch a female trooper masturbate for a male trooper. (Dixon 44-47, 110; A143-144,160).

26. Chaffinch also refers publically to another secretary in headquarters as "Lemon titties," referring to her breast size. (Conley 38-39; Dixon 62; A148,438-439). He denies this. (Chaffinch 101; A106).

27. He also made it his "mission" (Dixon 87; A154), to remove the first and only female troop commander that the DSP has ever had. (Baylor 33-39; A172-174).[7]  In doing this, he ignored the advice of his entire Executive Staff who warned him that "it was not best for the organization" to remove

---

[7] Lt. Col. Marcin explained that he served as trooper commander of Troop 6 for 5 ½ years. (Marcin 4, Pepper 21-22; A50-51,67). After Capt. Mary Ann Papili was appointed by Col. Pepper to that post with a start date sometime in 2000 (Pepper 19-21; A50), Chaffinch prematurely removed her from command in September 2003, only 3 years into her rotation. (Marcin 23; A72).

her. (Baylor 37-38; A173-174).[8]

28.    During his command of the Division, Chaffinch never assigned a female to command a troop. (Chaffinch 125; A112).

29.    Reflecting his opinion of female officers, Chaffinch also diminished plaintiff's operational authority in various areas after he became Colonel. (Conley 40-44; Dixon 83-87; Baylor 58-59; A153-154,179,440-444). For example, he reduced plaintiff's job duties as Director of Traffic from what they had been when her position was previously occupied by male officers. (Baylor 54, 51-53; A177-178). Chaffinch took away "her leadership role." (Baylor 58; A179). Instead of developing policy and other similar duties, plaintiff was relegated to collecting data. (Baylor 58; A179).[9]

30.    Chaffinch's promotions in the DSP simply were not based upon merit. Instead, as Major Baylor testified, Chaffinch had an "older style of management," a style of promoting his buddies. (Baylor 51; A177). "There is a perception of a good old boys network in the [DSP]." (Baylor 16; A168). Promotions "are more based on who you know and who your connections are with and who your friends are than on merit in the [DSP]." (Baylor 16; A168).[10]

**D.  Fuentes Prong 1 in a Pretext Case - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions In the Defense Case.**

1.    On the experience promotion factor, admittedly the patrol function is the "backbone of the Division." (Chaffinch 153-154; Dixon 95; Pepper 61-62; A58-59,119-120,156). Plaintiff's experience included 18 years with patrol. (Chaffinch 153; A119). But **implausibly** comparator Hughes had less time in patrol than plaintiff when he was promoted to oversee patrol operations in Kent and Sussex Counties. (Chaffinch 155-156; A120). Comparator

---

[8]  It was bad organizationally, politically and from a public relations perspective. (Baylor 37-38; A173-174). In response, Chaffinch became "agitated" and "unhappy" with them for voicing their concerns. (Baylor 35,38;A173-174). He called them "spineless." (Baylor 36;A173).

[9]  (1) He also excluded her from annual national traffic conferences which her male predecessors attended. (2) He eliminated her monthly meetings with traffic lieutenants throughout the state. (3) He withheld from her knowledge of traffic related events within her authority. (4) He refused her public recognition for achievements within her command. (5) He let her be disrespected at commander's meetings. (Conley 40-44; A440-444).

[10]  Despite this lengthy laundry list of offensive and improper conduct, Col. MacLeish "feel[s] very strongly" that his friend Chaffinch is an "honorable man," a "good trooper," a "good person," and a "good man" who was "a good leader" for the DSP. (MacLeish 9-12; A296-297).

Eckrich also had less patrol experience. (Chaffinch 165; A122). So this purported factor was ignored by Chaffinch.

2.     On the tenure factor, both Hughes and Eckrich also **implausibly** had three less years with the DSP than plaintiff. So this factor also was ignored. (Chaffinch 156, 164; A120,122).

3.     On the experience factor, Chaffinch also claims that Major Eckrich had prior financial experience which made him attractive for the position of administrative/budget major. (Chaffinch 161, Pepper 66-68; A60,121). But this emphasis on experience is **weakened and contradicted** by the fact that his predecessor Major Swiski had no prior budget experience going into that slot, but he performed admirably in the job (Chaffinch 162, Marcin 26; A73,122), which actually consists of managing civilian staff. (Pepper 69-71; A60-61). Moreover, plaintiff dealt with multi million dollar grant applications in her position as the Director of Traffic and had already been sent by the DSP for training in budgetary functions. (Pepper 68, Dixon 114-115, 86; Marcin 26-27; A60,73,154,161).

4.     Reliance on the compatibility factor also is **weak** because Chaffinch was forced to admit that "there was nothing to disqualify Barbara Conley for the promotion in the area of compatibility." (Chaffinch 167; A123). So this factor also was ignored.

5.     Reliance on personal loyalty to Chaffinch factor is again **weak** because Chaffinch was forced to admit that plaintiff also was loyal to him at the time. (Chaffinch 181; A126). So this factor also was ignored also.

6.     Reliance on personal loyalty again is **contradicted** by the fact that the DSP Code of Ethics makes such a factor improper. (PX15 - Preamble to DSP Code of Ethics; A376).

7.     Chaffinch's admitted reliance on a personal loyalty factor is **contradicted** a second time by now Col. MacLeish who admitted that Troopers should "never ... permit personal feelings ... or friendships to influence [their] decisions." (MacLeish 26; A198).

8.     The claim that Chaffinch had the absolute discretion to make these two promotions to Major without consulting anyone else or following any objective process is **contradicted** by the requirements imposed upon him by Governor Minner and Secretary Lisa Blunt-Bradley's Report which required consultation with the State Personnel Director and Gregory Chambers and his Affirmative Action office when exercising the promotion

function. (Chaffinch 171-175; Marcin 39, 29-38; A73-76,124-125).[11]

9.        Chaffinch's claim that he can draw a distinction between his offensive utterances outside the office and his utterances and conduct in the office is flatly **contradicted** by the testimony of his predecessor Col. Pepper and his successor Col. MacLeish who each explained that no such distinction can be made. (Pepper 33-39; MacLeish 21-22, 25, 38; A53-55,196-197,201). The Division's Rules and Regulations and Code of Ethics also **contradict** Chaffinch's claim. (PX15; PX16; A374,378,381).

10.      Finally, despite its subjectivity, Chaffinch claims he went through a careful deliberative process in making the two promotions at issue. (Chaffinch 148, 160-161; A118,121). This is **contradicted** by the testimony of his Lt. Col. Thomas Marcin who testified that Chaffinch's mind was already made up for each promotion, and in particular the decision on Major Hughes was made in just 24 hours. (Marcin 43-44, 28-29; A73,77). Major Baylor's testimony confirms this. (Baylor 16-17, 12-14; A167-168).

## II.  Counts Two and Three - Retaliation for the Filing of This Lawsuit.

**A.  Plaintiff's Protected Speech and Petition Clause Activity.**  On October 27, 2004, plaintiff filed this lawsuit. (D.I. 1; Compl. & Ans. ¶ 108; MacLeish 117-118; A19,39,220-224).

**B.  The First Act of Retaliation - A Confidential and Internal DSP Document About Plaintiff is Leaked to the Delaware Media.**  Within hours of the filing of her lawsuit, an internal DSP document indicating that plaintiff faced confidential internal affairs charges was leaked to the Delaware media. (Aviola 53-55, 57-58; see PX 14; Aviola 65-67; A259-263,373). These charges were not pending in March and July of 2003 when the two challenged promotions occurred.

**C.  The Second Act of Retaliation - Defendants Refused to Investigate This Release.**  Despite the release of plaintiff's confidential internal affairs information,

---

[11]  Chaffinch's Lt. Col. testified "I was trying to get through to Aaron that you really couldn't ignore the Bradley report." (Marcin 38, A76).

defendants refused to investigate the release to the Delaware media.  (Aviola 62; MacLeish 145-150; A227-229,262).  Defendants admit that they do not know if even a single question was ever asked of any DSP employees about the release of this information. (MacLeish 150; Mitchell 50; A229,285).  The DSP "considered" investigating, but chose not to.  (Mitchell 49-50; A284-285).

**D.  The Third Act of Retaliation - Defendants Then Confirmed and Discussed the Nature of the IA Charges With the Delaware Media.**  Whenever media inquiries are made about lawsuits and other serious matters such as Internal Affairs investigations, Lt. Aviola, the PIO, is not authorized to respond.  Instead, he is required to relay those inquiries to the Colonel or the Lt. Colonel who then decide what kind of a response will be given.  (Aviola 15-20; A250-251).  "[M]ost of the time it's pretty specific [ ] what they want said."  (Aviola 20; A251).

Upon learning that the Delaware media was in possession of this confidential document, Lt. Aviola followed procedure and immediately consulted with then acting Colonel MacLeish.  (Aviola 55-64; MacLeish 129, 134-142; A223,225-227,260-262).

MacLeish next expressly ordered Aviola to confirm and discuss the contents of this confidential document with the Delaware media.  (Aviola 63-70, 76-77, 86-89; MacLeish 142, 165, 208; A227,232,243,262-265,268).[12]  "But for his authorization," Lt. Aviola would not have discussed the matter with the media, "other than saying 'no comment.'" (Aviola 89, 70; A268,264).  MacLeish's exact orders were "if you feel that it looks like

---

[12]  MacLeish testified that he would not have given these orders if defendant Secretary Mitchell had not "agreed and []sanctioned it or authorized it."  (MacLeish 135, 142, 165; Mitchell 47-48, 56-57; A225,227,232,284,286).  Thus he has laid this violation of policy and practice squarely at the doorstep of the defendant Cabinet Secretary.

one of our e-mails, then comment on it." (Aviola 63-64; A260-262). "[C]all Mr. Eldred back and give him the information." (Aviola 63; A262). Lt. Aviola complied with acting Col. MacLeish's order. (Aviola 68-70; A263-264).

      **1. Aviola was "Surprised" by This Order.** Several times at his deposition, Aviola testified that in light of the DSP policy and practice of never commenting on or discussing previous internal affairs charges against defendants Chaffinch and MacLeish themselves, (<u>see</u> Facts at section **II.E.4.d.** below), he was "surprised" when MacLeish instead <u>ordered</u> him to discuss plaintiff's leaked confidential internal document with the Delaware media. (Aviola 75-76; A265). Aviola even spoke up during his meeting with MacLeish and stated, "You know, it's an internal document. We are not going to comment on that; right?" (Aviola 76; A265). But MacLeish ordered him to discuss it anyway. (Aviola 63-64; A262).

      **2. The Prejudicial Content of This Release.** The prejudicial content of this release is clear. The released document stated that plaintiff herself was facing internal affairs charges for alleged violations of several DSP Rules and Regulations. (PX14; A373). Pursuant to MacLeish's specific order to "comment on it" (Aviola 63-64; A262), Aviola revealed to the media the inflammatory nature of the charges that plaintiff was facing - one count of sexual harassment and three counts of conduct unbecoming. (Aviola 70; PX14; A264,373).[13]

      **E. Substantial or Motivating Factor.** Cause and effect evidence is abundant on our record.

---

[13] The initial published article that resulted is in the record. (Del. State News, 10/29/04; A501). Numerous similar articles soon followed in the weeks and months to come.

**1. Defendants' Friendship Created a Motive to Retaliate Against the Person Who Sued Chaffinch and Caused Him to Be Suspended.** All three defendants are friends. Chaffinch and MacLeish are friends. (Chaffinch 187; Baylor 20; A128,169).[14] They are on a first name basis. (MacLeish 98; A216). Chaffinch chose MacLeish to serve as his Lt. Colonel, which was a "big deal" to MacLeish and a true "honor." (MacLeish 97; A215). They socialized together, even when Chaffinch was on leave for sexually inappropriate workplace misconduct. (PX 18; MacLeish 100-102; A216-217, 511). In MacLeish's own words, he and Chaffinch are "joined at the hip." (MacLeish 9; A296)

Similarly, defendant Mitchell also likes and is friends with Chaffinch and MacLeish. (Mitchell 28, 43, 51; A279,283,285).

**2. Demonstrated Antagonism Towards Plaintiff and Her Protected Activity.**

**a. Chaffinch Demands Blind Personal Loyalty.** Chaffinch expects "blind loyalty" from all those in the DSP. (Dixon 105; A158). "You have to just follow him ... and if you don't, he is done with you. You may suffer any consequences from that." (Dixon 105; A158). Now retired Major Baylor, who served on Chaffinch's Executive Staff for several years, also testified that "personal loyalty" is a factor that Chaffinch considered when making personnel decisions. (Baylor 20-21; A169). Defendant MacLeish (MacLeish 64; A207), and Chaffinch himself admitted to the same. (Chaffinch 179; A126).

Captain Dixon worked closely with Chaffinch in Sussex County for seventeen

---

[14] Because of their close friendship, MacLeish even promoted a retirement party in Chaffinch's honor. (MacLeish 102-115; PX19; A217-220,399-400).

years.  He testified, Chaffinch "is very vindictive" and "use[s] his rank or office in the

state police to be vindictive."  "[I]t is common knowledge ... you would not cross him ...

because of his vindictiveness.  You knew that your career would pretty much stop."

(Dixon 71-72; A150).[15]

        **b.  Chaffinch's Hostile Feelings.**  Four witnesses directly testified

about Chaffinch's fury with plaintiff.  Chaffinch was "mad" and "angry" at plaintiff for

bringing her lawsuit.  (Dixon 69-70; A149-150).  He was "ang[ry]," "displeased" and

"pissed off" about the suit.  (Mitchell 36; A281).  Chaffinch was "upset," "unhappy" "[h]e

wasn't pleased" and instead "was obviously displeased" about the suit.  (MacLeish 120-

121; A221).  He "wasn't too pleased" and was visibly "upset."  (Aviola 79, 82, 84; A266-

267).  He very well may have used some colorful language and other profanity to describe

it.  (Aviola 79; A266).  Chaffinch was so angry about plaintiff's lawsuit that he even took

his anger out on Captain Dixon.  (Dixon 69; A149).  After plaintiff's lawsuit was filed,

Chaffinch refused even to mention plaintiff's name.  (Dixon 71; A150).  He does not like

it when people sue him.  (Baylor 60; A179).

        **c.  MacLeish's Hostile Feelings.**  MacLeish admits that he also was

"unhappy" with plaintiff.  (MacLeish 179; A236).  He was "annoyed" and "displeased

with her conduct and actions" in bringing this lawsuit.  (MacLeish 179-180; A236).  He

repeatedly admitted that he was "unhappy" and"disappointed" by the lawsuit.  (MacLeish

125-126, 131, 180-181; A222-224,236).  "Do I like it?  No, I do not."  (MacLeish 126;

---

[15]  Captain Dixon even expressed concern that despite Chaffinch's retirement, he would still find a way to retaliate against him because of Dixon's truthful subpoenaed deposition testimony, (Dixon 72; A150), perhaps by way of Chaffinch's close friendship with defendants MacLeish, Mitchell and Senator Thurman Adams.

A223).  He told Lt. Aviola that he was "unhappy," "upset," "disappointed" and "displeased."  (MacLeish 131-132, 180-181; A224,236).  MacLeish was "personally disgusted" with some of plaintiff's allegations in her suit and was "disgusted" with the lawsuit itself.  (MacLeish 132-133; A224).  Lt. Aviola confirmed that MacLeish expressed these feelings. (Aviola 82, 84; A267).

MacLeish also was unhappy that plaintiff's lawsuit caused the DSP to be cast in a negative light in the local  Delaware as well as the regional Philadelphia and Baltimore news media.  (MacLeish 127, 181-182; A223,236-237).[16]  Indeed, he "would be very pleased" to get the DSP off of the front pages of the newspapers.  (MacLeish 133-134; A224-225).

    **d.  Mitchell's Hostile Feelings.**  Like MacLeish, Mitchell also was not happy that plaintiff had filed a lawsuit.  (Mitchell 29; A279).  He "[w]asn't happy" that the suit resulted in his having to focus his attention on the DSP to the neglect of other agencies in his charge, (Mitchell 37; A281), or that the DSP was "getting hammered heavy" in the press.  (Mitchell 40, 52-53, 11-12; A275,282,285).  Mitchell was "disappointed" in the filing of plaintiff's lawsuit. (MacLeish 143-144; A227).  He has not enjoyed the "negative press" about the Division.  (Mitchell 15; A276).

    **3.  Unusually Suggestive One or Two Day Temporal Proximity.**  On October 27, 2004, plaintiff filed this lawsuit.  (D.I. 1; Compl. & Ans. ¶ 108; MacLeish 117-118; A19,39,220-221).  The leak, for which each individual defendant had a motive, occurred within hours.  Immediately thereafter, on either October 27th or the 28th, the

---

[16]  Plaintiff's lawsuit attracted a great deal of local, regional and national media attention. (Mitchell 30-31; A280).

media followed up with inquiries to Lt. Aviola asking for confirmation and for comment. (Aviola 53; A259). No story would run without confirmation of the authenticity of the leak. That same day, defendant MacLeish ordered that Aviola give confirmation and comment on the confidential material. (Aviola 55-70; A260-264).

### 4. Numerous Violations of Statutes, Policies, Procedures, Practices, Rules and Regulations.

"[T]he confidentiality of internal documents and internal information is something which is valued in the Delaware State Police." (Baylor 11; A167). But contradictorily however, longstanding statutes, policies, rules and standing orders were violated by defendants.

### a. The Express and Unequivocal Confidentiality Protections of the LEOBOR.

The Law Enforcement Officers' Bill of Rights is something that DSP officers know about and think is important because Troopers value its privacy protections. (Aviola 20-21; A251). The relevant portions of it require that:

> Whenever a law-enforcement officer is under investigation ... the investigation ... shall be conducted under the following conditions:
>
> * * *
>
> All records compiled as a result of any investigation ... shall be and remain confidential and shall not be released to the public.

11 Del.C. § 9200(c) and (c)(12). This statute is in no way "unclear." (Aviola 28; A253).

The statute's confidentiality protections protect Troopers at the rank of Captain, such as plaintiff, and below. See 11 Del.C. § 9200(b). The statute also expressly states that these protections do not apply to either the Superintendent or the Deputy Superintendent, such as defendants Chaffinch and MacLeish. (MacLeish 153, 156-157;

-16-

PX6; A229-230,505); accord 11 Del.C. § 9200(b).[17]

    **b. DSP Rules, Regulations and Policies.**  The Division's written

Rules and Regulations reflect the official policy of the DSP.  (MacLeish 39, 43-44; A201-

202).  As Rule 1 itself states, these Rules and Regulations must be followed.  (PX16;

MacLeish 46-47; Mitchell 20; A203,277,381).[18]

      **(i).  Rule 10.**  This rule requires that "Members shall treat as

confidential the official communications and business of the Division."  (PX16; MacLeish

39; A201,383).

      **(ii).  Rule 18(b).**  This rule requires that "Any information

obtained in an official capacity shall not be disclosed either in writing or orally to any

unauthorized person, and no officer will divulge any matter that is his duty to keep secret."

(PX16; MacLeish 42-43; A202,384).

      **(iii).  Rule 19(a).**  This rule requires that "A member shall

give information to the news media in accordance with procedures established by the

Division."   (PX 16; MacLeish 43-44; A202,384).

      **(iv).  The DSP Code of Ethics.**  The Preamble to the DSP's

---

[17] Defendant MacLeish admits that his strained justification for the DSP's actions in releasing and discussing plaintiff's confidential internal affairs information "could be construed" as "a back door" and as "an end run" around LEOBOR's protections.  (MacLeish 162; A232).

[18] Defendants will falsely claim that their deputy attorney general authorized them to break the law. (MacLeish 135,139; A225-226).  But Secretary Mitchell and Major Baylor both testified that the DAG has no authority to do this and that such an order is an "unlawful order" that should not be followed.  No DAG can order a Trooper to violate standing orders or other laws.  (Mitchell 21-25; Baylor 9-11; A166-167,277-278).  Morever, MacLeish also admitted that the DAG only gave him advice, and that he made the ultimate decision, with Mitchell's concurrence, to release the information.  (MacLeish 140, 165; A226,232).  He is "not trying to hide behind" the DAG.  (MacLeish 165; A232).

own Code of Ethics requires that "Whatever I see or may hear of a confidential nature or that is confided to me in my official capacity will be kept secret unless revelation is necessary in the performance of my duty." (PX 15; MacLeish 25-26; A197-198,376). This is something that "is very important for a state trooper." (MacLeish 25-26; A197-198).

### c. An Order To Violate Any of These Statutes or Rules is an "Unlawful Order.

Defendant Secretary Mitchell is the cabinet Secretary responsible for the DSP. He has a long history in law enforcement. (Mitchell 5-10; A273-275). As Mitchell testified at some length, any order to violate the written DSP Rules and Regulations or other laws - even if ordered to do so by DSP legal counsel - is an "unlawful order" and a Trooper has an obligation to disobey such an order. (Mitchell 20-27; A277-279). Major Baylor also testified that an order to release internal confidential information, even when coming from the DAG, would be an unlawful order in violation of "clearly expressed" DSP rules and regulations. (Baylor 9-11; A166-167).

### d. Actual DSP Policies, Practices and Procedures.

**(i). Current Policy and Practice.** Lt. Aviola, the current PIO for the DSP, admitted at his deposition that the standard policy, practice and procedure of the DSP is that "we do not comment on the specifics of [an] internal complaint." (Aviola 35, 50, 71-72; A255,259,264). It is the "policy" of the DSP to "'no comment' or refuse to discuss the specifics" of internal affairs and other internal personnel matters. (Aviola 50, 72; A259,264). MacLeish admitted the same. (MacLeish 156; A230). This also is the "practice" and the "standard response." (Aviola 71,75; A264-265).

Indeed, defendants tellingly admitted in their Answer, and the record is undisputed,

that when the Delaware news media had previously and repeatedly inquired about the numerous Internal Affairs investigations, violations and convictions of defendants Chaffinch and MacLeish (who are explicitly excluded from LEOBOR's confidentiality protections), the DSP has always refused to comment in any way, shape or form because of the DSP policy of not commenting on internal personnel matters. (Compl. & Answer ¶¶ 129-135, A22-24,40).[19]  The documentary record confirms this (PX8-13; A359-372), as does the testimony of Lt. Aviola and defendant MacLeish himself. (Aviola 32, 34-35, 39-40, 47, 50; MacLeish 151-152, 154-156; A254-256,258-259).  This is the "policy," "practice," and "standard response" of the DSP.  (Aviola 50, 71, 75; MacLeish 156; A230,259,264-265).

> **(ii).  Long Time Historical Policy and Practice.**  This also

has been the longstanding practice in the PIO for well over a decade.  For example, retired Major David Baylor served in the PIO as a corporal beginning in September 1989 and then in 1992 was promoted to sergeant and served as the Director of the PIO.  Then, after he was promoted to Major in 2002, he had authority and responsibility for the operation of the PIO.  Major Baylor retired in August 2004.  (Baylor 5, 21-23; A165,169-170).  He said the DSP's policy "was pretty much that we would never really confirm or deny or comment on internal affairs matters."  (Baylor 23-24; A170).  Moreover, "[t]hat [is] pretty much standard practice in law enforcement."  (Baylor 23; A170).

> **e.  No Internal Affairs Investigation Resulted From These**

---

[19]  Chaffinch and MacLeish have been the subject of numerous internal affairs investigations and convictions while they held the positions of Colonel and Lt. Colonel of the DSP.  (MacLeish 115-117, 110-111, 114-115, 150-151, 156-158, 167, 169, 173, 175, 177-178, 192; Aviola 49-50, 74; PX8-13; A219-220,229-231,233-236,239,258-259,265,359-372).

**Numerous Violations.** Yet despite all of these things, as discussed above, defendants refused to ever investigate this release of confidential information which violated LEOBOR, as well as numerous DSP policies, procedures, practices, rules, regulations and standing orders. (Aviola 62; MacLeish 145-150; Mitchell 49-50; A228-229,262,284-285). This refusal to investigate independently violates several additional DSP rules. For example, Rule 1 requires that all laws, rules and regulations must be obeyed, and Rule 3 requires that any Trooper with knowledge of a violation of either the law or the rules and regulations immediately report such violations to Internal Affairs for investigation. (PX16; A381).

   **5. Disparate Treatment.** As discussed above, there is a clear and striking contrast between the stonewalling and refusal to comment that occurred after media inquiries about numerous IA charges Chaffinch and MacLeish faced and the wealth of statutorily mandated confidential information nonetheless released about plaintiff's IA charges.

<u>ARGUMENT</u>

I. **THERE IS ABUNDANT RECORD EVIDENCE OF ALL THE ELEMENTS OF A GENDER DISCRIMINATION PROMOTIONS CASE.**

  **A. A Prima Facie Case Has Been Proven.** Under the first step of the three step "pretext" or "indirect evidence" framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981), the record demonstrates that plaintiff has proven a prima facie case that she was denied promotion because of her gender. The <u>McDonnell Douglas</u> framework applies to claims brought under §1983. <u>Stewart v. Rutgers, The State Univ.</u>, 120 F.3d 426, 432 (3d Cir. 1997).

**1. Prima Facie Case.** "The burden of establishing a prima facie case . . . is not onerous." Burdine, 450 U.S. at 253. Plaintiff must prove the following elements: (1) that she is a female; (2) she was qualified for the position; (3) she did not receive the promotion at issue; and (4) the position was ultimately filled by a male. See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc). Chaffinch has admitted to these elements. (Chaffinch 183-185, 144-145; Compl. & Ans. ¶¶ 89,58,61; A127,117,12,16,36-38).

**2. Defendant's Burden.** Once plaintiff's prima facie showing is made, "the employer [i]s obliged to proffer a nondiscriminatory reason for its adverse employment action." Sheridan, 100 F.3d at 1065. Chaffinch claims he promoted the most qualified individual. (Chaffinch 148-149, 179; A118,126).

**B. Plaintiff's Ultimate Burden.** "[W]hen the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Sheridan, 100 F.3d at 1067. Here, plaintiff can proceed under either of the two prongs found in Fuentes, 32 F.3d at 764. Under prong one plaintiff proceeds with a "credibility" or "unworthy of credence case." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997). Here to make the case a "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find

them 'unworthy of credence.'" <u>Fuentes</u>, 32 F.3d at 764-65. The second prong requires evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." <u>Id.</u> at 762.

**1. Prong 1 - The Abundant Weaknesses, Implausibilities, Inconsistencies, Incoherencies, and Contradictions in Defendant's Case.** On our record, there are abundant weaknesses, implausibilities, inconsistencies, incoherencies and contradictions in the defendant's version of the case, such that a reasonable fact-finder could find it unworthy of belief. (<u>See</u> Facts at section **I.D.** above).

**2. Prong 2 - The Weight of the Evidence Demonstrates Gender is the Reason Plaintiff Was Not Promoted.** In the same way, the record is overflowing with evidence from which a jury can conclude that plaintiff's gender is the reason she was not promoted. (<u>See</u> Facts at section **I.C.** above).

**II. THERE IS ABUNDANT RECORD EVIDENCE OF ALL THE ELEMENTS OF A FREE SPEECH AND PETITION CLAUSE RETALIATION CASE.**

Public employee claims of retaliation for engaging in protected First Amendment activity are analyzed using a three-step process. <u>Hill v. City of Scranton</u>, 411 F.3d 118, 125 (3d Cir. 2005). First, the plaintiff must demonstrate that she engaged in protected activity. Second, that the protected activity was a substantial or motivating factor in the retaliatory action. Lastly, the burden shifts to the defense to demonstrate that the same action would have been taken in the absence of the protected conduct. <u>Id.</u>

**A. Protected Activity.** Plaintiff filed a lawsuit. (D.I. 1; Compl. & Ans. ¶ 108; A19,39). In the Third Circuit, "any [non-sham] lawsuit brought by an employee against a public employer qualifies as a protected 'petition' under the First Amendment." <u>Hill</u>, 411 F.3d at 126. Similarly, the free speech clause also protects the filing of plaintiff's gender

discrimination lawsuit.  See e.g., Konits v. Valley Stream Central High Sch. Dist., 394 F.3d 121, 125-126 (2d Cir. 2005); Azzaro v. County of Allegheny, 110 F.3d 968, 978 (3d Cir. 1997) (en banc); Swartzwelder v. McNeilly, 297 F.3d 228, 238 (3d Cir. 2002); Green v. Phila. Hous. Auth., 105 F.3d 882, 887 (3d Cir. 1997); Pro v. Donatucci, 81 F.3d 1283, 1291 (3d Cir. 1996); Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 926-27 (9th Cir. 2004).

**B.  Substantial or Motivating Factor.**  Following the determination that her conduct was constitutionally protected, plaintiff must demonstrate that this conduct was a "substantial" or "motivating factor" in the relevant decision.  Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  As discussed at section **II.E.** of the Facts above, the record is overflowing with evidence more than sufficient to meet plaintiff's burden.

**1.  Temporal Proximity.**  "[T]emporal proximity between the protected activity and the [retaliation] is sufficient to establish a causal link."  Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).  The Third Circuit has found that the temporal link alone can establish causation when the retaliation occurs within two days of the protected conduct, Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), because such a short period of time is "unusually suggestive."  Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).  As discussed above, the retaliation occurred, not within days, but within mere hours of plaintiff filing her lawsuit.

**2.  Demonstrated Anger, Hostility and Antagonism.**  Evidence of anger, hostility and other antagonism also demonstrates causation.  See Woodson, 109 F.3d at 920; Robinson v. SEPTA, 982 F.2d 892, 895 (3d Cir. 1993); Fasold v. Justice, 409 F.3d

178, 190 (3d Cir. 2005). As discussed above, the record reveals that defendants were very angry, annoyed, unhappy and otherwise displeased with plaintiff for filing her suit.

  **3. Violations of Law, Policies and Procedures.** Violations of laws, rules and procedures also are proof of wrongdoing. See Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252, 267 (1977); Stewart, 120 F.3d at 434; Bray, 110 F.3d at 992, 994. And as discussed above, the record is overflowing with abundant evidence of the numerous statutes, policies, procedures, practices, standing orders, rules and regulations that were violated by defendants when they retaliated against plaintiff.

  **4. Disparate Treatment.** Similarly, evidence of disparate treatment also can demonstrate causation. San Filippo v. Bongiovanni, 30 F.3d 424, 444 (3d Cir. 1994); Brennan v. Norton, 350 F.3d 399, 421 (3d Cir. 2003). Here, the undisputed record reveals that whenever media requests about defendants' own numerous internal affairs investigations and convictions were made, the DSP previously always refused to comment. Conversely however, when media requests were made about plaintiff's internal affairs issues, issues which are explicitly made confidential by statute, defendants quickly moved to confirm, release and discuss all of this information with the Delaware media.

  **5. The Big Picture.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario." Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990). The big picture in our case makes clear that defendants illicitly sought to destroy plaintiff because she had dared to expose Chaffinch's misconduct to the light of day.

-24-

**C. Same Decision Anyway Affirmative Defense.**  The burden of proof then

"shifts to the defendant to show 'by a preponderance of the evidence that it would have

reached the same decision even in the absence of the protected conduct.'"  <u>Nicholas v. Pa.</u>

<u>State Univ.</u>, 227 F.3d 133, 144 (3d Cir. 2000).  This last step is an "affirmative defense" to

be met by the defendants.  <u>Id.</u>  Defendants cannot meet this burden at trial.

## III.  THE COURT SHOULD EXERCISE ITS SOUND DISCRETION AND BIFURCATE THE TRIAL OR, IN THE ALTERNATIVE, SEVER THE COUNTS.

**A.  Introduction.**  Plaintiff's motion has independent basis under Rules 42(b) and

21 of the Federal Rules of Civil Procedure.  Rule 42(b) states that

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Rule 21 states in relevant part that "[a]ny claim against a party may be severed and

proceeded with separately."

"Separate trials under Rule 42(b) result in a single judgment while claims severed

under Rule 21 become independent actions with separate judgments entered in each.

While judgement on a claim severed under Rule 21 is final for purposes of appeal,

judgment on a claim bifurcated under Rule 42(b) is not an appealable final judgment."

<u>Chrysler Credit Corp. v. County Chrysler, Inc.</u>, 928 F.2d 1509, 1519 n.8 (10th Cir. 1991).

In other words, despite a Rule 42(b) bifurcation, there remains only one action.  But under

a Rule 21 severance, two separate actions are created, each with independent case

numbers, and rights of appeal.  <u>See id.</u>; <u>Rodin Properties-Shore Mall, N.V. v. Cushman &</u>

Wakefield of Pa., Inc., 49 F.Supp.2d 709, 720-21 (D.N.J. 1999); In re Brand-Name

Prescription Drugs Antitrust Litig., 264 F.Supp.2d 1372, 1376 (J.P.M.L. 2003);

Bancmortgage Financial Corp. v. The Guarantee Title & Trust Co., 2000 WL 1521600,

*1-2 (E.D.Pa. Oct. 6, 2000).[20]

     **B. Rule 42(b) Separate Trials or Bifurcation.**  "The court, in furtherance of

convenience or to avoid prejudice ... may order a separate trial of any claim."

Fed.R.Civ.P. 42(b); see Willemijn Houdstermaatchaapij BV v. Apollo Comp. Inc., 707

F.Supp. 1429, 1433 (D.Del. 1989) (noting that if one of the Rule 42(b) factors is present,

the Court may order separate trials).[21]  "[T]he rule in this circuit since 1972 has been that

the decision to bifurcate [v]el non is a matter to be decided on a case-by-case basis and

must be subject to an informed discretion by the trial judge in each instance." Lis v.

Robert Packer Hosp., 579 F.2d 819, 824 (3d Cir. 1978).

     **1. The Factors.**  The case law has identified the following six factors

which should be considered in deciding a motion for a Rule 42(b) bifurcation.

     **a. Overlap of Issues.**  This is a "significant consideration."

Akzona Inc. v. E.I. Du Pont de Nemours & Co., 607 F.Supp. 227, 232-33 (D.Del. 1984);

Willemijn, 707 F.Supp. at 1434.  And in our present case, it is clear that this factor weighs

---

[20]  The distinction between the two rules however is often obscured in the case law as the terms "severance" and "separate trial" or bifurcation are used interchangeably.  Rodin, 49 F.Supp.2d at 720.

[21]  Numerous courts have granted bifurcation motions in the civil rights and employment contexts.  See Pergine v. Penmark Management Co., Inc., 314 F.Supp.2d 486, 494  (E.D.Pa. 2004) (Title VII gender discrimination); Faerber v. Newport, 51 F.Supp.2d 115, 124 (D.R.I. 1999) (First Amendment retaliation); Morris v. Northrop Grumman Corp., 37 F.Supp.2d 556 (E.D.N.Y. 1999) (Title VII race discrimination); Webb v. Hyman, 861 F.Supp. 1094, 1119-20 (D.D.C. 1994) (Title VII gender discrimination).

in favor of bifurcation.

(i). **Common Questions of Law or Fact.** There are no common questions of law or fact between count one and then counts two and three. See Morris, 37 F.Supp.2d at 580. Count one is a plain vanilla claim of gender discrimination arising out of two promotions in March and July of 2003. All of the evidence and testimony relates to whether defendant Chaffinch was motivated by illicit gender animus when he made these two promotions in the year 2003. Conversely, counts two and three solely deal with illicit retaliation against plaintiff in the hours and days following the filing of this lawsuit on October 27, 2004. These counts only exist because plaintiff was retaliated against for filing her lawsuit challenging Chaffinch's illicit gender based actions. Thus, the issues are both temporally and legally distinct and this factor weighs in favor of bifurcation.

(ii). **Same Transaction or Occurrence.** Second, as discussed immediately above, the counts also do not arise out of the same transaction or occurrence. See Morris, 37 F.Supp.2d at 580.

(iii). **Witnesses and Other Evidence.** Another way of measuring overlap is by analyzing the amount of evidence or witnesses who would be presented at both trials. Willemijn, 707 F.Supp. at 1434; accord Morris, 37 F.Supp.2d at 580. The defendants themselves here provide a fitting example of the lack of overlap. Chaffinch was the sole defendant in the original promotions lawsuit as filed under count one. MacLeish and Mitchell were only added as defendants under counts two and three when plaintiff later amended her complaint to include their retaliation against her for daring to sue Chaffinch in the original filing. Neither MacLeish nor Mitchell are

-27-

defendants under count one.

Relatedly, plaintiff will prove her retaliation case under counts two and three primarily through the testimony of Lt. Aviola, and defendants MacLeish and Mitchell - none of whom will be witnesses to any issues under count one.

Indeed, the only non party witnesses who may be called in both suits are retired Major Baylor and Captain Glenn Dixon. And although each are significant witnesses to the illicit discrimination issues under count one, they are only minor witnesses to the retaliation issues under counts two and three. Major Baylor to the DSP's historic practice of never confirming or denying the existence of internal affairs issues and Captain Dixon to Chaffinch's general retaliatory animus. Their testimony under counts two and three will be short and sweet.

**b. Confusion or Complexity.** Second, the Court must analyze whether the issues carry a significant risk of confusing the fact finder, or whether the issues are particularly complex. Akzona, 707 F.Supp. at 1434-35. This burden is easier to meet when a case is to be tried to a jury, as in our present case. Id. at 1435.

It is clear that there is a significant risk of juror confusion if the three counts are tried together. The nature of the IA charges involving alleged sexual harassment and conduct unbecoming an officer is neither material nor relevant to the trial of plaintiff's plain vanilla promotion case which arose long before. But the presentation of evidence relating to these confidential disciplinary charges, which were not in the record when the two promotions were made, raises the specter of substantial prejudice and confusion of the issues before the jury on the promotion claim. It injects evidence and questions about plaintiff's performance which were not before the decisionmaker when the two

promotions were made but will be before the jury as it reexamines the promotion decisions and contrasts plaintiff's record with that of her two comparators.  One cannot be separated from the other.

          **c.  Judicial Economy.**  Third, judicial economy also is a relevant consideration.  See Procter & Gamble Co. v. Nabisco Brands, Inc., 604 F.Supp. 1485, 1492-93 (D.Del. 1985); Rodin, 49 F.Supp. 2d at 721; Morris, 37 F.Supp.2d at 580.

          **(i).  This Motion is Timely.**  Plaintiff filed this Motion more than eight months before trial is scheduled to begin, which enables and gives the Court enough time to thoughtfully and carefully consider these issues.  Notably however, the District of Delaware has repeatedly granted motions to bifurcate or sever, even when requested on the eve of trial.  See Bowtyz v. Skolnick, 113 F.R.D. 635 (D.Del. 1987) (after the pretrial conference, 18 days before trial); Philips Electronics North Amer. Corp. v. Contec Corp., 220 F.R.D. 415 (D.Del. 2004) (two months before trial).

          **(ii).  No Delay is Caused.**  Importantly, no delay to the legal process results from plaintiff's motion.  Plaintiff does not request a new trial date.  Plaintiff does not request additional trial time.  Plaintiff does not request an extension of the discovery deadline.  Instead, plaintiff respectfully requests that the trial time previously allotted be subdivided and that two shorter trials be conducted instead of one longer trial.  The Court previously allotted 10 days for trial of this case.  Plaintiff requests that this 10 days be subdivided into trials of 6 days on count one and 4 days on the others.

          **(iii).  The Evidentiary Conundrum That Will Be Avoided.**  In the absence of bifurcation, the Court and the parties will eventually have to address the evidentiary conundrum that has been created by defendants' retaliatory actions.

Specifically, inadmissible and inflammatory evidence which did not exist, and was thus not before the promotions decisionmaker in 2003, will inevitably be presented to and taint the jury as part of the retaliation case. This illicit taint directly results from defendants' wrongdoing.

Under the Federal Rules of Evidence, the fact that plaintiff was facing internal affairs charges late in the year 2004 has no bearing upon her qualifications for rank of Major in March and July 2003. See Fed.R.Evid. 401-402. Those false charges simply did not exist in 2003 and have no bearing on any ultimate fact relevant to the promotions case. See 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5164 at p. 37-38 (1978) ("[A]ny inquiry into relevance must begin with an identification of the ultimate fact to which the item of circumstantial proof is purportedly linked. The court must know what the target is before it can judge whether the evidentiary arrow is properly aimed").

There is no easy answer to this question. Those charges would not have been admissible to the jury in any way, shape or form under the count one of the Complaint as originally filed.[22] As the discovery record has revealed, it is only because of defendants' unprecedented retaliatory actions in releasing plaintiff's internal affairs information to the media that this issue has arisen as plaintiff was forced to amend her Complaint to add two counts of retaliation. These same defendants should not be permitted to benefit from their own wrongdoing. Defendants have unclean hands.

**d. Prejudice to the Non-moving Party.** This fourth factor has been described as "[p]erhaps the most important consideration." Akzona, 707 F.Supp. at

---

[22]  In addition to the bar of relevance, those charges would otherwise be inadmissible on numerous grounds under Fed.R.Evid. 403.

1435.  And it is clear that defendants will suffer no prejudice from separate trials.  As discussed above, neither trial nor discovery will be delayed by plaintiff's request.  The only prejudice that defendants will suffer is that they will be deprived of the ability to illicitly bias the jury - an illegitimate prejudice that carries no weight in the balancing.

> **e.  Prejudice to the Moving Party.**  As discussed throughout this brief, it is clear that plaintiff will suffer great prejudice if counts two and three are tried to the same jury as count one.  See Morris, 37 F.Supp.2d at 580.

> **f.  Overall Equities.**  Lastly, "a court must take into account the 'overall equities' of the case in ruling on a motion to bifurcate."  Willemijn, 707 F.Supp. at 1433-34; accord Rodin, 49 F.Supp. 2d at 721-22.[23]  Indeed, it has long been established that "equity will never suffer a wrong without a remedy."  Conn. General Life Ins. Co. v. Punia, 884 F.Supp. 148, 151 (D.N.J. 1995).[24]  And in the absence of bifurcation, the wrong plaintiff has suffered at the hands of defendants will be left without a remedy - as this retaliatory action taints the very promotions case that formed the foundation of this lawsuit.

Plaintiff filed a lawsuit challenging the denial of two promotions to the rank of Major in 2003.  Within mere hours of the filing of her suit, in direct contravention of state law, as well as in violation of numerous policies, practices, procedures, standing orders,

---

[23]  See Bowytz, 113 F.R.D. at 636 ("balancing the need for doing justice on the merits" along with the other bifurcation factors); Faerber, 51 F.Supp.2d at 124 (decision to bifurcate when trying the counts together would "impede the execution of justice").

[24]  Accord Blasband v. Rales, 971 F.2d 1034, 1044 (3d Cir. 1992) (discussing Delaware law - "equity will not suffer a wrong without a remedy"); Showalter v. Allison Reed Group, Inc., 767 F.Supp. 1205, 1214 (D.R.I. 1991) ("One of the great maxims of equity is that a Court of Equity will suffer no right to be without a remedy").

rules and regulations, defendants took the unprecedented step of releasing and discussing plaintiff's confidential internal affairs information with the Delaware news media.

At that point, what recourse did plaintiff have?  Indeed, plaintiff's immediate reaction was <u>not</u> to file suit.  Instead, plaintiff's counsel immediately brought the issue to the attention of the DSP's legal counsel who, not surprisingly, refused to respond in any way, shape or form.  In an e-mail dated November 5, 2004 (A502), counsel brought the specific issues to the fore, concluding the e-mail, with "I would like to give your office the opportunity to address these issues before we must do so in federal court."  (A504).  DSP legal counsel failed ever to respond.  That deafening silence speaks volumes.

Only then, after her attempt at internal remedies had failed, was plaintiff forced to amend her Complaint and add two counts of First Amendment retaliation for filing her lawsuit.  (D.I. 7).  Plaintiff was forced to amend because she was left without any other remedy, short of petitioning the courts for redress of her grievances.  And now, plaintiff is faced with irreparable harm to her original count of discrimination as a result of defendants' actions which resulted in counts two and three of retaliation.  It is in these circumstances, where the unclean hands of a defendant has endangered the fair trial rights of a plaintiff, that the Court should bifurcate the trial of count one from counts two and three.

**C.  Rule 21 Severance.**  "Any claim against a party [also] may be severed and proceeded with separately."  Fed.R.Civ.P. 21.  It has long been established that a "motion for severance ... is addressed to the sound discretion of the trial court."  <u>Walsh v. Miehle-Goss-Dexter, Inc.</u>, 378 F.2d 409, 412 (3d Cir. 1967).

**1.  The Factors.**  The case law is split on what factors the Court should

consider when making a Rule 21 severance decision, although the split appears to be in favor of applying the Rule 42(b) factors. <u>Compare</u> <u>Rodin</u>, 49 F.Supp.2d at 721 (no factors); with <u>Bancmortgage</u>, 2000 WL 1521600, at *2 (Rule 42(b) factors apply); <u>Morris</u>, 37 F.Supp.2d at 580 (same).

For the same reasons discussed above in the Rule 42(b) argument, plaintiff submits that if the Court does not see fit to grant plaintiff's Motion for bifurcation under Rule 42(b), that alternatively, the Court should grant plaintiff's Motion for severance under Rule 21.

## **<u>CONCLUSION</u>**

For the above stated reasons, the Court in the sound exercise of its discretion should either bifurcate the trials of count one from counts two and three, or alternatively sever counts one from counts two and three.


Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: September 16, 2005          Attorneys for Plaintiff

-33-

# Unreported Opinions



Not Reported in F.Supp.2d, 2000 WL 1521600
(E.D.Pa.)
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
BANCMORTGAGE FINANCIAL CORPORATION,
d/b/a BancFinancial Services Corp.,
v.
THE GUARANTEE TITLE & TRUST COMPANY,
et al.,
**No. Civ.A.99-CV-2932.**

Oct. 6, 2000.

Robert M. Bovarnick , Montgomery, McCracken,
Walker & Rhoads, LLP , Philadelphia, PA, David C.
Olson , Jill M. Vollman , Frost & Jacobs, Cincinnati,
OH, for the Guarantee Title & Trust Company,
Defendant.
Jay M. Green , Dechert, Price and Rhoads , Phila., PA,
Magdalen Braden , Phila., PA, William Crawford
Crenshaw , Powell, Goldstein, Frazer & Murphy ,
Washington, DC, Camille Bennett , Powell Goldstein,
Washington, DC, for BancMortgage Financial
Corporation d/b/a BancFinancial Services Corp.,
Plaintiff.
Michael J. Hynes , Jeffrey B. McCarron , Swartz,
Campbell & Detweiler, Philadelphia, PA, for J.H.
Troup, Inc., Appraisers, Defendant.
Samuel J. Pace, Jr. , Dugan, Brinkmann, Maginnis and
Pace, Philadelphia, PA, for Ousley, Inc. d/b/a Appraisal
Enhancement Services, Defendant.
Robert M. Bovarnick , Montgomery, McCracken,
Walker & Rhoads, LLP , Philadelphia, PA, David C.
Olson , Jill M. Vollman , Frost & Jacobs, Cincinnati,
OH, for the Guarantee Title & Trust Company,
Third-Party Plaintiff.
Peter D. Solymos , Griffith, Strickler, Lerman, Solymos
& Calkins, York, PA, for Mary E. Page, Third-Party
Defendant.
James S. Sorrentino , Sorrentino & Savoca, Lancaster,
PA, for Edgar M. Wright, Third-Party Defendant.

Laura Lyon Slaymaker , Blakinger, Byler and Thomas,
P.C., Lancaster, PA, for Glen Hartz, Third-Party
Defendant.
Laura Lyon Slaymaker, (See above), for Owen Hartz,
Third-Party Defendant.
Laura Lyon Slaymaker, (See above), for Karen Y.
Hartz, Third-Party Defendant.
Laura Lyon Slaymaker, (See above), for William A.
Formica, Third-Party Defendant.
Laura Lyon Slaymaker , (See above), Kelly R.
Ramsdell, Phila., PA, for Elizabeth K. Formica,
Third-Party Defendant.
Jeffrey M. Kolansky , Kolansky and Strauss, P.C.,
Phila., PA, for Vincent Dagen, Third-Party Defendant.

MEMORANDUM & ORDER

KAUFFMAN, J.

**\*1** This action involves the alleged fraudulent appraisal
and acquisition of properties located in the
Commonwealth of Pennsylvania. Plaintiff seeks
damages for common law fraud, breach of contract, and
negligence. Now before the Court is Plaintiff's Motion
to Sever Claims or, Alternatively, for Separate Trials.
For the following reasons, the Motion will be denied.

I. FACTUAL BACKGROUND

Plaintiff BancMortgage Financial Corporation, d/b/a
BancFinancial Sevices Corp., is the owner and holder
of a series of residential mortgage loans made to
Barrylee Beers and Mickey Weicksel (together, the
"Buyers"). The Buyers allegedly used these loans to
purchase property at artificially inflated prices and then
had a portion of the proceeds paid to entities with which
they were financially involved. (Second Am. Compl. at
¶ 11.) Defendant Guarantee Title & Trust Company
("Guarantee") was the title insurer for the loans. Other
Defendants in this action allegedly facilitated the
Buyers' fraudulent scheme in various ways. Defendant
J.H. Troup, Inc. ("Troup") is a residential appraisal
company that allegedly appraised the properties at
amounts much higher than market value. Defendant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ousley, Inc. ("Ousley") allegedly conducted negligent review appraisals of the initial appraisals done by Troup and supported the inflated prices. (Second Am. Compl. at ¶ 11.) Defendant Wheatland Abstract, Inc. ("Wheatland") is a title company that allegedly acted as Guarantee's agent for the purpose of issuing the title insurance and conducting the closings. Wheatland's principal, Pamela Sue Rife ("Rife"), allegedly issued multiple closing statements for the loans. (Second Am. Compl. At ¶ 11.)

Plaintiff originally brought this action against only Guarantee, but later filed a Second Amended Complaint naming as additional defendants Wheatland, Rife, Troup, and Ousley. Guarantee filed its Answer and Affirmative Defenses together with a Cross-Claim against co-defendants Wheatland, Rife, Troup, and Ousley. Guarantee also filed a Third-Party Complaint against William Rybczuk d/b/a Earth Mortgage ("Earth"), Mary E. Page, Edgar M. Wright, Glen Hartz, Owen Hartz, Karen Hartz, William A. Formica, Elizabeth K. Formica, and Vincent Dagan seeking indemnification from the third-party defendants. FN1 Plaintiff has now brought this motion to sever or try separately its claims against Guarantee pursuant to Rules 21 and 42(b) of the Federal Rules of Civil Procedure. Guarantee has filed an Objection to Plaintiff's Motion ("Def.Resp.")

FN1. According to Guarantee, "All of the Third Party Defendants, with the exception of Earth, were sellers of properties. As set forth in the Amended Complaint and the Second Amended Complaint, Earth served as the mortgage broker for all of the loans at issue, providing Habersham [ ("Habersham") (Plaintiff's predecessor in interest) ] with the underlying documents. Guarantee believes that Earth had actual or constructive knowledge of all material activities relating to the property purchase "program" of the Buyers, and Guarantee also believes that Earth located lenders for the Buyers, including Habersham. Further, Guarantee believes that Earth either had existing relationships with the lenders it contacted, or entered into agreements

specifically to facilitate the Buyers' "program." (Def. Opp. at 8.)

## II. LEGAL STANDARD

This Court is afforded broad discretion when determining whether to sever a case under Federal Rules of Civil Procedure 21 and 42(b). *Brunet v. United Gas Pipeline Co.,* 15 F.3d 500, 505 (5th Cir.1994) (citing Fed.R.Civ.P. 21 ); *Idzojtic v. Pa. R.R. Co.,* 456 F.2d 1228, 1230 (3d Cir.1972) (discussing Fed.R.Civ.P. 42(b)). Rule 21 provides, in pertinent part, that "[a]ny claim against a party may be severed and proceeded with separately." Rule 42(b) provides:

*2 The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Whereas separate trials under Rule 42(b) usually result in one judgment, severed claims under Rule 21 "become entirely independent actions to be tried, and judgment entered thereon, independently." *Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield of Pa., Inc.,* 49 F.Supp.2d 709, 720 (D.N.J.1999) (quoting 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure § 2387 (2d ed.1994)*).

To determine whether severance under Rule 21 or separate trials under Rule 42(b) is appropriate, the Court must consider the same concerns, namely, convenience of the parties, avoiding prejudice, and promoting expedition and economy. *Sutton Hill Assocs. v. Landes,* No. Civ.A.87-8452, 1988 WL 56710, at *2 (S.D.N.Y. May 25, 1988). Specifically, courts determine:

(1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted, and (4) whether the party

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 1521600 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

requesting the severance will be prejudiced if it is not granted.

*Official Comm. of Unsecured Creditors v. Shapiro,* 190 F.R.D. 352, 355 (E.D.Pa.2000) (quoting *German v. Fed. Home Mortgage Corp.,* 896 F.Supp. 1385, 1400 (S.D.N.Y.1995)).

### III. ANALYSIS

Plaintiff argues, "the convenience of the parties supports severance as it will simplify the proceedings.... The issues sought to be tried are significantly different from one another ... [requiring] different witnesses and different documentary proof." (Pl. Mot. at 7.) According to Plaintiff, "there are two core types of claims involved in the case: (1) Plaintiff's claims against Guarantee, all of which evolve out of the relationship between Plaintiff and Guarantee [specifically, whether Guarantee agreed to indemnify Plaintiff in the closing protection letters]; and (2) the remaining ancillary claims, all of which evolve out of the underlying mortgage fraud scheme." (Pl. Mot. at 4.) As Guarantee points out, however, Plaintiff added a myriad of new defendants when it filed its Second Amended Complaint and did not object to Guarantee's Motion to file its Third Party Complaint naming another group of new defendants allegedly involved in this fraudulent scheme. Furthermore, Guarantee argues that "whether [it] is liable to [Plaintiff] under the closing protection letters cannot be addressed until this Court determines whether ... [Plaintiff's] lending practices ... were negligent and, if so, were the proximate cause of the lending decisions." (Def. Resp. at 10.) In fact, during a Scheduling Conference on September 28, 2000, Guarantee represented that Plaintiff possibly was a participant in the fraudulent scheme.

**\*3** In consideration of the above, and in particular Guarantee's position that "any damages to [Plaintiff] were caused by [its] own actions" (Def. Sur Reply at ¶ 2), the Court finds that separating Plaintiff's claims against Guarantee from the ancillary claims related to the allegedly fraudulent scheme would not be in the interest of justice. Plaintiff is clearly interested in and affected by this allegedly fraudulent scheme, and its interests are not limited to the actions of Guarantee.

Furthermore, the fact that, once litigation commenced, new parties were added and the allegations and involvement spread to entities Plaintiff had not forseen when it filed its Second Amended Complaint is not enough to justify severing or trying separately Plaintiff's claims against Guarantee. Judicial economy and interest in non-conflicting judgments are paramount considerations in situations such as these. Separating Plaintiff's claims would ultimately confuse the issue, especially given Guarantee's contention that Plaintiff's pre closing actions are relevant to an appropriate determination of the liability, if any, of Guarantee. (Def. Resp. at 4). Accordingly, the Motion will be denied.

An Order follows.

### ORDER

AND NOW, this 5 [th] Day of October 2000, upon consideration of Plaintiff's Motion to Sever Claims or, Alternatively, for Separate Trials, IT IS ORDERED, for the reasons set forth in the accompanying Memorandum, that the Motion is DENIED.

E.D.Pa.,2000.
BancMortgage Financial Corp. v. Guarantee Title & Trust Co.
Not Reported in F.Supp.2d, 2000 WL 1521600 (E.D.Pa.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on September 16, 2005, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley/ Briefs / Conley - Sever OB.final