Page 18

1  that.
2          Colonel Chaffinch has testified that he
3  was disciplined for being the senior officer who was
4  present at the time.
5          Do you have any knowledge of that event or
6  discipline?
7    A.  Just -- just the same as the other event. It's
8  what I -- again, had made its rounds through the
9  department and that, you know, I guess the party had
10 gotten out of hand and that Colonel Chaffinch -- or
11 whatever his rank was at the time, I think he was
12 relatively -- I don't think he was anywhere close to
13 being a colonel at the time -- but that he was present
14 and that there was -- there were a lot of people
15 present when it happened.
16   Q.  But you don't -- you don't recall having a
17 personal conversation with Colonel Chaffinch?
18   A.  No.
19   Q.  Thank you.
20          Have you ever heard Colonel Chaffinch --
21 let's put it this way: Captain Dixon has testified
22 that he has heard Colonel Chaffinch refer to Captain
23 Conley by the nickname of "puss."
24          Did you ever hear Colonel Chaffinch refer

Page 19

1  to Captain Conley by the nickname of "puss"?
2    A.  No.
3    Q.  Paragraph 41 of the complaint, this is on page
4  9, indicates that Colonel Chaffinch has publicly
5  referred to his penis by a certain nickname.
6          Did you ever witness him doing that?
7    A.  No.
8    Q.  Would it be fair to say that -- I think this is
9  consistent with your earlier testimony -- that you
10 didn't consider Colonel Chaffinch a personal friend of
11 yours?
12   A.  I wouldn't say he was a friend. We were more a
13 professional relationship. We didn't have -- I did
14 not -- I wasn't part of that community, the Sussex
15 County community that attended these parties. I spent
16 my entire career up here.
17         Again, when I was appointed deputy
18 superintendent, the only time that we got together, he
19 and I got together off duty, pretty much, was, like I
20 said, at either retirement functions or promotional
21 ceremonies or -- or Police Academy graduations and
22 things like that.
23   Q.  Right.
24   A.  I think Aaron knew that -- that, you know, you

Page 20

1  know, if some of this stuff was happening, it wasn't
2  what I was about and it wasn't what, you know, that he
3  and I were really going to connect on. So --
4    Q.  So, is it fair to say that your relationship
5  with him on the job there was a professional
6  relationship?
7    A.  It was.
8    Q.  And I think you are telling me that he came --
9  he came up from the southern part of Delaware, his
10 experience and history was coming up through command
11 through the southern part of the state?
12   A.  Yes.
13   Q.  And your experience and history was coming up
14 through command through the northern part of the
15 state?
16   A.  That's correct.
17   Q.  For example, you know he was a Troop commander
18 at Troop 5 in Bridgeville?
19   A.  Yes.
20   Q.  You knew he was a patrol sergeant in
21 Bridgeville?
22   A.  Yes.
23   Q.  You came out of the academy, I guess you went
24 -- did you go north when you came out of the academy?

Page 21

1    A.  Yes. I went north and I think he went south
2  the rest of his career. Like I said, we really didn't
3  connect again until maybe 22 years later.
4    Q.  Right. Right. So, your relationship wasn't
5  such that he could come into your office and joke
6  around and things like that because you didn't travel
7  in his circles?
8    A.  Well, he -- he was the boss. I mean, if he
9  wanted to come in and joke around, I mean, reality of
10 the situation is you -- you listen. But --
11   Q.  But when he would let his hair hang down, he
12 didn't hang around with you?
13   A.  No. It wasn't with me.
14   Q.  Well, here is some things you might have some
15 knowledge about.
16          Do you remember when Colonel Pepper
17 promoted Mary Ann Papili to the rank of captain?
18 Let's do it this way: Did he promote Mary Ann Papili
19 to the rank of captain?
20   A.  I think he did because she worked for me as a
21 captain at Troop 6, and I don't recall whether she had
22 -- that she was already a captain or that she was part
23 of the promotional process. But when I assumed the
24 command responsibilities for the rank of major in New

Conley v. Chaffinch, et al.
Thomas F. Marcin   C.A. # 04-1394-GMS   August 10, 2005

Page 22

1   Castle County, she was -- she had assumed my command
2   at Troop 6.
3   Q.   So, she succeeded you at Troop 6; is that what
4   you are saying?
5   A.   I think.  So I don't think there was anyone
6   else in between.  There may have been, but,
7   eventually, for the bulk of my time as a New Castle
8   County major, Mary Ann was the captain at Troop 6.
9   Q.   And when you became the lieutenant colonel in
10  February, 2002, she was still serving as the commander
11  of Troop 6; is that correct?
12  A.   Yes.
13  Q.   And she was the first woman promoted to the
14  rank of captain in the Delaware State Police in its
15  history; does that sound like a correct statement?
16  A.   I think so.  If there was one before her, I
17  don't remember.
18  Q.   And does it sound about right that Captain
19  Barbara Conley was the second woman promoted?
20  A.   Yeah.  She would have had to have been.  I
21  couldn't remember who was promoted first, whether it
22  was Barbara or whether it was Mary Ann.  You may want
23  to check that.  It may have been Barbara first to the
24  rank of captain.

Page 23

1   Q.   After Colonel Chaffinch assumed command in
2   February of 2002, is it correct that he -- that he,
3   later in 2002, transferred Captain Papili from the
4   command at Troop 6 and sent her to an administrative
5   position as the OIC of information technology?
6   A.   Not in 2002.
7   Q.   I am sorry, 2003, September --
8   A.   Well, it was upon my retirement.  I was gone
9   when that occurred.
10  Q.   You left in July, and you are saying you
11  believe that she was --
12  A.   I believe she was still in command when I left.
13  Q.   But then did you learn that she was
14  transferred?
15  A.   Yes, I did.
16  Q.   I am trying to focus on when she might have
17  taken over the command of Troop 6.  I really -- I want
18  to see what you know.
19  A.   I am fairly certain, but not 100 percent
20  certain, that she assumed command after I was promoted
21  to the rank of major.  But, again, you know, someone
22  would have to check the files at human resources to
23  see if there was -- there was another captain who was
24  promoted on an interim basis.  But for the most of my

Page 24

1   command as a New Castle County major, Mary Ann was the
2   captain at Troop 6, I do recall that.  And then, as a
3   lieutenant colonel, Mary Ann, I know, for that
4   year-and-a-half, was the captain at Troop 6.  So, she
5   was there for a -- for a good period of time.
6   Q.   But the only way we really know is to ask her
7   or check --
8   A.   Either ask her or check the records, yeah.
9   Q.   During your time working with Colonel
10  Chaffinch, is it true that no female captain was
11  appointed by him to command a troop?
12  A.   I think that's fair, sure.  I think that's
13  accurate.
14  Q.   At the time, there were -- eventually, were you
15  there when Captain Shamany became a captain?
16  A.   No.  She was --
17  Q.   So that was after you?
18  A.   Yes.
19  Q.   While you were serving, there were only two
20  female captains?
21  A.   Yes, Barbara and Mary Ann.
22  Q.   And it is your understanding that Mary Ann was
23  transferred out of her command position by Colonel
24  Chaffinch?

Page 25

1   A.   Correct.  It was -- I don't know if it was in
2   '03 or sometime in '04, but it was after I left.
3   Q.   I believe the record might show that it was
4   around September of 2003.  Let's go on.
5        And it's your recollection that Captain
6   Shamany became a captain just after you left?
7   A.   I don't know when she was promoted to captain.
8   Q.   But it wasn't while you were there?
9   A.   No.  No.
10  Q.   Are you aware that when she was promoted, she
11  also was assigned to an administrative position at the
12  State Bureau of Investigation?
13  A.   Yes.
14  Q.   Now, in March, 2003, you knew Major Joseph
15  Swiski; right?
16  A.   Yes, I did.
17  Q.   He was the administrative budget major?
18  A.   Yes.
19  Q.   And around March of 2003, is it correct that he
20  retired?
21  A.   Yes.  I think he announced it in February or
22  March.  I think he left actually in April, maybe, of
23  '03.
24  Q.   Now, the administrative budget major deals with

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. Marcin | C.A. # 04-1394-GMS | August 10, 2005 |

Page 26

1 the budget, for example; right?
2   A.  Yes, sir.
3   Q.  And before Major Swiski became the
4 administrative budget major, what position did he hold
5 as a captain?
6   A.  I believe he was the commander of Troop 2.
7   Q.  Commander of Troop 2. Okay.
8       Was he like a northern guy, too?
9   A.  Yes, he was.
10   Q.  So his career was spent in the northern part of
11 the state?
12   A.  Yes.
13   Q.  So, did you interact with him?
14   A.  Frequently, yes.
15   Q.  He had never held a position prior to that
16 where he would deal with budget issues; right?
17   A.  No, he did not.
18   Q.  Now, that doesn't mean that he never received
19 any training in it, did he?
20   A.  No. He was -- I am sure that he received some,
21 you know, departmental training or state training, and
22 he ended up performing very well.
23   Q.  Just to go back, I mean, as you rise in the
24 command structure of the Delaware State Police, you

Page 27

1 know, it sends its managers off to various schools; is
2 that correct?
3   A.  Yes.
4   Q.  There is someplace called Northwestern?
5   A.  There is Northwestern. There is -- actually, I
6 attended a school called PERF, Police Executive
7 Research Form, it's in Boston. There is the FBI NA,
8 which is the big one, and then there is a few others.
9   Q.  And you take courses?
10   A.  That's correct.
11   Q.  And, for example, someone who is coming up
12 through the background in the patrol function gets
13 exposed to courses and management techniques?
14   A.  Yes, that's correct.
15   Q.  You get exposed to courses in, you know, budget
16 and things like that?
17   A.  Yes.
18   Q.  So, you are saying, when Major Swiski was
19 promoted to major, he had not held a position prior to
20 that where he was doing day-to-day budget things?
21   A.  No, he wasn't.
22   Q.  But you are telling us he performed admirably
23 in that position?
24   A.  Yes, he did, very good.

Page 28

1   Q.  And I guess, administratively, he was reporting
2 to you as the lieutenant colonel; right?
3   A.  He was.
4   Q.  Now, he was succeeded by a Captain Paul Eckrich
5 who was promoted to the administrative budget major
6 position; is that correct?
7   A.  Yes, he was.
8   Q.  And did that promotion occur before you
9 retired?
10   A.  I don't know when the promotion -- probably
11 not. I probably was there because I don't think it
12 took very long to name Paul Eckrich upon Joe's
13 retirement.
14   Q.  So you are saying you were still there when he
15 got promoted?
16   A.  Yes.
17   Q.  I have taken Colonel Chaffinch's testimony on
18 the factors that went into, you know, making the
19 decision on who to put in that position. I don't
20 think he indicated that he consulted with you in
21 making the decision.
22       What's your memory?
23   A.  My memory was that when Joe informed us that he
24 was going to retire and take a job at Winterthur, I

Page 29

1 talked to Aaron for a few minutes about a replacement.
2 It was fairly certain -- fairly clear to me at that
3 point that Aaron was -- had zeroed in on Paul Eckrich.
4 I told Aaron, I said I thought it might not be a bad
5 idea to open the process up to existing captains, pull
6 some jackets, look at qualifications, and also
7 consider diversity.
8   Q.  So you did tell him that?
9   A.  Yeah. We discussed that.
10   Q.  And was that, basically, what your input was?
11   A.  That's correct, it was.
12   Q.  Let's digress a little bit; okay?
13       You remember this thing call the Lisa
14 Blunt-Bradley report?
15   A.  Yes.
16   Q.  Let me show you what's Exhibit 5 in the record
17 here somewhere.
18       Does that appear to be a copy of the Lisa
19 Blunt-Bradley report?
20   A.  Yes.
21   Q.  Now, there was a period of time in 2001 when
22 the governor asked the state personnel director to
23 participate in a study of the Delaware State Police;
24 is that true?

8 (Pages 26 to 29)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. Marcin | C.A. # 04-1394-GMS | August 10, 2005 |

Page 30

1  A. Yes.
2  Q. You were present when all that was happening?
3  A. Yes, I was.
4  Q. And, in fact, you became the lieutenant colonel
5  a few months after that study was completed?
6  A. I don't know when the study was completed.
7  Q. I think the record will show -- I think this is
8  dated December of 2001.
9  A. Yes.
10 Q. Do you see at the bottom there, the first page,
11 December 1st, 2001?
12 A. Okay. I got it.
13 Q. Then you become the lieutenant colonel a couple
14 months later?
15 A. February.
16 Q. And the Delaware State Police, is it fair to
17 say, then began implementing various recommendations
18 that had been found in the study?
19 A. Yes, they did.
20 Q. There were these outside -- there was these
21 outside people from up in New England who came in and
22 participated in interviews and things like that;
23 right?
24 A. Yes.

Page 31

1  Q. And they examined the recruitment, hiring,
2  promotion, discipline -- and discipline process of the
3  Delaware State Police?
4  A. That's correct.
5  Q. Various changes were recommended in those
6  areas; right?
7  A. Yes.
8  Q. And they would be found in this Exhibit No. 5?
9  A. Yeah. I think that was primarily the purpose
10 of the -- of the report.
11 Q. Right. Right. You are aware that there have
12 been various complaints about lack of objectivity, for
13 example, in the promotion process of the Delaware
14 State Police?
15 A. Yes.
16 Q. You are aware that there had been various
17 complaints that the promotion process, for example,
18 had been operating unfairly in the past?
19 A. Yes. I was aware.
20 Q. I am not saying you agreed to it, but --
21 A. Yes, I understand.
22 Q. -- you are aware that there was those
23 complaints?
24 A. Yes, I was.

Page 32

1  Q. You were aware that, for example, the United
2  States Department of Justice had a lawsuit against the
3  Delaware State Police as challenging the tests it was
4  using several years ago for new recruits?
5  A. Yes.
6  Q. Once the Bradley report was issued, you
7  understood that she had received her mandate from
8  Governor Minner?
9  A. Correct.
10 Q. And as the operations person for the Delaware
11 State Police, did you try to take steps to see that
12 the recommendations and things found in the Bradley
13 report were adopted by the Delaware State Police?
14 A. We did.
15 Q. I mean, the Delaware State Police didn't throw
16 the Bradley report in a waste can and ignore its
17 conclusions, did it?
18 A. No, we didn't.
19 Q. While you were in operational command as the
20 lieutenant colonel, did you try to take steps, as best
21 you could, to make the kinds of changes that were
22 identified in the Bradley report?
23 A. We did. One of the first things that we did,
24 when we received the report, and after assuming

Page 33

1  command, I recommended to the colonel that we
2  establish a couple committees. And I am sure that you
3  may have records as to what they were, but they were
4  basically two committees, one to deal with our
5  internal discipline practices and then another with
6  recruitment hiring and promotion practices.
7      We thought, and the committees acted
8  professionally, we had some very good recommendations.
9  We met frequently with Lisa Blunt-Bradley and her
10 staff, and informed them on a -- initially, I think it
11 was on a bimonthly basis, and then it was a little bit
12 less frequent as time moved on, to keep -- to keep her
13 staff and state personnel updated as to what we were
14 doing, and things were rolling along fairly well. And
15 we were able to enact some of the changes that were a
16 result of the subcommittees; for example, I think, and
17 probably to this day, they have out sourced the
18 promotional process to -- to a company, an independent
19 firm who was actually conducting the -- the tests.
20     And, you know, how it's working, I really
21 don't know because I haven't spoken to anyone
22 recently, but there were some things that worked out
23 pretty well and some things that I wish we could have
24 moved a little quicker on, but, you know, we did the

9 (Pages 30 to 33)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. Marcin | C.A. # 04-1394-GMS | August 10, 2005 |

Page 34

1  best we could at the time, I thought.
2  Q. Well, let's talk about just a couple of the
3  changes that were made. I mean, for example, when
4  you, I think, left in July of 2003, there was -- was
5  Captain Yeomans responsible for the personnel
6  function?
7  A. Yes, he was.
8  Q. Prior to Captain Yeomans, there was a civilian
9  director of personnel?
10 A. Yes, John Dillman.
11 Q. D-i-l-l-m-a-n?
12 A. Yes.
13 Q. And there was also a uniformed officer who
14 worked as his deputy; is that how the structure was?
15 A. Yes.
16 Q. But there was a civilian director of personnel?
17 A. Yes.
18 Q. I think your career would have coincided with
19 it: Isn't it true that John Dillman served as the
20 civilian director of personnel for about 20 or more
21 years?
22 A. Yes.
23 Q. And before that, he had been the state director
24 of personnel for Governor Pete DuPont; is that

Page 35

1  correct?
2  A. Yes, he was.
3  Q. And before that, he was the Delaware State
4  Police, even, in the personnel function?
5  A. I think so, yes, that's correct.
6  Q. There came a time when John Dillman's
7  employment ended and the civilian director of
8  personnel function was eliminated; right?
9  A. Yes.
10 Q. And then there was a uniformed officer in the
11 chain of command for personnel that went directly to
12 the lieutenant colonel?
13 A. Yes.
14 Q. Is it fair to say that during the many years
15 that John Dillman was a director of personnel, that
16 there was little, if any, interaction between the
17 personnel function at the Delaware State Police and
18 the state personnel director's office that was last
19 headed up by Lisa Blunt-Bradley?
20 A. I don't know if that's fair to say. Honestly,
21 I don't know. For most of my career, until I was on
22 staff, I really had limited interaction with that type
23 of function. So, if John and his group were meeting
24 with the State H.R. people, I wouldn't have known

Page 36

1  about it.
2  Q. Well, I am trying to approach it from the point
3  of view of the Bradley report.
4  A. Okay.
5  Q. Is it correct that the Bradley report, and one
6  of the goals of the Bradley report, was to create more
7  interaction between the state personnel office --
8  A. Yes.
9  Q. -- and the personnel function of the Delaware
10 State Police?
11 A. Yes. I think that's fair.
12 Q. Yes. For example, the state personnel office
13 has resources that the Delaware State Police might not
14 have available to it, resources or experience that the
15 Delaware State Police might not have available?
16 A. Yes.
17 Q. During the course of the Bradley report
18 investigation or even the implementation of it, did
19 you meet this Mr. Greg Chambers who worked for Lisa
20 Blunt-Bradley at the time?
21 A. Yes, I have met with Greg, sure.
22 Q. Now, Mr. Chambers, for example, heads up some
23 sort of an office that dealt with affirmative action,
24 things like that; right?

Page 37

1  A. Yes. I think it was called the Affirmative
2  Action Office, yes.
3  Q. There might be four words, but definitely part
4  affirmative action; right?
5  A. Yes.
6  Q. And you have met him yourself; right?
7  A. Yes.
8  Q. And is it fair to say that you found him to be
9  a very experienced person in the kinds of things he
10 does?
11 A. He is.
12 Q. He has been doing it for decades; is that
13 right?
14 A. Yes.
15 Q. The Bradley report comes along, and I think you
16 are telling us that there is -- that it's intended
17 that there be more consultation and interaction with
18 the Delaware State Police personnel function and the
19 state personnel function?
20 A. One of the functions, yes, the purpose of the
21 report.
22 Q. That was one of the things the Bradley report
23 tried to achieve; is that right?
24 A. Yes. That was my understanding.

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd.       Professional Court Reporters       (302)655-0477

Case 1:04-cv-01394-GMS   Document 75-6   Filed 09/16/2005   Page 6 of 16

Conley                                 v.                          Chaffinch, et al.
Thomas F. Marcin              C.A. # 04-1394-GMS                   August 10, 2005

Page 38

1  Q. Now we flip back to the Paul Eckrich promotion?
2  A. Okay.
3  Q. And I am just trying to understand the little
4  bit I know about the process. Colonel Chaffinch
5  testified, when I deposed him, that there were no
6  written orders or policies of the Delaware State
7  Police that he had to refer to when he made the
8  decision on who to promote to the administrative
9  budget position.
10     Do you agree with that?
11 A. Well, I mean, if you look internally at our --
12 at the DSP Human Resources function, in that context,
13 probably not. However, at the time, this is one of
14 the points that I was trying to get through to Aaron,
15 that you really couldn't ignore the Bradley report and
16 you really couldn't ignore what was happening around
17 us. And one of -- and he and I talked, and I said,
18 you know, you need to remember one of the reasons why
19 you were brought in the door was to effect change.
20 And I am not saying that I was telling Aaron that I am
21 not saying that it necessarily has to -- we have to
22 promote or should promote a female or a minority
23 officer, but, clearly, they need to be considered, as
24 does -- should all other officers within the agency

Page 39

1  because, quite frankly, until we start pulling jackets
2  and until we start looking at certain qualifications,
3  maybe establishing a process, we really don't know.
4     And one of the reasons that Paul Eckrich,
5  I am sure, was selected, and I know that he was
6  selected, was because Paul had spent some time in the
7  position prior to the promotion. And I don't remember
8  when or for how long he was in that position, but, to
9  me, not to say that Paul wasn't qualified or isn't
10 doing a good job -- he may be doing a very good job at
11 this point, I don't know -- but I am sure we had other
12 officers out there that could have done just as well
13 that really never received the consideration.
14 Q. And it's process that I am trying to focus on
15 here.
16 A. Right.
17 Q. I believe part of the purpose of the governor's
18 investigation and the Bradley process and the Bradley
19 report was to make changes in the process of the
20 Delaware State Police; for example, in the area of
21 promotions; is that a fair statement?
22 A. Sure. That's fair.
23 Q. And the state personnel office had had
24 experience and resources in what works in state

Page 40

1  government; is that a fair statement?
2  A. Yes.
3  Q. And the state personnel office had experience
4  and resources in the office of Mr. Gregory Chambers;
5  right?
6  A. Yes.
7  Q. You have told us that.
8     And I think you have told us that when you
9  did have your discussion with Colonel Chaffinch about
10 filling the vacancy, you were pointing out some things
11 to him that he should be touching base with?
12 A. He should be considering, correct.
13 Q. Should be considering.
14    And I think Colonel Chaffinch has told us
15 that there was no written process that he had to
16 follow when he filled this position that Captain
17 Eckrich went into.
18    Is it true, that there was no written
19 process that said, "This is how we go about filling
20 this major position"?
21 A. I think that's true. I don't think there was a
22 written process.
23 Q. Colonel Chaffinch was free to consult with the
24 state personnel director's office about how he should

Page 41

1  go about filling that position, wasn't he?
2  A. Absolutely.
3  Q. And Colonel Chaffinch was free to consult with
4  Gregory Chambers about how he should go about filling
5  that position; is that correct?
6  A. Yes.
7  Q. Colonel Chaffinch has testified that he did not
8  consult with Gregory Chambers.
9     Do you disagree with that?
10 A. No, I don't disagree with that.
11 Q. Colonel Chaffinch has testified he did not
12 consult with Lisa Bradley's office when he filled this
13 position.
14    Do you disagree with that?
15 A. No, I don't.
16 Q. And, like I am saying, he has testified that
17 there were no written criteria that he obtained from
18 any source whatsoever when he filled this position.
19    Do you disagree with that?
20 A. No, I don't disagree.
21 Q. Is it a fair statement that it was the intent
22 of the Bradley report that the resources of the state
23 personnel office be consulted in making promotion
24 decisions in the Delaware State Police at all levels?

11 (Pages 38 to 41)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. Marcin | C.A. # 04-1394-GMS | August 10, 2005 |

Page 42

1  A.  I think that's fair.
2  Q.  And if Colonel Chaffinch chose not to --
3  A.  If I can back up.
4  Q.  Go right ahead.
5  A.  I think it's fair to say they wanted to be and
6  should have been consulted in the process. In the
7  actual selection, I am not sure that that was a
8  component. But certainly in the process, they wanted
9  to have a piece of it.
10  Q.  Just so we are clear, I mean, you didn't
11  believe that it was the purpose of the Bradley report
12  to make some other division of the state of Delaware
13  or candidate office responsible for making the actual
14  personnel decisions?
15  A.  No.
16  Q.  That authority resides in the Delaware State
17  Police?
18  A.  That's correct.
19  Q.  But as far as finding objective measures and
20  policies that should be followed, that professionally
21  would be considered fair and impartial, the state
22  personnel office was to be involved; is that correct,
23  in the promotion process?
24  A.  They should have been involved or at least

Page 43

1  should have been consulted.
2  Q.  I have already told you what Colonel Chaffinch
3  testified.
4  A.  Right.
5  Q.  You are unaware of John Yeomans going to the
6  state personnel office contrary to Colonel Chaffinch's
7  wishes?
8  A.  No. I mean, I was going to send in a -- I was
9  going to state that Aaron may have called Lisa
10  Blunt-Bradley and consulted with her, but if he's
11  testified prior that he hasn't, then he didn't.
12  Q.  And then you retired and Major MacLeish became
13  the lieutenant colonel and he was replaced by Randall
14  Hughes?
15  A.  Yes.
16  Q.  But you wouldn't have been in the loop on any
17  of that because you were already gone?
18  A.  No. I wasn't in the loop.
19  Q.  Colonel Chaffinch didn't call you up and say,
20  Well, now I have got to replace Tom Marcin and here is
21  what my thoughts are? You didn't have that
22  conversation?
23  A.  The only conversation I had with Aaron was the
24  next day, after I had informed him that I was probably

Page 44

1  going to take the position with AAA Mid Atlantic, he
2  had told me that he was going to promote Captain
3  Hughes to major.
4  Q.  So, there comes a time when you announce your
5  retirement?
6  A.  Yes.
7  Q.  And probably, besides your wife and everybody,
8  you tell your boss as soon as possible?
9  A.  Yeah. I actually told him first. I had
10  interviewed for the position a few times. It was in,
11  I can recall, maybe the first week of July of '03, a
12  final interview in Philadelphia for the position, AAA
13  had indicated they needed an answer soon. I said I
14  needed just a few more days to make my decision.
15  After the interview, I get in the car and I call Aaron
16  and I told him that -- I called Aaron and I told him
17  that I had been offered a position and that I was
18  probably going to accept it.
19      And then we -- I -- this was maybe around
20  noon on a particular day, I spend the rest of the day
21  in New Castle County. I go back to work in Dover.
22  The next day, I see him around 10 or 10:30, and, you
23  know, we make some small talk about the job and what
24  it entails, and then he had told me that he probably

Page 45

1  was going to -- he was going to promote Hughes.
2  Q.  And I have taken his testimony, and I think his
3  testimony is that, once again, he didn't consult Lisa
4  Blunt-Bradley, her office, or Gregory Chambers as far
5  as following some sort of objective professional
6  process. You are unaware of his having done anything
7  like that?
8  A.  No. I am not aware.
9  Q.  Well, let's talk about two other things about
10  the Bradley report in front of you there. I think you
11  have might have been given responsibility for a couple
12  things. There is a recommendation in there, I think,
13  about a round table of women in policing to be
14  convened to address issues unique to women in law
15  enforcement. I think Barbara Conley would testify
16  that you somehow got her involved in that round table,
17  okay, and that it might have had maybe one meeting and
18  that you were working hard to try to implement this
19  recommendation, but that after you retired, nothing
20  further happened. This is on page 47 of the report.
21  I think it talks about the round table.
22      Do you remember any round table?
23  A.  Yes.
24  Q.  Were you taking steps to try to implement that

12 (Pages 42 to 45)

**Page 46**

1  recommendation?
2  A.  I tried.  What I did was I believe I called
3  Barbara, at some point, and Barbara and I spoke as to
4  what we thought, you know, would have been appropriate
5  as far as an agenda and what our goals should be and
6  what we were trying to accomplish.
7      I can recall asking Barbara to -- we had
8  some communication as to who should be included in the
9  meetings and what our -- again, what our goals and
10  objectives should be.  My goals and objectives at the
11  time were to, and I told Barbara this, that we needed
12  to open the lines of communication with our female
13  troopers; we needed to speak to how we could enhance
14  recruitment, our training efforts, sending female
15  troopers away to conferences for specific -- to
16  enhance their specific skills on the job, talk about
17  some of the -- some of the important day-to-day issues
18  that maybe our female troopers, over the years,
19  haven't had the ability -- didn't have the ability to
20  discuss with some superiors.
21      And I can recall, at one -- I think we may
22  have had two meetings and then I retired, I can recall
23  one of the meetings, and it was, to this day, it was
24  somewhat ironic, but we, at the end of the first

**Page 47**

1  meeting, one of the female troopers indicated, it
2  seemed somewhat small at the time, but I think at
3  Troop 6, we have dry cleaning, for example, and, you
4  know, the dry cleaning racks, for years and years and
5  years, had been in the men's locker room just because
6  that's where the space was and the female troopers
7  were upset because they had to knock on the door and
8  get their uniforms.
9      So, you know, we made a small little
10  change like that and helped maybe a little bit with
11  morale.
12      But from the bigger picture in the
13  context, we were trying to, again, get out there, get
14  the word out that the DSP, you know, is responsive to
15  qualified female candidates and how best to bring them
16  on board and how best to retain them, how to deal with
17  either some light duty or some specific gender issues
18  that men don't necessarily have to deal with, with
19  pregnancy, for one, and then, you know, work through
20  those things.
21      Whatever happened to the committees once I
22  left, I don't know.
23  Q.  But I think you are telling me that as far as
24  you understood, the charter for the round table on

**Page 48**

1  women in policing to be that, No. 1, it was looking at
2  some short-term issues?
3  A.  Correct.
4  Q.  And then it was concerned with a long-term
5  perspective also?
6  A.  Absolutely.
7  Q.  And you tried to accomplish that while you were
8  still there?
9  A.  Sure.
10  Q.  And then, on page 49, there was something
11  called the diversity committee, on page 49, I think,
12  of the Bradley report.  It says, "To assure
13  accountability in the area, the utilization of
14  uniformed officers, the Bradley report recommended
15  that the State Police create a diversity committee."
16      Do you have any recollections about that?
17  A.  Yes.  We had same specific -- same type of
18  meetings with members of our minority trooper
19  population and talked about specific issues and
20  concerns that related to them.
21  Q.  And while you were the lieutenant colonel with
22  responsibility for operational command, you were
23  trying to carry forward that mission also?
24  A.  Yes.

**Page 49**

1  Q.  And is it fair that the charter there again had
2  short-term and long-term goals?
3  A.  Yes, it did.
4  Q.  And you are unaware of whether that committee
5  carried forward after you left?
6  A.  I don't know.
7  Q.  And going back to the round table on women, you
8  don't know what's happened after you left?
9  A.  I have no idea.
10  Q.  And just for the record, I mean, we have talked
11  about female captains in the State Police.  There has
12  never been a female major of the State Police?
13  A.  No.
14  Q.  Never been a female lieutenant colonel?
15  A.  No.
16  Q.  And never been a female colonel; right?
17  A.  No.
18  Q.  Did you ever hear Colonel Chaffinch refer to
19  Captain Papili as Norma?
20  A.  No, I never heard that.
21  Q.  I am almost done.  Let me just check a few
22  things.
23      Captain Conley, I think -- we are almost
24  done -- Captain Conley, I think, has indicated that

13 (Pages 46 to 49)

Case 1:04-cv-01394-GMS   Document 75-6   Filed 09/16/2005   Page 9 of 16

Conley                                    v.                              Chaffinch, et al.
Thomas F. Marcin                  C.A. # 04-1394-GMS                      August 10, 2005

Page 50

1  you may have sat on one of her oral boards for
2  promotion.
3      A.  Yes. I recall.
4      Q.  Would that have been for captain or lieutenant?
5  Do you recall?
6      A.  I don't recall -- it may have been for
7  lieutenant. I believe she was a sergeant, but I am
8  not 100 percent sure at the time, so she would have
9  been competing for lieutenant. But I did sit on one
10 of her boards, I do recall that.
11     Q.  And did you form a positive evaluation of her
12 when you did that?
13     A.  Yes, I did. I rated her very highly, and I was
14 -- I can remember -- I didn't know much about Barbara.
15 Again, I think she spent most of her career in the
16 south.
17     Q.  Right.
18     A.  And I can remember, when she left the room,
19 being impressed that her knowledge of policy,
20 procedure, you know, she had a realistic vision for
21 the -- for the agency, I was overall impressed with
22 her skills.
23     Q.  And then when you were the lieutenant colonel,
24 she was the director of traffic?

Page 51

1      A.  Yes.
2      Q.  So, she was headquartered on the first floor of
3  the headquarters building?
4      A.  Yes.
5      Q.  And you were up on the second floor?
6      A.  Correct.
7      Q.  And traffic reports through a -- would have
8  reported to you through a major; right?
9      A.  Yes.
10     Q.  Her boss would have been --
11     A.  Seaford, I believe, Mark Seaford, yes.
12     Q.  But while you were serving as a lieutenant
13 colonel, did you form any opinions on how she was
14 performing her job?
15     A.  I thought she was performing very well. I did
16 attend, when I could, her traffic, monthly traffic
17 meetings. I certainly attended when I was a major in
18 operations. I thought she performed very well. She
19 was -- she was in solid communication with Office of
20 Highway Safety and "NITSA" and the feds. And she had
21 a good handle on, I think, the traffic budget, and I
22 thought that her relationship was positive with the
23 traffic lieutenants that were in the field that were
24 tasked with carrying out operational and enforcement

Page 52

1  responsibilities.
2          MR. NEUBERGER:  Then that, I think,
3  concludes my questioning. Mr. Durstein may have some
4  questions.



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
# v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

# Colonel L. Aaron Chaffinch

June 6, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:04-cv-01394-GMS   Document 75-6   Filed 09/16/2005   Page 11 of 16

Conley                                v.                          Chaffinch, et al.
Colonel L. Aaron Chaffinch      C.A. # 04-1394-GMS                June 6, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,            )
                                      )
            Plaintiff,                )
                                      )
                                      )   Civil Action
v.                                    )   No. 04-1394-GMS
                                      )
COLONEL L. AARON CHAFFINCH,           )
individually and in his official      )
capacity as the Superintendent,       )
Delaware State Police; LIEUTENANT     )
COLONEL THOMAS F. MACLEISH,           )
individually and in his official      )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.       )
MICHELL, individually and in his      )
official capacity as Secretary of the )
Department of Safety and Homeland     )
Security, State of Delaware; and      )
DIVISION OF STATE POLICE, DEPARTMENT  )
OF SAFETY AND HOMELAND SECURITY,      )
State of Delaware,                    )
                                      )
            Defendants.               )

        Deposition of COLONEL L. AARON CHAFFINCH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:35 a.m. on Monday,
June 6, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.
APPEARANCES:
        THOMAS S. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff
------------------------------------------------------
                WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 2

1  APPEARANCES (Continued):
2
3      JAMES E. LIGUORI, ESQUIRE
       LIGUORI, MORRIS & YIENGST
4        46 The Green
         Dover, Delaware 19901
5        for Defendant Colonel L. Aaron Chaffinch

6      RALPH K. DURSTEIN, ESQUIRE
       STEPHANI J. BALLARD, ESQUIRE
7      DEPARTMENT OF JUSTICE
         820 North French Street
8        Carvel State Office Building
         Wilmington, Delaware 19801
9        for Defendants Lieutenant Colonel Thomas F.
         MacLeish, David B. Mitchell, and Division
10       of State Police

11  ALSO PRESENT:
12      CAPTAIN BARBARA L. CONLEY
13            - - - - -
14         COLONEL L. AARON CHAFFINCH,
15      the witness herein, having first been
16      duly sworn on oath, was examined and
17      testified as follows:
18  BY MR. NEUBERGER:
19    Q.  Could you state your full name for the record?
20    A.  Aaron Chaffinch.
21    Q.  Colonel Chaffinch, my staff or myself, we've
22  taken your deposition on other occasions; isn't that
23  correct?
24    A.  Yes, sir.

Page 3

1    Q.  You've even testified in two federal court cases
2  that I was involved in; is that right?
3    A.  Yes, sir.
4    Q.  I called you as a witness in those cases; right?
5    A.  Yes, sir.
6    Q.  Now, you understand, based on that experience,
7  that if there's any question I ask you today and any
8  answer you give, and I call you at trial and you say
9  something different, I can point that out to the judge
10 and jury?
11    A.  Yes, sir.
12    Q.  You know that.  Okay.
13        Are you taking any medications or anything
14 that would interfere with your ability to remember
15 things?
16    A.  I don't believe so.
17    Q.  You don't take blood pressure, heart medicine,
18 things like that?
19    A.  I don't think it would affect my memory, I don't
20 believe.
21    Q.  But you are not on anything odd or something
22 that affects your memory that you know of?
23    A.  Not that I'm aware of.
24    Q.  If I ever ask you a question that you don't

Page 4

1  understand, just ask me and I'll be glad to rephrase it.
2  Is that okay?
3    A.  Yes, sir.
4        MR. NEUBERGER:  Let's do this.  Let's mark
5  this as Plaintiff's Exhibit Number 1 and then we'll be
6  referring back and forth to this.  Let me give a copy to
7  counsel.  It's a copy of the First Amended Complaint in
8  the action.
9        (Plaintiff's Exhibit 1 was marked for
10 identification.)
11 BY MR. NEUBERGER:
12   Q.  Colonel, I'm going to ask you some questions
13 about how long you were with the force and how your
14 career, your assignments might have tracked assignments
15 that Captain Barbara Conley had.  Okay?
16       If you turn to paragraph 10 of that
17 document that's in front of you on page 4, you can see
18 there in that paragraph a listing that Barbara Conley
19 prepared at an earlier time of her assignments starting
20 as a patrol trooper at Troop 5 in Bridgeville in 1982 at
21 the bottom.  Do you see that?
22   A.  Yes, I do.
23   Q.  Then she works all the way up to captain,
24 director of traffic control section in 2001.  Do you see

Page 5

1  that?
2    A.  Yes, sir.
3    Q.  Let me just ask you a few questions about her
4  history.
5        Now, she indicated that she joined the
6  force as a patrol trooper in Bridgeville in 1982 and
7  she'll testify to that fact.  Were you assigned to
8  Bridgeville at that time?
9    A.  Yes, sir.
10   Q.  I think she's indicated that she believes that
11 when she started in Bridgeville, she was a patrol trooper
12 and you would have been a trooper first class assigned in
13 Bridgeville.  Does that sound about right?
14   A.  That's correct.
15   Q.  Then she indicates she was in Bridgeville from
16 1982 to 1983?
17       MR. LIGUORI:  I think it's '93, Tom.
18       MR. NEUBERGER:  Yes.  Thank you, Jim.  All
19 right.
20 BY MR. NEUBERGER:
21   Q.  She has indicated during that period of time
22 there was a time when you were assigned at Bridgeville,
23 also?
24   A.  Part of that time, yes, sir.

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.           Professional Court Reporters           (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 6

1  Q. When would you have been in Bridgeville during
2  those years?
3  A. Well, I was there when she got there and I
4  stayed there until February the 27th of 1984 when I was
5  transferred to the drug unit.
6  Q. Right.
7  A. And I came back from the drug unit September the
8  18th of '86, so I was back at Troop 5 after
9  September 15th, 1986. And then I was there until January
10 the 8th of 1990 of which I was transferred to
11 headquarters.
12 Q. So then while you were at headquarters, let's
13 just follow up on that. Okay? So you were at
14 headquarters in 1990.
15 A. Yes.
16 Q. Then let's just track your career a little bit
17 because I think there was a time when you were the
18 commander at Troop 5, too. What happened from 1990
19 forward for you?
20 A. From '94?
21 Q. 1990. You said --
22 A. Okay. From 1990 I went to headquarters on
23 January the 8th of 1990. I stayed there until May of
24 '91. May of '91 I went back in the drug unit. I stayed

Page 7

1  in the drug unit until March of '92. March of '92 I went
2  to Troop 4 in Georgetown and I stayed at Troop 4 until
3  October of '93. However, October of '93 I was at the FBI
4  national academy, so I didn't actually get back to
5  Troop 5 until early '94, like January of '94.
6  Q. When you came back to Troop 5, were you the
7  commander of Troop 5?
8  A. No. I was lieutenant, traffic lieutenant at
9  Troop 5 at that time.
10 Q. The traffic lieutenant?
11 A. Yes.
12 Q. How long did you continue serving there at
13 Troop 5?
14 A. From that time until December of '96. December
15 of '96 I transferred back to headquarters and made
16 captain and went to the traffic section as the director
17 of traffic.
18 Q. Was there a time when you were the commander at
19 Troop 5?
20 A. Yes, sir.
21 Q. When would that have been?
22 A. I came back to Troop 5 on May the 11th of 1998
23 as the troop commander.
24 Q. How long did you continue serving there?

Page 8

1  A. Left there October the 15th of '99. So I was
2  commander for like a year and a half.
3  Q. Then you came back to headquarters on
4  October 15th, 1999?
5  A. Yes, as a major.
6  Q. As the major?
7  A. Of technology.
8  Q. Technology. Right.
9       Then under Colonel Pepper you became the
10 lieutenant colonel. What date would that have been?
11 A. May 30th of 2001.
12 Q. Thank you.
13      Now, was the drug unit part of what they
14 call the strike force or is that separate?
15 A. Special investigations. Part of it was the
16 strike force, yes.
17 Q. Even when you were in the drug unit involved in
18 the strike force, you were living in the Bridgeville area
19 at the time? Is that where your home was?
20 A. West of Greenwood.
21 Q. I'm sorry.
22 A. I've been living west of Greenwood since June of
23 '84.
24 Q. Even when you were doing that undercover work

Page 9

1  and things like that, is it true that you would visit
2  Troop 5 and see the men and women who were serving there?
3  A. Yes, I was there occasionally, yes.
4  Q. Now, Barbara has indicated --
5       MR. LIGUORI: Barbara Conley?
6       MR. NEUBERGER: I'm sorry.
7  BY MR. NEUBERGER:
8  Q. Captain Conley has indicated that there were
9  times when you and she would work as shift mates. Is
10 that true?
11 A. I believe we were on the same shift when she
12 first came down to Troop 5 out of the academy. I'm not
13 100 percent sure, but I remember early on being on her
14 shift for a short time, yes.
15 Q. Okay.
16 A. Or us being on the same shift.
17 Q. Based on your history and, as you can see, she
18 was at Troop 5 from 1982 to 1993, and then she was a
19 patrol shift supervisor at Troops 3 or 5 from 1993 to
20 1997, do you see that?
21 A. Yes.
22 Q. Do you see she spent two years as a traffic
23 lieutenant at Troop 3 from 1997 to 1999?
24 A. Yes, sir.

3 (Pages 6 to 9)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 10

1  Q. Do you see she was a traffic lieutenant at
2  Troop 5 from 1999 to 2000?
3  A. Yes, sir.
4  Q. So, for example, when she was a traffic
5  lieutenant, some of that time she would have been serving
6  under you as the commander of Troop 5; is that correct?
7  A. Yes, sir.
8  Q. So Barbara Conley has indicated that there were
9  times when, aside from working on the same shift, you and
10 she were assigned to the same troop, that is Troop 5. Is
11 that a true statement?
12 A. Yes, sir.
13 Q. Is it true that when you were a lieutenant at
14 Troop 5 she was a sergeant assigned to Troop 5?
15 A. I think part of the time, yes.
16 Q. Then I think I just asked you that.
17     When she was a lieutenant, you were the
18 troop commander for some of the time; right?
19 A. Yes.
20 Q. Then in the year 2000, paragraph 10 indicates
21 that she went to headquarters as the assistant director
22 of the traffic control section. Do you see that?
23 A. Yes, sir.
24 Q. Now, does that accord with your memory, that she

Page 11

1  eventually came as the assistant director of traffic at
2  headquarters?
3  A. Yes, sir.
4  Q. You are aware that from 2001 she began serving
5  as the director of the traffic control section; right?
6  A. Yes, sir.
7  Q. Now, for those years she's been at headquarters
8  from 2000 through the present, let me just ask you, has
9  she been in headquarters from 2000 to the present?
10 A. Yes, sir.
11 Q. You've been serving at headquarters during those
12 years?
13 A. Yes, sir.
14 Q. Captain Conley has indicated that with the
15 exception of her time at Troop 3 in Camden from 1997 to
16 1999, she has been in regular contact with you during her
17 professional career. Do you agree with that statement?
18 A. Mostly. You know, but as you know, the dates
19 when I was in the drug unit are -- was when she was at
20 Troop 5. So although I did stop in there some and I had
21 a little office in the back where I did some of my
22 paperwork, I mean, I don't know that I was in constant
23 contact with her.
24 Q. You wouldn't call it constant?

Page 12

1  A. No, sir.
2  Q. I appreciate that.
3  A. Okay.
4  Q. Now, if we jump ahead on this document,
5  Plaintiff's Exhibit Number 1, let's try to find
6  paragraphs 31 to 35. I'm just going to ask you to read
7  31 to 35 quietly to yourself and then I'm going to ask
8  you some questions about it.
9  A. (The witness reviews the document.)
10 Q. Have you looked at 31 to 35?
11 A. Yes, sir.
12 Q. Just looking at 32, for example, 32, is there
13 something called the Delaware Shield and Square Lodge of
14 Freemasonry that's located here in Delaware?
15 A. It's called the Lower Delaware Shield and Square
16 Club.
17 Q. Does it mention freemasonry in its name?
18 A. No, it does not.
19 Q. Is it a Masonic organization?
20 A. It's an independent body of Masonic order, yes.
21 Q. It's Lower Delaware Club --
22 A. Shield and Square Club.
23 Q. Where is that located?
24 A. Kent and Sussex counties.

Page 13

1  Q. It covers Kent and Sussex counties?
2  A. Yes. There's one in New Castle County, as well.
3  Q. Does it have a meeting lodge somewhere?
4  A. No, does not have a meeting lodge. We have
5  meetings at different places to eat, just like the Lions
6  Club goes to -- I mean, I use the Lions Club as an
7  example. But we go to different places and have our
8  meeting at, like, a restaurant.
9  Q. How long have you belonged to that organization?
10 A. I can't give you an exact date, but probably
11 started sometime in 1985 in that organization.
12 Q. Do you currently hold one of the highest three
13 ranks in freemasonry?
14 A. I'm third-degree Mason.
15 Q. Is it a third or 33rd-degree Mason?
16 A. Well, both.
17 Q. So there is a third-degree Mason title and you
18 hold that?
19 A. Mm-hmm.
20 Q. There's a 33rd-degree Mason title and you hold
21 that?
22 A. Yes.
23 Q. Are you something that's called a master Mason?
24 A. All third-degree masons are master masons.

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

**Page 14**

1  Q. Is the highest degree in freemasonry this
2  33rd-degree Mason?
3  A. Yes, sir.
4  Q. You received that honor sometime in the past
5  several years. Is that true?
6  A. 33rd degree?
7  Q. Yes.
8  A. I received it on the 21st of September of 2004.
9  I just received it last year.
10 Q. Was there some ceremony you went to out in the
11 Midwest to receive the title, or was that awarded to you
12 here?
13 A. I went to Milwaukee, Wisconsin.
14 Q. The Delaware organization that you've described,
15 I forget the title, is it true that it's never had an
16 African-American member?
17 A. I don't believe that it has, no.
18 Q. Is it true that it has never had a female
19 member?
20 A. That's correct.
21 Q. Is it true that only white males may join the
22 Delaware organization to which you belong?
23 A. Are you talking about the Lower Delaware Shield
24 and Square Club?

**Page 15**

1  Q. Yes, the Lower Delaware --
2  A. I'm not sure that we've ever had a black Mason
3  petition it, petition this independent body. I'm not
4  sure of that.
5  Q. So what you are saying is you don't know whether
6  an African-American has ever applied for membership?
7  A. That's correct.
8  Q. If that's correct, that would mean that no
9  African-American has ever been denied membership?
10 A. Not to my knowledge.
11 Q. Are you indicating that you are unaware that any
12 woman has ever applied for membership?
13 A. Yes.
14 Q. Okay.
15 A. I would indicate that, as well. I hadn't, but I
16 will, yes.
17 Q. Now, do you know whether the organization has
18 any written documents that describe the requirements for
19 membership?
20 A. I'm sure that it does.
21 Q. Have you ever seen those documents?
22 A. I probably have, but it's probably been years
23 ago. I'm not sure if I have or not. I know you have to
24 be 21 years of age. But other than that, I'm not -- I'm

**Page 16**

1  not sure.
2  Q. Well, is it true that it indicates you have to
3  be a male to join?
4  A. Yes.
5  Q. Do you know whether it indicates or not that
6  African-Americans can't join?
7  A. I'm sure that it does not indicate that. Blacks
8  have their own Masonic order and women have their own --
9  like a sister organization. The Order of the Eastern
10 Star is the sister organization of Masonic order.
11 Q. The masons historically is an organization that
12 goes back into the 1800s, at least. Would you agree with
13 that?
14 A. I would say it goes farther back than that,
15 probably.
16 Q. Does it go back --
17 A. George Washington was a Mason, so he is the
18 first president of the United States.
19 Q. So when you go down to Alexandria, Virginia,
20 there's that big Masonic Temple?
21 A. Yes, sir.
22 Q. Have you ever been there?
23 A. No. I've been by it, but I haven't been there.
24 Q. So it goes at least back to colonial times?

**Page 17**

1  A. That's correct.
2  Q. That's your understanding of it.
3     Would you agree that before the Civil War
4  in this country that there weren't Masonic organizations
5  that African-Americans belonged to?
6  A. I would imagine that's true, but I don't know
7  that for sure.
8  Q. Now, let me ask you some more questions.
9     So you are saying, I think, you joined the
10 masons sometime in the mid 1980s. Is that what you are
11 saying?
12 A. Joined my blue lodge in 1984.
13 Q. 1984. Okay.
14    Now, give me the name of the Delaware
15 organization again. You called it the --
16 A. Lower Delaware Shield and Square Club.
17 Q. Okay. Lower Delaware.
18    Now, is that a law enforcement component of
19 the masons?
20 A. You either have to be involved in law
21 enforcement or firefighting.
22 Q. Okay.
23 A. But you have to be a Mason first.
24 Q. So it encompasses public safety, meaning

Case 1:04-cv-01394-GMS   Document 75-6   Filed 09/16/2005   Page 16 of 16

Conley                                         v.                          Chaffinch, et al.
Colonel L. Aaron Chaffinch          C.A. # 04-1394-GMS                     June 6, 2005

Page 18

1 firefighting as well as law enforcement?
2     A.   That's correct.
3     Q.   Can a retired public safety officer apply for
4 membership?
5     A.   Sure.
6     Q.   I think what you said was you have to be a Mason
7 to apply?
8     A.   That's correct.
9     Q.   Got you.
10    A.   It's an independent body.
11    Q.   All right. I didn't quite get you, understand
12 you there. Okay.
13         So besides belonging to the Lower Delaware
14 Shield and Square Club here in Delaware, is there a
15 Masonic body in Delaware that you belong to?
16    A.   Yes, there is.
17    Q.   What is the name of that body?
18    A.   Hiram Lodge Number 21.
19    Q.   Hiram, H-i-r-a-m?
20    A.   Yes. It's located in Seaford.
21    Q.   When did you first join the Hiram Lodge Number
22 21?
23    A.   May the 10th, 1984.
24    Q.   When did you join this lower Delaware club?

Page 19

1     A.   You asked me earlier and I told you I couldn't
2 give an exact date, but I would think it's sometime in
3 1985.
4     Q.   So within a couple years of becoming a Mason?
5     A.   Probably within a year.
6     Q.   Within Masonry you've advanced to this 33rd
7 degree?
8     A.   That's correct.
9     Q.   This lower Delaware club, does it have degrees
10 that a person advances or anything --
11    A.   No, sir.
12    Q.   -- or is that --
13    A.   No, sir.
14    Q.   The lower Delaware club, has it ever had a
15 female member?
16    A.   Not to my knowledge.
17    Q.   The lower Delaware club, has it ever had an
18 African-American member?
19    A.   Not to my knowledge.
20    Q.   The Hiram Lodge Number 21 in Seaford, has it
21 ever had a female member?
22    A.   Not to my knowledge.
23    Q.   The Hiram Lodge Number 21 in Seaford, has it
24 ever had a female member?

Page 20

1     A.   Not to my knowledge.
2     Q.   Now, when you were working in Troop 5 during
3 your career and Barbara Conley was working at Troop 5
4 during her career, is it correct that there were other
5 officers, male officers working at Troop 5 who belonged
6 to this lower Delaware club?
7     A.   Yes, sir.
8     Q.   Barbara Conley is going to testify that when she
9 was working at Troop 5 and you were working there, that
10 she was taunted and teased about the fact that everyone
11 on her shift was a member of the lower Delaware club and
12 that she, as a woman, could not become a member.
13         Do you recall that happening?
14    A.   No, sir. It wasn't on that shift.
15    Q.   Now, when you went out to receive this award out
16 in -- I think you said it was Milwaukee in September of
17 2004 from the Masonic order, were there other
18 African-Americans there present at that meeting?
19    A.   Other African-Americans?
20    Q.   Yes. Members of Masonic lodges in other states.
21    A.   Yes, there were.
22    Q.   There are Masonic organizations in states
23 besides Delaware. Is that a fair statement?
24    A.   Sure is.

Page 21

1     Q.   Are they in the 50 states?
2     A.   Sure are.
3     Q.   Do some states allow African-Americans to
4 participate in lodges that men of Caucasian and other
5 races belong to?
6         MR. LIGUORI: Objection. Conclusion. I'll
7 let him answer it if he knows.
8         MR. NEUBERGER: Right.
9 BY MR. NEUBERGER:
10    Q.   You mentioned that there were some
11 African-Americans at the ceremony. I'm asking: Do you
12 know if African-Americans belong to other lodges in other
13 states that whites also belong to?
14    A.   As far as I know, they do in all states, to the
15 best of my knowledge.
16    Q.   Are you aware of any of the lodges in Delaware
17 that are integrated?
18    A.   I've never sat in a lodge that was, but I know
19 some masons that have.
20    Q.   When you attended this ceremony in Milwaukee,
21 were you surprised that there were African-Americans in
22 attendance?
23    A.   No, sir.
24    Q.   Now, when you were working at Troop 5 and during