Conley v. Chaffinch, et al.
Colonel L. Aaron Chaffinch    C.A. # 04-1394-GMS    June 6, 2005

Page 22

1 work hours, would there be times when you and other
2 members of the lower Delaware club would talk about club
3 activities?
4    A.   The only thing that I might say, I might ask
5 another Mason if he was going to go to a meeting that was
6 coming up.
7    Q.   So there would be meetings that would come up
8 and you could talk about are you going to go to the
9 meeting, things like that?
10    A.   Right.
11    Q.   Is there something called recitings, practicing
12 giving speeches that --
13    A.   There's something caught catechisms.
14    Q.   Catechisms.
15         Is that something that the lower Delaware
16 club, an activity that they engaged in?
17    A.   No, it's not.
18    Q.   Is that something that the Hiram Lodge engaged
19 in?
20    A.   Yes.
21    Q.   So for people who were members of the lower
22 Delaware club, did some of them also belong to the Hiram
23 Lodge Number 21 in Seaford?
24    A.   Yes, some of them did, yes, sir.

Page 23

1    Q.   Would practice of some of these catechism things
2 take place on the job, in the back room or something when
3 people weren't preoccupied with their duties?
4    A.   They may have.  I know when I was going through
5 mine I was in the drug unit and I would meet on off time
6 and go back in the room and meet with my instructor.
7         See, when I was going through it, I wasn't
8 attached to Troop 5 at that time.  But now I have met my
9 instructor at Troop 5 on both our off times.
10    Q.   Okay.
11    A.   In a private setting.
12    Q.   I understand.  You would work on this catechism
13 thing --
14    A.   Yes.
15    Q.   -- or other things?
16         Would there be projects you would work on
17 or something in your off time in the back room or
18 whatever?
19    A.   No, sir.
20    Q.   Just the catechism thing?
21    A.   Yes, sir.
22    Q.   How do you understand it, what's the reason why
23 women have to have their own separate auxiliary to belong
24 to the Masons?  Maybe that was a bad question.  I'll

Page 24

1 rephrase it.
2         Why do women have separate auxiliaries from
3 the Masons?
4    A.   I'm not sure.  I guess it's the same reason as
5 the Lions and Lioness, you know, which is the female
6 organization of the Lions Club.
7    Q.   You're proud of the fact that you've
8 successfully moved up to the 33rd degree level of the
9 Masons.  Is that a fair statement?
10    A.   Yes, sir.
11    Q.   Is it true that only a small handful of people
12 in Delaware have ever received the 33rd-degree level?
13    A.   I'm not sure how many.
14    Q.   Was it a common thing during your 20-some years
15 with the Masons?
16    A.   Delaware usually has one or two a year, anyway.
17    Q.   One or two a year?
18    A.   Yes.
19    Q.   Do you know how many members there are of
20 Masonic lodges in Delaware, just to give us a ballpark?
21    A.   I really don't.
22    Q.   No?
23    A.   I know there's a lot of lodges in Delaware, but
24 I don't know how many members.

Page 25

1         MR. NEUBERGER:  I'm going to mark this as
2 an exhibit.  Let's just make this Plaintiff's
3 Exhibit Number 2 for today.
4         (Plaintiff's Exhibit 2 was marked for
5 identification.)
6 BY MR. NEUBERGER:
7    Q.   What I've put in front of you as Plaintiff's
8 Exhibit 2 is a limerick, to use a word to describe it.  I
9 just want you to quietly read it over to yourself.
10    A.   (The witness reviews the document.)
11    Q.   Have you read that over?
12    A.   Yes, sir.
13    Q.   Is that a limerick that you are familiar with?
14    A.   Something close to it.
15    Q.   Do you have --
16    A.   But it's not a limerick.
17    Q.   What would you call it?
18    A.   It actually was a song.
19    Q.   A song.  Okay.  Let's call it a song, then.
20 Okay?
21         You're telling me you are familiar with
22 something similar to that?
23    A.   Yes.
24    Q.   Is that song something you've committed to

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

**Page 26**

1 memory?
2   A.  Yes.
3   Q.  Is that song something you recite on occasion?
4   A.  Yes, it is.
5   Q.  Is it something that you have recited off duty?
6   A.  Yes, it is.
7   Q.  On private occasions?
8   A.  Yes.
9   Q.  Is that something you've also recited on duty on
10 various occasions?
11   A.  I don't believe so.
12   Q.  You don't believe you've every cited it -- let's
13 put it this way -- in the workplace?
14   A.  No, sir.
15   Q.  So it's your testimony that a song similar to
16 this has not been recited by you at any time in a
17 Delaware State Police facility?
18   A.  I don't believe so.
19   Q.  So, for example, down at Troop 5, this song has
20 never been recited by you?
21   A.  I don't believe so in the troop, no.
22   Q.  At the headquarters building since you've been
23 there in 1999 or whatever, whatever the assignments were,
24 you've never recited this in the headquarters building?

**Page 27**

1   A.  I don't believe I have.
2   Q.  Okay.
3   A.  I don't recall it.
4   Q.  There are times when you, as the colonel of the
5 State Police, and previously as a lieutenant colonel, a
6 major or an officer attend functions that the public
7 attends; is that correct?
8   A.  That's correct.
9   Q.  They have the Governors Square Breakfast in
10 Dover they have once a year.  You've attended that on
11 occasions; right?
12   A.  Yes, sir.
13   Q.  You go to things like the CARE conference that's
14 held yearly?
15   A.  Yes, sir.
16   Q.  On these kinds of occasions when you're
17 participating in a function as a representative of the
18 Delaware State Police, have you ever recited this song?
19   A.  Not in -- not in the classroom part of the
20 seminar, but after hours I probably have, yes.
21   Q.  Okay.  Thank you.
22        At the Delaware State Fair, you've
23 participated in the Delaware State Fair as a volunteer or
24 as a representative of the Delaware State Police over the

**Page 28**

1 years; is that correct?
2   A.  Yes, sir.
3   Q.  At the Delaware State Fair, is it correct that
4 you've recited this song?
5   A.  After hours, yes, sir.
6   Q.  Are there after hours at the state fair
7 representing the Delaware State Police?
8   A.  Are there after hours?
9   Q.  Yes.
10   A.  You mean like the fair shuts down, people go
11 home?
12   Q.  No.  Doesn't the Delaware State Police have a
13 presence at the Delaware State Fair providing security
14 and doing various things during the week-long state fair?
15   A.  Oh, yes, sir.
16   Q.  By "after hours" what did you mean?  After
17 everybody goes home or --
18   A.  After the people that are attending the fair go
19 home and the fair shuts down for the evening or for the
20 night.
21   Q.  There's a place where the Delaware State Police
22 representatives assembled.  Do they have a barracks there
23 or how does it work?
24   A.  Yes.  Some stay overnight.

**Page 29**

1   Q.  So by "after hours" you're talking about
2 conversations that would have occurred after hours in the
3 police barracks there?
4   A.  Yes.  Well, actually, not the police barracks or
5 the police office, but where troopers stayed at night if,
6 in fact, they stayed at night.
7   Q.  Exhibit Number 2, in what way does the text of
8 this exhibit differ from the one that you have memorized?
9   A.  Well, there's a lot of lines that are not like I
10 say -- like I learned this when I was a kid.  So, you
11 know, but it is a story about Adam and Eve that I know.
12 But it's much different here on this paper than the way I
13 say it.
14   Q.  For the court reporter, could you just slowly
15 recite the version that you have memorized?
16   A.  Lord he thought he'd make a man, so he took a
17 little water and a little sand.  Adam, he was so powerful
18 blue, he didn't know exactly what to do.  So the Lord
19 took a rib from Mr. Adam's side and made Miss Eve for to
20 be his bride.  He put them in that garden fair.  He
21 thought they'd be so happy there.  Peaches and pears and
22 all that such, but of that tree, you darestn't touch.
23 But around that tree old Satan slunk and at Miss Eve his
24 eye he whunk.  "Eve, them apples look mighty fine.  Take

Page 30

one, gal. The Lord won't mind." So she took a pluck and she took a pull. Went right on, got a basket full.

"The next day when the Lord came around, he spied those cores all over the ground. "Adam, Adam, where art thou?" "Here I is, Lord. I'm a coming now." "Adam, who all these cores did leave?" "Don't know, Lord. Expect it was Eve." "Adam, you must leave this place and earn your living by the sweat of your face." So he took a hoe and he took a plow and that's why we are all aworking now.

The next day when it started to rain, Adam and Eve started raising Cain. That's all there is. There ain't no more. Eve got the apple. Adam got the core.

Q. Thank you.

You say you've been reciting that since you were young?

A. I learned it about ten years old in the 4-H Club.

Q. Would you agree that the message of this song at the end when it talks about Eve got the apple and Adam got the core, the message of the song is that men, generically, have to work because Eve messed up in the Garden of Eden?

Page 31

MR. LIGUORI: Objection. Conclusion.

Go ahead.

A. No, I would not agree with that.

Q. What do you understand to be the message that this song is transmitting?

MR. LIGUORI: Objection. Conclusion.

Go ahead.

A. Would you restate that again, please?

Q. Sure.

I think you've told us that you have recited this song on various occasions during your lifetime; right?

A. That's correct.

Q. And I'm asking you what you understand the meaning of the song to be.

A. I basically think it's just the story of how man began, man and woman began. You know, and it was made up into a song. And that's how I learned it as all other 4-H children learned it.

Q. So it's your testimony you learned this at some 4-H Club?

A. 4-H camp.

Q. Now, when you recite this song, do you dramatize it in any fashion?

Page 32

A. I don't know if I understand exactly what you mean by dramatizing it.

Q. Do you emphasize certain words? Do you use a dialect? Let me do it that way.

Do you use a dialect when you sing the song?

A. If it's called a dialect. It was the same way I was taught it by when I was a kid at 4-H camp. That's the way it was -- that's the way it was distributed to us as campers and that's the way I learned it.

Q. Well, the dialect, is it an African-American dialect when you recite this song?

A. No, it is not. It may be Old English or something of years ago, but it's not an African-American dialect, no, sir.

Q. Have you ever heard the word "Ebonics" as an African-American dialect?

A. I've heard it, but I'm not real familiar with it.

Q. Do you recite it in Ebonics when you recite the song?

A. No, sir.

Q. I think it's your testimony that you never recited this song at Troop 5?

Page 33

A. I don't remember doing it, no, sir.

Q. I think it's your testimony that you have not recited this song in the headquarters building?

A. Don't remember it, sir.

Q. Do you remember reciting this song at a post-Christmas party at Captain Conley's house in 2002?

A. Yes, I do. I was encouraged to do it by Captain Conley.

Q. What were the circumstances that she encouraged you to do that?

A. She just asked me to do the Adam and Eve story.

Q. Do you recall reciting the song in the presence of then-Lieutenant Dixon in the headquarters building?

A. I didn't -- I don't recall reciting it in the headquarters building.

Q. I understand. I'm trying to pry your memory then. I'm giving you somebody who would have been present.

Then-Lieutenant Dixon, when he was working in traffic, do you recall reciting the song in his presence?

A. No, sir, I don't. I may have done it in his presence, but I don't remember it at the headquarters building.

### Page 34

1  Q. Let's look at 39 in Plaintiff's Exhibit Number 1
2  that's in front of you. Paragraph 39 indicates that when
3  you were a major, you were counselled for openly telling
4  a sexually explicit joke during a coed in-service
5  training class. Do you see that?
6  A. Yes, sir.
7  Q. Is it true that around the year 2000 you were
8  reprimanded by Colonel Ellingsworth and Lieutenant
9  Colonel Pepper and Major Waggaman about telling a
10 sexually explicit joke?
11 A. Your statement is partially correct. Colonel
12 Ellingsworth was retired.
13 Q. Were you reprimanded?
14 A. I was counselled by --
15 Q. Counselled. Okay.
16 A. -- by Colonel Pepper and Lieutenant Colonel
17 Waggaman.
18 Q. So at the time it was Colonel Pepper and
19 Lieutenant Colonel Waggaman?
20 A. Yes, sir.
21 Q. Was this in the year 2000?
22 A. Yes, sir.
23 Q. Was it just verbal counselling?
24 A. As far as I know it was, yes.

### Page 35

1  Q. It's not something that you got any suspended
2  time or anything for?
3  A. Not that I was ever made aware of, no, sir.
4  Q. At the time were you a major on the executive
5  staff?
6  A. Yes, sir.
7  Q. Do you recall the nature of the sexually
8  explicit joke or story you told?
9  A. To some degree, yes.
10 Q. Was it at an in-service meeting in front of male
11 and female officers?
12 A. Yes, sir.
13 Q. Was the joke about a female using a vibrator so
14 frequently that it had become the main component of her
15 sex life?
16 A. No, sir, it was not.
17 Q. Did the joke indicate that at some point the
18 vibrator was found on the couch and her father had walked
19 in and said to someone, I want to introduce you to my
20 son-in-law?
21 A. No, sir.
22 Q. Was that part of the joke?
23 A. No, sir.
24 Q. Do you remember what the joke was that you were

### Page 36

1  counselled for?
2  A. Yes, sir.
3  Q. What was the joke?
4  A. The joke was about a daughter of a man and woman
5  that was like 35 years old and apparently had never been
6  married and she was caught by a vibrator by both her
7  mother and her father and that's the way that I said it.
8  And then her father -- the punch line was her father was
9  watching the football game with his son-in-law.
10 Q. Is it true that female members of the in-service
11 in attendance complained about it and that's how Colonel
12 Pepper and the lieutenant colonel found out about it?
13 A. No, sir, there was no female officer that
14 complained about it.
15 Q. How did they find out about it?
16 A. They found out about it by a male officer that
17 was assigned at the academy. Actually, I think they
18 heard about it kind of through the grapevine and then
19 they questioned a person that was assigned at the academy
20 at the time. And he said that, yes, I said that. And
21 then they questioned me about it.
22 Q. So this is while you were still a major?
23 A. Yes. Yes, sir.
24 Q. It was in the year 2000?

### Page 37

1  A. Yes, sir.
2  Q. Do you remember, was it at the beginning or the
3  end of the year?
4  A. March 21st.
5  Q. March 21st?
6  A. It was when I was counselled.
7  Q. Okay.
8  A. I'm not sure what date I was at the in-service.
9  It was early February.
10 Q. Is it true that you did not think you should
11 have been counselled?
12 A. The question was had someone made a complaint,
13 and the answer was no, no one had made a complaint.
14 Q. Is it true that you didn't feel you had done
15 anything wrong?
16 A. No. It was inappropriate. That's why I was
17 counselled.
18 Q. Did you tell others you were angry at having
19 been counselled?
20 A. I may have. I was angry because of the way that
21 I was counselled, not the fact that, you know, that I had
22 said this and that I needed to be counselled for it. But
23 there's a lot of other circumstances that go with that,
24 the reason I was angry.

Case 1:04-cv-01394-GMS   Document 75-7   Filed 09/16/2005   Page 5 of 14

Conley                                    v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch         C.A. # 04-1394-GMS                     June 6, 2005

Page 38

1  Q. When you were counselled, was Colonel Pepper and
2  the lieutenant colonel present during the counselling?
3  A. They sure were.
4  Q. Together?
5  A. Yes.
6  Q. Are you saying you were angry because of the way
7  they counselled you, the tone of their voice, that kind
8  of thing?
9  A. I'm saying they asked me -- they had their
10 secretary tell me I needed to be down to their offices at
11 such and such a time and then I had to wait for like two
12 hours and all this. And then I went in the office and I
13 was ignored for a while. And that part of it was the
14 part I was angry about. If they needed to discuss
15 something with me, discuss it, let's get to the point,
16 get it over with, and whatever needs to happen, happen.
17 That's the reason I was angry.
18 Q. Is it true that that's not the first time you
19 had told that joke in the presence of fellow officers?
20 A. I think it probably was because I learned it
21 from another officer. Another officer is the one that
22 told me that joke.
23 Q. But you're saying this is the first time you had
24 ever said it in the presence of other officers?

Page 39

1  A. Publicly. I think so. I mean, I don't remember
2  telling it -- well, I don't remember, basically.
3  Q. Okay.
4  A. I'm not sure.
5  Q. Is it true you have told that joke subsequent to
6  that occasion in March of the year 2000?
7      MR. LIGUORI: I think it was February. He
8  was counselled in March.
9      MR. NEUBERGER: So just change it.
10     MR. LIGUORI: I don't want to interrupt.
11 BY MR. NEUBERGER:
12 Q. Let me just say: Since February of 2000, you've
13 told that joke again?
14 A. In what setting?
15 Q. While on duty, in an official setting.
16 A. No, sir.
17 Q. Is it true that off duty you've told that joke
18 since then?
19 A. Not that I can remember.
20 Q. Before February of 2000, is it true you've told
21 that joke at Troop 5?
22 A. Not that I can remember. I didn't hear it from
23 anybody from Troop 5.
24 Q. Barbara Conley, Captain Conley has testified

Page 40

1  that sometime during 1999 to 2000 you had told that joke
2  at Troop 5. Does that jog your memory any?
3  A. It really don't because I don't believe -- when
4  I told it in early February, I don't think I had learned
5  it, but before that, you know, in short order before
6  that. I know who told me that joke.
7      MR. LIGUORI: May I ask you one other
8  question about that?
9      MR. NEUBERGER: Yes.
10     MR. LIGUORI: You said Barbara Conley
11 testified. Don't you mean she may testify?
12     MR. NEUBERGER: Right. That was referring
13 to the IA thing. I'll just rephrase that question that
14 way. She would testify to that. Okay?
15     MR. LIGUORI: Okay.
16 BY MR. NEUBERGER:
17 Q. But that doesn't jog your memory about having
18 told that joke at Troop 5?
19 A. No, sir.
20     MR. LIGUORI: I didn't mean to interrupt.
21     MR. NEUBERGER: No. That's fine, Jim.
22 Now, what I've done is I have printed out
23 some limericks this time I think they are. Why don't we
24 mark this next one as Plaintiff's Exhibit Number 3.

Page 41

1      (Plaintiff's Exhibit 3 was marked for
2  identification.)
3      MR. NEUBERGER: Then I have another one.
4  We'll call it PX-4.
5      (Plaintiff's Exhibit 4 was marked for
6  identification.)
7  BY MR. NEUBERGER:
8  Q. I'll ask you to just read it quietly to
9  yourself.
10 A. (The witness reviews the document.)
11 Q. Have you read them over?
12 A. Yes, sir.
13 Q. Just looking at PX-3, these four limericks, are
14 they limericks that you've committed to memory?
15 A. Not exactly.
16 Q. Let's just look. There's four paragraphs on
17 Exhibit 3; right?
18 A. Yes, sir.
19 Q. The very first paragraph, the first four lines
20 about Miss Sarong, do you see that?
21 A. Yes, sir.
22 Q. Is that a limerick you've committed to memory?
23 A. Yes, sir.
24 Q. Let's look at the next one, the next line

11 (Pages 38 to 41)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 42

1  dealing with Trent. That's the second paragraph, six
2  lines there. Is that a limerick you've committed to
3  memory?
4      A.  Not exactly.
5      Q.  Do you have some version of that committed to
6  memory?
7      A.  Yes.
8      Q.  Let's look at the third one, the one about
9  Nantucket. Do you see that, the third paragraph?
10     A.  Yes.
11     Q.  Is that something you've committed to memory?
12     A.  Not exactly.
13     Q.  Is there some version of that that you've
14 committed to memory?
15     A.  Yes, sir.
16     Q.  Then the last paragraph on Exhibit 3, have you
17 committed that to memory?
18     A.  Not exactly.
19     Q.  Have you committed some version of that to
20 memory?
21     A.  Yes, sir.
22     Q.  Then to look to the next exhibit, PX-4, that
23 limerick, have you committed that to memory?
24     A.  Not exactly.

Page 43

1      Q.  Have you committed some version of it to memory?
2      A.  Yes, sir.
3      Q.  Going back to Exhibit 3, I think you've
4  indicated that for the second, third, and fourth
5  limericks on there you've committed some version of those
6  to memory; is that correct?
7      A.  Yes, sir.
8      Q.  Just looking at the second paragraph, the one
9  about Trent, is your version similar to that version?
10     A.  Yes, sir.
11     Q.  The third limerick on Exhibit 3, is your version
12 similar to that Nantucket version?
13     A.  Yes, sir, similar.
14     Q.  How does your version differ from that one?
15     A.  Just a couple words are not the same the way
16 that I say them, but it's the same gist.
17     Q.  What words are different?
18     A.  I don't have the "and" in there on the third
19 word, and I have a "with" after "grin." I don't have
20 "wiping." I'd say it's real close.
21     Q.  Just going back up to the one from Trent, how
22 does your version of this one from Trent differ?
23     A.  I've never said the word "Trent." I've always
24 used "Kent."

Page 44

1      Q.  Kent, K-e-n-t?
2      A.  Yes.
3      Q.  Any other changes?
4      A.  I don't see the third line like that.
5      Q.  How do you say the third line?
6      A.  Actually, I have the fourth line and the third
7  line interchanged with a couple little words different.
8      Q.  So you are saying the fourth line is the third
9  line in yours?
10     A.  Yes.
11     Q.  And the third line moves down?
12     A.  Yes.
13     Q.  Any other differences?
14     A.  That's pretty much the same.
15     Q.  Then the fourth paragraph, the fourth limerick
16 there at the bottom, what differences are there in your
17 version from this version?
18     A.  I don't use "leg." I use "tail."
19     Q.  Okay.
20     A.  And I don't use "foot." I use "end."
21     Q.  "End"?
22     A.  Yes.
23     Q.  E-n-d; right?
24     A.  Yes. And that's it.

Page 45

1      Q.  Then if we go to Exhibit Number 4, this
2  limerick, how does your version differ from this one?
3      A.  I don't have two "up jumpeds" in the first line.
4      Q.  Just one "up jumped"?
5      A.  I don't have two "ups."
6      Q.  So yours just starts off "Up jumped the monkey"?
7      A.  Yes.
8      Q.  Okay.
9      A.  I don't use "mean." I use "cool."
10     Q.  C-o-o-l?
11     A.  Yes.
12     Q.  Okay. Thank you.
13     A.  I don't use "ditty."
14     Q.  What word do you use?
15     A.  "Two-buttoned collar with a three-buttoned
16 stitch."
17     Q.  What else is different?
18     A.  I don't use "loud."
19     Q.  You just don't use that word at all?
20     A.  Right.
21     Q.  What else is different?
22     A.  I don't use "bet anyone." I use "swore to God."
23     Q.  "Swore to God" you say?
24     A.  Mm-hmm.

12 (Pages 42 to 45)

Page 46

1  Q. What else is different?
2  A. Nothing else is different that's there.
3  Q. Okay. Thank you.
4      Now, is it correct that you've recited each
5  of these limericks in the headquarters building?
6  A. No, it's not correct.
7  Q. So it's your testimony that at no time whenever
8  you were assigned to the headquarters building have you
9  recited those limericks?
10 A. Not to my knowledge.
11 Q. Is it correct you've recited those limericks
12 also at Troop 5?
13 A. No, it's not.
14 Q. So it's your testimony that you've never recited
15 any of those limericks at Troop 5?
16 A. Not to my recollection.
17 Q. Is it your testimony that you've never recited
18 any of those limericks in any Delaware State Police
19 facility?
20 A. I don't have any recollection of it.
21 Q. Do you agree that you have recited those
22 limericks at parties?
23 A. Yes, I do.
24 Q. I had mentioned earlier about going to

Page 47

1  conferences like the CARE conference, various other
2  functions that you would attend in some capacity as a
3  representative of the Delaware State Police. Do you
4  remember that?
5  A. Yes, I do remember.
6  Q. Is it true that you recited those limericks at
7  those kinds of functions?
8  A. I may recite them at a CARE conference after
9  hours, like I said, not as part of the seminars that I
10 was attending.
11 Q. How about in the hospitality room at a CARE
12 conference?
13 A. I may have.
14 Q. You'd be wearing a name tag at the hospitality
15 room?
16 A. (No response.)
17 Q. It says "Aaron Chaffinch, Colonel, Delaware
18 State Police" on the name tag?
19 A. I may or may not have had it on. I'm not sure.
20 I mean, we had name tags at the seminars. Whether or not
21 once I went to the hospitality room, whether I still had
22 it or not, I can't recall.
23 Q. These CARE conferences, that's related to
24 traffic; correct?

Page 48

1  A. That's correct.
2  Q. In part of the career you were director of the
3  traffic division in some part of your career; is that
4  correct?
5  A. Yes, sir.
6  Q. You've attended many of these CARE conferences
7  over the years; right?
8  A. Seven.
9  Q. Seven. Okay.
10     Even when you moved on beyond the traffic
11 division, you still have been involved in these CARE
12 conferences?
13 A. That's correct.
14 Q. Are you like an eastern regional person in some
15 capacity?
16 A. I was the chairperson for Region 3.
17 Q. At these seven CARE conferences, there are
18 hospitality rooms?
19 A. I believe that there has been at each one, yes.
20 Q. There are dinners?
21 A. They usually have a banquet, yes.
22 Q. A banquet. There are seminars?
23 A. Yes, sir.
24 Q. Is it your testimony that in the hospitality

Page 49

1  rooms or at a private dinners you may have recited these
2  limericks at a CARE conference?
3  A. I've probably done it at a hospitality room. I
4  don't remember doing it at the dinner.
5  Q. I didn't mean the banquet. I just meant if you
6  are there for a couple days when you have to have other
7  meals there, too, you go out with people, don't you?
8  A. Yes, sir.
9  Q. Do you think you've recited them on those
10 private occasions, too?
11 A. I may have at private occasions.
12 Q. In the presence of Captain Harry Downes and
13 possibly then-Lieutenant Dixon, do you remember reciting
14 these limericks in the headquarters building sometime in
15 the year 2003?
16 A. No, sir.
17 Q. Do you remember reciting the limerick that's
18 found in Exhibit Number 4 about the monkey in Captain
19 Conley's office sometime in 2003?
20 A. No, sir.
21 Q. Would that have occurred in 2002 --
22 A. No, sir.
23 Q. -- in her office?
24 A. Not in her office.

Page 50

1   Q. So that's never happened in her office?
2   A. Not to my knowledge.
3   Q. Just focus on 2003 again. The early part of the
4 2003, I believe Captain Conley will testify that you
5 recited the limerick about the monkey in her office in
6 the early part of 2003. Do you deny that?
7   A. Yes, I do.
8   Q. Do you recall reciting it at the request of
9 Harry Downes in Captain Conley's office?
10  A. I remember having a conversation with Captain
11 Harry Downes and he said that he liked it, he'd like to
12 hear it again. But I do not remember saying it in
13 Captain Conley's office. It seems to me that the
14 conversation was we have to get together at some time for
15 me to do that.
16  Q. Do you recall Captain Glenn Dixon being present
17 when you were having that conversation with Harry Downes?
18  A. No. I remember the conversation with Harry
19 Downes being on the sidewalk outside the headquarters
20 building.
21  Q. Is it true that when you recite a limerick found
22 in Exhibit Numbers 3 or 4, you generally recite them all?
23  A. No, sir.
24  Q. No?

Page 51

1   A. No, sir.
2   Q. So you don't just run through all five in
3 succession?
4   A. No, sir.
5   Q. Do you remember one year when you were actually
6 in charge of the State Police functions at the Delaware
7 State Fair, a year when you were responsible for them?
8   A. Sure do.
9   Q. What year would that have been?
10  A. 1997.
11  Q. Do you recall reciting those limericks at the
12 state fair during that year when you were in charge?
13  A. After hours. I may have after hours. I can't
14 tell you for sure that I did each one of these, but I
15 know that I did some, yes.
16  Q. Let's just focus on the state fair function.
17     There are State Police there. Are they
18 assigned there or are they volunteer?
19  A. They are assigned there.
20  Q. So it's a duty assignment?
21  A. Yes.
22  Q. Are there like rotating shifts during the fair?
23  A. Well, usually you're assigned two or three days.
24 One person might be assigned two or three days and

Page 52

1 somebody else might be assigned two or three other days.
2 There are some people that work the whole time. There
3 are some people that work maybe half of it and somebody
4 else works another half of it. But for the most part,
5 two or three days is usually what people work.
6   Q. But are there people in the barracks who could
7 be on duty or leaving for duty or whatever and people who
8 would be coming off of duty or waiting to start duty?
9   A. Well, the hours that we would be in there, the
10 only ones that I think would be working the grounds
11 unless there would be something that came in that
12 constituted somebody else having to would be the K-9
13 officers. There's two K-9 officers usually every night
14 assigned to the fair from like eight at night till four
15 in the morning. They may have come in and get a cold
16 drink or something in the barracks from the refrigerator
17 or something. But other than that, others are not
18 working that are in the barracks.
19  Q. So, for example, could you be reciting some of
20 these limericks while you're off duty and other people
21 are off duty, but there still could be people going
22 through the barracks who are still on duty?
23  A. The only ones I could think of would be the K-9
24 officers.

Page 53

1   Q. The fair, does it run from seven to ten days?
2   A. Ten days.
3   Q. Ten days?
4   A. Yes, sir.
5   Q. So you're saying, I think, when you were in
6 charge of the public safety function at the state fair
7 for the State Police, you do remember reciting the
8 limericks as you described when you were off duty?
9   A. Yes.
10  Q. There's other years when you've been at the
11 state fair as a major or just somebody assigned there.
12 Isn't that true?
13  A. Oh, yes, sir. I was assigned there quite a few
14 years.
15  Q. On those occasions is it true that you would
16 recite the limericks, also?
17  A. I don't know that I recited them every year, but
18 there may be more than one time that I did it, yes.
19  Q. Okay.
20  A. But like I said, in all cases it would have been
21 after hours in that venue, that barracks.
22  Q. Is it true that you recited the limericks in the
23 presence of retired Colonel Gerry Pepper?
24  A. I may have. I'm not sure. I also know Casey at

### Page 54

1 the Bat and the year that he was in charge of the fair,
2 he asked me to recite Casey at the Bat. But I don't
3 remember actually Colonel Pepper being there.
4    Q. Let's just step back from the fair.
5       I think it's your testimony that aside from
6 the fair, you haven't done it at a State Police facility;
7 right?
8    A. Right.
9    Q. Recited those limericks. Okay.
10      So you're saying it's possible that you did
11 it in the presence of retired Colonel Pepper at the fair?
12   A. He wasn't retired at the time, but I know what
13 you're saying. It may be, but I don't really remember
14 Gerry being there.
15   Q. How about Lieutenant Colonel Waggaman?
16   A. No, sir, I don't ever remember seeing Lieutenant
17 Colonel Waggaman at the fair, to tell you the truth.
18   Q. How about then-Colonel Ellingsworth?
19   A. No, I would have never done it in front of
20 Colonel Ellingsworth. I only remember seeing him at the
21 fair one time and it was during the day.
22   Q. How about in the presence of now-retired but
23 then-Lieutenant Colonel Tom Marcin?
24   A. Are we taking at the fair?

### Page 55

1    Q. At the fair, yes.
2    A. I don't believe so.
3    Q. Do you ever remember reciting any of those
4 limericks in Tom Marcin's presence in a State Police
5 facility?
6    A. No, sir, I don't.
7    Q. Do you ever remember reciting any of those in
8 Tom Marcin's presence off duty?
9    A. I don't really remember, but I may have. I
10 mean, me and Tom Mason are classmates, so we go all the
11 way back to the academy in 1978, so I may have.
12   Q. How about in the presence of now-retired Major
13 Joseph Swiski, would you have recited any of those
14 limericks off duty?
15   A. Joe Swiski may very well been at the fair, at
16 the barracks. He may very well have been there, yes.
17   Q. How about in the presence of now-retired Major
18 Dave Baylor?
19   A. May have.
20   Q. How about in the presence of present-Captain
21 Nate McQueen?
22   A. I'm not sure about whether Nate has been there
23 or not during those times. My guess would be no, but I
24 don't know for sure.

### Page 56

1    Q. How about retired Lieutenant Larry Talley?
2    A. No, sir. Larry Talley has been retired since
3 1987.
4    Q. A long time, right.
5    A. I don't ever remember -- I haven't been in Larry
6 Talley's presence that many times, and I don't think I
7 ever have at the fair.
8    Q. Outside of work, how many times have you
9 socialized with Captain Barbara Conley over the years?
10   A. Outside of work?
11   Q. Outside of work, yes. I know you mentioned this
12 Christmas party. I think she'll testify that probably a
13 handful of times over the years, 20 or more years that
14 she's known you that you have socialized outside of work.
15 What would your recollection of it be?
16   A. What did you say? A half a dozen?
17   Q. A handful I said.
18   A. A handful. Yeah, I'd say that's fair to say.
19 We've been at police parties over the years.
20   Q. Right. People retire, people get promoted, all
21 kinds of things happen?
22   A. Yeah, I'd say that's fair to say.
23   Q. But aside from that, your interactions with her
24 would be on the job?

### Page 57

1    A. I think mostly, yes.
2    Q. At that Christmas party that you mentioned, I
3 think it was an after-Christmas party, December 2002, do
4 you remember that, at Barb's house?
5    A. I think it would have been January of '03, I
6 believe.
7    Q. But that's the time frame?
8    A. Yes.
9    Q. At that time you were the colonel of the State
10 Police?
11   A. That's correct.
12   Q. Did you recite any of these limericks at Barbara
13 Conley's house on that occasion?
14   A. Yes. I previously testified today that I did by
15 your questions.
16   Q. Did you say you recited all of them at that
17 time?
18   A. No, I didn't say I recited all of them. I'm not
19 sure which ones I recited and which ones I didn't. But I
20 remember she encouraged me to do the Adam and Eve story.
21   Q. Right. I know you did that one. What I'm
22 asking is besides the Adam and Eve story, did you recite
23 any of the other limericks that night?
24   A. Yes, I did.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 58

1  Q. Okay. More than one?
2  A. Sure.
3  Q. I want to jump back to one of these CARE
4  conferences. Was there one in the year 2003 at Columbus,
5  Ohio?
6  A. Yes, sir. I believe it was '03.
7  Q. April or May of 2003? Does that ring a bell?
8  A. I'm sure it was in that time frame, yes.
9  Q. In the hospitality room at that time, is it true
10 that you recited all of these limericks?
11 A. I don't know that I recited all of them. I may
12 have recited some of them.
13 Q. Is it true you recited more than one of them?
14 A. Yes.
15 Q. Let's put the Adam and Eve one aside.
16    Is it true you recited a couple of the
17 other five?
18 A. I may have. I'm not sure. But there's a lot
19 more that I can recite than those five, so I can't tell
20 you for sure.
21 Q. Well, I think you're telling me that you got a
22 lot of things memorized; right? You mentioned Casey at
23 the Bat, for example?
24 A. Yes, sir.

Page 59

1  Q. Have you memorized things that don't have sexual
2  connotations?
3  A. Sure. I don't think Casey at the Bat has sexual
4  connotations.
5  Q. So that's what you are telling me. There's
6  certainly things you got memorized that don't have sexual
7  connotations?
8  A. That's correct.
9  Q. Do you have other limericks memorized that have
10 sexual connotations?
11 A. Other than what's on these papers?
12 Q. Yes.
13 A. I'm sure that there may be.
14 Q. Not everything you have memorized has sexual
15 connotations?
16 A. That's correct.
17 Q. My point was back at this CARE conference, you
18 did recite more than one limerick that would have a
19 sexual connotation?
20 A. I can't recall which ones I did, but it may or
21 may not have been. I'm not sure.
22 Q. So it may or may not have been more than one?
23 Is that what you are saying?
24 A. I know I did more than one, but I don't know if

Page 60

1  it was more than one that has something to do with sexual
2  connotations.
3  Q. At that CARE conference, by the way, this one in
4  2003, Major Baylor attended that; is that true?
5  A. That's correct.
6  Q. Then-Captain Dixon was at that; is that right?
7  A. Yes, sir.
8  Q. And Captain Conley was at that; right?
9  A. Yes, sir.
10 Q. Do you tell jokes that have sexual connotations?
11 I'm not talking about limericks. Just talking about off
12 duty at parties. Do you agree that you tell jokes that
13 have sexual connotations?
14 A. I've told all kind of jokes over the years.
15 Q. Let's just go back.
16    Is it true that on the job after you became
17 colonel, let's narrow it down, okay, so let's say October
18 of 2001 you become the acting colonel forward. All
19 right?
20 A. Yes, sir.
21 Q. Is it true on the job you've told jokes that
22 have sexual connotations?
23 A. In -- what's the venue? What's the environment
24 you're talking about?

Page 61

1  Q. Let's talk about on October 26th, the year 2004,
2  the commanders' meeting. So the venue is a commanders'
3  meeting.
4  A. Okay.
5  Q. So it's on the job, you're there as the colonel,
6  you address the commanders. Did you tell a joke at that
7  time about Jimmy Hoffa?
8  A. Yeah, I made one statement about Jimmy Hoffa.
9  Another person brought Jimmy Hoffa's name up in a
10 conversation at the meeting.
11 Q. Up in front of the commanders, did you talk
12 about Jimmy Hoffa organizing labor in the maternity ward
13 at a Baltimore hospital?
14 A. Yes, I did.
15 Q. At that meeting were there 20 or more commanders
16 present?
17 A. Probably.
18 Q. Is that the usual number?
19 A. Yes.
20 Q. Was Lieutenant Alice Bailey present?
21 A. I believe that she was. I'm not sure, but I
22 believe that she was.
23 Q. Did you know that she was offended at your
24 making light of labor in maternity wards?

16 (Pages 58 to 61)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

**Page 62**

1  A. No, I did not.
2  Q. Do you know whether or not Captain Nate McQueen
3  made any comments about your joke?
4  A. Sure don't.
5  Q. A Lieutenant Colonel Collender, are you aware of
6  whether he made any comments about your joke?
7  A. Sure do not.
8  Q. Do you use jokes as like a form of, in public
9  meetings, do you use jokes as a form of like putting
10 people at ease? Why do you tell jokes at public
11 meetings?
12 A. In that particular instance, the only reason I
13 did it was because the officer that was talking about the
14 burglary ring up in Troop 2, that they had solved or they
15 were in the process of trying to solve it in Troop 2,
16 detectives brought the name up and that comment was made
17 to me by a methodist minister years ago that's now
18 deceased about that's where Jimmy Hoffa had been found.
19 So -- but, I mean, I wasn't using that to put people at
20 ease. The only reason it even came to my mind is because
21 that name was brought up by Lieutenant Tom Ford at that
22 meeting.
23 Q. I guess what I'm trying to get at is: Do you
24 regularly try to use humor at meetings in your official

**Page 63**

1  capacity?
2  A. I'd say that's probably fair to say, try to
3  lighten things up a little.
4  Q. You get a bunch of lawyers together and they'll
5  tell jokes about lawyers or whatever. Maybe police tell
6  jokes about policeman?
7       MR. LIGUORI: Judges. We tell jokes about
8  judges.
9  Q. The jokes you tell, they don't all have a sexual
10 connotation, do they?
11 A. No, sir.
12 Q. Do you, in those circumstances, sometimes tell
13 jokes that have a sexual connotation?
14 A. Now you're talking like a commanders' meeting?
15 Is that --
16 Q. Yes. I'm talking about on the job. Let's just
17 go back.
18      There's lots of meetings you attend on the
19 job. Is that a fair statement?
20 A. Yes.
21 Q. For example, you got an executive staff and
22 sometimes you have meetings with them?
23 A. Yes, sir.
24 Q. Then there's these commanders' meetings; right?

**Page 64**

1  A. Yes.
2  Q. There are all kinds of other meetings that you
3  attend that are part of your police functions with fellow
4  officers; is that right?
5  A. Yes.
6  Q. Okay.
7  A. I don't remember ever telling a joke at the
8  commanders' meeting other than what we've already
9  discussed and I don't know that that was a joke. It was
10 just a comment that was a follow-up of what Lieutenant
11 Ford said. I don't remember telling a joke at a
12 commanders' meeting other than -- other than if you want
13 to call that a joke.
14      Other meetings, I mean, I don't get the
15 floor to tell jokes. You know, we have business to
16 attend to. Or we did while I was working. But -- so,
17 you know, I don't just arbitrarily start telling jokes.
18 But, you know, I may try to lighten things up with a
19 little humor. Doesn't necessarily have to be a joke.
20 Q. What I'm getting at is when you use humor, do
21 you sometimes use humor that has a sexual connotation?
22 A. I don't believe so, not in those venues.
23 Q. October 2004, I'm trying to focus on
24 October 21st, 2004, in the presence of Captain Dixon and

**Page 65**

1  the location or the venue would be at Troop 5 in
2  Bridgeville, okay, do you recall being at Troop 5 in
3  Bridgeville around that time?
4  A. What day of the week was October 21st? I mean,
5  I don't really know for sure. I may have been. I'm at
6  Troop 5 occasionally, or I was.
7  Q. Do you recall joking to Captain Dixon about
8  putting mirrors in the commanders' office at Troop 5?
9  A. No, I do not. No, I do not.
10 Q. Nothing at all about --
11 A. None whatsoever.
12 Q. Do you recall joking with Captain Dixon about
13 putting mirrors in the rest room facilities at Troop 5?
14 A. No, sir.
15 Q. Do you recall at that time joking with him about
16 your wife?
17 A. About my wife?
18 Q. Yes.
19 A. No, sir.
20 Q. Do you recall joking with him about not having
21 enough sex in your private life?
22 A. No, sir, I do not.
23 Q. Do you recall joking with him about a hole in
24 your mattress at home?

Case 1:04-cv-01394-GMS   Document 75-7   Filed 09/16/2005   Page 12 of 14

| Conley | | |
|---|---|---|
| Colonel L. Aaron Chaffinch | v.<br>C.A. # 04-1394-GMS | Chaffinch, et al.<br>June 6, 2005 |

Page 66

1  A. No, sir, I do not.
2  Q. Now we'll move away from that date. We'll just
3  talk about joking again in the official setting, meaning
4  during the day. Okay?
5     Do you recall ever joking about women are
6  nothing but trouble, pain in the rear, can't live with
7  them, can't live without them, making those kinds of
8  remarks?
9  A. I do not remember. I don't have any
10 recollection of having a conversation with Captain Dixon
11 or anyone in the workplace with regarding to that.
12 Q. I'm moving away from Captain Dixon. I'm just
13 talking about in the workplace now, Captain Conley being
14 present or other troopers being present.
15    I'm trying to see: Do you recall making
16 these kinds of comments, women, can't live with them,
17 can't live without them, they're frustrating, that kind
18 of stuff?
19 A. No, sir.
20 Q. Did you used to have one of those Blackberry
21 electronic devices?
22 A. The state authorized me to have one, yes.
23 Q. Did you have a funny name for it? Dingleberry?
24 A. No, I did not.

Page 67

1  Q. That wasn't your name for it?
2  A. No.
3  Q. Going back to the 21st, the 21st of October 2004
4  that I was asking you about, I mentioned Glenn Dixon.
5  You heard me say that.
6     Could you have said any of those things in
7  the presence of a Lieutenant Brown or a Lieutenant Rust?
8  A. No, sir.
9     (A recess was taken at this time.)
10 BY MR. NEUBERGER:
11 Q. Let's go back to Exhibit Number 1 and look at
12 paragraph 41 of the complaint, if we could. Okay? I'm
13 sorry. I'm looking at paragraph 37. I jumped ahead
14 there. We'll get to 41.
15    Have you looked at that?
16 A. Paragraph 37?
17 Q. Paragraph 37. Okay? Let me give you some
18 context for that allegation. Okay?
19    We are talking around August of 2003. At
20 that time Captain Conley is the director of the traffic
21 control section. Okay? And I think Lieutenant Dixon had
22 been the lieutenant and he was being transferred out, I
23 think, to go to Troop 5. I guess he had been promoted or
24 something like that and there was going to have to be a

Page 68

1  replacement for Lieutenant Dixon. Okay?
2  A. Yes, sir.
3  Q. As the assistant director. So that's the time
4  frame. Okay?
5     Were you having discussions at that time
6  with Captain Conley about who were the possible people
7  who could replace Captain Dixon?
8  A. We had a conversation about some different ones
9  that could possibly come in as the assistant director,
10 yes, sir.
11 Q. Was the name of Lieutenant Alice Bailey one of
12 the people who came up?
13 A. Yes, it was.
14 Q. There were a couple names that came up during
15 your discussion; isn't that true?
16 A. There's more than two, actually. Three or four,
17 I believe.
18 Q. Now, when Alice Bailey's name came up, did you
19 indicate to Captain Conley that you weren't going to do
20 that because two women could not get along working
21 together?
22 A. No, I did not.
23 Q. So you didn't say that?
24 A. No, I did not.

Page 69

1  Q. So if Captain Conley said you did say that that
2  day, you disagree with her?
3  A. That's correct.
4  Q. You've never known of any problems in the
5  working relationship between Captain Conley and
6  Lieutenant Alice Bailey, did you?
7  A. To the best of my knowledge, they never worked
8  together.
9  Q. You weren't aware of any animosity between the
10 two of them, were you?
11 A. No, sir.
12 Q. Have you ever made that kind of a comment that
13 women can't get along in the workplace?
14 A. No, I have not.
15 Q. That finishes that.
16    Now let's talk about another incident.
17 This is in paragraph 38 of the complaint. Okay? It
18 indicates that when you were a lieutenant, you were
19 disciplined for participating in an incident where a
20 female beared her breasts for money at a party. Let me
21 give you some context. There was a retirement party or
22 some sort of an off-duty event that troopers were
23 attending. Were you present?
24 A. Yes, I was.

Case 1:04-cv-01394-GMS   Document 75-7   Filed 09/16/2005   Page 13 of 14

Conley                                                  v.                                       Chaffinch, et al.
Colonel L. Aaron Chaffinch                   C.A. # 04-1394-GMS                           June 6, 2005

Page 70

1  Q. There had been drinking and there were male and
2  female troopers present and some discussion went on about
3  a female trooper removing the upper portions of her dress
4  jokingly for money. Are you aware that an incident like
5  that occurred?
6  A. Yes, I'm aware that it occurred.
7  Q. Were you the senior person at the time on the
8  scene?
9  A. Well, it depends. I wasn't the senior person at
10 the party, no. Major Pepper, he was a major at the time
11 and he was at the party. And as a matter of fact, I was
12 speaking to him just prior to coming out of the building.
13 And when I realized what was going on over there, I left.
14 Q. Had he left before you did?
15 A. No, he had not.
16 Q. So he was still there?
17 A. That's correct.
18 Q. Was he there when this happened?
19 A. Yes, he was.
20 Q. When she started disrobing?
21 A. Yes, he was.
22 Q. Were you disciplined for this?
23 A. Yes, I was.
24 Q. Were you there when she started disrobing?

Page 71

1  A. No, I was not.
2  Q. But eventually you got disciplined for it?
3  A. That's correct.
4  Q. Who disciplined you?
5  A. Colonel Graviet was the colonel, and I guess he
6  instructed the people in Internal Affairs to, you know,
7  make up a discipline sheet for me.
8  Q. Did you get a couple penalty days or something
9  like that?
10 A. That's correct.
11 Q. How many penalty days did you get?
12 A. I believe I just got one.
13 Q. What supposedly was the infraction that they
14 felt you had committed?
15 A. Well, the main thing that I was told was that I
16 should have put a stop to it? Okay? Instead of leaving,
17 I should have stopped what was going on when I realized
18 what was going on. I don't remember exactly whether they
19 used poor judgment or -- I really don't remember. I
20 mean, I signed off on the sheet and it was gone.
21 Q. Did you tell them that Major Pepper was there
22 and he was the senior person or not?
23 A. They did a pretty extensive investigation. They
24 knew who was there and who wasn't.

Page 72

1  Q. Are you aware, is it possible that other people
2  got written up for it, too?
3  A. I think from the standpoint of me being a
4  lieutenant, I'm the only one of a lieutenant or above
5  that got in a discipline situation.
6  Q. So you are saying Major Pepper didn't get
7  disciplined?
8  A. Sure didn't.
9  Q. Let's look at paragraph 41 of Plaintiff's
10 Exhibit 1, the complaint. Okay? Just look it over
11 quietly. Okay?
12 A. (The witness reviews the document.)
13 Q. Have you read it over?
14 A. Yes, sir.
15 Q. Is it correct when it says you're not
16 circumcised?
17 A. That's correct.
18 Q. Is it correct that you made over the years
19 reference to, quote, having something extra?
20 A. No, sir.
21 Q. So you deny that; right?
22 A. That's correct.
23 Q. Is it correct when it says that you have
24 publicly referred to your penis with a nickname?

Page 73

1  A. No, it is not correct.
2  Q. So you deny that accusation; right?
3  A. That's correct.
4  Q. So do you also deny that you've talked about not
5  being circumcised in front of Curt Brown, Mark Rust,
6  Bruce VonGoerres, and Rich Dennis?
7  A. I've not talked about it in front of them, no.
8  They've talked about it.
9  Q. In your presence?
10 A. Yes.
11 Q. Would they have learned it from you, meaning you
12 had said it at some time in the past?
13 A. No, sir.
14 Q. When they talked about it and said whatever they
15 said, did you tell them that they were wrong?
16 A. I didn't say anything. I just passed it off.
17 Q. So are you saying this is like some teasing
18 that's happened among men joking?
19 A. I would imagine that's what they referred to it
20 as, yes.
21 Q. In the year 2003, 2004, did Rich Dennis start
22 using the term "hooded merganser" when he would talk
23 about you?
24 A. Rich Dennis?

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

### Page 74

1  Q. Is it Rich Dennis? Is that his name?
2  A. That's his name, but I'm not familiar with him
3  talking to me about the hooded merganser.
4  Q. So you are telling me you are unaware of him
5  ever using that term about you?
6  A. I'm not sure if I've ever heard him say it or
7  not.
8  Q. In the year 2003-2004, is it true that this
9  term, "hooded merganser," started to be used?
10  A. Yes, it sure did.
11  Q. Did it happen in your presence?
12  A. It has. It has before, yes.
13  Q. Do you know who gave you that nickname?
14  A. Yes, I do.
15  Q. Who was that?
16  A. Lieutenant Brown.
17  Q. Lieutenant Brown. Okay. He is an experienced
18  hunter?
19  A. Experienced hunter.
20  Q. Does he hunt wild game?
21  A. He does some hunting, yes.
22  Q. Duck?
23  A. Yes.
24  Q. In April of 2004, did you go to a luncheon, an

### Page 75

1  FBI luncheon down in St. Michaels, Maryland?
2  A. No, I did not. I went to Tilghman Island.
3  Q. An FBI thing at Tilghman Island?
4  A. That's correct.
5  Q. Two carloads of people from the State Police?
6  A. Yes, sir.
7  Q. Then coming back you stopped at a place called
8  Cohee's, C-o-h-e-e-s, on Route 404 in Maryland somewhere?
9  A. Yes, we did.
10  Q. During that day, among the group, was this term
11  "hooded merganser" used?
12  A. I'm sure that it was, yes.
13  Q. Did you use it that day during conversations?
14  A. No, sir.
15  Q. So what you're saying is you've never used the
16  term yourself?
17  A. I didn't even know what it was. I do now, but I
18  didn't. I'm not a hunter.
19  Q. Just so I understand, you were aware that
20  various people were referring to you as the hooded
21  merganser; is that correct?
22  A. I knew that at least one was, yes.
23  Q. But you didn't know what the term meant?
24  A. Not initially I didn't, no.

### Page 76

1  Q. You were not using the term yourself?
2  A. That's correct.
3  Q. Now, see if this refreshes your recollection.
4      Was Rich Dennis along with you that day?
5  A. Yes, he was.
6  Q. Was Barbara Conley along?
7  A. Yes.
8  Q. She had attended the thing at Tilghman Island?
9  A. Yes.
10  Q. And Captain Dixon?
11  A. I invited her.
12  Q. Captain Dixon?
13  A. Yes.
14  Q. This was after -- you know what the SOAR meeting
15  was, S-O-A-R?
16  A. I sure do.
17  Q. It was some sort of human relations, let's
18  develop good relationships among the staff, good working
19  relationships, that kind of a thing?
20  A. Yes, sir.
21  Q. Touchy/feeley, expose your souls, be open in
22  communicating, that type of thing?
23  A. I think that's fair enough to say.
24  Q. After this SOAR meeting, you and Captain Conley

### Page 77

1  were partnered up during the SOAR meeting; is that
2  correct?
3  A. Well, you had to pick a coach and I picked
4  Captain Conley for my coach.
5  Q. So she was your coach during the meeting?
6  A. Not during the meeting. It was after the fact.
7  You picked a coach, but you didn't have to tell who your
8  coach was. At some point in time you went and told
9  whoever you'd like to be your coach, and I went to
10  Captain Conley.
11  Q. Did that mean that as a follow-up to the SOAR
12  meeting you and her would have meetings?
13  A. Yes. We would discuss about things that maybe
14  we could change within the organization for the better
15  and that kind of thing.
16  Q. Just so I'm a little straight on this SOAR
17  meeting, I think I heard reference to it over the past
18  couple years or whatever. Was this something like the
19  majors and the captains?
20  A. Staff and the captains, yes.
21  Q. It wasn't lieutenants or people like that?
22  A. I think there was one or two lieutenants there
23  because captains couldn't come for whatever reason, they
24  had another assignment, and so they filled in. For the