| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 78

1 most part, it was captains, majors, and above.
2  Q. Then there was some outside like human
3 relations-type person --
4  A. Yes.
5  Q. -- spoke to you all?
6  A. Mr. Mike Nila, yes.
7  Q. Was it a one- or two-day thing?
8  A. I believe it was two days.
9  Q. What year was it?
10  A. I think it was '03. November of '03, I believe.
11  Q. Where was it held?
12  A. It was held at the Virden Center, Lewes.
13  Q. As a result of that, every person sort of picked
14 a coach?
15  A. They were supposed to. I don't know if
16 everybody did, but I did.
17  Q. Then as part of the follow-up, the instructor at
18 the meeting said there were things you could do with your
19 coach? What did you do? Was this studying catechism
20 somewhere?
21  A. No.
22  Q. What did you do with your coach? That's what
23 I'm trying find out.
24  A. You know, your coach tells you what's on their

Page 79

1 mind and you tell the coach what's on your mind and you
2 try to do for the better of the agency. So we discussed
3 different things involving the State Police.
4  Q. Did you have more than one meeting with Barbara
5 Conley?
6  A. Yes.
7  Q. Over the next -- what? Couple months?
8  A. I probably went down and talked to her -- I
9 don't know -- I'm going to guess four or five times.
10  Q. Then she came along with the group to this FBI
11 meeting we were just talking about; right?
12  A. Yes.
13  Q. Here we are, we are at this place called Cohee's
14 and you stopped on the way home. Were you having
15 something to eat or some refreshments?
16  A. I drank a beer at Cohee's.
17  Q. Well, you got waited on by a waitress?
18  A. Yes.
19  Q. Do you remember if she was an attractive
20 waitress?
21  A. I don't remember too much about her. I went in
22 the building and I went right to the bathroom. I came
23 out. Most people already had their refreshments. I got
24 mine. I drank one. I left.

Page 80

1  Q. Do you recall any teasing among the men and
2 flirting with her because she was an attractive waitress?
3  A. There may have been. There may very well have
4 been.
5  Q. What I'm trying to find out is: Do you recall
6 whether during the course of that sitting down --
7  A. I didn't even sit down.
8  Q. You were standing at the bar?
9  A. Yeah.
10  Q. Do you recall during the course of taking the
11 refreshment that you said something to the effect of
12 maybe I should introduce her, meaning the waitress, to
13 the hooded merganser?
14  A. No, I sure don't.
15  Q. Do you recall saying something like she'd like
16 the hooded merganser?
17  A. No, I did not.
18  Q. Was Roger Willey present, also?
19  A. He was one of the ones that went with us, yes.
20  Q. Glenn Dixon was there, too?
21  A. That's correct.
22  Q. Do you recall on other occasions at Troop 5
23 having discussions with Captain Dixon and your referring
24 to the hooded merganser?

Page 81

1  A. No, I do not.
2  Q. Let's try to give you another date to pinpoint.
3 Let's just move up a little bit. Let's say November
4 2004, shortly after the Thanksgiving holiday, at Troop 5,
5 do you remember being present at Troop 5 on that occasion
6 and explaining to Mark Rust, Captain Glenn Dixon, and
7 some others that you had had a conversation with a
8 relative over the holidays and discussed the hooded
9 merganser?
10  A. No, I do not.
11  Q. Could that have happened in October or November?
12  A. I was in Troop 5 about the date that you
13 explained, but I didn't have any conversation with
14 Captain Dixon. He was in his office and I wasn't in his
15 office.
16  Q. Is there a secretary who has worked for many
17 years at Troop 5 by the name of Carole Warnock?
18  A. Yes, there is.
19  Q. She is a civilian employee?
20  A. That's correct.
21  Q. Let's go to the summer of 2004. Okay?
22    Do you recall having any conversations with
23 Captain Dixon during the summer of 2004 about a female
24 trooper who was having sexual relations off duty with

21 (Pages 78 to 81)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

### Page 82

1 more than one male troopers?
2   A.  I don't recall having a conversation with him,
3 no.
4   Q.  Do you recall in that time frame one or more
5 male troopers just having a conversation with you about
6 having sexual relations off duty with a female trooper?
7   A.  No, I don't.
8   Q.  Do you remember a male trooper relaying to you
9 that there was a female trooper having sexual relations
10 with male troopers and that she would let people, males,
11 watch her masturbate?
12   A.  No, I sure do not.
13   Q.  No?
14       Do you remember having a conversation with
15 Captain Dixon about that kind of an incident?
16   A.  No, I do not.
17   Q.  Do you recall in that time period just simply
18 male troopers explaining to you the exploits of their sex
19 lives?
20   A.  No, I do not.
21   Q.  So since you never had any of these
22 conversations, you wouldn't have had any reactions to the
23 stories that were related to you; right?
24   A.  I didn't know the stories.

### Page 83

1   Q.  If I said that this happened in Captain Dixon's
2 office at Troop 5, would that jog your memory?
3   A.  Sure wouldn't.
4   Q.  No?  Okay.
5       If I expanded the time frame to the end of
6 the summer of 2004, from the beginning of the spring till
7 the end of the summer 2004, would that jog your memory?
8   A.  No, sir.
9   Q.  Let's look at Exhibit 1, paragraph 43, that you
10 allowed other troopers to disrespect Barbara Conley and
11 to call her "Puss."  Has that ever occurred in your
12 presence, other troopers calling her that kind of a
13 nickname?
14   A.  Retired troopers.  I've only heard three people
15 call her "Puss."  That's Ron Thomas, Larry Conley, and
16 Barbara Conley has called herself "Puss."  I've never
17 called her "Puss."
18   Q.  I wasn't asking if you called her that.  I was
19 asking if in your presence -- let's make it active duty
20 troopers.  Let's talk people at the motor pool.
21       Is there a motor pool behind the
22 headquarters building right there in Dover?
23   A.  There's where the mechanics work on the police
24 cars.

### Page 84

1   Q.  Right, right.  There is such a place?
2   A.  Right.
3   Q.  In your presence, haven't those mechanics called
4 Barbara that name?
5   A.  Not that I'm aware of.  Not in my presence.
6   Q.  Not that you are aware of.
7       So you said retired -- was it Sergeant
8 Thomas?
9   A.  No.  Corporal.
10   Q.  Corporal Thomas.
11   A.  Yes.
12   Q.  What was his first name?
13   A.  Ron.
14   Q.  So you say you did hear retired Corporal Ron
15 Thomas call her that?
16   A.  Yes.
17   Q.  Did that happen at the state fair?
18   A.  Yes, it did.
19   Q.  What year did that happen in?
20   A.  I guess it was last year.
21   Q.  So is it true --
22   A.  Either had to be last year or the year before,
23 but I think it was last year.
24   Q.  So it was either 2004 or 2003; right?

### Page 85

1   A.  Yes.  I think it was '4, but I'm not sure.
2   Q.  Is it true that retired Corporal Thomas was
3 acting as a volunteer for the State Police at the state
4 fair?
5   A.  Not to my knowledge.
6   Q.  Okay.
7   A.  I think he was there with his family.
8   Q.  So you don't remember --
9   A.  If he was a volunteer, I wasn't aware of it.
10   Q.  So in your presence, you heard him call her that
11 nickname?
12   A.  That's correct.  And then they embraced each
13 other.
14   Q.  In her presence you heard her call her that
15 nickname?
16   A.  Yes.
17   Q.  You're telling me you have never heard any of
18 the people in the motor pool call her that?
19   A.  No, I have not.
20   Q.  Corporal Thomas, did he, during his career,
21 spend time at Troop 5?
22   A.  Yes.
23   Q.  So did he spend most of his career at Troop 5?
24   A.  Well, early on he was at Troop 4, but he

22 (Pages 82 to 85)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 86

1  probably -- most of his years he probably worked at
2  Troop 5.
3      Q.  You mentioned that occasion.  Is it true that
4  when you were the captain commanding Troop 5, that
5  Corporal Thomas was still on active duty?
6      A.  Yes.
7      Q.  There was a time when you were a shift sergeant
8  at Troop 5; right?
9      A.  Yes.
10     Q.  Corporal Thomas would have been working there,
11 also?
12     A.  Most likely, yes.
13     Q.  Isn't it true that throughout his career he
14 would refer to Captain Conley as "Puss"?
15     A.  He may have, but I didn't hear every time that
16 he referred to her as that.
17     Q.  Certainly you wouldn't have been present all the
18 time.
19         My question is:  Is it true you've heard
20 him refer to her as "Puss" on other occasions besides the
21 state fair?
22     A.  Yes.
23     Q.  Is it true that when he would refer to her that
24 way, you would roll your eyes, meaning you disapproved of

Page 87

1  it?
2      A.  I'm not sure if I would or not.  I may have.  I
3  don't know, but, I mean, I would never call her that.  I
4  wouldn't call any female that.
5      Q.  I understand.
6          But you never admonished Corporal Thomas
7  not to use that nickname for her?
8      A.  Well, we may have been -- as I remember, when we
9  were on the road together, I wouldn't have been in a
10 supervisory capacity.  I may have heard him at some point
11 in time call her that back then, you know, but I don't
12 know that I've ever heard him call her that once I was a
13 supervisor other than what we've already discussed at the
14 fair.
15     Q.  So did you serve on the road with Corporal
16 Thomas?
17     A.  Oh, absolutely.
18     Q.  Was he ever your partner?
19     A.  No, not necessarily my partner, no.
20     Q.  But he would have been on your shift, that kind
21 of thing?
22     A.  I'm not sure if we were ever on the same shift
23 or not, to tell you the truth.  I don't remember going to
24 complaints with him, so we must not have been.

Page 88

1      Q.  But I think you said it's possible you heard him
2  say that nickname on more than one occasion during
3  Barbara's career?
4      A.  That's correct.
5      Q.  I think you're saying that you were never in a
6  supervisory capacity when you heard him use that
7  nickname?
8      A.  I don't believe that I was.  I don't believe
9  that I was.
10     Q.  I think Barbara would testify that when you
11 heard him say that at the state fair, for example, you
12 rolled your eyes indicating disapproval of that.  Do you
13 recall doing that kind of a gesture?
14     A.  I may have done that.  I don't recall.  I'm not
15 sure.
16     Q.  You indicated that you would never refer to a
17 female trooper that way; right?
18     A.  I'd never refer to a female that way.
19     Q.  Why didn't you say something to Corporal Thomas,
20 retired Corporal Thomas at the state fair when he said
21 that?
22     A.  Well, it could have turned into something very
23 ugly if I did because I have no control over him being a
24 retired person, and he could have probably just told me

Page 89

1  what to do real quick.  So I don't understand what the
2  significance would have been other than the situation
3  being worse than it was.
4      Q.  How about in 1999 when you were the troop
5  commander at Troop 5, Barbara, I believe, would testify
6  that in your presence you heard Corporal Thomas using
7  that nickname.  Would you disagree with that testimony?
8      A.  I don't recall.  I don't recall when I was troop
9  commander hearing him say that.
10     Q.  If Barbara testified that he did say that in
11 your presence, is there any reason why you would not have
12 disciplined him for that?  You would have been commander
13 then in a supervisory capacity?
14     A.  I don't remember it.
15     Q.  So you are saying it couldn't have happened,
16 otherwise, you would have disciplined him?
17     A.  I most likely would have told him to knock it
18 off, but I don't remember it when I was troop commander.
19     Q.  I think you are saying most likely if it had
20 happened in your presence, you would have told him to
21 knock it off?
22     A.  I think it would have been the right way to go.
23     Q.  Let's try to get some more specifics to what I
24 was saying about the men in the garage.  Okay?  Let's

23 (Pages 86 to 89)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Case 1:04-cv-01394-GMS    Document 75-8    Filed 09/16/2005    Page 4 of 15

| | | |
|---|---|---|
| Conley | v. | Chaffinch, et al. |
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

### Page 90

1  forget about anybody there using this word "Puss." Okay?
2  Because I think you say you don't recall any of them
3  doing that. Okay?
4     A. Sure don't.
5     Q. Do you remember the men in the garage making
6  comments in your presence when Barbara would leave for
7  lunch with male officers?
8     A. I don't ever remember seeing Captain Conley in
9  close proximity to the garage when I was at the garage,
10 ever.
11    Q. Well, from what I know of the building there,
12 you can come out two side entrances to the building, and
13 if you go to the one that's on the southern part of the
14 building, there's parking on that side of the building
15 and the garage is in the back there; right?
16    A. Yes, sir.
17    Q. So if their cars were parked on that side of the
18 building, they could leave for lunch and people working
19 in the garage could see them. That's physically
20 possible; right?
21    A. It sure is.
22    Q. I think you are saying you were never present
23 when people in the garage would have been making loud
24 comments about Barbara leaving for lunch with male

### Page 91

1  officers?
2     A. If, in fact, they were. I mean, I don't know
3  one way or the other.
4     Q. You're saying you were never present to see that
5  kind of a thing happen?
6     A. Not that I remember.
7     Q. Is it true that there was a running joke going
8  on with the men working in the garage whereby they would
9  keep close watch of who Barbara would be going to lunch
10 with?
11    A. I don't know.
12    Q. No? Okay.
13        Are you aware that she would go to lunch
14 with Sergeant Willey on occasion?
15    A. She may have. I don't know.
16    Q. Are you aware that she would go to work with
17 Lieutenant Glenn Dixon at the time on occasion?
18    A. She may have. I've been to lunch with both of
19 them.
20    Q. Are you aware that they would wolf whistle at
21 her when she would go to lunch with male officers?
22    A. No, I'm not.
23    Q. Are you aware that they would holler in a loud
24 voice at her when she would go to lunch with male

### Page 92

1  officers?
2     A. No, I am not.
3     Q. Do you recall ever asking Captain Dixon whether
4  or not Captain Conley had an inappropriate sexual
5  relationship with Captain Downes?
6     A. No, I do not.
7     Q. No? Okay.
8        You know Barbara is married --
9     A. Yes, I did.
10    Q. -- to retired officer Larry?
11    A. I know Larry.
12    Q. Now, the names of some of these people in the
13 garage, was there a Bill Johnson working in the garage as
14 a mechanic?
15    A. Yes, there was.
16    Q. Was there a Mike Hamilton working in the garage
17 as a mechanic?
18    A. Yes, sir.
19    Q. Let's jump ahead to paragraph 100 in the
20 complaint, if we could, in Exhibit Number 1. In there
21 Barbara Conley indicates that you've called Captain Mary
22 Ann Papili "Norman" after a most wanted criminal fugitive
23 and that you don't do that for male captains. Do you see
24 that?

### Page 93

1     A. Yes, I do.
2     Q. Have you ever used the name "Norman" to refer to
3  Captain Papili?
4     A. No, I have not.
5     Q. You've never done that?
6     A. No, I have not.
7     Q. I'll try to give you some specificity and see if
8  I can jog your memory. Okay?
9        It's 1999. You are the commander at
10 Troop 5. Okay? You were the commander at that time;
11 right?
12    A. Up until October 15th, yes.
13    Q. Barbara Conley at that time, is it true that she
14 was a traffic lieutenant under you at Troop 5?
15    A. That's correct.
16    Q. Do you remember there being a Delaware's most
17 wanted poster at that time and a man named Norman Johnson
18 or Norman Johnston was one of Delaware's most wanted?
19    A. Yes, I do.
20    Q. Do you recall that he bore some slight
21 resemblance to Mary Ann Papili, Officer Mary Ann Papili?
22    A. Well, I was made aware of that by another
23 officer. I really didn't see it when I looked at the
24 photograph and read what was under that, but I was made

**Page 94**

1 aware of that later that somebody had mentioned that.
2    Q. Somebody at the troop did mention that to you?
3    A. Well, they didn't mention it to me at the troop,
4 but they mentioned it and then another trooper was
5 telling me about it. I wasn't at the troop at the time
6 that I was told about it.
7    Q. So it was after you left as commander that --
8    A. No. I was still probably commander, but I was
9 riding up to headquarters one day and somebody mentioned
10 about it and I said, "Oh, maybe there was a resemblance."
11 I said, you know, "Now that I think about it, I think it
12 did look a little bit like Mary Ann Papili."
13    Q. With that context, now, after that point in
14 time, have you referred to her on occasion as "Norman"
15 because some people have said that she looked like this
16 guy on the wanted poster?
17    A. No, I have not.
18    Q. So if Captain Conley testified that in any
19 conversation she had with you where Mary Ann Papili's
20 name would come up, you'd use the word "Norman," you
21 would disagree with that?
22    A. I would disagree.
23    Q. If she testified that between 2001 and 2003,
24 even in headquarters, that you referred to Mary Ann

**Page 95**

1 Papili as "Norman," you would disagree with that?
2    A. I disagree.
3    Q. If she testified that even after becoming
4 colonel you referred to her as "Norman," you'd disagree
5 with that?
6    A. That's correct.
7       MR. LIGUORI: Referred to Mary Ann Papili
8 as "Norman."
9    A. I would disagree.
10    Q. In the complaint in front of us, let's go to
11 paragraph 46. Let's just take a look at that. Have you
12 looked that over?
13    A. Yes.
14    Q. Is there a woman by the name of Trish Roberts
15 who has worked for the Office of Highway Safety since at
16 least 1994?
17    A. Yes.
18    Q. Part of your career you were the director of
19 traffic at the State Police; right?
20    A. Yes, sir.
21    Q. One of the things the director of traffic does
22 is interact with the Office of Highway Safety; is that
23 correct?
24    A. That's correct.

**Page 96**

1    Q. So you would have had business dealings with
2 Trish Roberts while you were the director of highway
3 safety; right?
4    A. That's correct.
5    Q. I'll give you some context. It's around 1994.
6 We are talking about Troop 5. There was going to be a
7 dedication of a new fatal board, fatalities board down at
8 Troop 5.
9    A. Un-huh.
10    Q. Okay? You were going to attend as the director
11 of traffic.
12    A. 1994 I wasn't director of traffic.
13    Q. Right. No. The director of traffic was going
14 to attend. Let's just say that. Who would the director
15 of traffic have been at that time?
16    A. Doug Hancock.
17    Q. Okay. Doug Hancock.
18       Were you present when the dedication took
19 place and Trish Roberts attended?
20    A. Yes, I was there. I was the traffic lieutenant
21 at Bridgeville in Troop 5.
22    Q. So you were the traffic lieutenant?
23    A. I was there at it.
24    Q. It's part of your thing dealing with fatals and

**Page 97**

1 things like that?
2    A. I mean, it was right at Troop 5, so all the
3 administration at Troop 5 would have been there.
4    Q. Did you call her on that occasion "Trish the
5 Dish"?
6    A. To her face?
7    Q. No. To your other officers.
8    A. I may have.
9    Q. How did it come that you gave her that nickname?
10    A. Because it rhymes. I'm good friends with Trish
11 Roberts and her husband and it has nothing to do with any
12 sexual relations. So that's why that part is denied.
13    Q. Okay. All right. I understand what you are
14 saying about the allegation in the complaint. Okay.
15       Have you also publicly stated to her,
16 "You're so sweet, you don't need any sugar"?
17    A. To Trish Roberts?
18    Q. No, no, no.
19       Did you say that in the presence of Captain
20 Greg Warren on some occasion?
21    A. "You're so sweet, you don't need any sugar"?
22    Q. Yes.
23    A. No.
24    Q. Referring to Trish Roberts?

Case 1:04-cv-01394-GMS    Document 75-8    Filed 09/16/2005    Page 6 of 15

Conley                                    v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch        C.A. # 04-1394-GMS                         June 6, 2005

Page 98

1  A. No, I did not.
2  Q. Have you ever said to her, "You're so sweet, you
3  don't need any sugar"?
4  A. To Trish Roberts?
5  Q. To Trish Roberts.
6  A. No, I have not.
7  Q. Do you deny ever using these words, "You're so
8  sweet, you don't need any sugar" to refer to her?
9  A. To refer to Trish Roberts?
10 Q. Yes.
11 A. Yes, I do, I do deny that.
12 Q. Have you used that phrase to refer to other
13 women?
14 A. Captain Conley, when she said to me, "Give me
15 some sugar," I said, "You're so sweet, you don't need any
16 sugar."
17 Q. So you said that to Captain Conley?
18 A. Mm-hmm.
19 Q. Have you said it about anybody else in the
20 Department of Highway Safety?
21 A. No, I have not.
22 Q. Now, when you say "Trish the Dish," do you mean
23 to convey the idea Trish, the delicacy?
24 A. No, I do not.

Page 99

1  Q. Do you mean to convey the idea that she is a
2  very beautiful woman?
3  A. No, I do not.
4  Q. So you're just saying you made it up because it
5  rhymes with her first name?
6  A. That's right.
7  Q. Have you ever referred to her as "Trish the
8  Dish" in the presence of Major Dave Baylor?
9  A. I'm not sure. Probably have.
10 Q. Have you ever referred to her as "Trish the
11 Dish" in the presence of Captain Dixon?
12 A. Probably have.
13 Q. Since you became the acting colonel in October
14 of 2001 through your tenure as the colonel, is it true
15 that you've referred to her as "Trish the Dish" in front
16 of other officers?
17 A. I'm not sure. Probably.
18 Q. We are going to look at paragraph 47 on the
19 complaint in front of you. Okay?
20       Is there a woman who works in the
21 headquarters building by the name of Krista, K-r-i-s-t-a,
22 G-a-l-o, Galo?
23 A. Yes, there is.
24 Q. Is there a woman who works in the headquarters

Page 100

1  building by the name Kristy, with a K, Tuxward,
2  T-u-x-w-a-r-d?
3  A. Yes, there is.
4  Q. Have you ever made comments about them that
5  they're attractive women in the headquarters building?
6  Have you ever said that?
7  A. That they're attractive?
8  Q. Yes.
9  A. May have.
10 Q. Have you ever made comments like "she tears me
11 up" about either one of those women?
12 A. No, I have not.
13 Q. Have you ever made those comments, not to them,
14 but to other officers?
15 A. No, I have not.
16 Q. Have you ever made comments like "I'd love to do
17 her," referring to either of those women, to other
18 officers in the headquarters building?
19 A. Sure have not.
20 Q. Have you ever made that kind of a comment in
21 front of Captain Dixon about those women?
22 A. No, I have not.
23 Q. Kristy Tuxward, she works in human resources,
24 that's correct?

Page 101

1  A. That's correct.
2  Q. Krista Galo, is she one of your personal
3  secretaries?
4  A. Secretary for the majors, but she's up in the
5  same complex, yes.
6  Q. Is there a secretary in the building at
7  headquarters by the name of Laurie Robbins?
8  A. Yes, there is.
9  Q. Does she work upstairs or downstairs?
10 A. Upstairs.
11 Q. Now, the time frame here, we are talking
12 October 1st, 2001, into 2002 when you were either the
13 acting or the actual colonel, did you refer to Laurie
14 Robbins by the nickname of "lemon titties"?
15 A. No, I did not. Someone else referred to her,
16 but I didn't.
17 Q. Did you repeat that phrase that you picked up
18 from someone else about her?
19 A. I never referred to her as that, no.
20 Q. Did you ever call her "LT" for short?
21 A. No, I did not.
22 Q. Did you ever refer to her as "LT" in the
23 presence of Glenn Dixon?
24 A. No, I did not.

Page 102

1  Q. When you were a sergeant back at Troop 5 in
2  Bridgeville, were you a patrol shift commander?
3  A. Yes, I was.
4  Q. Were you on the C shift?
5  A. Yes, I was.
6  Q. Did you sometimes refer to the C shift as the
7  Chaffinch shift?
8  A. I may have, C shift.
9  Q. Well, while you were the shift commander of the
10 C shift, did you go out and purchase T-shirts for the
11 people working on your shifts which had the name
12 "Cockster," C-o-c-k-s-t-e-r, "Shift" on the T-shirts?
13 A. I didn't go out and purchase them, no.
14 Q. Did some of the men under you purchase such
15 T-shirts?
16 A. Yes.
17 Q. Did everybody on the shift get such T-shirts?
18 A. Yes, they did.
19 Q. So did you let the men under you wear T-shirts
20 that said "The Cockster Shift, Delaware State Police,
21 Troop 5"?
22 A. Did I let them wear them?
23 Q. Yes.
24 A. If their off duty, whether they wore them,

Page 103

1  that's up to them.
2  Q. You didn't tell them you disapproved of that?
3  A. No, I sure didn't.
4  Q. You're saying it wasn't your idea to call the
5  C shift the "Cockster Shift"?
6  A. No, it wasn't my idea initially, no.
7  Q. When you learned about it, did you tell them it
8  was a bad idea?
9  A. No, I did not.
10 Q. Did you tell them it was an inappropriate idea?
11 A. No, I did not.
12 Q. There were such T-shirts?
13 A. Yes, there were.
14 Q. What color were they?
15 A. I think they were like a yellow.
16 Q. On the back they had some big rooster?
17 A. Yeah, they had a -- yeah, they did.
18 Q. Now, the time frame for that, was that when you
19 were the sergeant, would that have been late 1980s, 1988,
20 1990?
21 A. 1989. It had "1989" right on it.
22 Q. So the shirt had the year 1989 on it?
23 A. Mm-hmm.
24 Q. Who did pay for the shirts?

Page 104

1  A. I guess we all paid for them, but you asked me
2  if I purchased them. I didn't purchase them. I can't
3  remember who went and got them and had them made up and
4  collected the money and all that, but I'm sure everybody
5  paid their part.
6  Q. Weren't there women troopers working at Troop 5
7  at that time?
8  A. There was a woman on the shift. There was a
9  woman on the shift. Excuse me.
10 Q. Who was that?
11 A. Sharon Dunn.
12 Q. And she got a shirt, too?
13 A. That's correct.
14 Q. Did she purchase one?
15 A. That's correct.
16 Q. Now, if we go to paragraph 49 of the complaint
17 in front of you, do you see that allegation?
18 A. Yes, I do.
19 Q. Do you recall ever recounting a story about the
20 size of a man's penis?
21 A. I heard other people talk about it. I haven't
22 talked about it.
23 Q. See if this refreshes your recollection.
24    In the presence of Captain Dixon, Sergeant

Page 105

1  Willey, do you recall ever recounting a story about a
2  Captain Pulling and you referring to his penis as the
3  size of a tuna can?
4  A. Absolutely not.
5  Q. Just to give you a date, within the year 2002 or
6  the beginning of 2003, would that help you to recall
7  telling such a story?
8  A. I never told the story.
9     MR. NEUBERGER: Off the record.
10    (Discussion off the record.)
11 BY MR. NEUBERGER:
12 Q. Let's look at paragraph 53 of the complaint.
13 I'm really going to try to focus on the last two
14 sentences of paragraph 53. There Captain Conley alleges
15 that since you assumed command of the Delaware State
16 Police, and let's just say that's October 1st of 2001 as
17 the acting colonel and then -- was it -- what? February
18 something of 2002 you became the real colonel?
19 A. Yes, sir.
20 Q. So we are talking about since you assumed
21 command, Barbara Conley is alleging that you've taken
22 steps to lessen her position within the State Police and
23 her section and, for example, you've ignored her at
24 monthly commanders' meetings and you've decreased her

27 (Pages 102 to 105)

Page 106

1 role in those meetings. Let me try to focus on that.
2   Do you deny those allegations?
3 A. That's correct. That's not true.
4 Q. Now, between 1997 and 2000, didn't a director of
5 the traffic division hold monthly traffic meetings with
6 the traffic lieutenants throughout the force?
7 A. Yes.
8 Q. The traffic lieutenants were required to attend
9 those meetings; right?
10 A. That's correct.
11 Q. They dealt with just traffic-related issues; is
12 that right?
13 A. That's correct.
14 Q. The director of traffic would have several hours
15 to pass on pertinent information to the traffic
16 lieutenants at those meetings; is that right?
17 A. I don't know if you would call it several hours.
18 They usually were limited to like a couple hours.
19 Q. I think they were like two to three hours. Does
20 that sound about right?
21 A. I'd say the ones I used to have were no more
22 than two hours because I didn't like for them to be more
23 than two hours. But, I mean, I can't speak for other
24 directors of traffic.

Page 107

1 Q. Just to refresh our minds, what years were you
2 the director of traffic?
3 A. December of '96 until May of '98.
4 Q. Then did Captain Paige succeed you?
5 A. Captain Baylor, I believe.
6 Q. Oh, okay. Captain Baylor succeeded you?
7 A. Yes.
8 Q. That would be Captain Paige after him?
9 A. Yes.
10 Q. Then Captain Conley?
11 A. I believe that's correct, yes.
12 Q. You changed that organizational structure after
13 you became the colonel; correct?
14 A. Changed what colonel --
15 Q. You eliminated those monthly meetings that the
16 director of traffic was having with the traffic
17 lieutenants?
18 A. No, I never eliminated them.
19 Q. Do you agree that they were eliminated?
20 A. They may have been, but I didn't eliminate them.
21 She's commander of the traffic section. She can have a
22 meeting of the traffic lieutenants if she wishes. She
23 don't have to get permission from the colonel to do that.
24 Q. It's your testimony that neither you nor the

Page 108

1 lieutenant colonel operating under your command directed
2 that those meetings be eliminated?
3 A. The first -- I never directed that those be
4 eliminated. I don't know about Lieutenant Colonel
5 Marcin, whether he did or didn't, because he's the first
6 lieutenant colonel I had. I assume that's who you're
7 speaking about.
8 Q. Within a matter of months of your assuming
9 command, is it true that those meetings -- do you know
10 that those meetings ended?
11 A. Seems to me the way it was supposed to be was
12 that she was supposed to get time during the commanders'
13 meeting and then if, in fact, she didn't get the time she
14 needed, she could have a separate meeting.
15 Q. So can we agree that she was directed --
16   MR. LIGUORI: "She" is Barbara Conley?
17 Q. -- meaning Barbara Conley was directed to bring
18 up that subject during the normal commanders' meetings?
19 A. She was supposed to be availed time at the
20 commanders' meeting, yes.
21 Q. So that wasn't her idea? That came up from the
22 chain of command, that idea?
23 A. It didn't come -- it didn't come from me, but it
24 must have come from the majors and the lieutenant

Page 109

1 colonel, I assume.
2 Q. When she was given time during the meetings, is
3 it true she was only given a minimum of five to ten
4 minutes to deal with these traffic issues?
5 A. I know that it was not nearly as much time as it
6 would be if you had a meeting of your own because there
7 was a lot of other things that were being discussed from
8 upstate operations to downstate operations and Kent
9 County operations and so on. But I always thought that
10 they -- and I think in some cases they had a meeting
11 after that meeting with the lieutenants that she did. So
12 she would get her time at that time, you know. So I
13 didn't diminish it.
14 Q. Well, the point is: You do agree that she was
15 directed to bring it up at the commanders' meetings? Did
16 that happen during your watch?
17 A. Everybody that comes to the commanders' meeting
18 gets a chance to bring up whatever they wish to bring up
19 at the commanders' meeting. That's the reason for the
20 commanders' meeting, for communication purposes.
21   But if there's individual things dealing
22 just with traffic lieutenants back at the troop, I don't
23 think that's necessary to be at a commanders'
24 meeting. That should be a separate meeting and she

Case 1:04-cv-01394-GMS   Document 75-8   Filed 09/16/2005   Page 9 of 15

Conley                                               v.                                          Chaffinch, et al.
Colonel L. Aaron Chaffinch            C.A. # 04-1394-GMS                                         June 6, 2005

Page 110

1  should call that meeting with her traffic lieutenants.
2     Q.  Commanders' meetings are largely criminally
3  directed, aren't they?
4     A.  Well, not necessarily. Some meetings may be and
5  then -- it just depends what's the hot topic at the time.
6  You know, sometimes we discuss -- like the Dover Downs
7  and the fair that's coming up, different big functions
8  that we are playing a part in. There's all kinds of
9  things that go on at the commanders' meetings.
10       But, you know, like passing out radar jobs
11 and different things that come through the traffic
12 section shouldn't be a part of the commanders' meeting.
13 That should be a separate meeting that Captain Conley
14 should have with her traffic lieutenants.
15    Q.  We'll look at the records and we'll see what the
16 written records say.
17       Captain Conley is going to testify that she
18 was not allowed to have her monthly traffic meetings with
19 the lieutenants, and your position would be that she was
20 free to have those meetings if she wanted to have them?
21    A.  That's correct. My position would always be
22 that way with any director of traffic.
23    Q.  Then there's this CARE conference that we talked
24 about. What does C-A-R-E stand for?

Page 111

1     A.  In that case it stands for Combined Accident
2  Reduction Effort.
3     Q.  Is that some sort of a national association?
4     A.  It's an association between State Police
5  agencies throughout the United States.
6     Q.  That's been going on for how long?
7     A.  I think about 1979.
8     Q.  1979. Okay. That's something that the State
9  Police was involved in at least when you were the traffic
10 director; right?
11    A.  Way before that.
12    Q.  Way before that the Delaware State Police has
13 been participating in that effort?
14    A.  That's correct.
15    Q.  When you were the director of traffic, you would
16 attend the CARE meetings?
17    A.  Yes.
18    Q.  You got so involved as you became some sort of a
19 regional director?
20    A.  That's correct.
21    Q.  When Captain Baylor was the director of traffic,
22 he would attend the care meetings?
23    A.  He did, and he also did when he was a major.
24    Q.  Yes. Right. In fact, we talked a little

Page 112

1  earlier about you're being present at a specific date of
2  a CARE meeting and he was there, Glenn Dixon was there,
3  Barbara Conley was there?
4     A.  Yes.
5     Q.  Captain Paige, when he was director of traffic,
6  he would attend CARE meetings?
7     A.  I know that he went to one. I'm not sure if he
8  ever went to any other one, but he went to one in
9  New Hampshire that I didn't go to.
10    Q.  How many years was he director of traffic?
11    A.  I'm going to guess a couple, but I don't know.
12    Q.  Now, Barbara Conley has been, since you took
13 over, she's not been allowed to go to all the CARE
14 meetings, has she?
15    A.  Not all of them, no. She went to a couple of
16 them.
17    Q.  One or two? As many as two?
18    A.  I know she went to Columbus. Did you go to
19 Indianapolis? Okay. Maybe you weren't there. Was Jim
20 Paige there in Indianapolis? Okay.
21    Q.  So my point is: Since Barbara Conley became the
22 director of traffic, she's only attended one of the CARE
23 meetings?
24    A.  Okay.

Page 113

1     Q.  There have been four of them since she became
2  the director of traffic?
3     A.  Okay.
4     Q.  CARE, does it help get funding for traffic
5  initiatives? Is it a governmental thing or is it just a
6  voluntary association of state agencies?
7     A.  It doesn't -- there's no funding that comes out
8  of CARE that I'm aware of.
9     Q.  Are there like national standards or efforts
10 that get promulgated and you come back with a plan that
11 helps you for your next year with your traffic function?
12    A.  You compare notes with different states and try
13 to see the best way you can to cut back on fatal
14 accidents and serious injury accidents. That's the main
15 function of it.
16    Q.  You would agree that cutting back on fatal
17 accidents and serious injuries is an important function
18 of the Delaware State Police?
19    A.  And public safety.
20    Q.  Right?
21    A.  Yes.
22    Q.  In fact, is it fair to say that you're committed
23 to the CARE concept because you've been involved with it
24 ever since you got involved back as a director of

Case 1:04-cv-01394-GMS   Document 75-8   Filed 09/16/2005   Page 10 of 15

Conley                                           v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch              C.A. # 04-1394-GMS                       June 6, 2005

Page 114

1  traffic?
2  A. That's correct.
3  Q. You've become a regional director, I think, is
4  what you said of the CARE organization?
5  A. Chairperson.
6  Q. Chairperson; right?
7  A. Yes.
8  Q. So I think you try to attend every year if you
9  can, don't you?
10 A. Yes, I do.
11 Q. Is it like a multi-day conference when they have
12 it?
13 A. Yes, it is.
14 Q. So I guess you would agree that there are
15 important things that happen at the CARE conference that
16 can benefit the State of Delaware?
17 A. That's correct.
18 Q. So the director of traffic has only been allowed
19 to go once during her four-year tenure; is that right,
20 Barbara Conley?
21 A. That's what she says.
22 Q. Is it true that since you took over as the
23 colonel of the Delaware State Police, Barbara has been
24 kept out of the loop on traffic-related events and

Page 115

1  functions?
2  A. With regards to what?
3  Q. Let's talk about a dedication memorial DelDOT
4  created related to victims of fatalities within the
5  state. Do you remember there being such an event?
6  A. Yes, I do.
7  Q. If I gave you a date around October 25th of
8  2004, do you remember such an event?
9  A. I guess that's the date. I remember the event.
10 Q. If barbara would testify as to the date, you
11 probably wouldn't dispute it, would you?
12 A. No, I would not.
13 Q. Is it true that you and the executive staff kept
14 Barbara in the dark about this event, didn't even let her
15 know, and as the director of traffic, she wasn't even
16 invited to this event dealing with fatalities?
17 A. Well, first of all, I didn't know about the
18 function, that it was even going on until my secretary
19 told me it was on my schedule. I didn't exactly know
20 what the function was. I didn't know who was going to be
21 there. I got there late. I saw who was there. Why the
22 Office of Highway Safety didn't pass it up on to the
23 director of traffic, I have no idea. I don't even know
24 how I -- how my office was made aware of it.

Page 116

1  But I remember I had a very busy day, as
2  many days were, and I got up there very late for it. It
3  was a very short thing, I guess, because -- at least once
4  I got there, it was short. I have no idea why Barbara
5  Conley didn't get invited to that, but I had no parts in
6  it whatsoever.
7  Q. So you learned about this event that was on your
8  schedule and you are saying you had a very busy day, and
9  instead of sending your director of traffic, you went?
10 A. No, I'm not saying instead of sending my
11 director of traffic I went. There wouldn't have been any
12 problem for both of us to have been there. And maybe her
13 assistant director, too, as far as that's concerned.
14 But why she wasn't made aware of that, I
15 don't have an answer for that. I don't know. It wasn't
16 like something that I had a lot ahead of time for my own
17 self.
18 Q. Is it true that in the year 2003 the number of
19 fatal accidents in the State of Delaware went up about
20 nine or 10 percent? Or went up? It just went up?
21 A. In 2003, I believe you're right.
22 Q. Then is it true the following year the number of
23 fatals and serious collisions went down?
24 A. Yeah, I think that they did, yes.

Page 117

1  Q. Is it true that Major Seifert was in the chain
2  of command overseeing Captain Conley in that period of
3  time? The chain went up through him?
4  A. He was a part of her chain at some point. I
5  don't know exactly when it switched.
6  Q. But is it true that he nominated her for
7  recognition for the excellent job which had been done in
8  reducing the number of fatals?
9  A. He may have. I'm not familiar with that,
10 either.
11 Q. Are you aware that that recognition and his
12 recommendation was refused?
13 A. No, I'm not.
14 Q. Are you aware he was recommending that her
15 section be recognized for decreasing the number of
16 fatalities and increasing grant funding to reduce
17 pedestrian crashes, things like that? Are you aware of
18 any of that?
19 A. I know that -- I remember that funding was
20 increased.
21 Q. Do you remember deciding that she would not
22 receive an award for any of that?
23 A. No, I do not. I had no part in it.
24 Q. So you are saying you had no part in any

30 (Pages 114 to 117)

Case 1:04-cv-01394-GMS    Document 75-8    Filed 09/16/2005    Page 11 of 15

Conley                                          v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch          C.A. # 04-1394-GMS                           June 6, 2005

Page 118
1  discussions by the executive staff or the lieutenant
2  colonel about whether or not she should receive that
3  recognition?
4     A.  That's correct, I do not.
5     Q.  Captain Mary Ann Papili, she was the first
6  female captain of the Delaware State Police; is that
7  correct?
8     A.  That's correct.
9     Q.  She was promoted by Colonel Gerald Pepper in
10 June of 2001; is that correct?
11    A.  No, it's not.
12    Q.  When was she promoted?
13    A.  I'm not sure exactly when she was promoted, but
14 it was by Colonel Ellingsworth.
15    Q.  Colonel Ellingsworth?
16    A.  That's correct.
17    Q.  Oh, okay.
18    A.  If my recollection serves me correct, it was in
19 1998 that she was promoted to captain, but I may be -- I
20 don't know exactly for sure. But I know that it wasn't
21 2001 when she was promoted.
22    Q.  Because you were the lieutenant colonel at that
23 time?
24    A.  In May of 2001, at the end of May I got

Page 119
1  lieutenant colonel, yes.
2     Q.  So you're saying you know what happened?
3     A.  She was promoted at the same time her husband
4  was promoted to captain, and I believe it was 1998.
5     Q.  Is it true that Colonel Pepper assigned her to
6  command Troop 6 in Prices Corner?
7     A.  Yes, it is.
8     Q.  Do you remember when that assignment --
9     A.  October 15th, 1999.
10    Q.  Did she serve continuously from that time in
11 October of 1999 through --
12    A.  Until she was put in technology in whatever it
13 was, '03, I believe, September of '03.
14    Q.  So you're saying that she served as the troop
15 commander for almost four years?
16    A.  That's correct.
17    Q.  So you're saying she served her normal three- or
18 four-year term as a troop commander, if there is such a
19 thing? Is there?
20    A.  Not that I'm aware of. I mean, I only served
21 for a year and a half and some people served less than
22 that, some people served more. I don't know that there's
23 any normal or abnormal amount of time for troop
24 commanders.

Page 120
1     Q.  Barbara Conley was the second woman promoted to
2  the rank of captain in the State Police?
3     A.  That's correct.
4     Q.  That was a promotion by Colonel Pepper in August
5  of 2001?
6     A.  That's correct.
7     Q.  You would have been the lieutenant colonel at
8  that time?
9     A.  I remember the day.
10    Q.  Did you concur in his decision to promote her?
11    A.  Yes.
12    Q.  Were there any reasons that you were aware of
13 that indicated that she wasn't qualified to be a captain
14 of the Delaware State Police?
15    A.  Not that I was aware of.
16    Q.  You had worked with her over the past?
17    A.  Yes, I had.
18    Q.  I think earlier you indicated the kinds of
19 contacts you'd had with her during your career; right?
20    A.  Yes, sir.
21    Q.  Was there anything in her career as you knew it
22 up to that time that disqualified her from the position
23 of being a captain in the Delaware State Police?
24    A.  Not that I'm aware of.

Page 121
1     Q.  Did you think that she had the temperament to be
2  captain of the Delaware State Police?
3     A.  I didn't see any reason why not.
4     Q.  Did you think she had the intellect to be a
5  captain in the Delaware State Police?
6     A.  As far as I knew, my contact with her.
7     Q.  Did you think she had the managerial ability to
8  be a captain in the Delaware State Police?
9     A.  Yes.
10    Q.  I think you are saying that you're not aware of
11 any characteristics she had which disqualified her from
12 being a captain?
13    A.  Not that I'm aware of.
14    Q.  You agreed with the decision to promote her?
15    A.  I agreed with it. It wasn't -- it wasn't my
16 choice. It was her -- it was captain -- I mean Colonel
17 Pepper's choice. I really didn't have any input into it.
18    Q.  I think I've taken testimony of majors in some
19 of these cases and they've indicated that at least for
20 lower level promotions or assignments, the majors might
21 be involved in making recommendations.
22        Does that happen just on assignments or
23 does that happen on promotions?
24    A.  It happens on promotions. In a lot of cases,

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 122

1  you know, the superintendent goes along with it. In some
2  cases he or she may have a different opinion about
3  something. But, you know, I never heard anything of that
4  nature with regards to Captain Conley.
5     Q.  What I'm saying is: When Colonel Pepper
6  promoted her to captain, that was on the recommendation
7  of the majors?
8     A.  I can't say for sure. I think so, but I can't
9  say for sure.
10    Q.  Well, that is how the system was working back
11 then?
12    A.  Well, it wasn't working the same way when
13 Colonel Pepper was in charge that it worked when I was in
14 charge. Everybody has their own ways of doing things, as
15 you know. And so different superintendents did things
16 differently.
17       So I can't -- I mean, they had staff
18 meetings that I wasn't evolved in. I was part of the
19 staff. So there may have been discussions that I wasn't
20 even privy to.
21    Q.  No. I understand that.
22       I think testimony has been given in some of
23 the other cases that, yes, the majors would have staff
24 meetings and make their own recommendations and all, and

Page 123

1  then that gets shown to the lieutenant colonel, gets
2  shown to the colonel, and of course the buck stops with
3  the colonel and all and the colonel keeps his own
4  confidences or whatever. But the majors play a role. I
5  think I've got testimony like that for certain time
6  periods.
7     A.  Okay.
8     Q.  My question for you is: During this time period
9  when Captain Conley was promoted, isn't it true that the
10 majors were making input to the colonel and the
11 lieutenant colonel when those kinds of promotions were
12 being made?
13    A.  I'm not -- I'm not for sure the answer to that.
14 Sorry. I'm not sure about the answer to that.
15    Q.  This is when you were the lieutenant colonel?
16    A.  It sure was.
17    Q.  So we are saying this is August of 2001 and you
18 do not recall whether or not the majors had any input
19 into the selections of any captains appointed at that
20 time?
21    A.  My guess is yes, but I don't remember
22 conversations going on between the majors with regards to
23 those promotions. I remember when Captain Conley was
24 called up and was told she was going to be promoted. I

Page 124

1  do remember that.
2     Q.  You had no objections to her being promoted?
3     A.  No, sir.
4     Q.  Now, was the next female promoted to captain now
5  Captain Elizabeth Shamany? She was the next female
6  promoted to captain?
7     A.  Yes, the next female promoted was Captain
8  Shamany.
9     Q.  Did that happen in July of 2003?
10    A.  I think that's fair to say. I don't remember
11 exactly, but yeah.
12    Q.  That promotion decision was made by you?
13    A.  That's correct. It sure was.
14    Q.  Former Secretary James Ford, was he a strong
15 advocate of her promotion?
16    A.  He never questioned any promotions that I made.
17 He looked at the list of people and went along with
18 everything. He never questioned anybody.
19    Q.  So he never advocated her being promoted? The
20 captain never had any discussions with you about that?
21    A.  No, not specifically about Betsy Shamany, no.
22 We might have talked about promotions coming up or some
23 different positions that needed to be filled and we
24 needed to fill them. But no, not specific to Betsy

Page 125

1  Shamany, no.
2     Q.  Since you took over as the colonel in October of
3  2001, is it true that no female captain has been assigned
4  to a command position?
5     A.  That is not true.
6     Q.  So who has been assigned to a command position
7  after you took over?
8     A.  All the positions -- all the positions of
9  captains are command positions.
10    Q.  Let's talk about troop commander, then.
11       No female has been assigned to be a troop
12 commander since you took over in October of 2001?
13    A.  That's correct.
14    Q.  Okay. I appreciate that.
15       When you retired in May of 2005, no woman
16 captain was then currently serving as a troop commander?
17    A.  That's correct.
18       MR. NEUBERGER: Let's mark this as the next
19 exhibit. This would be 5. This is the December 1st,
20 2001, Bradley report.
21       (Plaintiff's Exhibit 5 was marked for
22 identification.)
23 BY MR. NEUBERGER:
24    Q.  Now, you remember that after Colonel Pepper

32 (Pages 122 to 125)

Wilcox & Fetzer, Ltd.       Professional Court Reporters       (302)655-0477

Case 1:04-cv-01394-GMS    Document 75-8    Filed 09/16/2005    Page 13 of 15

Conley                                                v.                                      Chaffinch, et al.
Colonel L. Aaron Chaffinch           C.A. # 04-1394-GMS                          June 6, 2005

Page 126

1  retired and you were appointed to be the acting
2  superintendent of the Delaware State Police in October of
3  2001; is that right?
4      A.  Yes, sir.
5      Q.  You remember the governor ordered Lisa
6  Blunt-Bradley, the director of the State Personnel
7  Office, to conduct a review of the operations of the
8  Delaware State Police?
9      A.  That's correct.
10     Q.  This document I put in front of you as
11 Plaintiff's Exhibit 5 is the report that Lisa
12 Blunt-Bradley issued on December 1st, 2001.  Am I
13 correct?
14     A.  Yes, sir.
15     Q.  That was a lengthy report that resulted from a
16 lengthy study conducted by people working for Lisa
17 Blunt-Bradley; is that right?
18     A.  Yes, sir.
19     Q.  That dealt with the areas of recruitment,
20 hiring, training, promotions, discipline, terms and
21 conditions of the employment within the State Police; is
22 that right?
23     A.  Yes, sir.
24     Q.  Then the report also made various

Page 127

1  recommendations; is that correct?
2      A.  Yes, sir.
3      Q.  As part of your tenure as the colonel of the
4  Delaware State Police, you were charged with trying to
5  implement these kinds of changes and recommendations; is
6  that correct?
7      A.  Yes, sir.
8      Q.  I think you made various public statements
9  endorsing the objectives and the goals of the Bradley
10 report.  Is that a fair statement?
11     A.  Say that again, please.
12     Q.  Sure.
13         I think you made, after the report was
14 issued, I believe, you've made various statements in the
15 press and on other occasions endorsing the objectives and
16 goals of the Bradley report?
17     A.  I made some.  I don't know what you consider
18 "various," but I made two or three, yes.
19     Q.  What I'm saying is: You weren't an opponent of
20 the Bradley report?
21     A.  Absolutely not.
22     Q.  You were part of the team of the Bradley report?
23     A.  That's correct.
24     Q.  I want to ask you some questions about some

Page 128

1  things that are mentioned in the Bradley report.
2         Let's turn to page 47.  If we look at page
3  47 of the Bradley report, item number 6, it indicates
4  that "It is recommended that the State Personnel Director
5  conduct a Roundtable on Women in Policing," and then it
6  goes on.  Do you see that?
7      A.  Yes, I do.
8      Q.  Is it true that before he retired, Lieutenant
9  Colonel Tom Marcin, who was working under you, was taking
10 steps to try to implement this component of the report?
11     A.  He had been in contact with Lisa Blunt-Bradley
12 with regards to that, that's correct.  But as you can
13 see, the recommendation says for her to conduct the
14 roundtable.
15     Q.  Is it true that Lieutenant Colonel Tom Marcin
16 began to put this roundtable together?
17     A.  Yes.
18     Q.  Are you aware that he got Barbara Conley
19 involved in putting that roundtable together?
20     A.  I'm not sure of which females from the agency
21 that he contacted, to tell you the truth.
22     Q.  So you are not aware that Barbara Conley was
23 involved in the project with him?
24     A.  No, I'm not.  I know that Lisa would call and

Page 129

1  asked to have -- you know, she may say a particular
2  number of female office that she wanted and Tom would
3  take care of that, but I don't know -- I wouldn't know
4  which office -- or which female officers he contacted to
5  help with this.
6      Q.  Are you aware that he arranged for one meeting
7  of this roundtable involving female officers to occur?
8      A.  I know that we had a meeting with female
9  officers.  Now, I don't know if this is something
10 separate from the meeting we had or not.  I'm not sure.
11     Q.  Well, let me tell you some of the things that
12 happened at this meeting and see if that rings a bell in
13 your mind or reminds you.
14        Do you remember the female officers
15 bringing up the issue of there being no woman's bathroom
16 at the State Police firearms training unit and that being
17 rectified?
18     A.  Not for sure.  Not the meeting that I was at, I
19 don't believe so.  I must have not been at that meeting.
20     Q.  Do you remember that there was a meeting where
21 they discussed the Delaware State Police's lack of
22 support in sending women to conferences which dealt with
23 women in law enforcement issues?
24     A.  We may have hit on that at the meeting I was at.

33 (Pages 126 to 129)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 130

1   Q.  Do you remember that meeting addressing the
2  follow-up that would be necessary to continue this
3  woman's roundtable?
4   A.  No, I wasn't -- I couldn't have been at that
5  meeting.
6   Q.  Just to give you a date, now, do you recall that
7  this meeting, this one meeting I'm talking about,
8  happened in the first half of 2003?
9   A.  Do you know where it happened, where it was
10 held?
11  Q.  In the headquarters conference room.
12  A.  Okay.  That's where the one was that I went to.
13     CAPTAIN CONLEY:  He was not at this
14 meeting.
15     MR. LIGUORI:  The record should reflect
16 that the plaintiff says my client was not at this
17 meeting, so maybe we can move on.  Maybe it is a good
18 time to break.
19     MR. NEUBERGER:  We can finish these two
20 things here and then we can break.  Get that out of the
21 way.  Okay?
22     MR. LIGUORI:  Okay.
23 BY MR. NEUBERGER:
24  Q.  So you told us you don't recall attending a

Page 131

1  meeting in the first half of 2003 in the conference room.
2  Is that what you are saying?
3   A.  No, I do not.
4   Q.  My question to you is: After Tom Marcin left,
5  did you take any steps to continue the lieutenant
6  colonel's work on the roundtable on women in policing?
7   A.  To answer that, I will have to say that I had
8  phone calls, like I said, from Lisa Blunt-Bradley and she
9  would ask for a certain number of females to meet with
10 regards to this.  And I would say, fine, we'll get that
11 taken care of.  And I would pass that on to the
12 lieutenant colonel.
13     If the lieutenant colonel left and there
14 was somebody acting in that capacity, I would have passed
15 it on to them, which shortly after the lieutenant colonel
16 left, we had a new lieutenant colonel, Thomas MacLeish,
17 who I would have passed it on to him.
18     But I did not attend that meeting, so I
19 didn't keep up with what was discussed at that meeting.
20 I only know that whenever Lisa Blunt-Bradley contacted
21 me, I passed the information on so that it could go
22 forward.
23  Q.  Well, is it true that there was only one meeting
24 of this roundtable on women in policing?

Page 132

1   A.  I'm not sure.
2   Q.  If Barbara Conley testified that there was only
3  one meeting of the roundtable on women in policing, do
4  you have any information that would contradict that?
5   A.  No, I do not.
6   Q.  If Barbara Conley testified there is no
7  continuing roundtable on women in policing occurring in
8  the Delaware State Police, do you have any information to
9  contradict that?
10  A.  I don't have any information either way, one way
11 or the other.
12  Q.  If we look at page 49 of the Bradley report
13 that's in front of you as Exhibit 5, there is a paragraph
14 3 there about the Delaware State Police should create a
15 diversity committee.  Do you see that?
16  A.  Yes.
17  Q.  Do you agree that that was one of the
18 recommendations of the Bradley report to ensure
19 accountability in the Delaware State Police?
20  A.  Yes.
21  Q.  Is it true that the Delaware State Police does
22 not have a diversity committee?
23  A.  No, it is not true.
24  Q.  When was the diversity committee created?

Page 133

1   A.  It was created soon after I took over.
2   Q.  Who is on the committee?
3   A.  People from the outside such as Tony Allen;
4  Debbie Harris-Nock, a black female; Drew Fennell from
5  ACLU; there's a Hispanic couple downstate, Al Chavez and
6  Betty Arnold is on that committee.  And also I'm trying
7  to think of one guy's last name that's not coming to me
8  right now.  There's like eight or nine people on that
9  committee.
10  Q.  We are not talking about a civilian review board
11 or anything.
12  A.  I'm not talking about a citizen review board.
13 We don't have a --
14  Q.  Okay.  Paragraph 3 talks about reconstituting a
15 department-wide diversity committee, the Delaware State
16 Police creating its own committee.  You've told me about
17 a committee that's got all these outside people on it.
18     Is it true that the Delaware State Police
19 did not create a diversity committee within the
20 membership of the Delaware State Police consisting, for
21 example, of African-American members, consisting of
22 female members, and consisting of other unrepresented
23 groups?
24  A.  We created a lot of different committees

34 (Pages 130 to 133)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Case 1:04-cv-01394-GMS   Document 75-8   Filed 09/16/2005   Page 15 of 15

Conley                                          v.                           Chaffinch, et al.
Colonel L. Aaron Chaffinch        C.A. # 04-1394-GMS                          June 6, 2005

Page 134

1  depending on what the issue was.
2         For example, we created a committee to help
3  to work through a new promotional system, and that was
4  diverse. We created a committee to work through a new
5  discipline procedure within the State Police or make
6  changes that would be better, and that was a diverse
7  group.
8         And so as far as creating diversity
9  committees, we have done that.
10    Q.  Well, I think you're telling me that when the
11 Delaware State Police has created committees, it's had a
12 diverse membership. You've made sure that you had female
13 members, African-American members, various groups on the
14 committees. You definitely just told me that.
15    A.  Correct. And people with different --
16    Q.  Perspectives?
17    A.  -- tenure within the agency, new people, people
18 that have been on awhile, and then the real dinosaurs, if
19 you will.
20    Q.  Paragraph 3 of the report does not appear to be
21 directed to how various committees in the Delaware State
22 Police are constituted. Paragraph 3 appears to be
23 talking about an overarching committee whose function is
24 addressing the diversity function in the State Police.

Page 135

1  Do you agree with that?
2         MR. LIGUORI: Objection as to conclusion.
3         You can answer.
4     A.  I -- I mean, I guess anyone could look at it and
5  think it means something different. But from a
6  standpoint of a diversity committee, you know, I think
7  we've made strides during my tenure as a superintendent
8  with regards to diversity committees.
9     Q.  I understand what you are saying about you've
10 made sure that committees and groups are diverse; right?
11    A.  Yes.
12    Q.  What I'm talking about is: Is there a
13 department-wide diversity committee that has a charge to
14 be dealing with diversity issues? I'm unaware of such a
15 committee. Is there one?
16    A.  I guess the way that you are putting it, no,
17 there's not one.
18    Q.  Are you aware of whether there was resistance to
19 setting up such a diversity committee within the
20 executive staff?
21    A.  No, I'm not. I know that there was some things
22 with regards to roundtable or women in policing. There
23 was something that we were going to get involved with and
24 there was a money issue. And it was going to be $25 per

Page 136

1  attendee. And because of money situation, we couldn't do
2  that. So we did it with executive staff and a small
3  portion of captains.
4         But as far as there being resistance, I'm
5  not aware of it. I mean, you know, money is a situation
6  that runs everything, so you got to have money and
7  that's -- you know, you crawl before you walk, if you
8  will, and that's what we were trying to do.
9         MR. NEUBERGER: It's ten of one, so I think
10 now would be the time to recess for lunch.
11        (A luncheon recess was taken at this time.)
12        (Stephen J. Neuberger, Esquire, is now
13 present in the deposition room.)
14 BY MR. NEUBERGER:
15    Q.  Let's look at the complaint in front of us,
16 Exhibit Number 1. We are going to look at paragraphs 94
17 to 100, if you can find it on page 17. 94 indicates that
18 no woman has ever been promoted to the rank of major,
19 lieutenant colonel, or colonel of the State Police.
20        You agree with that statement, don't you?
21    A.  Yes, sir.
22    Q.  If we go to 95, this is talking about the
23 Bradley report. Okay? So we can turn to pages 8 and 11
24 of Exhibit Number 5 that's in front of you. So we talked

Page 137

1  about the Bradley report a little earlier. If you look
2  at page 8 there at the bottom, there's some statistics
3  given. At this time it indicated that 90 percent of the
4  State Police were males and 10 percent were females.
5         Do you see that in the middle of that
6  paragraph on the bottom?
7     A.  Yes, sir.
8     Q.  As of that time, the time they collected their
9  data around December of 2001, that was a true statement,
10 wasn't it?
11    A.  Yes, sir.
12    Q.  Then if we flip ahead to page 11 in the Bradley
13 report, at the bottom there, you see where it says
14 "Demographics"?
15    A.  Yes, sir.
16    Q.  There the Bradley report indicated that at that
17 time of approximately 608 troopers, 64 were women and
18 that was 10.52 percent. Do you see that?
19    A.  Yes, sir.
20    Q.  At that time those were correct statistics; is
21 that correct?
22    A.  As far as I know, sir.
23    Q.  Then if we go to page 12, do you see where
24 there's a category here that talks about "Delaware State