Conley                                                    v.                                    Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                              June 6, 2005

| Page 138 | Page 140 |
|---|---|
| 1 Police Workforce Statistical Analysis"? | 1    A.  To the best of my knowledge, yes, sir. |
| 2    A.  Yes, sir. | 2    Q.  When we go up to the female part of it at the |
| 3    Q.  Do you see the fourth paragraph down, it talks | 3 top where it says "Female Representation" and there's |
| 4 about "The Professionals EEO-4 Category includes | 4 four columns, EEO, labor market, Delaware State Police |
| 5 Lieutenants, Captains, and Majors"? | 5 percentage, and percentage available, do you see that? |
| 6    A.  Okay. | 6    A.  Yes, sir. |
| 7    Q.  Do you see that paragraph? | 7    Q.  If we look under "Professionals," do you see the |
| 8    A.  Yes, sir. | 8 second line, "Professionals"? |
| 9    Q.  Do you see that it indicates that female | 9    A.  Yes, sir. |
| 10 representation actually had decreased from 5.9 percent on | 10   Q.  Now, as I understand it, the "Professionals" |
| 11 October 1st, 1999, to 5.3 percent on October 1st, 2001. | 11 category would include majors.  Do you understand that's |
| 12 Do you see that? | 12 how the EEO works? |
| 13   A.  Yes, sir. | 13   A.  No, I really don't.  I would have thought it |
| 14   Q.  That was a correct statistic at that time, | 14 would have been under "Administrators," but maybe I'm |
| 15 wasn't it? | 15 wrong. |
| 16   A.  To the best of my knowledge. | 16   Q.  For now why don't we just accept my |
| 17   Q.  Then if we go on, I think we are going to stay | 17 representation that professionals includes majors, and |
| 18 in that same paragraph, let's go to the next page, page | 18 then it's saying the labor market availability in that |
| 19 13, do you see where there's at the top there a grid of | 19 category is 55 percent.  Do you see that? |
| 20 female representation? | 20   A.  Yes, sir. |
| 21   A.  Yes, sir. | 21   Q.  Then it says the percentage of females in the |
| 22   Q.  Then underneath that, minority.  Do you see | 22 Delaware State Police in that category is just 5 percent. |
| 23 that? | 23 Do you see that? |
| 24   A.  Yes, sir. | 24   A.  Yes, sir. |

| Page 139 | Page 141 |
|---|---|
| 1    Q.  Let's just look at the female.  Okay? | 1    Q.  Do you see the last column indicates that |
| 2    A.  Yes, sir. | 2 they're 50 percent below the labor market availability in |
| 3    Q.  The paragraph after minority before leadership, | 3 the professionals category?  Do you see that? |
| 4 it starts:  "This comparison indicates," do you see that | 4    A.  Yes, sir. |
| 5 sentence? | 5    Q.  That was a correct statistic at that time, too, |
| 6    A.  Yes, sir. | 6 wasn't it? |
| 7    Q.  Let me read it to you.  "This comparison | 7    A.  To the best of my knowledge. |
| 8 indicates that Delaware State Police is underrepresented | 8    Q.  All right.  I think we are done with that. |
| 9 in all EEO-4 Categories when it comes to minorities." | 9        Let's address the two promotions to major |
| 10       Do you see that? | 10 that you made and that are at issue in this case.  We are |
| 11   A.  Yes, sir. | 11 going to start focusing on that process.  Okay? |
| 12   Q.  Then it says:  "The problem is even greater when | 12       First of all, in her complaint, if we look |
| 13 looking at female representation." | 13 at Exhibit 1, let's turn to pages starting at the bottom |
| 14       Do you see that? | 14 of page 3, paragraph 8. |
| 15   A.  Yes, sir. | 15       You know that Barbara Conley was a graduate |
| 16   Q.  Then it indicates:  "Delaware State Police is | 16 of Caesar Rodney High School in Camden? |
| 17 underrepresented in all EEO-4 Categories for women, and | 17   A.  Yes, sir. |
| 18 except for the Protective Services Category, the | 18   Q.  You know that she holds two associate's degrees |
| 19 percentage of female under-representation is much higher | 19 in correctional science and police science from DelTech? |
| 20 than minority under-representation." | 20   A.  I didn't know that until I read this, but I know |
| 21       Do you see that? | 21 it now. |
| 22   A.  Yes, sir. | 22   Q.  Are you aware that she was on the dean's list |
| 23   Q.  Those were correct statements at that time, | 23 with a GPA of 3.67 when she was there? |
| 24 also, weren't they? | 24   A.  According to what I read, yes, sir. |

36 (Pages 138 to 141)

A116

Conley                                              v.                          Chaffinch, et al.
Colonel L. Aaron Chaffinch              C.A. # 04-1394-GMS                      June 6, 2005

Page 142

1    Q.   You don't dispute that?
2    A.   No, sir.
3    Q.   You had information like that available to you
4    when you made the two promotions to major that were at
5    issue in this case; right?
6    A.   Sure.
7    Q.   You had her personnel file available to you?
8    A.   That's correct.
9    Q.   Aside from the fact that you had worked with her
10   over the years?
11   A.   Yes, sir.
12   Q.   Do you agree that when you made the two
13   promotions in this case, she had as part of her record
14   having been selected the outstanding criminal justice
15   student by former Superintendent James L. Ford, Jr.?
16   A.   Was I aware of that then?
17   Q.   Yes.
18   A.   No.
19   Q.   You don't dispute that that's a fact, do you?
20   A.   No, I don't.
21   Q.   Did you have that information available to you
22   at the time she was promoted to be a major?
23   A.   Sure.
24   Q.   She wasn't --

Page 143

1    A.   I had her personnel file available as I did all
2    captains.
3    Q.   At that time do you also agree that she held a
4    Bachelor of Science and a general studies degree from
5    Wilmington College?
6    A.   I know she just recently finished that not too
7    long ago.
8    Q.   Okay.
9    A.   I know she was working on it.
10   Q.   Did you know she had a high cumulative average
11   at Wilmington College?
12   A.   It didn't surprise me when I saw what this
13   stated.
14   Q.   This says she had an average of 3.87.  You don't
15   disagree with that, do you?
16   A.   No, sir.
17   Q.   The Delaware State Police also sent her to
18   Northwestern University School of Police Staff and
19   Command; is that correct?
20   A.   Yes, sir.
21   Q.   When these promotions were made, you were aware
22   that she was a 1999 graduate of that school; right?
23   A.   Yes, I sure was.
24   Q.   Were you aware that she had an average, a grade

Page 144

1    average of 3.89 when she was there?
2    A.   No, I wasn't, but I don't dispute it.
3    Q.   That kind of information would have been
4    available to you when you made your promotions to major;
5    is that correct?
6    A.   That's correct.
7    Q.   Then we mentioned a little earlier paragraph 10,
8    the various duty assignments she had; right?
9    A.   Yes, sir.
10   Q.   You were aware of those duty assignments and
11   responsibilities she had when you made your promotions to
12   major; is that correct?
13   A.   Yes, I was.
14   Q.   So if we jump to March of 2003, Major Joseph
15   Swiski was the administrative budget major at that time;
16   right?
17   A.   Yes, sir.
18   Q.   Then he retired?
19   A.   Yes, sir.
20   Q.   Then somebody had to be selected to be his
21   successor; right?
22   A.   That's correct.
23   Q.   You selected Captain Paul Eckrich?
24   A.   That's correct.

Page 145

1    Q.   Then later on Lieutenant Colonel Tom Marcin
2    retired and you selected Thomas MacLeish to be your
3    lieutenant colonel; is that right?
4    A.   Yes, sir.
5    Q.   That created a vacancy in the position that Tom
6    MacLeish held?
7    A.   That's correct.
8    Q.   He was responsible for operations for Kent and
9    Sussex counties?
10   A.   Yes, sir.
11   Q.   Is it called field operations for Kent and
12   Sussex?
13   A.   Either one is fine.
14   Q.   You selected as his successor Captain Randall
15   Hughes; is that correct?
16   A.   Yes, sir.
17   Q.   What was the process that you and the Delaware
18   State Police followed at that time to fill those two
19   vacancies?  Were there any written rules or regulations
20   that you issued?
21   A.   No, sir.
22   Q.   Were there any preexisting written rules or
23   regulations that guided you in selecting the person for
24   those two positions?

37 (Pages 142 to 145)

A117

Conley                                           v.                          Chaffinch, et al.
Colonel L. Aaron Chaffinch              C.A. # 04-1394-GMS                    June 6, 2005

Page 146
1    A.  You mean that I may have inherited from the
2  previous superintendent?
3    Q.  Yes.
4    A.  Not to my knowledge.
5    Q.  I know, for example, that with reference to
6  lieutenants and sergeants, there's testing and there's
7  bands and things like that.  At that time the Delaware
8  State Police was using that process for those ranks;
9  right?
10   A.  For sergeant, lieutenant, captain, yes.
11   Q.  And for captain, too?
12   A.  Yes.
13   Q.  I remember seeing information about boards of
14 people who might interview captain candidates.
15   A.  Okay.
16   Q.  That's true, isn't it?
17   A.  Yes, sir.
18   Q.  Now, for majors there wasn't that kind of a
19 process?
20   A.  No, sir.
21   Q.  I think you're telling me that for majors there
22 was no process that you inherited from any of your
23 predecessors as far as filling those two major vacancies?
24   A.  That's correct.

Page 147
1    Q.  Are you telling me that there's no process in
2  the union contract between the State Police and the union
3  that applies to filling the vacancies?
4    A.  I'm not telling you that, no.
5    Q.  Is there anything in the union contract?
6    A.  Not to my knowledge.
7    Q.  I know there's that handbook, the Delaware State
8  Police rules and regulations, it's like a two-volume blue
9  thing I've seen with rules and regulations about the
10 State Police.  You are aware of that book; right?
11   A.  The administrative manual and the divisional
12 manual.
13   Q.  In those two manuals, was there any process that
14 guided your selection of the two majors for the positions
15 we are talking about?
16   A.  I think probably there may be something in there
17 about at the discretion of the superintendent, but
18 there's not any specific process, no.
19   Q.  So, for example, there was no preexisting rule
20 in writing that required that anybody selected for major
21 have a certain educational background?
22   A.  No, sir.
23   Q.  There wasn't anything in writing that required
24 that a person who was selected for major have any

Page 148
1  specific operational background?
2    A.  Well, I think it goes without saying you'd have
3  to be a captain.
4    Q.  Sure.
5    A.  You know what I mean.  So that is one parameter,
6  you know.  So you look at the captains in the agency to
7  make your selection and for the superintendent.  And
8  certainly education and background and experience and
9  tenure all came into play with any selections that I made
10 for executive staff people.
11   Q.  So you're saying that when you had to select
12 anybody to be part of the executive staff, you considered
13 education, background, experience, and tenure?
14   A.  That's correct.  Experience within the agency.
15   Q.  While that wasn't found in any preexisting
16 written document, those are factors you used?
17   A.  That's correct.
18   Q.  I guess I'm trying to find out:  Were there
19 other factors you used besides those four?
20   A.  Well, by background I would mean where they have
21 been within their tenure as a trooper based on what
22 position I'm filling.  I think you understand that.  That
23 somebody that had been in an administrative position but
24 not necessarily in an operational position probably

Page 149
1  wouldn't get an operational job.  You see what I'm
2  saying?  Those kind of things come into play with any
3  selections that I would make for staff level positions.
4        And compatibility with other members of the
5  executive staff certainly would come into play, as well.
6    Q.  I'll put down as another factor compatibility
7  with the other members of the executive staff.
8    A.  Yes.
9    Q.  So that gives me five categories.  Were there
10 any others that you considered?
11   A.  Not that I can recall.
12   Q.  I remember seeing in some of the other cases
13 affidavits or testimony talking about as people rise to
14 higher management levels in the State Police, it's
15 important that they have operational experience, meaning
16 like in patrol and actual on-the-road type experience.
17 That's a fair statement, isn't it?
18   A.  That's one very important facet, yes.
19   Q.  So that's important.  Okay.
20        For example, with respect to Captain
21 Barbara Conley, we know from paragraph 10 on page 4 of
22 the complaint that's in front of you that she was a
23 patrol trooper for eleven years at Troop 5.  Do you
24 remember that?

38 (Pages 146 to 149)

A118

Conley
Colonel L. Aaron Chaffinch

v.

C.A. # 04-1394-GMS

Chaffinch, et al.
June 6, 2005

Page 150

1    A.  Yes, sir.
2    Q.  And then she was a patrol shift supervisor as a
3  sergeant --
4    A.  Yes, sir.
5    Q.  -- at Troops 3 and 5 for four years.  Do you
6  remember that?
7    A.  Yes, sir.
8    Q.  Did you, by any chance, know what shifts that
9  would have been?  I think when you were a shift
10  supervisor there was an A, B, C, and a D shift.
11    A.  I have no idea.
12    Q.  But these shifts back in that point in time, it
13  could be a night shift?  It could be a day shift?
14    A.  It probably was a rotating shift, but --
15    Q.  Then her biography indicates that she was a
16  traffic lieutenant at Troop 5 for two or three years.  It
17  says it included responsibilities for about 50 troopers.
18         What kind of responsibilities do traffic
19  lieutenants have, never having deposed one or anything?
20  What do traffic lieutenants do?
21    A.  Well, they're in charge of the shifts, making
22  sure that the shifts handle the complaints that's
23  generated by the motoring public and by the citizens of
24  the area that we, you know, that we serve.

Page 151

1    Q.  So, for example, you got your shift sergeants
2  are the first-line supervisors?
3    A.  Yes.  And the traffic lieutenant is the
4  second-line supervisor.
5    Q.  So in a place like Troop 3 in Camden, would
6  there be more than one traffic lieutenant?
7    A.  No, sir.
8    Q.  So there's one there and all the shifts report
9  up through that traffic lieutenant?
10    A.  Well, it may or may not be that way because
11  there's also a criminal lieutenant at each troop and
12  sometimes, depending on how the troop commander wishes to
13  do it, there may be two shifts that report to the
14  criminal lieutenant and two report to the traffic
15  lieutenant, just in the chain of command, you know.  It
16  just depends.  It's not etched in stone that the traffic
17  lieutenant would have all four shift commanders under
18  their bailiwick.
19    Q.  Then she indicated that for two years in 1999
20  and 2000 she was the traffic lieutenant at Troop 5,
21  Bridgeville.  Do you remember that?
22    A.  Yes, sir.
23    Q.  For part of that time you were the commander of
24  Troop 5?

Page 152

1    A.  Yes, sir.
2    Q.  So she would have reported directly to you at
3  Troop 5?
4    A.  Yes, sir.
5    Q.  I believe she indicated there were about 35
6  troopers who would have reported up through her.  Does
7  that sound about right when you were there?
8    A.  That's about how many people that were there for
9  the patrol function, yes.
10    Q.  In the absence of the commander, meaning you,
11  did she substitute for you when you weren't there at
12  Troop 5?
13    A.  She may have or the other lieutenant may, as
14  well, both of them.
15    Q.  So, once again, at Troop 5 there would have been
16  two lieutenants, a criminal and a traffic?
17    A.  That's correct.
18    Q.  So is it your memory that in your absence either
19  one of the two lieutenants would substitute for you?
20    A.  Yes.  I mean, you know, I can't remember
21  specifics as far as who was on vacation or when I might
22  be on some other assignment or whatever the case might
23  be, but either one of them could have been acting as the
24  troop commander in my sted during my absence.

Page 153

1    Q.  Okay.
2    A.  Or if they were both working, they could have
3  done it together.
4    Q.  So I think the record would show that from 1982
5  to 2000, a period of 18 years, Captain Conley was
6  involved in the patrol function at a troop.  Would you
7  agree with that?
8    A.  Yes, indeed.
9    Q.  Right now, if my memory serves me right, I
10  remember at least an affidavit from Captain Yeomans --
11  Captain Yeomans, right now he's the director of personnel
12  at the State Police; right?
13    A.  That's right.
14    Q.  I remember at least an affidavit from him at
15  some length explaining the importance of being involved
16  in the patrol function prior to assuming leadership
17  positions in the Delaware State Police.  He would be in a
18  position to know about that as a human resources person;
19  right?
20    A.  That's correct.
21    Q.  You, yourself, I think may have testified about
22  the importance of this in at least one of our prior
23  cases.  Do you remember?
24    A.  Well, the patrol function is the backbone of the

39 (Pages 150 to 153)

A119

Conley                 v.                 Chaffinch, et al.
Colonel L. Aaron Chaffinch        C.A. # 04-1394-GMS            June 6, 2005

Page 154
1  division.  However -- however, there are a lot of other
2  things that weigh heavily on our job, as well, that, you
3  know, we have to do and we have to do well.  And so to be
4  more well rounded, other experiences are also good.  Not
5  taking anything away from the patrol function, but other
6  experiences are also good other than patrol.
7       Q.  Let's talk about this position, the position
8  that went to Captain Randall Hughes very briefly.  Okay?
9  He took the position of field operations in Kent and
10  Sussex counties.  That was one of the majors you filled;
11  right?
12       A.  Yes, sir.
13       Q.  Did he have more or less than 18 years of
14  experience in the patrol function when he was promoted to
15  major?  Do you remember?
16       A.  I'm sure he had less in the patrol function.  I
17  don't know exactly how much, but he worked in the drug
18  unit.  He had been a shift commander at both Troop 7 and
19  Troop 5.  He's been lieutenant at Troop 5.  He'd been at
20  the academy as -- in part of training.  And he'd been a
21  troop commander at Troop 5.  So, you know, and I don't
22  remember exactly how many years he has on patrol, but he
23  has a lot of other things that makes him a well-rounded
24  officer.

Page 155
1       Q.  So you're saying that Captain Hughes had
2  actually been a troop commander when he was promoted?
3       A.  Yes, he had.
4       Q.  You said that was at Troop 5?
5       A.  Yes, it was.
6       Q.  So was that the position he was promoted from to
7  major?  Did he go from --
8       A.  Yes, sir.
9       Q.  How long had he served as the troop commander?
10       A.  Well --
11       Q.  If you remember.
12       A.  Yes.  I'm not going to be able to tell you for
13  sure.  He went there when I left in '99.  So I would say
14  probably three years or so.  Maybe a little more.
15       Q.  So he replaced you?
16       A.  He replaced me when I left -- I was a promotion
17  by Colonel Pepper.
18       Q.  Then when he went up to major, that's where
19  Captain Dixon replaced him?
20       A.  Yes, sir.
21       Q.  Okay.
22       A.  Yes, sir.
23       Q.  I think you're saying that when he went to
24  major, he probably had less than 18 years' involvement in

Page 156
1  patrol?
2       A.  If we can come up with the exact date that he
3  went to major, I can tell you how long he had on the job
4  because --
5       Q.  Do you know when he --
6       A.  September the 3rd, 1985, is when he came on the
7  job.
8       Q.  So he started about three years after Barbara
9  Conley started?  She started in 1982?
10       A.  March of '82.
11       Q.  So he's her junior as far as tenure at the
12  Delaware State Police?
13       A.  That's correct.
14       Q.  So if tenure was a factor in that position, he
15  had less tenure than Barbara Conley did?
16       A.  Mm-hmm.
17       Q.  In background or experience, he was a troop
18  commander and that's certainly something she didn't have
19  in her background?
20       A.  That's correct.
21       Q.  Do you know how his educational record compared
22  to Barbara Conley's?
23       A.  He has a master's degree and he's a graduate of
24  the FBI National Academy, both.

Page 157
1       Q.  He's got a master's in what?  Do you know?
2       A.  I think human resource management.  It's either
3  that or public administration.  I'm not sure which, but
4  it's -- I mean, it's apropos for administrative position
5  on executive staff.
6       Q.  When you say he's a graduate of the FBI academy,
7  how much time did he spend down there?
8       A.  The FBI National Academy runs 11 weeks.  It's
9  almost like a semester of college.
10       Q.  This Northwestern University School of Police
11  Staff and Command where I know a lot of Delaware State
12  Police people go, how long is that training?
13       A.  I believe it's comparable.  It's like -- I think
14  they have a split in between, but it's like five and five
15  or five and six or something with a little split in the
16  middle.  But it's comparable.  It's comparable.  It's
17  another administrative school.
18       Q.  The Delaware State Police has historically sent
19  people to the FBI academy and to the Northwestern
20  University school?  Is that a fair statement?
21       A.  Yes.  Yes, sir.
22       Q.  Are there any other major police training
23  academies that historically your people have attended?
24       A.  Yes.

40 (Pages 154 to 157)

Conley                                                    v.                                    Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                    June 6, 2005

Page 158

1    Q.    What would they be called?
2    A.    The Southern Police Institute in Louisville,
3    Kentucky, and North Carolina -- I can't think of the name
4    of it, but we send them down to Raleigh, North Carolina.
5    We have in the past. We have some graduates from
6    whatever the name of that school is. I can't -- it's
7    North Carolina something. It has to do with command,
8    administrative police positions. And we do have
9    graduates from there.
10    Q.    Okay.
11    A.    And I'm sure there's others. That's the four
12    that I'm well aware of.
13    Q.    So his educational background I'm sure would be
14    in his personnel record; right?
15    A.    Yes.
16    Q.    Would you have consulted the personnel records
17    of all the captains when you were making this decision
18    who to promote to replace Tom Marcin?
19    A.    Tom Marcin?
20    Q.    Yes. I'm sorry. Tom Marcin stepped out and Tom
21    MacLeish stepped up. I'm sorry. Replaced MacLeish.
22    Randall Hughes replaced MacLeish as field operations.
23        Would you have looked at all the personnel
24    files of all the captains when you were mulling over who

Page 159

1    to promote?
2    A.    I could have. I could have, but I didn't.
3    Q.    So you're saying that you had access to the
4    personnel files?
5    A.    Yes. I've already testified to that today.
6    Q.    But you did not look over the personnel files of
7    all the existing captains when you made the promotion for
8    Randall Hughes?
9    A.    No, I did not. Not at all the captains, no.
10    Q.    Well, how about when you made the promotion for
11    Paul Eckrich? When you made that promotion, did you
12    review all the personnel files of the existing captains?
13    A.    Not all of them, no.
14    Q.    Just to go back to Randall Hughes, were there
15    some personnel files that you looked at for him?
16    A.    I looked at files both times.
17    Q.    So which files did you look at for Randall
18    Hughes? Which personnel files? Of which captains?
19    A.    Well, I can't really -- I don't know if I can
20    tell you all that I looked at.
21        But, first of all, let me just explain to
22    you. Probably if you're filling a position of Kent and
23    Sussex counties, you probably wouldn't look at a captain
24    that lives in Hockessin. You know what I'm saying?

Page 160

1    Q.    Travel.
2    A.    From a geographical standpoint. So I would have
3    looked at the downstate, Kent and Sussex counties',
4    captains what I would have looked at.
5    Q.    That would have included Barbara Conley?
6    A.    That's correct.
7    Q.    Who else would it have included at that time?
8    A.    Well, go back to -- then I got to try to
9    remember who the captains were. Some of them are
10    probably retired.
11    Q.    Right. I guess it would have been Greg Warren?
12    A.    Yes. Hawkins, Bobby Hawkins, Barbara Conley. I
13    don't think -- I don't know if Greg Nolt, N-o-l-t, was a
14    captain or not. If he was, I would have looked at it,
15    you know, if he was a captain in Kent and Sussex. So --
16    but going back to that time period, I'm not sure who
17    exactly was in those positions at that time, but I would
18    have looked at the Kent and Sussex ones.
19    Q.    So are you telling me, then, that for this
20    position that Randall Hughes filled, you did look at the
21    personnel files for all the existing captains who lived
22    in either Kent or Sussex counties?
23    A.    Yes.
24    Q.    So you say you had those files brought to you as

Page 161

1    part of your selection process?
2    A.    I went down and looked at them.
3    Q.    Then for Paul Eckrich, his position as the
4    administrative budget major, did you eliminate any people
5    for geography reasons for that?
6    A.    No, I wouldn't. Actually, that was an easy sell
7    because Paul had worked in that -- there's not many
8    people that work in administrative function that deals
9    with the finances of the State Police. And Paul had
10    worked in that capacity as a lieutenant under Colonel
11    Ellingsworth, so he had some experience in that capacity.
12        He also has a master's degree, as well, and
13    he's a graduate of the Southern Police Institute or
14    School of Command for State Police, or for law
15    enforcement.
16        So I wouldn't have looked -- I didn't
17    eliminate anyone, but that was -- that one was a quick
18    fix in my mind because of where he had been within the
19    agency. His degree, his undergraduate degree, if I'm not
20    mistaken, is in economics and he has his master's degree
21    in public administration and he had worked there and
22    under previous Major Michael McDonald, who was there
23    under Colonel Ellingsworth in that capacity. So he was
24    familiar with that.

41 (Pages 158 to 161)

A121

Conley                                                    v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                          June 6, 2005

Page 162
1        And that was something that, as a
2    superintendent, I wasn't that familiar with.  I worked a
3    short time in staff support and learned a little bit of
4    that function, but to be involved with the joint finance
5    committee and different things that the bond bill
6    committee and state government, I hadn't.  So I needed
7    somebody with some experience.  And as an underling of
8    Major McDonald when he was in that position, he was the
9    right man for the job.
10       Q.   Major Swiski preceded him in that position;
11   right?
12       A.   Yes.
13       Q.   What was Major Swiski's experience in those
14   functions when he became the administrative budget major?
15       A.   As far as I know, he didn't have any, but I
16   didn't select him.
17       Q.   But the point is, I guess, Major Swiski
18   performed the position admirably?  Is that a fair
19   characterization?
20       A.   Yes, yes.  And I talked with Major Swiski before
21   I made the selection of Captain Eckrich to go in that
22   position.
23       Q.   I guess what I'm saying is Major Swiski
24   performed the job appropriately?  You told me that;

Page 163
1    right?
2        A.   He did well while I was there, yes.
3        Q.   He didn't have any prior experience in the
4    function is what I'm saying?
5        A.   No, sir.
6        Q.   What kind of educational background did he have?
7    Did he have a master's in administration and things like
8    that?
9        A.   I'm not sure that he has a master's.  I don't
10   believe that he does, but I can't say 100 percent for
11   sure.  I'm sure that he has a bachelor's.  I'm not sure
12   about a master's.
13       Q.   So would you agree with the statement that
14   people have successfully held that position in the past
15   who did not have any background in the administrative
16   budget function?
17       A.   Yes, sir.
18       Q.   You thought that having background in the
19   function was a plus.
20       A.   I sure did.
21       Q.   For Mr. Eckrich?
22       A.   I sure did.
23       Q.   Now, just staying on Major Eckrich for a second,
24   was his tenure more or less than Barbara Conley's in

Page 164
1    1982?
2        A.   He's -- awhile ago I think I said -- I might
3    want to change something because I think I might have
4    said that Captain Hughes came on in September of '85, but
5    that's not right.  He came on in March of '85.
6        Q.   Okay.
7        A.   I want to retract that.  Paul Eckrich came on
8    September the 3rd of 1985.
9        Q.   So how does somebody come in in March?  I
10   thought your school sort of ends and you come in in
11   September.
12       A.   Back then they had two classes in 1985.  They
13   have had as many as three classes if you go back far
14   enough.
15       Q.   Okay.
16       A.   In the recent past we haven't.
17       Q.   So both of them are about three years junior to
18   Captain Conley's tenure.  Is that a fair statement?
19       A.   Time on the job, yes.
20       Q.   You mentioned some of the administrative
21   experience Captain Eckrich had.  What was the duration of
22   his experience in the patrol function?  How long had he
23   served in patrol?
24       A.   I'm not sure.  Like all troopers he started in

Page 165
1    patrol like everyone does.  At some point in time, and I
2    can't -- I can't tell you off the top of my head.  He was
3    in the youth division as a criminal detective and I know
4    that he was a shift commander for a time at Troop 4, so
5    he was back in patrol at that time.  He was also a
6    traffic lieutenant at Troop 7 for a time.  And he was
7    criminal lieutenant at Troop 5 for a time.  So the
8    criminal lieutenants and the traffic lieutenants out of
9    patrol troop both have interaction daily with the patrol
10   officers.
11       Q.   Would you agree that he had less than the
12   18 years of patrol experience that Barbara Conley had, or
13   do you know?
14       A.   I would agree that he would have less because
15   there's not many troopers on the job that have 18 years
16   of patrol because they have wherewithal to go in other
17   areas.
18       Q.   Are you indicating that it was a negative on
19   Barbara Conley's record that she had 18 years of
20   experience on patrol?
21       A.   I'm indicating that if you go into other areas
22   of the agency, you become more well rounded as an
23   officer, so you can help different functions.  Patrol
24   officers come in to play with criminal complaints,

42 (Pages 162 to 165)

A122

Conley                                            v.                           Chaffinch, et al.
Colonel L. Aaron Chaffinch              C.A. # 04-1394-GMS                       June 6, 2005

Page 166
1 traffic complaints, fatal accidents, all kinds of things.
2 But if you have background in criminal, you can help them
3 to write a search warrant. I mean, there's a lot of
4 different areas. The more you get, the more well rounded
5 you are, the better you are as an administrator. That's
6 what I'm indicating. Not to take anything away from the
7 patrol function as you heard me say earlier. It is the
8 backbone of the agency. Everyone starts there.
9    Q. Once again, we'll check the record on what
10 Captain Yeomans said about patrol and I believe you
11 testified on it at an earlier time. That's helpful.
12 I'll look at that.
13         How about this factor of compatibility with
14 other members of the executive staff? Let's focus on
15 Major Hughes here for a second. Okay?
16         Did you believe he would be more compatible
17 with other members of the executive staff than Barbara
18 Conley?
19    A. Not necessarily.
20    Q. So you --
21    A. But if I was looking at someone that wasn't
22 compatible with somebody on the agency, on the executive
23 staff, I wasn't. But if I was, that would have played
24 into it.

Page 167
1    Q. Okay.
2    A. In this particular case, it did not.
3    Q. So I think you're saying that there was nothing
4 to disqualify Barbara Conley for the promotion in the
5 area of compatibility?
6    A. I wouldn't think so.
7    Q. Then for the position that went to Captain
8 Eckrich, was there anything on this question of
9 compatibility with the other members of the executive
10 staff that would have disqualified Barbara Conley for
11 that position?
12    A. Not that I know of.
13    Q. Did you rank anybody when you were making your
14 decision on who you were going to promote?
15    A. No.
16    Q. Was Eckrich your first choice for that position?
17    A. Sure.
18    Q. I just want to make sure nobody turned you down
19 or anything.
20    A. Nobody turned me down.
21    Q. So Hughes was your first choice, too?
22    A. Yes, sir.
23    Q. Was there a second choice in case they did turn
24 you down?

Page 168
1    A. I would have went back to the drawing board if
2 they had turned me down, but I didn't have to.
3    Q. You didn't have a second place finisher in your
4 mind?
5    A. No, sir. If somebody turned me down, then I
6 would have had to regroup and checked out personnel files
7 and made a second decision. But I didn't have to.
8    Q. Well, as you know, in some of the lesser
9 position there's A bands, B bands, C bands, there's
10 people that get the highest score, that kind of a thing.
11         You are just telling me you did not rank
12 the eligible people in any fashion?
13    A. Sure didn't.
14    Q. Did you assign points to people as you were
15 evaluating these five factors that you identified?
16    A. No, sir.
17    Q. So, for example, five factors, is 20 percent of
18 it education, 20 percent background, 20 percent each of
19 the other factors?
20    A. No.
21    Q. So you didn't have any objective measure like
22 that that you were using?
23    A. There's no process in place, as we've already
24 talked about.

Page 169
1    Q. Was it left up to your best judgment and
2 discretion in evaluating the people to determine who was
3 best qualified?
4    A. I would say that's a fair statement.
5    Q. Now, you didn't have to report to anybody and
6 justify that decision, did you?
7    A. I had to get an okay from the cabinet secretary.
8    Q. So that would have been Secretary Ford at the
9 time?
10    A. Yes, it would have.
11    Q. So once you decided to promote them, did you
12 discuss it with Secretary Ford first?
13    A. Yes, I did. I wouldn't go telling anybody that
14 I'm going to promote them until I have the okay to
15 promote them. That's just -- you don't do that. I went
16 and talked to Colonel Ford or Secretary Ford at the time
17 and got his blessing.
18    Q. So it's your testimony you had to have his
19 approval to make the promotions?
20    A. Well, these are promotions to the executive
21 staff.
22    Q. Yes.
23    A. You don't make any promotions to executive staff
24 without consulting the cabinet secretary. I mean, there

43 (Pages 166 to 169)

A123

Conley            v.            Chaffinch, et al.
Colonel L. Aaron Chaffinch        C.A. # 04-1394-GMS        June 6, 2005

Page 170
1  could be a reason that -- there could be a reason that
2  for whatever reason, economically or financially, you
3  can't make a promotion right now even though you have an
4  opening or whatever. So that's why you go and run it by
5  the cabinet secretary. If the cabinet secretary says yes
6  or no, you can go ahead with it. And that's what he
7  said, so I did.
8      Q.  Did you tell him before you talked to Eckrich or
9  Hughes?
10     A.  Yes. He told me I could do it before I talked
11  to Eckrich or Hughes, yes.
12     Q.  What I'm asking: Did you do that as a courtesy
13  to Ford or is that required?
14     A.  When you're making a new member of the executive
15  staff, I don't know if there's anything written, but I
16  would certainly not make a new major without consulting
17  with the cabinet secretary. I just wouldn't do that.
18     Q.  Well, it's your staff, not his.
19     A.  That's right. That's right. But it's his --
20  he's one of the -- he's the head of all the division
21  directors that come under the cabinet and he knows
22  whether or not you can do that at this time or whatever.
23          Just like, for example, Dave Baylor left
24  and we didn't fill his position. I would have liked to

Page 171
1  have been able to fill that position and had a new
2  operations officer for New Castle County, but I couldn't
3  do that.
4      Q.  Right.
5      A.  So for the same reason I go to Colonel Ford and
6  he tells me to go ahead and I make the promotions.
7      Q.  Did he ask you if you had gone through any
8  process or anything in choosing who you wanted to select?
9      A.  No, he did not. He agreed with me and said, "Go
10  for it. Go for it."
11     Q.  Is it fair to say that the decision was left to
12  your subjective best judgment?
13     A.  Yes.
14     Q.  These criteria you identified, the five
15  criteria, are they just based upon your experience
16  working within the agency?
17     A.  And knowing the people that worked for the
18  agency, yes.
19     Q.  What I'm saying is you developed these five
20  criteria; right?
21     A.  Yes, sir.
22     Q.  Did you develop that on your own or did you list
23  it somewhere from a book you read or --
24     A.  I already explained. There was no process, sir.

Page 172
1      Q.  I understand, but I'm --
2      A.  It was from me.
3      Q.  It was from you. Okay.
4          You didn't check, for example, with Lisa
5  Blunt-Bradley of the State Personnel Office before you
6  made your decision?
7      A.  Certainly not.
8      Q.  How about Greg Chambers, do you know who Greg
9  Chambers is?
10     A.  Yes.
11     Q.  One of the things in the Bradley report was that
12  Greg Chambers was supposed to get involved with the
13  personnel function. Do you remember that portion, his
14  job title was supposed to get involved with the personnel
15  function at the State Police? Do you remember that being
16  in the Bradley report?
17     A.  Yes, sir.
18     Q.  When you had to fill these two vacancies for
19  major, was Greg Chambers consulted?
20     A.  No, he was not.
21     Q.  So when you came up with these five criteria to
22  follow in making the promotion to major, you did not
23  consult with Greg Chambers or his office; is that right?
24     A.  That's correct.

Page 173
1      Q.  When you made up this criteria as to how you
2  were going to select a major, you did not check with the
3  state personnel director?
4      A.  No, sir.
5      Q.  I don't remember if Miss Bradley would have
6  still been there at this time in --
7      A.  Yes, she would have, I believe.
8      Q.  So she was still available at that time, you
9  think; right?
10     A.  Yes. I don't answer to her.
11     Q.  Well, weren't there changes in the Bradley --
12     A.  There were recommendations.
13     Q.  There's no recommendation in there that made you
14  answer to her in the promotion process at the State
15  Police?
16     A.  No, sir. We revamped the whole promotion
17  process.
18     Q.  There's no recommendation in there that mandated
19  that the State Personnel Office be involved in the
20  promotion process indefinitely into the future at the
21  Delaware State Police?
22     A.  There's not anything mandated. They are
23  recommendations.
24     Q.  Was there a recommendation in there that the

44 (Pages 170 to 173)

Conley                                                          v.                                        Chaffinch, et al.
Colonel L. Aaron Chaffinch                        C.A. # 04-1394-GMS                              June 6, 2005

Page 174

1  State Personnel Office stay involved in the promotion
2  function of the Delaware State Police?
3      A.  I'd have to read it again, but I don't believe
4  it was specific to the promotional process.  It was
5  specific to staying in contact with our human resource
6  section, which I'm sure that Captain Yeomans and Greg
7  Chambers stay in contact fairly regularly, even to this
8  day.
9      Q.  Okay.
10     A.  If Greg Chambers is still in that position, and
11 I'm not sure of that, quite honestly, as I sit here
12 today.
13     Q.  You didn't have any consultations with Greg
14 Chambers.  You told us that?
15     A.  I didn't have any consultation with anyone
16 except for Colonel Ford, Secretary Ford.
17     Q.  So you didn't consult with John Yeomans?
18     A.  I looked at the personnel files, which is a part
19 of his office.
20     Q.  Well, did you sit down and say, John Yeomans,
21 these are the five factors I'm going to use in making my
22 promotions to major, do you agree with them?
23     A.  I sure didn't.
24     Q.  You felt that would be interfering with your

Page 175

1  prerogatives, your authority?
2      A.  I didn't feel one way or the other.  I just
3  didn't do it.
4      Q.  Well, the Bradley report, I think you indicated,
5  made certain recommendations about getting the state
6  personnel director involved or Mr. Greg Chambers' office
7  involved in the personnel function.
8          I think we agreed on that a little earlier;
9  is that right?
10         MS. BALLARD:  I object to the question to
11 the extent you are asking him about something specific in
12 the report.  It probably would be better if you refer him
13 to --
14         MR. NEUBERGER:  Well, thank you, Counsel.
15 We'll just move on.  Thanks for your objection.  You have
16 it for the record.
17         MS. BALLARD:  Thank you.
18         MR. NEUBERGER:  Okay?
19         Now, why don't you read the question back?
20         (The reporter read from the record as
21 requested.)
22     A.  Yes, we agree on that.
23 BY MR. NEUBERGER:
24     Q.  Now, I'm asking you:  Did John Yeomans consult

Page 176

1  with them prior to your making these two promotions to
2  major?
3      A.  They sure didn't.  Not to my knowledge.  I don't
4  know why I would.
5      Q.  You didn't bring him into the loop?
6      A.  Sure didn't.
7      Q.  After the fact, did you submit any information
8  to the state personnel director's office, Greg Chambers'
9  office, about the choices you had made for major?
10     A.  No, sir.
11     Q.  After the fact, did you write down in any form
12 whatsoever the reasons why you selected Major Eckrich or
13 Major Hughes?
14     A.  No, sir.
15     Q.  So you made no contemporaneous record of the
16 reasons why you selected those two people?
17     A.  No, sir.
18     Q.  After the fact, did you send an e-mail to the
19 members of your executive staff documenting the reasons
20 why you selected these two people?
21     A.  No, sir.
22     Q.  After the fact, did you send an e-mail to
23 retired Colonel Ford explaining why you had selected
24 these two people?

Page 177

1      A.  No, sir.
2      Q.  Before the fact, did you send an e-mail to
3  Colonel Ford indicating the reasons why you wanted to
4  select these two people?
5      A.  No, sir.
6      Q.  So as far as understanding what the reasons were
7  why you selected these two people, we have to rely on
8  your memory?  You didn't put it in writing anywhere?
9      A.  No, sir.
10     Q.  After the fact, did you sit down and talk with
11 anybody and explain these five reasons you were using to
12 select people?
13     A.  No, sir.
14     Q.  So there is no witness to an oral conversation
15 with you as to what factors you were using to make these
16 promotions?
17     A.  No, sir.
18     Q.  So as far as corroboration for these reasons,
19 factors for making a promotion, there's no
20 contemporaneous document we can point to; right?
21     A.  No, sir.
22     Q.  There's no witness to a conversation with you we
23 can point to; right?
24     A.  Other than getting the okay to go ahead with the

45 (Pages 174 to 177)

A125

Conley                                            v.                          Chaffinch, et al.
Colonel L. Aaron Chaffinch                 C.A. # 04-1394-GMS                     June 6, 2005

Page 178
1  promotion from the Secretary of Safety and Homeland
2  Security James Ford, no.
3      Q.  So if I asked you for the record what were the
4  reasons for selecting Hughes, what would you explain as
5  the reasons why you selected Hughes?
6      A.  I don't know if I can tell you exactly the five
7  that are there.  Tenure, background, education --
8      Q.  The five are:  First was education, second is
9  background, third is experience within the Delaware State
10  Police, fourth is tenure, and fifth is compatibility with
11  other members of the executive staff.  Okay?
12          With that as a help, what were the reasons
13  why you selected Major Hughes?
14      A.  Okay.  Well, his tenure within the agency was
15  very well rounded.  He -- like I explained earlier, he
16  had been to the academy as the assistant director of the
17  academy, so he had been involved in training.  He'd been
18  in special investigations as a drug officer, so he had
19  experience in criminal investigations.  He had been a
20  patrol sergeant and run a shift at Troop 7.  He had been
21  a traffic lieutenant at Troop 5.  He had been a troop
22  commander at Troop 5.  He was a graduate of the FBI
23  National Academy.  He attained a master's degree in
24  public administration.  And he had worked his entire

Page 179
1  career in Kent and Sussex counties and he was familiar
2  with the area and the other troopers and the other
3  administrators of those troops.
4      Q.  Are there any other reasons?
5      A.  I thought he would be compatible with the other
6  staff members.  I think I've hit -- I hit on experience.
7  I hit on his background.  I hit on his tenure and his
8  education.  So I guess that there's not any others.
9      Q.  I'm just trying to be thorough.
10      A.  Loyal to the superintendent.
11      Q.  Excuse me?
12      A.  Loyal to the superintendent.
13      Q.  Is it fair to say that that's an additional
14  factor, or is that just within the other ones?
15      A.  That's within the others.
16      Q.  So loyal to the superintendent.  What do you
17  mean by that?
18      A.  Well, I had worked close with him and I knew
19  that he would support me in my position as
20  superintendent.  He would also do a good job.  He's
21  always been a go-getter.  He was one of the biggest
22  workers on the road when he was on the road.  He wrote
23  his share of traffic citations.  And he -- you know, he
24  did a lot of criminal work.  And I'll put his record up

Page 180
1  against anybody in the agency as far as work and
2  experience on the Delaware State Police.
3      Q.  It's just that today is the time for you to give
4  all the reasons.
5      A.  I suppose it is.
6      Q.  So are there any other reasons why you selected
7  him over the other people?
8      A.  Not that jump right out at me.  I think I've hit
9  on them all.
10      Q.  Now, if we go to Major Eckrich, how about giving
11  me the reasons why he was selected for the position?
12      A.  Okay.  From education standpoint, he's got a
13  master's -- a bachelor's and a master's degree.  He's a
14  graduate of Southern Police Institute in Louisville,
15  Kentucky, which is a command school for law enforcement
16  administrators.  He's -- he had worked patrol.  He had
17  worked as a patrol supervisor, a shift commander.  He had
18  worked at both as a criminal lieutenant and a traffic
19  lieutenant.  And he'd been a troop commander.  And I had
20  worked closely with him and I knew that he would be loyal
21  and -- loyal to me and we would be a good team to be a
22  part of the executive staff.
23      Q.  You mentioned loyal two times, so I do want to
24  ask you about that.

Page 181
1          You worked with Barbara Conley over your
2  career, too?
3      A.  Yes, I have.
4      Q.  Is there any reason for you to think she
5  wouldn't be loyal to you if she was selected?
6      A.  No, there's not.
7      Q.  So are they all the reasons for Major Eckrich?
8      A.  The other reason that we talked about earlier is
9  the fact that he had been in that position as a
10  lieutenant and that is a -- that is a large factor in my
11  decision.
12      Q.  So just so you understand I'm being fair with
13  you, if there's anything else you said earlier, we'll
14  include that in reasons why he was selected.  Okay?
15      A.  Yes, sir.
16      Q.  Is there anything else that you remember was a
17  reason why he was selected?
18      A.  No, sir.
19      Q.  Did you look into his disciplinary record?
20  Let's say Eckrich right now.  Did you check and see
21  whether he had any violations, suspensions, or things
22  like that in his record?
23      A.  I'm pretty sure he doesn't have any, but I
24  couldn't tell you exactly for sure, but if he has

46 (Pages 178 to 181)

A126

Conley                                    v.                        Chaffinch, et al.
Colonel L. Aaron Chaffinch          C.A. # 04-1394-GMS                    June 6, 2005

Page 182
1  anything, it's got to be very, very minor. The same with
2  Major Hughes.
3      Q.   Where does one look to find out?
4      A.   The personnel file.
5      Q.   So, for example, if you dented the fender of the
6  patrol vehicle or something, that's something you could
7  get written up for?
8      A.   That's right. I got written up for it.
9      Q.   Or you miss a court appearance or something?
10     A.   That's right.
11     Q.   There are various rules and regulations of the
12 State Police that regulate conduct of troopers; right?
13     A.   Yes.
14     Q.   So you can commit a violation and then be
15 disciplined in various ways; right?
16     A.   That's correct.
17     Q.   For this position of major, would you have
18 looked at that part of the personnel file that deals with
19 these kinds of minor infractions?
20     A.   Yes, but I can't sit here today and tell you
21 what I saw because it's been so long ago.
22     Q.   Well, is there some kind of a threshold or
23 something? What if a person does have some
24 infractions -- let's say over a 20-year career they do

Page 183
1  have --
2      A.   It would depend on what the infractions were.
3  And I can tell you neither one of those captains that
4  subsequently became majors have anything that would be --
5  you know, that would scratch them from consideration.
6      Q.   Right. But it is something you look at is what
7  you are telling me, you would?
8      A.   And I did.
9      Q.   You're saying there was nothing in their
10 personnel record that would have eliminated them from
11 consideration?
12     A.   That's correct.
13     Q.   Do you remember whether there was an
14 accumulation of suspensions, be it one day or two days,
15 in their records?
16     A.   No, I don't remember sitting here today. It's
17 over two years ago, or nearly two years ago. And I can't
18 tell you what was in there. I'm sure they may well have
19 missed a court appearance as you used as an example
20 earlier, but there was nothing significant.
21     Q.   Nothing significant. Okay.
22          Do you agree that my client, Barbara
23 Conley, was qualified at that time to be a major?
24     A.   All captains were qualified.

Page 184
1      Q.   For example, you may not be aware of this, but
2  present-Colonel MacLeish sent out a notice to all the
3  captains last week indicating that he was taking
4  applications to be promoted to major, that there were two
5  positions he was going to fill and that anybody
6  interested should apply by June 17th. So just accept
7  that as a fact. Okay?
8          That seems to imply that this e-mail sent
9  to 19 captains indicates that they are qualified to
10 apply. Let me ask you about your policies. Okay?
11         Were you saying that when you were making
12 this decision as who to promote to major, that all the
13 existing captains were qualified to be promoted to major?
14     A.   Yes, I am.
15     Q.   Thank you. Okay.
16         It's your testimony that you selected the
17 most qualified persons?
18     A.   That's correct.
19     Q.   Got you.
20         You weren't even making people apply or
21 tell you whether they were interested at the time or not?
22     A.   Not at that time, no.
23     Q.   You knew who the captains were and you
24 considered all the captains?

Page 185
1      A.   That's correct.
2      Q.   That's correct?
3          MR. LIGUORI:  With regard to the
4  reservation that he said earlier about geography.
5          MR. NEUBERGER:  Yes, yes, with that
6  understanding, right, right. Exactly.
7          Let's take a break. Okay?
8          (A recess was taken at this time.)
9  BY MR. NEUBERGER:
10     Q.   You understand that you can't refuse to promote
11 a woman because she's a woman; right?
12     A.   That's correct.
13     Q.   You understand that the United States
14 Constitution would prevent that; right?
15     A.   That's correct.
16     Q.   You know that's illegal under state law; right?
17     A.   Yes, sir.
18     Q.   You know that would violate what we call the
19 14th Amendment, right to equal protection under the laws;
20 right?
21     A.   Yes, sir.
22     Q.   That's part of your police training to
23 understand that; right?
24     A.   Yes, sir.

47 (Pages 182 to 185)

A127

Conley                                                          v.                                    Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                                  June 6, 2005

Page 186
1    Q.   You explained about that you felt Barbara was
2    loyal a few minutes ago; right?
3    A.   Yes.
4    Q.   Your successor as colonel is Tom MacLeish who
5    has worked under you for a while; right?
6    A.   Yes, sir.  And I've worked under him.
7    Q.   Really?
8    A.   Yes.
9    Q.   When was that?
10   A.   When I was a lieutenant and he was a captain.
11   Q.   He's been around a long time?
12   A.   Longer than I.
13   Q.   Are you aware of whether Tom MacLeish has ever
14   indicated to you that he thought that Barbara Conley was
15   a disloyal person?
16   A.   No, sir.
17   Q.   He's never expressed that kind of a sentiment to
18   you, has he?
19   A.   No, sir.
20   Q.   In fact, he's never expressed a sentiment to you
21   that he's angry with Barbara?
22   A.   No, sir.
23   Q.   Has he ever indicated to you that he's mad at
24   Barbara?

Page 187
1    A.   No, sir.
2    Q.   Has he ever indicated to you that he's mad at
3    Barbara because she filed this lawsuit?
4    A.   No, sir.
5    Q.   There's an aspect of this lawsuit that I'm not
6    going to cover today.  It deals with the leak of some
7    confidential Internal Affairs information about Barbara,
8    but Tom MacLeish is a defendant in that.  Are you aware?
9    A.   I've heard about it, yes.
10   Q.   We are not going to go into that with you, but
11   has he ever indicated to you that he's angry at Barbara
12   for bringing the lawsuit involving him?
13   A.   No, sir.
14   Q.   Has he ever indicated to you that he's angry at
15   Barbara because she brought this lawsuit and involved you
16   with it?
17   A.   Say that again.
18   Q.   Has he ever indicated to you he's mad at Barbara
19   because she sued you?
20   A.   No, sir.
21   Q.   Is it fair to say that you and he are friends?
22   A.   Yes, sir.
23   Q.   I think I saw a thing in the Delaware State News
24   once that maybe your family at his son's basketball game

Page 188
1    or something like that, you guys sitting in the stands
2    together or something like that.
3            Do you go to sporting events together?
4    A.   That's the only one we ever went to, but we got
5    our picture in the paper.
6    Q.   But he's never told you --
7            MR. LIGUORI:  It's the Delaware State News.
8    Q.   He's never told you he couldn't work with
9    Barbara, has he?
10   A.   No, sir.
11   Q.   Has he ever told you he couldn't work with her
12   as a member of the executive staff?
13   A.   No, sir.
14   Q.   Do you believe that there's any animosity at all
15   that he bears towards Barbara?
16   A.   Not that he shared with me.
17   Q.   Have you ever observed him, you know, he sees
18   her down the hall and just throw her a dirty look or
19   anything like that?
20   A.   No, sir.  That's kid games.
21   Q.   I'm not talking about words, but I'm talking
22   about actions.
23            Have you ever observed any actions on his
24   part that indicate hostility towards --

Page 189
1    A.   I haven't.
2    Q.   The Delaware State Police right now has five
3    major positions authorized when you retired.  Is that a
4    fair statement?
5    A.   Well, they had five and then when Major Baylor
6    left, we weren't able to fill it, so I'm not sure how
7    many they have because I'm gone and it's still not
8    filled.  So I really don't know.
9    Q.   But when you left there were four major
10   positions filled?
11   A.   That's correct.
12   Q.   I did indicate a little earlier that there was
13   this e-mail last Friday saying they were going to fill
14   two more, but you are not aware of that; right?
15   A.   I'm not on the State e-mail anymore.
16   Q.   But the point is:  During your career as you've
17   been working at the State Police, there always has been
18   an executive staff?
19   A.   Yes, sir.
20   Q.   There's always been a lieutenant colonel?
21   A.   Yes, sir.
22   Q.   How many majors were there when you started out
23   in -- 1981 would it have been?
24   A.   '78.

48 (Pages 186 to 189)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

A128

Conley                                            v.                          Chaffinch, et al.
Colonel L. Aaron Chaffinch              C.A. # 04-1394-GMS                         June 6, 2005

Page 190

1    Q.   1978.
2    A.   I think -- I think there was only three majors
3  when I started, but I'm not 100 percent sure.
4    Q.   At some time during your tenure when you were
5  the colonel, there were five?
6    A.   Yes, sir.
7    Q.   Five filled spots?
8    A.   Yes, sir.
9    Q.   So what happens is people retire or move on and
10  these major positions turn over; is that right?
11    A.   Yes, sir.
12    Q.   And that whoever is the colonel at the time,
13  subject to budgetary constraints, then selects successors
14  for people in the major positions; right?
15    A.   That's correct.  That's the way it's been for a
16  long time, as far as I know.
17    Q.   Before you retired you haven't heard any talk
18  about eliminating the major positions or anything like
19  that, have you?
20    A.   I've heard all kind of things, but, you know, I
21  can't specifically say that some particular major was
22  going to be eliminated, no.
23    Q.   Are any of the current majors near 55 where they
24  have to retire?

Page 192

1                  INDEX TO EXHIBITS
2
PLAINTIFF'S EXHIBIT NO.:                         PAGE
3
4  1  A multipage copy of the First Amended
      Complaint                          4
5
   2  A one-page copy of a story          25
6
   3  A one-page copy of four limericks    41
7
   4  A one-page copy of one limerick      41
8
   5  A multipage copy of a Review of the Delaware
9     State Police, Executive Order Number 19    125
10
            - - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 191

1    A.   No, sir.  They're all young.  I was the oldest
2  one of the staff and Tom is now the oldest one.  He's 50.
3  He's be 51 in August.  Tom will be 51 in August.
4    Q.   And everybody else is in their forties?
5    A.   I think so.  Or thirties, bless their hearts.
6        MR. NEUBERGER:  We're done.  Thanks.
7        MR. LIGUORI:  Thank you.
8        (The deposition was then concluded at
9  3:25 p.m.)
10            - - - - -
11           INDEX TO TESTIMONY
12
13
   COLONEL L. AARON CHAFFINCH              PAGE
14
15  Examination by Mr. Neuberger              2
16            - - - - -
17
18
19
20
21
22
23
24

Page 193

1
2
3
4
5
6
7
8      REPLACE THIS PAGE
9
10     WITH THE ERRATA SHEET
11
12     AFTER IT HAS BEEN
13
14     COMPLETED AND SIGNED
15
16     BY THE DEPONENT.
17
18
19
20
21
22
23
24

49 (Pages 190 to 193)

Conley                                                v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch                   C.A. # 04-1394-GMS                      June 6, 2005

Page 194

1   State of Delaware )
2                    )
3   New Castle County )
4
5          CERTIFICATE OF REPORTER
6
7          I, Kathleen White Palmer, Registered Merit
    Reporter and Notary Public, do hereby certify that there
8   came before me on the 6th day of June, 2005, the deponent
    herein, COLONEL L. AARON CHAFFINCH, who was duly sworn by
9   me and thereafter examined by counsel for the respective
    parties; that the questions asked of said deponent and
10  the answers given were taken down by me in Stenotype
    notes and thereafter transcribed into typewriting under
11  my direction.
12         I further certify that the foregoing is a
    true and correct transcript of the testimony given at
13  said examination of said witness.
14         I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19         Kathleen White Palmer, RPR, RMR
           Certification No. 149-RPR
20         (Expires January 31, 2008)
21
    DATED:  June 8, 2005
22
23
24

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A130