Conley v. Chaffinch, et al.
David Baylor   C.A. # 04-1395-GMS   June 27, 2005

Page 46

1  and left early?
2  A. Yes.
3  Q. Okay. Now, did you ever attend a traffic
4  records forum in Colorado in July of 2003?
5  A. No. But I was in Colorado in July of 2003. I
6  was at the FBI conference.
7  Q. Okay. I've heard rumors about some kind of a
8  dinner which took place. I'd like to ask you some
9  questions about that.
10 A. Okay.
11 Q. Were there any other Delaware State Police
12 Officers out in Colorado at the same time that you were
13 out there?
14 A. Yes, sir.
15 Q. Okay. Who were the officers?
16 A. At the FBI conference it was myself, Colonel
17 Chaffinch and his wife. Retired Major Mike McDonald was
18 at the traffic records forum. Captain Laird and his wife
19 were at the FBI conference. And at that time Captain
20 Hughes was just informed that he was a major and he was
21 at the FBI conference. And then Lieutenant Dixon was at
22 the traffic records forum.
23 Q. Okay. Did everyone get together for dinner?
24 A. Yes, sir -- when I say "everyone," it was

Page 47

1  myself, the colonel and his wife, my daughter who
2  traveled with me, and Major McDonald, Captain Conley and
3  Lieutenant Dixon were all at a restaurant outside of
4  Denver.
5  Q. Okay. Now, how old was your daughter at that
6  time?
7  A. That was two years ago. What year was that?
8  2003?
9  Q. I believe so.
10 A. Here you go --
11 Q. I'm sorry.
12 A. I'm having a hard time trying to keep up with
13 the grades here. She would be -- she will be fourteen
14 this year. She would have been eleven, getting ready to
15 turn twelve.
16 Q. At this dinner did Colonel Chaffinch engage in
17 any inappropriate either speech or jokes or limericks or
18 things like that that you can remember?
19 A. I don't specifically remember, because I was
20 down at the other end of the table. I had heard
21 afterwards that there was a comment made, but to be quite
22 honest with you, I was sitting there trying to figure out
23 the menu and make sure that my daughter didn't order me
24 out of house and home, because when she orders she goes

Page 48

1  for the moon. I was trying to focus on that.
2  Q. What was this comment that you heard about
3  later?
4  A. I heard that, later heard that he said -- that
5  he made reference to Watermelon Gaines. Gaines is a
6  retired Delaware State Police corporal.
7  Q. Why was he calling him watermelon?
8  A. In the context of why it was said, there was
9  watermelon apparently on the menu or he saw watermelon or
10 the server offered watermelon as a dessert and that's
11 when he blurted it.
12 Q. I'm sorry. What's the trooper's full name?
13 A. Ronald L. W. Gaines.
14 Q. Is he a white or black trooper?
15 A. Black trooper, retired corporal. He was in
16 Colonel Chaffinch's academy class.
17 Q. Got you. Who did you hear about it later from?
18 A. Captain Conley and Lieutenant Dixon.
19 Q. Now, do you understand that this is a -- Captain
20 Conley, she has a sex discrimination claim?
21 A. Yes, sir.
22 Q. Did you understand that coming in here today?
23 A. Yes, sir.
24 Q. Do you remember anything else which you think

Page 49

1  the colonel may have done in the workplace which would
2  have reflected either gender stereotypes --
3  A. That's a broad question. Can you be more
4  specific?
5  Q. Sure. You have already testified a little bit
6  about some inappropriate limericks or jokes that the
7  colonel told. Do you recall that testimony?
8  A. Yes, sir.
9  Q. You have talked a little bit about certain
10 things that the colonel has said to a female secretary
11 in, I guess, I think it was in headquarters?
12 A. Maybe I said about. I don't think he actually
13 said it to them.
14 Q. About certain female secretaries in
15 headquarters. Is there any other inappropriate workplace
16 behavior which you think might be relevant to Captain
17 Conley's case?
18     MS. BALLARD: Object to form.
19 Q. You can answer.
20 A. Not right off the top of my head. I mean,
21 unless you have something specific, I don't.
22     Like I said, there was -- my head is still
23 spinning from my time, especially after the rank of
24 captain in the state police, because I was treated unfair

13 (Pages 46 to 49)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

A176

Page 50

1  and I dealt with a lot of stuff. So to try to recall
2  specifics, unless I'm asked specific questions that would
3  jog my memory, it's kind of hard, you know, to do that.
4      As a major it was a tough job and I was
5  just trying to focus on making sure that my people, the
6  people that worked for me, you know, were covered.
7      Q. Okay. Now I'll try to ask you some specific
8  questions, then.
9      Did Colonel Chaffinch ever express to you
10  that he thought that women were second class citizens?
11      A. No.
12      Q. Did Colonel Chaffinch ever express to you that
13  he thought that men were better than women?
14      A. No.
15      Q. Did Colonel Chaffinch ever make derogatory
16  comments about other female troopers in the workplace?
17      A. Yeah.
18      Q. Do you recall what those comments were?
19      A. He felt that some females shouldn't be troopers.
20      Q. Did you agree with that sentiment, that females
21  shouldn't be troopers?
22      MS. BALLARD: Object to the form.
23      A. I knew that was coming.
24      Q. You can answer.

Page 51

1      A. No. I don't agree. As I've given many
2  interviews to the newspaper about, that you have to have
3  diversity at the table to make sure that -- we make
4  decisions that affect, our decisions affect everyone, so
5  we have to take into account how everyone feels to try to
6  make the best decision.
7      Q. Do you think that Colonel Chaffinch disagreed
8  with that sentiment?
9      A. I think that Colonel Chaffinch's management
10  philosophy was different than mine.
11      Q. What do you think his management philosophy was?
12      A. I think that -- I think that his was a little
13  bit more of an older style of management than mine.
14      Q. Now, you said an older style of management than
15  yours. Would that be a style of like promoting your
16  buddies, things like that?
17      A. I think that that entered into the equation a
18  lot more frequently than it probably would of me.
19      Q. Okay. Now, I'd also like to ask you a couple
20  more questions about the Operation CARE.
21      A. Yes, sir.
22      Q. Now, I believe you indicated earlier that you
23  served as the director of traffic?
24      A. Yes, sir.

Page 52

1      Q. In that position did you attend Operation CARE
2  conferences throughout the country?
3      A. Yes, sir.
4      Q. Okay. How many years were you the director of
5  traffic?
6      A. From '98 to 2000 -- 98 to 2000, so I attended
7  CARE conferences every time I was the director of traffic
8  and then once as an operations major.
9      Q. So was it part of the job duties and
10  responsibilities of the director of traffic to attend the
11  CARE conferences?
12      A. Yes.
13      Q. Do you know who followed you as the director of
14  traffic?
15      A. Yes, Captain Conley -- Captain Paige I think --
16  I'm not sure now. It was, Captain Paige was my deputy
17  for a while, he was my lieutenant and then he got
18  promoted. So I want to say it was probably Captain
19  Conley who followed me.
20      Q. Do you know who preceded you as the director
21  of --
22      A. Colonel Chaffinch.
23      Q. Do you know if he attended CARE conferences as
24  part of his job duties and responsibilities as a director

Page 53

1  of traffic?
2      A. Yes, sir.
3      Q. In addition to attending the CARE conferences,
4  does the director of traffic -- while you were director
5  of traffic, did you have other Operation CARE
6  responsibilities?
7      A. Pretty much just -- I didn't do it actually. My
8  secretary did it and I took credit for it. But she --
9  part of Operation CARE, your responsibility as part of
10  this organization is collecting specific information
11  beginning Memorial Day to the end of the year. That
12  information is reported to the central CARE repository
13  and it's traffic related stuff, speeding, alcohol
14  related, stuff like that. And we would facilitate
15  gathering that information here in Delaware and sending
16  it off and my secretary did that.
17      There are regional positions but -- only
18  one who ever held a position was the colonel.
19      MR. NEUBERGER: I'd like to take a short
20  break. We're almost done.
21      (Recess taken.)
22  BY MR. NEUBERGER:
23      Q. Major Baylor, I just have a couple more
24  questions for you.

14 (Pages 50 to 53)

### Page 54

1  Now, when you were director of traffic were
2  there monthly or periodic traffic meetings where the
3  traffic lieutenants from all across the state would come
4  to some kind of centralized meeting?
5    A.  Yes, sir.
6    Q.  Did you run that meeting as the director of
7  traffic?
8    A.  Absolutely.
9    Q.  Would there be discussion about traffic issues
10 at those meetings?
11   A.  Yes, sir. I was required to put together the
12 agenda, have everything prepared for the superintendent
13 and deputy superintendent and majors, and then I would
14 run the meeting.
15   Q.  Okay. Do you know anything about those job
16 duties being stripped from Captain Conley after she
17 became director of traffic?
18   A.  Yes, sir.
19   Q.  Okay. Based on your understanding, are Captain
20 Conley's job responsibilities as director of traffic
21 different than your job responsibilities were as director
22 of traffic?
23   A.  Yes, sir.
24   Q.  Now, let's see. Speaking of the director of

### Page 55

1  traffic, do you have any familiarity with Captain
2  Conley's performance as the director of traffic?
3    A.  Well, I relied on her as an operations major in
4  my area and she pretty much provided me information
5  statewide. So, yes, I'm aware of her performance. Plus,
6  I used to be in that position, so you always kind of look
7  out for the position you were in, you know.
8    Q.  Has she done a good job in that position based
9  on your interactions with her?
10   A.  Barb has done a great job. I mean, she took it
11 and either I did a crappy job or she just took it to the
12 next level, because she was able to get us equipment and
13 assignments that we needed to do the job and take us to a
14 better position in the state in terms of traffic safety,
15 traffic enforcement. And her relationship with the
16 Office of Highway Safety I think was probably one of the
17 best things that has come out of her being there.
18   Q.  Okay. Now, change gears a little bit. Did you
19 ever hear Colonel Chaffinch call Captain Mary Ann Papili
20 "Norman"?
21   A.  I've heard the term, but I didn't know he was
22 referring to her. But I've heard him say the word, yeah.
23   Q.  What does that refer to?
24   A.  I have my own version of -- Norm is Cheers, the

### Page 56

1  guy who sits in the bar at Cheers. I didn't know any
2  other Norman. But I never asked him about it.
3    Q.  Now, you also testified a little bit ago about
4  the meeting in which there were discussions about
5  transferring Captain Papili out of Troop 6. Do you
6  recall testifying about that?
7    A.  Yes, sir.
8    Q.  I forgot to ask you: Did anybody take any notes
9  of that meeting?
10   A.  Notes of most meetings in the executive staff, I
11 never took notes, thank God. I never took notes, because
12 I was in college most of my law enforcement career and I
13 got tired of taking notes. But there was notes that were
14 taken on almost every meeting by Major Mark Seifert or
15 Major Joe Papili.
16   Q.  That's helpful.
17      MR. NEUBERGER: No further questions.
18 Counsel.
19 BY MS. BALLARD:
20   Q.  I just have a couple, I think just to clarify
21 some issues that you touched on in the first round of
22 questioning.
23   A.  Sure.
24   Q.  When Colonel Chaffinch promoted Majors Eckrich

### Page 57

1  and Hughes to their positions, do you know what process
2  he actually went through in his office or where ever to
3  make that decision?
4    A.  No.
5    Q.  You weren't present for that?
6    A.  No.
7    Q.  Have you personally reviewed the personnel files
8  of Paul Eckrich and Randall Hughes?
9    A.  No.
10   Q.  Have you reviewed Barbara Conley's personnel
11 files?
12   A.  No.
13   Q.  Have you reviewed disciplinary files for any of
14 those individuals?
15   A.  No, ma'am.
16   Q.  I believe you said that Colonel Chaffinch made a
17 comment that -- I believe these were your words -- some
18 females shouldn't be troopers?
19   A.  Yes.
20   Q.  Do you know if he was referring to certain
21 individuals when he made that comment?
22   A.  Yes. I believe that it was not a broad
23 statement. It was a more, you know, specific on some
24 individuals that I guess he had come across in his career

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

Page 58

1  that he felt shouldn't be troopers.
2      Q.  Did you ever hear him say that women shouldn't
3  be in the state police in general?
4      A.  No. I never heard that.
5      Q.  Captain Conley, before she came to headquarters,
6  was she out of Troop 5? Was that her home troop?
7      A.  That would be considered her home troop. I
8  think that's where she started. I know she had done a
9  tour as a traffic lieutenant at Troop 3.
10     Q.  That was Colonel Chaffinch's home troop,
11 correct?
12     A.  Troop 5, yes.
13     Q.  If you know, would you have considered Captain
14 Conley to be a friend of Chaffinch?
15     A.  I thought she was.
16     Q.  You were asked about Captain Conley's duties
17 being changed when she was head of the traffic section
18 and the term the attorney used was that her duties were
19 stripped. First of all, do you agree with that
20 statement? And, secondly, how were those duties changed?
21         MR. NEUBERGER: Objection. You can answer.
22     A.  Okay. Her duties were changed in that it was
23 more of a -- struggling for the appropriate word -- her
24 leadership role was taken away.

Page 59

1      Q.  What do you mean by that?
2      A.  Well, as a former director, I pretty much ran
3  the meeting. I set the tone. I pretty much led, even
4  though they fought me, I led with developing policy.
5  Hers was relegated to just collecting data and providing
6  the data and the meeting was run by Major Seifert.
7      Q.  What was his position?
8      A.  He was the technology major and I think that
9  traffic was put under him.
10     Q.  I think you said something about they fought you
11 when you were in Captain Conley's position. What did you
12 mean by that?
13     A.  Well, I had sued the colonel, so he wasn't, he
14 was not a happy camper with me. I wasn't going to be
15 coming to his house for dinner. And he fought me as a
16 result of that. He embarrassed me -- my first traffic
17 meeting, he walked in and yelled at me in front of
18 everybody. From there on there were little jabs to make
19 me feel like I was incompetent as I held the position.
20 That was Colonel Ellingsworth and Colonel Pepper.
21     Q.  The Norman remarks, did you ever hear Colonel
22 Chaffinch use that term with regard to Mary Ann Papili?
23     A.  Not specifically to her.
24     Q.  Was that one of those rumor mill things?

Page 60

1      A.  I think -- well, rumor from my standpoint that I
2  heard it through other people, yes. I never focused in
3  on what he was saying and attributing it to her as who he
4  was referring to.
5  BY MR. NEUBERGER:
6      Q.  One question from me, Major. I think you said
7  something to the effect that the colonel didn't like you
8  because you filed a lawsuit against him?
9      A.  Yes, sir.
10     Q.  Do you think the colonel was angered by that?
11     A.  Let me put it to you this way. The first
12 traffic meeting after the lawsuit was filed he made it a
13 point in front of Captain Morrison at the time and
14 Lieutenant Quig to show how stupid he thought I was, both
15 of them, to the point where Colonel Pepper told me after
16 he made colonel, when I asked him why Mary Ann Papili got
17 Troop 6 and I didn't, he said I needed to put a little
18 time between the lawsuit before I got assigned anywhere
19 else.
20     Q.  Based on your working with Colonel Chaffinch,
21 does he like it when people sue him?
22         MS. BALLARD: Object to form.
23     Q.  You can answer.
24     A.  No.

Page 61

1         MR. NEUBERGER: I have no further
2  questions.
3         MS. BALLARD: Nothing else.
4         (The deposition concluded at 11:14 a.m.)
5         - - - - -

16 (Pages 58 to 61)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Case 1:04-cv-01394-GMS   Document 75-13   Filed 09/16/2005   Page 5 of 15

Conley  
David Baylor
v.  
C.A. # 04-1395-GMS
Chaffinch, et al.  
June 27, 2005

**Page 62**

David Baylor

INDEX TO TESTIMONY

| DAVID BAYLOR | PAGE |
|---|---|
| Examination by Mr. Neuberger | 2, 60 |
| Examination by Ms. Ballard | 56 |

- - - - -

**Page 63**

David Baylor

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

**Page 64**

David Baylor

State of Delaware )
                  )
New Castle County )

CERTIFICATE OF REPORTER

I, Vincent J. Bailey, Notary Public, do hereby certify that there came before me on the 27th day of June, 2005, the deponent herein, DAVID BAYLOR, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Vincent J. Bailey  
Certification No. 171-RPR  
(Expires January 31, 2008)

DATED:   7-20-05



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
# v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

Captain Harry W. Downes, Jr.

July 15, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CAPTAIN BARBARA L. CONLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action |
| v. ) | No. 04-1394-GMS |
| ) | |
| COLONEL L. AARON CHAFFINCH, ) | |
| individually and in his official ) | |
| capacity as the Superintendent, ) | |
| Delaware State Police; LIEUTENANT ) | |
| COLONEL THOMAS F. MACLEISH, ) | |
| individually and in his official ) | |
| capacity as the Deputy Superintendent,) | |
| Delaware State Police; DAVID B. ) | |
| MICHELL, individually and in his ) | |
| official capacity as Secretary of the ) | |
| Department of Safety and Homeland ) | |
| Security, State of Delaware; and ) | |
| DIVISION OF STATE POLICE, DEPARTMENT ) | |
| OF SAFETY AND HOMELAND SECURITY, ) | |
| State of Delaware, ) | |
| ) | |
| Defendants. ) | |

　　　　Deposition of CAPTAIN HARRY W. DOWNES, JR., taken pursuant to notice at the law offices of The Neuberger Firm, P.A., 2 East 7th Street, Suite 302, Wilmington, Delaware, beginning at 9:45 a.m. on Friday, July 15, 2005, before Kathleen White Palmer, Registered Merit Reporter and Notary Public.
APPEARANCES:
　　　　THOMAS S. NEUBERGER, ESQUIRE
　　　　THE NEUBERGER FIRM, P.A.
　　　　　2 East 7th Street - Suite 302
　　　　　Wilmington, Delaware  19801
　　　　　for the Plaintiff

-----------------------------------------------------------
WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Captain Harry W. Downes, Jr.

Page 2

1  APPEARANCES (Continued):
2
     RALPH K. DURSTEIN, ESQUIRE
3    STEPHANI J. BALLARD, ESQUIRE
     DEPARTMENT OF JUSTICE
4      820 North French Street
       Carvel State Office Building
5      Wilmington, Delaware 19801
       for Defendants Lieutenant Colonel Thomas F.
6      MacLeish, David B. Mitchell, and Division
       of State Police
7
8  ALSO PRESENT:    CAPTAIN BARBARA L. CONLEY
9            - - - - -
10         CAPTAIN HARRY W. DOWNES, JR.,
11      the witness herein, having first been
12      duly sworn on oath, was examined and
13      testified as follows:
14 BY MR. NEUBERGER:
15   Q.  Could you state your full name for the record,
16 sir?
17   A.  Harry Willis Downes, Jr.
18   Q.  Okay.  Captain Downes, Captain Barbara Conley
19 has brought a lawsuit against the State Police about two
20 promotions that went to two current majors.  Okay?  Your
21 name, as well as many other names, has come up as a
22 possible fact witness in the case, so I'm here today as
23 Barbara Conley's lawyer to ask you questions about things
24 that could have occurred over your career interacting

Page 3

1  with Colonel Chaffinch or things you might even know
2  about Barbara Conley and her record as an officer.  Okay?
3  Do you understand that?
4    A.  Yes.
5    Q.  You probably have been a trooper for more than
6  15 years would be my guess.  How long have you been a
7  trooper?
8    A.  Twenty-two.
9    Q.  Okay.  Twenty-two years.  So you've probably
10 testified in court before, haven't you?
11   A.  Yes.
12   Q.  So you could get called as a witness in court
13 and you understand that; right?
14   A.  Yes.
15   Q.  So today if I ask you any question that you
16 don't remember or anything like that, just say "I don't
17 remember."  I rather you not guess.  Okay?
18   A.  All right.
19   Q.  If there's a question I ask you that you don't
20 understand, just ask me to rephrase it and I'll be glad
21 to do that.  Okay?
22   A.  Okay.
23   Q.  Why don't I ask you:  When did you graduate from
24 the police academy?

Page 4

1    A.  Well, I graduated from the police academy
2  because I went through Camden/Wyoming, so I actually went
3  through the police academy back in 1981.  But I was hired
4  with the State Police August 23rd of '83.
5    Q.  So 1983 is when you started with the Delaware
6  State Police?
7    A.  Right.
8    Q.  Could we just sort of march through your duty
9  assignments up to the present, what troops you were at
10 and your ranks as you changed over time?  So 1983 you are
11 a trooper, I guess; right?
12   A.  Yeah.  Did my FTO, field training, at Troop 5 in
13 Bridgeville.
14   Q.  Troop 5.  Okay.
15   A.  After I completed my field training, I think it
16 was nine weeks back then, I went to Troop 3 on patrol.
17   Q.  So immediately after that you went to Troop 3?
18   A.  Right.
19   Q.  Would that have still been in 1983 or maybe
20 1984?
21   A.  '83.
22   Q.  Got you.  So it was nine weeks at Bridgeville is
23 what you are saying?
24   A.  Right.

Page 5

1    Q.  So how about at Troop 3, how long were you
2  there?
3    A.  I was at Troop 3 on patrol for three years.
4    Q.  Would that take us to around 1986?
5    A.  Right.
6    Q.  Then what happened?
7    A.  1986 I went into special investigations unit.
8    Q.  Where is that located?
9    A.  They're based out of Troop 9 in Odessa.  At that
10 time they were.  It's undercover drug unit.  So I'm
11 working in Kent County, but we are still -- I'm working
12 Kent and Sussex County.  I was in the southern drug unit,
13 but they are based out of Troop 9 in Odessa.
14   Q.  So you are doing undercover drug in Kent County?
15   A.  Kent and Sussex County primarily, but really, we
16 work everywhere.
17   Q.  Was it like the southern part of the state or
18 you went up into New Castle County, too?
19   A.  We are assigned to the southern part of the
20 state, but we did work in New Castle County.  I was on a
21 DA task force, so I worked everywhere.  I worked out of
22 state.  I worked everywhere.
23   Q.  How long did you have that assignment?
24   A.  I was there for five years.

2 (Pages 2 to 5)

A183

Captain Harry W. Downes, Jr.

Page 6

1  Q. So you are there about until 1991?
2  A. Till about '91.
3  Q. Did your rank change at all from 1983 to 1991
4  here?
5  A. Yes. I was a corporal by that time.
6  Q. When did you become a corporal?
7  A. Probably in -- let's see -- '90 -- I don't know.
8  About three years later I became a corporal.
9  Q. Okay.
10  A. I don't remember back then.
11  Q. All right. Maybe you remember when you became a
12  sergeant. Let me ask you that.
13  A. I became a sergeant in 19 -- around '92 or '93.
14  About '93. '93.
15  Q. All right. '93, sergeant.
16     Well, we are in Odessa, special
17  investigations unit up until about 1991. What happens in
18  1991? What's your next assignment?
19  A. Then I go to headquarters.
20  Q. Oh, headquarters. How long were you there?
21  A. A couple years.
22  Q. Let's say till 1993. What were you doing at
23  headquarters?
24  A. Initially went there in an assignment called

Page 7

1  Community Outreach, basically just being a liaison
2  between the department and a lot of community groups.
3     Then just kind of switched over, because we
4  were under the same section, just changed the community
5  services. And then in around '93 when I got promoted to
6  sergeant, then I went back to Sussex County to start a
7  community policing unit in Sussex County.
8  Q. So 1993 is when you get promoted to sergeant and
9  you went back to Sussex and you are setting up a
10  community policing unit?
11  A. Right.
12  Q. Were you headquartered out of a troop?
13  A. No. We were still working out of headquarters.
14  Q. All right. Even though you are working out of
15  headquarters, did that require you to be spending a lot
16  of time in Sussex County?
17  A. I was always in Sussex County. Really never
18  headquarters. We were based out of headquarters, but you
19  are always in Sussex County.
20  Q. Did that mean that you interacted with the two
21  troops that are in Sussex County?
22  A. Yes, all three troops.
23  Q. Three? Okay. For my information, there's five.
24  What are the other two?

Page 8

1  A. Five, four, seven.
2  Q. Five, four, seven.
3     How long were you doing that? From 1993
4  till when?
5  A. '93 to '96 I was down there in Sussex County
6  policing unit. Then I was asked to come up to Kent
7  County to begin a community policing unit in Kent County.
8  Q. How long were you doing that?
9  A. Probably for another three years. About another
10  three years.
11  Q. Any promotion during that time up till 1999? To
12  lieutenant?
13  A. No.
14  Q. When did you get promoted to lieutenant?
15  A. 2000.
16  Q. So you are doing this community policing or
17  whatever in Kent County up till about 1999?
18  A. Yeah. About -- it goes into 2000. So it's like
19  three and a half years.
20  Q. Okay. We'll say into 2000. So what happens in
21  2000?
22  A. Then I was promoted to lieutenant and I was
23  traffic lieutenant at Troop 3.
24  Q. Who was the commander there? Was Greg Warren

Page 9

1  still there in 2000?
2  A. Right.
3  Q. Traffic lieutenant at Troop 3. What were your
4  next assignments after 2000?
5  A. In 2002 I was promoted to captain. Went to
6  headquarters as domestic violence coordinator.
7  Q. Do you still serve in that capacity?
8  A. No. Last April I was moved to the academy as
9  director of training.
10  Q. Okay. I hadn't heard about that. So you are
11  saying just about this past April you became director of
12  training at the police academy. Does that mean you are
13  the guy who -- that's like old Greg Warren's old job?
14  A. Right.
15  Q. Who was the guy right before you?
16  A. Homiak.
17  Q. What is Homiak doing now?
18  A. Troop commander at Troop 6.
19  Q. So you are the director of training at the
20  police academy. Okay. Thank you.
21     It appears that during a lot of your career
22  you spent in Sussex County, Kent/Sussex or whatever, but
23  you started off at Bridgeville there and you were
24  explaining the different things.

3 (Pages 6 to 9)

Page 10

1    Q. During your career, have you ever
2 intersected with any assignments with retired Colonel
3 Aaron Chaffinch?
4    A. My first -- when I was on FTO, he was my field
5 training officer for about a week.
6    Q. All right.
7    A. He was really substituting for one of my FTOs.
8 He was probably on vacation.
9    Q. Any other times when you were undercover --
10    A. Yes. When I was undercover he was our sergeant
11 in the unit.
12    Q. So he was your sergeant in the special
13 investigations unit?
14    A. For a period of time.
15    Q. For a period of time. All right. Let me write
16 that down.
17    A. Not for the entire period of time. It was for a
18 brief period of time, actually.
19    Q. I guess I forgot to tell you when I was telling
20 you about the purposes of the lawsuit today, we've got
21 the names of various witnesses, retired Lieutenant Tom
22 Marcin, he's going to be testifying, retired Colonel
23 Gerry Pepper. Major Baylor has already testified.
24 Captain Dixon has already testified. And then there's

Page 11

1 you. That's sort of the universe of witnesses. Okay.
2         About these special investigations. For
3 example, you said you are technically working out of
4 headquarters all those years.
5         Was Colonel Chaffinch stationed at
6 headquarters for any of those years, or was that when he
7 was commander at Troop 5? Do you remember, those early
8 years in the 1990s?
9    A. No. I think he was in Sussex County. I don't
10 remember him being at headquarters. And if he was, I
11 didn't have any interaction with him.
12    Q. When you started as traffic lieutenant at
13 Troop 3, that was 2000, you said; right? Then 2000 you
14 came to headquarters; right?
15    A. Right.
16    Q. So it was April 2002, Colonel Chaffinch moved
17 from acting superintendent to the full superintendent.
18         So is it fair to say that from when you
19 were in headquarters in 2002 through his recent
20 retirement, you were both working out of the headquarters
21 building?
22    A. Yes. He was colonel.
23    Q. Okay. He was the colonel. Okay.
24         Now, when you were a sergeant working

Page 12

1 throughout Sussex County from 1993 to 1996 and
2 interacting with Troops 5, 4, and 7, would he have been
3 stationed in Sussex County, if you remember, back then?
4    A. I don't recall. I didn't have any interaction
5 with him.
6    Q. He's told us at his deposition -- we've already
7 taken his testimony, too, where his assignments were.
8 Okay?
9         How about during your career, what kinds of
10 interactions did you have with Barbara Conley? Maybe we
11 can just go backwards, maybe, because when you say
12 traffic lieutenant, did you report to her when you were a
13 traffic lieutenant? Did you go to meetings with her, for
14 example, when you were traffic lieutenant at Troop 3?
15    A. Yes.
16    Q. Were they sort of like monthly or bi-monthly
17 meetings?
18    A. Monthly traffic lieutenant meetings.
19    Q. Did they take place at headquarters with Captain
20 Conley?
21    A. Yes.
22    Q. While you were serving as a domestic violence
23 coordinator, you were both working out of the same
24 building? Are you in the same building? Are you in one

Page 13

1 of those other buildings as a domestic violence
2 coordinator?
3    A. No. I'm in another building.
4    Q. On the same campus there?
5    A. Right.
6    Q. I know where the main building is. I know where
7 the academy is. I know there's a motor pool behind
8 there. Are you in one --
9    A. The office back where the motor pool is.
10    Q. How about any other times in your career did you
11 interact with Captain Conley? Any of your other
12 assignments?
13    A. She was traffic lieutenant at Troop 3 when I was
14 the sergeant of Kent County community policing,
15 interaction with her there.
16    Q. Did you have any interaction when you were down
17 in Bridgeville for your nine weeks of training at FTO in
18 1983?
19    A. No.
20    Q. When you spent this time at Troop 3 for three
21 years, did you interact with her at Troop 3?
22    A. When I was sergeant at --
23    Q. No. 1983 to 1986, your first three years of
24 patrol work was at Troop 3.

4 (Pages 10 to 13)

Page 14
1  A. No.
2  Q. I think the record shows that she was a patrol
3  shift supervisor from 1993 to 1997 at Troop 3 and
4  Troop 5.
5       Now, from 1993 till at least 1996 when you
6  were working in Sussex and Kent counties, would you have
7  had opportunity to interact with her at Troop 5 doing the
8  kinds of work you were doing in community policing?
9  A. No.
10 Q. That's helpful. Thank you.
11      Now, I'll tell you what I'll do. I'm going
12 to give you a copy of the complaint in this action.
13 There's a couple paragraphs in here that I'll probably
14 ask you if you know anything about. Okay? So let's just
15 turn to page 7. Okay? If you could turn to page 7,
16 we'll just look here at paragraphs 32, 33, and 34. Okay?
17 I'll just let you to quietly read that to yourself, if
18 you could.
19 A. (The witness reviews the document.) Okay.
20 Q. Colonel Chaffinch himself has testified that he
21 belonged to an organization called the Delaware Shield
22 and Square Lodge of Freemasonry. Okay?
23      Were you aware that he belongs to a Masonic
24 organization?

Page 15
1  A. Probably not until this lawsuit.
2  Q. So you had never been present when he had any
3  conversations about that kind of thing?
4  A. No.
5  Q. That's fine. We'll just skip over that, then.
6  Thank you.
7       I'd like to show you what was marked as
8  Plaintiff's Exhibit 2 at the deposition of Colonel
9  Chaffinch. It is a poem or a limerick that he's
10 testified he has committed to memory and he recites on
11 various occasions. Okay? I'm going to ask you to read
12 it over quietly to yourself and then I'm just going to
13 ask you if you've ever heard him recite that poem.
14 A. (The witness reviews the document.) Okay.
15 Q. Have you ever heard Colonel Chaffinch recite
16 that poem?
17 A. Yes.
18 Q. Have you heard him recite it on the job?
19 A. Not this one.
20 Q. Where did you hear him recite it?
21 A. I think I heard him recite this one at a party
22 at Captain Conley's house.
23 Q. Was that around Christmastime sometime?
24 A. I believe so.

Page 16
1  Q. So you heard him recite it there. Have you ever
2  heard him recite it anywhere else?
3  A. Not that I can recall.
4  Q. Okay. Let me have that back.
5  A. (Handing.)
6  Q. I'm going to give you what was marked as
7  Plaintiff's Exhibit 3 at Colonel Chaffinch's deposition.
8  This has four -- we'll call them limericks, four separate
9  limericks that Colonel Chaffinch testified about at his
10 deposition. Let's have you look at the first four lines
11 about a Sarah Sarong and read that quietly to yourself.
12 Okay?
13 A. (The witness reviews the document.) Okay.
14 Q. Have you ever heard Colonel Chaffinch recite
15 that limerick?
16 A. Yes.
17 Q. Have you ever heard him recite it on the job?
18 A. Not that I can recall.
19 Q. Have you ever heard him recite it off the job?
20 A. Yes.
21 Q. How many times, if you recall?
22 A. I can recall the one time, the night, like I
23 said, at the party, I remember him reciting all the
24 limericks.

Page 17
1  Q. Let's look at the second limerick on that page,
2  Exhibit 3. Have you ever heard him recite that second
3  limerick?
4  A. Yes.
5  Q. Let's looked at the third limerick. Have you
6  have you ever heard him recite that limerick.
7  A. Yes.
8  Q. Let's look at the fourth. Have you ever heard
9  him recite the fourth?
10 A. Yes.
11 Q. Have you ever heard him recite any of those on
12 the job?
13 A. Not as I recall, not these.
14 Q. You are saying you did hear these other three
15 that night at that party?
16 A. Yes.
17 Q. Let me show you the last limerick which is
18 marked as Exhibit 4 here. Take a peak at that.
19 A. (The witness reviews the document.) Yes.
20 Q. Have you heard him recite that one?
21 A. Yes.
22 Q. Was that on or off the job?
23 A. Both.
24 Q. So this is the one about the monkey; right?

5 (Pages 14 to 17)

Page 18

1  A. Right.
2  Q. Did you hear him recite it at the party that
3  night?
4  A. Yes.
5  Q. Where else have you heard him recite that one?
6  A. In Captain Conley's office.
7  Q. Do you recall what year that might have been, or
8  the circumstances?
9  A. It was during the time that I was traffic
10 lieutenant at Troop 3 and I was up at headquarters in
11 Captain Conley's office, probably something pertaining to
12 traffic stuff. I was up there all the time. He came in
13 the office, just started talking. I just remembered him
14 reciting this limerick.
15 Q. Okay. Thank you. I'll have it back. We are
16 done with that.
17 A. (Handing.)
18 Q. Were you ever present at any staff meeting where
19 the colonel told what it's been called in this case a
20 vibrator joke, a joke about a woman living alone, living
21 at home with her father and somebody comes in and the
22 father introduces the person to a vibrator and calls it
23 his son-in-law? Were you ever present at any meeting
24 where that joke was told by Colonel Chaffinch?

Page 19

1  A. No.
2  Q. No? Okay.
3     When you were engaging in your field
4  training back in 1983 in Bridgeville, Sergeant Chaffinch
5  was one of your training officers?
6  A. Right.
7  Q. Did he tell you anything about his shift, his
8  patrol shift being called the Cocksters?
9  A. No.
10 Q. Let me ask you some questions about when your
11 name has specifically come up during the investigation of
12 this matter. I guess this might have to do with the
13 up-jumped-the-monkey limerick. Okay? I think you are
14 trying to give me your memory that that occurred in the
15 office. Okay?
16    Do you remember whether now-Captain Dixon,
17 while you were the traffic lieutenant, might have been
18 present in the office when the colonel recited that
19 limerick?
20 A. Say that again.
21 Q. Was Captain Dixon present in the --
22 A. In the office when he recited that?
23 Q. Yes.
24 A. I don't recall him being there.

Page 20

1  Q. Okay.
2  A. I don't recall him being there.
3  Q. But he might have been there? You just don't
4  know?
5  A. He may have been there. I don't recall.
6  Q. Do you recall whether it was the early part of
7  2003 when that took place in the office? It was after
8  that Christmas party you mentioned?
9  A. I would say it probably was because I know it
10 was soon after the Christmas party. That was probably in
11 2002. And it probably was early 2003 when this happened.
12 I know it was soon after that.
13 Q. Do you know why Colonel Chaffinch brought it up
14 in the office that day? Do you remember any of the
15 circumstances about why he was reciting it?
16 A. I would assume for two reasons. One, because he
17 wanted to be funny and entertain people; and number two,
18 because he thought that I thought it was funny.
19 Q. Is it fair to say that aside from the time you
20 have been at headquarters and Colonel Chaffinch has been
21 the colonel, you feel you've had limited interaction with
22 him over the years? Would that be a fair
23 characterization?
24 A. Yeah. I haven't had a lot of interaction with

Page 21

1  him. I mean, you know, I've known him in FTA, he was a
2  sergeant a little while I was in the drug unit, but even
3  then I didn't have a lot of interaction with our
4  sergeants in that unit just because of the nature of the
5  work. And, you know, even at headquarters when he is
6  there, I don't have a lot of interaction with him.
7  Q. Just based on the interaction you did have with
8  him over the years, does he use humor as a thing in
9  dealing with people, a device?
10 A. Yeah. He's a comedian.
11 Q. All right. Some of the humor he uses would
12 include limericks of the kind that I've shown you?
13 A. Right.
14 Q. There's sometimes it's just a joke, he heard a
15 joke on Letterman or something like that, a funny joke?
16 Does he tell jokes like that, also?
17 A. He tells jokes. I mean, he'll tell jokes. He
18 recites stuff. He recites Casey at the Bat. He says his
19 alphabet backwards. That's what I remember him from my
20 FTO, if I remember anything from my week of FTO. He
21 tried to say the alphabet backwards, you know, and he
22 recited Casey at the Bat. You know, I don't know what
23 else I learned that week. I know how to do that.
24 Q. Some of his jokes, are they sexual humor?

6 (Pages 18 to 21)

A187

Captain Harry W. Downes, Jr.

### Page 22

1  A. Well, yeah, I would say yeah.
2  Q. Some of his limericks or poems, are they sexual
3  humor?
4  A. Right.
5  Q. Some of his jokes and poems, do they poke fun at
6  minorities that you've ever heard?
7  A. I don't -- well, minorities as women?
8  Q. No. Women aside. Let's say Africans, let's say
9  Indians, Asians.
10  A. I can't recall one that he stated that was
11  really pointed to minority groups like that. The one
12  here, the up-jumped-the-monkey one, that was the one that
13  kind of put me on edge because of how it started off. So
14  that was probably the only one that I can recall.
15  Q. Since you've been at headquarters building in
16  your recent term, you went up there in 2002, I think
17  that's what you said, through the present, have you, on
18  occasion, gone to lunch with Barbara Conley?
19  A. Yes.
20  Q. Did you ever observe Captain Dixon,
21  then-Lieutenant Dixon, go to lunch with Captain Conley?
22  A. Yes.
23  Q. There's Roger Willie and all sorts of people
24  have gone to lunch with Captain Conley; right?

### Page 23

1  A. Yes.
2  Q. Have you ever been there going to lunch with
3  Captain Conley when the men in the motor pool unit right
4  behind the headquarters building there would make jokes,
5  do wolf whistles, things like that when she'd be walking
6  out with a male officer to go to lunch?
7  A. I haven't noticed it.
8  Q. So you haven't noticed that happen?
9  A. No.
10  Q. Did that ever happen when you went out to lunch
11  with her that you remember?
12  A. Not that I -- not that I recall.
13  Q. Did Glenn Dixon ever report to you that the
14  colonel asked him once whether he thought you were
15  romantically involved with Captain Conley?
16  A. It may have been Glenn that told me that. I
17  can't recall who actually told that, but he asked -- he
18  has asked that question of her -- or asked that question
19  of Glenn if I was.
20  Q. Right. The colonel has asked that question?
21  A. Right.
22  Q. It's your understanding that the colonel has
23  done that?
24  A. Yes.

### Page 24

1  Q. Did the colonel ever ask you that question?
2  A. Was I involved with Captain Conley?
3  Q. Yes.
4  A. No.
5  Q. Before Lieutenant Colonel Tom Marcin retired,
6  you remember there was this Bradley report, the study
7  that was done?
8  A. Right.
9  Q. There was like a woman's round table and even a
10  diversity committee that were set up. Do you remember
11  either of those? Tom Marcin might have been dealing with
12  one of those?
13  A. I've heard about it.
14  Q. Were you on either of those committees, the
15  diversity committee that Tom Marcin had set up?
16  A. No.
17  Q. No? Okay.
18      Were you on any woman's round table
19  committee?
20  A. No.
21  Q. Did you ever have any discussions with Captain
22  Downes or Major Dave Baylor about the lack of
23  implementation of a diversity committee that the Bradley
24  report had recommended?

### Page 25

1  A. Did I have conversation -- you said me, but --
2  Q. Dave Baylor or Captain Downes about the lack of
3  implementing a diversity committee as recommended by the
4  Bradley report?
5  A. I've never had any discussion with Baylor about
6  it, no.
7  Q. How about Captain Dixon?
8  A. You were saying "Captain Downes." You mean
9  Captain Dixon?
10  Q. Captain Dixon, yes.
11  A. I don't recall a conversation with him about it.
12      MR. NEUBERGER: Can we just take a break?
13      MR. DURSTEIN: Sure.
14      (A recess was taken at this time.)
15  BY MR. NEUBERGER:
16  Q. We are just about done.
17      Right now the Delaware state police is
18  deciding to fill two major vacancies; is that correct?
19  A. Yes.
20  Q. All the captains were eligible to apply for
21  those vacancies. Did you apply?
22  A. Yes.
23  Q. Have you been interviewed?
24  A. Yes.

7 (Pages 22 to 25)

Captain Harry W. Downes, Jr.

Page 26
1  Q. Are you awaiting a decision on whoever is going
2  to get promoted?
3  A. Yes.
4       MR. NEUBERGER: I don't have any other
5  questions.
6       MR. DURSTEIN: No questions.
7       MR. NEUBERGER: We are done. We appreciate
8  you coming up. Thanks for fighting the traffic and all.
9       THE WITNESS: Okay.
10      (The deposition was then concluded at
11 10:20 a.m.)
12           - - - - -
13           INDEX TO TESTIMONY
14
15
CAPTAIN HARRY W. DOWNES, JR.              PAGE
16
17 Examination by Mr. Neuberger              2
18
           - - - - -
19
20           INDEX TO EXHIBITS
21
22 (There were no exhibits marked for identification.)
23
24           - - - - -

Page 28
1  State of Delaware )
2                   )
3  New Castle County )
4
5       CERTIFICATE OF REPORTER
6
7       I, Kathleen White Palmer, Registered Merit
   Reporter and Notary Public, do hereby certify that there
8  came before me on the 15th day of July, 2005, the
   deponent herein, CAPTAIN HARRY W. DOWNES, JR., who was
9  duly sworn by me and thereafter examined by counsel for
   the respective parties; that the questions asked of said
10 deponent and the answers given were taken down by me in
   Stenotype notes and thereafter transcribed into
11 typewriting under my direction.
12      I further certify that the foregoing is a
   true and correct transcript of the testimony given at
13 said examination of said witness.
14      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
15 interested in the event of this suit.
16
17
18
19      Kathleen White Palmer, RPR, RMR
        Certification No. 149-RPR
20      (Expires January 31, 2008)
21
   DATED: July 18, 2005
22
23
24

Page 27
1
2
3
4
5
6
7
8      REPLACE THIS PAGE
9
10     WITH THE ERRATA SHEET
11
12     AFTER IT HAS BEEN
13
14     COMPLETED AND SIGNED
15
16     BY THE DEPONENT.
17
18
19
20
21
22
23
24



In the Matter Of:

# Conley
# v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

# Corporal Thomas F. MacLeish

June 9, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com