| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 74

1  specificity of his education I do not -- I didn't know.
2   Q.  Where did you go to high school?
3   A.  Dover High School, class of '72.
4   Q.  Do you know that Captain Warren is an adjunct
5  faculty member at DelTech and Community College?  Are you
6  aware of that?
7   A.  Are -- Mr. Neuberger, are you asking me do I
8  know that now because you are telling me and I was aware
9  in some dim recesses?  Yes, I was aware he taught in
10 colleges.  What specific colleges, I couldn't tell you.
11  Q.  Just to be specific, I'm asking you:  Prior to
12 my asking you this question, did you have any independent
13 knowledge of whatever I'm asking you?
14  A.  I knew that he was an instructor at different
15 various colleges, yes.
16  Q.  I'm going to read some colleges to you and you
17 tell me if any of those ring a bell as to where Captain
18 Warren taught.  Okay?
19  A.  Okay.
20  Q.  DelTech?  Wilmington College?  Drexel
21 University?  U of D?  Do any of those ring a bell as to
22 your previous knowledge of his teaching experience?
23  A.  I knew he taught at colleges.  That's the best I
24 can give you.

Page 75

1   Q.  Fair enough.
2   A.  I can't sit here and say, yes, I knew he taught
3  at these specific places.
4   Q.  Do you know that Captain Warren wrote police
5  department textbooks in his spare time?
6       MS. BALLARD:  I want to place an ongoing
7  objection as to the relevance of the Warren questions,
8  but he can certainly answer if he knows.
9       MR. NEUBERGER:  Relevance is not the
10 standard governing depositions.  You can have your
11 objection, Counsel.
12 BY MR. NEUBERGER:
13  Q.  Do you know that he was the administrator of the
14 Council on Police Training for a number of years?
15  A.  Yes, I was aware of that.
16  Q.  To go back to the question which I had
17 previously read before I was interrupted, did you know
18 that Captain Warren wrote police officer textbooks in his
19 spare time?
20  A.  I was aware of one textbook that he wrote, yes.
21 I believe it's still -- it was in the academy.
22  Q.  Now, in making the promotions to the rank of
23 major, the promotions that went to Hughes and Eckrich, do
24 you know if the colonel reviewed personnel files of

Page 76

1  officers?
2   A.  I don't have any knowledge of that.
3   Q.  Did you ever see him go down into -- I guess it
4  would be the director of personnel's office or wherever
5  those types of files are kept?
6   A.  I saw him in that area.
7   Q.  Did you ever see him reviewing files of
8  candidates for the position of major?
9   A.  I answered that already.  No, I did not.
10  Q.  Did you ever see him reviewing Captain Conley's
11 file?
12  A.  I have not.
13  Q.  Did the colonel ever tell you that he reviewed
14 personnel files when preparing to make his decision as to
15 who to promote?
16  A.  To what rank?
17  Q.  Majors.  Specifically, the promotion that went
18 to Eckrich and Hughes.
19  A.  No, I have no knowledge that he -- he never
20 spoke to me about doing that.
21  Q.  Have you ever served with Major Hughes?
22  A.  Yes, I have.  Go ahead.
23  Q.  No.  Please.
24  A.  At what level, Mr. Neuberger?

Page 77

1   Q.  Prior to his being promoted to the rank of
2  major.
3   A.  Yes, I had.
4   Q.  Did you ever work together in a close
5  relationship?  Were you ever just one rank above him and
6  his immediate supervisory officer?
7   A.  Yes.
8   Q.  Was that at Troop 3?
9   A.  No, it was not.
10  Q.  I'm sorry.  Where was that?
11  A.  I was the operations major and he was troop
12 commander at Troop 5.
13  Q.  Have you ever served with him in any assignments
14 prior to his being promoted to the rank of major?
15  A.  You mean as peers, as like rank, or as a -- you
16 asked me about the supervisory.  He was there as a
17 captain.  I was -- as a major.
18  Q.  Really, in any capacity.
19  A.  Major Hughes was promoted -- the period of time
20 when I was at Troop 5 from January to July, during that
21 period of time he made sergeant and was transferred to
22 Troop 7.  He was a corporal working on a shift when I
23 first got there.  And he was promoted during that time
24 period.

20 (Pages 74 to 77)

Page 78

1  Q. What year was that?
2  A. Would have been 1994.
3  Q. Did you work with him any time after that?
4  A. No. Only as previously answered when I was the
5  operations major and he was the troop commander.
6  Q. You served on the executive staff since he was
7  promoted to major with Major Hughes; correct?
8  A. Yes, I have.
9  Q. He is still on the executive staff today;
10 correct?
11 A. Yes, he is.
12 Q. Are you on a first-name basis with him?
13 A. Yes.
14 Q. Do you consider him a friend?
15 A. Yes.
16 Q. Do you socialize together?
17 A. No.
18 Q. Do your families socialize together?
19 A. No.
20 Q. Is Colonel Chaffinch friends with Major Hughes?
21 A. You would have to ask Colonel Chaffinch.
22 Q. Are you aware if Colonel Chaffinch is friends
23 with Major Hughes?
24 A. Yes, in the same context as from my knowledge of

Page 79

1  what I consider Randy to be a friend, yes.
2  Q. Is Major Hughes a close friend of Colonel
3  Chaffinch?
4  A. I can't answer that.
5  Q. So if he was, you couldn't deny it, or if he
6  wasn't, you couldn't deny it; correct?
7  A. That's correct. I don't know what a close
8  personal friend would be to Colonel Chaffinch.
9  Q. Do you know if they socialize together?
10 A. I don't have any knowledge of that.
11 Q. Do you know if they served together at any point
12 in their careers?
13 A. Yes, because Lieutenant Chaffinch -- when I was
14 troop commander at Troop 5, Colonel Chaffinch was then
15 Lieutenant Chaffinch and worked for me. And then
16 Corporal Hughes worked under then Lieutenant Chaffinch
17 as -- he was a patrol lieutenant and Corporal Hughes --
18 it's difficult -- was -- was a shift member there. I
19 think so. I would say yes, they did work together in
20 that capacity. Beyond that, I couldn't answer -- I
21 couldn't say when they did or didn't.
22 Q. Ballpark, what year was that?
23 A. That was when I was there as a troop commander
24 and preceded me arriving. I got there in June -- January

Page 80

1  of '94.
2  Q. Okay.
3  A. Through July of '94.
4  Q. Have you ever served with now-Major Paul
5  Eckrich?
6  A. Yes.
7  Q. Let me limit that time frame.
8     Prior to his promotion to major, have you
9  ever served with Major Paul Eckrich?
10 A. Yes, I did.
11 Q. Where?
12 A. I was the operations major and he was troop
13 commander.
14 Q. What troop was he commander of?
15 A. Troop 4.
16 Q. I'm sorry. Which one is Troop 4?
17 A. Troop 4 is in Georgetown.
18 Q. Got you.
19    Did you work closely with him on
20 administrative matters or whatever would come up?
21 A. Yes.
22 Q. Did you ever serve with him at any other point
23 during your career?
24 A. Not that I'm aware of.

Page 81

1  Q. Currently you serve or since he was promoted to
2  major you served with Major Eckrich on the executive
3  staff, haven't you?
4  A. Yes, I have.
5  Q. You continue to serve with him today because now
6  he is on your executive staff?
7  A. That's correct.
8  Q. Are you on a first-name basis with him?
9  A. Yes.
10 Q. Is he a friend?
11 A. Yes.
12 Q. Do your families socialize together?
13 A. No, we don't.
14 Q. Is Major Eckrich a friend of Colonel Chaffinch?
15 A. Yes.
16 Q. Is he a close friend?
17 A. I wouldn't know how close he is with the colonel
18 or not, with Colonel Chaffinch.
19 Q. Just based on your observations and your
20 experience and your experience working together with
21 those officers.
22 A. They are friends. Whether they are close or
23 not, I can't answer that.
24 Q. Do you know if they socialize together outside

21 (Pages 78 to 81)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

**Page 82**

1  of work?
2  A.  I'm not aware of it.
3  Q.  Just to change gears a little bit, are there
4  currently any vacancies for the position of major in the
5  Delaware State Police?
6  A.  Yes, there are.
7  Q.  Now, overall, what are the total number of
8  majors' positions on the executive staff, total?
9  A.  Total is five.
10  Q.  How many vacancies are there of those five
11  currently as of today?
12  A.  Two.
13  Q.  Who are the majors currently on the executive
14  staff?
15  A.  Current majors are Major Papili, criminal
16  operations major.
17  Q.  Okay.
18  A.  Special operations, slash.
19        Then there's Major Hughes.  He's field
20  operations, Kent and Sussex.  And there's Major Eckrich,
21  who is my administrative major.
22  Q.  Who is your lieutenant colonel?
23  A.  Lieutenant Colonel Mark Seifert.
24  Q.  Who was just promoted last week, I think?

**Page 83**

1  A.  On Friday.
2  Q.  Saturday paper.
3  A.  That's right.
4  Q.  Front page, local section, top headline.
5  A.  Yes.
6  Q.  I would like to put a document in front of you.
7        MR. NEUBERGER:  Mark this as Plaintiff's
8  Exhibit 17.
9        (Plaintiff's Exhibit 17 was marked for
10  identification.)
11  BY MR. NEUBERGER:
12  Q.  Do you have that document in front of you?
13  A.  I do.
14  Q.  I'm going to ask you some questions about that
15  document.  Okay?
16  A.  Okay.
17  Q.  Now, at the top it says "From:  Harrison Pamela
18  R. (DSP)"?
19  A.  That's correct.
20  Q.  It was sent on Friday, July 3rd, 2005, at 1514
21  hours?
22  A.  That's correct.
23  Q.  It appears to be sent to a lot of captains.
24  Would that be accurate?

**Page 84**

1  A.  That's correct.
2  Q.  Would you know if these are all the captains
3  currently in the DSP?
4  A.  It better be.
5  Q.  So is that a yes?
6  A.  Yes.
7  Q.  Is the "Subject" line say "RE:  Vacancies on
8  Executive Staff, Correction"?
9  A.  Yes.
10  Q.  Could you take a look at the rest of this
11  document and tell me once you have?
12  A.  (The witness reviews the document.)  Yes, I've
13  read it.
14  Q.  Was this a document which was sent out pursuant
15  to your authority?
16  A.  Yes, it was.
17  Q.  Is this document indicating there are two vacant
18  positions on the executive staff?
19  A.  Yes, it is.
20  Q.  Are those the same two vacant positions you just
21  described to me before I gave you this document?
22  A.  I described two vacant positions on the
23  executive staff, yes.
24  Q.  What are the actual positions that are vacant?

**Page 85**

1  A.  Well, there's one current vacant position for
2  field operations, north.
3  Q.  Which is --
4  A.  Which is New Castle County.  Okay?
5        And then there is a second -- that was
6  vacated, that is, for what used to be called the
7  information technology position of major.  That is under
8  review with the executive staff now to make a
9  determination as to will we realign executive staff to
10  reflect a better, more efficient manner in which to run
11  the division.  There's multiple things, but homeland
12  security has come into the picture in a big way.  Do we
13  need a specific major for that?  So it's in a discussion
14  stage with executive staff.
15        I have the authority to fill two executive
16  staff positions with major.  So that's why you don't see
17  specificity to the open positions.
18  Q.  Of the five majors' positions, the actual
19  positions that officers hold on the executive staff,
20  which of those was the most recently created by the DSP?
21  A.  Would be the information technology position.
22  Q.  When was that created?
23  A.  I'm guessing.  Do you want me to guess?  Because
24  I wasn't there when the decision was made to make it,

22 (Pages 82 to 85)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 86

1  Mr. Neuberger.
2  Q.  Sure.
3       Do you know who the first officer was who
4  ever held that position?
5  A.  Now you are making me think. I can -- once
6  again, I can speculate. I can make an educated guess for
7  you, but I can't -- you know, I think I would be right,
8  but it is a guess.
9  Q.  No. Just to make it clear for the record, I
10 don't want you to guess. I don't want you speculating.
11 I definitely don't want you making things up.
12 A.  I wouldn't do that.
13 Q.  I certainly appreciate that.
14      Do you have any reason to dispute if I told
15 you that Colonel Chaffinch was the first person who held
16 that position?
17 A.  That's who I was going to say it was.
18 Q.  How long have these two positions that are
19 currently vacant been vacant?
20 A.  The one -- one of the positions, the one of
21 operations officer, had -- was vacated by Major Baylor in
22 August of '04. We reassigned responsibility on staff at
23 that time to Major Seifert. He became the operations
24 officer for New Castle County and the information

Page 87

1  technology and the communication section which falls
2  under that. And we relieved him of a portion of his
3  command and gave it to Major Hughes.
4  Q.  How long has the other position been vacant?
5  A.  Since Friday.
6  Q.  Okay.
7  A.  Last Friday by the appoint of Major Seifert.
8  Q.  Judging by this e-mail in front of you, which is
9  marked as Plaintiff's Deposition Exhibit 17, would it be
10 fair to say that you are seeking applicants to fill those
11 two vacant positions?
12 A.  Yes, I am.
13 Q.  Have you made any decisions yet on who you are
14 going to place in those two vacant positions?
15 A.  No, I have not.
16 Q.  Have you given it any thought whatsoever?
17 A.  No, I have not.
18      Excuse me. Are you talking about am I
19 thinking of individuals for the position or have I given
20 thought to filling the positions with what I'm looking
21 for?
22 Q.  How about first: Have you given thought to any
23 specific individuals to fill those positions?
24 A.  No, I have not.

Page 88

1  Q.  Now to go to the other, to the first part of
2  what you indicated, have you thought of what you are
3  looking for?
4  A.  Yes, I have.
5  Q.  What are you looking for?
6  A.  The right person for the job.
7  Q.  Can you be any more specific than that?
8  A.  If I could, I know that -- obviously the first
9  person on the list is Captain Conley is who this was sent
10 to. And I'll be very broad and general in my sense
11 because it would be unfair to anyone that would want to
12 apply for that position if I gave specific things that
13 I'm looking for because the date hasn't passed to send in
14 your resume and your letter of consideration. Those are
15 both going to be factors. And plus the interview.
16      Do you understand that, the position I'm
17 in, Mr. Neuberger?
18 Q.  Sure. I'd like to go through some of that with
19 you.
20      On the "To" line, Captain Conley's name is
21 listed first?
22 A.  Yes.
23 Q.  Does it appear the names are listed
24 alphabetically?

Page 89

1  A.  That's the way it appears to me, yes.
2  Q.  You indicated one of the things you would be
3  considering is a letter of interest along with the
4  resume?
5  A.  Yes. That's what's stated in the sheet.
6  Q.  When those things are submitted and when the
7  date finally closes, will those be things you look at in
8  determining who to put into the position?
9  A.  Those are a few of the things we would consider,
10 yes.
11 Q.  You mentioned something else, I think, in
12 addition to the resume and the letter of interest a few
13 moments ago. Do you recall what else you mentioned?
14 A.  No.
15      THE WITNESS: Could you read it back to me?
16      MR. NEUBERGER: Could you read that back to
17 me?
18      (Discussion off the record.)
19 BY MR. NEUBERGER:
20 Q.  So there's going to be an interview when
21 candidates for the position are interviewed? Is that
22 fair to say?
23 A.  Yes. Everyone -- go ahead.
24 Q.  Would that be fair to say?

23 (Pages 86 to 89)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 90

1  A. Yes, there are going to be interviews.
2  Q. And that those interviews are going to be for
3  candidates to fill the position; correct?
4  A. Positions.
5  Q. Positions. Excuse me.
6  Now, this e-mail, Plaintiff's Deposition
7  Exhibit 17, was sent to all the captains; correct?
8  A. That's correct.
9  Q. If all of these captains submitted letters of
10 interest along with a resume, would they all be
11 considered for the position?
12 A. Yes.
13 Q. Do you think that all these captains are
14 qualified to apply for the position and be considered for
15 the position?
16 A. Yes, I do.
17 Q. Do you have any favorites on this list?
18 A. Not at this time.
19 Q. Do you have any objective standards that you are
20 going to use once the date does close in determining who
21 to award the positions to?
22 A. I haven't interviewed them yet. I haven't seen
23 the applications.
24 Q. Are there going to be any standards that you are

Page 91

1  going to use in judging those interviews and in judging
2  those applications and in judging those letters of
3  interests and in judging those resumes?
4  A. There's going to be a process where Lieutenant
5  Colonel Seifert and I are going to conduct those
6  interviews. And based upon criteria for those positions
7  that we feel is important to those positions, that is
8  necessary for the positions, we will --
9  Q. What I'm trying to get at is: What are those
10 criteria?
11 A. That would be unfair for me to say that at this
12 point with Captain Conley here and put her in an
13 advantage over the other 19 captains that are out there
14 that don't have the same ability to hear what that
15 criteria is going to be. That's set here.
16 Q. Colonel, I'm story to put you in a bad position.
17 A. Right.
18 Q. But this is relevant to certain aspects of this
19 lawsuit, specifically, Counsel, the injunctive relief. I
20 do need to ask you to answer that question.
21 MS. BALLARD: I'm sorry. What injunctive
22 relief are you referring to? That she be made --
23 MR. NEUBERGER: Instatement it's called.
24 That she be promoted to the rank of major.

Page 92

1  MS. BALLARD: Are you suggesting that that
2  has some relationship to the current vacancies?
3  MR. NEUBERGER: Absolutely.
4  MS. BALLARD: I think that's an issue aside
5  from whether he can answer your question or not.
6  MR. NEUBERGER: I need to know what factors
7  he is considering in making his promotions.
8  MR. DURSTEIN: I think the problem we have,
9  and we talked this over beforehand anticipating this
10 might come up. Our difficulty is or the colonel's
11 difficulty is that there's a duty running to all of the
12 candidates to preserve the integrity of the process, and
13 to the extent it is confidential, to preserve the
14 confidentiality and the fairness of it.
15 I think the colonel recognizes that to
16 disclose on this record at this time too much what I'll
17 call inside information about the process would raise
18 issues of fairness as to the candidates. Without getting
19 into the advice I would give him in wearing my hat as
20 counsel for the division --
21 MR. NEUBERGER: I'm not asking you to do
22 that as that would violate Rule 30(d).
23 MR. DURSTEIN: I would say certainly it
24 would be a valid concern for the Colonel to have to

Page 93

1  effect the integrity of that selection process which has
2  not yet taken place by disclosing information that could
3  prejudice some of the applicants.
4  BY MR. NEUBERGER:
5  Q. Colonel, when would you be able to answer
6  questions about the factors that you are going to
7  consider in making these two promotions?
8  A. I hope -- I hope to have interviews and
9  everything completed and have selection made by the end
10 of the first week of July, because I've got until the
11 17th to get them in.
12 And then, obviously, there's other things
13 going on, but I'm planning on scheduling interviews
14 evenings and weekends in order to be able to get the
15 interviews in and complete them and then make a decision
16 and a selection.
17 And I would be glad to share that with you
18 after that time. I appreciate the respect you are
19 showing me in this decision.
20 Q. Very well.
21 MR. NEUBERGER: Counsel, although I think I
22 am within my rights to ask him to answer that question,
23 counsel will agree to leave the deposition open and we
24 can revisit the issue sometime after that date has passed

24 (Pages 90 to 93)

Case 1:04-cv-01394-GMS   Document 75-16   Filed 09/16/2005   Page 6 of 15

Conley                                           v.                                    Chaffinch, et al.
Corporal Thomas F. MacLeish              C.A. # 04-1394-GMS                             June 9, 2005

Page 94

1  consistent with all our schedules and calendars.
2        MS. BALLARD: As to that issue, that's
3  fine.
4        MR. DURSTEIN: Yes. I think that's a
5  reasonable compromise. Leave it open as to that issue.
6        MR. NEUBERGER: Sure. So we are specific
7  on what the issue is, the issue is his decision as to who
8  to promote in the process to fill those positions.
9        MS. BALLARD: I thought the issue was what
10 criteria he is going to apply in considering the various
11 applicants.
12       MR. NEUBERGER: Sure. I think that fits in
13 with the larger picture of who he is going to consider in
14 the process and who he actually ultimately promotes.
15       MS. BALLARD: That's different.
16       MR. NEUBERGER: I think this is still an
17 open issue from the Rule 16 as to whether we are going to
18 amend our lawsuit to include future promotions.
19       MS. BALLARD: If you amend, you amend.
20       MR. DURSTEIN: Maybe the best way to
21 approach it now is we agree to leave the deposition open
22 as to these promotions. We'll reserve the right to deal
23 with any issues that might come up at that point, but I
24 think the important thing is we'll produce the witness so

Page 95

1  that he can be here and answer the questions.
2        MR. NEUBERGER: Fair enough.
3  BY MR. NEUBERGER:
4     Q. Colonel, prior to the promotions at issue, and
5  to be specific, the promotions that went to Major Eckrich
6  and Major Hughes, prior to that time, had you ever served
7  with Captain Conley?
8     A. Yes.
9     Q. Were you friends with her at that time?
10    A. Yes.
11    Q. Now, again, you testified to this before and my
12 memory is a little faulty, so I apologize.
13       How many years have you been in the DSP?
14    A. I've completed 27. I'm in my 28th year.
15    Q. Thank you.
16       How many years have you served with
17 L. Aaron Chaffinch?
18    A. He came on the year after I did, so -- do the
19 math. Twenty-six and a half years, 27 years I served
20 with him.
21    Q. Did you ever serve with him at the same duty
22 assignment?
23    A. Yes.
24    Q. What duty assignments were they?

Page 96

1     A. The first we had a short overlap of when I
2  came -- when I was coming out of the drug unit in
3  February of -- I'm mixing up my years -- of '84 is when I
4  came out. We were finishing an operation in special
5  investigations. He came into the unit prior to my
6  departure. He was my replacement coming in and we had a
7  short overlap of one of about maybe four to six weeks, I
8  think. And then he took my place and I was out and he
9  was in.
10       The next time we actually served together
11 was when I had my stint as troop commander at Troop 5
12 from January of '94 through July of '94.
13    Q. What would his rank have been at that time?
14    A. He was a lieutenant at that time.
15    Q. Just for the purposes of the record, there's a
16 captain who is in charge of the troop and is the troop
17 commander; correct?
18    A. That's correct.
19    Q. Were there two lieutenants who served under him?
20    A. Yes.
21    Q. Do you recall what lieutenant's position Colonel
22 Chaffinch held?
23    A. Yes. He was the traffic lieutenant at that
24 time.

Page 97

1     Q. Did you work closely together with him in your
2  capacity as traffic lieutenant?
3     A. Yes.
4     Q. Did you serve with him after that?
5     A. When I came up on staff in June of '01, he was
6  the lieutenant colonel and I served under him. And then
7  he became the acting superintendent in October of that
8  year and I was his major -- I was a major on his staff as
9  operations officer.
10    Q. Did there come a time when he asked you to serve
11 as his lieutenant colonel?
12    A. Yes.
13    Q. How did you feel about that?
14    A. I was ecstatic.
15    Q. Was it a big deal to you?
16    A. Yes, it was.
17    Q. Was it --
18    A. It was an honor. The big deal is the honor.
19 It's an honor to serve in that capacity, yes.
20    Q. So as his lieutenant colonel, did you work
21 closely with him on a day-to-day basis?
22    A. Yes, I did.
23    Q. Did you also work closely with him while you
24 were a major and he was the lieutenant colonel?

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 98

1  A.  Yes, but not as close. And the reason behind
2  that is I came up on June of '01. The then-colonel was
3  Colonel Pepper. Colonel Chaffinch was lieutenant colonel
4  at that point in time. In June, July, August,
5  September -- I believe it was in September Colonel Pepper
6  retired. Colonel Chaffinch was made the acting
7  superintendent and duties and responsibilities were
8  spread out. Lieutenant colonel -- Major Marcin then
9  assumed a lot of the duties and responsibilities of
10 lieutenant colonel.
11         So daily contact and -- I mean, he was on
12 staff. We took our direction from him.
13  Q.  You had meetings together?
14  A.  Multiple layers.
15     Yes, sir.
16  Q.  Are you on a first-name basis with Colonel
17 Chaffinch?
18  A.  Most of the time it's "Colonel," but, yes, it's
19 Aaron, yeah.
20  Q.  Do you socialize together?
21  A.  In a sense of weekly things, no. Have we
22 been -- there's been one time we all went out together to
23 dinner. I went to a ball game with him on one occasion
24 with other staff members. Eat dinner, eat lunch together

Page 99

1  at work, yes.
2  Q.  I would like to focus on off-duty contact.
3         You mentioned, for example, you had dinner
4  together and you went to a ball game?
5  A.  We went to a ball game -- he invited different
6  members of staff to go to the ball game. I went with
7  him.
8  Q.  What ball game was that?
9  A.  Baltimore three years ago.
10  Q.  Have your families ever socialized together?
11  A.  Margie and I met him and Karen before we did our
12 first SOAR retreat.
13         THE WITNESS (to Captain Conley): When was
14 that? I'm sorry. I didn't mean to ask you.
15  A.  Our SOAR retreat was November '03 and we had
16 dinner together on that occasion, him and Karen and
17 Margie and I. And we went back to begin preparation to
18 begin the SOAR retreat.
19         When I had my promotion ceremony for
20 lieutenant colonel at my house in November of '03, him
21 and Karen were invited and came.
22         I'm trying to remember if he made it to
23 Danny's graduation.
24         I could count on one hand the number of

Page 100

1  times we've socialized together off duty.
2         MR. NEUBERGER: I would like to mark
3  another exhibit as Plaintiff's Deposition Exhibit 18.
4         (Plaintiff's Exhibit 18 was marked for
5  identification.)
6  BY MR. NEUBERGER:
7  Q.  Do you have that document in front of you?
8  A.  I do.
9  Q.  Now, is this a four-page document?
10  A.  Yes, it is.
11  Q.  On the very first page does it say "Sports" in
12 the top middle, then below that does it say "State News
13 Sunday, March 13, 2005"?
14  A.  Yes, it does.
15  Q.  If you turn to the second page -- you are also
16 going to have to look at the second and third page in
17 conjunction.
18  A.  I understand.
19  Q.  If you look at them together, you'll see that it
20 is the same page, and I can't explain this very well, so
21 I apologize.
22  A.  It's okay. Okay.
23  Q.  On the second and third page when viewed in
24 conjunction at the top it says page "14, The Downstate

Page 101

1  Daily, State News Sunday, March 13, 2005"?
2  A.  Yes, sir.
3  Q.  If you turn to the fourth page, the fourth page
4  has several pictures on it, does it not?
5  A.  Yes, it does.
6  Q.  I want to direct your attention to the bottom
7  picture.
8  A.  Yup.
9  Q.  Is that a picture of --
10  A.  That's my son.
11  Q.  Your son. That's your son on the right?
12  A.  Yes.
13  Q.  That's you in the middle; correct?
14  A.  That's me.
15  Q.  That's Colonel Chaffinch on the left?
16  A.  Yes, it is.
17  Q.  There's a caption underneath of it which said
18 "Ready for a 'shoot-out' by CR Rider Josh Thornton and
19 mates were, from left, Delaware State Police Col. Aaron
20 Chaffinch (a Woodbridge High grad and fan), Lieutenant
21 Colonel Tom MacLeish and handsome son, Ryan"?
22  A.  Yes.
23  Q.  Is that what it says?
24  A.  Yes. A very proud dad. Yeah. You left that

26 (Pages 98 to 101)

Case 1:04-cv-01394-GMS   Document 75-16   Filed 09/16/2005   Page 8 of 15

Conley                                              v.                                    Chaffinch, et al.
Corporal Thomas F. MacLeish         C.A. # 04-1394-GMS                         June 9, 2005

Page 102
1  part out.
2  Q. Is this a picture that appeared in the
3  State News on March 13, 2005?
4  A. Yes, it is.
5  Q. Was Colonel Chaffinch on suspension at that
6  time?
7  A. Yes, he was.
8  Q. Were you acting superintendent at that time?
9  A. Yes, I was.
10 Q. You can put that down.
11 A. Okay.
12 Q. I would like to put another document in front of
13 you. We are going to call this Plaintiff's Deposition
14 Exhibit 19.
15         (Plaintiff's Exhibit 19 was marked for
16 identification.)
17 BY MR. NEUBERGER:
18 Q. Do you have that document in front of you?
19 A. I do.
20 Q. On the very first page -- actually, this is a
21 two-page document, isn't it?
22 A. Yes, it is.
23 Q. The very first page, does this appear to be an
24 e-mail?

Page 103
1  A. Yes, it is.
2  Q. Does it say "From: Harrison Pamela R (DSP)"?
3  A. Yes, it does.
4  Q. Does it say "Sent: Tuesday, May 17, 2005,
5  14:25"?
6  A. Yes, it does.
7  Q. Does it say "To: DSP Users"
8  A. Yes, it does.
9  Q. Does it say "Subject: Invitation"?
10 A. Yes, it does.
11 Q. Do you see that there's some text for that
12 e-mail? There's one short sentence?
13 A. Yes.
14 Q. A sentence fragment, whatever it is.
15         Does it say "This message is sent authority
16 of Colonel Thomas R. MacLeish"?
17 A. Yes, it does.
18 Q. Does this e-mail indicate it was sent at your
19 authority?
20 A. Yes, it does.
21 Q. If you turn to the second page, does this appear
22 to be an attachment that was attached to the e-mail?
23 A. That does, yes.
24 Q. Did you actually receive this e-mail personally?

Page 104
1  A. Yes, I did.
2  Q. Did you open the attachment?
3  A. Yes, I did.
4  Q. Is page 2 of Plaintiff's Exhibit 19 the same
5  thing that was in your attachment?
6  A. It -- yes, it appears to be. I don't see any
7  reason why it wouldn't.
8  Q. On page 2 of this Plaintiff's Deposition
9  Exhibit 19, would it be fair to say that this is an
10 invitation to a retirement party being held for Colonel
11 L. Aaron Chaffinch for tomorrow, June 10th, 2005?
12 A. Yes, it does.
13 Q. This e-mail was sent at your authority?
14 A. Yes, it was.
15 Q. Are you going to be attending this party?
16 A. Yes, I am.
17 Q. Are you going to have a good time?
18 A. I hope to.
19 Q. Fair enough. All right. You can put that
20 document down.
21         Now, Colonel Chaffinch has served in the
22 Delaware State Police for a long time. Is that fair to
23 say?
24 A. Yes, it is.

Page 105
1  Q. Now, was there ever a time when he was not
2  colonel or lieutenant colonel?
3  A. Oh, yes.
4  Q. You served with him for many years; correct?
5  A. Yes.
6  Q. Isn't it true that before he made it to the
7  highest ranks of the Delaware State Police, that he was
8  disciplined several times during his career for
9  inappropriate behavior?
10 A. I know he was disciplined during the course of
11 his career. I don't know the specifics of that
12 discipline.
13 Q. Are troopers disciplined for breaking rules?
14 A. Yes.
15 Q. So do you think he was disciplined for violating
16 a rule?
17 A. Yes.
18 Q. Do you know what rules he violated?
19 A. Not off the top of my head.
20 Q. Fair enough.
21         Did that discipline stop him from being
22 promoted to lieutenant colonel and later to colonel?
23 A. Obviously it did not.
24 Q. Do you know if he was disciplined prior to his

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 106

1 promotion to major?
2  A.  During the course of his career was he
3 disciplined prior -- yes.
4  Q.  That didn't stop him from being promoted to
5 major, did it?
6  A.  No, it did not.
7  Q.  After Colonel Chaffinch became colonel, was he
8 investigated numerous times by Internal Affairs?
9  A.  Upon being...
10  Q.  Would you like me to rephrase the question?
11  A.  Yes, please.
12  Q.  After he was promoted to the rank of colonel,
13 was Colonel Chaffinch subsequently investigated by
14 Internal Affairs or by an outside investigatory agency?
15  A.  Yes.
16  Q.  That happened on one occasion or on several
17 occasions?
18  A.  On two occasions that I'm aware of.
19  Q.  Some of those times the charges were
20 substantiated.  Isn't that true?
21      MS. BALLARD:  Object to the form.
22  Q.  To the best of your knowledge, on some of those
23 occasions, were the charges substantiated?
24  A.  Yes.

Page 107

1  Q.  Was Colonel Chaffinch fired?
2  A.  No.
3  Q.  An hour ago or an hour and a half ago I asked
4 you some questions about the United States Constitution,
5 didn't I?
6  A.  Yes, you did.
7  Q.  I went through a long series of questions with
8 you about the Constitution, the Bill of Rights, the
9 amendments to the Constitution, and various DSP rules and
10 regulations, didn't I?
11  A.  Yes, you did.
12  Q.  Didn't you testify that the Constitution and its
13 amendments are very important in the Delaware State
14 Police?
15  A.  Yes.
16  Q.  After Colonel Chaffinch became colonel, in June
17 of 2003, did a federal court and jury find Colonel
18 Chaffinch guilty of violating the First Amendment,
19 freedom of speech rights of a Sergeant Christopher D.
20 Foraker?
21      MS. BALLARD:  Object to the use of the term
22 "guilty."
23  Q.  You can answer.
24  A.  I know that -- I'm not going to dance around the

Page 108

1 question with you, your terminology, but he was found
2 guilty of violating his First Amendment rights.  I know
3 the jury -- what I personally know is the jury verdict
4 went against us.  What specifically went against us --
5  Q.  I can rephrase the question for you and I'll
6 even lay a little better foundation.
7      Do you know that in June of 2003 there was
8 a jury trial in which Colonel Chaffinch was the
9 defendant?
10  A.  Yes.
11  Q.  The plaintiff in that case was a Sergeant
12 Christopher D. Foraker?
13  A.  Yes.
14  Q.  You testified in that trial, didn't you?
15  A.  Yes, I did.
16  Q.  You were a major at the time?
17  A.  Yes, I was.
18  Q.  Do you know at some point the jury in that case
19 returned a verdict?
20  A.  Yes.
21  Q.  The jury found that Colonel Chaffinch had
22 violated the First Amendment free speech rights of
23 Sergeant Foraker?  Do you have any knowledge of that?
24  A.  Yes.

Page 109

1  Q.  Colonel Chaffinch wasn't fired for that, was he?
2  A.  No, he was not.
3  Q.  Did Colonel Chaffinch ever apologize to Sergeant
4 Foraker?
5  A.  I have no knowledge if he did or did not.
6  Q.  Did Colonel Chaffinch ever tell you that he had
7 apologized to Sergeant Foraker?
8  A.  He never said.
9  Q.  The Constitution is a big deal in the Delaware
10 State Police, is it not?
11  A.  The Constitution is very important.
12  Q.  I would like to direct your attention to
13 Plaintiff's Deposition Exhibit 16 which I placed in front
14 of you a little bit earlier.  Do you have that?
15  A.  I have it.
16  Q.  I would like to direct your attention to Rule
17 and Regulation Number 3.  Do you see that?
18  A.  Yes, I do.
19  Q.  Could you read that quietly to yourself?
20  A.  (The witness reviews the document.)  Okay.
21  Q.  Would it be a fair paraphrase of this paragraph
22 to say that it requires a member of the Division of State
23 Police to report to Internal Affairs if that officer has
24 knowledge that a fellow officer has violated federal law?

28 (Pages 106 to 109)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 110

1  A. That's correct.
2  Q. You can put that down.
3     Did you ever report to Internal Affairs
4  that Colonel Chaffinch violated this rule when he was
5  found to have retaliated against Sergeant Foraker in
6  violation of the First Amendment?
7     MS. BALLARD: Object to the form.
8  Q. You can answer.
9  A. No, because it had already been done so.
10 Q. I'm sorry.
11 A. No, I did not report it to Internal Affairs
12 because it had already been done so.
13 Q. His violation had already been reported to
14 Internal Affairs?
15 A. Been reported to Internal Affairs, yes.
16 Q. Do you believe that was an appropriate action?
17 A. Personally, no, but it was reported to Internal
18 Affairs.
19 Q. Didn't you testify earlier about the importance
20 of the United States Constitution?
21 A. Yes, I did. Yes, I did.
22 Q. You testified about the importance of the First
23 Amendment?
24 A. Yes, I did.

Page 111

1  Q. Do you consider those violations to be important
2  enough to be reported to Internal Affairs?
3  A. They were reported to Internal Affairs.
4  Q. You said personally you didn't consider they
5  should have been or you didn't think that they should
6  have been?
7  A. I said personally I didn't feel that that
8  finding -- your definition of the finding that he was
9  found to have violated his First Amendment rights, in
10 that setting, in that civil setting, that wasn't done and
11 it's me -- that was done in a civil court of law, not a
12 criminal court of law. If he violated his rights
13 criminally, he would have been found with a civil rights
14 violation and went to jail for it. The FBI would have
15 investigated him for doing it and so forth. Okay?
16    But it was -- your original question of did
17 I report it? It wasn't necessary to report because it
18 was already reported, so there's no need to keep
19 reporting the same thing that somebody else is reporting.
20 Q. Are you drawing a distinction that a Delaware
21 state trooper can violate civil laws and get away with it
22 but not violate criminal laws?
23 A. I'm not -- I didn't mean to do that.
24 Q. Sure.

Page 112

1  A. Okay. No. Civil law is as important as
2  criminal law. In this case, from what I drew out of --
3  when it was reported, it was reviewed with better legal
4  minds than mine and it was determined that he did not
5  violate -- he was not in violation of this rule and
6  regulation. So, therefore, there was not an
7  investigation nor were there any criminal charges placed
8  against him.
9  Q. So just to make sure I understand what you're
10 testifying to, legal minds conferred at some point and
11 reached the conclusion that the jury finding that Colonel
12 Chaffinch had violated the First Amendment was really not
13 a jury finding that Colonel Chaffinch had violated the
14 First Amendment?
15    MS. BALLARD: Object to the form.
16 Q. You can answer.
17 A. One more time with your question, Mr. Neuberger.
18    MR. NEUBERGER: Could you repeat the
19 question, please?
20    (The reporter read from the record as
21 requested.)
22 A. What I stated was that upon -- when it was
23 reported that he had violated the First Amendment rights
24 of Corporal Foraker, just that it was looked at legally

Page 113

1  to say, yes, did he or didn't he. It was determined that
2  he did not by legal counsel. Therefore, no investigation
3  moved forward.
4  BY MR. NEUBERGER:
5  Q. So it was determined by DSP legal counsel that
6  the law had not been violated?
7  A. By state legal counsel.
8  Q. Fair enough.
9  A. Yes.
10 Q. I'll move on past that.
11 A. Okay.
12 Q. Also while he was colonel in January of 2004,
13 did a federal court and jury find Colonel Chaffinch to
14 have violated the Fourteenth Amendment and discriminated
15 against now Sergeant William Bullen, B-u-l-l-e-n, because
16 of his race?
17 A. Is there a question in there?
18 Q. Did that occur, to the best of your knowledge?
19 A. (No response.)
20 Q. You are the colonel of the State Police. At the
21 time I think you were the lieutenant colonel.
22 A. And on January of '04, yes, I was.
23    And, yes, there was a finding against the
24 division, again.

29 (Pages 110 to 113)

Wilcox & Fetzer, Ltd.      Professional Court Reporters      (302)655-0477

Conley v. Chaffinch, et al.
Corporal Thomas F. MacLeish    C.A. # 04-1394-GMS    June 9, 2005

Page 114

1  Q. It was found that Colonel Chaffinch and
2  Secretary Ford had violated the Fourteenth Amendment
3  right of Sergeant William Bullen to be free of race
4  discrimination?
5      MS. BALLARD: Objection to the form.
6  Q. You can answer.
7  A. Yes.
8  Q. Was Colonel Chaffinch fired for that?
9  A. No, he was not.
10 Q. Did he ever apologize to Sergeant Bullen?
11 A. Not that I'm aware of.
12 Q. Did you report Colonel Chaffinch to Internal
13 Affairs for this violation of DSP Rule and Regulation
14 Number 3?
15 A. Did I, personally? No, I did not.
16 Q. Did anyone?
17 A. Yes, he was reported again.
18 Q. When?
19 A. I don't know. Your dad is the one who reported
20 him.
21 Q. For the purposes of the record, my father is
22 Thomas S. Neuberger?
23 A. I'm sorry. I'm sorry.
24 Q. Do you know when that report occurred?

Page 115

1  A. I do not. I can't recall.
2  Q. Also in January of 2004 did that same federal
3  court and jury find the colonel to have violated the
4  Fourteenth Amendment right of now Sergeant Jeffrey Giles
5  to be free of race discrimination?
6  A. Yes, the jury found against us, against the
7  division.
8  Q. Was Colonel Chaffinch fired for that finding?
9  A. No, he was not.
10 Q. Did he ever apologize?
11 A. Not to my knowledge.
12 Q. Did you report that violation to Internal
13 Affairs?
14 A. No, I did not.
15 Q. Now, you were recently promoted to colonel --
16 A. Yes.
17 Q. -- from the rank of lieutenant colonel; correct?
18 A. Yes.
19 Q. You've had several run-ins with Internal Affairs
20 yourself over the last several years yourself, haven't
21 you?
22     MS. BALLARD: Object to the form.
23 A. I haven't had several. I've had a couple. I've
24 had a couple investigations, not run-ins with Internal

Page 116

1  Affairs.
2  Q. How many investigations have there been into
3  your conduct by either Internal Affairs or outside
4  investigatory agency?
5  A. Two.
6  Q. For example, in early 2004 you were investigated
7  for interfering in a criminal investigation on behalf of
8  a personal friend?
9  A. Yes.
10 Q. Then those charges were substantiated, weren't
11 they?
12 A. A charge was substantiated against me as a
13 result of that investigation, yes.
14 Q. You were punished for it, weren't you?
15 A. Yes, I was.
16 Q. Did that stop you from being promoted to the
17 rank of colonel?
18 A. No, it did not.
19 Q. There was another investigation in approximately
20 April of 2004, I believe?
21 A. Yes.
22 Q. Those charges were investigated by an outside
23 investigatory agency, weren't they?
24 A. That's correct.

Page 117

1  Q. Some of those charges were substantiated,
2  weren't they?
3  A. A charge was substantiated again me.
4  Q. You were punished for that, weren't you?
5  A. Yes, I was.
6  Q. Was that the using profanity charge?
7  A. Yes, it was.
8  Q. You took your punishment and you moved on,
9  didn't you?
10 A. Yes, I did.
11 Q. Did that stop you from being promoted to the
12 rank of colonel?
13 A. No, it did not.
14     (Discussion off the record.)
15     (A recess was taken at this time.)
16 BY MR. NEUBERGER:
17 Q. Colonel, I'd like to ask you some questions now
18 about some events surrounding the filing of this lawsuit.
19 A. Yes, sir.
20 Q. Are you aware that in October 2004 Captain
21 Conley filed a federal court lawsuit naming Colonel
22 Chaffinch and the Division of State Police as defendants?
23 A. Yes, I am.
24 Q. Do you recall that that lawsuit was filed on

30 (Pages 114 to 117)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Page 118

1  October 27th of 2004?
2    A.  Yes.
3    Q.  Why do you remember that date?
4    A.  I was with my son in Gettysburg, Pennsylvania,
5  on his class trip and my pager and Blackberry went off
6  indicating -- to indicate to call headquarters. And I
7  called in and was told that the case was being filed.
8    Q.  Did there come a time when the colonel was put
9  on paid suspension and you were named, I guess it would
10 be, acting superintendent?
11   A.  Yes, sir, you are right on the second part. He
12 was placed on administrative leave and I was named the
13 acting superintendent.
14   Q.  Was that that same day or was that the next day?
15   A.  It was the same day.
16   Q.  So you indicated that you were in Gettysburg --
17   A.  Yes.
18   Q.  -- with one of your children and that's how you
19 heard about the lawsuit?
20   A.  Yes.
21   Q.  Who was the first person that you talked to
22 about the lawsuit?
23   A.  I believe it was Colonel Chaffinch.
24   Q.  Did he call you on the telephone or did you call

Page 119

1  him?
2    A.  Mr. Neuberger, I don't believe he called me. I
3  believe I got a page indicating that I needed to call
4  into headquarters. So, therefore, I called in.
5    Q.  Sure.
6    A.  I was responsible for 12 kids plus my own that
7  day, so when I got it -- I think -- you could probably
8  help me with the time better than I can. But I'm
9  thinking it was around lunchtime is when I received it
10 because I had other parents there that could watch the
11 kids while I made a phone call. And basically it was
12 there's been a suit filed by Captain Conley and, you
13 know, it's being filed. Press conference. So I take it
14 there was a press conference that day announcing it. I
15 was, okay, fine.
16          Then it was much later in the day, toward
17 the end of the day, I believe, I received another call
18 and that was from the secretary's office telling me that
19 I was to report there in an hour. It wasn't going to
20 happen. And then I briefly spoke to him. That time
21 period was between five and six.
22   Q.  So you indicated that when you first got the
23 page you called into headquarters; correct?
24   A.  Yes.

Page 120

1    Q.  Who did you speak to?
2    A.  I spoke to Colonel Chaffinch.
3    Q.  What did Colonel Chaffinch say to you?
4    A.  That Conley's filed a lawsuit against us.
5  They're having a news conference -- I'm paraphrasing
6  because my memory isn't his. The conversation -- do you
7  have it? No, we didn't have it at that time. Are we
8  going to get our hands on a copy of it? We are going to
9  try to? Because typically it's announced and then we
10 don't get served until much later, but it's out there and
11 we're asked to comment on something we don't have our
12 hands on. So we were working on trying to get our hands
13 on a copy of it.
14   Q.  Did the colonel sound angry on the telephone?
15   A.  He sounded upset.
16   Q.  Did he sound unhappy?
17   A.  Upset, unhappy, six of one, half dozen of
18 another. He wasn't pleased that we had another lawsuit
19 filed against us.
20   Q.  Would it be fair to say he was pissed off?
21   A.  What's your definition of "pissed off"?
22   Q.  It's a variation of the word "angry."
23   A.  He was upset.
24   Q.  Was he very upset?

Page 121

1    A.  He was upset.
2    Q.  And he was upset because of the filing of the
3  lawsuit?
4          MS. BALLARD: Object to the form.
5    A.  That we were -- that once again the division
6  was, you know, being sued. He was -- he was upset. You
7  could tell he was obviously displeased that a lawsuit had
8  been filed.
9    Q.  Did he use any colorful language to describe
10 Captain Conley?
11   A.  I can't say he did. He was upset. "We're being
12 sued again. This time it's Conley." Do I specifically
13 recall him using colorful language? No, I do not.
14   Q.  Does Colonel Chaffinch use colorful language on
15 a regular basis when he speaks to you?
16   A.  Not typically, no.
17   Q.  Do you think that he did not use colorful
18 language during that conversation?
19   A.  I don't recall specifically what he said,
20 Mr. Neuberger, nor do I recall if he used colorful
21 language or did not.
22   Q.  By "colorful language," just so we are on the
23 same page, I mean some kind of profanity or some
24 inappropriate language. Do you understand that?

Case 1:04-cv-01394-GMS   Document 75-16   Filed 09/16/2005   Page 13 of 15

| Conley | v. | Chaffinch, et al. |
| --- | --- | --- |
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

**Page 122**

1  A. Yes, I do.
2  Q. You indicated that there was a second call which
3  was made in which you spoke to Cabinet Secretary
4  Mitchell's office?
5  A. Yes.
6  Q. Did you initiate that phone call or did they?
7  A. That was -- that was initiated -- once again, I
8  received a page. I called in. Went through the
9  secretarial staff and got to the secretary.
10 Q. Did you speak to the secretary at that time?
11 A. Yes, I did.
12 Q. What did he say?
13 A. He told me at that point Colonel Chaffinch was
14 being placed on administrative leave as a result of the
15 allegations in the lawsuit and that I would be named
16 acting superintendent.
17 Q. Based on your conversation with Secretary
18 Mitchell, what were his feelings towards the lawsuit
19 which had just been filed by Captain Conley?
20 A. He took the content of the lawsuit very
21 seriously.
22 Q. You indicated before that the secretary wanted
23 you at his office within an hour?
24 A. Yes.

**Page 123**

1  Q. Would it be fair to say that Gettysburg is more
2  than an hour away from Dover?
3  A. Wasn't going to happen.
4  Q. When did you finally get to the secretary's
5  office?
6  A. I didn't go that evening. I talked to him about
7  what time I anticipated getting back to Holy Cross, my
8  son's school. He would be gone by then. I think that
9  was between seven and 8:00 that night. And if you ever
10 rode from Gettysburg and came back to Dover, there's a
11 section between Gettysburg and Baltimore that is
12 extremely tough on cell phones and we were having
13 conversations that portions of it were being missed and
14 left out and disconnected.
15         And you're on a bus with about 40 kids. I
16 couldn't tell them to all be quiet while I took this
17 important call. So it was difficult, at best, to talk.
18 But the gist came through. You are going to be the
19 acting superintendent and we'll discuss it further
20 tomorrow.
21 Q. Did you talk to anyone else that day about the
22 filing of the lawsuit? You mentioned Colonel Chaffinch.
23 You've mentioned Secretary Mitchell.
24 A. Yes.

**Page 124**

1  Q. Was there anyone else you talked to either in
2  the Delaware State Police or outside the Delaware State
3  Police about the lawsuit? And I'm not asking if you told
4  your wife anything.
5  A. Thank you. She -- I did.
6          No. I wasn't going to share it with all
7  the kids on the bus. I can tell you that.
8  Q. Did you call anybody while you were either up in
9  Gettysburg or on your way back to Dover?
10 A. I don't believe I did, no. My only
11 conversations -- I believe my only conversation was with
12 Colonel Chaffinch and the secretary.
13 Q. Did you call anyone once you got home back to
14 Dover that night?
15 A. I'm trying to remember if I called that night
16 and talked to the executive staff just to talk about what
17 was going to be -- how we were going to disseminate
18 responsibilities.
19 Q. At some point in those next couple days you
20 talked to your other officers about the lawsuit?
21 A. The next -- on the 28th. The result of the
22 lawsuit, me being acting superintendent, yes, I spoke to
23 our -- my executive staff and attempt to disseminate
24 responsibilities. I had to sever my contact with

**Page 125**

1  Internal Affairs at that point because now I'm the acting
2  superintendent. I'm no longer the deputy superintendent.
3  I'm going to be the final call on discipline as the
4  superintendent. As the deputy I was -- my responsibility
5  was to oversee Internal Affairs and that relationship
6  gets severed. I turned that over to Major Paul Eckrich.
7  Q. Now, still sticking with October 27th of 2004,
8  the day the suit was filed, after you talked to Colonel
9  Chaffinch, what were your feelings about the lawsuit
10 buying filed?
11 A. I was disappointed.
12 Q. How so?
13 A. The division was back in the paper, that -- be
14 it Captain Conley or anybody else that would have filed a
15 suit would have come forward with the allegations through
16 the division because we have a process in which to report
17 that. It's not -- she has a right to do what she did, as
18 does anyone else.
19         But within the division, the preference
20 would have been to make those concerns known through the
21 division beforehand, before filing a suit, see if they
22 could be taken care of within the organization versus
23 going outside of the organization.
24 Q. Is it your preference that matters be dealt with

Conley                                    v.                              Chaffinch, et al.
Corporal Thomas F. MacLeish          C.A. # 04-1394-GMS                   June 9, 2005

Page 126

1   internally versus going outside the organization and
2   filing a lawsuit?
3       A.   It is my preference that we have the
4   opportunity, the division has the opportunity to address
5   the concerns of the individual prior to going outside.
6   That's my preference.
7       Q.   Do you frown upon somebody going outside of the
8   division and not raising it internally and getting the
9   State Police the opportunity to first address the issue?
10      A.   Do I frown upon it, your words?
11      Q.   Yes.
12      A.   No.  Do I like it?  No, I do not.
13      Q.   Is it something you were unhappy about, in
14  general?
15      A.   I was disappointed.  I was disappointed.
16      Q.   Were you disappointed in Captain Conley?
17      A.   I was disappointed in the fact that a lawsuit
18  was filed and not having had the opportunity to address
19  the concerns.
20      Q.   That lawsuit was filed by Captain Conley;
21  correct?
22      A.   Yes.
23      Q.   I believe you mentioned that -- and if I'm wrong
24  in paraphrasing, please correct me, but I believe you

Page 127

1   mentioned that you didn't want the Delaware State Police
2   to be on the pages of the paper or something to that
3   effect?
4       A.   I -- if that's what --
5       Q.   It's your memory.
6       A.   Once again, the division was being put on the
7   front page of the paper in a negative light.  It doesn't
8   do well for the public confidence in the division nor to
9   the morale of the membership, either.
10      Q.   Both public confidence and the morale of the
11  membership are important things; correct?
12      A.   Absolutely.
13      Q.   We talked about October 27th, 2004, the day the
14  lawsuit was filed; correct?
15      A.   Yes.
16      Q.   The next day was October 28th; correct?
17      A.   Yes, Thursday.
18      Q.   You went into headquarters that day; correct?
19      A.   Yes.
20      Q.   Was that the first thing that you did once you
21  left your home?
22      A.   I might have dropped the kids off at school
23  first, but --
24      Q.   Fair enough.

Page 128

1       A.   But I went to work.
2       Q.   Did you talk to anybody by telephone before you
3   got to work?
4       A.   Mr. Neuberger, I can't recall if I did or did
5   not on that morning, the 28th.
6       Q.   Now, after you got to work, what happened?
7       A.   I remember one of my calls was to Mike Tupman,
8   counsel for the division, because I wanted to be clear on
9   what my responsibilities were, what do I continue to hold
10  as -- the responsibilities that I could hold as acting
11  superintendent and those that I needed to sever as the
12  deputy superintendent.
13           Also knowing we were one position short
14  already, now we are two positions short, there was no way
15  I could just say, here, somebody handle all this while I
16  be the acting superintendent.  So I wanted a clear
17  understanding of what I could -- what my responsibilities
18  were and the ones that I would give up.
19           And it was obvious that the role of deputy
20  superintendent in charge of Internal Affairs had to go to
21  someone else, and that went to Major Eckrich because he
22  had sat in with me in Internal Affairs' matters previous
23  to that.
24      Q.   So after you talked to Mr. Tupman, did you have

Page 129

1   any meetings or telephone calls with either Delaware
2   state police officers or with other members of Delaware
3   government?
4       A.   Yeah.  In my course of business, I know I talk
5   to numerous people, Mr. Neuberger.  To talk about the
6   lawsuit, though?  No.  I spoke to -- newspapers were
7   calling wanting an interview with me.  "You are now the
8   acting superintendent.  What are you going to do?"  And
9   that was lined up late in the day.  I believe I had a
10  case review that day, an Internal Affairs case review
11  which involved Captain Paige, Lieutenant Coupe, and it
12  was either Mr. Tupman or Mr. Durstein.  I can't remember
13  whether -- exactly who was there.
14           I spoke to Lieutenant Aviola because he had
15  indicated that people wanted interviews and he also
16  approached me about a reporter having a copy of Captain
17  Conley's charge sheet that went out that previous Monday.
18      Q.   Let's focus on a couple of those.
19           Is it your testimony that you did not talk
20  to anybody about the lawsuit that day?
21      A.   No, I can't say that there's nobody I talked to
22  about the lawsuit on that day.  I don't recall
23  specifically -- you know, staff members that we may have
24  talked about.  In a general sense, you know, the suit was

33 (Pages 126 to 129)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Page 130

1  filed, what are we going to do now, what direction are we
2  going, that type of thing.
3      Q.  There have been a lot of lawsuits against the
4  State Police in the last several years. Would that be a
5  fair statement?
6          MS. BALLARD: Object to the form.
7      A.  There have been lawsuits against the division in
8  the last several years -- in the last four years, yes,
9  sir.
10     Q.  Is it your testimony that you did not talk with
11 the executive staff about this latest lawsuit that
12 resulted in the superintendent being placed on
13 administrative leave?
14     A.  Administrative leave.
15         The specific of which, what are we going to
16 change? In a general sense, you are going to talk to
17 legal counsel about that lawsuit. How do we minimize the
18 impact on the division, the rank and file, the men and
19 women of the division. Extreme importance.
20         Spoke to the HR director about, okay, it's
21 front-page material, the allegation's out there about
22 inappropriate behavior in the workplace. Let's
23 redistribute the sexual harassment policy here among the
24 division, what is appropriate and not appropriate

Page 131

1  conduct.
2          In that sense did I discuss the lawsuit?
3  Yes, I did. Did I discuss the specifics of the
4  allegations? No. There was no reason to.
5      Q.  Did you discuss your feelings about the lawsuit
6  with any members of the Delaware State Police, be it
7  civilian or uniformed?
8      A.  I'm sure I expressed my personal opinion to,
9  perhaps, Lieutenant Aviola.
10     Q.  What was your personal opinion that was
11 expressed to Lieutenant Aviola?
12     A.  At that point in time that the suit -- that
13 personally I felt that it should have come through the
14 division. You know, the allegations should come through.
15 If they were -- as produced in the document, in the suit
16 itself, or were they a result of the Internal Affairs
17 investigation that had taken place against Captain Conley
18 previous to that. Is it retaliation on her part? But I
19 was very careful with what I said and how I said it
20 because just where we are sitting here today.
21     Q.  For the purposes of the record, you were not a
22 defendant in the lawsuit at that time, were you?
23     A.  No, I was not.
24     Q.  Did you express to Lieutenant Aviola that you

Page 132

1  were unhappy with this lawsuit being filed?
2      A.  Yes.
3      Q.  Did you express to Lieutenant Aviola that you
4  were displeased at this lawsuit being filed?
5      A.  I was disappointed, displeased, same -- same
6  thing, yes.
7      Q.  Did you express to him that you were angry about
8  this lawsuit being filed?
9      A.  I didn't say angry. I said displeased or
10 disappointed.
11     Q.  Were you angry?
12     A.  Angry at who? I mean, disappointed in the fact
13 that we didn't have a chance to do it, angry that the
14 division was, once again, on the front page of the paper?
15     Q.  Sure.
16     A.  Upset and disappointed. Angry, it takes awhile
17 to get me angry.
18     Q.  Are you angry about this lawsuit today?
19     A.  No, not angry about it. Still disappointed.
20 Still displeased.
21     Q.  Are you disgusted?
22     A.  Personally disgusted that some of the
23 terminology, the allegations, the paining of troopers
24 that took place as a result of what was said, yeah, that

Page 133

1  disgusts me that it would be -- people would perceive all
2  troopers in a general sense that that's the way we walked
3  around and talked, spoke, acted. That disgusts me, yes.
4      Q.  That came about as a result of this lawsuit
5  being filed?
6      A.  I would have felt that way if -- if that were
7  the perception of any time before the lawsuit. The
8  lawsuit was filed, I was disgusted by that fact, yes.
9      Q.  What newspapers did you give interviews to that
10 day?
11     A.  I believe I spoke to the News Journal, Delaware
12 State News. Those are the two I remember, specifically.
13     Q.  Sure. Okay. Those are the two newspapers of
14 general circulation in the State of Delaware?
15     A.  Yes.
16     Q.  Did you express your personal opinion about this
17 lawsuit to any of the reporters who spoke to you on
18 behalf of those newspapers?
19     A.  If I did, it was in the context of I would be
20 disappointed that another lawsuit had been filed. But
21 anything outside of that I don't believe I did. Not that
22 I can recall.
23     Q.  Isn't it true that you would be very pleased if
24 the State Police got off the front pages of the

34 (Pages 130 to 133)