| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 190

1  A. Yes, it does.
2  Q. It was sent on Friday, October 29, 2004, at
3  10:33 a.m.?
4  A. Yes.
5  Q. Does it say "Subject: Conley, Capt. Barbara"?
6  A. Yes.
7  Q. Does this e-mail appear to be a complaint
8  requesting an Internal Affairs investigation? Before you
9  answer that, you should probably take a look at the
10  e-mail.
11  A. (The witness reviews the document.) Okay. I've
12  read it.
13  Q. Does this appear to be a complaint requesting an
14  Internal Affairs investigation into the release of
15  Captain Conley's confidential Internal Affairs
16  information to the Delaware media?
17  A. Yes, it does.
18  Q. Did this e-mail ever find its way across your
19  desk?
20  A. I could have seen it, but I don't -- I don't
21  recall acting on it because I wouldn't have been the one
22  to act on it.
23  Q. Okay. That's helpful. Thank you. You can put
24  that document down.

Page 191

1      Did there come a time when you learned that
2  I, Stephen J. Neuberger, filed a written complaint with
3  the deputy attorney generals responsible for advising the
4  Delaware State Police?
5  A. I wasn't aware of that.
6      MR. NEUBERGER: I would like to mark this
7  new exhibit as Plaintiff's Deposition Exhibit 21.
8      (Plaintiff's Exhibit 21 was marked for
9  identification.)
10 BY MR. NEUBERGER:
11  Q. You can take a quick look at that three-page
12  document.
13  A. (The witness reviews the document.) I've read
14  it.
15  Q. Now, is this document an e-mail?
16  A. Yes, it is.
17  Q. Is it from Stephen J. Neuberger to Michael
18  Tupman, DOJ?
19  A. Yes, it is.
20  Q. Is it sent on Friday, November 5th, 2004, at
21  2:22 p.m.?
22  A. Yes.
23  Q. Is it "Subject: DSP - Complaint and Request for
24  Criminal Investigation"?

Page 192

1  A. Yes. My copy also has a lot of ccs.
2  Q. Sure.
3      Does it say cc. Tom Eldred of the Delaware
4  State News on it?
5  A. Yes, it does.
6  Q. Does it say cc. Mary Allen of The News Journal?
7  A. Yes, it does.
8  Q. Does it say cc. Randall Chase of the Associated
9  Press?
10  A. Yes, it does.
11  Q. Does it say cc. Thomas S. Neuberger?
12  A. Right. We got the same one.
13  Q. This actually raises another question.
14      Did Randall Chase ever contact the Public
15  Information Office that you are aware of and request
16  information relating to the Internal Affairs
17  investigations into you and the Internal Affairs
18  investigations into Colonel Chaffinch?
19      MS. BALLARD: Object to the form.
20  Q. You can answer.
21  A. I don't know if he specifically asked. I don't
22  have personal knowledge. I know he's one of the three
23  that normally do, Delaware State News, Associated Press,
24  News Journal, typically.

Page 193

1  Q. So he's one of the three that typically contacts
2  the PIO, in general?
3  A. In general matters, yes.
4  Q. Does this e-mail appear to be a complaint filed
5  by myself to deputy attorney general Michael Tupman
6  requesting a criminal investigation into three separate
7  matters?
8  A. That's what this appears to be.
9  Q. Did this e-mail ever find its way across your
10  desk?
11  A. No, it did not.
12  Q. Did you ever hear about this e-mail?
13  A. I believe I was verbally told by Mr. Tupman
14  about this e-mail.
15  Q. Was he talking to you in the course of giving
16  you legal advice or were you just talking in general
17  about an e-mail?
18  A. No. He was informing me in his capacity as our
19  attorney, the division's attorney.
20  Q. All right. You can put that document to the
21  side.
22      Would it be fair to say that in response to
23  both Plaintiff's Deposition Exhibit 21 and Plaintiff's
24  Deposition Exhibit 20 you really had no involvement in

49 (Pages 190 to 193)

Page 194

1  the matters, in the requests for investigations contained
2  within these two deposition exhibits?
3     MS. BALLARD: Object to the form.
4  Q. You can answer.
5  A. That's correct.
6  Q. Now, there are currently two majors' vacancies;
7  correct?
8  A. Yes.
9  Q. The Delaware State Police has a mandatory
10 retirement age of, I believe, 55; isn't that correct?
11 A. That's correct.
12 Q. Would it be fair to say that every few years a
13 vacancy for the position of major opens up in the
14 Delaware State Police?
15 A. I would think that would be accurate.
16 Q. For example, it could be because of promotion,
17 retirement, or things of that nature?
18 A. That's correct. Usually that's what it is.
19 Yes, usually that's what it is.
20 Q. Has there ever been a different thing that had
21 happened?
22 A. Not to my knowledge.
23 Q. For example, Major Dave Baylor retired in
24 approximately --

Page 195

1  A. August.
2  Q. -- August of 2004?
3  A. Yes.
4  Q. You used to be a major until you got promoted to
5  lieutenant colonel?
6  A. That's correct.
7  Q. Then you got promoted from lieutenant colonel to
8  colonel?
9  A. Yes.
10 Q. Tom Marcin used to be a major?
11 A. Yes.
12 Q. He was promoted to lieutenant colonel?
13 A. Yes.
14 Q. Then he retired?
15 A. Yes.
16 Q. Each time someone is either promoted or retired,
17 that opens up a vacancy; isn't that correct?
18 A. Normally, yes.
19 Q. Fair enough.
20    I believe you testified several long hours
21 ago about the importance of the Constitution to the
22 Delaware State Police. Do you remember that testimony?
23 A. Yes, I do.
24 Q. Do you remember testifying that the Constitution

Page 196

1  is personally very important to you?
2  A. Yes, I do.
3  Q. Do you remember going through the DSP rules and
4  regulations with me and how often the Constitution and
5  federal law was referenced in those rules and
6  regulations?
7  A. Yes, I do.
8  Q. Do you remember telling me that the DSP rules
9  and regulations appeared to indicate that the
10 Constitution is important to the DSP?
11 A. Yes.
12 Q. If the Constitution is violated, in your opinion
13 as the colonel of the Delaware State Police, is it
14 important that those violations be rectified?
15    MS. BALLARD: I'll object to the form.
16 Q. You can answer.
17 A. Yes. If there's a violation of the
18 Constitution, if one of my officers violates somebody's
19 rights, then we make it whole. We determine whether it's
20 a training issue. Is it an act of commission or
21 omission? Yes, you evaluate the circumstances under
22 which the infraction occurred and then address it.
23 Q. Is that because it's really an empty right if
24 it's not enforced or if the violation of that right is

Page 197

1  left without any remedy?
2  A. If what you are saying that if we ignore
3  violations of Constitutional rights without taking action
4  in order to correct whether it occurred, yeah, then, you
5  know, you can't do that because the whole system will
6  begin to crumble.
7  Q. For example, if a police officer is using
8  excessive force in the course of his arrests, could that
9  potentially violate the Fourth Amendment?
10 A. It could possibly, yes.
11 Q. If he keeps doing it over and over and over
12 again, that would be an issue of some concern to the
13 Delaware State Police and to you personally as the
14 colonel?
15 A. Yes, it would.
16 Q. You would want to make sure that the Fourth
17 Amendment was not being violated; correct?
18 A. That's correct.
19 Q. Is the same reasoning applied to other
20 protections of the Constitution?
21 A. Yes.
22 Q. Let's change gears again. Do you need a break?
23 A. Yes.
24    MR. NEUBERGER: All right. Let's take a

Case 1:04-cv-01394-GMS   Document 75-18   Filed 09/16/2005   Page 3 of 15

Conley                                   v.                           Chaffinch, et al.
Corporal Thomas F. MacLeish        C.A. # 04-1394-GMS               June 9, 2005

Page 198
1 break.
2 (A recess was taken at this time.)
3 BY MR. NEUBERGER:
4   Q.  I had a couple more random areas just to touch
5 on and we are almost done. Okay? It's been a long day.
6   A.  For all of us.
7   Q.  I believe you mentioned before that you believed
8 that Captain Warren's IA complaints were filed
9 approximately April of 2004?
10  A.  Yes.
11  Q.  One of those complaints dealt with the jury
12 verdict against Colonel Chaffinch in the Bullen and Giles
13 case?
14  A.  Excuse me just a minute. I apologize. That
15 distracted me. Go. Would you start over again? I'm
16 sorry.
17  Q.  I believe you testified earlier that Captain
18 Warren filed his Internal Affairs charges against Colonel
19 Chaffinch in April of 2004?
20  A.  Yes.
21  Q.  One of those charges dealt with the jury verdict
22 in the Bullen and Giles case which found that Colonel
23 Chaffinch had violated the Fourteenth Amendment?
24  A.  I assume so. I know there were a series of

Page 199
1 charges against the colonel at that point. And do I
2 personally remember what each charge was, Mr. Neuberger?
3 I don't. But there were a series of charges there, so
4 I'd say yes, that was one of them.
5   Q.  Do you remember that those charges were filed in
6 April 2004 by Captain Warren?
7   A.  Yes. Yes, I do.
8   Q.  You understand that the jury verdict was in
9 January of 2004?
10  A.  The jury verdict that the charges were based on?
11  Q.  Correct.
12  A.  I don't mean to draw a fine line, but I don't
13 remember what the specific charges were because I didn't
14 see the colonel's -- I mean, I remember reading about
15 them in the paper.
16  Q.  Right.
17  A.  But I don't remember what the specific charges
18 or the minute detail of those charges were.
19  Q.  Putting that to the side, do you recall that the
20 jury verdict came down in January 2004?
21  A.  Yes.
22  Q.  After January is the month of February; correct?
23  A.  Yes.
24  Q.  After February is the month of March?

Page 200
1   A.  That's the way it works.
2   Q.  And after March is the month of April?
3   A.  Yes.
4   Q.  So are there three months there between January
5 and April of 2004?
6   A.  Actually, there's two months. If you count
7 January and February, you got February and March, so
8 there's two months between those two months.
9   Q.  Fair enough.
10      At any time during those two or three
11 months did you file a charge with Internal Affairs
12 against Colonel Chaffinch for violating DSP Rule and
13 Regulation Number 3?
14  A.  That violation of rule and reg. 3 is the one
15 dealing with the Constitution?
16  Q.  Yes, it is.
17  A.  No, I did not.
18  Q.  Now, you were scheduled to have your firearms
19 training yesterday, weren't you?
20  A.  Yes, I was.
21  Q.  Actually, your firearms certification. Is that
22 accurate?
23  A.  Recertification, yeah.
24  Q.  Recertification?

Page 201
1   A.  Yes.
2   Q.  Did you show up at your firearms certification
3 yesterday?
4   A.  No, I did not.
5   Q.  Did you not attend your firearms recertification
6 because Captain Conley was going to be there?
7   A.  No. Didn't know she was going to be.
8   Q.  So you weren't trying to avoid her?
9   A.  Not at all.
10  Q.  Were you trying to avoid Sergeant Christopher
11 Foraker?
12  A.  No.
13  Q.  What did you do yesterday instead of going to
14 your firearms recertification?
15  A.  There was an operational need that took me
16 elsewhere.
17      MS. BALLARD: He met with us in the
18 morning.
19  Q.  So are you indicating that you met with your
20 attorneys in the morning?
21  A.  I -- I'll tell you --
22  Q.  Your counsel said it. I just need it to come
23 from your mouth.
24  A.  Yes, I met with my attorneys, but that wasn't

| Conley | | |
|---|---|---|
| Corporal Thomas F. MacLeish | v.<br>C.A. # 04-1394-GMS | Chaffinch, et al.<br>June 9, 2005 |

Page 202

1  the reason I cancelled my firearms shoot.
2       I cancelled the firearms shoot for the
3  entire executive staff because we have issues going on in
4  the City of Wilmington that we are trying to put together
5  plans for and we thought we were under a time line of
6  Friday in getting them done, and I had to meet with the
7  secretary to discuss those operational plans with him
8  that required redeployment of about 40 to 50 uniforms
9  people into the city. And firearms didn't necessarily
10 jump right up real high on my list.
11     Q. So you indicated that you met with the
12 secretary, meaning Secretary Mitchell?
13     A. I had a meeting with the secretary, yes. I
14 started out with meeting at 8:00 in the morning with
15 counsel. I rolled right into a staff meeting at 10:00
16 with my executive staff. We had lunch sitting there as
17 we were talking. Rolled right to a meeting with the
18 secretary at 4:00 -- I mean, excuse me, at 2:00, and then
19 I was back in my office until about 5:00 last night.
20     Q. During your meeting with the secretary did you
21 talk about this lawsuit at all?
22     A. No. It wasn't on the list.
23     Q. Did it come up at all?
24     A. No, it did not.

Page 203

1     Q. Did he raise the issue at all?
2     A. No, he did not.
3     Q. Did you raise the issue at all?
4     A. No, I did not. I advised him I was coming for a
5  deposition today.
6     Q. What did he say?
7     A. "Oh. I go Friday."
8     Q. Was there anyone else present at your meeting
9  with the secretary?
10    A. Yes.
11    Q. Who?
12    A. Lieutenant colonel -- Lieutenant Colonel Seifert
13 and Major Papili.
14    Q. One last area of questioning and then we are
15 done.
16         How much money do you make a year?

Page 204

Page 205

4     MS. BALLARD: Counsel, I don't know how
5  much more on this line you want to ask. Can I just get a
6  proffer? Do you intend to delve further into his
7  finances? Relevance.
8     MR. NEUBERGER: Sure. We've been getting
9  lots of punitive damages jury verdicts in state officials
10 as of late, and the state statute dealing with punitive
11 damages states that the state is not to indemnify those
12 officials for either punitive damages judgments or
13 compensatory damage judgments.
14         The attorney general's office issued
15 whatever it's called, a written opinion on this topic as
16 to whether the State was allowed to indemnify Colonel
17 Chaffinch for the judgment of punitives and compensatory
18 damages arising out of Sergeant Christopher Foraker's
19 case.
20         This is relevant to the fact of how we
21 collect if we do get a judgment. We are going to be
22 making a request for production of documents along those
23 lines. I'm just trying to figure out how to do my RFPs,
24 what types of things to look for.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 206

1  MS. BALLARD: It just seems premature. If
2  and when there was a verdict, you could certainly have an
3  inquiry into assets. I just think it's not relevant at
4  this point. I want to place an objection on the record.
5  MR. NEUBERGER: Sure. You understand that
6  relevance is not the standard governing this. It's
7  reasonably calculated to lead to the discovery of
8  admissible evidence.
9  MS. BALLARD: And I would take the position
10 it is not.
11 MR. NEUBERGER: Do you intend to stipulate
12 on the record that you don't intend to argue at trial
13 that punitive damages should not be assessed against your
14 client because of his limited assets?
15 MS. BALLARD: No. We intend to argue that
16 no damages should be assessed against our clients.
17 MR. NEUBERGER: Okay. I appreciate your
18 objection, Counsel.
19 MS. BALLARD: Thank you.
20 MR. NEUBERGER: Subject to the issues I've
21 already put on the record regarding the motions to
22 compel, and also our agreement as to questioning
23 regarding the two current vacancies, which was all put on
24 the record previously, I have no further questions.

Page 207

1  BY MS. BALLARD:
2  Q. Colonel MacLeish, I just want to ask very fee
3  questions just to clarify a few issues.
4  The term "promotion" to colonel was used,
5  when somebody is promoted to colonel. Is somebody
6  actually promoted to colonel through the DSP process or
7  is somebody made colonel another way?
8  A. Made colonel. You are appointed by the
9  governor.
10 Q. Who has the power to remove a colonel?
11 A. The governor, the secretary. I believe it's the
12 secretary with concurrence of the governor.
13 Q. In the discussion of the Eldred e-mail, you used
14 the term "release information," meaning speak to Eldred
15 after Aviola had spoken to you.
16 Did you release any information beyond what
17 was already in the e-mail he had?
18 A. No, I did not.
19 Q. Did you instruct Lieutenant Aviola to release
20 any information beyond what Mike Tupman advised you you
21 could release?
22 A. No, I did not.
23 Q. Did you broach Mike Tupman about the issue? Did
24 you tell him you wanted to release information?

Page 208

1  A. No, I did not.
2  Q. Did you give him any position as to what you
3  wanted to do with this e-mail issue?
4  A. I believe I told him based upon legal advice I
5  had received, it would be my decision to --
6  Q. I'm sorry. When you --
7  MR. NEUBERGER: I believe your client was
8  answering a question. He should be allowed to complete
9  his answer.
10 MR. DURSTEIN: You can clarify the
11 question.
12 MS. BALLARD: I don't think my question was
13 clear.
14 MR. NEUBERGER: Colonel, was her question
15 clear?
16 THE WITNESS: I don't remember what the
17 question was at this point.
18 MS. BALLARD: You can read back the
19 question. I'm sorry.
20 (The reporter read from the record as
21 requested.)
22 A. It would be my decision to release the
23 information based upon what was contained in the
24 document.

Page 209

1  BY MS. BALLARD:
2  Q. The "him" referred to in my question was Mike
3  Tupman.
4  A. Yes, it did.
5  Q. When you got Mike Tupman on the phone, what did
6  you say to him first?
7  A. When he was first on the phone it was just to
8  discuss the fact that Eldred had the e-mail and -- I'm
9  trying to remember if we asked Mike -- I think it was
10 pretty much determined if he had the e-mail, it was going
11 to be a violation of the rules and regulations and we
12 were going to look into that.
13 Mike is counsel to Internal Affairs. That
14 could have been part of the discussion point with it
15 that, you know, where would we stand if we could
16 ultimately identify who sent that e-mail and, you know,
17 it being a violation of rules and regulations.
18 The secondary part of that conversation
19 involved the fact that if, in fact, Eldred had it and was
20 asking the division for verification of that document,
21 would we violate the LEOBOR and/or the rules and
22 regulations by doing that.
23 And the advice given was, as previously
24 stated, it was now no longer an internal document. It

53 (Pages 206 to 209)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 210
1  was in the public domain and it wasn't protected by
2  LEOBOR and it wasn't protected by the rules and
3  regulations and it was only to acknowledge what is in the
4  four corners of the document.
5         MS. BALLARD:  Thank you.
6         MR. NEUBERGER:  No further questions
7  subject to what's already on the record.
8         (The deposition was then concluded at
9  3:40 p.m.)
10                - - - - -
11         INDEX TO TESTIMONY
12
13
   COLONEL THOMAS F. MacLEISH         PAGE
14
15  Examination by Mr. Neuberger         2
    Examination by Ms. Ballard         207
16
17              - - - - -

Page 212

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 211
1       INDEX TO EXHIBITS
2
   PLAINTIFF'S EXHIBIT NO.:           PAGE
3
4  15  A multipage copy of a document entitled
       "Preamble to Code of Ethics and Rules &
5      Regulations Introduction"         19
6  16  A multipage copy of a document entitled
       "Delaware State Police Rules and Regulations"  34
7
   17  A one-page copy of an e-mail dated Friday,
8      June 3, 2005, from Pamela R. Harrison to a
       distribution list                 83
9
   18  A four-page copy of copies of pages from
10     the State News                    100
11 19  A one-page copy of an e-mail dated Tuesday,
       May 17, 2005, from Pamela R. Harrison to DSP
12     Users with a one-page attachment  102
13 20  A one-page copy of an e-mail dated Friday,
       October 29, 2004, from Stephen J. Neuberger
14     to James Paige                    189
15 21  A three-page copy of an e-mail dated Friday,
       November 5, 2004, from Stephen J. Neuberger
16     to Michael Tupman                 191
17              - - - - -

Page 213
1  State of Delaware )
2                   )
3  New Castle County )
4
5         CERTIFICATE OF REPORTER
6
7     I, Kathleen White Palmer, Registered Merit
   Reporter and Notary Public, do hereby certify that there
8  came before me on the 9th day of June, 2005, the deponent
   herein, COLONEL THOMAS F. MacLEISH, who was duly sworn by
9  me and thereafter examined by counsel for the respective
   parties; that the questions asked of said deponent and
10 the answers given were taken down by me in Stenotype
   notes and thereafter transcribed into typewriting under
11 my direction.
12     I further certify that the foregoing is a
   true and correct transcript of the testimony given at
13 said examination of said witness.
14     I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
15 interested in the event of this suit.
16
17
18
19        Kathleen White Palmer, RPR, RMR
          Certification No. 149-RPR
20        (Expires January 31, 2008)
21
   DATED: June 11, 2005
22

54 (Pages 210 to 213)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
## v.
## Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

## Joseph P. Aviola, Jr.

June 7, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:04-cv-01394-GMS   Document 75-18   Filed 09/16/2005   Page 8 of 15

Conley                                          v.                              Chaffinch, et al.
Joseph P. Aviola, Jr.                    C.A. # 04-1394-GMS                     June 7, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,           )
                                     )
            Plaintiff,               )
                                     )  Civil Action
v.                                   )  No. 04-1394-GMS
                                     )
COLONEL L. AARON CHAFFINCH,          )
individually and in his official     )
capacity as the Superintendent,      )
Delaware State Police; LIEUTENANT    )
COLONEL THOMAS F. MACLEISH,          )
individually and in his official     )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.      )
MICHELL, individually and in his     )
official capacity as Secretary of the)
Department of Safety and Homeland    )
Security, State of Delaware; and     )
DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY,     )
State of Delaware,                   )
                                     )
            Defendants.              )

        Deposition of LIEUTENANT JOSEPH P. AVIOLA, JR.,
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 2:00 p.m. on Tuesday,
June 7, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.
APPEARANCES:
        STEPHEN J. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff
-------------------------------------------------------
                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

A246

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

Page 2

1  APPEARANCES (Continued):
2
   RALPH K. DURSTEIN, ESQUIRE
3  STEPHANI J. BALLARD, ESQUIRE
   DEPARTMENT OF JUSTICE
4     820 North French Street
      Carvel State Office Building
5     Wilmington, Delaware 19801
      for Defendants Lieutenant Colonel Thomas F.
6     MacLeish, David B. Mitchell, and Division
      of State Police
7
8  ALSO PRESENT:
9     CAPTAIN BARBARA L. CONLEY
10        - - - - -
11     LIEUTENANT JOSEPH P. AVIOLA, JR.,
12     the witness herein, having first been
13     duly sworn on oath, was examined and
14     testified as follows:
15 BY MR. NEUBERGER:
16   Q.  Lieutenant Aviola, my name is Steve Neuberger.
17 I'm an attorney for Captain Conley.
18       Have you ever testified in court before?
19   A.  Yes, sir.
20   Q.  Approximately how many times?
21   A.  Quite a bit, both on the state and federal
22 level.
23   Q.  Have you ever had your deposition taken before?
24   A.  Yes, I have.

Page 3

1   Q.  Approximately how many times?
2   A.  I'd say at least over ten.
3   Q.  Then I'm just going to run through the basic
4 procedures with you so you have them just in case your
5 memory has faded at all since the last time that you did
6 this. Okay?
7   A.  Sure.
8   Q.  I'm going to ask you some questions and the
9 court reporter is going to type up your answers to those
10 questions. Okay? We have to take turns talking. If we
11 talk at the same time, the court reporter, although she
12 is very, very good, can't get everything down if we all
13 talk at the same time. Okay?
14   A.  Yes, sir.
15   Q.  Also, you have to verbalize your answers.
16 Instead of nodding your head, you have to say yes; or
17 instead of shaking your head, you have to say no.
18   A.  Okay.
19   Q.  After we are done here today, you'll have an
20 opportunity to review the transcript of the deposition to
21 correct any typographical errors that are made in the
22 transcription. Do you understand that?
23   A.  Yes, sir.
24   Q.  If I ask you a question and you don't understand

Page 4

1 the question, just ask me to rephrase it and I'll be
2 happy to do that. Okay?
3   A.  Yes.
4   Q.  Also, I don't want you to take any guesses. If
5 you don't know the answer to a question, just say so.
6 Okay?
7   A.  Yes.
8   Q.  Are you taking any medications or is there
9 anything else that would prevent you from remembering
10 accurately or testifying truthfully here today?
11   A.  No.
12   Q.  If you need any breaks, if you need to stretch
13 your back out or run to the john, if you need to do a
14 little bit of yoga, just let me know and I'm happy to
15 recess for five, ten minutes or something like that.
16   A.  All right. Thank you.
17   Q.  You've taken an oath to tell the truth today;
18 correct?
19   A.  Yes.
20   Q.  Do you understand the significance of that oath?
21   A.  Yes, I do.
22   Q.  The State Police, they have a dishonesty rule,
23 don't they?
24   A.  That is correct.

Page 5

1   Q.  If someone lies under oath or lies in the course
2 of their duty, they can be severely disciplined?
3   A.  Yes.
4   Q.  You understand that because you've been a police
5 officer for a very long time?
6   A.  Yes, sir.
7   Q.  What's your full name?
8   A.  Joseph P., as in Patrick, Aviola, Jr.
9   Q.  What is your present rank?
10   A.  I'm a lieutenant assigned to -- director of
11 public information for the Delaware State Police.
12   Q.  When were you born?
13   A.  May 27th, 1964.
14   Q.  27th. Okay. Got you. Also happy belated
15 birthday.
16   A.  Thank you.
17   Q.  Where were you raised?
18   A.  Wilmington, Delaware.
19   Q.  Where did you go to elementary school?
20   A.  St. Elizabeth's.
21   Q.  Where did you go to high school?
22   A.  St. Elizabeth's.
23   Q.  Was it your son who was the catcher for the
24 St. Mark's baseball team?

2 (Pages 2 to 5)

Conley v. Chaffinch, et al.
Joseph P. Aviola, Jr.   C.A. # 04-1394-GMS   June 7, 2005

Page 6
1  A.  He is my cousin and godson. His father and my
2  father are brothers.
3  Q.  Well, congratulations on the big win.
4  A.  Well, thank you. We are very pleased with that.
5  Q.  How many years have you been a police officer?
6  A.  Twenty years.
7  Q.  Have all 20 years been with the Delaware State
8  Police?
9  A.  Yes, sir.
10 Q.  What was your first year, then?
11 A.  1985, September 3rd, 1985.
12 Q.  Could you walk me through your promotional
13 history as a trooper from your time in the academy to the
14 present time, and also your present assignment now?
15 A.  Yes, sir. Again, I was hired September 3rd,
16 1985. Went to do field training at Troop 3 in Camden. I
17 was there for about six months for my field training.
18 Then I was reassigned to Troop 6 patrol, which is at
19 Prices Corner. Spent about five years in patrol, at
20 which time I was transferred to special investigations
21 unit, undercover detective. I was in there for almost
22 two years. Then I did a lateral transfer and went into
23 financial organized crime, investigating financial
24 crimes.

Page 7
1  Q.  What year would that have been, ballpark?
2  A.  1990 -- about '91 to '92.
3  Q.  Okay.
4  A.  When I came out of there, I was assigned to the
5  interstate criminal highway patrol unit for about three
6  and a half years. It was a two-person car. We worked on
7  the interstate, particularly looking for drugs basically
8  is what we did.
9      Came out of there. I was promoted to the
10 rank of sergeant in 1996 -- actually, the end of it in
11 '97. Became a patrol sergeant. Was a patrol sergeant at
12 Troop 6 again for approximately three and a half years.
13 Then I was transferred to the training academy as a
14 sergeant. And I was assigned to the training academy for
15 a little over three years, at which time I was promoted
16 to the rank of lieutenant. Sent back to Troop 6 again
17 and was in the criminal unit at Troop 6 for almost two
18 years. And after that I was at Troop 6, I was assigned
19 to the public information office. And that's my current
20 assignment.
21 Q.  What year were you assigned to Troop 6 as the
22 criminal lieutenant? What year did you go in there?
23 A.  Okay. I've been here almost -- September -- I
24 came in this unit almost two years ago in September, so

Page 8
1  what are we? In '95? I don't know. 2001.
2  Q.  So then you just indicated that you were in your
3  present position for the last two years since September
4  of --
5  A.  September of 2003 and then I'll finish and my
6  second year will be up in September 2005.
7  Q.  If I needed to subpoena you for trial, where
8  would I do so?
9  A.  The best way is to send it to headquarters down
10 in Dover, P.O. Box 430, Dover, Delaware.
11 Q.  So you would be available also if I wanted to
12 affect personal service, I could do that in DSP
13 headquarters in some fashion?
14 A.  Absolutely. There or I also have an office at
15 Troop 2, 100 Lagrange Avenue in Newark.
16 Q.  Would it be your preference I served you at work
17 as opposed to your house?
18 A.  Yes, it would be.
19 Q.  You indicated that your present position is as
20 lieutenant in charge of the public -- is it the Public
21 Affairs Office or the Public Information Office?
22 A.  Public Information Office.
23 Q.  You've been in there since September of 2003;
24 correct?

Page 9
1  A.  Yes, sir.
2  Q.  What are your job duties there?
3  A.  There are many. It's myself and two other
4  people. Primarily I try to have the other two people do
5  or handle day-to-day activities as far as news releases
6  of what our troopers do as far as making arrests, any
7  significant stories that would be of interest to the
8  public, as well as respond to questions from the media
9  outlets, whether they are TV, newspaper, radio. Give
10 sound bytes.
11     And then as director what I have to do is
12 deal with FOIA requests, any requests that specifically
13 come in that people want to interview, either people from
14 the agency and/or the executive staff or the
15 superintendent, deputy superintendent. We also are
16 responsible for setting up promotional ceremonies, along
17 those lines, memorial services.
18     So that's kind of, in brief, what we do.
19 Q.  Is there a document somewhere which would lay
20 out the job duties of the individuals in your office?
21 A.  We do have a policy and procedure for the Public
22 Information Office, and it was just recently revised by
23 myself to include some extra steps for FOIA requests.
24 Q.  When was the date of the recent revision?

3 (Pages 6 to 9)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

Page 10

1  A.  I would say -- I'm almost sure it was March
2  2005.  But other than that revision, everything has
3  pretty much been standard -- the policy hasn't been
4  changed since then.
5     Q.  Would the policy be located in that blue DSP
6  rules and regulations and policies manual?
7     A.  Yes, sir.
8     Q.  Do you know what section that is off the top of
9  your head?
10    A.  No, I do not.
11    Q.  You mentioned the two other individuals that
12 work with you in the PIO; correct?
13    A.  Yes, sir.
14    Q.  Who are those individuals and what are their
15 ranks?
16    A.  Corporal Helen Zane.  She's assigned to
17 New Castle County.  Then Corporal Jeffrey Oldham, and he
18 is assigned to Kent and Sussex.
19    Q.  You mentioned that they handle certain job
20 duties such as day-to-day activities.
21    A.  Yes, sir.
22    Q.  Could you run me through a comprehensive list of
23 the things that they would handle on a day-to-day basis?
24 You mentioned some of them, but you also mentioned it was

Page 11

1  a brief list.
2     A.  Primarily what I try to have them do, if there's
3  a crash on Kirkwood Highway and we feel -- we don't
4  report every crash.  We don't report every criminal
5  arrest, but primarily ones where road closure would be
6  involved, where there are significant injuries to someone
7  as far as for crashes.
8           For criminal, if it's an arrest of a felony
9  magnitude, it could be a misdemeanor, as well, but
10 obviously, I mean, we literally could probably put out --
11 I mean, if I'm permitted anywhere from 20 to 25 releases
12 a day, even one county statewide we could probably do 30
13 to 35.  That's not practical, nor are all the media going
14 to pick it up.  So that's why we primarily stick to
15 significant events.  Even in cases where we are sued, we
16 will do responses sometimes -- well, we do responses, and
17 that's primarily handled by myself.
18    Q.  Could you run through like a comprehensive list
19 of your own job duties?  Because you indicated earlier
20 the ones you indicated were only part of a brief list.
21    A.  Right.  Well, because I'm the director, I have
22 to fill in for the two corporals when they go on vacation
23 or they need a day off, and then handle day-to-day calls,
24 which are immediate.

Page 12

1           But then also because I am their
2  supervisor, I have to do a monthly schedule.  I have to
3  make sure that they have training, both on a monthly
4  basis which we have, and then like quarterly, like our
5  shoot, make sure that they're scheduled for their PT
6  test.
7           Then I also have daily correspondence where
8  certain reporters will call me directly to get access to
9  one of our troopers if they're looking for a story.  I
10 usually -- sometimes I go to Dover.  Sometimes I go to
11 Newark.  But primarily after assigning the schedule and
12 making sure -- like the policies and procedures are
13 updated, I write letters.  I write a lot of letters for
14 the superintendent's office.  I respond a lot in writing
15 for the office, for the State Police, in general.
16    Q.  Now, currently as of -- I guess today is
17 June 7th of 2005, what is your chain of command on up
18 from your --
19    A.  As of when?
20    Q.  As of today.
21    A.  I answer directly to the superintendent.
22    Q.  How about as of October 2004, what is your chain
23 of command as of that date?
24    A.  I believe it was the same.

Page 13

1     Q.  Do you recall a time in October of 2004 when
2  Colonel Chaffinch was placed on suspension?
3     A.  Yes, sir.
4     Q.  What happened with your chain of command at that
5  point?  Who did you report to?
6     A.  The acting superintendent, who was Thomas F.
7  MacLeish.
8     Q.  Now, is there a process or a procedure laid out
9  in DSP documents anywhere as to how specific media
10 inquiries are handled?
11    A.  Yes.  That's in our policy and procedure.
12    Q.  Is that part of what you just explained to me a
13 few minutes ago?
14    A.  Yes.
15    Q.  You mentioned that you handle responses when the
16 State Police is sued.  Do you recall stating that?
17    A.  Yes, I do.
18    Q.  What types of responses do you handle?  Could
19 you give me an example of what you would do?
20    A.  As I stated before, there's primarily two
21 reporters that I deal with.  When I say "deal with," I
22 mean if I don't talk to them on a weekly basis, I talk to
23 them on a daily basis.  And you have to understand -- and
24 maybe to set the arena here --

4 (Pages 10 to 13)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

Page 14

1  Q. Sure.
2  A. My first day as the public information officer,
3  my first phone call was from Mary Allen in the
4  News Journal because Greg Warren was suing the division.
5  That's the first call I ever got as the public
6  information office. Hence, no training was associated
7  with getting that call.
8  So I've gone through a series, probably,
9  more than any other public information officer, of
10 lawsuits that have dealt with the State of Delaware. I'm
11 not proud to say that, but I think I have, you know.
12 In any event, that's why I lay that
13 groundwork with you.
14 Q. Sure.
15 A. So somebody like -- it was Mary Allen for many
16 months until she left The News Journal. Jeff Brown from
17 the Dover Post would stay on top of it quite a bit. And
18 then Tom Eldred from the State News, as well. And I
19 actually talk to these people regularly and had quite a
20 few conversations with them.
21 Q. So would it be fair to say that you have a good
22 relationship with those three reporters whose names you
23 just listed?
24 A. I -- yes, I think I have a very good rapport

Page 15

1  with all three of them.
2  Q. Now, are there certain types of media inquiries
3  that you can handle versus certain types where you need
4  to go up the chain of command and seek authorization to
5  discuss issues?
6  A. Yes.
7  Q. Now, could you explain that to me? What are the
8  ones that you can handle on your own versus which are the
9  ones which you have to seek higher approval for things
10 that may be above your pay grid, for lack of a better
11 term?
12 A. Pretty much -- I don't know how well of a job I
13 did with it, but like day-to-day routine inquiries we can
14 handle and we follow the policy such as a crash or an
15 arrest of a pedophile, et cetera.
16 Anything that has to do with talking to an
17 individual, whether it be like the head of training, the
18 head of the training academy, the head of our aviation
19 section, something to deal -- something to deal with our
20 narcotics investigations, some question on what our
21 agency's position is on a certain stance, then I would
22 usually review it through the superintendent before I
23 provided a response, if we provided a response at all.
24 Q. You mentioned on your first day on the job in

Page 16

1  the PIO office was the day that Captain Gregory Warren
2  filed a lawsuit.
3  A. That is correct.
4  Q. As just a point of interest, that actually
5  occurred in here, the press conference. Probably right
6  around where you are sitting.
7  A. That's great.
8  Q. When that lawsuit was filed, who did you go to,
9  or did you just respond off the cuff in response to --
10 A. No. I -- well, first, like you say, lack of a
11 pay grade. I don't have that authority to make that
12 decision. I'm merely the facilitator of information.
13 And I would take the questions and -- question or
14 questions from whoever is asking, take them to the
15 superintendent or deputy superintendent, whoever is in
16 charge, and then wait for a response on how we are going
17 to respond to that.
18 Then they would usually give me the
19 response and then I would respond back to the people that
20 requested the information.
21 Q. So that's what occurred in the case of Captain
22 Warren?
23 A. Yes, sir.
24 Q. I believe a couple weeks later there may have

Page 17

1  been some type of a media event surrounding the Bullen
2  and Giles case relating to some briefing. Do you recall
3  anything happening short of their trial that you may have
4  responded to in that same time period?
5  A. I'm sure something did. To what degree or
6  specifics, I don't remember, but I'm sure we had many
7  inquiries, especially from Tom Eldred, I'm sure. But I
8  don't remember what the exact questions were or to what
9  degree.
10 Q. Do you remember a time in January of 2004 when a
11 jury verdict was rendered against Colonel Chaffinch and
12 against Secretary Ford?
13 A. Yes, I do.
14 Q. Do you remember that that occurred in the Bullen
15 and in the Giles case?
16 A. I do note, yes, I am familiar with a jury
17 verdict being handed down in the Bullen and Giles case.
18 Q. Did you receive any phone calls in reference to
19 that?
20 A. I'm sure I received quite a few.
21 Q. Actually, were any questions asked in reference
22 to the jury verdict which was rendered?
23 A. From the people that called or --
24 Q. Yes.

5 (Pages 14 to 17)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

Page 18

1  A. Yes.
2  Q. Who did you have to take those questions to?
3  A. Either the colonel or the acting superintendent.
4  I would assume it was Colonel Chaffinch.
5  Q. Several other lawsuits have been filed since
6  that time. For example, I believe a suit was filed on
7  behalf of a now-Captain Ralph H. Davis, III?
8  A. Yes.
9  Q. Did you receive media inquiries in reference to
10 that?
11 A. Yes, sir, we did.
12 Q. Did you take inquiries to the colonel and
13 lieutenant colonel in the same manner which you already
14 described?
15 A. Yes, sir.
16 Q. I think another case was filed on behalf of
17 Sergeant Christopher D. Foraker?
18 A. Which one? He's had quite a few filed.
19 Q. Fair enough. The one which was filed in August
20 of 2004 on his behalf alone.
21 A. Yes, sir. Yeah, if it's the same time frame.
22 Q. I believe another suit was filed later that
23 month on behalf of, again, Sergeant Foraker, a Master
24 Corporal Warren, and a Master Corporal Price?

Page 19

1  A. Yes, sir.
2  Q. Do you remember that?
3  A. Yes.
4  Q. Were there media inquiries which came in to you
5  or your office?
6  A. Yes, sir.
7  Q. Did you respond to those in the same manner in
8  which you already described?
9  A. Yes, sir.
10 Q. How detailed an answer do the colonel and the
11 lieutenant colonel give you when they respond to these
12 inquiries?
13 A. (No response.)
14 Q. Would you like me to rephrase the question or
15 just be more specific --
16 A. Yes, please.
17 Q. You testified earlier with questions about
18 lawsuits, for example, you have to take those up the
19 chain of command?
20 A. Yes, sir.
21 Q. You take those to either the colonel or the
22 lieutenant colonel?
23 A. Yes, sir.
24 Q. They come up with a response for you?

Page 20

1  A. Yes, sir.
2  Q. Now, do they actually write out the response or
3  do they give you general parameters within which to
4  respond? Or do they specifically give you the words to
5  say?
6  A. It's happened both ways, as you stated.
7  Sometimes -- sometimes it's verbatim. Sometimes they
8  just dictate to me what to write. Sometimes -- sometimes
9  they give generalities. But most of the time it's pretty
10 specific of what they want said, if they want to respond
11 at all.
12 Q. Okay. That's helpful.
13    Now, have you ever heard of something
14 called the Law Enforcement Officers' Bill of Rights?
15 A. Yes, sir.
16 Q. What is it?
17 A. It's -- well, my layman's terms, the best as I
18 know, it's a document that would protect a police officer
19 when certain allegations are made against them in
20 order -- kind of protection because they're a public
21 servant. I don't know if that's too clear.
22    But, I mean, there are certain -- I guess
23 information that can't be disseminated when, I guess,
24 they're sued by certain people because they have certain

Page 21

1  rights, too, just like a civilian would. That's my
2  understanding of it.
3  Q. Given your experience in the State Police over
4  20 years, is it something that police officers and the
5  State Police know about?
6  A. Yes, sir.
7  Q. Is it something that's important to them?
8  A. My opinion, I believe that it is.
9  Q. In general, is privacy important to police
10 officers?
11 A. Yeah, I think it is.
12 Q. For example, if a police officer has a
13 disciplinary problem, do they want that, in general,
14 splashed all over the front page of the Delaware State
15 News or The News Journal?
16 A. Not the ones that I know wouldn't want that, no.
17 Q. You've been a police officer for approximately
18 20 years with the troop; is that right?
19 A. Yes.
20 Q. You've worked with a large number of troopers
21 throughout your career?
22 A. Yes, sir.
23 Q. Would it be fair to say you've worked with a
24 great many state troopers over the course of your career?

6 (Pages 18 to 21)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

Page 22

1  A. Yes, sir.
2  Q. Do you have any idea why the General Assembly
3  would have passed that statute?
4  A. No, I don't.
5  Q. I'm not going to ask you any specifics about
6  this, but in general, have you ever had any disciplinary
7  issues at some point during your long 20-year career?
8  A. Yes, I've been disciplined.
9  Q. For example, did you ever have a little
10 fender bender where you got a little ding in your bumper?
11 A. Yes, I have.
12 Q. Is that something which you would have wanted
13 splashed on the front page of The News Journal or on the
14 front page of the Delaware State News?
15 A. It wouldn't really matter to me. I mean, I'm
16 big into accountability, and if I make a mistake, I make
17 a mistake. No, it wouldn't bother me.
18 Q. What if it was something more serious than just
19 a little fender bender?
20 A. Then I probably would rethink -- rethink it,
21 yes.
22 Q. If it was something more serious than a little
23 fender bender, would you have wanted it splashed on the
24 front page of The News Journal or the Delaware State

Page 23

1  News?
2  A. No, I would not.
3  Q. Let's say something was splashed on the front
4  page of The News Journal or the Delaware State News with
5  reference to your disciplinary history or background.
6  How would that make you feel?
7  A. Angered.
8  Q. Would you be happy about it or unhappy about it?
9  A. Unhappy.
10 Q. Would you be upset or just laid back, hakuna
11 matata about it?
12         MS. BALLARD: I'll make an objection as to
13 relevance, but you can answer.
14 Q. You can answer the question.
15 A. I would not be happy with that.
16 Q. Would it be embarrassing to you?
17 A. Absolutely.
18 Q. Would you be humiliated?
19 A. I guess one could say that.
20 Q. Now, how many troopers are in the Delaware State
21 Police?
22 A. 637.
23 Q. Now, do you have any idea how many troopers are
24 in a larger force like the Pennsylvania State Police or

Page 24

1  the New Jersey State Police or Maryland or the New York
2  troopers?
3  A. I believe New Jersey has probably about 2,500.
4  Pennsylvania has about 8,000. The Philadelphia PD has --
5  I'm sorry. Pennsylvania State Police -- Philly PD has
6  about eight to 10,000. And the Pennsylvania State Police
7  has about 4,500.
8  Q. Now, is the Delaware State Police relatively
9  close-knit compared to those larger organizations?
10 A. "Close." Can you rephrase that, please?
11 Q. Sure.
12         Do more troopers know each other in the
13 Delaware State Police than would know in the larger
14 organizations like Pennsylvania State Police or the
15 Jersey State Police?
16 A. I would say that's fair. Yes, they probably do.
17 Q. Delaware is a small state?
18 A. Yes.
19 Q. There are only three counties in Delaware?
20 A. Yes.
21 Q. How many troops are there in Delaware?
22 A. There's ten troops.
23 Q. How many of those troops have you ever served at
24 during the course of your career?

Page 25

1  A. One, two, three, four -- three troops, the
2  training academy, and headquarters.
3  Q. Do troopers talk about they that happen to other
4  troopers during the course of their lives as troopers?
5  A. Absolutely.
6  Q. Would it be fair to say that troopers are pretty
7  big gossips?
8  A. Yes.
9  Q. Would it be fair to say the life in the Delaware
10 State Police has a bit of a soap opera quality to it on
11 occasion?
12 A. Yes.
13 Q. Now, have you witnessed a fair amount of
14 disciplinary issues involving other troopers during the
15 course of your career?
16 A. I've witnessed discipline. I don't like the
17 word "fair," but I've seen people be disciplined over my
18 career, yes.
19 Q. Based on your long experience as a trooper, do
20 you think those people would have wanted their discipline
21 put on the front page of The News Journal or on the front
22 page of the State News?
23 A. I doubt it.
24 Q. Do you think those people would have wanted

7 (Pages 22 to 25)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

**Page 26**

1 their discipline put on the third page of The News
2 Journal or the third page of the State News?
3         MS. BALLARD:  Objection to form.
4     Q.  You can answer.
5     A.  Probably not.
6     Q.  I'm going to put a document in front of you.
7         MR. NEUBERGER:  Could I ask counsel, who is
8 defending the deposition?
9         MR. DURSTEIN:  We both are.
10        MR. NEUBERGER:  Okay.
11        I would like to mark this as Plaintiff's
12 Exhibit Number 6.
13        (Plaintiff's Exhibit 6 was marked for
14 identification.)
15        MS. BALLARD:  Just for the record, this is
16 the first exhibit given to Lieutenant Aviola today.
17 BY MR. NEUBERGER:
18    Q.  Lieutenant Aviola, you have a document in front
19 of you, don't you?
20    A.  Yes, sir.
21    Q.  Up top it says "Westlaw" at the top left-hand
22 corner?
23    A.  Yes, sir.
24    Q.  Two lines down from that it says "11 Delaware

**Page 27**

1 Code, Section 9200"?
2     A.  Yes, it does.
3     Q.  Do you know what this document is?
4     A.  I would say it's part of LEOBOR, Law Enforcement
5 Officers' Bill of Rights.
6     Q.  Just for the purposes of the record, if I refer
7 to LEOBOR, you would understand I'm talking about the Law
8 Enforcement Officers' Bill of Rights?
9     A.  Yes, sir.
10    Q.  Now I'd like to direct your attention to the
11 third full paragraph which is marked with the letter (c).
12 Do you see that?  It's also highlighted.
13    A.  Yes.
14    Q.  I want to read that to you and I want you to
15 tell me if I've read it accurately.
16        "Whenever a law-enforcement officer is
17 under investigation or is subject to questioning for any
18 reason which could lead to disciplinary action, demotion
19 or dismissal, the investigation or questioning shall be
20 conducted under the follow conditions:"  Does it say
21 that?
22    A.  Yes, sir, it does.
23    Q.  Then over the next two pages does it go on and
24 list 12 conditions?

**Page 28**

1     A.  Yes.
2     Q.  I would like to direct your attention on page 2
3 of this document to the 12th condition.  Do you see that
4 on the page?
5     A.  Yes.
6     Q.  It's highlighted on the page, isn't it?
7     A.  Yes, it is.
8     Q.  I'd like to read this to you and just tell me if
9 I'm reading it accurately.
10        "All records compiled as a result of any
11 investigation subject to the provisions of this chapter
12 and/or a contractual disciplinary grievance procedure
13 shall be and remain confidential and shall not be
14 released to the public."
15        Do you see that?
16    A.  Yes, I do.
17    Q.  Is there a part of this statute that I just read
18 to you that is unclear to you or that you don't
19 understand?
20    A.  No, sir.
21    Q.  I would like to put another document in front of
22 you, one which was actually marked as Plaintiff's
23 Exhibit 1 yesterday at the deposition of Colonel
24 Chaffinch.  I apologize.  Now-retired-Colonel Chaffinch.

**Page 29**

1         MR. NEUBERGER:  Counsel, do you guys have a
2 copy of this from yesterday?
3         MS. BALLARD:  That's the complaint; right?
4         MR. NEUBERGER:  Yes, it is.
5         MS. BALLARD:  Right.
6 BY MR. NEUBERGER:
7     Q.  Now, the document I've put in front of you is
8 the First Amended Complaint that was filed in this
9 lawsuit.  Okay?
10    A.  Yes.
11    Q.  I would like to direct your attention to page 22
12 and paragraph 129.  Tell me when you're there.
13    A.  I'm there.
14    Q.  I would like you to leave that open and I'm
15 going to put another document in front of you.
16        MR. NEUBERGER:  I would like to mark this
17 as Plaintiff's Exhibit 7.
18        (Plaintiff's Exhibit 7 was marked for
19 identification.)
20 BY MR. NEUBERGER:
21    Q.  I would like you to turn to the eighth page in
22 on that exhibit.  There are no page numbers, so you'll
23 have to count.
24        For the purposes of the record, this,