Conley v. Chaffinch, et al.
Joseph P. Aviola, Jr.    C.A. # 04-1394-GMS    June 7, 2005

Page 30

1  Plaintiff's Exhibit 7, is the Answer of Defendants to
2  First Amended Complaint.
3       I would like to direct your attention to
4  paragraph 129.
5    A.  Make sure I'm on the right page.  Does it start
6  with "150, Denied" at the top?  Is that page 8?
7    Q.  Let's go back one more page.  I apologize.
8    A.  124 at the top?
9    Q.  That is correct.  It has 124 at the top and at
10 the bottom it has number 149.
11   A.  Yes, sir.
12   Q.  Now, switching back to Plaintiff's Exhibit 1,
13 which is the First Amended Complaint, I'm going to read
14 the first sentence of paragraph 129 to you.  Okay?
15       It says:  "In violation of this law, as
16 discussed above, defendants publicly released and
17 discussed confidential internal affairs information about
18 plaintiff."
19       I'd like to direct your attention to
20 Plaintiff's Exhibit 7 in front of you, paragraph 129,
21 which says "The first sentence is denied."
22       Do you see that?
23   A.  Yes, I do.
24   Q.  Do you understand that the Answer of Defendants

Page 31

1  to First Amended Complaint is filed on behalf of the
2  defendants in this case?
3    A.  Can you repeat that again?
4    Q.  Sure.
5       You understand that the defendants' answer,
6  which is in front of you as Plaintiff's Exhibit 7, was
7  filed by the defendants?
8    A.  Okay.
9    Q.  Now I'd like to go back to Plaintiff's Exhibit 1
10 and read the rest of paragraph 129 to you.
11       It says:  "Yet when repeated media
12 inquiries were made as to internal affairs investigations
13 into defendant Chaffinch and MacLeish, defendants refused
14 to discuss those matters."
15   A.  That is correct.
16   Q.  Now I'd like to flip back to Plaintiff's
17 Exhibit 7 and read the rest of paragraph 129, which says
18 "The second sentence is admitted."  Do you see that?
19   A.  I do.
20   Q.  Do you understand that the defendants in this
21 case are admitting the second sentence of Plaintiff's
22 Exhibit 1, paragraph 129?
23   A.  Yes.
24       MS. BALLARD:  Objection to the extent it

Page 32

1  calls for a legal conclusion.
2    Q.  Now, would you agree that when media inquiries
3  were made as to an Internal Affairs' investigation into
4  defendants Chaffinch and MacLeish, that the defendants in
5  this case refused to discuss those matters as a matter of
6  historical policy and practice?
7    A.  Yes.
8    Q.  Now I'd like to direct your attention to
9  paragraph 130 of Plaintiff's Exhibit 1.  Do you have it?
10   A.  Yes, sir.
11   Q.  I'm going to read this to you again.
12       It says:  "For example, as set forth in the
13 April 15th, 2004 edition of the Delaware State News, DSP
14 spokesman Aviola refused to comment on those matters.  In
15 his own words:
16       "'They are internal.  As a policy, we don't
17       comment on internal matters.'
18       "'[W]e won't be disclosing the nature of the
19       charges because they are internal.'"
20       Do you see that?
21   A.  Yes, sir, I do.
22   Q.  I'd like to direct your attention to Plaintiff's
23 Exhibit 7, paragraph 130.  Do you see where it says
24 "Admitted"?

Page 33

1    A.  Yes.
2    Q.  Now I'd like to put another document in front of
3  you.  This may be a little bit confusing, so I apologize.
4        MR. NEUBERGER:  I would like to mark this
5  as Plaintiff's Exhibit 8.
6        (Plaintiff's Exhibit 8 was marked for
7  identification.)
8  BY MR. NEUBERGER:
9    Q.  Do you have that document in front of you?
10   A.  Yes, sir.
11   Q.  Now, what does this document appear to be?
12   A.  It looks like it's on a copy of an e-mail from
13 the Neuberger -- Stephen J. Neuberger to Stephen
14 Neuberger, and it appears to be an excerpt.  It says:
15 "Top troopers face charges:  Misconduct alleged against
16 superintendent, deputy, By Tom Eldred, Delaware State
17 News."
18   Q.  Tom Eldred, is he one of the reporters who you
19 indicated can deal directly with you?
20   A.  Yes.
21   Q.  Now, does the first paragraph of that article
22 discuss a lawsuit which had been filed against
23 Superintendent Chaffinch?
24   A.  Yes, it does.

| Conley<br>Joseph P. Aviola, Jr. | v.<br>C.A. # 04-1394-GMS | Chaffinch, et al.<br>June 7, 2005 |
|---|---|---|

**Page 34**

1  Q. Does it also discuss that Internal Affairs
2  charges were filed against Superintendent Colonel
3  Chaffinch and Deputy Superintendent Lieutenant Colonel
4  Thomas F. MacLeish?
5  A. Yes, sir.
6  Q. Now I'd like to direct your attention to the
7  third paragraph of that article. Does it say: "'I can
8  confirm that charges have been filed against the colonel
9  and lieutenant colonel,' he said. 'However, we won't be
10 disclosing the nature of the charges because they are
11 internal'"?
12 A. Yes.
13 Q. Is that a quote from you according to the
14 article?
15 A. Yes, it is.
16 Q. Do you have any reason to dispute that?
17 A. No, I don't.
18 Q. I'd like to direct your attention to the ninth
19 paragraph on that same page. It's marked with a little
20 star next to it.
21        Does that say that "'The head of internal
22 affairs, the colonel and the lieutenant colonel will not
23 be commenting on these matters,' Lieutenant Aviola said.
24 'They are internal. As a policy, we don't comment on

**Page 35**

1  internal matters'"? Does it say that?
2  A. Yes, it does.
3  Q. Is that a fair and accurate representation of
4  what you said to reporter Tom Eldred that day?
5  A. Yes.
6  Q. Now, looking away from the documents, is it the
7  policy of the Delaware State Police not to comment on
8  internal matters to the media?
9  A. The standard procedure is that we will
10 acknowledge if we, in fact, have a complaint. However,
11 yes, we do not comment on the specifics of that internal
12 complaint. But we have in the past verified that there's
13 an internal complaint against that particular officer.
14 But we don't discuss specifics.
15 Q. You can put aside PX-8. Just push it out in
16 front of you or someplace where it's not going to be in
17 the way.
18 A. Okay.
19 Q. I'd like to direct your attention to PX-1, the
20 First Amended Complaint again, paragraph 131.
21 A. Yes.
22 Q. Tell me when you're there.
23 A. Yes, sir.
24 Q. Does paragraph 131 say: "Similarly, as set

**Page 36**

1  forth in the April 23rd, 2004 edition of The News
2  Journal, in response to a request for a confidential
3  internal affairs document, the article states:
4        "'Aviola said it was an internal document
5        and would not be dispersed....'"
6        Now, does that say that?
7  A. It does say that.
8  Q. Now I'd like to direct your attention to the
9  other document in front of you, Plaintiff's Exhibit 7,
10 the Answer of Defendants to First Amended Complaint and
11 point you to paragraph 131. Do you see that?
12 A. Yes.
13 Q. Do you see where it says that the defendants
14 admitted that?
15 A. Yes.
16 Q. Now I'd like to put another document in front of
17 you.
18        MR. NEUBERGER: As a note to counsel, this
19 document was not in the gag order appendix, so this would
20 be my production of it to you.
21        MS. BALLARD: Okay. Is it a copy of the
22 news article?
23        MR. NEUBERGER: Yes, it is.
24        (Plaintiff's Exhibit 9 was marked for

**Page 37**

1  identification.)
2  BY MR. NEUBERGER:
3  Q. Do you have this article in front of you?
4  A. Yes, sir.
5  Q. At the top does it say it's an e-mail from
6  Stephen J. Neuberger to sjn@neubergerlaw.com?
7  A. Yes, it does.
8  Q. Is it dated at 8:47 a.m.?
9  A. Yes, sir.
10 Q. Does the e-mail contain an article from the
11 Local News from The News Journal website?
12 A. Yes, it does.
13 Q. Is the title of that article "Private firm
14 probing state police complaint"?
15 A. Yes.
16 Q. Is the subheadline of that, "Officials criticize
17 outsider's role"?
18 A. Yes.
19 Q. Is it an article written by Mary Allen of the
20 News Journal, staff reporter, dated April 23rd, 2004?
21 A. It is.
22 Q. I would like to direct your attention to the
23 seventh paragraph. Do you see that?
24 A. Yes, I do.

| Conley | | |
|---|---|---|
| Joseph P. Aviola, Jr. | v.<br>C.A. # 04-1394-GMS | Chaffinch, et al.<br>June 7, 2005 |

Page 38

1  Q. It has a little star next to it?
2  A. Yes, sir.
3  Q. I'd like to read it to you and you tell me if
4  I'm reading it accurately. Okay?
5  A. Yes.
6  Q. "Neuberger would not release a copy of Warren's
7  written complaint. Aviola said it was an internal
8  document and would not be dispersed Thursday, but he said
9  the agency would evaluate a request for it made under the
10 state's Freedom of Information Act."
11       Does that say that?
12 A. Yes, it does.
13 Q. Have you had a chance to take a look at this
14 article at all in the couple seconds which have passed
15 since I just handed to you?
16 A. No, I have not.
17 Q. If you take a look at the first paragraph of the
18 article, does it say that "A private investigative firm
19 is looking into a Delaware State Police captain's
20 misconduct complaint against the agency's top two
21 officers"?
22 A. Yes, it does.
23 Q. Do you recall a time when such a complaint was
24 made?

Page 39

1  A. Yes, I do.
2  Q. Was that alleging allegations of misconduct
3  against Colonel Chaffinch and Lieutenant Colonel
4  MacLeish?
5  A. Yes, it was.
6  Q. It was filed by a Captain Gregory Warren?
7  A. Yes.
8  Q. Captain Warren had a long, distinguished career
9  with the Delaware State Police, didn't he?
10 A. Yes, he did.
11 Q. He was the director of training, I believe, for
12 the Delaware State Police --
13 A. Yes, sir.
14 Q. -- at the time that he retired?
15 A. That's correct.
16 Q. He filed some type of charges against the
17 colonel and lieutenant colonel; correct?
18 A. Yes.
19 Q. In this article, in the seventh paragraph which
20 I directed you to, you indicated that the complaint
21 document was an internal document and would not be
22 released to the public?
23 A. Yes.
24 Q. Is that fair to say?

Page 40

1  A. Yes, it is.
2  Q. Is this paragraph a fair statement of what you
3  would have said to reporter Mary Allen that day?
4  A. Yes.
5  Q. You can put that document aside.
6     I would like to direct your attention to
7  Plaintiff's Exhibit 1 again, the First Amended Complaint,
8  paragraph 132. Do you have that?
9  A. Yes, sir.
10 Q. Does that say: "In the same way, as set forth
11 in the April 30th editions of the Delaware State News and
12 The News Journal, defendant Mitchell's predecessor
13 Secretary James L. Ford, when questioned about the
14 investigations into defendants Chaffinch and MacLeish
15 stated:
16       "'To protect the integrity of the process,
17 I will not comment further on these matters'"?
18       Now, does it say that?
19 A. Yes, it does.
20 Q. I would like to direct your attention to
21 Plaintiff's Exhibit 7, which is the Answer of Defendants
22 to First Amended Complaint. Can you find paragraph 132
23 on there?
24 A. Yes.

Page 41

1  Q. Does it say that the defendants in this case
2  admitted that paragraph?
3  A. Yes, it does.
4  Q. Now I would like to put another article in front
5  of you.
6     MR. NEUBERGER: I would like to call this
7  Plaintiff's Deposition Exhibit 10.
8     (Plaintiff's Exhibit 10 was marked for
9  identification.)
10 BY MR. NEUBERGER:
11 Q. Is this a document that at the top it says it's
12 an e-mail from Stephen J. Neuberger to
13 sjn@neubergerlaw.com?
14 A. Yes.
15 Q. It's dated Friday, April 30th, 2004, at
16 7:54 a.m.?
17 A. Yes, it is.
18 Q. Is this document an article in the Delaware
19 State News which was sent by e-mail?
20 A. It appears to be, yes.
21 Q. Does it say it was published on April 29th,
22 2004, at 10:52:41 p.m., Eastern Daylight Time?
23 A. Yes.
24 Q. Is the headline of the article "Top trooper

11 (Pages 38 to 41)

Case 1:04-cv-01394-GMS   Document 75-19   Filed 09/16/2005   Page 4 of 15

Conley                                                        v.                                    Chaffinch, et al.
Joseph P. Aviola, Jr.                          C.A. # 04-1394-GMS                                    June 7, 2005

Page 42

1  charges cut: Lawyer claims 'cover-up'"?
2      A.  Yes.
3      Q.  Is this an article by Tom Eldred of the Delaware
4  State News?
5      A.  Yes, it is.
6      Q.  I would like to direct your attention to the
7  second page of this document, the fifth paragraph.
8  Actually, just take a quick look to yourself at the prior
9  two paragraphs and tell me once you've done that.
10     A.  (The witness reviews the document.)  Yes, sir.
11     Q.  Is the fifth paragraph a quote from then-cabinet
12 Secretary James L. Ford, Jr.?
13         MS. BALLARD:  Objection to the form.
14     Q.  You can answer.
15     A.  I would interpret it that way.
16     Q.  I'll ask:  Does this appear to be a quote from
17 Secretary Ford?
18     A.  Yes.
19     Q.  Does it say:  "We will share the findings of the
20 investigation when it is completed.  To protect the
21 integrity of the process, I will not comment any further
22 on these matters'"?
23     A.  Yes, it says that.
24     Q.  Now I'd like to direct your attention to the

Page 43

1  next paragraph.  Actually, to the next two paragraphs.
2          Do those say:  "Lieutenant Joseph Aviola, a
3  spokesman for the state police, said Colonel Chaffinch
4  was out of the state and unavailable.  He said Captain
5  Paige and Captain Warren would not be permitted to
6  comment."
7          "'We won't have any comment,' Lieutenant
8  Aviola said.  'It's still classified as an internal
9  affairs investigation.'"
10         Does it say that?
11     A.  Yes, it does.
12     Q.  You can put that document aside.  I would like
13 to put another document in front of you and call this
14 Plaintiff's Exhibit 11.
15         (Plaintiff's Exhibit 11 was marked for
16 identification.)
17 BY MR. NEUBERGER:
18     Q.  Do you have that document in front of you?
19     A.  Yes, sir.
20     Q.  Now, is this another article that was e-mailed
21 from Stephen J. Neuberger to sjn@neubergerlaw.com?
22     A.  Yes, it is.
23     Q.  Is this an article from the News Journal?
24     A.  Yes, it is.

Page 44

1      Q.  Is the title of this article "State police probe
2  curtailed, lawyer says"?
3      A.  Yes, sir.
4      Q.  Is it an article by Mary Allen?
5      A.  Yes, it is.
6      Q.  Is it dated April 30th, 2004?
7      A.  Yes.
8      Q.  I would like to direct your attention to the
9  tenth paragraph down which has a little bracket next to
10 it.
11         Does that say:  "Ford went on in his
12 statement to say state officials will share findings of
13 the investigation when it is finished.  'To protect the
14 integrity of the process, I will not comment any
15 further,' he wrote."
16     A.  Yes, it says that.
17     Q.  You can put that document aside.
18         Now I would like to direct your attention
19 to Plaintiff's Exhibit 1, which is the First Amended
20 Complaint again, and direct your attention to paragraph
21 134.  We are skipping over paragraph 133.  I would like
22 to read this paragraph to you and you tell me if I'm
23 reading it accurately.  Okay?
24     A.  Yes.

Page 45

1      Q.  Does it say:  "Likewise, as set forth in the
2  March 27th edition of the Delaware State News, in
3  response to inquiries into a separate internal affairs
4  investigation into defendant MacLeish's actions, Aviola
5  stated:
6          "'It's a personnel matter.  I can't comment
7  on that'"?
8          Now, does that say that?
9      A.  Yes, it does.
10     Q.  I would like to direct your attention to
11 Plaintiff's Exhibit 7, the defendant's answer to the
12 First Amended Complaint and point you to paragraph 134.
13 Have you found that?
14     A.  Yes, I have.
15     Q.  Do you see where it says "Admitted?"
16     A.  Yes, I do.
17     Q.  I would like to put another document in front of
18 you.
19         MR. NEUBERGER:  I guess we will mark this
20 as Plaintiff's Exhibit 12.
21         (Plaintiff's Exhibit 12 was marked for
22 identification.)
23 BY MR. NEUBERGER:
24     Q.  Do you have that article in front of you?

| Conley | | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | v.<br>C.A. # 04-1394-GMS | June 7, 2005 |

Page 46

1   A.   Yes, I do.
2   Q.   Does this appear to be an article from
3   newszap.com?
4   A.   Yes, it is.
5   Q.   Do you know if that's the website of the
6   Delaware State News?
7   A.   Yes, that is.
8   Q.   This is a newspaper article?
9   A.   Appears to be, yes.
10  Q.   Is the title of the article "Trooper cleared in
11  investigation: No wrongdoing in influence probe"?
12  A.   Yes.
13  Q.   Is this an article written by Tom Eldred of the
14  Delaware State News?
15  A.   Yes, it is.
16  Q.   I would like to direct your attention to what I
17  think are the eighth and ninth paragraphs of this
18  document. I would like to read those to you. Okay?
19  A.   Yes.
20  Q.   "The spokesman, Lieutenant Joseph P. Aviola,
21  Jr., declined to disclose what action was taken, citing
22  the confidentiality of personnel matters."
23       "'It's a personnel matter. I can't comment
24  on that,' he said."

Page 47

1        Is that what it says?
2   A.   Yes.
3   Q.   Do you believe that's a fair and accurate
4   representation of the response you gave to Tom Eldred
5   that day?
6   A.   Yes.
7   Q.   Or probably the prior day?
8   A.   I'm sure I said that.
9   Q.   You can put that document down.
10       I would like to direct your attention to
11  Plaintiff's Exhibit 1 again, the First Amended Complaint,
12  paragraph 135. Do you have that?
13  A.   Yes, I do.
14  Q.   Does that say: "Regarding the same matter, the
15  March 25th edition of The News Journal stated:
16       "'Lieutenant Joseph P. Aviola, Jr., a state
17       police spokesman, declined to disclose steps
18       taken, saying it was a personnel matter'"?
19  A.   Yes, it says that.
20  Q.   To direct your attention one last time to
21  Plaintiff's Exhibit 7, the Answer of Defendants to First
22  Amended Complaint, do you have that in front of you?
23  A.   Yes, I do.
24  Q.   Do you see paragraph 135 in there?

Page 48

1   A.   Yes, sir.
2   Q.   That says "Admitted," doesn't it?
3   A.   Yes.
4   Q.   I would like to put another newspaper article in
5   front of you.
6        MR. NEUBERGER: This is going to be
7   Plaintiff's Exhibit 13.
8        (Plaintiff's Exhibit 13 was marked for
9   identification.)
10  BY MR. NEUBERGER:
11  Q.   Do you have that exhibit in front of you?
12  A.   Yes, I do.
13  Q.   Does this appear to be a printout from an online
14  site of The News Journal?
15  A.   Yes.
16  Q.   Does this appear to be an article which would
17  have run in the News Journal paper?
18  A.   Yes, it does.
19  Q.   Is the title of this article "State police clear
20  No. 2 commander"?
21  A.   Yes.
22  Q.   Is the subtitle "But 'appropriate action' taken
23  for intervention in forgery case"?
24  A.   Yes.

Page 49

1   Q.   Is this an article written by Jeff Montgomery?
2   A.   Yes, it is.
3   Q.   Was he a staff reporter for The News Journal?
4   A.   He is -- I don't know what his -- he's a
5   reporter for The News Journal.
6   Q.   Is this article dated March 25th, 2004?
7   A.   Yes.
8   Q.   I would like to direct your attention to the
9   third paragraph of this article.
10       Does that say: "Lieutenant Joseph P.
11  Aviola, Jr., state police spokesman, declined to disclose
12  steps taken, saying the case was a personnel matter.
13  Aviola says MacLeish remains deputy superintendent"?
14  A.   Yes, that's what that says.
15  Q.   Okay. You can put that document down, too. You
16  can push aside those documents now, too, PX-1 and PX-7.
17       Now, do you recall a time when Lieutenant
18  Colonel MacLeish, now-Colonel MacLeish -- at the time he
19  was lieutenant colonel; right?
20  A.   Yes.
21  Q.   And when then-Colonel L. Aaron Chaffinch were
22  being investigated for various Internal Affairs issues?
23  A.   Yes.
24  Q.   We just ran through a lot of articles regarding

13 (Pages 46 to 49)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

Page 50

1 those Internal Affairs investigation, didn't we?
2   A.  Yes, sir.
3   Q.  Would it be fair to say that in each case when
4 an inquiry was made by the media, that the State Police
5 would "no comment" or refuse to discuss the specifics of
6 the internal personnel or Internal Affairs matter?
7   A.  Yes.
8   Q.  Would it be fair to say that that is State
9 Police policy?
10   A.  Yes.
11   Q.  Do you need a break or anything?
12   A.  I'm okay.  Thank you.
13       MR. NEUBERGER:  Counsel?
14       MS. BALLARD:  No.  We can go a little
15 longer.
16       MR. NEUBERGER:  Okay.
17       (A discussion was held off the record.)
18       (A recess was taken at this time.)
19 BY MR. NEUBERGER:
20   Q.  Lieutenant Aviola, we are back on the record.
21       Do you remember that a lawsuit was filed on
22 Wednesday, October 27, 2004?
23   A.  I don't remember, but -- I mean, I don't -- may
24 have been.

Page 51

1   Q.  Do you remember that at some point Captain
2 Barbara L. Conley filed a lawsuit against -- at the time
3 it was against Colonel L. Aaron Chaffinch and the
4 Delaware State Police?
5   A.  Yes, sir.
6   Q.  Do you remember that that was approximately in
7 October of 2004?
8   A.  Yes.
9   Q.  Now, where were you that day, the day that the
10 lawsuit was filed?
11   A.  I don't remember.  I could have been in Newark.
12 I could have been in Dover.  I don't remember exactly
13 where.
14   Q.  But you were on duty that day?
15   A.  Yes.
16   Q.  You weren't on vacation?
17   A.  No.
18   Q.  How did you happen to learn that the lawsuit was
19 filed?
20   A.  As I get very often, probably somebody from the
21 media probably e-mailed it to me because I would get a
22 lot of -- I get it quite a bit.  Like if your firm would
23 have a press conference or send out an announcement, then
24 somebody would send me something letting me know that

Page 52

1 probably something -- that's why I know I was working
2 because I probably got tipped off that information was
3 coming that it's not a good day to take tomorrow off.
4   Q.  Okay.  Thank you.
5       So you think you learned about it from an
6 e-mail and do you remember the specific sequence of
7 events that happened that day at all?
8       MS. BALLARD:  Can you clarify what day you
9 mean?
10       MR. NEUBERGER:  Sure.  The day that Captain
11 Conley's lawsuit was filed.
12       MS. BALLARD:  Which would be October 27th.
13       MR. NEUBERGER:  He indicated he didn't have
14 knowledge of the exact date, but I think the record will
15 indicate it was October 27th, 2004.
16       MS. BALLARD:  The day he learned of it
17 could be a different day.  That's why I want it clear on
18 the record what day he is talking about.
19       MR. NEUBERGER:  Got you.  All right.
20 BY MR. NEUBERGER:
21   Q.  When would you have learned about the lawsuit?
22   A.  Like I said, many times I get tipped off, for
23 lack of a better term, that probably something is going
24 to happen either that day or the next day or something

Page 53

1 like that.
2   Q.  Do you remember specifically at this point in
3 time, June 7, 2005, exactly when you learned that a
4 lawsuit was being filed in --
5   A.  No.
6   Q.  Did you ever learn that some Internal Affairs
7 information about Captain Conley was released to the
8 media the same day that her lawsuit was filed?
9   A.  Probably.  I know I released some information --
10 I'm not trying to be difficult.  I just don't know
11 exactly what day.  Was it the day we got the suit or was
12 it the day after?  But I did release information.
13   Q.  Do you remember that prior to your release of
14 information -- or do you have any knowledge of an e-mail
15 being released to Tom Eldred of the Delaware State News
16 containing certain Internal Affairs information in
17 reference to Captain Conley?
18   A.  Yeah.  I have knowledge of an incident that
19 happened when he called me, yes.
20   Q.  So Reporter Eldred called you?
21   A.  Yeah, yes.
22   Q.  Do you remember what he said?
23   A.  Yes.
24   Q.  What did he say?

14 (Pages 50 to 53)

Case 1:04-cv-01394-GMS    Document 75-19    Filed 09/16/2005    Page 7 of 15

Conley                                   v.                              Chaffinch, et al.
Joseph P. Aviola, Jr.              C.A. # 04-1394-GMS                     June 7, 2005

Page 54

1  A.  Mr. Eldred had called me. And like I've stated
2  earlier, it was not unusual for us to have daily -- at
3  least weekly conversations about several different
4  things.
5      He called me on that particular day. He
6  said that he had questions. He said he was in receipt,
7  that he was holding what appeared to be a copy of an
8  e-mail, one of our internal documents that alleged that
9  Captain Barbara Conley had been brought up on some
10 charges and he asked me could I comment on that.
11     And I'll tell you flat out, I dealt enough
12 with Tom Eldred to know that if Tom Eldred tells me he's
13 sitting on information, he has it. I just -- you know, I
14 know that. And I have that type of rapport with him.
15 And I actually didn't see -- at the time he was asking
16 me, I didn't see the document, but he read it to me, and
17 based on the verbal that he was reading, there was no
18 doubt in my mind that he had this in his hand.
19     He asked me would we comment on that
20 particular document. I said I don't know. I'll have to
21 see some people and talk about it, go to our legal
22 people, go talk to the colonel, but that I would get back
23 with him on it.
24     He said, A -- what he wanted to know was,

Page 55

1  A, would I comment that that was our document, and B, if
2  it was our document, could I comment to what was inside
3  the document, what the document said.
4      I was at headquarters. I walked directly
5  upstairs. And just as I was walking into the colonel's
6  office, the colonel -- it was Colonel MacLeish at that
7  time, so I guess he was acting or -- yeah, because I
8  think Colonel Chaffinch was suspended. I don't know
9  exactly the order.
10     But in any event, Lieutenant Colonel
11 MacLeish was coming out with Captain Paige and Lieutenant
12 Coupe, who are in Internal Affairs. And I'm, like, "I
13 need to talk to all three of you right now. This
14 actually works out pretty well."
15     So we went back into the small conference
16 room and I said, "I just got off the phone with
17 Mr. Eldred. He says that he's in possession of one of
18 our e-mails that says that Captain Conley has been
19 charged. He would like to know, A, can I comment that
20 that's our e-mail, and B, to what's inside the e-mail,
21 what the content of the e-mail is."
22     So Colonel MacLeish told us to call Mike
23 Tupman. We put him on a conference call. So it was us
24 four and Mike Tupman. And I again told Mr. Tupman what

Page 56

1  we were facing, what the questions were. And I said,
2  "Can I comment on this document?"
3      And I told Mr. Eldred before I even went
4  upstairs, "If you're telling me you have this document,"
5  I said, you know, "I'm sure you probably do, but, you
6  know, whether I can go on record telling you that that's
7  ours, that's not up to me. I have to get that
8  information."
9      So I went upstairs and I told Mike
10 Tupman --
11     MS. BALLARD: Can you clarify for the
12 record who Mike Tupman is?
13     THE WITNESS: He is one of the two legal
14 counsels that represents the State Police along with
15 Mr. Durstein. And that's who the colonel told us to
16 call.
17 A.  We had him on conference call. I said, "He
18 wants us to comment on what I believe he has in his
19 possession." And he said, "Well" -- I said, "It's an
20 internal document. Can we comment on it?" He said,
21 "Well, it was internal until somebody sent it to
22 Mr. Eldred. If, in fact, he has the document, make him
23 produce the document, whether he hand delivers it or he
24 faxes it over to you. See the document. If it appears

Page 57

1  to be our document, then, yes, you can comment on the
2  content of the e-mail and the content only," as long as I
3  wasn't the one that sent the e-mail to him, which I
4  hadn't. I have no interest in sending an e-mail to Tom
5  Eldred. And he has plenty of other sources that he can
6  get information from, so -- that was it.
7      I went down, back to my little office down
8  there, called Mr. Eldred. I said, "Can you fax me over
9  the document?" He faxed it right over. It appeared to
10 be, you know -- I mean, what appeared to be one of our
11 e-mails. I took it back upstairs. I'm like, "Here's the
12 document. It appears to be that." And then I said,
13 "Yes, it appears to be a copy of one of our documents."
14 And then I commented on the content of the e-mail.
15 BY MR. NEUBERGER:
16 Q.  Now I'd like to take you through that in some
17 steps.
18 A.  Sure.
19 Q.  I believe first you indicated that you heard
20 from Ace Reporter Tom Eldred of the Delaware State News
21 and somehow he indicated he had come into possession of
22 the document.
23 A.  Yes.
24 Q.  He asked you if you would confirm that the

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

Page 58

1  document he had was an authentic State Police document?
2  Is that accurate?
3     A.  Yeah.  I mean, pretty much that's what he said.
4  You know, he said he had this e-mail that he was in
5  possession of it; could I confirm if it was, in fact, our
6  e-mail.
7     Q.  Also, in addition to that, he wanted you to
8  confirm the contents of that document?
9     A.  If I could answer the first question that that
10 appeared to be one of our e-mails, then could I comment
11 on the second part, the content of the e-mail.
12    Q.  You indicated to him that you would have to seek
13 higher approval or authority?  Is that accurate?
14    A.  Yes.  And I've had repeated conversations with
15 him.  He knows I don't have that authority, but I
16 always -- I don't have that authority to -- like I said,
17 "I have to go upstairs.  I have to seek legal counsel on
18 this and I'll get back to you."  He, in fact, read me the
19 document over the phone at that particular time.
20         Again, there's no doubt in my mind the way
21 he was reading it and just how he was reading it that he
22 had something.  And not only with that incident, but in
23 several incidents that you've laid out.  I mean, we have
24 other discussions other than what's your comment on it.

Page 59

1  And I know him well enough to know that, A, he has the
2  answer before he asks the question, and B, you know,
3  he's -- he has plenty of sources.
4     Q.  After you got off the telephone with Tom Eldred,
5  did you say you went upstairs?
6     A.  Yes, sir.  To the second floor where the
7  colonel's office is.
8     Q.  So your office is on the first floor?
9     A.  Yes.
10    Q.  And the colonel's office is on the second floor?
11    A.  Yes, sir.
12    Q.  Would this have been the day after Colonel
13 Chaffinch was suspended?
14    A.  (No response.)
15    Q.  Do you recall?
16    A.  No, I don't recall.
17    Q.  So you went up to the colonel's office, but in
18 the colonel's office was acting-Colonel Thomas MacLeish?
19    A.  Yes.
20    Q.  Is that correct?
21    A.  Yes, sir.
22    Q.  He was just walking out with Captain Paige and
23 Lieutenant -- is it Coupe?
24    A.  Yes, Robert Coupe.

Page 60

1     Q.  Robert Coupe.
2         They were walking out the door as you were
3  walking in?
4     A.  Yes.
5     Q.  What did you say to them, specifically?
6     A.  I said, "I need to talk to you three right now
7  based on a question that I just got from Mr. Eldred."
8     Q.  After you said that, did you go back into
9  MacLeish's office?
10    A.  There's a small conference room back in that
11 same area and that's -- we went back.  About maybe half
12 of size of this conference room.
13    Q.  When you walked into the conference room, was
14 the door closed behind you?
15    A.  Yes.
16    Q.  Was there anybody else in the conference room at
17 the time?
18    A.  No, sir.
19    Q.  So did you sit down around the conference table?
20    A.  Yes, we did.
21    Q.  What happened then?
22    A.  I explained to them my conversation with
23 Mr. Eldred.  Lieutenant Colonel MacLeish said, "Get
24 Mr. Tupman on the phone."  So they dialed up Mr. Tupman.

Page 61

1  And then we explained to him the same thing that I just
2  got done explaining to them.
3     Q.  Did Lieutenant Colonel MacLeish say anything
4  else other than "Get Mr. Tupman on the phone"?
5     A.  Not that I can remember.  Just to get him on the
6  phone and see what he has to say.  He's our legal
7  counsel.
8     Q.  Did Captain Paige say anything?
9     A.  If he did, I don't remember if he said anything.
10 I doubt if he said anything.
11    Q.  Now, at the time was Captain Paige the head of
12 Internal Affairs?
13    A.  Yes, he was.
14    Q.  Now, do you have any familiarity with the DSP
15 rules and regulations?
16    A.  Yes, I do.
17    Q.  That's because you've been a trooper for 20
18 years?
19    A.  Well, and I've been disciplined, so I probably
20 have had occasion to look at it.
21    Q.  Fair enough.
22        Isn't there a rule or regulation in there
23 about leaking documents, leaking internal State Police
24 documents?

16 (Pages 58 to 61)

Page 62

1   A.   I don't know.  Probably there's an area that
2   addresses that, I'm sure.
3   Q.   Did you indicate to Lieutenant Colonel MacLeish,
4   Captain Paige, and Lieutenant Coupe that Reporter Eldred
5   claimed to be in the possession of an internal State
6   Police document?
7   A.   Yes.
8   Q.   Did Captain Paige indicate that he was going to
9   open up an investigation as to how that document got
10  leaked?
11  A.   Not to me he didn't, no.
12  Q.   Did Lieutenant Coupe indicate anything to that
13  effect?
14  A.   Not that I can recall, no.
15  Q.   Did Lieutenant Coupe say anything at that
16  meeting?
17  A.   He may have said some things, but I don't
18  remember.  I know he did take notes of the whole
19  incident, detailed notes.  I've worked with him quite a
20  bit over the years.
21  Q.   Is he a good trooper?
22  A.   He's an outstanding trooper.
23  Q.   Did Captain Paige take any notes?
24  A.   I don't -- I really don't remember if he did or

Page 63

1   if he didn't.
2   Q.   Did lieutenant colonel and acting-Colonel
3   MacLeish take any notes?
4   A.   I don't think he did.
5   Q.   So it's then you picked up -- who is it who
6   actually called Deputy Attorney General Tupman?
7   A.   Either I dialed him up or Lieutenant Coupe did.
8   Q.   Was he on speakerphone or on the handset?
9   A.   He was on a speakerphone.
10  Q.   You were able to actually get a hold of him?
11  A.   Yes, sir.
12  Q.   Congratulations on that.
13       So you indicated that Deputy Attorney
14  General Tupman gave some advice; is that correct?
15  A.   Yes, sir.
16  Q.   How did MacLeish respond to that advice?
17  A.   Pretty much, "Then call Mr. Eldred back and give
18  him the information."
19  Q.   He told you to call Mr. Eldred back and give him
20  the information?
21  A.   Well, excuse me.  He said, "Make him produce the
22  document."
23  Q.   Okay.
24  A.   "Once you look at the document, if you feel that

Page 64

1   it looks like one of our e-mails, then comment on it."
2   And then he asked me did I send him the document I said,
3   "No, I didn't send him the document."
4   Q.   Were any phone calls made to Secretary Mitchell
5   during that conversation?
6   A.   Not in my presence they weren't.
7   Q.   Are you aware that any phone calls were made to
8   Secretary Mitchell?
9   A.   That I don't know.
10  Q.   Were any phone calls made to then-suspended
11  Colonel Chaffinch?
12  A.   I don't know.
13  Q.   Have you subsequently heard that any phone calls
14  were made to then-suspended Colonel Chaffinch?
15  A.   No.
16  Q.   So you called Reporter Eldred back?
17  A.   Yes.
18  Q.   What did you ask him?
19  A.   I asked him, I said, "I would like to see the
20  document.  Can you fax it over to me?"  And I gave him
21  the fax number of the headquarters and he sent it over
22  immediately.
23  Q.   What did Reporter Eldred say to you when you
24  told him to fax the document over immediately?

Page 65

1   A.   Something to the effect that, Give me the fax
2   number and I'll send it right over.
3   Q.   Did he fax it over immediately?
4   A.   Yes, he did.
5   Q.   When it came in on the fax machine, what did you
6   do?
7   A.   I read it.  And that particular document had
8   come out on our division-wide e-mail -- I don't know
9   exactly when, a little bit before.  I don't know the
10  date, but it had come out.  And, you know, and it was --
11  I mean, the way it was written, there's no doubt in my
12  mind that that was a copy of -- of course, like the
13  documents you were showing me, our documents have the
14  same thing, who's it from, the e-mail.  It didn't have
15  anything on that.  It just had the top line, then the
16  body of it, and then like a bottom line.  I mean, it was
17  verbatim.
18  Q.   I would like to put another document in front of
19  you.
20       MR. NEUBERGER:  Mark this as Plaintiff's
21  Exhibit 14.
22       (Plaintiff's Exhibit 14 was marked for
23  identification.)
24

Page 66

1  BY MR. NEUBERGER:
2  Q. Do you have the document in front of you?
3  A. Yes, sir.
4  Q. Does this document say at the very top "Paige
5  James (DSP)"?
6  A. Yes, sir.
7  Q. Does it say "Sent: Monday, October 25, 2004,
8  14:43" hours?
9  A. Yes.
10  Q. Is it sent to "DSP Users"?
11  A. Yes.
12  Q. Does it say "Subject: Divisional Trial Board"?
13  A. Yes, sir.
14  Q. Does this appear to be the e-mail that was faxed
15  to you by Reporter Eldred?
16  A. It looks to be the one like that, obviously
17  without the heading of Captain Paige on the top or his
18  signature at the bottom.
19  Q. So are you telling me that it only had the
20  body --
21  A. Yes.
22  Q. -- and the text?
23  A. Yes. That's all it had.
24  Q. So it didn't say it was from Captain James

Page 67

1  Paige?
2  A. That's correct.
3  Q. It didn't say it was being sent to DSP users;
4  correct?
5  A. Yes, that's correct.
6  Q. It was just four paragraphs?
7  A. Yes. And it had a solid line across the top and
8  a solid line under the bottom.
9  Q. The solid line, did that indicate that something
10  was being blacked out?
11  A. No. What it probably indicated was somebody
12  printed -- like if I printed it off my e-mail or somebody
13  and then it would -- it has the person's name at the top.
14  So it would have that. All that was either whited out or
15  taken out or whatever. I don't know what they did to it.
16  But obviously they didn't want to give up who gave them
17  the information.
18  Q. Do you still have this e-mail?
19  A. I don't know. I'd have to look and see if I
20  still have it.
21  Q. As a matter of policy and practice, do the State
22  Police throw away things that are faxed to them?
23  A. When they're not useful anymore they do.
24  Q. How about the practice of your office?

Page 68

1  A. All FOIA requests I keep in a folder, the
2  request, whether they were approved or denied. And if
3  they were approved, I make another copy of the
4  information that was sent. If they weren't, I just file
5  it in there.
6  Q. Now, after you received this e-mail, you
7  indicated that you read it; correct?
8  A. Yes.
9  Q. Then what did you do?
10  A. Called Mr. -- well, probably called back
11  upstairs or went back upstairs and told the lieutenant
12  colonel that, you know, this -- it's -- it's -- it looks
13  to me to be authentic and, you know, probably told him
14  that I was going to comment on it, to the content of it.
15  Q. What did Lieutenant Colonel MacLeish say?
16  A. I don't remember exactly what he said. He
17  didn't tell me not to comment on it.
18      And I went and called Mr. Eldred and, you
19  know, answered his questions that he had pertaining to
20  the document that he sent me.
21  Q. When you went back upstairs, was there anyone
22  else in Lieutenant Colonel MacLeish's office?
23  A. I don't know if there was or if there wasn't.
24  Q. Do you recall if Captain Paige was still there?

Page 69

1  A. No, I don't recall.
2  Q. Do you recall if Lieutenant Coupe was still
3  there?
4  A. No, I don't.
5  Q. Was the lieutenant colonel's secretary there?
6  A. No.
7  Q. Do you recall if Lieutenant Colonel MacLeish
8  took any notes of your conversation?
9  A. No, I don't.
10  Q. So that after you left his office, did you go
11  back down to your office on the first floor?
12  A. Yes.
13  Q. Did you call Reporter Eldred?
14  A. Yes, sir.
15  Q. What did you say to him?
16  A. I said -- verified that that looks to be a
17  copy -- similar document that would have came out on
18  e-mail. And then he asked me some questions. And I
19  think, if I remember, he was concerned about, I think,
20  who was sitting on the board. That was his question, the
21  board members, because one of the board majors is Major
22  Joseph Papili, and I think his wife is mentioned in this
23  lawsuit, if I'm right, and he felt -- and I think he
24  might have even asked me would that be a conflict.

Case 1:04-cv-01394-GMS   Document 75-19   Filed 09/16/2005   Page 11 of 15

Conley            v.           Chaffinch, et al.
Joseph P. Aviola, Jr.      C.A. # 04-1394-GMS      June 7, 2005

### Page 70

1   Q. Do you remember what else he asked you?
2   A. He might -- I think he asked me did I know what
3   Rule and Regulation Number 40 was and Rule and Regulation
4   Number 4, like could I be more specific on that.
5   Q. What did you say to him?
6   A. I think I did. I may have told him that Rule 4
7   dealt with sexual harassment -- I may have.
8   Q. Did you indicate to him what Rule 40 was?
9   A. I may have.
10  Q. Just for purposes of the record, do you know
11  what Rule 40 is today?
12  A. It might be conduct unbecoming.
13  Q. In answering these questions from Reporter
14  Eldred, were you acting pursuant to the authority given
15  you by Lieutenant Colonel MacLeish?
16  A. I felt I was, through him and Mr. Tupman.
17  Q. Would you have commented to Reporter Eldred if
18  Lieutenant Colonel MacLeish had not given you the
19  authority to comment?
20  A. No.
21  Q. Based on your past practice, would you have
22  commented to Reporter Eldred unless MacLeish had given
23  you the authority to comment?
24  A. No, I would not have.

### Page 71

1   Q. For example, I think you had testified a little
2   while ago about some Internal Affairs investigations
3   pertaining to Colonel Chaffinch and then-Lieutenant
4   MacLeish?
5   A. Yes.
6   Q. Do you remember that testimony?
7   A. Yes, I do.
8   Q. Do you remember testifying about Reporter Eldred
9   asking you about some specifics of some of the charges
10  pending against them?
11  A. Yes.
12  Q. Do you recall what your response to Reporter
13  Eldred was at that time?
14  A. Probably that they were personnel matters and
15  that we weren't going to comment on them, or Internal
16  Affairs matters or something along those lines.
17  Q. That's what you told him at the time?
18  A. Yes.
19  Q. Is that consistent with the past practice of the
20  Delaware State Police?
21  A. Yes.
22  Q. You've already testified about that a great
23  deal. I'll try not to get into it too much; correct?
24  That is consistent?

### Page 72

1   A. Yes, it is.
2   Q. In those past times, did you ever go up the
3   chain of command and ask whether you were authorized to
4   comment?
5   A. Yes.
6   Q. What was the answer given to you on those
7   occasions?
8   A. Pretty consistent with how I responded back to
9   the reporter that was asking. We won't have a comment
10  or, yes, we have an investigation, but we can't comment
11  on the specifics of the investigation.
12  Q. On those occasions would you have dealt with
13  Colonel Chaffinch or Lieutenant Colonel MacLeish?
14  A. Yes.
15  Q. Was Mr. Tupman ever involved in those
16  conversations?
17  A. He could have been. I don't -- or, you know, a
18  lot of times I take the question to them and they don't
19  give me an immediate response. I mean, sometimes it's
20  several hours later. I mean, they'll call me back and
21  then tell me what we are going to formulate or how they
22  are going to formulate the response.
23  Q. So on some of those occasions they may have gone
24  to Mr. Tupman? You just don't know?

### Page 73

1   A. They may have.
2   Q. On any of those occasions -- actually, did you
3   get a response on any of those occasions immediately?
4   A. I might have.
5   Q. Do you think you were involved in a conversation
6   with Mr. Tupman during any of those instances?
7   A. Could have. I mean, I could have been. I
8   mean -- again, you have to understand the magnitude of
9   complaints that have come in -- I'm sure you do -- and, I
10  mean, and the litany of calls I get from the media side.
11  You know, he could have been there. You know, I could
12  have asked him. But usually I take the information to
13  them and then most of the time they have to come back and
14  give me the information later.
15  Q. That's something that's sort of above your pay
16  grade, so to speak?
17  A. Much above my pay grade.
18  Q. Are you happy that that type of decision is
19  above your pay grade?
20  A. This gray hair didn't come from my kids. That's
21  for sure.
22  Q. So you mentioned that there have been a lot of
23  complaints or lawsuits or things of that nature filed
24  over the course of your career in the PIO office?

Page 74

1  A. Yes, sir.
2  Q. There have been a lot of lawsuits filed against
3  Colonel Chaffinch; isn't that correct?
4  A. Yes.
5      MS. BALLARD: Object to the form.
6  Q. Have there been a lot of lawsuits filed against
7  Mr. Chaffinch over the last several years?
8      MS. BALLARD: Same objection.
9  Q. You can answer.
10 A. There have been.
11 Q. Have there been a lot of Internal Affairs
12 complaints filed against Colonel Chaffinch and Lieutenant
13 Colonel MacLeish over the last several years?
14     MS. BALLARD: Same objection.
15 A. There have been. I don't say a lot, but there
16 have been complaints filed against them.
17 Q. More than one?
18 A. Probably.
19 Q. You've had to respond to requests from the media
20 with reference to those events, haven't you?
21 A. Yes, sir.
22 Q. On each of those occasions you had to take those
23 media inquiries up the chain of command to the colonel or
24 to the lieutenant colonel?

Page 75

1  A. Yes.
2  Q. At least in reference to the Internal Affairs
3  matters, I believe you testified before that the standard
4  response was something to the effect of no comment, we
5  don't comment on Internal Affairs or internal personnel
6  matters?
7  A. Yes.
8  Q. Based on your experience in the PIO office, did
9  you believe that the decision by Lieutenant Colonel
10 MacLeish was in reference to Captain Conley, was in
11 violation of past DSP policy or practice?
12     MS. BALLARD: Objection.
13 Q. You can answer.
14 A. I was -- I wouldn't say violation, but I was
15 surprised by their response.
16 Q. So based on your getting your two years in the
17 PIO office, and based on your experience dealing with
18 inquiries relating to Internal Affairs investigations
19 into Chaffinch and MacLeish, you were surprised that
20 Lieutenant Colonel MacLeish was authorizing you to
21 comment?
22 A. Yes.
23 Q. Your surprise arises from the past practice in
24 the Delaware State Police?

Page 76

1  A. Pretty much. I know on that phone -- I know
2  when I broached the subject with Mr. Tupman, I said, "You
3  know, it's an internal document. We are not going to
4  comment on that; right?" And he said, "Well" -- like I
5  said, "it was an internal document until somebody sent it
6  to Eldred" or "gave it to Eldred" and then it no longer
7  becomes -- then he says, "As long as you weren't the one
8  who sent it," and I said, "No, I wasn't."
9  Q. So you were surprised when that advice was
10 given?
11 A. I mean, based on my knowledge, yeah, yes.
12 Q. Did you say anything else during that telephone
13 conversation involving MacLeish, Paige, Lieutenant Coupe,
14 and Mr. Tupman?
15 A. No, sir.
16 Q. You just indicated that you didn't think that
17 the DSP would comment because it was an internal
18 document?
19 A. Well, I said, "This is an internal document, so
20 we won't respond to this; correct?" And I was wrong
21 because -- or based on the legal advice.
22 Q. The legal advice was given?
23 A. Yes.
24 Q. Then the Lieutenant Colonel MacLeish authorized

Page 77

1  you to comment?
2  A. Yes.
3  Q. Do you have personal knowledge of any times when
4  Lieutenant Colonel MacLeish or Colonel Chaffinch have
5  disregarded the legal advice given to them by the deputy
6  attorney generals?
7      MS. BALLARD: I'm going to object to that
8  and tell you not to answer that due to attorney/client
9  privilege.
10     MR. NEUBERGER: You are directing the
11 client not to answer?
12     MS. BALLARD: Don't you agree it goes into
13 a privileged area?
14     MR. DURSTEIN: Yes. Just so the record is
15 complete, we recognize that there was privileged
16 information that we could have objected to in this
17 instance, but we did not in order that the record might
18 be complete.
19     But when the question goes beyond this
20 particular case and this particular instance, we'll
21 exercise the right to object and instruct the witness not
22 to answer as to any other legal advice which was rendered
23 in other matters.
24     MR. NEUBERGER: Counsel, you understand I'm

20 (Pages 74 to 77)

Case 1:04-cv-01394-GMS   Document 75-19   Filed 09/16/2005   Page 13 of 15

Conley                                                                                    Chaffinch, et al.
Joseph P. Aviola, Jr.              C.A. # 04-1394-GMS                                      June 7, 2005

Page 78

1 not asking for the content about the advice, I'm just
2 asking for general instances, in general?
3     MR. DURSTEIN: Yes.
4     MR. NEUBERGER: You understand under the
5 Becker-Tuerkes case I am allowed to inquire as to the
6 date, time, and general content of that information?
7 That would be Judge McKelvie's opinion.
8     MR. DURSTEIN: Same instruction to the
9 witness.
10    MR. NEUBERGER: And then in this case, so
11 that we are all on the same page, Counsel -- okay. Fair
12 enough. I can explore this with another witness.
13 BY MR. NEUBERGER:
14    Q. Lieutenant, now I'd like to go back to the day
15 that the lawsuit was filed, which I believe the record is
16 going to indicate was October 27th of the year 2004.
17 Okay?
18    A. Yes, sir.
19    Q. Did you eventually make it down to headquarters
20 that day?
21    A. Yes, I did.
22    Q. Did you talk to anybody at headquarters that
23 day?
24    A. I talked to Colonel Chaffinch.

Page 79

1     Q. What did you and Colonel Chaffinch talk about?
2     A. The lawsuit.
3     Q. What did Colonel Chaffinch say about the
4 lawsuit?
5     A. Wasn't too pleased by it.
6     Q. Do you remember what his exact words were?
7     A. No, I don't.
8     Q. Was he angered by it?
9     A. I'll just say he wasn't too pleased by it.
10    Q. Did he use any colorful language to describe it?
11    A. He may have. I don't -- I don't remember what
12 exactly he said.
13    Q. Would he have used any profanity to describe the
14 lawsuit?
15    A. He may have, but if he did, I don't remember
16 specifics of what he said.
17    Q. Did he say anything about Captain Conley,
18 personally or individually?
19    A. He could have, but if he did, I don't -- I'm
20 not -- I don't remember what he said.
21    Q. Do you remember the specifics of your
22 conversation at all?
23    A. No, because he had been called by Secretary
24 Mitchell and he had to go down to Secretary Mitchell's

Page 80

1 office. And he said, "Can you come with me?" And I
2 said, "Okay."
3     I'm sorry. He said, "Can you meet me
4 there?" So this was before he had been suspended. And
5 he drove down there and I went downstairs to pack up my
6 stuff. And as I was on my way down there to meet him, I
7 got information that he had been suspended.
8     Q. Did you actually go to Mitchell's office to meet
9 with the colonel?
10    A. I did go to Mitchell's office and Kimberly
11 Chandler, who was there, I walked in and she was, like,
12 "Well, you can go now." I'm like, "What do you mean, I
13 can go now?" I'm like, "You told me to come down." I
14 said, you know, "The colonel told me to come down. He's
15 waiting for me." And she said, "I think it would be best
16 for you to leave."
17    And I had gotten numerous inquiries from
18 some media people about what was going on. Not that he
19 had been suspended, but about the lawsuit itself. And
20 that was one of the reasons they had asked me to go down
21 there, because I guess they were going to formulate some
22 response back to some of the questions we have gotten
23 because from time to time I'll get a question and they'll
24 tell me to refer it up to the secretary's office, and

Page 81

1 vice versa. They'll get a question that they don't want
2 to deal with, so I'll end up getting -- putting the
3 response out.
4     Q. Who is Miss Chandler?
5     A. She's supposed to be the public information
6 officer or spokesperson for the secretary of safety and
7 homeland security.
8     Q. Did you ever talk to Secretary Mitchell that
9 day?
10    A. No, I did not.
11    Q. Have you ever talked to Secretary Mitchell about
12 this lawsuit?
13    A. I don't believe I have.
14    Q. Now, still sticking on the day that this lawsuit
15 was filed, did you talk to Lieutenant Colonel MacLeish at
16 all?
17    A. I might have, but I'm not sure.
18    Q. Have you talked to Lieutenant Colonel MacLeish
19 at all about this lawsuit since the lawsuit was filed?
20    A. Probably.
21    Q. Do you remember the substance of any of those
22 conversations?
23    A. No.
24    Q. Do you remember whether Lieutenant Colonel

21 (Pages 78 to 81)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

Page 82

1  MacLeish ever expressed that he wasn't too pleased about
2  this lawsuit?
3     A.  He probably said that -- probably expressed his
4  displeasure for the lawsuit, or at least some of the
5  allegations that have been made in the lawsuit.
6     Q.  Did he ever express that he was bothered by the
7  lawsuit?
8     A.  He may have said that or expressed that he was,
9  again, not pleased with the allegations that were being
10 made.
11    Q.  Did he ever express that he was annoyed by the
12 lawsuit?
13    A.  I mean -- I mean, it's not a pleasurable mark
14 against the whole agency whether it's true or untrue. As
15 a trooper, any trooper, I think, is just not pleased with
16 the way the whole situation went. Not taking any side,
17 just unpleased with the whole situation.
18    Q.  Was he angered by it?
19        MS. BALLARD: Objection to the form.
20    A.  I just continue -- he was displeased like many
21 troopers were.
22    Q.  Was Colonel Chaffinch angered by the lawsuit
23 that first day you talked to him?
24        MS. BALLARD: Objection to the form.

Page 83

1         MR. NEUBERGER: I'll rephrase.
2  BY MR. NEUBERGER:
3     Q.  Was Colonel Chaffinch visibly upset or angry by
4  the lawsuit that first day you talked with him?
5     A.  I would say he was upset, yes.
6     Q.  Did you talk with any of the majors on the
7  executive staff about the lawsuit that first day?
8     A.  I don't believe I did. Probably the majority of
9  my contact was with the colonel and -- I'm not sure how
10 much contact I had with the lieutenant colonel.
11 Actually, I had more contact with him after the colonel
12 was suspended because I had to put out -- I'm pretty sure
13 I put out a division-wide e-mail that night.
14    Q.  Stating what?
15    A.  That the colonel had been suspended.
16    Q.  Did you send any e-mails to the colonel or the
17 lieutenant colonel in reference to the lawsuit or in
18 reference to their feelings about the lawsuit?
19    A.  No, I did not.
20    Q.  Did you make any phone calls to those same two
21 individuals, the colonel and lieutenant colonel, in
22 reference to the lawsuit or their feelings about the
23 lawsuit?
24    A.  What do you mean, "phone calls"? We talked

Page 84

1  quite a bit, you know, was called by them. But did I
2  generate the phone call to ask them how they felt? Is
3  that what you mean by the question?
4     Q.  I'll rephrase it.
5         Did you talk about this lawsuit at all with
6  the colonel or lieutenant colonel by telephone?
7         MS. BALLARD: Do you have a date in mind?
8         MR. NEUBERGER: Since October 27th, 2004.
9     A.  I'm sure we've had discussions about the
10 lawsuit, yeah.
11 BY MR. NEUBERGER:
12    Q.  What has been talked about?
13    A.  Just that they're -- they're not pleased with
14 the alleged allegations that were in there.
15    Q.  Was Colonel Chaffinch happy with the press
16 coverage the day after the lawsuit was filed?
17        MS. BALLARD: Object to the form.
18    A.  I don't -- I have no idea if he was or he
19 wasn't.
20    Q.  Do you know if Lieutenant Colonel MacLeish was
21 visibly upset, happy, or unhappy with the press coverage
22 of this lawsuit?
23    A.  No, I don't.
24    Q.  Did you ever talk to Majors Hughes or Eckrich

Page 85

1  about this lawsuit?
2     A.  I don't remember if I specifically have or not.
3  And again, you have to understand -- I mean, as you well
4  know, there was a public hearing on it, on the
5  disciplinary process of it. So, I mean, there was a lot
6  of talk throughout the division on it. Have I talked to
7  people about it? Absolutely. Who have I talked to? I
8  mean, I don't know. I didn't make a list -- you know,
9  I've talked to people about the lawsuit.
10    Q.  So, for example, are you telling me that there's
11 been a lot of talk throughout the division about this
12 lawsuit? Is that accurate?
13    A.  Yes.
14    Q.  Are you also indicating that there has been a
15 lot of talk throughout the division about the Internal
16 Affairs matters dealing with Captain Conley?
17    A.  In regards to the actual hearing that was held
18 at headquarters, it was open to the public.
19    Q.  So there's been a lot of talk about that?
20    A.  Yes.
21    Q.  Has it been positive talk or negative talk?
22    A.  There's been a lot of talk.
23    Q.  That's fair.
24        Did you ever inquire as to who released the

22 (Pages 82 to 85)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Case 1:04-cv-01394-GMS   Document 75-19   Filed 09/16/2005   Page 15 of 15

Conley                                    v.                            Chaffinch, et al.
Joseph P. Aviola, Jr.            C.A. # 04-1394-GMS                        June 7, 2005

Page 86

1  initial Internal Affairs e-mail to Reporter Tom Eldred?
2     A.  Did I?  No, I did not.
3     Q.  Do you know if there was any inquiry whatsoever
4  if that has occurred?
5     A.  I don't know if there has or hasn't been an
6  official inquiry into that.
7     Q.  Based on your 20 years' experience as a Delaware
8  state trooper, are internal State Police documents
9  released on a regular basis to reporters?
10    A.  Usually not, no.
11    Q.  Were you personally surprised when you found out
12 that that reporter, Tom Eldred, had an internal State
13 Police document?
14    A.  Anybody else I probably would have been
15 surprised with.  Tom Eldred, I wasn't.  And because,
16 again, in our numerous conversations that he and I have
17 had, you know, he would often say, you know, I've got --
18 to almost quote him, You know I got this from a source.
19 You know I have many sources.  And whether he does or he
20 doesn't, he has me as a believer because of the
21 information that he's always told me.  And if it's not
22 verbatim, it's close to it.  So I'm a believer in Tom
23 Eldred.
24         MR. NEUBERGER:  Counsel, I would like to

Page 87

1  take another five-minute break.  I'm just about done.
2         MS. BALLARD:  Okay.
3         (A recess was taken at this time.)
4  BY MR. NEUBERGER:
5     Q.  Now, Lieutenant Aviola, I just have a couple
6  more questions and then we are going to wrap it up.
7  Okay?  It's been a long day, or a long afternoon, at
8  least.
9     A.  Longer than I thought it was going to be.
10    Q.  I apologize for that.
11    A.  That's okay.
12    Q.  Now, did Lieutenant Colonel MacLeish authorize
13 you back in October of 2004 to release the specifics of
14 the charges referenced in the e-mail that Reporter Eldred
15 had in his possession?
16        MS. BALLARD:  Object to the form.
17    Q.  You can answer.
18    A.  What do you mean, "the specifics"?
19    Q.  What Rule 40 was?  What Rule -- I think it was 4
20 was?  Things of that nature?
21    A.  (No response.)
22    Q.  Maybe a better question would be:  Did he just
23 authorize you to say whatever you wanted to about the
24 Internal Affairs unit?

Page 88

1     A.  No, he didn't do that, no.  No.  It was is that
2  our e-mail and can I -- can I comment to the content of
3  the e-mail.
4     Q.  And he authorized you to do that?
5     A.  If I believed it was, which I say it was, to the
6  content of what's in the content of it.
7     Q.  Sure.
8     A.  To your question, if I, in fact, did elaborate
9  on what Rule and Regulation Number 4 was and 40, and I
10 know I think I did -- I think I did elaborate, but I
11 don't know for then -- probably, you know, I probably --
12 I don't think it came from him.  It probably was, you
13 know -- I just elaborated on to give Eldred what exactly
14 Rule and Reg. No. 4 was and Rule 40 was.
15    Q.  Were you elaborating because you thought you had
16 the authorization of the unit colonel?
17    A.  Yes, that's fair to say.  He authorized me to
18 respond, so I -- in my mind, for what that's worth, you
19 know, telling you -- to me, Rule and Regulation Number 40
20 doesn't mean diddly.  I mean, I could tell you Rule and
21 Regulation 500.  You know, what's Rule and Regulation
22 Number 4?  It pertains to our sexual harassment policy.
23 Rule and Regulation Number 40 is conduct unbecoming.
24        I mean -- so, I mean, did he specifically

Page 89

1  say that?  No, he didn't say that, but I felt this whole
2  ordeal was under their direction.
3     Q.  But for his authorization, you wouldn't have
4  talked about it at all other than saying "no comment"?
5     A.  I wouldn't, no.
6     Q.  You're currently a lieutenant; right?
7     A.  For the current -- yes, I am.
8     Q.  What band are you on?
9     A.  On B band.
10    Q.  How many lieutenants are on A band?
11    A.  Only two.
12    Q.  Would you like to be a captain some day?
13    A.  Sure, yes.
14    Q.  Now, Lieutenant Colonel MacLeish was recently
15 promoted to colonel, wasn't he?
16    A.  He was.
17    Q.  So he's currently your direct boss?
18    A.  Yes, that's correct.
19    Q.  You work with him on a daily basis?
20    A.  Pretty much.
21    Q.  Okay.
22        MR. NEUBERGER:  I have no further
23 questions, Counsel.
24        MS. BALLARD:  I just want to ask a couple.