Case 1:04-cv-01394-GMS   Document 75-21   Filed 09/16/2005   Page 1 of 13

CONFIDENTIAL        Conley                             v.                    Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                              June 10, 2005

Page 54

1  specific?
2  Q. I believe you testified that you were aware that
3  a complaint was made?
4  A. Yes.
5  Q. You served in police agencies for a long time.
6  Is that fair to say?
7  A. Yes.
8  Q. Is there a process by which complaints are
9  processed in police agencies?
10 A. Yes.
11 Q. Were you aware of the specifics of that process
12 in the Delaware State Police?
13 A. Not necessarily, no.
14 Q. Were you aware of it with regard to the
15 complaint that I filed with Captain Paige?
16 A. I was aware that Captain Paige received it, that
17 he was dealing with it. And the conclusion was as I
18 stated.
19 Q. What was your conclusion?
20 A. No. The conclusion was as I stated. The
21 conclusion was that we won't be able to find out who did
22 this.
23 Q. Did there come a time when you learned that I,
24 Stephen Neuberger, had filed several complaints with

Page 55

1  Deputy Attorney General Michael Tupman?
2  A. I vaguely recall.
3  Q. Were you consulted about that by the Delaware
4  State Police?
5  A. That you filed a complaint against or with Mike
6  Tupman?
7  Q. That is correct.
8  A. Not that I remember.
9  Q. Following the filing of this lawsuit, were you
10 involved in all aspects of Internal Affairs
11 investigations arising out of this lawsuit?
12       MS. BALLARD: Object to the form.
13 A. I received periodic reviews and updates.
14 Q. By whom?
15 A. Captain Jim Paige.
16 Q. Was he just letting you know or was he asking
17 for your approval as to different matters?
18 A. I believe on some matters he sought some
19 agreement or at least some assistance.
20 Q. Did any of those matters relate to the two
21 complaints that I had filed?
22 A. No.
23 Q. Now, did you agree in the decision of
24 then-Lieutenant Colonel MacLeish to not investigate the

Page 56

1  release of Captain Conley's Internal Affairs information?
2        MS. BALLARD: Object to the form.
3  Q. You can answer.
4  A. I don't believe that -- what I believe is simply
5  this: that Tom MacLeish received the complaint, that he
6  discussed it with Captain Jim Paige, that there was a
7  cursory review, that there was appropriate action taken.
8        There was information provided back to
9  Captain Paige to Lieutenant Colonel MacLeish to me that,
10 as I recall, our computer crimes unit said there's no way
11 we are going to be able to find out short of Mr. Eldred
12 saying so-and-so gave me this. There's no way we'll be
13 able to find that out. So I don't want to imply or say,
14 and I can't say that nothing was done.
15       Now, you can call that an investigation.
16 Q. Who had the ultimate authority or
17 decision-making power to make that call?
18 A. Tom MacLeish.
19 Q. Did you approve, authorize, or sanction his
20 decision in that regard?
21 A. I agreed that if there is no way to find out who
22 gave Tom Eldred a copy of an e-mail, that it is not a
23 wise use of State Police resources to try to find out.
24 Q. Are you saying you just simply agreed after the

Page 57

1  fact or are you telling me that you signed off on his
2  decision?
3  A. Either/or. I don't recall.
4  Q. If Colonel MacLeish gave some specific answer to
5  that question, would you go with his answer in light of
6  your not recalling?
7  A. No.
8  Q. Okay.
9  A. I don't know what his answer is.
10 Q. Now, are you aware that Colonel MacLeish gave
11 his sworn deposition in this case yesterday?
12 A. Yes.
13 Q. Did you have a meeting with him the day before
14 yesterday?
15 A. A meeting? I meet with Tom a lot, yes.
16 Q. So you're answering yes to my question?
17 A. I meet with Tom a lot. Yes, I've met with him
18 prior to his deposition yesterday.
19 Q. My question was: Today is Friday, is it not?
20 A. Yes, it is.
21 Q. And yesterday was Thursday; is that correct?
22 A. Yes, it is.
23 Q. And the day before that was Wednesday; is that
24 correct?

Case 1:04-cv-01394-GMS   Document 75-21   Filed 09/16/2005   Page 2 of 13

CONFIDENTIAL          Conley                    v.                    Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                      June 10, 2005

Page 58

1  A. Yes, it is.
2  Q. Did you meet with Thomas MacLeish, who is the
3  colonel of the Delaware State Police, on Wednesday?
4  A. I'd have to look at my calendar.
5  Q. So are you telling me that you don't remember?
6  A. I don't remember.
7  Q. Are you telling me that you don't remember
8  things that happened two days ago?
9  A. Not at this specific instance, Counsellor, no, I
10 don't. I have a lot of other things that are pressing
11 right now dealing with homeland security, and I'm sorry,
12 they're taking up all the gray matter in my head. But if
13 I have access to my calendar, I'll be glad to answer the
14 question.
15 Q. Are you telling me right now you just don't
16 remember?
17 A. I don't remember.
18 Q. Had you talked to Thomas MacLeish about his
19 testimony in this lawsuit, in this matter at any time?
20 A. Yes.
21 Q. What was said?
22 A. It was yesterday after the deposition. He
23 called me to say that he was finished with the
24 deposition. He wanted to alert me that he refused to

Page 59

1  answer certain questions. And that was the end of that.
2  Q. Did he say anything else to you?
3  A. No.
4  Q. Did you say anything to him?
5  A. Yes. That I was being deposed today.
6  Q. Did you say anything else to him?
7  A. No.
8  Q. You served as superintendent of the Maryland
9  State Police for several years; isn't that correct?
10 A. Eight.
11 Q. For eight years?
12 A. Yes.
13 Q. Prior to that you were with the Prince
14 George's -- is it Prince George County?
15 A. George's.
16 Q. Prince George's County.
17     During your time with either of those two
18 police agencies, were you ever a defendant in a gender
19 discrimination lawsuit?
20 A. Yes.
21 Q. Were you a personal department or an official
22 capacity defendant?
23 A. I don't recall.
24 Q. What was the result of those lawsuits?

Page 60

1  A. I don't recall.
2  Q. Were you found guilty of violating a trooper's
3  right to be free of his gender discrimination in at least
4  one of those lawsuits?
5      MS. BALLARD: Object to the form.
6  A. Not that I recall.
7  Q. Were you found to have violated a trooper's
8  right to be free of gender discrimination in one of those
9  lawsuits?
10 A. Not that I recall.
11 Q. What was the subject matter of those lawsuits?
12 What type of discrimination claims were raised in those
13 suits?
14 A. Counsellor, there were dozens. I mean, I served
15 as chief of police and a superintendent for 13 years,
16 first as the 38th largest police department in the
17 country and the second as the 7th largest State Police
18 force in the country. There were many lawsuits filed,
19 everything from racial profiling to gender issues. I
20 don't recall.
21 Q. Weren't you responsible for actually cleaning up
22 some racial profiling problems in the Maryland State
23 Police? Or am I thinking of a different officer?
24 A. It's certainly an issue I dealt with. It's

Page 61

1  ongoing litigation.
2  Q. Now, you are legally trained; correct?
3  A. Correct.
4  Q. You understand the difference between an
5  individual capacity suit and an official capacity suit?
6  A. Yes.
7  Q. You are telling me that you just can't remember
8  presently --
9  A. Right.
10 Q. -- whether you were an individual defendant in
11 any of those many, many, many lawsuits?
12 A. That's what I'm saying.
13 Q. Have you ever been sued for First Amendment free
14 speech retaliation?
15 A. I don't recall.
16 Q. Are you denying that it had ever occurred?
17 A. That's not what I said.
18 Q. Are you simply saying that you just don't
19 remember?
20 A. The answer speaks for itself. I don't recall.
21 Q. How much money do you make a year?
22 A. From what source?
23 Q. From all sources.
24     MS. BALLARD: I'm going to object to this

CONFIDENTIAL        Conley                    v.                      Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                      June 10, 2005

Page 62

1 line of questioning for the same reasons put on the
2 record yesterday.
3         MR. NEUBERGER: You can have your
4 objection, Counsel.
5         MS. BALLARD: I'm going to instruct him not
6 to answer it.
7         MR. NEUBERGER: Basis?
8         MS. BALLARD: That this is not reasonably
9 calculated to lead to relevant evidence in the case.
10         MR. NEUBERGER: As I explained on the
11 record yesterday, this relates to the issue of damages.
12 If you are willing to stipulate on the record that you
13 are going to argue that punitive damages should not be
14 assessed in light of how much money he makes a year, in
15 light of his assets -- are you willing to make that
16 stipulation?
17         MS. BALLARD: I don't understand what the
18 nature of your proposed stipulation is from what you just
19 said.
20         MR. NEUBERGER: Do you practice civil law
21 rights, Counsel?
22         MS. BALLARD: Yes, I do.
23         MR. NEUBERGER: Are you aware of punitive
24 damages case law under Smith v. Wade?

Page 63

1         MR. DURSTEIN: Let's get to the nature.
2 The tutorial is not necessary. What are you proposing?
3         MR. NEUBERGER: Are you willing to
4 stipulate that you are going to argue that punitive
5 damages shouldn't be assessed because of the lack or the
6 wealth of your clients' assets?
7         MS. BALLARD: That doesn't make sense to
8 me. I don't know what you are saying. Of course we
9 would like punitive damages not to be assessed. We would
10 like no damages to be assessed.
11         MR. NEUBERGER: Are you aware that one of
12 the things that defense lawyers sometimes argue in civil
13 rights cases when it comes to punitive damages is that
14 even if they are assessed, not very much should be
15 assessed because of the defendant's limited assets?
16         MR. DURSTEIN: Limited means? You mean
17 lack of wealth?
18         MR. NEUBERGER: The whole spectrum of
19 things.
20         MS. BALLARD: You are asking us to get into
21 our trial strategies now. I'm just saying you don't get
22 to the issue of damages until you prove liability.
23 That's what the deposition is for.
24         MR. NEUBERGER: The deposition also relates

Page 64

1 to issues.
2         MR. DURSTEIN: Well, damages. I think this
3 is execution, though.
4         MS. BALLARD: That's right.
5         MR. DURSTEIN: You are always entitled to
6 interrogatories and production in aid of execution after
7 you obtain a verdict in the event there's issues with
8 execution. We don't dispute damage claims. That's fine.
9 But I don't think that is what this is about.
10         MS. BALLARD: His net worth --
11         MR. NEUBERGER: The jury awards punitive
12 damages. The jury doesn't know how much of an award of
13 punitive damages to assess which will punish and deter an
14 individual unless they know -- this is one of the
15 factors, at least -- unless they know that person's
16 assets.
17         You've been on the receiving end of this in
18 several civil rights cases over the last several years in
19 which punitive damages were assessed and in which defense
20 counsel argued they should not be assessed because a
21 person had some limited means or some similar argument.
22         MR. DURSTEIN: I don't know if we argued
23 that or not.
24         MR. NEUBERGER: I believe I am entitled to

Page 65

1 explore this. If you wish to seal this part of the
2 deposition, I certainly have no problem with that given
3 that it deals with personal financial information. I
4 certainly have no intent to put this into the public
5 record prior to trial. If it does become part of the
6 public record, it will be filed, this portion of it, will
7 be filed under seal.
8         Do you understand the relevance of it now?
9         MS. BALLARD: Counsel, I believe it is not
10 relevant nor reasonably calculated to lead to the
11 discovery of relevant evidence. Obviously it's a
12 complicated legal issue that we are not prepared to fully
13 discuss at the table here today. If you would like to
14 brief it to the Court, that's fine.
15         MR. NEUBERGER: Then if you are instructing
16 your client not to answer, I'm going to have to leave
17 this deposition open until it can be raised with the
18 Court. Do you understand --
19         MS. BALLARD: Obviously if the Court
20 ordered him to answer the question, he is going to come
21 back to answer them.
22         MR. NEUBERGER: Consistent with a motion to
23 compel.
24         MR. DURSTEIN: The other way to handle it

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.        Registered Professional Reporters        302-655-0477

Page 66

1 might be, and not to tell you how to try your case,
2 request for production because you can get the numbers
3 that no witness is going to have off the top of his head.
4 That would be another way to deal with it. We would
5 either raise objections or not raise objections, but we
6 could probably -- I'm guessing because we haven't
7 discussed it -- provide a lot more accurate information
8 of the kind you are seeking.
9     MR. NEUBERGER: As I explained on the
10 record yesterday, the reason I want to ask some of these
11 general questions without going into specifics is so I
12 can tailor my request for production and not waste
13 counsel's time.
14     MR. DURSTEIN: Would you mind if we take a
15 recess and ask the Secretary his feeling about this?
16     MR. NEUBERGER: Yes. I can put on the
17 record now for your benefit the types of questions which
18 I am going to ask.
19     MR. DURSTEIN: That would be helpful.
20     MR. NEUBERGER: How much money he makes a
21 year, what property he owns, homes, vacation homes,
22 et cetera, other types of land. In general, where he
23 invests his money.
24     MR. DURSTEIN: Okay.

Page 67

1     MS. BALLARD: Without dollar amounts or
2 with dollar amounts?
3     MR. NEUBERGER: I want dollar amounts.
4     MS. BALLARD: You want dollar amounts.
5 Okay.
6     MR. NEUBERGER: If he knows them right now.
7 If not, I'm sure I can get them with similar RFPs.
8     MR. DURSTEIN: Why don't we take a
9 five-minute recess? We won't get into the subject matter
10 of the deposition. I know we can't do that.
11     MR. NEUBERGER: Fair enough.
12     MR. DURSTEIN: We'll see what his view is
13 on that.
14     MR. NEUBERGER: Off the record.
15     (A recess was taken at this time.)
16     MR. NEUBERGER: Counsel?
17     MS. BALLARD: We've spoken to the
18 Secretary. He is willing to answer your questions with
19 the stipulation that it is under seal and that none of
20 the parties in this room will repeat the information
21 outside of this room.
22     MR. NEUBERGER: Would that include me
23 talking to my cocounsel?
24     MS. BALLARD: Oh, no. To the media, to

Page 68

1 other officers.
2     MR. NEUBERGER: To the media and things
3 like that. If I dictate a memo to file, to my damages
4 subfile and the secretary types it up, are you --
5     MS. BALLARD: Obviously within counsel and
6 the parties.
7     MR. NEUBERGER: That's just different than
8 what you said. I wanted to make sure --
9     MS. BALLARD: I'm sorry. I didn't state it
10 very well.
11     MR. NEUBERGER: That's okay.
12     MS. BALLARD: And without waiving any other
13 objections we have to later raise with regard to this
14 issue.
15     - - - - -

Page 69

PAGES 70 AND 71 OF THIS TRANSCRIPT

HAVE BEEN DEEMED TO BE CONFIDENTIAL

BY THE PARTIES AND CAN BE FOUND IN A

SEALED ENVELOPE AT END OF THIS

TRANSCRIPT.

Case 1:04-cv-01394-GMS    Document 75-21    Filed 09/16/2005    Page 5 of 13

CONFIDENTIAL          Conley                    v.                    Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                      June 10, 2005

Page 70

[blank]

Page 71

[blank]

Page 72

1  BY MR. NEUBERGER:
2      Q.  Mr. Secretary, we are actually almost done.  I
3  have a few more areas to question you on, but they
4  probably shouldn't take that long.
5      A.  Okay.
6      Q.  Are you aware of something called the Combined
7  Accident Reduction Effort?
8      A.  Yes.
9      Q.  The acronym for that is CARE, C-A-R-E?
10     A.  That's correct.
11     Q.  Are you aware that it has been the historical
12 policy and practice in the Delaware State Police that the
13 director of traffic always attends the CARE conferences?
14     A.  I didn't know that.
15     Q.  Were you aware that in 1996 Colonel Chaffinch
16 was the director of traffic?
17     A.  Didn't know that.
18     Q.  Are you aware that in 1996 in that capacity
19 Colonel Chaffinch attended the CARE conferences which
20 took place while he was the director of traffic?
21     A.  Didn't know that.
22     Q.  Did you know that in 1999 now-retired Major
23 David Baylor was the director of traffic?
24     A.  Didn't know that.

Page 73

1      Q.  Did you know that in 1999 and while he was the
2  director of traffic, now-retired Major Baylor also
3  attended the CARE conferences?
4      A.  I didn't know that.
5      Q.  Are you aware that currently Captain Conley is
6  the director of traffic?
7      A.  I am aware of that.
8      Q.  Are you aware that she's held that position
9  since approximately 2001?
10     A.  I didn't know the exact time.
11     Q.  Are you aware that in the year 2002 Colonel
12 Chaffinch refused to allow her to attend the CARE
13 conferences?
14         MS. BALLARD:  Object to the form.
15     A.  I didn't know that.
16     Q.  Are you aware that in the year 2003 Captain
17 Conley was allowed to attend the CARE conferences but
18 only because of the intervention of now Captain Dixon?
19         MS. BALLARD:  Same objection.
20     A.  Didn't know that.
21         MR. NEUBERGER:  Counsel, you can have a
22 continuing objection to this whole line of questioning.
23         MS. BALLARD:  To the presumptive fact
24 behind your questions?

Case 1:04-cv-01394-GMS   Document 75-21   Filed 09/16/2005   Page 6 of 13

CONFIDENTIAL        Conley                              v.                         Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                                   June 10, 2005

Page 74

1    MR. NEUBERGER: Sure. I was asking if he
2 knew. If he doesn't know, so be it.
3 BY MR. NEUBERGER:
4    Q. Are you aware that in the year 2004 Colonel
5 Chaffinch again refused to allow Captain Conley to attend
6 the CARE conferences despite her holding the position of
7 director of traffic?
8    A. I didn't know that.
9    Q. Are you aware that in the year 2005 Colonel
10 Chaffinch, Colonel MacLeish, and now Major Hughes refused
11 to allow Captain Conley to attend the CARE conferences?
12    A. I didn't know that.
13    Q. Are you aware that Colonel Chaffinch himself
14 actually attended the CARE conference?
15    A. I'm aware of that.
16    Q. Are you aware for many years the Delaware State
17 Police director of traffic has been the enforcement
18 coordinator for Region 3 of Operation CARE?
19    A. I believe I knew that.
20    Q. Are you aware that this has recently been
21 removed from Captain Conley's responsibilities by Colonel
22 MacLeish and Major Hughes?
23    A. Didn't know that.
24    Q. Are you aware that as a result of Colonel

Page 75

1 MacLeish and Major Hughes's actions, that other states in
2 our CARE Region 3 region are no longer reporting to
3 Captain Conley on CARE issues as they always had in the
4 past, but are now bypassing her and dealing directly with
5 Colonel MacLeish?
6    A. I didn't know that.
7    Q. Are you aware that Colonel MacLeish and Major
8 Hughes have been changing Captain Conley's job duties as
9 director of traffic?
10    A. Didn't know that.
11    Q. Did you or your office receive a letter in
12 approximately early May from the International
13 Association of Chiefs of Police?
14    A. Early May of this year?
15    Q. Yes, of 2005.
16    A. Did I get a letter from IACP? I could have.
17    Q. Are you aware that the IACP, in conjunction with
18 the National Highway Traffic Safety Administration and
19 the National Sheriffs' Association, were hosting an
20 August 2005 program to promote traffic safety techniques
21 nationwide?
22    A. I don't recall that.
23    Q. Are you aware that this organization was trying
24 to teach proven traffic safety strategies to traffic

Page 76

1 safety professionals?
2    A. I am aware of that.
3    Q. Are you aware that they wanted the Delaware
4 State Police to choose individuals with, quote, a
5 management level position, unquote, whose duties deal
6 with improving traffic safety?
7    A. I didn't know that.
8    Q. Are you aware that Colonel MacLeish and Major
9 Hughes, they refused to inform Captain Conley of this
10 training opportunity?
11    A. Didn't know that.
12    Q. Are you aware that both of those individuals,
13 Colonel MacLeish and Major Hughes, bypassed her as
14 director of traffic and instead invited a sergeant under
15 her command?
16    A. Didn't know that.
17    Q. Are you aware that Captain Conley only found out
18 about this opportunity because a sergeant came to her and
19 reported that his chain of command had been bypassed and
20 he had been contacted directed?
21    A. I didn't know that.
22    Q. Excuse me. Contacted directly.
23    A. I didn't know that.
24    Q. Are you aware that Colonel MacLeish and Major

Page 77

1 Hughes have refused to recognize the accomplishments of
2 Captain Conley and her office or give any type of awards
3 for the drastic reduction in fatal accidents and other
4 noteworthy accomplishments that have been accomplished
5 over the last year or so?
6         MS. BALLARD: I just reiterate my ongoing
7 objection.
8         MR. NEUBERGER: Sure.
9    A. I don't recall that. I know that the Office of
10 Highway Safety certainly gave praise to the Delaware
11 State Police and I've heard conversations where Captain
12 Conley was praised highly.
13         MR. NEUBERGER: All right, Counsel. I have
14 no further questions subject to the stuff which is
15 already on the record.
16         MS. BALLARD: Thank you.
17         No questions.
18         MR. DURSTEIN: Thank you.
19         (The deposition was then concluded at
20 11:45 a.m.)
21         - - - - -

| | |
|---|---|
| CONFIDENTIAL     Conley | v.     Chaffinch, et al. |
| Secretary David B. Mitchell, Sr. | June 10, 2005 |

Page 78

1  INDEX TO TESTIMONY
2
3
   SECRETARY DAVID B. MITCHELL, SR.           PAGE
4
5  Examination by Mr. Neuberger              2
6
            - - - - -
7
8            INDEX TO EXHIBITS
9
10  (There were no exhibits marked for identification.)
11
12           - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

Page 79

1
2
3
4
5
6
7
8    REPLACE THIS PAGE
9
10   WITH THE ERRATA SHEET
11
12   AFTER IT HAS BEEN
13
14   COMPLETED AND SIGNED
15
16   BY THE DEPONENT.
17
18
19
20
21
22
23
24

Page 80

1  State of Delaware )
2                    )
3  New Castle County )
4
5         CERTIFICATE OF REPORTER
6
7       I, Kathleen White Palmer, Registered Merit
   Reporter and Notary Public, do hereby certify that there
8  came before me on the 10th day of June, 2005, the
   deponent herein, SECRETARY DAVID B. MITCHELL, SR., who
9  was duly sworn by me and thereafter examined by counsel
   for the respective parties; that the questions asked of
10 said deponent and the answers given were taken down by me
   in Stenotype notes and thereafter transcribed into
11 typewriting under my direction.
12      I further certify that the foregoing is a
   true and correct transcript of the testimony given at
13 said examination of said witness.
14      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
15 interested in the event of this suit.
16
17
18
19        Kathleen White Palmer, RPR, RMR
           Certification No. 149-RPR
20         (Expires January 31, 2008)
21
   DATED: June 12, 2005
22
23
24

21 (Pages 78 to 80)

Wilcox & Fetzer, Ltd.        Registered Professional Reporters        302-655-0477



**WILCOX & FETZER LTD.**

In the Matter Of:

# Price, et al.
# v.
# Chaffinch, et al.

C.A. # 04-1207

---

Transcript of:

Thomas F. MacLeish

July 19, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:04-cv-01394-GMS   Document 75-21   Filed 09/16/2005   Page 9 of 13

Price, et al.                               v.                          Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                    July 19, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE,            )
CORPORAL WAYNE WARREN,             )
and SERGEANT CHRISTOPHER           )
D. FORAKER,                        )
                                   )
        Plaintiffs,                )
                                   )
           v.                      ) C.A. No. 04-1207
                                   )
COLONEL L. AARON CHAFFINCH,)
individually and in his            )
official capacity as               )
Superintendent of the              )
Delaware State Police;             )
LIEUTENANT COLONEL THOMAS          )
F. MacLEISH, individually          )
and in his official                )
capacity as Deputy                 )
Superintendent of the              )
Delaware State Police;             )
DAVID B. MITCHELL, in his          )
official capacity as the           )
Secretary of the Department)
of Safety and Homeland             )
Security of the State of           )
Delaware; and DIVISION OF          )
STATE POLICE, DEPARTMENT OF)
SAFETY AND HOMELAND                )
SECURITY, STATE OF                 )
DELAWARE,                          )
                                   )
        Defendants.                )

         Deposition of COLONEL THOMAS F. MacLEISH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:30 a.m., on Tuesday,
July 19, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

Price, et al.  v.  Chaffinch, et al.
Thomas F. MacLeish    C.A. # 04-1207    July 19, 2007

Page 2

1  APPEARANCES:
2      STEPHEN J. NEUBERGER, ESQUIRE
       MARTIN HAVERLY, ESQUIRE
3      THE NEUBERGER FIRM, P.A.
        2 East 7th Street - Suite 302
4       Wilmington, Delaware 19801
        for the Plaintiffs
5
       EDWARD T. ELLIS, ESQUIRE
6      MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
        123 South Broad Street
7       Avenue of the Arts
        Philadelphia, Pennsylvania 19109
8       for the Defendants
9  ALSO PRESENT:
10     SERGEANT CHRISTOPHER D. FORAKER
       CORPORAL B. KURT PRICE
11     ALISON LASSETER
12             - - - - -

Page 3

1          COLONEL THOMAS F. MacLEISH,
2          the witness herein, having first been
3          duly sworn on oath, was examined and
4          testified as follows:
5  BY MR. NEUBERGER:
6     Q.  Colonel, my name is Steve Neuberger, and I'm an
7  attorney representing Master Corporal Price and Master
8  Corporal Wayne Warren. Are you aware of that?
9     A.  Yes.
10    Q.  Have you ever testified in court before?
11    A.  Yes, I have.
12    Q.  Have you ever had your deposition taken before?
13    A.  Yes, I have.
14    Q.  I'm going to ask you some questions, and the
15 court reporter here is going to type up your answers to
16 those questions. Okay?
17    A.  Yes.
18    Q.  We have to take turns talking because if we talk
19 at the same time, although the court reporter is very,
20 very good, she can't get everything down. So we have to
21 take turns.
22    A.  I understand.
23    Q.  You have to verbalize your answers. For
24 example, instead of nodding your head, just say yes.

Page 4

1  Instead of shaking your head, just say no.
2          Do you understand that?
3     A.  Yes, I do.
4     Q.  After we're done here today, you will have an
5  opportunity to review the transcript of the deposition to
6  correct any typographical errors that may be made. Do
7  you understand that?
8     A.  Yes, I do.
9     Q.  If I ask you a question and you don't understand
10 the question, just ask me to rephrase that question. I
11 will be more than happy to do that. Do you understand?
12    A.  Yes.
13    Q.  Do you understand that I don't want you to guess
14 at any answers?
15    A.  Yes.
16    Q.  Are you taking any medications or is there
17 anything else that would prevent you from testifying
18 truthfully or remembering accurately today?
19    A.  No, I'm not.
20    Q.  If you need any breaks, if you need to go to the
21 john, need to stretch your back out, need to take five
22 minutes, let me know and I'll be happy to take a
23 five-minute break.
24    A.  Yes.

Page 5

1     Q.  You have taken an oath to tell the truth today?
2     A.  Yes, I have.
3     Q.  Do you understand the significance of that oath?
4     A.  Yes, I do.
5     Q.  You understand that I'm going to be asking you
6  questions today concerning events arising out of two
7  separate lawsuits?
8     A.  Yes.
9     Q.  Foraker v. Chaffinch, MacLeish, and the DSP?
10    A.  Yes.
11    Q.  And then Price, Warren, and Foraker versus
12 Chaffinch, MacLeish, and the DSP?
13    A.  Yes.
14    Q.  Your current position is Colonel of the Delaware
15 State Police; isn't that right?
16    A.  Yes, it is.
17    Q.  Is that the highest-ranking position in the
18 Delaware State Police?
19    A.  Yes, it is.
20    Q.  When were you promoted to colonel?
21    A.  May 6 of 2005.
22    Q.  What was your position prior to that?
23    A.  I was lieutenant colonel.
24    Q.  What are the job responsibilities of the

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

A295

Price, et al.                           v.                          Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                      July 19, 2007

Page 6
1  lieutenant colonel of the Delaware State Police?
2      A.  Typically, they are -- you have all operations
3  report to you.  You have HR and the academy that fall
4  under you, directly fall under you, and then all the
5  majors report to you.  Take care of all operations,
6  day-to-day operations of the division.
7      Q.  Day-to-day operations of the Delaware State
8  Police are the responsibility of the lieutenant colonel,
9  also known as the deputy superintendent of the Delaware
10 State Police?
11     A.  Yes, that's correct.
12     Q.  Who promoted you to lieutenant colonel?
13     A.  Colonel Chaffinch did.
14     Q.  Before that you were a major on the executive
15 staff, weren't you?
16     A.  That's correct.
17     Q.  And in both of those capacities you worked
18 closely with Colonel Chaffinch on a day-to-day basis?
19     A.  Closer as lieutenant colonel than as major, but,
20 yes, I worked with him closely.
21     Q.  Was it a great honor to be promoted to
22 lieutenant colonel?
23     A.  Yes, it was.
24     Q.  Was it a privilege?

Page 7
1      A.  Yes.
2      Q.  Up until your promotion to colonel and
3  superintendent of the Delaware State Police, was that the
4  high point of your career?
5      A.  I think the high point of my career was being
6  appointed as a trooper.
7      Q.  Was it one of the high points of your career?
8      A.  Yes, it was.
9      Q.  You're on a first-name basis with
10 Colonel Chaffinch, aren't you?
11     A.  Most of the time it's colonel, but, yes, I call
12 him Aaron on occasion.
13     Q.  He's your friend, isn't he?
14     A.  Yes, he is.
15     Q.  For example, there was a profile story about
16 Colonel Chaffinch in the April 2005 edition of The News
17 Journal, wasn't there?
18         MR. ELLIS:  Object to the form of the
19 question.
20         MR. NEUBERGER:  You can answer.
21     A.  Sir, I don't recall if there is.  If you show it
22 to me, I'll probably remember it.
23     Q.  Do you recall that on -- actually, I apologize.
24 Do you recall that on March 27th of 2005, that there may

Page 8
1  have been a profile story about Colonel Chaffinch in the
2  Wilmington News Journal?
3      A.  I was in Hawaii when that article appeared.
4      Q.  Do you recall ever seeing a story about
5  Colonel Chaffinch in The News Journal?
6      A.  There have been several stories about
7  Colonel Chaffinch in the newspaper, Mr. Neuberger.
8      Q.  Have you ever been interviewed by a News Journal
9  reporter about Colonel Chaffinch and say good things
10 about him?
11     A.  Yes.
12     Q.  Would you remember that you were the only
13 trooper quoted in any of those articles actually saying
14 anything good about him?
15     A.  As I already stated, I don't recall reading the
16 article.  I was in Hawaii when that article was
17 published, and I never did find it.  I never read the
18 article.
19     Q.  How about any article published about
20 Colonel Chaffinch?
21         MR. ELLIS:  Object to the form of the
22 question if it's a question.
23     A.  If you're asking me specifically about an
24 article that I would say something good about him, I have

Page 9
1  said good things to him to reporters, but I can't recall
2  specific articles it appeared in.
3      Q.  Are you and Colonel Chaffinch close?
4      A.  Define "close."
5      Q.  More than friends?
6          MR. ELLIS:  Object to the form of the
7  question.
8      A.  Never had any physical relationship with him.
9      Q.  I'll rephrase the question.
10     A.  Mr. Neuberger, I could count on one hand the
11 number of times his wife and my wife and I went out to
12 dinner.  I don't socialize with him typically.  He is my
13 friend.  But close friends?  I feel very strongly about
14 him.  I think he's a good person, yes.
15     Q.  Have you ever publicly bragged at any
16 commanders' meeting that you and Colonel Chaffinch are,
17 quote, joined at the hip, close quote?
18         MR. ELLIS:  Object to the form of the
19 question.
20     A.  I told Colonel Chaffinch that we were joined at
21 the hip, yes, in a professional sense.
22     Q.  Did you ever say that publicly in a meeting of
23 commanders of the Delaware State Police?
24     A.  I may have, yes.

3 (Pages 6 to 9)

Wilcox & Fetzer, Ltd.           Professional Court Reporters           (302)655-0477

Case 1:04-cv-01394-GMS   Document 75-21   Filed 09/16/2005   Page 12 of 13

Price, et al.                                     v.                                Chaffinch, et al.
Thomas F. MacLeish                       C.A. # 04-1207                             July 19, 2007

Page 10

1   Q.   At another commanders' meeting last summer,
2   after Colonel Chaffinch got upset in front of all the
3   commanders, did you gently rub his back until he felt
4   better?
5   A.   I can't recall specifics, but I'm a touchy kind
6   of guy, yeah. I don't recall specifics of the incident
7   you're talking about, but it wouldn't be beyond me to do
8   that to someone if they were upset. Yes.
9   Q.   I think you just said that Colonel Chaffinch was
10  a good man. Was that your testimony?
11  A.   Yes.
12  Q.   Was he a good trooper?
13  A.   To my knowledge, yes, he was.
14  Q.   Was he a fine man?
15       MR. ELLIS: Object to the form of the
16  question.
17  BY MR. NEUBERGER:
18  Q.   In your opinion, was he a fine man?
19       MR. ELLIS: Object to the form of the
20  question.
21       MR. NEUBERGER: You can answer.
22  A.   What's the difference between good and fine? He
23  was a good man who, for many reasons, I felt he was an
24  honorable man. I don't typically use "a fine man." If

Page 11

1   you can tell me what specifically you're referring to,
2   how I would define that, I'd be glad to --
3   Q.   You're an intelligent person, aren't you?
4   A.   I think so.
5   Q.   You have been to high school?
6   A.   Yes.
7   Q.   And you went to college?
8   A.   Yes.
9   Q.   And you're now the superintendent of the
10  Delaware State Police; isn't that right?
11  A.   Yes.
12  Q.   Are you telling me that you don't know the
13  definition of the word "fine"?
14       MR. ELLIS: Object to the form of the
15  question.
16  A.   "Fine" and "good" to me are synonymous.
17  Q.   Okay. That works. Do you think that
18  Colonel Chaffinch was a good leader for the Delaware
19  State Police?
20       MR. ELLIS: Object to the form of the
21  question.
22       MR. NEUBERGER: You can answer.
23  A.   I think Colonel Chaffinch did the best he could.
24  Q.   So do you think he was a bad leader for the

Page 12

1   Delaware State Police?
2        MR. ELLIS: I object to the form of the
3   question.
4   A.   No, I do not think he was a bad leader.
5   Q.   Are you agreeing that he was a good leader or
6   are you disagreeing that he was a good leader?
7        MR. ELLIS: I object to the form of the
8   question.
9   A.   Aaron did some good things while he was
10  superintendent of the State Police.
11  Q.   Do you think that he was a good leader?
12       MR. ELLIS: I object to the form of the
13  question.
14  BY MR. NEUBERGER:
15  Q.   Colonel, I see it's taking you a while to answer
16  that question. Do you not understand the question? Are
17  you trying to waste time?
18  A.   No. Time is too valuable. I dedicated the day
19  to be up here. I'm not wasting any time, Mr. Neuberger.
20  The question of whether Colonel Chaffinch was a good
21  leader, to me, he was a good leader, yes.
22  Q.   Do you strive to be the kind of leader that
23  Colonel Chaffinch was?
24  A.   There are certain aspects of his leadership that

Page 13

1   I would attempt to emulate, but there are others that I
2   would not.
3   Q.   Do you think that we need more Delaware State
4   Police troopers like Colonel L. Aaron Chaffinch?
5        MR. ELLIS: I object to the form of the
6   question.
7        MR. NEUBERGER: Specifically what's the
8   form problem so that I can correct it?
9        MR. ELLIS: It's impossible to answer that
10  on one -- it's a question that would provide for a number
11  of levels of answer, and you're not giving the witness an
12  opportunity to do that. To say do you need more troopers
13  like Aaron Chaffinch when he was working undercover, more
14  troopers like him when he was directing traffic, more
15  troopers like him when he was in operations? It's a
16  question that has a lot of different parts. You're
17  putting it to the witness like there's only one. I don't
18  think that's fair to the witness. I object to the form
19  of the question.
20       MR. NEUBERGER: I will try to be a little
21  bit more fair, then.
22  BY MR. NEUBERGER:
23  Q.   You served with Colonel Chaffinch for a long
24  time, haven't you?

Price, et al.                                     v.                              Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                              July 19, 2007

Page 14
1  A.  I served under him for approximately three
2  years.
3  Q.  Did you ever have a chance to take the measure
4  of the man?
5      MR. ELLIS: I object to the form of the
6  question.
7  A.  Yes, I did.
8  Q.  Upon taking that measure of the man, do you
9  think we need more troopers who measure up to that
10 standard?
11     MR. ELLIS: I object to the form of the
12 question.
13     MR. HAVERLY: In the future, when you
14 object to the form of the question, could you identify
15 specifically so Mr. Neuberger can appropriately change
16 the question if possible? That's the normal way that is
17 transacted in Delaware.
18     MR. ELLIS: I was told by Mr. Neuberger's
19 father the last round of depositions that that was not
20 the way it was transacted in Delaware. I'm trying to do
21 it in a way that accommodates the local bar. I'll put
22 every objection I have on the record at length if you
23 want.
24     MR. HAVERLY: Not at length. Just

Page 15
1  briefly. If the problem is it's vague, just say
2  objection, vague, and that helps Mr. Neuberger to know
3  what the problem is.
4      MR. ELLIS: Does he need help? Can he
5  speak for himself?
6      MR. HAVERLY: He can. He has been.
7      MR. ELLIS: I didn't hear him asking me for
8  help. I will try to accommodate you.
9  BY MR. NEUBERGER:
10 Q.  I think we're still on the question do you think
11 we need more troopers like Colonel Chaffinch.
12     MR. ELLIS: My objection stands, for the
13 reasons stated.
14 A.  I think there are certain qualities of retired
15 Colonel Chaffinch that every trooper could possess.
16 Q.  Are you aware that on April 24th of 2002
17 Sergeant Christopher D. Foraker filed a First Amendment
18 free speech retaliation lawsuit against
19 Colonel Chaffinch?
20 A.  Yes.
21 Q.  You gave a deposition in that case, didn't you?
22 A.  Yes, I did.
23 Q.  You were a major at the time, I believe?
24 A.  Yes, I was.

Page 16
1  Q.  That case went to trial in June of 2003; isn't
2  that right?
3  A.  That's correct.
4  Q.  You testified at that trial, didn't you?
5  A.  Yes, I did.
6  Q.  You were still a major at that time; is that
7  correct?
8  A.  Yes, I was.
9  Q.  When you testified at deposition in that trial,
10 Christopher Foraker's first case, did you tell the truth?
11 A.  Yes, I did.
12 Q.  Is lying under oath a significant offense in the
13 Delaware State Police?
14 A.  Yes, it is.
15 Q.  Can a Delaware State Police trooper be punished
16 for lying under oath?
17 A.  Yes, they can.
18 Q.  Does the Delaware State Police have several
19 rules and regulations about telling the truth?
20 A.  Yes.
21 Q.  Is telling the truth something that is important
22 in the Delaware State Police?
23 A.  Yes, it is.
24 Q.  Is it important to you as a superintendent and

Page 17
1  the colonel of the Delaware State Police?
2  A.  Yes, it is.
3  Q.  Is it important to you personally?
4  A.  Yes, it is.
5  Q.  Should troopers lie under oath?
6  A.  They should not.
7  Q.  Why not?
8  A.  It goes to their integrity.
9  Q.  Do you think that lying under oath would hurt a
10 trooper's credibility in a criminal case?
11 A.  Absolutely.
12 Q.  Would it hurt their credibility in a civil case?
13 A.  Yes.
14 Q.  Is it important to you that troopers hold
15 themselves to a higher standard of conduct than the
16 average citizen?
17 A.  Yes, it is.
18 Q.  And does that include telling the truth and not
19 lying under oath?
20 A.  Yes.
21 Q.  As part of Christopher Foraker's first lawsuit,
22 do you recall that he claimed that the colonel of the
23 Delaware State Police, meaning Colonel Chaffinch, had
24 retaliated against him for speaking out about several

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd.            Professional Court Reporters              (302)655-0477