| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 18

1  issues?
2    A.  Yes, I'm familiar with that.
3    Q.  Do you recall that one of those issues was that
4  he had disciplined one of Colonel Chaffinch's close
5  friends for lying in the course of his duties?
6    A.  I'm familiar with that in the lawsuit, yes.
7    Q.  Do you recall that that was one of the claims
8  that Chris made?
9    A.  Yes.
10    Q.  Do you also recall that another thing that
11  Sergeant Foraker spoke out about was that this same
12  friend of Colonel Chaffinch be disciplined for sexually
13  harassing and groping a female civilian? I believe it
14  was a cleaning contractor at the FTU.
15    A.  I believe that was one of the claims. You're
16  telling me it was. I know there were circumstances in
17  there. Yes, I would say if you're telling me that that
18  was what was in that lawsuit, then, yes, it was in there.
19         MR. ELLIS:  The question is whether you
20  remember it yourself, not whether you can accept what
21  Mr. Neuberger tells you. Two different things.
22         MR. NEUBERGER:  I'm not asking you to take
23  my word for it. I want to know what you know.
24         THE WITNESS:  I don't recall specifically

Page 19

1  reading that in the lawsuit.
2  BY MR. NEUBERGER:
3    Q.  Did you testify about that?
4    A.  I don't think so, because I wouldn't have any
5  firsthand knowledge of it.
6    Q.  Do you recall that one of the claims that
7  Sergeant Foraker made was that he had given this friend
8  of Colonel Chaffinch an honest evaluation that was
9  negative in several areas?
10    A.  I don't recall, Mr. Neuberger.
11    Q.  Do you recall one of the areas that
12  Sergeant Foraker spoke out about were about blood lead
13  levels of Colonel Chaffinch's friend?
14    A.  I recall that in a general sense.
15    Q.  This friend served at the FTU?
16    A.  Yes.
17    Q.  Do you recall that one of the areas was that
18  Sergeant Foraker was speaking out about were health and
19  safety concerns at the FTU?
20    A.  I don't recall that specific part of the suit.
21  I thought the crux of the suit was that he had been moved
22  inappropriately for actions taken against a friend of the
23  colonel's. That's what I recall about the suit. I don't
24  recall those specific things, those specific areas you're

Page 20

1  defining.
2    Q.  As colonel of the Delaware State Police, is the
3  Constitution of the United States of America important to
4  you?
5    A.  Yes, it is.
6    Q.  Is it important to the division as a whole?
7    A.  Yes, it is.
8    Q.  Do you recall that in June of 2003 a federal
9  court jury found Colonel Chaffinch had violated the First
10  Amendment of the United States Constitution?
11    A.  I know the jury found against him in that trial.
12    Q.  Do you recall that they found against him and
13  found that he had violated the First Amendment of the
14  United States Constitution?
15         MR. ELLIS:  I think it was the Fourteenth
16  Amendment.
17         MR. NEUBERGER:  Actually, you can sue
18  directly upon the First Amendment, but that's another
19  matter.
20    A.  I know we lost the suit, Mr. Neuberger. The
21  specifics under what title and conditions, I was a major
22  at that time. I didn't have specific responsibility for
23  that directly.
24         MR. NEUBERGER:  I'd like to mark an

Page 21

1  exhibit. This would be MacLeish Deposition Exhibit
2  No. 1.
3         (MacLeish Deposition Exhibit No. 1 was
4  marked for identification.)
5  BY MR. NEUBERGER:
6    Q.  Colonel MacLeish, do you have this document in
7  front of you?
8    A.  Yes, I do.
9    Q.  I'd like you to take a look at the first page.
10  Does this appear to be a newspaper headline that says,
11  "Jury: Trooper's Rights violated"?
12    A.  Yes.
13    Q.  Does this appear to have been in the Delaware
14  State News?
15    A.  It doesn't say that on the front page. It says
16  "Downstate Delaware."
17    Q.  Turning to the second page, does that appear to
18  be a headline from The News Journal which says, "Trooper
19  awarded $100,000"?
20    A.  Yes, it does.
21    Q.  Turning two more pages, does that appear to be a
22  headline from the Delaware State News which says, "Del.
23  To Pay $243K settlement"?
24    A.  Yes.

6 (Pages 18 to 21)

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 22

1  Q. Turning to the second-to-last page in the
2  packet, does that appear to be a headline from the
3  Wilmington News Journal saying,"State to pay damages to
4  trooper"?
5  A. Yes, it does.
6  Q. Were you aware of Sergeant Foraker's lawsuit
7  receiving media coverage?
8  A. Yes.
9  Q. Did you ever see any of these articles?
10 A. Yes, I did.
11 Q. You can put the document down.
12    Sergeant Foraker's case settled in November
13 of 2003; isn't that right?
14 A. That's correct.
15 Q. And Sergeant Foraker was ordered to be
16 reinstated back to his position of NCOIC of the FTU by
17 Judge Farnan; isn't that right?
18 A. That's correct.
19 Q. There is a judicial order by Judge Farnan
20 setting forth the specifics of the reinstatement; isn't
21 that correct?
22 A. Yes.
23    MR. NEUBERGER: I'll put another document
24 in front of you. We will call this MacLeish Deposition

Page 23

1  Exhibit No. 2.
2    (MacLeish Deposition Exhibit No. 2 was
3  marked for identification.)
4  BY MR. NEUBERGER:
5  Q. Colonel MacLeish, does the front of this
6  document say, Sergeant Christopher D. Foraker, Lieutenant
7  Colonel, Secretary David B. Mitchell, and the Division of
8  State Police?
9  A. Yes, it does.
10 Q. Does this appear to be a complaint filed by
11 Sergeant Foraker?
12 A. Yes, it does.
13 Q. I'd like you to turn to the second-to-last page
14 of this document.
15 A. (Complied.)
16 Q. Are you there?
17 A. I'm there.
18 Q. At the top right-hand corner does it say, "Filed
19 Clerk U.S. District Court District of Delaware 2003
20 Nov 20 AM 10:38"?
21 A. Yes.
22 Q. Does it say "Stipulated Order"?
23 A. Yes, it does.
24 Q. Below where it says "Stipulated Order" does it

Page 24

1  say, "The parties to this case, acting through their
2  authorized counsel, hereby stipulate and agree as
3  follows, subject to the approval of the Court"?
4  A. Yes, it does.
5  Q. Is there a number 1 after that?
6  A. Yes, there is.
7  Q. Does it say that "Sergeant Christopher D.
8  Foraker is ordered reinstated to his prior position as
9  the Non-Commissioned Officer-in-Charge of the Firearms
10 Training Unit of the Delaware State Police with all the
11 rights, privileges, duties, responsibilities and
12 supervisory authority previously held by him when he
13 earlier occupied that position on February 20, 2002"?
14 A. Yes, it does.
15 Q. Turning to the next page, does that say,
16 "Joseph J. Farnan, Jr., United States District Court
17 Judge"?
18 A. Yes, it does.
19 Q. Up a little higher is the signature of
20 W. Michael Tupman, Esquire?
21 A. Yes.
22 Q. Is he one of the Deputies Attorney General who
23 serves the Delaware State Police?
24 A. Yes.

Page 25

1  Q. Were you aware of this order?
2  A. Yes, I was.
3  Q. You can put the document down.
4    In your opinion, did Colonel Chaffinch
5  disgrace both himself and the division by his actions in
6  the first lawsuit brought by Sergeant Foraker?
7  A. We received a lot of bad press out of it. Did
8  he disgrace himself and the division? He didn't put a
9  shining light on us. It was a jury's finding that went
10 against us.
11 Q. I'm sorry. Are you still testifying or are you
12 just hesitating?
13 A. I'm hesitating. The actions as they appeared in
14 the papers did not bring favor to the division.
15 Q. Is that something you were happy about?
16 A. I was not happy about it.
17 Q. Do you think that the civil justice system in
18 the United States of America is a good thing or bad
19 thing?
20 A. It's a good thing.
21 Q. Do you think the federal judiciary is a good
22 thing or bad thing?
23    MR. ELLIS: I object to the form of the
24 question. It's much too vague.

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd.       Professional Court Reporters       (302)655-0477

Case 1:04-cv-01394-GMS    Document 75-22    Filed 09/16/2005    Page 3 of 5

Price, et al.                                    v.                              Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                        July 19, 2007

Page 26

1  A. It's a good thing.
2  Q. Do you think that federal judges want their
3  judicial orders taken seriously?
4  A. I'm sure they do.
5  Q. Do you think they like it when their judicial
6  orders are violated?
7  A. I'm sure they don't.
8  Q. Do you think that the judicial orders of federal
9  judges should be obeyed?
10  A. Yes.
11  Q. Do you think that a person should make every
12  possible effort to obey and comply with the judicial
13  orders made by federal judges?
14  A. Yes, I do.
15  Q. Do you agree that a person should be punished if
16  they fail to obey a judicial order made by a federal
17  judge?
18  A. To knowingly disobey it? Yes.
19  Q. Do you agree that a person should be punished
20  severely if they fail to obey a judicial order made by a
21  federal judge?
22       MR. ELLIS: I object to the form of the
23  question.
24       MR. NEUBERGER: You can answer.

Page 27

1  A. You're talking life in prison for disobeying an
2  order? What is reasonable? There should be reasonable
3  action taken against someone that does.
4  Q. Do you think they should just get a slap on the
5  wrist?
6  A. If that judge feels that's what's necessary for
7  whatever the violation of the order would be.
8  Q. So you think it's up to the discretion of the
9  judge?
10  A. Yes. Within reason. There's appeals if you
11  disagree with it.
12  Q. You have been a police officer for over
13  25 years; isn't that right?
14  A. My 28th year, yes.
15  Q. You're currently the superintendent of the DSP?
16  A. Yes, I am.
17  Q. What would your reaction be if a trooper first
18  class refused to follow a judicial order made by a
19  federal judge?
20       MR. ELLIS: I object to the form of the
21  question. It's a hypothetical, too vague.
22       MR. NEUBERGER: I think he's the Colonel of
23  the State Police. I think this is within the scope of
24  his authority.

Page 28

1       MR. ELLIS: I'm not saying he can't answer.
2  I'm just saying I object to the question.
3  A. I would question more detail, what did he
4  violate, what did he do, was it intentional, was it an
5  act of omission or act of commission? I'd get the
6  details of what took place to try to determine what was
7  he or she thinking at that point in time.
8  Q. What if it was an intentional violation?
9  A. I believe we would have a duty to act.
10  Q. Would you have the same reaction regardless of
11  whether it was a trooper first class or whether it was a
12  higher-ranking officer?
13  A. I would go through the same process.
14  Q. What if that trooper was openly defiant of the
15  federal judicial order issued by that federal judge?
16       MR. ELLIS: I object to the form of the
17  question for the same reasons previously stated.
18  A. I would take further action against that
19  individual, find out, you know -- if the level of
20  discipline begins to escalate as you get -- as you move
21  through, that if he's openly defiant, said I'm not going
22  to comply with it, he would be charged and we would go
23  through the Internal Affairs investigation and processed.
24  Obviously I can't have somebody disobeying a federal

Page 29

1  judge's order.
2  Q. Are you saying they should be punished?
3  A. If in, in fact -- yes. If they were openly
4  defiant of this order, sure.
5  Q. Do Delaware state troopers make it a habit of
6  defying lawful judicial orders?
7  A. Not that I'm aware of.
8  Q. Should troopers ever disobey a lawful judicial
9  order made by a federal judge?
10  A. I think there are -- without knowing the
11  specific nature of the order, the application of the law
12  on the street sometimes takes a discretionary mode.
13  Sometimes you have to act in what's best in that
14  situation. You'd have to investigate it and evaluate
15  what were the actions and why did they do them and so
16  forth.
17  Q. So are you saying that sometimes the Delaware
18  state trooper should disobey orders made by federal
19  judges?
20  A. I'm saying that there are times when an officer
21  faced with a situation on the street in trying to make a
22  determination to act or not act or to do something or not
23  do something, that they have to have that area of
24  discretion and that you would evaluate that afterwards.

Price, et al.                                          v.                                    Chaffinch, et al.
Thomas F. MacLeish                           C.A. # 04-1207                                  July 19, 2007

### Page 30

1  That's what our system is built upon, why did you do what
2  you did and why do people violate the law all the time
3  and why did they do it. If it's a stipulated order from
4  the judge, you would think they would be in full
5  compliance of it, and sometimes things happen and they
6  don't. You take that into consideration.
7     Q. Are you in favor or against the general concept
8  of trial by jury in America?
9     A. I'm in favor of it.
10    Q. Do you think that juries are good for American
11 democracy?
12    A. Yes, I do.
13    Q. Do you think that juries are part of the beauty
14 of our American system of government?
15         MR. ELLIS: I object to the form of the
16 question.
17    A. Yes. Do I always agree with their findings?
18 No. But that's our system.
19    Q. Do you think that juries like having their time
20 wasted?
21    A. No, they don't.
22    Q. To change gears a little bit, I believe I
23 previously showed you an exhibit dealing with some of the
24 media coverage of Sergeant Foraker's jury verdict and

### Page 31

1  subsequent settlement. Do you recall that exhibit?
2     A. Yes, sir, I do.
3     Q. Were you happy that Sergeant Foraker had sued
4  Colonel Chaffinch and the Delaware State Police?
5     A. No, I wasn't happy.
6     Q. Do you like it when troopers sue the Delaware
7  State Police?
8     A. Typically, no.
9     Q. How does it make you feel when troopers sue the
10 Delaware State Police?
11    A. The publicity that takes place typically that
12 surrounds a suit around the division is negative in
13 nature, and I'd like to see the problems resolved through
14 the division versus going outside the division first.
15    Q. So do you like it when a trooper goes outside
16 the division and files a lawsuit?
17    A. It's their right to do that. Do I personally
18 like it if we haven't had a chance to address it inside?
19 No, I don't, but I understand they have a right to do
20 that.
21    Q. For example, Sergeant Foraker went outside the
22 division in April of 2002 and filed a federal lawsuit,
23 didn't he?
24    A. Yes, he did.

### Page 32

1     Q. Are you telling me that you weren't happy that
2  he had done that?
3     A. He has a right to do it. Was I happy about it?
4  Typically, no, I wouldn't be happy about that.
5     Q. What were your personal feelings about the fact
6  that Sergeant Foraker had filed a lawsuit against
7  Colonel Chaffinch?
8     A. Personally, he had the right to do so, but did I
9  feel that he was wronged at that time? No, I did not.
10 Not with the information that I had in his transfer that
11 he was -- to that point people are transferred all the
12 time. Chris was transferred. It was like he was a good
13 trooper. He worked for -- I worked with him, and I think
14 he worked for me back at Troop 3 many years ago. He was
15 a good officer. He was going to land on his feet and do
16 well. That's pretty much the way I felt personally. I
17 felt that life would go on, he would be all right,
18 because of his work ethic.
19    Q. Isn't it true that you never liked
20 Sergeant Foraker?
21    A. That couldn't be further from the truth.
22    Q. Isn't it true you don't like him now?
23    A. That's not true, either.
24    Q. Isn't it true you bear ill will towards him?

### Page 33

1     A. No.
2     Q. Isn't it true you were angry at him?
3     A. No.
4     Q. Isn't it true you bear animosity towards him?
5     A. No.
6     Q. But you don't like the fact that he filed a
7  lawsuit against Colonel Chaffinch?
8          MR. ELLIS: Objection. Asked and answered.
9          MR. NEUBERGER: You can answer.
10    A. Again, I felt that there were other options
11 available.
12    Q. Are you drawing a distinction between
13 Sergeant Foraker as a person and then his actual action
14 in going outside the division and filing a lawsuit?
15         MR. ELLIS: I object to the form of the
16 question.
17    A. Could you clarify that for me? What exactly are
18 you referring to?
19    Q. I believe you just indicated to me that you
20 don't bear any ill will towards Chris as a person.
21    A. That's correct.
22    Q. I believe you also indicated that you don't like
23 it when troopers don't raise issues internally and
24 instead go outside the division and file lawsuits.

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 34

1    A.   Yes. You asked me how I personally felt.
2    Q.   So would it be fair to say that you didn't like
3  his lawsuit but you like him?
4    A.   You don't let personal feelings influence
5  professional decisions. My opinion of Sergeant Foraker
6  goes back many, many years. It was formed in the '80s as
7  a young trooper and through the years working together.
8  He has a different -- he's shown a different tack to
9  resolving issues that affect him and the division that I
10  don't necessarily agree with. But at the same time I
11  still respect the fact that he's a qualified firearms
12  instructor.
13    Q.   You weren't happy with the fact that he had gone
14  outside the division and filed a lawsuit?
15         MR. ELLIS: Objection. You asked it two or
16  three times now.
17    A.   He has a right to do that. Was I happy about
18  it? No, I was not.
19    Q.   Did it irritate you?
20    A.   I would say I was mildly irritated.
21    Q.   Did it piss you off?
22    A.   I wasn't happy with it, Mr. Neuberger.
23    Q.   Are you saying yes, it did piss you off?
24    A.   No. I said I'm not happy with it.

Page 35

1    Q.   I believe you testified earlier that you didn't
2  like the fact that negative publicity resulted towards
3  the Delaware State Police as a result of the lawsuit and
4  the jury verdict and the subsequent settlement.
5    A.   Yes. I stated that the negative publicity that
6  comes from lawsuits, I'm not happy about that on the
7  front pages of the paper. It's also a fact of life
8  that's going to happen.
9    Q.   Is it true that you wanted the Delaware State
10  Police to get off of the front pages of the paper?
11    A.   Yes. For that type of stuff, I'd like to see
12  the positive stuff out there, but for the negative stuff,
13  yes, I would. I would like to do what's right to get off
14  the front pages of the paper.
15    Q.   Do lawsuits against the Delaware State Police
16  typically result in stories in the local media?
17    A.   Yes, they do.
18    Q.   You worked closely with Colonel Chaffinch; isn't
19  that right?
20    A.   Yes.
21    Q.   Does Colonel Chaffinch like Sergeant Foraker?
22         MR. ELLIS: I object to the form of the
23  question.
24         MR. NEUBERGER: I'll rephrase.

Page 36

1  BY MR. NEUBERGER:
2    Q.   Using your sensory perceptions and all the time
3  you have spent with Colonel Chaffinch, you have been
4  around Colonel Chaffinch and you have worked closely with
5  Colonel Chaffinch. Based on your observations of him,
6  using all five of your senses, does Colonel Chaffinch
7  like Sergeant Foraker?
8         MR. ELLIS: I object to the form of the
9  question.
10    A.   I don't believe he's going to invite him for
11  dinner. Colonel Chaffinch would have to answer whether
12  he likes him or not, but my perception is he's not real
13  fond of him.
14    Q.   Do you think Colonel Chaffinch was happy with
15  the fact that Sergeant Foraker had filed a lawsuit
16  against him?
17         MR. ELLIS: Do we have a time period on
18  that?
19         MR. NEUBERGER: The April 2002 lawsuit.
20         MR. ELLIS: The question was was he happy
21  in April 2000 --
22         MR. NEUBERGER: Was he happy about the fact
23  that the April 2002 lawsuit was filed.
24         MR. ELLIS: So the response is from

Page 37

1  April 2002 to the present?
2         MR. NEUBERGER: Sure.
3         MR. ELLIS: The way you asked it, it
4  sounded like you meant 2002.
5    A.   I can only say in April 2002 I don't believe
6  anyone on staff was happy that a lawsuit had been filed.
7  The concern had just been made in February of '02. But
8  to answer the question, no, I don't believe he was happy
9  about it.
10    Q.   Do you know if Colonel Chaffinch was happy about
11  the June 2003 jury verdict against him?
12         MR. ELLIS: I object to the form of the
13  question.
14    A.   I don't believe he was happy about that jury
15  verdict, no.
16    Q.   Did you think it made him look bad?
17         MR. ELLIS: I object to the form of the
18  question.
19    A.   Sure. It made him look bad, yeah.
20    Q.   Did he ever talk to you about his feelings about
21  Sergeant Foraker or Sergeant Foraker's lawsuit?
22    A.   He never talked to me specifically about his
23  feelings. He wasn't -- I can only give you from a
24  general sense. Specific conversations I don't recall.

10 (Pages 34 to 37)

| Wilcox & Fetzer, Ltd. | Professional Court Reporters | (302)655-0477 |
|---|---|---|

A303