Case 1:04-cv-01394-GMS   Document 75-23   Filed 09/16/2005   Page 1 of 13

Price, et al.                                         v.                              Chaffinch, et al.
Thomas F. MacLeish                          C.A. # 04-1207                        July 19, 2007

Page 38

1  Q.  How about in that general sense?
2  A.  In a general sense, he was not happy with the
3  jury verdict. He wasn't happy with the actions, the
4  lawsuit itself, in the fact that we lost the lawsuit. I
5  don't think any superintendent would be happy with losing
6  a lawsuit.
7  Q.  Prior to the June of 2003 jury verdict against
8  Colonel Chaffinch, are you aware of any time in the last
9  20 years that a jury has ruled against the Delaware State
10 Police in that fashion?
11 A.  Specifically against the superintendent, no. I
12 know the division has been in court before for various
13 other things, but I couldn't tell you over the course of
14 20 years what we lost or didn't. I don't know if we were
15 100 percent wins in all that, but I know a superintendent
16 had never been -- never went to trial and lost at trial.
17 I don't believe.
18 Q.  So to the best of your knowledge, was that
19 unprecedented?
20 A.  Yes, it was.
21 Q.  You're currently the highest-ranking officer in
22 the State Police, right?
23 A.  Yes, I am.
24 Q.  Does the buck stop with you now that you're

Page 39

1  colonel?
2  A.  Yes, it does.
3  Q.  For better or worse?
4  A.  For richer, for poorer. Yes. I'm sorry. Yes.
5  Q.  Are you familiar with the Firearms Training
6  Unit?
7  A.  Yes, I am.
8  Q.  What is it?
9  A.  It's our unit that trains all our recruits,
10 municipal officers, does the requalification, looks at
11 weapons that we carry, ammunition that we carry, makes
12 recommendations for -- that they currently work under the
13 training academy. They're a subdivision of our training
14 academy. Currently they're working under Captain
15 Harry Downes, who's the director of training.
16 Q.  Is it also a physical location in Smyrna
17 somewhere?
18 A.  That's where our site is located, yes.
19 Q.  Historically, based on what you know from your
20 long career as a Delaware state trooper, has the FTU been
21 a troubled facility?
22         MR. ELLIS:  I object to the form of the
23 question.
24 A.  If I could ask for clarification, Mr. Neuberger.

Page 40

1  In what way? Employee-wise, facility-wise, or what
2  specifically are you referring to?
3  Q.  How about facility-wise?
4  A.  Facility-wise, yes, it has been.
5  Q.  Has the FTU had a very long history of problems
6  since its very inception, to the best of your knowledge?
7  A.  To the best of my knowledge, yes.
8  Q.  Can you share any details with me? What are
9  some of the specifics of that long history of troubles
10 that you're aware of?
11 A.  Funding construction to begin with, budgetary
12 restraints, air-handling problems, lead exposure problems
13 to our employees. I think that would about cover it.
14 Q.  Did there come a time in the last several years
15 when the FTU was shut down?
16 A.  Yes. It's been shut down on a few different
17 occasions.
18 Q.  When was the most recent time?
19 A.  The most recent time was in -- effectively, the
20 date was March, but we, for all intents and purposes, had
21 it shut down by the first week in February.
22 Q.  What year?
23 A.  I'm sorry. Of '04.
24 Q.  How did that come about, the FTU being shut

Page 41

1  down?
2  A.  It was brought to the training academy's
3  attention; therefore, it came to my attention that there
4  was projectiles we were shooting that were producing a
5  dust that was creating health problems with the recruits
6  that were in training and the firearms training staff.
7  And it became at that point what we thought was -- prior
8  to that point it was always referred to as ceramic
9  ammunition, frangible ammunition that everybody thought
10 was ceramic, and ceramic to many, I think it was some
11 type of clay-type product. But then it came to our
12 attention that this frangible ammunition was made up of
13 copper, tin, and zinc, I believe. It was creating mucous
14 problems to the -- for the recruits and a copper taste in
15 their mouth and things of that nature.
16 Q.  How did you first learn about it?
17 A.  Through Sergeant Foraker who informed
18 Captain Warren who then informed me.
19 Q.  You're saying that Sergeant Foraker through the
20 chain of command brought these things to your attention?
21 A.  Yes. Through the chain of command he did.
22 Q.  I think you just talked a little bit about your
23 involvement in the process with the chain of command.
24 Are you above the academy?

Case 1:04-cv-01394-GMS   Document 75-23   Filed 09/16/2005   Page 2 of 13

Price, et al.                                  v.                              Chaffinch, et al.
Thomas F. MacLeish                      C.A. # 04-1207                         July 19, 2007

Page 42

1  A. Yes. At that point in time I was.
2  Q. What was the chain of command below you in
3  reference to the FTU?
4  A. It would have been the captain, director of the
5  academy, and then down through Sergeant Foraker.
6  Q. Was there a major between you?
7  A. There is a major who was my administrative
8  officer.
9  Q. Who was that at the time?
10 A. Major Paul Eckrich.
11 Q. Who was the captain at the time?
12 A. At that point in time it was Captain
13 Greg Warren.
14 Q. Who were the FTU firearms instructors at the
15 time?
16 A. Sergeant Foraker, Corporal Price,
17 Corporal Warren, Corporal Jim Warwick. I believe that's
18 it.
19 Q. Who made the decision to shut down the FTU?
20 A. I asked that question when it was brought to my
21 attention on January 29th. I received a call from
22 Captain Warren who indicated they were having severe
23 problems at the range. That evening -- and he was
24 talking about his firearms instructors, about a dust

Page 43

1  cloud and breathing problems, and that evening I asked
2  him: "Do we need to shut this down?" He told me no. I
3  said, "Blood work and physicals for the employees."
4     He says, "We will get the blood work done
5  now."
6     I said, "Let's meet tomorrow morning."
7     And we met Friday, the 30th. And it was
8  Major Eckrich, Captain Warren, Lieutenant Davis, who was
9  the deputy director of the academy. We met in our
10 conference room.
11 Q. What was said at that meeting?
12 A. We discussed the conditions at the range. Once
13 again, it was reiterated do we need to shut it down.
14 "No, we can finish this shoot." The municipal class was
15 coming up. I believe that was their final week -- the
16 upcoming week was going to be their final week of
17 firearms training, and they were shooting shotguns, I
18 believe. So it was leaded. It wasn't the frangible
19 ammunition. And we began making plans to finish that out
20 so that they could do so safely and then meet and discuss
21 what we were going to do to address the problems as they
22 were presented at the range.
23 Q. When was the first time you learned about these
24 problems at the range?

Page 44

1     MR. ELLIS: Object. Which problems?
2     MR. NEUBERGER: All the problems he just
3  discussed.
4  A. There was an e-mail December 19th from
5  Sergeant Foraker that discussed a problem with the bullet
6  recovery system. I was on vacation at that time. And I
7  responded to that on I believe it was when I returned
8  January the 6th to Captain Warren to address the issues
9  that Sergeant Foraker had brought to his attention and to
10 take appropriate action. And that's on January the 6th.
11 That's what my response was. And Captain Warren then
12 dealt with the Firearms Training Unit to address whatever
13 problems they had.
14 Q. Did he take appropriate action?
15 A. I know he worked with them in order to try to
16 resolve the issues. They began working -- they were
17 working with Facilities Management in order to address
18 some of the issues they were having, because they're the
19 keepers of the facility, so to speak, and they worked
20 with them.
21    I relied on Captain Warren to address the
22 issues as they were -- and brief conversations between
23 January the 6th and the 29th, but the 29th it was like
24 that was the culmination of all the problems we were

Page 45

1  having there at the range, that it was of such magnitude
2  that something needed to be done and it needed to be done
3  immediately. That's when I asked: "Do we shut the range
4  down?"
5     And I was told: "No, we don't need to. We
6  can finish out the shoot."
7  Q. Who said that?
8  A. Captain Warren.
9  Q. In your opinion, is there any fault involved for
10 the problems and conditions which resulted in the FTU
11 being shut down?
12 A. My approach to this from the very beginning was
13 not to assess blame or fault. It was to correct the
14 problems that we were having at the range. Initially,
15 the range had been shut down on two prior occasions for a
16 massive cleanup. That's the direction I was going. In
17 working with Facilities Management, have that done once
18 the range was shut down.
19    The area we were looking at in order to
20 move into the future of the range was to identify the
21 potential problem that we were having. Was it the
22 ammunition? Was the bullet trap not capable of handling
23 that? Was it the air handling system? There was a
24 multitude of areas there that we needed to examine.

Case 1:04-cv-01394-GMS   Document 75-23   Filed 09/16/2005   Page 3 of 13

Price, et al.                                      v.                                      Chaffinch, et al.
Thomas F. MacLeish                         C.A. # 04-1207                                  July 19, 2007

Page 46

1    Initially, it was the health of our people.
2    What was the status of their health? What was the effect
3    of this ammunition that we were shooting the copper,
4    zinc, and tin? I think I said it earlier. I think it
5    was copper, tin, and zinc were the three ingredients.
6    What effect did that have on them? What exactly were
7    they being exposed to? We didn't know. We began making
8    plans to have the air -- to do a testing to find out
9    exactly what was in the facility and we ramped up
10   meetings with Facilities Management in order to start
11   addressing some of the problems and the issues.
12       Q.   Are you saying that the problems at the FTU were
13   not anyone's fault?
14       A.   Our equipment in that facility was more than six
15   years old at that point.
16       Q.   I'm sorry. The what?
17       A.   Our equipment. The bullet trap was more than
18   six years old. There had always been questions about the
19   air-handling system in the facility. I wasn't intimately
20   knowledgeable at that point in time about exactly what
21   they were. I know far more today than I knew in January
22   of '04 about the -- that air-handling system and what
23   recommended industry standards there are and so forth,
24   what is an acceptable lead level, what isn't an

Page 47

1    acceptable lead level, things of that nature. I didn't
2    have knowledge of that prior to January '04, but in the
3    subsequent weeks and months that followed, I began to get
4    more knowledgeable about those type of things.
5        Q.   Did Chris Foraker destroy the FTU?
6            MR. ELLIS:   Objection to the form of the
7    question.
8        A.   I haven't done an investigation to indicate
9    that.
10       Q.   Did Master Corporal Kurt Price destroy the FTU?
11           MR. ELLIS:   Objection to the form of the
12   question. There's no evidence it's been destroyed.
13   That's the basis for my objection. At least if he's
14   talking about the physical facility.
15           MR. NEUBERGER:   You can answer.
16       A.   There's been no investigation that I have
17   conducted to indicate that.
18       Q.   Did Master Corporal Wayne Warren destroy the
19   FTU?
20           MR. ELLIS:   Same objection.
21       A.   There's been no indication, no investigation
22   that indicates that to me.
23       Q.   If they had destroyed the FTU, would there have
24   been an investigation into their conduct?

Page 48

1            MR. ELLIS:   Objection. Hypothetical.
2        A.   The division didn't order an investigation. The
3    division's stance at that point in time was to correct
4    the problems that we were having and get the facility
5    cleaned, operating appropriately and safely, and get it
6    reopened. That's the division's stance in January of
7    '04.
8        Q.   I believe Joe Aviola may have testified about a
9    month ago one time he got in a minor fender-bender and he
10   was disciplined for getting a dent in the bumper of the
11   car. Are troopers disciplined for getting into minor
12   fender-benders or backing into telephone poles?
13       A.   Yes, they are.
14       Q.   You're indicating that no discipline has been
15   handed down to Sergeant Foraker, Master Corporal Warren
16   or Price for their actions or inactions at the FTU?
17       A.   That's correct.
18       Q.   If you had to assign blame for the conditions at
19   the FTU, where would you assign blame?
20           MR. ELLIS:   Objection.
21       A.   I would go to the source. I would go to the
22   NCOIC in the unit and say what happened, what went wrong.
23       Q.   Are you telling me that you're not blaming the
24   NCOIC of the unit, Sergeant Christopher Foraker?

Page 49

1        A.   In January of '04 my thought was to just get
2    that facility up and running, and I thought it was a
3    culmination of factors. The facility was six years old,
4    let's get it right, let's get it back open again.
5        Q.   Let's expand the time period. Let's go through
6    the base of knowledge as of the end of April of 2004.
7    We're expanding from what you knew from January of 2004,
8    which I believe you just indicated you had been talking
9    about, to what you knew as of April 2004. Okay?
10       A.   Yes.
11       Q.   That's our baseline. That's where my questions
12   are going to come from. Do you understand that?
13       A.   Yes.
14       Q.   Based on what you knew as of April 2004, did you
15   think that Sergeant Christopher D. Foraker was the cause
16   of the conditions at the FTU?
17       A.   I had discovered at that point in time that
18   maintenance that had been done before was not -- had not
19   been conducted. It seemed to me the magnitude of the
20   problems we had up there were greater than what any one
21   individual could have been responsible for, meaning the
22   breakdown in the bullet trap system, the dust that was
23   created from the frangible ammunition, contamination
24   behind the range and on the range itself; that in a

Case 1:04-cv-01394-GMS   Document 75-23   Filed 09/16/2005   Page 4 of 13

Price, et al.                                    v.                              Chaffinch, et al.
Thomas F. MacLeish                         C.A. # 04-1207                        July 19, 2007

### Page 50

1 period from December the 1st to the end of January, that
2 one person could have been responsible for all that?
3 Just didn't seem -- were there certain things that
4 weren't done? Yes, they weren't done. I found out
5 through the course of January to April. Once again,
6 during that time period the main thought in the process
7 was to work with Facilities Management. It was not to
8 assign blame. It was to fix the facility.
9   Q.   Blame has been assigned subsequently, hasn't it?
10  A.   The division has taken no action.
11  Q.   Isn't it your position in this case that
12 Sergeant Foraker, Master Corporal Wayne Warren, and
13 Kurt Price destroyed the FTU?
14       MR. ELLIS: I object to the form of the
15 question.
16       MR. NEUBERGER: You can answer.
17  A.   That is not my position. My position was to fix
18 the range and get it open.
19  Q.   So are you telling me that's not a position or
20 defense you're taking in this case --
21       MR. ELLIS: I object to the form of the
22 question.
23 BY MR. NEUBERGER:
24  Q.   -- that those troopers destroyed the FTU?

### Page 51

1        MR. ELLIS: I object to the form of the
2 question.
3   A.   My position is from the beginning was to fix the
4 problems at the range to get it open. It was not one to
5 assign blame. There has been an auditor's report that
6 was ordered by the Governor that indicated a lack of
7 maintenance being conducted resulted in the failure of
8 the range.
9        My position as the lieutenant colonel and
10 now as superintendent is and was to get the range fixed,
11 get it fixed right, get it done safely, and reopen the
12 doors.
13  Q.   Do you believe that Sergeant Foraker, corporals
14 Price and Warren put recruits and other personnel in
15 harm's way in December of 2003 through the closing of the
16 range?
17  A.   Chris was the NCOIC of the facility, and if he
18 felt it was unsafe for them to be there, he would shut
19 the range done. He had that authority to do so as the
20 NCOIC.
21  Q.   You're indicating that Sergeant Foraker had the
22 authority to shut down the FTU?
23  A.   If he needed to. If he felt it was unsafe for
24 his employees and those recruits that were shooting, then

### Page 52

1 he had the authority to do so.
2   Q.   Is it your position that Sergeant Foraker,
3 corporals Price and Warren did not care about the safety
4 of their students?
5        MR. ELLIS: I object to the form of the
6 question.
7   A.   Would you please repeat the question.
8   Q.   Is it your position that Sergeant Foraker,
9 Corporal Price, and Corporal Warren did not care about
10 the safety of the students they trained at the FTU?
11  A.   No, I don't feel that way.
12  Q.   Is it your position that Sergeant Foraker,
13 Corporal Price, and Corporal Warren were incompetent?
14  A.   In the training of the firearms? No.
15  Q.   Is it your position that they were incompetent
16 in their management of the FTU?
17       MR. ELLIS: Could we have a time frame on
18 that?
19       MR. NEUBERGER: December 2003 through the
20 closing of the FTU.
21  A.   Their actions and subsequent knowledge that no
22 maintenance was being conducted comes into question, but,
23 once again, I questioned the equipment that we had in
24 there at that point in time that was six years old and

### Page 53

1 broken down and that things weren't functioning properly.
2 I haven't done a full in-depth analysis of -- I guess,
3 Mr. Neuberger, that I never looked at this to assign
4 blame for what occurred there. It was to fix what went
5 wrong and move on. That was the position that I adopted
6 from the beginning and it still is today.
7   Q.   Did Colonel Chaffinch look at it to assign
8 blame?
9        MR. ELLIS: I object to the form of the
10 question.
11  A.   We never conducted an -- there was never an
12 Internal Affairs investigation conducted. The closest
13 that that came to was when I told Captain Warren that
14 Sergeant Foraker had submitted an e-mail alluding to
15 sabotage of equipment, and I asked Captain Warren to look
16 into that and make a determination if we had somebody
17 sabotaging the equipment, was it sabotage to me as a
18 direct -- taking direct action in order to create a
19 problem, and I think that's the closest that --
20 if Captain Warren had come back and said yes, we have got
21 an issue of that manner, we need to conduct an
22 investigation, I would have done so. But everything
23 subsequently to that, that's not the direction I was
24 going or leading.

Case 1:04-cv-01394-GMS   Document 75-23   Filed 09/16/2005   Page 5 of 13

Price, et al.                                    v.                         Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                              July 19, 2007

Page 54

1 Colonel Chaffinch did not play a role in
2 the decision-making process of how this was going to be
3 handled. He never told me to launch a criminal
4 investigation -- or an Internal Affairs investigation of
5 what was going on. He let me handle it.
6   Q.  That's because you were the operational officer
7 for the Delaware State Police at the time?
8   A.  That's correct.
9   Q.  You were lieutenant colonel at the time, right?
10  A.  Yes.
11  Q.  So as operational officer for the DSP, you're
12 telling me that the personnel at the FTU did not do
13 anything wrong at the FTU?
14        MR. ELLIS:  I object to the form of the
15 question.
16  A.  I had worked through the chain of command,
17 directed Captain Warren to look into the problems that
18 were associated with the range and what were those
19 problems and what were we going to do to correct them.
20 He submitted a report that did not indicate any behavior
21 by Sergeant Foraker or anyone on his staff that they had
22 done anything wrong. He indicated there was an issue
23 with the air system, the fact that the bullet recovery
24 system had failed, and that is the direction I went in.

Page 55

1 It was to fix what the problems were, not to assign
2 blame.
3        If he would have indicated that there were
4 issues there with the personnel that worked for him and
5 recommended action, we would have done so.
6   Q.  Is the State Police a paramilitary organization?
7   A.  Yes, it is.
8   Q.  So you have to rely on, I guess, the reports of
9 those who are below you in the chain of command?
10  A.  Yes, you do.
11  Q.  Are you indicating that you relied on
12 Captain Warren's report that there was no wrongdoing at
13 the FTU?
14        MR. ELLIS:  I object to the form of the
15 question.
16  A.  I relied on Captain Warren to do his job and
17 report -- and to take appropriate action where he felt
18 was necessary, yes.
19  Q.  As of today, July of 2005, I'm not sure of the
20 exact date, do you believe that Captain Warren did his
21 job?
22  A.  I believe he did not fully answer all the
23 questions that were presented in 2005. What I asked for
24 as far as what occurred and what went on, he went through

Page 56

1 an historical perspective of what occurred at that range.
2 He submitted a report to me in late January that I had
3 asked for on the 6th of January with what issues
4 Sergeant Foraker had brought to our attention, and that
5 report was a large report on history and what happened
6 here -- there was no assessment of blame in the body of
7 that report.
8   Q.  Was Captain Warren ever disciplined?
9   A.  No, he was not.
10  Q.  Was he ever disciplined for not following your
11 order, as I believe you indicated?
12  A.  No, he was not.
13  Q.  Just to be clear, because we have been all over
14 the place here -- would you agree with me?
15  A.  Yes.
16  Q.  -- it's your position that Sergeant Foraker,
17 Corporal Price, and Corporal Warren were not responsible
18 for the problems that caused the shutdown of the FTU?
19        MR. ELLIS:  I object to the form of the
20 question.
21        MR. NEUBERGER:  You can answer.
22  A.  It is my -- I think their lack of maintenance
23 resulted in some of the conditions that occurred at that
24 range, resulted in some of the problems that we saw, but

Page 57

1 I also feel that there was equipment failures in there
2 that they did not have control of. So what came first,
3 the chicken or the egg? To specifically assign blame, I
4 didn't go into this -- into this from the very beginning
5 looking to assign blame to anyone. I looked to fixing
6 the problem.
7   Q.  Are you telling me that they had any culpability
8 at all?
9   A.  Their culpability would have been their lack of
10 conducting general maintenance, but I believe there's the
11 contributing factors of the age of the equipment and the
12 air-handling system and those type of things were
13 equally -- equally contributory to the shutdown of the
14 range.
15  Q.  If you had to assign a percentage to their
16 culpability, what would that percentage be?
17        MR. ELLIS:  Objection. He just did.
18  A.  I think I used the term --
19        MR. NEUBERGER:  I'm sorry. What's your
20 objection?
21        MR. ELLIS:  He just did. He said equally
22 culpable. That's 50/50.
23        MR. NEUBERGER:  He named more than two
24 things.

15 (Pages 54 to 57)

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 58

1   MR. ELLIS: He said that their
2  culpability -- I don't want to review his testimony. I
3  don't care. I'm not instructing him not to answer.
4  BY MR. NEUBERGER:
5   Q. What percentage of culpability would you assign
6  to them?
7   A. I use the term "equally culpable" on both sides,
8  equipment and otherwise. 50/50.
9   Q. So despite this 50 percent culpability, the men
10 were never brought up on charges?
11  A. No, they were not. To clarify that,
12 Mr. Neuberger, the intent was never to assign blame for
13 what occurred there on behalf of this division. It was
14 to fix the problems that we had.
15  Q. Is it your position that you never assigned
16 blame to the men until today?
17  A. That's correct.
18  Q. Is it your position that Colonel Chaffinch never
19 assigned blame until today?
20  A. Colonel Chaffinch, by his statement in one of
21 the papers, indicated in a broad sense that -- I believe
22 his term was he who lives in glass houses shouldn't throw
23 stones, or something of that nature. I believe that's
24 what his statement was.

Page 59

1   I read that in the paper. I was not there
2  when he made that statement. Major Eckrich was. When I
3  was with him at the range with reporters on another
4  occasion and when asked who's responsible for this, I
5  told them I was.
6   Q. So would you disagree with Colonel Chaffinch's
7  statement that Chris Foraker was responsible for the
8  problems at the range?
9   A. By what was said, yes.
10  Q. I'm sorry?
11  A. What was reported in the paper, I would say yes.
12 That's who the colonel felt was responsible.
13  Q. Let's take a step back from just what was
14 reported in the paper to the overall scenario on
15 everything that had happened at the FTU. Okay? We're
16 stepping back just from what was in the paper to more of
17 the big picture. Do you understand that?
18  A. Yes.
19  Q. If Colonel Chaffinch said Sergeant Foraker and
20 the men under his command were responsible for the
21 conditions of the range, would you disagree with that
22 statement?
23   MR. ELLIS: When you say "big picture,"
24 what do you mean?

Page 60

1  BY MR. NEUBERGER:
2   Q. Do you understand what "big picture" means?
3   A. Are you talking about the very end? At that
4  point in time? Remember, if we carried this through
5  from opinions and things that were given early on in this
6  process after it all went public to what people's
7  opinions are of who's responsible for the shutdown,
8  Colonel Chaffinch felt that Sergeant Foraker and the
9  staff were responsible for the shutdown of the range.
10  Q. Let's say how about from as of the end of
11 April 2004. Okay?
12  A. Uh-huh.
13  Q. Do you disagree with Colonel Chaffinch's
14 statement that Sergeant Foraker and the men under his
15 command were responsible for the problems at the FTU?
16   MR. ELLIS: I object to the form of the
17 question.
18  A. Yes.
19  Q. How about if Colonel Chaffinch made that
20 statement today, would you agree or disagree with that
21 statement?
22  A. As I previously stated, I think it was a
23 culmination of things that led to the shutdown of the
24 range, problems with the range.

Page 61

1   Q. I think you indicated that men were responsible
2  for the upkeep of the range. Is that correct?
3   A. I said maintenance and upkeep.
4   Q. Maintenance and upkeep. Which conditions at the
5  range were caused by lack of maintenance?
6   A. The filters for the bullet trap system weren't
7  being taken care of, general cleanup was not being done
8  inside the facility that were typically done by the
9  firearms training staff.
10  Q. What do you mean by "general cleanup"?
11  A. Sweeping the floor, making sure the facility was
12 maintained in a clean and proper manner.
13  Q. And the only specific you have there is sweeping
14 the floor?
15  A. Well, the floor accumulates a great deal of
16 debris from shooting, and it didn't appear as though it
17 was being taken care of as it had been in the past.
18  Q. Do you know if the men had the training
19 necessary to clean the range?
20  A. Once again, I have learned many times you
21 shouldn't assume things, but the facility had been open
22 for approximately six years when this occurred and it was
23 always maintained in a clean state and taken care of, and
24 we had people there that had been there since the

16 (Pages 58 to 61)

Price, et al. v. Chaffinch, et al.
Thomas F. MacLeish    C.A. # 04-1207    July 19, 2007

**Page 62**

1  beginning, and my assumption was that they had been
2  trained in how to properly clean the facility, yes.
3      Q.  You said you're assuming that they had been
4  trained.
5      A.  Correct.
6      Q.  What if they had not actually been trained?
7      A.  Well, they had received training in firearms and
8  things in the past, and at that point in time, as I said,
9  the facility had been open -- I don't recall specifically
10 receiving training on how to sweep a floor.  When I was
11 14 I learned to be a janitor.  But there were brooms
12 there, there was a man there.  As I said, these people
13 had been at the range for quite sometime.  But am I
14 knowledgeable that they had specific training?  No, I am
15 not.
16     Q.  Are you saying it's like a common-sense thing
17 that everybody knows how to clean up a firing range?
18     A.  That prior to 2004 people apparently did know
19 how to clean the range.
20     Q.  Do you know if there were standard operating
21 procedures at the time for how to operate and clean the
22 firing range?
23     A.  I found out subsequent to that no, there is not.
24     Q.  Are there standard operating procedures for just

**Page 63**

1  about everything in the Delaware State Police?
2      A.  Yes, but we don't have standard operating
3  procedures for cleaning a troop.
4      Q.  You served as a troop commander at some point?
5      A.  Yes, I have.
6      Q.  Let's say a patrol car had a problem with its
7  engine.  Was the trooper who was driving the patrol car
8  authorized to fix it?
9      A.  No, he was not.
10     Q.  What did he have to do?
11     A.  He'd write it up and report it to a mechanic who
12 would fix it.
13     Q.  Would you agree that the FTU is a multi-million
14 dollar firearms facility?
15     A.  Yes.
16     Q.  Would you agree that it is a specialized
17 facility?
18     A.  Yes.
19     Q.  Do you agree that a lot of highly technical
20 equipment is located in that facility and is essential
21 for training?
22         MR. ELLIS:  I object to the form of the
23 question.
24     A.  Yes.

**Page 64**

1      Q.  Is it your position that the men had a
2  responsibility to clean and fix this highly technical
3  equipment?
4      A.  The air-handling system was handled by
5  Administrative Services who had people trained to do so.
6  So they would report it -- any type of malfunction or
7  problem that they had to them.
8          The bullet trap system was a system much
9  like the engine on a car.  I'm not saying it's exactly
10 similar, but there are certain things that you're
11 responsible for taking care of in a general sense.  You
12 check the oil, you make sure that it's running properly,
13 if you have problems, you report them.
14         That's the general sense that I have of the
15 range.
16     Q.  Do you know if the men were given respirators to
17 use while cleaning the range?
18     A.  They were not.
19     Q.  Do you know whether they were given Tyvec suits
20 to wear when cleaning the range?
21     A.  They were not.
22     Q.  Do you know if they were given moon suits to
23 wear when cleaning the range?
24     A.  They were not.

**Page 65**

1      Q.  Were they given little booties to wear over
2  their shoes while they were cleaning the range?
3      A.  They were not.  Was I aware they needed any of
4  those things?  No, I was not.
5          MR. NEUBERGER:  I'd like to put another
6  document in front of you.  Mark this as MacLeish
7  Deposition Exhibit 3.
8          (MacLeish Deposition Exhibit No. 3 was
9  marked for identification.)
10         (A recess was taken.)
11 BY MR. NEUBERGER:
12     Q.  Colonel, I just put a document in front of you;
13 isn't that right?
14     A.  Yes, you did.
15     Q.  At the top of this document does it say in the
16 darkened section, "Delaware State Police Planning
17 Section"?
18     A.  Yes, it does.
19     Q.  Underneath that does it say "MEMORANDUM"?
20     A.  Yes, it does.
21     Q.  Does this appear to be a memo to Lieutenant
22 Colonel MacLeish?  That would be right?
23     A.  Yes, it is.
24     Q.  Does it say it's from Captain Albert J. Homiak?

Case 1:04-cv-01394-GMS    Document 75-23    Filed 09/16/2005    Page 8 of 13

Price, et al.                                v.                          Chaffinch, et al.
Thomas F. MacLeish            C.A. # 04-1207                      July 19, 2007

Page 66

1    A. Yes.
2    Q. Is the date on this March 4, 2004?
3    A. Yes.
4    Q. Does it say, "Re: Firearms Range"?
5    A. Yes.
6    Q. Have you ever seen this memo before?
7    A. Yes, I have.
8    Q. Was this a memo which was prepared for you by
9 Captain Homiak?
10   A. Yes, it is.
11   Q. Are you familiar with this memo without looking
12 at it at all?
13   A. I am familiar with it.
14   Q. Was this a memo that Captain Homiak prepared in
15 response to a request you made of him?
16   A. Yes.
17   Q. Do you recall what you had asked him to look
18 into?
19   A. I asked him -- the planning section does a lot
20 of research from other state agencies. There's a list
21 served that they put questions on, and other state
22 agencies typically will respond and provincial agencies,
23 and I asked him to look into what other places were doing
24 with regards to their ranges, from maintenance to

Page 67

1 personnel to health-related issues. I was trying to get
2 more informed with regards to the issues we were having
3 at our range.
4    Q. Could you turn to the second page, please?
5    A. (Complied.)
6    Q. If you take a look at the third full paragraph
7 down, the one that begins "Routine range maintenance," do
8 you see that?
9    A. Yes, I do.
10   Q. Could you read that to me?
11   A. "Routine range maintenance, except in very few
12      cases, was conducted by range personnel. This
13      may involve minor things such as changing lights
14      to putting salt on icy sidewalks. Some of the
15      more proactive agencies clean their ranges daily
16      with range officers, but they require their
17      officers to use a vacuum with a HEPA filter.
18      Dallas PD conducts routine and scheduled
19      maintenance that their personnel are capable of
20      doing, however they wear protective gear and
21      respirators. Some agencies require protective
22      slippers to be worn when conducting even the most
23      minor repairs. They are discarded when
24      finished."

Page 68

1    Q. Does the very first sentence of that paragraph
2 indicate that routine range maintenance is usually
3 conducted by range personnel?
4    A. Yes, it does.
5    Q. Does the second sentence go on to indicate that
6 routine range maintenance are types of minor things such
7 as changing lightbulbs and putting salt on icy sidewalks?
8    A. It does indicate that, yes.
9    Q. It says that some of the more proactive agencies
10 clean their ranges daily using range officers and they
11 use a vacuum with a HEPA filter?
12   A. Yes.
13   Q. It goes on to say that Dallas Police Department
14 have their personnel wear protective gear and respirators
15 when they clean the range.
16   A. Yes.
17   Q. Did the Delaware State Police have its range
18 officers wear protective gear and respirators when
19 cleaning the range?
20   A. No, they did not.
21   Q. To the best of your knowledge?
22   A. To the best of my knowledge, no.
23   Q. After you read this memo, did you think that's
24 something that perhaps the range personnel should be

Page 69

1 equipped with if they were responsible for cleaning?
2    A. Yes.
3    Q. Let's go on to the next paragraph. Does the
4 first sentence say, "Someone other than range personnel
5 handle scheduled maintenance and removal of lead and
6 other toxins in all cases"?
7    A. Yes.
8    Q. Does it say that?
9    A. Yes, it does.
10   Q. Does this sentence indicate to you in all of the
11 ranges surveyed by Captain Homiak, that someone other
12 than range personnel removed the lead and other toxins
13 from the range environment?
14   A. That's what it indicates, yes.
15   Q. It appears to indicate that that was that way as
16 to all the police departments or other law enforcement
17 agencies that he surveyed?
18   A. Yes.
19   Q. Could you just read the rest of the paragraph
20 quietly to yourself?
21   A. (Complied.)
22   Q. Tell me when you're finished.
23   A. I'm finished.
24   Q. Does the rest of the paragraph indicate that

18 (Pages 66 to 69)

Case 1:04-cv-01394-GMS   Document 75-23   Filed 09/16/2005   Page 9 of 13

Price, et al.                              v.                         Chaffinch, et al.
Thomas F. MacLeish                  C.A. # 04-1207                    July 19, 2007

Page 70

1  some agencies have outside vendors come in or other
2  outsiders come in to actually clean up the range of lead
3  and other toxins and heavy metals?
4     A.  That's correct.
5     Q.  Was that done at the Delaware State Police in
6  recent years, to the best of your knowledge?
7     A.  Yes, it was.
8     Q.  An outside agency regularly came in?
9     A.  It came in to remove the lead and they came in
10 and removed the toxins.  When I say that, I mean it's my
11 understanding that, when we were shooting lead, an
12 outside group would come in and take care of the spent
13 ammunition.  The frangible ammunition, I'm not sure who
14 was called in to remove that sludge, but I know that at a
15 point in time it would have been removed by someone other
16 than range personnel.  That's my understanding.
17    Q.  Do you know if it was done on a regular basis?
18    A.  I can't say what the -- no, I can't say what the
19 regular basis was.
20    Q.  Do you think that the people who would know the
21 specifics of what did and did not occur were the people
22 who worked at the range on a daily basis?
23    A.  Yes.
24    Q.  And that would include Sergeant Foraker and

Page 71

1  corporals Price and Warren?
2     A.  Yes.  And the filters that are referred to, that
3  type of thing, I know was done by Facilities Management.
4  On what basis, I'm not sure.
5     Q.  Do you know if they always put in the required
6  HEPA filters?
7     A.  I'm not aware of that.  At that point in time I
8  wasn't aware.  Subsequent to that, I think when we
9  switched to frangible ammunition, they stopped using the
10 HEPA filters.  I believe that's what I have heard had
11 happened, but I know that that -- our range personnel
12 were responsible for the air handling -- the filters in
13 the air-handling system.  That was the responsibility of
14 Facilities Management.
15    Q.  To the best of your knowledge, with the
16 air-handling system, that was responsible for removing
17 all of the I think you mentioned copper, tin, and several
18 other types of metals from the air?
19    A.  No.  I said that the frangible ammunition is
20 made up of copper, tin, and zinc, and the air-handling
21 system is supposed to push those products away from the
22 shooter and down range and then they subsequently are
23 either removed through the air-handling system as it's
24 exhausted and run through those filters.  I'm not

Page 72

1  intimately familiar with it.  That's my assumption of how
2  this all would work.  What projectile struck and broke
3  into the dust and went into the system, that was taken
4  back to the -- into the bullet trap recovery system.
5     Q.  Were the men responsible for maintaining the
6  bullet trap?
7     A.  Making sure it was operational and I believe
8  cleaning the filters is what they were responsible for,
9  to make sure that the system worked properly, because
10 there's spray heads that wet -- it's a wet system.
11        MR. ELLIS:  You're referring to water
12 filters at this point as opposed to air filters?
13        THE WITNESS:  Yes, I am.
14        MR. NEUBERGER:  Yes.  He mentioned the
15 bullet trap.
16        MR. ELLIS:  I want to make sure the record
17 was clear.
18 BY MR. NEUBERGER:
19    Q.  Were there any written policies regarding
20 cleaning of the bullet trap or the water filters?
21    A.  I don't believe there was.
22    Q.  Do you think there should have been?
23    A.  Yes.
24    Q.  Were there any written or oral directives about

Page 73

1  how to safely clean the bullet trap or the water filters
2  on the bullet trap?
3     A.  I think it's come to our attention that there
4  were not, but there were things routinely done, because
5  we didn't have this problem before.
6     Q.  Did any other memos like this, like Deposition
7  Exhibit 3, ever come to your attention or any other memos
8  like that ever sent to you?
9         MR. ELLIS:  I object to the form of the
10 question.
11        MR. NEUBERGER:  Compound?
12        MR. ELLIS:  When you say like this
13 document, like in what way?  Like in three pages?  Like
14 addressed to MacLeish from Homiak?  Like what?
15 BY MR. NEUBERGER:
16    Q.  Did you ever receive any other memos or other
17 communications from staff regarding range issues who were
18 responding to your request to research how other agencies
19 handled things?
20    A.  Yes.
21    Q.  Do you recall when you received those?
22    A.  In or about this same time.  I asked
23 Sergeant Foraker to research what maintenance
24 responsibilities he saw the FTU unit being responsible

Case 1:04-cv-01394-GMS   Document 75-23   Filed 09/16/2005   Page 10 of 13

Price, et al.                                                      v.                                              Chaffinch, et al.
Thomas F. MacLeish                                        C.A. # 04-1207                                           July 19, 2007

Page 74
1  for. I had our HR director, Captain Yeomans, prepare a
2  report for me on blood lead levels so I could look at
3  those. I think the third item that I saw was a report
4  prepared by retired Major Swiskey (phonetic) on range
5  operations that went to Colonel Pepper that I found in
6  the armoire of the colonel's office -- this was well
7  after the fact -- with recommendations for maintenance
8  and so forth in that.
9      Q.  Which colonel?
10     A.  Colonel Pepper. It was sent to Colonel Pepper.
11         MR. NEUBERGER: I'd like to put another
12 exhibit in front of you. We will call this MacLeish
13 Deposition Exhibit No. 4.
14         (MacLeish Deposition Exhibit No. 4 was
15 marked for identification.)
16 BY MR. NEUBERGER:
17     Q.  Colonel, do you have that exhibit in front of
18 you?
19     A.  Yes, I do.
20     Q.  Does the letterhead on this indicate that it
21 came from the State of Delaware, Department of Labor,
22 Division of Industrial Affairs?
23     A.  Yes.
24     Q.  Is the title on this document "RECOMMENDATIONS

Page 75
1  AND DESIGN CONSIDERATIONS FOR INDOOR RIFLE RANGES"?
2      A.  Yes.
3      Q.  Underneath that does it say, "taken from various
4  OSHA and NIOSH publications"?
5      A.  Yes.
6      Q.  Do you know what OSHA and NIOSH are?
7      A.  Yes.
8      Q.  What are they?
9      A.  Occupational Safety and Health Administration,
10 and NIOSH is --
11     Q.  Could it be the National Institute of --
12     A.  Occupational Safety and Health.
13     Q.  Yes. Down below that does it say, "To reduce
14 and/or eliminate the health hazards associated with
15 indoor firing ranges the following design considerations
16 and work practices are recommended:"?
17     A.  Yes.
18     Q.  Do you know if the Delaware State Police at the
19 FTU instituted these recommendations and design
20 considerations?
21     A.  I'm sorry. I don't know the answer to that
22 question.
23     Q.  Do you think they should have?
24         MR. ELLIS: I'm going to object to the form

Page 76
1  of the question. You have to establish the basis for him
2  to be able to answer that question. That's a highly
3  technical question, as you can see from the document.
4      A.  Once again, it says, "RECOMMENDATIONS AND DESIGN
5  CONSIDERATIONS," and many times when we have seen the
6  75 feet per minute at the firing line, that is based upon
7  for a static line. Ours is a tactical line. Our
8  shooters move. The targets remain stationary. That was
9  recommended, I take it, by firearms personnel in the past
10 to more actively reflect what the type of tactical
11 situations we would be involved in versus us just
12 standing in one spot and having the target move to or
13 from us as many ranges are.
14         So as I look at this document, I take it
15 just as it says at the top they're recommendations and
16 considerations to be taken. So I would think that the
17 people that were doing the design, the engineers that
18 were hired and so forth, would be far more knowledgeable
19 than I and would design a range that would be safe for
20 our people to shoot at and our instructors to instruct
21 at.
22     Q.  You're indicating that you really had no
23 involvement in the construction of the range, right?
24     A.  I had none.

Page 77
1      Q.  I believe probably about an hour or so ago you
2  mentioned something about 75 feet per minute being -- I
3  believe your testimony was something to the effect that's
4  the recommended air flow. Did you testify about that
5  about an hour ago?
6          MR. ELLIS: An hour ago?
7          MR. NEUBERGER: I think so. I'm asking if
8  he remembers that.
9      A.  I have talked a lot in the last couple hours.
10     Q.  I can narrow the question down.
11     A.  I'm not trying to be evasive. There's been a
12 lot I have said. I do recall having knowledge of that
13 particular standard, 75 feet per -- feet per minute.
14     Q.  How did you learn about that?
15     A.  Subsequent to all this occurring at the range,
16 that that was a recommendation from -- I believe that's a
17 NIOSH recommendation that is made for a static range, and
18 subsequent to that we have done a lot of travel and found
19 that some ranges have that on a -- pretty much most of
20 them have -- maintain a static range, have that standard.
21 Other ones, it's recommended. It's not always applicable
22 on a tactical range to maintain that type of air flow
23 during the entire length of your range.
24     Q.  Let's turn to the second page. Item No. 17, do

20 (Pages 74 to 77)

Price, et al.  v.  Chaffinch, et al.
Thomas F. MacLeish   C.A. # 04-1207   July 19, 2007

### Page 78

1  you see that?
2     A.  Yes, sir.
3     Q.  Does that indicate that "All air being exhausted
4  from the range should be filtered using a High Efficiency
5  Particulate Filter," a HEPA filter, "or equivalent"?
6     A.  Yes.
7     Q.  That's another recommendation made by OSHA or
8  NIOSH?
9     A.  Yes.
10    Q.  It's in this document which was apparently
11 published by the Division of Industrial Affairs?
12    A.  Yes.
13    Q.  Do you see a little farther down on that page
14 where it says, "RECOMMENDED WORK PRACTICES"?
15    A.  Yes.
16    Q.  Do you see that item No. 2?
17    A.  Yes.
18    Q.  Does that indicate that sweeping the range
19 should not be done with like a hand-broom or things like
20 that?
21    A.  Yes.
22    Q.  Does that indicate there's a specialized method
23 for sweeping the range using certain types of machinery?
24    A.  Yes.

### Page 79

1     Q.  Do you see item No. 3 right below that?
2     A.  Yes, I do.
3     Q.  Does that indicate that, when working on the
4  bullet trap, a NIOSH-approved respirator for the removal
5  of lead, dust, and fumes must also be worn?
6     A.  Yes, it does.
7     Q.  Are you aware that the bullet trap at the FTU is
8  partially composed of a lead substance?
9     A.  I wasn't aware of that.
10    Q.  Then No. 4 right below that, does that say that
11 "Proper ear protection should be provided for and worn by
12 all individuals inside the firing area"?
13    A.  Yes.
14    Q.  Does that also indicate that "The ear protectors
15 should be selected on the basis of offering maximum
16 protection"?
17    A.  Yes.
18    Q.  That last sentence, would you agree with that
19 statement, that the ear protection worn by those at the
20 DSP firing range should provide maximum protection?
21    A.  Yes.
22    Q.  You can put that document down.
23        Were you in attendance at a press
24 conference held at the FTU on April 6 of 2004?

### Page 80

1     A.  No, I was not.
2     Q.  Do you know if there was a press conference held
3  on April 6 of 2004 at the FTU?
4     A.  I'm aware, yes, there was.
5     Q.  Do you know who was there?
6     A.  I know that the colonel was there and
7  Major Eckrich was there.  There was a representative from
8  Facilities Management, I believe it was Secretary Homer,
9  Secretary of Administrative Services, and she was
10 accompanied by people from her group, but I couldn't say
11 specifically who.
12    Q.  How did you learn about that meeting or that
13 press conference?
14    A.  I had received a call from the colonel that they
15 were going to be holding that up there.  I was on
16 vacation.  He was going -- he was going to attend and be
17 accompanied by Major Eckrich, and it was called -- if I'm
18 not mistaken, it was called by the Secretary of
19 Administrative Services, by Secretary Homer, not by the
20 division.
21    Q.  Were you on vacation locally or out of state?
22    A.  I was local.
23    Q.  Were you reachable by a camera crew?
24    A.  If they knew where I lived, I could imagine they

### Page 81

1  would have come to my house, yes.
2     Q.  Were you interviewed that day by a TV camera
3  crew from WBOC TV in Salisbury, Maryland?
4     A.  No, I was not.  I answered no, I was not.  You
5  said April the 6th.  I was there on another occasion with
6  WBOC crew.  I wasn't there on the date the colonel made
7  the statement about the FTU staff.  I apologize for
8  making that assumption.  There was a subsequent date when
9  I was there at the firing range, and I apologize for not
10 recalling the specific date, but I was there on another
11 occasion.
12    Q.  Would that have been after April 6?
13    A.  Sir, I can't recall.  I know there was another
14 occasion.  It was after the initial press conference that
15 was done that I was there with the colonel at the firing
16 range and BOC was there.
17    Q.  Do you recall what was said during that press
18 conference?
19    A.  It was more of a walk-through.  Once again, I
20 want to say Secretary Homer was there again.  We were
21 accompanying her.  She was doing most of the talking and
22 pointing out.
23        The thing I specifically recall was I got
24 back in behind the bullet trap and they were looking at

21 (Pages 78 to 81)

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 82

1 the debris that was back there and so forth, and I
2 remember them specifically asking me who was responsible
3 for this condition and what was back there. I said I
4 was.
5    Q. Sir, are you indicating that there were two
6 press conferences held at the range at various times?
7    A. You're using the term "press conference." I
8 know that the initial one that the colonel went to I
9 believe had more reporters there and so forth. I know we
10 returned there on a second occasion, and if you have me
11 locked in on April the 6th, I'd have to say yes because I
12 know I was there on a second date. I was not there for
13 an initial press conference.
14    Q. So for the date that you were there, you
15 mentioned Colonel Chaffinch being there?
16    A. Yes.
17    Q. And yourself?
18    A. Yes.
19    Q. Was Major Eckrich there?
20    A. I don't believe he was there with me on that
21 occasion, no.
22    Q. Was Secretary Homer there?
23    A. I believe she was.
24    Q. Was there anyone else from Secretary Homer's --

Page 83

1 I guess it's her department, her bailiwick?
2    A. Her department. I believe she was accompanied
3 by others from her department, but I can't tell you who.
4 I don't recall.
5       MR. NEUBERGER: I'd like to put another
6 document in front of you. This will be 5.
7       (MacLeish Deposition Exhibit No. 5 was
8 marked for identification.)
9 BY MR. NEUBERGER:
10    Q. Colonel, do you have this document in front of
11 you right now?
12    A. I do.
13    Q. At the top of this page does it say from
14 Stephen J. Neuberger to sjn@NeubergerLaw.com?
15    A. Yes.
16    Q. Does it say sent Wednesday, April 7, 2004, at
17 10:25 a.m.?
18    A. Yes, it does.
19    Q. In the bottom right-hand corner of the page does
20 it say FTU2863?
21    A. I'm sorry. Where were you asking me to look?
22    Q. The bottom right-hand corner.
23    A. Yes.
24    Q. Does it say four-page document?

Page 84

1    A. Is it a -- page 1 of 4, yes.
2    Q. Does this appear to be a newspaper article from
3 Tom Eldred of the Delaware State News?
4    A. Yes.
5    Q. Have you ever seen this article before?
6       MR. ELLIS: The notations on the top of the
7 first page of Exhibit 5 are a little bit confusing. Is
8 this an article that appeared in the paper on April 7th,
9 2004? Is that what they mean?
10       MR. NEUBERGER: Yes.
11       MR. ELLIS: That's fine.
12 BY MR. NEUBERGER:
13    Q. Colonel, does this appear to be an article that
14 was written by Tom Eldred of the Delaware State News?
15    A. Yes, it does.
16    Q. Is the title of this article "Debate rages on
17 blame at range"?
18    A. Yes, that's the title.
19    Q. The first paragraph mentions a media tour of the
20 closed Delaware State Police firing range; isn't that
21 right?
22    A. Yes.
23    Q. There's a picture to the right of that of
24 Secretary Homer and Colonel Chaffinch; isn't that

Page 85

1 accurate?
2    A. Yes.
3    Q. You indicated you have read this article before.
4 Right?
5    A. Yes.
6    Q. Do you recall if you read it around the time it
7 was published or whether it was just something you have
8 seen more recently?
9    A. No, I read it after -- probably on April the
10 7th.
11    Q. You were on vacation at that point?
12    A. Yes.
13    Q. And the fourth paragraph down says, "Determining
14 who is at fault is another matter." Is that correct?
15    A. Yes.
16    Q. Taking a quick look at the couple paragraphs
17 before that, does that sentence reference who was at
18 fault for the conditions of the FTU?
19    A. Following that or prior to it?
20    Q. Prior to it. Just so you can get the context.
21       MR. ELLIS: Where are you asking him to
22 read from?
23       MR. NEUBERGER: The first four paragraphs.
24    A. I have read to "Determining who is at fault is

22 (Pages 82 to 85)

Wilcox & Fetzer, Ltd.      Professional Court Reporters      (302)655-0477

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

### Page 86

1  another matter."
2  Q. Does that sentence reference who is responsible
3  for the conditions at the FTU?
4  A. Yes.
5  Q. Could you go down three more paragraphs, the one
6  that begins "Mrs. Homer said"?
7  A. Yes.
8  Q. Could you read that paragraph quietly to
9  yourself?
10  A. (Complied.)
11    Okay.
12  Q. Does the second sentence of that paragraph state
13  that "Col. Chaffinch acknowledged problems but indicated
14  the blame lies only with one or two troopers under his
15  command"?
16  A. Yes.
17  Q. Is that consistent with your understanding of
18  where Colonel Chaffinch places the blame for the
19  conditions at the FTU?
20  A. Yes.
21  Q. Do you know who those two troopers are that he's
22  referring to?
23  A. I would assume one being Sergeant Foraker and
24  one being Captain Warren.

### Page 87

1  Q. Do you place blame for those conditions on those
2  same people that Colonel Chaffinch places blame on?
3  A. No.
4  Q. If you turn to the third page -- I'm sorry.
5  Just to get the context, can you please turn to the
6  second page? Actually begins on the bottom of the second
7  page. Four lines up where it says, "Col. Chaffinch said
8  he was unaware." Do you see that?
9  A. Yes, I do.
10  Q. Could you read from that point to the top of the
11  next page just so you can have the context of what I'm
12  about to read to you?
13  A. (Complied.)
14  Q. I'm going to actually read this to you. Do you
15  understand that these statements at the top are
16  statements from Colonel Chaffinch as reported by the
17  paper?
18    MR. ELLIS: I object to the form of the
19  question. Are you asking him whether Chaffinch actually
20  made these statements?
21    MR. NEUBERGER: I'm asking him does the
22  newspaper article indicate that these are statements made
23  by Colonel Chaffinch. I'm not asking him if he has
24  personal knowledge.

### Page 88

1  A. Yes. The way I'm reading this, the newspaper is
2  saying these are statements by Colonel Chaffinch.
3  Q. At the top of the third page, does that say,
4  "'There was some discoloration in the bullet trap but
5  that was about it'"? Does it say that?
6  A. Yes, it does.
7  Q. Does it go on to say that "'I think people who
8  live in glass houses shouldn't throw stones. It's a lot
9  dirtier now. Things seemed in their proper places in the
10  fall. I've never seen it like this'"? Does it indicate
11  that?
12  A. Yes.
13  Q. You mentioned this people in glass houses
14  throwing stones thing a little earlier in your testimony;
15  isn't that right?
16  A. Yes, I did.
17  Q. Then this newspaper article appears to be saying
18  that Colonel Chaffinch said that; isn't that right?
19  A. Yes.
20  Q. Do you know what he meant by that?
21    MR. ELLIS: I object to the form of the
22  question.
23  A. I think he was referring to Captain Warren and
24  Sergeant Foraker.

### Page 89

1  Q. Does it also appear that he's indicating that
2  he's never seen the range in the conditions that they
3  were currently in as of when he was giving this tour?
4  A. I'm sorry. One more time.
5  Q. The last sentence says, "'I've never seen it
6  like this.'" is that correct?
7  A. Yes, it does.
8  Q. Would that appear to you to be indicating that
9  he had never seen the range in those types of conditions?
10  A. Yes.
11  Q. Skipping down two more paragraphs, do you see
12  that the paragraph starts with "'The previous sergeant in
13  charge'"?
14  A. Yes.
15  Q. Does that say that, quote, "'The previous
16  sergeant in charge did a good job'"? Does it state that?
17  A. I'm sorry. I was looking at --
18  Q. It's the third paragraph down.
19  A. All right.
20  Q. Does that state that "'The previous sergeant in
21  charge did a good job'"?
22  A. Yes, it does.
23  Q. Does it go on to state that "'Things changed in
24  December when another sergeant came in. That's at least