Price, et al.                                    v.                           Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                          July 19, 2007

Page 186

1  opinion after he passed his fitness-for-duty exam?
2  A. Yes, he was sent for a second opinion.
3  Q. Why did you send him for a second opinion after
4  he passed his fitness-for-duty exam?
5  A. It was the recommendation of the HR director.
6  Q. It's your position that you weren't just trying
7  to find a way to get rid of him; you were concerned for
8  his health and I guess his hearing?
9  A. Absolutely, yes.
10 Q. Were you concerned about the health and hearing
11 of all of the troopers under your command in general?
12 A. Yes.
13 Q. Then you were especially concerned about the
14 health and hearing of the troopers who had served at the
15 FTU, Sergeant Foraker, Corporal Price, Warren, and
16 Warwick?
17 A. Yes.
18 Q. Do you know who Sergeant Ryan Fitzpatrick is?
19 A. Yes, I do.
20 Q. He was the NCOIC of the FTU from approximately
21 1998 to 2000; isn't that right?
22 A. I would assume, yes. He was there for a period
23 of time.
24 Q. At some point in the past he served at the

Page 187

1  current facility that is the FTU; is that correct?
2  A. Yes.
3  Q. He's currently with the Delaware State Police,
4  right?
5  A. Yes, he is.
6  Q. What are his current duties, do you know?
7  A. He's a shift commander, Troop 4.
8  Q. Where is Troop 4?
9  A. It's located in Georgetown.
10 Q. Did you ever contact Sergeant Brian Fitzpatrick
11 and tell him that maybe he should get his hearing checked
12 because he served at the FTU?
13 A. No, I did not.
14 Q. Do you know who Sergeant Ralph Matt Engler is?
15 A. Yes, I do.
16 Q. He served at the FTU for a period of time; isn't
17 that right?
18 A. Yes.
19 Q. Is he currently with the Delaware State Police?
20 A. Yes.
21 Q. Did you ever contact Sergeant Engler and tell
22 him perhaps he should get his hearing checked because you
23 had a concern about hearing loss of officers who had
24 served at the FTU?

Page 188

1  A. No, I did not.
2  Q. Do you know who Sergeant Al Parton is?
3  A. Yes, I do.
4  Q. He was at one time the NCOIC of the FTU?
5  A. Yes.
6  Q. Does he currently run the SORT team?
7  A. Yes.
8  Q. That is the Special Operations Response Team?
9  A. Yes.
10 Q. Is that the Delaware State Police's version of a
11 SWAT team?
12 A. Yes.
13 Q. Have you ever contacted him and said to
14 Sergeant Parton, maybe you should get your hearing
15 checked because you served at the FTU? Have you ever
16 done that?
17 A. No, I haven't.
18 Q. Do you know if either Sergeant Fitzpatrick,
19 Sergeant Engler, or Sergeant Parton have been contacted
20 by anyone, be it in personnel or by you or by
21 Colonel Chaffinch, and told they should get their hearing
22 checked because they served at the FTU at one point?
23 A. No, I have not.
24 Q. Do you know who Corporal Eddie Cathell is?

Page 189

1  A. Yes.
2  Q. Isn't it true he served at the FTU for a
3  several-year period?
4  A. Yes.
5  Q. Do you recall if it was approximately 1998 to
6  the year 2003?
7  A. I think that would be relatively accurate.
8  Q. He's currently retired, isn't he?
9  A. Yes.
10 Q. He's actually one of the colonel's buddies,
11 isn't he?
12 A. My understanding is he's a friend of the
13 colonel's, yes.
14 Q. Did you or anyone else call up Corporal
15 Eddie Cathell and say, hey, Eddie, or hey,
16 Corporal Cathell, whatever your greeting is to him,
17 perhaps you should go get your hearing checked because
18 you served at the FTU for a long period of time?
19 A. No, I did not.
20 Q. Do you know who Corporal Bruce Peachey is?
21 A. Yes, I do.
22 Q. Corporal Peachey served for approximately a year
23 or so at the FTU in approximately 2002 to 2003?
24 A. Yes.

48 (Pages 186 to 189)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

A341

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 190

1  Q. He retired in early 2004; isn't that right?
2  A. Yes.
3  Q. Did you ever call up Corporal Peachey and say,
4  Corporal Peachey, perhaps you should get your hearing
5  checked because there are some issues with hearing of
6  officers?
7  A. No.
8  Q. Do you know if he was ever contacted by anyone
9  at DSP about that?
10  A. To my knowledge, no.
11  Q. Do you know who Sergeant William Rhoades is?
12  A. Yes, I do.
13  Q. Did he serve at the FTU from approximately 1998
14  to the year 2000?
15  A. He served at the firing range. Those are
16  specific dates. I don't know.
17  Q. But do you know that he served at the current
18  facility, that is the FTU in Smyrna off of something
19  something road? I'm blanking on the name of the road.
20  A. Yes, he did.
21  Q. He's currently retired?
22  A. Yes.
23  Q. Did you ever contact Sergeant William Rhoades
24  and say, Sergeant Rhoades, I have some concern for your

Page 191

1  hearing, you served at the FTU for a number of years, you
2  should come in and get your hearing checked?
3  A. No, I did not.
4  Q. Do you know if anyone from the DSP contacted him
5  and asked him?
6  A. No, I do not.
7  Q. Do you know who Sergeant Richard Ashley is?
8  A. Yes, I do.
9  Q. He was the NCOIC at the FTU from approximately
10  2002 to 2003?
11  A. Yes.
12  Q. He was the NCOIC at the FTU from April 8 of 2002
13  through November 30th of 2003. Does that sound ballpark
14  accurate to you?
15  A. Yes.
16  Q. He retired in early 2004, didn't he?
17  A. Yes.
18  Q. Did you ever contact him and say, hey,
19  Sergeant Ashley, perhaps you should get your hearing
20  checked because you served at the FTU where there were
21  problems with hearing issues?
22  A. No, I did not.
23  Q. To the best of your knowledge, did anyone from
24  DSP contact those people?

Page 192

1  A. No, they did not.
2  Q. Did you ever give an order to Captain Yeomans to
3  contact any of those seven troopers whose names I just
4  listed?
5  A. No.
6  Q. You're telling me that, to the best of your
7  knowledge, DSP has never contacted any of those troopers
8  and expressed concern for their hearing?
9  A. No, I did not.
10  Q. You never ordered that to happen?
11  A. Did not. The division annually does physicals.
12  Q. There's no question posed, Colonel.
13       MR. ELLIS: He's finishing answering the
14  last question, I think.
15       MR. NEUBERGER: The question was did he
16  give an order that those people be contacted.
17       MR. ELLIS: He's finishing his answer.
18       THE WITNESS: I was finishing my answer.
19       MR. NEUBERGER: Please finish.
20       THE WITNESS: The members of the division
21  are given physicals on an annual basis, and part of that
22  physical is sight, hearing, overall body function, and if
23  something were to come up, then it would be -- then it
24  would be addressed. But, to my knowledge, none of those

Page 193

1  officers have ever said they have got a hearing problem
2  or brought it to anyone's attention, either.
3  BY MR. NEUBERGER:
4  Q. Does the DSP like to be proactive on health
5  issues?
6  A. That's why we have annual physicals and we have
7  our physical fitness test.
8  Q. Colonel MacLeish, did there come a time when
9  Kurt Price and Wayne Warren were placed on light duty?
10  A. Yes.
11  Q. Why were they placed on light duty?
12  A. As a result of their fitness-for-duty
13  evaluation.
14  Q. Was that because they had hearing problems?
15  A. Yes.
16  Q. Was that the extent of your concern in putting
17  them on light duty, were their hearing problems?
18  A. The reason for placing them on light duty is the
19  doctor submitted that they were not fit for duty, and the
20  concern for them and the welfare -- their welfare and the
21  welfare of the public by the doctor telling me a trooper
22  is not fit for duty, I can't very well put them out there
23  in a full-duty capacity.
24  Q. Did you have any other reasons for placing them

49 (Pages 190 to 193)

Wilcox & Fetzer, Ltd.  Professional Court Reporters  (302)655-0477

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 194

1  on light duty? Any other reasons whatsoever?
2  A. No.
3  Q. Were you trying to get rid of them?
4  A. No, I was not.
5  Q. Were you trying to remove a thorn from the side
6  of the Delaware State Police?
7  A. No, I was not.
8  Q. Were you trying to remove a thorn from your own
9  side?
10 A. No.
11 Q. Were you trying to remove a thorn from the side
12 of Colonel Chaffinch?
13 A. No, I was not.
14 Q. Was Colonel Chaffinch involved in the decision
15 to put Corporal Price and Corporal Warren on light duty?
16 A. No, he was not.
17 Q. It was just you?
18 A. Yes.
19 Q. Was Colonel Chaffinch informed of your decision
20 to put corporals Warren and Price on light duty?
21 A. Yes.
22 Q. What did he say, if anything, to you when he was
23 informed of that?
24 A. Nothing sticks in my mind other than it was

Page 195

1  appropriate procedure.
2  Q. I'd like to show you two documents that were
3  marked as Dave Baylor Deposition Exhibit 1 and
4  Dave Baylor Deposition Exhibit 2 yesterday. Okay?
5  A. Yes, sir.
6  Q. Do you have copies of these? I don't.
7      MR. ELLIS: I know what they are.
8  BY MR. NEUBERGER:
9  Q. Colonel MacLeish, could you take a quick look at
10 the top letter? Who is that addressed to?
11 A. Corporal Kurt Price.
12 Q. Does the date say June 25th, 2003?
13 A. Yes.
14 Q. Does that appear to be a typo?
15 A. Yes, it does.
16 Q. Should the real date say June 23, 2004?
17 A. Yes.
18 Q. Could you take a look at the second letter which
19 would be Baylor Deposition Exhibit No. 2? Do you see
20 that?
21 A. Yes.
22 Q. Who's that addressed to?
23 A. Corporal Wayne Warren.
24 Q. Is that also dated June 23rd, 2003?

Page 196

1  A. Yes, it is.
2  Q. Is that a typo?
3  A. Yes.
4  Q. That should really say June 25th, 2004?
5  A. Yes.
6  Q. Can you take a quick look at these two letters
7  and just compare them and if you could tell me if they're
8  identical except for the names?
9  A. Yes, they are identical.
10 Q. I'd like you to take a look at Baylor Deposition
11 Exhibit No. 1. If you can just put to the side Exhibit
12 No. 2.
13 A. Okay.
14 Q. Were you sending these letters to corporals
15 Price and Warren to let them know that they were on
16 light-duty status?
17 A. Yes.
18 Q. Is it true they had been on light-duty status
19 since the date on this letter, since the actual date of
20 this letter, which would be June 25th, 2004?
21 A. Yes.
22 Q. I'd like you to take a look at --
23     MR. ELLIS: Point of question here.
24 There's a pencil mark on both these documents, and the

Page 197

1  "3" is crossed out and the "4" is written in in pencil.
2  Is that something that was done in Baylor's deposition,
3  because I have not seen that in other copies?
4      MR. NEUBERGER: I think it may have been.
5  I think Robert actually -- I wasn't in the depo., but I
6  think Robert pointed out it was the wrong date.
7      MR. ELLIS: It's clearly the wrong date.
8      MR. HAVERLY: I was present, and that is
9  what happened.
10     MR. ELLIS: Somebody in the deposition
11 yesterday wrote on it?
12     MR. HAVERLY: Yes.
13     MR. ELLIS: Who wrote on it?
14     MR. HAVERLY: It may have been Robert, but
15 I'm not sure.
16 BY MR. NEUBERGER:
17 Q. Just to confirm, Colonel, that is the wrong date
18 the date that is written on this document, June 25th,
19 2003?
20     MR. ELLIS: I will stipulate to that. I'm
21 not disagreeing with that. I have seen two or three
22 different versions of this letter.
23 BY MR. NEUBERGER:
24 Q. Colonel, there are a number of things enumerated

50 (Pages 194 to 197)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                    v.                              Chaffinch, et al.
Thomas F. MacLeish                      C.A. # 04-1207                           July 19, 2007

Page 198

1  on here, 1 through 6; isn't that right?
2  A. Yes.
3  Q. Does No. 1 say, "Your work status will be light
4  duty, nonuniformed, consisting of administrative desk
5  duties"?
6  A. Yes.
7  Q. Is this letter considered an order to
8  Corporal Price and Corporal Warren?
9  A. Yes.
10 Q. If they violate this order, they could be
11 disciplined for not following orders; isn't that right?
12 A. Yes, they could.
13 Q. No. 2 says that they have to report to work in
14 civilian business attire?
15 A. Yes.
16 Q. It orders them that they are not to wear a DSP
17 uniform for work purposes or otherwise?
18 A. Yes.
19 Q. No. 3 says that they can keep their assigned
20 divisional weapon; however, it shall not be used for any
21 police-related duties?
22 A. Yes.
23 Q. Would it be fair to say that No. 4 says if they
24 observe a crime in progress, that they are to run the

Page 199

1  other way?
2         MR. ELLIS: I object to the form of the
3  question.
4  A. It doesn't say run the other way. It talks
5  about if you observe a crime in progress or foresee that
6  a situation may occur which has the potential of placing
7  you in a confrontational or dangerous position, you are
8  to remove yourself from the situation and notify a
9  full-duty officer or a communication officer of the
10 situation.
11        I think what they're telling them to do is
12 if they're observing something that looks like it's
13 getting ready -- that some type of confrontation, they're
14 involving themselves in a physical confrontation, because
15 it says "confrontational or dangerous situation."
16 Confrontational, the way I interpret it is one in which
17 they would have to physically become involved with a
18 subject. As they see that develop, they're supposed to
19 pick up a phone and call 911 and get a full-duty police
20 officer there.
21 Q. They're not supposed to get involved in that
22 situation other than calling 911 or notifying some type
23 of law enforcement authority?
24 A. That's correct.

Page 200

1  Q. So if a woman was being raped by a gun-toting
2  maniac, they were supposed to walk the other way and
3  contact the appropriate authorities?
4  A. No, because I think that's why if we did not
5  want them to be involved in anything at all, I think they
6  would -- their divisional weapon would have been removed
7  from them. We realized that they're able to act in some
8  way, shape, or form. If it says if you observe a crime
9  in progress or foresee that a situation which has the
10 potential of placing you in confrontation or a dangerous
11 situation, you are to remove yourself from the situation
12 and act in the same capacity as a civilian by notifying a
13 full-duty officer. There's civilians that act --
14 Q. But also says they're supposed to remove
15 themselves from the situation. Wouldn't a gun-toting
16 maniac be a confrontational or dangerous situation?
17 A. It would be, yes. And in that they would in
18 fact -- what they're saying is that they're not to act in
19 full-duty capacity as an officer, as a trooper. They
20 have got to use discretion. It's probably not the
21 best-worded -- this was written by our HR department and
22 signed by me, and I'm responsible for my signature on it,
23 but they aren't to go out and put themselves in positions
24 where that can happen. If there was the gun-toting

Page 201

1  maniac raping a woman, I think any one of us would act,
2  and they would not be held in violation of an order.
3  Q. Would that action be in violation of an order?
4  A. In its finite sense, would they be prosecuted
5  for that? Absolutely not.
6  Q. Would it be a violation of this order?
7  A. It could be in violation of the order.
8  Q. You see No. 6, as well, it says, "You are to
9  avoid any situations that potentially work against the
10 successful rehab of your illness or injury"?
11 A. Right. Yes.
12 Q. That was also an order, right?
13 A. Yes.
14 Q. You can put that document down.
15        Isn't it true that you have subsequently
16 ordered both corporals Warren and Price -- since this
17 letter was sent to corporals Warren and Price, have you
18 since also ordered them to separate from the DSP by
19 August of 2005?
20 A. They must submit their paperwork for that by --
21 I thought it was August the 10th of 2005.
22 Q. What kind of paperwork?
23 A. Submit for a disability retirement, pension.
24 Q. If they were not to submit their disability

51 (Pages 198 to 201)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A344

Page 202

1 retirement pension papers by that date, would the
2 division fire them?
3    A.  That course needs -- remains to be determined
4 through HR and our attorneys, but they have been asked to
5 submit their pension paperwork and asked to separate from
6 the division.
7    Q.  You used the word "asked." Isn't it true they
8 have been ordered to do that by that date?
9    A.  They have been directed to submit -- I don't
10 have that document in front of me, but they have been --
11 I'm sure you have it. But they have been asked -- they
12 have been directed, too. They have been given an
13 extension to August 10th to have their paperwork
14 submitted, yes, for disability pension.
15    Q.  In March of 2005 did you receive an e-mail from
16 Corporal Price requesting that he be allowed to stay on
17 light duty for two years?
18    A.  Yes.
19    Q.  Why aren't you allowing them to stay on the
20 light duty for two years? By "them," I mean corporals
21 Warren and Price.
22    A.  By our policy, by what it's interpreted by our
23 policy, by our HR director, in researching that, that
24 their disability -- their injury is permanent, it cannot

Page 203

1 change, it cannot be accommodated. Therefore, the policy
2 is set to give the second year in the event that a
3 trooper would be able to return to full-duty capacity.
4 We know now that they do not have the ability to return
5 to full-duty capacity. So by the advice I was given from
6 HR and our attorney through the application of this
7 policy, indicated that separation was the proper course.
8    Q.  By "attorney" you mean Deputy Attorney General
9 Mike Tupman or Ralph Durstein?
10    A.  Mike Tupman.
11    Q.  Are there any other reasons for your refusal to
12 grant Corporal Price and Corporal Warren two years of
13 light duty?
14    A.  No.
15    Q.  Was this your decision to make or was this
16 Colonel Chaffinch's decision?
17    A.  It was my decision to make.
18    Q.  Did Colonel Chaffinch have any involvement in
19 that decision?
20    A.  No, he did not.
21    Q.  Was he notified of that decision?
22    A.  He was off at that time. I was the acting
23 superintendent.
24    Q.  When was the decision made?

Page 204

1    A.  In March 2005.
2    Q.  Was he subsequently notified about that decision
3 after he came back in March or April of 2005?
4    A.  He returned the end of March. I was in Hawaii
5 at the time. He was informed at that point in time.
6    Q.  Did he say don't do that, give them two years?
7    A.  No, he did not.
8    Q.  Had you and Colonel Chaffinch talked about that
9 at any other time since that one conversation you just
10 referenced?
11    A.  I talked to him sporadically during this time
12 that he was on administrative leave, but I did not recall
13 the specifics of that because it evolved to the point of
14 trying to make that determination and that was between
15 HR, our attorneys, and myself.
16    Q.  Did Colonel Chaffinch have the authority to
17 overrule your determination because he was the colonel of
18 the Delaware State Police after he came back from was it
19 administrative leave?
20    A.  Yes.
21    Q.  Did he have that authority to overrule your
22 determination and give them the two years?
23    A.  He was the colonel. He could have if he elected
24 to or if it was brought to his attention.

Page 205

1    Q.  You're indicating that it was brought to his
2 attention, wasn't it?
3    A.  He was informed of the decision, yes.
4    Q.  Did he overrule your decision?
5    A.  No, he did not.
6    Q.  I'd like to put this e-mail in front of you,
7 this e-mail from Corporal Price to you. Call it MacLeish
8 Deposition Exhibit No. 19.
9         (MacLeish Deposition Exhibit No. 19 was
10 marked for identification.)
11 BY MR. NEUBERGER:
12    Q.  Colonel, do you have this e-mail in front of
13 you?
14    A.  Yes.
15    Q.  Does this appear to be an e-mail from Kurt Price
16 to you dated Saturday, March 5th, 2005, at 12:02 p.m.?
17    A.  Yes.
18    Q.  Did you read this e-mail before?
19    A.  Yes, I have.
20    Q.  Are you familiar with its contents?
21    A.  Relatively familiar, yes.
22    Q.  Could you take a look at it and just read it
23 quietly to yourself and then tell me when you're done?
24    A.  (Complied.)

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 206

1   Okay. I read this.
2   Q. Is this the same e-mail that you actually
3   received from Kurt Price?
4   A. Yes.
5   Q. You can put that document down.
6       Remember a few minutes ago I asked you
7   about a long list of troopers who had previously served
8   at the FTU and who had not been either sent for or
9   advised of going for hearing exams?
10  A. Yes.
11  Q. I have one more trooper I'd like to ask you
12  about. Do you know who Lieutenant William Bryson is?
13  A. Yes, I do.
14  Q. Was he the NCOIC of the FTU at one point?
15  A. Yes, he was.
16  Q. Do you recall when he served there?
17  A. He opened the facility and stayed -- I think he
18  preceded Sergeant Fitzpatrick. I believe. He preceded
19  Sergeant Fitzpatrick.
20  Q. He's now retired now, isn't he?
21  A. Yes, he is.
22  Q. He's a --
23  A. Police chief.
24  Q. Of Camden, Delaware?

Page 207

1   A. Camden Police Department.
2   Q. You were the best man at his wedding?
3   A. Yes.
4   Q. Have you contacted him and said,
5   Lieutenant Bryson or Chief Bryson or Bill, whatever you
6   call him, you've had some issues with hearing problems at
7   the FTU, you should get your hearing checked?
8   A. No, I have not.
9       MR. NEUBERGER: I'd like to take a short
10  break.
11      (A recess was taken.)
12  BY MR. NEUBERGER:
13  Q. Colonel, I think you mentioned that in the end
14  of November of 2003 you had a meeting at the FTU with
15  Sergeant Ashley and some of the other range personnel?
16  A. Yes, I did.
17  Q. Where was that meeting at in the FTU?
18  A. It was located in the conference room.
19  Q. Were you able to see the firing line of the
20  range from there?
21  A. No.
22  Q. Were you able to see behind the bullet trap from
23  there?
24  A. No.

Page 208

1   Q. Did you go and inspect the firing line?
2   A. No.
3   Q. Did you go in and inspect behind the bullet
4   trap?
5   A. No.
6   Q. Did you ever speak to the State Auditor's Office
7   about the conditions at the FTU?
8   A. Yes, I did.
9   Q. When was that?
10  A. They would have the specific date I was
11  interviewed. June/July '04. I think. I believe it's
12  that time frame. I don't know specifically.
13  Q. Was Colonel Chaffinch interviewed at the same
14  time you were?
15  A. I don't believe so. I think it was just -- I
16  remember they came in; they interviewed Major Eckrich.
17  Following that I was interviewed, an interview with the
18  Auditor's Office. I don't recall being interviewed with
19  Colonel Chaffinch there. I went to a presentation of
20  their -- that was done by the State Auditor, Tom Wagner,
21  and I'm mixing up my dates or losing my years here. I
22  believe Secretary Mitchell was there. Take took place at
23  the Auditor's Office.
24  Q. Was that the initial presentation of the

Page 209

1   preliminary report?
2   A. Yes, it was.
3   Q. I want to focus solely on your interview.
4   A. Okay.
5   Q. At any point during that interview did you say
6   that the problems at the FTU were the fault of the staff,
7   including Sergeant Foraker, Corporal Price,
8   Corporal Warren, and any other staff there?
9   A. I believe that I indicated, as my earlier
10  testimony, that they were a component of that -- the
11  problems at the range.
12  Q. Did you also indicate that they had never
13  received training in certain types of maintenance
14  procedures required at such a specialized facility?
15  A. I believe I indicated that I was aware that they
16  hadn't received specialized training, but that in prior
17  years it had been -- we did not face these issues, these
18  specific issues.
19  Q. Did you give them any documents during your
20  meeting?
21  A. I don't recall.
22  Q. Do you know if you gave them any documents prior
23  to your meeting or after your meeting as part of the
24  Auditor's investigation?

53 (Pages 206 to 209)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477