150. Denied.

151. Denied.

152. Denied as alleged. Admitted only that Delaware State Police policy prohibits all types of harassment. The balance of the averment is denied.

153. Denied.

154. Denied.

155. Denied.

156. Denied.

157. Denied.

158. Denied.

159. Denied.

160. Denied.

161. The defendants restate and incorporate by reference the responses set forth in paragraphs 1 through 160 above.

162. Denied that any "retaliatory adverse action" was taken by defendants.

163. Denied.

164. Denied.

### First Affirmative Defense

The complaint fails to state a claim upon which relief can be granted as a matter of law.

### Second Affirmative Defense

To the extent they are sued in their official capacities, the individual defendants enjoy qualified immunity from any claim for monetary damages.

### Third Affirmative Defense

The Eleventh Amendment of the United States Constitution bars suit against the State of Delaware, the Department of Safety and Homeland Security, and the Division of State Police.

### Fourth Affirmative Defense

The Eleventh Amendment bars any claim for monetary damages against the individual defendants in their official capacities.

WHEREFORE, the defendants pray that the Court dismiss the plaintiff's action in its entirety, with prejudice, with all costs payable by the plaintiff.

*/s/ Ralph K. Durstein III*
Ralph K. Durstein III (ID# 912)
Deputy Attorney General
Department of Justice
State of Delaware
820 N. French Street
Wilmington, DE 19801
(302)577-8510

Dated: January 10, 2005

# CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on January 10, 2005, he caused two (2) copies of the attached ANSWER OF DEFENDANTS TO FIRST AMENDED COMPLAINT to be delivered to the following persons in the form and manner indicated:

**NAME AND ADDRESS OF RECIPIENT(S):**

| | |
|---|---|
| Thomas S. Neuberger, Esq. | Chad M. Shandler |
| Thomas S. Neuberger, P.A. | Richards Layton & Finger |
| 2 E. Seventh St., Suite 302 | One Rodney Square |
| Wilmington, DE 19801 | P.O. Box 551 |
| | Wilmington, DE 19899-0551 |

**MANNER OF DELIVERY:**

\_\_\_\_\_ One true copy by facsimile transmission to each recipient

\_\_\_\_\_ Two true copies by first class mail, postage prepaid, to each recipient

__X__ Two true copies by hand delivery to each recipient

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Ralph K. Durstein III
Ralph K. Durstein III, I.D. #912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th floor
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendants

I:\ralph.durstein\Litigation\Conley v DSP\cos.doc



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
## v.
## Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

Gerald R. Pepper

August 12, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,           )
                                     ) Civil Action
         Plaintiff,                  ) No. 04-1394-GMS
                                     )
v.                                   )
                                     )
COLONEL L. AARON CHAFFINCH,          )
individually and in his official     )
capacity as the Superintendent,      )
Delaware State Police, LIEUTENANT    )
COLONEL THOMAS F. MACLEISH,          )
individually and in his official     )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.      )
MICHELL, individually and in his     )
official capacity as Secretary of the)
Department of Safety and Homeland    )
Security, State of Delaware; and     )
DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY,     )
State of Delaware,                   )
                                     )
         Defendants.                 )

         Deposition of GERALD R. PEPPER taken pursuant to notice at the law offices of THE NEUBERGER FIRM, Two East Seventh Street, Suite 302, Wilmington, Delaware, beginning at 10:00 a.m. on Friday, August 12, 2005, before Renee A. Meyers, Registered Professional Reporter and Notary Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM
           Two East Seventh Street, Suite 302
           Wilmington, Delaware  19801
           for the Plaintiff

              WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Gerald R. Pepper | C.A. # 04-1394-GMS | August 12, 2005 |

Page 2

1  APPEARANCES (Continued):
2      STEPHANIE J. BALLARD, ESQ.
        DEPARTMENT OF JUSTICE
3       820 North French Street
        Carvel State Office Building
4       Wilmington, Delaware 19801
        for the Defendants Lieutenant Colonel
5       Thomas F. MacLeish, David B. Mitchell,
        and Division of State Police
6
   ALSO PRESENT: BARBARA CONLEY
7
8          GERALD R. PEPPER,
9      the witness herein, having first been
10     duly sworn on oath, was examined and
11     testified as follows:
12 BY MR. NEUBERGER:
13  Q.  Just for the record, what's your full name?
14  A.  Gerald R. Pepper, P-e-p-p-e-r.
15  Q.  And I issued you a subpoena that made you
16 appear today to give testimony; is that right?
17  A.  Yes, sir.
18  Q.  And, so, you are being forced to testify today;
19 is that right?
20  A.  Yes, sir.
21  Q.  Now, did you retire as the colonel of the
22 Delaware State Police?
23  A.  Yes, sir, I did.
24  Q.  And was that around -- well, your day-to-day

Page 3

1 duties, did they end around October 1st, 2001?
2  A.  Yes, sir, they did.
3  Q.  And how many years had you been with the
4 Delaware State Police through your official
5 retirement?
6  A.  Twenty-seven years.
7  Q.  Twenty-seven years?
8  A.  Yes, sir.
9  Q.  And what year would that have been that you
10 graduated from the academy?
11  A.  It would have been 1975, is when I was
12 appointed, August 1st, 1975. And then my official
13 retirement date is August 1st, 2002.
14  Q.  And how long did you serve as colonel?
15  A.  About three years.
16  Q.  About three years?
17  A.  Yes.
18  Q.  So, would it have been around 1999, you became
19 the colonel?
20  A.  Yes, sir.
21  Q.  And before that, did you serve as lieutenant
22 colonel?
23  A.  Yes, sir, I did.
24  Q.  And who would have been the colonel you served

Page 4

1 under?
2  A.  It would have been Colonel Allen Ellingsworth.
3  Q.  And about how long did you serve as lieutenant
4 colonel?
5  A.  I think just about five years. It's been a
6 while, but I am going to say that it was -- I became
7 lieutenant colonel somewhere in the vicinity of 1994,
8 perhaps.
9  Q.  And just for the record, I am only asking you
10 for your best memory today. We all understand that;
11 right?
12  A.  Sure.
13  Q.  In fact, I have even taken your testimony on at
14 least one other occasion, haven't I?
15  A.  Yes, sir.
16  Q.  And we probably went through some of this at
17 that time?
18  A.  Yes, sir, we did.
19  Q.  And, in fact, you have even -- I have even
20 subpoenaed you to testify in at least one trial; isn't
21 that true?
22  A.  Yes, sir.
23  Q.  So, we could always look at what was said at
24 that time. But about five years is your memory?

Page 5

1  A.  Yes, sir.
2  Q.  And then is it fair to say you were a major
3 before then?
4  A.  Yes, sir.
5  Q.  And about how long were you a major?
6  A.  I am going to say probably about two years.
7  Q.  And what were your duties as the major? Where
8 was your assignment?
9  A.  Kent and Sussex Counties, the troops in Kent
10 and Sussex Counties in addition to the communications
11 centers in Kent and Sussex.
12  Q.  Were you the operations major for Kent and
13 Sussex?
14  A.  Yes, I was.
15  Q.  From your appointment, was your career a career
16 in the southern part of the State of Delaware?
17  A.  I worked, for the most part, in Kent County. I
18 never worked in Sussex. And I worked in New Castle
19 County.
20  Q.  Prior to being a major, were you the commander
21 of the Troop in Kent County, for example?
22  A.  No, sir. Let me just give you a brief run
23 down.
24  Q.  Okay.

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Gerald R. Pepper | C.A. # 04-1394-GMS | August 12, 2005 |

Page 6

1  A. Prior to being appointed as the major in charge
2  of operations down in Kent and Sussex Counties, I was
3  the commander of the internal affairs section for
4  probably one year. Prior to that, I was a deputy
5  troop commander at Troop 3, which is in Kent County.
6  Prior to that, deputy troop commander of Troop 9,
7  which is in southern New Castle County.
8      Prior to that, I was assigned to the
9  public information office, and then going back a bit
10 further prior to that, I was assigned to Troop 3 in
11 the investigative section.
12 Q. Thank you. That was helpful.
13     There is a court case that was filed by a
14 Captain Barbara Conley.
15     Do you know who she is?
16 A. Yes, sir, I do.
17 Q. And she has a court case against former Colonel
18 Aaron Chaffinch, arising from issues concerning two
19 promotions to major that went to a now current Major
20 Eckrich and Hughes.
21     You know those men, too, don't you?
22 A. Yes, sir, I do.
23 Q. And your name came up when I was taking the
24 testimony of former Colonel Chaffinch in the case;

Page 7

1  okay? And, so, I am going to ask you some questions
2  -- that's why you were called today.
3  A. Okay.
4  Q. So I am going to ask you some questions about
5  some things he said, and then while you are here,
6  probably cover some other areas. In fact, there is
7  several areas that he -- that I think touch upon you;
8  okay?
9  A. Okay.
10 Q. Colonel Chaffinch testified that, at a period
11 of time when he was a lieutenant, I believe, there was
12 an incident for which he received some discipline. I
13 believe the record would show that it involved some
14 sort of a party or a recreational event, off duty, you
15 know, someplace, you know, bar, restaurant, something
16 like that, and I believe the testimony would indicate
17 that there was a female trooper, and there might have
18 been drinking, or whatever, and she might have been
19 dancing on the top of a table and people were, you
20 know, promising her money to remove her blouse or
21 something like that. Okay?
22     And Colonel Chaffinch testified that --
23     (Discussion off the record.)
24 BY MR. NEUBERGER:

Page 8

1  Q. I was explaining that Colonel Chaffinch
2  testified, I believe, that, eventually, there was an
3  investigation of conduct that night, and that he was
4  disciplined for it. And then he testified that he
5  shouldn't have been disciplined, that you were present
6  that night and were the senior officer on duty --
7  well, senior officer off duty, on the site, when this
8  inappropriate conduct occurred. Okay? And that due
9  to your command influence or things like that, you
10 weren't disciplined, but, instead, the onus for that
11 incident fell on him.
12     MS. BALLARD: Just object to the form.
13 BY MR. NEUBERGER:
14 Q. Are you aware of any such incident?
15 A. Yes, sir, I am.
16 Q. Could you tell me what your memory of the
17 incident is and your participation in it, the
18 discipline process for the colonel? What was your
19 rank at the time? Let's start there.
20 A. I was a major at the time.
21 Q. You were a major?
22 A. Yes, sir.
23 Q. And do you remember approximately the year that
24 this would have happened?

Page 9

1  A. It was sometime ago because I believe -- I
2  believe that the superintendent then was Colonel
3  Graviet, I believe. I am going to say it was probably
4  early '90s, perhaps, '93, somewhere in that vicinity.
5  I mean, there is a clear record that exists.
6  Q. In internal affairs?
7  A. Yes. Yes.
8  Q. So go ahead.
9  A. So, that's the -- about the time of the
10 occurrence. If I got your question right, you want me
11 to just explain to you --
12 Q. Well, explain to me: Were you privy to the
13 investigation? That was when you were in charge of
14 the internal affairs?
15 A. No, sir. I was a major then and I left the
16 internal affairs, and internal affairs, at that time,
17 fell under the lieutenant colonel at that time.
18 Q. Let's just do it this way: Why don't you tell
19 us if you attended the party, when you left,
20 everything you sort of know, and then I will just sort
21 of swing back and be more specific.
22 A. If I recall correctly, this was either a
23 retirement party for someone or a promotion party, and
24 I -- I can't recall exactly which. Anyhow, it was a

3 (Pages 6 to 9)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

### Page 10

social function that was held at a pavilion or building located in Redden, which is in Sussex County. It was well attended. There were troopers there. And there were other business people there as well that I didn't know. I assume they were probably from Sussex or perhaps friends of some of the troopers that were there.

    I am going to say I was probably there maybe an hour to an hour and a half, early on. My standard procedure would be to attend a social function of this nature, because of the position I was in, not stay very long, and then just leave.

    I left, I had not drank any alcoholic beverages that night. My practice was, you know, social function with other troopers, I would drink water. So, I left and that's the last I knew of anything that had occurred at the function.

Q. So, there was no dancing and taking of blouses off while you were there?

A. No, sir. I became aware of that perhaps a few days later. When I say "perhaps a few days later," I can't recall what night of the week it was on, whether it was a mid week or a Friday night, but a couple days probably went by when it was brought to my attention.

### Page 11

I couldn't even tell you who brought it to my attention. The facts, as you had mentioned before, that someone had removed her top or at least pulled their top up, whatever, and I went to Colonel Graviet with the information and advised him that I thought that there needed to be some type of investigation conducted because it was a serious, serious matter. He agreed.

    The investigation was given to internal affairs, and, to this day, I couldn't tell you what the outcome was other than I know that Colonel Chaffinch did -- or then Lieutenant Chaffinch did receive some type of discipline as well as maybe one or two other people.

    I can tell you that it had a pretty serious effect on the female individual that was involved to the point where she wanted to resign, and she met with, I believe, Allen Ellingsworth, and she changed her mind. It was an embarrassing situation is what I am trying to say.

Q. I am not asking for anybody's names or anything.

A. Right. But that's the extent of what I --

Q. Did I.A. interview you? Do you remember?

### Page 12

Let's just say it this way: Do you remember if I.A. interviewed you?

A. They may have. I can't recall at this point. If they did, it's a matter of record.

Q. But it's your testimony that none of these embarrassing events happened while you were at the event?

A. Yes, sir. That is correct.

Q. And is it your testimony that you would deny exerting any improper command influence to try to steer the investigation away from you?

A. Yes, sir. That's correct.

Q. Now, has Colonel Chaffinch ever told you that he was disciplined for the incident? Did he ever have that kind of a conversation with you?

A. No, sir.

Q. So, anything you have learned, you have learned about his being punished or anything would be second nature -- I mean secondhand?

A. Yes, sir.

Q. And he has testified, under oath, that he did receive some sort of a discipline for the incident, but as I indicated, denied that he was the most senior person there when the event occurred, and you would

### Page 13

disagree with that?

    MS. BALLARD: Object to the form.

    THE WITNESS: At the time that event occurred, yes, I would.

    MR. NEUBERGER: You had an objection.

    MS. BALLARD: Object to the form.

BY MR. NEUBERGER:

Q. Then there was also testimony, I think, made by the colonel about another incident he admitted to of being disciplined. I think this was when he was a major. It had to do with an in service training day or class or something where he made an inappropriate sexual joke while speaking about a farm, a farmer, a farmer/daughter, the use of a vibrator, you know, for sexual activities or something like that.

    Are you aware of anything about that discipline?

A. Yes, sir, I am.

Q. What do you remember about that discipline?

A. The date of that is probably in service -- we held in service during the winter months, in January, February. In this particular case, the in service was held at the National Guard Armory in Georgetown, and for the Sussex troops and I believe Kent was also --

Case 1:04-cv-01394-GMS   Document 76-3   Filed 09/19/2005   Page 9 of 15

Conley                                           v.                              Chaffinch, et al.
Gerald R. Pepper                      C.A. # 04-1394-GMS                      August 12, 2005

Page 14

1  Kent County troops were also included in that as well.
2  And it went on for several days and several different
3  topics were discussed and presentations were made.
4       It was brought to my attention that then
5  Major Chaffinch, he had a block of time for
6  instruction for the area that he was responsible for,
7  it was brought to my attention that he had told a joke
8  in class, in open forum, that was inappropriate.
9    Q.   Coed class?
10   A.   Yes, sir, it was. And he had left on vacation,
11 and when he got back, myself and Colonel Waggaman,
12 Lieutenant Colonel Waggaman, had then Major Chaffinch
13 come in the office, and we sat down and had a pretty
14 lengthy discussion about that particular incident.
15 And there was what I would call some pretty serious
16 counseling that took place, and he was reprimanded for
17 that, although it was a verbal reprimand.
18   Q.   Right. I think he testified something to the
19 effect of it was he was kept waiting in the waiting
20 room a very, very long time, okay, and sort of felt
21 humiliated by that, and then there was a long session,
22 I think, with you and Lieutenant Colonel Waggaman,
23 where he was criticized for misbehavior?
24   A.   Yes, sir.

Page 15

1    Q.   So, when you did meet with him that day, did he
2  admit that he had told the joke?
3    A.   Yes, sir. Yes, sir, he did.
4    Q.   And before that, it had been reported to you
5  that he had told the joke?
6    A.   Yes, sir.
7    Q.   How did you learn that he had told the
8  inappropriate joke in coed class?
9    A.   I believe it came back to me through the --
10 through the ranks. I think the initial or the formal
11 notification to me would have been probably through
12 Major Forrester, who had gotten it from some source.
13      Then what I did is had Bill Waggaman, who
14 was then a lieutenant colonel, do a little bit of
15 research to see what other -- what else we could find
16 out about that particular incident.
17      Then lieutenant Colonel Chaffinch was away
18 on vacation, so when he got back --
19   Q.   But did you mean Major Chaffinch was away on
20 vacation? I think you said Lieutenant Colonel
21 Chaffinch.
22   A.   Excuse me. Lieutenant Colonel Waggaman did the
23 research, and by the time we finished doing that, it
24 was, basically, a fact gathering type of thing. When

Page 16

1  we were ready to sit down with Major Chaffinch, he was
2  away on vacation, but we did that, I believe it was
3  his first day back from vacation.
4    Q.   Do you remember approximately the year, then?
5    A.   I think it was March of 2000.
6    Q.   He was working at the headquarters building at
7  that time, I think, as a major?
8    A.   Yes, sir.
9    Q.   And is it correct that complaints about his
10 comments had been made by female uniformed troopers?
11   A.   I don't know that. I know that there were
12 female uniformed troopers in the in service. I,
13 personally, had no females come to me or pass anything
14 through a major or any other rank to me complaining
15 about that. But I do know that it was a mixed group
16 when he told the joke.
17   Q.   And that's when you were serving as the
18 operations manager for Kent and Sussex County?
19   A.   No, sir.
20   Q.   I am sorry.
21   A.   That's when I was superintendent.
22   Q.   Oh, you are right. This is 1999. Okay. I
23 apologize.
24   A.   Actually, it was 2000.

Page 17

1    Q.   No, sir. You became colonel in 1999, and this
2  incident was in 2000, when you were the
3  superintendent?
4    A.   Yes.
5    Q.   That was my mistake.
6        So, Lieutenant Colonel Waggaman was your
7  lieutenant colonel?
8    A.   Yes, sir.
9    Q.   I had forgotten that.
10   A.   Yes, sir.
11   Q.   And then there did come a time when he retired;
12 right?
13   A.   Yes, sir.
14   Q.   And then Aaron Chaffinch was selected to be his
15 successor; right?
16   A.   Yes, sir.
17   Q.   Do you remember when he started working for you
18 as your lieutenant colonel?
19   A.   I think -- I think Lieutenant Colonel Waggaman
20 retired probably sometime in April of 2001, and then
21 it was probably -- probably a month or two after that,
22 so that would have been maybe May or June of 2001.
23   Q.   Right. He didn't -- he served as your
24 lieutenant colonel for probably less than six months?

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Gerald R. Pepper | C.A. # 04-1394-GMS | August 12, 2005 |

Page 18

1   A.   Absolutely.
2   Q.   Aaron Chaffinch?
3   A.   Yes.
4   Q.   So, you had learned about the incident from
5   Major Forrester, who had learned from other people?
6   A.   Yes.
7   Q.   And then you had your lieutenant colonel do the
8   investigation?
9   A.   Yes, sir, I did.
10  Q.   And your lieutenant colonel would have been the
11  person in charge of, you know, the operational --
12  A.   Yes, sir.
13  Q.   Is that the same Major Forrester who was -- he
14  was a commander for -- he was responsible for
15  operations for Kent and Sussex County?
16  A.   Yes, sir.
17  Q.   Do you remember when he retired?
18  A.   I am going to say probably sometime in August,
19  maybe, perhaps August of 2000.
20  Q.   I have heard --
21  A.   August of 2000, perhaps. It was before Bill
22  Waggaman, and that's why I am kind of searching for a
23  date here.
24  Q.   Well, I heard it said that he wore a hearing

Page 19

1   aid or hearing aids; is that true?
2   A.   I believe he wore one, yes, sir.
3   Q.   One?
4   A.   I believe.
5   Q.   Did that interfere with his being able to hear
6   accurately from, you know, people who would give him a
7   complaint of this nature?
8   A.   No, sir.
9   Q.   He didn't miss receive what the complaint was?
10       MS. BALLARD: Object to the form.
11       THE WITNESS: I don't think so.
12  BY MR. NEUBERGER:
13  Q.   You don't know that he misunderstood?
14  A.   I don't know.
15  Q.   Thank you.
16       And, so, this was a verbal reprimand that
17  Chaffinch received?
18  A.   Yes, sir.
19  Q.   Then there was some specific testimony by
20  Colonel Chaffinch about a Captain Mary Ann Papili. I
21  just want to sort of change gears here.
22  A.   Yes, sir.
23  Q.   Weren't you the person who sort of -- was it in
24  the summer or whatever the two -- well, did you

Page 20

1   promote her to captain?
2   A.   Yes, I did.
3   Q.   Was she the first female captain in the
4   Delaware State Police?
5   A.   I believe she was. I believe she was.
6   Q.   You also promoted my client, Barbara Conley, to
7   captain?
8   A.   Yes, sir, I did.
9   Q.   So one of them was the first and the other one
10  was the second, something like that?
11  A.   Yes, sir.
12  Q.   Was the promotion of Captain Papili, was it in
13  that June 2001 period or was it earlier?
14  A.   It was earlier.
15  Q.   So, it was earlier?
16  A.   It was earlier.
17  Q.   I think my client would testify that she was
18  promoted in June of 2001.
19  A.   Yes.
20  Q.   And she would testify that she was the second
21  person; does that sound fair?
22  A.   Yes.
23  Q.   So that might indicate that Mary Ann Papili was
24  promoted before June 2001?

Page 21

1   A.   I believe she was, yes, sir.
2   Q.   Do you remember whether it was 2000 or 2001?
3   A.   Again, I am trying to think of assignments,
4   and, again, there is a record of this for assignments.
5   Q.   She eventually went to Troop 6 as the
6   commander?
7   A.   That's correct. She went directly to Troop 6
8   with that promotion to captain, which was the largest
9   troop in the state, and she had worked there for quite
10  some time while he was superintendent. So, it had to
11  be 2000, at least sometime in 2000.
12  Q.   So, you are saying sometime in 2000, you
13  promoted her to captain; right?
14  A.   Yes, sir.
15  Q.   And you immediately assigned her to be the
16  commander of Troop 6?
17  A.   Yes, sir.
18  Q.   Now, that would have been with other groups of
19  promotions? They are usually done in groups, aren't
20  they?
21  A.   Yes, sir, they are.
22  Q.   So, do you remember who served at Troop 6
23  before her? Was it Tom Marcin?
24  A.   Yes, sir.

6 (Pages 18 to 21)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Gerald R. Pepper | C.A. # 04-1394-GMS | August 12, 2005 |

Page 22

1  Q. I think he testified, and I think I took his
2  testimony two days ago, I think he testified he had
3  been the commander of Troop 6 for approximately five
4  and a half years; does that sound about right?
5  A. It was a long time, yes, sir.
6  Q. Now, Colonel Chaffinch, I believe, testified
7  that -- and I could be wrong on this -- he didn't
8  promote Mary Ann Papili?
9  A. No, sir.
10 Q. He did not assign Mary Ann Papili to Troop 6?
11 A. No, sir.
12 Q. And when you retired in October of 2001, Mary
13 Ann Papili was still serving as the commander of Troop
14 6?
15 A. Yes, sir, she was.
16 Q. And I apologize if I have already asked this
17 question: Was she the first female to command the
18 troop in the history of the State Police?
19 A. Yes, sir.
20 Q. Thank you.
21     Those are specific areas that we covered,
22 and while we have got you here, I am going to ask you
23 about some other things that have been addressed in
24 this lawsuit; okay?

Page 23

1  A. Okay.
2  Q. So, first, I'd like to show you what's been
3  marked as Plaintiff's Exhibit 3 at the deposition of
4  Aaron Chaffinch, and it recounts four limericks or
5  poems that Colonel Chaffinch has testified that he has
6  memorized and that he recites on various occasions.
7     I want you just to quietly read those
8  over.
9  A. Okay.
10 Q. Have you ever heard Aaron Chaffinch recite any
11 of these limericks?
12 A. No, sir.
13 Q. No?
14 A. No, sir.
15 Q. Now, you wouldn't have considered yourself a
16 personal friend of his, would you?
17 A. No, sir, I would not.
18 Q. And you didn't come from the same academy
19 classes or anything like that, did you?
20 A. No, sir.
21 Q. Your class was earlier than his?
22 A. Yes, sir, it was.
23 Q. And I think you sort of testified a lot of your
24 career was in Kent County; right?

Page 24

1  A. Yes, sir.
2  Q. And it's a fair statement, isn't it, that his
3  career was in Sussex County?
4  A. Yes, sir.
5  Q. So, as you were coming up through the ranks
6  ahead of him, your career wasn't intersecting with
7  his?
8  A. No, sir.
9  Q. And did your careers start intersecting when he
10 came to the headquarters building in around 2000 --
11 the year 2000, when he was promoted to major or was it
12 earlier?
13 A. Professionally?
14 Q. Professionally?
15 A. I can tell you that I never socialized with
16 former Colonel Chaffinch.
17 Q. Well, let me show you another limerick that
18 former Colonel Chaffinch has also testified --
19     (Discussion off the record.)
20 BY MR. NEUBERGER:
21 Q. Just for the sake of the record, we had
22 probably a half hour recess. There was a false fire
23 alarm in the building and the fire department had to
24 check out the building. Now we are back and safe.

Page 25

1     Let's pick up. I had just shown you, I
2  think, some of these limericks, and you had complained
3  some things about contacts with Colonel Chaffinch. I
4  want to go back to the vibrator joke thing. Something
5  just reminded myself.
6     When Major Chaffinch was disciplined in
7  March of 2000, for telling that inappropriate joke in
8  a coed meeting, was he warned not to do it again?
9  A. Sir, I can't sit here and tell you exactly what
10 was said and he was warned not to do that again. I
11 think, from the meeting, it was clear that that type
12 of behavior or actions or joke telling was not
13 acceptable in the workplace and under my command.
14 Q. And would it have been indicated to him that if
15 there was a repeat of that behavior, that even more
16 severe discipline would be facing him?
17 A. I think that was a verb, yes, sir.
18 Q. I think, I believe there has been testimony in
19 this case by a Captain Glenn Dixon.
20     Do you know who he is?
21 A. Yes, sir, I do.
22 Q. I think right now he is a commander of Troop 5
23 in Bridgeville; did that sound about right?
24 A. Yes, sir.

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Case 1:04-cv-01394-GMS    Document 76-3    Filed 09/19/2005    Page 12 of 15

Conley                                              v.                              Chaffinch, et al.
Gerald R. Pepper                         C.A. # 04-1394-GMS                         August 12, 2005

Page 26

1  Q. And I think he testified that Aaron Chaffinch,
2  after he was counseled and disciplined in 2003, said
3  to him and to others in the, probably the Sussex
4  community of the State Police, that no one was going
5  to tell him what to do.
6         Did that ever get reported back to you?
7         MS. BALLARD: Object to the form.
8         THE WITNESS: No, sir.
9  BY MR. NEUBERGER:
10  Q. Captain Dixon has also testified that if
11 Colonel Chaffinch ever had -- former Colonel Chaffinch
12 ever had a problem with discipline or anything, he had
13 a powerful friend, Senator Thurman Adams, who Colonel
14 Chaffinch would call the "Thurminator," who would take
15 care and protect him?
16         MS. BALLARD: Object to the form.
17 BY MR. NEUBERGER:
18  Q. Did Colonel Chaffinch ever refer to Senator
19 Adams as the "Thurminator" in your presence?
20  A. No, sir.
21  Q. Did Colonel Chaffinch ever indicate, in your
22 presence, that he would be protected by Senator Adams
23 for any misconduct while he was in the Delaware State
24 Police?

Page 27

1  A. No, sir.
2  Q. So, you aren't witness to that conversation
3  between Colonel Chaffinch and Captain Dixon?
4         MS. BALLARD: Object to the form.
5         THE WITNESS: No, sir.
6  BY MR. NEUBERGER:
7  Q. So, let's just go back to these exhibits. Here
8  is another one, Exhibit 4, which is another limerick
9  that Colonel Chaffinch has admitted he has memorized.
10        Let me just ask you to quietly read that
11 over.
12  A. Okay.
13  Q. In your presence, did Colonel Chaffinch ever
14 recite that poem?
15  A. No, sir.
16  Q. And then, lastly, on these poems, here is a
17 song or a poem, marked as Plaintiff's Exhibit 2, that
18 former Colonel Chaffinch has indicated he has
19 committed to memory and says on occasion. Take a look
20 at that.
21  A. Okay.
22  Q. Have you ever heard him recite that?
23  A. No, sir.
24  Q. Well, then, let's just quickly take a look at

Page 28

1  whether there might be some other matters to address
2  here.
3         Captain Dixon has testified that colonel,
4  former Colonel Chaffinch has indicated that -- has, at
5  a time, stated, on more than one occasion, that he
6  does not believe that females, in general, should ever
7  serve as troopers in the Delaware State Police; did
8  you ever witness such a statement?
9  A. No, sir.
10        MS. BALLARD: Object to the form of the
11 question.
12 BY MR. NEUBERGER:
13  Q. Captain Dixon has testified that, while on
14 duty, former Colonel Chaffinch has stated that women
15 are nothing but trouble and women are a pain in the
16 ass.
17        Did you ever witness such a statement?
18  A. No.
19  Q. Would such a statement be inappropriate by a
20 uniformed officer of the Delaware State -- officer at
21 the rank of major or above in the Delaware State
22 Police?
23  A. Yes, sir, it would be.
24  Q. It would be?

Page 29

1  A. Yes, sir.
2  Q. Would such a remark be inappropriate by any
3  uniformed officer on the Delaware State Police?
4  A. Yes, sir, it would.
5  Q. Captain Dixon has testified that Colonel
6  Chaffinch has referred to my client, Barbara Conley,
7  as a bitch.
8         Have you ever witnessed such a statement?
9  A. No, sir.
10  Q. Would such a statement by Colonel Chaffinch,
11 again, be inappropriate?
12  A. Yes, sir, I believe it would.
13  Q. Captain Dixon has also testified that Colonel
14 Chaffinch has referred to my client by the nickname
15 "puss."
16        Did you ever witness that?
17  A. No, sir.
18        MS. BALLARD: I just want to put an
19 ongoing objection to the form because you are
20 recounting his testimony in your own words.
21        MR. NEUBERGER: You have a continuing
22 objection.
23 BY MR. NEUBERGER:
24  Q. Would such a statement by former Colonel

8 (Pages 26 to 29)

Page 30

1  Chaffinch, in any of his ranks during his career in
2  the State Police, have been inappropriate towards a
3  female uniformed officer?
4      A.  Such as those ones you previously asked about?
5      Q.  Yes, puss?
6      A.  Yes, sir.
7      Q.  That would be inappropriate?
8      A.  Oh, yes, sir, it would be.
9      Q.  Would calling a uniformed female officer puss
10 or a bitch, would that potentially subject a uniformed
11 officer to discipline?
12     A.  Yes, sir, it would.
13     Q.  And you indicated you were responsible for the
14 internal affairs function?
15     A.  Yes.
16     Q.  For at least a year during your career?
17     A.  That is correct, yes.
18     Q.  And there are policies, standing orders,
19 written directives of the Delaware State Police that
20 would prohibit that kind of -- the use of that kind of
21 -- those kinds of words directed to female officers;
22 is that correct?
23     A.  Yes, sir.  Annually, and as part of the in
24 service, those types of issues, there is a block of

Page 31

1  time set aside for discussions around those types of
2  issues.
3      Q.  So, you are telling me that there is annual
4  training that members of the Delaware State Police,
5  the uniformed staff, receive in that regard?
6      A.  There was, yes, sir.
7      Q.  There was, at least when you were there?
8      A.  Yes, sir.
9      Q.  So, that happened during your stewardship as a
10 superintendent; right?
11     A.  It was mine as well as Colonel Ellingsworth's.
12     Q.  And that was immediately before you?
13     A.  Yes.
14     Q.  So, you instituted, both of you instituted
15 those -- that kind of training?
16     A.  Yes, sir.
17     Q.  And that kind of training, would that indicate
18 that uniformed troopers should not be referred to as a
19 pain in the ass?
20     A.  Yes, sir.
21     Q.  That kind of training, would it indicate that
22 uniformed troopers should not refer to women as
23 anything -- as nothing but trouble?
24     A.  Yes, sir.

Page 32

1      Q.  In your presence, did you ever hear former
2  Colonel Chaffinch refer to Captain Papili by the male
3  name of Norman?
4      A.  No, sir.
5      Q.  There has been testimony by Captain Dixon and
6  even Captain Conley, in this case, that former Colonel
7  Chaffinch would apply the male nickname Norman to
8  Captain Papili, which is the name of a most wanted
9  fugitive you would find on, you know, the most wanted
10 fugitive list.
11         Would the use of a male name, referring to
12 a female officer, again, be a violation of -- a
13 failure to meet the standards set forth in this annual
14 training that you had all the troopers undergo?
15     A.  Yes.  Just let me give you some ideas what the
16 annual training was.  We had an in service training.
17 As part of the in service training, again, there is
18 probably a record of the in service training at the
19 academy in terms of the blocks that were set aside,
20 blocks that were set aside for cultural diversity as
21 well as sexual harassment.  And you had instructors --
22 we had instructors for each of those.
23         In addition to that, we had an individual
24 by the name of Ondre Berry, I believe he was a deputy

Page 33

1  chief of Reno Police Department, annually contracted
2  to come in and did mandatory training in the area of
3  cultural diversity.
4          In addition to that, we had the legal
5  counsel for the California Highway Patrol -- I am
6  trying to remember his name -- Gordon Graham come in
7  and spend a whole day talking about risk management
8  and those types of -- prior to teaching those types of
9  subjects, with, particularly, Ondre Berry and Gordon
10 Graham, they would -- each one of those instructors
11 would meet with myself and Colonel Ellingsworth and
12 discuss topics and recent issues to kind of localize
13 what the agency needed to hear, what type of training
14 we needed to hear for that particular year.
15         So, those types of comments and whatnot
16 would have been covered in those areas of training.
17     Q.  And the uniformed staff was being trained that
18 those kinds of comments were inappropriate in a
19 professional capacity as a trooper?
20     A.  Yes, sir.
21     Q.  And troopers just don't take off their trooper
22 hat when they go home in the evening, do they?
23     A.  I would hope not.
24     Q.  I mean, you expect your people to be living 24

9 (Pages 30 to 33)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Gerald R. Pepper | C.A. # 04-1394-GMS | August 12, 2005 |

Page 34

1  hours a day by a certain standard?
2  A. Yes, sir.
3  Q. There are certain -- you know there is that
4  blue -- the two volume divisional manual; do you
5  remember that?
6  A. Yes, sir, I do.
7  Q. And when you look into that divisional manual,
8  I think it's in the front somewhere, you find various
9  rules about unprofessional conduct and things like
10 that. You know what I am talking about, don't you?
11 A. Yes, sir, I do.
12 Q. And I think there is even some, like, national
13 professional standards that troopers are -- that law
14 enforcement personnel are supposed to adhere to that
15 are in the manual? Do you remember that?
16 A. No, sir, I don't. I think you may be referring
17 to the accreditation standards, which is -- that's
18 national. And that's for the agency to meet.
19 Q. Okay.
20 A. But I am not sure that it's a specific --
21 specific to individuals, as I believe you are
22 referring.
23 Q. I might be confused, then. Let me check some
24 of my notes on all this. Maybe I am thinking about

Page 35

1  something called the code of ethics, the preamble to
2  the Delaware State Police code of ethics.
3         Is there such a thing as a code of ethics,
4  even?
5  A. Yes, sir. I think, and, again, I have been
6  away for four years, but what you are referring to, I
7  think, is probably in the beginning of the rules and
8  regulations associated with the Delaware State Police.
9  Q. Right. And those are standards that the
10 Delaware State Police are expected to meet, too?
11 A. Yes, sir.
12 Q. Because they are following the rules and
13 regulations?
14 A. Yes, sir.
15 Q. For example, I showed you Plaintiff's Exhibit
16 3, the first four limericks.
17         Do you find them to be offensive?
18 A. I find them to be offensive and inappropriate.
19 Q. And would you say the same thing for the
20 limerick on Plaintiff's Exhibit 4?
21 A. Yes, sir.
22 Q. And would you say the same thing for the
23 exhibit on Plaintiff's Exhibit 2?
24 A. Yes, sir.

Page 36

1  Q. And would the recitation of any of those
2  limericks, songs, or poems, be inappropriate in the
3  workplace?
4  A. Yes, sir, they would be.
5  Q. And would you expect that a trooper, let's just
6  take a trooper -- you know members of your staff went
7  to national conferences on occasions?
8  A. Yes, sir.
9  Q. Do you remember something called, like, the
10 care conference?
11 A. Yes, sir.
12 Q. Sort of traffic related thing?
13 A. I never went, but I do remember that, yes, sir.
14 Q. There are conferences that representatives of
15 your agencies and other agencies attend?
16 A. Yes, sir.
17 Q. And would, during social hours or whatever,
18 would you -- would it be your position that the
19 recitation of any of these kinds of limericks, found
20 in Exhibit 3, 4, or 2, be inappropriate when you are
21 representing the Delaware State Police at a national
22 conference?
23 A. In my opinion, yes, sir, it would be.
24 Q. And would you expect that the men and women

Page 37

1  working under your command would not publicly be
2  reciting limericks such as the Exhibits 3, 4, or 2,
3  even in their off duty hours, when they are known to
4  be members of the State Police?
5  A. Yes, sir. In my opinion, yes, sir.
6  Q. Uniformed troopers, are they representatives to
7  the public 24 hours a day?
8  A. In my opinion, yes, sir.
9  Q. Yes, I understand. For example, troopers work
10 as coaches of teams throughout the state; has that
11 been your experience?
12 A. Yes, sir.
13 Q. Troopers work with young kids; has that been
14 your experience?
15 A. Yes.
16 Q. Troopers are involved in all kinds of community
17 activities; is that true?
18 A. Yes, sir.
19 Q. And troopers are encouraged to do those kinds
20 of things, aren't they?
21 A. They were, yes, sir.
22 Q. And did you find, over your police career, that
23 the kind of people who are drawn to police work are
24 generally pretty community oriented?

10 (Pages 34 to 37)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Gerald R. Pepper | C.A. # 04-1394-GMS | August 12, 2005 |

Page 38

1  A. In a lot of cases, yes, sir. Not everybody is.
2  I mean, everybody is different when you are talking
3  about an agency the size of, you know, 850 people
4  totalled with the civilian complement. But a lot of
5  people -- a lot of our employees -- and I can only
6  speak for the time that I was there, I don't know
7  about now -- were actively involved in the community,
8  yes, sir.
9  Q. And even though they are coaching a team or
10 something like that, I mean, the public knows that
11 they are members of the Delaware State Police,
12 generally?
13 A. Yes, sir.
14 Q. And while acting as, even in their private
15 lives, things they do can reflect on the Delaware
16 State Police adversely or positively; is that true?
17 A. Yes, sir.
18 Q. And the kinds of rules and regulations that
19 existed, at least through your command, that dealt
20 with the conduct and standards for troopers to meet,
21 did those rules and regulations reflect the fact that
22 conduct by troopers, even off duty, could reflect back
23 on the Delaware State Police?
24 A. Yes, sir.

Page 39

1  Q. And were uniformed troopers expected, in their
2  off duty hours, to exhibit a level of conduct higher
3  than a citizen who is not a trooper would be expected
4  to meet?
5  A. Yes, sir. They would be expected to abide by
6  the rules and regulations that are set forth, and
7  those policies, rules, and regulations, in my opinion,
8  the code of conduct, whether you are on or off duty.
9  Q. The Delaware State Police is a paramilitary
10 organization; right?
11 A. Yes, sir.
12 Q. And it's got a chain of command?
13 A. Yes, sir.
14 Q. It has rules and regulations and a culture that
15 is different from in the civilian work force; is that
16 a fair statement?
17 A. Yes, sir, I would say so.
18 Q. Have you ever served in the Armed Forces?
19 A. No, sir.
20 Q. Are you aware that the Armed Forces are not a
21 paramilitary organization, they are a strict military
22 organization?
23 A. Yes, sir, I am.
24 Q. And you are aware that they -- that's a highly

Page 40

1  regulated environment?
2  A. Yes, sir.
3  Q. And police forces, you are familiar with around
4  the country; right?
5  A. Yes, sir, I am.
6  Q. And they are a regulated environment but not a
7  -- not exactly the same as the military; right?
8  A. That's correct, yes, sir.
9  Q. But police forces have standards, very high
10 standards of conduct for their members; is that a fair
11 statement?
12 A. Yes, sir.
13 Q. Captain Dixon has testified that Colonel
14 Chaffinch advised him that when he was -- "he,"
15 Colonel Chaffinch, was the commander of Troop 5, he
16 installed mirrors in the troop commander's office and
17 in the bathroom so he could watch himself masturbate.
18 Colonel Chaffinch has denied this. But if that
19 occurred, would that be a violation of any standards
20 of conduct of police officers if Colonel Chaffinch had
21 done that?
22 A. Yes, sir. That's the first time I have heard
23 that.
24         MR. NEUBERGER: I think I might be done.

11 (Pages 38 to 41)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477