| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Gerald R. Pepper | C.A. # 04-1394-GMS | August 12, 2005 |

Page 53

```
1   A.  That's correct.
2   Q.  Or the basis for their testimony?
3   A.  No, ma'am.
4           MS. BALLARD:  That's all I have got.
5   Thank you.
6   BY MR. NEUBERGER:
7   Q.  Colonel, I am going to have to ask you some
8   other questions since you went into some other areas,
9   so let me try to be brief and get you out of here.
10          You retired in 2001, you explained; right?
11  A.  Yes, sir.
12  Q.  So, you have no personal knowledge of what the
13  promotional policies of the Delaware State Police were
14  in the year 2003; is that correct?
15  A.  That is a fair statement, yes, sir.
16  Q.  And one of the promotions involved in this case
17  is a, I believe, a May promotion to replace Major
18  Swiski that was awarded to now Major Eckrich.
19          You wouldn't have any idea what the
20  policies that the Delaware State Police had to apply
21  at that time for that promotion were?
22  A.  No, sir, I wouldn't.
23  Q.  And then in July, then Lieutenant Colonel Tom
24  Marcin retired and now Colonel MacLeish replaced him,
```

14 (Pages 50 to 53)

Conley v. Chaffinch, et al.
Gerald R. Pepper    C.A. # 04-1394-GMS    August 12, 2005

Page 54

1 and that created a vacancy in the Kent and Sussex
2 County operations major.
3    You have no idea or personal knowledge
4 what the policies of Delaware State Police were in
5 July of 2003, to fill that major vacancy, do you?
6    A.   No, sir, I don't.
7    Q.   Do you recall that around the time of your
8 retirement, that last half of the year, 2001, that
9 Governor Minner appointed state personnel director
10 Lisa Blunt-Bradley to conduct a survey in a study of
11 the Delaware State Police?
12    A.   Yes, sir, I am.
13    Q.   And you are aware, aren't you, that, in
14 December of that year, Secretary Bradley issued a
15 lengthy report making certain conclusions and
16 recommendations about the Delaware State Police; do
17 you know that?
18    A.   Yes, sir, I do.
19    Q.   And are you aware that there were various
20 changes made in the promotion policies and practices
21 of the Delaware State Police as follow-up to that
22 report?
23    A.   I don't know what those changes were, but I
24 understand that there were changes.

Page 55

1    Q.   And you wouldn't know what they were?
2    A.   No, sir.
3    Q.   Lieutenant Colonel Tom Marcin, now retired,
4 testified earlier this week that he was in charge of
5 implementing all the changes that had to be made which
6 were mandated by that report and by Governor Minner.
7    You weren't involved in that process, were
8 you?
9    A.   No, sir.
10    MS. BALLARD:   Objection to the form of the
11 question.
12 BY MR. NEUBERGER:
13    Q.   He also testified that the Delaware State
14 Police, for the position of major, was required,
15 henceforth, to involve the state personnel office in
16 the promotion process for major after December of
17 2001, up until the present; you are unaware of whether
18 that was a policy of the Delaware State Police, aren't
19 you?
20    A.   This is the first I have heard of it.
21    Q.   You don't have any knowledge about that?
22    A.   No, sir.
23    Q.   So that just gets us back to you have no idea
24 what the policies and standing orders of the Delaware

Page 56

1 State Police were when former Colonel Chaffinch had to
2 fill two major positions in the year 2003?
3    A.   That's correct.
4    Q.   When you testified earlier, you were testifying
5 about actions you would take consistent with the
6 previous policies, practices, or customs of the
7 Delaware State Police in making promotions; is that a
8 fair statement?
9    A.   Yes, sir, it is.
10    Q.   Then you were asked some question about
11 something about a watch and credit card use.
12    There would be records about that; right?
13    A.   Yes, sir.
14    Q.   They would be the best things for us to look
15 at; right?
16    A.   Yes, sir.
17    Q.   And you don't have a lot of recollection about
18 that?
19    A.   No, sir, I don't.
20    Q.   And the word "discipline" was continually used
21 by counsel.
22    Was my client suspended or anything
23 because of whatever this thing was?
24    A.   I believe that Lieutenant Colonel Waggaman did

Page 57

1 take disciplinary action, but --
2    Q.   But you don't know what it is?
3    A.   I can't remember what that may have been.
4    Q.   I think you talked about it might have been in
5 2001 or earlier; you remembered that?
6    A.   I thought it was earlier.
7    Q.   You then, in June or so of 2001 -- 2001,
8 promoted my client to captain?
9    A.   Yes.
10    Q.   So, whatever this incident was, it did not
11 disqualify her from being promoted to captain?
12    A.   No, sir, it did not.
13    Q.   I mean, I am sure, when you promoted my client,
14 did you approach the task of deciding whether to
15 promote my client with the seriousness appropriate to
16 the decision?
17    A.   As in every case with promotions, I made it a
18 point to look at everybody's personnel file that was
19 going to be considered for promotion.
20    Q.   It wasn't a light-hearted decision, was it?
21    A.   No, sir, it wasn't. And weighed everything, as
22 I described, in consideration of a promotion.
23    Q.   So, it wasn't a casual inadvertent decision to
24 promote her, was it?

15 (Pages 54 to 57)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Page 58

1  A.  No, sir.
2  Q.  You didn't promote her by mistake, did you?
3  A.  No, sir.
4  Q.  Whatever this thing was about purchasing of
5  something on a credit card, that did not disqualify
6  her from serving as a captain of the Delaware State
7  Police?
8  A.  No, sir.
9  Q.  And it wouldn't disqualify her as serving as a
10 major in the Delaware State Police, would it?
11 A.  I would not think so.
12 Q.  Well, let me tell you, Colonel Chaffinch has
13 testified in this case about the two promotions we are
14 involved with, and he has testified that Barbara
15 Conley was qualified to be promoted to major in the
16 Delaware State Police.  So just accept that; okay?
17 A.  Yes, sir.
18 Q.  Up until the time that you left the Delaware
19 State Police in late 2001, in your opinion, was
20 Barbara Conley qualified to be promoted to major?
21 A.  In 2001, when I left?
22 Q.  Yes.  Up until 2001 -- I am not saying there
23 was a vacancy that existed.  Would she be considered
24 to be in the pool for people who could be promoted to

Page 59

1  major eventually in her career in the state of
2  Delaware?
3  A.  Yeah.  All captains would have been considered
4  with the same considerations as I had outlined before.
5  Q.  You knew of nothing in her background that
6  would have disqualified her from ever serving as a
7  major?
8  A.  That's correct.
9  Q.  In fact, I am going to show you what's marked
10 as Plaintiff's Exhibit 1 in this case, which is the
11 complaint Barbara Conley filed, and I am going to ask
12 you, just very quietly, to read paragraphs seven
13 through ten, which just sort of detailed her resume
14 with the State Police through December of 2004.  Why
15 don't you just look at that.
16 A.  (Witness complies.)  Did you say through ten?
17 Q.  Yes.  Have you read that?
18 A.  Yes, sir.
19 Q.  You talked about you served -- you were asked
20 about serving as the operations major in Kent and
21 Sussex County?
22 A.  Yes, sir.
23 Q.  Was there anything in that career path that
24 would make Barbara Conley attractive to serve as the

Page 60

1  operations major for Kent and Sussex County?
2  A.  Colonel Ellingsworth and myself tried to, early
3  on, develop people for leadership positions, and I had
4  forgotten, until I read this, but then again, it's
5  1999, according to this, No. 9, we -- in doing so,
6  what we tried to do is have a competitive process for
7  leadership schools, and Northwestern -- when I say
8  "competitive process," because we had limited seats
9  available, so there was a -- it was a competitive
10 process and you could apply for that, I am not sure
11 whether or not a resume had to be submitted or not,
12 but there was at least an interview process and a
13 scoring that went along with that.
14        And in 1999, Barbara graduated from
15 Northwestern School of Police Staff and Command, and
16 it states in here that, what her GPA was at the time
17 of graduation.
18        I can tell you I don't believe any of
19 those -- I think there were three schools,
20 Northwestern, the FBI academy, and I can't remember
21 what the -- oh -- I can't remember the other one.  It
22 was in Kentucky.  I want to say Southwestern, but I am
23 not sure that's it -- none of those schools, because I
24 attended one myself, none of those schools were a

Page 61

1  breeze and it was a lot of hard work and study that
2  went in.  There were multi week schools.  And when I
3  say "multi week," I think Northwestern, I may be
4  mistaken, but I think it was maybe nine weeks.  So,
5  that would, you know, that would be attractive.
6  Q.  So she distinguished herself, according to this
7  GPA, at that school; right?
8  A.  According to this, yes.
9  Q.  Now, let's just focus in on ten and the
10 assignments she's had through her career.  There has
11 been -- you know I have been involved in a lot of
12 cases involving the State Police; right?
13 A.  Yes, sir, I do.
14 Q.  And there has been testimony in various cases
15 by various managers in the State Police that patrol is
16 the backbone of the State Police.
17        Have you ever heard that reference?
18 A.  I have heard it numerous times, yes, sir.
19 Q.  And Colonel Chaffinch admitted that in his
20 testimony in this case and I believe in some of my
21 other cases, even from the stand at trial, and at
22 depositions, he had stated that.
23        Is that an accurate statement,
24 "Patrol is the backbone of the State Police"?

16 (Pages 58 to 61)

Conley v. Chaffinch, et al.
Gerald R. Pepper   C.A. # 04-1394-GMS   August 12, 2005

Page 62

1  A. I -- I believe it is. I found it to be,
2  probably through the rank, probably the most
3  challenging because you dealt with something different
4  every day. And as you were elevated to a supervisor
5  position, then you moved from dealing with general
6  people every day to not only dealing with general
7  people every day but general employees every day with
8  individual issues and problems and whatnot, and it
9  served as a good, I thought, a good development.
10  Q. Is it true, historically, that many, many, many
11  majors in the Delaware State Police have had careers
12  that were greatly devoted to going up through the
13  patrol process?
14  A. Yes. That is true for almost every rank.
15  That's where you start.
16  Q. You start, then you could be a patrol sergeant;
17  right?
18  A. Right.
19  Q. You could be a traffic lieutenant; right?
20  A. That's correct.
21  Q. You could be a captain who is the commander of
22  a troop?
23  A. Yes, that's correct.
24  Q. And with all the responsibilities that follow;

Page 63

1  right?
2  A. Yes, sir.
3  Q. And paragraph 10 of this resume, I think, would
4  show that Barbara Conley had 18 years experience in
5  the patrol function rising from patrol to, you know,
6  to shift sergeant, to traffic lieutenant, to the --
7  she would even testify that -- I guess there is sort
8  of like a second in command of a troop besides the
9  captain commander, you know, she served in this sort
10  of second in command capacity at times?
11  A. Yes.
12  Q. That would be relevant experience if one was
13  considering her for promotion to major; is that
14  correct?
15  A. Yes, sir.
16  Q. And, for example, one of the issues in our case
17  is the fact that Major Hughes was promoted to the
18  major position with operational responsibility for
19  Kent and Sussex County; you understand that; right?
20  A. Yes.
21  Q. And you said you had even served in that
22  position?
23  A. Yes, sir.
24  Q. Well, the record, I think, will show that Major

Page 64

1  Hughes had three or less years of experience in the
2  patrol function than my client, Barbara Conley, did in
3  July of 2003.
4     If he had less experience in the patrol
5  function, is that something that -- if someone was
6  considering experience in patrol to make an
7  appointment to the operations commander in Kent and
8  Sussex County, would that be a plus on Barbara
9  Conley's part?
10  A. That's a -- I guess that would be considered a
11  judgment call by the superintendent that's making the
12  selection in terms of what he or she may be looking
13  for.
14     In other words, I find it very difficult
15  to sit here and give a very direct short answer to
16  that question without looking -- I mean, I am just
17  trying to place myself in that position, what I would
18  consider looking at here versus another candidate, not
19  specifically R.L. Hughes, but someone with a resume
20  like you had just described, sitting next to here, and
21  then considering some of the other things as I had
22  outlined in my previous testimony.
23  Q. Well, I understand.
24  A. I am trying to describe to you what I would be

Page 65

1  looking for and it's a little bit difficult to give
2  you a cut and dry answer to your question.
3  Q. Right. I appreciate that. Because I know you
4  are looking at it from the prism of the policies and
5  practices when you were in command; right?
6  A. Yes, sir.
7  Q. And you don't know what the policies and
8  practices were when former Colonel Chaffinch was in
9  command?
10  A. That's correct.
11  Q. And former Colonel Chaffinch has testified that
12  one of the factors he considered was the length of
13  experience and tenure of the individual in making his
14  promotion decision to operations commander for Kent
15  and Sussex County.
16     Are you aware that Barbara Conley had more
17  years in patrol than R.L. Hughes in July of 2003?
18  A. I can't say that I do.
19  Q. So you don't know what class he graduated from?
20  A. No, sir, I don't.
21  Q. But you don't see anything on here that would
22  disqualify Barbara Conley from being the operations
23  commander for Kent and Sussex County, do you?
24  A. No, sir, I don't.

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

Case 1:04-cv-01394-GMS    Document 76-4    Filed 09/19/2005    Page 5 of 15

Conley                                              v.                                    Chaffinch, et al.
Gerald R. Pepper                          C.A. # 04-1394-GMS                        August 12, 2005

Page 66

1   Q.  In fact, she did have lengthy experience in the
2   patrol function in the southern half of the state; is
3   that true?
4   A.  Yes, sir.
5   Q.  Then you were also asked about Major Swiski,
6   and you indicated that you, yourself, had promoted
7   Major Swiski to that position; right?
8   A.  Yes, sir, I did.
9   Q.  And he was the budget administrative major?
10  A.  Right.
11  Q.  Is that the right word, budget administrator,
12  something like that?
13  A.  I understand.
14  Q.  The testimony in this case is that before he
15  was promoted, he did not have experience in that
16  particular office, budget administrative.
17          Do you recall whether that's true one way
18  or the other?
19  A.  I don't know what his -- he does have a college
20  degree.  I think everybody that was on staff at that
21  time had a college degree, minimum of a Bachelor's
22  degree, and I am not sure what his background would
23  have been.  I just can't recall.
24  Q.  Well, I think counsel was asking you about

Page 67

1   prior budget experience, and you may or may not, the
2   record would show, have indicated that he did have
3   prior budget experience?
4   A.  No.  He had --
5          MS. BALLARD:  Are we referring to Swiski?
6          MR. NEUBERGER:  Swiski, I am talking about
7   Swiski.
8   BY MR. NEUBERGER:
9   Q.  Are you sure as to whether he had prior budget
10  experience or not?
11  A.  No.  I don't think I said that.  What I said
12  was that he had -- we had a project.
13  Q.  I remember that.
14  A.  The Troop 2 project.
15  Q.  Right.  I heard you on that.
16  A.  He was very instrumental in that project,
17  moving that project along, meeting with the architect
18  and the people that were involved in the design and
19  whatnot, and then part of that administrative job was
20  dealing with capital projects.
21  Q.  I understand that.  And I think you did testify
22  to that at length.  But then I think counsel went into
23  another area that might have been unclear to you, and
24  that's what I am probing now.  I think counsel went

Page 68

1   into the fact that he had prior budget experience and
2   abilities, and I don't think he had those kinds of
3   assignments.
4          Do you know one way or the other?
5   A.  I don't think he had those kind of assignments.
6   He did -- I think I did testify that he had worked in
7   the internal affairs section under me as a lieutenant
8   colonel.  I found him to be a very thorough
9   investigator and detailed.  That kind of shined
10  through in the operation of the old Troop 2 under his
11  command, but then also in the handling of a major
12  project, I think it was about an $11 million project
13  for the new Troop 2.
14  Q.  Is it true that Major Swiski, his career would
15  have gone to one of these command schools, too?
16  A.  He did.
17  Q.  Is it true that in these three command schools
18  you were mentioning, that they teach you budget
19  things, for example?
20  A.  Yes, they do.
21  Q.  The Delaware State Police, and I think you may
22  have indicated this when I deposed you on a prior
23  occasion, the Delaware State Police is concerned with
24  developing well rounded managers to go up through the

Page 69

1   system; is that a fair statement?
2   A.  Yes, sir, at that time, yes, sir.
3   Q.  And when you were there and when the colonel
4   you served under as lieutenant colonel was there, you
5   were concerned with finding capable people and sending
6   them to command schools for training?
7   A.  Yes, sir.
8   Q.  And would Major Swiski have been one of those
9   people who went to a command school?
10  A.  I believe Major Swiski attended -- I am almost
11  certain he attended Northwestern.
12  Q.  So that's the same school that Barbara Conley
13  attended?
14  A.  Yes.
15  Q.  And while you were still serving there, Major
16  Swiski, is it fair to say he did a good job as the
17  administrative budget major?
18  A.  I found him to do a decent job.  But, again,
19  just so you understand the budget part of the Delaware
20  State Police, you have a staff, a staff that is --
21  that takes care of the finances and whatnot, the every
22  day, the payroll, that type of thing, and that
23  particular major oversees that function; okay?
24  Q.  Okay.

### Page 70

1  A. And, so, it's not like you have a major that's
2  doing the payroll and that type of thing, but you have
3  a major that is accountable for the audits that take
4  place for the special units, the -- the audits that
5  take place -- special duty, the general audits that
6  take place. The State Police does have a -- does
7  employ a comptroller, so that person, again, is --
8  works for the budget major, administrative major, or
9  did, at that time, but that major is also responsible
10 for -- or was then, at any given time, being able to
11 tell you -- tell the superintendent, okay, how much
12 money do we have in this particular area? Do we have
13 enough money to purchase how many cars? That
14 particular major was responsible for that and also
15 facilitating the purchase of things.
16         I think the purchasing section also fell
17 under the major, who was also, then, responsible for
18 making sure that we adhered to the bidding laws and
19 whatnot. So I give you that information just to clear
20 up any misunderstanding as to what an
21 administrative/budget major performed.
22  Q. You are telling me, first of all, that there
23 are civilian employees who work for the administrative
24 budget major?

### Page 71

1  A. Yes, sir.
2  Q. And the administrative budget major is not out
3  there crunching numbers and things like that; right?
4  A. That's correct.
5  Q. He's got people to do that for him, he or she?
6  A. For the most part, yes. And he or she is
7  responsible for being on top of that and knowing the
8  answers to some of the questions that may be put to
9  them.
10 Q. And there was nothing in Major Swiski's prior
11 background that prevented you from appointing him to
12 that position; right?
13 A. That's correct.
14 Q. And there was nothing in his prior background
15 that proved to be an obstacle to him successfully
16 completing the duties of that position?
17 A. That's correct.
18 Q. And, in fact, some of the things he would have
19 learned at Northwestern would have helped prepare him
20 for that position?
21 A. I would think so, yes, sir.
22 Q. Now, I think it was you that appointed Barbara
23 Conley as a director of traffic at the Delaware State
24 Police?

### Page 72

1  A. Yes, sir, it was.
2  Q. And while you were the lieutenant colonel at
3  one time, right?
4  A. Yes, sir.
5  Q. So that meant you had operational
6  responsibility for the Delaware State Police?
7  A. Yes, sir.
8  Q. And you had a major report to you who was
9  responsible for the director of traffic function;
10 right?
11 A. Yes, sir.
12 Q. And you were aware of the kinds of things the
13 director of traffic did?
14 A. Yes, sir, I was.
15 Q. I think, under you, did major -- did captain --
16 did Captain Baylor serve in the traffic function under
17 you as a director of traffic at some point in time?
18 A. Yes, sir.
19 Q. Aaron Chaffinch did, too; right? Maybe I am
20 wrong. No, it wasn't Aaron Chaffinch.
21         MS. CONLEY: He was in there. I am not
22 sure if it was under him.
23         THE WITNESS: I think that was under
24 Colonel Ellingsworth.

### Page 73

1  BY MR. NEUBERGER:
2  Q. Now, the director of traffic deals with large
3  capital grants of money from the Federal Government?
4  A. Yes, sir.
5  Q. Significant amounts of money; isn't that true?
6  A. Yes.
7  Q. It looks like Barbara Conley only served under
8  you in that function for three or so months; is that a
9  fair statement?
10 A. Yes, sir.
11 Q. So, you are not aware of how she has even
12 increased the federal grants and everything to the
13 State Police in subsequent years, are you?
14 A. No, sir, I am not.
15 Q. But several years of experience, serving as the
16 director of traffic, would they -- and the kinds of
17 things the director of traffic does, would they serve
18 as positive indicators that a person could be
19 performing the administrative budget function of the
20 Delaware State Police?
21 A. Again, it's -- you know, it would be something
22 that would be considered by the superintendent at the
23 time, but I am familiar with the functions of that
24 traffic section and there are quite a few

Page 74

1  administrative responsibilities, as you have outlined,
2  in coordinating the grants with the office of highway
3  safety and the purchasing of equipment for the troops.
4  So, that -- that could be a benefit.
5   Q.  It's not a disqualifying factor?
6   A.  That's correct.
7   Q.  And just to flip back to the operations major
8  for a second, in the Kent and Sussex County position,
9  I think counsel asked you a couple questions about
10 that, and you mentioned the geographic functionality,
11 the ability to handle incidents.
12      You are aware that Barbara Conley's entire
13 career has been based in the southern part of the
14 state; I think you told us that; right?
15  A.  That is correct.
16  Q.  And, so, even under your old standards, as far
17 as geographic functionality, I mean, she would be a
18 possible person who could be the operations major for
19 Kent and Sussex County?
20  A.  Yes, sir.
21  Q.  Because that's where her career was?
22  A.  Yes, sir.
23      MR. NEUBERGER:  I think that's covered it.
24 How about you, counsel?

Page 75

1  BY MS. BALLARD:
2   Q.  I literally just have a few more.
3       When you promoted Barbara Conley to
4  captain, I believe you previously testified that
5  potential captains were on a certain band.
6       Would she have had to have been on the
7  appropriate band to be promoted to captain?
8   A.  Yes.  Yes, ma'am.
9   Q.  And that was through a testing process;
10 correct?
11  A.  Yes, ma'am.  I believe that was, at that time,
12 that was a, what they call an assessment center.  That
13 was the process where you had an independent group
14 come in and do the -- through the entire process.
15  Q.  That's what generated the bands?
16  A.  Yes, ma'am.
17  Q.  Is Southern Police Institute the other third
18 school you couldn't think of?
19  A.  Yes, ma'am, it is.
20  Q.  You named the three schools.
21      Do you consider any one of them to be
22 better than the others?
23  A.  No, I don't.  No, I don't.
24  Q.  Are you aware that R.L. Hughes went to the

Page 76

1  Southern Police Institute?
2   A.  I can't remember that.  I recall that
3  subsequent to my retirement, or following my
4  retirement, I think he went to the FBI Academy.
5   Q.  Well, let me rephrase.
6       Are you aware that he went to one of the
7  three schools that you mentioned?
8   A.  Yes.  I am now, yes, ma'am.
9   Q.  Now, if I understood the gist of your testimony
10 previously, you couldn't sit here today, without
11 personnel files in front of you, and compare the
12 qualifications of Barbara Conley and R.L. Hughes;
13 correct, to be major?
14  A.  Yeah.  And that's kind of what I was getting at
15 when I was answering a question from Mr. Neuberger in
16 terms of putting one resume next to another.  It's
17 really up to the superintendent and the weight that he
18 or she would give.
19  Q.  And sitting here today, you don't have the
20 information on R.L. Hughes' background, experience,
21 education, that sort of thing, here with you today to
22 look at?
23  A.  No, ma'am, I don't.
24  Q.  And I assume you don't have information on the

Page 77

1  qualifications of other Kent and Sussex captains who
2  might be qualified to be promoted to major?
3   A.  No, ma'am, I don't.
4   Q.  As far as the administrative position goes,
5  does that major need to understand the nature of the
6  work the civilian employees under him or her are
7  doing?
8   A.  I think they need to understand the budget
9  process.  The reason I say that is that prior to being
10 assigned to that particular position, I can't remember
11 any of the -- the majors that were -- that served that
12 position having direct knowledge of each civilian
13 position under them prior to getting there.  I mean,
14 they had -- they had an idea in terms of how the
15 agency functioned in the budgetary process because
16 that's one of the things that we covered in every in
17 service for troopers right on up through the captains
18 with more of a concentration in the captain and
19 lieutenant rank.  But as far as getting back to your
20 original question, it's something that they probably
21 would hone or acquire the depth of knowledge once they
22 were in that position.
23  Q.  And the budget process you discussed, that
24 involves the various units, troops, etcetera, sending

20 (Pages 74 to 77)

Conley v. Chaffinch, et al.
Gerald R. Pepper   C.A. # 04-1394-GMS   August 12, 2005

Page 78
1  in budgetary requests, and I assume the administrative
2  major assesses those requests and puts it into the
3  budget?
4    A.  Prioritizes those requests because, you know,
5  there is never enough money to go all the way around.
6        MS. BALLARD:  That's all.
7        MR. NEUBERGER:  Well, to close, I want to
8  say something for the record to counsel and put
9  counsel on notice.  I mean, counsel was engaged in a
10 questioning today of this witness about personnel
11 files and things like this, credit cards, stuff like
12 this.
13       We have requested the personnel files of
14 my client.  We have requested the files of the two
15 comparators, and the documentary record would reflect
16 the fact that the defense has done nothing but stone
17 wall us.
18       MS. BALLARD:  Well --
19       MR. NEUBERGER:  Let me finish, stone wall
20 us on these files and we will be moving to compel the
21 production of these things.  We have dealt with the
22 issue of a confidentiality order.  You have blown us
23 off on all of this.  You can't have --
24       MS. BALLARD:  You don't need to put

Page 79
1  inflammatory comments on the record.
2        MR. NEUBERGER:  You can't have it both
3  ways.  I am putting you on notice here instead of a
4  letter, you can't have it both ways.  If you intend to
5  be trying to use these files, you better produce them.
6  We are, in due course, taking the issue to the judge.
7  You can say whatever you want on the record here, but
8  this is further notice that we are not going to forget
9  the issue of these files and you can't blind side us.
10       I will recess this deposition subject to
11 recall should there be anything in those files later
12 on that would have been appropriate at this deposition
13 had you produced them in the timely manner required by
14 the rules.  Now, can say whatever you want.
15       MS. BALLARD:  Sir, first of all, this
16 matter is totally inappropriate to be on the record at
17 a deposition.  However, I will respond.  We timely
18 responded to your discovery.  The records are in our
19 office, copied, ready to be sent to you.
20       MR. NEUBERGER:  Deliver them.
21       MS. BALLARD:  You have not engaged in any
22 discussion on the confidentiality order which we
23 discussed with you and with Steve Neuberger.  We made
24 changes suggested by Steve Neuberger to the

Page 80
1  confidentiality order and submitted that proposed
2  order to you.  We have had no response in I believe
3  it's six weeks.
4        MR. NEUBERGER:  The record will reflect
5  what it reflects.  You have said what you want to say.
6  That's fine.
7        Now, colonel, you have the right to read
8  and review the deposition should you want.  I think in
9  the past, you have just waived that right.  It just
10 makes it easier for you.  Which do you want to do?
11       THE WITNESS:  I trust that the record is
12 correct and I will waive that.
13       MR. NEUBERGER:  That's fine, then.  On
14 behalf of my client, I do want to thank you for your
15 cooperation today.
16       (The deposition was concluded at 12:05
17 p.m.)
18       - - - - -

Page 81
INDEX TO TESTIMONY

GERALD R. PEPPER                          PAGE

Examination by Mr. Neuberger              2, 53
Examination by Ms. Ballard                41, 75

- - - - -

INDEX TO EXHIBITS

(There were no exhibits marked for identification.)

                                          PAGE

CERTIFICATE OF REPORTER....................82

21 (Pages 78 to 81)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Gerald R. Pepper | C.A. # 04-1394-GMS | August 12, 2005 |

Page 82

Gerald R. Pepper

State of Delaware )
                  )
New Castle County )

CERTIFICATE OF REPORTER

I, Renee A. Meyers, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 12th day of August, 2005, the deponent herein, GERALD R. PEPPER, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed into typewriting under my direction.
    I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.
    I further certify that reading and signing of the deposition were waived by the deponent and counsel.
    I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

        Renee A. Meyers
        Certification No. 106-RPR
        (Expires January 31, 2008)

DATED: August 15, 2005

22 (Page 82)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
# v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

Thomas F. Marcin

August 10, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,              )
                                        )Civil Action
            Plaintiff,                  )No. 04-1394-GMS
                                        )
    v.                                  )
                                        )
COLONEL L. AARON CHAFFINCH,             )
individually and in his official        )
capacity as the Superintendent,         )
Delaware State Police, LIEUTENANT       )
COLONEL THOMAS F. MACLEISH,             )
individually and in his official        )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.         )
MICHELL, individually and in his        )
official capacity as Secretary of the   )
Department of Safety and Homeland       )
Security, State of Delaware; and        )
DIVISION OF STATE POLICE, DEPARTMENT    )
OF SAFETY AND HOMELAND SECURITY,        )
State of Delaware,                      )
                                        )
            Defendants.                 )
```

Deposition of THOMAS F. MARCIN taken pursuant to notice at the law offices of THE NEUBERGER FIRM, Two East Seventh Street, Suite 302, Wilmington, Delaware, beginning at 10:00 a.m. on Wednesday, August 10, 2005, before Renee A. Meyers, Registered Professional Reporter and Notary Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM
          Two East Seventh Street, Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. Marcin | C.A. # 04-1394-GMS | August 10, 2005 |

Page 2

```
 1  APPEARANCES (Continued):
 2      RALPH K. DURSTEIN, ESQ.
        DEPARTMENT OF JUSTICE
 3      820 North French Street
        Carvel State Office Building
 4      Wilmington, Delaware  19801
          for the Defendants Lieutenant Colonel
 5        Thomas F. MacLeish, David B. Mitchell,
          and Division of State Police
 6
    ALSO PRESENT: CHRISTINE WHITEHEAD
 7
 8          THOMAS F. MARCIN,
 9      the witness herein, having first been
10      duly sworn on oath, was examined and
11      testified as follows:
12  BY MR. NEUBERGER:
13  Q.  Could you state your full name for the record?
14  A.  Thomas F. Marcin.
15  Q.  And you are a retired lieutenant colonel of the
16  Delaware State Police?
17  A.  That's correct.
18  Q.  And I think I have taken your deposition
19  before.  Yes, I did, at least once?
20  A.  Yes.
21  Q.  And I have even called you as a witness or
22  cross-examined you in a trial?
23  A.  Yes, you did.
24  Q.  So you understand the process; is that a fair
```

Page 3

```
 1  statement?
 2  A.  Yes.
 3  Q.  Now, when did you retire from the Delaware
 4  State Police?
 5  A.  I retired in July -- end of July of '03.
 6  Q.  July of '03.
 7       And how many years had you served with the
 8  Delaware State Police?
 9  A.  Twenty-five.
10  Q.  And when you retired, you were the lieutenant
11  colonel; right?
12  A.  Yes.
13  Q.  And when did you assume that position as
14  lieutenant colonel?
15  A.  February of '02.
16  Q.  Oh, okay.  Right.  All right.
17       And is it true that the lieutenant colonel
18  has the day-to-day responsibilities for the
19  operational command of the Delaware State Police?
20  A.  Yes.
21  Q.  And prior to being a lieutenant colonel, you
22  were a major?
23  A.  Yes, I was.
24  Q.  And when did you become a major?
```

Page 4

```
 1  A.  I knew you were going to ask me these
 2  questions.
 3  Q.  Approximately?
 4  A.  When you are gone for two years, you somewhat
 5  forget.
 6  Q.  I understand.
 7  A.  I was -- I was a major for approximately five
 8  to six years.
 9  Q.  That's good enough.
10       And were you the major with operational
11  responsibility for New Castle County?
12  A.  Yes, I was.
13  Q.  And you must have been a captain before that;
14  right?
15  A.  Yes, I was.
16  Q.  And what positions did you hold when you were
17  captain?
18  A.  I was, for most of my tenure as a captain, I
19  was a commander at -- in our patrol troops.  I spent
20  the longest time, prior to being appointed major, as a
21  captain in Prices Corner Troop 6 for approximately
22  five and a half years.
23  Q.  And were there other troops that you commanded?
24  A.  Yes.  Troop 1, Penny Hill.  I also had command
```

Page 5

```
 1  responsibility for the community services section for
 2  approximately a year.  It may have been another
 3  command, and I don't recall at this point.
 4  Q.  And when you were -- well, a major was just
 5  solely New Castle County?  You didn't have any of the
 6  other major positions?
 7  A.  I did temporarily.  I had full state wide
 8  responsibility for -- for maybe seven or eight months
 9  when Major Joe Forrester retired in New Castle County,
10  and then I had state wide responsibility.  And then I
11  think Tom MacLeish was promoted to the rank of major
12  and then he assumed Kent and Sussex County command and
13  I just went back to my normal duties as New Castle
14  County major.
15  Q.  I have heard Major Forrester's name mentioned a
16  couple times.
17       When he was a major, was he responsible
18  for operations in Kent and Sussex?
19  A.  Yes, he was.
20  Q.  And then when there was a vacancy, you assumed
21  command for all of those three?
22  A.  I did.
23  Q.  And that was about eight or so months?
24  A.  I think it was maybe seven or eight months
```

2 (Pages 2 to 5)

Case 1:04-cv-01394-GMS    Document 76-4    Filed 09/19/2005    Page 13 of 15

Conley                                    v.                              Chaffinch, et al.
Thomas F. Marcin              C.A. # 04-1394-GMS                          August 10, 2005

Page 6

1  until they -- they promoted Tom MacLeish into the
2  position.
3    Q.  Well, there is a lawsuit that's presently
4  pending which has been filed by Captain Barbara
5  Conley.
6        Did you know her?
7    A.  Yes, I did.
8    Q.  And the lawsuit involves certain allegations
9  relating to things said or done by former colonel,
10 retired Colonel Aaron Chaffinch.
11       You know him; right?
12   A.  Yes.
13   Q.  And your name has been mentioned at least as a
14 witness to some things in that lawsuit.  So, that's
15 the purpose of the deposition today.
16   A.  I understand.
17   Q.  So, before I even get to the complaint, what
18 I'd like to do is I will just show you what was marked
19 at an earlier deposition as Plaintiff's Exhibit No. 3,
20 and it consists of four limericks, and I will just ask
21 you to read them over quietly to yourself, and then I
22 am going to ask you some questions.
23   A.  Okay.
24   Q.  Have you read that?

Page 7

1    A.  Yes, I did.
2    Q.  Did you ever hear now retired Colonel Aaron
3  Chaffinch recite any of those limericks?
4    A.  Not that I can recall, no.
5    Q.  No?
6    A.  No.
7    Q.  Let me show you what's marked as Plaintiff's
8  Exhibit 4 and show you another limerick; okay?
9        Have you read that over?
10   A.  Yes.
11   Q.  Have you ever heard Colonel Aaron Chaffinch
12 recite that limerick?
13   A.  No, I didn't.
14   Q.  No?
15   A.  No.
16   Q.  So, your testimony is you don't recall him
17 reciting the limerick?
18   A.  No, I don't.
19   Q.  Now, let me show you what's been marked as
20 Plaintiff's Exhibit 2, and this is sort of like a poem
21 or a song, okay, so I will ask you to quietly read
22 that over to yourself; okay?
23       Have you read that?
24   A.  Yes.

Page 8

1    Q.  Do you recall Colonel Chaffinch ever reciting
2  that poem or song?
3    A.  No, I don't.
4    Q.  Now, I took Colonel Chaffinch's testimony in
5  this case, and he indicated that the five limericks I
6  have shown to you on Exhibit 3 and 4, and the poem or
7  song on Exhibit 2, are things that he has recited from
8  memory off duty; okay?
9        Does that jog your memory any of whether
10 or not you may have heard any of those at parties or
11 social gatherings or things like that recited by
12 Colonel Chaffinch?
13   A.  No.  Even though, you know, I was, obviously,
14 his deputy superintendent for a year-and-a-half,
15 probably the only time that Aaron and I ever
16 socialized together was, I can recall, maybe in the
17 late summer, early fall of '02, after our promotion.
18 He had four tickets to an Orioles game.  He knew that
19 I was a baseball fan.  So he took myself and I think
20 Major Swiski and Major Baylor to the ball game.  And
21 other than -- other than attending some retirement
22 get-togethers that were departmental affairs and
23 things like that, we never socialized together.
24   Q.  And I think it is your testimony today that you

Page 9

1  don't recall his reciting any of those in the
2  headquarters building --
3    A.  No.
4    Q.  -- when he was a -- the colonel, lieutenant
5  colonel, or major?
6    A.  No, I don't.  The only -- the only rhyme or
7  riddle that I can ever recall him reciting was "Casey
8  at the bat."
9    Q.  Okay.  And there has also been testimony that
10 he has recited that.  You do recall hearing that?
11   A.  Yes.  Yes.
12   Q.  And would that have been at the baseball game?
13   A.  No, it wasn't at the baseball game.  He and I
14 were classmates.  We were both hired at the same time
15 in 1978.  After -- after our graduation from the
16 Police Academy, quite frankly, if I saw him once a
17 year, that was at a -- at a training function, that
18 was a lot.  And then we lost touch until -- until we
19 were on staff together years later.
20       So, I -- I really didn't have an occasion
21 to communicate with him.
22   Q.  So, what you are saying is that you both
23 graduated from the same academy class in '78; right?
24   A.  Correct.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. Marcin | C.A. # 04-1394-GMS | August 10, 2005 |

Page 10

1  Q.  And then you really, your careers really were
2  not intersecting until you became a member of the
3  executive staff?
4  A.  That's correct.
5  Q.  Now, who became a member of the executive staff
6  first, him or you?
7  A.  I did.
8  Q.  So, that would be approximately five or six
9  years before 2002.  '98?  '97?  Does that sound about
10 right?
11 A.  No.  It was later -- later than that.  Colonel
12 Pepper promoted me to the rank of major -- I am not
13 exactly sure of the year -- but then sometime after my
14 promotion to major, Colonel Chaffinch was also
15 promoted.
16 Q.  And when you were promoted to major, you had
17 operational responsibilities for New Castle County?
18 A.  Yes, I did.
19 Q.  And were you located in the headquarters
20 building?
21 A.  Yes.
22 Q.  And that's the building in Dover?
23 A.  Correct.
24 Q.  And then now retired Colonel Chaffinch was

Page 11

1  promoted to major; right?
2  A.  Yes.
3  Q.  And he had some sort of computer
4  responsibilities?
5  A.  Yeah.  He had responsibility for technology,
6  administrative services, I think.  His office was
7  located in another hallway in the building.  Same
8  floor, different hallway, that's all.
9  Q.  But your offices weren't next to each other?
10 A.  No, they were not.
11 Q.  So, you are saying, on a daily basis, you
12 weren't interacting a lot?
13 A.  No.  I mean, we didn't have a lot of need --
14 staff meetings, we would see each other, but there
15 wasn't -- his world really didn't, you know, relate
16 too much to mine at the time.  I mean, we were on the
17 same staff, did see each other at different functions,
18 but, again, we weren't socializing or anything like
19 that.
20 Q.  When you both became members of the executive
21 staff, there would be periodic executive staff
22 meetings; right?
23 A.  Yes.
24 Q.  That everybody would attend?

Page 12

1  A.  Yes.
2  Q.  But the frequency of your interaction with him,
3  you have just described for us; right?
4  A.  At that time, yes, sure.
5  Q.  Then he became -- well, let's go back.  There
6  was the time when he became the lieutenant colonel?
7  A.  Yes.
8  Q.  Under Gerry Pepper?
9  A.  Correct.
10 Q.  That was maybe sometime in 2000 -- early 2001;
11 does that sound about right?
12 A.  Sounds about right, yeah.
13 Q.  And then you would be serving under him?
14 A.  Yes, I did.
15 Q.  And I guess his office gets relocated somewhere
16 else?
17 A.  Yes.  Same hallway as me.
18 Q.  But is lieutenant colonel's office near the
19 colonel's?
20 A.  It's directly across the hall.
21 Q.  And you go up those steps there?
22 A.  Yes.
23 Q.  Then he is in command over you and your
24 interaction with him as a major would have just been,

Page 13

1  again, at those executive staff meetings?
2  A.  Correct.
3  Q.  Then he becomes the acting colonel on October
4  1st of 2001; does that about sound right?
5  A.  Yes.
6  Q.  And the lieutenant colonel position was left
7  vacant through the following February of 2002; right?
8  A.  He was technically still a lieutenant colonel,
9  paid as a lieutenant colonel, I am sure, but he was
10 the acting superintendent.  We didn't have a
11 lieutenant colonel at the time.
12 Q.  Right.  And then he becomes, I think it's
13 February, 2002, the governor announces he is becoming
14 the actual superintendent?
15 A.  Yes.
16 Q.  And then you are appointed the lieutenant
17 colonel?
18 A.  Yes.
19 Q.  Do you start interacting with him more then?
20 A.  Yes.
21 Q.  And during that period of time, from February,
22 2002, for about 17 months, you are the lieutenant
23 colonel; right?
24 A.  Yes.

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. Marcin | C.A. # 04-1394-GMS | August 10, 2005 |

Page 14

1  Q. And you are telling us that during that period
2  of time, you don't recall him reciting those limericks
3  or poems that I have just referred to?
4  A. No.
5  Q. You don't recall him doing that in the office?
6  A. No, not at all.
7  Q. You don't recall him doing that at any meetings
8  of the executive staff?
9  A. No. No. Not at all.
10  Q. Now, I think what we will do is I am going to
11  ask you about some things that may appear in the
12  complaint in this case. I am going to put a copy of
13  what was marked as Plaintiff's Exhibit 1 earlier in
14  these depositions in front of you and then we may
15  refer to some things.
16  A. Okay.
17  Q. The colonel has told us at his deposition that
18  he was a member of an organization named the Masons;
19  did you know that?
20  A. No, I didn't.
21  Q. You had no idea?
22  A. No.
23  Q. So we will skip over the Masons' questions.
24      There has been testimony that when Colonel

Page 15

1  Chaffinch was a major -- this is paragraph 39 of the
2  complaint -- that he was counseled for openly telling
3  a sexually explicit joke during a co-ed in-service
4  training class; did he ever tell you about that?
5  A. Yes. I don't know that he ever told me about
6  it or that it just ended up being common knowledge
7  throughout the department.
8  Q. Why don't you tell us what you know about --
9  this is on page 8 of the complaint, it's paragraph 39.
10  I think it had something to do with a vibrator and a
11  single woman living on a farm with her father or
12  something like that. I mean, what did you know about
13  that?
14  A. That's, essentially, what I recall. I don't
15  remember the year. I don't remember whether it was an
16  in-service training event or whether it was a Troop
17  meeting that he was attending. I remember hearing
18  that he told a sexually offensive joke and that he was
19  eventually disciplined for it.
20  Q. But you don't know if you heard that from the
21  colonel or not? You just know you heard it?
22  A. Yeah.
23  Q. That's fine.
24  A. I don't know if I heard it from him. I mean,

Page 16

1  it was -- it had made its way throughout the
2  department, and it was fairly common knowledge at the
3  time, I think.
4  Q. I have taken the deposition of a Captain Glenn
5  Dixon?
6  A. Yes.
7  Q. Did you know him as an officer?
8  A. Yes, I did.
9  Q. And did you find him to be a truthful person?
10  A. I never had any reason to doubt Glenn, sure.
11  Q. Well, in fact, the Delaware State Police, they
12  have a rule about being truthful?
13  A. Yes.
14  Q. So it's a serious matter being a trooper?
15  A. Yes.
16  Q. Did he have a reputation for being a truthful
17  officer?
18  A. Yes. Yeah.
19  Q. Now, he's testified that he actually had a
20  conversation with Colonel Chaffinch where the colonel
21  did explain that this did happen to him and he's given
22  us whatever the details might have been.
23      You weren't witness to that conversation,
24  were you?

Page 17

1  A. No, I wasn't.
2  Q. And you are saying you don't have a
3  recollection of whether you ever had such a
4  conversation with Colonel Chaffinch, yourself?
5  A. No, not about -- this wouldn't -- I am sure --
6  I think, maybe I am speculating here, that the telling
7  of the joke predated his appointment to
8  superintendent. I recall it being some time ago prior
9  to that. So, like I said, I am not sure at what
10  venue, where he said it. I just know that, you know,
11  he did tell a joke and it was -- it was dealt with
12  internally.
13  Q. Now, if we look at paragraph 38, we are still
14  on page 8 there, there was an earlier incident when
15  retired Colonel Chaffinch was a lieutenant where it's
16  alleged he was disciplined for participating in an
17  incident where a female bared her breasts for money at
18  a party. I mean, the testimony about this has been to
19  the effect of there was some sort of a retirement or
20  other off duty party, a lot of troopers attending,
21  would have been some drinking going on, and a female
22  trooper, you know, jumped up on top of a table and was
23  dancing around and removed her blouse or something.
24  Maybe people threw money at her or something like

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd.                Professional Court Reporters                (302)655-0477