Conley                                                                v.                                              Chaffinch, et al.
Colonel L. Aaron Chaffinch                              C.A. # 04-1394-GMS                                         June 6, 2005

Page 138

1  Police Workforce Statistical Analysis"?
2    A. Yes, sir.
3    Q. Do you see the fourth paragraph down, it talks
4  about "The Professionals EEO-4 Category includes
5  Lieutenants, Captains, and Majors"?
6    A. Okay.
7    Q. Do you see that paragraph?
8    A. Yes, sir.
9    Q. Do you see that it indicates that female
10 representation actually had decreased from 5.9 percent on
11 October 1st, 1999, to 5.3 percent on October 1st, 2001.
12 Do you see that?
13   A. Yes, sir.
14   Q. That was a correct statistic at that time,
15 wasn't it?
16   A. To the best of my knowledge.
17   Q. Then if we go on, I think we are going to stay
18 in that same paragraph, let's go to the next page, page
19 13, do you see where there's at the top there a grid of
20 female representation?
21   A. Yes, sir.
22   Q. Then underneath that, minority. Do you see
23 that?
24   A. Yes, sir.

Page 139

1    Q. Let's just look at the female. Okay?
2    A. Yes, sir.
3    Q. The paragraph after minority before leadership,
4  it starts: "This comparison indicates," do you see that
5  sentence?
6    A. Yes, sir.
7    Q. Let me read it to you. "This comparison
8  indicates that Delaware State Police is underrepresented
9  in all EEO-4 Categories when it comes to minorities."
10       Do you see that?
11   A. Yes, sir.
12   Q. Then it says: "The problem is even greater when
13 looking at female representation."
14       Do you see that?
15   A. Yes, sir.
16   Q. Then it indicates: "Delaware State Police is
17 underrepresented in all EEO-4 Categories for women, and
18 except for the Protective Services Category, the
19 percentage of female under-representation is much higher
20 than minority under-representation."
21       Do you see that?
22   A. Yes, sir.
23   Q. Those were correct statements at that time,
24 also, weren't they?

Page 140

1    A. To the best of my knowledge, yes, sir.
2    Q. When we go up to the female part of it at the
3  top where it says "Female Representation" and there's
4  four columns, EEO, labor market, Delaware State Police
5  percentage, and percentage available, do you see that?
6    A. Yes, sir.
7    Q. If we look under "Professionals," do you see the
8  second line, "Professionals"?
9    A. Yes, sir.
10   Q. Now, as I understand it, the "Professionals"
11 category would include majors. Do you understand that's
12 how the EEO works?
13   A. No, I really don't. I would have thought it
14 would have been under "Administrators," but maybe I'm
15 wrong.
16   Q. For now why don't we just accept my
17 representation that professionals includes majors, and
18 then it's saying the labor market availability in that
19 category is 55 percent. Do you see that?
20   A. Yes, sir.
21   Q. Then it says the percentage of females in the
22 Delaware State Police in that category is just 5 percent.
23 Do you see that?
24   A. Yes, sir.

Page 141

1    Q. Do you see the last column indicates that
2  they're 50 percent below the labor market availability in
3  the professionals category? Do you see that?
4    A. Yes, sir.
5    Q. That was a correct statistic at that time, too,
6  wasn't it?
7    A. To the best of my knowledge.
8    Q. All right. I think we are done with that.
9       Let's address the two promotions to major
10 that you made and that are at issue in this case. We are
11 going to start focusing on that process. Okay?
12      First of all, in her complaint, if we look
13 at Exhibit 1, let's turn to pages starting at the bottom
14 of page 3, paragraph 8.
15      You know that Barbara Conley was a graduate
16 of Caesar Rodney High School in Camden?
17   A. Yes, sir.
18   Q. You know that she holds two associate's degrees
19 in correctional science and police science from DelTech?
20   A. I didn't know that until I read this, but I know
21 it now.
22   Q. Are you aware that she was on the dean's list
23 with a GPA of 3.67 when she was there?
24   A. According to what I read, yes, sir.

36 (Pages 138 to 141)

Wilcox & Fetzer, Ltd.                       Professional Court Reporters                              (302)655-0477

A116

Case 1:04-cv-01394-GMS    Document 76-8    Filed 09/19/2005    Page 2 of 15

Conley                                                v.                                  Chaffinch, et al.
Colonel L. Aaron Chaffinch              C.A. # 04-1394-GMS                       June 6, 2005

Page 142

1  Q. You don't dispute that?
2  A. No, sir.
3  Q. You had information like that available to you
4  when you made the two promotions to major that were at
5  issue in this case; right?
6  A. Sure.
7  Q. You had her personnel file available to you?
8  A. That's correct.
9  Q. Aside from the fact that you had worked with her
10 over the years?
11 A. Yes, sir.
12 Q. Do you agree that when you made the two
13 promotions in this case, she had as part of her record
14 having been selected the outstanding criminal justice
15 student by former Superintendent James L. Ford, Jr.?
16 A. Was I aware of that then?
17 Q. Yes.
18 A. No.
19 Q. You don't dispute that that's a fact, do you?
20 A. No, I don't.
21 Q. Did you have that information available to you
22 at the time she was promoted to be a major?
23 A. Sure.
24 Q. She wasn't --

Page 143

1  A. I had her personnel file available as I did all
2  captains.
3  Q. At that time do you also agree that she held a
4  Bachelor of Science and a general studies degree from
5  Wilmington College?
6  A. I know she just recently finished that not too
7  long ago.
8  Q. Okay.
9  A. I know she was working on it.
10 Q. Did you know she had a high cumulative average
11 at Wilmington College?
12 A. It didn't surprise me when I saw what this
13 stated.
14 Q. This says she had an average of 3.87. You don't
15 disagree with that, do you?
16 A. No, sir.
17 Q. The Delaware State Police also sent her to
18 Northwestern University School of Police Staff and
19 Command; is that correct?
20 A. Yes, sir.
21 Q. When these promotions were made, you were aware
22 that she was a 1999 graduate of that school; right?
23 A. Yes, I sure was.
24 Q. Were you aware that she had an average, a grade

Page 144

1  average of 3.89 when she was there?
2  A. No, I wasn't, but I don't dispute it.
3  Q. That kind of information would have been
4  available to you when you made your promotions to major;
5  is that correct?
6  A. That's correct.
7  Q. Then we mentioned a little earlier paragraph 10,
8  the various duty assignments she had; right?
9  A. Yes, sir.
10 Q. You were aware of those duty assignments and
11 responsibilities she had when you made your promotions to
12 major; is that correct?
13 A. Yes, I was.
14 Q. So if we jump to March of 2003, Major Joseph
15 Swiski was the administrative budget major at that time;
16 right?
17 A. Yes, sir.
18 Q. Then he retired?
19 A. Yes, sir.
20 Q. Then somebody had to be selected to be his
21 successor; right?
22 A. That's correct.
23 Q. You selected Captain Paul Eckrich?
24 A. That's correct.

Page 145

1  Q. Then later on Lieutenant Colonel Tom Marcin
2  retired and you selected Thomas MacLeish to be your
3  lieutenant colonel; is that right?
4  A. Yes, sir.
5  Q. That created a vacancy in the position that Tom
6  MacLeish held?
7  A. That's correct.
8  Q. He was responsible for operations for Kent and
9  Sussex counties?
10 A. Yes, sir.
11 Q. Is it called field operations for Kent and
12 Sussex?
13 A. Either one is fine.
14 Q. You selected as his successor Captain Randall
15 Hughes; is that correct?
16 A. Yes, sir.
17 Q. What was the process that you and the Delaware
18 State Police followed at that time to fill those two
19 vacancies? Were there any written rules or regulations
20 that you issued?
21 A. No, sir.
22 Q. Were there any preexisting written rules or
23 regulations that guided you in selecting the person for
24 those two positions?

Page 146

1   A.   You mean that I may have inherited from the
2   previous superintendent?
3   Q.   Yes.
4   A.   Not to my knowledge.
5   Q.   I know, for example, that with reference to
6   lieutenants and sergeants, there's testing and there's
7   bands and things like that. At that time the Delaware
8   State Police was using that process for those ranks;
9   right?
10   A.   For sergeant, lieutenant, captain, yes.
11   Q.   And for captain, too?
12   A.   Yes.
13   Q.   I remember seeing information about boards of
14   people who might interview captain candidates.
15   A.   Okay.
16   Q.   That's true, isn't it?
17   A.   Yes, sir.
18   Q.   Now, for majors there wasn't that kind of a
19   process?
20   A.   No, sir.
21   Q.   I think you're telling me that for majors there
22   was no process that you inherited from any of your
23   predecessors as far as filling those two major vacancies?
24   A.   That's correct.

Page 147

1   Q.   Are you telling me that there's no process in
2   the union contract between the State Police and the union
3   that applies to filling the vacancies?
4   A.   I'm not telling you that, no.
5   Q.   Is there anything in the union contract?
6   A.   Not to my knowledge.
7   Q.   I know there's that handbook, the Delaware State
8   Police rules and regulations, it's like a two-volume blue
9   thing I've seen with rules and regulations about the
10   State Police. You are aware of that book; right?
11   A.   The administrative manual and the divisional
12   manual.
13   Q.   In those two manuals, was there any process that
14   guided your selection of the two majors for the positions
15   we are talking about?
16   A.   I think probably there may be something in there
17   about at the discretion of the superintendent, but
18   there's not any specific process, no.
19   Q.   So, for example, there was no preexisting rule
20   in writing that required that anybody selected for major
21   have a certain educational background?
22   A.   No, sir.
23   Q.   There wasn't anything in writing that required
24   that a person who was selected for major have any

Page 148

1   specific operational background?
2   A.   Well, I think it goes without saying you'd have
3   to be a captain.
4   Q.   Sure.
5   A.   You know what I mean. So that is one parameter,
6   you know. So you look at the captains in the agency to
7   make your selection and for the superintendent. And
8   certainly education and background and experience and
9   tenure all came into play with any selections that I made
10   for executive staff people.
11   Q.   So you're saying that when you had to select
12   anybody to be part of the executive staff, you considered
13   education, background, experience, and tenure?
14   A.   That's correct. Experience within the agency.
15   Q.   While that wasn't found in any preexisting
16   written document, those are factors you used?
17   A.   That's correct.
18   Q.   I guess I'm trying to find out: Were there
19   other factors you used besides those four?
20   A.   Well, by background I would mean where they have
21   been within their tenure as a trooper based on what
22   position I'm filling. I think you understand that. That
23   somebody that had been in an administrative position but
24   not necessarily in an operational position probably

Page 149

1   wouldn't get an operational job. You see what I'm
2   saying? Those kind of things come into play with any
3   selections that I would make for staff level positions.
4       And compatibility with other members of the
5   executive staff certainly would come into play, as well.
6   Q.   I'll put down as another factor compatibility
7   with the other members of the executive staff.
8   A.   Yes.
9   Q.   So that gives me five categories. Were there
10   any others that you considered?
11   A.   Not that I can recall.
12   Q.   I remember seeing in some of the other cases
13   affidavits or testimony talking about as people rise to
14   higher management levels in the State Police, it's
15   important that they have operational experience, meaning
16   like in patrol and actual on-the-road type experience.
17   That's a fair statement, isn't it?
18   A.   That's one very important facet, yes.
19   Q.   So that's important. Okay.
20       For example, with respect to Captain
21   Barbara Conley, we know from paragraph 10 on page 4 of
22   the complaint that's in front of you that she was a
23   patrol trooper for eleven years at Troop 5. Do you
24   remember that?

Case 1:04-cv-01394-GMS   Document 76-8   Filed 09/19/2005   Page 4 of 15

Conley                                                                    v.                                              Chaffinch, et al.
Colonel L. Aaron Chaffinch                                       C.A. # 04-1394-GMS                                      June 6, 2005

Page 150

1  A. Yes, sir.
2  Q. And then she was a patrol shift supervisor as a
3  sergeant --
4  A. Yes, sir.
5  Q. -- at Troops 3 and 5 for four years. Do you
6  remember that?
7  A. Yes, sir.
8  Q. Did you, by any chance, know what shifts that
9  would have been? I think when you were a shift
10 supervisor there was an A, B, C, and a D shift.
11 A. I have no idea.
12 Q. But these shifts back in that point in time, it
13 could be a night shift? It could be a day shift?
14 A. It probably was a rotating shift, but --
15 Q. Then her biography indicates that she was a
16 traffic lieutenant at Troop 5 for two or three years. It
17 says it included responsibilities for about 50 troopers.
18     What kind of responsibilities do traffic
19 lieutenants have, never having deposed one or anything?
20 What do traffic lieutenants do?
21 A. Well, they're in charge of the shifts, making
22 sure that the shifts handle the complaints that's
23 generated by the motoring public and by the citizens of
24 the area that we, you know, that we serve.

Page 151

1  Q. So, for example, you got your shift sergeants
2  are the first-line supervisors?
3  A. Yes. And the traffic lieutenant is the
4  second-line supervisor.
5  Q. So in a place like Troop 3 in Camden, would
6  there be more than one traffic lieutenant?
7  A. No, sir.
8  Q. So there's one there and all the shifts report
9  up through that traffic lieutenant?
10 A. Well, it may or may not be that way because
11 there's also a criminal lieutenant at each troop and
12 sometimes, depending on how the troop commander wishes to
13 do it, there may be two shifts that report to the
14 criminal lieutenant and two report to the traffic
15 lieutenant, just in the chain of command, you know. It
16 just depends. It's not etched in stone that the traffic
17 lieutenant would have all four shift commanders under
18 their bailiwick.
19 Q. Then she indicated that for two years in 1999
20 and 2000 she was the traffic lieutenant at Troop 5,
21 Bridgeville. Do you remember that?
22 A. Yes, sir.
23 Q. For part of that time you were the commander of
24 Troop 5?

Page 152

1  A. Yes, sir.
2  Q. So she would have reported directly to you at
3  Troop 5?
4  A. Yes, sir.
5  Q. I believe she indicated there were about 35
6  troopers who would have reported up through her. Does
7  that sound about right when you were there?
8  A. That's about how many people that were there for
9  the patrol function, yes.
10 Q. In the absence of the commander, meaning you,
11 did she substitute for you when you weren't there at
12 Troop 5?
13 A. She may have or the other lieutenant may, as
14 well, both of them.
15 Q. So, once again, at Troop 5 there would have been
16 two lieutenants, a criminal and a traffic?
17 A. That's correct.
18 Q. So is it your memory that in your absence either
19 one of the two lieutenants would substitute for you?
20 A. Yes. I mean, you know, I can't remember
21 specifics as far as who was on vacation or when I might
22 be on some other assignment or whatever the case might
23 be, but either one of them could have been acting as the
24 troop commander in my sted during my absence.

Page 153

1  Q. Okay.
2  A. Or if they were both working, they could have
3  done it together.
4  Q. So I think the record would show that from 1982
5  to 2000, a period of 18 years, Captain Conley was
6  involved in the patrol function at a troop. Would you
7  agree with that?
8  A. Yes, indeed.
9  Q. Right now, if my memory serves me right, I
10 remember at least an affidavit from Captain Yeomans --
11 Captain Yeomans, right now he's the director of personnel
12 at the State Police; right?
13 A. That's right.
14 Q. I remember at least an affidavit from him at
15 some length explaining the importance of being involved
16 in the patrol function prior to assuming leadership
17 positions in the Delaware State Police. He would be in a
18 position to know about that as a human resources person;
19 right?
20 A. That's correct.
21 Q. You, yourself, I think may have testified about
22 the importance of this in at least one of our prior
23 cases. Do you remember?
24 A. Well, the patrol function is the backbone of the

Case 1:04-cv-01394-GMS   Document 76-8   Filed 09/19/2005   Page 5 of 15

Conley                                   v.                           Chaffinch, et al.
Colonel L. Aaron Chaffinch         C.A. # 04-1394-GMS                 June 6, 2005

Page 154

1  division. However -- however, there are a lot of other
2  things that weigh heavily on our job, as well, that, you
3  know, we have to do and we have to do well. And so to be
4  more well rounded, other experiences are also good. Not
5  taking anything away from the patrol function, but other
6  experiences are also good other than patrol.
7     Q.  Let's talk about this position, the position
8  that went to Captain Randall Hughes very briefly. Okay?
9  He took the position of field operations in Kent and
10 Sussex counties. That was one of the majors you filled;
11 right?
12    A.  Yes, sir.
13    Q.  Did he have more or less than 18 years of
14 experience in the patrol function when he was promoted to
15 major? Do you remember?
16    A.  I'm sure he had less in the patrol function. I
17 don't know exactly how much, but he worked in the drug
18 unit. He had been a shift commander at both Troop 7 and
19 Troop 5. He's been lieutenant at Troop 5. He'd been at
20 the academy as -- in part of training. And he'd been a
21 troop commander at Troop 5. So, you know, and I don't
22 remember exactly how many years he has on patrol, but he
23 has a lot of other things that makes him a well-rounded
24 officer.

Page 155

1     Q.  So you're saying that Captain Hughes had
2  actually been a troop commander when he was promoted?
3     A.  Yes, he had.
4     Q.  You said that was at Troop 5?
5     A.  Yes, it was.
6     Q.  So was that the position he was promoted from to
7  major? Did he go from --
8     A.  Yes, sir.
9     Q.  How long had he served as the troop commander?
10    A.  Well --
11    Q.  If you remember.
12    A.  Yes. I'm not going to be able to tell you for
13 sure. He went there when I left in '99. So I would say
14 probably three years or so. Maybe a little more.
15    Q.  So he replaced you?
16    A.  He replaced me when I left -- I was a promotion
17 by Colonel Pepper.
18    Q.  Then when he went up to major, that's where
19 Captain Dixon replaced him?
20    A.  Yes, sir.
21    Q.  Okay.
22    A.  Yes, sir.
23    Q.  I think you're saying that when he went to
24 major, he probably had less than 18 years' involvement in

Page 156

1  patrol?
2     A.  If we can come up with the exact date that he
3  went to major, I can tell you how long he had on the job
4  because --
5     Q.  Do you know when he --
6     A.  September the 3rd, 1985, is when he came on the
7  job.
8     Q.  So he started about three years after Barbara
9  Conley started? She started in 1982?
10    A.  March of '82.
11    Q.  So he's her junior as far as tenure at the
12 Delaware State Police?
13    A.  That's correct.
14    Q.  So if tenure was a factor in that position, he
15 had less tenure than Barbara Conley did?
16    A.  Mm-hmm.
17    Q.  In background or experience, he was a troop
18 commander and that's certainly something she didn't have
19 in her background?
20    A.  That's correct.
21    Q.  Do you know how his educational record compared
22 to Barbara Conley's?
23    A.  He has a master's degree and he's a graduate of
24 the FBI National Academy, both.

Page 157

1     Q.  He's got a master's in what? Do you know?
2     A.  I think human resource management. It's either
3  that or public administration. I'm not sure which, but
4  it's -- I mean, it's apropos for administrative position
5  on executive staff.
6     Q.  When you say he's a graduate of the FBI academy,
7  how much time did he spend down there?
8     A.  The FBI National Academy runs 11 weeks. It's
9  almost like a semester of college.
10    Q.  This Northwestern University School of Police
11 Staff and Command where I know a lot of Delaware State
12 Police people go, how long is that training?
13    A.  I believe it's comparable. It's like -- I think
14 they have a split in between, but it's like five and five
15 or five and six or something with a little split in the
16 middle. But it's comparable. It's comparable. It's
17 another administrative school.
18    Q.  The Delaware State Police has historically sent
19 people to the FBI academy and to the Northwestern
20 University school? Is that a fair statement?
21    A.  Yes. Yes, sir.
22    Q.  Are there any other major police training
23 academies that historically your people have attended?
24    A.  Yes.

| Conley | | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | v.  C.A. # 04-1394-GMS | June 6, 2005 |

Page 158

1  Q. What would they be called?
2  A. The Southern Police Institute in Louisville,
3  Kentucky, and North Carolina -- I can't think of the name
4  of it, but we send them down to Raleigh, North Carolina.
5  We have in the past. We have some graduates from
6  whatever the name of that school is. I can't -- it's
7  North Carolina something. It has to do with command,
8  administrative police positions. And we do have
9  graduates from there.
10  Q. Okay.
11  A. And I'm sure there's others. That's the four
12  that I'm well aware of.
13  Q. So his educational background I'm sure would be
14  in his personnel record; right?
15  A. Yes.
16  Q. Would you have consulted the personnel records
17  of all the captains when you were making this decision
18  who to promote to replace Tom Marcin?
19  A. Tom Marcin?
20  Q. Yes. I'm sorry. Tom Marcin stepped out and Tom
21  MacLeish stepped up. I'm sorry. Replaced MacLeish.
22  Randall Hughes replaced MacLeish as field operations.
23    Would you have looked at all the personnel
24  files of all the captains when you were mulling over who

Page 159

1  to promote?
2  A. I could have. I could have, but I didn't.
3  Q. So you're saying that you had access to the
4  personnel files?
5  A. Yes. I've already testified to that today.
6  Q. But you did not look over the personnel files of
7  all the existing captains when you made the promotion for
8  Randall Hughes?
9  A. No, I did not. Not at all the captains, no.
10  Q. Well, how about when you made the promotion for
11  Paul Eckrich? When you made that promotion, did you
12  review all the personnel files of the existing captains?
13  A. Not all of them, no.
14  Q. Just to go back to Randall Hughes, were there
15  some personnel files that you looked at for him?
16  A. I looked at files both times.
17  Q. So which files did you look at for Randall
18  Hughes? Which personnel files? Of which captains?
19  A. Well, I can't really -- I don't know if I can
20  tell you all that I looked at.
21    But, first of all, let me just explain to
22  you. Probably if you're filling a position of Kent and
23  Sussex counties, you probably wouldn't look at a captain
24  that lives in Hockessin. You know what I'm saying?

Page 160

1  Q. Travel.
2  A. From a geographical standpoint. So I would have
3  looked at the downstate, Kent and Sussex counties',
4  captains what I would have looked at.
5  Q. That would have included Barbara Conley?
6  A. That's correct.
7  Q. Who else would it have included at that time?
8  A. Well, go back to -- then I got to try to
9  remember who the captains were. Some of them are
10  probably retired.
11  Q. Right. I guess it would have been Greg Warren?
12  A. Yes. Hawkins, Bobby Hawkins, Barbara Conley. I
13  don't think -- I don't know if Greg Nolt, N-o-l-t, was a
14  captain or not. If he was, I would have looked at it,
15  you know, if he was a captain in Kent and Sussex. So --
16  but going back to that time period, I'm not sure who
17  exactly was in those positions at that time, but I would
18  have looked at the Kent and Sussex ones.
19  Q. So are you telling me, then, that for this
20  position that Randall Hughes filled, you did look at the
21  personnel files for all the existing captains who lived
22  in either Kent or Sussex counties?
23  A. Yes.
24  Q. So you say you had those files brought to you as

Page 161

1  part of your selection process?
2  A. I went down and looked at them.
3  Q. Then for Paul Eckrich, his position as the
4  administrative budget major, did you eliminate any people
5  for geography reasons for that?
6  A. No, I wouldn't. Actually, that was an easy sell
7  because Paul had worked in that -- there's not many
8  people that work in administrative function that deals
9  with the finances of the State Police. And Paul had
10  worked in that capacity as a lieutenant under Colonel
11  Ellingsworth, so he had some experience in that capacity.
12    He also has a master's degree, as well, and
13  he's a graduate of the Southern Police Institute or
14  School of Command for State Police, or for law
15  enforcement.
16    So I wouldn't have looked -- I didn't
17  eliminate anyone, but that was -- that one was a quick
18  fix in my mind because of where he had been within the
19  agency. His degree, his undergraduate degree, if I'm not
20  mistaken, is in economics and he has his master's degree
21  in public administration and he had worked there and
22  under previous Major Michael McDonald, who was there
23  under Colonel Ellingsworth in that capacity. So he was
24  familiar with that.

41 (Pages 158 to 161)

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477

Page 162

1    And that was something that, as a
2  superintendent, I wasn't that familiar with. I worked a
3  short time in staff support and learned a little bit of
4  that function, but to be involved with the joint finance
5  committee and different things that the bond bill
6  committee and state government, I hadn't. So I needed
7  somebody with some experience. And as an underling of
8  Major McDonald when he was in that position, he was the
9  right man for the job.
10     Q.  Major Swiski preceded him in that position;
11  right?
12     A.  Yes.
13     Q.  What was Major Swiski's experience in those
14  functions when he became the administrative budget major?
15     A.  As far as I know, he didn't have any, but I
16  didn't select him.
17     Q.  But the point is, I guess, Major Swiski
18  performed the position admirably? Is that a fair
19  characterization?
20     A.  Yes, yes. And I talked with Major Swiski before
21  I made the selection of Captain Eckrich to go in that
22  position.
23     Q.  I guess what I'm saying is Major Swiski
24  performed the job appropriately? You told me that;

Page 163

1  right?
2     A.  He did well while I was there, yes.
3     Q.  He didn't have any prior experience in the
4  function is what I'm saying?
5     A.  No, sir.
6     Q.  What kind of educational background did he have?
7  Did he have a master's in administration and things like
8  that?
9     A.  I'm not sure that he has a master's. I don't
10  believe that he does, but I can't say 100 percent for
11  sure. I'm sure that he has a bachelor's. I'm not sure
12  about a master's.
13     Q.  So would you agree with the statement that
14  people have successfully held that position in the past
15  who did not have any background in the administrative
16  budget function?
17     A.  Yes, sir.
18     Q.  You thought that having background in the
19  function was a plus.
20     A.  I sure did.
21     Q.  For Mr. Eckrich?
22     A.  I sure did.
23     Q.  Now, just staying on Major Eckrich for a second,
24  was his tenure more or less than Barbara Conley's in

Page 164

1  1982?
2     A.  He's -- awhile ago I think I said -- I might
3  want to change something because I think I might have
4  said that Captain Hughes came on in September of '85, but
5  that's not right. He came on in March of '85.
6     Q.  Okay.
7     A.  I want to retract that. Paul Eckrich came on
8  September the 3rd of 1985.
9     Q.  So how does somebody come in in March? I
10  thought your school sort of ends and you come in in
11  September.
12     A.  Back then they had two classes in 1985. They
13  have had as many as three classes if you go back far
14  enough.
15     Q.  Okay.
16     A.  In the recent past we haven't.
17     Q.  So both of them are about three years junior to
18  Captain Conley's tenure. Is that a fair statement?
19     A.  Time on the job, yes.
20     Q.  You mentioned some of the administrative
21  experience Captain Eckrich had. What was the duration of
22  his experience in the patrol function? How long had he
23  served in patrol?
24     A.  I'm not sure. Like all troopers he started in

Page 165

1  patrol like everyone does. At some point in time, and I
2  can't -- I can't tell you off the top of my head. He was
3  in the youth division as a criminal detective and I know
4  that he was a shift commander for a time at Troop 4, so
5  he was back in patrol at that time. He was also a
6  traffic lieutenant at Troop 7 for a time. And he was
7  criminal lieutenant at Troop 5 for a time. So the
8  criminal lieutenants and the traffic lieutenants out of
9  patrol troop both have interaction daily with the patrol
10  officers.
11     Q.  Would you agree that he had less than the
12  18 years of patrol experience that Barbara Conley had, or
13  do you know?
14     A.  I would agree that he would have less because
15  there's not many troopers on the job that have 18 years
16  of patrol because they have wherewithal to go in other
17  areas.
18     Q.  Are you indicating that it was a negative on
19  Barbara Conley's record that she had 18 years of
20  experience on patrol?
21     A.  I'm indicating that if you go into other areas
22  of the agency, you become more well rounded as an
23  officer, so you can help different functions. Patrol
24  officers come in to play with criminal complaints,

Case 1:04-cv-01394-GMS    Document 76-8    Filed 09/19/2005    Page 8 of 15

Conley                                                                              Chaffinch, et al.
Colonel L. Aaron Chaffinch          C.A. # 04-1394-GMS                              June 6, 2005

Page 166
1  traffic complaints, fatal accidents, all kinds of things.
2  But if you have background in criminal, you can help them
3  to write a search warrant. I mean, there's a lot of
4  different areas. The more you get, the more well rounded
5  you are, the better you are as an administrator. That's
6  what I'm indicating. Not to take anything away from the
7  patrol function as you heard me say earlier. It is the
8  backbone of the agency. Everyone starts there.
9     Q. Once again, we'll check the record on what
10 Captain Yeomans said about patrol and I believe you
11 testified on it at an earlier time. That's helpful.
12 I'll look at that.
13       How about this factor of compatibility with
14 other members of the executive staff? Let's focus on
15 Major Hughes here for a second. Okay?
16       Did you believe he would be more compatible
17 with other members of the executive staff than Barbara
18 Conley?
19    A. Not necessarily.
20    Q. So you --
21    A. But if I was looking at someone that wasn't
22 compatible with somebody on the agency, on the executive
23 staff, I wasn't. But if I was, that would have played
24 into it.

Page 167
1     Q. Okay.
2     A. In this particular case, it did not.
3     Q. So I think you're saying that there was nothing
4  to disqualify Barbara Conley for the promotion in the
5  area of compatibility?
6     A. I wouldn't think so.
7     Q. Then for the position that went to Captain
8  Eckrich, was there anything on this question of
9  compatibility with the other members of the executive
10 staff that would have disqualified Barbara Conley for
11 that position?
12    A. Not that I know of.
13    Q. Did you rank anybody when you were making your
14 decision on who you were going to promote?
15    A. No.
16    Q. Was Eckrich your first choice for that position?
17    A. Sure.
18    Q. I just want to make sure nobody turned you down
19 or anything.
20    A. Nobody turned me down.
21    Q. So Hughes was your first choice, too?
22    A. Yes, sir.
23    Q. Was there a second choice in case they did turn
24 you down?

Page 168
1     A. I would have went back to the drawing board if
2  they had turned me down, but I didn't have to.
3     Q. You didn't have a second place finisher in your
4  mind?
5     A. No, sir. If somebody turned me down, then I
6  would have had to regroup and checked out personnel files
7  and made a second decision. But I didn't have to.
8     Q. Well, as you know, in some of the lesser
9  position there's A bands, B bands, C bands, there's
10 people that get the highest score, that kind of a thing.
11       You are just telling me you did not rank
12 the eligible people in any fashion?
13    A. Sure didn't.
14    Q. Did you assign points to people as you were
15 evaluating these five factors that you identified?
16    A. No, sir.
17    Q. So, for example, five factors, is 20 percent of
18 it education, 20 percent background, 20 percent each of
19 the other factors?
20    A. No.
21    Q. So you didn't have any objective measure like
22 that that you were using?
23    A. There's no process in place, as we've already
24 talked about.

Page 169
1     Q. Was it left up to your best judgment and
2  discretion in evaluating the people to determine who was
3  best qualified?
4     A. I would say that's a fair statement.
5     Q. Now, you didn't have to report to anybody and
6  justify that decision, did you?
7     A. I had to get an okay from the cabinet secretary.
8     Q. So that would have been Secretary Ford at the
9  time?
10    A. Yes, it would have.
11    Q. So once you decided to promote them, did you
12 discuss it with Secretary Ford first?
13    A. Yes, I did. I wouldn't go telling anybody that
14 I'm going to promote them until I have the okay to
15 promote them. That's just -- you don't do that. I went
16 and talked to Colonel Ford or Secretary Ford at the time
17 and got his blessing.
18    Q. So it's your testimony you had to have his
19 approval to make the promotions?
20    A. Well, these are promotions to the executive
21 staff.
22    Q. Yes.
23    A. You don't make any promotions to executive staff
24 without consulting the cabinet secretary. I mean, there

Page 170
1  could be a reason that -- there could be a reason that
2  for whatever reason, economically or financially, you
3  can't make a promotion right now even though you have an
4  opening or whatever. So that's why you go and run it by
5  the cabinet secretary. If the cabinet secretary says yes
6  or no, you can go ahead with it. And that's what he
7  said, so I did.
8     Q.  Did you tell him before you talked to Eckrich or
9  Hughes?
10    A.  Yes. He told me I could do it before I talked
11 to Eckrich or Hughes, yes.
12    Q.  What I'm asking: Did you do that as a courtesy
13 to Ford or is that required?
14    A.  When you're making a new member of the executive
15 staff, I don't know if there's anything written, but I
16 would certainly not make a new major without consulting
17 with the cabinet secretary. I just wouldn't do that.
18    Q.  Well, it's your staff, not his.
19    A.  That's right. That's right. But it's his --
20 he's one of the -- he's the head of all the division
21 directors that come under the cabinet and he knows
22 whether or not you can do that at this time or whatever.
23        Just like, for example, Dave Baylor left
24 and we didn't fill his position. I would have liked to

Page 171
1  have been able to fill that position and had a new
2  operations officer for New Castle County, but I couldn't
3  do that.
4     Q.  Right.
5     A.  So for the same reason I go to Colonel Ford and
6  he tells me to go ahead and I make the promotions.
7     Q.  Did he ask you if you had gone through any
8  process or anything in choosing who you wanted to select?
9     A.  No, he did not. He agreed with me and said, "Go
10 for it. Go for it."
11    Q.  Is it fair to say that the decision was left to
12 your subjective best judgment?
13    A.  Yes.
14    Q.  These criteria you identified, the five
15 criteria, are they just based upon your experience
16 working within the agency?
17    A.  And knowing the people that worked for the
18 agency, yes.
19    Q.  What I'm saying is you developed these five
20 criteria; right?
21    A.  Yes, sir.
22    Q.  Did you develop that on your own or did you list
23 it somewhere from a book you read or --
24    A.  I already explained. There was no process, sir.

Page 172
1     Q.  I understand, but I'm --
2     A.  It was from me.
3     Q.  It was from you. Okay.
4         You didn't check, for example, with Lisa
5  Blunt-Bradley of the State Personnel Office before you
6  made your decision?
7     A.  Certainly not.
8     Q.  How about Greg Chambers, do you know who Greg
9  Chambers is?
10    A.  Yes.
11    Q.  One of the things in the Bradley report was that
12 Greg Chambers was supposed to get involved with the
13 personnel function. Do you remember that portion, his
14 job title was supposed to get involved with the personnel
15 function at the State Police? Do you remember that being
16 in the Bradley report?
17    A.  Yes, sir.
18    Q.  When you had to fill these two vacancies for
19 major, was Greg Chambers consulted?
20    A.  No, he was not.
21    Q.  So when you came up with these five criteria to
22 follow in making the promotion to major, you did not
23 consult with Greg Chambers or his office; is that right?
24    A.  That's correct.

Page 173
1     Q.  When you made up this criteria as to how you
2  were going to select a major, you did not check with the
3  state personnel director?
4     A.  No, sir.
5     Q.  I don't remember if Miss Bradley would have
6  still been there at this time in --
7     A.  Yes, she would have, I believe.
8     Q.  So she was still available at that time, you
9  think; right?
10    A.  Yes. I don't answer to her.
11    Q.  Well, weren't there changes in the Bradley --
12    A.  There were recommendations.
13    Q.  There's no recommendation in there that made you
14 answer to her in the promotion process at the State
15 Police?
16    A.  No, sir. We revamped the whole promotion
17 process.
18    Q.  There's no recommendation in there that mandated
19 that the State Personnel Office be involved in the
20 promotion process indefinitely into the future at the
21 Delaware State Police?
22    A.  There's not anything mandated. They are
23 recommendations.
24    Q.  Was there a recommendation in there that the

Page 174
1  State Personnel Office stay involved in the promotion
2  function of the Delaware State Police?
3      A.  I'd have to read it again, but I don't believe
4  it was specific to the promotional process.  It was
5  specific to staying in contact with our human resource
6  section, which I'm sure that Captain Yeomans and Greg
7  Chambers stay in contact fairly regularly, even to this
8  day.
9      Q.  Okay.
10     A.  If Greg Chambers is still in that position, and
11 I'm not sure of that, quite honestly, as I sit here
12 today.
13     Q.  You didn't have any consultations with Greg
14 Chambers.  You told us that?
15     A.  I didn't have any consultation with anyone
16 except for Colonel Ford, Secretary Ford.
17     Q.  So you didn't consult with John Yeomans?
18     A.  I looked at the personnel files, which is a part
19 of his office.
20     Q.  Well, did you sit down and say, John Yeomans,
21 these are the five factors I'm going to use in making my
22 promotions to major, do you agree with them?
23     A.  I sure didn't.
24     Q.  You felt that would be interfering with your

Page 175
1  prerogatives, your authority?
2      A.  I didn't feel one way or the other.  I just
3  didn't do it.
4      Q.  Well, the Bradley report, I think you indicated,
5  made certain recommendations about getting the state
6  personnel director involved or Mr. Greg Chambers' office
7  involved in the personnel function.
8          I think we agreed on that a little earlier;
9  is that right?
10         MS. BALLARD:  I object to the question to
11 the extent you are asking him about something specific in
12 the report.  It probably would be better if you refer him
13 to --
14         MR. NEUBERGER:  Well, thank you, Counsel.
15 We'll just move on.  Thanks for your objection.  You have
16 it for the record.
17         MS. BALLARD:  Thank you.
18         MR. NEUBERGER:  Okay?
19         Now, why don't you read the question back?
20         (The reporter read from the record as
21 requested.)
22     A.  Yes, we agree on that.
23 BY MR. NEUBERGER:
24     Q.  Now, I'm asking you:  Did John Yeomans consult

Page 176
1  with them prior to your making these two promotions to
2  major?
3      A.  They sure didn't.  Not to my knowledge.  I don't
4  know why I would.
5      Q.  You didn't bring him into the loop?
6      A.  Sure didn't.
7      Q.  After the fact, did you submit any information
8  to the state personnel director's office, Greg Chambers'
9  office, about the choices you had made for major?
10     A.  No, sir.
11     Q.  After the fact, did you write down in any form
12 whatsoever the reasons why you selected Major Eckrich or
13 Major Hughes?
14     A.  No, sir.
15     Q.  So you made no contemporaneous record of the
16 reasons why you selected those two people?
17     A.  No, sir.
18     Q.  After the fact, did you send an e-mail to the
19 members of your executive staff documenting the reasons
20 why you selected these two people?
21     A.  No, sir.
22     Q.  After the fact, did you send an e-mail to
23 retired Colonel Ford explaining why you had selected
24 these two people?

Page 177
1      A.  No, sir.
2      Q.  Before the fact, did you send an e-mail to
3  Colonel Ford indicating the reasons why you wanted to
4  select these two people?
5      A.  No, sir.
6      Q.  So as far as understanding what the reasons were
7  why you selected these two people, we have to rely on
8  your memory?  You didn't put it in writing anywhere?
9      A.  No, sir.
10     Q.  After the fact, did you sit down and talk with
11 anybody and explain these five reasons you were using to
12 select people?
13     A.  No, sir.
14     Q.  So there is no witness to an oral conversation
15 with you as to what factors you were using to make these
16 promotions?
17     A.  No, sir.
18     Q.  So as far as corroboration for these reasons,
19 factors for making a promotion, there's no
20 contemporaneous document we can point to; right?
21     A.  No, sir.
22     Q.  There's no witness to a conversation with you we
23 can point to; right?
24     A.  Other than getting the okay to go ahead with the

45 (Pages 174 to 177)

**Page 178**

1 promotion from the Secretary of Safety and Homeland
2 Security James Ford, no.
3   Q.  So if I asked you for the record what were the
4 reasons for selecting Hughes, what would you explain as
5 the reasons why you selected Hughes?
6   A.  I don't know if I can tell you exactly the five
7 that are there.  Tenure, background, education --
8   Q.  The five are:  First was education, second is
9 background, third is experience within the Delaware State
10 Police, fourth is tenure, and fifth is compatibility with
11 other members of the executive staff.  Okay?
12       With that as a help, what were the reasons
13 why you selected Major Hughes?
14   A.  Okay.  Well, his tenure within the agency was
15 very well rounded.  He -- like I explained earlier, he
16 had been to the academy as the assistant director of the
17 academy, so he had been involved in training.  He'd been
18 in special investigations as a drug officer, so he had
19 experience in criminal investigations.  He had been a
20 patrol sergeant and run a shift at Troop 7.  He had been
21 a traffic lieutenant at Troop 5.  He had been a troop
22 commander at Troop 5.  He was a graduate of the FBI
23 National Academy.  He attained a master's degree in
24 public administration.  And he had worked his entire

**Page 179**

1 career in Kent and Sussex counties and he was familiar
2 with the area and the other troopers and the other
3 administrators of those troops.
4   Q.  Are there any other reasons?
5   A.  I thought he would be compatible with the other
6 staff members.  I think I've hit -- I hit on experience.
7 I hit on his background.  I hit on his tenure and his
8 education.  So I guess that there's not any others.
9   Q.  I'm just trying to be thorough.
10   A.  Loyal to the superintendent.
11   Q.  Excuse me?
12   A.  Loyal to the superintendent.
13   Q.  Is it fair to say that that's an additional
14 factor, or is that just within the other ones?
15   A.  That's within the others.
16   Q.  So loyal to the superintendent.  What do you
17 mean by that?
18   A.  Well, I had worked close with him and I knew
19 that he would support me in my position as
20 superintendent.  He would also do a good job.  He's
21 always been a go-getter.  He was one of the biggest
22 workers on the road when he was on the road.  He wrote
23 his share of traffic citations.  And he -- you know, he
24 did a lot of criminal work.  And I'll put his record up

**Page 180**

1 against anybody in the agency as far as work and
2 experience on the Delaware State Police.
3   Q.  It's just that today is the time for you to give
4 all the reasons.
5   A.  I suppose it is.
6   Q.  So are there any other reasons why you selected
7 him over the other people?
8   A.  Not that jump right out at me.  I think I've hit
9 on them all.
10   Q.  Now, if we go to Major Eckrich, how about giving
11 me the reasons why he was selected for the position?
12   A.  Okay.  From education standpoint, he's got a
13 master's -- a bachelor's and a master's degree.  He's a
14 graduate of Southern Police Institute in Louisville,
15 Kentucky, which is a command school for law enforcement
16 administrators.  He's -- he had worked patrol.  He had
17 worked as a patrol supervisor, a shift commander.  He had
18 worked at both as a criminal lieutenant and a traffic
19 lieutenant.  And he'd been a troop commander.  And I had
20 worked closely with him and I knew that he would be loyal
21 and -- loyal to me and we would be a good team to be a
22 part of the executive staff.
23   Q.  You mentioned loyal two times, so I do want to
24 ask you about that.

**Page 181**

1       You worked with Barbara Conley over your
2 career, too?
3   A.  Yes, I have.
4   Q.  Is there any reason for you to think she
5 wouldn't be loyal to you if she was selected?
6   A.  No, there's not.
7   Q.  So are they all the reasons for Major Eckrich?
8   A.  The other reason that we talked about earlier is
9 the fact that he had been in that position as a
10 lieutenant and that is a -- that is a large factor in my
11 decision.
12   Q.  So just so you understand I'm being fair with
13 you, if there's anything else you said earlier, we'll
14 include that in reasons why he was selected.  Okay?
15   A.  Yes, sir.
16   Q.  Is there anything else that you remember was a
17 reason why he was selected?
18   A.  No, sir.
19   Q.  Did you look into his disciplinary record?
20 Let's say Eckrich right now.  Did you check and see
21 whether he had any violations, suspensions, or things
22 like that in his record?
23   A.  I'm pretty sure he doesn't have any, but I
24 couldn't tell you exactly for sure, but if he has

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 182
1  anything, it's got to be very, very minor. The same with
2  Major Hughes.
3      Q.  Where does one look to find out?
4      A.  The personnel file.
5      Q.  So, for example, if you dented the fender of the
6  patrol vehicle or something, that's something you could
7  get written up for?
8      A.  That's right. I got written up for it.
9      Q.  Or you miss a court appearance or something?
10     A.  That's right.
11     Q.  There are various rules and regulations of the
12 State Police that regulate conduct of troopers; right?
13     A.  Yes.
14     Q.  So you can commit a violation and then be
15 disciplined in various ways; right?
16     A.  That's correct.
17     Q.  For this position of major, would you have
18 looked at that part of the personnel file that deals with
19 these kinds of minor infractions?
20     A.  Yes, but I can't sit here today and tell you
21 what I saw because it's been so long ago.
22     Q.  Well, is there some kind of a threshold or
23 something? What if a person does have some
24 infractions -- let's say over a 20-year career they do

Page 183
1  have --
2      A.  It would depend on what the infractions were.
3  And I can tell you neither one of those captains that
4  subsequently became majors have anything that would be --
5  you know, that would scratch them from consideration.
6      Q.  Right. But it is something you look at is what
7  you are telling me, you would?
8      A.  And I did.
9      Q.  You're saying there was nothing in their
10 personnel record that would have eliminated them from
11 consideration?
12     A.  That's correct.
13     Q.  Do you remember whether there was an
14 accumulation of suspensions, be it one day or two days,
15 in their records?
16     A.  No, I don't remember sitting here today. It's
17 over two years ago, or nearly two years ago. And I can't
18 tell you what was in there. I'm sure they may well have
19 missed a court appearance as you used as an example
20 earlier, but there was nothing significant.
21     Q.  Nothing significant. Okay.
22         Do you agree that my client, Barbara
23 Conley, was qualified at that time to be a major?
24     A.  All captains were qualified.

Page 184
1      Q.  For example, you may not be aware of this, but
2  present-Colonel MacLeish sent out a notice to all the
3  captains last week indicating that he was taking
4  applications to be promoted to major, that there were two
5  positions he was going to fill and that anybody
6  interested should apply by June 17th. So just accept
7  that as a fact. Okay?
8          That seems to imply that this e-mail sent
9  to 19 captains indicates that they are qualified to
10 apply. Let me ask you about your policies. Okay?
11         Were you saying that when you were making
12 this decision as who to promote to major, that all the
13 existing captains were qualified to be promoted to major?
14     A.  Yes, I am.
15     Q.  Thank you. Okay.
16         It's your testimony that you selected the
17 most qualified persons?
18     A.  That's correct.
19     Q.  Got you.
20         You weren't even making people apply or
21 tell you whether they were interested at the time or not?
22     A.  Not at that time, no.
23     Q.  You knew who the captains were and you
24 considered all the captains?

Page 185
1      A.  That's correct.
2      Q.  That's correct?
3          MR. LIGUORI:  With regard to the
4  reservation that he said earlier about geography.
5          MR. NEUBERGER:  Yes, yes, with that
6  understanding, right, right. Exactly.
7          Let's take a break. Okay?
8          (A recess was taken at this time.)
9  BY MR. NEUBERGER:
10     Q.  You understand that you can't refuse to promote
11 a woman because she's a woman; right?
12     A.  That's correct.
13     Q.  You understand that the United States
14 Constitution would prevent that; right?
15     A.  That's correct.
16     Q.  You know that's illegal under state law; right?
17     A.  Yes, sir.
18     Q.  You know that would violate what we call the
19 14th Amendment, right to equal protection under the laws;
20 right?
21     A.  Yes, sir.
22     Q.  That's part of your police training to
23 understand that; right?
24     A.  Yes, sir.

47 (Pages 182 to 185)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 186
1  Q. You explained about that you felt Barbara was
2  loyal a few minutes ago; right?
3  A. Yes.
4  Q. Your successor as colonel is Tom MacLeish who
5  has worked under you for a while; right?
6  A. Yes, sir. And I've worked under him.
7  Q. Really?
8  A. Yes.
9  Q. When was that?
10 A. When I was a lieutenant and he was a captain.
11 Q. He's been around a long time?
12 A. Longer than I.
13 Q. Are you aware of whether Tom MacLeish has ever
14 indicated to you that he thought that Barbara Conley was
15 a disloyal person?
16 A. No, sir.
17 Q. He's never expressed that kind of a sentiment to
18 you, has he?
19 A. No, sir.
20 Q. In fact, he's never expressed a sentiment to you
21 that he's angry with Barbara?
22 A. No, sir.
23 Q. Has he ever indicated to you that he's mad at
24 Barbara?

Page 187
1  A. No, sir.
2  Q. Has he ever indicated to you that he's mad at
3  Barbara because she filed this lawsuit?
4  A. No, sir.
5  Q. There's an aspect of this lawsuit that I'm not
6  going to cover today. It deals with the leak of some
7  confidential Internal Affairs information about Barbara,
8  but Tom MacLeish is a defendant in that. Are you aware?
9  A. I've heard about it, yes.
10 Q. We are not going to go into that with you, but
11 has he ever indicated to you that he's angry at Barbara
12 for bringing the lawsuit involving him?
13 A. No, sir.
14 Q. Has he ever indicated to you that he's angry at
15 Barbara because she brought this lawsuit and involved you
16 with it?
17 A. Say that again.
18 Q. Has he ever indicated to you he's mad at Barbara
19 because she sued you?
20 A. No, sir.
21 Q. Is it fair to say that you and he are friends?
22 A. Yes, sir.
23 Q. I think I saw a thing in the Delaware State News
24 once that maybe your family at his son's basketball game

Page 188
1  or something like that, you guys sitting in the stands
2  together or something like that.
3    Do you go to sporting events together?
4  A. That's the only one we ever went to, but we got
5  our picture in the paper.
6  Q. But he's never told you --
7    MR. LIGUORI: It's the Delaware State News.
8  Q. He's never told you he couldn't work with
9  Barbara, has he?
10 A. No, sir.
11 Q. Has he ever told you he couldn't work with her
12 as a member of the executive staff?
13 A. No, sir.
14 Q. Do you believe that there's any animosity at all
15 that he bears towards Barbara?
16 A. Not that he shared with me.
17 Q. Have you ever observed him, you know, he sees
18 her down the hall and just throw her a dirty look or
19 anything like that?
20 A. No, sir. That's kid games.
21 Q. I'm not talking about words, but I'm talking
22 about actions.
23   Have you ever observed any actions on his
24 part that indicate hostility towards --

Page 189
1  A. I haven't.
2  Q. The Delaware State Police right now has five
3  major positions authorized when you retired. Is that a
4  fair statement?
5  A. Well, they had five and then when Major Baylor
6  left, we weren't able to fill it, so I'm not sure how
7  many they have because I'm gone and it's still not
8  filled. So I really don't know.
9  Q. But when you left there were four major
10 positions filled?
11 A. That's correct.
12 Q. I did indicate a little earlier that there was
13 this e-mail last Friday saying they were going to fill
14 two more, but you are not aware of that; right?
15 A. I'm not on the State e-mail anymore.
16 Q. But the point is: During your career as you've
17 been working at the State Police, there always has been
18 an executive staff?
19 A. Yes, sir.
20 Q. There's always been a lieutenant colonel?
21 A. Yes, sir.
22 Q. How many majors were there when you started out
23 in -- 1981 would it have been?
24 A. '78.

48 (Pages 186 to 189)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Conley v. Chaffinch, et al.
Colonel L. Aaron Chaffinch    C.A. # 04-1394-GMS    June 6, 2005

Page 190
1   Q.   1978.
2   A.   I think -- I think there was only three majors
3   when I started, but I'm not 100 percent sure.
4   Q.   At some time during your tenure when you were
5   the colonel, there were five?
6   A.   Yes, sir.
7   Q.   Five filled spots?
8   A.   Yes, sir.
9   Q.   So what happens is people retire or move on and
10  these major positions turn over; is that right?
11  A.   Yes, sir.
12  Q.   And that whoever is the colonel at the time,
13  subject to budgetary constraints, then selects successors
14  for people in the major positions; right?
15  A.   That's correct.  That's the way it's been for a
16  long time, as far as I know.
17  Q.   Before you retired you haven't heard any talk
18  about eliminating the major positions or anything like
19  that, have you?
20  A.   I've heard all kind of things, but, you know, I
21  can't specifically say that some particular major was
22  going to be eliminated, no.
23  Q.   Are any of the current majors near 55 where they
24  have to retire?

Page 191
1   A.   No, sir.  They're all young.  I was the oldest
2   one of the staff and Tom is now the oldest one.  He's 50.
3   He's be 51 in August.  Tom will be 51 in August.
4   Q.   And everybody else is in their forties?
5   A.   I think so.  Or thirties, bless their hearts.
6        MR. NEUBERGER:  We're done.  Thanks.
7        MR. LIGUORI:  Thank you.
8        (The deposition was then concluded at
9   3:25 p.m.)
10           - - - - -
11       INDEX TO TESTIMONY
12
13
   COLONEL L. AARON CHAFFINCH              PAGE
14
15  Examination by Mr. Neuberger              2
16           - - - - -

Page 192
INDEX TO EXHIBITS

PLAINTIFF'S EXHIBIT NO.:                    PAGE

1   A multipage copy of the First Amended
    Complaint                                  4

2   A one-page copy of a story                25

3   A one-page copy of four limericks         41

4   A one-page copy of one limerick           41

5   A multipage copy of a Review of the Delaware
    State Police, Executive Order Number 19   125

           - - - - -

Page 193

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

49 (Pages 190 to 193)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

A129

| | | |
|---|---|---|
| Conley<br>Colonel L. Aaron Chaffinch | v.<br>C.A. # 04-1394-GMS | Chaffinch, et al.<br>June 6, 2005 |

Page 194

```
 1   State of Delaware )
 2                    )
 3   New Castle County )
 4
 5              CERTIFICATE OF REPORTER
 6
 7         I, Kathleen White Palmer, Registered Merit
     Reporter and Notary Public, do hereby certify that there
 8   came before me on the 6th day of June, 2005, the deponent
     herein, COLONEL L. AARON CHAFFINCH, who was duly sworn by
 9   me and thereafter examined by counsel for the respective
     parties; that the questions asked of said deponent and
10   the answers given were taken down by me in Stenotype
     notes and thereafter transcribed into typewriting under
11   my direction.
12         I further certify that the foregoing is a
     true and correct transcript of the testimony given at
13   said examination of said witness.
14         I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.
16
17
18
19            Kathleen White Palmer, RPR, RMR
              Certification No. 149-RPR
20            (Expires January 31, 2008)
21
     DATED:  June 8, 2005
22
23
24
```