| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Captain Glenn Donald Dixon | C.A. # 04-1394-GMS | July 13, 2005 |

Page 114

1  Colonel Chaffinch.
2  Q. To your knowledge, has Barbara Conley held any
3  other positions in Delaware State Police other than her
4  positions at Troop 5 and her positions in traffic?
5  A. Well, she was a patrol sergeant at Troop 5,
6  patrol sergeant at Troop 3, traffic lieutenant at Troop
7  3, traffic lieutenant at Troop 5, the Deputy Director of
8  Traffic in the traffic section, and currently the
9  Director of Traffic.
10  Q. Any non-patrol or non-traffic positions to your
11  knowledge?
12  A. Not to my knowledge, no.
13  Q. You should answer my next question to your
14  knowledge. Has Barbara Conley ever worked in budget or
15  fiscal capacity for Delaware State Police?
16  A. She does every day in her current position.
17  Q. Can you explain that?
18  A. She is the Director of Traffic, and over a
19  million dollars' worth of funding goes through that
20  section yearly, every fiscal year, and she has a firm
21  grasp on the amount of funding that comes through and she
22  is proactive in obtaining that funding.
23  Q. Is that considered part of the budget department
24  of the Delaware State Police?

Page 115

1  A. Actually the budget department comes to her and
2  requesting that she either put in -- puts in grants or
3  contacts the Office of Highway Safety requesting money to
4  go toward the budget for funding, for equipment type of
5  purposes, radars, lidars, things like that.
6  Q. I understand you say she interacts with the
7  budget office, but is she under the budget office or the
8  budget department of the Delaware State Police?
9  A. No. But they come to her frequently for
10  requests.
11  Q. I believe the comment, well, my note was I wrote
12  down "every person on Barbara Conley's shift," I believe
13  you meant at Troop 5, "enjoyed working with her"?
14  A. Yes.
15  Q. Who are those people that you are referring to?
16  A. I was referring to general consensus that I
17  remember of working down there at the time. I have
18  worked with so many shifts it is hard for me to pinpoint
19  any specific people.
20  Q. Can you name any specific people that worked on
21  her shift?
22  A. I do know that John Owens was an assistant I
23  think on the shift. As far as anybody else, I can't
24  remember any specifics, any specific people.

Page 116

1  Q. But these would be people at Troop 5?
2  A. Yes.
3  Q. With what kind of rank?
4  A. From corporal down to trooper.
5        MS. BALLARD: That's all I have. Thank you.
6           RE-EXAMINATION
7  BY MR. NEUBERGER:
8  Q. That does prompt me to ask a follow-up question.
9  You say you went to the FBI academy?
10  A. Yes.
11  Q. How many weeks did you spend down there?
12  A. 11 weeks.
13  Q. 11 weeks, okay. Is it true that the Delaware
14  State Police tries to send its managers to places like
15  the FBI academy?
16  A. Yes.
17  Q. Right? There is some place called The
18  Northwestern University School of Police Staff and
19  Command where they send people also, right?
20  A. Yes.
21  Q. Isn't there a third place?
22  A. Southern Police Institute in Kentucky.
23  Q. Right. You are at these places for a couple
24  months; isn't that correct?

Page 117

1  A. Yes. I know FBI is 11 weeks. Others may be a
2  week or two longer.
3  Q. Okay. And one of the things they teach their
4  managers at these schools is the budget and fiscal
5  function? Don't they train them in that?
6        MS. BALLARD: Object to the form.
7  A. Well, pertaining to the FBI, you can request to
8  have a class in that. It is based upon the request of
9  that person.
10       I do remember Captain Conley, when she went
11  to Northwestern, said she took a similar class that like
12  you are referring to.
13  Q. They just don't teach you how to shoot a weapon
14  at these meetings?
15  A. Right.
16  Q. You take leadership training, right?
17  A. It is intended for future leaders of divisions or
18  police departments.
19  Q. And if Barbara Conley testified that, for
20  example, she took the courses in budget and fiscal, you
21  wouldn't dispute that?
22  A. No.
23  Q. And if Colonel Pepper, retired Colonel Pepper,
24  for example, testified, and I'll be taking his deposition

30 (Pages 114 to 117)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Conley v. Chaffinch, et al.
Captain Glenn Donald Dixon      C.A. # 04-1394-GMS      July 13, 2005

Page 118
1  shortly, that in sending their future leaders of the
2  Delaware State Police to these training academies, they
3  expect them to get this kind of broad-based experience?
4      A.  Sure.
5      Q.  Just to jump back to the Delaware State Police
6  and the fiscal and budget function, I think it was Major
7  Swiski, wasn't he the fiscal and budget officer at an
8  earlier time during your career?
9      A.  Yes.
10     Q.  And he had no prior experience in budget and
11 fiscal, based on your knowledge, did he?
12     A.  I don't know if he did or not.
13         MR. NEUBERGER:  Well, we can ask him about
14 that.  All right.  I think that's all my questions.
15         Do you have anymore, counsel?
16         MS. BALLARD:  I don't.
17         MR. NEUBERGER:  Okay.  That's it.  We are
18 all done.
19         (Proceedings conclude at 12:13 p.m.)

Page 120

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT.

Page 119
             I N D E X

DEPONENT:  GLENN DONALD DIXON              PAGE

    Examination by Mr. Neuberger          2, 116
    Examination by Ms. Ballard            106

(There were no exhibits marked for identification.)

ERRATA SHEET/DEPONENT'S SIGNATURE          120
CERTIFICATE OF REPORTER                    121

Page 121
1  State of Delaware )
                    )
2  New Castle County )
3
4          CERTIFICATE OF REPORTER
5
           I, Eleanor J. Schwandt, Registered
6  Professional Reporter and Notary Public, do hereby
   certify that there came before me on the 13th day of
7  July, 2005, the deponent herein, CAPTAIN GLENN DONALD
   DIXON, who was duly sworn by me and thereafter examined
8  by counsel for the respective parties; that the questions
   asked of said deponent and the answers given were taken
9  down by me in Stenotype notes and thereafter transcribed
   by use of computer-aided transcription and computer
10 printer under my direction.
11         I further certify that the foregoing is a
   true and correct transcript of the testimony given at
12 said examination of said witness.
13         I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17         Eleanor J. Schwandt
18         Certification No. 125-RPR
19         (Expires January 31, 2008)
20 DATED:

31 (Pages 118 to 121)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

**W&F**
**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
# v.
# Chaffinch, et al.

C.A. # 04-1395-GMS

---

Transcript of:

David Baylor

June 27, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,      )
                                )
          Plaintiff,            )
                                )
v.                              )   Civil Action No.
                                )   04-1395-GMS
COLONEL L. AARON CHAFFINCH,     )
Individually and in his         )
official capacity as the        )
superintendent, Delaware State  )
Police, et al.,                 )
                                )
          Defendants.           )

         Deposition of DAVID BAYLOR taken pursuant to
notice at The Neuberger Firm, P.A., 2 East 7th Street,
Suite 302, Wilmington, Delaware, beginning at 9:40 a.m.
on Monday, June 27, 2005, before Vincent J. Bailey,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          STEPHEN J. NEUBERGER, ESQ.
          THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
            Wilmington, Delaware  19801
            for the Plaintiff,

          STEPHANI J. BALLARD, ESQ.
          RALPH K. DURSTEIN, III, ESQ.
          DEPARTMENT OF JUSTICE
            820 N. French Street
            Wilmington, Delaware  19801
            for the Defendants.

------------------------------------------------
                  WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

Page 2

1  DAVID BAYLOR,
2  the deponent herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5  EXAMINATION
6  BY MR. NEUBERGER:
7  Q. My name is Steve Neuberger and I'm an attorney
8  for Captain Barbara Conley. Now I guess it's Mr. Baylor.
9  Have you ever testified in court before?
10  A. Yes.
11  Q. Have you ever given a deposition before?
12  A. Yes, sir.
13  Q. Approximately how many times, ball park?
14  A. I don't know. 50 to 100. Over 23 years it's
15  hard to assess.
16  Q. I'm going to run you through the basic procedure
17  of it, just to refresh your mind or recollection of the
18  process, okay.
19      I'm going to ask you some questions and the
20  court reporter here is going to type up your answers to
21  those questions, okay?
22  A. Yes, sir.
23  Q. We have to take turns talking. If we talk at
24  the same time the court reporter, although he's very

Page 3

1  good, can't get everything done. So we have to take
2  turns, okay?
3  A. Yes, sir.
4  Q. Also, you have to verbalize your answers.
5  Instead of shaking your head say no or instead of nodding
6  your head say yes, okay?
7  A. Yes, sir.
8  Q. All right. After we're done here today you will
9  have an opportunity to review the transcript of the
10  deposition to make any corrections or if there are any
11  typographical errors. Do you understand that?
12  A. Yes, sir.
13  Q. If I ask you a question and you don't understand
14  the question, just ask me to rephrase and I'll be happy
15  to do that, okay?
16  A. Yes, sir.
17  Q. Also, I don't want you to guess and that's very
18  important. If you don't know the answer to a question,
19  just say so, okay?
20  A. Yes, sir.
21  Q. Now, are you taking any medications or is there
22  anything else that would prevent you from remembering
23  accurately or testifying truthfully here today?
24  A. No, sir.

Page 4

1  Q. If you need any breaks, if you have to go to the
2  john, get up and stretch, let me know. We will be happy
3  to take a break.
4  A. Yes, sir.
5  Q. You have taken an oath to tell the truth. Is
6  that correct?
7  A. Yes.
8  Q. Do you understand the significance of that oath?
9  A. Yes, sir.
10  Q. What's your full name?
11  A. David Lawrence Baylor.
12  Q. What was your rank in the Delaware State Police
13  when you retired?
14  A. My rank was major.
15  Q. When were you born?
16  A. August 20, 1960.
17  Q. And where were you raised?
18  A. Wilmington, Delaware.
19  Q. Where did you go to school?
20  A. St. Mark's High School.
21  Q. Really?
22  A. Yes.
23  Q. Class of what?
24  A. 1978.

Page 5

1  Q. Okay. I did not know that.
2      Where did you go to college?
3  A. Wilmington College, undergrad. University of
4  Phoenix for master's.
5  Q. What's your master's in?
6  A. M.B.A. in technology management.
7  Q. How many years were you in the Delaware State
8  Police?
9  A. Total when I separated 23 years.
10  Q. Can you run me through your promotion history
11  from the time when you came into the academy until the
12  time when you retired?
13  A. Yes, sir. Entered the academy March 1, 1982,
14  finished the whole training program in September of '82,
15  was assigned to Troop 1, Penny Hill. I was there for a
16  couple months and then went to Troop 6, Prices Corner.
17  Both in patrol capacity.
18      Remained there until December 1985 when I
19  got assigned to the governor's detail under Mike Castle.
20  Remained there until January 1989, then I went to Troop
21  1, Penny Hill, back to patrol as a corporal.
22      In September of '89 I went to the public
23  information office. I was there until I think it was
24  January of '93 and went into the governor's detail where

2 (Pages 2 to 5)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

**Page 6**

1  I remained until October of '93 under Carper. I went
2  from there to patrol sergeant in Troop 6 from October to
3  September of '94. '94 I went to our human resource --
4  actually, at the time it's personnel, as a career
5  development officer as a lieutenant. Remained there and
6  was promoted to captain in December of '96.
7    And then in the spring of '98, April of
8  '98, I believe I was assigned to the traffic section
9  where I remained until February 2001. Then I became
10 troop commander of Troop 9, Odessa.
11    And then in February 2002 I became the
12 operations major, where I remained until I retired.
13   Q.  When did you retire?
14   A.  It was -- April 30, 2005 is my total retirement
15 date. I left the department, terminal leave, in
16 September of 2004.
17   Q.  Who is your current employer?
18   A.  Current employer is NKS Distributors, located in
19 New Castle.
20   Q.  If I needed to subpoena you for trial would I do
21 so there?
22   A.  Yes.
23   Q.  Now, I'd like to put in front of you an exhibit
24 which has been previously marked as Plaintiff's

**Page 7**

1  Deposition Exhibit 16. I believe the record reflects
2  that these are some of the rules and regulations of the
3  Delaware State Police.
4      MR. NEUBERGER:  Counsel, I believe you
5  already have a copy.
6      MS. BALLARD:  We should.
7  BY MR. NEUBERGER:
8    Q.  Here you go. Now I'd like you to turn to the
9  third page of this exhibit -- actually, I guess my first
10 question for you would be do you recognize this exhibit?
11   A.  Yes. It looks like a copy of our rules and
12 regulations.
13   Q.  Okay. Could you turn to the third page, please?
14   A.  Yes, sir.
15   Q.  At the bottom does it say Roman numeral VII-3-3?
16   A.  Yes, sir.
17   Q.  Could you take a look at rule and regulation
18 number 13, please, and read that quietly to yourself?
19   A.  (Witness complies.)
20   Q.  Does that say that no member shall threaten,
21 strike or otherwise assault any other member of the
22 division?
23   A.  Yes, sir.
24   Q.  So would that prohibit like one officer from

**Page 8**

1  coming up to another officer and just punching that
2  officer in the nose for no good reason?
3    A.  Yes, sir.
4    Q.  What if Deputy Attorney General Michael Tupman
5  ordered you while you were still a state trooper to walk
6  up to another officer and punch him in the nose, would
7  you?
8    A.  No, sir.
9    Q.  How come?
10   A.  It's against the law.
11   Q.  So would that be an unlawful order?
12   A.  Yes, sir.
13   Q.  And that would be because, first, it violates
14 some criminal laws, right?
15   A.  Yes, sir.
16   Q.  It also violates some of the Delaware State
17 Police rules and regulations. Is that correct?
18   A.  Yes, sir.
19   Q.  Can we take a look at rule and regulation number
20 15 on the same page?
21   A.  Yes, sir.
22   Q.  Is that what generally is known in the DSP as
23 the dishonesty rule?
24   A.  Yes, sir.

**Page 9**

1    Q.  If Deputy Attorney General Michael Tupman called
2  you up while you were still a trooper and ordered you to
3  lie under oath in a court proceeding, would you?
4    A.  No, sir.
5    Q.  How come?
6    A.  You can go to jail. I'm not going to jail for
7  anybody. It's an illegal act, plus a violation of rules
8  and regulations.
9    Q.  Is following the criminal and civil laws
10 something which was important in the Delaware State
11 Police while you were there?
12   A.  That's the oath of office that you took.
13   Q.  How about following the DSP rules and
14 regulations? Is that something that's important to
15 troopers?
16   A.  Yes.
17   Q.  Can you take a look at rule and regulation
18 number 10 on the same page?
19   A.  (Witness complies.)
20     Yes, sir.
21   Q.  Now, does that rule and regulation deal with
22 confidentiality of internal documents?
23   A.  Yes, sir.
24   Q.  If Deputy Attorney General Michael Tupman

3 (Pages 6 to 9)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

Page 10

1  ordered you to violate this rule, would you?
2     A. No, sir.
3     Q. How come?
4     A. It's clearly expressed here in the rules and
5  regulations.
6     Q. Could you turn over one more page to -- at the
7  bottom of that page does it say Roman numeral VII-4?
8     A. Yes, sir.
9     Q. Can you look at rule 18(b), please, and read
10 that quietly to yourself?
11    A. (Witness complies.)
12       Yes, sir.
13    Q. Now, does that rule deal with disclosing
14 information which was obtained in an official capacity?
15    A. Yes, sir.
16    Q. It says that's a bad thing?
17    A. Yes, sir.
18    Q. If Deputy Attorney General Michael Tupman
19 ordered you to violate this rule, would you?
20    A. No, sir.
21    Q. How come?
22    A. Because it's clearly expressed in our rules and
23 regulations.
24    Q. So based on rule and regulation 18(b) and then

Page 11

1  also moving back one page to rule and regulation number
2  10, would it be fair to say that the confidentiality of
3  internal documents and internal information is something
4  which is valued in the Delaware State Police?
5     A. Yes, sir.
6     Q. The Delaware State Police, they also have a
7  sexual harassment policy of some kind. Do you remember
8  that?
9     A. Yes, sir.
10    Q. If Deputy Attorney General Michael Tupman
11 ordered you to violate that policy while you were still
12 with the state police, would you have?
13    A. No, sir.
14    Q. I think we are done with that document. You can
15 push that out a little bit if you'd like.
16       Now I'd like to ask you some questions
17 about the promotion process to major, two separate
18 promotion processes to major which resulted in the
19 promotions of Paul Eckrich and Randall Hughes, help focus
20 you a little bit.
21    A. Yes, sir.
22    Q. Do you remember when Paul Eckrich was promoted
23 to major?
24    A. Yes.

Page 12

1     Q. Do you recall approximately when that was?
2     A. That was -- I don't know the exact dates, but I
3  know it was the retirement of Major Swiski, who was at
4  the time the administrative officer. His position was
5  filled by Captain Eckrich.
6     Q. At the time were you on the executive staff of
7  the Delaware State Police?
8     A. Yes, sir.
9     Q. And the executive staff -- how many individuals
10 at the time were on the executive staff?
11    A. The executive staff was made up of a colonel,
12 lieutenant colonel, five majors: operations major,
13 north, and operations major in Kent/Sussex County,
14 operations major for special units and special
15 investigations, technology major, and an administrative
16 major.
17    Q. Okay. Can you please describe for me the
18 promotion process which resulted in Paul Eckrich being
19 promoted?
20    A. As I know, it was pretty much Colonel Chaffinch
21 picked up the phone to call Captain Eckrich to make him
22 aware he was promoting him to major.
23    Q. Did you have any input in that decision?
24    A. No, sir.

Page 13

1     Q. Do you know if anyone else on the executive
2  staff had any input into that decision?
3     A. To my knowledge, nobody did.
4     Q. Were there any written standards or anything
5  like that?
6     A. No, sir.
7     Q. Were there any objective standards that you were
8  aware of?
9     A. The only thing that I've been made aware of over
10 time is that the members of the executive staff pretty
11 much came there with a bachelor's degree, some
12 experience, managerial experience depending on where they
13 were in the organization. And usually at that time,
14 besides two other majors, most of the majors had at least
15 20 years of service.
16    Q. Now I'd like to focus you on the promotion which
17 resulted in Major Hughes being promoted to major, okay?
18    A. Yes, sir.
19    Q. Can you describe for me the promotion process
20 that resulted in Major Hughes being promoted to the rank
21 of major?
22    A. Again, that was pretty much at the announcement
23 of Lieutenant Colonel Morrison's retirement, it created
24 an opening to lieutenant colonel. Shortly, very shortly

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

Page 14

1 after Lieutenant Colonel Morrison announced his
2 retirement, Captain Hughes and Major MacLeish were
3 announced, their promotions were announced, MacLeish to
4 lieutenant colonel and Hughes to Kent/Sussex.
5    Q.  Were there any objective standards that you were
6 aware of that Colonel Chaffinch applied in making that
7 decision?
8    A.  No.
9    Q.  Did you have any input into the decision which
10 resulted in Major Hughes being promoted?
11    A.  No.
12    Q.  Who made that decision?
13    A.  That decision was made by Colonel Chaffinch.
14    Q.  Did he discuss that decision with you?
15    A.  He briefly met with me at Bob Evans, I think it
16 was a Thursday, and indicated that he had a meeting with
17 the governor on Friday morning and that he wasn't sure
18 what he was going to do, that he was thinking about it --
19 and, you know, at that time the rumor mill started to
20 kick in, because it was announced that Colonel Morrison
21 was leaving and, of course, you know, you hear the
22 rumors. My name was brought up as a possible candidate
23 for the lieutenant colonel.
24        When we went to lunch it was just me and

Page 15

1 him and I pretty much told him, I said, Colonel, whatever
2 you decide, I mean, that's your call, you know. And we
3 didn't discuss it that much. I gave him an out, you
4 know, because I got the sense that it wasn't going to be
5 me to lieutenant colonel. I knew the politics had
6 already kicked in and I wasn't going to play the
7 political game. I didn't call anybody. And I just told
8 him, I said, you know, whoever you pick for lieutenant
9 colonel, that's your call. And whatever you decide, I'm
10 a major, I'm one of your majors, I'll support it.
11        That's it. We didn't talk about the
12 major's position, because that would have been kind of,
13 my opinion, premature.
14    Q.  Did he ask you for your opinion?
15    A.  On the major's position?
16    Q.  Yes.
17    A.  No.
18    Q.  You mentioned politics, the politics of the
19 promotion process. You served in the Delaware State
20 Police for a long time. Isn't that right?
21    A.  Yes, sir.
22    Q.  Based on your experiences within the Delaware
23 State Police and your use of your sensory perception, is
24 there a good old boys network in the Delaware State

Page 16

1 Police?
2        MS. BALLARD:  Object to form.
3    Q.  You can answer.
4    A.  Is there a good old boy network? There is a
5 perception of a good old boys network in the Delaware
6 State Police. Is there politics in the Delaware State
7 Police? That's probably a more accurate question. Yes.
8    Q.  So would it be fair to say that sometimes
9 promotions are more based on who you know and who your
10 connections are with and who your friends are than on
11 merit in the Delaware State Police?
12    A.  Yes, sir.
13    Q.  Now, were there any meetings of the executive
14 staff related to the promotions of Hughes and Eckrich?
15    A.  No.
16    Q.  Okay.
17    A.  No, sir.
18    Q.  Okay. Thank you.
19        Were there meetings of the executive staff
20 when Hughes and Eckrich were discussed at all?
21    A.  No, sir.
22    Q.  Were there any meetings of the executive staff
23 when Captain Conley was discussed?
24    A.  No, sir. I mean, I don't think anybody was

Page 17

1 discussed in terms of an executive staff, because it
2 happened so quickly.
3    Q.  Okay.
4    A.  The way this happened, to my recollection, is
5 Lieutenant Colonel Morrison announces his retirement to
6 the colonel on a Wednesday. By Friday the selections
7 were made. That's the way I recall it.
8    Q.  So would that be the selections both to fill
9 Lieutenant Colonel Morrison's position and also the major
10 vacancy?
11    A.  Yes, sir. Because I wasn't made aware -- I was
12 only made aware by pager.
13    Q.  Okay. That's helpful. Thank you.
14        Now, did Colonel Chaffinch ever give you
15 any reasons for why he promoted Major Paul Eckrich or
16 Major Randall Hughes?
17    A.  For Eckrich, he just -- he said that he thought
18 that his background lended to that position.
19        For Randall Hughes, his Troop 5 troop
20 command. That's where the colonel was from. He felt
21 comfortable with him and that's pretty much what I got
22 out of the promotion.
23    Q.  So Troop 5, that's --
24    A.  Bridgeville.

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Case 1:04-cv-01394-GMS    Document 77-3    Filed 09/19/2005    Page 9 of 15

Conley                                    v.                              Chaffinch, et al.
David Baylor                      C.A. # 04-1395-GMS                      June 27, 2005

Page 18

1  Q. The colonel is from Greenwood. Isn't that
2  correct?
3  A. He touts to me he's from Bridgeville.
4  Q. Would Bridgeville be his home troop?
5  A. It would have been his home troop.
6  Q. Was Colonel Chaffinch friends with Major Hughes
7  or with Major Eckrich prior to their promotion to major?
8  Was he close friends with them?
9  A. I think -- I mean, I didn't hang out with those
10 guys, but I think that probably he was closer to them
11 than the average trooper is the best way to describe it.
12 Q. What did you think of Major Hughes,
13 professionally or personally?
14 A. I'm not going to get into personal.
15 Q. Well, then, what did you think of him
16 professionally?
17 A. Professionally, I thought that he was learning
18 the position of troop commander. I thought that he could
19 pretty much be pretty opinionated and he could fly off
20 the handle at times, I mean, and not think the whole
21 thing through. I mean, that's -- he's a former
22 colleague. I'm not here to bash anyone.
23 Q. Sure.
24 A. It just as troop commander, I still thought

Page 19

1  there was room to grow.
2  Q. Did his men give him any affectionate nicknames
3  that you were aware of -- excuse me. Did his troopers,
4  men and women, give him any affectionate nicknames?
5  A. You hear the rumor mill, Little Caesar, Little
6  Hitler. That's what you heard him referred to.
7  Q. Little Caesar and Little Hitler?
8  A. Yes.
9  Q. You think Little Hitler is an affectionate
10 nickname?
11 A. Well, I don't know. I wouldn't see it as
12 affectionate, you know. Those were just nicknames, but
13 you -- I know how men and women can be, when you are at
14 the top you make decisions that aren't popular, you know,
15 people aren't happy with that and they will formulate
16 opinions and all and characterizations about you. That
17 kinds of goes with the territory.
18 Q. Now, in addition to serving with Colonel
19 Chaffinch, you have also served with now Colonel
20 MacLeish. Isn't that right?
21 A. He was a major on the staff with me, yes.
22 Q. And then he was promoted to lieutenant colonel
23 and you were also on staff still. Isn't that right?
24 A. Yes, sir.

Page 20

1  Q. Okay. Were Chaffinch and MacLeish friends,
2  based on your perceptions?
3  A. I think they became more -- developed more of a
4  friendship once the colonel became the colonel, when
5  Chaffinch became colonel.
6  Q. I believe that the record in this case will
7  reflect that Colonel Chaffinch and Colonel MacLeish gave
8  sworn deposition testimony in this case several weeks
9  ago. And I believe that the record also will reflect
10 that they each testified that when Colonel Chaffinch made
11 personnel decisions, one of the factors he usually
12 considered was whether the individual had been personally
13 loyal to him.
14     So I'd like to ask you some questions based
15 on your experience serving with the colonel, meaning
16 Colonel Chaffinch, whether loyalty to Colonel Chaffinch
17 was a factor which Colonel Chaffinch considered when
18 making personnel decisions.
19 A. Okay.
20 Q. Was personal loyalty a factor that Colonel
21 Chaffinch considered when making personnel decisions
22 based on your --
23 A. Yes, sir.
24 Q. -- based on your experience on the executive

Page 21

1  staff?
2  A. Yes, sir.
3  Q. And you served for several years on the
4  executive staff?
5  A. Yes, sir.
6  Q. And would it be fair to say you worked for
7  several years with Colonel Chaffinch and now Colonel
8  MacLeish closely?
9  A. Yes, sir.
10 Q. Okay. Now, you mentioned when you were giving
11 me your job history within the Delaware State Police that
12 you served in the public information office at one time.
13 Am I remembering that accurately?
14 A. Yes. I was PIO and then director for a period
15 of time.
16 Q. You were the PIO, was that in 1989?
17 A. Yeah. I started in '89.
18 Q. What was your rank then?
19 A. Corporal.
20 Q. When were you the director of the public
21 information office?
22 A. I believe I got promoted in '92.
23 Q. What rank were you?
24 A. Sergeant.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

Page 22

1  Q. At any time later after you were promoted above
2  the rank of sergeant, did you have either authority or
3  responsibility for the public information office?
4  A. I did, yes, sir.
5  Q. When would that have been?
6  A. As major.
7  Q. Now, during your time serving in the public
8  information office were you ever the person who the press
9  would call when they had a question about a story or
10 about some Delaware State Police matter?
11 A. Yes, sir.
12 Q. Okay. There are probably policies and
13 procedures out there as to how different things are dealt
14 with?
15 A. Yes, sir.
16 Q. That was your experience back in 1989 when you
17 were a corporal?
18 A. Yes, sir.
19 Q. And also in 1992 when you were sergeant?
20 A. Yes, sir.
21 Q. And would that also have -- would there also
22 have been policies and practices back when you were the
23 major in charge of it?
24 A. Yes, sir.

Page 23

1  Q. What year were you major in charge of the --
2  A. I think the colonel put the PIO's under me in
3  the fall of 2002, I believe. There were so many things
4  that happened during that time, that the dates may be --
5  but it's close to that.
6  Q. Just ball park, your best memory.
7  A. Okay.
8  Q. All right. Now, what was the public information
9  office's policy when it came to media inquiries about
10 internal affairs investigations of Delaware State
11 Troopers?
12 A. Our policy was pretty much that we would never
13 really confirm or deny or comment on internal affairs
14 matters. We basically -- because they were internal
15 affairs, matters. The only thing we would say is for the
16 obvious, if we had an officer involved in a shooting,
17 that the matter is under investigation by internal
18 affairs as part of our standard operation procedure.
19 Q. Now, would the policy of never really
20 confirming, denying or comment, would that have been
21 applied back in '89 when you were a corporal?
22 A. That was pretty much standard practice in law
23 enforcement from the time I became a PIO.
24 Q. So would that have still been standard practice

Page 24

1  in '92 when you were a sergeant in PIO?
2  A. Yes, sir. But I think the police officer's bill
3  of rights also covered that.
4  Q. Would that have still been the policy and
5  practice in 2002 when you were major with responsibility
6  for the public information office?
7  A. Yes, sir.
8  Q. Okay. I think you mentioned the policeman's
9  bill of rights. Am I correct?
10 A. Yes, sir.
11 Q. And based on your -- do you have any knowledge
12 of the policeman's bill of rights generally when it comes
13 to confidentiality?
14 A. General knowledge, yes.
15 Q. What is your general knowledge?
16 A. Pretty much is that any issues involving
17 disciplinary action, any personnel related issues
18 regarding members of law enforcement are confidential in
19 nature.
20 Q. I'd like to put another document in front of you
21 which was previously marked as Plaintiff's Deposition
22 Exhibit 6.
23     MR. NEUBERGER: Counsel, I believe you
24 already have a copy of this. This is the copy of the law

Page 25

1  enforcement officers bill of rights.
2     MS. BALLARD: Yes.
3  BY MR. NEUBERGER:
4  Q. Now, Major Baylor, could you take a look at the
5  document in front of you? Do you have that document in
6  front of you?
7  A. Yes, sir.
8  Q. Is this a copy of the law enforcement officers,
9  one section of the law enforcement officers bill of
10 rights?
11 A. Yes.
12 Q. Could you take a look at paragraph B and the
13 section which is highlighted and take a quick look at
14 that?
15 A. Okay.
16 Q. Now, this section doesn't apply to the colonel
17 and the lieutenant colonel of the Delaware State Police.
18 Isn't that right?
19 A. Yes.
20 Q. But it does apply to people with the rank of
21 captain and I guess below?
22 A. Yes.
23 Q. Is that in keeping with your general
24 understanding?

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

### Page 26

1  A. Yes. Actually, I thought as a major I was
2  protected, but I guess not.
3  Q. Also, could you take a look at paragraph C, also
4  highlighted? Tell me once you are done looking at that.
5  A. Okay.
6  Q. Could you turn to page 2 and then also take a
7  look at subparagraph 12, which is also highlighted?
8  A. (Witness complies.)
9  Q. Tell me once you have looked at that.
10 A. Okay.
11 Q. Based on reviewing this document, based on your
12 wealth of knowledge from serving in the State Police for
13 so long and serving with the public information office
14 for so long, could this be one of the sources of
15 authority for not talking about internal affairs matters
16 of Delaware State Police Officers?
17 A. Yes, sir.
18 Q. Okay. All right. You can push that document
19 away.
20         Now I'd like to change gears a little bit
21 and talk a little bit about some issues involving Colonel
22 Chaffinch.
23 A. Okay.
24 Q. Were you ever aware that Colonel Chaffinch is a

### Page 27

1  member of a group called Masons?
2  A. Yes, sir.
3  Q. Okay. Is that something which he ever discussed
4  in the workplace?
5  A. Yes, sir.
6  Q. Is that something that he was proud of based
7  upon your sensory perceptions?
8  A. Yes, sir.
9  Q. Okay. Did Colonel Chaffinch ever boast in front
10 of you that he belongs to that organization?
11 A. I mean, he acknowledged that he belonged to it
12 and you could tell he was happy to be proud of it. And
13 that I think he even commented that he was happy that he
14 achieved some positions in that organization.
15 Q. To the best of your knowledge, does the Delaware
16 group of the Masons allow female members?
17 A. You know, I really don't know about the Masons
18 until I read about it in the paper.
19 Q. I'm just asking based on what you know. If you
20 don't know something, please just say so.
21         Do you know if the Delaware Masons allow
22 African American members?
23 A. Again, I'm confused, because I had an uncle and
24 Frank Chandler, which is my drill instructor who is a

### Page 28

1  Mason, and then the colonel was a Mason. So I didn't
2  know there was a difference. I later learned that there
3  was a difference in the organizations.
4  Q. So are you saying that maybe they didn't belong
5  to the same organization, although they had --
6  A. The title of Mason. But, you know, my uncle and
7  Frank Chandler are both black, you know, and the colonel
8  is white. So I thought it was one group, one umbrella
9  group. Because I didn't have any aspirations of becoming
10 a Mason, I never looked into it. So I thought when they
11 said Masons, they may have been part of different
12 chapters, but I thought they were under the umbrella
13 group. I later learned that's not the case.
14 Q. Okay. Has Colonel Chaffinch ever said
15 something -- I'd like to ask you some questions about
16 things the colonel may have said in your presence or
17 things you became aware of by other means.
18         Did Colonel Chaffinch ever say in your
19 presence that the problems of mankind are all the fault
20 of women?
21 A. I don't recall that. I mean, he says -- he has
22 said a lot of things over the years and trying to
23 remember the specifics, I can't say yes or no. I don't
24 recall that specific.

### Page 29

1  Q. Okay. Did he ever say something similar to
2  that, to the best of your recollection?
3  A. I mean, he could have, you know.
4  Q. Would that be something that Colonel Chaffinch
5  would have sometimes said or would those have been
6  opinions that the colonel would have sometimes expressed?
7         MS. BALLARD: Object to the form.
8  Q. You can answer.
9  A. It's hard for me to answer. I don't want to
10 answer, because I'm not sure.
11 Q. Okay. Have you ever heard Colonel Chaffinch say
12 that two women can't work together because they just
13 won't get along?
14 A. Yes.
15 Q. Is that something he said to you on more than
16 one occasion?
17 A. I know of one occasion where it was definitely
18 said.
19 Q. Okay. Now, have you ever seen or heard Colonel
20 Chaffinch launch into a variety of very colorful and
21 sexually explicitly limericks or jokes?
22 A. Yes, sir.
23 Q. Were those in the workplace or were those
24 outside of the workplace?

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

Page 30

1    A.  Most of them were outside of the workplace, but
2 I think there have been a couple in the workplace.
3    Q.  Did you think that was appropriate behavior
4 talking about the sexually explicit limericks and jokes
5 in the workplace?
6    A.  Not something I don't think I would have said,
7 no.
8    Q.  For example -- are you married?
9    A.  Separated.
10   Q.  Okay. Do you have any kids?
11   A.  Yes.
12   Q.  Do you have --
13   A.  Daughter.
14   Q.  How old is your daughter?
15   A.  She will be fourteen.
16   Q.  How would you felt if the colonel had recited
17 those limericks in front of your 14-year-old daughter?
18       MS. BALLARD: Objection.
19   Q.  You can answer.
20   A.  We would have had a talk.
21   Q.  Would that have been something which you thought
22 was inappropriate?
23   A.  It would have been probably something I wouldn't
24 want my daughter to be exposed to.

Page 31

1    Q.  Okay. Have you ever been around Colonel
2 Chaffinch when he has told other individuals that he has
3 a little something extra in his pants?
4    A.  No. I didn't hear that one. I'm pretty glad
5 that I didn't have him tell me that.
6    Q.  Have you ever heard him refer to his male
7 genitalia by nickname?
8    A.  No. No, sir.
9    Q.  Had Colonel Chaffinch ever stated in your
10 presence that he wanted to watch certain women engage in
11 sexual relations?
12   A.  No, sir.
13   Q.  Have you ever heard or heard about Colonel
14 Chaffinch calling Captain Conley, quote, pus, closed
15 quote?
16   A.  Not a pus, no.
17   Q.  All right. What have you heard him call Captain
18 Conley?
19   A.  He called her a bitch.
20   Q.  Would that have been in the workplace or
21 outside?
22   A.  Outside the workplace.
23   Q.  Did he mean that as an affectionate term or as a
24 pejorative or negative term?

Page 32

1    A.  He was not a happy camper.
2    Q.  Okay.
3    A.  Happy individual I should say.
4    Q.  Do you recall approximately when this was?
5    A.  It was around July of 2003, right around the
6 time when Captain Warren filed his lawsuit.
7    Q.  That's helpful. Thank you.
8        Have you ever been around Colonel Chaffinch
9 when he has demanded private details of Captain Conley's
10 sex life?
11   A.  He hasn't demanded it from me, no.
12   Q.  Have you ever heard or heard about Colonel
13 Chaffinch calling a female State of Delaware employee
14 Trish the Dish?
15   A.  Yes, sir.
16   Q.  Have you ever heard him say to this particular
17 female that she is so sweet you don't need any sugar?
18   A.  Yes, sir.
19   Q.  Okay. Have you ever heard Colonel Chaffinch
20 refer to certain females who work in the headquarters
21 building and say that they are, quote, tearing him up,
22 closed quote?
23   A.  Yes, sir.
24   Q.  Have you ever heard him refer to certain females

Page 33

1 who work in the headquarters building and has the colonel
2 said he would love to do her?
3    A.  Yes, sir.
4    Q.  Okay. Have you ever heard Colonel Chaffinch
5 publicly refer to a certain secretary as, quote, lemon
6 titties, closed quote?
7    A.  No, sir.
8    Q.  Okay. Have you ever heard Colonel Chaffinch
9 brag about the enormous size of another male trooper's
10 genitalia?
11   A.  No. I personally haven't. See, I'm not going
12 to engage in that kind of conversation with a guy.
13   Q.  I understand. I appreciate that. I understand
14 that a lot of these questions are awkward.
15   A.  That's awkward. That definitely is.
16   Q.  Have you ever heard Colonel Chaffinch refer to
17 another man's genitalia as a tuna can?
18   A.  I'm trying to recall if it was he that said it
19 or somebody else. No. It was the colonel.
20   Q.  Do you recall who the first female captain was
21 in the Delaware State Police?
22   A.  Mary Ann Papili.
23   Q.  Did she have a command position?
24   A.  Yes, sir.

Wilcox & Fetzer, Ltd.     Professional Court Reporters     (302)655-0477

9 (Pages 30 to 33)

**Page 34**

1  Q. What was that?
2  A. Troop 6.
3  Q. Do you recall when she was transferred into that
4  position?
5  A. Yes. She was transferred in -- Lieutenant
6  Colonel Pepper became Colonel Pepper, because Captain
7  Morrison at the time was troop commander, where he became
8  major and she took his position.
9  Q. All right. Was there ever a time when you were
10  above Captain Papili in the chain of command while she
11  was serving in troop 6?
12  A. Yes, sir.
13  Q. Would you have been a major then?
14  A. Yes, sir.
15  Q. Did there come a time when Captain Papili was
16  removed or transferred out of Troop 6?
17  A. Yes, sir.
18  Q. Were there any meetings to discuss that?
19  A. Yes, sir.
20  Q. Okay. Do you remember any details about those
21  meetings?
22  A. Yes, sir.
23  Q. Could you relate those details to me?
24  A. I recall one meeting in which we sat down to

**Page 35**

1  talk about promotions, transfers. I think it was shortly
2  after Major Swiski retired. It was an afternoon meeting
3  in the conference room in headquarters. Myself, Major
4  Papili, Major Eckrich and Major MacLeish, Lieutenant
5  Colonel Morrison and Colonel Chaffinch were there.
6     At the beginning of the meeting, right into
7  the beginning of the meeting, Captain Papili's name came
8  up at that time. Major Papili made a statement, "Maybe I
9  shouldn't say this, but I wonder why she has to be
10  transferred." And at that time the colonel responded and
11  says, "You are right, maybe you shouldn't." And at that
12  time Major Papili and the colonel looked at each other
13  and then the major excused himself, Major Papili.
14     The meeting continued. Mary Ann's name
15  came up and Lieutenant Colonel Morrison said he didn't
16  feel it was a good idea to transfer her and I concurred.
17  At that time the colonel became agitated, especially with
18  me, because of my position. It got intense.
19  Q. Now, your position, were you the -- is it called
20  New Castle County Operations Major?
21  A. Yes, sir.
22  Q. You indicated that the colonel was a little
23  unhappy with you for voicing that you didn't believe that
24  Captain Papili should be transferred out?

**Page 36**

1  A. At that time, no.
2  Q. I think you also indicated that Lieutenant
3  Colonel Morrison was also opposed?
4  A. Yes, sir.
5  Q. Were any of the other officers on the executive
6  staff opposed?
7  A. At that time Major MacLeish spoke up and said
8  that if Dave's okay with her there, then why don't we
9  just leave her there because she has to report to him,
10  anyway. And the colonel didn't like that.
11  Q. Who else was on the executive staff at that
12  time?
13  A. Major Eckrich and Major Seifert.
14  Q. Did Major Eckrich voice any opinions on that at
15  that time?
16  A. Yeah. Eck pretty much just said he agrees, why
17  move her.
18  Q. What did the colonel do with all of your advice?
19  A. Called us spineless.
20  Q. Was he calling you spineless because you had the
21  audacity to disagree with him?
22     MS. BALLARD: Objection to form.
23  Q. You can answer.
24  A. I think he was not happy with my position.

**Page 37**

1  There were times where I had recommended that Captain
2  Papili be transferred, but we worked through some of
3  those issues and I said it was not best for the
4  organization at the time to move her.
5  Q. Okay. So you are indicating that you and
6  Captain Papili may have had some professional
7  disagreements on whatever topics?
8  A. Yes, sir.
9  Q. You worked through those?
10  A. Yes, sir.
11  Q. And that, would it be fair to say that you
12  worked through them because you are a police
13  professional?
14  A. Yes, sir.
15  Q. Now, at the time was Captain Papili the only
16  female captain in a real command position?
17  A. She was the only female captain in a troop
18  commander's position. Having been a former director of
19  the traffic section, I consider that a command position,
20  too. So I look at that, but she was the only female
21  troop commander that the organization has ever had.
22  Q. Did anybody bring that up at this meeting, at
23  this executive staff meeting?
24  A. Yes. I did.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

Page 38

1  Q. So you pointed that out to Colonel Chaffinch?
2  A. What I said was, and Lieutenant Colonel Morrison
3  said -- me, I look at the political implications, I look
4  at the public relations implication, and I look at the
5  organizational implications. Public relations-wise this
6  was not going to be a good move. Organizationally, it
7  wasn't a good move. And it just politically was probably
8  not a good time to do this.
9      And for those reasons -- and that she could
10 do the job. If she couldn't do the job, I would have
11 moved her or recommended that she be moved in a
12 heartbeat. She didn't do it the way I would do it, but
13 we all have different management styles, but she could do
14 the job.
15     So I said that she should stay there and I
16 brought to his attention that it would be in the best
17 interests of the outfit for them not to move her at that
18 time, knowing full well that on the table there was no
19 other females we were going to put in a troop commander
20 position.
21 Q. Despite your voicing your concerns, the colonel
22 transferred her out anyway?
23 A. At that time we broke up the meeting with him
24 saying, he was not happy with what he heard, he's

Page 39

1  inclined to do it, and he reserved his total decision.
2  And then we broke up and kind of all went into our
3  separate corners after that, because it was mentally an
4  emotionally draining at that point in time.
5  Q. Ultimately was Captain Mary Ann Papili
6  transferred out of there?
7  A. Yes, sir.
8  Q. Was that shortly thereafter?
9  A. Yes, sir.
10 Q. Do you know where she was transferred to?
11 A. Yes. To a computer position.
12 Q. Was that --
13 A. Technology position.
14 Q. Did she have a lot of troopers reporting to her
15 in that position?
16 A. No, sir.
17 Q. Okay. Now, do you know what CARE is, acronym
18 C-A-R-E?
19 A. Operation Care, Combined Accident Reduction
20 Effort.
21 Q. Did you ever attend any CARE conferences?
22 A. Yes, sir.
23 Q. Did you attend a conference in the year 2003?
24 A. Yes, sir.

Page 40

1  Q. Do you recall who else attended that conference?
2  A. I think that was in Columbus, Ohio. It was the
3  colonel, his wife, Captain Conley, Lieutenant Dixon, and
4  Lieutenant Dixon's wife.
5  Q. Okay. Do you recall an incident in a
6  hospitality room at that conference when the colonel
7  began expressing some of his jokes and limericks, which I
8  questioned you about earlier?
9  A. Yes, sir.
10 Q. Do you recall what the jokes or limericks were?
11 A. No, not specifically. But I know after reading
12 the I guess information regarding the filing of the
13 lawsuit, some of those I recall being said.
14 Q. So some of the limericks which you at some point
15 read in the complaint in this case, Colonel Chaffinch
16 also recited in the hospitality room at this CARE
17 conference in the year 2003?
18 A. Yes, sir.
19 Q. Do you think that was appropriate behavior?
20 A. I'm struggling, because -- I'm struggling with
21 being in a hospitality room after the hours, you know,
22 around a group that voluntarily wants to be there where
23 there is drinking going on, versus he is a superintendent
24 of the Delaware State Police and what kind of impression

Page 41

1  it would leave. So I'm struggling. I mean, are jokes
2  said in that type of setting? Absolutely. Not by just
3  Aaron Chaffinch, but by other people.
4  Q. Are sexually explicit jokes told in that kind of
5  setting?
6  A. I think that's where you have to know your
7  audience.
8  Q. Knowing the audience in the hospitality room at
9  this CARE conference, in your opinion were those
10 appropriate jokes to be told in that setting?
11 A. I wouldn't have said it.
12 Q. For example, someone might tell a joke, a man
13 walks into a bar, typical run of the mill joke. Have you
14 ever heard typical run of the mill jokes told in that
15 type of setting?
16 A. Yes, sir.
17 Q. And how often did you hear sexually explicit
18 jokes told in that kind of setting?
19 A. From time to time you would hear -- thank God
20 I'm blessed with not being able to remember them, so I
21 couldn't say them or repeat them.
22 Q. One of the people who would have told those
23 kinds of jokes in that kind of setting was the colonel of
24 the state police, Aaron Chaffinch?

11 (Pages 38 to 41)

Conley v. Chaffinch, et al.
David Baylor   C.A. # 04-1395-GMS   June 27, 2005

### Page 42

1  A. Yes, sir.
2      MS. BALLARD: Objection to form.
3  Q. Now, did Colonel Chaffinch ever express to you
4  any fascination or any kind of undue interest in the sex
5  lives of other officers under his command?
6  A. From time to time it would probably come up as
7  to, you know, who this guy is seeing, stuff like that.
8  Q. Did he ever express any interest in the sex life
9  of or personal life of a Captain Harry Downs?
10  A. Not that -- he never said anything around me.
11  Q. Okay. Do you remember a time, just to change
12  gears a little bit, when Lisa Blunt Bradley, the state
13  director of personnel, investigated the state police?
14  A. Yes, sir.
15  Q. Do you recall ball park when that was?
16  A. That was 2001, 9-11. I'll never forget. I was
17  a troop commander in Odessa.
18  Q. Okay. Now, at some point did she issue a
19  report?
20  A. Bradley Report, yes.
21  Q. Were those her findings and recommendations?
22  A. Yes, sir.
23  Q. Okay. At the time what was your rank?
24  A. Captain.

### Page 43

1  Q. Okay. Then you were promoted to major in --
2  A. After the report -- the report was issued in
3  November. I was promoted in February.
4  Q. Okay. Do you recall if one of the
5  recommendations in the report was something about a
6  diversity committee?
7  A. Yes, sir.
8  Q. And were there any advocates of implementing the
9  diversity committee on the executive staff?
10  A. No, sir.
11  Q. Did Lieutenant Colonel Morrison advocate the
12  implementation of a diversity committee?
13  A. I know of a specific meeting where Lieutenant
14  Colonel Morrison advocated that -- us to follow the road
15  map, as he put it, of the Bradley Report.
16  Q. Was one of the items on that road map the
17  diversity committee?
18  A. Yes, sir.
19  Q. Okay. Is the diversity committee the same thing
20  as a so-called round table discussion in the executive
21  staff -- maybe I'll rephrase that question. It's
22  unclear.
23      Was there something in the Bradley Report
24  about implementing a round table discussion about either

### Page 44

1  diversity issues or female issues?
2  A. Yes.
3  Q. Was that the same thing as the diversity
4  committee or was that something different?
5  A. I think that was different. And I think that
6  Lieutenant Colonel Morrison tried to get the women
7  troopers in the organization to come together, identify
8  issues and bring them to the staff so they can address
9  them.
10  Q. Okay. Is that something that Colonel Chaffinch
11  ever implemented?
12  A. I would have to assume that Colonel Morrison was
13  doing it at his direction. I don't know what
14  communication took place between them two about it, but I
15  know that Colonel Morrison wanted to see it done.
16  Q. Do you know if it ever was done?
17  A. There were some resistance to it by Captain
18  Papili. For whatever reason there seemed to be some
19  resistance to having all the females get together.
20  Q. Was that out of a fear of retaliation?
21      MS. BALLARD: Object to form.
22  Q. You can answer.
23  A. I can't answer that. Only thing I can come to a
24  conclusion is that by this time in the organization's

### Page 45

1  history everybody was hypersensitive over how they are
2  viewed, you know. I was sensitive to how blacks were
3  being viewed, how promotions were being -- because every
4  time a black got promoted it was only because he was
5  black. Never had to do with qualifications.
6      And I think that the women to a certain
7  extent felt the same way, that if they got together in a
8  group, that their white male counterparts especially
9  would view them as they are going to have more clout at
10  the table than they would. So I think the women to a
11  certain extent just wanted to come and do their job and
12  leave. That's the only way I can assess it.
13  Q. Okay. Now, how about the diversity counsel, was
14  that ever implemented?
15  A. No. Not that I know of.
16  Q. That was one of the recommendations in the
17  Bradley Report?
18  A. Yes, sir.
19  Q. And despite that being recommended, the colonel
20  never implemented it. Would that be fair to say?
21  A. I don't think it was one thing that ever got
22  done, along with some of the other things on that report.
23  Q. Okay. Were there ever diversity training
24  sessions that you attended where Colonel Chaffinch got up