Conley v. Chaffinch, et al.
Corporal Thomas F. MacLeish    C.A. # 04-1394-GMS    June 9, 2005

Page 14
1  reports corruption in the workplace; correct?
2    A.  That's correct.
3    Q.  You can't punish an officer who reports that
4  other officers are taking bribes, for example; correct?
5    A.  That's correct.
6    Q.  That's because the First Amendment forbids that;
7  correct?
8    A.  Yes.
9    Q.  You know that if an employee down at the
10 Delaware State Police headquarters reported that the
11 building was contaminated was asbestos, you would know
12 that you couldn't fire them for reporting that the
13 building was contaminated with asbestos; correct?
14   A.  That's correct.
15   Q.  Because asbestos is a threat to the health and
16 safety of the individuals?
17   A.  That's correct.
18   Q.  You know that you can't punish an officer who
19 files a charge of discrimination with the Equal
20 Employment Opportunity Commission or the Delaware
21 Department of Labor; correct?
22   A.  That's correct.
23   Q.  You know that you can't punish an officer who
24 files a lawsuit in the state or federal court; correct?

Page 15
1    A.  That's correct.
2    Q.  That's because the Constitution forbids that;
3  correct?
4    A.  That's correct.
5    Q.  Now, do you think the public would be concerned
6  if they heard about sex discrimination in the Delaware
7  State Police?
8    A.  Yes, I think they would.
9    Q.  Do you think the public would be concerned if
10 the Delaware State Police was violating the First
11 Amendment free speech rights of its employees?
12       MS. BALLARD:  Object to the form.
13   Q.  You can answer.
14   A.  Yeah, I believe the public has a concern.
15   Q.  Because the Constitution is the highest law in
16 the land; correct?
17   A.  That's true.
18   Q.  The Constitution is something that's very
19 important to the Delaware State Police and its officers;
20 correct?
21   A.  That's correct.
22   Q.  It's even important to you, personally; correct?
23   A.  Yes, it is.
24   Q.  Do you think the General Assembly would be

Page 16
1  interested in learning that officers in the Delaware
2  State Police were violating the Constitutional rights of
3  other troopers?
4        MS. BALLARD:  Object to the form.
5        You can answer.
6    Q.  You can answer.
7    A.  If that were the case, yes, I think they would
8  be.
9    Q.  Do you think that the governor would be
10 concerned if officers in the Delaware State Police were
11 violating the Constitutional rights of other officers?
12   A.  If that were the case, yes.
13       MS. BALLARD:  I want to list an ongoing
14 objection to asking questions about what other people
15 would be concerned about.
16       MR. NEUBERGER:  You can have your ongoing
17 objection.
18 BY MR. NEUBERGER:
19   Q.  Do you think the Delaware news media would be
20 concerned if Delaware state troopers were violating
21 Constitutional rights of other troopers?
22   A.  If that were the case, yes.
23   Q.  For example, you've been in the Delaware State
24 Police the last several years, haven't you?

Page 17
1    A.  Yes.
2    Q.  Hasn't there been a lot of media coverage of
3  allegations of Constitutional rights of troopers being
4  violated?
5    A.  Yes, there has.
6    Q.  There have been a lot of newspaper articles;
7  correct?
8    A.  Yes, there has.
9    Q.  There's been a lot of newspaper stories;
10 correct?
11   A.  Yes.
12   Q.  Do you think the public-at-large would be
13 interested in learning if Constitutional rights of
14 troopers were being violated by other troopers?
15   A.  If that were the case, yes.
16   Q.  Do you think that a trooper has an obligation to
17 speak out if they believe that Constitutional rights are
18 being violated by other troopers?
19   A.  I believe a trooper does have that right.  At
20 the same time, if you have problems within the
21 organization, you bring them to light within the
22 organization so that they can be fixed from within, also.
23       (Interruption.)
24

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 18

1  BY MR. NEUBERGER:
2  Q.  Does the Delaware State Police strive to treat
3  all people equally?
4  A.  Yes, we do.
5  Q.  Do they strive to treat all people equally
6  regardless of whether they are rich or regardless of
7  whether they are poor?
8  A.  That's correct.
9  Q.  How about if they are black or they are white,
10 does that matter?
11 A.  It does not matter.  They are treated equally.
12 Q.  How about if they are male or if they are
13 female?
14 A.  Doesn't matter.  They are treated equally.
15 Q.  What about if they are weak or if they are
16 powerful?
17 A.  Doesn't matter.
18 Q.  Is treating all people equally something that's
19 important to the Delaware State Police?
20 A.  Yes, it is.
21 Q.  Is it important to you?
22 A.  Yes, it is.
23 Q.  Would it be fair to say that treating people
24 equally and fairly is even more important in the Delaware

Page 19

1  State Police because you are charged with enforcement of
2  the law?
3  A.  Absolutely.
4  Q.  Is it of paramount importance that the law be
5  applied equally and fairly to all people?
6  A.  Yes.
7  Q.  Colonel, I'm going to put some documents in
8  front of you, or a document in front of you.
9       MR. NEUBERGER:  I would like to mark this
10 as Plaintiff's Exhibit 15.
11      (Plaintiff's Exhibit 15 was marked for
12 identification.)
13      MS. BALLARD:  For the record, Exhibit
14 Number 15 is a continuation of numbering from the
15 depositions of Colonel Chaffinch and Lieutenant Aviola.
16      MR. NEUBERGER:  Yes, it is.
17 BY MR. NEUBERGER:
18 Q.  Colonel, do you have that document in front of
19 you?
20 A.  Yes, I do.
21 Q.  Now, how many pages are in this document?
22 A.  There are seven and one blank.  The eighth page
23 is blank.
24 Q.  Sorry about that.

Page 20

1       On the first page, at the bottom of the
2  first page is there a Roman numeral VII-1-1?
3  A.  Yes, there is.
4  Q.  On the last page which actually has text on it,
5  is there a Roman numeral VII-2-5?
6  A.  Yes, there is.
7  Q.  Now, do the Delaware State Police have rules and
8  regulations which govern the conduct of officers?
9  A.  Yes, they do.
10 Q.  Is there a code of ethics or something of a
11 similar nature which governs the conduct of officers?
12 A.  Yes, there is.
13 Q.  Now, on the first page of this document in front
14 of you, at the top does it say "Preamble to Code of
15 Ethics and Rules & Regulations Introduction"?
16 A.  Yes, it does.
17 Q.  I would like to direct your attention to the
18 fourth paragraph.  Could you read that to me?
19 A.  "Under our form of government, where public
20 confidence in the institutions of government is
21 essential, it is vital that the system upon which public
22 safety depends is maintained at a high level of
23 efficiency and that the system is administered in a
24 manner to assure the continued approval and respect of

Page 21

1  the public."
2  Q.  So does that paragraph indicate that public
3  confidence in the institutions of government is
4  essential?
5  A.  Yes, I read it to read that the daily activity,
6  the actions of troopers and the jobs that we do must be
7  done efficiently and fairly so that the public has
8  confidence in what we do.
9  Q.  Do you agree with that statement?
10 A.  Yes, I do.
11 Q.  Now I'd like to direct your attention to the
12 fifth paragraph.  I'm going to read the second sentence
13 to you.  Okay?
14 A.  Yes.
15 Q.  Does the sentence reads:  "Because the community
16 grants him far more discretion and authority than the
17 ordinary citizen does, he is expected to conform to a
18 higher standard of conduct than the ordinary citizen
19 does."
20      Does it say that?
21 A.  Yes, it does.
22 Q.  Do you agree that a police officer is expected
23 to conform to a higher standard of conduct than an
24 ordinary citizen is expected to?

6 (Pages 18 to 21)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 22
1  A. Yes.
2  Q. I would like to read the next sentence to you.
3  It starts on this page and it goes over on to the next
4  page. Okay?
5  A. Okay.
6  Q. Does it say: "The price of the authority
7  granted a State Police officer is not only the
8  expectation that he will discharge his legal duties but
9  that he will attempt to avoid even the appearance of
10 impropriety"? Does it say that?
11 A. Yes, it does.
12 Q. Do you agree with that?
13 A. Yes, I do.
14 Q. Now we are still on the second page of that
15 document, which at the very bottom says Roman numeral
16 VII-1-2.
17       Does it say here that this was "Promulgated
18 and signed this 15th day of November, 2000"?
19 A. Yes, it does.
20 Q. Is that the signature of Colonel Gerald R.
21 Pepper, Jr.?
22 A. That's correct.
23 Q. At the time was he the superintendent of the
24 Division of State Police?

Page 23
1  A. Yes, he was.
2  Q. Do you know if this Preamble to the Code of
3  Ethics and Rules & Regulations introduction is still in
4  force under your leadership?
5  A. It is in force.
6  Q. I would like you to turn to the third page which
7  at the top says "Preamble to Law Enforcement Code of
8  Ethics." Do you see that?
9  A. Yes, I do.
10 Q. Do you see at the bottom it has Roman numeral
11 VII-2-1?
12 A. Yes, I do.
13 Q. I would like to direct your attention to the
14 first paragraph. Just read that quietly to yourself.
15 A. (The witness reviews the document.)
16 Q. Tell me when you're done.
17 A. I'm done.
18 Q. Does this first paragraph indicate that one of a
19 police officer's fundamental duties is to protect the
20 innocent against deception?
21 A. Yes, it does.
22 Q. Do you agree that that is one of a law
23 enforcement officer's primary duties?
24 A. It is, yes, it is one of their duties.

Page 24
1  Q. Do you believe that that's one of the primary
2  duties of Delaware state troopers?
3  A. Yes, it is.
4  Q. Does this paragraph also indicate that one of
5  the fundamental duties of a Delaware state trooper is to
6  protect the weak against oppression or intimidation?
7  A. Yes.
8  Q. And do you agree with that statement?
9  A. Yes, I do.
10 Q. Does this paragraph also indicate that one of
11 the fundamental duties of a Delaware state trooper is to
12 respect the Constitutional rights of all men to liberty,
13 equality, and justice?
14 A. Yes, it does.
15 Q. Do you agree with that statement?
16 A. Yes, I do.
17 Q. I would like to direct your attention to the
18 second paragraph on that same page. Do you have that in
19 front of you?
20 A. Yes, I do.
21 Q. Does the first portion of the first sentence of
22 that paragraph indicate that a law enforcement officer
23 will conduct his private life above reproach?
24 A. That's the first line.

Page 25
1  Q. Do you agree that a law enforcement officer
2  should conduct his private life above reproach?
3  A. Yes.
4  Q. I would like to direct your attention to the
5  second sentence in that same paragraph. I'm going to
6  read that to you. Okay?
7  A. Yes.
8  Q. Does it say: "Honest in thought and deed in
9  both my personal and official life, I will be exemplary
10 in obeying the laws of the land and the regulations of my
11 Department"? Does it say that?
12 A. Yes, it does.
13 Q. Do you agree that an officer should do that?
14 A. Yes, I do.
15 Q. I would like to direct your attention to the
16 last sentence of that same paragraph. Okay?
17 A. Yes.
18 Q. Does it say: "Whatever I see or may hear of a
19 confidential nature or that is confided to me in my
20 official capacity will be kept secret unless revelation
21 is necessary in the performance of my duty"? Does it say
22 that?
23 A. Yes.
24 Q. Do you agree that that is very important for a

7 (Pages 22 to 25)

Page 26

1  state trooper?
2  A. Yes, I do.
3  Q. You are the colonel of all the state troopers;
4  correct?
5  A. That's right.
6  Q. I would like to direct your attention to the
7  third paragraph, the first sentence of that paragraph.
8  I'm going to read that to you. Okay?
9  A. Yes.
10 Q. All right. Does it say: "I WILL never act
11 officiously or permit personal feelings, prejudices,
12 animosities, or friendships to influence my decisions"?
13 A. Yes, it does.
14 Q. Now, do you agree with that?
15 A. Yes, I do.
16 Q. Do you agree that that is very important for
17 state police officers and for police officers, in
18 general?
19 A. Yes, I do.
20 Q. I would like to direct your attention to the
21 fourth paragraph and the last paragraph on this same
22 page, the second sentence of that paragraph.
23       Does that state: "I will constantly strive
24 to achieve these objectives and ideals, dedicating myself

Page 27

1  before God to my chosen profession .... law enforcement"?
2  Does it say that?
3  A. Yes, it does.
4  Q. Does this indicate that police officers will
5  constantly strive to achieve some of these objectives and
6  ideals which I previously read to you?
7  A. Yes, it does.
8  Q. Do you agree that a police officer should
9  constantly strive to achieve those objectives and ideals?
10 A. Yes, I do.
11 Q. I would like you to turn the page and at the top
12 of this page does it say "Canons of Law Enforcement
13 Ethics"?
14 A. Yes, it does.
15 Q. At the bottom of the page Roman numeral VII-2-2?
16 A. Yes, it does.
17 Q. Could you read the first paragraph for me under
18 the heading Article 1, "Primary Responsibility"?
19 A. "The primary responsibility of law enforcement,
20 and the individual officer, is the protection of the
21 people of the United States through the upholding of
22 their laws; paramount among these is the Constitution of
23 the United States and its amendments. The law
24 enforcement officer always represents the whole of the

Page 28

1  community and its legally expressed will and is never the
2  arm of any political party or clique."
3  Q. Now, does this paragraph indicate that one of
4  the primary responsibilities of law enforcement officers
5  is upholding federal law in the United States
6  Constitution?
7  A. Yes, it does.
8  Q. Is that important to the Delaware State Police?
9  A. Yes, it is.
10 Q. Is that something that you agree with?
11 A. Yes, I do.
12 Q. Does this paragraph also indicate that a law
13 enforcement officer should represent the public as a
14 whole and not just a small subset of the public such as a
15 clique?
16 A. That's correct.
17 Q. Is that something that is important to the
18 Delaware State Police?
19 A. Yes, it is.
20 Q. Is that something that is important to you?
21 A. Yes, it is.
22 Q. I would like to direct your attention to the
23 second paragraph here. It's entitled Article 2,
24 "Limitations of Authority." Do you see that?

Page 29

1  A. Yes, I do.
2  Q. I would like you to read me the last sentence of
3  that paragraph. The sentence that begins --
4  A. If you don't mind, Mr. Neuberger, I would like
5  to read the whole thing before I get to that. Then I
6  will read that out loud for you.
7  Q. No problem.
8  A. (The witness reviews the document.)
9       "He must recognize the genius of the
10 American system of government which gives to no man,
11 groups of men, or institution, absolute power, and he
12 must insure that he, as a prime defender of that system,
13 does not desecrate its character."
14 Q. The "he" in that sentence, that's referring to
15 law enforcement officers such as state troopers; is that
16 correct?
17 A. That's correct.
18 Q. Do you agree with the sentiment of this
19 paragraph, and specifically what that last sentence you
20 just read expresses?
21 A. Yes, I do.
22 Q. Do you believe that it's very important to a
23 state trooper not to desecrate the American system of our
24 government?

Case 1:04-cv-01394-GMS   Document 77-6   Filed 09/19/2005   Page 5 of 15

Conley                                         v.                                 Chaffinch, et al.
Corporal Thomas F. MacLeish          C.A. # 04-1394-GMS               June 9, 2005

**Page 30**

1  A. That's true.
2  Q. Would that include not desecrating the
3  United States Constitution?
4  A. That's true.
5  Q. I would like to direct your attention to
6  Article 3, which is entitled "Duty to be Familiar with
7  Law and Responsibilities." Do you see that?
8  A. Yes, I do.
9  Q. I would like to read the first sentence to you.
10 Okay?
11 A. Yes.
12 Q. Does that say: "The law enforcement officer
13 shall diligently apply himself to the study of the
14 principles of the laws which he is sworn to upheld"?
15 A. It says "to uphold," yes.
16 Q. I'm sorry. "To uphold."
17 A. Yes.
18 Q. Do you agree with that sentiment?
19 A. Yes, I do.
20 Q. Do you agree that a Delaware state trooper
21 should study the laws he's sworn to uphold?
22 A. Yes, I do.
23 Q. Would that include the United States
24 Constitution and its amendments?

**Page 31**

1  A. Yes.
2  Q. Do you think that's something that's important
3  to the Delaware State Police?
4  A. Yes, I do.
5  Q. I would like to direct your attention to
6  Article 4, "Utilization of Proper Means to Gain Proper
7  Ends." This is the last paragraph on that page. Do you
8  see it?
9  A. Yes, I do.
10 Q. I would like to read to you the second sentence.
11 Okay?
12 A. Yes.
13 Q. Actually, the first half of the second sentence.
14 Okay? Up until the semicolon. "Violations of law or
15 disregard for public safety and property on the part of
16 an officer are fundamentally wrong;..." Does it say
17 that?
18 A. Yes, it does say that.
19 Q. Does the sentence then continue and say:
20 "...they are self-defeating in that they instill in the
21 public mind a like disposition"? Does it say that?
22 A. Yes.
23 Q. Would you agree that violations of law or
24 disregard for public safety and property on the part of

**Page 32**

1  law enforcement officers is fundamentally wrong?
2  A. Yes, I do.
3  Q. Is that something which would be of concern to
4  the Delaware State Police?
5  A. Yes, it is.
6  Q. Is that something that would be of concern to
7  you, personally?
8  A. Yes, it is.
9  Q. I would like to read to you the last sentence of
10 that same paragraph. Okay?
11 A. Okay.
12 Q. Does that say: "If the law is to be honored, it
13 must first be honored by those who enforce it"?
14 A. That's correct.
15 Q. Do you agree with that?
16 A. Yes, I do.
17 Q. Do you think that's something that's important
18 in society, that those who enforce the law should also
19 follow it?
20 A. Yes, I do.
21 Q. I would like to turn the page. At the bottom of
22 this page does it same Roman numeral VII-2-3?
23 A. Yes, it does.
24 Q. I would like to direct your attention to the

**Page 33**

1  second paragraph, which is entitled Article 6, "Private
2  Conduct." Do you see that?
3  A. Yes, I do.
4  Q. Could you read me the first three sentences,
5  please?
6  A. "The law enforcement officer shall be mindful of
7  his special identification by the public as an upholder
8  of the law. Laxity of conduct or manner in private life,
9  expressing either disrespect for the law or seeking to
10 gain special privilege, cannot but reflect upon the
11 police officer and the police service. The community and
12 the service require that the law enforcement officer lead
13 the life of a decent and honorable person. Following the
14 career of a police officer gives no person special
15 financial gains."
16 Q. Do you agree with those sentiments?
17 A. Yes, I do.
18 Q. Do you think those sentiments are important to
19 the Delaware State Police?
20 A. Yes, I do.
21 Q. Now I would like to read you the last sentence
22 of that same paragraph. Okay?
23 A. Yes.
24 Q. Does that read: "Rather, he will so conduct his

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 34
1  private life that the public will regard him as an
2  example of stability, fidelity, and morality"?
3      A.  Yes, it does.
4      Q.  Do you agree with that statement?
5      A.  Yes, I do.
6      Q.  Is that statement something which is important
7  to the Delaware State Police?
8      A.  Yes, it is.
9      Q.  All right.  You can put that document down.
10          I would like to put another document in
11  front of you.  Okay?
12      A.  Yes.
13          MR. NEUBERGER:  This is going to be marked
14  as Plaintiff's Exhibit 16.
15          (Plaintiff's Exhibit 16 was marked for
16  identification.)
17  BY MR. NEUBERGER:
18      Q.  Do you have that document in front of you?
19      A.  Yes, I do.
20      Q.  I need to say that for the purpose of the actual
21  record.
22      A.  I understand.  I understand.
23      Q.  Now, at the top of this page does it say
24  "Delaware State Police Rules and Regulations?

Page 35
1      A.  Yes, it does.
2      Q.  I believe you indicated before that the Delaware
3  State Police does have certain rules and regulations that
4  govern the conduct of its officers; is that correct?
5      A.  Yes, it does.
6      Q.  Are these rules and regulations revised very
7  often?
8      A.  Yes, they are.
9      Q.  How often?  On a regular basis?  Is it --
10      A.  On a regular basis they are reviewed.  If you
11  see at the bottom the OPR says, and that's the Office of
12  Professional Responsibility, superintendent's office and
13  the OIC of Internal Affairs.  So on an annual basis they
14  are reviewing these, our rules and regulations, and how
15  do they apply and so forth.  And then they are updated or
16  changed or whatever is necessary.
17      Q.  Thank you.  That's helpful.
18          I would like to direct your attention to
19  rule and regulations number 1.  Do you see that?
20      A.  Yes, I do.
21      Q.  Now, read that quietly to yourself.  Okay?
22      A.  (The witness reviews the document.)  I've read
23  it.
24      Q.  Does that paragraph indicate that members of the

Page 36
1  Delaware State Police shall observe and obey state and
2  federal laws, DSP rules and regulations, as well as a
3  host of other sources of law or sources of standards?
4      A.  Yes, it does.
5      Q.  Do you agree with that statement?
6      A.  Yes, I do.
7      Q.  Is this rule number 1 something that is
8  important to the Delaware State Police?
9      A.  Yes, it is.
10      Q.  I would like to direct your attention to rule
11  number 2.  Do you see that?
12      A.  Yes, I do.
13      Q.  Now read that quietly to yourself.
14      A.  (The witness reviews the document.)  Okay.
15      Q.  Have you read that?
16      A.  Yes, I have.
17      Q.  Does that paragraph indicate that all members of
18  the Delaware State Police should maintain a general
19  loyalty to the division?
20      A.  Yes, it does.
21      Q.  It says that that loyalty should be consistent
22  with state and federal laws, rules and regulations, and
23  things of that nature; correct?
24      A.  Yes, it does.

Page 37
1      Q.  Do you agree with that?
2      A.  Yes, I do.
3      Q.  Now I would like to direct your attention to
4  rule number 3.  Do you see that?
5      A.  Yes, I do.
6      Q.  Now, read that quietly to yourself and tell me
7  when you are done reading it.
8      A.  (The witness reviews the document.)  I've read
9  it.
10      Q.  Does that paragraph indicate that a member of
11  the Delaware State Police has an obligation to report a
12  fellow police officer if they know that that individual
13  has violated state or federal law?
14      A.  Yes, it does.
15      Q.  They're supposed to report that officer to the
16  Internal Affairs division or the Internal Affairs
17  officer?
18      A.  That's what it says, yes.
19      Q.  Do you believe that a Delaware state trooper has
20  an obligation to report to Internal Affairs violations
21  committed by other troopers of state and/or federal law?
22      A.  Yes.
23      Q.  Do you believe that a Delaware state trooper has
24  an obligation to report to Internal Affairs violations of

10 (Pages 34 to 37)

Page 38

1  the DSP rules and regulations when committed by fellow
2  officers?
3     A.  Yes.
4     Q.  Take a look at rule number 4. Do you see that?
5     A.  Yes, I do.
6     Q.  Read it quietly to yourself.
7     A.  (The witness reviews the document.) I've read
8  it.
9     Q.  Does this paragraph indicate that members of the
10 Delaware State Police shall conduct themselves, both on
11 and off duty, in a manner which will reflect most
12 favorably on the Division of State Police?
13    A.  Yes, I do.
14    Q.  Do you agree with that sentiment?
15    A.  Yes, I do.
16    Q.  Does it also indicate that conduct unbecoming an
17 officer includes conduct which brings the division into
18 disrepute or reflects discredit upon the officer?
19    A.  Yes.
20    Q.  Do you agree with that statement?
21    A.  Yes, I do.
22    Q.  Still on that first page, at the bottom of the
23 page it says Roman numeral VII-3-1, does it not?
24    A.  Yes, it does.

Page 39

1     Q.  I would like you to turn to the third page in.
2  At the bottom of that page does it say Roman numeral
3  VII-3-3?
4     A.  Yes, it does.
5     Q.  I would like to direct your attention to rule
6  and regulation number 10. Do you see that?
7     A.  Yes, I do.
8     Q.  Does that rule and regulations indicate that
9  "Members shall treat as confidential the official
10 communications and business of the Division"?
11    A.  Yes, it does.
12    Q.  Now, do you agree with that statement?
13    A.  Yes, I do.
14    Q.  Is that statement the policy of the Delaware
15 State Police?
16    A.  Yes, it is.
17    Q.  All these rules and regulations reflect the
18 policy of the Delaware State Police; correct?
19    A.  Yes, they do.
20    Q.  These rules and regulations are very important
21 to you?
22    A.  That's correct.
23    Q.  Is rule number 10 important to you?
24    A.  Yes, it is.

Page 40

1     Q.  I would like to direct your attention to rule
2  number 15. It's down little farther on the same page.
3  Have you found that?
4     A.  Yes, I have.
5     Q.  Now, let me read that to you. Does that say:
6  "No member shall knowingly make a false statement,
7  falsify any written or verbal report made to a superior
8  officer, or willingly and intentionally withhold material
9  matter from such report or statement"?
10    A.  Yes, it does.
11    Q.  In general, does that rule punish dishonest
12 conduct by officers?
13    A.  Yes, it does.
14    Q.  Is honesty a big deal to police officers?
15    A.  Honesty and integrity, yes.
16    Q.  Do you have any knowledge of Attorney General
17 Brady sending a letter to the police chief several years
18 ago saying how officers with dishonesty convictions
19 should not be put into positions dealing with criminal
20 cases or in positions where they would have to testify in
21 criminal cases?
22    A.  You've paraphrased that very well and, yes, it's
23 a recommendation that she makes.
24    Q.  That's a recommendation made by Attorney General

Page 41

1  Brady as the attorney general of the State of Delaware?
2     A.  Correct.
3     Q.  Why would police officers with dishonesty
4  convictions be a problem in the Delaware State Police?
5     A.  It goes to their integrity when they testify.
6  Many times it's just the police officer's findings of
7  fact and it's their testimony as to what they've seen,
8  what they've observed, what they've discovered. They're
9  given a lot of authority to arrest people and so forth.
10 And if they were dishonest, they could very well trump
11 something up.
12    Q.  So would it be fair to say that a police
13 officer's authority should not be abused because that can
14 reflect poorly upon the division and upon the public?
15    A.  That's correct.
16    Q.  Do you think that could have been one of the
17 things motivating Attorney General Brady in sending that
18 letter?
19        MS. BALLARD:  Object to the form.
20    Q.  You can answer.
21    A.  (No response.)
22    Q.  If you don't know, you can just say so.
23    A.  I don't -- I don't know what her thought was in
24 sending it.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

**Page 42**

1  Q.  Now, look at rule number 16 and then rule number
2  17 over on the next page.  Do you see those?
3  A.  Yes, I see 16 and I see 17.
4  Q.  Take a quick look at both of those rules.  Read
5  them quietly to yourself and tell me when you're done.
6  A.  (The witness reviews the document.)  I've read
7  them.
8  Q.  Do those rules also deal with falsification and
9  making false statements, putting false statements in
10 reports and things of that nature?
11 A.  Yes, it does.
12 Q.  Are those things frowned upon in the Division of
13 State Police?
14 A.  Yes, they are.
15 Q.  Take a look at rule number 18.  It's on the page
16 which at the bottom says Roman numeral VII-3-4.  Do you
17 see that?
18 A.  Yes, I do.
19 Q.  I would like to read rule number 18, subsection
20 B to you.  Okay?
21 A.  Okay.
22 Q.  Does that read:  "Any information obtained in an
23 official capacity shall not be disclosed either in
24 writing or orally to any unauthorized person, and no

**Page 43**

1  officer will divulge any matter that is his duty to keep
2  secret"?  Does it say that?
3  A.  Yes, it does.
4  Q.  Do you agree with that statement?
5  A.  Yes, I do.
6  Q.  Is that something that's important to the
7  Delaware State Police?
8  A.  Yes, it is.
9  Q.  Is that the policy of the Delaware State Police?
10 A.  Yes, it is.
11 Q.  Is that one of the procedures of the Delaware
12 State Police?
13 A.  Yes, it is.
14 Q.  I would like to direct your attention to rule
15 number 19, just below rule number 18, which is entitled
16 "Disclosure of Information - News Media."  Do you see
17 that?
18 A.  Yes.
19 Q.  I would like to read subsection A to you.  Okay?
20 A.  Yes.
21 Q.  Does that say:  "A member shall give information
22 to the news media in accordance with procedures
23 established by the Division"?
24 A.  Yes, it does.

**Page 44**

1  Q.  Does that statement reflect the policy of the
2  State Police?
3  A.  Yes, it does.
4  Q.  Does that statement reflect the procedure of the
5  State Police?
6  A.  Yes, it does.
7  Q.  Is that statement important to the State Police?
8  A.  Yes, it is.
9  Q.  Is that statement important to you, personally?
10 A.  Yes.
11 Q.  I would like you to turn to the next page.  At
12 the bottom it says Roman numeral VII-3-5.  Do you see
13 that?
14 A.  Yes, I do.
15 Q.  Rule number 21 is on that page; correct?
16 A.  Yes, it is.
17 Q.  That deals with "Deadly Force"?
18 A.  Yes, it does.
19 Q.  That deals with when deadly force should be used
20 and when it should not be used and things of that nature?
21 A.  That's correct.
22 Q.  Is that something that's important to the State
23 Police?
24 A.  Yes, it is.

**Page 45**

1  Q.  I would like you to turn to the next page, which
2  has Roman numeral VII-3-6 on the bottom.  Do you see
3  that?
4  A.  Yes, I do.
5  Q.  I would like to direct your attention to rule
6  number 22, which is entitled "Use of Force."  Do you see
7  that?
8  A.  Yes, I do.
9  Q.  I would like to read subsection A to you.  Okay?
10 A.  Yes.
11 Q.  Does that say:  "No member of the Division shall
12 use excessive, unnecessary or unreasonable force in the
13 performance of his duties"?
14 A.  Yes, it does.
15 Q.  Is that pretty clear and unequivocal?
16 A.  Yes.
17 Q.  Is that something that's important to the State
18 Police?
19 A.  Yes, it is.
20 Q.  Is that one of the policies and procedures of
21 the State Police?
22 A.  Yes, it is.
23 Q.  What if someone told you to violate that rule.
24 Would you?

12 (Pages 42 to 45)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 46

1  A.  No.
2  Q.  Why?
3  A.  You don't -- you don't bully people. You don't
4  beat people up.
5  Q.  How come?
6  A.  Not only because it's against the rule, it's
7  against moral character. You have the authority -- you
8  have the authority to act in only as much force as is
9  necessary. I think that's what's missing in that
10 context. That it can be anything from a verbal put that
11 down, don't leave, you're under arrest, verbal commands
12 to putting your hands on somebody to, you know,
13 resistance level escalating and so forth. But to have
14 somebody just telling me to go use force against somebody
15 when there's no need to use force against them, it's not
16 going to be done.
17 Q.  Is it important the fact that it's just simply a
18 rule of the division putting aside the morality of it?
19 A.  I think even more so it's the morality of it,
20 but, yes, it is a rule in the division and it must be
21 followed.
22 Q.  So all the rules of the division must be
23 followed? Would that be fair to say?
24 A.  That's a pretty blanket statement, but, yes,

Page 47

1  they're there to be followed. Are they always followed?
2  No.
3  Q.  Can officers be prosecuted or brought up on
4  Internal Affairs charges if they don't follow the rules
5  of the division?
6  A.  Yes.
7  Q.  What if you were instructed to violate the rule
8  regarding deadly force, which is rule and regulation
9  number 21. Would you?
10 A.  No.
11 Q.  Why?
12 A.  It's morally wrong. You don't kill somebody.
13 Q.  I would like you to flip five papers. At the
14 bottom is VII-3-11.
15 A.  Got it.
16 Q.  At the top of that page does it say "Delaware
17 State Police Policy Against Sexual and Other Harassment
18 and Improper Workplace Behavior"?
19 A.  Yes, it does.
20 Q.  Could you read the very first paragraph to me?
21 It's in bold.
22 A.  "The Delaware State Police is committed to
23 providing a workplace environment for all employees that
24 is free from any form of sexual or other harassment and

Page 48

1  encourages employees to conduct themselves with integrity
2  and in a professional manner affording respect to
3  subordinates and co-workers."
4  Q.  Do you agree with that statement?
5  A.  Yes, I do.
6  Q.  Is that important DSP policy?
7  A.  Yes, it is.
8  Q.  Is that important to you, personally?
9  A.  Yes, it is.
10 Q.  I would like to direct your attention to the
11 fourth paragraph down, the one that starts with the words
12 "Discrimination on the basis of." Do you see that?
13 A.  Got it.
14 Q.  Just read that paragraph quietly to yourself and
15 tell me when you're done.
16 A.  (The witness reviews the document.) I've read
17 it.
18 Q.  Does that paragraph generally indicate that
19 discrimination on the basis of sex is illegal under
20 certain state and federal laws?
21 A.  Yes, it is.
22 Q.  It lists a state law and it also lists a federal
23 law, correct?
24 A.  Yes, it does.

Page 49

1  Q.  You are aware discrimination on the base of sex
2  also violates the United States Constitution; correct?
3  A.  That's correct.
4  Q.  Could you turn the page? At the bottom of the
5  page it has VII-3-12. Do you see that?
6  A.  Yes, I do.
7  Q.  Can you read to me the paragraph in the very
8  middle of the page which says "Improper Workplace
9  Behavior"? It's in bold.
10 A.  Yes.
11 Q.  Could you read that aloud, please?
12 A.  "Improper Workplace Behavior is defined as
13 offensive conduct of a personal or sexual nature within
14 the workplace. Severe and/or repeated incidents of
15 improper workplace behavior may rise to the level of
16 sexual or other harassment."
17 Q.  What do you think about improper workplace
18 behavior in the workplace that is the Delaware State
19 Police?
20 A.  Could you clarify your question, please?
21 Q.  Are you in favor of improper workplace behavior
22 or are you against improper workplace behavior?
23 A.  I'm against it.
24 Q.  Could you read the rest of the page quietly to

13 (Pages 46 to 49)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

### Page 50

1 yourself?
2    A. (The witness reviews the document.) I've read
3 it.
4    Q. Do you agree that those types of things are
5 frowned upon in the Delaware State Police?
6    A. Yes, they are.
7    Q. Do you agree that graphic sexual descriptions
8 have no place in the verbal or written communications of
9 Delaware State Police officers outside the course of
10 enforcing the criminal law? That was very unclear.
11 Don't answer that question.
12       Do you believe that verbal behavior not
13 related to work activities such as graphic sexual
14 behavior, graphic sexual descriptions and things of that
15 nature have anyplace in the workplace?
16    A. They do not.
17    Q. Do you believe that offensive jokes, jesting, or
18 kidding based upon gender or race which have a lewd,
19 risque, or sexual nature have anyplace in the workplace
20 when they are not related to work activities?
21    A. No, they do not.
22    Q. Do you believe that reflects the policy of the
23 Delaware State Police?
24    A. That's correct.

### Page 51

1    Q. I would like you to turn to the page which at
2 the bottom says Roman numeral VII-3-15. Have you found
3 that?
4    A. Yes, I have.
5    Q. Do you see the paragraph, the second paragraph
6 at the top which begins "Also if appropriate"?
7    A. Yes.
8    Q. Could you read that quietly to yourself?
9    A. (The witness reviews the document.) Yes, I've
10 read it.
11    Q. This paragraph mentions some training relative
12 to sexual harassment laws and/or the policy on improper
13 workplace behavior. It mentions that, doesn't it?
14    A. Yes, it does.
15    Q. Putting the document down, do officers receive
16 training in the Delaware State Police when it comes to
17 sexual harassment laws and the policy on improper
18 workplace behavior?
19    A. Yes, they do.
20    Q. What kind of training is it?
21    A. Usually it's an in-service training or the Human
22 Resources Department conducts updated training on that on
23 an annual basis. It's a portion of a presentation that's
24 done. You get three days of in-service training to

### Page 52

1 update on a multitude of things within the division.
2 This is usually one of those that are covered.
3       Also on an annual basis the
4 nondiscrimination and sexual harassment policies are
5 normally distributed and the statements are made for a
6 work -- work free environment of this type of thing, of
7 nondiscrimination and/or sexual harassment.
8    Q. Okay. Thank you.
9       I would like you to turn to the very last
10 page of this exhibit. At the bottom it has Roman numeral
11 VII-3-18. Do you see that?
12    A. Yes, I do.
13    Q. Could you take a look at the last paragraph and
14 read it quietly to yourself?
15    A. (The witness reviews the document.) I've read
16 it.
17    Q. Now, does this paragraph indicate that the
18 sexual harassment and improper workplace behavior applies
19 to all uniformed employees?
20    A. Yes, all employees, all interaction with anyone.
21    Q. Including uniformed employees?
22    A. Yes.
23    Q. Does it indicate that it applies to all
24 communications whether initiated or transmitted on to

### Page 53

1 others, whether verbal or nonverbal, in person, or by
2 mail, telephone, electronic mail, voice mail, facsimile,
3 or other form?
4    A. Yes.
5    Q. So would it be fair to say this paragraph
6 indicates that it applies to all communications which
7 occur in Delaware State Police?
8    A. That's correct.
9    Q. This is something which is important to the
10 Delaware State Police, eliminating sexual and other
11 harassment as well as improper workplace behavior in all
12 communications in the Delaware State Police?
13    A. Yes, it does.
14    Q. At the bottom here this indicates that Colonel
15 Gerald R. Pepper, Jr., the superintendent, was
16 responsible for promulgating this?
17    A. Yes.
18    Q. Is this still in effect?
19    A. Yes, it is.
20    Q. You can put that document down.
21       If someone told you to violate the DSP
22 policy on sexual harassment, other harassment and
23 improper workplace behavior, would you violate that
24 policy?

14 (Pages 50 to 53)

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

**Page 54**

1  A. No, I would not.
2  Q. How come?
3  A. It's wrong by standard. It's morally wrong,
4  also.
5  Q. So the second thing you indicated was that it's
6  morally wrong; correct?
7  A. Yes.
8  Q. Are morals important in the Delaware State
9  Police?
10  A. Yes, they are.
11  Q. The first thing you mentioned was that it's
12  wrong by standard. What did you mean by it is wrong by
13  standard?
14  A. We just went through the policy. There's rules
15  prohibiting that type of behavior.
16  Q. So in addition to being morally wrong, it's also
17  wrong because there are rules and policies prohibiting
18  it; correct?
19  A. That's correct.
20  Q. If someone told you to discriminate against an
21  employee because of their race, would you?
22  A. No.
23  Q. How come?
24  A. It's wrong. It's wrong by rule and regulation

**Page 55**

1  and it's morally wrong.
2  Q. How about if they told you to retaliate against
3  somebody because they had spoken out?
4  A. I wouldn't do it.
5  Q. How come?
6  A. It's the wrong thing to do. It's prohibited by
7  rules and regulations.
8  Q. I would like to change gears a little bit and
9  move on to something a little more interesting. Okay?
10  A. Okay.
11  Q. Did there come a time when Major Paul Eckrich
12  was promoted to major?
13  A. Yes, there was.
14  Q. Do you know when that was?
15  A. I want to say February or March of '03. I
16  believe it was '03, yes.
17  Q. Now, could you please describe the promotion
18  process to me that resulted in Major Eckrich being
19  promoted to major?
20  A. He was selected by the colonel.
21  Q. Was there a written process?
22  A. I wouldn't know. He was selected by the
23  colonel.
24  Q. Were there any objective standards for the

**Page 56**

1  promotion process?
2  A. He was selected by the colonel.
3  Q. So you are indicating that you don't know
4  whether there were any objectives --
5  A. In fact, when I was told -- Major Eckrich worked
6  for me as a captain in Troop 4 at that time. I was told
7  he was coming up on staff. Major Swiski had retired.
8  Major Eckrich was selected.
9  Q. Who told you?
10  A. I don't recall. It was one of two people.
11  Q. Who are those two people?
12  A. It would have either been Lieutenant Colonel
13  Marcin at that time or Colonel Chaffinch.
14  Q. For the purposes of the record, what was your
15  rank at that time?
16  A. I was major. I was a major.
17  Q. So it was then-Colonel Chaffinch who made the
18  decision to promote Major Eckrich from captain to the
19  rank of major?
20  A. Yes.
21  Q. Were there any executive staff meetings where
22  this was discussed?
23  A. No.
24  Q. Did he just walk in one day and say, Paul's

**Page 57**

1  being promoted?
2  A. Those are your words, did he just walk in. My
3  recollection of that time period is that Major Swiski had
4  announced his retirement. They were looking for a
5  replacement. Speculation of who it would be -- it's the
6  colonel's decision to make. It's his discretionary
7  opinion to select who he wants to be major. He
8  selected -- he selected Captain Eckrich as major.
9  Q. How long a time period was there between the
10  time when Major Swiski stepped down and when then-Captain
11  Eckrich was promoted or announced to go in the spot?
12  A. I don't recall -- I don't recall a specific time
13  period. I don't recall it taking a long period of time.
14  Q. So to the best of your knowledge, the only
15  person that had any input into that decision would have
16  been Colonel Chaffinch?
17  A. I don't know what Colonel Chaffinch -- I know he
18  didn't ask me who I thought it should be.
19  Q. Do you know if he asked anybody else?
20  A. I have no idea.
21  Q. Do you know if he consulted with then-Secretary
22  Ford?
23  A. I wouldn't have any idea.
24  Q. Do you know if he consulted with the governor?

15 (Pages 54 to 57)

Case 1:04-cv-01394-GMS   Document 77-6   Filed 09/19/2005   Page 12 of 15

Conley                                v.                              Chaffinch, et al.
Corporal Thomas F. MacLeish      C.A. # 04-1394-GMS                   June 9, 2005

Page 58

1  A. No idea.
2  Q. Do you know why he decided to promote Captain
3  Eckrich to major?
4  A. For that position, more than likely Captain
5  Eckrich had worked within the administrative offices in
6  the past, had worked directly for that major -- not Major
7  Swiski, but the previous administrative officer. I
8  believe his education and background was one of business
9  management. He had a background in budgets and so forth.
10 He thought -- I guess he felt he was the best person for
11 the job.
12 Q. Were there any another reasons for the colonel's
13 decision that you are aware of?
14 A. Not that I'm aware of.
15 Q. Do you know if he considered loyalty to the
16 superintendent as one of the factors when deciding to
17 promote Captain Eckrich to major?
18 A. There's got to be a clarification here. I don't
19 know if that was one of the things that he would have
20 considered in that particular instance.
21 Q. Sure.
22 A. But I think that would be a consideration that
23 he may have made. I can't say specifically that he made
24 that one, but --

Page 59

1  Q. So, in general, when then-Colonel Chaffinch was
2  making personnel decisions, was loyalty one of the
3  factors which he would consider across the board for
4  promotions, transfers, or any other type of personnel
5  decision?
6  A. No, I wouldn't --
7      MS. BALLARD: Object to the form.
8      You can answer.
9  Q. You can answer.
10 A. Okay. I was watching who was talking at the
11 time.
12     Would you please repeat the question?
13 Q. Sure.
14     I think you just indicated that in the
15 decision to promote Major Eckrich that you didn't know
16 whether Colonel Chaffinch considered Major Eckrich's
17 loyalty to Colonel Chaffinch as one of the factors;
18 correct?
19 A. I stated that he did not share with me what he
20 thought it would be, and I indicated that that would,
21 perhaps, be a consideration in that assignment.
22 Q. But you didn't have any specific recollection --
23 A. Correct.
24 Q. -- of whether you knew that was a factor that he

Page 60

1  was considering?
2  A. No. You misspoke.
3  Q. Sure.
4  A. I said I did not know if Colonel Chaffinch said
5  loyalty -- that in the selection of colonel -- of Major
6  Eckrich to that position was -- if loyalty was one of the
7  things he considered because he didn't discuss what his
8  criteria was for elevation to staff. And I said that, in
9  a general sense, loyalty would be something, and what
10 that definition of loyalty is to the individual would be
11 a consideration. You know, could be a consideration in
12 that selection. If you asked me to speculate, that's my
13 speculation.
14 Q. I'm not asking you to speculate.
15 A. Okay. Then I don't have any knowledge of
16 whether or not that was one of the considerations that he
17 had.
18 Q. Where did this idea of loyalty come from then?
19 A. You brought it up.
20 Q. Have you ever seen the colonel use loyalty as a
21 consideration in making personnel decisions in the past?
22 A. How would you define "loyalty"?
23 Q. Personal loyalty to Colonel Chaffinch.
24 A. I don't -- I can't say I can say I can think of

Page 61

1  a specific instance where that was an overriding factor
2  in determination of a selection. Are we talking about
3  Major Eckrich or are we talking about across-the-board
4  promotions, transfers, whatever?
5  Q. Talk about across the board.
6  A. Across the board, I don't believe Colonel
7  Chaffinch used loyalty as the only factor, personal
8  loyalty to him. Loyalty to the division, loyalty, in
9  general, yes. Personal loyalty? No, I've never seen him
10 say that was an overriding factor to make a transfer or
11 whatever.
12 Q. Just to make sure I'm clear on what you said,
13 you're saying that you have never seen Colonel Chaffinch
14 use personal loyalty to him as the overriding factor in
15 making personnel decisions?
16 A. That's correct.
17 Q. So has it ever been a factor?
18 A. Your term of personal loyalty to an individual
19 versus loyalty to the division is always a consideration.
20 Q. I'm sorry. What is --
21 A. Loyalty to the division and to the men and
22 women -- when I speak of "the division," loyalty to the
23 men and women of the division is a consideration.
24 Personal loyalty to an individual, no, not necessarily.

16 (Pages 58 to 61)

| | |
|---|---|
| Conley<br>Corporal Thomas F. MacLeish | v.   Chaffinch, et al.<br>C.A. # 04-1394-GMS   June 9, 2005 |

Page 62

1  Q. Now, I thought you indicated that personal
2  loyalty to Colonel Chaffinch had never been an
3  overriding, and to inject my term into it, a "but for"
4  factor in making personnel decisions. Would that be
5  fair?
6  A. That I have seen.
7  Q. Correct. That you have seen, that you have
8  personal knowledge of.
9  A. Okay. Would you -- I'm not sure what I'm
10 answering at this point.
11 Q. Sure.
12    Are you aware of Colonel Chaffinch ever
13 considering personal loyalty to be a factor in making
14 personnel decisions in the Delaware State Police?
15 A. And your definition of "loyalty" was personal
16 loyalty to Colonel Chaffinch?
17 Q. Personal loyalty to the colonel.
18 A. No.
19 Q. It's never been a factor?
20 A. I didn't say -- personal loyalty to the colonel
21 in an overriding decision as to somebody being
22 transferred, no.
23 Q. Not as an overriding factor. A factor. I'll
24 step back a minute.

Page 63

1    Even in a situation where it was only a
2  consideration, it wasn't the determinative consideration,
3  it wasn't the only consideration, the same decision would
4  have happened, anyway, even if that consideration had not
5  been considered, but the fact that it was a
6  consideration?
7    Does that help you?
8  A. Yes. Yes, it does.
9    Do I have personal knowledge of that as in
10 him stating this guy's not loyal to -- this man or woman
11 is not loyal to me, therefore, I'm not going to promote
12 them? I don't have knowledge on that.
13 Q. Everything you've seen or heard throughout your
14 career in the Delaware State Police -- for example,
15 you're selected by Colonel Chaffinch to be a major,
16 weren't you?
17 A. No, I was not. I was selected by Colonel
18 Pepper.
19 Q. You were selected by Colonel Chaffinch to be his
20 lieutenant colonel?
21 A. Yes, I was.
22 Q. Did you ever work closely on a day-to-day basis
23 with Colonel Chaffinch while you were a lieutenant
24 colonel and he was colonel?

Page 64

1  A. Yes.
2  Q. Did you ever make decisions together?
3  A. Yes, we did.
4  Q. Did you ever powwow and put your heads together
5  to think of a solution to problems?
6  A. Yes, we did.
7  Q. Even prior to then, you served on the executive
8  staff of Colonel Chaffinch?
9  A. Yes.
10 Q. What was his rank when you were a major?
11 A. When I first came up, he was lieutenant colonel.
12 And then he was acting superintendent for a period of
13 about five months until he was appointed in February of
14 '02.
15 Q. So would it be fair to say you've worked closely
16 with Chaffinch in varying degrees for the last several
17 years?
18 A. Yes. Since 2001, yes.
19 Q. Based on that background of experience, that's
20 the time frame, the foundation, based on that background
21 of experience, has loyalty, has personal loyalty to
22 Colonel Chaffinch been a factor Colonel Chaffinch
23 considers in making personnel decisions?
24 A. A factor, yes.

Page 65

1  Q. Now you are the colonel?
2  A. Thank you.
3  Q. You've taken Colonel Chaffinch's place?
4  A. I have taken over as superintendent of the
5  division, yes.
6  Q. Fair enough.
7    I just lost my train of thought, so I'll
8  strike that and I'll come back to it.
9  A. Okay.
10    While you are collecting that, would you
11 mind if I --
12    MR. NEUBERGER: This is a good spot for a
13 break.
14    THE WITNESS: Thank you.
15    (A recess was taken at this time.)
16 BY MR. NEUBERGER:
17 Q. Colonel, I think you were just telling me about
18 what you knew as to the colonel's thought process and
19 actions regarding the promotion of Captain Paul Eckrich
20 to major in approximately February or March of 2003.
21    I would like to direct your attention to
22 another promotion which was made given to now-Major
23 Hughes. What is his full name?
24 A. Randall L. -- I couldn't tell you what the L.

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

**Page 66**

1  stood for. But I refer to him as R.L.
2       CAPTAIN CONLEY: Lee.
3       THE WITNESS: Lee?
4       CAPTAIN CONLEY: Yes.
5   A. Randall Lee Hughes.
6  BY MR. NEUBERGER:
7   Q. Do you remember approximately when he was
8  promoted to major?
9   A. About the same time I was promoted to lieutenant
10 colonel. It was -- he was brought up on staff, I
11 believe, in July of '03, the July/August time frame. He
12 was -- I think he had the same promotion date as me,
13 official promotion date of November of '03.
14  Q. Lieutenant Colonel Tom Marcin retired or stepped
15 down in some fashion?
16  A. He retired.
17  Q. He retired.
18     Are you then promoted to the position of
19 lieutenant colonel and deputy superintendent?
20  A. Yes.
21  Q. Would it be fair to say, then, that then-Captain
22 Hughes was promoted to the vacancy created by your
23 promotion on the executive staff?
24  A. Yes.

**Page 67**

1   Q. Did you have any involvement in the promotion
2  process that resulted in Major Hughes being promoted?
3   A. No, I did not.
4   Q. Do you know if any objective standards were used
5  in the promotion process which resulted in Hughes being
6  promoted?
7   A. Objective -- I know he was selected by the
8  colonel.
9   Q. Right. So, for example, there wasn't a grid
10 with questions that had to be answered and each question,
11 for example, his experience was awarded three points, his
12 tenure with the DSP was awarded five points, grids or
13 charts like that that were used in the process?
14  A. I'm speculating.
15  Q. Sure. So you just don't know?
16  A. I don't know.
17  Q. That's fair. Thank you.
18     Were there any meetings with the executive
19 staff in which Colonel Chaffinch discussed his decision
20 to promote Major Hughes?
21  A. No.
22  Q. Do you know if there were any meetings with
23 then-Lieutenant Colonel Marcin?
24  A. I have no knowledge.

**Page 68**

1   Q. To the best of your knowledge, who had input in
2  the decision to promote Major Hughes?
3   A. I have no knowledge of who would have had input.
4  The colonel made the decision.
5   Q. It wasn't you?
6   A. That's correct.
7   Q. Do you know if personal loyalty was a factor
8  that the colonel considered in making his decision of
9  Major Hughes?
10  A. (No response.)
11  Q. If you don't know, you don't know.
12  A. I don't have knowledge that that was a
13 consideration.
14  Q. Do you know if any other members of the
15 executive staff at the time met with Colonel Chaffinch to
16 discuss the promotion of Major Hughes?
17  A. I don't have any knowledge if they did or
18 didn't.
19  Q. Do you know why Major Hughes was promoted?
20  A. Once again, he worked for me. He was extremely
21 qualified. He handled multiple projects. Had the
22 background, the work experience.
23  Q. Now, are those the reasons why you think he was
24 promoted or are those the reasons you know why the

**Page 69**

1  colonel promoted --
2   A. No. You have to go back to your question. What
3  did you ask me? That's why I answered it --
4   Q. I'll just ask --
5       CAPTAIN CONLEY: Why was he promoted,
6  period.
7   Q. Did the colonel ever sit down and tell you why
8  he was promoting Major Hughes?
9   A. I recall him telling me he was going to
10 promote -- that R.L. was going to be the next major,
11 thought he was the natural fit for the position based
12 upon where he worked. Specifics I can't recall as to
13 here's a litany of reasons why he was promoted.
14  Q. Did the colonel give you a litany of reasons and
15 you just can't remember them now, or do you just not
16 remember the specifics of that conversation?
17  A. I don't recall the specifics of the conversation
18 or a litany of whether it was a litany. I remember him
19 saying I'm selecting -- you know, he gave me a reason for
20 him being selected. I don't recall what it was. But it
21 was a very general, you know, he's going to be it because
22 he was troop commander, he's a hard worker. Very general
23 type. No specifics. No point values or anything like
24 that in his selection process.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

### Page 70

1   Q.  Now, did he say he was going to be promoted
2  because he was a troop commander?
3   A.  I don't recall him specifically saying that.
4   Q.  Did he say --
5   A.  His work experience in general is what I recall.
6   Q.  So the colonel indicated that his work
7  experience was a factor?
8   A.  Overall work experience, yes.
9   Q.  Sure.
10      The fact that he was a hard worker, was
11  that mentioned specifically by the colonel?
12   A.  I remember that, yes.  Captain Major Hughes is
13  known for that work ethic.
14   Q.  Does he have any affectionate nicknames given to
15  him by the men in DSP?
16   A.  Not that I'm aware of.
17   Q.  Is he popular with the troops?
18   A.  I think he's respected by the troops.  Popular
19  and respected may not always be interchangeable.
20   Q.  Machiavellian respect based on fear or something
21  like that?
22   A.  That's not necessarily it.  I wouldn't say that.
23   Q.  You mentioned you don't remember any specifics
24  of the reasons the colonel gave you for the promotion of

### Page 71

1  Major Hughes; correct?
2   A.  That's correct.
3   Q.  Do you remember any more generalities of the
4  reasons he gave you for the promotion of Major Hughes?
5   A.  I believe I've already given them.  Work
6  experience, his work ethic, things of that general --
7  general nature.
8   Q.  To the best of your knowledge, it was the
9  colonel who made the decision to promote him; correct?
10   A.  Yes.
11   Q.  Did Lieutenant Colonel Tom Marcin ever tell you
12  that he had any input into the decision?
13   A.  No.
14   Q.  Did any of the other officers on the executive
15  staff at the time indicate to you that they had any input
16  into the decision?
17   A.  No.
18   Q.  Was his education a factor?
19   A.  All -- all captains are pretty much the same
20  educational level.  There's certain different command
21  schools that people attend.  I'm sure it could have been
22  a consideration, but I can't say that it was a distinct
23  consideration in this case.
24   Q.  Is education something that's important when it

### Page 72

1  comes to the promotion of an officer from captain to
2  major?
3   A.  It is one of the considerations.
4   Q.  Sure.  Okay.  That's helpful.
5       Have you ever served with a captain by the
6  name of Gregory Warren?
7   A.  Yes, I have.
8   Q.  How long did you serve with Captain Warren?
9   A.  He worked for me at Troop 3 when -- my
10  assignment, when I was in charge of the F.A.I.R. unit, he
11  worked for me.  At that point in time he was a corporal.
12  He was at community service when I was a troop commander
13  which didn't fall under me.  And then he worked directly
14  for me again when I was -- for a brief period of time.
15  When I was named deputy superintendent in the academy, he
16  ran the academy and he worked for me at that point in
17  time.
18   Q.  Was Greg a good troop?
19   A.  What's your definition of "good"?
20   Q.  A good trooper in your personal opinion.
21   A.  Greg Warren was competent.  He was a trooper.
22   Q.  Is it fair to say you don't like Greg Warren
23  very much?
24   A.  No, that's not fair to say.

### Page 73

1   Q.  Would it be fair to say that you bear hostility
2  against Greg Warren because he filed an Internal Affairs
3  charges against you?
4   A.  That's not why I would hold hostility against
5  him.
6   Q.  Do you know that Greg Warren holds a Ph.D.?
7   A.  I was aware, yes.
8   Q.  Are you aware he got his Ph.D. from Temple
9  University in 1992?
10   A.  Yes, I was.
11   Q.  Are you aware he also holds a Master of Science
12  in personnel management which was awarded in 1995?
13   A.  Because you are telling me, yeah.  I assume
14  before he got his Ph.D. he had to get his masters.
15   Q.  Fair enough.
16       Are you aware that he holds two bachelors'
17  degrees?
18   A.  No, I was not.
19   Q.  Are you aware that he holds an associate's
20  degree, as well?
21   A.  You're telling me.  Yes.
22   Q.  So independent of my telling you, do you have
23  any knowledge?
24   A.  I was aware he was educated, yes.  The

19 (Pages 70 to 73)