Conley                                         v.                              Chaffinch, et al.
Corporal Thomas F. MacLeish         C.A. # 04-1394-GMS                 June 9, 2005

**Page 134**

1 newspapers in Delaware?
2    A.  I would be -- I would be very pleased to say
3 that the work the men and women in this division do on a
4 daily basis are on the front page of the paper. And,
5 yes, a by-product of that would be I would be very
6 pleased to not have the negative publicity that comes
7 with lawsuits on the front page. I would be very pleased
8 to have it off of there, yes.
9    Q.  Did you talk to Secretary Mitchell on
10 October 28th, 2004, the day after the lawsuit was filed?
11    A.  Yes, I did.
12    Q.  How many times did you talk to him? A lot? A
13 few?
14    A.  More on the "few" line.
15    Q.  What did you talk about?
16    A.  I had reason to talk to him late in the day as a
17 result of Lieutenant Aviola coming forward and saying
18 that Eldred had the -- had a copy of Captain Conley's
19 charge sheet with naming her board and the date of her
20 trial board. And the reason I had to talk to him was I
21 had made a decision and I wanted to run that decision by
22 him after seeking legal counsel.
23    Q.  Now, you said that you made the decision in
24 reference to that matter?

**Page 135**

1    A.  Yes.
2    Q.  Was the decision run by Secretary Mitchell prior
3 to it becoming official?
4    A.  By "official," what do you mean?
5    Q.  Was authorization required by Secretary Mitchell
6 in order to give that order?
7    A.  I told him that is what I was going -- I said
8 this is the advice I got from counsel and here is their
9 reasons, and the information will be released based upon
10 what's in the four corners of the document.
11    Q.  Would did Secretary Mitchell say?
12    A.  "I concur with you."
13    Q.  Would you have made the decision to authorize
14 the release if Secretary Mitchell hadn't agreed and
15 subsanctioned it or authorized it?
16    A.  No.
17    Q.  You mentioned some material, an e-mail that was
18 sent to Tom Eldred who is a reporter for the Delaware
19 State News; correct?
20    A.  Well, that was one of the problems. We couldn't
21 figure out whether he received an e-mail or whether he
22 received a fax and we were hoping to be able to determine
23 that.
24    Q.  You were hoping or you currently are hoping?

**Page 136**

1    A.  No. That day -- that day, that time, we were
2 hoping to be able to determine who had sent it to him.
3    Q.  Tom Eldred is a reporter for the Delaware State
4 News?
5    A.  Yes.
6    Q.  He's covered the DSP a great deal?
7    A.  Yes, he has.
8    Q.  So did there come a time when he sent a document
9 to Lieutenant Aviola who was the public information
10 officer for the DSP?
11    A.  Yes.
12    Q.  How did you first find out about that?
13    A.  From Lieutenant Aviola.
14    Q.  Did he send you an e-mail?
15    A.  No.
16    Q.  Did he call you on the telephone?
17    A.  No.
18    Q.  Did he come to your office?
19    A.  Yes.
20    Q.  What day was this? Was this --
21    A.  It was the 28th. It was late in the day.
22    Q.  It was late in the day on the 28th?
23    A.  Afternoon.
24    Q.  Afternoon of the 28th. Okay. That's helpful.

**Page 137**

1    Did he knock on your door?
2    A.  No. I -- I say "no" because nobody knocks on my
3 door. They go through the secretarial staff.
4    Suffice to say that either we ran into one
5 another in the hallway or he came in and said he had
6 something to discuss with me. And what he had to discuss
7 with me was that he had received a phone call from Tom
8 Eldred of the State News and Mr. Eldred had told him he
9 had a copy of what appeared to be an official document of
10 the division where sergeant -- excuse me -- Captain
11 Conley was being charged with violations of rules and
12 regulations and her trial board was being set. And that
13 had been sent out on Monday of that week.
14    I -- either we had just finished a case
15 review, but needless to say, Captain Paige and Lieutenant
16 Coupe were still there. I believe -- I don't believe.
17 Mr. Tupman had left. I wanted him on the phone for legal
18 counsel and I wanted to determine what our
19 responsibilities were. Okay? We have a reporter that
20 has a document that was from the division.
21    And two things here. One, can we determine
22 who sent it, how he got it, how he got his hands on it.
23 Is Tom Eldred going to give up that source of
24 information? No. So an interview with him wasn't going

Case 1:04-cv-01394-GMS    Document 77-8    Filed 09/19/2005    Page 2 of 14

Conley                                    v.                              Chaffinch, et al.
Corporal Thomas F. MacLeish          C.A. # 04-1394-GMS                    June 9, 2005

Page 138

1  to happen.
2         But Captain Paige was there. He was
3  directed -- well, one is can we obtain a copy of what
4  Mr. Eldred had. And once we obtained that, it was pretty
5  simplistic thinking. Just as you see this, if it was an
6  e-mail to him, would it be "From," "To," would he be
7  naive enough to send us that so we could find out who
8  sent it to him in that manner, or if it was a fax, could
9  we be able to determine -- it's usually on top of a fax
10 sheet the source from which it came.
11        But it was important that we get the
12 document in our hands in order to try to find out who
13 sent it and then bring that person up on charges of
14 violating the rules and regulations of the division.
15        There were other avenues. Would there be a
16 way through our HTC unit --
17    Q.  Which is what?
18    A.  Our high-tech crimes unit, our computer unit,
19 and/or our IT section to determine if any -- if we could
20 determine what anybody that had sent any documentation to
21 the Delaware State News through any internal means so we
22 would be able to track it down that way. And the purpose
23 was to identify who had sent it and investigate that and
24 bring them up on charges.

Page 139

1         The secondary thing was, okay, two,
2  Mr. Tupman, legally, he has it in his possession. If --
3  and he was asking for confirmation of the information on
4  the document. Would we violate LEOBOR if we did that or
5  not, and would I be -- by violating LEOBOR, would I be
6  violating any laws by confirming it, confirming or
7  denying the fact that it was real?
8         The advice of counsel --
9         THE WITNESS: Go ahead?
10        MR. DURSTEIN: Yes.
11    A.  The advice of counsel was to obtain the document
12 from Mr. Eldred, to determine its authenticity, not just
13 what somebody is telling you, but have the document in
14 front of us. He, in fact, faxed it to -- I believe he
15 faxed it to Lieutenant Aviola. Lieutenant Aviola then
16 had the document. It was the same document that was sent
17 out on Monday, but it didn't have any of the things we
18 were looking for in order to determine its source from
19 within the division.
20        And the information I received from
21 Mr. Tupman was that while it was an internal document of
22 the division, it is now in the public domain, it's
23 outside the division, and that you could confirm the
24 information without violating somebody's -- according to

Page 140

1  my legal counsel, without violating an officer's rights
2  under LEOBOR or criminally. Our rules in the division, I
3  could confirm what was in that. That's legal advice.
4  You know you give legal advice.
5         It was my determination, it was my decision
6  to go ahead and confirm the facts of that and the facts
7  of that only.
8         MR. NEUBERGER: This might be a good time
9  to take our lunch break.
10        Counsel, do you agree?
11        MS. BALLARD: Yes.
12        (A luncheon recess was taken at this time.)
13 BY MR. NEUBERGER:
14    Q.  All right, Colonel MacLeish. I would like to
15 try to pick back up where we left off. I believe you
16 were testifying that when Lieutenant Aviola brought the
17 matter of Tom Eldred's inquiry to your office, that some
18 kind of a meeting resulted or --
19    A.  Yes.
20    Q.  -- or a conversation resulted with Secretary
21 Mitchell.
22        Eventually there was a conversation with
23 Secretary Mitchell, but first you talked with -- was it
24 Lieutenant Aviola, Deputy Attorney General Michael

Page 141

1  Tupman? Was there anyone else in that meeting?
2     A.  Could I clarify?
3     Q.  Sure.
4     A.  Upon being contacted by Lieutenant Aviola that
5  Eldred had the e-mail announcement of Captain Conley's
6  upcoming trial board and charge sheet -- I had a meeting
7  in our conference room. Present was Lieutenant Aviola,
8  Lieutenant Coupe, and Captain Paige, Lieutenant Coupe and
9  Lieutenant Paige both being from Internal Affairs.
10 Phoned in -- having phoned in was Mike Tupman. He was
11 not physically present at the meeting.
12        We had a meeting to discuss could we
13 determine where that document came from that Eldred had
14 in his possession in order to pursue an Internal Affairs
15 investigation in that manner. That was one part of the
16 purpose for the meeting.
17        The second part was to have legal advice as
18 to, okay, he's got it, says he's got it. Where does that
19 put us?
20        After a result of that meeting, I then had
21 a phone conversation with the secretary to advise him,
22 here's what took place in the meeting, here's what the
23 information is as I have it, and to inform him of the
24 decision that I made. I received legal advice. Here is

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

**Page 142**

1 the decision I was going to make. Did he concur with
2 that? It was like, yes, okay, go ahead and do it. And
3 it was done.
4  Q. So the decision was already made when you had
5 talked to Secretary Mitchell?
6  A. I was advising him of it. He concurred with it.
7 You asked me a question during the period if he'd have
8 said no, would I have done it? No, I would not have.
9  Q. Now, when you talked to Secretary Mitchell, was
10 he on speakerphone or were you talking on the handset?
11  A. I was speaking to him on -- from my office on
12 phone, not speakerphone.
13  Q. Was there anyone else there?
14  A. In the room when I spoke to the secretary?
15  Q. Correct.
16  A. No. It was just myself.
17  Q. Do you know if there was anyone else there on
18 his end?
19  A. I don't have one of those video -- to my
20 knowledge, no. He answered the phone -- or he didn't
21 answer his phone. The secretary answered the phone and
22 transferred it to him. Whether or not I was on
23 speakerphone or not, I don't recall.
24  Q. I think one question I forgot to ask you, and

**Page 143**

1 I'm getting a little bit out of order here, but what was
2 Secretary Mitchell's reaction to the filing of the suit?
3 Did I ask you that before?
4  A. (No response.)
5  Q. In that case, do you recall what Secretary
6 Mitchell's reaction was to the filing of this lawsuit?
7  A. You did ask me that because I believe my answer
8 was he was very concerned with the seriousness of the
9 allegations and took the action he felt was appropriate.
10  Q. Based on your observations, was he angry?
11  A. Based on my observations being what took place
12 over the phone? No, he was not angry.
13  Q. Using your sensory perception, I believe you are
14 telling me that you do not believe Secretary Mitchell was
15 angry?
16  A. From what I could take from a phone
17 conversation, no. Was he -- used the term distraught. I
18 have to be careful of the words I use with you. That --
19 was it a normal course of the day, you know,
20 conversation? No. It was something that we had to deal
21 with. It was very serious. It was important.
22   There was -- to keep from using the same
23 words that I've used over again, but I don't have any
24 other ones to choose from is that I believe there was

**Page 144**

1 disappointment that, once again, we are on the front page
2 of the newspaper. You know, we have to take this course
3 of action. This is the direction we are going. And that
4 was the end of it.
5  Q. So he was disappointed that the Delaware State
6 Police were again on the front page of the newspaper?
7   MS. BALLARD: Object to the form.
8  A. Disappointed in that there were going to be
9 negative articles about the division again and the fact
10 that we, once again, were faced with a lawsuit from
11 within the division.
12  Q. You mentioned now, let's go back to -- I guess
13 it's really forward. Let's go forward to your meeting
14 with Lieutenant Aviola, Captain Paige, Lieutenant Coupe,
15 with Mike Tupman on the speakerphone.
16  A. On the phone, yes.
17  Q. Do you know what meeting I'm talking about?
18  A. Yes. It was on the 28th.
19  Q. I believe you mentioned that he talked about the
20 types of avenues of investigation for an IA investigation
21 into the release of the document?
22  A. How could -- go ahead. Were you done? I'm
23 sorry.
24  Q. I would like to ask you some questions about

**Page 145**

1 that general line of discussion.
2  A. Okay.
3  Q. Do you understand what I'm talking about?
4  A. Yes, I do.
5  Q. Who raised that issue?
6  A. I did.
7  Q. I believe your previous testimony was you
8 mentioned something about having high tech computer or
9 high tech crimes --
10  A. HTCU.
11  Q. -- your HTCU investigate --
12  A. No. Go ahead.
13  Q. What did an IA investigation result from that?
14  A. What I directed Captain Paige to do was was it
15 possible, based upon the information that we had, to make
16 a determination as to whether we could find who was --
17 you know, I'm -- it was an internal document. Somehow it
18 got outside the division.
19  Q. Sure.
20  A. All right? And with 637 members of the
21 division, everyone becomes suspect. And at that point it
22 wasn't 637, but that's what we have today.
23   So what is reasonable in conducting an
24 investigation to make that determination? He's the

37 (Pages 142 to 145)

Wilcox & Fetzer, Ltd.     Professional Court Reporters     (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

**Page 146**

1 investigator. Those were some of the things that --
2 avenues I directed him to pursue in trying to determine
3 was it possible, reasonably possible to be able to
4 determine who had did this.
5     As I said, I knew Mr. Eldred wasn't going
6 to tell me who sent him the piece. I mean, that goes
7 without saying. Look how long "Deep Throat" stayed
8 under.
9     But with regards to this incident and the
10 seriousness of it, I was upset that somebody would do
11 that. We've got enough issues to deal with without
12 constantly having to address other ones that compound
13 something.
14   Q.  So you were upset that the e-mail had been
15 released?
16   A.  Yes.
17   Q.  Did you release the e-mail?
18   A.  I released the e-mail to our rank and file. I'm
19 the one that authorizes that. On Monday -- I think that
20 went out under me. But did I release it to Mr. Eldred?
21 No, I did not.
22   Q.  Do you know who did?
23   A.  No. If you can tell me, I'd be glad to take
24 that under advisement and conduct an investigation into

**Page 147**

1 that.
2   Q.  Who do you suspect did so?
3   A.  I have no idea. 637 people. Pick one.
4   Q.  Did Captain Paige ever conduct any type of an
5 investigation into the release of that e-mail or that
6 document to Reporter Eldred?
7   A.  He came back to me and told me that it was
8 basically impossible based upon what -- the information
9 that we had at that time to conduct an investigation.
10   Q.  So is the answer to my question no, he did not
11 conduct an investigation?
12   A.  He conducted an inquiry. An investigation would
13 be he went to individuals and interviewed them. We had
14 no suspects at that time. It was very, very broad in
15 that sense.
16   Q.  So essentially he thought about investigating
17 but did not actually investigate?
18   A.  No. He conducted an inquiry into determining
19 whether or not he could conduct an investigation. Not an
20 investigation in futility, but an actual investigation to
21 an individual.
22   Q.  Do you know if he picked up the telephone and
23 ask Colonel Chaffinch, Did you release this document?
24   A.  I have no idea whether he did or did not.

**Page 148**

1   Q.  Do you think, based upon your 27 and almost
2 28 years of experience as a Delaware state trooper, that
3 would have been a good place to start?
4   A.  As I said, the suspect list is long and varied.
5 It could have been any one of 637 people -- 636 because I
6 know I didn't send it.
7   Q.  Now, I appreciate that and that's helpful.
8     But let's get back to the question that I
9 asked you, which was: Based upon your 27 and almost
10 28 years of experience as a Delaware state trooper, do
11 you think asking Colonel Chaffinch, if he had released
12 the document, would have been a good place to start an
13 investigation?
14   A.  No, I do not, and the reason why is you don't --
15 unless you have something that leads you to someone and
16 you already -- kind of like an attorney, you don't ask
17 questions until you already know the answers. You
18 don't -- you don't go right to someone you may think have
19 done it without having some type of proof on which to
20 lead you in that direction other than just supposition.
21     As I said, there were many others that
22 could have sent that thing, also.
23   Q.  Would it be fair to say that not one question
24 was asked as part of any investigation into the release

**Page 149**

1 of that document to Reporter Eldred?
2   A.  Not one question asked of whom?
3   Q.  Of anyone.
4   A.  I think there were questions asked by
5 Captain Paige of our HTCU personnel or our IT personnel
6 to make a determination based upon this information, can
7 we track down and see who did it.
8   Q.  Did captain --
9   A.  Go ahead.
10   Q.  No. Please finish your answer.
11   A.  I was.
12   Q.  Did Captain Paige interview anyone or ask anyone
13 any questions aside from your high tech unit people?
14   A.  To my knowledge, no. But at this point I
15 severed my responsibility with Internal Affairs and Major
16 Eckrich would have assumed that at that point in time.
17   Q.  Do you think Major Eckrich would have had a
18 conflict of interest in investigating that matter?
19   A.  No, I do not.
20   Q.  So you're currently the colonel of the State
21 Police?
22   A.  Yes, I am.
23   Q.  At the time you were the acting superintendent?
24   A.  Yes.

38 (Pages 146 to 149)

Conley v. Chaffinch, et al.
Corporal Thomas F. MacLeish    C.A. # 04-1394-GMS    June 9, 2005

Page 150

1  Q. You have no knowledge one way or the other as to
2  whether any questions were asked of any troopers or DSP
3  employees into did you release this document?
4  A. To my knowledge, no, that was not done.
5  Q. Would you agree that the release of that
6  document violated various DSP rules and regulations?
7  A. No, I would not agree to that.
8  Q. You would not agree that that document being
9  given to reporter Tom Eldred violated DSP rules and
10 regulations?
11 A. I'm sorry. I misunderstood the question.
12 Q. Sure.
13 A. I thought you were inferring that my release of
14 that information was a violation.
15     I agree that, yes, the release -- the
16 initial release of that information to Tom Eldred was a
17 violation of our rules and regulations.
18 Q. Do you agree that by confirming the existence
19 and the contents of that document you compounded the
20 violation of DSP rules and regulations?
21 A. No, I do not.
22 Q. Do you remember a time when Captain Greg Warren
23 filed Internal Affairs charges against you in
24 approximately April of 2004?

Page 151

1  A. You are pretty accurate. It was April 2004.
2  Q. Do you recall a time when reporter Tom Eldred
3  found out about those charges?
4  A. Yes.
5  Q. Do you recall a time when he wrote a
6  front-page Delaware State News story about those charges?
7  A. I recall that very well.
8  Q. Do you recall that he had some of the
9  information and specifics about those charges?
10 A. Yes, I do.
11 Q. Do you recall the response of the DSP Public
12 Information Office to Mr. Eldred's inquiries about those
13 charges?
14 A. Would you refresh my memory?
15 Q. Sure.
16     Do you recall that the PIO, Lieutenant
17 Aviola, or someone else said something to the effect of
18 "These are internal. As a policy, we don't comment on
19 internal matters"?
20 A. What was the question that was posed?
21 Q. "Can you give us more information about those
22 charges?"
23 A. Okay.
24 Q. Do you recall the response of the public

Page 152

1  information officer?
2  A. Now that you said that, yes, I do.
3  Q. Do you recall that they also said, "We won't be
4  disclosing the nature of the charges because they are
5  internal"?
6  A. Yes.
7  Q. Do you find that response materially
8  inconsistent with your response to the inquiry from
9  Reporter Eldred in October of 2004?
10 A. No, I don't. And the reason I don't is because
11 during the initial phase of an investigation, the
12 investigation is ongoing. We don't confirm Internal
13 Affairs investigations of a -- of a -- what would be an
14 internal inquiry, and that's the typical response that we
15 give.
16     In this case the investigation was
17 concluded. It was finished. The charge had been -- the
18 charges had been established and a trial board had been
19 set. And she was -- not she -- the charging sheet --
20 there was no further investigation to take place that
21 could influence one way or another the content of that
22 investigation. It was done. And therein lied the
23 difference.
24     During an ongoing investigation, you would

Page 153

1  not confirm or deny in order to try to influence the
2  investigation whatsoever.
3  Q. Let's put another document in front of you.
4  This was marked at some point several days ago as
5  Plaintiff's Deposition Exhibit Number 6.
6     MR. NEUBERGER: Counsel, you have a copy?
7     MS. BALLARD: I believe so.
8  BY MR. NEUBERGER:
9  Q. Now, does this appear to be a copy of
10 11 Delaware Code, Section 9200?
11 A. Yes.
12 Q. Is this statute part of what is generally known
13 as the Law Enforcement Officers' Bill of Rights?
14 A. Yes.
15 Q. Now, I'd like to direct your attention to
16 paragraph B, the portion of that paragraph which is
17 highlighted. You see where that says: "...this chapter
18 shall not apply to the Superintendent or Deputy
19 Superintendent of the Delaware State Police"?
20 A. Yes.
21 Q. Do you agree that this statute does not apply to
22 protect you as superintendent or at the time as deputy
23 superintendent of the Delaware State Police?
24 A. That's correct.

39 (Pages 150 to 153)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 154

1  Q. You can put the document down.
2  A. I'd like to read it, read the whole thing,
3  please. (The witness reviews the document.)
4  Q. Colonel, please put the document down. I'm not
5  going to question you about the document.
6      MR. DURSTEIN: He can read it if he wants
7  to.
8      MR. NEUBERGER: I can also continue to ask
9  him questions, Counsel.
10     MR. DURSTEIN: And he can refuse to answer
11 your questions and there's not much you can do about
12 that. If he wants to read the document, it's up to him,
13 not you.
14 BY MR. NEUBERGER:
15  Q. Colonel, do you recall a time when Mary Allen of
16 The News Journal would contact Lieutenant Aviola of the
17 Public Information Office and request specific details of
18 concluded Internal Affairs investigations into your
19 conduct?
20     MS. BALLARD: Just for the record, into
21 who's conduct?
22     MR. NEUBERGER: Colonel MacLeish's conduct.
23  A. I recall there were inquiries into my conduct.
24 Do I recall it being Mary Allen? No, I don't. Tom

Page 155

1  Eldred and a few others? Maybe.
2  BY MR. NEUBERGER:
3  Q. Do you recall the reporters for the two Delaware
4  newspapers, the Delaware State News and The News Journal,
5  making inquiries into the results of investigations into
6  your conduct?
7  A. Yes.
8  Q. Do you recall that the response of the Public
9  Information Office was always something to the effect of
10 we do not comment on internal personnel matters or
11 something to that effect?
12 A. I would like to see exactly what they said, but
13 our PIO directed -- was directed to give a response. I
14 didn't direct them to give that response, if that's what
15 you're asking me.
16 Q. That's helpful.
17     But do you recall learning that those types
18 of questions were asked of the PIO office?
19 A. Yes, I do.
20 Q. I think you just indicated that the PIO usually
21 refused to comment?
22 A. I did not direct them to refuse to comment, but
23 if they refuse -- I recall that they did not comment,
24 that's correct.

Page 156

1  Q. That's because DSP policy is to not comment or
2  not release internal information; correct?
3  A. That's correct.
4  Q. Now, you're not covered by the Law Enforcement
5  Officers' Bill of Rights because you are currently the
6  superintendent and previously you were a deputy
7  superintendent?
8  A. That's correct.
9  Q. Would you agree that the PIO's decision not to
10 release that information violated the statute?
11 A. No, because if I remember correctly, the PIO was
12 working under the direction and advice of counsel in
13 making that decision.
14 Q. Okay. That's helpful, Colonel. Thank you.
15     I guess another question I forgot to ask
16 you earlier is: In sticking with this Internal Affairs
17 information, what was your punishment for the
18 interference in a criminal investigation issue?
19 A. I'm not going to answer that.
20 Q. Why?
21 A. Because it was my punishment.
22 Q. And what was it?
23 A. It was my punishment, Mr. Neuberger. I'm not
24 going to answer that.

Page 157

1  Q. I believe you are not covered by the Law
2  Enforcement Officers' Bill of Rights. Do you recall
3  stating that a few moments ago?
4  A. That's correct.
5  Q. Despite that, are you still refusing to answer
6  the question?
7  A. Yes, I am.
8      MR. NEUBERGER: Counsel, are you directing
9  your client not to answer the question?
10     MS. BALLARD: We didn't direct him not to
11 answer the question.
12     MR. NEUBERGER: Okay.
13 BY MR. NEUBERGER:
14 Q. You're still refusing to answer?
15 A. Yes, I am.
16     MR. NEUBERGER: I guess for the purposes of
17 the record I'll be taking that to Judge Sleet at a later
18 time to resolve this issue and to get a motion to compel,
19 and perhaps for sanctions of some type.
20 Q. I believe you also indicated earlier in the
21 deposition that you received some kind of punishment for
22 a profanity issue. Do you recall testifying to that?
23 A. Yes.
24 Q. That was in response to some of the charges

40 (Pages 154 to 157)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 158

1 filed by Captain Greg Warren?
2   A.  Yes.
3   Q.  You indicated you did receive punishment for
4 that; correct?
5   A.  Yes.
6   Q.  What was that punishment?
7   A.  I refuse to answer that.
8   Q.  Are you refusing to answer on the advice of your
9 counsel?
10  A.  It was my punishment.
11  Q.  So you are just flatly refusing to answer the
12 question?
13  A.  Yes, I am.
14      MR. NEUBERGER:  Again, for the purposes of
15 the record, I would like to note that I'll be taking this
16 issue to Judge Sleet for a motion to compel and for
17 sanctions of some type.
18      MS. BALLARD:  Just for the record, we
19 didn't address this issue with the witness.  We didn't
20 instruct him to answer or not answer.
21      MR. NEUBERGER:  I appreciate that, Counsel.
22 Thank you.
23 BY MR. NEUBERGER:
24  Q.  Colonel Chaffinch was placed on -- I think it's

Page 159

1 called administrative leave on October 27th, 2004;
2 correct?
3   A.  Yes, sir.
4   Q.  He was reinstated sometime in April of 2005?
5 Does that sound accurate?
6   A.  No.
7   Q.  When did he come back from administrative leave?
8   A.  I believe it was March.
9   Q.  During that time when he was out on
10 administrative leave, did you ever talk to him about this
11 lawsuit?
12  A.  Yes.
13  Q.  What was said?
14  A.  General conversation about it.  That there was
15 another suit against us.  I did not -- I did not believe
16 nor do I believe that he ever did any of those things
17 maliciously or intentionally to harm anyone.  There were
18 allegations of that context.
19  Q.  What things?
20  A.  Of the limericks and/or jokes that were said.
21  Q.  Got you.  Okay.  Thank you.
22      Did you ever talk to him about the IA
23 investigation that he was the subject of?
24  A.  No, I did not.

Page 160

1   Q.  Do you find it appropriate that you were talking
2 with someone who was the subject of an Internal Affairs
3 investigation to which ultimately the issue might come to
4 you as the acting superintendent?
5   A.  It would not come to me.  It would go to the
6 secretary.
7   Q.  Is that because of something that Secretary
8 Mitchell stated?
9   A.  No, because secretary -- well, yes and no.  How
10 do you like that for an answer?
11      At the very beginning I recused myself from
12 any part of this investigation and it was -- the Internal
13 Affairs investigation was conducted by our Internal
14 Affairs unit.  It never was reviewed by myself or Major
15 Eckrich.  It was reviewed with -- for administrative-type
16 issues it may have been -- contact may have been there,
17 but it went directly to the secretary's office.
18  Q.  Now I'd like to go back to the meeting between
19 you, Lieutenant Aviola, Captain Paige, Lieutenant Coupe,
20 and Deputy Attorney General Mike Tupman by speakerphone.
21 Do you understand which meeting I'm talking about?
22  A.  Yes, I do.
23  Q.  What did Deputy Attorney General Mike Tupman say
24 during that conversation?

Page 161

1   A.  To the best of my recollection, he indicated
2 that this was not -- that we would not be in violation of
3 LEOBOR, that the document was in the public domain, and
4 that we could -- once we observed, actually had
5 physical -- our hands on the document that Mr. Eldred
6 had, that we could then confirm what was contained within
7 that document.
8   Q.  So is it so much the document or just the
9 information contained within the document which is the --
10  A.  It was important to have the document that he
11 said he had, not to just go with what he had -- he may
12 have heard.
13      If he may have heard something, he may have
14 heard anything.  Our course of action would have been the
15 same.  We would have -- you know, he did not have
16 something physically in his hands.  It would have just
17 been kind of like the allegations against myself when
18 they were denied.  You know, if it's just a speculative
19 type thing or I've heard that this is out there.
20      He said, "I have this document.  Will you
21 confirm it's authenticity and the content of it?"  Before
22 we are going to do either one of those two things, we are
23 going to make sure that what he says he has, he does
24 have.  He produced it.

41 (Pages 158 to 161)

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 162

1  Q. Is it fair to say that's a back door around the
2  rule and regulation saying that the document can't be
3  released?
4      MS. BALLARD: Object to the form.
5  Q. You can answer.
6  A. It could be construed that way.
7  Q. Now, would you also agree that it could be
8  construed as being an end run around the rule and
9  regulation saying that internal documents can't be
10 released?
11     MS. BALLARD: Same objection.
12 Q. You can answer.
13 A. Once again, I would say it could be construed
14 that way, sure. In this case --
15 Q. Of course.
16     MR. DURSTEIN: Did you finish your answer?
17 A. In this case it could be construed that way. If
18 you're implying that I released that information or had
19 that information released so I could do that, you're
20 100 percent wrong.
21 Q. I appreciate that. I believe I had already
22 asked you that question. You indicated you had nothing
23 to do with it; correct?
24 A. That's correct.

Page 163

1  Q. Do you remember sometime earlier, much earlier
2  this morning you walked through a lot of rules and
3  regulations?
4  A. Yes, I did.
5  Q. Do you recall we also walked through some law
6  enforcement ethical canons?
7  A. Yes, we did.
8  Q. Do you recall that several of those either rules
9  or canons did deal with the confidentiality of
10 information?
11 A. That's correct.
12 Q. And several dealt with other topics such as the
13 policy on deadly force; correct?
14 A. I do recall that.
15 Q. If Mr. Tupman instructed you to violate the
16 policy on use of deadly force, would you?
17 A. No, I would not.
18 Q. If he instructed you to violate the policy on
19 sexual harassment or other inappropriate workplace
20 behavior, would you?
21 A. No, I would not.
22 Q. If he instructed you to discriminate against
23 someone because of their gender, would you?
24 A. No, I would not.

Page 164

1  Q. If he instructed you to retaliate against
2  someone because of their free speech, would you?
3  A. No, I would not.
4  Q. If he instructed you to violate rules regarding
5  the confidentiality of information, would you?
6  A. The -- the information sought was was I going to
7  violate any law or criminally or any division policy by
8  doing that. I was advised by him legally, no, I was not.
9  I, therefore, made a decision to go ahead and release the
10 information.
11 Q. So you --
12 A. I did not feel I was violating the law based
13 upon legal advice.
14 Q. So if your legal advice told you to violate the
15 excessive force policy, that would wipe your culpability
16 clean?
17 A. I think there's a difference there. It's very
18 clear in deadly force, use of deadly force. If I'm told
19 to go out and shoot someone that's not armed, it's pretty
20 clear and concise. I'm not going to go do that.
21     If I'm asking for an attorney these are the
22 circumstances -- we'll keep with the deadly force -- John
23 Smith has a gun pointed at Mary Smith's head and he's
24 threatening to kill her, do I have the authority to -- do

Page 165

1  I have the authority to authorize a sniper to take that
2  person out? Legally, where I do stand, Mike? And Mike
3  says legally you're on good grounds, go ahead and do it.
4  Have I taken deadly force? Yes, I have. On advice of
5  counsel? Yeah. It's still my call to make.
6  Q. So it is still your call to make even, I guess,
7  despite the advice of counsel?
8  A. Yes, it is.
9  Q. So ultimately you have to take responsibility
10 for those actions; correct?
11 A. Yes, I do.
12 Q. You're not trying to hide behind Mike Tupman,
13 are you?
14 A. No, I am not. I made that clear earlier.
15 Q. Certainly.
16     I think you also indicated that Secretary
17 Mitchell authorized and sanctioned you for the response
18 of the PIO and that you would not have made that decision
19 without his authorization; correct?
20 A. He had the authority to override my decision. I
21 made the decision.
22 Q. Did Mr. Tupman say anything else during that
23 telephone conference with you, Lieutenant Aviola, Captain
24 Paige, and Lieutenant Coupe?

Case 1:04-cv-01394-GMS    Document 77-8    Filed 09/19/2005    Page 9 of 14

Conley                                    v.                              Chaffinch, et al.
Corporal Thomas F. MacLeish         C.A. # 04-1394-GMS                    June 9, 2005

Page 166

1  A. Not that I can recall.
2  Q. So he generally said that release of the
3  information would not violate the Law Enforcement
4  Officers' Bill of Rights and it would not violate any
5  civil or criminal laws? Is that the gist of it?
6  A. I would have not violated LEOBOR and I would not
7  be violating the rules and regulations of the division by
8  acknowledging what was in the four corners of that
9  document they had. And it was -- the document was --
10 left the confines of the agency and was now considered in
11 the public domain.
12 Q. The distinction between the situation I'm
13 questioning you about regarding Captain Conley and the
14 release of the information, you're saying that there's a
15 distinction between that and the Captain Warren
16 situations involving you?
17 A. Yes.
18 Q. You are saying that's based entirely on the
19 presence of a physical document?
20 A. In my mind, yes.
21 Q. Whenever the DSP PIO receives questions about
22 Internal Affairs' matters, they go up the chain to
23 either -- is it the colonel or the lieutenant colonel?
24 A. Lieutenant colonel.

Page 167

1  Q. Is that even so when it's a matter involving
2  you?
3  A. No. Then it would bypass me and go to the
4  colonel or the secretary.
5  Q. Sure.
6       Would you agree that there have been
7  numerous instances over the last two years when a member
8  of the media has inquired of the PIO as to Internal
9  Affairs issues involving either yourself or now-retired
10 Colonel Chaffinch?
11 A. Yes.
12 Q. On those occasions, did you go and seek legal
13 counsel?
14 A. Yes, on many -- on most of those occasions I
15 would, yes, if not all.
16 Q. The end result of those occasions was the advice
17 not to release the information; correct?
18      MS. BALLARD: I object to that question on
19 the base of attorney/client privilege.
20      MR. NEUBERGER: Are you instructing your
21 client not to answer?
22      MS. BALLARD: Yes.
23 BY MR. NEUBERGER:
24 Q. When was the date of those communications with

Page 168

1  your legal counsel?
2  A. I don't recall.
3  Q. Would it have been on each instance when an
4  Internal Affairs issue was brought to the attention of
5  the Public Information Office?
6  A. Yes.
7  Q. Who would have been privy to those
8  conversations?
9  A. Obviously an attorney. It would have either
10 been Mr. Durstein or Mr. Tupman. It would have -- some
11 of those inquiries, they would have been directed to the
12 secretary's office. And then Lieutenant Aviola --
13 usually it was Lieutenant Aviola, not the other members
14 of the Public Information Office.
15 Q. In general, what would the contents of the
16 statement have been?
17 A. I didn't generate the statement. Whatever was
18 said was either said that we would not release the
19 information -- those were Lieutenant Aviola's words.
20 They wouldn't have been my words.
21 Q. Are you saying those would have been the
22 instructions given to Lieutenant Aviola as to what to
23 say?
24      MS. BALLARD: Instructions by whom? By

Page 169

1  counsel? If it's by counsel, I'll instruct him not to
2  answer.
3       MR. NEUBERGER: Okay.
4  BY MR. NEUBERGER:
5  Q. Would it have been instructions from you or from
6  Colonel Chaffinch to Lieutenant Aviola not to answer or
7  say something to that effect?
8  A. Okay. Could we be specific as to what incidents
9  we are talking about? We are talking a very long area
10 and kind of getting lost in this.
11 Q. Fair enough.
12 A. Because there were other investigations into
13 other officers, not just the colonel and I, where this
14 same type of conversation took place and the information
15 was denied and/or acknowledged.
16 Q. I'm focusing first on Internal Affairs
17 investigation into you for interfering with a criminal
18 investigation on behalf of a personal friend.
19      Do you understand the Internal Affairs
20 situation to which I am referring?
21 A. Yes, I do.
22 Q. Did any media inquiries come in in reference to
23 that?
24 A. Yes, there were.

43 (Pages 166 to 169)

Page 170

1  Q. Were those taken up the chain of command?
2  A. They would have been taken directly to the
3  colonel.
4  Q. Would the colonel have consulted with DSP legal
5  counsel?
6  A. I would assume he would have.
7  Q. DSP legal counsel would have given him some kind
8  of advice?
9  A. I would assume they would have.
10 Q. Then what would the order have been from Colonel
11 Chaffinch to Lieutenant Aviola as to how to respond?
12     MS. BALLARD: I'm going to object and tell
13 him not to answer. The instruction from counsel is
14 really given to the entity, not just because it's given
15 to the colonel and he conveys it to somebody else. It's
16 still privileged.
17 Q. Would it be fair to say that anything Lieutenant
18 Aviola said in that type of a situation would have been
19 authorized by someone in his chain of command?
20 A. Yes.
21     MR. NEUBERGER: Counsel, are you claiming
22 privilege as to all of those conversations?
23     MR. DURSTEIN: All which conversations?
24     MR. NEUBERGER: I guess this is sort of

Page 171

1  broad. First as to all conversations when either
2  then-Lieutenant Colonel MacLeish -- no disrespect,
3  Colonel.
4      THE WITNESS: None taken.
5      MR. NEUBERGER: -- or Colonel Chaffinch
6  would have gone to legal counsel for legal advice how to
7  respond.
8      MR. DURSTEIN: Yes.
9      MS. BALLARD: Yes. Other than the discrete
10 situation here with this meeting we talked about where
11 the police have waived the privilege.
12     MR. NEUBERGER: So you are going to
13 instruct the client not to answer all the questions I am
14 planning to ask about those conversations?
15     MR. DURSTEIN: About legal advice, yes.
16     MR. NEUBERGER: Sure. That's the same
17 thing you instructed Lieutenant Aviola as to two days
18 ago?
19     MS. BALLARD: I don't recall what that
20 question was. It was one question. I don't recall. But
21 we did believe whatever that question was pertained to
22 privileged conversations or advice.
23     MR. NEUBERGER: Okay. Will you produce a
24 privileged log as to when those conversations occurred,

Page 172

1  as to the general content of those conversations?
2      MS. BALLARD: My understanding of a
3  privileged log is as to documents. We are claiming
4  privilege to allow the witness to claim a privilege from
5  testifying.
6      MR. NEUBERGER: So the answer is no?
7      MS. BALLARD: There can be no privileged
8  log created. There are no documents at issue here.
9      MR. DURSTEIN: If you want to make a
10 request for production of documents related, we'll
11 respond to that.
12     MR. NEUBERGER: Okay. It would be fair to
13 say you are probably going to claim privilege?
14     MR. DURSTEIN: I don't even know if there
15 are any such documents at this point.
16     MR. NEUBERGER: Got you.
17     MR. DURSTEIN: But I think we would --
18 sure.
19     MS. BALLARD: And I think we need some
20 specificity with regard to dates of these.
21     MR. NEUBERGER: Sure.
22     MR. DURSTEIN: I don't want to prejudice
23 the request. A lot of it depends on what the request is,
24 what the reaction is. There are a lot of ways you can

Page 173

1  make the request that might not generate a claim of
2  privilege, so let's not prejudge that. I don't want to
3  discourage you from doing it. But I think that,
4  procedurally, that's the way to do it.
5  BY MR. NEUBERGER:
6  Q. There would have been an instance as to when
7  members of the media were inquiring into that first IA
8  investigation involving yourself; correct?
9  A. That's correct.
10 Q. Do you think just one Delaware newspaper asked
11 about it or do you think several Delaware newspapers
12 would have asked about it?
13 A. What I think? I think probably several asked.
14 Q. Each time a request came in, would that have
15 gone up the chain of command?
16 A. I think once asked, once answered would be the
17 reply.
18 Q. I'm sorry. Could you explain that to me?
19 A. I believe once asked, once answered. We don't
20 have to keep going back for the same information.
21 Q. Got you.
22     Then there would have been -- once that IA
23 investigation into you was concluded, there would have
24 been more inquiries, I believe, from the local Delaware

Conley                                             v.                                    Chaffinch, et al.
Corporal Thomas F. MacLeish                C.A. # 04-1394-GMS                              June 9, 2005

Page 174

1  newspapers.
2      Does the situation change at all once the
3  IA investigation is concluded when the target of that
4  investigation is either the colonel or the lieutenant
5  colonel when it comes to releasing information?
6      MS. BALLARD: Object to the form.
7   Q.  You can answer.
8   A.  Would you ask the question again, please?
9   Q.  Sure.
10     I believe you testified a little while ago
11 about there being some kind of a distinction when an
12 investigation is ongoing. Do you recall saying something
13 to that effect?
14  A.  Yes, I do.
15  Q.  Does the decision not to release change when the
16 investigation is concluded and the subject of those
17 investigations or the target of those investigations is
18 explicitly not covered by the Law Enforcement Officers'
19 Bill of Rights?
20  A.  We still do not release the information.
21  Q.  Would the PIO have to ask again or is it the
22 same once asked, once answered response?
23  A.  If it was unique in that this case being the
24 colonel and lieutenant colonel, I would have been -- it

Page 175

1  would have been asked again. In the normal course of
2  business, it would have been the once asked, once
3  answered. Once an investigation is concluded and the
4  officer is charged, whatever happens after that, any
5  inquiries into that we are not going to release. The
6  investigation has been completed and that's the end of
7  it.
8   Q.  In the situations after the investigation had
9  been concluded, still focusing on your first situation --
10 do you understand which one I am referring to?
11  A.  Yes.
12  Q.  The request would go in to Lieutenant Aviola, he
13 would take it up to Colonel Chaffinch. At that point
14 would Colonel Chaffinch go to counsel again for the
15 division and ask whether this can be released or asked
16 how to respond to this inquiry?
17  A.  I would assume that's what Colonel Chaffinch
18 would have done.
19  Q.  Then a response would flow back, essentially?
20  A.  Yes.
21  Q.  So that's your first IA issue. Let's focus on
22 your second IA issue, the one regarding issues raised by
23 Captain Warren.
24  A.  Yes.

Page 176

1   Q.  If media inquiries came in regarding that,
2  because it is a different situation, would the PIO have
3  to go back up the chain of command again?
4   A.  I go back to my once asked, once answered. It's
5  the same thing. I would think that they -- I would think
6  that he already would have an answer to that. You would
7  have to ask Lieutenant Aviola. Maybe he did, maybe he
8  didn't. I'm not sure. He didn't come to me.
9   Q.  Just so you know where I'm trying to go with
10 this, I'm trying to find out how many conversations
11 happened with Mike Tupman.
12     MS. BALLARD: On any --
13     MR. NEUBERGER: On the specific IA issue
14 involving Colonel MacLeish and Colonel Chaffinch.
15     MS. BALLARD: On media inquiries as to IA
16 matters?
17     MR. NEUBERGER: As to his IA issue, meaning
18 Colonel MacLeish's and Colonel Chaffinch's IA issues.
19     MS. BALLARD: You want to know how many
20 conversations with Mike Tupman?
21     MR. NEUBERGER: I want to know how many,
22 the date, who was involved in the conversation.
23     MR. DURSTEIN: I guess this is on the
24 record.

Page 177

1      This witness has testified that he was, in
2  effect, recused, just in terms of --
3      MS. BALLARD: The witness -- he's not your
4  witness.
5      MR. DURSTEIN: I don't want to mislead you.
6  There may have been conversations that this witness would
7  not know about. I guess you understand that. But he's
8  further testified that he was probably out of the loop on
9  that. So it's not an improper question, but I just
10 didn't want that to go unremarked.
11     MR. NEUBERGER: Okay.
12 BY MR. NEUBERGER:
13  Q.  Focusing still on the IA investigation arising
14 from the outside agency investigation arising from the
15 charges filed by Captain Warren, specifically with regard
16 to you, do you have any knowledge of legal counsel being
17 consulted as to how to respond to media inquiries?
18  A.  No, I do not.
19  Q.  How about the outside investigatory agency
20 investigation arising out of charges filed by Captain
21 Warren into the conduct of Colonel Chaffinch, do you know
22 if counsel was consulted as to how to respond to media
23 inquiries in that situation?
24  A.  No, I do not.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 178

1  Q. How about the most recent Internal Affairs
2  investigation into Colonel Chaffinch which was opened in
3  October, the end of October 2004 into the allegations
4  raised by Captain Conley in her federal court lawsuit?
5  A. Secretary Mitchell, in his office, would have
6  been the response. I know they came in to us for our
7  Internal Affairs brief. I'm trying -- the reason I'm
8  trying -- I'm trying to remember the number of calls that
9  came in at the onset of that in November with regards to
10 release of what was taking place at that time. And the
11 majority of the information went out of the secretary's
12 office versus out of ours.
13 Q. Is that because the secretary was running, for
14 lack of a better term, the investigation?
15 A. Yes. The investigation was being conducted out
16 of his office.
17    MR. NEUBERGER: Counsel, for the purposes
18 of the record, I'll also be making a motion to compel as
19 to the contents of the conversations with DSP legal
20 counsel as to how to respond to specific Internal Affairs
21 inquiries into present-Colonel MacLeish and then-Colonel
22 Chaffinch to put you all on notice and to put it on the
23 record.
24    MR. DURSTEIN: We'll put you on notice that

Page 179

1  we'll claim the privilege that obviously applies.
2  BY MR. NEUBERGER:
3  Q. Now, Colonel, isn't it true that you've never
4  liked Captain Barbara Conley?
5  A. I wouldn't say that's the case.
6  Q. Isn't it true that you don't like her now?
7  A. It's not the case.
8  Q. Isn't it true that you bear ill will towards
9  her?
10 A. That's not the case.
11 Q. Isn't it true that you are angry at her?
12 A. No.
13 Q. Isn't it true that you are unhappy with her?
14 A. Yes.
15 Q. Isn't it true you are displeased with her?
16 A. Not displeased with her. Displeased with her
17 conduct and actions.
18 Q. Isn't it true you are irritated by her?
19 A. I'm not irritated by her.
20 Q. Isn't it true you are peeved at her?
21 A. No.
22 Q. Isn't it true you are pissed off at her?
23 A. No.
24 Q. Isn't it true you are annoyed at her?

Page 180

1  A. Annoyed by actions, not by her. By her actions.
2  Q. Isn't it true you are disgusted by her?
3  A. No.
4  Q. You had to think about the answer to the
5  question of are you angry and are you annoyed.
6  A. In its context. You're using terms that are
7  your words. And when I think about angry at an
8  individual? No, not necessarily. But by actions,
9  sometimes actions upset me, sure. But angry? No.
10 Q. Isn't it true that you bear animosity towards
11 her?
12 A. No.
13 Q. I believe you testified before that you were not
14 happy with the actual lawsuit that was filed by her
15 against Colonel Chaffinch; is that correct?
16 A. I believe I testified I was unhappy that we
17 didn't have the opportunity to address the problems
18 in-house before they went outside.
19 Q. So you were unhappy that the issues were raised
20 in an outside forum as opposed to an internal forum?
21 A. I was unhappy that we didn't have the
22 opportunity to address them internally before they were
23 addressed externally.
24 Q. Isn't it true that you were unhappy that the

Page 181

1  filing of this lawsuit caused the DSP to get back on the
2  front pages of the Delaware State News and The News
3  Journal?
4  A. I don't know if we ever got off the front pages,
5  so to say that we were back on, I was -- I was unhappy
6  that we were -- that once again we were on the front
7  pages of the paper, yeah.
8  Q. Isn't it true that you were unhappy that this
9  lawsuit attracted even more widespread media attention
10 both on a regional and a national scale?
11 A. I'm not familiar with the national scale of it.
12 Q. How about the regional?
13 A. I'm trying to think of what your interpretation
14 of "regional" is, Mr. Neuberger.
15 Q. Sure. I can help you with that. Regional:
16 Philadelphia, Baltimore media covering the filing of this
17 lawsuit and the removal of Superintendent Chaffinch from
18 his position.
19 A. Was I unhappy about the regional nature of it?
20 Is that what your question was?
21 Q. Yes.
22 A. Yes. Yes, and may I just --
23 Q. Absolutely.
24 A. Why was I unhappy with it? Due to the fact that

46 (Pages 178 to 181)

**Page 182**

1  public perception of my troopers and what they do and how
2  they do are affected by this type of media blitz. That
3  it affects every one of my troopers when they go out
4  there to do their job. That when they come in contact
5  with the public, are they going to be treated unfairly
6  because somebody is going to have the perception of what
7  this organization is represented as being portrayed in
8  the media.
9      Q.  So, for example --
10     A.  Therefore, it does -- I am unhappy about that,
11 that they would have to face that on a day-to-day basis.
12     Q.  That's really not just as a result of this
13 lawsuit? It's as a result of this suit and other
14 lawsuits that have been filed?
15     A.  Yes.
16     Q.  Do you feel that the filing of those lawsuits,
17 including this lawsuit, have tarnished an image you've
18 worked 27 years of your life to build up, almost
19 28 years?
20     A.  That's making it too personal. I -- I feel that
21 it's tarnished the image of an organization that is
22 serving the citizens of this state for well over 80 years
23 and has done so on a daily basis to an incredible
24 professional way. We've learned from every -- from the

**Page 183**

1  mistakes that we've made. We tried to do better coming
2  out.
3          So when I look -- when I look at my
4  division and its historical perspective and what the
5  future brings, I see good things because I know the good
6  things that are being done. And when things like this
7  happen -- bad things happen all the time. How you deal
8  with them and where you go with them is what makes the
9  difference with the outcome.
10     Q.  Do you think the unexplained release of Captain
11 Paige's e-mail dealing with Captain Conley's Internal
12 Affairs information was unfortunate?
13     A.  It was extremely unfortunate.
14     Q.  Did there come a time when you learned that I,
15 meaning Stephen Neuberger, had filed an Internal Affairs
16 complaint with Captain James Paige into the release of
17 Captain Conley's Internal Affairs' information?
18     A.  Did I become aware of that?
19     Q.  Yes.
20     A.  I think I heard about that and it was dealt with
21 through the secretary's office, though, not through mine.
22     Q.  The secretary's office had involvement in it?
23 Is that what you are indicating?
24     A.  It would have to -- because it involved Captain

**Page 184**

1  Conley and the lawsuit, it would have been addressed by
2  the secretary's office.
3      Q.  Would you have had anything to do with that
4  complaint that was filed or the investigation into it?
5      A.  Not at that time because I recused myself as
6  the --
7      Q.  Would Major Eckrich have had an involvement?
8      A.  Yes.
9      Q.  Isn't it true at some point Captain Conley was
10 being brought up on Internal Affairs charges and there
11 was a trial board appointed consisting of Major Papili
12 and two captains?
13     A.  Yes.
14     Q.  Are you aware that Major Papili was removed from
15 the board because his wife, Captain Mary Ann Papili, was
16 mentioned by name in Captain Conley's lawsuit? Are you
17 aware of that?
18         MS. BALLARD:  Object to the form.
19     Q.  You can answer.
20     A.  Would you repeat the question, please? Because
21 there was a couple things that happened there and I want
22 to be specific as to what you are asking me.
23     Q.  Sure.
24         MR. NEUBERGER:  Could I ask the court

**Page 185**

1  reporter to repeat that question, please?
2          (The reporter read from the record as
3  requested.)
4      A.  I am aware that Major Papili requested to be
5  recused from the board because of the mention of his wife
6  in the lawsuit, yes.
7  BY MR. NEUBERGER:
8      Q.  So did Major Papili request just to be taken out
9  of the loop because he didn't want anything to do with
10 it?
11         MS. BALLARD:  Object to the form.
12     Q.  Are you aware that Major Papili asked to be
13 taken completely out of that loop because his wife was
14 mentioned, and so as a result he just wanted nothing to
15 do with it?
16     A.  He asked to be recused from the board, yes.
17     Q.  Did that decision have to be approved by either
18 you or Secretary Mitchell?
19     A.  Mr. Neuberger, we got to remember our time
20 frames now, not the time of how late it's getting today,
21 but the time frame of when these things were taking place
22 and these things took place, the recusal of Major
23 Papili --
24     Q.  Perhaps I can narrow the time frame for you.

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Corporal Thomas F. MacLeish | C.A. # 04-1394-GMS | June 9, 2005 |

Page 186

1  A. If you would.
2  Q. December of 2004, a couple days before her
3  hearing was scheduled to go to trial.
4  A. Okay.
5  Q. Does that help you at all?
6  A. No, it doesn't, but try to work back and through
7  it.
8        When Captain Conley was charged, she was
9  given a sheet to strike --
10        THE WITNESS: Is it all right if I talk
11  about this? It's okay?
12        MR. DURSTEIN: Sure.
13        MR. NEUBERGER: Actually, I understand this
14  whole area, but I'm trying to focus on --
15        MS. BALLARD: Let him explain it for the
16  record if he would like to.
17        MR. NEUBERGER: Sure.
18  BY MR. NEUBERGER:
19  Q. Go ahead.
20  A. I remember that Major Seifert couldn't be on the
21  board because he was a direct line supervisor. Major
22  Hughes was at the present current time her first line
23  supervisor. That left Major Eckrich, who was eliminated
24  through the process. So the only one on it was Major

Page 187

1  Papili. She struck Major Papili initially on her
2  submission, and that was early October.
3        THE WITNESS: (To Captain Conley): I
4  apologize. It's hard not to look over.
5  A. But he was struck originally.
6        We then impaneled -- we used the captains
7  that were on the list and we were going to designate a
8  chair of that panel. And then we received a letter from
9  Mr. Tom Neuberger, your partner, who said he wanted Major
10  Papili brought back on it.
11        And at that point in time it was determined
12  that Major Papili opted to recuse himself from that
13  because of the conflict due to a lawsuit.
14  Q. You can continue.
15  A. I think that's where I'm bringing myself
16  up-to-date to.
17        And then -- I'm trying to remember. You
18  mentioned the date of the original trial board, when it
19  was supposed to take place. I'm trying to remember the
20  sequence of events when it was determined to go through
21  the criminal justice counsel to impanel a group to hear
22  the charges. And that was done in consultation with
23  Mr. Tupman, the secretary, and myself.
24  Q. Why was Major Papili removed? Why did he remove

Page 188

1  himself?
2  A. He removed himself because of his wife's mention
3  in the lawsuit.
4  Q. Did he feel that would have some impact on his
5  ability to be impartial?
6  A. He felt it -- he felt it could be perceived that
7  he was impartial.
8  Q. So would it be fair to say that he was concerned
9  with the appearance of impropriety?
10  A. I'd say you'd have to ask Joe, but I just
11  remember him asking himself to be recused because of his
12  wife's involvement. He would have to answer whether or
13  not that was his reason.
14  Q. So are you telling me that he was never actually
15  on her trial board?
16  A. I didn't say that. I said that he was one of
17  the original names that was struck by Captain Conley and
18  then he was put back on as a result of -- I believe it
19  was either a letter or a request from Mr. Tom Neuberger
20  that he be placed back on it again. And that once he was
21  placed back on it again, then he was -- then he submitted
22  his letter to be recused.
23  Q. Why did Major Papili sign off on the final
24  punishment that was netted out to Captain Conley if he

Page 189

1  believed there was an appearance of impropriety?
2  A. I didn't say that he thought it was the
3  appearance of impropriety. I said he asked to be recused
4  because of -- because he asked to be recused. He'd have
5  to answer the question what his reasons were.
6  Q. Do you know if he was ordered to make that
7  decision?
8  A. I know I did not order him to make that
9  decision.
10  Q. Do you know if Secretary Mitchell ordered him to
11  make that decision?
12  A. I do not.
13  Q. I would like to put in front of you another
14  document.
15        MR. NEUBERGER: I would like to mark this
16  as Plaintiff's Deposition Exhibit 20.
17        (Plaintiff's Exhibit 20 was marked for
18  identification.)
19  BY MR. NEUBERGER:
20  Q. Colonel, do you have Plaintiff's Deposition
21  Exhibit 20 in front of you?
22  A. Yes, I do.
23  Q. Does this appear to be an e-mail from Stephen J.
24  Neuberger to James Paige (DSP)?

48 (Pages 186 to 189)