Conley                                    v.                              Chaffinch, et al.
Joseph P. Aviola, Jr.              C.A. # 04-1394-GMS                      June 7, 2005

Page 90

BY MS. BALLARD:
Q. I promise I won't keep you here very long.
    The document that we've been talking about that you got from Tom Eldred, that was this one page, Exhibit 14, e-mail; correct?
A. No, it wasn't this.
Q. I understand. Without the identifying information.
A. Yes.
Q. You did not receive any other documents from Tom Eldred?
A. No, ma'am.
Q. You did not disclose any other Internal Affairs documents to Tom Eldred?
A. No, ma'am.
Q. Now, in the conference room when you had Mike Tupman on the speakerphone, did you hear the advice Mike Tupman was giving?
A. Yes, I did.
Q. Did you believe that your response to Tom Eldred complied with that advice?
A. Yes.
Q. Did Lieutenant Colonel MacLeish tell you to go beyond Mike Tupman's advice --

Page 91

A. No.
Q. -- in terms of speaking with Mr. Eldred?
A. No, ma'am.
Q. The rules and regulations cited in Exhibit 14, numbers 4 and 40, are they a matter of public information, the content of those rules?
A. Yes.
Q. If Tom Eldred were to call out of the blue and say what does this rule say, would you let him know?
A. Yes.
    MS. BALLARD: I think that's all I have.
    MR. NEUBERGER: No further questions.
    MS. BALLARD: Thank you.
    (The deposition was then concluded at 4:05 p.m.)
            -----
        INDEX TO TESTIMONY

JOSEPH P. AVIOLA, JR.                    PAGE

Examination by Mr. Neuberger              2
Examination by Ms. Ballard               90

            -----

Page 92

        INDEX TO EXHIBITS

PLAINTIFF'S EXHIBIT NO.:                 PAGE

6  A three-page copy of a printout from Westlaw    26
7  A multipage copy of the Answer to Defendants
   to First Amended Complaint                      29
8  A four-page copy of an e-mail dated Thursday,
   April 15, 2004                                  33
9  A two-page copy of an e-mail dated Friday,
   April 23, 2004                                  36
10 A three-page copy of an e-mail dated Friday,
   April 30, 2004                                  41
11 A one-page copy of an e-mail dated Friday,
   April 30, 2004                                  43
12 A two-page copy of a document from newszap.com  45
13 A two-page copy of a document printed out
   from www.delawareonline.com                     48
14 A one-page copy of an e-mail dated Monday,
   October 25, 2004                                65

            -----

Page 93

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

24 (Pages 90 to 93)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Joseph P. Aviola, Jr. | C.A. # 04-1394-GMS | June 7, 2005 |

Page 94

```
 1   State of Delaware )
 2                    )
 3   New Castle County )
 4
 5           CERTIFICATE OF REPORTER
 6
 7           I, Kathleen White Palmer, Registered Merit
     Reporter and Notary Public, do hereby certify that there
 8   came before me on the 7th day of June, 2005, the deponent
     herein, JOSEPH P. AVIOLA, JR., who was duly sworn by me
 9   and thereafter examined by counsel for the respective
     parties; that the questions asked of said deponent and
10   the answers given were taken down by me in Stenotype
     notes and thereafter transcribed into typewriting under
11   my direction.
12           I further certify that the foregoing is a
     true and correct transcript of the testimony given at
13   said examination of said witness.
14           I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.
16
17
18
19           Kathleen White Palmer, RPR, RMR
             Certification No. 149-RPR
20           (Expires January 31, 2008)
21
     DATED:  June 8, 2005
22
23
24
```

25 (Page 94)

Wilcox & Fetzer, Ltd.     Professional Court Reporters     (302)655-0477



**WILCOX & FETZER LTD.**

# CONFIDENTIAL

In the Matter Of:

Conley
v.
Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

Secretary David B. Mitchell, Sr.

June 10, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

CONFIDENTIAL        Conley                    v.                Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                June 10, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,          )
                                    )
            Plaintiff,              )
                                    )   Civil Action
v.                                  )   No. 04-1394-GMS
                                    )
COLONEL L. AARON CHAFFINCH,         )
individually and in his official    )
capacity as the Superintendent,     )   PAGES 70 AND 71
Delaware State Police; LIEUTENANT   )   ARE CONFIDENTIAL
COLONEL THOMAS F. MACLEISH,         )
individually and in his official    )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.     )
MICHELL, individually and in his    )
official capacity as Secretary of the )
Department of Safety and Homeland   )
Security, State of Delaware; and    )
DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY,    )
State of Delaware,                  )
                                    )
            Defendants.             )

        Deposition of SECRETARY DAVID B. MITCHELL, SR.,
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 10:10 a.m. on Friday,
June 10, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.
APPEARANCES:
        STEPHEN J. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff
-----------------------------------------------------------
                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

CONFIDENTIAL    Conley    v.    Chaffinch, et al.
Secretary David B. Mitchell, Sr.    June 10, 2005

Page 2

1  APPEARANCES (Continued):
2
       RALPH K. DURSTEIN, ESQUIRE
3      STEPHANI J. BALLARD, ESQUIRE
       DEPARTMENT OF JUSTICE
4      820 North French Street
       Carvel State Office Building
5      Wilmington, Delaware 19801
       for Defendants Lieutenant Colonel Thomas F.
6      MacLeish, David B. Mitchell, and Division
       of State Police
7
8  ALSO PRESENT:
9      CAPTAIN BARBARA L. CONLEY
10         - - - - -
11         SECRETARY DAVID B. MITCHELL, SR.,
12     the witness herein, having first been
13     duly sworn on oath, was examined and
14     testified as follows:
15  BY MR. NEUBERGER:
16     Q.  Mr. Secretary, my name is Steve Neuberger and
17  I'm a lawyer for Captain Barbara Conley. Okay?
18         Have you ever testified in court before?
19     A.  Yes, I have.
20     Q.  Approximately how many times?
21     A.  Hundreds.
22     Q.  Hundreds?
23         Have you ever had your deposition taken
24  before?

Page 3

1     A.  Yes, I have.
2     Q.  Approximately how many times?
3     A.  Dozens.
4     Q.  I'm going to run through the procedure for you
5  just one more time just to make sure that it's fresh in
6  your memory. Okay?
7     A.  Okay.
8     Q.  I'm going to ask you some questions and the
9  court reporter here is going to type up your answers to
10 those questions.
11    A.  I understand that.
12    Q.  We have to take turns talking. Although she is
13 very good, she can't take everything down if we are both
14 talking at the same time. Okay?
15    A.  Okay.
16    Q.  You have to verbalize your answers. Instead of
17 nodding your head, just say yes, or instead of shaking
18 your head, just say no. Okay?
19    A.  Okay.
20    Q.  After we are done here today, you'll have an
21 opportunity to review the transcript of this deposition
22 to make any corrections if there are any typographical
23 errors. Do you understand that?
24    A.  I understand it.

Page 4

1     Q.  If I ask you a question and you don't understand
2  the question, just ask me to rephrase the question and I
3  would be happy to do that. Okay?
4     A.  Okay.
5     Q.  It is very important. I do not want you to
6  guess. If you don't know an answer, just say so and I'll
7  move on. Okay?
8     A.  Okay.
9     Q.  Now, are you taking any medications or is there
10 anything else that would prevent you from testifying
11 truthfully or remembering accurately today?
12    A.  No.
13    Q.  If you need any breaks, if you have to go to the
14 bathroom or stretch your back out, if you want to do some
15 yoga, whatever it is, just let me know and we'll be happy
16 to take a short break for you. Okay?
17    A.  Thanks.
18    Q.  Now, you've taken an oath to tell the truth
19 today; correct?
20    A.  Correct.
21    Q.  Do you understand the significance of that oath?
22    A.  Yes, I do.
23    Q.  You used to be a police officer; correct?
24    A.  That is correct.

Page 5

1     Q.  It was in Maryland?
2     A.  Yes.
3     Q.  Was it the Maryland State Police?
4     A.  As well as Prince George's County, Maryland.
5     Q.  Now, did those two agencies have rules and
6  regulations that talked about the importance of telling
7  the truth under oath?
8     A.  They do.
9     Q.  You understood that at the time, didn't you,
10 that it was important to tell the truths under oath?
11    A.  I do understand it.
12    Q.  Do you understand that today?
13    A.  I understand that today.
14    Q.  Now, what is your full name?
15    A.  David Bruce Mitchell, Sr.
16    Q.  What is your position in the State of Delaware
17 government as of today?
18    A.  Secretary of the Department of Safety and
19 Homeland Security.
20    Q.  When were you born?
21    A.  September 17th, 1950.
22    Q.  Where were you raised?
23    A.  First 12 years, Pittsburgh, Pennsylvania. The
24 next three years, Edgewood Arsenal, Maryland. The next

Case 1:04-cv-01394-GMS   Document 78-4   Filed 09/19/2005   Page 6 of 17

CONFIDENTIAL       Conley                           v.                          Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                                June 10, 2005

Page 6

1  three years in Stuttgart, Germany. And the balance in
2  lower Maryland until I became a police officer.
3      Q.  Where did you go to high school?
4      A.  I went to Ludwigsburg High School in Stuttgart,
5  Germany, and I went to Laurel High School in Laurel,
6  Maryland.
7      Q.  Have you continued your education after high
8  school?
9      A.  Yes.
10     Q.  Could you run me through that education?
11     A.  Associate's degree from Prince George's
12 Community College in law enforcement.
13     Q.  What year was that?
14     A.  In and around 1979.
15     Q.  Okay.
16     A.  Bachelor's degree from the University of
17 Maryland, University College in Technology and
18 Management, 1981. Master's degree in public policy,
19 University of Maryland, School of Public Affairs, 1986.
20 Law degree, University of Maryland School of Law, 1996.
21     Q.  So you are a law school graduate?
22     A.  Yes.
23     Q.  So that means you have a JD?
24     A.  That's correct.

Page 7

1      Q.  Did you enjoy your time in law school?
2      A.  Very much.
3      Q.  Did you take the class called Constitutional
4  law?
5      A.  Yes.
6      Q.  Did you study the Constitution in your Con. law
7  class?
8      A.  Of course.
9      Q.  Did you study the Bill of Rights in your Con.
10 law class?
11     A.  Yes, I did.
12     Q.  Did you study the rest of the amendments in your
13 Con. law class?
14     A.  Yes.
15     Q.  Would it be fair to say that you have some
16 training in the Constitution and its amendments?
17     A.  That's fair.
18     Q.  Did you ever take a bar exam?
19     A.  Yes.
20     Q.  Where?
21     A.  Maryland.
22     Q.  Did you pass the bar exam?
23     A.  The first time.
24     Q.  What year was that?

Page 8

1      A.  1997.
2      Q.  Did you ever practice?
3      A.  Yes.
4      Q.  For how many years?
5      A.  Less than a year when you add it all up.
6      Q.  What kind of law did you practice?
7      A.  Disability.
8      Q.  I think you mentioned before that you served for
9  some time as a police officer; is that correct?
10     A.  That's correct.
11     Q.  What agencies did you serve with?
12     A.  Prince George's County, Maryland, from 1971 to
13 1995. Maryland State Police from 1995 to 2003.
14     Q.  When you served with Prince George's County, can
15 you walk me through the ranks you achieved from the time
16 you came in initially until the time you left that
17 agency?
18     A.  I came in as a police officer. I left as chief
19 of police.
20     Q.  How many years were you chief of police?
21     A.  Five.
22     Q.  What is the rank below chief of police in Prince
23 George's County?
24     A.  Deputy chief of police.

Page 9

1      Q.  Were you ever deputy police of chief?
2      A.  I was a deputy chief. I was a major. I was a
3  captain. I was a lieutenant. I was a sergeant. I was a
4  corporal. I was a police officer first class. And I
5  started as a police officer.
6      Q.  Did you enjoy your time serving with Prince
7  George's County?
8      A.  Very much.
9      Q.  Then you mentioned that you worked for the
10 Maryland State Police; is that correct?
11     A.  That's correct.
12     Q.  What did you do with them?
13     A.  I was a superintendent.
14     Q.  For how many years?
15     A.  Eight.
16     Q.  Did you enjoy your time at the Maryland State
17 Police?
18     A.  Very much.
19     Q.  So would it be fair to say you've spent a large
20 portion of your working life working with police
21 officers?
22     A.  Over half of my adult life.
23     Q.  Is that an experience which you value, that you
24 value and treasurer?

### Page 10

1  A. Yes.
2  Q. When did you assume your present position in the
3  Delaware state government?
4  A. I was appointed in May of 2004 and I was
5  confirmed by the senate on June 2nd, 2004.
6  Q. Have you enjoyed your time in Delaware state
7  government?
8  A. Very much.
9  Q. Who initially contacted you about coming to
10 Delaware state government?
11 A. The governor's chief of staff, Mark Brainard.
12 Q. Did you jump at the opportunity?
13 A. That's fair to say, yes.
14 Q. Were you given any major tasks to complete when
15 you were brought into Delaware state government?
16 A. I'm not sure I understand the question.
17 Q. Were there any pressing concerns that you were
18 asked to solve and/or address when you were brought into
19 Delaware state government?
20 A. Yes.
21 Q. What were they?
22 A. Crime in the City of Wilmington and what the
23 State can do to assist the Wilmington city police
24 department and city government, and the issues

### Page 11

1  surrounding the Delaware State Police involving morale
2  and ongoing suits.
3  Q. Were you asked to try to solve the morale
4  problem?
5  A. Of course.
6  Q. Were you asked to try to solve the problems
7  related to the ongoing suits?
8  A. Yes.
9  Q. Were you asked to try to assure that there would
10 be no more suits?
11 A. I wasn't asked that, no.
12 Q. Was it your hope that there would be no more
13 lawsuits after you were brought in?
14 A. Certainly.
15 Q. Are you disappointed that there have been
16 several more lawsuits since you were brought in?
17 A. It's fair to say I'm disappointed to see the
18 agency characterized the way it has been. That's fair to
19 say.
20 Q. Now, are you saying it's disappointing to see
21 the agency characterized that way in the lawsuits or in
22 some other fashion?
23 A. In the lawsuits.
24 Q. The media attention which has been generated by

### Page 12

1  these lawsuits, has that been fun?
2  A. No, I wouldn't characterize that as fun.
3  Q. Has it been somewhat unpleasant?
4  A. It's challenging. I don't know if it's
5  unpleasant. After 34 years, you take them as they come.
6  Q. Sure.
7     You spent 34 years in law enforcement
8  pretty much; correct?
9  A. That's correct.
10 Q. You are aware that law enforcement intends to
11 generate public attention?
12 A. Absolutely.
13 Q. Given the system of government that we operate
14 under, is that to be expected?
15 A. Oftentimes.
16 Q. Do you think that is a good thing for democracy?
17 A. I think democracy is wonderful.
18 Q. Do you think one of the wonderful things about
19 democracy is the right of the citizens to criticize the
20 government?
21 A. Absolutely.
22 Q. Do you think one of the wonderful things about
23 democracy is the right of citizens to petition the
24 government for redress of grievances?

### Page 13

1  A. Absolutely I support that.
2  Q. Being a law school graduate and an individual
3  who has taken and passed the Maryland bar exam, you are
4  aware that the right to petition the government arises
5  under the First Amendment of the United States
6  Constitution; correct?
7  A. That's correct.
8  Q. Would you agree that one of the wonderful things
9  about democracy is the right of citizens to speak out and
10 exercise their First Amendment right to freedom of
11 speech?
12 A. Absolutely.
13 Q. Now, if we needed to serve you with a subpoena
14 of some type in this case, would you prefer that we do
15 this at your place of business or would you prefer that
16 we do it at your home?
17 A. I prefer that you serve my attorney. But if you
18 insist on serving me, at my place of business. And if
19 you would kindly just call, I'll make those arrangements.
20 Nobody has to hunt me down.
21 Q. So if your attorney is not available to be
22 served for whatever reason, you would prefer that we
23 serve you at your place of business?
24 A. Call me. Just have me called. I'll make the

CONFIDENTIAL   Conley   v.   Chaffinch, et al.
Secretary David B. Mitchell, Sr.   June 10, 2005

Page 14

1  arrangements.
2   Q.  You will make yourself available to receive that
3  subpoena?
4   A.  Absolutely.
5   Q.  I appreciate that.
6       You mentioned and testified a little bit
7  about being brought into the Delaware state government to
8  solve some of the problems --
9   A.  Yes.
10   Q.  -- facing the Delaware State Police; is that
11  correct?
12   A.  That's correct.
13   Q.  Is one of your assignments to get the Delaware
14  State Police off the front page of the local papers?
15   A.  I wouldn't characterize it as that, no.
16   Q.  How would you characterize it?
17   A.  As you stated, I was given the assignment to
18  solve some of the problems in the Delaware State Police.
19   Q.  Did you want to get the Delaware State Police
20  off of the front page of The News Journal and the
21  Delaware State News?
22   A.  I'm not sure I -- did I want to get the Delaware
23  State Police off the front page of The News Journal and
24  State News?  That's two newspapers?  Is that your

Page 15

1  question?
2   Q.  That is my question.
3   A.  I certainly didn't enjoy negative press about
4  Delaware State Police or any units under my command, but
5  I can't say that I woke up every morning and that was my
6  goal.
7   Q.  Now, in addition to the State Police, what other
8  agencies are encompassed within the Department of Safety
9  and Homeland Security of the State of Delaware?
10   A.  There are five other divisions:  Division of
11  Capital Police, the Division of Emergency Management, the
12  Division of Communications, the Division of Highway
13  Safety, and the Division of Alcohol and Tobacco
14  Enforcement.
15   Q.  Do you find that the Delaware State Police is in
16  the news in a negative way more often than the rest of
17  the division under your command?
18   A.  Yes.
19   Q.  Being a law school graduate and a law
20  enforcement officer for many years, you are aware that
21  the highest law in the land is something called the
22  United States Constitution; correct?
23   A.  Yes.
24   Q.  When you were an officer in Maryland, you were

Page 16

1  trained in the laws which governed your conduct; correct?
2   A.  That's correct.
3   Q.  For example, you received training under the
4  Fourth Amendment regarding search and seizure; is that
5  correct?
6   A.  That is correct.
7   Q.  You also know that under the Constitution you
8  can't discriminate against an officer in promotions or
9  transfers because of their race; is that correct?
10   A.  That's correct.
11   Q.  And that you can't discriminate against them
12  because of their sex or gender?
13   A.  That is correct.
14   Q.  That's because the Fourteenth Amendment to the
15  United States Constitution, as well as various other
16  federal laws, forbid that; is that correct?
17   A.  That's correct.
18   Q.  You know that you can't transfer or punish an
19  officer because of where he goes to church; correct?
20   A.  Correct.
21   Q.  You know you can't transfer or punish an officer
22  because of who he votes for in an election; correct?
23   A.  That's correct.
24   Q.  It's because the First Amendment to the

Page 17

1  United States Constitution forbids that; correct?
2   A.  Correct.
3   Q.  Do you know you can't punish an officer who
4  reports corruption in the workplace; correct?
5   A.  Correct.
6   Q.  It's because the First Amendment would forbid
7  that; correct?
8   A.  Yes.
9   Q.  You know you can't punish an officer because he
10  or she has filed a charge with the Equal Employment
11  Opportunity Commission or filed a charge with the
12  Delaware Department of Labor; is that correct?
13   A.  That's correct.
14   Q.  Do you know you can't punish or retaliate
15  against an officer who has filed a lawsuit in state or
16  federal court; is that correct?
17   A.  That's correct.
18   Q.  That's because the Constitution and its
19  amendments forbid that?
20   A.  Correct.
21   Q.  Now, since you've been in the chain of command,
22  so to speak, for the Delaware State Police, has the State
23  Police strived to treat all people equally?
24   A.  To the best of my knowledge, yes.  I am aware of

CONFIDENTIAL          Conley                              v.                    Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                                June 10, 2005

Page 18

1  certain findings in civil actions that are contrary to
2  that.
3      Q.  Is it important to you that the Delaware State
4  Police treat all people equally?
5      A.  Absolutely.
6      Q.  It important to you that the DSP treat people
7  the same regardless of whether they are rich or whether
8  they are poor?
9      A.  Of course.
10     Q.  Is it important that they treat people the same
11 regardless of whether they are black or whether they are
12 white?
13     A.  Of course.
14     Q.  How about if they are male or female?
15     A.  Naturally.
16     Q.  How about if they are weak or powerful?
17     A.  Absolutely.
18     Q.  Would it be fair to say that treating people
19 equally and fairly is even more important in the Delaware
20 State Police because they are the police and they are
21 responsible for enforcing the law?
22     A.  I'd say that for any police department.
23     Q.  It's of paramount importance that the law be
24 applied fairly and equally to all?

Page 19

1      A.  Yes.
2      Q.  I would like to put a document in front of you
3  which was previously marked as Plaintiff's Exhibit 16.
4          MR. NEUBERGER:  Counsel, I believe you
5  already have a copy of this document?
6          MS. BALLARD:  This is the rules and
7  regulations?
8          MR. NEUBERGER:  Yes, it is.
9          MS. BALLARD:  Okay.
10 BY MR. NEUBERGER:
11     Q.  Mr. Secretary, do you have that document in
12 front of you?
13     A.  Yes, I do.
14     Q.  Do you see at the top where it says "Delaware
15 State Police Rules and Regulations (26.1.1)"?
16     A.  I do.
17     Q.  Do you see at the bottom it says Roman numeral
18 VII-3-1?
19     A.  I do.
20     Q.  So we are looking at the same page?
21     A.  That is correct.
22     Q.  I would like to direct your attention to Rule
23 and Regulation Number 1.  Could you please read that
24 quietly to yourself?

Page 20

1      A.  (The witness reviews the document.)  Okay.
2      Q.  Would it be fair to say that that rule requires
3  members of the State Police to obey and observe state and
4  federal laws, as well as DSP rules and regulations, as
5  well as a host of other rules and regulations?
6      A.  Yes.
7      Q.  Do you think that's important?
8      A.  Yes.
9      Q.  Do you think this is important to troopers in
10 the Delaware State Police?
11     A.  Yes.
12     Q.  Troopers could be punished for violating this
13 rule and regulation; is that correct?
14     A.  They could be.
15     Q.  Now, if you ordered a trooper in the Delaware
16 State Police to violate state or federal law, do you
17 expect that trooper would do so?
18     A.  I would hope not.
19     Q.  Because that would be wrong?  Would that be fair
20 to say?
21     A.  An unlawful order.
22     Q.  Does a trooper have an obligation to disobey an
23 unlawful order?
24     A.  I would say yes.

Page 21

1      Q.  What if DSP legal counsel told a trooper to
2  violate the United States Constitution?  Should they?
3      A.  Not knowingly.
4      Q.  Observing an order from the legal counsel
5  wouldn't really be an order; it would more be advice,
6  wouldn't it?
7      A.  That is correct.
8      Q.  Because the attorneys work for Delaware State
9  Police?
10     A.  Indirectly, but yes.
11     Q.  I would like you to turn two pages in.  At the
12 bottom of the page does it say Roman numeral VII-3-3?
13     A.  It did.
14     Q.  I would like to direct your attention to Rule
15 and Regulation Number 13.  Could you read that quietly to
16 yourself?
17     A.  (The witness reviews the document.)  I have.
18     Q.  Now, in your own words, what does that rule and
19 regulation require?
20     A.  The rule specifically requires that no member --
21 implying of the Delaware State Police -- shall threaten,
22 strike, or otherwise assault any other member of the
23 division.
24     Q.  Do you think that's pretty clear?

CONFIDENTIAL        Conley                           v.                        Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                                June 10, 2005

Page 22

1  A. Yes.
2  Q. If Deputy Attorney General Mike Tupman ordered a
3  Delaware State Police officer to punch another officer in
4  the nose, should that officer do so?
5  A. No.
6  Q. How come?
7  A. Because it would be an unlawful order.
8  Q. Now, take a look at DSP Rule and Regulation
9  Number 15. Do you see that?
10 A. I do.
11 Q. Could you read that quietly to yourself?
12 A. (The witness reviews the document.) I have.
13 Q. In your own words, what does that rule require?
14 A. It requires truthfulness in statements that are
15 made in writing or verbally to a superior officer. And
16 that also means that you cannot withhold information
17 willingly and intentionally from any report or statement
18 that would be relevant to the matter at hand, I would
19 assume.
20 Q. Now, in your capacity as homeland security
21 secretary, do you think this rule would cover the conduct
22 of an officer who lies under oath in court?
23 A. Yes.
24 Q. Is lying under oath in court a serious matter?

Page 23

1  A. Yes.
2  Q. Would you hope that every officer under your
3  command would strive to tell the truth in court at all
4  times?
5  A. Yes.
6  Q. If Delaware State Police legal counsel ordered a
7  trooper to lie under oath in court, should they?
8  A. No.
9  Q. Why?
10 A. They're committing a crime, number 1. Number 2,
11 it's an unlawful order.
12 Q. Now, could you turn two more pages? Are you
13 looking at the page that at the bottom has a Roman
14 numeral VII-3-5?
15 A. I am.
16 Q. Will you take a look at Rule and Regulation
17 Number 21? Do you see that?
18 A. I see that.
19 Q. Is the heading of that rule and regulation
20 "Deadly Force"?
21 A. It is.
22 Q. Given your long experience as a police officer,
23 do you know that deadly force should not be used lightly?
24 A. Yes.

Page 24

1  Q. Could you take a look at Rule and Regulation
2  Number 21? I'm not going to question you indepth, but I
3  would like you to take a look at it.
4  A. (The witness reviews the document.) I've read
5  it.
6  Q. Is this deadly force rule an important rule to
7  the Delaware State Police?
8  A. Yes.
9  Q. Is it an important rule to you?
10 A. Yes.
11 Q. If DSP legal counsel advised a Delaware state
12 trooper to violate this rule, should they?
13 A. No.
14 Q. Why?
15 A. It's an unlawful order.
16 Q. If you turn one more page, at the bottom of this
17 next page does it say Roman numeral VII-3-6?
18 A. Yes, it does.
19 Q. I would like to direct your attention to Rule
20 and Regulation Number 22. Do you see that?
21 A. I see that.
22 Q. Could you read that quietly to yourself?
23 A. (The witness reviews the document.) I've read
24 it.

Page 25

1  Q. If DSP legal counsel ordered a trooper to
2  violate this rule, should they?
3  A. No.
4  Q. Why?
5  A. It's an unlawful order.
6  Q. Now, the State Police, they also have rules
7  governing drinking and driving, for example, don't they?
8  A. They do.
9  Q. Was there a rule promulgated last summer that a
10 trooper, even when off duty, can't drink and drive their
11 police car?
12 A. With exceptions.
13 Q. But the general rule is that a trooper who is
14 off duty and is driving his police car can't drink while
15 driving?
16 A. I'm not trying to be evasive here. I think the
17 rule essentially is you can't -- you cannot -- of course
18 you cannot consume alcoholic beverages while operating a
19 police vehicle.
20 Q. Okay. That's helpful.
21    If DSP legal counsel advised a trooper to
22 drink alcohol or alcoholic beverages and then drive a
23 police car, should they?
24 A. No.

Case 1:04-cv-01394-GMS    Document 78-4    Filed 09/19/2005    Page 11 of 17

CONFIDENTIAL    Conley    v.    Chaffinch, et al.
Secretary David B. Mitchell, Sr.                June 10, 2005

Page 26

1   Q. How come?
2   A. That would be, I guess, against the rules and
3   regulations of the Delaware State Police.
4   Q. Is that probably a bad thing for a trooper to
5   violate his own rules and regulations?
6   A. Yes.
7   Q. You agree that police officers should be a cut
8   above and should set an example to the public?
9   A. I agree that we are held to a higher standard of
10  conduct, yes.
11  Q. So you agree that Delaware state troopers are
12  held to a higher standard of conduct than the
13  public-at-large is held to?
14  A. Yes.
15  Q. Do you believe that troopers should always
16  strive to meet that higher standard of conduct?
17  A. Yes, I do.
18  Q. Turn four more pages, please. At the bottom of
19  this page does it say Roman numeral VII-3-11?
20  A. Yes, it does.
21  Q. At the top of that page it says "Delaware State
22  Police Policy Against Sexual and Other Harassment and
23  Improper Workplace Behavior"?
24  A. Yes.

Page 27

1   Q. Have you ever seen this policy before?
2   A. I believe I have.
3   Q. Based on your looking at this policy previously,
4   is this a policy that is important to the Delaware State
5   Police?
6   A. Yes, it is.
7   Q. Is this policy important to you?
8   A. Yes.
9   Q. If DSP legal counsel ordered a trooper to
10  violate the policy against sexual and other harassment
11  and improper workplace behavior, should that trooper do
12  so?
13  A. No.
14  Q. How come?
15  A. It would be against the rules and procedures of
16  the Delaware State Police.
17  Q. Okay. You can put that document down.
18      Do you know who L. Aaron Chaffinch is?
19  A. Yes, I do.
20  Q. Are you aware he recently stepped down as
21  superintendent and colonel of the Delaware State Police?
22  A. Yes.
23  Q. When you came on the Delaware scene, so to
24  speak, in May of 2004, was he the colonel of the State

Page 28

1   Police?
2   A. He was.
3   Q. Then you served with Colonel Chaffinch from that
4   time until his retirement?
5   A. That's correct.
6   Q. Do you like Colonel Chaffinch?
7   A. Yes.
8   Q. Do you like him as a person?
9   A. It's fair to say that I'm friends with Colonel
10  Chaffinch, yes.
11  Q. Colonel Chaffinch is your friend; correct?
12  A. Yes.
13  Q. Are you on a first-name basis with him?
14  A. He calls me "Secretary," I call him "Aaron."
15  Q. Have your families ever socialized together?
16  A. Never.
17  Q. Have you ever socialized with just him? Have
18  you gone out for a beer?
19  A. No.
20  Q. Are you aware that in October of 2004 a lawsuit
21  was filed by Captain Barbara Conley against Colonel
22  L. Aaron Chaffinch and the Delaware State Police?
23  A. Yes.
24  Q. How did you find out about that lawsuit?

Page 29

1   A. As I recall, I read it in the -- either -- a
2   copy of the suit either in an e-mail or I read it in the
3   newspaper, one of the two.
4   Q. Do you remember the date that the lawsuit was
5   filed on?
6   A. No.
7   Q. If I told you it was October 27th of 2004, would
8   you agree, disagree, or just not know?
9   A. I don't know.
10  Q. But you do remember a time when a lawsuit was
11  filed?
12  A. Oh, yes.
13  Q. What were your feelings on that lawsuit?
14  A. I was very disappointed to read what I was
15  reading.
16  Q. Who were you disappointed in?
17  A. I don't know that I was -- I don't know that I
18  was disappointed in anybody. I can say that if the
19  allegations were true, I was going to be very
20  disappointed in the superintendent.
21  Q. Were you happy that a lawsuit had been filed
22  instead of the issues being raised internally in the
23  Delaware State Police?
24  A. No.

Case 1:04-cv-01394-GMS   Document 78-4   Filed 09/19/2005   Page 12 of 17

CONFIDENTIAL      Conley                          v.                    Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                        June 10, 2005

Page 30

1  Q. Now, at any point after this lawsuit was filed,
2  was Colonel Chaffinch relieved of his command as
3  superintendent of the Delaware State Police?
4  A. He was.
5  Q. Who ordered that?
6  A. I did.
7  Q. Why?
8  A. It was in the best interest of the Delaware
9  State Police and the State of Delaware government and the
10 people who pay our salaries, the residents and citizens
11 of our state.
12 Q. Now, why was it in their best interests that he
13 be relieved of command after a lawsuit was filed?
14 A. I don't know that it was necessarily because a
15 lawsuit was filed. It's because of the serious,
16 compelling, detailed allegations that were contained
17 within the lawsuit that I felt it was in his best
18 interest and our best interest that he be placed on leave
19 with pay until the allegations were resolved.
20 Q. Do you think the public would have been
21 concerned about the allegations raised in the lawsuit?
22 A. Oh, I think they have been, sure.
23 Q. For example, there have been many newspaper
24 stories run about the lawsuit and the allegations in the

Page 31

1  lawsuit. Would that be fair to say?
2  A. Absolutely.
3  Q. You've seen many of those newspaper articles
4  yourself, haven't you?
5  A. I certainly have.
6  Q. They've been in the Wilmington News Journal;
7  correct?
8  A. Among others.
9  Q. And the Delaware State News?
10 A. Among others.
11 Q. So are you saying yes in answer to that
12 question?
13 A. Yes.
14 Q. Have there been stories written by the
15 Associated Press?
16 A. Yes.
17 Q. Have there been stories written in the regional
18 media?
19 A. Yes.
20 Q. Are you aware of any stories being written in
21 the national media such as USA Today?
22 A. I believe, yes, as I recall.
23 Q. So would it be fair to say that the filing of
24 this lawsuit attracted a great deal of media attention?

Page 32

1  A. Oh, yes.
2  Q. When you first found out about this lawsuit, did
3  you talk to anyone about it?
4  A. Yes.
5  Q. Who did you talk to?
6  A. I talked to the governor's chief of staff, Mark
7  Brainard.
8  Q. I'm sorry. What's his name?
9  A. Mark Brainard.
10 Q. What did you talk to the governor's chief of
11 staff about?
12 A. The fact that a lawsuit had been filed, that --
13 I believe I forwarded it to him, a copy of it. It was
14 very compelling allegations, very serious allegations
15 against the superintendent, personally and
16 professionally, and that I was quite concerned. And that
17 I would digest as much as I could with regard to the
18 issues surrounding the filing and have a recommendation
19 as to how to proceed.
20 Q. Did you talk to anybody else about the lawsuit?
21 A. I believe -- yes. I believe -- well, my staff,
22 yes, Bill Bush.
23 Q. Bill Bush. Who is Bill Bush?
24 A. He is policy advisor on my staff. And Neal

Page 33

1  Mills, who is my chief of administration, and Dan Cox,
2  who is my chief -- or who is the deputy secretary.
3  Q. Was the last name Bill Cox?
4  A. No. Dan Cox.
5  Q. Dan Cox.
6     What did you say to Dan Cox about the suit?
7  A. Just FYI, it is a very compelling front-page
8  story, and it's going to bring a firestorm of -- I
9  speculated it was going to bring a firestorm of protests.
10 Q. Did you hear about the lawsuit before there was
11 a newspaper story?
12 A. I don't recall.
13 Q. Did you place Colonel Chaffinch on
14 administrative leave before a newspaper story had run?
15 A. I don't recall.
16 Q. You mentioned a Neal someone who you also talked
17 to?
18 A. Mills.
19 Q. Neal Mills?
20 A. Yes. Chief of administration.
21 Q. What did you say to him about the lawsuit?
22 A. I believe I asked him what he thought.
23 Q. What did he say?
24 A. He confirmed my assessment. It was very

Page 34

1  compelling, very detailed, very serious allegations that
2  had been placed and made against the highest ranking
3  member of the Delaware State Police.
4     Q.  You mentioned a gentleman by the name of Bill
5  Bush?
6     A.  Yes.
7     Q.  You said he's a policy advisor?
8     A.  And an attorney here, yes.
9     Q.  Was he rendering you legal advice or was he
10 generally serving as a policy advisor?
11    A.  No. He generally serves as a policy advisor.
12    Q.  What did you say to Bill Bush about the lawsuit?
13    A.  Essentially the same thing. They are my
14 immediate staff. Essentially the same message: that we
15 have this front-page, hot-burning issue that is going to
16 draw enormous attention to the agency and to be aware of
17 it; that media requests would be handled by Kim Chandler,
18 who is my press officer.
19    Q.  Did you talk to anyone in the Delaware State
20 Police about the filing of the lawsuit?
21    A.  Yes.
22    Q.  Who did you talk to?
23    A.  I talked to -- in addition to the
24 superintendent, I talked to the deputy superintendent,

Page 35

1  Tom MacLeish, and I talked to the president of the
2  Delaware State Troopers' Association, Sergeant Vincent
3  Fiscella.
4     Q.  Those are the only officers in the Delaware
5  State Police who you talked to about the filing of the
6  lawsuit?
7     A.  At that time, yes. I've had many discussions
8  with, you know, just in general, with troopers as I see
9  them.
10    Q.  About this lawsuit?
11    A.  Well, about the publicity surrounding the
12 lawsuit.
13    Q.  You indicated that you talked to the
14 superintendent, Colonel Chaffinch about this lawsuit;
15 correct?
16    A.  That's correct.
17    Q.  What did you say to him?
18    A.  I called him to my office, and present was my
19 chief of administration, Neal Mills, who is a retired
20 lieutenant colonel from the United States Air Force, and
21 I told Aaron that I was very concerned with what I had
22 read; that the allegations were very serious, they are
23 very compelling, and that I was placing him on
24 administrative leave with pay.

Page 36

1     Q.  Is that the first time that you had talked to
2  him that day?
3     A.  I don't recall.
4     Q.  Is it the first time you had talked to him about
5  the lawsuit, period?
6     A.  I believe so.
7     Q.  Did Colonel Chaffinch say anything during that
8  meeting?
9     A.  Yes, he did.
10    Q.  What did he say?
11    A.  He was disappointed that he was being placed on
12 administrative leave. He said there was no merit to the
13 allegations. He asked, you know, what the restrictions
14 on his duties were, if any, things like that.
15 Essentially that was it.
16    Q.  Did Colonel Chaffinch express any feelings
17 regarding the lawsuit?
18    A.  Yes. Anger.
19    Q.  Was he unhappy about the lawsuit?
20    A.  Absolutely.
21    Q.  Was he displeased about the lawsuit?
22    A.  Yes.
23    Q.  Was he pissed off about the lawsuit?
24    A.  That's a fair assessment.

Page 37

1     Q.  What were your feelings about the lawsuit?
2     A.  Challenging.
3     Q.  Were you annoyed by the lawsuit?
4     A.  I don't know that annoyed is the best way to put
5  it.
6     Q.  What is a better way to put it?
7     A.  It caused me to focus exclusively on the
8  Delaware State Police to the extent that I could have the
9  other five divisions being led by my staff. So it was a
10 challenge that I accepted and didn't look forward to.
11 Wasn't happy about it. Accepted it. Knew that this
12 called into question the appropriateness of the colonel
13 remaining at the head of the State Police during an
14 investigation, and came to a resolution on that and took
15 the action that I took.
16    Q.  So you weren't happy that you had to direct your
17 attentions to only one division and had to -- and as a
18 result were not able to direct your attention to other
19 divisions under your command?
20    A.  Yes. And homeland security issues, sure.
21    Q.  Were you pissed off about this lawsuit?
22    A.  No.
23    Q.  You mentioned you also had some conversations
24 with the lieutenant colonel who is the present colonel,

### Page 38

1 Thomas MacLeish; is that correct?
2   A.  That's correct.
3   Q.  You talked to him about this lawsuit after it
4 had been filed?
5   A.  Yes.
6   Q.  Do you remember how many times you talked to him
7 about that?
8   A.  You know, we've talked off and on about this
9 lawsuit since it's been filed, but the first conversation
10 that I had with Lieutenant Colonel, at the time, MacLeish
11 was to notify him that he -- I was placing him in charge
12 temporarily as the acting superintendent and that the
13 superintendent was being placed on administrative leave
14 with pay.
15   Q.  Now, did you have a meeting with him when you
16 told him that?
17   A.  No.
18   Q.  How did you communicate with him?
19   A.  Telephonically.
20   Q.  What was said during that conversation?
21   A.  Just what I said.
22   Q.  Was anything else said during that conversation?
23   A.  I didn't know how long it would be, but I was
24 going to order the Delaware State Police Internal Affairs

### Page 39

1 division to investigate the allegations and that this
2 going to take some time because they -- the allegations
3 are detailed and they are many and this is going to take
4 a period of time to resolve.
5   Q.  Did Lieutenant Colonel MacLeish express any
6 feelings to you about the lawsuit that had just been
7 filed?
8   A.  I don't recall any at that particular time.
9   Q.  Did he express any feelings to you about Colonel
10 Chaffinch being placed on administrative duty?
11   A.  No.  This was pretty much a one-way
12 conversation.
13   Q.  You mentioned you had a conversation with a
14 Sergeant Vincent Fiscella?
15   A.  That's correct.
16   Q.  Is he the president of the Delaware State
17 Troopers' Association?
18   A.  That is correct.
19   Q.  Is that the recognized collective bargaining
20 unit for Delaware state troopers?
21   A.  Yes, it is.
22   Q.  Did you call him or did he call you?
23   A.  I called him.
24   Q.  What did you say to Sergeant Fiscella?

### Page 40

1   A.  That I placed the superintendent on
2 administrative leave with pay pending the outcome of the
3 investigation into the allegations that were filed and
4 formed the basis for the suit at hand.
5   Q.  Did you say anything else?
6   A.  That the lieutenant colonel, Tom MacLeish, would
7 be the acting superintendent until further notice.
8   Q.  Was that all that you said to him?
9   A.  No, it wasn't.
10   Q.  What else did you say to him?
11   A.  Just, you know, basically that, you know, it's
12 unfortunate that the agency is getting hammered as heavy
13 as it is in the press, but, you know, we accept, you
14 know, the allegations.  We are going to investigate the
15 allegations and we are going to come to conclusions and
16 we are going to move forward.
17   Q.  Were you happy that the agency was getting
18 hammered in the press?
19   A.  No.
20   Q.  Did you talk to the governor about the filing of
21 the lawsuit?
22   A.  No.
23   Q.  When was the next time you had a meeting with
24 Colonel Chaffinch after you placed him on administrative

### Page 41

1 leave?
2   A.  The next time I had a meeting with Colonel
3 Chaffinch was when I delivered the findings of the
4 investigation and the recommended discipline.
5   Q.  When was that?
6   A.  Sometime in February of this year.
7   Q.  Now, in the interim time period did you talk to
8 Colonel Chaffinch at all?
9   A.  Twice.
10   Q.  Was it by telephone?
11   A.  Yes.
12   Q.  What did you talk about?
13   A.  I called to check to see how he was doing.  I
14 told him that I was praying for him and his family.  That
15 I know that he is under a tremendous amount of stress.
16 His family, I'm sure, and his children are feeling the
17 effects of this and that I wished him well.
18   Q.  Did you say anything else to him during those
19 telephone conversations?
20   A.  No.
21   Q.  Was that the gist of both conversations that you
22 had with him?
23   A.  Essentially, yes.
24   Q.  Did you communicate with him by any other means?

Page 42

1  A.  No.
2  Q.  Did he communicate with you by any other means?
3  A.  No. He didn't send me any messages or anything,
4  no.
5  Q.  Now, you mentioned you had a telephone call with
6  Lieutenant Colonel Thomas MacLeish; is that correct?
7  A.  That's correct.
8  Q.  After the conclusion of that telephone call, did
9  you meet with, talk with, or communicate with Lieutenant
10 Colonel Thomas MacLeish any more thereafter?
11 A.  Yes.
12 Q.  In any of those conversations did you talk about
13 this lawsuit?
14 A.  Yes.
15 Q.  When was the next conversation after that
16 telephone conversation you've already described to us?
17 A.  I don't recall.
18 Q.  Did you have a meeting with him?
19 A.  Not on the lawsuit itself, no, but we were in
20 meetings together.
21 Q.  Did you have any meetings with him about issues
22 arising out of the filing of the lawsuit?
23 A.  I'm sorry. Did I have any meetings with him to
24 deal directly with outcomes or issues surrounding the

Page 43

1  lawsuit?
2  Q.  So the question was: Did you have any meetings
3  with him to discuss issues arising out of the filing of
4  the lawsuit?
5       MS. BALLARD:  Object to the form.
6  Q.  You can answer.
7  A.  I don't recall any specific meetings, no. We
8  had discussions. It is a guy I talk to every day.
9  Q.  You work closely with him?
10 A.  Absolutely, as I do all the division directors.
11 Q.  Even when he was just acting superintendent, did
12 you work closely with him then?
13 A.  Oh, absolutely.
14 Q.  Do you work closely with him now now that he is
15 the official superintendent of the Delaware State Police?
16 A.  Certainly.
17 Q.  Is Thomas MacLeish a friend of yours?
18 A.  Yes.
19 Q.  Are you on a first-name basis with him?
20 A.  He calls me "Secretary."
21 Q.  What do you call him?
22 A.  "Tom."
23 Q.  Have you ever socialized with either he or his
24 family?

Page 44

1  A.  I've never met his family.
2  Q.  Has your family --
3  A.  I've had dinner with him.
4  Q.  Was there anyone else at that dinner?
5  A.  No.
6  Q.  Have you had dinner with him on more than one
7  occasion?
8  A.  Maybe twice.
9  Q.  Did you talk about this lawsuit at that dinner?
10 A.  No.
11 Q.  Did you talk about the suspension of the colonel
12 at that dinner?
13 A.  No.
14 Q.  Did you talk about any other lawsuit at that
15 dinner?
16 A.  Yes.
17 Q.  You know that there's a newspaper called the
18 Delaware State News; correct?
19 A.  Yes.
20 Q.  You know that they have a reporter by the name
21 of Tom Eldred; correct?
22 A.  Yes.
23 Q.  Mr. Eldred has actually interviewed you on
24 occasion, hasn't he?

Page 45

1  A.  Yes.
2  Q.  Did there come a time when you learned that
3  Mr. Eldred had an internal State Police document?
4  A.  Yes.
5  Q.  A document relating to Captain Conley?
6  A.  Yes.
7  Q.  How did you first learn about that?
8  A.  The content of the message, which I don't recall
9  how I received -- one of two ways. It was probably
10 through my press officer or an e-mail. That essentially
11 there was a document that Mr. Eldred had that essentially
12 was a notice of a trial board involving Captain Conley
13 and the Delaware State Police were dealing with the
14 media, questions.
15 Q.  Did you ever respond to that communication?
16 A.  I did not talk to anybody in the Delaware State
17 Police.
18 Q.  Did you talk to anybody outside of the Delaware
19 State Police?
20 A.  My press officer.
21 Q.  I'm sorry. What was her name again?
22 A.  Kimberly Chandler.
23 Q.  You indicated that she may have sent you an
24 e-mail about that?

| CONFIDENTIAL | Conley | v. | Chaffinch, et al. |
|---|---|---|---|
| Secretary David B. Mitchell, Sr. | | | June 10, 2005 |

**Page 46**

1     A.   Either that or she told me personally.
2     Q.   Does your office have document retention
3  policies?
4     A.   Yes. The state does.
5     Q.   Are they followed?
6     A.   To my knowledge, yes.
7     Q.   Has any order been given to destroy documents?
8     A.   Oh, no.
9     Q.   Okay.
10    A.   I mean, I give orders to destroy documents a
11 lot, you know, every day, so -- not involving this case.
12 But I get intelligence information that goes right to a
13 shredder and I hand it over to my secretary and I say,
14 "Shred this." So we destroy a lot of stuff.
15    Q.   That's helpful. Thank you.
16    A.   Yeah. But nothing that would be of evidentiary
17 value or...
18    Q.   You are an attorney and you probably understand
19 what the term "evidentiary value" means to attorneys.
20 Would that be fair to say?
21    A.   Yes.
22    Q.   Did you ever communicate with either the
23 Delaware State Police or anyone else in your office any
24 further in reference to this document that Mr. Eldred

**Page 47**

1 had?
2     A.   Kimberly Chandler later in the day as I recall.
3     Q.   Did you have a conversation with her?
4     A.   I did.
5     Q.   Did you communicate in writing or in any other
6 form of communication with her?
7     A.   I don't recall.
8     Q.   You indicated you had a conversation with her;
9 is that correct?
10    A.   As I recall, yes.
11    Q.   What was said during that conversation?
12    A.   That DSP had resolved the issue. They had
13 received legal advice to confirm the authenticity of the
14 document only and to say nothing more.
15    Q.   Do you have any involvement in that decision to
16 confirm the authenticity of the document, to use your
17 words?
18    A.   Not that I recall, no.
19    Q.   So if Lieutenant Colonel MacLeish testified to
20 something else yesterday, would he be mistaken?
21    A.   He -- I wouldn't necessarily say that. He might
22 have a different recollection than I do.
23    Q.   If he testified that but for your authorization
24 and sanctioning he would not have authorized the release

**Page 48**

1 of that document, would he be telling the truth or
2 mistaken or -- what would he be?
3         MS. BALLARD: Object to the form.
4     Q.   You can answer.
5     A.   You know, I wouldn't say he would necessarily be
6 mistaken.
7     Q.   So did you authorize or sanction the release of
8 that information to Mr. Eldred?
9     A.   I think you can imply it probably. If you are
10 my press officer, you can probably imply that I did.
11 Usually how it works is a press officer from a department
12 will check with a higher authority's press officer, run
13 by the strategy, get an okay, and then carry out the
14 strategy and move on. And with that, there is probably
15 some -- there's an implication, tacit approval and so
16 forth.
17    Q.   Did Colonel MacLeish ever talk to you directly
18 about that?
19        MS. BALLARD: Object to the form.
20    A.   I don't recall that.
21    Q.   Would you deny that any such conversation had
22 ever occurred?
23    A.   No.
24    Q.   You just don't remember?

**Page 49**

1     A.   I don't recall a conversation with Tom MacLeish
2 about that document. And if it occurred, I have to --
3 somebody has to refresh my recollection because I don't
4 remember that.
5     Q.   Was the release of the internal affairs e-mail
6 to Mr. Eldred ever investigated?
7     A.   It was considered.
8     Q.   What was it considered?
9     A.   The investigation of how that e-mail got into
10 the hands of Mr. Eldred.
11    Q.   Were you involved in that process in any way,
12 shape, or form?
13    A.   I was involved to the extent that I was given
14 information about it, yes.
15    Q.   What information were you given about it?
16    A.   That computer crimes could not determine -- it
17 would be impossible to determine if somebody forwarded
18 it. Given the volume that's reached by this policy, I
19 guess, that the DSP has, it's so-and-so's charge, that
20 that goes so many different places that somebody could
21 have hit the print button, mailed it. It could have been
22 forwarded -- computer crimes doesn't have the resources
23 nor -- I mean, it would be impossible to determine who
24 did that.

13 (Pages 46 to 49)

CONFIDENTIAL        Conley                              v.                                    Chaffinch, et al.
Secretary David B. Mitchell, Sr.                                                              June 10, 2005

### Page 50

1  Q. Now, I believe you mentioned before -- and if
2  I'm incorrect, please correct me -- that the public had a
3  strong interest in the filing of this lawsuit as
4  evidenced by all the media stories?
5      MS. BALLARD: Object to the form.
6  Q. You can answer.
7  A. Yes, yes, the public had a strong interest.
8  Q. Despite the strong interest, no investigation
9  was undertaken into the release of that Internal Affairs
10 e-mail?
11 A. I guess it depends -- it depends on how you
12 define "investigation." It was considered, to my
13 knowledge. It was discussed. It was hypothesized. And
14 the conclusion was that we won't be able to determine how
15 this happened.
16 Q. Was Colonel Chaffinch ever questioned and asked
17 if he had released it?
18 A. I don't know.
19 Q. Were any of Colonel Chaffinch's buddies, pals,
20 or friends ever questioned as to whether they had
21 released it?
22 A. I wouldn't even know who that is, but I don't
23 know.
24 Q. Did you release it?

### Page 51

1  A. No.
2  Q. You mentioned you were a friend of his.
3  A. Well, yes, I did, Counsel.
4      No, I didn't give this to Tom Eldred. Did
5  you release it?
6  Q. I actually didn't have the e-mail at the time.
7  A. Good.
8  Q. Now, do you know if Lieutenant Colonel Tom
9  MacLeish released it?
10 A. I -- no. I doubt very seriously if he did.
11 Q. Now --
12 A. It doesn't serve our best interest to release
13 that stuff.
14 Q. Do you know who was running the Internal Affairs
15 department at the time that that investigation was
16 discussed?
17 A. Yes.
18 Q. Who was running the Internal Affairs department
19 at the time?
20 A. Captain Jim Paige.
21 Q. Who did he report to?
22 A. To the best of my knowledge, Lieutenant Colonel
23 MacLeish. It was his assessment that I was aware of that
24 we can't find out who did this. And I believe so

### Page 52

1  strongly in Jim Paige and his work that I accepted that.
2  Q. It was Jim Paige's assessment or it was Tom
3  MacLeish's assessment?
4  A. It was Jim Paige's assessment through Tom
5  MacLeish that we are not going to know who sent it.
6  Q. Now, at the time Captain Paige was in charge of
7  Internal Affairs; correct?
8  A. Yes.
9  Q. He's a troop commander now?
10 A. That's correct.
11 Q. Do you recall what troop he's at?
12 A. No, no. Mid -- above Dover. I'm sorry.
13 Q. Fair enough.
14 A. Yeah. He's not down south. I know that.
15 Q. Isn't it true that you don't like Barbara
16 Conley?
17 A. That's not true.
18 Q. Isn't it true you bear ill will towards her?
19 A. No.
20 Q. So are you telling me you don't bear her ill
21 will even though she filed this lawsuit which caused all
22 this adverse media attention?
23 A. That's what I'm telling you.
24 Q. Are you telling me or did you previously tell me

### Page 53

1  that you weren't happy about all of the adverse media
2  attention?
3  A. I said that. I'm not.
4  Q. You're not happy about it?
5  A. That's correct.
6  Q. You don't bear her any ill will?
7  A. Absolutely not.
8  Q. Did there come a time when you learned that I,
9  Stephen Neuberger, had filed a complaint with Captain
10 Paige requesting an Internal Affairs investigation into
11 the release of Captain Conley's Internal Affairs
12 information?
13 A. I was aware that you had corresponded or
14 communicated with Captain Paige with regard to what
15 Mr. Eldred had.
16 Q. Did you have any involvement in that process?
17 A. I was made aware of it.
18 Q. But beyond simply being made aware of it, were
19 you involved at all?
20 A. I didn't direct anybody to do anything, no.
21 Q. Were you aware of what was going on within the
22 process other than just being generally aware that a
23 complaint was made?
24 A. I don't understand that. Could you be more