Price, et al.                                      v.                                    Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                           July 19, 2007

Page 90
1  a portion of where the ball was dropped'"?
2    A.  Yes.
3    Q.  Do you know who he's referring to there?
4    A.  Sergeant Foraker.
5    Q.  Do you know who the previous sergeant was?
6    A.  Sergeant Ashley.
7    Q.  Does it appear he's indicating here Sergeant
8  Richard Ashley did a good job?
9    A.  Yes.
10   Q.  Does it appear to you that he's indicating that
11 Sergeant Foraker did not do a good job?
12   A.  That's what it appears.
13   Q.  He's saying that Sergeant Foraker dropped the
14 ball?
15   A.  Yes.
16   Q.  Would you read this as saying that
17 Sergeant Foraker was not doing his job very well?
18   A.  With regards to the condition of the range, yes.
19   Q.  Do you think that's pretty clear from reading
20 that?
21   A.  Yes.
22   Q.  And the article goes on in the next four
23 paragraphs to identify who the previous sergeant was,
24 right?

Page 91
1    A.  Yes, it does.
2    Q.  It goes on to identify who the current sergeant
3  was, right?
4    A.  Yes, it does.
5    Q.  Going down one more paragraph, the paragraph
6  that starts "Contacted later," do you see that?
7    A.  Yes, I do.
8    Q.  Does that say, "Contacted later, Col. Chaffinch
9  said Sgt. Ashley has retired.  He would not permit the
10 Delaware State News to interview Capt. Warren or
11 Sgt. Foraker"?  Does it state that?
12   A.  Yes.
13   Q.  Does that appear to be indicating that
14 Colonel Chaffinch would not allow Captain Warren or
15 Sergeant Foraker to respond?
16   A.  Yes.
17   Q.  Does this appear to indicate that a gag order
18 was being placed?
19         MR. ELLIS:  I object to the form of the
20 question.
21   A.  He was not allowing them to be interviewed.
22   Q.  Do you know why he was not allowing them to be
23 interviewed?
24         MR. ELLIS:  I object to the form of the

Page 92
1  question.
2          MR. NEUBERGER:  What's wrong with that
3  question?
4          MR. ELLIS:  You're asking him for
5  Chaffinch's statement of mind.
6          MR. NEUBERGER:  I'm asking if he knows it.
7          MR. ELLIS:  You can ask him did Chaffinch
8  tell him.  You can't ask him what's in Chaffinch's head.
9          MR. NEUBERGER:  Go ahead.
10   A.  At this point in time -- I don't know what the
11 colonel was thinking when he said don't give -- I can
12 give you what my opinion is as to why he would have said
13 that.
14   Q.  Did Colonel Chaffinch ever tell you why he gave
15 that order?
16   A.  To protect the division.
17   Q.  Going on to the next paragraph, does that state,
18 "'I have the authority to say yes or no,' he said.  'I'm
19 not going to allow those people to be interviewed at this
20 point in regard to this particular situation.  I'm not
21 trying to create any more of a mess than we already
22 have'"?  Does it state that?
23   A.  Yes, it does.
24   Q.  Does that at least appear to be part of his

Page 93
1  explanation for not allowing the Delaware State News to
2  interview Sergeant Foraker and Captain Warren?
3    A.  Yes.
4    Q.  Just keep following with me.  I'm going to keep
5  reading.  Does it say, "He praised Sgt. Ashley for his
6  work at the range"?  Goes on to say that "'Because of the
7  frangible ammunition we were using, the bullet trap
8  required hands-on, daily cleaning,' he said"?  Does it
9  state that?
10   A.  Yes.
11   Q.  Does it go on to say that Sergeant Ashley was
12 willing to do that?
13   A.  Yes.
14   Q.  Going on to the next paragraph, does it state
15 that "'I cannot say Sgt. Foraker was willing to do that.
16 He was interested in instruction and teaching people how
17 to shoot.  He did not feel (bullet trap cleaning) was
18 part of his purview.  He felt that was putting him in
19 harm's way'"?  Does it state that?
20   A.  Yes.
21   Q.  So based on reading that, does that appear to
22 indicate to you that he was saying that Sergeant Foraker
23 was a coward?
24         MR. ELLIS:  I object to the form of the

24 (Pages 90 to 93)

Wilcox & Fetzer, Ltd.              Professional Court Reporters                       (302)655-0477

Price, et al.                                    v.                                    Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                              July 19, 2007

Page 94

1  question.
2  A. I don't read that, Mr. Neuberger. I think he
3  just made a clear statement that Sergeant Foraker wasn't
4  willing to do it and he wasn't going to do it.
5  Q. He's contrasting that with stating that
6  Sergeant Ashley was willing to do that, right?
7  A. Yes. By the previous statement.
8  Q. You've read this entire article sometime in the
9  past, correct?
10  A. Yes. Long time ago.
11  Q. Are you generally familiar with it?
12  A. Generally, yes.
13  Q. Have you ever seen this article out in a public
14  place anywhere?
15          MR. ELLIS: I object to the form of the
16  question.
17  A. I saw it in my house.
18  Q. Did you ever see it at Sambo's?
19  A. I have heard it was in Sambo's, but Sambo's uses
20  newspapers to line their tables with.
21  Q. You're aware that Sambo's is a crab shack in
22  Leipsic Delaware?
23  A. Yes.
24  Q. It's a place you have been to before?

Page 95

1  A. Yes.
2  Q. You think it's a popular place in I guess that's
3  Kent County?
4  A. Yes, I would say so. That and the Boondocks.
5  You go back and forth.
6  Q. On occasion does the Delaware State Police have
7  out-of-state police officers come in to help with certain
8  testing procedures?
9  A. Yes.
10  Q. Do you know if the Delaware State Police has
11  ever taken those out-of-state police officers to Sambo's
12  to eat?
13  A. Yes, we have. Well, in recent years it was on
14  our dime, but this year, in this particular case we
15  aren't allowed to do that with them anymore because of
16  perceptions of impropriety. So we went there with them
17  and had dinner. They paid for theirs. We paid for ours.
18  It's kind of a local custom. We eat crabs.
19  Q. What particular case were you referencing?
20  A. In the particular case -- when this article, if
21  or when it was on the tables, if it was around the same
22  time, we were doing testing, promotional testing, and --
23  I can't remember when, but we went with the people that
24  were in doing the testing, we went to Sambo's for crabs.

Page 96

1  Q. Putting the article aside, I'd like to focus on
2  your recollection of what was said during the time you
3  were at the FTU with Colonel Chaffinch, Secretary Homer,
4  and the WBOC camera crew.
5  A. Yes.
6  Q. Do you recall any statements that were made by
7  Colonel Chaffinch?
8  A. No, I don't. Not at that time.
9  Q. Do you recall any statements that were made by
10  Secretary Homer?
11  A. Specific things, no. I remember her pointing
12  around -- pointing her finger at the condition of the
13  range. We were on the range. We were behind the bullet
14  trap. We were in the gun-cleaning area. Her indication
15  of the debris that was left around indicating that that
16  was not typical of the way it should be done and that
17  that's not a reflection on her people because they don't
18  have responsibility for that. In a general sense, that's
19  what she was doing.
20  Q. Do you recall if Colonel Chaffinch indicated
21  that he agreed with what Secretary Homer was saying?
22  A. I don't recall him agreeing or not. I know that
23  I indicated that -- at that point in time we had shut
24  down the facility. We were leaving. It was left as is.

Page 97

1  That's not the normal state. They made a point of where
2  the men and women from the FTU -- men of the FTU -- we
3  didn't have any women assigned there at that time. But
4  were they normally on that last week, they are going to
5  break down all the weapons and clean them and do their
6  armors work on them, and due to the nature of us leaving
7  that facility, there were things left out that normally
8  wouldn't have been left out. I indicated that that is
9  not -- that's not the way it normally is; that due to the
10  nature of what had happened, that's why it was -- that's
11  why that particular area was left in the condition it was
12  in.
13          Basically, we abandoned the facility at
14  that point. We left it and we left it as is. And that
15  shouldn't be reflected on the men from the FTU unit.
16  Q. Do you recall anything else that you said that
17  day?
18  A. Yes. Back behind the bullet trap, I was asked
19  by a reporter who was responsible for this, and I said I
20  was.
21  Q. Do you recall anything else that was said that
22  day --
23  A. No.
24  Q. -- by you? I'm sorry.

25 (Pages 94 to 97)

Case 1:04-cv-01394-GMS   Document 80-3   Filed 09/19/2005   Page 3 of 15

Price, et al.                                  v.                          Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                             July 19, 2007

Page 98

1   A.  By me, no, I don't.
2   Q.  In general, I think you indicated a few minutes
3   ago that you didn't recall any specifics of what
4   Colonel Chaffinch said in the media that day. Is that
5   correct?
6   A.  That's correct.
7   Q.  Do you recall anything he may have said
8   generally, topics he may have addressed, people he may
9   have blamed, things of that nature?
10  A.  I don't recall, Mr. Neuberger.
11  Q.  Colonel Chaffinch blamed Sergeant Foraker and
12  the staff at the FTU, as well as Captain Warren for the
13  problems at the FTU; isn't that correct?
14       MR. ELLIS:  I object to the form of the
15  question.
16  A.  According to the newspaper articles and my
17  general knowledge, yes.
18  Q.  You have had conversations with him about that,
19  haven't you?
20  A.  Yes.
21  Q.  You've heard him talk about that topic before,
22  haven't you?
23  A.  Yes.
24  Q.  During those conversations did Colonel Chaffinch

Page 99

1   state that he blamed Captain Warren and Sergeant Foraker
2   and the staff at the FTU for the problems at the FTU?
3   A.  Yes. He assigned blame in that way, yes.
4   Q.  You're indicating that you disagreed with that
5   assignment of blame, aren't you?
6   A.  I think they had a responsibility to do certain
7   things, and if they weren't going to do them, they had a
8   responsibility to report the fact that they weren't going
9   to do them. The overall condition of that range was a
10  combination, as I have stated earlier, of that lack of
11  reporting, lack of conducting what was considered at that
12  point in time to be routine maintenance to the
13  air-handling system and the bullet trap system at that
14  point in time, and those two things combined created the
15  problems at the range. There was a responsibility there,
16  yes, but total responsibility? No.
17  Q.  You indicated that you had had some
18  conversations and had spoken with Colonel Chaffinch about
19  this topic. Correct?
20  A.  Yes.
21  Q.  Do you recall who was present for those
22  conversations?
23  A.  Major Eckrich could have been. I handled the
24  range. The colonel can have his opinion and he can

Page 100

1   assign -- I never launched an investigation by Internal
2   Affairs into what occurred at that range because that
3   wasn't what we were setting out to do. We were setting
4   out to fix what was going on at that range and get it
5   back open and operational safely.
6   Q.  Do you recall if anyone else other than
7   Major Eckrich was present for those conversations?
8   A.  I can't recall anyone being there.
9   Q.  Do you recall when those conversations took
10  place?
11  A.  In that time period of February/March/April.
12  February the colonel was pretty much gone. He was in
13  Florida. Usually took two weeks. He was in Florida in
14  February. So I would say March/April time frame.
15  Q.  That's of 2004?
16  A.  Yes.
17  Q.  I believe we talked a little a few minutes ago
18  about a gag order being placed on Captain Warren and
19  Sergeant Foraker. Isn't that right?
20       MR. ELLIS:  I object to the form of the
21  question.
22  A.  You used the term "gag order." I stated that it
23  was -- they were ordered -- they weren't allowed to speak
24  to the media.

Page 101

1   Q.  And the not allowed to speak to the media order
2   was placed by Colonel Chaffinch?
3   A.  Yes. And I agreed with it.
4   Q.  For example, there's a rule and regulation in
5   your rules and regs book which talks about dealing with
6   the media?
7   A.  Yes.
8   Q.  It says that officers can't speak to the media
9   unless they have been authorized by either the colonel,
10  the lieutenant colonel, or the PIO?
11  A.  Yes.
12  Q.  Captain Warren wasn't allowed to speak to the
13  media about this topic; is that right?
14  A.  Yes.
15  Q.  Sergeant Foraker wasn't allowed to speak to the
16  media about this topic?
17  A.  Yes.
18  Q.  Master Corporal Price wasn't allowed to speak to
19  the media about this topic, right?
20  A.  That's correct.
21  Q.  Master Corporal Warren wasn't allowed to speak
22  to the media about this topic, right?
23  A.  Yes.
24  Q.  Corporal Warwick, I'm not sure what type of

Price, et al.  
Thomas F. MacLeish  
v.  
C.A. # 04-1207  
Chaffinch, et al.  
July 19, 2007

### Page 102

1 corporal he was, but he also wasn't allowed to speak to
2 the media about this topic, correct?
3    A.  No, he was not.
4    Q.  Did the media request to speak to any of those
5 officers?
6    A.  Yes.
7    Q.  Colonel Chaffinch made the decision not to allow
8 them to respond, correct?
9    A.  Yes.
10   Q.  Does the DSP strive to treat all people equally?
11        MR. ELLIS:  I object to the form of the
12 question.
13   A.  Yes, we do.
14   Q.  You're the superintendent of the Delaware State
15 Police; isn't that right?
16   A.  That's correct.
17   Q.  You're the highest-ranking officer?
18   A.  Yes, I am.
19   Q.  In April of 2004 you were the operations officer
20 of the Delaware State Police; isn't that right?
21   A.  I was the deputy superintendent.
22   Q.  You were responsible for day-to-day operations?
23   A.  Yes, sir.
24   Q.  Does the DSP try to treat people equally

### Page 103

1 regardless of whether they are black or white?
2    A.  Yes.
3    Q.  How about if they're male or female?
4    A.  Yes.
5    Q.  How about if their Protestant or Catholic?
6    A.  Yes.
7    Q.  How about Muslim or Jew?
8    A.  Yes.
9    Q.  How about if they're rich or poor?
10   A.  Yes.
11   Q.  How about powerful or weak?
12   A.  Yes.
13   Q.  Be fair to say the DSP strives to treat all
14 people fairly in addition to equally?
15   A.  Yes, we do.
16   Q.  Is that something that's important in the
17 Delaware State Police?
18   A.  Yes, it is.
19   Q.  Is that something that is important to you
20 personally?
21   A.  Yes, it is.
22   Q.  Colonel Chaffinch was blaming staff at the FTU
23 for some of the problems at the FTU; isn't that right?
24   A.  Yes.

### Page 104

1    Q.  Then he refused to allow them to speak to the
2 media to defend themselves; isn't that right?
3    A.  Yes.
4    Q.  Does that strike you as unfair?
5    A.  I think he did what was in the best interest of
6 the division at that point.
7    Q.  So it does not strike you as unfair?
8    A.  Put in your context, yes, it does seem unfair,
9 but put in the context of what was best for the division
10 at that point, I feel it was the right course of action.
11   Q.  Does it strike you as an abuse of power?
12   A.  No, it does not.
13   Q.  Does it strike you as an abuse of discretion?
14   A.  No, it does not.
15   Q.  Does it strike you as dishonorable?
16   A.  No, it does not.
17        MR. ELLIS:  I object to the form of the
18 question.
19   Q.  Does it strike you as cowardly?
20   A.  No, it does not.
21        MR. ELLIS:  I object to the form of the
22 question.
23   Q.  Colonel, I'd like to show you a couple more
24 documents.  Okay?

### Page 105

1    A.  Okay.
2        MR. NEUBERGER:  I'd like to mark this as
3 MacLeish Deposition Exhibit No. 6.
4        (MacLeish Deposition Exhibit No. 6 was
5 marked for identification.)
6 BY MR. NEUBERGER:
7    Q.  Colonel, do you have this document in front of
8 you?
9    A.  Yes, I do.
10   Q.  At the bottom right-hand corner of the page does
11 it say "FTU2756"?
12   A.  Yes, it does.
13   Q.  At the top of the page does it say "Range Tech"?
14   A.  Yes, it does.
15   Q.  A little bit below that does it say,
16 "Recommendation for construction of the Delaware State
17 Police Firing range"?
18   A.  Yes, it does.
19   Q.  Is it dated March 27th of 1996?
20   A.  Yes, it does.
21   Q.  Is it addressed to Lieutenant William E. Bryson?
22   A.  Yes.
23   Q.  Do you know who Lieutenant Bryson is?
24   A.  Yes, I do.

27 (Pages 102 to 105)

Case 1:04-cv-01394-GMS    Document 80-3    Filed 09/19/2005    Page 5 of 15

Price, et al.                                v.                            Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                        July 19, 2007

### Page 106

1  Q. Who is he?
2  A. He's a retired member of the division. He's
3  currently chief of the Camden Police Department in
4  Delaware.
5  Q. Is he a friend of yours?
6  A. Yes, he is.
7  Q. Was he best man in your wedding?
8  A. No. I was best man in his.
9  Q. Got you. I'd like you to take a look at the
10 first paragraph on page 1. Could you read that quietly
11 to yourself?
12 A. (Complied.)
13    Okay.
14 Q. Does that paragraph indicate that range tech has
15 evaluated the ventilation system for the proposed State
16 Police firearms facility and concluded that, as designed,
17 it will not work?
18 A. That's what it says.
19 Q. Then the next paragraph, does that state that
20 "The definition of 'will not work' is simply that the
21 present design will not perform as it is required to
22 under the present requirements established by OSHA &
23 NIOSH"?
24 A. Yes, it does.

### Page 107

1  Q. Can you turn to the second page, please?
2  A. (Complied.)
3  Q. Do you see the section where it says "Findings"?
4  A. Yes.
5  Q. I'd like to read the first paragraph to you.
6  Okay?
7  A. Yes, sir.
8  Q. Does that state that "We have concluded that the
9  designed ventilation system will inevitably fail if it is
10 constructed as designed"?
11 A. Yes.
12 Q. It goes on to list some findings, does it not?
13 A. Yes.
14 Q. Have you ever seen this letter before?
15 A. I have read a lot of correspondence between
16 January of '04 and now, and, yes, I believe I have seen
17 this before.
18 Q. Have you read it before?
19 A. I believe I scanned it.
20 Q. A statement that the ventilation system will not
21 work, would that raise a red flag in your mind if you
22 were to receive this letter?
23 A. Yes, it would.
24 Q. You can put the document down.

### Page 108

1     MR. NEUBERGER: I'd like to mark this next
2  document as MacLeish Deposition Exhibit No. 7.
3     (MacLeish Deposition Exhibit No. 7 was
4  marked for identification.)
5  BY MR. NEUBERGER:
6  Q. Do you have this document in front of you?
7  A. I do.
8  Q. At the bottom right-hand corner of the page does
9  it stay "FTU2956"?
10 A. Yes, it does.
11 Q. Does this appear to be a memo to Lieutenant
12 William Bryson?
13 A. Yes, it does.
14 Q. Is it from Sergeant Brian Fitzpatrick?
15 A. Yes.
16 Q. It's copied to a Captain Thomas DiNetta?
17 A. Yes.
18 Q. It's dated November 8 of 1998?
19 A. Yes, sir.
20 Q. It says, "Re: Range ventilation problem"?
21 A. Yes.
22 Q. Does the first sentence of this memo state that
23 "Since the first day of the in-service shoot, the
24 Firearms Training Staff occasionally noticed an excessive

### Page 109

1  odor of gun smoke on the range"?
2  A. Yes.
3  Q. Could you skip down three more sentences to the
4  sentence that begins "On 11/05/98"?
5  A. Yes.
6  Q. Do you see that?
7  A. Yes.
8  Q. Does that state that on November 5th, 1998,
9  "Jim Ferguson of Trane responded and identified that the
10 ventilation system is causing a horizontal tornado (best
11 way to describe it) swirling the smoke from floor level
12 to the ceiling"?
13 A. Yes.
14 Q. Does the next sentence then state that
15 Lieutenant Bryson contacted Jade Engineering about this
16 problem?
17 A. Yes.
18 Q. Does the sentence after that state that "Mr. Ide
19 stated the problem is because the deflectors that were
20 identified in the blue prints were not installed
21 therefore the system is not working properly"?
22 A. Yes.
23 Q. Does this memo appear to indicate that something
24 that was identified in the blueprints was not installed

Price, et al.　　　　　　　　　　　　　　　　v.　　　　　　　　　　　　　　　　Chaffinch, et al.
Thomas F. MacLeish　　　　　　　　　　C.A. # 04-1207　　　　　　　　　　　　July 19, 2007

Page 110
1　as part of the range ventilation system?
2　　A.　Yes, that's what it states.
3　　Q.　Let's go to the last sentence on the page.  Do
4　you see that?
5　　A.　Yes.
6　　Q.　Does it say, "However, the range staff is
7　exposed daily and there is a potential for serious health
8　problems"?
9　　A.　Yes.
10　　Q.　You indicated that you're friends with
11　Lieutenant William Bryson; isn't that right?
12　　A.　Yes, sir.
13　　Q.　Do you think Lieutenant Bryson would cry wolf,
14　so to speak, about the serious health problems if there
15　wasn't a serious cause for concern?
16　　A.　I don't think he's crying wolf.  I think he
17　would state specifically that there was an issue and we
18　needed to address it.
19　　Q.　Thank you.  You can put that document down?
20　　　　MR. ELLIS:  Bryson didn't write this.
21　　　　MR. NEUBERGER:  I'm sorry.  Let me ask that
22　question again, then.
23　BY MR. NEUBERGER:
24　　Q.　Do you know Sergeant Brian Fitzpatrick?

Page 111
1　　A.　Yes, I do.
2　　Q.　Is he currently a Delaware state trooper?
3　　A.　Yes, he is.
4　　Q.　Do you think Sergeant Fitzpatrick would have
5　flagged these concerns if they weren't serious?
6　　A.　Yes, I think Sergeant Fitzpatrick would have
7　forwarded his concerns in the appropriate manner as he
8　did in this document.
9　　　　MR. NEUBERGER:  I'd like to mark this next
10　document as MacLeish Deposition Exhibit No. 8.
11　　　　(MacLeish Deposition Exhibit No. 8 was
12　marked for identification.)
13　BY MR. NEUBERGER:
14　　Q.　Colonel, do you have that document in front of
15　you?
16　　A.　I do.
17　　Q.　At the bottom right-hand corner does it say
18　"FTU2973"?
19　　A.　Yes, sir, it does.
20　　Q.　At the very top does it say "Batta," B-a-t-t-a?
21　　A.　Yes, it does.
22　　Q.　Below that does it say, "Batta Environmental
23　Associates, Inc."?
24　　A.　Yes.

Page 112
1　　Q.　Does this appear to be a letter that was sent to
2　Mr. Doyle Tiller of the facilities program administrator?
3　　A.　Yes.
4　　Q.　On December 1st of 1998?
5　　A.　Yes.
6　　Q.　I would like to direct your attention to the
7　body of the letter.  If you take a look at the third
8　paragraph, the fourth line down in the third paragraph.
9　Starts with "Levels in the firing range area."
10　　A.　Yes.
11　　Q.　Do you see that?
12　　A.　Yes, I do.
13　　Q.　Does that state that "Levels in the firing range
14　area taken at the firing points during small arms firing
15　were analyzed as being above the OSHA limit of 0.05 MG/M"
16　either squared or cubed.
17　　A.　Yes.
18　　Q.　Does that at least appear to indicate that
19　levels of something in the firing range were above the
20　OSHA limit?
21　　A.　Yes, it does.
22　　Q.　Let's skip down two more paragraphs to the
23　paragraph that begins "Batta recommends."  Do you see
24　that?

Page 113
1　　A.　Yes.
2　　Q.　Does that paragraph state that "Batta recommends
3　having the HVAC systems adjusted to evacuate the airborne
4　contamination in a more efficient manner, and have follow
5　up monitoring performed in order to provide documentation
6　of the response and corrective action"?
7　　A.　Yes, it does.
8　　Q.　Have you ever seen this letter before?
9　　A.　No.
10　　　　MR. NEUBERGER:  I'd like to mark this next
11　document as MacLeish Deposition Exhibit No. 9.
12　　　　(MacLeish Deposition Exhibit No. 9 was
13　marked for identification.)
14　BY MR. NEUBERGER:
15　　Q.　Colonel, do you have that document in front of
16　you?
17　　A.　Yes, I do.
18　　Q.　At the bottom right-hand corner of the page does
19　it say "FTU2983"?
20　　A.　Yes.
21　　Q.　At the top of the page does it say, "Delaware
22　State Police Firearms Training Unit Memorandum"?
23　　A.　Yes, it does.
24　　Q.　Does this appear to be a memo to Captain

29 (Pages 110 to 113)

Price, et al.                                      v.                                      Chaffinch, et al.
Thomas F. MacLeish                     C.A. # 04-1207                                  July 19, 2007

Page 114
1  Thomas DiNetta, cc'd to a Ms. Elritta Annett from
2  Sergeant Brian Fitzpatrick?
3     A.  Yes.
4     Q.  Is it dated December 3rd, 1998?
5     A.  Yes.
6     Q.  Does the re line say, "Range Ventilation"?
7     A.  Yes.
8     Q.  Could you take a look at the first sentence of
9  the first paragraph and read that quietly to yourself,
10 please?
11    A.  (Complied.)
12    Q.  Does that sentence indicate that the range was
13 shut down until the air-handling system could be fixed?
14    A.  That's correct.
15    Q.  Do you recall that there was a time when the
16 range was shut down prior to March of 2004?
17    A.  Yes, I do.
18    Q.  Put that document down. Are you aware of the
19 engineering firm who designed the FTU?
20    A.  JAED, J-A-E-D.
21        MR. ELLIS: All caps.
22    Q.  Do you know if they had ever built an indoor
23 firing range before?
24        MR. ELLIS: Does he know from his personal

Page 115
1  knowledge or does he know from all the media attention
2  and all the memos that have been written?
3        MR. NEUBERGER: His personal knowledge.
4     A.  I apologize for my dismay here, but from my
5  personal knowledge, at that time did I know that they had
6  not? No, I did not. Subsequent to that, beginning in
7  January of '04, did I then learn that they had never
8  designed another range? Yes, I did learn that.
9        MR. NEUBERGER: I'd like to put another
10 document in front of you have. We will call this
11 MacLeish Deposition Exhibit No. 10.
12       (MacLeish Deposition Exhibit No. 10 was
13 marked for identification.)
14 BY MR. NEUBERGER:
15    Q.  Colonel, do you have that document in front of
16 you?
17    A.  Yes, I do.
18    Q.  At the bottom right-hand corner does it say
19 "FTU3040"?
20    A.  Yes, sir.
21    Q.  At the top does it say, "Firearms Training Unit
22 Memorandum"?
23    A.  Yes.
24    Q.  Does this say memo from Sergeant

Page 116
1  Brian Fitzpatrick to Captain Thomas DiNetta, cc'd to
2  Major McDerby?
3     A.  Yes, sir.
4     Q.  Is it dated April 29th, 1999?
5     A.  Yes.
6     Q.  Is it "Re: Range Project"?
7     A.  Yes.
8     Q.  Could you take a look at item No. 4? Do you see
9  item No. 4 on that page?
10    A.  Yes, I do.
11    Q.  I'd like to read part of that to you. Okay?
12    A.  Yes, sir.
13    Q.  Does the first sentence indicate that "April 26,
14 1999 the rear of the range was found to have a large
15 amount of lead dust on the floor and equipment"? Does it
16 state that?
17    A.  Yes, sir.
18    Q.  Do you know what he's referring to by "rear of
19 the range"?
20    A.  Yes. Well, I'll assume that that is the bullet
21 trap area of the range.
22    Q.  Does the next sentence indicate that Master
23 Corporal Eddie Cathell showed his lead level rose from a
24 14 to a 21?

Page 117
1     A.  Yes.
2     Q.  And that Corporal Price went from an 8 to an 11?
3     A.  Yes.
4     Q.  Would this appear to indicate that the lead
5  levels of corporals Cathell and Price were rising?
6     A.  That would indicate that, yes.
7     Q.  Was Sergeant Brian Fitzpatrick the NCOIC of the
8  FTU at the time, to the best of your knowledge?
9     A.  To the best of my knowledge.
10    Q.  You can put that document to the side.
11        MR. ELLIS: I need to take a brief recess.
12        MR. NEUBERGER: It's 10 after 12:00. Do
13 you all want to eat? We will take a break.
14        (A lunch recess was taken at 12:10 p.m.)
15        (The deposition resumed at 1:00 p.m.)
16 BY MR. NEUBERGER:
17    Q.  Colonel MacLeish, let's keep going. I want to
18 run you through a couple more exhibits, and I'd like to
19 put those in front of you and we will go from there.
20 Okay?
21    A.  Sure.
22        MR. NEUBERGER: I'll mark this as MacLeish
23 Deposition Exhibit No. 11.
24        (MacLeish Deposition Exhibit No. 11 was

30 (Pages 114 to 117)

Case 1:04-cv-01394-GMS   Document 80-3   Filed 09/19/2005   Page 8 of 15

Price, et al.                                                                    Chaffinch, et al.
Thomas F. MacLeish         C.A. # 04-1207                        July 19, 2007

Page 118

1  marked for identification.)
2  BY MR. NEUBERGER:
3      Q.  Colonel, do you have that document in front of
4  you?
5      A.  Yes, I do.
6      Q.  In the bottom right-hand corner does it say
7  "FTU3881"?
8      A.  Yes.
9      Q.  At the very top, top left-hand corner, does it
10 say, "Warren Gregory A (DSP)"?
11     A.  Yes.
12     Q.  Does this say, "To: MacLeish Thomas F (DSP)"?
13     A.  Yes.
14     Q.  Does it say, "Subject: RE: Emergency Range
15 Issues"?
16     A.  Yes.
17     Q.  Does this appear to be several different
18 e-mails?
19     A.  Three e-mails, yes.
20         MR. ELLIS:  Is there some reason why the
21 top e-mail is not dated?
22         MR. NEUBERGER:  For some reason I noticed
23 in going through some of the documents, some of them just
24 don't have a date on them.  Some of them will have a date

Page 119

1  right here and some don't.  Some will have all the date
2  stuff right here.  I don't know why that is.
3          MR. ELLIS:  I think it is because Outlook
4  doesn't put a date on it until it's sent.  I'm not saying
5  that this wasn't sent.  I'm only saying that you may have
6  a copy of it that was generated before it was sent,
7  meaning the one that was sent could have been changed.
8          MR. NEUBERGER:  I'm only going to be asking
9  about the ones which were sent.
10 BY MR. NEUBERGER:
11     Q.  Colonel, do you see a little bit down from the
12 top on the first page it says "Original Message"?
13     A.  Yes, I do.  Sorry.
14     Q.  Do you see it says, "From:  MacLeish Thomas F"?
15     A.  Yes.
16     Q.  And the date is January 5th, 2004, at 7:06 a.m.?
17     A.  Yes.
18     Q.  It's being sent to Chris Foraker and
19 Greg Warren?
20     A.  Yes.
21     Q.  Also copied to several people?
22     A.  Yes.
23     Q.  The text of that e-mail says, "Sgt. Foraker, I
24 read this email this morning."  And does it go on from

Page 120

1  there?
2      A.  Yes.
3      Q.  The e-mail that's referring to, is that the next
4  e-mail down on the same page?
5      A.  Yes, it is.
6      Q.  Is that an e-mail from Sergeant Foraker dated
7  December 19th, 2003, at 7:20 p.m.?
8      A.  Yes.
9      Q.  Is it sent to you and to Major Paul Eckrich?
10     A.  Yes, it is.
11     Q.  Is the subject of that e-mail the emergency
12 range issues?
13     A.  Yes, it is.
14     Q.  So this is an e-mail that you once received,
15 correct, the bottom e-mail?
16     A.  That's correct.
17     Q.  When you received it, did you read it?
18     A.  I didn't -- I received it on the day he sent it.
19 I didn't read it until January the 5th when I responded
20 to it.
21     Q.  That's helpful.  Thank you.  You can put that
22 document down.
23         MR. NEUBERGER:  I'd like to mark another
24 document as Deposition Exhibit 12.

Page 121

1          (MacLeish Deposition Exhibit No. 12 was
2  marked for identification.)
3  BY MR. NEUBERGER:
4      Q.  Do you have that document in front of you right
5  now?
6      A.  Yes, I do.
7      Q.  At the bottom right-hand corner does it say
8  "FTU2348"?
9      A.  Yes, it does.
10     Q.  At the top does it appear to say it's an e-mail
11 from Davis, Ralph H.?
12     A.  Yes.
13     Q.  And the date on it appears to be January 9th,
14 2004?
15     A.  Yes.
16     Q.  And it appears to be Sergeant Chris Foraker,
17 right?
18     A.  Yes.
19     Q.  There's an original message a little farther
20 down, correct?
21     A.  Yes, there is.
22     Q.  That's an e-mail from Chris Foraker to
23 Ralph Davis and Greg Warren?
24     A.  Yes.

Case 1:04-cv-01394-GMS     Document 80-3     Filed 09/19/2005     Page 9 of 15

Price, et al.                                v.                              Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                         July 19, 2007

Page 122

1  Q. Do you see the subject line says, "Standard
2  Operating Procedures & issues"?
3  A. Yes, I do.
4  Q. I'd like to direct your attention to the second
5  paragraph which begins, "I would also like to point out
6  that." Do you see that?
7  A. Yes, I do.
8  Q. I'd like to read this to you. "I would also
9  like to point out that the firearms industry standard for
10 instructor to student ratio is 1 instructor for every 4
11 students of in-service personnel and 1 instructor to
12 every 2 recruit students (MAXIMUM NUMBER OF STUDENTS ON
13 EACH COUNT)." Do you see that?
14 A. Yes, I do.
15 Q. Does that appear to be referring to some sort of
16 safe staffing level concerns?
17 A. It appears to me is they're telling me what --
18 that the firearms industry standard for
19 instructor-to-student ratio is 1 to 4 for inservice and 1
20 to 2 recruit students.
21 Q. Did you ever hear Sergeant Foraker or any of the
22 other personnel at the FTU raise concerns as to the
23 staffing levels at the FTU?
24 A. Yes, I have.

Page 123

1  Q. Did you ever see this e-mail, to the best of
2  your recollection?
3  A. Not this e-mail I have not.
4  Q. But you had heard those same concerns raised by
5  Sergeant Foraker and the rest of the staff?
6       MR. ELLIS: I object to the form of the
7  question.
8  BY MR. NEUBERGER:
9  Q. Have you heard those same concerns raised by
10 Sergeant --
11 A. I recall addressing these concerns through
12 Captain Warren.
13 Q. Do you know if Captain Warren was raising those
14 issues because his subordinates had raised those issues
15 to him?
16 A. I would assume that's why he brought them to my
17 attention, yes.
18 Q. You can put that document down.
19       MR. NEUBERGER: I'd like to mark this next
20 document as MacLeish Deposition Exhibit No. 13.
21       (MacLeish Deposition Exhibit No. 13 was
22 marked for identification.)
23 BY MR. NEUBERGER:
24 Q. Colonel, do you have that document in front of

Page 124

1  you?
2  A. Yes, I do.
3  Q. At the bottom right-hand corner of that document
4  does it say "FTU2351"?
5  A. Yes, it is.
6  Q. Does it appear to be an e-mail from
7  Sergeant Foraker to Captain Greg Warren, copied to
8  Lieutenant Ralph Davis?
9  A. Yes.
10 Q. Is it dated January 9th, 2004, at 7:58 p.m.?
11 A. Yes.
12 Q. Is the subject line of that e-mail "Range Health
13 issues and Departmental liability"?
14 A. Yes.
15 Q. Does the first sentence of the first paragraph
16 indicate that "We are experiencing significant air flow
17 problems at the range"?
18 A. Yes, it does.
19 Q. Now, skipping on to the third sentence of that
20 same paragraph, does it state, "Corporals Warren and
21 Price have expressed that this problem has been in
22 existence for many months and has only been 'band aided'
23 over time when complaints have been made"?
24 A. Yes, it does.

Page 125

1  Q. Is this in keeping with what you testified to
2  earlier about some preexisting problems regarding
3  ventilation?
4       MR. ELLIS: I object to the form of the
5  question.
6  A. I testified that, in a general sense, there had
7  been air-handling problems at the range. Yes.
8  Q. Did you know about any specifics at the time?
9  A. At that time? No.
10 Q. Were specifics about the air-handling problems
11 at the range subsequently brought to your attention?
12       MR. ELLIS: I object to the form of the
13 question. I don't see the time frame.
14       MR. NEUBERGER: Okay.
15       MR. ELLIS: Subsequent to this e-mail?
16       MR. NEUBERGER: No. I'm trying to use
17 e-mail to bring certain issues to his attention and go
18 from there.
19       MR. NEUBERGER: For a time frame I'm going
20 to say December of 2003 to April 2004.
21       MR. ELLIS: What's the question? Did he
22 know about ventilation issues during that time period.
23       MR. NEUBERGER: Yes.
24 A. No, I was not aware of the ventilation issues

32 (Pages 122 to 125)

Case 1:04-cv-01394-GMS    Document 80-3    Filed 09/19/2005    Page 10 of 15

Price, et al.                                 v.                              Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                        July 19, 2007

Page 126
1  from -- the first knowledge I had of issues at the range
2  involved one of the previous e-mails that
3  Sergeant Foraker had sent on December the 19th. That was
4  my first knowledge of issues at the range with the
5  air-handling system. It was later in the month of
6  January that more specific things about the air-handling
7  system were coming out, and it was my understanding we
8  were working with Facilities Management to address them.
9      Q.  Did you ever hear that Sergeant Foraker and the
10 rest of the staff at the FTU were trying to get the
11 ventilation problems at the FTU fixed during that same
12 time period?
13     A.  I knew they were working with Facilities
14 Management in order to address the air-handling problems.
15 That's what I was briefed on by the captain.
16     Q.  Did you ever hear that they were concerned about
17 their health and safety due to problems with the
18 ventilation system?
19     A.  I'm trying to remember the time frame. In the
20 January time frame, I remember the first time that it
21 came glaringly out there that there were problems,
22 significant problems, with health issues was at the end
23 of the month, and that was that phone call I got from
24 Captain Warren on the 29th that said that there were

Page 127
1  problems with nasal discharges and things of that nature,
2  that they needed to -- that there was a cloud, there was
3  a reference to a cloud of dust, and that's when I said,
4  "Do we need to shut it down? Do we need to shut it down?
5  Do we need to get blood work, get physicals for our
6  personnel?"
7      Q.  Could you take a look at the paragraph
8  numbered 1? Do you see that?
9      A.  Yes, I do.
10     Q.  Does that appear to indicate that, quote, "A
11 reddish haze in the air that is suspended throughout the
12 air when the bullet strikes the bullet trap"?
13     A.  Yes.
14     Q.  Does it then say that "The airborne" -- I can't
15 read the next word -- "are inhaled by the instructors and
16 students"? Does it state that?
17     A.  Yes, it does.
18     Q.  Does it go on to state, "When anyone blows their
19 nose, a large amount of the reddish debris is
20 discharged"?
21     A.  Yes.
22     Q.  "Students and instructors also complain of a
23 copper penny taste in their mouth after shooting and
24 described a significant eye mucus present when awaking

Page 128
1  the following morning after a day on the range"?
2      A.  Yes, it does.
3      Q.  Putting the document down, are those some of the
4  health concerns that were related to you by Captain
5  Greg Warren?
6      A.  Yes. I can recall saying to Captain Warren, "Do
7  we need to shut the range down?"
8          "No, we can continue shooting."
9          The recommendation being wear masks,
10 wear -- it's not a surgical mask but a paper-type mask
11 over their face to reduce the amount of reddish cloud
12 that -- this airborne cloud that they were obviously
13 standing in. I likened it to mowing your grass and if
14 you're mowing a lot of grass with dirt and pollen and
15 stuff, it's going to eliminate some of that stuff from
16 getting into your nasal passages and you're ingesting it.
17 If we weren't going to shut it down, they didn't feel we
18 had to shut it down, what precautions could we take to be
19 safe.
20     Q.  Who indicated that a paper mask should be worn?
21     A.  I'm trying to think of the proper terminology
22 for it. It wasn't -- it's not a surgical mask, it's not
23 a ventilator, but it's a device to wear over your face.
24 We have them issued for people that would like to

Page 129
1  expectorate on our troopers. We put them on them so that
2  they're not going to be putting things on our troopers.
3      Q.  Was that your idea or Captain Warren's?
4      A.  That was my idea. It wasn't well received.
5      Q.  By whom?
6      A.  By the firearms training staff, as shared with
7  me by Captain Warren.
8      Q.  Why was it not well received, do you know? Was
9  that told to you?
10     A.  My understanding is that they felt it would
11 infringe upon their ability to communicate with the range
12 personnel. I was told that they needed training in
13 putting that on, in use of that if we were going to
14 mandate that they use it. My only suggestion in using
15 that mask was to cut down on the amount of mucus and the
16 foreign material they were ingesting. If they weren't
17 going to shut it down, they didn't feel it was necessary
18 to shut it down, how could we, while working to fix the
19 system, we their exposure to this dust, the ingesting of
20 this dust? That was my recommendation.
21     Q.  Did anyone tell you that the FTU staff thought
22 it may have been a safety concern wearing that type of a
23 mask?
24     A.  That was where I alluded to their ability to

33 (Pages 126 to 129)

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 130
1  give verbal commands and things like that to students.
2  They're the ones that are up there. I understand that.
3    Q.  Let's go down to the paragraph numbered 2
4  towards the bottom of the page. Do you see that?
5    A.  Yes, I do.
6    Q.  Let's skip to the second sentence which starts
7  with the words "Due to the fact." Do you see that?
8    A.  Yes, I do.
9    Q.  I'd like to read that to you. Okay?
10   A.  Yes.
11   Q.  "Due to the fact that cleaning out the
12       filters/screens and the sprayer jet heads as well
13       changing out the failed pumps greatly increases
14       the blood lead level, this maintenance should be
15       executed by professionals who are well versed and
16       properly equipped in the prevention of lead
17       exposure in a contaminated environment."
18       Does it say that?
19   A.  Yes, it does.
20   Q.  Just based on reading this, does it appear that
21  they were trying to raise a safety concern there?
22   A.  Yes, it does.
23   Q.  Is it a safety concern which you ever heard
24  about independently of this e-mail?

Page 131
1    A.  No, it is not.
2    Q.  Did anyone ever tell you that the FTU staff
3  members thought that professionals should be cleaning the
4  range because of the hazardous materials at the range?
5    A.  After the fact, yes, that was stated, but not
6  during this time.
7    Q.  When is after the fact?
8    A.  After the 29th of January.
9    Q.  Of 2004?
10   A.  2004.
11   Q.  Would that have been in February or March of
12  2004?
13   A.  It could have been.
14   Q.  You can put that document down.
15       MR. NEUBERGER: I'd like to put another
16  document in front of you. We will mark this as MacLeish
17  Deposition Exhibit 14.
18       (MacLeish Deposition Exhibit No. 14 was
19  marked for identification.)
20  BY MR. NEUBERGER:
21   Q.  Do you have that document in front of you,
22  Colonel?
23   A.  I do.
24   Q.  On the bottom right-hand corner does it say

Page 132
1  "FTU3886"?
2    A.  Yes, it does.
3    Q.  Does this appear to be something which was
4  printed out from Captain Gregory Warren's e-mail account?
5    A.  If by reference to the name at the top it's
6  Captain Gregory Warren or it has Gregory A. Warren, I can
7  assume that is where it originated.
8    Q.  At the top it does say Captain Gregory A.
9  Warren, right?
10   A.  Yes.
11   Q.  It says, "To: Foraker Christopher"?
12   A.  Yes.
13   Q.  It says, "Re: Bullet Trap Update/Air Handler"?
14   A.  Yes.
15   Q.  Does it say, "10-4, I'll call you first thing
16  Tuesday morning ref. coming up and meeting with you. I
17  want to review some items with you, prior to submitting
18  my final report to Macleish. Thanks, Greg"? Does it say
19  that?
20   A.  Yes, it does.
21   Q.  What report is that referencing, do you know?
22   A.  My assumption by reading this is from my
23  reference to the January 5th response to Captain Warren
24  advising him to prepare a report for me on the problems

Page 133
1  at the range.
2    Q.  There's another e-mail message right below that.
3  Do you see that? It says "Original Message"?
4    A.  Yes, I do.
5    Q.  Is that dated January 23rd, 2004?
6    A.  Yes.
7    Q.  Is that an e-mail from Chris Foraker to Captain
8  Warren, Ralph Davis, and the rest of the staff at the
9  FTU?
10   A.  Yes, it is.
11   Q.  Does the subject line say, "Bullet Trap
12  Update/Air Handler"?
13   A.  Yes.
14   Q.  Putting this document down, did anyone ever tell
15  you that there were problems with the bullet trap at the
16  FTU?
17   A.  Yes. Sergeant Foraker made me aware of that on
18  December 19th.
19   Q.  Were you made aware of subsequent problems with
20  it?
21   A.  No. On January the 5th when I responded -- if I
22  could look back, I can tell you a specific date, but it
23  was in that time frame, January the 5th or 6th, when I
24  responded to Sergeant Foraker's original e-mail of

34 (Pages 130 to 133)

**Page 134**

1  December the 19th that said do what you got to do, Greg
2  prepare a report and work on the problems. I assumed
3  that was going on by the director of the academy and his
4  staff along with FTU.
5  Q. At some point a report was submitted to you,
6  correct?
7  A. Yes.
8  Q. Do you know if Captain Warren interviewed the
9  members of the FTU staff as he prepared that report?
10  A. I don't know if he specifically did. I know the
11  report contained information that dealt with the range,
12  but it wasn't specific to the issues in the original
13  e-mail. It was kind of an all-encompassing report.
14  Q. I would like to direct your attention to the
15  second paragraph of this document, the one which begins,
16  "Regarding the air quality testing."
17  A. Yes.
18  Q. Do you see that?
19  A. Yes.
20  Q. I'd like to direct your attention to the third
21  sentence in that paragraph, the one that begins, "I was
22  also advised." Do you see that?
23  A. Yes, I do.
24  Q. I'd like to read that to you. Okay?

**Page 135**

1  A. Sure.
2  Q. "I was also advised by both Cpl. Price and
3  　　Cpl. Warren when they had approached Sgt. Ashley
4  　　regarding maintaining the pumps and the water
5  　　system as well the spike in the lead levels in
6  　　their blood causing health problems, Sgt. Ashley
7  　　responded with 'You have to die from something.'
8  　　This statement offended them and they as well as
9  　　Jim Warwick and myself are extremely concerned
10  　　over our health and the health of those who we
11  　　train."
12  　　Does it say that?
13  A. Yes, it does.
14  Q. As the highest-ranking officer of the DSP
15  currently, I'd like to ask you some questions about what
16  this paragraph says. Okay?
17  A. Okay.
18  Q. Should a supervisor respond to a trooper's
19  health and safety concerns by saying you have to die from
20  something?
21  　　MR. ELLIS: I object to the form of the
22  question.
23  A. I think that Sergeant Ashley in the context in
24  which it was said, was it said in a joking manner? Was

**Page 136**

1  it said -- the setting in which it was said has to be
2  taken into consideration before you start making a
3  judgment on what those words mean that he said.
4  　　So the context under which it's presented
5  here, I can see where you would make that assumption, but
6  the context in which the conversation took place between
7  those parties that were there when it was said, all
8  parties would have to be talked to and discuss it.
9  Q. Were you a party to that conversation?
10  A. No, I was not.
11  Q. If it wasn't said in a joking manner, would that
12  be an appropriate response from a supervisor to a
13  subordinate?
14  　　MR. ELLIS: I object to the form of the
15  question.
16  A. It's not the best way to say, you know, get on,
17  get your work done, but it could be said better.
18  Q. If a trooper on patrol went up to his shift
19  supervisor and said my bulletproof vest isn't working,
20  should the supervisor respond to him that, well, just
21  don't wear it, you have to die from something? Would
22  that be an appropriate response in that context?
23  　　MR. ELLIS: I object to the form of the
24  question.

**Page 137**

1  A. The hypothetical that you just gave me, I would
2  anticipate my sergeant saying how do you know it's not
3  functioning properly? What are your concerns, specific
4  concerns? Take it off and don't bother wearing it. It's
5  going to offer you some level of protection anyway, much
6  the same as with this is -- you're working with these
7  things. Is that the appropriate response? Or the
8  appropriate response could have been let's wear gloves,
9  prevent it from touching us, and clean it in that manner.
10  If those are your concerns and that's the area -- that's
11  the basis of it, then take appropriate safety precautions
12  in dealing with it. That would be the appropriate
13  response I would say. And the trooper -- the supervisor
14  telling somebody don't wear your vest because you don't
15  think it's going to work is not an appropriate response.
16  Q. I'd like to show you another document. You can
17  put that one down. We will call this MacLeish Deposition
18  Exhibit No. 15.
19  　　(MacLeish Deposition Exhibit No. 15 was
20  marked for identification.)
21  BY MR. NEUBERGER:
22  Q. Do you have that document in front of you?
23  A. Yes, I do.
24  Q. In the bottom right-hand corner does it say

Price, et al.  v.  Chaffinch, et al.
Thomas F. MacLeish   C.A. # 04-1207   July 19, 2007

**Page 138**

1  "FTU3894"?
2  A. Yes, it does.
3  Q. Does this appear to be an e-mail from Sergeant
4  Chris Foraker to Major Paul Eckrich dated February 19,
5  2004?
6  A. Yes, it does.
7  Q. I'd like to direct your attention to the
8  paragraph that is written it looks like in bold. Do you
9  see that?
10  A. Yes.
11  Q. Does that state, "I am overwhelmed with concern
12  for the health and safety of my staff and their wives and
13  children"?
14  A. Yes.
15  Q. Skipping the next sentence, does the next
16  sentence say, "I have spent much less time on the range
17  when compared to my staff and yet my copper and lead
18  levels are the same as the others"? Does it say that?
19  A. Yes, it does.
20  Q. Does it say, "My lead level shot up from a 3 to
21  9 and my copper is at 971 in just 2 months"?
22  A. Yes.
23  Q. Does this paragraph appear to be expressing
24  health and safety concerns about the conditions at the

**Page 139**

1  range?
2  A. Yes.
3  Q. Do you think that's a valid concern?
4  MR. ELLIS: Object to the form of the
5  question. Do you mean is health and safety a valid
6  concern or is the material in the bold paragraph in
7  Exhibit 15 a valid health and safety concern?
8  BY MR. NEUBERGER:
9  Q. Is health and safety in general a valid concern?
10  A. Yes, it is.
11  Q. How about health and safety when it comes to
12  levels of lead and tin, copper and other things like that
13  in the working environment, independent of that document,
14  Colonel?
15  A. Any exposure of our people to anything that
16  could be hazardous to their health is a concern, and
17  that's why early in the month -- once again, the time
18  frame, it was either on or about this or prior to -- I
19  asked, to have a better understanding of where we were,
20  what levels we were at. And I go back to back on the
21  29th when I said to Captain Warren, "Get blood work done
22  and do physicals."
23  He told me "We're not at the physical point
24  at this time. They are waiting for the blood results to

**Page 140**

1  come back in to find out where blood levels were in a
2  short amount of time."
3  I had asked our HR person, Captain Yeomans,
4  to prepare a report on the blood lead levels to get an
5  understanding, and with the thought always being out
6  there that I had already offered getting physicals to all
7  these personnel and I even included recruits if they
8  thought it was necessary, and at that point
9  Captain Warren didn't feel it was necessary, and I guess
10  neither did the people in the Firearms Training Unit,
11  because that's where the information was passed on
12  through.
13  Q. How do you know it was passed on and through to
14  them?
15  A. I would assume that the captain would carry that
16  message forward as any individual would in that capacity
17  that oversees that type of a unit, who oversees any unit
18  within the State Police, because the health and safety of
19  our people are always important.
20  Q. Thank you. That's helpful.
21  MR. NEUBERGER: I'd like to put another
22  document in front of you. We will call this MacLeish
23  Deposition Exhibit No. 16.
24  (MacLeish Deposition Exhibit No. 16 was

**Page 141**

1  marked for identification.)
2  BY MR. NEUBERGER:
3  Q. Colonel, do you have that document in front of
4  you?
5  A. Yes, I do.
6  Q. At the bottom right-hand corner does it say
7  "FTU2593"?
8  A. Yes, it is.
9  Q. At the top does it say, "Firearms Training Unit
10  Indoor Range Maintenance and Service Report"?
11  A. Yes, it does.
12  Q. Does it say, "Prepared by FTU Staff"?
13  A. Yes, it does.
14  Q. I would like to make clear, I don't think this
15  is the report you were just referencing.
16  A. Correct.
17  MR. NEUBERGER: He was referencing a report
18  by Greg Warren.
19  MR. ELLIS: There's a Greg Warren report
20  dated January 30th.
21  MR. NEUBERGER: This is not it. I want to
22  make that clear for the record.
23  THE WITNESS: Yes. This is not the report
24  I'm referencing.

36 (Pages 138 to 141)

Wilcox & Fetzer, Ltd.   Professional Court Reporters   (302)655-0477

Page 142

1  BY MR. NEUBERGER:
2     Q. This is another report prepared by the FTU
3  staff; isn't that right?
4     A. Yes.
5     Q. Have you ever seen this report before?
6     A. May I look it over?
7     Q. Absolutely.
8     A. I'm remembering I had asked Sergeant Foraker to
9  prepare a report for me that addressed maintenance
10 responsibilities and so forth, and I believe there's
11 parts of this that are included in that report that he
12 prepared for me, but I'm not recalling seeing this
13 specific report.
14    Q. In that case you can put the document down.
15       Now, in general, just independent of all
16 these documents, did anyone tell you at any point from
17 December of 2003 through approximately April of 2004 that
18 Sergeant Chris Foraker and corporals Warren and Price
19 were concerned about their working environment at the
20 FTU?
21    A. I assumed that from the initial documentation
22 that was submitted on December the 19th by
23 Sergeant Foraker, and that's why I addressed it to the
24 captain in charge of the training academy to determine

Page 143

1  what problems they were having and propose solutions.
2     Q. Eventually the captain of the training academy
3  prepared some kind of a report, correct?
4     A. Yes, he did. But what preceded that report was
5  his phone call to me on the 29th where -- and now looking
6  at the documentation that was submitted from the 23rd and
7  throughout the month, that there were multiple issues
8  there and that it had risen to such a level that we
9  needed to take prompt and immediate action.
10    Q. Who did you talk to during this same time frame
11 about the problems at the FTU?
12       MR. ELLIS: Who did who talk to?
13       MR. NEUBERGER: Who did Colonel MacLeish
14 talk to at the time he was lieutenant colonel.
15 BY MR. NEUBERGER:
16    Q. Who did you talk to about those problems at the
17 FTU?
18       MR. ELLIS: Again, we're talking in
19 December of '03 to April '04?
20       MR. NEUBERGER: That is correct.
21    A. Major Eckrich, Captain Warren. Lieutenant Davis
22 was present during some of those. I stopped and spoke to
23 Sergeant Foraker at the range in mid -- I believe it was
24 mid-January. I was returning from a meeting up north. I

Page 144

1  spoke to -- I briefed the colonel on what was occurring
2  up there.
3     Q. So you briefed the colonel on the problems that
4  were occurring at the FTU?
5     A. The initial submission by Sergeant Foraker, I
6  briefed him on the content of that and the direction I
7  had given. And then toward the end of January when
8  everything was coming in, he was briefed on that.
9     Q. After January. So moving forward from January
10 of '04 through the end of April of '04, did you ever talk
11 to Colonel Chaffinch about the problems at the FTU again?
12    A. Yes, I had conversations with him about it.
13    Q. What did you talk about during those
14 conversations?
15    A. Briefing him from that point. From that point,
16 January 29th, January 30th, we established a series of
17 meetings that took place between the Firearms Training
18 Unit, myself, Major Eckrich, and the academy staff to
19 discuss a course of action, how were we going to fix the
20 problems. That's what it boiled down to, what we were
21 going to do to address the problems that we had at the
22 range. The unknown substance that was there, the
23 frangible ammunition, what was going on with that? What
24 were they being exposed to? The test was scheduled for

Page 145

1  the 11th, and, if I'm not mistaken, the 11th was a date
2  the SORT team was -- the Special Operations Response
3  Team -- scheduled to shoot on the range. So we weren't
4  bringing in anyone else, and it was going to be strictly
5  for their shoot to have this testing material in there to
6  conduct what was in the air when guns were discharged.
7  And that took place on the 11th.
8        There was one test. There was another test
9  that we scheduled. But there were meetings that were set
10 up with Facilities Management to try to sit down with
11 them at the table and say what are we going to do -- what
12 are we going to do to fix this problem? What are our
13 problems? What do we need to do to fix them?
14       Obviously, one of the first things was it
15 needed to be cleaned. The facility needed to be taken
16 care of. It needed to be cleaned. It had been cleaned
17 on two prior occasions, and it's basically a HAZMAT
18 cleanup because of the lead that's there. One of them
19 was referenced earlier in one of these documents that you
20 provided me where the range was shut down because of the
21 high levels of lead, and it was cleaned.
22       If you looked at when the range opened in
23 '98 and this is 2004, it appeared to be cleaned on about
24 every two-year basis. So I was looking at it in that

37 (Pages 142 to 145)

| Price, et al.<br>Thomas F. MacLeish | v.<br>C.A. # 04-1207 | Chaffinch, et al.<br>July 19, 2007 |
|---|---|---|

Page 146

1  light. Six-year mark it's due to be cleaned again. Step
2  up Facilities Management, let's get this done.
3       We were looking at the air-handling system
4  in the facility because of what was prior history and it
5  constantly was tweaked. That's the term that was used.
6  And that turned out to tweak meant rebalanced. When the
7  officers on the range noticed there was an issue there,
8  they would rebalance the system.
9       Q.  I'm sorry. Who would rebalance the system?
10      A.  The Facilities Management would. Whether they
11 contracted with somebody to do that, I don't know, but
12 that was one of the fixes that would take place on a
13 relatively regular basis to address the air-handling
14 problems within the range.
15      We had got hold of the fire community, got
16 hold of Mr. Preventure who prepared a report on the range
17 itself, and then subsequent to that you find out that he
18 had been involved with the range many years before which
19 had him familiar with the facility, but at the same time
20 you could understand how he could be considered to be
21 prejudice, and I didn't say he was, but I just said the
22 perception could be that he would be -- already have a
23 dog in the fight, so to speak, in giving his opinion on
24 it. Facilities Management saying no, everything is fine.

Page 147

1  You got this guy saying everything is messed up about it.
2       My point there was let's put this together
3  and get somebody independent in here, totally not related
4  to you, Facilities Management, because the guys at the
5  Firearms Training Unit don't trust him or you,
6  Mr. Preventure, who has addressed issues here before, and
7  let's find somebody independent to do an engineering
8  study of our area.
9       That is the ultimate issue, but the bottom
10 line was we had to clean the range first before we even
11 moved forward. We weren't going to shoot on it. For all
12 intents and purposes, that range was shut down as of the
13 first week in February, because the recruits were done,
14 we weren't scheduled for shooting, and I think early
15 before anything ever really developed I told
16 Captain Warren, I believe Sergeant Foraker was present,
17 "We need to have a contingency plan for our fall shoot."
18 He had already -- he had already or very quickly
19 thereafter already contacted the National Guard about
20 using their range -- I said fall. I meant our spring
21 shoot that was going to be upcoming in March and April.
22      Q.  You mentioned Mr. Bill Preventure.
23      A.  Yes.
24      Q.  Is he the gentleman who has designed and built

Page 148

1  approximately 50 firing ranges for the United States
2  Navy?
3       A.  I know he has had a hand in the building of
4  firing ranges, Mr. Neuberger. I can't say whether it was
5  50. I know he had experience in building firing ranges.
6  There's some affiliation with the U.S. Navy, yes.
7       Q.  Do you know if he built any firing ranges for
8  the federal government?
9       A.  I believe he did, yes.
10      Q.  Do you have any idea if he's considered an
11 expert in the field?
12      A.  I think he came with some real good credentials.
13      Q.  To change gears a little bit, was the condition
14 of the Firearms Training Unit a subject of media
15 attention from the time period of say December of 2003
16 onward in the Delaware media?
17      A.  No.
18      Q.  Were there any articles in the Delaware State
19 News or The News Journal from December 2003 say for the
20 next six months about the conditions at the FTU?
21      A.  Yes.
22      Q.  Was there a lot of media attention?
23      A.  Yes.
24      Q.  Do you understand that The News Journal and the

Page 149

1  Delaware State News are the two newspapers of general
2  circulation in the state of Delaware?
3       A.  Yes.
4       Q.  Did you and Colonel Chaffinch ever talk about
5  the media coverage of the conditions at the FTU?
6       A.  Yes, we did.
7       Q.  Did Colonel Chaffinch express to you any
8  feelings of unhappiness with that media coverage?
9       A.  I think it was a mutual discussion of
10 unhappiness with what occurred at the range. The media
11 coverage, the initial outlet of the media coverage that
12 took place. When I first became aware of it, I was at a
13 fellow trooper's father's funeral service when I got a
14 call from another cabinet secretary inquiring as to what
15 was being discussed with the media with regards to the
16 range, and, to my knowledge, I wasn't aware of anybody
17 discussing anything. And subsequent to that I found out
18 that Tom Eldred had inquired -- he had received one of
19 his anonymous tips that there was problems at the range,
20 and he was inquiring as to it being closed. And
21 Lieutenant Aviola forwarded that to Captain Warren to
22 address.
23      I'm getting this call on Friday and that
24 pass-on took place on Wednesday. So there had already

38 (Pages 146 to 149)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A331