| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 150

1  been discussion about that. So I was trying to find
2  out -- the cabinet secretary was wondering what was said,
3  what was discussed, what information was given.
4     Q.  What cabinet secretary was it?
5     A.  Secretary Homer.
6     Q.  Did you ever hear that Captain Warren had
7  described the range as, quote, "The absolute epitome of a
8  project from hell since its very inception," close quote?
9     A.  I read that in the paper. The day I tried to
10 find out what was said, there was a telephone
11 conversation on that Friday with Captain Warren. I was
12 in the parking lot of a church off of Route 7 with
13 Major Baylor in the car with me, and the phone was on
14 speakerphone, and I was talking to Captain Warren, asking
15 him about what occurred, and what he kept answering me
16 was "I told the truth. I told the truth." I would ask
17 him what the details of the truth were. He told me he
18 told the truth.
19          I wasn't getting anywhere, and Major Baylor
20 passed me a note that said ask him to write it down what
21 he said. So I asked him to do that. He said he would.
22 I told him I would be returning and I would expect to see
23 it when I got back to headquarters. Subsequent to that
24 the article appeared in the paper.

Page 151

1     Q.  In those meetings that you had with
2  Colonel Chaffinch talking about the media coverage about
3  the FTU, do you remember discussing those a few minutes
4  ago?
5     A.  Yes.
6     Q.  Those meetings took place in the December '03 to
7  April of '04 time frame, correct?
8     A.  No. The media issues took place -- media
9  discussion issues took place on that Friday when I found
10 out what had occurred. I believe it was March, Friday in
11 March when I found out that. I think the article was
12 published that weekend. And our conversations about the
13 media took place at that time.
14    Q.  Did you ever talk about any other media coverage
15 that occurred of the problems at the FTU?
16    A.  During what time frame, sir?
17    Q.  March, April, May, June, July of '04.
18    A.  In March and April there were a lot of
19 discussions that took place about the media coverage.
20    Q.  Is that because there was a lot of media
21 coverage during that time frame?
22    A.  Quite a bit was generated, yes.
23    Q.  During those discussions with Colonel Chaffinch,
24 did he ever say to you or indicate to you that he blamed

Page 152

1  the FTU personnel for the problems at the range?
2     A.  Initial conversations took place over how the
3  information originally was released and our dismay at the
4  actions of Captain Warren in releasing and basically
5  attacking another state agency that we're trying to work
6  with, and that's why we wouldn't allow him to speak
7  anymore. We felt that the division could be represented
8  more professionally by a member of staff by stating that
9  we had issues at the range, we were working with another
10 agency to address them and clean them up.
11         Subsequent to that, when Colonel Chaffinch
12 made the determination of who was responsible for the
13 problems there, I knew he had those feelings, but I
14 didn't share with him the fact -- I didn't feel they
15 should be -- they were not inaccurate, but it's not the
16 professional way to address problems.
17    Q.  Back on those meetings you had with
18 Colonel Chaffinch, and just to frame the time period
19 again, we're going to say December of '03 through July of
20 '04. Anytime in that time frame. Okay?
21    A.  Yes.
22    Q.  Did you have meetings with Colonel Chaffinch
23 during that time frame about the issues at the FTU?
24    A.  Yes.

Page 153

1     Q.  During any of those meetings did
2  Colonel Chaffinch state or indicate to you that he blamed
3  the FTU personnel for the conditions at the FTU?
4     A.  He indicated they bore some responsibility, yes.
5     Q.  Did you disagree with him?
6     A.  I did not disagree with him.
7          MR. ELLIS: Are you asking whether he
8  disagreed with him in his mind or whether he articulated
9  in a conversation that he disagreed with
10 Colonel Chaffinch?
11    Q.  Did you disagree with him in your mind?
12    A.  Personally, I felt that the Firearms Training
13 Unit, as I have said earlier, had a responsibility in
14 some of the events that occurred at the range. I also
15 felt that the range, the air-handling system and the
16 bullet trap system, were of an age that they -- that we
17 needed to address them, too. I think they were
18 contributing factors to what occurred there. It was true
19 that prior to December the 1st we didn't have these
20 issues at the range. We didn't. It's just a known fact.
21 We had issues with the bullet-handling system and we had
22 issues with the air-handling system on occasion, but they
23 were addressed through Facilities Management. They were
24 rebalanced or whatever and we were operational.

39 (Pages 150 to 153)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                           v.                           Chaffinch, et al.
Thomas F. MacLeish                C.A. # 04-1207                    July 19, 2007

Page 154

1   After December the 1st, the cleanliness and
2   the upkeep, it was obvious that it wasn't there
3   subsequent to the fact, that I was last at the range in
4   September. It was in one of these pieces of paper for
5   our fall shoot. It seemed to be clean and kept up. When
6   I stepped in there -- when I stopped in to see the
7   facility in January, mid-January, you could see that
8   there was less -- it was not as clean as it was
9   previously.
10    Q.  So things went downhill when Sergeant Foraker
11  came in?
12    A.  There was a noticeable difference in the way the
13  facility was being maintained.
14    Q.  Was it a positive difference or a negative
15  difference?
16    A.  In the cleanliness, it was a negative
17  difference.
18    Q.  Did there come a time when you heard that the
19  Governor ordered an investigation of the FTU by the State
20  Auditor's Office?
21    A.  Yes.
22    Q.  How did you learn about that?
23    A.  I believe it was through the cabinet secretary
24  at that time.

Page 155

1   Q.  Would that have been secretary Jim Ford?
2   A.  Yes.
3   Q.  Or Jim Ford, Jr.?
4   A.  Yes.
5       MR. NEUBERGER:  How about we take a short
6   five-minute break?
7       (A recess was taken.)
8   BY MR. NEUBERGER:
9   Q.  Colonel, from September of 2003 through
10  December 1st of 2003, how many times did you go to the
11  FTU?
12    A.  Twice that I can recall.
13    Q.  When did you go to the FTU during that time
14  frame?
15    A.  I can be general. Once was during the fall
16  shoot.
17    Q.  Which would have been?
18    A.  Which would have been sometime in
19  September/October time frame. And then the second time
20  would have been just before Sergeant Foraker returned to
21  duty there.
22    Q.  Sergeant Foraker returned to duty on
23  December 1st of 2003, correct?
24    A.  Yes.

Page 156

1   Q.  Are you saying you would have visited the FTU
2   sometime in November of 2003?
3   A.  Late November. I made a point of going up
4   there. When we were told Sergeant Foraker was coming
5   back, I made a point of scheduling an appointment with
6   the firearms training staff to talk to them.
7   Q.  Would that have been all of the staff there at
8   the time or was it only Sergeant Ashley?
9   A.  I believe everyone was there. Sergeant Foraker
10  wasn't there. It was Sergeant Ashley, Corporal Price,
11  Corporal Warren, Corporal Warwick. Corporal Peachey was
12  assigned and he came in at the time we said we were going
13  to start. I think I said we were going to start at 8:30,
14  and I got there early. I think it was -- there was like
15  a half-hour difference in the time we started and the
16  time I said we were going to start. It was either 8:30
17  and I got there early. But he came in in the middle of
18  it. So I was there then. We talked in the conference
19  room.
20    Q.  Do you have personal knowledge of the conditions
21  of the FTU on December 1st, 2003?
22    A.  No, I do not.
23    Q.  Before we took the break I started to ask you
24  some questions about the State Auditor investigation. Do

Page 157

1   you recall that?
2   A.  Would you refresh my memory.
3   Q.  No problem. At some point did you find out that
4   the Governor had ordered the State Auditor's Office to
5   investigate the FTU?
6   A.  Yes.
7   Q.  You found that out from Secretary Ford, correct?
8   A.  That's what I recall. Typically that's the way
9   I would have found that type of information out, yes.
10    Q.  Was there any media coverage of the decision to
11  have the State Auditor's Office investigate the FTU?
12    A.  Do I recall specifically sitting here right now
13  that media covered that? I can't say that, but I would
14  assume, yeah, there was coverage. As you said earlier,
15  there was a lot of coverage during that period of time.
16    Q.  You would agree with that statement, that there
17  was a lot of coverage during that period of time?
18    A.  Yes.
19        MR. ELLIS:  A lot of coverage of what? Of
20  the auditor investigation or the range?
21        MR. NEUBERGER:  Of the range.
22        THE WITNESS:  Of the range, yes. There had
23  been from mid-March through April/May time frame, yes.
24

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

### Page 158

1  BY MR. NEUBERGER:
2      Q.   Did there come a time when you learned that
3  Sergeant Foraker and corporals Price and Warren had
4  spoken to the Auditor's Office?
5      A.   My understanding was they gave statements to the
6  State Auditor's Office. They did not necessarily speak
7  to them. Statements were given through this office.
8      Q.   Did you ever talk to Colonel Chaffinch about
9  that?
10     A.   Yes.
11     Q.   What did you say to Colonel Chaffinch about
12  that?
13     A.   I found it odd that when the Auditor's Office
14  met with them, that they would meet at an attorney's
15  office to give their statements and then they wouldn't
16  speak. It would just be written statements handed over
17  by an attorney. That was the crux of what we discussed.
18     Q.   What did Colonel Chaffinch say to you about them
19  giving those statements to the State Auditor's Office, if
20  anything?
21     A.   I can't recall him saying anything specifically.
22     Q.   How about generally?
23     A.   Generally, it was the same thing. I just
24  described what I said, the oddity of them giving

### Page 159

1  statements at their attorney's office. I guess that was
2  telling us at that point in time that there was -- that
3  there was going to be a lawsuit in the future and we were
4  heading down that road again.
5      Q.   Do you recall how soon after the men spoke to
6  the State Auditor's Office that you learned about it?
7      A.   I don't recall at this point.
8           MR. NEUBERGER: I'd like to put another
9  exhibit in front of you. We will call this MacLeish
10  Deposition Exhibit 17.
11          (MacLeish Deposition Exhibit No. 17 was
12  marked for identification.)
13  BY MR. NEUBERGER:
14     Q.   Colonel, do you have that document in front of
15  you?
16     A.   Yes, I do.
17     Q.   On page 1 does this appear to be a copy of the
18  front page of the Delaware State News for Friday,
19  May 14th, 2004?
20     A.   Yes, it does.
21     Q.   Does the top headline say in big bold letters,
22  "Shots traded over range"?
23     A.   Yes.
24     Q.   Underneath that does it say, "Troopers differ on

### Page 160

1  blame for health woes at Smyrna site"?
2      A.   Yes.
3      Q.   Do you think you ever saw this article?
4      A.   Yes, I did.
5      Q.   When bad things about the Delaware State Police
6  are in the papers, are they usually brought to your
7  attention when you were either lieutenant colonel or when
8  you are colonel?
9      A.   Yes, they are.
10     Q.   For example, I think there was a story in The
11  News Journal about a month ago dealing with the trooper
12  holding up a noose that was on the front page of the
13  paper. Was that brought to your attention?
14     A.   Yes, it was.
15     Q.   On the first page of this exhibit, there's a
16  front-page story of the State News, and that was brought
17  to your attention, also, wasn't it?
18     A.   Actually, I think I read this at home.
19     Q.   Do you think you read the entire article?
20     A.   Yes.
21     Q.   Could we turn to the very last page of this
22  exhibit? Are you there?
23     A.   I'm there.
24     Q.   At the bottom right-hand corner of the page does

### Page 161

1  it say "FTU2897"?
2      A.   Yes, it does.
3      Q.   Does this appear to be an article with the
4  title, "Troopers discuss firing range"?
5      A.   Yes.
6      Q.   Was it written by Mary Allen?
7      A.   Yes.
8      Q.   Is it dated May 13th, 2004?
9      A.   Yes.
10     Q.   Do you think you saw that article?
11     A.   May I look at it quickly?
12     Q.   Absolutely.
13     A.   Yes, I probably read it.
14     Q.   You can put that document down.
15          Did you ever talk to Colonel Chaffinch
16  about these two articles?
17          MR. ELLIS: About specifically these two
18  articles or the information that's in them?
19          MR. NEUBERGER: Specifically these two
20  articles.
21     A.   I'm sure we did, but I don't recall the
22  specifics of whatever -- of what we discussed. It didn't
23  involve anything that would have resulted in any action
24  we were going to take divisionally.

41 (Pages 158 to 161)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Case 1:04-cv-01394-GMS    Document 80-4    Filed 09/19/2005    Page 4 of 9

Price, et al.                                    v.                              Chaffinch, et al.
Thomas F. MacLeish                      C.A. # 04-1207                          July 19, 2007

**Page 162**

1  Q. Were you happy that the Delaware State Police
2  was back on the front pages of the Delaware State News,
3  for example?
4  A. It was an article of ongoing interest over what
5  was occurring at the range. And happy? I was somewhat
6  dismayed when, being told not to speak to the media,
7  there was a way that -- they found a way to get into the
8  media. But according to counsel, it was done through
9  their counsel and it was okay to do it the way they did
10 it, because the statements were attributed to them, but
11 they were read by their attorneys.
12  Q. Did you ever talk to anyone on the executive
13 staff at the time about these two media articles?
14  A. I'm sure in a general discussion way, yeah, it
15 was discussed the articles being in the paper, but
16 whether it was Major Papili -- I know Eckrich or Hughes
17 or Baylor at that point in time in a general sense were
18 staff officers. You're going to discuss things that are
19 in the paper, positive and negative.
20  Q. Did you ever discuss with the members of the
21 executive staff Sergeant Foraker, Corporal Price, or
22 Corporal Warren during this same time frame?
23      MR. ELLIS: You're talking May 13th,
24 May 14th?

**Page 163**

1       MR. NEUBERGER: I'll specify the time frame
2  a little better.
3  BY MR. NEUBERGER:
4  Q. From December of 2003 through approximately July
5  of '04, did you ever talk to members of the executive
6  staff about Sergeant Foraker, Corporal Price, or Corporal
7  Warren?
8  A. I'm sure that I did.
9  Q. Do you remember what you said to them?
10 A. Not specifically, no.
11 Q. Do you recall if you said good things about them
12 or if you said bad things about them?
13 A. Maybe a little bit of both. During that period
14 of time hidden in here is when we became -- hidden in
15 here during this time frame is when we found that there
16 may be some hearing problems associated with people at
17 the range, although it wasn't specific, and there was
18 frustration in why weren't people forthcoming in telling
19 us about their hearing-related issues. And that came out
20 I believe at the March 17th meeting. And then we got the
21 specifics on that so we could act on that.
22      I may have discussed with members of the
23 staff the placement of Price and Warren -- because they
24 were going to be placed on light-duty status -- at that

**Page 164**

1  point in time they were on light-duty status, but what
2  should we do if their hearing is affected and we don't
3  know the extent of that hearing loss? Was it a result of
4  recently being exposed to loud noises? And I use the
5  example of myself working in the flight line when I was
6  in the service. I worked a 3:00-to-11:00 shift and I
7  worked the flight line with planes coming in and going
8  out and different apparatus you used.
9       At night when I would go home, I'd listen
10 to my radio on the way back to the barracks. The next
11 morning when I would get up to go and do something and
12 I'd start the car, the radio would be blaring. Obviously
13 I had to turn it up that loud. I didn't think it was
14 that loud the night before. I use the example that my
15 hearing was deadened.
16      So where did we go? Was it the appropriate
17 course of action to say once it was determined that Price
18 and Warren had suffered a hearing loss to put them back
19 in that same environment not knowing where or the extent
20 of their hearing loss? So I think I discussed that with
21 members of staff and to get their ideas and thoughts
22 about it.
23 Q. Did you ever say to any member of the staff that
24 these guys are a real pain in the rear?

**Page 165**

1  A. I may have said that as I became frustrated in
2  dealing with getting information from them in this
3  regard.
4  Q. Did you use the word "rear" or would you have
5  used another term such as "ass"?
6  A. I have been known to use that word on occasion.
7  Q. Do you recall which one you used at the time?
8  A. It was probably the latter.
9  Q. So you said these guys are a real pain in the
10 ass?
11 A. You're saying did I say it. I'm saying it's a
12 possibility I said it. I don't recall saying it, but did
13 I feel that way? Yes. But you're the one saying that I
14 said that. I don't recall specifically saying that I
15 said they were a pain in the rear. But could I have said
16 that? Yeah, I possibly could have.
17 Q. You mentioned light duty. I'm going to skip
18 around a little bit and ask you some general questions
19 about that.
20      As lieutenant colonel, and now it's
21 colonel, of the Delaware State Police, do you care about
22 the troopers under your command?
23 A. I absolutely do.
24 Q. Do you only care because you're colonel or

Case 1:04-cv-01394-GMS    Document 80-4    Filed 09/19/2005    Page 5 of 9

Price, et al.                                    v.                              Chaffinch, et al.
Thomas F. MacLeish                      C.A. # 04-1207                       July 19, 2007

Page 166

1  because you were the lieutenant colonel or have you
2  generally always cared for your subordinates?
3      A.  I care for all the men and women in this
4  division.
5      Q.  Do you care about their health and safety
6  specifically?
7      A.  Yes, I do.
8      Q.  Do you care deeply about their health and
9  safety?
10     A.  Every night I take them to bed with me.
11     Q.  How many times have you called Sergeant Foraker
12 and expressed your concern for his health, safety, and
13 general wellbeing?  To limit the time frame from December
14 of '03 forward.
15     A.  None.
16     Q.  How many times from December of '03 forward have
17 you called Corporal Warren and expressed concern for his
18 health, safety, and general wellbeing?
19     A.  Once.
20     Q.  When?
21     A.  It was in -- I believe it was 911 day in Sussex
22 County.  He was down at Sussex County Airport.  He was
23 there and I had a discussion with him and I expressed my
24 concern for him.

Page 167

1      Q.  I'm sorry.  This is when?
2      A.  It was in -- I believe it was May of '04.  I
3  think it was.  Whenever Sussex County's open house was, I
4  ran into him there.
5      Q.  Have you ever expressed concern for his health,
6  safety, and wellbeing since then to him?
7      A.  No, I have not.
8      Q.  How many times have you called Corporal Price
9  and expressed concern for his health, safety, and general
10 wellbeing?
11     A.  I did one time at the range that was in April of
12 '04, and then subsequent to that I called to inquire
13 that -- I had heard he was upset, so I was calling to
14 inquire what he was upset about, and subsequent to that I
15 received an e-mail from you, but I went ahead and talked
16 to him anyway.
17         During that conversation I asked how he was
18 doing.  But when I say it, I have 637 troopers that work
19 for me.  I don't call them up every night and ask them
20 how they're doing.  During any given time there are
21 different levels -- if they suffered injury, they may
22 have had surgery, I make every effort to try to express
23 my concerns if not personally, then through their
24 commanders, and my expectation is that the information

Page 168

1  keeps going down to them of how they're doing and making
2  sure that they're being taken care of through not just
3  myself but through my majors, my captains, and so forth.
4      Q.  You mentioned one time when you talked to
5  Corporal Price at the firing range.
6      A.  Yes.
7      Q.  Is that the FTU or was that at the National
8  Guard range?
9      A.  It was at the National Guard range.
10     Q.  I'm going to use some profanity right now.  I
11 want you to tell me if that's accurate.  I apologize if I
12 offend you.
13     A.  Yes.
14     Q.  Did you ever state to him that, quote, "I am not
15 going to fuck you," close quote?
16     A.  Perhaps, yes, I said that.  I don't recall
17 saying it, but if he wrote it down that I said it, then I
18 guess I did.  I'm not going to dispute the fact --
19     Q.  Would you take Corporal Price's word for it,
20 that if he later testifies that you made that statement,
21 would you disagree with that?
22     A.  In the context of that conversation, I was
23 trying to assure him that the reason why he wasn't
24 allowed on the range was for his safety and the

Page 169

1  division's interest and in the best interest of the
2  division to keep him away from an unknown at that point.
3  We knew he had suffered a hearing loss.  Was it
4  attributable to the range?  And I was the one that wanted
5  to keep him assigned to the Firearms Training Unit
6  because he's a good instructor.  There's classroom
7  instruction and he's also an armor.  I thought there
8  would be armor's work to be done there, also.
9      Q.  You're indicating you wanted him to work at the
10 Firearms Training Unit but not on the firing line?
11     A.  I didn't want him anywhere near that line.  That
12 was the information that was passed on to his captain
13 that I felt was relayed down through his chain of command
14 through Sergeant Foraker to him.
15     Q.  Did you ever say to Kurt, be it at this meeting
16 or any other meeting, that "Kurt, we just don't know what
17 to do with you because you have been at the range so
18 long"?
19     A.  If I had the whole conversation, I may be able
20 to recall it, Mr. Neuberger, but he had been at the range
21 since it opened.  He could always go back on the street.
22 He could always go back and work in patrol.
23     Q.  Is that a threat -- I'm sorry.  Go ahead.
24     A.  No.  None of that was meant as a threat.

Case 1:04-cv-01394-GMS    Document 80-4    Filed 09/19/2005    Page 6 of 9

Price, et al.                                      v.                              Chaffinch, et al.
Thomas F. MacLeish                       C.A. # 04-1207                            July 19, 2007

Page 170
1   Q.  You can continue your answer, then I'll ask you
2   another question. I cut you off.
3   A.  The entire context of that conversation with
4   Corporal Price --
5   Q.  At which conversation?
6   A.  The one that took place at the firing range in
7   April when I stopped by there. I believe it was either
8   the first or second week of recruit training at the
9   range, firearms training, and I stopped by to see how was
10  it going for the men and women there and what was going
11  on.
12          When I walked up, I believe it was a break
13  for lunch, they were picking up brass, the recruits were
14  picking up brass, and as I approached the range, walking
15  across the range with a headset in his hand was
16  Corporal Price. When I saw the headset in his hand, my
17  first thought was he was out there while they were
18  shooting, and I thought my instructions had been pretty
19  specific and explicit that you don't -- I didn't want him
20  anywhere near the shooting; he should be in a classroom
21  teaching or doing armor's work, not involved near or by
22  that range in any way with the students while they were
23  live firing.
24          Sergeant Foraker was not there at that

Page 171
1   time. Trying to think who was calling the range that
2   day. I don't recall. But my discussion with
3   Corporal Price was to explain my position in asking him
4   not to be on that range and that it was for his health
5   and his welfare and that he was going to be kept there
6   and I wasn't out to screw him.
7   Q.  And the word you used was a different word?
8   A.  It was a different -- yeah. We went from where
9   everybody was gathered and we walked around to another
10  shooting site, because they were shooting the recruits on
11  a facility that we weren't -- when I say "we," that for
12  inservice purposes we weren't going to be using to shoot.
13  And Kurt walked me over to where we would be, and him and
14  I had a talk over there.
15          What goes beyond just lieutenant colonel to
16  corporal is Corporal Price and I have known each other
17  for most of our careers from Troop 3 all the way through
18  the years. Our families swam at the same swim club and
19  everything else. I wanted to assure him that nobody was
20  out to hurt him; we're just trying to do what was right.
21  Q.  On the question of "Kurt, we don't know what to
22  do with you because you have been at the range so long,"
23  do you recall ever making that statement?
24  A.  I don't recall making it.

Page 172
1   Q.  Have you ever stated to either the FTU personnel
2   or Captain Greg Warren that, quote, "They should expect
3   hearing loss; they work at the range," close quote?
4   A.  In its context was much the same as what I
5   shared earlier about my experiences on the flight line.
6   You're in an occupation and you're in a specific job
7   function that exposes you to high noise levels. Law
8   enforcement in general suffers some type of hearing loss
9   if you spend a great deal of time riding in a patrol car,
10  marked unit, and you're running your siren and things of
11  that nature. That's a given fact. Our helicopter pilots
12  are exposed to higher levels of noise.
13          So in a broad perspective, yes, but that
14  terminology was used when discussing what is the
15  extent -- we have heard that you have a hearing loss,
16  what do we have to back that up? We weren't getting that
17  type of information.
18  Q.  On another occasion did you ever state to any of
19  the FTU personnel or to Captain Greg Warren that, quote,
20  "Just like if you work in the artillery in the military,
21  you work at a range, you would expect to have high lead
22  levels and hearing loss," close quote?
23  A.  I don't know if those are my exact words, but I
24  did talk about a corporal that was on the job,

Page 173
1   John Powell. He was a K9 officer out of Troop 3, and he
2   worked artillery. Every other word you said to him, he
3   said huh. He had a hearing loss. Obviously wasn't
4   enough to keep him off the job. But that was many, many
5   years ago. That example was just used in the same type
6   of context.
7   Q.  Are you saying you did give that example once?
8   A.  I have used that example.
9   Q.  Then I believe you testified a little while at
10  some point today about the paper dust mask?
11  A.  Yes.
12  Q.  Do you recall testifying about that?
13  A.  I do recall testifying about that.
14  Q.  That occurred during a conversation with Captain
15  Greg Warren; is that correct?
16  A.  Yes.
17  Q.  You told him to have the FTU staff personnel put
18  on a paper dust mask to protect them from the hazardous
19  materials in the air?
20  A.  And the recruits. Because that was when I was
21  informed of the ingestion of the dust and the clouds and
22  everything else, and it was a recommendation, and a
23  strong one, that they wear them for their safety.
24  Q.  Did you ever have a conversation with Sergeant

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 174

1 Chris Foraker about that?
2  A. I can't recall.
3  Q. I think you also testified a little bit ago that
4 you called Corporal Price three times to express concern
5 for his health, safety, and wellbeing. Do you recall
6 testifying to that?
7  A. I don't think I said three times. I think I
8 said I contacted him at the firing range and then I
9 contacted him subsequent to that as a result of a meeting
10 with the secretary and the president of DSTA where the
11 president expressed concern that he had heard that as a
12 result of an interview with the auditors, that
13 Corporal Price was -- they were all concerned, but
14 Corporal Price was the main one, that he was concerned
15 about there was an allegation that the division had
16 directed the Auditor's Office to conduct an Internal
17 Affairs investigation. That was the gist of what I got
18 out of Sergeant Facella (phonetic).
19  Q. During this contact with Corporal Price, did you
20 call him on the telephone or page him somehow?
21  A. I attempted to contact him. I think I got this
22 on Wednesday or Thursday at the secretary's office. I
23 returned back to my office. I called over and I was
24 informed, I think it was through Lieutenant Davis, that

Page 175

1 he was out sick that day. I said don't bother him; I
2 would catch up with him in the morning. I think I left
3 the instruction to have him call me in the morning, but
4 don't bother him at home if he's sick.
5      The next morning I called and
6 Lieutenant Davis wasn't in. Captain Warren wasn't in.
7 Sergeant Foraker was. I spoke to Sergeant Foraker on the
8 phone and said I needed to talk to Kurt and this is what
9 it was about, and I told him that, as a result of a
10 meeting I had, he told me he was spending time with his
11 family. I said no problem, don't get that opportunity to
12 do that very often, just let him know I'd like to talk to
13 him on Monday and I needed to talk to him Monday about
14 it. That was the message that was left.
15  Q. Then subsequently did you receive an e-mail from
16 one of Corporal's Price's attorneys saying don't meet
17 with and interrogate my client without my presence?
18  A. Yes, I did receive that.
19  Q. Did you subsequently talk with Corporal Price
20 anyway outside of the presence of his attorneys?
21  A. Yes, I did.
22  Q. Did you interrogate Corporal Price during that
23 meeting?
24  A. No, I did not.

Page 176

1  Q. Did you browbeat Corporal Price during that
2 meeting?
3  A. No, I did not.
4  Q. Did you attempt to interview him during that
5 meeting?
6  A. No, I did not.
7  Q. Did you grill him during that meeting?
8  A. No, I did not.
9  Q. Did you tell Corporal Price during that meeting
10 that if he was found to be culpable for any of the
11 problems at the FTU, that you would be bringing him up on
12 Internal Affairs charges?
13  A. No, I did not.
14  Q. Now, do you think that it is of paramount
15 importance for employees of the DSP to work in a safe and
16 healthy working environment?
17      MR. ELLIS: I object to the form of the
18 question.
19      MR. NEUBERGER: You can answer.
20  A. In a very general sense, yes.
21  Q. You testified a little while ago about a group
22 called the National Institute of Occupational Safety and
23 Health, didn't you, also known as NIOSH?
24  A. Yes.

Page 177

1  Q. Are you aware that they are a federal agency of
2 some type which deals with occupational safety and
3 health?
4  A. Yes.
5  Q. At any time did anyone tell you that NIOSH was
6 willing to come in and investigate the problems at the
7 FTU free of charge to the DSP?
8  A. Yes, I became aware of that.
9  Q. How did you become aware of that?
10  A. Through Major Hughes.
11  Q. Did Major Hughes also tell you that NIOSH was
12 offering free medical, audiological, and other types of
13 care for the FTU staff?
14  A. I don't recall that.
15  Q. Ultimately did NIOSH come in and investigate the
16 FTU and give free medical care to the FTU staff?
17  A. Not that I'm aware of.
18  Q. Do you know why they didn't come in?
19  A. There was a discussion between our attorneys
20 with NIOSH, and it had to do with standing, and we
21 invited them to come in and talk to us, and, to my
22 knowledge, that meeting never took place.
23  Q. Do you know why?
24  A. No, I don't.

45 (Pages 174 to 177)

Price, et al.  v.  Chaffinch, et al.
Thomas F. MacLeish    C.A. # 04-1207    July 19, 2007

Page 178

1  Q. Any idea who would know why?
2  A. Major Hughes may.
3  Q. Do you think having full resources of the
4  federal government investigating the problems at the FTU
5  would have been a good thing for the Delaware State
6  Police?
7      MR. ELLIS: I object to the form of the
8  question.
9      MR. NEUBERGER: You can answer.
10 A. Would you repeat the question again, please.
11     MR. NEUBERGER: Could you repeat the
12 question?
13     (The reporter read back as instructed.)
14     THE WITNESS: Not necessarily. At that
15 point in time we had Facilities Management and we hired
16 outside -- people had been brought in. Money had been
17 expended to take a look at the range, and it was really
18 in Administrative Services' hands. That's another party
19 that got involved in the issue of having NIOSH come in to
20 sit down and discuss it. It was pretty much in
21 Facilities Management's hands at that point in time.
22     We were at such a level with an outside
23 engineering firm having been hired to come in and look
24 and assess what needed to be done and assurances that the

Page 179

1  facility wouldn't open if it wasn't safe to do so, and it
2  was beyond our scope at that point in time to have them
3  come in.
4  Q. Are you aware that NIOSH routinely conducts
5  health hazard evaluation reports of police firing ranges
6  all over the country?
7  A. No, I was not.
8      MR. ELLIS: I object to the form of the
9  question.
10 Q. Are you aware that in March 2003 NIOSH
11 investigated the Fort Collins, Colorado, police firing
12 ranges?
13 A. No, I was not.
14     MR. NEUBERGER: We're going to call this
15 MacLeish Deposition Exhibit No. 18.
16     (MacLeish Deposition Exhibit No. 18 was
17 marked for identification.)
18 BY MR. NEUBERGER:
19 Q. Colonel, do you have that document in front of
20 you?
21 A. Yes, I do.
22 Q. Does this appear to be an e-mail from
23 Jim Warwick to Greg Warren which was copied to
24 Chris Foraker, Wayne Warren, Kurt Price, and Ralph Davis?

Page 180

1  A. Yes.
2  Q. Does it say sent Wednesday, April 21st, 2004?
3  A. Yes.
4  Q. Does the subject line say "NIOSH"?
5  A. Yes.
6  Q. Could you just read this e-mail quietly to
7  yourself and tell me when you're done?
8  A. (Complied.)
9      This is the first I have seen it.
10 Q. I'd like to direct your attention to the first
11 paragraph. Does that paragraph indicate that
12 Corporal Warwick did some investigating and found out
13 that NIOSH had conducted some extensive testing at the
14 request of Fort Collins's police department?
15 A. That's what it says.
16 Q. You don't have any independent knowledge of
17 that, do you?
18 A. No, I do not.
19 Q. Do you know who Dr. Randy Tubbs is?
20 A. No, I do not.
21 Q. Do you see the third paragraph?
22 A. Yes.
23 Q. I'll just read the first two sentences to you.
24 Okay?

Page 181

1  A. Yes, sir.
2  Q. Does it say, "On Tuesday, April 20, 2004, I
3  received a call from Dr. Randy Tubbs. He told me that
4  Mr. Doyle Tiller had just called him and said that a
5  'Political Block' is now preventing him from allowing
6  NIOSH to come in and conduct testing on the air handling
7  system."
8      Do you know who Mr. Doyle Tiller is?
9  A. Yes, I do.
10 Q. He works for Facilities Management?
11 A. Yes, sir.
12 Q. I'm going to keep on reading. "He said
13 Mr. Tiller told him that the state police could give
14 NIOSH permission to come in and conduct testing, however,
15 he could not due to politics."
16     Do you see that?
17 A. Yes, I do.
18 Q. Would it be fair to say that that paragraph is
19 indicating that some kind of political block had stopped
20 Facilities Management from allowing NIOSH to come in and
21 investigate?
22     MR. ELLIS: I object to the form of the
23 question.
24 A. That's what it indicates.

46 (Pages 178 to 181)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

A339

Price, et al.                                     v.                                  Chaffinch, et al.
Thomas F. MacLeish                        C.A. # 04-1207                              July 19, 2007

Page 182
1    Q. That's just what this document says. I'm not
2  asking you if that's true.
3    A. Yes, that's what it indicates.
4    Q. Independent of this document, has anyone told
5  you that a political block stopped Facilities Management
6  from inviting NIOSH to come in and investigate the range?
7    A. No. First time I am aware of anything within
8  this document is two minutes ago when I read it.
9    Q. I just want to ask you some more questions about
10 the document.
11   A. Okay.
12   Q. Do you know if a political block stopped
13 Major Hughes from inviting NIOSH to come in and
14 investigate the range?
15   A. No.
16   Q. Did Major Hughes ever tell you the reason why
17 NIOSH was not invited to come in and investigate the
18 range on behalf of the Delaware State Police?
19   A. No. I know there was an issue of standing and
20 they were trying to make the arrangements to get that
21 done, and that -- once again, we aren't in this time
22 frame. We aren't in the 4/21/04 time frame. We're
23 talking --
24   Q. April/May of 2005?

Page 183
1    A. Yes. It was almost a year later when the NIOSH
2  issue and having somebody came in first came to my
3  attention.
4    Q. Has anyone told you that politics played a role
5  in how the FTU situation regarding Sergeant Foraker,
6  Corporal Price, and Corporal Warren has been handled?
7         MR. ELLIS: I object to the form of the
8  question. What do you mean by "situation"?
9         MR. NEUBERGER: I'll rephrase.
10 BY MR. NEUBERGER:
11   Q. Has anyone told you that politics played a role
12 in how Sergeant Foraker, Corporal Price, Corporal Warren
13 had been blamed for the problems at the FTU?
14        MR. ELLIS: I object to the form of the
15 question.
16        MR. NEUBERGER: You can answer.
17   A. Has anyone told me --
18   Q. Yes.
19   A. -- that politics played a role in it? No.
20   Q. Have you told anyone that?
21   A. No.
22   Q. Through your own personal opinion, do you think
23 politics played a role?
24   A. In the way they have been treated?

Page 184
1    Q. Yes.
2    A. No.
3    Q. Do you think personal animosity played a role?
4    A. No. I called the shots in this. I was the
5  one -- not this document, but in this from the beginning
6  to the end within what was in my purview of trying to
7  make the best decisions with the information I had.
8    Q. Did there come a time when you sent
9  Chris Foraker, Wayne Warren, Kurt Price, and
10 Jimmy Warwick for fitness-for-duty exams?
11   A. Yes.
12   Q. Do you recall when that was?
13   A. I believe it took place when we received the
14 results of the physicals that they had that indicated
15 each of them had some type of hearing loss, but it
16 wasn't -- it wasn't clear as to what -- the extent of the
17 loss in all of them. We first tried to get further
18 information from Omega who contacts the person out in the
19 Midwest somewhere that was trying to do a survey, and
20 then it became they took their hearing test approximately
21 a month after the range had closed down. It was
22 recommended by the doctors that they have a second test
23 that could, quote/unquote, be called a baseline test,
24 would there be a change in a month, to determine if there

Page 185
1  was another problem if the problem was still there. And
2  that kind of falls in with was it a temporary hearing
3  loss or not.
4         They were sent back for that, and then
5  those results -- I think that was the second set of
6  results. I think that was when they were sent for their
7  fitness for duty or we got those results in and then they
8  were sent to Dr. Green to have those results interpreted
9  and a determination made.
10   Q. Who had involvement in that process, was it you
11 or was it Colonel Chaffinch?
12   A. It was me.
13   Q. Did you tell Colonel Chaffinch what you were
14 doing?
15   A. The decision to do that was made between -- I
16 was going on recommendations from HR from
17 Captain Yeomans.
18   Q. Did Wayne and Kurt pass the fitness-for-duty
19 exams?
20   A. No, I don't believe they did.
21   Q. Did Chris Foraker pass the fitness-for-duty
22 exam?
23   A. Yes.
24   Q. Did you then send Chris Foraker for a second

47 (Pages 182 to 185)