Price, et al.  
Thomas F. MacLeish  
v.  
C.A. # 04-1207  
Chaffinch, et al.  
July 19, 2007

Page 210

1  A. I know that they asked for documents, and
2  Major Eckrich was the one responsible for gathering those
3  documents for them. Did I specifically give them any? I
4  may have, but I don't recall.
5  Q. Did Colonel Chaffinch tell you that he was
6  interviewed?
7  A. I don't recall him telling me that.
8  Q. Do you know if Colonel Chaffinch ever was
9  interviewed from any other source?
10 A. By the Auditor's Office?
11 Q. Yes.
12 A. Not that I can recall.
13 Q. To the best of your knowledge, was anyone else
14 on the executive staff level interviewed by the Auditor's
15 Office? You mentioned Major Eckrich -- actually, did you
16 mention that Major Eckrich was?
17 A. Yes, I did.
18 Q. Then you mentioned Colonel Chaffinch you just
19 didn't know, correct?
20 A. That's correct.
21 Q. You mentioned yourself who was?
22 A. Yes.
23 Q. There's Major Baylor, Major Papili?
24 A. I believe Major Hughes was.

Page 211

1  Q. Did you ever talk to those executive staff
2  officers about their interviews with the Auditor?
3  A. No.
4  Q. I asked you probably at some point this morning
5  whether you liked Chris Foraker.
6  A. Yes.
7  Q. I think you said that you did?
8  A. I have to go back and ask her to look back
9  through all that.
10 Q. I can just strike the question.
11 A. You asked me if I disliked him, and I said no.
12 Q. I'll go with that.
13    Do you like Kurt Price?
14 A. Yes.
15 Q. Do you like Wayne Warren?
16 A. Yes. Known those troopers a long time.
17 Q. Isn't it true that you bear ill will towards
18 both Kurt Price and Wayne Warren?
19 A. No, that's not true.
20 Q. Isn't it true that you were angry at those
21 officers as of today?
22 A. I have been disappointed in the course of action
23 they have taken.
24 Q. Meaning?

Page 212

1  A. In some of their actions that when I have
2  reached out, what's come back has come back in a negative
3  way. There's a mistrust there. Simple act of taking a
4  meeting with a secretary and the president of DSTA to
5  reach out to Kurt and I attempted to do so and within
6  relative minutes of making that inquiry through chain of
7  command I'm getting a notice from an attorney.
8     Am I frustrated by those type of actions?
9  Sure. Sure, because it does inhibit the natural ebb and
10 flow of the relationship and conversation when everything
11 is geared towards a lawsuit, appears to be geared towards
12 a lawsuit, that there are -- it does inhibit your natural
13 interaction with others. Do I hate them? No, I do not
14 hate them.
15 Q. Do you bear any animosity towards them?
16 A. No, I do not.
17 Q. Is it true that you don't like that they spoke
18 out about the health and safety problems at the FTU?
19 A. The manner in which they did so I don't like and
20 I don't agree with. I think they could have done the
21 same thing in-house. We sat at a table together for
22 months in attempting to resolve the issue. Nothing was
23 ever spoken at that time about a lot of these issues. We
24 were working to resolve them is what we were doing.

Page 213

1  Q. So are you saying that you're not happy about
2  how they spoke to the Auditor?
3  A. No. They had to talk to the Auditor. The
4  manner in which they did so when they spoke to the
5  Auditor was on the front pages of the papers. Everybody
6  else who was interviewed wasn't on the front pages of the
7  paper with the Auditor, all the other interviews that
8  took place. They chose that path. Am I disappointed in
9  choosing that path? Sure.
10 Q. You're disappointed at what they said ended up
11 on the front pages of the paper?
12 A. I'm disappointed in the path that they chose to
13 talk to the auditors. Not disappointed that they talked
14 to them. They have to talk to the auditors. But in
15 talking to the auditors, of course in the course of the
16 investigation they want to publicize it.
17 Q. Isn't it true that you don't like Kurt Price,
18 Wayne Warren, and Chris Foraker because they sued you?
19 A. No.
20 Q. No, you do like them or, no, you don't like them
21 because of that?
22    MR. ELLIS: I object to the form of the
23 question. Sounds like there's all three at once.
24

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 214

1  BY MR. NEUBERGER:
2     Q.  How about individually? First Chris Foraker, do
3  you like the fact that he sued you, Chaffinch, and the
4  Delaware State Police?
5     A.  Do I like that, the fact that I'm sued? No.
6     Q.  Does it make you angry?
7     A.  No. It concerns me.
8     Q.  Are you displeased about it?
9     A.  I would rather not be in that position. Do I
10 relish the thought of being sued? No, I do not.
11    Q.  It's a rather unpleasant experience, isn't it?
12    A.  It is when you think of four children and
13 putting them through college and everything you work for,
14 your life, and you're personally named, yes. It makes a
15 big difference.
16    Q.  Are you pissed off that they sued you?
17       MR. ELLIS: I object to the form of the
18 question.
19 BY MR. NEUBERGER:
20    Q.  I'm sorry. That Chris Foraker sued, are you
21 pissed off that Chris Foraker sued you?
22       MR. ELLIS: My objection is that the term
23 "pissed off" is a little imprecise.
24

Page 215

1  BY MR. NEUBERGER:
2     Q.  Are you irritated that Chris Foraker sued you?
3     A.  I'm disappointed in being sued.
4     Q.  Are you equating irritation with disappointment?
5     A.  I'm disappointed in being sued.
6     Q.  But you're not irritated?
7     A.  I'm disappointed in being sued.
8     Q.  But are you irritated?
9     A.  I'm disappointed in being sued.
10    Q.  You're indicating that you're not irritated?
11    A.  I'm disappointed in being sued.
12    Q.  I think you're expressing you're disappointed in
13 being sued?
14    A.  I'm disappointed in being sued.
15    Q.  Are you peeved at being sued?
16    A.  I'm disappointed at being sued.
17    Q.  How about being disgusted?
18    A.  I'm disappointed in being sued.
19    Q.  Do you like the fact that Kurt Price filed a
20 lawsuit against you and Colonel Chaffinch and the
21 Delaware State Police?
22    A.  No, I do not like the fact that I'm being sued
23 personally.
24    Q.  Are you angry at him for it?

Page 216

1     A.  No, I'm not.
2     Q.  Are you disappointed in him for it?
3     A.  I am disappointed in being sued.
4     Q.  Fair to say you're unhappy as a result of that?
5     A.  I'm disappointed in being sued.
6     Q.  How about Corporal Wayne Warren, are you happy
7  that he filed a lawsuit against you and Chaffinch and
8  Delaware State Police?
9     A.  No, I am not happy over it.
10    Q.  Would it be fair to say you're disappointed in
11 that action?
12    A.  I am disappointed in that action.
13    Q.  Isn't it true that you weren't happy that as a
14 result of Sergeant Foraker, Corporal Price, and
15 Corporal Warren speaking out about health and safety
16 issues, that negative publicity for the Delaware State
17 Police resulted?
18       MR. ELLIS: I object to the form of the
19 question. Which speaking out are you referring to, any
20 particular speaking out?
21       MR. NEUBERGER: The entire course of
22 speaking out about the health and safety issues at the
23 Delaware State Police that are at issue in this lawsuit.
24 Entire course of conduct.

Page 217

1     A.  What was the first part of that question?
2     Q.  Isn't it true that you didn't like the negative
3  publicity that resulted from them speaking out about
4  health and safety issues?
5     A.  I would have preferred to have them bring those
6  issues to the division and we handle them and handle them
7  in-house and had the opportunity to address them, and we
8  were. As it continued on and on, the dialog pretty much
9  stopped. So I was disappointed in the fact that we
10 didn't get an opportunity to fully work through the
11 issues that they were presenting without going public
12 with them. We were working on them. We were addressing
13 them.
14    Q.  Today is July 19th of the year 2005; isn't that
15 right?
16    A.  That is correct.
17    Q.  Is the FTU fixed and operating?
18    A.  No. We're still working at getting it fixed.
19    Q.  Has Colonel Chaffinch ever told you that he
20 bears animosity or ill will towards any of the plaintiffs
21 in this lawsuit, meaning Sergeant Foraker,
22 Corporal Price, or Corporal Warren?
23    A.  He has never told me he bears animosity toward
24 any one of them.

55 (Pages 214 to 217)

Price, et al.  v.  Chaffinch, et al.
Thomas F. MacLeish    C.A. # 04-1207    July 19, 2007

Page 218

1  Q.  Has he ever said he just doesn't like them very
2  much?
3  A.  Trying to remember conversations I have had with
4  Colonel Chaffinch and when he's talked about the members
5  of the FTU unit. I know he hasn't been happy with
6  their -- some of their actions, but...
7  Q.  What actions was he unhappy with?
8  A.  Same type of things we just discussed, the
9  publicity -- the fact that they had issues with what was
10  going on out there. Fine, bring them to our attention,
11  but the manner in which they brought them to our
12  attention through the media and, therefore, the division
13  gets placed in a bad light. That's what's been
14  disappointing.
15  Q.  Now, has the colonel ever said anything to you
16  which either indicates or implies that he bears any type
17  of animosity, ill will, or anger towards Corporal Price,
18  Corporal Warren, or Sergeant Foraker?
19      MR. ELLIS: I object to the form of the
20  question.
21      MR. HAVERLY: Based on what?
22      MR. ELLIS: It's the same question he asked
23  a couple minutes ago. He just asked the exact same
24  question.

Page 219

1      MR. NEUBERGER: I think I actually used
2  different words.
3      MR. ELLIS: It's awful close.
4      MR. NEUBERGER: Colonel?
5  A.  One more time with the question, please. I'm
6  sorry. It's been a long day for all of us.
7      MR. NEUBERGER: Could you read that
8  question back?
9      (The reporter read back as instructed.)
10      THE WITNESS: He's expressed, as I said,
11  disappointment in their actions, and he has never told me
12  he hates them, that he can't stand them. I have never
13  heard him use those words around me.
14  BY MR. NEUBERGER:
15  Q.  Has he ever said to you that "I'm going to get
16  them"?
17  A.  No.
18  Q.  I'd like to change gears a little bit and talk
19  about a different topic. Isn't it true that since
20  Chris Foraker was reinstated to the FTU on December 1st
21  of 2003, that his job duties as NCOIC of the FTU have
22  been changed?
23  A.  We have put him in a different facility, but
24  other than that, the basic duties are still there.

Page 220

1  Q.  So is it your position that his duties as of
2  today, with the exception of the facility change, are the
3  same duties he had as of April 8 of 2002?
4  A.  The unit did not fall under me on April the 8th
5  of 2002, but the duties and responsibilities that he
6  currently has are similar to what our firearms
7  instructors are required to do.
8  Q.  Isn't it true that his duties now are less than
9  what they once were?
10  A.  Not to my knowledge.
11  Q.  Isn't it true that you personally have
12  diminished his job duties?
13  A.  I don't believe that's true.
14  Q.  Isn't it true that you once publicly threw him
15  out of a commanders and section chiefs meeting?
16  A.  No. I removed him from a commanders and section
17  chiefs meeting. Publicly did so? I went over and I
18  spoke to him one-on-one. He was sitting in the back of
19  the room. And commanders meetings are lieutenants and
20  captains and section chiefs. And if a section chief of
21  the Firearms Training Unit falls under the academy staff,
22  I had talked to -- I think Lieutenant Davis was present
23  at that meeting. I asked him if he had him there for a
24  specific reason. He said he did not. If one of my

Page 221

1  section chiefs or troop commanders is going to have a
2  specific reason to have someone there to address the
3  group, they're allowed to remain in the group.
4      When he was present he was -- and I did ask
5  him to leave because he didn't have anything to present.
6  He had his lieutenant and his direct line of command was
7  present in that room representing the DSP academy.
8  Q.  Was Sergeant Foraker a section chief as the
9  NCOIC of the FTU?
10  A.  That fell under the academy. So no, he was not
11  in the intent -- with the intention of who was present in
12  that room.
13  Q.  So you're indicating that Sergeant Foraker
14  doesn't qualify as a section chief?
15  A.  Under the format of who's required to be at that
16  meeting, no, he did not.
17  Q.  Was that a commanders and section chiefs
18  meeting?
19  A.  Yes, it is section chiefs being those that stand
20  alone. PIO, homicide unit stand alone. They don't
21  report to a commander of one of those units.
22  Q.  Are you aware that Sergeant Foraker was
23  previously allowed to attend those meetings prior to
24  April 8 of 2002?

56 (Pages 218 to 221)

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 222

1  A. Prior administration. We made those changes to
2  the structure of our commanders meetings to make them
3  more efficient, more effective, that we did not have
4  sergeants there. It was command staff and command staff
5  only.
6  Q. Are you aware that Sergeant Foraker was actually
7  invited to attend that meeting?
8  A. I was not aware of that. I know there was a
9  series of e-mails that went out, and in one of them there
10 was a question about having the proper -- having
11 photographs of the proper section chiefs and so forth,
12 and I think that's how he became included in the
13 invitation to that.
14 Q. So the only reason that he got those e-mails
15 were because of the photo issue?
16 A. From what I understand of that, yes, because it
17 did become a question. He informed me he was invited to
18 that, and I knew that he should not have been. Not
19 because he's Chris Foraker, because there were other --
20 there weren't other sergeants in charge of sections that
21 were present. The only other sergeant that's normally
22 there is Sergeant Alex Peterson from our planning
23 section. Our planning section set up the meetings, and
24 he sits in on occasion when Lieutenant Cohee or now

Page 223

1  Captain Davis may or may not be able to be present there.
2  But, for the most part, sergeants are not at that meeting
3  unless they're going to present something specific.
4         MR. NEUBERGER: I'd like to mark another
5  exhibit as MacLeish Deposition Exhibit No. 20.
6         (MacLeish Deposition Exhibit No. 20 was
7  marked for identification.)
8  BY MR. NEUBERGER:
9  Q. Colonel, do you have this document in front of
10 you?
11 A. Yes, I do.
12 Q. Does it appear to be a multipage document?
13 A. It's multi pages.
14 Q. At the bottom of the first page in the bottom
15 right-hand corner does it say "CF20"?
16 A. Yes, it does.
17 Q. Could you flip to the very, very last page?
18 A. (Complied.)
19 Q. Does that say in the bottom right-hand corner,
20 does it say "CF63"?
21 A. Yes, it does.
22 Q. Can you turn back to the first page again?
23 A. (Complied.)
24 Q. Does this appear to be an e-mail sent by

Page 224

1  Captain Homiak on March 29th of 2004?
2  A. Yes.
3  Q. Is it sent to DSP troop commanders and DSP
4  section chiefs sworn?
5  A. Yes.
6  Q. At the top left of this e-mail it says, "Foraker
7  Christopher D (DSP)"?
8  A. Yes.
9  Q. Circumstantially at least would that indicate
10 that this e-mail was sent to Sergeant Foraker?
11 A. Yes, it does.
12 Q. Could you turn to the next page? At the bottom
13 right-hand corner does it say "CF21"?
14 A. Yes.
15 Q. Does this appear to be an e-mail from
16 Captain Homiak?
17 A. Yes.
18 Q. Dated May 27, 2004?
19 A. Yes, it does.
20 Q. Is the subject June commanders meeting?
21 A. Yes.
22 Q. Does the text of the e-mail say, "Good morning,
23 The June Commanders Meeting is scheduled for June 23 at"
24 9:00 a.m. at the DSP academy?

Page 225

1  A. Yes.
2  Q. Again, circumstantially would it appear that
3  this e-mail was sent to Sergeant Foraker?
4  A. By going by what's at the top, yeah, I would
5  assume that it would indicate that it applied to him.
6  Q. Don't the two lines say that it was sent to DSP
7  section chiefs sworn and DSP troop commanders?
8  A. Yes.
9  Q. Can you turn several more pages to the page that
10 at the bottom right-hand corner says CF27?
11 A. (Complied.)
12 Q. Tell me when you found that.
13 A. Got it.
14 Q. Is this also an e-mail from Captain Homiak?
15 A. Yes.
16 Q. Date of June 29th, 2004, at 12:22 p.m.?
17 A. Yes.
18 Q. In the "To" line, DSP section chiefs sworn and
19 DSP troop commanders?
20 A. Yes.
21 Q. Does the subject line say, "Commanders Meeting
22 and NIBRS Numbers"?
23 A. Yes.
24 Q. Does the text of this e-mail appear to be a

57 (Pages 222 to 225)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 226

1  reminder to attend the July commanders meeting?
2     A.  Yes, it does.
3     Q.  Circumstantially, looking at the top left-hand
4  corner of this document, would it appear that this e-mail
5  was sent to Sergeant Foraker?
6     A.  Yes.  As we go through these, Sergeant Foraker
7  in our computer system and notification system, it's
8  easier, rather than have to write everybody out, that he
9  is under that designation of a section chief as a
10 firearms instructor of the FTU.  That falls under the
11 training academy.  I would venture to say that
12 Corporal Anderson, who is our K9 officer, also received
13 these.  He doesn't come to the commanders meetings.  He's
14 the section chief of our K9 section, but he is not -- the
15 intent of the commanders meetings and section chiefs are
16 for those commissioned officers.
17    Q.  You're indicating that the DSP computer system
18 recognizes Sergeant Foraker as a DSP section chief and
19 sends section chief e-mails to section chief
20 Sergeant Foraker?
21          MR. ELLIS:  I object to the form of the
22 question.
23    A.  I thought -- you paraphrased what I said, but
24 what I'm saying is that for the ease -- our computer

Page 227

1  support section, when identifying individuals to make
2  global e-mails for notification of section chiefs, would
3  need to have without filtration through their chain of
4  command, that's why they do that.  There can be numerous
5  sections.  Our intel section has numerous subsections
6  under it where they're identified as the section chief.
7  They're not invited to the commander and section chiefs
8  meetings.  It would grow too large.
9     Q.  Can you turn to the page that says CF29 on the
10 bottom right-hand corner?
11    A.  (Complied.)
12    Q.  Are you at that page?
13    A.  I am.
14    Q.  At the very top does it say from Laurie A.
15 Robbins, DSP?
16    A.  Yes.
17    Q.  Does it say sent Thursday, July 15, 2004,
18 3:19 p.m.?
19    A.  Yes.
20    Q.  Does the "To" line say, among many other names,
21 DSP troop commanders and DSP section chiefs sworn?
22    A.  Yes.
23    Q.  Going down to the body of the e-mail, does it
24 say, "The following email has been authorized by Colonel

Page 228

1  L. Aaron Chaffinch"?
2     A.  Yes.
3     Q.  At the top left-hand corner of this document,
4  does it say, "Foraker Christopher D"?
5     A.  Yes.
6     Q.  Turning several more pages ahead to the page
7  that in the bottom right-hand corner says CF35, are you
8  at that page?
9     A.  Yes, I am.
10    Q.  Does this say from Richard Cohee, DSP?
11    A.  Yes, it does.
12    Q.  Dated August 23, 2004?
13    A.  Yes.
14    Q.  Is it sent to DSP section chiefs, DSP troop
15 commanders, and executive staff?
16    A.  Yes.
17    Q.  Does it say in large bold underlined words,
18 "THIS MESSAGE SENT AUTHORITY OF COLONEL L. AARON
19 CHAFFINCH"?
20    A.  Yes.
21    Q.  I want you to keep on turning a few more pages
22 to the page which in the bottom right-hand corner says
23 CF62.  Tell me when you have arrived at that page.
24    A.  Got it.

Page 229

1     Q.  Is this an e-mail from Elizabeth B. Seay?
2     A.  Yes.
3     Q.  Is it dated Friday, June 10th, 2005, at
4  2:31 p.m.?
5     A.  Yes.
6     Q.  Is it to DSP troop commanders, DSP section
7  chiefs sworn?
8     A.  Yes.
9     Q.  At the top left-hand corner does it say,
10 "Foraker Christopher D (DSP)"?
11    A.  Yes.
12    Q.  In the body of the e-mail does it say, "Troop
13 Commanders and Section Chiefs:"?  Does it say that?
14    A.  Yes.
15    Q.  Does it go on to say that the commanders meeting
16 scheduled for Wednesday, June 15th, has been postponed
17 until the following week, the date and location to be
18 determined.  The planning section will make the
19 notification.  Does it say that?
20    A.  Yes.
21    Q.  Does it go on to say that "This message is being
22 sent authority of Colonel Thomas F. MacLeish"?
23    A.  Yes.
24    Q.  You mentioned a little while ago the meeting

Case 1:04-cv-01394-GMS   Document 80-6   Filed 09/19/2005   Page 6 of 19

| Price, et al.<br>Thomas F. MacLeish | v.<br>C.A. # 04-1207 | Chaffinch, et al.<br>July 19, 2007 |
|---|---|---|

**Page 230**

1  which you asked Sergeant Foraker to leave. Do you recall
2  that?
3     A.  Yes, I do.
4     Q.  Did you take him out in the hallway to tell him
5  to leave?
6     A.  I went and sat down by him seated in a room and
7  I explained to him that these meetings were for
8  commissioned officers and, in fact, was he presenting
9  something specific on firearms. He said no. I said,
10  "Then you're not to attend the meeting." And he wanted
11  to have an exchange. We then went into the hall, and I
12  just reiterated my position.
13     Q.  Out in the hallway did you order him to leave?
14     A.  I told him he was not to attend the meeting.
15     Q.  Did you intend that to be an order?
16     A.  Yes.
17     Q.  At that point did you go back in the meeting?
18     A.  Yes, I did.
19     Q.  Did you talk to anybody in there about what you
20  had just done, to the best of your recollection?
21     A.  I can't recall whether I did. I know I
22  subsequently spoke to Lieutenant Davis and explained to
23  him why Sergeant Foraker was not to attend the meeting.
24  Other sergeants, other section chiefs that fell under an

**Page 231**

1  existing branch were not in attendance at those meetings.
2     Q.  At some point in that meeting did Captain Nate
3  McQueen stand up and ask for Sergeant Foraker's
4  assistance in organizing certain funeral activities
5  arising out of the tragic death of a fallen trooper?
6     A.  At this same meeting? I remember Captain
7  McQueen asking -- I think that was Corporal Shay's
8  funeral. I remember Captain McQueen's asking for
9  Foraker's assistance.
10     Q.  Did you get angry at Captain McQueen?
11     A.  No.
12     Q.  Did you give him a dirty look?
13     A.  Not that I can recall.
14     Q.  Did you glare at him?
15     A.  Not that I'm aware of.
16     Q.  Changing gears a little bit again. Is it your
17  position that Sergeant Foraker's job duties are the same
18  now as they were prior to April 8 of 2002?
19     A.  Yes, it is my opinion it is the same.
20     Q.  Is safe staffing levels at the FTU an important
21  thing?
22     A.  Yes, they are.
23     Q.  Are you aware that Sergeant Ashley was given a
24  fifth full-time firearms instructor at the FTU while he

**Page 232**

1  was in charge of the facility?
2     A.  I count five including Sergeant Ashley. Is that
3  what you're referring to?
4     Q.  Yes.
5     A.  Yes.
6     Q.  Sergeant Foraker has never had five since he has
7  been reinstated; isn't that correct?
8     A.  I believe when he first started he had five
9  because he had the same group that Sergeant Ashley had
10  with the exception of Sergeant Ashley. It was
11  Sergeant Foraker, Corporal Warren, Corporal Price,
12  Corporal Warwick, and Corporal Peachey.
13     Q.  Corporal Peachey was still working at that
14  point?
15     A.  Yes, he was. As of December the 1st.
16     Q.  It's your position that he continued to serve at
17  the FTU thereafter?
18     A.  Until his retirement. I think he retired in
19  January of '04.
20     Q.  Have you ordered Major Eckrich, Captain Homiak,
21  and Lieutenant Hagen and other officers above
22  Sergeant Foraker in the chain of command to harass him in
23  the performance of his daily --
24     A.  No.

**Page 233**

1     Q.  Are you aware of Colonel Chaffinch giving such
2  an order?
3     A.  No, I'm not.
4     Q.  Do you know if Corporal Peachey was mostly out
5  on sick leave during his time at the FTU in December 2003
6  due to his injuries?
7     A.  It had come to my attention through
8  Captain Warren that Corporal Peachey was using sick time.
9  If he was using his sick time, then he was to be
10  accountable just as anybody else was.
11     Q.  I'm sorry. I'm not following.
12     A.  If, in fact, you have an employee that's using
13  their sick time, then they must have documentation as to
14  why they're using their sick time. He was directed to do
15  that.
16         The other issue of minimum staffing in a
17  firing range and maintaining those minimum standards, it
18  does fall back to the NCOIC of the unit that we have
19  always used others from the field to help and make those
20  numbers work, whether it's on a student shoot or a
21  inservice reshoot, requalification. There are those in
22  the field that have that. Sometimes people show up to
23  shoot that day. They are tapped into service and it's
24  NCOIC's responsibility to make sure that he or she has

Case 1:04-cv-01394-GMS   Document 80-6   Filed 09/19/2005   Page 7 of 19

Price, et al.                                                    v.                                           Chaffinch, et al.
Thomas F. MacLeish                                   C.A. # 04-1207                                           July 19, 2007

Page 234

1  the sufficient numbers to conduct the shoot.
2      Q.  If he doesn't have the sufficient numbers, what
3  should the NCOIC do?
4      A.  He would adjust accordingly.
5      Q.  So, for example, he wouldn't train as many
6  people that day?
7      A.  Maybe that's the case.  If he felt he didn't
8  have sufficient numbers to do so with what was in reason,
9  then my expectation would be that he would make those
10 adjustments.
11     Q.  You have been a police officer for more than
12 25 years; isn't that correct?
13     A.  I'm in my 28th year.
14     Q.  Do you know that under our form of government
15 the highest law of the land is something called the
16 United States Constitution?
17     A.  Yes.
18     Q.  Are you aware that there is also a Bill of
19 Rights?
20     A.  Yes.
21     Q.  Are you aware that there are also amendments to
22 the United States Constitution?
23     A.  Yes.
24     Q.  Is the United States Constitution something that

Page 235

1  is important to the Delaware State Police?
2      A.  Yes, it is.
3          MR. ELLIS:  Asked and answered.  Come on.
4  You asked him all these questions already.
5          MR. NEUBERGER:  Did I?
6      Q.  As a police officer, you have been trained to
7  obey the U.S. Constitution?
8      A.  Yes.
9      Q.  For example, under the Fourth Amendment you have
10 been trained in laws governing search and seizure and
11 things like that?
12     A.  Yes.
13     Q.  You know that under the Constitution you can't
14 discriminate against an officer in transfers or
15 promotions or things like that because of their religion?
16     A.  That's correct.
17     Q.  Or their gender?
18     A.  Yes.
19     Q.  That's because the Fourteenth amendment to the
20 U.S. Constitution forbids that?
21     A.  Yes.
22     Q.  You know you can't transfer or punish an officer
23 because of where he goes to church?
24     A.  That's right.

Page 236

1      Q.  You can't transfer or punish an officer because
2  of how he votes; isn't that right?
3      A.  That's right.
4      Q.  That's because the First Amendment to the United
5  States Constitution forbids that; isn't that right?
6      A.  Yes.
7      Q.  You know you can't punish an officer who reports
8  corruption in the workplace; isn't that right?
9      A.  That's right.
10     Q.  You know that you can't punish an officer who
11 reports that police officers are taking bribes?
12     A.  That's right.
13     Q.  You know you can't punish an officer who speaks
14 out about health and safety in the workplace?
15     A.  That's correct.
16     Q.  For example, if there was an officer at the DSP
17 headquarters in Dover who reported that the building was
18 contaminated with asbestos, you know that you couldn't
19 retaliate against that officer for their speech on that
20 matter?
21     A.  That's correct.
22     Q.  You know you can't punish an officer who files a
23 lawsuit in the state court, right?
24     A.  That's correct.

Page 237

1      Q.  And you know you can't punish an officer who
2  files a lawsuit in federal court?
3      A.  That's correct.
4      Q.  In your opinion, should police officers violate
5  the Constitution or its amendments?
6      A.  No, they should not.
7      Q.  Is it a serious thing when police officers do
8  violate the Constitution or its amendments?
9      A.  Yes, it is.
10         MR. NEUBERGER:  I'd like to take another
11 break.
12         (A recess was taken.)
13         MR. NEUBERGER:  Colonel, I don't have any
14 more questions for you, but I'm going to recess the
15 deposition from plaintiffs' perspective because we
16 haven't gotten certain discovery in the case yet, meaning
17 when we do get that discovery, you're going to have to
18 come back.  Just for the purposes of the record, I'd like
19 to get that down.  Subject to that, I have no further
20 questions.
21         MR. ELLIS:  Are you referring to anything
22 other than what we just gave you in terms of discovery
23 you haven't gotten?
24         MR. NEUBERGER:  What discovery did we get

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 238

1  from you last?
2      MR. ELLIS: I thought we just gave you a
3  box of documents yesterday.
4      MR. NEUBERGER: I haven't even actually
5  seen that yet. I think there's a box in my office
6  somewhere. But I'm specifically referring to the
7  personnel file issue. I think Robert and I are still
8  working that out.
9      MR. ELLIS: Okay. I don't know that this
10 witness is going to know any of those documents anyway.
11 For purposes of today, I'll accept that and we will
12 decide --
13     MR. HAVERLY: I think they're also
14 documents dealing with the Foraker case solely. There's
15 been requests served. You may or may not have reviewed
16 it yet or anything like that.
17     MR. ELLIS: When did it get to us?
18     MR. HAVERLY: Sometime this week is when it
19 should get to you.
20     MR. ELLIS: You just sent us some stuff.
21     MR. HAVERLY: Yes.
22     MR. ELLIS: I may not have seen it yet. We
23 responded to two sets of requests for production of
24 documents I believe yesterday. I hope it was yesterday.

Page 239

1  And we produced several thousand pages' worth of
2  documents. If there's a new request for production, then
3  I'm not aware of it.
4      MR. HAVERLY: I'm just saying that there
5  is.
6      MR. NEUBERGER: I apologize for not being
7  up on the documents. I'm sure we have them if you guys
8  sent them over.
9      MR. ELLIS: Thank you.
10     MR. NEUBERGER: Do you have any questions?
11     MR. ELLIS: I'm not going to ask him
12 questions when you're not done. That wouldn't be fair.
13     MR. NEUBERGER: In that case we're going to
14 recess the deposition. It's 4:10.
15     (Deposition concluded at 4:10 p.m.)
16     (Deposition to be continued.)
17     - - - - -

Page 240

    T E S T I M O N Y

DEPONENT: COLONEL THOMAS F. MacLEISH    PAGE

BY MR. NEUBERGER............................. 3

    E X H I B I T S

MacLEISH DEPOSITION EXHIBIT NO.       MARKED

1 - Copies of newspaper articles Bates
stamped CF69 through CF76..................... 21

2 - A multipage document entitled,
"COMPLAINT".................................. 23

3 - A three-page memorandum dated March 4,
2004.......................................... 65

4 - A three-page document entitled,
"Recommendations and Design
Considerations For Indoor Rifle Ranges........ 74

5 - A four-page e-mail dated April 7, 2004.... 83

6 - A three-page document Bates stamped
FTU2756 through FTU2758...................... 105

7 - A memorandum dated 11/8/98................ 108

8 - A letter to Mr. Doyle Tiller from
Kenneth M. Belmont, dated December 1, 1998... 111

9 - A two-page memorandum dated 12/3/98...... 113

10 - A memorandum dated April 29, 1999....... 115

Page 241

    E X H I B I T S (cont'd)
MacLEISH DEPOSITION EXHIBIT NO.       MARKED
11 - Two-page e-mails Bates stamped
FTU3881 through FTU3882..................... 117

12 - Two-page e-mails Bates stamped
FTU2348 through FTU2349..................... 121

13 - A two-page e-mail dated January 9,
2004......................................... 123

14 - E-mails Bates stamped FTU3886........... 131

15 - An e-mail dated February 19, 2004....... 137

16 - A three-page document entitled,
"Firearms Training Unit Indoor Range
Maintenance and Service Report, dated
March 31, 2004............................... 140

17 - A six-page newspaper article Bates
stamped FTU2901 through FTU2897.............. 159

18 - An e-mail dated 4/21/04................. 179

19 - An e-mail dated March 5, 2005........... 205

20 - Multiple pages of e-mails Bates
stamped CF20 through CF63.................... 223

ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 242

CERTIFICATE OF REPORTER              PAGE 243

61 (Pages 238 to 241)

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 242

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 243

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
)
NEW CASTLE COUNTY)

    I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 19th day of July, 2005, the deponent herein, COLONEL THOMAS F. MacLEISH, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.
    I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.
    I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

    Kimberly A. Hurley
    Certification No. 126-RPR
    (Expires January 31, 2008)

DATED:

PLF
EXHIBIT NO. 2
KWP 6-6-05

Now the Lord he thought he'd make a man.  So he took a little water and he took a little sand.  Stirred that mixture around and round.  Pulled Mr. Adam right out of the ground.  Now Adam he was looking mighty blue.  He didn't know exactly what to do.  So the Lord took a rib from Adam's side and made Miss Eve for to be his bride.  He put them in that garden fair.  He thought they'd be so happy there.  Peaches, pears, and plums, and such.  But of that tree you darest not touch.  But around that tree old Satan slunk and at Miss Eve his eye he whunk.  Miss Eve those apples look mighty fine.  Go ahead girl the Lord won't mind. So she took a pluck and she took a pull.  Pretty soon had a whole bag full.  Well the next day when the Lord came around.  He spied those cores all over the ground.  Adam, Adam where fore art thou.  Here I is Lord. I've a coming now.  Adam who these cores did leave.  I don't Lord but I expect it was Eve.  Adam you must leave this place and earn your living from the sweat of your face.  So he took a pick and he took a plow and that's why we's all a working now.  That's all there is.  There ain't no more.  Eve got the apple.  Adam got the core.



The Nipples of Sarah Sarong
When excited were twelve inches long.
Her tender young lover was soon to discover.
She expected no less of his dong.


There Once was a Man from Trent
Whose dick was so long that it bent.
To save himself trouble
He stuck it in double
And instead of coming
He went.


There was a man from Nantucket
Whose dick was so long he could suck it.
And he said with a grin
Wiping cum from his chin.
If my ear were a cunt
I would fuck it.


If I had a dog who could piss this stuff.
And I thought he could piss enough.
I'd tie his leg to the foot of the bed.
And suck his dick till we both fell dead.

39

PLF
EXHIBIT NO. 4
KWP 6-6-05

Up jumped up jumped the monkey from the coconut grove.
He was a mean Mother Fucker you could tell by his clothes.
He wore a two-buttoned ditty and a three-buttoned stitch.
He was a loud Mother Fucking Son of a Bitch.
He lined 100 woman up against the wall and bet anyone he could fuck them all.
He fucked 98 till his balls turned blue.
Then he backed off, jacked off, and fucked the other two.

Page 1 of 4

EXHIBIT NO. 8
PLF
KWP 6-7-05

3 - sjn@neubergerlaw.com

From: "Stephen J. Neuberger" <SJN@neubergerlaw.com>
To: "Steve Neuberger" <SJN@neubergerlaw.com>
Sent: Thursday, April 15, 2004 6:49 PM
Subject: 2004-04-15 - DSN

Published: Apr 14, 2004 - 11:14:17 pm EDT

Top troopers face charges: Misconduct alleged against superintendent, deputy
By Tom Eldred, Delaware State News

DOVER - A Delaware State Police captain who has a federal lawsuit pending against state police Superintendent Col. L. Aaron Chaffinch has filed internal charges alleging misconduct against the colonel and Deputy Superintendent Lt. Col. Thomas F. MacLeish.

Lt. Joseph Aviola, a state police spokesman, said the charges were filed with the agency's internal affairs section.

"I can confirm that charges have been filed against the colonel and lieutenant colonel," he said. "However, we won't be disclosing the nature of the charges because they are internal." 

Wilmington attorney Thomas S. Neuberger said Capt. Gregory A. Warren, director of training for the state police, filed the charges last week.

Mr. Neuberger, who represents Capt. Warren in an employment discrimination lawsuit against Col. Chaffinch, confirmed six charges were filed against Col. Chaffinch and four against Lt. Col. MacLeish.

"I am surprised that this matter has been made public," Mr. Neuberger said.

Although he declined to release copies of the charges, Mr. Neuberger outlined them as ranging from cronyism to perjury in federal court to sexually offensive language to drinking and driving in a state police cruiser.

Lt. Aviola denied requests by the Delaware State News for interviews with Col. Chaffinch, Lt. Col. MacLeish and internal affairs director Capt. James Paige.

"The head of internal affairs, the colonel and the lieutenant colonel will not be commenting on these matters," Lt. Aviola said. "They are internal. As a policy, we don't comment on internal matters." 

He said the paper's request to speak with Capt. Warren also would be denied.

"They are not going to let Greg Warren be interviewed," he said.

James L. Ford Jr. is secretary of the state Department of Safety and Homeland Security, which includes supervisory authority over the state police.

"I'm aware that these charges have been filed with internal affairs," he said Wednesday.

"Because the complaints are directed at the leadership of the Delaware State Police, to avoid the

12/14/2004

A151

A359

appearance of any impropriety and to maintain public confidence, an investigation will not be conducted by the Delaware State Police.

"(It) will be handled by personnel designated through the office of the Cabinet secretary (of Safety and Homeland Security)."

Mr. Ford said selection of personnel assigned to conduct the investigation has not taken place.

Charges are varied

Mr. Neuberger said the allegations against Col. Chaffinch include official misconduct and perjury, as a result of two recent federal court cases that went against the colonel.

Sgt. Christopher D. Foraker brought the first lawsuit, claiming the colonel violated his constitutional right to free speech when he abruptly transferred the sergeant after Sgt. Foraker disciplined and spoke out against a friend of the colonel's.

The jury agreed with Sgt. Foraker, awarding him more than $100,000 in compensatory and punitive damages.

"Based on the verdict in the Foraker case, my client believes Col. Chaffinch is guilty of official misconduct," Mr. Neuberger said.

Mr. Neuberger said Capt. Warren charged the colonel with perjury, based on his testimony in the Foraker case and during a second trial, which focused on claims of reverse discrimination brought by two white state police corporals.

The jury awarded corporals William Bullen and Jeffrey Giles $350,000 in compensatory damages in that case.

"Capt. Warren believes that on numerous occasions the colonel attempted to alter his previous sworn testimony during those trials," Mr. Neuberger said.

Two of the charges against Col. Chaffinch center on acts of alleged cronyism that violated department rules and regulations, while another alleges the colonel made "derogatory and mocking" remarks about an African-American woman at a public event, Mr. Neuberger said.

The final charge, he said, alleges that Col. Chaffinch has been "drinking and driving while on duty," in violation of department regulations.

MacLeish charges

Mr. Neuberger said the charges filed against Lt. Col. MacLeish include a direct command from the lieutenant colonel forbidding the captain from making statements to the media.

He said another allegation centers on Gov. Ruth Ann Minner's Executive Order 19, which tasked state Personal Director Lisa Blunt-Bradley with conducting a comprehensive review of the workplace environment of the state police.

The review, released in December 2001, required the state personnel office to continue monitoring state police hiring, promotion and discipline on an annual basis.

12/14/2004

A152

"My client says Lt. Col. MacLeish on repeated occasions has sought to misinform Lisa Blunt-Bradley on things that are supposed to be reported to her in Executive Order 19," Mr. Neuberger said.

"He charges that Lt. Col. MacLeish ordered him several times to change the annual report to her."

Ms. Blunt-Bradley said Wednesday that she had not seen Capt. Warren's allegation and could not comment.

Mr. Neuberger said a third charge alleges that the lieutenant colonel made sexually explicit comments during a commanders' meeting that included female troopers.

The final charge, he said, focuses on an "illegal order" the deputy superintendent made regarding a lieutenant's paid overtime request that was in violation of the trooper's labor contract with the division.

No Minner comment

Rep. William A. Oberle, R-Newark, who has called for a legislative probe into problems surrounding the closed state police firing range near Smyrna, said word of Capt. Warren's charges against his superiors concerns him.

"These are allegations and very serious allegations," Rep. Oberle said. "They may be worthy of legislative pursuit. I would say the burden right now falls on Capt. Paige to determine the validity of the charges."

Rep. Oberle said he is disappointed that Gov. Minner has not become more involved with the issues involving the state police.

"I consider the governor a personal friend," he said. "I've served with her since 1976. It's been my hope that she would take these matters into her own hands, but she hasn't so far.

"One would like to believe police officers are honorable people who will do the right thing."

Gregory S. Patterson, a spokesman for Gov. Minner, said the governor would have no comment on Capt. Warren's allegations.

Rep. Oberle said he is concerned with the allegation that Capt. Warren has been ordered not to make public statements.

"I find that troubling," he said. "My impression is that Capt. Warren has pretty much been given gag orders by the colonel."

Rep. Oberle also questioned the division's reluctance to release specifics of Capt. Warren's allegations.

"This circumstance is a bit unique," he said. "I would think public access to these charges should be open.

"I would think the colonel would welcome a public hearing regarding all the allegations that have been swirling around him."

Senior writer Tom Eldred can be reached at 741-8212 or at teldred@newszap.com.

12/14/2004

A153

```
*********************************
```
Stephen J. Neuberger, Esq.
The Neuberger Firm
Attorneys and Counselors at Law
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
Phone: 302-655-0582
Fax: 302-655-9329
E-Mail: SJN@NeubergerLaw.com

12/14/2004

A154

3 - sjn@neubergerlaw.com

From:     "Stephen J. Neuberger" <SJN@NeubergerLaw.com>
To:       <sjn@NeubergerLaw.com>
Sent:     Friday, April 23, 2004 8:47 AM
Subject:  2004-04-23 - TNJ - 1

**Local News** from TheNewsJournal

 need help? have questions?

### Private firm probing state police complaint
#### Officials criticize outsider's role

By MARY ALLEN
Staff reporter
04/23/2004

A private investigative firm is looking into a Delaware State Police captain's misconduct complaint against the agency's top two officers, state officials said Thursday.

Capt. Gregory Warren, who has a lawsuit pending against both the agency and its commanders, filed the complaint through the state police's department of internal affairs. But James L. Ford Jr., secretary of the Department of Safety and Homeland Security, which oversees state police, said in a prepared statement that investigation of the complaint would be handled outside the department "due to the unique situation."

That decision drew sharp criticism Thursday and left one politician at a loss for words.

"The colonel and lieutenant colonel should make the argument that they would want to be investigated by the state police internal affairs section to show that their accountability and standards are the same as any other trooper," said Sgt. Vincent P. Fiscella Jr., president of the Delaware State Troopers Association. The men could ask that results be reported to Ford, he said.

Neither State Police Col. L. Aaron Chaffinch nor his second-in-command, Lt. Col. Thomas F. MacLeish, would take questions on the matter Thursday, state police spokesman Lt. Joseph Aviola said. Ford would not comment beyond his prepared statement, spokeswoman Kimberly Holland Chandler said.

Warren filed the complaint against the men, said Thomas S. Neuberger, Warren's attorney. Warren could not be reached for comment. State police policy requires all news media requests for interviews with troopers to go through Aviola's office. He said Thursday a request to speak with Warren was denied.

Neuberger would not release a copy of Warren's written complaint. Aviola said it was an internal document and would not be dispersed Thursday, but he said the agency would evaluate a request for it made under the state's Freedom of Information Act. 

Delaware law exempts the state police superintendent and deputy superintendent from confidentiality privileges given to lower-level troopers with regard to documents compiled in an investigation.

Warren's complaints of cronyism and mismanagement were also made in a document he drafted for a recent meeting with legislators. The meeting concerned the state police firing range shutdown last month because of environmental contamination problems.

The firm handling the investigation, Hyden Associates, directed calls Thursday to Ford's office. Ford's statement said the firm was chosen with the concurrence of the Attorney General's Office. Hyden advertises as an association of former federal and state investigators, and Ford's statement said the agency has "the experience, expertise and independence to complete this investigation." A report is due within 60 days.

Lori Sitler, spokeswoman for Attorney General M. Jane Brady, said Brady discussed the matter with Ford. Because it involves an internal complaint in an agency under his jurisdiction, the final decision on how to proceed was his, she said.

Rep. William A. Oberle Jr., R-Beechers Lot, said Thursday he thought Capt. James Paige, who heads the agency internal affairs office, was going to lead the investigation. Paige is an investigator respected for integrity and objectivity, Oberle said.

"My faith in the process was vested in the captain," Oberle said. "I don't know how to react to this."

6/4/2005

Neuberger said he thought state police were setting up the investigation for a "whitewash" by keeping Paige out of it.

"They're taking it away from someone everyone believes would be unbiased," he said.

This will be the second investigation of MacLeish since he became deputy superintendent last year. He was cleared in March of any direct rule violations in a personal appeal he made for a man targeted in a theft and forgery investigation. Police reported taking "appropriate action" with MacLeish for conduct creating a "potential appearance of impropriety."

Warren has a federal lawsuit pending against Chaffinch, state police, the Department of Safety and Homeland Security and Gov. Ruth Ann Minner. He claims Minner, a Democrat, blocked his promotion to major five times because he publicly supported her Republican opponent in the 2000 election. Minner has denied the allegations in court documents.

A spokesman for Minner could not be reached Thursday.

6/4/2005

PLF
EXHIBIT NO. 10
KWP 6-7-05

Page 1 of 3

**3 - sjn@neubergerlaw.com**

From: "Stephen J. Neuberger" <SJN@NeubergerLaw.com>
To: <sjn@NeubergerLaw.com>
Sent: Friday, April 30, 2004 7:54 AM
Subject: 2004-04-30 - DSN

Published: Apr 29, 2004 - 10:52:41 pm EDT

Top trooper charges cut: Lawyer claims 'cover-up'
By Tom Eldred, Delaware State News

DOVER - The lawyer for a Delaware State Police captain who filed internal misconduct charges against state police Superintendent Col. L. Aaron Chaffinch was furious Thursday upon learning that three of the allegations would not be investigated.

In a related matter, the president of the Delaware State Troopers Association warned that protections in the Law Enforcement Officers' Bill of Rights could be waived if troopers participate in the investigation.

"These are the allegations of the crimes of perjury and official misconduct," attorney Thomas S. Neuberger said. "The state has now stated that it does not want to investigate crimes reported by an experienced state police captain.

"This is an outrageous cover-up and whitewash of the powerful who think they are above the law. It is a double standard."

Mr. Neuberger represents state police training director Capt. Gregory A. Warren. The captain filed internal charges against the colonel and Deputy Superintendent Lt. Col. Thomas F. MacLeish earlier this month.

Internal charges are normally handled by the state police internal affairs section, but at the direction of Secretary of Safety and Homeland Security James L. Ford Jr., a private firm - Hyden Associates - is investigating.

Capt. Warren also has a job discrimination lawsuit against Col. Chaffinch and Gov. Ruth Ann Minner pending in federal court.

Mr. Neuberger said Capt. Warren received a letter from Capt. James Paige, head of internal affairs, indicating that three of the allegations against Col. Chaffinch would be dropped.

Mr. Neuberger said Capt. Paige told Capt. Warren that Deputy Attorney General W. Michael Tupman had advised Mr. Ford the allegations would not be probed because they were based on federal court litigation.

Mr. Neuberger said the three charges, which he called the "most serious" against the colonel, are:

• Perjury in two U.S. District Court trials in which Col. Chaffinch allegedly made sworn statements at least 14 times contradicting his earlier sworn deposition testimony;

• official misconduct as a result of one of the trials that found the colonel engaged in intentional discriminatory behavior;

12/14/2004

A155