http://cgi.delawareonline.com/cgi-bin/advprint/print.cgi

 

Requires Adobe Acrobat. If you don't have the FREE Adobe Acrobat reader, download it here!

SPONSORED LINKS

ESSENTIALS

- **Weather**
- **Traffic**
- **Obituaries**
- **Celebrations**
- **Government**
- **Births**
- **Lottery**
- **Police news**
- **Fire calls**
- **Divorces**
- **Blogs**

SPECIALS

**SPACE.COM**
News and info about our universe!

**INTERACTIVE TOWN HALL**
Participate in government!

Copyright ©2003, The News Journal. Use of this site signifies your agreement to the Terms of Service (updated 12/19/2002)



-----Original Message-----
**From:** Paige James (DSP)
**Sent:** Monday, October 25, 2004 14:43
**To:** DSP_Users
**Subject:** Divisional Trial Board

A Divisional Trial Board has been scheduled for Monday, December 20, 2004, at 0900 hours at Delaware State Police Headquarters to hear charges against Captain Barbara L. Conley. She is charged with three counts of violating Delaware State Police Rule and Regulation #4 and one count of violating Delaware State Police Rule and Regulation #40.

The board will be composed of Major Joseph A. Papili, Captain Jeffrey R. Evans and Captain Paul E. Smentkowski.

Any member of this Division, uniformed or civilian, who believes any of the officers selected to this Board would be biased, prejudicial or otherwise predisposed in the above matter, will immediately contact the Internal Affairs Division office.

Additionally, any member, uniformed of civilian, who may possess any information that would affect the proceeding will, likewise, contact the Internal Affairs Division office.


Captain James Paige
Delaware State Police
Internal Affairs
302-739-5990



PLF

EXHIBIT NO. 15

KWP 6-9-05

**PREAMBLE TO CODE OF ETHICS AND RULES & REGULATIONS INTRODUCTION**

By virtue of the authority vested in the Secretary of the Department of Public Safety, pursuant to 29 Del. C. s. 8203, and the authority vested in the Superintendent of the Division of State Police, the following Code of Ethics and Rules and Regulations are hereby enacted and shall govern the administration of the Division and the conduct of employees.   (1.1.2)

These Rules and Regulations are intended for the guidance of members of the Division so they may be informed on the operations of their Division, their responsibilities, and Code of Ethics they are expected to observe.  No member of the Division shall be disciplined except for just cause, and all discipline shall be uniformly applied.

In establishing such Rules and Regulations, it must be recognized that it is not possible to anticipate every potential situation that may arise.  However, the lack of a rule or regulation covering a specific situation should not be interpreted as lessening the requirement that personal conduct must at all times be well within the bounds of propriety and that discretion and good judgment must be exercised in the performance of duty.

Under our form of government, where public confidence in the institutions of government is essential, it is vital that the system upon which public safety depends is maintained at a high level of efficiency and that the system is administered in a manner to assure the continued approval and respect of the public.

A member must be aware at all times of the authority and discretion that has been given him by virtue of his role as a State Police officer.  Because the community grants him far more discretion and authority than the ordinary citizen does, he is expected to conform to a higher standard of conduct than the ordinary citizen does.  The price of the authority granted a State Police officer is not only the expectation that he will discharge

**OPR: Superintendents Office**

VII-1-1

A374

his legal duties but that he will attempt to avoid even the appearance of impropriety. Accordingly, a member must strive at all times to fulfill the trust and responsibility that has been placed in him to serve the people well and faithfully. It is both a privilege and an obligation to carry on the fine traditions that have won esteem and prestige for the Delaware State Police and have made the Division a symbol of dedication and service.

Promulgated and signed this 15th day of November, 2000

Colonel Gerald R. Pepper, Jr.
Superintendent, Division of State Police

## GENDER STATEMENT

As used herein, words denoting the masculine gender may and, where necessary, shall be construed as denoting the feminine gender unless the context requires otherwise.

VII-1-2

A375

**PREAMBLE TO LAW ENFORCEMENT CODE OF ETHICS**
**(26.1.1; 26.1.3)**

AS A LAW ENFORCEMENT OFFICER, I recognize that my fundamental duties are to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the constitutional rights of all men to liberty, equality, and justice.

I WILL conduct my private life above reproach; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department. Whatever I see or may hear of a confidential nature or that is confided to me in my official capacity will be kept secret unless revelation is necessary in the performance of my duty.

I WILL never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime, with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I RECOGNIZE the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession .... law enforcement.

**Revised: 6/30/94, 11/12/97**

VII-2-1

A376

CANONS OF LAW ENFORCEMENT ETHICS (1.1.2)

ARTICLE I.  PRIMARY RESPONSIBILITY

The primary responsibility of law enforcement, and the individual officer, is the protection of the people of the United States through the upholding of their laws; paramount among these is the Constitution of the United States and its amendments.  The law enforcement officer always represents the whole of the community and its legally expressed will and is never the arm of any political party or clique.

ARTICLE 2.  LIMITATIONS OF AUTHORITY

The first duty of a law enforcement officer, as upholder of the law, is to know its bounds upon him in enforcing it.  Because he represents the legal will of the community, be it local, state or federal, he must be aware of the limitations and prohibitions which the people, through law, have placed upon him.  He must recognize the genius of the American system of government which gives to no man, groups of men, or institution, absolute power, and he must insure that he, as a prime defender of that system, does not desecrate its character.

ARTICLE 3.  DUTY TO BE FAMILIAR WITH LAW AND RESPONSIBILITIES

The law enforcement officer shall diligently apply himself to the study of the principles of the laws which he is sworn to uphold. He will make certain of his responsibilities in the particulars of their enforcement, seeking aid from his superiors in matters of technicality or principle when these are not clear to him; he will make special effort to fully understand his relationship to other public officials, particularly on matters of jurisdiction, both geographically and substantively.

ARTICLE 4.  UTILIZATION OF PROPER MEANS TO GAIN PROPER ENDS

The law enforcement officer shall  be mindful of his responsibility to pay strict heed to the selection of means in discharging the duties of his office.  Violations of law or disregard for public safety and property on the part of  an officer are fundamentally wrong; they are self-defeating in that they instill in the public mind a like disposition.   The employment of illegal means, no matter how worthy the end, is certain to encourage disrespect  for the law and its officers.  If the law is to be honored, it must first be honored by those who enforce it.

OPR: Superintendent's Office  Revised: 10/01/97

VII-2-2

**ARTICLE 5.** COOPERATION WITH PUBLIC OFFICIALS IN THE DISCHARGE
OF THEIR AUTHORIZED DUTIES

The law enforcement officer shall cooperate fully with other public
officials in the discharge of authorized duties regardless of party
affiliation or personal prejudice. He shall be meticulous,
however, in assuring himself of the propriety, under the law, of
such actions and shall guard against the use of his office or
person, whether knowingly or unknowingly, in any improper or
illegal action. In any situation open to question, he shall seek
authority from his superior officer, giving him a full report of
the proposed service or action.

**ARTICLE 6.** PRIVATE CONDUCT

The law enforcement officer shall be mindful of his special
identification by the public as an upholder of the law. Laxity of
conduct or manner in private life, expressing either disrespect for
the law or seeking to gain special privilege, cannot but reflect
upon the police officer and the police service. The community and
the service require that the law enforcement officer lead the life
of a decent and honorable person. Following the career of a police
officer gives no person special financial gains. It does give the
satisfaction and pride of following and furthering an unbroken
tradition of safeguarding the American republic. The officer who
reflects upon this tradition will not degrade it. Rather, he will
so conduct his private life that the public will regard him as an
example of stability, fidelity, and morality.

**ARTICLE 7.** CONDUCT TOWARD THE PUBLIC

The law enforcement officer, mindful of his responsibility to the
whole community, shall deal with individuals of the community in a
manner calculated to instill respect for its laws and its police
service. The law enforcement officer shall conduct his official
life in a manner such as will inspire confidence and trust. Thus,
he will be neither overbearing nor subservient, as no individual
citizen has an obligation to stand in awe of him nor a right to
command him. The officer will give service where he can, and
require compliance with the law. He will do neither from personal
preference or prejudice, but rather as a duly appointed officer of
the law discharging his sworn obligation.

VII-2-3

ARTICLE 8.  CONDUCT IN ARRESTING AND DEALING WITH LAW VIOLATIONS

The law enforcement officer shall use his powers of arrest strictly in accordance with the law and with due regard to the rights of the citizen concerned. His office gives him no right to persecute the violator nor to mete out punishment for the offense. He shall, at all times, have a clear appreciation of his responsibilities and limitations regarding detention of the violator; he shall conduct himself in such a manner as will minimize the possibility of having to use force. To this end, he shall cultivate a dedication to the service of the people and the equitable upholding of their laws whether in the handling of law violators or in dealing with the law-abiding.

ARTICLE 9.  GIFTS AND FAVORS

The law enforcement officer, representing government, bears the heavy responsibility of maintaining, in his own conduct, the honor and integrity of all government institutions. He shall, therefore, guard against placing himself in a position in which any person can expect special consideration or in which the public can reasonably assume that special consideration is being given. Thus, he should be firm in refusing gifts, favors, or gratuities, large or small, which can, in the public mind, be interpreted as capable of influencing his judgment in the discharge of his duties.

ARTICLE 10.  PRESENTATION OF EVIDENCE

The law enforcement officer shall be  concerned equally in the prosecution of the wrong-doer and the defense of the innocent. He shall ascertain what constitutes evidence and shall present such evidence impartially and without malice.  In so doing, he will ignore social, political, and all other distinctions among the persons involved, strengthening the tradition of the reliability and integrity of an officer's word. The law enforcement officer shall take special pains to increase his perception and skill of observation, mindful that in many situations his is the sole impartial testimony to the facts of a case.

VII-2-4

A379

**ARTICLE 11.**  ATTITUDE TOWARD PROFESSION

The law enforcement officer shall regard the discharge of his duties as a public trust and recognize his responsibility as a public servant.  By diligent study and sincere attention to self-improvement, he shall strive to make the best possible application of science to the solution of crime and, in the field of human relationships, strive for effective leadership and public influence in matters affecting public safety.  He shall appreciate the importance and responsibility of his office, hold police work to be a honorable profession rendering valuable service to his community and his country.

**Revised 6/30/94, 10/01/97**

VII-2-5

A380

PLF

EXHIBIT NO. 16

KWP 6-9-05

**DELAWARE STATE POLICE RULES AND REGULATIONS (26.1.1)**

1.  Members shall observe and obey State and Federal Laws, municipal ordinances, Rules, Regulations, Job Performance Standards, Orders, the requirements of the Complaint and Disciplinary Procedures of the Division, rules of the Training Academy while in attendance there, and the Standard Operating Procedures of the Division.

2.  All members shall maintain a loyalty to the Division of State Police and its associates as is consistent with State and Federal Law, Rules, Regulations, and Orders of the Division.

3.  A Member of the Division having knowledge of a fellow police officer violating State or Federal Laws, municipal ordinances or Rules, Regulations, or Orders of the Division, or disobeying orders, Job Performance Standards, the Complaint and Disciplinary Procedures of the Division, rules of the Training Academy while in attendance there, and the Standard Operating procedures of the Division, shall report such violations to the Internal Affairs Officer.

4.  Members shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Division.  Conduct unbecoming an officer shall include that which tends to bring the Division into disrepute or reflect discredit upon the officer as a member of the Division, or that which tends to impair the operation and efficiency of the Division or the officer.

5.  No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty.

6.  All members of the Division of State Police shall render assistance and take appropriate enforcement action toward aiding a fellow police officer whose personal safety is actually or potentially threatened.

7.  All sworn members of the Delaware State Police are required to establish and maintain their actual bona fide residence and domicile within the boundaries of the State of Delaware. Recruit troopers are required to meet this residency requirement prior to beginning the Field Training Officer (FTO) program.  Decisions on residency require judgment based upon the totality of circumstances present in each case.  The factors cited below are among the indicia, which will be considered in applying that judgment on a case by case basis.

**OPR: Superintendent's Office, OIC Internal Affairs**

VII-3-1

Residence means more than mere physical presence and includes the legal concept of domicile.  Residence shall mean actual living quarters, which must be maintained within the State by an officer and his or her immediate family (spouse and/or children).  Neither voting in the state or the payment of taxes of any kind by itself shall be deemed adequate to satisfy the requirements of this section.  Ownership of real property within the State, when not coupled with maintaining of actual living quarters in the State as herein required shall be deemed insufficient to meet the requirements of this section.  No consideration shall be give to the fact that an officer intends to maintain a residence in the State if he or she does not maintain a residence as specified above.

The determination of bona fide residency shall include, but not be limited to, an overall consideration of the following factors, with the weight of any factor to be determined by the hearing officers based upon the evidence received:

A.    At what location do the officer's immediate family members reside and attend school?

B.    At what location does the officer keep his or her tangible personal property and effects?

C.    At what location does the officer receive his or her general correspondence?

D.    At what location does the officer spend his or her off duty time?

E.    What location does the officer list as his or her residence for official documents?

F.    What location is more suitable in terms of aesthetics, habitability, comparative comfort, convenience and regular access?

G.    At what location is habitation fixed without any present intent to move?

H.    At what location is there an apparent intent to make a permanent domicile?

I.    In the event that one location is owned and the other is rented or shared with persons not of the immediate family, some presumption of residency shall be applied to the non-shared property.

VII-3-2

8.   It shall be the duty of every member of the Division to maintain the high public regard in which the Division is held by giving assistance when it is requested or otherwise necessary and by impartial administration of the law.

9.   No member shall interfere with the operation or discipline of the Division provided, however, the foregoing shall not preclude proper utilization of the grievance procedures.

10.  Members shall treat as confidential the official communications and business of the Division.

11.  No member shall make any effort to go outside the structure of the Division of State Police in an effort to bring influence to bear upon the Superintendent for the purpose of securing promotion or transfer or to avoid the penalties for reprehensible action or conduct.

12.  No member shall make any public statement, written, or oral, criticizing the Division, or any member thereof, where such expression is:

   A.   Defamatory

   B.   Unlawful

   C.   Of such a nature that it is likely to impair the operation of the Division; or

   D.   Made with reckless disregard for its truth or falsity

13.  No member shall threaten, strike or otherwise assault any other member of the Division.

14.  No Division record shall be removed from any Troop without prior authorization of the Troop Commander.  Headquarters records shall not be removed without the authorization of the Section Chief concerned, or the Superintendent.  No record shall be removed in any case without proper notation being made as to the name of the person receiving it and the date it was removed.

15.  No member shall knowingly make a false statement, falsify any written or verbal report made to a superior officer, or willingly and intentionally withhold material matter from such report or statement.

16.  No member shall knowingly make a false official report or knowingly enter or cause to be entered in any Divisional book or record any inaccurate, false or improper entries or misrepresentation of facts.

VII-3-3

A383

17. No member shall knowingly have made a false statement, falsified any verbal or written report, or have willfully and/or intentionally withheld material matter from such report or statement in the pre-employment process.

18. **Disclosure of Information - Generally**

   A. Sources of information or the names of informants shall not be disclosed to anyone outside the Division.

   B. Any information obtained in an official capacity shall not be disclosed either in writing or orally to any unauthorized person, and no officer will divulge any matter that is his duty to keep secret.

   C. This rule is not to be construed so as to interfere with the proper cooperation with regularly constituted law enforcement agencies or such other agencies as may be assisting in an investigation.

19. **Disclosure of Information - News Media**

   A. A member shall give information to the news media in accordance with procedures established by the Division.

   B. Under no circumstances shall any information be released to the news media which might potentially jeopardize the successful completion of any case which has not been finally adjudicated.

20. **Property**

   A. Care of Property

      (1) Division property shall be used for official purposes only and in the capacity for which it was designed.

      (2) No member shall negligently damage, misuse, fail to properly maintain or wrongfully dispose of any property of the Delaware State Police.

      (3) Members shall be responsible for compensating the Division for lost or damaged property, where such property has been lost or damaged as a consequence of malicious or grossly negligent conduct by the member.

      (4) No member shall cause or permit any property or equipment to be modified or otherwise altered, except in accordance with maintenance and repair standards approved by the Superintendent.

VII-3-4

B.   Seized or Recovered Property

   (1)   In the course of his duties each member of the
Division is responsible and accountable for all
property seized, recovered, held as evidence, or
otherwise coming into his possession, as
prescribed by Standard Operating Procedures and
orders of the division.

21.   **Deadly Force**

A.   A member shall carry, handle, transport, and use
firearms in a manner as to avoid endangering any
innocent person.

B.   A member will be justified in using deadly force **ONLY**
in the following circumstances.

   (1)   **Use of deadly force in self-defense.**

      (a)   A member may use deadly force to defend
himself or to defend another person, when he
believes that such force is immediately
necessary to protect himself or another
person from death or serious physical
injury.

   (2)   **Use of deadly force to effect an arrest.**

      (a)   A member may use deadly force to effect an
arrest **ONLY** after **ALL** of the following
conditions have been met:

All other reasonable means of apprehension have been
exhausted; **AND** It is definitely believed that the
arrest is for a **FELONY** involving serious physical
injury or the threat thereof and the deadly force is
directed **ONLY AT A VEHICLE** for the purpose of
disabling it, so that an arrest can be made; **OR**

It is definitely believed that the arrest is for a
**FELONY** involving physical injury or the threat
thereof, in which case the deadly force may be
directed at the person being arrested; **AND** It is
definitely believed that the deadly force will not
endanger innocent persons; **AND** It is definitely
believed that should deadly force not be used, there
is a substantial risk that the person to be arrested
will cause death or serious physical injury if the
apprehension is delayed.

VII-3-5

   (3)  **Use of deadly force to prevent the commission of a crime.**

      (a)  A member may use deadly force to prevent the commission of a crime **ONLY** after **BOTH** of the following conditions have been met:

         (1)  If there is a substantial danger that death or serious physical injury will be caused to another person if the crime is not prevented by deadly force; **AND**

         (2)  It is definitely believed that the deadly force will not endanger innocent persons.

   (4)  **Use of deadly force in misdemeanor crimes.**

      (a)  Under no circumstances shall a member use deadly force upon any person who is fleeing to avoid arrest for a misdemeanor charge.

  C.  Any provision contained herein, which is inconsistent or in conflict with any written directive concerning deadly force, shall be superseded by that directive.

22.  **Use of Force** (1.3.1)

  A.  No member of the Division shall use excessive, unnecessary or unreasonable force in the performance of his duties.

23.  **Operation of Departmental Vehicles**

  A.  Vehicles, aircraft, and equipment shall be operated in a safe and cautious manner in obedience to law and established procedures.  **Under no circumstances** shall traffic rules and regulations be violated unless a police **emergency exists and vehicle emergency equipment is used** provided, however, that where necessary to avoid detection, a member may refrain from using emergency equipment with due regard for public safety.

  B.  **Members involved in a collision with a departmental vehicle will immediately notify their supervisor and the appropriate communications center.**

VII-3-6

24. **Intoxicating Beverages, Drugs**

    A.    No member shall bring any intoxicating beverage into any building, quarters, or property officially occupied by the State Police, nor shall he permit the same to be brought therein, except on order of a physician for medical purposes, as evidence in current cases, or at the discretion of the Superintendent.

    B.    All members of the Division are strictly prohibited from consuming any intoxicating beverages while on duty, in uniform, or partial uniform, except when required in the performance of duty or at the discretion of the Superintendent.

    C.    No member shall use intoxicants to the extent that there is any measurable evidence at a level of .02 or greater and/or any observable manifestation of consumption of alcohol while reporting to or performing his/her regularly scheduled duties.

    D.    No member of the Division shall, while in uniform or on duty, enter any place where intoxicating beverages are sold (excluding those establishments holding a restaurant license), except when required in the performance of his duties.

    E.    Intoxicating beverages, which are held as evidence, shall be properly tagged and processed in accordance with Division procedures.

    F.    No member shall possess or consume any controlled substance or other like substance except as permitted by law.

    G.    Any controlled substance or other like substance that is held as evidence shall be properly tagged and processed in accordance with Division procedures.

25. **Obedience to Orders**

    A.    No member shall knowingly disobey a lawful command or order, either verbal or written, of a senior officer.

26. No member of the Division shall feign illness or otherwise abuse sick leave.

27. No member of the Division shall absent himself without proper leave. Any member, prior to absenting himself on vacation or leave, shall leave with his Supervisor his vacation or leave address.

VII-3-7

28. **Assigned Patrol or Post**

   A.  A member of the Division assigned to patrol or post shall not leave the patrol or post, except for police necessity or personal necessity, unless properly relieved.

   B.  If forced to quit his patrol or post, the member shall, at the first opportunity, report same to his superior officer, and the reason therefore.

29. Members of the Division shall be punctual in attendance to all calls, requirements of duty, court appearances and all other situations where time is specified.

30. No member shall recommend or request the reduction or dismissal of any criminal or traffic charge which has been filed against any person who has been arrested, or enter into any agreement with a prisoner or his counsel regarding the charge or charges for which the prisoner may be prosecuted, except as authorized by the Superintendent.

31. Members shall refrain from knowingly having personal contacts or business transactions with persons who are under criminal investigation or indictment, or who have an open and notorious reputation in the community for felonious criminal or immoral behavior, except when necessary to engage in such conduct in the performance of their duty.

   A.  Any member subpoenaed or requested to testify for the defense in any hearing or trial, or against the department in any hearing or trial, shall notify the Superintendent in writing via the chain of command immediately upon receipt of the subpoena or request. Members shall not appear, without prior written approval of the Superintendent or his representative, as a character witness for any defendant in a criminal trial or inquiry.

32. Whenever a potential conflict of interest may exist, members are prohibited from knowingly engaging in any commercial transaction with any complainant, suspect, witness, defendant, prisoner, or other person involved in any case which has come to their attention through their Division employment, unless such transaction is specifically authorized by the Superintendent.

VII-3-8

33. A member shall not indulge in any type of gambling while in uniform or on duty, except when authorized by the Superintendent.

34. Members shall not be permitted to follow or engage in any other calling, occupation, or business, without authority from the Superintendent.

35. No member of the Division shall permit the use of a photograph of himself which identifies him as a member of the Division in connection with any testimonial or advertisement of any commodity or commercial enterprise; nor shall he endorse or subscribe to any such testimonial or advertisement or authorize the use of his title, rank, or identification with the Division in this connection.

36. No member of the Division shall, in an official capacity, solicit subscriptions, sell tickets, or collect donations for any purpose whatsoever, except by permission of the Superintendent.

37. Members shall not accept any gift, gratuity, or reward in money or other consideration for services rendered in the line of duty to the community or to any person, business or agency, except lawful salary and other remuneration, which may be authorized by law, or by permission of the Superintendent.

38. Members shall not, under any circumstances, accept or solicit any gift, gratuity, loan or fee where there is any direct or indirect connection between the solicitation and their divisional membership or employment, except by permission of the Superintendent.

VII-3-9

39. **Political Activities**

As per Title 11, Chapter 9200(a), members of the Division shall have the same rights to engage in political activity as are afforded to any other person, except:

1. No member shall solicit any assessments, contributions, or services for any political party while on duty, in uniform, or while acting in his official capacity.

2. No member shall actively participate in the campaign of any candidate for partisan political office while on duty, in uniform, or while acting in his official capacity.

3. No member of the Division shall sign any petition while on duty, in uniform, or while acting in his/her official capacity, except on authority of the Superintendent.

VII-3-10

A390

DELAWARE STATE POLICE

POLICY AGAINST SEXUAL AND OTHER HARASSMENT

AND IMPROPER WORKPLACE BEHAVIOR

**The Delaware State Police is committed to providing a workplace environment for all employees that is free from any form of sexual or other harassment and encourages employees to conduct themselves with integrity and in a professional manner affording respect to subordinates and co-workers.**

Pursuant to Title VII of the United States Code sexual harassment is a form of discrimination and is illegal.

**SEXUAL HARASSMENT is defined as:**

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made, either explicitly or implicitly, a term or condition of employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. *
> *  29 C.F.R.  1604.11(A) 1990

Discrimination on the basis of race, marital status, color, age, religion, sex, disability, or national origin is illegal under Title VII of the United States Code and Title 19, Chapter 711 of the Delaware Code.  Limited exceptions may exist when discrimination on the basis of religion, age, sex, or national origin can be demonstrated to be a bona fide occupational qualification reasonably necessary to the normal operation of the particular business or enterprise.

Any employee who is the victim of sexual or other harassment or is aware of harassment occurring within the workplace should recognize his or her responsibility to inform the proper authorities of such activities. The proper channel for reporting harassment is the Director of Human Resources or the Affirmative Action Officer followed by the immediate supervisor and/or Troop Commander/Section Chief.  If the harassment is being committed by or with the awareness of a supervisor within the direct chain of command, the employee may, at his or her discretion, report the matter only to the Director of Human Resources or the Affirmative Action Officer.

VII-3-11

The Delaware State Police prohibit retaliation against any employee who in good faith brings forth a charge of sexual or other harassment or improper workplace behavior, assists in filing a complaint, or cooperates in an investigation. Further, employees may be assured that all investigations of sexual or other harassment or improper workplace behavior will be conducted in a manner to insure confidentiality to the maximum extent possible.

The Director of Human Resources and/or the Affirmative Action Officer shall be responsible for investigating or directing investigation of all allegations of sexual harassment and allegations of harassment involving race, gender, or other factors protected by Title VII of the U.S. Code or Title 19 of the Delaware Code. Members of the Internal Affairs Section may assist the Director of Human Resources and the Affirmative Action Officer in the investigation. First level supervisors shall be responsible for assuring that the workplace is free of sexual and other harassment and for assuring that no improper workplace behavior exists. First level supervisors are also responsible for investigating and resolving allegations of improper workplace behavior except as noted below.

**IMPROPER WORKPLACE BEHAVIOR is defined as offensive conduct of a personal or sexual nature within the workplace. Severe and/or repeated incidents of improper workplace behavior may rise to the level of sexual or other harassment.**

**Improper workplace behavior may include, but is not limited to:**

Unwanted and/or unnecessary physical contact including touching, pinching, stroking, or intentionally brushing up against another employee;

Verbal behavior not related to work activities such as: continuing chatter of a sexual nature; demeaning comments based on racial, gender, or other stereotypical factors; graphic sexual descriptions; sexual, racial, or gender-based slurs; suggestive or insulting sounds such as whistling, wolf-calls, or related sounds; innuendoes, or other comments about a person's clothing, body, and/or sexual activities;

Offensive jokes, jesting, or kidding based on race, gender, or other protected factors or of a lewd, risqué or sexual nature;

VII-3-12

Distribution or display within the workplace of obscene, pornographic, or derogatory materials of a sexual, gender, or racial nature not required by or related to official business operations.

<u>Unwelcome and continuing</u> requests for dates or social interaction occurring within the workplace or arising out of the workplace.

**First line supervisors are responsible for assuring a workplace environment that is free of sexual or other harassment and free of improper workplace behavior.** This is accomplished by training, open communication, being accessible and receptive to subordinate concerns, and by being aware of the workplace environment. Supervisors should establish the foundation of a proper workplace environment by encouraging an atmosphere of mutual respect between employees, and reinforcing the Division's core values of loyalty, attitude, discipline, service, courage, honor, and integrity.

The proper channel for reporting improper workplace behavior is the first line supervisor, or the first level above that at which the improper behavior is occurring or to the Director of Human Resources or to the Affirmative Action Officer. Supervisors are responsible for investigating allegations of improper behavior and for assuring the confidentiality of claimants to the fullest extent possible.

**Supervisor investigation of improper workplace behavior:**

Investigation of complaints is required by the guidelines established by the Equal Employment Opportunity Commission, the agency charged with enforcement of the federal laws governing sexual and other harassment. Judicial interpretation has extended this obligation to informal complaints and has established that supervisors have a proactive responsibility to prevent harassment and a responsibility to be generally aware of the workplace environment.

The Supervisor should conduct the investigation as a neutral party advocating neither for the employee nor the employer. The investigation should be thorough and expedient and result in a secure, written document that reaches a conclusion and, if appropriate, disciplines the offender(s), establishes a system to assure future compliance with Division policy, provides for training, and monitoring of the workplace environment.

VII-3-13

A393

The Supervisor should interview the complainant in a private
setting and obtain as much information about the alleged policy
violation as possible.  The supervisor should attempt to
determine:

1.    The specific allegation of the improper workplace
      behavior.

2.    The identify of the individual(s) who engaged in the
      improper workplace behavior.

3.    The date(s), time(s), and location(s) of the alleged
      improper behavior and possible witnesses to the behavior.

4.    Any known conduct of a similar nature that has occurred
      by the alleged party (ies) in the past.

5.    Any statements made by the complainant or by other people
      to the individual(s) allegedly violating policy that
      their behavior was not appreciated or welcomed.

6.    Whether any written materials or other physical evidence
      is available to support the allegation(s).

7.    What impact the alleged conduct had on the complainant.

Obviously, the supervisor should be sensitive to the nature of
the complaint and be as compassionate and supportive as possible.
The supervisor should stress that he or she will maintain
confidentially to the fullest extent possible, but in no way
should the investigator insure anonymity to the complainant or
guarantee that confidentially will be maintained.  Complainants
who request that no investigation be conducted or that the
Division take no action in the matter should be advised that the
Delaware State Police has the obligation to investigate the
matter and to take necessary action to insure that the violation
does not occur again.

The Supervisor should next interview the alleged policy violator(s)
following the conditions established by the Police Officers Bill of
Rights and as defined in the Administrative Manual.

The Supervisor should not identify the complainant unless it is
essential to the allegation(s) being made, but should provide
sufficient information about the allegation to allow a response.

VII-3-14

If appropriate, the individual alleged to have violated policy should be asked to provide an explanation of the behavior, identify any witnesses to the behavior, and provide any facts that may support his or her belief that the complainants motives are less than pure.

Also if appropriate, the alleged violator should be asked if he or she is aware of and fully understands the Division's policy, whether he or she has attended training relative to sexual harassment laws and/or the policy on improper workplace behavior. Lastly, the supervisor should discuss with the alleged violator the Divisions guarantee of no retaliation to any employee who in good faith files a complaint of sexual harassment or improper workplace behavior.

The supervisor should interview witnesses to confirm the complainant's and the alleged violator's statements and attempt to clarify information that will differentiate between the statements of the parties or provide better understanding of the nature, tone, motivation, and setting of the incident. The supervisor should re-interview witnesses, and the parties as necessary.

Following investigation, the supervisor should advise the complainant of his or her findings and any actions, which will be taken against the other party. If no disciplinary action will be taken, the supervisor should explain to the complainant the inconclusive nature of the investigation. The supervisor should again explain the Division's policy against retaliation and advise the complaint that the alleged violator has been advised not to retaliate in any manner. The complainant should be advised to report any acts that he or she would deem to be retaliation.

The alleged violator should be advised in writing at the conclusion of the investigation. The document, regardless of findings of the investigation should reference the Divisions policy guaranteeing no retaliation toward a good faith complaint of improper workplace behavior. Should the investigation substantiate improper workplace behavior, the supervisor should issue summary discipline in accordance with the Rules and Regulations of the Division. The violator should be advised that any retaliation against the complainant or other employees or any further acts of improper workplace behavior will lead to more severe discipline.

VII-3-15

Finally, the supervisor should follow up with remedial actions. Occasionally question the complainant to insure that the actions taken have been effective in resolving the issues and that no retaliation is occurring. Provide closer supervision of subordinates found in violation of improper workplace behavior policies. Assume a greater awareness of the environment and interactions of employees within the workplace. Training and addressing general issues of workplace behavior and sexual harassment issues at line-ups, Troop and Section meetings can be effective in insuring that employees understand and respect the policies.

If at any time during the investigation, the supervisor believes that improper workplace behavior has occurred, or may have occurred, to the level of sexual harassment, the supervisor should notify the Troop Commander/ Section Chief who in turn will notify the Director of Human Resources.

**SEXUAL HARASSMENT COMPLAINTS:**

The Director of Human Resources shall investigate or cause to be investigated:

1.  All allegations of improper workplace behavior that are sufficiently severe to constitute sexual harassment;

2.  All allegations of improper workplace behavior constituting a possible second offense of the policies;

3.  All allegations of retaliation for having made a complaint of sexual harassment or improper workplace behavior;

4.  All allegations of sexual harassment as defined above by federal and state law.

The Director of Human Resources will employ the services of the Internal Affairs Section and/or external resources to assist in the investigation of complaints. All investigations of sexual harassment and improper workplace behavior will be conducted in accordance with the Police Officer's Bill of Rights and other applicable rules of the Division.

VII-3-16

**THE EMPLOYEE'S RESPONSIBILITIES:**

Quid pro quo sexual harassment exist when submission to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature is made, either explicitly or implicitly, a term or condition of employment or when submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual. If you are being subjected to quid pro quo harassment, you should confront the harasser and clearly state that the behavior offends you. Write down what happened, where and when it happened, and who witnessed it. Next, report the behavior immediately to the proper authorities. Quid pro quo harassment is illegal behavior as soon as it is practiced.

Sexual harassment in the form of a hostile work environment exist when unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. Again, the victim should confront the harasser and clearly state that the behavior is offensive and unwelcomed. If the harasser fails to stop the behavior, or if the conduct is severe, the victim should report the behavior to the proper authorities.

Repeated offenses of improper workplace behavior can lead to a hostile work environment and therefore constitute illegal sexual harassment. Again, the affected employee should keep a record of what happened, when and where it happened, what response was given to the harasser and by the harasser, and who witnessed the behavior.

Upon filing a complaint with a supervisor or the Director of Human Resources, the complainant should be advised that pursuant to federal law, a victim of sexual harassment may file a complaint with the Equal Employment Opportunity Commission. A complaint must be filed within 300 days of the illegal act. In accordance with the laws of the State of Delaware, a victim may file charges of sexual harassment with the Delaware Department of Labor, Office of Labor Law Enforcement, Anti-discrimination Section. The complaint must be filed within 90 days of the illegal behavior. However, it is important that an employee advise the Division of any sexual harassment or improper work

VII-3-17

behavior that is occurring within the workplace.  While the
Division attempts to be proactive and prevent such conduct from
occurring through policy, training, and participative management,
awareness of problems that may occur and the ability to
thoroughly investigate and take corrective action is essential to
assuring a professional, hostility free work environment for all
personnel.

This policy is intended to include all uniformed and civilian
employees, temporary and casual/seasonal employees, cadets,
interns, contractors, subcontractors, and members of the public
interacting with Divisional employees.  This policy applies to
all communications whether initiated or transmitted on to others,
whether verbal or nonverbal, in person or by mail, telephone,
electronic mail, voice mail, facsimile or other form.

**Colonel Gerald R. Pepper, Jr.**
**Superintendent**

**Revised: February 1, 2000**

VII-3-18

*P LF*

EXHIBIT NO. *19*

KWP *6-9-05*

**From:** Harrison Pamela R (DSP)
**Sent:** Tuesday, May 17, 2005 14:25
**To:** DSP_Users
**Subject:** Invitation

This message is sent authority of Colonel Thomas F. Mac Leish

<<Col Chaffinch Retirement Flyer.doc>>



## YOU ARE CORDIALLY INVITED TO A
## RETIREMENT CELEBRATION FOR

# COLONEL L. AARON CHAFFINCH

## CELEBRATING 27 YEARS OF DSP SERVICE

**WHERE:**    Marvel Carriage Museum
South Bedford Street, Ext.
Georgetown

**FOOD:**    Lt. Rick Chamberlin will prepare his famous roast pig and Lt. Mitch Cooper will be frying chicken. There will be various side dishes. Plenty of good food in true Sussex County fashion!

**DRESS:**    The dress will be casual

**BAND:**    Randy Lee Ashcraft & the Saltwater Cowboys

**FRIDAY, JUNE 10, 2005 at 7:00 p.m.**
**$20.00 Per Person**
**$40.00 Per Couple**

**RSVP BY JUNE 1, 2005**

---

**FOR TICKETS CALL:**

Lt. Mark Rust, 337-8251
Lt. Gary Kresge, 761-6677 ext. 212
Sgt. Doug Hudson, 644-5020
Cpl/3 Billy Porter, 739-3990
Pam Harrison, 739-5911

**MAKE CHECKS PAYABLE TO "Troop 5 Admission Fund"**

A400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1394-GMS** |
| **individually and in his official capacity as the** | : | |
| **Superintendent, Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as the Deputy Superintendent,** | : | |
| **Delaware State Police; DAVID B. MITCHELL,** | : | |
| **individually and in his official capacity as** | : | |
| **Secretary of the Department of Safety and** | : | |
| **Homeland Security, State of Delaware; and** | : | |
| **DIVISION OF STATE POLICE,** | : | |
| **DEPARTMENT AND SAFETY AND** | : | |
| **HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |

### PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff, by and through her attorneys, hereby objects to Defendants' First Set of

Interrogatories Directed to Plaintiff ("Discovery") in accordance with the numbered paragraphs

as set forth below. Plaintiff reserves the right to amend or supplement the responses contained

herein as may be necessary or appropriate in the future.

Discovery has not concluded in this case. Plaintiff reserves the right to supplement her

responses at a later time as discovery is completed.

-1-

A401

## GENERAL OBJECTIONS

1.    Plaintiff objects generally to Discovery insofar as it requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product, or which are otherwise privileged or protected and not subject to discovery.

2.    Plaintiff objects generally to Discovery to the extent that it seeks information not relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff objects generally to Discovery insofar as it requests information or documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.    Plaintiff objects generally to Discovery insofar as it  requests personal or confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.    Plaintiff objects generally to Discovery insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b). Plaintiff will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

6.    Plaintiff objects generally to Discovery insofar as it seeks discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure

-2-

A402

and either cannot be produced without agreement of a third party or cannot be produced without an appropriate stipulation and order of confidentiality.

7.    Plaintiff objects generally to Discovery insofar as it is unduly burdensome because the discovery it seeks is already in the possession, custody or control of defendants.

8.    Plaintiff's responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    Plaintiff objects to Defendants' definitions and instructions insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the case law in the Third Circuit.

2.    Plaintiff objects to Defendants' definitions and instructions to the extent they imply an obligation to supplement answers to Discovery which impose upon Plaintiff an obligation beyond that required by Fed.R.Civ.P. 26(e).

3.    Plaintiff objects to Defendant's definitions and instructions insofar as they would require counsel for Plaintiff to disclose their mental impressions, conclusions, opinions or legal theories in violation of Fed.R.Civ.P. 26(b)(3).

4.    Plaintiff objects to Defendants' definitions and instructions regarding claims of privilege insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the applicable case law.

5.    Plaintiff objects to the extent that Defendants' definitions and instructions cause each interrogatory to ask multiple questions.

-3-

A403

## OBJECTIONS TO SPECIFIC INTERROGATORIES
## (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1. Identify by name, address, phone number, location, date and persons present, all individuals who have been interviewed by you in connection with this matter and whether any documents or memoranda were prepared relating to that interview.

**Answer:** None.

2. Identify each and every document, photographs, videotapes, audio tapes or any other form of recording media, or other item of evidence that you intend to use in this lawsuit, for any purpose, including, but not limited to, cross-examination, during any pretrial or trial proceedings, either as exhibits, for purposes of impeachment, or as demonstrative evidence.

**Answer:** Objection. Overbroad and premature. This request is beyond the scope of the discovery rules and the pretrial procedures which will govern the preparation of the pretrial order. In accordance with the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware, at the time of the preparation of the pretrial order the trial exhibits and demonstrative evidence will be identified. Impeachment documents are unknowable until a witness contradicts himself from the stand. Additionally, discovery is just beginning and the record in this regard remains to be developed. Moreover, this question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.P. 26(b)(3).

3. For each claim you are asserting in this matter, state with particularity and

-4-

A404

specificity the complete factual basis for each allegation and identify all persons having

knowledge of facts supporting the allegation, as well as all documents or other items of

evidence in your possession that relate to each claim.

**Answer:** Objection. Vague, overbroad, unduly burdensome and premature.

Additionally, discovery is just beginning and the record in this regard remains to be developed.

Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions,

conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.P.

26(b)(3). Subject to and without waiving these objections:

See the lengthy depositions that have already been taken in this case which multiple

defense attorneys attended. Additionally,

(a) For Count I of the Amended Complaint, by substantive paragraph, plaintiff responds

as follows:

### (1) ¶ 10 - Foundation of Contacts with Chaffinch.

Prior to being assigned to Troop 5, I did not know Aaron Chaffinch.

I met him once I became employed with the Delaware State Police in 1983 or the latter

part of 1982, when I probably actually met him.

He was a patrol officer and my recollection is that he would have been a Trooper First

Class at that point.

He was a long-term member of the free masons and I was taunted and teased when I

arrived at Troop 5 and began my assignment there. The members of my shift at the time and

Chaffinch taunted and teased me. Additionally, I and others were required to engage in the

obscene sexual simulation known as the "Bridgeville handshake" as my initiation at Troop 5.

-5-

A405

As seen in paragraph 10 of the amended complaint my career has tracked that of the Colonel. Starting with my first assignment in Bridgeville at Troop 5 my and Chaffinch's careers have mirrored each other because of the amount of frequency and contact that I've had with him and the number of times that I've heard inappropriate language and comments from him.

I started at Troop 5 which was in 1982 and was there through 1993 as a patrol officer and, at that time frame, Colonel Chaffinch was also an officer who was assigned to Troop 5. We worked in the capacity of shift mates a large amount of that time, members of the same troop, and in addition to that, during time frames and I don't have the exact dates for his career, but there were times that he was given other assignments such as the Strike Force and so forth. But, Aaron has always lived in the Bridgeville area. And as a result of that, the Colonel has frequented Troop 5 on a regular basis whatever his assignment may be at that time. So even the periods were I was at Troop 5 and he may have been assigned somewhere else, we still had what I would call almost daily contact with him of some form. As the career continued, our paths crossed a number of other years in that I was a Sergeant at Troop 5 while he was a Lieutenant at Troop 5. I was a Lieutenant at Troop 5 while he was the Troop Commander at Troop 5.

Once I was assigned to the Headquarters complex, he had already been assigned to the Headquarters complex. So for that last four-year period of time, we've both been working out of this facility so I would estimate that probably, with the exception of about 2-1/2 years that I was assigned solely to Troop 3 in Woodside, I have had probably for the better part of 18 years, somewhat daily to regular contact with this individual as a course of our career path.

Just to clarify, I am at Bridgeville, Troop 5 for 11 years (1982 to 1993). Then I am back again at Bridgeville for some period of time between 1993 and 1997 as a Sergeant. I was at

-6-

A406

Troop 3 for about six months in 1993. Aside from that six months, the rest of the time is at Troop

5. Then I am back to Troop 3 from 1997 to 1999. Then I am back as a Traffic Lieutenant in

Bridgeville and Captain Ralph Mitchell is the troop commander there, in 1999 to 2000.

There was a time when Chaffinch was Troop Commander there also and I was under him.
When Captain Mitchell was there, the Colonel was a Traffic Lieutenant at Troop 5 also and then

he left for a brief period of time, I believe to come to Headquarters for an assignment, and then

ultimately he came back and replaced Captain Ralph Mitchell as the Troop Commander while I

was still at Troop 5. So I was at Troop 5 when he was the Troop Commander also. And then

eventually sometime in 2000 he came to Headquarters.

Between 2000 and 2004 I have been at Headquarters the whole time.

### (2) ¶¶ 31-35 - Member of the Masons.

In these years of contact I became aware of the fact that Colonel Chaffinch has been a

long-term member of the Mason organization, a sub-component of that being the Delaware

Shield and Square which is a law enforcement component. You must be a current or Retired law

enforcement officer to become a member. When I worked on the shift with him, as well as at

Troop 5 with him in the early years of my career, it was made quite clear to me by him and some

of his other associates that this was an organization that did not allow in women. I was taunted

and teased about the fact that everyone on my shift was a member at this one particular time of

the Masonic organization and that I could not become a member. However, I could become a

member of what would be an equivalent to like a ladies auxiliary at the fire company in that they

have an Eastern Star organization which is just for the woman and that maybe I could join that

sometime and help cook meals for the males. So I wasn't appreciative of that at the time. I didn't

-7-

A407

say anything about it at the time because of the ramifications of speaking out about such things. But it was talked about quite frequently. They talked about going to meetings. They talked about their various degrees and recitings that they have to pass in order to move up within that organization. Over time I also heard that blacks were not allowed to be a member of the free masons as well although they do have their own sub-chapter that they can become a member of on their own. It's a sub-set with a separate charter completely.

Over the years, I've heard a lot about that and most recently the fact that Chaffinch received what is known as the 33rd degree in masonry which is supposed to be bestowed upon someone who has long standing in the organization and is an exemplary member of the community and other such attributes. This was confirmed by a newspaper article that was out on Election Day of 2004, that he was a member of that organization and that he did receive the 33rd degree award during this year. I was aware that he was going to, I believe Wisconsin, to receive that degree. I did some research on the internet into the free mason organization to verify that this information was correct and that information is true that this organization does not allow in women nor does it allow in black males. Some other states allow black males to participate in some of their ceremonial activities but Delaware does not.

And, I believe that this has become an ingrained part of the Colonel's mentality and that he brings that mentality to work that women and other minorities are to be excluded. And he has been a member for that as long as I can remember gone back to when I first came on the job in 1982.

There was a conversation was with Lieutenant Brown, I believe at Troop 5, that Aaron was taken back a little bit by this 33rd degree ceremony out of state because he was surprised that

-8-

black males were in attendance. And that's because in that particular state they are allowed to

participate in some of their ceremonial activities. And they've allowed those two charters to

attend ceremonial things even though they would be separate memberships and he was a little bit

stunned or taken back by the fact that they were in attendance because he's not use to that in

Delaware.

I learned that through Captain Glenn Dixon.

Probably by at least 1983 I first learned Chaffinch was involved in the masons. A large

part of 1982 was field training and so forth in the Police Academy and everything so, probably

within the year 1983 would have been when I first actually heard about it. When I was actually

assigned a shift and so forth.

I had the specific conversations with Aaron Chaffinch in those early years regarding the

free masons that I've already talked about, where he explained what the free masons were to me

and that I could not be part of it. These were conversations that I was privy to because I was

there. Where he and other members are talking about meetings that they're going to have, events

or ceremonies that they're going to have, recitings. They would practice at the troop from time to

time. They would go back in the back room, close the door, and practice these recitings that they

have to give in order to get, they have first, second, and third degree mason and they have to do

certain components in order to advance throughout that organization. And my understanding is

that they're, I wouldn't call them poems, but they're recitings of some type because they would

practice at the troop often times but I was never allowed to be included in that. I just knew it was

going on and they would go back in one of the back rooms, close the door, and practice.

They would talk about it while they were working on duty. I would say that most likely

-9-

A409