because I've been a Traffic Lieutenant since 1997 up through 2000, and even before that I can remember there being monthly traffic meetings and those were generally run by the Director of Traffic and all the Traffic Lieutenants were required to attend. And this monthly meeting - there have been times when they've skipped a month or back and forth maybe made it quarterly or might have skipped a meeting here or there, but generally speaking, they were monthly meetings. And they only dealt with traffic related issues and the Director of Traffic had the benefit of at least two hours maybe three to pass on pertinent information. Make sure that they had the right information that they needed to run the operations at the troop level. This tradition continued up through and including when Pepper was the Colonel.

And shortly after Colonel Pepper left and Chaffinch took over within a matter of months they had completely done away with the separate meeting and said that it would be incorporated into the monthly Commander's meetings. This makes it extremely difficult for me to clarify information for the Traffic Lieutenants and make sure that they have the right information, they do the right reporting, and so forth.

And, this is during a time frame where we have more money being filtered through my section then ever before for a multitude of mobilizations and initiatives and so forth and grant money. Although they stated that they were going to incorporate into the Commander's meetings, I get a - sometimes I don't get to speak at all. Other times I get a bare minimum of five to ten minutes at the most to pass on some information and it's very general in nature. The meetings before were used for very, very specific purposes where we could go over case law. We could go over reporting procedures. We could go over a wide variety of things that may be an issue at the time. And, I don't get that housekeeping type of time in these Commander's meetings because

-41-

A441

they're largely criminally oriented. They are very lengthy and I just am not afforded an opportunity to hardly pass on anything and obviously there's no time for any kind of housekeeping type issues about, you know, all the particulars of some overtime reporting and statistical reporting and things of that nature.

This makes it more and more difficult to be efficient at the job and the procedures involved there. They started to completely ignore passing on some elements of what we were passing on prior to that and I told them at the very beginning of that year which was 2003 that the less and less they focused on traffic, the less and less tickets would be written, etc. etc. It bleeds all the way down to the line and fatals would go up as a result. They blew me off, the Colonel blew me off, Lt. Colonel, all of them pretty much ignored it until they got to the end of 2003 and fatals were up and then they started to panic. We talked a little bit more about traffic in the meetings than they were doing before but I still was not given back the separate meeting like I had asked for.

Previously we went over it in great detail before where we presented a monthly power point where we showed every troop individually, what their crash data was, what their traffic arrest data was, where they were low, where they were high, all that detail gone. And as you all know, traffics a little bit of a hard sell anyway, and you, and they have to feel a slight degree of attention and pressure to make sure they maintain that aspect at the lowest, lowest levels of the troop in order to maintain the production that you need to make a difference.

C. As recently as October 2004 they're now failing to even let me know about some traffic related events. There was a dedication having to do with a memorial at DelDot related to victims of fatalities within the state. We were invited through the staff. They received the initial

-42-

A442

invitation but even though it was traffic related I received no invite from the staff to go. I was not even told that it was taking place until I saw about it in the paper the next day which is highly unusual. The Colonel attended, left his own Commander's meeting to attend rather than send the Director of Traffic to this ceremony that was held at the rest stop in Smyrna.

D. Then in 2003 the fatals went up while in 2002 there was a drastic decrease - drastic for our state and about a 9% decrease in fatalities and a lot of other good things that came out of the traffic section. That leads me to another example of not getting any recognition or anything. I was submitted for an award for my section and from what I've been told, Mark Seifert was trying to get us recognized for the (1) decrease in fatalities, and (2) the increase in equipment and (3) increase in grant funding and so forth, just overall some of the reductions that we had in pedestrian crashes and a lot of things. Basically, the Colonel decided that it wasn't something that they were going to give an award for and I received a notice from Major Seifert that I would get the Divisional letter that everybody typically gets if you're submitted but you don't fit the guidelines according to them for getting an award.

E. He also placed Lieutenant Brown in a Traffic Lieutenants position. He's largely had a criminal background and he is probably not overly happy about the position that he got. But at any rate, at one of the meetings when he first took over they even laughed and made fun of traffic in that Kurt Brown said something like, you know, traffic is my life you know so I'm gonna go out and even put a radar on my dash and go out there and write a few tickets.

And they all laughed at this open meeting and, it really diminishes your authority and things and what your mission is. When they laugh and make fun and tease about the whole issue of traffic safety.

-43-

A443

I even had to address an issue with Lt. Colonel MacLeish because he was making fun of the Traffic Section for all the travel that we attend. And, basically it is also part of historic record that there are several functions every year that the Traffic Sections involved in; one being the CARE conference, Traffic Records Forum, Lifesavers, and a couple other things, and over the last couple of years they've added a few things through the federal NITSA organization. They have some smaller, what they call summits.

So through the grant writing that I do, I have obtained a lot of funding to be able to send ourselves and a lot of people even at the troop level, to these summits and they're almost like a quasi pep rally. They're to get people prepared and geared up for events like Click-It or Ticket, other occupant protection initiatives, DUI mobilizations like Check Point Strike Force and so forth.

So when I walked into one of the Commander's meetings, it was right after MacLeish was appointed Lt. Colonel. He walked in the meeting and he was going around so we're talking -- early summer of 2003. He came into that very next meeting after that announcement was made and he was kinda going around the room and, you know, looking for people to shake his hand and congratulate him and all this kind of stuff and he made it around to me and when he got to me he looked at me and said, oh, it's the travel section. And, I looked at him and at that point was offended because I think it's a good thing to get that money for training and so forth and I didn't invent travel for the Traffic Section. That's why Aaron liked being in Traffic because he got to travel all over the place.

### (19) ¶¶ 98, 99 - Ignored the Bradley Report.

Chaffinch also has blocked the recommendation of the Bradley Report that a roundtable

-44-

of women in policing be convened to address issues unique to women in law enforcement in the state police and strategies to address those issues. Former Lt. Colonel Thomas Marcin tried to implement this recommendation but since his retirement, Chaffinch has ignored the recommendation of the Bradley Report at 47.

I read the report and I know that it was in the report that they were to have some type of roundtable that dealt with the women in policing. Before Lt. Colonel Marcin retired, he began to try to implement this component of the report. He came to me and asked me to get together some information, write down some concerns or some topics to maybe be discussed, pick a date and meet with the female troopers to get this roundtable started. And, we did that. In furtherance of that I ran some informational stuff that I had from some of the women in policing conferences that I had attended and so forth and put together this meeting. Even that meeting was hard to put together from some aspects because a lot of the women as so afraid to be singled out for even a meeting like that. But we did put the meeting together and we met one time. Several issues were addressed. One was their lack of support for sending women to some of these conferences like the annual MAAWLE conference, which is an organization of women in law enforcement in the Mid-Atlantic region. And that was addressed, the issue of the fact that there was no female bathroom at the range was addressed, and shortly after that was remedied as a result of this initial meeting and so forth.

And, of course, the plan was for this to follow-up and be a regular component of repair for the agency and since Lt. Colonel Marcin left - nothing. I've heard nothing about it. No attempts by any of the staff has taken place to try and continue that, or re-vamp it, get it reorganized or anything of that nature.

-45-

In addition to that, they were supposed to create a diversity committee which, from my perspective, includes women and minorities. There was a very lame attempt at having a study circle meeting with the minorities and they broke that down into what is supposed to be a one to two week event - training event - they broke that down into two 4-hour sessions with a day in between and they didn't even attend all of the second half of the session because they said they had a meeting with Governor who was the person that ordered that they do this in the first place. So we were left there myself, Captain Downes, Captain McQueen, and Major Baylor very disappointed in the fact that they set this thing up and they - they short-changed it so greatly and then the Colonel and the Lt. Colonel leave early.

### (20) Other Sexually Inappropriate and Gender Based Activity.

Thinking about the big picture of his conduct towards me since I've been in the DSP, I can say the following. I remember during the first two years I was on the job, Chaffinch worked on my shift. I remember being invited to a pool party at our Sergeant's house in approximately 1983. On numerous occasions over the years since then, Chaffinch has repeatedly told me that he would never forget that black bathing suit I wore to that party and how he really wanted to move in on me.

Other times, he would inexplicably buy me presents, always out of the blue. For example, he once bought me earrings - little gold hoops with red hearts that were interchangeable. I always thought that was a bit odd of a present for a boss to give your subordinate.

Other times, he would go on bragging about how Miller is his favorite beer. And then would walk up to me and say "it's Miller time." Chaffinch knows that my maiden name is

-46-

A446

Miller. And often when he would say this to me, he would say it with a smirk and a smile on his face, implying a certain sexual connotation.

He also comes up with little "cutesy" nicknames for me like Barbarica, which he shortens to Rica.

The list goes on and on.

### (21) Other Inappropriate Activity.

As I said before, in some of the limericks he talks in ebonics and things like that which is not right but also, there's been a couple incidents over the year, some very recently that I don't think were appropriate relating to race. I think that there's been other incidents and I think that Major Baylor and Captain Warren are both familiar with some racially, inappropriate comments by him as well.

For the ones that I know about personally. One incident is - goes back quite a few years. But it's a story that he's continued to tell or make fun of in some vain ever since. Back in the days when he was at Troop 5 as a Corporal and I think it may have been for his work in the area of DUI. He received an award from an organization called the Black Ministers Who Care. He attended this ceremony and when they called him up to give him his award, they messed his name up. And instead of saying Leonard Aaron Chaffinch or Aaron Chaffinch, they said Leonard Aaron.

And he has relayed that story to me on numerous, numerous occasions more than I can count. He's either relayed that story or repeated the story and repeated it for numerous people at Troop 5. Again that same list of people we've all heard him do this and he will talk in ebonics and he will mock this organizations leadership in the way in which they presented this award to

-47-

A447

him. Much like this he would say, what from the black ministers who care we would like to present this award to Leonard Aaron. And that is just the biggest deal to him to repeat this in ebonics, or in what he would consider to be their manner of speech and make fun of this organization.

Here they are presenting him an award and he's making fun of the fact about the way they talk and the way they messed up his name and the way they enunciated his name and so forth.

Another incident: he has over the years repeatedly again, same type of situation, made fun of a female rape victim from Coverdale Crossroads a largely black community. At the scene the investigator asked her where she had been raped, meaning a street location, like on Second Street or I was raped at my house or whatever, but instead she pointed to her genitals and said right here in my mess. And I don't know if Aaron was present when that was done or if he heard about it but he has repeated and told that story ever since, again, from that same time frame all through his career with the same thing that he has to mock the tone, mock the enunciation, and so forth and basically make fun of this black female that who was raped at Coverdale. Like how stupid could she be to say that when they meant what location were you raped. Obviously they knew it was there and so forth and he has done that over the years repeatedly.

The most recent incident took place at the Traffic Records Forum in July of 2003. He was attending with Major Hughes and Major Baylor. Major Hughes - it had just been announced that he was going to be the next Major and it had just been announced that he was obviously bypassing Major Baylor and making Marcin the Lt. Colonel. So it was within a matter of a few days of that announcement being made.

They were attending, in Colorado Springs, an FBI function. Myself, Lieutenant Dixon at

-48-

the time, and Ret. Major McDonald were attending the Traffic Records Forum in Denver. So

because we were all within about a half hour to forty-five minute drive of each other, before we

left there, there had been conversation about maybe meeting for dinner one of those nights. Well

we kind of were hoping that he wouldn't call at all, I mean, we could do our own thing and there

were DelDot people there too. And we didn't really want to just leave them and go off but at any

rate on the last night that we were going to be there they did get up with us. Contacted us, I think

through Dixon's cell phone and asked us if we wanted to meet. Karen Chaffinch was with Aaron.

So we said well yeah I guess since they called we'll go ahead and meet them for dinner or

whatever. So, the three of us met them halfway between Denver and Colorado Springs and

went out to dinner with Colonel Chaffinch, Karen Chaffinch, myself, Captain Dixon, Major

Baylor, and Major Baylor's young daughter.

    So we're sitting there. We're having dinner.  At any rate we're sitting there and you

could just tell that, you know, he was in rare form.  He's very loud. Almost a little sarcastic that

night and I think it was partly because he's sitting there with Major Baylor who he just bypassed,

he's sitting across the table from me who he just bypassed, and promoted R. L. and I think he was

in an uncomfortable circumstance to some degree and he was trying to compensate for it. So in

the course of the evening he's talking and joking around and I don't remember any of the specific

jokes just acting, you know, belligerent and silly overall and he starts telling about being

classmates and kind of reminiscing a little bit with Major McDonald who was there and different

things about that.

    And he starts telling a story about Ronald Gaines who was a black trooper, retired now,

and they were actually academy classmates. And he starts recounting this story and he goes right

-49-

into telling about the fact that his middle initials were "LW" and from the Academy on they called him "Ronald Loves Watermelon Gaines".

So he's recounting this story at the table where Baylor and his daughter were sitting. And, I was just stunned and, Mike McDonald was looking at me and Glenn's looking at me and I'm just like - you almost couldn't believe it was happening in front of your eyes. And Karen actually elbowed him and he looked at her and went, what, and then she said made some kind of a noise or a face at him or whatever and he said, oh Dave doesn't mind he's my bud. And at that point Dave didn't say anything he just looked at him and they - he just went right on telling about the story and the conversation and everything and, you know, me and Glenn and Mike McDonald all talked about it on our way back to the hotel that night that we could not believe that he did that at all let alone in 2003 he would even bring up this story again and tell about it.

I had heard him refer to that before over the years but it had been a while. And, again, that he would tell it in the first place, let alone tell it in front of Dave Baylor and his daughter who's only like 12 or 13 and but certainly old enough to understand that stereotype. And Dave never said anything about it to him, you know to his face that I know of. He did talk with me about it afterwards and he was like, I just take it all in and keep it in my mind and it was wrong and he was offended. But again, he's in this situation where here he is, he's one of his staff members, and, what are you supposed to do.

So we were just all stunned and appalled and a lot of talk on the way back to the hotel about it. The fact that he was going to, if he continued that kind of behavior he was going to bury himself. And there were already several suits against him already. We were going through all this issue with the Bradley Report and everything else and he just put it right out there.

-50-

In addition to that, that same night, at the same table, he - he just was terrible to the waitress, just disrespectful and just what I would consider tormenting her all night, being silly and things like that. And, you could tell she was frustrated with him. And Karen looked like she was disgusted with him that night too but, she's married to him.

When the waitress came to take his plate, he had steak that night and he had left some of it on there and he handed it back up to her and again he said, here I've had all I can handle give my leftovers to the starving Ethiopians. And that was after the other statement that he had done and I was like. I mean it just kept getting worse.

I also recall from Capt. Greg Warren vaguely that he had some incidents where both himself and Ralph Davis were embarrassed at a couple of police related functions like the Mayor of Dover Prayer Breakfast where Aaron was relaying some type of story having to do with Aunt Jemima or he was speaking in an Aunt Jemima voice. That he was talking in ebonics again and Aaron's very loud when he is in that mode. They were embarrassed and they said to me that if they could have sunk down into the floorboards and disappeared that's what they would have done because they could not believe how loud he was and there were other minorities there that they were afraid were gone over hear him and so forth and they were just, offended by his behavior and didn't really know what to do.

They were embarrassed for him to be our Colonel. And I have to say that would be my conclusion as well. You know, he's just, in my viewpoint, he's a disgrace on so many levels that it's unbelievable to me.

(b) For Counts II and III of the Amended Complaint, plaintiff responds as follows.

-51-

A451

See Answer to Interrogatory # 7 below. See the depositions of defendants and their DSP employees that have already been taken in this case. Additionally:

Defendants Chaffinch, MacLeish, Mitchell and their agents were greatly angered and antagonized because Captain Conley had invoked her protected First Amendment rights to file this lawsuit against Chaffinch. Because they were so angered and upset by this, they and their agents set out to punish and destroy her in retaliation for filing this lawsuit.

First, in violation of state law, they released confidential and statutorily protected information from Captain Conley's internal affairs file to the Delaware media.

Second, again in violation of state law, as well in violation of the DSP's own policies, procedures, past practices as well as several DSP Rules and Regulations, defendants and their agents publically discussed the contents of this confidential and statutorily protected internal affairs information with the Delaware media.

These actions opened pandora's box as the media then began to run the first of numerous news stories about the information, destroying Captain Conley's good name and reputation statewide, as well as in the close knit law enforcement and traffic communities.


4. List by name, address, occupation, and employer each and every witness which you expect to be called to testify at trial on behalf of the plaintiff, and indicate the paragraphs of the amended Complaint as to which each witness will testify.

**Answer:** Objection. Any identification of trial witnesses is premature prior to preparation of the pretrial order. Fact witnesses already have been identified in the Rule 26 disclosures. For facts of which these witnesses are aware see the answer to interrogatory 3 above

-52-

A452

and the lengthy depositions that have already been taken in this case which multiple defense attorneys attended.

5. State and identify by names of parties, court or administrative body and case number all civil lawsuits or legal proceedings, at law or equity, of any nature in which Plaintiff, Barbara Conley was a party, and the current status or disposition of each such matter.

**Answer:** None.

6. As to those individuals who held the rank of Captain in the Delaware State Police in March and August of 2003, identify those individuals who the plaintiff contends were [a] more qualified, [b] equally qualified, and [c] less qualified for promotion, as compared to herself, to the rank of Major at that time.

**Answer:** Objection. This question is irrelevant and is not reasonably calculated to lead to the discovery of relevant or admissible evidence. Plaintiff is proceeding on a pretext theory, not a mixed motive theory.

7. Identify each and every confidential record from the Internal Affairs investigative file on Barbara Conley that the plaintiff contends was provided by Defendants to the news media including, but not limited to, Tom Eldred of the Delaware State News.

**Answer:** Objection. Discovery is just beginning and the record in this regard remains to be developed. Additionally, defendants have maliciously refused to allow plaintiff to even obtain her own personnel file. Subject to and without waiving this objection:

-53-

(1) The first item of confidential information defendants provided to the Delaware news media was the internal and confidential e-mail sent by Capt. Paige to DSP Users on Monday, October 25, 2004 with the subject of "Divisional Trial Board." This internal and confidential DSP document is protected from disclosure and contains confidential internal affairs information protected by the Law Enforcement Officers Bill of Rights, 11 Del.C. § 9200, et seq., as passed by the Delaware General Assembly. It also is explicitly covered and made confidential by DSP Rules and Regulations #'s 10 and 18, among others. Furthermore, because of defendants' malicious retaliatory intent to harm Capt. Conley by releasing this e-mail to the Delaware news media in retaliation against her for filing a lawsuit against defendants, defendants' actions also violated the Free Speech and Petition clauses of the First Amendment to the U.S. Constitution.

(2) The second item of confidential information defendants provided to the Delaware news media is as follows. After providing internal and confidential item #1 to the Delaware news media, defendants then continued and violated:

(a) their own past and current practices,

(b) their own past and current procedures,

(c) their own past and current policies,

(d) DSP Rules and Regulations, and

(e) the Speech and Petition Clauses of the First Amendment to the U.S. Constitution,

by publically discussing and disseminating the contents of this confidential internal affairs document to the Delaware media in order to retaliate against Capt. Conley for standing up for the rights of employees to be free of illegal, inappropriate and harassing behavior in the workplace.

-54-

A454

Defendant Chaffinch's inappropriate workplace behavior that Captain Conley was opposing included sex discrimination, sexist jokes and comments, racist jokes and comments, and all of the many other types of inappropriate workplace behavior engaged in by defendant Chaffinch, behavior which violates, among other things, the Fourteenth Amendment to the U.S. Constitution, numerous federal and state civil rights laws, numerous DSP Rules and Regulations, the DSP Sexual Harassment Policy and the Law Enforcement Code of Ethics and its Ethical Canons.

8.   Identify the date, time, and place (e.g. at home, at her DSP workstation, etc.) where Captain Conley received the original electronic mail message issued by Captain James Paige on October 25, 2004 regarding the scheduling of her disciplinary hearing and the composition of her trial board.

**Answer:** To the best of Captain Conley's recollection, she received the e-mail from Captain Paige either late in the afternoon of the date it was sent or early the next day, in either case, at her workstation at Headquarters.

9.   As to the electronic mail message referenced above (Interrogatory #8), indicate any and all persons to whom Captain Conley forwarded, copied, or otherwise provided the text of said message, and the date, time, and place of such transmission[s] or copying.

**Answer:** Captain Conley did not forward the e-mail to anyone. Indeed, she did not need to because it had been sent to the entire Division. Additionally, she made copies for her own personal records.

-55-

A455

10.  To the extent you contend that a named defendant violated the plaintiffs clearly established constitutional rights, state with particularity and specificity for each defendant the right(s) violated, the bases for your contention, and identify the individuals with knowledge, documents or tangible physical evidence that support you[r] contentions.

**Answer:** Objection. Premature. Discovery is just beginning and the record in this regard remains to be developed. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.P. 26(b)(3). This question also calls for a legal conclusion. Subject to and without waiving the foregoing objections:

**A. Introduction.** Qualified immunity is a two part inquiry. Atkinson v. Taylor, 316 F.3d 257, 261 (3d Cir. 2003) (noting that the Supreme Court reaffirmed the "two-part inquiry" in Saucier v. Katz, 533 U.S. 194 (2001)). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" Atkinson, 316 F.3d at 261. Upon meeting this threshold, the court must next decide whether the right allegedly violated was a clearly established one. Wilson v. Layne, 526 U.S. 603, 609 (1999). "Whether a governmental official is entitled to protection under the doctrine of qualified immunity is a 'purely legal question.'" Rogers v. Powell, 120 F.3d 446, 454 (3d Cir. 1997).

The Constitutional rights at issue are plaintiff's Fourteenth Amendment right to be free of illicit gender discrimination and her First Amendment rights to be free of retaliation for exercising her rights to freedom of speech and to petition the government for redress of grievances. So the test for qualified immunity in this case is whether it was clearly established

-56-

A456

for a public official in and around the year 2003 to believe that discriminating against plaintiff because of her gender was lawful and whether retaliating against plaintiff in the year 2004 because she filed a lawsuit was lawful. And in sworn deposition testimony, each of the defendants testified that they know it is illegal to discriminate against an employee because of their gender, and that it is illegal to retaliate against an employee who files a lawsuit.

If there was any doubt on what is needed to put a reasonable public official on notice of clearly established law, the short answer is found in a recent U.S. Supreme Court case. Hope v. Pelzer, 536 U.S. 730 (2002), addresses the issue of qualified immunity which defendants no doubt will make the cornerstone of their defense. And that case holds that "officials can still be on notice that their conduct violates established law even in *novel factual circumstances*." Id. at 741 (emphasis added). The Supreme Court unanimously agreed on this issue. Id. at 753-54 (Thomas, J. dissenting with whom Rehnquist, C.J. and Scalia, J. join) (agreeing that "officials can still be put on notice that their conduct violates established law even in novel factual circumstances"). This holding is in accord with a plethora of preexisting Third Circuit and Supreme Court law, discussed in much greater length below, and puts to rest in our present case any conceivable uncertainty regarding the level of factual correspondence needed between the right asserted and prior cases.

Even prior to the Hope decision, the law was the same as is demonstrated by many other Third Circuit and Supreme Court opinions. "[Q]ualified immunity applies if 'reasonable officials in the defendants' position at the relevant time could have believed, *in light of what was in the decided case law*, that their conduct would be lawful.'" Doe, 257 F.3d at 318 (emphasis added) (quoting Good v. Dauphin County, 891 F.2d 1087, 1092 (3d Cir. 1989)). Continuing -

-57-

A457

> Thus, having determined that Doe has alleged a violation of a constitutional right, we must determine whether Doe's right [ ] was "clearly established" in a "particularized" sense. Anderson v. Creighton, 483 U.S. 635, 640 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. *We do not require precise factual correspondence between the right asserted and prior case law.* Good, 891 F.2d at 1092. Whether an official may be protected by qualified immunity turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Wilson v. Layne, 526 U.S. 603, 614 (1999) (internal quotes omitted). The issue is whether, given the established law and the information available to Defendants, reasonable [] officials in Defendants' positions could have believed that their conduct was lawful. See Paff v. Kaltenback, 204 F.3d 425, 431 (3d Cir. 2000).

Id. (emphasis added). The Third Circuit also has explained that the "clearly established" language test requires "some but not precise factual correspondence and [demands] that officials apply general, well-developed legal principles." Bennis v. Gable, 823 F.2d 723, 733 (3d Cir. 1987); see also Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989) ("the general legal principles governing analogous factual situations, if any, and a subsequent determination whether the official should have related this established law to instant situations" are the basis for the court's inquiry); accord Hicks v. Finney, 770 F.2d 375, 380 (3d Cir. 1985).[1] The Supreme Court in U.S. v. Lanier, 520 U.S. 259, 271 (1997), also stated that a "general constitutional rule already identified in the decisional law" may give fair warning to a public official if the rule applies "[w]ith obvious clarity to the specific conduct in question" even though

---

[1] Additionally as indicated by the Supreme Court, all that is required to defeat a qualified immunity claim is a "consensus of cases of persuasive authority." Wilson, 526 U.S. at 616. Note that this says nothing of a consensus of binding authority. This is the point made in 1989 by the Third Circuit in Good, 891 F.2d at 1092, that precise factual correspondence is not needed between the right asserted and prior cases. "A right may be clearly established even if there is no 'previous precedent directly in point.'" Leveto, 258 F.3d at 162 (quoting Good, 891 F.2d at 1092); see also Assaf v. Fields, 178 F.3d at 177. This point was reiterated again by the Third Circuit in 1999, that a court need not have ruled on a case bearing a "precise factual correspondence" with the one under consideration. Assaf, 178 F.3d at 177.

-58-

A458

the specific issue has not been previously addressed. Finally, in the Third Circuit a law may be clearly established even if the Court has not ruled on an issue and even if there is some disagreement among other Circuits, as long as "[n]o gaping divide has emerged in the jurisprudence" which would lead a party to "reasonably expect" the Courts in this Circuit to rule other than one way. Bieregu v. Reno, 59 F.3d 1445, 1459 (3d Cir. 1995).

Thus, government officials will not be granted immunity if they fail to make obvious inferences from a generally established right and apply the right in particular situations. So it was unreasonable in our case for defendants to believe that they could, for example, refuse to promote plaintiff or diminish her job duties because of her gender, or purposefully and maliciously retaliate her because she had dared to expose defendant Chaffinch's discriminatory and illegal actions in the DSP by filing a lawsuit in light of the obvious inference from the large body of prior Supreme Court and Third Circuit public employee case law that such discrimination and retaliation is illegal and defendants' admitted knowledge that such conduct is illegal.

**B. Gender Discrimination.** In 1990, the Third Circuit held that a government official was not entitled to qualified immunity in a § 1983 Fourteenth Amendment Equal Protection sex discrimination case because "the right to be free of discrimination based upon sex in the workplace, was well grounded in law and widely known to the public by 1986." Andrews v. City of Phila., 895 F.2d 1469, 1479 (3d Cir. 1990); see also U.S. v. Virginia, 518 U.S. 515 (1996) (gender based classifications violate equal protection). Additionally, it is self-apparent that the right to be free of gender discrimination has been clearly established in our nation since the passage of the Civil Rights Act of 1964.

-59-

    **C. Free Speech.** In the same way, there are more than 23 years of protection for public

employees from retaliatory discharges arising from protected speech, <u>Baldassare v. State of N.J.</u>,

250 F.3d 188, 201 (3d Cir. 2001), protections which have been granted at the Supreme Court,

Third Circuit and district court level. In the light of long established First Amendment case law

protecting legions of public employees in both the Supreme Court and the Third Circuit, there is

no way that defendants could have reasonably believed (or can now in good faith assert) that they

could retaliate against plaintiff by releasing portions of her IA file to the media because she had

dared to file a lawsuit against them challenging their illegal activities.[2] Concerning the huge

body of public employee case law (only a portion of which is listed in the preceding footnote),

---

    [2] <u>See e.g.</u>, <u>Azzaro v. County of Allegheny</u>, 110 F.3d 968 (3d Cir. 1997) (en banc) (public employee who reported sexual harassment by a superior protected); <u>Monsanto v. Quinn</u>, 674 F.2d 990 (3d Cir. 1982) (public employee who criticized management policies in a public agency protected); <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968) (public school teacher who criticized school district superintendent and school board protected); <u>Mount Healthy City Bd. of Educ. v. Doyle</u>, 429 U.S. 274 (1977) (public school teacher who criticized school district policy protected); <u>Baldassare v. State of N.J.</u>, 250 F.3d 188 (3d Cir. 2001) (public employee who conducted internal investigation into wrongdoing and breach of the public trust in a public agency protected); <u>Feldman v. Phila. Housing Auth.</u>, 43 F.3d 823 (3d Cir. 1994) (public employee who exposed corruption, inefficiency, and other improprieties in public agency protected); <u>Czurlanis v. Albanese</u>, 721 F.2d 98 (3d Cir. 1983) (public employee who criticized waste and inefficiency in public agency protected); <u>Johnson v. Lincoln Univ. of Com. System of Higher Educ.</u>, 776 F.2d 443 (3d Cir. 1985) (public university professor's speech was on a matter of public concern when he criticized department chair over academic standards, among other issues); <u>Rankin v. McPherson</u>, 483 U.S. 378 (1987) (public employee who stated a hope that the next assassination attempt on President Reagan would be successful protected); <u>Rode v. Dellarciprete</u>, 845 F.2d 1195 (3d Cir. 1988) (public employee's criticism of racism in police department protected); <u>O'Donnell v. Yanchulis</u>, 875 F.2d 1059 (3d Cir. 1989) (public employee's statements that police chief was fixing traffic citations protected); <u>Holder v. City of Allentown</u>, 987 F.2d 188 (3d Cir. 1993) (public employee's speech criticizing actions of city council was on a matter of public concern); <u>Watters v. City of Phila.</u>, 55 F.3d 886 (3d Cir. 1995) (public employee who criticized policies in public agency protected); <u>Pro v. Donatucci</u>, 81 F.3d 1283 (3d Cir. 1996) (public employee who was subpoenaed to testify at supervisor's divorce proceeding protected); <u>Brennan v. Norton</u>, 350 F.3d 399 (3d Cir. 2003) (public employee who criticized policies and health hazards in a public agency protected).

-60-

the Third Circuit recently held that in our Circuit *since 1982*, the law has been clearly established

that no public employee can suffer adverse action or other "retaliation for exercising his rights

under the first amendment." Baldassare, 250 F.3d at 201.

The general legal principles from these many closely analogous cases would put any

reasonable official on notice that plaintiff had a clearly established First Amendment right to be

free of retaliation against her for exercising her free speech rights by filing a lawsuit challenging

illegal and unconstitutional gender discrimination in the Delaware State Police. There is more

than enough factual correspondence between these cases and the present one so that defendants

knew that their actions were illegal. Accordingly, plaintiff's First Amendment right as a public

employee to be free of retaliation was clearly established and readily apparent to any reasonably

informed public official. As a result, qualified immunity should be denied.

**D. Petition Clause.** In the same way, the right to petition has been clearly established

for even longer than the rights protected by the free speech clause. The citizen's right to petition

the government was part of the Magna Carta and also was such a well-recognized part of the law

that it was included in Blackstone's famous works. San Filippo v. Bongiovanni, 30 F.3d 424,

443 and n. 22-23 (3d Cir. 1994). In the U.S., the right to petition the government has been

clearly established under decades of Supreme Court precedent. See e.g., NAACP v. Button, 371

U.S. 415, 429-30 (1963); Bhd. of R.R. Trainmen v. Va. Ex Rel. Va. State Bar, 377 U.S. 1, 5

(1964); United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217, 221-225 (1967);

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-16 (1972); McDonald v.

Smith, 472 U.S. 479, 482-85 (1985). Similarly, the Third Circuit has repeatedly and

exhaustively discussed the right of a public employee to petition the government for redress of

-61-

A461

grievances. See San Filippo, 30 F.3d at 434-43; Anderson v. Davila, 125 F.3d 148, 161-63 (3d

Cir. 1997); Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003); Hill v. City of Scranton, 411

F.3d 118, 126-27 (3d Cir. 2005); see also We, Inc., v. City of Phila., 174 F.3d 322, 326-30 (3d

Cir. 1999) (non-employment context).  All of these are controlling precedent, sufficient to put

reasonable officials on notice of the law that has been clearly established for many years.


    11. State and describe all administrative and/or legal steps Captain Conley took to address

the claims and concerns set forth in paragraphs 1-105 of her Complaint prior to filing suit,

including but not limited to, internal DSP remedies, union grievance procedures, mediation,

arbitration, and/or reference to State or Federal agencies.   Please include the specific time and

date of the steps taken, and identify any persons contacted, and identify any documents filed in

connection therewith.

    **Answer:**  Objection.  This question seeks no relevant or admissible evidence and is not

reasonably calculated to lead to the discovery of relevant or admissible evidence.  There is no

requirement to exhaust administrative remedies under Counts I, II or III of the Amended

Complaint.  The United States Constitution, which is the highest law in the land, does not require

a public employee to subject themselves to further harassment and reprisals by raising an issue

internally.  The U.S. Constitution does not require any public employee to exhaust administrative

remedies when the public employee is suing for violations of the Fourteenth Amendment right to

be free of gender discrimination or the First Amendment right to be free of retaliation for

exercise of the rights to freedom of speech and to petition the government for redress of

grievances.

-62-

A462

Subject to and without waiving this objection plaintiff responds as follows.

For a woman to complain within the DSP is a career ending act.

I did not indicate to anybody that I was offended or displeased with the fact that I was being taunted or teased regarding the free mason organization. As a female officer on this job, even more so back in that time frame, you were trying to assimilate and get along in an environment that is largely male and I learned very early on that you do not make complaints or point out things that you're unhappy with because if you do you will be retaliated against, ostracized and labeled as a troublemaker or a malcontent.

And through the years this was further brought home to me in that I did have an issue with a Troop Commander in approximately 1987 to 88 and did, in fact, have issues with him that I thought were serious enough to respond to Human Resources and issue a complaint to Mr. Dillman at that time and I received no assistance, no support from the Division about any of that. I had to go outside the agency to the EEOC, and although ultimately, after about 18 months, they transferred and remedied for me these individuals that were causing me the problem and I didn't have any problems after that.

It took me still another probably year and a half to two years to overcome the stigma and get outside of that label that you were a malcontent or a troublemaker. So, you know as a female trooper on this job in the early 80' s and even today on some level, you are not encouraged to complain. If you don't comply and laugh at their jokes and go along with the program so to speak, they don't have any use for you and you can't get along in this environment without any support. You cannot function as a police officer when that retaliation begins.

Concerning the limericks and the fact that they were offensive, this was not brought to

-63-

A463

Chaffinch's attention because as I said before, I felt that would be detrimental to my career. I feel that speaking out in that manner is frowned upon and that you will be harassed, stigmatized and retaliated against for opposing such illegal behavior.

And like I said, I've had 18 years of working around this man. I know him quite well. I know his nature. And from the time I walked in the doors at Troop 5 it was talked about the fact that this man had very, very strong political connections. His brother was already a Lieutenant and then subsequently was Captain on this job and everyone knows and he boasts about the fact that he's associated with Thurman Adams and that Thurman Adams is a powerful, political person.

And I was told from the very beginning of my career Aaron will probably be the Colonel someday. And that has ended up ringing true.

It would not be a good career move all the way around to tell Aaron that you're offended by his behavior.

As Captain Dixon testified at his deposition, Chaffinch is vengeful, that is a component of his personality and who he is. Chaffinch demands blind personal loyalty from those who serve under him. And he has boasted about the fact when he's been reprimanded in prior years about this type of behavior that he still was not going to change for anybody including Colonel Pepper and Colonel Ellingsworth.

He's very strong willed and stubborn and I did not feel I was at liberty to oppose what he was doing without he and others ending my career as a police officer. Like I said, I've learned a major lesson about that. I did have hopes of advancing through my career and being successful and hopefully getting to a position someday when I could try to make some changes within this

-64-

department but I didn't feel that was going to happen if I would be vocal or forthright about telling someone as powerful as Colonel Chaffinch that I'm not impressed, not happy with your comments and I'm offended by them. I didn't feel I was at liberty at that time to do that.

As an example of his spitefulness, if I have a party at my house and there's going to be any troopers there, where this may get out that you had this event and you don't ask Colonel Chaffinch to that party, he will not be happy with you, lets put it that way. You are fearful that he'll be mad or retaliate against you because he wasn't invited.

He's very blatant about questioning things of that nature. Why was I not invited to this party? Now as recently as 2004 on Memorial Day, Trooper Scott Gray had a picnic at his house. He had some prior knowledge that Colonel Chaffinch wasn't going to be around during this time frame so he sent out a massive e-mail with a large amount of troopers names on there inviting them to this Memorial picnic, myself included. When I saw it I looked at it and I thought it was odd that Colonel Chaffinch's name wasn't on there but I didn't think about it all that much but I subsequently found out through Colonel Chaffinch, through comments that Captain Dixon overheard him say to Corporal Gray, and from Corporal Gray himself that he was questioned about the fact that he was not invited to this picnic. Aaron was very offended and very mad that he wasn't invited. He complained to me about it. He complained to Captain Dixon about it at Troop 5. He complained to Scott Gray himself even making comments to him like, and again Captain Dixon witnessed this, and Scott Gray talked to me about it at the picnic that apparently you have forgotten where your transfer came from. And, the guy was stunned, he approached him in the parking lot at Troop 5 and he was like no, I mean, I would have invited you but I knew you were out of town and he tried to explain it that way by saying, normally, he would have.

-65-

A465

But the statement from Aaron was nobody has an event in Sussex County and doesn't invite me. And those statements were made to me, to Captain Dixon, and he outright confronted this Trooper in the parking lot of Troop 5. He stopped in there for gas, he stopped in there for gas and that vague threat that I'm the one who gave you your assignment as a detective i.e. I'm also the one that can take it away, how dare you not invite me. So those type incidents confirm my belief that, you don't have a party at your house and not invite him. If there's even an inkling that's he's going to know that it took place especially if he considers you a part of his circle so to speak.

Now I believe since then, since Scott Gray has tried to explain it away and I don't know if this is true, but he says that he explained it away by stating that, he already knew that the Colonel wasn't going to be in town that particular day and it was now just a mis-understanding. And I haven't talked to Scott Gray about that but that's again, the rumor mill is that Aaron backed off of him a little bit because he had some type of a viable excuse. But, trust me when I say he has not forgotten it.

As another example, the Puss harassment offends me and it's inappropriate but again, you know, weighing the grief and stigma factor it's like at some point I guess you just keep thinking that maybe a male superior will step up to the plate and end this offensive behavior, but they don't.  Remember, they are all aware it is happening, they've watched it daily for years.


12. Identify all individuals consulted or retained as experts or who may be called as witnesses under F.R.E. 702,703 or 705 by plaintiff, and provide the following:

(i) any and all opinions rendered by the expert, or as to which the expert will testify;

-66-

A466

(ii) a current and complete listing of the expert's qualifications as set forth in the expert's *curriculum vitae;*

(iii) a list of all publications authored by the proposed expert within the last ten years;

(iv) the amount of compensation paid to date, the rate charged, and the amount to be paid to the proposed expert; and

(v) listings of all cases in which the proposed expert has testified or offered an opinion in the last four years.

**Answer:** Objection. Overbroad and premature. Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.P. 26(b)(3). The information required under the Rules will be produced at the appropriate time.

Subject to and without waiving these objections:

See Plaintiffs' Rule 26 Disclosures and subsequent amendments.


13. State and identify all compensatory, statutory, punitive, and future damages, including both general and special damages, plaintiff claims as a result of the defendants' alleged conduct and include the basis for your calculations of those amounts, if any.

**Answer:** Objection. To the extent this question seeks information on wage and benefit loss, pension loss and front pay it violates the scheduling order and Civil Rule 26. Plaintiffs forensic economic expert will issue a timely report on these issues.

As to the other elements of damages plaintiff responds as follows.

-67-

(a) Emotional distress.

(1) Expert Component. Objection. Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

(2) Non-Expert Component.

(i) Introduction. When I came on this job I had great expectations although I knew it would be rough and difficult for a female police officer in a male dominated police environment. Nonetheless, I set out within my career to establish a strong operational background so that I would be respected and effective later on as a supervisor of almost 90% males. I did this by staying in patrol related functions for the majority of my career. I did establish that respect I was looking for and never had any problems leading the men and women within my ranks. I had always sought to become a part of DSP history and set a goal of becoming one of the first females to make a command rank and/or become a member of the Executive staff. I was well on my way until Chaffinch destroyed my reputation and my career. I was sought out by many DSP personnel as a mentor, to guide them and to assist them in the path to seeking promotions and other areas of the career. The masses knew that despite being in operations the most, I had a wide range of knowledge about most areas of the Division. While working at HQ as a Captain, it was commonplace for troopers I had worked with in the past to stop by and visit and or seek advice.

But as a result of defendant Chaffinch, MacLeish and Mitchell's illegal actions, I have seen my dream of being the first female Major on the department slip away for no legitimate reason and this has caused me a great deal of anxiety and stress. I used to be asked all the time "when are they gonna make you a Major" and when openings arose I was rumored to be the

-68-

A468

female most likely to get it. In the same way, many were supportive just as they were always supportive of my coming to their troop as a troop commander. I was always asked that as well. But Troopers do not ask these things anymore. They know I will never recover from the damage defendants Chaffinch, MacLeish and Mitchell caused and knowing that is extremely distressing and upsetting to me. It is distressing to know that lesser qualified persons bypassed me even after I put in over 23 years of hard work to climb the ladder, mark my course and help blaze a trail. I wanted to be able to be placed in a position to be a role model to other women. That has been lost and destroyed now. I wanted to be able to make changes that would better the department and increase its opportunities for minorities and women. That is now lost as well.

(ii) Emotional and Physical Problems. I have had so much stress that I have virtually stopped working out like I used to. The fitness group we attended says I need to exercise because the stress of this job situation can be silently harming my health. It just seems so difficult to focus on due to lack of time, being stressed and depressed all the time. As a result I am at greater risk for not passing my PT tests and weigh-in which of course causes even more stress. So far I am passing everything but there is no doubt the discrimination and retaliation has had ill health effects. My hair is turning grayer by the day. And the depression and feelings of hopelessness are a constant.

I have had a lot of intestinal problems since this started and have had to have my doctor change many of my medications for blood pressure to try to offset the other issues. I have had flare ups of allergy related symptoms like swollen glands, throat and tongue on more than one occasion - things I had not experienced for years. The most recent one was the worst (to date) and it was the night before I was scheduled to work the state fair and be faced with Chaffinch and

-69-

his buddies as they seek to publically belittle, humiliate and ostracize me. I had to double my dosage of Benadryl to overcome it enough to work.. Sometimes I lie awake until three in the morning because I cannot shut out all of the worry on so many levels.

All of this has hurt me a great deal personally. For example, my husband is a retired Trooper and was previously very well liked by members of the Division. But now, he must deal with the same ridicule I am forced to deal with. And that is upsetting to me. Additionally, even though he is retired, he must put up with the additional stresses of the job via me as I often times come home and unload on him about everything going on within the department because I am so upset, stressed out and out of sorts. He has noticed that my mood just begins to improve over the weekend and then when I go back to work - due to the environment and the retaliation - I am stressed out and grouchy when I get home. On occasion I am brought to tears by the way myself and my few remaining friends at work are now treated. For example, one night while at Applebee's restaurant with two friends, I completely broke down because I simply could not believe what was happening to me simply because Chaffinch wanted to ruin me.

(iii) Fearing for Her Personal Safety. Very often I am fearful and afraid because of what these people are capable of and therefore do not feel completely comfortable or safe leaving my house, be it for vacation or for anything else. Additionally, I am afraid to leave my post at work for fear of what will happen next when I get back. During the height of the retaliation, I was afraid for my personal safety. My friends were worried about my personal safety as well. I was urged not to work late the way I usually do so that there would always be people around and I would be safe. I did not stay late for a long time and even when I did, my friends would call and say it is time for you to get out of there. This was especially true

-70-

A470