during the Chaffinch suspension and during his brief stint back at HQ before he retired. You begin to wonder if they would actually set you up or not and begin to be overly cautious while en route back and forth to my residence.

(iv) Frequent Nightmares. I have nightmares frequently and most of them have Chaffinch in them. We run into each other somewhere, he confronts me and things deteriorate from there. I had nightmares about going to the range to shoot because I was scheduled when the staff was scheduled. I was afraid of what might happen to me when the staff was there with loaded weapons.

(v) Sleeplessness. I find it more and more difficult to sleep as this has progressed. Oftentimes I have to take pain pills like Advil or something just to knock the edge off enough to sleep. Then I am dragging by the end of the week and sleep more and more over the weekend. Sometimes I take a nap just to escape the thoughts and stress of what defendants have done to me.

(vi) Impact on the Family. In addition to the negative impact discussed above, my husband Larry and I have much less time to spend together now that defendants have tried to destroy me. I am always upset, stressed, tired and cranky. You cannot spend quality time with your spouse when you are feeling that way. Then he ends up as upset and frustrated as I am, because he also cannot understand why Chaffinch and the other defendants would be doing this to me. In an effort not to burden him with my problems, I have been trying to vent and unload to friends, but in doing so, that decreases the amount of time we spend together.

(vii) Devastation Caused by the Release of her Confidential

-71-

A471

Internal Affairs Information. The leak of my confidential internal affairs information to the media by defendants was devastating. This had never been done before. The DSP policy is to no comment in such situations, not to circulate statutorily protected and confidential information. When the media previously asked about the many internal affairs investigations and convictions relating to defendants Chaffinch and MacLeish, they always refused to even discuss the matter at all, even though the confidentiality statute explicitly does not protect Chaffinch and MacLeish, and Chaffinch and MacLeish had been repeatedly convicted of wrongdoing, not only by multiple federal court juries for violating the Constitutional rights of Troopers under their command, but also for violating numerous rules and regulations of the Division. But when it came to them, the DSP never, ever, released and discussed such information.

Yet the statute explicitly protected me as a Captain and they were forbidden to discuss anything about my confidential matters. But they did it anyway. They violated their own policies, procedures, practices, rules and even a state statute. And I am just blown away by that. Not only was what they did unprecedented, but they have completely destroyed me publically. How am I supposed to function in my work environment and in my local community after all of the dirt and innuendo they spread about me?

I suffered a great deal of stress over the possibility that my career could be effectively ended as a result of all of this. How can I function as a police officer when they have publically destroyed me? How can I be respected by my subordinates when the DSP leadership has no respect for me? When they released my information to the public they caused me much pain in that my family including two stepsons and their families and three grandchildren were made privy to my situation and were asked about it by their co workers as well. They were made privy

-72-

A472

to comments made in a private work setting that were not meant to be heard by others. Then with the lack of detail, they and the rest of the public were to reach their own conclusions as to what had really occurred.

(viii) Distress Over the Destruction of Her Reputation and Future Employment Prospects. Relatedly, the negative impact on my reputation and future employment prospects has been greatly distressing to me. Defendants' retaliation against me by releasing my confidential internal affairs materials to the Delaware media has caused many persons in the highway safety industry to read about the specifics of what occurred. No doubt this will effect my future earnings potential as I now will be construed as a risk that they will not want to take a chance on. This can effect me on both the state and local level. And because Chaffinch, MacLeish and their political allies set out to destroy me, my earnings potential in other state jobs in my post-DSP career has been harmed.

For example, I had studied greatly and worked hard with Captain Downes teaching and instructing in areas of cultural awareness and sensitivity and diversity. I had plans to continue that and potentially do something upon retirement in that vein either with him or on my own. That has now been ruined because of the nature of the way they distorted the facts on some of my confidential charges. My credibility in that arena has been compromised and that can never be recovered.

(ix) Withdrawal From Social Relationships. Many of our long time friends have refused to speak to or associate with us because of defendants' actions. As a result, both Larry and I have become withdrawn socially from the way we used to be before defendants tried to destroy me.

-73-

A473

The many interpersonal relationships my husband and I have forged over the years have been badly damaged as a result of defendants' discrimination and retaliation. For example, Larry and I were not invited to Troop 5's Christmas party in 2004 for the first time since he retired in 1991. Retired troopers from that troop are always invited but because Chaffinch has such a strong and loyal following, his cronies threatened to boycott the party if Larry and I were invited. So we were ostracized and not invited for the first time in over a decade.

In the same way, I have not had my annual Christmas party at my house for the last several years because of everything that has occurred. Most of my friends were simply afraid to come so I did not even bother having it so I would not have to suffer the humiliation.

(b) Humiliation. See above. Additionally, I have suffered greatly because of the retaliation in that I have lost the security that anonymity brings. Local restaurants and stores that I frequent now know not only that I am a trooper but about the charges also. I cannot get an appointment at my regular hair dresser anymore because of what has occurred. A retired DSP mechanic was in a local eatery talking of my case and speaking to how I should be home in the kitchen anyway and he "hoped that girl never does get promoted." That is the public perception of me now and it is humiliating. All the people I work with in DelDot have seen the papers. All the people who work with my son in the correctional department have seen the papers. Old friends even going back to high school have heard about it and inquired about it.

My name has been ruined. Not only have people in my local social and work communities heard negative things about me, but as a direct result of what defendants have done, the entire State of Delaware, and no doubt parts of the region also have. As a direct result of defendants retaliation, my name and picture has been plastered all over the News Journal, the

-74-

A474

State News and I'm sure other media outlets.

(i) Ostracization. Both myself and those friends who have not abandoned me have been tormented by Chaffinch and his followers. We are shunned and treated like outcasts. It hurts me even more when those friends who did not abandon me in the way that defendants wanted are then retaliated against for associating with me because they are innocent victims of defendants' wrath. Civilian workers within the division treat me like an outcast and are impolite because they have been made privy to every detail about me.

As discussed above, previously numerous officers, both male and female, would seek me out for advice and counsel in the DSP. But as a direct result of what defendants have done to me, passing me over for promotion, and then publically setting out to destroy me because I had filed this lawsuit, only the strongest and staunchest of supporters will even speak to me. Many are now afraid that because of the public actions taken against me, that they will be retaliated against by the spiteful and vindictive Chaffinch and MacLeish if they even associate with me. Many are forced to choose sides based on their work environment. As a result I have lost many long term friendships due to the actions of defendants. I have been ostracized and cast out by many members of this Division that I love.

As another example, I was the only command level person not invited to work the state fair in 2004. Then in 2005, I worked my three days but my personal safety was endangered while working there. At the fair, I was forced to patrol without the typical Trooper pairing, which is done for safety reasons. No one wanted to be associated with me. Many people shunned me completely with no regard for rank. There are now disrespect issues even coming from non-commissioned officers. This is because Chaffinch is a fair board member and they fear his

-75-

A475

retaliation even now, from the outside if he sees them talking to me.

(ii) Loss of Credibility on the Job. I also have lost credibility within my job mostly because many officers, such as many of the traffic lieutenants and others, do not have any respect or even rank based fear associated with me anymore. Once they know that the leadership of the entire Division, including the Colonel and Lt. Colonel have no respect for you and think you are nothing but a piece of trash, then your basis of authority - your rank and your respect - have been stripped away from you. The benefit provided by rank within the agency no longer applies. Many subordinates do not take your authority seriously as before. This problem is compounded because of how hard it is to be taken seriously as a female officer in the first place. It takes an utmost level of support from staff above you to gain respect and support and now all of that has been stripped away.

(iii) Public Humiliation. It is humiliating to have to deal with the stares from people I do not even know. Then, it is hard to deal with the stares from fellow troopers in the close-knit community that is the DSP. Even when I try to explain what really went on and how defendants are singling me out for discriminatory treatment and treating me differently than any other trooper has ever been treated, oftentimes I am met by disbelief and people just do not want to listen. The perception in the DSP and throughout the general public is that I did something wrong. And this is humiliating.

Troopers and others in the law enforcement community are talking as a result of defendants' release of information. And this has made it extremely hard for me to function in the close-knit DSP and also in the law enforcement communities since defendants singled me out to destroy me. It is hard to hold your head up high when you go to work. You have to deal with the

-76-

constant stares and whispers from comrades. I have been shunned and ostracized within this close-knit community of police officers.

Defendants' retaliatory release of my confidential internal affairs information directly and proximately resulted in widespread and extensive media coverage of my internal, confidential and statutorily protected internal affairs information. There has been widespread and detailed media coverage in the News Journal, the Delaware State News, the Associated Press and other local and regional media outlets. Information about me that would have otherwise been completely and totally confidential as a result of the Law Enforcement Officers' Bill of Rights was instead widely publicized and I forever lost her right to confidentiality as a result of defendants' actions.

Additionally, once defendants leaked my confidential internal affairs material to the Delaware media, the damage was done. The genie could not be put back in the bottle. Despite the best efforts of my attorneys to combat the irreparable harm that was done to me by defendants' malicious wrongdoing, that can never be corrected. I never would have waived confidentiality over my IA trial board and hearing if defendants had not released my IA materials to the media. But to do that was necessary to somehow try and combat the very public damage done by the illegal release. Everything thereafter was my trying to mitigate the damages done by that release. It is something that I can never recover from.

(iv) Being Singled Out. In the same way, it is humiliating and embarrassing to be singled out for special and unprecedented treatment by the DSP. It has been the longtime policy and practice of the DSP to never comment about internal affairs material. It is never discussed. All that is given is a no comment. Indeed, that is what was done when the

-77-

A477

press made inquiries about the numerous internal affairs charges that were filed against Chaffinch and MacLeish for violating numerous DSP Rules and Regulations, as well as the U.S. Constitution. The DSP no commented and refused to answer those inquiries. Everyone in the DSP knows that the response that is always given is a 'no comment.' But when inquires were made about me, they suddenly cannot stop talking about my confidential information. It is a double standard. I have been singled out and that is humiliating in this police community.

(c) Injury to Reputation. The DSP is a small, close-knit police force with approximately 600 uniformed Troopers and 250 civilian employees. It is a much smaller force than the state police forces of other larger states, such as Pennsylvania, New Jersey and New York. As a result, Troopers have a much higher degree of knowledge of and interaction with each other than would be found in larger departments. Indeed, because it is a small force, life in the DSP has a soap opera quality to it, with everyone talking about what happened to everyone else. And as discussed above, my reputation has been decimated in this close-knit police community as a result of defendants' actions. Morever, my reputation in the highway safety community and in the State of Delaware community also has been destroyed, as discussed.

In the same way, as a result of defendants' release of my confidential internal affairs information, much of this negative information about her is now available for public consumption on the internet and the world wide web for the entire world to see.

(d) Diminished earning capacity. Objection. Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure. Subject to and without waiving the forgoing objection - see above.

(e) Economic losses. Objection. Expert discovery is governed by the scheduling

order and the Federal Rules of Civil Procedure.

14. State and itemize by date, task, and hours all attorney fees and other costs that have accrued by plaintiff in this matter up to and including the date on which these Interrogatories are answered.

**Answer:** Objection. This question seeks information protected by the attorney/client and work product privileges. Counsel knows of no case in the Third Circuit which would permit discovery of such information. Should plaintiff prevail on the merits such information will be provided in any timely attorneys' fees and costs application under the applicable fees statute.

15. As to the incidents or statements or conduct alleged in the following paragraphs of the Complaint: 7731,36-39,40-49,53,59, and 62 Indicate by date, time, place, and identify all other person(s) present, the incidents, statements, or conduct actually witnessed by the plaintiff.

**Answer:** See Answer to Interrogatory # 3 above.

16. As to the incidents, statements or conduct alleged in Counts II and III of the Complaint ("retaliation" claims regarding the "Eldred email" issue), identify all persons whom you contend participated in or have knowledge of the incidents, statements or conduct alleged in these Counts.

**Answer:** Objection. Discovery is just beginning and the record in this regard remains to be developed. Subject to and without waiving these objections:

See the Rule 26 disclosures and lists of witnesses included therein.

-79-

See the numerous lengthy depositions that have already been taken in this case which multiple defense attorneys attended and participated in, as well as the numerous specific individuals identified therein.

As to Objections:

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger

**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ.  (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs

Dated: August 2, 2005

-81-

A481

## DECLARATION OF CAPT. BARBARA L. CONLEY UNDER 28 U.S.C. § 1746

1. I am the Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendants' Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

_____

**CAPT. BARBARA L. CONLEY**

_____

Date

Conley / Pleadings / Interrogatory Answers.final

-82-

A482



**WILCOX & FETZER LTD.**

In the Matter Of:

# Dillman
## v.
# Chaffinch

C.A. # 02-509 KAJ

-----------------------------------------------------------------------

Transcript of:

# Joseph Swiski

January 2, 2004

-----------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE


   JOHN A. DILLMAN, III,            )
                                    )
            Plaintiff,              )
                                    )
   v.                               )
                                    )
   COL. L. AARON CHAFFINCH,         )
   Individually and in his          )
   official capacity as the         )
   Superintendent, Delaware         )  Civil Action No.
   State Police, LT. COL.           )    02-509 (KAJ)
   THOMAS F. MARCIN,                )
   individually and in his          )
   capacity as the Deputy           )
   Superintendent, Delaware         )
   State Police, and DIVISION OF )
   STATE POLICE DEPARTMENT OF       )
   SAFETY, STATE OF DELAWARE,       )
                                    )
            Defendants.             )
```

Deposition of JOSEPH SWISKI taken pursuant to
notice at the law offices of Aber, Goldlust, Baker &
Over, First Federal Plaza, Suite 600, Wilmington,
Delaware, beginning at 10:00 a.m. on Friday, January 2,
2004, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.

APPEARANCES:

```
          GARY W. ABER, ESQ.
          ABER, GOLDLUST, BAKER & OVER
            First Federal Plaza - Suite 600
            Wilmington, Delaware  19801
            for the Plaintiff,
```

```
   ------------------------------------------------
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
```

Dillman                                    v.                              Chaffinch
C.A. # 02-509 KAJ                   Joseph Swiski                     January 2, 2004

---

Page 2

1   APPEARANCES (CONT'D):
2        EDWARD T. ELLIS, ESQ.
         MONTGOMERY, MC CRACKEN, WALKER & RHOADS, LLP
3          123 South Broad Street
           Philadelphia, Pennsylvania  19109
4          for the Defendants.
5   ALSO PRESENT: JOHN A. DILLMAN, III
6              - - - - -
7          JOSEPH SWISKI,
8        the witness herein, having first been
9        duly sworn on oath, was examined and
10       testified as follows:
11  BY MR. ABER:
12       Q.  Your name is Joseph Swiski?
13       A.  Yes.
14       Q.  What is your address?
15       A.  My home address?
16       Q.  If I need to get a hold of you.  Yes.
17            But can I still reach you at Winterthur?
18       A.  Yes.  That would be fine.
19       Q.  You are a retired member of the Delaware State
20  Police?
21       A.  Yes.
22       Q.  Can you give me a quick sketch of your background
23  and history with the state police?
24       A.  Yes.  I was hired September 4th, 1979, attended

---

Page 3

1   training academy, successfully completed the academy, and
2   went on to do approximately maybe two years and a few
3   months on the road in normal patrol, uniform patrol.  And
4   I did a year after that in ASAP, which was the drunk
5   driving patrol.  Then I became a detective, remained a
6   detective at various capacities through basically the
7   rest of my career holding ranks of sergeant, lieutenant
8   and captain as detective.
9        Q.  Okay.  When did you --
10       A.  I've shaved off some assignments.  I was assigned
11  to Internal Affairs for 18 months.
12       Q.  Did you ever have any assignments in the
13  personnel or human resources departments?
14       A.  No.
15       Q.  Did you ever work with them other than to make
16  personal inquiries?
17       A.  With recruit selection I guess I would be
18  involved.
19       Q.  What was your involvement with the recruits?
20       A.  Well, it was the entire executive board.  We
21  would get together and review the potential list of
22  applicants for new hire.
23       Q.  When did you make major?
24       A.  May of 2000.

---

Page 4

1        Q.  That would have been Colonel Pepper selected you
2   to be major?
3        A.  Yes.
4        Q.  As I understand it, the advancement from captain
5   to major was a personal selection made by the
6   superintendent.
7        A.  Yes.
8        Q.  You don't take any tests or anything for that?
9        A.  No.
10       Q.  Okay.  What were your assignments once you were
11  promoted to major?
12       A.  My title was the administrative major, so I was
13  responsible for the budget, overseeing the dispensing of
14  the budget for the division.  I was responsible for the
15  facilities.  The state police has numerous buildings,
16  troops.  The fleet came under me -- the police cars and
17  the non-police-type cars also.  After Colonel Pepper
18  left, I became involved as -- I like to refer to it as
19  advisor status with Internal Affairs -- investigations.
20       Q.  Once Colonel Pepper left and you became involved
21  with IA, did you still maintain your administrative
22  responsibilities for the budget?
23       A.  Yes.
24       Q.  Okay.  When did you first become aware as the

---

Page 5

1   person in charge of budget that Mr. Dillman might be
2   losing his job?
3            MR. ELLIS:  I object to the form of the
4   question.
5            MR. ABER:  What's wrong with it?
6            MR. ELLIS:  When did he become aware as the
7   person in charge of the budget?
8            MR. ABER:  Yes.
9   BY MR. ABER:
10       Q.  I want to focus on your job as administering the
11  budget for the state police.  Maybe that's refining it.
12  Let's just back up.
13           MR. ELLIS:  You can ask him when he found
14  out about it.
15  BY MR. ABER:
16       Q.  When did you first learn that Mr. Dillman might
17  lose his job?
18       A.  The first mention, as I recall, was in October.
19  Prior to Colonel Chaffinch actually becoming colonel, it
20  was kind of -- obviously, he was going to become the
21  colonel after Colonel Pepper left.  In a very brief
22  conversation, Colonel Chaffinch spoke of making -- he
23  would like to make some changes in the way the department
24  is run and the way we do business.  And the one change he

---

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 6

1    spoke of was taking the director of personnel and making
2    it back to a uniformed position as it had been years ago.
3        Q.  Was there ever anything in writing about that
4    that you ever saw?
5        A.  No.
6        Q.  Okay.  When was the next time you heard any
7    mention of Mr. Dillman losing his job?
8        A.  Shortly after that -- I think after -- yes.  It
9    was after Colonel Chaffinch became colonel.  There was a
10   staff meeting, and he was going over some things again
11   with the staff that he was thinking about.  He just kind
12   of repeated the same statement.  The first time was
13   myself -- I know I was there, and I believe Lieutenant
14   Colonel Marcin was there with Colonel Chaffinch.  That --
15   they weren't their titles at that point.  And the second
16   time was at a staff meeting.
17       Q.  I understand that Colonel Chaffinch became
18   superintendent and the full rank of colonel sometime, I
19   believe, in February of 2002.
20       A.  Well, but he was acting prior to that.
21       Q.  Right.
22           So the second conversation you said was
23   after he became superintendent?
24       A.  Well, I believe it was after he was in the acting

Page 7

1    capacity, and it was at a staff meeting.  I'm not
2    absolutely sure if he had been given the designation
3    official at that point or he was named but was in an
4    acting capacity.  I can't remember the time line on that.
5        Q.  Okay.  Do you remember any discussions about what
6    would happen to Mr. Dillman's position as far as the
7    effect on the budget?
8        A.  Yes.
9        Q.  What were those discussions?
10       A.  Well, the position itself, as I was told, was
11   going to be reverted to public safety to Secretary Ford's
12   office.
13       Q.  We've heard reference to the fact that -- the
14   term was going to be that his position was going to be
15   "cannibalized."
16       A.  Yes.  Well, once it got back to Secretary Ford's
17   office, what I drew from the conversation or from what I
18   heard was that the position in itself would never exist
19   as it was taken from us, but it would be taken -- in part
20   was going to be given to somebody in Secretary Ford's
21   office and another part was going to be given to somebody
22   else.
23       Q.  So as far as the position of personnel
24   administrator/civilian administrator of personnel of the

Page 8

1    state police, would that position have been abolished?
2        A.  It would have not existed.
3        Q.  Is that the same thing --
4        A.  Yes.
5        Q.  -- as abolished?
6        A.  Right.
7        Q.  Other than my telephone call to you about a week
8    or so ago asking you to come in for this deposition, have
9    you had occasion to discuss Mr. Dillman's litigation with
10   anybody else in the last year?
11       A.  Oh, yes.
12       Q.  Who would you have had those discussions with?
13       A.  Well, Mr. Ellis.  I had a discussion with him.
14       Q.  Okay.  When was that discussion?
15       A.  Last week.
16       Q.  Was that after I called you?
17           I gave you his --
18       A.  Yes.
19       Q.  -- telephone number and such.
20       A.  Right.  That was after you spoke to me and gave
21   me his information.
22           Tom Marcin.  I've had discussions with him.
23           You're saying in the last year; correct?
24       Q.  I'm trying to get a feel for what you've done,

Page 9

1    and then I'll refine when each of these took place.
2        A.  Oh.  Tom Marcin's conversations?
3        Q.  Right.
4            You've had a conversation with Lieutenant
5    Colonel Marcin, with Mr. Ellis.
6        A.  Right.
7        Q.  Anybody else?
8        A.  I can't be positive with anybody else.
9        Q.  Okay.
10       A.  I'm sure there has been, but I can't be
11   specific -- positive enough.
12       Q.  When you were speaking to Mr. Ellis, were you
13   speaking to him as your attorney or as attorney for
14   Mr. Marcin and Colonel Chaffinch?
15       A.  He wasn't representing me, so I believe it was as
16   Mr. Marcin and Mr. Chaffinch's representation.
17       Q.  How many times have you discussed Mr. Dillman's
18   lawsuit with Mr. Marcin?
19       A.  Numerous times.
20       Q.  Can you tell me what the substance of those
21   conversations were?
22       A.  It was a matter of rehashing how everything
23   transpired.  Mr. Marcin -- Tom Marcin expressing a high
24   level of frustration, certain aspects of it which I'm

3 (Pages 6 to 9)

Dillman                                    v.                              Chaffinch
C.A. # 02-509 KAJ              Joseph Swiski                        January 2, 2004

---

Page 10

1  sure he can explain better than me.
2  Q.  Is this just numerous conversations, discussions,
3  same thing over and over again?
4  A.  Pretty much so, yes.
5  Q.  Okay.  With Mr. Ellis, how long did that
6  conversation last?
7  A.  Forty-five minutes.
8  Q.  Was it by telephone?
9  A.  No.  It was in person in his office.
10  Q.  In Wilmington?
11  A.  Yes.
12  Q.  In the discussions with Lieutenant Colonel
13  Marcin, did you discuss the promotional process of 2001
14  with him?
15  A.  Yes.
16  Q.  Do you have a recollection of that process and
17  how things developed during it?
18  A.  It's kind of broad.
19  Q.  Okay.
20  A.  Can you be a little more specific?
21  Q.  I was trying to be broad.  Then I'll get down to
22  the specifics.
23  A.  Okay.  Good.
24  Q.  Do you remember --

Page 11

1  A.  The whole process, you mean.
2  Q.  Do you remember what was the nature of those
3  discussions with Lieutenant Colonel Marcin concerning the
4  2001 promotion process?
5  A.  I believe that was the conversation maybe perhaps
6  related to the second list.
7  Q.  Okay.  What about the second list?  Do you
8  remember?
9  A.  Oh, yes, I do remember.
10  Q.  What do you recall?
11       MR. ELLIS:  Are you asking about his
12  conversations with Marcin now or --
13       MR. ABER:  Well, I guess he has said that he
14  discussed with Major Marcin the second list.
15       THE WITNESS:  Yes.
16  BY MR. ABER:
17  Q.  Now I'm going to ask you not about your
18  discussion with Major Marcin but what you recall about
19  the second list --
20  A.  Okay.
21  Q.  -- independent of your discussion with Lieutenant
22  Colonel Marcin.
23  A.  Oh, yes.  Definitely.
24  Q.  Okay.

Page 12

1  A.  It probably would have been like the second week
2  of November 2001.  I was the administrative major.  I was
3  at headquarters, and I received a phone call.  The
4  information that was relayed to me in the phone call was
5  that there was going to be a special meeting of the DSTA,
6  and it's in reference to the current promotional process
7  and a second list being generated.  And Vince, being
8  Vince Fiscella, who's president of DSTA, is concerned
9  about it and he's going to meet with the board of
10  directors of the DSTA.  I hung up.  I had absolutely no
11  knowledge or idea what they were talking about, this
12  caller.  And before you ask me the caller's name, I
13  cannot remember who called me.
14  Q.  Okay.
15  A.  I don't remember if I got a page and called back
16  somebody or if I got a direct call on my line, but I just
17  remember the essence of the conversation.
18  Q.  Was it a trooper, as what I will call an enlisted
19  man, or was it an officer?
20  A.  I know it was a member of the division.
21  That's -- I feel comfortable in my recall.  I try to
22  backtrack to try to figure out who it was.
23  Q.  When you say a "member of the division," I'm not
24  sure what the "member of the division" means?

Page 13

1  A.  A member of the state police.
2  Q.  So that could be anybody from the colonel on
3  down.
4  A.  I know it wasn't the Colonel.
5  Q.  So do I.
6  A.  So I could start out with I know it wasn't him
7  and I know it wasn't the lieutenant colonel.  It was one
8  of -- I don't know.
9  Q.  Somebody other than the executive staff?
10  A.  Yes.
11  Q.  Okay.  But it could have been a lieutenant or a
12  captain -- those two people?
13  A.  Yes, it could have been a lieutenant, captain.  I
14  feel confident it was probably an officer, meaning a
15  lieutenant and above.
16  Q.  Nce you're a captain, there is no promotional
17  process for you from there on, is there?
18  A.  No.  No, there isn't.
19  Q.  So a captain would have no concern about the
20  second list except maybe as a matter of public concern?
21  A.  Correct.  Yes.
22  Q.  Okay.  But you think it may have been a
23  lieutenant?
24  A.  It may have been a lieutenant, a captain.  And

4 (Pages 10 to 13)

Dillman                                      v.                              Chaffinch
C.A. # 02-509 KAJ                    Joseph Swiski                    January 2, 2004

Page 14

1  their call was more of a heads-up, along the lines of,
2  hey, I don't know if you heard, but Vince is going to the
3  executive board and there's potential brew-ha-ha about a
4  second list and things like that.
5      Q.  Do you remember when you got that call, whether
6  it was morning or afternoon?
7      A.  It was afternoon.
8      Q.  But you don't remember the date?
9      A.  It has to be around the second week of November
10 is the best I feel comfortable with.
11     Q.  Sometime, then, between November 7th and
12 November 14th?
13     A.  Yes.
14     Q.  Okay.  When you got that information, did you
15 discuss that telephone call with anybody?
16     A.  Yes.
17     Q.  With who?
18     A.  I immediately hung up from that call and went to
19 see Lieutenant Colonel Marcin.  See, at that time I don't
20 know if he was major or lieutenant colonel.  I went to
21 see Tom Marcin.
22     Q.  What did you tell him?
23     A.  I said, hey, I just received a heads-up that
24 there is some type of special meeting of the DSTA and

Page 15

1  Vince Fiscella is kind of up in arms about some kind of
2  second list.  I said I don't know what they're talking
3  about.  And at that point I think Lieutenant -- or
4  Aaron Chaffinch was right across the hall.  And I recall
5  Tom Marcin saying, hey, you better come in here and
6  listen to this.  I repeated it.  Collectively, they gave
7  me an explanation as to perhaps what the conversation I
8  received the information about was about.
9      Q.  What was the explanation they gave you?
10     A.  Collectively, they said that prior to that day
11 John Dillman had received the list -- or the promotional
12 lists.  They told me that Colonel Chaffinch -- or
13 Aaron Chaffinch went downstairs to see the list or
14 discuss it.  Aaron told me -- he said he was looking at
15 it.  And John apparently allegedly said to Aaron, you
16 know, there's another way that you can do this, another
17 way to figure this out.
18         Aaron told me -- he just says "oh" and
19 turned around and walked away.  And he said that that --
20 to that point was the only involvement -- or the only
21 discussion about a second list.  He assured me there
22 was no second list created and one really didn't exist,
23 that there was just conversation about it.
24         So having given this information, Tom Marcin

Page 16

1  said, well, go ahead and give Vince a call back -- give
2  Vince a call, because I didn't speak to him as of yet.
3  Give him a call.
4          So I went back to my office and I
5  called Vince.  I said, Vince, what's going on?  I
6  understand you're calling a special session of the DSTA.
7  I said something about a second list.  You know, what's
8  going on?
9          And he said that he was very concerned, very
10 upset.  He was questioning the integrity of the colonel,
11 Aaron Chaffinch.  And he went on to say that he had
12 conversations with John Dillman about a second list being
13 generated.  He subsequently had conversations with
14 Dr. Shaman.  Then he went to Colm Connelly, who is the --
15 well, he's a U.S. attorney general -- and discussed the
16 matter with him.  And at this point I'm going, whoa, you
17 know, what's this all about?  Why is the great concern
18 here?
19          And he just said that it was, you know,
20 illegal.  You can't do that.  And I kept telling him what
21 I had been told, that, you know, there is no second list.
22 There was discussion, but there is no second list.
23          So I talked for a few more minutes with him
24 and hung up.  And then I went back and reported to

Page 17

1  Tom Marcin what Vince had told me.
2      Q.  Let's back up for a second.
3          When you mentioned the first telephone call,
4  what I will call the anonymous call --
5      A.  Right.
6      Q.  It wasn't anonymous when it was given to you.
7      A.  No.  It wasn't, you know, one of those muffled
8  voices or anything like that.  I knew who I was talking
9  to.
10     Q.  Right.  I didn't want to put a stigma to it that
11 wasn't there.
12     A.  No.  Okay.  Thank you.
13     Q.  When you received this informative telephone call
14 and you went to, I think it was, then Major Marcin --
15     A.  Right.
16     Q.  -- and told him about the call --
17     A.  Right.
18     Q.  -- before Colonel Chaffinch was called in, did
19 Major Marcin say anything to you that he indicated he
20 knew what you were talking about?  Was this a surprise to
21 him?
22     A.  He didn't -- no.  He didn't say anything either
23 way.  He listened to me.  And with that, he said, hey,
24 Aaron, you better come in and listen to this.

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 18

1    Q.   Now, I'm assuming that the subject matter that
2    you and I are now discussing -- you've had numerous
3    conversations, you said, with Mr. Marcin since
4    Mr. Dillman filed his lawsuit.
5    A.   Yes.
6    Q.   I want to make sure that I'm getting your
7    recollection independent of those discussions as opposed
8    to what Major Marcin might have told you he recalled.  Do
9    you understand what I mean?
10   A.   Yes.  I'm not relying on anything that Lieutenant
11   Colonel Marcin may have said in reference to this.
12   Q.   Okay.
13   A.   If anything, the conversations I had with
14   Lieutenant Colonel Marcin -- my recall was a lot more
15   accurate than I think his was.
16   Q.   Okay.  When Lieutenant Colonel Chaffinch -- I
17   think he was still Lieutenant Colonel Chaffinch -- came
18   over and the three of you sat down, did either of them
19   mention to you that there had been two lists prepared,
20   regardless of who suggested the second list?
21   A.   No.  As a matter of fact, I was told that there
22   was -- no second list was ever created.  And I know for a
23   fact that's what I was told because that's the message I
24   took to the troopers association meeting shortly

Page 19

1    thereafter that.
2          MR. ABER:  Can we mark this as Swiski 1,
3    please?
4          (Swiski Deposition Exhibit No. 1 was marked
5    for identification.)
6    BY MR. ABER:
7    Q.   Let me show you a document which has been marked
8    as Swiski 1.
9          MR. ELLIS:  This already has other exhibit
10   names.
11         MR. ABER:  It may have.  I just couldn't
12   find it.  It may be a duplicate.
13   BY MR. ABER:
14   Q.   Now, this is a set of two e-mails.  One is from
15   John Dillman to Dr. Shaman.  You know who Dr. Shaman was?
16   A.   I had heard his name.
17   Q.   Okay.
18   A.   Yes.
19   Q.   I'll tell he was at the University of
20   Pennsylvania.
21   A.   A statistician of some sort.
22   Q.   Who did a lot of the calculations regarding the
23   promotional test.
24         The second one is to Lisa McNatt from

Page 20

1    John Dillman which really transmits the main one.  Okay?
2    A.   Okay.
3    Q.   But there are two e-mails there.  The first one
4    takes up about two inches of the top.
5    A.   Mm-hmm.
6    Q.   But the main one is the one I'm concerned about.
7          Have you ever seen this document before?
8    A.   I may have seen this in Mr. Ellis's office --
9    Q.   Okay.
10   A.   -- last week.
11   Q.   Basically, the first two pages show the results
12   of two different calculations --
13   A.   Okay.
14   Q.   -- of the promotional list using the statistical
15   method depending where you placed the first standard
16   deviation in relationship to the mean.
17   A.   Right.
18   Q.   I direct your attention to the second page where
19   it says "Our superintendent prefers the later methodology
20   in order to increase the minority representation at the
21   ranks of sergeant and lieutenant."
22         Do you see that language?
23   A.   Yes.
24   Q.   Okay.  Now, this e-mail is dated November 6th,

Page 21

1    2001.  Now, from the sequence that you've described to
2    me, this e-mail would have been sent before you got that
3    heads-up phone call.
4    A.   Correct.
5    Q.   If Mr. Dillman is to be believed, at that point
6    there had already been discussions of an alternative
7    list, because, then, he's telling Dr. Shaman that the
8    superintendent has already expressed a desire to use the
9    new one.
10         MR. ELLIS:  I object to the form of the
11   question, if that's a question.
12   BY MR. ABER:
13   Q.   Do you understand that to be what's being said
14   here?
15   A.   From what you presented to me and what I read
16   here, yes --
17   Q.   Okay.
18   A.   -- I understand that it would have been prior to
19   our discussions.
20   Q.   Is that consistent with what happened in that
21   three-way meeting that you had after the heads-up phone
22   call?
23   A.   No.  No, it wouldn't be.
24   Q.   What is the inconsistency?

Dillman                          v.                          Chaffinch
C.A. # 02-509 KAJ            Joseph Swiski           January 2, 2004

Page 22

1     A. I remember distinctly being told that there was
2  no list has been generated. It was just conversation
3  about it and that previous superintendents had had
4  conversations about it. I do remember Lieutenant Colonel
5  Marcin becoming very upset with Colonel Chaffinch like
6  just, you know, telling him to drop it, leave the idea of
7  a second list alone. The way he referred to it made it
8  sound like nothing had occurred as yet.
9     Q. Okay. Let me show you another e-mail which has
10 previously been marked Defendants' 5. This is the e-mail
11 from Thomas Marcin to John Dillman dated November 9th,
12 which might have been about the same time as your heads-
13 up call. I'm going to ask you to review that one.
14    A. First time I've seen this document.
15    Q. Okay. What does that e-mail mean to you as you
16 review it, the one marked Defendants' 5?
17    A. Well, it would appear that Lieutenant Colonel
18 Marcin had knowledge of the request for a second list and
19 was actually soliciting Mr. Dillman to produce it.
20    Q. After consultation with Dr. Shaman?
21    A. Right.
22    Q. That would have been the consultation in what has
23 now been marked Swiski 1, the e-mail that Mr. Dillman
24 sent three days earlier to Dr. Shaman.

Page 23

1     A. Okay.
2     Q. Is that e-mail, then, consistent with what was
3  represented to you at this three-way meeting after the
4  heads-up phone call?
5        MR. ELLIS: I object to the form of the
6  question.
7     A. No, no.
8        MR. ABER: All right. Just for the record,
9  Mr. Ellis is correct. What has been marked Swiski 1 is
10 also Defendants' Exhibit 8.
11       MR. ELLIS: Okay.
12       MR. ABER: Off the record.
13       (A brief discussion was held off the
14 record.)
15       THE WITNESS: Can I clarify something?
16       MR. ABER: Anything you want.
17       THE WITNESS: The e-mails you just showed me
18 indicate that the list did exist -- had been not sent
19 yet. Correct?
20       MR. ABER: Well, the e-mail marked Swiski 1
21 is sending the -- take a look at it -- is sending the two
22 lists -- is sending the list up --
23       THE WITNESS: To Dr. Shaman.
24       MR. ABER: -- the scores up to Shaman --

Page 24

1        THE WITNESS: Okay.
2        MR. ABER: -- and asking him to compute it
3  two ways --
4        THE WITNESS: Right.
5        MR. ABER: -- one with the first standard
6  deviation centered on the mean --
7        THE WITNESS: Right.
8        MR. ABER: -- and then with the first
9  deviation starting at the mean and moving right.
10       THE WITNESS: Yes. But there's no
11 indication that this went to Marcin. Correct?
12       MR. ABER: No.
13       THE WITNESS: Okay. So at this point
14 Marcin, when he said that a second list does not exist,
15 in his mind, he -- that's very well possible.
16       MR. ABER: But there had been discussions of
17 creating a second list.
18       THE WITNESS: Well, yes. Well, I knew that
19 when they -- when --
20 BY MR. ABER:
21    Q. Okay. Let me show you --
22    A. I mean, the colonel told me that there were
23 discussions of that.
24    Q. He told you there had been discussions of two

Page 25

1  bands?
2     A. Well, no. He said that when that Mr. Dillman
3  said, you know, there's a second way to do that that
4  night -- I believe he was downstairs in Mr. Dillman's
5  office.
6     Q. In Swiski 1, Mr. Dillman is telling Dr. Shaman
7  that there are two methods and Colonel Chaffinch prefers
8  one method over the other.
9     A. Mm-hmm.
10    Q. Then you have the e-mail marked Defendants' 5
11 from Major Marcin saying let's get the bands up to us
12 with Dr. Shaman's comments --
13    A. Right.
14    Q. -- on the two alternatives.
15    A. Right.
16    Q. Okay.
17    A. But he didn't possess those lists when he was
18 telling me the second list doesn't exist.
19    Q. Now, let me show you another e-mail marked
20 Defendants' 9, which is an e-mail from Mr. Dillman to, I
21 believe, Lieutenant Colonel Chaffinch.
22    A. Okay.
23    Q. At this point on November 13th it's clear that
24 there are two bands in existence.

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477