Dillman                                    v.                              Chaffinch
C.A. # 02-509 KAJ                    Joseph Swiski                    January 2, 2004

Page 26

1    A. Right.
2    Q. Okay. Were you ever told that there were two
3    bands in existence?
4    A. I believe Sergeant Fiscella made a mention of
5    that, but I'm not sure.
6    Q. Were you ever told by either Major Marcin or
7    Lieutenant Colonel Chaffinch that two bands existed?
8    A. Not by Colonel Chaffinch. And I can't be
9    specific on Lieutenant Colonel Marcin. It wasn't -- you
10   know, if he did mention it, it wasn't during the time
11   this was all transpiring.
12   Q. After your call to Sergeant Fiscella saying there
13   are no two bands --
14   A. Mm-hmm. I told him there was discussion.
15   Q. Okay. You're now saying you're unsure whether
16   you ever knew two bands did exist?
17   A. Oh, no. I did not have any knowledge of two
18   bands existing.
19   Q. I understand.
20       So you never had a reason to call
21   Sergeant Fiscella up and say, "What I told you about two
22   bands is wrong. I now know there are two bands"?
23   A. I may have had a discussion with
24   Sergeant Fiscella about that, but it would have been

Page 27

1    months after.
2    Q. After you called Sergeant Fiscella up and said
3    there are no two bands, did you ever have another
4    conversation with Sergeant Fiscella before the bands were
5    actually published -- the final one was chosen?
6    A. I may have, but it -- I think it was along the
7    lines of telling him, listen, I've been guaranteed or
8    assured that this band is going to be put out like all
9    the other bands have been put out and there's no need to
10   have a concern.
11   Q. Okay. I will tell you -- and I don't have it in
12   front of me. But there is an e-mail from Major Marcin to
13   Mr. Dillman on November 14th at 8:03 a.m. in the morning?
14       MR. ELLIS: That would be D-11.
15       MR. ABER: What?
16       MR. ELLIS: Do you want to show him D-11?
17       MR. ABER: D-11? Is that it?
18       They're in so many different forms. I just
19   don't recognize the form.
20       You're correct.
21       MR. ELLIS: I'm just showing the witness
22   D-11.
23       MR. ABER: I understand. Thank you.
24       Off the record.

Page 28

1       (A brief discussion was held off the
2    record.)
3       THE WITNESS: Okay.
4    BY MR. ABER:
5    Q. All right. Do you remember whether you had a
6    telephone call with Sergeant Fiscella on the evening of
7    November 13th?
8    A. What day of the week was that?
9       The reason I'm asking you is I went to
10   a troopers association meeting and it was shortly
11   after -- it was within a week of my first involvement
12   with this. It was after a meeting that occurred with
13   Sergeant Fiscella and the executive staff on the second
14   floor library of the academy.
15   Q. That meeting took place near the end of November,
16   I think.
17   A. This -- the meeting I had -- it could have been.
18   Yes.
19   Q. We understand that there was a telephone
20   conversation between you and Sergeant Fiscella on the
21   same day that Sergeant Fiscella had gone to see the
22   U.S. attorney, Colm Connelly.
23   A. That was the first call I had with -- the first
24   conversation I had with Sergeant Fiscella, because he

Page 29

1    told me during that conversation he had gone to see
2    Colm Connelly.
3    Q. Okay. He has quoted you as saying, "I don't know
4    of any second list. I'm out of the loop on this." Do
5    you remember saying that?
6    A. That's probably an accurate representation.
7    Q. Okay. So on the 13th you made a representation,
8    if his dates are correct, that there was no two lists.
9    A. That was my understanding.
10   Q. But we now understand there were two lists on the
11   13th.
12   A. Well, I don't know when that second list would
13   have been delivered.
14   Q. Well, if you look back at --
15   A. I don't know when it went -- got into Lieutenant
16   Colonel Marcin's hands.
17   Q. We know that on the 13th at 2:30 in the
18   afternoon, according to -- let me show you again -- if
19   you turn to Tab 9 there, you'll see an e-mail there
20   November 13th at 2:30.
21   A. Mm-hmm.
22   Q. Colonel Chaffinch had been sent two bands by
23   John Dillman where he had been told he has calculated the
24   bands using both methodologies.

8 (Pages 26 to 29)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A491

Dillman                                      v.                              Chaffinch
C.A. # 02-509 KAJ                      Joseph Swiski                     January 2, 2004

Page 30

1    A. Okay.
2    Q. All right. So you would agree with me, as of
3    November 13th at 2:30, two bands had been communicated to
4    Colonel Chaffinch?
5    A. I don't know when Colonel Chaffinch opened this.
6    I don't know if he read it or his secretary read it.
7    Q. I understand that.
8    A. Okay.
9    Q. All right.
10   A. I'm not trying to be evasive, but I can't say
11   that I know for a fact he had it on that day. He never
12   said to me, anyway --
13   Q. You're a police officer and you're a --
14   A. Well, I try to be.
15   Q. Okay. But on the 13th Mr. Dillman had
16   communicated by e-mail to Colonel Chaffinch of the second
17   band by e-mail.
18   A. According to this Exhibit 9, yes.
19   Q. Do you know on what basis Major Marcin made the
20   decision let's -- about, you know, with 12 hours later
21   the next morning at 8:03 to use the old banding method
22   rather than the new banding method?
23   A. He had been speaking of that. He made a few
24   comments on the night with the phone calls with -- the

Page 31

1    night I called Vince and then I went back. He made a
2    couple comments to Colonel Chaffinch like, Aaron, you
3    know, don't mess around with any second lists. Just --
4    let's just do it the way we've done it in the past.
5    Along those lines.
6    Q. Who said that?
7    A. Marcin said that to Chaffinch.
8    Now I'm hearing this. But all I know is
9    there was talk about maybe doing it an alternative way, a
10   very aloof -- you know, the way it was given to me, it
11   was like a passing comment like, hey, you know, there's
12   another way we can do that. And Colonel Chaffinch was
13   very specific when he told me. He said, "oh," and turned
14   around and walked away.
15   Q. Okay.
16   A. So he never said do it -- never told me he said,
17   yes, Mr. Dillman do that. Okay.
18   Q. If your call with Swiski is on the 13th --
19   A. I'm Swiski.
20   Q. Excuse me. I'm reading your name.
21   A. That's all right.
22   Q. If your call with Sergeant Fiscella is on the
23   13th and that's when you tell him you're out of the loop
24   and that's your first notice of this, you then go have

Page 32

1    this three --
2    A. No, no, no, no. The conversation -- the three-
3    way -- I'm sorry. I should let you finish. Go ahead.
4    Q. You told me, when I asked you about the
5    conversation, that Sergeant Fiscella has recorded, at
6    least in his notes, November 13th where you agreed that
7    you might have used the term "I'm lout of the loop."
8    A. Okay.
9    Q. That was the first call?
10   A. No, no.
11   Q. Second call?
12   A. I don't specifically remember that phone call. I
13   remember the first phone call I had with Vince. Okay.
14   Q. Where --
15   A. And that was when I received the heads-up call
16   from somebody. I went to Marcin. I spoke with
17   Chaffinch. Then I called Vince that time -- the first
18   time.
19   Q. Is that the one where you denied the existence of
20   the second list?
21   A. Correct. I was operating under what I believe I
22   was being told, that there's no second list exists.
23   Q. Okay.
24   A. And, according to your e-mails, that was true.

Page 33

1    Q. Well, we'll get to that in a minute.
2    A. Okay.
3    Q. But that call where you call back and say there's
4    no two lists that exists, is that the call that
5    Mr. Fiscella is saying happened on the 13th?
6    A. No, no. I wouldn't have made a comment to him at
7    that point like I'm out of the loop on this because I
8    just got knowledge of it. So I couldn't have established
9    a loop existed.
10   Q. So, then, the comment that I'm out of the loop
11   would have been before you met with Marcin and Chaffinch?
12   A. It would have been long after. Not long after.
13   It would have been after that.
14   Q. Now I'm confused.
15   A. Okay. I'll try --
16   Q. Let's go through the sequence again.
17   The first call that you got from anybody is
18   the heads-up call.
19   A. Correct.
20   Q. You think that was somewhere between the 7th and
21   the 14th of November.
22   A. Probably closer to the 12th -- 11th or 12th.
23   Q. You then immediately go to Marcin.
24   A. And Chaffinch.

9 (Pages 30 to 33)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Dillman
C.A. # 02-509 KAJ

v.
Joseph Swiski

Chaffinch
January 2, 2004

Page 34

1  Q.  And Chaffinch.
2  A.  Right.
3  Q.  They tell you there is no second list.
4  A.  Right. I'm told specifically that
5  Colonel Chaffinch went down when he heard that
6  Mr. Dillman had the bands. He's looking at the bands.
7  Mr. Dillman, unsolicited by Colonel Chaffinch, says, "Do
8  you know there's another way to do that?"
9  Q.  Okay.
10  A.  Colonel Chaffinch says, "oh," turns around and
11  walks away.
12  Q.  We know at that time already a week or so earlier
13  around the 6th Mr. Dillman is communicating with
14  Dr. Shaman that the superintendent prefers the new method
15  to the old method.
16  A.  Well, I know that as of today, yes.
17  Q.  After you had that meeting, you then call
18  Sergeant Fiscella back.
19  A.  I call him for the first time.
20  Q.  Oh, the first time he called.
21  A.  No, no.
22  Q.  Okay.
23  A.  I received an anonymous call.
24  Q.  You're right. Okay. You're right. I

Page 35

1  understand. You got the heads-up call, the meeting with
2  Marcin and Chaffinch.
3  A.  Correct.
4  Q.  Then you call Fiscella up.
5  A.  First time.
6  Q.  Okay. Is that the time when you said that you're
7  out of the loop?
8  A.  No.
9  Q.  It was some later date?
10  A.  It probably was.
11  Q.  Sergeant Fiscella is relating that comment to
12  November 13th.
13  A.  Not to my recall.
14  Q.  On November 13th you call him back and say there
15  is no second list.
16  A.  You know, I can't tell you exactly how many
17  phone calls or conversations I would have had with
18  Sergeant Fiscella. I know I was trying to convince him
19  that there's nothing wrong, that everything is copacetic,
20  that there's no problems. So this could have been phone
21  calls. I know it was at the DSTA meeting. There's a
22  couple communications we had.
23  Q.  Okay.
24  A.  And for me to say I'm not in the loop on that, he

Page 36

1  may have been telling me something that would be outside
2  of my purview. And my answer would be, hey, Vince, I
3  don't know. I'm out of the loop on that.
4  Q.  Give me a minute. I'm going to read to you
5  testimony from Sergeant Fiscella.
6      MR. ELLIS: What page are you on?
7      MR. ABER: Page 97.
8      MR. ELLIS: Do you want him to read it out
9  of here?
10      MR. ABER: Well, let me read.
11      MR. ELLIS: I'm sorry. Go ahead. Do
12  whatever you want.
13  BY MR. ABER:
14  Q.  Okay. He is saying on the same day that he met
15  the U.S. attorney he's coming back from Wilmington. It
16  says:
17      "QUESTION: Joe Swiski called you that day
18  as well.
19      After the emergency meeting with the board?
20      "ANSWER: Actually, he called me minutes
21  after I left the U.S. Attorney's Office."
22      "QUESTION: He said, "Oh, my God. I'm out
23  of the loop. I don't know what's going on"?
24      "ANSWER: Yes, sir.

Page 37

1      "QUESTION: What was going on? What did you
2  understand him to mean by that?
3      Well, let's just do it this way. He called
4  you and said what?
5      "ANSWER: "Is it true that you met with the
6  U.S. attorney"?
7      "QUESTION: And he called you minutes after
8  you met with the U.S. attorney?
9      "ANSWER: Yes, sir. I was on my way back to
10  Troop 9.
11      "QUESTION: You were on your way back to the
12  troop?
13      "ANSWER: I was on my way book to Troop 9 in
14  Odessa. That's probably a 25-minute ride. Joe Swiski
15  called me on my cell phone. And at that time Joe Swiski
16  and I were pretty close.
17      "QUESTION: He said, "Is it true you met
18  with the U.S. attorney?"
19      You said, "Yes, it is."
20      "ANSWER: Yes.
21      "QUESTION: He said, "I'm out of the loop."
22      "ANSWER: He said, "Oh, my God. I'm out of
23  the loop.
24      "QUESTION: Your response to that was?

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477

A493

Dillman                                          v.                              Chaffinch
C.A. # 02-509 KAJ                         Joseph Swiski                      January 2, 2004

Page 38

1    "ANSWER: "It seems like everybody is out of
2    the loop."
3            MR. ELLIS: You might want to read the next
4    two lines.
5            MR. ABER: "QUESTION: Was there any other
6    conversation?
7            "ANSWER: Not that I recall, no.
8            "QUESTION: Okay. So you confirmed that he
9    was out of the loop. He didn't offer any more
10   information.
11           "ANSWER: I did not.
12           "QUESTION: Did you talk to him what you
13   talked to the U.S. attorney about?
14           "ANSWER: No.
15           "QUESTION: Did you talk to him about your
16   concern with the cut-off scores?
17           "ANSWER: No.
18           "QUESTION: The banding process?
19           "ANSWER: No.
20           "QUESTION: The discussions or
21   representations that Dillman made concerning Marcin's
22   suggestions to change the banding score?
23           "Answer: No."
24           Is that enough?

Page 39

1            MR. ELLIS: That's fine with me.
2            MR. ABER: Okay.
3    BY MR. ABER:
4        Q. So, according to him, there was a conversation
5    with him on the 13th as he's coming back from the
6    U.S. attorney which he says occurred at about
7    eleven o'clock. Do you recall that conversation that you
8    asked him whether he had been to the U.S. attorney?
9        A. I can't be sure. I -- as I recall, the first
10   conversation I had with him, he said he was going to
11   see -- I'm scheduling an appointment. I'm going to
12   see -- I'm going to meet with Colm Connelly. So it may
13   have been the next day. I don't know.
14       Q. So you may have called him back after he met with
15   him?
16       A. It's a possibility. So -- but I'm not one to
17   say, "Oh, my God. I'm out of the loop." I would never
18   use that terminology.
19       Q. Well, you might say, "I'm out of the loop."
20       A. I might say, "I'm out of loop," but I would never
21   say, "Oh, my God. I'm out of the loop."
22       Q. Okay.
23       A. You know, this "out of the loop" talk, it could
24   be I'm out of the loop with the attorney general's office

Page 40

1    at the federal level.
2        Q. I just want to know what was said as opposed
3    to --
4        A. I can't draw back to that.
5        Q. Were you ever told by either Major Marcin or
6    Lieutenant Colonel Chaffinch that a second banding
7    method had actually been calculated and presented to
8    them?
9            MR. ELLIS: Presented to whom?
10           MR. ABER: Colonel Chaffinch and Major
11   Marcin.
12       A. No. As I recall, there was discussions about it.
13   And Marcin -- Lieutenant Colonel Marcin or Major
14   Marcin -- Tom Marcin was emphatic with Chaffinch -- just,
15   you know, don't mess with any second list. The idea of
16   it -- just don't even pursue it. Something along those
17   lines.
18       Q. Well, then, with that impression, we have what I
19   previously showed you, I believe, Major Marcin's e-mail
20   to Mr. Dillman marked Defendants' 5 where he's asking
21   Mr. Dillman to send the bands completed both ways up to
22   Colonel Chaffinch.
23       A. Mm-hmm.
24       Q. Now, does that jive with his --

Page 41

1        A. Assuming, you know, my conversation with Fiscella
2    was on the 12th, which it's got -- I'm almost positive it
3    was around the 12th.
4        Q. The first conversation?
5        A. Yes, the first conversation with Fiscella.
6            You know, Marcin very well may have decided
7    after he heard about Fiscella that -- to abandon any
8    proceedings.
9        Q. But he knew there were going to be two bands
10   calculated before that because he's asking Dillman to
11   send them both up on November 9th.
12           MR. ELLIS: I object to the form of the
13   question.
14   BY MR. ABER:
15       Q. Let me show you that e-mail again.
16           MR. ELLIS: I've got it right here.
17           MR. ABER: Defendants' 5.
18       A. I didn't specifically ask --
19       Q. Okay.
20       A. -- Marcin. I didn't walk in and say, you know,
21   Aaron, Tom, do you guys have a second list?
22       Q. I understand that.
23       A. I didn't ask that. And what they told me was at
24   that time a second list doesn't exist.

11 (Pages 38 to 41)

Dillman                                          v.                                     Chaffinch
C.A. # 02-509 KAJ                          Joseph Swiski                          January 2, 2004

Page 42

1    Q.  Okay.
2    A.  There was talk about it.  And, then, when Marcin
3  changed in -- not changed into -- but said, Aaron, you
4  know, don't even mess around with this.  You know, don't
5  even -- don't further explore it.  That's --
6    Q.  That was after you had learned that Fiscella was
7  consulting with the U.S. attorney?
8    A.  That's when he was going to have a
9  conversation, yes.
10    Q.  Okay.
11    A.  That was the first conversation I had with
12  Fiscella.
13    Q.  So prior to knowledge that Fiscella was going to
14  the U.S. attorney, we know that Marcin was asking for
15  both lists to be prepared.
16    A.  You know that.
17    Q.  Well, we know that from Defendant D-5, the e-mail
18  from Marcin to Dillman asking that they be completed both
19  ways.
20    A.  Okay.
21    Q.  So am I correct that, before Fiscella says I'm
22  going to the U.S. attorney's office, Marcin is asking for
23  the bands to be prepared both ways?  Isn't he?
24    A.  According to this e-mail, yes.

Page 43

1    Q.  Okay.
2    A.  Now, is that under the direction of the
3  superintendent?
4    Q.  That's for Major Marcin to answer.
5    A.  Okay.  So true.
6    Q.  Did Major Marcin ever represent to you that he
7  knew that the second band was being calculated and/or had
8  been requested?
9    A.  Not to my knowledge.
10    Q.  The first time you learned of that was today?
11    A.  I heard a second band had been generated after
12  some depositions were taken.
13    Q.  The second band to be calculated after the
14  depositions or --
15    A.  No, no, no, no.
16    Q.  Okay.
17    A.  I had gained knowledge of the fact that it
18  probably had occurred after a series of depositions, you
19  know --
20    Q.  But is today the first time that you realized
21  that Major Marcin had actually knew that they were being
22  calculated and/or requested them at the same time
23  you're talking to him and Colonel Chaffinch?
24    A.  Yes.

Page 44

1    Q.  Okay.  That's the difference with your prior
2  understanding?
3        MR. ELLIS:  I object to the form of the
4  question.
5  BY MR. ABER:
6    Q.  Did you answer the last question?
7    A.  Pardon?
8    Q.  Did you answer the last question?
9    A.  No.  I'm still thinking about it.
10        It varies from what I -- from my
11  understanding when I walked out of their office prior to
12  calling Fiscella for the first time, it's -- my level of
13  understanding is different from what I hear today.
14    Q.  Okay.  When you walked out of the office of this
15  three-person meeting --
16    A.  Right.
17    Q.  -- did you have an understanding that a second
18  list had been considered and had already been rejected or
19  it was being considered and we haven't decided yet or was
20  it there had been no discussions?
21    A.  My interpretation:  It was perhaps something that
22  might be in the works, but it doesn't exist.
23    Q.  Okay.
24    A.  And then I hear -- I recall Marcin telling Aaron

Page 45

1  that, listen, let's just, you know, drop this whole
2  thing, you know, about a second list.
3    Q.  That was after Fiscella --
4    A.  When I came back and told them what Fiscella had
5  told me.
6    Q.  That he was going to go to the U.S. attorney?
7    A.  Well, that and -- not so much the U.S. attorney.
8  That didn't bother me.  But the going to the executive
9  board -- this administration was in its infantile stage.
10  There wasn't a lot of trust to begin with.  Okay?  And
11  here's what that -- you know, even if there was no harm
12  done -- more or less, no harm was done -- the harm was
13  already done.  The damage was done.  So my concern was
14  the integrity -- the perceptions of the administration.
15    Q.  Were you aware that prior to Major Marcin
16  directing Mr. Dillman to produce the band, the
17  promotional band, what I call the old-fashioned way, on
18  the morning of the 14th --
19    A.  Mm-hmm.
20    Q.  -- that he had called Fiscella twice that same
21  night, the night before?
22    A.  No.  There were conversations that I know I had
23  with Fiscella of reassuring him that things were going to
24  be done the way they had been done in the past.  Marcin

12 (Pages 42 to 45)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A495

Dillman                                    v.                              Chaffinch
C.A. # 02-509 KAJ              Joseph Swiski              January 2, 2004

Page 46

1  may have had the same types. I don't know.
2      Q. According to Sergeant Fiscella, he got a calls on
3  the 13th at 6:30 and at ten o'clock that same night from
4  Major Marcin on the issue of the banding. Has Lieutenant
5  Colonel Marcin ever told you about those calls?
6      A. I don't specifically recall.
7      Q. Okay.
8      A. He had mentioned conversations he had with Vince.
9  I don't know if it was those two. And the conversations
10 he had with Vince was trying to convince him that,
11 listen, the bands are going out the way they've gone out
12 in the past. And I know that was a topic of conversation
13 that I had with him.
14     Q. Were you aware that on the 14th a decision had
15 been made to use the old banding method?
16     A. I was under the impression that that was agreed
17 upon from the beginning.
18     Q. Well, that's not quite accurate now, you know.
19            MR. ELLIS: I object to the form of the
20 question.
21     A. So true.
22     Q. Do you agree that's not quite accurate now?
23            MR. ELLIS: I object to the form of the
24 question?

Page 47

1      A. It appears that there is some above discussion,
2  but nowhere does it say that this is the way it's going
3  to be done, you know.
4      Q. I understand.
5            Did you understand what the purpose of the
6  alternative or new method of calculating the bands was to
7  be -- why they were considering it?
8      A. No.
9      Q. Just because it seemed like a new method?
10     A. Well, you know, given the brief rundown I was
11 given about the meeting that Aaron allegedly had with
12 Mr. Dillman -- and I'm not -- you know, I'm not in a
13 position to turn to the colonel and say, well, why are
14 you doing that? He's the colonel. I couldn't get --
15 you'd have -- he would be the only one or Marcin would be
16 the only ones to answer that.
17     Q. Okay. Between the 14th when the decision was
18 made to use the old banding method and the meeting that
19 Sergeant Fiscella had with the executive staff, do you
20 know of any other discussions by anybody concerning the
21 use of this alternative banding method?
22     A. There may have been. I, you know --
23     Q. I'm not asking you what may have been. I'm
24 asking: Do you know any knowledge of any other

Page 48

1  discussions before you went into the executive meeting
2  with Sergeant Fiscella?
3      A. Yes.
4      Q. What conversations were those?
5      A. It was a conversation that I heard Lieutenant
6  Colonel Marcin and the colonel having. I was there. I
7  mean, I wasn't, you know, very active in it, but it was,
8  again --
9      Q. You were or were not active in it?
10     A. I was listening. I was in the room.
11     Q. Okay.
12     A. I didn't weigh in on it, so to speak. It was
13 Lieutenant Colonel Marcin telling the colonel, listen,
14 you know, we're just going to go -- the same calculations
15 we've done in the past, you know. And the colonel's
16 response was, hey, look, you know, we didn't do nothing.
17 We didn't create a second list or -- he was saying
18 that -- because even though there's discussion of a
19 second list, the fact that the first list is the one that
20 goes out is all that matters.
21            And the lieutenant colonel was trying to
22 argue -- not argue -- was trying to stress to him that
23 the mere discussion of the second list going through the
24 rank and file is being very disruptive. It's causing a

Page 49

1  lot of concerns among the rank and file.
2            And the colonel's response was along the
3  lines of, listen, you know, I didn't do anything wrong.
4  I mean, I talked about a second list, but the first --
5  the way it has always been done in the past is the way
6  it's going to be done. And that was it.
7      Q. Was Mr. Dillman's name brought up at all during
8  that conversation?
9      A. No.
10     Q. Okay. Before the executive staff meeting, was
11 Mr. Dillman's name brought up at all with regards to the
12 preparation of the second list other than to say that
13 that he was going to calculate it?
14     A. No. See, the only mention of Mr. Dillman's name
15 that I knew of with that second list was when -- that
16 night after Fiscella called, there was a call --
17 conversation with Mr. Dillman, Marcin -- and I was there.
18 I believe it was on a speakerphone. Well, I know it was
19 on a speaker. That's the only conversation that I
20 remember Mr. Dillman being involved with any mention of a
21 second list.
22     Q. Okay. I don't think we've discussed this
23 conference call before. When did this occur?
24     A. The night -- after I had the conversation with

13 (Pages 46 to 49)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 50

1  Fiscella.
2     Q.  **Before he went to the U.S. attorney or after he**
3  **went to the U.S. attorney?**
4     A.  This was the first conversation I had with
5  Fiscella.
6     Q.  **When he said he was going to the U.S. attorney.**
7     A.  Right.  He was scheduled to meet with -- he was
8  going to meet -- something along those lines.  I went
9  back and told Marcin what I had learned from Fiscella.
10  He said get a hold of John Dillman.  And I believe he
11  paged him or -- I didn't page.  I know that.  But it came
12  from Mr. Dillman to call in on Marcin's line.  Marcin was
13  there.  I was there.  I believe Chaffinch was in the
14  hallway or across the hall.  And it was a very brief
15  conversation.
16          Marcin said, "John, did you have occasion to
17  discuss the possibility of a second list with Vince
18  Fiscella?"
19          John answered, "Yes."
20          Then Marcin says, well, it's caused -- I
21  can't remember his exact words -- but it's creating a
22  fire storm, so to speak.  And I -- at that point, I mean,
23  I think I said something along the lines of, you know,
24  don't have any more until this gets straightened out.

Page 51

1  Something along those lines.  And that was about the
2  whole conversation.  That's the only tie-in I knew of
3  Mr. Dillman or know of Mr. Dillman in that second list
4  conversation.
5     Q.  **After the e-mail went out from Major Martian on**
6  **the 14th at 8:03 in the morning that says use the old**
7  **list --**
8     A.  Yes.
9     Q.  **-- you then had that one other conversation**
10  **between you, Marcin and Chaffinch prior to the executive**
11  **staff meeting concerning the second banding process.**
12     A.  Right.
13     Q.  **But there were no other conversations concerning**
14  **the second banding until you got into the executive staff**
15  **meeting with Sergeant Fiscella.  Am I correct?**
16     A.  Well, yes.  I had a conversation at the troopers
17  association meeting.
18     Q.  **What did you tell them?**
19     A.  I -- you know, it was the same day.  We had the
20  executive meeting on the second floor of the library.
21  Vince was there.  And that's when Marcin and Chaffinch
22  were telling Vince, you know, there's not going to be any
23  alternative ways to do it.  It's going to be done the
24  same way.  Aaron repeated about going downstairs to see

Page 52

1  Mr. Dillman and that it was a very brief conversation,
2  that they're not changing the way anything is going to be
3  done.
4          Then that night I went to a troopers
5  association meeting -- and it was a pretty big
6  attendance -- and Vince was reporting to the membership
7  about the meeting.  Well, he was, you know, reporting it,
8  and it was kind of like a tongue and cheek, you know,
9  well, I was told this and I was told that.
10         Then I raised my hand and I challenged
11  Vince.  I said, listen, you know, you were told and you
12  were assured by the superintendent -- or Marcin and
13  Chaffinch that, you know, things are going to be done the
14  way they have always been done and along those lines.
15  And that was it.
16     Q.  **You then had the executive staff meeting?**
17     A.  That was -- no.  The first -- well, the executive
18  staff meeting, is that the one in the library on the
19  second floor?
20     Q.  **The one with Sergeant Fiscella.**
21     A.  Okay.  Yes.  That night was the troopers meeting.
22     Q.  **Okay.  All right.  I'm not worried about the**
23  **sequence exactly.**
24     A.  Okay.

Page 53

1     Q.  **At the executive staff meeting, what was brought**
2  **up and discussed?**
3          MR. ELLIS:  This is the meeting with
4  Fiscella?
5          MR. ABER:  Yes.
6     A.  Well, the whole topic of, you know, that there
7  was going to be a second list or an alternative way of
8  calculating the bands.
9     Q.  **Was it ever admitted during that meeting that**
10  **Mr. Dillman had been requested to prepare a second list?**
11         MR. ELLIS:  I object to the form of the
12  question.
13         MR. ABER:  What's wrong with it?
14         MR. ELLIS:  Admitted?
15         MR. ABER:  Okay.
16  BY MR. ABER:
17     Q.  **Was it ever discussed or mentioned that**
18  **Mr. Dillman had actually been requested to prepare a**
19  **second banding method?**
20     A.  What was said was he offered to prepare a second
21  list.  And the colonel was very noncommittal.
22     Q.  **Did anybody say that Major Marcin had directed**
23  **him to send the second band up, reflecting the e-mail**
24  **that I've shown you, Defendants' 5?**

14 (Pages 50 to 53)

Dillman                                         v.                                    Chaffinch
C.A. # 02-509 KAJ                        Joseph Swiski                        January 2, 2004

Page 54

1  A.  I don't recall that being mentioned at all.
2  Q.  Okay.  During the meeting did anybody get upset?
3  A.  Yes.
4  Q.  Who got upset?
5  A.  Vince, Lieutenant Colonel Marcin.  It was kind of
6  an emotional meeting.
7  Q.  Okay.  Who got upset first?
8  A.  I can't recall for sure.  It may have been
9  Lieutenant Colonel Marcin got upset.  When you say "got
10 upset," I want to be clear, there was no yelling,
11 screaming, threatening, cursing or anything like that.
12 Voices got elevated.  There were some curt responses, but
13 I don't recall anybody threatening anybody or anything
14 like that.
15 Q.  So if there was testimony that there was yelling,
16 screaming and cursing, that would be different than your
17 recollection?
18 A.  That's different than my recollection, yes.
19 Q.  Okay.
20 A.  I mean, it was an emotionally-charged meeting.
21 Q.  What I had shown you marked Swiski 1, which is
22 also Defendants' 8, had you ever seen that e-mail before
23 today?
24 A.  This one?

Page 55

1  Q.  Yes.
2  A.  No.  Well, at Mr. Ellis's office.
3  Q.  Okay.
4  A.  I believe this is one I saw.
5  Q.  Was it in the form that you just were looking
6  through with the tabs on it or was it handed to you with
7  others?
8  A.  I believe it was handed to me as a single
9  document.
10 Q.  Okay.  Did you review it at that time?
11 A.  In Mr. Ellis's office I just scanned it.
12 Q.  When you reviewed it, did you realize that in
13 that document Mr. Dillman had recounted a preference by
14 the superintendent for the new methodology of calculating
15 the bands?
16 A.  I recall reading that, yes.
17 Q.  Did that surprise you when you read it?
18 A.  Well, see, it would be tough to say
19 "surprised," because since these depositions began there
20 has been -- maybe even not specifically these.  There has
21 been a lot of depositions where a lot of different
22 versions of what occurred has come out.  And I think I
23 already was aware of the fact that this allegation or
24 this fact had been established.

Page 56

1  Q.  Before you went to review the document?
2  A.  Right.  So it wasn't like a big shock.
3  Q.  But it's not something you were aware of as the
4  events were happening?
5  A.  No.
6  Q.  The discussions concerning the development of the
7  second band method, you were never told by anybody that
8  Major Marcin was a participant in those discussions -- am
9  I correct? -- as opposed to Colonel Chaffinch.
10     MR. ELLIS:  I object to the form of the
11 question.
12 A.  Do you mean was Lieutenant -- Lieutenant Colonel
13 Marcin was there that night that apparently Chaffinch
14 spoke to Mr. Dillman.
15 Q.  Okay.  But Major Marcin was not?
16 A.  Pardon?
17 Q.  But Major Marcin was not?
18 A.  No.  Marcin was there that night.  As I recall,
19 what I was told was Marcin was down talking to
20 Mr. Dillman, found out that the bands were ready.  He
21 went upstairs and told Chaffinch, and then Chaffinch went
22 down.  And that's when this conversation took place.
23 Q.  Now, is that something that you've discussed with
24 Mr. Marcin since his deposition in this matter was taken?

Page 57

1  A.  No.  This was way in the beginning.
2  Q.  Let me ask you a question.
3     When did you retire from the state police?
4  A.  April.
5  Q.  Of?
6  A.  This year.
7  Q.  2003?
8  A.  Yes.  I'm sorry.  2003.
9  Q.  It's two days into it.  You can make that
10 mistake.
11 A.  Right.
12 Q.  Based on your years of serving the state police,
13 do you believe that Aaron Chaffinch has a reputation one
14 way or the other for truthfulness?
15 A.  It pains me to say this, but he has a reputation
16 for not being very truthful.
17 Q.  Is there any specific example you can think of?
18 A.  Well, the version of initially what occurred on
19 this whole second list, the one that I took to the
20 membership of the Delaware State Troopers Association
21 meeting, defending him, defending his actions when in
22 fact it wasn't exactly the way it happened.
23     He directly -- apparently directly solicited
24 Mr. Dillman to prepare a second list.  And that's very

15 (Pages 54 to 57)

Dillman                                    v.                          Chaffinch
C.A. # 02-509 KAJ                   Joseph Swiski                   January 2, 2004

Page 58

1  inconsistent with what he told me. And I remember very
2  clearly what he told me, because before I stand up in
3  front of an entire membership of the troopers association
4  and defend somebody I'm going to have what they told me
5  in my mind.
6      **Q.  Any other examples?**
7          **I'm not asking for your personal knowledge.**
8  **We're talking about your knowledge of his reputation**
9  **within the state police.**
10     A.  This particular incident has generated a lot of
11 that reputation. Outside of that I don't have any other
12 specific incidents that I can recall.
13     **Q.  Do other people in the state police believe him**
14 **to be truthful?**
15         MR. ELLIS: I object to the form of the
16 question.
17     A.  There are people in the state police that believe
18 he's truthful, yes.
19     **Q.  Are there members of the state police that**
20 **believe he's not truthful?**
21     A.  Yes.
22     **Q.  Is that a widely-held belief or is it 50/50?**
23     A.  Well, see, I never really took a poll, because,
24 you know, there's negative things said about everybody.

Page 59

1          MR. ABER: All right. I have no other
2  questions, sir. Thank you.
3          THE WITNESS: Okay.
4          MR. ABER: Sorry this took longer than I
5  expected.
6          THE WITNESS: That's fine.
7          MR. ELLIS: I don't have any questions.
8          MR. ABER: You have the option of reading
9  your deposition. You cannot delete anything that's in
10 it, but you can make corrections from what the court
11 reporter has taken down or you can make additions or
12 corrections, understanding, though, you can't delete
13 anything substantive.
14         THE WITNESS: Right.
15         MR. ABER: Or you can waive that and just
16 let it be filed as is. But that option is up to you.
17         THE WITNESS: I would like to review it, if
18 I may.
19         MR. ABER: What will happen is I'll get a
20 copy with an errata sheet, and I will -- now I need an
21 address --
22         THE WITNESS: Okay.
23         MR. ABER: -- where to send it.
24         THE WITNESS: 102 Marley Road, Middletown,

Page 60

1  19709.
2          MR. ABER: Thank you.
3          (The deposition concluded at 11:20 a.m. this
4  same day.)
5
6          - - - - -
7
8              INDEX TO TESTIMONY
9
   JOSEPH SWISKI                          PAGE
10
   Examination by Mr. Aber                  2
11
12
13         - - - - -
14
15             INDEX TO EXHIBITS
16
   SWISKI^ NAMEHERE DEPOSITION EXHIBIT NO.      PAGE
17
   1 ..........................  19
18
19
20         - - - - -
21
22
23
24

Page 61

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

16 (Pages 58 to 61)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Dillman
C.A. # 02-509 KAJ

v.
Joseph Swiski

Chaffinch
January 2, 2004

Page 62

State of Delaware )
                 )
New Castle County )
          CERTIFICATE OF REPORTER
     I, Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 2nd day of
January, 2004, the deponent herein, JOSEPH SWISKI, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed into
typewriting under my direction.
     I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
     I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


          Robert Wayne Wilcox, Jr.
          Certification No. 101-RPR
          (Expires January 31, 2005)


DATED:  January 3, 2004

17 (Page 62)

Wilcox & Fetzer, Ltd.                Professional Court Reporters                (302)655-0477

A500

10                                    The Downstate Daily                    Delaware State News, Friday, October 29, 2004

# Plaintiff in latest suit subject of internal investigation

**By Tom Eldred**
Delaware State News

DOVER — A spokesman for the Delaware State Police confirmed that the captain who filed a federal gender discrimination lawsuit against state police Superintendent Col. L. Aaron Chaffinch on Wednesday is facing internal charges within the division.

One of the captain's attorneys said the agency might have violated its own rules by confirming the internal investigation.

State police spokesman Lt. Joseph Aviola responded to questions from the Delaware State News after a copy of an internal state police e-mail was faxed anonymously to the newspaper.

"I can tell you that the e-mail is from Capt. James Paige, head of the internal affairs section," Lt. Aviola said. "So far as I can tell you, the copy of the e-mail is accurate."

The e-mail, dated Oct. 25 and sent to "DSP users," says a divisional trial board has been scheduled for 9 a.m. Dec. 20 at state police headquarters to hear charges against Capt. Barbara L. Conley.

"She is charged with three counts of violating Delaware State Police Rule and Regulation (No.) 4 and one count of violating Delaware State Police Rule and Regulation (No.) 40," the e-mail states.

"The board will be composed of Maj. Joseph A. Papili, Capt. Jeffrey R. Evans and Capt. Paul E. Smerkowski."

Capt. Conley's lawsuit, filed in U.S. District Court, claims she was denied promotion to the rank of major twice by Col. Chaffinch because of his bias against women.

The lawsuit alleges that Col. Chaffinch repeats sexually offensive jokes, limericks and demean-

ing stories about women to men and women under his command, and that he talks about sexual relations and his sexual desires and skills.

David B. Mitchell, secretary of the state Department of Safety and Homeland Security, placed Col. Chaffinch on administrative leave with pay after the lawsuit was filed and ordered an immediate investigation.

Mr. Mitchell oversees the state police.

According to state police documents, Regulation No. 4 is conduct unbecoming to an officer. Regulation No. 40 is sexual harassment.

Lt. Aviola said the Police Officer's Bill of Rights prohibits public disclosure of the specifics leading up to Capt. Conley's internal charges.

"I can tell you she was formally charged on Sept. 17," he said. "She has the right to waive her rights (to

privacy) and talk to you about (it) on.

"I think this is further evidence that Capt. Conley was discriminated against," said Capt. Conley's attorney, Stephen J. Neuberger of Wilmington, said Capt. Conley could not comment.

Her name was not listed in a phone directory for Greenwood, where the lawsuit says she resides.

Mr. Neuberger said his client cannot speak out because she is under a gag rule that prohibits all state police troopers from criticizing the division in public.

He said internal affairs proceedings in the state police are not public and that the division might have violated its own rules by confirming the charges against Capt. Conley.

"In order for her, to fully respond, the division would be criticized," he said. "The charges are frivolous, vexatious and utterly without merit, as a violation of their own procedures and violation of the law's evidence of discrimina-

ted against," said Capt. Conley's attorney, Stephen J. Neuberger of Wilmington, said Capt. Conley could not comment.

specifics."

Mr. Neuberger said Capt. Conley decided to apply for a major's position after Maj. David Baylor left vacant when Maj. David L. Baylor retired at the end of august.

"In August she announces she is going to be applying for Maj. Baylor's position and in September hey file internal affairs charges against her," he said. "That's, just more retaliation and discrimination by the police because, as the lawsuit alleges, of this well-known admission toward all things woman."

Mr. Mitchell said he does not believe Capt. Conley would be disciplined for speaking out publicly regarding the charges.

Thomas S. Neuberger, Capt. Conley's other attorney, issued a

prepared statement.

"We will not confirm that there are (internal affairs) charges pending against Capt. Conley," he said. "If any charges exist, they are retaliatory because she was seeking a promotion to major.

"If they have released a document protected by the Policeman's Bill of Rights, that is a crime. We will demand that everyone responsible for releasing the document be confirming its existence be prosecuted to the fullest extent of the law, and Internal Affairs charges be filed against them and they be fired.

"I will not allow them to violate the Policeman's Bill of Rights to protect their lawless behavior."

*Post comments on this issue at* newszap.com under *Sound off* or e-mail *can be reached at 741-8212 or teldred@newszap.com.*

## 1 - SJN Work

| | |
|---|---|
| **From:** | "Stephen J. Neuberger" <SJN@NeubergerLaw.com> |
| **To:** | "Michael Tupman (DOJ)" <Michael.Tupman@state.de.us> |
| **Cc:** | "Tom Eldred (DSN)" <teldred@newszap.com>; "Mary Allen (TNJ)" <mallen@delawareonline.com>; "Randall Chase (AP)" <rchase@ap.org>; "Thomas S. Neuberger" <TSN@NeubergerLaw.com> |
| **Sent:** | Friday, November 05, 2004 1:22 PM |
| **Subject:** | DSP - Complaint and Request for Criminal Investigation |

Dear Mike,

Please consider this e-mail a formal complaint, filed in my capacity as attorney for Captain Barbara L. Conley, DSP. It is sent to you in your capacity as legal counsel for the DSP.

The grounds for this complaint are several fold and are detailed below.

### Complaint #1

On Monday, October 25, 2004, Captain James Paige of DSP Internal Affairs sent an e-mail to the entire Division. This e-mail dealt with matters made confidential by the Law Enforcement Officer's Bill of Rights. 11 Del.C. § 9200 et. seq.

However, the DSP procedure that purports to require the circulation of this information has not been uniformly applied in the nondiscriminatory manner required by both the Fourteenth Amendment and other federal laws prohibiting gender-based disparate treatment.

For example, this procedure was not applied to a male DSP officer who recently was brought up on serious IA charges. In his case, the e-mail was only sent following his conviction. Conversely however, this procedure was applied to my client in the absence of any conviction, and before even a hearing took place. This gender based discriminatory policy has been used in an attempt to stifle dissent and intimidate my female client from opposing practices made illegal by the U.S. Constitution.

This discriminatory policy violates federal law and I formally request that the Attorney General's office undertake an immediate investigation.

### Complaint #2

On October 27, 2004, the aforementioned confidential e-mail was given to the media in blatant retaliation against my client for daring to file a federal lawsuit against the Colonel earlier that same day.

On October 29th, I filed a complaint with Captain Paige, requesting that Internal

12/15/2004

Affairs open an immediate probe to investigate who is responsible for this flagrant violation of Delaware law.

In a letter dated November 1st, Captain Paige formally refused to investigate this violation of the law or to take any steps to inform the DSP of their confidentiality obligations under state law and DSP regulations. He further refused to warn the Division of the internal and also criminal consequences that further violations of these laws will entail.

As the DAG responsible for the Division, I request that you undertake an immediate investigation into this refusal to investigate a flagrant violation of the Delaware Code.

## Complaint #3

On Thursday October 28th, the DSP confirmed the contents of the confidential e-mail to the Delaware media. This action was taken by the Public Affairs Officer, no doubt acting on the authority of a higher-ranking officer, such as Acting Superintendent MacLeish.

By publically confirming the existence of the confidential charges against Captain Conley to the news media, the Public Affairs Officer violated the confidentiality guarantees enacted in the Law Enforcement Officer's Bill of Rights. By confirming the existence of and the specifics contained within a document which the DSP is forbidden by statute from publically releasing, the Division has violated 11 Del.C. §9200(c)(12) ("All records compiled as a result of any investigation subject to the provisions of this chapter . . . shall be and remain confidential and not be released to the public").

In so doing, the Public Affairs Officer and whomever authorized and sanctioned his illegal actions, also have committed the crime of official misconduct, in violation of 11 Del.C. §1211.

In his November 1st letter, Captain Paige confirmed the DSP's actions, but refused to take any remedial action.

Secretary Mitchell is quoted in today's edition of the Delaware State News as stating that the Attorney General's office authorized this release. I find that explanation to be incredible and unworthy of belief. The statute's language is clear and as explained above, the statute has been violated.

I request that the Attorney General's office undertake an immediate investigation into the violation of 11 Del.C. §9200(c)(12) and other provisions of the Law Enforcement Officer's Bill of Rights.

12/15/2004

Relatedly, I request that a criminal investigation be immediately opened into the actions of those responsible for committing, authorizing or sanctioning this violation, which itself constitutes the crime of official misconduct under 11 Del.C. §1211.

### Conclusion

Mike, as you realize, these are serious issues that raise claims under Constitutional provisions and corresponding federal law. Disparate treatment because of gender violates the Fourteenth Amendment. Likewise, retaliation for filing a lawsuit runs afoul of the First Amendment's Petition and Speech Clauses. I would like to give your office the opportunity to address these issues before we must do so in federal court.

Lastly, I find it disconcerting when the police department refuses to investigate violations committed by its own members. I seriously hope that the DSP is not beginning to go down the same path as the New Castle County Police Department.

Please let me know if I can be of any aid in your investigation.

Very Truly Yours,

/s/ Stephen J. Neuberger


***********************************
Stephen J. Neuberger, Esq.
The Neuberger Firm
Attorneys and Counsellors at Law
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
Phone: 302-655-0582
Fax: 302-655-9329
E-Mail: SJN@NeubergerLaw.com

12/15/2004

Westlaw.

**C**
DELAWARE CODE ANNOTATED
TITLE 11. CRIMES AND CRIMINAL PROCEDURE
PART VI. VICTIMS OF CRIMES
CHAPTER 92. LAW-ENFORCEMENT OFFICERS' BILL OF RIGHTS
    **§ 9200  Limitations on political activity; "law-enforcement officer" defined;**
    **rights of officers under investigation.**

(a) A law-enforcement officer within a jurisdiction in this State has the same rights
to engage in political activity as are afforded to any other person. The right to
engage in political activity shall not apply to any law-enforcement officer while on
duty or when acting in an official capacity or while in uniform.

(b) For purposes of this chapter a "law-enforcement officer" is defined as a police
officer who is a sworn member of the Delaware State Police, of the Wilmington City
Police Department, of the New Castle County Police, of the University of Delaware
Police Division, the Delaware State University Police Department, of the police force
established by the Delaware River and Bay Authority, or of the police department,
bureau of police or police force of any incorporated municipality, city or town within
this State or who is a sworn uniformed police or enforcement officer of the Department
of Natural Resources and Environmental Control or of the Delaware State Capital Police,
or a Probation and Parole Officer of the Department of Corrections; provided, however,
that this chapter shall not apply to the Superintendent or Deputy Superintendent of the
Delaware State Police, or to any officer above the rank of Captain in the Delaware
State Police, or to the chief of police of any police force in this State, or to any
other officer who is the highest ranking officer in the law-enforcement agency.
Furthermore, no law-enforcement officer not a member of 1 of the above agencies shall
be covered by this chapter.

(c) Whenever a law-enforcement officer is under investigation or is subjected to
questioning for any reason which could lead to disciplinary action, demotion or
dismissal, the investigation or questioning shall be conducted under the following
conditions:

    (1) The questioning shall be conducted at a reasonable hour, preferably at a time
    when the officer is on duty unless the gravity of the investigation in the opinion
    of the investigator is of such degree that immediate questioning is required.

    (2) The questioning shall take place at the agency headquarters or at the office
    of the local troop or police unit in which the incident allegedly occurred as
    designated by the investigating officer or unless otherwise waived in writing by
    the officer being investigated.

    (3) The law-enforcement officer under investigation shall be informed of the name,
    rank and command of the officer in charge of the investigation. All questions
    directed to the officer shall be asked by and through no more than 2
    investigators. No formal complaint against a law-enforcement officer seeking
    dismissal or suspension or other formal disciplinary action shall be prosecuted
    under departmental rule or regulation unless the complaint is supported by
    substantial evidence derived from an investigation by an authorized member of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DE ST TI 11 § 9200                                                        Page 2
**11 Del.C. § 9200**

department.

(4) The law-enforcement officer under investigation shall be informed in writing of the nature of the investigation prior to being questioned.

(5) Interview sessions shall be for reasonable periods of time. There shall be times provided for the officer to allow for such personal necessities and rest periods as are reasonably necessary.

(6) Except upon refusal to answer questions pursued in a valid investigation, no officer shall be threatened with transfer, dismissal or other disciplinary action.

(7) A complete record, either written, taped or, if taped, transcribed as soon as practicable, shall be kept of all interviews held in connection with the administrative investigation upon notification that substantial evidence exists for seeking an administrative sanction of the law-enforcement officer. A copy of the record shall be provided to the officer or the officer's counsel at the officer's expense upon request.

(8) If the law-enforcement officer under interrogation is under arrest or may reasonably be placed under arrest as a result of the investigation, the officer shall be informed of the officer's rights, including the reasonable possibility of the officer's arrest prior to the commencement of the interrogation.

(9) Upon request, any officer under questioning shall have the right to be represented by counsel or other representative of the officer's choice, who shall be present at all times during the questioning unless waived in writing by the investigated officer. The questioning shall be suspended for a period of time if the officer requests representation until such time as the officer can obtain the representative requested if reasonably available.

(10) An officer who is charged with violating any departmental rules or regulations, or the officer's representative, will be provided access to transcripts, records, written statements, written reports, analyses and video tapes pertinent to the case if they are exculpatory, intended to support any disciplinary action or are to be introduced in the departmental hearing on the charges involved. Upon demand by the officer or counsel, they shall be produced within 48 hours of the written notification of the charges.

(11) At the conclusion of the administrative investigation, the investigator shall inform in writing the officer of the investigative findings and any recommendation for further action.

(12) All records compiled as a result of any investigation subject to the provisions of this chapter and/or a contractual disciplinary grievance procedure shall be and remain confidential and shall not be released to the public.

(d) Unless otherwise required by this chapter, no law-enforcement agency shall be required to disclose in any civil proceeding, other than those brought by a citizen against a law-enforcement officer alleging that the officer breached the officer's official duties and that such breach resulted in injury or other damage to the citizen, any:

(1) Personnel file; or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DE ST TI 11 § 9200                                                    Page 3
**11 Del.C. § 9200**


    (2)  Internal  affairs  investigatory  file  compiled  in  connection  with  a
law-enforcement officer under investigation or subjected to questioning for any
reason which could lead to disciplinary action, demotion, or dismissal.

(65 Del. Laws, c. 12, § 1; 65 Del. Laws, c. 139, §§ 1, 2; <u>67 Del. Laws, c. 237, § 1;</u>
<u>69 Del. Laws, c. 298, § 1; 70 Del. Laws, c. 175, § 1; 70 Del. Laws, c. 186, § 1; 70</u>
<u>Del. Laws, c. 467, §·1; 71 Del. Laws, c. 456, § 1; 72 Del. Laws, c. 367, § 6.)</u>

            <General Materials (GM) - References, Annotations, or Tables>


NOTES, REFERENCES, AND ANNOTATIONS

**Discovery.** -- Although defendants argued that disclosure of the information
plaintiff sought, specifically the Office of Professional Standards (OPS) files, was
clearly prohibited by subdivision (c)(12) and subsection (d) of this section, the
OPS files that plaintiff sought were relevant to prove whether the 37 other officers
charged and/or convicted of dishonesty and/or inaccurate reporting were similarly
situated to plaintiff; defendants were also required to produce responsive
information regarding camera room assignments and training opportunities because
that information was also relevant to plaintiff's ability to establish a prima facie
burden with respect to a retaliation claim. <u>Jones v. City of Wilmington,  299 F.</u>
<u>Supp. 2d 380 (D. Del. 2004)</u>.

**11 Del.C. § 9200, DE ST TI 11 § 9200**


Current through 2004 Regular Session of the 142nd General Assembly

   Delaware Code Annotated.  Copyright © 2004 by the State of Delaware.


  All rights reserved.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Sports

State News Sunday

March 13, 2005

PLF
EXHIBIT NO. 18
KWP 6-9-05

## DSU going to Big Dan

### Win over Ham b

### earns NCAA b

**By Chris Gasiewski**
Delaware State News

RICHMOND, Va. — Greg Jackson walked on the court with tears in his eyes.

The Delaware State men's basketball coach embraced several of his players before heading to the trophy presentation table.

Chants of "Coach of the Year" echoed throughout the Richmond Coliseum as Jackson accepted and hoisted the new hardware.

Top-seeded DSU (19-13), headed to the NCAA Tournament for the first time in school history, felt just one thing — elation — after edging No. 2 (17-13) Hampton 55-53 in the Mid-Eastern Athletic Conference

● Champion
respect **Page**

of the individu:
Delaware State

The win gav
automatic bid i:
ney, which b
They are likely
lotte, N.C., anc
opponent at 6
CBS when t
brackets are ar
the hour-long s

It was Aaro
provided the d
Hampton.

Williams s
points, but he i
basket with two
The 6-2
grabbed Bruce
three-point att
one motion. W



### FRICK'S PICKS

**By George Frick**

George Frick offers a "Frick's Picks"-torial of the past week's sensational high school hoop tournament action on Page 14.

## Best Bet

Find out who the Delaware State Hornets will be playing this week on the NCAA Basketball Championship Selection Show at 6 p.m. today on CBS.

## At A Glance

## Miller captures World Cup skiing

LENZERHEIDE, Switzerland (AP) — Bode Miller had the per-

A508

# By George Frick

## FRICK'S PICKS



Continuing the string of "U's" which began in Friday's "Picks" column... "Ursuline" Academy is the winner and still champion of female basketball in the First State after "upending" St. Elizabeth, 68-51, in what some are calling "The greatest girls basketball game ever played in Delaware" Friday night, before an "unbelievable" sold-out audience at the "U" of Delaware.

DIAA Exec Jack Holloway hailed the 4,800 crowd as "fantastic." "It was the second straight title for the "unequalled" (25 & 1) champs (11 times overall) and their "unbelievable" ninth-grade star (that keeps becoming brighter and brighter), Elena DelleDonne. The "unassuming" 6-4 young lady had a record-breaking 35 points for a state final (11-for-11 from the foul line, also a record) and 15 rebounds while leading her mates in "untying" the shoes of the Vikings and their soph ace,

Khadijah Rushdan, who had the "unenviable" task of trying to stop the Red Raiders representing the big "U."

Coach Sheila DiNardo's "unit" is a joy to watch, unless, of course, they're "utilizing" their "unparalleled" talents against the team for which "you" are rooting. Even then, fans look on in "utmost" amazement. Truly, a great group of gals.

□□□

The boys state final between the favored (by GF among others) defending state champions of Middletown, coached by Chuck Robinson and Caravel Academy, headed by James Kane, played Saturday after this column had been submitted. The results can be found elsewhere in these DSN sport sheets.

□□□

Now, a Sunday special "Frick's Picks"-torial picturing some of the friendly faces found in the tournament crowds this past week...





NO FOOD OR DRINK IN T GYM

Delaware State News/George Frick
Girls' tournament committee members Pat Borowski of Lake Forest, left, who has seen 'em all, 33 finals; and Josette McCullough of Caesar Rodney.

Boys' committee stalwarts, Sam Willia left, and Jim Powell, right, representin #129, welcome Dale Farmer, longtin (replaced by DIAA) to the Bob Carpente



Five in "love" with the Lady Riders, from left, Sue and Joe Hajec, Steve and Connie Welde and Ron Love.



Former Cape Henlopen superintendent his delightful wife Diane cheered and Vikings of Lewes.

A509

The Downstate Daily

State News Sunday, March 13, 2005

## orge

![FRICK'S PICKS header]



: string of "U's"
riday's "Picks"
e" Academy is
ill champion of
in the First State
St. Elizabeth, 68-
are calling "The
sketball game
slaware" Friday
e "unbelievable"
e at the "U" of

ack Holloway
crowd as "fan-
second straight
qualled" (25 &
times overall)
ievable" ninth-
eeps becoming
ighter). Elena
"unassuming"
had a record-
nts for a state
cord) and 15
5 leading her
g' the shoes of
heir soph ace,

Khadijah Rushdan, who had the
"unenviable" task of trying to
stop the Red Raiders representi-
ing the big "U."

Coach Sheila DiNardo's
"unit" is a joy to watch, unless,
of course, they're "utilizing"
their "unparalleled" talents
against the team for which "you"
are rooting. Even then, fans look
on in "utmost" amazement.
Truly, a great group of gals.

⬜⬜⬜

The boys state final between
the favored (by GF among oth-
ers) defending state champions of
Middletown, coached by Chuck
Robinson and Caravel Academy,
headed by James Kane, played
Saturday after this column had
been submitted. The results can
be found elsewhere in these DSN
sport sheets.

⬜⬜⬜

Now, a Sunday special "Frick's
Picks"-torial picturing some of the
friendly faces found in the tourna-
ment crowds this past week...



NO FOOD OR DRINK IN THE GYM

Delaware State News/George Frick
Girls' tournament committee members Pat Borowski of Lake
Forest, left, who has seen 'em all, 33 finals; and Josette
McCullough of Caesar Rodney.



Boys' committee stalwarts, Sam Williams of Milford High,
left, and Jim Powell, right, representing the refs of IAABO
#129, welcome Dale Farmer, longtime exec of DSSAA
(replaced by DIAA) to the Bob Carpenter Center.



Five in "love" with the Lady Riders, from left, Sue and Joe
Hajec, Steve and Connie Welde and Ron Love.



Former Cape Henlopen superintendent Dr. Jim Wilson and
his delightful wife Diane cheered and "cheesed" it for the
Vikings of Lewes.



A510



A happy quartet of fans at the Bob, from left, Samantha Jacobs, Marqui Coverdale, Kattina Young and Melissa Wright kept humming.



Caesar Rodney's District "super," Dr. Harry Roberts, left, an Robinson, rooted for the Riders.



J.C. Burton, Cape Henlopen High's "keeper of the stats" for 20 years, didn't miss a "Pt." or "RB" at the scorer's table.



Middletown High senior William Merritt, an aspiring "Satchmo," blew a happy tune as the Cavaliers moved on to the final game.



Ready for a "shoot-out" by CR Rider Josh Thornton and mates were, from left, Delaware State Police Col. Aaron Chaffinch (a Woodbridge High grad and fan), Lt. Col. Tom MacLeish and handsome son, Ryan.