**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

CAPTAIN BARBARA L. CONLEY,  )
)
      Plaintiff,  )
)
    v.  )     C.A. No. 04-1394-GMS
)
COLONEL L. AARON CHAFFINCH,  )
Individually and in his official capacity as the  )
Superintendent, Delaware State Police; et al.  )
)
      Defendants,  )

**DEFENDANTS' ANSWERING BRIEF
IN OPPOSITION TO PLAINTIFF'S MOTION TO BIFURCATE
THE TRIAL OF COUNT ONE FROM COUNTS TWO AND THREE
OR IN THE ALTERNATIVE TO SEVER COUNT ONE
FROM COUNTS TWO AND THREE**

**DEPARTMENT OF JUSTICE
STATE OF DELAWARE**

RALPH K. DURSTEIN, III, I.D. #912
STEPHANI J. BALLARD, I.D. #3481
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants MacLeish, Mitchell
and Division of State Police

DATED: September 30, 2005

## **TABLE OF CONTENTS**

Page

TABLE OF CITATIONS ....................................................................................... ii

NATURE AND STAGE OF THE PROCEEDINGS ............................................1

STATEMENT OF FACTS .....................................................................................3

    1. Facts Relevant to Count I: the Issue of Promotion ..................................... 3

    2. Facts Relevant to Counts II and III:  Alleged "Leak" and Retaliation ........................8

ARGUMENT ........................................................................................................12

I.    THE MERITS OF THE ALLEGATIONS RAISED IN COUNT I, GENDER DISCRIMINATION IN PROMOTION, ARE NOT AT ISSUE IN THIS MOTION AND ARE, IN ANY EVENT, NOT AS ARGUED BY PLAINTIFF..................12

II.    THERE IS NO EVIDENCE IN THE RECORD TO SUPPORT PLAINTIFF'S ALLEGATIONS OF "FIRST AMENDMENT" RETALIATION" AS ALLEGED IN COUNTS II AND III, OR ANY ILLEGAL CONDUCT ON THE PART OF DEFENDANTS ...............................................................................................13

III.    PLAINTIFF FAILS TO ESTABLISH GROUNDS FOR SEVERANCE OF THE COUNTS SHE ADDED IN HER AMENDED COMPLAINT OR FOR SEPARATE TRIALS..................................................................................................16

    A. Plaintiff's Burden ......................................................................................17

    B. Factors to be Considered ...........................................................................19

    C. Bifurcation Motions in Employment Cases ..............................................22

CONCLUSION ......................................................................................................25

i

# TABLE OF CITATIONS

**<u>Case Name</u>**                                                                                    **<u>Page</u>**

<u>Akzona Incorporated v. E.I. Du Pont de Nemours & Company</u>,
    607 F.Supp. 227, 232 (D.Del. 1984) ........................................................................ 18

<u>Albright v. Oliver</u>, 510 U.S. 66 (1994) ......................................................................... 16

<u>Faerber v. City of Newport</u>, 51 F.Supp.2d 115 (D.R.I. 1999) ......................................... 22-23

<u>F&G Scrolling Mouse, L.L.C. v. IBM Corporation</u>, 190 F.R.D. 385, 387
    (M.D.N.C. 1999) ............................................................................................... 17-18

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982) ..................................................................... 16

<u>In re: Blech Securities Litigation</u>, 2003 WL 1610775 at 10 (S.D.N.Y. 2003) ................. 17, 20

<u>Lee v. Mihalich</u>, 847 F.2d 66, 69 (1988) ......................................................................... 16

<u>Maldonado Cordero, et al. v. AT & T, et al.</u>, 190 F.R.D. 26, 29 (D.P.R. 1999) .................... 17

<u>Miller v. American Bonding Co.</u>, 257 U.S. 304, 307 (1921) .............................................. 17

<u>Monaghan v. SZS 33 Assocs., L.P.</u>, 827 F.Supp. 233, 245 (S.D.N.Y. 1993) .................... 17-18

<u>Morris v. Northrop Grumman Corporation</u>, 37 F.Supp.2d 556 (E.D.N.Y. 1999) ................. 23

<u>Peregine v. Penmark Management Co., Inc.</u>, 314 F.Supp.2d 486 (E.D.Pa. 2004) ................. 22

<u>Procter & Gamble Co. v. Nabisco Brands, Inc.</u>, 604 F. Supp. 1485, 1492 (D.Del. 1985) ..... 18

<u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 443 (3d Cir. 1994) ........................................... 13

<u>Smith v. Alyeska Pipeline Co.</u>, 538 F.Supp. 977, 982 (D.Del. 1982) .................................. 22

<u>Street v. Cherba</u>, 662 F.2d 1037 (4th Cir. 1981) .......................................................... 16

<u>Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.</u>,
    707 F.Supp. 1429, 1433 (D.Del. 1989) .............................................................. 18, 21

<u>Webb v. Hyman</u>, 861 F.Supp. 1094 (D.D.C. 1994) ......................................................... 23

**<u>Statutes, Rules and Other Authorities</u>**

11 <u>Del.C.</u> §9200(c)(12) ...................................................................................14

Federal Rule of Civil Procedure 15(a) .......................................................24

Federal Rule of Civil Procedure 20..........................................................19

Federal Rule of Civil Procedure 42(b) ...............................................17, 19, 21

Federal Rule of Evidence 105 ..................................................................24

9 Wright, *Federal Practice and Procedure,* at 474 ................................17

5 *Moore's Federal Practice* ¶42.03[1] ....................................................17

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed her original complaint in this matter on October 27, 2004, alleging gender discrimination as a result of Plaintiff's failure to be selected, from among more than 20 troopers holding the rank of Captain, for two promotions to the rank of Major in the Delaware State Police in 2003. (Docket #1 (D.1)). Prior to service of the original complaint, Plaintiff subsequently filed a "First Amended Complaint" on December 6, 2004. This complaint was amended for the purpose of adding "Count II (Free Speech Clause Retaliation)" and "Count III (Petition Clause Retaliation)." (D.7). The essence of these new allegations was that, "mere hours" after the filing of the original Complaint, Defendants MacLeish and/or Mitchell and/or Chaffinch conspired to "leak" purportedly confidential internal affairs information regarding Plaintiff to the Delaware State News, as "retaliation" for Plaintiff's filing suit. (D.7, ¶110-111 *ff*.). Defendants' Answer to the Amended Complaint was filed on January 11, 2005, denying all allegations of wrongdoing. (D. 33).

A scheduling Order was set by the Court on March 28, 2005, and discovery has been proceeding. Plaintiff concedes that deposition discovery is complete as to Counts II and III--the First Amendment "retaliation" counts. (Plt's Op. Brf. at p.1). Plaintiff incorrectly advises the Court that, as to Count I (promotion) the "record" includes the "deposition[] of . . . Ret. Major Joseph Swiski." (Id.) Major Swiski's deposition has not been taken in this matter. Plaintiff's counsel refers to testimony of Ret. Major Swiski in the body of the Opening Brief, without advising the court that this deposition testimony was taken in early 2004 in a matter entirely unrelated to this litigation. (*See* Op. Brf. at p. 13, fn. 3).[1]

---

1 Dillman v. Chaffinch, C.A. 02-509, at pages A-483-500. In addition Plaintiff refers to testimony of Colonel MacLeish taken in the unrelated case of Price v. Chaffinch, C.A. 04-1207, at pages A293-355, without identifying it

Plaintiff has now filed a Motion to bifurcate the Counts that were added by her own Amended Complaint into two sequential trials, or alternatively to sever these two "retaliation" counts from the underlying promotion count.   Defendants have filed a Motion to Stay consideration of the Motion to Bifurcate, as Defendants plan on filing a Motion for Summary Judgment as to Counts II and III.   In addition to legal defenses to these counts, there is no evidence whatsoever produced by plaintiff in support of her conspiracy theory or her claims of "retaliation." Nor is there any evidence that any confidential information from the Internal Affairs file on Plaintiff was released.   The testimony and documentary evidence (discussed further herein) is undisputed that the actions taken by Defendants were in compliance with established Delaware State Police procedures, unrelated to the filing of the lawsuit, and in accordance with the advice of their legal counsel. As a matter of logic and judicial economy, the Court need not consider whether these counts should be heard in one trial or two, before making the determination of whether they can withstand summary judgment and go to a jury at all.   If they cannot, the issue of bifurcation or severance is moot.   If and when the Court does address Plaintiff's Motion for Bifurcation, for the reasons set forth herein, that Motion should be denied.

---

as such in the body of the Brief.

## STATEMENT OF FACTS

The motion Plaintiff presents to the Court ostensibly pertains solely to whether Counts II and III, added by Plaintiff herself to the original Complaint, should be bifurcated or severed from Count I and tried separately. However, in the first eight pages of the seventeen-page "Statement of Facts," Plaintiff's counsel cites to what he represents is evidence concerning the details, including many statements of allegedly salacious conduct, of the specific allegations in Count I. The Opening Brief is replete with statements of purported facts in the evidentiary record which have no evidentiary support and/or grossly misrepresent the actual evidence of record. Plaintiff's Statement of Facts as to Count I both misrepresents the evidence and has virtually no bearing on the legal issue of whether bifurcation is proper or desirable. Such assertions are highly prejudicial to Defendants, and appear to have been made for the purpose of prejudicing the case in the public eye and through the media. Only at page twenty-five of the thirty-three-page Brief does Plaintiff address the actual issue before the Court, and her argument as to the legal standards and criteria for bifurcation or severance.

## 1. Facts Relevant to Count I: the Issue of Promotion.

Briefly, the evidence of record as to the promotions issue is that Colonel Chaffinch promoted Majors Eckrich and Hughes in the normal manner in which he exercised discretionary decisions to fill this executive rank. (Chaffinch at 145 *ff.* (A-117)). Unlike promotions to lower ranks of Sergeant, Lieutenant and Captain, for which there are set criteria, procedures, and tests, promotions to the executive rank of Major follow no formal guidelines and are made at the

3

discretion of the Colonel.  (Chaffinch at 145-48 (A-117-18),  Pepper at 45-46 (B-18-19)[2].  There are five Majors in Delaware State Police, who handle different operational areas and who report directly to the Lieutenant Colonel and the Colonel. (MacLeish at 82, A-212).

Colonel Chaffinch testified that he considered the backgrounds of the various captains who were suitable to fill these positions by virtue of factors such as education, experience in the agency, including a well-rounded background, and geographical location in State.  (Chaffinch at 148, 159, 165-66 (A-121-23)).  These are the same types of factors which former Colonel Pepper testified he considered when making promotions.  (Pepper at 44-47, (B-17-20)).  Colonel Chaffinch testified that he personally reviewed the personnel files of all of the Kent and Sussex captains, including Plaintiff, before making the promotion decision for the Kent/Sussex Major position.  (Chaffinch at 159-61 (A-121)).  R.L. Hughes was selected for the position based upon his well-rounded experience in the State Police, his education, including a master's degree, his career in Kent and Sussex County, and compatibility with staff.  (Chaffinch at 178-80 (A-126)). Chaffinch testified that he could "put [Hughes'] record up against anybody in the agency as far as work and experience on the Delaware State Police."  Id. at 180 (A-126).

For the Administrative Budget Major position, Colonel Chaffinch determined that Paul Eckrich was the best qualified Captain for this position by virtue of his experience working in the administrative office under a previous Administrative Major, and his bachelor's and master's degrees in Economics and Public Administration, respectively.  (Chaffinch at 161 (A-121)). Plaintiff incorrectly advises the Court that she had "been sent by the DSP for training in

---

2  References "A-___" refer to pages in Plaintiff's Appendix and "B-___" to pages in Defendants' Appendix to this brief.

budgetary functions," citing to deposition testimony of former Colonel Pepper at page 68 (A-60). Colonel Pepper's testimony was that the three "command schools" (which Majors Hughes and Eckrich had also attended) "teach you budget things," as part of a general leadership program. (Pepper at 60-61, 68, 75-76 (A-58, 60, 62)).  Plaintiff's work experience at DSP has been solely in the areas of patrol and traffic functions.  (Amd. Complaint, D.7 at ¶10).

Plaintiff places heavy reliance on a document issued by Lisa Blunt-Bradley, former Director of the State of Delaware Personnel Office, dated December 1, 2001, and entitled "Review of the Delaware State Police, Executive Order Number 19."  Plaintiff's counsel incorrectly represents to the Court that this Report "imposed *mandatory procedural requirements* on all DSP promotions *including to Major*."  (Op. Brf. at p.4, emphasis added; *see also* p.9, ¶8).  The "Bradley Report," introduced as a deposition exhibit in this case, speaks for itself.  It clearly contained only "Recommendations for Change" and, as to promotions, addressed promotions only up to and including the level of Captain. (Bradley Report, pp. 3, 6-7, 61-62, (B-3, 6-7, 12-13)).  No mandatory directives can (or could) appear in this "Review of the Delaware State Police" by an outside agency, and no discussion of promotions to the executive level Major positions appears in the report.  (Id at 6, 28-31 (B-6, 8-11)).  Notably, the Report states:

> [w]ith regard to gender, there was a finding that, overall, the systems for selection and promotion of troopers do not exclude or impact women in a statistically significant way. . . . most women stated emphatically that they had not experienced sexual harassment.

(Bradley Report at 5-6, (B-5-6)).

Plaintiff incorrectly represents that former Lt. Col. Thomas Marcin testified that "the process followed by the Colonel [Chaffinch] violated <u>mandatory</u> procedural requirements imposed on the DSP by [the Blunt-Bradley Report]."  (Op. Brf. at 3, emphasis in original).  Contrary to counsel's

representations to the Court, a review of these pages of testimony reveal that *nowhere* did Lt. Col.

Marcin state that the Bradley report imposed "mandatory" obligations on DSP.  (*See* Marcin at  38-

42 (A-76-77)).  What Lt. Col. Marcin actually testified was that, while consultation with the State

Personnel Office might be desirable and Colonel Chaffinch was "free to" consult with the State

Personnel Office, the Bradley report did not give authority or responsibility for DSP promotional

decisions to any other State agency other than DSP itself:

> Q.	 Is it a fair statement that it was the intent of the Bradley report that the resources of the state personnel office be consulted in making promotion decisions in the Delaware State Police at all levels?
> A.	I think that's fair.
> Q.	And if Colonel Chaffinch chose not to --
> A.	If I can back up.
> Q.	Go right ahead.
> A.	I think it's fair to say they wanted to be and should have been consulted in the process.  In the actual selection, I am not sure that that was a component.  But certainly in the process, they wanted to have a piece of it.
> Q.	Just so we are clear, I mean, you didn't believe that it was the purpose of the Bradley report to make some other division of the state of Delaware or candidate office responsible for making the actual personnel decisions?
> A.	No.
> Q.	That authority resides in the Delaware State Police?
> A.	That's correct.

(Marcin at 41-42, (A-76-77)).  This testimony is in accord with Colonel Chaffinch's own testimony

regarding the Bradley Report:

> Q.	Well, weren't there changes in the Bradley –
> A.	There were recommendations.
> Q.	There's no recommendation in there that made you answer to her in the promotion process at the State Police?
> A.	No sir.  We revamped the whole promotion process.
> Q.	There's no recommendation in there that mandated the State Personnel Office be involved in the promotion process indefinitely into the future at the Delaware State Police?
> A.	There's not anything mandated.  There are recommendations.

(Chaffinch at 173 (A-124)).

Lt. Col. Marcin further testified, in testimony omitted by Plaintiff from the Appendix, that, according to the Bradley report, it would be a good idea to go down and look at the personnel files of various candidates for major. (Marcin at 56-57 (B-27-28)).  Col. Chaffinch testified that this was, in fact, his procedure.  (Chaffinch at 158-61 (A-121)).  Clearly, Plaintiff's contention that the evidence of record demonstrates some violation of mandatory directives in the Blunt-Bradley report is without merit.

The bulk of Plaintiff's purported Statement of Facts concerns limericks or remarks allegedly made by Colonel Chaffinch, most of which are denied by Defendant Chaffinch or admitted solely as being told off duty, and the bulk of which are derived from hearsay testimony of one witness, Captain Glenn Dixon.[3]  These remarks have no bearing on the legal issue of bifurcation/severance, and once again, the facts asserted in the Opening Brief do not accurately reflect the statements in the record.  As only two of many examples, Plaintiff refers to the deposition testimony of former Colonel Gerald Pepper at page 29, for the allegation that "he [Chaffinch] also calls her a bitch." (Op. Brf. p. 5, ¶9).  This page actually shows the following interchange with Colonel Pepper:

> Q.  Captain Dixon has testified that Col. Chaffinch has referred to my client Barbara Conley, as a bitch.  Have you witnessed such a statement?
> A.  No sir.

(Pepper at 29, A-52).  In the same way, Plaintiff's counsel alleges that Colonel Chaffinch has

---

[3]  It should also be noted that counsel provides, as evidentiary references throughout the Brief, indications to "Conley" followed by page numbers in the same manner as he cites to the deposition testimony of other witnesses. In fact, the deposition of Barbara Conley has not (yet) been taken and these references are apparently to long, narrative responses to interrogatories filed by Plaintiff, not to testimonial evidence.  At page 6, paragraph 18, Plaintiff's counsel tells the Court "Plaintiff testified that 50% of his jokes" were inappropriate.  Plaintiff has not yet testified, nor been subjected to cross examination, in this case at all.

publicly nicknamed a female captain "Norman," citing Colonel Pepper's deposition at page 32 (A-53).  Colonel Pepper's deposition at page 32 actually states the following:

> Q.    In your presence did you ever hear former Colonel Chaffinch refer to Captain Papili by the male name of Norman?
> A.    No sir.

## 2. Facts Relevant to Counts II and III:  Alleged "leak" and Retaliation.

The purported "facts" related by Plaintiff as to Counts II and III suffer from the same lack of candor and foundation in the record as do the allegations concerning promotions.  (Op. Brf. at 10-20).  The "DSP document" referred to throughout is an October 25, 2004 email sent to "DSP Users" (that is, all DSP personnel) concerning the fact that a Divisional Trial Board was scheduled to hear charges against Plaintiff, and naming the members of the Trial Board.  (B-38).  This type of email is routinely issued, pursuant to written DSP policy,[4] to all personnel, uniformed and civilian, whenever a trial board is convened, so that personnel can report potential bias or conflicts (if any) of the members, and so that any potential witnesses may come forward.  (Id.; DSP Rules, VII-5-13 (B- 41-42).  The email in this case conformed in all respects to the specific requirements of the DSP Administrative Manual.  Contrary to Plaintiff's claims, the email did not disclose any confidential information from the Internal Affairs investigation of Plaintiff.

At some point between the issuance of this email on October 25, 2004, and October 28, 2004 (the day after Plaintiff filed suit), Tom Eldred, a reporter from the Delaware State News, obtained a copy of the trial board email from an unknown source and telephoned the DSP public information officer, Lt. Joseph Aviola, to verify its authenticity.  (Aviola at 53-55 (A-259-60)).  Aviola then met

---

4 Copies of the applicable Regulations regarding trial board emails were produced to Plaintiff during discovery and are included in Defendants' Appendix.  (B-41-42).

with (then) Lt. Colonel MacLeish and two internal affairs officers to tell them about the call. (Aviola at 55 (A-260)). Lt. Colonel MacLeish immediately called State Police legal counsel, W. Michael Tupman, Deputy Attorney General, and put him on a conference call. Id. at 55-56, 61 (A-260-61). Lt. Aviola advised Mr. Tupman of what had transpired, and Mr. Tupman responded that the document "was internal only until the time someone sent it to Eldred, and advised "make [Eldred] produce the document . . . See the document. If it appears to be our document, then, yes, you can comment on the content of the email and the content only." Id at 56-57 (A-260). Lt. Aviola confirmed that his sole communications with reporter Eldred were in accordance with the legal advice given, and went no further:

> Q. You did not receive any other documents from Tom Eldred?
> A. No, ma'am.
> Q. You did not disclose any other Internal Affairs documents to Tom Eldred?
> A. No, ma'am.
> Q. Now, in the conference room when you had Mike Tupman on the speakerphone, did you hear the advice Mike Tupman was giving?
> A. Yes, I did.
> Q. Did you believe that your response to Tom Eldred complied with that advice?
> A. Yes.
> Q. Did Lieutenant Colonel MacLeish tell you to go beyond Mike Tupman's advice --
> A. No.
> Q. -- in terms of speaking with Mr. Eldred?
> A. No, ma'am.

(Aviola at 90-91 (A-269)). Colonel MacLeish's deposition testimony as to this meeting and conference call with DAG Tupman was identical to Lt. Aviola's recollection. (MacLeish at 135-140, A-225-26). Also produced in discovery by Defendants were notes taken during the conference call with DAG Tupman by Col. MacLeish and Lt. Robert Coupe, which conform to the testimony above. (B-36-37).

Plaintiff characterizes the "leak" of the email to the reporter as an "Act of Retaliation" by

Defendants, despite denials by Defendants that they had released the email or had authorized its release, and the production of no evidence whatsoever to the contrary.[5]  (*See* Aviola at 57 (A-260), MacLeish at 146 (A-228); Mitchell at 50-51 (A-285)).  Plaintiff next maintains that Defendants "retaliated" by "refus[ing] to investigate this release."  (Op. Brf. at 10-11, see also p. 20 ("defendants refused to ever investigate this release . . . .").  These representations are flatly contradicted by the record.  Colonel MacLeish testified that, upon learning a reporter had the email, he wanted to "try to find out who sent it and then bring that person up on charges . . . ."  (MacLeish at 138, 141(A-226)).  He testified that he directed Captain Paige (of Internal Affairs) to contact the high-tech crimes unit (HTCU) to see if they had any way of knowing who might have sent the email to Eldred.  Id.; p. 145, 149 (A-227-28).  Ultimately, Captain Paige, in consultation with HTCU, determined that it was impossible to find out which of the 637 addressees had actually sent the email to Eldred.  (MacLeish at 147 (A-228); Mitchell at 51-52, 56 (A-285-86)).  Notes taken by Captain Paige concerning his inquiry to HTCU were produced, in which he related that HTCU "advised that the search did not find anyone forwarding this particular email [from the DSP network]."  (B-39-40).

Plaintiff states that "MacLeish  . . . *expressly ordered* Aviola to confirm and *discuss* the contents of this confidential document with the Delaware media." . . . "MacLeish *ordered him to discuss it* . . . ."  (Op. Brf. at 11, 12, emphasis added).  Again, this misrepresents the undisputed evidence, which was that MacLeish and Aviola consulted with counsel, obtained advice--which was simply to verify and confirm the four corners of the document--and followed that advice to the letter.  (Aviola at 90-91 (A-269); MacLeish at 207, 210 (A-243-44)).

---

5 Colonel MacLeish, for example, testified that he was out of state on a field trip with his son in Gettysburg, PA on the day Plaintiff filed suit, and when she alleges the "leak" to Eldred occurred.  (MacLeish at 117-19, A-220-221).

Q. . . Did you release any information beyond what was already in the e-mail [Eldred] had?

A.    No, I did not.

Q.    Did you instruct Lieutenant Aviola to release any information beyond what Mike Tupman advised you you could release?

A.  No, I did not.

(MacLeish at 207 (A-243)).

Obviously, neither Lt. Aviola's nor Colonel MacLeish's testimony establish any facts to support Plaintiff's claim that MacLeish "ordered" Aviola to "discuss" the matter with the Reporter. "[T]he advice given was, as previously stated, it was now no longer an internal document. It was in the public domain and it wasn't protected by LEOBOR. . . and it was only to acknowledge what is in the four corners of the document." (MacLeish at 209-210 (A-243-44)). As to Defendant, Secretary Mitchell, his testimony was that his sole involvement in this matter was being advised by his press officer about the email issue and that DSP "had received legal advice to confirm the authenticity of the document only and to say nothing more." (Mitchell at 45-47 (A-283-84)).

## ARGUMENT

**I. THE MERITS OF THE ALLEGATIONS RAISED IN COUNT I, GENDER DISCRIMINATION IN PROMOTION, ARE NOT AT ISSUE IN THIS MOTION AND ARE, IN ANY EVENT, NOT AS ARGUED BY PLAINTIFF.**

Plaintiff argues that there is "abundant" record evidence of gender discrimination as to Count I, the failure to promote allegations. Defendants disagree that there is *any* record evidence of job or promotion discrimination against Plaintiff Conley on the part of former Colonel Chaffinch or the Delaware State Police. In fact, as noted in the Statement of Facts, the evidence shows that promotions to Major were discretionary appointments, and were made based upon the then-Colonel's assessment of the candidates' qualifications following review of personnel files. All indications are that the backgrounds, education and work histories of Captains Hughes and Eckrich made it objectively clear that they were better-qualified than Plaintiff to fill the positions of Kent/Sussex Major and Administrative/Budget Major, respectively. The depositions of these two comparators have been scheduled; Captain Conley's deposition has been scheduled, and the record will speak for itself on the issue of qualifications.[6]

All of that notwithstanding, the issue which Plaintiff purports to present to this Court is whether the "email retaliation" counts should be severed from the gender discrimination count. That issue is governed by the nature of the allegations and the law on bifurcation and severance. The Court is not obliged to engage in a "mini-trial" of the merits of each count based upon the skewed record presented by Plaintiff in her brief. That is a consideration properly left to summary judgment.

---

6 It should be noted that there were some twenty other officers holding the rank of Captain who were potentially eligible for one or both of the Major positions. Many of these individuals presented credentials that exceeded those of Plaintiff.

II.   **THERE IS NO EVIDENCE IN THE RECORD TO SUPPORT PLAINTIFF'S ALLECATIONS OF "FIRST AMENDMENT" RETALIATION AS ALLEGED IN COUNTS II AND III, OR ANY ILLEGAL CONDUCT ON THE PART OF DEFENDANTS.**

As noted above regarding the promotion issue, the actual merits of the allegations raised in the Amended Complaint, including Counts II and III (the "email retaliation" counts) need not be decided by the Court on this motion for bifurcation and/or severance.   However, Plaintiff's suggestion that there is "abundant record evidence" to support these claims could not be further from the truth.

Defendants will put aside for the moment the critical issue of whether Plaintiff's filing of this lawsuit, regarding two promotions to which she thought she was entitled, constitutes protected First Amendment "speech."   Contrary to Plaintiff's blanket assertion, the case law does not provide that every single lawsuit rises to the level of protected First Amendment speech.   *See e.g.* San Filippo v. Bongiovanni, 30 F.3d 424, 443 (3d Cir. 1994) (remanding for determination of which, *if any*, of public employee's grievances and lawsuits constituted a petition). Defendants will more fully explore this issue as part of the motion for summary judgment on Counts II and III.

Looking purely at the evidence of record in this case, Counts II and III cry out for dismissal or summary judgment.   The sum total of the evidence on the alleged "retaliatory" actions—on which Plaintiff bears the burden of proof—show that a reporter received an informational trial board notification email, issued in the ordinary course of business to 637 recipients, containing no confidential information, from an unknown person.   No evidence ties any defendant or agent of DSP to the release of the October 25, 2004 email.   Next, the reporter

called DSP to confirm whether the email was a true DSP document.  Defendants did not say anything regarding the matter at that time, but rather immediately called their attorney for advice on what to do.  This attorney, a Deputy Attorney General, and not a DSP employee, gave his advice—that the email should be seen to make sure it was authentic and that, if it was, only the four corners of the document should be confirmed.  Defendants followed this legal advice, and that was the end of the matter.  There is absolutely no evidence that any information beyond verification of the four corners of the document was supplied to reporter Eldred, or any other party, or that there was any discussion of the details of the internal affairs allegations.  There is no evidence of any conspiracy on the part of Defendants MacLeish or Mitchell or anyone else to "retaliate" against Plaintiff.

Plaintiff argues that the "leak" of the trial board email violated the Law Enforcement Officers Bill of Rights (LEOBOR), specifically 11 <u>Del.C.</u> §9200(c)(12).  (Op. Brf. at 16-17).  This is not the case.  The language of this section, cited by Plaintiff herself, provides as follows:

> *All records compiled as a result of any investigation* subject to the provisions of this chapter . . . shall be and remain confidential and shall not be released to the public. (emphasis added).

This statute pertains, by its plain terms, to "records compiled" as a result of investigation.  The email in question here is not a "record" compiled for, or as a result of, the investigation into Plaintiff's misconduct.  It is a notification document created at the culmination of an investigation in which there is to be a trial board hearing to consider disciplinary charges.  The content of the email is specifically mandated by the Rules and Regulations of the Delaware State Police.  (B-41-42).  The dissemination of this email "to all troops and sections" is mandatory under the Rules, and the Rules provide that any employee, uniformed or civilian, receiving the information must convey pertinent

14

knowledge regarding the matter to Internal Affairs.  Id. (B-38).  The email, according to the Rules, is

supposed to identify the officer, identify the rule(s) allegedly violated, identify the date, time and

place of the hearing, and identify the officers selected to serve on the trial board.  This email met all

of these criteria, but contained no more.  There was no information as to the factual allegations

which gave rise to the charges against plaintiff, to witnesses, to documents, nor to anything that

could be considered part of the investigatory file.  While trial board notification emails are not

expected to be disseminated to the public at large outside of DSP, the unfortunate release of this

email, issued to 637 persons pursuant to the provisions of the DSP Rules and Regulations, can hardly

be considered the release of an investigatory "record" under LEOBOR.[7]  Colonel MacLeish

specifically testified that he inquired of DSP's attorney, Mike Tupman, whether confirming the

veracity of the email to Eldred would in any way violate LEOBOR or any other law:

> The secondary thing was, okay, two, Mr. Tupman, legally, he has it in his possession. . . .
> Would we violate LEOBOR if we did that or not, . . . would I be violating any laws by
> confirming it, confirming or denying the fact that it was real?

(MacLeish at 139 (A-226)).  Deputy Attorney General Tupman advised:

> that you could confirm the information without violating somebody's -- according to my legal
> counsel, without violating an officer's rights under LEOBOR or criminally.

> *    *    *

> [T]he advice given was, as previously stated, it was now no longer an internal document.  It
> was in the public domain and it wasn't protected by LEOBOR and it wasn't protected by the
> [DSP] rules and regulations and it was only to acknowledge what is in the four corners of the
> document.

(MacLeish at 139, 209-210 (A-226, 243-44)).

---

7  Interestingly, Plaintiff herself elected to open the entire disciplinary evidentiary hearing (which would otherwise
have been private) to the public, when it was finally held on March 9-10, 2005.

It is well settled that government officials performing discretionary functions enjoy qualified immunity from damages when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lee v. Mihalich, 847 F.2d 66, 69 (3d Cir. 1988) (*citing* Harlow v. Fitzgerald, 457 U.S. 800 (1982) (Lee v. Mihalich abrogated on unrelated grounds per Albright v. Oliver, 510 U.S. 66 (1994)). In Lee, the Third Circuit found that the State actors' consultation and reliance on advice of counsel was reasonable in an uncertain legal situation and entitled them to qualified immunity. 847 F.2d at 71-72. In the same way here, when faced with the unprecedented situation of a reporter who had already obtained a trial board email from an unknown source[8], the seeking and reliance on legal advice—which was simply to confirm the authenticity of the document and not to go beyond its four corners--by Defendants was entirely reasonable. *See also* Street v. Cherba, 662 F.2d 1037 (4th Cir. 1981) (police defendants entitled to qualified immunity when they relied on directive from another official who had obtained legal advice).

## III. PLAINTIFF FAILS TO ESTABLISH GROUNDS FOR SEVERANCE OF THE COUNTS SHE ADDED IN HER AMENDED COMPLAINT OR FOR SEPARATE TRIALS.

The procedural posture of this case is unlike any of those cited by the plaintiff in her brief. This is a case in which a plaintiff, having added two counts of so-called "retaliation" allegations to her original Complaint, now seeks to sever those same Counts. In the alternative, she seeks a separate trial on the very counts that she added to her original Complaint. No court has ever granted such relief to a plaintiff under such circumstances. No case cited by the plaintiff

---

8 As noted above, there is not a shred of evidence that any of the Defendants in this case had any knowledge of or role in the email's dissemination to Tom Eldred.

would support such an extraordinary step by the Court. Under the standard set forth in Federal Rules of Civil Procedure 20 and 42(b), plaintiff is not entitled to separate trials. She is bound by her tactical decision to amend her original Complaint to add the additional allegations.[9]

## A.  Plaintiff's Burden

In a motion for severance or bifurcation, the moving party bears the burden of establishing that separate trials are necessary to prevent prejudice or confusion, and to serve the ends of justice. In re: Blech Securities Litigation, 2003 WL 1610775 at 10 (S.D.N.Y. 2003); *see also* Maldonado Cordero, et al. v. AT & T, et al., 190 F.R.D. 26, 29 (D.P.R. 1999) (bifurcation denied; little risk of jury confusion or prejudice).

Separate trials remain the exception, rather than the rule. Monaghan v. SZS 33 Assocs., L.P., 827 F.Supp. 233, 245 (S.D.N.Y. 1993). The bifurcation of issues and the separate trial of them is not the usual course of events. 9 Wright, *Federal Practice and Procedure,* at 474. It is usually not necessary to try different issues in the same case separately. 5 *Moore's Federal Practice* ¶42.03[1]. Nothing else appearing, a single trial will be more expedient and efficient. F&G Scrolling Mouse, L.L.C. v. IBM Corporation, 190 F.R.D. 385, 387 (M.D.N.C. 1999). The presumption is that all claims in a case will be resolved in a single trial. It is only in exceptional instances, where there are special and persuasive reasons for departing from this practice, that distinct causes of action asserted in the same case may be made the subject of separate trials. Miller v. American Bonding Co., 257 U.S. 304, 307 (1921).

---

9 Plaintiff claims that she was "forced" to proceed by way of an amendment to her pleading. As a procedural matter, that is untrue. She was free to file a separate action alleging so-called "retaliation". The decision to amend the Complaint was a tactical one, presumably based on the factors before her.

Courts have emphasized that separate trials should not be ordered unless such a disposition is clearly necessary. Monaghan, *supra,* at 246. Bifurcation is reserved for truly extraordinary situations of undue prejudice. Id. at 245. Even where bifurcation would promote judicial economy[10], the Court has refused to order separate trials if bifurcation would result in unnecessary delay, additional expense, or some other form of prejudice. Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc., 707 F.Supp. 1429, 1433 (D.Del. 1989).

The party requesting separate trials bears the burden of convincing the court that such an exercise of its discretion will [1] promote greater convenience to the parties, witnesses, jurors, and the court, [2] be conducive to expedition and economy, and [3] not result in undue prejudice to any party. F&G Scrolling Mouse, L.L.C., *supra.* Merely presenting some proof which supports bifurcation is not enough. Willemijn Houdstermaatschaapij BV, *supra,* at 1433-1434.

For example, if a case contains a large number of dissimilar and complex issues, bifurcation is often advisable in order to avoid the danger of confusing the jury. Akzona Incorporated v. E.I. Du Pont de Nemours & Company, 607 F.Supp. 227, 232 (D.Del. 1984). Courts will rarely grant bifurcation when the issues to be decided are not particularly complex, and a single trial on all issues does not carry with it a significant risk that the trier of fact will be confused. Procter & Gamble Co. v. Nabisco Brands, Inc., 604 F. Supp. 1485, 1492 (D.Del. 1985). The burden of showing a significant risk of confusion is on the party seeking bifurcation. Id.

---

10  That would not be the case here, as two trials instead of one would unnecessarily complicate the picture and delay final disposition of the lawsuit. Judicial economy would best be served by proceeding with a single trial, as scheduled, on all claims, and as to all defendants.

18

**B.  Factors to be Considered**

Severance is governed by Rule 20(b), which provides as follows:

> **Separate Trials.**  The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom the party asserts no claim and who asserts no claim against the party, and may order separate trials or make other orders to prevent delay or prejudice.

The interest protected by Rule 20(b) in the present context is that of the defendants MacLeish and Mitchell, who are named in Counts II and III, but not in Count I.  Severance should not be a remedy available here to the plaintiff, when she made the election to join the claims against defendants MacLeish and Mitchell to her claim against the Delaware State Police and the defendant Chaffinch, rather than filing a separate action against MacLeish and Mitchell. Presumably, plaintiff and her lawyers calculated the risk of embarrassment, delay, expense, and prejudice in making that election, and should not be afforded procedural relief now, simply because she has changed her mind.[11]

Rule 42 governs both consolidation and bifurcation (although the latter term does not appear in the text of the Rule).  It provides in pertinent part as follows:

> **(b)  Separate Trials.**  The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim,…or of any separate issue or any number of…issues . . . .

Among the factors to be considered in deciding whether to grant bifurcation are [1] whether the issues sought to be tried separately are significantly different form one another; [2] whether the

---

11  Plaintiff again asserts, at page 32 of her brief, that she was "left without any other remedy" than the amendment of her Complaint.  That is untrue.  She had the option of filing a separate lawsuit, if she was worried about the impact of her disciplinary case on a jury hearing her failure to promote claim.  The purported "irreparable harm" to her

severable issues require the testimony of different witnesses and different documentary proof; [3] whether the party opposing the severance will be prejudiced if it is granted; and [4] whether the party requesting the severance will be prejudiced if it is not granted.  In re: Blech Securities Litigation, 2003 WL 1610775 at 12 (S.D.N.Y. 2003).

In considering these factors, it quickly becomes apparent that the same evidence, namely the filing of the lawsuit and the notice of the trial board, would be presented as to each claim. The issues raised in Count I and in Counts II and III are inextricably intertwined.  In making the allegation that the routine notice of the pending disciplinary hearing constituted "retaliation" for her lawsuit, the plaintiff herself linked these two independent matters, and created for herself the burden of proving a causal link between them.  In practical terms this means that the jury hearing the failure to promote claim would learn of the disciplinary case (if the claims remain together), or the jury hearing the "retaliation" claims would learn of the lawsuit (if the claims are severed, or bifurcated).  Faced with this choice, the plaintiff elected to combine the claims, rather than insure separate trials by filing a second lawsuit.

One trial, rather than two, would further the goal of convenience mentioned in the Rule, and would unquestionably be conducive to expedition and judicial economy.  Sequential trials would cause inconvenience, delay, and added expense.  This is not a case where a particular verdict on Count I would obviate the need for a second trial on Counts II and III, either as a matter of law or fact or in terms of settlement potential.  Giving the plaintiff two bites of the apple would reduce the prospects for resolution of the case.

---

discrimination claim from the amendment of her Complaint cannot be attributed to the defendants or their alleged conduct.  That decision was plaintiff's and plaintiff's alone.

This is not a complex case, particularly when compared to patent matters involving multiple parties and issues.  Plaintiff's claims have been characterized as "plain vanilla" by her lawyers.  Op. Brf. at 27.  Jurors are most unlikely to be confused by her claim that she deserved promotion ahead of some twenty other officers holding the rank of Captain, and can certainly consider that claim on its merits.  If the so-called retaliation claims survive summary judgment, the jurors would be able to evaluate the allegations in light of the circumstances, without prejudice to the plaintiff.

Perhaps the most important consideration for a court ruling on a motion to bifurcate is whether separate trials would unduly prejudice the non-moving party.  <u>Willemijn Houdstermaatschaapij BV</u>, *supra*, at 1435.  Prejudice may simply amount to unfair delay in the final disposition of the matter.  <u>Id</u>.  In this case, the plaintiff is wildly optimistic in suggesting that two trials could take place within the time frame presently reserved for one.  What is far more likely is that a second trial would have to take place at a later time.  This is not a matter of simple addition, where one ten-day trial can be split into six and four-day trials.  That claim ignores the duplication of jury selection, instruction, and deliberation, to start.  Additional delay would result from multiple opening statements and closing arguments, and the presentation of duplicative evidence.  The Court would be forced to determine *in limine* how much the jury in the "retaliation" case could hear about the lawsuit that had been filed, and how to deal with the resulting prejudice to the defendants.  Here, as in <u>Willemijn Houdstermaatschaapij BV</u>, *supra*, bifurcation would be an unacceptable "gamble" for the Court, given the limited benefit claimed and the substantial risk of delay and prejudice to the defendants.

In accordance with the broad language of Rule 42(b), trial courts are given a great deal of

discretion in deciding motions to bifurcate. <u>Smith v. Alyeska Pipeline Co.</u>, 538 F.Supp. 977, 982 (D.Del. 1982). In exercising that discretion, the Court can consider the fact that the plaintiff has reversed field, after initially consolidating these claims. The Court is not required to accommodate an attempted change in tactics. Plaintiff has failed to carry her burden of establishing "special and persuasive reasons" that mark this as an "extraordinary" case. It is not. The interests of justice are best served by a single trial, as contemplated by the plaintiff herself in amending her Complaint to include the additional claims.

### C.  Bifurcation Motions in Employment Cases

The plaintiff cites four cases to support her claim that "numerous courts have granted bifurcation motions in the civil rights and employment contexts [sic]." None are on point. None offer support for the plaintiff's Motion in this case.

In <u>Peregine v. Penmark Management Co., Inc.</u>, 314 F.Supp.2d 486 (E.D.Pa. 2004), the Court considered cross motions for summary judgment. Faced with an issue of "piercing the corporate veil", the Court, *sua sponte*, severed the issue of shareholder liability from the underlying sex discrimination claims. It is telling that the Court notes that it would revisit the corporate veil issue at a later time, **if necessary**. <u>Id</u>. at 494. The trial judge clearly expected that the trial on the main issue would render moot the corporate veil issue. That is not the case here. The plaintiff would surely contend that she could proceed with a second trial on the alleged "retaliation", were she to fail in a first trial on the failure to promote claim.

In <u>Faerber v. City of Newport</u>, 51 F.Supp.2d 115 (D.R.I. 1999), the Court, faced with questions as to the ripeness of state law claims raised on summary judgment, simply chose to order trial on a distinct federal constitutional claim first. Again, the Court acted *sua sponte*, in

the context of a summary judgment motion, with the expectation that a second trial would not be

necessary.  "If [plaintiff] is successful, the remedies available to him may make the state-law

claims moot."  Id. at 124.  Again, there is no theory under which a second trial in this case would

be rendered unnecessary by virtue of a particular outcome in a first trial.

In Morris v. Northrop Grumman Corporation, 37 F.Supp.2d 556 (E.D.N.Y. 1999), a

motion by the defendant employer to sever the unrelated claims of two plaintiffs was granted,

given the clear risk of prejudice presented.  Id. at 581.  The only common ground between the

two claims was the defendant employer.  This was a severance of parties, not the severance of

claims or issues sought by the plaintiff here.

Finally, in Webb v. Hyman, 861 F.Supp. 1094 (D.D.C. 1994), the Court, in the context of

post-trial motions, dismissed the remaining claims of the plaintiff.  The Court had previously

ordered that certain claims be tried first.  This was based on the theory that "[i]f a single issue

could be dispositive of the case, and resolution of it might make it unnecessary to try the other

issues, separate trial of that issue may be desirable to save the time of the court and reduce the

expenses of the parties."  Id. at 1120.  It would be wishful thinking for the defendants to assert

here that *any* result in a first trial would deprive this plaintiff of further remedies in a second trial

(as was the case in Webb).  For that reason, this case, too, is readily distinguished.

What is noteworthy is not merely the lack of authority for plaintiff's argument, but the

absence of any case in which a plaintiff, having amended her original complaint to add claims,

seeks to sever those very claims, or seeks separate trials.  It would appear that no plaintiff in such

a position has ever attempted such a procedural anomaly, at least in a context that required a

federal judge to rule in a contested matter.  It would be reasonable to conclude that this lack of

23

authority is a direct result of the impossible burden of proof that would face such a plaintiff, given the factors cited above. Further evidence of this would be the common practice of hearing retaliation claims arising out of employment discrimination claims together in the same trial.

The plaintiff has failed to assert any prejudice that would result from trial of the issues she consolidated in a single Amended Complaint. Presumably, plaintiff and her lawyers considered whether to file a separate action containing the allegations set forth in Counts II and III, and concluded that her interests would best be served by amending the complaint, which was her right under FRCP 15(a). The defendants did not participate in this tactical decision, nor could they have opposed it. The plaintiff should be bound by her decision, and should be estopped from challenging it at this late stage.

To the extent that the Court would find any risk that the jury would confuse the issues raised by Counts I, II, and III, the appropriate remedy would be a curative or limiting instruction to the jury. Federal Rule of Evidence 105 provides in pertinent part as follows: "When evidence which is admissible …for one purpose but not admissible…for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

24

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request this Honorable Court deny Plaintiff's Motion to Bifurcate and/or sever Counts II and III from Count I of the Amended Complaint.

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**


By:___/s/ Stephani J. Ballard_____
        RALPH K. DURSTEIN, III (I.D. No. 912)
        STEPHANI J. BALLARD  (I.D. No. 3481)
        Deputy Attorneys General
        Carvel State Office Building
        820 North French Street
        Wilmington, DE 19801
        (302) 577-8400
        Attorneys for Defendants, MacLeish
        Mitchell and Division of State Police

**LIGOURI, MORRIS & YIENGST**


By: ___/s/ James E. Ligouri_____
        JAMES E. LIGOURI
        46 The Green
        Dover, DE  19901
        (302) 678-9900
        Attorney for Defendant, L. Aaron Chaffinch


DATED:  September 30, 2005

25

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1394-GMS |
| | ) | |
| COLONEL L. AARON CHAFFINCH, | ) | |
| Individually and in his official capacity as the | ) | |
| Superintendent, Delaware State Police; et al. | ) | |
| | ) | |
| Defendants, | ) | |

**<u>CERTIFICATE OF MAILING AND/OR DELIVERY</u>**

The undersigned certifies that on September 30, 2005, he caused the attached Defendants'

Answering Brief in Opposition to Plaintiff's Motion to Bifurcate to be electronically filed with the

Clerk of Court using CM/ECF which will send notification of such filing to the following:

Thomas S. Neuberger, Esq.
Stephen J. Neuberger, Esq.
Two East Seventh Street, Suite 302
Wilmington, DE 19801

/s/ Ralph K. Durstein III
Ralph K. Durstein III, I.D. #912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400
Attorney for Defendants MacLeish,
Mitchell, and Division of State Police

26