Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re: BLECH SECURITIES LITIGATION
**No. 94 Civ. 7696(RWS).**

March 26, 2003.
Kaplan, Kilsheimer & Fox, New York, NY, By: Richard Kilsheimer, Robert N. Kaplan, Milberg Weiss Bershad Hynes & Lerach, New York, NY, By: David J. Bershad, Richard H. Weiss, Brian C. Kerr, Gilman and Pastor, Saugus, MA, By: David Pastor, Pater A. Lagorio, Curtis V. Trinko, LLP, New York, NY, By: Neal A. DeYoung, for Plaintiff, of counsel.

Cadwalader, Wicksersham & Taft, New York, NY, By: Dennis J. Block, Michael G. Dolan, Suzanne J. Romajas, Adam M. Masin, for Defendant Bear, Stearns & Co., Inc., of counsel.

Wexler & Burkhart, Mitchel Field, NY, By: Stephen B. Wexler, for Defendant Baird Patrick & Co., Inc., of counsel.

*OPINION*

SWEET, J.

*1 This Document Relates to: ALL ACTIONS

The parties to this consolidated securities action have moved *in limine* to exclude certain evidence from the trial, which is anticipated to commence on April 7.

The Plaintiffs seek to:

1. Preclude Defendants from calling witnesses, who are not made available to testify live at trial;
2. Exclude testimony about Self-Regulatory Organizations ("SRO") Regulatory Provisions

Defendant Bear Stearns & Co., Inc. ("Bear Stearns") seeks to:
1. Exclude evidence as irrelevant, inadmissible, and prejudicial;
2. Exclude audio-tapes and related transcripts;
3. Exclude evidence as to Bear Stearns relating to the U.S. Attorney's Criminal Proceedings and the SEC's Proceedings against David Blech ("Blech");
4. Hold a separate trial from Defendants Blech, David Blech & Company, Inc. ("DBCO"), and Baird Patrick & Co., Inc. ("Baird Patrick") and to bifurcate the issues of liability and damages;
5. Modify the Court's Class Certification Order and to exclude certain evidence.

Defendant Baird Patrick & Co. ("Baird Patrick") seeks to:
1. Exclude Blech's plea allocution and the amended complaint in the SEC proceedings against Blech.

The motions are dispensed of as follows for the reasons set forth below:
I. Plaintiffs' motion to preclude Defendants from calling witnesses, who are not made available to testify live at trial is denied as unnecessary.
II. Plaintiffs' motion to exclude testimony about SRO Regulatory Provisions is denied.
III. Bear Stearns' motion to exclude evidence as irrelevant, inadmissible, and prejudicial is denied in part and granted in part. Those records, which are business records and admissions against interest, will be admitted against Baird Patrick and as evidence of the Blech scheme to defraud.
IV. Bear Stearns' motion to exclude audio-tapes and related transcripts is denied in part and granted in part.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

V. Bear Stearns' motion to exclude evidence relating to the U.S. Attorney's Criminal Proceedings and the SEC's Proceedings against Blech is denied in part and granted in part.

VI. Bear Stearns' motion for a separate trial and bifurcation is denied. The requested instruction will be given.

VII. Bear Stearns' motion to modify the Court's Class Certification Order and to exclude certain evidence is granted in part and denied in part.

VIII Baird Patrick's motion to exclude Blech's plea allocution and the amended complaint in the SEC proceedings against Blech is denied in part and granted in part.

The plaintiffs have challenged the qualifications and testimony of Bear Stearns experts Daniel R. Fischel ("Fischel") and Baird Patrick's expert Vincent Buchanan ("Buchanan"). Bear Stearns and Baird Patrick have challenged the qualifications of the plaintiffs' experts Howard Berg ("Berg") and Blaine F. Nye ("Nye"). As set forth below, all experts are qualified and objections to their testimony are sustained in part.

*Prior Proceedings*

**\*2** This class action alleging securities violations by Bear Stearns, a clearing broker for DBCO; Baird Patrick, a broker; DBCO; and various issuers, was initiated on October 21, 1994.

Discovery was commenced and completed, and various motions have been disposed of, familiarity with which is assumed. *See In re Blech Sec. Litig.*, 928 F.Supp. 1279 (S.D.N.Y.1996) *("Blech I" )*; *In re Blech Sec. Litig.*, 961 F.Supp. 569 (S.D.N.Y.1997) *("Blech III" )*; *In re Blech Sec. Litig.*, No. 94 Civ. 7696(RWS), 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002) *("Blech IV" )*.

Defendant Blech is in bankruptcy proceedings in New York, and consequently, this action has been stayed against him pursuant to the automatic state provisions of the Bankruptcy Code. Defendant DBCO went out of business in 1994, is now defunct, and has not been represented by counsel or been in active party in this litigation for several

years. Certain settlements with initial defendants have been reached, and the remaining active defendants are Bear Stearns and Baird Patrick. The instant motions were fully submitted on February 24, 2003.

*THE PLAINTIFFS' MOTIONS*

\_\_\_\_\_ I. *Motion to Preclude Defendants from Calling Witnesses who Are Not Made to Testify Live*

Plaintiffs have sought a pretrial ruling that any witnesses under defendants' control, who testify on the defense case, be made available to testify live on the Plaintiffs' case rather than by deposition. The application appears unnecessary.

The parties will identify their witnesses in the pretrial order. If the Plaintiffs wish to present in their case witnesses under the defendants' control, they will identify them and, if necessary, subpoena them. It is assumed that this formality will not be required, and that the parties will be willing to produce witnesses under their control.

II. *Motion to Exclude Testimony about SRO Regulatory Provisions*

The Plaintiffs have moved *in limine* to exclude testimony about Self-Regulatory Organizations ("SRO") Regulatory Provisions. For the reasons discussed below, the motion *in limine* is denied. [FN1]

> FN1. The term "SRO Rules," for purposes of this motion, includes New York Stock Exchange Rules 342, 382, 401, 405 and 431, NASD Rule 3230, AMEX Rule 400 and Federal Reserve Board Regulation T.

*A. NYSE Rule 382*

In 1982, the New York Stock Exchange deleted those portions of NYSE Rule 405 that had imposed supervisory duties on clearing brokers and made NYSE Rule 382 "the exclusive [NYSE] Rule which concerns itself with the [clearing] relationship." NYSE Rule 382, as amended, permits clearing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

brokers to contractually allocate all supervisory and other responsibilities vis-a-vis the customer solely to the introducing broker and requires the clearing agreement to specifically address the clearing broker's and the introducing broker's respective responsibilities in the following seven areas: (1) opening, approving and monitoring of accounts; (2) extension of credit; (3) maintenance of books and records; (4) receipt and delivery of funds and securities; (5) safeguarding of funds and securities; (6) confirmations and statements; and (7) acceptance of orders and execution of transactions, thereby giving recognition not only to a clearing broker's more ministerial activities but also to a clearing broker's normal function as a creditor.

*3 The Clearing Agreement entered into between Bear Stearns and DBCO ("Clearing Agreement") allocated the responsibilities between DBCO and Bear Stearns for monitoring its customers' accounts and ensuring that the trading therein complied with applicable rules and regulations and for responding to customer inquiries and complaints remaining in compliance with the net capital rules and reporting requirements, and for reporting on at least a monthly basis "all financial information and reports" filed with the National Association of Securities Dealers, the SEC or any SRO, including monthly and quarterly Financial and Operational Combined Uniform Single Reports ("FOCUS" Reports), issuing confirmations, monthly account statements and notices directly to customers and for supplying daily reports, including customer confirmations, margin status reports, money line reports and daily commission detail reports.

**B. *Evidence Relating To SRO Rules Is Relevant To An Evaluation Of Bear Stearns' Conduct***

Evidence of Bear Stearns' compliance with the SRO Rules is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Indeed, the standard for finding relevance "is not high." *United States v. Southland Corp.,* 760 F.2d 1366, 1375 (2d Cir.1985), *cert. denied,* 474 U.S. 825 (1985).

Here, evidence that Bear Stearns' conduct was consistent with the SRO Rules (and the Clearing Agreement which derives from the SRO Rules and allocates responsibilities and defines rights and obligations in accord with custom and practice in the clearing industry) is directly relevant to demonstrate (i) the industry standard for routine conduct for a clearing broker and creditor, and (ii) whether or not Bear Stearns' conduct under those standards was entirely routine and appropriate conduct for the industry or engaged in non-actionable aiding and abetting or whether it "crossed the line" and became an active participant in David Blech's manipulative scheme.

The *Blech IV* decision held that "an otherwise innocent act if undertaken with an intent to manipulate the market, can become a contrivance to accomplish a security fraud," *In re Blech Sec. Litig.,* No. 94 Civ. 7696(RWS), 2002 WL 31356498, at *17 (S.D.N.Y. Oct. 17, 2002) (holding a question of fact existed as to Bear Stearns' intent in purportedly withholding stock from short sellers and delaying sell-outs under Reg T, even if such actions were "not a security violation in and of [themselves]"), and stated that the issue was whether Bear Stearns performed its clearing functions "knowingly in such a manner as to enhance the Blech market manipulation scheme." *In re Blech Sec. Litig.,* 2002 WL 31356498, at *6.

Here, Bear Stearns maintains (i) that its conduct was not motivated by a fraudulent intent, but rather by the normal and routine motivations of a clearing broker and creditor, (ii) that information in Bear Stearns' possession concerning DBCO's trading activities, obtained as a result of its normal, routine functions as a clearing broker acting in compliance with industry practice, did not constitute knowledge of Blech's fraudulent scheme, and (iii) that, although certain information in Bear Stearns' possession might (in theory) have caused DBCO's compliance department or regulatory authorities to conduct an investigation, because Bear Stearns had no obligation under the SRO Rules to do so, Bear Stearns was not acting either recklessly or with a motive to commit fraud by not investigating any alleged "red flags."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

**\*4** Whether its conduct constituted a direct, knowing participation in Blech's fraud is the ultimate issue. The SRO Rules are evidence of industry practice but do not constitute an exemption from liability. The effect of any "red flags" in the context of Rules is relevant. The 1999 amendment to NYSE Rule 382 enacted after the events at issue is not relevant to Bear Stearns' conduct in 1994. *See Van Alen v. Dominick & Dominick, Inc.,* 441 F.Supp. 389, 396 (S.D.N.Y.1976) (testimony of defendant firm's officers that they believed the firm was operating within the guidelines set forth by the NYSE found relevant to defendant's lack of scienter), *aff'd,* 560 F.2d 547 (1977); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 94 Civ. 5587(PKL)(RLE), 2002 WL 31780188, at \*2 (S.D.N.Y. Dec. 11, 2002) (evidence of defendant's state of mind at the time could tend to show he did not act with scienter).

Indeed, the Court's *Blech IV* decision expressly recognized that a factual issue at trial will be whether Bear Stearns performed its functions pursuant to the SRO Rules and the Clearing Agreement "knowingly in such a manner as to enhance the Blech market manipulation scheme." *In re Blech Sec. Litig.,* 2002 WL 31356498, at \*6.

Thus, the SRO Rules and compliance with the rules are relevant to analyses performed and opinions given by Plaintiffs. Bear Stearns' affirmative defenses that (i) "in the conduct of its affairs ... [it] did not know, and in the exercise of reasonable care could not have known, of any of the acts, misstatements or omissions by [Blech or DBCO]" (Block Aff. Ex. 10 (Answer) ¶ 118) and (ii) "Bear Stearns acted at all times relevant to the allegations of the Complaint in good faith" (Block Aff. Ex. 10 (Answer) ¶ 119).

The Plaintiffs' motion *in limine* to exclude testimony regarding SRO Regulatory provisions is, therefore, denied.

*BEAR STEARNS' MOTIONS*

III. *Motion to Exclude Evidence as Irrelevant, Inadmissible, and Prejudicial*

Defendant Bear Stearns has moved *in limine* pursuant to Rules 402, 403, 602, 802, 805, and 1002 of the Federal Rules of Evidence to preclude Plaintiffs from offering the following evidence:
1. Internal materials of Defendant DBCO--including memoranda and employee notes--("Internal DBCO Documents");
2. Communications by Stanley Berk ("Berk Communications"), including a spreadsheet of trades created by Berk in connection with this litigation and various regulatory investigations ("Berk Spreadsheet"); and
3. Communications by Defendant Baird Patrick and its equities trader, Alifehim Prodani ("Prodani") ("Baird Patrick Communications").

The Internal DBCO Documents include intra-office memoranda and letters, handwritten notes by DBCO employees, internal policies and procedures memoranda, and other documents showing daily DBCO activities.

*Benesch's April 1994 Memo*

On or about April 19, 1994, DBCO's former compliance director, John Benesch ("Benesch") sent an internal memorandum to David Blech ("Blech") and Steve Ross ("Ross")--DBCO's top two executives--detailing serious concerns about DBCO's trading practices ("April 19th Benesch Memo"). The concerns reflected in the memo include, among other things:
**\*5** • Unauthorized trades, supported by various verbal and written customer complaints;
• Large blocks being executed within the last half hour and many crosses with specific market makers;
• Numerous customer tickets stamped after the close;
• Possible wash sales between D. Blech & Co. market making account and certain employee or family related accounts;
• Numerous sellouts, reneges and cancels all indicating possible unauthorized trading, and
• Positions in error account held well over 1 or 2 days.
Such concerns, according to the memo, were unresolved after months of internal discussion and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

DBCO's compliance director believed that "[DBCO] will not pass its next regulatory audit without certain restrictions or sanctions being placed on our business by the NASD."

As to relevance, under Fed.R.Evid. 401, evidence of the existence and scope of the Blech scheme is a "fact that is of consequence to the determination of the action," and the Benesch memo is evidence that makes the existence of that fact "more probable."

The Benesch memo is not hearsay because it is a business record under Fed.R.Evid. 803(6). Fed.R.Evid. 803(6) favors admission of evidence if the evidence has any probative value at all. *Phoenix Assocs. III v. Stone,* 60 F.3d 95, 101 (2d Cir.1995). Documents may be admitted as business records under Rule 803(6), even though they are not the business records of one of the parties, and here DBCO is still a defendant in this litigation. *United States v. Consolidated Edison Co. of N.Y.,* 580 F.2d 1122, 1131 n. 18 (2d Cir.1978); *Schactman Fagan, Inc. v. Winthrop Labs., Inc.,* 1985 WL 3126, *1 (S.D.N.Y. Oct. 15, 1985). The key determination as to whether a document falls under the business record exception to the hearsay rule is whether the document is trustworthy. *Miss. River Grain Elevator, Inc. v. Bartlett & Co., Grain,* 659 F.2d 1314, 1319 (5th Cir.1981).

The Benesch memo was prepared by Benesch, DBCO's compliance director, and the preparation of the memorandum was within Benesch's regular business activity. It was prepared by a person in a position of knowledge of the facts conveyed, at a time when he had no motive to lie. Accordingly, the Benesch memo constitutes a business record under Rule 803(6) and is, therefore, excluded from the hearsay rule.

As to Fed.R.Evid. 403, the prejudice claimed by Bear Stearns must be substantial and unfair. *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 151 (2d Cir.1997); *Weinstein's Federal Evidence,* § 403.04 (Matthew Bender 2003). Here, the probative value of the Benesch memo is not outweighed by any prejudicial value. The Benesch memo tends to prove DBCO's manipulative conduct, which the

Plaintiffs must prove as part of their case in chief.

DBCO's former compliance assistant and liaison with the DBCO trading room, Michelle Kristel ("Kristel"), maintained a notebook from May through August 1994 ("Kristel Notebook"). The notebook relates parts of conversations among various DBCO employees characterized as "hearsay within hearsay," under Rule 805 as well.

**\*6** As to Fed.R.Evid. 401, the Kristel Notebook does provide relevant and reliable evidence of DBCO's trading practices. Although characterized as a personal diary by Bear Stearns, the Kristel Notebook constitutes a business record under Rule 803(6). The notebook was compiled as part of Kristel's duties as an employee in the compliance department of DBCO. It was kept "in the course of a regularly conducted business activity," and "it was the regular practice of that business activity to make" the business record. Fed.R.Evid. 803(6). It represents a record of various events that she observed and contemporaneously recorded in her notebook, as part of her duties as a compliance officer of DBCO. The fact that these notes are handwritten and contained in a written notebook does not defeat the applicability of the business record exception in Rule 803(6). *United States v. McPartlin,* 595 F.2d 1321, 1347-48 (7th Cir.1979), *cert. denied,* 444 U.S. 833 (1979) (court held that personal a appointment book was a business record within Rule 803(6) as it was part of a regular business activity and entries were made with regularity, at or near the time of the event described in the appointment book); *United States v. Hedman,* 630 F.2d 1184, 1197-98 (7th Cir.1980), *cert. denied,* 450 U.S. 965 (1981) (court held that diary which contained a detailed description of bribes paid over the years was a business record under Rule 803(6) because the diary was kept as a business activity and entries were made with regularity at or near the time of the recorded events).

The Kristel Notebook also constitutes an admission by a party-opponent under Fed.R.Evid. 801(d)(2), offered against DBCO as evidence of the illegal conduct which occurred at DBCO during the relevant time period.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 6

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

Portions of the notes contain hearsay within hearsay under Fed.R.Evid. 805, in particular conversations Kristel had with other DBCO employees, DBCO memoranda, and trading tickets, all constitute inadmissible hearsay within hearsay. With respect to the DBCO documents, such as internal memoranda and trading tickets that formed part of the Kristel Notebook, these documents conform to the business records exception of the hearsay rule and, therefore, are not hearsay. Certain of the conversations would constitute admissions of a party-opponent under Rule 801(d)(2). A further hearing may be required before introduction of the notebook to identify such conversations.

Benesch and Kristel made certain handwritten notes. Benesch made a note in preparation for the April 19th Benesch Memo, stating:
   Bear Stearns is controlling certain aspects of our operations and trading. They have conducted conference calls instructing & informing us of the excessive violations & that we are above all clearance firms when it comes to these problems & their auditors will pick up these excessive practices.
(Block Aff. Ex. 6 at 2.)

Kristel made an undated notation stating, "Trading is given account numbers after the close--in some cases with DB trades 2-3 days after Trade Date."

*7 Benesch's "memo to the file," dated April 13, 1994, describes various conversations within DBCO regarding "verbal complaints," concerns that the firm might "fall below net capital," and late trades. His "memo to the file," dated April 19, 1994, states, "New management may be put into place, effectively removing D[avid] B[lech] from day-to-day power. Compliance issues will be addressed."

Benesch's March 24, 1994 "memo to the file" describes a conversation in which Benesch told DBCO's Mark Germain about his "great concerns" regarding DBCO's operations--"[A]s usual MG said to handle it & I informed him that the only way to was to either go to Bear Stearns, Citibank, SEC or quit. MG said to handle it but I replied that I don't

have the authority or backing."

Benesch's handwritten notes of a purported May 4, 1994 conversation with Blech and DBCO's Steve Ross state: "The sellouts under David's RR # are wide spread and in accounts that should or could pay for such positions but now only reflect possible unauthorized trading but that the title of such [accounts] cause doubt if such clients will ever complain (i.e., Esther [Blech, a relative] )."

Kristel's handwritten memorandum to Benesch summarized Rick Silverman's statements on May 12, 1994 that "illegal" activity was occurring in DBCO accounts.

Benesch's May 13, 1994 memorandum to Blech and Ross stated that there had been little progress on the corrective procedures suggested in the April 19, 1994 memo and confirming that Blech and Ross would provide Benesch with "counsel of your choice" to review the compliance concerns.

Further, as with the other DBCO documents discussed above, Bear Stearns contends these notes are inadmissible hearsay and hearsay within hearsay against Bear Stearns under Rules 802 and 805 and should be excluded under Rule 403.

The notes were taken by Benesch and by Kristel as part of their normal business activities, as compliance officers of DBCO, and reflect the compliance-related observations of both Benesch and Kristel. The notes are business records, not hearsay, under Rule 803(6). As to the hearsay within hearsay objection, a further hearing may be required to identify conversations constituting admissions.

Bear Stearns seeks to exclude other internal DBCO documents. The documents include sample DBCO order tickets with date stamps and an April 26, 1994 memo from Kristel to Blech about "time stamp deficiencies" on certain order tickets; Spindel's January 17, 1994 letter to Blech resigning as DBCO's financial and operations principal and describing various concerns with "capital, operations, and regulatory climate and leadership";

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

Benesch's July 7, 1994 memo resigning as compliance director and his September 6, 1994 memo resigning his employment; and various internal DBCO documents detailing firm policy and procedures, including a June 9, 1993 memo outlining "Trading Desk Responsibilities," and a January 19, 1994 memo to DBCO employees attaching an insert to update the DBCO compliance manual.

**\*8** These documents constitute business records and will be treated as the documents previously described.

Bear Stearns seeks to bar admission of a 77-page spreadsheet, entitled "Blech Securities Trades Through Berk Accounts" ("Berk Spreadsheet"), by Stanley Berk with his associates at the advice of counsel after the events at issue. This spreadsheet is a compilation of material from other documents, such as Berk's bank statements.

The Berk Spreadsheet does not constitute a business record, but the Plaintiffs seek its introduction as an admission against interest, maintaining that it reflects fictitious trades and was presented to the government to describe Berk's relationship with Blech. The spreadsheet, in and of itself, does not appear to be an admission against interest and is not admissible.

Bear Stearns seeks to exclude DBCO documents that reference Baird Patrick and its equities trader, Prodani, and their involvement in trades in Blech securities, principally upon grounds of relevance. For example, the Kristel Notebook, discussed above, contains the following references (among others) to internal DBCO conversations about Baird Patrick and Prodani:

R[ick] S[ilverman]: All D[avid] B[lech]'s accounts should be shipped out. It stinks what goes on in these accounts. That's why I get the tickets signed because it stinks and I want to get out of the loop--Same reason why I stay away from BPAT [Baird Patrick].

M[ichelle] K[ristel]: But other people are still doing bus[iness] with Ali [Prodani].

R[ick] S[ilverman]: Pat's a big boy. He's been

around long enough ... We'll get a slap on the wrist for the time stamps. You live with that but this other stuff stinks like parking or something. ...

Those records, which are business records and admissions against interest, will be admitted against Baird Patrick and as evidence of the Blech scheme to defraud. If necessary, a further hearing can be held to identify such documents.

IV. *Motion to Exclude Audio Tapes and Related Transcripts*

Defendant Bear Stearns has moved *in limine* pursuant to Rules 402, 403, 802 and 805 of the Federal Rules of Evidence to preclude Plaintiffs from offering four categories on the audio tapes and corresponding transcripts (collectively, "audio tapes") that were produced by Bear Stearns in this litigation:

1. Audio tapes regarding transactions in securities that are not one of the fifteen Blech Securities which remain in this case pursuant to the Court's order dated October 17, 2002 (the "Non-Class Securities Tapes").

2. Audio tapes reflecting communications between Bear Stearns and anonymous phone callers who purport to blow the whistle on D. Blech & Co.'s ("DBCO's") manipulation scheme on August 31, 1994 (and at later dates) (the "Anonymous Caller Tapes").

3. Audio tapes reflecting communications with Stanley Berk (or his employees or his bank) (collectively, "Berk") (the "Berk Tapes").

**\*9** 4. Audio tapes regarding events occurring *after* September 22, 1994, the date on which Bear Stearns removed DBCO from its clearance system (the "Post-September 22 Tapes").

The Non-Class Securities Tapes are alleged by Plaintiffs to evidence the manipulative scheme of David Blech ("Blech") and D. Blech & Co. ("DBCO") and Bear Stearns' knowledge of that scheme.

Fed.R.Evid. 401 defines relevant evidence as "evidence having any tendency to make the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Evidence of David Blech's financial condition, his need to bring in capital by selling off whatever liquid securities he could, and his use of controlled accounts, including the trust accounts and various other accounts, to engage in parking, prearranged wash sales, "painting the tape," and other fictitious transactions to effectuate his scheme, is relevant.

In addition, Plaintiffs seek to establish that Bear Stearns was aware of Blech's financial difficulties, concerned about the state of the collateral for the margin debt which it had advanced to Blech, DBCO, and its customers, and took steps to protect itself, including (i) demanding that Blech and DBCO reduce their debits with the knowledge that in order to do so they would have to engage in fraudulent and fictitious trades, and then clearing those trades, (ii) withholding securities from the market in order to maintain the artificially inflated price of those securities, and (iii) contriving trades to reduce the DBCO debt.

Because the Non-Class Securities Tapes are relevant to the common scheme alleged and Bear Stearns' knowledge, they will be admitted.

At Bear Stearns' request, a limiting instruction will be given at the time of the introduction of the Non-Class Securities Tapes that they are offered only with respect to the existence of a scheme to defraud, and that, in order to recover, the Plaintiffs must establish by separate evidence that their allegations of Blech's scheme and Bear Stearns' knowledge apply with respect to the Class Securities.

The Anonymous Caller Tapes are relevant as to Bear Stearns' knowledge and intent and are therefore admissible though not to establish the facts recounted by the caller and an instruction to that effect will be given if requested.

The Berk Tapes are admissible on the same grounds as the Non-Class Securities Tapes.

The Post-September 22 Tapes do not constitute admissions and are not relevant as to the knowledge and intent of Bear Stearns during the relevant period.

V. *Motion to Exclude Evidence Relating to Criminal and SEC Proceedings Against David Blech*

Defendant Bear Stearns has moved pretrial *in limine* to bar admission of the plea allocution of David Blech ("Blech") in *United States v. David Blech,* 97 Cr. 0403, and the judgment entered on that allocution and the amended complaint dated September 13, 1999, the orders entered on September 23, 1999 and January 31, 2002 against Blech, Richard Silverman ("Silverman") (DBCO's head trader) and Alifehim Prodani ("Prodani") (Baird Patrick's trader) ("SEC action consent orders"), and SEC Administrative orders against Blech (*In the Matter of Blech,* Securities Exchange Act Release No. 43693, 2000 SEC LEXIS 2698 (Dec. 8, 2000)), Silverman and Prodani, *SEC v. Blech,* Litigation Release No. 17354, 2002 SEC LEXIS 292 (Feb. 6, 2002)), Joseph Septimus ("Septimus") and Suzanne Pelosi ("Pelosi") (*In the Matter of Septimus and Pelosi,* Securities Act Release No. 7695, 1999 SEC LEXIS 1310 (Jun. 30, 1999)), and Pelosi (*In the Matter of Pelosi,* Securities Act Release No. 7927, 2000 LEXIS 2720) (Dec. 13, 2000)) ("Administrative Orders").

*10 For the reasons set forth below, the motion is denied part and granted in part.

The Blech allocution admitted to the securities fraud engaged with Stanley Berk, in which stocks were "flipped" but not actually purchased, and unauthorized guarantees were submitted to extend his margin credit at Bear Stearns.

On September 13, 1999, the SEC filed an amended complaint in *SEC v. Blech,* 99 Civ. 4770, alleging that Blech, Silverman, and Prodani directly participated in a market manipulation for numerous biotechnology securities from June 1, 1994 through September 22, 1994. On September 23, 1999, Blech entered into a consent order ("Consent Order") with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 9

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

the SEC, which was entered as a final judgment of permanent injunction and other equitable relief by consent against David Blech on December 5, 1999 ("Final Judgment") in *SEC v. Blech*, 99 Civ. 4770. The Final Judgment enjoined Blech, *inter alia,* from violating the securities laws and required Blech to disgorge $19,713,653.50, including interest. Blech expressly agreed to the Consent Order "without admitting or denying the allegations of the Commission's Complaint." On January 31, 2002, Silverman (DBCO's head trader) and Prodani (an equities and stockbroker trader at Baird Patrick) similarly consented to entry of judgments in the SEC action, entered on January 31, 2002. As with Blech, they did so "without admitting or denying the allegations of the Commission's Complaint."

On June 30, 1999, the SEC instituted administrative proceedings against Septimus, a DBCO employee, and Pelosi, DBCO's CEO and principal secretary, alleging both wilfully aided and abetted DBCO in violating the securities laws. *In the Matter of Septimus and Pelosi,* Securities Act Release No. 7695, 1999 SEC LEXIS 1310 (June 30, 1999). On December 13, 2000, pursuant to Pelosi's offer of settlement, the SEC ordered Pelosi to cease and desist from violating the securities laws and to pay a $5,000 civil penalty. Pelosi expressly consented to the order "without admitting or denying the findings" set forth therein.

On December 8, 2000, the SEC ordered, pursuant to Blech's offer of settlement, that Blech be immediately "barred from association with any broker or dealer." *In the Matter of Blech,* Securities Exchange Act Release No. 43693, 2000 SEC LEXIS 2698, at *4 (Dec. 8, 2000). Blech expressly consented to the order "without admitting or denying the findings set forth" in the order. *Id.* at 1. On February 6, 2002, the SEC ordered Silverman suspended from associating with a broker or dealer for six months and ordered Prodani suspended from associating with a broker or dealer for nine months (the "Administrative Consent Orders"). As with the consent orders in the SEC action, both Silverman and Prodani consented to the suspensions "without admitting or denying the findings of fact" contained in the respective orders. *Id.*

Blech's allocution, a statement against his penal interest, is not hearsay. *E.g., United States v. Wimbley,* No. 01-1048, 2000 U.S.App. LEXIS 38603, at * 6 (2d Cir. Aug. 29, 2000) ("This circuit has recognized plea allocutions as statements against penal interests" and thus an exception to the hearsay rule under Rule 80(b)(3).). It also establishes the existence of that particular fraud, which is relevant to the Plaintiffs' case. It does not establish Bear Stearns' participation, in that fraud and Bear Stearns is entitled to an instruction if requested to that effect if the plea and judgment are introduced. Whether Bear Stearns was the object of the fraud or a direct participant in the fraud is an issue to be determined by trial.

*11 The statements contained in the amended complaint are inadmissible hearsay, excluded by Rules 801, 802, and 803 of the Federal Rules of Evidence. This document is not evidence of anything other than the existence of an accusation. As the Second Circuit held, a complaint is not admissible to prove the truth of its contents. *Stevenson v. Hearst Consol. Publ'ns, Inc.,* 214 F.2d 902, 907 (2d Cir.1954) ("Of course, the complaint was inadmissible as hearsay to prove the truth of its contents.").

The SEC judgments are inadmissible under Federal Rule of Evidence 408, providing:
> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

Fed.R.Evid. 408. *See also New York City Dep't of Fin. v. Twin Rivers, Inc.,* 182 F.3d 900 (2d Cir.1999) (affirming the district court's exclusion of a consent judgment because it was inadmissible to prove facts related to a settling party's liability).

The plaintiffs in support of the admissibility of the Administrative orders have cited *United States v. Gilbert,* 668 F .2d 94, 97 (2d Cir.1981), for the proposition that such orders can establish knowledge or intent. Such knowledge gained at the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

time of the proceedings is immaterial here.

VI. *Motion for Separate Trials and Bifurcation*

Defendant Bear Stearns has moved *in limine* pursuant to Rules 20(b) and 42(b) of the Federal Rules of Civil Procedure for a separate trial from defendants Blech, DBCO, and Baird Patrick. In the alternative, Bear Stearns requests that the Court issue a limiting instruction under Federal Rule of Evidence 105, directing the jury not to consider evidence against Bear Stearns that is admissible only against the other defendants. Baer Stearns also moves to bifurcate the issues of liability and damages in any trial involving Bear Stearns, pursuant to Rule 42(b). For the reasons stated below, Bear Stearns' motion is denied, and the requested instruction will be given.

A. *Separate Trial for Bear Stears Legal Standard*

Under Federal Rule of Civil Procedure 42(b), courts have the authority to grant a separate trial "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Likewise under Federal Rule of Civil Procedure 20(b), courts can sever a trial in order to "prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom the party asserts no claim and who asserts no claim against the party."

In deciding whether to grant bifurcation or severance of a trial, courts do not apply a bright line rule, but "rather engage in a balancing test." *Lennon v. Seaman,* 99 Civ. 2664(LBS), 2002 U.S. Dist. LEXIS 1237, at \*34 (S.D.N.Y. Jan. 28, 2002). Factors generally considered include:
   **\*12** (1) whether the issues sought to be tried separately are significantly different from one another; (2) whether the severable issues require the testimony of different witnesses and different documentary proof; (3) whether the party opposing the severance will be prejudiced if it is granted; and (4) whether the party requesting the severance will be prejudiced if it is not granted.
*Martinez v. Robinson,* No. 99 Civ. 11911(DAB)(JCF), 2002 U.S. Dist. LEXIS 4454, at

\*5 (S.D.N.Y. March 18, 2002) (quoting *Lewis v. Triborough Bridge & Tunnel Auth.,* No. 97 Civ. 0607(PKL), 2000 U.S. Dist. LEXIS 4982, at \*4-5 (S.D.N.Y. April 19, 2000).

Nonetheless, "separate trials remain the exception rather than the rule." *Lewis,* 2000 U.S. Dist. LEXIS 4982, at \*5 (same); *Bowers v. Navistar Int'l Transp. Corp.,* No. 88 CIV 8857(SS), 1993 U.S. Dist. LEXIS 6129, at \*6 (S.D.N.Y.1993) (same); *Monaghan v. SZS 33 Assocs., L.P.,* 827 F.Supp. 233, 245 (S.D.N.Y.1993) (same). *See also* Fed.R.Civ.P. 42(b), advisory committee note (explaining that "separation of issues for trial is not to be routinely ordered"). As courts have repeatedly stated, "the presumption is that all claims in a case will be resolved in a single trial, and 'it is only in exceptional instances where there are special and persuasive reasons for departing from this practice that distinct causes of action asserted in the same case may be made the subject of separate trials." ' *Martinez,* 2002 U.S. Dist. LEXIS 4454, at \*5-6 (quoting *Miller v. American Bonding Co.,* 257 U.S. 304, 307 (1921)); *Lewis,* 2000 U.S. Dist. LEXIS 4982, at \*5-6 (same); *see also Bowers,* 1993 U.S. Dist. LEXIS 6129, at \*5 ("The piecemeal trial of separate issues in a single suit is not to be the usual course."); *Phillips v. Lenox Hill Hosp.,* No. 86 Civ. 1026(RWS), 1986 WL 12512, at \*1 (S.D.N.Y. Oct. 24, 1986) ("[C]ourts have emphasized that separate trials should not be ordered unless such a disposition is clearly necessary."); *Monaghan,* 827 F.Supp. at 246 (highlighting "the fundamental presumption which favors the trial of all issues to a single jury and underlies the assumption of Rule 42(b) that bifurcation ... is reserved for truly extraordinary situations of undue prejudice"). This is the case because "generally efficient judicial administration favors having only one trial whenever possible." *Id.* at 245 (citation omitted).

In a motion for severance· or bifurcation, the moving party bears the burden of establishing that "separate trials are necessary to prevent prejudice or confusion and serve the ends of justice." *Bowers,* 1993 U.S. Dist. LEXIS 6129, at \*7; *Lennon,* 2002 U.S. Dist. LEXIS 1237, at \*33 (same); *Martinez,* 2002 U.S. Dist. LEXIS 4454, at \*6 ("[T]he burden

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

Page 11

is on the party seeking bifurcation to demonstrate that it is warranted."). Here, Baer Stearns does not sufficiently establish the distinctiveness of the issues and evidence at stake and the prejudice it would suffer from a single trial.

*Overlapping Issues and Evidence*

**\*13** Separate trials are not appropriate when "issues, witnesses and documentary evidence overlap." *Bowers,* 1993 U.S. Dist. LEXIS 6129, at \*8; *Monaghan,* 827 F.Supp. at 245 ("[T]he court may find bifurcation to be inappropriate where the issues, witnesses and documentary evidence central to both claims overlap...."). This is the case because it is a "waste of judicial resources to have to rehash factual issues." *Lewis,* 2000 U.S. Dist. LEXIS 4982, at \*8. Courts have recognized that "[n]early every trial involving multiple defendants will involve some separate issues of fact that call for testimony from different witnesses on entirely unrelated matters." *Id.* at \*10. However, the question in a severance or bifurcation motion is "whether separate trials will require *substantial* overlap of witnesses or documentary proof." Id. (emphasis added); *Phillips,* 1986 WL 12512, at \*2 (focusing on the existence of a "significant overlap of evidence").

In the present case there is "significant evidentiary overlap" in the issues against Bear Stearns and Baird Patrick. *Lewis,* 2000 U.S. Dist. LEXIS 4982, at \* 10. Plaintiff is attempting to show that "Bear Stearns' financial interest and participation in DBCO's trading of Blech Securities" was "connected to the manipulative conduct by Baird Patrick of the market in Blech Securities." (Pls.' Mem. at 7.) As both Bear Stearns and Baird Patrick were financially bound to the market in Blech Securities, much of the documentary evidence and testimony proffered by the Plaintiffs against them overlaps.

For instance, the notes authored by Michelle Kristel, a member of DBCO's compliance department, will be brought by Plaintiffs to prove their claims against both Bear Stearns and Baird Patrick. According to Ms. Kristel's notes, Bear

Stearns in July of 1994 had substantially increased DBCO's margin requirements by 25%, while DBCO and Baird Patrick were heavily trading in the Blech Securities. (Block Aff., Ex. B at 52.)

Furthermore, although the memorandum by John Benesch, dated April 19, 1994 (Block Aff., Ex. A) does not expressly refer to Bear Stearns, it bears on the "knowledge and activity" of Bear Stearns. *In re Blech Sec. Litig.,* No. 94 Civ. 7696(RWS), 2002 U.S. Dist. LEXIS 19835, at \*34 (Oct. 17, 2002). Moreover, Mr. Benesch was involved in numerous communications with Bear Stearns' employees regarding trading in Blech Securities, and Mr. Benesch was the contact person for Bear Stearns in connection with certain of the initial offerings of Blech securities. (Trinko Decl., Ex. A, Aug. 13 1997 Benesch Tr. at 78, 145, 158.) Plaintiffs intends to call Mr. Benesch, Ms. Kristel, "as well as other former employees or associates of Belch and DBCO," as "material witnesses" against both Bear Stearns and Baird Patrick. (Pls.' Mem. at 11.)

Plaintiff's expert witnesses base their opinions on evidence that involves the acts of both Baird Patrick and Bear Stearns. Nye, for instance, relies on the database of Bear Stearns in extrapolating the amount of Plaintiffs' damages arising from its claims for relief against both defendants. (Nye Expert Report at 11). The testimony of Berg will address the trades effectuated by Stanley Berk, whose testimony would also be required at both the trials of Baird Patrick and Bear Stearns. Thus, Plaintiffs' claims against Bear Stearns and Baird Patrick present "far from two distinct and separate claims involving substantially different sets of witnesses." *Bowers,* 1993 U.S. Dist. LEXIS 6129, at \*4 (holding that two claims are "fundamentally intertwined" when "necessitating extensive testimony by the same factual and expert witnesses").

*No Undue Prejudice*

**\*14** Baird Stearns further would not suffer from "undue prejudice" from a single trial with Baird Patrick. *Pavone v. Gibbs,* No. CV 95-0033, 1997 U.S. Dist. LEXIS 16530, at \*5 (E.D.N.Y. Sep. 29,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 12

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

1997) (denying a severance motion since "Defendants have made no showing of undue prejudice"); *Monaghan,* 827 F.Supp. at 246 (holding that record did not support granting of Rule 42(b) since movant failed to prove "undue prejudice").

In its motion papers, Bear Stearns refers to three categories of evidence that would result in "significant risk of jury confusion and prejudice": internal DBCO documents; communications (and spreadsheet) of Blech's co-conspirator, Stanley Berk; and Baird Patrick communications. (Bear Stearns Mem. at 4.) However, Bear Stearns only provides three limited excerpts from the "more than 350 potential trial exhibits" (Bear Stearns Mem. at 1) as its sole ground for severance of the trial in this action. (Bear Stearns Memo. at 5). These three examples exhibit nothing "truly extraordinary" so as to warrant Rule 42(b) relief. *Monaghan,* 827 F.Supp. at 246. Furthermore, "when the claims, witnesses and evidence overlap, no prejudice is visited upon the parties by joint trial of the claims. This is so because the evidence on one claim is relevant and necessary to establish an independent but interrelated claim against another party to the lawsuit." *Bowers,* 1993 U.S. Dist. LEXIS 6129, at *9 (citation omitted).

In the criminal context, courts have recognized that guilt by association and spillover prejudice is less likely when there is a "reasonable number of defendants." *United States v. Dacunto,* No. 00 Cr. 620(AGS), 2001 U.S. Dist. LEXIS 42, at *7 (S.D.N.Y. Jan. 4, 2001). As this Court has explained, "When many defendants are tried together in a complex case and they have significantly different levels of culpability, the risk of prejudice is heightened ." *Id.* at 9.; *see also United States v. Berger,* 224 F.3d 107, 116 (2d Cir.2000) (noting that "any prejudicial spillover was limited, given the relatively small number of defendants and the fact that most or all of them were involved in the major frauds"). In the present case, jury confusion is less likely since there are only two active defendants.

Finally, as Bear Stearns suggests, a Rule 105

instruction, providing a jury with appropriate guidance, can cure potential "spillover prejudice" from trial testimony concerning Baird Patrick. (Bear Stearns Mem. at 10.) As held by *Lewis v. Triborough Bridge & Tunnel Authority,* "any prejudice or confusion can be remedied by a carefully drafted jury instruction." 2000 U.S. Dist. LEXIS 4982, at *14; *see also Dayton Monetary Assocs. v. Donaldson Lufkin & Jenrette Sec. Corps,* 1999 U.S. Dist. LEXIS 3254, at *17-18 (S.D.N.Y. Mar. 19, 1999) ("[R]isk [of spillover prejudice] can be eliminated through appropriate jury instructions and does not necessitate a separate trial.").

*Request for Limiting Instruction Will Be Given as Necessary*

*15 Federal Rule of Evidence 105 states the following: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." *See also United States v. Downing,* 297 F.3d 52, 59 (2d Cir.2002) (holding that a limiting instruction directing the jury to consider evidence admissible only against one defendant and not the other was appropriate).

However, "[a] request for a limiting instruction should be specific and timely." *United States v. Thirion,* 813 F.2d 146, 155 (8th Cir.1987). As the commentary to the Federal Rules of Evidence explains, "[T]he request should be pinpointed to meet the problematic evidence ... [I]f the objection is only to a single statement, the requested instruction should focus the jury on the problematic statement, rather than to the witness' testimony as a whole." U.S.C.S. Fed. Rules Evid., R. 105, Commentary (2002). In each instance, "[s]hould a concrete instance of [jury] confusion [later] arise, the Court may take remedial action, including issuing curative instructions." *HCC, Inc. v. RH & M Machine Co.,* No. 96 Civ. 4920(PKL), 1998 U.S. Dist. LEXIS 18968, *4 (S.D.N.Y. Dec. 4, 1998).

B. *Bifurcation Between Liability and Damages*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

Likewise, Bear Stearns' request to bifurcate the liability and damage phases of the trial is denied since there is overlapping evidence and no undue prejudice.

*Overlapping Issues and Evidence*

In this case, the "issues of liability and damages are intertwined," *P.K. Vichare v. Ambac Inc.,* 106 F.3d 457, 466 (2d Cir.1996) (denying bifurcation due to overlapping liability and damage issues in a Title VII discrimination suit), resulting in "an inevitable overlap of witnesses and documentary evidence central to both ... claims." *Monaghan,* 827 F.Supp. at 246 (denying bifurcation due to overlapping liability and damage evidence in a personal injury suit). Plaintiffs will be compelled to recall both of its expert witnesses, as well as reintroduce the documentary evidence upon which their opinions are based, should Plaintiffs be required to separately litigate the issue of damages after a jury trial is held on the issue of liability.

Courts grant bifurcation when it would "limit or streamline the remaining issues." *Lewis,* 2000 U.S. Dist. LEXIS 4982, at *12; *Dayton Monetary Assocs.,* 1999 U.S. Dist. LEXIS 3254, at *16 (same). Such streamlining can only take place "where the need to examine the same witnesses in both phases of the separated trial would be at a minimum." *HCC, Inc.,* 1998 U.S. Dist. LEXIS 18968, at *2. Otherwise, "duplicative testimony and redundant assessment of factual issues would be inefficient, reducing rather than increasing judicial economy." *Id.* at 6 (holding that the plaintiff's statutory and common law unfair competition and tortious interference claims, in this patent infringement case, would likely include testimony on liability relevant to damage issues).

*No Undue Prejudice*

*16 Bear Stearns fails to make a showing of undue prejudice that would result from an a single trial on both liability and damages issues. At most, Bear Stearns argues, "The jury's consideration of Bear Stearns' intent, knowledge, and actions during the relevant time period should not be cluttered by

evidentiary digressions into specific damage issues for each of the Blech Securities." (Bear Stearns Mem. at 13.) Bear Stearns thus does not overcome the "fundamental presumption which favors the trial of all issues to a single jury," *Monaghan,* 827 F.Supp. at 246, and that a single jury, with appropriate guidance from the Court, will be able to differentiate the issues of liability and damages.

VII. *Motion to Modify the Court's Class Certification Order and Exclude Certain Evidence*

Defendant Bear Stearns has moved, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to amend the Court's May 11, 1999 Class Certification Order (the "Class Order") and has moved *in limine* to exclude certain related evidence from the trial of this action. For the reasons stated below, Bear Stearns' motion is granted in part and denied in part.

Rule 23(c)(1) of the Federal Rules of Civil Procedure gives the Court the discretion to amend the Class Order. It states: "An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." *See also* Fed. R. Civ. Proc. 23(d) (giving the Court broad discretion to make appropriate orders in class actions).

The Class Period is amended to commence on March 1, 1994, as agreed by both parties. (Pls.' Br. at 1 n. 1; Bear Stearns' Br. at 6.) Plaintiffs allege no damages prior to March 1, 1994. Plaintiffs' damage expert defines the "Damages Period" as March 1, 1994 through September 24, 1994 (Block Aff. Ex. F (Nye Report) ¶ 3) and calculates his estimate of damages based on that period (*Id.* ¶¶ 27-32, Ex. 4). He testified that he used March 1, 1994 as the starting date for damages in accordance with his instructions from Plaintiff's counsel and with "my understanding of the Court ruling." (Block Aff. Ex. G (Nye Tr.) at 52). Plaintiffs further agree that Bear Stearns was not the exclusive clearing broker to D. Blech & Co., Inc. ("DBCO") until March 1994. The amended Class Period is thus March 1, 1994 to September 21, 1994.

The definition of Blech Securities is also amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 14

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

to cover only those securities for which Plaintiffs are seeking damages. Bear Stearns has moved to have the term, "Blech Securities," which is currently defined to include the securities of 22 companies, amended to eliminate the 7 securities as to which Plaintiffs have stated they will not be seeking damages. (Pls.' Rule 56.1 Statement ¶ 2). Plaintiffs agree in their opposition to this requested modification (Pls.' Br. at 1 n. 1), consistent with the Court's ruling on Bear Stearns' motion for summary judgment. *See In re: Blech Sec. Litig.,* No. 94 Civ. 7696(RWS), 2002 WL 31356498, at *2 (S.D.N.Y. Oct. 17, 2002).

**\*17** Since Bear Stearns' alleged actions occurred only in the secondary markets, the Court rules that persons who purchased in the primary markets cannot recover against Bear Stearns. Bear Stearns was not an underwriter of the Blech Securities, and the Complaint alleges "no interrelationship ... between the manipulations of primary market and that of the secondary market." (Block Aff. Ex. C (Class Order) at 19.) Furthermore, as Berg, Plaintiffs' own liability expert has testified, Bear Stearns did not direct the price of any IPO, and no connection has been established between the IPOs and Bear Stearns' debit reduction requests. (Block Aff. Ex. H (Berg Tr.) at 208-209.) Bear Stearns is thus only liable to members of the subclass for secondary market transactions, beginning no earlier than March 1, 1994.

All named representative who did not purchase Blech Securities at issue in this case, or who did not submit documentation as proof of their purchases, are dismissed from the case. Four of the named Plaintiffs—Stephen B. Ehrlich, Timothy D. Peykes, Robert Libauer, and James Wright—are dismissed from the case because they purchased only shares of the Blech Securities that are no longer at issue. (Block Aff. Ex. A (Compl.) at ¶¶ 13-14, 23-24. Three other Plaintiffs—Abraham Garfinkel, Raizy Levitin, and Edward Mehfarare dismissed as class representatives for failure to produce documents demonstrating that they purchased any Blech Security.

With the removal of these seven class

representatives, there are six Blech Securities, which have no named plaintiff as a class representative. However, since seven named representatives remain, they can adequately represent the interests of persons who purchased Advanced Surgical, Ecogen, Guilford Pharmaceuticals, Microbe, Neoprobe, and Pharmos. As previously held in granting class certification, although Plaintiffs did not purchase all 22 Blech Securities during the class period, Plaintiffs' claims to all Blech Securities "more than satisf[ied] the typicality requirement." *In re Blech Sec. Litig.,* 187 F.R.D. 97, 105 (S.D.N.Y.1999). This is the case because the typicality requirement of Rule 23(a) "does not require that the situations of the named representatives and the class members be identical," *In re NASDAQ,* 172 F.R.D. 119, 126 (S.D.N.Y.1997), or "co-extensive interests between the representative parties and members of the class." *Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981). It is only necessary that they arise "from the same course of events" and that each class member make "similar legal arguments to prove the defendant's liability." *In re Blech Sec. Litig.,* 187 F.R.D. at 105 (quoting *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992). *See also Tedesco v. Mishkin,* 689 F.Supp. 1327, 1335-36 (S.D.N.Y.1988) ("[I]t is not necessary for the named Plaintiffs to have invested in all of the investment vehicles" when "the supplemental amended complaint alleges a single pattern of fraud. The named Plaintiffs' claims arise out of that scheme, which also gives rise to the claims of the other class members. Further, the claims of the named Plaintiffs and class members are based on identical legal theories."). Thus, there need not be a class representative for every Blech security, as long as all the securities are part of a common fraudulent or manipulative scheme.

*BAIRD PATRICK'S MOTIONS*

VIII *Baird Patrick's motion to exclude Blech's plea Allocution and the amended complaint in the SEC Proceedings against Blech*

**\*18** Defendant Baird Patrick has moved *in limine*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

to exclude Blech's plea allocution and the amended complaint in the SEC proceedings against Blech. Baird Patrick's motion is denied in part and granted in part in accordance with Section V of this opinion, dealing with Bear Stearns' motion to exclude evidence relating to the U.S. Attorney's Criminal Proceedings and the SEC's Proceedings against Blech. Thus, Blech's plea allocution will not be excluded, while the amended complaint in the SEC proceedings against Blech will be excluded.

*EXPERT WITNESSES*

The standard for the admissibility of expert testimony at trial is set forth in Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the case.

Fed.R.Evid. 702.

The standard was the subject of extensive analysis by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999). The Supreme Court directed that "the trial judge is to act as a 'gatekeeper' with respect to expert testimony to ensure that such testimony is both relevant and reliable." *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 522 (S.D.N.Y.2001) (citing *Daubert,* 509 U.S. at 589-591). Thus, "[t]he determination as to the relevance and reliability of such evidence is committed to the sound discretion of the trial court."). *Id.* In *Kumho Tire Co. v. Carmichael,* the Supreme Court clarified that this gatekeeper function applies to all expert testimony, not just scientific testimony. 526 U.S. at 147 (explaining that Rule 702 makes "no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. It makes

clear that any such knowledge might become the subject of expert testimony.").

The Supreme Court proceeded to provide district courts with a checklist for assessing the reliability of expert testimony. This list of "specific factors" "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire,* 526 U.S. at 141. Listed considerations include whether an expert's theory can be tested, "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error", and "general acceptance" *Daubert,* 509 U.S. at 593-594. As repeatedly stressed, the "list of factors was meant to be helpful, not definitive." *Kumho Tire,* 526 U.S. at 151. *See also Daubert,* 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."); *Amorgianos v. AMTRAK,* 303 F.3d 256, 266 (2d Cir.2002) ("[T]he *Daubert* inquiry is fluid and will necessarily vary from case to case."). Thus, "[t]he trial court is to use its discretion to determine what are reasonable criteria of reliability and whether the proposed testimony meets those criteria based on the peculiarities of the case before it." *Primavera,* 130 F.Supp.2d at 522.

*19 However, "[t]he Rules' basic standard of relevance ... is a liberal one," *Daubert,* 509 U.S. at 587, and "the district court's *Daubert* gatekeeping role does not permit the district court, in ruling on evidentiary sufficiency, to reject admissible expert testimony." *Amorgianos,* 303 F.3d at 267-268. As the Advisory Committee noted, "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed.R.Evid. 702, Advisory Comm. Notes.

This case is complicated by the fact that the parties have not contended that there is an accepted methodology for determining liability and calculating damages in market manipulation cases. Market behavior is not as objectively ascertainable as reactions in the world of physical science. As the Advisory Committee to Rule 702 recognized, "Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 16

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." Fed.R.Evid. 702, Advisory Comm. Notes.

Nonetheless, expert testimony is especially appropriate in this case. The Advisory Committee Notes to Rule 702 instruct, "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Here, proper testimony is for an expert familiar with the market to explain terms and practices that a lay jury would not understand. As the Second Circuit stated, "Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts." *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991); *United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.1996) (same). Furthermore, "it is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards." *Primavera,* 130 F.Supp.2d at 529. Thus, experts in this case can testify that particular practices deviate from the norm, what effects they may have on the market, and whether Bear Stearns or Baird Patrick would have been aware of these effects.

I. *Plaintiffs' Motions against Defendants' Experts*

_____ A. *Fischel*

Bear Stearns' expert witness, Fischel, is qualified to testify. Fischel has presented similar types of analyses in the past. *E.g., AUSA Life Ins. v. Ernst & Young,* 119 F.Supp.2d 394, 401-402 (admitting Fischel's testimony in securities fraud case) (S.D.N.Y.2000); *Endo v. Albertine,* 863 F.Supp. 708, 723-724 (N.D.Ill.1994) (admitting Fishel's testimony regarding causation). A law professor at

the University of Chicago, who has written and lectured on economic issues relating to the law for a number of years, Fischel can bring to bear knowledge and expertise in economic matters that can assist the jury in evaluating Nye's analysis.

*20 Courts have often allowed expert testimony for the sole purpose of critiquing and thereby helping to explain the work of an expert witness retained by another party. *E.g., Fryniarz v. Nike, Inc .,* No. 00 Civ. 2623(NRB), 2002 WL 1968351, at *2 (S.D.N.Y. Aug. 23, 2002) (allowing testimony of an expert who pointed out flaws in the opposing party's expert study); *Bicardi & Co., Ltd. v. New York Lighter Co., Inc.,* No 97-CV-7140 (JS VVP), 2000 WL 298915, at *6 (E.D.N.Y. Mar. 15, 2000) (admitting testimony of a critiquing expert in a trademark infringement case).

Fischel's liquidity theory, positing that the price of Blech Securities plummeted because the market became illiquid when Blech dropped out of the market, is a proper hypothesis for the jury's evaluation. "When a trial court ... rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." Fed.R.Evid. 702, Advisory Comm. Notes. In this case, the jury can best form a judgment when presented with the two experts' competing theories.

However, further voir dire is necessary for Fischel to properly explain his calculations to the Plaintiffs. In their briefs, Plaintiffs indicate that they have repeatedly requested the materials and information on which Fischel based his calculations, but they have yet to receive a response. (Pls.' Br. at 3-4 (indicating that requests were issued on March 19, 2002; October 28, 2002; November 12, 2002; November 26, 2002).)

Finally, the inaccuracy in Fischel's Exhibit D must be corrected. Only one of the Blech SecuritiesNeoprobeincreased by an amount greater than the 3.90 return that Exhibit D purports to show for the portfolio of all fifteen securities. This security had a return of 5 .16. Exhibit D must, therefore, indicate that this return is only true for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

one stock, not all fifteen, and it must specify the stock by name.

_____ B. *Buchanan*

Beard Patrick's expert, Buchanan, is also qualified to testify. Although he has no prior court qualifications, he has testified as am expert witness in SEC and NASD proceedings. (Baird Patrick's Br. at 9; Buchanan *Curriculum Vitae* ) He has further acquired specialized knowledge of the stock brokerage industry through forty years of experience in almost all areas of business, including back office operations; sales, trading, syndicate operations; and senior management and ownership. *Id.* As the Advisory Committee Notes to Rule 702 explain, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *See also Primavera,* 130 F.Supp.2d at 523 (holding that an expert witness with extensive background and qualification in economics and in the analysis of securities prices and interest rates could qualify as an expert in the area of CMO prices).

**\*21** Buchanan can testify as to what ordinary broker activity entails and as to the customs and practices of the industry. However, he cannot conclude that Baird Patrick's trades were proper. First, his knowledge of Baird Patrick's trading activities is based almost exclusively on their trading records. (Buchanan Tr. at 28-29.) He engaged in no express methodology to reach his conclusions and admitted that he never discussed Baird Patrick's trading in Blech Securities with Prodani.

Furthermore, Buchanan's conclusion that Baird Patrick did not engage in parking or other stock manipulation improperly impinges upon the roles of the court and jury. Such "inappropriately drawn conclusions regarding the legal significance of various facts" has been rejected by the Southern District Court and Second Circuit. *Media Sports & Arts S.r.L. v. Kinney Shoe Corp,* No. 95 Civ. 3901(PKL), 1999 U.S. Dist. LEXIS 16035, at \*6

(S.D.N.Y. Oct. 19, 1999); *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505 (2d Cir.1977) (rejecting an expert witness's testimony for going beyond a business's common practice). Buchanan can testify from the records that there was a delay in settling the trade by Wexford Clearing, Baird Patrick's clearing firm, and what in his opinion the delay might have caused. However, he cannot determine the legal significance of documentary evidence. This is the case because "[a]lthough an expert may opine on the ultimate issue of fact, she 'may not give testimony stating ultimate legal conclusions based on those facts," 'which are in the jury's realm to decide. *Media Sport,* 1999 U.S. Dist. LEXIS 16035, at \*4 (quoting *Bilzerian,* 926 F.2d at 1294. Baird Patrick itself agrees that "Buchanan should only opine on the ultimate issues of fact," and "[t]o the extent that his report goes to ultimate legal issues, trial counsel will avoid questions that go to opinions of ultimate legal issues." (Baird Patrick's Br. at 12.)

Buchanan's opinion as to Berk's credibility is likewise improper and has no probative value for the jury. *See United States v. Scop,* 846 F.2d 135, 142 (2d Cir.1988) ("The credibility of witnesses is exclusively for the determination by the jury."). In both his Report and testimony, Buchanan repeatedly draws conclusion from his interpretation of the "tenor" and "tone" of the witnesses' deposition testimonies. (Buchanan Report at 9; Buchanan Tr. at 120.) This subjective review of evidence is improper. *Kumo Tire Co.,* 526 U.S. at 155 (expressing "concern" at the "subjectiveness" of the witness's "mode of analysis"). Furthermore, the fact that the expert witness had read someone else's deposition would not give him "personal knowledge of the underlying facts." *Pretter v. Metro N. Commuter R.R. Co.,* No. 00 Civ. 4366(JSR), 2002 U.S. Dist. LEXIS 18332, at \*5 (S.D.N.Y. Sept. 30, 2002). Thus, as repeatedly held, "evidence is not helpful if it draws inferences or reaches conclusions within the jury's competence or within the exclusive function of the jury." *Nichols v. Am. Nat'l Ins. Co.,* 154 F.3d 875, 883 (8th Cir.1998). *See also Primavera,* 130 F.Supp.2d at 528 (stating that an expert opinion should not be admitted "where it would merely tell the jury what result to reach.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 18

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

**\*22** Finally, Buchanan's opinion, that Baird Patrick could not have been a control person for the purpose of federal securities violations, is unfounded and inadmissible. Buchanan has no personal or specialized knowledge as to Baird Patrick's operations or seating arrangements. There is "simply is too great an analytical gap" between Buchanan's general experience in the industry and his conclusion on the control issue. *Lippe v. Bairnco Corp.,* No. 96 Civ. 7600(DC), 2003 U.S. Dist. LEXIS 1133, at \*16 (S.D.N.Y. Jan. 28, 2003) (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)).

II. *Defendants' Motions against Plaintiffs' Experts*

A. *Berg*

Berg is qualified to testify as an expert witness. He has thirty years of experience in the securities industry, including executive positions at major securities firms. Furthermore, he has a substantial background as a testifying expert at depositions, arbitration hearings, and in court. He was qualified as an expert in securities matters on at least nine occasions, and he has testified on clearing house issues in at least seven arbitration matters. (Pls .' Br. at 3-4.) *See also Cohen v. J.B. Oxford & Co., Inc.,* No. C-1-02- 571, slip op. at 6 (S.D.Ohio Oct. 9, 2002).

The Defendants general attack on Berg's methodology is unsuccessful. There is no established methodology for determining liability in market manipulation cases, and Berg's report has a "traceable, analytical basis in objective fact." *Primavera,* 130 F.Supp.2d at 522 (quoting *Bragdon v. Abbott,* 524 U.S.624, 653 (1998)). The materials reviewed by an expert and the expert's background and experience provide further indicia of reliability. As held in *SEC v. U.S. Envtl., Inc.,* No. 94 Civ. 6608(PKL)(AJP), 2002 WL 31323832, at \*3 (S.D.N.Y. Oct. 16, 2002):

Since the conclusions which Lowry [the expert] arrives at are based on his analysis of the trading records and other documents provided to him, and the process of comparing information contained therein with his knowledge of the

standard practices of the securities industry, the reliability of his testimony can be sufficiently evaluated by inquiring into Lowry's thirty years of experience as a regulator, compliance director, and securities consultant, as well as his experience testifying as an expert in approximately 30 securities actions.

Berg, likewise, has thirty years of experience in the securities industry (Berg Bear Stearns' Report at 2-3; Berg Tr. at 8-33), and he based his analysis on Bear Stearns' trading database and the trading records, deposition testimonies, and telephone transcripts provided to him. (Pls.' Br. at 14-15.)

In his report, Berg discusses the clearing industry, its standards and practices, and the role of a clearing broker. (Berg Bear Stearns Report at 9-18.) This testimony is certainly admissible and helpful to a jury.

However, Berg cannot testify as to legal conclusions. "Although an expert may opine on the ultimate issue of fact, she 'may not give testimony stating ultimate legal conclusions based on those facts." ' *Media Sport,* 1999 U.S. Dist. LEXIS 16035, at \*4 (quoting *Bilzerian,* 926 F.2d at 1294). This is the case because "[e]xpert evidence should not be permitted to 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Primavera,* 130 F.Supp.2d at 528 (quoting *GST Telecomm., Inc. v. Irwin,* 192 F.R.D. 109, 110 (S.D.N.Y.2000). Thus, in securities cases, the use of expert testimony must be "carefully circumscribed," *Bilzerian,* 926 F.2d at 1294, and experts are not to improperly use specific statutory and regulatory language, such as "manipulation" and "scheme to defraud" to describe the defendants' actions. *Scop,* 846 F.2d at 139-140.

**\*23** Berg, therefore, cannot simply state that he knows the market was manipulated. He can, however, point to factors indicating to him that market manipulation occurred, testify as to Bear Stearns' practices, and provide his reasoning as to why he believes they were manipulative. Rather than asserting, "Bear Stearns actively engaged in manipulative conduct aimed at directly affecting the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 19

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

market prices of the Blech Securities" (Berg Bear Stearns Report at 6), Berg should describe the evidence indicating that Bear Stearns' actions were manipulative. He cannot conclude, "Bear Stearns knowingly directed material components of a complex, concealed manipulative scheme to artificially inflate and maintain the market prices for Blech Securities during the time in which it acted as the clearing form [sic] for DBCO." (Berg Bear Stearns Report at 40-41.) Instead, he should limit himself to explaining why he believes that Bear Stearns's had knowledge that there did not exist a viable market for Blech Securities and that it acted upon this knowledge.

Similarly, it is an issue for the jury's determination: whether downsizing debit balances led to sham transactions. It is thus improper for Berg to state that Bear Stearns "continuously and systematically directed DBCO to reduce its debit balances with the knowledge that it would result in manipulative trading in Blech Securities, and then financed and cleared such trades." (Berg Bear Stearns Report at 30.) However, Berg can testify to industry practice with respect to reducing debt.

Thus, it is crucial that Berg provide specific factual support in the record for his opinions. *See Three Crown L.P. v. Salomon Bros., Inc.,* 906 F.Supp. 876, 893-894 (S.D.N.Y.1995). As the Court has previously noted, "noting in either *Daubert* or the Federal Rules of Evidence requires a District Court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Primavera,* 130 F.Supp.2d at 524-525 (quoting *Joiner,* 522 U.S. at 146).

Berg needs to limit his testimony to specific transactions, indicating the existence of market manipulation. General statements without adequate factual support are inadmissible. Berg admits his report does not identify the specific transactions he contends were manipulated in Blech controlled accounts. (Berg Tr. at 156.) Berg further does not provide any written record summarizing or listing the manipulative trades executed in response to any of the twenty "mandates" he identifies. (Berg Tr. at 163-185.) Without linking the debt mandates to

particular trades or categories of trade, the testimony is inadmissible. Berg may, however, testify as to his understanding of the effect of debt mandates.

Additionally, without reference to specific exhibits, Berg may not testify that Bear Stearns had knowledge that the IPO market was manipulated. He may testify on the effect of the receipt of IPO fees on the relationship between DBCO and Bear Stearns.

*24 Likewise, Berg needs to identify the specific source documentation for his statements about collateral swaps. (Berg Tr. at 288-289.)

In terms of painting the tape, or creating sham transactions to inflate a price, Berg cannot testify without reference to specific statements or exhibits that Bear Stearns "knew that DBCO was executing tape-painting trades to meet its demands." (Berg Bear Stearns Report at 32.) But, he can testify to any facts that lead to the conclusion that the tape was painted, and that Bear Stearns was aware of it.

Berg does not provide adequate evidence of impropriety by Mr. Shulman ("Shulman") of Bear Stearns. Berg could not identify the source of the documentation for his conclusions that Schulman monitored the accounts in which fraudulent trading was occurring, and he admitted he could not recall if Shulman "monitored a specific trade." (Berg Tr. at 228.)

In terms of Bear Stearns' "withholding of supply," Berg's testimony is adequately supported. He can testify with regards to the specific securities he referencesHemaSure and Bioseptra. (Berg Bear Stearns Report at 33-34.) Furthermore, he provides supporting documentation for his statements. *E.g.* referencing statements by Joseph Gottlieb from recorded internal telephone conversations (Berg Bear Stearns Report at 33.)

Berg may testify as to any specific instances in which he believes Bear Stearns "violat[ed] Reg. T for purposes of parking and free riding in Blech Securities" (Berg Bear Stearns Report at 9), the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 20

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

basis for that belief, and the effect that such violations had on the relationship between DBCO and Bear Stearns.

Berg's testimony about "red flags," such as excessive day breaks, is acceptable. (Berg Bear Stearns Report at 27). Berg may identify the factors, which he believes indicate market manipulation by Blech and DBCO. Although Bear Stearns may have had no legal and contractual obligation to investigate these "red flags," their existence presents circumstantial evidence of Bear Stearns' scienter, or knowledge of Blech's and DBCO's trading activities. As held in *Blech IV*, even if Bear Stearns performed all the functions assigned to it as a clearing broker, liability can still attach if "these functions were performed knowingly in such a manner as to enhance the Blech market manipulation scheme." *In re Blech Sec. Litig.*, 2002 WL 31356498, at *6.

Berg's testimony should not be excluded as unfairly prejudicial to Bear Stearns. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R.Evid. 403. In conducting this balancing test, "the general rule is that the balance should be struck in favor of admission." *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir.1980). *See also Daubert*, 509 U.S. at 587 ("The Rules' basic standard of relevance ... is a liberal one.").

B. *Nye*

*25 As an initial matter, Nye is qualified to testify as an expert witness. He has an extensive background as a financial economist and 22 years of experience as a consultant and expert witness in the areas of market efficiency, materiality, causation, and damages in securities actions. He has testified as an expert witness in more than 100 cases and is currently the President of Stanford Consulting Group, Inc., which provides research and consulting services in financial economics. (Nye Report ¶ 1.)

Under Federal Rule of Evidence 702, in order to

admit expert testimony, the trial court must first determine that "the testimony is the product of reliable principles and methods" and that "the witness has applied the principles and methods reliably to the case." Fed.R.Evid. 702. This assessment of reliability requires the court to "determine whether the expert testimony has 'a traceable, analytical basis in objective fact.' " *Primavera*, 130 F.Supp.2d at 522 (quoting *Bragdon*, 524 U.S. at 653). This is the case here. There is no established way of calculating damages in market manipulation cases against which to check Nye's methodology. However, Nye provides the rationale and basis for his calculations and the back-up data to support them. He applies established econometric techniques and regression analysis that have been subject to peer review and have a quantifiable rate of error. *See Daubert*, 509 U.S. at 593-594. His testimony is thus "grounded in an accepted body of learning or experience in the expert's field," and he explains "how the conclusion is so grounded." Fed.R.Evid. 702, Advisory Comm. Notes.

The Defendants general attack on Nye's methodology amounts to a simple disagreement of opinion. Where evidence meets the standards of Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of attack. *Daubert*, 509 U.S. 579 at 596. Thus, "conventional devices, rather than wholesale exclusion" are "the appropriate safeguards" for this evidence. *Id.*

There is further nothing improper for Nye to assume liability and limit his testimony at trial to damage issues. Nye is not the Plaintiffs' liability expert. Plaintiffs can meet their burden of proving Defendants' liability with other evidence.

Nye's methodology for calculating inflation per share is also valid. The Defendants fault Nye for failing to take into consideration "firm-specific factors" (Bear Stearns' Br. at 11; Baird Patrick's Br. at 6). Nye, in turn, claims to have taken these factors into account in his definition of the industry. He states, "We considered it because by definition of the industry, all the company specific

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 21

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

information has an expectation of zero around the industry line. In other words, a given company, one particular company, could have a return path that's different, company specific from the industry. In fact all of them do, but for every one that's above the line, there is one below the line because the line is their aggregate. So company specific variations around the industry sum to zero." (Nye Tr. at 85.) The proper way to account for firm-specific factors is again a difference of opinion to be resolved at trial, not grounds for disqualification. The same applies to the key disagreement between experts as to how liquidity factors into the analysis.

**\*26** Nye's methodology for the calculation of the number of damaged shares is likewise admissible. First, Bear Stearns attacks Nye for not making any calculation reducing the amount of damages of the common fund by those not expected to file. It is the common practice to award an aggregate verdict for the class as a whole. *E.g., In re Melridge, Inc. Sec. Litig.,* 837 F.Supp. 1076 (D.Or.1993) (upholding jury award of Rule 10b-5 damages based upon model of Plaintiffs' expert, which assumed that all class members would file claims). Whether or not class members ultimately submit a claim form, as long as they have not opted out, they remain members of the class and are bound by the judgment. The purpose of class certification is to permit adjudication of all the class members' claims.

If the Plaintiffs prevail at trial, the class as a whole, not merely those who submit claims, obtains a common fund, and every class member has the right to collect damages. As explained by *Boeing Co. v. Van Gemert,* the class members' "right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel." 444 U.S. 472, 480 (1980). *See also In re Oxford Health Plans, Inc. Sec. Litig.,* MDL 1222(CLB), slip op. at 7-8 (S.D.N.Y. Feb. 11, 2003) (explaining that "[i]t is no objection to following prior procedures," and awarding aggregate class wide damages in order to create a common fund for class members, that "certain members of the class may neglect to file proofs of claim").

Second, Bear Stearns argues that Nye's damage calculations are overstated because he failed to account for "out-and-in" traders, or purchasers of Blech Securities who sold their shares prior to the period. Defendants are not entitled to an offset, factoring in any gains made by these traders. As the court explained in *In re Crazy Eddie Sec. Litig.,* 948 F.Supp. 1154, 1172 (E.D.N.Y.1995):

> While such an off-set may be appropriate for purposes of sentencing in a criminal case, [defendant] presents no reason why he is entitled to this off-set here, let alone why a perpetrator of securities fraud should generally have any off-set against the class merely because there were some purchasers fortunate enough not to have been injured.

This is the case because the investor is injured at the time of the purchase of a security at an artificially inflated price. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155 (1972) ("[T]he correct measure of damages under § 28 of the [Exchange] Act, 15 U.S.C. § 78bb(a), is the difference between the fair value of all that the ... seller received and the fair value of what he would have received had there been no fraudulent conduct.").

Third, there was nothing improper for Nye to extrapolate damages from Bear Stearns' database to total reported volume. As Bear Stearns' database did not include all trading volume in Blech Securities—though it did include the majority of trading volume in damage securities—Nye had to extrapolate from Bear Stearns' volume figures to calculate total damages. Bear Stearns cites no evidence that shows why transactions in the Bear Stearns' database are not representative. This is an issue that can be explored further at trial.

**\*27** Bear Stearns' remaining arguments against Nye's methodology for the calculation of the number of damaged shares are similarly insufficient to bar his testimony. Bear Stearns contends that Nye's volume calculation is wrong because "he did not deduct trades made by holders of Blech Accounts ... through broker dealers other than DBCO." (Bear Stearns' Br. at 15.) Bear Stearns' own expert, Fischel, acknowledged at his deposition

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 22

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

that Nye properly eliminated from his damage calculations trading in Blech-related accounts through Bear Stearns, Stanley Berk, and Ali Prodani of Baird Patrick, and that he himself did no investigation of whether or not there were any additional Blech-related accounts. (Fischel Report ¶ 18; Fischel Tr. at 123.) Moreover, Fischel did no analysis of trading in any of those accounts, nor of the extent to which Nye's damage calculations would be affected if trading by those accounts were eliminated. (Fischel Tr. at 125-26.) Bear Stearns also claims that Nye failed to distinguish between the alleged wrongful conduct of Bear Stearns and the other defendants as to each of the Blech Securities. In denying the Bear Stearns' summary judgment motion, the Court already established that the Plaintiffs must allege loss causation as to each security. *In re Blech Sec. Litig.,* 2002 WL 31356498. As to participation in the Blech market manipulation scheme, if it is established by the Plaintiffs' proof, the liability will be joint and several. *In re Del-Val Fin. Corp. Sec. Litig.,* 868 F.Supp. 547, 558 (S.D.N.Y.1994) ("The basic rule in securities actions is joint and several liability among defendants against whom judgment is entered."); *Musick, Peeler & Garrett v. Employers Ins .,* 508 U.S. 286, 292 (1993) (finding that parties who have violated securities laws "share joint liability for that wrong under a remedial scheme established by the federal courts").

Bear Stearns, however, correctly argues that Nye should not apply his analysis to IPO transactions. As Bear Stearns' alleged actions occurred only in secondary markets, as determined above, persons who purchased in the primary market cannot recover against Bear Stearns. Blech was not an underwriter of the Blech Securities, and the Complaint alleges "no interrelationship ... between the manipulations of primary market and that of the secondary market." (Class Order at 19.) Furthermore, as Berg, Plaintiffs' own liability expert testified, Bear Stearns did not direct the price of any IPO, and there is no connection between the IPOs and Bear Stearns' debit reduction requests. (Berg Tr. at 208- 209.)

*CONCLUSION*

The evidentiary rulings set forth above can be clarified as necessary in a pretrial conference during the week of March 31st, at a time convenient to counsel and the Court. The pretrial order will be submitted on April 4 and any issues concerning it will be heard at 9:30 a.m. on that date.

Any further limitations or clarification of the testimony of the experts can be the subject of voir dire hearings during the trial out of the hearing of the jury.

**\*28** It is so ordered.

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23671677 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Support of Proposed Settlements with Bear Stearns and Baird Patrick and Counsel's Joint Petition for Fees and Reimbursement of Expenses (Oct. 02, 2003)

• 2003 WL 23671675 (Trial Motion, Memorandum and Affidavit) Defendant Bear, Stearns & Co. Inc.'s Memorandum of Law in Support of Its Motion in Limine to Exclude Evidence as to Certain Post-Class Period Events Involving Bear Stearns (Mar. 21, 2003)

• 2003 WL 23671653 (Trial Motion, Memorandum and Affidavit) Defendant Bear, Stearns & Co. Inc.'s Reply Memorandum in Support of Motion in Limine to Exclude the Opinions of Plaintiffs' Damage Expert, Blaine F. Nye (Feb. 24, 2003)

• 2003 WL 23671657 (Trial Motion, Memorandum and Affidavit) Defendant Bear, Stearns & Co. Inc.'s Reply Memorandum in Support of Motion to Modify the Court's Class Certification Order and Motion in Limine to Exclude Certain Evidence (Feb. 24, 2003)

• 2003 WL 23671662 (Trial Motion, Memorandum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 23

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

and Affidavit) Defendant Bear, Stearns & Co. Inc.'s Reply Memorandum in Support of Motion for Separate Trials and Bifurcation (Feb. 24, 2003)

• 2003 WL 23671665 (Trial Motion, Memorandum and Affidavit) Defendant Bear, Stearns & Co. Inc.'s Reply Memorandum in Support of Motion in Limine to Exclude the Opinions of Plaintiff's Liability Expert, Howard G. Berg (Feb. 24, 2003)

• 2003 WL 23671669 (Trial Motion, Memorandum and Affidavit) Defendant Bear, Stearns & Co. Inc.'s Reply Memorandum in Support of Motion in Limine to Exclude Irrelevant, Inadmissible, and Prejudicial Evidence (Feb. 24, 2003)

• 2003 WL 23671673 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Further Support of Their Motion in Limine to Preclude Defendants from Calling any Witnesses under Defendants Control Who Are Not Made Available to Testify Live During Plaintiffs' Case in Chief (Feb. 24, 2003)

• 2003 WL 23671612 (Trial Motion, Memorandum and Affidavit) Plainitffs' Memorandum of Law in Opposition to Bear Stearns' Motion in Limine to Exclude Certain Audiotapes (Feb. 12, 2003)

• 2003 WL 23671621 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to the Motion By Bear, Stearns & Co., Inc. for Separate Trials and Bifurcation (Feb. 12, 2003)

• 2003 WL 23671624 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendant Bear Stearns & Co. Inc.'s Motion to Amend Class Certification Order and Motion in Limine to Exclude Certain Evidence (Feb. 12, 2003)

• 2003 WL 23671627 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions in Limine to Exclude the Opinions of Plaintiffs' Damage Expert Blaine F. Nye (Feb. 12, 2003)

• 2003 WL 23671630 (Trial Motion, Memorandum

and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Exclude Certain Evidence Concerning David Blech's Conviction for Securities Fraud and Certain Sec Consent Orders and Final Judgments (Feb. 12, 2003)

• 2003 WL 23671633 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Bear Stearns' Motion in Limine to Exclude Certain Documents (Feb. 12, 2003)

• 2003 WL 23671636 (Trial Motion, Memorandum and Affidavit) Bear Stearns' Memorandum of Law in Opposition to Plaintiffs' Motion in Limine to Strike the Expert Report and to Preclude the Testimony of Daniel L. Goelzer (Feb. 12, 2003)

• 2003 WL 23671640 (Trial Motion, Memorandum and Affidavit) Bear Stearns' Memorandum of Law in Opposition to Plaintiffs' Motion in Limine to Exclude Testimony About SRO Regulatory Provisions (Feb. 12, 2003)

• 2003 WL 23671644 (Trial Motion, Memorandum and Affidavit) Bear Stearns' Memorandum of Law in Opposition to Plaintiffs' Motion in Limine to Preclude Defendants from Calling Live Witnesses (Feb. 12, 2003)

• 2003 WL 23671649 (Trial Motion, Memorandum and Affidavit) Bear, Stearns & Co. Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion in Limine to Strike the Report and Exclude the Testimony of Daniel R. Fischel (Feb. 12, 2003)

• 2003 WL 23671606 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendant Baird Patrick & Co., Inc. in Opposition to Plaintiff's Motion in Limine to Preclude Defendants from Calling any Witnesses under Defendants' Control Who are Not Made Available to Testify Live During Plaintiff's Case in C hief (Jan. 31, 2003)

• 2003 WL 23671609 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendant Baird Patrick & Co., Inc. in Opposition to Plaintiffs' Motion in Limine to Exclude the Report and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

**(Cite as: 2003 WL 1610775 (S.D.N.Y.))**

Testimony of Defendant Baird Patrick & Co., Inc.'s Expert Witness, Vincent Buchanan (Jan. 31, 2003)

• 2003 WL 23671600 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion in Limine to Exclude Testimony About Sro Regulatory Provisions (Jan. 21, 2003)

• 2003 WL 23671601 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiffs' Motion Inlimine to Strike the Expert Report and to Preclude the Testimony of Daniel L. Goelzer (Jan. 21, 2003)

• 2003 WL 23671603 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion in Limine to Exclude the Report and Testimony of Defendant Baird Patrick & Co., Inc.'s Proposed Expert Witness Vincent Buchanan (Jan. 21, 2003)

• 2003 WL 23671617 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions in Limine to Exclude the Opinions of Plaintiffs' Liability Expert Howard G. Berg (2003)

• 1995 WL 17163183 (Trial Motion, Memorandum and Affidavit) Reply Brief of Defendant Baird Patrick & Co. In Further Support of Its Motion to Dismiss the Amended Complaint (Jul. 26, 1995)

• 1:94cv07696 (Docket)
                    (Oct. 21, 1994)

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.