**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CAPTAIN BARBARA L. CONLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 04-1394-GMS |
| | ) |
| COLONEL L. AARON CHAFFINCH, | ) |
| Individually and in his official capacity as the | ) |
| Superintendent, Delaware State Police; et al. | ) |
| | ) |
| Defendants, | ) |

**DEFENDANTS' APPENDIX TO ANSWERING BRIEF
IN OPPOSITION TO PLAINTIFF'S MOTION TO BIFURCATE
THE TRIAL OF COUNT ONE FROM COUNTS TWO AND THREE
OR IN THE ALTERNATIVE TO SEVER COUNT ONE
FROM COUNTS TWO AND THREE**

**DEPARTMENT OF JUSTICE
STATE OF DELAWARE**

RALPH K. DURSTEIN, III, I.D. #912
STEPHANI J. BALLARD, I.D. #3481
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants MacLeish,
    Mitchell and Division of State Police

DATED: September 30, 2005

## TABLE OF CONTENTS

Excerpts from Report titled "Review of the Delaware State Police
Executive Order #19 ............................................................................... B0001 – B00013

Excerpt of Deposition Transcript of Gerald R. Pepper............................ B00014 – B00026

Excerpt of Deposition Transcript of Thomas F. Marcin.......................... B00027 – B00028

Defendants' Response to Plaintiff's Second Request for Production
of Documents ........................................................................................... B00029 – B00035

 Notes of Thomas MacLeish from October 28, 2004 meeting .................... B00036

 Notes of Robert Coupe from October 28, 2004 meeting ............................. B00037

 Divisional Trial Board E-mail faxed to Delaware State Police
 by Tom Eldred dated October 25, 2004 ....................................................... B00038

 Notes of James Paige .................................................................... B00039 – B00040

 Delaware State Police Rules and Regulations
 VII-5-12 and VII-5-13 ................................................................. B00041 – B00042

# REVIEW OF THE
# DELAWARE STATE POLICE
## Executive Order Number 19



Presented

To

## The Honorable Ruth Ann Minner, Governor
### The Honorable James L. Ford, Jr., Secretary
### Department of Public Safety

By

### Lisa Blunt-Bradley, Director
#### State Personnel Office
*December 1, 2001*

Document Control # 10-04-01-11-04

Chaffinch
Dep-Ex 5

# ACKNOWLEDGEMENTS

Thank you to the many Delawareans who have contributed to this project. They include Members of the General Assembly, Organizations, Institutions, and private citizens who care. A special note of thanks to the staff of the State Personnel Office:

Dana Jefferson, Ph.D., Deputy State Personnel Director
Gregory Chambers, HR Manager for EEO/AA
Gedehma McClain, HR Technician
Thomas LoFaro, HR Administrator/ Labor Relations & Employment Services
Peggy Henry, HR Manager for Employment Services
Casie Anthony, Executive Secretary to the Director

Most importantly we want to
Thank the women and men of the DSP for their professionalism and cooperation during this project and their dedication to the people of the First State everyday!

"We must become the change we wish to see."
Gandhi

B 0 0 0902

*December 1, 2001*

*Dear Governor Minner,*

*On behalf of the State Personnel Office, I am pleased to submit to you "A Review of the Delaware State Police" in response to Executive Order Number 19. This report is the first step of many to healing the wounds of those who feel wronged and moving forward as a community in a positive direction. While there are many perspectives and stories to tell, the focus of the report is on institutional and systemic issues and not individual situations.*

*With the signing of Executive Order Number 10 in the first month of your Administration, you sent a clear message that you would like Delaware State Government to be representative of the people we serve. This report represents the goal of having a Delaware State Police that continues to have high standards AND look like Delaware.*

*In initial interviews with Delaware leaders and troopers, when asked what are the issues, there was a range of theories. The answers varied greatly and included: There is no problem, it's a small group of people with problems, Northern vs. Southern Delaware, a Good Old Boy network, nepotism, favoritism, discrimination, reverse discrimination, racism, sexism, internal lack of communication, the media, in crowd vs. the out crowd..." One thing that was constant was that overall there is pride in our State Police.*

*I am confident that working in **partnership** with the DSP, we will restore hope and confidence for all troopers. We have a myriad of recommendations. Some of them are based on best practices from within State government and some will be new for State government. It is our hope that the Delaware State Police become a model not only for State Agencies but also for the Nation.*

*I thank you for the opportunity to contribute to building a 21st century roadmap for the DSP. It has truly been a blessing for me both personally and professionally, and I look forward to working on its further development and implementation.*

*Respectfully submitted,*


*Lisa Blunt-Bradley*
*Director of State Personnel*

3

# REVIEW OF THE
# DELAWARE STATE POLICE
## Executive Order 19
### *December 1, 2001*

## Table of Contents

| | | |
|---|---|---|
| I. | Executive Summary | 5 |
| II. | Methodology | 8 |
| III. | The Delaware Landscape | 10 |
| | A Historical Perspective | |
| | Current Organizational Structure | |
| IV. | Findings and Recommendations | 15 |
| | • *Equal Employment Opportunity* | 15 |
| | • *Recruitment* | 17 |
| | • *Hiring* | 21 |
| | • *Training* | 24 |
| | • *Promotions* | 28 |
| | • *Discipline* | 42 |
| | • *Working Conditions/Culture* | 45 |
| | • *Accountability* | 49 |
| V. | Conclusion | 51 |
| VI. | References | 52 |
| VII. | Appendices | |
| | A. *Executive Orders* | |
| | B. *Illinois State Police Merit Board* | |
| | C. *Model Promotional Process* | |
| | D. *Survey Results* | |
| | E. *Massachusetts Ombudsman Program* | |

B00004

# Executive Summary

Governor Ruth Ann Minner signed Executive Order No. 10 on January 23, 2001 establishing new equal opportunity hiring standards for Delaware government. The State Personnel Office (SPO) was given the central managerial role over all diversity and equal opportunity matters in the Executive Branch and overall responsibility for the implementation and management of policies and procedures set forth in the Order. (Appendix A)

The head of each Executive Branch agency was directed to maintain an Affirmative Action Plan that would comply with federal laws, state laws, and Executive Order No. 10. The plans are to be filed annually with SPO and the Governor's Council on Equal Employment Opportunity on or before September 15 of each year. (Appendix A)

Governor Minner signed Executive Order No. 19 on August 17, 2001, directing the Director of the SPO to undertake an investigation into the workplace climate at the Delaware State Police (DSP), and mandating full compliance with any state investigation by the DSP. This report is the result of that investigation as summarized below.

**Compliance with Executive Order 10:**

DSP is in compliance with Executive Order No. 10 in that Executive Order No. 10 requires that processes be in place to ensure equal opportunity and non-discrimination. DSP has made great strides in recent years in theses areas, especially in recruitment, so it is currently in technical compliance with Executive Order No. 10. However, the observations and findings of this report are that there are substantial issues still to be addressed. Therefore, now armed with the knowledge of these challenges, DSP must take action in order to remain in compliance with Executive Order No. 10.

**Findings as to the working conditions and culture of DSP:**

The overall finding of this report is that perception of a lack of fairness within DSP is not limited to minority or women troopers, but is held, to some extent, by a majority of the organization. Depending on which trooper you are talking to, race, gender, geography, seniority in DSP, family or membership in a "clique" can be viewed as affecting how one is treated within DSP.

With regard to race, this report finds that for the past two years, there does not exist a statistically significant impact generally with respect to DSP processes for application to the force, promotion, or termination. However, there are some particular employment devices that should be evaluated, and in some cases, re-evaluated, to ensure that they fairly measure job requirements. Although interviews and surveys of troopers generally show a positive approach to the DSP organization and work environment, there is cause for concern in that there is a significant difference in the way minority and non-minority troopers view the organization and their place in it.

With regard to gender, there was a finding that, overall, the systems for selection and promotion of troopers do not exclude or impact women in a statistically significant way.

5

Nevertheless, there are some employment measures that must be carefully studied. The survey of troopers found that most women stated emphatically that they had not experienced sexual harassment.

In the area of discipline, most troopers, not just minorities and women, believe there is a lack of consistency in the way discipline is applied throughout DSP.

In the area of promotions, there are a number of DSP practices which are not understood by the troopers and which, in some ways, are counterproductive to the goal of identifying and creating leaders and better troopers.

In the area of equal opportunity and discrimination complaints, it seems clear that troopers do not understand, trust or utilize the current system. When a DSP member feels that he or she must take action, it is often in the form of a lawsuit, a federal EEOC complaint, outreach to public officials or the media. Internal processes for resolving complaints are not being utilized.


**Recommendations for change:**

Throughout this report, there are a plethora of specific recommendations for changes in DSP policy and practices that will serve to continue the progress the agency has made over recent years.

   **Some of the major recommendations are:**

- To professionally review and validate, revise or eliminate the aspects of the application and promotion processes that were found to have a statistically significant adverse impact on minorities or women. Those include: the written test for application to DSP, found to have an adverse effect on minorities; the oral board test for promotion to Sergeant, found to have an adverse affect on minorities; and the written test for promotion to Sergeant, found to have an adverse effect on women.

- To create and implement written discipline standards that will better ensure uniformity of discipline practices from Troop to Troop and person to person, so as to eliminate any reality or perception of a lack of fairness in discipline.

- To rework the promotional process of the DSP, including the creation of a Test Validation Review Board to ensure that promotional tests are in synch with the real-world duties and policies of DSP.

- To expand recruitment efforts by establishing formal relationships with colleges and universities, creating career paths for current state employees who may be interested in or suited to police work and making the application to DSP more accessible.

6

B00006

- To clearly identify and strengthen the avenues of appeal for troopers who wish to complain of racial or sexual discrimination.

- To create a Delaware State Police Advisory Council to provide ongoing advice and problem solving.

- To give SPO a monitoring role in the hiring, promotion, transfer and disciplinary process of DSP.

B00007

# PROMOTION PROCESS

### Current Promotion Process Of The Delaware State Police

The DSP promotional process was revised in 1997 in part on the recommendation of the United Troopers Association (UTA). The purpose of the changes was reportedly to remove bias or the perception of bias, as it was "possible for Delawareans to know each other." An external board of assessors for the oral portion of the examination was chosen in lieu of a board exclusively from Delaware. The current process also reduced longevity requirements for eligibility, and removed points formerly added to the eligibility score for college credits, longevity, and performance evaluations. Previously, the components of the scoring for the promotional examination to Sergeant was 30% written, 30% oral board, 30% performance evaluation, 5% seniority, 5% education.

The process measures each candidate's knowledge, skills, and abilities related to the job tasks and creates an eligibility list that stands for two years. A test is administered at three supervisory ranks: Corporal to Sergeant, Sergeant to Lieutenant, and Lieutenant to Captain. The examination includes a written test of 100 multiple-choice questions constructed by an outside vendor: 40% is derived from a police management textbook, 10% from publications on cultural diversity and risk management, and 50% from the Delaware Criminal and Traffic Law Manual (open book) as well as divisional and administrative manuals (closed book.)

SPO uses automated scoring and the figures are sent to a statistics expert under contract with DSP to determine the cutoff scores related to the projected number of vacancies at each rank. An oral board is then conducted or, for candidates for the rank of Captain, an assessment center is convened. Candidates for Sergeant and Lieutenant appear before a board of five police officers from state police agencies outside of Delaware "with an emphasis on gender and minority representation."

According to the DSP, the oral board is trained to evaluate "concrete, behavioral benchmarks." Candidates are given a "realistic" work scenario and are given 45 minutes to prepare prior to the oral exam. At the oral board, the candidate is given 15 minutes to present his or her response to the scenario.

Candidates who score in the top 50% of the written examination for Captain proceed to an assessment center developed and conducted by the International Association of Chiefs of Police. Management knowledge, skills and abilities are assessed.

At the final selection phase for the ranks of Sergeant and Lieutenant, the written examination scores and oral board scores are equally weighted and combined to form a final score. An "outside statistical expert" creates groupings of the rankings or "bands." Candidates from band "A" must be selected before candidates from subsequent bands ("B", "C" or "D".) While bands must be exhausted sequentially, selecting officials are not required to select persons from individual scores within the bands.

B00008

Since 1994, most minorities that have made a promotable band ("A" or "B") have been promoted, according to one DSP supervisor. However, African-American troopers are usually clustered in the "C" and "D" bands.

For the Captain rank, candidates are not placed in bands. They are declared either eligible or ineligible for promotion. Candidates' written assessments are matched with the vacancies to be filled.

Promotion to positions above the rank of Sergeant requires a bachelor's degree. When asked about the necessity for this requirement, troopers responded that senior officials of rank have to handle complex issues including budgeting, human resources, employee motivation and other challenges, and higher education assists troopers with the skills needed to fulfill these tasks.

The DSP provides "tools to give promotional candidates equal standing." Among these tools are: a study skills seminar, including recommended study techniques, test-taking skills, and advanced reading comprehension; orientation and training for preparing for the sergeant or lieutenant oral board; orientation and training for the assessment center for the rank of captain; and orientation regarding the behavioral benchmarks for each scoring category.

Troopers who seek opportunities for rank and pay raises without supervisory responsibilities must have satisfactory "markings" in all areas of performance evaluations, continuing education credits for attending professional development training, proficiency on a written test, and service as either a certified instructor or as a field training officer to attain the rank of Master Corporal.

DSP offers a general Oral Board Rater Training package on the process and scoring guidelines. DSP also has a Promotional Oral Board Manual Sergeant Board, revised October 1999, for the Sergeant's exam, as well as a packet for the Lieutenant's exam.

There are time-in-grade requirements for eligibility for career or supervisory promotions. Troopers who are placed on probation, as a result of disciplinary action, are not eligible for promotion during that period of probation.

DSP also makes $60,000 per year available for leadership training. With these funds, troopers may attend training institutes at Northwestern University, North Carolina State, the University of Delaware, the Southern Police Institute and other institutions.

The Acting Superintendent has indicated that he will appoint an advisory committee to study police policies on promotions.

Promotion to Sergeant

One must be a Corporal to take the Sergeant's test. Months ahead of the test, the agency issues a department memo announcing the test. The test is held every two years. This is a positive feature of the process since many agencies do not test that frequently. For the most recent Sergeant's test, the areas involved were as follows:

     a.     Supervising Police Personnel, the Fifteen Responsibilities, by Paul A. Whisenand, 4th Edition. The memo further indicated that approximately 40% of the test would come from this source.

     b.     American Law Enforcement 2001: Tactical Risk Management, by Gordon J. Graham - approximately 5%.

     c.     Diversity for the 21st Century and Beyond Delaware State Police, by Ondra L. Berry - approximately 5%.

     d.     DSP Divisional and Administrative Manuals - approximately 20%.

     e.     Delaware Criminal and Traffic Law Manual 2000-01 Edition- approximately 30%. Also noted in the memo was the fact that the law section of the test would be completely open book.

After completion of the written test, candidates were informed that on the basis of a statistical analysis of written test scores performed by a professor from the Wharton School of the University of Pennsylvania, a certain percentage of them would proceed to the next phase of the selection process, an oral board.

The final score of candidates competing for the rank of Sergeant is explained as being a composite of the written examination and oral board weighted equally. Candidates are then placed in bands according to a standard deviation. All candidates within each band are then considered equally qualified for promotion when all other promotional requirements are met. The candidates within a band are arranged alphabetically. Selection from within the band will then be at the discretion of the Superintendent. When selecting a candidate for promotion from within a band, the Superintendent shall consider any or all, relevant factors necessary for successful performance at the higher rank. All candidates eligible for promotion at a particular point in the process from a higher band will be selected before consideration of individuals within a lower band.

Other noteworthy features of the process for promotion to Sergeant which were listed in this memo were:

     a.     The availability of a study skills seminar,

     b.     The availability of an orientation and training program for the oral board process.

Promotion to Lieutenant

The process for the promotion from Sergeant to Lieutenant is very much the same as that for Sergeant, with the following notable exceptions:

     a.     The text used is Police Administration: Structures, Processes, and Behavior, by Charles R. Swanson, et al. The percentage, however, remains at 40%.

     b.     The percentage for the Divisional and Administrative manuals increases to 30%.

B00010

    c.    The percentage for the Criminal and Traffic Law manual decreases to 20%.

<u>Promotion to Captain</u>

The process for the written portion of the examination for promotion from Lieutenant to Captain is very much the same as that for Sergeant to Lieutenant, with the following notable exceptions:

    a.    The percentage for the Divisional and Administrative Manuals increases to 40%.
    b.    The percentage for the Criminal and Traffic Law Manual decreases to 10%.

Unlike Sergeant and Lieutenant candidates, for Captain candidates there is no oral board after completion of the written test. Instead certain Captain candidates, based on a statistical analysis of their written test scores performed by a professor from the Wharton School of the University of Pennsylvania, proceed to the next phase of the selection process, an Assessment Center conducted by the IACP. The results of the Assessment Center are not quantified. Instead, the assessors generate comments on each candidate's performance in narrative form. And, all candidates who take the Assessment Center are then placed in what is essentially one broad band from which the Superintendent has the discretionary authority to select candidates to be promoted.

It should be noted that the DSP, which is exempt from State civil service laws, requires for those hired after July 1, 1985, a Bachelor's Degree for promotion to Captain and Lieutenant, and an Associate's Degree or an equivalent of credit hours (60 semester or 90 quarter) for promotion to Sergeant.

## Current Promotional Policy/Procedures: Statistical Analyses

### *DSP Trooper Promotion Process*

Wilcher analyzed DSP promotion data from the twelve-month period of October 1, 1999 - September 30, 2000, and the twelve-month period of October 1, 2000 - September 30, 2001. Total promotions from job titles (both competitive and non-competitive) were compared to incumbent employees in the job titles at the beginning of each of the twelve-month periods.

For 1999 promotions, there were no statistically significant differences among test scores and passage rates when comparing minority to non-minority, or male to female, promotions in the Captain's exam or the Lieutenant's exam. There were, however, statistically significant differences identified with respect to other promotional measures. In particular, non-minorities were promoted at a statistically significant higher level from the Trooper to Corporal rank. Further, non-minorities scored higher, and passed more frequently, on the Corporal to Sergeant oral board, and males scored higher than females on the Corporal to Sergeant written exam.

*1999*
*← oral board*
*not written*
*exam*

31

B 0 0 0 1 1

Appendix A(2)

**Executive Order No. 19 Directing An Investigation Into The Workplace Climate At The State Police, And Mandating Full Compliance To Any State Investigations Of The State Police**

WHEREAS, questions have been raised as to the fairness of employment, discipline and promotion policies at the Delaware State Police; and

WHEREAS, a mechanism is needed to thoroughly investigate the climate at the Delaware State Police and to ensure full cooperation by the Delaware State Police with any future Delaware State Senate investigations;

I, RUTH ANN MINNER, GOVERNOR OF THE STATE OF DELAWARE, HEREBY ORDER ON AUGUST 17, 2001:

1. The Director of State Personnel is directed to undertake an investigation of the working conditions at the Delaware State Police. This investigation shall include:

   a. Findings as to the compliance of the Delaware State Police with Executive Order No. 10, signed January 30, 2001.

   b. Findings as to the working conditions and organizational culture for women and minorities at the Delaware State Police, and conditions that might impede women and minorities from remaining with the State Police and advancing through the ranks of the State Police.

   c. Recommendations for changes at the State Police that could result in improvements in the state's ability to retain qualified State Troopers.

2. All state employees, including but not limited to members, employees, and officers of the Delaware State Police, are directed to fully and promptly comply with any requests made by the Director of State Personnel for access to persons, records, or other information in connection with the investigation I have ordered in paragraph 1 of this order.

3. The Director of State Personnel is directed to report her findings and recommendations to me and the Secretary of Public Safety by December 1, 2001.

4. All employees, officers and members of the Delaware State Police are directed to fully and promptly comply with any requests for information by the legislature of the State of Delaware or any formally constituted committee of that legislature. To the extent that any employee, officer or member seeks to withhold information on the basis that it is confidential or privileged, he or she shall do so only after receiving express permission to withhold that information from my office, and he or she shall explain to the legislature what information is being withheld and the specific reason that it is being withheld.

5. No employee, officer or member of the Delaware State Police shall be disciplined, punished, reprimanded, or sanctioned in any fashion as a consequence of providing information to the legislature of the State of Delaware or any formally constituted committee of that legislature.

6. No employee, officer or member of the Delaware State Police who has provided information in a public forum to the legislature of the State of Delaware or any formally constituted committee

61

B00012

of that legislature shall be transferred, demoted, or otherwise have his or her employment status changed unless my office and the Secretary of Public Safety has been provided with prior notice of such impending change.

7. Any failure by any employee, member or official of the Delaware State Police to comply with the terms of this Order shall be considered an act of direct insubordination and shall be subject to the discipline associated with such acts.

8. None of the directives in this order waive any of the existing obligations of the Delaware State Police to comply with existing state and federal laws and regulations. If any member of the Delaware State Police perceives any direct conflict between this Order and any existing state or federal law or regulation, said conflict shall be brought to my attention in writing immediately and will be resolved by my office.

Ruth Ann Minner
Governor

B00013

```
 1     Can I just take a break with Barbara for a second?

 2              MS. BALLARD:  Sure.

 3              (Recess taken.)

 4              MR. NEUBERGER:  I don't have any other

 5     questions.  How about counsel?

 6              MS. BALLARD:  I do have a few.

 7     BY MS. BALLARD:

 8       Q.   Colonel, you testified about codes of conduct

 9     and what you considered appropriate behavior in the

10     workplace for officers.

11              In your opinion, the kinds of things and

12     standards you discussed, would they apply equally to

13     female officers as well as male officers?

14       A.   Yes.

15       Q.   Would you consider it inappropriate for a

16     female officer to proposition a male officer for some

17     sort of sexual favor on the job?

18       A.   Yes, I would.

19       Q.   Would you consider it inappropriate for a

20     female officer to tell a male coworker officer that he

21     had a nice ass or something to that effect?

22       A.   Yes, I would.

23       Q.   And would you consider it inappropriate for a

24     female officer to grab or grope a male officer in a
```



Gerald R. Pepper                    42

1    sexual way on the job?

2        A.    Yes, I would.

3        Q.    Are you aware of an incident in which Captain

4    Conley was disciplined for purchasing a Rolex watch

5    with the state credit card?

6        A.    Yes, I am.

7        Q.    Can you tell me what you know about that?

8        A.    That was several years ago.  I believe that was

9    -- I believe that was at a conference -- I am not

10   sure, and I am not sure that there was an

11   investigation, but I believe that there was, and that

12   was handled by Lieutenant Colonel Waggaman at that

13   particular time.

14       Q.    If I represented to you that records show that

15   discipline occurred in February of 2001, would that

16   sound accurate to you?

17       A.    February of 2001?

18       Q.    2001.

19       A.    I thought it was earlier than that, but if you

20   have the records, I would accept that.

21       Q.    Did you take part in any way in investigating

22   or imposing discipline in that case?

23       A.    I did discuss it with Bill Waggaman, Lieutenant

24   Colonel Waggaman.

Gerald R. Pepper                    43

1    Q.    And what was the substance of your discussion?

2    A.    I don't recall the exact discussion other than

3    the situation was improper and needed to be taken care

4    of; primarily, any charge on a card had to be paid.

5    Q.    Was it your understanding that the purchase was

6    made but not reported when Captain Conley returned

7    from her trip?

8    A.    I don't recall that.

9    Q.    Do you know if the funds were repaid to the

10   State Police?

11   A.    I assume that they were.  I don't know that for

12   a fact, but I assume that they were.

13   Q.    Do you know if formal discipline was imposed?

14   A.    I believe that it was.

15   Q.    Did you speak with Captain Conley personally

16   about the incident?

17   A.    No, ma'am, I did not.

18   Q.    Do you know if Bill Waggaman did?

19   A.    I believe he did.

20   Q.    Let me go back to when you served as colonel.

21         Did you promote any officers to major

22   during that time?

23   A.    Yes, I did.

24   Q.    Do you recall who?

Gerald R. Pepper                    44

1    A.    Yes, ma'am, I do.

2    Q.    Who would that be?

3    A.    Major Marcin, Major Papili.

4    Q.    Joe Papili; correct?

5    A.    Yes.

6    Q.    Then Major Chaffinch.    Anyone else?

7    A.    Major MacLeish, Major Swiski.

8    Q.    So, you promoted a number of majors.

9          What sort of things did you look for in

10   making a decision to promote someone to major?

11              MR. NEUBERGER:  Objection, relevance.

12              MS. BALLARD:  This case is about --

13              MR. NEUBERGER:  I understand.  I have an

14   objection for relevance.  You can ask him the

15   questions all you want.  Colonel Chaffinch has

16   testified what he -- what standards -- the standards

17   he applied.  I mean, what this man would use is --

18              MS. BALLARD:  I am asking what --

19              MR. NEUBERGER:  I understand.  Go ahead.

20   BY MS. BALLARD:

21   Q.    What would you look for in making those

22   promotions?

23   A.    The particular job that was involved, past

24   performance.  As with all promotions that I made, not

1    just majors, past disciplinary records, geographical

2    location of the job, familiarity with that particular

3    geographical location, and individual talents.

4        Q.    Anything else?

5        A.    And career paths.

6        Q.    What do you mean by "career paths"?

7        A.    I will give you an example.  The easiest

8    example that I can think of is if you had somebody

9    that followed a career path that was primarily

10   associated with traffic enforcement and the operation

11   of uniformed troops probably the better fit to command

12   a position like that involved special units where you

13   have undercover operations and wire taps and that type

14   -- those types of operations probably would not be

15   suited for an individual that had a career path, as I

16   previously described.  You would probably want to look

17   for someone that had actually gone the career path to

18   command of special units.

19       Q.    So, am I understanding that former experience

20   as a trooper in the areas under the major's command

21   would be helpful; does that make sense?

22       A.    To some extent, yes.

23       Q.    Would you consider having a wide variety of

24   experience in the State Police to be helpful?



Gerald R. Pepper                                46

```
 1        A.    Yes.

 2        Q.    Is it your understanding, when you were

 3   colonel, that promoting a major was your discretionary

 4   decision, that is, it was really your call?

 5        A.    Was it my understanding?

 6        Q.    Yes.

 7        A.    To some extent, yes, ma'am.

 8        Q.    If I am correct, there is no testing process to

 9   become a major as with the lower level position; is

10   that right?

11              MR. NEUBERGER:   While you were there?

12              MS. BALLARD:   While you were there?

13              THE WITNESS:   There was no testing

14   procedure for that.

15   BY MS. BALLARD:

16        Q.    And being a major in the Delaware State Police

17   is considered a command position?

18        A.    Yes, ma'am.

19        Q.    And is it also part of the executive staff of

20   the colonel?

21        A.    Yes, ma'am.

22        Q.    Would you tend, in choosing a major, would you

23   tend to favor a candidate without a disciplinary

24   record over one with a disciplinary record?  Other
```



B00019          WILCOX & FETZER LTD.
                Registered Professional Reporters

1   things being equal?

2     A.   Other things being equal, it depends on --

3   again, it would depend upon the type of discipline,

4   type of discipline, the circumstances surrounding the

5   discipline, and the -- how long ago.

6     Q.   You testified that you actually served as the

7   Kent and Sussex operations major?

8     A.   Yes, ma'am.

9     Q.   Having served in that position and having been

10   colonel over that position, what sort of factors were

11   helpful for someone to serve as Kent and Sussex

12   operations manager?

13     A.   Again, the familiarity of the -- that

14   particular geographical location, the people that

15   worked in those locations, the ability to handle

16   critical incidents.  You will have to excuse me.  I

17   have been away for a while.

18     Q.   I understand.

19     A.   Those are some of the general things that I

20   would have looked at.

21     Q.   Tell me, in general, what does an operations

22   major do.  What sort of areas does he or she

23   supervise?

24     A.   The troops -- if you are familiar with the

1    hierarchy of the State Police, you have three troops

2    in Sussex County, you have one in Kent County -- I am

3    not sure what the structure is now with the State

4    Police, but, back then, you had the traffic section, I

5    believe, fell under the major for Kent and Sussex, I

6    believe, I am not 100 percent certain on that right

7    now, and the communications centers.  So, you were

8    responsible for the operation of all of those troops.

9    And, basically, the liaison between the -- those

10   troops, those captains, and those people that were

11   assigned to those troops, liaison between them and the

12   executive staff, or, particularly, the lieutenant

13   colonel and colonel.

14       Q.   Were there any special units under Kent and

15   Sussex operations, such as drug or vice?

16       A.   Yes, ma'am.  But that, again, fell under a

17   special units major, not the Kent and Sussex

18   operations major.

19       Q.   I understand.

20            Are you familiar with the position that I

21   believe is called administrative or budget major?

22       A.   Yes, ma'am.

23       Q.   And did you appoint anyone to that position

24   while you were colonel?

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1      A.    Yes, ma'am.

2      Q.    Is that Major Swiski?

3      A.    Yes, ma'am.

4      Q.    Not necessarily with reference to Major Swiski,

5    unless that's helpful for you, what sort of factors

6    did you look for in making appointment to that

7    position?

8      A.    That is a position that oversees the budget

9    within the agency.  What I looked for in the

10   appointment of Major Swiski was the ability to carry

11   capital projects, particularly, at the time, it was

12   Troop 2 that we were trying to construct, and that

13   Major Swiski had played a pretty significant role in

14   the -- in that project because he was actually the

15   troop commander of the old Troop 2.

16          So, I looked at that and his ability to do

17   that, and then, again, his administrative abilities in

18   terms of the budget at that particular time, and

19   that's the primary reason that I selected him.

20     Q.    Because he had experience in that area?

21     A.    He had experience in that area.  He had

22   previously worked in internal affairs section as well,

23   and, at that time, I found that his investigations

24   were pretty thoroughly detailed.



Gerald R. Pepper                    50

1    Q.    Would you consider a candidate with specific

2    education in finance or business administration to be

3    a helpful asset to that position?

4    A.    Yes, it could be.

5    Q.    Did you promote R.L. Hughes to the rank of

6    captain?

7    A.    Yes, ma'am, I did.

8    Q.    What, in general, was your assessment of R.L.

9    Hughes?

10    A.    At that time, R.L. Hughes was promoted to

11    captain, I believe, from an assignment at the training

12    academy.  And his career at the training academy, I

13    found to be, in terms of the administrative functions

14    at the training academy, I think he was the deputy

15    director of the training at the time -- I found his

16    administrative talents to, at that time, be quality,

17    and, at the time, he was promoted then to a

18    geographical opening in Troop 5 area.

19                He had worked at Troop 5 before, and I

20    think he had also worked in the southern special

21    investigations unit before.  So, again, looking at the

22    -- where the assignment was was a consideration, and

23    his talents.

24    Q.    Did you promote Paul Eckrich to the rank of

1    captain?

2       A.    Yes, I did.

3       Q.    And what assets did you find with Paul Eckrich,

4    having worked with him?

5       A.    I believe Paul's career was primarily at Troop

6    4.  He had worked a short period of time, I think, as,

7    perhaps, a lieutenant or maybe even a sergeant at the

8    headquarters facility in an administrative position, I

9    believe.  I am not -- again, it's been some time --

10      Q.    I realize you don't have records in front of

11   you.

12      A.    So, those factors were considered in his

13   promotion.  And, again, you know, I have given you

14   some of the things that I looked for, but in trying to

15   think back in that particular promotion process, I am

16   not sure where those people were at that particular

17   time in the promotional process.  And when I say that,

18   once you make it to a band, you are qualified to be

19   promoted to the next rank unless there is something

20   that says you are not qualified.  And if you have an

21   opening that has to be filled, it has to be filled off

22   of that band.

23              So, then again, I couldn't tell you if we

24   were down to one person on a band -- in other words, I

Gerald R. Pepper                                    52

1    guess what I am saying is if we had an opening and

2    there was only one of those people that was left on

3    the band, then that would have been a factor as well.

4        Q.    I understand.  And the bands are only relevant

5    through the level of captain; correct?

6        A.    Yes, ma'am.

7                MR. NEUBERGER:  Once again, back when you

8    retired.

9                THE WITNESS:  Yes, sir.

10   BY MS. BALLARD:

11       Q.    When you personally served as Kent and Sussex

12   operations major, what do you feel, from your

13   background, helped you do that job?

14       A.    Prior to -- I had -- I believe my career paths

15   had helped.

16       Q.    That is things you have done before in the

17   police?

18       A.    Yes.

19       Q.    Now, you didn't review the prior testimony of

20   any witness in this matter prior to testifying here

21   today, did you?

22       A.    No, ma'am.

23       Q.    So you don't have personal knowledge of what

24   they may have testified to; correct?

1      A.    That's correct.

2      Q.    Or the basis for their testimony?

3      A.    No, ma'am.

4            MS. BALLARD:    That's all I have got.

5      Thank you.

6      BY MR. NEUBERGER:

7      Q.    Colonel, I am going to have to ask you some

8      other questions since you went into some other areas,

9      so let me try to be brief and get you out of here.

10           You retired in 2001, you explained; right?

11     A.    Yes, sir.

12     Q.    So, you have no personal knowledge of what the

13     promotional policies of the Delaware State Police were

14     in the year 2003; is that correct?

15     A.    That is a fair statement, yes, sir.

16     Q.    And one of the promotions involved in this case

17     is a, I believe, a May promotion to replace Major

18     Swiski that was awarded to now Major Eckrich.

19           You wouldn't have any idea what the

20     policies that the Delaware State Police had to apply

21     at that time for that promotion were?

22     A.    No, sir, I wouldn't.

23     Q.    And then in July, then Lieutenant Colonel Tom

24     Marcin retired and now Colonel MacLeish replaced him,

1    decision was being made?

2      A.    I am going to say anywhere between 18 and 20,

3    something like that.

4      Q.    In your mind, did the universe of potential

5    candidates for that major position consist of those 18

6    to 20 captains?

7      A.    Not necessarily.  What I -- what I would have

8    done if it was, you know, if I was the colonel or if

9    he had dealt, you know, delegated that responsibility

10   to me, would have ordered the human resources director

11   to compile a, just a short bio on each captain and

12   present it to us for review and then maybe -- maybe

13   knock it down from there and -- and then, certainly,

14   include others in the process and make sure that we

15   have the best candidate available.

16     Q.    Did you necessarily say any of that, what you

17   have just said, to Aaron Chaffinch at the time?

18     A.    No.  I didn't -- I didn't say, you know, Go to

19   Yeomans and have this done.  My conversation was what

20   I had testified to.

21     Q.    But you were suggesting, to Colonel Chaffinch,

22   you thought it would be a good idea, in light of the

23   Blunt-Bradley report, to actually go down and look at

24   the various personnel files of potential candidates

Thomas F. Marcin                                57

1    other than Paul Eckrich?

2       A.    Yes.

3       Q.    Do you know if he followed that advice, if he

4    did that?

5       A.    No.

6       Q.    You don't know one way or the other?

7       A.    Don't know.

8       Q.    Is it fair to say that, in your mind, the

9    criteria for selection of a major would vary as to the

10   particular major position vacancy that was involved?

11      A.    That's fair.

12      Q.    Can you elaborate on that in terms of what the

13   different kinds of duties are?  And to keep it simple,

14   in terms of the major position that Major Swiski had

15   held and then the major position that was filled by

16   the promotion of Major Hughes, how were those two

17   different from the other major positions, just in

18   general terms, in terms of the skill set or the

19   background that would be appropriate for this?

20      A.    Which positions are you talking about?

21      Q.    Let's start with the one that was filled by the

22   promotion of Major Eckrich.

23             How was that different from the other

24   major positions?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,            )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        C.A. No. 04-1395-GMS
                                     )
COLONEL L. AARON CHAFFINCH,          )
Individually and in his official capacity as the  )
Superintendent, Delaware State Police;  )
LIEUTENANT COLONEL THOMAS F.         )
MACLEISH, individually and in his official  )
Capacity as the Deputy Superintendent,  )
Delaware State Police; DAVID B. MITCHELL,  )
Individually and in his official capacity as  )
Secretary of the Department of Safety and  )
Homeland Security, State of Delaware; and  )
DIVISION OF STATE POLICE,            )
DEPARTMENT OF SAFETY AND             )
HOMELAND SECURITY, STATE OF          )
DELAWARE,                            )
                                     )
            Defendants.              )

DEFENDANTS' RESPONSE TO PLAINTIFF'S
SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

REQUESTS

1.      All documents in your possession, custody or control that refer or relate in any

way to the process, discussions or decisions to allow Lt. Joseph Aviola and/or DSP to respond to

media and/or public requests for information relating to Captain Conley's internal affairs

information (including, but not limited to: all documents created by Lt. Aviola, Corporal Zane,

Cpl. Oldham, Lt. Robert Coupe, Captain James Paige, defendant MacLeish and Michael

Tupman; and the entire file in the Public Information Office on this matter, including the

document sent to Lt. Aviola by reporter Tom Eldred of the Delaware State News).

B00029

**ANSWER:**

Objection, this interrogatory is vague, overbroad and presumes facts not in evidence. Notwithstanding the foregoing objection and without conceding that the 10/26/04 "Trial Board" email constitutes "internal affairs information," please see the following documents, attached:

- copy of three handwritten pages of notes taken by Lt. Joseph Aviola, pertaining to meeting which took place following Tom Eldred's phone call that he had a copy of the Conley trial board notice;

- copy of page from (then) Lt. Col. Thomas MacLeish's datebook, dated October 28, 2004, pertaining to same meeting;

- copy of notes taken by Lt. Robert Coupe dated October 28, 2004, pertaining to same meeting;

- copy of 10/26/04 "Divisional Trial Board" email from James Paige to "DSP-Users" document faxed to Lt. Aviola by Tom Eldred, Delaware State News.

- copy of November 4, 2004 email from Joseph P. Aviola to Thomas F. MacLeish re: questions from Tom Eldred, and preceding emails, original email entitled "Investigation into wrongdoing by the Colonel"[1]

---

[1] Please note: certain responsive email documents were forwarded by Lt. Joseph Aviola to Stephani J. Ballard, counsel for DSP, and therefore contain a heading documenting that forwarding. The original emails begin under the line "Original Message" in each.

2.    All documents in your possession, custody or control that refer or relate in any way to the detailed written notes created by Lt. Robert Coupe, as specifically referenced in the June 7, 2005 deposition testimony of Lt. Aviola.

**ANSWER:**

See attached copy of notes taken by Lt. Robert Coupe dated October 28, 2004, pertaining to meeting which took place following Tom Eldred's phone call to Lt. Aviola, advising that he had obtained a copy of the Conley trial board notice.

3.    All documents in your possession, custody or control that refer or relate in any way to the process, discussions or decisions:

(1)  to 'no comment';

(2)  to refuse to publically respond;

(3)  to decline to respond or substantively respond because it is an internal personnel matter; and/or

(4)  to give any similar response

to the numerous prior and current requests from the media and/or the public, as directed to defendants, the DSP and/or the Public Information Office, for information pertaining to the numerous internal affairs investigations or outside investigatory investigations into defendants Chaffinch and MacLeish during the years 2004 and 2005. Some of the media requests are reflected in the June 7, 2005 deposition testimony of Lt. Aviola and also are reflected in plaintiff's deposition exhibits 8-13 which were used at Lt. Aviola's deposition.

**ANSWER:**

Objection, this interrogatory is vague, overbroad and presumes facts not in evidence. Notwithstanding the foregoing objection, please see the following documents, attached:

- copy of March 7, 2005 email from Kimberly Chandler to David B. Mitchell, cc: Joseph P. Aviola, and preceding emails below;

- copy of March 7, 2005 email from Kimberly Chandler to Joseph P. Aviola, and preceding emails below, both re: media inquiries into Chaffinch's and Conley's IA investigations.

The foregoing documents speak for themselves, and their production does not constitute Defendants' agreement that they meet the content set forth in subparts (1) – (4) above, but they are being produced due to their relevance to this matter.

4.    All documents in your possession, custody or control that refer or relate in any way to any internal affairs or other investigation (no matter how formal or informal) that was conducted into the release to reporter Eldred of the text of Captain Paige's October 25, 2004 e-mail to DSP_Users relating to Captain Conley.  This is the same document referenced and discussed at length during the June 7, 2005 deposition of Lt. Aviola and which Lt. Aviola indicated was read and later faxed to him by reporter Eldred.

**ANSWER:**

See copies of the following, attached:

- handwritten notes by Captain James Paige, Internal Affairs, re: communications with Keith Caskey, DSP/ISS;

- Captain Paige's copy of 10/26/04 "Divisional Trial Board" email.

- *See also* copy of page from (then) Lt. Col. Thomas MacLeish's datebook, dated October 28, 2004, previously produced in response to Request #1, above.

5.  All documents in your possession custody or control that refer or relate in any way to the actual document that was read and later sent to Lt. Aviola by reporter Eldred, including the actual document.

**ANSWER:**

See response to Request for Production, #1, above. *See also* the following, attached:

- pages VII-5-12 and VII-5-13 from DSP Rules and Regulations (copies attached), which pertain to the content and transmission of Hearing Board emails.

- copy of Captain Paige's handwritten notes, produced in response to Request #4, above,

- copy of October 29, 2004 email from Stephen Neuberger to Captain James Paige entitled "Conley, Capt. Barbara."

6.  All documents in your possession, custody or control that refer or relate in any way to files or other documents in the Public Information Office created by the staff of that office relating to media inquiries into the internal affairs and/or other investigations into defendants Chaffinch, MacLeish and/or plaintiff Captain Conley.

**ANSWER:**

Objection, this interrogatory is vague, overbroad and presumes facts not in evidence. Notwithstanding the foregoing objection, please see response to Request #1, above, as well as the following documents, attached (*see also* footnote 1):

- copy of October 28, 2004 email from Kimberly Chandler to Joseph P. Aviola, and preceding email, original email entitled "interview request with the Secretary";

- copy of November 4, 2004 email from Kimberly Chandler to Joseph P. Aviola, and preceding emails, original email entitled "Investigation into wrongdoing by the Colonel";

- copy of November 5, 2004 email from Kimberly Chandler to Joseph P. Aviola, and preceding emails, original email entitled "DSP-Complaint and Request for Criminal Investigation";

- copy of March 7, 2005 email from Kimberly Chandler to David B. Mitchell, entitled "FYI—Media Inquiries", and preceding emails, produced in response to Request # 3, above;

- copy of March 7, 2005 email from Kimberly Chandler to Joseph P. Aviola, entitled "FYI—Media Inquiries", and preceding emails, produced in response to Request # 3, above;

- copy of March 9, 2005 email from Michael Tupman to Joseph P. Aviola entitled "Conley";

- copy of March 15, 2005 email from Kimberly Chandler to David B. Mitchell and others, entitled "FYI—State News Follow-up to Conley IA Hearing."

7.      All documents in your possession, custody or control that refer or relate in any way to responses of defendants Mitchell, Chaffinch, MacLeish and/or any other Delaware State Trooper or Delaware State Police employee or inquiries or requests from employees of or officers assigned to the Public Information Office as to how to respond to requests or inquiries from the media and/or the public into the internal affairs and other investigations into defendants Chaffinch, MacLeish and/or plaintiff Captain Conley.

**ANSWER:**

Objection, this interrogatory is vague and overbroad. Notwithstanding the foregoing objection, none, other than documents previously identified in response to Requests # 1, 3 and 6, above. In addition, the Public Information Office Section of the DSP Divisional Manual, which

addresses media inquiries in general, is being produced in response to the Plaintiff's Third Set of Requests for Production of Documents.

8.    All documents in your possession, custody or control that refer or relate in any way to the involvement of Michael Tupman in the process, discussions or decisions of how to respond to requests or inquiries from the media and/or the public into the internal affairs and other investigations into defendants Chaffinch MacLeish and/or plaintiff Captain Conley.

**ANSWER:**

Objection, this interrogatory is vague and overbroad, and calls for the production of privileged attorney-client materials. Notwithstanding the foregoing objection, DSP has waived the attorney-client privilege with respect to advice given by Michael Tupman on or about October 28, 2004, with regard to the "Tom Eldred/trial board email" issue, and responsive documents have already been produced in response to Request #1 (MacLeish and Coupe notes, and copy of email faxed by Tom Eldred; reference to Tupman in 11/4/04 email from Aviola to MacLeish). *See also* copy of March 9, 2005 email from Michael Tupman to Joseph P. Aviola entitled "Conley", produced in response to Request #6, above.

STATE OF DELAWARE

DEPARTMENT OF JUSTICE

Ralph K. Durstein, III (I.D. No. 912)
Stephani J. Ballard (I.D. No. 3481)
Deputy Attorneys General
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8400

Attorneys for Defendants
MacLeish, Mitchell and DSP

DATED: July 8, 2005

B00035



*No, you never get any fun*
*Out of the things you haven't done.*
*—Ogden Nash*

**Monthly Focus: Mission—**
What is at the center of
your personal vision
and purpose?

# 28
**Thursday**
**October 2004**

### Daily Notes

302nd Day · 64 Left · Week 44

1430 - Lt. Avisla - Capt. Paige - Lt. Coupe - Myself

Eldred - Has a copy of Capt. Conley Trial Board announcment
verify the route of the Email was not sent out

E-Mail was sent out on Monday due to Capt. Paige Vacation.

Request he look at T-11   192   Section  CEOBR

Directed to give

Providing Direction on the Leadership of the

Reduction in Fatalities
Increased Seatbelt Belt
        Traffic Initiatives - ~~Traffic~~ Seatbelt Enforcmt
                              DUI Enforcemt
                              Aggressive Driving

DTAC

Working together as one is successful alone

Mission will be accomplished by the men + women of
this Division who are on the front line.

Interview with Maj Allen

Eldred Question - Conveying difference between   Administration +
                                                  Suspension

                                    Non Discipline       Discipline

                                                          Removal of
                                                          guns + badge

B00036

© FranklinCovey. All Rights Reserved. • franklincovey.com • Original-Monarch

CONFERENCE — HQ Conf Rm   10/28/04   1430

1. CAN WE ACKNOWLEDGE   E-MAIL ]yes NOT PROTECTED BY LEOBR AND/OR

2. REFER TO "/9200

3. RULE & REG #4        AND   R&R #40
   CONDUCT UNBECOMING           ANTI-HARRASSMENT
                        ← (STOP) →

OKAY TO GWB DATES + OF INVESTIGATION.

   LT. COL MACLEISH
   LT. J. AVIOLA
   LT. COWE
   CAPT Price
   DAG TURMAN — PHONE

B00037

**From:** Paige James (DSP)
**Sent:** Monday, October 26, 2004 2:43 PM
**To:** DSP_Users
**Subject:** Divisional Trial Board

A Divisional Trial Board has been scheduled for Monday, December 20, 2004, at 0900 hours at Delaware State Police Headquarters to hear charges against Captain Barbara L. Conley. She is charged with three counts of violating Delaware State Police Rule and Regulation #4 and one count of violating Delaware State Police Rule and Regulation #40.

The board will be composed of Major Joseph A. Papili, Captain Jeffrey R. Evans and Captain Paul E. Szczerbowski.

Any member of this Division, uniformed or civilian, who believes any of the officers selected to this Board would be biased, prejudicial or otherwise predisposed in the above matter, will immediately contact the Internal Affairs Division office.

Additionally, any member, uniformed or civilian, who may possess any information that would affect the proceeding will, likewise, contact the Internal Affairs Division office.

Captain James Paige
Delaware State Police
Internal Affairs
302-739-5990

B00038

October 25, 2004 e-mail sent to Divisional personnel
Regarding Conley's Trial Board.

① Contains Capt. Paige : Kevin Conley 10/29/04
REF a search of this particular e-mail to see
if the e-mail was forwarded by any Divisional
personnel.

② Contains Kevin Conley 11/1/2004 REF results of
search. Conley advised that the search did not
find anyone forwarding the particular e-mail.
 - Conley advised that the e-mail could have been
   forwarded if the subject line was changed and
   the search would not have picked it up.
 - Also added that if there was a particular
   suspect, the search could be specific to the suspect.

HANDWRITTEN NOTES BY CAPT. JAMES PAIGE

B00039

COPY

**Paige James (DSP)**

| | |
|---|---|
| **From:** | Paige James (DSP) |
| **Sent:** | Monday, October 25, 2004 2:43 PM |
| **To:** | DSP_Users |
| **Subject:** | Divisional Trial Board |

A Divisional Trial Board has been scheduled for Monday, December 20, 2004, at 0900 hours at Delaware State Police Headquarters to hear charges against Captain Barbara L. Conley. She is charged with three counts of violating Delaware State Police Rule and Regulation #4 and one count of violating Delaware State Police Rule and Regulation #40.

The board will be composed of Major Joseph A. Papili, Captain Jeffrey R. Evans and Captain Paul E. Smentkowski.

Any member of this Division, uniformed or civilian, who believes any of the officers selected to this Board would be biased, prejudicial or otherwise predisposed in the above matter, will immediately contact the Internal Affairs Division office.

Additionally, any member, uniformed of civilian, who may possess any information that would affect the proceeding will, likewise, contact the Internal Affairs Division office.

Captain James Paige
Delaware State Police
Internal Affairs
302-739-5990

1      B00040

      (3)    If it is determined that a Hearing Board should be convened, the Internal Affairs Officer will immediately notify the member under investigation, in writing, of the nature of the charges and the fact that a Hearing Board will convene; or, if a member elects not to contest the charges and allegations, that member may elect to have a hearing before the Superintendent.

      (4)    In a Superintendent's hearing, the member shall have the right to counsel as outlined in Section II-D-8; and the Superintendent shall have the authority to either dismiss the allegation or to impose disciplinary measures as detailed in Section II-D-9. And in the latter event, the accused can exercise their privilege of appeal to the Secretary of Public Safety as outlined in Section II-D-12. All such hearings before the Superintendent will be recorded.

   n.    All investigative determinations of unfounded, exonerated, or not substantiated shall be subject to review by the O.I.C. of Internal Affairs and by the Deputy Superintendent or designee. The officer under investigation will be notified as to the nature and final classification of the investigation.

D.   Divisional Hearing

   1.    When notified by the O.I.C. of Internal Affairs that a hearing is necessary, the Superintendent shall order a Trial Board. A new Trial Board shall be appointed for each case, except that one Trial Board may hear multiple charges against one or more officers if the charges arise out of the same transaction or occurrence. The Board shall consist of three members. The presiding member of the Board shall be selected from a list of three staff officers submitted by the Superintendent, of which the charged officer shall strike one name. The second member of the Board shall be selected from a list of five commissioned officers of which

VII-5-12

B00041

the charged officer shall strike two names.  The
final member of the Board shall be selected from a
list of five troopers of a rank similar to the
trooper charged of which the charged officer shall
strike two names.  Troopers serving as a Board
member must have at least ten years seniority with
the Division.

2.  Whenever any member of the Division has been
charged with an alleged transgression of the
Division's Rules and Regulations and a Divisional
Hearing Board is to be convened, the Internal
Affairs Officer will transmit an e-mail to all
troops and sections which will:

a.  Identify the defendant officer

b.  Identify the Rule or Job Performance Standard
allegedly violated.

c.  Identify the date, time, and place of the
hearing

d.  Identify the officers selected to hear the
matter

3.  Upon posting the e-mail, any employee of the
Division who believes that any officer selected to
the Board would be biased, prejudiced, or otherwise
predisposed in the matter, shall immediately
contact the O.I.C. of Internal Affairs.

4  Additionally, any employee of the Division who may
possess information that would affect the proceeding
shall contact the O.I.C. of Internal Affairs.

5.  The Internal Affairs Office will have responsibility
for preparation of cases for presentation to the
Divisional Hearing Board and may use the services of
a Divisional attorney.

6.  The Internal Affairs Office will schedule the
hearing and will arrange for all testimony to be
recorded.

7.  The Trial Board Presiding Officer shall decide any
question of procedure or admissibility of relevant
evidence. Hearsay evidence may be accepted as
admissible at the discretion of that officer.  A
Divisional attorney or a lawyer from the Attorney
General's Office may be used as counsel for the
Trial Board.

VII-5-13

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,        )
                               )
        Plaintiff,        )
                               )
       v.        )        C.A. No. 04-1394-GMS
                               )
COLONEL L. AARON CHAFFINCH,        )
Individually and in his official capacity as the        )
Superintendent, Delaware State Police; et al.        )
                               )
        Defendants,        )

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on September 30, 2005, he caused the attached

Defendants' Appendix to Answering Brief in Opposition to Plaintiff's Motion to

Bifurcate to be electronically filed with the Clerk of Court using CM/ECF which will

send notification of such filing to the following:

      Thomas S. Neuberger, Esq.
      Stephen J. Neuberger, Esq.
      Two East Seventh Street, Suite 302
      Wilmington, DE 19801

                        /s/ Ralph K. Durstein III
                        Ralph K. Durstein III, I.D. #912
                        Deputy Attorney General
                        Carvel State Office Building
                        820 N. French Street, 6th Floor
                        Wilmington, DE  19801
                        (302)577-8400
                        Attorney for Defendants MacLeish, Mitchell, and Division of State Police