# THE NEUBERGER FIRM
## ATTORNEYS AND COUNSELLORS AT LAW

### TWO EAST SEVENTH STREET
### SUITE 302
### WILMINGTON, DELAWARE 19801-3707

WWW.NEUBERGERLAW.COM
EMAIL: INFO@NEUBERGERLAW.COM

THOMAS S. NEUBERGER, ESQUIRE
STEPHEN J. NEUBERGER, ESQUIRE

PHONE: (302) 655-0582
FAX: (302) 655-9329

**FILED UNDER SEAL**

October 19, 2005

**Via CM/ECF Filing**

The Honorable Gregory M. Sleet
United States District Court
District of Delaware
844 King Street
Wilmington, DE 19801

RE:    **Conley v. Chaffinch, et al.**, Civil Action No. 04-1394-GMS
       **Request for an Emergency Chambers Conference**

Dear Judge Sleet:

**[Redacted]**

**[Redacted]**

**[Redacted]**

**[Redacted]**

**[Redacted]**

**[Redacted]**

Respectfully submitted,

/s/ Thomas S. Neuberger

Attorney for Plaintiff

enclosures

cc:     Stephen J. Neuberger, Esq. (by hand)
        Ralph K. Durstein, Esq. (via E-mail and U.S. Mail)
        Stephani Ballard, Esq. (via E-mail and U.S. Mail)
        James E.  Liguori, Esq. (via E-mail and U.S. Mail)

Conley \ Letters \ Sleet.06

# Tab A



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

-------------------------------------------------------------------------

Transcript of:

## Colonel L. Aaron Chaffinch

June 6, 2005

-------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:04-cv-01394-GMS    Document 92    Filed 10/19/2005    Page 9 of 64

Conley                                v.                    Chaffinch, et al.
Colonel L. Aaron Chaffinch            C.A. # 04-1394-GMS              June 6, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,                )
                                          )
                Plaintiff,                )
                                          )   Civil Action
v.                                        )   No. 04-1394-GMS
                                          )
COLONEL L. AARON CHAFFINCH,               )
individually and in his official         )
capacity as the Superintendent,          )
Delaware State Police; LIEUTENANT        )
COLONEL THOMAS F. MACLEISH,               )
individually and in his official         )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.          )
MICHELL, individually and in his         )
official capacity as Secretary of the )
Department of Safety and Homeland        )
Security, State of Delaware; and         )
DIVISION OF STATE POLICE, DEPARTMENT     )
OF SAFETY AND HOMELAND SECURITY,         )
State of Delaware,                        )
                                          )
                Defendants.               )

        Deposition of COLONEL L. AARON CHAFFINCH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:35 a.m. on Monday,
June 6, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.
APPEARANCES:
        THOMAS S. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
         2 East 7th Street - Suite 302
         Wilmington, Delaware  19801
         for the Plaintiff
    -------------------------------------------------
              WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

Conley                                               v.                                    Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                        June 6, 2005

Page 2

1   APPEARANCES (Continued):
2
3        JAMES E. LIGUORI, ESQUIRE
         LIGUORI, MORRIS & YIENGST
4          46 The Green
           Dover, Delaware 19901
           for Defendant Colonel L. Aaron Chaffinch
5
         RALPH K. DURSTEIN, ESQUIRE
6        STEPHANI J. BALLARD, ESQUIRE
         DEPARTMENT OF JUSTICE
7          820 North French Street
           Carvel State Office Building
8          Wilmington, Delaware 19801
           for Defendants Lieutenant Colonel Thomas F.
9          MacLeish, David B. Mitchell, and Division
           of State Police
10
11  ALSO PRESENT:
12       CAPTAIN BARBARA L. CONLEY
13            - - - - -
14       COLONEL L. AARON CHAFFINCH,
15       the witness herein, having first been
16       duly sworn on oath, was examined and
17       testified as follows:
18  BY MR. NEUBERGER:
19       Q.   Could you state your full name for the record?
20       A.   Aaron Chaffinch.
21       Q.   Colonel Chaffinch, my staff or myself, we've
22  taken your deposition on other occasions; isn't that
23  correct?
24       A.   Yes, sir.

Page 3

1        Q.   You've even testified in two federal court cases
2   that I was involved in; is that right?
3        A.   Yes, sir.
4        Q.   I called you as a witness in those cases; right?
5        A.   Yes, sir.
6        Q.   Now, you understand, based on that experience,
7   that if there's any question I ask you today and any
8   answer you give, and I call you at trial and you say
9   something different, I can point that out to the judge
10  and jury?
11       A.   Yes, sir.
12       Q.   You know that. Okay.
13            Are you taking any medications or anything
14  that would interfere with your ability to remember
15  things?
16       A.   I don't believe so.
17       Q.   You don't take blood pressure, heart medicine,
18  things like that?
19       A.   I don't think it would affect my memory, I don't
20  believe.
21       Q.   But you are not on anything odd or something
22  that affects your memory that you know of?
23       A.   Not that I'm aware of.
24       Q.   If I ever ask you a question that you don't

Page 4

1   understand, just ask me and I'll be glad to rephrase it.
2   Is that okay?
3        A.   Yes, sir.
4        MR. NEUBERGER:  Let's do this.  Let's mark
5   this as Plaintiff's Exhibit Number 1 and then we'll be
6   referring back and forth to this.  Let me give a copy to
7   counsel.  It's a copy of the First Amended Complaint in
8   the action.
9            (Plaintiff's Exhibit 1 was marked for
10  identification.)
11  BY MR. NEUBERGER:
12       Q.   Colonel, I'm going to ask you some questions
13  about how long you were with the force and how your
14  career, your assignments might have tracked assignments
15  that Captain Barbara Conley had.  Okay?
16            If you turn to paragraph 10 of that
17  document that's in front of you on page 4, you can see
18  there in that paragraph a listing that Barbara Conley
19  prepared at an earlier time of her assignments starting
20  as a patrol trooper at Troop 5 in Bridgeville in 1982 at
21  the bottom.  Do you see that?
22       A.   Yes, I do.
23       Q.   Then she works all the way up to captain,
24  director of traffic control section in 2001.  Do you see

Page 5

1   that?
2        A.   Yes, sir.
3        Q.   Let me just ask you a few questions about her
4   history.
5            Now, she indicated that she joined the
6   force as a patrol trooper in Bridgeville in 1982 and
7   she'll testify to that fact.  Were you assigned to
8   Bridgeville at that time?
9        A.   Yes, sir.
10       Q.   I think she's indicated that she believes that
11  when she started in Bridgeville, she was a patrol trooper
12  and you would have been a trooper first class assigned in
13  Bridgeville.  Does that sound about right?
14       A.   That's correct.
15       Q.   Then she indicates she was in Bridgeville from
16  1982 to 1983?
17       MR. LIGUORI:  I think it's '93, Tom.
18       MR. NEUBERGER:  Yes.  Thank you, Jim.  All
19  right.
20  BY MR. NEUBERGER:
21       Q.   She has indicated during that period of time
22  there was a time when you were assigned at Bridgeville,
23  also?
24       A.   Part of that time, yes, sir.

2 (Pages 2 to 5)

Conley                                               v.                                    Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                        June 6, 2005

Page 146

1    A.   You mean that I may have inherited from the
2  previous superintendent?
3    Q.   Yes.
4    A.   Not to my knowledge.
5    Q.   I know, for example, that with reference to
6  lieutenants and sergeants, there's testing and there's
7  bands and things like that.  At that time the Delaware
8  State Police was using that process for those ranks;
9  right?
10   A.   For sergeant, lieutenant, captain, yes.
11   Q.   And for captain, too?
12   A.   Yes.
13   Q.   I remember seeing information about boards of
14  people who might interview captain candidates.
15   A.   Okay.
16   Q.   That's true, isn't it?
17   A.   Yes, sir.
18   Q.   Now, for majors there wasn't that kind of a
19  process?
20   A.   No, sir.
21   Q.   I think you're telling me that for majors there
22  was no process that you inherited from any of your
23  predecessors as far as filling those two major vacancies?
24   A.   That's correct.

Page 147

1    Q.   Are you telling me that there's no process in
2  the union contract between the State Police and the union
3  that applies to filling the vacancies?
4    A.   I'm not telling you that, no.
5    Q.   Is there anything in the union contract?
6    A.   Not to my knowledge.
7    Q.   I know there's that handbook, the Delaware State
8  Police rules and regulations, it's like a two-volume blue
9  thing I've seen with rules and regulations about the
10  State Police.  You are aware of that book; right?
11   A.   The administrative manual and the divisional
12  manual.
13   Q.   In those two manuals, was there any process that
14  guided your selection of the two majors for the positions
15  we are talking about?
16   A.   I think probably there may be something in there
17  about at the discretion of the superintendent, but
18  there's not any specific process, no.
19   Q.   So, for example, there was no preexisting rule
20  in writing that required that anybody selected for major
21  have a certain educational background?
22   A.   No, sir.
23   Q.   There wasn't anything in writing that required
24  that a person who was selected for major have any

Page 148

1  specific operational background?
2    A.   Well, I think it goes without saying you'd have
3  to be a captain.
4    Q.   Sure.
5    A.   You know what I mean.  So that is one parameter,
6  you know.  So you look at the captains in the agency to
7  make your selection and for the superintendent.  And
8  certainly education and background and experience and
9  tenure all came into play with any selections that I made
10  for executive staff people.
11   Q.   So you're saying that when you had to select
12  anybody to be part of the executive staff, you considered
13  education, background, experience, and tenure?
14   A.   That's correct.  Experience within the agency.
15   Q.   While that wasn't found in any preexisting
16  written document, those are factors you used?
17   A.   That's correct.
18   Q.   I guess I'm trying to find out:  Were there
19  other factors you used besides those four?
20   A.   Well, by background I would mean where they had
21  been within their tenure as a trooper based on what
22  position I'm filling.  I think you understand that.  That
23  somebody that had been in an administrative position but
24  not necessarily in an operational position probably

Page 149

1  wouldn't get an operational job.  You see what I'm
2  saying?  Those kind of things come into play with any
3  selections that I would make for staff level positions.
4          And compatibility with other members of the
5  executive staff certainly would come into play, as well.
6    Q.   I'll put down as another factor compatibility
7  with the other members of the executive staff.
8    A.   Yes.
9    Q.   So that gives me five categories.  Were there
10  any others that you considered?
11   A.   Not that I can recall.
12   Q.   I remember seeing in some of the other cases
13  affidavits or testimony talking about as people rise to
14  higher management levels in the State Police, it's
15  important that they have operational experience, meaning
16  like in patrol and actual on-the-road type experience.
17  That's a fair statement, isn't it?
18   A.   That's one very important facet, yes.
19   Q.   So that's important.  Okay.
20         For example, with respect to Captain
21  Barbara Conley, we know from paragraph 10 on page 4 of
22  the complaint that's in front of you that she was a
23  patrol trooper for eleven years at Troop 5.  Do you
24  remember that?

38 (Pages 146 to 149)

Conley                                                    v.                           Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                      June 6, 2005

Page 178

1  promotion from the Secretary of Safety and Homeland
2  Security James Ford, no.
3      Q.  So if I asked you for the record what were the
4  reasons for selecting Hughes, what would you explain as
5  the reasons why you selected Hughes?
6      A.  I don't know if I can tell you exactly the five
7  that are there.  Tenure, background, education --
8      Q.  The five are:  First was education, second is
9  background, third is experience within the Delaware State
10 Police, fourth is tenure, and fifth is compatibility with
11 other members of the executive staff.  Okay?
12          With that as a help, what were the reasons
13 why you selected Major Hughes?
14     A.  Okay.  Well, his tenure within the agency was
15 very well rounded.  He -- like I explained earlier, he
16 had been to the academy as the assistant director of the
17 academy, so he had been involved in training.  He'd been
18 in special investigations as a drug officer, so he had
19 experience in criminal investigations.  He had been a
20 patrol sergeant and run a shift at Troop 7.  He had been
21 a traffic lieutenant at Troop 5.  He had been a troop
22 commander at Troop 5.  He was a graduate of the FBI
23 National Academy.  He attained a master's degree in
24 public administration.  And he had worked his entire

Page 179

1  career in Kent and Sussex counties and he was familiar
2  with the area and the other troopers and the other
3  administrators of those troops.
4      Q.  Are there any other reasons?
5      A.  I thought he would be compatible with the other
6  staff members.  I think I've hit -- I hit on experience.
7  I hit on his background.  I hit on his tenure and his
8  education.  So I guess that there's not any others.
9      Q.  I'm just trying to be thorough.
10     A.  Loyal to the superintendent.
11     Q.  Excuse me?
12     A.  Loyal to the superintendent.
13     Q.  Is it fair to say that that's an additional
14 factor, or is that just within the other ones?
15     A.  That's within the others.
16     Q.  So loyal to the superintendent.  What do you
17 mean by that?
18     A.  Well, I had worked close with him and I knew
19 that he would support me in my position as
20 superintendent.  He would also do a good job.  He's
21 always been a go-getter.  He was one of the biggest
22 workers on the road when he was on the road.  He wrote
23 his share of traffic citations.  And he -- you know, he
24 did a lot of criminal work.  And I'll put his record up

Page 180

1  against anybody in the agency as far as work and
2  experience on the Delaware State Police.
3      Q.  It's just that today is the time for you to give
4  all the reasons.
5      A.  I suppose it is.
6      Q.  So are there any other reasons why you selected
7  him over the other people?
8      A.  Not that jump right out at me.  I think I've hit
9  on them all.
10     Q.  Now, if we go to Major Eckrich, how about giving
11 me the reasons why he was selected for the position?
12     A.  Okay.  From education standpoint, he's got a
13 master's -- a bachelor's and a master's degree.  He's a
14 graduate of Southern Police Institute in Louisville,
15 Kentucky, which is a command school for law enforcement
16 administrators.  He's -- he had worked patrol.  He had
17 worked as a patrol supervisor, a shift commander.  He had
18 worked at both as a criminal lieutenant and a traffic
19 lieutenant.  And he'd been a troop commander.  And I had
20 worked closely with him and I knew that he would be loyal
21 and -- loyal to me and we would be a good team to be a
22 part of the executive staff.
23     Q.  You mentioned loyal two times, so I do want to
24 ask you about that.

Page 181

1          You worked with Barbara Conley over your
2  career, too?
3      A.  Yes, I have.
4      Q.  Is there any reason for you to think she
5  wouldn't be loyal to you if she was selected?
6      A.  No, there's not.
7      Q.  So are they all the reasons for Major Eckrich?
8      A.  The other reason that we talked about earlier is
9  the fact that he had been in that position as a
10 lieutenant and that is a -- that is a large factor in my
11 decision.
12     Q.  So just so you understand I'm being fair with
13 you, if there's anything else you said earlier, we'll
14 include that in reasons why he was selected.  Okay?
15     A.  Yes, sir.
16     Q.  Is there anything else that you remember was a
17 reason why he was selected?
18     A.  No, sir.
19     Q.  Did you look into his disciplinary record?
20 Let's say Eckrich right now.  Did you check and see
21 whether he had any violations, suspensions, or things
22 like that in his record?
23     A.  I'm pretty sure he doesn't have any, but I
24 couldn't tell you exactly for sure, but if he has

46 (Pages 178 to 181)

# Tab B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | C.A.No.04-1394-GMS |
| individually and in his official capacity as the | : | |
| Superintendent, Delaware State Police; | : | |
| LIEUTENANT COLONEL THOMAS F. | : | |
| MACLEISH, individually and in his official | : | |
| capacity as the Deputy Superintendent, | : | |
| Delaware State Police; DAVID B. MITCHELL, | : | |
| individually and in his official capacity as | : | |
| Secretary of the Department of Safety and | : | |
| Homeland Security, State of Delaware; and | : | |
| DIVISION OF STATE POLICE, | : | |
| DEPARTMENT OF SAFETY AND | : | |
| HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER MOTION TO BIFURCATE THE TRIAL OF COUNT ONE FROM COUNTS TWO AND THREE OR IN THE ALTERNATIVE TO SEVER COUNT ONE FROM COUNTS TWO AND THREE

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: September 16, 2005          Attorneys for Plaintiffs

counts, especially where the two trials will be successive and within the original ten days allotted to try the entire case.

## STATEMENT OF FACTS

### I. Count One - Gender Discrimination in the Denial of Two Promotions to Major.

**A. The Prima Facie Case.** At his deposition defendant Chaffinch admitted the elements of the prima facie case. Two vacancies for promotion to Major existed in March and July of 2003. Plaintiff and all captains were considered and found to be "qualified" for these spots. But the promotions went to two males over plaintiff, a female. (Chaffinch 144-145, 183, 184-185; Dixon 93-95; Compl. & Ans. ¶¶ 89,58,61; A12,16,36-38,117,127,155-156). Plaintiff was even more qualified for the position than the two comparators. (Dixon 93-95; see Marcin 39, 49-51; Baylor 55; Pepper 57-59, 61, 65, 73-74; A57-59,61-62,76,78-79,155-156,178).

**B. The Legitimate Non-Discriminatory Reason.** Chaffinch claims he promoted the most qualified person using five or six discretionary factors: education, background, experience, tenure, compatibility and personal loyalty to him. (Chaffinch 148-149, 179; A118,126). There were no written Orders, policies, restrictions or guidelines whatsoever on the exercise of his discretion regarding these newly created factors. (Chaffinch 145-146, 168-169; A117-118,123). But as Lt. Col. Thomas Marcin testified, the process followed by the Colonel violated mandatory procedural requirements imposed on the DSP by Governor Minner and State Personnel Director Lisa Blunt-Bradley. (Marcin 38, 40, 29-37; A73-75).

**C. Fuentes Prong 2 in a Pretext Case - The Weight of the Evidence Proves Gender Discrimination.** Through Chaffinch's own admissions and testimony of those

who worked closely with him over the years, the record contains abundant evidence

which a reasonable jury can accept to conclude that the denial of these two promotions

was gender based.   Both circumstantial and direct evidence of illicit intent exists.

These categories of evidence follow.

1.    The two promotions at issue were procedurally irregular.  Governor Minner and her agent State Director of Personnel Lisa Blunt-Bradley in December 2001 imposed mandatory procedural requirements on all DSP promotions, including to Major.  (Marcin 43-44, 39, 29-38, A73-77).  Chaffinch defied these obligations which are designed to ensure procedural regularity in the process.  (Marcin 41; Chaffinch 172; Conley 44-46; Chaffinch 127-128, 132; A76,113-114,124,444-446).[1]

2.    Former Superintendent Gerald Pepper explained that numerous instances of Chaffinch's misconduct violate written Policies, Standing Orders and training by the DSP and that such conduct by Chaffinch was impermissible both on and off duty.  (Pepper 30-40; A53-55).  As present Col. MacLeish also admitted, police officers are "expected to conform to a higher standard of conduct than an ordinary citizen is expected to."  (MacLeish 21-22; PX15; A196-197,374).  Troopers "should conduct [their] private life above reproach," (MacLeish 25; A197), and regardless of whether they are on or off duty, they are to conduct themselves in a manner which will reflect favorably on the DSP.  (MacLeish 38; Pepper 38-39; A55,201).[2]

3.    Chaffinch has verbally stated more than once that he does not believe that females in general should even serve as troopers, (Dixon 99-100; A57), let alone as a Major.

4.    While on duty, he tells people that "women are nothing but trouble" and "women are a pain in the ass."  (Dixon 77-78; see Pepper 28-31; A52-

---

[1]  Chaffinch believes he can get away with anything because, as he openly brags, his close relationship with Delaware State Senator Thurman Adams will protect him.  (Dixon 64-65; A148).  "Uncle Thurman ... would take care of him no matter what."  (Dixon 64-65; A148).  "[I]f he needed anything done, he would just go to ... the Thurmanator, and it would be done."  (Dixon 65; A148).

[2]  Rule 4 of the DSP Rules and Regulations requires the same.  (PX16; A381).  Article 6 of the DSP Code of Ethics requires that an officer "lead the life of a decent and honorable person. ... [H]e will so conduct his private life that the public will regard him as an example of stability, fidelity, and morality."  (PX15; A378).

53,151-152).

5.      Chaffinch also admits that he publically recites a long stereotypical song
        or poem (PX 2; A357) which indicates that all the problems of society are
        the fault of the Biblical person "Eve," and that it is men, symbolized by
        "Adam," who have to bear the penalty for women's mistakes.  (Chaffinch
        25-33; Conley  11-13; Downes 15; Dixon 16-18; <u>see</u> Pepper 35; A87-89,
        136-137,186,411-413).

6.      Chaffinch also has voiced the sexual stereotype to plaintiff and others that
        two women cannot work together in the same office.  (Conley 13-15;
        Baylor 29; A171,413-415).  He denies this.  (Chaffinch 68; A98).[3]

7.      Chaffinch also has allowed another trooper, in his presence and when he
        had operational authority over the trooper, to disrespect plaintiff  by
        applying the sexually offensive nickname "Puss" to her.  (Conley  31-32;
        Dixon 48-50; Chaffinch 86; A103,144-145,431-432).

8.      He also publically refers to plaintiff by the sexually offensive and
        stereotypical nickname "Puss."  (Dixon 49; <u>see</u> Pepper 29-30; A52-53,
        144).  Chaffinch denies this. (Chaffinch 83; A102).[4]

9.      He also calls her "a bitch."  (Baylor 31; <u>see</u> Pepper 29; A52,172).

10.     Chaffinch has allowed other troopers in the headquarters complex to
        disrespect plaintiff, who had the rank of captain, and to direct wolf
        whistles towards her.  (Conley  32-34; Dixon 51-53, 112; A145,160,432-
        434).  He denies this.  (Chaffinch 84; A102).

11.     He also has disrespected the first female captain in the Division (plaintiff
        was the second) by publically nicknaming her "Norman," the name of a
        most wanted fugitive.  (Conley 35-36; Dixon 55-56, <u>see</u> Pepper 32; A53,
        146,435-436).  Chaffinch denies this.  (Chaffinch 92, 94; A104-105).

12.     Chaffinch even has asked plaintiff private details of her sex life.  (Conley
        34-35; Dixon 53; A145,434-435).  He denies this.  (Chaffinch 92; A104).

13.     He also repeatedly has told plaintiff over the years about how she looks in
        a black bathing suit and that he wants to move in on her, implying have

---

[3]  But as now retired Major Joseph Swiski, who was a member of Chaffinch's own inner
circle Executive Staff, has testified, Col. Chaffinch "has a reputation for not being very truthful."
(Swiski 57; A498).

[4]  Unlike Chaffinch, Captain Dixon has a reputation as being truthful.  (Marcin 16; A70).

sexual relations with her.    (Conley 46-47; A446-447).

14.    One day Chaffinch saw plaintiff in a red dress and said he "would do" her. (Dixon 60-61; A147).

15.    Chaffinch also has purchased presents, such as gold earrings with little hearts on them, for plaintiff, and applies "cutesy" nicknames to her. (Conley  46-47; A446-447).

16.    The record also contains five gender based and patently offensive sexually charged limericks which reveal a demeaning attitude towards women on the part of Chaffinch.  (PX 3,4; <u>see</u> Pepper 35-37; A54,357-358).[5]

17.    Chaffinch also admitted he belongs to a private membership organization which denies membership to women and blacks.  (Chaffinch 14; <u>see</u> Conley  7-11; Dixon 13-15; Baylor 27; A85,171,135-136,407-411).

18.    Chaffinch also tells jokes all the time.  (Downes 21; <u>see</u> Chaffinch 64, A97,169).  Plaintiff testified that 50% of his jokes are "inappropriate or demeaning to some group be it women, or blacks."  (Conley 13; A413). Captain Dixon testified it is more like 70% of the time that his jokes are offensive.  (Dixon 36; A141).[6]

19.    Chaffinch himself also admitted that he was officially disciplined as a major for telling a sexually explicit joke about masturbation during a co-ed sensitivity training session.  (Chaffinch 34-37; Conley 16-18; Dixon 29-30; Pepper 13-17; A48-49,90,139-140,416-418).

20.    He also was forewarned that he would be held accountable for his off duty conduct when he was disciplined earlier in his career for being the senior

_____

[5]  Chaffinch admits he frequently recounts these limericks in mixed company but claimed he does not do so at work, in an attempt to claim they reveal nothing of his mind set at work. (Chaffinch 41-59; A91-96).   But various witnesses have testified in detail that he does recite them, even in the workplace.  (Conley 18-23; Dixon 18-26; Downes 16-18; Baylor 29-30; A137-139,171-172,186-187,418-423).  As other officers also testified, Chaffinch also told these sexually explicit limericks while representing the DSP at national conferences for Operation CARE.  (Baylor 39-42; Dixon 75; A151,174-175).

[6]  In Capt. Dixon's words, "any time you would have contact with [Chaffinch], it seems like he would have a new joke, and more times than not, they were dirty jokes."  (Dixon 24-25; A138).  Defendant MacLeish testified that offensive jokes or other conduct of a sexual nature should have no place in the workplace.  (MacLeish 50; A204).  Such inappropriate joking and improper workplace behavior also violates the plain terms of the DSP's Sexual Harassment Policy.  (PX16; A391).

officer present when a female trooper disrobed and removed her blouse while dancing on a table at a private party. (Chaffinch 69-71; Dixon 38-40; see Pepper 7-13, 25; A48-49,51,98-99,142).

21.     Chaffinch also publically and in mixed company uses a nickname for his penis and brags that he has "something extra," referring to his penis. (Conley 26-30; Dixon 41-44, 80-81; A142-143,152,426-430). He denies this. (Chaffinch 72-73, 80; A99,101). But he does admit that earlier in his career he also publically named the patrol shift which he headed the "cocksters." (Conley 29-30; Dixon 57; Chaffinch 102-104; A107,146,429-430).

22.     When he was the commander of Troop 5, Chaffinch installed mirrors in his office and in the bathroom so he could watch himself masturbate. (Dixon 79; A152). He denies this. (Chaffinch 65; A97).

23.     Chaffinch has publically nicknamed a female employee of the Office of Highway Safety "Trish the Dish," meaning "Trish the delicacy. You know what the connotation is there." (Conley 36-37; see Dixon 57-58; Baylor 32; Chaffinch 97-99; A105-106,146-147,172,436-437).

24.     Chaffinch also has commented publically about various women in the headquarters building, stating "oohh she tears me up" or he "would love to do her." (Dixon 60; Conley 38; Baylor 32-33; A147,172,438). He denies this. (Chaffinch 100; A106).

25.     He has publically discussed how he would like to watch a female trooper masturbate for a male trooper. (Dixon 44-47, 110; A143-144,160).

26.     Chaffinch also refers publically to another secretary in headquarters as "Lemon titties," referring to her breast size. (Conley 38-39; Dixon 62; A148,438-439). He denies this. (Chaffinch 101; A106).

27.     He also made it his "mission" (Dixon 87; A154), to remove the first and only female troop commander that the DSP has ever had. (Baylor 33-39; A172-174).[7] In doing this, he ignored the advice of his entire Executive Staff who warned him that "it was not best for the organization" to remove

---

[7] Lt. Col. Marcin explained that he served as trooper commander of Troop 6 for 5 ½ years. (Marcin 4, Pepper 21-22; A50-51,67). After Capt. Mary Ann Papili was appointed by Col. Pepper to that post with a start date sometime in 2000 (Pepper 19-21; A50), Chaffinch prematurely removed her from command in September 2003, only 3 years into her rotation. (Marcin 23; A72).

her. (Baylor 37-38; A173-174).[8]

28.    During his command of the Division, Chaffinch never assigned a female to command a troop. (Chaffinch 125; A112).

29.    Reflecting his opinion of female officers, Chaffinch also diminished plaintiff's operational authority in various areas after he became Colonel. (Conley 40-44; Dixon 83-87; Baylor 58-59; A153-154,179,440-444). For example, he reduced plaintiff's job duties as Director of Traffic from what they had been when her position was previously occupied by male officers. (Baylor 54, 51-53; A177-178). Chaffinch took away "her leadership role." (Baylor 58; A179). Instead of developing policy and other similar duties, plaintiff was relegated to collecting data. (Baylor 58; A179).[9]

30.    Chaffinch's promotions in the DSP simply were not based upon merit. Instead, as Major Baylor testified, Chaffinch had an "older style of management," a style of promoting his buddies. (Baylor 51; A177). "There is a perception of a good old boys network in the [DSP]." (Baylor 16; A168). Promotions "are more based on who you know and who your connections are with and who your friends are than on merit in the [DSP]." (Baylor 16; A168).[10]

## D. Fuentes Prong 1 in a Pretext Case - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions In the Defense Case.

1.    On the experience promotion factor, admittedly the patrol function is the "backbone of the Division." (Chaffinch 153-154; Dixon 95; Pepper 61-62; A58-59,119-120,156). Plaintiff's experience included 18 years with patrol. (Chaffinch 153; A119). But **implausibly** comparator Hughes had less time in patrol than plaintiff when he was promoted to oversee patrol operations in Kent and Sussex Counties. (Chaffinch 155-156; A120). Comparator

---

[8]    It was bad organizationally, politically and from a public relations perspective. (Baylor 37-38; A173-174). In response, Chaffinch became "agitated" and "unhappy" with them for voicing their concerns. (Baylor 35,38;A173-174). He called them "spineless." (Baylor 36;A173).

[9]    (1) He also excluded her from annual national traffic conferences which her male predecessors attended. (2) He eliminated her monthly meetings with traffic lieutenants throughout the state. (3) He withheld from her knowledge of traffic related events within her authority. (4) He refused her public recognition for achievements within her command. (5) He let her be disrespected at commander's meetings. (Conley 40-44; A440-444).

[10]    Despite this lengthy laundry list of offensive and improper conduct, Col. MacLeish "feel[s] very strongly" that his friend Chaffinch is an "honorable man," a "good trooper," a "good person," and a "good man" who was "a good leader" for the DSP. (MacLeish 9-12; A296-297).

Eckrich also had less patrol experience. (Chaffinch 165; A122). So this purported factor was ignored by Chaffinch.

2.   On the tenure factor, both Hughes and Eckrich also **implausibly** had three less years with the DSP than plaintiff. So this factor also was ignored. (Chaffinch 156, 164; A120,122).

3.   On the experience factor, Chaffinch also claims that Major Eckrich had prior financial experience which made him attractive for the position of administrative/budget major. (Chaffinch 161, Pepper 66-68; A60,121). But this emphasis on experience is **weakened and contradicted** by the fact that his predecessor Major Swiski had no prior budget experience going into that slot, but he performed admirably in the job (Chaffinch 162, Marcin 26; A73,122), which actually consists of managing civilian staff. (Pepper 69-71; A60-61). Moreover, plaintiff dealt with multi million dollar grant applications in her position as the Director of Traffic and had already been sent by the DSP for training in budgetary functions. (Pepper 68, Dixon 114-115, 86; Marcin 26-27; A60,73,154,161).

4.   Reliance on the compatibility factor also is **weak** because Chaffinch was forced to admit that "there was nothing to disqualify Barbara Conley for the promotion in the area of compatibility." (Chaffinch 167; A123). So this factor also was ignored.

5.   Reliance on personal loyalty to Chaffinch factor is again **weak** because Chaffinch was forced to admit that plaintiff also was loyal to him at the time. (Chaffinch 181; A126). So this factor also was ignored also.

6.   Reliance on personal loyalty again is **contradicted** by the fact that the DSP Code of Ethics makes such a factor improper. (PX15 - Preamble to DSP Code of Ethics; A376).

7.   Chaffinch's admitted reliance on a personal loyalty factor is **contradicted** a second time by now Col. MacLeish who admitted that Troopers should "never ... permit personal feelings ... or friendships to influence [their] decisions." (MacLeish 26; A198).

8.   The claim that Chaffinch had the absolute discretion to make these two promotions to Major without consulting anyone else or following any objective process is **contradicted** by the requirements imposed upon him by Governor Minner and Secretary Lisa Blunt-Bradley's Report which required consultation with the State Personnel Director and Gregory Chambers and his Affirmative Action office when exercising the promotion

-9-

function. (Chaffinch 171-175; Marcin 39, 29-38; A73-76,124-125).[11]

9.  Chaffinch's claim that he can draw a distinction between his offensive utterances outside the office and his utterances and conduct in the office is flatly **contradicted** by the testimony of his predecessor Col. Pepper and his successor Col. MacLeish who each explained that no such distinction can be made. (Pepper 33-39; MacLeish 21-22, 25, 38; A53-55,196-197,201). The Division's Rules and Regulations and Code of Ethics also **contradict** Chaffinch's claim. (PX15; PX16; A374,378,381).

10. Finally, despite its subjectivity, Chaffinch claims he went through a careful deliberative process in making the two promotions at issue. (Chaffinch 148, 160-161; A118,121). This is **contradicted** by the testimony of his Lt. Col. Thomas Marcin who testified that Chaffinch's mind was already made up for each promotion, and in particular the decision on Major Hughes was made in just 24 hours. (Marcin 43-44, 28-29; A73,77). Major Baylor's testimony confirms this. (Baylor 16-17, 12-14; A167-168).

## II. Counts Two and Three - Retaliation for the Filing of This Lawsuit.

**A.  Plaintiff's Protected Speech and Petition Clause Activity.** On October 27, 2004, plaintiff filed this lawsuit. (D.I. 1; Compl. & Ans. ¶ 108; MacLeish 117-118; A19,39,220-224).

**B.  The First Act of Retaliation - A Confidential and Internal DSP Document About Plaintiff is Leaked to the Delaware Media.** Within hours of the filing of her lawsuit, an internal DSP document indicating that plaintiff faced confidential internal affairs charges was leaked to the Delaware media. (Aviola 53-55, 57-58; <u>see</u> PX 14; Aviola 65-67; A259-263,373). These charges were not pending in March and July of 2003 when the two challenged promotions occurred.

**C.  The Second Act of Retaliation - Defendants Refused to Investigate This Release.** Despite the release of plaintiff's confidential internal affairs information,

---

[11]  Chaffinch's Lt. Col. testified "I was trying to get through to Aaron that you really couldn't ignore the Bradley report."  (Marcin 38, A76).

defendants refused to investigate the release to the Delaware media.  (Aviola 62; MacLeish 145-150; A227-229,262).  Defendants admit that they do not know if even a single question was ever asked of any DSP employees about the release of this information. (MacLeish 150; Mitchell 50; A229,285).  The DSP "considered" investigating, but chose not to.  (Mitchell 49-50; A284-285).

**D.  The Third Act of Retaliation - Defendants Then Confirmed and Discussed the Nature of the IA Charges With the Delaware Media.**  Whenever media inquiries are made about lawsuits and other serious matters such as Internal Affairs investigations, Lt. Aviola, the PIO, is not authorized to respond.  Instead, he is required to relay those inquiries to the Colonel or the Lt. Colonel who then decide what kind of a response will be given.  (Aviola 15-20; A250-251).  "[M]ost of the time it's pretty specific [ ] what they want said."  (Aviola 20; A251).

Upon learning that the Delaware media was in possession of this confidential document, Lt. Aviola followed procedure and immediately consulted with then acting Colonel MacLeish.  (Aviola 55-64; MacLeish 129, 134-142; A223,225-227,260-262).

MacLeish next expressly ordered Aviola to confirm and discuss the contents of this confidential document with the Delaware media.  (Aviola 63-70, 76-77, 86-89; MacLeish 142, 165, 208; A227,232,243,262-265,268).[12]  "But for his authorization," Lt. Aviola would not have discussed the matter with the media, "other than saying 'no comment.'" (Aviola 89, 70; A268,264).  MacLeish's exact orders were "if you feel that it looks like

_____

[12]  MacLeish testified that he would not have given these orders if defendant Secretary Mitchell had not "agreed and []sanctioned it or authorized it."  (MacLeish 135, 142, 165; Mitchell 47-48, 56-57; A225,227,232,284,286).  Thus he has laid this violation of policy and practice squarely at the doorstep of the defendant Cabinet Secretary.

one of our e-mails, then comment on it." (Aviola 63-64; A260-262). "[C]all Mr. Eldred back and give him the information." (Aviola 63; A262). Lt. Aviola complied with acting Col. MacLeish's order. (Aviola 68-70; A263-264).

      **1. Aviola was "Surprised" by This Order.** Several times at his deposition, Aviola testified that in light of the DSP policy and practice of never commenting on or discussing previous internal affairs charges against defendants Chaffinch and MacLeish themselves, (<u>see</u> Facts at section **II.E.4.d.** below), he was "surprised" when MacLeish instead <u>ordered</u> him to discuss plaintiff's leaked confidential internal document with the Delaware media. (Aviola 75-76; A265). Aviola even spoke up during his meeting with MacLeish and stated, "You know, it's an internal document. We are not going to comment on that; right?" (Aviola 76; A265). But MacLeish ordered him to discuss it anyway. (Aviola 63-64; A262).

      **2. The Prejudicial Content of This Release.** The prejudicial content of this release is clear. The released document stated that plaintiff herself was facing internal affairs charges for alleged violations of several DSP Rules and Regulations. (PX14; A373). Pursuant to MacLeish's specific order to "comment on it" (Aviola 63-64; A262), Aviola revealed to the media the inflammatory nature of the charges that plaintiff was facing - one count of sexual harassment and three counts of conduct unbecoming. (Aviola 70; PX14; A264,373).[13]

      **E. Substantial or Motivating Factor.** Cause and effect evidence is abundant on our record.

---

[13] The initial published article that resulted is in the record. (Del. State News, 10/29/04; A501). Numerous similar articles soon followed in the weeks and months to come.

**1. Defendants' Friendship Created a Motive to Retaliate Against the Person Who Sued Chaffinch and Caused Him to Be Suspended.** All three defendants are friends. Chaffinch and MacLeish are friends. (Chaffinch 187; Baylor 20; A128,169).[14] They are on a first name basis. (MacLeish 98; A216). Chaffinch chose MacLeish to serve as his Lt. Colonel, which was a "big deal" to MacLeish and a true "honor." (MacLeish 97; A215). They socialized together, even when Chaffinch was on leave for sexually inappropriate workplace misconduct. (PX 18; MacLeish 100-102; A216-217, 511). In MacLeish's own words, he and Chaffinch are "joined at the hip." (MacLeish 9; A296)

Similarly, defendant Mitchell also likes and is friends with Chaffinch and MacLeish. (Mitchell 28, 43, 51; A279,283,285).

**2. Demonstrated Antagonism Towards Plaintiff and Her Protected Activity.**

**a. Chaffinch Demands Blind Personal Loyalty.** Chaffinch expects "blind loyalty" from all those in the DSP. (Dixon 105; A158). "You have to just follow him ... and if you don't, he is done with you. You may suffer any consequences from that." (Dixon 105; A158). Now retired Major Baylor, who served on Chaffinch's Executive Staff for several years, also testified that "personal loyalty" is a factor that Chaffinch considered when making personnel decisions. (Baylor 20-21; A169). Defendant MacLeish (MacLeish 64; A207), and Chaffinch himself admitted to the same. (Chaffinch 179; A126).

Captain Dixon worked closely with Chaffinch in Sussex County for seventeen

---

[14] Because of their close friendship, MacLeish even promoted a retirement party in Chaffinch's honor. (MacLeish 102-115; PX19; A217-220,399-400).

years. He testified, Chaffinch "is very vindictive" and "use[s] his rank or office in the state police to be vindictive." "[I]t is common knowledge ... you would not cross him ... because of his vindictiveness. You knew that your career would pretty much stop." (Dixon 71-72; A150).[15]

**b. Chaffinch's Hostile Feelings.** Four witnesses directly testified about Chaffinch's fury with plaintiff. Chaffinch was "mad" and "angry" at plaintiff for bringing her lawsuit. (Dixon 69-70; A149-150). He was "ang[ry]," "displeased" and "pissed off" about the suit. (Mitchell 36; A281). Chaffinch was "upset," "unhappy" "[h]e wasn't pleased" and instead "was obviously displeased" about the suit. (MacLeish 120-121; A221). He "wasn't too pleased" and was visibly "upset." (Aviola 79, 82, 84; A266-267). He very well may have used some colorful language and other profanity to describe it. (Aviola 79; A266). Chaffinch was so angry about plaintiff's lawsuit that he even took his anger out on Captain Dixon. (Dixon 69; A149). After plaintiff's lawsuit was filed, Chaffinch refused even to mention plaintiff's name. (Dixon 71; A150). He does not like it when people sue him. (Baylor 60; A179).

**c. MacLeish's Hostile Feelings.** MacLeish admits that he also was "unhappy" with plaintiff. (MacLeish 179; A236). He was "annoyed" and "displeased with her conduct and actions" in bringing this lawsuit. (MacLeish 179-180; A236). He repeatedly admitted that he was "unhappy" and "disappointed" by the lawsuit. (MacLeish 125-126, 131, 180-181; A222-224,236). "Do I like it? No, I do not." (MacLeish 126;

---

[15] Captain Dixon even expressed concern that despite Chaffinch's retirement, he would still find a way to retaliate against him because of Dixon's truthful subpoenaed deposition testimony, (Dixon 72; A150), perhaps by way of Chaffinch's close friendship with defendants MacLeish, Mitchell and Senator Thurman Adams.

A223).  He told Lt. Aviola that he was "unhappy," "upset," "disappointed" and

"displeased."  (MacLeish 131-132, 180-181; A224,236).  MacLeish was "personally

disgusted" with some of plaintiff's allegations in her suit and was "disgusted" with the

lawsuit itself.  (MacLeish 132-133; A224).  Lt. Aviola confirmed that MacLeish expressed

these feelings. (Aviola 82, 84; A267).

     MacLeish also was unhappy that plaintiff's lawsuit caused the DSP to be cast in a

negative light in the local  Delaware as well as the regional Philadelphia and Baltimore

news media.  (MacLeish 127, 181-182; A223,236-237).[16]  Indeed, he "would be very

pleased" to get the DSP off of the front pages of the newspapers.  (MacLeish 133-134;

A224-225).

          **d.  Mitchell's Hostile Feelings.**  Like MacLeish, Mitchell also was

not happy that plaintiff had filed a lawsuit.  (Mitchell 29; A279).  He "[w]asn't happy" that

the suit resulted in his having to focus his attention on the DSP to the neglect of other

agencies in his charge, (Mitchell 37; A281), or that the DSP was "getting hammered

heavy" in the press.  (Mitchell 40, 52-53, 11-12; A275,282,285).  Mitchell was

"disappointed" in the filing of plaintiff's lawsuit. (MacLeish 143-144; A227).  He has not

enjoyed the "negative press" about the Division.  (Mitchell 15; A276).

          **3.  Unusually Suggestive One or Two Day Temporal Proximity.**  On

October 27, 2004, plaintiff filed this lawsuit.  (D.I. 1; Compl. & Ans. ¶ 108; MacLeish

117-118; A19,39,220-221).  The leak, for which each individual defendant had a motive,

occurred within hours.  Immediately thereafter, on either October 27th or the 28th, the

---

     [16]  Plaintiff's lawsuit attracted a great deal of local, regional and national media attention.
(Mitchell 30-31; A280).

media followed up with inquiries to Lt. Aviola asking for confirmation and for comment. (Aviola 53; A259). No story would run without confirmation of the authenticity of the leak. That same day, defendant MacLeish ordered that Aviola give confirmation and comment on the confidential material. (Aviola 55-70; A260-264).

### 4. Numerous Violations of Statutes, Policies, Procedures, Practices, Rules and Regulations. "[T]he confidentiality of internal documents and internal information is something which is valued in the Delaware State Police." (Baylor 11; A167). But contradictorily however, longstanding statutes, policies, rules and standing orders were violated by defendants.

### a. The Express and Unequivocal Confidentiality Protections of the LEOBOR. The Law Enforcement Officers' Bill of Rights is something that DSP officers know about and think is important because Troopers value its privacy protections. (Aviola 20-21; A251). The relevant portions of it require that:

> Whenever a law-enforcement officer is under investigation
> ... the investigation ... shall be conducted under the
> following conditions:
>         * * *
> All records compiled as a result of any investigation ... shall
> be and remain confidential and shall not be released to the
> public.

11 Del.C. § 9200(c) and (c)(12). This statute is in no way "unclear." (Aviola 28; A253).

The statute's confidentiality protections protect Troopers at the rank of Captain, such as plaintiff, and below. See 11 Del.C. § 9200(b). The statute also expressly states that these protections do not apply to either the Superintendent or the Deputy Superintendent, such as defendants Chaffinch and MacLeish. (MacLeish 153, 156-157;

-16-

PX6; A229-230,505); accord 11 Del.C. § 9200(b).[17]

    **b. DSP Rules, Regulations and Policies.**  The Division's written

Rules and Regulations reflect the official policy of the DSP.  (MacLeish 39, 43-44; A201-

202).  As Rule 1 itself states, these Rules and Regulations <u>must</u> be followed.  (PX16;

MacLeish 46-47; Mitchell 20; A203,277,381).[18]

    **(i).  Rule 10.**  This rule requires that "Members shall treat as

confidential the official communications and business of the Division."  (PX16; MacLeish

39; A201,383).

    **(ii).  Rule 18(b).**  This rule requires that "Any information

obtained in an official capacity shall not be disclosed either in writing or orally to any

unauthorized person, and no officer will divulge any matter that is his duty to keep secret."

(PX16; MacLeish 42-43; A202,384).

    **(iii).  Rule 19(a).**  This rule requires that "A member shall

give information to the news media in accordance with procedures established by the

Division."  (PX 16; MacLeish 43-44; A202,384).

    **(iv).  The DSP Code of Ethics.**  The Preamble to the DSP's

---

[17] Defendant MacLeish admits that his strained justification for the DSP's actions in releasing and discussing plaintiff's confidential internal affairs information "could be construed" as "a back door" and as "an end run" around LEOBOR's protections.  (MacLeish 162; A232).

[18] Defendants will falsely claim that their deputy attorney general authorized them to break the law. (MacLeish 135,139; A225-226).  But Secretary Mitchell and Major Baylor both testified that the DAG has no authority to do this and that such an order is an "unlawful order" that should not be followed.  No DAG can order a Trooper to violate standing orders or other laws.  (Mitchell 21-25; Baylor 9-11; A166-167,277-278).  Morever, MacLeish also admitted that the DAG only gave him advice, and that he made the ultimate decision, with Mitchell's concurrence, to release the information.  (MacLeish 140, 165; A226,232).  He is "not trying to hide behind" the DAG.  (MacLeish 165; A232).

own Code of Ethics requires that "Whatever I see or may hear of a confidential nature or that is confided to me in my official capacity will be kept secret unless revelation is necessary in the performance of my duty."  (PX 15; MacLeish 25-26; A197-198,376). This is something that "is very important for a state trooper." (MacLeish 25-26; A197-198).

### c.  An Order To Violate Any of These Statutes or Rules is an "Unlawful Order.

Defendant Secretary Mitchell is the cabinet Secretary responsible for the DSP.  He has a long history in law enforcement.  (Mitchell 5-10; A273-275).  As Mitchell testified at some length, any order to violate the written DSP Rules and Regulations or other laws - even if ordered to do so by DSP legal counsel - is an "unlawful order" and a Trooper has an obligation to disobey such an order.  (Mitchell 20-27; A277-279).  Major Baylor also testified that an order to release internal confidential information, even when coming from the DAG, would be an unlawful order in violation of "clearly expressed" DSP rules and regulations.  (Baylor 9-11; A166-167).

### d.  Actual DSP Policies, Practices and Procedures.

#### (i).  Current Policy and Practice.

Lt. Aviola, the current PIO for the DSP, admitted at his deposition that the standard policy, practice and procedure of the DSP is that "we do not comment on the specifics of [an] internal complaint."  (Aviola 35, 50, 71-72; A255,259,264).  It is the "policy" of the DSP to "'no comment' or refuse to discuss the specifics" of internal affairs and other internal personnel matters.  (Aviola 50, 72; A259,264).  MacLeish admitted the same.  (MacLeish 156; A230).  This also is the "practice" and the "standard response."  (Aviola 71,75; A264-265).

Indeed, defendants tellingly admitted in their Answer, and the record is undisputed,

that when the Delaware news media had previously and repeatedly inquired about the numerous Internal Affairs investigations, violations and convictions of defendants Chaffinch and MacLeish (who are explicitly excluded from LEOBOR's confidentiality protections), the DSP has always refused to comment in any way, shape or form because of the DSP policy of not commenting on internal personnel matters.  (Compl. & Answer ¶¶ 129-135, A22-24,40).[19]  The documentary record confirms this (PX8-13; A359-372), as does the testimony of Lt. Aviola and defendant MacLeish himself. (Aviola 32, 34-35, 39-40, 47, 50; MacLeish 151-152, 154-156; A254-256,258-259).  This is the "policy," "practice," and "standard response" of the DSP.  (Aviola 50, 71, 75; MacLeish 156; A230,259,264-265).

 **(ii).  Long Time Historical Policy and Practice.**  This also has been the longstanding practice in the PIO for well over a decade.  For example, retired Major David Baylor served in the PIO as a corporal beginning in September 1989 and then in 1992 was promoted to sergeant and served as the Director of the PIO.  Then, after he was promoted to Major in 2002, he had authority and responsibility for the operation of the PIO.  Major Baylor retired in August 2004.  (Baylor 5, 21-23; A165,169-170).  He said the DSP's policy "was pretty much that we would never really confirm or deny or comment on internal affairs matters."  (Baylor 23-24; A170).  Moreover, "[t]hat [is] pretty much standard practice in law enforcement."  (Baylor 23; A170).

 **e.  No Internal Affairs Investigation Resulted From These**

---

[19]  Chaffinch and MacLeish have been the subject of numerous internal affairs investigations and convictions while they held the positions of Colonel and Lt. Colonel of the DSP.  (MacLeish 115-117, 110-111, 114-115, 150-151, 156-158, 167, 169, 173, 175, 177-178, 192; Aviola 49-50, 74; PX8-13; A219-220,229-231,233-236,239,258-259,265,359-372).

**Numerous Violations.**  Yet despite all of these things, as discussed above, defendants refused to ever investigate this release of confidential information which violated LEOBOR, as well as numerous DSP policies, procedures, practices, rules, regulations and standing orders.  (Aviola 62; MacLeish 145-150; Mitchell 49-50; A228-229,262,284-285). This refusal to investigate independently violates several additional DSP rules.  For example, Rule 1 requires that all laws, rules and regulations must be obeyed, and Rule 3 requires that any Trooper with knowledge of a violation of either the law or the rules and regulations immediately report such violations to Internal Affairs for investigation. (PX16; A381).

       **5.  Disparate Treatment.**  As discussed above, there is a clear and striking contrast between the stonewalling and refusal to comment that occurred after media inquiries about numerous IA charges Chaffinch and MacLeish faced and  the wealth of statutorily mandated confidential information nonetheless released about plaintiff's IA charges.

<u>**ARGUMENT**</u>

**I.**    **THERE IS ABUNDANT RECORD EVIDENCE OF ALL THE ELEMENTS OF A GENDER DISCRIMINATION PROMOTIONS CASE.**

    **A.  A Prima Facie Case Has Been Proven.**  Under the first step of the three step "pretext" or "indirect evidence" framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981), the record demonstrates that plaintiff has proven a prima facie case that she was denied promotion because of her gender.  The <u>McDonnell Douglas</u> framework applies to claims brought under §1983.  <u>Stewart v. Rutgers, The State Univ.</u>, 120 F.3d 426, 432 (3d Cir. 1997).

# Tab C



## WILCOX & FETZER LTD.

In the Matter Of:

# Conley
v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---------------------------------------------------------------------

Transcript of:

Captain Glenn Donald Dixon

July 13, 2005

---------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Conley                                    v.                    Chaffinch, et al.
Captain Glenn Donald Dixon        C.A. # 04-1394-GMS              July 13, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,           )
                                     )
          Plaintiff,                 )
                                     )  Civil Action
v.                                   )  No. 04-1394-GMS
                                     )
COLONEL L. AARON CHAFFINCH,          )
individually and in his official     )
capacity as the Superintendent,      )
Delaware State Police; LIEUTENANT    )
COLONEL THOMAS F. MACLEISH,          )
individually and in his official     )
capacity as the Deputy Superintendent, )
Delaware State Police; DAVID B. MITCHELL )
Individually and in his official     )
capacity as Secretary of the Department )
of Homeland Security, State of Delaware;)
and DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY, State )
of Delaware,                         )
                                     )
          Defendants.                )

          Deposition of CAPTAIN GLENN DONALD DIXON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 9:30 a.m., on Wednesday, July 13,
2005, before Eleanor J. Schwandt, Registered Merit
Reporter and Notary Public.


APPEARANCES:

          THOMAS S. NEUBERGER, ESQ.
          THE NEUBERGER FIRM, P.A.
            2 East 7th Street, Suite 302
            Wilmington, Delaware  19801
            for the Plaintiff


          (Appearances continued on page 2.)

                    WILCOX & FETZER
      1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477

Conley                                    v.                          Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS                      July 13, 2005

Page 2

1   APPEARANCES (Continued):
2        STEPHANI J. BALLARD, ESQ.
         RALPH K. DURSTEIN, ESQ.
3        DEPARTMENT OF JUSTICE
           820 North French Street
4          Carvel State Office Building
           Wilmington, Delaware 19801
5          for the Defendants Lieutenant Colonel Thomas F.
           MacLeish, David B. Mitchell, and Division
6          of State Police
7   ALSO PRESENT:
         CAPTAIN BARBARA L. CONLEY
8        CAMILLE M. MARTIN, Law Clerk
9        - - - - - - - - - -
             (Mr. Durstein not present at this time.)
10
11           GLENN DONALD DIXON,
12      the witness herein, having first been
13      duly sworn on oath, was examined and
14      testified as follows:
15               EXAMINATION
16   BY MR. NEUBERGER:
17   Q.   Could you state your full name for the record.
18   A.   Yes, Glen Donald Dixon.
19   Q.   Okay.  And you are a captain in the Delaware
20  State Police?
21   A.   I am.
22   Q.   And is it fair to say you have testified in court
23  before?
24   A.   I have.

Page 3

1    Q.   Okay.  And have you ever had your testimony taken
2   in a deposition before?
3    A.   Maybe once or twice.
4    Q.   Okay.  So you are a little bit familiar?
5    A.   Yes.
6    Q.   Okay.  Well, what happens is the court reporter
7   types up the questions and answers.  You have the right
8   to look it over when it is done to see if she made a
9   mistake in taking down an answer or something to make
10  corrections.  Do you understand that?
11   A.   Yes, I do.
12   Q.   Okay.  And then at trial, at trial, if you said
13  something different than today, I would have the
14  opportunity to point that out to the judge and jury.  You
15  understand that?
16   A.   Yes.
17   Q.   Okay.  So I don't want you to do any guessing.
18  So try to answer to the best of your ability.  Or if I
19  ask a question that's a stupid question, you don't
20  understand, just ask me to rephrase it and I'll be glad
21  to do it.  Okay?
22   A.   All right.
23   Q.   Thanks.  Now, could I ask you very quickly, we
24  will just march through when you went to the academy to

Page 4

1   your present assignment.  When did you graduate from the
2   academy?
3    A.   1988.
4    Q.   1988.
5    A.   I began in June of '88 and graduated in the fall.
6    Q.   Okay.  What was your first assignment?
7    A.   It was at State Police Troop 5 in Bridgeville.
8    Q.   Troop 5.  So that was a, what do you call them,
9   patrol?
10   A.   Patrol troop.
11   Q.   All right.
12   A.   Yes.
13   Q.   So Troop 5, and how long were you there?
14   A.   I was there until I was promoted to sergeant,
15  which was about nine, nine years, and then I moved over
16  to Troop 4 in Georgetown.
17   Q.   Let me see.  Troop 4.  Was it six months in the
18  academy?  Three months?
19   A.   I think back then it was like a four-month
20  period.
21   Q.   Four months.  So would it have been the end of
22  '88 when you went to Troop 5 or the very beginning of
23  '89?
24   A.   It was actually around, with the field training

Page 5

1   in it, I trained in field training in Woodside, after
2   field training I went down there end of November, early
3   December, around there.
4    Q.   That's when you started at Troop 5?
5    A.   Yes.
6    Q.   Okay.  And then if we say nine years --
7    A.   Well, I was promoted in '96.
8    Q.   '96, sergeant?
9    A.   Yes.
10   Q.   All right.  So '96 is when you went to Troop 4
11  then?
12   A.   Yes.
13   Q.   All right.  How long did you stay at Troop 4?
14   A.   About a year-and-a-half, and then I transferred
15  back to Troop 5.
16   Q.   Okay.  So that would be some time in '98?
17   A.   Mm-hmm.
18   Q.   Back to Troop 5?
19   A.   Yes.
20           (Mr. Durstein present at this time.)
21   Q.   All right.  So sometime in '98 you transferred
22  back to Troop 5.  Is that still at the rank of sergeant?
23   A.   Yes.
24   Q.   Okay.  And what happened next?

2 (Pages 2 to 5)

Conley                                                    v.                                Chaffinch, et al.
Captain Glenn Donald Dixon                    C.A. # 04-1394-GMS                          July 13, 2005

Page 70

1    A.  Yes.
2    Q.  Okay.  Based on your observations, after the
3  lawsuit was filed was he mad at Captain Conley?
4    A.  Yes.  I believe, I'm sure he still is mad.
5    Q.  Right.  Do you remember any other feelings or
6  emotions he demonstrated towards Captain Conley after the
7  lawsuit was filed in the whole period of time up to the
8  present?
9    A.  Nothing strikes me specifically after the lawsuit
10  was filed.  He, after that, for the most part he -- well,
11  he wouldn't bring that lawsuit up specifically around the
12  troop.  So no, I guess my answer is no.
13    Q.  Well, you heard this remark about Trooper Scott
14  Gray.  You told us about that?
15    A.  Yes.
16    Q.  And that the colonel was upset at not having been
17  invited to a party, right?
18    A.  Yes.
19    Q.  And you heard the remark the colonel made about
20  you should remember who transferred you into detectives,
21  right?
22    A.  Yes.
23    Q.  Did you observe the colonel to be exhibiting any
24  hostility towards Captain Conley indicating he felt she

Page 71

1  was ungrateful or things like that towards Colonel
2  Chaffinch?
3        MS. BALLARD:  Object to the form.
4    Q.  You can answer the question.  I'm asking you what
5  you observed.  Did you observe --
6    A.  After the lawsuit had been filed?
7    Q.  Yes, after the lawsuit, him to exhibit any anger
8  at her thinking she was ungrateful to him?
9    A.  He wouldn't bring her name up around me
10  afterwards.
11    Q.  Okay.  So previously he would mention Captain
12  Conley in your presence?
13    A.  Yes.
14    Q.  And you are saying after the lawsuit was filed he
15  would never mention Captain Conley again in your
16  presence?
17    A.  Not that I recall, no.
18    Q.  Okay.  Is the colonel, based on your working with
19  him and having dealt with him over 17 years, the kind of
20  person who a reasonable person should fear he would
21  retaliate against them?
22        MS. BALLARD:  Object to the form.
23    A.  He is very vindictive.
24    Q.  Okay.  Now, are you saying you have observed him

Page 72

1  to be vindictive over your 17 years of working with him?
2    A.  Yes.
3    Q.  You have observed him to mention he has powerful
4  friends in political circles?
5    A.  Yes.
6    Q.  Are you saying that you have observed him to use
7  his rank or office in the state police to be vindictive?
8    A.  Yes.  You know, it is common knowledge, like I
9  said before, I think, that you don't -- you would not
10  cross him, you would not report him on anything because
11  of his vindictiveness.  You knew that your career would
12  pretty much stop.
13        I mean, it concerns me now, going through
14  this, even though he is still not the colonel or not
15  presently the colonel.
16    Q.  Now, I've subpoenaed you to testify today?
17    A.  Yes.
18    Q.  You understand that?
19    A.  Yes.
20    Q.  There is a court order requiring you to come here
21  today, right?
22    A.  Yes.
23    Q.  And I have never even met you before today, have
24  I?

Page 73

1    A.  No.
2    Q.  Okay.  I passed you in the waiting room here and
3  didn't even know who you were, right?
4    A.  Right.
5    Q.  So you have never met with me and discussed any
6  facts relating to this case; is that true?
7    A.  No -- yes, that is true.
8    Q.  I want to jump back to the up jump the monkey
9  limerick.  Do you remember there was one about a monkey?
10    A.  Yes.
11    Q.  I'm going to give you some setting, early part of
12  2003, in Captain Conley's office, in traffic, Captain
13  Harry Downes being there, and that would make you a
14  Lieutenant Dixon there at the same time.  The colonel
15  coming in at some point in time and during the course of
16  it him reciting the up jump the monkey limerick.  Do you
17  remember whether that happened around that time?
18    A.  Yes.  I think Harry was a lieutenant.  I thought
19  you said captain.  I think he was a lieutenant.
20    Q.  Okay.  2003, Columbus, Ohio, CARE conference?
21    A.  Yes.
22    Q.  You are attending, and I think your wife went
23  with you?
24    A.  Yes.

19 (Pages 70 to 73)

Conley                                                                 v.                                               Chaffinch, et al.
Captain Glenn Donald Dixon                          C.A. # 04-1394-GMS                                  July 13, 2005

Page 74

1    Q.    Major Baylor is there with his daughter?
2    A.    Yes.
3    Q.    Teenage daughter?
4    A.    I think her name is Sydney.
5    Q.    Captain Conley is there?
6    A.    Yes.
7    Q.    Colonel Chaffinch goes, and his wife I think is
8    attending also?
9    A.    Yes.
10   Q.    You wear name tags?
11   A.    Yes.
12   Q.    Hospitality room?  Was there a hospitality room?
13   A.    Yes.
14   Q.    So what would like your name tag say?
15   A.    Normally I wouldn't wear a name tag going to the
16   hospitality room after hours, so I don't know if I had
17   one on there, but it would have said Captain Glenn Dixon,
18   Delaware State Police.
19   Q.    And the colonel would have a name tag?
20   A.    Yes.  He actually wears a permanent -- not a
21   permanent name tag but one he stuffs in his pocket so
22   people know who he is.
23   Q.    He is an officer in the organization, on the
24   board or something like that?

Page 75

1    A.    In CARE?
2    Q.    In CARE?  Maybe I've got the wrong group.  Is it
3    CARE?
4    A.    Yes, yes.
5    Q.    You are saying he has a permanent name tag that
6    he uses that identifies him at the time as the colonel of
7    the Delaware State Police?
8    A.    Yes.
9    Q.    Okay.  In the hospitality room did the colonel
10   recite limericks and jokes that women or minorities could
11   find offensive?
12   A.    Yes.  It was kind of like a dueling process
13   between him and another -- I guess the group hired a
14   magician and slash comedian, so he was sparing off with
15   him, would recite the limericks and jokes, you know, both
16   clean jokes and dirty jokes, and the limericks that we
17   discussed.
18   Q.    All right.  Was there a dinner that you attended
19   with Major Baylor and his daughter and Colonel Chaffinch
20   and his wife and Barbara?  You all sat at the table
21   somewhere, went to Colorado Springs or something like
22   that?
23   A.    That was in Colorado, yes.
24   Q.    This was a different time?

Page 76

1    A.    Yes.
2    Q.    When was the Colorado Springs thing?
3    A.    That was I'm going to say around July or August
4    of 2003.
5    Q.    Okay.
6    A.    Around then, yes.  We were there as a traffic
7    records forum.
8    Q.    That's what it was, right.
9    A.    And then Colonel Chaffinch, as well as Major
10   Hughes, Major Baylor were there for an FBI conference in
11   Colorado Springs.  We were in Denver.
12   Q.    And they all met you for dinner?
13   A.    Yes.  We met halfway.
14   Q.    Okay.  And at that dinner was the colonel in rare
15   form?
16        MS. BALLARD:  Object to the form.
17   Q.    At the dinner was the colonel telling jokes or
18   engaging in conduct that women or minorities could find
19   offensive?
20   A.    He was -- I wouldn't say he was in rare form, but
21   he would lay some jokes out there, and I remember one
22   time when, I think it was a waitress, not a waiter,
23   picked his food up, he had some leftovers, and he told
24   the waitress that she could just feed it to the starving

Page 77

1    Ethiopians in Africa.  He also referred to major -- to
2    Ronnie Gaines as Ronnie Loves Watermelon Gaines in front
3    of Major Baylor and his daughter.
4    Q.    Ronnie Gaines is an African American trooper?
5    A.    Yes.  Retired, yes.
6    Q.    Retired trooper?
7    A.    Yes.
8    Q.    And he referred to him as Ronnie Watermelon
9    Gaines?
10   A.    Loves Watermelon Gaines.
11   Q.    So those were his words?
12   A.    And I've heard that numerous times throughout my
13   career, because I'm fairly certain that they went to the
14   academy together and that's when he gave him that
15   nickname, whenever he started the academy.
16   Q.    And Major Baylor's young teenage daughter was
17   present at the dinner too?
18   A.    I think at the time she was like 12.
19   Q.    Let me throw out a few other statements that
20   Captain Conley alleges she has heard from the colonel
21   over the years, okay, and see whether or not you heard
22   them.  Okay?  She alleges he has said things like
23   "Women are nothing but trouble, women are a pain in the
24   ass, you can't live with them, you can't live without

Conley                                                    v.                                    Chaffinch, et al.
Captain Glenn Donald Dixon                C.A. # 04-1394-GMS                          July 13, 2005

Page 78

1  them." Have you ever heard him make similar remarks?
2      A.  I don't recall the last one, but I've heard him
3  say pretty frequently "They are nothing but trouble."
4      Q.  Would that remark have been made on duty?
5      A.  Yes.
6      Q.  And would that remark have been made off duty?
7      A.  Yes.
8      Q.  All right.  The remark "Women are a pain in the
9  ass," have you heard him make that remark?
10     A.  Yes.
11     Q.  Has he made that remark on duty?
12     A.  Yes.
13     Q.  Has he made that remark off duty?
14     A.  Yes.
15     Q.  I'm going to try to focus on October 2004, Troop
16  5, in your presence and the colonel being there.  Okay?
17  Do you remember him making a remark about his wife Karen
18  being "puffed up like a toad, you know how women get"?
19     A.  Not specifically that date, but I've heard him
20  say that numerous times about Karen.
21     Q.  All right.  Around that time, is there a mirror
22  inside the closet door, inside your commander's office at
23  Troop 5?
24     A.  Yes.

Page 79

1      Q.  And around that time in October of 2004 did
2  Colonel Chaffinch make a point of noting that he had had
3  that mirror placed there when he was a troop commander?
4      A.  Yes.  He basically told me, and it was a
5  situation where we were planning to go to a retired
6  trooper's funeral and both my lieutenants and he, and
7  myself included, were getting our dress blouses on and
8  would use that mirror to make sure that everything looks
9  like it should, and that's when he made the statement
10  that he -- something like, I bet you didn't know that I
11  am the troop commander who had both the mirror in the
12  men's bathroom and the one behind the closet door in the
13  commander's office placed there, and it was placed there
14  so he could watch himself jerk off.
15     Q.  Have you heard him refer to his Blackberry
16  computer device as his Dingleberry?
17     A.  Yes.
18     Q.  Did you attend an event in April of 2004 in St.
19  Michaels, Maryland, a luncheon the FBI was giving or
20  something?
21     A.  In what year?
22     Q.  April 2004, FBI, St. Michaels.  You were there,
23  Lieutenant Brown, Lieutenant Rust --
24     A.  I forget what town it was.  I don't think it was

Page 80

1  St. Michaels.  We had to travel out there quite aways.
2      Q.  Right.
3      A.  But, yes, it was in Maryland.
4      Q.  And the colonel was with you that day, right?
5      A.  Yes.
6      Q.  There were like two cars that went?
7      A.  Yes.
8      Q.  And Captain Conley was in one of the cars?
9      A.  Yes.
10     Q.  And somewhere on Route 404, at a bar called
11  Cohee's, do you recall the group stopping?
12     A.  Yes.
13     Q.  Well, do you recall that there was a female
14  waitress in the restaurant that day?
15     A.  Yes.
16     Q.  She was waiting on you-all?
17     A.  Yes.
18     Q.  Do you recall the colonel saying to Rich Dennis,
19  "Maybe I should introduce her to the hooded merganser"?
20     A.  I don't recall him saying it specifically to him,
21  but I remember him hearing it.
22     Q.  You remember that being said, okay.
23     A.  I was present for it.
24     Q.  Okay.  You remember the colonel making that

Page 81

1  statement?
2      A.  Yes.
3      Q.  You don't know who he was saying it to?
4      A.  I just felt he was saying it to everybody that
5  could hear.
6      Q.  A hooded merganser is some kind of a duck; isn't
7  that right?
8      A.  From what I understand, yes.
9      Q.  Are you a hunter?
10     A.  No, I'm not.
11     Q.  Around November of 2004, around the Thanksgiving
12  holiday period, okay, perhaps right after the holiday, at
13  Troop 5, do you remember some remarks about the hooded
14  merganser at that time, referring to something in
15  Florida?
16     A.  He had just come back from Florida.  And I wasn't
17  in the same office.  It was in the office across the
18  hallway from me.  But I could hear, as is the case around
19  Troop 5, you know, you could be in one office and hear it
20  from, conversations up at the sergeant's area, but he was
21  talking with at least -- well, it had to have been both
22  lieutenants, about how his uncle was questioning him
23  about the hooded merganser and where it came from, and
24  they were laughing about it.

21 (Pages 78 to 81)

Conley                                                        v.                                    Chaffinch, et al.
Captain Glenn Donald Dixon                        C.A. # 04-1394-GMS                    July 13, 2005

Page 98

1    A.   Yes.
2    Q.   Yes, okay.  Did you ever observe Colonel
3  Chaffinch to do anything to try to interfere with or
4  sabotage the career of Captain Conley?
5    A.   I remember a conversation I had with him at the
6  state fair that he was -- well, he, basically, he said
7  she was a piece of shit and that we was done with her, and
8  that -- let me try to figure out what year that was.  It
9  was either 2001 or 2002.  I don't remember exactly.
10    Q.   Okay.  And did he give you an explanation of why
11  he was expressing those sentiments?
12    A.   It was purely because she had a conversation with
13  Captain Warren when he was still with the division, and I
14  guess they were talking about where the division should
15  go and what has gone wrong, what is going bad, what they
16  could do to better themselves and stuff like that.
17          And he was -- he got upset because I guess
18  at one point she gave a high five to Greg Warren.  I have
19  no idea, you know, what that was about.  But felt that
20  she was siding with Greg Warren, and I think that was at
21  the same time that he was going through some problems as
22  well with the division.
23    Q.   Okay.  Do you remember Colonel Chaffinch ever
24  making a remark to the effect that he didn't believe

Page 99

1  females should even be troopers?
2    A.   I've heard him say it a few times.
3    Q.   Really?  Okay.
4    A.   Yes.
5    Q.   Could you give us your best recollection of the
6  circumstances?
7    A.   I remember him saying it about Christine Price,
8  who worked in Sussex County.
9    Q.   Okay.
10    A.   Dawn Smith, who worked at Troop 5.  And Becky
11  McNatt.
12    Q.   Okay.  Do you remember when he made those
13  remarks?
14    A.   Well, it is a few years ago because I know Dawn
15  Smith has been gone for probably at least eight years, I
16  would say, as well as Christine price.  And probably
17  the same time span when Becky McNatt was working at Troop
18  5.  It was all when he was working at Troop 5 or would
19  stop by and their names would come up.  I don't know
20  exactly when those first two left the division, but Becky
21  worked at Troop 5 for quite some time also.  It would
22  have been the time frame when I worked at Troop 5.
23    Q.   Okay.  Well, you have explained about those
24  three, but you have also stated that he said that females

Page 100

1  shouldn't be troopers.  Was he talking about women in
2  general when he makes that kind of remark?
3          MS. BALLARD:  Object to the form.
4    Q.   Or was he talking about those three people?
5    A.   Well, I have heard him say both, both the general
6  statement and direct.
7    Q.   Have you, for example, heard him say the general
8  statement without discussing these three specific
9  females?
10    A.   Yes.
11    Q.   Yes.  Okay.  So that would be in discussions at
12  Troop 5?
13    A.   Yes.
14    Q.   That would be in discussions during working
15  hours?
16    A.   Yes.
17    Q.   Then in conversations about those specific
18  females he has also said that they shouldn't be troopers?
19    A.   Yes.
20    Q.   Should never have been troopers?
21    A.   Yes.
22    Q.   R. L. Hughes, does he refer to himself by any
23  nicknames?
24    A.   When I took over at Troop 5 I found out he calls

Page 101

1  himself SAC, the acronym SAC for supreme allied
2  commander.  That's what the two lieutenants told me, that
3  that is what he refers to him as down there.
4    Q.   Okay.  Major Eckrich, you know he went into a
5  slot that dealt with the budget function?
6    A.   Yes.
7    Q.   Have you had some conversations with him when he
8  took over that budget function about being lost and not
9  really being able to fulfill his duties?
10    A.   Basically that he was lost, didn't know what the
11  heck was going on and was thankful that Gene Sharp was
12  there to direct him.
13    Q.   Now, Gene Sharp is a civilian employee, long-term
14  civilian employee of the Delaware State Police?
15    A.   Yes.  And in the fiscal section.
16    Q.   In the fiscal section?
17    A.   Yes.
18    Q.   And Major Eckrich had, based on your
19  understanding, he had no specific background and training
20  or experience in the budgetary function?
21          MS. BALLARD:  Object to the form.
22    Q.   Do you know?
23    A.   I know he worked in the planning section.  I
24  don't know if he was involved in anything with the fiscal

26 (Pages 98 to 101)

# Tab D



**WILCOX & FETZER LTD.**

In the Matter Of:

# Price
v.
# Chaffinch, et al.

C.A. # 04-1207

--------------------------------------------------------------------

Transcript of:

Captain Glenn D. Dixon

September 21, 2005

--------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE,          )
CORPORAL WAYNE WARREN,           )
and SERGEANT CHRISTOPHER         )
D. FORAKER,                      )
                                 )
     Plaintiffs,                 )
                                 )
     v.                          )  C.A. No. 04-1207
                                 )
COLONEL L. AARON CHAFFINCH,)
individually and in his          )
official capacity as             )
Superintendent of the            )
Delaware State Police;           )
LIEUTENANT COLONEL THOMAS        )
F. MacLEISH, individually        )
and in his official              )
capacity as Deputy               )
Superintendent of the            )
Delaware State Police;           )
DAVID B. MITCHELL, in his        )
official capacity as the         )
Secretary of the Department)
of Safety and Homeland           )
Security of the State of         )
Delaware; and DIVISION OF        )
STATE POLICE, DEPARTMENT OF)
SAFETY AND HOMELAND              )
SECURITY, STATE OF               )
DELAWARE,                        )
                                 )
     Defendants.                 )


          Deposition of CAPTAIN GLENN D. DIXON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 10:00 a.m., on Wednesday,
September 21, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.
                  WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477

# Page Redacted

**(Subject to a Protective Order in the cases of <u>Price, et al. v. Chaffinch, et al.</u>, C.A.No. 04-956-GMS (D.Del.); <u>Foraker v. Chaffinch, et al.</u>, C.A.No. 04-1207-GMS (D.Del.)).**

# Page Redacted

**(Subject to a Protective Order in the cases of <u>Price, et al. v. Chaffinch, et al.</u>, C.A.No. 04-956-GMS (D.Del.); <u>Foraker v. Chaffinch, et al.</u>, C.A.No. 04-1207-GMS (D.Del.)).**

# Page Redacted

**(Subject to a Protective Order in the cases of <u>Price, et al. v. Chaffinch, et al.</u>, C.A.No. 04-956-GMS (D.Del.); <u>Foraker v. Chaffinch, et al.</u>, C.A.No. 04-1207-GMS (D.Del.)).**

# Page Redacted

**(Subject to a Protective Order in the cases of <u>Price, et al. v. Chaffinch, et al.</u>, C.A.No. 04-956-GMS (D.Del.); <u>Foraker v. Chaffinch, et al.</u>, C.A.No. 04-1207-GMS (D.Del.)).**

# Tab E



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

Gerald R. Pepper

August 12, 2005

---

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,            )
                                     )Civil Action
            Plaintiff,               )No. 04-1394-GMS
                                     )
v.                                   )
                                     )
COLONEL L. AARON CHAFFINCH,          )
individually and in his official     )
capacity as the Superintendent,      )
Delaware State Police, LIEUTENANT    )
COLONEL THOMAS F. MACLEISH,          )
individually and in his official     )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.      )
MICHELL, individually and in his     )
official capacity as Secretary of the )
Department of Safety and Homeland    )
Security, State of Delaware; and     )
DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY,     )
State of Delaware,                   )
                                     )
            Defendants.              )
            Deposition of GERALD R. PEPPER taken
pursuant to notice at the law offices of THE NEUBERGER
FIRM, Two East Seventh Street, Suite 302, Wilmington,
Delaware, beginning at 10:00 a.m. on Friday, August
12, 2005, before Renee A. Meyers, Registered
Professional Reporter and Notary Public.

APPEARANCES:

            THOMAS S. NEUBERGER, ESQ.
            THE NEUBERGER FIRM
              Two East Seventh Street, Suite 302
              Wilmington, Delaware  19801
              for the Plaintiff

            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

Conley                                      v.                          Chaffinch, et al.
Gerald R. Pepper                    C.A. # 04-1394-GMS                    August 12, 2005

Page 2

1  APPEARANCES (Continued):
2        STEPHANIE J. BALLARD, ESQ.
         DEPARTMENT OF JUSTICE
3        820 North French Street
         Carvel State Office Building
4        Wilmington, Delaware  19801
         for the Defendants Lieutenant Colonel
5        Thomas F. MacLeish, David B. Mitchell,
         and Division of State Police
6
   ALSO PRESENT:  BARBARA CONLEY
7
8        GERALD R. PEPPER,
9     the witness herein, having first been
10    duly sworn on oath, was examined and
11    testified as follows:
12 BY MR. NEUBERGER:
13    Q.   Just for the record, what's your full name?
14    A.   Gerald R. Pepper, P-e-p-p-e-r.
15    Q.   And I issued you a subpoena that made you
16 appear today to give testimony; is that right?
17    A.   Yes, sir.
18    Q.   And, so, you are being forced to testify today;
19 is that right?
20    A.   Yes, sir.
21    Q.   Now, did you retire as the colonel of the
22 Delaware State Police?
23    A.   Yes, sir, I did.
24    Q.   And was that around -- well, your day-to-day

Page 3

1  duties, did they end around October 1st, 2001?
2     A.   Yes, sir, they did.
3     Q.   And how many years had you been with the
4  Delaware State Police through your official
5  retirement?
6     A.   Twenty-seven years.
7     Q.   Twenty-seven years?
8     A.   Yes, sir.
9     Q.   And what year would that have been that you
10 graduated from the academy?
11    A.   It would have been 1975, is when I was
12 appointed, August 1st, 1975.  And then my official
13 retirement date is August 1st, 2002.
14    Q.   And how long did you serve as colonel?
15    A.   About three years.
16    Q.   About three years?
17    A.   Yes.
18    Q.   So, would it have been around 1999, you became
19 the colonel?
20    A.   Yes, sir.
21    Q.   And before that, did you serve as lieutenant
22 colonel?
23    A.   Yes, sir, I did.
24    Q.   And who would have been the colonel you served

Page 4

1  under?
2     A.   It would have been Colonel Allen Ellingsworth.
3     Q.   And about how long did you serve as lieutenant
4  colonel?
5     A.   I think just about five years.  It's been a
6  while, but I am going to say that it was -- I became
7  lieutenant colonel somewhere in the vicinity of 1994,
8  perhaps.
9     Q.   And just for the record, I am only asking you
10 for your best memory today.  We all understand that;
11 right?
12    A.   Sure.
13    Q.   In fact, I have even taken your testimony on at
14 least one other occasion, haven't I?
15    A.   Yes, sir.
16    Q.   And we probably went through some of this at
17 that time?
18    A.   Yes, sir, we did.
19    Q.   And, in fact, you have even -- I have even
20 subpoenaed you to testify in at least one trial; isn't
21 that true?
22    A.   Yes, sir.
23    Q.   So, we could always look at what was said at
24 that time.  But about five years is your memory?

Page 5

1     A.   Yes, sir.
2     Q.   And then is it fair to say you were a major
3  before then?
4     A.   Yes, sir.
5     Q.   And about how long were you a major?
6     A.   I am going to say probably about two years.
7     Q.   And what were your duties as the major?  Where
8  was your assignment?
9     A.   Kent and Sussex Counties, the troops in Kent
10 and Sussex Counties in addition to the communications
11 centers in Kent and Sussex.
12    Q.   Were you the operations major for Kent and
13 Sussex?
14    A.   Yes, I was.
15    Q.   From your appointment, was your career a career
16 in the southern part of the State of Delaware?
17    A.   I worked, for the most part, in Kent County.  I
18 never worked in Sussex.  And I worked in New Castle
19 County.
20    Q.   Prior to being a major, were you the commander
21 of the Troop in Kent County, for example?
22    A.   No, sir.  Let me just give you a brief run
23 down.
24    Q.   Okay.

2 (Pages 2 to 5)

Conley                                    v.                          Chaffinch, et al.
Gerald R. Pepper                    C.A. # 04-1394-GMS              August 12, 2005

Page 38

1    A.   In a lot of cases, yes, sir.  Not everybody is.
2  I mean, everybody is different when you are talking
3  about an agency the size of, you know, 850 people
4  totalled with the civilian complement.  But a lot of
5  people -- a lot of our employees -- and I can only
6  speak for the time that I was there, I don't know
7  about now -- were actively involved in the community,
8  yes, sir.
9    Q.   And even though they are coaching a team or
10 something like that, I mean, the public knows that
11 they are members of the Delaware State Police,
12 generally?
13   A.   Yes, sir.
14   Q.   And while acting as, even in their private
15 lives, things they do can reflect on the Delaware
16 State Police adversely or positively; is that true?
17   A.   Yes, sir.
18   Q.   And the kinds of rules and regulations that
19 existed, at least through your command, that dealt
20 with the conduct and standards for troopers to meet,
21 did those rules and regulations reflect the fact that
22 conduct by troopers, even off duty, could reflect back
23 on the Delaware State Police?
24   A.   Yes, sir.

Page 39

1    Q.   And were uniformed troopers expected, in their
2  off duty hours, to exhibit a level of conduct higher
3  than a citizen who is not a trooper would be expected
4  to meet?
5    A.   Yes, sir.  They would be expected to abide by
6  the rules and regulations that are set forth, and
7  those policies, rules, and regulations, in my opinion,
8  the code of conduct, whether you are on or off duty.
9    Q.   The Delaware State Police is a paramilitary
10 organization; right?
11   A.   Yes, sir.
12   Q.   And it's got a chain of command?
13   A.   Yes, sir.
14   Q.   It has rules and regulations and a culture that
15 is different from in the civilian work force; is that
16 a fair statement?
17   A.   Yes, sir, I would say so.
18   Q.   Have you ever served in the Armed Forces?
19   A.   No, sir.
20   Q.   Are you aware that the Armed Forces are not a
21 paramilitary organization, they are a strict military
22 organization?
23   A.   Yes, sir, I am.
24   Q.   And you are aware that they -- that's a highly

Page 40

1  regulated environment?
2    A.   Yes, sir.
3    Q.   And police forces, you are familiar with around
4  the country; right?
5    A.   Yes, sir, I am.
6    Q.   And they are a regulated environment but not a
7  -- not exactly the same as the military; right?
8    A.   That's correct, yes, sir.
9    Q.   But police forces have standards, very high
10 standards of conduct for their members; is that a fair
11 statement?
12   A.   Yes, sir.
13   Q.   Captain Dixon has testified that Colonel
14 Chaffinch advised him that when he was -- "he,"
15 Colonel Chaffinch, was the commander of Troop 5, he
16 installed mirrors in the troop commander's office and
17 in the bathroom so he could watch himself masturbate.
18 Colonel Chaffinch has denied this.  But if that
19 occurred, would that be a violation of any standards
20 of conduct of police officers if Colonel Chaffinch had
21 done that?
22   A.   Yes, sir.  That's the first time I have heard
23 that.
24        MR. NEUBERGER:  I think I might be done.

Page 41

1  Can I just take a break with Barbara for a second?
2        MS. BALLARD:  Sure.
3        (Recess taken.)
4        MR. NEUBERGER:  I don't have any other
5  questions.  How about counsel?
6        MS. BALLARD:  I do have a few.
7  BY MS. BALLARD:
8    Q.   Colonel, you testified about codes of conduct
9  and what you considered appropriate behavior in the
10 workplace for officers.
11       In your opinion, the kinds of things and
12 standards you discussed, would they apply equally to
13 female officers as well as male officers?
14   A.   Yes.
15   Q.   Would you consider it inappropriate for a
16 female officer to proposition a male officer for some
17 sort of sexual favor on the job?
18   A.   Yes, I would.
19   Q.   Would you consider it inappropriate for a
20 female officer to tell a male coworker officer that he
21 had a nice ass or something to that effect?
22   A.   Yes, I would.
23   Q.   And would you consider it inappropriate for a
24 female officer to grab or grope a male officer in a

11 (Pages 38 to 41)

Conley                                    v.                          Chaffinch, et al.
Gerald R. Pepper                    C.A. # 04-1394-GMS              August 12, 2005

| | |
|---|---|
| Page 42 | Page 44 |

Page 42

1  sexual way on the job?
2  A.  Yes, I would.
3  Q.  Are you aware of an incident in which Captain
4  Conley was disciplined for purchasing a Rolex watch
5  with the state credit card?
6  A.  Yes, I am.
7  Q.  Can you tell me what you know about that?
8  A.  That was several years ago.  I believe that was
9  -- I believe that was at a conference -- I am not
10  sure, and I am not sure that there was an
11  investigation, but I believe that there was, and that
12  was handled by Lieutenant Colonel Waggaman at that
13  particular time.
14  Q.  If I represented to you that records show that
15  discipline occurred in February of 2001, would that
16  sound accurate to you?
17  A.  February of 2001?
18  Q.  2001.
19  A.  I thought it was earlier than that, but if you
20  have the records, I would accept that.
21  Q.  Did you take part in any way in investigating
22  or imposing discipline in that case?
23  A.  I did discuss it with Bill Waggaman, Lieutenant
24  Colonel Waggaman.

Page 43

1  Q.  And what was the substance of your discussion?
2  A.  I don't recall the exact discussion other than
3  the situation was improper and needed to be taken care
4  of; primarily, any charge on a card had to be paid.
5  Q.  Was it your understanding that the purchase was
6  made but not reported when Captain Conley returned
7  from her trip?
8  A.  I don't recall that.
9  Q.  Do you know if the funds were repaid to the
10  State Police?
11  A.  I assume that they were.  I don't know that for
12  a fact, but I assume that they were.
13  Q.  Do you know if formal discipline was imposed?
14  A.  I believe that it was.
15  Q.  Did you speak with Captain Conley personally
16  about the incident?
17  A.  No, ma'am, I did not.
18  Q.  Do you know if Bill Waggaman did?
19  A.  I believe he did.
20  Q.  Let me go back to when you served as colonel.
21        Did you promote any officers to major
22  during that time?
23  A.  Yes, I did.
24  Q.  Do you recall who?

Page 44

1  A.  Yes, ma'am, I do.
2  Q.  Who would that be?
3  A.  Major Marcin, Major Papili.
4  Q.  Joe Papili; correct?
5  A.  Yes.
6  Q.  Then Major Chaffinch.  Anyone else?
7  A.  Major MacLeish, Major Swiski.
8  Q.  So, you promoted a number of majors.
9        What sort of things did you look for in
10  making a decision to promote someone to major?
11        MR. NEUBERGER:  Objection, relevance.
12        MS. BALLARD:  This case is about --
13        MR. NEUBERGER:  I understand.  I have an
14  objection for relevance.  You can ask him the
15  questions all you want.  Colonel Chaffinch has
16  testified what he -- what standards -- the standards
17  he applied.  I mean, what this man would use is --
18        MS. BALLARD:  I am asking what --
19        MR. NEUBERGER:  I understand.  Go ahead.
20  BY MS. BALLARD:
21  Q.  What would you look for in making those
22  promotions?
23  A.  The particular job that was involved, past
24  performance.  As with all promotions that I made, not

Page 45

1  just majors, past disciplinary records, geographical
2  location of the job, familiarity with that particular
3  geographical location, and individual talents.
4  Q.  Anything else?
5  A.  And career paths.
6  Q.  What do you mean by "career paths"?
7  A.  I will give you an example.  The easiest
8  example that I can think of is if you had somebody
9  that followed a career path that was primarily
10  associated with traffic enforcement and the operation
11  of uniformed troops probably the better fit to command
12  a position like that involved special units where you
13  have undercover operations and wire taps and that type
14  -- those types of operations probably would not be
15  suited for an individual that had a career path, as I
16  previously described.  You would probably want to look
17  for someone that had actually gone the career path to
18  command of special units.
19  Q.  So, am I understanding that former experience
20  as a trooper in the areas under the major's command
21  would be helpful; does that make sense?
22  A.  To some extent, yes.
23  Q.  Would you consider having a wide variety of
24  experience in the State Police to be helpful?

Wilcox & Fetzer, Ltd.              Professional Court Reporters            (302)655-0477

# Tab F

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

BARBARA CONLEY                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )          C. A. No. 04-1394-GMS
                                  )
STATE OF DELAWARE,                )
DIVISION OF STATE POLICE,         )
et al.,                           )
                                  )
          Defendants,             )

## DEFENDANTS' INITIAL DISCLOSURES
## PURSUANT TO FED. R. CIV. P. 26(a)

Pursuant to Fed. R. Civ. P. 26(a), Defendants State of Delaware and David W. Dryden make the following initial disclosures:

1.  The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.

**RESPONSE**:

Captain John A. Yeomans          Captain James Paige
Human Resources Section          Internal Affairs
1441 North Dupont Highway        1575 McKee Road
Dover, DE 19903-0430             Dover, DE 19904
(302) 739-5981                   (302) 739-5990

Lt. Mark Daniels                 Lt. Robert Coupe
Internal Affairs                 Internal Affairs
1575 McKee Road                  1575 McKee Road
(302) 739-5990                   (302) 739-5990
Dover, DE 19904                  Dover, DE 19904

The defendants reserve the right to supplement this list as discovery proceeds in this matter.

2.   A copy of, or description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

**RESPONSE**:

The plaintiff's personnel file, as maintained in the Human Resources Section of the Delaware State Police Headquarters Complex in Dover, Delaware.  A copy will be provided to counsel.

Documents, tape-recordings, and other materials contained in file maintained by the Internal Affairs Section with regard to the investigation ordered by Secretary Mitchell into the allegations made by the plaintiff in her lawsuit.  The Internal Affairs file is privileged and confidential and not subject to disclosure.

The personnel files of other Delaware State Police officers holding the rank of Major or Captain, whose qualifications are implicated in the allegations of the Complaint. These files are confidential and privileged from disclosure, absent a waiver by the individual employee.

The defendants reserve the right to supplement this response as appropriate during the course of discovery.

3.   A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

**RESPONSE**:  Not applicable.

4.   For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**RESPONSE**:  Not applicable.

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

_____
Ralph K. Durstein III, I.D. No. 912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400

Dated:  April 4, 2005

I:\ralph.durstein\Litigation\Conley v DSP\Initial Disclosures.do

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2005, I electronically filed Initial Disclosures pursuant to Rule 26 with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

Thomas S. Neuberger, Esquire
The Neuberger Firm, P.A.
2 East Seventh Street
Wilmington, DE 19801-3707
tsn@neubergerlaw.com

/s/ Ralph K. Durstein III
Department of Justice
State of Delaware
820 N. French Street
Wilmington, DE 19801
(302) 577-8510
ralph.durstein@state.de.us

# Tab G

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BARBARA CONLEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 04-1394-GMS |
| | ) | |
| STATE OF DELAWARE, | ) | |
| DIVISION OF STATE POLICE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants, | ) | |

## DEFENDANTS' SUPPLEMENTATION OF INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(e)

Pursuant to Fed. R. Civ. P. 26(e), the Defendants State of Delaware, Division of State Police, Col. Thomas F. MacLeish, and Secretary David B. Mitchell make the following supplementary disclosures:

1. The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.

**RESPONSE**:

      (a)    Cpl. Thad Boyce (Special Investigations – Troop 2)
               834-2630

      (b)    Lt. Curt Brown (Troop 5)
               337-8251

      (c)    Lt. John Campanella (OPR/Accreditation – Delaware
               State Police Headquarters)
               739-5901

(d)     Frank Chandler
        P.O. Box 1008
        Clayton, DE 19938

(e)     Frank Cummings
        RD#5, Box 91 ½
        Laurel, DE 19956

(f)     Lt. Gregory W. Donaway (Troop 3)
        697-2104x301

(g)     Pete Fraley (Homicide - HQ)
        739-2600

(h)     Mark Givens
        18180 McColley's Chapel Road
        Georgetown, DE 19947

(i)     Sr. Cpl. Rebecca (McKnatt) Gulledge (Troop 3)
        697-4454

(j)     Capt. Robert Hawkins (Troop 3)
        697-4454x201

(k)     Tammy Hyland (Planning&Special Projects - HQ)
        739-5969

(l)     Cpl. Debbie Jester (Troop 5)
        337-1090

(m)     Lt. Bob Moses (HTCU - HQ)
        739-2467

(n)     Sgt. Chuck Mullett (Troop 3)
        697-2104x316

(o)     Louis O'Day
        5381 Cedar Neck Road
        Milford, DE 19963

(p)    Capt. James Paige (Troop 9)
       378-5749x211

(q)    Horace Pepper
       Rt. 2, Box 326D
       Laurel, DE 19956-9355

(r)    Lt. Mark Rust (Troop 5)
       337-8252

(s)    Sr. Cpl. Tim Shockley (Troop 5)
       337-1090

(t)    Ronald Thomas
       202 Robinson Street
       Georgetown, DE 19947

(u)    Vernon Thomas
       c/o Martha Claverie
       Office of the Public Defender
       14 The Circle, 2nd Floor
       Georgetown, DE 19947

(v)    Charlie Vickers
       711 Concord Road
       Seaford, DE 19973-4280

(w)    Robert Walls
       502 Masters Lane
       Magnolia, DE 19962

(x)    Carol Warnock (Troop 5 – Secretary)
       337-8253

(y)    Master Cpl. Rodney Workman (Troop 5)
       337-1090

The defendants reserve the right to supplement this list as discovery proceeds in this matter.

DEPARTMENT OF JUSTICE
STATE OF DELAWARE


/s/ Stephani J. Ballard
Stephani J. Ballard, ID #3481
Ralph K. Durstein III, ID #912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400

Dated:  September 21, 2005

I:\ralph.durstein\Litigation\Conley v DSP\Supplementary.Disclosures.doc

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2005, I electronically filed Supplementary Disclosures pursuant to Rule 26(e) with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

Thomas S. Neuberger, Esquire
The Neuberger Firm, P.A.
2 East Seventh Street
Wilmington, DE 19801-3707
tsn@neubergerlaw.com

/s/ Stephani J. Ballard
Department of Justice
State of Delaware
820 N. French Street
Wilmington, DE 19801
(302) 577-8510
Stephani.Ballard@state.de.us