# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | C.A.No.04-1394-GMS |
| individually and in his official capacity as the | : | |
| Superintendent, Delaware State Police; | : | |
| LIEUTENANT COLONEL THOMAS F. | : | |
| MACLEISH, individually and in his official | : | |
| capacity as the Deputy Superintendent, | : | |
| Delaware State Police; DAVID B. MITCHELL, | : | |
| individually and in his official capacity as | : | |
| Secretary of the Department of Safety and | : | |
| Homeland Security, State of Delaware; and | : | |
| DIVISION OF STATE POLICE, | : | |
| DEPARTMENT OF SAFETY AND | : | |
| HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT ON COUNTS II AND III AND FOR PARTIAL SUMMARY JUDGMENT ON COUNT I

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: January 17, 2006          Attorneys for Plaintiff

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING..................................................................................1

SUMMARY OF THE ARGUMENT...............................................................................................1

STATEMENT OF FACTS............................................................................................................2

     A.     Count One - Gender Discrimination in the Denial of Two Promotions to Major...............2

          1.     The Prima Facie Case.......................................................................................2

          2.     The Legitimate Non-Discriminatory Reason........................................................2

          3.     Fuentes Prong 2 in a Pretext Case - The Weight of the Evidence Proves Gender Discrimination..................................................................................................2

          4.     Fuentes Prong 1 in a Pretext Case - Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions In the Defense Case..............7

     B.     Counts Two and Three - Retaliation for the Filing of This Lawsuit................................11

          1.     Plaintiff's Protected Speech and Petition Clause Activity...................................11

          2.     The First Act of Retaliation - A Confidential and Internal DSP Document About Plaintiff is Leaked to the Delaware Media.................................................11

          3.     The Second Act of Retaliation - Defendants Refused to Investigate This Release........................................................................................................11

          4.     The Third Act of Retaliation - Defendants Then Confirmed and Discussed the Nature of the IA Charges With the Delaware Media....................................12

               a.     Aviola was "Surprised" by This Order....................................................12

               b.     The Prejudicial Content of This Release.................................................13

          5.     Substantial or Motivating Factor.......................................................................13

               a.     Defendants' Friendship Created a Motive to Retaliate Against the Person Who Sued Chaffinch and Caused Him to Be Suspended............13

               b.     Demonstrated Antagonism Towards Plaintiff and Her Protected Activity.....................................................................................14

                    (1).     Chaffinch Demands Blind Personal Loyalty.............................14

                    (2).     Chaffinch's Hostile Feelings....................................................14

                    (3).     MacLeish's Hostile Feelings....................................................15

*i*

   (4). Mitchell's Hostile Feelings..............................................15

  c. Unusually Suggestive One or Two Day Temporal Proximity................16

  d. Numerous Violations of Statutes, Policies, Procedures, Practices,
   Rules and Regulations.....................................................16

   (1). The Express and Unequivocal Confidentiality Protections
    of the LEOBOR...........................................................16

   (2). DSP Rules, Regulations and Policies.......................................17

    (a). Rule 10................................................................17

    (b). Rule 18(b)............................................................17

    (c). Rule 19(a)............................................................17

    (d). The DSP Code of Ethics............................................17

   (3). An Order To Violate Any of These Statutes or Rules is an
    "Unlawful Order"......................................................17

   (4). Actual DSP Policies, Practices and Procedures........................18

    (a). Current Policy and Practice..........................................18

    (b). Long Time Historical Policy and Practice...................18

   (5). No Internal Affairs Investigation Resulted From These
    Numerous Violations.................................................19

  e. Disparate Treatment...............................................................19

  f. Selective Enforcement............................................................19

  g. Pretext and Coverup.............................................................19

   (1). Sgt. Christopher Foraker...........................................20

   (2). Master Corporals Price and Warren............................20

   (3). Captain Davis and Captain Warren............................21

ARGUMENT...................................................................................................21

 I. STANDARD OF REVIEW..................................................................21

II.    UNDER A COUNT I PRETEXT THEORY PLAINTIFF: 1) HAS PROVEN A PRIMA FACIE CASE THAT SHE WAS DENIED TWO PROMOTIONS BECAUSE OF HER GENDER; AND 2) HAS SUFFICIENT EVIDENCE OF PRETEXT TO GO TO THE JURY UNDER BOTH PRONGS 1 AND 2 OF <u>FUENTES</u>............................................22

 A.    A Prima Facie Case Has Been Proven................................................22

  1.    This is a Light Burden........................................................22

  2.    The Elements................................................................23

 B.    Defendant's Burden..............................................................23

 C.    Plaintiff's Ultimate Burden......................................................23

  1.    Prong 1 - Abundant Weaknesses, Implausibilities, Inconsistencies, Incoherencies, and Contradictions in Defendant's Case.......................25

  2.    Prong 2 - The Weight of the Evidence Demonstrates Gender is the Reason Plaintiff Was Not Promoted.......................................25

   a.    Chaffinch's Vulgar and Sexist Attitude Towards Women.........25

    (1).    Introduction.................................................25

    (2).    Why This Evidence is Relevant....................................26

    (3).    The General Rule........................................26

    (4).    Admissible for Proper Purposes....................................27

    (5).    The Evidence The Court Has Noted...........................27

     (a).    The Sexually Explicit Limericks and Jokes.....28

     (b).    The Public References to His Genitalia In Front of Women.................................................28

     (c).    The Sexual Objectification of a Secretary.......29

   b.    Other Categories of Evidence....................................29

III.    IN COUNT II PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH BY FILING HER LAWSUIT CHALLENGING ILLICIT GENDER DISCRIMINATION AND HER LAWSUIT WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST HER...........................29

 A.    Protected Activity...............................................................30

1.    Matter of Public Concern...................................................................30

    a.    Content.........................................................................30

        (1).    Gender Discrimination.................................30

        (2).    Wrongdoing, Illegality and Breach of the Public Trust........................................................................31

    b.    Form and Context.......................................................32

        (1).    The Police Department Setting.....................32

        (2).    Witness Intimidation in the Judicial Context...............32

        (3).    News Coverage........................................33

        (4).    Legislative Concern....................................33

2.    Balancing of Interests....................................................................34

B.    Substantial or Motivating Factor.............................................................34

    1.    Knowledge of Protected Conduct..........................................35

    2.    Temporal Proximity.................................................................35

    3.    Demonstrated Anger, Hostility and Antagonism...................35

    4.    Violations of Law, Policies and Procedures...........................36

    5.    Disparate Treatment................................................................36

    6.    Selective or Discriminatory Enforcement..............................36

    7.    Pretext......................................................................................36

    8.    Falsehoods...............................................................................37

    9.    Intentional Destruction of Key Evidence...............................37

    10.    The Big Picture.......................................................................37

C.    Same Decision Anyway Affirmative Defense.......................................38

IV.    IN COUNT III PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND HER LAWSUIT WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST HER.......................................................................38

A.    The Big Picture...................................................................................................39

B.    The Activities Protected.......................................................................................39

C.    The Specifics.........................................................................................................39

D.    Substantial or Motivating Factor and Same Decision Anyway............................40

CONCLUSION..................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

Adkins v. Rumsfeld, 389 F.Supp.2d 579 (D.Del. 2005)..................................................................29

Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999)............................................................................38

Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917 (9th Cir. 2004)............................................31

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997)..............................................................39, 40

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)............................................................21

Andrews v. City of Phila., 895 F.2d 1469 (3d Cir. 1990)..................................26, 27, 28-29, 37

Ansell v. Green Acres Contracting Co., Inc., 347 F.3d 515 (3d Cir. 2003)................................27

Arlio v. Lively, 392 F.Supp.2d 317 (D.Conn. Sept. 28, 2005)..........................................27, 37

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997).........................................30, 34

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001)..............................30, 31-32, 35, 38

Becker v. ARCO Chemical Co., 207 F.3d 176 (3d Cir. 2000)..............................25, 27, 28, 29

Bedford v. SEPTA, 867 F.Supp. 288 (E.D.Pa. 1994).....................................................34

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998)...................................21

Brady v. Fort Bend County, 145 F.3d 691 (5th Cir. 1998)..........................................38

Bray v. Marriott Hotels, 110 F.3d 986 (3d Cir. 1997)..........................................23, 36

Brennan v. Norton, 350 F.3d 399 (3rd Cir. 2003).......................................36, 39, 40

Briscoe v. LaHue, 460 U.S. 325 (1983)......................................................32

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972)...........................39

Carey v. Brown, 447 U.S. 455 (1980)..........................................................30

Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005).........................................31, 32

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991)..........................................38

City of San Diego v. Roe, 543 U.S. 77, 125 S.Ct. 521 (2004)..................................33

Connick v. Myers, 461 U.S. 138 (1983)....................................................30, 31

Cox v. Louisiana, 379 U.S. 536 (1965)......................................................36

Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387 (M.D.Pa. 2003).........................................34

Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509 (3d Cir. 1992).........................22

Fakete v. Aetna, Inc., 308 F.3d 335 (3d Cir. 2002)................................................................26

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005).....................................................................36

Feldman v. Philadelphia Housing Authority, 43 F.3d 823 (3d Cir. 1994).............................36

Flamm v. Am. Ass'n Of Univ. Women, 201 F.3d 144 (2d Cir.2000)....................................30

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)...............................................................23, 24

Furnco Constr. Corp. v. Waters, 438 U.S. 567 (1978).....................................................22, 25

Garrison v. Louisiana, 379 U.S. 64 (1964)............................................................................30

Glass v. PECO, 34 F.3d 188 (3d Cir. 1994)..........................................................................26

Green v. Phila. Hous. Auth., 105 F.3d 882 (3d Cir. 1997)................................................32, 33

Heyne v. Caruso, 69 F.3d 1475 (9th Cir. 1995)..........................................................25, 26, 28

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005)............................29-30, 35, 36, 39-40

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)........................30, 31, 32, 33, 36

Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571 (3d Cir. 2003).................34

Hurley v. Atlantic City Police Dept., 174 F.3d 95 (3d Cir. 1999).....................25, 26, 27, 28, 29

Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999)...............................................................22

Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989)................................................................35

Johnson v. Louisiana, 369 F.3d 826 (5th Cir. 2004).............................................................30

Johnston v. Harris County Flood Control Dist., 869 F.2d 1565 (5th Cir. 1989).......................33

Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992)..........................................................35

Keller v. Oriz Credit Alliance, Inc., 130 F.3d 1101 (3d Cir. 1997)........................................23

Konits v. Valley Stream Central High Sch. Dist., 394 F.3d 121 (2d Cir. 2005)...................30, 31

Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)............................................35

Marzano v. Computer Science Corp. Inc., 91 F.3d 497 (3d Cir. 1996).....................................22

Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933 (3d Cir. 1997)....................................22, 23

McDonald v. Smith, 472 U.S. 479 (1985)....................................................................................39

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)...........................................................22

McGreevy v. Stroup, 413 F.3d 359 (3d Cir. 2005)......................................................................34

Miller v. Cigna, Corp., 47 F.3d 586 (3d Cir. 1995)....................................................................35

Mitchell v. Street, 2005 WL 1993774 (E.D.Pa. Aug. 16, 2005)...................................................34

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)................................................35

NAACP v. Clairborn Hardware Co., 458 U.S. 886 (1982).........................................................30

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000)...........................................................38

O'Donnell v. Yanchulis, 875 F.2d 1059 (3rd Cir. 1989)..............................................................33

Ostad v. Oregon Health Sciences Univ., 327 F.3d 876 (9th Cir. 2003).......................................38

Pickering v. Bd. of Educ., 391 U.S. 563 (1968)..........................................................................33

Powell v. Alexander, 391 F.3d 1 (1st Cir. 2004)........................................................................39

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996).............................................................30, 32, 33

Rankin v. McPherson, 483 U.S. 378 (1987)................................................................................34

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)..........................................37

Robinson v. SEPTA, 982 F.2d 892 (3d Cir. 1993)......................................................................36

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)..................................................31, 33, 34

Saint Mary's Honor Ctr. v. Hicks 509 U.S. 502 (1993)...............................................................24

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)...........................................34, 36, 39, 40

Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995)......................................................22-23

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996)..............22, 23, 24, 25, 36, 37

Simpson v. Kay Jewelers, Div. of Sterling, 142 F.3d 639 (3d Cir. 1998)....................................22

Springer v. Henry, 2002 WL 389136 (D.Del. March 11, 2002)...................................................33

Stanley v. City of Dalton, Georgia, 219 F.3d 1280 (11th Cir. 2000)...........................................38

Stewart v. Rutgers, The State Univ., 120 F.3d 426 (3d Cir. 1997)......................................................22, 36

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)........................................................................................35

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002)..............................................................................32

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)....................................................................22

Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23 (1st Cir. 2004)................................................................38

Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252 (1977)......................36

Watson v. Fort Worth Bank and Trust, 487 U.S. 977 (1988)........................................................................22

Waters v. Churchill, 511 U.S. 661 (1994)....................................................................................................34

Watters v. City of Phila., 55 F.3d 886 (3rd Cir. 1993)..................................................................................34

We, Inc., v. City of Phila., 174 F.3d 322 (3d Cir. 1999)...............................................................................40

Williams v. Hepting, 844 F.2d 138(3d Cir. 1988)........................................................................................32

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997)....................................................................35, 36

Yalowizer v. Town of Ranchester, Wyoming, 18 Fed.Appx. 745 (10th Cir. 2001)....................................38

**Constitutions, Statutes and Rules**

U.S. Const., Amend. I.................................................................................................................passim

U.S. Const., Amend. XIV............................................................................................................passim

11 Del.C. § 9200(b)...............................................................................................................16, 17

11 Del.C. § 9200(c)....................................................................................................................16

11 Del.C. § 9200(c)(12).............................................................................................................16

Federal Rule of Civil Procedure 8(c)........................................................................................38

Federal Rule of Civil Procedure 56(c)......................................................................................21

## NATURE AND STAGE OF THE PROCEEDING

This is a civil action to remedy intentional gender discrimination by defendant Chaffinch when he twice denied to plaintiff promotion to administrative budget Major and operations Major for Kent and Sussex County.  This also is a public employee free speech and petition clause case arising from defendants' unprecedented actions of releasing and then discussing plaintiff's confidential internal affairs charges with the media, all within hours of the filing of her lawsuit.

The record includes the depositions of defendant Ret. Col. L. Aaron Chaffinch, defendant Col. Thomas MacLeish, defendant Secretary David Mitchell, Captain Glenn Dixon, Ret. Major David Baylor, Ret. Col. Gerald Pepper, Ret. Lt. Col. Thomas Marcin, Captain Harry Downes, Ret. Major Joseph Swiski, Major Randall Hughes, Major Paul Eckrich, Lt. Joseph Aviola, Deputy Attorney General Michael Tupman, the interrogatory answers of plaintiff, various documents and the Amended Complaint and Answer. (Hereinafter "Compl. & Ans.").[1]

This is plaintiff's opening brief and appendix in support of her motion for summary judgment on Counts II and III and for partial summary judgment on Count I.

## SUMMARY OF THE ARGUMENT

1.  Under a pretext theory, plaintiff has demonstrated a prima facie case of gender discrimination in promotions which gives rise to a reasonable inference that gender was the reason she was twice denied promotion to Major.  In light of the non-discriminatory reason given there also is overwhelming evidence of pretext on which a jury can rely.

2.  Plaintiff engaged in First Amendment protected activity by filing her gender discrimination lawsuit and in light of the overwhelming record evidence, as a matter of law, no

---

[1]  The record includes testimony from the present case, as well as from the following cases: <u>Dillman v. Chaffinch, et al.</u>, C.A.No.02-509-KAJ (D.Del.); <u>Bullen, et al. v. Chaffinch, et al.</u>, C.A.No.02-1315-JJF (D.Del.); <u>Price, et al. v. Chaffinch, et al.</u>, C.A.No.04-0956-GMS (D.Del.); <u>Foraker v. Chaffinch, et al.</u>, C.A.No.04-1207-GMS (D.Del.).

reasonable jury could conclude that the filing of her suit did not play a substantial role in the retaliation against her.  And because defendants have waived their Mt. Healthy affirmative defense, summary judgment should be entered against defendants on Counts II and III.

## STATEMENT OF FACTS

**A.  Count One - Gender Discrimination in the Denial of Two Promotions to Major.**

    **1.  The Prima Facie Case.**  At his deposition Chaffinch admitted the elements of the prima facie case.  Two vacancies for promotion to Major existed in late 2003.  Plaintiff and all captains were considered and found to be "qualified" for these spots.  But the promotions went to two males over plaintiff, a female.  (Chaffinch 144-145,183,184-185; Dixon 93-95; Compl.&Ans. ¶¶ 89,58,61; A100,110,310,16,12,36-38).  In addition to Chaffinch, both comparators also admit that plaintiff was qualified for these positions.  (Eckrich 113-14; Hughes 100-01; A732-33,825).  Several witnesses indicate she was even more qualified for the position than the two comparators.  (Dixon 93-95; see Marcin 39,49-51; Baylor 55; Pepper 57-59,61 65,73-74; A310,541,543-44,282,593-95,597-98).

    **2.  The Legitimate Non-Discriminatory Reason.**  Chaffinch claims he promoted the most qualified person using six discretionary factors: education, background, experience, tenure, compatibility and personal loyalty to him.  (Chaffinch 148-149, 179; A101,109).   There were no preexisting written Orders, policies, restrictions or guidelines whatsoever on the exercise of his discretion regarding these newly created factors.  (Chaffinch 145-146, 168-169; A100-01,106).  But as Lt. Col. Thomas Marcin testified, the process followed by the Colonel violated mandatory procedural requirements imposed on the DSP by Governor Minner and State Personnel Director Lisa Blunt-Bradley.  (Marcin 38,40,28-42; A540-41). And Chaffinch failed to consult with Secretary Blunt-Bradley about this process.  (Blunt-Bradley 56-57,74; A1365,1370).

    **3.  Fuentes Prong 2 in a Pretext Case - The Weight of the Evidence Proves**

**Gender Discrimination.** Through Chaffinch's own admissions and testimony of those who worked closely with him over the years, the record contains abundant evidence which a reasonable jury can accept to conclude that the denial of these two promotions was gender based. Both circumstantial and direct evidence of illicit intent exists. These categories of evidence follow.

1.      The two promotions at issue were procedurally irregular. Governor Minner and her agent State Director of Personnel Lisa Blunt-Bradley in December 2001 imposed mandatory procedural requirements on all DSP promotions, including to Major. (Marcin 43-44,39, 28-42, A538-42). Chaffinch defied these obligations which are designed to ensure procedural regularity in all promotions. (Marcin 41; Chaffinch 172; Conley Inter. 44-46; Chaffinch 127-128, 132; A541,107,1039-41,96-97).[2]

2.      Chaffinch's 6 factors do not include promoting diversity in the state workforce which violates Gov. Minner's Executive Order 10 (Blunt-Bradley 92; Exec. Order 10; A1374, 1214), which Chaffinch has previously sworn he follows to the letter and has striven to implement. (Chaffinch 39-40; A1089; Chaffinch 71-74,76-77; A1155-58,1160-61).

3.      Former Superintendent Gerald Pepper explained that numerous instances of Chaffinch's misconduct violate written Policies, Standing Orders and training by the DSP and that such conduct was impermissible both on and off duty. (Pepper 30-40; 587-89). As present Col. MacLeish also admitted, police officers are "expected to conform to a higher standard of conduct than an ordinary citizen is expected to." (MacLeish 21-22; PX15; A167-68,216). Troopers "should conduct [their] private life above reproach," (MacLeish 25; 168), and regardless of whether they are on or off duty, they are to conduct themselves in a manner which will reflect favorably on the DSP. (MacLeish 38; Pepper 38-39; A172,589).[3]

4.      Chaffinch has verbally stated more than once that he does not believe that females in general should even serve as troopers, (Dixon 99-100; A311), let alone as a Major.

_____

   [2] Chaffinch believes he can get away with anything because, as he openly brags, his close relationship with Delaware State Senator Thurman Adams will protect him. (Dixon 64-65; A302; Dixon 91; A685). "Uncle Thurman ... would take care of him no matter what." (Dixon 64-65; A302). "[I]f he needed anything done, he would just go to ... the Thurmanator, and it would be done." (Dixon 65; 3002). Chaffinch is "a very powerful person, he has political ties that are very strong." (Dixon 72-73; 680). As Chaffinch admitted, politics play a role in the day to day operations of the DSP. (Chaffinch 157; A649). Because of this, as one commander stated, opposing Chaffinch "would be the start of ending my career with the State Police." (Dixon 73; A680).

   [3] Rule 4 of the DSP Rules and Regulations requires the same. (PX16; A223). Article 6 of the DSP Code of Ethics requires that an officer "lead the life of a decent and honorable person. ... [H]e will so conduct his private life that the public will regard him as an example of stability, fidelity, and morality." (PX15; A220).

5.      While on duty, he tells people that "women are nothing but trouble" and "women are a pain in the ass." (Dixon 77-78; cf. Pepper 28-31; A305-06,586-87).

6.      Chaffinch also admits that he publicly recites a long stereotypical song or poem (PX 2; A114) which indicates that all the problems of society are the fault of the Biblical person "Eve," and that it is men, symbolized by "Adam," who have to bear the penalty for women's mistakes. (Chaffinch 25-33; Conley Inter. 11-13; Downes 15; Dixon 16-18; cf. Pepper 35; A70-72,1006-08,322,290-91,588).

7.      Chaffinch also has voiced the sexual stereotype to plaintiff and others that two women cannot work together in the same office. (Conley Inter. 13-15; Baylor 29; A1008-10,275).

8.      Chaffinch also has allowed another trooper, in his presence and when he had operational authority over the trooper, to disrespect plaintiff by applying the sexually offensive nickname "Puss" to her. (Conley Inter. 31-32; Dixon 48-50; Chaffinch 86; A1026-27,298-99,86).

9.      He also publicly refers to plaintiff by the sexually offensive and stereotypical nickname "Puss." (Dixon 49; cf. Pepper 29-30; A298,586-87). Chaffinch denies this. (Chaffinch 83; A85).[4]

10.     He also calls her "a bitch." (Baylor 31; cf. Pepper 29; A276,586).

11.     Chaffinch has allowed other troopers in the headquarters complex to disrespect plaintiff, who had the rank of captain, and to direct wolf whistles towards her. (Conley Inter. 32-34; Dixon 51-53, 112; A1027-29,299,314). He denies this. (Chaffinch 84,91; A85,87).

12.     He also has disrespected the first female captain in the Division (plaintiff was the second) by publicly nicknaming her "Norman," the name of a most wanted fugitive. (Conley Inter. 35-36; Dixon 55-56, cf. Pepper 32; A1030-31,300,587).

13.     Chaffinch even has asked plaintiff private details of her sex life. (Conley Inter. 34-35; Dixon 53; A1029-30,299).

14.     He also repeatedly has told plaintiff over the years about how she looks in a black bathing suit and that he wants to move in on her, implying have sexual relations with her. (Conley Inter. 46-47; A1041-42).

15.     One day Chaffinch saw plaintiff in a red dress and said he "would do" her. (Dixon 60-61; A301).

16.     Chaffinch also has purchased presents, such as gold earrings with little hearts on them, for plaintiff, and applies "cutesy" nicknames to her. (Conley Inter. 46-47; A1041-42).

---

[4] Now retired Major Joseph Swiski has testified that Col. Chaffinch "has a reputation for not being very truthful." (Swiski 57; A60). Unlike Chaffinch, Captain Dixon has a reputation as being truthful (Marcin 16; A535), as does plaintiff Capt. Conley. (Hughes 101; A825).

17.     The record also contains five gender based and patently offensive sexually charged limericks which reveal a demeaning attitude towards women on the part of Chaffinch, which he recited often after becoming Colonel. (Conley 57-63; PX 3,4; cf. Pepper 35-37; A927-29,115-16,588).[5]

18.     Chaffinch also admitted he belongs to a private membership organization which denies membership to women and blacks. (Chaffinch 14; see Conley Inter. 7-11; Dixon 13-15; Baylor 27; A68,1002-06,289-90,275).

19.     Chaffinch also tells jokes all the time. (Downes 21; see Chaffinch 64, A323,80). Plaintiff testified that 50% of his jokes are "inappropriate or demeaning to some group be it women, or blacks." (Conley Inter. 13; A1008). Captain Dixon testified it is more like 70% of the time that his jokes are offensive. (Dixon 36; A295).[6]

20.     Chaffinch himself also admitted that he was officially disciplined as a major for telling a sexually explicit joke about masturbation during a co-ed sensitivity training session. (Chaffinch 34-37; Conley Inter. 16-18; Dixon 29-30; Pepper 13-17; A73,1011-13,293-94,583).

21.     He also was forewarned that he would be held accountable for his off duty conduct when he was disciplined earlier in his career for being the senior officer present when a female trooper disrobed and removed her blouse while dancing on a table at a private party. (Chaffinch 69-71; Dixon 38-40; cf. Pepper 7-13,25; A81-82,296,581-82,585).

22.     Chaffinch also publicly and in mixed company uses a nickname for his penis and brags that he has "something extra" in his pants. (Conley Inter. 26-30; Dixon 41-44, 80-81; A1021-25,296-97,306). He denies this. (Chaffinch 72-73,80; A82,84). But he does admit that earlier in his career he also publicly named the patrol shift which he headed the "cocksters." (Conley Inter. 29-30; Dixon 57; Chaffinch 102-104; A1024-25,300,90).

23.     When he was the commander of Troop 5, Chaffinch installed mirrors in his office and in the bathroom so he could watch himself masturbate. (Dixon 79; A3006).

24.     Chaffinch has publicly nicknamed a female employee of the Office of Highway Safety "Trish the Dish," meaning "Trish the delicacy. You know what the connotation is there." (Conley Inter. 36-37; see Dixon 57-58; Baylor 32; Chaffinch 97-99; A1031-32,300-01,

---

[5]   Chaffinch admits he frequently recounts these limericks in mixed company but claimed he does not do so at work, in an attempt to claim they reveal nothing of his mind set at work. (Chaffinch 41-59; A74-79). But various witnesses have testified in detail that he does recite them, even in the workplace. (Conley Inter. 18-23; Dixon 18-26; Downes 16-18; Baylor 29-30; A1013-18,291-93,322-23,275-76). As other officers also testified, Chaffinch also told these sexually explicit limericks while representing the DSP at national conferences for Operation CARE. (Baylor 39-42; Dixon 75; A278-79,305).

[6]   In Capt. Dixon's words, "any time you would have contact with [Chaffinch], it seems like he would have a new joke, and more times than not, they were dirty jokes." (Dixon 24-25; A292). Defendant MacLeish testified that offensive jokes or other conduct of a sexual nature should have no place in the workplace. (MacLeish 50; A175). Such inappropriate joking and improper workplace behavior also violates the plain terms of the DSP's Sexual Harassment Policy. (PX16; A223).

276,88-89).

25.    Chaffinch also has commented publicly about various women in the headquarters building, stating "oohh she tears me up" or he "would love to do her." (Dixon 60; Conley Inter. 38; Baylor 32-33; A301,1033,276).

26.    He has publicly discussed how he would like to watch a female trooper masturbate for a male trooper. (Dixon 44-47, 110; A297-98,314).

27.    Chaffinch also refers publicly to another secretary in headquarters as "Lemon titties," referring to her breast size. (Conley Inter. 38-39; Dixon 62; A1033-34,302).

28.    He also made it his "mission" (Dixon 87; A308), to remove the first and only female troop commander that the DSP has ever had. (Baylor 33-39; A276-78).[7]  In doing this, he ignored the advice of his entire Executive Staff who warned him that "it was not best for the organization" to remove her. (Baylor 37-38; A277-78).[8]

29.    During his command of the Division, Chaffinch never assigned a female to command a troop. (Chaffinch 125; A95).

30.    Reflecting his opinion of female officers, Chaffinch also diminished plaintiff's operational authority in various areas after he became Colonel. (Conley Inter. 40-44; Dixon 83-87; Baylor 58-59; A1035-39,307-08,283).  For example, he reduced plaintiff's job duties as Director of Traffic from what they had been when her position was previously occupied by male officers. (Baylor 54,51-53; A281-82).  Chaffinch took away "her leadership role." (Baylor 58; A283).  Instead of developing policy and other similar duties, plaintiff was relegated to collecting data. (Baylor 58; A283).[9]

31.    Chaffinch's promotions in the DSP simply were not based upon merit. For example, Chaffinch had an "older style of management," a style of promoting his buddies. (Baylor 51; A281).  "There is a perception of a good old boys network in the [DSP]." (Baylor 16; A272).  Promotions in the DSP are not based on merit. (Baylor 16; A272).

32.    The State EEO and AA officer testified that in the "professionals" EEO-4 statistical

---

[7]  Lt. Col. Marcin explained that he served as trooper commander of Troop 6 for 5 ½ years. (Marcin 4, Pepper 21-22; A532,584-85).  After Capt. Mary Ann Papili was appointed by Col. Pepper to that post with a start date sometime in 2000 (Pepper 19-21; A584), Chaffinch prematurely removed her from command in September 2003, less than 3 years into her rotation.  (Marcin 23; Conley 70-71; A537,931).

[8]  It was bad organizationally, politically and from a public relations perspective.  (Baylor 37-38; A277-78).  In response, Chaffinch became "agitated" and "unhappy" with them for voicing their concerns and called them "spineless." (Baylor 35,36,38; A277-78).

[9]  (1) He also excluded her from annual national traffic conferences which her male predecessors attended. (2) He eliminated her monthly meetings with traffic lieutenants throughout the state. (3) He withheld from her knowledge of traffic related events within her authority. (4) He refused her public recognition for achievements within her command. (5) He let her be disrespected at commander's meetings. (Conley Inter. 40-44; A1035-39).

category, which consists solely of majors, captains and lieutenants, as of Dec. 1, 2001 the DSP was under represented by females by 50% when compared to a finely tuned available labor market for women. (Chambers 29; A1490-91; Chambers 128-130; A1266-68; PX5 at 12-13; A1391-1466). In the absence of discrimination against women this should not be occurring. (Chambers 22; A1489; Chambers 128-130,116-117; A1266-68,1254-55).

### 4. **Fuentes** Prong 1 in a Pretext Case - Weaknesses, Implausibilities,

**Inconsistencies, Incoherencies and Contradictions In the Defense Case.**

### Education Factor

1.  The claim that both comparators were promoted because one had a master's degree and another was working to that goal is **weak** because Major Hughes admitted neither Col. Chaffinch or Col. MacLeish have such a degree and its absence did not hold them back. (Hughes 128-29; A832).

2.  The education claim also is **weak** because plaintiff is a dean's list college graduate with nearly a straight "A" record (Eckrich Ex. 1; A749-53). Hughes was in the bottom 15% of his college class and even the bottom 30% in his major. (Hughes Ex 1; Hughes 21-23; A863,805-06). Eckrich was in the bottom third of his (Eckrich Ex 2; Eckrich 18-19; A759-61,709) but claimed he did well in college. (Eckrich 30; A712).

3.  The master's degree claim is **weak** because Chaffinch apparently ignored the actual personnel department records of educational achievement which showed no masters work for Hughes and demonstrated that he actually had seven less total educational credits than plaintiff and Chaffinch had no other independent knowledge of such schooling. (Hughes Ex.1; Hughes 10,14; A859,803-04).

4.  All three also were later sent to respected command schools by the DSP, where Barbara did "exceptionally well" in Chaffinch's words. (Hughes 27-29; A807). Again, the education claim is **weakened** by the fact that plaintiff here had a solid 3.67 (A-) grade average, which is not overshadowed by the record of the two comparators. (Eckrich Ex. 3; Hughes 24-28, Eckrich 27,19; A763,806-07,711,709).

### Background Factor

5.  The claim of superior background for Hughes is **weakened** by his own admission that when he was officially promoted on November 1, 2003 he was facing an open one year internal affairs investigation which began in October 2003 of his covering up crimes and physical abuse of a female by another male trooper. (Hughes 43-65; Hughes Ex. 2; A811-16,868-73).[10]

---

[10]  To his credit, Capt. Dixon repeatedly refused Chaffinch's direction to cover up these crimes. (Dixon 46-47,85-89,103-107,108-112; A674,683-84,688,690). Sadly, such criminal behavior has been standard operating procedure during defendants' tenure at the top of the DSP. Testimony revealed that MacLeish also interferes in criminal investigations to protect his personal friends. (MacLeish 116; A191).

6.   Any reliance on plaintiff's decades old summary discipline record prior to the two promotions in 2003 is **weakened** by Major Hughes' explanation of the summary discipline system where up to 40 hours punishment can be agreed to. Plaintiff's record here consists of old minor summary punishment offenses, such a being overweight, etc. (Hughes 35-37; A809) (Conley ex. 3; A1542-43).

7.   This background claim is **contradicted** when plaintiff's superior job evaluation is compared with Eckrich when they both served as traffic lieutenants in 2000. (Eckrich Ex 8, 7; A768-84) Plaintiff's individual scores were higher with three ratings of exceptional and none for Eckrich. Overall she had done a "fantastic job," (Eckrich Ex. 8; A778) while the job for Eckrich was a "challenge" with "some setbacks." (Eckrich Ex. 7; A770).

8.   A claim of superior background is **contradicted** by Eckrich's last written evaluation prior to his promotion to Major. (Eckrich Ex. 7; A768-75) His decision making, organizational skills and ability to handle stress are only average (Id.; A768-70). His goals imply that he is not guiding his two shifts appropriately (Id.; A771) and there are various negative performance comments found in the first four lines of Item XII. (Id.; A774).

9.   The 'background' factor is **also weak** because when this term is found on DSP employment application records it reveals that Eckrich had marijuana involvement and an alcohol arrest on his record, (Eckrich Ex. 6; A776-67) He also had originally repeatedly failed in seeking admission to various police forces. (Eckrich Ex. 6; A764) Plaintiffs' background record was clean. (Eckrich Ex. 1; A746-75).

### Experience Factor

10.  On the experience factor, Chaffinch also claims that Major Eckrich had prior financial experience which made him attractive for the position of administrative/budget major. (Chaffinch 161; Pepper 66-68; A104,596). The experience claim is flatly **contradicted** by Eckrich's two written job evaluations when served about 18 months as the lieutenant in his present section. He received 20 "Cs" and 6 "Ds" for his performance and requested a transfer out to stop his failing performance. (Eckrich Ex. 10; A785-91). Earlier, the most he could obtain were all "Cs" and he distinguished himself in no way. (Eckrich 11; A792-98). It is **weak** to claim that two average performances in a job make you attractive to head the section.

11.  This emphasis on financial experience is **weakened and contradicted** by the fact that his predecessor Major Swiski had <u>no prior budget experience</u> going into that slot, but he performed admirably in the job (Chaffinch 162, Marcin 26-27; Eckrich 80; A105,538,724), which actually consists of managing civilian staff. (Pepper 69-71; A597). Moreover, plaintiff dealt with multi million dollar grant applications in her position as the Director of Traffic and had already been sent by the DSP for training in budgetary functions. (Pepper 68, Dixon 114-115,86; Marcin 26-27; Eckrich Ex. 3; A596,315,308,538,763).

12.  The prior experience with budgets claim is also **weak** because Eckrich had about 18 months in the function prior to his promotion (Eckrich Ex. 10,11; A785-98) and plaintiff had two years as the Director of Traffic. (Conley 7; A915).

13.    On the experience promotion factor, admittedly the patrol function is the "backbone of the Division," (Chaffinch 153-154; Dixon 95; Pepper 61-62; Eckrich 70; A102-03,310,594-95,722), and Plaintiff's experience included 18 years with patrol. (Chaffinch 153; A102). But **implausibly** comparator Hughes had only 13 years in patrol when he was promoted to oversee patrol operations in Kent and Sussex Counties. (Chaffinch 155-156; Hughes 80; A103,820). Comparator Eckrich also had only 10 years patrol experience. (Chaffinch 165; Eckrich 71-72; A105,722). So this purported factor was ignored by Chaffinch.

### Tenure Factor

14.    On the tenure factor, both Hughes and Eckrich also **implausibly** had 3 or 3 ½ less years with the DSP than plaintiff. (Eckrich Ex 5, Eckrich 33-34, Hughes 30; A1287-89,712-13,808). So this factor also was ignored. (Chaffinch 156,164; A103,105).

### Compatibility Factor

15.    Reliance on the compatibility factor is **weak** because Chaffinch was forced to admit that "there was nothing to disqualify Barbara Conley for the promotion in the area of compatibility." (Chaffinch 167; A106). Eckrich testified plaintiff got along with everyone, including Chaffinch. (Eckrich 81; A724). So this factor also was ignored.

### Personal Loyalty Factor

16.    Reliance on a personal loyalty to Chaffinch factor is again **weak** because Chaffinch was forced to admit that plaintiff also was loyal to him in 2003. (Chaffinch 181; A109). So this third factor also was ignored.

17.    Reliance on personal loyalty again is **contradicted** by the fact that the DSP Code of Ethics makes such a factor improper. (PX15 - Preamble to DSP Code of Ethics; A216).

18.    Chaffinch's admitted reliance on a personal loyalty factor is **contradicted** a second time by now Col. MacLeish who admitted that Troopers should "never ... permit personal feelings ... or friendships to influence [their] decisions." (MacLeish 26; A169).

### Claim that Inappropriate Sexual Conduct in the Workplace Excluded Her

19.    The claim that this factor was considered by Chaffinch, and that plaintiff had a disqualifying history in this regard, is very **weak** in light of the deposition testimony of Chaffinch on the six factors he used in the promotions. Nowhere in the careful questioning did he ever indicate in any way that inappropriate sexual conduct in the workplace was included in any of his factors. (Chaffinch 148-149,179; A101,109).

20.    This after the fact assertion is **implausible** because such allegations are not substantiated in any preexisting written employment record or job evaluation found anywhere in plaintiff's written evaluations prior to the promotions in 2003. (Hughes Ex. 3-7; A874-908,1290-1347).

21.    It also is **implausible** because Major Hughes explained that such repeated misconduct would be reported under the categories of "relationships," "contribution to the organization," and "leadership" on those evaluations. But there is nothing but the highest

commendations for plaintiff's workplace conduct in these categories. (Hughes Ex. 3-7; Hughes 103-28,130-34; A874-908,826-34).[11]

22.     The claim is **contradicted** by the fact that Major Hughes also testified that during his long history with plaintiff as a coworker plaintiff never did any of this. (Hughes 108,111, 113,115; A827-29).

23.     It is also **contradicted** by Major Eckrich who testified that whenever he served with plaintiff she never engaged in inappropriate workplace behavior. (Eckrich 78; A724).

24.     The claim is **contradicted** by the fact that similar conduct did not exclude Hughes from promotion. The record contains at least three sexually inappropriate emails he directed to plaintiff and one sexually suggestive cartoon. (Hughes Ex. 8-11; Hughes 134-152; A1348-49,911,834-38).[12]

25.     The claim is also **contradicted** by Hughes' admission that sexual cartoons, jokes and sexual bantering are found throughout the DSP workplace and it is a means of easing the tension of a stressful job. (Hughes 136-37,143,145; A834,836).

26.     The specific claim that plaintiff and another trooper had sex while a fugitive was under a rug in the same room is **contradicted** by the fact that plaintiff never faced IA charges over such an incident and her written evaluations in that mid 1980s time period contain no reference to this defamatory allegation. (Hughes Ex. 7, Hughes 130-133; A1318-47,833). Instead plaintiff progressed through her career to Captain until she hit the glass ceiling of Major.

## Other

27.     The claim that Chaffinch had the absolute discretion to make these two promotions to Major without consulting anyone else or following any objective process is **contradicted** by the requirements imposed upon him by Governor Minner and Secretary Lisa Blunt-Bradley's Report which required consultation with the State Personnel Director and Gregory Chambers and his Affirmative Action office when exercising the promotion

---

[11] Plaintiff "maintains a positive relationship with co-workers." (Hughes Ex. 3; A881). She "has the skills, knowledge and ability to positively influence others within the department." (Hughes Ex. 4; A894). She "maintains a high level of credibility with her subordinates and peers." (Hughes Ex. 5; A899). She is "a tremendous asset to me and Troop 5 ... her attitude towards the Division and its values are outstanding." (Id.; A908). As Chaffinch himself wrote, she "maintains a harmonious relationship with all of her subordinates." (Hughes Ex. 6; A1293). She "is a very good leader with above average interpersonal skills." (Id.; A1294). She "possesses excellent interpersonal skills." (Id.; A1300,1304).

[12] When plaintiff was a lieutenant reporting to then Capt. Hughes, he invited her to come on over after he picked up his "'slave boy' outfit." (Hughes Ex. 9; Hughes 139-145; A909-10,835-36). Then he offered to give her an "injection" which would "slide it in, I mean squeeze it in, no, no I mean fit [,] gotta go it's getting hot in here." (Hughes Ex. 11; Hughes 147-152; A911,837-38). The suggestive cartoon is of a big breasted woman. (Hughes Ex. 8; Hughes 134-138; A1348,834-35).

function. (Chaffinch 171-175; Marcin 39, 29-38; AA107-08,538-41).[13]  In yet another case, Chaffinch previously admitted that State Personnel was supposed to be involved in the process.  (See Chaffinch 85-87; A1100-01).

28.     Chaffinch's claim that he can draw a distinction between his offensive utterances outside the office and his utterances are **contradicted** by the testimony of his predecessor Col. Pepper and his successor Col. MacLeish who each explained that no such distinction can be made.  (Pepper 33-39; MacLeish 21-22,25,38; A587-89,167-68,172). The Division's Rules and Regulations and Code of Ethics also **contradict** Chaffinch's claim. (PX15; PX16; A220,223).

29.     Despite its subjectivity, Chaffinch claims he went through a careful deliberative process in making the two promotions at issue.  (Chaffinch 148,160-161; A101,104).  This is **contradicted** by the testimony of his Lt. Col. Thomas Marcin who testified that Chaffinch's mind was already made up for each promotion, and in particular the decision on Major Hughes was made in just 24 hours. (Marcin 43-44,28-29; A542,538).  Major Baylor's testimony confirms this. (Baylor 16-17,12-14; A271-72).

**B.  Counts Two and Three - Retaliation for the Filing of This Lawsuit.**

        **1.  Plaintiff's Protected Speech and Petition Clause Activity.**  On October 27, 2004, plaintiff filed this lawsuit. (D.I. 1; Compl.& Ans. ¶ 108; MacLeish 117-118; A19,39,191-92).

        **2.  The First Act of Retaliation - A Confidential and Internal DSP Document About Plaintiff is Leaked to the Delaware Media.**  Within hours of the filing of her lawsuit, an internal DSP document indicating that plaintiff faced confidential internal affairs charges was leaked to the Delaware media. (Aviola 53-55,57-58; see PX 14; Aviola 65-67; A131-35,160). These charges were not pending in March and July of 2003 when the two challenged promotions occurred.

        **3.  The Second Act of Retaliation - Defendants Refused to Investigate This Release.**  Despite the release of plaintiff's confidential internal affairs information, defendants refused to investigate the release to the Delaware media. (Aviola 62; MacLeish 145-150;

---

        [13]  Chaffinch's Lt. Col. testified "I was trying to get through to Aaron that you really couldn't ignore the Bradley report." (Marcin 38; A541).  Secretary Blunt-Bradley testified that "in our routine meetings, I would expect that we would discuss it." (Blunt-Bradley 97-98; A1375-76).  Outside the context of this case, Chaffinch has previously testified the same.  (Chaffinch 39-40; A1089).

A134,198-200).  Defendants admit that they do not know if even a single question was ever asked of any DSP employees about the release of this information. (MacLeish 150; Mitchell 50; A200,259).  The DSP "considered" investigating, but chose not to.  (Mitchell 49-50; A258-59).

    **4.  The Third Act of Retaliation - Defendants Then Confirmed and Discussed the Nature of the IA Charges With the Delaware Media.**  Whenever media inquiries are made about lawsuits and other serious matters such as Internal Affairs investigations, Lt. Aviola, the PIO, is not authorized to respond.  Instead, he is required to relay those inquiries to the Colonel or the Lt. Colonel who then decide what kind of a response will be given. (Aviola 15-20; A122-23). "[M]ost of the time it's pretty specific [ ] what they want said." (Aviola 20; A123).

    Upon learning that the Delaware media was in possession of this confidential document, Lt. Aviola followed procedure and immediately consulted with then acting Colonel MacLeish. (Aviola 55-64; MacLeish 129, 134-142; A132-34,194,196-98).

    MacLeish next expressly ordered Aviola to confirm and discuss the contents of this confidential document with the Delaware media. (Aviola 63-70,76-77,86-89; MacLeish 142,165, 208; A134-37,140,198,203,214).[14]  "But for his authorization," Lt. Aviola would not have discussed the matter with the media, "other than saying 'no comment.'" (Aviola 89,70; A140,136).  MacLeish's exact orders were "if you feel that it looks like one of our e-mails, then comment on it."  (Aviola 63-64; A134).  "[C]all Mr. Eldred back and give him the information." (Aviola 63; A134).  Lt. Aviola complied with acting Col. MacLeish's order.  (Aviola 68-70; A135-36).

    **a.  Aviola was "Surprised" by This Order.**  Several times at his deposition, Aviola testified that in light of the DSP policy and practice of never commenting on or

---

[14]  MacLeish testified that he would not have given these orders if defendant Secretary Mitchell had not "agreed and []sanctioned it or authorized it."  (MacLeish 135,142,165; Mitchell 47-48,56-57; A196,198,203,258,260).  Thus he has laid this unprecedented violation of policy and practice squarely at the doorstep of the defendant Cabinet Secretary.

discussing previous internal affairs charges against defendants Chaffinch and MacLeish themselves, (see Facts at section **B.5.d.** below), he was "surprised" when MacLeish instead ordered him to discuss plaintiff's leaked confidential internal document with the Delaware media. (Aviola 75-76; A137). Aviola even spoke up during his meeting with MacLeish and stated, "You know, it's an internal document. We are not going to comment on that; right?" (Aviola 76; A137). But MacLeish ordered him to discuss it anyway. (Aviola 63-64; A134).

        **b. The Prejudicial Content of This Release.** The prejudicial content of this release is clear. The released document stated that plaintiff herself was facing internal affairs charges for alleged violations of several DSP Rules and Regulations. (PX14; A160). Pursuant to MacLeish's specific order to "comment on it" (Aviola 63-64; A134), Aviola revealed to the media the inflammatory nature of the charges that plaintiff was facing - one count of sexual harassment and three counts of conduct unbecoming. (Aviola 70; PX14; A136,160).[15]

        **5. Substantial or Motivating Factor.** Cause and effect evidence is abundant.

        **a. Defendants' Friendship Created a Motive to Retaliate Against the Person Who Sued Chaffinch and Caused Him to Be Suspended.** Chaffinch and MacLeish are admittedly "buddies" and "friends." (Chaffinch 16-17; MacLeish 7; A614,375; Chaffinch 187; Baylor 20; A111,273). MacLeish publicly brags that he and Chaffinch are "joined at the hip." (MacLeish 9; A375). He "feel[s] very strongly" that his good friend Chaffinch is an "honorable man," a "good trooper," a "good person," and a "good man" who was "a good leader" for the DSP. (MacLeish 9-12; A375-76). They are on a first name basis. (MacLeish 98; A187). Chaffinch chose MacLeish to serve as his Lt. Colonel, which was a "big deal" to MacLeish and a true "honor." (MacLeish 97; A186). They socialized together, even when Chaffinch was on leave for sexually inappropriate workplace misconduct. (PX 18; MacLeish 100-102; A241-

---

    [15] The initial published article that resulted is in the record. (Del. State News, 10/29/04; A44). Numerous similar articles soon followed in the weeks and months to come.

44,187-88).  MacLeish is so close to Chaffinch that he thinks that the numerous lawsuits, jury

verdicts, and court opinions upholding these jury verdicts against his good buddy are meritless.

(See MacLeish 107-114; A189-91).  Similarly, defendant Mitchell also likes and is friends with

Chaffinch and MacLeish.  (Mitchell 28,43,51; A253,257,259).

### b.  Demonstrated Antagonism Towards Plaintiff and Her Protected Activity.

**(1).  Chaffinch Demands Blind Personal Loyalty.**  Chaffinch

has always expected "blind loyalty" from all those in the DSP.  (Dixon 24; A668; Dixon 105;

A312).  "You have to just follow him ... and if you don't, he is done with you.  You may suffer

any consequences from that."  (Dixon 105; A312; Dixon 85; A683).  Chaffinch himself has

repeatedly admitted that "personal loyalty" is a factor he considers when making personnel

decisions.  (Chaffinch 158-159; A650; Chaffinch 179; A109).  Several other witnesses, including

MacLeish have confirmed this. (MacLeish 64; Baylor 20-21; A178,273).

Captain Dixon worked closely with Chaffinch in Sussex County for 17 years.  (Dixon 77,

90,92,4; A681,685,663; Dixon 7-10; A288-89).  He testified that Chaffinch "is very vindictive"

and "use[s] his rank or office in the state police to be vindictive."  "[I]t is common knowledge ...

you would not cross him ... because of his vindictiveness.  You knew that your career would

pretty much stop."  (Dixon 71-72; A304; Dixon 24,44; A668,673).  "He goes after people ... if he

feels that anyone has betrayed him.  That's his makeup."  (Dixon 44; A673).[16]

**(2).  Chaffinch's Hostile Feelings.**  Four witnesses directly

testified about Chaffinch's fury with plaintiff.  Chaffinch was "mad" and "angry" at plaintiff for

bringing her lawsuit.  (Dixon 69-70; A303-04).  He was "ang[ry]," "displeased" and "pissed off"

---

[16]  Captain Dixon even expressed concern that despite Chaffinch's retirement, he would still find a way to retaliate against him because of Dixon's truthful subpoenaed deposition testimony, (Dixon 72; A304), perhaps by way of Chaffinch's close friendship with defendants MacLeish, Mitchell and Senator Thurman Adams.

about the suit.  (Mitchell 36; A255).  Chaffinch was "upset," "unhappy," "[h]e wasn't pleased"

and instead "was obviously displeased" about the suit.  (MacLeish 120-121; A192).  He "wasn't

too pleased" and was visibly "upset."  (Aviola 79,82,84; A138-39).  He very well may have used

some colorful language and other profanity to describe it.  (Aviola 79; A138).  Chaffinch was so

angry about plaintiff's lawsuit that he even took his anger out on Captain Dixon.  (Dixon 69;

A303).  After plaintiff's lawsuit was filed, Chaffinch refused even to mention plaintiff's name.

(Dixon 71; A304).  He clearly does not like it when people sue him.  (Baylor 60; A283).

> **(3).  MacLeish's Hostile Feelings.**  MacLeish admits that he also

was "unhappy" with plaintiff.  (MacLeish 179; A207).  He was "annoyed" and "displeased with

her conduct and actions" in bringing this lawsuit.  (MacLeish 179-180; A207).  He repeatedly

admitted that he was "unhappy" and "disappointed" by the lawsuit.  (MacLeish 125-126,131,180-

181; A193-95,207).  "Do I like it?  No, I do not."  (MacLeish 126; A194). He told Lt. Aviola that

he was "unhappy," "upset," "disappointed" and "displeased."  (MacLeish 131-132,180-181;

A195, 207).  MacLeish was "personally disgusted" with some of plaintiff's allegations in her suit

and was "disgusted" with the lawsuit itself.  (MacLeish 132-33; A195).  Lt. Aviola confirmed that

MacLeish expressed these feelings. (Aviola 82,84; A139).

MacLeish also was unhappy that plaintiff's lawsuit caused the DSP to be cast in a

negative light in the local Delaware as well as the regional Philadelphia and Baltimore news

media. (MacLeish 127, 181-182; A194,207-08).[17]  Indeed, he "would be very pleased" to get the

DSP off of the front pages of the newspapers.  (MacLeish 133-134; A195-96).

> **(4).  Mitchell's Hostile Feelings.**  Like MacLeish, Mitchell also

was not happy that plaintiff had filed a lawsuit.  (Mitchell 29; A253).  He "[w]asn't happy" that

the suit resulted in his having to focus his attention on the DSP to the neglect of other agencies in

---

[17]  Plaintiff's lawsuit attracted a great deal of local, regional and national media attention.
(Mitchell 30-31; A254).

his charge, (Mitchell 37; A255), or that the DSP was "getting hammered heavy" in the press.

(Mitchell 40, 52-53, 11-12; A256,259,249).  Mitchell was "disappointed" in the filing of

plaintiff's lawsuit. (MacLeish 143-144; A198).  He has not enjoyed the "negative press" about the

Division.  (Mitchell 15; A250).

        **c. Unusually Suggestive One or Two Day Temporal Proximity.**  On

October 27, 2004, plaintiff filed this lawsuit.  (D.I. 1; Compl. & Ans. ¶ 108; MacLeish 117-118;

A19,39,191-92).  The leak, for which each individual defendant had a motive, occurred within

hours.  Immediately thereafter, on either October 27th or the 28th, the media followed up with

inquiries to Lt. Aviola asking for confirmation and for comment. (Aviola 53; A131). No story

would run without confirmation of the authenticity of the leak. That same day, MacLeish ordered

Aviola to give confirmation and comment on the confidential material. (Aviola 55-70; A132-36).

        **d. Numerous Violations of Statutes, Policies, Procedures, Practices,**

**Rules and Regulations.**  "[T]he confidentiality of internal documents and internal information is

something which is valued in the Delaware State Police." (Baylor 11; A271). But contradictorily

however, longstanding statutes, policies, rules and standing orders were violated by defendants.

        **(1).  The Express and Unequivocal Confidentiality**

**Protections of the LEOBOR.**  The Law Enforcement Officers' Bill of Rights is something that

DSP officers know about and think is important because Troopers value its privacy protections.

(Aviola 20-21; A123).  The relevant portions of it require that:

> Whenever a law-enforcement officer is under investigation ... the
> investigation ... shall be conducted under the following
> conditions:
>                    \* \* \*
> All records compiled as a result of any investigation ... shall be
> and remain confidential and shall not be released to the public.

11 Del.C. § 9200(c) and (c)(12).  This statute is in no way "unclear."  (Aviola 28; A125).

        The statute's confidentiality protections protect Troopers at the rank of Captain, such as

plaintiff, and below.  See 11 Del.C. § 9200(b).  The statute also expressly states that these

protections <u>do not apply</u> to either the Superintendent or the Deputy Superintendent, such as

defendants Chaffinch and MacLeish. (MacLeish 153, 156-157; PX6; A200-01,143-45); <u>accord</u> 11

Del.C. § 9200(b).[18]

> **(2). DSP Rules, Regulations and Policies.** The Division's

written Rules and Regulations reflect the official policy of the DSP.  (MacLeish 39,43-44; A172-

73).  As Rule 1 itself states, these Rules and Regulations <u>must</u> be followed.  (PX16; MacLeish 46-

47; Mitchell 20; A223,174,251).  **(a).  Rule 10.**  This rule requires that "Members shall treat as

confidential the official communications and business of the Division." (PX16; MacLeish 39;

A225,172).  **(b).  Rule 18(b).**  This rule requires that "Any information obtained in an official

capacity shall not be disclosed either in writing or orally to any unauthorized person, and no

officer will divulge any matter that is his duty to keep secret." (PX16; MacLeish 42-43;

A226,173).  **(c).  Rule 19(a).**  This rule requires that "A member shall give information to the

news media in accordance with procedures established by the Division." (PX 16; MacLeish 43-

44; A226,173).  **(d).  The DSP Code of Ethics.**  The Preamble to the DSP's own Code of Ethics

requires that "Whatever I see or may hear of a confidential nature or that is confided to me in my

official capacity will be kept secret unless revelation is necessary in the performance of my duty."

(PX 15; MacLeish 25-26; A218,168-69).  This is something that "is very important for a state

trooper." (MacLeish 25-26; A168-69).

> **(3).  An Order To Violate Any of These Statutes or Rules is an**

**"Unlawful Order."**  Defendant Secretary Mitchell is the cabinet Secretary responsible for the

DSP.  He has a long history in law enforcement.  (Mitchell 5-10; A247-49).  As Mitchell testified

at some length, any order to violate the written DSP Rules and Regulations or other laws - even if

ordered to do so by DSP legal counsel - is an "unlawful order" and a Trooper has an <u>obligation</u> to

---

[18]  Defendant MacLeish admits that his strained justification for the DSP's actions in releasing and discussing plaintiff's confidential internal affairs information "could be construed" as "a back door" and as "an end run" around LEOBOR's protections.  (MacLeish 162; A203).

disobey such an order.  (Mitchell 20-27; A251-53).  Major Baylor also testified that an order to release internal confidential information, even when coming from the DAG, would be an unlawful order in violation of "clearly expressed" DSP rules and regulations.  (Baylor 9-11; A270-71).

### (4).  Actual DSP Policies, Practices and Procedures.

**(a).  Current Policy and Practice.**  Lt. Aviola, the current PIO for the DSP, admitted at his deposition that the standard policy, practice and procedure of the DSP is that "we do not comment on the specifics of [an] internal complaint." (Aviola 35,50, 71-72; A127,131,136).  It is the "policy" of the DSP to "'no comment' or refuse to discuss the specifics" of internal affairs and other internal personnel matters.  (Aviola 50,72; A131,136).  MacLeish admitted the same.  (MacLeish 156; A201).  This also is the "practice" and the "standard response." (Aviola 71,75; A136-37).

Indeed, defendants tellingly admitted in their Answer, and the record is <u>undisputed</u>, that when the Delaware news media had previously and repeatedly inquired about the numerous Internal Affairs investigations, violations and convictions of defendants Chaffinch and MacLeish (who are explicitly excluded from LEOBOR's confidentiality protections), the DSP has always refused to comment in any way, shape or form because of the DSP policy of not commenting on internal personnel matters.  (Compl. & Answer ¶¶ 129-135; A22-24,40).[19]  The documentary record confirms this (PX8-13; A146-59), as does the testimony of Lt. Aviola and defendant MacLeish himself.  (Aviola 32,34-35,39-40,47,50; MacLeish 151-152,154-156; A126-28,130-31,200-01).  This is the "policy," "practice," and "standard response" of the DSP.  (Aviola 50,71,75; MacLeish 156; A131,136-37,201).

**(b).  Long Time Historical Policy and Practice.**  This

---

[19]  Chaffinch and MacLeish have been the subject of numerous internal affairs investigations and convictions while they held the positions of Colonel and Lt. Colonel of the DSP.  (MacLeish 115-117,110-111,114-115,150-151,156-158,167,169,173,175,177-178,192; Aviola 49-50,74; PX8-13; A190-91,200-02,204-07,210,130-31,137).

also has been the longstanding practice in the PIO for well over a decade.  For example, retired Major David Baylor served in the PIO as a corporal beginning in September 1989 and then in 1992 was promoted to sergeant and served as the Director of the PIO.  Then, after he was promoted to Major in 2002, he had authority and responsibility for the operation of the PIO. Major Baylor retired in August 2004. (Baylor 5,21-23; A269,273-74). He said the DSP's policy "was pretty much that we would never really confirm or deny or comment on internal affairs matters."  (Baylor 23-24; A274).  Moreover, "[t]hat [is] pretty much standard practice in law enforcement."  (Baylor 23; A274).

**(5).  No Internal Affairs Investigation Resulted From These Numerous Violations.**  Yet despite all of these things, as discussed above, defendants refused to ever investigate this release of confidential information.  (Aviola 62; MacLeish 145-150; Mitchell 49-50; A134,198-200,258-59).  This refusal to investigate independently violates several additional DSP rules.  For example, Rule 1 requires that all laws, rules and regulations must be obeyed, and Rule 3 requires that any Trooper with knowledge of a violation of either the law or the rules and regulations immediately report such violations to Internal Affairs for investigation. (PX16; A223).

**e.  Disparate Treatment.**  As discussed above, there is a clear and striking contrast between the stonewalling and refusal to comment that occurred after media inquiries about numerous IA charges Chaffinch and MacLeish faced and the wealth of statutorily mandated confidential information nonetheless released about plaintiff's IA charges.

**f.  Selective Enforcement.**  As discussed above, defendants chose to apply the protections of the LEOBOR to defendants when media inquiries were made about their own numerous internal affairs problems, but flip-flopped and refused to apply the statute to protect plaintiff.

**g.  Pretext and Coverup.**  Despite their repeated denials of retaliatory

-19-

motive and intent, the record reveals that defendants are blatantly hostile towards officers who file lawsuits or otherwise speak out about the DSP. Thus, under the case law discussed in the Argument below, defendants' denials of retaliatory intent can be disbelieved and instead, pretext can be inferred.

(1). **Sgt. Christopher Foraker.** For example, the evidence reveals that both Chaffinch and MacLeish disliked this officer because he had filed an earlier retaliation lawsuit. Chaffinch was "upset" and "unhappy" that Sgt. Foraker had filed his lawsuit. (Chaffinch 40; A620). He regularly stated that Sgt. Foraker is a "real pain in the ass" and is a "f-cking a–hole." (Dixon 16,76,74; A666,681).[20] Moreover, because of his hostility over the filing of the suit, Chaffinch openly bragged throughout the DSP - "**I'm going to get that son of a bitch**." (Dixon 17-18,77; A666-67,681). "[I]f people f-ck with Chaffinch, I'm going to f-ck back." (Dixon 10,53-54; A665,675-76).[21] In the same way, MacLeish was admittedly "irritated" and "not happy" that Foraker had filed a lawsuit. (MacLeish 34,31; A381-82). He too swore under oath that he thinks Foraker is a "real pain in the ass" because he had invoked his First Amendment rights. (MacLeish 164-165; A414).

Chaffinch has been "angry" at Sgt. Foraker "for a very long time," "since the lawsuit began." (Dixon 14,22-23,52,55; A666,668,675-776). He regularly mocked Foraker and joked about him. (Dixon 14-15,74-75; A666,681). He was angry the entire life of Foraker's suit. (Dixon 20,75; 667,681). His "anger increased" after Foraker's successful jury verdict and reinstatement. (Dixon 20-21; A667). It was regularly discussed among commanders that Chaffinch was "going after Sgt. Foraker." (See Dixon 69; A679).

(2). **Master Corporals Price and Warren.** In the same way,

---

[20] Notably, Chaffinch refused to refer to Sgt. Foraker by his rank. Instead, he substituted the word "f-cking" for the word 'sergeant.' (Dixon 9-10,53; A664-65,675).

[21] Chaffinch also said this about other Troopers who filed lawsuits. (Dixon 10; A665).

MacLeish testified that he thinks that plaintiff Master Corporals Price and Warren also are a "real pain in the ass" for speaking out. (MacLeish 164-165; A414; accord Baylor 253; A477). He is "not happy" and emphatically expressed that he is very "disappointed" in the fact that they filed suit. (MacLeish 214-217,211-213; A426-27). Chaffinch has expressed the same feelings (MacLeish 218-219; A428), and is "not happy" about their suit. (Chaffinch 142; A646). He refers to the suit as "f-cking bull-sh-t." (Dixon 79; A682).

(3). **Captain Davis and Captain Warren.** Similarly, defendants also disliked these officers because they also had sued Chaffinch and the Division. Major Baylor testified that defendants bore hostility towards them because they had filed lawsuits. They "didn't like" them because of it. (Baylor 363-64,389,410-11; A505,1520). Thus, there is abundant evidence which demonstrates that defendants' denials of retaliatory intent can be disbelieved as pretext for hostility towards those who speak out and file lawsuits.

<u>**ARGUMENT**</u>

**I.    STANDARD OF REVIEW.**

A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c). The substantive law will identify which facts are "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. Id. "[I]f a moving party satisfies its initial burden of proving a prima facie case for summary judgment, the opposing party must do more than simply show that there is some metaphysical doubt as to material facts." Boyle, 139 F.3d at 393. "[I]f the evidence is merely colorable or not significantly probative, summary judgment should be granted." Id.

-21-

II.     **UNDER A COUNT I PRETEXT THEORY PLAINTIFF: 1) HAS PROVEN A PRIMA FACIE CASE THAT SHE WAS DENIED TWO PROMOTIONS BECAUSE OF HER GENDER; AND 2) HAS SUFFICIENT EVIDENCE OF PRETEXT TO GO TO THE JURY UNDER BOTH PRONGS 1 AND 2 OF FUENTES.**

**A.   A Prima Facie Case Has Been Proven.**   Under the first step of the three step "pretext" or "indirect evidence" framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981), the record demonstrates that plaintiff has proven a prima facie case that she was denied promotion because of her gender.  The McDonnell Douglas framework applies to claims brought under §1983. Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997).

**1.   This is a Light Burden.**  "The burden of establishing a prima facie case ... is not onerous." Burdine, 450 U.S. at 253.[22]  Indeed, disputes over its elements are deferred to the pretext stage of the analysis. See Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 938-39 (3d Cir. 1997); Iadimarco v. Runyon, 190 F.3d 151, 163 (3d Cir. 1999).  The favorable treatment of merely one non-protected employee can be enough to meet the prima facie burden. Simpson v. Kay Jewelers, Div. of Sterling, 142 F.3d 639, 645-46 (3d Cir. 1998).  An "initial presumption of discrimination arises from the plaintiff's prima facie case of discrimination because [the court] presume[s such] acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Sheridan, 100 F.3d at 1069 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)) (internal punctuation omitted).

Moreover, when the employer's criteria for the position are subjective in nature as with Chaffinch's six factors, a prima facie analysis of such subjective qualities "is better left to the later stage of the McDonnell Douglas analysis." Matczak, 136 F.3d at 938; accord Sempier, 45

---

[22]   Accord Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 986 (1988); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1084 (3d Cir. 1996) (en banc); Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 508 (3d Cir. 1996); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995); Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992).

F.3d at 729 (the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason ... is pretext.") (internal punctuation omitted). "The rationale behind this position is that subjective evaluations are more susceptible of abuse and more likely to mask pretext and, for that reason, are better examined at the pretext stage than at the prima facie stage." Matczak, 136 F.3d at 938 (internal punctuation omitted).

       **2. The Elements.**  In our case, plaintiff must prove the following elements: (1) she is a female; (2) she was qualified for the position; (3) she did not receive the promotions at issue; and (4) the positions were ultimately filled by a male. See Sheridan, 100 F.3d at 1066 n.5. Chaffinch has admitted to these elements.  (Chaffinch 183-185, 144-145; Compl. & Ans. ¶¶ 89,58,61; A127,117,12,16,36-38).

       **B. Defendant's Burden.**  Once plaintiff's prima facie showing is made, "the employer [i]s obliged to proffer a nondiscriminatory reason for its adverse employment action." Id. at 1065. Chaffinch claims he promoted the most qualified individual. (Chaffinch 148-149,179; A118,126).

       **C. Plaintiff's Ultimate Burden.**  "[W]hen the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Sheridan, 100 F.3d at 1067.  Here, plaintiff can proceed under either of the two prongs found in Fuentes, 32 F.3d at 764, and which were reaffirmed twice by the Third Circuit en banc in Sheridan, 100 F.3d at 1067, and in Keller v. Oriz Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).

       Under prong one plaintiff proceeds with a "credibility" or "unworthy of credence case." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997).  Here to make the case a "plaintiff

must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them 'unworthy of credence.'" <u>Fuentes</u>, 32 F.3d at 764-65. The second prong requires evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." <u>Id.</u> at 762.

"In deciding the 'ultimate question' of whether the employer unlawfully discriminated . . . the factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination." <u>Sheridan</u>, 100 F.3d at 1067 (quoting <u>Saint Mary's Honor Ctr. v. Hicks</u> 509 U.S. 502, 511 (1993)). In other words, "[i]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." <u>Fuentes</u>, 32 F.3d at 764; <u>Sheridan</u>, 100 F.3d at 1071. Rather, "no additional proof of discrimination is required." <u>Hicks</u>, 509 U.S. at 511; <u>Sheridan</u>, 100 F.3d at 1066, 1071.

Regarding the effect of the falsity of a defendant's stated reason or other evidence, the Third Circuit has said, "a party's <u>falsehood</u> . . . in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoilation, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. <u>Sheridan</u>, 100 F.3d at 1069. Importantly, there the en banc court also declared "[w]e routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful discrimination." <u>Id.</u>

"Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with <u>some</u> reason, based his decision on an impermissible

-24-

consideration . . . ." Sheridan, 100 F.3d at 1069 (citing Furnco Constr. Corp., 438 U.S. at 577).

**1. Prong 1 - Abundant Weaknesses, Implausibilities, Inconsistencies, Incoherencies, and Contradictions in Defendant's Case.**  On our record, there are abundant weaknesses, implausibilities, inconsistencies, incoherencies and contradictions in the defendant's version of the case, such that a reasonable fact-finder could find it unworthy of belief.  (See Facts at section **A.4.** above).

**2. Prong 2 - The Weight of the Evidence Demonstrates Gender is the Reason Plaintiff Was Not Promoted.**  In the same way, the record is overflowing with evidence from which a jury can conclude that plaintiff's gender is the reason she was not promoted.  (See Facts at section **A.3.** above).  The evidence falls into several causal categories.

**a. Chaffinch's Vulgar and Sexist Attitude Towards Women.**

**(1).  Introduction.**  This category of evidence "is relevant and probative of [a defendant's] general attitude of disrespect towards his female employees, and his sexual objectification of them." Heyne v. Caruso, 69 F.3d 1475, 1480 (9th Cir. 1995) (emphasis added).[23]  This evidence is admissible "because of the discriminatory nature of the prior conduct, which in turn tend[s] to show the employer's state of mind or attitude towards members of the protected class.... [T]he inference of the employer's discriminatory attitude [comes] from the nature of the prior acts themselves." Becker v. ARCO Chemical Co., 207 F.3d 176, 194 n.8 (3d Cir. 2000).  Thus, "[b]y its very nature," plaintiff's category of proffered evidence demonstrates Chaffinch's "discriminatory attitude" towards female employees.  Id.[24]  Such evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that [Chaffinch] acted

_____

[23]  Items 5-6,17,22,26-27 in the Facts at section **A.3.** above fall into this category.

[24]  The Third Circuit has noted that a plaintiff need not have personal knowledge of the defendant's acts of harassment of other employees in the protected class.  This is because such evidence "go[es] to the motive behind the harassment, which may help the jury interpret otherwise ambiguous acts, and to the employer's liability." Hurley v. Atlantic City Police Dept., 174 F.3d 95, 111 (3d Cir. 1999) (emphasis added).

on it when he made the challenged employment decision." Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002).

**(2). Why This Evidence is Relevant.** "[E]vidence of an employer's sexual harassment of female employees other than the plaintiff and evidence of the employer's disparaging remarks about women in general [are] relevant to a discriminatory discharge claim which alleged that the plaintiff's discharge was motivated by the employer's general feelings of hostility towards women." Heyne, 69 F.3d at 1480 (emphasis added). "Evidence of sexually derogatory and sexist harassment makes disparate treatment claims more credible as well, since such discriminatory acts stem from similar motives." Hurley, 174 F.3d at 111 (emphasis added).

> Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices - evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.

Glass v. PECO, 34 F.3d 188, 195 (3d Cir. 1994) (emphasis added); see Hurley, 174 F.3d at 110 (observing that in Glass, the Third Circuit held that "evidence of past harassment and ... discrimination against others in the protected class is admissible"). As the Third Circuit has explained -

> The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course.

Andrews v. City of Phila., 895 F.2d 1469, 1482 n.3 (3d Cir. 1990) (another police department case) (emphasis added).[25]

**(3). The General Rule.** Regarding treatment of other women,

---

[25] Importantly however, "[t]o constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee. Intimidation and hostility towards women can obviously result from conduct other than explicit sexual advances." Andrews, 895 F.2d at 1485 (internal punctuation omitted).

"as a general rule, evidence of a defendant's prior discriminatory treatment of a plaintiff or other employees is relevant and admissible under the Federal Rules of Evidence to establish whether a defendant's employment action against an employee was motivated by invidious discrimination." Becker, 207 F.3d at 194 n.8.  "A plaintiff alleging employment discrimination may challenge the employer's proffered explanation by showing ... that the employer has discriminated against other members of his protected class or other protected categories of persons."  Ansell v. Green Acres Contracting Co., Inc., 347 F.3d 515, 521 (3d Cir. 2003).

Evidence of sexual harassment of women in a police department workplace "is also relevant to [claims of] intentional sex discrimination."  Hurley, 174 F.3d at 111.  "Evidence of harassment of other women and widespread sexism is also probative of whether one of the principal nondiscriminatory reasons asserted by an employer for its actions was in fact a pretext for discrimination."  Id. at 110 (internal punctuation omitted).  This type of evidence is "highly probative" id., because it helps establish "the employer's overall discriminatory attitude towards members of a protected class."  Becker, 207 F.3d at 194 n.8.

**(4).  Admissible for Proper Purposes.**  "Evidence of an employer's conduct towards other employees has long been held relevant and admissible to show that an employer's proffered justification is pretext."  Ansell, 347 F.3d at 521; see Arlio v. Lively, 392 F.Supp.2d 317, 324 (D.Conn. Sept. 28, 2005) (because "an employer's past discriminatory policy and practice may well illustrate that the employer' asserted reasons for disparate treatment are a pretext for intentional discrimination, this evidence should normally be freely admitted...").

Additionally, such evidence is admissible "for the proper purpose of establishing ... discriminatory intent."  Id.; see Hurley, 174 F.3d at 111 (in the police department context - the "general atmosphere of sexism reflected by the challenged evidence is quite probative of whether decisionmakers ... felt free to take sex into account when making employment decisions").

**(5).  The Evidence The Court Has Noted.**  In the Court's

-27-

November 7th Order (D.I. 107), it noted several examples of evidence of defendant Chaffinch's sexually laced conduct and inquired as to its relevance.

    **(a).  The Sexually Explicit Limericks and Jokes.**  The Third Circuit has previously addressed sexually explicit limericks and jokes in the police department context, <u>see</u> <u>Hurley</u>, 174 F.3d at 104 n.5, and found them to be "egregious," "offensive" and "of appallingly low character." <u>Id.</u> at 104; <u>cf.</u> <u>Heyne</u>, 69 F.3d at 1479 n. 3 (Ninth Circuit - finding error in district court's exclusion of sexually offensive jokes and vulgar sexual remarks).

    The sexually explicit limericks in our present case demonstrate Chaffinch's general "disrespect" for and "sexual objectification" of women in general. <u>See</u> <u>Heyne</u>, 69 F.3d at 4180. This "tend[s] to show [his] state of mind or attitude towards" women in general. <u>See</u> <u>Becker</u>, 207 F.3d at 194 n.8. In the Adam and Eve story, Chaffinch shows his animosity towards women and recounts that they are the source of all men's problems. This in turn is probative of his intent in making the two promotions at issue and it also demonstrates pretext as it tends to rebut the defense claim that Chaffinch does not discriminate against women. As the Third Circuit stated in the <u>Andrews</u> police case, 895 F.2d at 1482 n.3, "[t]he intent to discriminate on the basis of sex in cases involving ... innuendo, ... or sexual derogatory language is implicit, and thus should be recognized as a matter of course."

    **(b).  The Public References to His Genitalia In Front of Women.**  In the same way as discussed immediately above, Chaffinch's routine and public references to his genitalia further demonstrate his disrespect for and hostility towards women in the workplace. This discussion of private sexual matters is intended to humiliate women. <u>Cf.</u> <u>Hurley</u>, 69 F.3d at 105 (supervisor's statement that female officer "liked it hard and stiff," and asking her "if she wanted to drink out of his jock cup"). Again, an intent to discriminate against women can be inferred from such sexual innuendo and sexually derogatory language. <u>Andrews</u>,

-28-

895 F.2d at 1482 n.3.

### (c). The Sexual Objectification of a Secretary.

Similarly, Chaffinch's crude references and crass nickname for a secretary based upon the size of her breasts is yet another piece of evidence which demonstrates his sexual objectification of women.  He treats this woman as a sex object.  In addition to being probative of his intent, Hurley, 174 F.3d at 111, this "[e]vidence of harassment of other women and widespread sexism is also probative of whether" Chaffinch's hollow claim that he promoted two men because they were more qualified is "in fact a pretext for discrimination."  Id. at 110.  This evidence is "highly probative" id. and helps establish his "overall discriminatory attitude towards" females.  Becker, 207 F.3d at 194 n.8; cf. Hurley, 174 F.3d at 104 n. 5 (graphic examples of sexually inappropriate graffiti).

### b.  Other Categories of Evidence.

As review of the evidence set forth in the Facts reveals, there are numerous additional categories of causal evidence in the record that have been repeatedly recognized by the case law.  These categories include evidence of antagonism towards females as Troopers generally, hostility towards plaintiff in particular, violations of rules, procedures, policies and mandates, disparate treatment and more.  See, e.g. Adkins v. Rumsfeld, 389 F.Supp.2d 579, 586 (D.Del. 2005) (listing categories of causal evidence).

### III.    IN COUNT II PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH BY FILING HER LAWSUIT CHALLENGING ILLICIT GENDER DISCRIMINATION AND HER LAWSUIT WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST HER.

Public employee claims of retaliation for engaging in protected First Amendment activity are analyzed using a three-step process.  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).  First, the plaintiff must demonstrate that she engaged in protected activity.  Second, that the protected activity was a substantial or motivating factor in the retaliatory action.  Lastly, the burden shifts to the defense to demonstrate that the same action would have been taken in the

-29-

absence of the protected conduct.  Id.

A. **Protected Activity.**  The protected status of speech is a question of law.  Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001).  The protected speech examination requires a two part analysis for the trial court.  First, the court must determine that it addressed a matter of "public concern." Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997) (en banc).

1. **Matter of Public Concern.** "[S]peech concerning public affairs is more than self-expression, it is the essence of self-government." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993) (quoting Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964)). "[S]peech on public issues occupies the 'highest run of the hierarchy of First Amendment values,' and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145 (1983) (quoting NAACP v. Clairborn Hardware Co., 458 U.S. 886, 913 (1982) and Carey v. Brown, 447 U.S. 455, 467 (1980)).

"An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996).  This is determined by reference to the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48.

a. **Content**.

(1). **Gender Discrimination.**  "Gender discrimination in employment is without doubt a matter of public concern." Konits v. Valley Stream Central High Sch. Dist., 394 F.3d 121, 125 (2d Cir. 2005); see Flamm v. Am. Ass'n Of Univ. Women, 201 F.3d 144, 150 (2d Cir.2000) ("Gender discrimination is a problem of constitutional dimension, and the efforts .... to combat it clearly relate to a matter of public concern."); Johnson v. Louisiana, 369 F.3d 826, 830 n.6 (5th Cir. 2004) ("allegations of sexual harassment ... are always matters of public concern").  The Third Circuit en banc has already held that speech opposing gender discrimination by a high public official is protected by the First Amendment. Azzaro, 110 F.3d at

978-981. And as the Second Circuit recently held, lawsuits predicated upon gender discrimination in employment are protected by the free speech clause of the First Amendment. Konits, 394 F.3d at 125-26.

Additionally, the case law demonstrates discrimination by high public officials is inherently a matter of public concern. For example, as the Third Circuit has held in the context of the Pennsylvania State Police, speech by an employee claiming that she was mistreated because of "racial animus" is a matter of "grave public concern." Rode v. Dellarciprete, 845 F.2d 1195, 1201-02 (3d Cir. 1988). Other courts have held the same.[26] As the Ninth Circuit has explained,

> Disputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters. They involve the type of governmental conduct that affects the societal interest as a whole - conduct in which the public has a deep and abiding interest. Litigation seeking to expose such wrongful governmental activity is, by its very nature, a matter of public concern.

Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 926-27 (9th Cir. 2004).

### (2). Wrongdoing, Illegality and Breach of the Public Trust.

"The content of the speech may help to characterize it as relating to a matter of social or political concern of the community if . . . the speaker seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials" Holder, 987 F.2d at 195, such as misconduct in violation of the highest law in the land, by the highest ranking police official in the state. Speech is on a matter of public concern when it attempts "to expose specific wrongs and abuses" within the government, as plaintiff's suit did. Baldassare, 250 F.3d at 196 (internal punctuation omitted). It is well established that speech that seeks "to bring to light actual or potential wrongdoing or breach of the public trust" by public officials are of the utmost public

---

[26]  See Connick, 461 U.S. at 148 n.8 (a public employee's "right to protest racial discrimination [is] a matter of inherently public concern"); Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 925 (9th Cir. 2004) ("race and age discrimination by a governmental employer - was unquestionably a matter of public concern"); Caver v. City of Trenton, 420 F.3d 243, 263 n.16 (3d Cir. 2005) ("[i]t goes without saying that we strongly disapprove of the use of racial epithets, particularly by those charged with enforcing the law").

concern. Id. at 197; accord id. at 196 ("Disclosing corruption, fraud and illegality in a government agency is a matter of significant public concern."). Plaintiff's lawsuit which revealed and exposed Chaffinch's illegal behavior thus is of the utmost public concern.

   **b. Form and Context**. "The form and context of [ ] speech may help to characterize it as relating to a matter of social or political concern to the community if ... the forum where the speech activity takes place is not confined merely to the public office where the speaker is employed." Holder, 987 F.2d at 195.

   **(1). The Police Department Setting.** The Third Circuit has regularly "noted the 'awesome and dangerous power' conferred to police officers and the 'need in a democratic society for public confidence, respect and approbation of the public officials on whom the state confers that awesome power.'" Caver, 420 F.3d at 256 n.11. When police officers violate the law, that is certainly a matter of public import.

   **(2). Witness Intimidation in the Judicial Context.** "[P]ublic policy ... requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." Briscoe v. LaHue, 460 U.S. 325, 333 (1983). Given that those who file lawsuits challenging government misconduct are those who will give damaging testimony against the government at a later stage of the proceeding, permitting unchecked retaliation against those who invoke the judicial process contributes to and encourages witness intimidation and squarely inhibits the very truth seeking function that courts are supposed to protect. This is why "court testimony, whether compelled or voluntary, is always a matter of public concern." Swartzwelder v. McNeilly, 297 F.3d 228, 238 (3d Cir. 2002) (citing Green v. Phila. Hous. Auth., 105 F.3d 882, 887 (3d Cir. 1997) (voluntary testimony); Pro, 81 F.3d at 1291 (subpoenaed testimony)). "The function of witnesses is fundamental to the administration of justice" and "[e]very consideration of public policy requires that they should be as fearless in testifying as the judge and jury are independent in weighing their testimony." Williams v. Hepting, 844 F.2d 138,

141 (3d Cir. 1988). "The context of a courtroom appearance raises speech to a level of public concern, regardless of its content." <u>Green</u>, 105 F.3d at 887. A public employee's appearance as a witness, even in the absence of actual testimony, also is speech on a matter of public concern. <u>Pro</u>, 81 F.3d at 1291. In <u>Pro</u>, the Circuit found that even when the witness did not actually testify in the court proceedings, because she "was ready to testify truthfully," she was entitled to First Amendment protection. <u>Id.</u>

"The goal of ... civil trials is to resolve a dispute by gathering the facts and arriving at the truth, a goal sufficiently important to render testimony given in these contexts as speech 'of public concern.'" <u>Johnston v. Harris County Flood Control Dist.</u>, 869 F.2d 1565, 1291 (5th Cir. 1989) (quoted in <u>Green</u>, 105 F.3d at 887). The Third Circuit has justified such holdings because of "[t]he utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for appearance and truthful testimony." <u>Green</u>, 105 F.3d at 887. The "judicial interest in attempting to resolve disputes by arriving at the truth would be in jeopardy" if defendants' misconduct is sanctioned <u>Id.</u>

**(3). News Coverage.** Whether a particular issue receives news coverage also is relevant in determining the public import of speech.[27] In the Supreme Court's words, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." <u>City of San Diego v. Roe</u>, 543 U.S. 77, 125 S.Ct. 521, 525-26 (2004) (per curiam). The local, regional and nationwide media coverage of plaintiff's suit and the presence of the media Intervenor in this case (<u>see</u> D.I. 26), speak for themselves.

**(4). Legislative Concern.** Moreover, legislative interest may

---

[27] <u>See, e.g.</u> <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968) (newspaper); <u>O'Donnell v. Yanchulis</u>, 875 F.2d 1059 (television); <u>Holder</u>, 987 F.2d 188 (newspaper); <u>Rode</u>, 845 F.2d at 1202 (newspaper); <u>Watters</u>, 55 F.3d 886 (newspaper); <u>Springer v. Henry</u>, 2002 WL 389136, *5 (D.Del. March 11, 2002) (newspaper).

also be used to demonstrate the public value of speech.  See Rode, 845 F.2d at 1201-02.  In our present case, House Resolution No. 12 attests to the legislative interest in this matter. (A1540-41).

    **2.  Balancing of Interests.**  The trial court must next balance the interests of the government as an employer in promoting the effective and efficient fulfillment of its public responsibilities against the public employee's interest as a citizen in speaking out on matters of public concern and the value to the community at large of being free to hear such speech.  Azzaro, 110 F.3d at 980.  The burden is on the employer here to make a "substantial showing."  Waters v. Churchill, 511 U.S. 661, 674 (1994) (plurality opinion); Watters v. City of Phila., 55 F.3d at 816.

    "The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made."  McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) (internal punctuation omitted).  As the Supreme Court has warned, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."  Rankin v. McPherson, 483 U.S. 378, 384 (1987).

    Importantly however, "[t]his balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so."  San Filippo v. Bongiovanni, 30 F.3d 424, 434 n.11 (3d Cir. 1994) (emphasis added).[28]  If the employer denies that it dismissed the employee because of his protected speech, the balancing test "has no application."  Id.  Accordingly, because defendants flatly deny that they retaliated against plaintiff because of her speech, the balancing test "has no application."  Id.  Consequently, plaintiff's speech is protected by the First Amendment.

    **B.  Substantial or Motivating Factor.**  Following the determination that her conduct was

---

[28]  Accord Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571, 575 n.6 (3d Cir. 2003); Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387, 399, 399 (M.D.Pa. 2003); Mitchell v. Street, 2005 WL 1993774, *2 n.5 (E.D.Pa. Aug. 16, 2005); Bedford v. SEPTA, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994).

constitutionally protected, plaintiff must demonstrate that this conduct was a "substantial" or "motivating factor" in the relevant decision. Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). "But for" causation is not needed. Suppan, 203 F.3d at 236. "' Substantial factor' does not mean 'dominant' or 'primary' factor." Hill, 411 F.3d at 126 n.11. Instead, a plaintiff need only show that her protected First Amendment rights "played any substantial role in the relevant decision." Suppan, 203 F.3d at 236; see Miller v. Cigna, Corp., 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse decision). This is a question of fact, not one of law. Baldassare, 250 F.3d at 195. As discussed at section **B.5.** of the Facts above, the record is overflowing with evidence more than sufficient to meet plaintiff's burden.

      **1. Knowledge of Protected Conduct.** Sufficient evidence must be produced to demonstrate that the defendants knew of the protected activity. Keenan v. City of Phila., 983 F.2d 459, 466 (3d Cir. 1992). Supervisor liability may be established 1) "through allegations of personal direction or of actual knowledge and acquiescence," or 2) "through proof of direct discrimination by the supervisor." Id. Here, all defendants were aware of the filing of plaintiff's lawsuit. (Compl.& Ans. ¶ 109; MacLeish 117-20; Mitchell 28-30; A19,39,191-92,253-54).

      **2. Temporal Proximity.** "[T]emporal proximity between the protected activity and the [retaliation] is sufficient to establish a causal link." Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). The Third Circuit has found that the temporal link can establish causation when the retaliation occurs within two days of the protected conduct, Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), because such a short period of time is "unusually suggestive." Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). As discussed above, the retaliation occurred, not within days, but within mere hours of plaintiff filing her lawsuit.

      **3. Demonstrated Anger, Hostility and Antagonism.** Evidence of anger,

hostility and other antagonism also demonstrates causation. See Woodson, 109 F.3d at 920;

Robinson v. SEPTA, 982 F.2d 892, 895 (3d Cir. 1993); Fasold v. Justice, 409 F.3d 178, 190 (3d

Cir. 2005). As discussed in the Facts at section **B.5.b** above, the record reveals that defendants

were very angry, annoyed, unhappy and otherwise displeased with plaintiff for filing her suit.

    **4. Violations of Law, Policies and Procedures.** Violations of laws, rules and

procedures also are proof of wrongdoing. See Village of Arlington Heights v. Metropolitan Hous.

Develop. Corp., 429 U.S. 252, 267 (1977); Stewart, 120 F.3d at 434; Bray, 110 F.3d at 992, 994.

And as discussed above, the record is overflowing with abundant evidence of the numerous

statutes, policies, procedures, practices, standing orders, rules and regulations that were violated

by defendants when they retaliated against plaintiff.

    **5. Disparate Treatment.** Similarly, evidence of disparate treatment also can

demonstrate causation. San Filippo, 30 F.3d at 444; Brennan v. Norton, 350 F.3d 399, 421 (3d

Cir. 2003). Here there is a clear and striking contrast between the stonewalling and refusal to

comment that occurred after media inquiries about numerous IA charges Chaffinch and MacLeish

faced and the wealth of information released as to plaintiff.

    **6. Selective or Discriminatory Enforcement.** The state simply may not

selectively enforce a statute to punish an individual for exercising her First Amendment rights.

See Cox v. Louisiana, 379 U.S. 536, 557-558 (1965); Holder, 987 F.2d at 197-99; Hill, 411 F.3d

at 131-32. As just discussed, defendants have selectively enforced confidentiality laws and DSP

practices as to plaintiff.

    **7. Pretext.** Pretextual explanations by a defendant also are proof of causation.

Feldman v. Phila. Hous. Auth., 43 F.3d 823, 831 (3d Cir. 1994). This is because "[r]esort to a

pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness

of guilt, which is, of course, evidence of illegal conduct." Sheridan, 100 F.3d at 1069. Pretext

evidence is abundant on our record. First, defendants' justification for releasing plaintiff's IA

information can be disbelieved in light of their past policy and practice when it came to their own IA information. Secondly, defendants' denials of retaliatory intent can be seen as pretextual in light of their past practice of retaliating against those who speak out and file lawsuits. See Arlio, 392 F.Supp.2d at 323-24 (in the First Amendment retaliation context, admitting prior acts of retaliation to establish that the defendants' denials of hostility towards those who filed lawsuits were a pretext for animus towards those in the protected class - those who file lawsuits).

       **8. Falsehoods.** As the Supreme Court has held, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000). For example, from the unprecedented attack on plaintiff's character - the claims that she has sex while executing search warrants and similar baseless allegations which have no record support in her contemporaneously created performance evaluations - the jury can infer guilt. "We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful [retaliation]." Sheridan, 100 F.3d at 1069.

       **9. Intentional Destruction of Key Evidence.** As the Third Circuit has explained a party's destruction of evidence is evidence of guilt and illegal conduct. Id. As explained in great detail in plaintiff's destruction of evidence sanctions brief that is being contemporaneously filed, defendants destroyed defendant Chaffinch's entire work hard drive to deny plaintiff access to key evidence contained therein.

       **10. The Big Picture.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario." Andrews, 895 F.2d at 1484. The big picture in our case makes clear that defendants illicitly sought to destroy plaintiff because she had dared to expose Chaffinch's misconduct to the light of day.

       Thus, in light of the overwhelming record evidence discussed above, it is clear that the

filing of plaintiff's lawsuit, at the very least "played a substantial role" in the decision to release and discuss her internal affairs information with the Delaware media.  As a matter of law, no reasonable jury could conclude otherwise.

**C.  Same Decision Anyway Affirmative Defense.**  The burden of proof then "shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'"  Nicholas v. Pa. State Univ., 227 F.3d 133, 144 (3d Cir. 2000).  This is a question for the fact-finder.  Baldassare, 250 F.3d at 195.  This last step is an "affirmative defense" to be met by the defendants.  Nicholas, 227 F.3d at 144.[29]

But defendants failed to plead this affirmative defense in their Answer to the Complaint as required under the Federal Rules, see Fed.R.Civ.P. 8(c) (a party must plead any "matter constituting an avoidance or affirmative defense"), so no discovery was needed on this issue.  Accordingly, it has been waived.  See Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991) (noting the general rule that "[f]ailure to raise an affirmative defense by response pleading or by appropriate motion generally results in the waiver of that defense.") (internal footnotes omitted).

Accordingly, summary judgment should be granted for plaintiff on her First Amendment free speech Count II.  She has clearly engaged in protected conduct.  And as a matter of law, in light of the overwhelming record evidence, the filing of her lawsuit has certainly played a role in the unprecedented retaliation that occurred.  And lastly, because defendants chose not to assert their affirmative defense, liability has been established and all that is needed is a trial on damages.

**IV.  IN COUNT III PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND HER LAWSUIT WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST HER.**

---

[29]  Accord Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23, 30 (1st Cir. 2004); Adler v. Pataki, 185 F.3d 35, 47 (2d Cir. 1999); Brady v. Fort Bend County, 145 F.3d 691, 712 (5th Cir. 1998); Ostad v. Oregon Health Sciences Univ., 327 F.3d 876, 885 (9th Cir. 2003); Stanley v. City of Dalton, Georgia, 219 F.3d 1280, 1292 (11th Cir. 2000); Yalowizer v. Town of Ranchester, Wyoming, 18 Fed.Appx. 745, 754 (10th Cir. 2001) (all noting that this Mt. Healthy prong is an affirmative defense).

**A. The Big Picture.**  The First Amendment protects the "right to petition the Government for a redress of grievances."  U.S. Const., Amend. I.  "The right to petition the government for grievances is a fundamental component of a just and orderly society."  Anderson v. Davila, 125 F.3d 148, 164 (3d Cir. 1997).  "[W]hen one files a 'petition' one is addressing the government and asking government to fix what ... government has broken or has failed in its duty to repair."  San Filippo, 30 F.3d at 442. "[T]he values in the right of petition as an important aspect of self-government are beyond question."  McDonald v. Smith, 472 U.S. 479, 483 (1985). The right to petition "is implicit in the very idea of government, republican in form."  Id. at 482 (internal punctuation omitted).  The "fundamental importance of the right to petition [is] as a check against the government's abuse of power."  Anderson, 125 F.3d at 162.

**B. The Activities Protected.**  "For decades, the Supreme Court has consistently recognized the right to petition all branches of the government, including the courts, for redress of grievances as among the most precious of the liberties safeguarded by the Bill of Rights."  Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004) (internal punctuation and citation omitted).  "The right to petition extends to all departments of Government."  Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).  It extends to "administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government."  Id.; see McDonald, 472 U.S. at 484 ("filing a complaint in court is a form of petitioning activity").  It "is undisputed that filing lawsuits and grievances ... implicate[s] the Petition Clause of the First Amendment."  Brennan, 350 F.3d at 417; see Anderson, 125 F.3d at 161 (the filing of an employment discrimination lawsuit constitutes protected petitioning).  As the Third Circuit has recently noted, "any lawsuit brought by an employee against a public employer qualifies as a protected 'petition' under the First Amendment so long as it is not 'sham litigation.'"  Hill, 411 F.3d at 126.

**C. The Specifics.**  The protected status of petition is a matter of law.  Hill, 411 F.3d at

127.  Like free speech claims, petition clause claims also are analyzed using the same three-part protected activity analysis.  Id. at 125.  Importantly, the protected activity analysis under the petition clause is different than that under the free speech clause in that there is no disruption balancing nor is there a public concern analysis.  Instead, matters of purely private concern are protected, as long as the petition is not a sham.  Hill, 411 F.3d at 126; San Filippo, 30 F.3d at 440, 443; We, Inc., v. City of Phila., 174 F.3d 322, 330 n.2 (3d Cir. 1999); Brennan, 350 F.3d at 417; see San Filippo, 30 F.3d at 434-43.  As the Circuit stated in Brennan, a plaintiff need only show that their petition "was not frivolous in order to make out a prima facie claim for retaliation under the Petition Clause."  350 F.3d at 417.  The government simply may not retaliate against those who petition it as such a result "is hardly consistent with the fundamental principles of orderly protest, which our Constitution sought to preserve by protecting our right to petition the government for redress."  Anderson, 125 F.3d at 163.  And as the factual record set forth above demonstrates, the filing of plaintiff's initial gender discrimination lawsuit with this Court was clearly not a sham.  Thus, it is protected by the petition clause.

> **D.  Substantial or Motivating Factor and Same Decision Anyway.**  Plaintiff incorporates by reference her analysis discussed in the free speech argument above as to these two causal factors.  As a result, summary judgment should be granted for plaintiff.

## CONCLUSION

For the above stated reasons, the Court should grant summary judgment for plaintiff on liability for her First Amendment speech and petition clause counts and order a trial on damages alone.  Additionally, the Court should grant partial summary judgment and find that plaintiff has established a prima facie case of gender discrimination and that she has sufficient evidence to go to the jury under both prongs of Fuentes.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: January 17, 2006          Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

January 17, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

        Ralph K. Durstein III, Esquire
        Department of Justice
        Carvel State Office Building
        820 N. French Street
        Wilmington, DE 19801

        James E. Liguori, Esquire
        Liguori, Morris & Yiengst
        46 The Green
        Dover, DE 19901

        /s/ Stephen J. Neuberger
        **STEPHEN J. NEUBERGER, ESQ.**

Conley/ Briefs / Conley - SJOB.final

-42-