**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1394-GMS |
| | ) | |
| COLONEL L. AARON CHAFFINCH, | ) | |
| Individually and in his official capacity as the | ) | |
| Superintendent, Delaware State Police; et al. | ) | |
| | ) | |
| Defendants, | ) | |

**OPENING BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT,
AS TO COUNTS TWO AND THREE OF THE AMENDED COMPLAINT**

**DEPARTMENT OF JUSTICE
STATE OF DELAWARE**

RALPH K. DURSTEIN, III, I.D. #912
STEPHANI J. BALLARD, I.D. #3481
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants MacLeish, Mitchell
and Division of State Police

DATED:  January 17, 2006

## **TABLE OF CONTENTS**

Page

TABLE OF CITATIONS .......................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ................................................1

STATEMENT OF FACTS .......................................................................................2

    1. The October 25, 2004 "Trial Board" e-mail ............................................. 2

    2. Defendants' Actions in Response to Inquiry from Delaware State News ...................4

    3. Defendants' Attempt to try to ascertain who had released the e-mail ....................... 6

ARGUMENT ...........................................................................................................8

I.      SUMMARY JUDGMENT SHOULD BE GRANTED AS TO COUNTS II AND III,
         AS THERE IS NO EVIDENCE WHATSOEVER IN THE RECORD TO SUPPORT
         PLAINTIFF'S ALLEGATIONS OF "FIRST AMENDMENT" RETALIATION AS
         ALLEGED, AND NO EVIDENCE OF ANY ILLEGAL CONDUCT  ON THE
         PART OF DEFENDANTS...................................................................................8

A.  Standard of Review.......................................................................................8

B.  There is No Evidence In The Record to Support Plaintiff's Allegations
     of "Retaliation" ...........................................................................................9

    1.  Defendants did not release the e-mail to the newspaper reporter ......................9

    2.  When the reporter contacted DSP, Defendants promptly sought legal advice
       as to how to respond and followed that advice to the letter.............................11

    3.  Defendants gave out no information to the reporter other than to
       confirm the contents of the e-mail, as advised by counsel...............................14

    4.  Nothing in the e-mail constituted confidential information under LEOBOR...17

    5.  Defendants made reasonable efforts, at their own initiative, to try
       to find out who, among the 637 addressees, might have given the
       e-mail to the newspaper reporter...................................................................21

6.  Secretary David Mitchell had no involvement whatsoever with this matter, other than to learn of DSP's actions after the fact ...............................23

7.  Defendant Chaffinch had been placed on leave prior to Eldred's contact with DSP, and played no part in DSP's ensuing action......................24

8.  All evidence taken in discovery rebuts Plaintiff's claims, such that no reasonable jury could return a verdict in her favor on these Counts...............25

II.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO COUNTS II AND III, IN THAT PLAINTIFF'S CONDUCT IN FILING A LAWSUIT TO REDRESS PURELY PERSONAL EMPLOYMENT GRIEVANCES DOES LEGALLY NOT STATE A CLAIM FOR "RETALIATION" UNDER THE FIRST AMENDMENT ..........27

1.  Plaintiff's purported speech was not constitutionally protected, under Supreme Court First Amendment jurisprudence............................................................28

2.  Plaintiff's purported speech was not a substantial or motivating factor for the alleged adverse employment action .................................................................34

3.  Defendants would have made the same decision even in the absence of Conley's lawsuit ...................................................................................................36

III.   DELAWARE STATE POLICE AND DEFENDANTS IN THEIR OFFICIAL CAPACITIES ARE IMMUNE FROM SUIT UNDER THE ELEVENTH AMENDMENT, AND ENJOY QUALIFIED IMMUNITY IN THEIR INDIVIDUAL CAPACITIES ................................................................................................37

1.  Eleventh Amendment Immunity .....................................................37

2.  Qualified Immunity .........................................................................38

CONCLUSION............................................................................................40

Exhibit "A" – Unreported Cases

## TABLE OF CITATIONS

**Case Name**                                                                                 **Page**

Albright v. Oliver, 510 U.S. 266 (1994) ............................................................ 38

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ...................................... 8-9

Baker v. Mecklenburg County, 853 F.Supp. 889 (W.D.N.C. 1994),
    *aff'd* 48 F.3d 1215 (4th Cir. 1995) ............................................................ 31-32

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003) ................................................ 35

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................................................... 8-9

Coastal Barge Corp. v. Coastal Zone Indus. Control Board, 492 A.2d. 1242 (Del. 1985) .... 18

Connick v. Myers, 461 U.S. 138 (1983) ................................................... 28-33, 36

Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983) .............................................. 32

Edelman v. Jordan, 415 U.S. 651 (1974) ........................................................... 37

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ......................................................... 38

Lee v. Mihalich, 847 F.2d 66 (3d Cir. 1988) ................................................... 38-39

McDonald v. Smith, 472 U.S. 479 (1985) ...................................................... 32-33

Miller v. City of Philadelphia, 174 F.3d 368 (3d Cir. 1999) ................................ 38

Morgan v. Ford, 6 F.3d 750 (11th Cir. 1993),
    *cert denied*, 512 U.S. 1221 (1994) .......................................................... 29-31

Mt. Healthy City School Dist. Bd. of Education v. Doyle,
    429 U.S. 274 (1977) .................................................................. 27, 33-34, 36

Neeley v. Samis, 183 F. Supp. 2d 672 (D. Del. 2002) ......................................... 37

Pickering v. Board of Education, 391 U.S. 563 (1968) ....................................... 28

Pinkert v. Olivieri, 2001 WL 641737 (D.Del. 2001) ............................................. 9

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)
    *cert denied*, 513 U.S. 1082 (1995) .......................................................... 31-34

Schlichter v. Limerick Township, 2005 WL 984197 (E.D. Pa. 2005)...................................35

Schwartwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002) ...............................................28-29

Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996)....................................................37

State Dept. of Labor v. Reynolds, 669 A.2d 90 (Del. 1995)..................................................18

Street v. Cherba, 662 F.2d 1037 (4th Cir. 1981).................................................................39

We, Inc. v. City of Philadelphia, 174 F.3d 322 (3d Cir. 1999)..............................................33

Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989) .................................................38

Yatvin v. Madison Metropolitan School Dist., 840 F.2d 412 (7th Cir. 1988)...................33-34

**Statutes, Rules and Other Authorities**

United States Constitution, First Amendment ................................................................. *passim*

United States Constitution, Eleventh Amendment ..........................................................37-38

United States Constitution, Fourteenth Amendment ............................................................37

42 U.S.C.A. §1983.............................................................................................................37-38

11 Del.C. Ch. 92 ......................................................................................................................5

11 Del.C. §9200(c)(12) .....................................................................................................17-18

11 Del.C. §9203 ......................................................................................................................18

11 Del.C. §9204 ......................................................................................................................18

Federal Rule of Civil Procedure 56.................................................................................8, 26, 40

DSP Rules, VII-5-13 .........................................................................................................3-4, 18

DSP Rule and Regulation #4 ..........................................................................................15-16

DSP Rule and Regulation #40 ........................................................................................15-16

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed her original complaint in this matter on October 27, 2004, alleging gender discrimination as a result of her failure to be selected, from among more than 20 troopers holding the rank of Captain, for two appointments to the rank of Major in the Delaware State Police (DSP) in 2003. (Docket Index #1 (D.I. 1)). There are only five Majors in the Delaware State Police and, along with the Lt. Colonel, they make up the "Executive Staff" of the Colonel/Superintendent. Prior to service of the original complaint, Plaintiff filed a "First Amended Complaint" on December 6, 2004. This complaint was amended for the purpose of adding "Count II (Free Speech Clause Retaliation)" and "Count III (Petition Clause Retaliation)." (D.I. 7).[1] The essence of Plaintiff's new allegations was that, "mere hours" after the filing of the original Complaint, Defendants MacLeish and/or Mitchell and/or Chaffinch "conspired" to "leak" purportedly confidential internal affairs information regarding Plaintiff to the Delaware State News, as "retaliation" for Plaintiff's filing suit. (¶¶110-111 ff. (A-28-29)). Defendants' Answer to the Amended Complaint was filed on January 11, 2004, denying all allegations of wrongdoing. (D.I. 33).

According to the Court's scheduling Order, discovery ended on December 31, 2005.[2] Plaintiff conceded as of September 16, 2005 that discovery was complete as to Counts II and III--the First Amendment "retaliation" counts. (D.I. 75 at p.1). Since that time, Plaintiff has also taken the deposition of W. Michael Tupman, Esquire, the Deputy Attorney General who gave the legal advice with respect to the "e-mail issue" discussed herein. In addition, Plaintiff's own deposition was taken on December 7, 2005, and she was questioned as to the basis for her claims in Counts II and III. Thus, the evidentiary record as to Counts II and III is complete and consists of the depositions of:

---

1 Plaintiff's Amended Complaint and Defendants' Answer thereto are included, for the Court's convenience, in the Appendix to this brief.
2 The parties have stipulated to extend the discovery cut-off as to certain outstanding issues pertaining to Count I

Secretary David Mitchell, Colonel Thomas MacLeish, Lt. Joseph Aviola, Mr. Tupman and Plaintiff, along with documents produced by Defendants responsive to Plaintiff's second and third set of requests for production. (D.I. 69-70). In addition, affidavits of Captain James Paige, Captain Robert Coupe and former Colonel L. Aaron Chaffinch[3] are being submitted in support of this motion.

As discussed more fully herein, Plaintiff has produced no evidence whatsoever in support of her conspiracy theory or her claims of First Amendment "retaliation" in Counts II and III. Plaintiff has failed to identify any information deemed confidential that was disclosed by the defendants. There is no evidence that any information from her Internal Affairs file was released. Rather, the testimony and documentary evidence is undisputed that all actions taken by Defendants, in response to an unsolicited inquiry, were taken in accordance with the advice of their legal counsel, and did not violate any law or regulation. Moreover, none of these actions were related in any way to the filing of the lawsuit. For these reasons, no reasonable jury could find in plaintiff's favor on these counts and summary judgment should be granted to defendants as to Counts II and III.

This is Defendants' Opening Brief in support of their motion for Summary Judgment as to these counts.

---

only, which have no bearing on this motion.

3  This Affidavit is being submitted as an unsworn declaration, due to Colonel Chaffinch's unavailability to sign it prior to the filing of this motion. Chaffinch is out of state until January 26, 2006. Counsel can represent, as officers of the Court, that Chaffinch has verified the matters contained in the affidavit, and a sworn copy will be added to the record as soon as it is obtained.

2

## STATEMENT OF FACTS

### 1. The October 25, 2004 "Trial Board" e-mail.

On October 25, 2004, an e-mail was sent by Captain James Paige of the Delaware State Police ("DSP") Internal Affairs Office[4] to "DSP Users" (that is, all DSP personnel) stating that a Divisional Trial Board was scheduled to hear disciplinary charges against Plaintiff, Barbara Conley, for alleged violations of two Rules and Regulations, and naming the members of the Trial Board.  (A-61; Paige and Coupe affidavits, A-1-7).  This type of e-mail is routinely issued, pursuant to written DSP policy,[5] to all personnel, uniformed and civilian, whenever a trial board is convened to hear a disciplinary matter, so that personnel can report potential bias or conflicts (if any) of the trial board members or convey any information relevant to the proceeding.  (DSP Rules, VII-5-13 (A-65).  *See also* Paige & Coupe affidavits (A-1-7).  Specifically, Rule VII-5-13 provides:

2.  Whenever any member of the Division has been charged with an alleged transgression of the Division's Rules and Regulations and a Divisional Hearing Board is to be convened, the Internal Affairs Officer will transmit an e-mail to all troops and sections which will:

a.      Identify the defendant officer

b.      Identify the Rule or Job Performance Standard allegedly violated.

c.      Identify the date, time and place of the hearing

d.      Identify the officers selected to hear the matter

3.  Upon posting the e-mail, any employee of the Division who believes that any officer selected to the Board  would be biased, prejudiced, or otherwise predisposed in the matter, shall immediately contact the O.I.C. of Internal Affairs.

4.  Additionally, any employee of the Division who may possess information that would affect the proceeding shall immediately contact the O.I.C. of Internal Affairs.

---

4  The Internal Affairs office is the "disciplinary body" for Delaware State Troopers, which investigates and charges all allegations of trooper misconduct.  Complaints against officers may be brought by citizens or raised internally within the Division.  If contested by the officer, charges will be prosecuted before a Trial Board.
5  Copies of the applicable Regulations regarding trial board emails were produced during discovery and are included in Defendants' Appendix to the Motion for Summary Judgment.  (A-65).

(A-66).  *See also* Conley at 114 (A-86).

The e-mail in this case conformed in all respects to the specific requirements of Rule VII-5-13.  This e-mail is not considered part of the Internal Affairs investigation or the IA file, but rather issues only when the investigation has concluded and it has been determined that an officer should be charged.  (Paige Aff., A-1).  The e-mail did not disclose any confidential information from the Internal Affairs investigation of Plaintiff, nor any information at all beyond that mandated by Rule VII-5-13.  (Paige & Coupe Affs., A-1-7).  At the time of the October 25, 2004 e-mail, the group addressee "DSP Users" consisted of more than 600 individuals.  (*See* MacLeish at 145 (A-114); Conley at 122 (A-91)).

Plaintiff filed her initial complaint in this litigation on October 27, 2004.  (D.I. 1).  At some point between the issuance of the trial board e-mail on October 25, 2004, and October 28, 2004 (the day after Plaintiff filed suit), Tom Eldred, a reporter for the Delaware State News, obtained a copy of the trial board e-mail from an unknown source.  On October 28, 2004, Eldred telephoned the DSP public information officer, Lt. Joseph Aviola, to verify the e-mail's authenticity.  (Aviola at 53-55 (A-68–70)).

## 2. Defendants' Actions in Response to Inquiry from Delaware State News.

After receiving the phone call from the reporter on October 28, Aviola promptly sought out his superiors to inform them of the inquiry.  (Aviola at 55 (A-70)).  He went directly upstairs in the Headquarters building and ran into Lt. Colonel (then Acting Colonel) MacLeish, who was with Captain James Paige and Lt. Robert Coupe, both of Internal Affairs, on an unrelated matter.  (Id. at 55, 60-61 (A-70, 75–76); MacLeish at 137 (A-106)).  Aviola then went into a conference room with MacLeish and the two internal affairs officers to inform them about the call from Eldred.  (Aviola at 55 (A-70).  When informed of the reporter's inquiry, Lt. Colonel MacLeish immediately called State

Police legal counsel, W. Michael Tupman, Deputy Attorney General, and put him on a conference call. (Aviola at 55-56, 60-61 (A-70-71, 75-76); MacLeish at 137 (A-106)). Lt. Aviola told Mr. Tupman what had transpired, and Tupman advised him to "make [Eldred] produce the document . . . See the document. If it appears to be our document, then, yes, you can comment on the content of the e-mail and the content only." (Aviola at 56-57 (A-71-72)). DAG Tupman advised that confirming the document would not constitute a violation of LEOBOR [Law Enforcement Officers Bill of Rights, 11 Del.C. Ch.92] nor of any of the rules and regulations of DSP. (MacLeish at 139-40, 161, 166, 209-210 (A-108-109; 123, 125, 128-129); Tupman at 36-40 (A-147-151)). Lt. Col. MacLeish instructed Lt. Aviola to respond to the reporter in conformance with the advice given by Mr. Tupman. (MacLeish at 140 (A-109)). Aviola did so and had Eldred fax the document in his possession, which was a copy of the official DSP e-mail. (Aviola at 65-66 (A-80-81)). That was the extent of the discussion as to how to respond to the reporter's inquiry. (Aviola at 57, 90-91 (A-72, 83-84); MacLeish at 165-66, 209-210 (A-124-125, 128-129)). Lt. Aviola confirmed that his sole communications with reporter Eldred were in accordance with the legal advice given, and went no further:

> Q. You did not receive any other documents from Tom Eldred?
> A. No, ma'am.
> Q. You did not disclose any other Internal Affairs documents to Tom Eldred?
> A. No, ma'am.
> Q. Now, in the conference room when you had Mike Tupman on the speakerphone, did you hear the advice Mike Tupman was giving?
> A. Yes, I did.
> Q. Did you believe that your response to Tom Eldred complied with that advice?
> A. Yes.
> Q. Did Lieutenant Colonel MacLeish tell you to go beyond Mike Tupman's advice --
> A. No.
> Q. -- in terms of speaking with Mr. Eldred?
> A. No, ma'am.

(Aviola at 90-91 (A-83-84)). In other words, Aviola received and followed legal advice to confirm

the "four corners" of the e-mail.  (Tupman at 94 (A-156); MacLeish at 166, 209-210 (A-125, 128-129)).  Lt. Aviola did identify, at the reporter's request, the nature of the two rules and regulations being charged.  (Aviola at 70 (A-82)).  This information is public information, which would be freely available at any time upon request.  (Aviola at 91 (A-84); Tupman at 96 (A-158)).  No information beyond what was already in the e-mail was released.  (MacLeish at 207 (A-126); Aviola at 90 (A-83)).  Plaintiff herself testified that she did not contend that anything beyond the contents of the October 25, 2004 e-mail was released or confirmed.  (Conley at 118 (A-87)).

The deposition testimony of Colonel MacLeish and Deputy Attorney General Tupman, as to this meeting and conference call, was identical to Lt. Aviola's recollection.  (MacLeish at 135-140 (A-104-109); Tupman at 33-39 (A-144-150)). *See also* Coupe and Paige affidavits, (A-1-7).   Lt. Aviola testified that Lt. Robert Coupe took notes at the meeting/teleconference with Mr. Tupman.  (Aviola at 62 (A-77)).   Defendants produced in discovery the notes taken by both Col. MacLeish and Lt. Coupe during the conference call with DAG Tupman, which conform to the testimony above.  (A-62-63).  Neither Secretary Mitchell nor Colonel Chaffinch were involved with the e-mail issue, and played no part in the meeting as to how to respond to the reporter.  (Aviola at 64 (A-79)).  Colonel MacLeish did advise Secretary Mitchell of the legal advice after it was received, and Mitchell stated that he concurred.  (MacLeish  at 134-35, 141-42 (A-103-104, 110-111)).

**3. Defendants' Attempt to try to ascertain who had released the e-mail.**

Colonel MacLeish testified that, in addition to seeking legal advice as to how to answer the reporter's inquiry, his immediate concern was finding out, if possible, exactly who had given the e-mail to the reporter.  (MacLeish at 135-39, 145-150 (A-104-108, 114-119)).  This was actually the issue he addressed first with Deputy Attorney General Tupman.  (Id at 141, 145 (A-110, 114); A-63).  Colonel MacLeish was upset that the e-mail had been released outside the Division.  (Id at 146, (A-

115)).  MacLeish testified that he wanted to find out who had "leaked" the e-mail so that there could be an internal affairs investigation and that person could be brought up on charges.  (Id at 138, 141 (A-107, 110)).  To that end, he wanted to obtain a copy of Eldred's document to see, first of all, whether the e-mail might have any identifying characteristics.  (Id at 138 (A-107).  Secondly, he assigned Captain Paige, the officer in charge of the Internal Affairs unit, to inquire whether the DSP High Tech Crimes Unit (HTCU) had some way of determining which of the approximately 637 recipients might have disseminated the e-mail outside of the Division.  (Id at 138, 145-47 (A-107, 114-116); Tupman at 87-88 (A-153-154); A-1)).

Captain Paige made the inquiry as directed and, on November 1, 2004, he reported back to Colonel MacLeish that he had consulted with HTCU and IT and had learned that identifying the person who had released the e-mail was "basically impossible" on the limited information available. A1; (MacLeish at 147, 149 (A-116, 118)).  *See also* Tupman at 88 (A-154). Paige created handwritten notes of his inquiries which show that he requested, and Keith Caskey (DSP IT) conducted, an electronic search to see if anyone had forwarded the e-mail.  (A-64).  Paige reported back to MacLeish (who reported in turn to Secretary Mitchell) that the search was unproductive, and it was determined that further investigation into more than 600 "suspects" would be fruitless.  Id. MacLeish at 147-49 (A-116-118); Mitchell at 55-56 (A-141-142).

**ARGUMENT**

**I.     SUMMARY JUDGMENT SHOULD BE GRANTED AS TO COUNTS II AND III AS THERE IS NO EVIDENCE WHATSOEVER IN THE RECORD TO SUPPORT PLAINTIFF'S ALLEGATIONS OF "FIRST AMENDMENT" RETALIATION AS ALLEGED, AND NO EVIDENCE OF ANY ILLEGAL CONDUCT ON THE PART OF DEFENDANTS.**

**A.     Standard of Review.**

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment and judgment shall be entered forthwith, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

Disputes over facts are "material" only if they are critical facts which might affect the outcome of the suit under the governing substantive law. Id. at 248. Moreover, summary judgment is barred only if the dispute of material fact is "genuine", meaning "such that a reasonable jury could return a verdict for the nonmoving party" on the issue. Id. The moving party may satisfy the requirements of Rule 56(c) by showing the Court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). That showing is amply made below. In response to a motion for summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, . . . [but] must set forth *specific fact*s that indicate a genuine material issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). This Court has held that "[t]he mere existence of some evidence in support of the nonmoving party, however, will

8

not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party of that issue." <u>Pinkert v. Olivieri</u>, 2001 WL 641737 (D.Del. 2001) (*citing* <u>Anderson</u>, *supra*).  If the nonmoving party cannot make this showing, the moving party is entitled to judgment as a matter of law.  <u>Id</u> (*citing* <u>Celotex</u>, *supra*).

> **B.**      **There is No Evidence In The Record to Support Plaintiff's Allegations of "Retaliation."**

>      **1.  Defendants did not release the e-mail to the newspaper reporter.**

Counts II and III of Plaintiff's amended complaint are premised on her allegation that "as a direct and proximate result" of the filing of the original Complaint in this matter, Defendants Secretary Mitchell, Colonel Chaffinch and (then) Lt. Colonel MacLeish "set upon a course of conduct designed to retaliate against Plaintiff for daring to file a lawsuit challenging illegal practices in the State Police." (¶ 110 (A-28)).   Plaintiff first broadly contends that "defendants and their agents leaked confidential internal affairs material about plaintiff to the news media, specifically, to a Delaware State News reporter."  (<u>Id</u>., ¶ 111).  Defendants construe this as an allegation that the named defendants themselves, in cooperation with unnamed "agents," may have "leaked" the trial board e-mail to the reporter, Tom Eldred.

As a preliminary matter, given that the alleged "leak" is characterized as "retaliation" for the lawsuit filed on October 27, 2004, it is notable that Plaintiff has failed to adduce any evidence establishing or suggesting when the "leak" took place.  The trial board e-mail was issued to 600+ DSP personnel on October 25, 2004.  Suit was filed on October 27, 2004, although service was delayed for many weeks. (MacLeish at 120 (A-99)). Tom Eldred called PIO Aviola on October 28, 2004, to inquire about the e-mail he had received.  Thus, the e-mail was in circulation for approximately two days before Plaintiff's suit was filed.  The record is silent as to when (or how) the

e-mail was sent to Eldred, when Eldred first saw it, or how long he waited before contacting Aviola. Certainly if the reporter had obtained the e-mail *prior to* the filing of the lawsuit, it could not be retaliation for the as yet unknown suit. There was no demand or other advance notice of the filing of the lawsuit, and the plaintiff has admitted that she did not pursue any administrative remedies before filing. (A-53). The timing, an element upon which Plaintiff would bear the burden of proof, is unknown. Plaintiff adduced no facts in discovery which would support the timing of the "leak", let alone the identity of the person who released the e-mail to Eldred.

Defendants Mitchell and MacLeish,[6] along with Lt. Aviola, have each denied under oath that they released the e-mail or authorized its release to Eldred, and Plaintiff has produced no evidence whatsoever to the contrary.[7] (*See* Aviola at 57 (A-72); MacLeish at 146 (A-115); Mitchell at 50-51 (A-136-137)). Most notably, Plaintiff herself conceded at her deposition (on December 7, 2005) that she "ha[d] no idea who leaked it to the media." (Conley at 119 (A-88)). When asked about the named defendants' alleged involvement, she testified as follows:

> Q. The f-a-x, the facsimile I guess we should say, of the message to Eldred. Do you know who did that?
> A. No, I don't.
> Q. What evidence do you have, assuming for the moment that someone within the State Police did provide the information to the reporter, what evidence do you have that the person who did that was authorized by Secretary Mitchell?
> A. I don't have any.
> Q. Do you have any evidence that the person who did that was authorized by acting Colonel MacLeish?
> A. No.
> Q. Do you have any evidence that the person who did that was authorized to do so by Colonel Chaffinch?

---

6 Plaintiff never inquired of former Colonel Chaffinch, at his deposition, if he had released the email. In his Affidavit, he avers that he did not, nor did he authorize anyone else to do so. (A-8). Further, Colonel Chaffinch was relieved of his command and placed on administrative leave immediately upon the filing of Plaintiff's lawsuit. Plaintiff has alleged that the "leak" occurred after the filing of Plaintiff's lawsuit, when Chaffinch would not have been acting as Colonel or even present on DSP premises.

7 Colonel MacLeish, for example, testified that he was out of state on a field trip with his son in Gettysburg, PA on the day Plaintiff filed suit, and when she alleges the "leak" to Eldred occurred. (MacLeish at 117-19 (A-96-98).

A.  To send the original fax?  No.

(Conley at 123-24 (A-92-93)).

Putting aside the questionable legal basis for this Count (*see* Section II, *infra*), there are plainly no facts in the record to support the factual allegations raised under "Defendants' First Act of Illegal Retaliation in Violation of State Law," ¶¶ 111-114 (A-28-29).  Furthermore, the actual facts adduced in discovery establish that neither the named defendants nor any of their "agents" played any part in the release of the October 25, 2004 trial board e-mail to Eldred.  Thus, there are no genuine issues of material fact as to this allegation, and Defendants are entitled to summary judgment.

### 2.  When the reporter contacted DSP, Defendants promptly sought legal advice as to how to respond and followed that advice to the letter.

However it occurred, the Delaware State News reporter did get ahold of the trial board e-mail, and he called Lt. Aviola, the Public Information Officer, on October 28, 2004, seeking confirmation and comment on the document.  Plaintiff claims in her amended complaint (¶115 (A-29)) that the State News could not run a story on the e-mail until it obtained a confirmation from DSP.  That allegation is denied, and has not supported by any evidence produced in discovery.  Notably, Plaintiff has also failed to produce any evidence in support of her allegation that the reporter, in fact, published <u>anything</u> in the newspaper as a result of Lt. Aviola's confirmation of the trial board e-mail.  (*See* Amd. Compl. ¶125, A-30-31).  Defendants are aware that news stories ran much later in time, when Plaintiff herself opened the entire disciplinary hearing to the public, but are unaware of any story on the trial board close in time to October 28, 2004.  At any rate, no such evidence appears in the record.

Plaintiff alleges, as her "Second Act of Illegal Retaliation," that Secretary Mitchell and

Colonel MacLeish "ordered, authorized or otherwise directed [Lt. Aviola] to violate and ignore the Law Enforcement Officer's Bill of Rights and to commit the crime of official misconduct by discussing this confidential information with the news media." (¶119). Plaintiff claims that Defendants' purpose was to stifle and intimidate other employees from exercising their (purported) First Amendment right to file lawsuits. (¶120). Finally, Plaintiff claims that Defendant Chaffinch ratified or participated in DSP's actions with regard to the call from the newspaper reporter. As with the allegations in the "First Act of Retaliation," discovery taken in this case provides not a shred of evidence to support Plaintiff's additional allegation of retaliation and, in fact, shows that the State Defendants acted properly, legally and thoughtfully in determining how to respond to the media inquiry. Defendant Chaffinch, who had been placed on administrative leave by Secretary Mitchell, played no role in these events at all. (A-8).

As a threshold matter, it is important to note that it was not any of the Defendants who initiated contact with the reporter or volunteered any information. On October 28, 2004, there was a surprising and unsolicited inquiry by reporter Eldred to the PIO that led to the meeting and response that same day. The sworn testimonial and affidavit evidence of *all five witnesses* (including the attorney) present at this meeting is undisputed as to what happened next. What followed the reporter's inquiry, according to the undisputed evidence, was a reasoned and proper response on the part of Colonel MacLeish and DSP personnel, entirely consistent with the Law Enforcement Officers' Bill of Rights and the DSP Administrative Manual.

As soon as the call came in from Eldred, stating that he had a copy of Captain Conley's trial board e-mail, Lt. Aviola immediately and properly consulted his superiors, going directly to then-Acting Colonel MacLeish for advice on how to respond. Colonel MacLeish took the matter very seriously, and gave it his full attention, convening an immediate meeting with Aviola and the Internal

Affairs officers Paige and Coupe. (Aviola at 60 (A-75)). When Aviola told them about his conversation with Eldred, Aviola testified "Lieutenant Colonel MacLeish said 'Get Mr. Tupman on the phone.'" (Id; MacLeish at 137 (A-106)). They did so, and proceeded to discuss the issue. Clearly, reaching out to Divisional counsel was a prudent measure, under the circumstances.

Colonel MacLeish first expressed his concern and displeasure that this document had gone outside the Division and wanted to know what could be done to find and discipline the person who had released it, assigning Captain Paige to this task. Next, the conversation turned to what to do now that Eldred had the e-mail, and Mr. Tupman's advice was requested. As discussed in more detail in the statement of facts, Tupman's advice was first, to make Eldred produce the document (e-mail) he claimed to have, to make sure he actually had the actual DSP document. Second, if the document was legitimate, Tupman advised that Aviola could confirm the four corners of the e-mail, but not to comment on the specifics of the case. Aviola at 56-57 (A-71-72); MacLeish at 166, 209-210 (A-125, 128-129); Tupman at 36-37, 93-94 (A-147-148, 155-156)). DAG Tupman advised that confirming the accuracy of the contents of the document would not constitute a violation of LEOBOR nor of the DSP Rules and Regulations. (MacLeish at 139-40, 209-210 (A-108-109, 128-129); Tupman at 36-37, 39-40 (A-147-148, 150-151)). Colonel MacLeish then instructed Lt. Aviola to respond to the reporter by verifying the e-mail in accordance with the advice given by Mr. Tupman. (MacLeish at 140, 209 (A-109, 128)). Aviola did so and that was the end of the issue.

What is notably absent from these facts, related by all five individuals involved, is evidence of *any* retaliatory intent or conduct, or even the remotest suggestion of animus toward Plaintiff. The name of Captain Conley was not brought up, except to identify that the trial board e-mail pertained to her charges. There was no discussion of the lawsuit. There was no discussion of anyone's feelings about the lawsuit, or about Captain Conley. There was no discussion of Captain Conley having

"spoken out" against the Division.  There was no discussion of any other employees, lawsuits or potential lawsuits.  The attorney's advice was not predisposed; Colonel MacLeish did not express any desire to release information or to confirm the e-mail:

> Q.   Did you broach Mike Tupman about the issue?  Did you tell him you wanted to release information?
>
> A.   No, I did not.

(MacLeish at 207-08 (A-126-127)).

From these facts, Plaintiff incredibly claims "retaliation" against her and a conspiracy to infringe the First Amendment rights of others.  What actually took place on October 28, 2004 was the opposite of the "conspiracy theory" Plaintiff alleges.  Defendants were here faced with an unprecedented situation (a reporter obtaining an internal e-mail) not of their own making.  They recognized that certain laws and rules (LEOBOR and DSP Regulations) might conceivably be implicated.  They prudently sought the advice of their legal counsel as to whether and how those laws might govern what response could or should be given.  They obtained and followed, to the letter, the advice of their attorney.  Far from constituting "illegal," or even "criminal" conduct, as alleged by Plaintiff in her complaint (¶¶119-20; 123-25 (A-30-31)), Defendants' actions, on behalf of the Delaware State Police, were as measured and professional a response as one could hope for.  Quite simply, the record is devoid of any evidence that could prove Plaintiff's case, and Defendants are entitled to summary judgment on these "retaliation" counts.

### 3. Defendants gave out no information to the reporter other than to confirm the contents of the e-mail, as advised by counsel.

Plaintiff repeatedly alleges in the amended complaint that Defendants ordered Lt. Aviola to "discuss" details of Captain Conley's internal affairs investigation and charges.  (¶¶ 119, 122-23, 129 (A-30, 31-32).  Once again, the record obtained in discovery entirely contradicts this allegation.  The

evidence is undisputed that Defendants, acting on advice of counsel, confirmed the "four corners" of the October 25, 2004 e-mail, and gave out no further information concerning Captain Conley or any facts or details concerning the investigation and charges. The only information Lt. Aviola provided the reporter (upon request), that was not actually spelled out in the body of the e-mail, was the nature of Rules and Regulations 4 and 40 (*i.e.* the text of these provisions). (Aviola at 70 (A-82)). The e-mail stated that Captain Conley was charged "with three counts of violating Delaware State Police Rule and Regulation #4 and one count of violating Delaware State Police Rule and Regulation #40." (A-61), but it did not include the text of these rules. Lt. Aviola testified that the content of these Rules was a matter of public record:

> Q. The rules and regulations cited in Exhibit 14, numbers 4 and 40, are they a matter of public information, the content of those rules?
> A. Yes.
> Q. If Tom Eldred were to call out of the blue and say what does this rule say, would you let him know?
> A. Yes.

(Aviola at 91 (A-84)). Lt. Aviola confirmed that he believed his communications with reporter Eldred were in accordance with the legal advice given, and went no further:

> Q. You did not disclose any other Internal Affairs documents to Tom Eldred?
> A. No, ma'am.
> Q. Now, in the conference room when you had Mike Tupman on the speakerphone, did you hear the advice Mike Tupman was giving?
> A. Yes, I did.
> Q. Did you believe that your response to Tom Eldred complied with that advice?
> A. Yes.
> Q. Did Lieutenant Colonel MacLeish tell you to go beyond Mike Tupman's advice --
> A. No.
> Q. -- in terms of speaking with Mr. Eldred?
> A. No, ma'am.

(Aviola at 90-91 (A-83-84)). Colonel MacLeish testified that he did not instruct or advise Lt. Aviola to release any information to the reporter beyond the information which Mike Tupman

had said DSP could confirm:

> Q.  Did you release any information beyond what was already in the e-mail [Eldred] had?
> A.  No, I did not.
> Q.  Did you instruct Lieutenant Aviola to release any information beyond what Mike Tupman advised you you could release?
> A.  No, I did not.

(MacLeish at 207 (A-126)).  Finally, Deputy Attorney General Tupman confirmed that the actions

taken by Aviola following the teleconference comported with his advice:

> Q.  Lieutenant Aviola testified that  . . . Mr. Eldred asked him what those rules and regulations [#4 and #40] referred to and that he identified for Mr. Eldred what they referred to.  Would you consider that to be inconsistent with the advice you gave the State Police?
> A.  No.
> Q.  Are those rules and regulations a matter of public record?  That is, if you received a FOIA request for what is Rule and Regulation Number 4, would you feel free to give that out?
> A.  Certainly.

(Tupman at 95-96 (A-157-158)).

Clearly, neither Lt. Aviola's nor Colonel MacLeish's testimony establish *any* facts to support

Plaintiff's claim that MacLeish "ordered" Aviola to "discuss" any details of Captain Conley's

alleged misconduct, or information from the investigative file, with the Reporter.   Moreover,

Plaintiff herself conceded at deposition that she did not contend that any information was released

beyond the contents of the e-mail and the identity of the Rules which were being charged.  Plaintiff

testified:

> Q.  . . . Do you contend that anything beyond your name, the nature of the charges, the composition of the trial board and I believe the date and time of the hearing was provided to the media?
> A.  No.
> Q.  . . . statements witnesses made to internal affairs would be confidential?  Is that fair to say?
> A.  Yes.
> Q.  Do you contend that any statements by any witnesses in your investigation were released to the media?
> A.  No.

*     *     *     *     *

> Q. Is it true that the manual, Delaware State Police manual and the Law Enforcement Officer's Bill of Rights provide that investigative reports prepared by IA remain confidential?
> A. Yes.
> Q. Do you contend that any investigative reports in the investigation of you were leaked to the media?
> A. No.

Conley at 118-19 (A-87-88).

This sworn testimony stands in stark contrast to the lurid--and unsubstantiated--"conspiracy" allegations of the Complaint filed by Plaintiff's counsel. Once again, there is no evidence in the record upon which Plaintiff could proceed with a claim that Defendants "discussed" or released any confidential information regarding her investigation or the factual basis for the charges.

**4. Nothing in the e-mail constituted confidential information under LEOBOR.**

Plaintiff also argues that the conduct of Defendants in addressing the trial board e-mail/Eldred issue violated the Law Enforcement Officers Bill of Rights (LEOBOR). This claim is patently false, as a matter of fact and law. As discussed above, Defendants did not disseminate the e-mail to the media, nor did they authorize anyone else to do so and, when contacted by the reporter, did no more than confirm its accuracy, as advised by counsel.

11 <u>Del.C.</u> §9200(c) does provide legal protections for an officer during the course of an investigation. The provision under which Plaintiff claims to be aggrieved is §9200(c)(12), which provides:

> *All records compiled as a result of any investigation* subject to the provisions of this chapter . . . shall be and remain confidential and shall not be released to the public. (emphasis added).

This statute pertains, by its plain terms, to "records compiled" as a result of investigation. The October 25, 2004 trial board e-mail in question here was not a "record" compiled for, or as a result of, the investigation into Plaintiff's misconduct, and contained no references to any investigative

17

materials. Simply put, a trial board e-mail notice, mandated by DSP Rule VII-5-13 is not a "record" within the meaning of §9200(c)(12). (*See* Paige & Coupe Affs., A-1-7). It is a notification document created *following the conclusion* of an investigation, in disciplinary matters in which the employee elects to have a trial board hearing to consider disciplinary charges. Id.

Further analysis of the LEOBOR Chapter makes clear that a trial board notice is not intended to fall within the definition of "records" set forth at §9200(c)(12). 11 Del.C. §9203 provides an officer facing charges with the option to elect a hearing before a Divisional trial board. 11 Del.C. §9204 addresses notice and scheduling of that hearing. That section provides that: "a *hearing shall be scheduled* . . . [no] more than 30 days *following the conclusion of the internal investigation* . . . . The officer shall be given written notice of the time and place of the hearing and the issues involved . . . ." §9204 (emphasis added). Clearly, pursuant to statute, the scheduling and notification of the trial board hearing is a distinct event that takes place *after* the internal affairs investigation has concluded, and, thus, the notice created for this purpose cannot be considered a confidential "*record[] compiled* as a result of . . . investigation" under the terms of 11 Del.C. §9200(c)(12) (emphasis added). The trial board notice is plainly not an investigatory record and is created after the investigation (and its file) is, by law, closed.

It is a well settled rule of statutory construction that statutes should be read *in pari materia*. "A statute is passed by the General Assembly as a whole and not in parts or sections. Consequently, each part or section should be read in light of every other part or section to produce an harmonious whole." Coastal Barge Corp. v. Coastal Zone Indus. Control Board, 492 A.2d. 1242, 1245 (Del. 1985); State Dept. of Labor v. Reynolds, 669 A.2d 90, 94 (Del. 1995). Thus, the trial board "notice," sent by regulation to 637 DSP personnel, cannot be construed as a confidential document under §9200(c)(12) of LEOBOR.

Nor, as Deputy Attorney General Tupman advised, could the content of the trial board e-mail notice be said to contain "confidential" material protected by LEOBOR. The e-mail notice, mandated by the Rules and Regulations of the Delaware State Police, is supposed to identify the officer, the rule(s) allegedly violated, the date, time and place of the hearing, and the officers selected to serve on the trial board. This e-mail met all of these criteria, and contained nothing more. There was no information as to the factual allegations which gave rise to the charges against plaintiff, to witnesses, to documents, to statements, nor to anything that could be considered part of the investigatory file. The unfortunate release of this e-mail, issued to approximately 637 persons pursuant to the provisions of the DSP Rules and Regulations, can hardly be considered the release of a confidential investigatory "record" under LEOBOR.[8] To allay any doubt, Colonel MacLeish testified that he specifically inquired of DSP's attorney, Mike Tupman, whether confirming the veracity of the e-mail to Eldred would in any way violate LEOBOR or any other law:

> The secondary thing was, okay, two, Mr. Tupman, legally, he [Eldred] has it in his possession. . . . Would we violate LEOBOR if we did that or not, . . . would I be violating any laws by confirming it, confirming or denying the fact that it was real?

(MacLeish at 139 (A-108)). Deputy Attorney General Tupman advised:

> that you could confirm the information without violating somebody's -- according to my legal counsel, without violating an officer's rights under LEOBOR or criminally.
>
> *    *    *
>
> [T]he advice given was, as previously stated, it was now no longer an internal document. It was in the public domain and it wasn't protected by LEOBOR and it wasn't protected by the [DSP] rules and regulations and it was only to acknowledge what is in the four corners of the document.

(MacLeish at 139, 209-210 (A-108, 128-129)). Mr. Tupman, at his own deposition, confirmed

---

[8] Interestingly, Plaintiff herself elected to open the entire disciplinary evidentiary hearing (which would otherwise have been private) to the public, when it was finally held on March 9-10, 2005. Three counts of "conduct unbecoming an officer" were substantiated.

this analysis: "Well, I first looked at it from the standpoint of the Law Enforcement Officers' Bill of Rights. And in my opinion, the e-mail, which is an administrative e-mail that is routinely— not routinely—by State Police rules and regulations is sent out in every trial board situation, that it was not a file compiled as a part of the Internal Affairs investigation so that the Policeman's Bill of Rights was inapplicable." Tupman at 36 (A-147). The attorney's advice to DSP was reasonable and correct, and fully comports with the statutory analysis of LEOBOR noted above.

Plaintiff makes much, in her complaint, over alleged media inquires in other matters in which Delaware State Police officers, including former Colonel Chaffinch and Colonel MacLeish, were allegedly under investigation and (Plaintiff alleges) the State Police would not provide comment to media inquiries. (Amd. Complaint ¶¶ 129-135). As a preliminary matter, none of the specifics of these purported investigations are in evidence, and no context is provided for the questions and answers which may have gone back and forth between DSP and the news media. The Plaintiff's lawyers have simply failed to make a record in this regard. When questioned about some of these issues and the purported "inconsistency" with the DSP's response regarding Captain Conley's trial board e-mail, Colonel MacLeish testified as follows:

> Q. Do you find that response materially inconsistent with your response to the inquiry from Reporter Eldred in October of 2004?
> A. No, I don't. And the reason I don't is because during the initial phase of an investigation, the investigation is ongoing. We don't confirm Internal Affairs investigations of a -- what would be an internal inquiry, and that's the typical response that we give. In this [Conley] case the investigation was concluded. It was finished. The charge had been -- the charges had been established and a trial board had been set. And she was -- not she -- the charging sheet -- there was no further investigation to take place that could influence one way or another the content of that investigation. It was done. And therein lied the difference. During an ongoing investigation, you would not confirm or deny in order to try to influence the investigation whatsoever.

(MacLeish at 152-153 (A-121-122)). Finally, Plaintiff's argument on this point suffers from some

lack of logic.  If media inquiries were made to DSP about other officers who were being investigated for misconduct, then obviously the fact that they were or were potentially facing charges was already in the public domain.[9]  No more information than that was confirmed with the media here—simply, that Captain Conley had been charged and that a trial board hearing would take place.  And, as in the other purported instances, no details of the basis for Conley's charges was provided.

> **5.  Defendants made reasonable efforts, at their own initiative, to try to find out who, among the 637 addressees, might have given the e-mail to the newspaper reporter.**

Plaintiff next claims that Defendants "refused to investigate" the issue of the how the e-mail was obtained by Eldred. (Amd. Compl. at ¶¶ 136-143 (A-33-34)).  Specifically, Plaintiff alleges that upon receiving a "written complaint" from Plaintiff's lawyer (counsel in this case) on **October 29, 2004**, Defendants MacLeish and Mitchell ordered DSP personnel to "stonewall and refuse to investigate these [alleged] violations of state law." (¶ 138).  Plaintiff also makes various vague allegations of misconduct on the part of the Attorney General's office for allegedly refusing to "investigate" her complaints.  ¶¶ 140-143.  These allegations are without merit and of no consequence to this lawsuit, in which the Attorney General is not a defendant, nor are Deputy Attorneys General agents of the Delaware State Police.  (Tupman at 41 (A-152)).

In addition to there being no factual basis for these allegations, Plaintiff fails to show that she had any legal right to an "investigation" arising out of this release of a DSP e-mail by an unknown person, such that she could state any claim on this basis.  The investigation which, as discussed below, *was* undertaken, would be for the benefit of DSP and for the purpose of charging the individual(s) involved.  Captain Conley has no personal rights or interest in this process.

---

9 In addition, Plaintiff's claim that news stories were published following statements of "no comment" by DSP contradicts her other allegation that the State News "could not run a story" on her trial board email "until it obtained a confirmation of the information contained therein."  (Amd. Compl. ¶¶ 115, 130-35, A-29, 32-33).

Turning to the facts, not only are the "stonewalling" allegations about MacLeish and Mitchell completely unsupported by the factual record, the evidence is (again) entirely to the contrary.  The undisputed record is that Colonel MacLeish, with the subsequent approval of Secretary Mitchell, undertook, on **October 28, 2004**, *at his own initiative and prior to any complaint by Plaintiff's counsel*, an investigation into whether the source of the "leaked" e-mail to Eldred could be found, as soon as he learned that the e-mail had found its way into the reporter's hands.

Colonel MacLeish testified that, upon learning a reporter had the e-mail, he wanted to "try to find out who sent it and then bring that person up on charges of violating the rules and regulations of the division."  (MacLeish at 138 (A-107).  In stark contrast to Plaintiff's allegations that MacLeish and Mitchell "ordered that Paige stonewall and refuse to investigate" and that "Paige refused to investigate . . . in any way shape or form" (Amd. Compl. ¶¶138-39, A-), MacLeish testified that he directed Captain Paige (of Internal Affairs) to begin an investigation by contacting the high-tech crimes unit (HTCU) to see if they had any way of finding out who might have sent the e-mail to Eldred, in the event it was sent electronically.  MacLeish at 141, 145, 149 (A-110, 114, 118)) *See also* Paige Aff. (A-1).  Captain Paige began this inquiry as instructed, but ultimately, in consultation with IT and HTCU, determined that the e-mail had not been forwarded from the State Police e-mail network (A-1).  With no further information to go on, it was virtually impossible to find out who among the approximately 637 addressees had actually sent the e-mail to Eldred.[10]  (MacLeish at 147 (A-116); Mitchell at 51-52, 56 (A-137-138, 142)).  Notes taken by Captain Paige concerning his inquiry to HTCU were produced in discovery, confirming the investigation and his conclusion that HTCU "advised that the search did not find anyone forwarding this particular e-mail [from the DSP

---

10  Conceivably, the pool of possibilities was even larger than the 600+ DSP personnel.  As a hypothetical example, a DSP employee could have brought the email home and someone outside the Division could have disseminated it.

network]." (A-64).

Captain Conley herself conceded at deposition that the document did not contain information

that might have assisted DSP in uncovering the source:

> Q.  Do you see anything on this document other than that line [fax line from Tom Eldred]
>     that indicates what the source of it was?
> A.  The source of it from the State Police?
> Q.  Yes.
> A.  No.  And my understanding would be that they [Eldred] faxed this back to MacLeish
>     and Aviola upon their request because they wanted to visually see it and they definitely
>     had it and that's why it's coming from the Delaware State News at this time.
> Q.  But does it appear to you the Delaware State News in faxing this has not included any
>     information as to where Tom Eldred got it?
> A.  It appears as though, yes.
> Q.  So in terms of investigating, there doesn't appear to be anything on this document, does
>     there, that would suggest who at the State Police faxed or forwarded this message to
>     Eldred?
> A.  No.

(Conley at 124-25 (A-93-94)).

As with the other issues discussed above, as to Plaintiff's allegations that Defendants

"refused to investigate the "leak" of the e-mail to the Delaware State News, there are simply no

facts in evidence to support this claim, and Defendants are, accordingly, entitled to summary

judgment.

> **6.  Secretary David Mitchell had no involvement whatsoever with this
>     matter, other than to learn of DSP's actions after the fact.**

Defendant, Secretary Mitchell is clearly entitled to summary judgment, as the evidence shows

that his sole involvement in this matter was after the meeting and advice of counsel was received.

He played no role in the decision-making process as to how to handle the situation—thereby

obviating any "retaliation" claim.  Plaintiff has utterly failed to produce any facts in support of her

speculation as to his role in the perceived "conspiracy."  Secretary Mitchell testified that he was

advised by his press officer about the e-mail issue only after DSP "had resolved the issue.  They had

received legal advice to confirm the authenticity of the document only and to say nothing more." (Mitchell at 45-47 (A-131-133)).  Mitchell took no action personally.  Mitchell did not recall speaking personally with anyone at DSP about this.  Id at 45 (A-131).

Colonel MacLeish's recollection at deposition varied slightly, in that he recalled speaking with Secretary Mitchell late in the day on October 28, 2004, but again, after he had already received legal advice from Mr. Tupman and given the directive to follow that advice to Lt. Aviola. (MacLeish at 134, 142 (A-103, 111)).  MacLeish testified that he advised Mitchell "this is the advice I got from counsel and here is their reasons, and the information will be released based upon what's in the four corners of the document."  (Id at 135 (A-104)).  Secretary Mitchell responded "I concur with you."  Id.  Mitchell did not comment on or modify the prior decision in any way.  This is the sole evidence as to Secretary Mitchell's involvement with the "e-mail issue."  On these facts, no reasonably jury could possibly find evidence of "retaliation" by Secretary Mitchell against the Plaintiff.  He is entitled to summary judgment and dismissal as a defendant in this case.

### 7. Defendant Chaffinch had been placed on leave prior to Eldred's contact with DSP, and played no part in DSP's ensuing action.

As a result of the allegations made against him in the Complaint filed by Plaintiff on October 27, 2004, Colonel Chaffinch was temporarily removed from his position as Superintendent of the Delaware State Police by Secretary Mitchell that same day, and placed on administrative leave status. (Chaffinch Aff., A-8; MacLeish at 117-18 (A-96-97)).  Simultaneously, then-Lt. Colonel MacLeish was named Acting Superintendent by Secretary Mitchell.  Id.  MacLeish learned of these events by telephone as, on October 27, 2004, he was on a class trip with his son and 40 other children in Gettysburg, Pennsylvania.  (Id at 117-18, 123 (A-96-97, 102)).  When MacLeish reported to work on October 28, 2004, he was the Acting Superintendent.  Id.

Chaffinch therefore was not present at Headquarters on the following day, October 28, 2004, when the aforementioned meeting was held to deal with the Eldred inquiry into the Conley trial board. Lt. Col. MacLeish, now serving in his new capacity of Acting Superintendent, convened the meeting, sought legal advice, and instructed Lt. Aviola how to proceed. The Plaintiff has failed to show that Colonel Chaffinch played any role in the decision to confirm the contents of the e-mail message obtained by the reporter. There is no evidence whatsoever in the ample record in this case to support her claim.

Colonel Chaffinch's deposition was taken in this case. However, Plaintiff did not ask him any questions pertaining to the "e-mail issue." Retired Colonel Chaffinch has submitted an affidavit in support of this motion stating that he played no part in the "leak" of the e-mail to Eldred, nor in any DSP decisions concerning that issue thereafter. (A-8). On these facts, showing no personal involvement with the events Plaintiff complains of, no reasonable jury could find evidence of "retaliation" by Colonel Chaffinch as a result of the "e-mail issue". While Chaffinch remains a defendant as to Count I, he is clearly entitled to summary judgment as to Counts II and III.

### 8. All evidence taken in discovery rebuts Plaintiff's claims, such that no reasonable jury could return a verdict in her favor on these Counts.

At least 5 depositions have been taken pertaining to the claims in Counts II and III. Three affidavits are submitted. Documentary evidence has been produced. Looking at the entirety of the record in this case, Counts II and III cry out for summary judgment. Plaintiff claims that she was retaliated against, within one day, for filing her lawsuit. The sum total of the evidence on the alleged "retaliation"—on which Plaintiff bears the burden of proof—shows that a reporter received a copy of the informational trial board notification, containing no confidential information, from an unknown person. The e-mail was issued before the lawsuit was filed, and in the ordinary course of business to

637 recipients.  It is not even known whether Eldred received the e-mail before or after the lawsuit was filed.  No evidence ties any defendant or agent of DSP to the release of the e-mail.

Next, the reporter called DSP to confirm whether the e-mail was a true DSP document. Defendants did not say anything regarding the matter at that time, but rather immediately called their attorney for advice on what to do.  This attorney, a Deputy Attorney General, and not a DSP employee, gave his advice—that the e-mail should be seen to make sure it was authentic and that, if it was, only the four corners of the document should be confirmed.  Defendants followed this legal advice, and that was the end of the matter.  There is absolutely no evidence that any information beyond verification of the four corners of the document was supplied to reporter Eldred, or to any other party.  Nor was there any discussion of the details of the internal affairs allegations.  There was no discussion, at the October 28, 2004 meeting, of Captain Conley or of her lawsuit.  Secretary Mitchell and former Colonel Chaffinch played no part in the events concerning the e-mail and the reporter.  There is no evidence of any "conspiracy" on the part of Defendants MacLeish or Mitchell or anyone else to "retaliate" against Plaintiff.

This is a textbook case for Rule 56 Summary Judgment, which should be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  There are essentially no facts in dispute at all.  All of the witnesses, even including Captain Conley to the extent she addressed the issue, testified consistently, and the evidence they gave was uniformly contrary to the heated allegations of the Amended Complaint.  There are no facts upon which a reasonable jury could base a finding of "retaliation."  As discussed below, there are significant legal questions as to whether Plaintiff can even state a claim under the First Amendment on the facts of this case.  But, on a factual basis alone, the record speaks for itself and says, clearly and loudly, that Defendants are entitled to judgment as a matter of law on these two Counts.

## II.    SUMMARY JUDGMENT SHOULD BE GRANTED AS TO COUNTS II AND III, IN THAT PLAINTIFF'S CONDUCT IN FILING A LAWSUIT TO REDRESS PURELY PERSONAL EMPLOYMENT GRIEVANCES DOES LEGALLY NOT STATE A CLAIM FOR "RETALIATION" UNDER THE FIRST AMENDMENT.

As discussed extensively above, on the factual record alone, Plaintiff could not convince a reasonable jury that she was subject to any "retaliation" whatsoever and, if the Court so finds, this legal argument need not be reached.  Nonetheless, as a matter of law, Plaintiff's claims do not meet the legal standard to constitute "free speech" or "petition clause" retaliation claims under the First Amendment, and therefore Plaintiff cannot maintain these counts as a matter of law.

Plaintiff, in filing her initial Complaint in this action, claims that she was "engaging in protected speech and petitioning of the government for redress of grievances under the First Amendment to the U.S. Constitution." (Amd. Compl. ¶ 144 (A-34)).  Plaintiff further claims that, in her lawsuit, she was "sp[eaking] out on issues of public concern." (¶146).  While every lawsuit sets forth perceived grievances, Plaintiff's suit here does not rise to the level of protected First Amendment speech.  Nor does her suit address "issues of public concern," despite her use of these "magic words."  Rather, this suit was plainly filed to address Plaintiff's own private interests in her personal employment situation, albeit with a public employer.  Plaintiff's claims for damages make this clear.  Plaintiff seeks no relief for the "public at large" or even for a class of other similarly situated employees.  What Plaintiff seeks is purely personal, and primarily economic, redress, and an appointment to an executive position which is entirely personal to her--and to the exclusion of other qualified candidates, including other women.

In order to show a violation of the First Amendment, the burden is on the Plaintiff to show (1) that her conduct was constitutionally protected and (2) that this conduct was a substantial or motivating factor for the alleged adverse employment action.  <u>Mt. Healthy City School Dist. Bd. of</u>

Education v. Doyle, 429 U.S. 274, 287 (1977). If the Plaintiff makes this showing, the employer can then show, [3] by a preponderance of the evidence, that it would have made the same decision even in the absence of the protected conduct. Id.

### 1. Plaintiff's purported speech was not constitutionally protected, under Supreme Court First Amendment jurisprudence.

Plaintiff here cannot meet the first prong of her two-part burden outlined above. She cannot show that her conduct (in filing this lawsuit) was constitutionally protected. The United States Supreme Court has long held that not every utterance by a public employee rises to the level of protected "First Amendment" speech, from which one could seek redress for an adverse employment action. Connick v. Myers, 461 U.S. 138 (1983) (discharge of assistant district attorney did not violate First Amendment). In the same way, not every employment decision from which a person is aggrieved rises to the level of a "constitutional case." 461 U.S. at 149. It is well-settled that an employee cannot be discharged for exercising constitutionally protected freedom of expression. 461 U.S. at 142 (citing, inter alia, Pickering v. Board of Education, 391 U.S. 563 (1968) (teacher could not be terminated on basis of writing to newspaper criticizing board of education for its handling of educational funds)). However, while all legal speech has baseline protection under the First Amendment, Connick made clear that not all speech by a public employee gives rise to causes of action against the employer under that Amendment:

> We hold only that when a public employee speaks *not as a citizen* upon matters of public concern *but instead as an employee upon matters only of personal interest*, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Connick, 461 U.S. at 147 (emphasis added).[11] *See also* Swartzwelder v. McNeilly, 297 F.3d 228,

---

11 Connick and Pickering, at least implicitly, seemed to limit their recognition of valid First Amendment retaliation

235 (3d Cir. 2002).

Whether the "speech" is a matter of public concern is a question to be "determined by the content, form, and context" of the statement as revealed by the whole record. Id at 148. In Connick, the Court found that the employee's purported speech (in all but one respect) was personal, and arose out of her dissatisfaction with a transfer and subsequent "attempt to turn that displeasure into a cause celebre." Id.   While it cannot be disputed that the public has a constant and general interest in ensuring that public offices run fairly and properly, this does not translate to every public employee's grievance (or lawsuit) assuming constitutional import.   Connick recognized this important point when it stated that "to presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case . . . . [T]he First Amendment does not require a public office to be run as a roundtable for employee complaints . . . ." Id at 149.

Connick was applied in an Eleventh Circuit case involving purported First Amendment speech and alleged retaliations under circumstances similar to (but far more serious than) this case. The court upheld summary judgment for defendants on plaintiff's First Amendment claims.   In Morgan v. Ford, 6 F.3d 750 (11th Cir. 1993), cert denied, 512 U.S. 1221 (1994), a female Georgia Department of Corrections employee made serious claims of sexual harassment against her supervisor.   When she lodged internal affairs charges and later EEO charges against him, she was retaliated against by the supervisor, in that he unfairly disciplined her, reassigned her to several dangerous work assignments and told her to "drop" her employment action because "no one would believe her."   6 F.3d at 752-53.   Ultimately, Morgan brought suit alleging both Title VII claims and also "retaliation" claims under the First Amendment.   The court analyzed the case under Connick's

---

claims to cases involving dismissal from employment.

holding that a retaliation case could only stand if the public employee speaks out as a citizen upon matters of public concern, rather than as an employee upon matters only of personal interest. Id at 754. The court held that Morgan's purpose in speaking out, and even filing an employment action, was to further her own (legitimate, but private) interests, rather than to raise issues of public concern as a citizen:

> While we heartily agree with Morgan that sexual harassment in the workplace is a matter of important social interest, "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.

6 F.3d at 754 (citations omitted). Interestingly, Morgan contained another, more compelling, aspect, not present in this case: the plaintiff had spoken out on behalf of another female employee who was allegedly harassed by the defendant. Id at 752, 755. Despite this, which the court acknowledged as a public concern aspect, the 11th Circuit found that a First Amendment claim was not stated because because this was only incidental to "the main thrust of her speech . . .[which was] a private employee grievance." Id at 755.

Notably, in Morgan, as in the instant case, the "workplace" was a government agency and the defendant a public official. In finding that Morgan's "speech" pertained to private, rather than public, matters, the court focused on the fact that her claims "largely focused on how [defendant] behaved *toward her* and how that conduct affected *her work*" and that her formal complaints (petitions), such as to the EEOC, about the alleged harassment were not related to the public and "in no way [drew] the public at large or its concerns into the picture." Id at 755 (emphasis added). Doubtless, Plaintiff in the instant case would argue that, because her district court complaint was, by law, a "public" filing, that she related her claims to the public.[12] However, the focus of a First

---

[12] Captain Conley, in fact, could have, but never did file confidential EEOC or internal complaints as to Colonel Chaffinch's alleged wrongdoing, which she pleads in great detail. (Request for Admission Nos. ____). Instead, she registered her first complaint of any kind in this District Court lawsuit, almost 18 months after the first promotion,

Amendment analysis should be on the content of the purported speech or petition, and the rights which the plaintiff seeks to vindicate, rather than the venue in which the complaints are registered. Simply because, for whatever reasons, Plaintiff bypassed many available administrative remedies in favor of a noisy court filing (complete with press conference), this does not change the nature of the underlying speech.[13] Just as in <u>Morgan,</u> in this case, "[h]er complaints about [defendant's] behavior, as serious as they were, centered around her private [employment] matters, not matters of social interest.  As an employment grievance, [plaintiff's] speech was not a matter of public concern." <u>Id</u> at 755 (*citing* <u>Connick</u>).

Plaintiff has previously cited <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424 (3d Cir. 1994), *cert denied*, 513 U.S. 1082 (1995), in support of her claim that her lawsuit—just because it is a "lawsuit"—constitutes a protected First Amendment petition for purposes of maintaining a "retaliation" claim.  <u>San Filippo</u> distinguished First Amendment "speech" from a First Amendment "petition," finding that the former was subject to the Connick "public concern" test, but the latter was not.  The court stated its holding as follows: "the mere act of filing a non-sham petition [even as to purely private concerns] is not a constitutionally permissible ground for discharge of a public employee." 30 F.3d at 443.  The analysis that took the majority of the <u>San Filippo</u>'s panel (one judge dissenting) to this conclusion suffers from many legal flaws and, frankly, some tortuous logic.  The court itself noted that its holding was contrary to cases from every other circuit court in the country-- the 1st, 2nd, 5th, 6th, 7th, 9th and 11th circuits—which had considered the same issue.  30 F.3d at 440.  The 4th Circuit, in affirming <u>Baker v. Mecklenburg County</u>, 853 F.Supp. 889, 897 (W.D.N.C. 1994), *aff'd* 48 F.3d 1215 (4th Cir. 1995), cited *supra*, has since joined this list.  Defendants respectfully

---

and *20 years* after some of the alleged conduct she complains of, for the first time, on the part of Colonel Chaffinch.
13  "The First Amendment does not transform a lawsuit into speech merely because its proceedings are available to the public."  <u>Baker v. Mecklenburg County</u>, 853 F.Supp. 889, 897 (W.D.N.C. 1994), *aff'd* 48 F.3d 1215 (4th Cir.

submit that <u>San Filippo</u> also contradicted settled First Amendment case law from the United States Supreme Court. A holding that private expressions attain First Amendment protections simply because they take the form of a formal "petition," improperly elevates "form" above "content", in a way that is antithetical to the <u>Connick</u> analysis.

Briefly, the <u>San Filippo</u> court was bound by two important principles established by the High Court. First, the <u>Connick</u> rule that a First Amendment complaint could only be maintained if the public employee was speaking our as a *citizen* upon matters of general public concern and not as an *employee* upon matters only of personal interest.[14]  Second, and even more fundamental, the Supreme Court's pronouncement that

> [t]he right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression . . . . the Petition Clause [is not entitled] to special First Amendment status. . . . These First Amendment rights are inseparable, and *there is no sound basis for granting greater constitutional protection to statements made in a petition* . . . than other First Amendment expressions.

<u>McDonald v. Smith</u>, 472 U.S. 479, 485 (1985) (emphasis added). Instead of reading these two provisions, like virtually every other Circuit, to mean that a First Amendment action could only be maintained if the public employee's *petition* was filed as a citizen upon matters of general public concern, rather than filed by an employee *qua* employee, upon matters only of personal interest, the <u>San Filippo</u> majority attempted to dismiss <u>McDonald</u>'s holding as "dicta" limited to the facts of that case, in which the "petition" was a letter to the President. 30 F.3d at 439.

<u>San Filippo</u> thus resulted in the anomalous holding that an employee could maintain a First Amendment retaliation claim for filing a "petition," on a matter of purely private interest, but not for "speech" (*e.g.* to the press, to other employees) on the identical issue. This reasoning is not logical

---

1995).

14  Notably, in an earlier decision, the Third Circuit characterized the citizen/employee principle as an "essential distinction". <u>Czurlanis v. Albanese</u>, 721 F.2d 98, 103 (3d Cir. 1983).

and is, Defendants submit, squarely contrary to the High Court's precedents in <u>Connick</u> and <u>McDonald</u>.

The correctness of <u>San Filippo</u> notwithstanding, and despite being roundly criticized in subsequent cases (see Exhibit of citing references appended to this brief), the case is still valid law in the Third Circuit. However, in 1999, another panel of the Third Circuit, in distinguishing the case, very narrowly interpreted the holding <u>San Filippo</u>, with the resulting effect that <u>San Filippo</u> should not bind the Court in this case. The court in <u>We, Inc. v. City of Philadelphia</u>, 174 F.3d 322 (3d Cir. 1999), explained that <u>San Filippo</u>'s unusual speech/petition distinction was "explicitly confined" to petitions where the "employee[] avail[s] himself of a mechanism formally adopted by his government employer for redress of grievances against the employer"[15] and only in "the public employment/retaliatory discharge context." 174 F.3d at 330, fn.2. Applying those limitations to the instant case, Conley's purported First Amendment petition/lawsuit falls outside the limited "confines" of <u>San Filippo.</u> First, Plaintiff here did not avail herself of any "mechanism formally adopted by [the State Police] for redress of grievances." To the contrary, she knowingly bypassed several forms of administrative remedies within DSP in favor of filing this lawsuit. (A-53). This was, of course, her prerogative, but it removes her from the class of protected "petitions," as defined by <u>We, Inc</u>. Secondly, this case is not a "retaliatory discharge" case, as was <u>San Filippo</u> (and, in fact, <u>Connick</u> and <u>Mt. Healthy</u>). Plaintiff was not discharged for filing her complaint. She was not demoted, transferred, disciplined, nor was any other action taken against her job by DSP. This also removes her claim from the narrow confines of <u>San Filippo</u>.

Perhaps the Seventh Circuit's decision in <u>Yatvin v. Madison Metropolitan School Dist.</u>, 840

---

15 *See also* <u>San Filippo</u>, 30 F.3d at 443 (remanding for determination of which, *if any*, of public employee's grievances and lawsuits constituted a petition).

F.2d 412 (7th Cir. 1988) provides the most apt analysis of the instant case. In <u>Yatvin</u>, like here, the plaintiff complained of sex discrimination because of two denials of promotion. She also complained of retaliation for the filing of [EEO] sex discrimination charges after the first promotion. 840 F.2d at 414-15. Judgment was entered in defendants' favor on all counts and the circuit court affirmed. As to the retaliation claims, the court explained that, even in sex discrimination cases, "not every legal gesture—not every legal pleading—is protected by the First Amendment." 840 F.2d at 419. In <u>Yatvin</u>, the court found that, while sex discrimination is a matter of public concern, the plaintiff's grievance regarding a desired promotion to an Assistant Superintendent position was entirely personal. "She wanted to advance her career, not promote a cause." <u>Id</u>. The court also properly rejected the notion that the filing of a civil rights lawsuit was *per se* protected activity under the First Amendment. As Judge Posner wrote:

> Everyone exaggerates the importance of his or her own activity and it is therefore natural for lawyers to suppose that every legal pleading, however humble, comes trailing clouds of First Amendment glory. But this is an extreme position and we reject it. The vitality of the marketplace of ideas does not depend on the volume of litigation in the federal courts.

840 F.2d at 420.

### 2.  Plaintiff's purported speech was not a substantial or motivating factor for the alleged adverse employment action.

Plaintiff also cannot meet the second part of her burden under the <u>Mt. Healthy</u> test.  In addition to establishing that her conduct was constitutionally protected, plaintiff also bears the burden of showing that her conduct was a substantial or motivating factor for the allegedly adverse employment action taken by Defendants.  <u>Mt. Healthy City School Dist. Bd. of Education</u>, *supra*, 429 U.S. at 287.  First, as the factual analysis at Argument I, *supra*, makes clear, there was no adverse employment action.  While Plaintiff may have been displeased with the manner in which DSP responded to the reporter, the response was objectively reasonable and made without malice

and based upon legal advice.  Mere perceptions of retaliation, or simply being disgruntled with an action taken by one's employer do not rise to the level of actionable claims.

"[C]ourts have required that the nature of the [alleged] retaliatory acts committed by a public employer be more than *de minimus* or trivial."  Schlichter v. Limerick Township, 2005 WL 984197, *6 (E.D. Pa. 2005)(*citing* Brennan v. Norton, 350 F. 3d 399 (3d Cir. 2003)).  Courts have declined to find First Amendment violations in the face of retaliatory acts by employers such as "criticism, false accusations, or verbal reprimands."  Schlichter, *supra*.  If even false accusations are considered *de minimus*, then clearly the actions taken here, confirming without comment the facial content of a *true* document could not rise to the level of a constitutional violation.

If further evidence is needed of the incredibly trivial nature of Plaintiff's claim here, one should refer to the Schlichter court's finding that, as a matter of law, actions taken by a police chief against a subordinate officer who had spoken out on internal issues, appeared to be "little more than trivial annoyances not severe enough to cause 'reasonably hardy individuals to refrain from protected activity.'"  Id at p. 6, 10.  The actions in Schlichter included: publishing a Valentine's Day message in the newspaper alluding to an affair the plaintiff was allegedly having with a co-worker; leaving a hotel room key and a package on condoms on plaintiff's truck, and posting a photograph of plaintiff's car outside the female co-worker's home, along with a sarcastic message, in the workplace (a photograph which was also mailed to plaintiff's wife).  If such patently offensive actions have been deemed "trivial" in this circuit, it would seem the "retaliation by e-mail confirmation" claim in this case rank somewhere below even the level of "*de minimus*".

However, even assuming *arguendo* that Plaintiff's lawsuit constituted protected "speech" under Connick, and even assuming *arguendo* that Defendants simple confirmation of the four corners of the e-mail constituted "adverse employment action," there is simply no evidence

whatsoever in the record to support Plaintiff's claim that the lawsuit was the impetus for Defendants actions. The record, on its face, reveals, that at the brief meeting wherein Colonel MacLeish, the PIO, legal counsel and internal affairs officers discussed the reporter's inquiry and determined how to respond, there was no discussion of Captain Conley or her lawsuit at all. The focus was entirely on how to deal with a trial board e-mail that had somehow left the confines of the Division and a reporter's inquiry about it. Moreover, while Colonel MacLeish ratified and gave the directive to Aviola to confirm only the "four corners" of the e-mail, the actual advice to proceed in this manner came from Deputy Attorney General Tupman, who is not a Defendant in this case and whom plaintiff has not included in her alleged, far-reaching "conspiracy." On these facts, not only is there no "genuine issue" for a jury, Defendants submit it would be impossible for any reasonable jury to find in Plaintiff's favor. Defendants are entitled to judgment as a matter of law, as Plaintiff cannot meet this essential element of her burden.

### 3. Defendants would have made the same decision even in the absence of Conley's lawsuit.

Even if Plaintiff could meet both parts of her burden under <u>Mt. Healthy</u>, which she plainly cannot, there is still a third prong to the analysis which would bar Plaintiff's claim. If a defendant/employer can show, by a preponderance of the evidence, that it would have made the same decision even in the absence of the protected conduct, Plaintiff's complaint will not lie. 429 U.S. at 287. That is the case here. For the same reasons outlined under prong 2, above, the evidence clearly shows that Defendants here made their decision in this case without animus and with no consideration of Plaintiff's lawsuit. The facts are simple. Defendants were faced with an unusual, unprecedented situation where a reporter had obtained a trial board e-mail. Unsure of how to proceed, they immediately contacted legal counsel and followed legal advice. As Captain Conley's

lawsuit played no part in this course of action, it logically follows that this is the course of action that would have been taken in the absence of the lawsuit. For this reason also, Defendants are entitled to summary judgment.

### III.   DELAWARE STATE POLICE AND DEFENDANTS IN THEIR OFFICIAL CAPACITIES ARE IMMUNE FROM SUIT UNDER THE ELEVENTH AMENDMENT, AND ALSO ENJOY QUALIFIED IMMUNITY IN THEIR INDIVIDUAL CAPACITIES.

**1. Eleventh Amendment Immunity.**

To the extent Plaintiff's makes claims against the Delaware State Police or against Defendants in their official capacities, her claims are barred by the Eleventh Amendment, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." While the Amendment does not facially bar suits against the State by its own citizens, the United States Supreme Court has held that in the absence of consent, a state is "immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).

The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996). "[I]n the absence of congressional abrogation or consent, a suit against a state agency is proscribed." Neeley v. Samis, 183 F. Supp. 2d 672, 678 (D. Del. 2002). The United States Congress can waive the state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment; however, only a clear indication of Congress' intent to waive state immunity will produce this result. Id.

No such clear intent can be seen in 42 U.S.C.A. §1983. In fact, a review of the statute demonstrates that Congress did not intend to waive the states' immunity. The statute facially allows

suits only to be brought against "persons." 42 U.S.C.A. §1983. Neither the State of Delaware nor its officials acting in their official capacity are "persons" as contemplated by 42 U.S.C.A. § 1983. <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58 (1989).

### 2. Qualified Immunity.

Plaintiff fails to meet her legal burdens on the merits of Counts II and III, and the evidence of record fails to set forth any facts upon which a reasonable jury could base a verdict for Plaintiff. The Third Circuit has held that the proper analysis is for the trial court to first determine whether Plaintiff asserts a valid violation of a constitutional right, before considering immunity issues. <u>Miller v. City of Philadelphia</u>, 174 F.3d 368, 374 (3d Cir. 1999). Plaintiff here has not made that showing. Nonetheless, Plaintiff's claims (assuming any existed) against Defendants in their individual capacities would be barred by the doctrine of qualified immunity. It is well settled that government officials performing discretionary functions enjoy qualified immunity from damages when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Lee v. Mihalich</u>, 847 F.2d 66, 69 (3d Cir. 1988) (*citing* <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982) (<u>Lee v. Mihalich</u> abrogated on unrelated grounds per <u>Albright v. Oliver</u>, 510 U.S. 266 (1994)). The test is one of "objective legal reasonableness" of an official's acts. <u>Lee</u>, 847 F.2d at 69. Defendants are entitled to qualified immunity unless Plaintiff can show that (1) her "right" is clearly established by law and (2) the "unlawfulness [of Defendants' act] must [have been] apparent." <u>Id</u>. In <u>Miller</u>, the Third Circuit, citing Supreme Court authority, held that where abusive action is alleged against a government official, there will be no constitutional liability unless the "action [is] so ill-conceived or malicious that it 'shocks the conscience' . . . . officials will not be held liable for actions that are merely negligent" <u>Miller</u>, *supra*, 174 F.3d at 375 (citations omitted).

In <u>Lee</u>, the Third Circuit found that the State actors' consultation and reliance on advice of counsel was reasonable in an uncertain legal situation and entitled them to qualified immunity. 847 F.2d at 71-72. For the reasons set forth at length in Arguments I and II, above, in this case, when faced with the unprecedented situation of a reporter who had already obtained a trial board e-mail from an unknown source, the seeking and reliance on legal advice—which was simply to confirm the authenticity of the document and not to go beyond its four corners--by Defendants was entirely reasonable. *See also* <u>Street v. Cherba</u>, 662 F.2d 1037 (4th Cir. 1981) (police defendants entitled to qualified immunity when they relied on directive from another official who had obtained legal advice).

Applying the <u>Lee</u>/<u>Miller</u> test, it is clear that Plaintiff cannot show any facts that would defeat the qualified immunity of the named Defendants. Her "right"—purportedly not to have DSP confirm the authenticity of the trial board e-mail when a reporter had obtained a copy—is by no means a clearly established legal right. As discussed above, the trial board e-mail does not fall within the parameters of documents protected by LEOBOR. Nor does DSP's simple confirmation without further comment violate any law or regulation. If there was any question as to the objective legality of DSP's actions, Defendants' good faith consultation with counsel, and adherence to his legal advice, removes any doubt. Plaintiff simply cannot set forth any factual basis that would defeat the defense of good faith qualified immunity. For this reason also, Defendants are entitled to judgment as a matter of law as to Counts II and III of the Amended Complaint.

## CONCLUSION

For the foregoing reasons, there is no genuine issue as to any material fact and Defendants are entitled to judgment as a matter of law as to Counts II and III of the Amended Complaint. Accordingly, Defendants respectfully request this Honorable Court grant Summary Judgment in their favor as to Counts II and III, pursuant to Rule 56(c).

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

By: /s/ Stephani J. Ballard
RALPH K. DURSTEIN, III (I.D. No. 912)
STEPHANI J. BALLARD  (I.D. No. 3481)
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants, MacLeish
Mitchell and Division of State Police

LIGOURI, MORRIS & YIENGST

By: /s/ James E. Ligouri
JAMES E. LIGOURI
46 The Green
Dover, DE  19901
(302) 678-9900
Attorney for Defendant, L. Aaron Chaffinch

DATED:  January 17, 2006

40

**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1394-GMS |
| | ) | |
| COLONEL L. AARON CHAFFINCH, | ) | |
| Individually and in his official capacity as the | ) | |
| Superintendent, Delaware State Police; et al. | ) | |
| | ) | |
| Defendants, | ) | |

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on January 17, 2006, she caused the attached, *Opening Brief in*

*Support of Defendants' Motion for Partial Summary Judgment, as to Counts II and III of the*

*Amended Complaint*, to be electronically filed with the Clerk of Court using CM/ECF which will

send notification of such filing to the following:


Thomas S. Neuberger, Esq.
Stephen J. Neuberger, Esq.
Two East Seventh Street, Suite 302
Wilmington, DE 19801


/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400
Attorney for Defendants MacLeish,
Mitchell, and Division of State Police