**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF DELAWARE**

CAPTAIN BARBARA L. CONLEY,                       )
                                                 )
      Plaintiff,                              )
                                                 )
v.                                               )   C.A. No. 04-1394-GMS
                                                 )
COLONEL L. AARON CHAFFINCH,                      )
Individually and in his official capacity as the )
Superintendent, Delaware State Police; et al.    )
                                                 )
      Defendants,                             )

**APPENDIX TO OPENING BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT,**
**AS TO COUNTS TWO AND THREE OF THE AMENDED COMPLAINT**

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

RALPH K. DURSTEIN, III, I.D. #912
STEPHANI J. BALLARD, I.D. #3481
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants MacLeish,
   Mitchell and Division of State Police

DATED: January 17, 2006

## TABLE OF CONTENTS

Affidavit of Captain James Paige ........................................................................... A00001

Affidavit of Captain Robert M. Coupe ................................................................... A00005

Affidavit of L. Aaron Chaffinch ............................................................................ A00008

Amended Complaint ............................................................................................... A00010

Defendants' Answer to Amended Complaint .......................................................... A00042

Plaintiff's Answers and Objections to Defendants' First Set of
Requests for Admission ......................................................................................... A00053

October 25, 2004 Trial Board E-Mail from Captain James Paige ........................... A00061

Notes from October 28, 2004 meeting by Lt. Robert M. Coupe ............................. A00062

Notes from October 28, 2004 by Lt. Col. Thomas MacLeish .................................. A00063

Notes regarding e-mail investigation by Captain James Paige ................................ A00064

DSP Rules VII-5-12 – VII–5-13 ............................................................................ A00065

Deposition of Lieutenant Joseph P. Aviola, Jr. ...................................................... A00067

Deposition of Captain Barbara L. Conley .............................................................. A00085

Deposition of Colonel Thomas F. MacLeish .......................................................... A00095

Deposition of Secretary David B. Mitchell, Sr ...................................................... A00130

Deposition of W. Michael Tupman, Esq. ............................................................... A00143

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,       :
                                          :
        Plaintiff,               :
                                          :
       v.                       :      C.A. No. 04-1394-GMS
                                          :
COLONEL L. AARON CHAFFINCH,     :
et al.                                     :
                                          :
        Defendants,            :

## Affidavit of Captain James Paige

1.     I have been a member of the Delaware State Police since March 16, 1984, and have attained the rank of Captain. I am currently the Commander of DSP Troop #9 in Odessa.

2.     From September 10, 2001, until April 3, 2005, I was assigned to the Internal Affairs Unit, as the officer in charge. My responsibilities there included supervising and conducting investigations into complaints or allegations of serious misconduct against members of the Division. Upon completion of substantiated investigations, it was my responsibility to initiate charges against officers at the direction of the Lt. Colonel or his designee, and when appropriate, prepare cases for presentation in hearings before Divisional Trial Boards.

3.     When a Divisional Hearing Board is to be convened to hear charges against an officer, the Delaware State Police Administrative Manual, at page VII-5-13, requires that the Internal Affairs officer in each case "transmit an e-mail to all troops and sections which will: [a] Identify the defendant officer; [b] Identify the Rule or Job Performance

Standard allegedly violated; [c] Identify the date, time, and place of the hearing; and [d] identify the officers selected to hear the matter."

4.    The purpose of the notice to all personnel is to insure that the Board members will give a fair hearing to the officer charged. Upon the posting of the e-mail notification concerning the Divisional Hearing Board, any employee of the Division of State Police who believes that any member of the Board would be biased, prejudiced, or otherwise predisposed in the matter is required to immediately contact the officer in charge of Internal Affairs.

5.    A second purpose of the notice to all personnel is to determine if any officer may possess information relevant to the charges before the Board. Any employee of the Division who may possess information that would affect the proceeding is required to contact the officer in charge of Internal Affairs.

6.    The electronic notice of the convening of a trial board sent to all DSP personnel contains only the information set forth in paragraph 4 above. The notice does not disclose the content of any records compiled as a result of the investigation. All such records remain confidential, pursuant the DSP Manual provisions and the Law Enforcement Officers Bill of Rights.

7.    On October 25, 2004, an electronic mail notice of the trial board convened to hear the case against Captain Barbara Conley was sent to all DSP personnel. This notice conformed to the criteria set forth in the Administrative Manual. The e-mail notice was issued in the normal course of business of the Internal Affairs Unit. I issued the notice, as officer in charge of Internal Affairs, based upon procedure outlined in the Delaware State Police Administrative Manual's Complaint and Disciplinary Procedures (II.D.2).

A00002

8.      When senior staff learned that the reporter, Tom Eldred, had obtained a copy of

the e-mail notification and was seeking comment from DSP, advice of counsel was

sought. I was present at the meeting where counsel, Mr. Tupman, advised us to attempt

to obtain a copy of the document the reporter claimed to have. Once this was done,

counsel advised that the Public Information Officer could confirm only the information

already obtained by the reporter in the e-mail, and to provide no information beyond that.

No information deemed confidential under LEOBOR and/or the DSP Manual was

disclosed to the reporter. I did not release the e-mail to the reporter and have no

knowledge of who did.

9.      As officer in charge of Internal Affairs, I was directed by Colonel MacLeish to

investigate whether any DSP employee or trooper was involved in providing a copy of

the e-mail notice to the reporter. I initially contacted Captain Mary Ann Papili and Keith

Caskey on October 29, 2004, regarding a search of this e-mail, to determine if it was

forwarded by any Divisional personnel.

10.     I spoke to Keith Caskey on November 1, 2004 regarding the results of the search.

He advised that the search did not find anyone who had forwarded the e-mail in question.

It was therefore my conclusion that the message provided to the reporter could not be

electronically identified as to its source, or linked to any one of the approximately six

hundred recipients.

11.     On advice of counsel, it was determined that I could not compel the reporter

involved to answer my questions concerning the source of his information, and could not

compel the reporter to produce a copy of the e-mail provided to him. Lacking any other

information on possible suspects or sources of the information obtained by the reporter,

the Internal Affairs investigation into the matter could proceed no further. I so advised the Colonel.

BE IT REMEMBERED that on this _12 th._ day of _January_ , 2006 personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **JAMES PAIGE**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of her knowledge, information and belief.

JAMES PAIGE

SWORN TO AND SUBSCRIBED before me on this _12_ day of _January_ 2006.

Notary Public

A00004

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | C.A. No. 04-1394-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, et al. | : | |
| | : | |
| | : | |
| **Defendants,** | : | |

## Affidavit of Captain Robert M. Coupe

1.      I have been a member of the Delaware State Police since February 26, 1985, and have attained the rank of Captain. I am currently the Commander of DSP Troop #6 at Prices Corner.

2.      From April 8, 2002 until September 30, 2005, I was assigned to the Internal Affairs Unit. My responsibilities there included the conduct of investigations into allegations of improper conduct by Delaware State Police officers, including violations of the Divisional Rules and Regulations and Job Performance Standards. It was my responsibility to initiate charges against officers, where appropriate, and to prepare cases for presentation in hearings before Divisional Trial Boards. I worked under the supervision of Captain Paige.

3.      When a Divisional Hearing Board is to be convened to hear charges against an officer, the Delaware State Police Administrative Manual, at page VII-5-13, requires that the Internal Affairs officer in each case "transmit an e-mail to all troops and sections which will: [a] Identify the defendant officer; [b] Identify the Rule or Job Performance Standard allegedly violated; [c] Identify the date, time, and place of the hearing; and [d] identify the officers selected to hear the matter." Internal Affairs has routinely issued such notices on many occasions.

4.    The purpose of the notice to all personnel is to insure that the Board members will give a fair hearing to the officer charged. Upon the posting of the e-mail notification concerning the Divisional Hearing Board, any employee of the Division of State Police who believes that any member of the Board would be biased, prejudiced, or otherwise predisposed in the matter is required to immediately contact the officer in charge of Internal Affairs.

5.    A second purpose of the notice to all personnel is to determine if any officer may possess information relevant to the charges before the Board. Any employee of the Division who may possess information that would affect the proceeding is required to contact the officer in charge of Internal Affairs.

6.    The electronic notice of the convening of a trial board sent to all DSP personnel contains only the information set forth in paragraph 3 above. The notice does not disclose the content of any records compiled as a result of the investigation. All such records remain confidential, pursuant the Delaware State Police Manual provisions and the Law Enforcement Officers' Bill of Rights.

7.    On October 25, 2004, an electronic mail notice of the trial board convened to hear the case against Captain Barbara Conley was sent to all DSP personnel. This notice conformed to the criteria set forth in the Administrative Manual. The e-mail notice was issued in the normal course of business of the Internal Affairs Unit.

8.    On October 28, 2004, at approximately 2:30 p.m., I was present at a meeting in the Headquarters conference room. Acting Colonel MacLeish was present, as were Captain James Paige and Lieutenant Joseph Aviola, the Delaware State Police Public Information Officer. Divisional Counsel Mike Tupman participated by telephone. We met after learning from Lt. Aviola that a reporter had obtained a copy of the e-mail notification in the Conley disciplinary matter and was seeking comment from DSP. I did not release the e-mail to the reporter, and have no knowledge as to who did.

9.    Mr. Tupman advised that we could confirm the validity of the e-mail message, provided the reporter could first fax us a copy of what he had received. Mr. Tupman advised that the e-mail notice was not protected from disclosure by either the Law Enforcement Officers' Bill of Rights or the Freedom of Information Act and if the reporter had a copy it was already in the public domain.

A00006

10.    Lt. Aviola was authorized to confirm if in fact the e-mail that the reporter had in his possession was an e-mail issued by the Delaware State Police. If the e-mail was found to be authentic, then Lt Aviola could confirm the content of the email as to the charges against Captain Conley. He was not authorized to disclose any confidential information from the Internal Affairs file. Nor, to my knowledge, did he do so.

BE IT REMEMBERED that on this _16th_ day of _January_, 2006 personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **ROBERT M. COUPE**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of her knowledge, information and belief.

_____
ROBERT M. COUPE

SWORN TO AND SUBSCRIBED before me on this _16th_ day of _Jan._, 2006.

_____
Notary Public



OFFICIAL SEAL
**DONNA N. HAINES**
NOTARY PUBLIC - DELAWARE
PRINCIPAL OFFICE IN
NEW CASTLE COUNTY
My Commission Expires February 2, 2006

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : **C.A. No. 04-1394-GMS** |
| | : |
| **COLONEL L. AARON CHAFFINCH,** | : |
| **et al.** | : |
| | : |
| **Defendants,** | : |

### Affidavit of L. Aaron Chaffinch

1.      I was a member of the Delaware State Police from September 8, 1978 until May 5, 2005. I retired as the Superintendent. I assumed that position, with the rank of Acting Colonel, in October 2001, and assumed the position of Colonel thereafter.

2.      On October 27, 2004, I learned that Captain Barbara Conley had filed a lawsuit naming me as a defendant. In the lawsuit Captain Conley claimed that she was denied promotion to the rank of Major because of her gender. In the Complaint her lawyers drafted, there were numerous allegations about my conduct during my career as a police officer.

3.      As a result of the lawsuit and the allegations made against me, I was temporarily relieved of duty as Superintendent and assigned to administrative leave by Secretary David Mitchell of the Department of Safety and Homeland Security. Lt. Colonel Tom MacLeish was named as Acting Colonel.

4.      On October 25, 2004, an electronic mail notice of the trial board convened to hear the case against Captain Barbara Conley was sent to all DSP personnel. This notice conformed to the criteria set forth in the Administrative Manual. The e-mail notice was issued in the normal course of business of the Internal Affairs Unit.

5..    I did not provide any information to Tom Eldred of the *Delaware State News* concerning the disciplinary action against Captain Conley, or her trial board. I did not fax or forward the e-mail notice to Mr. Eldred. I do not know who, if anyone, did so. I did not authorize or instruct anyone at the Division of State Police to do so.

BE IT REMEMBERED that on this _____ day of _____, 2006 personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **L. AARON CHAFFINCH**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of her knowledge, information and belief.

_____
L. AARON CHAFFINCH

SWORN TO AND SUBSCRIBED before me on this ___day of _____, 2006.

_____
Notary Public

A00009

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE    2004 DEC -6  AM II: 03

CAPTAIN BARBARA L. CONLEY,           :
                                     :
          Plaintiff,                 :
                                     :
     v.                              :
                                     :
COLONEL L. AARON CHAFFINCH,          :    C.A.No.04-1394-GMS
individually and in his official     :
capacity as the Superintendent,      :
Delaware State Police; LIEUTENANT    :
COLONEL THOMAS F. MACLEISH,          :
individually and in his official     :
capacity as the Deputy               :
Superintendent, Delaware State       :    Trial by Jury Demanded
Police; DAVID B. MITCHELL,           :
individually and in his official     :
capacity as Secretary of the         :
Department of Safety and Homeland    :
Security, State of Delaware; and     :
DIVISION OF STATE POLICE,            :
DEPARTMENT OF SAFETY AND HOMELAND    :
SECURITY, STATE OF DELAWARE,         :
                                     :
          Defendants.                :

### FIRST AMENDED COMPLAINT[1]

     1.   This is a civil action to remedy intentional and

purposeful gender discrimination by the Delaware State Police

which proximately lead to the failure to promote plaintiff to the

---

     [1]  No Answer having been filed, pursuant to Fed.R.Civ.P.
15(a) plaintiff amends her Complaint as of right.  The caption
has been amended and paragraphs 106 - 164 have been added.
Defendant Mitchell has been added as a defendant in his
individual capacity.  Lt. Col. Thomas MacLeish has been added as
a defendant in both his individual and official capacities.

-1-

rank of Major. Plaintiff seeks detailed judicial inquiry under

intermediate or strict scrutiny analysis to insure that her

personal right to equal protection of the laws is upheld, that

discrimination odious to our nation's principles of equality is

halted and an award of compensatory and punitive damages and

injunctive relief because of invidious gender discrimination

against her. Defendant Chaffinch has denied plaintiff's right to

be free of gender discrimination in violation of the Fourteenth

Amendment of the U.S. Constitution.  Plaintiff twice has been

passed over for promotion to the rank of Major in the Delaware

State Police because she is a woman and that promotion was given

instead to less qualified males.  Plaintiff has direct and

circumstantial evidence that animosity towards women was the

reason defendant Chaffinch twice refused to promote her.

## I.  **JURISDICTION**

2.  The jurisdiction of this Court is invoked pursuant to 28

U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and

2202, and the Fourteenth Amendment to the U.S. Constitution.  The

cause of action arises under 42 U.S.C. § 1983.  The claim arose

in this judicial district.

## II.  **THE PARTIES**

3.  Plaintiff is a citizen of the United States and a

resident of Kent County Delaware.

4.  Defendant Colonel L. Aaron Chaffinch is currently the

-2-

A00011

Superintendent of the Delaware State Police and its highest ranking officer.  He is sued individually and in his official capacity.

5.   Defendant David B. Mitchell is currently Secretary of the Department of Safety and Homeland Security, State of Delaware.  He is sued in his official capacity.

6.   Defendant Division of State Police, Department of Safety and Homeland Security, State of Delaware ("State Police") is an agency of the State of Delaware, which is only joined in this action for purposes of collecting attorneys' fees and costs.

### III.   FACTS GIVING RISE TO THE ACTION

#### A.   PLAINTIFF'S QUALIFICATIONS

7.   Plaintiff is a 22 and one-half year veteran of the State Police.  She currently holds the rank of Captain and is its Director of the Traffic Control Section.

8.   Plaintiff is a 1979 graduate of Caesar Rodney Senior High School in Camden, Delaware.  She holds two Associates Degrees in Correctional Science and in Police Science from Delaware Technical and Community College, Terry Campus, where she was on the Dean's List with a GPA of 3.67 and upon graduation was selected the outstanding criminal justice student by former Delaware State Police Superintendent James L. Ford, Jr.  She holds a Bachelor of Science in General Studies Degree from Wilmington College where she was on the Dean's List with a GPA of

-3-

3.87.

9.   Plaintiff is also a 1999 graduate of Northwestern
University's School of Police Staff and Command where she was the
130th Class Officer Recording Secretary and had a GPA of 3.89.

10.   Plaintiff has held the following positions with the
State Police:

- Captain, Director of Traffic Control Section, 2001 to
  the present.
- Assistant Director of Traffic Control Section, 2000-
  2001.
- Traffic Lieutenant, Troop 5, Bridgeville, 1999-2000,
  which included responsibilities for about 35 troopers,
  and substituting for the Troop Commander, when
  necessary.
- Traffic Lieutenant, Troop 3, Camden, 1997-1999, which
  included responsibilities for about 50 troopers.
- Sergeant, Patrol Shift Supervisor, Troops 3 and 5,
  Camden and Bridgeville, 1993-1997.
- Patrol Trooper, Troop 5, Bridgeville, 1982-1993.

### B.   THE MANAGERIAL DUTIES OF MAJORS

11.   The State Police is a paramilitary organization.  It is
headed by a superintendent with the rank of Colonel and a deputy
superintendent with the rank of Lieutenant Colonel, both of whom
are appointed by the Governor and the Secretary of Safety and

-4-

A00013

Homeland Security, State of Delaware.

    12.   Organizationally the State Police is one division of the Cabinet level Department of Safety and Homeland Security, which at all times relevant hereto was headed by Cabinet Secretary defendant Mitchell or his predecessor James L. Ford, Jr.

    13.   There are five uniformed officers with the rank of Major in the State Police.

    14.   All the Majors are managers and they are not policy makers.

    15.   The Majors do not report organizationally to the Colonel or perform advisory functions for him.

    16.   The Majors are two levels organizationally below the Colonel.

    17.   They report to the Deputy Superintendent who is also the Lt. Colonel of the State Police.

    18.   The Majors are non-policymaking, nonconfidential government employees.

    19.   The duties of the Majors are described below.  Their duties are well defined and they are not of broad scope.

    20.   Organizationally the Colonel oversees the State Police. But only three units report directly to him: Planning, Inspections/Accreditation and Victim Services.  Office of Primary Responsibility regulation (hereinafter "O.P.R.") § 11.1.1.3.

21.   The Majors do not perform any of these three advisory functions for the Colonel.

22.   It is the Lieutenant Colonel who serves as the operations officer for the State Police.  O.P.R. § 11.1.1.3.B.

23.   The five Majors report only to him.

24.   The areas directed by the Majors are Administrative-Budget, Administrative-Technical Support, Field Operations in New Castle County, Field Operations in Kent and Sussex Counties, and Special Operations. O.P.R. § 11.1.1.3.B.

25.   The Administrative-Budget Major "oversees administrative services and certain support services including, purchasing, and supply, fiscal control, the fiscal/policy analyst, graphics and the transportation section." O.P.R. § 11.1.1.3.C.

26.   The Field Operations Major for Kent and Sussex Counties is responsible for the various troops within those counties (Troops 3, 4, 5 and 7), and the Executive Protection Unit which protects the Governor. O.P.R. § 11.1.1.3.F.

27.   The gender of the Majors does not interfere with the discharge of their public managerial duties.

28.   Majors do not have meaningful input into decision making concerning the nature and scope of major State Police programs.  Rather, the Colonel and the Secretary of the Department of Safety and Homeland Security make all meaningful decisions as to the nature and scope of all major State Police

-6-

programs.

29.    The position of Major can be effectively performed by someone who is a female.

**C.  CHAFFINCH HAS VICTORIAN NOTIONS ABOUT WOMEN IN THE WORKPLACE.**

**(a).  HE IS A MEMBER OF AN ORGANIZATION WHICH EXCLUDES WOMEN.**

30.    Defendant Chaffinch does not believe that women should be in the modern workplace or that they should be Majors in the State Police.  He does not believe that the position of Major can be effectively performed by someone who is a female.  He believes that the female gender of a Major would interfere with the discharge of her public managerial duties.

31.    Chaffinch publically boasts that he belongs to a private organization, Freemasonry, which discriminates against African-Americans and women and which historically in all its Lodges has always denied African-Americans and women membership.

32.    He is a member of the Delaware Shield and Square Lodge of Freemasonry.  That and any other Masonic organization to which he has ever belonged have never had an African-American or female member.

33.    He holds the highest of three ranks in Freemasonry, that of Master Mason, and he also holds the highest degree in Freemasonry, that of a 33rd Degree Mason.

34.    Only white males may join the Masonic organizations to which Chaffinch has ever belonged.

-7-

A00016

35.   Freemasonry has always denied membership to women in any of its Regular Masonic Lodges.

**(b).   CHAFFINCH HAS PUBLICALLY STATED THAT WOMEN ARE LESSER PERSONS THAN MEN AND HE HAS DEMEANED WOMEN.**

36.   Chaffinch repeatedly has stated to plaintiff and others that the trouble with mankind can be traced to the Garden of Eden discussed in the Book of Genesis in the Holy Bible.  He believes that the problems of society are the fault of women, symbolized by Eve, and it is men, symbolized by Adam, who have to bear the penalty for women's mistakes. This remark reflects sexist stereotypes about women.

37. Chaffinch has told plaintiff that he refused to assign two women to her Traffic Control Section because two women cannot get along and work together.  This remark reflects sexist stereotypes about women.

38.   Chaffinch when he was a Lieutenant was disciplined for participating in an incident where a female beared her breast for money at a party.

39.   Chaffinch when he was a Major was counseled for openly telling a sexually explicit joke during a coed inservice training class.

**(c). CHAFFINCH MAKES SEXUALLY OFFENSIVE REMARKS ABOUT WOMEN.**

40.   Chaffinch constantly, in the presence of plaintiff, other women and men, recounts a wide variety of more than five

-8-

sexually charged limericks and jokes which are offensive to women.  They include the following three (two are so offensive that they are being omitted here) -

> The nipples of Sara Sarong
> When excited were twelve inches long
> Her tender young lover was soon to discover
> She expected no less of his d---

> There once was a man from Trent
> Whose d--k was so long that it bent
> To save himself trouble, he stuck it in double
> And instead of coming he went

> There once was a man from Nantucket
> Whose d--k was so long he could suck it
> As he said with a grin, wiping c-m from his chin
> If my ear were a c--t, I would f--k it.

41.  Chaffinch tells plaintiff, other women and men, that he has "something extra," meaning that he is not circumcised. He then refers to his penis publically by a nickname.

42.  Chaffinch has publically stated in the presence of women that he wanted to watch others engage in sexual relations.

43.  Chaffinch has allowed other troopers to disrespect plaintiff and call her "Puss."

44.  Chaffinch has allowed other troopers to disrespect plaintiff and other women with offensive comments, rumors and wolf whistling.  He also eggs it on and condones this behavior.

45.  Chaffinch has demanded to know private details of plaintiff's sex life.  Plaintiff has been happily married to a retired Trooper for 17 years.

A00018

46.    Chaffinch tells plaintiff, other women, and men, that he considers a particular female to be "----- the Dish," by which he means to imply that he wishes to have sexual relations with her.    He also publically has stated to her "you're so sweet, you don't need any sugar."

47.    Chaffinch refers to several of the women who work in the headquarters building with him as "tearing him up" or that he "would love to do her," by which he means to imply that he wishes to have sexual relations with them and use them for his sexual gratification.

48.    Chaffinch publically refers to one secretary as "lemon Ti--ies," which is a reference to her breast size.

49.    Chaffinch tells plaintiff, other women, and men, a story about the enormous size of a male Trooper's penis.

**D. CHAFFINCH WILL NOT PLACE WOMEN IN COMMAND IN THE STATE POLICE.**

50.    Chaffinch assumed operational command of the State Police on October 1, 2001.    Since that time he has not placed a female in a command position as the head of a Troop and he has precipitously removed from Troop 6 the only woman who previously held a command position.

51.    The first woman ever promoted to the rank of Captain in the State Police was Mary Ann Papili who was promoted by former Col. Gerald R. Pepper, Jr. in June of 2001.    She then was assigned to be the Troop Commander of Troop 6 in Prices Corner.

-10-

Troop commanders normally serve three or more years in their posts. Captain Papili was an excellent Troop Commander who was well respected by those under her command.

52.  In September of 2003 Chaffinch removed Col. Pepper's appointee Captain Papili from command and transferred her to an administrative position as the OIC of Information Technology. She prematurely lost her command under Chaffinch.

53.  Plaintiff was the second woman ever promoted to Captain in the State Police. Col. Pepper promoted plaintiff in August of 2001 and assigned her to her present position as Director of the Traffic Section which is only an operational and support position. But since Chaffinch assumed command he has diminished the operational authority of plaintiff and lessened her position within the State Police and her Section. He also ignores her at monthly commanders meetings and has drastically decreased her role in such meetings.

54.  In July 2003 Chaffinch was forced by former Secretary James L. Ford Jr. to promote Elizabeth Shamany to the rank of Captain. But he did not place her in a command position. Instead she was assigned to an administrative position in the State Bureau of Investigation.

55.  No woman currently serves under Chaffinch in a command position.

**F. CHAFFINCH PROMOTED TWO LESS QUALIFIED MALES TO MAJOR**

-11-

56.   In August 2001 plaintiff was promoted to the rank of Captain by now retired Colonel Pepper.

57.   On September 30, 2001 Colonel Pepper retired. Chaffinch was named acting superintendent until February 8, 2002 when Governor Ruth Ann Minner appointed him as the permanent superintendent of the State Police.

58.   In March 2003 Major Joseph Swiski, the Administrative-Budget Major, retired and Captain Paul Eckrich, a person less qualified than plaintiff, was promoted to Major Swiski's position.

59.   Plaintiff was denied this promotion because of her gender and Chaffinch's bias against women.

60.   Lieutenant Colonel Thomas Marcin then retired.  Major Thomas MacLeish was selected for the position of Lieutenant Colonel.  This created a second promotion opportunity to the rank of Major for the Field Operations position in Kent and Sussex Counties where plaintiff had served her entire career.

61.   But a lesser qualified male, Captain Randall Hughes, then was promoted to that position.

62.   Plaintiff was denied this promotion because of her gender and Chaffinch's bias against women.

### G. DAMAGES

63.   As a direct and proximate result of the actions of the defendants as detailed herein, plaintiff will suffer lost wages,

-12-

A00021

earnings and benefits, she will suffer diminished earning

capacity and receive less pension and other benefits now and upon

her retirement, decreased employment and earnings opportunities,

and other pecuniary losses, emotional pain, suffering,

disappointment, anger, inconvenience, mental anguish, loss of

enjoyment of life, mental and physical pain, anguish,

humiliation, embarrassment, injury to reputation, and other non-

pecuniary losses and injury.

## IV.   **ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT**

64.   The individual defendant's actions violated clearly

established federal constitutional rights of which any official

would have known, including decades of Third Circuit case law

prohibiting gender discrimination against public employees.

65.   At all times material hereto the individual defendant

participated in, authorized, and sanctioned the federal

constitutional deprivations described above.

66.   At all times material hereto the individual defendant

and his agents were acting under color of law.  The federal

constitutional deprivations described herein are fairly

attributable to the State.

67.   The actions of the defendants and their agents or

employees were deliberately, intentionally, willfully,

purposefully, and knowingly done in violation of federal

constitutional rights and because of the exercise of those

-13-

A00022

rights.

68.    The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

69.    Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

70.    Their actions were wanton and malicious or taken with reckless indifference to federal constitutional rights.

71.    The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiff.

72.    The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to plaintiff.

73.    The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

74.    The defendants' actions were motivated by bias, bad faith, and improper motive.

75.    The defendants' actions constitute an abuse of governmental power.

76.    The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

77.    The defendants' actions are not so reasonable as to

-14-

A00023

further any governmental interest asserted and do not closely fit

the goal of serving those governmental interests.

### COUNT I (PROMOTIONS)

78.  Plaintiff repeats and realleges paragraphs 1 - 77 set

out above.

### A.  DIRECT EVIDENCE ANALYSIS

79. Plaintiff has provided direct evidence of gender

discrimination against her.  These statements or other evidence

reflect a discriminatory bias against female employees. They

provide direct evidence that the decisionmaker placed substantial

negative reliance on an illegitimate criterion in reaching the

challenged decision.

80.  Alternatively, impermissible gender based factors, as

well as permissible factors, were considered in the decision

making process.

81.  Plaintiff is within a protected gender group, that is,

she is female.

82.  She was not promoted on two occasions.

83.  Her gender was the motivating, determinative or even

the sole reason why she was not promoted.

84.   The defendants cannot prove by a preponderance of the

evidence that if they had not used gender based or suspect

classifications they still would not have promoted plaintiff.

### B.  PRETEXT ANALYSIS

-15-

A00024

85.   Plaintiff was qualified for promotion to Major.

86.   At all times material hereto she was a diligent, honest, and loyal employee who always performed her job in an exemplary manner.

87.   Plaintiff sought promotion to Major.

88.   Two vacancies for promotion to Major existed.

89.   Plaintiff is female.

90.   The promotions went to two less qualified males.

91.   Any legitimate non-discriminatory reason offered by the defendants for their actions is a pretext for intentional and purposeful discrimination based on gender.  Any reason offered by the defendants is unworthy of credence since plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that the defendants did not act for the asserted non-discriminatory reason.

92.   Alternatively, plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment actions was the gender of the plaintiff.

### (a).  CIRCUMSTANTIAL EVIDENCE OF INTENT

93.   The circumstantial and direct evidence of intent proves

-16-

A00025

invidious discriminatory purpose.  Examples include the following.

94.  Historically no woman has ever been promoted to the rank of Major, Lieutenant Colonel or Colonel of the State Police. Chaffinch has continued this historic pattern with the two less qualified males who he has promoted to Major.

95.  Approximately 90% of the State Police are males (544 men) and only 10% are females (64 women). Report by Lisa Blunt-Bradley, dated December 1, 2001, at 8, 11.

96.  In the Professionals EEO-4 Category which includes Lieutenants, Captains and Majors, female representation decreased from 5.9% on October 1, 1999 to 5.3% on October 1, 2001.  Bradley Report at 12.

97.  Using a workforce analysis, the State Police has been and continues to be under represented in all EEO-4 Categories for women.  Bradley Report at 13.  For example, in the Professionals category, which includes Majors, the labor market is 55% and the State Police percentage is only 5%.  Id.

98.  Chaffinch has blocked the recommendation of the Bradley Report that a Roundtable of Women in Policing be convened to address issues unique to women in law enforcement in the State Police and strategies to address those issues.  Former Lt. Col. Thomas Marcin tried to implement this recommendation but since his retirement Chaffinch has ignored the recommendation.  Bradley

-17-

Report at 47.

99.    To insure accountability in the area of the utilization
of uniformed women officers in the State Police the Bradley
Report recommended that the State Police create a Diversity
Committee.   Chaffinch has blocked the implementation of this
recommendation.

100.   Aside from the examples given earlier, Chaffinch
singles out women officers for disrespect and unequal treatment.
For example, he demeans and disrespects Captain Mary Ann Papili,
by calling her "Norman," after a most wanted criminal fugitive
with that first name.   But he calls no male Captain by the first
name of any criminal fugitive.

101. The specific sequence of events leading up to the two
challenged promotions evidences discriminatory intent.

102. In the handling of these two promotions there were
departures which occurred from the normal procedural sequence.

103.   Given the totality of the circumstances, a reasonable
fact-finder could conclude that the defendants intentionally and
purposefully treated plaintiff less favorably than others because
of her gender.

104.   Plaintiff has been illegally denied two promotions
because of her gender.

105.   Plaintiff's constitutional right to the equal
protection of the law and to be free of gender discrimination has

-18-

A00027

been denied under the Fourteenth Amendment to the U.S.
Constitution and 42 U.S.C. § 1983.

## COUNT II (FREE SPEECH CLAUSE RETALIATION)

106.  Plaintiff repeats and realleges paragraphs 1 - 105 set
forth above.

107.  In addition to the defendants listed above, the added
defendants for the purposes of Counts II and III of this
Complaint are: defendant Secretary Mitchell, in his individual
capacity; and defendant Lt. Col. Thomas F. MacLeish, who is the
Deputy Superintendent of the State Police.  He is sued in his
individual and official capacity.

### A.  Plaintiff's Protected Activity.

108.  Plaintiff filed her Complaint in this court on October
27, 2004.

109.  Defendants Mitchell, Chaffinch and MacLeish each were
aware personally that plaintiff had filed this lawsuit and each
of them were antagonized by it.

110.  As a direct and proximate result, defendants Mitchell,
Chaffinch and MacLeish set upon a course of conduct designed to
retaliate against plaintiff for daring to file a lawsuit
challenging illegal practices in the State Police.

### B.  Defendants' First Act of Illegal Retaliation
in Violation of State Law.

111.  Mere hours after the filing of this lawsuit and their
learning of it, that same day defendants and their agents leaked

-19-

A00028

confidential internal affairs material about plaintiff to the
news media, specifically, to a Delaware State News reporter.

112.   The material defendants released dealt with matters
made confidential by the Law Enforcement Officer's Bill of
Rights, 11 Del.C. § 9200 et. seq., the protections of which apply
to plaintiff.   See 11 Del.C. § 9200(a).

113.   Defendants' release of this confidential internal
affairs information was in violation of this state law.

114.   Defendants' actions also constitute the crime of
official misconduct under 11 Del.C. § 1211.

### C.   Defendants' Second Act of Illegal Retaliation in Violation of State Law.

115.   The Delaware State News could not run a story on this
leaked document until it obtained a confirmation of the
information contained therein.

116.   That same day, a reporter from the Delaware State News
contacted DSP public affairs officer Lieutenant Joseph Aviola and
questioned him about the confidential internal affairs material
that had been leaked to him.

117.   Aviola indicated that he would have to consult with
his superiors about how to respond to this inquiry.   Aviola knew
that the request dealt with information made confidential by
state law and he would not respond unless he obtained approval
from the top of his chain of command.

118.   Upon information and belief, Aviola then consulted

-20-

A00029

with defendants Mitchell and MacLeish, each of whom are in his
direct chain of command.

119.   Mitchell and MacLeish then ordered, authorized, or
otherwise directed their subordinate to violate and ignore the
Law Enforcement Officer's Bill of Rights and to commit the crime
of official misconduct by discussing this confidential
information with the news media.

120.   They hoped that their actions would stifle legitimate
dissent and intimidate other employees from exercising their
First Amendment right to petition government by filing lawsuits.

121.   Defendant Chaffinch ratified, sanctioned, authorized,
approved, acquiesced or participated in this decision.

122.   The next day, October 28th, Aviola contacted the
Delaware State News and confirmed the nature of and discussed the
information contained in this confidential document.  At all
times, Aviola was acting as the agent of defendants and pursuant
to their express directions.

123.   By publically confirming the existence of and
discussing the confidential material contained in that document,
defendants violated the confidentiality guarantees enacted in the
Law Enforcement Officer's Bill of Rights.

124.   In so doing, defendants also committed the crime of
official misconduct in violation of 11 Del.C. § 1211.

125.   As a result of defendants' illegal actions, numerous

-21-

A00030

stories have run in both the Delaware State News and the News
Journal, discussing the confidential internal affairs material
relating to plaintiff.

126.   Plaintiff has been irreparably harmed as a result of
defendants' illegality and retaliatory misconduct.  Her right to
confidential proceedings under state law has been lost forever
thus directly and proximately injuring her reputation.

### D.  Defendants' Actions Also Violate DSP Policy.

127.   Defendants' retaliatory animus is revealed by the
double standard they applied earlier this year in dealing with
repeated media inquiries made as to defendants Chaffinch and
MacLeish - who themselves have been the subject of several recent
internal affairs investigations.

128.   11 Del.C. § 9200(a) dictates that the confidentiality
provisions of the Law Enforcement Officer's Bill of Rights apply
to plaintiff.  Conversely, the statute also explicitly states
that its privacy protections "shall not apply to the
Superintendent or the Deputy Superintendent of the Delaware State
Police." Id.

129.   In violation of this law, as discussed above,
defendants publically released and discussed confidential
internal affairs information about plaintiff.  Yet when repeated
media inquiries were made as to internal affairs investigations
into defendants Chaffinch and MacLeish, defendants refused to

-22-

A00031

discuss those matters.

130.  For example, as set forth in the April 15th, 2004 edition of the Delaware State News, DSP spokesman Aviola refused to comment on those matters.  In his own words:

> "They are internal.  **As a policy, we don't comment on internal matters**."

> "[W]e won't be disclosing the nature of the charges because they are internal."

131.  Similarly, as set forth in the April 23rd, 2004 edition of the News Journal, in response to a request for a confidential internal affairs document, the article states:

> "Aviola said it was an internal document and would not be dispersed . . .."

132.  In the same way, as set forth in the April 30th editions of the Delaware State News and the News Journal, defendant Mitchell's predecessor Secretary James L. Ford, when questioned about the investigations into defendants Chaffinch and MacLeish stated:

> "To protect the integrity of the process, I will not comment further on these matters."

133.  In the same Delaware State News article, Aviola stated:

> "We won't have any comment.  It's still classified as an internal affairs matter."

134.  Likewise, as set forth in the March 27th edition of the Delaware State News, in response to inquiries into a separate internal affairs investigation into defendant MacLeish's actions,

-23-

A00032

Aviola stated:

> "It's a personnel matter.  I can't comment on that."

135.  Regarding the same matter, the March 25th edition of the News Journal stated:

> "Lt. Joseph P. Aviola Jr., a state police spokesman, declined to disclose steps taken, saying it was a personnel matter."

### E.  The DSP and Attorney General's Office Refuse to Investigate Breaches of State Law and their Own Internal Policies.

136.  On October 29th, plaintiff's counsel filed a written complaint with Captain James Paige of DSP internal affairs.

137.  This written complaint charged that defendants had violated the Law Enforcement Officer's Bill of Rights as well as the Delaware criminal law in their treatment of plaintiff.  It requested that internal affairs launch an immediate investigation into the matters discussed above.  It also requested that immediate steps be taken to inform the DSP of their obligations under these state laws.

138.  By information and belief, Paige then consulted with his superiors in his chain of command, including defendants Mitchell and MacLeish.  They ordered that Paige stonewall and refuse to investigate these violations of state law.

139.  In a letter dated November 1, 2004, Paige refused to investigate defendants' actions in any way shape or form.

140.  Accordingly, on November 5th, plaintiff's counsel

-24-

A00033

filed a written complaint with Deputy Attorney General Michael
Tupman - one of the attorneys for the DSP.  This complaint
detailed defendants' violations of both the civil and criminal
laws as discussed above.

141.  The complaint to Tupman specifically discussed
defendants' retaliation against plaintiff for filing her lawsuit
and Paige's refusal to investigate this illegality.  The
complaint stated that "I would like to give your office the
opportunity to address these issues before we must do so in
federal court."

142.  In response, on defendants' orders, there has been a
deafening silence from the Attorney General's office.  It has
refused to respond to these complaints about criminal and civil
wrongdoing committed by law enforcement officers.

143.  In a subsequent article in the Delaware State News,
Lori Sitler the spokeswoman for the Attorney General's office,
incredibly stated that the Attorney General's Office had not seen
the complaints but nonetheless had already made the determination
not to investigate the charges.

## F.  General Allegations.

144.  In filing her Complaint in the above captioned
lawsuit, plaintiff invoked the protections of and was engaging in
protected speech and petitioning of the government for redress of
grievances under the First Amendment to the U.S. Constitution.

-25-

A00034

145.  Defendants Mitchell, Chaffinch and MacLeish were aware that plaintiff had engaged in protected speech and petitioning activity by filing her lawsuit. Defendants were aware of this, for example, by way of innumerable telephone calls and other inquiries they received from interested members of the public, the media and co-workers who made them immediately aware of this suit shortly after its filing.

146.  At all times plaintiff spoke out on issues of public concern and petitioned the government for redress of grievances under the First Amendment and sought to bring to light actual or potential wrongdoing or breach of the public trust by high public officials and also sought to bring to light defendant Chaffinch's illegal actions which violated the U.S. Constitution.

147.  By its content, form and context, at all times plaintiff spoke out about matters of public concern.

148.  All of plaintiff's speech and petitioning was non-disruptive of any legitimate interest of her employer and was on matters of public concern to the DSP, as well as the General Assembly, the Governor of Delaware, the news media, voters and the public at large.  Her speech and petitioning related to matters of political, social and other concern to the community.

149.  Plaintiff was acting in good faith and with honest motive at all times when she exercised her First Amendment rights to freedom of speech and to petition the government.  At all

-26-

A00035

times, plaintiff believed that her speech was true and her speech
was in fact true.

150.    Plaintiff was not being disloyal by speaking out and
petitioning the government.  Rather, she has a duty as a sworn
police officer to uphold the U.S. Constitution.  In accord with
her duties, she sought to bring to light blatant violations of
the highest law in the land by the highest ranking police officer
in the State of Delaware.

151.    The public concern in and value to the community at
large of being free to hear plaintiff's speech and petition
outweighs any asserted government interest in the effective and
efficient provision of services.

152.    Nothing plaintiff said interfered with the regular
operations of the DSP.  Instead, DSP policy requires officers to
oppose sex discrimination in the workplace.  Plaintiff's speech
did not interfere with the DSP's interests in: crime fighting;
fostering trust and confidence among officers; protecting the
safety of officers or other members of the community.

153.    Plaintiff's speech did not threaten the authority of
defendants to run the DSP.

154.    Plaintiff's speech did not have a detrimental impact
on any close working relationship for which personal loyalty,
trust and confidence are necessary.  Plaintiff is not the alter
ego of defendants.  Organizationally, plaintiff is several ranks

-27-

A00036

below defendants Mitchell, Chaffinch and MacLeish in the chain of command.

155. Any disruption that was caused in the DSP was not caused by plaintiff's speech but was instead caused by the very problems that plaintiff's speech was in fact intended to address - defendant Chaffinch's illegal conduct.

156. In her position as a Captain in the DSP, plaintiff did not make or formulate DSP policy. Rather, formulation of DSP policy is left up to the Superintendent and Deputy Superintendent of the DSP.

157. As discussed above, defendants Mitchell, Chaffinch and MacLeish were aware that plaintiff had engaged in protected activity and were antagonized by it.

158. The totality of the retaliatory adverse action taken by defendants against plaintiff is sufficient to deter a person of ordinary firmness from exercising their First Amendment right to freedom of speech.

159. A reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to freedom of speech when threatened with the release of highly confidential internal affairs material which state law guarantees will remain private.

160. Plaintiff's constitutional right to freedom of speech has been denied under the First and Fourteenth Amendments to the

-28-

U.S. Constitution and 42 U.S.C. § 1983.

### COUNT III (PETITION CLAUSE RETALIATION)

161.    Plaintiff repeats and realleges paragraphs 1 - 160 set forth above.

162.    The totality of the retaliatory adverse action taken by defendants against plaintiff is sufficient to deter a person of ordinary firmness from exercising their First Amendment right to petition the government for redress of grievances.

163.    A reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to petition the government for redress of grievances when threatened with the release of highly confidential internal affairs material which state law guarantees will remain private.

164.    Plaintiff's constitutional right to petition the government for redress of grievances has been denied under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

**Wherefore,** plaintiff prays that the Court:

I.    Enter judgment against the defendants.

II.   Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiff's constitutional rights.

III.  Enter a judgment against the individual defendants for compensatory damages, including lost wages,

-29-

A00038

back pay, pension and other benefits, for future
or front pay, loss of earning capacity, emotional
distress, humiliation, embarrassment, and injury
to reputation.

IV.  Enter a judgment against the individual defendants
for punitive damages.

V.   Issue a mandatory injunction directing defendant
Chaffinch, or his successor, to promote plaintiff
immediately to the rank of major in the Delaware
State Police.

VI.  Award front pay until plaintiff can be promoted.

VII. Issue a reparative injunction directing that upon
retirement plaintiff's pension and other benefits
be calculated as if she had been promoted to the
rank of major as of March 1, 2003.

VIII. Issue a reparative injunction directing that the
individual defendants place a signed document in
plaintiff's personnel file indicating that she was
qualified to be promoted to the rank of major,
effective March 1, 2003, and that but for illegal
conduct by the defendants she would have been
promoted to that rank on that date, and
apologizing to plaintiff for violating her
constitutional rights.

-30-

IX.    Enjoin the defendants from retaliating against
       plaintiff.

X.     Award plaintiff attorney's fees, costs and pre and
       post judgment interest for this action.

XI.    Require such other and further relief as the Court
       deems just and proper under the circumstances.


                   **THE NEUBERGER FIRM, P.A.**


                   *Thomas S. Neuberger*
                   **THOMAS S. NEUBERGER, ESQUIRE** (#243)
                   **STEPHEN J. NEUBERGER, ESQUIRE** (#4440)
                   Two East Seventh Street, Suite 302
                   Wilmington, Delaware 19801
                   (302) 655-0582
                   TSN@NeubergerLaw.com
                   SJN@NeubergerLaw.com


                   Attorneys for Plaintiff


Dated: December 6, 2004


                              -31-

## CERTIFICATE OF SERVICE

The undersigned, being a member of the bar of this Court, do hereby certify that on December 6, 2004, I caused two (2) copies of this **Amended Complaint** to be served on the counsel named below by the means indicated:

> Ralph K. Durstein III
> Dept. Of Justice
> 102 West Water Street
> Dover, DE 19904-6750
> (U.S. Mail First Class Postage Prepaid)

STEPHEN J. NEUBERGER, ESQUIRE

Conley / Pleadings / First Amended Complaint.final

-32-

A00041

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BARBARA CONLEY ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C. A. No. 04-1394-GMS |
| ) | |
| STATE OF DELAWARE, ) | |
| DIVISION OF STATE POLICE, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

## ANSWER OF DEFENDANTS
## TO FIRST AMENDED COMPLAINT

The defendants respond as follows to the First Amended Complaint.  The numbered paragraphs in this Answer correspond to the numbered paragraphs in the First Amended Complaint.  Unless expressly admitted or qualified, all of the allegations in the First Amended Complaint are generally denied.

1. Denied, as to each and every particular.

2. The jurisdiction of the Court is admitted, and venue in this District is proper.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

A00042

7.    Denied as alleged.  The plaintiff is assigned to the Traffic Section.  The balance of the averment is admitted.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Denied as alleged.  The Division of State Police is a law enforcement organization.  The Secretary of Safety and Homeland Security appoints the Superintendent of the State Police with the written approval of the Governor.

12.    Admitted.

13.    Admitted.

14.    Denied.

15.    Denied as alleged.  Admitted only that Majors do not report directly to the Superintendent.  The balance of the averment is denied.

16.    Admitted.

17.    Admitted.

18.    Denied.

19.    Admitted only that the duties of Majors are well-defined.  The balance of the averment is denied as alleged.

20.    Admitted.

21.    Admitted.

22.    Admitted.

23.    Admitted.

24.    Admitted.

25.    Admitted.

26.     Denied as alleged. The Field Operations Major for Kent and Sussex Counties also bears responsibility for Fatal Accident Investigation and Reconstruction units at Troop #3 and Troop #7, as well as Criminal Investigation Units at Troop #3 and Troop #4, as well as the Domestic Violence Unit. The balance of the averment is admitted.

27.     Admitted.

28.     Denied.

29.     Admitted.

30.     Denied.

31.     Denied.

32.     Admitted.

33.     Admitted.

34.     Denied.

35.     Admitted.

36.     Denied.

37.     Denied.

38.     Admitted.

39.     Admitted.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied. Answering defendants are without sufficient knowledge or information to respond as to plaintiff's marriage.

46.     The allegation set forth in the first sentence is denied. The balance of the averment is admitted.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Denied as alleged.  Colonel Chaffinch assumed command as alleged, and has not replaced a troop commander with a woman.

51.    Admitted, except that the tenure of a troop commander may vary, depending upon a number of factors.

52.    Denied as alleged.  Admitted only that Captain Papili was transferred from her position as troop commander to a position as Officer in Charge of Information Technology.

53.    Admitted only that the plaintiff was the second female Captain within the Delaware State Police when she was assigned to her position in the traffic Section in August of 2001.  The balance of the averment is denied.

54.    Denied as alleged.  Admitted only that Captain Shamany was promoted in July of 2003, and was assigned as the ranking officer in the Administration of the State Bureau of Investigation.  The balance of the averment is denied.

55.    Denied.

56.    Admitted.

57.    Admitted.

58.    Denied as alleged.  Admitted only that Major Swiski retired in March of 2003, and Captain Eckrich was appointed to replace him.  The balance of the averment is denied.

59.    Denied.

60.    Admitted.

61.    Denied as alleged.  Admitted only that Captain Hughes was appointed to the position.  The balance of the averment is denied.

62.    Denied.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Denied.

68.    Denied.

69.    Denied.

70.    Denied.

71.    Denied.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied.

76.    Denied.

77.    Denied.

78.    Answering defendants restate and incorporate herein by reference thereto the responses set forth in paragraphs 1 through 77 above.

79.    Denied.

80.    Denied.

81.    The averment calls for a legal conclusion, and is therefore denied.

82.    Denied.

83.    Denied.

84.    Denied.

85.   Denied.

86.   Denied.

87.   Denied.

88.   Denied.

89.   Admitted.

90.   Denied.

91.   Denied.

92.   Denied.

93.   Denied.

94.   The first sentence is admitted.  The second sentence is denied.

95.   Denied as alleged.  Approximately 11% of Delaware State Police officers are women.

96.   Denied as alleged.  6.67% of Majors, Captains, and Lieutenants are female.

97.   Denied.

98.   Denied.

99.   The first sentence is admitted, by information and belief.  The second sentence is denied.

100.   Denied.

101.   Denied.

102.   Denied.

103.   Denied.

104.   Denied.

105.   Denied.

106.   Answering defendants restate and incorporate herein by reference thereto the responses set forth in paragraphs 1 through 105 above.

107.   Admitted.

108.  Admitted.

109.  Denied as alleged.  The defendants only became aware of the lawsuit through media publicity, and were not personally served until December.  The balance of the averment is denied.

110.  Denied.

111.  Denied.

112.  To the extent that the averment calls for a legal conclusion, it is denied.  Denied that any confidential information was disclosed by the defendants.

113.  Denied.

114.  Denied.

115.  The answering defendants are without sufficient information or knowledge to respond, and the averment is therefore denied.

116.  Denied as alleged.  Admitted only that a reporter contacted Lt. Aviola concerning information the reporter had learned from another source.

117.  Denied as alleged.  Admitted only that Lt. Aviola delayed responding to the inquiry until he could seek advice on the scope of any response.

118.  Denied.

119.  Denied.

120.  Denied.

121.  Denied.

122.  Denied as alleged.  Admitted only that Aviola confirmed only the non-confidential information the reporter had already learned from another source.  The balance of the averment is denied.

123.  Denied that any confidential material was discussed, or that any law was violated.

A00048

124.   Denied.

125.   Denied.

126.   Denied.

127.   Denied.

128.   The averment calls for a purely legal conclusion, and is therefore denied.

129.   The first sentence is denied.  The second sentence is admitted.

130.   Admitted.

131.   Admitted.

132.   Admitted.

133.   Admitted.

134.   Admitted.

135.   Admitted.

136.   Admitted.

137.   Admitted.

138.   Denied.

139.   Denied as alleged.  The letter speaks for itself.

140.   Admitted.

141.   Admitted.

142.   Denied.

143.   Denied.

144.   Denied.

145.   Denied.

146.   Denied.

147.   Denied.

148.   Denied.

149.   Denied.

150. Denied.

151. Denied.

152. Denied as alleged. Admitted only that Delaware State Police policy prohibits all types of harassment. The balance of the averment is denied.

153. Denied.

154. Denied.

155. Denied.

156. Denied.

157. Denied.

158. Denied.

159. Denied.

160. Denied.

161. The defendants restate and incorporate by reference the responses set forth in paragraphs 1 through 160 above.

162. Denied that any "retaliatory adverse action" was taken by defendants.

163. Denied.

164. Denied.

### First Affirmative Defense

The complaint fails to state a claim upon which relief can be granted as a matter of law.

### Second Affirmative Defense

To the extent they are sued in their official capacities, the individual defendants enjoy qualified immunity from any claim for monetary damages.

A00050

### Third Affirmative Defense

The Eleventh Amendment of the United States Constitution bars suit against the State of Delaware, the Department of Safety and Homeland Security, and the Division of State Police.

### Fourth Affirmative Defense

The Eleventh Amendment bars any claim for monetary damages against the individual defendants in their official capacities.

WHEREFORE, the defendants pray that the Court dismiss the plaintiff's action in its entirety, with prejudice, with all costs payable by the plaintiff.

Ralph K. Durstein III (ID# 912)
Deputy Attorney General
Department of Justice
State of Delaware
820 N. French Street
Wilmington, DE 19801
(302)577-8510

Dated: January 10, 2005

A00051

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on January 10, 2005, he caused two (2) copies of the attached

ANSWER OF DEFENDANTS TO FIRST AMENDED COMPLAINT to be delivered to the

following persons in the form and manner indicated:

### NAME AND ADDRESS OF RECIPIENT(S):

Thomas S. Neuberger, Esq.
Thomas S. Neuberger, P.A.
2 E. Seventh St., Suite 302
Wilmington , DE  19801

Chad M. Shandler
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899-0551

### MANNER OF DELIVERY:

_____    One true copy by facsimile transmission to each recipient

_____    Two true copies by first class mail, postage prepaid, to each recipient

___X___    Two true copies by hand delivery to each recipient

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

Ralph K. Durstein III, I.D. #912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th floor
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendants

I:\ralph.durstein\Litigation\Conley v DSP\cos.doc

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1394-GMS** |
| **individually and in his official capacity as the** | : | |
| **Superintendent, Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as the Deputy Superintendent,** | : | |
| **Delaware State Police; DAVID B. MITCHELL,** | : | |
| **individually and in his official capacity as** | : | |
| **Secretary of the Department of Safety and** | : | |
| **Homeland Security, State of Delaware; and** | : | |
| **DIVISION OF STATE POLICE,** | : | |
| **DEPARTMENT OF SAFETY AND** | : | |
| **HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |

### PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiff, by and through her attorneys, hereby objects to Defendants' First Set of

Requests for Admissions Directed to Plaintiff ("Discovery") in accordance with the numbered

paragraphs as set forth below. Plaintiff reserves the right to amend or supplement the responses

contained herein as may be necessary or appropriate in the future.

Discovery has not concluded in this case. Plaintiff reserves the right to supplement her

responses at a later time as discovery is completed.

-1-

## GENERAL OBJECTIONS

1.    Plaintiff objects generally to Discovery insofar as it requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product, or which are otherwise privileged or protected and not subject to discovery.

2.    Plaintiff objects generally to Discovery to the extent that it seeks information not relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff objects generally to Discovery insofar as it requests information or documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.    Plaintiff objects generally to Discovery insofar as it  requests personal or confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.    Plaintiff objects generally to Discovery insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b). Plaintiff will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

6.    Plaintiff objects generally to Discovery insofar as it seeks discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure

-2-

A00054

and either cannot be produced without agreement of a third party or cannot be produced without an appropriate stipulation and order of confidentiality.

      7.     Plaintiff objects generally to Discovery insofar as it is unduly burdensome because the discovery it seeks is already in the possession, custody or control of defendants.

      8.     Plaintiff's responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

      1.     Plaintiff objects to Defendants' definitions and instructions insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the case law in the Third Circuit.

      2.     Plaintiff objects to Defendants' definitions and instructions to the extent they imply an obligation to supplement answers to Discovery which impose upon Plaintiff an obligation beyond that required by Fed.R.Civ.P. 26(e).

      3.     Plaintiff objects to Defendant's definitions and instructions insofar as they would require counsel for Plaintiff to disclose their mental impressions, conclusions, opinions or legal theories in violation of Fed.R.Civ.P. 26(b)(3).

      4.     Plaintiff objects to Defendants' definitions and instructions regarding claims of privilege insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the applicable case law.

      5.     Plaintiff objects to the extent that Defendants' definitions and instructions cause each request to ask multiple questions.

-3-

A00055

## OBJECTIONS TO SPECIFIC INTERROGATORIES
## (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1. Following the promotion of Paul Eckrich to the rank of Major in 2003, Plaintiff did not pursue a grievance for gender discrimination, pursuant to Article 7 of the Collective Bargaining Agreement between the Delaware State Police (DSP) and the Delaware State Troopers Association (DSTA).

**Answer:**  Admitted.

2. Following the promotion of Paul Eckrich to the rank of Major in 2003, Plaintiff did not file or pursue any other type of grievance concerning this promotion with the Delaware State Police.[1]

**Answer:**  Admitted.

3. Following the promotion of R. L. Hughes to the rank of Major in 2003, Plaintiff did not pursue a grievance for gender discrimination, pursuant to Article 7 of the Collective Bargaining Agreement between the Delaware State Police (DSP) and the Delaware State Troopers Association (DSTA).

**Answer:**  Admitted.

4. Following the promotion of R. L. Hughes to the rank of Major in 2003, Plaintiff did not file or pursue any other type of grievance concerning this promotion with the Delaware State

---

[1] For purposes of these requests, this lawsuit shall not be considered a "grievance."

-4-

Police.

**Answer:**   Subject to the limited definition of grievance in #2 above (which excludes this lawsuit as a grievance) - Admitted.

5. Following the promotion of Eckrich to the rank of Major in 2003, Plaintiff did not file a complaint with the Equal Employment Opportunity Commission (EEOC).

**Answer:**   Admitted.

6. Following the promotion of Hughes to the rank of Major in 2003, Plaintiff did not file a complaint with the Equal Employment Opportunity Commission (EEOC).

**Answer:**   Admitted.

7. Following the promotion of Eckrich to the rank of Major, Plaintiff did not file an Internal Affairs complaint with the Delaware State Police regarding his promotion or her lack of promotion to the rank of Major.

**Answer:**   Admitted.

8. Following the promotion of Hughes to the rank of Major, Plaintiff did not file an Internal Affairs complaint with the Delaware State Police regarding his promotion or her lack of promotion to the rank of Major.

**Answer:**   Admitted.

-5-

A00057

9. Captain Paul Eckrich was qualified for promotion to the rank of Major at the time of his promotion in 2003.

**Answer:** Denied.

10. Captain R. L. Hughes was qualified for promotion to the rank of Major at the time of his promotion in 2003.

**Answer:** Denied.

11. Prior to this lawsuit, plaintiff has never filed an Internal Affairs Complaint with the DSP regarding alleged sexist remarks, jokes and/or conduct on the part of Aaron Chaffinch.

**Answer:** Admitted.

12. Aaron Chaffinch has issued favorable performance evaluations of Plaintiff, while Chaffinch was in a supervisory position to her. (See Plaintiff's personnel file, previously produced in discovery).

**Answer:** Admitted.

13. Aaron Chaffinch, in written performance evaluations of Plaintiff recommended promotion of Plaintiff to the ranks of Lieutenant or Captain. (See Plaintiff's personnel file, previously produced in discovery; see specifically evaluations by Aaron Chaffinch in 1994, 1995, 1996 and 1999).

**Answer:** Admitted.

-6-

A00058

14. Plaintiff's positions held within the Delaware State Police have been solely in the Patrol and Traffic units.

**Answer:** Denied.


15. Plaintiff has not applied for positions or work assignments in any special units (e.g. criminal, drug, detective) in the Delaware State Police.

**Answer:** Denied.


16. Plaintiff has never held the position of Troop Commander.

**Answer:** Admitted.


17. Plaintiff has been offered a Troop Commander position within the Delaware State Police, but has declined this position.

**Answer:** Denied.


18. Majors in the DSP are part of the executive staff of the Superintendent.

**Answer:** Admitted.


19. Selection of personnel to fill vacant Major positions is a discretionary decision on the part of the Superintendent.

**Answer:** Denied.


-7-

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ.  (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs

Dated:  December 19, 2005

Conley / Pleadings / Answers to Request for Admissions .final

-8-

A00060

From: Paige James (DSP)
Sent: Monday, October 25, 2004 2:43 PM
To: DSP_Users
Subject: Divisional Trial Board

A Divisional Trial Board has been scheduled for Monday, December 20, 2004, at 0900 hours at Delaware State Police Headquarters to hear charges against Captain Barbara L. Conley. She is charged with three counts of violating Delaware State Police Rule and Regulation #4 and one count of violating Delaware State Police Rule and Regulation #40.

The board will be composed of Major Joseph A. Papili, Captain Jeffrey R. Evans and Captain Paul E. Smentkowski.

Any member of this Division, uniformed or civilian, who believes any of the officers selected to this Board would be biased, prejudicial or otherwise predisposed in the above matter, will immediately contact the Internal Affairs Division office.

Additionally, any member, uniformed or civilian, who may possess any information that would affect the proceeding will, likewise, contact the Internal Affairs Division office.

Captain James Paige
Delaware State Police
Internal Affairs
302-739-5990

CONFERENCE — HQ CONF Rm   10/28/04   1430

1. CAN WE ACKNOWLEDGE E-MAIL? yes NOT PROTECTED By LEOBR AND/OR

2. REFER TO 11/9200

3. RULE & REG #4          AND      R&R #40

   CONDUCT UNBECOMING               ANTI-HARASSMENT

   ← (STOP) →

OKAY TO GWB DATES → OF INVESTIGATION.

LT. COL MacLEISH
LT. J. AVIOLA
LT. COWE
CAPT PRICE
DAG TUPMAN — PHONE

A00062



Monthly Focus: Mission—
What is at the center of
your personal vision
and purpose?

*No, you never get any fun*
*Out of the things you haven't done.*
*—Ogden Nash*

# 28
### Thursday
### October 2004

**Daily Notes**

302nd Day  64 Left  Week 44

| | |
|---|---|
| 1430 - | Lt. Avisla - Capt. Paige - Lt. Cooper - Myself |

Eldred- Has a copy of Capt. Conley Trial Board announcement
Verify the Results of the E-mail was not sent out.

E-Mail was sent out on Monday due to Capt. Paige Vacation

Request he look at T-11 Section CEOBR
192

Directed to sive

Providing Direction to the Leadership of the

Reduction in Fatalities
Increased Seatbelt Belt
Traffic Initiatives - Seatbelt Enforcement
                          DUI Enforcement
                          Aggressive Driving

DTAC

Working together no one is successful alone.

Mission will be accomplished by the men + women of
this Division who are on the front line.

Interview with Meg Atken

Eldred Question - Concerning difference between Administrative +
                                                        Suspension =
                Non Disciplinary         Disciplinary
                                          Removal of
                                          Gun + Badge

A00063

October 25, 2004 e-mail sent to Divisional personnel Regarding Conley's Trial Board.

① Contacted Capt. Paple: Keith Cosky 10/29/04 ref a search of this particular e-mail to see if the e-mail was forwarded by any Divisional personnel.

② Contacted Keith Cosky 11/1/2004 ref results of search. Cosky advised that the search did not find anyone forwarding the particular e-mail.
  - Cosky advised that the e-mail could have been forwarded if the subject line was changed and the search would not have picked it up.
  - Also added that if there was a particular suspect, the search could be specific to the suspect.

HANDWRITTEN NOTES BY CAPT. JAMES PAIGE

A00064

(3) If it is determined that a Hearing Board should be convened, the Internal Affairs Officer will immediately notify the member under investigation, in writing, of the nature of the charges and the fact that a Hearing Board will convene; or, if a member elects not to contest the charges and allegations, that member may elect to have a hearing before the Superintendent.

(4) In a Superintendent's hearing, the member shall have the right to counsel as outlined in Section II-D-8; and the Superintendent shall have the authority to either dismiss the allegation or to impose disciplinary measures as detailed in Section II-D-9. And in the latter event, the accused can exercise their privilege of appeal to the Secretary of Public Safety as outlined in Section II-D-12. All such hearings before the Superintendent will be recorded.

n. All investigative determinations of unfounded, exonerated, or not substantiated shall be subject to review by the O.I.C. of Internal Affairs and by the Deputy Superintendent or designee. The officer under investigation will be notified as to the nature and final classification of the investigation.

D. Divisional Hearing

1. When notified by the O.I.C. of Internal Affairs that a hearing is necessary, the Superintendent shall order a Trial Board. A new Trial Board shall be appointed for each case, except that one Trial Board may hear multiple charges against one or more officers if the charges arise out of the same transaction or occurrence. The Board shall consist of three members. The presiding member of the Board shall be selected from a list of three staff officers submitted by the Superintendent, of which the charged officer shall strike one name. The second member of the Board shall be selected from a list of five commissioned officers of which

the charged officer shall strike two names.  The final member of the Board shall be selected from a list of five troopers of a rank similar to the trooper charged of which the charged officer shall strike two names.  Troopers serving as a Board member must have at least ten years seniority with the Division.

2.  Whenever any member of the Division has been charged with an alleged transgression of the Division's Rules and Regulations and a Divisional Hearing Board is to be convened, the Internal Affairs Officer will transmit an e-mail to all troops and sections which will:

    a.  Identify the defendant officer

    b.  Identify the Rule or Job Performance Standard allegedly violated.

    c.  Identify the date, time, and place of the hearing

    d.  Identify the officers selected to hear the matter

3.  Upon posting the e-mail, any employee of the Division who believes that any officer selected to the Board would be biased, prejudiced, or otherwise predisposed in the matter, shall immediately contact the O.I.C. of Internal Affairs.

4   Additionally, any employee of the Division who may possess information that would affect the proceeding shall contact the O.I.C. of Internal Affairs.

5.  The Internal Affairs Office will have responsibility for preparation of cases for presentation to the Divisional Hearing Board and may use the services of a Divisional attorney.

6.  The Internal Affairs Office will schedule the hearing and will arrange for all testimony to be recorded.

7.  The Trial Board Presiding Officer shall decide any question of procedure or admissibility of relevant evidence. Hearsay evidence may be accepted as admissible at the discretion of that officer.  A Divisional attorney or a lawyer from the Attorney General's Office may be used as counsel for the Trial Board.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,       )
                                         )
            Plaintiff,       )
                                         )    Civil Action
v.                               )    No. 04-1394-GMS
                                         )
COLONEL L. AARON CHAFFINCH,     )
individually and in his official  )
capacity as the Superintendent,   )
Delaware State Police; LIEUTENANT )
COLONEL THOMAS F. MACLEISH,     )
individually and in his official  )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.    )
MICHELL, individually and in his   )
official capacity as Secretary of the )
Department of Safety and Homeland   )
Security, State of Delaware; and    )
DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY,    )
State of Delaware,              )
                                         )
            Defendants.      )

      Deposition of LIEUTENANT JOSEPH P. AVIOLA, JR.,
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 2:00 p.m. on Tuesday,
June 7, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
         2 East 7th Street - Suite 302
         Wilmington, Delaware  19801
         for the Plaintiff
------------------------------------------------------
              WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477



1   like that.

2       Q.    Do you remember specifically at this point in

3   time, June 7, 2005, exactly when you learned that a

4   lawsuit was being filed in --

5       A.    No.

6       Q.    Did you ever learn that some Internal Affairs

7   information about Captain Conley was released to the

8   media the same day that her lawsuit was filed?

9       A.    Probably.  I know I released some information --

10  I'm not trying to be difficult.  I just don't know

11  exactly what day.  Was it the day we got the suit or was

12  it the day after?  But I did release information.

13      Q.    Do you remember that prior to your release of

14  information -- or do you have any knowledge of an e-mail

15  being released to Tom Eldred of the *Delaware State News*

16  containing certain Internal Affairs information in

17  reference to Captain Conley?

18      A.    Yeah.  I have knowledge of an incident that

19  happened when he called me, yes.

20      Q.    So Reporter Eldred called you?

21      A.    Yeah, yes.

22      Q.    Do you remember what he said?

23      A.    Yes.

24      Q.    What did he say?

Lieutenant Joseph P. Aviola, Jr.                54

1      A.    Mr. Eldred had called me.  And like I've stated

2  earlier, it was not unusual for us to have daily -- at

3  least weekly conversations about several different

4  things.

5              He called me on that particular day.  He

6  said that he had questions.  He said he was in receipt,

7  that he was holding what appeared to be a copy of an

8  e-mail, one of our internal documents that alleged that

9  Captain Barbara Conley had been brought up on some

10  charges and he asked me could I comment on that.

11             And I'll tell you flat out, I dealt enough

12  with Tom Eldred to know that if Tom Eldred tells me he's

13  sitting on information, he has it.  I just -- you know, I

14  know that.  And I have that type of rapport with him.

15  And I actually didn't see -- at the time he was asking

16  me, I didn't see the document, but he read it to me, and

17  based on the verbal that he was reading, there was no

18  doubt in my mind that he had this in his hand.

19             He asked me would we comment on that

20  particular document.  I said I don't know.  I'll have to

21  see some people and talk about it, go to our legal

22  people, go talk to the colonel, but that I would get back

23  with him on it.

24             He said, A -- what he wanted to know was,

Lieutenant Joseph P. Aviola, Jr.          55

1   A, would I comment that that was our document, and B, if

2   it was our document, could I comment to what was inside

3   the document, what the document said.

4              I was at headquarters.  I walked directly

5   upstairs.  And just as I was walking into the colonel's

6   office, the colonel -- it was Colonel MacLeish at that

7   time, so I guess he was acting or -- yeah, because I

8   think Colonel Chaffinch was suspended.  I don't know

9   exactly the order.

10             But in any event, Lieutenant Colonel

11  MacLeish was coming out with Captain Paige and Lieutenant

12  Coupe, who are in Internal Affairs.  And I'm, like, "I

13  need to talk to all three of you right now.  This

14  actually works out pretty well."

15             So we went back into the small conference

16  room and I said, "I just got off the phone with

17  Mr. Eldred.  He says that he's in possession of one of

18  our e-mails that says that Captain Conley has been

19  charged.  He would like to know, A, can I comment that

20  that's our e-mail, and B, to what's inside the e-mail,

21  what the content of the e-mail is."

22             So Colonel MacLeish told us to call Mike

23  Tupman.  We put him on a conference call.  So it was us

24  four and Mike Tupman.  And I again told Mr. Tupman what

1  we were facing, what the questions were.  And I said,

2  "Can I comment on this document?"

3              And I told Mr. Eldred before I even went

4  upstairs, "If you're telling me you have this document,"

5  I said, you know, "I'm sure you probably do, but, you

6  know, whether I can go on record telling you that that's

7  ours, that's not up to me.  I have to get that

8  information."

9              So I went upstairs and I told Mike

10 Tupman --

11              MS. BALLARD:  Can you clarify for the

12 record who Mike Tupman is?

13              THE WITNESS:  He is one of the two legal

14 counsels that represents the State Police along with

15 Mr. Durstein.  And that's who the colonel told us to

16 call.

17    A.    We had him on conference call.  I said, "He

18 wants us to comment on what I believe he has in his

19 possession."  And he said, "Well" -- I said, "It's an

20 internal document.  Can we comment on it?"  He said,

21 "Well, it was internal until somebody sent it to

22 Mr. Eldred.  If, in fact, he has the document, make him

23 produce the document, whether he hand delivers it or he

24 faxes it over to you.  See the document.  If it appears

Lieutenant Joseph P. Aviola, Jr.                57

1    to be our document, then, yes, you can comment on the

2    content of the e-mail and the content only," as long as I

3    wasn't the one that sent the e-mail to him, which I

4    hadn't.   I have no interest in sending an e-mail to Tom

5    Eldred.   And he has plenty of other sources that he can

6    get information from, so -- that was it.

7                    I went down, back to my little office down

8    there, called Mr. Eldred.   I said, "Can you fax me over

9    the document?"  He faxed it right over.   It appeared to

10   be, you know -- I mean, what appeared to be one of our

11   e-mails.   I took it back upstairs.   I'm like, "Here's the

12   document.   It appears to be that."   And then I said,

13   "Yes, it appears to be a copy of one of our documents."

14   And then I commented on the content of the e-mail.

15   BY MR. NEUBERGER:

16       Q.    Now I'd like to take you through that in some

17   steps.

18       A.    Sure.

19       Q.    I believe first you indicated that you heard

20   from Ace Reporter Tom Eldred of the *Delaware State News*

21   and somehow he indicated he had come into possession of

22   the document.

23       A.    Yes.

24       Q.    He asked you if you would confirm that the

Lieutenant Joseph P. Aviola, Jr.                    58

1    document he had was an authentic State Police document?

2    Is that accurate?

3        A.    Yeah.   I mean, pretty much that's what he said.

4    You know, he said he had this e-mail that he was in

5    possession of it; could I confirm if it was, in fact, our

6    e-mail.

7        Q.    Also, in addition to that, he wanted you to

8    confirm the contents of that document?

9        A.    If I could answer the first question that that

10   appeared to be one of our e-mails, then could I comment

11   on the second part, the content of the e-mail.

12       Q.    You indicated to him that you would have to seek

13   higher approval or authority?   Is that accurate?

14       A.    Yes.   And I've had repeated conversations with

15   him.   He knows I don't have that authority, but I

16   always -- I don't have that authority to -- like I said,

17   "I have to go upstairs.   I have to seek legal counsel on

18   this and I'll get back to you."   He, in fact, read me the

19   document over the phone at that particular time.

20              Again, there's no doubt in my mind the way

21   he was reading it and just how he was reading it that he

22   had something.   And not only with that incident, but in

23   several incidents that you've laid out.   I mean, we have

24   other discussions other than what's your comment on it.

1  And I know him well enough to know that, A, he has the

2  answer before he asks the question, and B, you know,

3  he's -- he has plenty of sources.

4      Q.    After you got off the telephone with Tom Eldred,

5  did you say you went upstairs?

6      A.    Yes, sir.  To the second floor where the

7  colonel's office is.

8      Q.    So your office is on the first floor?

9      A.    Yes.

10     Q.    And the colonel's office is on the second floor?

11     A.    Yes, sir.

12     Q.    Would this have been the day after Colonel

13 Chaffinch was suspended?

14     A.    (No response.)

15     Q.    Do you recall?

16     A.    No, I don't recall.

17     Q.    So you went up to the colonel's office, but in

18 the colonel's office was acting-Colonel Thomas MacLeish?

19     A.    Yes.

20     Q.    Is that correct?

21     A.    Yes, sir.

22     Q.    He was just walking out with Captain Paige and

23 Lieutenant -- is it Coupe?

24     A.    Yes, Robert Coupe.

Lieutenant Joseph P. Aviola, Jr.                    60

1        Q.    Robert Coupe.

2              They were walking out the door as you were

3    walking in?

4        A.    Yes.

5        Q.    What did you say to them, specifically?

6        A.    I said, "I need to talk to you three right now

7    based on a question that I just got from Mr. Eldred."

8        Q.    After you said that, did you go back into

9    MacLeish's office?

10       A.    There's a small conference room back in that

11   same area and that's -- we went back.  About maybe half

12   of size of this conference room.

13       Q.    When you walked into the conference room, was

14   the door closed behind you?

15       A.    Yes.

16       Q.    Was there anybody else in the conference room at

17   the time?

18       A.    No, sir.

19       Q.    So did you sit down around the conference table?

20       A.    Yes, we did.

21       Q.    What happened then?

22       A.    I explained to them my conversation with

23   Mr. Eldred.  Lieutenant Colonel MacLeish said, "Get

24   Mr. Tupman on the phone."  So they dialed up Mr. Tupman.

1    And then we explained to him the same thing that I just

2    got done explaining to them.

3        Q.    Did Lieutenant Colonel MacLeish say anything

4    else other than "Get Mr. Tupman on the phone"?

5        A.    Not that I can remember.  Just to get him on the

6    phone and see what he has to say.  He's our legal

7    counsel.

8        Q.    Did Captain Paige say anything?

9        A.    If he did, I don't remember if he said anything.

10    I doubt if he said anything.

11        Q.    Now, at the time was Captain Paige the head of

12    Internal Affairs?

13        A.    Yes, he was.

14        Q.    Now, do you have any familiarity with the DSP

15    rules and regulations?

16        A.    Yes, I do.

17        Q.    That's because you've been a trooper for 20

18    years?

19        A.    Well, and I've been disciplined, so I probably

20    have had occasion to look at it.

21        Q.    Fair enough.

22              Isn't there a rule or regulation in there

23    about leaking documents, leaking internal State Police

24    documents?

1      A.   I don't know.  Probably there's an area that

2   addresses that, I'm sure.

3      Q.   Did you indicate to Lieutenant Colonel MacLeish,

4   Captain Paige, and Lieutenant Coupe that Reporter Eldred

5   claimed to be in the possession of an internal State

6   Police document?

7      A.   Yes.

8      Q.   Did Captain Paige indicate that he was going to

9   open up an investigation as to how that document got

10  leaked?

11     A.   Not to me he didn't, no.

12     Q.   Did Lieutenant Coupe indicate anything to that

13  effect?

14     A.   Not that I can recall, no.

15     Q.   Did Lieutenant Coupe say anything at that

16  meeting?

17     A.   He may have said some things, but I don't

18  remember.  I know he did take notes of the whole

19  incident, detailed notes.  I've worked with him quite a

20  bit over the years.

21     Q.   Is he a good trooper?

22     A.   He's an outstanding trooper.

23     Q.   Did Captain Paige take any notes?

24     A.   I don't -- I really don't remember if he did or

1    if he didn't.

2         Q.    Did lieutenant colonel and acting-Colonel

3    MacLeish take any notes?

4         A.    I don't think he did.

5         Q.    So it's then you picked up -- who is it who

6    actually called Deputy Attorney General Tupman?

7         A.    Either I dialed him up or Lieutenant Coupe did.

8         Q.    Was he on speakerphone or on the handset?

9         A.    He was on a speakerphone.

10        Q.    You were able to actually get a hold of him?

11        A.    Yes, sir.

12        Q.    Congratulations on that.

13              So you indicated that Deputy Attorney

14   General Tupman gave some advice; is that correct?

15        A.    Yes, sir.

16        Q.    How did MacLeish respond to that advice?

17        A.    Pretty much, "Then call Mr. Eldred back and give

18   him the information."

19        Q.    He told you to call Mr. Eldred back and give him

20   the information?

21        A.    Well, excuse me.  He said, "Make him produce the

22   document."

23        Q.    Okay.

24        A.    "Once you look at the document, if you feel that

Lieutenant Joseph P. Aviola, Jr.                    64

1   it looks like one of our e-mails, then comment on it."

2   And then he asked me did I send him the document I said,

3   "No, I didn't send him the document."

4       Q.   Were any phone calls made to Secretary Mitchell

5   during that conversation?

6       A.   Not in my presence they weren't.

7       Q.   Are you aware that any phone calls were made to

8   Secretary Mitchell?

9       A.   That I don't know.

10      Q.   Were any phone calls made to then-suspended

11  Colonel Chaffinch?

12      A.   I don't know.

13      Q.   Have you subsequently heard that any phone calls

14  were made to then-suspended Colonel Chaffinch?

15      A.   No.

16      Q.   So you called Reporter Eldred back?

17      A.   Yes.

18      Q.   What did you ask him?

19      A.   I asked him, I said, "I would like to see the

20  document.  Can you fax it over to me?"  And I gave him

21  the fax number of the headquarters and he sent it over

22  immediately.

23      Q.   What did Reporter Eldred say to you when you

24  told him to fax the document over immediately?

```
 1      A.    Something to the effect that, Give me the fax

 2  number and I'll send it right over.

 3      Q.    Did he fax it over immediately?

 4      A.    Yes, he did.

 5      Q.    When it came in on the fax machine, what did you

 6  do?

 7      A.    I read it.  And that particular document had

 8  come out on our division-wide e-mail -- I don't know

 9  exactly when, a little bit before.  I don't know the

10  date, but it had come out.  And, you know, and it was --

11  I mean, the way it was written, there's no doubt in my

12  mind that that was a copy of -- of course, like the

13  documents you were showing me, our documents have the

14  same thing, who's it from, the e-mail.  It didn't have

15  anything on that.  It just had the top line, then the

16  body of it, and then like a bottom line.  I mean, it was

17  verbatim.

18      Q.    I would like to put another document in front of

19  you.

20            MR. NEUBERGER:  Mark this as Plaintiff's

21  Exhibit 14.

22            (Plaintiff's Exhibit 14 was marked for

23  identification.)

24
```

1    BY MR. NEUBERGER:

2        Q.    Do you have the document in front of you?

3        A.    Yes, sir.

4        Q.    Does this document say at the very top "Paige

5    James (DSP)"?

6        A.    Yes, sir.

7        Q.    Does it say "Sent:  Monday, October 25, 2004,

8    14:43" hours?

9        A.    Yes.

10       Q.    Is it sent to "DSP_Users"?

11       A.    Yes.

12       Q.    Does it say "Subject:  Divisional Trial Board"?

13       A.    Yes, sir.

14       Q.    Does this appear to be the e-mail that was faxed

15   to you by Reporter Eldred?

16       A.    It looks to be the one like that, obviously

17   without the heading of Captain Paige on the top or his

18   signature at the bottom.

19       Q.    So are you telling me that it only had the

20   body --

21       A.    Yes.

22       Q.    -- and the text?

23       A.    Yes.  That's all it had.

24       Q.    So it didn't say it was from Captain James

Lieutenant Joseph P. Aviola, Jr.                    70

1       Q.    Do you remember what else he asked you?

2       A.    He might -- I think he asked me did I know what

3    Rule and Regulation Number 40 was and Rule and Regulation

4    Number 4, like could I be more specific on that.

5       Q.    What did you say to him?

6       A.    I think I did.  I may have told him that Rule 4

7    dealt with sexual harassment -- I may have.

8       Q.    Did you indicate to him what Rule 40 was?

9       A.    I may have.

10      Q.    Just for purposes of the record, do you know

11   what Rule 40 is today?

12      A.    It might be conduct unbecoming.

13      Q.    In answering these questions from Reporter

14   Eldred, were you acting pursuant to the authority given

15   you by Lieutenant Colonel MacLeish?

16      A.    I felt I was, through him and Mr. Tupman.

17      Q.    Would you have commented to Reporter Eldred if

18   Lieutenant Colonel MacLeish had not given you the

19   authority to comment?

20      A.    No.

21      Q.    Based on your past practice, would you have

22   commented to Reporter Eldred unless MacLeish had given

23   you the authority to comment?

24      A.    No, I would not have.

Lieutenant Joseph P. Aviola, Jr.                    90

```
 1   BY MS. BALLARD:
 2        Q.    I promise I won't keep you here very long.
 3                    The document that we've been talking about
 4   that you got from Tom Eldred, that was this one page,
 5   Exhibit 14, e-mail; correct?
 6        A.    No, it wasn't this.
 7        Q.    I understand.  Without the identifying
 8   information.
 9        A.    Yes.
10        Q.    You did not receive any other documents from Tom
11   Eldred?
12        A.    No, ma'am.
13        Q.    You did not disclose any other Internal Affairs
14   documents to Tom Eldred?
15        A.    No, ma'am.
16        Q.    Now, in the conference room when you had Mike
17   Tupman on the speakerphone, did you hear the advice Mike
18   Tupman was giving?
19        A.    Yes, I did.
20        Q.    Did you believe that your response to Tom Eldred
21   complied with that advice?
22        A.    Yes.
23        Q.    Did Lieutenant Colonel MacLeish tell you to go
24   beyond Mike Tupman's advice --
```

1    A.    No.

2    Q.    -- in terms of speaking with Mr. Eldred?

3    A.    No, ma'am.

4    Q.    The rules and regulations cited in Exhibit 14,

5    numbers 4 and 40, are they a matter of public

6    information, the content of those rules?

7    A.    Yes.

8    Q.    If Tom Eldred were to call out of the blue and

9    say what does this rule say, would you let him know?

10   A.    Yes.

11          MS. BALLARD:  I think that's all I have.

12          MR. NEUBERGER:  No further questions.

13          MS. BALLARD:  Thank you.

14          (The deposition was then concluded at

15   4:05 p.m.)

16                    - - - - -

17              INDEX TO TESTIMONY

18

19

JOSEPH P. AVIOLA, JR.                         PAGE

Examination by Mr. Neuberger                    2
Examination by Ms. Ballard                     90

                    - - - - -