IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RECEIVED
DEC 15 2005
CIVIL DIVISION

CAPTAIN BARBARA L. CONLEY                    )
                                             )
              Plaintiff,                     )
                                             )   Civil Action
v.                                           )   No. 04-1394-GMS
                                             )
COLONEL L. AARON CHAFFINCH,                  )
individually and in his official            )
capacity as the Superintendent,             )
Delaware State Police; LIEUTENANT           )
COLONEL THOMAS F. MACLEISH,                  )
individually and in his official            )
capacity as the Deputy                      )
Superintendent, Delaware State              )
Police; DAVID B. MITCHELL,                  )
individually and in his official            )
capacity as Secretary of the                )
Department of Safety and Homeland           )
Security, State of Delaware; and            )
DIVISION OF STATE POLICE,                    )
DEPARTMENT OF SAFETY AND HOMELAND            )
SECURITY, State of Delaware,                 )
                                             )
              Defendants.                    )


          Deposition of BARBARA L. CONLEY taken
pursuant to notice at the Delaware Department of
Justice, Carvel State Office Building, 820 North
French Street, 6th Floor, Wilmington, Delaware,
beginning at 9:40 a.m., on Wednesday, December 7,
2005, before Kurt A. Fetzer, Registered Diplomate
Reporter and Notary Public.




                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



A00085  WILCOX & FETZER LTD.
Registered Professional Reporters



Barbara L. Conley                    114

1    Q.    To give you a reference, count 2 begins on page

2    19 of the complaint, paragraph 106.

3              Are you familiar with the kind of notice

4    that is required to be sent when a trial board has

5    been named in a disciplinary matter?

6    A.    Yes, I'm familiar with that notice.

7    Q.    Is it your understanding that that notice is

8    normally sent to all active duty personnel?

9    A.    My recollection is that it's sent and I believe

10   it asks that if you have any particular reason why you

11   think someone would have a conflict of interest or

12   something of that nature to notify internal affairs.

13   Q.    So these days when everyone has e-mail, it

14   would customarily be sent out by e-mail to all active

15   duty officers?

16   A.    Yes.

17   Q.    And the notice, I mean the notice provision

18   comes from the manual, correct?

19   A.    Yes.

20   Q.    And I think as you just said it gives notice of

21   the officer charged, the nature of the charges, the

22   date of the hearing and the composition of the trial

23   board?

24   A.    Yes.

1   Q.    Let me ask it this way:  Do you contend

2   anything beyond your name, the nature of the charges,

3   the composition of the trial board and I believe the

4   date and time of the hearing was provided to the

5   media?

6   A.    No.

7   Q.    Now, in terms of what's confidential, would you

8   agree with me that the manual and the Law Enforcement

9   Officer's Bill of Rights provide that statements

10  witnesses made to internal affairs would be

11  confidential?  Is that fair to say?

12  A.    Yes.

13  Q.    Do you contend that any statements by any

14  witnesses in your investigation were released to the

15  media?

16  A.    No.

17  Q.    Another thing the manual and Law Enforcement

18  Officer's Bill of Rights provides is that

19  investigative reports prepared by IA in the course of

20  the investigation must remain confidential.

21          Do you agree with that?

22  A.    Could you repeat that?

23  Q.    Yes.

24          Is it true that the manual, Delaware State

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    Police manual and the Law Enforcement Officer's Bill

2    of Rights provide that investigative reports prepared

3    by IA remain confidential?

4    A.    Yes.

5    Q.    Do you contend that any investigative reports

6    in the investigation of you were leaked to the media?

7    A.    No.

8    Q.    Is it your contention that someone involved in

9    the investigation through internal affairs contacted

10   the media?    That would be to my knowledge Captain

11   Paige, Lieutenant Daniels, Captain Coupe or Sergeant

12   Zebley.

13            Do you contend that any of those

14   individuals were the ones who contacted the media or

15   leaked information?

16   A.    I have no idea who leaked it to the media.

17   Q.    I asked you the question about then acting

18   Lieutenant Colonel MacLeish.

19            With respect to Secretary Mitchell, are

20   you contending that he leaked information or that he

21   should have prevented the leak of information or

22   something else?

23   A.    Well, obviously in this day in retrospect I

24   think that they should employ some type of measures

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1    now to see that this information doesn't get leaked or

2    its availability to be leaked should be corrected.    At

3    the time this was a practice to send this out on this

4    division-wide e-mail.

5            So perhaps what I'm saying is that maybe

6    they couldn't prevent the leak, but they certainly

7    didn't try to investigate it to find out who did and,

8    beyond that, they confirmed that information so that

9    the media could print that.    They could never have

10   printed that if they didn't confirm it.    And their

11   past practice over and over and over and over again in

12   Colonel Chaffinch's and Colonel MacLeish's and other

13   officers' internal inquiries has always been that it

14   was an internal investigation and they would have no

15   comment, and they definitely commented on mine.

16   Q.    What is your basis for saying that once

17   Mr. Eldred had the information, as I understand it

18   it was a fax of the message from someone, what would

19   prevent him from publishing that or disclosing that to

20   the public?

21   A.    Well, I would think that they would want to

22   confirm that this information was true before they

23   printed it for obvious reasons of litigation and

24   liability and things of that nature.    And they

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    certainly wouldn't have printed it in my estimation

2    without some type of confirmation that it was true

3    from the State Police.

4    Q.    What's the basis for your contention that this

5    was not investigated, the alleged leak of information?

6    A.    We through my attorneys made a complaint

7    requesting that an investigation into the leak itself

8    be done and their statements are that they considered

9    it but considered it to be too large of an

10   investigation with a massive amount of manpower hours

11   that would had to have been utilized and extensive

12   research and perhaps they didn't feel electronically

13   they could find out who did it, so they basically did

14   not do that.

15   Q.    Did you directly or through your attorneys give

16   them any suspects or names or leads as to who you

17   suspected may have done this?

18   A.    Yes.    I believe through the attorneys, if my

19   recollection serves me, it was mentioned that perhaps

20   a good place to look may have been Colonel Chaffinch

21   and some of the people that were closest to him that

22   were also privy to this e-mail.

23   Q.    It's my understanding -- and if yours is

24   different, tell me -- that this message would have

1    gone out electronically to something like 661

2    different people.

3              Does that sound right to you in terms of

4    active duty personnel at the time?

5      A.    Yes.

6      Q.    I'm trying to get a handle on what you think it

7    is that should have been done to figure out which of

8    those 661 people, if any of them, was guilty of

9    leaking the information.

10     A.    Well, we have fax machines throughout the

11   division that could have been utilized to try to track

12   and see what numbers were dialed out, see who dialed

13   out to The Delaware State News, who may have actually

14   did a print of the e-mail as opposed to just reading

15   it and deleting.  I think they could have basically

16   just interviewed people that would have had the most

17   to gain by the release of that document.

18             And none of that was done that I'm aware

19   of.

20     Q.    You mentioned the fax.  Do you know for a fact

21   that no one bothered to check that fax to see if the

22   sending fax machine number was listed on there?

23     A.    I think they indicated, and I'm going by my

24   memory here, I think it's been indicated in

1    depositions that they did not do that by their own

2    admission.

3        Q.    You have seen the fax.  Was there anywhere on

4    the fax -- have you seen the fax?  I assume you have.

5        A.    I can't recall if I saw the actual fax or not.

6        Q.    Maybe we can come back to that.

7                  Let me ask you this:  Were you the one

8    that leaked the information to Tom Eldred?

9        A.    No, I was not.

10       Q.    Did you authorize anybody to contact Mr. Eldred

11   on your behalf?

12       A.    No, I did not.

13       Q.    Do you know who provided the fax?

14       A.    The additional information?

15       Q.    I'm sorry.  F-a-x.

16       A.    Oh, I thought f-a-c-t-s.

17       Q.    The f-a-x, the facsimile I guess we should say

18   of the message to Eldred.  Do you know who did that?

19       A.    No, I don't.

20       Q.    What evidence do you have, assuming for the

21   moment that someone within the State Police did

22   provide the information to the reporter, what evidence

23   do you have that the person who did that was

24   authorized by Secretary Mitchell?

Barbara L. Conley                                       124

1    A.    I don't have any.

2    Q.    Do you have any evidence that the person who

3    did that was authorized by acting Colonel MacLeish?

4    A.    No.

5    Q.    Do you have any evidence that the person who

6    did that was authorized to do so by Colonel Chaffinch?

7    A.    To send the original fax?  No.

8              MR. DURSTEIN:  I guess we should mark this

9    as Conley 1.

10             (Conley Deposition Exhibit No. 1 was

11   marked for identification.)

12   BY MR. DURSTEIN:

13   Q.    The document you now have in front of you

14   marked as Conley 1, is that a copy of the e-mail

15   message that was generated by Captain Paige on behalf

16   of IA on October 26th, 2004?

17   A.    It appears to be a copy of that, yes.

18   Q.    If you turn it sideways, it appears to have a

19   fax line indicating that it was transmitted from The

20   Delaware State News October 28th at 3:53 p.m.

21             Do you see where I am reading that?

22   A.    Yes.

23   Q.    Do you see anything on this document other than

24   that line that indicates what the source of it was?

1     A.    The source of it from the State Police?

2     Q.    Yes.

3     A.    No.  And my understanding would be that they

4     faxed this back to MacLeish and Aviola upon their

5     request because they wanted to visually see it and

6     they definitely had it and that's why it's coming from

7     The Delaware State News at this time.

8     Q.    But does it appear to you The Delaware State

9     News in faxing this has not included any information

10    as to where Tom Eldred got it?

11    A.    It appears as though, yes.

12    Q.    So in terms of investigating, there doesn't

13    appear to be anything on this document, does there,

14    that would suggest who at the State Police faxed or

15    forwarded the message to Eldred?

16    A.    No.

17    Q.    Now, other than an explanation of what rule and

18    reg. 4 is and what rule and reg. 40 is which you

19    testified to previously, do you contend that anything

20    beyond Conley 1, any information beyond what appears

21    here was disclosed to Eldred?

22    A.    No.

23    Q.    Thank you.

24          I am going to turn now just for a moment

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,               )
                                         )
                Plaintiff,               )
                                         )    Civil Action
v.                                       )    No. 04-1394-GMS
                                         )
COLONEL L. AARON CHAFFINCH,              )
individually and in his official         )
capacity as the Superintendent,          )
Delaware State Police; LIEUTENANT        )
COLONEL THOMAS F. MACLEISH,              )
individually and in his official         )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.          )
MICHELL, individually and in his         )
official capacity as Secretary of the )
Department of Safety and Homeland        )
Security, State of Delaware; and         )
DIVISION OF STATE POLICE, DEPARTMENT     )
OF SAFETY AND HOMELAND SECURITY,         )
State of Delaware,                       )
                                         )
                Defendants.              )

          Deposition of CORPORAL THOMAS F. MacLEISH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:40 a.m. on Thursday,
June 9, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff
-----------------------------------------------------
              WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

A00095     
WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

Colonel Thomas F. MacLeish                         117

1          Q.    Some of those charges were substantiated,

2    weren't they?

3          A.    A charge was substantiated again me.

4          Q.    You were punished for that, weren't you?

5          A.    Yes, I was.

6          Q.    Was that the using profanity charge?

7          A.    Yes, it was.

8          Q.    You took your punishment and you moved on,

9    didn't you?

10         A.    Yes, I did.

11         Q.    Did that stop you from being promoted to the

12   rank of colonel?

13         A.    No, it did not.

14                     (Discussion off the record.)

15                     (A recess was taken at this time.)

16   BY MR. NEUBERGER:

17         Q.    Colonel, I'd like to ask you some questions now

18   about some events surrounding the filing of this lawsuit.

19         A.    Yes, sir.

20         Q.    Are you aware that in October 2004 Captain

21   Conley filed a federal court lawsuit naming Colonel

22   Chaffinch and the Division of State Police as defendants?

23         A.    Yes, I am.

24         Q.    Do you recall that that lawsuit was filed on

1    October 27th of 2004?

2        A.    Yes.

3        Q.    Why do you remember that date?

4        A.    I was with my son in Gettysburg, Pennsylvania,

5    on his class trip and my pager and Blackberry went off

6    indicating -- to indicate to call headquarters.  And I

7    called in and was told that the case was being filed.

8        Q.    Did there come a time when the colonel was put

9    on paid suspension and you were named, I guess it would

10   be, acting superintendent?

11       A.    Yes, sir, you are right on the second part.  He

12   was placed on administrative leave and I was named the

13   acting superintendent.

14       Q.    Was that that same day or was that the next day?

15       A.    It was the same day.

16       Q.    So you indicated that you were in Gettysburg --

17       A.    Yes.

18       Q.    -- with one of your children and that's how you

19   heard about the lawsuit?

20       A.    Yes.

21       Q.    Who was the first person that you talked to

22   about the lawsuit?

23       A.    I believe it was Colonel Chaffinch.

24       Q.    Did he call you on the telephone or did you call

1    him?

2       A.    Mr. Neuberger, I don't believe he called me.    I

3    believe I got a page indicating that I needed to call

4    into headquarters.    So, therefore, I called in.

5       Q.    Sure.

6       A.    I was responsible for 12 kids plus my own that

7    day, so when I got it -- I think -- you could probably

8    help me with the time better than I can.    But I'm

9    thinking it was around lunchtime is when I received it

10   because I had other parents there that could watch the

11   kids while I made a phone call.    And basically it was

12   there's been a suit filed by Captain Conley and, you

13   know, it's being filed.    Press conference.    So I take it

14   there was a press conference that day announcing it.    I

15   was, okay, fine.

16            Then it was much later in the day, toward

17   the end of the day, I believe, I received another call

18   and that was from the secretary's office telling me that

19   I was to report there in an hour.    It wasn't going to

20   happen.    And then I briefly spoke to him.    That time

21   period was between five and six.

22      Q.    So you indicated that when you first got the

23   page you called into headquarters; correct?

24      A.    Yes.

Colonel Thomas F. MacLeish                    120

1      Q.    Who did you speak to?

2      A.    I spoke to Colonel Chaffinch.

3      Q.    What did Colonel Chaffinch say to you?

4      A.    That Conley's filed a lawsuit against us.

5   They're having a news conference -- I'm paraphrasing

6   because my memory isn't his.  The conversation -- do you

7   have it?  No, we didn't have it at that time.  Are we

8   going to get our hands on a copy of it?  We are going to

9   try to?  Because typically it's announced and then we

10  don't get served until much later, but it's out there and

11  we're asked to comment on something we don't have our

12  hands on.  So we were working on trying to get our hands

13  on a copy of it.

14     Q.    Did the colonel sound angry on the telephone?

15     A.    He sounded upset.

16     Q.    Did he sound unhappy?

17     A.    Upset, unhappy, six of one, half dozen of

18  another.  He wasn't pleased that we had another lawsuit

19  filed against us.

20     Q.    Would it be fair to say he was pissed off?

21     A.    What's your definition of "pissed off"?

22     Q.    It's a variation of the word "angry."

23     A.    He was upset.

24     Q.    Was he very upset?

1      A.    He was upset.

2      Q.    And he was upset because of the filing of the

3   lawsuit?

4                MS. BALLARD:    Object to the form.

5      A.    That we were -- that once again the division

6   was, you know, being sued.  He was -- he was upset.  You

7   could tell he was obviously displeased that a lawsuit had

8   been filed.

9      Q.    Did he use any colorful language to describe

10  Captain Conley?

11     A.    I can't say he did.  He was upset.  "We're being

12  sued again.  This time it's Conley."  Do I specifically

13  recall him using colorful language?  No, I do not.

14     Q.    Does Colonel Chaffinch use colorful language on

15  a regular basis when he speaks to you?

16     A.    Not typically, no.

17     Q.    Do you think that he did not use colorful

18  language during that conversation?

19     A.    I don't recall specifically what he said,

20  Mr. Neuberger, nor do I recall if he used colorful

21  language or did not.

22     Q.    By "colorful language," just so we are on the

23  same page, I mean some kind of profanity or some

24  inappropriate language.  Do you understand that?

Colonel Thomas F. MacLeish                    122

1    A.    Yes, I do.

2    Q.    You indicated that there was a second call which

3    was made in which you spoke to Cabinet Secretary

4    Mitchell's office?

5    A.    Yes.

6    Q.    Did you initiate that phone call or did they?

7    A.    That was -- that was initiated -- once again, I

8    received a page.  I called in.  Went through the

9    secretarial staff and got to the secretary.

10    Q.    Did you speak to the secretary at that time?

11    A.    Yes, I did.

12    Q.    What did he say?

13    A.    He told me at that point Colonel Chaffinch was

14    being placed on administrative leave as a result of the

15    allegations in the lawsuit and that I would be named

16    acting superintendent.

17    Q.    Based on your conversation with Secretary

18    Mitchell, what were his feelings towards the lawsuit

19    which had just been filed by Captain Conley?

20    A.    He took the content of the lawsuit very

21    seriously.

22    Q.    You indicated before that the secretary wanted

23    you at his office within an hour?

24    A.    Yes.

Colonel Thomas F. MacLeish                    123

1      Q.    Would it be fair to say that Gettysburg is more

2    than an hour away from Dover?

3      A.    Wasn't going to happen.

4      Q.    When did you finally get to the secretary's

5    office?

6      A.    I didn't go that evening.  I talked to him about

7    what time I anticipated getting back to Holy Cross, my

8    son's school.  He would be gone by then.  I think that

9    was between seven and 8:00 that night.  And if you ever

10   rode from Gettysburg and came back to Dover, there's a

11   section between Gettysburg and Baltimore that is

12   extremely tough on cell phones and we were having

13   conversations that portions of it were being missed and

14   left out and disconnected.

15              And you're on a bus with about 40 kids.  I

16   couldn't tell them to all be quiet while I took this

17   important call.  So it was difficult, at best, to talk.

18   But the gist came through.  You are going to be the

19   acting superintendent and we'll discuss it further

20   tomorrow.

21      Q.    Did you talk to anyone else that day about the

22   filing of the lawsuit?  You mentioned Colonel Chaffinch.

23   You've mentioned Secretary Mitchell.

24      A.    Yes.

1  newspapers in Delaware?

2      A.    I would be -- I would be very pleased to say

3  that the work the men and women in this division do on a

4  daily basis are on the front page of the paper.  And,

5  yes, a by-product of that would be I would be very

6  pleased to not have the negative publicity that comes

7  with lawsuits on the front page.  I would be very pleased

8  to have it off of there, yes.

9      Q.    Did you talk to Secretary Mitchell on

10  October 28th, 2004, the day after the lawsuit was filed?

11     A.    Yes, I did.

12     Q.    How many times did you talk to him?  A lot?  A

13  few?

14     A.    More on the "few" line.

15     Q.    What did you talk about?

16     A.    I had reason to talk to him late in the day as a

17  result of Lieutenant Aviola coming forward and saying

18  that Eldred had the -- had a copy of Captain Conley's

19  charge sheet with naming her board and the date of her

20  trial board.  And the reason I had to talk to him was I

21  had made a decision and I wanted to run that decision by

22  him after seeking legal counsel.

23     Q.    Now, you said that you made the decision in

24  reference to that matter?

1      A.    Yes.

2      Q.    Was the decision run by Secretary Mitchell prior

3  to it becoming official?

4      A.    By "official," what do you mean?

5      Q.    Was authorization required by Secretary Mitchell

6  in order to give that order?

7      A.    I told him that is what I was going -- I said

8  this is the advice I got from counsel and here is their

9  reasons, and the information will be released based upon

10 what's in the four corners of the document.

11     Q.    Would did Secretary Mitchell say?

12     A.    "I concur with you."

13     Q.    Would you have made the decision to authorize

14 the release if Secretary Mitchell hadn't agreed and

15 subsanctioned it or authorized it?

16     A.    No.

17     Q.    You mentioned some material, an e-mail that was

18 sent to Tom Eldred who is a reporter for the *Delaware*

19 *State News;* correct?

20     A.    Well, that was one of the problems.  We couldn't

21 figure out whether he received an e-mail or whether he

22 received a fax and we were hoping to be able to determine

23 that.

24     Q.    You were hoping or you currently are hoping?

1      A.    No.   That day -- that day, that time, we were

2   hoping to be able to determine who had sent it to him.

3      Q.    Tom Eldred is a reporter for the *Delaware State*

4   *News*?

5      A.    Yes.

6      Q.    He's covered the DSP a great deal?

7      A.    Yes, he has.

8      Q.    So did there come a time when he sent a document

9   to Lieutenant Aviola who was the public information

10  officer for the DSP?

11     A.    Yes.

12     Q.    How did you first find out about that?

13     A.    From Lieutenant Aviola.

14     Q.    Did he send you an e-mail?

15     A.    No.

16     Q.    Did he call you on the telephone?

17     A.    No.

18     Q.    Did he come to your office?

19     A.    Yes.

20     Q.    What day was this?  Was this --

21     A.    It was the 28th.  It was late in the day.

22     Q.    It was late in the day on the 28th?

23     A.    Afternoon.

24     Q.    Afternoon of the 28th.  Okay.  That's helpful.

1                     Did he knock on your door?

2      A.    No.    I -- I say "no" because nobody knocks on my

3    door.   They go through the secretarial staff.

4                     Suffice to say that either we ran into one

5    another in the hallway or he came in and said he had

6    something to discuss with me.   And what he had to discuss

7    with me was that he had received a phone call from Tom

8    Eldred of the *State News* and Mr. Eldred had told him he

9    had a copy of what appeared to be an official document of

10   the division where sergeant -- excuse me -- Captain

11   Conley was being charged with violations of rules and

12   regulations and her trial board was being set.   And that

13   had been sent out on Monday of that week.

14                   I -- either we had just finished a case

15   review, but needless to say, Captain Paige and Lieutenant

16   Coupe were still there.   I believe -- I don't believe.

17   Mr. Tupman had left.   I wanted him on the phone for legal

18   counsel and I wanted to determine what our

19   responsibilities were.   Okay?   We have a reporter that

20   has a document that was from the division.

21                   And two things here.   One, can we determine

22   who sent it, how he got it, how he got his hands on it.

23   Is Tom Eldred going to give up that source of

24   information?   No.   So an interview with him wasn't going

1   to happen.

2          But Captain Paige was there.  He was

3   directed -- well, one is can we obtain a copy of what

4   Mr. Eldred had.  And once we obtained that, it was pretty

5   simplistic thinking.  Just as you see this, if it was an

6   e-mail to him, would it be "From," "To," would he be

7   naive enough to send us that so we could find out who

8   sent it to him in that manner, or if it was a fax, could

9   we be able to determine -- it's usually on top of a fax

10  sheet the source from which it came.

11         But it was important that we get the

12  document in our hands in order to try to find out who

13  sent it and then bring that person up on charges of

14  violating the rules and regulations of the division.

15         There were other avenues.  Would there be a

16  way through our HTC unit --

17     Q.    Which is what?

18     A.    Our high-tech crimes unit, our computer unit,

19  and/or our IT section to determine if any -- if we could

20  determine what anybody that had sent any documentation to

21  the Delaware State News through any internal means so we

22  would be able to track it down that way.  And the purpose

23  was to identify who had sent it and investigate that and

24  bring them up on charges.

```
 1              The secondary thing was, okay, two,

 2  Mr. Tupman, legally, he has it in his possession.  If --

 3  and he was asking for confirmation of the information on

 4  the document.  Would we violate LEOBOR if we did that or

 5  not, and would I be -- by violating LEOBOR, would I be

 6  violating any laws by confirming it, confirming or

 7  denying the fact that it was real?

 8              The advice of counsel --

 9              THE WITNESS:  Go ahead?

10              MR. DURSTEIN:  Yes.

11     A.    The advice of counsel was to obtain the document

12  from Mr. Eldred, to determine its authenticity, not just

13  what somebody is telling you, but have the document in

14  front of us.  He, in fact, faxed it to -- I believe he

15  faxed it to Lieutenant Aviola.  Lieutenant Aviola then

16  had the document.  It was the same document that was sent

17  out on Monday, but it didn't have any of the things we

18  were looking for in order to determine its source from

19  within the division.

20              And the information I received from

21  Mr. Tupman was that while it was an internal document of

22  the division, it is now in the public domain, it's

23  outside the division, and that you could confirm the

24  information without violating somebody's -- according to
```

Colonel Thomas F. MacLeish                      140

1    my legal counsel, without violating an officer's rights

2    under LEOBOR or criminally.  Our rules in the division, I

3    could confirm what was in that.  That's legal advice.

4    You know you give legal advice.

5              It was my determination, it was my decision

6    to go ahead and confirm the facts of that and the facts

7    of that only.

8              MR. NEUBERGER:  This might be a good time

9    to take our lunch break.

10             Counsel, do you agree?

11             MS. BALLARD:  Yes.

12             (A luncheon recess was taken at this time.)

13   BY MR. NEUBERGER:

14       Q.    All right, Colonel MacLeish.  I would like to

15   try to pick back up where we left off.  I believe you

16   were testifying that when Lieutenant Aviola brought the

17   matter of Tom Eldred's inquiry to your office, that some

18   kind of a meeting resulted or --

19       A.    Yes.

20       Q.    -- or a conversation resulted with Secretary

21   Mitchell.

22             Eventually there was a conversation with

23   Secretary Mitchell, but first you talked with -- was it

24   Lieutenant Aviola, Deputy Attorney General Michael

1   Tupman?  Was there anyone else in that meeting?

2        A.    Could I clarify?

3        Q.    Sure.

4        A.    Upon being contacted by Lieutenant Aviola that

5   Eldred had the e-mail announcement of Captain Conley's

6   upcoming trial board and charge sheet -- I had a meeting

7   in our conference room.  Present was Lieutenant Aviola,

8   Lieutenant Coupe, and Captain Paige, Lieutenant Coupe and

9   Lieutenant Paige both being from Internal Affairs.

10  Phoned in -- having phoned in was Mike Tupman.  He was

11  not physically present at the meeting.

12           We had a meeting to discuss could we

13  determine where that document came from that Eldred had

14  in his possession in order to pursue an Internal Affairs

15  investigation in that manner.  That was one part of the

16  purpose for the meeting.

17           The second part was to have legal advice as

18  to, okay, he's got it, says he's got it.  Where does that

19  put us?

20           After a result of that meeting, I then had

21  a phone conversation with the secretary to advise him,

22  here's what took place in the meeting, here's what the

23  information is as I have it, and to inform him of the

24  decision that I made.  I received legal advice.  Here is

1   the decision I was going to make.  Did he concur with

2   that?  It was like, yes, okay, go ahead and do it.  And

3   it was done.

4       Q.   So the decision was already made when you had

5   talked to Secretary Mitchell?

6       A.   I was advising him of it.  He concurred with it.

7   You asked me a question during the period if he'd have

8   said no, would I have done it?  No, I would not have.

9       Q.   Now, when you talked to Secretary Mitchell, was

10  he on speakerphone or were you talking on the handset?

11      A.   I was speaking to him on -- from my office on

12  phone, not speakerphone.

13      Q.   Was there anyone else there?

14      A.   In the room when I spoke to the secretary?

15      Q.   Correct.

16      A.   No.  It was just myself.

17      Q.   Do you know if there was anyone else there on

18  his end?

19      A.   I don't have one of those video -- to my

20  knowledge, no.  He answered the phone -- or he didn't

21  answer his phone.  The secretary answered the phone and

22  transferred it to him.  Whether or not I was on

23  speakerphone or not, I don't recall.

24      Q.   I think one question I forgot to ask you, and

1  I'm getting a little bit out of order here, but what was

2  Secretary Mitchell's reaction to the filing of the suit?

3  Did I ask you that before?

4      A.    (No response.)

5      Q.    In that case, do you recall what Secretary

6  Mitchell's reaction was to the filing of this lawsuit?

7      A.    You did ask me that because I believe my answer

8  was he was very concerned with the seriousness of the

9  allegations and took the action he felt was appropriate.

10     Q.    Based on your observations, was he angry?

11     A.    Based on my observations being what took place

12 over the phone?  No, he was not angry.

13     Q.    Using your sensory perception, I believe you are

14 telling me that you do not believe Secretary Mitchell was

15 angry?

16     A.    From what I could take from a phone

17 conversation, no.  Was he -- used the term distraught.  I

18 have to be careful of the words I use with you.  That --

19 was it a normal course of the day, you know,

20 conversation?  No.  It was something that we had to deal

21 with.  It was very serious.  It was important.

22              There was -- to keep from using the same

23 words that I've used over again, but I don't have any

24 other ones to choose from is that I believe there was

1    disappointment that, once again, we are on the front page

2    of the newspaper.  You know, we have to take this course

3    of action.  This is the direction we are going.  And that

4    was the end of it.

5        Q.    So he was disappointed that the Delaware State

6    Police were again on the front page of the newspaper?

7                MS. BALLARD:    Object to the form.

8        A.    Disappointed in that there were going to be

9    negative articles about the division again and the fact

10   that we, once again, were faced with a lawsuit from

11   within the division.

12       Q.    You mentioned now, let's go back to -- I guess

13   it's really forward.  Let's go forward to your meeting

14   with Lieutenant Aviola, Captain Paige, Lieutenant Coupe,

15   with Mike Tupman on the speakerphone.

16       A.    On the phone, yes.

17       Q.    Do you know what meeting I'm talking about?

18       A.    Yes.  It was on the 28th.

19       Q.    I believe you mentioned that he talked about the

20   types of avenues of investigation for an IA investigation

21   into the release of the document?

22       A.    How could -- go ahead.  Were you done?  I'm

23   sorry.

24       Q.    I would like to ask you some questions about

Colonel Thomas F. MacLeish                    145

```
 1   that general line of discussion.

 2        A.    Okay.

 3        Q.    Do you understand what I'm talking about?

 4        A.    Yes, I do.

 5        Q.    Who raised that issue?

 6        A.    I did.

 7        Q.    I believe your previous testimony was you

 8   mentioned something about having high tech computer or

 9   high tech crimes --

10        A.    HTCU.

11        Q.    -- your HTCU investigate --

12        A.    No.  Go ahead.

13        Q.    What did an IA investigation result from that?

14        A.    What I directed Captain Paige to do was was it

15   possible, based upon the information that we had, to make

16   a determination as to whether we could find who was --

17   you know, I'm -- it was an internal document.  Somehow it

18   got outside the division.

19        Q.    Sure.

20        A.    All right?  And with 637 members of the

21   division, everyone becomes suspect.  And at that point it

22   wasn't 637, but that's what we have today.

23              So what is reasonable in conducting an

24   investigation to make that determination?  He's the
```

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    investigator.  Those were some of the things that --

2    avenues I directed him to pursue in trying to determine

3    was it possible, reasonably possible to be able to

4    determine who had did this.

5              As I said, I knew Mr. Eldred wasn't going

6    to tell me who sent him the piece.  I mean, that goes

7    without saying.  Look how long "Deep Throat" stayed

8    under.

9              But with regards to this incident and the

10   seriousness of it, I was upset that somebody would do

11   that.  We've got enough issues to deal with without

12   constantly having to address other ones that compound

13   something.

14   Q.    So you were upset that the e-mail had been

15   released?

16   A.    Yes.

17   Q.    Did you release the e-mail?

18   A.    I released the e-mail to our rank and file.  I'm

19   the one that authorizes that.  On Monday -- I think that

20   went out under me.  But did I release it to Mr. Eldred?

21   No, I did not.

22   Q.    Do you know who did?

23   A.    No.  If you can tell me, I'd be glad to take

24   that under advisement and conduct an investigation into

1    that.

2        Q.    Who do you suspect did so?

3        A.    I have no idea.    637 people.    Pick one.

4        Q.    Did Captain Paige ever conduct any type of an

5    investigation into the release of that e-mail or that

6    document to Reporter Eldred?

7        A.    He came back to me and told me that it was

8    basically impossible based upon what -- the information

9    that we had at that time to conduct an investigation.

10       Q.    So is the answer to my question no, he did not

11   conduct an investigation?

12       A.    He conducted an inquiry.    An investigation would

13   be he went to individuals and interviewed them.    We had

14   no suspects at that time.    It was very, very broad in

15   that sense.

16       Q.    So essentially he thought about investigating

17   but did not actually investigate?

18       A.    No.    He conducted an inquiry into determining

19   whether or not he could conduct an investigation.    Not an

20   investigation in futility, but an actual investigation to

21   an individual.

22       Q.    Do you know if he picked up the telephone and

23   ask Colonel Chaffinch, Did you release this document?

24       A.    I have no idea whether he did or did not.

Colonel Thomas F. MacLeish                    148

1       Q.    Do you think, based upon your 27 and almost

2   28 years of experience as a Delaware state trooper, that

3   would have been a good place to start?

4       A.    As I said, the suspect list is long and varied.

5   It could have been any one of 637 people -- 636 because I

6   know I didn't send it.

7       Q.    Now, I appreciate that and that's helpful.

8               But let's get back to the question that I

9   asked you, which was:  Based upon your 27 and almost

10  28 years of experience as a Delaware state trooper, do

11  you think asking Colonel Chaffinch, if he had released

12  the document, would have been a good place to start an

13  investigation?

14      A.    No, I do not, and the reason why is you don't --

15  unless you have something that leads you to someone and

16  you already -- kind of like an attorney, you don't ask

17  questions until you already know the answers.  You

18  don't -- you don't go right to someone you may think have

19  done it without having some type of proof on which to

20  lead you in that direction other than just supposition.

21              As I said, there were many others that

22  could have sent that thing, also.

23      Q.    Would it be fair to say that not one question

24  was asked as part of any investigation into the release

1    of that document to Reporter Eldred?

2        A.   Not one question asked of whom?

3        Q.   Of anyone.

4        A.   I think there were questions asked by

5    Captain Paige of our HTCU personnel or our IT personnel

6    to make a determination based upon this information, can

7    we track down and see who did it.

8        Q.   Did captain --

9        A.   Go ahead.

10       Q.   No.  Please finish your answer.

11       A.   I was.

12       Q.   Did Captain Paige interview anyone or ask anyone

13   any questions aside from your high tech unit people?

14       A.   To my knowledge, no.  But at this point I

15   severed my responsibility with Internal Affairs and Major

16   Eckrich would have assumed that at that point in time.

17       Q.   Do you think Major Eckrich would have had a

18   conflict of interest in investigating that matter?

19       A.   No, I do not.

20       Q.   So you're currently the colonel of the State

21   Police?

22       A.   Yes, I am.

23       Q.   At the time you were the acting superintendent?

24       A.   Yes.

1      Q.    You have no knowledge one way or the other as to

2   whether any questions were asked of any troopers or DSP

3   employees into did you release this document?

4      A.    To my knowledge, no, that was not done.

5      Q.    Would you agree that the release of that

6   document violated various DSP rules and regulations?

7      A.    No, I would not agree to that.

8      Q.    You would not agree that that document being

9   given to reporter Tom Eldred violated DSP rules and

10  regulations?

11     A.    I'm sorry.  I misunderstood the question.

12     Q.    Sure.

13     A.    I thought you were inferring that my release of

14  that information was a violation.

15               I agree that, yes, the release -- the

16  initial release of that information to Tom Eldred was a

17  violation of our rules and regulations.

18     Q.    Do you agree that by confirming the existence

19  and the contents of that document you compounded the

20  violation of DSP rules and regulations?

21     A.    No, I do not.

22     Q.    Do you remember a time when Captain Greg Warren

23  filed Internal Affairs charges against you in

24  approximately April of 2004?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1       A.    You are pretty accurate.  It was April 2004.

2       Q.    Do you recall a time when reporter Tom Eldred

3    found out about those charges?

4       A.    Yes.

5       Q.    Do you recall a time when he wrote a

6    front-page *Delaware State News* story about those charges?

7       A.    I recall that very well.

8       Q.    Do you recall that he had some of the

9    information and specifics about those charges?

10      A.    Yes, I do.

11      Q.    Do you recall the response of the DSP Public

12   Information Office to Mr. Eldred's inquiries about those

13   charges?

14      A.    Would you refresh my memory?

15      Q.    Sure.

16            Do you recall that the PIO, Lieutenant

17   Aviola, or someone else said something to the effect of

18   "These are internal.  As a policy, we don't comment on

19   internal matters"?

20      A.    What was the question that was posed?

21      Q.    "Can you give us more information about those

22   charges?"

23      A.    Okay.

24      Q.    Do you recall the response of the public

1    information officer?

2        A.    Now that you said that, yes, I do.

3        Q.    Do you recall that they also said, "We won't be

4    disclosing the nature of the charges because they are

5    internal"?

6        A.    Yes.

7        Q.    Do you find that response materially

8    inconsistent with your response to the inquiry from

9    Reporter Eldred in October of 2004?

10       A.    No, I don't.  And the reason I don't is because

11   during the initial phase of an investigation, the

12   investigation is ongoing.  We don't confirm Internal

13   Affairs investigations of a -- of a -- what would be an

14   internal inquiry, and that's the typical response that we

15   give.

16             In this case the investigation was

17   concluded.  It was finished.  The charge had been -- the

18   charges had been established and a trial board had been

19   set.  And she was -- not she -- the charging sheet --

20   there was no further investigation to take place that

21   could influence one way or another the content of that

22   investigation.  It was done.  And therein lied the

23   difference.

24             During an ongoing investigation, you would

Colonel Thomas F. MacLeish                    153

```
 1   not confirm or deny in order to try to influence the

 2   investigation whatsoever.

 3        Q.    Let's put another document in front of you.

 4   This was marked at some point several days ago as

 5   Plaintiff's Deposition Exhibit Number 6.

 6                    MR. NEUBERGER:   Counsel, you have a copy?

 7                    MS. BALLARD:   I believe so.

 8   BY MR. NEUBERGER:

 9        Q.    Now, does this appear to be a copy of

10   11 Delaware Code, Section 9200?

11        A.    Yes.

12        Q.    Is this statute part of what is generally known

13   as the Law Enforcement Officers' Bill of Rights?

14        A.    Yes.

15        Q.    Now, I'd like to direct your attention to

16   paragraph B, the portion of that paragraph which is

17   highlighted.  You see where that says:  "...this chapter

18   shall not apply to the Superintendent or Deputy

19   Superintendent of the Delaware State Police"?

20        A.    Yes.

21        Q.    Do you agree that this statute does not apply to

22   protect you as superintendent or at the time as deputy

23   superintendent of the Delaware State Police?

24        A.    That's correct.
```

1      A.    To the best of my recollection, he indicated

2    that this was not -- that we would not be in violation of

3    LEOBOR, that the document was in the public domain, and

4    that we could -- once we observed, actually had

5    physical -- our hands on the document that Mr. Eldred

6    had, that we could then confirm what was contained within

7    that document.

8      Q.    So is it so much the document or just the

9    information contained within the document which is the --

10      A.    It was important to have the document that he

11    said he had, not to just go with what he had -- he may

12    have heard.

13            If he may have heard something, he may have

14    heard anything.  Our course of action would have been the

15    same.  We would have -- you know, he did not have

16    something physically in his hands.  It would have just

17    been kind of like the allegations against myself when

18    they were denied.  You know, if it's just a speculative

19    type thing or I've heard that this is out there.

20            He said, "I have this document.  Will you

21    confirm it's authenticity and the content of it?"  Before

22    we are going to do either one of those two things, we are

23    going to make sure that what he says he has, he does

24    have.  He produced it.

1   I have the authority to authorize a sniper to take that

2   person out?  Legally, where I do stand, Mike?  And Mike

3   says legally you're on good grounds, go ahead and do it.

4   Have I taken deadly force?  Yes, I have.  On advice of

5   counsel?  Yeah.  It's still my call to make.

6        Q.    So it is still your call to make even, I guess,

7   despite the advice of counsel?

8        A.    Yes, it is.

9        Q.    So ultimately you have to take responsibility

10  for those actions; correct?

11       A.    Yes, I do.

12       Q.    You're not trying to hide behind Mike Tupman,

13  are you?

14       A.    No, I am not.  I made that clear earlier.

15       Q.    Certainly.

16             I think you also indicated that Secretary

17  Mitchell authorized and sanctioned you for the response

18  of the PIO and that you would not have made that decision

19  without his authorization; correct?

20       A.    He had the authority to override my decision.  I

21  made the decision.

22       Q.    Did Mr. Tupman say anything else during that

23  telephone conference with you, Lieutenant Aviola, Captain

24  Paige, and Lieutenant Coupe?

1      A.    Not that I can recall.

2      Q.    So he generally said that release of the

3  information would not violate the Law Enforcement

4  Officers' Bill of Rights and it would not violate any

5  civil or criminal laws?  Is that the gist of it?

6      A.    I would have not violated LEOBOR and I would not

7  be violating the rules and regulations of the division by

8  acknowledging what was in the four corners of that

9  document they had.  And it was -- the document was --

10  left the confines of the agency and was now considered in

11  the public domain.

12      Q.    The distinction between the situation I'm

13  questioning you about regarding Captain Conley and the

14  release of the information, you're saying that there's a

15  distinction between that and the Captain Warren

16  situations involving you?

17      A.    Yes.

18      Q.    You are saying that's based entirely on the

19  presence of a physical document?

20      A.    In my mind, yes.

21      Q.    Whenever the DSP PIO receives questions about

22  Internal Affairs' matters, they go up the chain to

23  either -- is it the colonel or the lieutenant colonel?

24      A.    Lieutenant colonel.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    BY MS. BALLARD:

2         Q.    Colonel MacLeish, I just want to ask very fee

3    questions just to clarify a few issues.

4              The term "promotion" to colonel was used,

5    when somebody is promoted to colonel.  Is somebody

6    actually promoted to colonel through the DSP process or

7    is somebody made colonel another way?

8         A.    Made colonel.  You are appointed by the

9    governor.

10        Q.    Who has the power to remove a colonel?

11        A.    The governor, the secretary.  I believe it's the

12   secretary with concurrence of the governor.

13        Q.    In the discussion of the Eldred e-mail, you used

14   the term "release information," meaning speak to Eldred

15   after Aviola had spoken to you.

16             Did you release any information beyond what

17   was already in the e-mail he had?

18        A.    No, I did not.

19        Q.    Did you instruct Lieutenant Aviola to release

20   any information beyond what Mike Tupman advised you you

21   could release?

22        A.    No, I did not.

23        Q.    Did you broach Mike Tupman about the issue?  Did

24   you tell him you wanted to release information?

1    A.    No, I did not.

2    Q.    Did you give him any position as to what you

3  wanted to do with this e-mail issue?

4    A.    I believe I told him based upon legal advice I

5  had received, it would be my decision to --

6    Q.    I'm sorry.  When you --

7              MR. NEUBERGER:  I believe your client was

8  answering a question.  He should be allowed to complete

9  his answer.

10             MR. DURSTEIN:  You can clarify the

11  question.

12             MS. BALLARD:  I don't think my question was

13  clear.

14             MR. NEUBERGER:  Colonel, was her question

15  clear?

16             THE WITNESS:  I don't remember what the

17  question was at this point.

18             MS. BALLARD:  You can read back the

19  question.  I'm sorry.

20             (The reporter read from the record as

21  requested.)

22    A.    It would be my decision to release the

23  information based upon what was contained in the

24  document.

BY MS. BALLARD:

    Q.    The "him" referred to in my question was Mike Tupman.

    A.    Yes, it did.

    Q.    When you got Mike Tupman on the phone, what did you say to him first?

    A.    When he was first on the phone it was just to discuss the fact that Eldred had the e-mail and -- I'm trying to remember if we asked Mike -- I think it was pretty much determined if he had the e-mail, it was going to be a violation of the rules and regulations and we were going to look into that.

        Mike is counsel to Internal Affairs. That could have been part of the discussion point with it that, you know, where would we stand if we could ultimately identify who sent that e-mail and, you know, it being a violation of rules and regulations.

        The secondary part of that conversation involved the fact that if, in fact, Eldred had it and was asking the division for verification of that document, would we violate the LEOBOR and/or the rules and regulations by doing that.

        And the advice given was, as previously stated, it was now no longer an internal document. It

1  was in the public domain and it wasn't protected by

2  LEOBOR and it wasn't protected by the rules and

3  regulations and it was only to acknowledge what is in the

4  four corners of the document.

5              MS. BALLARD:  Thank you.

6              MR. NEUBERGER:  No further questions

7  subject to what's already on the record.

8              (The deposition was then concluded at

9  3:40 p.m.)

10             - - - - -

11             INDEX TO TESTIMONY

12

13

   COLONEL THOMAS F. MacLEISH                    PAGE
14

15 Examination by Mr. Neuberger                    2
   Examination by Ms. Ballard                    207
16

17             - - - - -

18

19

20

21

22

23

24

**W&F**

A00129  **WILCOX & FETZER LTD.**
        Registered Professional Reporters

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,        )
                                 )
          Plaintiff,       )
                                 )   Civil Action
v.                              )   No. 04-1394-GMS
                               )
COLONEL L. AARON CHAFFINCH,      )
individually and in his official   )
capacity as the Superintendent,   )  <u>PAGES 70 AND 71</u>
Delaware State Police; LIEUTENANT  )  <u>ARE CONFIDENTIAL</u>
COLONEL THOMAS F. MACLEISH,     )
individually and in his official   )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.    )
MICHELL, individually and in his   )
official capacity as Secretary of the )
Department of Safety and Homeland   )
Security, State of Delaware; and    )
DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY,    )
State of Delaware,               )
                               )
          Defendants.      )

      Deposition of SECRETARY DAVID B. MITCHELL, SR.,
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 10:10 a.m. on Friday,
June 10, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff

-------------------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



A00130  WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

1      A.    Yes.

2      Q.    Did there come a time when you learned that

3  Mr. Eldred had an internal State Police document?

4      A.    Yes.

5      Q.    A document relating to Captain Conley?

6      A.    Yes.

7      Q.    How did you first learn about that?

8      A.    The content of the message, which I don't recall

9  how I received -- one of two ways.  It was probably

10 through my press officer or an e-mail.  That essentially

11 there was a document that Mr. Eldred had that essentially

12 was a notice of a trial board involving Captain Conley

13 and the Delaware State Police were dealing with the

14 media, questions.

15     Q.    Did you ever respond to that communication?

16     A.    I did not talk to anybody in the Delaware State

17 Police.

18     Q.    Did you talk to anybody outside of the Delaware

19 State Police?

20     A.    My press officer.

21     Q.    I'm sorry.  What was her name again?

22     A.    Kimberly Chandler.

23     Q.    You indicated that she may have sent you an

24 e-mail about that?

1        A.    Either that or she told me personally.

2        Q.    Does your office have document retention

3    policies?

4        A.    Yes.    The state does.

5        Q.    Are they followed?

6        A.    To my knowledge, yes.

7        Q.    Has any order been given to destroy documents?

8        A.    Oh, no.

9        Q.    Okay.

10       A.    I mean, I give orders to destroy documents a

11   lot, you know, every day, so -- not involving this case.

12   But I get intelligence information that goes right to a

13   shredder and I hand it over to my secretary and I say,

14   "Shred this."   So we destroy a lot of stuff.

15       Q.    That's helpful.   Thank you.

16       A.    Yeah.   But nothing that would be of evidentiary

17   value or...

18       Q.    You are an attorney and you probably understand

19   what the term "evidentiary value" means to attorneys.

20   Would that be fair to say?

21       A.    Yes.

22       Q.    Did you ever communicate with either the

23   Delaware State Police or anyone else in your office any

24   further in reference to this document that Mr. Eldred

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1    had?

2        A.    Kimberly Chandler later in the day as I recall.

3        Q.    Did you have a conversation with her?

4        A.    I did.

5        Q.    Did you communicate in writing or in any other

6    form of communication with her?

7        A.    I don't recall.

8        Q.    You indicated you had a conversation with her;

9    is that correct?

10       A.    As I recall, yes.

11       Q.    What was said during that conversation?

12       A.    That DSP had resolved the issue.  They had

13   received legal advice to confirm the authenticity of the

14   document only and to say nothing more.

15       Q.    Do you have any involvement in that decision to

16   confirm the authenticity of the document, to use your

17   words?

18       A.    Not that I recall, no.

19       Q.    So if Lieutenant Colonel MacLeish testified to

20   something else yesterday, would he be mistaken?

21       A.    He -- I wouldn't necessarily say that.  He might

22   have a different recollection than I do.

23       Q.    If he testified that but for your authorization

24   and sanctioning he would not have authorized the release

1    of that document, would he be telling the truth or

2    mistaken or -- what would he be?

3                MS. BALLARD:   Object to the form.

4        Q.    You can answer.

5        A.    You know, I wouldn't say he would necessarily be

6    mistaken.

7        Q.    So did you authorize or sanction the release of

8    that information to Mr. Eldred?

9        A.    I think you can imply it probably.  If you are

10   my press officer, you can probably imply that I did.

11   Usually how it works is a press officer from a department

12   will check with a higher authority's press officer, run

13   by the strategy, get an okay, and then carry out the

14   strategy and move on.  And with that, there is probably

15   some -- there's an implication, tacit approval and so

16   forth.

17       Q.    Did Colonel MacLeish ever talk to you directly

18   about that?

19                MS. BALLARD:   Object to the form.

20       A.    I don't recall that.

21       Q.    Would you deny that any such conversation had

22   ever occurred?

23       A.    No.

24       Q.    You just don't remember?

Secretary David B. Mitchell, Sr.          49

1      A.    I don't recall a conversation with Tom MacLeish

2  about that document.  And if it occurred, I have to --

3  somebody has to refresh my recollection because I don't

4  remember that.

5      Q.    Was the release of the internal affairs e-mail

6  to Mr. Eldred ever investigated?

7      A.    It was considered.

8      Q.    What was it considered?

9      A.    The investigation of how that e-mail got into

10 the hands of Mr. Eldred.

11     Q.    Were you involved in that process in any way,

12 shape, or form?

13     A.    I was involved to the extent that I was given

14 information about it, yes.

15     Q.    What information were you given about it?

16     A.    That computer crimes could not determine -- it

17 would be impossible to determine if somebody forwarded

18 it.  Given the volume that's reached by this policy, I

19 guess, that the DSP has, it's so-and-so's charge, that

20 that goes so many different places that somebody could

21 have hit the print button, mailed it.  It could have been

22 forwarded -- computer crimes doesn't have the resources

23 nor -- I mean, it would be impossible to determine who

24 did that.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Secretary David B. Mitchell, Sr.                50

1      Q.    Now, I believe you mentioned before -- and if
2   I'm incorrect, please correct me -- that the public had a
3   strong interest in the filing of this lawsuit as
4   evidenced by all the media stories?
5              MS. BALLARD:  Object to the form.
6      Q.    You can answer.
7      A.    Yes, yes, the public had a strong interest.
8      Q.    Despite the strong interest, no investigation
9   was undertaken into the release of that Internal Affairs
10  e-mail?
11     A.    I guess it depends -- it depends on how you
12  define "investigation."  It was considered, to my
13  knowledge.  It was discussed.  It was hypothesized.  And
14  the conclusion was that we won't be able to determine how
15  this happened.
16     Q.    Was Colonel Chaffinch ever questioned and asked
17  if he had released it?
18     A.    I don't know.
19     Q.    Were any of Colonel Chaffinch's buddies, pals,
20  or friends ever questioned as to whether they had
21  released it?
22     A.    I wouldn't even know who that is, but I don't
23  know.
24     Q.    Did you release it?

1    A.    No.

2    Q.    You mentioned you were a friend of his.

3    A.    Well, yes, I did, Counsel.

4              No, I didn't give this to Tom Eldred.    Did

5    you release it?

6    Q.    I actually didn't have the e-mail at the time.

7    A.    Good.

8    Q.    Now, do you know if Lieutenant Colonel Tom

9    MacLeish released it?

10   A.    I -- no.  I doubt very seriously if he did.

11   Q.    Now --

12   A.    It doesn't serve our best interest to release

13   that stuff.

14   Q.    Do you know who was running the Internal Affairs

15   department at the time that that investigation was

16   discussed?

17   A.    Yes.

18   Q.    Who was running the Internal Affairs department

19   at the time?

20   A.    Captain Jim Paige.

21   Q.    Who did he report to?

22   A.    To the best of my knowledge, Lieutenant Colonel

23   MacLeish.  It was his assessment that I was aware of that

24   we can't find out who did this.  And I believe so

1    strongly in Jim Paige and his work that I accepted that.

2        Q.    It was Jim Paige's assessment or it was Tom

3    MacLeish's assessment?

4        A.    It was Jim Paige's assessment through Tom

5    MacLeish that we are not going to know who sent it.

6        Q.    Now, at the time Captain Paige was in charge of

7    Internal Affairs; correct?

8        A.    Yes.

9        Q.    He's a troop commander now?

10       A.    That's correct.

11       Q.    Do you recall what troop he's at?

12       A.    No, no.  Mid -- above Dover.  I'm sorry.

13       Q.    Fair enough.

14       A.    Yeah.  He's not down south.  I know that.

15       Q.    Isn't it true that you don't like Barbara

16   Conley?

17       A.    That's not true.

18       Q.    Isn't it true you bear ill will towards her?

19       A.    No.

20       Q.    So are you telling me you don't bear her ill

21   will even though she filed this lawsuit which caused all

22   this adverse media attention?

23       A.    That's what I'm telling you.

24       Q.    Are you telling me or did you previously tell me

1    that you weren't happy about all of the adverse media

2    attention?

3        A.    I said that.  I'm not.

4        Q.    You're not happy about it?

5        A.    That's correct.

6        Q.    You don't bear her any ill will?

7        A.    Absolutely not.

8        Q.    Did there come a time when you learned that I,

9    Stephen Neuberger, had filed a complaint with Captain

10   Paige requesting an Internal Affairs investigation into

11   the release of Captain Conley's Internal Affairs

12   information?

13       A.    I was aware that you had corresponded or

14   communicated with Captain Paige with regard to what

15   Mr. Eldred had.

16       Q.    Did you have any involvement in that process?

17       A.    I was made aware of it.

18       Q.    But beyond simply being made aware of it, were

19   you involved at all?

20       A.    I didn't direct anybody to do anything, no.

21       Q.    Were you aware of what was going on within the

22   process other than just being generally aware that a

23   complaint was made?

24       A.    I don't understand that.  Could you be more

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    specific?

2        Q.    I believe you testified that you were aware that

3    a complaint was made?

4        A.    Yes.

5        Q.    You served in police agencies for a long time.

6    Is that fair to say?

7        A.    Yes.

8        Q.    Is there a process by which complaints are

9    processed in police agencies?

10       A.    Yes.

11       Q.    Were you aware of the specifics of that process

12   in the Delaware State Police?

13       A.    Not necessarily, no.

14       Q.    Were you aware of it with regard to the

15   complaint that I filed with Captain Paige?

16       A.    I was aware that Captain Paige received it, that

17   he was dealing with it.  And the conclusion was as I

18   stated.

19       Q.    What was your conclusion?

20       A.    No.  The conclusion was as I stated.  The

21   conclusion was that we won't be able to find out who did

22   this.

23       Q.    Did there come a time when you learned that I,

24   Stephen Neuberger, had filed several complaints with

1    Deputy Attorney General Michael Tupman?

2         A.    I vaguely recall.

3         Q.    Were you consulted about that by the Delaware

4    State Police?

5         A.    That you filed a complaint against or with Mike

6    Tupman?

7         Q.    That is correct.

8         A.    Not that I remember.

9         Q.    Following the filing of this lawsuit, were you

10   involved in all aspects of Internal Affairs

11   investigations arising out of this lawsuit?

12                   MS. BALLARD:    Object to the form.

13        A.    I received periodic reviews and updates.

14        Q.    By whom?

15        A.    Captain Jim Paige.

16        Q.    Was he just letting you know or was he asking

17   for your approval as to different matters?

18        A.    I believe on some matters he sought some

19   agreement or at least some assistance.

20        Q.    Did any of those matters relate to the two

21   complaints that I had filed?

22        A.    No.

23        Q.    Now, did you agree in the decision of

24   then-Lieutenant Colonel MacLeish to not investigate the

Secretary David B. Mitchell, Sr.          56

1    release of Captain Conley's Internal Affairs information?

2              MS. BALLARD:   Object to the form.

3       Q.    You can answer.

4       A.    I don't believe that -- what I believe is simply

5    this:  that Tom MacLeish received the complaint, that he

6    discussed it with Captain Jim Paige, that there was a

7    cursory review, that there was appropriate action taken.

8              There was information provided back to

9    Captain Paige to Lieutenant Colonel MacLeish to me that,

10   as I recall, our computer crimes unit said there's no way

11   we are going to be able to find out short of Mr. Eldred

12   saying so-and-so gave me this.  There's no way we'll be

13   able to find that out.  So I don't want to imply or say,

14   and I can't say that nothing was done.

15             Now, you can call that an investigation.

16      Q.    Who had the ultimate authority or

17   decision-making power to make that call?

18      A.    Tom MacLeish.

19      Q.    Did you approve, authorize, or sanction his

20   decision in that regard?

21      A.    I agreed that if there is no way to find out who

22   gave Tom Eldred a copy of an e-mail, that it is not a

23   wise use of State Police resources to try to find out.

24      Q.    Are you saying you just simply agreed after the

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,               )
                                         )
                    Plaintiff,           )
                                         )      Civil Action
v.                                       )      No. 04-1394-GMS
                                         )
COLONEL L. AARON CHAFFINCH,              )
individually and in his official         )
capacity as the Superintendent,          )
Delaware State Police; LIEUTENANT        )
COLONEL THOMAS F. MACLEISH,              )
individually and in his official         )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.          )
MICHELL, individually and in his         )
official capacity as Secretary of the )
Department of Safety and Homeland        )
Security, State of Delaware; and         )
DIVISION OF STATE POLICE, DEPARTMENT     )
OF SAFETY AND HOMELAND SECURITY,         )
State of Delaware,                       )
                                         )
                    Defendants.          )

          Deposition of W. MICHAEL TUPMAN, ESQUIRE,
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 10:0 a.m. on
Wednesday, December 21, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.

APPEARANCES:

          STEPHEN J. NEUBERGER, ESQUIRE
          CHERYL SASADEUSZ, ESQUIRE
          THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
            Wilmington, Delaware  19801
            for the Plaintiff
------------------------------------------------------
               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



A00143  

1        A.    He said that he had gotten a telephone call from

2   Tom Eldred, E-l-d-r-e-d, of the *State News* and said that

3   he had a copy of this e-mail, and I think he identified

4   it by date and author and basic subject matter, and was

5   asking for State Police comment on it.

6        Q.    What did you tell Lieutenant Aviola?

7        A.    I'm not sure if I talked with Aviola first or

8   whether he was -- there was a teleconference at some

9   point around this time.  I was in my office at Water

10  Street.  A call came in from headquarters asking if I

11  would be available for a teleconference.  I said sure.

12  And I'm trying to remember.

13             Lieutenant Colonel MacLeish was on the

14  phone.  Lieutenant Aviola was on the phone.  And I think

15  Captain Paige, P-a-i-g-e, was on the phone, and they may

16  have actually been physically someplace.  I was

17  telephonic.  And there may have been somebody else from

18  Internal Affairs on the phone.

19       Q.    Are you saying that there were multiple

20  conversations you had or multiple teleconferences?  Or

21  was there one?

22       A.    I can't remember if the initial call was just a

23  heads up from Joe Aviola and he was on his way to

24  headquarters and then the conference call was put in.  I

1    just can't recall.

2         Q.    Did Joe Aviola routinely call you?

3         A.    Not very often.

4         Q.    But he did call you?

5         A.    Yes.

6         Q.    Putting aside this one incident, you said "not

7    very often," that implies that he called you on previous

8    occasions?

9         A.    Yes.

10        Q.    Do you recall what he previously would have

11   called you about, a general topic?

12        A.    They usually were questions about the

13   application of the Freedom of Information Act.

14        Q.    Did he ever call you about lawsuits having been

15   filed?

16        A.    I don't think so.  Usually I would find out from

17   some other way, from one of your father's famous press

18   conferences or actual service on me as attorney for the

19   division.  I don't think Joe Aviola is my sort of

20   heads-up guy for letting me know when lawsuits are filed.

21        Q.    Did Joe Aviola ever call you about media

22   inquiries relating to -- how about media inquiries

23   related to lawsuits?

24        A.    He may have.  I don't recall a specific lawsuit.

W. Michael Tupman, Esquire                    35

1    Q.    But he may have done that in the past?

2    A.    He may have, yeah.

3    Q.    Did Joe Aviola ever call you about media

4    inquiries related to jury verdicts against the division?

5    A.    No.

6    Q.    Did Joe Aviola ever call you about media

7    inquiries relating to Internal Affairs complaints?

8    A.    No.

9    Q.    You are sure about that now?

10   A.    Pretty sure.

11   Q.    Did he ever call you about media inquiries

12   relating to Internal Affairs charges?

13   A.    I don't recall any.

14   Q.    Now, getting back to the teleconference that you

15   had with Aviola, MacLeish, Paige, and some other unnamed

16   party, do you recall what was said by any of those

17   individuals during that teleconference?

18   A.    I think that Joe Aviola set the stage in terms

19   of recounting the call from Tom Eldred and he said that

20   Eldred, that he would have to get back to him because it

21   was an unusual situation.  And I remember advising the

22   State Police to ask Tom Eldred to fax a copy of whatever

23   it is that he supposedly had just to, you know, see if he

24   had it.

1       Q.    So did the teleconference end at that point and

2    you waited until a fax came in?  What happened then?

3       A.    That I don't recall.  I know that Eldred did fax

4    the -- I think it was an October 25th, 2004, e-mail to

5    the State Police.

6       Q.    Did you continue your teleconference with

7    Colonel MacLeish, Lieutenant Aviola and the others?

8       A.    Yes.

9       Q.    Did they ask you any further questions?

10      A.    I'm not sure if it was in the form of questions.

11   I remember some discussions of what -- you know, what the

12   State Police could or could not be saying at that point

13   about this matter.

14      Q.    What was that discussion?

15      A.    Well, I first looked at it from the standpoint

16   of the Law Enforcement Officers' Bill of Rights.  And in

17   my opinion, this e-mail, which is an administrative

18   e-mail that is routinely -- not routinely -- by State

19   Police rules and regulations is sent out in every trial

20   board situation, that it was not a file compiled as a

21   part of the Internal Affairs investigation so that the

22   Policeman's Bill of Rights was inapplicable.

23              I then analyzed it from a privacy

24   perspective by analogy to the personnel exemption under

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1    the Freedom of Information Act.

2              And my conclusion was that however it came

3    about, the document was in the public domain so that

4    there was no privacy interest with respect to the

5    document itself, and I advised the State Police that they

6    could confirm that the document was what it purported to

7    be, but not to comment on the specifics of the case.

8        Q.    Just so we are clear, are you telling me that

9    the legal advice you gave to the Delaware State Police is

10   that they could confirm -- what was the word you used?

11       A.    Confirm that the document was what it purported

12   to be.

13       Q.    So that it was an official State Police e-mail?

14       A.    Well, it was an e-mail dated October 25th, 2004,

15   that was sent out by Captain Paige of the Internal

16   Affairs section announcing a divisional trial board in

17   the matter of Captain Conley.

18       Q.    So you told them that they could confirm that?

19       A.    I said they could confirm that the document was

20   what it purported to be.

21       Q.    I think you also said that you told them that

22   they could not go beyond that?

23       A.    No.  I said that they should not get into any of

24   the specifics in terms of the allegations of misconduct

W. Michael Tupman, Esquire                          38

1   against Captain Conley other than, of course, what is

2   actually reflected in the document, which is not very

3   specific, as I recall.

4       Q.   So if the State Police went beyond confirming

5   what I'm going to call the authenticity of the document,

6   would they have been going beyond what your legal advice

7   was?

8       A.   I don't understand the question.

9       Q.   Well, I think you indicated that the State

10  Police could confirm that the document is what it

11  appeared to be.  Would that be a fair --

12      A.   Right.

13      Q.   So if the State Police did more than confirming

14  that the document is what it appears to be, would they

15  have been going beyond the scope of what you advised them

16  to do?

17      A.   I don't know that they did.

18      Q.   I'm asking what if.

19      A.   That's a hypothetical.  I can't answer that

20  question.

21      Q.   Why can't you answer that question?

22      A.   Because it's a hypothetical question.

23      Q.   So you are indicating that you are not going to

24  answer that question?

W. Michael Tupman, Esquire                    39

1      A.    Right.

2      Q.    Okay.

3            Did you advise them of anything else?

4      A.    Could you be more specific?

·5      Q.    Sure.

6            You indicated you advised them that they

7    could confirm the document is what it appears to be?

8      A.    Correct.

9      Q.    Did you give them any further advice?

10      A.    On how to respond to Mr. Eldred?

11      Q.    Sure.

12      A.    Okay.  No.

13      Q.    I think you also indicated that you went through

14    somewhat of a legal analysis in your head before you gave

15    them the advice to confirm that the document is what it

16    appears to be.

17      A.    Correct.

18      Q.    For example, you talked about an analysis

19    related to the Law Enforcement Officers' Bill of Rights?

20      A.    Correct.

21      Q.    You talked about -- I think you said it was

22    almost a personnel file analysis related to FOIA?

23      A.    Correct.

24      Q.    You concluded that there was no privacy

1   protection because the document was already in the public

2   domain?

3        A.    No privacy protection with regard to the

4   contents of that document.

5        Q.    So if the contents of a document are in the

6   public domain, then there is no privacy protection?

7        A.    How could there be?

8        Q.    I'm asking.

9        A.    I don't see -- I don't see it.

10       Q.    So you think that there is no privacy protection

11  once the contents of a document are in the public domain?

12       A.    In this situation, no.

13       Q.    It could be different for other situations?

14       A.    I don't know.  I'd have to be presented with a

15  specific fact situation.

16       Q.    Sure.

17             Has Lieutenant Aviola ever told you that a

18  reporter needs more than one source before he can run a

19  story?

20       A.    No.

21       Q.    So if Lieutenant Aviola testified that that's

22  his understanding as to how things with reporters work,

23  would you have a basis to contest that?

24       A.    I have no basis to contest it or not to contest

 1   it.

 2       Q.   Did you authorize the Delaware State Police to

 3   comment on the contents of the e-mail itself?

 4       A.   I don't authorize them to do anything.  I give

 5   them legal advice when they ask for it.

 6       Q.   Because they are the client?

 7       A.   Correct.

 8       Q.   And you are the attorney?

 9       A.   Correct.

10       Q.   In a roundabout way, you are their agent?  Would

11   that be fair to say?

12       A.   No, not at all.

13       Q.   But you were their counsellor?

14       A.   I am -- I give legal advice to them as a deputy

15   attorney general.

16       Q.   Has the State Police ever not followed your

17   legal advice?

18       A.   They may have.

19       Q.   Did you advise them to comment on the contents

20   of the document?

21       A.   Not -- no, I did not directly say you must

22   comment on the contents of this document.

23       Q.   Instead you only told them that, again, to

24   confirm that the document is what it appears to be?

1    need to read it?

2        A.    No, no.  I'm familiar with it.

3        Q.    Have you reviewed this document recently?

4        A.    It may have been when I testified earlier about

5    the documents I had reviewed, the responses and

6    supplemental responses.  It may have been part of those.

7        Q.    Did you understand this e-mail to be a formal

8    complaint being filed by Stephen J. Neuberger on behalf

9    of Captain Barbara Conley?

10       A.    Yes.

11       Q.    Did you ever investigate the complaints raised

12   in this e-mail?

13       A.    I don't conduct any investigations, but -- so

14   can you rephrase your question?

15       Q.    Well, would the answer then be no, you did not

16   investigate the complaints made?

17       A.    I personally did not, no.

18       Q.    Who normally does in the Division of State

19   Police?

20       A.    It is my recollection that as a spin-off of the

21   teleconference that I had with Lieutenant Colonel

22   MacLeish and Captain Paige and Lieutenant Aviola, which I

23   believe was on October 28th, 2005, that Lieutenant

24   Colonel MacLeish directed Captain Paige to try and

W. Michael Tupman, Esquire                88

1    ascertain who within the division may have sent the

2    October 25, 2004, e-mail to Tom Eldred.

3         Q.    Okay.

4         A.    And it is my recollection that Captain Paige did

5    investigate, he did look into the matter.  And after

6    consulting with the appropriate tech people, they advised

7    him that it was impossible to determine from whose

8    trooper's terminal that e-mail may have been provided to

9    Tom Eldred.  I mean, it's not sure whether it was sent to

10   him anonymously as a hard copy or whether it was

11   forwarded to him or that it was just impossible to

12   determine.

13        Q.    Now, do you have any firsthand knowledge of this

14   investigation being conducted by Captain Paige?

15        A.    It may be that as part of that teleconference on

16   October 28th, after I had given my legal advice about how

17   to respond to Tom Eldred about the e-mail that he had,

18   that I may still have been on the phone conversation when

19   Lieutenant Colonel MacLeish directed Captain Paige to

20   investigate and see if Internal Affairs could ascertain

21   who sent the e-mail.

22        Q.    Cabinet Secretary Mitchell testified that no

23   investigation took place.  Would you have any reason to

24   disagree with him?

W. Michael Tupman, Esquire                    93

1  MacLeish's testimony and I'm not sure what change

2  Mr. Tupman's lack of recollection --

3            MR. NEUBERGER:  The areas of questioning

4  for Colonel MacLeish I think may be able to open up some

5  areas in which I may use to jog Mr. Tupman's memory.

6            MS. BALLARD:  We'll see what the Court

7  says, if anything.

8            MR. NEUBERGER:  Fair enough.

9            THE WITNESS:  If I can just, so I

10 understand, it's your contention that Colonel MacLeish

11 did not answer certain questions at his deposition for

12 privilege or other reasons, and that if you can get the

13 Court to compel him to answer those questions, it may

14 somehow impact back on me and you'd have to depose me

15 again?

16           MR. NEUBERGER:  I would say continue your

17 current deposition.

18           THE WITNESS:  Okay.  I just wanted to

19 understand.

20           MR. NEUBERGER:  Sure.

21           MS. BALLARD:  I have just a very few

22 questions.

23 BY MS. BALLARD:

24    Q.   Going back to the discussion of when you got the

1  phone call that Tom Eldred had obtained this e-mail and

2  you gave advice to Lieutenant Colonel MacLeish and

3  others, would you agree that your advice was essentially

4  to confirm the four corners of the document that Tom

5  Eldred had?

6      A.    That's another way of putting it, yes.

7      Q.    Let me put in front of you, and I'm not going to

8  put it in the record because it's already been produced

9  in discovery.

10           MR. NEUBERGER:  Do you have a copy of that,

11 Counsel?

12           MS. BALLARD:  I don't have extra copies of

13 it.  This is the actual e-mail that was made a copy --

14           MR. NEUBERGER:  May I see it?

15           MS. BALLARD:  It was produced at Lieutenant

16 Aviola and Colonel MacLeish's depositions, and also

17 produced in our request for production to responses.

18           MR. NEUBERGER:  Give me one second.  I may

19 have a copy here that I can review while you question the

20 witness.

21           MS. BALLARD:  Can I go ahead?

22           MR. NEUBERGER:  Can you hold on a second,

23 please?

24           MS. BALLARD:  Yes.

1          MR. NEUBERGER:  Go ahead.

2          MS. BALLARD:  I'll represent for the record

3    that this is a copy of what was previously produced as

4    the divisional trial board e-mail dated October 25th,

5    2004.

6          MR. NEUBERGER:  For the record, can I also

7    say this may be the same document as Plaintiff's General

8    Deposition Exhibit Number 14.

9          MS. BALLARD:  Okay.

10   BY MS. BALLARD:

11      Q.   This has fax line showing when Tom Eldred faxed

12   it from *Delaware State News* to Lieutenant Aviola.

13          Mr. Tupman, in the first paragraph of that

14   e-mail, is it correct that it references two departmental

15   rules and regulations?

16      A.   Yes.

17      Q.   That would be Rule and Regulation Number 4 and

18   Rule and Regulation Number 40?

19      A.   Correct.

20      Q.   Lieutenant Aviola testified that when he called

21   Tom Eldred back after he had gotten advice from you and

22   then direction from Lieutenant Colonel MacLeish, that

23   Mr. Eldred asked him what those rules and regulations

24   referred to and that he identified for Mr. Eldred what

1    they referred to.

2              Would you consider that to be inconsistent

3    with the advice you gave the State Police?

4       A.    No.

5       Q.    Are those rules and regulations a matter of

6    public record?  That is, if you received a FOIA request

7    for what is Rule and Regulation Number 4, would you feel

8    free to give that out?

9       A.    Certainly.

10      Q.    You briefly discussed a conversation with

11   Lieutenant Colonel MacLeish during the teleconference

12   regarding an investigation into how Tom Eldred may have

13   obtained this e-mail.

14             Did you fully put on the record your

15   recollection of the discussions of that?  Why don't you

16   just state your recollection of what Lieutenant Colonel

17   MacLeish said with that regard?

18      A.    I recall Lieutenant Colonel MacLeish -- and I

19   can't be sure whether it was on that teleconference or

20   around that time.  I do recall Captain Paige being tasked

21   with investigating how Tom Eldred came to have that

22   e-mail.

23             And I do recall, and I don't remember when

24   it was, but I do recall being told sometime after that

W. Michael Tupman, Esquire                       97

1    that Captain Paige had checked into the matter, had

2    consulted with various tech people, and they advised him

3    that there was no way that they could determine who

4    within the Division of State Police might have provided

5    this to Mr. Eldred because I think, as I testified

6    earlier, they didn't know whether whoever did it printed

7    a hard copy out and handed it to Tom Eldred or mailed it

8    to him, or even if they had forwarded it to him as part

9    of the state e-mail system, that there was no way to

10   trace the source.

11       Q.   Just to clarify, on these divisional trial board

12   e-mails, they go out to the addressees, DSP users, and

13   it's been previously testified to that that involves

14   approximately 600 to 650 persons.  Does that sound

15   correct to you?

16             MR. NEUBERGER:  Objection, but go ahead.

17       A.   Yeah.  Under the Internal Affairs rules and

18   regulations, an e-mail in this format is sent out to all

19   sworn troopers with respect to the announcement of any

20   divisional trial boards, that's correct.

21       Q.   Do these e-mails routinely identify the rules

22   and regulations at issue?

23       A.   Yes.

24       Q.   Other than for the training purposes you

1  mentioned when Mr. Durstein came on board as a designated

2  deputy for the State Police, do you recall any case

3  reviews where both you and Mr. Durstein sat in?

4      A.    There may have been one or two where there were

5  some crossed wires in terms of the secretary who sets

6  these things up, and we each thought we were the ones who

7  was going, and so we just happened to show up.  But that

8  may have happened.

9      Q.    But as a matter of routine, would you say only

10 one attorney is present?

11     A.    That's correct.  I mean, we have to allocate our

12 resources and there's really no reason for two deputies

13 to be there.

14           MS. BALLARD:  That's all I have.

15           MR. NEUBERGER:  I have no further questions

16 subject to what I've already put on the record.

17           THE WITNESS:  Okay.  Great.

18           (The deposition was then concluded at

19 12:20 p.m.)

20                  - - - - -

21

22

23

24

### IN THE UNITED STATES DISTRICT COURT
### IN AND FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,                )
                                          )
        Plaintiff,                      )
                                          )
    v.                                    )    C.A. No. 04-1394-GMS
                                          )
COLONEL L. AARON CHAFFINCH,               )
Individually and in his official capacity as the   )
Superintendent, Delaware State Police; et al.      )
                                          )
        Defendants,                     )

### CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on January 17, 2006, she caused the attached Appendix to Opening Brief in Support of Defendants' Motion for Partial Summary Judgment as to Counts Two and Three of the Amended Complaint to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

    Thomas S. Neuberger, Esq.
    Stephen J. Neuberger, Esq.
    Two East Seventh Street, Suite 302
    Wilmington, DE 19801

                      /s/ Stephani J. Ballard
                      Stephani J. Ballard, I.D. #3481
                      Deputy Attorney General
                      Carvel State Office Building
                      820 N. French Street, 6th Floor
                      Wilmington, DE 19801
                      (302)577-8400
                      Attorney for Defendants MacLeish, Mitchell, and Division of State Police