# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1394-GMS** |
| **individually and in his official capacity as the** | : | |
| **Superintendent, Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as the Deputy Superintendent,** | : | |
| **Delaware State Police; DAVID B. MITCHELL,** | : | |
| **individually and in his official capacity as** | : | |
| **Secretary of the Department of Safety and** | : | |
| **Homeland Security, State of Delaware; and** | : | |
| **DIVISION OF STATE POLICE,** | : | |
| **DEPARTMENT OF SAFETY AND** | : | |
| **HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFF'S COMPENDIUM OF UNREPORTED CASES FROM HER OPENING BRIEF IN SUPPORT OF HER MOTION FOR SANCTIONS AND OTHER RELIEF (D.I. 142).

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: January 17, 2005          Attorneys for Plaintiff



Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

United States District Court, N.D. Illinois, Eastern
Division.
David DANIS, on behalf of himself and all others
similarly situated, Plaintiffs,
v.
USN COMMUNICATIONS, INC., et al.,
Defendants.
**No. 98 C 7482.**

Oct. 23, 2000.

REPORT AND RECOMMENDATION

SCHENKIER, Magistrate J.

**\*1** Day in and day out, in countless courts throughout
this country, courts resolve disputes of every kind
imaginable. Even when disappointed (or outraged) by
the outcome, the parties to these disputes do not engage
in lawlessness or self-help. Having had their day in
court, the parties accept judgment and move on with
their lives. They would not do so unless they had faith
in the integrity of our judicial system. Not a faith that
the system is perfect and will never err, but rather a
faith that the system will give the parties a fair
opportunity to be heard.

This fair opportunity to be heard is achieved through
lawyers for each side, having obtained and marshaled
the relevant evidence, presenting their clients'
respective positions vigorously. Our system is premised
on the view that through this clash of competing stories,
judges and juries will have the information they need to
make a fair decision. In our system of civil litigation,
the discovery process is the principal means by which
lawyers and parties assemble the facts, and decide what
information to present at trial.

Federal Rule of Civil Procedure 26 requires a party to
produce non-privileged documents which are "relevant
to the subject matter involved in the pending action."
That requirement embraces not only documents
admissible at trial but also documents and information
that are "reasonably calculated to lead to the discovery
of admissible evidence." This broad duty of disclosure
extends to all documents that fit the definition of
relevance for the purposes of discovery-whether the
documents are good, bad, or indifferent. While it may
seem contrary to the adversarial process to require such
"self-reporting," it is in fact a central tenet of our
discovery process. The duty of disclosure finds
expression not only in the rules of discovery, but also in
this Court's Rules of Professional Conduct, which
prohibit an attorney from "suppress[ing] any evidence
that the lawyer or client has a legal obligation to reveal
or produce," Rules for the Northern District of Illinois,
LR 83.53.3(a)(13), or from "unlawfully obstructing
another party's access to evidence.... *Id.* LR 83.53.4(1).

This duty of disclosure would be a dead letter if a party
could avoid the duty by the simple expedient of failing
to preserve documents that it does not wish to produce.
Therefore, fundamental to the duty of production of
information is the threshold duty to preserve documents
and other information that may be relevant in a case.
That duty, too, finds expression in this Court's Rules of
Professional Conduct. *See* Rules for the Northern
District of Illinois, LR 83.53.4(1) (a lawyer shall not
"unlawfully alter, destroy, or conceal a document or
other material having potential evidentiary value").

Suffice it to say, there is no "bad document" exception
to these duties of preservation and production. These
twin obligations are so ingrained in our system, and in
the lawyers and parties who operate within it, that the
obligations routinely are discharged without question.
Parties and attorneys frequently are called upon to
preserve and produce documents that are against their
interest in a particular case. And when they do so, the
parties and the attorneys uphold the integrity of our
litigation system and inspire confidence in it.

**\*2** Conversely, when a charge is made that relevant
information has been destroyed, and especially when a

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

charge is made of intentional destruction, it is a charge that strikes at the core of our civil litigation system. The motion presently before this Court presents just such a charge.

This lawsuit involves a class action brought by two groups of purchasers of common stock issued by USN Communications, Inc. ("USN"), which is now in bankruptcy. The suit alleges a variety of federal securities law violations against three groups of defendants: (1) eleven officers or directors of USN; (2) three companies who managed the underwriting of USN's initial public offering in February 1998; and (3) the accounting firm that audited USN's financial statements and provided various consulting services to USN. In earlier rulings in this case, the District Judge denied a motion to dismiss (except as to one claim against certain individual defendants), and certified the case as a class action, with the class period running from February 4, 1998 to November 20, 1998. The trial in this case is set to commence on December 4, 2000.

On December 13, 1999, plaintiffs filed a motion for sanctions against six of the eleven individual officer and director defendants: Richard Brekka, J. Thomas Elliott, James Hynes, William Johnston, David Mitchell, and Eugene Sekulow. Mr. Elliott is the only one of those defendants who held the position of inside director to USN during the class period; the remaining defendants named in the motion were outside directors to USN during the class period. Plaintiffs premised their motion on the assertion that "USN employees, acting at the direction or under the supervision of the individual defendants and USN's senior officers, destroyed virtually all evidence of the massive fraud alleged in plaintiff's complaint" (Pls.' 12/13/99 Mot., at 1). As a sanction for this alleged misconduct, plaintiffs sought the most draconian remedy available under the rules against the individual defendants named in the motion: a default judgment.

On January 13, 2000, the District Judge referred the motion to this Court for a report and recommendation (doc. # 117) (subsequently, the referral was expanded to all discovery motions) (doc. # 131)). This Court held a status hearing on the sanctions motion on January 21, 2000. At that time, it was obvious that little discovery

had yet been done in the case: no documents had yet been produced from USN, and no depositions had yet been taken. Accordingly, the Court entered and continued plaintiffs' motion for sanctions pending completion of discovery, which would allow plaintiffs (and, if necessary, the Court) to determine more precisely what, if anything, had been destroyed; what information remained available notwithstanding any alleged destruction; and what prejudice, if any, the plaintiffs had suffered. At that time, non-expert fact discovery was set to close on April 30, 2000; by an order of the District Judge dated March 14, 2000, the period for non-expert fact discovery was extended to July 7, 2000 (doc. # 151).

**\*3** The parties indeed have engaged in discovery-with a vengeance. In the nearly six months between January 21 and July 7, 2000, the parties exchanged in excess of one million pages of documents, and took and defended some ninety non-expert fact depositions. The discovery was not only extensive, but was extraordinarily contentious-not including the sanctions motion, this Court has been required to rule on 27 contested discovery motions brought by the various parties, both plaintiffs and defendants alike (*see* doc.135, 137, 145, 157, 162, 165, 170, 183, 188, 191, 212, 214, 216, 225, 226, 276).

On July 12, 2000, after the completion of non-expert fact discovery, the Court discussed the status of plaintiffs' motion for sanctions. The plaintiffs indicated that they still wished to pursue the sanctions motion, and sought leave to file an addendum to advise the Court of further information developed in discovery. For their part, counsel for the individual defendants threatened to file a motion pursuant to Rule 11 of the Federal Rules of Civil Procedure if plaintiffs persisted with the sanctions motion. Because of the substantial additional information developed since the filing of the original sanctions motion, the Court suggested-and plaintiffs agreed-to withdraw their original motion for sanctions. The Court granted plaintiffs leave to file an amended motion for sanctions, if they chose to do so, by July 25, and set a briefing schedule that would apply if the motion were filed (doc. # 191).

On July 25, 2000, plaintiffs filed an amended motion

for sanctions (doc. # 208), directed at the same six individual defendants as the original sanctions motion (the amended motion and memorandum will be referred to as "Pls.' 07/25/00 Am. Mem."). [FN1] The amended motion alleges, among other things, that these individual defendants are "corporately" responsible for "having supervised, sanctioned, or permitted the destruction of crucial USN ... Finance, Accounting and Sales Department hard copy and electronically stored documents and data critical to plaintiffs' proof," in violation of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(C)(i), a preservation order entered by the District Judge on February 2, 1999, and the Federal Rule of Civil Procedure 37 (Pls.' 7/25/00 Am. Mem. at 1-2). In the amended sanctions motion, plaintiffs continue to seek the ultimate sanction against those defendants of a default judgment. Pursuant to the schedule set by the Court, the amended sanctions motion was fully briefed as of August 15, 2000: Mr. Elliott submitted an opposing memorandum ("Defs.' Mem."); the outside directors joined in that memorandum, and filed an additional memorandum of their own ("Outside Dirs.' Mem."); and plaintiffs filed a reply ("Pls.' Reply Mem.").

> FN1. Plaintiffs' statement that this Court ordered a sanctions motion to be filed (Pls.' 7/25/00 Am. Mem. at 1 n. 1) is incorrect. The Court did not order plaintiffs to file an amended sanctions motion; they were free to file or not to file a motion. What the Court ordered was that if such a motion were to be filed, the plaintiffs must do so by July 25.

Upon reviewing the briefs, on August 24, 2000, the Court ordered the individual defendants to present a supplemental submission setting forth, by Bates number and other identifying information, a list of certain documents that the individual defendants claimed to have produced but that plaintiffs claim they did not possess (doc. # 245). The individual defendants provided that submission on September 5, 2000 ("Defs.' 09/05/00 Submission"). On September 6, 2000, the Court ordered that the individual defendants supplement that submission, and that the plaintiffs

provide copies of their Rule 26 expert reports (doc. # 275). On September 7, 2000, all parties complied with that order (*see* Defs.' 09/07/00 Submission; Pls.' 09/07/00 Notice).

*4 Because the briefs and the supporting papers raised certain issues as to credibility of statements made by various witnesses, the Court planned to hold a hearing during the week of August 21 to take in-court testimony. At the request of plaintiffs, and with the agreement of the individual defendants, the hearing was postponed to August 28-29, 2000 (doc. # 241). Thereafter, at the request of counsel for certain individual defendants, the matter was further rescheduled-over the plaintiffs' objections-to September 11-12, 2000 (doc. # 245). The evidentiary hearing took place at that time, with the parties calling a total of twelve witnesses, including two of the individual defendants on this motion-Messrs. Elliott and Hynes. [FN2] At the close of that evidentiary hearing, the Court requested (doc. # 292), and has since received, further submissions by the parties stating the fees and costs they claim to have incurred in connection with the sanctions motions and related matters (*see* Pls.' 09/29/00 Submission; Certain Outside Dirs.' 09/29/00 Submission; Elliott's 09/29/00 Submission; Hynes' 09/29/00 Submission).

> FN2. The witnesses at the hearing also included an individual (George Doyle) whom plaintiffs sought leave to add to their witness list on September 7, 2000, on the ground that he would testify about "newly discovered evidence." The Court granted that motion (doc. # 283), over the written objection of the individual defendants (doc. # 282).

Before turning to the Court's findings and recommendations, the Court makes several observations about how this sanctions motion-and the case in general-has been litigated by the parties.

Sorting out what happened here has been a challenging task not only due the complexity of some of the issues presented, but-regrettably-due to assertions of counsel that often have confused than clarified the issues. On a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

number of occasions, plaintiffs have asserted that certain documents were not produced, when in fact it later turned out that the documents long ago had been produced. Conversely, defendants have on occasion informed the Court that they have produced certain documents, when in fact it turned out that they had not. Moreover, throughout these proceedings, the submissions by the lawyers too often have offered overblown rhetoric rather than accurate information and careful reasoning. In the Court's judgment, there are several reasons why-despite the high level of experience and quality of the attorneys-this has occurred.

*First,* even to this day, neither side to this motion has demonstrated to this Court a complete mastery of what types of documents were generated by USN in the ordinary course of business, how they were used, or their significance. In part, this may be a function of the fact that USN went into bankruptcy, and that the lawyers representing the individual defendants do not have a functioning client to which they can go for ready answers to such questions. In part, this may be attributable to plaintiffs' decision to take a case in which they had six months to conduct fact discovery and, instead of focusing and tailoring their discovery efforts accordingly, attempting to compress into a six-month time frame the amount of discovery that they might have sought to take if discovery had extended for a much longer period. The result was inevitable: discovery proceeded at a breakneck pace, and information was received faster than the attorneys could absorb it.

**\*5** *Second,* the heated rhetoric is, in the Court's view, a direct result of the serious charges that plaintiffs leveled against these defendants in the sanctions motion. Accusations of intentional misconduct are not generally conducive to an atmosphere of civility and cooperation among the attorneys, and this case was no exception. The plaintiffs, of course, cannot and should not be criticized for challenging USN's program for preserving of documents: not only did they have a reasonable basis to believe that adequate preservation steps were not taken, but (as is described below), they also were right. For their part, the individual defendants only further threw fuel on the fire by steadfastly defending a preservation program that was plainly inadequate.

However, in attempting to parlay that failing into a claim that their case had been undermined and that a default was appropriate, plaintiffs vastly overstated the missing evidence and its significance, and thus unreasonably upped the stakes of their sanctions motion. Again, the individual defendants did little to defuse matters. Indeed, even in their briefing in opposition to this sanctions motion, the defendants did not provide a straight-forward list of the key documents that the plaintiffs said they were missing but that they had in fact produced-until the Court ordered them to do so.

As a result, both sides were the losers. They lavished huge sums of time and money on an issue that did not remotely justify the expenditure, and which would have been more profitably spent focusing on the merits of this case.

The Court makes the following findings:

1. As of November 12, 1998, the date that this litigation commenced, USN had a duty to preserve documents and other information that might be discoverable in the litigation.

2. Plaintiffs have failed to establish that USN (or any of the individual defendants) intentionally destroyed, or directed others to destroy, documents to deprive plaintiffs of discoverable information in this case. However, plaintiffs have established that USN failed to implement adequate steps to discharge its duty to preserve documents and information that might be discoverable in this case.

3. Plaintiffs further have established that Mr. Elliott, both as a defendant himself and as Chief Executive Officer of USN, had the authority and responsibility to implement a suitable document preservation program; that Mr. Elliott was at fault for delegating that function to a person who lacked the experience to perform that job properly; and that Mr. Elliott further was at fault for failing to exercise any ongoing oversight to ensure that the job was done properly.

4. Plaintiffs have failed to establish that the other individual defendants on the motion, who were outside

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

directors without a physical presence at or supervisory role in the day-to-day operations at USN, are at fault for the failure to implement an adequate document preservation program-although, as will be described below, their conduct is not particularly worthy of praise.

**\*6** 5. The plaintiffs have established that as a result of the failure to implement an adequate preservation program, certain potentially discoverable documents and information may have been lost. Moreover, the evidence shows that each side has engaged in discovery conduct that unnecessarily increased the cost of this case for the other side.

6. Plaintiffs have substantially overstated the impact of the failure of USN to implement an adequate document preservation program. The documents and information that plaintiffs claim were destroyed have, in the main, been produced-although, in some instances, that production has been by third parties rather than the individual defendants. Moreover, to the extent that there are some gaps in the production of certain categories of documents that plaintiffs have described as critical, plaintiffs have failed to establish prejudice to their ability to litigate their claims.

In short, the Court finds that while plaintiffs have shown that the document preservation requirement was not fully met, plaintiffs have fallen far short of substantiating their assertions that the individual defendants engaged in intentional destruction, or that the documents and information missing are "critical to plaintiffs' proof" (Pls.' 7/25/00 Am. Mem. at 1). In light of these findings, the Court respectfully recommends that plaintiffs' amended motion for sanctions be granted in part and denied in part as follows:

1. The Court recommends that the request for a default judgment be denied. The Court believes that this ultimate sanction is completely inappropriate in this case, where the Court finds no evidence of intentional destruction by the defendants and where plaintiffs have failed to establish prejudice.

2. In order that the jury not draw any inference adverse to plaintiffs from any gaps in the production of documents, the Court recommends that pursuant to

Fed.R.Civ.P. 37(b), the District Court inform the jury that any such gaps are the result of USN failing to produce those documents, even though plaintiffs requested them.

3. The Court recommends that, as a result of his failure to adequately discharge his responsibility to institute a program to preserve documents, Mr. Elliott be required to pay a fine payable to the registry of the Court of $10,000.00. Even though the Court finds that the failure to institute a preservation program has not resulted in prejudice to the plaintiffs, the Court believes that this fine is appropriate as a sanction to impress upon Mr. Elliott the seriousness of the duty of preservation, and to deter others from failing to properly discharge that duty.

4. The Court recommends that no monetary sanctions be imposed on either party for their discovery missteps: the additional costs each has imposed on the other are roughly comparable, and it would be counter productive at this point to engage in further litigation on this issue.

5. The Court recommends that no attorneys' fees and costs be assessed in connection with the prosecution or defense of this motion. Plaintiffs claim that their fees and costs on the sanctions issue total $757,559.61, and (not to be outdone) the individual defendants assess their fees and costs at $767,202.42. Viewed separately, not to mention collectively, these statements of fees and costs are nothing short of shocking: they are wholly disproportionate to what the evidence has disclosed. Because the conduct of each side has contributed to an excessive expenditure of fees and costs, the Court considers the fees and costs incurred to be a self-inflicted wound by each side, and that neither side should be forced to pay the costs and fees of the other side.

I.

**\*7** We begin with the factual findings, which are drawn from the pleadings, the discovery record and prior proceedings in this Court, the written submissions on the amended motion for sanctions, and the testimony at the evidentiary hearing on September 11-12, 2000.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 6
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

A. The Parties.

This case proceeds as a class action, upon consolidation of 14 federal securities suits filed in this jurisdiction in late 1998 and early 1999 (*see* doc. # 12 (Pretrial Order No. 1)). [FN3] On June 17, 1999, the plaintiffs filed an amended complaint in these consolidated cases ("the Consolidated Complaint"). On October 29, 1999, the District Court certified a plaintiff class consisting of persons who purchased stock pursuant to USN's registration and prospectus statements of February 2 and 4, 1998, and those who purchased USN stock between February 4, 1998 (the date of USN's initial public offering) and November 20, 1998.

> FN3. The other seven suits were filed in the Southern District of New York in late 1998, and by a stipulation of January 27, 1999 were transferred to this District: *Glotzer v. USN Communications, Inc., et al.,* 98 C 8088, *Kassover v. USN Communications, Inc., et al.,* 98 C 8250, *Murphy v. USN Communications, Inc., et al.,* 98 C 8369, *Crowley v. USN Communications, Inc., et al.,* 98 C 8529, *Cummings v. USN Communications, Inc., et al.,* 98 C 8616, *Dawson v. USN Communications, Inc. et al.* 98 C 8781, and *Raino v. USN Communications, Inc., et al.,* 98 C 9189. Seven of the consolidated cases were originally filed in this District: *Danis v. USN Communications, Inc., et al.,* 98 C 7482, *Donoghue v. USN Communications, Inc., et al.,* 98 C 7610, *Rosenbaum v. USN Communications, Inc., et al.,* 98 C 7674, *Egan v. USN Communications, Inc., et al.,* 98 C 8044, *Chanik v. USN Communications, Inc., et al.,* 98 C 8082, *Roop v. USN Communications, Inc., et al.,* 99 C 0067, and *Brent v. USN Communications, Inc., et al.,* 99 C 119.

The individual defendants in this case (many of whom are not the subject of the sanctions motion) are J. Thomas Elliott, a director and USN's President and CEO since April 1996; Gerald Sweas, USN's Executive

Vice President and Chief Financial Officer until approximately July 1998; and Richard Brekka, Dean Greenwood, Donald Hoffmann, James Hynes, William Johnston, Ian Kidson, Paul Lattanzio, David Mitchell, and Eugene Sekulow, all of whom were directors of USN. The underwriter defendants, Merrill Lynch & Co., Inc., Cowan & Company, and Donaldson, Lufkin & Jenrette Securities Corporation, allegedly were all involved in the management of the underwriting of USN's initial public offering. The remaining defendant, Deloitte and Touche, L.L.P., audited USN's financial statements for the fiscal years preceding the public offering, and provided consulting services to USN both prior to and during the class period.

Notable by its omission from this roster of defendants is USN itself. USN was named as a defendant in each of the lawsuits originally filed. However, on or about February 19, 1999, USN filed for bankruptcy protection. Thereafter, when the Consolidated Complaint was filed on June 17, 1999, USN was not named as a defendant-presumably, to avoid potential complications that might be created by the automatic stay that protects those who have filed for bankruptcy protection. *See* 11 U.S.C. § 362.

B. The Allegations of the Consolidated Complaint.

USN was a "local telecommunications reseller" which sought to purchase various local and long distance telecommunication services from Regional Bell Operating Companies ("RBOCs"), bundle them into a single package of services, and sell that package of services to the public. USN sought to persuade the existing customers of RBOCs to switch to USN by offering them lower rates for the packaged services. When USN succeeded in gaining a customer, USN would "provision," or switch, the new customer from the existing telephone company over to USN.

The gravamen of the Consolidated Complaint is that USN allegedly embarked on a scheme to build a seemingly large, but in reality fictitious, book of business in order to induce a larger telecommunications company to purchase USN. The Consolidated Complaint alleges that in aid of this scheme, USN

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 7
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

issued false public reports and statements to portray USN as successful, when in fact it was not. Plaintiffs allege that when the truth became known, the value of its shares plummeted, causing injury to investors.

**\*8** The Consolidated Complaint is plead in four counts: Count I alleges that all defendants have violated Section 11 of the Securities Exchange Act of 1933 ("the Securities Act"), and that the individual defendants additionally have violated Section 15 of that Act; Count II alleges that the underwriter defendants have violated Section 12 of the Securities Act (the District Judge has dismissed the Section 12 claim alleged against the individual defendants); Count III alleges that all defendants have violated Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), and Rule 10b-5 promulgated thereunder; and Count IV alleges that the individual defendants have violated Section 20(a) of the Exchange Act.

The fundamental premise of plaintiffs' amended sanctions motion is that once the litigation commenced, USN destroyed key sales, financial and accounting documents that are "critical to plaintiffs' proof" that USN's public financial statements were false and misleading. In particular, plaintiffs' amended sanctions motion focuses on several categories of documents: (1) Monthly Sales Roll Up Reports; (2) Final Sum and Final Sum Summary Reports; (3) Aged Accounts Receivable Reports; and (4) Monthly Close Packages (*see, e.g.,* Pls.' Reply Mem. at 1-2). Thus, we begin with an explanation of those documents, and the evidence concerning how they were used at USN in the ordinary course of business.

### C. Business Documents Generated by USN.

During the course of soliciting and signing up a new customer, USN generated various sales and marketing-related documents. One type of sales-related document tabulated and totaled the new sales, as reported by the USN various sales offices. This document, referred to variously by different witnesses as a "Monthly Sales Roll Up Report" or "State Directors Report," tabulated sales on a weekly basis, and then totaled (or, "rolled up") those sales over a

four-week period for a cumulative total covering approximately a one-month period. The reports also provided projections by the sales force as to the number of lines sold and the amount of revenue that the sales would generate, as well as a comparison of the dollar value of the projected sales revenue to the sales quota provided for that particular office or region (a sample of a document labeled "State Directors Report" was offered at the evidentiary hearing as Defendants' Exhibit 2).

These "Monthly Sales Roll Up Reports" or "State Directors Reports" were generated at least through November 1997. Thereafter, beginning in mid-December 1997, this type of sales information was contained in a computer-generated Sales Summary report. One reason for using this computer system was an attempt to increase the reliability of the sales information reported from the field (Hrg. Tr. 422 (Dundon)). Because sales people earned commission based on sales volume, there was a concern at USN that sales numbers could be changed after they were initially submitted in order to increase commissions; according to the testimony, the switch to a computer system to generate sales reports was intended to provide sales information "on a more structured and more, I guess, rigorously auditable basis" (Hrg. Tr. 422 (Dundon)).[FN4]

> **FN4.** The parties disagree about whether a State Directors Report is the same thing as a Monthly Sales Roll Up, and whether either of those reports continued to be generated after November 1997. We address this dispute below (*see* 35-40, *infra* ).

**\*9** After receiving sales reports from the field, USN did not immediately switch the putative new customer to USN service. Rather, USN engaged in a process of "scrubbing," (that is, verifying) the sale, to make sure that the new customer actually desired to switch to USN, what level of service was requested, and whether the customer had provided all information necessary to effectuate the switch. This function originally was performed by the provisioning group in USN; as of approximately late 1997, this function was performed by a separate group, known as "Business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

Administration" ("BA"), which performed this check on the sales before providing the information to the provisioning group to actually effectuate the switch of the customer (Pls.' 07/25/00 Am. Mem., App. 13 (Jeavons Dec. ¶ 9)).

Once the switch was completed, and the customer was converted to USN, the customer would have to be billed for the services delivered. That billing function initially was outsourced to two companies: Spectrum and Profitec. As of the billing for the month ending October 1997, USN contracted with Spectrum to be the exclusive provider of issued bills for all USN accounts involving "competitive local exchange billing," including the Midwest and Northeast regions from November 10, 1997 onward (Hrg. Tr. 131-32 (Doyle)). In order to perform this billing function, Spectrum received various reports and information from USN, and sent various reports and information to USN. These exchanges of information were accomplished by e-mail and through a dedicated T-1 line. Information transmitted on this T-1 line did not run directly between Spectrum and USN's UNIX computer system. Rather, information was transmitted through a file transfer protocol ("FTP") server that linked Spectrum and USN (Hrg. Tr. 141 (Doyle)). The sole purpose of this FTP server use was to pass large amounts of data back and forth between Spectrum and USN (Hrg. Tr. 348 (Struble)).

According to the testimony of George Doyle, the founder and Executive Vice President of Spectrum, each month USN sent to Spectrum via the FTP server twelve to eighteen files (extracted from billing and financial databases) to use for billing (Hrg. Tr. 152, 158, 162 (Doyle); Hrg. Tr. 346-47, 381 (Struble)). Included among these files were credit files, which would show, on an account by account basis, the amount of credit to be applied to a particular customer and the reason the credit was given (*Id.,* at 147); Plaintiffs' Exhibit 3 is an example of such a credit file (*Id.,* at 149). Spectrum used the information from USN, as well as information obtained from the local or long distance carriers concerning usage (Hrg. Tr. 195-96 (Doyle)), to generate detailed billing information for each USN customer account.

This detailed billing information was transmitted over the T-1 line to USN (Hrg. Tr. 132, 145, 147 (Doyle)), where it was stored in a database called "REPGEN"-which is an acronym for "report generator" (Hrg. Tr. 349-50 (Struble)). Charles Struble, USN's Vice President for Information Systems, described REPGEN as a physical data base, containing detailed records from Spectrum in the form of tables, as well as other financial information (*Id.,* at 349). According to Thad Pellino, USN's Vice President of Revenue Assurance, who was responsible for calculating revenue and ensuring the accuracy of those calculations, this information was electronically accessible to USN, but was not conveyed by Spectrum to USN (or printed out by USN) in a hard copy report format (Hrg. Tr. 299-300). Once the REPGEN information was received by USN, the finance group would internally generate selected reports to use for balancing and reconciliation (Hrg. Tr. 367 (Struble)).

**\*10** In addition to this detailed source information, two reports relevant to billing were generated by Spectrum and delivered to USN. One such report was entitled Final Sum Summary, which Spectrum sent to USN by e-mail in an Excel spread sheet format. This report "aggregate[d] all billing categories or aggregate[d] each billing category for all accounts" and eliminated the account-by account detail, showing only totals by billing category (Hrg. Tr. 164 (Doyle)). The other report, entitled Final Sum, also was sent by e-mail in an Excel format, prior to 1998; according to Mr. Doyle, because of the volume of information communicated in the Final Sum Report, thereafter the report was converted to a Paradox format (which had greater capacity than Excel) and transmitted on the T-1 line (Hrg. Tr. 144 (Doyle)). [FN5]

> [FN5.] As with the "Monthly Sales Roll Up" reports, there is conflict in the testimony as to what constitutes a "Final Sum" Report. Mr. Doyle identified the detailed, voluminous report marked as Plaintiffs' Exhibit 2 as a Final Sum Report (Hrg. Tr. 134, 135), which he said was sent to USN for every billing period in 1998 (*Id .,* at 140-41, 143-44). However, Mr. Pellino identified that document

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 9
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

as a print-out from the REPGEN file, and testified that Defendants' Exhibit 7 (a much thinner document) was an example of the Final Sum Report (Hrg. Tr. 293-94). Likewise, Mr. Struble distinguished Final Sum Reports from the REPGEN file, which he said contained the physical data behind the Final Sum Reports (Hrg. Tr. 373). And, indeed, even Mr. Doyle at one point referred to Plaintiffs' Exhibit 2 not as a Final Sum Report, but as Final Sum "detail files" (Hrg. Tr. 164)-which is consistent with the explanations by Messrs. Doyle and Struble. While the Court is inclined to credit Mr. Pellino on this point, for the reasons described below, this dispute is not material to the outcome of the motion.

USN's Revenue Assurance Group, headed by Mr. Pellino, used the monthly billing information from Spectrum as the starting point for the revenue figures to be used in USN's financial statements (Hrg. Tr. 293 Pellino)). Adjustments then would be made to revenue and costs would be calculated, including the cost of the service purchased for the customer by USN from the RBOCs. In this regard, USN issued reports concerning not only the amounts of accounts receivable, but also their age: that is, the length of time a particular amount had been outstanding but unpaid. The various revenue and cost information would be assembled in what USN referred to as a "Monthly Close Package" or "Revenue Close Package," which would then form the basis of the cost and revenue information set forth in USN's financial statements.

### D. USN's Computer Systems.

Because much of the information at issue was stored electronically (in addition to or in lieu of hard copy printouts), we turn to a discussion of the USN computer system. As of November 1998, when the first lawsuits were filed, USN's computer systems were divided into two overarching categories (*see* Defs.' Demonstrative Ex. 1).

*First,* there was a UNIX server that contained a number of databases which could be accessed through different software application. The databases included (1) the FPS database, which was a repository of the billing information for customers, product and pricing information, and customer account data that was used to send the various reports to Spectrum (Hrg. Tr. 346 (Struble)); (2) the "Vantive" system, which was used by the sales organization and contained marketing and sales information (and from which the Sales Summary reports were generated beginning in mid-December 1997) (*Id .,* at 348); (3) Mas 90 (and later Oracle), which contained the financial information of the company (*Id.,* 348-49); and (4) "REPGEN," which was the repository for information received from Spectrum concerning customer billing (*Id.,* at 349). The Vantive system, which contained sales information, was maintained on a UNIX developmental server; the other databases mentioned, which contained financial and billing information, were on a UNIX production server.

**\*11** *Second,* USN maintained NT servers. These servers were used by USN for e-mail, desk top computers, and local area networks (Hrg. Tr. 345-46 (Struble)). Through these systems, USN employees could generate correspondence and other original documents. In addition, information contained in the databases on the UNIX system could be accessed through the desk top computers on the NT servers, but when accessed and/or copied electronically, the information also would remain stored in the UNIX database (Hrg. Tr. 346 (Struble)).

Charles Struble was the person with overall responsibility for all computer systems at USN. Mr. Struble delegated direct responsibility for the two sides of the USN computer systems to two different people: Christopher Urban was responsible for the NT servers and desk tops and David Rohrman was responsible for the UNIX servers (Hrg. Tr. 350-51 (Struble)).

### E. USN's Pre-Litigation Retention Practices.

Prior to the commencement of this litigation in November 1998, USN did not have in place any formal retention policy covering the many categories of documents and electronic information USN regularly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

created and received (Hrg. Tr. 215 (Monson), Hrg. Tr. 249 (Elliott)). Thus, not surprisingly, as of November 1998 it appears that USN did not have a set of complete and organized files of important business documents that were readily accessible. In September 1998, an Arthur Andersen report commented on the inability to locate certain types of business documents at USN (Pls.' Reply Mem., App. A). However, as of the time this litigation commenced, USN did maintain several practices documents that are of relevance here with respect to preservation (or elimination) of hard copy and electric.

*First,* with respect to e-mails, USN routinely created backup tapes that were stored on computers. USN maintained copies of these back-up tapes only for a period of about thirty days, in order to facilitate disaster recovery; the tapes used to make these copies were then reused. Thus, these back-up tapes were not intended to, and did not, create an archival record of the e-mail system (Hrg. Tr. 393 (Struble)).

*Second,* in approximately the summer of 1998, in anticipation of upcoming office closures and layoffs, USN put into place a set of procedures for "preserving company assets [and] retrieving key records" (Pls.' 07/25/00 Am. Mem., App. 12 (Foster Dec., ¶ 6)). Lane Foster, USN's Vice President for Human Resources, was placed in charge of developing these procedures (*Id.*). In putting together these procedures, Mr. Foster met with in-house lawyers at USN (including Dennis Monson, USN's Vice-President, Secretary, and General Counsel), and with Tom Jeavons, a Senior Vice-President for Sales (*Id.* at ¶ 7). As a result of those discussions, the criteria that USN put into place for preserving documents from the closed sales offices focused on preserving two categories of documents: (1) original documents that were important to USN's ability to service existing customers, and (2) other documents that individual sales people wished to maintain for their personal reasons. Documents not falling into one of those categories would be discarded.

**\*12** *Third,* in the summer of 1998, Mr. Urban was placed in charge of a project to purge the computer drives of terminated USN employees. This program was initiated for several reasons: (1) USN was concerned about security risks that might be created if terminated employees potentially could access the computers, and (2) computer server space was at a premium, and purging the computer files of former employees would free up space of the servers (Hrg. Tr. 43 (Urban)). As part of the procedure implemented by Mr. Urban, when an employee was terminated, Mr. Urban would notify appropriate people at USN that the terminated employee's files (including e-mail files) would be deleted, and that if anyone believed that something should be saved, then Mr. Urban was to be informed so that it would not be deleted (*Id.,* at 43-46). This process had been ongoing for several months prior to the filing of this litigation in November 1998 (*Id.,* at 43-46).

### F. The Initiation of Litigation.

On November 12, 1998, the *Glotzer* case was filed in the Southern District of New York. In rapid succession, 13 other lawsuits were filed against USN in the Southern District of New York, the Northern District of Illinois and elsewhere.

The *Glotzer* case did not contain many of the detailed allegations that are presently found in the Consolidated Complaint. However, in *Glotzer,* the plaintiff alleged, among other things, that USN falsely and misleadingly stated that the money collected in the initial public offering was sufficient to meet both capital expenditures and "anticipated negative operating cash flow for the foreseeable future" (¶¶ 66, 71(c)); that USN falsely and misleadingly stated that it attracted and retained customers well, due to its billing capabilities (¶¶ 67, 71(e)); and that USN in these and other ways materially misrepresented its financial condition (¶ 71).

Immediately upon the filing of the *Glotzer* lawsuit, USN was required to preserve for possible production in the lawsuit documents (whether in hard copy or electronic form) that might be discoverable. That duty flowed both from the Private Securities Litigation Reform Act of 1995 ("PSLRA") 15 U.S.C. § 78u-4(b)(3)(c)(i), and from a common law duty not to spoil documents that might be discoverable in the litigation. *See, e.g., Barnhill v. United States,* 11 F.3d 1360, 1368 (7 th Cir.1993).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### G. The November 12, 1998 Board Meeting.

The need to preserve documents in light of the *Glotzer* lawsuit, was discussed at a USN board meeting held on the evening of November 12, 1998, the day that the *Glotzer* case was filed. In attendance at that meeting were the defendants on this motion (Messrs. Elliott, Brekka, Greenwood, Hynes, Johnston, Mitchell, and Sekulow); USN's Chief Operating Officer, Dennis Dundon; USN's Vice-President/Secretary/General Counsel, Thomas Monson; USN's Executive Vice President (and formerly its general counsel), Ron Gavillet; and outside attorneys from the law firm of Skadden, Arps, Slate, Meagher & Flom ("Skadden"). The affidavits and in court testimony establishes that the participants at the meeting are unanimous on one point: one of the Skadden attorneys, Mr. Kraus, made it clear, in vivid terms, that with filing of the lawsuit document preservation must be a top priority at USN. The witnesses testified that Mr. Kraus warned that he "could deal with bad documents," but "there was nothing worse than destroying documents," thus, he emphasized the "importance of maintaining the documents" (Hrg. Tr. 210, 215 (Monson)); *see also* Defs.' Mem., App. 5 (Monson Supp. Decl. ¶ 3)).

**\*13** The testimony also has been unanimous that at the meeting, USN's directors took heed of this admonition and directed that USN management-headed by Mr. Elliott, the CEO-promptly take steps to preserve documents. The witnesses differ, slightly, on how they recall the direction being phrased. Several witnesses indicate that the advice by Mr. Kraus and the direction by the board was that "all *relevant* documents be preserved and not destroyed" (*See, e.g.,* Hrg. Tr. 247 (Elliott); Outside Dirs.' Mem., Apps. 4 (Aff. of D. Mitchell, ¶ 5) and 2 (Aff. of J. Hynes, ¶ 3)) (emphasis added). Other witnesses described the directive as requiring that USN preserve documents that "could be" or "may be" relevant to the litigation (*See* Defs.' Mem.' Apps. 22 (Supp. Dec. of T. Elliott, ¶ 3); and 19 (Dec. of R. Gavillet, ¶ 2)). One witness stated that both the advice and the direction were broader: that "the Board and management needed to preserve and not destroy *any* corporate files" (Outside Dirs.' Mem., App.5 (Aff. of E. Sekulow, ¶ 3)) (emphasis added).

### H. The Steps Taken to Implement the Board's Directive.

Shortly after the November 12, 1998 Board meeting, the need to preserve documents was discussed at a USN staff meeting attended by USN officers and high level managers representing every business group within USN: operations, sales, marketing, information technology, revenue assurance, and customer service. The attendees included, among others Messrs. Elliott, Gavillet, Monson, and Dundon, all of whom had been at the Board meeting; Messrs. Jeavons and Patrick, from sales; Mr. Pellino; Messrs. Struble and Bethke, from Information Systems; Ellen Craig (another in-house lawyer); and Steve Parrish (Executive Vice-President of Operations) (*see,* Defs.' Mem., App. 18, (Dundon Dep. 252)). Mr. Dundon testified that this meeting had several purposes: to inform the managers of the lawsuit, and to assure them that the company would respond to it appropriately; and for Mr. Monson to relate to managers the need to preserve documents (Hrg. Tr. 408). At the meeting, Mr. Monson relayed Mr. Kraus' admonition concerning the dangers of document destruction, and directed that all documents be preserved (Hrg. Tr. 226-27) (Monson). Mr. Monson further instructed that his direction be communicated by the managers "within their respective departments" ((Defs.' Mem., App. 5, Monson Supp. Dec., ¶ 4); *see also* Hrg. Tr. 358 (Struble)).

Several witnesses who attended the meeting have testified that Mr. Monson indeed communicated a broad directive that all documents were to be preserved. Mr. Jeavons testified that a "substantial warning was given" (Defs.' Mem., App. 4 (Jeavons Dep. 94)), and while no direction was given as to what specific types of documents to retain, *"my interpretation was don't throw out anything"* (*Id.* at 95) (emphasis added). Similarly, Mr. Dundon testified that, while he could not recall any specific instructions being given at the staff meeting, "I think it was just a caution that *most everything that the company had would need to be looked at by the lawyers"* (Defs.' Mem., App. 18 (Dundon Dep. 255)) (emphasis added).

**\*14** However, the Court finds that after this staff

Not Reported in F.Supp.2d                                                                                                                        Page 12
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

meeting, Mr. Elliott personally took no affirmative steps to ensure that the directive was followed. Mr. Elliott did not direct that USN implement a written, comprehensive document preservation policy, either in general or with specific reference to the lawsuit; he did not instruct that any e-mail or other written communication be sent to staff to ensure that they were aware of the lawsuit and the need to preserve documents; and he did not meet with the department heads after this staff meeting to follow up to see what they had done to implement the document preservation directive (Hrg. Tr. 247-48 (Elliott)). Mr. Elliott had a day-to-day presence at USN, and readily could have inquired into what was being done to preserve documents. He did not do so.

Rather, it appears that Mr. Elliott attempted to delegate that responsibility completely to Mr. Monson. In so doing, Mr. Elliott exhibited extraordinarily poor judgment. He had at his disposal the Skadden law firm, with scores of experienced attorneys capable of developing and implementing a suitable document preservation program in a major securities lawsuit. Instead, Mr. Elliott entrusted that task to Mr. Monson, an in-house attorney with no litigation experience whatsoever, and with no experience in putting together a document preservation program (Hrg. Tr. 208 (Monson)). Nor is there any evidence that Mr. Elliott (or Mr. Monson, for that matter) consulted with Skadden about how to implement such a program.

Mr. Monson's approach to the document preservation task reflected his inexperience. Mr. Monson did nothing to ensure that all USN employees who handled documents that might be discoverable were aware of the lawsuit and the need to preserve documents: he held no meetings with employees below the managerial level, and he did not issue any written communications to *anyone* on the subject (Hrg. Tr. 216-17 (Monson); 247-48 (Elliott)). Mr. Monson did nothing to determine whether the managers who attended the staff meeting followed his direction of communicating to their respective departments the need to preserve documents, or if they did so, in a way that sufficiently impressed upon USN's employees the urgency of the task. This resulted in potential inconsistencies in whether or how USN's managers communicated with staff on this important matter. And, indeed, the evidence is that employees responsible for discarding documents from the closed offices were unaware of any document preservation directive (*e.g.,* Hrg. Tr. 17, 19, 20 (Coleman); 103-04 (Van Dinther)).

Moreover, Mr. Monson did not review the pre-existing practices at USN relating to document preservation for terminated employees and closed offices, to determine whether these practices were still suitable in light of the need to preserve documents as a result of litigation. Had Mr. Monson conducted such a review, it would have been evident that they were not.

**\*15** The criteria for preserving documents from closed offices created in July 1998 (which called for saving documents necessary to service customers, and those requested by individual sales people) were far less inclusive than the broad directive Mr. Monson gave for documents to be preserved in light of the litigation. There were no specific criteria regarding what should be saved and what should not be saved related to the lawsuit (Hrg. Tr. 247-48 (Elliott)). Moreover, the plan implemented by Mr. Foster did not require attorneys to review documents before discarding them, whereas the message Mr. Monson delivered was that in light of the lawsuit, attorneys would need to review "most everything that the company had" (Defs.' Mem., App. 18 (Dundon Dep. 255)). Similarly, the procedure for purging e-mails from terminated employees was not reviewed in light of this lawsuit. While it may have been Mr. Monson's "expectation" that people who were intending to discard potentially relevant documents "against the backdrop of this litigation" would contact him for "further clarification" (Hrg. Tr. 245 (Monson)), he failed to take steps to determine if that expectation was being met.

The Court finds nothing in the record to suggest that, in the face of Mr. Kraus' warning and the Board's directive, Mr. Elliott (either directly or through Mr. Monson) embarked on a scheme to willfully destroy documents, or to knowingly turn a blind eye to destruction of documents relevant to this litigation.[FN6] Nonetheless, it was Mr. Elliott's responsibility, as the head of day-to-day management, to take steps to ensure that a suitable document presentation program was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 13
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
(Cite as: Not Reported in F.Supp.2d)

implemented. Through a failure to take action himself or to entrust that responsibility to someone with the experience to carry it out, Mr. Elliott failed to discharge that responsibility. The fact that this failure was the result of poor judgment (perhaps clouded by the chain of events that had sent USN reeling at the time) rather than malicious intent provides an explanation for Mr. Elliott's conduct that helps show it was not willful-but it does not entirely excuse his failing.

> FN6. Prior to the evidentiary hearing, Ms. Van Dinther had stated that Virginia Alpers, Mr. Elliott's secretary, had told Ms. Van Dinther that Mr. Elliot had instructed Ms. Alpers to throw away files. Ms. Alpers flatly denied that she had made such a statement to Ms. Van Dinther, or that Mr. Elliott had given her such an instruction (Hrg. Tr. 314 (Alpers)). At the hearing, Ms. Van Dinther clarified that Ms. Alpers had said that Mr. Elliott had told Ms. Alpers to "clean out" his old office after a move; Ms. Van Dinther admitted that she did not know if certain documents already had been set aside to retain (Hrg. Tr. 121-22). Based on the Court's assessment of these witnesses and Mr. Elliott (all of whom testified in person), the Court finds that Mr. Elliott did not direct that relevant documents be discarded.

As for the outside directors, the Court notes that the evidence is undisputed that they preserved and produced their documents, and certainly gave no direction to destroy documents. But, these defendants also did not play any active role in implementing a broader preservation policy at USN, and there is no credible evidence that they followed up with Mr. Elliott or others to determine if their directive had been implemented. None of the affidavits or declarations submitted by the directors detail any such follow-up efforts. The only director to testify at the hearing, Mr. Hynes, suggested that he sought at least one assurance that the directive was being followed. However, Mr. Hynes' affidavit contained no such assertion; and in his in-court testimony, Mr. Hynes could provide no details as to when, where or by whom the assurance was asked

for or given (Hrg. Tr. 205-06). We give Mr. Hynes in-court testimony on this point no weight.

**\*16** For this lack of follow up, the outside directors may fairly be criticized. This lack of follow up reflects the view, as expressed by Mr. Hynes in his testimony, that the outside directors believed that taking an active role in ensuring preservation of documents was not part of their "responsibility as director[s]," but that "[t]he people down in the trenches who gathered the data" would perform that task (Hrg. Tr. 202, 204 (Hynes)). This myopic view begs the question of who was supposed to see to it that the "people down in the trenches" actually carried out the task. The Court suspects that if the outside directors had instructed Mr. Elliott to pursue an advantageous corporate opportunity, they would have taken an "active" role to follow up to see what had been done. They should have done the same thing with respect to the less pleasant task of document preservation.

Nonetheless, the Court is mindful that these outside directors were just that: outside the company, without a day-to-day presence at USN. And, this is not a case where they learned of the duty to preserve and did nothing (or, even worse, directed document destruction). To the contrary, they gave an explicit direction to Mr. Elliott to see to it that documents were preserved. The Court finds that in the circumstances, the outside directors could reasonably rely on Mr. Elliott following a Board level directive to implement a preservation program, and thus they are not at fault for Mr. Elliott's failure to do so.

### I. The Gaps In USN's Document Preservation.

It is plain that USN made efforts to preserve documents-and, as will be discussed later, has produced a massive volume of hard copy and electronically stored information. However, the inadequacies in the document preservation program at USN created several potential gaps, which resulted in documents being discarded without having been reviewed to determine whether they should have been preserved. Each of these gaps will be discussed below.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 14
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

1. The Closing of Sales Offices.

As a result of financial distress, USN closed a number of sales offices in November 1998, including a substantial sales office located on the fourth floor of the USN offices at 10 South Riverside in Chicago. By November 1998, only the sales function remained on the fourth floor office; other administrative and executive functions had been moved elsewhere earlier in 1998 (Hrg. Tr. 261 (Elliott); 228-29 (Monson)).

Pursuant to the procedures implemented by Mr. Foster in July 1998, the documents in the closed offices were to be reviewed for the purposes of separating out and preserving those which were needed to support the customer base. The sales department was required to review the documents to determine what was to be preserved; once that process was completed, the rest would be discarded by persons under the direction of Mary Coleman, USN's Facilities Manager, who reported to Mr. Foster. The person from the sales department involved in that screening process was Christine Van Dinther, an Administrative Assistant to Messrs. Jeavons and Patrick.

**\*17** Ms. Van Dinther and Ms. Coleman both testified at the evidentiary hearing. Ms. Van Dinther stated that, despite the program implemented by Mr. Foster, she was never told what needed to be saved from the fourth floor; however, she "had an idea in [her] mind" that sales literature and customer files should be saved (Hrg. Tr. 104-05 (Van Dinther)). Ms. Van Dinther indicated that she identified and placed in the boxes those materials to be saved, as well as files from Ryan Mullaney, the former Vice-president of Sales and Marketing who had left USN in July 1998, and Lori Kloonan, his Administrative Assistant (Hrg. Tr. 104 (Van Dinther); *see also* Hrg. Tr. 266 (Elliott)). Ms. Van Dinther testified that when she performed this function of identifying which documents were to be preserved, she was unaware of the lawsuit and of the directive that documents needed to be preserved for litigation (*id.,* at 103-04). The individual defendants did not offer any testimony or other evidence at the hearing to contradict Ms. Van Dinther on this point. In light of USN's failure to implement a program to ensure employees knew of and followed the document preservation requirement,

the Court credits this testimony.

Ms. Coleman testified that her staff began discarding documents from the fourth floor office in November 1998, and that this process continued for several months through April 1999. It is undisputed that numerous dumpsters full of documents were discarded from that office during that time period (Hrg. Tr. 104, 107 (Van Dinther)). When Ms. Coleman discarded the documents, she believed that Ms. Van Dinther and the people working with her in the sales group already had gone through the documents and identified what needed to be retained. Ms. Coleman indicated that she, too, performed this function without having been informed of the lawsuit, or any special preservation requirements imposed by it (Hrg. Tr. 17 (Coleman)). In light of the absence of contrary testimony, the absence of Ms. Coleman or anyone from Human Resources at the staff meeting at which Mr. Monson gave the directive to preserve documents, and the absence of any systematic follow up after that meeting, the Court finds this testimony credible.

Through this process, numerous documents were discarded without ever having been reviewed by lawyers to determine their potential discoverability in this lawsuit (Hrg. Tr. 218 (Monson); 248 (Elliott)). That was a substantial flaw in USN's efforts to preserve documents. Nonetheless, the Court finds that, while it is impossible to say that *no* discoverable documents were discarded, it is unlikely that the sole sources of certain discoverable information were located in the closed sales offices.

By November 1998, the executive and financial branches of USN had already been relocated to different floors at the Riverside location. Thus, it is not likely that hard copy financial reports and other related documents had been moved to offices on other floors of the building. By all accounts, the documents in the sales offices largely consisted of sales and marketing forms, which were not likely to possess information relevant to the claims in this case. The sales offices also housed customer files, but under Mr. Foster's pre-suit preservation policy, those were preserved. Indeed, hundreds of customer files were produced; plaintiffs inspected a sample of 41 of those files, but elected not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 15
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

to copy any of them (Defs.' Mem., App. 1 (Walton Dec. ¶¶ 10-13)).

**\*18** The only clearly discoverable category of sales related documents identified by plaintiffs as having been discarded on the fourth floor are the Monthly Sales Roll Up reports. However, the testimony is seriously contested as to whether any such reports were destroyed. The principal evidence of destruction of Monthly Sales Roll Up Reports comes from Ms. Van Dinther. At the evidentiary hearing, Ms. Van Dinther stated that she had boxed up for preservation documents from the fourth floor, including customer files, sales literature, Monthly Sales Roll Up Reports, and certain other files, but subsequently was told by Ms. Coleman that those boxes had been destroyed (Hrg. Tr. 108 (Van Dinther)). The Court does not credit this testimony for two reasons.

*First,* Ms. Van Dinther's testimony concerning Ms. Coleman's purported statement is hearsay. The Court finds it curious that plaintiffs elicited this testimony from Ms. Van Dinther, whom they called to testify *after* Ms. Coleman had completed her testimony, without first asking Ms. Coleman if she had made such a statement to Ms. Van Dinther-even though plaintiffs also had called Ms. Coleman as a witness.

*Second,* plaintiffs elicited from Ms. Coleman the testimony that the only documents that Ms. Van Dinther had identified for preservation that had been lost were some preprinted sales forms, which had been discarded accidentally (Hrg. Tr. 28, 29 (Coleman)). Ms. Coleman was never confronted with the accusation that she had discarded boxes containing Monthly Sales Roll Up Reports. In these circumstances, the Court finds credible Ms. Coleman's testimony that the only box earmarked for preservation that was destroyed was the box of preprinted sales forms. [FN7]

> [FN7.] Ms. Van Dinther also testified that she had copies of Monthly Sales Roll Up Reports on her computer hard drive, but that these were lost in early 1999. Ms. Van Dinther stated that this occurred not in connection with an office closing, but occurred later when she

was changing job positions: she testified that in connection with that change, Mr. Patrick directed her to delete everything on her hard drive (Hrg. Tr. 102-04 (Van Dinther)). The defendants had designated Mr. Patrick as a witness at the evidentiary hearing, but then elected not to call him to testify. We credit Ms. Van Dinther's testimony on this point-but do not conclude that Mr. Elliott bears responsibility for the actions of Mr. Patrick, who was at the staff meeting and plainly was told not to discard documents.

2. The Purging of Terminated Employees' Computers.

There is a dispute in the testimony concerning whether Mr. Urban, who was in charge of purging e-mails of terminated employees, was told of the need to preserve documents for the litigation. Mr. Urban testified that the only knowledge he had of the pending litigation was through "hearsay," and that he was not instructed that e-mail files or other electronically stored documents had to be preserved as a result of pending litigation (Hrg. Tr. 53 (Urban)). Mr. Urban's supervisor, Charles Struble, was at the staff meeting where Mr. Monson gave the direction that documents had to be preserved. However, while Mr. Struble said that he informed his staff of this requirement, and that this would have included Mr. Urban, he did not specifically testify that he discussed with Mr. Urban the need to preserve documents as a result of the litigation (Hrg. Tr. 358 (Struble)).

In any event, there is no evidence that Mr. Urban was instructed to take special steps to modify the system of purging the e-mail files of terminated employees to make sure that potentially discoverable documents were preserved. Nor were there systematic efforts made to archive e-mails as of the commencement of this litigation until shortly before the sale of USN assets to CoreComm in May 1999. The Court nonetheless finds it unlikely that as a result of this omission, discoverable computer information was lost.

**\*19** *First,* Plaintiffs' suggestion that this program constituted a "systematic purging" of USN's LAN server drives (Pls.' 7/25/00 Mem. at 9) is a misleading

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 16
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

characterization of the evidence. The program of purging e-mail files applied not to all employees, but only to *terminated* employees (Hrg. Tr. 43-44, 46, 90-91 (Urban)). [FN8] And the people who were being terminated after the lawsuit were sales employees; no evidence has been offered that their e-mail files were likely to contain discoverable information that was not available elsewhere.

> FN8. The Court notes that in making this argument, plaintiffs selectively quote from a November 10, 1998 e-mail from Mr. Urban indicating that shortly he would be deleting data from network servers and workstations unless there was a request to maintain it (Pls.' 7/25/00 Mem. at 9 n. 7 and Pls.' App. 18). The portion of the e-mail that plaintiffs neglect to quote plainly states that this program would apply only to former employees, not current ones.

*Second,* USN's senior executives plainly were aware of the need to preserve documents, and the uncontradicted testimony is that with respect to their personal files (including e-mail files), they took that responsibility seriously and in fact preserved documents. It is undisputed that the outside directors preserved and produced their personal files (Outside Dirs.' Mem., Exs. 1-5), and that hard copy and computer files of senior executives were preserved and produced (*see* Defs.' Mem., App. 1 (Walton Dec., ¶ 7)). Plaintiffs do not assert that information from these files is missing. [FN9]

> FN9. Indeed, the undisputed evidence is that in May 1999, when a change in computer systems led Mr. Gavillet to be concerned that certain of his e-mails had been lost, efforts were undertaken-successfully-to restore them (Hrg. Tr. 84 (Urban); 316-18 (Alpers); 467-68 (Gavillet)).

*Third,* while a few important senior executives left the company in the summer of 1998 (specifically, Mr. Sweas and Mr. Mullaney), there is no evidence that their e-mail files still existed as of the time this litigation commenced in November 1998. To the contrary, Mr. Urban's testimony establishes that pursuant to the program of purging e-mail files that he put into place, the e-mail files of executives who left USN in the summer of 1998 would likely have been purged before November 1998 (Hrg. Tr. 90-91 (Urban)).

*Fourth,* the undisputed testimony established that Mr. Urban had responsibility only for the NT server side of USN's electronic data system. Mr. Urban had no responsibility whatsoever for USN's UNIX databases, which came under the responsibility of another employee, Mr. Rohrman. There is no evidence that the electronically stored billing and financial data on the UNIX system-which would include information on revenues and costs-was destroyed afer the lawsuit commenced.

To the contrary, the evidence establishes that USN in fact did take measures to preserve that data. In January 1999, backup tapes were made of the REPGEN files then existing in the UNIX system, in connection with the implementation of a new software application; "Quick Reports" (Hrg. Tr. 380 (Struble)). And in May 1999, after USN filed bankruptcy and its assets (including the computers) were about to be sold to CoreComm, USN made backup tapes of all of the data on the UNIX servers, so that information would be preserved after the sale of assets (*Id.,* at 374).

### J. The Discovery in This Case.

The documentary discovery in this case got off to a late start, as the result of a number of factors-not the least of which was the fact that USN was in bankruptcy, and a dispute arose as to the ability to obtain documents from USN in light of the pending bankruptcy proceeding. The Court resolved that dispute on January 27, 2000 (doc. # 135), and shortly thereafter, documents from USN were made available-in a volume that apparently no one expected. While counsel for the individual defendants originally indicated that USN had thirty-five boxes of documents to produce, some 587 boxes ultimately were produced, comprising more than one million pages of documents and various computer tapes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

containing countless additional (or duplicative) documents (Defs.' Mem., App. 1 (Walton Dec., ¶ 5)). The computer tapes produced included the backup tapes made of the UNIX computer system shortly before the sale to CoreComm in May 1999; however, it does not appear that the January 1999 backup tape was produced. Plaintiffs selected more than 500,000 pages of those documents for copying (Defs.' Mem., App. 1 (Walton Dec. ¶ 6)), and created a computer database for storing the documents electronically. According to plaintiffs' counsel, the database has word search capability to facilitate location and retrieval of documents (7/25/00 Tr. at 42).

**\*20** Despite this sophisticated system, it is clear that even as of the time that the amended motion for sanctions was refiled on July 25, 2000, plaintiffs did not have a firm grasp of what documents they possessed-and the individual defendants did do much to help plaintiffs figure it out. We focus the following discussion on the particular categories of information the plaintiffs claim are missing.

1. Sales Information.

In their amended motion, plaintiffs assert that no Monthly Sales Roll Up Reports had been produced, and that this information is critical to their case (Pls.' 7/25/00 Am. Mem. at 7). Plaintiffs' evidence fails to establish either point.

As discussed above, while it appears to be the case that no documents entitled "Monthly Sales Roll Up Report" have been produced, the individual defendants have produced reports that contain the same information as plaintiffs assert was contained in the Sales Roll Up Reports. It is clear that the defendants have produced raw sales data, as reported by the field, in "roll-up" form for every month since January 1997, in the form either of the State Directors Reports or the Summary Sales Reports generated from the Vantive database.

The testimony establishes that the State Directors Reports contain the same information as the Monthly Sales Roll Up reports. Ms. Reynolds testified that the State Directors Reports were the same as the Monthly

Sales Roll Up Reports (Defs.' Mem., App. 6 (Reynolds Dep. 82-84)). And, while Ms. Van Dinther said that the Roll Up Reports differed somewhat from the State Directors Reports, she also testified that they were based on the same source of information (Hrg. Tr. 124-25), and that any differences between them were not major (*Id.,* at 113-14). USN has produced State Directors Reports for each month from January through November 1997.

The evidence also establishes that beginning in mid-December 1997, USN began generating a Sales Summary Report from the Vantive system. The individual defendants produced to plaintiffs those reports covering the entire time period from December 15, 1997 through September 18, 1998 (Defs.' 09/05/00 Submission, Ex. A). The Sales Summary Reports generated from the Vantive system set forth the same information as the State Directors Reports (*compare* Defs.' Exhibit 2 (State Directors Report) *and* Defs.' Exhibit 3 (Sales Summary Report)). Both are based on information reported from the sales department, and both contain the same categories of information (*Id.; see also* Hrg. Tr. 425 (Dundon)). [FN10]

FN10. There is a dispute as to whether USN continued to generate hard copy Monthly Sales Roll Up Reports or State Directors Reports after November 1997. Ms. Van Dinther says that she continued to prepare Monthly Sales Roll Up Reports in 1998 (Hrg. Tr. 100 (Van Dinther)). By contrast, Mr. Dundon testified that the Monthly Sales Roll Up Reports and/or the State Directors Reports were not used after the implementation of Vantive in late 1997 (*i.e.,* late November or December 1997) (Hrg. Tr. 422, 426, 435-36 (Dundon)), and that the Vantive reports were "meant to be replacement for [the] sales roll-up reports" as "the place that the company was capturing its sales data for reporting" (*Id.,* at 425). We credit Mr. Dundon's testimony, which also is consistent with the fact that, while defendants produced State Directors Reports for each month through November 1997, no such reports were produced after that

Not Reported in F.Supp.2d                                                                 Page 18
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

time. In any event, since the Vantive Sales Summary Reports contain the same sales data as the Monthly Sales Roll Up Reports or State Directors Reports, this dispute is immaterial to the outcome of the motion.

Based on the foregoing, the Court finds that the State Directors Reports and the Sales Summary Reports produced by defendants contain essentially the same information the plaintiffs sought in the Monthly Sales Roll Up Reports. The Court therefore concludes that the plaintiffs have received the information they have sought regarding the raw, unprovisioned, sales data necessary to test their theory that the publicly-reported revenue numbers were based on inflated and untested sales data. Moreover, the Court finds plaintiffs' assertions to the contrary troubling in two regards.

**\*21** *First,* in a response to a request to admit served on July 18, 2000 (on the eve of the amended sanctions motion), plaintiffs asserted that they had received only "a very limited number" of State Directors Reports and the Sales Summary Reports generated by the Vantive system (Defs.' Mem., Ex. 25 (Request No. 11)). That grudging admission is belied by the evidence: the individual defendants have produced State Directors reports for each month from January through November 1997, and have submitted Sales Summary Reports generated by the Vantive system for the entire period from December 15, 1997 through September 18, 1998 (*see* Defs.' 09/05/00 Submission, App. A; Defs.' 09/07/00 Submission, App. A-1).

*Second,* the Court finds that plaintiffs plainly would have known-had they examined their computerized document data base-that they had received State Directors Reports for each month from January through November 1997. Plaintiffs also should have known that the Sales Summary Reports from the Vantive provided the same information. The documents generated from the Vantive database were voluminous, consisting of some 124 boxes which were produced for plaintiffs' review during the week of May 29, 2000. But, despite the volume of the documents, plaintiffs clearly were able to identify the Sales Summary Reports that contained the same categories of information as roll up reports: we know that because plaintiffs requested

copies of three months worth of those reports (April 15 through July 15, 1998). However, plaintiffs inexplicably failed to copy the Sales Summary Reports from the Vantive system covering the period December 16, 1997 through April 15, 1998, and the period July 16 through September 18, 1998 (Defs.' 09/05/00 Submission, App. A). Thus, to the extent that plaintiffs do not have the sales information they seek, it is not as a result of the defendants destroying it or failing to produce it-it is a result of plaintiffs failing to copy it.

The failure of plaintiffs to copy all of the Sales Summary Reports is particularly puzzling, since plaintiffs had expressed to the Court an urgent need to obtain them. During a hearing on April 11, 2000, plaintiffs stated that they had received only one Monthly Sales Roll Up Report, and while defendants disagreed, they were unable to specify how many of them (or how many State Directors Reports) had been produced and for what periods of time (4/11/00 Tr. at 24). Plaintiffs argued that they needed this sales information to show that the publicly reported revenue was based on information concerning sales that never actually matured into real billings, with the result being that the publicly reported revenue was overstated (*Id.,* at 22-23). The Court accepted plaintiffs' argument, and ordered the individual defendants to rebuild a computer system and application program that could access the Vantive sales data from the backup tapes of the UNIX databases made before the sale to CoreComm in May 1999. The Court ruled that while the backup tapes meant that the sales information on the Vantive system was not destroyed, the absence of a computer system capable of running the tapes to extract the information rendered that information unavailable, and that in those circumstances, it was fair to require the individual defendants to shoulder the cost of extracting that information (*Id.,* at 36-38).

**\*22** The individual defendants did so, and the cost was substantial: they place it at $159,632.63 (Elliott's 09/29/00 Submission, at Ex. G). Subsequent events have persuaded the Court that this was a cost that plaintiffs needlessly inflicted on defendants.

The failure to copy that information suggests what the Court finds the evidence shows: that the sales

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information does not command the central importance of this case that plaintiffs originally alleged. In the initial motion and in numerous statements to the Court thereafter, plaintiffs took the position that USN used inflated sales projection numbers set forth in the Monthly Sales Roll Up Reports as the basis for the publicly reported revenue figures. However, after extensive briefing and in court testimony, plaintiffs have offered no credible evidence that this was the case. The principal source of this allegation was Ms. Van Dinther, who has no financial background, who had no role in preparing the publicly reported financial statements, and who admitted that the sole source for her belief was overhearing a conference call that she had set up where those involved stated that the sales numbers were going to be "reported." Ms. Van Dinther admitted that she did not know to whom the sales numbers were being "reported," that she had no actual knowledge that rollups were used to report revenue publicly, and that her initial allegation that roll up reports were the basis for reported revenue could be mistaken (Defs.' Mem.App. 7 (Van Dinther Dep. 108-09, 115, 123)). The other source for this allegation, Ms. Reynolds, likewise offered no factual basis for her assertion that roll up reports were the basis for reported revenue, and admitted that she did not know how the company tracked revenue (*Id.,* App. 6 (Reynolds Dep. 85, 103-104, 123)). [FN11]

> [FN11.] Plaintiffs also have asserted that testimony by Mr. Parrish, USN's former executive vice president of operations, "confirmed" that the Monthly Sales Roll Up Reports were the "sole source" of USN's information on lines sold (Pls.' 07/25/00 Am.. Mem., at 7 and App. 9, at 97-101). However, Mr. Parrish's testimony refutes that assertion: he made it clear that the rollups were *not* the foundation of the lines sold information (*Id.,* at 98), and that lines sold statistics were based on what was provisioned after the "scrubbing" process described above at pp. 13-15 (*id.,* at 99-101).

Indeed, in the amended motion, plaintiffs now urge that publicly reported revenue was derived not from

internally reported sales information, but rather from what was actually billed to customers (Pls.' 7/25/00 Am. Mem. at 13). Plaintiffs should have known, long before filing the amended sanctions motion filed on July 25, 2000, that they suffered no prejudice from any loss of any Monthly Sales Roll Up Reports. [FN12]

> [FN12.] Plaintiffs nonetheless continue to assert that those reports would show that the revenues that were publicly reported were fictitious, and they assert that no such reports were produced for the period August 1997 through February 1998 (Pls.' Reply Mem. at 10-11). However, the evidence contradicts that assertion: the State Directors Reports and Vantive Sales Summary Reports-which, if they are not the same as roll up reports, contain the same information-were produced for that entire period (with the exception of a two-week gap December 1 through December 15, 1997).

2. Final Sums/Final Sum Summary Reports.

In the amended motion for sanctions, plaintiffs asserted that "not a single Final Sum or Final Sum Summary Report (in either hard copy or in Excel spread sheet format) was ever produced to plaintiffs by USN or any other defendant" (Pls.' 7/25/00 Am. Mem. at 13). However, plaintiffs' counsel conceded at the close of the evidentiary hearing what the evidence has clearly established: "[t]hat was an incorrect statement" (Hrg. Tr. at 486).

The individual defendants have produced Final Sum Summaries in hard copy form for each month during the period August 1996 through January 1999 (Defs.' 09/05/00 Submission, App. B). These reports are titled "Final Sum Summary," and thus plaintiffs would have known they had these documents had they looked for them on their computerized database. [FN13] This makes all the more disappointing plaintiffs' assurance in open court on July 25, 2000-the date the amended motion was filed-that plaintiffs' counsel had searched their litigation database and could verify that no Final Sum Summaries had been produced (07/25/00 Tr. at 42,

Not Reported in F.Supp.2d                                                                                    Page 20
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

57-58).

> FN13. The Court has determined this not from a computer database, but by a manual review of the documents listed by defendants as Final Sum *or* Final Sum Summaries (*see* Defs.' 09/05/00 Submission, App. B).

**\*23** The record is murkier with respect to the individual defendants' production of Final Sum Reports because even now, after the exchange of hundreds of thousands of pages of documents and the taking of scores of depositions, the parties cannot agree on precisely what a Final Sum Report is. Plaintiffs claim that the Final Sum Report is a voluminous document (one sample of which is Plaintiffs' Exhibit 2), an assertion that finds some support in the testimony of Mr. Doyle from Spectrum (Hrg. Tr. 164); but elsewhere in his testimony, Mr. Doyle referred to that document as a Final Sum "detailed file" (*Id.,* at 142, 164). On the other hand, the individual responsible at USN for dealing with such reports, Mr. Pellino, has testified that Plaintiffs' Exhibit 2 is not a Final Sum Report, but rather is a report generated from the REPGEN database file, which provides backup information for the much thinner Final Sum Report (Hrg. Tr. 294). Mr. Pellino identified Defendants' Exhibit 5 as an example of a Final Sum Report (*Id.* at 295). But, Mr. Pellino also described Defendants' Exhibit 7 as a Final Sum Report (*Id.* at 294-95)-even though it bears the title "Final Sum Summary." Mr. Struble tended to support Mr. Pellino's testimony, by identifying Plaintiff's Exhibit 2 as a Final Sum "detail report" (Hrg. Tr. 384), and his description of the information in the REPGEN database is consistent with the information contained in Plaintiffs' Exhibit 2.

The Court is inclined to credit Mr. Pellino's testimony on this score: he is the individual who was responsible at USN for dealing with these documents, and DX5 in fact bears the label "Final Sum," whereas PX2 bears no such label. However, whichever way this question is resolved provides no particular comfort to the individual defendants, because they have failed to make full production of either of these types of documents.

Even after extensive briefing and an evidentiary hearing, the individual defendants have never identified for the Court the extent of their production of Final Sum Reports. Thus, the Court has undertaken a manual review of all the documents that the defendants have identified as Final Sum or Final Sum Summaries. In so doing, the Court has found that 54 of the documents listed by the individual defendants as Final Sum or Final Sum Summary Reports (Defs.' 09/05/00 Submission, App. B) were not provided to the Court as requested. Based on the title of the documents the individual defendants have provided, or on a comparison of them to Defendants' Exhibit 5 (which the individual defendants identified as a Final Sum Report), if the Final Sum Report is the type of document described by Mr. Pellino, defendants have produced them only for a smattering on months: June 1998, August-September 1998, November 1998 and January 1999. FN14 Given that Final Sum Summaries covering the entire period for August 1996 through January 1999 were produced, these gaps are substantial. If the document that Mr. Pellino describes as being generated from the REPGEN database is instead a Final Sum Report, as Mr. Doyle suggests, the gaps in defendants' production are even more substantial: the individual defendants have not produced *any* of those reports.

> FN14. The Bates Numbers of these documents are USN3049587-96; USN12000877-79; USN1200040-41, 000892-93; USN6008101-102; and USN2-035369.

**\*24** This lack of production may stem in part from a lack of preservation of the information since, according to Mr. Doyle, prior to December 1997 some Final Sum Reports were sent by e-mail. However, the presence of so many Final Sum Summaries, and so few Final Sum Reports, leads this Court to conclude there was no intentional destruction, and that given the lack of any system of document preservation prior to this lawsuit, the missing reports may no longer have been retained by USN when this suit was filed. But the failure to implement a clear and rigorous document preservation program after this lawsuit commenced makes it difficult to determine when these hard copy Final Sums Reports were lost and why.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 21
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

Despite this absence of hard copy Final Sum Reports, the evidence suggests that copies of those documents were preserved by USN in electronic form. Thus, the failure to produce that information may reflect the failure by the individual defendants to search for and produce information available to them. We focus on three sources in particular that the individual defendants have failed to explore.

*First,* Mr. Struble testified that the volumes of data underlying the Final Sum Reports was always put onto the FTP server and downloaded to the REPGEN database on the UNIX server (Hrg. Tr. 371 (Struble)). Mr. Struble testified that in January 1999, a backup tape was made containing all information in the REPGEN database. Mr. Struble testified that this occurred because USN, for business and not litigation reasons, replaced the REPGEN system with a system called "Quick Reports," and then archived the REPGEN database on the backup tape (*Id.,* at 380-81, 384-86). Mr. Struble testified that this backup tape was conveyed to CoreComm in the sale of USN assets in May 1999, and that CoreComm still possesses that backup tape (*Id.*). Moreover, Mr. Struble testified that this January backup tape could be accessed at CoreComm, by restoring it to the UNIX servers presently at CoreComm (Hrg. Tr. 379)-a process that would take only "a few days" (*Id.* at 386).

Nonetheless, at the time of the hearing, the individual defendants had not asked CoreComm to examine that backup tape to see what REPGEN information was available on it. Mr. Struble testified that he had only been requested to look for backup tapes on September 11, 2000 (after Mr. Doyle's testimony), and had found backup tapes containing what he believed were credit files preserved from the REPGEN backup in January 1999, and which he produced for the first time when he came to court for the evidentiary hearing on September 12, 2000 (Hrg. Tr. 382-83).

*Second,* Mr. Struble testified that in May 1999, prior to the consummation of the sale to CoreComm, USN made a "snapshot" of the information on the UNIX servers, which would have "preserved all the data that existed" at the time on USN's production servers (Hrg. Tr. 360). [FN15] That information was then provided to counsel for

the individual defendants (*Id.* at 360-61). However, the individual defendants did not take steps to ensure that a computer system would be available to search for and extract the data on those tapes, as may be needed for the litigation (Hrg. Tr. 391 (Struble)). [FN16]

> [FN15.] At the hearing, Mr. Struble testified that the "snapshot" was taken of all the UNIX production servers,, as opposed to development servers, because the idea was to save the "production, operational, and financial information" not the development information (Hrg. Tr. 390). Although the Vantive database was saved to a CD Rom, Mr. Struble was not certain that Vantive was saved on the Snapshot, because he did not know if a snapshot was taken of the development servers, and he thought that Vantive was run on a development server (*Id.,* 389-90).

> [FN16.] At the April 11, 2000 hearing, during which the Court ordered the defendants to rebuild the computer system sufficiently to extract the Vantive sales information, the Court declined to order the individual defendants to recreate the system (and the software applications) to the extent that was necessary to run the financial and accounting information on that system. The Court did so based on the representation, unrebutted by the plaintiffs, that the defendants had produced in hard copy form all relevant financial records (4/11/00 Tr. 13-14, 39). Given the admitted importance of the Final Sum Reports as the starting point for USN's publicly reported revenue figures (Hrg. Tr. 296-297 (Pellino)), that representation clearly was incorrect.

**\*25** *Third,* the individual defendants did not ask CoreComm to search its active computer databases for Final Sum Reports until late August 2000-at which time the individual defendants learned that those computers have Final Sum Reports going back to August 1998 (Hrg. Tr. 362-63), which in early September they produced in disk form. In offering possible explanations for the lack of Final Sum Reports prior to August 1998,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 22
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

Mr. Struble testified CoreComm might have deleted that information for space reasons (*Id.* at 368). Mr. Struble testified that if that information was deleted for space reasons, it would be archived and preserved; but he was not asked by the defendants to look on any archived tapes for Final Sums Reports prior to August 1998 (*Id.*)

The Court finds that the individual defendants failed to conduct a sufficiently thorough search to locate Final Sum/REPGEN reports. The Court does not find convincing defendants' argument that there was no need to make such a search until they were ordered by the Court to do so on July 25, 2000 (Hrg. Tr. 372). On July 13, 1999, the District Court ordered mandatory disclosure in this case pursuant to Rule 26(a)(1) (doc. # 23); that disclosure was due by October 25, 1999 (doc. # 63). There could be no legitimate doubt about the discoverability of the Final Sum/REPGEN information, which Mr. Pellino described as the starting point for the revenue information contained in the public financial statements (Pls.' 07/25/00 Am. Mem., Ex. 19 (Pellino Dep. 51-57, 107)). Moreover, as described above, even the search for Final Sum Reports by the individual defendants after the July 25 order leaves much to be desired-they did not ask CoreComm to search for archived information, and they did not examine what might be on the January 1999 tapes. In ordering the search for Final Sum Reports (and certain other categories of documents raised in plaintiffs' motion), the Court directed that the individual defendants focus their search on the places where it is "most likely that a document will be found" (7/15/00 Tr. at 57)-which the individual defendants certainly should have known would be the tapes.

The Court is mindful of the difficulties created by the bankruptcy of USN, which deprived the individual defendants of ready access to a going-concern client which could provide thorough explanations of the documents and databases at USN (Hrg. Tr. 498-500). However, USN's bankruptcy was declared in February 1999. The sale to CoreComm did not close until May 1999; the testimony indicates that during that three-month period, outside counsel for the individual defendants spent time at USN reviewing and assembling documents. One would expect that as a part

of that process, there would be a discussion of what documents went into preparing the public financial reports-and such a discussion would have disclosed the existence and importance of the Final Sum Reports, and the REPGEN database from which it was drawn.

**\*26** Moreover, USN's sale of assets imposed on CoreComm a contractual obligation to aid the individual defendants in their search for discoverable information. The speed with which Mr. Struble was able to locate the January 1999 backup tapes and the relative ease of accessing the data on them is evidence that earlier requests by the individual defendants likely would have yielded fruitful information for both sides and for the Court and thus may have obviated-or drastically reshaped-this sanctions motion.

The failure of the individual defendants to produce the Final Sum Reports or information from the REPGEN database is mitigated only by the fact that, fortuitously for them, the plaintiffs have obtained this information from a non-party: Spectrum, the company that generated those documents. On or about July 18, 2000, plaintiffs received four CD Roms from Spectrum containing a wealth of information that passed between Spectrum and USN with respect to the billing of customers. At the evidentiary hearing, Mr. Doyle testified that the directory to the CD Roms showed that they contain what he referred to as Final Sum Reports (and what the individual defendants say is REPGEN) for the period July 1996 through September 1997, January 1998, and March 1998 through January 1999 (Hrg. Tr. 178-81). The only gaps in the Final Sum information from Spectrum may be October 1997 through December 1997 and February 1998: and we say that these "may" be gaps because further analysis of the CD Roms may yield additional information. [FN17]

> FN17. Plaintiffs may seek to assign significance to the fact that these missing months occurred shortly before the initial public offering in February 1998, to suggest that the absence implies intentional destruction. The Court finds otherwise. Given that Mr. Doyle was a "friendly" witness to the plaintiffs, who testified at their request, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 23
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

fact that he could not retrieve or find Final Sum Reports for those months from the independent records of Spectrum, which generated the reports, is consistent with those reports being absent for independent reasons. In fact, the Arthur Andersen Report indicated as early as September 25, 1998 (before the inception of the lawsuits) that certain USN's financial documents used to calculate revenues (such as the Final Sum Reports) were missing or "not as detailed" in the fourth quarter of 1997 as in the first and second quarters of 1998 (Pls. Reply Mem., App. A, at 2, 4) (billing information for the company's financial statements missing in the third and fourth quarters of 1997; and "historical financial supporting documents for Q3 and Q4 1997 is not as detailed as it is for Q1 and Q2 1998").

Thus, at the time that plaintiffs represented in their July 25, 2000 amended motion for sanctions that they had not received Final Sum Reports from USN "or any other defendant," they in fact were in possession of the CD Roms from Spectrum that contained the Final Sum information. Plaintiffs' counsel indicated that plaintiffs did not understand that this information was on the CD Roms from Spectrum until September 10, 2000, the day before the hearing (Hrg. Tr. 485-86). However, even to the uninitiated, the index to the CD Roms (Defendants' Exhibit 8) plainly shows multiple entries that should have alerted plaintiffs to the possible presence of the Final Sum Reports *See, e.g.,* Defendants' Exhibit 8 at 2 (five entries bearing the name "Final Sum"); 4 (one document entitled "Final Sum spec. doc"); 8-9 (a document referred to as Fnl _____ Sums. Zip," and entries bearing the labels "fs" for each month from July 1996 through September 1997); 16 (entries bearing the label "Final Sum. DB" for January 1998 and March 1998-January 1999). If plaintiffs did not understand what was on the CD Roms, it is because for two months they failed to make sufficient inquiry either of Spectrum or the individual defendants.

Nor have plaintiffs explained why they delayed in producing these CD Roms to defendants. Plaintiffs obtained these CDs from Spectrum on or about July 20,

2000, and the individual defendants had requested copies of any CDs received by plaintiffs. However, plaintiffs did not provide copies of those CDs until on or about September 5, 2000.

**\*27** What emerges from this thicket concerning the Final Sum/REPGEN documents is that even as of the hearing, neither the plaintiffs nor defendants have full command over what documents they possessed. Perhaps the most apt comment is the one made by plaintiffs' counsel at the close of the hearing, in which he stated that the understanding of the documents "was very much a learning process" that continued even through the time of the hearing (Hrg. Tr. 489). It appears to have been a learning process for both sides. That learning process has been protracted and rendered more difficult-and costly-by the fact that the parties have failed to use the tools available to get a handle on what documents exist. FN18

FN18. Plaintiffs have also claimed that defendants have destroyed, or improperly failed to produce, detailed statements showing what credits were applied to various accounts, and the reason for the credit (a sample of such a document is Plaintiffs' Exhibit 3). A number of those credit reports are on the tape received from Spectrum, but many others are unavailable because the information was corrupted (Hrg. Tr. 151) (Doyle). However, in an earlier ruling, the Court denied a motion to compel production of these documents, reasoning that information about what credits had been applied to which accounts would be available in the Final Sum Reports (7/25/00 Tr. at 64-65). And, in fact, the document identified by Mr. Doyle as a Final Sum Report (and by Mr. Pellino as a report from the REPGEN database) shows, for each account, what credit was applied against the customers' bill in a particular month. Having reviewed a full credit report, the Court is unpersuaded that the plaintiffs had been prejudiced by the fact that the credit report provides a description of the reason for the credit, while the Final Sum/REPGEN report does not.

Moreover, Mr. Doyle testified that even without the detailed credit reports, one could calculate the amounts that were billed and then credited back (Hrg. Tr. 167-68).

3. Aged Accounts Receivable Information.

According to plaintiffs, aged accounts receivable information is critical because it would show that many of the receivables publicly reported by USN as revenue in fact were very old, that USN did not sufficiently reserve for the collectability of these older receivables, and that the revenues were therefore inflated. On July 18, 2000, shortly before filing the amended motion, plaintiffs answered a request to admit by denying that "any aged accounts receivable reports were produced" (Defs.' Mem., App. 25 (Request to Admit No. 10)). One month later, when they filed their reply brief on the sanctions motion, plaintiffs asserted that they have received only scant production of documents showing aged accounts receivable information (Pls.' Reply Mem. 11-12), and that no such information was provided for the period prior to February 1998.

The evidence contradicts plaintiffs' assertion. The evidence shows that the individual defendants produced aged accounts receivable information in various forms for the period September 1996 through October 1997, which is virtually the entire time period before the beginning of the class period. Moreover, this time period encompasses the period relevant to the initial public offering, as that was based on financial information through October 1997 (Defs.' 09/08/00 Mem., at 9). Thereafter, there are account receivable reports for December 1997, March 1998, June 1998 through January 1999, and March through April 1999; (Defs.' 09/05/00 Submission, Exhibit C).[FN19] Moreover, while there are no reports for November 1997, January through February 1998, April through May 1998 and February 1999 aged receivable information for these months can be found in certain other documents for April and May 1998 (*see* USN 2-038332, USN 22-021567).

FN19. Subsequent to this submission, the individual defendants identified another report

setting forth aged accounts receivable information (Defendants' Exhibit 11), which covered the period of December 1997.

Plaintiffs argue that these missing months reflect an "unusual pattern of destruction," as they encompass "the critical [three-month] period" prior to the initial public offering and two months in the middle of the class period (Pls.' 09/07/00 Notice, at 10). The Court does not find that these gaps, or the time periods they cover, constitute persuasive evidence of intentional destruction. The prospectus only included information through November 1997; with the exception of November 1997, the individual defendants produced aged receivable information for each month from September 1996 through December 1997. While there are some missing months during the class period, there are far more months when the aged accounts receivable information has been produced.

*28 There is no testimony or evidence indicating that the missing aged receivable data is contained on the January 1999 back up tapes or on the snapshot taken of the UNIX production server (and thus exists in an unproduced form). While the absence of a preservation program raises questions as to whether reports for these months existed as of the initiation of this lawsuit and then were lost, the record also supports the inference that these missing documents may have been missing before the inception of this lawsuit. The Arthur Andersen Report states that with respect to "[t]he Company's accounts receivable agings (excluding wireless) as of June 30, 1998, March 31, 1998, December 31, 1997 and September 30, 1997 ... The company could only provide a detailed aging for the Midwest region as of June 30, 1998. Management stated that other detailed agings were not currently available due to system conversions, and the limited utility of the old systems" (Pls.' Reply Mem., Ex. A, at 17).

4. Monthly Close Packages/Revenue Close Packages.

Plaintiffs amended motion asserted that the individual defendants had failed to produce Monthly Close Packages or Revenue Close Packages (Pls.' 07/25/00

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 25
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

Am. Mem. at 10). On the day that the amended motion was filed, when asked in open court whether they had searched their database of documents produced by the defendants to locate any such reports, plaintiffs represented that they "absolutely" had done so and had verified that "we do not have those documents" (7/25/00 Tr. at 45). Once again, that assertion proved incorrect.

In a written submission filed on September 7, 2000-four days before the hearing-plaintiffs conceded that they had received the Monthly Close Packages, and withdrew reliance on the alleged non-production of those reports as a basis for their amended motion. When asked at the conclusion of the evidentiary hearing to explain why plaintiffs had provided the Court with incorrect information, plaintiffs' counsel indicated that the documents were not clearly labeled as Monthly Close or Revenue Close Packages, and that the plaintiffs thus were unaware that they had them (Hrg. Tr. 482-84). This explanation, however, is not satisfactory. If the database used by plaintiffs to store and retrieve documents produced in the lawsuit has word search capability, as plaintiffs have represented (7/25/00 Tr. 42), then a word search would have disclosed that many of the documents identified by the individual defendants bear the label of Revenue Close or Revenue Closing Check List.

K. Prejudice.

Plaintiffs have failed to establish substantive prejudice from the failure of USN to institute an appropriate document preservation plan in the face of the commencement of this lawsuit. Virtually all of the information that plaintiffs claim they has been deprived of has been produced to them-either by the individual defendants or non-parties.

*First,* the evidence has established that the information contained in the Monthly Sales Roll Up Reports referred to by Ms. Van Dinther is the same information that has been produced to plaintiffs in the form of the State Directors Reports and Sales Summary Reports produced from the Vantive database. Thus, the information that plaintiffs claim was destroyed was in

fact made available to them-even though, in the case of the Sales Summary Reports, plaintiffs elected not to obtain copies of most of that information. Moreover, plaintiffs' Rule 26 expert reports do not indicate that any of the sales information that plaintiffs chose to copy (such as the monthly Sales Directors Reports from January through November 1997) was given to plaintiffs' experts to use in forming their opinions. Had this information been critical to showing that the publicly reported revenue was inflated, because it was based on unreliable sales figures, one would have expected plaintiffs to provide the sales data to their experts so that they could test that hypothesis. Plaintiffs' failure to do so further undermines any claim of prejudice from the absence of what plaintiffs have labeled Monthly Sales Roll Up Reports.

**\*29** *Second,* the plaintiffs have received from the individual defendants aged accounts receivable information for all but one of the months in the period leading to the initial public offering, and for most of the period thereafter. While there are some gaps in the time period of production, they are small in relation to what has been produced. And plaintiffs have not offered any evidence as to what an analysis of the aged accounts receivable information they have received shows; indeed, the Rule 26 reports do not indicate that that information has ever been provided to their experts. The Court finds that plaintiffs cannot claim prejudice from the missing months of aged accounts receivable information, when they have not even used the information they have received with their experts.

*Third,* while plaintiffs have received from the individual defendants Final Sum Summary Reports for the entire relevant time period, the individual defendants clearly have failed to produce Final Sum Reports for every month in the class period. This failure to produce is material because the REPGEN source data and the Final Sum Reports generated by Spectrum were, by all accounts, central to USN's publically-reported revenue numbers: Mr. Dundon testified that this data was "vitally important" to the revenue process (Hrg. Tr. 444), and Mr. Pellino testified that it was the "starting point" for his revenue calculations (Hrg. Tr. 294). While it appears that the defendants preserved the electronically-stored information that would include the

Final Sum /REPGEN information, even now they have not searched the available sources (such as the backup tapes located at CoreComm) to see what information is there.

Any substantive prejudice in prosecuting the case, however, has been eliminated by the fact that plaintiffs now have received the Final Sum/REPGEN reports from Spectrum covering virtually the entire period from August 1996 through January 1999. The Court notes that plaintiffs have not made-and thus have waived-the argument that they have been prejudiced because of a delay in obtaining the Final Sums/REPGEN reports. Even if such an argument had been made, the Court would not find it persuasive. According to plaintiffs, it was the testimony of Mr. Doyle in his deposition on June 13, 2000 that highlighted the significance of the Final Sum Reports as providing "the backbone of USN's publicly reported revenues and accounts receivable" (Pls.' Reply Mem. at 10). However, after receiving the CD Roms from Mr. Doyle by about July 20, 2000, plaintiffs-even as of the time of the evidentiary hearing on September 11 and 12, 2000-had not taken the steps necessary to fully examine the information on the CDs. Once they obtained the CD Roms from Spectrum, plaintiffs did not act with the urgency one would expect in examining the information that they claimed to be so critical to the case. Moreover, the plaintiffs did not make use of the Final Sum Summaries and Final Sum Reports that they did have in their possession in the expert reports they submitted.

**\*30** The Court finds that there is one element of prejudice that plaintiffs suffered from the failure of the individual defendants to produce the Final Sum/REPGEN information: cost. The assertion by the individual defendants that it would be easier for plaintiffs to get the information from Spectrum than for the individual defendants to search for it (*see* 07/25/00 Tr. at 62-63) is belied by Mr. Struble's testimony that it would take CoreComm only a few days to restore the January 1999 backup tapes containing Final Sum/REPGEN files (Hrg. Tr. 386 (Struble)). The fact that the individual defendants had to go to Spectrum, a third-party, to obtain what the individual defendants should have produced resulted in the plaintiffs incurring costs they should not have been forced to shoulder. The

Court is skeptical about the fees and costs plaintiffs assign to getting and understanding the Spectrum data-$53,192.75 in fees and costs, and $125,583.00 in experts fees. But certainly, as plaintiffs did to defendants with the rebuilding of a computer system to run the Vantive database, defendants have saddled plaintiffs with some level of unnecessary fees and costs.

II.

As presented by plaintiffs' amended motion for sanctions, the question before the Court is the alleged destruction of documents by USN (and the responsibility of Mr. Elliott and certain outside directors for any such destruction). As the evidence has unfolded, the Court views the issue as more complex: it presents not only a destruction issue, but an issue as to how each side has conducted itself in this discovery process.

For the reasons set forth below, the Court concludes that USN failed to implement an adequate document preservation policy and that Mr. Elliott is responsible for that failure; the outside directors are not. The Court further finds that the absence of an adequate document preservation policy has not substantively prejudiced plaintiffs; however, the conduct of each side in discovery has inflicted needless cost on the other.

In Part A, we discuss the governing legal principles. In Part B, we explain the reasoning that leads us to the foregoing findings. In Part C, we set further the recommendations that flow from those findings.

A. The Applicable Legal Standards.

The Court's authority to sanction a party for the failure to preserve and/or produce documents is both inherent and statutory. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50-51, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (federal courts may sanction bad faith conduct by its inherent powers or by the Federal Rules of Civil Procedure); *Barnhill v. United States,* 11 F.3d 1360, 1368 (7th Cir.1993) (same). Whether proceeding under Rule 37 of the Federal Rules of Civil Procedure or under a

Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

court's inherent powers, the "analysis is essentially the same." *Cobell v. Babbit,* 37 F.Supp.2d 6, 18 (D.D.C.1999); *GatesRubber Co. v. Bando Chem. Indus., Ltd.,* 167 F.R.D. 90, 107 (D.Col.1996) ("any distinctions between Rule 37 and the inherent powers of the court are distinctions without differences"). However, the power to enter a default judgment or to dismiss a case for noncompliance with an order to preserve and produce documents for discovery "depends exclusively upon Rule 37, which addresses itself with particularity to the consequences of a failure to make discovery" by "any party" and authorizes "any order which is 'just.' ' *Societe Internationale Pour Participations Industrielles et Commerciales, S. v. Rogers,* 357 U.S. 197, 207, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

**\*31** In general, sanctions are intended to serve one or more of the following purposes: (1) to ameliorate the prejudice caused to an innocent party by a discovery violation; (2) to punish the party who violates his or her obligations; and/or (3) to deter others from committing like violations. *See generally National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (noting dual purpose of punishment and deterrence); *Marrocco v. General Motors Corp.,* 966 F.2d 220, 224 (7th Cir.1997) (discussing compensatory purpose of directed verdict as sanction for prejudice resulting from lost documents: "sanctions can be employed for a wide array of purposes, but they cannot replace lost evidence"); *Telectron v. Overhead Door Corp.,* 116 F.R.D. 107, 135 (S.D.Fla.1987) (discussing three purposes of sanctions: punishment, deterrence and compensation for prejudice). A district court considering the imposition of sanctions "must be guided by a certain measure of restraint[,]" *Barnhill,* 11 F.3d at 1368, and any sanction leveled must adhere to "the norm of proportionality...." *Newman v. Metropolitan Pier & Exposition Authority,* 962 F.2d 589, 591 (7th Cir.1992).

This is not to say that a court is always required "to fire a warning shot" before imposing a stiff sanction; it is not. *Hal Commodity Cycles Mgmt. Co. v. Kirsch,* 825 F.2d 1136, 1139 (7th Cir.1987). Nor must a court select the "least drastic" or "most reasonable" sanction.

*Melendez v. Illinois Bell Telephone Co.,* 79 F.3d 661, 672 (7th Cir.1996) (citing cases). Dismissal or default, although harsh, may be appropriate so long as "the sanction selected [is] one that a reasonable jurist, apprized of all the circumstances, would have chosen as proportionate to the infraction." *Long,* 213 F.3d at 986 (*quoting Salgado v. General Motors Corp.,* 150 F.3d 735, 740 (7th Cir.1998)). *See also Langley v. Union Elec. Co.,* 107 F.3d 510, 515 (7th Cir.1997) ("An award of sanctions must be proportionate to the circumstances surrounding the failure to comply with discovery"); *Melendez,* 79 F.3d at 672 (same). *See generally Anderson v. Beatrice Foods Co .,* 900 F.2d 388, 395 (1st Cir.1990) (judges must "take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms").

A court is given broad discretion to choose the appropriate sanction for a discovery violation given the unique factual circumstances of every case. *National Hockey League,* 427 U.S. at 642. The Seventh Circuit has directed that any sanctions rendered be proportionate to the offending conduct, *United States v. Golden Elevator, Inc.,* 27 F.3d 301, 303 (7th Cir.1994); *Crown Life Ins. Co. v. Craig,* 995 F.2d 1376, 1382 (7th Cir.1993), and that the harsh sanction of default be reserved for extreme circumstances. *Ellingsworth v. Chrysler,* 665 F.2d 180, 185 (7th Cir.1981). In our view, the Court's discretion in this case is informed by three principle factors: (1) a breach of the duty to preserve or produce documents; (2) the level of culpability for the breach; and (3) the prejudice that results from the breach.

1. Breach of the Duty to Preserve and/or Produce.

**\*32** The duty to preserve documents in the face of pending litigation is not a passive obligation. Rather, it must be discharged actively:

[i]t was incumbent on senior management to advise its employees of the pending litigation ..., to provide them with a copy of the Court's order, and to acquaint its employees with the potential sanctions ... that could issue for noncompliance with [the] Court's Order.

When senior management fails to establish and distribute a comprehensive document retention policy,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 28
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

it cannot shield itself from responsibility because of field office actions. The obligation to preserve documents that are potentially discoverable materials is an affirmative one that rests squarely on the shoulders of senior corporate officers.

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 169 F.R.D. 598, 615 (D.N.J.1997). *See also Nat'l Assoc. of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 557-58 (N.D.Cal.1987) ("The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials"); *Cohn v. Taco Bell Corp.,* 1995 WL 519968,[*] 9 n. 3 (N.D.Ill.1995) (court did not "countenance" a "failure to warn its employees to preserve documents known to be relevant to the issues in the instant litigation"); *see generally Marrocco,* 966 F.2d at 224-25 (court awarded sanction where defendant acted with gross negligence in flagrantly disregarding its assumed duty to preserve and monitor the condition of physical evidence critical to plaintiffs' proof); *China Ocean Shipping Group Co. v. Simone Metals Inc.,* NO. 97 C 2694, 1999 WL 966443,[*] 4 (N.D.Ill.1999) (defendant "took no specific, direct action to maintain and preserve" the evidence and "never directly contacted anyone ... to ensure" preservation).

The scope of the duty to preserve is a broad one, commensurate with the breadth of discovery permissible under Fed.R.Civ.P. 26. "The duty to preserve evidence includes any relevant evidence over which the nonpreserving entity had control and reasonably knew or could reasonably foresee was material to a potential legal action." *China Ocean,* 1999 WL 966443,[*] 3 (citing inter alia *Langley,* 107 F.3d at 514; *Melendez,* 79 F.3d at 671; and *Marrocco,* 955 F.2d at 223-225). In this case, the duty to preserve also arises from statute. The PSLRA requires that a defendant in a securities action preserve evidence.[FN20]

FN20. The PSLRA provides that sanctions may be awarded under the PSLRA "only" when a party is "aggrieved by the *willful* failure of an opposing party to comply" with

the dictates of the statute, 15 U.S.C. § 78u-4(b)(3)(C)(i) (emphasis added). The PSLRA, which was cited by the District Judge in her preservation order of February 2, 1999, imposed an obligation requiring the preservation of evidence once the federal securities claims in this case were filed. However, unlike the case with Rule 37, sanctions may be imposed under the PSLRA only for willful document destruction.

To be sure, the duty to preserve does not require a litigant to keep every scrap of paper in its file. *See* 7 JAMES WM. MOORE *et al.,* MOORE'S FEDERAL PRACTICE § 37.120 (3d ed. 1999) ("A party is not obligated to retain every document or tangible item that is in its possession, or subject to its control, after a complaint has been filed"); *see also Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 593 F.Supp. 1443, 1455 (C.D.Cal.1984) (same). But a litigant "is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." *Wm. T. Thompson, Co.,* 593 F.Supp. at 1455.

**\*33** Moreover, the case law establishes that a discovery request is not necessary to trigger this duty. "A party clearly is on notice of [t]he relevance of evidence once it receives a discovery request. However, the complaint itself may also alert a party that certain information is relevant and likely to be sought in discovery." *Cohn,* 1995 WL 519968, at [*] 5 (citing, e.g., *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991)); *see also Alliance to End Repression v. Rochford,* 75 F.R.D. 438, 440 (N.D.Ill.1976).

Preservation duties do not exist in the abstract, but to serve a purpose: that is, to ensure that discoverable documents are available to be produced. Thus, along with the duty of preservation, there exists a concomitant obligation by all parties to produce the discoverable information within their custody and control. *See* Fed.R.Civ.P. 26(a)(1) ("a party shall, without awaiting a discovery request, provide to other parties ...."); 37(b)(2) ("if a party or an officer, director, or managing

Not Reported in F.Supp.2d                                                                                      Page 29
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

agent ... fails to obey an order to provide or permit discovery ... the court ... may make such orders in regard to the failure as are just....").

Both the duty to preserve and the duty to produce are issues in this case. With respect to preservation, the question is whether individual defendants to this motion breached a duty to preserve; with respect to production, the question is whether these individual defendants breached a duty to produce discoverable information that was preserved.

### 2. Culpability.

Although Rule 37 permits a variety of sanctions to effectuate one or more of its purposes, the most severe sanction is the entry of a default judgment. The case law interpreting Rule 37 has established, however, that the sanction of default (or its equivalent, dismissal) is reserved only for the most egregious violations of the discovery process. In particular, the United States Supreme Court has cautioned that "there are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of [the] cause." *Societe Internationale*, 357 U.S. at 209. These "constitutional limitations" are derived from the Fifth Amendment's guarantee that "no person shall be deprived of property without due process of law." *Id.*

Because a default judgment deprives a party of a hearing on the merits, the harsh nature of this sanction should usually be employed only in extreme situations where there is evidence of willfulness, bad faith or fault by the noncomplying party. *Societe Internationale*, 357 U.S. at 212. *See also Marrocco,* 966 F.2d at 223 (quoting other cases); *Long v. Steepro,* 213 F.3d 983, 985 (7th Cir.2000) (citing cases):
Although wilfulness and bad faith are associated with conduct that is intentional or reckless, the same is not true for fault. Fault does not speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct-or lack thereof-which eventually culminated in the violation. Fault, however, is not a catch-all for any minor blunder that a litigant or

his counsel might make. Fault, in this context, suggests objectively unreasonable behavior; it does not include conduct that we would classify as a mere mistake or slight error in judgment.

**\*34** (internal quotations omitted). To justify a dismissal or default judgment, the level of "fault" must reflect "extraordinarily poor judgment," "gross negligence," or "a flagrant disregard" of the duty to "preserve and monitor the condition of evidence which could be pivotal in a lawsuit." *Marrocco,* 966 F.2d at 224. FN21

FN21. The Seventh Circuit has also held that dismissal may be appropriate where there is a "clear record of delay" or "contumacious conduct," or when "other less drastic sanctions have proven unavailable." *See, e.g., Marrocco,* 966 F.2d at 224. "Contumacious" conduct is defined as "stubbornly disobedient" or "rebellious." MERRIAM WEBSTER'S COLLEGIATE DICTIONARYNARY (10th Ed .). We do not read the cases as indicating-nor do we perceive-any substantive difference between a finding of contumacious conduct, and conduct that is willful or in bad faith. Conversely, the case law does not equate contumacious conduct with fault and, to that extent, there is a difference between the two standards. *See* M. Rosenberg, Sanctions To Effectuate Pretrial Discovery, 58 Col.L.Rev. 480, 491 (1958) (noting that the failure to act as well as action, may be willful, but the flavor of "willful" in the statute "seems more appropriate to the term 'refusal' (*i.e.,* "rejection") than to "fails,' which ordinarily signifies an omission by default").

The Seventh Circuit has not indicated the quantum of proof necessary for a moving party to establish such culpability under Rule 37. With respect to a court's *inherent powers,* cases outside this Circuit apply a clear and convincing evidence standard for default judgments. *Compare Shepherd v. Am. Broadcasting Companies, Inc.,* 62 F.3d 1469, 1472, 1477 (D.D.C.1995) (because sanction of dismissal serves same purpose as contempt, same standard of proof,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

clear and convincing evidence, should apply) *with Gates Rubber Co., 167 F.R.D. at 108* ("burden of proof for sanctions should be as stringent as the circumstances require" and "if a judge intends to order dismissal or default judgment ... the judge should do so only ... by evidence which is clear and convincing"). Because there is no material difference between an analysis under the Court's inherent powers and under Rule 37, we believe the rationale for applying a clear and convincing evidence standard applies with equal force to Rule 37 cases, and in the absence of any contrary authority, adopt the clear and convincing evidence standard in this case. [FN22]

FN22. Issue-related sanctions, such as adverse inferences, preclusion of evidence, and jury instructions do not require clear and convincing evidence but may be imposed by preponderance of the evidence showings "that a party's misconduct has tainted the evidentiary resolution of the issue." *Shepherd, 62 F.3d at 1478.* This is because "issue-related sanctions are fundamentally remedial rather than punitive and do not preclude a trial on the merits." *Id.* Fines, however, still require clear and convincing evidence under the *Shepherd* rationale because they are "fundamentally penal." *Id.*

3. Prejudice.

Although careful to "eschew grafting a requirement of prejudice onto a district court's ability to dismiss or enter judgment as a sanction under its inherent power[,]" the Seventh Circuit has recognized that "dismissal or judgment is such a serious sanction that it should not be invoked without first considering what effect-if any-the challenged conduct has had on the course of the litigation." *Barnhill, 11 F.3d at 1368.* Some misconduct may prove to be so "contumacious" that the entry of a default judgment is warranted to preserve the integrity of the judicial process, *Barnhill, 11 F.3d at 1368,* but in cases where the noncompliance is the result of fault rather than a more culpable mental state, courts often have used prejudice as a balancing tool or fulcrum upon which the scales may tip in favor

of default or against it. *See, e .g., Marrocco,* 966 F.2d at 224-25 (directed verdict for plaintiffs affirmed where court found defendant at fault for failing to preserve unique physical evidence essential to plaintiffs' proof because plaintiffs were irreparably prejudiced by destruction of this evidence); *Langley v. Union Elec. Co., 107 F.3d 510, 515 (7th Cir.1997)* (court affirmed district court's decision to exclude plaintiff's use of physical evidence claimed to be "crucial" to case as a sanction for loss of such evidence based on fault where loss of evidence prejudiced the defense and led to speculation regarding plaintiff's proof). *See also China Ocean Shipping Co.,* 1999 WL 966443, *5 (district court dismissed case because the destruction of physical evidence, caused by the fault of certain parties, *i.e.,* the failure to take specific steps to preserve the evidence, irreparably prejudiced certain other parties' defense of the case).

**\*35** The prejudice suffered from the destruction of documents can take many forms, the most severe of which occurs when the evidence destroyed is the only proof available on an issue or defense in the case. *See, e.g., Marrocco,* 966 F.2d at 225 (loss of tire's side ring prevented plaintiffs from establishing prima facie case of negligent manufacturing). In such cases, evidence of fault in conjunction with such prejudice would support the entry of severe sanctions, such as a default judgment. This is because "the dilemma of lost evidence is that the aggrieved party can never know what it was, and can therefore never know the value that it may have had to the aggrieved party's case[,]" *Gates, 167 F.R.D. at 105,* and "therein lies the prejudice." *Marrocco, 966 F.2d at 223.*

However, in cases where fault, rather than a culpable state of mind, gives rise to the destruction of evidence and the prejudice suffered is because some-perhaps even the "best," but not necessarily the only-evidence has been destroyed, then the choice of the severest sanction is not necessarily justified. *Compare Cohn, 1995 WL 519968,* *9 (reports lost were relevant but "not the only relevant evidence on the issue" before the court; plaintiffs had produced an abundance of cumulative information via different documents that minimized and eliminated prejudice to plaintiffs case) *with China Ocean,* 1999 WL 966443, at *2, 4 (court

Not Reported in F.Supp.2d                                                                                            Page 31
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

dismissed case against plaintiff and cross-claimant where parties were at fault for failure to preserve "critical piece of evidence").

There are two basic principles that motivate the entry of a lesser, issue-related sanction, as opposed to a default or a dismissal in cases of misconduct that do not result in destruction of the *only* critical evidence in the case. *First,* Rule 37 does not impose a duty on a party to preserve every piece of paper for purposes of discovery. *Second,* the purposes for sanctions do not support the entry of a default judgment-which deprives parties of a trial on the merits-when there is at least *some* evidence that allows the plaintiff to prove the case and where there are less drastic remedies available to cure the absence of certain evidence, deter others from similar conduct, and to punish the wrongdoer for destruction of this evidence. *See, e.g., Societe Internationale,* 357 U.S. at 212 (although absence of "complete disclosure" may justify a variety of curative remedies under Rule 37, it does not warrant dismissal with prejudice that deprives party of trial on the merits, especially where failure to comply due to inability "fostered neither by its own conduct nor by circumstances within its control"); *Gates Rubber Co.,* 167 F.R.D. at 109-10 (production of large number of relevant documents shows good faith of party seeking to avoid sanctions and lack of prejudice to party moving for sanctions).

### B. Analysis.

With these legal standards in mind, we turn to an analysis of the evidence as it relates to the following questions: (1) whether there was a duty to preserve, and if so, when it arose and what scope it embraced; (2) was the duty breached; (3) if so, who is responsible for the breach, and what level of culpability is involved; and (4) what prejudice resulted from any breach of the duty to preserve documents, or the concomitant duty to produce them.

### 1. The Duty To Preserve.

**\*36** The threshold issue in deciding any sanctions motion under Rule 37 is whether the accused party had

a duty to preserve and produce the documents that were allegedly destroyed and/or not produced. *Langley,* 107 F.3d at 514; *Melendez,* 79 F.3d at 571; *Marrocco,* 966 F.2d at 223-25. The duty to preserve and produce discoverable evidence only covers the discoverable information that a party knows or reasonably should know may be relevant to the pending or impending litigation. *Wm. T. Thompson, Co.,* 593 F.Supp. at 1455. As outlined above, a party is on notice when it receives a complaint and/or a discovery request. *See, e.g., Cohn,* 1995 WL 519968, at \*5.

In this case, the individual defendants received the complaint in *Glotzer* on November 12, 1998. The Court finds that the allegations in that original complaint-although not as specific as the allegations in the Consolidated Complaint-were sufficient to put the individual defendants on notice that sales data, as well as the financial data and source material for it, including the documents now allegedly missing (*e.g.,* Revenue or Monthly Close Packages; Final Sum and Final Sum Summary Reports; Aged Accounts Receivable data and reports; and the Monthly Sales Roll Up Reports) likely would be discoverable.

Indeed, one step Mr. Monson did take in his attempt to alert senior management of the litigation was distribution of the original complaint to them (Hrg. Tr. 216, 217 (Monson)). Although USN's former senior managers may not have been trained in the law, the dissemination of this complaint-along with Mr. Monson's comments at the meeting with departmental heads-should have been sufficient to alert them to the general categories of documents that they should preserve, *e.g.,* sales and financial information, including source data.

The individual defendants assert that they did not know that these types of documents needed to be preserved, because the *Glotzer* complaint did not specifically challenge the "accuracy of USN's prior financial statements, billing, accounting or sales practices, or the capability of USN's billing vendors" (Defs.' Mem. 3-4). This argument is unavailing for several reasons.

*First,* it takes too narrow a view of what was plead in the original complaint. The *Glotzer* complaint, plainly

Not Reported in F.Supp.2d                                                                                    Page 32
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

challenged the veracity of USN's public financial statements, and claimed that those statements materially misrepresented USN's financial condition. The plaintiff in that case made allegations that specifically called into question USN's stated revenues (*see* ¶ 60) and costs (*see* ¶¶ 66, 71(c)). While those allegations lack the detail of the Consolidated Complaint, they were sufficient to put USN on notice that documents concerning its sales, revenues and costs would be discoverable-and thus should be preserved.

*Second,* defendants' argument is inconsistent with the uniform testimony that at the time, USN viewed the original complaint as triggering a broad preservation obligation. The Board gave Mr. Elliott a broad directive, which at least one Board member has recalled as being "to preserve and not destroy *any* corporate files" (Outside Dir. Mem.App. 5 (Aff. of E. Sekulow, ¶ 3)) (emphasis added). Mr. Monson conveyed that directive to certain USN managers in terms that were interpreted as equally broad: Mr. Dundon recalled that the message was "don't throw anything out" (Defs.' Mem.App. 4) (Jeavons Dep. 95)). The reason was that "most everything that the company had would need to be looked at by the lawyers" (Defs.' Mem.App. 18 (Dundon Dep. 255)). Mr. Monson gave the instruction to USN managers to preserve any and all documents that were subject to discovery. Those who attended the meeting uniformly understood the obligation to preserve was exceedingly broad (*e.g.,* Defs.' Mem., App. 4 (Jeavons Dep. 94); App. 18 (Dundon Dep. 255)). The individual defendants' current litigation position is thus undermined by the contrary understanding USN had at the time suit was filed.

### 2. Breach of the Duty.

**\*37** Given notice and understanding of the obligations to preserve all discoverable hard copy and electronic data, one would expect that USN's next step would have been to implement a comprehensive written document preservation plan with specific criteria for finding and securing (although "ensuring" is not a legal requirement) relevant evidence for the litigation. This is especially true given the urgency of Skadden's directive and the importance of that duty, as Mr. Elliott

and everyone in a position of authority admittedly understood it.

Regrettably, that was not done. Skadden was apparently cast aside, and the task of conveying the duty to preserve and the obligation to see that this duty was satisfied was assigned to Mr. Monson, USN's general counsel, a person who did not know how to devise and manage document preservation in a company under severe financial distress with new securities fraud lawsuits being filed against it virtually every day.

The steps-or lack of steps-Mr. Monson took to carry out the duty to preserve documents speak volumes about his inexperience. There was no general dissemination in writing to all employees of the need to preserve documents and the consequences of not doing that (Hrg. Tr. 216-17 (Monson); Tr. 247 (Elliott)); there were no specific criteria regarding what should be saved and what should not be saved related to the lawsuit (especially on the 4th Floor during the closing of those offices (*Id.* at 247-48)); and there was no attorney review of what was in the offices being closed before uninformed persons were sent in to throw away dumpsters full of documents (*Id.* at 218 (Monson); 248 (Elliott)). Skadden attorneys did not come back on to the scene to begin document collection for discovery until early March 1998-nearly four months after the first complaint was filed (*Id.* at 218-19). That is not the kind of "comprehensive document retention policy" that the case law envisions, or that the urgency of the warning delivered by Mr. Kraus required. *See, e.g., In Re Prudential Ins. Co., 169 F.R.D. at 615.*

We hasten to add that there is no evidence of a purposeful effort to destroy key documents: there were no written memoranda or direct testimony offered indicating that people were told to destroy evidence, and there is no evidence of systematic purging of relevant evidence. [FN23] There was, however, direct-and unrebutted-testimony to the contrary. The witnesses who testified were repeatedly asked whether they were ordered to destroy documents, to which they answered "no" (Hrg. Tr. 264 (Elliott) (he never threw away or instructed Ms. Alpers to throw away his documents); 426-27 (Dundon) (there was no directive issued at USN to destroy documents, if there had been he would have

known about it; and he only heard an allegation that someone had directed document destruction); 369 (Struble) (he was never told to and never did destroy documents; and no destruction took place without a backup tape being made); 318 (Alpers) ((she "never saw an order from anyone at USN to destroy documents because of this litigation"); 234 (Monson) (he never learned that any documents that Skadden was looking for had been destroyed by the company)). Moreover, the individual defendants and senior management took steps to preserve their own personal files (*see*, p. 27, *supra* ).

> FN23. The plaintiffs have alleged that various e-mail accounts were "systematically purged" following the commencement of this litigation (Pls.' 07/25/00 Am. Mem. at 8-9) (*citing* Pls.' App. Ex. 17, ¶ 10). For the reasons stated above (*see* pp. 32-34, *supra* ), the Court rejects this assertion.

***38** The question of intent and/or bad faith, of course, may encompass not only direct destruction, but also "willful blindness" (especially in the face of office closings where documents were being thrown out without criteria based on a systematized document preservation plan in place that officers of the company were monitoring with vigor). But the plaintiffs have not offered any evidence to support the willful blindness theory (*e.g.,* they have not shown the Court that Mr. Elliott knew that relevant, discoverable financial data had been left on the 4th Floor of the executive offices, or in his office, but nonetheless allowed those offices to be swept clean and purged of documents).

Thus, the Court does not believe there was intentional destruction. But we also believe that more than good intentions were required; those intentions had to be followed up with concrete actions reasonably calculated to ensure that relevant materials would be preserved. We believe that the failure to put into place clear procedures and standards concerning document preservation, and the failure to do any follow-up to see that the general oral directive was broadly disseminated and followed, constitutes fault-that is, "extraordinarily poor judgment" or "gross negligence." *Marrocco*, 966

*F.2d at 224*.

### 3. Assigning Responsibility.

In most cases that involve a corporation's failure to take sufficient steps to preserve documents, the responsibility for that failure would rest squarely with the corporation. *Lewy v. Remington Arms Co., Inc.*, 836 *F.2d 1104, 1113* (8 [th] Cir.1988) (corporation responsible for preserving documents it knew or should have known would be material at some point in the future and document retention policies would not shield intentional destruction of documents). This case presents a more complex situation, due to the fact that USN is not a defendant in this case and is in bankruptcy. Thus, this Court has no authority to hold USN responsible for the failure to implement a suitable document preservation plan.

However, the inability to hold USN to account for that failure does not mean that no one can be held responsible. To the contrary, corporate officers and managers can be held personally responsible for a corporation's failure to preserve relevant evidence. *See, e.g., In re Prudential Ins. Co. of America Sales Practices Litigation*, 169 F.R.D. 598 (1997); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 58, 72 (S.D.N.Y.1991). *See also National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556 (N.D.Cal.1987) (same); *Kansas-Nebraska Natural Gas Co. v. Marathon Oil Co.*, 109 F.R.D. 12, 18 & n [*] (D.Neb.1983) (same). In this case, plaintiffs seek to hold accountable USN's CEO, Mr. Elliott, as well as the five outside directors who attended the November 12, 1998 Board meeting; plaintiffs do not name in their sanctions motions the director defendants in this case who did not attend that meeting.

***39** We address separately the responsibility *vel non* of Mr. Elliott on the one hand, and the outside directors on the other hand.

### a. Mr. Elliott.

The evidence does not support a finding of willful or

intentional destruction by Mr. Elliott. Mr. Elliott did not ignore altogether the mandate of the Board to preserve documents. There is no evidence that he personally destroyed evidence, or directed others to do so-indeed, the evidence is to the contrary (Hrg. Tr. 264 (Elliott) (he never threw away or instructed Ms. Alpers to throw away his documents); 426-27 (Dundon) (there was no directive issued at USN to destroy documents, if there had been he would have known about it; and he only heard an allegation that someone had directed document destruction); 369 (Struble) (he was never told to and never did destroy documents; and no destruction took place without a backup tape being made); 318 (Alpers) ((she "never saw an order from anyone at USN to destroy documents because of this litigation"); 234 (Monson) (he never learned that any documents that Skadden was looking for had been destroyed by the company)).

However, as the findings above made clear, the evidence establishes that Mr. Elliott was legally at "fault" for the failure to implement a suitable document preservation program. The Seventh Circuit has defined "fault" in this context as "gross negligence" or "extraordinarily poor judgment," *Marrocco*, 966 F.2d at 224-and there is plenty of evidence that Mr. Elliott's conduct falls squarely in this category.

In so concluding the Court is mindful that the types of steps that must be taken to satisfy the obligation to preserve evidence may vary from case to case, based on the circumstances facing the defendant. *See generally National Hockey League*, 427 U.S. at 642 (the unique factual circumstances of a case guide a court's decision regarding sanctions). In this case, however, we believe that Mr. Elliott did not take steps to tailor a plan that took into account the realities of the situation facing USN as of November 12, 1998, when this lawsuit was initiated. USN was in financial distress (Hrg. Tr. 414, 440 (Dundon)); offices were being closed and employees were leaving (*Id.,* at 414); documents (both hard copy and electronic) were being discarded as part of those office closings and employee departures (Hrg. Tr. 102, 104) (Van Dinther)); and the company had "no formal written document retention policy at USN at that time" (*Id.* at 215 (Monson)). The only policy USN had in place simply governed the preservation of documents

during office closures for *business* purposes (Hrg. Tr. 249 (Elliott)), not for *litigation* purposes.

Given these facts, together with the admonition by outside counsel of the critical importance of preserving documents (Hrg. Tr. 247 (Elliott)), and the Board's directive to implement a document preservation plan (*Id.*), Mr. Elliott's actions simply were insufficient, and reflected extraordinarily poor judgment. Mr. Elliott did not personally take steps to implement a comprehensive document preservation plan (Hrg. Tr. 215-216 (Monson); 247 (Elliott)). Nor did Mr. Elliott enlist outside counsel in developing and implementing such a plan: there was no request that Skadden prepare a written preservation policy (Hrg. Tr. 215, 216 (Monson)) and there were no arrangements for Skadden to meet with employees to convey specific criteria for preserving documents (*Id.*).

**\*40** Of course, we do not suggest that a company always must retain an army of outside lawyers to implement a document preservation plan. But a company must see to it that the person(s)-whether inside or outside the company-given the task have the ability to perform the task, and to do so capably.

Here, Mr. Elliott delegated the responsibility to Mr. Monson, who did not have that ability. The "plan" that Mr. Monson implemented had only these elements: he gave senior management a copy of the complaint (Hrg. Tr. 216, 217 (Monson)), and he orally instructed a group of department managers to inform their employees of the need to preserve documents (*Id.* at 256 (Elliott)). Neither Mr. Elliott nor Mr. Monson put into writing-for all employees to see-precisely what the preservation duty involve and how to comply with it (Hrg. Tr. 217 (Monson); 247 (Elliott)).

Nor did Mr. Elliott or Mr. Monson follow up to see what the department managers or their employees actually were doing to see to it that documents were preserved (Hrg. Tr. 256 (Elliott); 221 (Monson)). Mr. Monson left the duty to preserve documents up to the judgment of the managers and employees of USN (*Id.* at Tr. 247, 248 (Elliott); 244 (Monson)). In Mr. Elliott's own words "[t]here was nothing, nothing formally done" (*Id.* at 256).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Monson explained that he did not think anything "formal" or "specific" needed to be done because it was his "expectation" that people who were intending to discard potentially relevant documents "against the backdrop of this litigation" would contact him for "further clarification" (Hrg. Tr. 245 (Monson)), which he says they did (*Id.*). He further stated that it was his "belief" that:

anything that was relevant to the company was being packed up and brought back to Chicago either for storage at our office here in Chicago or for off-site storage ... the relevant information would have been forwarded to our operations center for processing, or the sales information would have been forwarded to or committed to electronic form and would have been in the company's possession. So it was not my view that there were sensitive documents from the standpoint of this litigation that existed in the sales offices ... [or] the 4th Floor [since] the material there would have consisted of marketing materials and other things that wouldn't really be relevant to the litigation. So I didn't-do anything specific.

(Hrg. Tr. 221, 222).

As a result of not doing anything "specific," large quantities of documents were discarded from closed offices without any attorney first reviewing them to see if they should be preserved. And, while the documents discarded may not have been relevant, as Mr. Monson believed, no steps were taken to verify that this was so. Skadden did not begin its process of reviewing documents at USN until March 1999 (Hrg. Tr. 218, 219 (Monson)) and the USN employees who were culling out what to save and what to discard from closed offices were not given criteria to use to decide what was needed for litigation-and may not even have known that the litigation imposed special preservation requirements (Hrg. Tr. 111) (Van Dinther); 17, 19-20 (Coleman)). Although the law does not require every piece of paper to be saved, *Wm. T. Thompson, Co.,* 593 F.Supp. at 1455, certainly specific criteria are necessary to ensure that relevant information is preserved. *Turnage,* 115 F.R.D. at 557-58. The affirmative obligation to preserve documents does not exist in a vacuum; its effective implementation requires criteria by which employees may have some idea of what documents they must

preserve and how to accomplish that task. *See In re Prudential,* 169 F.R.D. at 615; *Cohn,* 1995 WL 519068, *9 and n. 3. In this case, where a corporation is closing its offices and discarding documents (in contrast to an existing corporation where documents stay in place during the pendency of the suit), we believe that the requirement to initiate a written comprehensive document preservation plan disseminated to all employees was crucial.

**\*41** Nor may Mr. Elliott escape responsibility by virtue of the fact that he assigned Mr. Monson the task of handling document preservation. The buck must stop somewhere-and here, the Court believes that the appropriate place is with Mr. Elliott: he was the CEO, he was directed by the Board to see to it that documents were preserved, and he was on the scene with the ability to follow through and see that the job was completed. Delegating wholesale the obligation to Mr. Monson, who did not craft the criteria or the plan necessary to satisfy the obligation, was a case of "extraordinarily poor judgment" that constitutes fault. [FN24]

FN24. We reject the suggestion that Mr. Elliott cannot be held accountable because the people who discarded documents "did not even know about the litigation," and were doing as a result of office closures and not "to destroy [documents] because of the litigation" (Defs.' Mem. at 18 n. 17). This only further underscores the problem with the preservation program that Mr. Elliott (through Mr. Monson) put into place: it permitted many documents to be discarded without a review to ensure that nothing relevant was lost.

b. The Outside Directors.

Plaintiffs also seek to hold the outside directors responsible for the failure to preserve documents. However the outside directors who are defendants on this sanctions motion stand on a different footing from Mr. Elliott. They did not have a physical presence at USN on a day-to-day basis, and thus had less opportunity-and ability-to follow up than would Mr. Elliott, who was on the scene. Outside directors are not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　　　　　　Page 36
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

primarily responsible for the inner workings of the company and its employees. Rather, they serve as advisors to the company, and although they are responsible fiduciaries under the securities laws, practically speaking, they do not do the work of the company, nor do they carry out the duties and responsibilities attendant to litigation against the company.

This is not to suggest that the outside directors had no duty to preserve, but the distinction is relevant to an analysis of what they must do to discharge that duty. Certainly, had the outside directors disregarded Skadden's admonition to preserve documents (or, worse yet, had directed their destruction), the Court would have no difficulty in finding them at fault or guilty of intentional destruction. But that is not the case here. There is no evidence that the outside directors destroyed documents in their possession, or instructed others to destroy evidence; but there is ample evidence to the contrary. (Hrg. Tr. 264 (Elliott) (he never threw away or instructed Ms. Alpers to throw away his documents); 426-27 (Dundon) (there was no directive issued at USN to destroy documents, if there had been he would have known about it; and he only heard an allegation that someone had directed document destruction); 369 (Struble) (he was never told to and never did destroy documents; and no destruction took place without a backup tape being made); 318 (Alpers) (she "never saw an order from anyone at USN to destroy documents because of this litigation"); 234 (Monson) (he never learned that any documents that Skadden was looking for had been destroyed by the company)).

The outside directors who attended the November 12, 1998 meeting acted on Skadden's advice by directing that documents be preserved. While they justly may be criticized for not following up to see what was done, the Court does not believe that this lack of follow up equates to "extraordinarily poor judgment" that would support sanctions. In that regard, we note that plaintiffs have chosen to pursue this motion only against the directors who attended the November 12, 1998 Board meeting; the motion does not target those who were absent–even though all directors are properly charged with knowledge of the directive given to Mr. Elliott in

that meeting, and none of them followed up. Thus, if we were to hold the outside directors liable for the lack of followup, there would be no reason to distinguish between those who attended the Board meeting and those who did not–as plaintiffs do in their motion.

**\*42** Rule 37(b) provides that sanctions may run against directors: "[i]f a party *or* an officer, director, or managing agent of a party ... fails to obey an order to provide or permit discovery, ... the court .... may make such orders in regard to the failure as are just, ..." Fed.R.Civ.P. 37(b)(2) (emphasis added). While Rule 37 does not specifically distinguish between inside and outside directors, we believe that the consideration of a "just" order must consider the practical distinction between them. The parties have not cited, and this Court has not found, a single case where a court has found an outside director personally responsible for the destruction of corporate documents under Rule 37 or its inherent powers. The Court concludes that the outside director defendants named in the sanctions motion are not responsible for the shortcomings in the document preservation program, and thus should not be sanctioned for them. [FN25]

FN25. In their brief, the outside directors cite cases that speak not to the document preservation issue, but rather to the issue of liability under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 1999 WL 688780 (N.D.Ill.1999), and *Cohn v. Taco Bell Corp.*, No. 92 C 5852, 1995 WL 519968 (N.D.Ill.1995). Those cases (and the cases cited therein) do not resolve the separate question of an outside director's personal responsibility for the preservation of documents under Rule 37. Thus, in recommending denial of sanctions against the outside directors, we do not suggest-and should not be construed as suggesting-any view on the merits of plaintiffs' securities law claims against the outside directors.

4. Prejudice.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Because we conclude that Mr. Elliott is at fault for USN's failure to implement an appropriate program for preserving documents, we consider the question of what prejudice resulted. For the reasons set forth in Part a. below, the Court concludes that plaintiffs have failed to demonstrate any substantive prejudice from the shortcomings that existed in USN's document preservation program.

Because the duty to preserve documents exists to insure that relevant documents are available to be produced, we also consider whether the failure of the individual defendants to search for and produce certain documents during discovery has caused plaintiffs any prejudice. For the reasons set forth in Part b. below, we conclude that there has been a failure to search for and produce the Final Sum Reports that has caused plaintiffs financial prejudice in that it has increased their cost of discovery-but that this cost has been offset by unnecessary costs that plaintiffs have inflicted on defendants in discovery.

### a. The Absence of Substantive Prejudice.

The Court has no doubt that it was the intent of Mr. Elliott to follow the instruction of the outside directors and to see to it that documents were preserved for the litigation. And, in fact, a vast quantity of documents was indeed preserved and produced in this lawsuit. In response to discovery requests, USN produced more than one million pages of documents, of which plaintiffs selected 560,624 for copying (Defs.' Mem.App. 1 (Walton Dec. at ¶¶ 5-6)). These documents included the files of key USN personnel from every department in the company (*id.,* at ¶ 7); numerous accounting and finance department files, which included USN's draft and final monthly and quarterly statements, accounts payable registers and journal entries, invoices, cash balance reports, draft and final budgets, and memoranda relating to accounts receivable, accounts payable, and "cash burn" rates (*id.,* at ¶¶ 8-9); and nearly 100,000 pages of customer files (*id.,* at ¶¶ 10-13).

**\*43** At the same time, it is clear that as a result of the

failure to implement a suitable document preservation plan, to communicate that plan effectively to all employees, and to follow up to insure that the directive was being followed, there were holes in the document preservation plan through which discoverable materials may have been lost. Large quantities of documents were discarded from closed sales offices without attorneys first reviewing them, and without the employees who selected what to preserve and what to discard knowing what criteria to use for purposes of preserving documents necessary for the litigation. E-mail files of terminated employees also were purged, without there being a systematic procedure for insuring that nothing on those files needed to be preserved for the lawsuit.

Because the inadequacies in the document preservation program were the result of fault (that is "extraordinarily poor judgment") and not intentional efforts to destroy responsive documents, the Court does not draw the inference that these gaps caused plaintiffs to lose responsive documents that were, as plaintiffs allege, "critical to plaintiffs' proof" in the case (Pls. 07/25/00 Am. Mem. at 1). That conclusion is bolstered by the fact the evidence shows that the closed sales offices and the e-mail files of the employees terminated in those closings were not likely to contain the sole versions of documents "critical" to plaintiffs' case. Moreover, the individual defendants have produced many documents that plaintiffs certainly would label as damaging to the individual defendants' case: that is clear from plaintiffs' assertion in the amended sanctions motion that they have alleged "certain core claims which have been borne out through discovery" (Pls.' 07/25/00 Am. Mem. at 4). In the face of this evidence the Court will not infer that these gaps led to large-scale destruction of documents to the prejudice of plaintiffs.

Rather, the Court will focus-as have plaintiffs in their amended motion-on specific categories of documents that plaintiffs claim were lost through destruction: the sales information as reported from the field; aged account receivable information; and Final Sum Reports. We discuss each of those categories in turn. [FN26]

---

[FN26.] There are no longer any destruction or production issues with respect to the "Revenue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 38
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

Close Packages" or "Monthly Close Packages." According to Mr. Pellino's deposition testimony, taken on June 1 and 2, 2000, those reports were used to prepare the financial statements that were the basis for the February 1998 IPO. Plaintiffs' amended motion asserted that those documents had not been produced (Pls.' 07/25/00 Mem. at 7); but plaintiffs withdrew that assertion on the eve of the evidentiary hearing (Pls.' 09/07/00 Notice at 10-11). And with good reason-the individual defendants produced those reports for each month from January 1997 through February 1999 (*see* Defs.' 09/05/00 Submission, App. D.)

The Court does not accept plaintiffs' suggestion that their claims regarding the missing Revenue Close Packages earlier in the case were justified because these documents were only produced pursuant to an agreement between counsel sometime after this Court's ruling denying plaintiffs'motions to compel on July 25, 2000 regarding these documents. In response to a question raised by the Court at the hearing, the defendants revealed that they had produced all of these materials in February and March 2000 (Elliott's 09/29/00 Submission, App. D). Thus, when plaintiffs filed their amended motion for sanctions based in part on the alleged destruction of Revenue Close Packages, they in fact had had those reports in their possession for at least four months.

*Sales Data.* The evidence establishes that the individual defendants have produced sales information, as reported from the field, for virtually the entire period from January 1997 through the end of the class period on November 20, 1998. The only gaps in that information are a two week period from December 1 through December 16, 1997, and a two month period from September 18 through November 20, 1998 (Defs.' 09/05/00 Submission, App. A). These gaps are explainable for reasons independent from shortcomings in the documents preservation program. As to the two-week gap in December 1997, that was at a time when USN was in transition from the manually

prepared sales reports to the computer generated sales reports from the Vantive system. As to the two-month gap between September 18 and November 20, 1998, that was during a time when USN began laying off its sales force and closing its sales offices (*e.g.,* Hearing Tr. 104 (Van Dinther); 409 (Dundon)). Moreover, these gaps are small in relation to the period for which the information has been produced, and thus we find it difficult to perceive any real prejudice to plaintiffs from these gaps.

**\*44** Nor does the evidence demonstrate that plaintiffs have been prejudiced because the sales data has been produced in the form of documents entitled State Directors Reports and Sales Summary Reports, rather than in the form of documents entitled Monthly Sales Roll Up Reports. In determining prejudice, we look beyond the question of form and focus on substance. And here, the testimony establishes that even if the State Directors Reports were not the same document as the Monthly Sales Roll Up Reports, a matter about which the witnesses disagree (*see,* pp. 35-40, *supra* ), the information in them comes from the same sources and is substantially the same (Hrg. Tr. 113-14, 124-25 (Van Dinther)). That weighs heavily against the finding of prejudice. *See, e.g., Cohn, 1995 WL 519968,* at *9 (plaintiffs did not suffer any real prejudice where the reports that were lost were relevant but were "not the only relevant evidence on the issue," and where similar information had been produced by way of other documents).

Plaintiffs assertion of prejudice from the absence of Monthly Sales Roll Up Reports is further undermined by four additional factors.

*First,* the plaintiffs elected not to make copies of many months of sales reports that were generated from the Vantive system. The Court finds it inexplicable that plaintiffs would neglect to copy these reports, which plaintiffs demanded that defendants should produce despite the great cost involved, if the sales information truly was as significant as plaintiffs insist.

*Second,* plaintiffs have offered no evidence that they used the substantial amount of sales information that was produced to test their theory that the sales

Not Reported in F.Supp.2d                                                                    Page 39
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

information was being used as the basis for publicly reported revenue. The plaintiffs' Rule 26 expert reports do not indicate that the sales information was provided to plaintiffs' experts, so that they could compare that information to the publicly reported revenue figures. It is hard to find prejudice from the absence of certain sales information when plaintiffs did not use the substantial amount of sales information that they possessed.

*Third,* plaintiffs have offered no evidence to support their assertion that untested sales information from the field was used as the basis for USN's publicly reported revenue numbers. The only support for that assertion came from untested statements by Ms. Van Dinther and Ms. Reynolds in last 1999, which were given to plaintiffs on oath in a question and answer format but outside the presence-and without the knowledge-of defense counsel. When those statements were tested in depositions Ms. Van Dinther and Ms. Reynolds gave in May and July of 2000, it should have been clear to plaintiffs that these individuals had no basis for their speculation that sales numbers were being used to publicly report revenue (*see,* 39-40, *supra* ).

*Fourth,* the plaintiffs' theory-as it evolved through the sanctions motion-further suggests that, in fact, the sales information does not command the importance that plaintiffs have asserted. Mr. Pellino testified clearly that the Final Sum Reports, which reflected USN's billings as reported by Spectrum (and earlier Profitec) and not sales reports, provided the critical starting point for USN's publicly reported revenue numbers. Plaintiffs have not disputed that assertion, but in fact have embraced it (Pls.' 07/25/00 Mem. at 13) (identifying the Final Sum Reports as one of the "fundamental building blocks utilized by USN to publicly report its revenue"). In light of the central importance that plaintiffs now attach to the Final Sum Reports, and their failure to provide any demonstrable link between the sales reports and the publicly reported revenue numbers, the Court finds that plaintiffs have failed to show any prejudice from the small gaps in the sales information produced.

**\*45** *Aged Accounts Receivable Information.* The evidence has established that plaintiffs' assertion that they received only a smattering of aged accounts receivable information is unfounded. USN has produced aged accounts receivable information for the entire period covering September 1996 through the class period of November 20, 1998, with the exception of the following months: November 1997 and January, February, April, May, and July 1998 (Defs.' 09/05/00 Submission, Ex. C). In addition, it is clear that this information was produced to the plaintiffs in February and March of 2000 (Elliott's 09/29/00 Submission, Ex. D), and thus had been in plaintiffs' possession for many months prior to the filing of the amended sanctions motion in July 2000. [FN27]

> [FN27.] On September 12, 2000, the second day of the evidentiary hearing, the defendants produced to the plaintiffs (and the Court) a one page document identified as aged accounts receivable information for December 1997, previously unproduced to the plaintiffs (Hrg. Tr. 334).

Moreover, a review of the accounts receivable information produced by USN indicates that even though reports have not been produced for each of these four months, other reports provide information that appears to cover certain of those months. There are documents that show accounts receivable aging information for virtually all of April 1998 (USN 2-038332), and for the month ending May 31, 1998 (USN 22-021567). Nonetheless, gaps do remain for November 1997 and January through February and July 1998. The question remains whether these gaps are the result of the shortcomings in the document preservation program, and if so, what prejudice this has caused to the plaintiffs.

On the first question, the record supports the inference that these documents may have been missing before the inception of this lawsuit. An Arthur Andersen Report issued in September 1998 states that with respect to "[t]he Company's accounts receivable agings (excluding wireless) as of June 30, 1998, March 31, 1998, December 31, 1997 and September 30, 1997 ... the company could only provide a detailed aging for the Midwest region as of June 30, 1998. Management stated that other detailed agings were not currently

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

available due to system conversions, and the limited utility of the old systems" (Pls. Reply Mem., Ex. A, at 17). If certain documents did not exist at USN as of the time this litigation commenced, as the Arthur Andersen report suggests, then the absence of those documents is not the result of the shortcomings in the post-litigation preservation program.

Moreover, the Court finds that plaintiffs have failed to establish prejudice from these gaps in the information. The significance of this information, according to plaintiffs, is that it would show that USN's publicly reported revenues were inflated, because USN did not take into account that many of the receivables it was counting as revenue were so old that they were not likely to be collectible. Plaintiffs have offered no explanation why the substantial volume of aged receivable information they possess is insufficient to test that theory. Nor is there any evidence that, as of the time of the evidentiary hearing, they had given the aged accounts receivable information they possess to their experts for analysis. In these circumstances, the Court finds that the missing months of aged accounts receivable information have not prejudiced the plaintiffs. [FN28]

> [FN28.] Nor does the Court find persuasive the plaintiffs' argument that the fact that the missing months occur right before and shortly after the February 1998 initial public offering supports the inference of intentional destruction or concealment of material information. The February 1998 initial public offering was based on financial reports through November 1997 (Defs. 09/08/00 Submission, at 9), and plaintiffs have received aged receivable information from January through October 1997, with only November 1997 missing. Moreover, the Court can discern no particular pattern from the missing months of aged account receivable information that would suggest intentional destruction: the information was not produced in January, February, March and July 1998, but aging information was produced for every month through the class period.

**\*46** *The Final Sum Reports.* Plaintiffs' categorical assertion that "not a single FINAL SUM or Final Sum Summary report (in either hard copy or in Excel spread sheet format) was ever produced to plaintiffs by USN or any other defendant" (Pls.' 07/25/00 Am. Mem. at 13) has proven incorrect. USN in fact has produced Final Sum Summary Reports for every month from August 1996 through the class period (Defs. 09/05/00 Submission, Ex. B). Moreover, these reports all were produced in February and March 2000 (Elliott's 09/29/00 Submission, Ex. C), more than four months prior to the time that plaintiffs filed the amended motion. Thus, had plaintiffs reviewed the document production before filing their motion, they would have known that basing the sanctions motion on alleged nonproduction of Final Sum Summary Reports was unfounded.

The Final Sum Reports present a different matter. As explained above (pp. 40-48, *supra* ), however one defines the Final Sum Report, it is clear that the individual defendants have produced either none or next to none of them. The testimony establishes that those reports should have existed as USN as of the time of this lawsuit: Spectrum has copies of the Final Sum Reports (or the REPGEN files from which they are generated) going back to January 1996 (Hrg. Tr. 149-50 (Doyle)), and Spectrum transmitted that information to USN on a regular basis (*id.* at 152, 154). If Spectrum retained these files, then USN should have had these files on its databases as of the time this lawsuit commenced in November 1998.

Thus, the failure of USN to produce these documents leads to one of two conclusions: either the documents were not preserved, as a result of the shortcomings in the preservation program put into effect by USN after this lawsuit, or they were preserved but have not been produced in this litigation. The Court finds that the evidence tends to support the latter conclusion, for several reasons.

*First,* Mr. Struble testified that in January 1999, shortly after this litigation commenced, USN made a set of backup tapes of the UNIX servers that would include the REPGEN files (Hrg. Tr. 380-81). The fact that these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

backup tapes were made for business reasons (because USN was shifting to a different software package) rather than for litigation reasons is immaterial: the point is that these tapes should have captured the Final Sum or REPGEN information that existed. And the evidence shows that as of the time of the evidentiary hearing on this motion, the individual defendants had never asked anyone to examine those backup tapes to see what Final Sum or REPGEN information could be extracted from them-even though it would take only a few days to restore those tapes to the UNIX servers being used at CoreComm (Hrg. Tr. 379, 386 (Struble)), and even though CoreComm has an obligation, pursuant to its asset purchase agreement with USN, to provide assistance to USN as necessary for the litigation. The defendants did not ask Mr. Struble to look for the January 1999 backup tapes until after Mr. Doyle's testimony on September 11; overnight, he located those tapes and produced them in Court on September 12 (Hrg. Tr. 363-64, 382-83 (Struble)). But, as of that time, he had not looked on the tapes to see what Final Sum information they might contain.

**\*47** *Second,* the individual defendants did not make efforts to examine the backup tapes made in May 1999 immediately prior to the sale of assets to CoreComm. Those tapes contained a "snapshot" of all the information on the production servers on the UNIX system, which would include the REPGEN database (Hrg. Tr. 360 (Struble)). [FN29]

> [FN29.] It is unclear to the Court whether examination of these tapes would require the rebuilding of a computer system and software application, as was the case with the Vantive database that contained the summary sales reports. The Court did not order the individual defendants to rebuild a system to run these tapes at the April 11, 2000 hearings, when the Court ordered a system to be rebuilt to run the Vantive sales data. At that time, the Court was informed by the defendants that any financial data stored on those tapes had already been produced in hard copy form. That turned out to be incorrect.
> In the event that building a database would be

necessary, the individual defendants failed in their duty to preserve documents in a retrievable form. Making the backup tapes is useless without insuring that there is a system capable of running it, and Mr. Struble testified that after making the backup tapes, very little or nothing was done to insure that a system was capable of running these backup tapes (Hrg. Tr. 391).

*Third,* it was not until late August 2000, shortly before the evidentiary hearing, that the individual defendants asked CoreComm to check its computer database to see if Final Sum Reports were available on it (Hrg. Tr. 363-64, 371-72 (Struble)). And when that inquiry was made, Mr. Struble only examined the active CoreComm network database, which he found contained Final Sum Reports dating from August 1998 through March 2000 (Hrg. Tr. 373). Even then, Mr. Struble did not look for what he characterized as the REPGEN database, which is source information for the Final Sum Reports (*Id.* at 372). Nor did he search backup tapes made by CoreComm after the sale to see what they contained (*Id.*).

Based on this evidence, it appears to the Court that the Final Sum/REPGEN information likely exists on these tapes that USN (or CoreComm) preserved, but that the individual defendants have failed to access and produce in usable form during discovery. However, any substantive prejudice resulting from that failure to produce the Final Sum/REPGEN information has been mitigated by the ability of the plaintiffs to obtain that information from another source: Spectrum. Mr. Doyle testified that Spectrum was able to retrieve from its database and produce to plaintiffs the files that contain the Final Sum/REPGEN information for virtually all of the period from July 1996 through January 1999: the only gaps are for October through December 1997, and February 1998 (Hrg. Tr. 179-181). The Court does not believe that these missing documents are attributable to intentional destruction or inadvertent loss due to gaps in the document preservation policy-the fact that the gaps exist in the information produced by Spectrum, which would have no motive to purge that information and which appeared (through Mr. Doyle) as a friendly witness for plaintiffs, would undermine any such

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　　　Page 42
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

inference.

Moreover, the Court does not believe that these missing four months of Final Sum information prejudiced the plaintiffs in light of the substantial body of Final Sum/REPGEN information that is available for more than one year prior to and nearly one year after this "gap." Indeed, this gap is consistent with Arthur Andersen's observations concerning the lack of billing information for the last quarter of 1997 and the first quarter of 1998-even prior to the commencement of this lawsuit.

Finally, although not raised by plaintiffs, the Court does not believe that the timing of this production from Spectrum has resulted in prejudice to the plaintiffs. As explained above (pp. 82-86, *supra* ), plaintiffs had received the CD Roms containing this information from Spectrum on or about July 20, 2000. However, nearly two months later (and, according to plaintiffs, after the expenditure of $178,000 in attorneys and expert fees), plaintiffs claimed not to know precisely what information was on those CDs (Hrg. Tr. 484-85)-even though a simple review of a printout of the directory to the CDs made it plain that they contained a large volume of Final Sum information. Given the importance of this information, which plaintiffs admit they knew of at least as of the time of Mr. Pellino's deposition in early June 2000, one would have expected plaintiffs to move with much greater alacrity in extracting this information from the CD Roms. In light of their failure to do so for two months after receiving them, the Court finds no prejudice from the timing of the production of the CD Roms.

b. Financial Prejudice.

**\*48** The absence of substantive prejudice, however, does not mean that the failure of the individual defendants to produce Final Sum/REPGEN information caused no prejudice of any kind. The Court finds that plaintiffs have suffered financial prejudice due to the individual defendants' failure to produce the data contained on the January 1999 backup tapes and/or the Snapshot tapes in usable form. The plaintiffs clearly have been required to spend money-according to them,

substantial sums of money-to get from Spectrum information that the individual defendants were required to produce.

We are not persuaded by the defendants' argument that they had a good faith basis to object to production, and thus had no obligation to search for or produce that information prior to the Court compelling them to do so on July 25, 2000. That argument ignores the fact that USN management have testified to the central role of the Final Sum information in preparing the USN publicly reported revenue numbers. Mr. Dundon testified that this data was "vitally important" to the revenue process (Hrg. Tr. 444), and Mr. Pellino testified that it was the "starting point" for his revenue calculations (Hrg. Tr. 294).

Given what these knowledgeable people say about the Final Sum Reports, the individual defendants cannot legitimately contend that they could question the discoverability of these documents in a case where plaintiffs from the start have challenged the veracity of USN's publicly reported revenue figures. Moreover, the individual defendants had a duty to produce this information, long before the plaintiffs asked for it. The District Judge ordered initial disclosures pursuant to Rule 26(a)(1) to be made by October 25, 1999 (doc. # 62). As a result, the individual defendants were required to disclose documents (and data compilations) "relevant to disputed facts alleged with particularity in the pleadings." Fed.R.Civ.P. 26(a)(1)(B). By the time this disclosure was due, the Consolidated Complaint was on file, which should have dispelled any arguable doubt concerning the relevance of the Final Sum information.

The individual defendants did not search for, much less produce, the Final Sum/REPGEN data and thus did not comply with Rule 26(a)(1). Nor did they comply with this Court's July 25, 2000 order to search for final sums in the most likely places they might be found (07/25/00 Tr. at 57, 62-63)-they did not review the January 1999 backup tapes, even though it would take only a few days to get those up and running at CoreComm.

The phrase "no harm, no foul" does not fully apply here: while the preservation and production of Final Sum Reports and REPGEN data from Spectrum

eliminates any real substantive harm caused by the individual defendants' failure to produce the information, that does not eliminate the cost plaintiffs needlessly incurred by having to go to Spectrum for the information. Mr. Struble made very clear that the individual defendants never asked him to look for backup tapes with archived REPGEN source material or Final Sum Reports prior to September 11, 2000. Instead, the individual defendants argued it was too burdensome for them to search for this information (07/25/00 Tr. at 62-63), even through it could be accessed in relatively short order by CoreComm. Thus, plaintiffs were required to find the Final Sum Reports now available through Spectrum, a non-party, on their own and at great cost and expense of time to them. This is not the kind of discovery process envisioned by Rule 26(a)(1) or by this Court's July 25 order.

**\*49** We do not believe that the individual defendants intentionally withheld those tapes in bad faith; we are inclined to accept the explanation of the individual defendants' counsel that they did not know what they had. That has been a recurring problem throughout this case, both for defendants (who initially said USN had 35 boxes of documents to produce, when ultimately more than 500 boxes were produced) and for plaintiffs (who, as detailed above, repeatedly have protested that they were deprived of documents that in fact they possessed).

However, to ignore the individual defendants' violation of the rules of full disclosure would be tantamount to creating an "ignorance" exception (*i.e.,* a "judge, we just didn't know those tapes existed" exception). At some point, a party and/or its attorneys must be held responsible for knowing what documents are discoverable and where to find them, since certainly neither the party's opponent nor the Court can answer those questions. The case law indicates that a refusal to provide discovery may be sanctionable, *Societe,* 357 U.S. at 207, and that a "refusal to obey" need not be willful, but is sanctionable even if the refusal is simply a simple failure to comply with the dictates of the federal rules. *Id.* That is what we find here.

Having said this, the Court would be remiss in failing to address the fact that plaintiffs, too, have unnecessarily

inflicted costs on the individual defendants by the manner in which they have conducted discovery, and the manner in which they have litigated this sanctions motion. As the Court has explained above, the defendants successfully urged this Court to require the individual defendants to rebuild the Vantive database and application software, in order to extract from backup tapes sales data that plaintiffs urged was critical to their proof of this case. It turned out that this evidence not only was far from "critical" to plaintiffs' case, but in fact was so unimportant that plaintiffs elected not to copy most of it.

At the time this Court ordered the individual defendants to rebuild the Vantive database and application software, the Court did not-under Rule 26(b)(2)-elect to shift the cost of doing that to the plaintiffs, on the reasoning that the defendants were to blame for failing to preserve the information in a form that did not require maintenance of a database capable of extracting it. However, subsequent developments have persuaded the Court that this cost was unnecessarily and unfairly inflicted upon the individual defendants. And that cost was substantial, according to the defendants: $159,632 .63.

In addition, having reviewed all of the evidence presented by the parties, the Court has reached the conclusion that while plaintiffs were correct in challenging the efficacy of the individual defendants' document preservation program, they litigated the motion on a breadth and scope that was entirely unwarranted by the facts. Plaintiffs repeatedly asserted that they had been deprived of documents that long had been produced to them, such as the Revenue Close Packages, the Aged Accounts Receivable Information, and the Final Sum Summary Reports. They protested that they had not received sales information in the form of Monthly Sales Roll Up Reports, despite the fact that (1) their own lead witness on the point, Ms. Van Dinther, admitted that the State Directors Reports (which were produced) contained substantially the same information, and (2) the uncontradicted evidence established that the Sales Summary Reports from the Vantive system-most of which plaintiffs did not copy-also contained the same type of information from the same sources. Plaintiffs continued to advance the

proposition that the sales information provided the basis for the revenue figures, relying on uncrossexamined statements by witnesses (Ms. Van Dinther and Ms. Reynolds) which were discredited during their deposition testimony.

**\*50** Based on these assertions, which plaintiffs should have known were not meritorious when they filed the amended sanctions motion, plaintiffs continued to insist that a default judgment was in order when, based on the case law, there was no evidence of intentional misconduct or prejudice of the type that would warrant that most extreme of all sanctions. When the dust settles from the mountain of paper and accusations that the parties have hurled at one another, what emerges is far from the "wholesale destruction of documents" that are "critical to plaintiffs' proof" (Pls.' 07/25/00 Am. Mem. 1, 2). Instead, the evidence shows that there were shortcomings in the document preservation program that USN attempted to implement which, while serious, at the end of the day did not deprive plaintiffs of the documents and other information that will allow them to attempt to prove their claims at trial. This is not the stuff of which default judgments are made, and plaintiffs should have known that. While courts have a responsibility "neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if the dragon looms," *Anderson*, 900 F.2d at 395, litigants as well have a responsibility to be measured and proportionate when they assert that their opponents have committed sanctionable conduct.

Regrettably, plaintiffs failed in that responsibility, a failing which has helped exact a serious cost on the plaintiffs and the individual defendants alike. By the parties' calculations, they have spent an enormous sum of money litigating the sanctions issue: a collective total of $1,524,762.03. That expenditure has been used solely for the purpose of "litigating the litigation," and has not contributed to advancing this case to the disposition on the merits that the parties in this case deserve. The thousands of hours that the plaintiffs and the individual defendants' attorneys have spent on this issue are hours that would have been far better spent evaluating the evidence in this case, and preparing for trial. Indeed, the Court cannot help but wonder whether, if the parties had spent some of those thousands of

hours investigating and gaining mastery over the documents, the plaintiffs would have understood that they long had had in their possession key documents (sales information, Revenue Close Packages, Final Sum Summaries, and Aged Accounts Receivable information) that they claimed had been destroyed or otherwise were missing; whether the individual defendants would have straightforwardly told plaintiffs what they had, without the need for the Court to order them to do so; and whether the individual defendants would have thought to ask Mr. Struble to investigate all backup tapes to see what information they might contain.

Finally, even given the serious charges raised by plaintiffs, the Court was stunned to learn that the parties had spent $1,524,762.03 on the litigation of the sanctions issue (and the Court emphasizes that this figure is in addition to the amount that plaintiffs say that they spent on obtaining the CDs from Spectrum and analyzing them, and that the individual defendants say that they spent in rebuilding the Vantive system). The Court finds it astonishing that plaintiffs and the individual defendants alike say that they *each* spent in excess of $170,000 on the original sanctions motion filed in December 1999-a motion that involved only a few briefs, and never proceeded to an evidentiary hearing. The Court is no less stunned that the parties claimed to have spent collectively nearly $400,000 on discovery related solely to the sanctions issue. And, the fees and costs that the parties attribute to litigation of the amended sanctions motion-$300,000 for the plaintiffs and some $480,000 by the individual defendants-defies logic. It is difficult for the Court to conceive of how the parties could have incurred more than three quarters of a million dollars of attorneys' fees and costs on an amended sanctions motion that involved (1) an opening memorandum and exhibits by the plaintiffs; (2) separate responses by Mr. Elliott on the one hand and the individual defendants on the other hand with exhibits; (3) a reply memorandum with exhibits by the plaintiffs; (4) a few short supplemental memoranda submitted by the parties at the Court's request (largely to fill in important details that were missing from the defendants' filings); and (5) a two-day evidentiary hearing. [FN30]

Not Reported in F.Supp.2d                                                                                    Page 45
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

FN30. On the amended sanctions motion, counsel for Mr. Elliott-who took the lead-listed nearly $380,000 in fees and costs. The outside directors had separate representation from Mr. Elliott; Mr. Hynes was represented by one set of counsel, and their outside directors by another. Each of those two additional sets of counsel say that it cost them approximately $50,000 to litigate the sanctions motion, a figure which in some ways is even more mind boggling-particularly in the case of counsel for Mr. Hynes, who did not file a separate memorandum on the sanctions motion and who attended the evidentiary hearing only on the first day. Moreover, the witness preparation for Mr. Hynes' brief testimony could not have been too difficult or time consuming.

**\*51** These number speak for themselves, and require no further comment from the Court other than this observation: no one reasonably could believe that this sanctions issue deserved the amount of money that the parties lavished on it.

C. Sanctions.

Based on the foregoing findings and conclusions, the Court believes that the following sanctions are a measured and proportionate response to the conduct that occurred.

*First,* because the Court has found that none of the outside director defendants are at fault for the failings and the document preservation, the Court recommends that no sanctions be issued against them.

*Second,* because the Court has found Mr. Elliott to be at fault for the failures in the document preservation program, the Court believes sanctions are appropriate against him. Given the lack of substantive prejudice that the Court has found from the shortcomings in that program, the Court finds that it would be wholly inappropriate to issue a default judgment against Mr. Elliott, or to issue a preclusion order barring him from using certain documents. However, the Court believes

that some sanction must be imposed against Mr. Elliott, to impress upon him the importance of the preservation duties that he failed to properly discharge and to deter others from taking that obligation lightly. Accordingly, the Court recommends that an appropriate sanction against Mr. Elliott be that he pay the sum of $10,000 into the registry of this Court. While the imposition of a fine is not one of the sanctions specifically enumerated in Rule 37(b)(2), the language of Rule 37(b)(2) makes it clear that the enumerated sanctions are "among others" that a Court may enter, and that they are therefore not intended to be exclusive. WRIGHT, MILLER & MARCUS, Civil: § 2284, at 612 (1994 Ed.). In other words, a Court is not limited to the particular sanctions set forth in Rule 37(b).

*Third,* the Court recommends that with respect to the gaps in production of certain documents (the Final Sum Reports for October through December 1997 and February 1998; the Aged Accounts Receivable information for November 1997, January through February 1998 and June 1998; and the sales information for December 1 through 16, 1997 and September 18 through November 20, 1998), at trial the jury be instructed that plaintiffs sought production of that information, but that USN failed to produce those documents for those respective time periods. This sanction is consistent with Rule 37(c), which authorizes the Court to "inform [ ] the jury of the failure to make the disclosure." The Court does not believe it appropriate to instruct the jury that these documents were destroyed because of an inadequate document preservation program, because the evidence has not demonstrated whether the absence of these documents is attributable to the shortcomings in USN's post-litigation document preservation program as opposed to inadequacies in the pre-litigation document retention policies. However, we believe that this recommended instruction would be fair, in that it would make clear to the jury that the responsibility for the absence of those documents rests not with plaintiffs, but with USN.

**\*52** *Fourth,* the Court believes that each side has abused the other in the discovery process: plaintiffs by demanding the rebuilding of the Vantive system, then failing to copy the sales information that was produced,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 46
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

and defendants by failing to search for and produce the Final Sum/REPGEN information likely available on the January 1999 backup tapes and on the CoreComm system. As a result of that conduct, the plaintiffs could be required to bear the costs of rebuilding of the Vantive system (which defendants state was $159,632.63), and the defendants could be ordered to pay the costs that the plaintiffs incurred in getting the Final Sum information from Spectrum (which, according to plaintiffs, is $178,775.75). The Court believes that in light of the vast sums that have already been (over)spent on this sanctions issue, the last thing that should be done here is to issue an order that will lead to further dispute and litigation between the parties about the reasonableness of those respective figures. Accordingly, inasmuch as those figures are comparable, the Court believes that ordering each side to pay the others' costs is not prudent at this point: in substance, each side already has paid-albeit indirectly-for their respective discovery missteps.

*Fifth,* the Court does not believe that any award of attorneys' fees and costs is appropriate in this case. We are mindful that under Rule 37(b), a party who engages in sanctionable conduct must pay the opponents "reasonable expenses, including attorneys' fees, caused by the failure, unless the Court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Plaintiffs have prevailed on the amended sanctions motion, to a limited extent: they have established that the document preservation program was inadequate, and that discoverable documents might have been lost as a result. But they have failed to demonstrate that the outside directors are responsible for those shortcomings; they failed to demonstrate that Mr. Elliott, while responsible, was guilty of intentional or willful misconduct; and they failed to show any substantive prejudice as a result of the shortcomings in the document preservation program. Moreover, as recounted above, in the course of the amended sanctions motion, plaintiffs advanced a number of factual assertions concerning missing documents that proved to be inaccurate, and that plaintiffs should have known were inaccurate at the time that they filed the amended motion. Finally, the amount of attorneys' fees and costs plaintiffs claimed to have expended on the sanctions motions-$757,559.61-is

grossly excessive in relation to the issue presented and the victory achieved.

The Court finds that in these circumstances an award of attorneys' fees and costs to plaintiffs in any amount would be unjust.

CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends that plaintiffs' amended motion for sanctions (doc. # 208-1) be granted in part and denied in part as follows:

**\*53** 1. The Court recommends that the motion be denied as to the outside director defendants.

2. The Court recommends that the motion be granted as to Mr. Elliot, but that the plaintiffs' request for a default against him be denied. Instead, the Court recommends that Mr. Elliott be required to pay a $10,000 fine into the registry of this Court.

3. The Court further recommends that at trial, the jury be instructed that plaintiffs sought production of certain missing documents (Final Sum Reports for October through December 1997 and February 1998; sales data from December 1 through December 16, 1997 and September 18 through November 20, 1998; and Aged Accounts Receivable information for November 1997, January through February 1998 and June 1998), but that USN did not produce those categories of documents for those time periods.

4. The Court recommends that no monetary sanctions be imposed in connection with the discovery conduct by plaintiffs or the individual defendants.

5. The Court recommends that no attorneys fees and costs be awarded to plaintiffs on this amended sanctions motion.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed.R.Civ.P. 72(a). Failure to file objections with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828
**(Cite as: Not Reported in F.Supp.2d)**

district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this court in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir.1986).*

N.D.Ill.,2000.
Danis v. USN Communications, Inc.
Not Reported in F.Supp.2d, 2000 WL 1694325 (N.D.Ill.), 53 Fed.R.Serv.3d 828

Briefs and Other Related Documents (Back to top)

• 1:98cv07482 (Docket) (Nov. 20, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**Ⅱ Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States District Court,E.D. Texas, Texarkana Division.

In re: TRITON ENERGY LIMITED SECURITIES LITIGATION

No. 5:98CV256.

March 7, 2002.

ORDER

CRAVEN, Magistrate J.

***1** Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges dated January 15, 1994, Plaintiffs' Motion for a Log of Withheld Documents and for Certification of Preservation and Retention of Documents and Production of Triton's Computer Storage Systems (Docket Entry # 212) was referred to the Honorable Caroline M. Craven for the purposes of hearing and determining said motion. The Court, after considering the motion, the supplemental brief, the responses, and hearing arguments of counsel, [FN1] is of the opinion that the motion should be GRANTED in part.

> FN1. A hearing was held on Plaintiffs' motion on March 6, 2002.

I. BACKGROUND

Plaintiffs filed their current motion, complaining that documents which bear significantly on this lawsuit have just recently been produced as opposed to when disclosures were made initially in June, 2001. Specifically, Plaintiffs assert that recent events discovered in the deposition phase of this case raise a serious concern that documents have been destroyed in

violation of this Court's previous document preservation Order and the Local Rules. As an example of this concern, Plaintiffs state Defendants failed to include in their initial disclosures basic information and correspondence which supports Plaintiffs' allegations that the OCENSA pipeline transaction was not a sale, "but rather an off-balance sheet transaction virtually identical to the transactions utilized by Enron to hide debt, mislead shareholders, and falsely inflate Triton's earnings." [FN2] Plaintiffs further assert they did not receive these documents until late-January, over six months after Defendants' initial disclosures were due. In addition, Plaintiffs assert Defendants only produced these documents after Plaintiffs specifically demanded them and threatened to file a motion to compel . [FN3]

> FN2. Plaintiffs' mot. at 2.

> FN3. Another reason Plaintiffs argue more documents are in the possession of Defendants is based on documents Plaintiffs recently received regarding Triton's southeast Asian reserves. Plaintiffs assert that the quantity and quality of the reserves have been in issue from the beginning of this lawsuit, yet Plaintiffs only recently received a report regarding those reserves from Gaffney Cline and Associates, an outside reserve engineering firm. Plaintiffs similarly contend that these documents were only received after Plaintiffs threatened to file a motion to compel.

Plaintiffs provide the following time line of Defendants' document production. On June 29, 2001, Triton produced sixteen boxes of documents and re-produced the "data room" documents in Dallas. On July 18, 2001, Triton produced approximately 215 more documents. Defendants supplemented its production with documents in September 2001. Subsequently, Plaintiffs raised a concern over the loss of documents during the Amerada Hess Corporation and Triton merger, and on December 14, 2001, the undersigned issued an Order reiterating the parties' obligation to preserve documents.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2
Not Reported in F.Supp.2d, 2002 WL 32114464 (E.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs contend fifteen depositions have already been taken in this case, including the depositions of Lead Plaintiffs, several of Defendants' officers and directors, outside security analysts, and independent companies who visited Triton's data rooms during the bidding process. Plaintiffs assert hundreds if not thousands of documents were produced after key depositions were taken or on the eve of the depositions. Plaintiffs contend they did not have the benefit of many important documents before the depositions were taken, and therefore some depositions will have to be re-taken.

**\*2** For these reasons, Plaintiffs are asking the Court for the following: (a) Plaintiffs seek from Defendants a log of all documents that it or its attorneys have withheld from Plaintiffs on any ground(s); (b) Plaintiffs seek an Order requiring Triton to produce a written certification to the Court describing the efforts, if any, it has undertaken to comply with this Court's previous Orders regarding the preservation and production of evidence and their obligations under the Private Securities Litigation Reform Act ("PSLRA"); and (c) Plaintiffs seek access to Triton's computer storage systems (including servers and hard drives) and those of all present and former members of the Board of Directors, who served on the Board between January 1, 19998 until the time Triton's Board of Directors ceased to exist, and to allow non-destructive testing of these systems to determine what documents and e-mails, if any, have been deleted and what, if any, of this information bears significantly on the subject matter of this lawsuit.

## II. ARGUMENTS

### A. Log of Withheld Documents

Plaintiffs first seek from Defendants a log of all documents that it or its attorneys have withheld from Plaintiffs on any ground(s). Defendants respond that neither the facts nor the law justifies Plaintiffs' extraordinary request that Triton be ordered to undertake the enormously expensive and time-consuming task of cataloguing the universe of documents that are nonresponsive and that it has not

produced in this litigation.

### B. Written Certification of Preservation and Retention of Documents

Plaintiffs further seek an Order requiring Triton to produce a written certification to the Court describing the efforts, if any, it has undertaken to comply with this Court's previous Orders regarding the preservation and production of evidence and their obligations under the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs assert that the certification shall include (1) the names of all present and former employee(s) and/or present member(s) of the Board of Directors contacted by Triton and/or its attorneys regarding the pendency of this lawsuit and the duty of each such person(s) to retain all documents bearing significantly on this litigation; (2) the earliest date(s) upon which such communication was made with each such person(s); (3) a description of all evidence in the possession of each person(s) and a description of what, if any, such evidence was destroyed, discarded, lost, misplaced, or not preserved, for whatever reason; (4) a description of all evidence in the possession of each such person(s), if any, which has been withheld from production to Plaintiffs; and (5) a description of all evidence in the possession of each such person, which has been produced to Plaintiffs. Plaintiffs further assert that the certification should include, as to the certification regarding evidence possessed by each person(s), the date(s) upon which Triton and/or its counsel first (1) became aware of the existence of such evidence and (2) came into possession of such evidence.

### C. Production of Triton's Computer Storage Systems

**\*3** Finally, Plaintiffs seek access to Triton's computer storage systems (including servers and hard drives) and those of all present and former members of the Board of Directors, who served on the Board between January 1, 19998 until the time Triton's Board of Directors ceased to exist, and to allow non-destructive testing of these systems to determine what documents and e-mails, if any, have been deleted and what, if any, of this information bears significantly on the subject matter of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 32114464 (E.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

this lawsuit.

In support of its request, Plaintiffs assert they have recently deposed three of Triton's former directors. At the hearing on Plaintiffs' motion, Plaintiffs played excerpts from the depositions, wherein each former director testified he had not been asked by Triton's counsel to produce any documents. Each of the directors was also asked if Triton's counsel had asked them to retain any documents which might pertain to this lawsuit, and each of the directors answered that they had not been asked to retain any documents.

Plaintiffs further assert James C. Musselman, another Triton director and Chief Executive Officer for a substantial period of time during the pendency of this lawsuit, testified that he had never been asked for any documents, nor had he been asked to retain any documents. Additionally, Plaintiffs assert that Sheldon Erickson, a former Triton board member and Chairman of the Board, testified that he had sent and received e-mails relating to his involvement in Triton while serving on the board but those e-mails were only retained on his company's e-mail server for a period of one year before being destroyed. This lawsuit was filed on July 18, 1998, one day after the class period ended. Therefore, Plaintiffs assert any relevant e-mails in Mr. Erickson's possession would have remained on his server until at least July 18, 1999. Mr. Erickson testified Triton's counsel never asked him to retain the documents, and all of the e-mails have since been destroyed.

Don Drinkard, one of the Triton employees in charge of development and production, testified that he had never been asked for documents relevant to this litigation and that, the week before the deposition, he pulled approximately 25 e-mails relating to this litigation off of his computer at Triton and discussed them with counsel. Those e-mails were produced to Plaintiffs on February 12, 2002. Mr. Drinkard further testified that he has additional e-mails "archived" on his computer that he felt pertained to this lawsuit. Plaintiffs maintain that the responses of Triton's directors and top employees raises a serious concern that documents have been destroyed in violation of the law.

Triton responds that it has produced those documents that bear significantly on the claims specifically raised in Plaintiffs' Consolidated Class Action Complaint and that it has been doing a rolling production as permitted and required by the rules. Triton maintains it has made a huge effort to supplement its production by responding to new issues raised in depositions even though they are not alleged in the Complaint. Specifically, Triton asserts that Plaintiffs only allege the reserves in Malaysia were improperly classified. Therefore, based on the substantive differences between quantity and classification of reserves, Triton did not initially produce documents relating to quantity. Triton adds, however, that even though not specifically alleged in the Consolidated Class Action Complaint, once the issue of quantity was raised in depositions, Triton produced such documents.

**\*4** Triton asserts it alerted and cautioned its employees on July 23, 1998 that Triton cannot destroy any documents pertaining to the strategic alternatives process or any matters that may be the subject of the suit. The communication further instructed Triton employees that the documents to be preserved encompassed drafts, correspondence, and information in electronic form. Triton asserts it has sent follow-up communications reminding its employees that documents relating to this lawsuit cannot be destroyed. Triton further contends it identified and preserved thousands of e-mails from its computer system, which were reviewed for responsiveness and where appropriate, produced in this litigation.

While Triton submitted affidavits that it advised its employees to preserve documents during the pendency of this litigation, Triton did not advise its outside directors to preserve documents since they were not Triton employees. Triton conceded at the hearing that it did not tell its outside directors to preserve documents. Triton argues, however, that it only has control over employees and the documents within their possession. Specifically, Triton argues the three, independent outside directors whom Plaintiffs have deposed are not named parties to this litigation. Triton further asserts that two of the directors had no hard copy documents to produce. Triton further objects to Plaintiffs request for the personal computers of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2002 WL 32114464 (E.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Erickson, Musselman, and McMahon and any other former directors of Triton because Triton does not have control over the personal computers of these former directors. Triton argues Plaintiffs' intrusion into the personal computers would allow Plaintiffs to view material produced for other corporations and for the directors' personal use far beyond the scope of their roles as former Triton directors.

Finally, Defendants Thomas Finck and Peter Ruggs assert that they have produced all of the non-privileged documents in their possession, custody, or control. The individual Defendants further argue Plaintiffs have not alleged any basis for any sanctions against them.

### III. DISCUSSION

#### A. Log of Withheld Documents

Plaintiffs maintain that Triton's production of key documents after the conclusion of depositions of Triton directors justifies the production of a log of withheld documents from Defendants. The Court agrees that Triton's production of documents at or after a deposition is unfair to Plaintiffs. However, there exists in the rules a duty to supplement, [FN4] which indicates to the Court that the rules contemplate a situation such as here where it is problematic to produce in one fell swoop *all* documents which bear significantly. In a simple case, this could be done. This is a complex lawsuit. The Court concludes the burden to Defendants outweighs the likely benefit of a log of all withheld documents. Therefore, the Court is of the opinion that this request should be granted only to the extent the documents are being withheld by a claim of privilege. If Triton is withholding the production of any documents or electronic data that bear significantly on the lawsuit, Triton shall set forth a description of the document(s) or the data and the reason(s) why it is being withheld within fourteen days from the date of entry of this Order. This also applies to the individual Defendants Thomas Finck and Peter Ruggs.

FN4. *See* Local Rule CV-26(f).

#### B. Written Certification of Preservation and Retention of Documents

**\*5** Defendants have submitted to the Court adequate evidence of its efforts to inform its employees of the duty to preserve and produce documents. Moreover, the Court is of the opinion that the certification would do little to aid in the resolution of this matter. As the Court discusses below, the Court makes provision for a special master to review the computer hard drives to determine whether any documents or data that bear significantly have been deleted of not produced. Accordingly, Plaintiffs' request for a written certification is denied.

#### C. Production of Triton's Computer Storage Systems

Plaintiffs maintain that the responses of Triton's directors and top employees raises a serious concern that documents have been destroyed in violation of the law. Specifically, Plaintiffs seek access to Triton's computer storage systems to determine whether Triton has complied with its obligations to preserve and produce documents which bear significantly. Attempting to fashion a workable remedy for this situation, the Court will appoint a computer specialist to extract information as well as a special master to review and determine what documents or electronic data, if any, were destroyed which bear significantly on this litigation. The reasons for the Court's decision are as follows.

During pending litigation, a party is under a duty to preserve relevant evidence. Moreover, the PSLRA provides that "[d]uring the pendency of any stay of discovery ... any party with actual notice of the allegations contained in the complaint shall treat all documents ... that are relevant to the allegations as if they were the subject of a continuing request for production ...." 15 § 77z-1(b)(2). Therefore, Defendants had a common law duty not to spoil documents (in hard copy or electronic form) that might be discoverable in this litigation as well as a duty pursuant to the PSLRA. 15 U.S.C. § 78u4(b)(3)(c)(i).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 5
Not Reported in F.Supp.2d, 2002 WL 32114464 (E.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

The Court has not found any authority specifically addressing the issue of whether Triton has a duty to instruct its outside directors to preserve documents. However, the Court finds instructive *Danis v. USN Communications, Inc., 2000 WL 1694325 (N.D.Ill.2000),* wherein the plaintiffs filed a motion for sanctions against six of the eleven individual officers and director defendants. Only one of the defendants, Mr. Elliott, held the position of inside director of USN during the class period; the other defendants were outside directors to USN during the class period. USN was not named as a defendant because it filed for bankruptcy protection. The need to preserve documents was discussed at a USN board meeting the day the case was filed. The named defendants attended the meeting. The affidavits and the court testimony established that one of the attorneys "made it clear, in vivid terms, that with filing of the lawsuit document preservation must be a top priority at USN." *Id.* at 12. The witnesses testified that the attorney warned that he "could deal with bad documents," but "there was nothing worse than destroying documents," thus he emphasized the "importance of maintaining the documents." *Id.* The need to preserve documents was later discussed at a USN staff meeting attended by USN officers and high level managers representing every business group within USN.

**\*6** The court in *Danis* concluded that the document preservation program was inadequate, though not intentionally so. The court further concluded that the outside directors, although under a duty to preserve, were not responsible for the failure to preserve documents. Instead, the court sanctioned the CEO, Mr. Elliott because "he was directed by the Board to see to it that documents were preserved, and he was on the scene with the ability to follow through and see that the job was completed." *Id.* at 41. While the court found USN failed to implement adequate steps to discharge its duty to preserve documents and information that might be discoverable, USN's attorney had admonished the outside directors and upper level employees to preserve documents.

In this case, Triton asserts it admonished its employees to preserve documents, but not its outside directors. The Court is of the opinion that it would have been prudent

and within the spirit of the law for Triton to instruct its officers and directors to preserve and produce any documents in their possession, custody, or control. As stated above, the Court does not find that Triton *intentionally* failed to instruct the outside directors to preserve and produce relevant documents. In fact, a large quantity of documents which bear significantly on this litigation has been preserved and produced to Plaintiffs. At the same time, "it is clear that as a result of the failure to implement a suitable document preservation plan, to communicate that plan effectively to [outside directors], and to follow up to insure that the directive was being followed, there were holes in the document preservation plan through which discoverable materials may have been lost." *Id* . at 43.

The Court is of the opinion that Plaintiffs' suggestion of allowing them unfettered access to Triton's computer hard drives would potentially violate Triton, its employees, and outside directors right to privacy and privileges. In an effort to alleviate these concerns, the Court will appoint a special master to review the information retrieved from the computer storage systems. [FN5] The Court will also appoint a forensic computer specialist to retrieve information from Triton's computer storage systems (including servers and hard drives) and those of all other former officers and directors as well as all present and former members of the Board of Directors, who served on the Board between January 1, 1998 until the time the Board of Directors ceased to exist. The computer specialist will conduct non-destructive testing of these systems to determine what documents and e-mails, if any, have been deleted. The special master will then review and determine what documents and electronic data, if any, were destroyed that bear significantly on the claims and defenses in this lawsuit. Based on the special master's report, the Court will determine whether Triton has complied with its disclosure obligations and whether a sanctions hearing is necessary.

FN5. The Court has the authority to appoint a special master to review and prepare a report to the Court. *See* FED. R. CIV. P. 53.

IV. CONCLUSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*7 Based on the foregoing, it is

ORDERED that Defendants shall produce a log of all documents withheld by a claim of privilege, including a description of the document(s) and/or electronic data as well as the reason(s) why it is being withheld, within fourteen days from the date of entry of this Order. It is further

ORDERED that Defendants, including all outside directors, shall produce any additional documents which bear significantly on the claims and defenses of this lawsuit within ten days from the date of entry of this Order. Defendants shall continue to supplement their production of documents which bear significantly on the claims and defenses in this lawsuit, including documents from present and former outside directors. Defendants are advised that by supplementing, rather than producing the documents at one time, the Court places upon Defendants the burden of paying the costs for any additional deposition, if any, that Plaintiffs may need to take because they did not have the documents timely. This includes depositions of new witnesses or witnesses that have previously been deposed. It is further

ORDERED that the parties shall meet, confer, and submit to the Court within ten days from the date of entry of this Order mutually agreeable names of (1) an outside forensic computer specialist and (2) a special master knowledgeable in securities litigation. The Court will then appoint a computer specialist to retrieve information from Triton's computer storage systems (including servers and hard drives) and those of all other former officers and directors as well as all present and former members of the Board of Directors, who served on the Board between January 1, 1998 until the time the Board of Directors ceased to exist. The computer specialist will conduct non-destructive testing of these systems to determine what documents and e-mails, if any, have been deleted.

The Court will also appoint a special master who will determine, considering the allegations plead in Plaintiff's Consolidated Class Action Complaint as well as applicable privileges, what additional documents and electronic data, if any, should have been preserved and produced to Plaintiffs. Triton shall provide a list of all documents which have been produced to Plaintiffs in this litigation. Plaintiffs shall bear the costs of such testing and retrieval unless the special master determines Triton has not preserved and produced all documents which bear significantly on the claims and defenses in this lawsuit.

IT IS SO ORDERED.

E.D.Tex.,2003.
In re Triton Energy Ltd. Securities Litigation
Not Reported in F.Supp.2d, 2002 WL 32114464 (E.D.Tex.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 31887575 (Verdict and Settlement Summary) (Sep. 23, 2002)
• 2002 WL 32132996 (Verdict and Settlement Summary) (Sep. 23, 2002)
• 2002 WL 32155165 (Verdict and Settlement Summary) (Sep. 23, 2002)

END OF DOCUMENT



Slip Copy                                                                                                    Page 1
Slip Copy, 2005 WL 3303861 (E.D.Pa.)
**(Cite as: Slip Copy)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
PARAMOUNT PICTURES CORP.
v.
John DAVIS
**No. Civ.A. 05-0316.**

Dec. 2, 2005.

Alexandra N. Deneve, Loeb & Loeb LLP, New York, NY, Cheryl A. Krause, Paul W. Kaufman, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA, for Paramount Pictures Corp.
John Davis, Philadelphia, PA, pro se.

MEMORANDUM

ONEILL, J.
**\*1** Plaintiff, Paramount Pictures Corp., filed a John Doe complaint on January 21, 2005 under the Copyright Act of 1976, 17 U.S.C. § 101, et seq., claiming that defendant, later identified as John Davis, pro se, violated its exclusive rights to reproduce and distribute plaintiff's motion picture, "Lemony Snicket's: A Series of Unfortunate Events," by willfully and knowingly obtaining an illegal digital copy of the motion picture and making the motion picture available for digital distribution via an internet distribution system named eDonkey one week after the motion picture's theatrical release date. Plaintiff seeks a permanent injunction precluding defendant from infringing upon its motion picture copyrights under 17 U.S.C. § 502(a), $50,000 in statutory damages under 17 U.S.C. § 504(c), and $38,437.68 in attorneys' fees and costs under 17 U.S.C. § 505. Neither party has requested a jury trial. Before me now are the parties' cross motions for summary judgment.

BACKGROUND

*I. The Internet*

Prior to discussing the specific facts of this case, I find it necessary to place this case in the technological context. The internet is a vast collection of interconnected computers and computer networks that communicate with each other. It allows hundreds of millions of people around the world to exchange ideas and information freely and easily. For example, users of the internet freely exchange academic research, literary works, financial data, music, audiovisual works, graphics, and other digital data. With the aid of other technological developments, the internet also has afforded users with opportunities to infringe on the rights of owners of copyrighted works, including motion pictures. Given the open and digital nature of the internet, once a motion picture has been transformed into an unsecured digital format, it can be copied further and distributed an unlimited number of times over the internet without degradation in picture or sound quality.

*A. P2P Networks*

Many individuals seeking to copy and distribute copyrighted motion pictures over the internet use online media distribution systems called "peer-to-peer" ("P2P") networks. P2P networks, in their most common form, are computer systems that enable internet users to make files stored on each user's computer available for copying by other users, to search for files stored on other users' computers, and to transfer exact copies of files from one computer to another via the internet. Although P2P networks allow the copying and transfer of many different types of digital files, I focus my discussion on copyrighted motion pictures at issue in this case. Here, Paramount has never authorized any of its motion pictures to be distributed via P2P networks.

*B. First Propagator*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 2
Slip Copy, 2005 WL 3303861 (E.D.Pa.)
**(Cite as: Slip Copy)**

For any one copy of a motion picture to be made available without authorization of a copyright owner on a P2P network, there must be a "first propagator" (also known as an "early propagator" or a "first mover") of that copy of that motion picture. A first propagator is the particular P2P user who is the first to obtain (via some means) an illegal digital copy of a motion picture. He or she then places that copy in a publicly shared directory that he makes available to the P2P users around the world over the internet. But for the infringing acts by a first propagator, an infringing copy of a motion picture would never appear on P2P networks and the chain of infringing copies would never commence. All means of obtaining a digital file of a motion picture without authorization of the copyright owner are illegal. One method of obtaining such a file is to sneak a camcorder into the movie theater after an opening weekend and illegally film the motion picture. Once the recording of the motion picture is converted into a digital film, it can be distributed on the internet.

**\*2** The motion picture industry (along with the recording industry and other producers and distributers of copyrighted media) takes particular offense to the activities of first propagators because their ability to obtain and offer an illegal digital copy of a motion picture on a public P2P network for widespread unauthorized copying and distribution sets off a chain reaction that enables millions of people to copy and further distribute that motion picture to others. Paramount claims that such activity damages the value of their copyrights, particularly when the first propagator distributes the motion picture on a P2P network while the motion picture is still in the theatrical release stage of distribution and has not yet reached the home video (DVD and VHS) stage of distribution. Paramount claims that such illegal distribution can severely diminish or destroy the profitability of the motion picture because the revenue from the theatrical and home video releases are necessary to recover a motion picture's substantial production and marketing costs.

### C. BayTSP

In an effort to combat such activities, Paramount hired BayTSP, an antipiracy technology specialist, to identify direct infringers and first propagators of its motion pictures over P2P networks. BayTSP has developed a specific technology platform to detect unauthorized distribution of digital motion pictures (and other digital content) over several P2P networks, including eDonkey. BayTSP also has developed a method to identify first propagators of specific digital content on the eDonkey network (and other P2P networks). Paramount provides BayTSP with lists of copyrighted motion pictures it believes may be the subject of infringing activity, particularly those motion pictures that are about to begin their theatrical release.

To determine whether certain specific motion pictures are being offered on the eDonkey network, BayTSP connects to the network and searches for users who are offering copies of the motion picture. BayTSP uses the same basic technical processes that are used by eDonkey users to identify users who are making Paramount's motion pictures available over the internet. Once BayTSP locates an eDonkey network user who is offering for download a specific motion picture, a BayTSP employee downloads the motion picture file and executes an evidence gathering software program that obtains the Internet Protocol address of that user while the motion picture is downloading.

An IP address is a unique numerical identifier that is automatically assigned to a user by its Internet Service Provider each time a user logs on to the network. Although a subscriber may be assigned a different IP address each time he or she logs on, ISPs are assigned certain blocks or ranges of IP addresses and ISPs keep track of the IP addresses assigned to its subscribers at any given moment and retain user logs of their activity. Therefore, if provided with a user's IP address and the date and time of the infringing activity, an ISP can use its user logs to identify the name and address of the ISP subscriber who was assigned that IP address at that date and time.

**\*3** In addition to the motion picture file and IP address, BayTSP simultaneously downloads other publicly available identifying information from the network user. For example, BayTSP downloads and records for each

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

file downloaded from each user: (a) the video file's metadata (digital data about the file), such as its title and file size, which is not part of the actual video content but that is attached to the digital file and helps identify the content of the file; (b) the time and date at which the file was downloaded from the user; (c) the IP address assigned to each user at the time of activity; and (d) the percentage of the file the eDonkey user is offering on his or her computer. BayTSP then creates evidence logs for each user and stores this information. Paramount then confirms that the file downloaded is in fact one of its motion pictures.

Digital copies of motion pictures are very large computer files and take anywhere from several hours to several days to download from one network user to another. In order to speed up this process, eDonkey software (provided free of charge to network users) enables a user to obtain a particular copy of a motion picture from many different users. When a user searches for a particular motion picture, the eDonkey network finds many different people who have a copy or portions of a copy of that motion picture on their shared directory and enables the user to download different pieces of the motion picture from more than one user. Downloading the motion picture in different pieces from different sources increases the likelihood that the user will obtain the whole motion picture file and decreases that period of time necessary to download the entire file. Once a user obtains a portion of a motion picture file, that portion of that motion picture becomes available for download by another user.

When a first propagator makes a complete copy of a motion picture file available on eDonkey by placing it in a special shared folder on his or her computer, the eDonkey software automatically assigns a unique Hash Identifier or number to that file, which is how that file and portions thereof are identified within the network. The hash identifier is a binary number eighty characters long. Therefore, the probability of two files sharing the same hash number is $2^{80}$, i.e. more than one septillion (one followed by twenty four zeros) to 1. The probability of two files sharing the same hash number and the same file size is even smaller. Any eDonkey user who holds a portion of a file with the same hash number as the hash number assigned to the first

propagator's complete file obtained that file (either directly or indirectly) from the first propagator.

To find a first propagator of a motion picture on the eDonkey network, BayTSP makes a constant search of the network until it finds the first instance of a particular digital copy of a motion picture identified by a specific hash number. There are two key characteristics to BayTSP's search that allow BayTSP to confirm its determination that a user is a first propagator of a specific digital copy of a motion picture on the eDonkey network. First, BayTSP's constant search for a particular title on the eDonkey network begins before the motion picture is released in theaters. This ensures that BayTSP will find the digital copy at the precise time or within a short time after the first propagator makes the pirated motion picture available on the network. Second, BayTSP determines the percentage of the total file a user holds when detected by the system. This ensures that the user identified as the first propagator has the entire file available for download. If a particular user is both the first in time to appear on the network with a unique copy (identified by a unique hash number) of the motion picture and appears on the network with the complete digital file, then that user is the first propagator and was the first person to place that copy of the motion picture on the P2P network. If a user were shown to be offering less than the complete motion picture, then that user would still be downloading the motion picture from another user, who would therefore not be a first propagator.

## II. John Davis

**\*4** Prior to the motion picture's theatrical release on December 17, 2004, Paramount instructed BayTSP to search the eDonkey network for the motion picture and identify first propagators of the motion picture on the eDonkey network. The motion picture was one of Paramount's 2004 December holiday releases. It cost more than $120 million to produce.

### A. Finding the Infringer

Using the method described above, BayTSP began

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4
Slip Copy, 2005 WL 3303861 (E.D.Pa.)
**(Cite as: Slip Copy)**

searching for the motion picture on eDonkey in early December 2004. On December 23, 2004 at 04:49:52 PM Eastern Standard Time, <u>FN1</u> BayTSP located an eDonkey user offering for download 100% of a file labeled "lemony snickets 'jim carey' .mpg" with the IP address 69.141.202.170. BayTSP downloaded segments of the digital file, saved the relevant identifying information described above, and created an evidence log for this infringer. BayTSP also concluded that this infringer was a first propagator because he or she was the first to offer a digital copy of the motion picture with a unique hash identifier not previously assigned to other files on the eDonkey network and he or she offered for download a file that had 100% of the picture. Paramount claims that this evidence collected and prepared by BayTSP proves that this individual was infringing on Paramount's copyright and was a first propagator. Paramount later confirmed that this file was its motion picture.

> <u>FN1.</u> Confusingly, Paramount asserts a different time of infringing activity (11:49:52 AM Eastern Standard Time) in its motion for summary judgment. For the sake of simplicity, I will use the time asserted in Paramount's complaint.

### B. Identifying John Davis

Based on the infringer's IP address, BayTSP determined that Comcast Cable Communications was the infringer's ISP. In order to identify this infringer, Paramount filed a John Doe lawsuit in this Court on January 21, 2005 against the infringer because Comcast resides in this District. Paramount simultaneously filed a motion to serve discovery prior to the Rule 26(f) conference seeking leave from the Court to serve Comcast with a subpoena for the infringer's true identity by use of the IP address and date and time of infringement. My deceased colleague, Judge Kelly granted this motion, and on March 3, 2005, Paramount served Comcast with the subpoena. Before responding to the subpoena, Comcast informed the infringer (its subscriber) in writing on March 9, 2005 of the lawsuit against him and its intention to respond to the subpoena by revealing his identity.

After checking its subscriber logs and notifying Davis of the lawsuit and subpoena, Comcast identified Davis as the suspected infringer on March 30, 2005. On May 26, 2005, Paramount filed an amended complaint naming Davis as the John Doe defendant. Davis was served with the complaint and summons on June 2, 2005.

### C. Answer by John Davis

Davis filed an answer to the complaint on July 27, 2005. In his answer, Davis parrots the language of Paragraphs Four and Five of plaintiff's complaint:
4. Plaintiff Paramount is among the world's leading creators and distributors of motion pictures. Paramount is a Delaware corporation, with its principal place of business at 5555 Melrose Avenue, Los Angeles, California. Paramount is engaged in the production, acquisition and distribution of motion pictures for theatrical exhibition, home entertainment and other forms of distribution. Paramount is the owner of the copyrights and/or the pertinent exclusive rights under copyright in the United States in motion pictures, including the motion picture *Lemony Snicket's: A Series of Unfortunate Events* (the "Copyrighted Motion Picture"), which has been unlawfully distributed over the Internet by Davis. (emphasis added)
**\*5** 5. John Davis is an individual who resides in this District at 1523 19th Street, Apt. B, Philadelphia, Pennsylvania, 19121. Davis is also known to Paramount by the Internet Protocol ("IP") address assigned to him by his ISP on the date and time at which the infringing activity of Davis was observed (69.141.202.170 12/23/2004 04:49:52 PM (EST)). Davis' identity was confirmed through the expedited discovery this Court allowed in this case as originally filed. (emphasis added)

At first glance it would appear that he admits as much. However, Davis later "denies using an online media distribution system to distribute to the public, including by making available to others, the Copyrighted Motion Picture. Davis denies violating Paramount's exclusive rights to reproduction and distribution." Davis further "denies being a 'first propagator' of the unauthorized distribution of the Copyrighted Motion Picture" and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"denies committing the alleged foregoing acts of infringement." In short, Davis answers that he has been misidentified as the infringer of Paramount's copyright.

### D. Further Investigation

In response to Davis' denials, Paramount requested access to Davis' Macintosh G4 Cube computer in order to investigate the hard drives of his computer by a third party forensic specialist, Kroll Ontrack Electronic Evidence Services. Upon completion of its analysis, Kroll reported on August 1, 2005 that on March 25, 2005, Davis wiped his hard drive clean of all data, and then reinstalled an operating system. Paramount finds Davis' actions of wiping the hard drive clean of all data to be suspicious because it was sixteen days after Davis received notice from Comcast of the John Doe lawsuit pending against him. The effect of Davis wiping the hard drive clean of all data was to make it impossible to determine whether the motion picture or eDonkey software was on the computer prior to March, 25, 2005. Paramount alleges that Davis' actions were intentional to prevent detection of his infringing activities. Davis denies this allegation and claims that he wiped his hard drive clean in preparation for selling it to Stephanie Seymour for $390 on March 30, 2005. Davis supports his claim with a letter to this Court by Seymour, in which she avers: (1) that she expressed an interest in buying the computer in February 2005; (2) that Davis had emailed her a picture of the computer on February 23, 2005; (3) that she was supposed to pick up the computer on March 30, 2005; (4) that she was precluded from picking up the computer because of this action; and (5) that as a result of her own financial situation did not purchase the computer until September 30, 2005.

Davis further claims that the operating system found on the computer in July 2005, MAC OS 9.2.2, is incompatible with the eDonkey network. Davis supports this claim with a printout of the eDonkey network application download page which states that eDonkey "runs on Windows, Mac OS X, and Linux." Paramount disputes this claim and alleges that while the operating system in place in July 2005 was not compatible with the eDonkey network there is no evidence of what

operating system was in place at the time of the alleged infringing activity. Paramount further alleges that it is unlikely that the MAC OS 9.2.2 operating system was installed on the computer at the time of the alleged infringing activity because: (a) MAC OS 9.2.2 was last sold in late 2001, approximately four years ago, and MAC OS X was released earlier that same year; and (b) Davis is a self employed computer consultant who had worked for the government as a computer consultant. Paramount asserts that because it is unlikely for an individual with his proficiency with computers to be using an outdated operating system on his computer, I should infer from this evidence that Davis intentionally wiped the hard drive clean to prevent Paramount from detecting his infringing activities and replaced the compatible operating system with an outdated version that was incompatible with the eDonkey network.

### STANDARD OF REVIEW

**\*6** Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (2004). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions ... which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (2004).

I must determine whether any genuine issue of material fact exists. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is material only if the dispute over the facts "might affect the outcome of the suit under the governing law." *Id.* In making this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

determination, I must view the facts in the light most favorable to the non-moving party, and the non-moving party is entitled to all reasonable inferences drawn from those facts. *Id.* However, the nonmoving party may not rest upon the mere allegations or denials of the party's pleading. *See Celotex, 477 U.S. at 324.* The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, mere suspicions. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.1989).* If the evidence for the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson, 477 U.S. at 249-50* (citations omitted).

Cross motions are claims by each party that it alone is entitled to summary judgment; they do not constitute an agreement that if one is denied the other is necessarily granted or that the losing party waives judicial consideration and determination of whether genuine issues of material fact exist. *Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968).* If any such issue exists it must be disposed of at trial and not on summary judgment. *Id.* In the present case, I conclude that there are five genuine issues of material fact. I will therefore deny both motions for summary judgment.

I find that the parties' disagreements as to whether Davis engaged in any infringing activity, whether he was a first propagator of the motion picture, whether he was misidentified, whether he intentionally wiped the computer's hard drive clean in order to avoid detection of his infringing activities, and whether the motion picture and the eDonkey compatible operating system were on the computer at the time of the alleged infringing activity create five genuine issues of material fact that preclude summary judgment for either party.

## DISCUSSION

**\*7** To establish its claim of copyright infringement, Paramount must establish: "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *Dun & Bradstreet*

*Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 206 (3d Cir.2002).* With respect to the first element, Paramount asserts-and Davis does not dispute-that it holds a valid United State Copyright Registration for the motion picture and that it is the exclusive licensee of the motion picture. With respect to the second element, "[c]opying refers to the act of infringing any of the exclusive rights that accrue to the owner of a valid copyright, as set forth at *17 U.S.C. § 106,* including the rights to distribute and reproduce copyrighted material." *Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 207 (3d Cir.2005) quoting Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 291 (3d Cir.1991)* (internal quotations omitted). [FN2] Copying "may be demonstrated by showing that the defendant had access to the copyrighted work and that the original and allegedly infringing works share substantial similarities." *Id.*

FN2. Section 106 of the Copyright Act provides:
Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
(5) in the case of literary, musical, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 U.S.C. § 106 (2005).

Paramount argues that the evidence demonstrates that Davis infringed on its copyright to reproduce and distribute the motion picture, "Lemony Snicket's: A Series of Unfortunate Events." Paramount has produced evidence to show that, working on behalf of Paramount, BayTSP located at the time of the infringement (December 23, 2004 at 04:49:52 PM Eastern Standard Time) an eDonkey user with the infringing IP address (69.141.202.170) offering 100% of the motion picture for download. BayTSP identified this infringer as a first propagator because he or she was the first to offer 100% of a unique copy of the motion picture on the eDonkey network. BayTSP determined that the infringer was a Comcast subscriber because the infringer's assigned IP address was within the range of IP addresses assigned to Comcast subscribers. Comcast identified Davis as the suspected infringer because its user logs indicated that Davis was the user with the same IP address at that specific moment in time.

In his answer, Davis denies that he infringed on Paramount's copyrights and argues in his motion for summary judgment that he has been misidentified as the infringing user. Paramount asserts that Davis offers no evidence for his contention that he was misidentified and argues that Davis cannot rely on a bare denial or unsupported allegation in his motion for summary judgment to create a genuine issue of fact. *See Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* AFL-CIO, 982 F.2d 884, 892 (3d Cir.1992) ("this court has made it clear that arguments, allegations or 'facts' contained in briefs, that are not evidentiary because they are not sworn to, are insufficient to overcome a motion for summary judgment based on sworn affidavits. Thus, the allegations raised solely in [defendant's] brief do not suffice to raise any genuine issue of material fact.") *citing Thornton v. United States,* 493 F.2d 164, 167 (3d Cir.1974) ("A statement in a brief or in oral argument does not constitute evidence" for purposes of summary judgment.). Paramount further argues that because Davis admitted in his answer that the infringing IP address was assigned to him at the date and time of the alleged infringement he cannot now deny those allegations at the summary judgment stage. *See*

Fed.R.Civ.P. 8(d) (2005) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."); *United States v. Merritt-Chapman & Scott Corp.,* 305 F.2d 121, 123 (3d Cir.1962) ("Since the Answer fails to deny the quoted allegations in the Complaint, they are deemed admitted.").

**\*8** However, I am guided by Rule 8(f)'s prescription that "[a]ll pleadings shall be so construed as to do substantial justice" and the principle that pro se pleadings should be construed liberally. *See Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding the allegations of a pro se complaint to a less stringent standard than formal pleadings drafted by lawyers); *Alston v. Parker,* 363 F.3d 229, 234 (3d Cir.2004); *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir.2003) ("because [plaintiff] filed his complaint *pro se,* we must liberally construe his pleadings, and we will apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name."). Upon review of Davis' answer, I find that the "admissions" in paragraphs four and five of his answer are merely a verbatim parroting of paragraphs four and five of Paramount's complaint. By contrast, in paragraphs eight through thirteen of his answer, Davis specifically denies: (a) using an online media distribution system to make the motion picture available to the public; (b) violating Paramount's exclusive rights to reproduce and distribute the motion picture; (c) being a first propagator; and (d) committing the alleged acts of infringement. Therefore, I will construe Davis' answer as a denial of Paramount's allegations that Davis engaged in the alleged acts of infringement upon its copyright of the motion picture. I will also allow Davis to assert his defense of misidentification. This defense is a logical outgrowth of his general denials: if he claims the infringer was not he, then naturally he is claiming that any infringement was done by someone else. I therefore find there to be genuine issues of material fact as to whether Davis was correctly identified as the infringer, whether he was the first propagator of the motion picture, and whether he engaged in any infringing activity.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 8
Slip Copy, 2005 WL 3303861 (E.D.Pa.)
**(Cite as: Slip Copy)**

*A. Spoliation Inference*

Davis also argues that there is no evidence to suggest that motion picture or eDonkey network software was ever on his computer. Paramount argues that this lack of evidence does not create a genuine issue of material fact because Davis is subject to spoliation sanctions for intentionally wiping his hard drive clean of all data in order to make it impossible to determine whether the motion picture or eDonkey software was on the computer at the time of the infringing activity. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd., 348 F.Supp.2d 332, 335 (D.N.J.2004).* A showing of spoliation may give rise to a variety of sanctions: "[1] dismissal of a claim or granting judgment in favor of a prejudiced party; [2] suppression of evidence; [3] an adverse inference, referred to as the spoliation inference; [4] fines; [and][5] attorneys' fees and costs." *Id.* [FN3]

> [FN3.] Spoliation sanctions serve three functions:
> Spoliation sanctions serve a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without spoliation. They also serve a punitive function, by punishing the spoliator for its actions, and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be.
> *Mosaid, 348 F.Supp.2d at 335.*

**\*9** There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of evidence; rather, such a decision is left to the discretion of the Court. *Erie Ins. Exchange v. Applica Consumer Prods., Inc.,* No. 02-1040, 2005 WL 1165562, at \*3 (May 17, 2005) *citing Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir.1994).* In exercising this discretion, however, I am guided by the following factors: "(1) the degree of fault

of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid, 13 F.3d at 79.* In choosing an appropriate sanction for the spoliation of evidence, courts should "select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Id.; Baliotis v. McNeil, 870 F.Supp. 1285, 1289 (M.D.Pa.1994)* ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only if no alternative remedy by way of a lesser, but equally efficient sanction is available.") (internal citations and quotations omitted).

*1. Degree of Fault*

"When determining the degree of fault and personal responsibility attributable to the party that destroyed the evidence, the court must consider whether that party intended to impair the ability of the other side to effectively litigate its case." *In re Wechsler, 121 F.Supp.2d 404, 415 (D.Del.2000); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir.1995)* ("[I]t must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for.").

Paramount argues that Davis is at fault because he willfully wiped the computer's hard drive clean of all information when he knew that the computer's memory was relevant to the litigation. *Baliotis, 870 F.Supp. at 1290-91* ("A litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action."); *Mosaid, 348 F.Supp.2d at 336* ("While a litigant is under no duty to keep or retain every document in its possession, even in advance of litigation, it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation."). I agree. Davis knew

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or should have known that the computer's memory was relevant to the lawsuit against him because he received notice of the action against him on March 9, 2005-sixteen days before he wiped the hard drive clean.

**\*10** Davis argues that he is not at fault because he reasonably wiped the computer's hard drive clean of all prior memory in preparation for selling it to Seymour, who had expressed interest in the computer as early as February 23, 2005. This argument does not obviate his duty to preserve the computer's memory. Once he learned of the lawsuit pending against him and the subject matter of that lawsuit, he either knew or should have known that the computer's memory was a crucial piece of evidence in this action. His failure to preserve this evidence places the fault for its destruction squarely upon Davis.

### 2. Prejudice

"When considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evidence in question before it was destroyed." *Wechsler,* 121 F.Supp.2d at 416 ("[W]hen one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, then sanctions for spoliation are generally appropriate."). Paramount is prejudiced by the destruction of this evidence because it has not and will not have any opportunity to determine whether its motion picture or the eDonkey network software was stored on Davis' computer on the date of the alleged infringement. There are no other means of retrieving the information stored on Davis' computer prior to the time of the alleged infringement; that information is lost forever. *See id.* ("Of course, when a party is denied any opportunity to examine the evidence, this test would automatically be satisfied.").

### 3. Substantial Unfairness and Deterrence

Paramount argues that in order to avoid substantial unfairness and deter such conduct by others in the future I should impose a spoliation inference sanction against Davis for wiping his hard drive clean; Paramount asserts that this is the least onerous sanction to impose. *See Mosaid,* 348 F.Supp.2d at 335. The spoliation inference permits a fact finder to infer that the "destroyed evidence might or would have been unfavorable to the position of the offending party." *Id.* at 336 ("If a party has notice that evidence is relevant to an action, and either proceeds to destroy that evidence or allows it to be destroyed by failing to take reasonable precautions, common sense dictates that the party is more likely to have been threatened by that evidence."); *Brewer,* 72 F.3d at 334 ("When an item of evidence is relevant to an issue in a case, the trier of fact generally may receive the fact of the item's nonproduction or destruction as evidence that the party that has prevented production did so out of the well founded fear that the item of evidence would harm him or her."); *Schmid,* 13 F.3d at 78 *quoting Nationwide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 218 (1st Cir.1982) (Breyer, J.) ("the evidentiary rationale for the spoliation inference is nothing more than the common sense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence than is a party in the same position who does not destroy the document.").

**\*11** The spoliation inference applies only where: (1) "the evidence in question was within the party's control," *Brewer,* 72 F.3d at 334; (2) "there has been an actual suppression or withholding of the evidence," *id.;* (3) "the evidence destroyed or withheld was relevant to claims or defenses," *Mosaid,* 348 F.Supp.2d at 336; and (4) "it was reasonably foreseeable that the evidence would later be discoverable," *id.* The spoliation inference sanction is appropriate in this case because, as discussed above, the information stored on the computer was within Davis' exclusive control, he destroyed that information by wiping his hard drive clean after receiving notice of this action, the information destroyed was relevant to Paramount's copyright infringement claim, and Davis knew or should have known that the information stored on his computer would later be necessary to confirm any copyright infringement or to demonstrate that he had not infringed on Paramount's copyright.

Slip Copy                                                                                    Page 10
Slip Copy, 2005 WL 3303861 (E.D.Pa.)
**(Cite as: Slip Copy)**

However, because neither party has requested a jury trial, Paramount argues that the typical spoliation inference jury instruction is inapplicable here. Instead, Paramount argues that I should act as the fact finder now to find as a matter of law that Davis stored the motion picture file and eDonkey network software on his computer. In other words, Paramount argues that because Davis wiped the hard drive clean of all information I should decide the motion for summary judgment by concluding from the spoliation inference that the motion picture and eDonkey network software were in fact stored on his computer at the time of the infringement.

It may be that Davis intentionally wiped the computer's memory in order to impair the ability of Paramount to discover evidence of the motion picture and eDonkey network software on his computer. However, such a factual finding is not appropriate at the summary judgment stage for three reasons. First, making such an adverse inference at this stage is tantamount to granting summary judgment-a far more severe sanction-in favor of Paramount and against Davis merely for wiping the hard drive clean. I also note that Paramount has not moved for a summary judgment sanction. *See Baliotis, 870 F.Supp. at 1289* ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only if no alternative remedy by way of a lesser, but equally efficient sanction is available."). Second, with respect to Paramount's motion for summary judgment, I must view the evidence in the light most favorable to Davis and draw all inferences in his favor. Paramount has not cited and I cannot find any case in which a court has used the spoliation inference to determine an issue of fact in favor of granting summary judgment. Third, a spoliation inference is merely an inference that a fact finder may draw from a view of all the evidence presented at trial; it is not a legal conclusion that must be reached when evidence is presented that a party has willfully destroyed relevant evidence.

**\*12** Notwithstanding the spoliation inference, there remain genuine issues of material fact as to whether the motion picture and eDonkey network software were on Davis' computer at the time of the alleged infringement

and whether Davis intentionally wiped his computer hard drive clean to avoid Paramount discovering his infringing activities. Accordingly, there are three related genuine issues of material fact: whether Davis engaged in any infringing activity; whether he was a first propagator of the motion picture; and whether he was misidentified. My ruling here does not mean that Paramount will not have the benefit of the spoliation inference at trial. I will take Davis' willful destruction of evidence into consideration at the time of trial.

The genuine issues of material fact discussed above also preclude Davis' motion for summary judgment. The parties' cross motions for summary judgment will be denied. An appropriate order follows.

ORDER

AND NOW, this 2nd day of December, upon consideration of the parties' cross motions for summary judgment and for the reasons set forth in the accompanying memorandum, it is ORDERED that the parties' cross motions for summary judgment are DENIED. I recommend that defendant seek legal representation.

E.D.Pa.,2005.
Paramount Pictures Corp. v. Davis
Slip Copy, 2005 WL 3303861 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 442453 (Trial Pleading) Complaint (Jan. 21, 2005)
• 2:05cv00316 (Docket) (Jan. 21, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                              Page 1
Not Reported in F.Supp.2d, 2003 WL 21104954 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
POSITRAN MANUFACTURING, INC.,
Plaintiff/Counter-Defendant,
v.
DIEBOLD, INC., Defendant/Counter-Claimant.
**No. 02-466 GMS.**

May 15, 2003.

MEMORANDUM AND ORDER

SLEET, J.

I. INTRODUCTION

*1 On May 31, 2002, the plaintiff, Positran Manufacturing Inc. ("Positran"), filed the above-captioned action asserting claims for breach of contract. In response, the defendant, Diebold, Inc. ("Diebold") has asserted counterclaims for breach of contract, fraud, and unjust enrichment. A two-day bench trial is scheduled to begin on June 16, 2003.

Presently before the court is Diebold's motion for relief from Positran's allegedly intentional destruction of evidence. For the following reasons, the court will grant Diebold relief, albeit not in the requested form.

II. BACKGROUND

In the first count of its counterclaim, Diebold asserts that Positran failed to make payments to Mosler as they became due for goods tendered by Mosler under its agreement with Positran. FN1 Positran, however, argues that this obligation was "canceled out" under a supposed oral agreement between it and Mosler to "net" that obligation against amounts Mosler allegedly owed to Positran.

FN1. Diebold subsequently purchased Mosler's assets and accounts-receivable, including the roughly $1.3 million account-receivable against Positran.

Diebold now contends that, while its discovery requests were pending, and just days before his deposition, Positran's Vice-President, Joseph Uhl ("Uhl"), intentionally destroyed relevant evidence. Specifically, Diebold alleges that Uhl destroyed his handwritten notes which set forth his contemporaneous account of events that are the subject of both Positran's claim and Diebold's counterclaim. This fact is not in contention because, at his July 11, 2002 deposition, Uhl admitted that, just before his deposition, he did, in fact, throw away his handwritten notes.

Diebold alleges that the destroyed notes reflected communications between Positran and Mosler regarding Mosler's product orders to Positran. According to Diebold, these communications are crucial to the issue of the scope of the implied license to make Mosler goods. Diebold further alleges that the destroyed notes contained information on the Positran-Diebold negotiations that led to the agreement upon which Positran bases its "netting" claim.

Additionally, Diebold maintains that, not only did Uhl destroy documents, he fabricated a typewritten document which was subsequently produced to Diebold in discovery. Uhl then falsely testified that the document was a verbatim, typed version of the destroyed handwritten notes. In support of its contention that this document is fraudulent, Diebold points to the following testimony taken from Uhl at his July 11, 2002 deposition. At that deposition, Uhl stated that the only documents to which he referred in creating the typed document were the handwritten notes that he destroyed. He further testified that the only difference between the documents is that, whereas the destroyed documents were handwritten, the produced document is typewritten.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2003 WL 21104954 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Upon closer inspection of the produced document, however, Diebold noticed that it duplicates, often verbatim, excerpts from Positran's complaint. Additionally, while Uhl stated that his handwritten notes did not refer to exhibits, the typed document does refer to exhibits. Those exhibit references in turn exactly match the exhibit references in Positran's complaint.

### III. DISCUSSION

**\*2** A party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit. *See, e.g., Howell v. Maytag, 168 F.R.D. 502, 505 (M.D.Pa.1996)* (citing *Baliotis v. McNeil, 870 F.Supp. 1285, 1290 (M.D.Pa.1994)*); *accord Shamis v. Ambassador Factors Corp., 34 F.Supp.2d 879, 888-89 (S.D.N.Y.1999)* (asking whether the party "knew or should have known that the destroyed evidence was relevant to pending, imminent, or reasonably foreseeable litigation"); *Bass v. General Motors Corp., 929 F.Supp. 1287, 1288 (W.D.Mo.1996)* (same). A party who breaches this duty by destroying relevant evidence or by allowing relevant evidence to be destroyed may be sanctioned by the court. *See, e.g., Howell, 168 F.R.D. at 505; accord TeleCom Int'l Am. Ltd. v. AT & T Corp., 189 F.R.D. 76, 81 (S.D.N.Y.1999)*. When this destruction is willful or in bad faith and intended to prevent the other side from examining the evidence, the court may impose the most severe sanction of them all-the outright dismissal of a claim or the entry of a default judgment. *See Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74 (S.D.N.Y.1991)* ("[T]he even harsher sanction of default [or dismissal] may be imposed as a sanction for the intentional destruction of evidence if the party seeking the evidence has been severely prejudiced and no lesser sanction is adequate."); *accord TeleCom, 189 F.R.D. at 81* (noting that the sanction of dismissal is a "drastic remedy" which should be imposed only in "extreme circumstances," such as when a party willfully destroys evidence or otherwise acts in bad faith) (relying on *West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.1999)*); *Baliotis, 870 F.Supp. at 1289* ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost

or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient, sanction is available.' ") (citations omitted).

When determining whether to impose sanctions for the spoliation of evidence, the court must consider the following three factors:
(1) the degree of fault and personal responsibility of the party who destroyed the evidence;
(2) the degree of prejudice suffered by the other party; and
(3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the same type of conduct in the future.

*See Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir.1994); accord Indemnity Ins. Co. of N. Am. v. Liebert Corp., 1998 WL 363834, at \*3 (S.D.N.Y. June 29, 1998)*.

As the *Schmid* court emphasized, when determining the degree of fault and personal responsibility attributable to the party that destroyed the evidence, the court must consider whether that party intended to impair the ability of the other side to effectively litigate its case. *13 F.3d at 80; see also Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir.1995)* ( "[I]t must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."); *accord Collins v. Throckmorton, 425 A.2d 146, 150 (Del.1980)* ( "[W]here a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case .").

**\*3** In addition, when considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evidence in question before it was destroyed. *See Thiele v. Oddy's Auto & Marine, Inc., 906 F.Supp. 158, 162 (W.D.N.Y.1995)*. As the *Thiele* court explained, when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21104954 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, sanctions for spoliation are generally appropriate. *Id* . at 162-63 ("[W]ithout any ability to examine the boat, [the third-party defendant] will be greatly frustrated in its ability to defend its case. Since [the plaintiff] is plainly at fault for allowing the boat to be placed in a landfill, any claims against [the third-party defendant] must be dismissed."); *see also* Baliotis, 870 F.Supp. at 1290-91 ("At a minimum ... an opportunity for inspection should be afforded ... before relevant evidence is destroyed.").

In the present case, it is clear that Uhl's destruction of his notes reflects an extreme degree of fault and personal responsibility. Indeed, he admits that he personally destroyed his contemporaneous account of events that are, at a minimum, relevant to the central issues in this case. Further, he destroyed the evidence, not before litigation ensued, but rather, months after Diebold served document requests in a related case, a month after Positran filed its complaint in the present case, and mere days before his own deposition. On these facts, Positran cannot credibly claim that Uhl was unaware of his obligations.

More disturbing still, Positran now attempts to explain the similarities between Uhl's typewritten document and its complaint by arguing that the typewritten document is verbatim only to the extent that portions of the information were taken from Uhl's handwritten notes. Positran further explains that Uhl may have also referred to other documents in preparing his typewritten notes. Thus, Positran's explanation is basically that some of the typewritten document is a verbatim transcript of Uhl's handwritten notes, but not necessarily all of it reflects his notes. Moreover, although Uhl himself denied having referred to outside documents at his April 16, 2003 deposition, Positran takes the position that he was "intimidated" during the questioning, and was thus incorrect on this point.

While the problems with Positran's explanation are manifold, the court need only address one to make its point. Assuming that Positran's version is correct, this position merely exacerbates the problem because it makes it even less clear whether the typed document

bears any resemblance to Uhl's handwritten notes. Neither the court, nor Diebold, can know what Uhl culled from his notes, what he pulled from other sources, and what may have been destroyed in notes he ultimately omitted from the typewritten document.

**\*4** Likewise, because Diebold has no means of determining what Uhl's contemporaneous notes described, the prejudice to Diebold is not insignificant. There is no question that Diebold did not have the opportunity to examine Uhl's notes prior to their destruction. Additionally, Diebold has presented evidence that the information in Uhl's handwritten document would have been relevant to its case. For instance, focusing just on the May 7, 2001 entry in Uhl's typed document, the meeting that day allegedly related to a "credit hold," Positran's refusal to ship products, a production cut-back, quality issues, and a possible account "netting" arrangement. These are all issues in the present case and in its related companion case. Instead of Uhl's contemporaneous notes of this meeting, however, Diebold is left with Positran's assurance that Uhl completely and accurately transcribed all of his notes from that meeting. Moreover, Uhl's actions have deprived Diebold of the opportunity to use a contemporaneous record to cross-examine Positran's representative to determine what really occurred. Thus, given Positran's own inability to coherently and consistently explain what the typewritten document actually consists of, the court is compelled to conclude that Diebold has suffered prejudice through the loss of the handwritten document.

In light of the circumstances surrounding Uhl's destruction of his notes, the unavoidable inference is that the notes would have been helpful to Diebold's case. The court does not, however, believe that Diebold's requested sanction of dismissal is warranted in this case. Diebold has not argued that Uhl's handwritten notes are the only evidence available to prove its claims and adequately defend itself. Thus, while a sanction is clearly warranted, dismissal would be unjustly harsh. The court will, therefore, impose a "spoliation inference" in this case. This inference will allow the trier of fact, in this case, the court, to assume the destroyed evidence would have been unfavorable to the offending party. Such a sanction is sufficient to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 21104954 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

avoid substantial unfairness to Diebold, while at the same time serving as a deterrent to Positran, as well as other future litigants who may consider engaging in similar dilatory tactics.


## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. Diebold's Motion for Relief from Intentional Destruction of Evidence (D.I.25) is GRANTED.
2. Positran's Motion to Exceed Its Answering Brief Page Limit (D .I. 44) is declared MOOT.


D.Del.,2003.
Positran Mfg., Inc. v. Diebold, Inc.
Not Reported in F.Supp.2d, 2003 WL 21104954 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:02CV00466 (Docket) (May. 31, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on January 17, 2006, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**