**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH, individually and in his official capacity as the Superintendent, Delaware State Police; LIEUTENANT COLONEL THOMAS F. MACLEISH, individually and in his official capacity as the Deputy Superintendent, Delaware State Police; DAVID B. MITCHELL, individually and in his official capacity as Secretary of the Department of Safety and Homeland Security, State of Delaware; and DIVISION OF STATE POLICE, DEPARTMENT OF SAFETY AND HOMELAND SECURITY, STATE OF DELAWARE,** | : | **C.A.No.04-1394-GMS** |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS II AND III**

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: January 31, 2006

Attorneys for Plaintiff

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING....................................................................................1

SUMMARY OF THE ARGUMENT..............................................................................................................1

STATEMENT OF FACTS.........................................................................................................................1

ARGUMENT...........................................................................................................................................1

I. STANDARD OF REVIEW....................................................................................................1

II. THE FILING OF PLAINTIFF'S GENDER DISCRIMINATION LAWSUIT CHALLENGING THE ILLEGAL ACTIONS OF THE HIGHEST RANKING POLICE OFFICER IN THE STATE CONSTITUTES PROTECTED SPEECH AND PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES UNDER THE FIRST AMENDMENT..................................................2

A. Petition Clause..................................................................................................3

1. This Court Cannot Overrule the Third Circuit.......................................3

2. San Filippo is Still Good Law and Its Holding Has Been Repeatedly Reaffirmed.............................................................................3

B. Free Speech Clause...........................................................................................4

1. The Third Circuit, en banc, Has Held that Gender Discrimination by High Public Officials is a Matter of Public Concern...............................4

2. Plaintiff's Speech Exposed Illegal Conduct by a High Public Official....5

3. Plaintiff's Motivations............................................................................5

4. Defendants Have Waived The Pickering Balancing Defense...................7

III. DEFENDANTS' RETALIATION AGAINST PLAINTIFF WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST AMENDMENT RIGHTS...................................................................................................7

A. Defendants' Unlawful Retaliation Against Plaintiff...........................................7

1. The First Act of Retaliation - A Confidential and Internal DSP Document About Plaintiff is Leaked to the Delaware Media..................7

2. The Second Act of Retaliation - Defendants Refused to Investigate This Release..........................................................................................8

3. The Third Act of Retaliation - Defendants Then Confirmed and Discussed the Nature of the IA Charges With the Delaware Media.........9

B. The Law of First Amendment Adverse Action....10

III. THE RECORD IS OVERFLOWING WITH CAUSAL EVIDENCE WHICH DEMONSTRATES THAT PLAINTIFF'S PROTECTED FIRST AMENDMENT ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE UNPRECEDENTED RETALIATION AGAINST HER....12

A. Substantial or Motivating Factor....13

1. Knowledge of Protected Conduct....13

a. MacLeish's Involvement....14

b. Mitchell's Authorization....14

c. Chaffinch's Involvement....14

2. Temporal Proximity....16

3. Demonstrated Anger, Hostility and Antagonism....16

4. Violations of Law, Policies and Procedures....17

a. Longstanding DSP Policies, Practices and Procedures....17

(1). Current Policy and Practice....18

(2). Long Time Historical Policy and Practice....21

(3). MacLeish's Justification for Violating These Policies and Practices Does Not Hold Water....21

b. DSP Rules, Regulations and Policies....22

(1). Rule 10....22

(2). Rule 18(b)....22

(3). Rule 19(a)....22

(4). The DSP Code of Ethics....23

(5). Defendants Violated All of These Rules....23

c. An Order To Violate Any of These Rules is an "Unlawful Order."....23

d. No Internal Affairs Investigation Resulted From These Numerous Violations....23

e. The Express and Unequivocal Confidentiality Protections of the LEOBOR....24

5. Disparate Treatment....26

6. Selective or Discriminatory Enforcement....26

7. Pretext....27

8. Falsehoods....27

9. Intentional Destruction of Key Evidence....28

10. The Big Picture....28

B. Same Decision Anyway Affirmative Defense....29

V. DEFENDANT DELAWARE STATE POLICE AND THE OFFICIAL CAPACITY DEFENDANTS ARE PROPERLY JOINED IN THIS ACTION FOR THE PURPOSES OF COLLECTING ATTORNEYS' FEES AND COSTS....29

VI. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY....30

A. Introduction....30

B. The Facts Show that Defendants Violated Plaintiff's First Amendment Rights....30

C. Plaintiff's First Amendment Rights Were Clearly Established....31

1. Free Speech....33

2. Petition Clause....35

D. Clearly Established Rights Under DSP Policies, Practices and LEOBOR....36

E. Advice of Counsel Defense....36

1. The Only Time Defendants Ever Consulted With An Attorney Was When They Wanted to Find a Way to Release Plaintiff's Confidential Information....36

2. Legal Advice to Violate a DSP Rule or Regulation is an "Unlawful Order" that a Trooper Has an "Obligation" to Refuse to Follow....37

3. The Factual Dispute as to Defendants' Motives Must Be Resolved By the Jury....38

4. The Advice of Counsel Exception in the Qualified Immunity Context....38

CONCLUSION....................................................................................................................................40

## TABLE OF AUTHORITIES

**Cases** **Page**

Adkins v. Rumsfeld, 389 F.Supp.2d 579 (D.Del. 2005)....................13-14,16-17,26

Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999)....................29

Agosto-de-Feliciano v. Aponte-Rogue, 889 F.2d 1209 (1st Cir. 1989) (en banc)....................11

Allah v. Seiverling, 229 F.3d 220 (3d Cir. 2000)....................11-12

Anderson v. Creighton, 483 U.S. 635 (1987)....................32

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997)....................3,9-10,36

Andrews v. City of Phila., 895 F.2d 1469 (3d Cir. 1990)....................28

Arlio v. Lively, 392 F.Supp.2d 317 (D.Conn. 2005)....................27

Assaf v. Fields, 178 F.3d 170 (3d Cir. 1999)....................33

Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003)....................30

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc)....................4,34-35

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001)....................5-6,10,12-13,29,34

Bart v. Telford, 677 F.2d 622 (7th Cir. 1982)....................11

Bedford v. SEPTA, 867 F.Supp. 288 (E.D.Pa. 1994)....................7

Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005)....................11

Bennett v. Murphy, 274 F.3d 133 (3d Cir. 2002)....................31,36

Bennett v. Murphy, 2005 WL 78581 (3d Cir. Jan. 14, 2005)....................31

Bennis v. Gable, 823 F.2d 723 (3d Cir. 1987)....................10,32

Bhd. of R.R. Trainmen v. Va. Ex Rel. Va. State Bar, 377 U.S. 1 (1964)....................35

Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995)....................33

Bloch v. Ribar, 156 F.3d 673 (6th Cir.1998)....................11

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998)....................1-2

Brady v. Fort Bend County, 145 F.3d 691 (5th Cir. 1998)....................29

Bray v. Marriott Hotels, 110 F.3d 986, 992 (3d Cir. 1997)....................17

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)....................................3,6,17,2,34,36

C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159 (3d Cir. 2005)....................................13-14

C.H. v. Olivia, 226 F.3d 198 (3d Cir.2000) (en banc)....................................14

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972)....................................35

Carroll v. Pfeffer, 262 F.3d 847 (8th Cir.2001)....................................11

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991)....................................29

City of San Diego v. Roe, 543 U.S. 77 (2004) (per curiam)....................................5

Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474 (4th Cir. 2005)....................................11

Cox v. Louisiana, 379 U.S. 536 (1965)....................................27

Crawford-El v. Britton, 523 U.S. 574 (1998)....................................31

Curley v. Klem, 298 F.3d 271 (3d Cir. 2002)....................................38

Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983)....................................34

Davis v. Zirkelbach, 149 F.3d 614 (7th Cir. 1998)....................................39

Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387 (M.D.Pa. 2003)....................................7

Doe v. Delie, 257 F.3d 309 (3d Cir. 2001)....................................32

EEOC v. Univ. of Pa., 850 F.2d 969 (3d Cir. 1988)....................................3

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005)....................................16

Feldman v. Phila. Housing Auth., 43 F.3d 823 (3d Cir. 1994)....................................27,34

Fernandez v. Leonard, 784 F.2d 1209 (1st Cir. 1986)....................................39

Foraker v. Chaffinch, C.A.No. 02-302-JJF (D.Del. June 17, 2003) (slip op.)....................................30

Foraker v. Chaffinch, C.A.No. 02-302-JJF (D.Del. June 18, 2003) (slip op.)....................................34

Garcia v. City of Trenton, 348 F.3d 726 (8th Cir. 2003)....................................11

Ginaitt v. Haronian, 806 F.Supp. 311 (D.R.I. 1992)....................................39

Good v. Dauphin County, 891 F.2d 1087 (3d Cir. 1989)....................................32-33

Harlow v. Fitzgerald, 457 U.S. 800 (1982)....................................31,39

Hicks v. Finney, 770 F.2d 375 (3d Cir. 1985)....................................33

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005)..................................................2-3,13,15,25,27,36

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)..................................................................27,34

Hope v. Pelzer, 536 U.S. 730 (2002)..........................................................................................................32

Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571 (3d Cir. 2003)...................................7

Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989)......................................................................................16

Johnson v. Lincoln Univ. of Com. System of Higher Educ., 776 F.2d 443 (3d Cir. 1985)....................6,34

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997)...........................................................16

Kadetsky v. Egg Harbor Township Bd. of Educ., 82 F.Supp.2d 327 (D.N.J. 2000)..................................11

Katzenmoyer v. City of Reading, 2001 WL 1132374 (E.D.Pa.)................................................................11

Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992)...............................................................................13

Keenan v. Tejeda, 290 F.3d 252 (5th Cir.2002)..........................................................................................11

Kelleher v. City of Reading, 2002 WL 1067442 (E.D.Pa.).........................................................................11

Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)...............................................................16

Kunda v. Muhlenberg College, 621 F.2d 532 (3d Cir. 1980).....................................................................17

Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist., 2006 WL 167443 (3d Cir. Jan. 24, 2006)...........11

Leveto v. Lapina, 258 F.3d 156 (3d Cir. 2001)..........................................................................................33

McDonald v. Smith, 472 U.S. 479 (1985)...................................................................................................35

Marrero v. Camden County Bd. of Social Serv., 164 F.Supp.2d 455 (D.N.J. 2001).................................11

Melton v. Oklahoma City, 879 F.2d 706 (10th Cir. 1989)...........................................................................31

Miller v. Cigna, Corp., 47 F.3d 586 (3d Cir. 1995) (en banc)....................................................................13

Missouri v. Jenkins, 491 U.S. 274 (1989)...................................................................................................30

Mitchell v. Street, 2005 WL 1993774 (E.D.Pa. Aug. 16, 2005)...................................................................7

Molloy v. Blanchard, 907 F.Supp. 46 (D.R.I. 1995)......................................................................31,36,39-40

Monsanto v. Quinn, 674 F.2d 990 (3d Cir. 1982).......................................................................................34

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)........................................................1,1,34

NAACP v. Button, 371 U.S. 415 (1963).....................................................................................................35

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000)....29

O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989)....34

Ostad v. Oregon Health Sciences Univ., 327 F.3d 876 (9th Cir. 2003)....29

Paff v. Kaltenback, 204 F.3d 425 (3d Cir. 2000)....32

Pickering v. Bd. of Educ., 391 U.S. 563 (1968)....7,34

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996)....34

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)....2,15,27

Rankin v. McPherson, 483 U.S. 378 (1987)....34

Resident Advisory Bd. v. Rizzo, 564 F.2d 126 (3d Cir. 1977)....17

Rhodes v. Robinson, 408 F.3d 559 (9th Cir. 2005)....11

Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)....11,13-14

Robinson v. Clemons, 987 F.Supp. 280 (D.Del. 1998)....38

Robinson v. SEPTA, 982 F.2d 892 (3d Cir. 1993)....16

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)....6,34-35

Rodriguez v. Torres, 60 F.Supp.2d 334 (D.N.J. 1999)....11

Rogers v. Powell, 120 F.3d 446 (3d Cir. 1997)....30

Roska v. Peterson, 328 F.3d 1230 (10th Cir. 2003)....39

Rutan v. Republican Party, 497 U.S. 62 (1990) ....10

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)....3,7,26,35-36

Saucier v. Katz, 533 U.S. 194 (2001)....30-31

Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997)....38

Shehee v. City of Wilm., 67 Fed.Appx. 692 (3d Cir. May 13, 2003)....11

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc)....27-28

Smith v. Plati, 258 F.3d 1167 (10th Cir.2001)....11

Stanley v. City of Dalton, Georgia, 219 F.3d 1280 (11th Cir. 2000)....29

Stewart v. Rutgers, the State Univ., 120 F.3d 426 (3d Cir. 1997)....17

Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3d Cir. 1989)....................................................32-33

Sunkett v. Misci, 183 F.Supp.2d 691 (D.N.J. 2002)............................................................................11

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)...........................................................................10-13

United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217 (1967).......................................35

U.S. v. Lanier, 520 U.S. 259 (1997).....................................................................................................33

V-1 Oil Co. v. State of Wyoming, Dept. Of Environmental. Quality, 902 F.2d 1482 (10th Cir. 1990)......39

Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23 (1st Cir. 2004)..........................................................29

Versarge v. Township of Clinton N.J., 984 F.2d 1359 (3d Cir. 1993)......................................................6

Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252 (1977)......................17

Washington v. County of Rockland, 373 F.3d 310 (2d Cir.2004)...........................................................11

Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995)............................................................................34

We, Inc. v. City of Phila., 174 F.3d 322 (3d Cir. 1999)......................................................................3,36

Wilson v. Layne, 526 U.S. 603 (1999)..........................................................................................30,32-33

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997).....................................................................16

Wright v. City of Phila., 409 F.3d 595 (3d Cir. 2005)............................................................................31

Yalowizer v. Town of Ranchester, Wyoming, 18 Fed.Appx. 745 (10th Cir. 2001)....................................29

Zamboni v. Stamler, 847 F.2d 73 (3d Cir. 1988).......................................................................................6

Zugarek v. Southern Tioga Sch. Dist., 214 F.Supp.2d 468 (M.D.Pa. 2002).............................................11

**Constitutions, Statutes and Rules**

U.S. Const., Amend. I.....................................................................................................................passim

Fed.R.Civ.P. 8(c)...................................................................................................................................29

Fed.R.Civ.P. 56(c)....................................................................................................................................1

11 Del.C. § 9200(b)...........................................................................................................................24-25

11 Del.C. § 9200(c)...........................................................................................................................24-25

11 Del.C. § 9200(c)(12).......................................................................................................................24,26

Law Enforcement Officers' Bill of Rights....................................................................................passim

Third Circuit Internal Operating Procedures at Chapter 8.C..........................................................................3

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff relies upon the Nature and Stage of the Proceedings set forth in her Opening Brief in Support of her Motion for Summary Judgment. (D.I. 139). This is plaintiff's answering brief in opposition to defendants' motion for summary judgment on Counts II and III.[1]

## SUMMARY OF THE ARGUMENT

Plaintiff clearly engaged in protected First Amendment activity and there is abundant evidence on the Mt. Healthy causal factors, sufficient to survive summary judgment. Additionally, the unprecedented retaliation against her was sufficient to chill a person of ordinary firmness from exercising their First Amendment rights.

Likewise, the claim of absolute immunity is frivolous, while long established First Amendment retaliation law and longstanding DSP confidentiality policies and practices make it clear that the defense claims of qualified immunity also are without merit.

## STATEMENT OF FACTS

Plaintiff relies upon the exhaustive Statement of Facts contained in her summary judgment opening brief.

## ARGUMENT

### I. STANDARD OF REVIEW.

A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c). "All facts and inferences are construed in the light most favorable to the non-moving party." Boyle, 139 F.3d at 393. At summary judgment, "a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." Id. To raise a genuine issue of material fact, "the

[1] Defendants' summary judgment opening brief will be cited as "DOB" and plaintiff's own summary judgment opening brief will be cited as "POB."

[summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the 'mere scintilla' standard." Id. (internal punctuation omitted).

The Third Circuit recently revisited summary judgment standards in the First Amendment retaliation context. The recent opinion in Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005), held that when an employer moves for summary judgment, even the uncontradicted testimony of interested witnesses supporting the employer, such as supervisors, employees and other workers, should not be considered or otherwise weighed in the summary judgment balancing. “[W]hen evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant.” Hill, 411 F.3d at 131 n.22 (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149-151 (2000)); see also Hill, 411 F.3d at 129 n.16.

Thus, the Hill decision reaffirms long existing Third Circuit and Supreme Court precedent and dictates that the defense reliance herein upon testimony and affidavits from its own employees and even one of its attorneys is misplaced at the summary judgment stage due to their obvious bias, fear of losing their jobs or other retaliation. Thus, their testimony should be excluded from the Court’s analysis of summary judgment issues. Additionally, defendants’ own testimony should be disregarded because, as defendants, they certainly are “interested witness[es]” under Hill. 411 F.3d at 131 n.22.

## II. THE FILING OF PLAINTIFF’S GENDER DISCRIMINATION LAWSUIT CHALLENGING THE ILLEGAL ACTIONS OF THE HIGHEST RANKING POLICE OFFICER IN THE STATE CONSTITUTES PROTECTED SPEECH AND PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES UNDER THE FIRST AMENDMENT.

Defendants claim that as a matter of law, the filing of plaintiff’s lawsuit does not constitute protected activity under the First Amendment. (DOB at 27-34). Defendants are clearly mistaken.

**A. Petition Clause.**

**1. This Court Cannot Overrule the Third Circuit.** First, defendants invite this Court to overrule long established Third Circuit petition clause precedent. Specifically, they ask the Court not to follow San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994), because defendants believe it “suffers from many legal flaws and, frankly, some tortuous logic.” (DOB at 31).

Although certainly a novel request, unfortunately for defendants, a district court cannot overrule or simply ignore binding Third Circuit precedent. EEOC v. Univ. of Pa., 850 F.2d 969 (3d Cir. 1988) (noting that a "district court ... lacks the authority to overrule an opinion" of the Third Circuit). Indeed, not even a panel of the Third Circuit can overrule a previous panel’s decision. Only the Circuit sitting en banc can do that. See Third Circuit Internal Operating Procedures at Chapter 8.C. So despite the fact that defendants do not like the reasoning, legal analysis or conclusion of the Third Circuit in San Filippo, it still must be followed and it should have gone without saying that of course this Court will follow binding legal precedent.

**2. San Filippo is Still Good Law and Its Holding Has Been Repeatedly Reaffirmed.** Secondly, defendants are simply wrong on their petition clause legal analysis. The Third Circuit has repeatedly reaffirmed San Filippo’s holding. See, e.g. Anderson v. Davila, 125 F.3d 148, 161-63 (3d Cir. 1997); Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003). Indeed, as the Circuit held again just last summer, "[i]n this circuit, any lawsuit brought by an employee against a public employer qualifies as protected 'petition' under the First Amendment so long as it is not 'sham litigation.'" Hill, 411 F.3d at 126. Defendants do not assert that plaintiff's lawsuit was a sham, thus, it is clear that the filing of plaintiff’s lawsuit is protected by the petition clause.[2]

[2] Defendants have misrepresented the holding of We, Inc. v. City of Phila., 174 F.3d 322 (3d Cir. 1999), which even a cursory analysis of the We footnote which defendants cite reveals. (DOB at 33). See We, 174 F.3d at 330 n.2.

**B. Free Speech Clause.**

**1. The Third Circuit, en banc, Has Held that Gender Discrimination by High Public Officials is a Matter of Public Concern.** Citing Eleventh Circuit precedent, defendants also invite this Court to again ignore settled Third Circuit law in the free speech arena. (DOB at 29). In Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc), the Third Circuit addressed the issue of whether gender discrimination by a high public official is a matter of public concern. The en banc Court held that it clearly is. Id. at 978-79. As the Court stated,

> We believe this form of discrimination, when practiced by those exercising authority in the name of a public official, is as much a matter of public concern as racial discrimination practiced under similar circumstances.

Id. at 978. Additionally, the Circuit explained that Azzaro's speech about gender discrimination by a high public official was speech that "brought to light actual wrongdoing on the part of one exercising public authority that would be relevant to the electorate's evaluation of the performance of the office...." Id. It also did not matter to the Court that Azzaro's primary motive in speaking out was her concern to save her own job and that of her husband. Id. at 979. Because of the nature of her speech and its value to the public at large, the Court nonetheless held that it was on a matter of public concern. Id.

The en banc Azzaro opinion is the end of the matter. Defendant Chaffinch was the highest ranking police officer in the State of Delaware, and was the Superintendent of the DSP, an important public agency. As plaintiff's summary judgment opening brief explains in great detail, while holding that position, he regularly debased and degraded women with his words and actions, both in the workplace and outside of it. Plaintiff's lawsuit exposed Chaffinch's despicable and degrading behavior and also exposed that he had repeatedly denied her promotion because of her gender in violation of the Fourteenth Amendment. As in Azzaro, this type of gender discrimination and other sexually inappropriate behavior by a high public official like

Chaffinch are inherently matters of public concern.

In the Supreme Court's words, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004) (per curiam). As was explained in plaintiff's opening brief, the public concern in plaintiff's speech has been overwhelming demonstrated by the flood of media attention it brought, the News Journal's actions in intervening in this lawsuit because of the overwhelming public interest, the actions of Delaware legislature, as well as defendants own actions in suspending Chaffinch for seven months because of his sexually inappropriate behavior which this lawsuit exposed. (POB at 29-34).

**2. Plaintiff's Speech Exposed Illegal Conduct by a High Public Official.** Additionally, police officers swear to uphold and protect the U.S. Constitution. Here plaintiff's lawsuit exposed that Chaffinch has repeatedly violated the highest law in the land. So in the Third Circuit, a Circuit which is much more welcoming to civil rights cases than many other Circuits which defendants apparently prefer, "[d]isclosing corruption, fraud and *illegality* in a government agency is a matter of significant public concern." Baldassare v. State of N.J., 250 F.3d 188, 196 (3d Cir. 2001) (emphasis added); accord id. at 197 (speech that seeks "to bring to light actual or potential wrongdoing or breach of the public trust" by public officials is of the "utmost public concern"). Plaintiff's lawsuit exposed Chaffinch's *illegal* behavior. Her lawsuit brought the bright light of public scrutiny to bear upon Chaffinch's wrongdoing while holding high public office. So as a result the case law dictates that her lawsuit was on a matter of public concern.

**3. Plaintiff's Motivations.** Defendants also claim that plaintiff's lawsuit should not be protected because she seeks relief personal to her. (DOB at 27). Essentially, defendants claim that plaintiff's motive in bringing the lawsuit was only to help herself and not

women as a class. First, plaintiff wholeheartedly disagrees with such a characterization of her motivations. Plaintiff believes that women Troopers, as a class, are now much better off in the DSP since Chaffinch was forced into retirement as a result of her suit. Someone had to speak up and oppose how Chaffinch treats women, and plaintiff is proud to have blazed that path for other women.

But even under the relevant legal paradigms, although motive of the speaker is one factor to be considered, Versarge v. Township of Clinton N.J., 984 F.2d 1359, 1364 (3d Cir. 1993), "complete reliance on [the employee's] motivation for speaking is inappropriate." Rode v. Dellarciprete, 845 F.2d 1195, 1201 (3d Cir. 1988). "[T]he speaker's motive, while often a relevant part of the context of the speech, is not dispositive." Brennan, 350 F.3d at 413. "[T]he mere fact that an employee's statement is an outgrowth of his personal dispute does not prevent some aspect of it from touching upon matters of public concern." Johnson v. Lincoln Univ. of Com. System of Higher Educ., 776 F.2d 443, 451 (3d Cir. 1985) (internal punctuation omitted). Indeed

> Common sense suggests that public employees, no less than other employees, will be more likely to speak out when they are disgruntled or personally dissatisfied with some aspect of their employment or employer. Nevertheless, the harm that results from silencing or chilling public speech is neither negated nor mitigated merely because the speaker may have harbored motivations that were less than altruistic.

Brennan, 350 F.3d at 413. As the Third Circuit has observed, "it is unlikely that any employee who lacks a personal interest in the subject that gives rise to the speech in question would file a lawsuit to vindicate her or her First Amendment rights." Zamboni v. Stamler, 847 F.2d 73, 78 (3d Cir. 1988). In other words, even if an employee has a personal stake in the outcome or is even motivated by ill will, her speech may still be of public concern. "[M]otivations will rarely, by themselves, justify silencing speech that otherwise addresses matters concerning the public." Brennan, 350 F.3d at 413. It is the nature and value of the speech itself that matters most. Baldassare, 250 F.3d at 197; Brennan, 350 F.3d at 413. As is discussed above and in plaintiff's

opening brief, the nature and value of plaintiff's speech is exceptionally high. (POB at 30-34). Accordingly, for these reasons, and those discussed in greater detail in plaintiff's opening brief, her lawsuit was clearly on a matter of public concern.

**4. Defendants Have Waived The Pickering Balancing Defense.** As discussed in plaintiff's opening brief, the Pickering v. Bd. of Educ., 391 U.S. 563 (1968) "balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." San Filippo, 30 F.3d at 434 n.11 (emphasis added).[3] If the employer denies that it dismissed the employee because of his protected speech, the balancing test "has no application." Id. Accordingly, because defendants flatly deny that they retaliated against plaintiff because of her speech, the balancing test "has no application." Id. Consequently, plaintiff's speech is protected by the First Amendment.

## III. DEFENDANTS' RETALIATION AGAINST PLAINTIFF WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST AMENDMENT RIGHTS.

### A. Defendants' Unlawful Retaliation Against Plaintiff.

**1. The First Act of Retaliation - A Confidential and Internal DSP Document About Plaintiff is Leaked to the Delaware Media.** Within hours of the filing of her lawsuit, an internal DSP document indicating that plaintiff faced confidential internal affairs charges was leaked to the Delaware media. (Aviola 53-55,57-58; see PX 14; Aviola 65-67; A131-35,160). These charges were not pending in March and July of 2003 when the two challenged promotions occurred.

As to the defense claim that there is no evidence pertaining to when the leak occurred.

[3] Accord Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571, 575 n.6 (3d Cir. 2003); Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387, 399 (M.D.Pa. 2003); Mitchell v. Street, 2005 WL 1993774, *2 n.5 (E.D.Pa. Aug. 16, 2005); Bedford v. SEPTA, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994).

(DOB at 9-10). Lt. Aviola testified that he received a telephone call the same day or the day after the suit was filed from Tom Eldred, ace reporter for the Delaware State News. (Aviola 53-55; A131-32). Eldred related to Aviola that he had in his possession what he believed to be an internal DSP e-mail stating that plaintiff was being brought up on internal affairs charges. (Aviola 54; A132). Eldred wanted confirmation that the e-mail was in fact an internal DSP document and he wanted comment on the contents of the e-mail. (Aviola 54-55; A132). Notably, Aviola did not testify that he received the call from Eldred prior to the suit being filed. Instead, he testified that he received the call only after plaintiff filed her lawsuit. (Aviola 53-54; A131-32). Given that Eldred did not call about the e-mail until after the lawsuit was filed, it is a fair inference (all the more so at summary judgment where plaintiff receives all the inferences) that the e-mail had not yet been leaked to him prior to the suit being filed.

**2. The Second Act of Retaliation - Defendants Refused to Investigate This Release.** Despite the release of plaintiff's confidential internal affairs information, defendants refused to investigate the release to the Delaware media. (Aviola 62; MacLeish 145-150; Mitchell 49-50; A134,198-200,258-59). Defendants admit that they do not know if even a single question was ever asked of any DSP employees about the release of this information. (MacLeish 150; Mitchell 50; A200,259). The DSP "considered" investigating, but chose not to. (Mitchell 49-50; A258-59). In MacLeish's words, "an inquiry" was conducted, but "it was basically impossible" to conduct an "investigation" because they did not know where to start to investigate. (MacLeish 147; A199). Defense protestations to the contrary aside (DOB at 21-23), defendant MacLeish was very clear in his testimony and took pains to point out that an "investigation" was not conducted because amazingly there were "no suspects" at that time. (MacLeish 147; A199).[4]

---

[4] Plaintiff notes that even a school child would have thought that Chaffinch would be a good suspect given that he had the motive to retaliate given that he was the one who had been sued by plaintiff less than 24 hours earlier. Or perhaps one of Chaffinch's close friends within the Division might have

**3. The Third Act of Retaliation - Defendants Then Confirmed and Discussed the Nature of the IA Charges With the Delaware Media.** Whenever media inquiries are made about lawsuits and other serious matters such as Internal Affairs investigations, Lt. Aviola, the PIO, is not authorized to respond. Instead, he is required to relay those inquiries to the Colonel or the Lt. Colonel who then decide what kind of a response will be given. (Aviola 15-20; A122-23). "[M]ost of the time it's pretty specific [ ] what they want said." (Aviola 20; A123).

Upon learning that the Delaware media was in possession of this confidential document, Lt. Aviola followed procedure and immediately consulted with then acting Colonel MacLeish. (Aviola 55-64; MacLeish 129, 134-142; A132-34,194,196-98).

MacLeish next expressly ordered Aviola to confirm and discuss the contents of this confidential document with the Delaware media. (Aviola 63-70,76-77,86-89; MacLeish 142,165, 208; A134-37,140,198,203,214). As Aviola testified, MacLeish's exact orders were-

> [C]all Mr. Eldred back and give him the information. ... Once you look at the document, if you feel that it looks like one of our e-mails, then comment on it.

(Aviola 63-64; 134). Aviola testified that, pursuant to MacLeish's order, he did in fact comment beyond the four corners of the document,[5] and explained to reporter Eldred that plaintiff was facing charges for conduct unbecoming and sexual harassment. (Aviola 70; A136).[6]

---

been a good place to start the DSP's investigation and search for suspects. But alas, the DSP had "no suspects" and so could not investigate. (MacLeish 147; A199).

[5] This contradicts the explicit defense contention that "[t]here is absolutely no evidence that any information beyond verification of the four corners of the document was supplied to reporter Eldred, or to any other party." (DOB at 26).

[6] The defense claim that Aviola could have otherwise answered an ordinary inquiry from reporter Eldred as to what #4 and #40 of the DSP rules and regulations were (DOB at 16) misses a very fundamental point of First Amendment jurisprudence. It has long been established that "an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." Anderson, 125 F.3d at 161. As far as it relates to the First Amendment, "motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual." Id. If MacLeish's order to Aviola to confirm and comment was

"But for his authorization," Lt. Aviola would not have discussed the matter with the media, "other than saying 'no comment.'" (Aviola 89,70; A140,136).

> Q. Based on your past practice, would you have commented to Reporter Eldred unless MacLeish had given you the authority to comment?
>
> A. No, I would not have.

(Aviola 70; A136).

Notably, the defense claim that no news story ran in the Delaware media as a result of defendants' unprecedented confirmation and comment is equally without merit. (DOB 11). Defendants ignore the October 29, 2004 Delaware State News article that is in the record. (A44). Defendants also ignore other evidence in this regard. (Conley Inter. at p.52; A1047)

**B. The Law of First Amendment Adverse Action.** In the First Amendment context, "the constitutional violation is not in the harshness of the sanction applied, but in the imposition of *any* disciplinary action for the exercise of permissible free speech." Bennis v. Gable, 823 F.2d 723, 731 (3d Cir. 1987) (public employee context) (emphasis added). It "is implicated whenever a government employee is disciplined for his speech." Id. As the U.S. Supreme Court took pains to note (and as the Third Circuit has recognized),

> [T]he First Amendment ... protects state employees [not only just from dismissals] but also from even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights.

Rutan v. Republican Party, 497 U.S. 62, 76 n.8 (1990) (public employee context) (internal punctuation omitted) (emphasis added); accord Suppan v. Dadonna, 203 F.3d 228, 234 (3d Cir. 2000) (public employee context). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not

---

motivated by the filing of plaintiff's lawsuit, then assuming *arguendo* that despite what might have been "an otherwise legitimate" government action, that action is made illegal because "it was undertaken in retaliation for the exercise of [plaintiff's] First Amendment speech." Id. Motives are key in this context. That is why such causal determinations are the reserved province of the fact-finder. See Baldassare, 250 F.3d at 195.

be great in order to be actionable." Suppan, 203 F.3d at 235(quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).

Adverse action is found if "retaliatory conduct [is] *sufficient to deter a person of ordinary firmness* from exercising his First Amendment rights." Suppan, 203 F.3d at 235 (internal punctuation omitted) (emphasis added); accord Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000); Shehee v. City of Wilm., 67 Fed.Appx. 692, 694 (3d Cir. May 13, 2003) (public employee context); see Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist., 2006 WL 167443, *2 (3d Cir. Jan. 24, 2006) (public employee context) (reversing the district court for failing to apply the person of ordinary firmness standard in a First Amendment retaliation case).[7] Put another way, the retaliatory actions must be sufficiently severe to "cause reasonably hardy individuals" to refrain from protected activity. Agosto-de-Feliciano, 889 F.2d at 1217.[8] This is an objective test, not a subject one. Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003).[9]

As was discussed in plaintiff's opening brief as well as herein, within hours of the filing of plaintiff's lawsuit, defendants violated numerous longstanding DSP policies, practices,

---

[7] Numerous other courts have adopted this standard. See e.g. Bennett v. Hendrix, 423 F.3d 1247, 1254-55 (11th Cir. 2005); Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir.2004); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir.2002); Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir.2001); Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir.2001); Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir.1998); . Agosto-de-Feliciano v. Aponte-Rogue, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc); Bart, 677 F.2d at 625; Rodriguez v. Torres, 60 F.Supp.2d 334, 349 (D.N.J. 1999); Kadetsky v. Egg Harbor Township Bd. of Educ., 82 F.Supp.2d 327, 337 (D.N.J. 2000); Katzenmoyer v. City of Reading, 2001 WL 1132374, *2 (E.D.Pa.); Marrero v. Camden County Bd. of Social Serv., 164 F.Supp.2d 455, 467 (D.N.J. 2001); Sunkett v. Misci, 183 F.Supp.2d 691, 708 (D.N.J. 2002); Kelleher v. City of Reading, 2002 WL 1067442, *5 (E.D.Pa.); Zugarek v. Southern Tioga Sch. Dist., 214 F.Supp.2d 468, 476-77 (M.D.Pa. 2002).

[8] This is an easier standard to meet than the statutorily based adverse action test in the Title VII context. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1297-1300 (3d Cir. 1997) (setting forth the stricter Title VII standard); Rodriguez, 60 F.Supp.2d at 345 n.10 (recognizing the distinction between the adverse action standards in the First Amendment and Title VII contexts).

[9] Because this is an objective standard, a plaintiff need not demonstrate that she actually was deprived of her First Amendment rights. See Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005). Indeed, "[s]peech can be chilled, even when not completely silenced." Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005); see Constantine, 411 F.3d at 500 ("The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely").

customs and rules and released to and discussed with the media the fact that plaintiff was facing confidential internal affairs charges. This was an unprecedented action. Indeed, when faced with similar, if not identical, circumstances relating to media inquiries into defendants' own internal affairs charges, defendants always refused to comment.

As the causal evidence discussed below makes clear, by releasing this information, defendants intended to punish and humiliate plaintiff for exercising her First Amendment rights. The release of such confidential information is certainly sufficient to make a person of ordinary firmness think twice about exercising their First Amendment rights. Any reasonably hardy individual would think twice about filing a lawsuit if confidential information about them will be released. Indeed, who would dare to stand up and file a lawsuit if they know that the defendant then will release confidential information about them to the media where it will then be published on a local and regional scale? Few, if any individuals would do so. Importantly however, the adverse action standard is satisfied if the "retaliatory conduct [is] sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." Suppan, 203 F.3d at 235. All that is needed is a chill, and the defense efforts certainly meet this standard. To the extent that the Court has any doubts in this regard, because the question of whether a retaliatory action would chill a person with an ordinary backbone from exercising their rights is a question for the fact finder, see Suppan, 203 F.3d at 235; Allah, 229 F.3d at 225; Baldassare, 250 F.3d at 195, this is uniquely a question to be resolved by a jury. Additionally, in light of the standard of review in which plaintiff receives all the inferences, it is clear that plaintiff has met her burden and that summary adjudication for lack of adverse action is inappropriate.

**III. THE RECORD IS OVERFLOWING WITH CAUSAL EVIDENCE WHICH DEMONSTRATES THAT PLAINTIFF'S PROTECTED FIRST AMENDMENT ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE UNPRECEDENTED RETALIATION AGAINST HER.**

Defendants claim that there is no record evidence to meet plaintiff's First Amendment burden on causation. As discussed below and in plaintiff's summary judgment opening brief,

defendants are mistaken.

**A. Substantial or Motivating Factor.**  Following the determination that her conduct was constitutionally protected, plaintiff must demonstrate that this conduct was a "substantial" or "motivating factor" in the relevant decision.  Suppan, 203 F.3d at 235; Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  "But for" causation is not needed.  Suppan, 203 F.3d at 236.  "'Substantial factor' does not mean 'dominant' or 'primary' factor."  Hill, 411 F.3d at 126 n.11.  Instead, a plaintiff need only show that her protected First Amendment rights "played any substantial role in the relevant decision."  Suppan, 203 F.3d at 236; see Miller v. Cigna, Corp., 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse decision).  This is a question of fact, not one of law.  Baldassare, 250 F.3d at 195.  Plaintiff notes that the overwhelming causal evidence in this regard was discussed in great detail in her opening brief.  However, plaintiff will discuss that evidence in even greater detail below.

**1. Knowledge of Protected Conduct.**  Sufficient evidence must be produced to demonstrate that the defendants knew of the protected activity.  Keenan v. City of Phila., 983 F.2d 459, 466 (3d Cir. 1992).  Here, all defendants were aware of the filing of plaintiff's lawsuit. (Compl.& Ans. ¶ 109; MacLeish 117-20; Mitchell 28-30; A19,39,191-92,253-54).

Supervisor liability also may be established 1) "through allegations of personal direction or of actual knowledge and acquiescence," or 2) "through proof of direct discrimination by the supervisor." Id.  Importantly, "[w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct." Robinson, 120 F.3d at 1294; accord Adkins v. Rumsfeld, 389 F.Supp.2d 579, 585-86 (D.Del. 2005).  "To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it." C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005) (citing

C.H. v. Olivia, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).

**a. MacLeish's Involvement.** Defendants have not contended that MacLeish was not involved in the decision to release plaintiff's internal affairs information to the Delaware media - nor could they since he gave the order to Aviola to release and discuss the information at issue. (Aviola 63-70,76-77,86-89; MacLeish 142,165, 208; A134-37,140, 198, 203,214).

**b. Mitchell's Authorization.** Defendants do however contend that Mitchell had no involvement. (DOB at 23-24). Yet defendant MacLeish testified that he would not have given these orders if defendant Secretary Mitchell had not "agreed and []sanctioned it or authorized it." (MacLeish 135,142,165; Mitchell 47-48,56-57; A196,198,203,258,260).

> Q. Would you have made the decision to authorize the release if Secretary Mitchell hadn't agreed and []sanctioned it or authorized it?
>
> A. No.

(MacLeish 135; A196). Thus, despite Mitchell's own tainted denials of involvement, fellow defendant MacLeish's testimony makes clear that Mitchell "acquiesced in (i.e., tacitly assented to or accepted)" and otherwise "fail[ed] to act to stop" MacLeish's retaliatory actions despite Mitchell's ability to do so. Robinson, 120 F.3d at 1294; Adkins, 389 F.Supp.2d at 585-86. Under settled Third Circuit law, Mitchell's failure to stop MacLeish's actions despite his clear ability, opportunity and authority to do so, is sufficient to establish that Mitchell "individually participated in the alleged constitutional violation or approved of it." C.N., 430 F.3d at 173.

**c. Chaffinch's Involvement.** Defendants also contend that there is no evidence of Chaffinch's involvement in any retaliatory actions. (DOB at 24-25). Plaintiff notes that there would be a great deal more evidence of Chaffinch's involvement if defendants had not erased Chaffinch's computer hard drive and forever destroyed the Arch system messages that plaintiff had expected to use to prove involvement with direct evidence.

However, there is more than sufficient circumstantial evidence to demonstrate

Chaffinch's involvement despite his self-serving denials - denials that are to be disregarded given our present summary judgment posture and the standard of review. See Hill, 411 F.3d at 131 n.22; Reeves, 530 U.S. at 149-151; Hill, 411 F.3d at 129 n.16.

As defendant Mitchell admitted, Chaffinch was "ang[ry]," "displeased" and "pissed off" about the filing of plaintiff's lawsuit. (Mitchell 36; A255). And there is a great deal of record evidence that Chaffinch and MacLeish are "buddies" and "friends." (Chaffinch 16-17; MacLeish 7; A614,375; Chaffinch 187; Baylor 20; A111,273). In fact, MacLeish publicly brags that he and Chaffinch are "joined at the hip." (MacLeish 9; A375). Thus, it is a fair inference that Chaffinch's good buddy MacLeish was acting at Chaffinch's direction when he retaliated against plaintiff, the person who had hurt and upset his good friend. This inference is strengthened all the more in light of the record evidence that Chaffinch expects "blind loyalty" from all those under his command and his history of vindictiveness and vengefulness towards those who oppose him. (See POB at 14). Additionally, in light of defendants' destruction of evidence, the compelling temporal proximity, the violation of numerous DSP policies, practices and customs and the other categories of causal evidence discussed below, it is a fair inference that Chaffinch was in fact involved in the retaliation against plaintiff.

Defendants contend that Chaffinch was "immediately" relieved of command and was not present on DSP property and so could not have leaked the internal affairs e-mail to the Delaware media. (DOB at 10 n.6). Notably, defendants have not given a record cite for this allegation - no doubt because it is patently false. Plaintiff notes that Lt. Aviola testified that Chaffinch was at headquarters the day the suit was filed. It was only later that Chaffinch was summoned to defendant Mitchell's office where he was suspended later that same day. (Aviola 78-80; A138). Given that Chaffinch was at HQ and was visibly "upset" by the filing of plaintiff's lawsuit (Aviola 83; A139) and certainly had the motive to retaliate against the person who had exposed his vile conduct, he had plenty of time and opportunity to release the e-mail in question to the

media before Mitchell suspended him. Of course, again, plaintiff acknowledges that some of the best evidence of Chaffinch's retaliatory intent and actions was located his Arch text messaging system on his DSP computer, which defendants destroyed despite its relevance and the pendency of this litigation.

**2. Temporal Proximity.** "[T]emporal proximity between the protected activity and the [retaliation] is sufficient to establish a causal link." Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). The Third Circuit has found that the temporal link alone can establish causation when the retaliation occurs within two days of the protected conduct, Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), because such a short period of time is "unusually suggestive." Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). This "is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) (internal punctuation omitted). As discussed above, some retaliation occurred within ours of the filing of plaintiff's suit while the rest of the retaliation occurred the very next day.

**3. Demonstrated Anger, Hostility and Antagonism.** Evidence of anger, hostility and other antagonism also demonstrates causation. It is well established that "a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." Woodson, 109 F.3d at 920-21; accord Adkins, 389 F.Supp.2d at 586 ("antagonism toward Plaintiff" proof of causation); see Robinson v. SEPTA, 982 F.2d 892, 895 (3d Cir. 1993). For example, evidence that a defendant is "irritated" or otherwise angered by a plaintiff can be compelling evidence of causation. See Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (defendant "irritated" by

protected conduct).[10]  As discussed in plaintiff's opening brief, there is compelling record

evidence from defendants and their agents that they all were "mad," "angry," "upset," "pissed

off," "unhappy," "disappointed" and otherwise displeased at plaintiff because of the filing of her

lawsuit.  (POB at 14-16).

    **4.  Violations of Law, Policies and Procedures.**  Violations of laws, rules and

procedures also are proof of causation and wrongdoing.  See Village of Arlington Heights v.

Metropolitan Hous. Develop. Corp., 429 U.S. 252, 267 (1977) ("Departures from the normal

procedural sequence also might afford evidence that *improper purposes are playing a role.*

Substantive departures, too, may be relevant, particularly if the factors usually considered

important by the decisionmaker strongly favor a decision contrary to the one reached."); Stewart

v. Rutgers, the State Univ., 120 F.3d 426, 434 (3d Cir. 1997) (departures from the normal

procedural sequence afford evidence that *improper purposes are playing a role*); see Bray v.

Marriott Hotels, 110 F.3d 986, 992, 994 (3d Cir. 1997); Kunda v. Muhlenberg College, 621 F.2d

532, 539 (3d Cir. 1980); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 143-44 (3d Cir. 1977);

Adkins, 389 F.Supp.2d at 586 (violations of Air Force policies are probative of causation in First

Amendment retaliation context).  As discussed in plaintiff's opening brief (POB at 16-19) and in

greater detail below, the record is overflowing with abundant evidence of the numerous policies,

procedures, practices, standing orders, rules and regulations that were violated by defendants

when they retaliated against plaintiff.

    **a.  Longstanding DSP Policies, Practices and Procedures.**  "[T]he

confidentiality of internal documents and internal information is something which is valued in

the Delaware State Police." (Baylor 11; A271).  But contradictorily however, defendants violated

numerous and longstanding DSP policies, practices and procedures when they released plaintiff's

---

    [10]  Even "a significant delay between the expressive activity and the retaliation [will] not
preclude finding the required nexus where there is evidence of continuing hostility to connect events that
would not otherwise appear to be related to each other."  Brennan, 350 F.3d at 420.

confidential internal affairs information to the Delaware media.

**(1). Current Policy and Practice.** Lt. Aviola, the current PIO for the DSP, admitted at his deposition that the standard policy, practice and procedure of the DSP is that "we do not comment on the specifics of [an] internal complaint." (Aviola 35,50, 71-72; A127,131,136). It is the "policy" of the DSP to "'no comment' or refuse to discuss the specifics" of internal affairs and other internal personnel matters. (Aviola 50,72; A131,136). Defendant MacLeish also admitted that this is the DSP's "policy." (MacLeish 156; A201). This also is the "practice" and the "standard response." (Aviola 71,75; A136-37).

In addition to the testimonial evidence quoted and cited immediately above, the admissions from defendants and their agents in this regard include the following. Lt. Aviola testified as to past practice as follows:

> Q. Now, would you agree that when media inquiries were made as to an Internal Affairs' investigation into defendants Chaffinch and MacLeish, that the defendants in this case refused to discuss those matters as a matter of historical and practice.
>
> A. Yes.

(Aviola 32; A126).

> Q. Would it be fair to say that in each [past] case when an inquiry was made by the media, that the State Police would "no comment" or refuse to discuss the specifics of the internal personnel or Internal Affairs matter?
>
> A. Yes.

(Aviola 50; A131).

> Q. At least in reference to the Internal Affairs matters, I believe you testified before that the standard response was something to the effect of no comment, we don't comment on Internal Affairs or internal personnel matters?
>
> A. Yes.

(Aviola 75; A137).

Tellingly, defendants also admitted the DSP's past practice of refusing to comment on internal personnel and internal affairs matters in their Answer to the First Amended Complaint.

> Yet when repeated media inquiries were made as to internal affairs investigations into defendants Chaffinch and MacLeish, defendants refused to discuss those matters.

(Compl. & Ans. ¶ 129A22-23,40). Continuing, in their Answer, defendants admitted the following about their past practice of 'no commenting.'

> 130. For example, as set forth in the April 15th, 2004 edition of the Delaware State News, DSP spokesman Aviola refused to comment on those matters. In his own words:
>
> > "They are internal. **As a policy, we don't comment on internal matters**."
> >
> > "**[W]e won't be disclosing the nature of the charges because they are internal**."
>
> 131. Similarly, as set forth in the April 23rd, 2004 edition of the News Journal, in response to a request for a confidential internal affairs document, the article states:
>
> > "Aviola said it was an internal document and would not be dispersed . . .."
>
> 132. In the same way, as set forth in the April 30th editions of the Delaware State News and the News Journal, defendant Mitchell's predecessor Secretary James L. Ford, when questioned about the investigations into defendants Chaffinch and MacLeish stated:
>
> > "To protect the integrity of the process, I will not comment further on these matters."
>
> 133. In the same Delaware State News article, Aviola stated:
>
> > "We won't have any comment. It's still classified as an internal affairs matter."
>
> 134. Likewise, as set forth in the March 27th edition of the Delaware State News, in response to inquiries into a separate internal affairs investigation into defendant MacLeish's actions, Aviola stated:
>
> > "It's a personnel matter. I can't comment on that."
>
> 135. Regarding the same matter, the March 25th edition of the News Journal stated:
>
> > "Lt. Joseph P. Aviola Jr., a state police spokesman, declined to disclose steps taken, saying it was a personnel matter."

(Compl. & Ans. ¶¶ 130-135; A23-24,40). Lt. Aviola testified at length about the DSP's past practice when it came to refusing to comment about the Internal Affairs investigations into Chaffinch and MacLeish - the same ones admitted by defendants in their Answer. (Aviola 29-50; A125-31). Aviola also confirmed the authenticity of the specific media articles at issue which

contained his quotes and refusals to comment in accord with DSP practice. (Id.; PX 8-13; A146-59). Again, in Aviola's words -

> Q. Now do you recall a time when Lieutenant Colonel MacLeish, now-Colonel MacLeish - at the time he was lieutenant colonel; right?
>
> A. Yes.
>
> Q. And when then-Colonel L. Aaron Chaffinch were being investigated for various Internal Affairs issues?
>
> A. Yes.
>
> Q. We just ran through a lot of articles regarding those Internal Affairs investigation[s], didn't we?
>
> A. Yes sir.
>
> Q. Would it be fair to say that in each case when an inquiry was made by the media, that the State Police would 'no comment' or refuse to discuss the specifics of the internal personnel or Internal Affairs matter?
>
> A. Yes.
>
> Q. Would it be fair to say that that is State Police policy?
>
> A. Yes.

(Aviola 49-50; A130-31). At his deposition, defendant MacLeish himself confirmed Aviola's testimony and admitted that "DSP policy is not to comment or not release internal information." (MacLeish 156; A201).

Again, to summarize the evidence laid out above, defendants tellingly admitted in their Answer, and the record is undisputed, that when the Delaware news media had previously and repeatedly inquired about the numerous Internal Affairs investigations, violations and convictions of defendants Chaffinch and MacLeish, the DSP has always refused to comment in any way, shape or form because of the DSP policy of not commenting on internal personnel matters. (Compl. & Answer ¶¶ 129-135; A22-24,40). The documentary record confirms this (PX8-13; A146-59), as does the sworn deposition testimony of Lt. Aviola the PIO and defendant MacLeish himself. (Aviola 32,34-35,39-40,47,50; MacLeish 151-152,154-156; A126-28,130-

31,200-01). This is the "policy," "practice," and "standard response" of the DSP. (Aviola 50,71,75; MacLeish 156; A131,136-37,201).

Yet despite the DSP's own policy, practice and custom, as explained above, defendants not only refused to 'no comment' in response to the media inquiries, they commented on them in an unprecedented manner and disclosed to the media the very nature of the inflammatory charges that plaintiff was facing. Several times at his deposition, Lt. Aviola testified that in light of the DSP policy and practice of never commenting on or discussing previous internal affairs charges against defendants Chaffinch and MacLeish themselves, he was "surprised" when MacLeish instead ordered him to discuss plaintiff's leaked confidential internal document with the Delaware media. (Aviola 75-76; A137). Aviola even spoke up during his meeting with MacLeish and stated, "You know, it's an internal document. We are not going to comment on that; right?" (Aviola 76; A137). But MacLeish ordered him to discuss it anyway (Aviola 63-64; A134) in violation of the DSP's own policies, practices and customs.

**(2). Long Time Historical Policy and Practice.** This also has been the longstanding practice in the PIO for well over a decade. For example, Major David Baylor served in the PIO as a corporal beginning in September 1989 and then in 1992 was promoted to sergeant and served as the Director of the PIO. Then, after he was promoted to Major in 2002, he had authority and responsibility for the operation of the PIO. Major Baylor retired in August 2004. (Baylor 5,21-23; A269,273-74). He said the DSP's policy "was pretty much that we would never really confirm or deny or comment on internal affairs matters." (Baylor 23-24; A274). Moreover, "[t]hat [is] pretty much standard practice in law enforcement." (Baylor 23; A274). Yet defendants violated their own standard law enforcement practice in how they handled plaintiff's situation.

**(3). MacLeish's Justification for Violating These Policies and Practices Does Not Hold Water.** Defendants build a cornerstone of their defense to

plaintiff's retaliation case upon the claim that they could release plaintiff's IA information because it was not confidential since the internal affairs investigation into her was concluded. (DOB at 20). Defendants cite MacLeish's testimony in this regard where he contended that it is DSP policy to no comment during an ongoing investigation, but once the investigation concludes, everything is fair game for comment to the media. (DOB at 20; MacLeish at 152-53; A200).

Notably, MacLeish contradicted himself and gave very different testimony on this same key issue at another point during his deposition. When later asked whether the decision to release information about an IA investigation to the press changes when an investigation is concluded, MacLeish flip-flopped and testified that "[w]e still do not release the information." (MacLeish 174; A206). "Once an investigation is concluded and the officer is charged, whatever happens after that, any inquiries into that we are not going to release." (MacLeish 175; A206).

**b. DSP Rules, Regulations and Policies.** The Division's written Rules and Regulations reflect the official policy of the DSP. (MacLeish 39,43-44; A172-73). As Rule 1 itself states, these Rules and Regulations must be followed. (PX16; MacLeish 46-47; Mitchell 20; A223,174,251).

**(1). Rule 10.** This rule requires that "Members shall treat as confidential the official communications and business of the Division." (PX16; MacLeish 39; A225,172).

**(2). Rule 18(b).** This rule requires that "Any information obtained in an official capacity shall not be disclosed either in writing or orally to any unauthorized person, and no officer will divulge any matter that is his duty to keep secret." (PX16; MacLeish 42-43; A226,173).

**(3). Rule 19(a).** This rule requires that "A member shall give information to the news media in accordance with procedures established by the Division." (PX 16; MacLeish 43-44; A226,173).

**(4). The DSP Code of Ethics.** The Preamble to the DSP's own Code of Ethics requires that "Whatever I see or may hear of a confidential nature or that is confided to me in my official capacity will be kept secret unless revelation is necessary in the performance of my duty." (PX 15; MacLeish 25-26; A218,168-69). This is something that "is very important for a state trooper." (MacLeish 25-26; A168-69).

**(5). Defendants Violated All of These Rules.** Yet defendants nevertheless violated all their own rules and discussed plaintiff's confidential internal affairs information with the Delaware media.

**c. An Order To Violate Any of These Rules is an "Unlawful Order."** Defendant Secretary Mitchell is the cabinet Secretary responsible for the DSP. He has a long history in law enforcement. (Mitchell 5-10; A247-49). As Mitchell testified at some length, any order to violate the written DSP Rules and Regulations or other laws - even if ordered to do so by DSP legal counsel - is an "unlawful order" and a Trooper has an "obligation" to disobey such an "unlawful order." (Mitchell 20-27; A251-53). Major Baylor also testified that an order to release internal confidential information, even when coming from the DAG, would be an unlawful order in violation of "clearly expressed" DSP rules and regulations. (Baylor 9-11; A270-71).[11] Notably, despite an "obligation" to disobey such "unlawful order[s]" which violated numerous "clearly expressed" DSP Rules and Regulations, defendants refused to follow their own rules and instead released plaintiff's confidential information to the media. (Mitchell 20-27; Baylor 9-111 A251-53, 270-71).[12]

**d. No Internal Affairs Investigation Resulted From These**

---

[11] Defendant MacLeish admitted that he would not follow advice from the DAG to violate numerous DSP rules, regulations and ethical cannons. (MacLeish 163-64; AA203). However, when it came to whether he would violate the specific rules and regulations at issue in this case - regarding confidentiality of internal information - he testified that it was ok to violate those rules because the DAG told him it was ok. (MacLeish 164-65; A203). There is a glaring inconsistency in MacLeish's position.

[12] This testimony also dooms defendants' advice of counsel defense.

**Numerous Violations.** Yet despite all of these things, as discussed above, defendants refused to ever investigate this release of confidential information. (Aviola 62; MacLeish 145-150; Mitchell 49-50; A134,198-200,258-59). In MacLeish's words, "an inquiry" was conducted, but "it was basically impossible" to conduct an investigation because they did not know where to start to investigate. (MacLeish 147; A199).[13] This refusal to investigate independently violates several additional DSP rules. For example, Rule 1 requires that all laws, rules and regulations must be obeyed, and Rule 3 requires that any Trooper with knowledge of a violation of either the law or the rules and regulations immediately report such violations to Internal Affairs for investigation. (PX16; A223).

**e. The Express and Unequivocal Confidentiality Protections of the LEOBOR.** The Law Enforcement Officers' Bill of Rights is something that DSP officers know about and think is important because Troopers value its privacy protections. (Aviola 20-21; A123). The relevant portions of it require that:

> Whenever a law-enforcement officer is <u>under investigation or is subjected to questioning for any reason which could lead to disciplinary action</u>, demotion or dismissal, the investigation or questioning shall be conducted under the following conditions::
>
> * * *
>
> All records compiled as a result of any investigation ... shall be and remain confidential and shall not be released to the public.

11 Del.C. § 9200(c) and (c)(12) (emphasis added). This statute is in no way "unclear," (Aviola 28; A125), and it makes "all records" confidential. <u>Id.</u>

The statute's confidentiality protections protect Troopers at the rank of Captain, such as plaintiff, and below. <u>See</u> 11 Del.C. § 9200(b). The statute also expressly states that these protections <u>do not apply</u> to either the Superintendent or the Deputy Superintendent, such as

[13] As a highly trained police investigator with over twenty years of police experience, plaintiff respectfully suggests that perhaps a good place to start an investigation into the leak of the information would be with the people who had the motive to release the information - such as Chaffinch and his close allies and friends - including MacLeish and the two comparators who were promoted to Major over plaintiff.

defendants Chaffinch and MacLeish. (MacLeish 153, 156-157; PX6; A200-01,143-45); accord 11 Del.C. § 9200(b).

Thus, it is clear that defendants' release of the e-mail about plaintiff's internal affairs matters as well as their discussion of this same e-mail with the Delaware media also violates LEOBOR. Defendant MacLeish even admits that his strained justification for the DSP's actions "could be construed" as "a back door" and as "an end run" around LEOBOR's protections. (MacLeish 162; A203).

The entire defense argument on the LEOBOR issue appears to be that the e-mail at issue that was leaked to the press is not a "record" within the meaning of the statute. (DOB 17-20). But the defense claim is built on several false premises.

First, the only citation defendants give for the proposition that the e-mail is not a "record" are the affidavits of two interested DSP employees - Capt. Paige and Capt. Coupe. (DOB at 18). But no where in their affidavits do they assert that the e-mail at issue is not a "record" within the meaning of LEOBOR. And given that neither Paige nor Coupe are judges, it is certainly not their place to interpret or modify the plain meaning of a law passed by a legislative body. More importantly however, as Captains in the hierarchical organization that is the DSP, both Paige and Coupe are employees of defendants and have an obvious bias towards their defendant employer and superior officers who can take retaliatory actions against them. Under the standard of review here at summary judgment, the Court "should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant." Hill, 411 F.3d at 131 n.22. Both Paige and Coupe are plainly biased and interested witnesses, so their testimony can be disregarded in its entirety.

Second, defendants also falsely claim that 11 Del.C. § 9200(c) only provides "legal protections for an officer during the course of an investigation." (DOB at 17). As quoted above, the plain text of § 9200(c) belies such an assertion. § 9200(c)'s protections are not limited to the

context of an investigation. Instead, its protections continue and apply whenever an officer "is subjected to questioning for any reason which could lead to disciplinary action." Id. (emphasis added). That obviously would include the quasi-judicial hearing that follows the conclusion of the investigation. Thus, the statute's protections are not limited to the investigatory phase of an internal affairs matter. The confidentiality protections apply equally to the stages after the investigation is complete - such as the prosecutory and hearing stages - where questioning also can "lead to disciplinary action." Id.

Third, the defense claim that the e-mail is not a record when the entire statute is read together is equally without merit. (DOB at 18). Defendants play fast and loose with the statutory language in this regard. They try to equate the word "record" with the word "hearing" and somehow argue that because a hearing takes place after an investigation, that the e-mail is not a record - an argument that is missing several logical steps. In addition to missing the point that the statute applies beyond the investigatory stage, such a reading also ignores the plain words of § 9200(c)(12) which nowhere states that a record cannot be compiled after an investigation is closed. Instead, the statutory language itself simply states that "All records compiled as a result of any investigation ... shall be and remain confidential and shall not be released to the public." Id. at §9200(c)(12). As a matter of logic, a record can be created and compiled as a result of an investigation that is closed. Memos can be written. E-mails can be sent. A trial and hearing record can still be created, all based upon the results of a closed investigation.

**5. Disparate Treatment.** Similarly, evidence of disparate treatment also can demonstrate causation. San Filippo, 30 F.3d at 444; Brennan, 350 F.3d at 421; Adkins, 389 F.Supp.2d at 586. Here there is a clear and striking contrast between the stonewalling and refusal to comment that occurred after media inquiries about numerous IA charges Chaffinch and MacLeish faced and the harmful information released as to plaintiff.

**6. Selective or Discriminatory Enforcement.** The state simply may not

selectively enforce a statute or rule to punish an individual for exercising her First Amendment rights. See Cox v. Louisiana, 379 U.S. 536, 557-58 (1965); Holder v. City of Allentown, 987 F.2d 188, 197-99; Hill, 411 F.3d at 131-32. As just discussed, defendants have selectively enforced numerous DSP policies, practices and customs as well as LEOBOR as to plaintiff and refused to apply them to protect plaintiff's confidentiality rights.

**7. Pretext.** Pretextual explanations by a defendant also are proof of causation. Feldman v. Phila. Hous. Auth., 43 F.3d 823, 831 (3d Cir. 1994). This is because "[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1069 (3d Cir. 1996) (en banc). Pretext evidence is abundant on our record. First, defendants' justification for releasing plaintiff's IA information can be disbelieved in light of their past policy and practice when it came to their own IA information. Secondly, as discussed in plaintiff's opening brief (POB at 19-21), defendants' denials of retaliatory intent can be seen as pretextual in light of their past practice of retaliating against those in the protected class - those who speak out and file lawsuits. See Arlio v. Lively, 392 F.Supp.2d 317, 323-24 (D.Conn. 2005) (in the First Amendment retaliation context, admitting prior acts of retaliation to establish that the defendants' denials of hostility towards those who filed lawsuits were a pretext for animus towards those in the protected class - those who file lawsuits).

**8. Falsehoods.** As the Supreme Court has held, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." Reeves, 530 U.S. at 147. As discussed above, MacLeish testified that the only reason he authorized the release of plaintiff's information was allegedly because confidentiality protections no longer applied because the investigation was completed. (MacLeish 152-53; A200). Yet later on in his testimony, he flip-flopped and contradicted himself and testified that even when an investigation is concluded, "[w]e still do not release the

information." (MacLeish 174; A206). "Once an investigation is concluded and the officer is charged, whatever happens after that, any inquiries into that we are not going to release." (MacLeish 175; A206). MacLeish cannot have it both ways. Either he is being dishonest with his former statement, or he is being dishonest with his latter statement. In light of the longstanding DSP policies and practices, plaintiff respectfully suggests that it is his former statement which is the dishonest one. "We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful [retaliation]." Sheridan, 100 F.3d at 1069.

**9. Intentional Destruction of Key Evidence.** As the Third Circuit has explained a party's destruction of evidence is evidence of guilt and illegal conduct. Id. As explained in great detail in plaintiff's destruction of evidence sanctions brief, defendants destroyed defendant Chaffinch's entire work hard drive to deny plaintiff access to key evidence contained therein. In doing so, defendants deprived plaintiff of a great deal of key relevant evidence - including evidence that reasonably had bearing on the initial release and leak of plaintiff's internal affairs information to the Delaware media.

**10. The Big Picture.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario." Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990). The big picture in our case makes clear that defendants illicitly sought to destroy plaintiff because she had dared to expose Chaffinch's misconduct to the light of day.

Thus, in light of the overwhelming record evidence discussed above, it is clear that the filing of plaintiff's lawsuit, at the very least "played a substantial role" in the decision to release and discuss her internal affairs information with the Delaware media. As a matter of law, no reasonable jury could conclude otherwise. Thus, the defense motion for summary judgment must

be denied.

**B. Same Decision Anyway Affirmative Defense.** The burden of proof then "shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'" Nicholas v. Pa. State Univ., 227 F.3d 133, 144 (3d Cir. 2000). This is a question for the fact-finder. Baldassare, 250 F.3d at 195. This last step is an "affirmative defense" to be met by the defendants. Nicholas, 227 F.3d at 144.[14]

But despite their claim and assertion of this defense in their brief (DOB at 36), defendants failed to plead this affirmative defense in their Answer to the Complaint as required under the Federal Rules, see Fed.R.Civ.P. 8(c) (a party must plead any "matter constituting an avoidance or affirmative defense"), so no discovery was needed on this issue. Accordingly, it has been waived. See Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991) (noting the general rule that "[f]ailure to raise an affirmative defense by response pleading or by appropriate motion generally results in the waiver of that defense.") (internal footnotes omitted).

Accordingly, summary judgment for defendants is inappropriate on her First Amendment retaliation counts. Plaintiff has clearly engaged in protected conduct and there is overwhelming causal evidence to meet her substantial or motivating factor burden. And lastly, because defendants chose not to assert their affirmative defense, liability has been established and all that is needed is a trial on damages.

## V. DEFENDANT DELAWARE STATE POLICE AND THE OFFICIAL CAPACITY DEFENDANTS ARE PROPERLY JOINED IN THIS ACTION FOR THE PURPOSES OF COLLECTING ATTORNEYS' FEES AND COSTS.

Defendants also assert that the Eleventh Amendment bars this suit against the state and the official capacity defendants. Plaintiff is well aware of the law in this regard. Indeed, as ¶ 6

[14] Accord Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23, 30 (1st Cir. 2004); Adler v. Pataki, 185 F.3d 35, 47 (2d Cir. 1999); Brady v. Fort Bend County, 145 F.3d 691, 712 (5th Cir. 1998); Ostad v. Oregon Health Sciences Univ., 327 F.3d 876, 885 (9th Cir. 2003); Stanley v. City of Dalton, Georgia, 219 F.3d 1280, 1292 (11th Cir. 2000); Yalowizer v. Town of Ranchester, Wyoming, 18 Fed.Appx. 745, 754 (10th Cir. 2001) (all noting that this Mt. Healthy prong is an affirmative defense).

of her Amended Complaint makes perfectly clear, the DSP "is only joined in this action for purposes of collecting attorneys' fees and costs." Here the Supreme Court has explained that, "an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment." Missouri v. Jenkins, 491 U.S. 274, 279 (1989). In the case of Foraker v. Chaffinch, C.A.No. 02-302-JJF (D.Del. June 17, 2003) (slip op. at 2 n.1) (attached), Judge Farnan rejected this identical defense argument because, as here, the State had explicitly only been joined for the purposes of collecting fees and costs.

**VI. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.**

**A. Introduction.** Qualified immunity is a two part inquiry. Atkinson v. Taylor, 316 F.3d 257, 261 (3d Cir. 2003) (noting that the Supreme Court reaffirmed the "two-part inquiry" in Saucier v. Katz, 533 U.S. 194 (2001)). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" Atkinson, 316 F.3d at 261. Next, the court must next decide whether the right allegedly violated was a clearly established one. Wilson v. Layne, 526 U.S. 603, 609 (1999). "Whether a governmental official is entitled to protection under the doctrine of qualified immunity is a 'purely legal question.'" Rogers v. Powell, 120 F.3d 446, 454 (3d Cir. 1997).

The Constitutional rights at issue are plaintiff's First Amendment right to be free of retaliation for exercising her rights to freedom of speech and to petition the government for redress of grievances. So the test for qualified immunity in this case is whether it was clearly established for a public official in October 2004 to believe that releasing confidential information about plaintiff in retaliation for the filing of her lawsuit was unlawful.[15]

**B. The Facts Show that Defendants Violated Plaintiff's First Amendment Rights.** As explained both above and in plaintiff's opening brief in support of her motion for summary

[15] Notably, each of the defendants testified that they know it is illegal to retaliate against an employee who files a lawsuit. (MacLeish 14-15; Mitchell 17; Chaffinch 9; A166,250,612). Thus it is apparent that defendants themselves are already aware of clearly established law in this regard.

judgment, plaintiff has established that defendants violated her First Amendment free speech and petition clause rights. Thus, plaintiff has met prong one of her qualified immunity burden and established a constitutional violation.

**C. Plaintiff's First Amendment Rights Were Clearly Established.** "Once it is determined that evidence of a constitutional violation has been adduced, courts evaluating a qualified immunity claim move to the second step of the analysis to determine whether the constitutional right was clearly established." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002) ("Bennett I").

> That is, *in the factual scenario established by the plaintiff*, would a reasonable officer have understood that his actions were prohibited. *The focus in this step is solely upon the law*. If it would not have been clear to a reasonable officer what the law required *under the facts alleged*, he is entitled to immunity. If the requirements of the law would have been clear, the officer must stand trial.

Id. at 136-37 (emphasis added) (original emphasis removed); accord Bennett v. Murphy, 2005 WL 78581, *3 (3d Cir. Jan. 14, 2005) (Bennett II); Wright v. City of Phila., 409 F.3d 595, 600 (3d Cir. 2005); Saucier v. Katz, 533 U.S. 194, 201 (2001).

The prong two question becomes would a reasonable public official be put on notice that the constitutional violation already established under prong one runs afoul of clearly established law.[16]

---

[16] The reasonableness of an official's conduct is not a separate question from whether the law was clearly established. Instead, these are two sides of the same coin. The "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. This is because "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Crawford-El v. Britton, 523 U.S. 574, 591 (1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)). In other words, the law presumes that reasonably competent public officials are aware of clearly established law. Thus if the law is clearly established, a reasonably competent public official would have known of it. Id. "Adopting [defendants'] proffered [advice of counsel] position would immunize officials from liability via the simple expedient of consulting with counsel ... [W]here the law is clearly established, there is no justification for excusing individuals from liability. In sum, officials are presumed to know and abide by clearly established law. When their actions are otherwise, their claims of immunity will fail" Molloy v. Blanchard, 907 F.Supp. 46, 49 (D.R.I. 1995) (quoting Melton v. Oklahoma City, 879 F.2d 706, 731 (10th Cir. 1989)).

If there was any doubt on what is needed to put a reasonable public official on notice of clearly established law, the short answer is found in the U.S. Supreme Court case of Hope v. Pelzer, 536 U.S. 730 (2002). Hope held that "officials can still be on notice that their conduct violates established law even in *novel factual circumstances*." Id. at 741 (emphasis added). The Supreme Court unanimously agreed on this issue. Id. at 753-54 (Thomas, J. dissenting with whom Rehnquist, C.J. and Scalia, J. join) (agreeing that "officials can still be put on notice that their conduct violates established law even in novel factual circumstances"). This holding is in accord with a plethora of preexisting Third Circuit and Supreme Court law, discussed in much greater length below, and puts to rest in our present case any conceivable uncertainty regarding the level of factual correspondence needed between the right asserted and prior cases.

Even prior to the Hope decision, the law was the same as is demonstrated by many other Third Circuit and Supreme Court opinions. "[Q]ualified immunity applies if 'reasonable officials in the defendants' position at the relevant time could have believed, *in light of what was in the decided case law*, that their conduct would be lawful.'" Doe v. Delie, 257 F.3d 309, 318 (3d Cir. 2001) (emphasis added) (quoting Good v. Dauphin County, 891 F.2d 1087, 1092 (3d Cir. 1989)). Continuing -

> Thus, having determined that Doe has alleged a violation of a constitutional right, we must determine whether Doe's right [ ] was "clearly established" in a "particularized" sense. Anderson v. Creighton, 483 U.S. 635, 640 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. *We do not require precise factual correspondence between the right asserted and prior case law.* Good, 891 F.2d at 1092. Whether an official may be protected by qualified immunity turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Wilson v. Layne, 526 U.S. 603, 614 (1999) (internal quotes omitted). The issue is whether, given the established law and the information available to Defendants, reasonable [] officials in Defendants' positions could have believed that their conduct was lawful. See Paff v. Kaltenback, 204 F.3d 425, 431 (3d Cir. 2000).

Id. (emphasis added). The Third Circuit also has explained that the "clearly established" language test requires "some but not precise factual correspondence and [demands] that officials apply general, well-developed legal principles." Bennis, 823 F.2d at 733; see also Stoneking v.

Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989) ("the general legal principles governing analogous factual situations, if any, and a subsequent determination whether the official should have related this established law to instant situations" are the basis for the court's inquiry); accord Hicks v. Finney, 770 F.2d 375, 380 (3d Cir. 1985).[17] The Supreme Court in U.S. v. Lanier, 520 U.S. 259, 271 (1997), also stated that a "general constitutional rule already identified in the decisional law" may give fair warning to a public official if the rule applies "[w]ith obvious clarity to the specific conduct in question" even though the specific issue has not been previously addressed. Finally, in the Third Circuit a law may be clearly established even if the Court has not ruled on an issue and even if there is some disagreement among other Circuits, as long as "[n]o gaping divide has emerged in the jurisprudence" which would lead a party to "reasonably expect" the Courts in this Circuit to rule other than one way. Bieregu v. Reno, 59 F.3d 1445, 1459 (3d Cir. 1995).

Thus, government officials will not be granted immunity if they fail to make obvious inferences from a generally established right and apply the right in particular situations. So it was unreasonable in our case for defendants to believe that they could, for example, maliciously retaliate against plaintiff because she had dared to expose defendant Chaffinch's discriminatory and illegal actions in the DSP by filing a lawsuit in light of (1) the obvious inference from the large body of prior Supreme Court and Third Circuit public employee case law that such retaliation is illegal and (2) defendants' admitted knowledge that such conduct is illegal.

**1. Free Speech.** In the same way, there are more than 23 years of protection for

[17] Additionally as indicated by the Supreme Court, all that is required to defeat a qualified immunity claim is a "consensus of cases of persuasive authority." Wilson, 526 U.S. at 616. Note that this says nothing of a consensus of binding authority. This is the point made in 1989 by the Third Circuit in Good, 891 F.2d at 1092, that precise factual correspondence is not needed between the right asserted and prior cases. "A right may be clearly established even if there is no 'previous precedent directly in point.'" Leveto v. Lapina, 258 F.3d 156, 162 (3d Cir. 2001)(quoting Good, 891 F.2d at 1092); see also Assaf v. Fields, 178 F.3d at 177. This point was reiterated again by the Third Circuit in 1999, that a court need not have ruled on a case bearing a "precise factual correspondence" with the one under consideration. Assaf, 178 F.3d 170, 177 (3d Cir. 1999).

public employees from retaliatory discharges arising from protected speech, Baldassare, 250 F.3d at 201, protections which have been granted at the Supreme Court, Third Circuit and district court level. In the light of long established First Amendment case law protecting legions of public employees in both the Supreme Court and the Third Circuit, there is no way that defendants could have reasonably believed that they could retaliate against plaintiff by releasing portions of her IA file to the media because she had dared to file a lawsuit against them challenging their illegal activities.[18] Concerning the huge body of public employee case law (only a portion of which is listed in the preceding footnote), the Third Circuit recently held that in our Circuit *since 1982*, the law has been clearly established that no public employee can suffer adverse action or other "retaliation for exercising his rights under the first amendment." Baldassare, 250 F.3d at 201; see Foraker v. Chaffinch, C.A.No. 02-302-JJF (D.Del. June 18, 2003) (slip op. at 2) (holding that it was clearly established as of 1999 that defendant Chaffinch could not transfer a Trooper in retaliation for that Trooper's protected speech) (attached).

---

[18] See e.g., Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc) (public employee who reported and opposed gender discrimination by a superior protected); Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) (public employee's criticism of racism in police department protected); Monsanto v. Quinn, 674 F.2d 990 (3d Cir. 1982) (public employee who criticized management policies in a public agency protected); Pickering v. Bd. of Educ., 391 U.S. 563 (1968) (public school teacher who criticized school district superintendent and school board protected); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) (public school teacher who criticized school district policy protected); Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001) (public employee who conducted internal investigation into wrongdoing and breach of the public trust in a public agency protected); Feldman v. Phila. Housing Auth., 43 F.3d 823 (3d Cir. 1994) (public employee who exposed corruption, inefficiency, and other improprieties in public agency protected); Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983) (public employee who criticized waste and inefficiency in public agency protected); Johnson v. Lincoln Univ. of Com. System of Higher Educ., 776 F.2d 443 (3d Cir. 1985) (public university professor's speech was on a matter of public concern when he criticized department chair over academic standards, among other issues); Rankin v. McPherson, 483 U.S. 378 (1987) (public employee who stated a hope that the next assassination attempt on President Reagan would be successful protected); O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989) (public employee's statements that police chief was fixing traffic citations protected); Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) (public employee's speech criticizing actions of city council was on a matter of public concern); Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995) (public employee who criticized policies in public agency protected); Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996) (public employee who was subpoenaed to testify at supervisor's divorce proceeding protected); Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003) (public employee who criticized policies and health hazards in a public agency protected).

Specifically in 1997 in the gender discrimination context, the Third Circuit held in the en banc Azzaro, 110 F.3d 968, opinion that a public employee who opposes gender discrimination by a high public official is protected from retaliation. Similarly, in 1988, the Third Circuit held that a public employee who reported and opposed race discrimination in the Pennsylvania State Police also could not be retaliated against for her speech. See Rode, 845 F.2d 1195. Each of these cases is close enough factually and legally to the issues in our present one to put defendants on notice of clearly established law.

The general legal principles from these many closely analogous cases would put any reasonable official on notice that plaintiff had a clearly established First Amendment right to be free of retaliation against her for exercising her free speech rights by filing a lawsuit challenging illegal and unconstitutional gender discrimination in the Delaware State Police. There is more than enough factual correspondence between these cases and the present one so that defendants knew that their actions were illegal. Accordingly, plaintiff's First Amendment right as a public employee to be free of retaliation was clearly established and readily apparent to any reasonably informed public official. As a result, qualified immunity should be denied.

**2. Petition Clause.** In the same way, the right to petition has been clearly established for even longer than the rights protected by the free speech clause. The citizen's right to petition the government was part of the Magna Carta and also was such a well-recognized part of the law that it was included in Blackstone's famous works. San Filippo, 30 F.3d at 443 and n. 22-23. In the U.S., the right to petition the government has been clearly established under decades of Supreme Court precedent. See e.g., NAACP v. Button, 371 U.S. 415, 429-30 (1963); Bhd. of R.R. Trainmen v. Va. Ex Rel. Va. State Bar, 377 U.S. 1, 5 (1964); United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217, 221-225 (1967); Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-16 (1972); McDonald v. Smith, 472 U.S. 479, 482-85 (1985). Similarly, the Third Circuit has repeatedly and exhaustively

discussed the right of a public employee to petition the government for redress of grievances, including by filing lawsuits. See San Filippo, 30 F.3d at 434-43 (retaliation for filing a grievance); Anderson, 125 F.3d at 161-63 (retaliation for filing a lawsuit and an EEOC charge); Hill, 411 F.3d at 126-27 (retaliation for filing a lawsuit); Brennan, 350 F.3d at 417; see also We, 174 F.3d at 326-30 (non-employment context). All of these are controlling precedent, sufficient to put reasonable officials on notice of the law prohibiting retaliation against an employee for protected petitioning that has been clearly established for many years.

       **D. Clearly Established Rights Under DSP Policies, Practices and LEOBOR.** As discussed above, plaintiff's right to not have her internal affairs information released to and discussed with the Delaware media also was clearly established under long standing DSP polices, practices and customs. Additionally, LEOBOR's prohibitions also clearly apply. See Molloy, 907 F.Supp. at 50 (rejecting an advice of counsel defense in the police context when the law being interpreted was "unambiguous" and the attorney's advice was in clear violation of the law at issue).

       **E. Advice of Counsel Defense.** The defense claim that they are entitled to qualified immunity because they relied upon the advice of counsel also is without merit. (DOB 39). Preliminarily, plaintiff again notes that this prong one qualified immunity issue must be viewed in the light most favorable to her given settled summary judgment standards and in the factual scenario established by plaintiff under qualified immunity law. Bennett I, 274 F.3d at 136-37. It is plaintiff who gets the inferences, not defendants.

       **1. The Only Time Defendants Ever Consulted With An Attorney Was When They Wanted to Find a Way to Release Plaintiff's Confidential Information.** First, as explained at length above, the DSP has a long standing policy, practice and custom of simply no-commenting when it comes to media inquiries into internal affairs investigations. Defendants admitted this in their Answer, and Lt. Aviola, defendant MacLeish and Major Baylor confirmed

this in their deposition testimony. That is what the DSP has historically always done, and tellingly, that is what they did when it came to media inquiries into the numerous internal affairs charges faced by defendants Chaffinch and MacLeish in the recent past. The DSP always refuses to comment.

It is in this light, in the light most favorable to plaintiff, that the DSP's request for legal advice from Mr. Tupman must be viewed. Instead of conforming to their long established and admitted policy, practice and custom and simply 'no commenting,' defendants instead ignored this and sought out a pretext to retaliate and somehow find a way to comment. They found that pretext by asking their attorney for advice.

Indeed, MacLeish admitted he does not know if DSP legal counsel was <u>ever</u> consulted in the past as to how to respond to IA inquiries. (MacLeish 177; A206). DSP legal counsel cleared up any remaining uncertainty and tellingly admitted to the same - that he has no recollection of <u>ever</u> being consulted by the DSP in the past as to how to handle media inquiries into internal affairs complaints and charges filed against Chaffinch and MacLeish. (Tab A - Tupman 22, 23, 27-28, 30-31). In his words, "[i]f it had happened, I would remember." (Tab A - Tupman 28). So the undisputed testimony of one defendant and also defendants' own attorney makes clear that the DSP has <u>never</u>, <u>ever</u>, consulted with their attorneys in the past as to how to respond to media inquiries. Instead, defendants always 'no commented' and refused to discuss internal affairs matters with the media. So it is only when defendants are searching for a way to destroy a female captain who had the audacity to stand up to the powers that be and challenge the status quo that defendants decide to find a way around their policies and practices and naturally go to their attorney to find a way to do it. Tellingly, the record is devoid of evidence that defendants explained their longstanding 'no comment' policy to Tupman when they asked him for advice. The inference is clear - this sham consultation was a simple pretext for retaliation.

**2.  Legal Advice to Violate a DSP Rule or Regulation is an "Unlawful**

**Order" that a Trooper Has an "Obligation" to Refuse to Follow.**  As discussed above, Mitchell testified that any order to violate the written DSP Rules and Regulations or other laws - even if ordered to do so by DSP legal counsel - is an "unlawful order" and a Trooper has an "obligation" to disobey such an "unlawful order."  (Mitchell 20-27; A251-53).  Major Baylor also testified that an order to release internal confidential information, even when coming from the DAG, would be an unlawful order in violation of "clearly expressed" DSP rules and regulations.  (Baylor 9-11; A270-71).  Thus, one defendant and another high ranking officer on the DSP Executive Staff both have admitted that a Trooper should not follow advice from DSP legal counsel to violate the DSP's own rules and regulations - such as those prohibiting the dissemination of internal affairs and other confidential information.  Yet notably, despite an "obligation" to disobey such "unlawful order[s]" which violated numerous "clearly expressed" DSP Rules and Regulations, defendants refused to follow their own rules and instead released plaintiff's confidential information to the media, (Mitchell 20-27; Baylor 9-11; A251-53, 270-71), using their attorney as a pretext.

   **3.  The Factual Dispute as to Defendants' Motives Must Be Resolved By the Jury.**  Thus the advice of counsel defense is simply jury argument on the issue of motive and causation.  Accordingly, this implicates the sole exception to qualified immunity analysis being a purely legal issue and the issue of defendants' intent in consulting with Mr. Tupman is a factual question which must be submitted to the jury for resolution before this issue can be addressed.  See Sharrar v. Felsing, 128 F.3d 810, 827-28 (3d Cir. 1997); Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002); Robinson v. Clemons, 987 F.Supp. 280, 282 n.3 (D.Del. 1998).  The jury can simply choose to disbelieve the defense claim that they were relying on the advice of counsel.

   **4.  The Advice of Counsel Exception in the Qualified Immunity Context.**
Moreover, as a matter of law, the defense argument appears to be trying to implicate the narrow "extraordinary circumstances" exception of Harlow, where despite admittedly clearly established

law, an official still receives qualified immunity because they "neither knew nor should have known of the relevant legal standard." 457 U.S. 800, 819. But such an analysis still turns on "objective factors" id., and the burden of proving it rests on defendants. V-1 Oil Co. v. State of Wyoming, Dept. Of Environmental. Quality, 902 F.2d 1482, 1488 (10th Cir. 1990).

The case law makes clear that this narrow exception applies only "rarely" and that the "circumstances must be such that the defendant was so 'prevented' from knowing that his actions were unconstitutional that 'he should not be imputed with knowledge of an admittedly clearly established right.'" V-1 Oil, 902 F.2d at 1488; Molloy, 907 F.Supp. at 50; see Fernandez v. Leonard, 784 F.2d 1209, 1216 (1st Cir. 1986) ("Proof of 'extraordinary circumstances' must amount to a showing that despite the clearly established existence of the legal rights of the plaintiffs something extraordinary prevented the defendant from actually knowing it."). In light of this, its application must be decided on a case by case basis. V-1 Oil, 902 F.2d at 1489.

Several courts have warned against over-expansive interpretations of the advice of counsel defense. "Of course, such reliance [on the advice of counsel] is not inherently extraordinary, for few things in government are more common than the receipt of legal advice." V-1 Oil, 902 F.2d 1488. "Advice of counsel' would be reduced to an empty shibboleth - a password to immunity - if used knowingly to disregard the law," Ginaitt v. Haronian, 806 F.Supp. 311, 319 (D.R.I. 1992), as defendants have used it in our present case.

The case law has identified several factors that should be considered in determining whether the extraordinary circumstances exception is met in this context, including: (1) how complete the information provided to the attorney was; (2) the prominence and competence of the attorney; (3) how unequivocal and specific the advice was; and (4) the time taken between giving the advice and the action taken. Roska v. Peterson, 328 F.3d 1230, 1253-54 (10th Cir. 2003); Davis v. Zirkelbach, 149 F.3d 614, 620 (7th Cir. 1998). Consideration of these factors is fatal to the defendants' claims.

First, it is clear that Mr. Tupman was never provided with the complete information relevant to his decision. Simply put, nowhere in either the testimony of Lt. Aviola, defendant MacLeish, Tupman himself or the affidavits of Paige and Coupe does it say that defendants explained to Tupman the DSP's longstanding and admitted policy, practice and custom of 'no commenting' on internal affairs matters. It is the fact that plaintiff was singled out for unprecedented treatment which is key in this case, yet defendants never explained to Tupman what they had always done in the past.

Secondly, defendants have failed in their burden to create a record establishing Mr. Tupman's prominence or competence. He is just another attorney in the eyes of the law. Third, Tupman's advice was clear and unequivocal, but it was undoubtedly misinformed given that he was only operating on partial information. More importantly however, like the police chief in Molloy, 907 F.Supp. at 50-51, Tupman's advice was contrary to the plain text of both LEOBOR and plain DSP policies and practices which defendants, as "experienced law enforcement officer[s]" have knowledge of and which defendant MacLeish admitted are very important to him and to all State Troopers. (MacLeish 25-26, 36, 39, 42-44; Aviola 20-21; A168-69,171-73,123). Last, the haste in which a decision was made is revealing of an ulterior motive. Reporters lose or have to wait on stories all the time due to lack of corroboration. Why the rush?

It is clear that Tupman was used to evade clear rules, regulations, policies, practices, statutes and long established federal law. "Here, the advice of counsel cannot shield the defendant from liability where the law was so clear and where advice of counsel should not have prevented a reasonable police chief from knowing that it applied to plaintiff." Molloy, 907 F.Supp. at 51. Defendants were aware of the law, but they chose to disregard it anyway.

## CONCLUSION

Defendants' motion for summary judgment should be denied in its entirety.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger

**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: January 31, 2006                Attorneys for Plaintiff

# Unreported Opinions



H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Sally BENNETT, Administratrix of the ESTATE OF David BENNETT,
Appellant,
v.
Francis J. MURPHY, III, Individually and as a Pennsylvania State Police Officer of the Commonwealth of Pennsylvania; Mark F. Nowakowski, Individually and in his capacity as a corporal of the Pennsylvania State Police of the Commonwealth of Pennsylvania.
**No. 04-1643.**

Submitted pursuant to Third Circuit LAR 34.1(a) on Dec. 6, 2004.
Decided Jan. 14, 2005.

**Background:** Estate of suspect killed by state trooper brought § 1983 action alleging use of excessive force. On remand, 274 F.3d 133, the United States District Court for the Western District of Pennsylvania, Arthur J. Schwab, J., granted summary judgment for trooper on qualified immunity grounds, and estate appealed.

**Holding:** The Court of Appeals, Shadur, Senior District Judge, sitting by designation, held that trooper was not entitled to qualified immunity.

Reversed and remanded.

West Headnotes

**Civil Rights 1376(6)**
78k1376(6) Most Cited Cases
"Immediate threat" standard for use of deadly force was sufficiently clear, in case of officer who shot armed distraught suspect who, although refusing to drop his weapon over course of hour-long standoff, had never pointed his single-shot shotgun at anyone but himself and who was not in flight at time of shooting, to warrant denial of qualified immunity from § 1983 liability. 42 U.S.C.A. § 1983.

***914** On Appeal from the United States District Court for the Western District of Pennsylvania. D.C. Civ. No. 94-214. District Judge: The Honorable Arthur J. Schwab.

Vincent A. Coppola, Pribanic & Pribanic, Pittsburgh, PA, for Appellant.

John G. Knorr, III, Office of Attorney General of Pennsylvania, Harrisburg, PA, for Appellee.

Before AMBRO and VAN ANTWERPEN, Circuit Judges, and SHADUR, [FN*] District Judge.

> FN* Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

OPINION OF THE COURT

SHADUR, District Judge.

****1** Sally Bennett ("Bennett") appeals the District Court's grant of summary judgment in favor of State Trooper Francis Murphy ("Murphy") on the ground of qualified immunity in Bennett's suit for damages following the fatal shooting of her son David Bennett ("David"). Because we conclude that the District Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

erred in holding that the law regarding the use of deadly force was insufficiently clear as applied to the facts alleged by Bennett, we hold that Murphy is not entitled to qualified immunity. Accordingly we reverse the District Court's grant of summary ***915** judgment in Murphy's favor and remand the case for trial.

*Background*

Murphy shot David fatally following a prolonged armed standoff between David and police in a field near an apartment complex on January 4, 1994. Bennett brought suit in February 1994 under 42 U.S.C. § 1983 ("Section 1983"), alleging the use of excessive force by a police officer in violation of the Fourth Amendment. Following a trial on the merits in September 1996, the jury returned a verdict in Murphy's favor. Bennett filed a motion for a new trial one year later on the ground that information in Murphy's personnel records relevant to his credibility had been withheld during discovery. After the District Court granted that motion, Murphy in turn moved for summary judgment on the ground of qualified immunity. Concluding in *"Bennett I,"* 127 F.Supp.2d 689, 699 (W.D.Pa.2000) that "Murphy is not entitled to qualified immunity on summary judgment because of disputes of fact and issues of credibility that should be submitted to a jury," the District Court denied that motion.

During the pendency of Murphy's ensuing appeal to this Court, the Supreme Court decided *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), which definitively prescribed the analysis to be undertaken by courts facing claims of qualified immunity in excessive force cases. Engaging in *Saucier's* two-step analysis, we held in *Bennett v. Murphy,* 274 F.3d 133, 136 (3d Cir.2001) (*"Bennett II"*) that the facts taken in the light most favorable to Bennett indeed showed a constitutional violation. But we remanded the case for the District Court to engage in the second step of the *Saucier* inquiry: whether the law regarding the use of excessive force, as applied to the facts alleged by Bennett, was clearly established at the time of the incident (*Bennett II,* 274 F.3d at 136-37).

In the interim Judge Robert Cindrich, the District Court judge who had been presiding over the case, announced his retirement and the case was reassigned to Judge Arthur Schwab. In a memorandum opinion dated February 20, 2004 Judge Schwab concluded in "*Bennett III,"* No. 94-214, mem. order at 7 that "under the factual scenario asserted by the plaintiff, a reasonable police officer would not have understood that his actions were prohibited, nor would it have been clear to a reasonable officer what the law required." Because he thus held that Murphy was entitled to qualified immunity, Judge Schwab granted his motion for summary judgment. Bennett appeals, and we have jurisdiction under 28 U.S.C. § 1291.

*Murphy's Lack of Entitlement to Qualified Immunity*

****2** Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). After nearly two decades of further development of that doctrine, *Saucier* dictated a two-part inquiry to be used in determining whether an official is entitled to qualified immunity. At step one, the question is whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right (533 U.S. at 201). If that question is answered in the affirmative, "the next, sequential step is to ask whether the right was clearly established" (*id.*).

***916** Judge Cindrich's initial opinion in *Bennett I,* 127 F.Supp.2d at 690-91 (record citations omitted) summarized the facts alleged, viewed in the light most favorable to Bennett:

> The state police were called to the courtyard of a group of apartment buildings on the evening of January 4, 1994 to confront a man, David Bennett, who they soon learned was distraught at being unable to see his girlfriend. He was armed with a single shot shotgun that he held vertically in front of him, with the barrel pointed up at his head, and the stock facing down. He was "very deliberate in holding [the gun] toward himself or in the air," and did not point the gun at anyone, including state troopers. He said that he wanted to kill himself. As the troopers took up

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

positions surrounding him in the open area between the apartment buildings, he became agitated and began moving toward a group of them, but stopped for perhaps four seconds before he was shot. Murphy was positioned 80 yards behind Bennett when he fired. Almost an hour passed between the time the state troopers first arrived on the scene, and the time Bennett was shot.

We adopted that version of the facts in *Bennett II,* and we do so again for purposes of the present qualified immunity inquiry.

In terms of the first step of the *Saucier* analysis, *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) had earlier held that the use of force by police is subject to the Fourth Amendment and its "reasonableness standard." And *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) had still earlier made it clear that the use of deadly force by an officer is constitutionally unreasonable and violates the Fourth Amendment unless a felony suspect poses an immediate threat of physical harm to police or others.

On that score we concluded in *Bennett II,* 274 F.3d at 136 that the facts alleged by Bennett demonstrated that David did not pose a threat to anyone but himself, hence the use of deadly force against him was objectively unreasonable. Although we did not then quote the summary of facts in *Bennett I,* 127 F.Supp.2d at 691 that compelled that conclusion, we find that statement unexceptionable:

> ****3** Bennett admittedly was angry and defiant in the face of a group of determined, armed state troopers. But to take the version of the facts most favorable to Bennett, is it indisputably reasonable as a matter of law for a law enforcement officer 80 yards away; at night; under conditions of poor visibility; to shoot someone who is standing still; facing away; with a gun pointed at his own head, threatening suicide; surrounded by heavily armed fellow officers in close proximity; out of fear of a threat to other troopers positioned at one third the distance; who were in a much better position to see the decedent; and who did not shoot; after almost an hour had passed with no offensive action by the state police?

Because we not only agreed with the District Court's "no" answer to that question but affirmatively concluded that a constitutional violation had occurred under Bennett's version of the facts, we remanded for the District Court to consider whether David's Fourth Amendment right was clearly established, explaining the inquiry as follows (*Bennett II,* 274 F.3d at 136- 37 (emphasis in the original)):

> [I]n the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited? The focus in this step is solely upon the law. If it would not ***917** have been clear to a reasonable officer *what the law required* under the facts alleged, he is entitled to qualified immunity. If the requirements of the law would have been clear, the officer must stand trial.

As stated earlier, the District Court then concluded that the law with respect to excessive force was not clearly established as applied to Bennett's factual scenario. Its holding relied on two cases: *Montoute v. Carr,* 114 F.3d 181, 185 (11th Cir.1997), and *Leong v. City of Detroit,* 151 F.Supp.2d 858 (E.D.Mich.2001). Both of those cases involved armed suspects as to whom, although they never pointed their weapons at police, the courts concluded that the police reasonably believed the suspects presented an immediate threat and that the use of deadly force was therefore justified. In light of those cases, the District Court accepted Murphy's argument that even though *Graham* and *Garner* clearly established the "immediate threat" standard, that standard was not clear as applied to David, who was armed and refused commands to drop his weapon. On appeal Bennett argues that the law of excessive force was not as murky as Murphy would have it and that the cases relied upon by the District Court, because they involved dramatically different factual scenarios, do not support its conclusion that Murphy reasonably believed the law entitled him to shoot David.

At the outset we recognize that there is a degree of "duplication inherent in [*Saucier's*] two-part scheme" as applied to excessive force cases (*Saucier,* 533 U.S. at 213) (Ginsburg, J., concurring in the judgment). That is, the question whether the amount of force an officer used was unreasonable and violated the Fourth Amendment may be viewed as blending somewhat into the question whether the officer reasonably believed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the amount of force he used was lawful. But *Saucier* makes clear that the two inquiries are distinct: Even where an officer's actions are unreasonable under *Graham's* constitutional standard (as *Bennett II* held was true of Murphy's conduct), that officer is still entitled to immunity if he or she has a reasonable "mistaken understanding as to whether a particular amount of force is legal" in a given factual situation (*Saucier,* 533 U.S. at 205). Murphy thus asserts that even assuming his actions were constitutionally unreasonable, he made a reasonable mistake as to the legality of those actions. To support that assertion he puts forth two related arguments.

****4** First, he contends that *Garner's* "immediate threat" standard, while clearly established, offered no guidance in the particular situation he faced. In that respect we are of course mindful of the principle, which the Supreme Court recently reaffirmed in *Brosseau v. Haugen,* --- U.S. ----, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004)(per curiam)(quoting *Saucier,* 533 U.S. at 201), that the inquiry whether an injured party's constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Applying that principle, *Brosseau, id.* at 599-600 stated that *Graham* and *Garner* "are cast at a high level of generality" and provided little guidance as applied to the situation confronting the officer in that case: "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."

We agree of course that *Graham* and *Garner* set out a standard that is general in nature in the context addressed in *Brosseau.* And we also agree with the District Court that there are circumstances, such as those in *Brosseau,* in which the "immediate threat" standard may be "subject to ***918** differing interpretations in practice" (*Bennett III,* mem. order at 7). But we cannot say that the *Graham* and *Garner* "immediate threat" standard is lacking in adequate substantive content as applied to the very different situation that Murphy addressed in Bennett's factual scenario: whether to shoot an armed distraught man who, although refusing to drop his weapon over the course of an hour-long standoff, had never pointed his single-shot shotgun at anyone but himself and who was not in flight at the time he was shot. [FN1] As *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) teaches, "general statements of the law are not inherently incapable of giving fair and clear warning" to public servants that their conduct is unlawful. And because (as we held in *Bennett II*) the facts alleged by Bennett disclose no basis from which to conclude that David posed an immediate threat to anyone but himself, we conclude that this case is one in which the "general constitutional rule already identified in decisional law ... appl[ies] with obvious clarity to the specific conduct in question" (*Id.*).

FN1. Before David was shot, officers far closer than Murphy (who was fully 80 yards away and did not have full vision of the entire scene) had ordered him to halt (he had begun to move toward them, with the snow at the scene posing some difficulty in that regard). Witnesses whose testimony must be credited for present purposes swore that David had not only obeyed that "halt" order for a full four seconds when Murphy nevertheless chose to shoot him, but one of those witnesses said that David had actually taken a step backwards. And the duration of a time measured in seconds is seldom appreciated until one recites "one thousand and one, one thousand and two" and so on in a measured cadence to mark that passage of time.

Murphy's second and related argument is that in light of what he terms "similar" cases involving deadly force, his mistaken application of the "immediate threat" standard was reasonable. Murphy cites two of those cases, *Montoute* and *Leong,* in support of the proposition that he reasonably believed David could lawfully be shot because he had a weapon and refused to put it down. But in reality neither of those cases calls into question the rule, recognized as clearly established prior to this incident by the Ninth Circuit in *Harris v. Roderick,* 126 F.3d 1189, 1204 (9th Cir.1997), that under *Graham* and *Garner* "[l]aw enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." [FN2]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. Although the District Court refused to consider *Harris* because it was decided in 1997, three years after this incident, that refusal was misguided--for *Harris* had analyzed the state of the law as it existed at the time of the infamous Ruby Ridge incident in 1992. While it is therefore true that Murphy cannot be charged with knowledge of the decision itself, *Harris* is nonetheless relevant to our own analysis of the state of the law in 1994 as to the use of deadly force by police.

****5** As to *Montoute,* Murphy seizes on the court's statement (114 F.3d at 185) that "[a]t least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force." But the portion of the opinion immediately following that language (*id.*) demonstrates that the court's holding that the suspect posed an immediate threat did not rest upon the suspect's mere possession of a weapon, but rather on the use the suspect had made of his weapon:

> Sergeant Carr faced a situation fraught with danger. Montoute had fired an illegal weapon while in a crowd of people in a near-riot situation. He was armed with a 12-gauge, pistol-grip, sawed-off, pump shotgun. Such weapons are specifically ***919** designed or altered, and frequently used, by criminals to kill people....Any officer would know that, and would know that pump shotguns can carry and fire more than one round....Montoute's unexplained refusal to obey the repeated orders to drop the sawed-off shotgun provided an additional basis for inferring that he presented a risk of serious physical injury to an officer or someone else.

We simply cannot accept Murphy's position that *Montoute* shows him to have been reasonably mistaken about the legality of his actions in a factual matrix worlds away from the one confronting the officer in that case.

That applies as well to *Leong,* where "[t]he officers in this case were faced with a situation where (i) Mr. Leong had led them on a chase through several streets and alleys; (ii) upon cornering the suspect, he fired his shotgun into the roof of his truck and emerged from his vehicle with this weapon; and (iii) Mr. Leong disregarded repeated warnings that he put down his gun, and instead racked his gun and invited the officers to shoot him" (151 F.Supp.2d at 868). It was in that factual context that the court said (*id.* at 866):

> Plainly, an armed and gun-wielding suspect can turn and train his weapon on an officer or bystander in an instant, with disastrous consequences.

So *Leong* and its sharply different factual situation likewise offer no support for Murphy's contention that he made a reasonable mistake as to the legality of his action in killing David.

Murphy cites a number of other cases in his brief in attempted support of his contention that he could not reasonably understand what the law required in the circumstances he faced. To the contrary, the contrast between the situations confronting the officers in those cases--cases such as *Rhodes v. McDannel,* 945 F.2d 117, 118, 120 (6th Cir.1991)(per curiam), *Wilson v. Meeks,* 52 F.3d 1547, 1549-50, 1552-54 (10th Cir.1995) and *Sigman v. Town of Chapel Hill,* 161 F.3d 782, 784-85, 786-88 (4th Cir.1998)--and the scenario in this case actually point in the opposite direction. On the facts as we must credit them, Murphy acted precipitately at a time and under circumstances totally lacking in the urgency posed by all of those cases: More than an hour had passed during the standoff with David, a period throughout which he had threatened to harm no one but himself; and when Murphy chose that instant to shoot to kill, David was at a standstill 20 to 25 yards from the nearest officer and fully 80 yards from Murphy himself.

****6** Surely Murphy cannot rely on such cases, all of them involving suspects who unquestionably posed an immediate threat of physical harm to police, in support of the contention that he reasonably believed it was lawful to shoot David, who posed no such threat. To be sure, those other cases may illustrate that the concept of excessive force "is one in which the result depends very much on the facts of each case" (*Brosseau,* 125 S.Ct. at 600). But as we have already explained, the facts alleged by Bennett, which we take as true for purposes of the qualified immunity inquiry, are such that any reasonable officer would understand, without reference

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to any other case law, that *Graham* and *Garner* prohibited shooting David. For that reason we conclude that Murphy is not entitled to qualified immunity.

*Conclusion*

We have determined on the record before us that Murphy is not entitled to qualified immunity. That of course is not the end of the matter--we reiterate our statement in *Bennett II,* 274 F.3d at 137 ***920** that nothing precludes Murphy "from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff. An officer may still contend that he reasonably, but mistakenly, believed that his use of force was justified by the circumstances as he perceived them; this contention, however, must be considered at trial." We thus reverse the District Court's grant of summary judgment in Murphy's favor and remand the case for a full consideration of Bennett's claims at trial.

120 Fed.Appx. 914, 2005 WL 78581 (3rd Cir.(Pa.))

**Briefs and Other Related Documents** **(Back to top)**

• 04-1643 (Docket) (Mar. 11, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pleadings

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2003 JUN 17 PM 1:46

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT CHRISTOPHER D. FORAKER,

Plaintiff,

v.

COLONEL L. AARON CHAFFINCH, individually and in his official capacity as Superintendent of the Delaware State Police, DIVISION OF STATE POLICE, DEPARTMENT OF PUBLIC SAFETY, STATE OF DELAWARE,

Defendants.

C.A. No. 02-302-JJF

**MEMORANDUM AND ORDER**

Pending before the Court is Defendants' Motion for Summary Judgment (D.I. 19). For the reasons discussed below, the Court will deny the Motion.

This is a public employee free speech retaliation case filed under 42 U.S.C. § 1983. Plaintiff Christopher D. Foraker, a Sergeant ("Sgt.") in the Delaware State Police ("DSP"), was transferred in alleged retaliation for reporting various inappropriate acts of Corporal ("Cpl.") Eddie Cathell, who was Sgt. Foraker's subordinate and an alleged personal friend of the Superintendent of the DSP, Defendant Colonel ("Col.") L. Aaron Chaffinch. Defendants have filed for summary judgment contending that Sgt. Foraker's transfer did not amount to adverse employment action and that Sgt. Foraker's speech was not protected

activity.[1]

**I. Was Sgt. Foraker's Transfer An Adverse Employment Action?**

On February 22, 2002, Sgt. Foraker was transferred from his position as the non-commissioned officer in charge ("NCOIC") of the Firearms Training Unit ("FTU") after having held the position for seven months, which, historically, is a very short tenure in the position. The FTU is responsible for the firearms training of all police academy recruits and the annual retraining of all 620 DSP troopers. In addition to his duties in the FTU, Sgt. Foraker also served as a member of the Special Operations Response Team ("SORT"). Sgt. Foraker's service in the SORT accounted for 53 to 71% of his overtime income. Sgt. Foraker took a leave of absence from the SORT in March 2002 and resigned from the SORT in December 2002.

Sgt. Foraker contends he was permanently transferred to the Police Academy on February 22, 2002, to a dead-end job with no

---

[1]Defendants also contend that Sgt. Foraker's Section 1983 claims for monetary damages against the Division of State Police, Department of Public Safety, State of Delaware, and Col. Chaffinch in his official capacity (the "State Defendants") must be dismissed for lack of subject matter jurisdiction. In response, Sgt. Foraker contends that he joined the State Defendants solely for the purpose of collecting attorneys' fees and costs associated with obtaining prospective relief. (D.I. 1 at ¶ 6). Because "an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment," the Court concludes that it has subject matter jurisdiction over Sgt. Foraker's claim for attorneys' fees and costs against the State Defendants. Missouri v. Jenkins, 491 U.S. 274, 279 (1989).

job description or responsibilities. Defendants contend the transfer, which involved no change in rank, base pay, or benefits, was a temporary one intended to allow Sgt. Foraker to wrap up two projects related to his work in the FTU. After three weeks at the Police Academy, Sgt. Foraker was transferred to Troop 6 as a patrol sergeant with no change in rank, base pay, or benefits. Sgt. Foraker contends that Defendants transferred him to Troop 6 after they heard about his impending retaliation lawsuit.

Defendants contend that Sgt. Foraker's temporary transfer to the Police Academy does not rise to the level of an adverse employment action because it was short term. Sgt. Foraker contends that there is a genuine issue of material fact as to whether the transfer was temporary. Viewing the facts in the light most favorable to Sgt. Foraker, the Court agrees with Sgt. Foraker. (D.I. 22 at 17 n.10). If the transfer was not temporary, it would satisfy the adverse action requirement. Torre v. Casio, Inc., 42 F.3d 825, 831 n. 7 (3d Cir. 1994)(finding transfer without loss of pay or benefits to a dead end job was an adverse action). Because there is a genuine issue of material fact regarding whether the initial transfer was an adverse action, the Court concludes that summary judgment on the issue is inappropriate.

Defendants also contend that Sgt. Foraker's subsequent

transfer to Troop 6 as a patrol sergeant was not an adverse action because it was a mere lateral transfer involving no change in benefits, base pay, or rank. Defendants characterize the harm to Sgt. Foraker caused by the transfer as nothing more than a bruised ego and contend that Sgt. Foraker's preference to do another job does not make the transfer an adverse action. Defendants provide a detailed comparison of the two positions and argue that Sgt. Foraker's responsibilities and chances for overtime and promotion are actually higher in the new position.

In response, Sgt. Foraker contends that the transfer to Troop 6 was an adverse employment action because he suffered monetary loss as a result of it. Sgt. Foraker contends that the emotional distress and depression caused by Defendants' retaliation made him unable to safely discharge his duties in the SORT and led to his resignation. Sgt. Foraker contends that he lost the source of 53-71% of his overtime pay due to Defendants actions. The Court concludes that, viewed in the light most favorable to Sgt. Foraker, these facts raise a genuine issue of fact for trial that precludes summary judgment.

Sgt. Foraker also contends that the transfer to Troop 6 was not a mere lateral transfer. In essence, Sgt. Foraker contends that the position of NCOIC of the FTU is significantly different from and objectively more desirable than the patrol sergeant position at Troop 6. The Third Circuit has held that a transfer

to a less desirable position can constitute an adverse employment action. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 411-12 (3d Cir. 1999)(finding adverse action when teacher transferred to a less desirable school and lost the opportunity to teach physics); Hampton v. Borough of Tinton Falls Police Dept., 98 F.3d 107, 115-16 (3d Cir. 1996)(reversing grant of summary judgment on the issue of adverse action where police officer was transferred to less desirable assignment and Department asserted transfer was merely lateral reassignment). Based on these cases, the Court concludes that the decision regarding whether Sgt. Foraker's transfer to Troop 6 was an adverse employment action is a fact bound inquiry that must be resolved by the jury.

For all of these reasons, the Court concludes that summary judgment is not appropriate as to the issue of whether Sgt. Foraker suffered an adverse employment action.

**II. Was Sgt. Foraker's Speech Protected Activity?**

A public employee's claim of retaliation for engaging in protected activity is analyzed under a three-step process:

> First, plaintiff must show that the activity in question was protected. To be protected the speech must be on a matter of public concern, and the employee's interest in expression on this matter must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees. Second, plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action.

> Finally, defendant may defeat plaintiff's claim by demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of the protected conduct.

Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995)(internal citations omitted). Whether the speech is protected activity is a legal question for the court, whereas whether the protected activity was a substantial or motivating factor and whether the same actions would have been taken absent the protected activity are questions of fact for the jury. Id. at 892 n.3; see also Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001).

"An employee's speech addresses a matter of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community ... The public concern inquiry is a legal one, to be determined by the content, form, and context of a given statement, as revealed by the whole record." Watters, 55 F.3d at 892. "The content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.'" Baldassare, 250 F.3d at 195.

Sgt. Foraker contends that his speech, which consisted of several reports and email messages delivered to his superiors in the DSP, concerned a subordinate who lied on the job, failed to perform his job duties, had dangerously high levels of lead in

his blood, and sexually harassed a female civilian. Sgt. Foraker contends that these issues are a matter of public concern because they relate to wrongdoing by a public official.

Defendants contend that Sgt. Foraker's speech was not protected activity because it was communicated internally as part of his normal job duties. However, in Givhan v. Western Line Consolidated School District, 439 U.S. 410, 415-16 (1979), the United States Supreme Court stated: "[t]he First Amendment forbids abridgment of the 'freedom of speech.' Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." Moreover, the Third Circuit has noted that:

> the community's interest in the free exchange of information and ideas relating to matters of public concern is not limited to public declarations. That interest is implicated in internal exchanges as well as in exchanges between an individual and members of the public. Internal dissemination of information and ideas can be as important to effective self-governance as public speeches. Thus, if the content and circumstances of an internal communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech, even though it occurred in a private context.

Baldassare, 250 F.3d at 198 (internal punctuation omitted).

Because Sgt. Foraker's communications attempted to bring to

light wrongdoing on the part of a government official,[2] the Court

concludes that the communications, when viewed in the light most

favorable to the nonmovant, involved a matter of public concern.

The Court further concludes, based on Baldassare, that the

internal nature of Sgt. Foraker's communications does not deprive

---

[2]The DSP originally used lead based ammunition for firearms training; however, there came a time when the DSP realized that it needed to stop using lead based ammunition because of its hazardous side-effects, such as long-term, permanent damage to the nervous system. Thus, after building a multi-million dollar indoor range and spending $500,000 to upgrade its air handling system to eliminate lead particles discharged in the air, the DSP began using lead free handgun ammunition. Nonetheless, because there is not an adequate substitute, all shotgun ammunition remains lead based.

Because of the health hazards posed by lead based ammunition, Troopers working in the FTU are required to have their blood tested every 90 days to evaluate the lead levels in their blood. There are wide ranges of medical opinion as to what constitutes acceptable levels of lead in the bloodstream, but Sgt. Foraker was told by his superiors that a level of 20 was dangerous.

Cpl. Cathell's lead levels were consistently two to three times higher than any other Trooper at the FTU, even after the change to non-lead based handgun ammunition. Sgt. Foraker took steps to reduce Cpl. Cathell's exposure to lead and repeatedly asked Cpl. Cathell if he was doing anything off duty that could be adversely affecting his blood lead levels. Over the course of several years, Cpl. Cathell denied that he was doing anything which could be contributing to his abnormally high lead levels.

In October 2001, after Cpl. Cathell's lead levels came in more than twice as high as the next FTU Trooper, Cpl. Cathell admitted to Sgt. Foraker that he had been loading and reloading lead based ammunition for off duty shooting competitions. Sgt. Foraker subsequently reported to his superiors that Cpl. Cathell's lead levels were in the high teens and that Cpl. Cathell had been lying to his superiors about the cause of his high lead levels. Sgt. Foraker also reported that Cpl. Cathell was suffering from lesions, headaches, blurred vision, and tingling fingers. Finally, in January 2002, Sgt. Foraker reported that Cpl. Cathell's lead level had hit 20, which was the danger level set by Sgt. Foraker's superiors.

them of First Amendment protection. Once a court determines that the speech regards a matter of concern, it must evaluate whether the employee's interest in the expression is outweighed by any injury the speech could cause to the state's interest in providing efficient public services. Watters, 55 F.3d at 892. Here, Sgt. Foraker's interest in reporting unacceptable behavior by a subordinate is very high and actually serves to increase the efficiency of the State Police. Thus, the Court concludes that the balance tilts in favor of treating Sgt. Foraker's speech as protected activity.

NOW THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (D.I. 19) is **DENIED**.

June 17, 2003
DATE

Joseph J. Farnan Jr.
UNITED STATES DISTRICT JUDGE

Pleading

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2003 JUN 18 AM 8:48

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT CHRISTOPHER D. FORAKER,

Plaintiff,

v.

C.A. No. 02-302-JJF

COLONEL L. AARON CHAFFINCH, individually and in his official capacity as Superintendent of the Delaware State Police, DIVISION OF STATE POLICE, DEPARTMENT OF PUBLIC SAFETY, STATE OF DELAWARE,

Defendants.

**MEMORANDUM AND ORDER**

In Plaintiff's Bench Memorandum on the Issue of Qualified Immunity, Plaintiff objects to Defendants' proposed jury instruction regarding qualified immunity. Plaintiff contends that there are no fact driven qualified immunity issues and that the issue is not appropriate for the jury.

In response, Defendant admits that qualified immunity is a legal issue but argues that the issue cannot be resolved in this case until the jury resolves three material factual disputes: (1) whether Sgt. Foraker's protected speech was a substantial or motivating factor in Col. Chaffinch's decision to transfer him; (2) whether Col. Chaffinch would have transferred Sgt. Foraker for other reasons in the absence of any protected speech; and (3) whether a transfer from the FTU to Troop 6 would chill a person of reasonable firmness from exercising his right of free speech.

Defendant contends that once the jury resolves these factual issues, the Court can then resolve whether it was clearly established in 2002 that a transfer like Sgt. Foraker's was an adverse employment action.

In the Court's view, the issue is whether transferring a public employee to a less desirable position for engaging in protected speech could constitute an adverse employment action in February 2002. In 1999, three years before the events at issue in the instant case transpired, the Third Circuit held in Jones v. School Dist. of Philadelphia, 198 F.3d 403, 411-12 (3d Cir. 1999), that an undesirable transfer with equal pay made in retaliation for protected speech could rise to the level of an adverse employment action. Thus, the Court concludes that Sgt. Foraker's right to not be transferred for engaging in protected speech was clearly established by 1999, and therefore, the Court further concludes that qualified immunity is not available for Col. Chaffinch's alleged actions as a matter of law.

NOW THEREFORE, IT IS HEREBY ORDERED that Plaintiff's written objection to Defendants' proposed qualified immunity jury instruction is **SUSTAINED**.

6/18/03
DATE

UNITED STATES DISTRICT JUDGE



Not Reported in F.Supp.2d Page 1
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Michael KATZENMOYER, Charlotte Katzenmoyer,
v.
CITY OF READING, et al.
**No. CIV. A. 00-5574.**

Sept. 21, 2001.

MEMORANDUM

JOHN R. PADOVA, Judge.
***1** Defendants move for summary judgment on Counts VII and VIII of the Amended Complaint. For the reasons that follow, the Court grants Defendants' Motion and grants judgment in favor of Defendants on these counts.
I. Background

In Count VII, Plaintiff Charlotte Katzenmoyer ("Katzenmoyer") brings a claim under § 1983 and the First Amendment. Specifically, Katzenmoyer alleges that Defendants City of Reading ("City"), Mayor Joseph Eppihimer ("Eppihimer") and Jesus Pena ("Pena") refused to promote her to the position of City Engineer in retaliation for filing and maintaining a lawsuit against them. In Count VIII, Katzenmoyer seeks "mandatory injunctive relief" in relation to the claims made in Count VII.

In her response to Defendants' Motion, Plaintiff argued that the existing record provided sufficient basis to deny the motion, but, in the alternative, asked that the Court defer disposition of the Motion until discovery had been completed. The Court deferred judgment under Rule 56(f) until the completion of discovery, and set a deadline for the filing of supplemental memoranda. On August 30, 2001, Defendants filed a supplemental brief, but Plaintiff did not, thus choosing to rely on her prior submission. [FN1]

FN1. By letter to the Court dated September 7, 2001, Plaintiff's counsel confirmed that she would not be filing any supplemental materials in opposition to the Motion for Partial Summary Judgment.

I. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 2
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

II. Discussion

***2** Section 1983 of Title 42 of the United States Code provides a remedy against "any person" who, under the color of law, deprives another of his constitutional rights. 42 U.S.C. § 1983 (1994). Courts apply a three-step, burden-shifting analysis for retaliation claims made pursuant to the First Amendment under § 1983. *Mount Healthy City Sch. Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 285-86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995). First, the plaintiff must show that she engaged in conduct or speech that is protected by the First Amendment. *Id.* Second, the plaintiff must show that the defendant responded with retaliation, and that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Anderson v. Davila,* 125 F.3d 148, 161 (3d Cir.1997); *Watters,* 55 F.3d at 892. Third, the defendant may defeat the plaintiff's claim by demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of the protected conduct. *Watters,* 55 F.3d at 892.

Defendants contend they are entitled to judgment because Plaintiff cannot establish that an adverse employment action was taken against her. (Def. Mot. at 11.) Specifically, Defendants contend that Plaintiff cannot demonstrate that she was entitled to or had a property right in the position, because she lacked the necessary professional licensing. In such a § 1983-First Amendment claim, however, a plaintiff need not demonstrate she was entitled to the promotion. *See Rutan v. Republican Party of Illinois,* 497 U.S. 62, 72, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (citing *Perry v. Sinderman,* 408 U.S. 593, 596-98, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)); *Suppan v. Dadonna,* 203 F.3d 228, 234 (3d Cir.2000)(rejecting the argument that the First Amendment rights of public employees had not been infringed because they were not entitled to promotion, transfer, or rehire). Retaliatory conduct falling within the scope of § 1983 and the First Amendment is conduct that would "deter a person of ordinary firmness from exercising his First Amendment rights." *Suppan,* 203 F.3d at 235. "[T]he First Amendment ... protects from ... even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights." *Rutan,* 497 U.S. at 76 n. 8.

Defendants further contend, however, that they are entitled to judgment because Plaintiff cannot adduce evidence that there is a causal link between Plaintiff's exercise of First Amendment rights and Defendants' failure to promote her. The Court agrees. In a First Amendment retaliation case, the plaintiff has the initial burden of showing that the constitutionally protected conduct was a "substantial" or "motivating factor" in the relevant decision. *Mount Healthy,* 429 U.S. at 287. It is sufficient if a plaintiff establishes that the exercise of the First Amendment rights played some substantial role in the relevant decision; a plaintiff need not establish that the retaliation was motivated solely or even primarily by the protected activity. *Id.* at 270-71.

In response to Defendants' Motion, Plaintiff presents evidence consisting of an affidavit and a city job description. In order to be considered on summary judgment, facts set forth in affidavits must be such that they would be admissible in evidence. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.") Of Plaintiff's many averments, only a few appear to suggest any link to her filing and maintenance of the law suit with the decision not to promote her:

***3** 6. Mr. White told me on numerous occasions that Mr. Eppihimer told him that I would not be elevated to the position of Director Public Works unless and until

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 3
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

my husband Michael Katzenmoyer withdrew his law suit against the City of Reading.
7. Mr. White also advised me that Mayor Eppihimer would claim that I could not be elevated to the position of Director of Public Works because I did not yet have my Professional Engineer's license. Mr. White told me on more than one occasion that this was not true. He said Mayor Eppihimer told him that the basis for the denial of the promotion was the existence of Michael Katzenmoyer's law suit.
11. I had several conversations with Jeffrey White about my selection as Director of Public Works and was advised by him, ... that the reason I was not selected was in retaliation for my support of my husband Michael Katzenmoyer in his legal action against the City of Reading.
12. Mr. White made clear to me that my support of as well as my association with Michael Katzenmoyer and his law suit made me unacceptable [sic] Joseph Eppihimer
19. I spoke with Eppihimer about becoming Director of Public Works because of the Professional Engineer's license requirement of the City Charter he said “you know that is not the case.”

Pl. Answer to Def. Mot. for Summ. Judgment Ex. A. None of these statements, however, are made on the affiant's personal knowledge; they are hearsay statements that would not be admissible into evidence. Plaintiff's only other submission-the job description-sheds no light as to causation. The Court concludes that Plaintiff's submissions are insufficient to show that there is a genuine issue of material fact as to the issue of whether Plaintiff's lawsuit was a substantial motivating factor in Defendants' decision not to promote her. Accordingly, the Court concludes that Defendants are entitled to judgment on Count VII. The Court also grants judgment in favor of Defendant on Count VIII, insofar as entitlement to the relief sought in Count VIII depends on proof of the claim in Count VII.

An appropriate Order follows.

ORDER

AND NOW, this day of September, 2001, upon consideration of Defendants' Motion for Partial Summary Judgment (Doc. No. 21), any responses thereto and all attendant briefing, IT IS HEREBY ORDERED that said Motion is GRANTED. Judgment is entered in favor of Defendants on Counts VII and VIII of the Amended Complaint.

E.D.Pa.,2001.
Katzenmoyer v. City of Reading
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:00CV05574 (Docket) (Nov. 02, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d Page 1
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Linda KELLEHER,

v.

CITY OF READING, et al.

**No. CIV.A.01-3386.**

May 29, 2002.

*MEMORANDUM*

PADOVA, J.

***1** The instant matter arises on the two separate Motions for Summary Judgment filed by the Defendants. Plaintiff Linda Kelleher, the City Clerk of the City Council of Reading, Pennsylvania, filed this suit against the City of Reading ("City"), Mayor Joseph Eppihimer ("Eppihimer"), the Mayor's assistant Kevin Cramsey ("Cramsey"), and City Councilman Jeffrey Waltman ("Waltman") for a series of allegedly harassing actions taken by the Defendants against her in retaliation for exercising her First Amendment rights to free speech. Plaintiff brings First Amendment retaliation claims and conspiracy claims pursuant to 42 U.S.C. § 1983. She also brings a claim for invasion of privacy against Defendant Cramsey for allegedly publicizing e-mails and other purportedly private information relating to her suspension by the City Council. Defendant Waltman filed a Motion for Summary Judgment asserting qualified immunity as well as other bases for dismissal or judgment. The remaining Defendants filed a joint Motion for Summary Judgment asserting a variety of grounds for judgment. For the reasons that follow, the Court grants the Motions as to all claims in favor of all Defendants.

I. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 2
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

II. Discussion

A. *Qualified Immunity-Claims Against Defendant Waltman*

***2** Defendant Waltman moves for summary judgment on all claims against him on the basis of qualified immunity. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Government officials have qualified immunity from suit under § 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The test is whether reasonable persons in the defendants' position at the relevant time "could have believed, in light of clearly established law, that their conduct comported with established legal standards." *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The defendant has the burden of pleading and proving qualified immunity. *Harlow,* 457 U.S. at 815.

When resolving issues of qualified immunity, a court must first determine whether the plaintiff has alleged a deprivation of a constitutional right. *Saucier,* 121 S.Ct. at 2156; *Torres v. McLaughlin,* 163 F.3d 169, 172 (3d Cir.1998) (internal citations omitted). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 121 S.Ct. at 2156. If the court determines that a constitutional violation is viable on a favorable view of the parties' submissions, the court must then ask whether the right was clearly established. *Saucier,* 121 S.Ct. at 2156. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.* Although a right may be clearly established even if there is no prior precedent that is directly on point, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Saucier,* 121 S.Ct. at 2156 (internal quotations omitted); *Eddy v. Virgin Islands Water & Power Auth.,* No.99-3849, 2001 WL 770088, at *2 (3d Cir. July 10, 2001). Accordingly, the relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier,* 121 S.Ct. at 2156; *Eddy,* 256 F.3d 204, 2001 WL 770088, at *2.

Plaintiff alleges that Waltman spoke to the media and disclosed information relating to her suspension in order to retaliate against her for engaging in conduct that was protected by the First Amendment. Where a plaintiff alleges an unconstitutional subjective intent, she must proffer particularized evidence of direct or circumstantial facts that support the claim of an improper motive in order to avoid summary judgment on qualified immunity grounds. *Keating v. Bucks Cty. Water & Sewer Auth.,* Civil Action No. 99-1584, 2000 U.S. Dist. LEXIS 18690, at *29 (E.D.Pa. Dec. 29, 2000). "The standard allows an allegedly offending official sufficient protection against baseless and unsubstantiated claims, but stops short of insulating an official whose objectively reasonable acts are besmirched by a prohibited unconstitutional motive." *Id.* at 30 (citing *Sheppard v. Beerman,* 94 F.3d 823, 828 (2d Cir.1996)).

***3** In this case, Plaintiff admits that she has no direct evidence demonstrating that Defendant Waltman disseminated copies of the e-mails to the media, but adduces some circumstantial evidence designed to establish such dissemination. (Pl.'s Resp. to Def. Waltman's Mot. at 6.) It is undisputed that Defendant Waltman spoke to the media in interviews. (Pl.'s Resp. to Def. Waltman's Mot. Ex. 3 at 6-8.) Plaintiff also presents evidence that Waltman advocated Plaintiff's termination. (Def. Waltman's Ex. A. at 68.)

Absent, however, is any evidence showing any connection between Plaintiff's alleged constitutionally

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 3
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

protected speech and any actions taken by this Defendant. [FN1] In the context of qualified immunity analysis, Plaintiff has failed to provide any evidence of an improper motive by Defendant Waltman for any of the actions taken. Although Plaintiff alleges in her Complaint that the motive was to retaliate for speech in which she engaged, none of the evidence has the tendency to prove such a motive either directly or circumstantially. Plaintiff has likewise adduced no evidence demonstrating that Waltman conspired with the other Defendants for the purpose of retaliating against her for exercising her free speech rights. With no evidentiary connection whatsoever between any actions that might have been taken by this Defendant and Plaintiff's First Amendment free speech rights, reasonable persons in the Defendant's position at the relevant time "could have believed, in light of clearly established law, that [his] conduct comported with established legal standards." *See Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Accordingly, Defendant Waltman is entitled to qualified immunity. The Court dismisses all claims against him.

> FN1. Because this part of the qualified immunity inquiry is based on the pleadings rather than evidence in the record, the Court has considered the possible connection between Plaintiff's alleged conduct relating to the Reading Water Authority and the televised debate. As indicated below, infra, Plaintiff has failed to establish that she engaged in the alleged conduct that serves as the basis for the alleged retaliation.

B. *First Amendment Retaliation Claim* [FN2]

> FN2. Count 1 brings a retaliation claim under 42 U.S.C. § 1983 against the City of Reading and each of the individual Defendants in their official capacities. Count 2 brings the same retaliation claim against the Defendants in their individual capacities.

Plaintiff alleges that the Defendants violated her constitutional rights by retaliating against her for exercising her First Amendment right to free speech. Plaintiff alleges that the Defendants engaged in a campaign of harassment as a result of certain conduct and speech which they thought she engaged in.

***4** The First Amendment protects public employees from retaliation by their employer. Under 42 U.S.C. § 1983, a public employee may sue to enforce that protection if: (1) she spoke on a matter of public concern; (2) her interest in that field outweighed the government's concern with the effective and efficient fulfillment of its responsibilities to the public; (3) the speech caused the retaliation; and (4) the retaliatory action would not have occurred but for the speech. *Green v. Philadelphia Housing Auth.,* 105 F.3d 882, 885 (3d Cir.1997).

The Court determines that Plaintiff has failed to establish a genuine issue of material fact to sustain her claim of First Amendment retaliation. Plaintiff has failed to adduce evidence that she engaged in speech or conduct that is protected by the First Amendment. Furthermore, even if Plaintiff could establish that she engaged in such speech or conduct, she has failed to establish that the conduct was the substantial motivating factor behind the allegedly retaliatory actions taken by the Defendants.

1. *Protected Speech*

In order to be considered protected speech under the First Amendment, the speech or activity engaged in must address a matter of public concern. *Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997). Speech addresses a matter of public concern when it relates "to any matter of political, social, or other concern to the community." [FN3] *Id.* at 977. However, regardless of the subject of the alleged speech, a plaintiff must actually engage in the type of conduct protected from retaliation under the First Amendment. *Fogarty v. Boles,* 121 F.3d 886, 887-88 (3d Cir.1997) (dismissing retaliation claim based on allegation the employer believed plaintiff engaged in the protected conduct where plaintiff denied actually speaking to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 4
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

press about the matter). A retaliation claim cannot be based on speech or conduct if the defendant erroneously believed that the plaintiff engaged in such speech or conduct. *Id.; Barkoo v. Melby,* 901 F.2d 613, 619 (7th Cir.1990) ("[Plaintiff] provides no authority for the proposition that her free speech rights are deprived in violation of § 1983 when the speech at issue admittedly never occurred.")

FN3. "A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social or other concern to the community.' " *Green,* 105 F.3d at 885-86 (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In this respect, we focus on the content, form, and context of the activity in question. *Connick,* 461 U.S. at 147-48; *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995). Speech in a form that is not deemed a matter of public concern in one context does not become a matter of public concern simply because it could be deemed protected in a different context. *See Connick,* 461 U.S. at 148 n. 8.

Here, Plaintiff alleges that the Defendants retaliated against her because of their perception that she engaged in speech or conduct relating to two public issues: the municipal trash collection referendum and the proposal to abolish the Reading Area Water Authority ("Authority"). She alleges that this speech and conduct was protected by the First Amendment. The primary incident occurred in 1998, and related to Plaintiff's role in organizing and overseeing a televised debate on the trash collection referendum. (Compl. ¶ 22; Defs.' Ex. F ("Kelleher Dep.") at 88, 90-91.) Plaintiff testified in her deposition that her role in the debate was helping to secure a debate representative for each side and establishing rules regarding the format of the debate. (Kelleher Dep. at 88.) Kelleher testified that while she was involved in screening calls to put on the air, she only screened the calls to ensure the remarks related to the debate topic, and not to determine which side the caller intended to support. (*Id.* at 89-90.) She testified that after the debate, she perceived that Eppihimer was upset with her "because of the way the programming went." (*Id.* at 92.) Plaintiff did not appear on the debate or speak to the Defendants on the issue at that time.

In light of Plaintiff's own testimony regarding the limited nature of her activities in connection with the debate, and her testimony that she did not engage in the specific conduct that purportedly motivated the Defendants to retaliate against her, Plaintiff's showing is insufficient to establish that she engaged in conduct that is protected by the First Amendment. For example, even if Plaintiff could show at trial that Eppihimer became upset with her because he perceived that she barred callers from speaking against the municipal trash collection referendum, Plaintiff's own deposition testimony that she did not engage in such activity means that any actions taken on his part in retaliation for such conduct would be based on a mistaken belief as to what Plaintiff had done. Even if such conduct were protected, [FN4] the fact that Plaintiff did not actually engage in such conduct means that the televised debate incident cannot be the basis for Plaintiff's First Amendment retaliation claim. [FN5] *See Barkoo,* 901 F.2d at 619.

FN4. Because the Court determines that the Plaintiff has failed to establish a genuine issue of material fact as to whether she engaged in the purportedly protected activity, it need not consider the legal question of whether such conduct would be protected by the First Amendment.

FN5. Plaintiff further testified in her deposition that she spoke on the subject of municipal trash collection when she objectively told Eppihimer the "pros and cons" of adopting such a plan. (Pl.'s Resp. to Defs.' Mot. Ex. 1 ("Kelleher Verification") ¶ 23.) This speech, however, is not alleged in the Complaint, and therefore is not part of Plaintiff's retaliation claim here. Furthermore, Plaintiff fails to identify the specifics of that speech, such as the time and place at which it took place or the circumstances in which the speech was given. Even had Plaintiff included

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 5
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

an allegation that she engaged in such speech, Plaintiff has provided insufficient evidence to establish a genuine issue of material fact concerning whether she engaged in speech that was protected.

***5** Plaintiff's evidence is similarly insufficient concerning the other alleged incident. Plaintiff alleges that in 1997, Eppihimer, then a Councilman, asked her to draft an ordinance to abolish the Authority. (Compl. ¶ 13.) Plaintiff alleges that she researched the issue and learned that abolishing the Authority would, among other things, place restrictions on the City's sale of water to outlying communities and force the City to assume the Authority's bond debt. (*Id.* ¶ 14.) When Plaintiff informed Eppihimer of these facts, he "began yelling at her, and saying that she was against him and he would have her fired." (*Id.* ¶ 15.) Plaintiff's retaliation claim, with respect to this incident, is based on the Defendant's perception that she was speaking against his position on the abolition of the Authority.

Kelleher testified in her deposition, however, that she made no such recommendation or criticism regarding the merits of Eppihimer's proposal to abolish the Authority. (Kelleher Dep. at 53-54.) Plaintiff admits that she did not have an opinion as to whether the authority should be abolished. (*Id.*) She denies that she did anything other than objectively relay the results of her research to Eppihimer. (*Id.*) Because Plaintiff denies having engaged in the speech that forms the alleged basis of Defendants' alleged retaliatory motive, that speech cannot form the basis of her retaliation claim.

2. *Nexus Between Alleged Retaliation and Speech*

Furthermore, even if Plaintiff could establish that she engaged in protected speech and conduct, she has failed to establish a connection between that speech and conduct and the allegedly retaliatory conduct by the Defendants. A plaintiff must show that her protected activity was a substantial or motivating factor in the actions alleged to be retaliatory. *Anderson v. Davila,* 125 F.3d 148, 161 (3d Cir.1997). Even assuming that Plaintiff engaged in protected activity, Plaintiff has failed to meet her burden to show that the protected activity was a substantial or motivating factor in the alleged retaliatory actions.

In this case, Plaintiff alleges that the Defendants engaged in a campaign of harassment that included a host of different retaliatory actions: (a) Plaintiff's one-week suspension; (b) Plaintiff's lock-out from City Hall during her suspension; (c) the retrieval and reading of Plaintiff's e-mails; (d) dissemination of her e-mail messages to the media; (e) dissemination of the ethics complaint to the media; (f) public comments regarding Plaintiff's suspension; (g) refusal to issue Plaintiff a parking permit; (h) refusal to pay Plaintiff additional salary allotted by the City Council; and (i) initiation of rumors of Plaintiff's extramarital affairs. [FN6]

FN6. Because the Court determines that Plaintiff has failed to establish a genuine issue of material fact with respect to there being a retaliatory motive, it is unnecessary to examine in detail the evidence that such retaliation took place at the hands of the Defendants. The Court notes, however, that in several respects, Plaintiff's evidentiary showing is insufficient to establish genuine issues of material fact.
For example, Plaintiff points to no admissible evidence that she was actually locked out of either the building (after hours) or the computer system during the relevant period. Although Plaintiff testified in her deposition that Councilman Waltman ordered her to be locked out of City Hall and the computer system, and that Eppihimer did so, (Kelleher Dep. at 282-88), Plaintiff admits that she had no personal knowledge of Mr. Waltman having told Defendant Eppihimer to lock Plaintiff out of City Hall. (Kelleher Dep. at 288.)
Similarly, Plaintiff provides no admissible evidence that Defendants actually disseminated the e-mails. Plaintiff provides a statement in her Verification that Don Kaiser, a television news reporter, "sent [a copy of] the e-mails and ethics complaint to me after I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 6
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

agreed to trim off the header. I looked at the header before I trimmed it off, and saw that the facsimile had been sent from the Mayor's office, ...” (Kelleher Verification ¶ 58.) However, this account of events is contradicted by her prior deposition testimony, in which she indicated that “... Kaiser and.... Weiler ... told me they received copies of the complaint. It was faxed. And although they, let's say, trimmed the lead, whatever you call that section at the top, they did tell me that it was from the mayor's office.” Plaintiff also testified in her deposition that she never saw any copy of the ethics complaint with any fax identifier on it. (Kelleher Dep. at 238, 324-26). Given the conflict in testimony, it is appropriate to disregard the subsequent verification statement, because on a motion for summary judgment, a court may properly refuse to consider testimony presented in an affidavit when the non-movant's affidavit contradicts, without satisfactory explanation, testimony previously provided in deposition. *See Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703, 706 (3d Cir.1988) (“The objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit.”) Furthermore, Plaintiff's statements as to what Kaiser and Weiler told her about the origins of the e-mails (that they came from Eppihimer's office) are inadmissible hearsay.

Moreover, Plaintiff fails to establish that all of the allegedly retaliatory actions were sufficiently serious enough for purposes of the retaliation claim. In a First Amendment retaliation case, the alleged retaliatory action itself does not have to infringe on a federally protected right independent of the First Amendment. *See Perry v. Sinderman,* 408 U.S. 593, 596-98 (1972) (“[E]ven though a person has no “right” to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, ... [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests ... his interest in freedom of speech.); *see also Rutan v. Republican Party of Illinois,* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

Nevertheless, while the actions taken do not independently need to violate a constitutional right, not every action of harassment is actionable under § 1983 in a retaliation case. Rather, the actions must be such that they would “deter a person of ordinary firmness” from exercising her First Amendment rights. *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000). “[I]n the field of constitutional torts de minimis non curat lex. Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ...” *Suppan,* 203 F.3d at 235 (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982)).

Several of the retaliatory actions likely do not pass the *Suppan* test. For example, Plaintiff alleges that the Defendants monitored and screened her private e-mails, yet she adduces no evidence to demonstrate that such correspondence was confidential. In fact, Plaintiff admits that she signed a statement saying that she received and read a copy of the City's usage guidelines, which specifically reserve the City's right to read and monitor e-mail communications. (Kelleher Dep. at 430-33; Defs.' Ex. T (“Guidelines.”) Plaintiff also does not dispute that such monitoring has occurred on other occasions with other employees. (Defs.' Ex. C (“Tangredi Dep.”) at 121-24.) Given that Plaintiff was clearly subject to such monitoring, had notice of such monitoring, and that such monitoring had occurred before with another employee, the action seems far less likely to deter a person of ordinary firmness from the exercise of protected activity.

Similarly, Plaintiff alleges that the Defendants denied her a dashboard parking permit.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

However, notwithstanding her unsubstantiated claim that it "is undisputed that free parking is one of the fringe benefits of fulltime employees of the City of Reading who work in City Hall," (Pl.'s Resp. at 12), Plaintiff adduces no evidence, and there is no evidence in the record, which establishes such an entitlement. Plaintiff, in fact, did not receive a new permit until after the City Council passed an ordinance granting parking passes to the City Council and employees, thus suggesting that she was not entitled to such a permit. (*See* Kelleher Dep. at 418.) Furthermore, Plaintiff's primary grievance is the large number of parking tickets that she received; yet Plaintiff received tickets for parking in areas where she admits she did not know whether the dashboard permits allowed for the waiver of the parking rules. (*See* Kelleher Dep. at 426-27.) In light of Plaintiff's failure to adduce evidence that she was entitled to such a permit and that such a permit would have prevented all of her parking tickets, it is unlikely that such a denial of the permit would deter a person of ordinary firmness from engaging in protected conduct.

***6** Examining the evidence in the record, however, the Court can identify no admissible evidence that draws a connection between Plaintiff's alleged speech and conduct in 1997 and 1998, and the alleged retaliatory actions that form the "campaign of harassment." [FN7] None of the deposition testimony or the documentary evidence establishes such a connection. Plaintiff argues that this connection can be inferred from the series of retaliatory actions themselves; however, this kind of circular reasoning simply underscores the fact that there is no genuine issue of material fact with respect to a nexus between the protected conduct and the retaliation. In the absence of some other type of evidence, this inference is not one that can be supported solely by the alleged "retaliatory campaign." This is particularly true in light of Plaintiff's failure even to adduce evidence to support that all of the actions took place.

FN7. Plaintiff does point to statements that tend to indicate Eppihimer's desire to see Plaintiff terminated as the City Clerk. (Kelleher Dep. at 84.) However, these statements, even if admissible, are insufficiently connected to Plaintiff's speech in 1997 and 1998. Moreover, the statements are an insufficient basis upon which to infer that Defendants engaged in particular activities for the purpose of retaliating against her.

Moreover, the large gap in time between the allegedly protected speech (in 1997 and 1998) and the alleged retaliatory activities (in 2000 and later) cuts against Plaintiff's position that the Defendants' actions were motivated by a retaliatory motive. [FN8] Temporal proximity between the protected activity and the allegedly retaliatory action is a factor to consider in retaliation cases. *See Grimm v. Borough of Norristown,* No.01-CV-431, 2002 U.S. Dist. LEXIS 3954, at *83 (E.D.Pa. Mar. 11, 2002) (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279-80 (3d Cir.2000) (noting that temporal proximity has probative value in retaliation cases, but that other evidence suggesting a causal connection between protected activity and allegedly retaliatory action may be considered)); *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997) (noting that if timing alone could ever be sufficient to establish a causal link, the timing of the alleged retaliatory action must be "unusually suggestive" of retaliatory motive); *see generally Russoli v. Salisbury Twp.,* 126 F.Supp.2d 821, 855 (E.D.Pa.2000).

FN8. The only exception is that the alleged spreading of rumors took place closer in time to Plaintiff's allegedly protected speech. However, Plaintiff has adduced no admissible evidence that either individual Defendant was responsible for spreading any such rumors. Plaintiff states that "I believe that Mr. Eppihimer was responsible for these rumors [of extramarital affairs] because a variety of people told me that they heard that he was spreading the rumors." (Kelleher Verification ¶ 13.) Plaintiff also discusses at length in her deposition the various rumors. (Kelleher Dep.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 8
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

at 58-77.) However, Plaintiff provides no testimony from any of the individuals that allegedly heard Mr. Eppihimer make such statements or otherwise had personal knowledge that he spread the rumors. Plaintiff has likewise provided insufficient evidence upon which to infer that Eppihimer was responsible for starting them. Accordingly, the Court has not considered the rumors as part of Plaintiff's contention that there was a retaliatory motive behind the alleged "campaign of harassment."

Accordingly, judgment on the retaliation claims is granted in favor of the City of Reading and the individual Defendants in their official and individual capacities.

C. *Conspiracy Claims* FN9

FN9. Count 3 brings a conspiracy claim under 42 U.S.C. § 1983 against the City of Reading and the individual Defendants in their official capacities. Count 4 brings the same conspiracy claim against the individual Defendants in their individual capacities.

***7** Plaintiff also alleges that the Defendants conspired to violate her First Amendment rights. To demonstrate a conspiracy under § 1983, a plaintiff must show: (1) there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences; (2) the purpose of the plan was to violate a constitutional right of the plaintiff; (3) an overt act resulted in an actual deprivation of the plaintiff's constitutional rights; and (4) the constitutional violation was the result of an official custom or policy of the municipality. *Sieger v. Township of Tinicum,* Civ.A. No. 89-5236, 1990 WL 10349, at *2 (E.D.Pa. Feb. 6, 1990).

As discussed above, Plaintiff has failed to demonstrate the deprivation of a constitutional right, because she has failed to demonstrate retaliation under the First Amendment. Accordingly, her conspiracy claims fail, and Defendants are entitled to judgment on those claims.

D. *Invasion of Privacy Claim*

Plaintiff's final count is a claim for invasion of privacy against Defendant Cramsey in his individual capacity. Pennsylvania law provides four theories on which a claim of invasion of privacy can be based: (1) intrusion upon seclusion; (2) appropriation of name and likeness; (3) publicity given to private life; and (4) publicity placing a person in false light. *Smith,* 112 F.Supp.2d at 434. Plaintiff's claim proceeds on the "intrusion upon seclusion" and "publicity given to private life" theories. For the reasons that follow, the Court determines that Defendant is entitled to judgment on this Count.

The Pennsylvania courts have adopted section 652B of the Restatement (Second) of Torts which provides:
One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1976); *Harris v. Easton Publ'g Co.,* 335 Pa.Super. 141, 483 A.2d 1377, 1383 (Pa.Super.Ct.1984). The invasion may take various forms including: (a) physical intrusion into a place where the plaintiff has secluded herself; (2) use of the defendant's senses to oversee or overhear the plaintiff's private affairs; or (3) some other form of investigation into plaintiff's private concerns. Restatement (Second) of Torts § 652B cmt. b (1976); *Harris,* 483 A.2d at 1383. Defendant is subject to liability under this section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about her person or affairs. Restatement (Second) of Torts § 652B cmt. c (1976). There is no liability unless the interference with the plaintiff's seclusion is both substantial and highly offensive to the ordinary reasonable person. *Id.* cmt. d; *Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 621 (3d Cir.1992).

Defendant first contends that Plaintiff had no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 9
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

expectation of privacy with respect to her e-mail communications. Some courts have held that there is no reasonable expectation of privacy in e-mail communications. *See* *Smyth v. Pillsbury Co.,* 914 F.Supp. 97, 101 (E.D.Pa.1996) ("[U]nlike urinalysis and personal property searches, we do not find a reasonable expectation of privacy in e-mail communications voluntarily made by an employee to his supervisor over the company e-mail system notwithstanding any assurances that such communications would not be intercepted by management."); *see also* *Commonwealth v. Proetto,* 771 A.2d 823, 827, 830-31 (Pa.Super.Ct.2001) (rejecting criminal defendant's challenge under the Fourth Amendment that e-mail evidence used against him at trial was improper). *Smyth* and *Proetto* do not necessarily foreclose the possibility that an employee might have a reasonable expectation of privacy in certain e-mail communications, depending upon the circumstances of the communication and the configuration of the e-mail system. *See, e.g., McLaren v. Microsoft Corp.,* No. 05-97-00824-CV, 1999 Tex.App. LEXIS 4103, at *10-12 (Tex.Ct.App. May 28, 1999) (examining the configuration of the company e-mail system to determine if there was an expectation of privacy).

***8** In this case, however, the uncontroverted evidence demonstrates that Plaintiff did not have a reasonable expectation of privacy with respect to her e-mail. The City's Guidelines regarding the expectation of privacy of e-mail messages, which are uncontroverted, explicitly informed employees that there was no such expectation of privacy:

Messages that are created, sent, or received using the City's e-mail system are the property of the City of Reading. The City reserves the right to access and disclose the contents of all messages created, sent, or received using the e-mail system. The E-mail system is strictly for official City of Reading messaging.

(Defs.' Ex. T ("Guidelines")). Plaintiff signed an acknowledgment that she had received and read the Guidelines on September 16, 1999. (*Id.;* Kelleher Dep. at 431-33.) Although Plaintiff contends that other employees were not subject to such review, she adduces no evidence to support her allegations, and, in fact, Defendant presents evidence, again uncontroverted, of at least one other instance in which an employee had his e-mail communications monitored and reviewed. (Defs.' Ex. C ("Tangredi Dep.") at 131-32.) It is clear from the undisputed evidence in the record that there is no genuine issue of material fact, and that the Plaintiff clearly lacked a reasonable expectation of privacy with respect to her e-mail communications on the City of Reading's e-mail system. *See* *Smyth,* 914 F.Supp. at 101.

Aside from the e-mail communications, Plaintiff alleges that Defendant "disseminated information about the executive session in which it was decided to suspend her without pay for one week; and/or disseminated information about the Ethics Complaint which had been lodged against her." (Compl. ¶ 109.) Whether these allegations are sufficient to support the intrusion upon seclusion claim depends on whether Plaintiff had a reasonable expectation of privacy in this information. Plaintiff alleges that the information involved was not part of the public record, and that she therefore had a reasonable expectation of privacy in this information. [FN10] However, Plaintiff adduces no evidence to support her contention that she had a reasonable expectation of privacy in this information. Although she testified in her deposition that Mayor Eppihimer had previously said that the reasons that he fired an employee were confidential, such evidence does not tend to demonstrate that her being disciplined by a different body-here, the City Council-is similarly confidential.

FN10. If, for example, this information was deemed to be part of the public record, then there could be no intrusion upon seclusion for publicizing the information. Restatement (Second) of Torts § 652B cmt. c.

***9** Similarly, Plaintiff's privacy claim fails under the publicity of private life theory. Section 652D of the Restatement (Second) of Torts states:

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter published is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 10
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

public.

Restatement (Second) of Torts § 652D; *Harris,* 483 A.2d at 1384. To state a cause of action, the plaintiff must prove that the defendant (1) publicized (2) private facts (3) that would be highly offensive to a reasonable person, and (4) are not of legitimate concern to the public. *Id.* The publicity element requires that the matter be communicated "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Kryeski v. Schott Glass Techs., Inc.,* 426 Pa.Super. 105, 626 A.2d 595, 601 (Pa.Super.Ct.1993) (quoting Restatement (Second) of Torts § 625E (1976)); *Harris,* 483 A.2d at 1384. Disclosure of information to only a small number of people is insufficient to constitute publicity. *See* *Kryeski,* 626 A.2d at 602 (disclosure to two people is insufficient); *Harris,* 483 A.2d at 1384 (disclosure to one person is insufficient).

To determine if facts are "private facts," the line is drawn "when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. The limitations, in other words, are those of common decency...." Restatement (Second) of Torts § 652D cmt. h.

In this case, Plaintiff adduces no evidence demonstrating that the fact of her suspension by the City Council constitutes private information, the publication of which would offend standards of decency. Plaintiff has cited no evidence demonstrating that she had any expectation of privacy in this information, which related to her professional conduct in the course of her job as the clerk for the City Council.

***10** Furthermore, even if Plaintiff did adduce evidence establishing that she had a privacy right in the fact of her being suspended by the City Council, or that the fact of her suspension constituted private facts the disclosure of which would represent an intrusion into her private life, she has adduced no evidence that Defendant Cramsey, the only Defendant remaining in this Count, took any action to publicize or distribute the information. Plaintiff's only evidence is testimony from her deposition that Cramsey spent a great deal of time with Mayor Eppihimer. Such evidence is insufficient to support an inference that proves Plaintiff's position.

For these reasons, the Court grants judgment in favor of Defendant Cramsey as to the invasion of privacy claims.

III. Conclusion

For all of the above reasons, the Court grants Defendant Waltman's Motion for Summary Judgment and Defendants City of Reading, Joseph Eppihimer, and Kevin Cramsey's Motion for Summary Judgment. The claims against Defendant Waltman are dismissed under the doctrine of qualified immunity. Judgment is entered in favor of the remaining Defendants on all of the remaining claims.

An appropriate Order follows.

*ORDER*

AND NOW, this day of May, 2002, upon consideration of Defendants' Unopposed Motion to File Reply Brief (Doc. No. 26), IT IS HEREBY ORDERED that said Motion is GRANTED and the Reply Brief is filed herewith. IT IS FURTHER ORDERED that:

1. Upon consideration of Plaintiff's Motion to Amend Response to Defendants' Motion for Summary Judgment (Doc. No. 28), and the response thereto, said Motion is GRANTED and the Response is considered AMENDED as specified by Plaintiff.

2. Upon consideration of Defendant Jeffrey Waltman's Motion for Summary Judgment (Doc. No. 16), and all responsive and supporting briefing, IT IS HEREBY ORDERED that said Motion is GRANTED. All claims against said Defendant are DISMISSED under the doctrine of qualified immunity.

3. Upon consideration of Defendants City of Reading, Joseph D. Eppihimer, and Kevin Cramsey's Motion for Summary Judgment (Doc. No. 21), and all responsive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 11

and supporting briefing, IT IS HEREBY ORDERED that said Motion is GRANTED. Judgment is ENTERED in favor of said Defendants on all remaining counts.

E.D.Pa.,2002.
Kelleher v. City Of Reading
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:01CV03386 (Docket) (Jul. 05, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Thomas F. LAPINSKI, Appellant
v.
THE BOARD OF EDUCATION OF THE BRANDYWINE SCHOOL DISTRICT; Joseph P. Dejohn;
Donald Fantine, Jr.; Ralph Ackerman; Paul Hart; Robert Blew; Nancy Doorey; G. Lawrence Pelkey, Jr.; G. Harold Thompson; Raymond Tomasetti, Jr.
**No. 04-1709.**

Argued Jan. 10, 2005.
Decided Jan. 24, 2006.

On Appeal from the United States District Court for the District of Delaware. (Dist.Ct. No. 00-cv-00173). District Judge: Hon. Kent A. Jordan.

Swartz Campbell LLC, Wilmington, Delaware, By: Neil R. Lapinski (Argued), for Appellant.

Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, By: Barry M. Willoughby (Argued), William W. Bowser, Scott A. Holt, for Appellees.

Before ROTH and CHERTOFF, [FN*] Circuit Judges, and RESTANI, [FN**] Chief Judge.

FN* Judge Chertoff heard oral argument in this case but resigned prior to the time the opinion was filed. The opinion is filed by a quorum of the panel. 28 U.S.C. § 46(d).

FN** The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

OPINION OF THE COURT

ROTH, Circuit Judge.

***1** Appellant Thomas F. Lapinski appeals the decision by the District Court granting summary judgment for appellees. We will reverse and remand.

I

The facts of this case are set forth in detail in the District Court's opinion. We briefly set forth only the most relevant facts here, in the light most favorable to Lapinski. Lapinski alleges that, during his time as principal of Mount Pleasant High School (MPHS), appellees engaged in certain retaliatory actions against him due to "whistle blowing" letters he wrote and statements he made to appellee former superintendent Joseph P. DeJohn and other Brandywine School District administrators. The specific whistle blowing activities are set forth in the District Court's opinion, *see Lapinski v. Bd. of Educ.,* No. 00- 173, 2004 U.S. Dist. LEXIS 1124, at *3-7 & nn. 3-4 (D.Del. Jan. 29, 2004), and we will not repeat them here. Lapinski alleges that in response to these whistle blowing activities, appellees decided in December 1999 not to renew his employment contract, though under Delaware law Lapinski could have stayed on at MPHS as a teacher, earning a teacher's salary rather than the higher principal's salary.

On March 13, 2000, Lapinski filed a complaint alleging, inter alia, various forms of First Amendment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

retaliation. On January 29, 2004, the District Court granted appellees' motion for summary judgment. Lapinski thereafter filed a motion for reargument, which the District Court denied.

II

Our review of a District Court's grant of summary judgment is plenary. *See* *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.,* 316 F.3d 431, 443 (3d Cir.2003). We assess the record using the same summary judgment standard that guides district courts. *See* *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir.2000). To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In granting appellees' motion for summary judgment, the District Court noted that Lapinski had voluntarily resigned as the principal of MPHS after learning that appellees did not intend to renew his contract. Concluding that an employee's decision to resign or retire, even in the face of pending termination, is presumptively voluntary, the District Court required Lapinski to show that he had been constructively discharged.

We need not address whether Lapinski was constructively discharged, as appellees' failure to renew Lapinski's employment contract constitutes an adverse employment action for purposes of Lapinski's First Amendment retaliation claim. In *Suppan v. Dadonna,* we held that defendants' action of placing plaintiffs lower on promotion ranking lists in retaliation for the exercise of their First Amendment free speech rights was sufficiently adverse to state a claim for retaliation. 203 F.3d 228, 234-35 (3d Cir.2000). In doing so, we relied primarily on *Rutan v. Republican Party,* 497 U.S. 62 (1990). The *Rutan* "Court rejected the argument that the First Amendment rights of public employees had 'not been infringed because they [had] no entitlement to promotion, transfer, or rehire." ' *Suppan,* 203 F.3d at 234 (alteration in original) (quoting *Rutan,* 497 U.S. at 72). *See also* *Brennan v. Norton,* 350 F.3d 399, 419 (3d Cir.2003) ("A public employer adversely affects an employee's First Amendment rights when it refuses to rehire an employee because of the exercise of those rights or when it makes decisions, which relate to promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights." (quotation marks omitted)).

***2** We therefore conclude that appellees' failure to renew Lapinski's employment contract was "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights," *Suppan,* 203 F.3d at 235. That Lapinski had a right under Delaware law to remain at MPHS as a teacher does not change our conclusion. Even though appellees could not have terminated Lapinski's employment entirely, the nonrenewal was a demotion in title and salary and therefore actionable conduct. *See, e.g.,* *Brennan,* 350 F.3d at 419; *Baldassare v. New Jersey,* 250 F.3d 188, 201 (3d Cir.2001) (noting that it is clearly established that a public employee cannot be demoted in retaliation for exercising his or her First Amendment rights).

III

For the foregoing reasons, we will reverse the judgment of the District Court and remand for further proceedings not inconsistent with this opinion.

Slip Copy, 2006 WL 167443 (3rd Cir.(Del.))

**Briefs and Other Related Documents** **(Back to top)**

• 04-1709 (Docket) (Mar. 18, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Robert J. MITCHELL, Plaintiff,
v.
Mayor John F. STREET and The City of Philadelphia, Defendants.
**No. Civ.A. 04-3213.**

Aug. 16, 2005.

James E. Beasley, William T. Hill, The Beasley Firm, Philadelphia, PA, for Plaintiff.
Shelley R. Smith, City of Philadelphia Law Department, Philadelphia, PA, for Defendants.

MEMORANDUM

KELLY, J.

I. *INTRODUCTION*

***1** Presently pending before this Court is the Defendants', Mayor John F. Street ("Mayor Street") and the City of Philadelphia, Motion for Summary Judgment. On July 7, 2004, Mitchell filed his Complaint with this Court. Mitchell's Complaint contains three counts. Specifically, the counts are: Violation of the First & Fourteenth Amendment and 42 U.S.C. § 1983 (Count I); Violation of Article I, Section I, of the Pennsylvania Constitution (Count II); and Violation of Article I, Section XI, of the Pennsylvania Constitution (Count III). Defendants have moved for summary judgment on all three counts. For the following reasons, Defendants' Motion is denied. However, as will be explained in *infra* Part IV.B, Counts II and III of the Complaint will be dismissed without prejudice.

II. *BACKGROUND*

Plaintiff, Robert J. Mitchell ("Mitchell") is the former Deputy Police Commissioner for the City of Philadelphia. Mitchell held that title from 1996 until 2004. In early 2004, a rumor began to circulate that Mitchell had obtained an illegal gun permit. In late February, 2004, the media picked up the story and reported that Mitchell allegedly possessed an illegal gun permit. Initially, Police Commissioner Sylvester Johnson ("Johnson") announced his support for Mitchell at a press conference on February 26, 2004. That same day, Mayor Street called a meeting to discuss the gun permit issue. Present at this meeting were Mayor Street, Johnson, Mitchell, Mayor Street's Chief of Staff Joyce Wilkerson ("Wilkerson"), Communications Director Barbara Grant ("Grant") and Police Counsel Karen Simmons, Esquire ("Simmons"). At the meeting, Mitchell denied any wrongdoing with respect to the gun permit. The parties dispute the actual outcome of this meeting as it related to Mitchell's continued employment, however, what is certain is that on February 27, 2004, at a press conference, Mayor Street stated that Mitchell would be taking a leave of absence from his position as Deputy Police Commissioner. An investigation then commenced into the gun permit issue.

On March 11, 2004, Mitchell filed a complaint in Equity with the Court of Common Pleas of Philadelphia County. The complaint sought to enjoin Mayor Street and the City of Philadelphia from removing him from his post as Deputy Police Commissioner pending the results of the investigation regarding the gun permit. FN1

FN1. That complaint was dismissed as moot by the Court of Common Pleas on June 11, 2004. (*See* Defs.' Mot. Summ. J. Ex. E).

On May 26, 2004, Philadelphia District Attorney Lynne Abraham announced the results of her investigation into the gun permit issue. The District Attorney concluded that Mitchell had engaged in no wrongdoing whatsoever.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On May 27, 2004, Mitchell appeared on the Michael Smerconish ("Smerconish") radio program. [FN2] During this appearance, Smerconish and Mitchell discussed the District Attorney's public announcement regarding the gun permit issue and her findings that Mitchell engaged in no wrongdoing. On June 1, 2004, Mitchell received a letter from Johnson terminating his employment. Mitchell subsequently filed his Complaint with this Court approximately one month later.

FN2. Mitchell previously appeared on the Smerconish show on March 4, 2004 after the announcement by Street that Mitchell was suspended from his position as Deputy Police Commissioner.

III. *STANDARD*

***2** "Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.' " *Hines v. Consol. Rail Corp.,* 926 F.2d 262, 267 (3d Cir.1991) (citations omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. [FN3] *Big Apple BMW, Inc. v. BMW of N. Am. Inc.,* 974 F.2d 1358, 1362 (3d Cir.1992). Once the moving party has produced evidence in support of summary judgment, the non-movant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial. *Id.* at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

FN3. "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.' " *Compton v. Nat'l League of Prof'l Baseball Clubs,* 995 F.Supp. 554, 561 n. 14 (E.D.Pa.1998) (citations omitted), *aff'd,* 172 F.3d 40 (3d Cir.1998).

IV. *DISCUSSION*

Defendants have moved for summary judgment on all three counts. Under Count I, Defendants assert that no genuine issue of material fact exists regarding Plaintiff's claim for retaliation under both his First Amendment right to free speech and his right to petition. Second, under Counts II and III, Defendants assert that there is no cause of action for damages under the Pennsylvania Constitution. Finally, Mayor Street asserts he is shielded from liability based upon the doctrine of qualified immunity. These arguments will be considered in turn. [FN4]

FN4. The Defendants do not contest that the Plaintiff has met the threshold for there to be municipal liability under *Monell v. Dep't of Social Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, I will not engage in a discussion of this issue.

A. COUNT I

Count I actually contains two separate causes of action. First, Mitchell asserts that the Defendants retaliated against him and terminated his employment based upon the filing of his equity complaint with the Court of Common Pleas of Philadelphia County. Mitchell asserts this violated his right to petition the government for a redress of grievances. Additionally, Mitchell asserts that he was fired in retaliation for exercising his free speech rights by appearing on the Smerconish radio program. The parties are in agreement as to the elements that make up both of these claims. Both claims require the following three-step analysis:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[f]irst, plaintiff must show that he engaged in a protected activity. Second, plaintiff must show that the protected activity was a substantial factor motivating the dismissal decision. Finally, defendant may defeat plaintiff's claim by demonstrating that the same action would have taken place even in the absence of the protected conduct.

*San Filippo v. Bongionvanni,* 30 F.3d 424, 430 (3d Cir.1994) (citations omitted). [FN5] I will consider these elements as they relate to Plaintiff's right to petition and free speech causes of action.

FN5. As set out in *San Filippo,* "a public employer may dismiss an employee for speech addressing a matter of public concern if the state's interest, as an employer, in promoting the efficiency of its operations outweighs the employee's interest, as a citizen, in commenting upon matters of public concern." 30 F.3d at 434 n. 11 (citation omitted). However, "[t]his balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." *Id.; see also, Dennison v. Pa. Dep't of Corr.,* 268 F.Supp.2d 387, 399 (M.D.Pa.2003). The Defendants deny that they fired Mitchell because of his allegedly protected speech so as to deem the balancing test inapplicable. Furthermore, neither party asserts that the balancing test should be utilized in this case.

1. Protected Activity

***3** The first step requires this Court to consider whether Mitchell engaged in a protected activity under his right to petition and free speech claims. As to his right to petition, Defendants concede that the filing of Mitchell's equity complaint with the Court of Common Pleas of Philadelphia County was a protected activity. However, Defendants vigorously contest that Mitchell engaged in any protected activity under his free speech claim.

The United States Court of Appeals for the Third Circuit ("Third Circuit") has noted that in a claim for retaliatory discharge from government employment, the plaintiff "must establish that the conduct which triggered the discharge was protected under the first amendment." *San Filippo,* 30 F.3d at 434. Specifically: [w]here the alleged retaliation is based on expressive conduct constituting speech, a court must first determine whether or not the speech can be fairly characterized as addressing a 'matter of public concern,' for a governmental employee who makes public comments about problems not of 'public concern' has no first amendment immunity against employer discipline.

*Id.* "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Baldassare v. N.J.,* 250 F.3d 188, 195 (3d Cir.2001)(internal quotation marks and citation omitted). Thus, a court must focus on the "content, form, and context of the activity in question." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995)). Furthermore, "[t]he content of the speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Id.* (internal quotation marks and citations omitted). Determining whether the public employee's speech involved a matter of public concern is a question of law for the court. *Id.* (citing *Watters,* 511 U.S. at 668; *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997)).

The parties dispute whether Mitchell's appearance on the Smerconish radio program to discuss the gun permit issue and the District Attorney's findings constituted a matter of public concern. Defendants assert that this case is similar to *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, and that I should therefore find as a matter of law that Mitchell's speech did not involve a matter of "public concern." However, for the following reasons, I find that *Connick* is distinguishable from the instant case.

In *Connick,* the plaintiff, Shiela Myers ("Myers"), was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employed as an Assistant District Attorney in New Orleans for five and one half years. 461 U.S. at 140. Myers was informed that she would be transferred to prosecute cases in a different section of the criminal court. *Id.* Myers opposed this transfer and she then "prepared a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. She then distributed the questionnaire to her co-workers the next day. *Id.* Later that day, Myers was terminated by Harry Connick ("Connick") the District Attorney for Orleans Parish for refusing the transfer. Myers brought suit under 42 U.S.C. § 1983, asserting that she was wrongfully terminated because she had exercised her constitutionally protected right to free speech by distributing the questionnaire. *Id.*

***4** The United States Supreme Court ("Supreme Court") noted that practically all of Myers questions did "not fall under the rubric of matters of 'public concern.' " *Id.* at 145. The Supreme Court noted that the questionnaire did not seek to inform the public that the District Attorney's office was discharging its governmental responsibilities in the investigation or prosecution of criminal cases in an improper manner nor did the questionnaire seek to bring to light actual or potential wrongdoing on the part of Connick or others. *Id.* The Supreme Court continued by noting that the questions posed by Myers reflected her dissatisfaction with her transfer and her "attempt to turn that displeasure into a cause celebre." *Id.*

Unlike the majority of the questions posed in *Connick,* however, I find that the issues discussed on the Smerconish radio program did involve matters of public concern. Unlike *Connick,* the gun permit issue involved possible illegal activity and corruption on the part of a high ranking government official, namely Mitchell. As previously noted, the courts have stated that matters of public concern can include attempts to bring to light actual or potential wrongdoing on the part of government officials. *See Baldassare,* 250 F.3d at 195 (citations omitted). Thus, it follows that the discussion on the Smerconish radio program regarding the District Attorney's investigation and findings regarding the possible wrongdoing and/or illegality of how Mitchell received the gun permit involved matters of "public concern." The instant case goes beyond the intra-office dissatisfaction in *Connick* since there is the additional element of potential wrongdoing/illegality that brought the gun permit issue to the forefront of the pubic sphere in the first place. Therefore, as Mitchell's appearance on the Smerconish radio program involved a matter of "public concern," Mitchell engaged in a protected activity under the law.

2. Substantial Factor Motiving the Dismissal

The next step in the analysis is to determine whether Mitchell's protected activities were a substantial factor which motivated the decision to terminate Mitchell's employment. The Defendants assert that Mitchell cannot satisfy this element. The Plaintiff asserts that he can survive summary judgment with respect to this element by discrediting the Defendants' reasons for his termination. For the following reasons, I agree with Plaintiff's position.

To survive summary judgment, "a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted). In this case, Mitchell attempts to discredit the Defendants reason for his termination. [FN6]

FN6. While *Fuentes* was a Title VII case, courts have noted that "[p]retext analysis used in Title VII cases is also useful in deciding First Amendment retaliation claims." *Cavicchia v. Phila. Hous. Auth.,* No. 03-0116, 2003 WL 22595210, at *9 n. 2 (E.D.Pa. Nov.7, 2003), *aff'd,* 2005 WL 1506038 (3d Cir. June 27, 2005)(non-precedential)(citing *Azzaro v. County of Allegheny,* 110 F.3d 968, 981 (3d Cir.1997)(en banc); *Feldman v. Phila.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Hous. Auth.,* 43 F.3d 823, 831 (3d Cir.1994); *Zappan v. Pa. Bd. of Prob. & Parole,* No. 00-1409, 2002 WL 32174230, at *11 (E.D.Pa. Nov.25, 2002); *Rodriguez v. Torres,* 60 F.Supp.2d 334, 340 n. 2 (D.N.J.1999) *Fogarty v. Boles,* 938 F.Supp. 292, 299 n. 4 (E.D.Pa.1996), *aff'd,* 121 F.3d 886 (3d Cir.1997)).

***5** The Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. Thus, it is the Defendants' position that Mitchell could not be retaliated against for his protected activities because the decision to fire him occurred before any of the protected activities occurred. However, I find that there are factual inconsistencies in the record that would allow a reasonable fact finder to find Defendants' proffered reason unworthy of credence. *See Fuentes,* 32 F.3d at 765 (citations and footnote omitted). For example, the Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. This meeting was called to discuss the gun permit issue. No party suggests that budgetary concerns were discussed at this meeting as it related to Mitchell's further employment as Deputy Police Commissioner. Yet, Johnson's press conference on June 1, 2004 detailing Mitchell's termination and the corresponding news coverage explains that Mitchell was fired for budgetary reasons. (*See* Pl.'s Resp. Defs.' Mot. Summ. J., Ex. O). This and other inconsistencies in the record discredit Defendants' proffered theory of Mitchell's termination enough so as to create material issues of fact as to this element. [FN7]

FN7. Additionally, with respect to the free speech retaliation claim, the Third Circuit has noted that the temporal proximity between the employee's protected activity and the adverse employment action "is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997)(internal quotation marks and citations omitted). In this case, Mitchell appeared on the Smerconish radio program and was terminated less than one week later. It is worth noting, however, that Mitchell's termination was also soon after the District Attorney made her findings with respect to the gun permit issue.

3. Same Action Would have been Taken Absent the Protected Activity

Defendants do not address this third element of Plaitniff's right to petition and free speech claims. Therefore, I find it unnecessary to address it in the context of deciding Defendants' Summary Judgment Motion. As there are material issues of fact remaining as to all three elements of Plaintiff's right to petition and free speech retaliation claims, I find summary judgment is inappropriate as it relates to Count I of Mitchell's Complaint.

B. COUNTS II AND III

Counts II and III seek money damages under the Pennsylvania Constitution, Article I, Section I and Article I, Section XI respectfully. The Defendants assert that summary judgment should be granted in their favor because Plaintiff cannot maintain a cause of action under the Pennsylvania Constitution for money damages. For the following reasons, based upon the discretion given to me as stated under 28 U.S.C. § 1367(c)(1), I will decline to exercise supplemental jurisdiction over these two counts and dismiss them without prejudice.

Section 1367(c)(1) states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if the claim raises a novel or complex issue of state law." As one court in this District has recently noted, "[t]he question of whether there exists a 'right of action for money damages against government officials of the Pennsylvania Constitution' is unclear." *Gremo v. Karlin,* 363 F.Supp.2d 771, 794 (E.D.Pa.2005)(quoting *Robbins v. Cumberland County Children & Youth Serv.,* 802 A.2d 1239, 1251 (Pa.Cmwlth.Ct.2002)); *compare Erdman v. Mitchell,* 207 Pa. 79, 90-91, 56 A. 327, 331 (1903)(holding that there is a right of action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for injunctive relief under the first article of the Pennsylvania Constitution); *Harley v. Schuylkill County,* 476 F.Supp. 191, 195-96 (E.D.Pa.1979)(extending *Erdman* to apply to claims for damages); *Jones v. City of Phila.,* 68 Pa. D. & C.4th 47, 68-75 (writing in support of its determination that Article I of the Pennsylvania Constitution is self-executing and permits private parties to seek civil remedies for constitutional violations); *with Millar v. Windsor Township,* No. 04-2529, 2005 WL 1513120, at *3-4 (M.D.Pa. June 24, 2005)(stating that there is a dearth of case law on the issue and declining to exercise jurisdiction over the state constitutional claims because deference to the state appellate courts is appropriate); *Tillman v. Alonso,* No. 04-4391, 2005 WL 1311588, at *5-6 (E.D.Pa. May 31, 2005)(explaining the uncertainty of the state of the law on the issue of bringing a state constitutional claim under Article I and declining to exercise jurisdiction over state constitutional claims because of this uncertainty); *Mulgrew v. Fumo,* No. 03-5039, 2004 WL 1699368, at *2-4 (E.D.Pa. July 29, 2004)(explaining that the issue of whether a direct right of action under Article I of the Pennsylvania Constitution is unclear and declining to exercise supplemental jurisdiction over these state constitutional claims).

***6** In light of the unclear state of the law on Mitchell's state constitutional claims, I find that the most appropriate course of action in this particular case is to decline supplemental jurisdiction over Counts II and III of the Complaint pursuant to 28 U.S.C. 1368(c)(1). [FN8] Therefore, Counts II and III will be dismissed without prejudice.

FN8. This decision is particularly prudent in light of the fact that it appears that the issue of "whether a cause of action for money damages arises under the state constitution is an issue currently pending before the Commonwealth Court of Pennsylvania." *Millar,* 2005 WL 1513120, at *3 n. 5 (citing *City of Phila. v. Jones,* No. 795-CD-2004 (Pa. Commw. Ct. filed Apr. 19 2004). "Argument was heard by the [Commonwealth] court *en banc* on June 8, 2005." *Id.*

C. QUALIFIED IMMUNITY

Finally, Defendant Mayor Street asserts that he is entitled to qualified immunity. "Qualified immunity is available to government officials performing discretionary functions." *Lodato v. Ortiz,* 314 F.Supp.2d 379, 385-86 (D.N.J.2004)(citing *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818 (citing *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)).

A court required to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [government official's] conduct violated a constitutional right? This must be the initial inquiry.... If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties's submissions, the next, sequential step is to ask whether the right was clearly established.

*Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(internal citation omitted).

Regarding the first part of the qualified immunity test, as set out in *supra* Part IV.A., I have found that Mitchell has alleged a violation of his constitutional rights to be free from retaliation for filing his equity complaint and for speaking out on a matter of public concern. Therefore, the first part of overcoming Mayor Street's qualified immunity has been satisfied by Mitchell.

Next, I note that the Defendants do not attempt to make any type of argument as to the second part of the qualified immunity test. Specifically, the Defendants sole argument with respect to qualified immunity is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that, "[b]ecause the plaintiff cannot establish that his constitutional rights were violated, Defendant Mayor Street is entitled to qualified immunity, and, therefore, judgment in his favor." (Mem. Law. Supp. Defs.' Mot. Summ. J., at 11). Thus, Mayor Street does not attempt to contest that both of these rights were clearly established at the time he acted. However, it is clear that both of these rights were established at the time Mayor Street acted. *See* *Watters,* 55 F.3d at 891 (stating that "it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal.... Judicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech.") (citations omitted); *San Filippo,* 30 F.3d at 441-443 ("The mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee."); *Bennis v. Gable,* 823 F.2d 723, 733 (3d Cir.1987)(stating that the law was clearly established that a public employee could not be retaliated against for exercising his rights under the First Amendment). Thus, I find Defendant Mayor Street shall not be entitled to qualified immunity.

V. *CONCLUSION*

***7** In conclusion, I find that summary judgment is improper as to Count I of the Complaint. I find that material issues of fact remain in Mitchell's claims for retaliation under the First Amendment's free speech and right to petition clauses. Additionally, I conclude that because Counts II and III raise novel and complex issues of state law, I will decline supplemental jurisdiction over these state constitutional claims and dismiss them without prejudice. Finally, I have concluded that Defendant Mayor Street is not entitled to qualified immunity.

An appropriate Order follows.

ORDER

AND NOW, this 16th day of August, 2005, upon consideration of the Defendants' Motion for Summary Judgment (Doc. No. 11), and the Response and Replies thereto, it is hereby ORDERED that:
1. the Motion is DENIED; and
2. Counts II and III of the Complaint are DISMISSED WITHOUT PREJUDICE.

E.D.Pa.,2005.
Mitchell v. Street
Slip Copy, 2005 WL 1993774 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

- 2005 WL 2150103 (Trial Motion, Memorandum and Affidavit) Order (Jul. 12, 2005)
- 2:04cv03213 (Docket) (Jul. 07, 2004)
- 2:04cv01110 (Docket) (Mar. 15, 2004)
- 2004 WL 2695311 (Trial Pleading) Complaint (2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab A



WILCOX & FETZER LTD.

In the Matter Of:

# Conley
# v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

W. Michael Tupman, Esquire

December 21, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY, )
)
Plaintiff, )
) Civil Action
v. ) No. 04-1394-GMS
)
COLONEL L. AARON CHAFFINCH, individually and in his official capacity as the Superintendent, Delaware State Police; LIEUTENANT COLONEL THOMAS F. MACLEISH, individually and in his official capacity as the Deputy Superintendent, Delaware State Police; DAVID B. MICHELL, individually and in his official capacity as Secretary of the Department of Safety and Homeland Security, State of Delaware; and DIVISION OF STATE POLICE, DEPARTMENT OF SAFETY AND HOMELAND SECURITY, State of Delaware, )
)
Defendants. )

Deposition of W. MICHAEL TUPMAN, ESQUIRE, taken pursuant to notice at the law offices of The Neuberger Firm, P.A., 2 East 7th Street, Suite 302, Wilmington, Delaware, beginning at 10:0 a.m. on Wednesday, December 21, 2005, before Kathleen White Palmer, Registered Merit Reporter and Notary Public.

APPEARANCES:

STEPHEN J. NEUBERGER, ESQUIRE
CHERYL SASADEUSZ, ESQUIRE
THE NEUBERGER FIRM, P.A.
2 East 7th Street - Suite 302
Wilmington, Delaware 19801
for the Plaintiff

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Page 2

APPEARANCES (Continued):

RALPH K. DURSTEIN, ESQUIRE
STEPHANI J. BALLARD, ESQUIRE
DEPARTMENT OF JUSTICE
820 North French Street
Carvel State Office Building
Wilmington, Delaware 19801
for Defendants Lieutenant Colonel Thomas F. MacLeish, David B. Mitchell, and Division of State Police

ALSO PRESENT:
CAPTAIN BARBARA L. CONLEY

\- - - - -

W. MICHAEL TUPMAN, ESQUIRE, the witness herein, having first been duly sworn on oath, was examined and testified as follows:

BY MR. NEUBERGER:

**Q. Mr. Tupman, my name is Steve Neuberger and I'm an attorney for Captain Barbara Conley. Do you understand that?**

A. Yes, I do.

**Q. Have you ever testified in court before as a witness?**

A. Yes.

**Q. Have you ever testified in a deposition before as a witness?**

Page 3

A. Yes.

**Q. In addition to testifying as a witness, you've also sat in the chair I'm sitting in now and taken many, many depositions?**

A. Many, many, many. I have taken and defended many depositions.

**Q. Now, I'm just going to run through the procedure again. I'm sure you are aware of it, but just so we are both on the same page. Okay?**

A. Okay.

**Q. I'm going to ask you some questions and the court reporter here is going to type up your answers to those questions. Okay?**

A. Yes.

**Q. We have to take turns talking. The court reporter, although she is very, very good, can't take everything we say if we both talk at the same time. Do you understand that?**

A. Yes.

**Q. Also, you have to verbalize your answers. Instead of nodding your head, say yes, or instead of shaking your head, just say no.**

A. Understood.

**Q. As you know, you'll have the opportunity to**

Page 4

**review the deposition transcript to correct any typographical errors that happen to slip through. It doesn't happen very often, but it does happen every now and then.**

A. Understood.

**Q. If I ask you a question that you don't understand, just ask me to rephrase it. I'd be more than happy to. Do you understand that?**

A. Yes.

**Q. Very important. I don't want you to guess. If you don't know an answer, just say so. All right?**

A. Understood.

**Q. Are you taking any medications or is there anything else that would prevent from you testifying truthfully or remembering accurately today?**

A. No.

**Q. If you need any breaks, if you need to run to the john, to stretch your back, you need to do some yoga, just let me know. Okay?**

A. I will.

**Q. Now, you've taken an oath to tell the truth today, haven't you?**

A. Correct.

**Q. Do you understand the significance of that oath?**

Page 5

A. Yes, I do.

**Q. Now, what is your full name?**

A. My full name is William Michael, M-i-c-h-a-e-l, Tupman, T as in Tom, u-p, as in Peter, m-a-n.

**Q. What position do you hold?**

A. I am the deputy attorney general.

**Q. Is that in the Department of Justice?**

A. Correct.

**Q. How old are you today, Mike -- Mr. Tupman?**

A. Mike is fine, Steve. We've known each other for a long time.

I am 51.

**Q. Where were you born and raised?**

A. I was born in Dover, Delaware, courtesy of the United States Air Force. I was raised in Alexandria, Virginia.

**Q. How did you end up back here in Delaware?**

A. I worked -- when I graduated from law school in 1979, I moved to Washington, D.C., and I worked there for 12 years and I moved back to Delaware in 1991.

**Q. Where did you go to law school?**

A. University of Virginia.

**Q. So did you enjoy your time in Charlottesville?**

A. Absolutely.

**Q. Have you had a basis to form a personal relationship with him?**

A. No.

**Q. How about a professional one?**

A. I mean, I have been at meetings with him where he's acting as secretary and it's a State Police matter of interest to the department. I'm not assigned to the Department of Safety and Homeland Security, so he really isn't my client, but there has been some interaction.

**Q. Now, you work with defense counsel Durstein and Ballard; isn't that right?**

A. When you say "work" --

**Q. Work with. I'm sorry.**

A. I don't really work with Stephani. She's in another unit with a whole nother roster of clients.

**Q. So generally you don't work with Ms. Ballard?**

A. That's correct.

**Q. But you do work with Mr. Durstein?**

A. Yes. As the two deputies assigned to the division, there is a fair amount of interaction, although it's more in the nature of dividing things up to get the work done.

**Q. Okay.**

A. We have never -- with the exception of the Becky

McKnatt, M-c-K-n-a-t-t, trial, we have never actually worked together on a, you know, particular matter.

**Q. Do you get along with Mr. Durstein professionally?**

A. Oh, yes.

**Q. Do you get along with him personally?**

A. I don't know him personally.

**Q. Do you know Mr. Jim Liguori?**

A. Yes.

**Q. Do you know him personally or professionally?**

A. Professionally.

**Q. Do you get along professionally with him?**

A. Yes.

**Q. Mr. Durstein is also your attorney in this case; isn't that right?**

A. Well, it is my understanding that Mr. Durstein and Ms. Ballard are here today -- I wouldn't say so much as my attorney.

**Q. I thought you testified a little while ago that you were being represented by counsel here today by Mr. Durstein and Ms. Ballard.**

A. Yeah. It's not really the sort of the traditional attorney/client relationship since I'm not a party to the case. I'm here, as I understand it, as a

fact witness.

**Q. Sure. Okay. But they are your attorneys as to this particular matter in which you are a witness?**

A. I would say so, yes.

**Q. Do you recall in June 2003 the jury verdict against Colonel Chaffinch for violating the First Amendment rights of Sergeant Christopher D. Foraker?**

MS. BALLARD: Objection to the form.

A. I remember -- I was cocounsel at the trial. I was there when the jury came back and rendered its decision, yes.

**Q. Now, do you recall at some time in the fall of 2003 that Internal Affairs charges were filed against Colonel Chaffinch arising out of the jury verdict against him for violating the United States Constitution?**

MS. BALLARD: Same objection.

A. I don't understand the question.

**Q. Do you recall Internal Affairs charges being filed against Colonel Chaffinch or an Internal Affairs complaint being filed against Colonel Chaffinch because of the jury verdict in the Foraker case?**

A. I remember your father sending a letter to the State Police. I'm not sure to whom it was addressed requesting an Internal Affairs investigation. Yeah, I

recall that.

**Q. As a general matter, based on your years of experience with the Department of Justice and also with the Division of State Police, can a citizen from the general public request that charges be filed against a state police officer?**

A. You are jumping ahead when you say charges filed.

**Q. So maybe it's a terminology thing.**

A. Yes.

**Q. Could you explain it to me, then, what the difference in terminology is, what the appropriate words would be for me to use?**

A. Well, a person can file a complaint with the Internal Affairs section and that person could be somebody within the division or somebody without the division or outside the division. And the complaint will then be investigated. If the complaint is substantiated, then charges may be issued.

**Q. Then do you recall in the fall of 2003 a complaint being filed against Colonel Chaffinch arising out of the jury verdict against Colonel Chaffinch from June of 2003?**

A. I remember a letter, as I said previously, from

Page 22

your father -- I don't know to whom it was directed -- asking for an Internal Affairs investigation.

**Q. Was an Internal Affairs investigation conducted?**

A. At that time? No.

**Q. Do you recall that there were media inquiries from Tom Eldred directed to you and also directed to whoever the head of Internal Affairs was at the time regarding that Internal Affairs complaint?**

A. I have no recollection of that.

**Q. Do you have any recollection of being consulted by the DSP as to how to handle media inquiries that were coming in?**

A. With reference to what?

**Q. That same complaint.**

A. Your father's complaint?

**Q. Yes.**

A. No.

**Q. Just for the purposes of the record, my father is Tom Neuberger; correct?**

A. Yes.

**Q. Skipping ahead, do you recall an Internal Affairs investigation against then-Lieutenant Colonel MacLeish around approximately March of 2004 charging that he had interfered in a forgery and theft of state**

Page 23

**property, criminal investigation on behalf of a personal friend?**

MS. BALLARD: Objection to the form.

A. I don't believe that that's what the nature of the complaint was. I do recall that there was an investigation involving a contact that Lieutenant Colonel MacLeish had had with DNREC.

**Q. Do you recall that there were media inquiries from Tom Eldred to the Delaware State News and Mary Allen of The News Journal directed to the Delaware State Police as to that investigation?**

A. I have no recollection.

**Q. Do you recall being consulted by the Delaware State Police as to how to respond to those media inquiries?**

A. No.

**Q. Do you recall that in April of 2004 Captain Gregory Warren, who at that time was the director of training of the Delaware State Police, filed Internal Affairs either complaints or charges against Colonel Chaffinch for various matters?**

A. Complaint.

**Q. Complaint? So do you recall that at that time that Captain Warren filed an Internal Affairs complaint?**

Page 24

A. Yes.

**Q. Do you recall that one of the charges that Captain Warren filed, one of the complaints that Captain Warren levied would be that Colonel Chaffinch committed perjury for repeatedly lying under oath in the Foraker and then in the Bullen and Giles trials?**

MS. BALLARD: Objection to form.

A. I don't recall the specifics of Captain Warren's complaint.

**Q. Do you recall that one of the complaints was that the colonel had committed the crime of official misconduct under Title 11 of the Delaware Code as a result of the race discrimination jury verdict against him in the Bullen and Giles trial?**

A. Again, I don't recall the specifics of any of Captain Warren's complaint.

**Q. I'm going to try to jog your memory to see if this helps.**

A. Okay.

**Q. Do you recall that another charge, another complaint that he levied was one of cronyism at the Delaware State Police firing range; specifically, that Colonel Chaffinch had pressured then-Lieutenant Betsy Shamany, who at that time was an IA, to drop and cover up**

Page 25

**an Internal Affairs investigation into the colonel's friend who I'm going to refer to as Trooper C?**

MS. BALLARD: Objection to the form.

A. I don't recall.

**Q. Do you know who I'm talking about, Trooper C, when I refer to --**

A. Yes, that I do.

**Q. Do you recall that Captain Warren also levied a complaint that the colonel had put officers at the FTU in harm's way by having them work at an unsafe facility?**

A. I don't recall.

MS. BALLARD: I'll just put a standing objection on the record as to your representation of what the charges and various complaints were.

MR. NEUBERGER: Sure.

BY MR. NEUBERGER:

**Q. Do you recall that another of the charges that Captain Warren filed was in violation of State Police rules and regulations that Colonel Chaffinch had caved into pressure from State Representative Ben Ewing to give special treatment to one DSP recruit at the expense of all other recruits?**

A. I don't recall any of the specifics of Captain Warren's complaint.

Page 26

**Q. Do you recall that one of Captain Warren's complaints was that the colonel had made racist remarks about African-Americans at the annual police chiefs banquet center in Rehoboth Beach in approximately May of 2003 at the Convention Center?**

A. I don't recall any specifics of Captain Warren's complaint.

**Q. Do you recall that one of Captain Warren's complaints is that the colonel had engaged in drinking and driving in his police car?**

A. I don't recall any of the specifics of Captain Warren's complaint.

**Q. Are you aware that the drinking and driving complaint was eventually substantiated?**

A. I have no knowledge of that.

**Q. Do you recall that then-Secretary Ford publicly announced that several of these charges were not going to be investigated?**

A. I have no recollection.

**Q. Are Internal Affairs complaints regularly made against the colonel and lieutenant colonel of the Delaware State Police?**

A. What do you mean by regular?

**Q. Is it something that happens often?**

Page 27

A. It doesn't happen often.

**Q. So despite the fact that it doesn't happen often, you just don't remember today any of the specifics of those particular times I've questioned you about?**

A. That's correct.

**Q. Do you recall if you were consulted by the Delaware State Police as to how to respond to the media inquiries into the complaint that was filed by Captain Warren in approximately April of 2004?**

A. I have no recollection.

**Q. Are you saying it didn't happen or you just don't remember?**

A. That's always a subtle -- I understand the distinction. I don't remember.

**Q. Now, as to the Internal Affairs complaint that was filed against Colonel MacLeish in approximately March of 2004 arising out of what I'm going to refer to as forgery and theft of state property issue, I think you testified that you didn't remember whether you were consulted as to the DSP on how to respond to any media inquiries?**

A. That's correct.

**Q. Again, just so we are clear, is it that you just don't remember if you were consulted, or you were not consulted?**

Page 28

A. I don't remember.

**Q. So it could have happened, but you just don't remember?**

A. No. If it had happened, I would remember.

**Q. So if it had happened, you would remember?**

A. Yes.

**Q. But I thought you said you just didn't remember if it had happened.**

A. Again, I find these questions confusing in terms of whether it's a memory thing or whether it's a negative that just didn't happen.

**Q. To the best of your recollection, did the State Police consult with you as to how to handle media inquiries from, for example, Tom Eldred of the Delaware State News or, for example, Mary Allen of the Wilmington News Journal, did the State Police consult with you as to how to handle media inquiries from those persons about the investigation into Colonel MacLeish?**

A. I don't believe they did.

**Q. Do you recall that in April of 2004 Captain Warren filed Internal Affairs complaints against Lieutenant Colonel MacLeish?**

A. I thought Warren filed one complaint with allegations against both Colonel Chaffinch and Lieutenant Colonel MacLeish. I was not aware that they were separate.

Page 29

**Q. Do you recall that a complaint was levied against Lieutenant Colonel MacLeish in some fashion?**

A. Yes.

**Q. Do you recall that one of the complaints was that MacLeish had ordered Captain Warren to submit a false Executive Order 19 report to Secretary Lisa Blunt-Bradley to deceive her about the work that DSP was doing relating to diversity on important issues?**

A. I have no recollection of the specifics of Captain Warren's complaint.

**Q. Do you recall that one of the complaints was that Colonel MacLeish had to use sexually explicit and other offensive language during the February 2nd, 2004, commanders' meeting and also in the weeks leading up to that meeting?**

A. I have no recollection of the specifics of Captain Warren's complaint.

**Q. Do you recall that one of Captain Warren's complaints was that MacLeish had given an illegal order to Captain Warren to violate the state troopers' union contract as to the use of flex time?**

Page 30

A. I have no recollection of the specifics of Captain Warren's complaint.

**Q. Do you recall that one of the complaints alleged was that MacLeish had violated the First Amendment to the United States Constitution by gagging Captain Warren and hiding from the public and the media dangerous conditions at the Firearms Training Unit?**

A. I have no recollection of the specifics of Captain Warren's complaints.

**Q. Do you recall if there were any media inquiries about the complaints that had been filed?**

A. To me?

**Q. Okay. To you.**

A. No.

**Q. Do you recall learning at any time that there were media inquiries directed to the Delaware State Police?**

A. That I don't have any recollection of.

**Q. Do you have any recollection of the Delaware State Police consulting with you about any media inquiries that may or may not have occurred?**

A. I don't believe they did.

**Q. So you actually do remember that fact that they did not consult with you?**

Page 31

A. I don't recall.

**Q. You don't recall one way or the other?**

A. Right.

**Q. Do you recall that an Internal Affairs investigation was conducted against Colonel Chaffinch beginning approximately the end of October 2004 arising out of the filing of Captain Barbara Conley's lawsuit?**

A. Yes.

**Q. Was that an investigation or was that charges? Or what was that?**

A. I know almost nothing about it. I wasn't involved in any way in that investigation. I'm just aware from, I believe, newspaper accounts that Secretary Mitchell made some public statements after he relieved Colonel Chaffinch of his command that there was an investigation ongoing.

**Q. Are you aware if the Delaware State Police ever publicly announced the charges that Colonel Chaffinch faced arising out of that investigation?**

A. I don't remember. I don't remember what Secretary Mitchell may have said publicly.

**Q. But you just don't know one way or the other?**

A. Correct.

**Q. Do you recall that Captain Barbara Conley filed**

Page 32

**a lawsuit against Colonel Chaffinch in October of 2004?**

A. Yes.

**Q. How did you learn about that lawsuit?**

A. I believe that your father held a press conference at the courthouse on the morning that the complaint was filed and that a copy of the complaint was faxed to headquarters.

**Q. Now, did you attend that press conference?**

A. No. I had no idea it was happening.

**Q. Did you have any firsthand knowledge of the specifics of the press conference?**

A. No.

**Q. That is just what you've heard?**

A. Yes.

**Q. Are you aware that sometime soon thereafter reporter Tom Eldred of the Delaware State News came into possession of an e-mail that had been sent from Captain Paige to the division?**

A. Yes.

**Q. How did you become aware of that?**

A. I got a call from -- I think it was Lieutenant Joseph P. Aviola, A-v-i-o-l-a, who at the time was the State Police public information officer.

**Q. What did Lieutenant Aviola say?**

Page 33

A. He said that he had gotten a telephone call from Tom Eldred, E-l-d-r-e-d, of the State News and said that he had a copy of this e-mail, and I think he identified it by date and author and basic subject matter, and was asking for State Police comment on it.

**Q. What did you tell Lieutenant Aviola?**

A. I'm not sure if I talked with Aviola first or whether he was -- there was a teleconference at some point around this time. I was in my office at Water Street. A call came in from headquarters asking if I would be available for a teleconference. I said sure. And I'm trying to remember.

Lieutenant Colonel MacLeish was on the phone. Lieutenant Aviola was on the phone. And I think Captain Paige, P-a-i-g-e, was on the phone, and they may have actually been physically someplace. I was telephonic. And there may have been somebody else from Internal Affairs on the phone.

**Q. Are you saying that there were multiple conversations you had or multiple teleconferences? Or was there one?**

A. I can't remember if the initial call was just a heads up from Joe Aviola and he was on his way to headquarters and then the conference call was put in. I

**CERTIFICATE OF SERVICE**

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on January 31, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley/ Briefs / Conley - SJAB.final