**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF DELAWARE**

CAPTAIN BARBARA L. CONLEY,               )
                                                                    )
                       Plaintiff,                            )
                                                                    )
              v.                                                )         C.A. No. 04-1394-GMS
                                                                    )
COLONEL L. AARON CHAFFINCH, et al,   )
.                                                                    )
                                                                    )
                       Defendants,                        )


**REPLY BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT,**
**AS TO COUNTS TWO AND THREE OF THE AMENDED COMPLAINT**


**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**


RALPH K. DURSTEIN, III, I.D. #912
STEPHANI J. BALLARD, I.D. #3481
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants MacLeish, Mitchell
and Division of State Police


DATED:  February 7, 2006

# **TABLE OF CONTENTS**

Page

ARGUMENT .......................................................................................................................1

    I.     THE PLAINTIFF HAS FAILED TO DEMONSTRATE ANY FACTS IN ISSUE
         THAT WOULD SUPPORT A JURY FINDING THAT DEFENDANTS
         ENGAGED IN RETALIATORY ACTS .........................................................1

    II.    THERE IS NO EVIDENCE THAT SECRETARY MITCHELL PARTICIPATED
         IN THE DECISION TO CONFIRM THE INFORMATION IN THE FAX
         RECEIVED BY THE REPORTER ..................................................................6

    III.   THERE IS NO EVIDENCE THAT COLONEL CHAFFINCH "LEAKED" THE
         E-MAIL MESSAGE OR PARTICIPATED IN THE MEETING WITH
         COUNSEL ......................................................................................................7

    IV.   ATTACKS ON THE CREDIBILITY OF WITNESSES HAVE NO PLACE IN
         THE CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT...9

    V.    PLAINTIFF CANNOT CREATE "PUBLIC CONCERN" OVER HER
         LAWSUIT THROUGH A SELF-SERVING MEDIA CAMPAIGN STAGE-
         MANAGED BY HER LAWYERS .................................................................11

    VI.   FAR FROM BEING SEEN AS A "TRAIL-BLAZER", PLAINTIFF HAS BEEN
         REJECTED BY OTHER FEMALE OFFICERS AS A ROLE MODEL, AND
         HER CONDUCT IS SEEN AS DETRIMENTAL TO WOMEN IN LAW
         ENFORCEMENT ...........................................................................................11

    VII.  THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY
         BECAUSE THE LEAK OF A ROUTINE MESSAGE WAS TOO TRIVIAL
         AND INSUFFICIENT TO DETER PLAINTIFF FROM EXERCISING HER
         FIRST AMENDMENT RIGHTS .................................................................13

    VIII. DEFENDANTS, FACING AN UNPRECEDENTED SITUATION,
         PRUDENTLY RELIED ON THE ADVICE OF EXPERIENCED
         COUNSEL ......................................................................................................17

CONCLUSION ...............................................................................................................20

i

## <u>TABLE OF CITATIONS</u>

**<u>Case Name</u>**                                                                                              **<u>Page</u>**

<u>Ambrose v. Township of Robinson, Pa.</u>, 303 F.3d 488 (3d Cir. 2004) .................................. 9

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986) ......................................................... 1

<u>Azzaro v. County of Allegheny</u>, 110 F.3d 968 (3d Cir. 1997)............................................. 16

<u>Baldassare v. State of New Jersey</u>, 250 F.3d 188 (3d.Cir. 2001)................................... 9,14,16

<u>Bart v. Telford</u>, 677 F.2d 622 (7th Cir. 1982).................................................................. 13-14

<u>Brennan v. Norton</u>, 350 F.3d 399 (3d Cir. 2003)............................................................. 14,16

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) ....................................................................... 1

<u>Czurlanis v. Albanese</u>, 721 F.2d 98 (3d Cir. 1983) ............................................................. 16

<u>Feldman v. Phila. Housing Auth.</u>, 43 F.3d 823 (3d Cir. 1994)............................................. 16

<u>Hill v. City of Scranton</u>, 411 F.3d 188 (3d Cir. 2005) ...................................................... 2, 9-10

<u>Holder v. City of Allentown</u>, 987 F.2d 188 (3d Cir. 1993) ................................................... 16

<u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108 (6th Cir. 1989),
    *cert. denied* 494 U.S. 1091 (1990) ....................................................................................... 1

<u>Johnson v. Lincoln Univ. of Com. System of Higher Educ.</u>,
    776 F.2d 443 (3d Cir. 1985)............................................................................................ 16

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986)............................ 1

<u>McKee v. Hart</u>, ___ F.3d ___, 2006 WL 27474 (3d Cir. 2006)....................................... 14-16

<u>Mt. Healthy City School Dist. Bd. of Education v. Doyle</u>,
    429 U.S. 274 (1977)..................................................................................................... 9,16

<u>Monsanto v. Quinn</u>, 674 F.2d 990 (3d Cir. 1982)................................................................ 16

<u>O'Donnell v. Yanchulis</u>, 875 F.2d 1059 (3d Cir. 1989) ....................................................... 16

<u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968) ................................................................... 16

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996)........................................................................ 16

Rankin v. McPherson, 483 U.S. 378 (1987) ........................................................................... 16

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) ................................. 2, 9

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) ............................................................ 16

Rutan v. Republican Party, 497 U.S. 62 (1990)..................................................................... 13

Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995)............................................................. 16

## Statutes, Rules and Other Authorities

United States Constitution, First Amendment ............................................................... *passim*

42 U.S.C.A. §1983...................................................................................................................13

11 Del.C. §9200(c)(12) ........................................................................................................ 5-6

Federal Rule of Civil Procedure 56......................................................................................1,4,6

<u>**ARGUMENT**</u>

**I.    THE PLAINTIFF HAS FAILED TO DEMONSTRATE ANY FACTS IN ISSUE THAT WOULD SUPPORT A JURY FINDING THAT DEFENDANTS ENGAGED IN RETALIATORY ACTS**

Summary judgment "shall be entered forthwith" if the record in the case fails to show that there is any genuine issue as to any material fact bearing upon the claims for which judgment is sought. F.R.C.P. 56(c). The defendants have satisfied Rule 56(c) by showing the Court that there is an absence of evidence to support the plaintiff's "retaliation" claims. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Plaintiff seems content to rest upon the mere allegations of Counts II and III of her Amended Complaint. She has failed to "set forth specific facts that indicate a genuine material issue for trial." F.R.C.P. 56(e); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

It is not sufficient for the plaintiff to "simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, *supra*, 477 U.S. at 324. Moreover, while all reasonable inferences are granted to the nonmoving party, reasonable inferences must stem from *facts*, not speculations. In assessing whether there is a genuine issue of material fact, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." <u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied 494 U.S. 1091 (1990).

Plaintiff's Answering Brief, when stripped of rhetoric, unsupported allegations, mere speculation, and distortions of the evidence of record, does not point the Court to *any facts*, let alone any genuine issues of material fact, which would support the "retaliation" charges she makes in Counts II and III of the Amended Complaint. As the United States Supreme Court has stated: "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole. . . ." <u>Celotex</u>, 477 U.S. at 327. "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact . . . but also for the rights of persons opposing such claims and defenses to demonstrate . . . prior to trial, that the claims and defenses have no factual basis." <u>Id</u>.

The Plaintiff has filed a brief that is long on caselaw and short on facts. Lacking the latter,

she has tried to over-compensate with the former.  Her argument is replete with legal authority as to how a court should weigh evidence that an employer has engaged in an act characterized as "retaliation".  She cites cases in which employers have disciplined, demoted, suspended or harassed, yet fails to present any evidence of any such acts by the defendants in the case at bar.  Plaintiff, though she admittedly lacked any personal knowledge whatsoever, made very specific allegations as the foundation for Counts II and III of her Amended Complaint. She has yet to present any facts of record to support these claims.  What is missing in her brief is any evidence concerning an act of retaliation on the part of Defendants that the Court could even weigh.  She asks the Court to hold Defendants strictly liable for an anonymous "leak" to the newspaper, in the absence of any intent on their part to retaliate – an impossible standard.  It is axiomatic that there must be *some evidence* of record that Defendants engaged in the acts complained of, before the Court can embark on weighing the consequences (if any) of those acts.

In her answering brief, Plaintiff sets forth the novel proposition that the Court should disregard the testimony of Defendants and DSP personnel because they are "interested witnesses." This is apparently premised upon the mere fact that they are employed by DSP.  In the absence of evidence of such witnesses (which would obviously include Plaintiff, as a party), there would be no evidence whatsoever in this case.  In the typical employment case the evidence is likely to come from either parties to the action or employees of a defendant employer.  Under Plaintiff's analysis, courts would be prevented from granting summary judgment in any workplace civil rights case.  Yet the testimony of witnesses with some arguable interest in the case has formed the basis for judgment as a matter of law in numerous such cases.

Notably, the cases cited by Plaintiff do not define the scope of "interested witnesses."  In Hill v. City of Scranton, 411 F.3d 188, 129 (fn.16) (3d Cir. 2005), the "interested witness" was one of the defendants, and he gave the sole evidence on the issue in question.  Hill also noted that the testimony of one of the plaintiffs was "self-serving and somewhat unlikely."  411 F.3d at 131.  It would appear that Hill equated "interested witness" with "party" in the case.  The holding in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), cited by Hill, supports this interpretation.  Reeves, in fact, points out that, on summary judgment, "the court should review *all of the evidence* in the record."  530 U.S. at 150 (emphasis added).  Thus, even if one were to disregard the testimony of Colonel MacLeish, the only "party" who offered any factual evidence concerning DSP's response to

the "Eldred/e-mail" issue, the Court would still be left with the consistent and unrebutted testimony/affidavits of non-party witnesses Aviola, Paige, Coupe and DAG Tupman (notably <u>not</u> a DSP employee), as to this issue.

The question for the Court here is: on the record of this case, is there any genuine issue of material fact in support of Plaintiff's claims that she was "retaliated" against for filing her lawsuit. In addition to the written pleadings, the Court has the depositions of MacLeish, Mitchell, Aviola, Paige, Coupe, Tupman and Conley; and the affidavits of Paige, Coupe, Chaffinch and Tupman.[1] This record shows the following undisputed facts. A reporter, Tom Eldred, received a copy of the standard trial board e-mail from an anonymous source. The e-mail, which contained no specifics as to the basis for the charges against Plaintiff, was issued by Regulation to 637 DSP recipients - before Plaintiff's lawsuit was filed. No evidence ties any defendant or agent of DSP to the release of the e-mail to Eldred.

Eldred called DSP seeking more information about the document. The defendants responded by first calling their attorney, Deputy Attorney General Mike Tupman, for advice on how to respond. The attorney had never encountered a situation in which the media had obtained an internal trial board e-mail. This was a matter of "first impression." (Tupman affidavit at ¶6 (C-2)). Tupman advised that the document in Eldred's possession should first be reviewed, to make sure it was authentic. Once the document was verified as genuine, Tupman's advice was that only the four corners of the document should be confirmed. Colonel MacLeish accepted that legal advice, and directed his Public Information Officer to proceed on that basis, taking care to avoid disclosure of any information deemed confidential. He also ordered an investigation into the source of the "leaked" e-mail, but was advised that this could not feasibly be ascertained because of the wide dissemination of the document within DSP. There was no discussion, at the October 28, 2004 meeting, of Captain Conley or of her lawsuit. Secretary Mitchell and former Colonel Chaffinch played no part in the events concerning the e-mail and the reporter. There is no evidence of any "conspiracy" on the part of Defendants MacLeish or Mitchell or anyone else to "retaliate" against Plaintiff.

---

1 For the reasons set forth in Defendants' Motion to Strike the Plaintiff's Opening Brief in support of her motion for summary judgment (D.I. 151), the references in plaintiff's answering brief to unrelated lawsuits, not cited as legal precedent, should be disregarded. Plaintiff's anecdotal accounts of other cases add nothing to her argument, and cannot be used to avoid summary judgment.

Plaintiff attacks this record, not with facts in contradiction, but only with innuendo and distortion, arguing that: (1) the testimony of DSP personnel should be disregarded (addressed *supra*); (2) defendants were "upset" at Plaintiff having filed suit (Ans. Brf. at 16-17); (3) Aviola commented beyond the four corners of the document (Ans. Brf. at 9); (4) DSP's response in this situation differed from their response to prior media inquiries (Ans. Brf. at 18-21); and (5) Deputy Attorney General Tupman gave "illegal" advice or an "unlawful order" and Colonel MacLeish followed it anyway (Ans. Brf. at 34-38). Each of these arguments fails factually and legally to meet Plaintiff's Rule 56(e) burden.

The "upset at Plaintiff filing suit" argument is easily addressed on this record. First, it is fair to say that almost any defendant will be "upset" when they are sued, not to mention the subject of personal attacks in the news media. It is an illogical leap to assume that this means all Defendants will engage in "retaliation" as a result. Here, Defendant Secretary Mitchell who, as discussed below, played no part in the Eldred/e-mail response, testified that, while he was not happy about adverse media attention towards DSP, he bears no ill will toward Plaintiff (Mitchell at 52-53; A-138-39). Colonel Chaffinch played no part in the DSP response and was not even questioned at his deposition about his feelings about the lawsuit. Colonel MacLeish did testify that Chaffinch was "upset" that DSP was being sued again (MacLeish at 120-21, A-99-100), and testified that he, himself, was "disappointed" that Captain Conley had not given DSP a chance to address her concerns internally prior to filing suit (Id at 125-26, 132, A193-95). However, even assuming *arguendo* from this fairly innocuous testimony that Defendants could be seen as "angry" at Plaintiff for filing suit, Plaintiff would still have to show, not assume, that they took some retaliatory action against her. This Plaintiff candidly admitted at her deposition that she had no such evidence, and her lawyers have failed to find any. Being "angry" or "upset", without a tangible showing of some act or retaliatory conduct, is not actionable.

As to Plaintiff's statement that Aviola commented beyond the four corners of the document, the record speaks for itself and shows that he did not. *See e.g.* Plaintiff's own testimony: Conley at 118-19 (A-87-88). The October 30, 2004 *Delaware State News* article shows conclusively that Lt. Aviola followed the advice of Mr. Tupman to the letter (C-4). In the article, Eldred states that Aviola confirmed the contents of the e-mail ("everything in the copy of the e-mail is accurate"), and

the public information as to the nature of Regulations 4 and 40.  The reporter then writes:

> *Lt. Aviola said the Police Officer's Bill of Rights prohibits public disclosure of the specifics leading up to Capt. Conley's internal charges.*  "I can tell you she was formally charged on Sept. 17th, he said.  "She has the right to waive her rights (to privacy) and talk to you about the specifics."

Id (C-4) (emphasis added).  Clearly, here, in black and white, is confirmation that no confidential information  was discussed or disclosed.

Plaintiff next attempts to argue that DSP's response to the Eldred inquiry differed from its response to prior media inquiries.  Again, this is not borne out by the record.  In this case, as in prior cases, DSP would not comment to media on the allegations.  The practice was for the PIO not to provide information beyond what was already known by the reporter.  This was the approach taken, regardless of whether the initial complainant was a civilian or a police officer.  Plaintiff has failed to show that there was a departure from this approach in the unique situation presented in this case.

DSP was faced here with an issue of first impression.  The source, while anonymous, had forwarded an internal e-mail notice to the media.  This prompted the request for legal advice ("he's got it.  Where does that put us?").  (MacLeish at 141, 137-41 (A-110, 106-110); Tupman aff. ¶ 6).  Deputy Attorney General Tupman states "I believe that Colonel MacLeish's action in contacting me for legal advice was prudent in light of this unprecedented inquiry.  This was essentially a legal issue of 'first impression.'"  (Tupman aff. at ¶6 (C-2)).  Other media inquiries, where the reporter may have had information but no DSP documents, can be distinguished.  Nevertheless, Aviola's response here was consistent.  DSP refused to comment on any of the specifics concerning Captain Conley's charges, citing the LEOBOR restrictions.  MacLeish also had no reason to question the validity of the legal advice received.

The record of the hastily-called meeting is completely devoid of evidence of *any* retaliatory intent or conduct, or even the remotest suggestion of animus toward Plaintiff.  The meeting focused solely on obtaining advice of counsel in order to properly and legally respond to the inquiry.  There is no evidence from any witness of any discussion of Captain Conley, her conduct, or her lawsuit.  There was no anger or animosity, just a businesslike attempt to address an unusual, emergent situation.  *See* Tupman aff. at ¶7 (C-2).

A notification document required by Administrative Regulation VII-5-13 to be issued to more than 600 DSP personnel is not legally or logically a confidential "record" within the meaning of 11

Del. C. §9200(c)(12). (*See* A-66; Paige & Coupe Affs., A-1-7). Despite the document's exemption from LEOBOR, Defendants took the extra step of consulting with their attorney to make sure that their response would not violate LEOBOR or any other law or regulation. Deputy Attorney General Tupman advised that, since the document was already in the public domain, DSP could confirm that the e-mail was what it appeared to be, but should not comment on the specifics of the misconduct that gave rise to the charges. (Tupman at 36 (A-147); Tupman Aff. ¶ 7 (C-2-3)). "I advised DSP that it was my legal opinion that such a course of action would not violate any law or regulation, including LEOBOR." (Tupman Aff. ¶7 (C-3)).

With no legal grounds for her argument, Plaintiff next attacks the credibility of affiants Paige and Coupe, the internal affairs officers. Captain Paige actually authored the trial board notice e-mail, following the conclusion of his IA investigation into Captain Conley's conduct, and both officers participated in the meeting with Tupman. With no basis, other than to note that these officers are DSP employees, Plaintiff claims that they "have an obvious bias towards their defendant employer . . . who can take retaliatory actions against them," and therefore their testimony should be completely disregarded. (Ans. Brf. at 25). Plaintiff essentially asks the Court to presume that these two sworn law enforcement officers, Captains in their own right, and veterans of the internal affairs department which "polices" the police, are both *lying to the Court* in their affidavits out of misplaced loyalty to, or fear of, their employer. Such an allegation is baseless, reckless and not worthy of a member of the bar this Court.

This is a textbook case for Rule 56 Summary Judgment. The testimony from the witnesses with knowledge of the alleged events is undisputed. There are simply *no facts* upon which a reasonable jury could base a finding of that the Defendants engaged in any acts of "retaliation." No matter how many times the Plaintiff repeats her allegations, without factual support, she will not meet her burden under Rule 59(e).

## II.     THERE IS NO EVIDENCE THAT SECRETARY MITCHELL PARTICIPATED IN THE DECISION TO CONFIRM THE INFORMATION IN THE FAX RECEIVED BY THE REPORTER.

Plaintiff does not pursue a claim that it was Secretary Mitchell who leaked the e-mail to the *Delaware State News.* The only claim asserted against Secretary Mitchell relates to the meeting to seek legal advice on the "leak" to the *Delaware State News,* and action taken at that meeting. If Secretary Mitchell is to remain a defendant in the case, Plaintiff must present some evidence of

record that he participated in that meeting or in that decision. There is no such evidence in the record from any source, and Plaintiff's claim against Secretary Mitchell must fail.

The Plaintiff attempts to play semantics with the testimony of Colonel MacLeish, concerning the role (or lack thereof) of Secretary Mitchell in the decision to seek (and follow) legal advice. It is uncontroverted that Secretary Mitchell knew nothing of this meeting until after it had concluded, and after Lt. Aviola had already contacted the reporter to confirm that the message was genuine and to decline comment on the substance of the allegations against the Plaintiff. There is no evidence that Secretary Mitchell was consulted before the action was taken. It is clear that he only learned of the action taken after the fact. He could not possibly be held accountable for a decision he did not make, reached at a meeting he did not attend.

Plaintiff refers (Ans. Brf. at 14) to a hypothetical question asked of Colonel MacLeish, concerning what he *would* have done, *if* Secretary Mitchell had not agreed with the decision. The question could only have been hypothetical, in that MacLeish had already testified that Mitchell was not consulted. The Secretary thus had no opportunity to agree, sanction, authorize, or ratify the action before it was taken. Therefore, the response from Colonel MacLeish could only have been hypothetical, as well. Not surprisingly, given the chain of command, his response was that he would not have proceeded, if the Secretary of Safety and Homeland Security had not authorized him to proceed. Of course, what the record does reflect is that Secretary Mitchell agreed – after the fact - with the legal advice given, the decision to follow it, and the limited action taken. He did not testify that the Superintendent should have consulted with him first. He did not testify that the action taken was improper. However, mere acquiescence after the fact cannot form a basis for liability. The purely hypothetical question and answer, changing the sequence of events, is mere speculation, and no substitute for evidence of what actually did happen on October 28, 2004. No reasonable jury could possibly find evidence of "retaliation" by Secretary Mitchell against Plaintiff on these facts.

## III. THERE IS NO EVIDENCE THAT COLONEL CHAFFINCH "LEAKED" THE E-MAIL MESSAGE OR PARTICIPATED IN THE MEETING WITH COUNSEL.

The Plaintiff has exhausted the means available to her in discovery to support her allegations linking former Colonel Chaffinch to the "leak" of the trial board e-mail, without success. The Internal Affairs investigation determined conclusively that the computer assigned to Chaffinch was not used to forward the message. Chaffinch denied having anything to do with it in his affidavit, and

no other witness who was deposed had anything to offer in support of Plaintiff's allegations.  The Plaintiff herself, in her deposition testimony, had nothing to offer in support of her theory that Chaffinch was responsible. The newspaper article from the October 29, 2004 *Delaware State News* indicates that the reporter received "an anonymous fax" of the message, making it unlikely that even Mr. Eldred could shed light on the issue.   (C-4).

As a result of the allegations made against him in the Complaint filed by Plaintiff on October 27, 2004, Colonel Chaffinch was temporarily removed that same day by Secretary Mitchell from his position as Superintendent of the Delaware State Police, and was placed on administrative leave status. (Chaffinch Aff., A-8; MacLeish at 117-18 (A-96-97)).  Plaintiff quibbles that Defendants, in stating that Chaffinch was "immediately" relieved of command, do not give a record cite for this allegation, because it is "patently false."  Once again, Plaintiff's attack is belied by the record.  Page 24 of the Opening Brief provides extensive citation to the record documenting the same-day removal of Chaffinch, and replacement of MacLeish in the Acting Colonel role.  Colonel MacLeish testified that he was advised of this by Secretary Mitchell on the very day Plaintiff filed suit, a fact he remembers because he was on a bus trip in Gettysburg at the time.  (MacLeish at 117-19, 123 (A-96-98, 102)).  It would seem that even the hypothetical "school child" referred to in Plaintiff's Answering Brief (Ans. Brf. at p.8, fn. 4), could piece together this testimony documenting the Secretary's prompt action in relieving Colonel Chaffinch of his command.

It remains undisputed that Chaffinch was *not* present at Headquarters on the following day, October 28, 2004, when the Eldred inquiry came in and the meeting was held to address it.  The Plaintiff has entirely failed to point to any facts in the record to show, or even suggest, that Colonel Chaffinch played any role in the decision to confirm the contents of the e-mail message obtained by the reporter.  Colonel Chaffinch's affidavit, submitted with Defendants' Opening Brief, confirms that he played no part in the "leak" of the e-mail to Eldred, nor in any DSP decisions concerning that issue thereafter.  (A-8).

As set forth in Defendant's Answer to the Plaintiff's self-styled "Sanctions" motion (D.I. 141), no evidence as to electronic communications by Chaffinch has been lost.  The State network server would preserve e-mail traffic from any user in the DSP system, including messages sent by "Blackberry" portable devices.  As the affidavit of Lt. Moses makes clear, this would include document files (if any) attached to messages sent through the system.  (D.I. 152, Ex.A).  As the

plaintiff has acknowledged, the record on this issue is complete, and there are no facts to support an inference that Chaffinch was the source of the fax apparently received by the reporter. It is not sufficient for Plaintiff to insinuate that Chaffinch would or could have leaked the information, or influenced the meeting with counsel. Suspicions are no substitute for facts. There is simply no evidence to connect Chaffinch with the reporter, and no evidence to connect Chaffinch with the meeting. On these facts, no reasonable jury could find evidence of "retaliation" by Colonel Chaffinch as a result of the "e-mail issue."

## IV. ATTACKS ON THE CREDIBILITY OF WITNESSES HAVE NO PLACE IN THE CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT

In Reeves v. Sanderson Plumbing Products, Inc, 530 U.S. 133 (2000), a case relied on by the Plaintiff (Ans. Brf. at 2), the Court observed that the trial judge may not make determinations as to the credibility of witnesses or weigh the evidence, as these are functions of the jury. Id. at 150. In Reeves, unlike here, the plaintiff employee was able to produce extensive evidence as to (age) discrimination, and the Court upheld the trial court's denial of defendant's motion for judgment notwithstanding the verdict. The focus in the case at bar should not be on the credibility or bias of defense witnesses, as Plaintiff suggests. The Court need not reach such issues. Rather, the focus should be on the Plaintiff's failure in discovery to produce *any evidence* to support her allegations that the defendants were responsible for the release of a routine internal message to the news media.

As the Third Circuit made clear in Hill v. City of Scranton, *supra*, 411 F.3d at 127, another case cited by Plaintiff, courts may grant summary judgment on a First Amendment retaliation claim based on the second and third steps of the test to evaluate claims of retaliation. *See* Baldassare v. State of New Jersey, 250 F.3d 188, 195-196 (3d.Cir. 2001). The second factor that proves fatal to the Plaintiff's claim here. She has failed to produce evidence to show that her lawsuit was "a substantial factor in the alleged retaliatory actions." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). In fact, she has failed to produce any evidence that the defendants engaged in or authorized the alleged act of retaliation, namely the release of the trail board e-mail. Absent such proof, she cannot hope to satisfy the "substantial factor" test. The Court need not even reach the 'substantial factor" determination, where, as here, there is simply no evidence that the defendants were responsible for an alleged act of retaliation. Only genuine questions of fact may be submitted to the jury. Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 496 (3d Cir. 2004)

(plaintiff failed to present sufficient evidence that his protected activity was a substantial factor in his suspension).  The <u>Hill</u> holding can readily be distinguished in this regard, as the plaintiffs there presented considerable evidence that the public employer had threatened discharge based on their legal challenge to a municipal residency requirement.

In raising a false issue as to the credibility of defense witnesses, Plaintiff cannot avoid the critical deficiency that is fatal to the claims of retaliation set forth in Counts II and III.  She has failed to produce any evidence that the broad conspiracy she imagines in her Amended Complaint ever took place.  Plaintiff is not above character assassination in her desperate attempts to avoid summary judgment on the "retaliation" claims.  Her Brief misrepresents the testimony of Colonel MacLeish (Ans. Brf. at 21-22), accuses him of "flip-flopping", and subsequently accuses him of "falsehoods" and "dishonesty" (<u>Id</u> at 27).  Essentially she is calling the Superintendent a liar, and asking the Court to validate her claim based on this accusation.

Placed in context, it is apparent that Plaintiff's argument is nothing but a cheap shot that accomplishes nothing.  In a bungled "apples and oranges" attempt to create a discrepancy, she compares her <u>summary</u> of testimony to a later quote from the transcript.  Colonel MacLeish was asked about a front-page article in the *Delaware State News* in April of 2004 concerning an ongoing Internal Affairs investigation.  (MacLeish at 151, A-120)  In that instance, as in the present case, the DSP declined to comment further on the (very detailed) information the reporter already had obtained from an undisclosed source.  Colonel MacLeish pointed out that the April 2004 investigation had not been completed, whereas the investigation of Captain Conley had been completed prior to October 29, 2004, and formal charges had in fact been brought against her.  Thus, in the case of Conley, "there was no further investigation to take place that could influence one way or another the content of that investigation."  (<u>Id</u> at 152, A-121)  The distinction made was that "[d]uring an ongoing investigation, you would not confirm or deny in order to try to influence the investigation whatsoever."  (<u>Id</u> at152-153, A-121-22)  In other words, the risk of influencing an investigation in progress is not present when the investigation has concluded, certainly a fair point, but not a determinative one on the issue of publicity, as Colonel MacLeish subsequently made clear:

> Q.  I believe you testified a little while ago about there being some kind of a distinction when an investigation is ongoing.  Do you recall saying something to that effect?
> A.  Yes, I do.
> Q.  Does the decision not to release change when the investigation is concluded and the subject of those investigations or the target of those investigations is explicitly not

covered by the Law Enforcement Officers' Bill of Rights?

A.  We still do not release the information.  (MacLeish at174)

It is apparent that there is no contradiction, no inconsistency, and certainly no "falsehood" or "dishonesty" on the part of the witness.  A comment on the increased risk of publicity while an investigation is ongoing, as compared to a concluded investigation, does not equate to a distinction as to policy or procedure.  Moreover, it is clear from the testimony that the "leak" in April of 2004 was handled in the same way as the "leak" in October of 2004:  DSP had no further comment beyond what appeared in the reporter's account.  Far from affecting credibility, the testimony effectively rebuts Plaintiff's central claim that she was treated differently.

## V.   PLAINTIFF CANNOT CREATE "PUBLIC CONCERN" OVER HER LAWSUIT THROUGH A SELF-SERVING MEDIA CAMPAIGN STAGE-MANAGED BY HER LAWYERS.

In a classic example of "bootstrapping", the Plaintiff argues that public concern over her lawsuit "has been overwhelmingly demonstrated by the flood of media attention it brought".  (Ans. Brf. at 5).  As set forth in Defendants' previous motion regarding prejudicial pretrial publicity (D.I. 9), the Plaintiff (who had failed, prior to filing suit, to pursue any of the administrative remedies available to her) announced her lawsuit to the world at large through a press conference orchestrated by her lawyers, who attempted to tie her failure to promote claim based on gender discrimination to other, unrelated, cases in which the lawyers had represented other plaintiffs.  This media campaign continued with publicity generated by the lawyers through their media contacts.  The Court should not confuse such politically-motivated media self-promotion with legitimate public interest in Plaintiff's claims.

## VI.   FAR FROM BEING SEEN AS A "TRAIL-BLAZER", PLAINTIFF HAS BEEN REJECTED BY OTHER FEMALE OFFICERS AS A ROLE MODEL, AND HER CONDUCT IS SEEN AS DETRIMENTAL TO WOMEN IN LAW ENFORCEMENT

The Plaintiff would also have this Court see her as a "trailblazer" whose lawsuit complaining of her lack of promotion to the rank of Major would stand to benefit other female officers.  She claims protection from the Court based on this purported motive for her lawsuit.  "Plaintiff believes that women troopers, as a class, are now much better off in the DSP….Someone had to speak up and oppose how Chaffinch treats women, and plaintiff is proud to have blazed that path for other women."  (Ans. Brf. at 6).

The reality of Plaintiff's position is quite different. Her lawsuit, if successful, would benefit only herself, through money damages. She seeks a forced promotion to the rank of Major, ahead of other more worthy candidates, including other women and minorities. Since she was in direct competition for promotion to Major in 2003 with some twenty other officers holding the rank of Captain, her success as a result of her lawsuit would be detrimental, not beneficial, to those other Captains. A necessary element of her claim in Count I is that she was better qualified for promotion than the two Captains who were named to the rank of Major, and better qualified than any of the other officers then holding the rank of Captain, including women and minorities. Far from placing herself in the position of "role model" or "trailblazer," Plaintiff in filing her lawsuit has taken on the role of antagonist.

Nor does the record support Plaintiff's claim that she represents the interests of other female officers seeking advancement to Executive Staff positions. For example, in the view of fellow Captain Betsy Shamany, Conley was not qualified for promotion to Major, and is "an embarrassment" who is not worthy of the uniform. (Defendants' Second Supplementation of Initial Disclosures, hereinafter "DSSID" at 4, C-17; *see also* C-9). This opinion is based on Conley's past behavior toward other officers, her conduct toward uniform and civilian staff while at Headquarters, and her disciplinary history, including the unauthorized purchase of a $3,000 Rolex watch using a DSP credit card. Lt. Alice Bailey understood that Conley was not someone to emulate. (DSSID at 10, C-22-23) Captain Mary Ann Papili was "mortified" by Conley's crude behavior and her condescending, vindictive, and rude attitude toward other female police officers. (DSSID at 10, C-23) Sgt. Melissa Zebley would regard Captain Shamany or Captain Papili, and not Captain Conley, as mentors. Id. The prevailing attitude is that Conley's lawsuit and the public attacks on the Delaware State Police by her lawyers, purportedly on her behalf, have hurt, rather than helped, the cause of female troopers. It should also be borne in mind that the disciplinary matter raised by Conley in Counts II and III involved her unprofessional behavior toward male and female subordinates, including civilians, at Headquarters. (C-9, 17). This conduct took place both before and after the promotions at issue. Id. An independent trial board found Conley guilty of three counts of "Conduct Unbecoming an Officer" after a two-day open hearing as a result of this conduct. In no way can she claim to be the standard-bearer for women employed by the DSP.

**VII.    THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE LEAK OF A ROUTINE MESSAGE WAS TOO TRIVIAL AND INSUFFICIENT TO DETER PLAINTIFF FROM EXERCISING HER FIRST AMENDMENT RIGHTS.**

Plaintiff has no response for Defendants' argument that she cannot prevail because the alleged action taken against her (which Defendants flatly deny was retaliatory) was nothing more than a *de minimis* act, which might have aggrieved Plaintiff but which did not rise to the level of a Constitutional violation.   Plaintiff incorrectly represents to the Court that *any* adverse action against an employee gives rise to a First Amendment claim.   The very law cited by Plaintiff says just the opposite and recognizes that isolated, *de minimis* acts are of no Constitutional significance. Plaintiff's counsel misleadingly cites a United States Supreme Court case for the proposition that an act as trivial as a retaliatory "fail[ure] to hold a birthday party" for an employee could give rise to a cause of action.   The citation provided, <u>Rutan v. Republican Party</u>, 497 U.S. 62, 76, n.2 (1990) is actually a citation where the Court was quoting from the 7th Circuit's decision on review, which in turn was citing yet another 7th Circuit decision, <u>Bart v. Telford</u>, 677 F.2d 622 (7th Cir. 1982).

<u>Bart</u> was a case in which the plaintiff alleged that she was subject to an ongoing campaign of petty harassments in the workplace designed to retaliate against her for running as a mayoral candidate.   One of these "petty" acts was employer ridiculing plaintiff for bringing a birthday cake to work for another employee.   The court took pains to note that an act of the "birthday cake" magnitude would be viewed as of no constitutional significance by itself, but took on a different character because of evidence of an entire "campaign of harassment" against plaintiff.   677 F.2d at 625.   The court held:

> It is true that a certain air of the ridiculous hangs over the harassment allegations, in particular the allegation that we quoted earlier regarding the birthday cake. But we cannot say as a matter of law that the exercise of First Amendment rights by public employees cannot be deterred by subjecting employees who exercise them to harassment and ridicule through selective enforcement of work rules. . . . *Yet even in the field of constitutional torts de minimis non curat lex.* Section 1983 is a tort statute. A tort to be actionable requires injury. *It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable* no matter how unlikely to deter a person of ordinary firmness from that exercise . . . . However, more is alleged here--an entire campaign of harassment which though trivial in detail may have been substantial in gross. It is a question of fact whether the campaign reached the threshold of actionability under section 1983.

677 F.2d at 625 (internal citations omitted).

13

Clearly, the law is as Defendants, and not Plaintiff, represents to the Court, and it is that retaliatory acts committed by a public employer be more than *de minimis* or trivial to be actionable. Brennan v. Norton, 350 F. 3d 399 (3d Cir. 2003). The alleged act here—Defendants' responding to an unsolicited press call by confirming the accuracy of a notification document, complete with the imprimatur of counsel, and with no evidence of animus against Plaintiff---does not even amount to a "birthday cake claim," to continue to the analogy to Bart. There is certainly no "campaign" of harassment against Plaintiff, and therefore, other legal and factual problems aside, the single *de minimis* act she complains of cannot provide a basis under the law for her First Amendment claim.

In one of the most recent pronouncements from the Third Circuit, McKee v. Hart, ___ F.3d ___, 2006 WL 27474 (3d Cir. Jan. 6, 2006), the Court of Appeals held that a defendant public employer was entitled to qualified immunity on a First Amendment retaliation claim, because the alleged retaliatory acts were *de minimis,* and therefore would not have deterred a person of ordinary firmness from exercising his or her First Amendment rights. The Court distinguished the holdings in Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000), Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003), and Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001)--cases relied on by the Plaintiff.[2] Notably, the Third Circuit reversed the trial court's denial of the defense motion for summary judgment, on appeal under the collateral order doctrine. Id. at 4. This recent result is instructive, as the plaintiff in McKee presented a much stronger factual record in the face of a summary judgment motion than has the Plaintiff here, and was ultimately unsuccessful.

The plaintiff in McKee, a special investigator for the Commonwealth Office of Inspector General, claimed that he was subjected to "intimidation and harassment" by his supervisor. This claim was based upon a number of critical comments from the defendant supervisor that the plaintiff characterized as "retaliation" for his having voiced concerns about the scope of an investigation. The

---

2 Contrast the factual scenario in Suppan, wherein the Court considered a campaign of retaliatory harassment over a period of more than a year, including admonishment of employees for their union activities and support for a particular mayoral candidate, culminating in low ratings on promotion eligibility evaluations. Suppan, *supra,* 203 F.3d at 230-231. Nothing of the sort happened here. In Brennan, the plaintiff had been removed from the payroll for some time, and had been given various suspensions, allegedly as a result of his speech. The Court considered the "cumulative impact" of repeated chastisements and threats from superiors. *Id.* 350 F.3d at 422. Plaintiff here has continued to enjoy the privileges of her rank, to receive her full salary and benefits, and has continued in her same assignment. The only discipline she has received has been pursuant to an Internal Affairs investigation that began and concluded before she filed suit in this case, and as to which she received full due process, including a hearing open to the public at her request. The plaintiff does not contend that the penalty she received for Conduct Unbecoming an Officer was part of the so-called "retaliation" against her, nor could she.

Court pointed out that the plaintiff suffered no discipline for speaking out, nor were his job status, pay, or benefits adversely affected. In contrast to this case, where there is no proof that any of the defendants had a role in the "leak" of the e-mail, the defendant supervisor in McKee essentially admitted making the statements critical of the plaintiff. Notwithstanding this distinction, the Court's analysis of qualified immunity in McKee provides yet another ground for rejecting Conley's "retaliation" claims. Not every act attributed to an employer provides a basis for a colorable allegation that the employee has been deprived of her constitutional rights. Id. at 5. If the series of critical comments by the supervisor in McKee was seen as "*de minimis*" on summary judgment, then the single unauthorized, anonymous release to a reporter in this case of a routine divisional message devoid of any confidential information is certainly not actionable under the test set forth therein. Id. at 4.

Plaintiff acknowledges that the law provides that government officials performing discretionary functions enjoy qualified immunity from damages when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lee v. Mihalich, 847 F.2d 66, 69 (3d Cir. 1988). Immunity will attach unless Plaintiff can show that (1) her "right" is clearly established by law and (2) the unlawfulness of Defendants' act must have been apparent." Id. Her burden is to show, in the context of this action, that Colonel MacLeish[3] violated a right that was "clearly established," and that there was sufficient precedent at the time of the action, factually similar to the Plaintiff's allegations, to put the defendant on notice that the conduct was constitutionally prohibited. McLaughlin v. Watson, 271 F.3d 566,572 (3d Cir. 2001).The question is not knowledge in the abstract, but whether Defendants were aware that *their particular actions in this case* would run afoul of the First Amendment. For that purpose, as Plaintiff herself concedes, one must look to the facts in the case at bar (the alleged retaliatory conduct), compared to factual instances in other cases where the courts have held that First Amendment retaliation occurred. As the Third Circuit held in McKee:

> "[C]learly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." Put another way "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." [] The Supreme Court has recently reiterated

---

3 As there is no evidence of record that either Secretary Mitchell or Colonel Chaffinch participated in the decision, no mention of either is made. However, the same test as to qualified immunity would apply.

this point, stating that "[i]t is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case*, not as a broad general proposition."

McKee v. Hart, __ F.3d __, 2006 WL 27474 at p.*5 (citations omitted) (emphasis added).

The specific context of this case is Plaintiff's allegation that DSP retaliated against her by is Plaintiff's allegation that DSP retaliated against her by confirming the four corners of the trial board email (after obtaining legal advice to do so) with the Reporter, who had initiated contact with DSP. That is the "factual scenario" in the case at bar. Tellingly, Plaintiff cites to no analogous instances where "retaliation" was found, such that an employer such as DSP would have been placed on notice that its conduct was wrong. Plaintiff claims that a "huge body" of public employment supports her claims. In a misleading footnote (Ans. Brf. at 34, fn.18), Plaintiff cites to fifteen Supreme Court and Third Circuit decisions, which collectively stand for no more than the undisputed principle that a public employee has the right not to be retaliated against for constitutionally protected speech. Defendants agree. What the cases do not show—and what Plaintiff nowhere shows in her brief—is any case, anywhere, in which a single instance of anonymous disclosure, or confirmation, of an internal, factual communication was seen as grounds for a First Amendment violation. Of the fifteen cases cited in the footnote, eleven deal with employees who were *fired* as a result of their speech; three cases deal with retaliatory suspensions, and one case with a pattern of harassment, including retaliatory transfer and discipline.[4] Thus, this body of law puts Defendants on notice that it would be illegal to fire, suspend, or adversely change job conditions. It in no way establishes, or even hints at, the suggestion that confirming--at the request of a third party, and after obtaining advice of counsel-- the true contents of a document containing no confidential information, would constitute illegal retaliation under the First Amendment.

In this case, as in *McKee,* Defendants are entitled to qualified immunity because the

---

4 Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997)(plaintiff fired); Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)(retaliatory suspension); Monsanto v. Quinn, 674 F.2d 990 (3d Cir. 1982)(plaintiff suspended without pay); Pickering v. Bd. of Educ., 391 U.S. 563 (1968)(plaintiff fired); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)(fired); Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001)(fired); Feldman v. Phila. Housing Auth., 43 F.3d 823 (3d Cir. 1994)(fired); Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983)(suspended); Johnson v. Lincoln Univ. of Com. System of Higher Educ., 776 F.2d 443 (3d Cir. 1985)(fired); Rankin v. McPherson, 483 U.S. 378 (1987)(fired); O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989)(fired); Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)(fired); Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995)(fired); Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996)(fired); Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)(retaliatory transfer and discipline).

purported right claimed by the Plaintiff, in the context of this case, was not clearly established. The unexplained leak of a routine message, immediately investigated and simply confirmed as genuine on advice of counsel, would not have deterred a person of ordinary firmness from exercising her First Amendment rights.[5]

## VIII.   DEFENDANTS, FACING AN UNPRECEDENTED SITUATION, PRUDENTLY RELIED ON THE ADVICE OF EXPERIENCED COUNSEL.

Under the 4-part criteria set forth in Roska v. Peterson, 328 F.3d 1230, 1253-1254 (10th Cir. 2003) and Davis v. Zirkelbach, 149 F.3d 614, 620 (7th Cir. 1998), both cases cited by the Plaintiff (Ans. Brf. at 40), it is clear that the defendants are entitled to qualified immunity for consulting with experienced counsel concerning the unauthorized release of the trial board notice to the news media. [1] The information provided to Mr. Tupman was thorough and accurate. He was made aware of the precise nature of the communication, and in fact directed the PIO, Lt. Aviola, to obtain a copy of the document in the reporter's possession. Contrary to Plaintiff's unfounded suggested, Tupman was well aware of DSP policies and practices concerning the release of potentially confidential material, and had routinely advised DSP on this issue over the years (Tupman aff. at ¶2-3 (C-1-2)); [2] Mr. Tupman was not "just another attorney" wandering into a conference with the Executive Staff, as Plaintiff suggests. The record reflects that he had years of experience as counsel for the Delaware State Police, and was very familiar with Internal Affairs procedures, including the required notice of a trial board hearing in disciplinary cases. (Tupman aff. at ¶1-4 (C-1-2)). He was also quite familiar with the provisions of the Law Enforcement Officers Bill of Rights, as well as the DSP Administrative Manual. Id. He realized, for example, that no confidential information was included in the e-mail, and insured that Lt. Aviola would not disclose any information from the Internal Affairs file. [3] As Plaintiff concedes, Mr. Tupman's advice was unequivocal and specific. It was also a correct statement of the law. [4] The time between the advice and the action taken was minimal. Time was clearly of the essence.

As soon as the content of the e-mail was confirmed, Lt. Aviola was authorized only to confirm that the document was genuine, and was not permitted to comment on the facts of the investigation or anything in the Internal Affairs file. He followed that advice to the letter. Mr.

---

[5] It certainly did not deter the plaintiff here, who immediately challenged the leak of information in the media and through counsel, and who ultimately elected to open her disciplinary hearing to the public.

Tupman's advice was consistent with the law and the policy of the DSP not to comment on the specific allegations or the evidence against the officer subject to disciplinary action. Thus, under the very test proposed by the Plaintiff, it is apparent that the defendants are entitled to qualified immunity, in that they wisely sought and followed advice from an experienced lawyer with extensive background and expertise in the very area in question.

The plaintiff has failed to identify any information from the Internal Affairs file that was disclosed to the reporter. Contrary to her claims, none of the statements, reports, or other evidence in that voluminous file was communicated to the reporter. The confidentiality of the investigation was preserved. The e-mail itself most emphatically was not part of the file, and was not confidential. Quite to the contrary, it was a notice required to be sent in such cases. The Plaintiff ignores the obvious distinction between the mere notice of the trial board hearing, and the evidence to be presented at the hearing itself. Disclosure of the latter would be prejudicial. Disclosure of the former would not. The reporter learned nothing of the case against the plaintiff beyond what was in the message he already had.

Paradoxically, the Plaintiff claims that further investigation by DSP would have yielded information on the source of leak, information her lawyers have failed to elicit after a year of discovery. Plaintiff has never been able to articulate how or where further investigation would have succeeded, which is not surprising, given the lack of evidence in the record. If the Plaintiff, armed with the full panoply of discovery tools at her disposal, has failed to produce additional facts, it is hard to see how the Internal Affairs Unit could have proceeded with its investigation.

The immediate investigation ordered by Colonel MacLeish directed Internal Affairs, with assistance from the High Tech Crimes Unit, to determine whether any one of over six hundred DSP officers had forwarded the departmental message concerning Conley's trial board. The investigation revealed that no such DSP user had forwarded the message. With nearly seven hundred recipients of the message, and no "leads," further investigation would have been futile. HTCU had no way of tracing a fax, or a copy of the message in question. The reporter could claim that information on his sources was privileged, and in any event his single article on the e-mail described his source as "anonymous". Further investigation of active-duty troopers would have been governed by the Administrative Manual and the Law Enforcement Officers Bill of Rights. The "witch hunt" contemplated by the Plaintiff could not legally have been pursued.

18

Colonel MacLeish acted decisively and prudently in dealing with the leak of information, seeking advice of legal counsel, and immediately ordering an investigation of the source of the leak.[6] He is entitled to summary judgment on the only claim asserted against him in this lawsuit. There is nothing in his handling of the matter that could possibly suggest any retaliatory motive against the Plaintiff.  Her lawsuit was not even mentioned.  Faced with an unauthorized "leak" of information, he effectively performed "damage control," by preventing the disclosure of any confidential information from the Internal Affairs file.  He thus insured that Plaintiff's rights under LEOBOR and the Administrative Manual were fully protected.

---

[6]  Interestingly, while Plaintiff faults MacLeish for his actions, they actually could be seen as inuring to her benefit. Had DSP not sought and followed Tupman's advice in obtaining and confirming the e-mail, they ran the risk of allowing the newspaper to write an article on what was potentially a false document, masquerading as a true DSP communication.

## <u>CONCLUSION</u>

The Plaintiff has failed to carry her burden of eliciting any facts in the course of discovery that would lend support to her claim of "retaliation" by any of the defendants.  The record is devoid of any evidence to support her allegations that the defendants released, or authorized or permitted the release, of the e-mail message regarding her trial board.  The message was a routine notice of a disciplinary hearing, and contained no information deemed confidential regarding the internal affairs investigation into Plaintiff's misconduct.  Colonel MacLeish acted immediately to seek the advice of legal counsel, and to investigate the source of the "leak."  Neither Colonel Chaffinch nor Secretary Mitchell participated in the meeting called to deal with the reporter's call.  It is apparent that Plaintiff never has had information to lend support to the allegations set forth in Counts II and III.   The Defendants are therefore entitled to judgment, as a matter of law, as to Counts II and III of the Amended Complaint.

**DEPARTMENT OF JUSTICE
STATE OF DELAWARE**


By:___/s/ Stephani J. Ballard_____
RALPH K. DURSTEIN, III (I.D. No. 912)
STEPHANI J. BALLARD  (I.D. No. 3481)
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorneys for Defendants, MacLeish
DATED: February 7, 2006          Mitchell and Division of State Police


**LIGOURI, MORRIS & YIENGST**


By: /s/ James E. Ligouri_____
JAMES E. LIGOURI
46 The Green
Dover, DE  19901
(302) 678-9900
Attorney for Defendant, L. Aaron Chaffinch


DATED:  February 7, 2006

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1394-GMS |
| | ) | |
| COLONEL L. AARON CHAFFINCH, | ) | |
| Individually and in his official capacity as the | ) | |
| Superintendent, Delaware State Police; et al. | ) | |
| | ) | |
| Defendants, | ) | |

**CERTIFICATE OF MAILING AND/OR DELIVERY**

The undersigned certifies that on February 7, 2006, she caused the attached *Defendants'*

*Reply Brief in Support of Defendants' Motion for Partial Summary Judgment, as to Counts II and III*

*of the Amended Complaint*, to be electronically filed with the Clerk of Court using CM/ECF which

will send notification of such filing to the following:


Thomas S. Neuberger, Esq.
Stephen J. Neuberger, Esq.
Two East Seventh Street, Suite 302
Wilmington, DE 19801


/s/ Stephani J. Ballard
Ralph K. Durstein III, I.D. #912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400
Attorney for Defendants MacLeish,
Mitchell, and Division of State Police

21