## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,               )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )          C.A. No. 04-1394-GMS
                                         )
COLONEL L. AARON CHAFFINCH, et al.,      )
                                         )
          Defendants.                    )

## APPENDIX TO REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AS TO COUNTS TWO AND THREE OF THE AMENDED COMPLAINT

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

RALPH K. DURSTEIN, III, I.D. #912
STEPHANI J. BALLARD, I.D. #3481
Deputy Attorneys General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
  Attorneys for Defendants MacLeish,
  Mitchell and Division of State Police

DATED: February 7, 2006

## **TABLE OF CONTENTS**

Affidavit of W. Michael Tupman, Esq. .................................................................. C00001

October 29, 2004 article from the Delaware State News .......................................... C00004

Answers of Defendants Delaware State Police, MacLeish, and Mitchell to
Plaintiff's First Set of Interrogatories ....................................................... C00005

Defendants' Second Supplementation of Initial Disclosures Pursuant to
Fed.R.Civ.P. 26(e) ................................................................................ C00014

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 04-1394-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | |
| et al. | : | |
| | : | |
| Defendants, | : | |

### Affidavit of W. Michael Tupman, Esquire

1. I am a Deputy Attorney General with the State of Delaware, Department of Justice and have represented the Delaware State Police (DSP) as legal counsel since February, 1998. I was admitted to practice law in the District of Columbia in 1979, in the State of New York in 1988, and in Delaware in 1991. I have been a Deputy Attorney General employed by the Delaware Department of Justice since February 11, 1991.

2. In the course of providing legal representation to the Delaware State Police over the last nine years, I have attained an extensive awareness and understanding of the laws and rules and regulations which govern the conduct of members of the State Police, including laws and regulations pertaining to internal affairs proceedings, such as the Law-Enforcement Officers' Bill of Rights (LEOBOR). Part of my regular duties as DSP counsel is to advise DSP personnel as to compliance with LEOBOR in the course of internal affairs investigations and hearings.

3. My deposition was taken in this case on December 21, 2005. At that deposition, I was asked if I recalled being consulted by DSP as to media inquiries pertaining to certain particular internal affairs charges. My testimony was that I did not recall being consulted about any media inquiries regarding those particular internal affairs charges. This does not mean that I never gave advice to the DSP regarding how to handle confidential data. I have done so many times in the course of my nine years of legal representation. I also frequently give advice with respect to the Freedom of Information Act. The DSP does not routinely consult with me on such media matters as responding to the filing of

lawsuits or the status of criminal investigations since DSF personnel are familiar with how to handle these based on legal advice they have received in the past.

4.    The Divisional Hearing Board email, dated October 25, 2004, pertaining to Barbara Conley, was issued pursuant to and in compliance with the Delaware State Police Administrative Manual, Section VII-5-13. Such trial board emails, issued by regulation to all DSP personnel, do not contain confidential information and do not fall within the parameters of confidential investigatory "records" under LEOBOR, specifically 11 Del.C. §9200(c)(12). In fact, nothing in LEOBOR or DSP Rules specifically addresses the status of trial board notification emails in terms of confidentiality.

5.    As I testified at deposition, I was consulted by telephone on the afternoon of October 28, 2004, by Lt. Colonel Thomas F. MacLeish, the Acting Superintendent, along with Captain James Paige, Captain Robert Coupe and Lieutenant Joseph Aviola, the DSP Public Information Officer. They informed me that a reporter, Tom Eldred, had obtained a copy of the e-mail trial board notification in the Conley disciplinary matter and was seeking comment from DSP.

6.    I had never before been faced with a situation in which the media had obtained a DSP trial board email. I had never given advice on this issue before, nor to my knowledge, had any DSP attorney, as the situation had not previously arisen. I believe that Colonel MacLeish's action in contacting me for legal advice was prudent in light of this unprecedented inquiry. This was essentially a legal issue of "first impression."

7.    Lt. Colonel MacLeish did not express any opinion as to if or how he wanted to respond to the reporter, but rather requested my advice as to what the DSP could or could not do in response to the reporter's inquiry. I advised the Lt. Colonel that the DSP should first confirm whether the reporter actually had a copy of the e-mail by having him fax it to Lieutenant Aviola. The reporter faxed the e-mail to Lieutenant Aviola, who confirmed that it was a copy of the Divisional Hearing Board e-mail dated October 25, 2004. As I testified at my deposition, I advised the DSP that since the document was already in the public domain, the DSP could confirm that the e-mail was what it appeared to be, but

C00002

should not comment on the specifics of the misconduct that gave rise to the charges. I advised DSP that it was my legal opinion that such a course of action would not violate any law or regulation, including LEOBOR.

BE IT REMEMBERED that on this _7th_ day of _February_ , 2006 personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **W. MICAHEL TUPMAN**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of her knowledge, information and belief.

_____
W. MICHAEL TUPMAN

SWORN TO AND SUBSCRIBED before me on this _7th_ day of _Feb_ , 2006.

_____
Notary Public

C00003

10

The Dotoian Daily

Delaware State News, Friday, October 29, 2004

# Plaintiff in latest suit subject of internal investigation

By Tom Eldred
Delaware State News

C00004

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **BARBARA CONLEY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C. A. No. 04-1394-GMS** |
| | ) | |
| **STATE OF DELAWARE,** | ) | |
| **DIVISION OF STATE POLICE,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ANSWERS OF DEFENDANTS DELAWARE STATE POLICE, MACLEISH, AND MITCHELL TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.     Give the full home street address where a deposition subpoena can be served for each of the 25 witnesses you identified on September 21, 2005 in this case in your supplemental Rule 26 disclosures.

**Answer:** The active-duty Delaware State Police officers listed may be served at the Delaware State Police Headquarters Complex, 1441 North DuPont Highway, Dover, DE 19903. All available address information has been provided on the remaining witnesses. This information will be updated, as additional information becomes available.

2.     Describe in detail the subjects of the information that each of these 25 witnesses possess.

**Answer:** These witnesses are familiar with various aspects of the plaintiff's career with the Delaware State Police, including her performance on the job, her disciplinary infractions, her ability in command positions, as well as her character and behavior. As set forth below, many of these witnesses can testify as to lewd behavior, crude language, sexually-suggestive jokes and devices, and sexual overtures on the part

of the plaintiff in the workplace, directed at male and female troopers, on numerous occasions. Many of the witnesses are also familiar with the careers of Major Paul Eckrich and Major R. L. Hughes, and their qualifications to be considered for promotion to the rank of Major. In general, the witnesses would testify that Eckrich and Hughes were well-respected for their ability, hard work, leadership capabilities, and willingness to take on new and difficult assignments. The plaintiff, while a competent trooper who was able to advance in rank over time, lacked these qualities. The plaintiff had a close and favorable relationship with Colonel Chaffinch for many years, and he encouraged and facilitated her advancement. He did not discriminate against her. Many of the witnesses served with former Colonel Chaffinch, or participated in his training. They are familiar with his personality, and have witnessed his conduct in professional and social settings. They are prepared to testify about the various allegations directed at Colonel Chaffinch in the Amended Complaint. They would testify that many of the incidents did not occur, or did not occur as alleged, or have been distorted or taken out of context, and in any event do not reflect any bias on the part of Chaffinch toward Conley. *See also* the responses to Interrogatories 3, 4, and 6 below for additional information.

3.      For each of these 25 witnesses, give the paragraphs of the Amended Complaint, the Answer, and the Amended Answer with respect to which that person has knowledge.

**Answer:**

**Boyce:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Brown:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Campanella:** ¶¶7,11,14,15,18,19,26,28,63,64-77,79-86,90,93-105 of the Amended Complaint and the Answer.

**Chandler:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90-105 of the Amended Complaint and the Answer.

**Cummings:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Donaway:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Fraley:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Givens:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**McKnatt:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Hawkins:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Hyland:** ¶¶7,11,14,15,18,19,26,28,63,64-77,79-86,90,93-105 of the Amended Complaint and the Answer.

**Jester:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Moses:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Mullett:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**O'Day:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Paige:** ¶¶7,11,14,15,18,19,26,28,58,59,61-63,85,86,90,109-129,138,139,142-160, 162-164 of the Amended Complaint and the Answer.

**Pepper:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Rust:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Shockley:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Thomas:** ¶¶7,63,85,86,90 of the Amended Complaint and the Answer.

**Vickers:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Walls:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-
84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Warnock:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-
84,85,86,90,91,92 of the Amended Complaint and the Answer.

**Workman:** ¶¶7,30,31,34,36,37,40-49,50,52-55,58,59,61,62,63,64-77,79-
84,85,86,90,91,92 of the Amended Complaint and the Answer.

Each of the witnesses set forth above would provide testimony that would support
the four Affirmative Defenses in the Answer to the Amended Complaint.

4.     Describe in detail all facts and discoverable information known to each of these
25 witnesses.

**Answer:** See the responses to Interrogatory ##2, 3, and 6. Defense counsel is in
the process of interviewing witnesses, and further information will be provided, to the
extent required by the Rules. In addition, the following witnesses would testify as
follows:

**Vernon Thomas** would testify that he broke into a home in 1981 in order to
commit a burglary. When he heard police officers arrive, he hid under a rug in the master
bedroom. He would identify the plaintiff as one of the officers who arrived and
conducted a cursory search of the premises. He then witnessed the plaintiff engage in a
sexual act with another police officer, using the victim's bed. When additional officers
arrived, Mr. Thomas was found by them in his hiding place, and arrested. He told these
officers what he had observed, and they believed him.

**Robert Hawkins** and **Gregory Donaway** are familiar with the details of the
Vernon Thomas incident, as related above.

**Mark Givens** is a retired DSP officer who served with the plaintiff at Troop #5
until 1983. He recalls that she "cursed like a sailor" from her very first day on the job.
Harsh and lewd language was not offensive to her. She engaged in suggestive and sexual
joking at work as much as anyone. She also had sexual relations with a number of
different officers. He recalls one joke in particular that Conley would tell, concerning a
blowjob and a family form West Virginia. She would tell this joke at the expense of
Larry Conley, now her husband, who is originally from West Virginia. Givens felt that

Conley "did enough to get by" as a police officer. By comparison, both Eckrich and Hughes were "squeaky clean", with no skeletons in the closet.

**Ron Thomas** was Conley's field training officer. He liked her, and they worked well together. She had a foul mouth, and loved to tell dirty jokes. It was common for her to tell fellow [male] officers to "suck my pussy". After her first two or three years, Conley did not work as hard or as steady on the job. She was a good supervisor who looked after her people. She was not ambitious. By contrast, both Paul Eckrich and Randy Hughes were energetic, go-getter types who worked extra hours. Hughes in particular "busted his ass" and actively sought extra work and difficult assignments.

**Bob Walls** was the Director of Instruction at the Delaware State Police Academy when Chaffinch, Eckrich, and later Conley were in training. He has a distinct memory of Aaron Chaffinch, who clearly had leadership potential and stood out from his classmates. Chaffinch was wiry and athletic, had a phenomenal memory, and an outgoing sense of humor. Paul Eckrich was quiet and thoughtful, obviously bright and thorough. He had not recollection of Conley at the Academy. He later recalls her as a competent accident investigator at Troop #5. Walls reached the rank of Captain, and was interviewed by Governor Castle for the position of Superintendent.

**John Campanella and Tammy Hyland** would testify as to the plaintiff's conduct and behavior toward uniform and civilian subordinates at Headquarters, including specifically her repeated and unwelcome use of profanity, vulgar humor, dirty jokes, sexually suggestive remarks in the workplace, which ultimately formed the basis for the Internal Affairs investigation of the plaintiff and the disciplinary charges against her.

**James Paige** would testify as to the Internal Affairs investigation into the alleged "leak" of a departmental message to a newspaper reporter, including the steps he took, in conjunction with the High Tech Crimes Unit, to determine if the person who provided the message to the reporter could be detected by tracing the fax of the e-mail obtained from the reporter. Captain Paige could also testify as to the steps taken on advice of counsel in response to the contact from the reporter concerning the message. Captain Paige can confirm that such messages are standard practice in disciplinary cases, and do not disclose any confidential information from the disciplinary file.

**Rust, Fraley, Mullett, and Moses** are familiar with the plaintiff's use of sexually suggestive language and crude comments directed at other officers, including references to sex acts, body parts, and sexual orientation of fellow troopers.

**Boyce, Brown, Chandler, Vickers, Workman** worked with the plaintiff and would testify about her conduct on the job and her ability as a police officer, and her interaction with Aaron Chaffinch. These officers also worked through the years with Chaffinch, and would testify as to the allegations in the Amended Complaint concerning his conduct, his ability, and his relationship with plaintiff. These witnesses would be in a position to compare the plaintiff's qualifications for promotion to the rank of Major with those of Paul Eckrich and R.L. Hughes.

**Carol Warnock** would testify concerning the plaintiff's promotion of "sex toys" and her sexually-suggestive references to other troopers.

**Louis O'Day** worked with the plaintiff, and would testify as to her likelihood of being offended or damaged by sexually-suggestive or crude language or humor, given her own behavior and reputation.

5.    If in your Answer or Amended Answer you have raised any affirmative defenses, state, individually for each such defense, all facts supporting it, the names and present or last known addresses of all persons having knowledge of any such facts, and the description or designation of each document, as defined in Rule 34(a), which in any way records or refers to any such facts.

    <u>Answer:</u>  Four affirmative defenses are raised in the Answer. The First is based on the failure of plaintiff to state a valid claim under federal law. This is based on plaintiff's failure to articulate a valid cause of action under the Fourteenth Amendment and 42 U.S.C. §1983. Any such claim is barred. Plaintiff failed to pursue the administrative remedies for supposed gender discrimination available to her, prior to filing her lawsuit. Plaintiff has failed to show that she was better qualified for promotion to Major than either Paul Eckrich or R.L. Hughes, or the other officers holding the rank of Captain who were considered for promotion to the rank of Major. Plaintiff's so-called "retaliation" claims are based on the disclosure of a routine message containing no confidential material or information, where the defendants acted according to advice of

C 0 0 0 1 0

counsel and no harm was sustained. The witnesses in support of this Affirmative Defense are as set forth above in Interrogatory #3. The Second Affirmative Defense is based on the qualified immunity of the defendants, as a matter of law, when sued in their official capacities. The Third and Fourth Affirmative Defenses are based on the legal bar to the law suit embodied in the Eleventh Amendment, as a matter of law.

6.      Identify each person who has been interviewed on your behalf or from whom an oral or written statement has been taken concerning the facts alleged in any pleading.

**Answer:** The following individuals have been interviewed by counsel to date, in addition to the named defendants themselves:

Mark Givens, James Paige, Ronald Thomas, Robert Walls, John Yeomans, Joseph Aviola, Paul Eckrich, R.L. Hughes, William Waggamon, Paul Swiski, Alan Ellingsworth, Henry Downes, Mary Ann Papili, Nate McQueen, and Lisa Blunt-Bradley.

In each case, notes on the interview were taken contemporaneously by counsel, and subsequently revised, analyzed, and prepared in typewritten form for inclusion in the case file. The original notes and subsequent work product constitute trial preparation materials.

7.      Identify each person who has supplied information for the answers to each of these interrogatories and all requests for production of documents filed by Plaintiff.

**Answer:** Information has been provided by the defendants, by Major Eckrich, Major Hughes, and by Captain Yeomans and personnel in the Human Resources Unit of Delaware State Police.

8.      Identify each person whom you expect to call as an expert witness at trial, and state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, a summary of the grounds for each opinion, and the dates of any reports relating thereto.

**Answer:** The defendants expect to call Lisa Blunt-Bradley as a witness, and to qualify her as an expert in personnel matters. The subject matter of her testimony would be contained in the Report she authored regarding the recruitment, hiring, evaluation,

promotion, and disciplinary procedures utilized by the Delaware State Police. In particular, it is anticipated that she would testify as to her findings regarding the advancement of female troopers, and the implementation by the Delaware State Police of various recommendations and suggestions in the aforementioned Report. It is anticipated that her expert testimony would rebut the assertions concerning the Report made by the plaintiff in her Amended Complaint, at paragraphs 93-105.

In the event that the plaintiff indicates an intent to call an economist to testify as an expert on her behalf, the defendants reserve the right to retain an expert to analyze and rebut such testimony, or, in the alternative or in addition to such expert, the defendants reserve the right to call Captain Yeomans as an expert on Human Resources issues in general, and the plaintiff's salary and benefit history and pension rights in particular.

9.      For each denial or partial denial found in your Answer, which denies in whole or in part any allegation of the Amended Complaint, state all facts upon which said denial or partial denial is based, the names and last known addresses of all person having knowledge of such facts, and the description or designation of each document, as defined in Rule 34(a), which in any way records or refers to such facts.

**Answer:** *See* the response to Interrogatory #3 above. In addition to those witnesses, the following witnesses would testify, as well:

**Aaron Chaffinch:** ¶¶7,11,14,15,18,19,26,28,30,31,34,36,37,40-50,52-55,58-59,61-77,79-86,90-105,109-114,121,123-129,144-164 of the Amended Complaint and the Answer.

**Paul Eckrich; R.L. Hughes:** ¶¶7,11,14,15,18,19,26,28,58,59,61-77,85,86,90-105 of the Amended Complaint and the Answer.

**Thomas MacLeish:** ¶¶7,11,14,15,18,19,26,28,30,31,34,36,37,40-50,52-55,58-59,61-77,79-86,90-105,109-114,121,123-129,144-164, 109-129,138,139,142-164 of the Amended Complaint and the Answer.

**David Mitchell:** ¶¶11,14,15,18,19,26,28,93-105,109-129,138,139,142-164 of the Amended Complaint and the Answer.

**Lisa Blunt-Bradley:** ¶¶93-105 of the Amended Complaint and the Answer.

**Joseph Aviola:** ¶¶93-105,109-129,138,139,142-164 of the Amended Complaint and the Answer.

**William Waggamon, Paul Swiski, Alan Ellingsworth:**
¶¶7,11,14,15,18,19,26,28,93-105 of the Amended Complaint and the Answer.

**Harry Downes, Mary Ann Papili, Nate McQueen:**
¶¶7,11,14,15,18,19,26,28,58,59,61,62,85,86,90-105 of the Amended Complaint and the Answer.

DEPARTMENT OF JUSTICE
STATE OF DELAWARE


/s/ Stephani J. Ballard
Stephani J. Ballard, ID #3481
Ralph K. Durstein III, ID #912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400

Dated:  October 24, 2005

C00013

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **BARBARA CONLEY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C. A. No. 04-1394-GMS** |
| | ) | |
| **STATE OF DELAWARE,** | ) | |
| **DIVISION OF STATE POLICE,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants,** | ) | |

### DEFENDANTS' SECOND SUPPLEMENTATION
### OF INITIAL DISCLOSURES
### PURSUANT TO FED. R. CIV. P. 26(e)

Pursuant to Fed. R. Civ. P. 26(e), the Defendants State of Delaware, Division of State Police, Col. Thomas F. MacLeish, and Secretary David B. Mitchell make the following supplementary disclosures:

1. The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.

**RESPONSE**:

The following responses are in addition to the Answers of Defendants to Plaintiff's First Set of Interrogatories, previously served on plaintiff, which are incorporated herein by reference.

**Captain Robert Hawkins** is Commander of Troop Four. He arrested Vernon Thomas several times in the 1980's. Thomas served as a confidential informant in drug cases, and provided reliable information used to investigate and prosecute drug dealers. Thomas described an incident in 1986 when two troopers, later identified as Barbara Miller [the plaintiff] and Larry Conley, were searching a residence, and Thomas was hiding from them in a bedroom. Thomas heard Miller and Conley on the bed, engaging in a sex act.

Hawkins knew Barbara Conley [then Barbara Miller] in college. They were in the same class at Delaware Technical and Community College – Terry Campus in Dover. They also went through the Delaware State Police Training Academy together in 1982.

C00014

He did not serve with her after that. He expressed interest in the vacant Kent/Sussex operations position filled by Major Hughes. Conley would not have been a serious candidate for that position. She had insufficient experience in criminal investigation, and had never held a troop command.

Hawkins suggested to Colonel Chaffinch that Paul Eckrich was the ideal person for the administrative/budget major position. Neither he [Hawkins] nor Conley had the background for that Major position.

**Sgt. Charles R. Mullett** entered the Delaware State Police in 1987 after eight years in the military. He encountered the plaintiff at Troop #5. His very first encounter with the plaintiff was memorable. In his presence, and with several other officers present as well, the plaintiff said to a trooper "I'll suck your dick so good, you'll never go back to your wife". The plaintiff then pinched another male trooper on the buttocks. Mullett was appalled at this behavior, which would never have been tolerated in a male trooper. He repeatedly observed and overheard the plaintiff engaging in such unprofessional behavior.

Mullett would testify that he was on his way home from work in 1989, when he heard a broadcast of a fight in progress a Coverdale Crossroads, a notoriously dangerous area for police officers. Another officer had been dispatched, and Mullett heard the dispatcher repeatedly trying to contact the plaintiff, who was working. The plaintiff finally responded, indicating she was in Bridgeville, and was directed to respond to Coverdale Crossroads immediately. Mullett, with his emergency equipment activated, then observed the plaintiff, without her emergency equipment activated, stopped at an intersection in Bridgeville. She then proceeded toward the scene at a leisurely pace, under the posted speed limit, such that Mullett was forced to pass her.

Mullett was assigned an assault case involving a broken jaw that had previously been handled by the plaintiff. He reviewed medical records that listed the plaintiff by name as the officer contacted by the emergency room personnel. However, a year later, he could find no report or record of arrest. He contacted the plaintiff at Troop #$3, and she had no recollection of the incident. He then investigated, obtained a confession, and made an arrest.

Mullett served briefly under L. Aaron Chaffinch, who was his shift commander. He found Chaffinch to be knowledgeable and professional. He can recall socializing with Chaffinch on one occasion, where he recited "Casey at the Bat" from memory. Chaffinch had a sense of humor, and a remarkable memory, but Mullett never saw him act with disrespect toward women or to anyone else.

Around 1995 or 1996 the plaintiff ordered several troopers, one of whom was then-Cpl. Mike Cosgrove, to witness the removal of furniture she had seized from the dwelling of her brother, Brad Miller. Mullett felt there was no legal basis for this use of Delaware State Police officers.

Another incident involved plaintiff's brother making an obscene gesture to her ("flipping the bird") from a car, after a court hearing involving the estate of their parents. The plaintiff pursed her brother's car in her police car and stopped him in Dover. She then contacted Dover Police and demanded that her brother be arrested. She claimed that his driver's license was suspended, but that could not be verified. The Dover Police officer declined to arrest Miller for allegedly making an obscene gesture. The plaintiff then called Troop #3 and demanded that a Delaware State Police officer be dispatched to arrest her brother. When Sgt. Joe Huttie refused, the plaintiff filed an internal complaint against him. After investigation, the complaint was determined to be unfounded.

Mullett bent a wheelcover on his police car on a curb, in the process of investigating a robbery and recovering a stolen bank bag from a dumpster. He reported the damage to then-Sgt. Homiak and to Sgt. Hitchens of the FAIR team, and was told to do a memo. When the plaintiff learned of the dented wheel cover, she claimed that Mullett should have filed a departmental accident report, and initiated a disciplinary action against him.

Mullett would testify that the plaintiff was not qualified to be promoted to Major.

**Captain Betsy Shamany** was in the recruit class of 1979, three years ahead of Conley. She recalls that she first learned of the plaintiff by reputation. The plaintiff was notorious for her sexual advances toward many male troopers, her unprofessional conduct, and her lackadaisical attitude toward work.

Shamany worked for Internal Affairs from 1994-1999 in the Headquarters building. At that time, the IA offices were just down the hall from the Traffic Section. The plaintiff could frequently be heard, down the hall, fooling around, telling jokes, making comments (including frequent references to her "titties"), and otherwise engaging in inappropriate behavior. Several of the employees complained about the plaintiff's conduct. Shamany thought that the plaintiff's conduct was unprofessional and embarrassing.

Shamany was assigned at Internal Affairs investigation by then-Major Swiski that involved the plaintiff. The plaintiff, while on a trip on behalf of the Delaware State Police, had used a State credit card to purchase a Rolex watch worth several thousand dollars. When she returned, she did not report the purchase. She was confronted with the bill received by the accounting department. She then had her husband issue a check for the amount involved, but the check "bounced". Internal Affairs brought charges against the plaintiff, who requested a hearing, where the charges were substantiated, and she was punished.

Shamany also recalled the Internal Affairs matter arising from the plaintiff's demand that her brother be prosecuted. She readily determined that Lt. Huttie was not at fault, and in fact had made the correct decision in declining to arrest Miller for making an obscene gesture. The complaint was unfounded or unsubstantiated. When Shamany took

C00016

the time to explain her conclusion to the plaintiff, Conley "blew up' at her, and she had to walk away.

Shamany had little contact with Colonel Chaffinch. He did promote her to Captain, although others on her band were promoted first. She does not believe that Chaffinch discriminated against women, or had any gender bias that affected promotional decisions. The plaintiff was simply not qualified for promotion to Major. In Shamany's view, Conley is an "embarrassment" and should not be wearing the uniform.

Shamany knows Major Eckrich. Conley could not compare to him, in terms of qualifications for the administrative/budget major position. She does not know Major Hughes as well. She could not see Conley in the Kent/Sussex administrative position. Conley lacks special units and troop command experience. Hughes is more well-rounded in terms of experience, capable of leadership and sound decision-making.

**Lt. Gregory W. Donaway** is in his twenty-seventh year with the Delaware State Police. He first encountered the plaintiff when he was a Sergeant at Troop #5 in 1991-1992, and the plaintiff was a corporal. She was one of three women on her shift, doing patrol work. He does not have any specific recollection of the plaintiff, during the short period they worked on the same shift. She did not stand out at all.

Donaway worked with L. Aaron Chaffinch at Troop #5 in the early 1980's. They also knew each other from playing softball. He would occasionally socialize with Chaffinch (due to softball, rather than work). He recalls Chaffinch having a sense of humor and an amazing memory. He can recall Chaffinch reciting Limericks on social occasions, but not in work situations. Chaffinch's humor was not mean-spirited, nor was it directed at women.

Donaway has a long-term friendship with Major Eckrich, and regards him as a top-notch guy, who was extremely well-qualified by training and experience for the Administrative Major position.

Donaway knew R.L. Hughes as a shift commander at Troop #7 in the mid-Nineties. He did a good job. He was hard-driven, dedicated officer.

**Carole Warnock** has worked for DSP for 28 years, at Headquarters in Dover, and for 18-20 years at Troop #5. She is the administrative secretary and "mother figure" at the Troop. She was friendly with Conley for many years.

She first encountered Barbara Conley at Troop #5 in 1986 or 1987. They became friends, and attended trooper funerals together. Conley was very outspoken. She would boast about her sexual abilities, and her sexual conquests, at work. She would bump and grind against male troopers with her breasts and her genital area. She would proposition male troopers. If she were a male, Warnock believes, she would have been fired long ago for such conduct. When confronted or disciplined, Conley could become vindictive, and

would retaliate. Many men were simply afraid to discipline her, and tolerated her misbehavior.

Conley was rough and tough as a trooper. She was never a "go-getter", but she knew how to handle herself. She would take an assignment and handle it. She was not ambitious, and she had performance issues and disciplinary problems. Conley was irate at not being promoted to sergeant sooner. She keeps volumes of documents from work in her garage, in boxes that are lined up on the garage floor.

Conley had a good relationship with Aaron Chaffinch. However, when Chaffinch was promoted to Superintendent, Conley said to Carole, "that was a mistake". He and his wife were at Conley's house for parties. Carole recalls one such occasion when she, Aaron and his wife Karen, Roger Willey and his wife, Glenn Dixon and his wife Amy were present. Chaffinch was telling jokes, but none of a sexual or racial nature or off-color. No one was offended. Carole never heard or saw any improper conduct on Chaffinch's part, and never heard him say anything derogatory about women. He is not a sexist or a racist.

It is laughable that Conley would claim offense from joking or banter. She engaged in potentially offensive conduct herself, all the time.

There is no comparison between Conley and Major Hughes or Major Eckrich, in terms of ability on the job. Conley lacks "people skills". She is not as well educated or as well trained as them. She has poor judgment.

Shortly after Carole learned of Conley's lawsuit, in November of 2004, on Civilian Appreciation Day, she asked Barbara about it. Conley said "if those SOB's think they're gonna fuck me..." She then left the Troop, and got into a car with Glenn Dixon in the parking lot.

**Lt. Curt Brown** has been with DSP for 22 years, and is now a lieutenant at Troop #5. He likes Conley, with whom he worked until 1989, but feels that her lawsuit is "over the top". He recalls that her work ethic was bad. She was lazy and didn't want to handle complaints. She is good at reports. He would not consider her qualified to be a Major.

Conley says things you would be shocked at. Every conversation Conley has seems to involve sex. She has to top everybody in terms of smuttiness. She would take the lead in the sexually based conversations. He hasn't seen Conley grab or grope others but has seen her grab her own breasts. In 2003 Mark Rust, Brown and Barbara Conley went down to see now-Captain Glenn Dixon at the FBI Academy. It was a smutty conversation all the way down. They were talking about a female trooper, who is attractive, who had recently left the force. Whenever anyone would talk about another woman it was always a negative reaction from Barbara Conley. This trooper's name was Dawn Perry. Conley said "she isn't nothing. I'd rather eat Donna's or Tammy's pussy than hers." Donna and Tammy were the names of Brown and Rust's wives. Conley always has to talk about sex. Over the years she has told Brown "you could have had it"

"you had you chance" meaning sex with her. Her reputation is very bad. She is vindictive.

Brown has worked with Major Hughes at Troop 5 and with Major Eckrich at Troop 4. Hughes. is aggressive and a good trooper. He will get wound up and butt heads, but he doesn't hold grudges. As to the Kent/Sussex position, R. L. is definitely more qualified than Conley, as are many other Captains. Brown cannot say enough about Paul Eckrich. He fully expected him to have the administrative/budget Major job. Eckrich clearly has the qualifications for this job.

Lieutenant Brown is responsible for the "hooded merganser" nickname. Conley, Dixon, Rust, Rich Dennis and another officer went to an FBI lunch with Chaffinch. Barbara Conley was not even in the same car as Chaffinch and Rich Dennis when Brown came up with the hooded merganser remark. Brown has never heard Aaron Chaffinch himself say hooded merganser. Brown takes full responsibility for the nickname. Chaffinch has a sense of humor, but tells Limericks at parties, not at work. He has never heard Chaffinch make negative remarks about women or female troopers in any setting. Barbara Conley finds fault with all women. She always wants to be the center of male attention.


**Lt. Mark Rust** has been on the job since September of 1984. He went to high school [Sussex Central] with both Eckrich and Hughes. He worked at Troop #5 as a traffic sergeant with Conley as his lieutenant. He also worked as a K-9 officer with Conley's shift at Troop #7.

Eckrich and Hughes have very different personalities, but both very capable. Eckrich is well-respected, thoughtful, educated. He was groomed by Col. Ellingsworth to be a manager with financial and accounting expertise and to handle budget issues. He is an excellent worker and has experience with many different DSP operations. Hughes is a "workaholic" who "lives and breathes being a trooper". Rust worked for him at Troop #5 with no problem. Hughes is very well-respected.

Conley would not be the first choice among Captains for the Kent/Sussex operations Major position, based on resumes. She could probably do the job, but not as well as Hughes. Hughes was involved in many more operations, such as special units, and brings more to the table. As Major he must deal with criminal investigation units at Troop #3 and Troop#4, as well as SORT and drug unit. He has been there. She has not.

Conley as a sergeant had good instincts, and took care of her people. She was a good test-taker. She was ambitious as far as promotions, but not as to special assignments. Her niche seemed to be traffic and administrative work, not in the field. She was not a well-rounded trooper. She was never a "ball of fire" in the field. Her work habits were not good.

Conley was vulgar and could "hang with anybody' as far as language and not be offended. In 1999 or 2000, at Troop #5, Conley initiated a conversation about penis size. Debbie Jester later mentioned it to Rust, because she could see he was embarrassed.

Aaron Chaffinch is a jokester with a photographic memory. He would never intend to offend anybody with his humor. He would never have dreamed that Conley would be offended. He trusted her, and she has tried to sabotage his career. Rust has never heard Chaffinch make derogatory remarks about women. His attitudes probably adapted and changed over time, and the promotions he made reflect that.

**Rep. Pete Schwartzkopf** worked with Barbara Conley for many years at Troop 5 as her superior officer. She was never a worker. Not a good employee. Numerous times she wouldn't answer her radio. At one point when Schwartzkopf was her Sergeant she had not answered her radio and SussCom complained that she would ignore radio dispatches. After one of these incidents, he took Conley out to her car and had SussCom call and the radio worked fine. She then said she hadn't heard it. He took her in the back and chastised her, not in front of anyone else. He told her that he knew about her having affairs with other officers but that she had no such leverage over him, and she was to get her ass out there and do her work and answer her radio. The next day she went out and produced more than anyone else. This lasted about one week and then she got lazy again. He believes Barbara Conley should never have been promoted to Captain.

As to qualifications for Major, it is entirely discretionary on the part of the Colonel. This makes sense. The Superintendent ought to be able to pick his or her top people. Schwartzkopf thinks highly of Paul Eckrich and says he was the best one for this job. R. L. Hughes is in a different league than Barbara Conley. Traffic is a comparatively easy administrative job. In order to advance you should be in special units and having a Troop Command is a plus. It is not just your qualifications or what you have done, but in terms of making someone a Major, you have to choose someone whom people trust and respect.

He recalls another incident when he was Lieutenant and Conley was supposedly home sick. They went to pick up the police car assigned to Conley, and she was not home. When they brought the car back they found two-week-old stolen property in the car, evidence laying around in the car, initial reports that were never written or filed, and stolen knives lying on the seats (in a car used to transport suspects). Schwartzkopf initiated an IA investigation of this. As a result, Conley became extremely angry about troopers taking "her car" (a DSP car). Immediately afterwards Schwartzkopf got transferred to Troop 7.

There was an incident where Conley grabbed Schwartzkopf in the crotch at Troop 5. There was another incident at the State Fair when she ran her hand up his shorts.

Schwartzkopf has never heard Aaron Chaffinch make derogatory remarks about women in the work place. He did tell jokes. He was the "class clown" and always wants to be funny. Barbara Conley was one of the people who would ask him to tell the jokes.

**Pete Fraley** has been on the job since September of 1984. He worked the same shift as Conley in 1985. She would not answer radio calls. She was basically lazy, and avoided work. He recalls responding to a minor motor vehicle accident involving an elderly lady, and seeing Conley sitting in her car, just three-tenths of a mile away. This was typical.

Once she was called by SussCom to respond to a report of a man lying in a field. She refused, and told them to send somebody else. The guy had been beaten by three guys from New Jersey, and later died. The case was investigated by Mike Warrington as a homicide. This was a serious neglect of duty.

He finds it incredible that Conley, of all people, would complain about language or conduct. She was as graphic and vulgar as any of the men, and would initiate the teasing and humor. Once, early in 1985, in the old Troop #5, Conley was bragging about her ability to give blowjobs, and specifically mentioned "Randy", a dispatcher at SussCom who worked part-time with the Selbyville Police Department. Conley reached over and grabbed him in the crotch, twice. He recalls her rubbing the upper leg of Glenn Dixon in 2003, at Headquarters.

John Owings gave her the nickname "Puss in Boots". She laughed when he said it. She used the name herself. She enjoyed being the center of attention, and could not be offended.

Four years ago, at the State Fair, there was a report of a rape that had occurred back along the railroad tracks. Conley was with another woman [not a police officer] in the parking lot. Conley remarked "that bitch needed a good fucking". Fraley was stunned, and the other female was clearly offended and upset.

Aaron Chaffinch was in the drug unit when Fraley started at Troop #5. He did not socialize with him, and had little contact on the job.

R.L. Hughes worked on the same shift with Fraley at Troop #5. Hughes was a good worker who loved writing tickets, and was very competitive. He rose quickly through the ranks, and tested well. He can be abrasive, and was called "Little Hitler". He does not bear grudges. There is no comparison between Hughes and Conley in terms of qualifications for the Kent/Sussex Major position. Hughes was well-qualified. Others such as Tim Winstead, Bob Hawkins, and John Laird, were better qualified than Conley for that position.

Fraley has known Paul Eckrich since they both were involved in youth work at different troops. He worked for Eckrich when Paul was Troop Commander at Troop #5. It was great to work for him; a breath of fresh air. Paul was the most qualified person to assume the administrative/budget major position. It is critical that such a person have experience as a troop commander.

**Mark Givens** retired from DSP in 1987. He presently works at First State Chevrolet. He started on the job in 1973, and was assigned to Troop #5 in Bridgeville from 1974 to 1984. He recalls Conley as a rookie trooper. She cursed like a sailor, and coarse language was not offensive to her. She would tell jokes with sexual references in mixed company. She would boast of her sexual conquests. She had a particular fascination with blowjobs. This kind of behavior was consistent, not occasional. She was not a good cop. She did enough to get by. She was not a thinker. He would not give her a tough assignment.

**Ron Thomas** served with the State Police from October of 1977 to March of 2003. He was in Colonel MacLeish's class at the Academy. He likes Barbara Conley and Aaron Chaffinch. Conley started out okay, but after two or three years, did not work as hard or as steady. She earned a reputation for being lazy, and not ambitious. She was a good supervisor, and looked out for her people. But she did not "broaden her horizons' at any time. In order to qualify for promotion, a trooper needs road time, time in a special unit, then back to the road as a senior corporal or shift commander, sergeant, and then additional special unit experience.

R.L. Hughes and Paul Eckrich were both guys who busted their tails, worked extra hours. They were go-getters and hustlers. In contrast, Conley was simply not as well-rounded or as educated or as hard-working.

**Bob Walls** served with the Delaware State Police from 1971 to 1992. He was an instructor at the Academy when both Chaffinch and Eckrich came through. He worked with Conley while a Lieutenant and later as Captain and Troop Commander at Troop #5, but he did not have much contact with her.

He has a distinct memory of Chaffinch at the Academy. He was athletic, and clearly had potential. He also had a sense of humor.

**Alice Bailey** was promoted to Lieutenant by Aaron Chaffinch in August of 2003. She started at Troop #5, and has worked with both Chaffinch and Conley. Conley was nice and helpful when Bailey was new. Bailey had no sense – one way or the other – as to Chaffinch's attitudes toward women.

Bailey was an English/Journalism major in college, and has taught report-writing at the DSP Academy. She worked for a while at Headquarters, as an administrative aide to Colonel Pepper and then Colonel Chaffinch. Chaffinch said he would not recommend her for the traffic lieutenant job, working with Conley, in 2004. Bailey was not interested in this position. She preferred returning to the road and criminal work to traffic.

She knew that Major Hughes was intense, fast-paced, and particular about how things are done. She was surprised by the "Little Hitler" nickname, because it was not in character. She regarded him as businesslike and fair. Hughes was one of her Field Training Officers. He was impatient with her and wanted her to speed up. After her first hands-on experience, he was very reassuring.

She understood that Conley was not someone to emulate in a predominantly male profession. You need to keep your distance.

**Melissa Zebley** has been with the Delaware State Police for fourteen years. She spent six years in patrol, four years at the Academy, and then became a patrol sergeant at Troop #1. She is presently the Public Information Officer for New Castle County. In 2004 she had a temporary duty assignment with the Internal Affairs Unit, and worked on the investigation of Colonel Chaffinch.

She worked with Chaffinch when he was the Lieutenant Colonel. He was pleasant and down-to-earth; and did nothing inappropriate. They were on a first-name basis. He had a sense of humor, but did not say anything inappropriate. They had no negative interaction.

She has had little or no contact with Conley. She has heard stories about her. Conley's style and reputation would not be the path of choice for a female trooper. A better role model would be Captain Shamany or Captain Papili. She regards those officers as mentors. Promotion is a competitive process, and it can be difficult to be one of the few women.

She worked with R.L. Hughes at the DSP Academy. They had a professional friendship. He acted as a mentor, and treated her very fairly.

**Susan Jones** started with the Delaware State Police in September of 1988. She was promoted to Sergeant by Colonel Chaffinch in 2003. She is currently a detective assigned to Troop #2. She has worked in major crimes for seven years. She has had a great career; has been treated fairly; has no complaints. She had no contact with Chaffinch before her promotion. She was promoted off of the "C" Band in the second round of promotions. She thought that the process was fair.

**Mary Ann Papili** is a State Police Captain, and the former Troop Commander of Troop #6 in New Castle County. She was promoted to Captain by Colonel Alan Ellingsworth. She now works in Information Technology at Headquarters.

She did not have a high regard for Aaron Chaffinch as Colonel. She recalls that he was disciplined for telling an inappropriate rude joke an in-service training when he was a Major. Chaffinch took care of his friends, including Barbara Conley. Conley was close to Chaffinch for a long time, and they were partners at the SOAR retreat in 2003.

She was "mortified" by Conley's crude behavior and language at the Academy. Conley has very poor verbal communication skills. Conley attacks other women and is condescending, vindictive, and rude to female police officers. She does not deal with hard issues, but pushes them off to other people, a technique of "dump and blame". Conley told her that she will argue in her lawsuit that she is "a product of her environment".

C00023

Both Eckrich and Hughes were more qualified than Conley for promotion to Major. Eckrich had commanded a Troop, and had ample patrol and criminal experience. R.L. Hughes had lots of operations experience, and knew Sussex County and its politics well. Conley had no operations or command experience. She had basically stayed with traffic her entire career. Conley seemed to assume that Chaffinch would promote her to Major. It would be upsetting for Conley to be the first female Major.

**Rebecca McKnatt** could not be interviewed, as she is represented by counsel in a matter adverse to the Division of State Police that is not yet fully concluded.

**John Campanella** and **Tammy Hyland** would testify consistent with their sworn testimony at Conley's disciplinary hearing.

**Debbie Jester** and **Roger Willey** are to be interviewed next week. Each is expected to be familiar with the plaintiff's mediocre performance as a police officer.

**Horace Pepper** and **Frank Cummings** are retired officers who have not been located.

**William Dudley** was plaintiff's supervisor at Troop #5, and would testify as to his evaluations and disciplinary actions against plaintiff, as set forth in her Troop file, that were the subject of questions at her recent deposition. Likewise, **Mike Warrington** and **Joe Huttie** are potential witnesses who were identified for the first time as a result of the Troop File materials provided by plaintiff's counsel at the Hughes deposition on December 2, 2005. Defense counsel expect to interview these individuals next week. It is anticipated that they would confirm the statements made and actions taken, as reflected in the documents contained in plaintiff's Troop File.

The defendants reserve the right to supplement this list as discovery proceeds in this matter.

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

/s/ Ralph K. Durstein III
Stephani J. Ballard, ID #3481
Ralph K. Durstein III, ID #912
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302)577-8400

Dated: December 15, 2005

I:\ralph.durstein\Litigation\Conley v DSP\Supplementary.Disclosures.doc

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2005, I electronically filed Defendants'
Second Supplementation of Initial Disclosures pursuant to Rule 26(e) with the Clerk of
the Court using CM/ECF, which will send notification of such filing to the following:

Thomas S. Neuberger, Esquire
The Neuberger Firm, P.A.
2 East Seventh Street
Wilmington, DE 19801-3707
tsn@neubergerlaw.com

/s/ Ralph K. Durstein III
Department of Justice
State of Delaware
820 N. French Street
Wilmington, DE 19801
(302) 577-8510
ralph.durstein@state.de.us

C00025

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1394-GMS |
| | ) | |
| COLONEL L. AARON CHAFFINCH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF MAILING AND/OR DELIVERY**

The undersigned certifies that on February 7, 2006, she caused the attached *Appendix to Reply Brief in Support of Defendants' Motion for Partial Summary Judgment, as to Counts II and III of the Amended Complaint* to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

> Thomas S. Neuberger, Esq.
> Stephen J. Neuberger, Esq.
> Two East Seventh Street, Suite 302
> Wilmington, DE 19801

> /s/ Stephani J. Ballard
> Stephani J. Ballard, I.D. #3481
> Deputy Attorney General
> Carvel State Office Building
> 820 N. French Street, 6th Floor
> Wilmington, DE 19801
> (302)577-8400
> Attorney for Defendants MacLeish, Mitchell, and Division of State Police