Not Reported in F.Supp.2d                                                                                                   Page 1
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Tierra GRAZIER, Minor, by and through her mother, Tonia White, and Dwayne Campbell, Plaintiffs
v.
CITY OF PHILADELPHIA, Officer Thomas Hood, and Officer Anthony Swinton, Defendants
No. Civ.A. 98-CV-6063.

July 26, 2001.

*MEMORANDUM*

TUCKER, J.

### I. BACKGROUND

**\*1** Plaintiffs Tierra Grazier and Dwayne Campbell filed separate civil rights actions against the City of Philadelphia and Philadelphia Police Officers Thomas Hood and Anthony Swinton; the actions were consolidated into the present action. Plaintiffs claimed that the individual defendants violated their civil rights on October 3, 1997, when Hood shot Campbell through the windows of the car in which plaintiffs were driving, and Swinton failed to intervene to prevent the shooting. Plaintiffs also claimed that the City was liable for their injuries, on a theory of respondeat superior. The case went to trial on January 8, 2001. At the conclusion of the plaintiffs' case, on defendants' motion under Fed.R.Civ.P. 50, the Court dismissed the claims against the City, but allowed the claims against the individual defendants to proceed to the jury. On February 9, 2001, a jury found that neither defendant was liable to the plaintiffs. Plaintiffs filed the instant motion for a new trial, citing seventeen assignments of error. For the following reasons, plaintiffs' motion will be denied.

### II. LEGAL STANDARD

Fed.R.Civ.P. 59 provides that a new trial may be granted to any party on all or part of the issues in an action in which there has been a trial by jury. Under this rule, a court, in the exercise of discretion, may grant a new trial if, inter alia, the jury's verdict was against the weight of the evidence, or if substantial errors occurred in the admission or exclusion of evidence or in the charge to the jury. *See Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).* The standard to be applied by the trial court varies according to the grounds for which relief is sought under Rule 50. *See Henry v. Hess Oil Virgin Islands Corp., 163 F.R.D. 237, 242 (D.V.I.1995).* In general, courts will sustain jury verdicts if, drawing all reasonable inferences in favor of the prevailing party, there is a reasonable basis to uphold the verdict; courts will examine the record for evidence that could reasonably have led to the jury's verdict. *See Nissim v. McNeil Consumer Products Co., 957 F.Supp. 600, 602-04 (E.D.Pa.1997), aff'd. without opinion, 135 F.3d 765 (3d Cir.1997).* An error of law by the court will provide sufficient grounds for a new trial, but only if it was actually prejudicial to the moving party. *See Moran v. Vermeer Mfg. Co., 742 F.2d 456, 458-59 (8th Cir.1984); see also Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1543-44 (11th Cir.1996)*("Under this standard, if the jury charge as a whole correctly instructs the jury, even if it is technically imperfect, no reversible error has been committed." (citing *Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1372 (5th Cir.1981)*). Under Fed.R.Civ.P. 61, "no error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the Court or by any of the parties is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice."

**\*2** A party moving for a new trial on the basis of an improper jury instruction must have made an appropriate and timely objection prior to the start of jury deliberations. *See Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc., 74 F.3d 488, 496 (4th Cir.1996), cert. den. 117 S.Ct. 53 (1996); Juneau Square Corp. v. First Wis. Nat'l. Bank, 624 F.2d 798, 810 (7th Cir.1980), cert. den., 449 U.S. 1013 (1980).*

### III. DISCUSSION

The Court will discuss plaintiffs' assignments of error in the order in which they are listed in the motion for a new trial.

#### A. Dismissal Of Claims Against City

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 2
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs argue that the Court erred in dismissing their claims against the City for failure to train, supervise, and discipline its police officers. They assert that sufficient evidence was presented at trial to allow these claims to proceed to the jury.

As a matter of law, plaintiffs could not have prevailed on their claims under Section 1983 against the City, because a municipality cannot be held liable under Section 1983 for failure to train, supervise, or discipline individual employees if those individuals themselves did not violate the plaintiffs' rights. See *Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573 (1986)(per curiam)("[N]either *Monell v. New York City Dept. of Social Services* ... nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."); *Thompson v. Boggs,* 33 F.3d 847, 859 (7th Cir.1994), *cert. den.,* 514 U.S. 1063 (1995)("[T]he plaintiff is asserting that the trial court erroneously granted summary judgment on (the *Monell* claim). Even if there was error, it was harmless ... because the jury verdict in favor of [defendant] on the question of whether he used excessive force precludes the possibility that [plaintiff] could prevail on his *Monell* claim."); *see also Rooney v. Watson,* 101 F.3d 1378, 1381 (11th Cir.1996)("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."); *Evans v. Avery,* 100 F.3d 1033, 1039 (1st Cir.1996).

In the instant case, the jury found that neither Officer Hood nor Officer Swinton had violated plaintiff's constitutional rights. Therefore, even if the Court were in error in dismissing plaintiffs' *Monell* claims for lack of evidence at the conclusion of plaintiffs' presentation of their case in chief, the error was harmless, because plaintiffs' claims against the City would have failed as a matter of law in light of the verdict. FN1

> FN1. Moreover, the evidence presented at trial showed that no reasonable jury could have found in favor of plaintiffs on their claims against the City. No witness testified that the department did not train its officers, and several members of the police department testified that the department gave each officer specific training in the policies and procedures to follow when approaching and stopping cars, and that the department offered some retraining to officers when they discharged their weapons in the line of duty. Officers Hood and Swinton were subject to discipline, not because they obeyed a fundamentally flawed policy, but specifically because they failed to follow the guidelines that had been set for them. Plaintiffs complain that officers who commit weapons violations while in plainclothes should be required to take additional retraining of a particular sort, but the evidence at trial did not demonstrate the existence of a pattern of unnecessary shootings by plainclothes officers, such that the department knew or reasonably should have known that its training and supervision methods were insufficient to prevent violations of citizens' rights. Plaintiffs alluded to a series of past police shootings, but these occurred in different situations and with different explanations; the evidence quite clearly failed to demonstrate a systemic failure to train police officers, such that the department's alleged failure demonstrated "deliberate indifference to the rights of persons with whom the police come into contact," and that the City had made a deliberate or conscious choice to fail to provide adequate training. See *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388-89, 109 S.Ct. 1197, 1204-05 (1989).

B. Exclusion Of Evidence Of Subsequent Remedial Measures

Plaintiffs argue that the Court, per Judge DuBois, erred in granting defendants' motion in limine to exclude evidence of subsequent remedial measures by the City. Plaintiffs argue that evidence of changes in the Police Department's directives regarding the use of force and the assignments for plainclothes officers was relevant to demonstrate a pattern or practice by the Department, as well as to show the feasibility of implementation of these changes before the shooting by Officer Hood.

**\*3** As explained above, plaintiffs' claim against the City

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

fails as a matter of law, because the jury found that the individual officers had not violated plaintiffs' constitutional rights. Any error by the Court in excluding evidence regarding the City's liability was therefore harmless, and is now moot. Furthermore, plaintiffs' proffered evidence was properly excluded under Fed. R. Ev. 407, which provides that "evidence of subsequent remedial measures is not admissible to prove evidence of negligence or culpable conduct in connection with the event."

Plaintiffs argue that they offered this evidence for a different purpose: to show
(a) the Police Force had knowledge of the needs to train, deficiencies that were apparent ... (all of which is an exception to the Rule 407 preclusion's) [sic] (b) that the prior disciplinary practices after prior shootings and uses of deadly force inappropriately [sic], did not properly address the wrong, and violations of citizens rights (c) the deficiencies in training was [sic] closely related to the ultimate injuries to Campbell and Grazier.

Plaintiffs' Brief in Support of Post Trial Motions at 9.

Plaintiffs' purported 'exceptions' to Rule 407 speak for themselves-they are all examples of proof of negligent or knowingly culpable conduct in connection with the event here at issue, precisely the type of evidence which is excluded by Rule 407. Demonstrating that the City maintained a policy of deficient training, which "directly led to the injuries of plaintiffs," as plaintiffs argue in their brief at 11, is indistinguishable from demonstrating that the City was culpable for those injuries because it was negligent or indifferent to the need to improve its training, and that said negligence or indifference was the proximate cause of plaintiffs' injuries.

The only theory offered by plaintiffs which would not run afoul of Rule 407 is that the evidence was relevant to show the feasibility of correcting deficiencies and implementing correct training methods. This theory is merely a effort to smuggle excluded evidence into the case, because the ease of implementing directives which limit plainclothes assignments and officers' discretion in the use of force is self-evident, and does not require "proof" that the Police Department implemented new directives after Officer Hood shot at the plaintiffs. Police departments implement new directives as a matter of course, and have the discretion to limit their employees' assignments and use of weapons as they see fit. The only real utility of plaintiffs' proffered evidence would have been to demonstrate that the City was negligent or deliberately indifferent to the need to train its employees, and Rule 407 precludes evidence offered for that purpose.

C. Failure To Introduce Requested Admissions As Evidence

Plaintiffs argue that the Court erred by declining to read to the jury, as evidence, plaintiffs' Request for Admissions, to which defendants allegedly failed to respond within the time required by Fed.R.Civ.P. 36. Defendants did file a response, which, taking plaintiffs at their word, was twenty-two days late, but the decision whether or not to deem plaintiffs' requests admitted by virtue of the late response, and to read them to the jury as evidence, was within the sound discretion of the Court; the Court did not err by declining to treat these matter as admitted merely because defendants' counsel filed a belated response. In any event, the two requested admissions both dealt with the claims against the City, and, as noted above, these claims failed as a matter of law, so that any erroneous failure to admit evidence pertaining to these claims was harmless and is now moot.

D. Failure to Give Jury Instruction Regarding 'Reasonableness Of Force'

**\*4** Plaintiffs complain that the Court did not give their requested jury instruction on reasonableness of the use of force, which would have paraphrased language from *Gilmere v. City of Atlanta,* 774 F .2d 1495, 1501-02 (11th Cir.1995) and *Abraham v. Raso,* 183 F .3d 279 (3d Cir.1999). Plaintiffs assert that these cases hold that a court reviewing a claim of excessive force under the Fourth Amendment should consider all of the circumstances leading up to the use of force, and they complain that "the court did not include any pre-seizure conduct language in its charge!" Plaintiffs' Brief at 18.

The Court did include language in its jury instructions which encompassed pre-seizure conduct. The Court instructed the jury that "all of the events transpiring during

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01394-GMS   Document 178-4   Filed 03/28/2006   Page 4 of 14

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

the officers' encounter with the plaintiffs can be considered in evaluating the reasonableness of Hood's shooting." This statement closely paraphrased language employed by the Third Circuit in *Raso, 183 F.3d at 292,* and directed the jury's attention to events prior to the moment at which Hood fired his gun. The Court also instructed the jury to determine whether it was objectively reasonable for Hood to have believed that Campbell posed a significant threat of death or serious physical injury "in light of the totality of the circumstances," and stated that in determining whether the amount of force used to effect the stop was reasonable, "you may take into account the reason for the stop [and] the severity of the crime." These instructions correctly informed the jury that, as *Raso* holds, it could evaluate pre-seizure conduct in assessing the reasonableness of a seizure, *see id.,* and the instructions therefore correctly described the state of the law in the Third Circuit.

Plaintiffs complain, in essence, not that the Court gave incorrect instructions, but that it should have also included "just a 'blurb' that gave [a] little justice to the real communication to the jury of what 'events during the encounter' was." [sic] Plaintiffs' Brief at 16. The Court's duty is not to give instructions favorable to one side or the other, but rather to be as neutral as possible without improperly emphasizing any aspect of one's sides case to the jury. Plaintiffs' proffered 'blurb' would have read, "you may consider that there was more than a minor departure from [Police] Department policy when it indicates in the Internal Affairs Report itself that Officers Hood and Swinton improperly [performed a series of actions]. If you so find, then you may conclude the officers would have unreasonably created the encounter ...". Plaintiffs' Brief at 15-16. Plaintiffs' suggested language is deeply slanted in their favor, and was not necessary to alert the jury that they could consider the officers' pre-shooting actions.

Plaintiffs' concern that the phrase employed by the Court, "the officers' encounter with the plaintiffs," might have been taken by the jury to mean only the shooting itself is a stretch of logic, and is belied by the other language in the Court's instructions which referred to the "totality of the circumstances." Contrary to plaintiffs' contention, the Court's instructions correctly and sufficiently alerted the jury that it could consider actions and events prior to the actual shooting. The Court's failure to give plaintiffs' requested additional instruction did not result in a failure to instruct the jury on a controlling issue, and does not warrant a new trial.

### E. Instruction Regarding Discipline Of Police Officer

**\*5** Plaintiffs assert that the Court should not have instructed the jury that "the fact that Officer Hood was disciplined by the Police Department, without more, is not sufficient to establish that plaintiff's constitutional rights were violated." Plaintiffs' complaint is that the Court had indicated to counsel for the parties that it would not read this particular section of the draft version of the instructions to the jury. Plaintiffs do not cite any authority for the proposition that all instructions must legally be reviewed with counsel prior to being read to the jury; they state that this was an 'abuse of discretion," but, quite to the contrary, it is within the Court's sound discretion to give jury instructions which properly alert the jury to the state of the law. Plaintiffs' only possible point of contention is that the instruction is an improper statement of the law, and that they did not have a proper chance to lodge an objection to it before the jury began its deliberations.

Plaintiffs have been afforded the opportunity to lodge an objection now, in the form of a post-trial motion, and the Court will not reject this assignment of error on the basis that plaintiffs did not register a timely objection at trial. Rather, the Court rejects this assignment of error because the Court's instruction was a correct statement of the law, and was properly presented to the jury. Plaintiffs accuse the Court of making "an incorrect statement of the law," Plaintiffs' Brief at 19, but they cite no authority whatsoever for this proposition. The instruction was not, contrary to plaintiffs' contention, severely prejudicial to the plaintiffs' case; if anything, the Court had aided the plaintiffs' case by permitting evidence that Hood had been disciplined, and added a slight safeguard, in the form of this mild instruction, to remind the jury that departmental discipline all by itself does not suffice to establish a violation of the Constitution.

### F. Failure To Include Special Interrogatory Regarding Seizure Under Fourth Amendment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 5
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff argue that the Court erred by not including, in its Special Jury Interrogatories, a query regarding the existence of a seizure by defendants for purposes of the Fourth Amendment. The Court did not include such an interrogatory because, as Officer Hood correctly notes in his Memorandum of Law in Oppositions to Plaintiffs' Post-Trial Motions, "when the Court determined not to place the issue of seizure before the jury the plaintiffs were excused from proving an element of their claim ... The jury was never asked if the force used effected a Fourth Amendment seizure because it was clear to the Court, as a matter of law, that plaintiff Campbell was seized." Plaintiffs were not prejudiced by the failure to include a special interrogatory on seizure, because the Court decided that issue in their favor when determining to send the case to the jury.

### G. Instruction Regarding Violation Of Police Directives

**\*6** Plaintiffs argue that the Court erred by instructing the jury that, "[y]ou are further instructed that a violation of police directives does not automatically constitute a violation of the laws of Pennsylvania or the Constitution." As with the instruction regarding Hood's discipline by the Department, plaintiffs complain that this instruction was not a proper instruction under the law, but do not cite authority that supports their argument. The Court's instruction, as given, was a correct statement of the law. *See Davis v. Scherer,* 468 U.S. 183 (1984); *Boveri v. Saugus,* 113 F.3d 4, 7 (1st Cir.1997); *Jones v. Chieffo,* 833 F.Supp. 498, 506 (E.D. Pa 1993), *aff'd w/o op.,* 22 F.3d 301 (1994) and *Amsden v. Moran,* 904 F.3d 980, 989 (1st Cir.1990).

Plaintiffs contend that *Chieffo* held that courts must consider other factors besides a violation of police directives, Plaintiffs' Brief at 22, but that is precisely what the Court told the jury in this case to do. The Court instructed the jury that it could consider a series of factors in determining whether the amount of force used to effect the stop was that which a reasonable officer would have employed, including "the reason for the stop, the severity of the crime, whether plaintiffs posed an immediate threat to the safety of the defendants or others, and whether the plaintiffs actively resisted or attempted to evade the stop." The Court did not, as plaintiffs contend, emphasize or focus on the fact that violations of police directions do not amount to automatic violations of the Constitution. Rather, the Court made a simple, measured statement so that the jury would not be confused by evidence that internal police review proceedings had determined that the individual defendants had violated police directives. The Court gave that instruction in the context of a series of reminders that the jury should consider the foregoing list of factors, and indeed the "totality of the circumstances," in reaching its verdict.

### H. Application Of "Shocks The Conscience" Standard To Fourteenth Amendment Claim

Plaintiffs contend that the Court erred in instructing the jury that conduct must "shock the conscience" in order to constitute a violation of the substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs assert that the Court derived the language of this instruction from several cases which were decided after the events at issue in this case, i.e. *County of Sacramento v. Lewis,* 523 U .S. 833, 118 S.Ct. 1708 (1998), *Miller v. City of Philadelphia,* 174 F.3d 368 (3d Cir.1999), and *Cannon v. City of Philadelphia,* 86 F.Supp.2d 460 (E.D.Pa.2000), and that therefore the standard announced in those cases in not applicable to this case. The problem with plaintiffs' argument is that the Supreme Court stated in *Lewis* that "shocks the conscience" had been the standard for substantive due process claims for half a century, *see id.* at 846, 118 S.Ct. at 1717.

**\*7** Plaintiffs also assert that the standard was incorrect, because it applies only to high-speed police chases. As the Supreme Court held in *Lewis,* the "shocks the conscience" standard applies to all substantive due process claims, *see id.* at 846-49, 118 S .Ct. at 1717-18; what may change, depending on the context, as plaintiffs themselves note at page 24 of their Brief, is the level of conduct that may suffice to shock the conscience, *see id.* at 849-51, 118 S.Ct. at 1718-19. The Court recognized this, and accordingly instructed the jury that

[i]n order to find that the actions of Officer Hood or Swinton was conscience-shocking, the plaintiff must prove, by a preponderance of the evidence, that the officer acted with gross negligence and arbitrariness. The officer need not have acted with a purpose to cause harm. The actions of the defendant must have been more serious than both

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 6
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

negligence and deliberate indifference ... Conduct that shocks the conscience in one environment may not be so egregious in another.

The Court therefore informed the jury that the "intent to harm" standard, which has been applied in high-speed police chases, did not apply in this case. The Court's instruction as given correctly stated the law on this point. See *Lewis,* 523 U.S. at 849-51, 118 S.Ct. at 1718-19, *Miller,* 174 F.3d 368, 375-76 (3d Cir.1999). Plaintiffs do not cite any contrary authority in their Brief.

I. Incorrect Statement Of Standard For Fourth Amendment Liability

Plaintiffs argue that the Court erred by stating the wrong standard on the Verdict Slip for a claim for excessive force under the Fourth Amendment. The Interrogatory regarding the Fourth Amendment claim asked whether plaintiffs had proven that either officer used "unreasonable force" in violation of the plaintiffs' Fourth Amendment rights.[FN2] Plaintiffs' brief is not entirely clear on this issue, but it appears to argue that the jury should have been asked whether either defendant used "excessive force," because that is "determined after one views an objective reasonable officer," while "reasonable force or unreasonable force, can be subjective." Plaintiffs' Brief at 25. As plaintiffs themselves state, "it is the reasonableness of the conduct, that one looks [to]," in assessing an excessive force claim. *Id.* Obviously, if excessive force is determined by considering the "reasonableness of the conduct" from the viewpoint of an "objective reasonable officer," then reasonableness is the standard for determining excessive force, just as reasonableness is the standard for determining "unreasonable force." Plaintiffs do not explain why a test proscribing "unreasonable force" calls for a subjective opinion, while a "reasonableness of the conduct" test calls for an objective opinion.

> FN2. The Court does not recall any timely objection to this wording on the Verdict Slip at trial by counsel for plaintiffs. Plaintiffs will not be heard to object after the fact if they did not file a timely objection, and they do not allege making such an objection in their Brief. Nevertheless, without scouring the trial transcript in search of such an objection, the Court will discuss why this assignment of error must fail on its merits.

Plaintiffs' implicit theory appears to be that the Court's instructions had employed the phrase "excessive force," and that the Court had told the jury that "excessive force" requires consideration of the amount of force that a reasonable officer would have employed in effecting the stop under similar circumstances. The Court did not instruct the jury on the meaning of the phrase "unreasonable force," and therefore, plaintiffs may be attempting to argue, the jury was free to consider its own, subjective view of the appropriate level of force.

**\*8** Plaintiffs cannot claim any prejudice from the use of the phrase "unreasonable force" on the Verdict Slip. If anything, "unreasonable force" is a lesser standard to meet than excessive force, and made plaintiffs' burden easier to carry. More importantly, the phrasing did not impede the correct statement of the legal standard for liability. The issue in this case is whether the seizure, made by means of allegedly excessive force, was unreasonable. *Brower v. County of Inyo,* 489 U.S. 593, 599, 109 S .Ct. 1378, 1383 (1989). The Court instructed the jury that "[p]laintiffs' claims of excessive force must be analyzed under the reasonableness standard of the Fourth Amendment," and that "[i]n evaluating the reasonableness of the use of force in this situation ... you must determine whether the amount of force used to effect the stop was that which a reasonable officer would have employed." The Court also explained to the jury that their task was to evaluate "the reasonableness of a particular use of force ... from the perspective of a reasonable officer on the scene," and in general to make a "determination of reasonableness." Thus, the overwhelming tenor of the jury instructions, to which plaintiffs' counsel offered no general objection, was that the jury must consider whether the force employed by Officer Hood was 'reasonable.' This standard properly stated the law under the Fourth Amendment, and the Verdict Slip instructed the jury to apply the standard which was discussed throughout the jury instructions as the standard for evaluating excessive force claims. The Verdict Slip was not in error and did not result in any prejudice to plaintiffs.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

### J. Failure To Allow Rebuttal Time

Plaintiffs complain that they were not allowed to present a rebuttal statement after the conclusion of defendants' closing arguments. Plaintiffs note that this was a lengthy trial, which went on for nearly five weeks, and that Local Rule of Civil Procedure 39.1 states that "plaintiff's counsel sums up first, followed by defendant's counsel, followed by a rebuttal summation by plaintiff's counsel." In this case, however, as plaintiffs concede, the Court, exercising its discretion, allotted plaintiffs' counsel one hour for close and rebuttal, permitting them to reserve as much of their hour as they desired for their rebuttal. In court, as plaintiff's counsel approached the one-hour mark during his summation, the Court reminded him to keep track of his time. Counsel for plaintiffs nevertheless took up more than a full hour in his initial summation. The Court was within its discretion to refuse to permit plaintiffs' counsel to take up even more time for rebuttal, when he had already gone beyond the hour to which he had initially agreed. Any prejudice to plaintiffs from the absence of a rebuttal was de minimis, FN3 as they had already enjoyed more a than a full hour to sum up their case before the jury, and in any event such de minimis prejudice was entirely the result of counsel's failure to manage his time properly, and not of any error by the Court. No new trial is warranted on this ground.

> FN3. Plaintiffs assert that they were prejudiced because defendants, in their close, implied that a witness on damages had attempted to hide aspects of his past employment, and made other unrebutted "misstatements." Any comments regarding a witness on damages were irrelevant and moot, because the jury found no liability and did not reach the issue of damages. The only other alleged misstatement is that, as to plaintiffs' witness Dr. Pesuit, the case was a 'puppet show' wherein plaintiffs' counsel were 'marionetters.' This is not a factual statement, subject to rebuttal, but merely a subjective characterization which the jury was free to accept or reject without comment by plaintiffs' counsel.

### K. Improper Contact By Counsel With Spectator

*9 Plaintiffs argue that the Court erred in permitting defendants' counsel to communicate with the husband of one of the jurors, who attended the trial and sat in the rear of the courtroom. When plaintiffs' counsel raised this issue with the Court, the Court instructed all counsel to have minimal contact with jurors' relatives, without being rude to them. If plaintiffs' counsel observed subsequent communications, they had every opportunity to ask the Court to conduct voir dire of the juror or her husband, in order to determine the nature of the communications, but counsel did not do so. Plaintiffs do not allege that any communications with this spectator were actually improper, and in any event they have forfeited their opportunity to inquire into those communications in order to find out. The Court will not order a new trial because of an alleged conversation which may or may not have had anything to do with this case, and which plaintiffs did not investigate.

### L. Improper Admission Of Hearsay Statement

Plaintiffs argue that the Court erred in permitting defendants' counsel to cross-examine witnesses by describing the out-of-court statement of Benjamin Pitts. Pitts is reported to have stated that it appeared that Campbell was attempting to run over Hood with his car at the time of the shooting. Plaintiffs assert that the statement was inadmissible hearsay, because it was offered to prove the truth of the matter asserted. In fact, defendants did not offer Pitts' statement in evidence. Rather, defendants' counsel mentioned the statement while cross-examining witnesses. The jury was instructed that "statements and arguments of counsel are not evidence in the case unless the statement is made as an admission or as a stipulation of fact," and Pitts' statement was not presented as evidence. Plaintiffs may be concerned that the statement was, in effect, placed before the jury when defendants' counsel described it for purposes of asking whether witnesses had considered it or agreed with it, but the statement was only described in questions to the witnesses, who were free to reject it, contradict it, or deny that they had heard of it. Defendants' counsel were within their rights to use the statement for the limited purpose of cross-examining plaintiffs' expert Paul Rappaport, especially after Rappaport testified that Pitts' statement was among the pieces of

Not Reported in F.Supp.2d                                                                                                    Page 8
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

evidence he considered and discounted when forming his opinions. Defendants' counsel used the statement for the sole and proper purpose of cross-examining witnesses, and not as hearsay evidence, and the Court did not err in permitting this use of the statement.

### M. Dismissal Of Tort Claims For Gross Negligence And Property Damage

Plaintiffs contend that the Court erred by dismissing their claims for gross negligence and for property damage to the car driven by Campbell. Plaintiffs concede that these tort claims were barred unless they fell within one of the exceptions set out in Section 8542(b) of the Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8541 et seq. Plaintiffs repeat the argument they made at trial that both claims fall within the vehicle exception, which permits claims based on torts stemming from operation of a motor vehicle by an employee of a municipality. Plaintiffs argue that the chain of events in this case was set in motion by the officers' use of their unmarked car to blockade Campbell's car at a street intersection.

**\*10** The Court correctly found that defendants' alleged torts did not constitute, or occur during or because of, operation of a motor vehicle. Plaintiffs' tort claims arose entirely out of Hood's act of firing his gun once he had left the unmarked car, and Swinton's alleged failure to intervene to prevent plaintiffs' injuries. The Pennsylvania Supreme Court has endorsed a narrow interpretation of the vehicle exception, *see* Beitler v. City of Philadelphia, 738 A.2d 37, 38 (Pa.Cmwlth.1999), and has held that "to operate something means actually to put it in motion ... acts taken at the cessation of operating a vehicle are not the same as actually operating that vehicle." Love v. City of Philadelphia, 518 Pa. 370, 375, 543 A.2d 531, 533 (1993); *see also* City of Philadelphia v. Melendez, 156 Pa.Cmwlth. 271, 274-75, 627 A.2d 234, 235-36 (1993) (finding vehicle already parked at time of collision was no longer in operation, so tort claim stemming from collision did not fall under vehicle exception); Beitler, 738 A.2d at 39 (parked car with motor running not in operation for purposes of vehicle exception). Under Pennsylvania law, plaintiffs' tort claims did not arise from the operation of a motor vehicle, but rather from acts taken at the cessation of operating a vehicle. Therefore, plaintiffs' claims did not fall within the vehicle exception to the Tort Claims Act, and were properly dismissed.

### N. Failure To Give Specific Instruction Regarding Plainclothes Officers

Plaintiffs assert that the Court erred in failing to give their requested jury instruction regarding appropriate conduct by plainclothes officers, specifically their obligation to identify themselves as police officers before attempting to stop a civilian. "An instruction on negligent identification, the failure of identification, and its impact on the totality of circumstances should have been provided." Plaintiffs' Brief at 34. Plaintiffs assert that a plainclothes officer's failure to identify himself before attempting to make a stop constitutes "gross negligence," and that the Court should have instructed the jury on that point.

Plaintiffs cite Celmar v. Quarberg, 203 N.W.2d 45 (Wis.1973), and describe it as "controlling law." Setting aside the question of the binding effect of decisions of the Wisconsin Supreme Court on federal courts in the Eastern District of Pennsylvania, *Celmar* does not establish that a plainclothes officer violates the Fourth Amendment as a matter of law when he attempts to make a stop without first identifying himself. Celmar involved a common law tort claim for negligence, *see id.* at 50, the sort of claim that was properly dismissed in the instant case, see *supra.* At best, *Celmar* suggests that an officer's failure to identify himself is one factor that a jury may consider as part of the totality of the circumstances in assessing the reasonableness of a seizure. Here, the Court instructed the jury to consider the totality of the circumstances, and it would have been unnecessary and improper to assist plaintiffs by adding an instruction for the sole purpose of drawing their attention to a particular piece of evidence. Plaintiffs assert that "the jury did not have an appropriate instruction to consider on this issue ... [and] Plaintiffs are entitled therefore to a New Trial." Plaintiffs' Brief at 34. The jury did have an instruction on this issue: they were instructed that they could consider the totality of the circumstances. To claim that plaintiffs are automatically entitled to a new trial because the Court failed to draw the jury's attention to one action in a series of actions by a defendant, all of which

Case 1:04-cv-01394-GMS    Document 178-4    Filed 03/28/2006    Page 9 of 14

Not Reported in F.Supp.2d                                                                                           Page 9
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

were discussed at length at trial and during closing, is unfounded and absurd.

**\*11** Plaintiffs also cite Soller v. Moore, 84 F.3d 964, 969-70 (7 th Cir.1996), commenting that "one of the issues asserted was that the off duty officer was not immunized from using deadly force under 1983 because ... in failing to [identify himself as an officer,] he created a physically threatening situation." It is hard to understand why plaintiffs have cited this case, because the Seventh Circuit's actual holding, which applies nearly exactly to the facts in the instant case, rejected the very argument for which plaintiffs cite the case: In this case, giving an instruction on negligent identification and self-defense theories on the basis of this evidence might have been confusing to the jury. It was not one of the pivotal issues to be decided. Furthermore, the jury instructions actually given as a whole correctly informed the jury of the applicable law. The jury was instructed on the law regarding § 1983 actions, Fourth Amendment protections against unreasonable seizures, and a police officer's duty, in making an arrest or seizure, to use only such force as is necessary under the circumstances. More specifically, the jury was instructed that whether or not the force used was reasonable was to be determined in light of all the surrounding circumstances. Soller was able to argue to the jury that the surrounding circumstances included Moore's failure to clearly identify himself and, therefore, his use of deadly force against Satermo was unreasonable. This was simply an excessive force case requiring the jury to objectively review the officer's conduct in light of the surrounding circumstances. On this issue, the jury was properly instructed.

Soller, 84 F.3d at 970. Here, likewise, the jury was properly instructed on excessive force and the law against unreasonable seizures. Plaintiffs had no claim for negligent identification, and that was not one of the pivotal issues to be decided; rather, it was one factor that the jury could consider in determining whether or not the force used was reasonable. There was no void in the applicable law on use of excessive force that was presented to the jury, and the refusal to provide an instruction on negligent identification did not prejudice plaintiffs, and does not warrant a new trial

### O. Verdict Against Greater Weight Of Evidence

Plaintiffs contend that the Court should grant a new trial because the verdict was against the greater weight of the evidence. "Where the movant seeks a new trial on the basis that the verdict is against the weight of the evidence, the Court's power to overturn the jury's award is severely circumscribed." Henry v. Hess Oil Virgin Islands Corp., 163 F.R.D. 237, 242 (D.V.I.1995). The Third Circuit Court of Appeals has held that where, as here, the subject matter of the trial is simple and easily comprehended by intelligent laymen, the verdict should be subjected to less demanding scrutiny. See Lind v. Schenley Indus., Inc., 278 F.2d 79, 90-91 (3d Cir.), cert. den., 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1349 (3d Cir.1991). If the verdict offends the conscience of the court, however, "on a motion for a new trial ... the judge may set aside the verdict even though there is substantial evidence to support it." 11 Wright, Miller & Kane, Federal Practice and Procedure § 2806 (2d ed.1995). To survive Rule 59 scrutiny on "weight of the evidence" grounds, the jury's verdict must have more than just some evidentiary basis; it must be plausible in light of the full evidentiary record. See Williamson, 926 F.2d at 1349.

**\*12** In the instant case, the verdict was fully supported by the evidence, and it did not result in a miscarriage of justice. The evidence allowed the jury to find that a reasonable officer in Hood's place would have felt that he was at grave risk of serious physical harm if he did not use deadly force to defend himself, and that Swinton did not have a realistic opportunity to intervene in an attempt to prevent the use of deadly force. The uncontradicted evidence showed that, once his car was partially blocked in front by the unmarked police vehicle, Campbell had accelerated in the general direction of Hood, who, after driving around the left side of Campbell's car, making a right turn and stopping in a generally perpendicular alignment to Campbell's car, had exited the driver's side of his car and walked to the back to approach Campbell's stopped car. The jury was entitled to believe the witnesses, including Hood himself, who testified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01394-GMS   Document 178-4   Filed 03/28/2006   Page 10 of 14

Not Reported in F.Supp.2d                                                                                                              Page 10
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

that he verbally identified himself as an officer, held up a badge, drew his weapon as the car began to drive towards him and fired his gun only as the car was coming close to him and he was moving backwards in an effort to get out of the car's path. This testimony, if believed, would clearly lend support to the defendants' theory that a reasonable officer, under similar circumstances, would also have employed deadly force, because he would have felt that he was at risk of serious bodily injury, and that the car was coming towards him even as he tried to evade it, so that the only way to avoid serious bodily injury was to fire his weapon. The jury was also entitled to believe Swinton's testimony that he had no idea what was about to happen, and did not realize that Hood had his gun out until Hood was about to fire and he was too far away to have any chance to intervene.

The evidence was contradictory on the points in plaintiffs' case, and plaintiffs understandably wish that the jury and the Court would accept the testimony of those witnesses who suggested that Hood failed to identify himself, had his gun drawn as he walked towards Campbell's car, began to fire before the car even started to accelerate, and stood in one spot as he fired, with no apparent concern for his safety. The jury was not obliged to accept this testimony, however, and the witnesses who contradicted plaintiffs' theory of the case were not obviously dissembling or otherwise lacking in credibility. Plaintiffs' own expert, Dr. Pesuit, showed the jury and the Court a computer graphics reconstruction of the incident as he believed it had taken place, and his video depicted a car which, at least for a moment, was driving almost directly at Hood from a distance of less than forty feet. FN4 As the Supreme Court has stated, the determination of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments, in tense and rapidly evolving circumstances, about the amount of force that is necessary in a particular situation. Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872 (1989); Raso, 183 F.3d at 289.

> FN4. Plaintiffs' argument that the verdict went against the weight of the evidence rests largely on their faith in the testimony of Dr. Pesuit. They complain that "the jury essentially rejected the unshaken 'geometry' and findings in the reenactment of Pesuit, and also his conclusion, and Hood own testimony that he shot at the back/rear of Campbell, as the car is already passed him; according to Pesuit-90 feet up the road." Plaintiffs also submit that "Hood has himself running backwards and shooting ... which according to Pesuit would mean he can run backwards (while shooting even) faster than the fastest human runs forward-30 ft. per second." Plaintiffs' Brief at 40. Plaintiffs may wish it were otherwise, but the jury was fully entitled to reject part or all of Dr. Pesuit's testimony, even if no other 'expert' specifically rebutted every single point that he made. His testimony involved a series of interlocking estimates and suppositions, and the jury was entitled to conclude that one or more of the assumptions that formed the basis of his reenactment were incorrect. Hood testified that, terrified and frantic, he fired all four shots as fast as he could, rather than waiting until the car was up the road. No eyewitness specifically testified that Hood coldly waited to fire his last shot until the car was ninety feet past him, and the jury was entitled to reject the reenactment by Pesuit, who was not present for the shooting.

**\*13** The central issue in this case, as defined by the Third Circuit and as explained to the jury in the Court's instructions, was this: giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that the suspect posed a significant threat of death or serious physical injury to the officer, and that deadly force was necessary to prevent the suspect from causing death or serious physical injury? *See* Raso, 183 F.3d at 289. On the evidence presented at trial, the jury could reasonably have found that it was objectively reasonable for Hood to believe that it was necessary to use deadly force to prevent Campbell from causing him serious physical injury. A jury could likewise have found that Swinton did not have realistic opportunity to intervene, and that plaintiffs could therefore not maintain a claim against Swinton for failure to

Case 1:04-cv-01394-GMS   Document 178-4   Filed 03/28/2006   Page 11 of 14

Not Reported in F.Supp.2d                                                                                                   Page 11
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

intervene to prevent the use of excessive force. *See Boggs, 33 F.3d at 857.* The Court, subjecting the verdict to 'less demanding scrutiny,' and respecting its own severely circumscribed authority, finds that the verdict does not 'cry out' to be overturned, does not shock the Court's conscience, and does not form the basis for granting a new trial.

### P. Manifest Injustice

Plaintiffs argue that the verdict has caused a manifest injustice, and that they are therefore entitled to a new trial. Plaintiffs' argument on this point essentially consists of a rehash of their argument on the other sixteen assignments of error, and those arguments fail for the reasons set forth above. FN5

> FN5. For instance, plaintiffs complain that "[t]his jury was not told that they should consider the preparation of blocking the Campbell vehicle as a part of the totality of circumstances in accessing [sic] the reasonableness of the shooting of Dwayne Campbell[.]" Plaintiffs' Brief at 49. As explained above, it is not the role of the Court to assist plaintiffs by drawing the jury's attention to pieces of evidence which assist their argument. The jury was told that it could consider the officers' actions prior to the shooting, and it would have been improper for the Court to single out particular actions, thereby alerting the jury to the special importance of those actions. If the jury wished to view the officers' act of blocking the Campbell vehicle as part of the totality of the circumstances, they were free to do so; the Court did not say anything to the jury which discouraged or prevented them from doing so. Plaintiffs' counsel was free to draw the jury's attention to that action during closing statements, but it is not the role of the Court to marshal the evidence in plaintiffs' favor.
>
> Plaintiffs appear to register the additional complaint that the Court should have instructed the jury to consider whether or not the officers' actions prior to the shooting also constituted excessive force in violation of the Fourth Amendment.

Plaintiffs state, "because of what happened whenever the Campbell vehicle was blocked, ... some additional facts come into play. The Jury was not also instructed that this additional conduct was required to be assessed for not only its unreasonable nature, but ... whether it constituted excessive force unreasonably imposed upon the Plaintiffs ." Plaintiffs' Brief at 47. According to the evidence at trial, neither Hood nor Swinton made physical contact with plaintiffs or with their car until Hood fired his gun. Plaintiffs cite no authority for the proposition that police officers can be liable for excessive force when they do not make any physical contact with a suspect. It is doubtful that plaintiffs could maintain a claim for excessive force under the Fourth Amendment when the officers did not apply any force directly to them, *see Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989) ("[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest ... or other "seizure"... should be analyzed under the Fourth Amendment .... [b]ecause the Fourth Amendment provides ... constitutional protection against this sort of *physically intrusive* governmental conduct[.]") (emphasis added), but even assuming such a claim could exist in theory, plaintiffs could not maintain such a claim in this case, as they were sitting in a stopped car when the officers drove in front of them, and the officers' conduct had no physical effect upon them, directly or indirectly, until Hood fired his gun.

Plaintiffs' discussion on the issue of 'manifest injustice' emphasizes one particular point which is threaded throughout their brief, and evidently forms the background for their entire view of the case. They believe that, in *Abraham v. Raso,* 183 F.3d 279, 295 (3d Cir.1999) the Third Circuit explicitly adopted the holding in *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1501-02 (11 th Cir.1995), and that *Gilmere* holds that "an officer's gross negligence in creating the need to use deadly force constitutes an impermissible seizure under the Fourth Amendment," and that the officer is automatically liable for injuries resulting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 12
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

from that use of force. Plaintiffs' Brief at 47. Plaintiffs believe that, whatever Hood may have been thinking at the moment of the shooting, he was grossly negligent in performing an abrupt, non-textbook traffic stop for a minor violation, while in plainclothes in an unmarked police car, and then (allegedly) failing to identify himself to a motorist who feared that he was being carjacked and consequently tried to escape the encounter. Plaintiffs appear to believe that the officers' pre-shooting behavior was therefore the sole cause of the shooting, and that, under *Gilmere,* the officers are automatically liable for the shooting, because the seizure in this case was by definition "unreasonable," no matter how honestly Hood may have feared serious bodily injury at the moment he fired. Plaintiffs believe that this conclusion is obvious and compelled by controlling law, and that any finding to the contrary is therefore shocking to the conscience. As plaintiffs describe the "main point" of their argument: "What is the effect of Hood/Swinton's failure to employ 'reasonable methods' in whatever the nature of the intended confrontation with the Campbell vehicle on the availability to them of the right to use deadly force in alleged self defense?" Plaintiffs' Brief at 44.

**\*14** Plaintiffs have misinterpreted the state of the law. Contrary to plaintiffs' insistence, the Third Circuit has not adopted the holding of *Gilmere,* as plaintiffs describe it. The court noted in *Raso* that "where an officer's conduct amounts to more than a minor departure from internal department policy, and in particular where the officer engaged in intentional misconduct, courts have found that the officer's acts creating the need for force are important in evaluating the reasonableness of the officer's eventual use of force." *Raso,* 183 F.3d at 295 (citing *Gilmere,* 774 F.2d at 1501-02). *Gilmere,* therefore, does not stand for the proposition that officers who act unreasonably in a manner that helps to create the need for force are automatically liable for damages resulting from the force they use; rather, according to the Third Circuit, *Gilmere* stands for the proposition that an officer's actions play an 'important' role into the evaluation of the reasonableness of the use of force, so long as those acts amount to more than a minor departure from department policy. FN6

> FN6. In the present case, as explained above, the jury was told it could examine the officers' acts prior to the use of force. If the Court departed from the *Gilmere* holding, as elucidated by *Raso,* it was only in declining to emphasize that the officers' acts may have created the need for force and that they are therefore "important" in evaluating the reasonableness of the shooting.

Even this proposition was not adopted in *Raso.* The court noted that it did not reach the issue of whether a breach of police policy which created the need for deadly force would have rendered that deadly force automatically unreasonable. *See Raso* at 295. The court pointed out that "a number of courts have refused to find officers liable based on their lapses in following police department procedures, even though those lapses may have contributed to the use of force," and cited *Gilmere* as a case which reached a contrasting result. *Id.* The court explicitly stated that it would "leave for another day how these cases should be reconciled." *Id.* at 296.

The cases mentioned by the Third Circuit in *Raso,* moreover, deal with deliberate creations of a need for deadly force. In *Gilmere,* the officers brutally beat a suspect, who, naturally and predictably, tried to get away from them, and had gotten up and ran at one officer when he was shot. *See id.* at 1497. In *Estate of Starks v. Enyart,* 5 F.3d 230, 234 (7 th Cir.1993), an officer jumped in front of the decedent's car after the car began accelerating. If these cases were adopted in the Third Circuit, and if departures from policy were, as a matter of law, important factors in creating liability for the use of force, it would be because those departures constituted intentional misconduct, or something close to it. The connection between *Gilmere* and *Enyart* is that in both cases, the officer had a full opportunity to realize that he or she was doing something wrong, that their actions were very likely to lead immediately to the need to employ deadly force to stop a suspect, and that he or she could and should choose a different course of action which would not set up a situation in which a frightened, confused suspect was heading directly towards them.

**\*15** In the present case, by contrast,, however serious the officers' departures from policy may have been, there is no evidence that they were intentional, and they did not consist

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01394-GMS    Document 178-4    Filed 03/28/2006    Page 13 of 14

Not Reported in F.Supp.2d                                                                                          Page 13
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

of actions which created an obvious, unmistakeable likelihood that the suspect would move towards them threateningly. Campbell's car was stopped, and there was no evidence that the officers' actions knowingly left Campbell with no option other than to drive in Hood's direction. Viewing the evidence from plaintiffs' perspective, it may have been entirely understandable that Campbell would feel that he would feel that he was being carjacked, and that he had to attempt to leave the encounter for his own safety and that of his niece, but the evidence did not establish, as a matter of law, that the officers' improper traffic stop, in and of itself, created the need for deadly force. Campbell could have remained stationary, as he was when they drove up, and it is entirely plausible that the officers expected him to do just that. The purpose of pulling their car in front of his, after all, was to discourage flight, not to encourage it. Hood's approach to Campbell's car may have been unprofessional, ill-advised, and puzzling, but he did not jump in front of a moving car, or physically beat Campbell-he simply walked towards a stopped car.

On the facts of this case, even if the Court were to assume that *Gilmere* had been tacitly adopted in the Third Circuit, the officers did not knowingly create the need for deadly force, and therefore the Court did not err by declining to instruct the jury that the officers' actions held special importance in assessing the use of deadly force. The jury was allowed to consider the officers' actions leading up to the shooting as part of the totality of the circumstances in which the shooting took place, but those actions were not especially "important in evaluating the reasonableness of the officer's use of force" in this case, because the reasonableness of the use of deadly force depends upon whether it was objectively reasonable for the officer to believe that the suspect posed a significant threat of serious physical injury to the officer, and that deadly force was necessary to prevent the suspect from causing such serious physical injury. An officer's violations of departmental policy which knowingly create a dangerous situation by provoking a suspect are important to the evaluation of the reasonableness of the use of force, because an objectively reasonable officer would recognize that such actions are likely to create the need for deadly force. An objectively reasonable officer, in such circumstances, would recognize that deadly force would not be necessary to prevent the suspect from causing serious physical injury because the officer could and should choose to cease his violations of department policy, which he knew to be provoking a deadly encounter, and thereby avoid creating such an encounter. By contrast, when an officer does not intentionally or knowingly create the need for deadly force, a reasonable officer in similar circumstances might not recognize that he or she had an alternative to the use of deadly force, and therefore would likely believe that deadly force is necessary to prevent serious bodily injury. In short, the reasonableness of the use of deadly force depends upon whether a reasonable officer would believe that he or she had to employ such force, and if a reasonable officer would not recognize that his or her transgressions were creating the need for deadly force, and that the need for force could be averted by ceasing those transgressions, then the officer's violations of policy are of no special importance in evaluating the constitutional reasonableness of the ultimate use of force.

***16** In the present case, plaintiffs were entitled to argue to the jury that Hood and Swinton had knowingly or intentionally created the need for the use of deadly force, and that Hood could have easily refrained from pointing his gun at the car, and could have easily stayed out of the path of the car rather than standing still and firing off four shots. The jury was not obliged to accept this argument, however, and there has been no manifest injustice if the jury weighed the evidence and found that Hood, though he acted foolishly and unprofessionally, did not expect the car to come towards him, and reasonably felt that he was left with no choice but to fire his gun, in order to avoid being run over by a driver who ignored his instructions to remain still. An objectively reasonable officer would probably not have committed the violations of police directives that Hood committed, but, even having committed them, a reasonable officer in Hood's situation would not necessarily have realized that he was about to be put in fear of life or limb by the suspect's reaction to his improper traffic stop.

Plaintiffs do not argue that the record shows that Hood and Swinton knowingly or intentionally created the need for deadly force in this case; rather, they assert that, under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01394-GMS    Document 178-4    Filed 03/28/2006    Page 14 of 14

Not Reported in F.Supp.2d                                                                                                    Page 14
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Fourth Amendment, the officers' conduct prior to the shooting must be evaluated "for gross negligence in creating the need to use deadly force under *Gilmere* principals [sic] of law." Plaintiffs' Brief at 46. Plaintiffs are so taken with their theory that they actually state that "an officer's gross negligence in creating the need to use deadly force constitutes an impermissible seizure under the Fourth Amendment," ending the sentence with quotation marks as though it were a quote from a case, and then provide a cite to *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701 (1985). Plaintiffs' Brief at 47. *Garner* does not support this proposition, directly or indirectly, on that page or any other, and neither does *Raso;* nor, as the Court reads it, does *Gilmere. Gilmere,* as elucidated by the Third Circuit in *Raso,* see *supra,* does not introduce a new tort standard into Fourth Amendment analysis; rather, it identifies one factor which may be given special weight in the usual examination of the reasonableness of the seizure. As the Fifth Circuit has noted, and as plaintiffs recognize, "the constitutional right to be free from unreasonable seizure has never been equated by the Supreme Court with the right to be free from a negligently executed stop or arrest." *Young v. City of Killeen,* 775 F.2d 1349, 1353 (5 th Cir.1985).

The degree to which plaintiffs have been led astray by their misguided theory of the law is manifest in the wording they choose to describe the "main point" of their argument: "What is the effect of Hood/Swinton's failure to employ 'reasonable methods'... on the availability to them of the right to use deadly force in alleged self defense?" Plaintiffs' Brief at 44. Plaintiffs appear to believe that when an officer acts with what plaintiffs consider "gross negligence," he or she forfeits the right to use deadly force in self-defense. That is not the law in the Third Circuit, however-the right to use deadly force remains 'available' to a police officer whenever he or she reasonably believes that such force is necessary to prevent death or serious bodily injury to himself or another person. In the Third Circuit, unlike in the Eleventh, district courts have not been directed to place special importance upon a officer's knowing or intentional violations which create the need for deadly force. Rather, courts continue to examine the totality of the circumstances, and to focus on the viewpoint of an objectively reasonable officer in similar circumstances. In this case, based on the evidence, a jury viewing the totality of the circumstances was able to conclude that Hood's admitted violations of police procedure did not put him on notice of an imminent need to use deadly force, and therefore that when the car accelerated in his general direction, he could have found himself in unexpected danger, and made a reasonable split-second decision that shooting at Campbell's car was necessary to avoid serious physical harm. The verdict was not manifestly unjust-it was in accordance with the law and with a plausible view of the facts.

### IV. CONCLUSION

**\*17** Plaintiffs' claims for failure to train and supervise, for negligence, and for property damage were properly dismissed. The Court did not make any error at trial in ruling on admissions, evidence, or argument by counsel, or in giving instructions and special interrogatories to the jury, which resulted in prejudice to plaintiffs. The jury's verdict comported with the evidence presented at trial, and did not result in a manifest injustice. For these reasons, plaintiffs' motion for a new trial is denied. An appropriate order follows.

### *ORDER*

AND NOW, this 25 th day of July, 2001, upon consideration of Plaintiffs' Post Trial Motions, requesting a new trial (Doc. # 120), and Defendants' Responses thereto, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that Plaintiffs' Motion is DENIED.

E.D.Pa.,2001.
Grazier ex rel. White v. City of Philadelphia
Not Reported in F.Supp.2d, 2001 WL 1168093 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.