## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,       :
       :
       Plaintiff,       :
       :
       v.       :
       :
COLONEL L. AARON CHAFFINCH,       :    C.A.No.04-1394-GMS
individually and in his official capacity as the       :
Superintendent, Delaware State Police;       :
LIEUTENANT COLONEL THOMAS F.       :
MACLEISH, individually and in his official       :
capacity as the Deputy Superintendent, Delaware       :
State Police; DAVID B. MITCHELL, individually       :
and in his official capacity as Secretary of the       :
Department of Safety and Homeland Security,       :
State of Delaware; and DIVISION OF STATE       :
POLICE, DEPARTMENT OF SAFETY AND       :
HOMELAND SECURITY, STATE OF       :
DELAWARE,       :
       :
       Defendants.       :
       :

## PLAINTIFF'S SECOND MOTION IN LIMINE TO EXCLUDE WITNESS TESTIMONY CONCERNING PLAINTIFF'S ALLEGED SEXUAL HISTORY

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: March 29, 2006       Attorneys for Plaintiff

**A.  Introduction.**    Defendants have made clear their intention to smear plaintiff with evidence of her alleged prior sexual history in this litigation. This intention was solidified in their supplements to their Rule 26 initial disclosures.  Defendants initially identified only four witnesses, but at the end of the discovery period, they managed to find and identify more than 40 witnesses. However, the purpose for many of these witnesses' testimony is to testify about plaintiff's past sexual history, a subject completely irrelevant to the facts and issues of the case.  Defendants are clearly trying to confuse and mislead the jury so they will not focus on the law and relevant facts and instead shift the focus away from defendant Chaffinch's wrongdoing.

**B. Discussion.**    Essentially, defendants claim that plaintiff should not be able to use evidence illustrating defendant Chaffinch's attitude and mind-set toward women and use of inappropriate sexual language and actions in the workplace.  So in return, as evidenced by their "what's good for the goose is good for the gander" statement[1], defendants want to smear plaintiff with her irrelevant sexual history because Chaffinch's actions are being brought to light.

There is a glaring disconnect between plaintiff's alleged sexual history and the evidence demonstrating Chaffinch's mindset towards women.  The evidence regarding Chaffinch is entirely relevant as to whether the decision-maker in this promotions case had an animus toward women, a protected class of persons whom he has never promoted to the rank of Major.  The Third Circuit has repeatedly held that evidence of a decision-maker's general hostility towards or disrespect for women is relevant to the issues of pretext and intent in gender discrimination

---

[1] At the November 17, 2005 chambers conference, defense counsel repeatedly used this phrase to justify the attempt to insert plaintiff's irrelevant sexual history into the case. (Tab A - Conference at 17, 21).  As plaintiff previously stated, "what's good for the goose is good for the gander" is not a legal principle. (Conference at 33).  The relevancy of the evidence must determined by its relation to the relevant legal theory. (Id.).

actions.[2]  The evidence is not being admitted for its propensity, which is barred by Federal Rule of

Evidence 404(b), but for non-propensity purposes such as intent and on the issue of pretext.

To the contrary, evidence of plaintiff's past sexual history is irrelevant and of no

consequence to this case. Fed.R.Evid. 401-402.  Further, the evidence lacks any probative value.

Any speculative probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues and the danger of misleading the jury. Fed.R.Evid. 403.  Chaffinch

testified at length about his purported reasons for not promoting plaintiff in 2003 and he did not

identify plaintiff's alleged sexual history as a reason. (Tab B - Chaffinch 148-49, 179).  Similarly,

plaintiff's alleged sexual history has never been identified as a reason for defendants' decision to

release plaintiff's confidential internal affairs information to the Delaware media within hours of

her filing this lawsuit.

> 1.      Chaffinch did not Consider Prior Sexual History When Making
>         Promotion Decisions.

Defendant Chaffinch has unequivocally admitted he only uses six factors when making a

promotion decision, sexual history was not included. (Chaffinch 148-49, 179).  Furthermore, he

had ample opportunities to expand upon these factors during his deposition.  For example,

Chaffinch originally identified five categories for making his decision - education, background,

experience with the DSP, tenure, and compatibility with other Executive Staff members.

(Chaffinch 148-149).  He was given an opportunity to expand these five categories.

Q.      So that gives me five categories. Were there any others that you considered?

A.      Not that I can recall.

(Chaffinch 149).  Later in the deposition, Chaffinch identified an additional factor, loyalty to the

---

[2]  See Becker v. ARCO Chemical Co., 207 F.3d 176, 194 n.8 (3d Cir. 2000); Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002); Hurley v. Atlantic City Police Dept., 174 F.3d 95, 110-11 (3d Cir. 1999); Andrews v. City of Phila., 895 F.2d 1469, 1485-86 (3d Cir. 1990).

Superintendent, bringing the total to six. (Chaffinch 179).  While testifying specifically about the

two promotions at issue and the six factors he took into consideration in making these promotions

he was given another chance to expand on the identified six factors.

> Q.    It's just that today is the time for you to give all the reasons.
>
> A.    I suppose it is.
>
> Q.    So are there any other reasons why you selected [Hughes] over the other
>        people?
>
> A.    Not that jump right out at me. I think I've hit on them all.
>
>                              * * *
>
> Q.    Is there anything else that you remember was a reason why [Eckrich] was
>        selected?
>
> A.    No, sir.

(Chaffinch 180-81).

In sum, Chaffinch never took a captain's sexual history into account when making the

2003 promotions to Major.  He clearly identified six relevant factors and was given ample

opportunity to expand those factors to include sexual history.  He never stated sexual history

played any role in his decision not to promote plaintiff over two less qualified males.[3]

> 2.    Testimony relating to the 1986 arrest of Vernon Thomas.

Additionally, defendants want to march several witness into court to testify to a

longstanding and false rumor that in 1986 plaintiff engaged in a sex act with another Trooper

while executing a search warrant in Vernon Thomas' home.  Defendants identify various

witnesses who "are familiar with the details" of this event, including Vernon Thomas, a convicted

felon.  Interestingly, however, if any part of this rumor and alleged incident had ever been

---

[3]  If this door is permitted to be opened, to rebut such claim, plaintiff will be forced to offer a
great deal of evidence pertaining to the sexual history, extra-marital affairs and other improprieties of the
male comparators in this case - such as Major Hughes.

substantiated by the DSP, it would have been investigated.  Then if found to be true, plaintiff

would have been brought up on disciplinary charges.  For example, minor infractions such as

denting the fender of a patrol vehicle or missing a court appearance are offenses you can get

written up for. (Chaffinch 182).  Yet, defendants would have us believe that something as serious

as engaging in an alleged sex act while searching for a fugitive somehow simply slipped through

the cracks.

      Any testimony by these witnesses about this alleged incident amounts to impermissible

hearsay. Fed.R.Evid. 801,802.  The details of this event are entirely irrelevant and have no

probative value. Fed.R.Evid. 401,403.  Further, any possible probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues and the danger of

misleading the jury. Fed.R.Evid. 403.  Additionally, most, if not all, of these witnesses lack

personal knowledge of the alleged incident. Fed.R.Evid. 602.

      To the extent defendants will argue that plaintiff's reputation is relevant and admissible

under Rule 412(b)(2), they are in error.  Rule 412(b)(2) only allows the admission of a victim's

sexual reputation if plaintiff was placed it in controversy.  Plaintiff never placed her sexual

reputation in controversy by filing a suit for denial of promotion and retaliation.  Furthermore, in

order to admit evidence under Rule 412(b)(2) defendants must show its probative value

*substantially* outweighs the harm to the victim.  Accordingly, they cannot meet this test as the

evidence has no probative value and any possible probative value is substantially outweighed by

the danger of unfair prejudice, confusion of the issues and the danger of misleading the jury.

      3.    <u>Testimony regarding plaintiff's prior sexual relations.</u>

      Defendants have not identified any witness who claims to have engaged in a sexual

relationship with plaintiff.  They only identified witnesses who claim to know about plaintiff's

alleged sexual affairs.  Thus, these witnesses who will only testify to knowledge of rumors lack

any personal knowledge with regard to plaintiff's sexual history. Fed.R.Evid. 602. Moreover,

testimony in this regard is irrelevant.  Again, plaintiff's sexual history is entirely irrelevant to

whether plaintiff was denied the two promotions because of her gender or was retaliated against

for exercising her right to free speech and petition.  Defendant Chaffinch had ample opportunity

to admit what factors and considerations he uses when making a promotion.  Never did he

identify a trooper's past sexual history in making his decision.  Furthermore, any sexual history

plaintiff may have had prior to her promotion to captain has been wiped clean under Third Circuit

case law. Hugh v. Butler County Family YMCA, 418 F.3d 265, 268 (3d Cir. 2005).[4]

**C. Conclusion.**  Consequently, plaintiff Moves that the defense be prohibited from

introducing evidence pertaining to plaintiff's prior alleged sexual history as it is irrelevant.

Moreover, any alleged speculative probative value does not substantially outweigh its prejudicial

effect, confusion of the issues and its potential to seriously mislead the jury into thinking plaintiff's

prior sexual history is any way relevant to the case.


Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

---

[4] When an employer chooses to promote a plaintiff, despite knowledge of alleged deficiencies in her qualifications, the employer cannot later rely on these same alleged deficiencies to claim that the employee was unqualified for the position at issue. Hugh, 418 F.3d at 268. See also Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989); Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995).

Dated: March 29, 2006                    Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,   :
             :
   Plaintiff,      :
             :
 v.          :
             :
COLONEL L. AARON CHAFFINCH,  :  C.A.No.04-1394-GMS
individually and in his official capacity as the :
Superintendent, Delaware State Police;  :
LIEUTENANT COLONEL THOMAS F.  :
MACLEISH, individually and in his official :
capacity as the Deputy Superintendent, Delaware :
State Police; DAVID B. MITCHELL, individually :
and in his official capacity as Secretary of the :
Department of Safety and Homeland Security, :
State of Delaware; and DIVISION OF STATE :
POLICE, DEPARTMENT OF SAFETY AND :
HOMELAND SECURITY, STATE OF  :
DELAWARE,        :
             :
   Defendants.     :
             :

## ORDER

  This _____ day of _____, 2006, it is hereby

ORDERED that the defendants be prohibited from introducing evidence pertaining to plaintiff's

prior alleged sexual history as it is irrelevant.


       _____
       THE HONORABLE GREGORY M. SLEET, U.S.D.J.

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that

on March 29, 2006, I electronically filed this **Motion** with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following:

Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley / Pleadings / Motion in Limine - Sexual History. FINAL

Tab

A

*Conley Pleadings* 1
*"Nov. 17 Teleconference Transcript"*

1      IN THE UNITED STATES DISTRICT COURT

2      IN AND FOR THE DISTRICT OF DELAWARE

3                    - - -

4    CAPTAIN BARBARA L. CONLEY,        :      Civil Action
                                       :
5              Plaintiff,              :
                                       :
6         v.                           :
                                       :
7    COLONEL L. AARON CHAFFINCH,       :
     individually and in his official:
8    capacity as the Superintendent, :
     Delaware State Police,            :
9    LIEUTENANT COLONEL THOMAS F.      :
     MACLEISH, individually and in     :
10   his official capacity as the      :
     Deputy Superintendent, Delaware :
11   State Police; DAVID B. MITCHELL,:
     individually and in his official:
12   capacity as Secretary of the      :
     Department of Safety and          :
13   Homeland Security, State of       :
     Delaware; and DIVISION OF         :
14   STATE POLICE, DEPARTMENT OF       :
     SAFETY AND HOMELAND SECURITY,     :
15   STATE OF DELAWARE,                :
                                       :
16         Defendants.                 :      No. 04-1394-GMS

17                    - - -

18              Wilmington, Delaware
            Thursday, November 17, 2005
19                 9:00 a.m.
              In Chambers

20                    - - -

21

22   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

23   **RECEIVED**
     NOV 3 0 2005

24

25   *TRANSCRIPT ORDERED*            *SEALED*

1    **APPEARANCES:**

2            **THOMAS S. NEUBERGER, ESQ., and**
             **STEPHEN J. NEUBERGER, ESQ.**
3            **The Neuberger Firm, P.A.**

4                            **Counsel for Plaintiff**

5            **STEPHANI J. BALLARD, ESQ., and**
             **RALPH K. DURSTEIN, III, ESQ.**
6            **Department of Justice - State of Delaware**

7                            **Counsel for Defendants**
                             **Delaware State Police,**
8                            **MacLeish and Mitchell**

9            **JAMES LIGUORI, ESQ.**
             **Liguori, Morris & Yiengst**

10
                             **Counsel for Defendant**
11                           **Chaffinch**

12                       **-   -   -**

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. Liguori, I understand you may

2    have to leave.

3          MR. LIGUORI:  Not necessarily.  If a phone call

4    comes, Your Honor.

5          THE COURT:  I am sure you have already told

6    everyone.  Mr. Liguori has a jury out.

7          Let's go around the room to identify ourselves.

8          MR. T. NEUBERGER:  Yes, I am Tom Neuberger

9    representing the plaintiff, Barbara Conley.

10          MR. S. NEUBERGER:  I am Steve Neuberger,

11    representing the plaintiff, Barbara Conley.

12          MR. DURSTEIN:  Ralph Durstein, representing

13    Defendants Delaware State Police, MacLeish and Mitchell.

14          MR. LIGUORI:  Jim Liguori, representing

15    Defendant Aaron Chaffinch.

16          MS. BALLARD:  Stephani Ballard for the State

17    Police, MacLeish and Mitchell.

18          THE COURT:  Good morning, all.

19          It seems things have gotten a bit testy.  I

20    thought this was appropriate, in light of the

21    letter-writing, even though one of the defendants or all of

22    the defendants maybe made a procedural point of the failure

23    to file a motion.  Nonetheless, the Court feels obliged to

24    manage its docket in the way it sees best to manage it.

25    This is the way I felt in this situation it was best to

1    and remarks not offend her, but she embraced and perpetuated

2    that kind of conduct.

3                But I would prefer, in good faith, to have it

4    explored, and then file the appropriate motions.  We don't

5    want to -- you know, maybe we should look at this at some

6    point in time, what is good for the goose is good the

7    gander, later on, after we get to discovery.  I submit, as I

8    mentioned in my note, I didn't think there was any

9    misconduct or anything on the part of anyone representing

10    the defendants.  I think the assumptions and supposition by

11    the plaintiffs are wrong.  As simple as that.

12                MR. T. NEUBERGER:  Your Honor, if I might

13    respond.

14                They have two arguments.  It's relevant on

15    liability, and then it's admissible on damages.  So I would

16    just like to -- he has raised the it's admissible on damages

17    argument.  I would like to just briefly respond to that.

18                THE COURT:  Is this related to your bifurcation

19    motion?

20                MR. T. NEUBERGER:  No.  He is saying they should

21    be able to take this discovery.

22                THE COURT:  I understand what you are saying.

23                MR. T. NEUBERGER:  What I am saying is, there

24    are two claims that they are arguing.  They are saying

25    because we are seeking injury to reputation and we are

1    official capacity or individual capacity defendants, the

2    judgment runs to the state with the new 11th Amendment bar.

3              THE COURT:  You mean the individual capacity.

4              MR. T. NEUBERGER:  Yes.  Or you get injunctive

5    relief running to the official, the attorneys' fees.  Maybe

6    they don't indemnify him or whatever and you can't collect

7    on your judgment.  The attorneys' fees can be collected.

8              So the state is in on both counts for that

9    purpose.  But they are not in for liability.

10             THE COURT:  Mr. Durstein, did you want to react

11   further to that?

12             MR. DURSTEIN:  I still have a duty to defend my

13   client, Your Honor.  I think it definitely matters.

14             MR. LIGUORI:  Your Honor, reading the complaint,

15   when responses were made, I agreed, I thought we were

16   defendants together in that.  I am a little surprised now to

17   hear that.

18             I will tell you that if plaintiffs want to

19   distill this down to just let's put the three people in the

20   pot, the two Majors and Conley, and forget everything else,

21   we are ready to do that.  What's good for the goose is good

22   for the gander.  I don't think anything has been done,

23   respectfully, in bad faith, at all.  I think there is a

24   good-faith basis for some of these comments because of the

25   way, now we want to say garden variety, the garden-variety

1    could respond in an intelligent fashion and decide who I had

2    to depose in the next six weeks.

3            This idea of putting off, carrying discovery a

4    couple months, may interfere with briefing and the trial

5    date.  I don't know if that is a good idea.  I have trials

6    in January and February, just like everybody else.  We have

7    all made our schedules accordingly.  I have got a one-week

8    trial in front of Judge Jordan, I have got a trial in

9    Newark, New Jersey, beginning of February.  Those kinds of

10   things always happen.

11           But that's a fair statement of where we are on

12   the interrogatories.

13           This thing about the ethics charge and

14   everything, I stand on the pleadings.  Rule 412 does not

15   permit them to be going down this road.  And I have tried to

16   articulate the reasons.  Good for the goose is good the

17   gander is not a legal principle that I am aware of.

18   Relevance is determined by what the legal theory is.

19           On Count One, the conduct of Chaffinch is

20   admissible because it shows his state of mind.  He treats

21   women as sex objects.  He disrespects women in the

22   workplace.  That is why his conduct is relevant.  For them

23   to claim therefore that opens up my client's conduct when

24   the issue, as I said in my memo, is -- and I gave

25   Chaffinch's deposition testimony, he says there were six

Tab

B



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

-------------------------------------------------------------------------

Transcript of:

## Colonel L. Aaron Chaffinch

June 6, 2005

-------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,            )
                                     )
              Plaintiff,             )
                                     )   Civil Action
v.                                   )   No. 04-1394-GMS
                                     )
COLONEL L. AARON CHAFFINCH,          )
individually and in his official     )
capacity as the Superintendent,      )
Delaware State Police; LIEUTENANT    )
COLONEL THOMAS F. MACLEISH,          )
individually and in his official     )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.      )
MICHELL, individually and in his     )
official capacity as Secretary of the )
Department of Safety and Homeland    )
Security, State of Delaware; and     )
DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY,     )
State of Delaware,                   )
                                     )
              Defendants.            )


          Deposition of COLONEL L. AARON CHAFFINCH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:35 a.m. on Monday,
June 6, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.
APPEARANCES:
          THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
            Wilmington, Delaware  19801
            for the Plaintiff
     -------------------------------------------------
                 WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

Conley                                          v.                          Chaffinch, et al.
Colonel L. Aaron Chaffinch              C.A. # 04-1394-GMS                   June 6, 2005

Page 2

1   APPEARANCES (Continued):
2
3       JAMES E. LIGUORI, ESQUIRE
        LIGUORI, MORRIS & YIENGST
4          46 The Green
           Dover, Delaware 19901
           for Defendant Colonel L. Aaron Chaffinch
5
        RALPH K. DURSTEIN, ESQUIRE
6       STEPHANI J. BALLARD, ESQUIRE
        DEPARTMENT OF JUSTICE
7          820 North French Street
           Carvel State Office Building
8          Wilmington, Delaware 19801
           for Defendants Lieutenant Colonel Thomas F.
9          MacLeish, David B. Mitchell, and Division
           of State Police
10
11  ALSO PRESENT:
12      CAPTAIN BARBARA L. CONLEY
13            - - - - -
14         COLONEL L. AARON CHAFFINCH,
15      the witness herein, having first been
16      duly sworn on oath, was examined and
17      testified as follows:
18  BY MR. NEUBERGER:
19      Q.  Could you state your full name for the record?
20      A.  Aaron Chaffinch.
21      Q.  Colonel Chaffinch, my staff or myself, we've
22  taken your deposition on other occasions; isn't that
23  correct?
24      A.  Yes, sir.

Page 3

1       Q.  You've even testified in two federal court cases
2   that I was involved in; is that right?
3       A.  Yes, sir.
4       Q.  I called you as a witness in those cases; right?
5       A.  Yes, sir.
6       Q.  Now, you understand, based on that experience,
7   that if there's any question I ask you today and any
8   answer you give, and I call you at trial and you say
9   something different, I can point that out to the judge
10  and jury?
11      A.  Yes, sir.
12      Q.  You know that.  Okay.
13          Are you taking any medications or anything
14  that would interfere with your ability to remember
15  things?
16      A.  I don't believe so.
17      Q.  You don't take blood pressure, heart medicine,
18  things like that?
19      A.  I don't think it would affect my memory, I don't
20  believe.
21      Q.  But you are not on anything odd or something
22  that affects your memory that you know of?
23      A.  Not that I'm aware of.
24      Q.  If I ever ask you a question that you don't

Page 4

1   understand, just ask me and I'll be glad to rephrase it.
2   Is that okay?
3       A.  Yes, sir.
4           MR. NEUBERGER:  Let's do this.  Let's mark
5   this as Plaintiff's Exhibit Number 1 and then we'll be
6   referring back and forth to this.  Let me give a copy to
7   counsel.  It's a copy of the First Amended Complaint in
8   the action.
9           (Plaintiff's Exhibit 1 was marked for
10  identification.)
11  BY MR. NEUBERGER:
12      Q.  Colonel, I'm going to ask you some questions
13  about how long you were with the force and how your
14  career, your assignments might have tracked assignments
15  that Captain Barbara Conley had.  Okay?
16          If you turn to paragraph 10 of that
17  document that's in front of you on page 4, you can see
18  there in that paragraph a listing that Barbara Conley
19  prepared at an earlier time of her assignments starting
20  as a patrol trooper at Troop 5 in Bridgeville in 1982 at
21  the bottom.  Do you see that?
22      A.  Yes, I do.
23      Q.  Then she works all the way up to captain,
24  director of traffic control section in 2001.  Do you see

Page 5

1   that?
2       A.  Yes, sir.
3       Q.  Let me just ask you a few questions about her
4   history.
5           Now, she indicated that she joined the
6   force as a patrol trooper in Bridgeville in 1982 and
7   she'll testify to that fact.  Were you assigned to
8   Bridgeville at that time?
9       A.  Yes, sir.
10      Q.  I think she's indicated that she believes that
11  when she started in Bridgeville, she was a patrol trooper
12  and you would have been a trooper first class assigned in
13  Bridgeville.  Does that sound about right?
14      A.  That's correct.
15      Q.  Then she indicates she was in Bridgeville from
16  1982 to 1983?
17          MR. LIGUORI:  I think it's '93, Tom.
18          MR. NEUBERGER:  Yes.  Thank you, Jim.  All
19  right.
20  BY MR. NEUBERGER:
21      Q.  She has indicated during that period of time
22  there was a time when you were assigned at Bridgeville,
23  also?
24      A.  Part of that time, yes, sir.

2 (Pages 2 to 5)

Conley                                              v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch                C.A. # 04-1394-GMS                        June 6, 2005

Page 146

1    A.  You mean that I may have inherited from the
2  previous superintendent?
3    Q.  Yes.
4    A.  Not to my knowledge.
5    Q.  I know, for example, that with reference to
6  lieutenants and sergeants, there's testing and there's
7  bands and things like that.  At that time the Delaware
8  State Police was using that process for those ranks;
9  right?
10    A.  For sergeant, lieutenant, captain, yes.
11    Q.  And for captain, too?
12    A.  Yes.
13    Q.  I remember seeing information about boards of
14  people who might interview captain candidates.
15    A.  Okay.
16    Q.  That's true, isn't it?
17    A.  Yes, sir.
18    Q.  Now, for majors there wasn't that kind of a
19  process?
20    A.  No, sir.
21    Q.  I think you're telling me that for majors there
22  was no process that you inherited from any of your
23  predecessors as far as filling those two major vacancies?
24    A.  That's correct.

Page 147

1    Q.  Are you telling me that there's no process in
2  the union contract between the State Police and the union
3  that applies to filling the vacancies?
4    A.  I'm not telling you that, no.
5    Q.  Is there anything in the union contract?
6    A.  Not to my knowledge.
7    Q.  I know there's that handbook, the Delaware State
8  Police rules and regulations, it's like a two-volume blue
9  thing I've seen with rules and regulations about the
10  State Police.  You are aware of that book; right?
11    A.  The administrative manual and the divisional
12  manual.
13    Q.  In those two manuals, was there any process that
14  guided your selection of the two majors for the positions
15  we are talking about?
16    A.  I think probably there may be something in there
17  about at the discretion of the superintendent, but
18  there's not any specific process, no.
19    Q.  So, for example, there was no preexisting rule
20  in writing that required that anybody selected for major
21  have a certain educational background?
22    A.  No, sir.
23    Q.  There wasn't anything in writing that required
24  that a person who was selected for major have any

Page 148

1  specific operational background?
2    A.  Well, I think it goes without saying you'd have
3  to be a captain.
4    Q.  Sure.
5    A.  You know what I mean.  So that is one parameter,
6  you know.  So you look at the captains in the agency to
7  make your selection and for the superintendent.  And
8  certainly education and background and experience and
9  tenure all came into play with any selections that I made
10  for executive staff people.
11    Q.  So you're saying that when you had to select
12  anybody to be part of the executive staff, you considered
13  education, background, experience, and tenure?
14    A.  That's correct.  Experience within the agency.
15    Q.  While that wasn't found in any preexisting
16  written document, those are factors you used?
17    A.  That's correct.
18    Q.  I guess I'm trying to find out:  Were there
19  other factors you used besides those four?
20    A.  Well, by background I would mean where they had
21  been within their tenure as a trooper based on what
22  position I'm filling.  I think you understand that.  That
23  somebody that had been in an administrative position but
24  not necessarily in an operational position probably

Page 149

1  wouldn't get an operational job.  You see what I'm
2  saying?  Those kind of things come into play with any
3  selections that I would make for staff level positions.
4         And compatibility with other members of the
5  executive staff certainly would come into play, as well.
6    Q.  I'll put down as another factor compatibility
7  with the other members of the executive staff.
8    A.  Yes.
9    Q.  So that gives me five categories.  Were there
10  any others that you considered?
11    A.  Not that I can recall.
12    Q.  I remember seeing in some of the other cases
13  affidavits or testimony talking about as people rise to
14  higher management levels in the State Police, it's
15  important that they have operational experience, meaning
16  like in patrol and actual on-the-road type experience.
17  That's a fair statement, isn't it?
18    A.  That's one very important facet, yes.
19    Q.  So that's important.  Okay.
20         For example, with respect to Captain
21  Barbara Conley, we know from paragraph 10 on page 4 of
22  the complaint that's in front of you that she was a
23  patrol trooper for eleven years at Troop 5.  Do you
24  remember that?

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Conley                                                    v.                                    Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                            June 6, 2005

Page 178

1    promotion from the Secretary of Safety and Homeland
2    Security James Ford, no.
3        Q.   So if I asked you for the record what were the
4    reasons for selecting Hughes, what would you explain as
5    the reasons why you selected Hughes?
6        A.   I don't know if I can tell you exactly the five
7    that are there.  Tenure, background, education --
8        Q.   The five are:  First was education, second is
9    background, third is experience within the Delaware State
10   Police, fourth is tenure, and fifth is compatibility with
11   other members of the executive staff.  Okay?
12           With that as a help, what were the reasons
13   why you selected Major Hughes?
14       A.   Okay.  Well, his tenure within the agency was
15   very well rounded.  He -- like I explained earlier, he
16   had been to the academy as the assistant director of the
17   academy, so he had been involved in training.  He'd been
18   in special investigations as a drug officer, so he had
19   experience in criminal investigations.  He had been a
20   patrol sergeant and run a shift at Troop 7.  He had been
21   a traffic lieutenant at Troop 5.  He had been a troop
22   commander at Troop 5.  He was a graduate of the FBI
23   National Academy.  He attained a master's degree in
24   public administration.  And he had worked his entire

Page 179

1    career in Kent and Sussex counties and he was familiar
2    with the area and the other troopers and the other
3    administrators of those troops.
4        Q.   Are there any other reasons?
5        A.   I thought he would be compatible with the other
6    staff members.  I think I've hit -- I hit on experience.
7    I hit on his background.  I hit on his tenure and his
8    education.  So I guess that there's not any others.
9        Q.   I'm just trying to be thorough.
10       A.   Loyal to the superintendent.
11       Q.   Excuse me?
12       A.   Loyal to the superintendent.
13       Q.   Is it fair to say that that's an additional
14   factor, or is that just within the other ones?
15       A.   That's within the others.
16       Q.   So loyal to the superintendent.  What do you
17   mean by that?
18       A.   Well, I had worked close with him and I knew
19   that he would support me in my position as
20   superintendent.  He would also do a good job.  He's
21   always been a go-getter.  He was one of the biggest
22   workers on the road when he was on the road.  He wrote
23   his share of traffic citations.  And he -- you know, he
24   did a lot of criminal work.  And I'll put his record up

Page 180

1    against anybody in the agency as far as work and
2    experience on the Delaware State Police.
3        Q.   It's just that today is the time for you to give
4    all the reasons.
5        A.   I suppose it is.
6        Q.   So are there any other reasons why you selected
7    him over the other people?
8        A.   Not that jump right out at me.  I think I've hit
9    on them all.
10       Q.   Now, if we go to Major Eckrich, how about giving
11   me the reasons why he was selected for the position?
12       A.   Okay.  From education standpoint, he's got a
13   master's -- a bachelor's and a master's degree.  He's a
14   graduate of Southern Police Institute in Louisville,
15   Kentucky, which is a command school for law enforcement
16   administrators.  He's -- he had worked patrol.  He had
17   worked as a patrol supervisor, a shift commander.  He had
18   worked at both as a criminal lieutenant and a traffic
19   lieutenant.  And he'd been a troop commander.  And I had
20   worked closely with him and I knew that he would be loyal
21   and -- loyal to me and we would be a good team to be a
22   part of the executive staff.
23       Q.   You mentioned loyal two times, so I do want to
24   ask you about that.

Page 181

1            You worked with Barbara Conley over your
2    career, too?
3        A.   Yes, I have.
4        Q.   Is there any reason for you to think she
5    wouldn't be loyal to you if she was selected?
6        A.   No, there's not.
7        Q.   So are they all the reasons for Major Eckrich?
8        A.   The other reason that we talked about earlier is
9    the fact that he had been in that position as a
10   lieutenant and that is a -- that is a large factor in my
11   decision.
12       Q.   So just so you understand I'm being fair with
13   you, if there's anything else you said earlier, we'll
14   include that in reasons why he was selected.  Okay?
15       A.   Yes, sir.
16       Q.   Is there anything else that you remember was a
17   reason why he was selected?
18       A.   No, sir.
19       Q.   Did you look into his disciplinary record?
20   Let's say Eckrich right now.  Did you check and see
21   whether he had any violations, suspensions, or things
22   like that in his record?
23       A.   I'm pretty sure he doesn't have any, but I
24   couldn't tell you exactly for sure, but if he has

Conley
Colonel L. Aaron Chaffinch

v.

C.A. # 04-1394-GMS

Chaffinch, et al.
June 6, 2005

Page 182

1 anything, it's got to be very, very minor. The same with
2 Major Hughes.
3     Q. Where does one look to find out?
4     A. The personnel file.
5     Q. So, for example, if you dented the fender of the
6 patrol vehicle or something, that's something you could
7 get written up for?
8     A. That's right. I got written up for it.
9     Q. Or you miss a court appearance or something?
10    A. That's right.
11    Q. There are various rules and regulations of the
12 State Police that regulate conduct of troopers; right?
13    A. Yes.
14    Q. So you can commit a violation and then be
15 disciplined in various ways; right?
16    A. That's correct.
17    Q. For this position of major, would you have
18 looked at that part of the personnel file that deals with
19 these kinds of minor infractions?
20    A. Yes, but I can't sit here today and tell you
21 what I saw because it's been so long ago.
22    Q. Well, is there some kind of a threshold or
23 something? What if a person does have some
24 infractions -- let's say over a 20-year career they do

Page 183

1 have --
2     A. It would depend on what the infractions were.
3 And I can tell you neither one of those captains that
4 subsequently became majors have anything that would be --
5 you know, that would scratch them from consideration.
6     Q. Right. But it is something you look at is what
7 you are telling me, you would?
8     A. And I did.
9     Q. You're saying there was nothing in their
10 personnel record that would have eliminated them from
11 consideration?
12    A. That's correct.
13    Q. Do you remember whether there was an
14 accumulation of suspensions, be it one day or two days,
15 in their records?
16    A. No, I don't remember sitting here today. It's
17 over two years ago, or nearly two years ago. And I can't
18 tell you what was in there. I'm sure they may well have
19 missed a court appearance as you used as an example
20 earlier, but there was nothing significant.
21    Q. Nothing significant. Okay.
22       Do you agree that my client, Barbara
23 Conley, was qualified at that time to be a major?
24    A. All captains were qualified.

Page 184

1     Q. For example, you may not be aware of this, but
2 present-Colonel MacLeish sent out a notice to all the
3 captains last week indicating that he was taking
4 applications to be promoted to major, that there were two
5 positions he was going to fill and that anybody
6 interested should apply by June 17th. So just accept
7 that as a fact. Okay?
8       That seems to imply that this e-mail sent
9 to 19 captains indicates that they are qualified to
10 apply. Let me ask you about your policies. Okay?
11      Were you saying that when you were making
12 this decision as who to promote to major, that all the
13 existing captains were qualified to be promoted to major?
14    A. Yes, I am.
15    Q. Thank you. Okay.
16       It's your testimony that you selected the
17 most qualified persons?
18    A. That's correct.
19    Q. Got you.
20       You weren't even making people apply or
21 tell you whether they were interested at the time or not?
22    A. Not at that time, no.
23    Q. You knew who the captains were and you
24 considered all the captains?

Page 185

1     A. That's correct.
2     Q. That's correct?
3       MR. LIGUORI: With regard to the
4 reservation that he said earlier about geography.
5       MR. NEUBERGER: Yes, yes, with that
6 understanding, right, right. Exactly.
7       Let's take a break. Okay?
8       (A recess was taken at this time.)
9 BY MR. NEUBERGER:
10    Q. You understand that you can't refuse to promote
11 a woman because she's a woman; right?
12    A. That's correct.
13    Q. You understand that the United States
14 Constitution would prevent that; right?
15    A. That's correct.
16    Q. You know that's illegal under state law; right?
17    A. Yes, sir.
18    Q. You know that would violate what we call the
19 14th Amendment, right to equal protection under the laws;
20 right?
21    A. Yes, sir.
22    Q. That's part of your police training to
23 understand that; right?
24    A. Yes, sir.

47 (Pages 182 to 185)