# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1394-GMS** |
| **individually and in his official capacity as the** | : | |
| **Superintendent, Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as the Deputy Superintendent, Delaware** | : | |
| **State Police; DAVID B. MITCHELL, individually** | : | |
| **and in his official capacity as Secretary of the** | : | |
| **Department of Safety and Homeland Security,** | : | |
| **State of Delaware; and DIVISION OF STATE** | : | |
| **POLICE, DEPARTMENT OF SAFETY AND** | : | |
| **HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFF'S THIRD MOTION IN LIMINE TO PRECLUDE TESTIMONY OF AN ALLEGED SEXUAL RELATIONSHIP

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: March 29, 2006                    Attorneys for Plaintiff

**A. Introduction**.  Defendants are obviously unhappy with the sworn testimony of

Capt. Glenn Dixon.  After all, as an insider with Col. Chaffinch, he was privy to the most

revealing statements about his mind set toward women.  For example, while on duty, he tells

people that "women are nothing but trouble" and "women are a pain in the ass." (Tab A -

Dixon 77-78).[1]  Capt. Dixon's testimony offers powerful testimony relevant to Chaffinch's

animosity towards women as the decision-maker in this promotions case.  Capt. Dixon was

subpoenaed to give his deposition and expressed fear that he would be retaliated against for his

subpoenaed testimony. (Dixon 72).

**B. Discussion.**  To discredit Dixon's testimony, the defense have identified witnesses

who will testify that Dixon and plaintiff have worked closely together and allude to some

alleged, illicit sexual affair.  Further, as testimony from these same witnesses in the <u>Price</u> and

<u>Forkaer</u> cases have revealed, defendants have a carefully orchestrated plan to address this

alleged affair during trial.[2]  More importantly, however, plaintiff's entire sexual history, much

less this illusion of an affair between plaintiff and Dixon, is irrelevant to the case.  Chaffinch

admitted he did not take into account sexual history when determining who to promote.  The

defendants' efforts to smear Capt. Dixon and plaintiff's names and their attempts to intimidate

and influence their testimony in this lawsuit are meritless.  Unfortunately, by testifying truthfully in

_____

[1] All appendix cites refer to plaintiff's appendix in support of her motion for summary judgment.

[2] These witnesses were also identified in the <u>Price</u> and <u>Foraker</u> cases and it is apparent that these same identified witnesses have more to say than defendants have revealed in the present case.  Either defendants have not been as forthcoming in their disclosures as in the <u>Price</u> and <u>Foraker</u> cases or they simply have been unable to elicit the same testimony from these witnesses.  Regardless, plaintiff is legitimately concerned about the obvious potential for sandbagging at trial regarding this alleged sexual relationship.

this case, Capt. Dixon's family now faces the threat of exposure to this false and scandalous

information which has no legal bearing upon the facts of this case. Further, plaintiff's

relationship and interactions with Capt. Dixon, which are entirely platonic in nature, are

immaterial to the present action.

First, the basis for the proposed testimony does not survive evidentiary scrutiny. It is

not based upon the personal knowledge of a competent witness. Fed.R.Evid. 602. The

majority of the testimony is also clearly incapable of surviving a hearsay challenge. Fed.R.Evid.

801-802. Additionally, the testimony is entirely irrelevant to the issues of the case. Fed.R.Evid.

401-402. And even if the testimony had an ounce of relevance, it is substantially outweighed

by its delay, prejudice, confusion and misleading nature of the issues because it simply lacks any

logical probative connection to any issue in the case. Fed.R.Evid. 403. Additionally, the

evidence offered is often speculative and subject to many interpretations.

> 1. Janet Vetter, a recently deceased civilian employee, told Lt. Campanella that
> "Conley had managed to get Glenn Dixon....to sleep with her and Janet could tell when
> it happened because of a sharp change in demeanor with both of them."

Campanella has no personal knowledge of the alleged remarks. Further, this statement

is undeniably irrelevant. Whether plaintiff and Dixon were sexually involved is of no

consequence to the determination of whether Conley was unfairly passed up for promotions or

whether the DSP retaliated against her for filing a lawsuit. Dixon was not a decision maker and

was not involved in the DSP leak of information. Further, Chaffinch admitted he did not take

into account sexual history when making promotion decisions. (Tab B - Chaffinch 148-

49,179).

This testimony is also hearsay. To the extent defendants claim this is a dying declaration

under Fed.R.Evid. 804(b)(2), defendants are mistaken as to the hearsay exception's

application.  The statement must be "made by a declarant while believing that the declarant's

death was *imminent*." Fed.R.Evid 804(b)(2) (emphasis added).  Campanella would testify that

he visited Ms. Vetter when she was in the hospital and that "she wanted him to know the truth"

and "'she could not die' with this on her mind."

There is no indication that while Ms. Vetter was in the hospital, she made this statement

believing her death was *imminent*.  "Fear or even belief that illness will end in death will not

avail itself to a make a dying declaration." <u>Shepard v. United States</u>, 290 U.S. 96, 99 (1933).[3]

"There must be 'a settled hopeless expectation' that death is near at hand, and what is said

must have been spoken in the hush of its impending presence." <u>Id.</u> at 100.  Ms. Vetter's

statements to Campenella clearly do not fall into this narrow hearsay exception.  There is no

indication that Ms. Vetter uttered these words to Campanella in the face of her imminent death.

Thus, these statements are excludable as inadmissible hearsay.

    2. Testimony that Capt. Dixon and plaintiff spent hours on the telephone, rode in a car
    together, rode around in a golf car together, spent time behind "closed doors," and
    were "always together at events."

This line of testimony is entirely irrelevant.[4]  How many hours Conley was on the phone

with Dixon has no bearing on Chaffinch's decision not to promote her or the retaliation taken

---

[3]  <u>See</u> <u>U.S. v. Peppers</u>, 302 F.3d 120, 137 (3d Cir. 2002)(The statement must be made "while 'conscious of impending death and under the belief that there is no chance of recovery.'"); <u>Sternhagen v. Dow Co.</u>, 108 F.Supp.2d 1113 (D.Mont.1999) (imminent death not found when declarant had three to six months to live).

[4]  On December 27, 2005 defendants clearly stated their intentions not to pursue Workman as a witness "unless necessary for impeachment or rebuttal." Accordingly, plaintiff submits that defendants have waived the use of Sgt. Workman as a witness.

against her.  Also, whether plaintiff and Capt. Dixon rode in a car together one night or rode around in a golf car together at the State Fair has no bearing on the issues in this case.  Further, the fact that they spent time behind closed doors and were seen together at events is perfectly understandable as they are co-workers and have worked together for years.  This testimony has no bearing on the pertinent facts of this case whatsoever and will only advance defendants smear campaign and intimidation of witnesses.  Even if the evidence had some scintilla of probative value, it would be substantially outweighed by its prejudicial effect and/or misleading or confusion of the issues.

 3. Sgt. Pete Fraley's testimony that plaintiff rubbed the upper leg of Glenn Dixon in 2003 at Headquarters.

 Testimony to this alleged occurrence is again, irrelevant.  The only plausible purpose defendants have for attempting to admit such testimony is to further their conspiracy theory that plaintiff and Dixon were involved in some alleged sexual affair.  Even still, this connection is entirely speculative in nature.  It is entirely possible Sgt. Fraley misinterpreted a friendly knee slap or an understanding, supportive gesture between friends.

 4. Capt. Dixon's subpoenaed testimony at his deposition in the <u>Price, et al. v. Chaffinch, et al.</u>, C.A.No. 04-956-GMS (D.Del.), and <u>Foraker v. Chaffinch, et al.</u>, C.A.No. 04-1207-GMS (D.Del.).

 On September 21st, 2005, Capt. Dixon was forced to testify under subpoena in the <u>Price</u> and <u>Foraker</u> cases.  Defense counsel therein asked a number of improper questions pertaining to defendants' intentions to smear Capt. Dixon and Capt. Conley's names and to intimidate them and influence their testimony in this lawsuit.

  Q. Isn't it true that you're totally compromised as a witness because you had an affair with Barbara Conley?

A. No.

Q. Have you ever had sex with Barbara Conley?

A. No.

\* \* \*

Q. Isn't it true that you would say anything you had to in this deposition to keep Barbara Conley from making the fact that you had sex with her public?

A. No.

(Tab C - Dixon deposition from <u>Price v. Chaffinch</u>, at 98-101).  The baseless line of questioning only reveals the concerted and well thought out defense attack and smear campaign which has the dual purpose of introducing plaintiff's sexual history and discrediting her name, while placing fear in the mind of Capt. Dixon to influence his damaging testimony to defendant Chaffinch.

**C. Conclusion.** Consequently, plaintiff Moves that the defense be prohibited from using witnesses to the extent they will testify about an alleged relationship between Capt. Dixon and plaintiff and that they be precluded from raising these issues in any way whatsoever in this action.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: March 29, 2006              Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1394-GMS** |
| **individually and in his official capacity as the** | : | |
| **Superintendent, Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as the Deputy Superintendent, Delaware** | : | |
| **State Police; DAVID B. MITCHELL, individually** | : | |
| **and in his official capacity as Secretary of the** | : | |
| **Department of Safety and Homeland Security,** | : | |
| **State of Delaware; and DIVISION OF STATE** | : | |
| **POLICE, DEPARTMENT OF SAFETY AND** | : | |
| **HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**ORDER**

This _____ day of _____, 2006, it is hereby

ORDERED that the defendants be prohibited from using witnesses to the extent they will testify

about an alleged relationship between Capt. Dixon and plaintiff and that they be precluded from

raising these issues in any way whatsoever in this action.

_____
**THE HONORABLE GREGORY M. SLEET, U.S.D.J.**

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that

on March 29, 2006, I electronically filed this **Motion** with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following:


Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley / Pleadings / Motion in Limine - Dixon issues. FINAL

Tab

A



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---------------------------------------------------------------

Transcript of:

Captain Glenn Donald Dixon

July 13, 2005

---------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Conley                                    v.                          Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS                      July 13, 2005

Page 1

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,            )
                                      )
                Plaintiff,            )
                                      )  Civil Action
v.                                    )  No. 04-1394-GMS
                                      )
COLONEL L. AARON CHAFFINCH,           )
individually and in his official      )
capacity as the Superintendent,       )
Delaware State Police; LIEUTENANT     )
COLONEL THOMAS F. MACLEISH,           )
individually and in his official      )
capacity as the Deputy Superintendent, )
Delaware State Police; DAVID B. MITCHELL )
Individually and in his official      )
capacity as Secretary of the Department )
of Homeland Security, State of Delaware;)
and DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY, State )
of Delaware,                          )
                                      )
                Defendants.           )

        Deposition of CAPTAIN GLENN DONALD DIXON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 9:30 a.m., on Wednesday, July 13,
2005, before Eleanor J. Schwandt, Registered Merit
Reporter and Notary Public.


APPEARANCES:

            THOMAS S. NEUBERGER, ESQ.
            THE NEUBERGER FIRM, P.A.
              2 East 7th Street, Suite 302
              Wilmington, Delaware  19801
              for the Plaintiff

            (Appearances continued on page 2.)

                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Conley                                        v.                          Chaffinch, et al.
Captain Glenn Donald Dixon        C.A. # 04-1394-GMS                      July 13, 2005

Page 2

1  APPEARANCES (Continued):
2        STEPHANI J. BALLARD, ESQ.
         RALPH K. DURSTEIN, ESQ.
3        DEPARTMENT OF JUSTICE
            820 North French Street
4           Carvel State Office Building
            Wilmington, Delaware  19801
5           for the Defendants Lieutenant Colonel Thomas F.
            MacLeish, David B. Mitchell, and Division
6           of State Police
7  ALSO PRESENT:
         CAPTAIN BARBARA  L. CONLEY
8        CAMILLE M. MARTIN, Law Clerk
9            - - - - - - - - - -
         (Mr. Durstein not present at this time.)
10
11        GLENN DONALD DIXON,
12     the witness herein, having first been
13     duly sworn on oath, was examined and
14     testified as follows:
15            EXAMINATION
16  BY MR. NEUBERGER:
17     Q.  Could you state your full name for the record.
18     A.  Yes, Glen Donald Dixon.
19     Q.  Okay.  And you are a captain in the Delaware
20  State Police?
21     A.  I am.
22     Q.  And is it fair to say you have testified in court
23  before?
24     A.  I have.

Page 3

1     Q.  Okay.  And have you ever had your testimony taken
2  in a deposition before?
3     A.  Maybe once or twice.
4     Q.  Okay.  So you are a little bit familiar?
5     A.  Yes.
6     Q.  Okay.  Well, what happens is the court reporter
7  types up the questions and answers.  You have the right
8  to look it over when it is done to see if she made a
9  mistake in taking down an answer or something to make
10  corrections.  Do you understand that?
11     A.  Yes, I do.
12     Q.  Okay.  And then at trial, at trial, if you said
13  something different than today, I would have the
14  opportunity to point that out to the judge and jury.  You
15  understand that?
16     A.  Yes.
17     Q.  Okay.  So I don't want you to do any guessing.
18  So try to answer to the best of your ability.  Or if I
19  ask a question that's a stupid question, you don't
20  understand, just ask me to rephrase it and I'll be glad
21  to do it.  Okay?
22     A.  All right.
23     Q.  Thanks.  Now, could I ask you very quickly, we
24  will just march through when you went to the academy to

Page 4

1  your present assignment.  When did you graduate from the
2  academy?
3     A.  1988.
4     Q.  1988.
5     A.  I began in June of '88 and graduated in the fall.
6     Q.  Okay.  What was your first assignment?
7     A.  It was at State Police Troop 5 in Bridgeville.
8     Q.  Troop 5.  So that was a, what do you call them,
9  patrol?
10     A.  Patrol troop.
11     Q.  All right.
12     A.  Yes.
13     Q.  So Troop 5, and how long were you there?
14     A.  I was there until I was promoted to sergeant,
15  which was about nine, nine years, and then I moved over
16  to Troop 4 in Georgetown.
17     Q.  Let me see.  Troop 4.  Was it six months in the
18  academy?  Three months?
19     A.  I think back then it was like a four-month
20  period.
21     Q.  Four months.  So would it have been the end of
22  '88 when you went to Troop 5 or the very beginning of
23  '89?
24     A.  It was actually around, with the field training

Page 5

1  in it, I trained in field training in Woodside, after
2  field training I went down there end of November, early
3  December, around there.
4     Q.  That's when you started at Troop 5?
5     A.  Yes.
6     Q.  Okay.  And then if we say nine years --
7     A.  Well, I was promoted in '96.
8     Q.  '96, sergeant?
9     A.  Yes.
10     Q.  All right.  So '96 is when you went to Troop 4
11  then?
12     A.  Yes.
13     Q.  All right.  How long did you stay at Troop 4?
14     A.  About a year-and-a-half, and then I transferred
15  back to Troop 5.
16     Q.  Okay.  So that would be some time in '98?
17     A.  Mm-hmm.
18     Q.  Back to Troop 5?
19     A.  Yes.
20        (Mr. Durstein present at this time.)
21     Q.  All right.  So sometime in '98 you transferred
22  back to Troop 5.  Is that still at the rank of sergeant?
23     A.  Yes.
24     Q.  Okay.  And what happened next?

2 (Pages 2 to 5)

Conley                                          v.                                    Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS                    July 13, 2005

Page 70

1    A.  Yes.
2    Q.  Okay.  Based on your observations, after the
3  lawsuit was filed was he mad at Captain Conley?
4    A.  Yes.  I believe, I'm sure he still is mad.
5    Q.  Right.  Do you remember any other feelings or
6  emotions he demonstrated towards Captain Conley after the
7  lawsuit was filed in the whole period of time up to the
8  present?
9    A.  Nothing strikes me specifically after the lawsuit
10  was filed.  He, after that, for the most part he -- well,
11  he wouldn't bring that lawsuit up specifically around the
12  troop.  So no, I guess my answer is no.
13    Q.  Well, you heard this remark about Trooper Scott
14  Gray.  You told us about that?
15    A.  Yes.
16    Q.  And that the colonel was upset at not having been
17  invited to a party, right?
18    A.  Yes.
19    Q.  And you heard the remark the colonel made about
20  you should remember who transferred you into detectives,
21  right?
22    A.  Yes.
23    Q.  Did you observe the colonel to be exhibiting any
24  hostility towards Captain Conley indicating he felt she

Page 71

1  was ungrateful or things like that towards Colonel
2  Chaffinch?
3        MS. BALLARD:  Object to the form.
4    Q.  You can answer the question.  I'm asking you what
5  you observed.  Did you observe --
6    A.  After the lawsuit had been filed?
7    Q.  Yes, after the lawsuit, him to exhibit any anger
8  at her thinking she was ungrateful to him?
9    A.  He wouldn't bring her name up around me
10  afterwards.
11    Q.  Okay.  So previously he would mention Captain
12  Conley in your presence?
13    A.  Yes.
14    Q.  And you are saying after the lawsuit was filed he
15  would never mention Captain Conley again in your
16  presence?
17    A.  Not that I recall, no.
18    Q.  Okay.  Is the colonel, based on your working with
19  him and having dealt with him over 17 years, the kind of
20  person who a reasonable person should fear he would
21  retaliate against them?
22        MS. BALLARD:  Object to the form.
23    A.  He is very vindictive.
24    Q.  Okay.  Now, are you saying you have observed him

Page 72

1  to be vindictive over your 17 years of working with him?
2    A.  Yes.
3    Q.  You have observed him to mention he has powerful
4  friends in political circles?
5    A.  Yes.
6    Q.  Are you saying that you have observed him to use
7  his rank or office in the state police to be vindictive?
8    A.  Yes.  You know, it is common knowledge, like I
9  said before, I think, that you don't -- you would not
10  cross him, you would not report him on anything because
11  of his vindictiveness.  You knew that your career would
12  pretty much stop.
13        I mean, it concerns me now, going through
14  this, even though he is still not the colonel or not
15  presently the colonel.
16    Q.  Now, I've subpoenaed you to testify today?
17    A.  Yes.
18    Q.  You understand that?
19    A.  Yes.
20    Q.  There is a court order requiring you to come here
21  today, right?
22    A.  Yes.
23    Q.  And I have never even met you before today, have
24  I?

Page 73

1    A.  No.
2    Q.  Okay.  I passed you in the waiting room here and
3  didn't even know who you were, right?
4    A.  Right.
5    Q.  So you have never met with me and discussed any
6  facts relating to this case; is that true?
7    A.  No -- yes, that is true.
8    Q.  I want to jump back to the up jump the monkey
9  limerick.  Do you remember there was one about a monkey?
10    A.  Yes.
11    Q.  I'm going to give you some setting, early part of
12  2003, in Captain Conley's office, in traffic, Captain
13  Harry Downes being there, and that would make you a
14  Lieutenant Dixon there at the same time.  The colonel
15  coming in at some point in time and during the course of
16  it him reciting the up jump the monkey limerick.  Do you
17  remember whether that happened around that time?
18    A.  Yes.  I think Harry was a lieutenant.  I thought
19  you said captain.  I think he was a lieutenant.
20    Q.  Okay.  2003, Columbus, Ohio, CARE conference?
21    A.  Yes.
22    Q.  You are attending, and I think your wife went
23  with you?
24    A.  Yes.

19 (Pages 70 to 73)

Conley                                                    v.                                    Chaffinch, et al.
Captain Glenn Donald Dixon                    C.A. # 04-1394-GMS                              July 13, 2005

Page 74

1    Q.   Major Baylor is there with his daughter?
2    A.   Yes.
3    Q.   Teenage daughter?
4    A.   I think her name is Sydney.
5    Q.   Captain Conley is there?
6    A.   Yes.
7    Q.   Colonel Chaffinch goes, and his wife I think is
8    attending also?
9    A.   Yes.
10   Q.   You wear name tags?
11   A.   Yes.
12   Q.   Hospitality room?  Was there a hospitality room?
13   A.   Yes.
14   Q.   So what would like your name tag say?
15   A.   Normally I wouldn't wear a name tag going to the
16   hospitality room after hours, so I don't know if I had
17   one on there, but it would have said Captain Glenn Dixon,
18   Delaware State Police.
19   Q.   And the colonel would have a name tag?
20   A.   Yes.  He actually wears a permanent -- not a
21   permanent name tag but one he stuffs in his pocket so
22   people know who he is.
23   Q.   He is an officer in the organization, on the
24   board or something like that?

Page 75

1    A.   In CARE?
2    Q.   In CARE?  Maybe I've got the wrong group.  Is it
3    CARE?
4    A.   Yes, yes.
5    Q.   You are saying he has a permanent name tag that
6    he uses that identifies him at the time as the colonel of
7    the Delaware State Police?
8    A.   Yes.
9    Q.   Okay.  In the hospitality room did the colonel
10   recite limericks and jokes that women or minorities could
11   find offensive?
12   A.   Yes.  It was kind of like a dueling process
13   between him and another -- I guess the group hired a
14   magician and slash comedian, so he was sparing off with
15   him, would recite the limericks and jokes, you know, both
16   clean jokes and dirty jokes, and the limericks that we
17   discussed.
18   Q.   All right.  Was there a dinner that you attended
19   with Major Baylor and his daughter and Colonel Chaffinch
20   and his wife and Barbara?  You all sat at the table
21   somewhere, went to Colorado Springs or something like
22   that?
23   A.   That was in Colorado, yes.
24   Q.   This was a different time?

Page 76

1    A.   Yes.
2    Q.   When was the Colorado Springs thing?
3    A.   That was I'm going to say around July or August
4    of 2003.
5    Q.   Okay.
6    A.   Around then, yes.  We were there as a traffic
7    records forum.
8    Q.   That's what it was, right.
9    A.   And then Colonel Chaffinch, as well as Major
10   Hughes, Major Baylor were there for an FBI conference in
11   Colorado Springs.  We were in Denver.
12   Q.   And they all met you for dinner?
13   A.   Yes.  We met halfway.
14   Q.   Okay.  And at that dinner was the colonel in rare
15   form?
16        MS. BALLARD:  Object to the form.
17   Q.   At the dinner was the colonel telling jokes or
18   engaging in conduct that women or minorities could find
19   offensive?
20   A.   He was -- I wouldn't say he was in rare form, but
21   he would lay some jokes out there, and I remember one
22   time when, I think it was a waitress, not a waiter,
23   picked his food up, he had some leftovers, and he told
24   the waitress that she could just feed it to the starving

Page 77

1    Ethiopians in Africa.  He also referred to major -- to
2    Ronnie Gaines as Ronnie Loves Watermelon Gaines in front
3    of Major Baylor and his daughter.
4    Q.   Ronnie Gaines is an African American trooper?
5    A.   Yes.  Retired, yes.
6    Q.   Retired trooper?
7    A.   Yes.
8    Q.   And he referred to him as Ronnie Watermelon
9    Gaines?
10   A.   Loves Watermelon Gaines.
11   Q.   So those were his words?
12   A.   And I've heard that numerous times throughout my
13   career, because I'm fairly certain that they went to the
14   academy together and that's when he gave him that
15   nickname, whenever he started the academy.
16   Q.   And Major Baylor's young teenage daughter was
17   present at the dinner too?
18   A.   I think at the time she was like 12.
19   Q.   Let me throw out a few other statements that
20   Captain Conley alleges she has heard from the colonel
21   over the years, okay, and see whether or not you have
22   heard them.  Okay?  She alleges he has said things like
23   "Women are nothing but trouble, women are a pain in the
24   ass, you can't live with them, you can't live without

Conley                                        v.                              Chaffinch, et al.
Captain Glenn Donald Dixon              C.A. # 04-1394-GMS                     July 13, 2005

Page 78

1  them." Have you ever heard him make similar remarks?
2      A. I don't recall the last one, but I've heard him
3  say pretty frequently "They are nothing but trouble."
4      Q. Would that remark have been made on duty?
5      A. Yes.
6      Q. And would that remark have been made off duty?
7      A. Yes.
8      Q. All right. The remark "Women are a pain in the
9  ass," have you heard him make that remark?
10     A. Yes.
11     Q. Has he made that remark on duty?
12     A. Yes.
13     Q. Has he made that remark off duty?
14     A. Yes.
15     Q. I'm going to try to focus on October 2004, Troop
16  5, in your presence and the colonel being there. Okay?
17  Do you remember him making a remark about his wife Karen
18  being "puffed up like a toad, you know how women get"?
19     A. Not specifically that date, but I've heard him
20  say that numerous times about Karen.
21     Q. All right. Around that time, is there a mirror
22  inside the closet door, inside your commander's office at
23  Troop 5?
24     A. Yes.

Page 79

1      Q. And around that time in October of 2004 did
2  Colonel Chaffinch make a point of noting that he had had
3  that mirror placed there when he was a troop commander?
4      A. Yes. He basically told me, and it was a
5  situation where we were planning to go to a retired
6  trooper's funeral and both my lieutenants and he, and
7  myself included, were getting our dress blouses on and
8  would use that mirror to make sure that everything looks
9  like it should, and that's when he made the statement
10  that he -- something like, I bet you didn't know that I
11  am the troop commander who had both the mirror in the
12  men's bathroom and the one behind the closet door in the
13  commander's office placed there, and it was placed there
14  so he could watch himself jerk off.
15     Q. Have you heard him refer to his Blackberry
16  computer device as his Dingleberry?
17     A. Yes.
18     Q. Did you attend an event in April of 2004 in St.
19  Michaels, Maryland, a luncheon the FBI was giving or
20  something?
21     A. In what year?
22     Q. April 2004, FBI, St. Michaels. You were there,
23  Lieutenant Brown, Lieutenant Rust --
24     A. I forget what town it was. I don't think it was

Page 80

1  St. Michaels. We had to travel out there quite aways.
2      Q. Right.
3      A. But, yes, it was in Maryland.
4      Q. And the colonel was with you that day, right?
5      A. Yes.
6      Q. There were like two cars that went?
7      A. Yes.
8      Q. And Captain Conley was in one of the cars?
9      A. Yes.
10     Q. And somewhere on Route 404, at a bar called
11  Cohee's, do you recall the group stopping?
12     A. Yes.
13     Q. Well, do you recall that there was a female
14  waitress in the restaurant that day?
15     A. Yes.
16     Q. She was waiting on you-all?
17     A. Yes.
18     Q. Do you recall the colonel saying to Rich Dennis,
19  "Maybe I should introduce her to the hooded merganser"?
20     A. I don't recall him saying it specifically to him,
21  but I remember him hearing it.
22     Q. You remember that being said, okay.
23     A. I was present for it.
24     Q. Okay. You remember the colonel making that

Page 81

1  statement?
2      A. Yes.
3      Q. You don't know who he was saying it to?
4      A. I just felt he was saying it to everybody that
5  could hear.
6      Q. A hooded merganser is some kind of a duck; isn't
7  that right?
8      A. From what I understand, yes.
9      Q. Are you a hunter?
10     A. No, I'm not.
11     Q. Around November of 2004, around the Thanksgiving
12  holiday period, okay, perhaps right after the holiday, at
13  Troop 5, do you remember some remarks about the hooded
14  merganser at that time, referring to something in
15  Florida?
16     A. He had just come back from Florida. And I wasn't
17  in the same office. It was in the office across the
18  hallway from me. But I could hear, as is the case around
19  Troop 5, you know, you could be in one office and hear it
20  from, conversations up at the sergeant's area, but he was
21  talking with at least -- well, it had to have been both
22  lieutenants, about how his uncle was questioning him
23  about the hooded merganser and where it came from, and
24  they were laughing about it.

21 (Pages 78 to 81)

Tab

B



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
## v.
## Chaffinch, et al.

C.A. # 04-1394-GMS

-------------------------------------------------------------------------

Transcript of:

# Colonel L. Aaron Chaffinch

June 6, 2005

-------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Conley
Colonel L. Aaron Chaffinch

v.

C.A. # 04-1394-GMS

Chaffinch, et al.
June 6, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,          )
                                    )
          Plaintiff,                )
                                    )     Civil Action
v.                                  )  No. 04-1394-GMS
                                    )
COLONEL L. AARON CHAFFINCH,         )
individually and in his official    )
capacity as the Superintendent,     )
Delaware State Police; LIEUTENANT   )
COLONEL THOMAS F. MACLEISH,         )
individually and in his official    )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.     )
MICHELL, individually and in his    )
official capacity as Secretary of the )
Department of Safety and Homeland   )
Security, State of Delaware; and    )
DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY,    )
State of Delaware,                  )
                                    )
          Defendants.               )

          Deposition of COLONEL L. AARON CHAFFINCH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:35 a.m. on Monday,
June 6, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.
APPEARANCES:
          THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM, P.A.
           2 East 7th Street - Suite 302
           Wilmington, Delaware  19801
           for the Plaintiff
    --------------------------------------------------
               WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477

Conley                                             v.                                    Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                          June 6, 2005

Page 2

1   APPEARANCES (Continued):
2
3       JAMES E. LIGUORI, ESQUIRE
        LIGUORI, MORRIS & YIENGST
4         46 The Green
          Dover, Delaware  19901
          for Defendant Colonel L. Aaron Chaffinch
5
        RALPH K. DURSTEIN, ESQUIRE
6       STEPHANI J. BALLARD, ESQUIRE
        DEPARTMENT OF JUSTICE
7         820 North French Street
          Carvel State Office Building
8         Wilmington, Delaware  19801
          for Defendants Lieutenant Colonel Thomas F.
9         MacLeish, David B. Mitchell, and Division
          of State Police
10
11  ALSO PRESENT:
12      CAPTAIN BARBARA L. CONLEY
13      - - - - -
14      COLONEL L. AARON CHAFFINCH,
15      the witness herein, having first been
16      duly sworn on oath, was examined and
17      testified as follows:
18  BY MR. NEUBERGER:
19      Q.   Could you state your full name for the record?
20      A.   Aaron Chaffinch.
21      Q.   Colonel Chaffinch, my staff or myself, we've
22  taken your deposition on other occasions; isn't that
23  correct?
24      A.   Yes, sir.

Page 3

1       Q.   You've even testified in two federal court cases
2   that I was involved in; is that right?
3       A.   Yes, sir.
4       Q.   I called you as a witness in those cases; right?
5       A.   Yes, sir.
6       Q.   Now, you understand, based on that experience,
7   that if there's any question I ask you today and any
8   answer you give, and I call you at trial and you say
9   something different, I can point that out to the judge
10  and jury?
11      A.   Yes, sir.
12      Q.   You know that.  Okay.
13          Are you taking any medications or anything
14  that would interfere with your ability to remember
15  things?
16      A.   I don't believe so.
17      Q.   You don't take blood pressure, heart medicine,
18  things like that?
19      A.   I don't think it would affect my memory, I don't
20  believe.
21      Q.   But you are not on anything odd or something
22  that affects your memory that you know of?
23      A.   Not that I'm aware of.
24      Q.   If I ever ask you a question that you don't

Page 4

1   understand, just ask me and I'll be glad to rephrase it.
2   Is that okay?
3       A.   Yes, sir.
4           MR. NEUBERGER:  Let's do this.  Let's mark
5   this as Plaintiff's Exhibit Number 1 and then we'll be
6   referring back and forth to this.  Let me give a copy to
7   counsel.  It's a copy of the First Amended Complaint in
8   the action.
9           (Plaintiff's Exhibit 1 was marked for
10  identification.)
11  BY MR. NEUBERGER:
12      Q.   Colonel, I'm going to ask you some questions
13  about how long you were with the force and how your
14  career, your assignments might have tracked assignments
15  that Captain Barbara Conley had.  Okay?
16          If you turn to paragraph 10 of that
17  document that's in front of you on page 4, you can see
18  there in that paragraph a listing that Barbara Conley
19  prepared at an earlier time of her assignments starting
20  as a patrol trooper at Troop 5 in Bridgeville in 1982 at
21  the bottom.  Do you see that?
22      A.   Yes, I do.
23      Q.   Then she works all the way up to captain,
24  director of traffic control section in 2001.  Do you see

Page 5

1   that?
2       A.   Yes, sir.
3       Q.   Let me just ask you a few questions about her
4   history.
5           Now, she indicated that she joined the
6   force as a patrol trooper in Bridgeville in 1982 and
7   she'll testify to that fact.  Were you assigned to
8   Bridgeville at that time?
9       A.   Yes, sir.
10      Q.   I think she's indicated that she believes that
11  when she started in Bridgeville, she was a patrol trooper
12  and you would have been a trooper first class assigned in
13  Bridgeville.  Does that sound about right?
14      A.   That's correct.
15      Q.   Then she indicates she was in Bridgeville from
16  1982 to 1983?
17          MR. LIGUORI:  I think it's '93, Tom.
18          MR. NEUBERGER:  Yes.  Thank you, Jim.  All
19  right.
20  BY MR. NEUBERGER:
21      Q.   She has indicated during that period of time
22  there was a time when you were assigned at Bridgeville,
23  also?
24      A.   Part of that time, yes, sir.

2 (Pages 2 to 5)

Conley                                                  v.                            Chaffinch, et al.
Colonel L. Aaron Chaffinch                    C.A. # 04-1394-GMS                          June 6, 2005

Page 146

1    A.   You mean that I may have inherited from the
2  previous superintendent?
3    Q.   Yes.
4    A.   Not to my knowledge.
5    Q.   I know, for example, that with reference to
6  lieutenants and sergeants, there's testing and there's
7  bands and things like that.  At that time the Delaware
8  State Police was using that process for those ranks;
9  right?
10   A.   For sergeant, lieutenant, captain, yes.
11   Q.   And for captain, too?
12   A.   Yes.
13   Q.   I remember seeing information about boards of
14  people who might interview captain candidates.
15   A.   Okay.
16   Q.   That's true, isn't it?
17   A.   Yes, sir.
18   Q.   Now, for majors there wasn't that kind of a
19  process?
20   A.   No, sir.
21   Q.   I think you're telling me that for majors there
22  was no process that you inherited from any of your
23  predecessors as far as filling those two major vacancies?
24   A.   That's correct.

Page 147

1    Q.   Are you telling me that there's no process in
2  the union contract between the State Police and the union
3  that applies to filling the vacancies?
4    A.   I'm not telling you that, no.
5    Q.   Is there anything in the union contract?
6    A.   Not to my knowledge.
7    Q.   I know there's that handbook, the Delaware State
8  Police rules and regulations, it's like a two-volume blue
9  thing I've seen with rules and regulations about the
10  State Police.  You are aware of that book; right?
11   A.   The administrative manual and the divisional
12  manual.
13   Q.   In those two manuals, was there any process that
14  guided your selection of the two majors for the positions
15  we are talking about?
16   A.   I think probably there may be something in there
17  about at the discretion of the superintendent, but
18  there's not any specific process, no.
19   Q.   So, for example, there was no preexisting rule
20  in writing that required that anybody selected for major
21  have a certain educational background?
22   A.   No, sir.
23   Q.   There wasn't anything in writing that required
24  that a person who was selected for major have any

Page 148

1  specific operational background?
2    A.   Well, I think it goes without saying you'd have
3  to be a captain.
4    Q.   Sure.
5    A.   You know what I mean.  So that is one parameter,
6  you know.  So you look at the captains in the agency to
7  make your selection and for the superintendent.  And
8  certainly education and background and experience and
9  tenure all came into play with any selections that I made
10  for executive staff people.
11   Q.   So you're saying that when you had to select
12  anybody to be part of the executive staff, you considered
13  education, background, experience, and tenure?
14   A.   That's correct.  Experience within the agency.
15   Q.   While that wasn't found in any preexisting
16  written document, those are factors you used?
17   A.   That's correct.
18   Q.   I guess I'm trying to find out:  Were there
19  other factors you used besides those four?
20   A.   Well, by background I would mean where they have
21  been within their tenure as a trooper based on what
22  position I'm filling.  I think you understand that.  That
23  somebody that had been in an administrative position but
24  not necessarily in an operational position probably

Page 149

1  wouldn't get an operational job.  You see what I'm
2  saying?  Those kind of things come into play with any
3  selections that I would make for staff level positions.
4          And compatibility with other members of the
5  executive staff certainly would come into play, as well.
6    Q.   I'll put down as another factor compatibility
7  with the other members of the executive staff.
8    A.   Yes.
9    Q.   So that gives me five categories.  Were there
10  any others that you considered?
11   A.   Not that I can recall.
12   Q.   I remember seeing in some of the other cases
13  affidavits or testimony talking about as people rise to
14  higher management levels in the State Police, it's
15  important that they have operational experience, meaning
16  like in patrol and actual on-the-road type experience.
17  That's a fair statement, isn't it?
18   A.   That's one very important facet, yes.
19   Q.   So that's important.  Okay.
20          For example, with respect to Captain
21  Barbara Conley, we know from paragraph 10 on page 4 of
22  the complaint that's in front of you that she was a
23  patrol trooper for eleven years at Troop 5.  Do you
24  remember that?

38 (Pages 146 to 149)

Conley                                    v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch          C.A. # 04-1394-GMS                      June 6, 2005

Page 178

1 promotion from the Secretary of Safety and Homeland
2 Security James Ford, no.
3     Q.  So if I asked you for the record what were the
4 reasons for selecting Hughes, what would you explain as
5 the reasons why you selected Hughes?
6     A.  I don't know if I can tell you exactly the five
7 that are there.  Tenure, background, education --
8     Q.  The five are:  First was education, second is
9 background, third is experience within the Delaware State
10 Police, fourth is tenure, and fifth is compatibility with
11 other members of the executive staff.  Okay?
12         With that as a help, what were the reasons
13 why you selected Major Hughes?
14     A.  Okay.  Well, his tenure within the agency was
15 very well rounded.  He -- like I explained earlier, he
16 had been to the academy as the assistant director of the
17 academy, so he had been involved in training.  He'd been
18 in special investigations as a drug officer, so he had
19 experience in criminal investigations.  He had been a
20 patrol sergeant and run a shift at Troop 7.  He had been
21 a traffic lieutenant at Troop 5.  He had been a troop
22 commander at Troop 5.  He was a graduate of the FBI
23 National Academy.  He attained a master's degree in
24 public administration.  And he had worked his entire

Page 179

1 career in Kent and Sussex counties and he was familiar
2 with the area and the other troopers and the other
3 administrators of those troops.
4     Q.  Are there any other reasons?
5     A.  I thought he would be compatible with the other
6 staff members.  I think I've hit -- I hit on experience.
7 I hit on his background.  I hit on his tenure and his
8 education.  So I guess that there's not any others.
9     Q.  I'm just trying to be thorough.
10     A.  Loyal to the superintendent.
11     Q.  Excuse me?
12     A.  Loyal to the superintendent.
13     Q.  Is it fair to say that that's an additional
14 factor, or is that just within the other ones?
15     A.  That's within the others.
16     Q.  So loyal to the superintendent.  What do you
17 mean by that?
18     A.  Well, I had worked close with him and I knew
19 that he would support me in my position as
20 superintendent.  He would also do a good job.  He's
21 always been a go-getter.  He was one of the biggest
22 workers on the road when he was on the road.  He wrote
23 his share of traffic citations.  And he -- you know, he
24 did a lot of criminal work.  And I'll put his record up

Page 180

1 against anybody in the agency as far as work and
2 experience on the Delaware State Police.
3     Q.  It's just that today is the time for you to give
4 all the reasons.
5     A.  I suppose it is.
6     Q.  So are there any other reasons why you selected
7 him over the other people?
8     A.  Not that jump right out at me.  I think I've hit
9 on them all.
10     Q.  Now, if we go to Major Eckrich, how about giving
11 me the reasons why he was selected for the position?
12     A.  Okay.  From education standpoint, he's got a
13 master's -- a bachelor's and a master's degree.  He's a
14 graduate of Southern Police Institute in Louisville,
15 Kentucky, which is a command school for law enforcement
16 administrators.  He's -- he had worked patrol.  He had
17 worked as a patrol supervisor, a shift commander.  He had
18 worked at both as a criminal lieutenant and a traffic
19 lieutenant.  And he'd been a troop commander.  And I had
20 worked closely with him and I knew that he would be loyal
21 and -- loyal to me and we would be a good team to be a
22 part of the executive staff.
23     Q.  You mentioned loyal two times, so I do want to
24 ask you about that.

Page 181

1         You worked with Barbara Conley over your
2 career, too?
3     A.  Yes, I have.
4     Q.  Is there any reason for you to think she
5 wouldn't be loyal to you if she was selected?
6     A.  No, there's not.
7     Q.  So are they all the reasons for Major Eckrich?
8     A.  The other reason that we talked about earlier is
9 the fact that he had been in that position as a
10 lieutenant and that is a -- that is a large factor in my
11 decision.
12     Q.  So just so you understand I'm being fair with
13 you, if there's anything else you said earlier, we'll
14 include that in reasons why he was selected.  Okay?
15     A.  Yes, sir.
16     Q.  Is there anything else that you remember was a
17 reason why he was selected?
18     A.  No, sir.
19     Q.  Did you look into his disciplinary record?
20 Let's say Eckrich right now.  Did you check and see
21 whether he had any violations, suspensions, or things
22 like that in his record?
23     A.  I'm pretty sure he doesn't have any, but I
24 couldn't tell you exactly for sure, but if he has

46 (Pages 178 to 181)

# Tab

# C



## In the Matter Of:

# Price
## v.
# Chaffinch, et al.

### C.A. # 04-1207

---------------------------------------------------------------------

## Transcript of:

### Captain Glenn D. Dixon

### September 21, 2005

---------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
CORPORAL B. KURT PRICE,        )
CORPORAL WAYNE WARREN,         )
and SERGEANT CHRISTOPHER       )
D. FORAKER,                    )
                               )
     Plaintiffs,               )
                               )
     v.                        ) C.A. No. 04-1207
                               )
COLONEL L. AARON CHAFFINCH,    )
individually and in his        )
official capacity as           )
Superintendent of the          )
Delaware State Police;         )
LIEUTENANT COLONEL THOMAS      )
F. MacLEISH, individually      )
and in his official            )
capacity as Deputy             )
Superintendent of the          )
Delaware State Police;         )
DAVID B. MITCHELL, in his      )
official capacity as the       )
Secretary of the Department)
of Safety and Homeland         )
Security of the State of       )
Delaware; and DIVISION OF      )
STATE POLICE, DEPARTMENT OF)
SAFETY AND HOMELAND            )
SECURITY, STATE OF             )
DELAWARE,                      )
                               )
     Defendants.               )
```

        Deposition of CAPTAIN GLENN D. DIXON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 10:00 a.m., on Wednesday,
September 21, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.
                  WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Price                                    v.                          Chaffinch, et al.
Captain Glenn D. Dixon          C.A. # 04-1207              September 21, 2005

Page 2

1   APPEARANCES:
2         THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM, P.A.
3            2 East 7th Street - Suite 302
             Wilmington, Delaware 19801
4            for the Plaintiffs
5         ROBERT J. FITZGERALD, ESQUIRE
          MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
6            123 South Broad Street
             Avenue of the Arts
7            Philadelphia, Pennsylvania 19109
             for the Defendants
8
    ALSO PRESENT:
9
          CORPORAL WAYNE WARREN
10                - - - - -
11        CAPTAIN GLENN D. DIXON,
12        the witness herein, having first been
13        duly sworn on oath, was examined and
14        testified as follows:
15  BY MR. NEUBERGER:
16        Q.   Captain Dixon, I subpoenaed you to be here
17  today; is that correct?
18        A.   Yes, you did.
19        Q.   And I had subpoenaed you in another case called
20  Conley versus Chaffinch to give testimony on July 13th,
21  2005. Do you remember that?
22        A.   Yes, I do.
23        Q.   Prior to that date, July 13th, 2005, you had
24  never met me before, had you?

Page 3

1         A.   No.
2         Q.   Since then, except for answering some questions
3   on how to get here and sending the subpoena to you, you
4   and I haven't spoken, have we?
5         A.   The other day, whatever day it was, was it
6   Tuesday, I called in reference to another prior meeting
7   that I was going to request a continuance in this. But
8   it didn't work out. But that was the only time.
9         Q.   And I refused to give you a continuance?
10        A.   Yes.
11        Q.   You're being forced to testify today, right?
12        A.   By subpoena.
13        Q.   When I took your deposition on July 13th, 2005,
14  I explained the process. You remember that?
15        A.   Yes.
16        Q.   Since that time are you taking any medications
17  or anything that would interfere with your memory?
18        A.   No.
19        Q.   If I ask you a question today that you don't
20  understand, just ask me to rephrase it. Is that okay?
21        A.   Okay.
22        Q.   Just to quickly skip over something, back in
23  July I asked you a series of questions about your
24  contacts with Aaron Chaffinch over the years. Do you

Page 4

1   remember that?
2         A.   Yes.
3         Q.   You sort of explained about approximately
4   17 years during your career the various kinds of contacts
5   you would have with him, right?
6         A.   Yes.
7         Q.   And presently you're the troop commander of
8   Troop 5 down in Bridgeville, Delaware?
9         A.   I am, yes.
10        Q.   And he was the former troop commander there, for
11  example?
12        A.   Yes.
13        Q.   And he lives within a couple miles of the troop,
14  right?
15        A.   Two miles.
16        Q.   So to set the stage, what I'm going to do is
17  show you a yellowed copy of the Delaware State News dated
18  Wednesday, April 7th, 2004, and it's got a story on the
19  front page that then goes into page 6 about a media tour
20  given the day before by Aaron Chaffinch and Gloria Homer,
21  the Secretary of Administrative Services back at that
22  time.
23            MR. FITZGERALD:  I'll object only to the
24  characterization that it was a tour given by Chaffinch.

Page 5

1   BY MR. NEUBERGER:
2         Q.   Let's just simply say it relates to an event at
3   the Firearms Training Unit the day before. Okay?
4         A.   Okay.
5         Q.   And this is in the record as some sort of an
6   exhibit. I don't know the number right now, but I think
7   that's a sufficient reference to it.
8             What I will do is we will just take a
9   minute and I'll ask you to read through the story.
10        A.   Okay.
11        Q.   I have scratched in red some references to
12  Colonel Chaffinch himself and some things, some
13  references to him in there. But you just take your time
14  and just read through the story and then I'll probably
15  ask you a few questions. Okay?
16        A.   Okay.
17            MR. FITZGERALD:  Before you ask the
18  questions, Tom, I'd like to look at just your markings on
19  it.
20            MR. NEUBERGER:  Please.
21            MR. FITZGERALD:  After you read it.  Go
22  ahead.
23            MR. NEUBERGER:  Why don't you just read
24  through it.

2 (Pages 2 to 5)

Price                                                    v.                                    Chaffinch, et al.
Captain Glenn D. Dixon                            C.A. # 04-1207                    September 21, 2005

Page 94

1         MR. FITZGERALD:  It has to do with this
2   case in that this witness has testified that defendant
3   Chaffinch has made certain comments.  Our client denies
4   those comments.  We don't think that those comments were
5   ever made.  We think his testimony is false, and we're
6   putting it on the record and that would question his
7   credibility and whether or not what he's saying today is
8   accurate.
9         I'm not asking anything that isn't already
10  on the record in the Conley case.  So it's not discovery
11  outside the scope of this.  These questions have to do
12  with the reaction of this witness, not any party in the
13  Conley case.
14        MR. NEUBERGER:  I'm saying I'm going to
15  recess this deposition.  The procedure I think with
16  Judge Sleet would be to call him and to schedule a time
17  to talk about this.  I'd like to ask the court reporter
18  how quickly she can prepare this part of the deposition
19  and we can take that to the judge in an orderly fashion.
20  Perhaps you would want to go on and cover other areas.
21        MR. FITZGERALD:  I will go on, and that's
22  fine.  I will not ask questions about his testimony in
23  the Conley case and the credibility of that as it relates
24  to his credibility today, but I will go on and ask other

Page 95

1   questions related to his credibility.
2         MR. NEUBERGER:  Please try to.
3   BY MR. FITZGERALD:
4      Q.  Isn't it true that your testimony today is a
5   total fabrication, that Colonel Chaffinch never came down
6   and said "I'm going to stick it to fucking Foraker" prior
7   to going to the range for the media tour?
8      A.  Well, he didn't say he's going to stick it, but
9   your general question is no.
10     Q.  Isn't it true that Barbara Conley has concocted
11  your testimony in the case today to maximize her chances
12  of success in her lawsuit?
13     A.  No.
14     Q.  Isn't it true that you and she have conspired to
15  damage Chaffinch's reputation?
16     A.  No, absolutely not.
17     Q.  Did you report Colonel Chaffinch's alleged
18  wrongdoing through any other channels other than
19  depositions and lawsuits?
20     A.  Well, I didn't seek a deposition, have not
21  sought a lawsuit.  So I'm not seeking that here now
22  today.  I'm called as a witness.  But have I gone to any
23  other measures?  No.
24     Q.  Isn't it true that your testimony today,

Page 96

1   regardless of the testimony you gave in the Conley case,
2   only came up during this deposition and was not shared
3   with anybody else prior to this lawsuit and the
4   deposition that resulted from the lawsuit?
5      A.  Can you repeat that, please?
6         MR. FITZGERALD:  Can you repeat that
7   because I can't?
8         (The reporter read back as instructed.)
9         THE WITNESS:  So the question is what's the
10  basis of the question?
11        MR. NEUBERGER:  I didn't really understand
12  it myself.
13        MR. FITZGERALD:  I'll rephrase.
14  BY MR. FITZGERALD:
15     Q.  Isn't it true that this story of Chaffinch
16  coming down and saying "I'm going to put it on Foraker
17  and I'm going to put the blame on Foraker" was not told
18  to anyone except Counsel here today as a result of your
19  subpoena for a deposition?
20     A.  You're saying that -- basically is what you're
21  asking is that conversation did not happen?
22     Q.  No.  I'm asking if you ever told anybody about
23  that conversation before today.
24     A.  We talked about it the day it happened with

Page 97

1   Major Baylor and Captain Conley.  As far as that --
2      Q.  Isn't it true you're not sure you talked about
3   it with Major Baylor?
4      A.  I didn't say that.  The overall atmosphere, the
5   overall summation of the conversation was talked about
6   with Major Baylor.
7      Q.  Then I have to ask this again.  Did you tell
8   Major Baylor what Aaron Chaffinch allegedly told you in
9   Barbara Conley's office that morning?
10     A.  Specifically?
11     Q.  Yes.
12     A.  I can't say that I did.  But the conversations
13  were to the point where it was understood what was said.
14  What we talked about specifically, I can't say verbatim.
15     Q.  How can those things that Aaron Chaffinch
16  allegedly said have been understood generally?
17     A.  Based on any conversation that Major Baylor had
18  with Colonel Chaffinch and anything that was discussed
19  between the three of us about the morning conversation.
20     Q.  Then isn't it true that absent that general
21  conversation and the conversation you may have had with
22  Barbara Conley after Colonel Chaffinch came down, that
23  you haven't told anybody what Colonel Chaffinch said
24  except for today during this deposition?

25 (Pages 94 to 97)

Price                                                v.                                              Chaffinch, et al.
Captain Glenn D. Dixon                    C.A. # 04-1207                        September 21, 2005

Page 98

1    A.  Right.
2       Q.  Isn't it true that these allegations of
3    Colonel Chaffinch making a threat were only being offered
4    in this deposition because Barbara Conley has sued
5    Chaffinch?
6    A.  No.
7       Q.  Isn't it true that your testimony here today is
8    as a result of Conley instructing you what to say and how
9    to say it?
10   A.  No, absolutely not.
11      Q.  Isn't it true that you would continue to say
12   whatever Barbara Conley told you to say for her case?
13   A.  No.
14      Q.  Isn't it true that you would say whatever
15   Barbara Conley told you to say in order to destroy
16   Chaffinch?
17   A.  No.
18      Q.  Isn't it true that you consider it necessary to
19   say what Conley tells you to say because she's
20   blackmailing you?
21   A.  No.
22      Q.  Isn't it true that you were totally compromised
23   as a witness because you have had an affair with
24   Barbara Conley?

Page 99

1       MR. NEUBERGER:  Objection.  Do you have
2    foundation for a question like that?  My question is:  Do
3    you have a foundation?  Has somebody represented to you
4    who was an officer of the court something that would
5    legitimize you're asking that question or are you making
6    that up out of whole cloth?
7       MR. FITZGERALD:  That's a fair question.
8       MR. NEUBERGER:  You're telling me you're
9    speculating and you want to ask that question because
10   it's speculation and nobody's represented that to you.
11      MR. FITZGERALD:  Tom, before you get on the
12   record about speculation and everything else, that's
13   clearly not what I'm saying.  You asked if I had a
14   foundation and a basis for doing -- you mentioned
15   officers of the court and everything like that.  I don't
16   know what you mean by officer of the court.  I don't need
17   officers of the court.  I have a basis for asking this.
18   We have information about this and so it's not pure
19   speculation.
20      MR. NEUBERGER:  That's what you're saying.
21      MR. FITZGERALD:  That is what I'm saying
22   your representation that it's pure speculation.
23      MR. NEUBERGER:  I was asking if it is pure
24   speculation.  If somebody says that to you or whatever,

Page 100

1    ask the question.
2       MR. FITZGERALD:  I would like to say that
3    and I said it was a fair question because it is not pure
4    speculation.  I'm not making this up for the pure purpose
5    of asking an embarrassing question of this witness.
6    BY MR. FITZGERALD:
7       Q.  Isn't it true that you're totally compromised as
8    a witness because you had an affair with Barbara Conley?
9    A.  No.
10      Q.  Have you ever had sex with Barbara Conley?
11   A.  No.
12      Q.  Isn't it true that you would say anything you
13   had to in this deposition to keep Barbara Conley from
14   making the fact that you had sex with her public?
15      MR. NEUBERGER:  Now I'm going to stop.  He
16   has answered.  He's answered those two questions.  Now I
17   think you're trying to conduct this to embarrass and
18   annoy, and, if I recall, this kind of questioning might
19   even have been asked in the Conley case of another
20   witness.  Okay?  And he's answered the questions.
21      Once again, I'm going to say I want to
22   recess the deposition.  We can stop after your two
23   questions and if you want to put on the record other
24   questions you want to ask on this line of authority, we

Page 101

1    will ask the judge to decide whether or not it is now
2    being conducted to harass and embarrass and annoy.  You
3    have got two denials from him.
4       MR. FITZGERALD:  Clearly, as you recognize,
5    you can't instruct him not to answer.  This question is
6    different from the two denials.  He can answer it if he
7    wants to.  I'm going to ask it again.  This is the last
8    question on my list.
9       MR. NEUBERGER:  The last one.  Let's hear
10   your question.
11      MR. FITZGERALD:  This is all I have.
12   BY MR. FITZGERALD:
13      Q.  Isn't it true that you would say anything in
14   this deposition to keep Barbara Conley from making the
15   fact that you have had an affair with her public?
16   A.  No.
17      MR. FITZGERALD:  That's all I have.
18   BY MR. NEUBERGER:
19      Q.  We will stop it there.  At least we got that out
20   of the way.
21      I think I am going to have to ask you a
22   question.  I didn't intend to.
23      This whole concept of Aaron Chaffinch being
24   a powerful man, for example, are you aware that

26 (Pages 98 to 101)

Price                                      v.                          Chaffinch, et al.
Captain Glenn D. Dixon              C.A. # 04-1207                   September 21, 2005

Page 102

1  Aaron Chaffinch testified in the Chris Foraker case from
2  the stand, he said he was the colonel of the State Police
3  and he can do anything he wants, transfer anybody at any
4  time, assign anybody --
5      A.  As a result of the lawsuit.
6      Q.  No.  He's the colonel and he can do anything
7  that he wants.  Are you aware that he said that in that
8  case?
9          MR. FITZGERALD:  I would only object, to
10 the extent that the testimony is what the testimony is.
11 Any characterization that is different from the testimony
12 is objected to.
13 BY MR. NEUBERGER:
14     Q.  First of all, you weren't at the trial?
15     A.  No.
16     Q.  You wouldn't know if he took the stand and said
17 I'm the colonel of the State Police, I can transfer
18 anybody at any time?  You weren't there?
19     A.  I wasn't there, but I think I remember somebody
20 saying it.  It could have been him.
21     Q.  Over the years has Colonel Chaffinch ever
22 indicated in your presence that, as the commander of the
23 State Police, he could transfer you or anybody else at
24 any time?

Page 103

1      A.  I think I remember him stating something like
2  that.
3      Q.  And over the years you've indicated that, since
4  the very beginning, he bragged about Thurman Adams being
5  a powerful protector of his.
6      A.  Yes.
7          MR. FITZGERALD:  We're not going to talk
8  about that because that is subject to the discussion that
9  you've -- we can if you want to, but that's part of the
10 topics of the Conley deposition that we suspended this
11 element of the deposition on.
12         MR. NEUBERGER:  You asked him questions
13 about Thurmanator.
14         MR. FITZGERALD:  That's right, which was
15 part of the Conley deposition questions.  You don't have
16 my outline, so you don't know that.
17         MR. NEUBERGER:  Okay.  I'll just keep
18 going.
19 BY MR. NEUBERGER:
20     Q.  You were asked a lot of questions about this
21 message that was sent to you to lie down about a criminal
22 matter.  Right?
23     A.  Right.
24     Q.  Is it correct that a trooper under your command

Page 104

1  you thought had committed a crime or a trooper in the
2  State Police?
3      A.  It was involving a trooper that was assigned to
4  my troop, Troop 5.  There was a victim of another crime
5  by another trooper.
6      Q.  A trooper under your command had been the victim
7  of a crime, right?
8      A.  Yes.
9      Q.  And it was a violent crime?
10     A.  It was reported as, yes, a violent crime.
11 Burglary and breaking into a residence.
12 Domestic-related.  So, yes, I would consider that
13 violent.
14     Q.  And the crime was committed by another trooper
15 assigned somewhere else?
16     A.  Yes.
17     Q.  You thought it was your obligation to see that
18 the law was enforced and that the trooper be
19 appropriately investigated and punished, who was the
20 perpetrator.
21     A.  When I discovered of the incident, about five to
22 six months had expired without it being reported -- well,
23 it was reported, but it wasn't dealt with properly.  So
24 that's when it was brought to my attention.  So, yes, I

Page 105

1  just wanted to follow it through with the investigation
2  to make sure it was done properly.
3      Q.  Members of the executive staff were blocking the
4  investigation?
5          MR. FITZGERALD:  Objection to the form.
6  BY MR. NEUBERGER:
7      Q.  Based on your knowledge, members of the
8  executive staff were blocking the investigation?
9      A.  Yes.
10     Q.  You thought it was an appropriate subject for an
11 Internal Affairs investigation?
12     A.  Yes.
13     Q.  It's your understanding that Aaron Chaffinch did
14 not want the matter to be handled the way you were
15 suggesting?
16     A.  That's correct.
17     Q.  Did Internal Affairs investigate the matter as
18 you suggested?
19     A.  From my understanding, eventually they did, yes.
20         MR. FITZGERALD:  I thought you were going
21 to object to any discussion of Internal Affairs anything.
22     Q.  You received this message from Barbara Conley
23 that you have described earlier, right?
24     A.  Yes.

27 (Pages 102 to 105)