## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　Plaintiff,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　v.　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
COLONEL L. AARON CHAFFINCH,　　　　　:　　　C.A.No.04-1394-GMS
individually and in his official capacity as the　:
Superintendent, Delaware State Police;　　　:
LIEUTENANT COLONEL THOMAS F.　　　:
MACLEISH, individually and in his official　:
capacity as the Deputy Superintendent, Delaware　:
State Police; DAVID B. MITCHELL, individually　:
and in his official capacity as Secretary of the　:
Department of Safety and Homeland Security,　:
State of Delaware; and DIVISION OF STATE　:
POLICE, DEPARTMENT OF SAFETY AND　　:
HOMELAND SECURITY, STATE OF　　　　:
DELAWARE,　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　Defendants.　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:

## PLAINTIFF'S FOURTH MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION
## OF STALE PERFORMANCE ISSUES FROM EARLY IN HER CAREER

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: March 29, 2006　　　　　　Attorneys for Plaintiff

**A.  Introduction**.  Defendants have made plaintiff's past summary discipline history a primary issue in this litigation as part of their defense that two male officers promoted to Major were more qualified than plaintiff, a female.  At plaintiff's December 7, 2005 deposition, defendants outlined, in an 18 year survey and chart, plaintiff's summary discipline history with the DSP. (Tab A).  She was questioned extensively by defendants about each and every stale item of her disciplinary history contained on this exhibit.  Defendants focus on plaintiff's past performance issues in the face of evidence that plaintiff has excelled at her job and was promoted to sergeant, lieutenant, and then to her present rank of captain.  Under relevant Third Circuit law, plaintiff's long past and stale history has since been washed clean.  Defendants cannot now rely on plaintiff's past performance issues prior to her promotion to captain in June of 1998.

**B. Discussion.**  Defendants' belated attempt to justify their discriminatory actions by pointing to plaintiff's stale past performance and employment history is precluded by Third Circuit case law.  It is well established that a plaintiff's "satisfactory performance of duties over a long period of time leading to a promotion clearly establishe[s] [her] qualifications for the job."  Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989).  A plaintiff's prior satisfactory performance of a job "leads to the almost inevitable inference that [she] was qualified for the position" she was denied.  Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995).  More specifically, however, when an employer chooses to promote a plaintiff, despite knowledge of alleged deficiencies in her qualifications, the employer cannot later rely on these same alleged deficiencies to claim that the employee was unqualified for the position at issue.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 268 (3d Cir. 2005).  "[S]atisfactory

1

performance of duties leading to a promotion does establish a plaintiff's qualifications for a job."

Id.

> The YMCA chose to promote Hugh, despite her lack of a degree and caseworker experience. It is a fair inference that the decision to promote Hugh was based on her satisfactory performance in her two previous positions with the YMCA. <u>Once the YMCA made this choice, it was deeming Hugh's prior satisfactory performance sufficient qualification</u> for [the position at issue]. ... <u>The YMCA, having promoted Hugh with full knowledge of her background, cannot now say that she was unqualified for the position, her promotion was an acknowledgment that she was qualified at the time</u>.

Id. (emphasis added).

Simply put, defendants have been well aware of plaintiff's prior stale disciplinary history for at least 18 years. The law discussed above simply does not allow defendants to rely upon an 18 year old employment history to justify a present day adverse action. That past history has long since been washed clean by numerous subsequent merit promotions up through the ranks. Accordingly, this stale disciplinary history is inadmissible under at least seventeen years of Third Circuit case law.

Conversely, disciplinary actions from the time of an employee's last promotion can be taken into consideration by an employer. For example, Major Hughes' disciplinary actions for covering up crimes and the physical abuse of a female trooper by another male trooper could have been taken into account prior to his promotion to Major. Thus, if Capt. Conley has engaged in some type of misconduct since her promotion to captain and prior to the promotions in issue, that is clearly fair game.

However, Capt. Conley's records prove she was promoted from trooper first class to sergeant. Subsequently, she was promoted to lieutenant. Plaintiff was then awarded the honor of being the second woman ever in the DSP to be promoted to captain. Stale censure records

from plaintiff's time as a trooper first class, sergeant and even lieutenant are irrelevant to the issues in this case. The belated defense attempt to inject this stale evidence is barred by Third Circuit case law which holds that plaintiff's records may not be considered in light of the fact that it did not stop her from being promoted up through the ranks.

### C.  Major Hughes' Pending Internal Affairs Investigation During the Promotion Period.

In October of 2003, Major Hughes, then Captain Hughes, was involved a domestic dispute between two State Troopers. At this time he was working from Headquarters as acting field operations officer. (Tab B - Hughes 47). Yet in blatant disregard for DSP policy, he failed to report the incident to internal affairs despite the requirement that anytime a trooper is a victim, it must be reported to Internal Affairs. (Hughes 58). By requesting that victim services be provided to the victim/trooper, he thought he "was closing or providing the services we needed to provide." (Hughes 45). Further, Hughes claims at that time, he was unaware that the perpetrator, as well as the victim, was a State Trooper. (Hughes 45). Regardless, on November 1, 2003, Hughes was promoted to Major - only a few weeks after the incident. (Hughes 48).

As indicated, in an attempt to justify defendants' adverse action they point to plaintiff's censure record spanning over 20 years. Yet, less than a month before Hughes was promoted to the same Major position plaintiff was passed over for, he blatantly failed to follow DSP policy and procedure. By his own admission, when Hughes was officially promoted he was facing an open one year internal affairs investigation of his covering up crimes and physical abuse of a female by another male trooper. (Hughes 43-65; Hughes Ex. 2). Obviously censure records and adherence to DSP policy do not hold as much weight in the decision-making

process as the defendants would have us believe.

      **D. Conclusion.** Consequently, plaintiff Moves that the defense be prohibited from introducing evidence pertaining to plaintiff's past summary discipline history prior to her promotion to Captain in accordance with relevant Third Circuit law and its irrelevance to defendants' decision-making process.

                                                  Respectfully Submitted,

                                                  **THE NEUBERGER FIRM, P.A.**

                                                  /s/ Thomas S. Neuberger
                                                  **THOMAS S. NEUBERGER, ESQ. (#243)**
                                                  **STEPHEN J. NEUBERGER, ESQ. (#4440)**
                                                  Two East Seventh Street, Suite 302
                                                  Wilmington, Delaware 19801
                                                  (302) 655-0582
                                                  TSN@NeubergerLaw.com
                                                  SJN@NeubergerLaw.com

Dated: March 29, 2006               Attorneys for Plaintiff

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1394-GMS** |
| **individually and in his official capacity as the** | : | |
| **Superintendent, Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as the Deputy Superintendent, Delaware** | : | |
| **State Police; DAVID B. MITCHELL, individually** | : | |
| **and in his official capacity as Secretary of the** | : | |
| **Department of Safety and Homeland Security,** | : | |
| **State of Delaware; and DIVISION OF STATE** | : | |
| **POLICE, DEPARTMENT OF SAFETY AND** | : | |
| **HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### ORDER

This _____ day of _____, 2006, it is hereby

ORDERED that the defendants be prohibited from introducing evidence pertaining to plaintiff's

past summary discipline history prior to her promotion to Captain in accordance with relevant

Third Circuit law and its irrelevance to defendants' decision-making process.

_____

**THE HONORABLE GREGORY M. SLEET, U.S.D.J.**

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on March 29, 2006, I electronically filed this **Motion** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley / Pleadings / Motion in Limine - Prior Perf. FINAL

# Tab

# A

## CENSURES

**OFFICER:**     CONLEY, Barbara L.

12-07-04          <u>Notification of Suspension</u>
                  Suspended with pay and benefits pending administrative investigation



D00427

## CENSURES

**OFFICER:**   CONLEY, Barbara L.

**DATE**         **REMARKS**

01-24-84    CHARGE:      Section 19-A-2
            PENALTY:     4 hours w/option; opted to work

09-14-84    CHARGE:      Section 14
            PENALTY:     4 hours w/option; opted to work

01-24-85    CHARGE:      Failure to fill out property receipts
            PENALTY:     8 hours w/option; opted to work

04-08-85    CHARGE:      Violation of weight control program
            PENALTY:     40 hours w/option; **APPEALED: DISMISSED**

06-03-85    CHARGE:      Section 4
            PENALTY:     40 hours w/option; opted to work

12/26/87 -  CHARGE:      Section 5
01/13/88    PENALTY:     16 hours w/out pay; **APPEALED: SUSTAINED**

Unknown     CHARGE:      Section 14
            PENALTY:     40 hours w/out pay; **APPEALED: DISMISSED**

12-26-87    CHARGE:      Section 24
            PENALTY:     24 hours w/out pay; **APPEALED: DISMISSED**

11-22-89    CHARGE:      Section 22A
            PENALTY:     8 hours w/option; chose to be suspended without pay

12-06-90    CHARGE:      False report
            PENALTY:     Official reprimand

12-06-90    CHARGE:      Failure to be punctual
            PENALTY:     Official reprimand

09-16-92    CHARGE:      Failure to attend quarterly troop meeting
            PENALTY:     4 hours w/option; chose to be suspended without pay

05-11-95    CHARGE:      Violation of weight control program
            PENALTY:     40 hours w/option; chose to be suspended without pay

10-19-00    CHARGE:      Use of poor judgment in adherence to SOP
            PENALTY:     16 hours w/option; **APPEALED: SUSTAINED** - chose to be suspended w/out
                         pay

D00428

Tab

B



# Conley
# v.
# Chaffinch, et al.

## C.A. # 04-1394-GMS

---

## Deposition of:

# Randall L. Hughes, II

## December 2, 2005

Wilcox & Fetzer, Ltd.
Phone: (302)655-0477
Fax: (302)655-0497
Email: lhertzog@wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY       )
                              )
        Plaintiff,       )
                              ) Civil Action
v.                         ) No. 04-1394-GMS
                              )
COLONEL L. AARON CHAFFINCH,    )
individually and in his official  )
capacity as the Superintendent,   )
Delaware State Police; LIEUTENANT )
COLONEL THOMAS F. MACLEISH,     )
individually and in his official  )
capacity as the Deputy          )
Superintendent, Delaware State    )
Police; DAVID B. MITCHELL,      )
individually and in his official  )
capacity as Secretary of the     )
Department of Safety and Homeland )
Security, State of Delaware; and  )
DIVISION OF STATE POLICE,       )
DEPARTMENT OF SAFETY AND HOMELAND )
SECURITY, State of Delaware,     )
                              )
        Defendants.      )

Deposition of RANDALL L. HUGHES, II
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Wilmington,
Delaware, beginning at 9:35 a.m., on Friday,
December 2, 2005, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Conley                                              v.                                    Chaffinch, et al.
Randall L. Hughes, II                    December 2, 2005                        C.A. # 04-1394-GMS

Page 2

```
1   APPEARANCES:
2       THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
3         2 East Seventh Street - Suite 302
          Wilmington, Delaware 19801
4         For the Plaintiff
5       RALPH K. DURSTEIN, ESQ.
        STEPHANI J. BALLARD, ESQ.
6       DEPARTMENT OF JUSTICE
          820 North French Street
7         Carvel State Office Building
          Wilmington, Delaware 19801
8         For the Defendants Lieutenant Colonel
          Thomas F. MacLeish, David B. Mitchell,
9         and Division of State Police
10  ALSO PRESENT:
        CAPTAIN BARBARA L. CONLEY
11
12              - - - - -
13          RANDALL L. HUGHES, II,
14      the deponent herein, having first been
15      duly sworn on oath, was examined and
16      testified as follows:
17              EXAMINATION
18  BY MR. NEUBERGER:
19      Q.  Major Hughes, I'm Tom Neuberger.  And Barbara
20  Conley, as you may or may not know, has a court case
21  against the State Police about a promotion that went
22  to you and Major Eckrich and the reasons that might
23  have gone behind the promotion.  Okay?
24      A.  Mm-hmm.
```

Page 3

```
1       Q.  So I am going to be questioning you on things
2   related to the court case today.  Okay?
3       A.  Sure.
4       Q.  Now, have you ever won the prize and had your
5   deposition taken in a civil case before?
6       A.  Only in traffic accidents and, as I told
7   Stephani, several years ago.
8       Q.  But I'm sure you have testified in criminal
9   court?
10      A.  Yes, sir.
11      Q.  Right.  Would it be fair to say dozens of
12  occasions during your career?
13      A.  Many times, yes.
14      Q.  Many times.  So let me just explain a little
15  something about the civil process.  Okay?
16          I'll be asking the questions.  The court
17  reporter will take them down.  He types up the
18  questions and answers and then you will have an
19  opportunity to review that.  For example, if he put
20  down that you were 65 years old and you're really 45,
21  you could make those little kinds of corrections to
22  errors in typing or whatever.
23          Do you understand that?
24      A.  Yes, sir.
```

Page 4

```
1       Q.  In May when there's a trial in this case if
2   you're called as a witness and I ask you a question
3   and you give a different answer to a question than you
4   gave today, I have the right to point that difference
5   out to the judge and jury.
6       A.  Sure.
7       Q.  Okay.  Are you on any cold medications or
8   anything else that might interfere with your ability
9   to remember or to testify today?
10      A.  No, sir.  I have not taken any pain medication
11  for my shoulder surgery in a few days.
12      Q.  Okay.  You're coming along okay on that?
13      A.  It hurts.  It interferes with sleep, but it's
14  going to get better.
15      Q.  We will probably go in hour, hour and ten
16  minute increments or whatever, but if at any time you
17  want to take a break just let me know.
18      A.  Well, the only thing that I may ask you may see
19  me just stand a bit because my back does get a little
20  tight.
21      Q.  Okay.  Well, we all have bad backs here.
22      A.  It's amazing how a shoulder surgery leads to
23  into some tightness in the back.
24      Q.  If you think a different type of chair would be
```

Page 5

```
1   more comfortable --
2       A.  No.  I'm fine.  I'll just stretch my legs a
3   little.
4       Q.  If I ask you a question that you don't
5   understand or you might have to guess at, just let me
6   know and I will be glad to rephrase it.  Okay?
7       A.  Certainly.
8       Q.  Once again, if do you need a break just let me
9   know.  Okay?
10          Now, how old are you?
11      A.  I am 43 years old.
12      Q.  And where do you generally reside, what county?
13      A.  Sussex.
14      Q.  Sussex.  Near any town?
15      A.  Millsboro.  I live in the limits of Millsboro.
16      Q.  And over your career you've worked with Barbara
17  Conley, haven't you?
18      A.  Yes, sir.
19      Q.  I think I have seen some job evaluations you
20  have even written of her, right?
21      A.  Yes, sir.
22      Q.  Would it be fair to say that at work you
23  consider yourself friends?
24      A.  Yes, sir.
```

2 (Pages 2 to 5)

Case 1:04-cv-01394-GMS    Document 182    Filed 03/29/2006    Page 15 of 23

Conley                                    v.                        Chaffinch, et al.
Randall L. Hughes, II              December 2, 2005              C.A. # 04-1394-GMS

Page 42

1  appear in court?
2  A.  Yes, sir.
3  Q.  And you got eight hours for that, right?
4  A.  Yes, sir.
5      I can shed a little light on that one.
6  Q.  Yes.  Did you get caught in traffic or
7  something?
8  A.  No.  I was the traffic lieutenant, patrol
9  lieutenant at Troop 5 at the time.  I had been out
10  working the street and made an arrest.  The violator
11  requested a trial and I failed to appear.  And when I
12  caught that one, because I'm the one who would be
13  reviewing the pink slips as they come through, I wrote
14  up a summary disciplinary sheet like you see on the
15  second page and I took it to the captain.  And
16  actually I had put it down and listed that he should
17  take two days, 16 hours from me because as a
18  lieutenant I felt that I have to be held to a little
19  bit of a higher standard.
20      Captain Mitchell, he decided that it would
21  only be the eight and then I signed off on it.  So I
22  brought that to his attention.
23  Q.  Good.  Good.  And that was a summary discipline
24  type thing?

Page 43

1  A.  Yes, sir, it was.
2  Q.  And then I guess we have got this one that says
3  10-26-03 poor judgment.
4  A.  Yes, sir.
5  Q.  Do you see that?
6  A.  Yes, sir, I do.
7  Q.  What were the circumstances of that?
8  A.  Without mentioning any names of other folks --
9  Q.  Sure.  We don't need any names.
10  A.  -- the bottom line is I was informed of an
11  incident where, and the only reason I'm pausing, I
12  apologize, is to make sure I don't blurt out any
13  names.
14  Q.  Let's just stop here for a second.
15      MR. NEUBERGER:  Why don't we seal my
16  questions on this for the time being just in case he
17  does blurt something out?  Do you want to do that?
18      MS. BALLARD:  We can do that, although I
19  would still ask you not to use the names.
20      MR. NEUBERGER:  Right.
21      MS. BALLARD:  That's fine.
22      MR. NEUBERGER:  Do you want to seal it or
23  just wait and see?  Let's just ask the questions and
24  we will wait and see if we want to seal it.

Page 44

1      MS. BALLARD:  I think that's fine.
2      I think you can do it without mentioning
3  names.
4      THE WITNESS:  I will do it without
5  mentioning the names.
6  BY MR. NEUBERGER:
7  Q.  Why don't you tell us about the incident?
8  A.  Yes, sir.  There was an incident that occurred
9  where a trooper, a female trooper was at her
10  residence.  Another individual attempted to gain entry
11  into her residence.
12      The bottom line is it involved a domestic
13  dispute but, however, when the information was relayed
14  to me I was told that the female trooper knew who the
15  suspect, if you will, was but did not want to come
16  forward with it, didn't want anything else done.
17      I then, in turn, said I want this person
18  to be offered up victim services and I want victim
19  services counseling afforded to her.  However, that
20  is -- and where this penalty comes from is the fact
21  that I should have reported to the internal affairs
22  section.  I thought I was covering that with the fact
23  that we were having victim services, we were taking
24  that extra step to go there.  I did not know at the

Page 45

1  time that the other person involved was also a
2  trooper.  I did not know that.
3  Q.  So it was being classified as a domestic
4  incident you're saying, right?
5  A.  Yes.
6  Q.  And you didn't know the perpetrator was a
7  trooper also?
8  A.  That's correct.
9  Q.  You're saying that the victim you did know was
10  a trooper?
11  A.  Yes.  Yes, I did.
12  Q.  Go ahead.
13  A.  Yes.  At the time that I did not know the
14  suspect or perpetrator, as you said, was also a
15  trooper, I did not know that.  I didn't know that the
16  victim had been dating or had been seeing that person
17  on a continuous basis.  So I requested that we have
18  victim services, we offer up counseling services to
19  her, but I did not report that to internal affairs.
20      I thought that I was closing or providing
21  the services that we needed to provide, but when you
22  check the rules and regulations I did not and  I
23  should have contacted internal affairs and I did not.
24  Q.  What year would this have happened?  Right

Conley                                           v.                              Chaffinch, et al.
Randall L. Hughes, II                   December 2, 2005                         C.A. # 04-1394-GMS

---

Page 46

1  during 2003?
2      A.   Yes, sir.  It was in 2003.  It was shortly --
3  the incident took place shortly after I was brought up
4  to headquarters.  Actually, I was not even a major at
5  the time.  I was still working as a captain.
6      Q.   Okay.  So it wasn't like this was 2000 and it
7  somehow surfaced several years later or something?
8      A.   No.  Some time went by before the investigation
9  all came to light because once I heard -- I was at a
10 function where a person told me, asked me some
11 questions about it once the perpetrator became known.
12 And I launched -- I then went in and contacted the
13 lieutenant colonel and requested that we launch an
14 internal affairs investigation into the entire process
15 once I learned that information.
16     Q.   Just so I understand that, am I right that you
17 learned of this incident while you were still a troop
18 commander at Troop 5?
19     A.   No, sir.  I'm sorry.
20     Q.   Go ahead.
21     A.   I had been moved to headquarters in July-ish,
22 perhaps August time frame, but had not been promoted.
23 I was filling in.  I was the acting field
24 operations --

---

Page 47

1      Q.   All right.
2      A.   I had assumed those responsibilities so,
3  therefore, it's my responsibility.
4      Q.   But your predecessor was who in field
5  operations?
6      A.   Major MacLeish at the time, now Colonel
7  MacLeish.
8      Q.   So he became lieutenant colonel?
9      A.   Yes.
10     Q.   Sometime in 2003, right?
11     A.   Yes.
12     Q.   And then somebody had to be covering his job
13 and you were temporarily put into his job?
14     A.   Yes.  I had been informed that I was going to
15 be promoted and brought up and I worked assuming the
16 responsibilities of the field operations officer, but
17 I was not officially promoted to major until I believe
18 November-ish.  I would have to look.  I would have to
19 check the dates.
20     Q.   We will see a date here in a while.
21     A.   So there was a period of time that I worked in
22 that position as the acting field operations officer
23 with captain's bars until I was officially promoted to
24 major.

---

Page 48

1      Q.   Right.  You were officially promoted I think
2  the record show on November 1st of 2003.  Does that
3  sound right?
4      A.   That does sound about right, yes, sir.
5      Q.   And this discipline here, this record on Hughes
6  2 shows that on October 26th, 2003 you received this
7  penalty of poor judgment, right, penalty of 16 hours
8  for poor judgment?
9      A.   Actually, I think that must be -- that's
10 probably the date of the offense.  That's the date of
11 the offense.  The penalty -- this took quite some
12 time.  I think the penalty -- here it is.  It says in
13 October of '04.  You can see where I signed off.  You
14 can see the dates there.  You can see that.
15          That's why it went, some time went by
16 before I became aware that there was much more to this
17 incident and, therefore, requested the internal
18 affairs investigation.
19     Q.   Okay.  So you're telling me that on Hughes
20 Exhibit No. 2, page 1441 where it shows a charge of
21 poor judgment and it lists the date of October 26,
22 2003, you believe that's the date of the offense you
23 were charged with?
24     A.   Yes, sir.

---

Page 49

1      Q.   Right?
2      A.   Yes, sir.
3      Q.   And if we look at page 2 there, page 1442,
4  you're saying that you agreed to summary discipline on
5  it looks like August 19 of 2004?
6      A.   Actually, if you go to page D01443, the date I
7  signed it is October 14, '04.
8      Q.   Gotcha.  Thank you.
9          And was this a summary discipline form,
10 these two pages here?
11     A.   Yes, sir, it is.
12     Q.   And as we mentioned a little bit early, you
13 give up your rights to appeal and things like that,
14 right?
15     A.   Yes, sir.
16     Q.   And that's a standard form that the State
17 Police uses?
18     A.   Yes, sir.
19     Q.   Just going back, I'm trying to understand then.
20          And this is sort of jumping ahead anyway.
21 Let's talk about how you learned you were going to be
22 promoted.  Okay?
23     A.   Okay.
24     Q.   Let's try to get those dates down and then we

---

13 (Pages 46 to 49)

Conley
Randall L. Hughes, II

v.

December 2, 2005

Chaffinch, et al.
C.A. # 04-1394-GMS

Page 50

1  can sort of flip back to maybe when you learned that
2  this female trooper had been a victim. Okay?
3      I think the record would show that at
4  sometime in 2003 then operations commander, field
5  operations for Sussex and Kent County Tom MacLeish was
6  promoted to lieutenant colonel?
7  A. I believe so, yes, sir.
8  Q. And do you remember when you began to
9  temporarily fill in for him? Let's maybe pin down a
10  month. September or August or summertime?
11  A. I wish I could be more specific for you with
12  dates. I remember the day I received the phone call.
13  I don't know the exact day. I want to say it was in
14  July.
15  Q. Let's start there. You received a phone call?
16  A. Actually, actually it was Camp Barnes. Maybe
17  that's in August. The Camp Barnes race. When did we
18  have the Camp Barnes race? It was around that time
19  frame. Yes.
20      I'm sorry. I did receive a phone call
21  from at that time Colonel Chaffinch.
22  Q. Let's stop there. You think it may be July or
23  August is what you're saying?
24  A. Yes, sir, that I received that call.

Page 51

1  Q. But it had something to do with some event that
2  happens at Camp Barnes?
3  A. That's my recollection because I do believe
4  that Colonel Marcin left about at the time of the Camp
5  Barnes race that year of 2003 and I think that created
6  some of the openings.
7  Q. Right. So when you received the call had
8  Colonel Marcin left yet?
9  A. Yes. Yes.
10  Q. Or announced he was leaving, something like
11  that?
12  A. Yes. Yes, sir.
13  Q. Because that's what created your vacancy?
14  A. Yes. That opportunity, yes.
15  Q. Lieutenant Colonel Marcin has either left or
16  he's announced he's leaving, right?
17  A. Yes, sir.
18  Q. And did the announcement that Tom MacLeish was
19  going to become the lieutenant colonel occur before
20  you got into the loop about replacing him?
21  A. Mr. Neuberger, I'm not sure. I don't know if
22  it all happened on the same day. I don't know.
23  Q. So you're just somewhere and you get a phone
24  call?

Page 52

1  A. I'm at home.
2  Q. Okay. So tell us what you remember about that.
3  You get a phone call whenever that was.
4  A. Well, it was in the midmorning time probably
5  because I had been out for a run. I was going to work
6  that evening. When I was troop commander I liked to
7  work a certain number of nights because I had more
8  chance to see the different shifts and see the
9  different people.
10      So I got a phone call from Colonel
11  Chaffinch. He was asking me a couple of questions at
12  first about some things that were going on at Troop 5
13  and I answered them. And then he told me that I had
14  been selected as the major for Kent and Sussex County.
15  Well, I was to be honest with you, I stumbled over
16  many thank yous. And then I remember him telling me
17  something about being a major, some of the
18  things that I had done at Troop 5 while there and
19  working on the project. We were starting into a
20  project of building a new troop. And he said I was
21  going to continue on with that and some of the rapport
22  that I had established with the County Council in
23  Sussex County.
24      And to be honest with you, Mr. Neuberger,

Page 53

1  I was giddy, to be honest with you, and very, very
2  happy at the time. There may have been more said. In
3  fact, I'm sure there was more said, but my
4  big thing at that time was to stumble over many thank
5  yous. I remember saying, "I'll work as hard as I can
6  for the division." And I think I even told the
7  colonel, I think I said -- because I know my thought
8  was I want to call my wife. That's what I remember of
9  that day.
10      And I did go to work that night.
11  Q. So you said this was in the evening?
12  A. No. This was in the daytime. This was during
13  the daytime, yes, sir.
14  Q. You went to work that night. Had it been
15  announced publicly? Did they send an e-mail out or
16  something saying that you were going to be --
17  A. No.
18  Q. Did you keep it a secret?
19  A. No. There are no secrets. No. It was coming
20  out. I don't know if they had announced it or not
21  when I got there, but I do remember asking, I do
22  remember asking the question "Am I allowed to tell
23  anyone?" And it was "Yes."
24  Q. Okay.

14 (Pages 50 to 53)

Conley                                      v.                        Chaffinch, et al.
Randall L. Hughes, II              December 2, 2005              C.A. # 04-1394-GMS

Page 54

1    A.   And I probably told as many people as I could
2    come across.  I'll be honest with you, I probably did.
3       Q.   Sure.  Do you remember if Colonel Chaffinch
4    told you anybody he had consulted with prior to making
5    the decision to promote you?
6    A.   No, sir.  I don't remember hearing that.
7       Q.   Do you recall if Colonel Chaffinch told you
8    anything about any process he went through that led to
9    his deciding to choose you?
10   A.   No, sir, I don't recall hearing him say
11   anything to that effect, other than about hard working
12   and I remember that, which I try to work hard and
13   those few things that I had talked about.
14        But, no, sir, I don't recall him telling
15   me here's the process.  You know, I don't recall that
16   at all.
17      Q.   Do you recall if he said he had talked to Tom
18   Marcin about you?
19   A.   No, sir, I don't recall that.  No.
20      Q.   Do you recall if he said he had talked to
21   lieutenant colonel, well, then going to be Lieutenant
22   Colonel Tom MacLeish?
23   A.   No, sir, I don't.
24      Q.   So you don't know one way or the other whether

Page 55

1    he talked to anybody?
2    A.   No, sir.  I can't answer that question.  Coming
3    from that phone conversation that we had that day, no,
4    sir.
5       Q.   After the conversation did he ever explain to
6    you how he arrived at the decision to promote you?
7    A.   Again, we have had other meetings about when I
8    came up "I'm happy to have you here on staff, I want
9    you to continue," kind of laid out some of the things
10   that I was to continue working on and "You have done a
11   nice job with these so far; I want you to continue
12   on."
13        No, I don't remember him telling me or
14   anyone telling me "This is the process that I went
15   through to select folks," no, sir.  I don't think I
16   have ever been told that.
17      Q.   So you learned you were going to be promoted.
18   How soon were you asked to go up to the headquarters
19   building?
20   A.   Normally it's two weeks.  I think I went a
21   little bit sooner.  I needed to wrap up a few things
22   at Troop 5.  I finished out some things there and then
23   I went shortly thereafter.  I think it was within a
24   two-week period I was up in the office at

Page 56

1    headquarters.
2       Q.   So is it fair to say that sometime in July or
3    August you were working at headquarters?
4    A.   Yes, sir.  And I can perhaps pin that down if I
5    go back and check my calendar at home.  My wife
6    probably even wrote it down.  She's pretty good about
7    things.
8       Q.   But you're at headquarters acting in Tom
9    MacLeish's capacity, right?
10   A.   Yes, sir, I was.
11      Q.   And you're not formally promoted until November
12   1st of 2003, right?
13   A.   Yes, sir.
14      Q.   But sometime in July or August you're at
15   headquarters.  Let's start there.  Okay?
16   A.   Mm-hmm.
17      Q.   Is that when you learned about this female
18   trooper becoming a victim after you started there at
19   headquarters?
20   A.   Yes, sir.  Yes.  I had assumed the
21   responsibilities as the field operations officer.
22      Q.   Okay.  Just to jump back, did Colonel Chaffinch
23   tell you he reviewed your personnel file before he
24   promoted you?

Page 57

1    A.   No, sir.  I don't think he, I don't, I don't
2    think he told me that.
3       Q.   I'm just asking you if you remember.
4    A.   No, sir.
5       Q.   It's July or August and you're learning about
6    this female trooper and the domestic incident, right?
7    A.   Yes, sir.
8       Q.   Does this happened shortly after your assuming
9    your duties there?
10   A.   Yes, sir.  Yes.  It's very near the beginning
11   of that time, yes, sir.
12      Q.   So it's like within the first two weeks of
13   assuming your duties?
14   A.   And it may be more than two weeks, but it's in
15   the very early stages of me assuming them, yes.
16      Q.   Several weeks to a month, is that what you're
17   saying, the early stages of --
18   A.   Mr. Neuberger, I cannot give you -- I wish I
19   could.  I would pin it down to a specific date if I
20   could.  But at this time I just can't do that, but
21   it's in the beginning, it's in the very beginning.
22      Q.   All right.  And you're saying somehow you learn
23   of the incident?
24   A.   Yes.

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302)655-0477

Conley                                              v.                              Chaffinch, et al.
Randall L. Hughes, II                      December 2, 2005                    C.A. # 04-1394-GMS

Page 58

1    Q.   Now, you're the field operations --
2    A.   No.  I learned of the incident because I do get
3  a phone call from a troop commander telling me there
4  was this incident that took place and when this
5  incident took place I was given a certain set of facts
6  from which to operate from.  Those facts included that
7  there was a female trooper victim.  As it turns out,
8  she was related in a domestic or involved in a
9  domestic incident and knew who the perpetrator was but
10  did not wish to disclose it.
11       With those set of facts, I said, my
12  response was offer victim services, make sure victim
13  services, contact victim services counseling for her.
14  Make sure if there's anything else that we can offer
15  for her or do for her and we will honor her wishes not
16  to go forward.
17       I made a mistake.  Whenever a trooper is
18  involved in an incident, a domestic violence incident
19  or an incident of this type it should go to internal
20  affairs.
21    Q.   Even if there's not a trooper who is the
22  suspect but just that the trooper is a victim IA has
23  to learn of it?
24    A.   Any time, yes, sir.  And I should have told him

Page 59

1  I did not.  I made a mistake.
2       Then subsequently several months go by and
3  actually at a MADD ceremony down at the Bay Center in
4  Dewey Beach I learn then that the other person was
5  another trooper, which caused me quite a bit of
6  distress.  And actually that night I left, I walked
7  out of that ceremony to get on the phone and start
8  making phone calls to find out, to verify if, in fact,
9  that was the case.
10       And then our next steps were going to be
11  what we were going to do.  And that was on I believe a
12  Saturday evening.  And then on Monday morning -- and I
13  had over the weekend made the then lieutenant colonel
14  aware of this and we decided then all right, Monday
15  morning we're going to start this internal affairs, we
16  will contact internal affairs.  And I gave him all of
17  the information that I knew that was going on and then
18  the investigation was launched.
19    Q.   Okay.  And on October 26th of 2003 did you like
20  self-report yourself to somebody also?
21    A.   Yes, sir.  And in those initial conversations
22  with -- no.
23    Q.   I'm trying to understand.
24    A.   I know.  October 26th is probably the day where

Page 60

1  they could narrow it down to about when -- it's
2  probably just a date they picked to be about when the
3  incident took place thereabouts.  Maybe it did occur
4  on October 26th.  I would have to go back and check
5  all of the records on that when that occurred.
6       The time that I would self-report is going
7  to be the day, the Monday after the MADD ceremony at
8  the Bay Center is when -- I remember having Captain
9  Paige in my office and saying, "Jimmy, this is what we
10  have got and I am sure that somewhere in your
11  investigation you will be back to me with your tape
12  recorder."
13       And then the investigation was launched
14  and it was handled.
15    Q.   Let me just see.  I think that might be it.
16  Let me just try to think here.
17       So it looks like -- well, you definitely
18  reported yourself to Captain Paige?
19    A.   Oh, yes.
20    Q.   He was the head of IA?
21    A.   Yes, sir.  Actually, at the time of that first
22  one I said, "You will be back to me to talk about
23  this."  And even at that exact time I was along the
24  lines of -- because I knew it looked like I was trying

Page 61

1  to or it looks like things weren't reported in a
2  timely fashion.  So I said, "I know you will be back
3  with me to talk to me more."  And I said, "Yes, this
4  is everything that I have done up until this point."
5  I told him about offering up victim services and all
6  that.
7       In essence, it was a self-report, yes,
8  sir.
9    Q.   Yes.  Right.  That's a fair characterization?
10    A.   I think so, yeah.
11    Q.   I think you also said that you reported it to
12  Lieutenant Colonel Tom Marcin?
13    A.   MacLeish.
14    Q.   I'm sorry.  MacLeish?
15    A.   Right.
16    Q.   Yes?
17    A.   Yes.
18    Q.   So that's even before you talked to Captain
19  Paige?
20    A.   Yes.  Yes.
21    Q.   Right.  And Lieutenant Colonel MacLeish was
22  your direct report, right?  You had to report to him?
23    A.   Yes, sir.
24    Q.   He was the operations commander for the whole

Conley                                     v.                           Chaffinch, et al.
Randall L. Hughes, II              December 2, 2005              C.A. # 04-1394-GMS

Page 62

1   **State Police, right?**
2   A.   Yes, sir.
3   **Q.   Did you report it to Colonel Chaffinch too?**
4   A.   No.  No.  I don't know if Colonel Chaffinch --
5   No. It went to Colonel MacLeish.  I went to my person
6   was Colonel MacLeish.
7   **Q.   Right.  Right.  It was just a one-on-one**
8   **meeting with you and him?**
9   A.   Well, it was a one phone call that evening and
10  then that Monday morning in his office, yes, sir.
11  **Q.   Yes.  Well, you have been on the executive**
12  **staff for a couple of years now, right?**
13  A.   Yes, sir.
14  **Q.   And before that you were a troop commander,**
15  **right?**
16  A.   Yes, sir.
17  **Q.   Before that, well, while you were a troop**
18  **commander -- when were you promoted to captain?**
19  A.   Hold on.  I'll get this for you.  It's October,
20  I want to say it was October 1999, I think.  October
21  15th, 1999.
22  **Q.   You at least were attending commanders meetings**
23  **since then?**
24  A.   Yes.  But now -- yes.  Yes.

Page 63

1   **Q.   Right.  So you have been at commanders meetings**
2   **during your career, right?**
3   A.   Yes, sir.
4   **Q.   And you have been to executive staff meetings**
5   **recently the past couple of years?**
6   A.   Yes, sir.
7   **Q.   When troopers are having IA charges**
8   **investigated, isn't it true that the colonel is kept**
9   **informed of the fact that a trooper is --**
10  A.   I now --
11  **Q.   Let me just finish the question.**
12  A.   Oh, okay.
13  **Q.   Based on your experience, isn't it true that**
14  **the colonel is kept informed of the fact that an IA**
15  **investigation is going on?**
16  A.   That may be true, but that information wouldn't
17  come from me as an operations officer.
18  **Q.   No.  I understand that.**
19  A.   I mean as an operations officer.  Now, I guess
20  what I am trying to say to clarify that is I'm not
21  sure how the internal affairs process at that level is
22  keeping the colonel abreast of investigations because
23  that is handled through case review and I think Major
24  Eckrich has had a part in internal affairs.

Page 64

1   I don't.  I'm not a part of the internal
2   affairs process because I may be serving on a
3   disciplinary board at sometime, so by design I'm not
4   supposed to be.
5   **Q.   I understand that.  I understand that.**
6   **You have explained to me a little earlier**
7   **the nature of the organization, a quasi-military or**
8   **paramilitary, right?**
9   A.   Yes, sir.
10  **Q.   There's back then in 2003 610, 630 troopers,**
11  **right?**
12  A.   Yes, sir.
13  **Q.   I'm asking you based on your experience within**
14  **the State Police if the ultimate commander of the**
15  **State Police keeps himself informed that a charge is**
16  **pending?  I'm not saying the facts and circumstances**
17  **but knows that troopers under his command may be**
18  **undergoing investigations?**
19  A.   I don't think I can answer that because I know
20  by design it goes to the lieutenant colonel as the
21  deputy superintendent to have that function.  If the
22  lieutenant colonel is filling in the colonel and all
23  that, I can't, I can't sit here and tell you that.
24  **Q.   No, I'm not asking you whether you have been**

Page 65

1   privy to those conversations.
2   **I'm asking you whether you have been privy**
3   **to conversations with or meetings with the colonel or**
4   **whatever where it's just simply evident that he knows**
5   **that an investigation could be going on.  I'm not**
6   **talking about prejudging it.**
7   A.   Yes.  Perhaps that an investigation is going
8   on, yes, sir.  Yes, I do believe so, yes.
9   **Q.   We're not talking about prejudging?**
10  A.   Right.
11  **Q.   There's a whole elaborate system for protecting**
12  **people's rights?**
13  A.   Yes, sir.
14  **Q.   All right.  I think that ends that.**
15  **So that was the poor judgment summary**
16  **discipline that you received, right?**
17  A.   Yes, sir.
18  MR. NEUBERGER:  Look, it's been an hour
19  and fifteen minutes.  Why don't we take that break
20  right now?  Okay?
21  (A brief recess was taken.)
22  MR. NEUBERGER:  Just for the record,
23  counsel had asked me for my client's they call it the
24  troop file?

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.              Registered Professional Reporters              (302)655-0477

# CENSURES

**OFFICER:**  HUGHES, Randall L.

| DATE | REMARKS | |
|------|---------|---|
| 01-04-90 | CHARGE: | Departmental accident |
| | PENALTY: | 16 hrs. w/option; forfeited vacation |
| 08-14-97 | CHARGE: | Failure to appear for court |
| | PENALTY: | 8 hrs. w/option; forfeited vacation |
| 10-26-03 | CHARGE: | Poor judgment |
| | PENALTY: | 16 hrs. w/option; forfeited vacation |


DEPOSITION EXHIBIT
Hughes ⊘
12-2-05 KF
PENGAD 800-631-6989

B01441

## SUMMARY DISCIPLINARY ACTION

NAME OF MEMBER: Randall L. Hughes

RANK: Major          IBM#: 596     TROOP/SECTION: HQ

DATES OF VIOLATION (S): October 26, 2003

VIOLATION (S): Delaware State Police Job Performance Standard #12 – Poor Judgment

OFFICIAL REPRIMAND: ☐

SUSPENSION: ☒          _____ HOURS WITHOUT PAY:

MATRIX:     ☐     16   HOURS WITH OPTION TO FORFEIT VACATION:

I, Randall L. Hughes, having been given the option to forfeit vacation leave do hereby;

☒  elect to forfeit vacation.

☐  elect to be suspended without pay on the following date (s)
(As designated by the Troop Commander/ Section Chief)
-16 hours vacation/penalty 10/2004

RESUME OF VIOLATION (S): On or about October 26, 2003, Major Hughes used poor judgment when per telephone conversation with Captain Hawkins, Major Hughes was made aware of an incident, complaint 03-03-38183, involving Delaware State Troopers and failed to notify Internal Affairs.

OFFICER RECOMMENDING PENALTY:                    DATE:
LTC R M Ll                                        8-19-2004

SIGNATURE OF HIGHEST REVIEWING OFFICER:          DATE:
                                        2.17     8-19-2004

APPROVED: LTC R M Ll                             DATE:
DEPUTY SUPERINTENDENT                            10-14-04

PURSUANT TO THE POLICE BILL OF RIGHTS (11 DEL. CODE CHAPTER 92) I HAVE THE RIGHT TO HAVE THIS MATTER TRIED BY AN IMPARTIAL HEARING BOARD. BY ACCEPTING THE SUMMARY PUNISHMENT, I ACKNOWLEDGE MY RIGHTS AND WAIVE THEM.

D01442

A869

## RIGHT TO APPEAL

I, Randall L. Hughes, having been advised of my right to appeal to the Summary Discipline Appeal Board do hereby:

☑ WAIVE MY RIGHT TO APPEAL

☐ APPEAL THE PENALTY AND REQUEST THAT A SUMMARY DISCIPLINE APPEAL BOARD BE CONVENED

☐ APPEAL THE PENALTY AND, IN LIEU OF A SUMMARY DISCIPLINE APPEAL BOARD, ENTER A PLEA OF NO CONTEST. I UNDERSTAND THAT THE DISCIPLINE INITIALLY IMPOSED WILL REMAIN IN EFFECT.

### Reason(s) For Appeal

_____

_____

_____

_____

| SIGNATURE OF OFFICER | DATE: 10-14-04 |
|---|---|

### SUMMARY DISCIPLINE APPEAL BOARD

The Summary Discipline Appeal Board, after hearing the evidence in this appeal, hereby renders its decision that the penalty above shall be:

| | |
|---|---|
| ☐ DISMISSED | ☐ REDUCED TO REPRIMAND |
| ☐ DECREASED TO SUSPENSION OF ___ HOURS WITHOUT PAY | ☐ SUSTAINED |
| ☐ DECREASED TO SUSPENSION OF ___ HOURS WITH OPTION TO FORFEIT VACATION LEAVE | ☐ INCREASED TO SUSPENSION OF ___ HOURS WITHOUT PAY |
| | ☐ INCREASED TO SUSPENSION OF ___ HOURS WITH OPTION TO FORFEIT VACATION LEAVE |

☐ OTHER:

| THE MAJORITY DECISION RENDERED ON | AS FOLLOWS: |
|---|---|
| | (Board Member) |
| | (Board Member) |
| | (Board Member) |

Form #317
Revised 11/5/03

D 0 1 4 4 3

A870