## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,      :
      :
        Plaintiff,      :
      :
   v.      :
      :
COLONEL L. AARON CHAFFINCH,      :    C.A.No.04-1394-GMS
individually and in his official capacity as the      :
Superintendent, Delaware State Police;      :
LIEUTENANT COLONEL THOMAS F.      :
MACLEISH, individually and in his official      :
capacity as the Deputy Superintendent, Delaware      :
State Police; DAVID B. MITCHELL, individually      :
and in his official capacity as Secretary of the      :
Department of Safety and Homeland Security,      :
State of Delaware; and DIVISION OF STATE      :
POLICE, DEPARTMENT OF SAFETY AND      :
HOMELAND SECURITY, STATE OF      :
DELAWARE,      :
      :
        Defendants.      :
      :

## PLAINTIFF'S SIXTH MOTION IN LIMINE TO ALLOW LEADING QUESTIONS DURING THE DIRECT EXAMINATION OF CAPTAIN GLENN DIXON

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: March 29, 2006        Attorneys for Plaintiff

**A.  Introduction**. Captain Dixon's sworn testimony is exceedingly damaging to defendants case.  Since Capt. Dixon was a friend to and also served as an insider to Col. Chaffinch, he was privy to very revealing statements. Capt. Dixon's testimony offers powerful testimony relevant to Chaffinch's animosity towards women in this promotions case and to his anger and fury with those who file suit against him.

**B.  Discussion.**

**1. Capt. Dixon's Fear of Retaliation for His Truthful Testimony.**   Capt. Dixon was subpoenaed to give his deposition and expressed fear that he would be retaliated against for his subpoenaed testimony. (Tab A - Dixon 72).  Capt. Dixon's fears are valid and legitimate.  Capt. Dixon has testified that Chaffinch "is very vindictive" and "use[s] his rank or office in the state police to be vindictive."  "It is common knowledge...you would not cross him...[y]ou knew your career would pretty much stop." (Dixon 24, 44,71-72).

Further, in plaintiff's counsel's experience as a seasoned trial attorney, when a witness is fearful of retaliation for testifying truthfully, there exists a probability that the witness will retreat from their prior testimony.  For example, in the case of Foraker v. Chaffinch, et al, C.A. No. 02-302-JJF, now Lieutenant Colonel Seifert, then Major Seifert, gave favorable testimony for the plaintiff at his deposition.  Yet at trial he recanted his testimony and present counsel was forced to impeach him on the stand.  At a later date, present counsel was informed by defense counsel in the Foraker action that Seifert's testified contrary to his deposition testimony because he had been threatened by his superiors that he would be demoted to captain if he did not change his testimony.

In the present case, defendants have taken a similar tactical intimidation approach with Capt. Dixon by attempting to bring up unfounded allegations that Capt. Dixon and plaintiff have engaged in an alleged sexual affair.  Their intentions to drag Capt. Dixon's name through the mud

and disrupt his marriage are crystal clear. Capt. Dixon must be protected on the witness stand to elicit his truthful testimony which is obviously very damaging to defendants on liability.[1]

## 2. Federal Rule of Evidence 611 Permits Leading Questions to Elicit

**Truthful Testimony.** To protect a witness and to elicit truthful testimony, the Federal Rules of Evidence permit the use of leading questions on direct for "witnesses automatically regarded as adverse, and therefore subject to interrogation by leading questions without further showing of actual hostility." Ellis v. City of Chicago, 667 F.2d 606, 612-13 (7th Cir. 1981); see FRE 611(c) Advisory Committee Notes. Rule 611(c) states:

> Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or *a witness identified with an adverse party*, interrogation may be by leading questions.

Fed.R.Evid. 611(c) (emphasis added). The use of leading questions is mostly left to the "sound discretion of the trial judge." Ellis, 667 F.2d at 613. Ultimately it is the trial court who "has the authority and responsibility to control the examination of witnesses and the presentation of evidence in order to achieve the objectives of ascertaining truth and avoiding needless consumption of time." Haney v. Mizell, 744 F.2d 1467, 1477 (11th Cir. 1984).

It is clear that Capt. Dixon is employed by the DSP as a high level manager - Trooper Commander for Troop 5 Bridgeville - with responsibility for all of western Sussex County. Further, the DSP, Dixon's employer, Col. MacLeish, Dixon's commander in this paramilitary organization, and Col. Chaffinch, Dixon's former commander, all are defendants in these actions, and obviously are adverse parties to plaintiff. Moreover, although not a defendant, comparator Major Hughes, whose qualifications and competence are being challenged in this discrimination

---

[1] Notably, these allegations surfaced only after Dixon gave his truthful and very damaging testimony in this case.

action, is Dixon's direct commander.  Thus, as an employee and subordinate of adverse parties and witnesses, Capt. Dixon is a "witness identified with an adverse party" thus permitting leading questions on direct.

        **a. "Witness Identified With an Adverse Party."**  The phrase "witness identified with an adverse party" has been developed to assist trial courts in ruling on FRE 611(c) issues by including those "identified with an adverse party" such as "*employees, agents, friends, or relatives of an adverse party.*" <u>Vanemmerik v. The Ground Round</u>, 1998 WL 474106, *1 (E.D. Pa. July 16, 1998) (emphasis added).   The phrase "is intended to apply broadly to an *identification based upon employment* by the party or by virtue of a demonstrated connection to an opposing party." <u>U.S. v. McLaughlin</u>, 1998 WL 966014, *1 (E.D.Pa. Nov. 18, 1998) (emphasis added).  Employees called by the party opposing their employer, are identified with the adverse party under Rule 611(c).

        **(1).  Police Officers Identified With Their Employer.**   More specifically, in <u>Ellis v. City of Chicago</u>, the Seventh Circuit held the district court erred by not allowing plaintiff to examine two police officers as on cross. <u>Ellis</u>, 667 F.2d at 613.  The two officers were employed by the defendant, the City of Chicago, throughout the entire life of the litigation and were present during portions of the incident in question. <u>Id.</u>  Further, the two officers "worked closely with the specific defendant during their periods of employment. <u>Id.</u>  Notably, the court never addressed the content of the police officer's testimony as a deciding factor for permitting leading questions.  Instead, the appeals court held the two officers "*clearly qualified* as 'witness(es) identified with an adverse party' for purposes of Rule 611(c)." <u>Id.</u> (emphasis added).  Likewise, Captain Dixon worked closely with Chaffinch and remains gainfully employed as a high level manager by the DSP.

        By analogy, in the criminal context, a police officer is almost automatically deemed

identified with the government and against the defendant by virtue of his or her employment as a police officer. U.S. v. Duncan, 712 F.Supp. 124, 126 (S.D.Ohio 1988). "[A] government agent's 'interests ... could safely be assumed to be adverse to those of the defendant.'" Id. (citing U.S. v. Bryant, 461 F.2d 912, 917 (6th Cir. 1972)); see also Commonwealth v. Lambert, 1998 WL 558749, *22 (Pa.Com.Pl. Aug. 24, 1998) (recognizing "the use of leading questions in direct examination of law enforcement officials...because they are 'identified' with an adverse party, i.e. the prosecution."). The underlying reason for this assumption is that a police officer "called by the defense as a witness, 'will not be predisposed to accept suggestions offered by defense counsel's [leading] questions.'" Duncan, 712 F.Supp. at 126. Likewise, the Utah Supreme Court held a Highway Patrol Lieutenant was identified with the adverse party, the prosecution, for purposes of testifying to inconsistencies in a State Trooper's prior testimony. State v. Johnson, 784 P.2d 1135, 1143 (Utah 1989). Thus, in the criminal context, the courts have also repeatedly found a police officer identified with the adverse party, the government, absent any showing of hostility or bias and based on the virtue of their employment.

In the case at hand, Captain Dixon is a high level manager and Trooper commander employed by the DSP whose commander and immediate former commander in this paramilitary organization are defendants in this action. Accordingly, Captain Dixon is identified with the adverse party in this litigation by virtue of his employment relationship.

### (2). Employees Identified With Their Employer in Other Settings.

Additionally, other employee/agent relationships have been sufficient to identify a witness with the adverse party, their employer. A nurse called to testify by the plaintiff was sufficiently identified with the defendant, her employer, since she was present when the legal wrong occurred. Haney, 744 F.2d at 1478. A Volkswagen employee was also identified with his employer, the defendant, for purposes of FRE 611(c). Perkins v. Volkswagen of America, Inc.,

596 F.2d 681, 682 (5th Cir. 1979).  Similarly, a witness that may not be in "cahoots" but is at least

in "cohorts" with an adverse party is enough. McLaughlin, 1998 WL 966014 at *1.  In

McLaughlin, the witness and the defendant clearly worked together and did continual business for

at least ten years. Id.  Accordingly, the witness was deemed identified with the adverse party.

Even former employees have been identified with their employer for purposes of FRE

611(c).  A former president and personnel director of a defendant school have been found to be

identified with the adverse party.  See Chonich v. Wayne County Comm. College, 874 F.2d 359,

368 (6th Cir. 1989).  Likewise, a former administrative secretary was deemed identified with her

former employer because of her previous employment and her ongoing relationship with

defendant.  See Stahl v. Sun Microsystems, Inc., 775 F.Supp. 1397, 1398 (D.Colo. 1991).  Also, a

former supervisor of a plaintiff employee was identified with the defendant employer purely by

virtue of his employment. See Garden v. General Elec. Co., 1992 WL 184345, *1 (D.N.J. July 6,

1992).  Accordingly, by virtue of Capt. Dixon's employment he is plainly identified with adverse

parties.

    **b.  Alteration of a Witness' Testimony on the Witness Stand.**  In

Vanernmerik v. The Ground Round, the court found nothing to indicate that plaintiff's treating

doctors, who were called to testify and compensated by the defendant, would "have any incentive

to alter their testimony to assist plaintiff." 1998 WL 474106, *1.  While the court does not state

that if the witness had an incentive to alter his or her testimony, than leading questions would be

permissible, a clear inference of this can be drawn.  It is a reasonable assertion that if there were

any indication alluding to the possibility of a witness altering their testimony, leading questions on

direct should be allowed to ensure truthful testimony.  Due to his continued employment with the

DSP and his commanding officers, Capt. Dixon is facing a serious conflict, much like the one Lt.

Col. Seifert faced.  The court has been afforded complete discretion by the Federal Rules of

Evidence to remedy this conflict by allowing plaintiff to use leading questions on direct to ensure honest testimony.

      **C. Conclusion.** Consequently, plaintiff Moves that the court allow plaintiff to use leading questions on direct examination of Capt. Glenn Dixon to ensure his testimony is in accordance with his truthful deposition testimony.

      Respectfully Submitted,

      **THE NEUBERGER FIRM, P.A.**

      /s/ Thomas S. Neuberger
      **THOMAS S. NEUBERGER, ESQ. (#243)**
      **STEPHEN J. NEUBERGER, ESQ. (#4440)**
      Two East Seventh Street, Suite 302
      Wilmington, Delaware 19801
      (302) 655-0582
      TSN@NeubergerLaw.com
      SJN@NeubergerLaw.com

Dated: March 29, 2006      Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1394-GMS** |
| **individually and in his official capacity as the** | : | |
| **Superintendent, Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as the Deputy Superintendent, Delaware** | : | |
| **State Police; DAVID B. MITCHELL, individually** | : | |
| **and in his official capacity as Secretary of the** | : | |
| **Department of Safety and Homeland Security,** | : | |
| **State of Delaware; and DIVISION OF STATE** | : | |
| **POLICE, DEPARTMENT OF SAFETY AND** | : | |
| **HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**ORDER**

This _____ day of _____, 2006, it is hereby

ORDERED that plaintiff is allowed to use leading questions on direct examination of Capt.

Glenn Dixon.

_____
**THE HONORABLE GREGORY M. SLEET, U.S.D.J.**

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that

on March 29, 2006, I electronically filed this **Motion** with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following:


Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley / Pleadings / Motion in Limine - Dixon Leading Ques. FINAL

Tab

A



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
## v.
## Chaffinch, et al.

C.A. # 04-1394-GMS

-----------------------------------------------------------------------

Transcript of:

Captain Glenn Donald Dixon

July 13, 2005

-----------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,            )
                                     )
            Plaintiff,               )
                                     )  Civil Action
v.                                   )  No. 04-1394-GMS
                                     )
COLONEL L. AARON CHAFFINCH,          )
individually and in his official     )
capacity as the Superintendent,      )
Delaware State Police; LIEUTENANT    )
COLONEL THOMAS F. MACLEISH,          )
individually and in his official     )
capacity as the Deputy Superintendent, )
Delaware State Police; DAVID B. MITCHELL )
Individually and in his official     )
capacity as Secretary of the Department )
of Homeland Security, State of Delaware;)
and DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY, State )
of Delaware,                         )
                                     )
            Defendants.              )

        Deposition of CAPTAIN GLENN DONALD DIXON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 9:30 a.m., on Wednesday, July 13,
2005, before Eleanor J. Schwandt, Registered Merit
Reporter and Notary Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street, Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff

        (Appearances continued on page 2.)

            WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

Conley                                    v.                        Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS                July 13, 2005

Page 2

1   APPEARANCES (Continued):
2        STEPHANI J. BALLARD, ESQ.
         RALPH K. DURSTEIN, ESQ.
3        DEPARTMENT OF JUSTICE
           820 North French Street
4          Carvel State Office Building
           Wilmington, Delaware 19801
5          for the Defendants Lieutenant Colonel Thomas F.
           MacLeish, David B. Mitchell, and Division
6          of State Police
7   ALSO PRESENT:
         CAPTAIN BARBARA L. CONLEY
8        CAMILLE M. MARTIN, Law Clerk
9        - - - - - - - - - -
         (Mr. Durstein not present at this time.)
10
11       GLENN DONALD DIXON,
12   the witness herein, having first been
13   duly sworn on oath, was examined and
14   testified as follows:
15              EXAMINATION
16   BY MR. NEUBERGER:
17   Q.   Could you state your full name for the record.
18   A.   Yes, Glen Donald Dixon.
19   Q.   Okay.  And you are a captain in the Delaware
20   State Police?
21   A.   I am.
22   Q.   And is it fair to say you have testified in court
23   before?
24   A.   I have.

Page 3

1    Q.   Okay.  And have you ever had your testimony taken
2    in a deposition before?
3    A.   Maybe once or twice.
4    Q.   Okay.  So you are a little bit familiar?
5    A.   Yes.
6    Q.   Okay.  Well, what happens is the court reporter
7    types up the questions and answers.  You have the right
8    to look it over when it is done to see if she made a
9    mistake in taking down an answer or something to make
10   corrections.  Do you understand that?
11   A.   Yes, I do.
12   Q.   Okay.  And then at trial, at trial, if you said
13   something different than today, I would have the
14   opportunity to point that out to the judge and jury.  You
15   understand that?
16   A.   Yes.
17   Q.   Okay.  So I don't want you to do any guessing.
18   So try to answer to the best of your ability.  Or if I
19   ask a question that's a stupid question, you don't
20   understand, just ask me to rephrase it and I'll be glad
21   to do it.  Okay?
22   A.   All right.
23   Q.   Thanks.  Now, could I ask you very quickly, we
24   will just march through when you went to the academy to

Page 4

1    your present assignment.  When did you graduate from the
2    academy?
3    A.   1988.
4    Q.   1988.
5    A.   I began in June of '88 and graduated in the fall.
6    Q.   Okay.  What was your first assignment?
7    A.   It was at State Police Troop 5 in Bridgeville.
8    Q.   Troop 5.  So that was a, what do you call them,
9    patrol?
10   A.   Patrol troop.
11   Q.   All right.
12   A.   Yes.
13   Q.   So Troop 5, and how long were you there?
14   A.   I was there until I was promoted to sergeant,
15   which was about nine, nine years, and then I moved over
16   to Troop 4 in Georgetown.
17   Q.   Let me see.  Troop 4.  Was it six months in the
18   academy?  Three months?
19   A.   I think back then it was like a four-month
20   period.
21   Q.   Four months.  So would it have been the end of
22   '88 when you went to Troop 5 or the very beginning of
23   '89?
24   A.   It was actually around, with the field training

Page 5

1    in it, I trained in field training in Woodside, after
2    field training I went down there end of November, early
3    December, around there.
4    Q.   That's when you started at Troop 5?
5    A.   Yes.
6    Q.   Okay.  And then if we say nine years --
7    A.   Well, I was promoted in '96.
8    Q.   '96, sergeant?
9    A.   Yes.
10   Q.   All right.  So '96 is when you went to Troop 4
11   then?
12   A.   Yes.
13   Q.   All right.  How long did you stay at Troop 4?
14   A.   About a year-and-a-half, and then I transferred
15   back to Troop 5.
16   Q.   Okay.  So that would be some time in '98?
17   A.   Mm-hmm.
18   Q.   Back to Troop 5?
19   A.   Yes.
20        (Mr. Durstein present at this time.)
21   Q.   All right.  So sometime in '98 you transferred
22   back to Troop 5.  Is that still at the rank of sergeant?
23   A.   Yes.
24   Q.   Okay.  And what happened next?

2 (Pages 2 to 5)

Conley                                          v.                          Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS                      July 13, 2005

Page 22

1    A.    Those, along with others, yes.
2    Q.    And then let's go to Exhibit Number 4, which is
3    the last one of these, Exhibit Number 4 from Colonel
4    Chaffinch's deposition.  Let me ask you to read that over
5    quietly, a limerick about a monkey and a coconut grove.
6    A.    Okay.
7    Q.    Have you read that?
8    A.    Yes, I have.
9    Q.    And is this a limerick that you've heard the
10   colonel recite throughout your career and interacting
11   with him?
12   A.    Yes.
13   Q.    And has he recited this, to use your words,
14   frequently in the workplace?
15   A.    Yes.
16   Q.    And has he recited this off duty?
17   A.    Yes.
18   Q.    Now, if we look at paragraph 40 in the complaint
19   Captain Conley has filed here, she indicates that in her
20   presence and the presence of men and women he recounts a
21   wide variety of more than five sexually-charged limericks
22   and jokes which she characterizes as offensive to women.
23   Do you see that?
24   A.    Yes.

Page 23

1    Q.    And then she gives the example of three of the
2    ones you have read here today, and I'll represent that
3    she would testify that the other two that we showed to
4    you are the other ones she is referring to.  In your
5    recollection has Colonel Chaffinch recited these
6    limericks when women were present?
7    A.    Yes.
8    Q.    Okay.  So in the troop when you would have heard
9    these recited, female officers, you are saying, or
10   secretaries could have been present?
11   A.    Sure.
12   Q.    Okay.  And you are saying, is it a correct
13   statement that he has recited these poems in the presence
14   of either female officers or female staff working for the
15   state police?
16   A.    He would recite these for whoever would listen
17   to, male, female, it doesn't matter what rank, what
18   position the person would hold.
19   Q.    And let's just talk about the non-uniformed
20   personnel.  There are non-uniformed personnel at Troop 5?
21   A.    Yes.
22   Q.    Have these things been said in earshot of
23   non-uniformed female personnel at Troop 5?
24   A.    Absolutely.

Page 24

1    Q.    Okay.  Do you remember whether, do you have a
2    present recollection of whether any of these would have
3    been said in the presence of non-uniformed personnel up
4    in the headquarters building?
5    A.    One was said, I know, in the headquarters
6    building.  The up jump the monkey one, where it wasn't
7    said directly to non-uniformed, but it was said loud
8    enough and the proximity of where he said it could have
9    been heard by non-uniformed.
10   Q.    Okay.  So would that have been in the traffic
11   section; do you remember?
12   A.    Yes.
13   Q.    Well, are there four or five uniformed female
14   workers in the traffic section?
15   A.    Yes.  I mean, there have been some changes, but,
16   yes, at least that.
17   Q.    When you were there we are talking about.
18   A.    Yes.
19   Q.    Are there other limericks that I haven't
20   identified here that the colonel recites that are
21   sexually charged?
22   A.    I can't think of any specific limericks per se,
23   but any time you would have contact with him it seems
24   like he would have a new joke, and more times than not

Page 25

1    they were dirty jokes, not limericks per se.
2    Q.    Okay.  Have you ever witnessed a female officer,
3    subordinate officer, in the presence of Colonel Chaffinch
4    when one of these limericks or sexually-charged jokes
5    were recited complain to him about that?
6    A.    Not to my recollection, no.
7    Q.    Have you ever witnessed him recite these
8    limericks or jokes in the presence of an officer of
9    higher rank than he?
10   A.    Yes.
11   Q.    Okay.  What ranks higher than he would he have
12   recited them in the presence of?
13   A.    It would depend on what rank he was at the
14   current time.  Now, if he was sergeant, you know, it
15   would be people above him, lieutenant, the same as he
16   progressed.
17   Q.    When he was a sergeant he would be in a troop,
18   right?
19   A.    Yes.
20   Q.    Or I think he did undercover work too, right?
21   A.    Yes.
22   Q.    And when he was a lieutenant, I think he was like
23   a traffic lieutenant in the troop; is that true?  Maybe
24   I'm wrong.

7 (Pages 22 to 25)

Case 1:04-cv-01394-GMS    Document 184    Filed 03/29/2006    Page 15 of 147

Conley                                    v.                        Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS              July 13, 2005

Page 42

1    A.   I've heard him say it in the assembly room, in
2 the lieutenant's office and my office.
3    Q.   Okay.  So once again, just for those who aren't
4 familiar, the assembly room is where everybody assembles
5 before a shift and gets ready to go out on patrol; is
6 that right?
7    A.   It is basically a meeting area, yes.
8    Q.   Okay.  And so down at Troop 5, for example, when
9 are the patrols?  Are they 12-hour shifts?
10    A.   Yes, yes.
11    Q.   So twice a day there will be assemblies?
12    A.   Well, there is no formal meetings prior to the
13 officers going out on shifts, because they have to take
14 their own cars.  But officers would stop in periodically
15 throughout the day.
16    Q.   Oh, okay.
17    A.   In order to check in, check their mail boxes,
18 discuss things over with their sergeants.
19    Q.   Okay.  So there would be people periodically in
20 the assembly room?
21    A.   Yes.
22    Q.   Now, on occasion there were announcements or
23 something that would have to be made from headquarters
24 and everybody would have to get together officially, that

Page 43

1 happens once in awhile?
2    A.   Yes, quarterly troop meetings.
3    Q.   Okay.  And you are saying that you've heard him
4 make that reference in the assembly room?
5    A.   Yes.
6    Q.   And would women troopers be present?
7    A.   I know officers would be present.  Every shift
8 has a female -- not every shift.  Three out of four
9 shifts have females on them, so it is possible a female
10 could have heard.  I don't remember specifically.
11    Q.   In paragraph 41 Captain Conley also says that
12 Colonel Chaffinch has said in the presence of men and
13 women that he has something extra, meaning he is not
14 circumcised.  Is that a true statement?
15    A.   I've never heard him express it in that way, that
16 he has something extra, but it is common knowledge that
17 I've had and many people have had, well, since I've
18 started at Troop 5 that that was the case, he was
19 uncircumcised.  He would openly talk about it.
20    Q.   Okay.  So you learned about that from his own
21 lips?
22    A.   Yes.
23    Q.   Okay.  So he would openly talk about the fact he
24 was not circumcised?

Page 44

1    A.   Yes.
2    Q.   And you've heard him make that kind of a
3 reference throughout your career?
4    A.   Yes.
5         (Discussion off the record.)
6    Q.   Let's move on to paragraph 42.  In 42 Captain
7 Conley charges that Colonel Chaffinch has publicly stated
8 in the presence of women that he wants to watch others
9 engage in sexual relations.  Is there any incident in
10 your recollection that would coincide with that
11 allegation?
12    A.   One that comes to mind immediately was a
13 conversation with two lieutenants at the troop and
14 Colonel Chaffinch, and I was present, and they were
15 talking about a certain female troop that would
16 masturbate in front of another troop while they are
17 having sex, you know, and we talked about that, how he
18 would lose it if he saw that happen.
19    Q.   Okay.  So there was some sort of a conversation
20 going on about a female trooper having sex with two male
21 troopers; is that what you are saying?
22    A.   No, no, one male trooper.
23    Q.   With one male trooper?
24    A.   And she would masturbate for him on herself.

Page 45

1    Q.   Okay.  This conversation was happening when the
2 colonel was present and two lieutenants at Troop 5 were
3 present?
4    A.   Yes.
5    Q.   And did you come upon the conversation?  Did you
6 initiate it?  How did you get in the room?  How did this
7 come about?
8    A.   Conversations like this would come up if we are
9 just talking about anything, work-related or otherwise.
10 And then someone would make a statement about this female
11 trooper, and then it would go from there.  So just in the
12 passing of normal conversation.
13    Q.   Okay.  Well, I think you indicated when Colonel
14 Chaffinch would stop in at the troop he would visit in
15 the assembly room, he would visit in the lieutenant's
16 office, and he would visit in your office, right?
17    A.   Yes.
18    Q.   And you are saying that there was a conversation
19 going on about other matters, and then this came up
20 during the conversation?
21    A.   Yes.
22    Q.   Okay.  So it wasn't like the four of you had a
23 meeting to talk about troopers having sex?
24    A.   No.

12 (Pages 42 to 45)

Page 70

1    A.  Yes.
2    Q.  Okay.  Based on your observations, after the
3   lawsuit was filed was he mad at Captain Conley?
4    A.  Yes.  I believe, I'm sure he still is mad.
5    Q.  Right.  Do you remember any other feelings or
6   emotions he demonstrated towards Captain Conley after the
7   lawsuit was filed in the whole period of time up to the
8   present?
9    A.  Nothing strikes me specifically after the lawsuit
10   was filed.  He, after that, for the most part he -- well,
11   he wouldn't bring that lawsuit up specifically around the
12   troop.  So no, I guess my answer is no.
13    Q.  Well, you heard this remark about Trooper Scott
14   Gray.  You told us about that?
15    A.  Yes.
16    Q.  And that the colonel was upset at not having been
17   invited to a party, right?
18    A.  Yes.
19    Q.  And you heard the remark the colonel made about
20   you should remember who transferred you into detectives,
21   right?
22    A.  Yes.
23    Q.  Did you observe the colonel to be exhibiting any
24   hostility towards Captain Conley indicating he felt she

Page 71

1   was ungrateful or things like that towards Colonel
2   Chaffinch?
3       MS. BALLARD:  Object to the form.
4    Q.  You can answer the question.  I'm asking you what
5   you observed.  Did you observe --
6    A.  After the lawsuit had been filed?
7    Q.  Yes, after the lawsuit, him to exhibit any anger
8   at her thinking she was ungrateful to him?
9    A.  He wouldn't bring her name up around me
10   afterwards.
11    Q.  Okay.  So previously he would mention Captain
12   Conley in your presence?
13    A.  Yes.
14    Q.  And you are saying after the lawsuit was filed he
15   would never mention Captain Conley again in your
16   presence?
17    A.  Not that I recall, no.
18    Q.  Okay.  Is the colonel, based on your working with
19   him and having dealt with him over 17 years, the kind of
20   person who a reasonable person should fear he would
21   retaliate against them?
22       MS. BALLARD:  Object to the form.
23    A.  He is very vindictive.
24    Q.  Okay.  Now, are you saying you have observed him

Page 72

1   to be vindictive over your 17 years of working with him?
2    A.  Yes.
3    Q.  You have observed him to mention he has powerful
4   friends in political circles?
5    A.  Yes.
6    Q.  Are you saying that you have observed him to use
7   his rank or office in the state police to be vindictive?
8    A.  Yes.  You know, it is common knowledge, like I
9   said before, I think, that you don't -- you would not
10   cross him, you would not report him on anything because
11   of his vindictiveness.  You knew that your career would
12   pretty much stop.
13       I mean, it concerns me now, going through
14   this, even though he is still not the colonel or not
15   presently the colonel.
16    Q.  Now, I've subpoenaed you to testify today?
17    A.  Yes.
18    Q.  You understand that?
19    A.  Yes.
20    Q.  There is a court order requiring you to come here
21   today, right?
22    A.  Yes.
23    Q.  And I have never even met you before today, have
24   I?

Page 73

1    A.  No.
2    Q.  Okay.  I passed you in the waiting room here and
3   didn't even know who you were, right?
4    A.  Right.
5    Q.  So you have never met with me and discussed any
6   facts relating to this case; is that true?
7    A.  No -- yes, that is true.
8    Q.  I want to jump back to the up jump the monkey
9   limerick.  Do you remember there was one about a monkey?
10    A.  Yes.
11    Q.  I'm going to give you some setting, early part of
12   2003, in Captain Conley's office, in traffic, Captain
13   Harry Downes being there, and that would make you a
14   Lieutenant Dixon there at the same time.  The colonel
15   coming in at some point in time and during the course of
16   it him reciting the up jump the monkey limerick.  Do you
17   remember whether that happened around that time?
18    A.  Yes.  I think Harry was a lieutenant.  I thought
19   you said captain.  I think he was a lieutenant.
20    Q.  Okay.  2003, Columbus, Ohio, CARE conference?
21    A.  Yes.
22    Q.  You are attending, and I think your wife went
23   with you?
24    A.  Yes.

# Unreported Opinions





**Motions, Pleadings and Filings**

United States District Court, D. New Jersey.
Murray GARDEN, Plaintiff,
v.
GENERAL ELECTRIC COMPANY, Defendant.
**Civ. No. 91-1204 (CSF).**

July 6, 1992.

OPINION

CLARKSON S. FISHER, District Judge.

**\*1** Before the court is a motion brought by defendant, General Electric Company (GE), to preclude the admission at trial of certain evidence of conversations between plaintiff, Murray Garden, and Carl Falcon, Garden's former supervisor and a former GE employee. For the reasons set forth below, the defendant's motion is granted.

On March 19, 1991, plaintiff commenced this action against GE alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., and the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. § 10:5-1 et seq. Plaintiff alleges that despite performing his job in a "highly competent fashion" throughout his employment with GE, he was discharged because of his age. Plaintiff was discharged on May 17, 1990, at the age of 59. Moreover, plaintiff alleges that prior to his discharge he received "unfair and discriminatory performance appraisals." Additionally, Garden claims that he was "unfairly limited in regard to the opportunity to work on significant projects."

Garden asserts that, consequently, he neither received appropriate merit raises nor was paid an appropriate salary. Concomitantly, plaintiff alleges that not only were substantially younger employees paid higher compensation, but also, at the time of his discharge, GE retained these younger employees, who possessed equal or less expertise and qualifications than Garden possessed. As a result, Garden filed this lawsuit alleging that his age was a determining factor in connection with his discharge from GE.

To prove these allegations, Garden plans to introduce surreptitiously recorded tapes of two conversations plaintiff had with Falcon, Garden's former supervisor. The defendant has moved to prohibit the admission of the tape recordings and the transcripts of them, based on three grounds. First, GE asserts that the tapes and transcripts are hearsay evidence, prohibited by Rule 802 of the Federal Rules of Evidence. Next, defendant asserts that the conversations are irrelevant and, therefore, barred by Rule 402 of the Federal Rules of Evidence. Finally, defendant asserts that the evidence is barred under Rule 403 of the Federal Rules of Evidence because its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury and the needless presentation of cumulative evidence.

In opposition, plaintiff argues that because Falcon will testify at trial, the tape recordings are not hearsay. Also, plaintiff asserts that, assuming for purposes of argument, the tapes and transcripts of the conversations are, in fact, hearsay, the evidence would be admissible as a vicarious omission of a party opponent, as contemplated by Rule 801(d)(2)(D) of the Federal Rules of Evidence. Moreover, plaintiff invokes the state of mind exception to the hearsay rule. Fed.R.Evid. 803(3).

In opposition to defendant's argument that the tapes are irrelevant, Garden asserts that the discussions between plaintiff and his former supervisor concerning plaintiff's performance evaluations is highly relevant to this age discrimination case. See Fed.R.Evid. 401.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** Finally, plaintiff contends that the court should reject defendant's Rule 403 argument because "the probative value of plaintiff's conversations with Falcon far outweighs any possibility of unfair prejudice, confusion of the issues, misleading of the jury and undue delay from its admission." Fed.R.Evid. 403.

Rule 403 provides: "Although relevant, evidence may be excluded ... if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Fed.R.Evid. 403.     Thus, the rule places in the sound discretion of the trial court the decision to exclude even relevant evidence. *Bhaya v. Westinghouse Elec. Corp.,* 922 F.2d 184, 187 (3d Cir.1990), *cert. denied,* 111 S.Ct. 2827 (1991) (citing *U.S. v. DePeri,* 778 F.2d 963, 973-74 (3d Cir.1985), *cert. denied,* 475 U.S. 1110 (1986)).

Primarily, it should be noted that the conversations between Garden and his former supervisor concerning GE's method of evaluation of its employees is relevant to this age discrimination action.     *See* Fed.R.Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Additionally, the court has listened to the tapes and examined the transcripts of the tapes and found that both have a modicum of probative value. Although throughout the conversations Falcon consistently denied that age was a motivating factor in any employment decisions concerning Garden, Falcon did discuss certain GE employment practices that may assist plaintiff in proving his case.     Nevertheless, because both plaintiff and defendant have listed Falcon on their respective witness lists, and because Falcon was Garden's supervisor for a period of time relevant to this lawsuit, it is apparent to the court that Falcon will be called as a witness at trial.     Consequently, it is more than likely that Falcon, when called as a witness, can and should be questioned about the same information contained in the tape recordings. Certainly, if the plaintiff calls Falcon he will be treated as a party

"identified with an adverse party" as contemplated within Rule 611(c) of the Federal Rules of Evidence, and thus, leading questions will be permitted. Similarly, should defendant call Falcon, plaintiff will have the opportunity to cross-examine the witness.     Therefore, trial counsel will be able to elicit the relevant information without resort to the poor quality tapes and the incomplete transcripts.

The court's ruling will obviate the need for having to play all of the tapes to the jury and, therefore, avoid undue delay, waste of time and the presentation of cumulative evidence.     Additionally, because the court has excluded use of the tapes and transcripts as part of the plaintiff's direct case, it is unnecessary to address the defendant's hearsay arguments.     It should be noted, however, that if Falcon's testimony contradicts statements made during the tape recorded conversations, the court will be inclined to permit plaintiff to introduce the tapes at that time, because the same hearsay concerns will not be present.

**\*3** Therefore, the defendant's motion to exclude the tapes and transcripts of the conversations is granted. Any other objections will be heard at the time of trial. An order accompanies this opinion.  No costs.

### ORDER

This matter having come before the court on motion by defendant, General Electric Company (GE), for an order precluding the admission at trial of certain evidence of conversations between plaintiff, Murray Garden, and Carl Falcon, Garden's former supervisor and a former GE employee;  and the court having considered the written submissions and oral arguments of counsel;  and good cause appearing,

IT IS on this 6th day of July, 1992,

ORDERED that defendant's motion is granted and the plaintiff is precluded from introducing the subject tapes and transcriptions of them at trial.

Not Reported in F.Supp., 1992 WL 184345 (D.N.J.), 59 Fair Empl.Prac.Cas. (BNA) 862

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1992 WL 184345 (D.N.J.), 59 Fair Empl.Prac.Cas. (BNA) 862
**(Cite as: 1992 WL 184345 (D.N.J.))**


    **Motions, Pleadings and Filings** **(Back to top)**

• 3:91cv01204 (Docket) (Mar. 19, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                            Page 1
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**


**H**

Only the Westlaw citation is currently available.


Court of Common Pleas of Pennsylvania.
COMMONWEALTH OF PENNSYLVANIA
v.
Lisa Michelle LAMBERT
**No. 0423-1992.**

Aug. 24, 1998.

OPINION

STENGEL, J.


TABLE OF CONTENTS

I.      INTRODUCTION ......................................................... 1

II.     BACKGROUND ........................................................... 5
        A.  The Trial ........................................................ 5



        B.  Post Verdict Motions ............................................. 5
        C.  State Court Appeals .............................................. 9
        D.  The Petition for Writ of Habeas Corpus in the District Court .... 10

III.    THE POST CONVICTION RELIEF ACT PETITION ............................. 15
        A.  Procedural History: Motions, Petitions, Conferences, Orders ..... 15
        B.  Legal Issues Pertaining to this Petition and Hearing ............ 31
            1.  Eligibility for PCRA relief ................................. 31
                a.  Constitutional violations: prosecutorial misconduct and
                    Brady ................................................... 32
                b.  Ineffective assistance of counsel ....................... 37
                c.  After-discovered evidence: subsequent availability of
                    exculpatory evidence .................................... 40
            2.  "Finally litigated" and waiver under the PCRA .............. 42

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 2
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

          3.  This court's role ........................................... 44
          4.  To lead or not to lead: adverse and hostile witnesses ....... 47

IV.    THE 1992 VERDICT: FINDINGS OF FACT AND CONCLUSIONS OF LAW .......... 60

V.     STATE COURT AND FEDERAL COURT ...................................... 73
       A.  A Comity of Errors ............................................. 73


       B.  What Does "Actual Innocence" Actually Mean? .................... 77

VI.    PETITIONER'S STORY LINE: A CONTEXT ................................. 80

VII.   LISA MICHELLE LAMBERT'S CASE: ISSUES AND DISCUSSION ................ 97
       A.  Laurie Show's Dying Declaration ............................... 97
       B.  The "29 Questions" ............................................ 116
       C.  The Abuse Issue ............................................... 121
           1.  Relationship with Lawrence Yunkin ......................... 126
           2.  Allegation of gang rape ................................... 130
           3.  Cambridge Springs ......................................... 136
       D.  Tabitha Buck's Involvement .................................... 139
           1.  The scratch on Tabitha Buck's face ........................ 139
           2.  Tabitha Buck's animus ..................................... 140
           3.  Scent of a co-defendant ................................... 140
           4.  Tabitha Buck's story ...................................... 141
       E.  Lawrence Yunkin's Involvement ................................. 160
       F.  Kathleen Bayan's Observation .................................. 165
           1.  Credibility ............................................... 166
           2.  Discovery obligation ...................................... 169
           3.  Truth-determining process ................................. 175


       G.  Hazel Show's Recollection of Mr. Yunkin's Car ................. 176
       H.  The Mihalakis Issue .......................................... 181
       I.  Credibility of Laura Thomas .................................. 196
       J.  The Black Sweatpants ......................................... 204
       K.  The River Search Video ....................................... 215
       L.  Ms. Lambert's Statement ...................................... 220
       M.  Crime Scene Photographs ...................................... 233
           1.  The telephone cord around the leg ........................ 234
           2.  Footprints in the hallway and bedroom .................... 238
           3.  The white sweatshirt ..................................... 243
           4.  "Missing" or "destroyed" photographs ..................... 243

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

N.   The Pearl Earring .............................................. 249
O.   Robert Reed's Testimony ....................................... 253
P.   Proposed Admissions from the Federal Record ................... 257
Q.   Ineffective Assistance of Counsel of Roy D. Shirk, Esquire ..... 259
R.   Ineffective Assistance of Counsel of Jules Epstein, Esquire .... 273
S.   Mr. Madenspacher's "Concession" ............................... 275
T.   Brady/Giglio Violations ....................................... 277
U.   The Commonwealth v. Smith Issue ............................... 317

VIII.  CONCLUSION: THE QUESTION OF INNOCENCE ............................. 319



     ORDER ......................................................... 323

     ADDENDUM TO OPINION ........................................... 324

## I. INTRODUCTION

**\*1** Lisa Michelle Lambert's petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. Section 9541 et seq. (1998 Supp.), [FN1] is now before this court. Ms. Lambert was convicted of first degree murder for the death of Laurie Show and sentenced to life in prison. The guilty verdict was entered on July 20, 1992, after a non-jury trial.

> FN1. Ms. Lambert's petition is governed by the PCRA, as amended on November 17, 1995. The amended Act is applicable to all petitions filed after January 16, 1996.

Ms. Lambert's petition contends that her conviction and sentence are wrongful, illegal and unconstitutional on the basis of after-discovered evidence. She believes that this after-discovered evidence proves her innocence and credibility, and establishes a fundamental miscarriage of justice. She also argues that intentional acts of prosecutorial misconduct, deliberate falsification of evidence, witness tampering, violations of discovery obligations, presentation of perjured testimony and ineffective assistance of both trial and appellate counsel formed the basis for her conviction. Ms. Lambert contends that she cannot be retried because the prosecution intended to deny her a fair trial.

The 257 claims stated in the amended petition present various facets of certain major issues. In this opinion, we address these issues. This court has had an opportunity to consider Ms. Lambert's claims in light of the testimony at her 1992 trial, the testimony at her eight week 1998 PCRA hearing and the legal issues and arguments presented by her counsel and by the Commonwealth. On the basis of this fully developed record, we are in a position to make factual findings, credibility rulings and legal decisions in the interest of a full resolution of all claims raised by Ms. Lambert.

We find that Hazel Show's testimony regarding her daughter's dying declaration was credible in 1992 and remains credible today. We find that the expert analysis so ably presented by both sides of this case does not constitute such "after-discovered evidence" as would cause this court to make any change in the credibility determination which formed an important basis for the 1992 verdict.

We find that the so-called "29 questions" did not and could not raise a reasonable doubt as to petitioner's guilt and does not form the basis for any contention that the Commonwealth presented perjured testimony.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

While sympathetic to the evidence of past abuse presented by Ms. Lambert, we do not find, under the law, that her diagnosis as a "battered person" has any legal impact on the issues before us.

We find petitioner's evidence regarding the involvement of Tabitha Buck and Lawrence Yunkin to be fraught with concerns over Ms. Lambert's credibility. Should we resolve many of those credibility questions in petitioner's favor, we still do not believe the testimony about the involvement of others is exculpatory of Ms. Lambert and it certainly does not establish her innocence.

We are concerned regarding the discovery issues arising out of the information made available to the police in 1992 by Kathleen Bayan and by Hazel Show. After careful analysis of the legal obligations of the Commonwealth and the credibility of all the witnesses involved in these two issues, we do not believe the issues provide a basis for relief under the PCRA.

**\*2** In 1992 we resolved the issue regarding the contact by First Assistant District Attorney John A. Kenneff with defense expert witness Isidore Mihalakis, M.D., in advance of trial. Nothing about the hearing in 1998 changes our view of that issue.

We find the issues regarding Laura Thomas's credibility, Lawrence Yunkin's black sweatpants, the video of the river search, the statement taken of Ms. Lambert, the photographs of the crime scene and the pearl earring to have more sensational appeal than legal merit. The issues have generated more heat than light in this case.

We have analyzed the many allegations of constitutional or discovery violations and find that the Commonwealth's compliance with the Pennsylvania Rules of Criminal Procedure regarding discovery and the requirements of Brady v. Maryland [FN2] has been well established by the facts and the law.

> FN2. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Finally, we find no basis in law or in fact to hold either trial counsel or appellate counsel ineffective.

On the basis of our consideration of these issues, our study of the law and our careful consideration of the now fully developed record, we find that Ms. Lambert has not established a basis for relief under the Post Conviction Relief Act. Our findings on the individual issues raised by the petition will be set forth in the sections to follow.

## II. BACKGROUND

Lisa Michelle Lambert, in addition to another woman, Tabitha Faith Buck, was charged with criminal homicide for the death of Laurie Show. The homicide took place on December 20, 1991, in the condominium occupied by Ms. Show and her mother, Hazel Show. Ms. Lambert was 19 years old at the time; Ms. Show was 15 years old. A third person, Lawrence Stewart Yunkin, was charged with hindering apprehension. Ms. Lambert was Mr. Yunkin's girlfriend; she was, at the time, pregnant to him.

### A. The Trial

After waiving her right to a trial by jury, Ms. Lambert proceeded to trial and was found guilty of first degree murder and criminal conspiracy to commit murder on July 20, 1992. The Commonwealth elected to seek the death penalty in the Lambert case. Following a hearing on the penalty phase, the court declined to impose the death penalty and sentenced Ms. Lambert to a term of life in prison without the possibility of parole.

### B. Post Verdict Motions

Ms. Lambert's post verdict motions were filed on July 28, 1992. In essence, Ms. Lambert argued that her conviction was against the weight of the evidence. She raised a dozen claims of error essentially challenging evidentiary or procedural rulings, [FN3] but her primary thrust was that there was insufficient evidence to support a conclusion that she was the killer of Laurie Show. The court denied Ms. Lambert's post verdict motions in an opinion dated July 19, 1994. [FN4] No appeal was taken from that order.

> FN3. The issues for consideration in Ms. Lambert's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                     Page 5
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
(Cite as: 1998 WL 558749 (Pa.Com.Pl.))

post verdict motions included: error to deny defendant's motion for change of venue and/or venire; error to deny the motion for sanctions relative to the alleged prosecutorial misconduct in contacting defense expert, Dr. Isidore Mihalakis; error to admit the statement of co-defendant Tabitha Buck; error to allow the trier of fact to take notes during trial and potentially use them during deliberation; error to affirm and read the Commonwealth's points for charge Nos. 3 and 4; error not to grant a mistrial when the request for supplemental discovery of Laura Thomas was not granted; error not to grant a mistrial when the request for supplemental discovery of Mrs. Show was not granted; error not to grant a mistrial when the supplemental discovery of Richard Kleinhans was not granted; error not to grant a mistrial when the prosecution withheld evidence that a jergo was discarded and that they were aware of its location; error to qualify Dr. Enrique Penades as an expert in forensic pathology since he was not board certified; error not to grant a mistrial when the prosecution withheld from discovery a portion of Yunkin's statement of February 4, 1992; error not to grant a mistrial when the assistant district attorney asked defendant's expert witness, Dr. Samuel J. Golub, two questions beyond his area of expertise; and insufficient evidence existed to sustain the verdict.

**FN4.** The post verdict motions were filed on July 28, 1992. The last trial transcript was filed on September 23, 1992, and a briefing schedule was issued by the trial court on October 23, 1992. Counsel for defendant, at the request of Ms. Lambert's family, requested additional time to file an amended or supplemental brief in support of post verdict motions. Given the gravity of charges and the many issues raised on appeal, the court granted all of these requests for extensions of time. Defendant's last motion was submitted to the court on June 3, 1994, and the matter was ripe for disposition at that time.

Ms. Lambert's family then hired a new attorney who filed a

request with this court for a new trial on the basis of after-discovered evidence and the alleged ineffectiveness of her court-appointed attorney. At the joint request of the assistant district attorney and her privately-retained attorney, an evidentiary hearing was conducted over a two-day period in November 1994. [FN5] Counsel indicated a desire to take all issues up on appeal at that time. [FN6]

**FN5.** There will be reference throughout this opinion to "the trial," "the post verdict hearing," "the federal habeas hearing," and "the PCRA hearing." The trial took place in July 1992 and resulted in a verdict of guilty of first degree murder. The post verdict hearing was held on November 18 and 21, 1994, on defendant's claims of ineffective assistance of counsel and after-discovered evidence. The federal habeas hearing took place in the United States District Court for the Eastern District of Pennsylvania in April 1997. The PCRA hearing began on April 30, 1998, and continued through June 24, 1998.

**FN6.** The procedural posture of the case permitted the taking of testimony to supplement the record on these two new issues. Ms. Lambert was convicted of first degree murder and criminal conspiracy to commit murder. At the time of sentencing, it was agreed between the assistant district attorney and the defense attorney that the Commonwealth would seek a sentence on the first degree murder conviction only. Because the first degree murder conviction carried a mandatory life sentence, the court was not requested to impose a sentence on the criminal conspiracy charge. Technically, defendant had never been sentenced on the criminal conspiracy and, therefore, her appeal period from a judgment of sentence from that charge had not yet expired. This accommodation to defendant at the time of formal sentencing on the first degree murder charge resulted in a "loophole" through which the defense sought to introduce new evidence in the hope of obtaining a new trial. It appeared to the court at that time that all parties recognized that the loophole existed, that the loophole was not the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

result of inadvertence either by any of the parties or by the court, and that it existed because of an accommodation to Ms. Lambert. It was on this basis, then, that the court had the capacity to receive new evidence and consider defendant's request for a new trial at the time of the post verdict hearing in November 1994.

**\*3** The post verdict evidentiary hearing addressed the issues of ineffective assistance of counsel and after-discovered evidence. Ms. Lambert attacked only the assistance of counsel rendered to her by Roy D. Shirk, Esquire. [FN7] Specifically, she claimed he was ineffective for the following reasons: (1) failing to call character witnesses in her defense; (2) failing to introduce evidence of abuse by Mr. Yunkin; (3) calling a witness to contradict her testimony; (4) failing to seek suppression of statements she made to the police; (5) failing to present evidence of bad reputation for the veracity of witness Laura Thomas; (6) failing to seek a new trial based upon new evidence of Mr. Yunkin's *nolo contendere* plea to third degree murder; and (7) failing to impeach Mr. Yunkin with his statements to the police that he knew prior to the death of Laurie Show of plans to physically harm her.

> FN7. Ms. Lambert enjoyed the benefit of two court-appointed attorneys and one court-appointed criminal investigator. Mr. Shirk was appointed within a day or two of Ms. Lambert's arrest for the murder of Laurie Show. He requested the appointment of Alan G. Goldberg, Esquire, to assist him in the case with the death penalty phase, if necessary. Both are experienced, respected members of the Lancaster County bar who specialize in criminal defense cases. Mr. Goldberg participated in the defense effort throughout the investigation and trial. Mr. Shirk conducted the bulk of the defense on guilt at trial. Mr. Goldberg assisted in arguing points of law to the court and in the examination of some witnesses. Mr. Goldberg handled the death penalty phase of the trial exclusively. Mr. Shirk appeared as a witness on Ms. Lambert's behalf at the death penalty phase.

The after-discovered evidence was that Mr. Yunkin "lied" about his involvement in the crime, thereby violating the terms of his plea agreement with the District Attorney's Office. [FN8] Ms. Lambert argued that if she had known at trial that Mr. Yunkin was going to violate his plea agreement and that he would admit to third degree murder, her defense at trial would have been enhanced. New counsel argued that "this Court was deprived of critical information--evidence that Yunkin was not merely an accessory after the fact, but that he had deliberately lied, that he was in breach of a plea agreement, and that he pled *nolo contendere* to involvement in the killing of Laurie Show." (Defendant's Memorandum of Law in Support of Post Verdict Motion for a New Trial at 14) The question was whether this court, or any finder of fact, could reasonably have been swayed by an admission that Mr. Yunkin had lied in his testimony at trial. A review of the record and a consideration of the totality of the record showed that Mr. Yunkin's credibility was dubious at best.

> FN8. Prior to the Lambert trial, Mr. Yunkin entered into a plea agreement with the Commonwealth. Essentially, the Commonwealth offered a plea of guilty to obstruction of justice in exchange for testimony at the Lambert trial and at the trial of Ms. Lambert's co-conspirator, Tabitha Buck. The condition of the plea agreement was that Mr. Yunkin testify truthfully. After the Lambert trial and after the Buck trial, Mr. Yunkin entered a plea, not to obstruction of justice, but to third degree murder. The Commonwealth indicated that it was justified in seeking the more serious charge because Mr. Yunkin was not truthful in his testimony at the Lambert trial.

The court found that the "after-discovered" evidence was not really new evidence at all. It was simply the same story introduced at the Lambert trial with a slightly different "spin." The court denied Ms. Lambert's post verdict motion for a new trial in an order and opinion dated March 14, 1995.

C. State Court Appeals

Ms. Lambert appealed this court's findings to the Superior Court of Pennsylvania, raising essentially the same claims regarding ineffective assistance of trial counsel and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 7
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

after-discovered evidence. Specifically, Ms. Lambert claimed that her trial counsel was ineffective for failing to introduce evidence of her good character and of the abuse inflicted upon her by Mr. Yunkin. Ms. Lambert also argued the after-discovered evidence of Mr. Yunkin's plea agreement and perjury. The Superior Court affirmed the judgment of sentence without opinion on January 4, 1996. Commonwealth v. Lambert, 450 Pa.Super. 714, 676 A.2d 283 (1996) (table).

In her appeal to the Pennsylvania Supreme Court filed on February 2, 1996, Ms. Lambert raised the same claims. The petition for allowance of appeal to the Supreme Court of Pennsylvania was subsequently denied without comment on July 2, 1996. Commonwealth v. Lambert, 545 Pa. 650, 680 A.2d 1160 (1996).

D. The Petition for Writ of Habeas Corpus in the District Court

*4 Ms. Lambert never filed a petition under the Pennsylvania Post Conviction Relief Act. Instead, she sent a handwritten pro se petition for writ of habeas corpus to the United States District Court for the Eastern District of Pennsylvania on September 12, 1996. Counsel was appointed by the district court to represent her on a pro bono basis and an amended petition for writ of habeas corpus was filed on January 3, 1997. The petition included the claims previously presented in state court, but also introduced new claims asserting that (1) Ms. Lambert was "actually innocent," (2) that there was massive misconduct by the prosecution and the police, (3) that after-discovered evidence created manifest injustice, and (4) that trial counsel had been ineffective in a multitude of ways.

In its answer to the amended petition, the Commonwealth maintained that Ms. Lambert was not entitled to federal review because she had not exhausted her state court remedies as to all of the claims in her pleading and had committed procedural default. In the alternative, the Commonwealth claimed that the habeas petition should be denied on its merits. The Commonwealth explicitly stated in its pleading that it was not waiving the exhaustion requirement in any way.

Simultaneously with the first amended petition, counsel filed a motion for permission to take discovery, which the Commonwealth opposed. The district court granted the motion on January 16, 1997, citing unspecified unusual circumstances, and ordered broad, expedited discovery in the federal habeas corpus proceeding. [FN9]

> FN9. The evidence presented in the district court in very large part was obtained through federal discovery and had previously been unavailable in state court. For example, the Commonwealth was compelled to produce the working notes of the prosecutor from the 1992 trial. Habeas petitioners, unlike usual civil litigants in federal court, are not entitled to discovery as a matter of ordinary course. Rule 6 of the Federal District Court Rules Governing Habeas Corpus Cases provides that any party may utilize the processes of discovery available under the Federal Rules of Civil Procedure (Rules 26-37) if, and to the extent that, the judge allows such discovery upon a showing of good cause. In the Advisory Committee Notes to Rule 6, mention is made of the fact that Rule 6 is consistent with the Supreme Court pronouncement in Harris v. Nelson, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), regarding discovery in federal habeas proceedings: "[I]t is clear that there was no intention to extend to habeas corpus, as a matter of right, the broad discovery provisions ...of the new [Federal Rules of Civil Procedure]."

Despite the Commonwealth's objections to the petition on the grounds of exhaustion, the matter proceeded to an evidentiary hearing [FN10] on Ms. Lambert's claims of actual innocence and prosecutorial misconduct. [FN11] The hearing commenced on March 31, 1997. [FN12] After 14 days of testimony, the district court granted the writ, declared Ms. Lambert to be "actually innocent," barred the Commonwealth from conducting a retrial for the murder of Laurie Show, and permanently released Ms. Lambert from prison.

> FN10. Petitioner's pleadings and briefs frequently characterize the proceedings which occurred in the federal district court as a "trial" and also refer to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 8
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

"pretrial" conferences. (*See, e.g.,* Petitioner's Motion to File the Federal Record at paras. 24-25, 28-29, 31-32.) There was no "trial" in the district court; rather, the court held a habeas corpus hearing pursuant to 28 U.S.C. Section 2254. The only trial ever held in Ms. Lambert's case took place in the Court of Common Pleas of Lancaster County. That trial resulted in a guilty verdict and sentence of life imprisonment for Ms. Lambert's murder of Laurie Show.

FN11. The district court did not address other grounds raised in Ms. Lambert's petition regarding ineffective assistance of counsel and after-discovered evidence.

FN12. In the habeas corpus proceeding, the Commonwealth was represented by the Lancaster County Office of the District Attorney.

In its 90-page memorandum opinion of April 21, 1997, the district court found numerous instances of prosecutorial misconduct and offered its opinion that some of this conduct might involve criminal activity on the part of members of the Lancaster County District Attorney's staff. The court also ruled that Ms. Lambert had exhausted all her state claims with the exception of those based on after-discovered evidence. To the extent that there were claims which a Pennsylvania court might view as not having been waived, the district court found that the state proceedings would be ineffective to protect Ms. Lambert's rights. Lambert v. Blackwell, 962 F.Supp. 1521, 1553-55 (E.D.Pa.1997).

The district court referred First Assistant District Attorney Kenneff to the United States Attorney for the Eastern District of Pennsylvania for investigation of allegations of criminal activity in the prosecution of the Lambert homicide case. The district court also (1) demanded that District Justice Ronald W. Savage, a former county detective involved in the investigation of the Lambert case, be investigated by the Judicial Conduct Board of the Pennsylvania Supreme Court, and (2) offered its opinion that another assistant district attorney and two county detectives, one now retired, were guilty of prosecutorial

misconduct.

**\*5** The district court's ruling was appealed to the Court of Appeals for the Third Circuit on April 22, 1997. [FN13] On December 29, 1997, a three-judge panel of the Third Circuit vacated the decision of the district court and remanded this case to the district court with the direction to dismiss the federal habeas petition without prejudice. Lambert v. Blackwell, 134 F.3d 506 (3d Cir.1997). The Third Circuit found that the district court was without jurisdiction to hear the case because Ms. Lambert had not yet exhausted her state remedies. Ms. Lambert's application for rehearing en banc was denied, with four judges dissenting.

FN13. For the purpose of appealing from the grant of habeas corpus relief, the District Attorney's Office retained private counsel.

While her application for rehearing was pending, Ms. Lambert moved for a stay of the Third Circuit's order and also filed an emergency application seeking the same relief from the United States Supreme Court. On February 2, 1998, the Third Circuit refused to stay its order, as did Justice David H. Souter, as Circuit Judge, the same day. Thereafter, petitioner surrendered to prison officials on February 4, 1998. [FN14]

FN14. Petitioner was free from April 21, 1997, until February 4, 1998, approximately ten months.

A petition for writ of certiorari, seeking review of the Third Circuit's opinion, was filed by petitioner on April 23, 1998, and is pending in the United States Supreme Court, where it is docketed at No. 97-8812. On April 24, 1998, petitioner filed with the Third Circuit an application, pursuant to Rule 23 of the Federal Rules of Appellate Procedure, for release from custody pending the Supreme Court's consideration of her petition for writ of certiorari. [FN15] This petition for release from custody was denied by the Third Circuit in an order and opinion filed on August 3, 1998.

FN15. On May 6, 1998, the PCRA proceeding was interrupted when the court received an opinion from a two-judge motions panel of the Third Circuit remanding the Fed. R.App. P. 23 application to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                  Page 9
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

district court "with instruction to grant the motion for release with such conditions as the court considers appropriate" pending the disposition of Ms. Lambert's petition for writ of certiorari. This order was immediately followed by an order on May 6, 1998, from the Eastern District Court scheduling a hearing in Philadelphia for May 8, 1998, directing the Commonwealth to "immediately deliver Ms. Lambert to the custody of the Court." Ms. Lambert was transported from the Lancaster County Prison to federal court on May 7, 1998, pursuant to a further order from the district court specifically setting forth the procedure for transfer of custody. Also on May 7, 1998, the Commonwealth made an emergency application to stay the Third Circuit order which was granted the same day by the same motions panel, pending the Commonwealth's application for rehearing if filed in a timely fashion. On May 8, 1998, the Commonwealth filed an application for rehearing with a suggestion for rehearing en banc which was granted by the Court. Despite the Third Circuit's stay of its May 6, 1998, order on May 7, 1998, the district court nonetheless required the parties to be present at the "release" hearing on May 8, 1998, as previously scheduled. Following the hearing, upon stipulation of counsel, Ms. Lambert was returned to the Lancaster County Prison and the PCRA hearing resumed on May 11, 1998. The Commonwealth's petition for rehearing en banc was subsequently granted followed by an order by the Chief Judge on May 15, 1998, vacating the Motions Panel's order and opinion of May 6, 1998.

## III. THE POST CONVICTION RELIEF ACT PETITION

A. Procedural History: Motions, Petitions, Conferences, Orders

An unverified Post Conviction Relief Act petition was filed on behalf of Ms. Lambert in the Court of Common Pleas of Lancaster County on February 2, 1998. [FN16] Contemporaneously with the filing of the PCRA petition, Ms. Lambert's counsel filed a petition with the Supreme Court of Pennsylvania requesting that the Supreme Court

assume King's Bench jurisdiction over this case, remove the PCRA petition from the Court of Common Pleas of Lancaster County, render a decision based upon the record established in the habeas corpus proceeding in district court, and stay the reincarceration of Ms. Lambert pending her appeal.

FN16. Ms. Lambert's counsel filed a petition with the Pennsylvania Supreme Court for the exercise of plenary jurisdiction and emergency motion for writ of prohibition to prevent reincarceration on January 28, 1998. On January 30, 1998, the Supreme Court denied Ms. Lambert's petition and emergency motion, without prejudice to her right to refile, as there was no matter pending before any tribunal within the Commonwealth. Thereafter, the PCRA petition was filed.

On February 2, 1998, the district attorney requested the Commonwealth of Pennsylvania Office of Attorney General to assume prosecution of this case. The Attorney General granted that request under the Commonwealth Attorneys Act, pursuant to 71 P.S. Section 732-205(a)(3) and (c) (1990). On February 9, 1998, the Attorney General entered an appearance and filed pleadings in the Supreme Court. On February 10, 1998, Ms. Lambert's attorneys asked the Supreme Court of Pennsylvania to remove the Attorney General as counsel for the Commonwealth.

The Supreme Court denied petitioner's request for King's Bench jurisdiction and issued an order dated February 25, 1998, remanding the PCRA petition to the Court of Common Pleas of Lancaster County with a directive that the petition be disposed of within 120 days. [FN17] The Court also dismissed the motion to compel removal of the Attorney General without prejudice to petitioner's right to refile that motion in the Court of Common Pleas. Lastly, the emergency motion for writ of prohibition to prevent the reincarceration of petitioner was dismissed as moot, petitioner having returned to prison on February 4, 1998.

FN17. Given the number of complex factual and legal issues and the lengthy nature of the proceeding, this court requested, on June 9, 1998, an additional 60 days to dispose of this matter.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 10
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Petitioner filed a four-page objection to this court's request for extension. We were notified on June 18, 1998, by letter from the Prothonotary of the Pennsylvania Supreme Court, that the Supreme Court had granted the request for a 60-day extension to conclude this PCRA matter, the time being calculated from June 25, 1998.

**\*6** This court obtained a copy of the order of the Supreme Court on March 2, 1998. [FN18] The PCRA petition also was received in chambers on March 2, 1998. A copy of petitioner's motion to disqualify the Attorney General was forwarded to the court on March 4, 1998. A response was sent by the Attorney General on March 5, 1998, and a hearing was held on this matter on March 6, 1998. [FN19]

   FN18. The court actually received a copy of the original order dated February 25, 1998, and a revised order dated February 25, 1998.

   FN19. The motion to compel was ultimately filed with the Office of the Clerk of Courts on March 9, 1998. During this PCRA proceeding, the court permitted the parties to submit motions, petitions and briefs via facsimile. This was done to accommodate the expedited schedule imposed by the Pennsylvania Supreme Court and to allow the court to consider the parties' filings as soon as possible. It was our procedure then that the originals be filed by regular mail with the Clerk of Courts. Attached to this opinion is an addendum which lists the documents filed in this case with a listing of the date each document was received in chambers as well as the official filing date with the Clerk of Courts. This addendum is attached to facilitate review of the record by the appellate courts.

  Ms. Lambert's motion to compel removal of the Attorney General as counsel was denied in an opinion and order dated March 11, 1998, the court having held that the Attorney General had the power to prosecute the PCRA petition pursuant to 71 P.S. Section 732-205. Upon motion of counsel for petitioner, an additional order was entered on March 11, 1998, directing the Commonwealth to file an

answer to the PCRA petition. The Attorney General subsequently filed a response to Ms. Lambert's PCRA petition on behalf of the Commonwealth on March 31, 1998.

  The original PCRA petition contained some 57 claims of after-discovered evidence, 117 claims of prosecutorial misconduct, including 45 claims of Brady/Giglio violations, and 21 claims of ineffective assistance of counsel. For this reason, the court did not impose an expedited deadline on the filing of an answer, but chose to require an answer within the 20 days which would normally be required under the Pennsylvania Rules of Civil Procedure for an answer to a complaint or a petition. The Commonwealth's filing of an answer in 20 days in no way delayed the proceeding, due to the plethora of motions filed by petitioner, which are chronicled below.

  On March 6, 1998, the court issued an "Order Limiting Publicity" which contained the text of Rule 3.6 of the Rules of Professional Conduct. [FN20] This was the subject of collateral litigation in this court which took place in March 1998 and which resulted in a modification of the original order. [FN21] For a discussion, *see* Commonwealth v. Lambert, 76 Lanc. L.Rev. 184 (1998), now pending in the Superior Court.

   FN20. These Rules have been adopted by the Pennsylvania Supreme Court and govern the conduct of any attorney practicing in Pennsylvania.

   FN21. On March 17, 1998, Philadelphia Newspapers, Inc., t/a *The Philadelphia Inquirer,* filed an action in the United States District Court for the Eastern District of Pennsylvania seeking an injunction lifting the "gag" order. *See* Philadelphia Newspapers, Inc., publisher of The Philadelphia Inquirer v. Lancaster County Court of Common Pleas and The Honorable Lawrence F. Stengel, Civil Action No. 98-CV-1393 (1998). After a hearing on the matter, Philadelphia Newspapers' request for a temporary restraining order was denied. The court referred to the litigation in the Lancaster County Court of Common Pleas and noted that principles of "common sense and comity"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mandated that the objections to the order be raised first before the judge who entered the order.

In addition to the motion to remove the attorney general, petitioner filed an additional 17 prehearing motions or petitions for the court's consideration over an eight-week period. Most of these matters were briefed by the parties; all were argued orally before the court at petitioner's request. Petitioner's additional filings will be set forth *seriatim* in chronological order.

On March 11, 1998, petitioner filed a motion to file the record of the habeas corpus hearing before the federal district court with this PCRA court and to deny a hearing on the issues covered therein. Received with this approximately 50-page motion were 30 volumes of the Federal Court of Appeals' Appendix. After the issues were briefed by the parties and argued by counsel, the court denied petitioner's motion to enter the federal record as the record in this PCRA proceeding in an opinion and order entered on April 6, 1998. [FN22] *See* Commonwealth v. Lambert, 76 Lanc. L.Rev. 169 (1998).

> FN22. When the Third Circuit vacated the district court's order of April 21, 1997, the proceedings before the district court were rendered void *ab initio*. *See* Stern v. Williams, 970 F.2d 1043, 1054-55 (2d Cir.1992), *cert. denied*, 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993) ( "judgment [which has been vacated] or set aside has no preclusive effect"); United States v. Williams, 904 F.2d 7, 8 (7th Cir.1990) (vacated judgment "place[s] the parties in the position of no trial having taken place at all"); Rushton Mining Co. v. Morton, 520 F.2d 716, 719 (3d Cir.1975) (by definition, vacatur renders lower court's order "void *ab initio* "). The Third Circuit's decision vacating the district court's judgment not only found the district court's hearing was invalid because it was without any authority to conduct that proceeding but it expressly refused to give any weight to the district court's determinations: "[W]e do not give weight to the district court's factual findings in this appeal." 134 F.3d at 509 n. 1. The merits panel said that "[r]esolution of these difficult questions

must...await the appropriate forum." Id. at 524-25. Among the "difficult questions" identified were "serious factual issues concerning the district court's finding that Lambert was actually innocent of first degree murder." Id. at 524. The "appropriate forum" referred to is "the state courts." Id.

*7 Because Ms. Lambert's petition and the Commonwealth's response thereto raised material issues of fact, the court, on April 6, 1998, entered an order scheduling a hearing on the petition pursuant to Pa. R.Crim. P. 1508. A prehearing conference was scheduled for April 9, 1998.

Ms. Lambert's counsel made oral motions at the prehearing conference on April 9, 1998, to have themselves and their law firm appointed as counsel for petitioner. In the alternative, counsel requested that petitioner be permitted to proceed in forma pauperis so that they could be reimbursed all costs incurred on petitioner's behalf. Written motions regarding the appointment of counsel, the in forma pauperis status of petitioner, and the reimbursement of costs were subsequently filed with the Clerk of Courts on April 15, 1998.

Included in petitioner's prehearing memorandum of April 21, 1998, was a written request to incorporate admissions of the Commonwealth "actors"from prior proceedings, as well as all of the police reports, police notes, and other documents turned over by the Commonwealth during the federal proceeding. The Commonwealth responded on April 20, 1998, with a motion in limine directed to Ms. Lambert's proposed introduction of prior federal testimony as "admissions." On April 23, 1998, after hearing argument from counsel, the court denied petitioner's request to incorporate certain portions of the testimony from the federal habeas proceeding as admissions against the Commonwealth in the PCRA proceeding. [FN23]

> FN23. *See* Section VII.P on admissions, *infra*.

Petitioner next presented to the court on March 13, 1998, a 119-page motion for bail and release on her own recognizance pending disposition of her PCRA petition by this court. The parties filed legal memoranda and presented oral argument. An opinion and order were entered on April

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3, 1998, denying petitioner's motion for bail. [FN24] *See* Commonwealth v. Lambert, No. 0423-1992, slip op. (Lanc. Co. C.P. April 3, 1998).

> FN24. The court held that as Ms. Lambert had been found guilty of an offense punishable by life in prison, Rule 4009 of the Rules of Criminal Procedure clearly prohibits any entitlement to bail. There was simply no basis in law or fact for this court to grant the request for bail.

  Petitioner's first motion for discovery was received by the court on April 3, 1998, and argued before the court at the first prehearing conference on April 9, 1998. At the conclusion of the argument, the court issued a ruling from the bench regarding the various discovery matters raised in petitioner's first discovery motion. [FN25] Specifically, the court denied petitioner's request to (1) depose inmates at SCI-Dallas relative to statements allegedly made by Mr. Yunkin, (2) depose "Smokey" Roberts regarding the existence of a report or log of his diving shoots, (3) obtain discovery of the Commonwealth's "discriminate use of PCRA rules," (4) obtain discovery of the Commonwealth's "purpose" in pursuing Ms. Lambert's PCRA, and (5) obtain discovery of the Commonwealth's efforts to "intimidate" the judiciary over the Lambert case. The court did grant petitioner's request for any logs maintained by the police of all photographs taken by police in the murder investigation, directing the Commonwealth to determine if they existed and, if so, to produce them to petitioner.

> FN25. Rule 1502 of the Pennsylvania Rules of Criminal Procedure entitled, "CONTENT OF PETITION FOR POST-CONVICTION COLLATERAL RELIEF; REQUEST FOR DISCOVERY," was amended in 1997 to address requests for discovery in PCRA petitions. Specifically, Paragraph (a)(16) requires that a request for discovery be included in the petition: "(a) A petition for post-conviction collateral relief...shall contain substantially the following information:...(16) if, applicable, any request for discovery." Paragraph (e) sets forth the standards for permitting discovery. Except as provided in Rule 1502(e)(2) for death penalty cases, no

discovery is permitted at any stage of the proceedings, except upon leave of court with a showing of exceptional circumstances. Pa. R.Crim. P. 1502(e)(1). This language implements 42 Pa.C.S.A. Section 9545(d)(2): "No discovery, at any stage of proceedings under this subchapter, shall be permitted except upon leave of court with a showing of exceptional circumstances." Ms. Lambert submitted nothing which demonstrated, in any substantive manner, that any truly exceptional circumstances warranted granting her request for discovery. The "proof" of "exceptional circumstances" was the same phrase which pervades her filings in this court and elsewhere, that she is "the victim of the worst prosecutorial misconduct in the history of the English-speaking world." Such a conclusory characterization, by itself, was insufficient to meet the requirements of Rule 1502(e). Ms. Lambert's situation is neither different from, nor more substantive than, that which any PCRA petitioner might be expected to claim, namely, that he or she "didn't do it." Moreover, much of what Ms. Lambert sought to obtain in discovery was otherwise available to her.

  **\*8** On April 6, 1998, petitioner served a change of venue motion on the court. This was followed on April 8, 1998, with a motion for definite pleading by the Commonwealth on the issues of waiver and other procedural requirements under the PCRA and for a determination by the court whether it would raise such issues *sua sponte*. On April 15, 1998, petitioner filed a motion for sanctions against John Show, the victim's father, and Justice Ronald Savage, a former officer with the East Lampeter Police Department, for violation of the original "Order Limiting Publicity." These three outstanding motions were argued via a speaker phone in the courtroom at the second prehearing conference on April 21, 1998. [FN26]

> FN26. These arguments were heard via a speaker phone in the courtroom to accommodate the interest of the public and because of security concerns voiced by petitioner's counsel.

  Petitioner's counsel began the April 21, 1998, conference by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 13
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

requesting the disqualification of this court pursuant to Rule 3(C)(1)(a) of the Rules of Professional Responsibility. Counsel argued that because the court viewed a piece of evidence at the 1992 trial in this matter, the court *could be* a fact witness at the PCRA proceeding as to the physical nature of that evidence. Specifically, Ms. Lambert argued that the sweatpants introduced into evidence at the 1992 trial were not the same sweatpants introduced at the federal habeas hearing in 1997. Counsel for petitioner asserted that this court had personal knowledge of a disputed evidentiary matter which required recusal. This court's findings regarding the size of the clothing and its significance at trial were clearly stated in our July 19, 1994, opinion. *See* Section IV, *infra.* Ms. Lambert's request was denied on the record after the court considered the arguments of counsel.

 The parties thereafter addressed the change of venue issue, the motion for definite pleading by the Commonwealth, the motion for sanctions for violation of the "gag" order, the motion for appointment of counsel, and the motion for reimbursement of costs. At the conclusion of this first prehearing, the court issued oral rulings from the bench denying the motion for a more definite pleading and denying the motion for sanctions. [FN27] The court reserved its ruling on the other matters.

> FN27. The motion for sanctions was filed with the Clerk of Courts one day after the April 14, 1998, amended order limiting publicity was entered. The persons who were the subject of petitioner's motion for sanctions were subject to restrictions which were removed by the amended gag order.

 On April 23, 1998, the court held a third prehearing conference via a speaker phone in the courtroom. Counsel discussed Ms. Lambert's petition to proceed in forma pauperis, the request for reimbursement of costs, the motion for appointment of counsel, and the change of venue motion. Immediately following this conference on April 23, 1998, the court entered a written order confirming rulings made from the bench and disposing of several other of petitioner's motions. Specifically, (1) the court denied the motion for more definite pleading, (2) the court denied as moot the motion for sanctions for violations of the gag order, (3) the court denied the motion to sit outside

Lancaster County, (4) the court denied petitioner's request to incorporate certain admissions from the habeas hearing, (5) the court granted the motion to proceed in forma pauperis and to have all costs necessary for the PCRA proceeding reimbursed by the County, and (6) the court denied the motion for court appointment of defense counsel. [FN28]

> FN28. This court is cognizant of Rule of Criminal Procedure 1504 which requires the appointment of counsel for a defendant on her first post conviction relief petition if the court is satisfied that "the defendant is unable to afford *or otherwise procure* counsel ." Pa. R.Crim. P. 1504(a) (emphasis added). Under the circumstances of this case, we found that petitioner was able to "otherwise procure counsel."
>
> In Commonwealth v. Duffey, No. 156 Capital Appeal Docket (May 21, 1998) (to be reported at: 713 A.2d 63), the Supreme Court considered the question of whether the appellant's *pro se* status was a "fiction" given the fact that attorneys filed and signed notices of appeal from two trial court orders. The Court cited Rule 9020 of the Pennsylvania Rules of Criminal Procedure which states that all motions for relief shall be made by written motion and *shall be signed by the person or attorney making the motion.* The signature of an attorney "shall constitute a certification that the attorney has read the motion, that to the best of the attorney's knowledge, information, and belief there is good ground to support the motion, and that it is not interposed for delay." Pa. R.Crim. P. 9020(b)(1). The Supreme Court held that nothing in Rule 9020 permits an attorney to sign pleadings for *pro se* defendants. "To the contrary, an attorney's signature is a legal certification that gives good cause to support the pleading, and an attorney cannot avoid that certification through the addition of creative language describing the attorney as a mere 'preparer' on behalf of a *pro se* defendant. Thus, when an attorney signs and files a pleading for an unrepresented defendant, that attorney will be deemed to represent that defendant. We do not condone counsel's attempts to file a notice of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appeal without entering an appearance in this case." The Supreme Court concluded that the attorneys who signed the notices of appeal became the defendant's attorneys of record for the appeal when they filed the notices with the court. (Slip op. at 11-12.) Likewise, the attorneys in this case, Christina Rainville and Peter Greenberg, signed the PCRA petition, and every other document filed with the court, as counsel for Ms. Lambert. These attorneys became Ms. Lambert's attorneys of record for this PCRA proceeding when they filed the petition with this court on February 2, 1998. Clearly, petitioner was able to "otherwise procure counsel" and did not require court appointment of counsel in this case.

**\*9** A second motion for discovery was filed by Ms. Lambert on April 28, 1998. In this motion, petitioner requested (1) all evidence favorable to her which had not previously been disclosed, (2) a summary of the anticipated testimony of each witness the Commonwealth intended to call, (3) the addresses and telephone numbers of all Commonwealth witnesses, (4) all evidence of any prior statements that were inconsistent with testimony that the Commonwealth intended to offer in the PCRA proceeding, (5) all documents that related to or embodied agreements or proposed or prospective agreements between Commonwealth witnesses and/or their counsel in exchange for testimony in the PCRA proceeding, (6) a copy of all exhibits that the Commonwealth intended to use, and (7) the Commonwealth's impressions as to why Tabitha Buck may have been untruthful in her federal deposition. [FN29] The court granted petitioner's request for all Brady/Giglio [FN30] materials, the addresses and telephone numbers of Commonwealth witnesses, and copies of all Commonwealth exhibits. The remaining discovery requests were denied.

FN29. Acknowledging the need for a showing of exceptional circumstances to justify discovery in this PCRA, petitioner claimed that discovery was warranted because "the Commonwealth is presenting new witnesses against Petitioner and neither Petitioner nor her counsel have the slightest idea who these individuals are, what there [sic] testimony is going to be, whether deals or

other promises have been made in exchange for the testimony, or whether they are withholding other evidence favorable to Petitioner." The court did not find these circumstances to be exceptional.

FN30. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

On April 30, 1998, the first day the court heard testimony in this PCRA proceeding, petitioner moved for leave to amend the PCRA petition. This motion was granted the same day. In addition, petitioner filed three motions on April 30, 1998, all of which were argued in open court.

The first was a motion to admit the federal court testimony of Haresh G. Mirchandani, M.D., the chief medical examiner for Philadelphia. Dr. Mirchandani had recently declined to appear as an expert witness for petitioner in her PCRA proceeding in Lancaster. An order was entered on April 30, 1998, denying the motion to admit the prior federal court testimony of Dr. Mirchandani as he was not an "unavailable witness" as that term is defined in 42 Pa.C.S.A. Section 5917.

The second motion requested transcripts and corresponding ASCII disks of all prehearing matters, as well as the PCRA proceeding. The court ordered that transcripts be given to petitioner but declined to order the court reporters to produce ASCII disks.

Lastly, on April 30, 1998, Ms. Lambert petitioned the court to retain an investigator to assist in her case. An order was entered on May 13, 1998, granting this motion and authorizing an investigator to be compensated by the court at the rate of $40.00 per hour with a maximum allowable expense of $1,000.00 for the investigation. [FN31] Petitioner subsequently filed a second motion for appointment of an investigator to assist in her rebuttal case, which this court approved on June 16, 1998.

FN31. The case law indicates that there is no requirement that the Commonwealth furnish investigative services to PCRA petitioners. *See* Commonwealth v. Strong, 522 Pa. 445, 563 A.2d 479 (1989); Commonwealth v. Woods, 394 Pa.Super. 223, 575 A.2d 601 (1990). *See also* Commonwealth

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

v. Gelormo, 327 Pa.Super. 219, 475 A.2d 765 (1984) ("There is no constitutional mandate, either federal or state, that experts be appointed at public expense to assist in preparation of a defense whenever requested by one accused of a crime").

During the course of the PCRA hearing, petitioner presented seven additional motions to the court. On May 28, 1998, petitioner filed a motion to subpoena the bank statements, canceled checks, and church wedding records of Officer John Bowman and his wife. This motion was granted on June 16, 1998, after an in-chambers conference with counsel for the Bowmans.

*10 Petitioner also filed motions in limine to preclude the expert testimony of three Commonwealth witnesses: (1) Roger J. Levin, M.D., an otolaryngologist; (2) Wayne K. Ross, M.D., a forensic pathologist; and (3) Joseph L. Burton, M.D., a forensic pathologist. [FN32] Additionally, counsel for petitioner filed a motion in limine to preclude all evidence not introduced at the 1992 trial and to limit the Commonwealth's witnesses. Following oral argument by counsel, these motions in limine were denied by the court on June 16, 1998.

FN32. Petitioner's counsel indicated on the record at the time of argument on this motion that the motion in limine to exclude the testimony of Dr. Burton was withdrawn.

The last two motions were filed by petitioner on June 10, 1998, at the close of her case. Petitioner submitted a list of admissions to be offered into evidence. Those proposed admissions will be addressed in this opinion in Section VII.P, infra. She also filed a second motion for leave to amend the petition, which was granted on June 16, 1998.

The Commonwealth filed two prehearing motions. As discussed previously, the Commonwealth filed a motion in limine objecting to the proposed use of federal testimony as admissions in the PCRA proceeding. The court denied petitioner's request to incorporate the testimony of Commonwealth "actors" as admissions and, in effect, granted the Commonwealth's first motion in limine.

On April 27, 1998, the Commonwealth filed a second motion in limine to preclude the testimony of Ann W. Burgess, Ph.D., on the issue of "battered person syndrome." After briefing and argument by the parties, the court denied the Commonwealth's motion in limine on May 18, 1998, and permitted the testimony of Dr. Burgess in this proceeding. [FN33]

FN33. See Section VII.C, infra.

The Commonwealth's last motion in limine was filed on May 12, 1998, during the course of the proceeding. This motion sought to preclude the testimony of Professor Charles W. Wolfram on legal ethics and the propriety of lawyers' conduct. After reviewing the parties' briefs and hearing oral argument on the issue, the court granted this motion in limine on May 18, 1998. [FN34]

FN34. The testimony in the federal district court of Professor Wolfram involved the ex parte communication of Assistant District Attorney John A. Kenneff with Dr. Isidore Mihalakis in connection with Ms. Lambert's civil trial in 1992. Specifically, this expert testified that such conduct, that is, contacting an expert witness for the defense without the consent of defense counsel, was a "no-brainer." (Notes of Testimony ("N.T."), Habeas Hearing at 1007.) The interpretation of the Rules of Professional Conduct and the Rules of Criminal Procedure is a legal issue to be decided by a court, for which use of an expert would be wholly inappropriate. A court may not abdicate its role to determine the ultimate issue by allowing expert testimony. See Commonwealth v. Neal, 421 Pa.Super. 478, 481, 618 A.2d 438, 439 (1992) (improper for court to admit testimony of an attorney addressing the legal issue to be decided by the court). For these reasons, this court granted the Commonwealth's motion in limine.

The hearing commenced on April 30, 1998. [FN35] Petitioner presented 73 witnesses and offered the admission of 478 exhibits. She rested her case on June 11, 1998.

FN35. The court issued an order on April 13, 1998,

scheduling the PCRA hearing to begin on Monday, April 27, 1998. In furtherance of that order, on April 14, 1998, a writ of habeas corpus was issued directing the superintendent at the Edna Mahan Correctional Facility for Women in New Jersey to produce Ms. Lambert at the PCRA hearing in Lancaster on April 27, 1998. Petitioner resisted any effort to effectuate her transfer to Lancaster County Prison. Ms. Lambert's counsel went so far as to send a letter to New Jersey Assistant Attorney General Ronald Bollheimer essentially advising him that Ms. Lambert was protesting being moved, pursuant to the writ issued by this court, from the New Jersey prison, where she was ordinarily confined, to the Lancaster County Prison, and threatening to hold New Jersey officials responsible for what she claimed would be compliance with an illegal order. The strong inference in counsel's correspondence, if not an outright demand, was that New Jersey should refuse to obey the court's order. On April 22, 1998, the court received a letter from petitioner's counsel informing it of Ms. Lambert's filing of her petition for writ of certiorari and motion for release from custody pursuant to Fed. R.App. P. 23. In this letter, counsel referred to Supreme Court Rule 36(1), which they claimed applied to Ms. Lambert so long as she remained in custody. Rule 36 governs the custody and release of federal and state prisoners pending appellate review of a decision in a federal habeas corpus proceeding. Specifically, Rule 36(1) provides that pending review of a decision in a federal habeas corpus proceeding, "the person having custody of the prisoner shall not transfer custody to another person" without the permission of the court, justice, or judge rendering the decision that is under review. Petitioner's counsel claimed that no such authorization existed for the transfer of Ms. Lambert from the Edna Mahan Correctional Facility to the Lancaster County Prison for purposes of the PCRA proceeding which was to commence on April 27, 1998. Through a series of telephone calls and letters, the Pennsylvania Department of Corrections confirmed for the court that Ms.

Lambert is and always has been in the custody of the Pennsylvania Department of Corrections and that, although convicted in Pennsylvania, is incarcerated in the New Jersey facility pursuant to the provisions of the Interstate Corrections Compact, 61 P.S. Section 1061 et seq. (1998 Supp.). Ms. Lambert's official status is as a prisoner of the Pennsylvania state system. Therefore, the Pennsylvania Department of Corrections is the "custodian" of Ms. Lambert. Based upon this information, the hearing was rescheduled for April 29, 1998, and again a writ of habeas corpus issued directing the superintendent at the Edna Mahan Correctional Facility to produce Ms. Lambert at the hearing on April 29, 1998. Once the status of custodian was confirmed, an application, pursuant to Rule 36.2, was filed by the Commonwealth with the Third Circuit seeking authorization for Ms. Lambert's transfer to the Pennsylvania prison authorities. That authorization was obtained on April 29, 1998. An order was entered on April 29, 1998, again directing the superintendent to produce Ms. Lambert. She was transferred to Lancaster on the evening of April 29, 1998. As the hearing was scheduled to begin on April 29, 1998, the court heard oral argument on several outstanding motions on April 29, 1998, but heard no testimony in the case until petitioner was present in the courtroom on April 30, 1998.

 The Commonwealth presented 39 witnesses and offered the admission of 123 exhibits. The Commonwealth rested its case June 22, 1998. Closing arguments were held on June 24, 1998, lasting a full day.

 The record includes 36 volumes of notes of testimony (more than 8,000 pages) and 601 exhibits. The court addressed 28 motions, wrote four opinions, and issued 28 orders. It heard oral argument on outstanding legal matters on at least three occasions prior to the hearing and additionally held three prehearing conferences. The PCRA hearing itself covered 38 days in court over an eight-week period.

 At the conclusion of the hearing, the court was asked to decide petitioner's claims of 157 allegations of prosecutorial

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Page 17

misconduct, including 66 allegations of Brady/Giglio violations, 72 allegations of after-discovered evidence, and 28 allegations of ineffective assistance of counsel.

B. Legal Issues Pertaining to this Petition and Hearing

1. Eligibility for PCRA relief

**\*11** The petitioner must establish that an error or defect in her case resulted in a "fundamentally unfair conviction." Commonwealth v. Carbone, --- Pa. ----, 707 A.2d 1145, 1148 (1998) (quoting Commonwealth v. Weinder, 395 Pa.Super. 608, 626-27, 577 A.2d 1364, 1374 (1990)). The purpose of the PCRA is to provide a means of obtaining collateral relief for those persons who did not commit the crimes for which they have been convicted, or who are serving sentences longer than the legal maximum. 42 Pa.C.S.A. Section 9542. It is not a means of re-litigating issues that have already been addressed on direct appeal, or which could have been raised earlier. Commonwealth v. Buehl, 540 Pa. 493, 500, 658 A.2d 771, 775 (1995).

To obtain relief under the PCRA, the petitioner must prove, by a fair preponderance of the evidence, that her conviction was the result of:

(1) a violation of the Constitution of Pennsylvania or the Constitution or laws of the United States, which, under the circumstances, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place, 42 Pa.C.S.A. Section 9543(a)(2)(I); or

(2) the ineffective assistance of counsel, at trial or on appeal, which, under the circumstances, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place, 42 Pa.C.S.A. Section 9543(a)(2)(ii); or

(3) the unavailability at the time of trial of exculpatory evidence that has subsequently become available and which would have changed the outcome of the trial if it had been introduced, 42 Pa. C .S.A. Section 9543(a)(2)(vi).

These elements under a PCRA claim provide general categories for consideration of the many claims asserted by

Ms. Lambert. To further explain the process by which this court must evaluate Ms. Lambert's claims for relief, we discuss the elements of a PCRA case in the subsections to follow.

a. Constitutional violations: prosecutorial misconduct and *Brady*

The question of prosecutorial misconduct is by far the most troubling in this case. This is the area where concerns about the integrity of the system, the corruption of the criminal trial process, and alleged unethical conduct by the prosecuting attorney and the investigating detectives come under sharp scrutiny. This is an area rife with emotion and a distracting level of hyperbole. The history of this case teaches that reasoned analysis of the prosecutorial misconduct issues can easily give way to rhetorical flourish and personal outrage. Yet, no issue is well resolved through the barometer of personal feelings of advocates or a ground swell of community opinion or media coverage. It is necessary to look at the law to determine what might constitute prosecutorial misconduct and then to look directly to the facts of this case to analyze what happened, what did not, and what it might mean.

The issue of prosecutorial misconduct is subject to an analysis under the PCRA statute and under the Pennsylvania Supreme Court decision in Commonwealth v. Smith, 532 Pa. 177, 615 A.2d 321 (1992).

**\*12** There is no specific provision for prosecutorial misconduct under the PCRA. However, the Act provides that a petitioner, to be eligible for relief, must plead and prove by a preponderance of the evidence that her conviction resulted from:

A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

42 Pa.C.S.A. Section 9543(a)(2)(i). Ms. Lambert claims that police and prosecutors' misconduct deprived her of due process. She further contends that the Commonwealth's failure to disclose certain information to her trial counsel was a constitutional violation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A second focus in the prosecutorial misconduct area is Smith. The Pennsylvania Supreme Court in Smith held that the double jeopardy clause of the Pennsylvania constitution prohibits the retrial of a defendant (1) when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, or (2) when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. 532 Pa. at 186, 615 A.2d at 325.

In Smith, there were two incidents of intentional prosecutorial misconduct. The first concerned adhesive lifters. Certain adhesive lifters were used at the autopsy to remove granular particles which looked like sand from between the victim's toes. These adhesive lifters were discovered by the Commonwealth during the Smith trial but were not disclosed to Smith's defense counsel. The prosecutor wrote a memo saying, "It is obvious from [defense counsel's] tactics thus far that he will attempt to establish that Mrs. Reinert was killed at the shore in Cape May, New Jersey by William Bradfield, Chris Pappas, and Susan Myers. The sand, therefore, is extremely material to the defense case." 532 Pa. at 182, 615 A.2d at 323. The Commonwealth's theory in Smith was that the victim was murdered in Pennsylvania. The defense theory was that she was murdered in Cape May, New Jersey, and the sand in her toes would have supported the defense position. Yet the Commonwealth did not disclose the existence of the sand between the toes of the victim.

The second incident involved denial of an agreement with a witness. The Court found that the Commonwealth deliberately denied the existence of an agreement under which its witness, Mr. Martray, received lenient treatment at sentencing in return for testimony against Smith. 532 Pa. at 181, 615 A.2d at 322-23.

For purposes of this opinion, the alleged prosecutorial misconduct will be considered to determine whether it was intended to provoke Ms. Lambert into moving for a mistrial or whether it was intentionally undertaken to prejudice defendant to the point of the denial of a fair trial. 532 Pa. at 186, 615 A.2d at 325.

Ms. Lambert also argues that failure to turn over exculpatory evidence violated her constitutional rights as set forth in Brady. In Brady, the United States Supreme Court held that "the suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor." 373 U.S. at 104. Pennsylvania promulgated Criminal Rule of Procedure 305(B)(1) in response to Brady, requiring Commonwealth disclosure to defense counsel, upon request, of "any evidence favorable to the accused which is material either to guilt or to punishment, and which is within the possession of the attorney for the Commonwealth." Pa. R.Crim. P. 305(B)(1)(a).

**13** When the reliability of a witness may be determinative of the guilt or innocence of an accused, nondisclosure of evidence affecting the credibility of witnesses falls within the general rule as pronounced by Brady. Giglio, 405 U.S. at 154. Undisclosed evidence is "material" under Brady, however, only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The prosecution in Bagley failed to disclose impeachment material about its two key witnesses: the witnesses had contracts with the government to pay them money commensurate with information furnished. This violated respondent's due process rights under Brady. Bagley, 473 U.S. at 671.

The Supreme Court shed yet more light on the materiality issue by pronouncing that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," and that Brady is violated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Kyles also adds to the materiality test that suppressed evidence must be considered collectively, rather than just item by item. Id. at 507.

However, a defendant is not entitled to the benefit of the Brady doctrine "[w]here the exculpatory information is not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 19
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

only available to the defendant but also lies in a source where a reasonable defendant would have looked." Barnes v. Thompson, 58 F.3d 971, 975 (4th Cir.1995) (citations omitted). *See* Commonwealth v. McElroy, 445 Pa.Super. 336, 352, 665 A.2d 813, 820 (1995) (citing Gelormo, 327 Pa.Super. at 231, 475 A.2d at 771, indicating that Rule 305(B)(1) is not intended to apply where defense counsel has equal access to evidence it seeks to compel).

   Most recently, the Supreme Court of Pennsylvania held that "the Brady rule is not an all-encompassing directive to the prosecution to disclose all evidence in its possession to a criminal defendant." Commonwealth v. Appel, 547 Pa. 171, 203, 689 A.2d 891, 907 (1997). The evidence that was the subject of Appel's alleged Brady violation was statements made by people who knew the appellant which were descriptive of his strange behavior and unusual ideas. Appellant maintained that the Commonwealth had a duty to disclose this information to the defense or the trial court to be considered in determining his competency. The court held that the statements were not relevant to Appel's guilt or innocence, but merely to his competency, and as such did not violate the rule as pronounced in Brady. Appel, 547 Pa. at 203, 689 A.2d at 907.

   b. Ineffective assistance of counsel

   The PCRA requires a petitioner to plead and prove ineffective assistance of counsel which so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. 42 Pa.C.S.A. Section 9543(a)(2)(ii); Appel, 547 Pa. at 199-201, 689 A.2d at 905. Petitioner must prove: (1) there is merit to the underlying claim; (2) counsel had no reasonable basis for his course of conduct; and (3) there is a reasonable probability that but for the act or omission in question the outcome of the proceeding would have been different. Commonwealth v. Douglas, 537 Pa. 588, 597, 645 A.2d 226, 230 (1994) (citing Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987)) (referred to hereafter as the "Douglas/Pierce" test). "Prejudice in the context of a claim of ineffective assistance of counsel is determined by an evaluation of whether 'but for the arguably ineffective act or omission there is a reasonable probability that the result would have been different.' " Commonwealth v. Sneeringer,

447 Pa.Super. 241, 248, 668 A.2d 1167, 1170 (1995) (quoting Commonwealth v. Donahue, 428 Pa.Super. 259, 282, 630 A.2d 1238, 1249-50 (1993)).

   *14 A petitioner cannot obtain post-conviction review of claims previously litigated on appeal by alleging ineffective assistance of prior counsel and presenting new theories of relief to support previously litigated claims. Commonwealth v. Peterkin, 538 Pa. 455, 460-61, 649 A.2d 121, 123 (1994), *cert. denied,* 515 U.S. 137 (1995). Further, counsel cannot be considered ineffective for failing to assert a meritless claim and is presumed to have been effective. Id.; Commonwealth v. Marshall, 534 Pa. 488, 633 A.2d 1100 (1993). *See* Commonwealth v. Henry, 550 Pa. 346, 706 A.2d 313, 323 (1997); Commonwealth v. Baker, 531 Pa. 541, 562, 614 A.2d 663, 673 (1992).

   When the three prongs of the Douglas/Pierce standard are met, the petitioner is then required to demonstrate that the ineffectiveness rendered the truth-determining process inherently unreliable. 42 Pa.C.S.A. Section 9543(a)(2)(ii). In Buehl, a plurality decision, the Supreme Court was divided on the issue of whether this statutory requirement is merely a restatement of the prejudice standard set forth in Douglas/Pierce, which requires a "reasonable probability" that but for the ineffectiveness the outcome of the proceeding would have been different, or whether it constitutes a higher burden for the petitioner in a PCRA proceeding. The lead opinion in Buehl held that the PCRA requires a more stringent showing of prejudice than that required on direct appeal. Buehl, 540 Pa. at 505, 658 A.2d at 777. In Buehl, the plurality found that counsel was ineffective for failing to request a cautionary instruction regarding the use of other crimes evidence but concluded that "while we are able to say that due to the prejudicial nature of the evidence in question the outcome of Appellant's trial may have been different ... we are unable to say that due to the omission the adjudication of guilt is unreliable." Id. at 508, 658 A.2d at 779. This conclusion was based on the court's finding that all the evidence in the case "created overwhelming evidence of Appellant's guilt." Id.

   In Buehl, Chief Justice Nix, concurring, and Justices Cappy and Flaherty, in dissent, concluded that there is no distinction between the prejudice prong of the test in Pierce

and the language of the PCRA requiring proof that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Justices Cappy and Flaherty expressed the view that a determination that counsel's ineffectiveness may have resulted in a different outcome necessarily renders the truth-determining process unreliable. Buehl, 540 Pa. at 515, 658 A.2d at 786 (Cappy, J., dissenting).

The Superior Court subsequently held that there is no substantive distinction between the prejudice standard applicable on direct appeal and the prejudice standard applicable under the PCRA. Commonwealth v. Kimball, 453 Pa.Super. 193, 199-200, 683 A.2d 666, 669 (1996) (en banc), allocatur granted, 548 Pa. 615, 693 A.2d 587 (1997). See Carbone, --- Pa. at ----, 707 A.2d at 1153. This position would seem to be supported by recent cases of the Supreme Court in which the Court has stated that to prevail on an ineffectiveness claim raised under the PCRA, the defendant must demonstrate the three elements of the Douglas/Pierce test only. See, e.g., Commonwealth v. Henry, 550 Pa. at ----, 706 A.2d at 323; Appel, 547 Pa. at 199-200, 689 A.2d at 905.

c.  After-discovered evidence: subsequent availability of exculpatory evidence

**\*15** After-discovered evidence can provide the basis for a remedy on a collateral appeal under the PCRA. The petitioner must prove: (1) the evidence must have been unavailable at the time of trial; (2) the evidence must be exculpatory; and (3) the evidence must be of such a quality that it would change the outcome of the trial. Commonwealth v. Bonaccurso, 425 Pa.Super. 479, 484, 625 A.2d 1197, 1199 (1993); 42 Pa.C.S.A. Section 9543(a)(2)(vi). To grant such relief the court must be satisfied that the evidence "could not have been obtained at trial by reasonable diligence, that it is not cumulative or of such a nature that it merely impeaches credibility, and that it would be likely to compel a different result." Commonwealth v. Reese, 444 Pa.Super. 38, 44-45, 663 A.2d 206, 209 (1995). See Commonwealth v. Schuck, 401 Pa. 222, 229, 164 A.2d 13, 17 (1960), cert. denied, 368 U.S. 884, 82 S.Ct. 138, 7 L.Ed.2d 188 (1961).

Unlike the test for ineffective assistance of counsel which

focuses on the reliability of the truth-determining process, after-discovered evidence claims focus on whether that evidence "would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. Section 9543(a)(2)(vi) (amended November 1995, effective January 16, 1996). [FN36] In granting a new trial in Bonaccurso, the PCRA court made two crucial credibility determinations: that the after-discovered witness's testimony was reliable and that the defendant did not have the opportunity to tell his story to the court at the original trial because of counsel's ineffectiveness for presenting the wrong defense.

> FN36. The 1995 amendments substituted the word "changed" for the word "affected." This amendment appears to have substituted a more strict test from what had been in place before.

In a concurring opinion in Bonaccurso, Judge Beck of the Superior Court noted that the after-discovered evidence must independently and reliably corroborate the defense theory presented at trial. She noted her concern that the majority opinion in Bonaccurso could lead to "hindsight justice." 425 Pa.Super. at 489, 625 A.2d at 1202. Judge Beck noted that generally defendants will not likely succeed in obtaining collateral relief based upon new theories inconsistent with their trial defense.

The standard for after-discovered evidence is more strict than for a Brady/Giglio disclosure violation and the reason for this difference has been explained by the United States Supreme Court:

[T]he fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice. United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). This explains why a petitioner may

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 21
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

prevail upon her Brady claims where her after-discovered evidence claims provide no relief. Commonwealth v. Galloway, 433 Pa.Super. 222, 227 n. 5, 640 A.2d 454, 457 n. 5 (1994).

2. "Finally litigated" and waiver under the PCRA

**\*16** An issue is deemed finally litigated if (1) the highest appellate court in which a petitioner could have had review as a matter of right has ruled on the merits of the issue, Commonwealth v. Szuchon, 548 Pa. 37, 41, 693 A.2d 959, 961 (1997), or (2) the issue has been raised and decided in a proceeding collaterally attacking the conviction or sentence. 42 Pa.C.S.A. Section 9544(a); Appel, 547 Pa. at 186, 689 A.2d at 898. Allegations of ineffectiveness of counsel may not be used to obtain subsequent review of an issue that has previously been found to be without merit. Commonwealth v. DeHart, 539 Pa. 5, 17, 650 A.2d 38, 44 (1994). The PCRA petitioner must plead and prove that the failure to litigate the issue prior to trial, during trial, or on direct appeal could not have been the result of any "rational, strategic or tactical decision by counsel." 42 Pa.C.S.A. Section 9543(a)(4).

If the allegations of error have not been fully litigated, the PCRA also requires that a petitioner demonstrate that these allegations of error have not been waived. An issue is deemed waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state post conviction proceeding. 42 Pa.C.S.A. Section 9544(b). To obtain review of such an issue, the petitioner must show that his failure to appeal a ruling or raise an issue was not knowing and intentional. Commonwealth v. Craddock, 370 Pa.Super. 139, 142-43, 535 A.2d 1189, 1191 (1988), aff'd, 522 Pa. 491, 564 A.2d 151 (1989).

Finally, the PCRA requires that all petitions be filed within one year of the date the judgment becomes final, which is either at the conclusion of direct review, or at the expiration of the deadline for seeking review. 42 Pa.C.S.A. Section 9545(b)(3).

3. This court's role

The PCRA statute and the case law provide certain elements which the petitioner must establish by a preponderance of the evidence in each of the several areas she asserts. Each section requires the judge to determine what impact the evidence in question would have had at trial. The after-discovered evidence must have been unavailable, exculpatory and *would have changed the outcome of the trial if it had been introduced*. The prosecutorial misconduct charges require the court to determine whether the constitutional violations *so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place*. Similarly, the PCRA requires a petitioner to establish ineffective assistance of counsel *which rendered the truth-determining process unreliable*.

For there to be a Brady violation, the petitioner must prove that the Commonwealth failed to disclose exculpatory evidence or favorable evidence which was "material." Brady, 373 U.S. at 87-88. "Material" has been defined as follows:

The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

**\*17** Galloway, 433 Pa.Super. at 229, 640 A.2d at 457 (quoting Bagley, 473 U.S. at 682). The Brady claims then require the court to find that the *result of the proceeding would have been different* had the material evidence been disclosed.

In each of these four major areas, there is an element for the trial court to determine whether the alleged misconduct, Brady violations, after-discovered evidence or ineffective assistance of counsel would have made a difference to the outcome of the trial. Would the after-discovered evidence have "changed the outcome of the trial?" Did the prosecutorial misconduct "so undermine the truth-determining process that no reliable adjudication of guilt or innocence could have taken place?" Did the Brady violations involve "material" evidence, i.e., would the evidence have changed the outcome of the trial? Did the ineffective assistance of counsel render the truth-determining process unreliable?

In this case, the judge sitting in review of the PCRA claims also sat without a jury in the 1992 trial. In a typical case, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 22
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

PCRA court would consider claims of after-discovered evidence, prosecutorial misconduct, ineffective assistance or Brady violations and make its best judgment as to what would have influenced the jury. In the case of a constitutional violation, the truth-determining process would have been the jury's analysis and deliberations on the verdict. The court could speculate about what would have mattered to the jury and what would not have mattered. And so it goes for the after-discovered evidence, the Brady violations and the ineffective assistance claims.

In this case, however, there was no jury and there is no need for this court to project what *might* have mattered and what *might* have affected the jury's analysis of the case. Here, the court listened to the evidence in 1992, considered the arguments of counsel and determined a verdict. This court is in a unique position to say what would have made a difference in the truth-determining process in 1992. This court knows what affected the outcome of the case, knows what was important in the truth-determining process and knows what was material.

Our research has disclosed no appellate case law on the standard to be applied to a PCRA petition to a court who heard the initial case non-jury. It seems to make sense that the court in the unique position of hearing a case non-jury would have insight into the basis for the verdict that would not be available to a judge in a jury trial. To speculate about the impact of certain evidence on a jury when in reality the court itself heard the evidence and made the decision would seem both unproductive and unnecessary. For example, how could this court in good conscience find that after-discovered evidence would have changed the outcome of the trial were a jury to hear the new evidence when, in reality, this court knows that it would not have changed the outcome?

This is one practical consequence of petitioner's decision to waive her right to a jury trial in 1992. In all the appeals, motions and petitions which followed since the verdict in 1992, never once has petitioner contended that her decision to proceed non-jury was improper. Never once has she contended that Attorney Shirk was ineffective for advising her to proceed non-jury, never once has she argued that her waiver was something other than knowing and voluntary,

and never once has she challenged the colloquy which led to the court approval of her waiver of a jury trial. In fact, it is likely that petitioner views that decision as a successful decision. In any event, by her choice to proceed non-jury, petitioner has afforded this court an insight into the PCRA issues which would not otherwise have been available had the case been tried with a jury.

4. To lead or not to lead: adverse and hostile witnesses

**\*18** Early in petitioner's case, she called Lieutenant Renee L. Schuler [FN37] as a witness. Petitioner's counsel requested permission to cross-examine this witness because she was "hostile" or "adverse." This request was denied. On May 4, 1998, petitioner called retired Pennsylvania State Police Officer Carl S. Harnish. The request to treat the witness as hostile or adverse was renewed. We asked for case authority and each side presented legal argument.

> FN37. Renee L. Schuler is currently a lieutenant with the East Lampeter Township Police Department. In 1991-1992, she had the rank of corporal with the same department.

Petitioner cited Commonwealth v. Butler, 529 Pa. 7, 601 A.2d 268 (1991), in support of her request that she be allowed to cross-examine police witnesses on direct. Mr. Greenberg argued on behalf of petitioner that these proceedings went directly to the workings of the criminal justice system, that the police witnesses in this proceeding were hostile and adverse, as those terms are used in the law, and that justice required that petitioner be allowed to cross-examine each witness and to proceed with leading questions rather than standard direct examination. This court considered Butler and found it to provide no support for petitioner's contention. [FN38] We indicated at that time that the question of a police witness being hostile or adverse could not be addressed in a blanket ruling. The court promised to consider the situation as to each witness and make a determination before, or during, that witness's testimony about whether the witness would be treated as a hostile or adverse witness.

> FN38. Counsel for petitioner miscited and misrepresented the law when presenting legal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argument to the court on many occasions. *See,* e.g., petitioner's reliance on Commonwealth v. Wells, 322 Pa.Super. 380, 469 A.2d 672 (1983), *appeal after remand,* 345 Pa.Super. 623, 496 A.2d 855, *rev'd,* 513 Pa. 463, 521 A.2d 1388 (1987), in support of his motion to file the federal habeas record as the record of this PCRA proceeding, Commonwealth v. Bonaparte, 366 Pa.Super. 182, 530 A.2d 1351 (1987) (plurality), in support of his motion for bail, and Commonwealth v. Reese, 444 Pa.Super. 38, 663 A.2d 206 (1995), in support of his motion to exclude the expert testimony of Dr. Levin and all evidence not introduced at the 1992 trial and to limit the Commonwealth's witnesses.

We advised counsel that "hostility" required a showing of surprise during the witness's testimony or an obvious lack of cooperation, reluctance or evasiveness in answering questions. As to whether a witness is "adverse," the court informed counsel that such a declaration required a showing that the witness had a direct personal interest in the outcome of the litigation.

This same analysis was applied when former Detective Ronald C. Barley testified. On May 5, 1998, at the beginning of the afternoon session and during the time Mr. Barley was on the stand, Mr. Greenberg asked if he might "put a position on the record." He was given permission and made the following statement:

Your Honor, I feel obligated to put this position on the record to establish what our position is going forward in this proceeding so there's no subsequent question. And I want to assure the court that I'm not taking this position lightly.

The situation that I predicted yesterday is exactly as I then suggested. By immunizing the police and the prosecutor witnesses from cross examination and in addition by allowing the Commonwealth to lead them, the court has made it impossible for the petitioner to properly put on her case.

Crucial points of witness testimony made explicitly in federal court that could be established by a single cross examination question that never will be asked in this proceeding now are removed from the record before this court by witnesses' convenient losses of memory and

recollection.

**\*19** The result is that the record being made in our view, and our position is, is completely corrupted. We will go forward as we must to exhaust the alleged state remedies that are allegedly available to this petitioner, but it's our position that this proceeding is without integrity in terms of finding fact and seeking truth and it's our position that any findings made herein against petitioner are entitled to absolutely no deference as a result in any subsequent court.

(N.T., PCRA at 783-784.) [FN39]

FN39. The notes of testimony for this PCRA proceeding were lodged with the Clerk of Courts on August 3, 1998. There are more than 8,000 pages of testimony contained in 36 bound volumes. Counsel requested 30 days to review the notes of testimony and file objections to the transcript with the court. Given the enormity of the record, this request was granted on August 11, 1998. Therefore, citations in this opinion will be to the "unofficial" notes of testimony which are subject to change at a later date.

A reading of the text of Mr. Greenberg's diatribe does little to capture the disdainful tone of these remarks. When given an opportunity to present case law in support of his request to cross-examination police witnesses, he produced nothing. Faced with a ruling adverse to his position, he chose to stand in open court and assault the integrity of this court.

The issue of leading questions came up with every police or prosecution witness. In addition to Lieutenant Renee Schuler and former Detective Barley, petitioner sought to ask leading questions of First Assistant District Attorney Kenneff, Detective Raymond E. Solt, [FN40] and District Justice Ronald W. Savage, [FN41] among others. Because this issue featured so prominently throughout the hearing, we have included a discussion of the law on this point.

FN40. Detective Solt is presently employed by the Lancaster County District Attorney's Office. In 1991 and 1992 he was a corporal with the Pennsylvania State Police and assisted in the investigation of the Show murder.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN41. Ronald W. Savage was a detective with the East Lampeter Township Police Department in 1991-1992. At the time of the PCRA hearing, he was a district justice.

The general rule is that the party calling a witness is not permitted to examine him or her by means of leading questions. Wargo v. Pittsburgh Railways Co., 376 Pa. 168, 101 A.2d 638 (1954); Buckman v. Philadelphia & Reading Railway Co., 227 Pa. 277, 75 A. 1069 (1910). "A leading question is one which puts the desired answer in the mouth of the witness." Commonwealth v. Chambers, 528 Pa. 558, 579, 599 A.2d 630, 640 (1992) (citing Commonwealth v. Dreibelbis, 493 Pa. 466, 476, 426 A.2d 1111, 1116 (1981)).

One may, however, cross-examine his own witness where the witness proves to be hostile and unwilling, or where the party calling the witness is surprised by testimony of the witness inconsistent with prior statements. Gantt v. Cox & Sons Co., 199 Pa. 208, 48 A. 992 (1901). A thorough examination of the Pennsylvania case law associated with this exception reveals an abundance of cases which define "hostility" by way of the definition of "surprise," but an absence of any cases which offer a definition of the discrete term "hostile witness." [FN42]

FN42. A federal court has offered the following definition: "A 'hostile' witness, in the jargon of evidence law, is not an adverse party but a witness who shows himself or herself so adverse to answering questions, whatever the source of the antagonism, that leading questions may be used to press the questions home." Rodriguez v. Banco Central Corp., 990 F.2d 7, 12-13 (1st Cir.1993).

The term "hostile" has been considered by a number of courts. Where a party is surprised in the testimony of a witness by his unexpectedly turning hostile, counsel may exercise the right of cross-examination of the witness, or impeach his testimony by other witnesses. Commonwealth v. Turza, 340 Pa. 128, 16 A.2d 401(1940). The party requesting leave to declare its witness hostile bears the burden of proving that statements by the witness were unexpected, contradictory to earlier statements, harmful to the party calling the witness, and would result in injustice

should the movant's request be denied. Tiburzio-Kelly v. Montgomery, 452 Pa.Super. 158, 186, 681 A.2d 757, 771 (1996). When one's witness turns hostile by telling a different version on the witness stand than he told the calling party prior thereto, the latter may plead surprise and request leave to cross-examine the witness and impeach him by his prior inconsistent statement. Commonwealth v. Duffy, 238 Pa.Super. 161, 167, 353 A.2d 50, 54 (1975). Clearly, the term "hostile" has been treated by Pennsylvania courts as involving an element of "surprise."

*20 It is within the sound discretion of the trial court to decide whether counsel may exercise the right to cross-examine his own witness on a plea of surprise. Commonwealth v. Barber, 275 Pa.Super. 144, 151, 418 A.2d 653, 657 (1980); Duffy, 238 Pa.Super. at 167, 353 A.2d at 54. In exercising its discretion, the trial court must apply a four-part test. First, the testimony given by the witness must be unexpected; second, the testimony must be contradictory to the witness's earlier statements; third, the testimony must be hurtful or injurious to the party calling the witness and beneficial to the opposing side; and fourth, the scope of the cross-examination may not be excessive. Id. at 151-52, 418 A.2d at 657; Duffy, 238 Pa.Super. at 167-68, 353 A.2d at 54.

Since the purpose of the cross-examination and impeachment is to induce the fact finder to disbelieve the testimony of the witness, there must be something in the witness's testimony, which, if believed by the fact finder, will be hurtful or injurious to the party calling him. Commonwealth v. Thomas, 459 Pa. 371, 379, 329 A.2d 277, 281 (1974). Therefore, if there is no testimony which needs to be neutralized, or which if accepted unchallenged will not aid the opposite party, or which was not hurtful to the side calling him, there is no excuse for cross-examination to impeach or discredit. Seldon v. Metropolitan Life Ins. Co., 157 Pa.Super. 500, 509, 43 A.2d 571, 577 (1945).

Even without a plea of surprise, where the witness is identified with an adverse party and reluctant to testify against that party, leading questions may be used in direct examination within the discretion of the trial court. Duffy, 238 Pa.Super. at 167-68, 353 A.2d at 54. Since the issue depends heavily upon evaluating the witness's in-court demeanor, aspects of which may not even be reflected in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 25
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

record, it is recognized that trial courts must be given discretion to determine whether a witness is hostile or unwilling to testify.

It is well settled that a witness who has an interest adverse to the party calling him may be called as on cross-examination. Whether a witness's interest is adverse to the party calling him to testify, for purposes of determining whether he could be called as if under cross-examination, is a factual determination within the court's discretion. American States Ins. Co. v. Maryland Casualty Co., 427 Pa.Super. 170, 192, 628 A.2d 880, 891 (1993) (citing Gaul v. Consolidated Rail Corp., 383 Pa.Super. 250, 556 A.2d 892 (1989)). This interest must be a direct interest in the outcome of the suit in which he is called. An agent-principal relationship alone is not sufficient. Indirect, contingent and supplementary interests will not suffice. Brown v. Popky, 413 Pa. 236, 196 A.2d 638, 645-46 (1964). Nor are employees of an adverse party ordinarily themselves "adverse" for purposes of permitting a party to call them as on cross. Commonwealth, Department of Health v. Brownsville Golden Age Nursing Home, Inc., 103 Pa.Cmwlth. 449, 470 n. 7, 520 A.2d 926, 936 n. 7 (1987).

**\*21** In this case, we considered whether any of these police or prosecution witnesses had any legal rights or liabilities which would be affected by this court's decision on the PCRA issues. We approached this issue at the outset of the hearing by contemplating three possible remedies or outcomes in this case which could arguably affect these witnesses: (1) a new trial for Ms. Lambert; (2) a declaration that there has been prosecutorial misconduct and that she cannot be retried under Smith; and (3) a finding of prosecutorial misconduct which may be used to further a federal investigation that might be taking place. [FN43]

> FN43. The assumption, of course, is that the federal investigating authorities will be moved by what is decided here. It is already clear that the federal courts disregarded findings of fact made by this court in the 1992 trial, e.g., the dying declaration and the import of the "29 questions." It is already clear that Mr. Greenberg has taken a position that no court should give any deference to this court's findings and it is clear that whatever

investigation is being done is at the request of the federal district court and by federal authorities, and not at the behest of any state court or by state authorities.

If this court would award a new trial to Ms. Lambert, there would be no direct effect on any personal rights or liabilities of any of the police witnesses. New trials are granted by appellate courts in regular course. A declaration that because of intentional prosecutorial misconduct Ms. Lambert cannot be retried under Smith does not affect the personal rights or liabilities of any of these police or prosecution witnesses. To say that one or all of them might be disappointed with such a result is not to say that it would have a direct effect on the personal rights or liabilities of these individuals. The possible impact of this court's decisions in this case on the federal investigation demanded by the district court is contingent and remote. There is simply no basis to find that this court's decision in favor of Ms. Lambert would somehow prejudice the investigation against the police or that the converse is true. Even if the federal investigative authorities will look to this court's findings for additional information about the conduct of the police, that does not rise to the level of a direct personal interest in the outcome of this litigation. The fact that there may be some instructive or persuasive value in a collateral proceeding does not establish this kind of interest.

There simply was no basis to consider the police and prosecution witnesses adverse under Pennsylvania law. Nor was there any basis to find any of them hostile, with the exception of Officer Robert S. Reed, who was declared hostile and whose testimony will be dealt with below. All, except Officer Reed, demonstrated a willingness to answer questions.

The federal rules depart from Pennsylvania practice on this issue. Rule 611(c) of the Federal Rules of Evidence permits the use of leading questions on direct examination of a hostile witness, an adverse party, or a witness identified with an adverse party, *without any requirement of a showing of hostility or adversity*. Rule 611(c) suggests that witnesses who are adverse parties or identified with one may be presumed predisposed against the direct examiner without requiring a demonstration of that fact.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Prior to the adoption of F.R.E. Rule 611(c), before a party could lead a witness on direct examination, it had to be shown that the witness was actually hostile or was an adverse party, officer, director, or managing agent of such adverse party. Ellis v. City of Chicago, 667 F.2d 606, 612 (7th Cir.1981); United States v. Bryant, 461 F.2d 912, 918-19 (6th Cir.1972). Rule 611(c), however, significantly enlarged the class of witnesses presumed hostile, "and therefore subject to interrogation by leading questions without further showing of actual hostility." Ellis, 667 F.2d at 613 (citing F.R.E. 611 advisory committee note); see also Perkins v. Volkswagen of America, Inc., 596 F.2d 681, 682 (5th Cir.1979) (error for trial court to rule that employee of defendant would be plaintiff's witness if plaintiff called him).

**\*22** The federal courts, in applying Rule 611(c), have allowed the use of leading questions in direct examination of law enforcement officials (regardless of whether he or she is a local, state or federal officer) because they are "identified" with an adverse party, i.e., the prosecution, in actions by the Government against criminal defendants. United States v. Duncan, 712 F.Supp. 124 (S.D.Ohio 1988) (granting the defendant's motion to invoke Rule 611(c) in direct examination of police officers and government agents). In such cases, the burden is on the Government to make a positive showing that the witness is *not* hostile, biased or so identified with the adverse party that "the presumption of hostility which is the cornerstone of Fed.R.Evid. 611(c) should not be indulged." Id. at 126.

Some commentators and courts have cautioned against such unwarranted generalizations about the type of relationship sufficiently close to a party to permit a presumption of bias and suggest that Rule 611(c) be applied with caution. See Charles A. Wright & Victor J. Gold, Federal Practice and Procedure: Evidence Section 6168 at 426 (1993 & 1998 Supp.). See also Suarez Matos v. Ashford Presbyterian Community Hosp., 4 F.3d 47, 50 (1st Cir.1993) (trial court erred in permitting plaintiff to ask leading questions of witness as he could not be deemed a hostile witness simply by virtue of the fact he was expected to give testimony favorable to defendant). One federal court has recognized that Rule 611(c) is subject to the overriding command of Rule 611(a) that the court "shall exercise reasonable control over the mode ... of interrogating

witnesses" to elicit truth, avoid delay and protect against harassment. F.R.E. 611(a). The court noted that a district judge would certainly not allow leading questions of an adverse party where this mode of interrogation was distorting the testimony of the witness. Rodriquez v. Banco Central Corp., 990 F.2d at 13.

None of the police and prosecution witnesses listed above were parties in this case; their interests were adverse to petitioner's only in a collateral sense. The simple fact is that petitioner had previously been involved in a federal habeas corpus proceeding where allegations of misconduct were made against these witnesses. That does not create a personal interest or stake in the outcome of this PCRA litigation.

Petitioner's counsel demonstrated hostility toward each of these witnesses by the tone and manner of their questioning, if nothing else. Their demonstrated hostility to these witnesses does not make the witnesses themselves adverse or hostile. This court had every opportunity to observe these witnesses on the stand. Each appeared willingly, some in response to a subpoena. There was no need for petitioner or the court to coerce their attendance at the hearing nor did their answers to any questions appear to be evasive. In fact, each appeared willing to answer questions. Each was cooperative and responsive. There was nothing about the testimony of any of these witnesses which would even suggest that any was hostile.

**\*23** Leading questions are useful to exact truthful statements from a witness who has a clear and demonstrated tendency to give evasive, unresponsive or argumentative answers. Leading questions should not be used to exact admissions, in the manner of an inquisition, from a witness who is attempting to provide responsive answers to direct questions. Nor should leading questions be used to cut off a witness's opportunity to provide an explanation. In short, leading questions are not meant to be loaded questions. And when an affirmative answer is exacted from a witness to a line of questioning loaded with assumptions favoring only the inquisitor, the leading question becomes not a tool of truth but of advocacy and intimidation. Our decision to require direct questioning of witnesses called by petitioner is supported by the law and was a sound exercise in

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

discretion. The fact that the federal district court permitted leading questions of police witnesses in the habeas corpus proceeding does not dictate how this court should apply Pennsylvania law.

The record indicates that these witnesses were extensively examined and repeatedly impeached by petitioner. Under these circumstances, there was no abuse of the PCRA court's discretion.

## IV. THE 1992 VERDICT: FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ms. Lambert was found guilty of first degree murder on July 20, 1992. She filed post verdict motions in which she claimed that her conviction was against the weight of the evidence. In a July 19, 1994, opinion filed in response to the issues raised in the post verdict motions, this court discussed its factual findings leading to the conviction and whether the verdict was against the weight of the evidence. We found that the verdict was well supported by the evidence.

Because so much of the analysis of the PCRA claims has a direct bearing on the integrity of the truth-determining process or whether any new information would have changed the outcome of the case, we include our findings of fact from the 1994 opinion:

The arguments raised by defendant are best considered in a factual context. The facts, as found by the trial court, may be summarized as follows. Lisa Michelle Lambert was romantically involved with Lawrence Yunkin. During an interlude in their relationship, Mr. Yunkin dated Laurie Show. They apparently dated on one or two occasions during the summer of 1991. The evidence at trial made clear that Ms. Lambert reacted strongly to this development and that she expressed her anger at Laurie Show to a number of her friends. In fact, a plan was developed in the summer of 1991 that included kidnaping, harassing and terrorizing Laurie Show. Apparently, Ms. Lambert was the author of this plan and she enlisted several of her friends to execute the plan. The 'kidnaping' did not happen when several of the group warned Laurie Show.

This 'bad blood' continued. Ms. Lambert confronted Laurie Show at the East Towne Mall and struck her.

According to the victim's mother, Hazel Show, the victim was afraid of Ms. Lambert. It appears that Ms. Lambert was stalking Laurie Show during the summer and into the fall of 1991.

**\*24** On December 20, 1991, Hazel Show received a call from a person who claimed to be her daughter's guidance counselor. The caller requested a conference with Hazel Show before school the next morning. The following morning Hazel Show left the condominium to keep this 'appointment.' While she was gone, two persons knocked on the door of the Show condominium and entered when Laurie Show answered. A commotion followed and these two figures then left the second floor condominium, walked across a field, cut through a parking lot by some adjoining condominiums in the same complex and got into an automobile. Hazel Show waited at the Conestoga Valley High School for the guidance counselor and when the guidance counselor did not appear at the time for the appointment, Hazel Show returned by automobile to her condominium. She found her daughter laying on the floor of her bedroom, bleeding profusely from a large slash wound across her neck. Laurie whispered to her mother the words, 'Michelle... Michelle did it.' Laurie Show then died in her mother's arms.

All this happened on the morning of December 20, 1991. During the evening of that same day, East Lampeter Township Police, assisted by the Pennsylvania State Police, arrested Lisa Michelle Lambert, Lawrence Yunkin and Tabitha Faith Buck in a bowling alley. During questioning by police, Ms. Lambert admitted to being in the condominium that morning but said Ms. Buck did the stabbing. Mr. Yunkin admitted to driving the two women to the location and waiting in the car until they returned. Ms. Buck made no statement to the police.

The evidence at trial clearly established a pattern and history of ill will directed by Ms. Lambert to Laurie Show. Various witnesses documented an assault by Ms. Lambert on Laurie Show at the East Towne Mall in November, 1991. There was no evidence to controvert this. Ms. Lambert threatened Laurie Show with harm if she went to the police regarding the assault in November, 1991. Ms. Lambert encountered a friend of hers in December, 1991 at the Park City Mall and indicated that she was aware that the police were looking for her on a simple assault charge. In addition, Hazel Show had confronted Ms. Lambert on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at least one prior occasion and had called the East Lampeter Township Police in the summer of 1991. In December, 1991, Hazel Show went to the East Lampeter Township Police to discuss the simple assault charge. There was credible testimony at the trial to show that Laurie Show was afraid of Ms. Lambert.

All of this evidence was relevant as to whether Laurie Show would have willingly admitted Ms. Lambert and Ms. Buck to her condominium on the morning of December 20, 1991. Given this history of ill will, it is completely credible that Laurie Show would have admitted Ms. Lambert or anyone in the company of Ms. Lambert to her home at any time.

Numerous facts developed at trial provided both direct and circumstantial evidence linking Ms. Lambert to the homicide. On December 19, 1991, defendant bought a 50 foot length of rope and two ski hats at the K-Mart in the East Towne Mall. This was established by credible testimony from Mr. Yunkin and through a K-Mart receipt. Defendant took the rope with her on December 20, 1991. Defendant, by her own admission, took a knife from her kitchen at home to the Show condominium on December 20, 1991. Mr. Yunkin and Ms. Lambert picked Ms. Buck up at her home at approximately 6:30 a.m. and Mr. Yunkin dropped the two women off near the Show condominium at approximately 6:45 a.m. Mr. Yunkin was seen by the manager of a McDonald's at approximately 7:00 a.m. on December 20, 1991. This McDonald's is very close to the Show home.

**\*25** It is very safe to conclude from the evidence that Mr. Yunkin was aware of Ms. Lambert's feelings about Laurie Show. Mr. Yunkin had dated Laurie Show for a brief period and then was part of two kidnapping plots in July of 1991 and August of 1991. Mr. Yunkin was aware that Ms. Lambert and Ms. Buck were going to the Show condominium on December 20, 1991. He was also aware that Ms. Lambert had a rope and a knife with her.

The Show condominium is on the second floor of a two story structure containing a number of condominiums. Access to the Show home is gained by ascending a flight of steps which are on the exterior of the building. The steps are made of metal and they are partially enclosed. A sidewalk runs in front of the building. A person going up or down the steps can easily be heard by someone standing out on the sidewalk. A person walking normally

on the deck outside the Show condominium can be plainly heard by someone inside the condominium or someone outside the condominium. The construction of the condominium is such that sound travels through the walls. These facts were clearly established by testimony from Hazel Show, from the neighbors who lived in the condominium under the Show condominium and by the court's own view conducted at the premises during the trial.

Mr. and Mrs. Richard Kleinhans, the neighbors who lived in the condominium beneath Laurie and Hazel Show, testified that they could hear Laurie Show getting ready for school in the morning.

A physical inspection of the Show condominium reveals that at least half of Laurie Show's bedroom can be seen from the main hallway of the condominium. From the small hallway outside her bedroom, most of her bedroom can be seen. It should be noted that the layout and construction of the condominium is such that any commotion in Laurie Show's bedroom could easily have been heard from any location in the front part of the Show condominium.

The structure of the condominium and the testimony of Mr. Kleinhans with respect to his ability to hear what was going on in the Show condominium are very important in this case. Ms. Lambert indicated, in one version of the events, that she was outside Laurie Show's bedroom and that Ms. Buck was inside the bedroom struggling with the victim. This version of the story would suggest that Ms. Lambert was not in the bedroom at the time of the killing. The defendant offered this version of the facts to support her story that Ms. Buck did the killing and that she was a horror-struck bystander. A visit to the Show condominium taken by the court in the company of counsel and an examination of the layout of the condominium severely undermines Ms. Lambert's position under this version of the facts. Simply stated, any person standing in the dining room area, kitchen area or bathroom area of the Show condominium would be well aware of any struggle, commotion or disturbance going on in Laurie Show's bedroom. The condominium is simply not that big. A person standing in the hallway or in the dining area would have an easy view into the bedroom and would certainly be able to hear almost anything taking place in the bedroom.

**\*26** From the physical layout of the condominium alone,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 29
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Ms. Lambert's position that she was helpless and unaware of what Ms. Buck might have been doing in Laurie Show's bedroom is patently unbelievable.

The secondary significance of a description of the layout of the Show condominium is to buttress and support the testimony of Mr. Kleinhans, who lives with his wife below the Show condominium. He testified as to his ability to hear any commotion or unusual noise from the condominium above his. An inspection of the premises wholly and absolutely supports Mr. Kleinhans. The construction is such that any commotion, noise or disturbance can be heard in the condominium below. In fact, the court observed during a visit to the condominium that a person walking normally up the steps and across the small balcony to the front door of the Show condominium can easily be heard from the area below the condominium.

The physical findings at the crime scene, the testimony at trial of the defendant, the trial testimony of Hazel Show, the history of ill will between defendant and the victim and the circumstantial evidence developed at trial all lead to the conclusion that defendant was guilty of the murder of Laurie Show.

Commonwealth v. Lambert, No. 0423-1992, slip op. at 3-10 (Lanc.Co.C.P. July 19, 1994). [FN44]

> FN44. In the July 19, 1994, opinion, this court erroneously stated that the murder took place on the morning of December 21, 1991. In fact, the murder took place on December 20, 1991. The questioning of the suspects took place in the early morning hours of December 21, 1991. For the sake of clarity, we corrected the date in the material quoted above. The mistake remains in the original.

In 1994, we specifically considered Ms. Lambert's version of the events of December 20, 1991, as she presented them at trial. We summarized her story as follows:

> Defendant's story, as presented at trial, was that she and Ms. Buck initially went to the condominium. She and Ms. Buck then went inside and began to struggle with Laurie Show. Somehow, somewhere, a knife 'appeared.' According to Ms. Lambert, she was initially holding down Laurie Show's legs so that Ms. Buck could cut her hair. When Ms. Buck began to stab Laurie Show, Ms. Lambert

began to pull Laurie from the apartment but Laurie 'slipped' from her hands. According to Ms. Lambert, she ran out of the condominium, in horror, and sat on the staircase down at the ground area. At this point, Mr. Yunkin appeared, uttered an expletive and jumped over Ms. Lambert and went into the apartment. In Ms. Lambert's view of the case, whatever happened when Mr. Yunkin and Ms. Buck were in the apartment resulted in Laurie Show's death.

Commonwealth v. Lambert, July 19, 1994, slip op. at 12.

Putting aside the issue of credibility and considering only the legal significance of Ms. Lambert's version of the facts, we concluded:

> ... Even if Ms. Lambert's story at trial was completely credible, she would still be an accomplice to the crime of murder. She freely admits to going to the condominium in possession of a rope and a knife. She admits to going into the condominium and participating in the attack. The only variation is that she contends that Ms. Buck was the aggressor and that Mr. Yunkin ultimately assisted. Her presence and her participation, by her own admission, would support a finding of criminal responsibility for the death of Laurie Show on an accomplice basis.

**\*27** Commonwealth v. Lambert, July 19, 1994, slip op. at 12-13.

At trial, Ms. Lambert's testimony, her statement to Corporal Solt, Mr. Yunkin's testimony and the questionnaire [FN45] created a number of factual inconsistencies. The court found the questionnaire to be inconclusive and not sufficient to raise a reasonable doubt about defendant's guilt. We were aware that either Ms. Lambert's testimony at trial or Ms. Lambert's statement to Corporal Solt was at least partially untruthful and we viewed Mr. Yunkin's testimony with a large measure of skepticism. Much of this controversy was created by the self-serving statements of the participants in the crime. To resolve these factual inconsistencies, we carefully considered the observations of witnesses who had no interest in the proceeding and who observed pieces of this drama as it unfolded on the morning of December 20, 1991. This discussion is found in the 1994 opinion:

> FN45. Now referred to as the "29 questions."

Not Reported in A.2d                                                                      Page 30
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

The observations of disinterested third parties established several very important facts. Mr. Kleinhans, who lived in the condominium below the Shows, heard footsteps up the outdoor steps, heard Laurie Show's door open, heard a scream followed by a thud. After several minutes passed, he heard the door slam and heard people descending the steps. He looked out the window and saw two figures of roughly the same height and build with hoods pulled over their heads. Ms. Buck and Ms. Lambert are of roughly the same height and, given winter clothing and hoods over their heads, could have appeared to be of roughly the same build. Ms. Lambert wanted the court to believe that one of those figures was Mr. Yunkin and the other Ms. Buck. Mr. Yunkin is significantly taller than either of the two women. Mr. Kleinhans gave very credible testimony that the two figures he observed were of roughly the same stature.

Another disinterested witness observed two figures with hoods over their heads coming across a lawn adjacent to the parking lot at the Show condominium. They were coming from the vicinity of the Show condominium down across another parking area toward a road. The timing of this sighting of the two figures coincides with the time at which Hazel Show was returning from Conestoga Valley High School and was shortly after Mr. Kleinhans made his observation of the two figures.

A third fact established by a disinterested witness was that Mr. Yunkin was at the nearby McDonald's restaurant at 7:00 a.m. The manager testified that she observed Mr. Yunkin and that she later recognized his picture on the newscast following the arrest of the three. This coincides with Mr. Yunkin's story that he went to the McDonald's, ordered an orange juice and home fries, waited for a period of time and then went to pick up the women along the road.

Mr. Kleinhans's testimony completely undermines the story told by Ms. Lambert. To hear Ms. Lambert's version, there must have been a great deal of shouting, bumping, sweating, crying, screaming and general commotion in the condominium. This was followed by, according to Ms. Lambert, her 'escape' from the mayhem inflicted by Ms. Buck. As part of this 'escape,' Ms. Lambert related that she went half way down the staircase and sat. Then, supposedly, Mr. Yunkin ascended the steps, swore out

loud when Ms. Lambert told him that Ms. Buck was in the condominium and went in after Ms. Buck.

**\*28** Mr. Kleinhans testified that he heard no such commotion. Nor did Mr. Kleinhans observe three individuals. Nor did Mr. Kleinhans observe anyone the size of Mr. Yunkin. Nor did Mr. Kleinhans hear any screaming, fighting or doors slamming, other than the initial entrance and exit.

Given the court's view of the condominium and Mr. Kleinhans's description of the layout of his condominium in relation to the Show condominium, his testimony is very important. By his clear factual statements, the likelihood that such a commotion, as described by Ms. Lambert, took place is extremely slight at best. Mr. Kleinhans testified as to what he heard and as to what he did not hear. He offered no opinion and offered no interpretation of the events he related. He was found to be extremely credible by the court sitting as fact finder in this case. His testimony was in direct conflict with Ms. Lambert's version of the story at trial. Her version would have involved a kind of 'noiseless mayhem' and this simply is not a credible story. Mr. Kleinhans was directly below, was paying attention to what was going on and remembered very clearly what he heard and what he did not hear. The lack of any commotion, crashing, shouting, stomping, yelling or other related noises renders Ms. Lambert's already incredible story completely incredible. Commonwealth v. Lambert, July 19, 1994, slip op. at 15-18.

 The testimony of Mr. Kleinhans, of Mr. and Mrs. Fry who saw the two hooded figures coming from the direction of the Show condominium toward their own condominium, and of the manager of the McDonald's restaurant established facts which were entirely consistent with the Commonwealth's theory of the case and which were largely uncontradicted. The testimony of these witnesses established circumstantial evidence which was very important in this court's reasoning process in 1992. [FN46]

> FN46. It appears that the district court had reservations about the credibility of Mr. Kleinhans's testimony. In the habeas corpus opinion, the district court discussed this court's findings of fact as set forth in the slip opinion cited above. Where this court's discussion of Mr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                     Page 31
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Kleinhans is quoted in the federal court opinion, the district court included a footnote which reads as follows:

We note, although this does not play a part in our decision, the following excerpts from Mr. Kleinhans's testimony at the habeas hearing:

Q. I noticed in here that you have a little hard time hearing what is being said.

A. Yes.

Q. Back in '91, did you also have a hard time hearing as well?

A. Not as much as now, no.

Q. Was it okay then?

A. It wasn't okay. But--

Q. It was not okay?

A. No.

Lambert v. Blackwell, 962 F.Supp. at 1524 n. 7.
The only possible purpose to include a reference to Mr. Kleinhans's testimony in federal district court about his ability to hear would be to cast doubt on this court's reliance on Mr. Kleinhans in 1992. In fact, this court had every opportunity to observe Mr. Kleinhans as he testified and counsel for defense had every opportunity to cross-examine Mr. Kleinhans on his ability to see, to hear or to know the things about which he testified. His ability to hear what was going on on December 20, 1991, was a part of our assessment of his credibility. The federal district court's reference to this could have only been intended to cast doubt on our finding that Mr. Kleinhans was credible. The proper place to assess Mr. Kleinhans's credibility in this case was in 1992, not retrospectively in 1997.

Ms. Lambert claimed that her conviction was against the weight of the evidence. This court denied post verdict motions on that basis and Ms. Lambert did not appeal. Although petitioner filed a direct appeal in the Superior Court, she failed to include a challenge to the weight of the evidence. This issue, therefore, was waived and cannot be renewed in a collateral proceeding under the PCRA. 42 Pa.C.S.A. Section 9544. *See also,* Appel, 547 Pa. at 186, 689 A.2d at 898; Commonwealth v. Williams, 389 Pa.Super. 489, 492, 567 A.2d 709 (1989). An issue has been waived "if the

petitioner could have raised it but failed to do so...on appeal." 42 Pa.C.S.A. Section 9544(b).

In the July 19, 1994, opinion, we did consider whether the verdict was supported by or was against the weight of the evidence. In so many words, petitioner has challenged the sufficiency of the 1992 evidence in this PCRA proceeding. Much of Ms. Lambert's PCRA case calls into question the evidence introduced in the 1992 trial. Rather than rule that she has waived any possible challenge to the 1992 evidence by not raising the issue of "sufficiency" in the Superior Court, we allowed her to present her evidence and her arguments which called the 1992 evidence into question. We did this in the interest of full litigation of all of petitioner's claims.

**\*29** After Ms. Lambert's challenge to the weight of the evidence in her initial post verdict motions filed by Mr. Shirk, she then was given an opportunity to challenge the effectiveness of her trial attorney and to raise certain claims of after-discovered evidence and prosecutorial misconduct in a post verdict hearing on November 18, 1994. This court made certain findings in response to those claims. *See* Commonwealth v. Lambert, No. 0423-1992, slip op. (Lanc.Co.C.P. March 14, 1995).

In consideration of those post verdict issues raised by the new attorney retained by Ms. Lambert's family, we again considered the record of the 1992 trial. We noted that Ms. Lambert's counsel, Jules Epstein, Esquire, raised a number of issues and appeared to ask this court to consider those issues out of the context of the entire record. For example, Mr. Epstein challenged trial counsel's failure to call character witnesses in a first degree murder case. A superficial consideration of that issue might suggest that the failure to call witnesses for the defendant in an important case would be problematic. However, considering this issue against the backdrop of the entire record, the decision not to call character witnesses seemed more than prudent. As to the request that we ignore the record in favor of certain discreet issues, we noted:

Ms. Lambert's new attorney invites this court, and any reviewing court, to view the transcript of this trial as if it were a cold specimen in a laboratory, to be studied, dissected and analyzed in a sterile environment. The court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is invited to excise certain portions of the transcript with the cold scalpel of cynicism and to carefully study those portions of the record which, under a certain light or a different lens, could be viewed as error. While interesting as pure, detached legal analysis, this method of analysis of a trial record yields only part of the whole picture.

This case is not a law school research project or an examination question. This case involves a consideration of the record of a murder trial. And as with all trials, it is necessary to look at the record in totality. This trial was conducted in a context, as is every trial. This trial was more than a recording of words, more than the emotionless, cold series of questions and answers reflected in a transcript. A trial involves human beings, thinking, speaking, pausing, listening, telling the truth, shading the truth, avoiding the truth. It involves people speaking loudly, speaking softly, crying, reacting to others who are speaking or crying. Counsel, the parties and the fact finder observe facial expressions, tone of voice, body position, inflection, statements and reactions to statements.

This court will not reevaluate the evidence from the trial nor is it required to do so. This court can, however, recall and consider the entire record of the trial in evaluating the performance of trial counsel. The court must consider the whole record to determine whether any alleged errors by trial counsel were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. *Commonwealth v. Carter, supra.* Considering the various alleged errors of trial counsel in the light of the entire record, this court can find no error which, in any way, deprived defendant of a fair trial.

**\*30** Commonwealth v. Lambert, March 14, 1995, slip op. at 38-40.

## V. STATE COURT AND FEDERAL COURT

### A. A Comity of Errors

If nothing else, this case will give pause to anyone who considers the relationship between the federal and the state courts. A brief consideration of the principle of comity is necessary in this opinion for several reasons. First, it will help to explain why this court conducted an eight-week hearing on a PCRA petition. Second, a view of the comity

question from our vantage point may possibly help in understanding this court's decision as the case progresses through an appellate court. Third, the context of this case has been instrumental in framing the issues. A complete discussion of the context of this case would be greatly lacking without a consideration of the treatment afforded the issues and the participants by the federal district court in 1997.

What do we mean by "comity?" The Third Circuit, in considering this case in 1997, gave a succinct and clear answer:

The doctrine of comity " 'teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." ' *Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982) (quoting *Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950)). Indeed, we opined in *Toulson v. Beyer,* 987 F.2d 984, 986 (3d Cir.1993), that requiring exhaustion of state remedies 'addresses federalism and comity concerns by "afford[ing] the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." '

*Lambert v. Blackwell,* 134 F.3d at 513 n. 18 (citations omitted).

Comity appears to require deference. Comity appears to require understanding and, perhaps, even respect for the treatment given the issues in state court. The federal district court took significant liberties with state court criminal practice. The federal district court did this in a number of ways. First, it allowed for an unprecedented and unbounded level of discovery. In a three-month period of time, some 55 depositions were taken. [FN47] The document production ordered by the federal district court was at odds with any concept of attorney work product under even the most liberal standards. In effect, the most permissive approach to civil discovery was applied to a criminal case.

> FN47. Subsequent attempts at the state court PCRA hearing in 1998 to use these depositions for impeachment purposes evidenced poorly focused

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 33
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

questioning which provided more obfuscation than explication of the issues.

Second, the federal district court substituted its own fact finding on critical issues from the 1992 trial. Something other than "comity" is at work when fundamental findings of fact in a state court homicide case are "dismissed" by the federal district court.

Third, the federal district court substituted its legal judgment for the state court's analysis. For example, this court made a ruling on the discussion between First Assistant District Attorney Kenneff and Dr. Mihalakis in response to Ms. Lambert's counsel's motion for a mistrial at the 1992 murder trial. In making that finding, this court held a conference in chambers, on the record, in the presence of all counsel and the expert witness. This issue will be treated in more detail in Section VII.H, *infra*. Suffice it to say, for purposes of our discussion of comity, that substitution of the federal judge's legal analysis for the state court judge's legal analysis was an "overruling" by a court which, at the moment, possessed a stronger and more immediate power. It was not "comity" befitting a constitutional democracy.

**\*31** Finally, by employing a creative and aggressive approach to exhaustion, the federal district court deprived this court of the opportunity to revisit the legitimate issues raised by petitioner in a proper context. Aggressive may be a good adjective for investment strategy or athletic performance, but not for legal analysis.

Is this what the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. Section 2254, contemplated? If so, then federal legislation defining the role of federal habeas corpus in the criminal justice universe has made this a very strange place. This approach to "comity" will cause the state court murder trial simply to become a rest stop on the way to federal justice. Will we have state court homicide convictions ultimately decided in a forum under a lighter burden of proof and where state court criminal convictions will come under the often misleading microscope of civil discovery? Will we now as a matter of federal due process and equal protection put every state court murder conviction under the scrutiny of boundless discovery, creative advocacy and a court willing to reach

conclusions based upon a partly developed record?  [FN48]

FN48. For the reader who suspects that this court is attempting to match the hyperbole of the federal habeas proceeding, one might question why the federal district court was referring to the 1992 trial as the "alleged trial" on the fourth day of a three-week hearing. (*See* N.T., Habeas Hearing at 949.)

In federal habeas corpus litigation, factual determinations made by the state courts are correct unless the petitioner can rebut the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. 2254(e)(1). With respect to legal conclusions, the federal courts are required to give deference to legal conclusions made on the claims for relief by the state courts. *See* 28 U.S.C. Section 2254(b).

In Commonwealth v. Traviglia, 541 Pa. 108, 661 A.2d 352 (1995), the Supreme Court reiterated that it is the responsibility of the state--not federal-- courts to make factual determinations in the first instance and that the latter must give deference to the former. Specifically, both the Post Conviction Hearing Act court and the federal district court resolved a factual dispute: whether a non-use agreement had been struck in Indiana County. The PCHA court concluded that a non-use agreement was not in existence; the district court came to the opposite conclusion. In this regard, the Supreme Court stated:

Similar, nearly identical, records can legitimately support two different holdings; that two different holdings may result from similar records does not mean that one determination is somehow invalid.... A factual determination by a federal district court in no way 'overturns' the factual determination made by, and subsequently affirmed by, the courts of our commonwealth.

541 Pa. at 108, 661 A.2d at 362-63 (footnote omitted).

In this case, the federal district judge failed to give the state court record due consideration and the deference to which it is entitled under law. For our purposes, the "findings" of the district court in the habeas case in no way "overturned" the factual findings made by this court.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 34
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

B. What Does "Actual Innocence" Actually Mean?

**\*32** As the Court of Appeals appropriately noted, "a finding of actual innocence, as that term has come to be used in federal habeas corpus jurisprudence, is not the equivalent of a finding of not guilty by a jury or by a court at a bench trial." Lambert v. Blackwell, 134 F.3d at 509. *See* Bousley v. United States, 523 U.S. 614, 118 S.Ct. 1604, 1607, 140 L.Ed.2d 828, 840-41 (1998) (" 'actual innocence' means factual innocence, not mere legal insufficiency") (citing Sawyer v. Whitley, 505 U.S. at 339).

Ms. Lambert maintains in this PCRA that she is actually innocent of Laurie Show's murder. In the heading to the first section of her list of claims, she states: "After-Discovered Evidence Proves Lambert's Innocence ...." (*See* Exhibit A, Section A. [FN49]) Pennsylvania law, unlike its federal counterpart, does not specifically recognize "actual innocence" as a basis for relief. [FN50] Consequently, there is no body of state law specifically defining the parameters of proof of such a claim. But, in federal decisional law, it is well established that when a petitioner makes a claim of this sort, the government is not limited to the existing record to rebut any showing that petitioner might make. It may present "any admissible evidence of [a] petitioner's guilt...." Bousley, 523 U.S. at ----, 118 S.Ct. at 1607, 140 L.Ed.2d at 841. While a finding of "actual innocence" is not within the purview of the PCRA, Ms. Lambert's case is centered on her belief that she is an innocent person, wrongly convicted.

FN49. Exhibit A to the PCRA petition, which will be referred to throughout this opinion, was attached to Petitioner's Second Motion for Leave to Amend, which was filed with the court on June 10, 1998, and granted on June 16, 1998. Exhibit A contains the listing of petitioner's claims.

FN50. Actual innocence is actually a creation of federal case law, not the habeas statute. A commentator has noted: "The habeas statute, of course, makes no mention of 'actual innocence' as a criterion for gaining access to a habeas forum. Thus, the pervasive role that innocence currently occupies in the jurisprudence illustrates the Court's common-law approach to defining the scope of the

writ." Jordan Steiker, *Innocence and Federal Habeas*, 41 U.C .L.A. L.Rev. 303, 388 (1993).

A two-judge motions panel of the Third Circuit in reviewing this case stated: "Although the district court could not of course make a determination that Lambert was not guilty of an offense tried in a state court proceeding, a finding of 'innocence' by the district court would appear to be a conclusion that prosecutorial misconduct was a determinative factor in unjustly bringing about a guilty verdict." *See* 962 F.Supp. at 1528." Lambert v. Blackwell, Nos. 97-1281, 97-1283 and 97-1287, slip op. at 7 (3d Cir. May 6, 1998).

The finding of "actual innocence" could not have been a declaration that Ms. Lambert did not commit this crime. "Actual innocence" does not actually mean "innocent." It is, rather, a commentary on the weight of the evidence of prosecutorial misconduct and the application of a remedy under federal law. Ms. Lambert has not been proven innocent and she does not stand before this court as an innocent woman forced to prove her conviction was unfair. She has been convicted of first degree murder and the federal finding of "actual innocence" is no more than a footnote to that verdict.

VI. PETITIONER'S STORY LINE: A CONTEXT

This case presents a complex narrative of police corruption, heartless, dishonest prosecutors, ineffective defense lawyers, an unwitting trial judge, rubber stamp appellate courts and a fast breaking series of "shocking" revelations and "explosive" disclosures. The petition raises well over two hundred allegations of prosecutorial misconduct, new evidence, ineffective assistance of counsel, and discovery violations. To accept petitioner's theory of this case, it is necessary to understand her entire story. Each allegation has a place along a story line which must be true if Ms. Lambert's case is to have any merit. Before delving into a discussion of the merits of this case, we offer, as context, the following synopsis of the story, according to Ms. Lambert.

**\*33** We caution that this section does not present this court's findings of fact. Rather, these "facts" represent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)

**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

petitioner's version of this story.

On Friday morning, December 20, 1991, a 15 year old girl was murdered in her condo in East Lampeter Township. Her mother returned home from a brief errand, found her and held her in her arms until she died. Hearing the mother's cries for help, a neighbor called 911. A dispatch was broadcast to East Lampeter Township Police. Officer Robin Weaver, a Township police officer, was on patrol in that area and heard the broadcast over his radio. He recognized the location and the name and he responded without being dispatched.

Weaver was the first officer on the scene. He realized the victim was Laurie Show and recalled Laurie Show had been harassed in a local mall by Michelle Lambert, a 19 year old local resident. Weaver knew that Ms. Lambert and her boyfriend, Lawrence Yunkin, had a disagreement of some sort with Laurie Show. Weaver also knew that three officers from his department gang raped Ms. Lambert in her apartment on June 17, 1991.

As he stood in the Show condo that morning, while Laurie Show died in the arms of her grieving mother, Weaver's response was not to summon help, not to comfort Mrs. Show, not to render aid to the victim, and not to search the condo premises for suspects. Rather, Weaver's response was to plan, then and there, a conspiracy which would implicate Michelle Lambert in the murder of Laurie Show, thereby relieving his cohorts of any further worries about the gang rape of Ms. Lambert that prior June.

This is the essential truth of this case as presented by petitioner: that the murder of Laurie Show was a fortuitous moment for the East Lampeter Township police. Further "truths" follow as the story unravels. Detective Savage, the crime investigator for East Lampeter Township, responded to the scene. Savage knew about the gang rape. Savage and Weaver heard Mrs. Show tell neighbors and family that she believed the murder was "a set up" and that she believed Michelle did it. They took her aside that morning and as they questioned her about the case, they suggested to her that her daughter told her that Michelle did it. Because she was vulnerable, because she was in shock, and because she hated Michelle Lambert, Mrs. Show was willing to believe,

then and there, what the police told her: that her daughter made a dying declaration identifying Michelle as her killer. Later, based solely on the subliminal suggestion of a cunning detective made just outside her daughter's blood-soaked bedroom, Mrs. Show would testify about this dying declaration under oath in two preliminary hearings and two first degree murder trials.

The police suggested this dying declaration even though they had proof that morning that Laurie Show couldn't speak. This proof was in the form of an observation by Ken Zeyak, an EMT with no training in anatomy, no medical education and no experience in observing wounds such as those suffered by Laurie Show. Yet, Mr. Zeyak, the first ambulance person on the scene, immediately noted that the victim had a severed left carotid artery. Zeyak, Weaver and Savage knew that a severed left carotid artery means you can't speak. Yet, knowing she couldn't speak, the police suggested to the mother that the dying declaration pointed the finger squarely at the woman they had gang raped six months before.

**\*34** A team from the police department descended on the condo and began to gather evidence. They took pictures all over the condo. Some of these pictures showed blood in the front hallway, including bloody footprints all over the tile floor. The victim's body was taken from the scene and transported to the county morgue located in the basement of the county nursing home. An autopsy was scheduled for 9 o'clock the following morning.

The police conspiracy to frame Ms. Lambert, hatched that morning in the midst of an emotional and confusing murder scene before an investigation even began, forever changed the "true" facts of this case. Ms. Lambert has now presented her view of what really happened.

Lisa Michelle Lambert and Lawrence Yunkin began dating in 1989. He was abusive to her, sodomized her, and struck her whenever he disagreed with her. She came from a strong Christian, middle class, suburban family and she had lost her virginity to him. This meant that she was going to marry him, despite the abuse. She left home at the age of 16 and began to live with Lawrence at his parents' home. Later they moved into their own apartment and in the late summer, early fall of

Not Reported in A.2d                                                                    Page 36
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

1991, they moved to a trailer in Pequea, a rural township "across town" from East Lampeter.

Lawrence turned her from a brown haired, brown eyed, shy, Christian, suburban teenager into a lynx. He told her to dye her hair blond, which she did. He told her to make her brown eyes blue, which she did with tinted contact lenses. He told her to ditch the frumpy suburban teenage wardrobe and get something tight and short, which she did. She became Rural Barbie, with an attitude. This 19 year old lumberyard laborer, with the Adonis looks and the Svengali mind, dominated and controlled her every move. They had a sexual relationship, but she didn't like it much because he was cruel and rough. In fact, she didn't like it much for over two years.

In the early summer of 1991, Lisa Michelle, known now only as "Michelle," began to look for a way out of the relationship. She was tired of being a blond haired, blue eyed wearer of tight clothes just to please this galoot. She broke up with Lawrence, but they continued to live together and to sleep in the same bed. She even saw another man, but this was when Lawrence was sleeping, exhausted from a day of boorish behavior. While Lawrence slept, Michelle crept out of the bedroom to the outside where she encountered Allen Rudolph, her new friend. She and Allen played midnight basketball. Then Allen would pull her in the window of his house where they would sit on the floor in his bedroom, listen to rock and roll, laugh and, of course, have sex. Then she would, by the light of the early dawn, creep back into Lawrence's bed.

Lawrence found out about this and came to the swimming pool where she was sunning herself in a bikini, although she really didn't like wearing small tight clothes. Lawrence threw all of her clothes out of the van, all over the swimming pool and screamed at her for four or five hours. This caught the attention, and the affection, of Michael Pawlikowski, a life guard at the pool. He became romantically, but not sexually, involved with Michelle through the rest of the summer.

**\*35** On June 17, 1991, around the time when Michelle had broken up with Lawrence but was still sleeping with him, was sleeping with Allen but not dating him, and was inadvertently catching the eye of Mike the life guard, she was gang raped by three police officers. As she lounged at

twilight in her living room in her bikini after a day of sunbathing, three police officers came to her door. They were able to open the door because Lawrence had broken the window pane one day. The three officers raped her. She heard each of them speak but she couldn't see them. She could only see their police badges reflecting light off the street lights coming in through the window.

Michelle's first response to this rape was to call Mrs. Show, the mother of Laurie Show. She called Mrs. Show because Lawrence was, at that time and for a period of one week, dating Laurie Show. She called Mrs. Show to find out where Lawrence was. Mrs. Show didn't quite understand the question because it was hidden among a screaming barrage of obscenities, profanities and threats against her daughter. Michelle then called a number of other people looking for Lawrence. She didn't call her parents, she didn't go to the hospital, she didn't go to a rape crisis center and she didn't go to any police officer in any other department anywhere.

She called Mrs. Show a lot that summer. She would call her to find out where Lawrence was and to tell Mrs. Show to keep her daughter away from Lawrence. Sometimes, when Mrs. Show would hang up after being called every day for several weeks, Michelle would continue to call and the phone would ring in the Show residence all evening. Mrs. Show changed her number to an unlisted one and the telephone calls stopped.

Michelle didn't think the phone calls were getting through to Laurie so she got some friends to help her with a plan to "embarrass" Laurie, to keep her away from Lawrence. They were going to go to Laurie's home, kidnap her and take her down to "the ward." [FN51] They were going to cut off her hair, take off her clothes, blindfold her, and tie her to a post. They were going to hang a sign around her indicating that she was available for sex for any of the locals. One evening, they got so far as to get in two cars and to head over to the Show residence. It was at this point that two of the teenagers decided that this sounded like a little more than a "prank" and decided to warn Laurie not to answer the door if anyone should come. They turned around and didn't go to the Show residence that evening. [FN52]

FN51. The "ward" is an unofficial, pejorative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

designation for a large area of downtown Lancaster.

FN52. Later, under oath in a courtroom, Ms. Lambert testified that this was, in fact, her plan. Her only quarrel was that she never told the kids that she was going to "slit Laurie's throat." Much later, in a federal courtroom, where Michelle, now called Lisa and represented by two lawyers from Philadelphia, said that the "slit her throat" language in a police report was a fabrication and a violation of her constitutional rights.

Time passed and Michelle discovered that she was pregnant to Lawrence, she believed with twins. Even though she lived with Lawrence miles from East Lampeter, even though Lawrence no longer saw Laurie, even though they were living worlds apart, Michelle wanted to make sure Laurie never took her man from her again. So, she asked her new friend, Tabby, to go to the Show residence with her to really scare Laurie. She told Tabby that she had arranged for Mrs. Show to be out of the home that morning. [FN53]

FN53. Recently, at the PCRA hearing, Ms. Buck testified that she knew the night before the murder that Mrs. Show was going to be gone. She had said under oath last year that she did not know it until the morning of the murder.

*36 Michelle bought a 50 foot length of rope and two ski masks from K-Mart. She took a large butcher knife from her kitchen. She told Tabby to wear sunglasses, put her hair up and leave the makeup in the bathroom.

Michelle and Tabby went to the condo a few days before Christmas. Michelle wanted to talk to Laurie. They knocked on the door and when Laurie answered, they pushed their way in and began to struggle. Michelle just wanted to talk, but Tabby wanted to cut Laurie's hair off. Tabby pulled out a knife that came from Michelle's kitchen, even though Tabby hadn't been in Michelle's kitchen that morning, and Tabby stabbed Laurie. Michelle realized that this was a bad scene. She told Tabby to stop it and she tried to pull Laurie by her wrists out of her bedroom and down the hall. This left blood all over the floor and the walls. But Tabby pulled

Laurie back in the bedroom and Michelle went outside. Michelle sat on the steps and cried because she was afraid of Tabby and worried about Laurie. Lawrence arrived and asked what had happened. Michelle told Lawrence about Tabby and Laurie. Lawrence swore at Michelle and went inside. Then Lawrence and Tabby came out and all three ran to Lawrence's car and drove home.

Michelle knew something bad happened to Laurie but she couldn't get help. She couldn't call any friends, she couldn't call the police, she couldn't tell her parents. This was because Lawrence watched her "like a hawk" and she knew he would hit her if she made a false move. So they drove home, took showers and drove Tabby to school. They ate lunch at home and Michelle watched Matlock, which would come in handy later when she was questioned by the police because she would already know about her rights. Then they went Christmas shopping. Then they went to cut down a Christmas tree at Lawrence's grandmother's house. This explains why they had ski masks, a knife and a rope. On the package of the rope, there is a picture of a man dragging a Christmas tree, which is why Michelle bought that particular rope--to pull the Christmas tree.

Last year when they were cutting down a Christmas tree with a knife at grandmom's, Michelle got wood chips in her eyes and in her hair. She got "pink eye" from the wood chips. So this year she took sunglasses and a ski mask and gloves so that she would be protected.

Then they went to Tabby's house. Tabby was watching the news and heard that the girl was dead. So they decided not to arouse any suspicion and to go about their normal Friday night business, which means they went to the bowling alley. The police came to the bowling alley and asked Tabby why she had a big scratch on her cheek. Michelle, who was afraid of Tabby and who didn't make one false move because Lawrence was watching her "like a hawk," stepped up and told the police that Tabby got the scratch in a fight with some Puerto Ricans girls who had made a pass at Lawrence that morning.

The police then took them to the station. Michelle told the police about the Puerto Rican girls and the scratch and about cutting the Christmas tree. When the police told her

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Laurie Show was dead, she started to cry, but not because she had anything to do with it. Then Corporal Raymond Solt, a Pennsylvania State Police polygraph examiner, gave Michelle a lie detector test. He strapped Velcro straps all over her arms. Then he took out a needle and told her he was going to inject her with something. Probably it was truth serum. She thought this was part of the test so she let him do it. Then he asked her some questions. She began to tell him about going to the Show condo that morning. She told him that she and Tabby went inside and that all three struggled. She said that Tabby pulled a knife and that she, Michelle, held Laurie's feet so Laurie wouldn't kick her. She then told Solt that she and Tabby left, pulled their hoods up and ran across a parking lot, across a field, down a hill, across a stream, through some woods and out onto a road, where Lawrence was waiting. She told Solt that she didn't plan to kill Laurie, that Tabby went crazy and that she held Laurie down while Tabby went crazy.

**\*37** Solt typed up her statement and she read it. She signed her name across each page of the statement. Then Solt gave her some blank papers to sign her name. She didn't understand this but she signed her name across these papers, too.

Meanwhile, the police reviewed four rolls of photographs of the crime scene. Michelle told them she tried to help Laurie escape. Michelle also told them that Tabby threw the phone across the room. When they looked at the crime scene photographs, sometime after five or six in the morning when Michelle told them this information, they realized that the photographs were wrong. If the telephone was across the room, this would mean that Michelle was telling the truth and Tabby was the killer. But the police needed to prove that Michelle was the killer, because they had gang raped her and wanted her to go to prison forever or maybe get the death penalty. There was only one thing to do: take Laurie's body back to the condo and take the pictures again.

Sometime after 6 o'clock in the morning, when Michelle's statement was finished, the police went to the county morgue, in the basement of a public building, took the body out of the morgue and put it in a police car. Then they drove to the condo where they were met by a state police officer, who agreed to take the pictures again because he got it

wrong earlier that day. First, they cleaned up all the blood in the hallway. They missed one or two footprints but most of the blood was cleaned up so the new pictures would show that Michelle was lying about helping Laurie get out of the condo. [FN54]

> FN54. If Michelle had really helped Laurie get out of the condo, there must have been blood all over the floor. The police had to clean the blood up to prove Michelle was lying.

They took new pictures of the body with the telephone cord wrapped around the leg. This would show that Michelle was lying about Tabby throwing the telephone across the room. The telephone cord around the leg would show that Michelle was the killer.

Then they got the body back in the police car, back down the highway and into the morgue. They had to do this by 9 o'clock because the autopsy was scheduled at 9 o'clock and they had to have the body back for the autopsy.

The autopsy was very important because Weaver and Savage knew they had to tell the doctors that Laurie spoke and that her carotid artery couldn't have been severed, even though they knew from Ken Zeyak, the ambulance person who had never seen a carotid artery, that the carotid was "definitely cut." So they called First Assistant District Attorney Kenneff, who prosecutes these cases. They told him what the problem was. Mr. Kenneff went to the autopsy that morning and told Dr. Penades, the pathologist, all about the carotid. Even though Dr. Penades was board certified in anatomical pathology, the prosecutors had to tell him how the carotid artery worked and that it was cut. They got Dr. Annese, a throat surgeon, to attend the autopsy. He was a good choice because he was a friend of the Show family. Together with Dr. Penades, he would say that the carotid artery was intact. They would all agree that Laurie Show could have spoken to her mother.

**\*38** This seems like a lot to happen inside one day. But the next day, police officers go to the river. Lawrence and Michelle told the police that they had put Lawrence's sneakers and a shirt in a pink trash bag and cast it into the river. They also threw the knife in the river but it was not in

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

a bag. The police go to the river two days before Christmas when the water temperature is in the thirties, and they try to figure out how they can use the river to really frame Michelle Lambert. They are looking for a pink trash bag with sneakers in it. They find the pink trash bag and they notice that one of the divers has a video camera and is filming them. So they wave at him to turn the camera off. They take Lawrence's sneakers and other items out of the bag and throw them away. Then they take the pink bag and they put it in ice. They think of a way to make it look like it was stuck in frozen ice, even though when they took the sneakers out it was not stuck in ice. Then they take a picture of the pink bag stuck in frozen ice to make it look like they never found a bag in the first place.

The next day a diver finds a sneaker which is full of mud and has black rot all around the canvas where it touches the sole. Even though the murder was three days before and it looks like the sneaker has been in the river for two years, they figure it is probably the sneaker of the murderer and they throw it away, too.

A month later, the police record the statement of Lawrence Yunkin. They have been rehearsing his statement with him for a month to make sure that he says exactly what they want him to say so they can frame Michelle. He is represented by a lawyer, who is an officer of the court and enjoys a good reputation in his community. They take a recorded statement of Lawrence but he can't seem to get the wrong story right so they have to keep stopping the tape to tell him what to say.

In the meantime, Michelle decided to cover up for Lawrence even though she knew Lawrence and Tabby killed Laurie and even though she was sorry about this and even though she didn't know what really happened. So she wrote some questions on paper and left them in a book in the prison library. Lawrence got the questions and wrote in answers. A lot of the questions looked strange because words are squeezed in, words are inserted and some of the words are written over very heavily. The answers, which Lawrence wrote on the paper, did not make sense but they could be interpreted to say that Lawrence at least knew something about the murder. Even though Michelle was covering up for Lawrence, she thought it was necessary to send him a

questionnaire to find out what he did. So that she could cover up. She got the questionnaire some time in February. Her baby was born in March. She wouldn't tell her attorney about the questions until closer to trial. Her attorney told her she might get the death penalty and that evidence linking anyone else to the crime, especially Lawrence, might help her. Still, she stuck to her guns. It was only when her attorney offered to give her a bottle of hair bleach that she came up with the questions. It was important for Michelle to bleach her hair because Lawrence wanted her to be a blond. Her need to dye her hair blond for Lawrence, even though she had been in prison for four months, was facing a murder charge and knew that Lawrence was going to testify against her, was important. It was important because she was a battered woman and Lawrence had control over her.

**\*39** At her trial in July 1992, Michelle decided not to cover for Lawrence anymore. She told the judge that she went to the condo that morning to talk to Laurie. When they got inside, Tabby went crazy and Michelle tried to help her. All she did was sit on Laurie's legs while Tabby attacked her. Then she ran outside to the steps and that is when Lawrence came in.

She was interviewed before trial by Dr. Carey, a psychiatrist. She told Dr. Carey about the gang rape but asked him not to mention it. Dr. Cary testified about his evaluation of Michelle. He felt she was abused and controlled by Lawrence and that she had been extremely upset about Lawrence's attentions to Laurie. He found it significant that Michelle had only ever been with one man and that she was true and faithful to Lawrence. Six years later in a post conviction hearing, Michelle was asked about Allen Rudolph and why she didn't tell Dr. Carey about sneaking out at night with Allen. Michelle testified that she did tell this to Dr. Carey but he had a hearing aid and didn't hear her.

Michelle was convicted of first degree murder and given a sentence of life in prison. While in a women's prison in Cambridge Springs, Pennsylvania, she was brutally raped, beaten and kept in isolation for 18 months. Because of the mistreatment she received at this prison, she was unable to help the lawyer whom her parents hired to file her appeal. She couldn't tell him the true story. That is why her

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

conviction was affirmed by the Superior Court of Pennsylvania and that is why the Pennsylvania Supreme Court denied the request for review.

She was eventually transferred to a prison in Delaware; then transferred again to a prison in New Jersey. At the prison in New Jersey, she wrote in her own hand a federal habeas corpus petition. Attorneys were appointed for her from a large Philadelphia law firm and she went to court in April 1997 before a federal judge in Philadelphia. He understood the truth of this case. He knew that the police were corrupt and that they changed the evidence. He knew that the statements she gave to Solt were really made up by the police. He knew that all they were doing that morning at the condo, with a knife and a rope, was a "teenage prank." He knew that the dying declaration was phony because an EMT saw the severed carotid artery and a speech professor, who did not, said there is no way Laurie could have spoken. He saw through to the truth that police officers, in response to a horrifying murder scene, saw the fortuitous opportunity to frame a teenage girl because they had gang raped her. He knew that she was telling the truth because she was a battered woman and any inconsistencies in her story were because she had been battered. He knew that the "29 questions" really was nothing more than a confession by Lawrence and that it was a reliable document. He knew that a state court trial judge had found the dying declaration to be credible and had ruled that the "29 questions" was unreliable and inconclusive. He didn't know that the police carried the body back into the condo and he didn't know that the police injected Michelle with truth serum before they took her statement. He didn't know this because Michelle's lawyers didn't learn about this until later, after the habeas proceeding.

**\*40** So, even though Michelle was in the condo that morning and even though Michelle had a demonstrated history of hatred and animus toward Laurie, and even though two versions of Michelle's story not only put her in the condo that morning but had her involved in the struggle leading to Laurie's death, he found her to be "innocent" and declared her a victim.

This is the story line which flows logically from the individual allegations of misconduct and "new evidence."

Item by item, the allegations of prosecutorial misconduct taken out of the context of Ms. Lambert's entire story make this look like a corrupt and unreliable prosecution. But in order to accept them and find them true, it is also necessary to accept their place along this story line.

The above scenario is an understatement. It is a bare boned description of what must have happened in 1991 and through the progress of this case, according to petitioner. This is the context as seen by Ms. Lambert for the claims she has presented to this court.

## VII. LISA MICHELLE LAMBERT'S CASE: ISSUES AND DISCUSSION

### A. Laurie Show's Dying Declaration

The "dying declaration" is in this case simply because a federal judge disagreed with this court's assessment of the facts at trial. At the core of this issue is the credibility of Hazel Show. The expert testimony is relevant to support or question her veracity on this point.

With an attitude that does not even suggest deference to the state court's fact finding, the federal district court dismissed the "keystone" of the 1992 verdict at the start of his analysis:

It became clear during the hearing that this keystone of the Commonwealth's case must be removed, and by that fact alone the arch of guilt collapses.

Lambert v. Blackwell, 962 F.Supp. at 1528.

That choice, to reach back five years into a state court record which had been reviewed and affirmed on appeal and to change this court's finding of a crucial fact, has become another keystone. That choice, which was a keystone of the district court's decision, now supports petitioner's case.

Mrs. Show testified in the 1992 trial that her daughter Laurie made a dying declaration to her in which she identified Michelle Lambert as the killer. Mrs. Show testified in 1992 that she came upon her daughter in her bedroom, that she took her head and shoulders into her arms and she cradled her, after cutting the rope that had been tightened around Laurie's throat. (N.T., Trial at 792- 93.) As she cradled

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Laurie's head in her arms, Laurie uttered the words, "Michelle did it...Michelle...Michelle...I love you...I love you...I love you...I love you...I love you." (N.T., Trial at 793, 795, 818.)

Whether this dying declaration ever occurred was a central issue in the 1992 trial. It was a central issue in the federal habeas proceeding in 1997 and was perhaps *the* central issue in the PCRA hearing. No less than six expert witnesses testified at the PCRA hearing regarding the medical and physiological issues presented by the dying declaration.

**\*41** This court found Mrs. Show to be a credible witness on this and other topics in the 1992 trial. *See* Commonwealth v. Lambert, July 19, 1994, slip op. at 17-18. We found her to be credible by observing her testimony in the courtroom on the witness stand as she related her recollection from the morning of December 20, 1991. We further considered her conversations with medical personnel and others at the scene of the murder on the morning of December 20, 1991. We knew in 1992 that she related almost immediately that "Michelle" committed the murder and that it was a "set up." Her recollection from that morning and the information in the police reports show that she, at some point, told investigating police officers that her daughter spoke those words to her.

At the 1992 trial, we also had the benefit of the testimony of Dr. Penades, the pathologist who performed the autopsy on Laurie Show, and Dr. Annese, an otolaryngologist who attended the autopsy specifically to observe the structures of the neck and to offer an opinion of the possibility of speech. The defense called Dr. Mihalakis, who ruled out the possibility of clear and normal speech but who acknowledged that Laurie Show was capable of "somewhat slurred and less intelligible" communication consistent with the dying statement. (N.T., Trial at 344-45, 357.)

With the benefit of this evidence, the court made a decision in 1992 that the dying declaration took place, that Mrs. Show was credible on this point, and that the dying declaration linked Ms. Lambert to the murder.

The PCRA petition raises a number of counts of after-discovered evidence which petitioner contends cast doubt on the dying declaration. Specifically, petitioner contends that Laurie Show's left carotid artery was severed, (Exhibit A, Section A at para. 1), that Laurie Show could not have been conscious at the time she made the dying declaration, (Exhibit A, Section A at para. 2), and that speech was medically impossible, according to Charles R. Larson, Ph.D., (Exhibit A, Section A at para. 59). Further, petitioner cites as after-discovered evidence certain credibility questions which impact on the 1992 testimony supporting the dying declaration: that Dr. Mihalakis was paid more by Lancaster County after the 1992 trial, (Exhibit A, Section A at para. 17); that Dr. Mihalakis changed his testimony, (Exhibit A, Section A at para. 18); that Dr. Annese compromised his testimony because of his familiarity with the Show family, (Exhibit A, Section A at para. 60); and that Mrs. Show did not tell anyone that Laurie said "Michelle did it" until nearly two hours after the murder, (Exhibit A, Section A at para. 61).

The federal district court found that Ms. Lambert proved to him "at least by clear and convincing evidence that Laurie Show could not have said 'Michelle did it'." Lambert v. Blackwell, 962 F.Supp. at 1529. In so doing, the federal district court ruled that Mrs. Show was not credible on this point, despite the fact that he did not have an opportunity to hear and observe her testimony in 1992. Further, the federal district court based its finding on "evidence" that Laurie Show's carotid artery was cut, thereby rendering speech impossible. He based this finding on the testimony of an EMT, who admittedly had minimal, if any, training in anatomy, and on the testimony of a speech professor from Northwestern University, Dr. Larson, who never observed Laurie Show's body, who did not attend her autopsy, who is not a medical doctor, whose sole surgical experience is limited to monkeys, and who was willing to offer opinions far outside his area of expertise. [FN55] The federal district court was able, somehow, to overlook the testimony of Dr. Penades from the 1992 trial, as well as the testimony of Dr. Annese from the 1992 trial. Each of these witnesses had, literally, hands-on contact with the structures of the neck of Laurie Show during the course of the autopsy. [FN56]

FN55. Dr. Larson's opinions as to the possibility of speech were, in effect, medical conclusions.

FN56. It is interesting to note that the federal

district court sought to discredit the trial testimony of Dr. Penades by reference to an interview he gave to a reporter from the Lancaster *New Era* and reported in that newspaper on April 1, 1997. It appears that the reporter, Andrea S. Brown, testified in the habeas proceeding as to her conversation with Dr. Penades. The district court noted that Dr. Penades "may well have retracted most or all of his trial testimony" in that interview. *See* Lambert v. Blackwell, 962 F.Supp. at 1528-29 n. 13. The testimony of Ms. Brown was offered by petitioner in this case. We ruled that Ms. Brown's testimony as to an out-of-court statement made to her by Dr. Penades, and, offered for its truth, was hearsay.

**\*42** At the PCRA hearing, petitioner produced Dr. Larson to testify about the mechanisms of speech. He made a thorough and interesting presentation on how the various structures of the neck and mouth and respiratory system work together to produce speech. He offered this as a prelude to his expert opinion that it was not possible for Laurie Show to articulate intelligible speech. Dr. Larson contends it was not possible for Laurie Show to say "Michelle did it." (N.T ., PCRA at 2414-15.) He offered this opinion without ever having had the opportunity to observe the structures in Laurie Show's neck and relied exclusively on crime scene and autopsy photographs, the autopsy report and testimony at the various prior hearings. (N.T., PCRA at 2442.)

Dr. Larson also offered an opinion that the left carotid artery on Laurie Show was severed. (N.T., PCRA at 2381.) Dr. Larson, whose knowledge of human anatomy, albeit well articulated and detailed, is limited to charts, diagrams, photographs, transparencies, past experience performing experimental surgeries on live monkeys and, apparently, the occasional experiment with a cadaver, was called to offer an opinion as to the integrity of the anatomy of a crime victim whom he never observed. Would that this were not enough, he never offered an opinion as to the significance of the cut carotid. Petitioner's counsel apparently chose to leave these conclusions to the medical witnesses who, indeed, did address the significance of "the cut carotid."  [FN57]

FN57. There is little question that Dr. Larson appeared as much as an advocate as he was an expert witness. In the federal proceeding, he took a somewhat more aggressive posture. There, Dr. Larson offered an opinion that the carotid artery was cut and went on to say that this meant, in short, that Laurie Show could not possibly have spoken. (N.T., Habeas Hearing at 54, 61, 73.) It was enough of a stretch for him to say that the carotid was cut. He went completely beyond his realm of expertise into the realm of medical opinion by testifying on the significance of the cut carotid. (N.T., Habeas Hearing at 73-74.) Perhaps because the evidentiary standards are different from federal to state court, Dr. Larson was not asked about the significance of the cut carotid artery at the PCRA hearing. In addition, when asked by Mr. Madenspacher in federal district court how he reconciled his testimony with the testimony of the two physicians who actually looked into the neck of Laurie Show and observed that the carotid was intact, Dr. Larson simply stated that he believed they were not telling the truth. (N.T., Habeas Hearing at 112-13.)

Dr. Larson testified that the cut on Laurie Show's neck was between the thyroid cartilage and the hyoid bone. He gave his opinion that this injury would cause the tongue to, essentially, lose its anchor, resulting in movement of the tongue up into the pharynx. Dr. Larson testified that the trauma to the neck would have caused the tongue to change its position and occlude the air passage necessary to create speech. (N.T., PCRA at 2418.) Dr. Larson appeared to this court to be knowledgeable about the speech process. He could say what would happen if a certain portion of the vocal tract is impaired or destroyed. He could not, however, testify with any expertise about what actually might happen to the structures effecting the vocal tract given certain physical injuries. His knowledge in this area is only theoretical. He must make certain assumptions about the impact of certain trauma on the vocal tract. With these assumptions, he can then conclude what the possible effect on the victim's ability to form words, syllables or sounds might be. Perhaps if Dr. Larson's analysis of the mechanisms of speech had been supported by credible and persuasive

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Page 43

medical testimony, his opinion and explanation might have been more helpful to the court. The medical witnesses offered by petitioner did not provide the necessary medical support for Dr. Larson's theoretical explanations of the process of human speech.

Michael M. Baden, M.D., was the first medical expert called by petitioner. He is a forensic pathologist from New York City and has extremely impressive credentials. He was originally contacted by the Commonwealth, who decided not to call him as a witness after receiving his report. (*See* Report of Dr. Baden, Petitioner's Exhibit 3011.) They disclosed the report to petitioner and petitioner's counsel called Dr. Baden.

**\*43** His opinion, in essence, was that Laurie Show would have died within a few minutes of receiving her wounds. He felt she would have had to lose consciousness within three minutes and suffer brain death within two minutes after that. (N.T., PCRA at 3165-66.) If her left carotid was severed, she would have lost consciousness within a minute or so. (N.T., PCRA at 3169.)

There were several troubling aspects to Dr. Baden's evaluation. His report referred to the victim of this case as Lisa Michelle Lambert. [FN58] Dr. Baden also opined from his review of the autopsy report and testimony relating to the autopsy that there was no dissection of the neck. (N.T., PCRA at 3175.) He believes there was an obligation to dissect the neck. (*Id.*) In fact, the testimony of the physicians who performed the autopsy, and the physicians who took the time to review the autopsy report, was that the larynx and trachea were dissected from the neck and the carotid examined. (N.T., PCRA at 6845.) While it does not appear that the carotid artery was taken apart, piece by piece, while it lay inside the neck of the victim, it was dissected and tied off. It was Dr. Penades who noted upon examination of the carotid artery after the neck had been dissected that the carotid was not cut and that it was intact. (N.T., Trial at 96.) How Dr. Baden could offer an opinion as to the autopsy procedure and the integrity of the carotid artery in light of this clear testimony and statement in the report defies belief. He created the impression for this court that his analysis may well have been hurried in the midst of other pressing matters.

FN58. In fact, he testified that he did not review the report and noted that he really meant to say that the victim was Laurie Show. (N.T., PCRA at 3158.)

Dr. Baden focused more on the cause of death and the time of death in relation to the time of the infliction of the injuries. He gave a range of time within which Laurie Show would have lived given certain assumptions as to the nature and extent of the injuries to her neck. He specifically noted that he could not tell from the autopsy photographs whether the carotid artery was severed. He made the statement that an EMT would be in a better position to give an opinion as to the carotid artery given the EMT's opportunity to observe the injury at the scene. [FN59] (N.T., PCRA at 3197.) He offered no support for this belief. Dr. Baden appeared to this court to beg the issue of whether the carotid artery was, in fact, cut by deferring to the observations of the EMT, Ken Zeyak, who testified earlier in the hearing. With the opportunity to observe Dr. Baden on the witness stand and to attempt to reconcile his testimony with other evidence in the case, we found this statement to be patently unbelievable. Later in the hearing, Dr. Levin, a throat surgeon, testified that medical students and medical residents who observe neck surgery are often unable to pick out structures in the neck and throat area without guidance from a more experienced physician. (N.T., PCRA at 6244.)

FN59. Dr. Burton expressed serious reservations about Dr. Baden's judgment in making that statement. He stated, when asked about Dr. Baden's willingness to rely on the diagnosis made by an EMT: "My belief is that testimony will haunt Dr. Baden." (N.T., PCRA at 6980 .)

We believe it is likely that Dr. Baden was attempting to be respectful of other witnesses in this proceeding and that his choice to "defer" to the EMT testimony was, in reality, a way of saying that he, himself, could not tell whether the carotid artery was cut. Dr. Baden did not offer an in-depth discussion of the impact of the neck wounds of Laurie Show on her mechanisms of speech. This would have been the medical testimony necessary to give support and credence to Dr. Larson's explanation of the speech processes. Dr. Baden provided no significant medical support for Dr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Page 44

Larson's opinion regarding the mechanisms of speech involved in this case.

**\*44** Petitioner's next dying declaration expert was John E. Smialek, M .D., chief medical examiner for the State of Maryland. Dr. Smialek offered an opinion that was interesting but implausible given other evidence in the case. According to Dr. Smialek, Laurie Show did not die from the horrific lacerations to her neck. Rather, she bled to death from the stab wound to her back. (N.T., PCRA at 3276-77.) In fact, she bled to death so quickly from the stab wound that she was dead when her throat was cut, according to Dr. Smialek. We know that the throat was cut before Ms. Buck and Ms. Lambert left the condominium and we know that Laurie Show demonstrated signs of life to a number of personnel, medical and otherwise, that morning. Thomas Chapman felt a pulse and observed Laurie move her leg, (N.T., PCRA at 914), Charles Robert May noted faint ventricular fibrillation, goose bumps and lip movement, (N.T., PCRA at 1430-32, 1434), Lisa Hinkle Billiter observed ventricular fibrillation some time after Mr. May, (N.T., PCRA at 1018), and Mrs. Show observed Laurie communicating the identity of her killer, (N.T., PCRA at 5658). For Dr. Smialek to be believed, all these other witnesses would have to be completely disbelieved.

Dr. Smialek offered an interesting medical view of an alternative scenario. He did, however, note that it was impossible to tell from the autopsy photographs whether the carotid artery was severed. (N.T ., PCRA at 3282-84.) Dr. Baden also found it difficult to tell from the photographs if the carotid was severed. (N.T., PCRA at 3197.) These two experts, called by petitioner, cast serious doubt on the witness who appeared to provide the most convincing testimony to the federal district court: Ken Zeyak.

Mr. Zeyak was at the time a volunteer EMT and was the first of the medical personnel to arrive in the condominium that morning. Mr. Zeyak had EMT training for five months, eight hours per week. He believes he learned the location of the carotid artery in basic anatomy. He admitted that the training he received as a registered nurse, subsequent to this incident, provided him with much more anatomy training. He recalled a clear observation of the left carotid and noted that it was severed, it was spasming and no blood

was coming from the artery. (N.T., PCRA at 706.) He has never in his life seen an autopsy nor seen an exposed carotid artery. (N.T., PCRA at 718.) He has no good idea of the basic anatomy of the neck as was evidenced by his answers on cross-examination. (N.T., PCRA at 719-723.) In his EMT training he never observed an autopsy, never observed surgery, never looked at a cadaver, never viewed a model of the neck structures, though he believes there may have been diagrams of the carotid in one of his anatomy texts. (N.T., PCRA at 718, 746-47.) It was interesting and instructive as to Mr. Zeyak's credibility that he was able to identify the carotid artery on photographs, (Petitioner's Exhibit 1514A; N.T., PCRA at 743), which were of no help to two world famous forensic pathologists, Drs. Baden and Smialek. [FN60]

> FN60. In fact, what Mr. Zeyak identified as the severed carotid artery was later identified by Roger J. Levin, M.D., as musculature, which was partly torn by the knife.

**\*45** Dr. Levin, a professor of otolaryngology at the Penn State College of Medicine in Hershey, Pennsylvania, testified in the Commonwealth's case. Dr. Levin also testified at the federal habeas proceeding in 1997. Dr. Levin performs surgery on the neck at least three times per week. Much of his experience is in the oncology field and he has some experience in traumatic injuries to the neck and throat.

Dr. Levin testified that it was "very unlikely" that Laurie Show's carotid artery was cut. (N.T., PCRA at 6172.) He based this on the autopsy report and autopsy and crime scene photographs. In direct contradiction of Mr. Zeyak, Dr. Levin testified that he could not see the carotid artery, much less a cut carotid artery, on any of the autopsy photographs. He opined that the carotid artery lies deep to the sternocleidomastoid muscle and offered his opinion from the photographs that the sternocleidomastoid muscle was intact on Laurie Show. (N.T., PCRA at 6175.) According to Dr. Levin, several of the "strap muscles" anterior to the sternocleidomastoid muscle were severed and a portion of the sternocleidomastoid muscle was cut but the muscle itself was intact. This suggested to Dr. Levin that the carotid was intact as well. Further, Dr. Levin noted that in Dr. Penades's autopsy report the carotid was observed and found to be

Not Reported in A.2d                                                                                     Page 45
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

uncut and intact.

  Dr. Levin opined that Laurie Show could have been alive and that medically speaking, she had the capacity to utter weak, breathy sounds such as her mother described. (N.T., PCRA at 6185-86, 6188.) Dr. Levin also testified that with the head cradled in the fashion described by Mrs. Show, the internal airways could have been sufficiently closed to allow air passage through the larynx such as to create some speech. He believes it would not have been a complete closure and that air would have been escaping through the holes in the neck, but that some closure sufficient for speech could have been achieved.  [FN61] (N.T., PCRA at 6186-87.)

> FN61. Dr. Levin testified at the PCRA hearing and in federal court that, at least theoretically, the injury to Laurie Show's neck could have been repaired. He acknowledged the difficulty transferring her to a competent trauma center and does not believe the failure of medical personnel to resuscitate her was in any way remiss. Simply by way of comparing this wound to other damage to the throat and neck which he has observed in surgery, he offered the opinion that under ideal circumstances, a correction could have been made. The medical school professor and throat surgeon was then questioned:
>
> THE COURT: So it is your testimony you could have fixed this?
>
> THE WITNESS: Sure.
>
> THE COURT: That it would all be--just like that (snapping fingers)?
>
> THE WITNESS: Oh, not like that, but a tracheostomy, but it is certainly repairable. BY MR. GREENBERG:
>
> Q. Well, is it your testimony that we don't need you to fix it, that it would just fix by itself?
>
> THE COURT: Heal by itself, like a wound on the fingers?
>
> THE WITNESS: No. I think it needed to be closed, but I think had it not been closed, over time it would have closed, assuming she could have breathed.
>
> THE COURT: And it would all grow back together

and she'd be normal.
THE WITNESS: Yes. Essentially.
THE COURT: Do you also think that severed limbs regenerate themselves?
THE WITNESS: No, they don't.
(N.T., Habeas Hearing at 2777-2778.)

  Dr. Burton, a forensic pathologist from the Atlanta area, testified on behalf of the Commonwealth as well. Dr. Burton was the only medical witness who acknowledged that medicine has its limits. He testified as to the physiology and the anatomy involved in speech, particularly in the victim of this crime. (N.T., PCRA at 6873-74.) He also testified that frequently events occur which appear to be impossible from a medical standpoint. (N.T., PCRA at 6886-88.) Dr. Burton, in addition to providing thorough and interesting medical testimony, articulated the central issue for the analysis of all these expert opinions: the experts are talking about that which is possible or impossible strictly from a medical or scientific perspective. Dr. Burton was the only medical expert who assessed the situation taking into account the medical facts *and* the clinical picture. (N.T., PCRA at 6875, 6955-56.) Dr. Burton testified that the presence of Mrs. Show may have stimulated and aroused Laurie. (N.T., PCRA at 6875.) Dr. Baden and Dr. Smialek were impressive with their knowledge and their background, but neither acknowledged the need to consider the clinical picture in the context of the medical possibilities. The clinical picture in this case is what Mrs. Show saw and heard and did.

  **\*46** Dr. Burton offered the following expert opinions: (1) there was no anatomic evidence that Laurie Show could not speak, (N.T., PCRA at 6873, 6884- 88); (2) there was no forensic or medical evidence that the carotid artery was severed, (N.T., PCRA at 6840, 6844, 6865, 6981); (3) he could not identify the carotid artery in the autopsy photographs, (N.T., PCRA at 6841, 6988-89); (4) Laurie could have been conscious when her mother returned to the condominium, (N.T., PCRA at 6884, 6884-88); and (5) the carotid had been dissected by Dr. Penades, (N.T., PCRA at 6927, 6981-82).

  Dr. Ross, the forensic pathologist for Lancaster County, was the last medical expert to testify on behalf of the Commonwealth. Dr. Ross took exception to most, if not all, of the expert opinions offered by Drs. Baden and Smialek.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 46
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Unlike his colleagues, Dr. Ross believes that (1) Laurie was conscious when her mother came home, (N .T., PCRA at 7329-30, 7332-33, 7354, 7400-01, 7404-07), (2) cradling Laurie's neck could reestablish her airway and make speech possible, (N.T., PCRA at 7361-62, 7388-89), (3) Laurie was capable of speech, (N.T., PCRA at 7363, 7401-02, 7403), (4) Laurie was alive when the neck wound was inflicted, (N.T., PCRA at 7310), (5) the carotid artery was not severed, (N.T., PCRA at 7302, 7378), and (6) Dr. Penades did dissect out the neck, (N.T., PCRA at 7366). Dr. Ross, however, did agree with the defense experts on one thing: one cannot identify the carotid artery on the autopsy or crime scene photographs. (N.T., PCRA at 7369.)

This collection of expert opinions all goes to whether the testimony of Mrs. Show in July 1992 was credible. Experience teaches that expert opinion is sometimes helpful, sometimes not. Experts once thought the world was flat. Dr. Burton's admonition that we must look at the clinical picture in conjunction with the medical evidence is most helpful. Drs. Levin, Ross, Penades, Annese and Burton all testified that what Mrs. Show perceived was possible. They did not say it happened, they did not say it did not happen. They only said that what Mrs. Show observed was medically and physiologically possible.

For purposes of our PCRA hearing, all this testimony comes under the heading of "after-discovered evidence." The court must inquire as to whether this evidence was unavailable at trial, is exculpatory and whether it would have changed the outcome of the trial. Reese, 444 Pa.Super. at 44, 663 A.2d at 209. On the first issue, all of this evidence was available at trial. The essential facts, the autopsy photographs, the autopsy report and the essence of the dying declaration, were all well known in 1991 and 1992. Had petitioner chosen to do so, she could have called expert witnesses to testify as to what Drs. Baden, Smialek and Larson said at the PCRA hearing. Nothing about the essential facts as to the dying declaration has changed. The only after-discovered evidence is the expert analysis of those facts. This court does not believe that an expert's opinion is after-discovered evidence. Expert opinion may well be a subsequent interpretation of the available evidence and might be "after-discovered" in the sense that no one inquired as to these opinions at the time of the trial. But the essential facts,

the evidence on which the opinions are based, are the same today as they were in 1991 and 1992.

**\*47** Is the after-discovered evidence exculpatory? The opinions are mixed and there is a disagreement among the experts as to whether Laurie Show could have spoken. Certainly the opinions of experts who testified favorably as to petitioner would be exculpatory as to her position. Yet these are only exculpatory *opinions,* not exculpatory facts or evidence.

Finally, would the new "opinions" have changed the outcome of the trial? This court has considered the expert opinions in 1992 and the expert opinions in 1998 and finds nothing that would have changed the verdict in this case. The testimony of Dr. Larson, a speech professor, was informative but largely in a theoretical sense. He "picked out" the carotid artery on the autopsy photographs and offered an opinion that it was severed. But Drs. Baden, Smialek, Levin, Burton and Ross, all medical doctors, said that they could not determine whether the carotid artery was severed from a review of the same photographs. Dr. Larson's opinion as to the impact of the neck wounds on the movement of Laurie Show's tongue was disputed by Drs. Levin, Burton, and Ross. No medical witness called by petitioner was able to give credible supporting medical testimony for Dr. Larson's explanation. Dr. Larson's understanding is based largely on charts, diagrams and photographs. In the face of the overwhelming medical evidence presented by the Commonwealth, both at trial and at the PCRA hearing, his expert opinion fell short.

In an analysis of whether the new "opinions" would have changed the outcome of the trial, we begin with the testimony of Mrs. Show. We found her to be credible in the 1992 trial. At that time, the court had the benefit of the testimony of Dr. Penades and Dr. Annese, both of whom carefully observed the structures in Laurie Show's neck during the autopsy. We found them to be credible. Based on their examination of the neck wound, the vocal tract, and the structures of Laurie Show's neck during the autopsy, they offered opinions which have yet to be contradicted in any credible way.

Petitioner's case, led principally by Dr. Larson, assumes that

Laurie Show's carotid artery was cut. The court is asked to conclude on this basis that there was no possibility of speech and that death followed the infliction of the wounds in a very short period of time. We find that there is conclusive evidence that the carotid artery was not cut. Petitioner would have this court ignore the autopsy report and the testimony of Drs. Penades and Annese. In the alternative, petitioner would have us believe that the autopsy report was falsified and that these two physicians lied under oath about findings in the autopsy. We simply find no support anywhere in this case for that argument. We observed Drs. Penades and Annese testify, we considered their testimony and find no basis to conclude that they were lying.

The testimony of the EMTs carries no weight on this issue. Only Mr. Zeyak is sure that the carotid artery was cut but he did not, and does not, have the medical expertise to make this finding. Dr. Baden's and Dr. Smialek's testimony that Laurie Show would have died, or would have been without brain function, before Mrs. Show arrived is contradicted by witnesses at the scene who observed signs of life. The medical personnel and neighbors arrived well after Mrs. Show came back into her home and found her daughter. The more credible and persuasive expert testimony was that of Drs. Levin, Burton, and Ross.

**\*48** This "battle of the experts" has not shaken the credibility of Mrs. Show on this issue. Petitioner contends that Mrs. Show did not tell anyone that Laurie said "Michelle did it" until nearly two hours after the murder. (Exhibit A, Section A at para. 61.) Lisa Hinkle Billiter, the registered nurse on Community Hospital's life support unit which responded to the scene, testified that after attending to Laurie, she and the other medics left the bedroom and approached Mrs. Show in the living room to inform her that they were unable to do anything further for her daughter. At that time, Mrs. Show "explained that she felt that Laurie had--that she'd been setup, that she had been made to go to the school for a guidance counselor appointment that was never to occur, and that Lisa had--or excuse me--that Laurie had said to her Michelle did it." (N.T., PCRA at 1025-26.) This statement  [FN62] by Mrs. Show occurred well before her police interviews and reveals that petitioner's contention that the dying declaration was "suggested" to her by the

police is baseless.  [FN63]

> FN62. This statement was admitted under the "excited utterance" exception to the hearsay rule.

> FN63. The federal district court, in support of its conclusion that the vagus and laryngeal nerves were severed thereby making speech impossible, dismissed Mrs. Show's testimony of the dying declaration as the rantings of a hysterical woman in such emotional upheaval that she could not accurately recall whether, in fact, her daughter spoke to her before her death or whether some unscrupulous policemen exploited the situation for their good by suggesting that her daughter spoke. The court stated:
> At the end of her dramatic testimony...Mrs. Show reiterated her belief that her daughter said, "Michelle did it."... We have not the slightest doubt that this constitutes Mrs. Show's sincere belief. But amid the maelstrom of emotions that day, it is not hard to see how she could be mistaken--or, worse, suggested--into this belief. The earliest accounts by East Lampeter Police, as confirmed by their testimony before us, was that Hazel Show, understandably hysterical, repeated over and over, 'It was a setup! Michelle did it!' ... It was at this world-ending time a small step to make her deduction into a recollection that her daughter said those words. And it is a measure of the depressing record before us that we cannot exclude the possibility that some law enforcement official suggested this small step to her.
> 962 F.Supp. at 1529 n. 13 (citations omitted).

No expert has established that it would have been impossible for Laurie Show to speak. In fact, competent and credible expert testimony proves in a clear and convincing way that the dying declaration was possible. No evidence was presented in 1992 or has been presented in the PCRA hearing which would cause this court to change its finding that Mrs. Show was credible in 1992 when she testified as to her daughter's dying declaration. The expert opinions in 1998, had they been presented in 1992, would not have changed the outcome of the case.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 48
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

B. The "29 Questions"

The "29 questions" is a document which was passed between Ms. Lambert and Mr. Yunkin at the Lancaster County Prison between the time of their arrest and Ms. Lambert's trial. [FN64] How can a document which was of no consequence to the fact finder in 1992 take on significance six years after the trial? Petitioner contends that certain after-discovered evidence regarding this document gives it added weight and points toward the culpability of Mr. Yunkin and away from the culpability of Ms. Lambert. The after-discovered evidence is the fact that Lawrence Yunkin was probably not truthful and forthcoming in his testimony about the "29 questions" in the 1992 trial.

> FN64. The document actually contained 31 questions and answers, but only 29 of these are numbered. During the 1992 trial and the post verdict hearing and arguments, the document was referred to as the "questionnaire." During the PCRA hearing, counsel and the witnesses referred to this document as the "29 questions" and that designation will continue in this discussion.

That would have, perhaps, some significance to this court as the fact finder in the PCRA context had the court given any weight to Mr. Yunkin's testimony in the first instance. This court made clear in its opinion on the post verdict motions that it did not find Mr. Yunkin credible and had many reservations about the veracity and reliability of the "29 questions." *See* Commonwealth v. Lambert, July 19, 1994, slip op. at 11-12.

All Mr. Yunkin really said about those questions and answers is that he remembered a similar document, that he recalled the questions being written in pencil and that he wrote answers in pen. (N.T., Trial at 274-79.) He believed that the document marked Petitioner's Exhibit 1119 at the PCRA hearing and Defendant's Exhibit 5 at the 1992 trial was not the document on which he actually wrote. (N.T., Trial at 276.)

**\*49** At the 1992 trial, the defense produced John C. Gencavage, a handwriting expert who examined the document. He offered his opinion that the document

contained no erasures and no graphite, indicating that there had been no pencil writing on the document. (N.T., Trial at 869.) Mr. Kenneff stipulated to this testimony on the basis that he had the document examined by a Pennsylvania State Police document examiner as well. (N.T., Trial at 888-89.) There was never any effort by the Commonwealth to hide what Mr. Yunkin said or to somehow bolster what Mr. Yunkin said with expert testimony. Mr. Kenneff freely and openly acknowledged that his expert's analysis of the document was consistent with the defense expert and these expert opinions were both inconsistent with Mr. Yunkin's testimony.

Mr. Kenneff made the appropriate argument that these facts went to the veracity of Mr. Yunkin and the reliability of the document. Mr. Kenneff further argued that the court was free to accept all, part, or none of the document and the testimony regarding the document. [FN65] (N.T., Trial at 1231-32.)

> FN65. In the federal habeas proceeding, the district court appeared to find something wrong with this argument. In fact, it is an elementary tenet of the law that a fact finder is always free to accept all or part or none of the evidence offered. *See* Pa. SSJI (Crim) No. 4.17(1) ("[Y]ou must judge the truthfulness and accuracy of each witness's testimony and decide whether to believe all or part or none of that testimony"), citing Commonwealth v. Williams, 323 Pa.Super. 512, 521-22, 470 A.2d 1376, 1381 (1984); Commonwealth v. Dolny, 235 Pa.Super. 241, 250-51, 342 A.2d 399, 404 (1975). To somehow suggest that the prosecutor was dishonest for making this argument or that the court was less than alert for accepting the argument is simply to misunderstand basic criminal trial practice.

In 1992 and today, this court assessed the "29 questions" as inherently suspicious and of very little help to the fact finder. (A copy of this document is attached to this opinion in the "Addendum to Opinion.") To say this document is a "confession" by Mr. Yunkin [FN66] is simply wrong. This is a document which contains answers which are barely responsive to the questions. The questions contain words

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 49
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

which are crammed in the spaces and the questions are, if nothing else, entirely self-serving. A number of possibilities exist. One is that Mr. Yunkin did, in fact, answer a questionnaire which was written in pencil and that Ms. Lambert then traced his answers onto another document all in pen. This would alleviate the erasures and the traces of graphite. Another possibility is that there were several such documents circulated between Ms. Lambert and Mr. Yunkin. At the PCRA hearing, Petitioner's Exhibit 1474 was offered into evidence. This was a copy of another questionnaire which appears to be in the same or similar handwriting as appears on Petitioner's Exhibit 1119.

> FN66. *See* Lambert v. Blackwell, 962 F.Supp. at 1529-1532.

The "29 questions" does not take on the stature of after-discovered evidence simply because a federal judge disagreed with a state judge's analysis of the document's importance. Perhaps the "29 questions" would have raised a reasonable doubt to the federal judge and perhaps, standing alone, this inherently unreliable document would have served as the basis for his conviction of Mr. Yunkin.

The reality of this case is that the "29 questions" was fully and well considered in the 1992 trial. Mr. Shirk made every possible use of this document, pointing out to the court that Mr. Yunkin appeared to have made admissions as to his involvement in the murder, that Ms. Lambert's story that she was covering for Mr. Yunkin is buttressed by the "29 questions" and that, if nothing else, the "29 questions" created a reasonable doubt as to who was actually in the condominium and who actually killed Laurie Show. Subsequent discussions of that document have not changed this court's mind as to its importance in 1992 or today.

**\*50** Mr. Kenneff never hid his belief that Mr. Yunkin was not being forthright about that document. In truth, no one involved in the 1992 trial could quite figure out who wrote what on that document and what it meant. Had the Commonwealth been able to use that document in a way to implicate Mr. Yunkin, this court believes the Commonwealth would have done so. At no time in 1992 did the Commonwealth evidence any interest in removing Mr.

Yunkin from the case. In fact, in Mr. Kenneff's closing, he noted that "his heart, his mind, and his stomach" told him that Mr. Yunkin participated in the murder of Laurie Show. (N.T., Trial at 1272.)

To say that Mr. Yunkin's testimony that he wrote answers in pencil was perjury is interesting. Under this world view, any testimony that differs from any other testimony might well be "perjury" in the eye of the person who disagrees. In this case, that would mean that at least one or more of the experts who testified are perjurers. Certainly they did not agree and they gave diametrically opposed testimony on certain basic facts, i.e., whether the carotid artery was severed.

With respect to the "29 questions," all petitioner can say is that Mr. Yunkin testified in a way that was disputed by expert testimony. That argument goes to the weight of Mr. Yunkin's testimony and the court gave little weight to Mr. Yunkin's testimony.

Subsequent developments, i.e., the appearance of Petitioner's Exhibit 1474, [FN67] would suggest that Mr. Yunkin may well have not perjured himself with respect to the "29 questions." It is now clear that there was more than one document passed between Ms. Lambert and Mr. Yunkin. Could Petitioner's Exhibit 1474, which is a copy, have been originally written partly in pen and partly in pencil and used in some fashion by Ms. Lambert to create a document written entirely in pen? Did she include words and omit words so as to compose questions suited to the answers? These are all questions that are unanswered and unanswerable.

> FN67. Petitioner's Exhibit 1474 appears to have surfaced with Ms. Lambert's federal habeas petition and was not involved in any prior proceeding.

For the purposes of analysis of the evidence in this case, the "29 questions" was and remains an unreliable, inconclusive document. At best, it would have established a reasonable doubt. This court found that it did not and that finding has not been assailed by anything other than sound and fury, signifying nothing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 50
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

C. The Abuse Issue

Dr. Ann W. Burgess testified for a full day on "battered person syndrome" and its application to this case. Dr. Burgess holds a doctorate in psychiatric nursing and is a professor at the University of Pennsylvania. She was described by petitioner's counsel as the world's leading expert on the psychology of battered women. "Battered person syndrome" testimony is generally admissible under Pennsylvania law for the very limited purpose of showing a defendant's state of mind as it relates to self-defense in murder prosecutions.

In Commonwealth v. Gallagher, 519 Pa. 291, 547 A.2d 355 (1988), the Supreme Court ruled that an expert witness's testimony regarding a victim's affliction with "rape trauma syndrome" took the issue of the victim's credibility from the jury and was, therefore, improper. In Gallagher, the expert witness was Dr. Ann Burgess, who testified that aspects of the syndrome could affect a rape victim's ability to identify the rapist. In commenting on Dr. Burgess's testimony, the Pennsylvania Supreme Court stated: "It is clear that the only purpose of the expert testimony was to *enhance the credibility* of the victim." 519 Pa. at 297, 546 A.2d at 358 (emphasis in original). The Court went on to note:

**\*51** The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon inferences drawn from the ordinary experiences of life and common knowledge as to the natural tendencies of human nature, as well as upon observations of the demeanor and character of the witness.... [T]he question of a witness' credibility has routinely been reserved *exclusively* for the jury.

Gallagher, 519 Pa. at 297, 546 A.2d at 358 (quoting Commonwealth v. Seese, 512 Pa. 439, 443, 517 A.2d 920, 922 (1986) (citations omitted; emphasis added)). The Court added that "[s]uch testimony would invest the opinions of experts with an unwarranted appearance of authority on the subject of credibility, which is within the facility of the ordinary juror to assess." 519 Pa. at 297, 547 A.2d at 358 (footnote omitted).

In 1997, the federal district court accepted Dr. Burgess's testimony to bolster Ms. Lambert's credibility. The testimony was used almost exclusively for that purpose. The

federal district court noted that Dr. Burgess's testimony "explain[s] why for so long [Ms. Lambert] covered for...Yunkin." Lambert v. Blackwell, 962 F.Supp. at 1535. [FN68]

> FN68. The Federal Rules of Evidence do not seem to provide for expert testimony on the subject of witness credibility. The federal district court's opinion contains no citation to any authority, statute, case or otherwise, which would support admission of such testimony. The best we have is the court's description of the testimony as "dramatic." In state court criminal cases, the term "dramatic" is not a synonym for "relevant" or "admissible."

The most recent development in the use of battered person syndrome is seen in Commonwealth v. Miller, 430 Pa.Super. 297, 634 A.2d 614 (1993), *appeal denied* 538 Pa. 622, 646 A.2d 1177 (1994). In Miller, battered person syndrome expert testimony was admissible on the question of the reasonable belief requirement of self defense in a case which involved a history of abuse between the victim and the defendant. The Superior Court confirmed earlier jurisprudence in this area by stating that such evidence is not admissible "to improperly bolster the credibility of the defendant...." Id. at 313, 634 A.2d 614, 634 A.2d at 622." The use of expert testimony to explain the statements made by the defendant after the killing improperly invades the providence of the jury. Id. at 311 n. 3, 634 A.2d at 622 n. 3. Under Miller, battered person syndrome might be relevant if the victim of the killing had been the abuser.

But that is not the way it was offered in this case. The battered person syndrome was offered for the following purposes:

(1) to explain why Ms. Lambert "covered up" for Lawrence Yunkin;

(2) to explain why Ms. Lambert refused to give Mr. Shirk the "29 questions" until several months after the murder;

(3) to explain why Ms. Lambert told one story to Detective Solt, another story to the court in 1992, and another story in

Not Reported in A.2d                                                                    Page 51
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

her deposition, the federal habeas hearing, and the PCRA hearing;

(4) to explain why Ms. Lambert was of little help to Mr. Shirk and Mr. Epstein during the litigation of the post verdict motions; and

(5) to explain why Ms. Lambert finally told the "real story" in her hand written federal habeas petition, composed on the floor of her cell in New Jersey by the light streaming in under her cell door.

The Commonwealth moved to exclude the testimony of Dr. Burgess on the basis that it was "bolstering" testimony which went only to enhance the credibility of Ms. Lambert. The Commonwealth cited to the Gallagher and Miller decisions, and other Pennsylvania appellate decisions in support of this argument.  [FN69] This court agreed with the Commonwealth's position that the testimony of Dr. Burgess insofar as it explains why Ms. Lambert told one story, changed her story, covered up for another person, took the blame for the murder or protected her paramour, is not relevant under any reading of Pennsylvania law.

FN69. *See* Commonwealth v. O'Searo, 466 Pa. 224, 352 A.2d 30 (1976) (expert testimony of clinical psychologist to substantiate and corroborate the defendant's version of the critical events and the case was prohibited); Commonwealth v. Evans, 412 Pa.Super. 332, 603 A.2d 608 (1992) (reversible error to admit detective's testimony as to child sexual abuse accommodation syndrome as such testimony was proffered solely to enhance the witness's credibility after defense counsel pointed out that the children did not immediately report abuse); Commonwealth v. Purcell, 403 Pa.Super. 342, 589 A.2d 217 (1991) (expert testimony on dynamics of child sexual abuse may not be used by Commonwealth to bolster credibility of alleged victim of child abuse; child had not reported alleged sexual abuse until six and one-half years after the first incident); Commonwealth v. Smith, 389 Pa.Super. 626, 567 A.2d 1080 (1989) (counsel ineffective for not objecting to expert's opinion as to the truth telling capabilities of a seven year old

child); Commonwealth v. Newman, 382 Pa.Super. 220, 555 A.2d 151 (1989) (defendant not permitted to offer expert witness opinion that defendant was hexed where defendant believed himself to be a victim of Voodoo).

**\*52** We allowed Dr. Burgess's testimony on the narrow issue of waiver. That is, petitioner asserted a concern that the Commonwealth might ask this court to dismiss the petition because it was not filed within the applicable statute of limitations, i.e., one year from the date the judgment became final. *See* 42 Pa.C.S.A. Section 9595(b)(1).

At the PCRA hearing, counsel for the Commonwealth did not take a position on whether the petition was barred by the statute of limitations. It was determined that this argument would be made at the conclusion of the hearing after all the evidence was in and the parties were given an opportunity to assert legal argument. It seemed appropriate to consider Ms. Lambert's state of mind during the 1992 through 1997 time frame to the extent it explained why she did not file a PCRA in a timely fashion.

At this point, the Commonwealth has made no motion to dismiss the petition for failure to file within the required time. In fact, it appears there was no issue regarding the limitation period. The narrow issue, therefore, on which Dr. Burgess's testimony was permitted is not, in fact, an issue in this case.

Yet, consistent with the history of this case, we are required to discuss an issue which has great emotional and public appeal while having little or no legal importance. The issue of abuse in this case has taken on a life of its own. The issue of abuse is central to Ms. Lambert's emotional case. Because Ms. Lambert's status as a victim is central to almost every claim she raises, a full analysis of the truth of her case requires an analysis of the expert testimony offered to secure her place in that sad galaxy. Further, because it is clear to this court that petitioner will litigate the issue of battered person syndrome in the appellate courts, this discussion is included to explain our analysis and decision.

1. Relationship with Lawrence Yunkin

Petitioner makes much of the impact on her life of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 52
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

abusive relationship she shared with Lawrence Yunkin. Mr. Yunkin's abusive conduct toward Ms. Lambert was a central issue in the 1992 trial, the post verdict motions and the appeals to the Superior and Supreme Courts of Pennsylvania. Mr. Yunkin's conduct was described in vivid and detailed testimony by Ms. Lambert. Mr. Yunkin, himself, acknowledged certain bizarre and arguably abusive behaviors when he testified. It appeared likely to this court in 1992 that Mr. Yunkin and Ms. Lambert shared an abusive relationship which, sadly, was not unlike many we see in the criminal system, domestic violence system and family court. Asked to describe his relationship with Ms. Lambert in 1992, Mr. Yunkin gave the ironic response, "Constantly at each other's throats." (N.T., Trial at 250.) Certain witnesses characterized the relationship as more one-sided and others pointed out that each did a share of the arguing and the confronting.

  Petitioner asserts that Mr. Yunkin's abusive, domineering and controlling persona directed every aspect of her existence. According to Ms. Lambert, her blond hair and blue eyes were a function of Mr. Yunkin's obsession that she look like a "Barbie." In fact, we now know that she was bleaching her own hair blond as early as age 13 or 14 and that she discussed with her hairdresser the damage that was being done to her hair by the dye. (N.T., PCRA at 6373-74.) Further, during the eight-day 1992 trial, Ms. Lambert appeared in the courtroom every day with blond hair and blue eyes. We have learned through testimony at this hearing that the blue eyes were created by the wearing of tinted contact lenses. We note, however, that the trial took place eight months after her last contact with Mr. Yunkin, eight months after her incarceration, and with no reason for her to continue a behavior pattern that was "dictated" entirely by Mr. Yunkin. In short, the assertions about her appearance simply are not credible.

  **\*53** According to Ms. Lambert, Mr. Yunkin dominated her every move. Yet, the tone of correspondence exchanged between Mr. Yunkin and Ms. Lambert after each had been arrested would suggest otherwise. A fair reading of the letters offered into evidence in this proceeding   [FN70] would show that Ms. Lambert was anything but demure and unassertive. Ms. Lambert apparently learned that Mr. Yunkin sent a handwritten postcard to Mrs. Show from

prison on December 23, 1991. The postcard states:

> FN70. They were not offered for the truth of the matters set forth in the letters but as an expression of the state of mind of the reader and the writer. For a classic definition of the term "hearsay," *see generally* Baird v. Unemployment Compensation Board, 30 Pa.Cmwlth. 118, 121, 372 A.2d 1254, 1257 (1977) (hearsay constitutes statements made outside of court offered for the truth of the matter(s) contained therein).

  I don't know what to say for what happened but I'm sorry. I know this doesn't bring Laurie back. If I could die & take her place & let her come back, I swear to you I would. Laurie was a nice person, and she cared about you & her father a lot [sic]. When Michelle saw her somewhere I would try to keep her from Laurie and that's the truth. I had nothing against Laurie. For that week we went out she was so nice to me. I feel it was my fault for going out with her & none of this would of happened. All I can say is I'm sorry & I didn't know. Sincerliy [sic] Lawrence
(Petitioner's Exhibit 1018.)

  In a letter postmarked January 25, 1992, from Ms. Lambert to Mr. Yunkin, while both were in prison, Ms. Lambert wrote the following:

  Dear Sweet Pea,

  Lawrence, where is your head? *Why* on *earth* did you write to Laurie's mother? *WHAT* in the world did you say? You should know better than that! All her mother has ever done, is harrass [sic] us! Just leave her alone! That post-card could end up *in the paper!* Are you crazy? What are you trying to pull? Her mother is telling lies about us, trying to get us in real bad trouble, and you go and try to be buddies with her!...
  (Commonwealth Exhibit 10 (emphasis in original).)

  It is difficult to pinpoint a moment in the PCRA hearing as the most bizarre. One likely contender, however, was the testimony by Dr. Burgess as to the sexually explicit poem dated January 16, 1992, written by Ms. Lambert for Mr. Yunkin. Dr. Burgess focused on one line at the end of the poem to suggest that the sexual relationship between Ms. Lambert and Mr. Yunkin was violent, abusive and "not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 53
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

pleasurable for the female." We print the poem in its entirety only to illustrate that the author, Lisa Michelle Lambert, may well have been contemplating another kind of relationship:

Hick-o-ry, *Dick*-o-ry--*Dock,*
I'll *lick* you stiff as a *rock,*
When the clock strikes four,
I'll *shove* you onto the floor,
And *ride* your *fat hard cock.*
You'll *feel* me *fast* and *tight,*
And make me *scream* all thru the night,
I'll *beg* for *more* and *more,*
As you *pull* my hair, and call me a *whore,*
And you *ram* me *harder* and *harder,*
Until the morning light.
And when you fall asleep,
I'll still *make* you do me *deep,*
And when you tiredly *moan,*
I'll match you with a *groan,*
As you *hurt me* 'till I *weep.*

**\*54** (Petitioner's Exhibit 422 (emphasis in original).)

The image that Ms. Lambert now tries to market, that she was a demure, dominated, controlled victim, is contrary to so much evidence. From her verbal and physical assaults on Laurie Show, to her planning the abduction in the summer of 1991, from planning the attack on Laurie Show on the morning of December 20, 1991, to her strongly worded letter to Mr. Yunkin in the prison, Ms. Lambert demonstrated a character that is anything but demure and controlled.

2. Allegation of gang rape

The first reference to the alleged gang rape of Ms. Lambert came in the testimony of Gene L. Carey, M.D., a psychiatrist from Hershey Medical Center, at the death penalty phase of the trial of 1992. Dr. Carey volunteered that Ms. Lambert had shared with him a description of this incident and had asked him not to mention it in his testimony. (N.T., Penalty Phase at 58.) If, in fact, this rape occurred, it is inexcusable and wrong. On the assumption that it did happen on June 17, 1991, the impact of that incident on petitioner's claims for relief must be addressed. The gang rape may be relevant for three reasons: (1) it may explain why the East Lampeter Township police officers "framed" Ms. Lambert for the murder; (2) it may explain why Ms. Lambert did not go to the

police immediately on the morning of December 20, 1991; and (3) it serves to buttress Dr. Burgess's characterization of Ms. Lambert as a victim.

There is no proof that the gang rape occurred other than Ms. Lambert's own statement. She chose not to seek medical help, she chose not to contact any authorities, she chose not to tell her parents and she chose not to share the experience with her boyfriend or any friend. She drew a picture of one of the "rapists" and that picture was later "identified" in testimony by Mr. Shirk as Officer John Bowman of East Lampeter Township Police. (N.T., PCRA at 3428-29.) On the basis of this irresponsible "identification," serious allegations were made against Officer Bowman at the outset of this proceeding and in the prelude to this proceeding. [FN71]

> FN71. The charge against Sergeant Bowman characterized the tone of much of petitioner's case. There was no question at the outset of this hearing that Sergeant Bowman was considered by petitioner's counsel to be one of the gang rapists. So much so, that they subpoenaed his bank records for a three month period in 1991, when Sergeant Bowman asserted that he was in Virginia Beach, Virginia, with his wife on their honeymoon at the time of the alleged rape, i.e., June 17, 1991. At oral argument in the courtroom on the motion to compel the production of these bank records, petitioner's counsel, Christina Rainville, Esquire, informed the court that Ms. Lambert was no longer accusing Sergeant Bowman of being a rapist. However, Ms. Rainville allowed, Sergeant Bowman was welcome to come into court and clear his name of this allegation. (N.T., PCRA at 3460.) The court informed Ms. Rainville at that time that this is not how the system works. One does not cast serious and harmful accusations out into the public place and then invite the "accused" to come in and clear his name. This approach to investigation, discovery and litigation shows the kind of paranoia that appears to motivate the petitioner and certainly follows in the wake of her counsel's efforts. Despite the fact that Mr. Bowman was never identified as a rapist, never placed at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

scene, never connected in any way with the alleged rape, it was necessary for him to come into court, with his wife, and testify as to their whereabouts, their activities and their expenditures on their honeymoon seven years ago.

Officer Robin Weaver of the East Lampeter Township Police Department was named by Ms. Lambert as one of the rapists. Yet, no proof of this very serious allegation was established. Rather, Ms. Lambert testified to being terrified upon seeing an East Lampeter Township police officer at the Lancaster Catholic High Carnival within a week of the alleged rape (or three, depending on the witness) to the extent that she rushed to avoid any eye contact with this police officer. Her description of terror in seeing him, buttressed by the testimony of Michael Pawlikowski, who accompanied her to the carnival, suggested that she lived in fear of the officers who did this to her. Yet, on August 1, 1991, in response to a harassment and assault complaint, the very same Officer Robin Weaver spoke with Mr. Yunkin and Ms. Lambert at the East Towne Mall for a period of 20 minutes or more. He spoke to them about their contacts with Laurie Show and about the charge of assault and harassment. He attempted to talk to them about their behavior. (Commonwealth's Exhibit 51.) According to Officer Weaver's uncontradicted and credible testimony, Ms. Lambert and Mr. Yunkin participated in this discussion with him. (N.T., PCRA at 6359-63.) This would appear to belie Ms. Lambert's position that she lived in fear of the police officers, especially Officer Weaver.

**\*55** Ms. Rainville, co-counselor for petitioner, went so far as to suggest throughout the hearing that Ms. Lambert's child, born in March 1992, was the product of this gang rape. (N.T., PCRA at 32.) Yet, we know better. In one of Ms. Lambert's letters to Mr. Yunkin while in prison, she refers specifically to the baby and to Lawrence as the father. She wrote:

Listen to me. Yes, I told my parents *they* can have the baby! They are going to take care of him until I get out. I can *not* give the baby to *your* parents, Lawrence! Look at what your parents did to you! Your mom "babied" you so much, *you* can't even *think* for *yourself!*

(Commonwealth Exhibit 10 (emphasis in original).) Ms. Lambert then wrote in the same letter:

Another thing, you weren't even *happy* when I told you I was pregnant! You hit me, and went out and slept with that tramp! And then, for 4 months after that, you didn't even *believe* I was pregnant! As far as I'm concerned, this baby doesn't *have* a father!
...
*Lawrence, I love you, but because of how horrible you've treated me, I love the baby more. I love the baby more, because he is the good part of you.*

(Commonwealth Exhibit 10 (emphasis in original).)

We know as a matter of public record here in Lancaster County that the custody of her daughter has been the subject of several court proceedings. We know that Mr. Yunkin has acknowledged paternity and we know that DNA testing was conducted. Judge Wayne G. Hummer of this court wrote: "DNA testing has been completed and found that Lawrence Yunkin was not excluded as the biological father of the said child and calculated that the probability of paternity was 99.98 %. Defendants [Leonard M. Lambert, Judy L. Lambert and Lisa Michelle Lambert] have not objected to these results." Yunkin v. Lambert, No. 102 - 1993, slip op. at 2 (Lanc. Co. C.P. June 29, 1994) (court held that the Yunkins, as paternal grandparents, had standing to request custody of Ms. Lambert's and Mr. Yunkin's daughter). Does it appear curious to anyone beside this court that Ms. Lambert will allow her attorney to assert that one of the rapists was the father of her daughter while choosing not to contest DNA evidence that Lawrence Yunkin was the father of the child by a probability of 99.98 percent?

The fact of the gang rape has little, if any, legal significance in the analysis of the issues raised by the PCRA petition. It has enormous significance in creating a level of emotional intensity and sympathy, which drives much of petitioner's case.

It would be a tragic and inexcusable event if, indeed, it took place. The level of sorrow one might feel for petitioner having undergone such terrible treatment has no bearing, however, on the legal significance of that event to her case. Whatever occurred on June 17, 1991, has no place in the analysis of petitioner's claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 55
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

The gang rape is in this case only to give the police a motive to frame Ms. Lambert for the murder of Laurie Show. To believe this, the court must believe that Officer Weaver, upon entering the Show condominium on December 20, 1991, observed a dying teenage girl and thought first to use the event to frame Ms. Lambert. To believe this, the court must accept that Detective Savage took a grieving mother aside within an hour of her daughter's death and planted in her mind the suggestion that her daughter made a dying declaration. To believe this, the court would have to accept that these police officers were acting first and foremost in an effort to use the murder of Laurie Show to frame a woman who was gang raped six months earlier by them or by members of their department. This is just not believable.

**\*56** Nor does the gang rape explain why Ms. Lambert failed to go to the police on the morning of December 20, 1991. In fact, given every opportunity to explain to the police and at trial why she did not report the murder after she fled from the condominium complex, she never mentioned fear of the police because of a "gang rape." She talked about Mr. Yunkin watching her "like a hawk," she talked about being afraid of Ms. Buck, and she talked about not having access to a telephone. Yet, she went to collect her paycheck, she went to the local mall, she went to Mr. Yunkin's grandmother's home, she went back to Ms. Buck's residence and then ultimately to the bowling alley. It strikes this court as unbelievable that Ms. Lambert failed to report this incident to anyone because of fear of the police arising out of the "gang rape."

Except as support for Dr. Burgess's characterization of Ms. Lambert as a victim, the gang rape has no legal significance in this case. As we discussed earlier in this section, Dr. Burgess's evaluation of Ms. Lambert would not be admissible under Pennsylvania law to explain her conduct, her statements, or her choice to "cover up" for Mr. Yunkin. The expert opinion that Ms. Lambert is a victim of abuse and that she, therefore, acts in certain ways because of this status, has no bearing on any legal issue in this case.

The gang rape would neither explain nor would it justify the well documented course of physical and verbal assaults by Ms. Lambert on Laurie Show, a history of stalking Laurie Show and the plot to kidnap and do serious physical harm

to Laurie Show. Nor would it excuse the plan to go to her condominium on December 20, 1991, to cut off her hair, an incident which has been irresponsibly referred to as a "prank." For these reasons, we find that the gang rape has no legal significance in this case. There is no factual support in the record. It certainly would not explain any of petitioner's actions nor would it explain or call into question the conduct of the police during the course of the investigation of this case.

3. Cambridge Springs

Petitioner contends that she was subjected to brutal, degrading and long lasting mistreatment while at the State Correctional Institution at Cambridge Springs. It is true that a corrections officer was convicted of sexual offenses having to do with his conduct with Ms. Lambert. She contends this was a repeated and prolonged course of prison rape. The facts suggest otherwise.

The perpetrator of these incidents with Ms. Lambert was convicted of aggravated indecent assault, indecent assault and official oppression. He was not charged with nor was he convicted of rape or any of the other sex offenses involving force or lack of consent. [FN71] It appears from the evidence at the PCRA hearing that Ms. Lambert and this corrections officer had a voluntary sexual relationship and that he was convicted because he was a corrections officer and she was an inmate. In fact, in her conversations with her counselor in prison, Ms. Lambert referred to the perpetrator as "her buddy." (N.T., PCRA at 7564.) She also justified her relationship with this man by telling her counselor: "[M]y hormones are up to here [the counselor gestured by raising her hand above her head].... All the other women have everybody else out there, outside the fence, and I have what's in here." (*Id.*)

FN72. The corrections officer at the state correctional institution at Cambridge Springs was charged with and convicted of each of the following crimes: aggravated indecent assault, formerly codified at 18 Pa.C.S.A. Section 3125(5); indecent assault, formerly codified at 18 Pa.C.S.A. Section 3126(a)(5); and official oppression, *see* 18 Pa.C.S.A. Section 5301. As to none of these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

offenses was *forcible* sexual conduct an element. (N.T., PCRA at 7578-79.)

**\*57** To suggest that the incidents involving Ms. Lambert were not "rape" is not to diminish them or to excuse them. They should never have happened and the state corrections system and the authorities in Crawford County took action in response to this conduct. Interestingly, it was not Ms. Lambert who reported the conduct. Rather, she was contacted by investigating authorities. In fact, she denied having any relationship with the perpetrator in the initial interviews. (N.T., PCRA at 7578.)

The significance of the conduct at Cambridge Springs is high in emotion and low in legal relevance. No prison inmate should be subjected to official oppression nor should any inmate be subjected to indecent assault. Yet, these incidents do not excuse murder, they do not excuse a period of intense harassment or stalking of the victim which occurred in 1991, and they do not call for a new trial. The Cambridge Springs incidents enhance petitioner's victim status which, once established and enhanced, goes nowhere. It appears that the narrow legal significance would be to explain how little Ms. Lambert was able to offer in assisting Mr. Epstein in litigating her post verdict motions. [FN73] That may well be true. Yet, there was no prejudice because Mr. Epstein did a credible and thorough job representing Ms. Lambert. She has been given every opportunity to litigate every meritorious claim, and many other claims, in the federal proceeding and in this PCRA.

FN73. In testimony at the PCRA hearing, Ms. Lambert contrasted her involvement with Mr. Epstein as her attorney with how helpful she has been to Ms. Rainville and Mr. Greenberg. She testified that in the first telephone call she had with Ms. Rainville, she told Ms. Rainville that she needed to hire a "clothing expert about the jergo, speech expert, a pathologist, an expert on handwriting, every--everything that you asked me I said that we could get an expert for it." (N.T., PCRA at 5162.) It appears that Ms. Lambert even assisted in writing the reports of her own expert witnesses. To this end, she gave the following testimony:

Q. In the federal proceeding, what, if anything, did you ask to see of drafts of expert reports?
A. As soon as an expert gave a draft, I asked you to send it to me and I would read it right away.
Q. And what, if anything, did you do after you read it?
A. I would look at it and then I would write down questions for you to ask the expert.
Q. And did we make changes to the expert reports based on your comments?
A. Yes. I would ask you to ask them a question and give their best opinion to a degree of scientific certainty and then you would ask them and whatever they said would be included in the reports.
(N.T., PCRA at 5168-69.)

Ms. Lambert would have this court believe that once safe in the confines of the Edna Mahan Correctional Facility in New Jersey, she was able not only to assist her attorneys but to participate in the writing of expert reports. Normally, experts write their own reports. The blithe acknowledgment by petitioner and petitioner's counsel to the act of participation in the writing of expert reports provides considerable insight into a number of issues in this case.

D. Tabitha Buck's Involvement

1. The scratch on Tabitha Buck's face

Tabitha Buck received a severe scratch on her face on December 20, 1991. There is no question that she received that scratch either in the Show condominium or during her flight across the field and through the trees to Mr. Yunkin's car. Ms. Buck has no explanation for when she got the scratch, but does not deny she sustained the injury during or immediately after the murder.

Petitioner's counsel devote substantial energy to this issue and to the suggestion that the police somehow "overlooked" this scratch. Petitioner's counsel suggest that because Ms. Buck had a scratch and Ms. Lambert had no scratches or bruises, that Ms. Buck must have been the murderer.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 57
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

In fact, Ms. Buck is a convicted murderer. She was found guilty by a jury of second degree murder arising out of the events of December 20, 1991. The prosecuting attorney and police officers in this case never wavered from their position that Ms. Buck was fully involved in the murder. The fact that the victim may well have injured Ms. Buck and did not injure Ms. Lambert does not prove that Ms. Lambert is innocent. At best, it proves that Ms. Buck was, in fact, involved and this issue has already been proven beyond a reasonable doubt to a jury.

2. Tabitha Buck's animus

The same holds true with evidence of Ms. Buck's animus toward Laurie Show. There was testimony at the PCRA hearing from Rick Lentz that he was in Laurie Show's company when she was verbally assaulted and "smacked around" by Ms. Buck in the fall of 1991. (N.T., PCRA at 2945-46.) This testimony would only go to support Ms. Buck's involvement in the murder. Ms. Buck has been convicted of murder. Proof of her actions toward Laurie Show or her animus does not disprove petitioner's actions or animus. The evidence of Ms. Buck's animus is of no relevance to this PCRA proceeding.

3. Scent of a co-defendant

**\*58** The police used a bloodhound to search for evidence along the Susquehanna River. *See* Section VII.K, *infra*. Mr. Shirk testified that he did not know that Ms. Buck's sweater was used to scent the bloodhound. (N.T., PCRA at 3364.) However, he also stated that he had received and reviewed Officer Reed's river search report which clearly states: "A white sweater worn by def. Tabatha Buck was brought to the scene by myself for use of the blood hound [sic]." (Petitioner's Exhibit 1295.)

Ms. Lambert admitted buying the rope, (N.T., Trial 991-92), admitted agreeing with Ms. Buck and Mr. Yunkin to use the rope to tie up Laurie Show, (N.T., Trial at 1000-01), and admitted watching as Ms. Buck cut off a portion of the rope, (N.T., Trial at 1000). Of course, Ms. Buck's scent was on the rope. However, just because Ms. Buck's scent was on the rope does not mean that Ms. Lambert's was not. There was no testimony that the dog attempted to trace Ms. Lambert's

scent and failed. This "evidence" that Ms. Buck's scent was on the rope does not exculpate Ms. Lambert.

4. Tabitha Buck's story

Tabitha Buck's testimony in this hearing marked the first time she has testified under oath in a courtroom about the events of December 20, 1991. Previously she testified in a deposition as part of the federal proceeding but was not called as a witness. We discuss Ms. Buck's testimony in this section because it is relevant to Ms. Lambert's involvement in the killing of Laurie Show, it is relevant to the extent it corroborates or disputes essential facts which have been called into question by petitioner, and it is relevant to the core issue of Ms. Lambert's petition: that she is an innocent woman wrongly convicted.

Ms. Buck first met Ms. Lambert and Mr. Yunkin in September 1991 while riding "the loop" in Lancaster. [FN74] (N.T., PCRA at 6617-18 .) Ms. Buck was 17 years old at the time and was attending Penn Manor High School. She, Michelle and Lawrence "hung out" through the fall of 1991. (N.T., PCRA at 6618.) In the fall of 1991, she became aware of difficulties between Michelle and Laurie Show. She recalled Michelle saying that she did not like Laurie and referring to her several times as a "bitch." (N.T., PCRA at 6619.)

> FN74. The "loop" is an unofficial designation of a large block composed of several streets and extending over eight or nine city blocks in downtown Lancaster. It has long been a hang out for teenagers in cars or on foot.

On the evening of December 19, 1991, around 10:30 p.m., Michelle came to visit her at the apartment she shared with her mother. Lawrence was outside in the car. Michelle was "very upset" and "went on and on about wanting to get Laurie back...." (N.T., PCRA at 6620.) Ms. Buck described her as "crying and ranting, raving, she was upset." (*Id.*) Ms. Buck testified, "I asked her what she was going to do. She said, I'll kill her." (N.T., PCRA at 6620-21.) Michelle told Ms. Buck that she wanted her (Buck) to go with her to see Laurie the next morning. Ms. Buck was also told to "wear [her] hair up, to not wear any make-up and not to wear any fingernail

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 58
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

polish." (N.T., PCRA at 6622.) Ms. Buck testified that she knew Laurie Show "by sight" because they rode the same school bus when Ms. Buck attended Conestoga Valley High School. (N.T., PCRA at 6623.)

**\*59** Ms. Buck testified that Michelle and Lawrence picked her up on the morning of December 20, 1991. (N.T., PCRA at 6623.) Michelle appeared to give Lawrence directions from the intersection by the McDonald's on Lincoln Highway. (N.T., PCRA at 6625-26.) Lawrence dropped them off on Oak View Road by a field. (N.T., PCRA at 6626-27 .) Ms. Buck understood that Lawrence was going to go to McDonald's. (N.T., PCRA at 6628.) Michelle told him to pick them up in 15 minutes. (*Id.*) They then walked across the field toward the condominium complex. (N.T., PCRA at 6628-29.) Michelle was looking for the condominium and was not sure of the correct number. She then located the condominium. (N.T., PCRA at 6629-30.) They went to the bottom of the steps and Michelle told Ms. Buck to go upstairs, knock on the door and ask for Hazel Show. She did so and Laurie answered the door. Ms. Buck asked if Hazel was home and Laurie said, "No." (N.T., PCRA at 6630-31.) Michelle told Ms. Buck the night before that Hazel should not be there because she had called and arranged for Mrs. Show to be at a counselor's appointment. (N.T., PCRA at 6631-32.)

At that point, Michelle made her way inside. Ms. Buck then described:

> Michelle apparently pushed Laurie back some distance. They were, like, in front of the kitchen area or the living room area. And they were holding each other's arms wrestling, like, arguing, yelling. At one point, Laurie, I guess, broke away from Michelle and came toward me and I remember Michelle saying something about don't go, stop or something and--oh, I did have sunglasses on. I failed to mention that. And Laurie grabbed my face, pushed me somehow and knocked the sunglasses off and Michelle was behind her and she had a knife and they were in the corner there where the door meets the wall, the hinges of the door, I guess.
>
> (N.T., PCRA at 6633-34.)

Ms. Buck then went on to describe Laurie's attempts to escape:

> A.... Laurie coming at me, moving me. I was right there

inside the doorway.

> Q. Okay. Do you know what Laurie was trying to do when she came toward you?
> A. My guess is she was probably trying to leave.
> Q. Okay. And could she leave?
> A. She didn't have a chance.
> Q. And why not?
> A. Michelle was on her.
> (N.T., PCRA at 6636.)

Ms. Buck described the knife as a "large kitchen knife" and described how Michelle ended up huddled with Laurie in the corner near the front door. (N.T., PCRA at 6637-38.) Laurie had grabbed the blade of the knife and Michelle pulled it out of her hand. As a result, Laurie's hands were cut. (N.T., PCRA at 6638.) According to Ms. Buck, Laurie then got away and went into her bedroom. Michelle then "grabbed her by the back of her hair when she walked through the door and she cut her hair." (N.T., PCRA at 6637-39.) Ms. Buck recalls seeing Laurie with a phone in her hand and was uncertain about what happened to the phone. (N.T., PCRA at 6640.)

Ms. Buck then went on to describe more of a struggle in the bedroom. When Laurie was on her knees facing the bed, Michelle hit her in the back of the head with the butt of the knife. She hit her more than twice in this way. (N.T., PCRA at 6641-42.) Michelle then handed Ms. Buck the knife and attempted to put a rope over Laurie's head. (N.T., PCRA at 6642.) Apparently, Michelle told Laurie to stop struggling and to cooperate because "it would be a lot easier this way" and then she put the rope over her head. (*Id.*) Laurie then began to struggle and reached for a pair of scissors. Ms. Buck moved the scissors out of Laurie's reach. (N.T., PCRA at 6643-44.)

**\*60** Ms. Buck testified:

> Q. What happened after you moved the scissors out of Laurie's reach?
> A. Michelle told me to cut her throat.
> Q. Michelle told you to cut Laurie's throat?
> A. Uh-huh.
> Q. What did you say to Michelle?
> A. I said, no.
> Q. Okay. Did you still have the knife in your hand at that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 59
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

point?

A. Yes.

Q. What did you do with the knife?

A. Michelle took it back.

Q. What happened after that?

A. She cut her leg and told her to stop struggling.

(N.T., PCRA at 6644.)

Ms. Buck then went on to describe
    Laurie
    kicking and
    fighting with
    Michelle.
    She testified:
    A. Michelle told me to grab her feet, make her stop kicking and I did.
    Q. You did that?
    A. Yes.
    (N.T., PCRA at 6645.)

Ms. Buck described sitting on Laurie's feet and facing away from her. As she sat on Laurie's feet, Laurie was struggling and at some point her feet stopped moving. Then Ms. Buck got off her feet and looked at Laurie. When asked what she saw, she said, "I saw her throat cut." (N.T., PCRA at 6647-48.) She noted that Michelle was sitting next to Laurie, on Laurie's right side. She said that the throat was cut deeply enough that she (Ms. Buck) could see into Laurie's throat and could hear a "hissing, whooshing sound." (N.T., PCRA at 6648.) She then testified:

Q. After you turned around and saw that Laurie's throat was cut and you saw that Michelle was still next to Laurie, did you see that the knife was still in Michelle's hand?

A. Yes.

Q. What did you see Michelle do then?

A. When I looked at Laurie I said, is she dead? Did you kill her? And Michelle said, I don't know and proceeded to further cut Laurie's throat.

Q. Can you describe what she did when she further cut Laurie's throat?

A. She held her chin back with her left hand and cut her throat as though she were cutting bread.

Q. Okay. Did you see how many times that cut went across Laurie's throat?

A. Several times.

(N.T., PCRA at 6649.)

Ms. Buck related that Michelle had the tip of the knife and handed it to her. Ms. Buck put it in her coat pocket, picked up her sunglasses and they left the condominium. Michelle told her to put her hood up and they went back across the complex area. (N.T., PCRA at 6650-51.) She testified that they went down the staircase and headed in the direction toward the wooded area. They walked behind or in a line of trees behind the Frys' condominium, went across a field and toward the road. They ended up along the road in some bushes. Ms. Buck indicated on an aerial photograph of the condominium complex, (Commonwealth's Exhibit 5), that she and Michelle ended up on Oak View Road north of the condominium entrance. She testified that Lawrence was there and picked them up. (N.T., PCRA at 6651-55.) All she recalls about the conversation in the car was Lawrence looking over at Michelle and saying, "Blood?" (N.T., PCRA at 6655- 56.)

**\*61** They then went back to Michelle's and Lawrence's trailer. Michelle and Ms. Buck took showers. She recalls that she took the tip of the knife out of her pocket and tossed it somewhere in a room in the trailer. She borrowed a pair of black stretch legging pants, put on her white sweatshirt and Michelle and Lawrence took her to school. (N.T., PCRA at 6657-58.)

Ms. Buck testified about the cut on her cheek and she believes that she got the cut sometime during the events that occurred in the morning of December 20.  [FN75] (N.T., PCRA at 6658-59.) She recalls that she took her jeans off and borrowed pants because there was blood on her jeans. She left her Miami Dolphins jacket with Michelle and Lawrence because they said they would wash it. (N.T., PCRA at 6659-60.)

FN75. There was considerable testimony at the PCRA hearing regarding certain scratches on Ms. Buck's shoulder and back. Photographs were taken of her at the time of her arrest and Lieutenant Renee Schuler testified as to observing those scratches. The scratches were discernible on the photographs admitted into evidence. Ms. Buck was asked about these scratches and was unable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 60
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

to provide any explanation for them. She does not believe she sustained those scratches on the morning of December 20 because she was wearing a sweatshirt and her Miami Dolphins jacket over top of the sweatshirt at all times. She believes she did them herself by scratching her back. (N.T., PCRA at 6665.)

On cross-examination, Ms. Buck acknowledged that she lied in her April 1997 federal deposition in that she was not complete in her answers. She also indicated that she was not truthful when speaking to Detective Joseph Geesey when he came to visit her at Muncy in 1997. (N.T., PCRA at 6726.) Ms. Buck testified that there were certain significant issues which she "left out" in her deposition testimony. These were:

(1) she did not talk about Michelle placing the rope around Laurie Show's neck;

(2) she did not talk about Michelle's feelings about Laurie Show;

(3) she did not talk about her sunglasses;

(4) she did not talk about Michelle making the last cut on Laurie Show's throat;

(5) she did not talk about Michelle telling her about the phone call to Mrs. Show the night before. Rather, she suggested that she learned that Mrs. Show would not be in the condominium that morning as they approached the front door;

(6) she left out the testimony about Michelle telling her not to wear make-up and nail polish and to put her "hair up";

(7) she left out the testimony about Michelle handing the knife to her during the attack;

(8) she left out the testimony about Michelle telling her to "cut Laurie's throat"; and

(9) she lied about wearing black stretch pants because she knew that her jeans had blood on them and did not want to

admit that. (N.T., PCRA at 6732; 6773; 6732; 6733; 6729-30; 6731-32;6732; 6733; 6732-33.)

When questioned as to why she did not tell the whole truth in her deposition, Ms. Buck testified:

A. Several reasons. One, I was very scared. I had been told for a very long time--

...

A. I was told not to say anything to anybody for a very long time and I was left under the impression that the more I knew of anything the worse off it would be for me. And aside from that, I was extremely intimidated that day. And I don't expect many people will understand this other reason. But being a lifer and having been incarcerated a lifer for as long as I have now, I would like to see women doing a life sentence go home, get out of jail, and I just couldn't see saying certain things, even against Michelle, if this were going to be a chance for her to go home.
**\*62** (N.T., PCRA at 6673-74.)

At Ms. Buck's deposition during the federal proceeding, she was represented by R. Russell Pugh, Esquire, of Lancaster. Immediately following the deposition, she wrote a letter to Mr. Pugh explaining that she had been less than completely truthful in her deposition testimony. We reprint the entire letter in the text of this opinion because it sheds light on the extent of Ms. Buck's untruthfulness in her deposition and her state of mind at that time, and it contains an explanation as to her actions. It is also significant to this court that she chose to acknowledge her lack of complete candor in a letter to her attorney without any prompting and before she was ever confronted with any inconsistencies. The deposition was April 4, 1997. The letter bears the date of April 8, 1997:

Mr. Pugh,
I have not been completely honest about what happened. Most of what I've told you is the truth but I've purposely left some things out. Some very important things. I knew how Michelle felt about Laurie. She talked about it all the time. She always said how she wanted to kill her. She would think of different ways to do it and would ask me my opinion, would tell her that her plans would work and she'd laugh. She never followed through with any of them so I truly didn't take her seriously. At first I didn't know who she was talking about when she said 'Laurie' but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

when she told me her name was Laurie Show and she went to C.V., I made a point to find out who it was. Laurie rode my bus and I avoided her. I never spoke to her. I doubt if she even knew my name.

When Michelle came to the apartment on the 19th, she was upset and wanted to talk. She said she was going to get Laurie because the police were after her for an assault against Laurie. She told me she had called Ms. Show and pretended to be a counselor from school. She said that Ms. Show wouldn't be at home in the morning and she wanted me to go with her. I asked her what she was going to do and she said she was going to kill her. I didn't believe her and I told her so. Then she said she was just going to get her back for dating Lawrence and for calling the police on her. I had never seen Michelle fight anyone--she was all talk so I guess I just figured she was just talking and wasn't really going to hurt Laurie. I told her I would go with her. She said for me not to wear any nail polish or make-up and to put my hair up. She said that way, if anything did happen--there would be no evidence of who was there. Again, I didn't take her seriously.

The next day, I wore an old pair of blue jeans that were a favorite of mine and my white sweatshirt. When Michelle came she asked if I had any sunglasses and I said yes. She told me to bring them. I did wear make-up and my hair was down. She didn't say anything about it so I knew she wasn't serious about what she had said.

When we got to the apartment Michelle told me to put the sunglasses on so that Laurie wouldn't recognize me. I told her she didn't know me anyway but she insisted I wear them. Once we were inside the apartment, all hell broke loose. When Laurie tried to run to the door, she grabbed my glasses and threw them in the corner. She may have scratched me then.

**\*63** In the bedroom when Laurie was kneeling over the bed, Michelle handed me the knife after hitting Laurie with it. Then she pulled out the rope from under her shirt (jergo) and tried to put it around Laurie's neck. She told Laurie it would look like a suicide and if Laurie didn't give in, then she (Michelle) would get a group of pagans to sacrifice her. Laurie stopped struggling and allowed Michelle to put the rope completely over her head. Then she went for the scissors. When I pushed them away Michelle told me to cut Laurie's throat. I looked at her like she was crazy and I said 'no!' She told me to give her the

knife and I did. Laurie was struggling again and Michelle cut her leg. She told her it would be a lot worse if she didn't cooperate. That's when Laurie started kicking again and Michelle told me to grab her feet. In the process of getting her feet down, she kicked me in my mouth.

When I got off of Laurie's feet, I saw the neck wound and heard the air escaping. In my mind I knew that she must be dead but I asked anyway. I asked Michelle, 'Is she dead? Did you kill her?' She said, 'I don't know.' Then she cut Laurie's neck even deeper. I saw her do it. That's when she said, 'Come on. Let's go.' On my way out I picked up my sunglasses and we left.

At the trailer we took showers and Michelle gave me a pair of black stretch pants to wear. My jeans had ripped open on one of the legs and there was blood on them.

Everything else I told you was true. I didn't think she would actually do it and once she did--I was scared half to death. I don't know why I didn't tell you about her calling Ms. Show. I don't know why I didn't tell you about the rope. All I know is that I'm telling you the *whole* truth now. This is very hard for me to do but I figure--what do I have to lose? I'm already doing Life. I know that I lied under oath at the deposition and I don't know what that will mean now. When I testify in court, I want to tell the truth. I hope that it isn't too late.

I know I've disappointed you. You believed me and I lied to you. I apologize to you for deceiving you. If you want to wash you hands of my case--I won't blame you. Maybe I'll end up dying in prison but at least my conscience will be clear. I know that I had no intentions of harming Laurie and I didn't believe Michelle would, either. But maybe I do deserve this life sentence. If I'm meant to go home--God will let me go and it won't happen without Him.

Again, I am so sorry for lying to you. I'm sorry for lying to everybody including Detective Geesey. I hope that you won't hate me because of it. I feel like the world has been lifted from my shoulders but I know it will be hard for me to face you now. I am so sorry.

Sincerely, Tabitha F. Buck

(Commonwealth's Exhibit 65 (emphasis in original); N.T., PCRA 6678-82.)

The court is faced with an unusual and interesting credibility assessment with this witness. She has acknowledged that she was less than completely truthful

Not Reported in A.2d                                                                                    Page 62
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

under oath. It appears that on several points she told the truth but not the whole truth. On other points, she made statements contrary to the truth. Yet, almost immediately, she confessed these lies to her lawyer. [FN76] Ms. Buck was never called as a witness in the federal proceeding, so it is likely that she may never have been "caught" in her lies. Her lack of truthfulness did not help or hurt her own situation, given that she is serving a life sentence for murder. To this end, it is unlikely that fear of perjury charges would have motivated her to confess her lack of honesty to her attorney. She is serving a life sentence without the possibility of parole, which in Pennsylvania means exactly that. Possible perjury penalties would have little, if any, real impact on her life.

> FN76. The letter to Mr. Pugh was written four days after her deposition. Ms. Buck soft-pedaled certain facts that she sent the letter from the Lancaster County Prison before being returned to the State Correctional Institution at Muncy. (N.T., PCRA at 6692.)

**\*64** Further, her decision not to tell the whole truth did not hurt Ms. Lambert. In fact, Ms. Buck soft-pedaled certain facts regarding Ms. Lambert's involvement. Had these "lies" been for a malicious purpose, i.e., to prejudice Ms. Lambert's petition in federal court, they might carry greater weight. It appears that the "lies" were an effort, however ignoble, to help her former co-defendant. She explained this as a feeling of sympathy not so much for a former co-defendant but for a fellow "lifer."

Petitioner's counsel did a good and thorough job of exposing these various lies in cross-examination of Ms. Buck. Petitioner would have us completely disregard Ms. Buck's testimony on that basis. This is not the law, however. We frequently include in our instructions to a jury in a criminal case the maxim "falsus in uno, falsus in omnibus " which means "false in one, false in all." Essentially, this means that if a witness deliberately testified falsely about a material point, the fact finder may choose to disbelieve the rest of his or her testimony. But the fact finder is not required to do so. The fact finder should consider all other factors bearing on the witness's credibility in deciding whether to believe other parts of his or her testimony. Commonwealth v. Parente, 184 Pa.Super. 125, 130-32, 133

A.2d 561, 563-64 (1957), *aff'd*, 392 Pa. 38, 139 A.2d 924 (1958). *See* Commonwealth v. Tyler, 305 Pa.Super. 15, 23, 451 A.2d 218, 222 (1982); Commonwealth v. Joyce, 202 Pa.Super. 350, 353 n. 1, 197 A.2d 226, 228 n. 1 (1963).

In evaluating credibility, the court looks to how the witness testifies, what the witness says, what interest the witness has in the outcome of the proceeding and the relationship of the witness to the petitioner/defendant or others involved in the case. The court considers whether, in general, the witness's testimony makes sense. We look not only at the witness herself, and her background and history in the case, but also to extrinsic factors which impact on credibility. For example, it is proper for the court to consider whether other evidence in the case supports the testimony of the witness. If other evidence, including the testimony of other witnesses and items of physical evidence, shows that the witness's testimony is less than accurate, then these other items of evidence would have a negative impact on credibility.

One very important factor is whether the witness is willing to falsify testimony so as to further her own interests. This does not seem to be the case with Tabitha Buck. At the PCRA hearing, we had the benefit of an exchange of letters between petitioner's counsel and Ms. Buck regarding petitioner's intentions in the federal habeas proceeding. Ms. Buck received a "solicitation" of sorts from petitioner's counsel, Ms. Rainville. Ms. Rainville was writing to Ms. Buck with a request for cooperation and a suggestion that she may wish to follow Ms. Lambert's path through federal court with a federal habeas petition of her own. Ms. Buck replied, also in writing, with certain statements that provide insight to her credibility and which confirm certain statements she made in her testimony at the PCRA hearing. For completeness sake, we include the text of each letter as it was read into the record at the hearing. The letter from Ms. Rainville to Ms. Buck is dated November 15, 1996, and was admitted as Commonwealth's Exhibit 64. The letter reads:

**\*65** Dear Ms. Buck,

My law firm has been appointed by the federal court in Philadelphia to represent Lisa Lambert in the preparation of her federal habeas petition. I am writing to you because I believe that we have discovered new evidence that may help you as well as Lisa. We believe that the new

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
(Cite as: 1998 WL 558749 (Pa.Com.Pl.))

evidence may prove that Butch Yunkin was present, and participated in the murder. Since Mr. Yunkin was a key prosecution witness against both you and Lisa, this new evidence may meet the standard set forth in a relatively new Supreme Court case, *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), which held that a retrial was warranted due to the prosecution's failure to disclose evidence favorable to the defense regarding a key informant and prosecution witness. Simply stated, while you will need your own lawyer to give you guidance, our new evidence might be enough to get you a new trial.

You and Lisa are no longer friends, and I understand that there is a great deal of bitterness between the two of you. Indeed, the two of you have many legal interests that are in conflict. However, we have information which may help you get a new trial, and you have information which might help prove that Yunkin was there.1991 was a long time ago, and you and Lisa are now in a unique situation of being able to help each other by telling the truth about Yunkin's real role in the killing.

If you are currently represented by a lawyer, you should forward my letter to your lawyer, and have your lawyer call me. If you are not represented by a lawyer, you may call me collect at 215-751-2374. I hope that I will be hearing from you or your lawyer soon.

Sincerely, Christina Rainville

(Commonwealth's Exhibit 64; N.T., PCRA at 6668-69.)

Ms. Buck's response is undated, but was written in response to Ms. Rainville's letter. It was admitted into the record at the PCRA hearing as Commonwealth's Exhibit 63. It reads as follows:

Dear Ms. Rainville:

In response to your letter dated November 15, 1996, I must say that whatever 'new evidence' you claim to have discovered is, in fact, untrue. I realize that your law firm was appointed to Miss Lambert's case and you will do whatever you can in defense of her. You would even place Mr. Yunkin at the scene of the crime and try to pin the blame, so to speak, on him in an effort to help Michelle (Lisa). The truth is, however, Mr. Yunkin was *not* there and he did *not* participate in the crime. Michelle knows that fact as well as I do. I will not fabricate lies and corroborate with Michelle just to get myself off easy. You

see, contrary to popular belief, I do not take other people's lives into my own hands. I don't know if Mr. Yunkin knew what Michelle was planning to do but I do know he was not there and he did not kill Laurie. I will not lie and cause him to have a life sentence for something he didn't even do. I know exactly what being in that situation feels like. I have no information that would help Michelle nor do I have any that would hurt Lawrence.

**\*66** Ms. Rainville, if I'm to be granted a re-trial, it will not be based on circumstantial evidence which I know to be untrue. I resent the assumption that I would jeopardize someone else's life just to make my own a little easier. That is a character flaw of your client, Ms. Lambert, and I am *nothing* like her. There is only one truth. I know it. Michelle knows it. God knows it.

I will be of no assistance to you and Lisa Michelle Lambert.

Cordially, Tabitha F. Buck

(Commonwealth's Exhibit 63 (emphasis in original); N.T., PCRA at 6670-72.)

While we believe that Ms. Buck's decision to withhold portions of the truth in her deposition testimony and in her discussions with Detective Geesey was unfortunate, we do not think that this choice establishes that she is a wholly untruthful person who is not worthy of belief in any way in this proceeding. In fact, she relates aspects of the story which are consistent with other testimony in evidence and which are consistent in general terms with her letter to Ms. Rainville written prior to the deposition. There cannot be a justification for lying under oath but there certainly can be explanations which bear on the overall credibility of the person shown to be untruthful on certain points.

From Ms. Buck's testimony, we can conclude with certainty that Ms. Lambert is anything but innocent of the charge of murder. Ms. Buck's testimony is consistent with the observations made by Mr. Kleinhans, Mr. and Mrs. Fry, and with the history of hatred and animus demonstrated by Ms. Lambert during the summer and fall of 1991. The evidence as to Ms. Lambert's planning of the assault, Ms. Lambert's and Ms. Buck's approach to the condominium, their escape, and their activities the remainder of the day of December 20, 1991, is consistent with much of the evidence both at trial and the PCRA.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
(Cite as: 1998 WL 558749 (Pa.Com.Pl.))

In assessing Ms. Buck's credibility in the PCRA hearing, we carefully considered her testimony in light of its inconsistency with her deposition. We have carefully considered the fact that she was untruthful at points in her deposition and in her discussions with Detective Geesey. We observed her as she testified and we noted the substance of her responses and the manner in which she considered and responded to questions. Unlike Ms. Lambert, Ms. Buck does not have an answer for everything. She has acknowledged that there are certain facts which she cannot reconcile, and she is candid about that which she does not remember. She was forthcoming about her untruthful answers in her deposition and in her discussion with Detective Geesey.

We firmly believe that Ms. Buck found herself in the middle of a vengeful conspiracy. We do not doubt for a minute that she was aware that Ms. Lambert intended to do harm to Laurie Show and that she went along for reasons that only she knows. She is not an innocent. But to her credit, she acknowledges that fact.

Ms. Buck has nothing to gain by lying about Ms. Lambert's involvement in the death of Laurie Show. In her testimony at the PCRA, she had the candor and the decency to accept responsibility for her own role in the killing. She knows that she blocked Laurie Show's path as Laurie tried to escape. She knows that she held Laurie's legs down while Ms. Lambert cut her throat. In our close observation of Ms. Buck as she testified and in our subsequent consideration of her testimony, we find her to be credible in her description of the murder. She has acknowledged that she deserves her sentence because of her actions on December 20, 1991. She has acknowledged her guilt under oath in a courtroom in the same courthouse in which her own PCRA petition is pending. What possible impact will this admission have on her own PCRA claim that her trial resulted in a "fundamentally unfair" conviction?

*67 Ms. Buck knows full well that, when she took the stand to acknowledge, under oath in a courtroom, that she actively participated in the killing of Laurie Show, she severely compromised any chance she has that a state or federal court will be inclined to find that she has been wrongly convicted. Her testimony will not take a day off her life

sentence and will not change the events of December 20, 1991. We find her credible in her description of what happened that morning.

E. Lawrence Yunkin's Involvement

In his statement to the police and in his testimony at trial, Lawrence Yunkin denied involvement in the murder of Laurie Show. Ms. Lambert denied Mr. Yunkin's involvement in her statement to Corporal Solt. In four months' of letters from prison, she denied his involvement. At trial, Ms. Lambert implicated Mr. Yunkin in the murder of Laurie Show. Much of petitioner's case in the PCRA hearing involves evidence pointing to Mr. Yunkin's involvement, evidence as to his credibility, evidence as to why Ms. Lambert might have "covered" for Mr. Yunkin, and an attempt to discredit those facts which show that Mr. Yunkin was not involved.

In separate sections of this opinion we consider some of those issues. The "29 questions" go directly to Mr. Yunkin's involvement and this is discussed in Section VII.B., *supra*. Kathleen Bayan's testimony would implicate Mr. Yunkin and is discussed in Section VII .F, *infra*. Similarly, Hazel Show's testimony concerns Mr. Yunkin's involvement and is considered in Section VII.G, *infra*. The issue of the pearl earring contains allegations of after-discovered evidence and prosecutorial misconduct and is considered in a separate section of this opinion, Section VII.N, *infra*.

In this section, we address the remaining allegations pointing to Mr. Yunkin's involvement. The first of these is the license plate found in the search of Mr. Yunkin's car after his arrest. The license plate bears the number YHM-028. Two characters of this license plate were identified by Kathleen Bayan to Detective Savage in his interview of her in July 1992. Petitioner points to this evidence as conclusive proof that Mr. Yunkin drove in the condominium complex that morning with the YHM-028 license plate and later changed the license plate to evade the authorities.

There is a problem with this line of reasoning. The police investigation at the time the license plate was found in the Yunkin car revealed that YHM-028 was a plate *registered to Lawrence Yunkin*. It was apparently a license plate which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

was on a van previously owned by Mr. Yunkin. In any event, the police concluded at that time that the license plate was of no evidentiary value. This court finds it unlikely that Lawrence Yunkin would have "disguised" his vehicle by using another license plate which was registered to him. We do not believe that the license plate found in the Yunkin vehicle implicates Mr. Yunkin in the murder.

A second issue concerns 158 seconds of the audiotape of Mr. Yunkin's statement. At the beginning of one side of the tape of a cassette used to record Mr. Yunkin's statement is 158 seconds of narrative in a female voice. The narrative has nothing to do with this case and appears to be an academic lecture of some kind. Did the police mask an incriminating portion of Mr. Yunkin's statement by taking the cassette to an academic lecture? That seems unlikely. More likely is that the cassette used to record Mr. Yunkin's statement had been used by someone on a prior occasion to record a speech. It seems likely that the police simply did not rewind the tape completely. This lack of attention to detail on the part of Detective Savage in preparing the tape recorder to record Mr. Yunkin's statement does not prove anything.

**\*68** The third issue is related to the tape recording of Mr. Yunkin's statement. Listening to the tape, one can hear several "clicks," indicating that the tape was stopped, or paused, and started again. District Justice Savage recalls that the taping was interrupted so that Mr. Yunkin could confer with his attorney, Douglas Cody, Esquire. This is confirmed by Mr. Cody. (N.T., PCRA at 6465.) There is a break near the end, after Mr. Yunkin had been given an opportunity to review his typed statement. At that point, he included several corrections. Petitioner contends that the "breaks" or "clicks" indicate occasions when Mr. Yunkin was coached by the police to state certain facts which would incriminate Ms. Lambert or to remove certain statements exculpatory to Ms. Lambert.

This court found Mr. Cody's testimony on this subject to be credible and convincing. Mr. Cody testified that the police did nothing improper in taking the statement and that the recorder was not turned off for any improper reason. (N.T., PCRA at 6466.) When asked whether the police officers did anything to coach his client, Mr. Cody responded: "Absolutely not." (*Id.*) When asked if the police

did anything to suggest how Mr. Yunkin should answer or should not answer, Mr. Cody replied: "Not on one question." (*Id.*) Mr. Cody also confirmed that he did not observe the police erase anything on the tape. (N.T., PCRA at 6467.) Finally, Mr. Cody confirmed that the transcript of the statement accurately reflected the statement given by Mr. Yunkin. (*Id.*)

Based on the record from the PCRA hearing, we find beyond any doubt that there was no misconduct in the taking or recording of Mr. Yunkin's statement.

A fourth issue regarding Mr. Yunkin's involvement concerns the alleged date rape of Laurie Show. We should note that the only "proof" of the date rape came from police reports of discussions with Hazel Show regarding her daughter's brief relationship with Mr. Yunkin. Mr. Yunkin never acknowledged a "date rape," no police report was filed and no investigation conducted. In fact, it appears that Ms. Lambert is convinced that there was never any "date rape." A review of her many letters to Mr. Yunkin from prison in which she characterized Laurie Show as a "tramp," "slut," and "whore" would suggest that Ms. Lambert believed the brief relationship between Mr. Yunkin and Laurie Show, if any, was consensual and not the product of any force by Mr. Yunkin. The only possible relevance of this "date rape" charge was Mr. Yunkin's purported fear that the incident would be investigated by the police and that he would go to jail for rape. There appears to be nothing more than speculation and surmise in support of this argument.

At best, it would support some animus by Mr. Yunkin or some motivation by Mr. Yunkin to murder Laurie Show. We already know that Mr. Yunkin drove Ms. Lambert and Ms. Buck to the condominium that morning, that he was aware they had certain items with them which could be used in an assault on Laurie Show and that he picked them up after this was over. We believe Mr. Yunkin was aware of their plans. There is no doubt that Mr. Yunkin was involved in this conspiracy. Could his fear of a date rape charge have motivated his participation in this murderous conspiracy? Certainly. Does it establish that he was in the condominium that morning committing the murder? It certainly does not.

F. Kathleen Bayan's Observation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)

**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

**\*69** The prosecution's failure to disclose the information supplied by Ms. Bayan in no way violated the due process rights afforded by Brady and Pa. R.Crim. P. 305.

Kathleen Bayan contends that she spoke to Detective Savage in early July 1992. As a result of that conversation, Ms. Bayan prepared a handwritten statement for Detective Savage detailing the events of the morning of the murder. (Petitioner's Exhibit 2008 at DA3037-DA3042.) According to her statement, she was pulling out of her driveway in the Oak Condominium complex when she saw a late model brown car speeding by. The driver was male and appeared to have light hair. The front and back passengers were of an indeterminate sex and had dark clothing on. Ms. Bayan stated that she could not see their faces clearly because of the distance between the cars, because of the dirty car windows and because of a perceptual disability that limits her span of focus. She did, however, note that the occupants of the car were between the ages of 16 and 22.

Ms. Bayan told this to Detective Savage when he came to her condominium in July 1992 to inquire about the whereabouts of her son, Elliott, on the morning of the murder. (N.T., PCRA at 4759-60, 4761.) Apparently, witnesses had observed a number of young people at or around the school bus stop near the condominium entrance and Elliott was one of those students who occasionally waited for the bus. Kathleen Bayan related this story to Detective Savage after approximately one-half hour of a discussion regarding herself, her son and her son's educational and medical problems.

At the PCRA hearing, Ms. Bayan related that on the morning of the murder, she left her home between 7:10 and 7:15 a.m. for an appointment in Harrisburg. (N.T., PCRA at 4752.) As she started to pull out of her driveway, she saw a brown car driving in an erratic manner on Black Oak Drive. She recalls seeing a man with long curly blond hair wearing a baseball cap driving with a front female passenger and a back female passenger. (N.T., PCRA at 4757.) He was driving very fast and was swerving. (N.T., PCRA at 4758.) It appeared to her there was an argument going on inside the car and that the driver was attempting to push down the heads of the passengers. (N.T., PCRA at 4757-58.) Ms. Bayan clearly recalled seeing the face of the girl in the

backseat and identified her as Tabitha Buck. (N.T., PCRA at 4757, 4796-97.) She saw all this in a matter of seconds as they drove past her going 30 to 35 m.p.h. (N.T., PCRA at 4803.) She then followed them out of the condominium complex, following several car lengths behind. (N.T., PCRA at 4802.)

1. Credibility

Kathleen Bayan observed a great deal of detail from her vantage point in her own car while the car in question flashed past her. She indicated that there was an argument going on and recalls the color of the car, the color of the driver's hair and a description of the passengers. She offered no explanation for not coming forward with that information between December 1991 and July 1992. This fact in and of itself would not be fatal to her credibility but it does raise a question. She had ample opportunity to read newspapers, become acquainted with the facts of the case and come to know the details of the description of the participants long before July 1992.

**\*70** In addition, she did not immediately tell Detective Savage of her observations. Only after she had a lengthy discussion of other personal issues, did she offer her observation of what she had seen.

It is appropriate for the PCRA court to consider the credibility of a witness to determine if the after-discovered witness's testimony is reliable. Bonaccurso, 425 Pa.Super. at 490, 625 A.2d at 1202 (Beck, J., concurring). Ms. Bayan's credibility was somewhat diminished in her testimony in the PCRA proceeding by her responses to questions on cross-examination. She acknowledged that she has a visual handicap. This handicap affects her ability to perceive objects other than that specific object on which she focuses. That is, as Ms. Bayan explained, if she looks at one object, she cannot see the details of anything else surrounding that finite discreet item. This suggests that perhaps if Ms. Bayan was looking at the long curly hair of the driver of the brown car, perhaps she was unable to see the occupants. Or, if she was observing the make and color of the car, perhaps she was unable, due to her handicap, to see the occupants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Ms. Bayan testified in this proceeding by way of teleconference from Pensacola, Florida. She had represented to the court and counsel in a telephone conference at the beginning of the proceeding that she was unable to travel to Pennsylvania because she is the sole support and transportation for a handicapped fiancé. Because of this sympathetic concern, the court made arrangements for Ms. Bayan to testify by way of video conference. She testified from a public broadcasting studio in Pensacola and her testimony was observed and questions posed to her from the WGAL television studio in Lancaster, Pennsylvania. These arrangements were made because the credibility of Ms. Bayan is a crucial part of this hearing and because credibility can best be assessed by a face-to-face observation of a witness as the witness is telling her story and responding to questions.

There are two important credibility points regarding Ms. Bayan's testimony. First, by the court's observation of her as she testified, she appeared less than completely credible as she answered the questions. The court is not surprised that Detective Savage, upon his interview with her in July 1992, found there to be problems with her credibility.

The second and more important issue as to Ms. Bayan's credibility has to do with the contention that she was unable to travel to Pennsylvania. As we learned later in the hearing, Ms. Bayan has an active warrant for her arrest in the offices of District Justice Savage, formerly Detective Savage. [FN77] This warrant arises out of her failure to pay certain county tax obligations while she was a resident of Lancaster County. (N.T., PCRA at 6327-28.) We also note that she was the defendant in a lawsuit by her condominium association and the judgment was satisfied by a sheriff's execution sale of her furniture, presumably left behind at the condominium. (N .T., PCRA at 6329-30.) Ms. Bayan was sued twice before by the taxing authority, permitted the obligations to go to judgment, and satisfied the prior two obligations upon the issuance of warrants. (N.T., PCRA at 6325-26, 6329-30.)

FN77. The fact that the warrant was issued in the office of District Justice Savage is more coincidence than anything else. District Justice Savage's office happens to have jurisdiction over the area where Ms. Bayan resided.

**\*71** It is reasonable to infer that she was aware that a warrant had issued or would issue for her given her past history with the local taxing authority. One is left to wonder whether Ms. Bayan's reluctance to come to the jurisdiction was truly the result of her life situation or rather whether the existence of an active warrant in Lancaster County played some role. Even giving Ms. Bayan the benefit of the doubt, this fact does impugn her credibility.

2. Discovery obligation

In Pennsylvania, it is mandatory for the Commonwealth to disclose evidence which is favorable to the accused and which is material to either guilt or punishment. Pa. R.Crim. P., Rule 305(B)(1), 42 Pa.C.S.A. The comment to Rule 305 indicates that the rule is intended to apply the constitutional guarantees which Brady commands.

Absent a specific request by the defendant for exculpatory evidence, a prosecutor has a duty to make evidence available to the defense that is truly exculpatory rather than merely favorable. [FN78]

FN78. The distinction between exculpatory evidence and favorable evidence is that exculpatory evidence extrinsically tends to establish a defendant's innocence of the crimes charged, contrasted to that which, albeit favorable, is merely collateral or impeaching. Commonwealth v. Hudgens, 400 Pa.Super. 79, 97-98, 582 A.2d 1352, 1361 (1990); Commonwealth v. Redmond, 395 Pa.Super. 286, 577 A.2d 547, 552 (1990); Commonwealth v. Hicks, 270 Pa.Super. 546, 550, 411 A.2d 1220, 1222 (1979). The evidence suppressed in Redmond was the identity of a confidential informant who gave information concerning an alternative suspect in a murder case, where the prosecution's case rested on the testimony of only one police officer. Redmond, 395 Pa.Super. at 298, 577 A.2d at 552. The court opined that the evidence was both exculpatory and material, as there was reasonable probability that the evidence might have made a difference in the outcome of the case. Id. at 299, 577 A.2d at 553.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 68
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
(Cite as: 1998 WL 558749 (Pa.Com.Pl.))

The Supreme Court of Pennsylvania has defined Brady violations as: (1) the failure to disclose an agreement between the Commonwealth and a witness, Commonwealth v. Moose, 529 Pa. 218, 602 A.2d 1265 (1992); (2) the failure to disclose out-of-court statements by an accomplice claiming responsibility for the murder, Commonwealth v. Green, 536 Pa. 599, 640 A.2d 1242 (1994); and (3) the pretrial failure of the Commonwealth to disclose evidence proving bias of a defense witness, Commonwealth v. Ulen, 539 Pa. 51, 650 A.2d 416 (1994).

In contrast, the Pennsylvania Supreme Court has held that where the prosecution did not reveal statements by its witness that he saw someone other than the defendant in possession of the murder weapon several weeks after the murders, such evidence was not exculpatory and, thus, lacked materiality. Buehl, 540 Pa. at 504, 658 A.2d at 776. Likewise, a prosecution's failure to disclose an alleged agreement with one guilt-phase witness was not a Brady violation entitling the defendant to a new trial. Commonwealth v. Morales, 549 Pa. 400, 701 A.2d 516 (1997).

A central issue in this case is whether Kathleen Bayan's disclosure to Detective Savage in July 1992 should have been disclosed to Attorney Shirk. Mr. Kenneff was aware of the Bayan disclosure and was aware that Detective Savage had obtained this information from her just prior to the start of the trial. At that time, Ms. Lambert had related her story to Corporal Solt. Her story, as set forth in the "Solt Statement," was that she and Ms. Buck left the Show condominium, proceeded across the condominium complex, across a lawn, down a gully, through some bushes and across a field to Oak View Road. (*See* Section VII.L, *infra.*) There, on Oak View Road, they were picked up by Lawrence Yunkin. As of early July 1992, the only "story" the Commonwealth knew from Ms. Lambert was that she fled on foot from the Show condominium to Oak View Road. She was not contending that Mr. Yunkin was in the complex, that the two young women entered the car in the condominium complex, or that they entered the condominium complex and drove around for any purpose.

**\*72** The district attorney's discovery obligation under Rule 305 and under Brady was to disclose information to the defense which would be material and exculpatory. As of the start of trial, the disclosure by Kathleen Bayan was neither material nor exculpatory to defendant. In fact, all Ms. Bayan's disclosure accomplished was to place Mr. Yunkin in the condominium complex. This may have been inculpatory for Mr. Yunkin, but not exculpatory for Ms. Lambert.

Mr. Kenneff evaluated his discovery obligation and chose to communicate with Mr. Shirk regarding Ms. Lambert's position. He did so in a letter asking simply whether Ms. Lambert still asserted that Mr. Yunkin picked her up on Oak View Road. (Petitioner's Exhibit 1764.) Mr. Shirk responded to Mr. Kenneff that this was her contention.

Under these facts and under Rule 305 and Brady, Mr. Kenneff had no obligation to disclose the Bayan statement to Mr. Shirk. Examine for a moment what possible basis there would be for the disclosure. Given Ms. Lambert's statement to Corporal Solt, providing the Bayan disclosure to Ms. Lambert would give her a reason to change or modify her story. Giving a criminal defendant an opportunity to revise her story is not a basis for requiring disclosure in discovery.

Should the Commonwealth have anticipated that Ms. Lambert would dramatically change her story during the course of the trial? Discovery under either Rule 305 or Brady does not require that the prosecution employ a crystal ball. Now, in hindsight, we know that Ms. Lambert changed her story at trial and placed Mr. Yunkin in the condominium complex. This story was told after the Commonwealth rested its case and during the defense case-in-chief.

The question then became whether Mr. Kenneff had an affirmative obligation to provide information about the Bayan statement to the defense once Ms. Lambert told a new version of her story during trial. The Commonwealth's contention was that Ms. Lambert was lying at trial. Her statement of December 21, 1991, was the most credible version of the facts because she gave that statement before she understood the legal ramifications to her of placing herself in the condominium. She had every reason to change her story at trial and the Commonwealth's argument that the story at trial was a fabrication had considerable merit.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 69
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

   Mr. Kenneff did the responsible thing by confirming with Mr. Shirk what Ms. Lambert's story was going to be. Mr. Shirk replied that Ms. Lambert contended that she was picked up on Oak View Road. There is nothing unusual about one party weighing its obligations under the rules and making choices under those rules as to what must be disclosed. This is the essence of the adversarial process and Mr. Kenneff did nothing more than evaluate his own obligations under the rules of discovery. His choice, upon confirmation of the story by Mr. Shirk, to not disclose the Bayan statement was proper.

   When Ms. Lambert changed her story at trial, Mr. Kenneff's obligation was the same: to disclose evidence that was exculpatory. Ms. Bayan's statement was not exculpatory merely because Ms. Lambert calls it exculpatory. It is true that Ms. Bayan's statement, if credible, would support some part of Ms. Lambert's trial testimony. Ms. Bayan's statement would support only Ms. Lambert's description of how she fled that morning. Yet, Ms. Lambert's own testimony put her in flight from the condominium after participating in an assault which led to a murder. Her trial testimony established that she was deeply involved in the conspiracy and the murder. Ms. Bayan's statement might have been inculpatory to Mr. Yunkin but not exculpatory to Ms. Lambert.

   **\*73** Exculpatory evidence is evidence which extrinsically tends to establish a defendant's innocence. Hudgens, 400 Pa.Super. at 97-98, 582 A.2d at 1361. Ms. Bayan's story does nothing to establish Ms. Lambert's innocence. Evidence that Ms. Lambert was seen fleeing the scene of a murder in the company of two people whom she identified at trial as the murderers would not "extrinsically tend to establish" her innocence. The Kathleen Bayan story is, simply stated, not exculpatory as to Ms. Lambert. At best, Ms. Bayan's story would tend to support the version Ms. Lambert told at trial and would thereby "shade" her level of culpability for the murder. Yet, by her own admission of going with Ms. Buck to the condominium that morning, of planning an assault on Laurie Show and of participating at some level in the assault which led to Laurie Show's death, she would still be guilty of first degree murder. The information would, therefore, not be "material" for Brady/Giglio purposes or for compliance with Pa. R.Crim. P. 305 in that the information would not

have changed the outcome of the trial.

   3. Truth-determining process

   The ultimate question is whether the failure to disclose the Bayan statement so undermined the truth-determining process that no reliable verdict was possible. This court finds that even if Ms. Bayan had testified at trial, even if Ms. Lambert had the support of Ms. Bayan for her revised story that Mr. Yunkin was in the complex, the verdict would have been the same.

   We did not find Kathleen Bayan credible at the PCRA hearing. We find that Ms. Lambert's statement to Corporal Solt of how she fled, Ms. Buck's testimony about how they fled together, Mr. Kleinhans's testimony about seeing two hooded figures of about the same size heading away from the condominium, and the observations of Mr. and Mrs. Fry, to be convincing and credible on this point. Because it is contrary to overwhelming credible evidence, her story would have had no impact. Even if we were to find that the failure to disclose Ms. Bayan's statement was a constitutional violation, it did not so undermine the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

   In fact, petitioner's contention that Ms. Bayan saw Ms. Lambert, Ms. Buck and Mr. Yunkin in the complex that morning cannot be reconciled with petitioner's contention that Mrs. Show saw them as well. Ms. Lambert would have this court believe that Mrs. Show left the school at 7:25 a.m., per Ms. Berry. Testimony has shown that the trip from the school to the complex takes approximately ten minutes. If Mrs. Show saw the three that morning, it would have been around 7:35 a.m. Yet, Ms. Bayan testified that she saw them as she left for Harrisburg between 7:10 a.m. and 7:15 a.m. This internal inconsistency in petitioner's case lends further support to our finding that Ms. Bayan's testimony would not have changed the outcome of the trial. Nor does it have any impact on the reliability of the verdict.

   G. Hazel Show's Recollection of Mr. Yunkin's Car

   **\*74** Mrs. Show testified at the PCRA hearing that she saw a car on the morning of December 20, 1991, that she now

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 70
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

believes may have been Mr. Yunkin's car. She testified in response to questions by petitioner's counsel:

Q. Mrs. Show, on the morning of December 20th, 1991, when you drove back into the condominium complex, what, if anything, did you see driving out of the condominium complex?

A. Remembering in 1991, I did not remember anything. Until 1997 I had a memory of seeing Yunkin in a car.

Q. Can you tell us what you remember today of seeing Yunkin in the car?

A. I remember coming in the entrance. I don't know approximately where. But it had to be in a break between the trees and the shrubbery, looking over to my left, and seeing Lawrence's face. At that time not even realizing who it was, that it was just a man with blond hair. But he's looking at me with a startled, surprised look on his face, seeing him push someone down in the front seat with blond hair and seeing someone with dark hair in the back seat. But I don't recall seeing the car.

Q. Do you recall what color the car is?

A. It's just a brownish color.

(N.T., PCRA at 5635-36.)

Mrs. Show was then asked if she had ever discussed the possibility that she saw this car with Detective Savage:

Q. Okay. Back in 1991, 1992, did you have any discussions with anyone about it?

A. No.

Q. Did you discuss with Detective Savage at all the fact that you'd seen a brown car?

A. What I told Detective Savage, he had told me a neighbor lady mentioned that she had seen a brown car leaving our complex.

When he said that, I saw a flash of a brownish color and I said to him, a brownish color? And then we went over this, had I seen a car? I wasn't sure. Where was it? I wasn't sure. What type of car? Was anyone in it? And I had nothing in my memory except when he said this brown color, I just saw a flash of a brown car. Not even knowing that it was a car or anything and I tried to jog my memory to get more information but there wasn't anything there.

And I started to become upset about this because it was important because this neighbor lady was saying there were three people in the car. But nothing was there. I

couldn't remember anything and he told me that I was getting upset and he told me not to worry about it, if something came back, we'd go from that point. But nothing ever came back and I was to testify in a couple of days and I just forget [sic] all about it.

Q. When did you have this discussion with Detective Savage?

A. It was probably a couple days before the trial.

Q. Before Ms. Lambert's trial?

A. Yes.

(N.T., PCRA at 5642-43.)  [FN79]

> FN79. During the federal habeas corpus hearing, Mrs. Show informed District Attorney Madenspacher that she recalled seeing a car of brownish color the morning of the murder as she reentered the condominium complex. Her memory was refreshed as she sat in the courtroom listening to the testimony of former Detective Savage. This was immediately brought to the attention of the federal judge, who conducted a hearing in chambers on April 16, 1997. Mrs. Show's recollection was then made a part of the federal record.

Her chief recollection is that the car was coming toward her and there was nothing impeding her view of the car. She recalls that she had to drive a distance after she saw the car. It is possible that she saw the car out on Oak View Road. (N.T., PCRA at 5648.) She thinks it was around 7:20 a.m. when she was coming back from the school. (N.T., PCRA at 5649.)

**\*75** Mrs. Show testified at the PCRA hearing that Detective Savage told her "not to worry about it." Petitioner's counsel referred Mrs. Show to her federal testimony and asked the following questions:

Q. Do you remember testifying in federal court that Detective Savage told you not to dwell on it?

...

Q. Do you remember testifying to that?

A. I think I've said that here. That he said, you know, not to worry about it, not to get upset about it or dwell on it because as far as what I had to testify to, I was saying what I remembered and something that I had no memory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Page 71

about there wasn't much I could do about it. So don't get upset about it.

(N.T., PCRA at 5644-45.)

This revelation by Mrs. Show, long after the 1992 trial, presents several issues. First, does this testimony establish that she saw the Yunkin car? Second, was Detective Savage's instruction to her "not to worry about it" a form of misconduct? Third, is the information about the car after-discovered evidence entitling Ms. Lambert to relief?

First, Mrs. Show did not say at the PCRA hearing that she remembered a car in 1992. She recalled a brownish flash and was not sure it was a car. She did not recall a car until she was sitting in a federal courtroom in 1997 listening to District Justice Savage. At most, this testimony, had it been presented in 1992, would buttress the testimony of Ms. Bayan that a brown car was seen leaving the condominium complex. The problem is that Mrs. Show cannot conclusively put the car inside the condominium complex. She cannot rule out the possibility that she saw the car out on Oak View Road.

Second, as to the misconduct question, it appears from Mrs. Show's testimony that she was not reasonably certain of any detail in 1992. From her own description, she was becoming very upset because she thought she was failing to recall important information which would help the police. It was in this context that Detective Savage told her not to worry. At that time, the police had the testimony of the Kleinhanses and the Frys who put Ms. Lambert and Ms. Buck fleeing together across the fields toward Oak View Road. Ms. Lambert and Mr. Yunkin had both told the police in their statements that the pick up was on Oak View Road. The only information to disclose is that Mrs. Show had an "image" of a brownish flash as she approached or entered the complex that morning. It does not seem that there was really anything to disclose. Detective Savage's comment "not to worry about it" in the circumstances does not appear to be a directive to "bury" exculpatory evidence.

Third, is this after-discovered evidence? It certainly was unavailable at the trial, so the first prong is met. We turn then to the question of whether the information is "exculpatory." At best, it corroborates the story told by Ms.

Lambert at trial and undermines the story told by Ms. Lambert to Corporal Solt. It would tend to show that Ms. Lambert was being untruthful with the police when she gave her statement. Given the paucity of detail in the story, it is entirely likely that the recollection would have been given little weight. It was certainly not exculpatory in the sense that it established that Ms. Lambert was fleeing the scene of a murder. Given the fact that she planned the activities of that morning, given the fact that she participated in the assault on Laurie Show that morning and given the fact that, at trial, she was placing responsibility for the murder on Mr. Yunkin and Ms. Buck, the fact that she was seen in a car in their company fleeing the complex does not sound too exculpatory. The only significance of this "recollection" of Mr. Yunkin's car would be to place Mr. Yunkin at the scene. But evidence inculpatory to Mr. Yunkin is not exculpatory to Ms. Lambert. If Mr. Yunkin and Ms. Lambert are fleeing the scene of a murder arising out of an assault which Ms. Lambert "started" and Mr. Yunkin "finished," the fact that she is seen in his car is hardly exculpatory.

**\*76** It is unlikely that this information would have changed the outcome of the trial. Even if entirely believed and even if it was found to support Ms. Lambert's story that Mr. Yunkin was inside the condominium complex and that she was in the car with him, this does not exculpate Ms. Lambert. It might lend more support to an argument that Mr. Yunkin was somehow involved, which does not exclude Ms. Lambert's involvement. Under the best story put forth by Ms. Lambert, she was in the condominium and participated in the acts which led to the death of Laurie Show. She claims she left and Mr. Yunkin went in. We never believed that story. The fact that Mrs. Show remembered something that may buttress one fact of a story we found to be incredible does not suggest that the story became any more credible. It would not have made a difference in the outcome of the trial.

H. The Mihalakis Issue

Shortly before trial, Mr. Shirk informed Mr. Kenneff that Dr. Mihalakis, a forensic pathologist, would be testifying for the defense. In April 1992, Dr. Mihalakis had entered into a contract with the County of Lancaster to perform forensic pathology services in criminal cases. Over the weekend

Not Reported in A.2d                                                                                    Page 72
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

before trial, Mr. Kenneff placed a telephone call to Dr. Mihalakis to express his concern about the doctor's choice to testify for the defense.

The issues regarding the involvement of Dr. Mihalakis were raised at trial and in post verdict motions, and considered by this court in its opinion of July 19, 1994. Nevertheless, petitioner has included this issue in her case. The Commonwealth argues that this issue has been previously litigated and, therefore, waived. Because petitioner raised a claim of after-discovered evidence and "witness tampering" with respect to Dr. Mihalakis, we will address the issue in this opinion. We note further that the federal district court featured this issue in its discussion of the federal habeas petition . [FN80]

FN80. *See* Lambert v. Blackwell, 962 F.Supp. at 1545-47.

The issues raised in the PCRA petition are:

(1) Dr. Mihalakis's income from Lancaster County increased 400 percent the year after the Lambert trial (1993) and then dropped to nothing, (Exhibit A, Section A at para. 17);

(2) Mr. Kenneff discussed with Dr. Mihalakis his proposed testimony and cross-examination questions and that Dr. Mihalakis did not want Mr. Kenneff to be upset with him and offered to withdraw, thus Dr. Mihalakis changed his testimony to help the prosecution, (Exhibit A, Section A at para. 18); and

(3) Mr. Kenneff's unauthorized, pretrial ex parte contact with a defense expert, Dr. Mihalakis, (Exhibit A, Section B(4) at para. 30).

In 1994, in response to Ms. Lambert's long delayed post verdict motions and briefs, we considered this issue in an opinion. At that time, we stated:

During the trial, a lengthy conference was held in chambers regarding the possible testimony of Dr. Isidore Mihalakis. Dr. Mihalakis is a forensic pathologist who was called by the defense to testify as to the wounds inflicted on the neck of the victim. This expert was going to explain the difficulty, or impossibility, of a person speaking with

these wounds. The point of this testimony was to rebut the Commonwealth's evidence that the victim identified her killer just before she died.

**\*77** Prior to the testimony of Dr. Mihalakis, counsel for the defense submitted a motion for sanctions to the court on the basis that the assistant district attorney had contacted Dr. Mihalakis in advance of his testimony. Defendant argued that the assistant district attorney attempted to intimidate or coerce Dr. Mihalakis.

The court held a hearing on this motion in chambers with the assistant district attorney, the district attorney, defense counsel, defendant's private investigator and Dr. Mihalakis all present....

Essentially, Dr. Mihalakis was under a consulting contract with the Lancaster County District Attorney's Office. The assistant district attorney, Mr. Kenneff, indicated his surprise and concern when it was learned that Dr. Mihalakis would appear as a defense witness. Mr. Kenneff was concerned as to his ability to cross-examine a witness whom he has retained for testimony in other cases. He placed a call to Dr. Mihalakis and raised this concern and also discussed with him, in general terms, his anticipated trial testimony.

The court specifically addressed Dr. Mihalakis at the hearing in chambers. The court questioned Dr. Mihalakis on whether he felt intimidated, coerced or in any way threatened by Mr. Kenneff's call. Dr. Mihalakis emphatically stated he did not. In fact, Dr. Mihalakis had issued a report and indicated, in chambers, that it was his intention to testify consistent with that report.

Nothing about the testimony of Dr. Mihalakis in the hearing in chambers nor anything about Dr. Mihalakis's testimony during the trial indicates that there were any threats, intimidation or coercion. The court found defendant's motion for sanctions to be without any basis in law or in fact and properly denied the motion.

Commonwealth v. Lambert, July 19, 1994, slip op. at 22-23.

At trial in 1992, Dr. Mihalakis testified as to the cause of death. He agreed with Dr. Penades that, essentially, Laurie Show bled to death. He stated that asphyxiation due to breathing in blood was a contributing factor. His first opinion was as to cause of death and the length of time it would have taken the victim to die. He testified:

A. To bleed to death, it would take multiple minutes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

There are a lot of variables; however, I think it would definitely be considerably less than a half hour.

Q. Somewhere between multiple minutes and considerably less than a half hour?

A. Right.

(N.T., Trial at 341.) He was asked how long it would take for Laurie Show to lose consciousness. He stated: "Unconsciousness would have to be minutes. It would not have to be a huge number of minutes but it wouldn't be that terribly quickly also." (N.T., Trial at 342.)

Dr. Mihalakis was then asked by defense counsel about Laurie Show's ability to speak. He noted damage to the tongue muscle and to the structures in the neck. He gave the following testimony:

Q. What would be the effect of that loss of dexterity to the central portions of the tongue?

*78 A. The loss of the dexterity would be those words that have a tongue related sound; may be somewhat slurred and less intelligible.

Q. And a tongue related sound as you described it would be, for the record and for the Court, what kind of a sound might that be?

A. A sa, da, ja, ka, yul.

(N.T., Trial at 344.) Dr. Mihalakis further testified:

Q. There may be testimony presented at a later date in this trial that the decedent might've possibly said, Michelle did it. Are the sounds in that phrase, would they be affected by the damage to the muscles in the center of the tongue, affecting the tongue and speech, would that have affected the ability to speak that phrase?

A. It would have to be affected in part. Ma is predominately a lip sound, and the tongue and lips are controlled by a different set of nerves so the ma sound should not've been affected. If it was affected it was to a minor degree.

The chael may have been somewhat less clear and the da may have been somewhat less clear.

(N.T., Trial at 344-45.)

On cross-examination at trial, Dr. Mihalakis affirmed this testimony:

Q. Moving on to the issue to the injuries to the neck and the effect on the ability to speak. As I understand your testimony, you feel that the ability of Laurie Show to speak as a result of the injuries that she suffered would be compromised but not eliminated.

A. That is correct.

(N.T., Trial at 357.)

There was absolutely nothing about this testimony which was in any way inconsistent with Dr. Mihalakis's report to defense counsel of June 29, 1992. This report was prepared before Mr. Shirk informed Mr. Kenneff that Dr. Mihalakis would be testifying and before Mr. Kenneff had any contact with Dr. Mihalakis. In the report of June 29, 1992, Dr. Mihalakis addresses a question put to him by defense counsel's investigator:

Question 3: Could Laurie Show say anything afterward; could she have said, 'Michelle did it'?

Answer: The wound track of the neck wounds described by Dr. Penades involves cutting of a major portion of the base of the tongue except for possibly the pillars on each side. Such a cut would certainly limit but not totally eliminate phonation especially words and letters that involve the tongue. M is a letter that is primarily phonated by the lips. If the head is down and air can pass from the windpipe to the mouth M could certainly be enunciated. 'Chelle' are somewhat more difficult to enunciate and 'did' it very much tongue dependent so that would be very difficult to enunciate but not totally impossible depending on how much tongue muscle was left. We are told by Dr. Penades that literally one could look at her throat and see the vertebral column. However, we are not told about the sides of the tongue. The other factors that must be taken into consideration are the recurrent laryngeal nerves. If one such nerve is cut, it causes a hoarse voice, and if both are cut, the cords assume a midline neutral position, and at best, the only sound that can be made is a 'breathy' type sound but hardly any intelligible speech. Neither Dr. Penades nor his consulting otolaryngologist, Dr. Joseph S. Annese, address the status of the recurrent laryngeal nerves. In spite of this shortcoming I believe that these nerves were not out because they are tucked in such a location that to selectively injure them without cutting the carotids and deep jugular vessels is essentially impossible. Thus, for all intents and purposes, you have to consider phonation based on the injury to the tongue. *79 (Petitioner's Exhibit 2090.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Page 74

At the colloquy in chambers on July 10, 1992, Dr. Mihalakis acknowledged that he had been contacted by Mr. Kenneff. He testified that he did not feel intimidated or coerced by Mr. Kenneff. He stated clearly, unequivocally, and emphatically that he would testify at trial consistent with his June 29, 1992, report. Dr. Mihalakis is a medical professional of considerable stature in his field and in his community. When he said that he would testify to the opinions expressed in his letter, he was completely credible. And, in fact, his testimony at trial bore out this representation.

During the colloquy in chambers on Friday, July 10, 1992, Mr. Kenneff asked Mr. Shirk to "address what chilling effect the phone call has had on his ability to present his defense." Mr. Shirk's response demonstrates that, upon talking further with Dr. Mihalakis, he did not believe the phone call would make any difference in Dr. Mihalakis's testimony:

I asked Doctor Mihalakis, I indicated to him I never met him. I never met him, I don't know him, and I asked him quite frankly if this would affect his testimony in any way, shape or form. I think the exact word I used was whether he would pull his punches. He indicated to me he would not.

I indicated, you know, it was very important because, you know, I don't want to find out on the stand Friday and he indicated that in no way, in any way would it affect his testimony Friday. I can honestly say to you at this point there is no way it has a chilling effect. He hadn't been on the stand. I think he's an honorable enough man that it will not have a chilling effect.

TH E COURT: What's the problem?

MR. SHIRK: I think there is a problem in the call being made in the first place. Your Honor, I'm going to say right here on the record, I think Mr. Kenneff's phone call was probably the result of blowing off some steam. I'm not going to accuse him of having any ulterior motive.

(N.T., Trial at 323-24.)

Mr. Shirk and Mr. Kenneff had a discussion about coming in to see the judge on Monday, the first day of trial to address the Mihalakis issue. It was going to be Mr. Kenneff's intention to ask the court to direct Mr. Shirk away from questions about Dr. Mihalakis's contract with the County. Mr. Kenneff alluded to this fact, among others, in responding to Mr. Shirk.

With regard to what would happen on Monday, I did frankly discuss with Doctor Mihalakis the problem that I saw of the defense being able to put him up on the stand and say to him, isn't it true you are testifying for Mr. Kenneff a couple months down the road? I could not possibly, once that type of question was asked in front of a jury, do anything with his testimony no matter how damaging it was.

And about a contract. I said I was going to address the matter with the Court. What my thinking on it was, those questions, even though they are time and again asked of expert witnesses, are irrelevant. I was going to come in here and tell the Court that we would not object as long as the Court rules that questions of that nature were irrelevant.

**\*80** We came in here Monday and found there was no need for that because there wasn't a jury. A particular judge with a background such as yours knows exactly what the story is with these guys and for that reason I didn't pursue the matter any further, and for that reason I'm not concerned whatsoever about Doctor Mihalakis testifying in this case.

Finally, it would be stupid for me to threaten the doctor when I have to use him a few months down the line in a case just as important as this case.

(N.T., Trial at 326-27.)

The court then had an opportunity to question Dr. Mihalakis:

THE COURT: All right. No one made a request of you that you withdraw, did they?

DR. MIHALAKIS: No, no, they did not. In fact we kind of--actually it was more joking than anything with Mr. Kenneff. What do we do with you now that you are a consultant? And then in fact I offered, I said look, I won't mention it when it comes to mentioning my credentials.

THE COURT: You are a forensic pathologist by training and background?

DR. MIHALAKIS: That's correct.

THE COURT: And probably today is not the first time you've testified in a criminal case.

DR. MIHALAKIS: No, it is not.

THE COURT: And you've done your examination and you have your opinions that you are going to state as part of this case, I take it.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
(Cite as: 1998 WL 558749 (Pa.Com.Pl.))

Page 75

DR. MIHALAKIS: Yes. I have a consultative letter.
THE COURT: What is the date of that letter? About when was it written to him?
DR. MIHALAKIS: (Looking at a document..) June 29.
THE COURT: All right. And I take it that your testimony would be consistent with that consultative letter.
DR. MIHALAKIS: I would hope so, yes.
THE COURT: Okay. Is there anything about the discussion you had with Mr. Kenneff that causes you to not say what was in that letter?
DR. MIHALAKIS: No, I don't believe so.
THE COURT: Did you feel threatened or intimidated or coerced by that discussion you had with Mr. Kenneff?
DR. MIHALAKIS: No, sir, I did not.
THE COURT: Okay.
Mr. Shirk, are you aware of any rule of professional conduct that prevents an attorney in a criminal case from contacting an expert of a witness who would testify for the other side?
MR. SHIRK: No, I'm not.
(N.T., Trial at 328-30.)

The problem was that Dr. Mihalakis did not give the testimony that Mr. Shirk had in mind. Mr. Shirk testified in this PCRA hearing that he was aware of the report and did not think the report was very helpful. In fact, Mr. Shirk testified that he told Dr. Mihalakis that the report wasn't going to "help us a lot." (N.T., PCRA at 3440.) After a discussion with Dr. Mihalakis about the report, Mr. Shirk seemed to think that Dr. Mihalakis could be possibly more helpful in court than he was in his letter. However, Mr. Shirk testified that Dr. Mihalakis "indicated to me at all times that he would not be able to say, to a degree of medical certainty, that Laurie Show could not talk." (Id.) Mr. Shirk was aware that Dr. Mihalakis *believed* she did not speak and Dr. Mihalakis gave Mr. Shirk his reasons. (N.T., PCRA at 3440-41.) Mr. Shirk believes that Dr. Mihalakis "modified" his opinion in a telephone conversation. (N.T., PCRA at 3441.)

**\*81** In fact, Messrs. Shirk, Goldberg and Mihalakis had a meeting at a local restaurant just prior to Dr. Mihalakis's testimony. There is no doubt that they knew what Dr. Mihalakis was going to say on the witness stand. In fact, in this PCRA hearing, Dr. Mihalakis testified that there was

"no doubt in my mind that Mr. Shirk knew very much what I was going to say." (N.T, PCRA at 2542.)

The only "new" evidence presented at the PCRA hearing had to do with Dr. Mihalakis's income from the county. Dr. Mihalakis testified that his income from Lancaster County increased because there was an increase in murder cases in Lancaster County. He performed a number of autopsies in 1992 and these cases came to trial in 1993. He did 16 autopsies for Lancaster County in 1993. It is clear that his compensation increased because there was an increase in homicide cases in Lancaster County in 1992 and 1993.

To take the fact of increased compensation out of context and attach some sinister significance to this is misleading. [FN81] As testimony established, Lancaster County was in a period of transition in 1992 in terms of handling murder cases. Dr. Penades, who had been the county pathologist for years, was in the process of retiring. The district attorney entered into a contract with Dr. Mihalakis dated April 8, 1992, for consulting services involving forensic pathological examinations, assistance in criminal investigation, training, and expert testimony at preliminary hearings and trials. (Petitioner's Exhibit 2087.) Pursuant to this agreement, Dr. Mihalakis performed autopsies in 1992 and 1993. He also testified in several major cases in 1993. His income began to trail off after 1993 because of the involvement of Dr. Ross, a forensic pathologist who took over these responsibilities in Lancaster County on a full-time basis in 1994.

FN81. *See* Lambert v. Blackwell, 962 F.Supp. at 1546.

According to the testimony of Mr. Kenneff and Mr. Madenspacher, both of whom were uncontradicted on this point, there was a significant increase in homicide cases in their office in 1992 and 1993. Unlike the major metropolitan centers, the number of homicide cases in Lancaster County each year is relatively low. In a year where there is a significant increase, there is a significant strain on the system and a significant increase in the need for, among other things, expert testimony from a forensic pathologist. When given more than superficial consideration, the increase in compensation *does not even come close* to the kind of "payola" pronounced by petitioner's counsel. [FN82]

FN82. This argument was accepted by the district court. Lambert v. Blackwell, 962 F.Supp. at 1546.

The second allegation of after-discovered evidence by Ms. Lambert basically involves Mr. Kenneff's conversation with Dr. Mihalakis and this has been fully considered in the 1994 opinion and in the discussion above.

The third allegation of wrongdoing involving Dr. Mihalakis is a claim of "witness tampering or retaliation." In essence, the federal district court disagreed with this court's finding that there was no prejudice to defendant by the conversation between Mr. Kenneff and Dr. Mihalakis. The federal district court attached greater significance to this issue than did the state court without the benefit of any additional relevant evidence.

**\*82** In 1992 during a colloquy in chambers, and again in considering post verdict motions in 1994, we carefully considered whether the behavior of Mr. Kenneff was unethical under the Rules of Professional Responsibility. Clearly, Mr. Kenneff should not have contacted Dr. Mihalakis and, in hindsight, all would agree with this. Did it violate any stated canon of professional responsibility? The answer to that is no. In fact, counsel for the defense was asked that specific question during the colloquy and was unable to point to any violation of the Rules of Professional Responsibility. [FN83]

FN83. The district court found that Mr. Kenneff's "violation" of an ethical duty in contacting Dr. Mihalakis was a "no-brainer," which is an interesting characterization of an issue which required expert testimony. This finding is just not true. At least three bar association ethical committees have concluded that the Rules of Professional Conduct do not expressly prohibit a lawyer from contacting an expert retained by opposing counsel and that the resolution of the issue is "fact sensitive." *See* Philadelphia Bar Association Professional Guidance Comm., Guidance Op. 94- 22 (1995). *See also* ABA Comm. on Ethics and Responsibility, Formal Op.93- 378 (1993); New York State Bar Ass'n, Comm. on

Professional Ethics, Ethical Op. 577 (1986).

This was more than simply an advocate contacting his opponent's expert witness. In fact, Mr. Kenneff and Dr. Mihalakis were involved in a contractual relationship that was in existence for only three months at the time of the trial. This expert was "sprung" on the Commonwealth just before trial in that Mr. Shirk informed Mr. Kenneff that Dr. Mihalakis would be testifying in a conversation on Thursday, July 2, 1992. Trial was set to begin the following Monday. These extenuating circumstances explain Mr. Kenneff's displeasure at Mr. Shirk's retaining of Dr. Mihalakis and at Dr. Mihalakis's willingness to assist the defense. His call to Dr. Mihalakis was the result of this displeasure.

Mr. Kenneff testified at the PCRA hearing that he was going to ask the court for cautionary instructions about the relationship between Dr. Mihalakis and the County. When the case turned into a non-jury trial, this concern was alleviated.

The court does not make evidentiary rulings based upon allegations of unethical conduct. The court can sanction counsel, can warn counsel and can suggest appropriate disciplinary action. [FN84] The remedy for a violation of the Rules of Professional Conduct is disciplinary action. While the contact between Mr. Kenneff and Dr. Mihalakis created an issue in the 1992 trial, this court saw no reason for a mistrial based on a demonstrated lack of prejudice to petitioner. This court saw no basis on which to refer Mr. Kenneff to the Disciplinary Board. This court also notes that in the ensuing years, neither Mr. Shirk, nor Mr. Goldberg, nor Mr. Epstein, nor Ms. Lambert, nor Ms. Lambert's family saw fit to refer this issue to the disciplinary authorities. It was arguably improper conduct with some justification under the circumstances. The bottom line is that it did not affect the witness's testimony at trial. He testified consistent with his report and his testimony was no surprise to petitioner's counsel.

FN84. This is a concept which does not appear to have been lost on the district court. *See* Lambert v. Blackwell, 962 F.Supp. at 1547 n. 39.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 77
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

The question remains why did Mr. Shirk and Mr. Goldberg call Dr. Mihalakis under these circumstances? Possibly, it was to cast doubt about Laurie Show's ability to speak. Dr. Mihalakis certainly established that any speech would have been faint. Keep in mind that the Commonwealth witnesses said that speech was possible and Dr. Mihalakis qualified this and said it would have been very difficult for her to enunciate.

A second reason to call Dr. Mihalakis would have been to cast doubt on the fact that Laurie Show was alive for a full half hour. He helped the defense in this area by providing a strong basis on which a fact finder could doubt that Laurie Show lived long enough to speak to her mother. The fact that this court did not find a reasonable doubt about guilt based upon this testimony does not mean it was a mistake to put Dr. Mihalakis on the stand.

**\*83** A third possibility, that defense counsel put Dr. Mihalakis on the stand knowing he would not help them but with the belief that the Kenneff conversation would create a strong appeal issue, is not considered by this court. This court is aware of the professional integrity, skill and judgment of the defense attorneys involved in this case and rules out any untoward use of Dr. Mihalakis's testimony under these circumstances. It is likely that Dr. Mihalakis was put on the stand because of his strong testimony on the time of death, the time for loss of consciousness, and the difficulty in phonation or enunciation. The fact that he could not rule out speech does not mean he was useless to the defense.

I. Credibility of Laura Thomas

Petitioner contends that she now has after-discovered evidence relevant to the credibility of Laura Thomas. Ms. Thomas was a witness at trial as to Ms. Lambert's animus against Laurie Show. Specifically, Ms. Lambert contends that after the murder, Ms. Thomas was caught lying to the East Lampeter Township police about being "kidnaped." Petitioner contends that after Ms. Thomas agreed to say Ms. Lambert planned to "slit Laurie's throat" in her trial testimony, her charges were reduced to disorderly conduct and she was only made to pay a small fine. (Exhibit A, Section A, para. 41.) Further, petitioner claims that neither

Laura Thomas nor her father, Floyd Thomas, said anything about Ms. Lambert's plans to "slit [Laurie's] throat" in their initial interviews with the police. (Exhibit A, Section A, para. 42.) Ms. Lambert lists those same allegations under the heading of Brady/Giglio violations. (Exhibit A, Section B(5), paras. 66 and 68.) Finally, Ms. Lambert refers to Ms. Thomas's testimony as "false and/or perjured" to the extent that Ms. Thomas related that Ms. Lambert wanted to "slit Laurie Show's throat." (Exhibit A, Section B(6), paras. 109 and 110.)

To understand this issue, it is important to look first at Laura Thomas's testimony in 1992. Ms. Thomas was a friend of Ms. Lambert's in 1991. She was one of a group of teenagers enlisted by Ms. Lambert to abduct Laurie Show. She testified at trial about discussions of a plan to do harm to Laurie Show:

Q. Who participated in the discussions leading to this plan to do something bad?

A. It was myself, Kimona Warner, Vince Orsi, Rachel Winesickle, Lawrence and Michelle.

Q. Who told you what the plan was to be?

A. Michelle.

Q. What did Michelle tell you the plan was to be?

A. Okay. We were supposed to go over to Laurie's house and, myself and Kimona, and we were supposed to go and knock on her door and say that we were going to a fraternity party and there was like three college guys we were supposed to meet there, supposedly.

We were supposed to get her out of the house and then we were supposed to go take her downtown on Green Street, tie her to a telephone pole, or some kind of a pole, and Michelle was going to cut her hair and slit her throat, beat her up, spray paint a sign, black pussy, on her.

**\*84** Q. All of this was told to you by Michelle?

A. Yes.

(N.T., Trial at 668-69.)

This plan never came to fruition because Laura Thomas and Kimona Warner went to Laurie Show's house and warned her.

Ms. Thomas went on to describe another discussion regarding harm to Laurie Show:

Q. Now did Michelle ever try to obtain your assistance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 78
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

again in a similar plan or another plan to hurt Laurie?

A. Yeah. She always wanted me to go and pick her up, get her out of the house because she knew that I was friends with Laurie.

Q. Where did the conversation regarding this occur?

A. Right outside my house on my picnic table that we all sat at.

Q. At any time did Michelle say to you what she intended to do once you got Laurie out of the house?

A. Well, this time it wasn't getting her out of the house; I don't know what it was. But she just said I swear to God I'm going to kill her. She said I'm going to slit her throat.

(N.T., Trial at 673.)

Now, six years later, Ms. Lambert claims to have after-discovered evidence that proves Ms. Thomas was lying. Ms. Lambert centers this issue on the absence of any reference to slitting Laurie Show's throat in Ms. Thomas's interviews with the police at the time of the murder. Ms. Thomas spoke to Officer Flory on December 20, 1991, to Officer Bowman on January 2, 1992, and to Officer Renee Schuler on January 5, 1992. Only the January 14, 1992, report of Officer Bowman's interview with Laura Thomas on January 2, 1992, contains any reference to Ms. Thomas's recollection of a statement by Ms. Lambert that she was going to slit Laurie Show's throat. (Commonwealth's Exhibit 4; Commonwealth's Exhibit 41.)

Ms. Lambert suggests that Ms. Thomas included the language "slit her throat" at trial in exchange for favorable treatment by the East Lampeter Township Police Department on a "false reports" charge against her. This is absurd given the fact that Ms. Thomas's January 2, 1992, statement very clearly includes the "slit her throat" language. This statement was taken six weeks before the "false reports" charge was made against Ms. Thomas.

Moreover, this is a misleading argument based upon a contrived and superficial understanding of the "false reports" incident. The incident involved a call by Linda Thomas, Laura's mother, to the East Lampeter Township police regarding her daughter's story about a "kidnaping." Officer Robert Reed of East Lampeter Township interviewed Laura Thomas and prepared a report dated February 18, 1992. In short, Laura Thomas had "staged" her own

kidnaping to attract the attention of her apparently disinterested boyfriend. Her report was intended to get back to the boyfriend and to draw his sympathies. It was not intended to get back to Mrs. Thomas or to the police. Because the police did become involved and because her deception led to a police investigation, albeit prompted by her mother, Officer Reed charged Laura Thomas with disorderly conduct.

**\*85** Petitioner makes much of the fact that this was a "false reports" charge which was "reduced" to disorderly conduct by the East Lampeter Township police. First of all, this was not a "false reports" charge in any way, shape or form. A "False Reports to Law Enforcement Authorities" charge under 18 Pa.C.S.A. 4906(b), would have involved conduct *by Laura Thomas* in making a false report *to the police* about an incident knowing it did not occur. Laura Thomas did not do this. The elements of "false reports" could not have been established under these facts.

In any event, a "false reports" charge would be a misdemeanor of the third degree. The difference between a misdemeanor of the third degree and a summary offense to a juvenile offender, to the police or to the Juvenile Court, is legally and factually insignificant. Only a lack of understanding of the elements of a crime under Pennsylvania law, a lack of understanding of the different treatment afforded juvenile offenders and adult offenders under Pennsylvania law, and a tendency to proclaim dramatic findings based upon a partially informed analysis could lead anyone to attach significance to Officer Reed's decision to charge Ms. Thomas with summary disorderly conduct. In fact, it is likely that neither a misdemeanor false reports nor a summary disorderly conduct would have placed Ms. Thomas in the formal juvenile justice system. It is more likely that either charge would have been handled in the same or in a similar way: with a fine at the district justice level or through informal probation with the Juvenile Probation Office involving no more than a fine.

The second issue with respect to Laura Thomas is whether the report about her "kidnaping" should have been disclosed to Mr. Shirk. [FN85] At the PCRA hearing, Mr. Shirk testified that he would have liked to have been able to cross-examine Ms. Thomas about this kidnaping report.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

(N.T., PCRA at 3392.) When questioned about what use he could have made of the report at trial, he was less emphatic. In fact, he acknowledged that it could be put to no legal use at trial but that he certainly would have "attempted to use it and let the other side stop me." (N.T., PCRA at 3526.) Is it a Brady/Giglio violation to withhold information that could never be put to a legal use or purpose at trial? Does the Commonwealth have an obligation to provide the defendant with information which would create error if used? We suggest that Mr. Shirk knows the answers to these questions and Mr. Shirk candidly acknowledged that he would have tried to use the kidnaping incident, hoping the Commonwealth would fail to object.

> FN85. The Reed report, Petitioner's Exhibit 1299, is not contained in Commonwealth's Exhibit 4, a compilation of all reports given to Mr. Shirk in discovery.

To argue that this report would have generated admissible impeachment material as to Laura Thomas is just plain wrong. There is no other way to describe it. Under the Juvenile Act, Ms. Thomas's juvenile record would have been inadmissible for impeachment purposes in 1992. *See,* 42 Pa.C.S.A. Section 6354. [FN86]

> FN86. Only recently, in the 1995 amendments to the Juvenile Act, can an offender's juvenile record be used for impeachment purposes, much like an adult record. 42 Pa.C.S.A. Section 6354(b)(4) (1998 Supp.) This was not the state of the law in 1992.

**\*86** The "slit her throat" issue has no merit. Mr. Shirk had available to him the report of Officer Bowman which described Laura Thomas's description of Ms. Lambert's plan to "slit" Laurie's throat. (Commonwealth's Exhibit 4; Commonwealth's Exhibit 41.) He also had reports of Officers Flory and Schuler which did not mention the "slit her throat" language. (*See,* Commonwealth's Exhibit 4 .) He had every opportunity to cross-examine Ms. Thomas on this inconsistency and to argue that she fabricated this aspect of her story. The real question is whether this would have made any difference at all. Given the violent, premeditated, degrading plot to kidnap Laurie Show, remove her clothing, physically assault her, and leave her tied up and vulnerable

to predators, the expression "slit her throat" is mere icing on the cake. Without that language, Ms. Thomas was still describing a series of felonies which spoke loudly and clearly to Ms. Lambert's hatred toward Laurie Show. When and where and why she included language about slitting Ms. Show's throat is but one fact in an otherwise unshakeable body of evidence demonstrating this prolonged and hostile attitude exhibited by Ms. Lambert against Ms. Show.

Whether there was any discovery or Brady violation is addressed by Mr. Shirk's cross-examination of Ms. Thomas at trial. In his cross-examination, he refers to a police report of an interview of January 10, 1992. (N.T., Trial at 677.) Not only did Mr. Shirk have the police reports available to him regarding the initial interviews of Ms. Thomas, he also met with Ms. Thomas on June 18, 1992, in his office in preparation for trial. The thrust of Mr. Shirk's cross-examination was to establish that there was no mention of slitting a throat in the meeting of June 18, 1992. In fact, this was a major thrust of Mr. Shirk's cross-examination of Ms. Thomas in general. Ms. Thomas would not agree with Mr. Shirk's characterization of their meeting. Mr. Shirk, in reference to the meeting in his office on June 18, 1992, with Ms. Thomas and friends, asked the following of Laura Thomas:

> Q. And didn't everyone pretty much agree that there was nothing said that night about slitting Laurie's throat; it was simply to--not simply--but to take her to town, tie her to a pole, cut her hair and put a sign, write on her, free black pussy?
> A. No, we did say we were going to slit her throat.
> Q. Who said that?
> A. Me and Kim and Rachel. She wouldn't -
> Q. That night in my office?
> A. Yes.
> (N.T., Trial at 687.)

The clear testimony was that in the June 18, 1992, meeting with Mr. Shirk, Ms. Thomas related that Michelle said she was going to slit Laurie's throat. Whether Mr. Shirk wanted to use the December 1991 and January 1992 interviews of Ms. Thomas to impeach her on this point, he certainly could not claim surprise at trial about this aspect of Ms. Thomas's testimony. She clearly told Mr. Shirk from the witness stand

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that she had informed him prior to trial that the "slit the throat" concept had been discussed by Ms. Lambert in the summer of 1991.

J. The Black Sweatpants

**\*87** The black sweatpants were of relatively little value to this court as the fact finder in 1992. Today, they play a leading role in Ms. Lambert's post conviction drama. In 1992, the issue of the black sweatpants was simple. Mr. Yunkin testified that Ms. Lambert wore them on the morning of the murder, but that they were his sweatpants. Ms. Lambert told Corporal Solt that she was wearing black sweatpants at the time of the murder. The only real question was whether she could have worn sweatpants owned by the larger Lawrence. This was resolved by the court's observations of the sweatpants, of Mr. Yunkin, of Ms. Lambert, and the conclusion that Ms. Lambert could certainly have worn the garment.

Today petitioner contends that Mr. Yunkin's testimony about Ms. Lambert wearing his clothing was false and perjured testimony. Further, petitioner contends that some time between the 1992 trial and the 1997 federal habeas hearing, the Commonwealth "switched" a pair of lady's (or boy's extra large) sweatpants for the men's extra large sweatpants admitted into evidence in 1992 as Commonwealth's Exhibit 9. Specifically, petitioner contends that the bloody sweatpants, sized men's extra large, were destroyed by the Commonwealth and a smaller pair substituted.

The analysis can begin, and should end, with the observation that there was no charge of misconduct regarding the black sweatpants in the 1992 trial. Petitioner can point to no fabrication, alteration, modification or destruction of any evidence regarding any item of clothing at or before the 1992 trial. Petitioner's *only contention* with respect to the 1992 trial is that Mr. Yunkin's testimony about Ms. Lambert wearing his clothing must have been false and, therefore, the Commonwealth offered perjured testimony in support of the conviction. [FN87]

FN87. Petitioner tends to define "perjury" as "information which does not help her." Or,

petitioner points to evidence which she finds incredible or with which she disagrees and labels it "perjury ." *See,* e.g., Lambert v. Blackwell, 962 F.Supp. at 1531 (Mr. Yunkin's testimony about the "29 questions"), 1535 (Mr. Yunkin's statement about picking up Ms. Lambert and Ms. Buck on Oak View Road), 1545 n.35 (Mr. Savage's testimony about Mr. Yunkin's recorded statement), and 1542 (Detective Solt's testimony about taking the statement from Ms. Lambert).

References to clothing are easily ascertained from the 1992 record. Ms. Lambert's first description to the police about her attire was given in her statement dated December 21, 1991. She told the police that she "had on a jergo. It's a strawy thing, with a hood on it. I have it in my closet. I also had on a Bart Simpson T-Shirt, stretch pants, and these white shoes and socks." (Petitioner's Exhibit 1016-A, Pennsylvania State Police Investigative Report of December 22, 1991, at 10.) Toward the end of her interview with Corporal Solt, she changed her story:

The reason I was so scared, when I walked out I had different shoes, (sneakers), socks, a red flannel shirt & white socks on, & black sweat pants. When Tabby came out, she had blood on her hands & she grabbed my arm & got blood all over the arm of my flannel shirt. I don't know if Lawrence saw that or not. I put it in a dumpster, behind K-Mart or something.

(Petitioner's Exhibit 1023 at 7.)

In fact, the clothing described by Ms. Lambert was recovered by the police from a truck that had picked up the trash from behind the K-Mart dumpster. (N.T., Trial at 132-34.) [FN88]

FN88. Testimony at the PCRA hearing established that Ms. Lambert gave the first part of her statement to Corporal Solt sitting at a desk in the East Lampeter Township police station. Thereafter, she was moved to another portion of the station, where she sat in the open squad room. Lieutenant Renee Schuler testified that from that vantage point, Ms. Lambert was able to hear the ongoing broadcast over the police radio about the progress of the efforts to locate the bag Ms. Lambert and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Yunkin threw into the dumpster behind the K-Mart after the murder. (N.T., PCRA at 3838-39, 3840- 41.) It is entirely likely and believable that Ms. Lambert heard the transmission that the bag had been found and, at that point, chose to come clean with Corporal Solt about what she was wearing that morning.

**\*88** At trial, Ms. Lambert admitted that while she changed her statement regarding the clothes she wore, that changed statement was a lie designed to cover up Mr. Yunkin's participation. (N.T., Trial at 1035-36, 1172-73.) At trial she gave yet another version of her apparel at the crime scene. She stated: "I had on black pants. They were like black slush pants and a black Harley Davidson shirt, my black MTV sweatshirt and gray and white jergo." (N.T., Trial at 1076.) This testimony contradicted both versions given to Corporal Solt.

Mr. Yunkin testified at trial about Ms. Lambert's apparel on the morning of the murder. On direct questioning by Mr. Shirk, Mr. Yunkin testified:

Q. Now when you dropped Michelle and Tabby off, do you recall what they were wearing?

A. Yes. Michelle had on a flannel shirt, sweatpants and a jergo.

(N.T., Trial at 203.) Mr. Kenneff then held up the black sweatpants marked as Commonwealth's Exhibit 9 and questioned Mr. Yunkin about these:

A. Sweatpants that I owned.

Q. Do you recall seeing those on December 20, 1991?

A. Yes, I do; on Michelle.

Q. Were those sweatpants on Michelle when she left your car on the morning of December 20, 1991 at approximately 6:45 a.m.?

A. Yes.

(N.T., Trial at 207.)

Q. Was it unusual for Michelle to wear your clothing?

A. No it was not.

Q. Was there anything in particular at that time to cause Michelle to wear your clothing?

A. She was pregnant at the time.

Q. How many months pregnant was she?

A. About seven months.

(N.T., Trial at 208.)

Mr. Shirk cross-examined Mr. Yunkin and Mr. Yunkin confirmed that Ms. Lambert was wearing "black sweatpants." He also confirmed that those sweatpants were his. (N.T., Trial at 225-26.)

Donald Bloser testified at trial that Commonwealth's Exhibit 9, the black sweatpants, tested positive for the presence of blood. (N.T., Trial at 613-14.)

Vincent M. Orsi was called as a defense witness at trial and was shown the black sweatpants by Mr. Shirk. Mr. Shirk first questioned him as to whether he had ever seen Mr. Yunkin in black sweatpants:

Q. When had you seen Mr. Yunkin wearing black sweatpants?

A. I had slept over a few times and he wore them to bed, or if he was bumming around the apartment he would wear them.

Q. I'm going to show you what's been marked Commonwealth's exhibit 9. Do you recognize those sweatpants?

A. (Looking at the exhibit) Yeah. He would wear them to bed, bumming around the house.

Q. They look familiar and similar to the ones he would wear?

A. (Nodding head affirmatively) Yeah.

(N.T., Trial at 904-05.)

None of this testimony appeared particularly pivotal at the 1992 trial. The black sweatpants were never mentioned in Mr. Kenneff's opening statement or in Mr. Shirk's opening statement. The sweatpants were not mentioned in Mr. Kenneff's closing argument where certain items of evidence material to the Commonwealth's theory of the case were discussed. Mr. Shirk argued that the sweatpants were worn by Mr. Yunkin in his closing. (N.T., Trial at 1243-44.) Mr. Shirk argued that the more likely wearer of the sweatpants was Mr. Yunkin and that this suggested that Mr. Yunkin was in the condominium that morning and participated in the murder. This court carefully considered that argument at trial and rejected it as proof that Mr. Yunkin was present in the condominium. This issue was addressed in this court's opinion on post verdict motions. *See* Commonwealth v. Lambert, July 19, 1994, slip op.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
(Cite as: 1998 WL 558749 (Pa.Com.Pl.))

Page 82

**\*89** There is absolutely no merit to the contention that Mr. Yunkin's testimony about Ms. Lambert wearing her clothes was false or perjured. We found this to be believable in 1992 and nothing we have learned or heard since that time changes that opinion.

Further, there is no proof that the sweatpants admitted into evidence as Commonwealth's Exhibit 9 in 1992 have ever been altered, changed, or substituted. Petitioner suggests that the sweatpants in 1992 were so large that Ms. Lambert would be "swimming in them." There is simply no testimony or even any argument to this effect. [FN89]

> FN89. The closest petitioner can come would be the closing argument of James P. Cullen, Esquire, (now Judge Cullen) defense counsel in the Buck trial. Mr. Cullen referred to the clothing worn by Ms. Lambert on the morning of the murder and argued that it was ridiculous to think that she would be wearing that clothing. He was clearly attempting to implicate Mr. Yunkin in the murder. His reference was to an oversized flannel shirt and he did not specifically refer to the sweatpants.

The controversy over the black sweatpants arose at the federal habeas hearing. In petitioner's amended habeas petition she refers to "Yunkin's grossly oversized clothing, that would have severely impeded her movements...." *See* Lambert v. Blackwell, 962 F.Supp. at 1531. Petitioner's characterization of the black sweatpants as "grossly oversized clothing" appeared to be at odds with the size of the sweatpants which were produced to petitioner by the Commonwealth. These sweatpants, according to the Commonwealth, were the same sweatpants as were admitted into the 1992 trial as Commonwealth's Exhibit 9. Armed with the *assumption* that Commonwealth's Exhibit 9 was, in fact, a grossly oversized pair of baggy black sweatpants and faced with a pair of black sweatpants which do not appear to be "grossly oversized," petitioner's counsel leaped to the conclusion that the sweatpants were "switched ." For petitioner to argue that the sweatpants were "switched" is somewhat tame. [FN90] But the evidence does not support this dramatic and "shocking" possibility.

> FN90. We should bear in mind that this theory is generated by the creative machinery which would have us believe that Ms. Lambert's incriminating statement was actually the result of a truth serum injection, that Ms. Lambert's admission to wearing clothing found in the dumpster was actually the result of a fabricated statement, that the crime scene photographs were actually taken after the body was carried back into the condominium by crooked police officers under the cover of night, and that the dying declaration was really the result of a cunning detective's suggestion to a distraught mother that she lie through two preliminary hearings and two homicide trials to support a "frame up" that would presumably convict defendant, who said she was once gang raped by three police officers.

In the PCRA hearing, Mr. Shirk was shown Petitioner's Exhibit 1004, the black sweatpants in question. He testified that to the best of his recollection, they are smaller than the sweatpants used at trial. (N.T., PCRA at 3301.) He offered his opinion that these sweatpants would not fit Mr. Yunkin. (N.T., PCRA at 3302.) Julius Hyman, a textile expert, offered his opinion that the black sweatpants, Petitioner's Exhibit 1004, were actually sized boy's extra large, not men's extra large. (N.T., PCRA at 358.) He was shown a photograph of the sweatpants which was taken in 1992 by Mr. Shirk, (Petitioner's Exhibit 3833), and compared that with the sweatpants introduced into evidence at the PCRA as Petitioner's Exhibit 1004. He offered his opinion that the sweatpants are different. (N.T., PCRA at 371-72.)

Yet, the Commonwealth's investigator, James Gallagher, testified that he conducted an experiment where he obtained the same cardboard box lids, (Commonwealth's Exhibits 56 and 57), on which the sweatpants rested in Mr. Shirk's 1992 photograph. (N.T., PCRA at 6568-69.) He took the sweatpants in question, laid them out over the same box lids, and took a photograph that was substantially the same as Mr. Shirk's photograph. (N.T., PCRA at 6569-75.)

Lieutenant Renee Schuler testified to Petitioner's Exhibit 1158, which is an evidence log, listing the contents of a trash bag found at the incinerator on Saturday morning, December 21, 1991. (N.T., PCRA at 3835.) Officer Renee

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                           Page 83
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Schuler found a pair of "ladies dress 'black' sweatpants (appears small size)" and listed these on the evidence log. (*Id.*) Mr. Kenneff testified that these sweatpants eventually became Commonwealth's Exhibit 9 at the 1992 trial. (N.T., PCRA at 1900.) Donald Bloser, who performed blood testing on the sweatpants in 1992, identified his markings on the exhibit in question at the PCRA hearing. (N.T., PCRA at 218.) He noted that the markings are faded. (N.T., PCRA at 217.)

**\*90** This court had the opportunity to view the sweatpants during the hearing. Certainly they would have been baggy on Ms. Lambert. Certainly they appear to be more consistent with a "ladies' large" or a "boy's extra large" size than with a "men's extra large." We are left only to speculate as to whether the pants fit Mr. Yunkin . [FN91]

> FN91. Of course, the best way to address this issue would have been to ask Mr. Yunkin to try the pants on during his testimony. Neither side suggested this step.

We found no evidence to suggest that the sweatpants were "switched." There appears to be some disagreement as to whether Mr. Yunkin could have worn these pants, whether they were "baggy" sweatpants as recalled by Mr. Shirk, and whether by the size alone of the sweatpants they could have been worn by either Ms. Lambert or Mr. Yunkin. We are left with the reliable and uncontradicted evidence log which catalogs these as ladies' dress black sweatpants. We are left with a comparison of the photographs from Mr. Shirk's office in 1992 and from the evidence room in the PCRA hearing in 1998. These photographs are substantially similar. We note Mr. Hyman's conclusion that the sweatpants in evidence contain an elastic waistband and the sweatpants in Mr. Shirk's photograph do not appear to have an elastic waistband. However, upon careful examination, the photograph taken by Mr. Shirk is out of focus and it appears that there could possibly have been an elastic waistband, although blurred by the photograph.

All this discussion about "switched" sweatpants is misleading. It would have been silly to switch these sweatpants. They were considered at trial, they were identified as having been owned by Mr. Yunkin and worn

by Ms. Lambert. The court issued an opinion in 1994 confirming that "title" to the sweatpants had nothing to do with the verdict. The most we could conclude in 1992 was that Ms. Lambert could possibly have worn the sweatpants and the fact they were owned by Mr. Yunkin did not prove Mr. Yunkin's involvement in the murder.

Even if we assume the sweatpants were "switched" during the habeas corpus hearing, that does nothing to establish after-discovered evidence, prosecutorial misconduct or ineffective assistance of counsel under the PCRA. Even if the sweatpants had been "switched" in 1997, this is is not a fact that would have changed the outcome of the 1992 trial nor did it so undermine the truth-determining process in 1992 that no reliable verdict was possible. Petitioner's counsel would simply disagree with this court's conclusion that Ms. Lambert could have worn the sweatpants offered into the record in 1992. They were not present at the trial. This court was present and concluded on the record that it was possible for her to have worn these sweatpants.

In the July 19, 1994, opinion, we noted: "The court listened to the testimony regarding the clothing, observed the size of the garments and the size of the people involved, i.e., Ms. Lambert, Ms. Buck and Mr. Yunkin, and found there to be no question raised by the fact that the clothing appeared to be Mr. Yunkin's." Commonwealth v. Lambert, July 19, 1994, slip op. at 14. That factual finding was within the province of this court and was not attacked in any way by counsel in the appellate process. If the federal district court found that the sweatpants were "switched" during the proceeding, then it had every right to be concerned. But the concern would have been for the Commonwealth's conduct during the habeas hearing, not for the effect switching the sweatpants in 1997 would have had on the 1992 verdict. We simply do not have any conclusive evidence in this record which would establish that the sweatpants were switched. We further find that argument is of no legal significance to this PCRA case even if it would have factual support. We looked at what was available to this court in 1992 and whether after-discovered evidence regarding the *integrity of the evidence in 1992* is now available to this court. We considered whether presentation of the sweatpants as evidence in 1992 was the result of prosecutorial misconduct. We find neither to be the case. Therefore, we find that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 84
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

issue of the black sweatpants has no bearing on petitioner's post conviction claim.

K. The River Search Video

**\*91** On December 22, 1991, two days after the murder of Laurie Show, the police conducted a search of the Susquehanna River near the Pequea Creek inlet. (Petitioner's Exhibit 1295.) Two critical pieces of evidence were found: a large butcher knife and a rope. (N.T., PCRA at 800, 805.) This search was conducted by the East Lampeter Township Police Department with the assistance of local scuba divers. The search was filmed by William "Smokey" Roberts, a professional scuba diver and videographer. (Petitioner's Exhibit 1040.) Mr. Roberts reviewed, edited and copied the tape made of the search for the police and the district attorney's office. [FN92] (Petitioner's Exhibit 1695; N.T., PCRA at 1107-1110.) Only this edited version was turned over to Ms. Lambert's defense attorney. Mr. Shirk testified to seeing the river search tape at the East Lampeter Township Police Department. (N.T., PCRA at 3360, 3363.) He also stated that he received a copy of Officer Reed's report that stated the videotape was edited by Smokey Roberts "to cut down on time span and to eliminate unnecessary background noise." (N.T., PCRA at 3358; Petitioner's Exhibit 1295.) At no time, however, did Mr. Shirk request a copy of the unedited tape.

FN92. The federal testimony by Mr. Roberts, after viewing both videotapes, was that he had, in fact, edited the video before giving it to the police:
Q. Is it possible that you edited those items out when you made this?
A. Sure. I probably did. I don't think anybody had anything to do with that but me.
...
THE COURT: I'm a little confused based on that last answer you gave, couple answers ago to Mr. Madenspacher.
THE WITNESS: Sure.
...
THE COURT: You have no reason to believe that when you made the copy originally, that you gave it to them in an edited form?
THE WITNESS: I think it was in an edited form

when I gave it to them, yes. I think now--
THE COURT: And it was edited?
THE WITNESS:--after seeing it, I--
THE COURT: Why would it have been edited?
THE WITNESS: By me.
THE COURT: Why would you have edited it? It might have been an important thing.
THE WITNESS: To cut out the walking and to cut out something else. But nothing--it wasn't an important situation at all to me.
THE COURT: It is now.
THE WITNESS: I know.
THE COURT: So I want you to be very careful. You're being 'very sloppy' in your answers, so let's try this again. Go ahead. I'm not going to let you leave here until we find the truth. That's the purpose of this. You understand that?
THE WITNESS: Well, I would not lie on the stand.
THE COURT: And you understand that you're under oath, don't you?
THE WITNESS: Yes, I do, and I would--
THE COURT: Good. And I want you to be-- THE WITNESS: And I would not lie on this stand.
THE COURT: I want you to be 'very careful.'
(N.T., Habeas Hearing at 374-378.)

Ms. Lambert contends that the police and/or prosecution edited the videotape to delete allegedly exculpatory evidence of the police finding a pink bag at the river. (Exhibit A, Section B(4) at para. 48.) The edited tape, however, showed an empty pink bag embedded in ice. (N.T., PCRA at 1110, 3498-99; Petitioner's Exhibit 1695.) This pink bag was determined by the police to be immaterial to the case and so was not recovered. (N.T., PCRA at 801-03.) The edited tape also showed another empty bag of indeterminate color which was found by the police along the river bank. (N.T., PCRA at 3498; Petitioner's Exhibit 1695.) However, this too was found to be irrelevant to the investigation and was not seized as evidence.

At trial, Detective Barley was questioned by defense counsel as to whether during the river search he found a trash bag containing sneakers. He stated he did not. (N.T, Trial at 144.) Mr. Shirk explained in his PCRA testimony that he did not impeach Detective Barley with the video, which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 85
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

clearly shows the discovery of a pink bag, because he assumed it was one of many things found at the river that simply was not relevant to the investigation. (N.T., PCRA at 3363.) As Mr. Shirk's testimony reveals, it is reasonable to interpret Detective Barley's answer as a denial that a trash bag with evidence in it, i.e., Mr. Yunkin's sneakers, the rope, the knife, two pairs of sunglasses and the hats, was found during the search. The evidence before this court, testimonial and video, showed that the plastic bags were empty. [FN93]

> FN93. The federal district court concluded that a sneaker was found inside a plastic bag. *See* Lambert v. Blackwell, 962 F.Supp. at 1543. However, a review by this court of both videotapes of the river search confirms that the pink bag and the other bag were both empty. A conclusion that one of these bags contained a sneaker requires a leap from the premise that Mr. Yunkin's sneakers were put in a plastic bag to the conclusion that because plastic bags were found, they must have contained sneakers *and* those sneakers were then destroyed by the police. This "leap" requires reliance on another unfounded assumption: that the police within a day or two after the murder, were doing everything possible to destroy proof of Mr. Yunkin's involvement. This is contrary to the credible testimony of both Mr. Madenspacher and Mr. Kenneff that the Commonwealth was very interested in any evidence which would tie Mr. Yunkin into the murder. Further, this "leap" assumes that the police ignored another reality: that a bag containing Mr. Yunkin's sneakers but discarded by Ms. Lambert would have been further evidence of her involvement in the murder or in the conspiracy. Moreover, a sneaker was found but not until the second search conducted on December 23, 1991. Mr. Roberts was not present on December 23, 1991, and no videotape was done of that search.

Detective Barley's denial that he found a pink trash bag was immaterial to the case, especially in light of the fact that the disposal of a trash bag by Ms. Lambert was not an issue at trial. Ms. Lambert testified at trial that she disposed of a red

bag [FN94] containing the rope, the knife, two pairs of sunglasses, the hats, Yunkin's sneakers and some rocks by throwing it into the Susquehanna River. (N.T., Trial at 1025-27, 1056.) Although Mr. Kenneff questioned Ms. Lambert about the color and size of the bag and whether Mr. Yunkin threw anything in the river separate from the bag, he did not question that Ms. Lambert threw the bag in the river. (N.T., Trial at 1154-55.) At trial, the Commonwealth never contended that Ms. Lambert did not throw a bag into the river. To the contrary, the Commonwealth introduced Mr. Yunkin's testimony that Ms. Lambert *did* throw a bag into the river. (N.T., Trial at 219.) This testimony had no effect on the outcome of the trial.

> FN94. On cross-examination Ms. Lambert explained that the items were first placed in a white bag and it was when they arrived at the river that Mr. Yunkin took the white bag and placed it inside a red trash bag weighted down with rocks. Ms. Lambert then threw the red bag into the river. (N.T., Trial at 1154-55.) Mr. Yunkin testified that the bag thrown into the river was white. (N.T., Trial at 262-63 .)

**\*92** A second river search was organized for December 23, 1991. (Petitioner's Exhibit 1295.) At that time a diver discovered a sneaker in the Pequea Creek. (N.T., PCRA at 823-24.) Detective Barley determined that it had no evidentiary value because it was old, stained brown, decaying, packed with mud, had black rot, had rotted threads, and had clearly been in the water more than three days. (N.T., PCRA at 823-24, 828-30.) It was found not in the river, like the rope and knife, but in the Pequea Creek inlet which empties into the river and, therefore, could not have been the sneaker the police were looking for. (N.T., PCRA at 824, 825.) For these reasons, the sneaker was not seized as evidence.

Ms. Lambert contends that the undisclosed sneaker was exculpatory and, thus, kept from the defense. At the time of the search, the police knew only that: (1) Mr. Yunkin said that Ms. Lambert threw a trash bag containing shoes and rocks into the river, (Commonwealth's Exhibit 4, West Lampeter Township Police Supplemental Report by Officer Jere Schuler), and (2) Ms. Lambert said she had tossed

Not Reported in A.2d                                                                                                          Page 86
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

sneakers into the river, (Petitioner's Exhibit 2079). Thus, at the time of the search, the police would have believed that anything found in the river relating to the murder would incriminate Ms. Lambert because Ms. Lambert was the person who disposed of the evidence. Clearly, so early in the investigation, the police would not ignore evidence that might assist them in solving the murder, whether it incriminated only Ms. Lambert (if the sneaker was Ms. Lambert's), or both Ms. Lambert and Mr. Yunkin (if the sneaker was Mr. Yunkin's, but discarded by Ms. Lambert). Thus, it is certainly plausible that an empty pink bag, embedded in ice, would be insignificant to the searching officers, as would a black, rotted sneaker that had been in the Pequea Creek for an extended period of time. The prosecutors and police officers in this case could not then have known that Ms. Lambert would later disavow her pre-search statements and later implicate Mr. Yunkin. The investigation must be viewed in the light of what they knew when they acted.

L. Ms. Lambert's Statement

Early in the morning of December 21, 1991, Ms. Lambert gave a statement to Corporal Raymond Solt of the Pennsylvania State Police. This has been referred to as the "Solt Statement' and has the designation of Petitioner's Exhibit 1023. Corporal Solt was originally called in to administer a polygraph examination, to which Ms. Lambert had consented.

Ms. Lambert actually gave to the police two statements on December 21, 1991.  [FN95] The first, given to Corporal Solt prior to the polygraph, was a handwritten statement containing what has become known as "the alibi story." [FN96] She gave this handwritten statement in response to Corporal Solt's request to tell him what happened. He was going to use her story to compose questions for the polygraph examination.

FN95. Petitioner's Exhibit 1016-A is a 16-page Pennsylvania State Police Investigative Report by Corporal Solt concerning his interviews with Ms. Lambert on December 21, 1991. Attached to the report is a photocopy of the seven page "Solt Statement" signed by Ms. Lambert, five and

one-half typed pages and one and one-half handwritten pages. The body of the 16 page report contains a summary and quotes from the 7 page statement.

FN96. This is a story created by Ms. Lambert, Ms. Buck and Mr. Yunkin in preparation for possible questioning by the police.

During the polygraph, Corporal Solt advised Ms. Lambert of his opinion that she was not being truthful about what happened in the Show condominium. Ms. Lambert then departed from the "alibi story." [FN97]

FN97. At this point, Corporal Solt began to take a second statement from her, i.e., the "Solt Statement." He asked Corporal Renee Schuler of East Lampeter to assist him by taking notes as Ms. Lambert talked. Corporal Solt then typed out the statement and gave it to Ms. Lambert for her review and approval. This is Petitioner's Exhibit 1023.

**\*93** She told Corporal Solt that she and Ms. Buck were dropped off by Mr. Yunkin and, in fact, they went into the Show condominium. She told Corporal Solt that it was her idea to go because "I wanted to talk to Laurie." (Petitioner's Exhibit 1016-A, PSP Report at 7.) She described how Ms. Buck went to the door, how Laurie answered the door and how both went into the condominium: "I went upstairs and went in and shut the door." (*Id.*)

Ms. Lambert described an attack, largely conducted by Ms. Buck and largely witnessed by Ms. Lambert. On the second page of the "Solt Statement," Ms. Lambert related:

Laurie tried to grab a scissors, and Tabby took them away and I don't know what she did with them. I saw she had a knife and I saw her bring it down. It looked like it bounced off. It didn't look real. Whenver [sic] she pulled it, Laurie jerked and fell on the floor and rolled away and I heard that sound (indicating a 'woosh') and Laurie coughing and kept saying that she was sorry. She was sorry, and saying: 'You're not going to leave me here?' and I saw Tabby take the knife and hitting and I saw the knife come down, in her hair. Seh [sic] couldn't breathe right and was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

making that sound ('woosh') and coughing and laying there and saying: 'Don't leave me.'. She said she was sorry. She coughed, her body was jerking and stuff. I couldn't look anymore and I turned away.
(Petitioner's Exhibit 1023 at 2.)

From her statement, it is clear that she was aware that Laurie had been stabbed. She described a sound consistent with the back injury which punctured a lung and she described how Ms. Buck's action made her sick. She went on to describe the path she took when she left the apartment. In Corporal Solt's report, he relates what Ms. Lambert told him:

....I started to run, I'm not sure which way. Tabby told me to slow down. I ran like up through the buildings and came out in somebody's back yard. I came out at the cream house with shutters, I think they were blue.

Tabby ran a different way.

I met up with her then right by the bushes at the woods.
(Petitioner's Exhibit 1016-A, PSP Report at 8.)

Later, at page 5 of the "Solt Statement," when asked where she went when she left the apartment, she stated:

I got confused and I had no idea where I was and I ended up in someone's back yard. I was in two fields while I was running and a patch of woods. I steped [sic] in a creek and tripped over a barbed wire fence and fell. The creek was like a little run off, not like a creek. I fell and landed in the briars. I ended up in those people's back yard. I stood still and I saw Tabby walking down, through the woods, and she was calm about it, and I ran.
(Petitioner's Exhibit 1023 at 5.)

Ms. Lambert also described what she was wearing:

When we walked up, I had on a jergo. It's a strawy thing, with a hood on it. I have it in my closet. I also had on a Bart Simpson Tshirt, stretch pants, and these white shoes and socks. I didn't have my hood up. We just walked around. Tabby had her hood up. That is my jacket that I had on, over there. (pointing to a black leather jacket in the interview room.)
**\*94** (Petitioner's Exhibit 1023 at 1.)

The typewritten statement taken by Corporal Solt, i.e., the "Solt Statement," covers five and one-half typed pages. Each of these pages was signed by petitioner in red

felt-tipped pen upon completion of the statement. At the bottom of page six and extending to page seven, there is hand printed lettering and then cursive writing which contains an addition to the statement. This information was obtained by Corporal Solt from Ms. Lambert in response to his question to her about whether she had anything further to add to the statement. The pages containing the hand printed and hand written portions are also signed by Ms. Lambert.

Ms. Lambert contends that the hand printed, handwritten portion on the last one and one-half pages of her original statement are phony. She contends that she signed blank papers at the time of her interview but that she did not understand why she was doing that. She contends that Corporal Solt "filled in" these signed papers with a "statement" which he created.

Petitioner presented expert witness testimony from William J. Ries, a forensic document examiner. He testified that the recording of a statement from Ms. Lambert on "plain paper" as opposed to "statement paper" is "unusual and odd." (N.T., PCRA at 3621.) He opined that a statement should be taken on "formal statement paper." (*Id.*) He also opined that the signature of Lisa Michelle Lambert across the statement is "highly unusual." (N.T., PCRA at 3622-23.) When asked whether he could tell if Ms. Lambert's signature was placed on the document after the statement itself, he stated that "the red ink appears to be on top of the black ballpoint pen writing on page 7 of Miss Lambert's statement." (N.T., PCRA at 3635.)

Mr. Ries is a retired Philadelphia police officer with experience in examining documents. He testified as to the standard practice in Philadelphia, that is, the taking of a statement on "official statement paper." He could not give any reason for that practice other than compliance with department procedure and certainly could offer no opinion as to how the lack of "official statement paper" might affect the integrity of the contents of the statement. (N.T., PCRA at 3644-45.) Mr. Ries gave his commentary on Corporal Solt's methods and disapproved of the use of plain paper in favor of "official statement paper." He disapproved of the practice of having Ms. Lambert sign the statement across the page and noted that he has never seen this done. [FN98] (N.T.,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 88
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

PCRA at 3622-23.) Taken to its logical conclusion, Mr. Ries's opinion would suggest that Corporal Solt should not have taken the statement because he did not have "official statement paper" available to him. The fact is that Mr. Ries really had very little to offer this court by way of criticism of the "Solt Statement." His opinion failed to take into account that Corporal Solt was taking a statement in the middle of night in a local police station using materials available to him. Mr. Ries's tone of disapproval and his inconsequential criticism of Corporal Solt's methods were of no help to this court and appeared to be little more than advocacy dressed in expert's clothing.

   FN98. Mr. Yunkin had, in fact, signed his statement the very same way. (Petitioner's Exhibit 1661.)

 **\*95** Detective Solt testified that he used the paper available to him in the East Lampeter Township Police Department. The first section of the statement, that is the five and one-half typed pages, is on bond paper, which he obtained from a secretary's desk by the typewriter he was using to type her statement. (N.T., PCRA at 3099, 3122.) Ms. Lambert was then transported to another room of the station and, at that point, she began to give him additional information. He took the only available paper, from another desk, which was a different grading of paper, and began to record what she was saying, first in hand printed lettering and then in cursive writing. (N.T., PCRA at 3105-06, 3111-12, 3122.) He testified that he switched from hand printing to cursive because he was writing quickly. (N.T., PCRA at 3111-12, 3130.) Detective Solt testified at the PCRA hearing that he saw her sign each page with a red pen after each paper was reviewed. (N.T., PCRA at 3114, 3129-30.)

   The Commonwealth presented expert testimony from Lieutenant Joseph Bonenberger, a document examiner with the Pennsylvania State Police. He offered his opinion that the signature of Lisa Michelle Lambert is on top of the written and printed material on the last two pages of her statement. Under microscopic examination, he determined that wherever the red fibers crossed the other printing, there was a slight smearing. His conclusion was that the statement was signed by Ms. Lambert after the writing was placed on the paper. (N.T., PCRA at 7170-71.)

   The time at which Ms. Lambert signed the statement also presents an issue in this case. In Corporal Solt's report, he notes that the statement was completed at 7:51 a.m. and that Ms. Lambert signed the original of the "typed notes of the interview" at 8:07 a.m. (Petitioner's Exhibit 1016, Corporal Solt's report of December 22, 1991.) These times are confirmed in Corporal Solt's testimony. (N.T., PCRA at 3101, 3118.)

   Ms. Lambert points the court to the testimony of Detective Clarence L. Flory, who transported Ms. Lambert to Community Hospital to have blood drawn. He testified:
   Q. What time did you transport Ms. Lambert to Community Hospital?
   A. 8:00 a.m. Roughly, 8:00 a.m.
   Q. And what time was her blood drawn?
   A. Approximately right away, around 8:00 a.m. I just have an approximate time.
   (N.T., PCRA at 3715.)

   In Detective Flory's report, he notes on the last page: "At approx. 0800 hrs., 21 December 91, this officer transported Lambert to Community Hospital of Lancaster to obtain a sample of blood. Blood being drawn by Kimberly Felger, R.N. at approx. 0800 hrs., 21 December 91." (Petitioner's Exhibit 2065.)

   Ms. Lambert's argument is that Corporal Solt presented false testimony about the time she signed the statement, noting that she was at Community Hospital at the time Corporal Solt contends the statement was signed.

   It appears that the sequence of events here might be more reliable than the precise times. Corporal Solt testified that the statement was completed at 7:51 a.m. and signed at 8:07 a.m. From his overall testimony and from his practice of recording specific times, we believe his recollection of the times to be reliable. It appears that Detective Flory was giving an approximate time, not an exact time. In fact, every time Detective Flory referred to the time of transport to Community Hospital, he used the word "approximate." This appears in his testimony and in his report. He testified that he transported Ms. Lambert at "roughly 8:00 a.m." and that her blood was drawn "around 8:00 a.m." (N.T., PCRA at 3715.) We know that one or the other of those events did

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not take place at exactly 8:00 a.m. The East Lampeter Township Police Department office is located east of the City of Lancaster; Community Hospital is located just east of the city line. The time of transport would be approximately 10 to 15 minutes. Allowing for time to place Ms. Lambert in a police car, to drive to Community Hospital, to remove her from the police car and to escort her to the blood lab, it is reasonable to expect that the process took anywhere from 15 to 20 minutes.

**\*96** When asked about the sequence of events that morning, without respect to exact times, Detective Flory testified that he transported Ms. Lambert to Community Hospital when Ms. Lambert's questioning was finished. (N.T., PCRA at 3715.)

From this testimony, we can conclude that Detective Flory took custody of Ms. Lambert after her questioning was finished. Could Detective Flory's testimony that he took her to the hospital at "approximately 8:00 a.m.," "roughly 8:00 a.m.," or "around 8:00" have meant that he took her after she signed her statement at 8:07 a.m.? That certainly seems reasonable and we believe it is fair to conclude that that is how this took place. To point to Detective Flory's testimony as precise on the question of time and to, therefore, leap to the conclusion that Corporal Solt was falsifying his report is a leap unsupported by the facts or by common sense. It is clear that the sequence of events that morning had Ms. Lambert finish her statement, review the statement, sign the statement and then to go to Community Hospital in the company of Detective Flory.

Petitioner's final claim regarding her "fake statement" is that Corporal Solt "injected" her in the arm before administering the polygraph examination. This bizarre and wholly unsupported allegation surfaced at the PCRA hearing. The "factual basis" for this charge is that Ms. Lambert had a slight bruise on the inside of her arm upon inspection at the time of her arrest. (N.T., PCRA at 3784-85; Petitioner's Exhibit 1609.) This slight, unexplained bruise became the marking of a truth serum injection. Ms. Lambert was quick to adjust her story to accommodate the "injection." She described how she was hooked up to the polygraph machine with a number of Velcro straps and that Corporal Solt then injected her with a needle. (N.T., PCRA at 5297, 5372.)

There is absolutely no support in the record for the allegation that Ms. Lambert was injected with truth serum. In fact, if she was really injected with "truth serum," why should she complain about what she said under its influence? We dismiss that charge as incredible.

With respect to the substance of the statement, we note that Ms. Lambert expressed familiarity with its contents at the 1992 trial. At the PCRA hearing, Ms. Lambert was reluctant to say that she had even read the statement in 1992. However, Mr. Shirk noted that he went over the statement with her in detail. (N.T., PCRA at 3447-49, 3527-28.) This would be consistent with basic, good practice for a criminal defense lawyer and Mr. Shirk has demonstrated a high level of skill, dedication and expertise at a very high level. It would be unbelievable to this court that Mr. Shirk would not have gone over Ms. Lambert's statement with her in great detail in preparation for trial. Mr. Shirk is uncertain whether he actually showed her the statement or whether he had it in front of him and read portions of the statement to her in preparing her for trial. (*Id.*) There really would be no significant difference between these two approaches. The fact is that she was familiar with the contents of her entire statement before trial. Her own trial counsel established this fact.

**\*97** In fact, in 1992, Ms. Lambert was asked about what she told Corporal Solt. This question was in specific reference to her statement. She was asked, "Everything Trooper Solt said you said was the truth[?]." And she responded, "Yes." (N.T., Trial at 1035 .)

Further, in a letter written from Ms. Lambert to Mr. Yunkin in the prison on December 23, 1991, she adopted the information she gave to Corporal Solt in the statement. (Commonwealth's Exhibit 16.) That is, her letter to Mr. Yunkin sets forth the same information with respect to her apparel on the day of the murder.

In the handwritten portion of the "Solt Statement," Ms. Lambert states she was wearing "... a red flannel shirt & white socks [ ] & black sweat pants." (Petitioner's Exhibit 1023 at 7.) She makes further reference to Ms. Buck getting "blood all over the arm of my flannel shirt." (*Id.*)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 In the December 23, 1991, letter, she uses the same reference to how Ms. Buck grabbed her arm and "got blood all over my red flannel ." (Commonwealth's Exhibit 16 at 2.) Also in the letter, she refers to fleeing with Ms. Buck and meeting up with her "down at the woods ." (Commonwealth's Exhibit 16 at 3.)

 Any contention that the handwritten (or printed) portion of the statement was made up by Corporal Solt after Ms. Lambert signed the statement is clearly contradicted by her own testimony at trial and her own handwritten letter to Mr. Yunkin of December 23, 1991.

 For PCRA analysis purposes, this issue of the "altered statement" involves neither prosecutorial misconduct nor after-discovered evidence. There simply is no proof of either under the elements required by the Act.

 To establish prosecutorial misconduct, Ms. Lambert must prove by a preponderance of the evidence that Detective Solt had her sign blank pages and then completed, in his own handwriting, a false statement which he then attributed to Ms. Lambert. On this issue we have Detective Solt's sworn testimony against Ms. Lambert's sworn testimony. Having listened carefully to the testimony of each witness, this court finds that Detective Solt is far more credible than Ms. Lambert on this issue. We consider their statements at the PCRA hearing together with all other evidence in this case both from the 1992 trial and from the balance of the testimony at the PCRA hearing. For one thing, Ms. Lambert was well aware in 1992 of the contents of her statement and never in her own testimony or through her lawyers' arguments made an issue of or raised a question about her statement. Her bald assertion that the statement was phony against Detective Solt's testimony as to the steps he took to obtain the statement carries no weight whatsoever. Petitioner's expert, Mr. Ries, does nothing to establish that the statement was the result of any prosecutorial misconduct. The Commonwealth's expert, Lieutenant Bonenberger, offers a reasonable opinion that the signature of Ms. Lambert was placed on the document after the typed, printed or written portions. This court really does not require the assistance of the experts on this issue. Given Ms. Lambert's testimony, Detective Solt's testimony, Ms. Lambert's letter of December 23, 1991, to Mr. Yunkin, and

Ms. Lambert's testimony at trial, we find there to be no basis for a finding of prosecutorial misconduct on this issue.

 **\*98** With respect to after-discovered evidence, the simple truth is that if that statement had been altered, the alteration was plainly available to Ms. Lambert at the 1992 trial. She is unable to meet the first prong of the after-discovered test, i.e., that the evidence was unavailable at trial. The contention that this was an "altered statement" is without merit under any analysis.

 Petitioner contends that Detective Solt is guilty of perjury in his testimony about the statement. There is certainly no basis for a finding that Detective Solt perjured himself in testifying about the statement. At best, his testimony is at odds with Ms. Lambert's testimony. [FN99] We have already acknowledged that Detective Solt's testimony is at odds with Ms. Lambert's testimony regarding the statement. We resolved in 1992, and we resolve again, this credibility issue in favor of Detective Solt and against Ms. Lambert. This inconsistency between these witnesses is not perjury as to either Detective Solt or Ms. Lambert.

> FN99. We note that the federal district court found that the statement was a "fabrication." *See* Lambert v. Blackwell, 962 F.Supp. at 1541-1542. There is no mention in the district court's analysis of the December 23, 1991, letter from Ms. Lambert to Mr. Yunkin nor is there any reference to Mr. Shirk's testimony about his reviewing the statement very carefully with Ms. Lambert prior to trial. Nor is there any reference to Ms. Lambert's clear testimony at trial about the accuracy of the "Solt Statement." Perhaps had these important facts been made available to the district court, the leap from "unique" to "fabricated" would have been approached with somewhat more caution. We do not accept the conclusion that Detective Solt's testimony about the statement was "perjury" based upon Mr. Ries's weak testimony that the statement was "unique."

 M. Crime Scene Photographs

 Ms. Lambert contends that the police altered or fabricated

photographs of the crime scene to (1) show a telephone cord wrapped around the victim's leg, thereby proving that Ms. Lambert's version of the story of what happened in the condominium that morning is false, (2) hide bloody footprints in the front hallway and in Laurie Show's bedroom, and (3) include Tabitha Buck's white sweatshirt in the crime scene.

A second level of alleged police misconduct regarding the crime scene photographs concerns the nature of the photographs and the number of photographs taken. Ms. Lambert contends that photographs of important parts of the crime scene, such as, fingerprints, blood spatters and the like, were not taken. In the alternative, she argues that such photographs were taken but were destroyed.

1. The telephone cord around the leg

A series of crime scene photographs show a telephone cord wrapped around the leg of Laurie Show. Laurie's body was positioned in her bedroom and a number of photographs show the cord connecting a handset to the base of the telephone wrapped once around her leg down near the ankle. Why is this of significance? First, because the diagrams prepared by Officer Weaver do not show the telephone cord wrapped around the leg of the victim. In fact, they show the telephone close to her leg but not touching it. Second, Ms. Lambert testified at trial that Ms. Buck grabbed the telephone from Laurie Show's hand and threw it across the room. If Ms. Lambert was telling the truth, then the telephone would be somewhere away from Laurie Show's body. If Ms. Lambert was not telling the truth, then the telephone might, presumably, be near Laurie Show's body. In essence, petitioner believes that the police wrapped the telephone cord around the leg of the victim in an intentional act to discredit her story. Ms. Lambert attempts to discredit the crime scene photographs by pointing to the crime scene diagram prepared by Officer Weaver.

**\*99** Officer Weaver testified that he did not prepare the diagram to scale, that there were literally hundreds of items in the bedroom and that he did not record the location or the description of each and every item. (N.T., PCRA at 1710.) The telephone was placed in the diagram after the body was

removed from the bedroom. (N.T., PCRA at 1783.) In fact, he was preparing these diagrams essentially to show the position of the body and the major articles of furniture in the bedroom. (N.T., PCRA at 1710.) This was the first homicide investigation in which he had been involved and the first crime scene he had drawn. (N.T., PCRA at 1777.) In his testimony he did not seem to attach much, if any, significance to the precise location of these various objects. (N.T., Trial at 34; N.T., PCRA at 1784-86.)

Petitioner questioned almost every witness who was present in the crime scene that morning as to the location of the telephone cord. No one was able to specifically recall whether the telephone cord was, in fact, wrapped around the leg of Laurie Show. Petitioner takes this wholesale lack of recollection about a detail of questionable relevance and parlays it into an affirmative statement that the telephone cord was not wrapped around the leg of the victim.

This analysis requires two substantial leaps: (1) a leap from the failure of any witness to recall the telephone cord around the leg to the conclusion that the cord was not around the leg; and (2) a leap from that conclusion to the conclusion that the police found it necessary to go back into the condominium, lay the body out on the floor, wrap the telephone cord around the leg and then take a series of photographs. These photographs would show that Ms. Lambert was lying when she gave her statement about Ms. Buck throwing the telephone across the room.

Followed to its logical end, what possible reason would the police have to discredit Ms. Lambert's statement that Ms. Buck threw the telephone across the room? Certainly, they were not interested in ruling out evidence of Ms. Buck's involvement. Certainly, Ms. Buck's throwing the telephone across the room and the location of the cord around Laurie Show's leg are not mutually exclusive. It appears that the telephone was close to the entrance of the bedroom, by the bed, when Laurie picked it up. If Ms. Buck threw it across the relatively small bedroom, it could easily have landed near the closet where Laurie's body came to rest. With the base separated from the handset, the apparatus could have extended across the floor on the opposite, i.e., window, side of the room. With respect to wrapping the cord around the leg, Laurie's body could have come to rest on top of the

Not Reported in A.2d                                                                                  Page 92
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

cord and the telephone could have been moved as the several medical and police personnel tended to Laurie or processed the crime scene.

This allegation of misconduct assumes that the police took every detail of Ms. Lambert's statement in the early hours of December 21, 1991, and sought to orchestrate the items of physical evidence available to them, in this case, the photographs, to discredit that statement. This just does not make any sense. In so "discrediting" Ms. Lambert's statement, the police would have been compromising evidence of Ms. Buck's involvement. The police have never, under any circumstances or under any interpretation of the evidence, sought to diminish Ms. Buck's involvement. In fact, the Commonwealth pursued a first degree murder prosecution against Ms. Buck resulting in a jury verdict of second degree murder in September 1992.

**\*100** As to the issue of after-discovered evidence, the crime scene photographs were certainly available to Mr. Shirk in 1992. The crime scene drawings prepared by Officer Weaver were available as well. In fact, Officer Weaver took the stand in 1992 and was cross-examined by Mr. Shirk. If any discrepancy between the photographs and the drawing were of any importance to the Lambert defense effort in 1992, they would have been raised at that time. This is certainly not evidence which was unavailable at the time of trial. The only thing "unavailable" at the time of trial was the unfounded suspicion that there is something untoward about these photographs due to the fact that they are not entirely consistent with the crime scene drawings.

With respect to "prosecutorial misconduct," petitioner has established nothing by way of facts or evidence to show that these photographs were somehow fabricated or changed. Under the analysis required in a PCRA proceeding, nothing about these photographs undermined the truth-determining process or would have changed the outcome of the trial.

2. Footprints in the hallway and bedroom

Petitioner presented the testimony of a representative of Compleat Restorations. Compleat Restorations was called to the scene on December 23, 1991, to clean the condominium

at the request of Mrs. Show's insurance company. Compleat Restorations took some photographs, one of which shows a reddish smudge or mark on the floor in the tile entranceway. This mark could be interpreted to be a footprint. This is now presented by petitioner as proof that the testimony in 1992 that there was no blood in the hallway or any footprints in the hallway was false, fabricated and perjured.

The fact that a Compleat Restorations photograph shows a smudge in the entranceway which could be viewed as a footprint establishes nothing. Compleat Restorations came into the condominium three days after the murder. In that time, literally dozens of persons were in and out of the home. Testimony was that the blood on the carpet on Laurie's bedroom had soaked through to the point where it had stained the concrete underneath. There were copious amounts of blood all over the bedroom. Anyone going in and out of that room could well have tracked blood out through the hallway. To say that a smudge on the floor which looks like a footprint had to be the footprint of the murderer (and no one else) and was, therefore, hidden by the police is just not true. The Compleat Restorations' photographs do show markings on the floor which could be interpreted to be bloody shoe prints. This does not establish that the shoe prints were placed there by the killer.

Officer Weaver testified at trial that there was a bloody footprint in the hallway and that he believed that it was made by medical personnel. (N.T., Trial at 38, 49-50, 54-55.) He also testified that he saw no distinct footprints in the bedroom. (N.T., Trial at 53-54.) Pennsylvania State Police Trooper Anthony Suber testified credibly about this at the PCRA hearing, as well. (N.T., P .C.R.A. at 6539-40, 6545.)

**\*101** Perhaps petitioner and her counsel disagree with the police assessment on the morning of December 20, 1991, about the relevance or the importance of the footprints in the bedroom. That issue was available to petitioner and her defense counsel at trial and, in fact, there was a significant amount of discussion and argument over footprints at the scene. Nothing about the case has changed since that time.

Finally, Trooper Suber, who took the photographs at the crime scene, took a videotape of the interior and the exterior

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
(Cite as: 1998 WL 558749 (Pa.Com.Pl.))

of the condominium at the conclusion of his work. By that time most of the investigative personnel had cleared out of the condominium, Laurie Show's body had been taken to the morgue, and the investigation was largely completed. He photographed, by way of a video camera, the entire interior of the Show condominium before he left that morning. The video shows some markings on the tile floor which could well have been consistent with a significant amount of traffic in and out of the condominium that morning. This video was taken prior to the photographs taken by Compleat Restorations. There are blood spatters and markings on the wall just inside the doorway with corresponding spots, presumably blood, on the floor just underneath. Trooper Suber carefully recorded these on the videotape. That tape was available to trial counsel and was shown at the trial.

The photographs of the front hallway are very important to petitioner's theory of this case. In the story she told at trial, she attempted to rescue Laurie Show by grabbing her by the wrists and dragging her from the bedroom to the hallway. At that point, Laurie Show had been stabbed in the back and, presumably, would have been bleeding profusely. [FN100] Yet, the crime scene photographs show very little blood in the front hallway. This led Mr. Kenneff to pose the question in his closing argument: "Where is the blood?" (N.T., Trial at 1283.) Mr. Kenneff was referring to the crime scene photographs and pointing out that the physical evidence did not support Ms. Lambert's story that she became Laurie Show's "rescuer" that morning.

> FN100. Indeed, according to Dr. Smialek, the stab wound to the back would have caused death within a matter of minutes.

Ms. Lambert's response to this is that the police altered or fabricated photographs to dispute her story. [FN101] She contends: (1) that the hallway was cleaned up before the photographs were taken; or (2) a rug was moved so as to hide bloody footprints while the photographs were taken; or (3) the photographs were "cropped" so as to cut out bloody footprints.

> FN101. It is worth considering that the charge of "fabricating" crime scene photographs of the hallway concerns police conduct at the time of the

investigation or within the next day. At that point, Ms. Lambert had told the police that Ms. Buck went crazy in the condominium and that she (Lambert) turned away in horror. The story about grabbing Laurie Show's wrists and attempting to pull her from the bedroom into the hallway did not materialize until the trial. Yet, Ms. Lambert contends that the police altered or staged photographs on December 20 or 21, 1991, to discredit a story they would not hear until July 1992 in a courtroom.

In reality, several of the photographs of the hallway show an Oriental type throw rug which is positioned in somewhat of an angle. A careful inspection of several of these photographs shows a reddish smudge near the doorway, which could certainly be a mark made by a shoe which had tracked across blood. One of these photographs shows a figure standing outside the condominium door, who was later identified as Reverend Samuel Knupp. Reverend Knupp testified that he was present at the condominium that morning and had been summoned there to assist Mrs. Show. (N.T., PCRA at 5939, 5941-43.) This would establish that the photograph of the hallway was taken that morning and not later that night or the next day as petitioner suggests. In any event, on certain of the photographs, a reddish smudge is visible. The fact that the carpet may have been moved to cover a portion of the smudge does not suggest a sinister cover up. Rather, it suggests that the throw rug was easily moved and shifted to different positions as people moved in and out of the condominium that day.

**\*102** With respect to the "cropping" of photographs, Trooper Suber testified that certain machines which print photographs from negatives will sometimes cut the print at an inappropriate point. (N .T., PCRA at 6525-26.) This could easily have been done in the many copies made of the many photographs which are now in the record of this case. It is important to note that there are "noncropped" photographs of the same door, hallway and portion of the wall showing a full view.

Petitioner argues that the photographs show a blood spatter on the wall and at least one bloody footprint in the hallway. She contends that this establishes that Mr.

Kenneff's "where's the blood?" argument was false and misleading. The photograph of the wall showing the blood spatter just inside the front door of the condominium was carefully reviewed at trial. The photographs of the entranceway to the condominium were available for all to see at trial. Mr. Kenneff's argument that there is no physical evidence to support Ms. Lambert' s story was absolutely correct. The fact that there is a bloody footprint and a blood spatter on the wall does not support her contention that she dragged the mortally wounded and bleeding Laurie Show by the wrists into the hallway. Judging from the amount of blood on the carpet in the bedroom, it is logical to conclude that were Ms. Lambert's story to be true, there would be copious amounts of blood in the hallway. The court understood Mr. Kenneff's argument to be a reference to a lack of significant blood in the hallway. The fact that there was a blood spatter and a footprint or two does not render the "where's the blood?" argument false or misleading.

3. The white sweatshirt

  Petitioner presented evidence that Ms. Buck wore a white sweatshirt on the morning of the murder. She also presented testimony that Ms. Buck appeared at Penn Manor High School after the murder wearing a white or off-white sweatshirt turned inside out. Petitioner points to the white sweatshirt in the crime scene photographs and argues that this is Ms. Buck's sweatshirt, placed there by the police.

  The problem is that there is no testimony which would establish that the police had Ms. Buck's sweatshirt or that the police had access to Ms. Buck's sweatshirt while the crime scene photographs were taken or when they were allegedly fabricated in the early morning hours of December 21, 1991. The bald assertion that the white sweatshirt lying near or next to Laurie Show's body in certain crime scene photographs is Ms. Buck's sweatshirt is without any foundation in the evidence.

4. "Missing" or "destroyed" photographs

  Ms. Lambert contends that photographs of the crime scene are missing or they were destroyed. She bases this argument on essentially two grounds: (1) the testimony of Stephen Hale; and (2) by inference from the fact that the

photographs produced to her counsel during the federal proceeding were not produced all at one time, in logical sequence, accompanied by a printed log.

  **\*103** Mr. Hale is a retired police officer from rural Ohio who has experience in investigating crime scenes. He has taken photographs of crime scenes. He offered his opinion that had he photographed the crime scene at the Show condominium on December 20, 1991, he would have taken more pictures. Ms. Rainville, as counsel for Ms. Lambert, argues from this "opinion" that some pictures must, therefore, be missing. That is, because the Commonwealth did not produce in federal discovery the number and type of photographs Mr. Hale would have taken, the Commonwealth must, therefore, be hiding something. All Mr. Hale was able to establish at the PCRA hearing was that the police officers taking the crime scene photographs were "incompetent" in his view. But this is not a case about incompetent photographers or negligence on the part of an investigating police department. This is a case where the court is evaluating claims of after-discovered evidence, prosecutorial misconduct and ineffective assistance of counsel. The fact that Mr. Hale, or his "ordinary competent crime scene photographer," might have done more than Trooper Suber and Pennsylvania State Police Trooper Joseph C. Reeves did is of little or no consequence to this case. Perhaps rather than four rolls of film, they should have taken ten rolls of film. That argument invites nothing more than speculation and leads nowhere. The fact is there were ample photographs taken for the Commonwealth, the defense and the court to understand the nature of the crime scene at the 1992 trial. No issue was raised as to the photographs at that time.

  With respect to the "destruction" of photographs, Detective Geesey testified that he took step s to verify that the District Attorney's Office had all the Pennsylvania State Police photographs prior to turning them over to petitioner's counsel in 1997. (N.T., PCRA at 3900.) Lieutenant Renee Schuler was asked to obtain photographs from East Lampeter. Photographs from the District Attorney's files were also obtained. It appears that the photographs were produced in stages to petitioner's counsel in Philadelphia pursuant to the district court's order. The photographs were not produced all at one time, in an orderly fashion. This

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appears entirely reasonable given the fact that the various crime scene photographs had been used in two preliminary hearings and two homicide trials more than five years before the federal discovery order. It was established at the PCRA hearing that there was no set procedure or protocol for the storage of photographs. It appears likely that some were in the District Attorney's files, certain photographs were with the Pennsylvania State Police and others may have been at East Lampeter Township. The record makes clear that reasonable and good faith efforts were made to locate all available photographs.

  The "destruction of photographs" claim basically arose in the discovery phase to the federal habeas proceeding. A number of witnesses testified in the PCRA hearing as to the manner in which the Lancaster County District Attorney's Office produced photographs to petitioner's counsel in Philadelphia. Several witnesses testified to the so-called "Christmas Eve production" where a series of photographs arrived in the offices of Schnader Harrison Segal & Lewis, counsel for petitioner, on December 24, 1996. It appears from all accounts that photographs were received from the Lancaster County District Attorney's Office in several stages. This manner of complying with the discovery directives of the district court, combined with the fact that the State Police did not take the hundreds of photographs Mr. Hale would have taken, has led to petitioner's conclusion that photographs were hidden or destroyed rather than disclosed to her counsel in Philadelphia prior to the habeas hearing. As we discussed above, it appears more likely that the production of photographs was accomplished in stages because the photographs were located in several different places.

  **\*104** As an ironic commentary on this issue, petitioner's counsel found themselves poorly organized and frustrated when it came time to organize their photographs to move their admission into evidence during the PCRA hearing. On June 9, 1998, during the questioning of District Attorney Madenspacher, counsel for petitioner attempted to have certain photographs shown to the witness. There was confusion as to the numbering and location of the exhibits despite the fact that the court had dedicated a secure area adjacent to the courtroom for the storage of evidence. In addition, counsel for petitioner had at least two paralegals

at all times assisting the two attorneys trying this case. Nevertheless, when attempting to organize and present certain photographs, counsel for petitioner were unable to locate the exhibits. There were several breaks taken during the afternoon session for the purpose of locating these photographs. Christy Fawcett, Esquire, counsel for the Commonwealth, made the following statement for the record:

  I would like to place on the record that we have now spent approximately 15 to 20 minutes attempting to straighten out exhibits that were previously marked by the petitioner. And in addition we also spent some time during Mr. Madenspacher's testimony attempting to clarify some of those issues. In addition to what has been today, there was a period at the beginning of the case, and this frankly may or may not be on the record, I don't recall, but where there was several hours spent trying to clear up mismarking of exhibits.

  And my purpose for requesting that this be placed on the record is not to indicate in anyway that I think anybody was deliberately trying to rearrange or cause problems with the exhibits, but I think it is instructive and illustrative of the problems that occur when there are large numbers of photographs and other exhibits that--and other items of evidence that are being given into discovery, for instance, being attempted to locate, subsequent to a trial, to give to counsel and so forth.

  And I think it's an illustration of how mistakes sometimes happen that are nobody's fault. They're simply honest mistakes and I think that's occurred here and, as I argue to the court later on, that could've been easily what occurred at later points in this case.

  (N.T., PCRA at 5806-07.)

  In essence, petitioner's counsel could not locate photographs that had previously been marked, were somewhere in the courtroom or in the evidence room, and which they wished to show to a witness. The court quite agrees with counsel's statement that the organization, management and retrieval of large numbers of exhibits, photographs or otherwise, can be very difficult.  [FN102] The PCRA hearing was a clinic on this subject. It is not at all hard for this court to believe that the District Attorney's Office, East Lampeter Township and the Pennsylvania State Police might have had difficulty locating and producing all photographs of the crime scene in one complete and

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
(Cite as: 1998 WL 558749 (Pa.Com.Pl.))

well-orchestrated production. Human nature and the litigation process being what they are, it is completely understandable how these photographs could have been produced in 1996 and 1997 in several stages without any sinister significance. There simply is no proof of any prosecutorial misconduct, destruction of evidence or fabrication of evidence arising out of these facts with the crime scene photographs.

FN102. At the start of the hearing, on April 30, 1998, petitioner's counsel called Lieutenant Renee Schuler to the stand. Lieutenant Renee Schuler was shown some 35 items of evidence which had been marked for identification by petitioner's counsel. Normally, the court reporter would mark exhibits but because of the large number of exhibits and because many of these exhibits had been used previously by petitioner's counsel, the court believed that the best system would be for them to use their own numbering system. After 30 some exhibits had been shown to Lieutenant Schuler, counsel for the Commonwealth pointed out that two items had been marked Exhibit 883, two items had been marked Exhibit 900, none of the exhibits marked had any dates or initials as to who marked them, and that at least one empty envelope that came with an exhibit was no longer attached to the exhibit. (N.T., PCRA at 137.) We took a recess and determined that the safest course would be for the court reporter to mark the exhibits. A substantial portion of the afternoon of April 30 and nearly all of the morning of May 1, 1998, were consumed with the remarking and organization of these exhibits. This substantial delay was caused by the lack of any true organization of these important exhibits despite the good efforts of petitioner's counsel. This is testimony itself to the difficulty in managing large numbers of exhibits in a complex case where problems arise from these circumstances without any dishonest or otherwise bad motive.

N. The Pearl Earring

*105 In early to mid-January 1992, Dean Haas, Hazel

Show's nephew, was helping clean the Show condominium. He found a pearl earring on the tile floor just inside the front door up against a baseboard. Mrs. Show turned this earring over to Corporal Renee Schuler and told her she did not recognize the earring as her daughter's. Corporal Renee Schuler turned the earring over to Detective Savage who prepared a report dated February 7, 1992. The report notes that the earring was shown to Mr. Yunkin:

On 02-07-92, this officer showed the pearl stud earring to Lawrence Yunkin. At that time, Yunkin stated that he is sure that Michelle Lambert did, in fact, own a set of earrings exactly like the earring that this officer presented to him. Yunkin stated he does not recall when Michelle may have worn said earrings, did not recall if she had this type of earring on the morning of 12-20-91 and did not recall Tabatha Buck having earrings on on 12-20-91. Yunkin stated that other than remembering that Lambert had earrings exactly like these, he could provide no other information as to where they were at this time when she wore them or any other information.

(Petitioner's Exhibit 1190.)

Petitioner's contends that there is misconduct associated with this pearl earring. Specifically, she claims that the report of Detective Savage, (Petitioner's Exhibit 1190), was a "deliberate falsification of evidence" because Mr. Yunkin had told the police on February 5, 1992, that he sometimes wore the earring. Petitioner is actually referring to the testimony of Detective Barley from the PCRA hearing. Detective Barley testified that Mr. Yunkin told him he wore "an earring." (N.T., PCRA at 677.) Mr. Yunkin *never* acknowledged to Detective Barley that he wore that specific pearl earring. The most Mr. Yunkin said was that on occasion he wore an earring similar to that one but did not state or admit that he wore that earring at any time.

Whether or not Mr. Yunkin acknowledged that he wore the pearl earring found in the Show condominium, there is no proof whatsoever of destruction of evidence, after-discovered evidence, prosecutorial misconduct or any other untoward behavior regarding the pearl earring. In fact, Ms. Lambert's defense counsel at trial emphasized the earring and suggested very strongly that Mr. Yunkin wore that earring that morning. Roy Shirk had available to him Mr. Yunkin's printed statement, a 19-page document, which was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

marked in the PCRA hearing as Petitioner's Exhibit 1661. Mr. Shirk was aware that the earring had been found in the condominium, was aware that Mr. Yunkin wore earrings, and worked very hard to find someone who could say that Mr. Yunkin wore that pearl earring. In the PCRA hearing, Mr. Shirk testified that Richard Jeffries "went to great lengths ... to find people who had seen Mr. Yunkin wearing that earring." (N.T., PCRA at 3388.) Ms. Lambert had told Mr. Shirk that Mr. Yunkin wore that specific earring.

**\*106** Assuming the complete truth of all of petitioner's allegations regarding misconduct as to the earring, they come to nothing. Mr. Shirk believed that Mr. Yunkin wore the earring, searched for witnesses to support this, and cross-examined Mr. Yunkin on whether he wore the earring. He could have done nothing more with the earring at trial.

Mr. Shirk cross-examined Mr. Yunkin about the pearl earring in a thorough and forceful way. It was obvious to the court that Mr. Shirk was prepared on this issue and he, in fact, established that the earring was one that Mr. Yunkin had worn on occasion or similar to one that Mr. Yunkin had worn on occasion. Mr. Shirk showed Mr. Yunkin a photograph of the pearl earring at trial and asked him if he been shown that by the police. Mr. Yunkin testified that he did talk about the earring with the police and said, "I said it looks like an earring that Michelle owns." (N.T., Trial at 258.) Mr. Shirk then asked him:

   Q. But who wore them?
   A. I wore--About three times I wore one.
   Q. You wore the pearl earrings?
   A. One, yes.
   (N.T., Trial at 258-59.)

Mr. Yunkin went on to tell Mr. Shirk at trial that he had told the police he wore the earring. Mr. Shirk then argued to the court that the police intentionally left out a reference to Mr. Yunkin's wearing the earring in the report they filed. He also accused the police of leaving that information out of Mr. Yunkin's statement. In fact, Mr. Yunkin was not certain that he told the police about the earring in giving his statement. He was sure that he told Corporal Solt about the earring in his meeting with Corporal Solt just prior to trial. (N.T., Trial at 259.)

Mr. Shirk moved for a mistrial on the basis of the Commonwealth's failing to disclose to him that Mr. Yunkin wore the pearl earring. Mr. Shirk argued that the defense was not notified that Mr. Yunkin wore a pearl earring like that and contended "it was kept out of his statement." (N.T., Trial at 1181.) Mr. Kenneff noted to the court that he found out that Mr. Yunkin wore the pearl earring from Mr. Shirk. (N.T., Trial at 1197.) The court found there to be no prejudice and no evidence that the information was "kept out of the statement" or withheld from the defense. Mr. Shirk made every good use of the information about the pearl earring in cross-examining Mr. Yunkin. Under cross-examination by Mr. Shirk, Mr. Yunkin admitted that he wore a pearl earring. That appears to the court to be the most use Mr. Shirk could have made of the earring at trial.

The earring itself was apparently a generic pearl-like earring, as described by a number of witnesses. There was nothing distinctive about the earring. In fact, the earring could have come from Mr. Yunkin, from Ms. Lambert or from Ms. Buck. We ruled out the fact that it may have come from Laurie Show because her mother stated early on in the investigation that her daughter did not own an earring like that. The fact that Mr. Yunkin wore earrings and the fact that the earring was of a generic type does not establish what petitioner wants to establish: that Mr. Yunkin wore that earring in the condominium that morning and that it fell out while he was murdering Laurie Show. There simply is no factual basis for this finding nor is there enough of a basis to draw any inference in petitioner's favor on this point.

O. Robert Reed's Testimony

**\*107** Robert S. Reed was called as a witness by petitioner. Mr. Reed is a former East Lampeter Township police officer who participated to some extent in the investigation of this case. Mr. Reed was called as a witness in the PCRA hearing on May 11, 1998. Two days before that, he had been convicted of several felonies involving sexual assaults on a minor. At least two of these charges carried with them mandatory minimum sentences of five years each.

When Mr. Reed came into the courtroom, he stated his name and then indicated that he did not wish to answer questions. He was given an opportunity during a recess to

consult with his attorney and then returned to the witness stand. At that time, the following colloquy occurred:

THE COURT: Mr. Reed, you indicated a few moments ago that you did not wish to answer any questions until you had a chance to speak with your attorney. Is that correct?

THE WITNESS: That's correct, your Honor.

THE COURT: All right. Have you had a chance now to speak with your attorney?

THE WITNESS: Yes, I did, your Honor.

THE COURT: All right. And is that Attorney Robert Reese?

THE WITNESS: That's correct.

THE COURT: Having spoken with Mr. Reese, do you wish to answer questions at this time?

THE WITNESS: No, I do not.

THE COURT: And why is that, Mr. Reed?

THE WITNESS: At this time I'd just like to reserve that for a later time, your Honor. I have no explanation at this time. I just don't want to answer any questions.

THE COURT: Okay. Mr. Reed, is your refusal to answer any questions today motivated in any way by a concern against self incrimination?

THE WITNESS: No, your Honor.

(N.T., PCRA at 1539-40.)

At that point, a conference was held at sidebar with counsel. Counsel discussed with the court whether there was a legitimate Fifth Amendment privilege which could be invoked by Mr. Reed. The court then explained to Mr. Reed that if he refused to answer a question, the court could direct him to answer and his failure to comply could result in a contempt citation. The court further advised him that if it was a matter of self incrimination, he could invoke his rights under the Fifth Amendment of the United State Constitution and, if satisfied that there was a basis on which to invoke the privilege, we would not direct him to answer the question.

Our research on this issue during the trial disclosed that a witness's right to invoke the Fifth Amendment extends to potential criminal liability that is collateral or remote. This court was aware that Officer Reed was one of the police officers whose conduct was condemned by the federal district court in 1997 and who was referred to the United States Attorney's Office for investigation. This court has no idea as to the status or progress of any such investigation. However, the fact remained on May 11, 1998, that there was a potential open investigation in the United States Attorney's Office in the Eastern District of Pennsylvania and that answers to any questions put to Mr. Reed during the PCRA hearing could have bearing on his culpability on any charges or allegations being investigated by the United States Attorney. This court honestly believed that the privilege would apply even if the possibility of investigation, charges or conviction in federal court was remote. [FN103]

FN103. As a practical matter, we believed and expressed to counsel at that time that possible sanctions for his conduct in the Lambert investigation imposed by the federal courts or any possible contempt citation for failure to answer questions at the PCRA hearing would be of little concern to Mr. Reed. He had just been convicted of five sex offenses. At the time this discussion was taking place on May 11, 1998, Mr. Reed faced a substantial state prison sentence. On July 6, 1998, Mr. Reed received a sentence of 9 to 18 years.

**\*108** The court then gave permission to petitioner's counsel to question Mr. Reed. In response to a series of questions, he asserted his privilege under the Fifth Amendment and refused to answer. It became clear that he was asserting this privilege as to every question. For example, he responded to a question as to his employment status by invoking the Fifth Amendment privilege:

Q. Mr. Reed, where were you employed in 1991?

A. I'm refusing to answer that under the Fifth Amendment.

(N.T., PCRA at 1544-45.)

We ruled that it was proper for Mr. Reed to invoke the Fifth Amendment privilege in light of the allegations made in the federal proceeding. The question remains for our purposes, what is the remedy? Petitioner's counsel argue that we should draw an adverse inference to his assertion of the Fifth Amendment privilege on each question. The Commonwealth contends that Mr. Reed should be considered "unavailable" and that his testimony in the federal proceeding should be used as his testimony in this

proceeding.

Generally, the fact finder may not draw an inference from a witness's exercise of his constitutional right not to incriminate himself regardless of whether the inference is favorable to the prosecution or the defense. Commonwealth v. Greene, 445 Pa. 228, 231, 285 A.2d 865, 867 (1971). In this case, the initial colloquy with Mr. Reed disclosed that he was not so much concerned about self incrimination as he was simply unwilling to participate in the hearing. Given his apparent state of mind following the conviction on the sex offenses, this was understandable. With the explanation given to him as to his options in answering questions, it appears that Mr. Reed used the Fifth Amendment privilege against self incrimination as a "ticket" to not answer any questions. He appeared hostile to the proceedings and, at one point, refused to look at the river search videotape which was played directly in front of him and about which he was asked some questions. The court noted for the record that Mr. Reed did not look at the television screen for the entire eight minutes it took to play the video. (N.T., PCRA at 1554.) It appears that Mr. Reed may well have been angry with himself or at the world. In any case, this led to a wholesale lack of cooperation with counsel's questions.

Given the circumstances and in light of Greene, it seems appropriate to consider Mr. Reed "unavailable." We have, therefore, considered his testimony from the federal proceeding, which was presented on Monday, April 14, 1997, the tenth day of the habeas corpus hearing. (N.T., Habeas Hearing at 2184-2228.)

P. Proposed Admissions from the Federal Record

On June 10, 1998, counsel for petitioner submitted a document entitled "Petitioner Lisa Lambert's List of Admissions to be Offered into Evidence." The document contains a long listing of page references from the transcript of the federal habeas proceeding involving the testimony of Detective Solt, former Detective Barley, Officer Bowman, Mr. Kenneff, former Chief Jacob A. Glick, District Justice Savage, Lieutenant Renee Schuler and Officer Weaver. Each of these witnesses was called by petitioner at the PCRA hearing. The proposed admissions refer to substantial portions of the deposition and federal court testimony of

these witnesses. They are offered in this proceeding as "admissions" by these witnesses. We addressed the proposed use of petitioner's federal habeas corpus record in this proceeding in an opinion filed April 6, 1998. See Commonwealth v. Lambert, 76 Lanc. L.Rev. 169 (1998). In that opinion, we considered the various arguments in favor of the request that we accept the federal habeas record as the evidentiary record for the PCRA. We ruled at that time that there is no basis in law or in common sense for so doing. With respect to the federal habeas record, we noted: *109 This is not to say that the record produced in April 1997 in federal court cannot be put to any use in this proceeding. As all parties have agreed, the record contains testimony under oath and may be used in the same way prior testimony under oath can be used in any proceeding. The court would prefer not to decide this case on a series of admissions extracted from depositions and from the federal record. The court is aware that Rule 1507, 'Disposition Without Hearing,' provides for the disposition of a petition without a hearing when the petition and answer show that there is no genuine issue concerning any material fact. Pa. R.Crim. P. 1506(b). The court does not view this Rule as an invitation to the parties to submit this case in a posture similar to a motion for summary judgment under Rules 1035.1 through 1035.5 of the Rules of Civil Procedure.

76 Lanc. L.Rev. at 182.

Our position has not changed since that time. In fact, counsel for petitioner put the federal habeas record to good use during the PCRA proceeding. The record was used to impeach witnesses, to refresh the recollection of witnesses and, in the case of Officer Reed, to provide testimony where a witness has become "unavailable" for the PCRA hearing. The wholesale use of testimony from the federal proceeding and the ensuing necessary argument as to whether certain statements constitute admissions under the law was precisely what we hoped to avoid in holding a PCRA hearing. Now, after a lengthy hearing, we believe the request that we consider statements from the federal proceeding as "admissions" is superfluous. We, therefore, deny the request that the proposed admissions contained in petitioner's pleading be used as evidence in this case.

Q. Ineffective Assistance of Counsel of Roy D. Shirk,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Page 100

Esquire

The elements of a PCRA ineffective assistance of counsel claim are discussed in Section III.B.1.b, *supra*, of this opinion. As to each allegation of ineffective assistance, Ms. Lambert must show: (1) there is merit to the underlying claim; (2) counsel had no reasonable basis for his course of conduct; and (3) that there is a reasonable probability that but for the act or omission in question, the outcome of the proceeding would have been different. There are 22 allegations of ineffective assistance of counsel regarding Mr. Shirk in petitioner's second amended petition. (Exhibit A, Section C .) We will address those allegations in this section.

1. Failing to push for discovery

Mr. Shirk, Ms. Lambert's trial counsel, did, in fact, request discovery. He requested and "pushed for" all information to which he was entitled under Pa. R.Crim. P. 305. In fact, Mr. Shirk requested a conference with the court on discovery and presented his concerns before trial.

Petitioner criticizes Mr. Shirk for failing to obtain the level of discovery she achieved in the federal habeas proceeding. The simple answer to that is the Rules of Criminal Procedure in Pennsylvania do not provide for that kind of discovery. In the federal proceeding, petitioner's counsel took in excess of 50 depositions and caused the production of attorney work product from the prosecuting attorney. The level of discovery permitted by the district court far exceeded the scope of discovery under the Pennsylvania Rules of Criminal Procedure. This court is satisfied that Mr. Shirk made a request for all materials discoverable under Pa. R.Crim. P. 305 and Brady.

2. Failing to call character witnesses

**\*110** This issue has been previously litigated. This court considered the claim raised by Mr. Epstein on behalf of Ms. Lambert. *See* Commonwealth v. Lambert, March 14, 1995, slip op. at 6-24. No additional evidence was offered on this issue at the PCRA hearing.

3. Failing to use an expert in speech

Mr. Shirk retained a well known forensic pathologist, Dr. Mihalakis, to testify on the issue of speech in this case. Dr. Mihalakis prepared a report for Mr. Shirk in which he discussed the possibilities of speech for Laurie Show.

The "underlying claim" here is that a speech expert would have established that Laurie Show could not have spoken to her mother. This is a claim of questionable merit. As we have seen from the lengthy testimony at the PCRA hearing, this is an area on which experts sharply disagree. We have had the opportunity to consider the testimony of Dr. Larson in this case. We find that there is no reasonable probability that the outcome of the proceeding would have been different had Mr. Shirk called Dr. Larson or an expert in Dr. Larson's field to testify at the trial. For a more complete discussion of the impact of expert testimony on the issue of Laurie Show's dying declaration, *see* Section VII.A, *supra*.

4. Failing to use an expert on abuse and rape trauma

Mr. Shirk cannot be ineffective for failing to call an expert on a subject that is not relevant under Pennsylvania law. Had Mr. Shirk presented Dr. Burgess or a similar expert at trial, she/he would not have been permitted to testify. *See* discussion of this issue in Section VII.C, *supra*.

5. Failing to use an expert in pathology

In fact, Mr. Shirk did use an expert in pathology. Dr. Mihalakis was unable to determine whether the major vessels in Laurie Show's neck were cut. As we have seen, Dr. Penades, who performed the autopsy, and Dr. Annese, a throat surgeon who attended the autopsy, testified that the major vessels were not cut. Specifically, petitioner is referring to the carotid artery. Drs. Baden and Smialek, world renowned forensic pathologists called by petitioner at the PCRA hearing, could not offer an opinion as to whether the carotid artery was cut. All the information made available to them would have been available to a pathologist retained by Mr. Shirk at the time of trial. Drs. Burton and Ross offered opinions based upon the autopsy photographs and the autopsy report that the carotid was not cut.

We find that no expert, EMT or board certified forensic pathologist, could have countered the clear and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unequivocal testimony of Drs. Penades and Annese that the carotid artery was intact.

6. Failing to use an expert in crime scene photography

Petitioner contends that her expert in crime scene photography, Stephen Hale, has demonstrated that the prosecution has destroyed evidence. We have not been able to make that finding based upon the testimony of Stephen Hale. Mr. Hale basically testified that he would have done a better job than Troopers Suber and Reeves. That does not establish that the state police or the East Lampeter Township police destroyed evidence. There is no merit to this claim.

7. Failing to use an expert in document authenticity

**\*111** This is an interesting claim in light of William Ries's testimony that he could not determine whether Ms. Lambert's statement was altered or fabricated. Mr. Ries was the document expert called by petitioner in this PCRA hearing. Upon examination of the five and one-half typewritten pages and the one and one-half handwritten pages, Mr. Ries could not say whether Ms. Lambert's signature was placed on the statement before or after the statement was prepared.

The wild assertion that Ms. Lambert's statement was fabricated is simply contrary to the evidence. We discussed this issue in Section VII.L, *supra*. In light of Ms. Lambert's testimony at trial that her statement contains that which she told Corporal Solt, in light of Mr. Shirk's testimony at the PCRA hearing that he went over the statement with her very carefully and in light of her letter of December 23, 1991, where she adopts the portion of the statement which is handwritten, an attack on the authenticity of her statement at trial would have been a peculiar move indeed for Mr. Shirk.

8. Failing to give Ms. Lambert her statement to review

There is no merit to this claim. *See* Section VII.L, *supra*.

9. Failing to attack Detective Barley about the pink bag

Mr. Shirk viewed the edited river search video, which shows a pink bag embedded in ice. He was present for Detective Barley's testimony at trial that the police did not find the trash bag. Mr. Shirk did not confront Detective Barley about this inconsistency. There are three possible explanations for this: (1) Mr. Shirk did not make the connection and missed an opportunity to impeach Detective Barley; (2) Mr. Shirk did not find there to be anything of evidentiary value about the pink trash bag; or (3) Mr. Shirk was aware that a bag was found but chose not to highlight this issue as it was strongly suggestive of Ms. Lambert's involvement in the murder.

Given the level of Mr. Shirk's preparation for trial and his understanding of the factual and legal issues, it is unlikely that he simply "missed" an opportunity to impeach Detective Barley. It is more likely that he chose to keep his client as far away from the trash bag as possible because of the implications arising from her knowledge of or disposal of the bag. It is equally likely that he, in essence, agreed with Detective Barley that there was nothing of evidentiary value found in the bag. In the event that Mr. Shirk considered the pink trash bag a collateral issue, he showed good sense and effective trial strategy by not impeaching Detective Barley on a collateral issue.

10. Failing to have Ms. Lambert and her family testify about the "29 questions"

Mr. Shirk made a strategic decision as to the use of the "29 questions" at trial. It was his purpose to use the document to demonstrate Mr. Yunkin's involvement in the murder. The "29 questions" did nothing to exculpate Ms. Lambert. In fact, in that suspect document, she refers to "our prank," she refers to "Laurie's scary dead eyestare," and she acknowledges participating in the conspiracy and the cover up. (*See* Petitioner's Exhibit 1119; Addendum to this Opinion.) To open the door through Ms. Lambert's testimony to these issues would have served no purpose. There has been no showing here by petitioner that anyone in the Lambert family had any light to shed on the "29 questions."

11. Failing to get an expert to replace Dr. Mihalakis

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Page 102

**\*112** Petitioner contends that Mr. Shirk should have sought a continuance or obtained an expert to replace Dr. Mihalakis. This issue is the subject of the discussion in Section VII.H, *supra.*

With the considerable testimony on Laurie Show's ability to speak, the damage done to Laurie Show's neck and her physical condition following the assault that morning, we know that the subject matter of Dr. Mihalakis's testimony is a subject matter upon which experts disagree. We have had the benefit of three well qualified experts who offered their opinions that Laurie Show could not have spoken. We have the benefit of three experts who say that Laurie Show could have spoken. As we noted in Section VII.A, *supra,* "Laurie Show's Dying Declaration," this is an area where the expert testimony is one factor to be considered on the question of Mrs. Show's credibility as to the "dying declaration."

With the benefit of all the expert discussion at the PCRA hearing, we can say with confidence that Mr. Shirk's finding an expert to replace Dr. Mihalakis would not have changed the outcome of this proceeding. Our conclusion now is the same as our conclusion then. The additional mountain of expert opinions, pro and con, has not changed that finding.

12. Failing to present evidence available that showed Mr. Yunkin's involvement

Here petitioner is referring specifically to the statement made by Mr. Yunkin to Hector Feliciano as he (Yunkin) was leaving work the week before the murder. The out-of-court statement by Mr. Yunkin to Mr. Feliciano is hearsay. Mr. Shirk is not ineffective for failing to elicit hearsay from a witness. In fact, Mr. Shirk articulated a legitimate tactical reason for keeping the Feliciano statement out of evidence. *See* discussion of Brady/Giglio claim 12, *infra.*

13. Failed to have John Balshy look at other writings in blood at the scene

John C. Balshy testified at trial that the letters "T" and "B" were written in blood on the closet door. (N.T., Trial at 956.) This court viewed the photographs at trial and did not agree with Mr. Balshy's "findings."

It is interesting to note that at the PCRA hearing, Mr. Shirk's own investigator, Richard Jeffries, felt the same way. In fact, it was Mr. Jeffries who contacted Mr. Balshy in 1992. When Mr. Balshy contacted Mr. Jeffries about his "finding" the letters written in blood, Mr. Jeffries disagreed with him. Mr. Jeffries testified at the PCRA hearing that he continues to believe that those letters are not written in blood on the closet door. (N.T., PCRA at 7694.) This court found Mr. Balshy less than credible on that point. *See* Section VII.M, *supra.*

Mr. Shirk is not ineffective for failing to ask Mr. Balshy to look at other writings in blood at the scene given the fact that his testimony as to the writings he "found" was incredible. It certainly did not undermine the truth-determining process.

14. Failed to recognize that the last part of Ms. Lambert's statement was altered

**\*113** This issue has been considered in Section VII.L, *supra,* and in our discussion of allegation of ineffective assistance 7, *supra,* in this section.

Two brief points bear repeating. One, Ms. Lambert acknowledged in her testimony at trial that her statement was accurate. Two, Ms. Lambert wrote a letter on December 23, 1991, to Mr. Yunkin where she adopted the information contained in the last page of her statement. There is no evidence whatsoever in this or any other record that the last page of her statement was "obviously altered."

15. Failed to present available evidence that Mr. Yunkin was lying about what Ms. Lambert wore during the murder

Petitioner contends that Mr. Shirk was ineffective because he failed to present available evidence that Mr. Yunkin was lying about what Ms. Lambert wore during the murder.

Mr. Shirk cross-examined Mr. Yunkin on his recollection of what Ms. Lambert was wearing. Mr. Shirk made a point of arguing to this court that Mr. Yunkin must have been lying in that testimony. All of the "inconsistent" statements made by Mr. Yunkin regarding Ms. Lambert's attire that morning were available to Mr. Shirk. Mr. Shirk fully and completely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

litigated this issue in the trial. There is no merit to the claim set forth in the petition on this point.

16. Failed to present available corroborating evidence about the date rape

Petitioner claims that Mr. Shirk was ineffective in that he failed to present evidence corroborating the Yunkin date rape of the victim. In the first place, the police reports are hearsay and would not have been admissible at trial. There does not appear to be any credible evidence that there was, in fact, such a date rape. There were suggestions and references made as to this possibility in police reports. That is not competent evidence. Mr. Shirk was not ineffective for the failure to offer hearsay at trial.

17. Failed to point out the time of death as listed on the autopsy report

The autopsy report notes the time of death as 7:15 a.m. This is simply contrary to a significant amount of evidence. Perhaps Mr. Shirk understood that the time on the autopsy report was an approximation. Perhaps Mr. Shirk was aware that the 911 call had been made at 7:35 a.m. and that persons on the scene saw signs of life after the call. Whether Mr. Shirk was aware of that or not in 1992, we are certainly aware of those facts today. There is no merit to the claim.

18. Failed to present evidence that Ms. Lambert was not jealous

To suggest that Ms. Lambert was not jealous of Mr. Yunkin's involvement with Laurie Show in the summer of 1991 would be a significant departure from reality. At trial, there was, as Mr. Shirk described, a "parade" of teenage witnesses who described the animosity from Ms. Lambert to Laurie Show at that time. Mrs. Show testified as to specific incidents in which Ms. Lambert acted in an irrational, hysterical and jealous rage.

The fact that Michelle Lambert might have been sexually active with another man during the summer of 1991 does not establish a lack of jealousy. It would probably not have been effective trial strategy for Mr. Shirk to enhance his client's outrageous behavior in the summer of 1991 with

proof of some sexual promiscuity. In any event, this contention has no merit.

19. Failed to present evidence in news video footage that Ms. Lambert did not appear pregnant

**\*114** There was no evidence offered at the PCRA hearing on this claim.

20. Failed to present evidence of Mr. Yunkin's scratches and bruises

As with so many of these issues, petitioner never really presented any evidence in support of this contention. After nearly nine weeks of hearing testimony, we do not know whether there exists any "news footage" showing that Mr. Yunkin had scratches and/or bruises on his face. What we do know is that the prison records show that he had no bruises or scratches upon his commitment to Lancaster County Prison on December 21, 1991. (Commonwealth's Exhibit 49.) The nurse who did his intake physical examination at the prison on December 21 testified that he had no scratches or bruises. (N.T., PCRA at 6354.) There is no merit to this contention.

21. Failed to present evidence of "another Michelle"

The contention that there was "another Michelle" who had been "involved with the victim" is very misleading. There certainly was no person at any time material to this case who was "involved with the victim" to the extent that Lisa Michelle Lambert was "involved with the victim." To suggest that Laurie Show might have known another girl named Michelle is of no consequence. The inference here is that Laurie Show was referring to this other Michelle in her dying declaration. Given the history between Ms. Lambert and Laurie Show, given what we know of Ms. Lambert's participation that morning by her own admission, and given the demonstrated fear Ms. Show had of Michelle Lambert during the summer and fall of 1991, to suggest that the dying declaration may have referred to another Michelle has no basis in fact.

22. Failed to get Ms. Lambert's statement suppressed due to a violation of Pennsylvania's six hour rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The "six hour rule" issue did not surface until Detective Solt was testifying in the PCRA hearing on May 20, 1998. Detective Solt testified that he took a statement from Ms. Lambert and that at around 4 o'clock in the morning on December 21, 1991, he telephoned Assistant District Attorney Kenneff to consult with him. (N.T., PCRA at 3076-77.) The subject matter of this consultation was whether the questioning could proceed in light of the "six hour rule." Displaying some confusion over this issue, petitioner's counsel asked Detective Solt to explain. He went on to explain to them that a person in custody must be arraigned within six hours and that a statement taken beyond this six hour period from the time of arrest might well be illegal. (N.T., PCRA at 3079-80.)

The second amended petition was submitted to the court by petitioner on June 10, 1998, during the hearing and *after* Detective Solt's testimony. This amended petition contains this allegation of ineffective assistance based on the "six hour rule." This "learn as you go" approach has led to yet another frivolous issue introduced into this hearing. We will address the issue because it has been raised.

**\*115** In Commonwealth v. Davenport, 471 Pa. 278, 370 A.2d 301 (1977), the Pennsylvania Supreme Court ruled that a statement taken from a defendant more than six hours after arrest may be suppressed. This rule was qualified in Commonwealth v. Duncan, 514 Pa.Super. 395, 525 A.2d 1177 (1987). Our courts have since held that the Duncan/Davenport rule is not to be applied in a mechanistic fashion. Voluntary statements given by a defendant and initiated within six hours after arrest may not be suppressed just because the process of obtaining the statement runs over six hours. Commonwealth v. Odrick, 410 Pa.Super. 245, 599 A.2d 974 (1991). *See also* Commonwealth v. Bond, 539 Pa. 299, 652 A.2d 308 (1995).

Detective Solt's candid testimony about his concerns for the Duncan/Davenport rule were intended to explain why he broke off the interview. Mr. Kenneff advised him that he could take no new information but that he could obtain clarifications and confirmations of information he had already taken from Ms. Lambert.

Mr. Shirk was asked by petitioner's counsel why he did not

have the statement suppressed. He testified that he was familiar with the Duncan/Davenport rule and that he felt it would be a fruitless exercise to seek to have the statement suppressed. He noted that Ms. Lambert all but confirmed the contents of her statement in the letter of December 23,1991, to Mr. Yunkin. Second, he was aware that recent developments in the law would probably have supported the use of the statement because Ms. Lambert had begun the statement within the six hour period of time. Further, the last part of the statement, where she changed her story as to her attire at the time of the murder, was apparently given voluntarily and not in response to questions.

Mr. Epstein, a specialist in criminal law from Philadelphia and Ms. Lambert's appellate counsel, testified that he did not think there was any merit to a suppression issue based on the Duncan/Davenport rule.

Mr. Shirk stated a clear tactical reason for not seeking to suppress the statement. He certainly had a reasonable basis for his course of conduct. The content of Ms. Lambert's statement, even if the statement itself had been suppressed, would have been admitted through her subsequent letters and statements to others.

R.  Ineffective Assistance of Counsel of Jules Epstein, Esquire

Ms. Lambert contends that Mr. Epstein was ineffective. Mr. Epstein was hired as appellate counsel to pursue the issues raised on appeal by Mr. Shirk. Mr. Epstein was given permission to expand on these issues in his amended post verdict motions. Petitioner contends that he was ineffective for failing to address "the many irregularities in the record." This allegation is too vague to merit any response. The court is uncertain as to these "irregularities" and dismisses this contention as having no merit.

Petitioner contends that Mr. Epstein was ineffective for failing to call the experts that petitioner's counsel called at the federal habeas hearing. In fact, Mr. Epstein was pursuing an appeal to the Pennsylvania Superior Court. Typically, expert witnesses do not testify in the appellate courts. Mr. Epstein may also have recognized that expert testimony is not after-discovered evidence and chose not to

Not Reported in A.2d                                                                                           Page 105
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

call these experts in the post verdict hearing. There simply is no merit to the claim that he should have called experts during the appeal process.

**\*116** Petitioner's contention that he failed to raise all the claims contained in the petition for writ of habeas corpus and that he failed to move for discovery is misguided. Mr. Epstein was pursuing a remedy in a different forum. He was pursuing a direct appeal to the Pennsylvania Superior Court. Perhaps had the Lambert family retained him to file a Post Conviction Relief Act petition after the direct appeals had been exhausted, this might have been a different story. His appeal to the Pennsylvania Superior Court would not have been the appropriate place to move for discovery or to raise the various issues raised in the petition for writ of habeas corpus.

Mr. Epstein was certainly not ineffective for failing to raise the "six hour rule." He made a reasonable judgment there was no Duncan/Davenport issue. We discussed this issue in the section above regarding Mr. Shirk. The same analysis applies.

Finally, the contention that Mr. Epstein was ineffective for failing to preserve issues raised by Mr. Shirk has no merit. He chose to proceed with those issues he found to be meritorious. This was within his professional judgment. Petitioner has not demonstrated that he was without a reasonable basis for his course of conduct.

S. Mr. Madenspacher's "Concession"

Petitioner contends that the District Attorney of Lancaster County has gone on record as agreeing that she is entitled to relief. This argument appears throughout her pleadings and briefs in this and other courts.

This issue arises from a discussion which took place during the habeas corpus proceeding following Mrs. Show's testimony in the district court's chambers. At that time, Mrs. Show informed the court and counsel of her new recollection about seeing Mr. Yunkin's car in the condominium complex on the morning of December 20, 1991. After Mrs. Show's in-chambers testimony, District Attorney Madenspacher conceded that "some relief... is justified in

this particular case." (N.T., Habeas Hearing at 2701.) The district court then asked: "So, are we agreed that the Petitioner will tonight be released into the custody of Ms. Rainville?" To which Mr. Madenspacher replied, "I don't see how I can object to that, your Honor." (N.T., Habeas Hearing at 2704.)

This "concession" has been offered as justification, in and of itself, of Ms. Lambert's entitlement to the habeas, and now PCRA, relief. To contend that the Commonwealth has somehow agreed that Ms. Lambert should be released, should be given a new trial or should be declared innocent, ignores Mr. Madenspacher's actions on the record of the federal habeas proceeding the very next day. When court convened, Mr. Madenspacher made an oral motion for reconsideration and a stay of the district court's order of the previous day granting relief to Ms. Lambert:

MR. MADENSPACHER: ....
Yesterday, you Ordered the interim relief of petitioner.
THE COURT: With the consent of the Commonwealth.
**\*117** MR. MADENSPACHER: Your Honor, I agree I agreed to that. In retrospect, I was wrong.
I reviewed carefully last night the testimony of what went on inside Chambers, and I said I still feel that certain significant things have happened regarding Mrs. Show, and I had an obligation to make that clear to the Court.
But in reading it carefully, you said that: This testimony is totally consistent with what Miss Lambert has said since 1992.
In retrospect, when I consider that, that is wrong, your Honor.
Miss Lambert consistently since her trial, and even in this proceeding, has maintained that she was never in that apartment complex.
(N.T., Habeas Hearing at 2791.)

The significance of Mr. Madenspacher's statement on the day after the "concession" is that he retracted his statement of the previous day. The Third Circuit took pains to point this out. In the Third Circuit's opinion on the subject of the District Attorney's "concession," the court pointed out that the district court "did not recognize that the Commonwealth withdrew this concession the very next day." 134 F.3d 511 n. 11. The Court of Appeals clarified, and this court believes, that the "concession," to the extent there ever was a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concession, to relief, was withdrawn on the record at the next available opportunity. We find no basis in this record to grant relief on the basis of any agreement or concession by the Commonwealth.

T. Brady/Giglio Violations

In the most recently amended PCRA petition, petitioner sets forth a catalog of Brady/Giglio violations under the general heading of "A Miscarriage of Justice was Caused by Many Acts of Intentional Prosecutorial Misconduct." (Exhibit A, Section B.) These begin at page 14 of Exhibit A and the numbering begins with the number 32 in a series of allegations of intentional prosecutorial misconduct. To address these Brady/Giglio claims, we will follow the numbering system in the petition. A discussion of the legal issues raised by these Brady/Giglio claims can be found in Section III.B.1.a and Section VII.F.2, supra.

We will refer to these as Brady claims, unless otherwise noted. Brady requires the disclosure of exculpatory material to the defense. Giglio extends Brady to include material pertinent to the credibility of witnesses.

32. Failed to disclose the identify of the medical people at the crime scene

Corporal Renee Schuler's report of December 31, 1991, contains two references to ambulance vehicles present on the scene that morning. (Petitioner's Exhibit 1607, Commonwealth's Exhibit 4.) [FN104] This report was turned over to Mr. Shirk in discovery prior to the trial. Mr. Shirk had every opportunity to obtain the identity of each person from the investigating police officers or from the Community Hospital or East Lampeter Township Ambulance Departments, interview them and determine whether to call them as witnesses at trial. They were not kept secret. Brady does not require that the Commonwealth do the investigative work for defense counsel. There was no question and no secret about the fact that emergency personnel were all over the crime scene that morning. As to the allegation that "medical people" determined that the victim's carotid artery was severed, that is, in fact, a miscasting of the evidence. Mr. Zeyak is certain it was severed, Ms. Harrison testified that she was influenced by

Mr. Zeyak's recollection and Mr. May believes it was severed. This issue is addressed more completely in Section VII.A., supra.

FN104. Commonwealth's Exhibit 4 is a compilation of police reports produced to Mr. Shirk in discovery in 1992.

33. Failed to disclose that the Chapmans were at the scene prior to the medical people

*118 Mr. Chapman was referred to in Corporal Renee Schuler's report of December 31, 1991. (Petitioner's Exhibit 1607; Commonwealth's Exhibit 4.) Mr. Shirk was aware that he had been in the condominium and had every right and opportunity to interview him and call him as a witness.

34. Failed to disclose that victim's carotid artery was severed

See Section VII.A, supra.

35. Failed to disclose that Tom Chapman made a call to 911

Mr. Chapman was referred to in Corporal Renee Schuler's report of December 31, 1991. (Petitioner's Exhibit 1607; Commonwealth's Exhibit 4.) Mr. Chapman's identity and his presence at the scene that morning were known to the police and, through the discovery process, known to Mr. Shirk. In fact, the report identifies Mr. Chapman as the person making the 911 call.

36. Failed to disclose that Ms. Berry saw Hazel Show leave the school at 7:25

Corporal Renee Schuler's report of January 2, 1992, (Petitioner's Exhibit 2081), indicates that Mrs. Show spoke to a secretary at Conestoga Valley Junior High School on the morning of December 20, 1991. There has been no showing that the investigating police officer knew the identity of the secretary or attached any importance to the identity of the secretary with whom Mrs. Show spoke. There is no evidence in this hearing of an intentional failure to disclose that name. In fact, the report reflects that there was a conversation between Mrs. Show and a secretary and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

certainly the identity of the secretary could have been easily determined had defense counsel chosen to contact Conestoga Valley.

This was not a Brady violation. Mr. Shirk was aware from the January 2, 1992, report that Mrs. Show spoke to a secretary immediately before leaving the school. The report was among the documents produced to him in discovery. (*See* Commonwealth's Exhibit 4.) In her testimony in this court, Ms. Berry testified that Mrs. Show left the school at "approximately 7:25 a.m." (N.T., PCRA at 52.) It was necessary for Ms. Berry to review a police report to refresh her recollection. (*See* Petitioner's Exhibit 2035) She did not recall looking at the clock. She admitted: "I don't remember anything definite about what time she left." (N.T., PCRA at 53.) She recalls that Mrs. Show left prior to the arrival of the secretary who gets in at 7:30 a.m. (*Id.*) This is far from precise. It is the best recollection available to Ms. Berry and her testimony was credible to this court. Did the secretary who gets in at 7:30 get in five minutes early or five minutes late? Did Mrs. Show leave ten minutes before that secretary arrived? Fifteen minutes? Five minutes?

From the various times described by various witnesses in 1992 and at the 1998 PCRA hearing, it is likely that many of these times were approximations and estimates. There is no evidence that all relevant parties had coordinated their watches or any testimony that each was going by a certain clock. The only time that appears to be in any way certain was the time the 911 call was received by Lancaster County Wide Communications, that is, 7:35 a.m. Given the fact that Ms. Berry's testimony about time was an approximation and given the fact that there are variables affecting the time line that morning, Ms. Berry's testimony as presented to this court in the PCRA hearing was not material in the sense that there is no showing that it would have changed the outcome of the case in 1992.

37. Failed to disclose interview of a neighbor, Lena Fisher, wherein she stated she heard screams and saw a man leave at 7:15

**\*119** In fact, this "man" appears to have been Brad Heisler. What were not "disclosed" were Corporal Renee Schuler's own personal notes from her interviews and discussions

during the early stage of the investigation. There is absolutely no duty under Brady or under Rule 305 for a prosecuting officer or investigating officer to disclose his or her personal notes. In fact, the subject matter of these "notes" could reasonably been have viewed as included in the various police reports regarding the events of that morning. There are reports noting that Brad Heisler was on the scene, but the reports vary in terms of the timing and location of his presence. From the various reports, we can conclude that Mr. Heisler came to pick Laurie Show up for school and that he went into the condominium very briefly after the Kleinhans went in but before the police arrived. This would be entirely consistent with Lena Fisher's observations as noted by Corporal Schuler.

Lieutenant Renee Schuler testified at the PCRA hearing that her notes, taken in shorthand, confirmed an observation by Ms. Fisher, that she saw Brad and another man "stop and leave." (N.T., PCRA at 3827-28.) She never wavered from this testimony. If this was Ms. Fisher's recollection, then that would be consistent with Mr. Heisler's brief visit to the condominium that morning.

Petitioner's argument that this is a failure to disclose material information is premised on an assumption that the "man" was Lawrence Yunkin and that Corporal Renee Schuler recorded in shorthand that Ms. Fisher saw the man "stand up and leave." To accept this version, we must accept the expert testimony on shorthand from Leola Bennett and of two secretaries from Schnader Harrison Segal & Lewis that Corporal Schuler actually wrote "stand up and leave" and not "stop and leave." Lieutenant Schuler testified unequivocally at the PCRA hearing that she used her own system of shorthand based on what she learned in school and that the symbol she used was her symbol for "stop" not "stand up." (N.T., PCRA at 3828.)

38. Failed to disclose that Jim and Craig Ellis denied seeing Mr. Yunkin at McDonald's

There was no evidence offered at the PCRA hearing on this claim.

39. Failed to disclose that Ms. Bayan saw Mr. Yunkin driving his car on a street he said he was not on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

*See* Section VII.F, *supra.*

40. Failed to disclose that Mr. Yunkin said he drove by "twice"

There was no evidence offered at the PCRA hearing on this claim.

41. Failed to disclose that Ms. Bayan saw the three suspects in the car at the condominium

*See* Section VII.F, *supra.*

42. Failed to disclose that Ms. Bayan saw Mr. Yunkin drive the getaway car "fast"

*See* Section VII.F, *supra.*

43. Failed to disclose that Mr. Yunkin claimed he was not working on December 20th

There was no evidence offered at the PCRA hearing on this claim.

44. Failed to disclose that Mr. Yunkin saw a male student waiting for the bus and that no one was waiting for the bus that morning

**\*120** Jay M. Garber testified at the PCRA hearing that he dropped his grandson off at the bus stop at the entrance to the Oaks Condominium complex that morning. (N.T., PCRA at 6082.) This establishes that there was someone waiting for the bus that morning. There is no proof that the police failed to disclose that Mr. Yunkin told them he saw a male standing waiting for the bus.

45. Failed to disclose that there were multiple blood stains in the hallway by the front door

Photographs taken by the Pennsylvania State Police at the Show condominium the morning of the murder were available for inspection by defense counsel. At the 1992 trial, there was testimony about blood spatter on the wall in the hallway by the front door.

The only photographs introduced at the PCRA hearing showing blood on the floor in the hallway were from Compleat Restorations, a company retained to perform clean-up at the Show condominium. Compleat Restorations came into the condominium on December 23, 1991, the third day after the murder. In the interim, police, family, medical personnel, neighbors and friends who assisted in cleaning up the condominium were in and out of the premises.

To say that the "stains" or "spots" on the floor in the hallway are indicative of bloody footprints left by the murderer is patently unreliable. Those footprints could have been placed there by anyone who entered the condominium and walked in the vicinity of the bedroom.

*See* Section VII.M., *supra.*

46. Failed to disclose that the front hallway showed signs of an obvious struggle

Photographs introduced at the 1992 trial and at the 1998 PCRA hearing clearly show evidence of some blood spatter on the wall in the hallway. The amount of blood was relatively insignificant in relation to the amount of the blood in the bedroom. There was testimony at the trial and argument by counsel as to the amount of blood in the hallway and as to the significance. There was also testimony regarding markings on the wall. Finally, Trooper Suber's videotape clearly shows markings on the wall on the inside of the front door consistent with a struggle. This court finds no evidence of a Brady violation on this point.

47. Failed to disclose that Mr. Kleinhans went upstairs and saw the blood in the hallway

Petitioner has produced no evidence that Mr. Kleinhans told the police that he saw blood in the hallway that morning. He testified in his deposition and he testified in the PCRA hearing that he saw blood in the front hallway. Mr. Kleinhans testified at trial but was not asked, by either side, about what he saw in the Show residence. Mr. Kleinhans is not the only person who observed the front hallway. There has never been any question that there was some blood in the hallway. Mr. Kleinhans had nothing to add on this subject.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48. Failed to disclose the unedited video of the river search

It is clear that there were two videos made of the river search, one recorded by "Smokey" Roberts containing sound and lasting approximately 13 minutes and another, also recorded by Mr. Roberts from his original tape, lasting approximately 8 minutes and containing no sound.

**\*121** It is equally clear that the editing to the tape was done by Mr. Roberts before he gave the tape to the police. *See* Section VII.K, *supra.* There is no proof that the police cut, edited, changed or altered the videotape of the river search. It appears that Mr. Roberts made the decision to remove the sound.

This court had the opportunity to view the edited and the unedited videotapes on several occasions during the hearing. We viewed the footage of Detective Barley bending over and looking at what appears to be a pink trash bag. We heard the statement, "What do you got, a bag?" and we saw Detective Barley wave at the camera at that time. To this court, sitting as fact finder, there is nothing about the unedited, longer tape which appears to be in any way sinister or problematic. Detective Barley's "wave" seemed to be little more than an indication that there was nothing of significance. It was not the hurried "let's keep the cameras away from this important evidence" gesture as argued by petitioner. All that the unedited tape shows is that Detective Barley found a bag and that it appeared to be a pink trash bag. The edited version, viewed by Mr. Shirk prior to trial shows a pink bag as well. The edited tape was provided to Mr. Shirk and he testified that he viewed that tape. (N.T., PCRA at 3363.) He was, therefore, aware that there was a tape made of the river search and that a pink bag was found during the course of that search. A police report produced to him referred to the tape as "edited." (Petitioner's Exhibit 1295; Commonwealth's Exhibit 4.)

Mr. Shirk could have asked to see the unedited tape. His failure to do so was not ineffective or negligent. The bottom line is he knew that a pink trash bag was located by the police and if he thought there was some significance to that, he could have pursued the issue in further discovery or in questioning witnesses at trial.

Petitioner's counsel would have the court believe that a pink bag was discovered containing incriminating evidence (presumably to Mr. Yunkin) which was then emptied of its contents (inculpatory to Mr. Yunkin; exculpatory to Ms. Lambert) and then repacked in ice so that someone (presumably Detective Barley) could be filmed digging around the bag with the tip of his shoe and a stick to demonstrate that the bag was embedded in ice. There is simply no proof that this took place. There are only the bald assertions of petitioner's counsel.

The important facts are that Mr. Shirk knew there was a search of the river, knew who was involved, knew that a tape was made, knew that the tape had been edited, viewed that tape, knew that a pink bag was found and had every opportunity to question police witnesses, Mr. Yunkin, and his client, and to develop the significance of those points at trial.

49. Failed to disclose that the phone cord was broken in half

In fact, photographs taken by the state police at the crime scene show the phone cord broken in half. This is neither consistent nor inconsistent with Ms. Lambert's testimony. The fact that Ms. Buck threw the phone across the room does not necessarily mean the phone cord snapped. The fact that the cord was snapped does not necessarily mean that the phone was thrown. It appears clear that the phone cord snapped or was broken during the course of the struggle that morning. The struggle was described by both Ms. Lambert and Ms. Buck, each with a different perspective. Photographs of the victim's bedroom showing her legs and feet clearly depict a torn telephone cord. (*See* Petitioner's Exhibits 1742, 1747, 1749, 1749-A.)

**\*122** *See* Section VII.M, *supra.*

50. Failed to disclose that a sneaker was found by the river

A sneaker was found in the Pequea Creek, which empties into the Susquehanna River. This was well described at the PCRA hearing. (N.T ., PCRA at 823-24.) The sneaker found was a canvas sneaker packed with mud and showing signs of what was described as "black rot." This black rot suggested to Detective Barley that the sneaker had been a

denizen of the deep for longer than two or three days. Detective Barley made the decision that the sneaker was of no evidentiary value and, as would be common practice with anything, fish or otherwise, caught in a river and determined to have no value, he threw it back. The police are not required under Brady or any other authority to disclose to the defense every insignificant item disclosed during a search. Does Brady require that the police, in making a search of a creek and river bed and banks, catalog and save every item located? There is nothing to indicate that the sneaker found in the creek had any evidentiary value at all. Nothing learned in the PCRA hearing would suggest that Detective Barley found a sneaker that had any significance to this case. That is the bottom line for a Brady analysis.

  51. Failed to disclose that a clump of hair was found precisely where Ms. Lambert testified Ms. Buck threw it

  The "finding" of a clump of hair "precisely where Ms. Lambert testified Tabitha Buck threw it" resulted from petitioner's counsel's enlargement of a photograph and their opinion that an item in that enlarged photograph constitutes a clump of hair. (Petitioner's Exhibit 1785.) The clump of hair was not visible on the small photograph. The photograph was produced to Mr. Shirk in 1992. This is really a claim that Mr. Shirk was not as diligent as Ms. Rainville in having the photograph enlarged so as to identify a clump of hair. There is no merit to this as a Brady violation or as an ineffective assistance of counsel claim.

  More importantly, there was hair, or clumps of hair, found on the floor of Laurie Show's bedroom in the course of the investigation. In fact, Mr. Shirk went to the trouble, and the County went to the expense, of hiring a hair and fiber expert to testify at the 1992 trial. The expert testified that the hair was cut, not pulled or torn. (N.T., Trial at 980.)

  It is difficult to imagine that a clump of hair, conclusively established by the defense at the 1992 trial to have been cut by a knife, would fall anywhere "precisely" where someone threw it during the kind of struggle described by all participants. Mr. Shirk knew there was hair on the floor of the bedroom and he made every effort to make use of that testimony in his defense of Ms. Lambert at trial. His use of expert testimony and his arguments were in an effort to

confirm Ms. Lambert's story that Ms. Buck went after Laurie Show with a knife and cut off pieces of her hair. [FN105] The expert confirmed that the hair was cut with a sharp object. (N.T., Trial at 980.) There certainly was no Brady violation here.

> FN105. Ms. Buck, in her testimony at the PCRA hearing, confirmed that Laurie's hair was cut with the knife. She recalls that Ms. Lambert cut Laurie's hair.

  52. Failed to disclose that a bloodhound found the rope based on Ms. Buck's scent

  **\*123** *See* Section VII.D.3, *supra.*

  53. Failed to disclose that Scott Hershey told the prosecution that Laurie wanted to get even with Michelle and Brad had heard rumors Lawrence was going to beat him up

  There was no evidence offered at the PCRA hearing on this claim.

  54. Failed to disclose Officer Fassnacht's report of Mr. Yunkin's rape of Ms. Show

  Two East Lampeter Township police reports refer to the allegation that Lawrence Yunkin raped Laurie Show. These reports were each produced to Mr. Shirk. (*See* Commonwealth's Exhibit 4.)

  The first report was Corporal Renee Schuler's report dated January 2, 1992. At page 7 of that report, Officer Schuler related the facts of a previous harassment incident which occurred at Root's Market in September 1991. The report contains the following sentence: "This was the first time Hazel mentioned to Lambert that Laurie was raped by Yunkin." On page 8 of the same report, Officer Schuler related a conversation John and Hazel Show had with their daughter regarding her involvement with Mr. Yunkin. Page 8 of Officer Schuler's January 2, 1992, contains the following sentence: "Hazel then spoke to Laurie about this and Laurie indicated she had been raped by Yunkin."

Commonwealth's Exhibit 4 contains a copy of another East Lampeter Township police report dated August 10, 1991. It concerns Incident No. 3648-1991 which apparently was an investigation of an ongoing harassment by Ms. Lambert of Laurie Show. The report is prepared by an officer who is not identified on the report. The officer refers to working with Officer Abram but does not identify himself or herself on the report. This report was produced to Mr. Shirk and contains the following sentence: "Show only last night told her mother that Yunkin raped her in the end of June, while they were in Yunkin's van. After that, she left him." (*See* Commonwealth's Exhibit 4.) The record of this case proves that there was no Brady violation.

55. Failed to disclose that Larry Ware heard Mr. Yunkin say he would be in jail for murder

In Corporal Renee Schuler's report dated January 10, 1992, at page 3, there is a reference to a discussion involving Larry Ware and Hector Feliciano. This refers to Mr. Yunkin's speaking of not being at work on December 23, 1991, because he would "be in jail." This report was provided to Mr. Shirk during discovery. Whether there was a specific disclosure about Mr. Ware actually hearing Mr. Yunkin say he would be in jail for the murder is unclear. Certainly the report identifies Mr. Ware, identifies Mr. Feliciano and refers to the conversation in question. Had Mr. Shirk wished to pursue this, this information was available during discovery.

As to whether this was a Brady violation, the question of "materiality" warrants discussion. Mr. Shirk testified at the PCRA hearing that he specifically stayed away from this area of testimony at trial. He did not put Mr. Feliciano on the stand to testify as to Mr. Yunkin's statement. Mr. Shirk described in clear terms that he wanted to avoid associating any of the three participants with any evidence of premeditation or specific intent. (N.T., PCRA at 3474-75 .) Mr. Shirk explained that had he established that Mr. Yunkin was expressing an intention to kill someone, then that "specific intent" could have been ascribed to his own client. Ms. Lambert was constantly in Mr. Yunkin's company and undoubtedly was in Mr. Yunkin's company on the morning of December 20, 1991.

**\*124** It appears that the information which is the subject of

this alleged Brady violation was made known to Mr. Shirk. It does not appear that it was in any way "material" to the defense. In fact, Mr. Shirk was aware of the information, was aware of the conversation in which Mr. Yunkin is reported to have stated that he was going to kill someone, and specifically chose not to use that information. There certainly was no Brady violation here.

56. Failed to disclose that Mr. Kenneff told the Yunkins to stop sending money to Ms. Lambert

In fact, there is no evidence that Mr. Kenneff told Lawrence Yunkin's parents to stop sending money to Ms. Lambert. It has been established through the testimony of Mr. Cody, counsel for Mr. Yunkin in 1992, that it was Mr. Cody who told the Yunkins to cease any further contact with Ms. Lambert when she was in prison. This was confirmed by Lawrence Yunkin's mother, Johnnie May Yunkin. (N.T., PCRA at 6462, 7592.)

57. Failed to disclose that the prosecution found a license plate in the back of Yunkin's car

During an inventory search of the Yunkin car, a license plate was discovered. The license plate corresponded with a license number contained in Officer Bowman's notes.

Petitioner's theory of the case is that Mr. Yunkin drove in the condominium complex in a vehicle with a license number YHM-028 and that later in the day to hide this fact, he changed the license plate and left the YHM-028 license plate in his car. The specific Brady claim is that the police knew he was seen in the condominium complex with the YHM-028 license plate and that they later found the incriminating, material license plate in his car and failed to disclose this to Mr. Shirk.

In fact, Ms. Lambert testified in the PCRA hearing that she was with Mr. Yunkin the entire day. [FN106] Ms. Lambert at no time observed Mr. Yunkin changing a license plate on his car. Further, the license plate on the brown Mercury which was driven by Mr. Yunkin that morning and the YHM-028 license plate found inside the car were both registered to Mr. Yunkin. Detective Savage testified that he or Officer Bowman ran the license plate found in the car and found

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that it was registered to Mr. Yunkin. (N.T., PCRA at 4428-31.) Its use as perhaps hiding Mr. Yunkin's presence in the condominium was eliminated. Why would Mr. Yunkin place a license plate on his car, registered to another vehicle in his name, to mislead the authorities as to his presence that morning? [FN107]

> FN106. She was emphatic about this because to establish her reason for not seeking help for Laurie Show or contacting the authorities regarding the brutal murder, she stated she was watched all day by Mr. Yunkin "like a hawk." (N.T., PCRA at 5569.)

> FN107. This is yet another example of an issue which on superficial analysis looks bad. Upon careful consideration of what the license plate was, what steps were taken by the police and what it ultimately might mean, what looked bad has really no significance. An analysis of this issue which proceeds beyond the superficial establishes no Brady violation.

58. Failed to disclose that at least one eyewitness reported seeing this license plate at the crime scene on the morning of the murder

*See* discussion of Brady/Giglio claim 57, *supra.*

59. Failed to disclose Mr. Yunkin's letters to Shawn Lapp

Petitioner claims that these letters demonstrate that Mr. Yunkin was lying to Ms. Lambert in his letters to her in prison, demonstrate that Ms. Lambert believed Mr. Yunkin was a rapist, and demonstrate that Laurie Show had filed charges for rape against Mr. Yunkin. Petitioner has not established any relevance or materiality of this information. This evidence links to Ms. Lambert's "Burgess theory" that she was manipulated by Mr. Yunkin, abused by Mr. Yunkin and afraid of criminal charges from Laurie Show.

**\*125** Further, the "Burgess" evidence is relevant only to a very limited issue which, as the case has developed, is not being pursued by the Commonwealth. The Shawn Lapp letters are only material to the extent that they relate to the expert opinion of Dr. Burgess, i.e., that Mr. Yunkin

manipulated Ms. Lambert. This opinion is not relevant under Pennsylvania law. Therefore, the letters are not material. There has been no showing of materiality necessary to establish a Brady violation.

60. Failed to disclose that the victim had identified the killers by writing in her own blood

Petitioner makes the claim that the Commonwealth should have disclosed something that was never there. At the 1992 trial, Mr. Shirk argued that Laurie Show had written the initials "TB" for Tabitha Buck and "B" for Buck. At the federal hearing, petitioner's counsel added the initials "BY" for "Butch" Yunkin. Mr. Shirk argued that Laurie Show's dying act was not to identify "Michelle" but rather to write "TB" on the closet door. This was the subject of expert testimony by John C. Balshy, a crime scene investigator who first "discovered" the "TB" initials in blood. This court had every opportunity to view at trial the photographs referred to by Messrs. Shirk and Balshy and found that the initials were not there. The court did not accept Mr. Shirk's argument on this point and did not accept Mr. Balshy's expert testimony that the initials were written in blood on the closet door.

Ms. Lambert contends it is a constitutional violation for the Commonwealth not to anticipate a creative and ultimately unsuccessful argument based upon an interpretation of evidence to create an issue that might possibly distract, confuse or miscast the truth in the interest of raising a reasonable doubt at trial. In fact, Mr. Shirk made a valiant effort to argue the existence of something that really was not there. He did that in good faith to make every possible use of every possible item of evidence in Ms. Lambert's defense. He based his argument on the "findings" of Mr. Balshy, which this court, or fact finder, considered and did not accept. There is no indication anywhere that the initials "BY" appear anywhere in Laurie Show's bedroom, let alone on the carpet or the closet door.

To demonstrate the problems with this claim, we look to the testimony of Richard W. Jeffries at the PCRA hearing. Mr. Jeffries is a licensed private investigator who was court appointed to assist Mr. Shirk in the defense of Lisa Michelle Lambert in 1992. [FN108]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 113
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

FN108. Mr. Jeffries was listed as a Commonwealth witness in the PCRA case. Despite this, and without leave of court or discussion with the Commonwealth, petitioner's counsel retained Mr. Jeffries as their own investigator. They did this despite the fact that Mr. Jeffries worked closely with Mr. Shirk in 1992 and Mr. Shirk is the object of some 25 counts of ineffective assistance of counsel.

In the PCRA hearing, Mr. Jeffries testified in the Commonwealth's case about the "TB" initials. He stated that Mr. Balshy contacted him in 1992 with the "revelation" that he had found Tabitha Buck's initials in blood on the closet door. Mr. Jeffries demonstrated that his ability to analyze evidence was not colored by the side he represented when he candidly acknowledged that he did not agree with Mr. Balshy. He did not agree with Mr. Shirk's use of Mr. Balshy as a witness in 1992. In fact, Mr. Jeffries testified before us in 1998 that he looked at the photographs which had been enlarged by Mr. Balshy and determined that the initials "seen" by Mr. Balshy on enlargement would have, in fact, been onehalf to three-quarters of an inch high. Mr. Jeffries found it unlikely, and this court completely agrees, that a person in the condition of Laurie Show after her killers left the condominium could have been capable of crawling across the floor and inscribing in rather minute characters several initials of her killers on the closet door. [FN109] (N.T., PCRA at 7693.)

FN109. We need not develop, but should note, that this theory is completely at odds with the Baden/Smialek/Larson expert triumvirate which opined that Ms. Show was dead anywhere from one minute (with the carotid severed) to five minutes (under the best of conditions) after her wounds were inflicted. Petitioner's counsel would have this court believe, by virtue of Baden/Smialek/Larson that Ms. Show was dead almost immediately. Yet, she was able to move across the floor to the closet door and inscribe initials on the door. It appears that this would have taken much more effort, thought and fine motor skill than the breathy, hoarse whisper she uttered

to her mother as she died.

61. Failed to disclose Mr. Yunkin's admission that he sometimes wore the earring found at the crime scene

**\*126** There is no evidence that Mr. Yunkin wore the earring found at the crime scene. There was evidence that Mr. Yunkin wore an earring similar to that earring. In fact, it appears that there are many, many earrings similar to that which was found on the floor of the condominium.

At trial, Mr. Shirk was aware and questioned Mr. Yunkin about the fact that Mr. Yunkin wore a similar earring on occasion. This was an important point of Mr. Shirk's defense and was fully litigated and fully argued to this court. This issue is more fully developed in Section VII.N, *supra*. The possibility that the earring found in the Show condominium was worn by Mr. Yunkin at the time of the murder was well presented to this court. It did not affect the outcome of the trial. That, in itself, is proof that the information was not material for Brady purposes.

62. Failed to disclose that Pat Fry described the two suspects as having "broad shoulders or bulky clothes"

Officer Jere Schuler of the West Lampeter Township Police Department interviewed Fred Fry at his residence on the day of the murder. Officer Schuler's report is dated January 2, 1992, and was one of the police reports provided to Mr. Shirk in discovery. (*See* Commonwealth's Exhibit 4.)

In the report, Officer Schuler related a description given of the two suspects who Mr. Fry saw at approximately 7:12 a.m.: "Both appeared to be between 5'5" and 5'8"." He described both as being "none too slim." He felt they both had "bulky clothing on."

A report of Officer Bowman's meeting with Mr. and Mrs. Fry on December 22, 1991, was also contained in the materials provided to Mr. Shirk in discovery. This report describes a meeting where Officer Bowman showed various items of clothing which had been recovered during the investigation. The Frys felt that the Miami Dolphins jacket looked familiar but were unable to identify any of the other items of clothing with any degree of certainty.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Officer Jere Schuler also interviewed Pat Fry on the morning of December 20, 1991. Mrs. Fry described two individuals who she believed were female wearing hooded sweatshirts or jackets. This report was dated January 2, 1992, and was provided to Mr. Shirk in discovery. (*See* Commonwealth's Exhibit 4.)

63. Failed to disclose that the Frys thought the two people they saw were Hispanic

The ethnic origin of the two people seen by the Frys was never an issue and would certainly not have effected the outcome of the trial. Officer Jere Schuler interviewed Mr. and Mrs. Fry. His report of January 2, 1992, contained a summary of the interview and was produced to Mr. Shirk. (*See* Commonwealth's Exhibit 4.) Neither Mr. nor Mrs. Fry could provide a description of the faces of the two people they observed. The reference to "appearing Hispanic" comes from Sergeant Carl Harnish's narrative account of what he heard from various police officers that morning. There is no report of the Frys making this statement to anyone.

64. Failed to disclose that the Gladfeiters were two of only eight people on Yunkin's visitor list in prison

**\*127** There is no obligation on the part of the Commonwealth to disclose a material witness's prison visitor list. Failure to disclose that which defense counsel can access on his own is not a Brady violation.

65. Failed to disclose that Mr. Fry said it was "too dark" to see

There was no evidence offered at the PCRA hearing on this claim.

66. Failed to disclose that Laura Thomas had made a false kidnaping report

Ms. Thomas never made a false report to law enforcement regarding a kidnaping. *See* Section VII.I, *supra.*

67. Failed to disclose that Pat Fry said the person wearing the Miami Dolphins jacket was wearing black sweatpants

There was no evidence offered at the PCRA hearing on this claim.

68. Failed to disclose that neither Laura Thomas nor her father, Floyd Thomas, said anything about "slit her throat" in their initial interviews

All the police reports involving discussions with Laura Thomas and Floyd Thomas were disclosed. If there were inconsistencies between early reports and subsequent reports, these inconsistencies were available to defense counsel for cross-examination purposes. In fact, Mr. Shirk made good use of these inconsistencies.

Commonwealth Exhibit 4 contains a report of Officer Bowman's interview of Laura Thomas on January 2, 1992. Interestingly, this report describes one of the plots to kidnap Laurie Show: "Lambert would then take Show, tie her to a phone pole and shave her head and 'slit' Laurie's throat." Certainly, Mr. Shirk was aware of this interview by virtue of the Commonwealth's response to his discovery request.

This report is somewhat inconsistent with Corporal Renee Schuler's report of January 10, 1992, regarding an interview with Laura Thomas on January 5, 1992. Ms. Thomas at that time related Ms. Lambert's plans to do harm to Laurie Show but did not mention anything about "slitting her throat." Again, this document was available to Mr. Shirk. To the extent that there was an inconsistency between the two reports, he was in a position to question Ms. Thomas about her interviews with the police. There was no failure to disclose. For further discussion of this issue, *see* Section VII.I, *supra.*

69. Failed to disclose that Tabby had admitted her prior involvement in a murder in Alaska

There was no evidence offered at the PCRA hearing on this claim. This evidence would not be admissible at trial.

70. Failed to disclose that Woody Woodward knew that Tabby had fought Laurie

There was no evidence offered at the PCRA hearing on this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

claim.

71. Failed to disclose that Rick Lentz saw Tabby fight Laurie and heard Tabby tell Laurie that she was "going to get her"

This claim involves evidence of Tabitha Buck's animus or bad acts prior to the murder. The Commonwealth has no duty to discover, uncover or relate to the defense negative information about a co-defendant. In fact, the Commonwealth at all times asserted that Tabitha Buck was involved in the killing. Evidence which would establish Ms. Buck's motive or conduct would in no way exculpate Ms. Lambert. Such evidence simply would not be material to this case. *See* Section VII.D.2, *supra*.

72. Failed to disclose that the rope found around the body was 12 feet long, not 23-1/2 feet or 24-1/2 feet as testified to, and not 22'5" as the rope in evidence appears to be

**\*128** The rope was at all times available to defense counsel to be measured. The significance of mistakes in measurement or discrepancies between reports about the lengths of the various ropes seems questionable at best. After extensive testimony and argument, this court does not find the inconsistencies to be material. We do not believe Brady places an affirmative duty to disclose the respective lengths of the various ropes. The Commonwealth produced these ropes to defense counsel for inspection. They could have been tested, compared and measured in the discretion of defense counsel. The Commonwealth certainly met its duty of disclosure as to the ropes.

73. Failed to disclose that someone fabricated a story that Hazel Show had called home and spoken to Laurie from the school, and that Laurie had told her mother that Michelle was there or on her way over

This is one version of the events of that morning which is reflected in Sergeant Harnish's report. (Petitioner's Exhibit 1351.) It is likely that this version reflects a misunderstanding that was communicated during the course of the confusion that morning. This information is not in any way exculpatory or favorable to petitioner.

74. Failed to disclose that Officer Weaver was not

dispatched to crime scene

The dispatch reports were available to defense counsel, as they were available to counsel for the Commonwealth. In fact, Officer Weaver was not specifically directed to report to the condominium. However, he heard the call over his radio, was in the vicinity and followed proper procedure and responsible conduct in responding to the call.

This "fact " is material only to the conspiracy theory which first surfaced at the federal habeas hearing and was a significant part of the PCRA hearing. Under the conspiracy theory, Robin Weaver went to the condominium without being officially dispatched so as to begin his "frame up" of Ms. Lambert. The conspiracy theory was never even suggested by the defense at trial. Simply stated, there was absolutely no significance at trial as to whether Officer Weaver was dispatched to the scene. The information was not "material" under Brady and Giglio.

75. Failed to disclose that Ms. Lambert's telephone records showed no telephone calls to the Show residence

During the period of time when Ms. Lambert was making the many harassing and threatening phone calls to the Show residence, she was making them from her apartment on Route 340 in Bridgeport. This is within the same township as the Show home and then would have been local calls. Detective Savage testified that he looked into telephone records and determined that the telephone company did not keep records of local calls. (N.T., PCRA at 4343-4350.) When Ms. Lambert and Mr. Yunkin moved to Pequea, a rural township on the southwest of Lancaster City, they had no telephone. It appears that there were no records to disclose.

76. Failed to disclose that the dispatch records show that Detective Savage arrived on the scene at 9:17

**\*129** There was testimony that the recorded time of Detective Savage's and two other police officers' arrival at the scene was made arbitrarily. It is clear that this record does not accurately reflect the time when any of them arrived or left. (N.T., PCRA at 4690-4725) Lancaster County Wide Communications relies upon the officers to report their time of arrival. Detective Savage, Officer Bowman and

Not Reported in A.2d                                                                                          Page 116
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

Corporal Schuler were all recorded by Lancaster County Wide Communications as arriving at 9:17 a.m. In fact, they each arrived earlier than 9:17 a.m. It seems likely that one of the group, or someone else, reported them as present at 9:17 a.m. The time coincides with the report by Officer Jan Fassnacht that he left the scene at 9:17 a.m.

77. Failed to disclose that Hazel Show failed to tell many people at the murder scene that Laurie spoke until two hours after the murder

All police reports regarding what Mrs. Show said and what Mrs. Show did not say on the morning of the murder were available to defense counsel. Defense counsel had every available opportunity to raise these discrepancies. In fact, petitioner's contention is not true. Mrs. Show told Lisa Hinkle Billiter almost immediately after Laurie's death that Laurie had spoken to her. *See* discussion of Laurie Show's Dying Declaration, Section VII.A, *supra.*

78. Failed to disclose the postcard that Mr. Yunkin wrote Hazel Show immediately after the murder, setting up Ms. Lambert

The phrase "setting up Lambert" is purely a product of petitioner's counsel's argument. The postcard from a material witness to the mother of the victim, having been reviewed by the court, does not appear to be material. In fact, Mr. Shirk testified that the postcard was not exculpatory. The contents of the postcard are reprinted in Section VII.G, *supra.* Further, Mr. Shirk testified at the PCRA hearing that the postcard was not exculpatory as to Ms. Lambert. (N.T., PCRA at 3520-21.)

79. Failed to disclose that the tip of the knife was in Buck's jacket

There is no clear evidence as to the location of the tip of the knife. Ms. Buck testified that she put the tip of the knife in the pocket of her Dolphins jacket and that she later discarded the tip at the Lambert/Yunkin residence. Judge Cullen, then court-appointed counsel to Ms. Buck in 1992, testified that he felt something sharp and metallic when he reached into the jacket pocket during his closing argument in the Buck trial. He never looked into the pocket and only

assumed it was the tip of the knife. (N.T., PCRA at 7713.) Even if the tip of the knife was in Ms. Buck's jacket, that does not exculpate Ms. Lambert in any way. It is, in fact, consistent with Ms. Buck's story that Ms. Lambert at some point handed her the tip of the knife and she put it in her jacket pocket. The Dolphins jacket was available for inspection by Mr. Shirk at all times. There is no testimony to establish that the Commonwealth ever knew that the knife tip was in the jacket pocket. It stands to reason that the Commonwealth would have used the knife tip as evidence at both the Lambert and Buck trials.

80. Failed to disclose that witnesses saw Ms. Buck wearing her sweatshirt inside-out at school

**\*130** Carol Blackburn testified that Ms. Buck was wearing a white or gray or off-white sweatshirt turned inside out when she reported to school after the murder. (N.T., PCRA at 1119.) She was as available to defense counsel as she was to the Commonwealth for an interview before trial. It is not a Brady violation to fail to disclose information that is readily available to the defense.

81. Failed to disclose that Ms. Buck's hands were swollen

Donna Mallik testified at the PCRA hearing that Ms. Buck's hands seemed swollen. (N.T., PCRA at 3677.) She also testified at the 1992 trial, (N.T., Trial at 601-06), and could certainly have been cross-examined as to her observations of Ms. Buck's hands. Again, Ms. Buck's involvement in the murder, the conditions of her hands, the identity of her clothing, the condition of her face and anything else which might implicate her does nothing to exculpate Ms. Lambert. At all times, the Commonwealth offered its theory of the case that both girls were present in the condominium and both girls participated in the murder.

*See* Section VII.D, *supra.*

82. Failed to disclose that Ms. Buck admitted that her hands hurt on the morning after the murder

*See* discussion of Brady/Giglio claim 81, *supra.*

83. Failed to disclose Officer Flory's interview with Laura

Thomas

The interview was conducted at Conestoga Valley High School on the day of the murder. There is a brief account of the discussion in Officer Flory's report of January 17, 1992. The report does not contain Brady material. Further, Mr. Shirk's cross-examination of Laura Thomas at trial demonstrated that he was well aware of the facts related by Ms. Thomas to Officer Flory.

84. Failed to disclose Officer Flory's interview with Brad Heisler

The interview was conducted at Conestoga Valley High School on the day of the murder and was described by Officer Flory in his report of January 17, 1992. The report of the discussion does not contain Brady material.

85. Failed to disclose that Hazel Show saw Mr. Yunkin drive away from the scene in the complex

It is unclear that Mrs. Show saw Mr. Yunkin drive away from the complex that morning. Her recollection, to the extent that she had one in 1991 and 1992, was communicated to Detective Savage. She was not able to give him any specific information. From these facts, it is difficult to determine exactly what Detective Savage should have disclosed. Mrs. Show did testify that Detective Savage told her to let him know if her memory about seeing a car that morning became clearer. *See* discussion of Hazel Show's Recollection, in Section VII.G, *supra.*

86. Failed to disclose that Ms. Buck's sweatshirt had Laurie's blood on it

Petitioner has failed to establish that the white sweatshirt in evidence was Ms. Buck's sweatshirt. The white sweatshirt which was marked Petitioner's Exhibit 1002 was also introduced at the trial of this case in 1992. It is identified on the evidence envelope as "white sweatshirt with blood stain located on floor to victim's right side." It was examined by Donald Bloser on March 13, 1992.

**\*131** Ms. Buck has acknowledged that she was wearing a white sweatshirt at the time of the murder. She also testified

that she wore her Miami Dolphins jacket in the Show condominium that morning. (N.T., PCRA at 6665-66.) This fact alone would make it highly unlikely that the white sweatshirt worn by Ms. Buck would have any blood on it since it was covered by a heavy jacket. Petitioner has asked the court to make a leap from Ms. Buck's testimony about wearing a white sweatshirt to the conclusion that the white sweatshirt in evidence was Ms. Buck's. Petitioner's counsel showed the white sweatshirt, turned inside out, to Carol Blackburn, the attendance officer at Penn Manor High School, during the PCRA hearing. Ms. Blackburn acknowledged that the white sweatshirt, worn inside out on Ms. Buck when she reported to school on December 20, 1991, was similar. She also acknowledged that there was nothing unique about the sweatshirt and it was not unlike any other "whitish" sweatshirt. (N.T., PCRA at 1123.)

In order to establish a Brady/Giglio violation on this issue, petitioner should first establish that the white sweatshirt that "had Laurie's blood on it" was, in fact, Ms. Buck's. She has not done this. She, therefore, has not established a Brady violation.

*See* Section VII.M.3, *supra.*

87. Failed to disclose that Ms. Buck's sweatshirt had cuts in it made by a sharp object

Ms. Buck testified at the PCRA hearing as to the appearance of the sweatshirt she was wearing on the morning of the murder:

A. It's white, long sleeved with blue decorating glue that I had used, made it myself, had my name in the upper left hand corner and on the back it had 1992.
Q. So it had your name, Tabby, on it?
A. Yes.
Q. And it had 1992 on the back.
A. Yes.
Q. That was printing you placed on the sweatshirt yourself?
A. Yes.
(N.T., PCRA at 6625.)

Ms. Buck did not leave her sweatshirt in the Show condominium when she and Ms. Lambert left that morning.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

When questioned as to what she was wearing when she went to school later that morning, she testified:

Q. When you arrived at school that day, what were you wearing on the upper part of your body?

A. The same sweatshirt I was wearing that morning.

Q. That's the same sweatshirt you described to us?

A. Yes.

(N.T., PCRA at 6659-60.)

By Ms. Buck's description, her sweatshirt was different from the one that was entered into evidence in 1992. There has never been any proof that the sweatshirt found at the crime scene was, in fact, Ms. Buck's sweatshirt. Ms. Lambert contends that the police obtained Ms. Buck's white sweatshirt during the investigation and then brought it back to the condominium to put in the "staged" crime scene photographs. There really is no proof of this, however. In fact, Ms. Buck describes a sweatshirt that is different from the sweatshirt which was found in the condominium and which appeared in the photographs. There can be no Brady/Giglio violation on this point because there is no proof that the sweatshirt was, in fact, Ms. Buck's.

88. Failed to disclose that Ms. Buck's sweatshirt appeared in the "faked" crime scene photos

**\*132** Whether the crime scene photographs were "faked" is discussed in Section VII.M, *supra*. Regardless of whether the photographs were real or "faked," a white garment appears next to the body of Laurie Show. These photographs were available to the Commonwealth and to the defense before and during trial. It is difficult to imagine how there could be a Brady violation for failing to disclose what appears on a photograph produced to defense counsel.

89. Failed to disclose that the rope obtained by police at K-Mart came in a bag with a picture of a man pulling a Christmas tree

The package of the new rope which was introduced at trial to show the similarity between the rope at the crime scene and the rope purchased by Ms. Lambert at K-Mart showed a man pulling an evergreen tree, for whatever relevance that might have. The rope was obtained in the course of the

Commonwealth's trial preparation. It does not constitute Brady material.

90. Failed to disclose that the rope found at the river was 24" long, not 24.5 feet, as testified to by Detective Savage to Lambert's trial

*See* discussion of Brady/Giglio claim 72, *supra*.

91. Failed to disclose that the rope purported to be found at the crime scene was 22 feet 5 inches

*See* discussion of Brady/Giglio claim 72, *supra*.

92. Failed to disclose that Ms. Buck's jacket had blood on it

In fact, in the testing done on the jacket prior to the Lambert trial, no blood was found on the Buck jacket. Donald Bloser, of the Pennsylvania State Police crime lab, testified that he took samples from discreet sections of Ms. Buck's Miami Dolphins jacket and found no blood. (N.T., Trial at 609; N.T., PCRA at 194.) After the Lambert trial and in preparation for the Buck trial, Mr. Bloser examined the jacket more thoroughly for blood and found some blood in the area of the hood. The Commonwealth was not aware that there was blood on the Buck jacket prior to the Lambert trial. There was, therefore, nothing to disclose. In any event, this information is not material for purposes of a Brady analysis.

93. Failed to disclose that Dr. Annese (a) worked with Hazel Show, (b) had Mrs. Show over to his home for a party, (c) treated Laurie, (d) had treated patients referred to him by Dr. Show, and (e) had received financial benefits from Dr. Show's referrals

No testimony or any other evidence at the PCRA hearing established that the Commonwealth had any knowledge of any relationship between Dr. Annese and the Show family prior to the 1992 trial. Dr. Annese testified in 1992 and was available for cross-examination by the defendant as to the basis for his opinions and as to any bias, interest or motive. At the PCRA hearing, petitioner failed to establish that Dr. Annese's minimal involvement with the Show family in any way colored his trial testimony. This is not a Brady violation

for two reasons: (1) the information is not "material" as that term is defined for Brady purposes; and (2) there is no proof that the Commonwealth was aware of any relationship prior to trial.

94. Failed to disclose that Mr. Kleinhans saw Brad Heisler enter the apartment prior to the police or medical personnel

**\*133** There was no evidence offered at the PCRA hearing on this claim.

95. Failed to disclose that the front door of the Show condominium was "wide open" for Mr. Heisler and Mr. Kleinhans to enter and thus the door neither closed nor locked automatically

There was no evidence offered at the PCRA hearing on this claim.

96. Failed to disclose that Mr. Yunkin described the woman who waited on him at McDonald's as white, older and with grayish hair, when he was interviewed by the police in early 1992

Mr. Yunkin testified at the PCRA that he told the police that the person who waited on him at the McDonald's was "an older woman and that she was white." (N.T., PCRA at 4515.) This was not in a report provided to defense counsel. Petitioner appears to contend that this information would have been impeachment material for Yvette Rodriquez at trial. Ms. Rodriquez testified that she was the manager at the McDonald's that morning and that she observed Mr. Yunkin. She was not sure that she served him. (N.T., Trial at 592.) An inconsistency between Mr. Yunkin's description of the person who served him and the actual appearance of Ms. Rodriquez is not Brady material. There is nothing about this information which is exculpatory or favorable to Ms. Lambert, nothing which would affect the outcome of the case and nothing of any consequence which would impugn the credibility of either Mr. Yunkin or Ms. Rodriquez.

97. Failed to disclose that the person who took the 7:35 a.m. call to 911 determined that Laurie Show was unconscious from the information provided in the telephone call, and had training to make that determination

According to the testimony of Richard Harrison of Lancaster County Wide Communications, the 911 operators did not have formal training in classifying calls as "unconscious person" or some other classification. (N.T., PCRA at 4703-04.) He testified that "back in 1991 it was more or less our in-house training and on-the-job experience at that time." (N.T., PCRA at 4704.)

The inference here is that a 911 operator/dispatcher made a diagnosis that Laurie Show was "unconscious" based upon information give to him/her with the benefit of sufficient training to make that determination. It appears from Mr. Harrison's testimony that there was not this kind of training. It also appears from his testimony that "unconscious person" is their highest level of priority and is a code used when someone is in a life threatening condition. Whether Laurie Show was conscious or unconscious when the 911 call was made, there is no question that she was in a very serious and life threatening condition.

In any event, the 911 dispatch records were available to defense counsel in 1992 if he believed these were material. There can be no Brady violation for the failure to disclose information that could have been obtained by defense counsel.

U. The *Commonwealth v. Smith* Issue

Petitioner contends that she must be released and cannot be retried under Smith. In Section III.B.1.a, *supra*, we discussed the legal impact of Smith in this case. Essentially, if the conduct of the prosecution in this case was intentionally undertaken to prejudice Lisa Michelle Lambert to the point that she was denied a fair trial, then Smith would apply and double jeopardy would bar any subsequent retrial on these charges.

**\*134** At various points in Section VII, *supra*, we discussed the allegations of prosecutorial misconduct. We reviewed the claims regarding the "29 questions," Lawrence Yunkin's statement, Kathleen Bayan's story, the involvement of Dr. Mihalakis, the river search, Ms. Lambert's statement, and the crime scene photographs. In addition, we reviewed 66 allegations of discovery or Brady/Giglio violations. We have considered all of these points in our analysis of whether

there was prosecutorial misconduct under the PCRA, new evidence exculpatory to petitioner, or constitutional violations of the Commonwealth's duty of disclosure. We have also considered each of these allegations insofar as they might establish intentional prosecutorial misconduct undertaken to prejudice defendant to the point of the denial of a fair trial.

This is not a Smith case. There is not one item raised by petitioner and proven by competent evidence which compares to the intentional acts of misconduct in the Smith case. We find no evidence of any intentional conduct by the District Attorney's Office or by the investigating police officers which would establish conduct intentionally undertaken to prejudice Lisa Michelle Lambert to the point of a denial of a fair trial.

VIII. CONCLUSION: THE QUESTION OF INNOCENCE

We are left with the question posed by our first reference in this opinion to the elements of a PCRA claim: Was this a "fundamentally unfair" conviction? Is Lisa Michelle Lambert an innocent woman wrongly convicted? We have referred throughout this opinion to facts which established guilt and which have been resolved in the post verdict stage and in the PCRA proceeding. Many important facts were established in the 1992 trial and have been unshaken throughout the many petitions, motions, hearings and court orders entered across the history of this case.

We know that in the spring, summer and fall of 1991, Lisa Michelle Lambert demonstrated, time and again, hostility and aggression toward Laurie Show. We know of the many hysterical phone calls, the menacing language and the relentless, threatening conduct. There is no question that Ms. Lambert contemplated, over an extended time period, the possibility of doing physical harm to Laurie Show. We find that Ms. Lambert discussed killing Laurie Show on at least two occasions.

The witnesses in this case have established that Ms. Lambert enlisted others to kidnap and assault Laurie Show, and that Ms. Lambert assaulted Laurie Show at the East Towne Mall. We know that credible witnesses, among them Hazel Show, Laura Thomas, Floyd Thomas, Rose Metzger,

and George Haas, established beyond any doubt that Ms. Lambert hated Laurie Show and that Laurie Show was terrified of Ms. Lambert.

We find credible Tabitha Buck's testimony that Ms. Lambert came to her home the night before the murder and arranged for Ms. Buck to accompany her to Laurie Show's home. We find Ms. Buck's testimony that Ms. Lambert arranged for Mrs. Show to be out of the condominium that morning to be credible and we find there to be no question at all that Ms. Lambert's purpose in going to the condominium that morning was to inflict serious harm to Laurie Show.

**\*135** In 1992, we found that Ms. Lambert bought a rope, ski masks, and gloves and took these items, along with a knife from her kitchen, to the Show condominium that morning. We reject the preposterous suggestion that these items were for the purpose of cutting a Christmas tree.

We know that Ms. Lambert planned the events of December 20, 1991, and we know that she participated in the assault leading to Laurie Show's death. There are several versions of exactly what happened at or about 7:00 a.m. in the Show condominium that morning, but we have never wavered from our belief as to the truth of that morning. It was our belief in 1992, and remains our belief today, that Ms. Lambert went to that condominium that morning to assault Laurie Show or to kill Laurie Show. Even if her purpose had been "only" to assault Laurie, at some point during the assault, Ms. Lambert formed the specific intent to kill. Injuries such as those inflicted on Laurie Show were not inflicted accidentally. The injuries to Laurie Show demonstrate that the person who inflicted them had a specific intent to kill. We saw no reason in 1992 to believe that after all the harassment, stalking, and threatening behavior that preceded December 20, 1991, after enlisting Ms. Buck, planning the trip to the Show condominium and obtaining the materials used for the crime, that Lisa Michelle Lambert suddenly turned into a passive, terrified observer in the condominium. Consistent with her actions toward Laurie Show in the months before the murder and her activities on the day before the killing, Ms. Lambert went to that condominium with a plan. Once inside, she carried out that plan.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 121
Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)
**(Cite as: 1998 WL 558749 (Pa.Com.Pl.))**

  These are the facts as this court viewed them in 1992. Yet, there is a fall back position. What if Ms. Lambert had been telling the truth at trial and the killer was really Tabitha Buck? Under the facts as testified to by Ms. Lambert at trial, she was guilty of first degree murder on an accomplice basis. Under Ms. Lambert's version of that morning, as presented at trial, she planned to go to the Show condominium and she enlisted Ms. Buck to go with her. She took certain items with her consistent with an intent to inflict bodily harm to Laurie Show. She participated in the assault and, at one point, held Laurie Show's legs down while Ms. Buck cut her throat. She then fled the scene and took no steps to report this incident to the authorities. When arrested, she presented an alibi story which she had discussed with Mr. Yunkin and Ms. Buck. Ms. Lambert would be an "accomplice" if she had the intent of promoting or facilitating the murder and if she aided or agreed or attempted to aid Ms. Buck in planning or committing the murder. 18 Pa.C.S. Section 306. From Ms. Lambert's description of holding down Laurie's legs while Ms. Buck slit Laurie's throat, we could reasonably conclude that she had the intent of "promoting or facilitating" the killing and that she planned, or aided, or attempted to aid Ms. Buck. In fact, we do not believe that is what happened. Yet, based upon the story Ms. Lambert presented at trial, a verdict of first degree murder on an accomplice basis would have been supported by the evidence.

  **\*136** We know that Ms. Lambert then fled the scene. Regardless of whether she was picked up in the condominium complex by Mr. Yunkin or whether she was picked up by Mr. Yunkin on Oak View Road, Lisa Michelle Lambert fled the murder in haste and did not look back.

  In his closing argument, Mr. Kenneff suggested that whoever committed this murder was guilty of first degree murder. This court believed that to be true at the time and believes it to be true today. The crime scene photographs, the autopsy photographs, the condition of the condominium, and the condition of the body of Laurie Show led this court to one inescapable conclusion: whoever performed these acts did so with a level of rage completely inconsistent with any accidental killing or a death incidental to a "prank." We firmly believed in 1992 that Lisa Michelle Lambert drew the knife across the throat of Laurie Show,

causing her death. She was the only person with the level of emotion, the focus of purpose and the clear opportunity to have performed that dreadful act. There is no question that Ms. Lambert is not, and never will be, "innocent" of this crime.

### ORDER

  AND NOW, this 24th day of August, 1998, upon consideration of the petition filed under the Post Conviction Relief Act, 42 Pa.C.S.A. Section 9541, et seq. (1998 Supp.), the evidence admitted at the hearing and the arguments of counsel, and for the reasons set forth in the attached opinion, this court finds that petitioner has failed to prove that she is entitled to relief under the Act. Therefore, her petition shall be denied.

### ADDENDUM TO OPINION

  1. List of Documents Filed with the Court in this Case

  2. The "29 Questions"--Petitioner's Exhibit 1119

  Not Reported in A.2d, 1998 WL 558749 (Pa.Com.Pl.)

  END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 1998 WL 966014 (E.D.Pa.)
(Cite as: 1998 WL 966014 (E.D.Pa.))



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
UNITED STATES of America
v.
Russell McLAUGHLIN, Jr.
**No. CRIM.A. 95-CR-113.**

Nov. 19, 1998.

Robert E. Welsh, Jr., Robert E. Welsh, Jr., Catherine M. Recker,  Welsh & Recker, P.C., Phila, for Russell Mc Laughlin, Jr., Defendants.

Maureen Barden, Phila, for U.S. Attorneys.

MEMORANDUM

GAWTHROP, J.

*1 Before the Court is a two-edged motion of the government concerning how a witness is to be treated on direct examination and on cross. William St. Clair, CPA, is the defendant's accountant and testified at great length at a previous trial in this matter. [FN1] He also testified at that trial that he had long been the accountant, as an independent contractor, for the defendant's corporation. Further, Mr. St. Clair, a fact witness under government subpoena, called to the stand by the government, was being paid--by the defendants  [FN2] --$165 per hour for his testimonial time. *United States v. McLaughlin, 1996 WL 555269 at *2-4 (E.D.Pa. Aug.30, 1996), [FN3]* The same pecuniary arrangement is not present in this trial, but the fact remains that his professional affiliation with defendant and his corporation, Building Inspection Underwriters ("BIU"), is decade-long and close.

FN1. That judgment was partially reversed. *United States v. McLaughlin,* 126 F.3d 130 (3d Cir.1997), *cert. den.,* 524 U.S. 951, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998).

FN2. The prior proceedings involved three defendants, only one of whom is being retried here.

FN3. The Third Circuit skirted the issue, finding no error in the court's examination of the "witnesses's relationship with the defendants." It did not, however, address the propriety of the defendants' compensating a fact witness, at $165/hour, his-door-to-his-door, for his time taken to testify under a government subpoena. 126 F.3d at 137.

 The government intends to call Mr. St. Clair at this trial and seeks to ask leading questions  [FN4] of him, calling him at the very least "a witness identified with an adverse party," or even "a hostile witness," thus permitting leading questions under Federal Rule of Evidence 611(c). [FN5] The defendant objects, saying that there is no affiliation of any moment; nor, he says, is the witness hostile. I shall first treat the affiliation approach, which will moot the issue of hostility.

FN4. A leading question is one which, either through form or substance of the interrogation, instructs a witness, or puts words in the witness's mouth to be echoed back, or one which suggests to the witness the answer desired. Glen Weissenberger, *Federal Evidence 1996 Courtroom Manual* 134 (1995); *Black's Law Dictionary* 888-89 (6th ed.1991).

FN5. "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." Fed.R.Evid. 611(c).

"The object of examination is to get the facts. Whether direct or cross questions best serve that end depends on the circumstances." *Mitchell v. United States,* 213 F.2d 951, 956 (9th Cir.1954). The trial judge is in the best position to make such a determination. *Id.* Toward that end, rule 611(c) gives the judge discretion to allow leading questions, on direct examination, of both hostile witnesses and witnesses "identified with an adverse party." Fed.R.Evid. 611(c). "The term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to an opposing party." Weissenberger at 134.

Here, Mr. St. Clair clearly is "identified with an adverse party"--the defendant. *See Perkins v. Volkswagen of Am.,* 596 F.2d 681, 682 (5th Cir.1979) (employee of an adverse party was "identified" with employer). Although I would not call them in cahoots, they were, at the very least, cohorts. Defendant and this witness worked together to see BIU's tax returns compiled and filed with the Internal Revenue Service. Defendant and this witness have done business continually since 1988. And since January 1989, for almost ten years, the witness has served--albeit in the role of an independent contractor rather than an in-house employee--as BIU's primary accountant. The unrebutted fact is that Mr. St. Clair prepared the 1988 tax return for BIU, the defendant's corporation; it is the content of that very document which brings this case to court; that identifies the witness with BIU and with the defendant. I shall thus permit leading questions by the government.

**\*2** The second prong of the government's motion gives the case a somewhat different twist: may the defense, on cross-examination, ask leading questions of this witness? The government argues that for the defense to be permitted to spoon-feed leading questions to their own man, would tend to make the examiner's task too easy, to the detriment of the truth.

This is an ancient principle. The first recorded prohibition of leading questions is found in the writings of Lord Coke. 4th Inst. 279 (1634). In *Conningsmark's Trial,* 9 How. St. Tr. 1, 37 (1682), it was argued that there "is a great deal of difference, I find, where you examine a man with the hair and where you examine him against the hair. Where you find it difficult to make a man answer, you will pump him with questions and cross-interrogate him, to sift out the truth."

Leading questions are permitted on cross-examination because the witness is often reluctant and resistant to respond directly. This is due to "not only the presumable bias of the witness for the opponent's cause, but also his sense of reluctance to become the instrument of his own discrediting." *Wigmore on Evidence* § 773. Yet, where the reason ceases, the rule must also cease. Thus, when an opponent's witness proves to be biased in favor of the cross-examiner, the danger arises that leading questions will avoid the complete truth, and such questions may be forbidden, *id.; Mitchell,* 213 F.2d at 956; *In re Rogan's Estate,* 404 Pa. 205, 171 A.2d 177, 181 (Pa.1961), with the court treating the cross-examination as if it were on direct. *Weinstein's Federal Evidence* § 611.06(4); *Woods v. Lecureux,* 110 F.3d 1215, 1221 (6th Cir.1997).

Were I to allow defense counsel to lead this witness, it would tend to make the person under oath on the stand not the *de facto* witness; rather, those shoes would tend to be filled by the lawyer representing the person with whom the friendly witness is identified. The tendency would be to get the questioner's version of the "facts"--a version which might have more of a pro-client tilt, the lawyer being (quite properly) an advocate. It better serves the quest for truth to let the witness testify unswayed by counsel's leading, whether that leading be of the patent put-words-in-mouth variety, or just mere, gentle nudging. [FN6]

FN6. The potential ills may best be illustrated by an earlier "cross"-examination, by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant's counsel, of one of defendant's employees. The witness responded to the question: "If you can, describe for us the duties of Russell McLaughlin during the period between 1986 to 1989?" with the answer: "As I said [on direct examination], he was more the spokesperson for the company. He would speak to the townships, municipalities, about using our services and, check with the other municipalities that we serviced to make sure that everything was going fine, meet with them occasionally." Not finding that not-leading question up to the task, defense counsel proceeded to lead:

ATTORNEY: Russell McLaughlin was the marketing person for BIU, he was the person responsible to get customers, make sure the customers were happy and keep them with BIU?

WITNESS: Right.

ATTORNEY: So is it fair to say that Russell McLaughlin was the person responsible to wine and dine, make sure things worked on the outside?

WITNESS: Yes.

N.T. Nov. 18, 1998, at 40-41 (edited preliminary transcript).

 Direct examination is an art, and an oft-unsung one at that. When done right, it looks deceptively easy. To that end, lawyers in this land have the right to prepare their own witnesses so that testimony comes forth smoothly, clearly, and logically. Once the witness is on the stand, however, lawyers no longer have that right, including the right to lead. The search for truth is better served when the witness actually goes it on his own, without friendly counsel serving as some sort of testimonial TelePrompTer.TM

 An order follows.

## ORDER

 AND NOW, this 19th day of November, 1998, upon consideration of the government's Memorandum Regarding Federal Rule of Evidence 611(c) and the defendant's response in opposition thereto, it is ordered that:

 **\*3** 1) For the purpose of direct examination by the government, William St. Clair shall be considered, pursuant to Rule 611(c), a witness identified with an adverse party. As such, leading questions shall be allowed.

 2) The defense examination of William St. Clair shall be treated as if it were a direct examination, and leading questions shall not be permitted.

 3) None of this is to preclude counsel from objecting, at trial, should this ruling spawn overreaching on either side.

 Not Reported in F.Supp.2d, 1998 WL 966014 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:95cr00113 (Docket) (Mar. 09, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 474106 (E.D.Pa.)
**(Cite as: 1998 WL 474106 (E.D.Pa.))**

Page 1

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Brenda VANEMMERIK and Peter Vanemmerik, w/h,
Plaintiffs
v.
THE GROUND ROUND, INC., Defendant
**No. CIV.A. 97-5923.**

July 16, 1998.

Richard M. Jurewicz, Galfand, Berger, Lurie, Brigham, Jacobs, Swan, et al., Phila, for Brenda Vanemmerik, Peter Vanemmerik, W/H, Plaintiffs.

Kevin L. Connors, Reger & Rizzo, Wayne, Glen D. Kimball, Kevin L. Connors, Reger and Rizzo, Phila, for Ground Round, Inc., The Ground Round, Inc., Defendants.

MEMORANDUM AND ORDER

SMITH, Magistrate J.

I. STATEMENT OF FACTS

**\*1** This action arises in the context of several injuries sustained by plaintiff Brenda Van Emmerick when the bathroom door at defendant's restaurant fell on May 11, 1996. Discovery has proceeded in this matter and trial is scheduled for August 24, 1998. Plaintiff submitted an expert report from her treating physician, Dr. Scott Fried, connecting her claimed injuries to the accident. In response, defendant has sought videotaped trial testimony of four of plaintiff's past treating physicians, including her long-term family physician, regarding her medical condition both before and after the accident. As these depositions will constitute trial testimony, defendant seeks leave of this Court to use leading

questions. For the reasons which follow, I will deny the Motion.

II. DISCUSSION

Federal Rule of Evidence 611(a) grants the Court substantial authority over the method of presenting witnesses:

The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

FED.R.EVID. 611(a). This Rule assures that "[t]he ultimate responsibility for the effective working of the adversary system rests with the judge." FED.R.EVID. 611(a) (Advisory Committee Notes).

On a more specific level, Rule 611(c) dictates when the Court may allow a party to ask leading questions in his/her presentation:

Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

FED.R.EVID. 611(c). Prior to the adoption of this Rule, the use of leading questions on a direct examination required a showing of either actual hostility or that the witness being examined was an adverse party, or an officer, director, or managing agent of such an adverse party. *Ellis v. Chicago,* 667 F.2d 606, 612 (7th Cir.1981) *citing* FED.R.CIV.P 43(b) (repealed Jan. 2, 1975 by Pub.L. 93-595, sec. 3, 88 Stat.1926). However, the Advisory Committee found these limitations to represent "an unduly narrow concept of those who may safely be regarded as hostile without further demonstration." FED.R.EVID. 611(c) (Advisory Committee Notes). As such, "[t]he phrase of the rule, 'witness identified with' an adverse party, is designed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 2
Not Reported in F.Supp., 1998 WL 474106 (E.D.Pa.)
**(Cite as: 1998 WL 474106 (E.D.Pa.))**

enlarge the category of persons thus callable." *Id.* [FN1]

> FN1. Insofar as they deal with the examination of witnesses, the Federal Rules of Evidence are made applicable to depositions by Fed.R.Civ.P. rule 30(c) ("Examination and cross-examination of witnesses may proceed as permitted at the trial under the provisions of the Federal Rules of Evidence.").

The normal sense of a person "identified with an adverse party" has come to mean, in general, an employee, agent, friend, or relative of an adverse party. *See, e.g.,Haney v. Mizell Memorial Hosp.,* 744 F.2d 1467, 1477-78 (11th Cir.1984); *United States v. Hicks,* 748 F.2d 854, 859 (4th Cir.1984) (allowing plaintiff to lead defendant's girlfriend); *Ellis v. Chicago,* 667 F.2d 606, 613 (7th Cir.1981) (allowing plaintiff to lead police officers who worked closely with defendant police officer); *Perkins v. Volkswagen of Am., Inc.,* 596 F.2d 681, 682 (5th Cir.1979) (stating that employee of a party is clearly identified with the party); *United States v. Brown,* 603 F.2d 1022, 1026 (1st Cir.1979) (allowing prosecutor to lead witness who was close friend of defendant and a participant in crime); *Stahl v. Sun Microsystems, Inc.,* 775 F.Supp. 1397, 1398 (D.Colo.1991) (allowing plaintiff to ask leading questions of defendant's former administrative secretary). Scholars have warned that, although the rule allows ample room to maneuver, "the courts should be careful before extending this list much further." 28 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 6168, *6 (1993).

**\*2** Even if a witness is not deemed to be "identified with an adverse party," the court may find the witness to be "hostile" and therefore subject to leading questions. FED.R.EVID. 611(c). This classification usually involves a showing by the examining party that the witness is biased against the direct examiner, his/her client or both and often is demonstrated by examples of that witnesses demeanor. 28 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 6168, *7 (1993). This bias may also be revealed by pretrial actions and demeanor. *U.S. v. Tunnell,* 667 F.2d 1182,

1188 (5th Cir.1982) (trial court did not abuse its discretion in permitting prosecution to ask leading questions on direct examination of a witness whose videotaped deposition revealed hostility to the prosecution through his motions, facial expressions, and voice inflection). "The witness' refusal to meet with the direct examiner before trial to prepare for his testimony may be particularly important since the refusal suggests hostility and the failure to prepare reduces the likely impact of suggestion." 28 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 6168, * 7 (1993).

In the instant matter, defendant seeks leave to use leading questions during the trial depositions of three of plaintiff's treating physicians. [FN2] However, despite its burden to make a showing that the physicians to be deposed are either (1) identified with plaintiff or (2) hostile witnesses, defendant has failed to do so. First, defendant Ground Round contends that the physicians are "identified with" plaintiff, particularly her family physician, Dr. John Dulcey, since he has had an ongoing relationship with her. As noted above, the "identified with" clause of Federal Rule of Evidence 611(c) has been generally interpreted to mean agents, friends, relatives or employees. Defendant has cited nothing to show that a treating doctor should be included in that class of witnesses . [FN3] The mere existence of a treatment relationship between a doctor and a patient, be it ongoing or short-term, does not, without more, automatically align the physician with the party-patient for purposes of the use of leading questions under Rule 611(c). [FN4] Nothing indicates that the doctors, who are being presented as defense witnesses only and are being compensated by the defendant, will have any incentive to alter their testimony to assist plaintiff. Should this court find to the contrary, a whole new category of witnesses would improperly be subject to leading questions simply by virtue of a professional relationship. As I decline to so expand Rule 611(c), I do not find that the proposed physician deponents are "identified with" plaintiff.

> FN2. Defendant originally sought leave to use leading questions for four different

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 474106 (E.D.Pa.)
(Cite as: 1998 WL 474106 (E.D.Pa.))

Page 3

physicians. However, defendant already took the deposition of Dr. Terry L. Cunning on June 25, 1998, one of plaintiff's providers, and did not utilize leading questions. As such, this Memorandum addresses itself to the remaining three depositions.

FN3. The case on which defendant relies to support its argument, *Dunn v. Owens-Corning Fiberglass, 774 F.Supp. 929 (D.Vi.1991)*, vacated *Dunn v. Hovic,* 1 F.3d 1371 (3d Cir.1993), does nothing to bolster any of its claims. That case, which runs for 22 pages, states in two brief sentences that the court committed no error in allowing the limited use of leading questions during trial by one party to further develop the medical testimony of its expert. *Id.* at 942-943.

FN4. Defendant argues that it does not have the right to engage in ex parte communication with these treating physicians, thus demonstrating their affiliation with plaintiff. As plaintiff properly points out, this argument is completely untenable. There is a well-established physician-patient confidentiality which prevents doctors from communicating about their patients' files without some form of justification. Consequently, this argument has no merit and provides no support for defendant's motion.

In an alternative attempt to establish its argument, defendant claims that the treating doctors are hostile and, therefore, subject to leading examination. However, the mere "unwillingness", as stated by the defendant, of one of the doctors to attend his deposition does not per se demonstrate hostility. Moreover, the already completed deposition of one of the doctors for whom defendant sought leave to subject to leading questions, shows that the doctor was, in fact, quite cooperative during the deposition. Nothing in defendant's supporting documents indicates, in any way, that any less can be expected of the remaining three physicians. Consequently, I will

deny the pending Motion.

*3 An appropriate order follows.

ORDER

AND NOW, to wit, this 16 day of July, 1998, upon consideration of defendant's Motion in Limine to Permit the Use of Leading Question of Plaintiffs' Treating Physicians during Their Videotaped Trial Depositions and Plaintiffs' Response thereto, it is hereby ORDERED that the Motion is DENIED.

It is so ORDERED.

Not Reported in F.Supp., 1998 WL 474106 (E.D.Pa.)

**Motions, Pleadings and Filings** (Back to top)

• 2:97cv05923 (Docket) (Sep. 22, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.