# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,      :
                                :

        **Plaintiff,**           :
                                :

    **v.**                       :
                                :

COLONEL L. AARON CHAFFINCH,     :     **C.A.No.04-1394-GMS**
individually and in his official capacity as the  :
Superintendent, Delaware State Police;  :
LIEUTENANT COLONEL THOMAS F.  :
MACLEISH, individually and in his official  :
capacity as the Deputy Superintendent,  :
Delaware State Police; DAVID B. MITCHELL,  :
individually and in his official capacity as  :
Secretary of the Department of Safety and  :
Homeland Security, State of Delaware; and  :
DIVISION OF STATE POLICE,  :
DEPARTMENT OF SAFETY AND  :
HOMELAND SECURITY, STATE OF  :
DELAWARE,  :
                                :

        **Defendants.**       :

---

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE FOR DETERMINATION OF ADMISSIBILITY OF EVIDENCE OF AN ALLEGED SEXUAL AND/OR ROMANTIC RELATIONSHIP BETWEEN PLAINTIFF AND CAPTAIN GLENN DIXON**

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: April 11, 2006              Attorneys for Plaintiff

**A.  Introduction.**  Defendants are plainly unhappy with Capt. Dixon's testimony in this case.[1] And the fear that Dixon expressed at his deposition that he would be retaliated against for testifying truthfully (see Dixon 72), has now become reality.  Defendants now ask the Court to give judicial imprimatur to their smear campaign against an unwilling witness who was forced to testify under subpoena in this case.  For the reasons discussed below, the Court should decline to do so.

**B.  Relevance.**  Plaintiff concedes that defendants are permitted to offer evidence that Capt. Dixon or any other witness may be biased towards plaintiff.

**C.  Lack of Foundation.**  However, defendants are unable to lay a proper foundation for their scandalous claims of sexual affairs.  Thus, such a line of questioning is improper and inadmissible. See U.S. v. Tse, 375 F.3d 148 (1st Cir. 2004) (a "defendant must lay a proper foundation before evidence of bias is admitted.") Bui v. DiPaolo, 170 F.3d 232, 245 (1st Cir.1999) ("[A] defendant ... must present a satisfactory foundation for the critical elements on which his hypothesis of bias depends.").

Defendants have not offered any evidence that there is or was a romantic/sexual relationship between Dixon and plaintiff.  Defendants have only presented speculative evidence that Dixon and plaintiff, at the most, had a close friendship.  One cannot take the evidence offered by defendants and make an illogical leap to claim that they are engaging in sexual relations.  Claims of spending time on the phone or behind close doors in an office setting, does not render the conclusion that they are engaging in a sexual relationship.  Defendants cannot use such speculative evidence to smear a witness and skirt the evidence rules.  Claims of a sexual relationship are unfounded and therefore inadmissible to prove bias.

Given the highly inflammatory nature of the sexual claims defendants are making, defendants should have specifically identified the witnesses they intended to call and the substance of their testimony in this regard.  However, the only witnesses generally identified by defendants are found in their motion.  Accordingly, plaintiff will address them.

---

[1]  For example, Dixon testified that while on duty, Chaffinch tells people that "women are nothing but trouble" and "women are a pain in the ass." (Tab A - Dixon 77-78).

**1. Fraley.** Sgt. Pete Fraley will purportedly testify that he "observed [plaintiff] and Dixon together in her office at Headquarters at night, and saw [plaintiff] rubbing Dixon's upper thigh." (Motion at 2). But Fraley's testimony does not survive scrutiny.

First, like the rest, it comes from a witness whom defendants failed to timely identify and subsequently refused to produce for deposition. Defendants did not identify Fraley and the subject of his testimony until the Court compelled them to do so until December 2005 - shortly before the December 31st discovery cut-off. Plaintiff then immediately noticed Fraley's deposition (D.I. 83), but defendants refused to attend and produce him. Accordingly, defendants have waived their right to use this witness in this case. (*See* plaintiff's motion in limine on this issue - D.I. 179).

Additionally, Fraley's testimony is entirely irrelevant and does not support the proposition for which it is cited. The only plausible purpose defendants have for attempting to admit such testimony is to further their conspiracy theory that plaintiff and Dixon were involved in some alleged sexual affair. Even still, this connection is entirely speculative in nature. It is entirely possible Sgt. Fraley misinterpreted a friendly knee slap or an understanding, supportive gesture between friends. This evidence fails to prove the existence of a sexual relationship between plaintiff and Dixon and thus fails to establish a foundation of bias. Its admission would only lead to a "mini-trial" as to whether a relationship actually existed, which is not an issue before the court.

**2. Hyland and Wiley.** Tammy Hyland, a civilian employee, and Lt. Roger Wiley will allegedly testify that they observed Dixon in plaintiff's "office for hours behind locked doors on an almost daily basis." (Motion at 2). Further, they will testify that this was "widely discussed among the civilian staff." (Id.) Interestingly, defendants never identified such testimony by Hyland or Wiley in their previous disclosures. Defendants first identified that Hyland would testify consistent with her testimony in plaintiff's IA hearing - which did not address these issues. (D.I. 168 Exhibit - Second Supplementation). Subsequently, in March of 2006 several months after the discovery cut-off, defendants identified that Hyland would testify to, among other things, her work experience with plaintiff. (D.I. 168 Exhibit - Fifth

Supplementation). Likewise, defendants only stated that Wiley would testify to, among other things, his work experience with plaintiff.[2] Yet despite defendants' untimely identification of Hyland and Wiley as witnesses, this evidence also fails to survive an evidentiary challenge.

Evidence of how much time plaintiff and Dixon spent in plaintiff's office is irrelevant to the facts of the case and certainly does not demonstrate bias. The fact that plaintiff and Dixon spent time together behind closed doors is perfectly understandable as they are co-workers (Dixon was Conley's second in command in the Traffic section) and have worked together for many years. Further, how much time a subordinate manager should spend reporting to his boss is certainly not something to be measured by office rumor, speculation or guess. Defendants expect the court to assume that Dixon spent more time than other subordinate officers without any offer of proof for such an assumption and then also make a speculative leap that they must be having sexual relations as well. Accordingly because this speculative testimony fails to prove Dixon's bias, its admission will only serve to advance defendants' smear campaign.

**3. Warnock.** Another civilian employee, Carole Warnock, will purportedly testify that "at a party, [plaintiff] touched her in a sexual manner and said 'that's what I'm going to do to Glenn.'" (Motion at 2). Again, defendants never identified such testimony by Warnock in their previous supplementation.[3] Defendants only revealed that Warnock would testify to her work experience with plaintiff and that on one occasion, plaintiff got into a car with Dixon. (D.I. 168 Exhibit - Second Supplementation). This testimony also does not survive scrutiny under Fed.R.Evid. 401 or 412, nor does it prove any bias on the part of Dixon in that it does not even appear Dixon was aware of such an alleged comment. Further, it does not prove any actual sexual activity had ever occurred. At best, if the remarks

---

[2] Defendants stated in mid-December of 2005 that Wiley was "to be interviewed next week." (D.I. 168 Exhibit - Second Supplementation). However, plaintiff did not receive the content of Wiley's testimony until March 6, 2006 - well after the discovery cut-off. (D.I. 168 Exhibit - Fifth Supplementation).

[3] Warnock is among the other 41 defense witnesses who were not timely identified. *See* plaintiff's motion in limine on this issue - D.I. 179.

were ever made, this is speculation that an act might one day occur.  For example, at a party a woman might boast of hoped for sexual acts with Richard Gere or Harrison Ford, and a man with some sexpot actress.  But that is not proof the act ever occurred.   Thus, this evidence fails to lay a foundation of an alleged sexual relationship and thus is improper to prove bias.

**4. Amy Dixon.**  Defendants claim that Amy Dixon, Capt. Glenn Dixon's wife, allegedly told Chaffinch at the State Fair in 2003, "'Aaron, he loves her', referring to her husband and [plaintiff]." (Motion at 2).  First, Amy Dixon was never identified as a Rule 26 witness in this case.  Secondly, to the extent Chaffinch testifies to this alleged statement, it is inadmissible hearsay and also raises issues of spousal privilege.  Chaffinch also has no personal knowledge of the alleged feelings by Capt. Dixon. Fed.R.Evid. 602.  Further this remark, if ever made, is not indicative of any bias or an alleged sexual relationship.[4]  Admission of this evidence would require the Court to engage in speculation as to the meaning of this statement and Mrs. Dixon's use of the word "love."  This evidence would only further defendants smear campaign of a witness whose only crime is to have told the truth under oath when he was forced to attend a deposition.[5]

**D.  Fed.R.Evid. 403.**

**1. Unfair Prejudice.**  As discussed above, the evidence proffered by defendants does

---

[4] In 2003, Dixon still worked in the HQ traffic section as Conley's lieutenant.  Chaffinch could have asked Mrs. Dixon at the State Fair if her spouse was still happy in his job working with Conley. Her response could have been "Yes, Aaron, he loves her," perfectly innocuous in context.  Love, a word the Greeks had many words for, also can mean many things: brother or sisterly love, platonic love, sexual love, etc.  But for a wife allegedly to have said her husband "loves her" is not proof that anything physical has ever occurred, dirty minds to the contrary.

[5] Defendants also assert in conclusory fashion that all of this sexually charged evidence is highly relevant to plaintiff's work ethic, reputation for leadership and qualifications for promotion. (Opening Brief at 2).  Putting aside the fact that the evidence does not support the proposition for which it is cited, Chaffinch identified and later defined six distinct factors he used when making promotions and this was not one of them.  (Tab B - Chaffinch 148-49, 179).  Nowhere have defendants identified how this evidence of an alleged sexual relationship is "highly relevant."  Additionally, to the extent defendants seek to offer this evidence to rebut plaintiff's claims for reputation damages, defendants forget that plaintiff abandoned her claims for reputation damages on the record during the November 2005 chambers conference with the Court.

not support the conclusion of a sexual relationship. Given this lack of support and the repeated defense references to extra-marital sexual activity, the unfair prejudicial effect and appeal to the jury's emotions rather than to reason is apparent. Prejudice is undue or unfair when it "'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case." U.S. v. Guerrero, 803 F.2d 783 (3d Cir. 1986) (quoting Carter v. Hewitt, 617 F.2d 961, 972 (3d Cir. 1980)). Such is the nature of the defense offer in this regard. Accordingly, any minor probative value is substantially outweighed by the danger of unfair prejudice.

      **2. Confusion of the Issues and Misleading the Jury.** As the Third Circuit has noted, under Rule 403 "evidence may be excluded when its admission would lead to litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issues." Spain v. Gallegos, 26 F.3d 439, 453 (3d Cir. 1994) (emphasis added). Allowing defendants to make baseless accusations of extra-marital affairs without the good faith basis in fact for doing so will require plaintiff to then offer evidence to demonstrate that the defense attack is baseless and false. A side issue and mini-trial will result which will distract the jury from its primary task - determining whether plaintiff was discriminated and retaliated against. Accordingly, the minor probative value of this evidence also is substantially outweighed on this ground as well.

      **F. Conclusion.** The defense motion should be denied.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: April 11, 2006                    Attorneys for Plaintiff

Tab

A



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

-------------------------------------------------------------------

Transcript of:

Captain Glenn Donald Dixon

July 13, 2005

-------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,           )
                                     )
            Plaintiff,               )
                                     )  Civil Action
v.                                   )  No. 04-1394-GMS
                                     )
COLONEL L. AARON CHAFFINCH,          )
individually and in his official     )
capacity as the Superintendent,      )
Delaware State Police; LIEUTENANT    )
COLONEL THOMAS F. MACLEISH,          )
individually and in his official     )
capacity as the Deputy Superintendent, )
Delaware State Police; DAVID B. MITCHELL )
Individually and in his official     )
capacity as Secretary of the Department )
of Homeland Security, State of Delaware;)
and DIVISION OF STATE POLICE, DEPARTMENT )
OF SAFETY AND HOMELAND SECURITY, State )
of Delaware,                         )
                                     )
            Defendants.              )

        Deposition of CAPTAIN GLENN DONALD DIXON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 9:30 a.m., on Wednesday, July 13,
2005, before Eleanor J. Schwandt, Registered Merit
Reporter and Notary Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street, Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff

        (Appearances continued on page 2.)

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

Conley                                    v.                              Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS                    July 13, 2005

Page 2

1   APPEARANCES (Continued):
2         STEPHANI J. BALLARD, ESQ.
          RALPH K. DURSTEIN, ESQ.
3         DEPARTMENT OF JUSTICE
            820 North French Street
4           Carvel State Office Building
            Wilmington, Delaware 19801
5           for the Defendants Lieutenant Colonel Thomas F.
            MacLeish, David B. Mitchell, and Division
6           of State Police
7   ALSO PRESENT:
          CAPTAIN BARBARA L. CONLEY
8         CAMILLE M. MARTIN, Law Clerk
9              - - - - - - - - - -
          (Mr. Durstein not present at this time.)
10
11           GLENN DONALD DIXON,
12      the witness herein, having first been
13      duly sworn on oath, was examined and
14      testified as follows:
15           EXAMINATION
16  BY MR. NEUBERGER:
17      Q.  Could you state your full name for the record.
18      A.  Yes, Glen Donald Dixon.
19      Q.  Okay.  And you are a captain in the Delaware
20  State Police?
21      A.  I am.
22      Q.  And is it fair to say you have testified in court
23  before?
24      A.  I have.

Page 3

1       Q.  Okay.  And have you ever had your testimony taken
2   in a deposition before?
3       A.  Maybe once or twice.
4       Q.  Okay.  So you are a little bit familiar?
5       A.  Yes.
6       Q.  Okay.  Well, what happens is the court reporter
7   types up the questions and answers.  You have the right
8   to look it over when it is done to see if she made a
9   mistake in taking down an answer or something to make
10  corrections.  Do you understand that?
11      A.  Yes, I do.
12      Q.  Okay.  And then at trial, at trial, if you said
13  something different than today, I would have the
14  opportunity to point that out to the judge and jury.  You
15  understand that?
16      A.  Yes.
17      Q.  Okay.  So I don't want you to do any guessing.
18  So try to answer to the best of your ability.  Or if I
19  ask a question that's a stupid question, you don't
20  understand, just ask me to rephrase it and I'll be glad
21  to do it.  Okay?
22      A.  All right.
23      Q.  Thanks.  Now, could I ask you very quickly, we
24  will just march through when you went to the academy to

Page 4

1   your present assignment.  When did you graduate from the
2   academy?
3       A.  1988.
4       Q.  1988.
5       A.  I began in June of '88 and graduated in the fall.
6       Q.  Okay.  What was your first assignment?
7       A.  It was at State Police Troop 5 in Bridgeville.
8       Q.  Troop 5.  So that was a, what do you call them,
9   patrol?
10      A.  Patrol troop.
11      Q.  All right.
12      A.  Yes.
13      Q.  So Troop 5, and how long were you there?
14      A.  I was there until I was promoted to sergeant,
15  which was about nine, nine years, and then I moved over
16  to Troop 4 in Georgetown.
17      Q.  Let me see.  Troop 4.  Was it six months in the
18  academy?  Three months?
19      A.  I think back then it was like a four-month
20  period.
21      Q.  Four months.  So would it have been the end of
22  '88 when you went to Troop 5 or the very beginning of
23  '89?
24      A.  It was actually around, with the field training

Page 5

1   in it, I trained in field training in Woodside, after
2   field training I went down there end of November, early
3   December, around there.
4       Q.  That's when you started at Troop 5?
5       A.  Yes.
6       Q.  Okay.  And then if we say nine years --
7       A.  Well, I was promoted in '96.
8       Q.  '96, sergeant?
9       A.  Yes.
10      Q.  All right.  So '96 is when you went to Troop 4
11  then?
12      A.  Yes.
13      Q.  All right.  How long did you stay at Troop 4?
14      A.  About a year-and-a-half, and then I transferred
15  back to Troop 5.
16      Q.  Okay.  So that would be some time in '98?
17      A.  Mm-hmm.
18      Q.  Back to Troop 5?
19      A.  Yes.
20          (Mr. Durstein present at this time.)
21      Q.  All right.  So sometime in '98 you transferred
22  back to Troop 5.  Is that still at the rank of sergeant?
23      A.  Yes.
24      Q.  Okay.  And what happened next?

Conley                                          v.                          Chaffinch, et al.
Captain Glenn Donald Dixon            C.A. # 04-1394-GMS                        July 13, 2005

---

Page 70

1    A.  Yes.
2    Q.  Okay.  Based on your observations, after the
3  lawsuit was filed was he mad at Captain Conley?
4    A.  Yes.  I believe, I'm sure he still is mad.
5    Q.  Right.  Do you remember any other feelings or
6  emotions he demonstrated towards Captain Conley after the
7  lawsuit was filed in the whole period of time up to the
8  present?
9    A.  Nothing strikes me specifically after the lawsuit
10  was filed.  He, after that, for the most part he -- well,
11  he wouldn't bring that lawsuit up specifically around the
12  troop.  So no, I guess my answer is no.
13    Q.  Well, you heard this remark about Trooper Scott
14  Gray.  You told us about that?
15    A.  Yes.
16    Q.  And that the colonel was upset at not having been
17  invited to a party, right?
18    A.  Yes.
19    Q.  And you heard the remark the colonel made about
20  you should remember who transferred you into detectives,
21  right?
22    A.  Yes.
23    Q.  Did you observe the colonel to be exhibiting any
24  hostility towards Captain Conley indicating he felt she

Page 71

1  was ungrateful or things like that towards Colonel
2  Chaffinch?
3        MS. BALLARD:  Object to the form.
4    Q.  You can answer the question.  I'm asking you what
5  you observed.  Did you observe --
6    A.  After the lawsuit had been filed?
7    Q.  Yes, after the lawsuit, him to exhibit any anger
8  at her thinking she was ungrateful to him?
9    A.  He wouldn't bring her name up around me
10  afterwards.
11    Q.  Okay.  So previously he would mention Captain
12  Conley in your presence?
13    A.  Yes.
14    Q.  And you are saying after the lawsuit was filed he
15  would never mention Captain Conley again in your
16  presence?
17    A.  Not that I recall, no.
18    Q.  Okay.  Is the colonel, based on your working with
19  him and having dealt with him over 17 years, the kind of
20  person who a reasonable person should fear he would
21  retaliate against them?
22        MS. BALLARD:  Object to the form.
23    A.  He is very vindictive.
24    Q.  Okay.  Now, are you saying you have observed him

Page 72

1  to be vindictive over your 17 years of working with him?
2    A.  Yes.
3    Q.  You have observed him to mention he has powerful
4  friends in political circles?
5    A.  Yes.
6    Q.  Are you saying that you have observed him to use
7  his rank or office in the state police to be vindictive?
8    A.  Yes.  You know, it is common knowledge, like I
9  said before, I think, that you don't -- you would not
10  cross him, you would not report him on anything because
11  of his vindictiveness.  You knew that your career would
12  pretty much stop.
13        I mean, it concerns me now, going through
14  this, even though he is still not the colonel or not
15  presently the colonel.
16    Q.  Now, I've subpoenaed you to testify today?
17    A.  Yes.
18    Q.  You understand that?
19    A.  Yes.
20    Q.  There is a court order requiring you to come here
21  today, right?
22    A.  Yes.
23    Q.  And I have never even met you before today, have
24  I?

Page 73

1    A.  No.
2    Q.  Okay.  I passed you in the waiting room here and
3  didn't even know who you were, right?
4    A.  Right.
5    Q.  So you have never met with me and discussed any
6  facts relating to this case; is that true?
7    A.  No -- yes, that is true.
8    Q.  I want to jump back to the up jump the monkey
9  limerick.  Do you remember there was one about a monkey?
10    A.  Yes.
11    Q.  I'm going to give you some setting, early part of
12  2003, in Captain Conley's office, in traffic, Captain
13  Harry Downes being there, and that would make you a
14  Lieutenant Dixon there at the same time.  The colonel
15  coming in at some point in time and during the course of
16  it him reciting the up jump the monkey limerick.  Do you
17  remember whether that happened around that time?
18    A.  Yes.  I think Harry was a lieutenant.  I thought
19  you said captain.  I think he was a lieutenant.
20    Q.  Okay.  2003, Columbus, Ohio, CARE conference?
21    A.  Yes.
22    Q.  You are attending, and I think your wife went
23  with you?
24    A.  Yes.

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Conley                                    v.                    Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS              July 13, 2005

Page 74

1    Q.   Major Baylor is there with his daughter?
2    A.   Yes.
3    Q.   Teenage daughter?
4    A.   I think her name is Sydney.
5    Q.   Captain Conley is there?
6    A.   Yes.
7    Q.   Colonel Chaffinch goes, and his wife I think is
8    attending also?
9    A.   Yes.
10   Q.   You wear name tags?
11   A.   Yes.
12   Q.   Hospitality room?  Was there a hospitality room?
13   A.   Yes.
14   Q.   So what would like your name tag say?
15   A.   Normally I wouldn't wear a name tag going to the
16   hospitality room after hours, so I don't know if I had
17   one on there, but it would have said Captain Glenn Dixon,
18   Delaware State Police.
19   Q.   And the colonel would have a name tag?
20   A.   Yes.  He actually wears a permanent -- not a
21   permanent name tag but one he stuffs in his pocket so
22   people know who he is.
23   Q.   He is an officer in the organization, on the
24   board or something like that?

Page 75

1    A.   In CARE?
2    Q.   In CARE?  Maybe I've got the wrong group.  Is it
3    CARE?
4    A.   Yes, yes.
5    Q.   You are saying he has a permanent name tag that
6    he uses that identifies him at the time as the colonel of
7    the Delaware State Police?
8    A.   Yes.
9    Q.   Okay.  In the hospitality room did the colonel
10   recite limericks and jokes that women or minorities could
11   find offensive?
12   A.   Yes.  It was kind of like a dueling process
13   between him and another -- I guess the group hired a
14   magician and slash comedian, so he was sparing off with
15   him, would recite the limericks and jokes, you know, both
16   clean jokes and dirty jokes, and the limericks that we
17   discussed.
18   Q.   All right.  Was there a dinner that you attended
19   with Major Baylor and his daughter and Colonel Chaffinch
20   and his wife and Barbara?  You all sat at the table
21   somewhere, went to Colorado Springs or something like
22   that?
23   A.   That was in Colorado, yes.
24   Q.   This was a different time?

Page 76

1    A.   Yes.
2    Q.   When was the Colorado Springs thing?
3    A.   That was I'm going to say around July or August
4    of 2003.
5    Q.   Okay.
6    A.   Around then, yes.  We were there as a traffic
7    records forum.
8    Q.   That's what it was, right.
9    A.   And then Colonel Chaffinch, as well as Major
10   Hughes, Major Baylor were there for an FBI conference in
11   Colorado Springs.  We were in Denver.
12   Q.   And they all met you for dinner?
13   A.   Yes.  We met halfway.
14   Q.   Okay.  And at that dinner was the colonel in rare
15   form?
16        MS. BALLARD:  Object to the form.
17   Q.   At the dinner was the colonel telling jokes or
18   engaging in conduct that women or minorities could find
19   offensive?
20   A.   He was -- I wouldn't say he was in rare form, but
21   he would lay some jokes out there, and I remember one
22   time when, I think it was a waitress, not a waiter,
23   picked his food up, he had some leftovers, and he told
24   the waitress that she could just feed it to the starving

Page 77

1    Ethiopians in Africa.  He also referred to major -- to
2    Ronnie Gaines as Ronnie Loves Watermelon Gaines in front
3    of Major Baylor and his daughter.
4    Q.   Ronnie Gaines is an African American trooper?
5    A.   Yes.  Retired, yes.
6    Q.   Retired trooper?
7    A.   Yes.
8    Q.   And he referred to him as Ronnie Watermelon
9    Gaines?
10   A.   Loves Watermelon Gaines.
11   Q.   So those were his words?
12   A.   And I've heard that numerous times throughout my
13   career, because I'm fairly certain that they went to the
14   academy together and that's when he gave him that
15   nickname, whenever he started the academy.
16   Q.   And Major Baylor's young teenage daughter was
17   present at the dinner too?
18   A.   I think at the time she was like 12.
19   Q.   Let me throw out a few other statements that
20   Captain Conley alleges she has heard from the colonel
21   over the years, okay, and see whether or not you have
22   heard them.  Okay?  She alleges he has said things like
23   "Women are nothing but trouble, women are a pain in the
24   ass, you can't live with them, you can't live without

Conley                                    v.                              Chaffinch, et al.
Captain Glenn Donald Dixon          C.A. # 04-1394-GMS                    July 13, 2005

Page 78

1   them." Have you ever heard him make similar remarks?
2       A. I don't recall the last one, but I've heard him
3   say pretty frequently "They are nothing but trouble."
4       Q. Would that remark have been made on duty?
5       A. Yes.
6       Q. And would that remark have been made off duty?
7       A. Yes.
8       Q. All right. The remark "Women are a pain in the
9   ass," have you heard him make that remark?
10      A. Yes.
11      Q. Has he made that remark on duty?
12      A. Yes.
13      Q. Has he made that remark off duty?
14      A. Yes.
15      Q. I'm going to try to focus on October 2004, Troop
16  5, in your presence and the colonel being there. Okay?
17  Do you remember him making a remark about his wife Karen
18  being "puffed up like a toad, you know how women get"?
19      A. Not specifically that date, but I've heard him
20  say that numerous times about Karen.
21      Q. All right. Around that time, is there a mirror
22  inside the closet door, inside your commander's office at
23  Troop 5?
24      A. Yes.

Page 79

1       Q. And around that time in October of 2004 did
2   Colonel Chaffinch make a point of noting that he had had
3   that mirror placed there when he was a troop commander?
4       A. Yes. He basically told me, and it was a
5   situation where we were planning to go to a retired
6   trooper's funeral and both my lieutenants and he, and
7   myself included, were getting our dress blouses on and
8   would use that mirror to make sure that everything looks
9   like it should, and that's when he made the statement
10  that he -- something like, I bet you didn't know that I
11  am the troop commander who had both the mirror in the
12  men's bathroom and the one behind the closet door in the
13  commander's office placed there, and it was placed there
14  so he could watch himself jerk off.
15      Q. Have you heard him refer to his Blackberry
16  computer device as his Dingleberry?
17      A. Yes.
18      Q. Did you attend an event in April of 2004 in St.
19  Michaels, Maryland, a luncheon the FBI was giving or
20  something?
21      A. In what year?
22      Q. April 2004, FBI, St. Michaels. You were there,
23  Lieutenant Brown, Lieutenant Rust --
24      A. I forget what town it was. I don't think it was

Page 80

1   St. Michaels. We had to travel out there quite aways.
2       Q. Right.
3       A. But, yes, it was in Maryland.
4       Q. And the colonel was with you that day, right?
5       A. Yes.
6       Q. There were like two cars that went?
7       A. Yes.
8       Q. And Captain Conley was in one of the cars?
9       A. Yes.
10      Q. And somewhere on Route 404, at a bar called
11  Cohee's, do you recall the group stopping?
12      A. Yes.
13      Q. Well, do you recall that there was a female
14  waitress in the restaurant that day?
15      A. Yes.
16      Q. She was waiting on you-all?
17      A. Yes.
18      Q. Do you recall the colonel saying to Rich Dennis,
19  "Maybe I should introduce her to the hooded merganser"?
20      A. I don't recall him saying it specifically to him,
21  but I remember him hearing it.
22      Q. You remember that being said, okay.
23      A. I was present for it.
24      Q. Okay. You remember the colonel making that

Page 81

1   statement?
2       A. Yes.
3       Q. You don't know who he was saying it to?
4       A. I just felt he was saying it to everybody that
5   could hear.
6       Q. A hooded merganser is some kind of a duck; isn't
7   that right?
8       A. From what I understand, yes.
9       Q. Are you a hunter?
10      A. No, I'm not.
11      Q. Around November of 2004, around the Thanksgiving
12  holiday period, okay, perhaps right after the holiday, at
13  Troop 5, do you remember some remarks about the hooded
14  merganser at that time, referring to something in
15  Florida?
16      A. He had just come back from Florida. And I wasn't
17  in the same office. It was in the office across the
18  hallway from me. But I could hear, as is the case around
19  Troop 5, you know, you could be in one office and hear it
20  from, conversations up at the sergeant's area, but he was
21  talking with at least -- well, it had to have been both
22  lieutenants, about how his uncle was questioning him
23  about the hooded merganser and where it came from, and
24  they were laughing about it.

21 (Pages 78 to 81)

Tab

B



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
## v.
## Chaffinch, et al.

C.A. # 04-1394-GMS

------------------------------------------------------------------------

Transcript of:

# Colonel L. Aaron Chaffinch

June 6, 2005

------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

```
                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,              )
                                        )
                 Plaintiff,             )
                                        )    Civil Action
v.                                      )    No. 04-1394-GMS
                                        )
COLONEL L. AARON CHAFFINCH,             )
individually and in his official        )
capacity as the Superintendent,         )
Delaware State Police; LIEUTENANT       )
COLONEL THOMAS F. MACLEISH,             )
individually and in his official        )
capacity as the Deputy Superintendent,)
Delaware State Police; DAVID B.         )
MICHELL, individually and in his        )
official capacity as Secretary of the )
Department of Safety and Homeland       )
Security, State of Delaware; and        )
DIVISION OF STATE POLICE, DEPARTMENT   )
OF SAFETY AND HOMELAND SECURITY,        )
State of Delaware,                      )
                                        )
                 Defendants.            )
```

           Deposition of COLONEL L. AARON CHAFFINCH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:35 a.m. on Monday,
June 6, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.
APPEARANCES:
          THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
            Wilmington, Delaware  19801
            for the Plaintiff
     -------------------------------------------------
                  WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Conley
Colonel L. Aaron Chaffinch

v.

C.A. # 04-1394-GMS

Chaffinch, et al.
June 6, 2005

Page 2

1  APPEARANCES (Continued):
2
3      JAMES E. LIGUORI, ESQUIRE
       LIGUORI, MORRIS & YIENGST
4        46 The Green
         Dover, Delaware 19901
         for Defendant Colonel L. Aaron Chaffinch
5
       RALPH K. DURSTEIN, ESQUIRE
6      STEPHANI J. BALLARD, ESQUIRE
       DEPARTMENT OF JUSTICE
7        820 North French Street
         Carvel State Office Building
8        Wilmington, Delaware 19801
         for Defendants Lieutenant Colonel Thomas F.
9        MacLeish, David B. Mitchell, and Division
         of State Police
10
11  ALSO PRESENT:
12      CAPTAIN BARBARA L. CONLEY
13          - - - - -
14      COLONEL L. AARON CHAFFINCH,
15      the witness herein, having first been
16      duly sworn on oath, was examined and
17      testified as follows:
18  BY MR. NEUBERGER:
19      Q.  Could you state your full name for the record?
20      A.  Aaron Chaffinch.
21      Q.  Colonel Chaffinch, my staff or myself, we've
22  taken your deposition on other occasions; isn't that
23  correct?
24      A.  Yes, sir.

Page 3

1      Q.  You've even testified in two federal court cases
2  that I was involved in; is that right?
3      A.  Yes, sir.
4      Q.  I called you as a witness in those cases; right?
5      A.  Yes, sir.
6      Q.  Now, you understand, based on that experience,
7  that if there's any question I ask you today and any
8  answer you give, and I call you at trial and you say
9  something different, I can point that out to the judge
10  and jury?
11      A.  Yes, sir.
12      Q.  You know that.  Okay.
13          Are you taking any medications or anything
14  that would interfere with your ability to remember
15  things?
16      A.  I don't believe so.
17      Q.  You don't take blood pressure, heart medicine,
18  things like that?
19      A.  I don't think it would affect my memory, I don't
20  believe.
21      Q.  But you are not on anything odd or something
22  that affects your memory that you know of?
23      A.  Not that I'm aware of.
24      Q.  If I ever ask you a question that you don't

Page 4

1  understand, just ask me and I'll be glad to rephrase it.
2  Is that okay?
3      A.  Yes, sir.
4      MR. NEUBERGER:  Let's do this.  Let's mark
5  this as Plaintiff's Exhibit Number 1 and then we'll be
6  referring back and forth to this.  Let me give a copy to
7  counsel.  It's a copy of the First Amended Complaint in
8  the action.
9          (Plaintiff's Exhibit 1 was marked for
10  identification.)
11  BY MR. NEUBERGER:
12      Q.  Colonel, I'm going to ask you some questions
13  about how long you were with the force and how your
14  career, your assignments might have tracked assignments
15  that Captain Barbara Conley had.  Okay?
16          If you turn to paragraph 10 of that
17  document that's in front of you on page 4, you can see
18  there in that paragraph a listing that Barbara Conley
19  prepared at an earlier time of her assignments starting
20  as a patrol trooper at Troop 5 in Bridgeville in 1982 at
21  the bottom.  Do you see that?
22      A.  Yes, I do.
23      Q.  Then she works all the way up to captain,
24  director of traffic control section in 2001.  Do you see

Page 5

1  that?
2      A.  Yes, sir.
3      Q.  Let me just ask you a few questions about her
4  history.
5          Now, she indicated that she joined the
6  force as a patrol trooper in Bridgeville in 1982 and
7  she'll testify to that fact.  Were you assigned to
8  Bridgeville at that time?
9      A.  Yes, sir.
10      Q.  I think she's indicated that she believes that
11  when she started in Bridgeville, she was a patrol trooper
12  and you would have been a trooper first class assigned in
13  Bridgeville.  Does that sound about right?
14      A.  That's correct.
15      Q.  Then she indicates she was in Bridgeville from
16  1982 to 1983?
17      MR. LIGUORI:  I think it's '93, Tom.
18      MR. NEUBERGER:  Yes.  Thank you, Jim.  All
19  right.
20  BY MR. NEUBERGER:
21      Q.  She has indicated during that period of time
22  there was a time when you were assigned at Bridgeville,
23  also?
24      A.  Part of that time, yes, sir.

2 (Pages 2 to 5)

Conley                                                          v.                                                    Chaffinch, et al.
Colonel L. Aaron Chaffinch                                C.A. # 04-1394-GMS                                    June 6, 2005

Page 146

1    A. You mean that I may have inherited from the
2  previous superintendent?
3    Q. Yes.
4    A. Not to my knowledge.
5    Q. I know, for example, that with reference to
6  lieutenants and sergeants, there's testing and there's
7  bands and things like that. At that time the Delaware
8  State Police was using that process for those ranks;
9  right?
10    A. For sergeant, lieutenant, captain, yes.
11    Q. And for captain, too?
12    A. Yes.
13    Q. I remember seeing information about boards of
14  people who might interview captain candidates.
15    A. Okay.
16    Q. That's true, isn't it?
17    A. Yes, sir.
18    Q. Now, for majors there wasn't that kind of a
19  process?
20    A. No, sir.
21    Q. I think you're telling me that for majors there
22  was no process that you inherited from any of your
23  predecessors as far as filling those two major vacancies?
24    A. That's correct.

Page 147

1    Q. Are you telling me that there's no process in
2  the union contract between the State Police and the union
3  that applies to filling the vacancies?
4    A. I'm not telling you that, no.
5    Q. Is there anything in the union contract?
6    A. Not to my knowledge.
7    Q. I know there's that handbook, the Delaware State
8  Police rules and regulations, it's like a two-volume blue
9  thing I've seen with rules and regulations about the
10  State Police. You are aware of that book; right?
11    A. The administrative manual and the divisional
12  manual.
13    Q. In those two manuals, was there any process that
14  guided your selection of the two majors for the positions
15  we are talking about?
16    A. I think probably there may be something in there
17  about at the discretion of the superintendent, but
18  there's not any specific process, no.
19    Q. So, for example, there was no preexisting rule
20  in writing that required that anybody selected for major
21  have a certain educational background?
22    A. No, sir.
23    Q. There wasn't anything in writing that required
24  that a person who was selected for major have any

Page 148

1  specific operational background?
2    A. Well, I think it goes without saying you'd have
3  to be a captain.
4    Q. Sure.
5    A. You know what I mean. So that is one parameter,
6  you know. So you look at the captains in the agency to
7  make your selection and for the superintendent. And
8  certainly education and background and experience and
9  tenure all came into play with any selections that I made
10  for executive staff people.
11    Q. So you're saying that when you had to select
12  anybody to be part of the executive staff, you considered
13  education, background, experience, and tenure?
14    A. That's correct. Experience within the agency.
15    Q. While that wasn't found in any preexisting
16  written document, those are factors you used?
17    A. That's correct.
18    Q. I guess I'm trying to find out: Were there
19  other factors you used besides those four?
20    A. Well, by background I would mean where they have
21  been within their tenure as a trooper based on what
22  position I'm filling. I think you understand that. That
23  somebody that had been in an administrative position but
24  not necessarily in an operational position probably

Page 149

1  wouldn't get an operational job. You see what I'm
2  saying? Those kind of things come into play with any
3  selections that I would make for staff level positions.
4        And compatibility with other members of the
5  executive staff certainly would come into play, as well.
6    Q. I'll put down as another factor compatibility
7  with the other members of the executive staff.
8    A. Yes.
9    Q. So that gives me five categories. Were there
10  any others that you considered?
11    A. Not that I can recall.
12    Q. I remember seeing in some of the other cases
13  affidavits or testimony talking about as people rise to
14  higher management levels in the State Police, it's
15  important that they have operational experience, meaning
16  like in patrol and actual on-the-road type experience.
17  That's a fair statement, isn't it?
18    A. That's one very important facet, yes.
19    Q. So that's important. Okay.
20        For example, with respect to Captain
21  Barbara Conley, we know from paragraph 10 on page 4 of
22  the complaint that's in front of you that she was a
23  patrol trooper for eleven years at Troop 5. Do you
24  remember that?

38 (Pages 146 to 149)

Conley                                    v.                      Chaffinch, et al.
Colonel L. Aaron Chaffinch            C.A. # 04-1394-GMS              June 6, 2005

Page 178

1 promotion from the Secretary of Safety and Homeland
2 Security James Ford, no.
3     Q.   So if I asked you for the record what were the
4 reasons for selecting Hughes, what would you explain as
5 the reasons why you selected Hughes?
6     A.   I don't know if I can tell you exactly the five
7 that are there.  Tenure, background, education --
8     Q.   The five are:  First was education, second is
9 background, third is experience within the Delaware State
10 Police, fourth is tenure, and fifth is compatibility with
11 other members of the executive staff.  Okay?
12         With that as a help, what were the reasons
13 why you selected Major Hughes?
14     A.   Okay.  Well, his tenure within the agency was
15 very well rounded.  He -- like I explained earlier, he
16 had been to the academy as the assistant director of the
17 academy, so he had been involved in training.  He'd been
18 in special investigations as a drug officer, so he had
19 experience in criminal investigations.  He had been a
20 patrol sergeant and run a shift at Troop 7.  He had been
21 a traffic lieutenant at Troop 5.  He had been a troop
22 commander at Troop 5.  He was a graduate of the FBI
23 National Academy.  He attained a master's degree in
24 public administration.  And he had worked his entire

Page 179

1 career in Kent and Sussex counties and he was familiar
2 with the area and the other troopers and the other
3 administrators of those troops.
4     Q.   Are there any other reasons?
5     A.   I thought he would be compatible with the other
6 staff members.  I think I've hit -- I hit on experience.
7 I hit on his background.  I hit on his tenure and his
8 education.  So I guess that there's not any others.
9     Q.   I'm just trying to be thorough.
10     A.   Loyal to the superintendent.
11     Q.   Excuse me?
12     A.   Loyal to the superintendent.
13     Q.   Is it fair to say that that's an additional
14 factor, or is that within the other ones?
15     A.   That's within the others.
16     Q.   So loyal to the superintendent.  What do you
17 mean by that?
18     A.   Well, I had worked close with him and I knew
19 that he would support me in my position as
20 superintendent.  He would also do a good job.  He's
21 always been a go-getter.  He was one of the biggest
22 workers on the road when he was on the road.  He wrote
23 his share of traffic citations.  And he -- you know, he
24 did a lot of criminal work.  And I'll put his record up

Page 180

1 against anybody in the agency as far as work and
2 experience on the Delaware State Police.
3     Q.   It's just that today is the time for you to give
4 all the reasons.
5     A.   I suppose it is.
6     Q.   So are there any other reasons why you selected
7 him over the other people?
8     A.   Not that jump right out at me.  I think I've hit
9 on them all.
10     Q.   Now, if we go to Major Eckrich, how about giving
11 me the reasons why he was selected for the position?
12     A.   Okay.  From education standpoint, he's got a
13 master's -- a bachelor's and a master's degree.  He's a
14 graduate of Southern Police Institute in Louisville,
15 Kentucky, which is a command school for law enforcement
16 administrators.  He's -- he had worked patrol.  He had
17 worked as a patrol supervisor, a shift commander.  He had
18 worked at both as a criminal lieutenant and a traffic
19 lieutenant.  And he'd been a troop commander.  And I had
20 worked closely with him and I knew that he would be loyal
21 and -- loyal to me and we would be a good team to be a
22 part of the executive staff.
23     Q.   You mentioned loyal two times, so I do want to
24 ask you about that.

Page 181

1         You worked with Barbara Conley over your
2 career, too?
3     A.   Yes, I have.
4     Q.   Is there any reason for you to think she
5 wouldn't be loyal to you if she was selected?
6     A.   No, there's not.
7     Q.   So are they all the reasons for Major Eckrich?
8     A.   The other reason that we talked about earlier is
9 the fact that he had been in that position as a
10 lieutenant and that is a -- that is a large factor in my
11 decision.
12     Q.   So just so you understand I'm being fair with
13 you, if there's anything else you said earlier, we'll
14 include that in reasons why he was selected.  Okay?
15     A.   Yes, sir.
16     Q.   Is there anything else that you remember was a
17 reason why he was selected?
18     A.   No, sir.
19     Q.   Did you look into his disciplinary record?
20 Let's say Eckrich right now.  Did you check and see
21 whether he had any violations, suspensions, or things
22 like that in his record?
23     A.   I'm pretty sure he doesn't have any, but I
24 couldn't tell you exactly for sure, but if he has

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on April 11, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley/ Pleadings / Conley - AB to Ds M inL - Dixon relationship. Final