IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** individually and in his official capacity as the Superintendent, Delaware State Police; **LIEUTENANT COLONEL THOMAS F. MACLEISH,** individually and in his official capacity as the Deputy Superintendent, Delaware State Police; **DAVID B. MITCHELL,** individually and in his official capacity as Secretary of the Department of Safety and Homeland Security, State of Delaware; and **DIVISION OF STATE POLICE, DEPARTMENT OF SAFETY AND HOMELAND SECURITY, STATE OF DELAWARE,** | : : : : : : : : : : : : : | C.A.No.04-1394-GMS |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE FOR DETERMINATION OF ADMISSIBILITY OF PLAINTIFF'S ALLEGED "ON THE JOB" MISCONDUCT**

                                                                        **THE NEUBERGER FIRM, P.A.**
                                                                        **THOMAS S. NEUBERGER, ESQ. (#243)**
                                                                         **STEPHEN J. NEUBERGER, ESQ. (#4440)**
                                                                         Two East Seventh Street, Suite 302
                                                                         Wilmington, DE 19801
                                                                         (302) 655-0582
                                                                         TSN@NeubergerLaw.com
                                                                         SJN@NeubergerLaw.com

Dated: April 11, 2006                  Attorneys for Plaintiff

**A. This Evidence is Irrelevant.** First, defendants' belated attempt to justify their discriminatory actions by pointing to plaintiff's stale past performance and employment history is precluded by Third Circuit case law. It is well established that a plaintiff's "satisfactory performance of duties over a long period of time leading to a promotion clearly establishe[s] [her] qualifications for the job." Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989). A plaintiff's prior satisfactory performance of a job "leads to the almost inevitable inference that [she] was qualified for the position" she was denied. Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995). More specifically, however, when an employer chooses to promote a plaintiff, despite knowledge of alleged deficiencies in her qualifications, the employer cannot later rely on these same alleged deficiencies to claim that the employee was unqualified for the position at issue. Hugh v. Butler County Family YMCA, 418 F.3d 265, 268 (3d Cir. 2005). "[S]atisfactory performance of duties leading to a promotion does establish a plaintiff's qualifications for a job." Id.

> The YMCA chose to promote Hugh, despite her lack of a degree and caseworker experience. It is a fair inference that the decision to promote Hugh was based on her satisfactory performance in her two previous positions with the YMCA. Once the YMCA made this choice, it was deeming Hugh's prior satisfactory performance sufficient qualification for [the position at issue]. ... The YMCA, having promoted Hugh with full knowledge of her background, cannot now say that she was unqualified for the position, her promotion was an acknowledgment that she was qualified at the time.

Id. (emphasis added).

Simply put, defendants have been well aware of plaintiff's prior stale disciplinary history for at least 18 years. The law discussed above simply does not allow defendants to rely upon an 18 year old employment history to justify a present day adverse action. That past history has long since been washed clean by numerous subsequent merit promotions up through the ranks. Accordingly, this stale disciplinary history is inadmissible under at least seventeen years of Third Circuit case law.

Conversely, disciplinary actions from the time of an employee's last promotion can be taken into consideration by an employer. For example, Major Hughes' disciplinary actions for covering up crimes and the physical abuse of a female trooper by another male trooper could have been taken into account

1

prior to his promotion to Major. Thus, if Capt. Conley has engaged in some type of misconduct since her promotion to captain and prior to the promotions in issue, that is clearly fair game.

However, Capt. Conley's records prove she was promoted from trooper first class to sergeant, then to lieutenant, then to Captain. Stale censure records from plaintiff's time as a trooper first class, sergeant and even lieutenant are irrelevant to the issues in this case. The belated defense attempt to inject this stale evidence is barred by Third Circuit case law which holds that plaintiff's records may not be considered in light of the fact that it did not stop her from being promoted up through the ranks.

Second, at his deposition, Chaffinch never identified plaintiff's alleged performance deficiencies as a reason for his failure to promote her. Chaffinch testified that he considered six discretionary factors when making his promotion decision: education, background, experience, tenure, compatibility and personal loyalty to him. (Tab A - Chaffinch 148-149, 179). Then Chaffinch continued and explained what each of these factors consisted of and nowhere in his explanations did he identify on the job misconduct. Instead, Chaffinch readily admitted that plaintiff was qualified for promotion to Major. (Chaffinch 183). But at no point did he indicate that she was not qualified because of this alleged misconduct or her performance history.

Chaffinch had every opportunity during his lengthy deposition to discuss plaintiff's alleged on the job misconduct. But rather than do so, Chaffinch instead testified that plaintiff was qualified and had comparable education, background and tenure to both comparators. Defendants cannot now run from Chaffinch's sworn testimony by offering irrelevant testimony of non-decisionmakers in an attempt to cloud the issues. Thus, plaintiff's alleged misconduct is not relevant to her denial of promotion because it was never a consideration by the decision-maker. Accordingly, this then reveals that the defense efforts to offer this irrelevant evidence are simply intended as a smear tactic.

Third, and relatedly, the issue in this case is whether Chaffinch did not promote plaintiff because of her gender. The issue is not whether defendants can dredge up testimony from non-decisionmakers over the past 20 years who have negative things to say about plaintiff. Chaffinch did not testify that he

2

relied upon things said by non-decisionmakers. Accordingly, their testimony in this regard is irrelevant.

**B. Rule 403 Also Bars This Evidence.** Even assuming *arguendo* that the evidence has some relevance, the probative value is substantially outweighed by Fed.R.Evid. 403 considerations.

Chaffinch testified at length to his decision-making process and listed and discussed six distinct factors he used and work misconduct was not one of them. Therefore, evidence of such alleged misconduct is irrelevant and would only serve to mislead the jury and confuse the issues.

Relatedly, because the defense claims of wrongdoing have no foundation in her contemporaneously created performance evaluations from the relevant time period - a place where such on the job misconduct would be reflected - this invites further jury confusion as a mini-trial on the authenticity and circumstances surrounding each of these newly created allegations will be required.

**C. Rule 412 Also Bars This Evidence.** In regards to plaintiff's alleged misconduct of a sexual nature, Rule 412 bars admissibility of such evidence. Evidence is inadmissible in a civil cases where it is "offered to prove that any alleged victim engaged in other sexual behavior" or "offered to prove any alleged victim's sexual predisposition." Fed.R.Evid. 412. While the comment to Rule 412 provides two examples of civil actions where evidence of a sexual nature may be at issue, sexual assault or sexual harassment, the comment's language does not expressly limit Rule 412's application. A victim of sex discrimination is certainly the victim of sex-based misconduct and may be afforded protection if the evidence being offered tends to prove an alleged victim's sexual behavior or sexual predisposition.

The spirit of the rule is to protect victims of sexually motivated wrongdoing from the admission of irrelevant evidence pertaining to sexual history or predisposition. The purpose of the rule is "to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process." Advisory Committee Notes, 1994. Accordingly, for admission of such evidence, the "evidence offered to prove a victim's sexual behavior or sexual predisposition is admissible (if it is otherwise admissible) only if 'its probative value substantially outweighs the danger of

harm to any victim and of unfair prejudice to any party.'" B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1104 (9th Cir. 2001); Fed.R.Evid. 412(b)(2).

> [T]he balancing test to be employed in assessing whether to admit proposed evidence is 'more stringent' than that governing Rule 403: First, it [r]everses that usual procedure ... by shifting the burden to the proponent to demonstrate admissibility rather than making the opponent justify exclusion of the evidence. Second, ... it raises the threshold for admission by requiring that the probative value of the evidence substantially outweigh the specified dangers. Finally, the Rule 412 test puts 'harm to the victim' on the scale in addition to prejudice to the parties.'

Id.; Advisory Committee Notes. In Wolak v. Spucci, 217 F.3d 157 (2d Cir. 2000), the court ruled that evidence of a sexual harassment victim's out-of-work sexual experiences were inadmissible under Rule 412. Evidence that a victim viewed pornographic material outside of work did not exhibit a probative value substantially outweighing its prejudicial effect "since plaintiff may still have been injured and her status altered by the displaying of pornographic images at work." Id. at 160-61. The plaintiff's out-of-work conduct had no bearing on whether the sexual advances at work were welcomed. Id.; see also Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 856 (1stCir. 1998)(denying admission to evidence of plaintiff's moral character and marital status of her boyfriend).

Likewise, defendants here are attempting to insert irrelevant evidence of plaintiff's alleged misconduct of a sexual nature when its probative value is substantially outweighed by harm to plaintiff. Defendants have failed to meet their burden under this Rule. This conduct had no bearing on Chaffinch's decision not to promote plaintiff on the basis of her gender or the retaliation taken against her. Since plaintiff was the victim of Chaffinch's sex based animus and, plaintiff should be afforded protection under Rule 412 as it precludes the admissibility of evidence of a sexual nature when it has no relevance to the material issues of the case.

The Rule with regard to a victim's sexual predisposition is "designed to exclude evidence that does not directly refer to sexual activities or thoughts but that the proponent believes may have a sexual connotation for the factfinder." Advisory Committee Notes. Much of the defense evidence regarding conduct and language in this regard is barred as it may have a sexual connotation for the jury and it is irrelevant to the issues before them. The Rule directs that "[a]dmission of such evidence would

4

contravene Rule 412's objectives of shielding the alleged victim from potential embarrassment and safeguarding the victim against stereotypical thinking." Advisory Committee Notes. Thus, unless the proponent of the evidence can satisfy the heightened relevancy requirement under (b)(2), "evidence ...relating to the alleged victim's mode of dress, speech, or life- style will not be admissible." Id. The present case is not one where the jury need determine if plaintiff's alleged conduct welcomed sexual advances in the workplace - ours is not sexual harassment case. Plaintiff's alleged use of language of a sexual nature or actions are not issues before the court. Yet if admitted, the jury may judge plaintiff based on this irrelevant evidence - a result forbidden by Rule 412. Plaintiff was purportedly denied promotion based on 6 factors - none of which addressed any misconduct. Rule 412 precludes such use of irrelevant evidence to tarnish plaintiff's image when it has no bearing on the issues of the case.[1]

**D. Defendants Have Waived the Use of These Witnesses by Failing to Comply with the Scheduling Order.** Most of the witnesses defendants offer on these issues were within the employ and control of defendants when this case began. However, defendants did not identify them as witnesses until the late stages of discovery. Accordingly, the defense sandbagging tactic should not be countenanced and their use of these witnesses has been waived. Additionally, when plaintiff did try to depose these witnesses after defendants belatedly identified them, defendants refused to attend or otherwise cooperate in scheduling their depositions.[2] In the interests of time and judicial economy, plaintiff refers the Court to her motion in limine on this issue. (See D.I. 179).

**E. Conclusion.** The defense motion should be denied.

---

[1] To the extent defendants claims plaintiff put her reputation at issue, defendants fail to remember that plaintiff dropped her claims for reputation damages at the November Chambers Conference with the Court.

[2] Thus, the repeated defense claim that plaintiff declined to depose these witnesses is false. Plaintiff sought to depose these witnesses but was not able to due to defendants' actions. Under the plain terms of the Court's Rule 16 Scheduling Order, plaintiff was barred from taking any depositions after December 31, 2005 in this case - the discovery cut-off date.

5

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: April 11, 2006                Attorneys for Plaintiff

# Tab

# A



In the Matter Of:

# Conley
# v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

---

Transcript of:

# Colonel L. Aaron Chaffinch

June 6, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:04-cv-01394-GMS   Document 190   Filed 04/11/2006   Page 10 of 15

Conley                                           v.                              Chaffinch, et al.
Colonel L. Aaron Chaffinch              C.A. # 04-1394-GMS                       June 6, 2005

Page 1

```
             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE

    CAPTAIN BARBARA L. CONLEY,           )
                                         )
                  Plaintiff,             )
                                         )  Civil Action
    v.                                   )  No. 04-1394-GMS
                                         )
    COLONEL L. AARON CHAFFINCH,          )
    individually and in his official     )
    capacity as the Superintendent,      )
    Delaware State Police; LIEUTENANT    )
    COLONEL THOMAS F. MACLEISH,          )
    individually and in his official     )
    capacity as the Deputy Superintendent,)
    Delaware State Police; DAVID B.      )
    MICHELL, individually and in his     )
    official capacity as Secretary of the )
    Department of Safety and Homeland    )
    Security, State of Delaware; and     )
    DIVISION OF STATE POLICE, DEPARTMENT )
    OF SAFETY AND HOMELAND SECURITY,     )
    State of Delaware,                   )
                                         )
                  Defendants.            )
```

Deposition of COLONEL L. AARON CHAFFINCH taken pursuant to notice at the law offices of The Neuberger Firm, P.A., 2 East 7th Street, Suite 302, Wilmington, Delaware, beginning at 9:35 a.m. on Monday, June 6, 2005, before Kathleen White Palmer, Registered Merit Reporter and Notary Public.

APPEARANCES:

      THOMAS S. NEUBERGER, ESQUIRE
      THE NEUBERGER FIRM, P.A.
        2 East 7th Street - Suite 302
        Wilmington, Delaware  19801
        for the Plaintiff

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Page 2

```
 1  APPEARANCES (Continued):
 2
        JAMES E. LIGUORI, ESQUIRE
 3      LIGUORI, MORRIS & YIENGST
         46 The Green
 4       Dover, Delaware  19901
           for Defendant Colonel L. Aaron Chaffinch
 5
        RALPH K. DURSTEIN, ESQUIRE
 6      STEPHANI J. BALLARD, ESQUIRE
        DEPARTMENT OF JUSTICE
 7        820 North French Street
          Carvel State Office Building
 8        Wilmington, Delaware  19801
            for Defendants Lieutenant Colonel Thomas F.
 9          MacLeish, David B. Mitchell, and Division
            of State Police
10
11  ALSO PRESENT:
12      CAPTAIN BARBARA L. CONLEY
13                - - - - -
14          COLONEL L. AARON CHAFFINCH,
15      the witness herein, having first been
16      duly sworn on oath, was examined and
17      testified as follows:
18  BY MR. NEUBERGER:
19    Q.  Could you state your full name for the record?
20    A.  Aaron Chaffinch.
21    Q.  Colonel Chaffinch, my staff or myself, we've
22  taken your deposition on other occasions; isn't that
23  correct?
24    A.  Yes, sir.
```

Page 3

```
 1    Q.  You've even testified in two federal court cases
 2  that I was involved in; is that right?
 3    A.  Yes, sir.
 4    Q.  I called you as a witness in those cases; right?
 5    A.  Yes, sir.
 6    Q.  Now, you understand, based on that experience,
 7  that if there's any question I ask you today and any
 8  answer you give, and I call you at trial and you say
 9  something different, I can point that out to the judge
10  and jury?
11    A.  Yes, sir.
12    Q.  You know that.  Okay.
13        Are you taking any medications or anything
14  that would interfere with your ability to remember
15  things?
16    A.  I don't believe so.
17    Q.  You don't take blood pressure, heart medicine,
18  things like that?
19    A.  I don't think it would affect my memory, I don't
20  believe.
21    Q.  But you are not on anything odd or something
22  that affects your memory that you know of?
23    A.  Not that I'm aware of.
24    Q.  If I ever ask you a question that you don't
```

Page 4

```
 1  understand, just ask me and I'll be glad to rephrase it.
 2  Is that okay?
 3    A.  Yes, sir.
 4        MR. NEUBERGER:  Let's do this.  Let's mark
 5  this as Plaintiff's Exhibit Number 1 and then we'll be
 6  referring back and forth to this.  Let me give a copy to
 7  counsel.  It's a copy of the First Amended Complaint in
 8  the action.
 9        (Plaintiff's Exhibit 1 was marked for
10  identification.)
11  BY MR. NEUBERGER:
12    Q.  Colonel, I'm going to ask you some questions
13  about how long you were with the force and how your
14  career, your assignments might have tracked assignments
15  that Captain Barbara Conley had.  Okay?
16        If you turn to paragraph 10 of that
17  document that's in front of you on page 4, you can see
18  there in that paragraph a listing that Barbara Conley
19  prepared at an earlier time of her assignments starting
20  as a patrol trooper at Troop 5 in Bridgeville in 1982 at
21  the bottom.  Do you see that?
22    A.  Yes, I do.
23    Q.  Then she works all the way up to captain,
24  director of traffic control section in 2001.  Do you see
```

Page 5

```
 1  that?
 2    A.  Yes, sir.
 3    Q.  Let me just ask you a few questions about her
 4  history.
 5        Now, she indicated that she joined the
 6  force as a patrol trooper in Bridgeville in 1982 and
 7  she'll testify to that fact.  Were you assigned to
 8  Bridgeville at that time?
 9    A.  Yes, sir.
10    Q.  I think she's indicated that she believes that
11  when she started in Bridgeville, she was a patrol trooper
12  and you would have been a trooper first class assigned in
13  Bridgeville.  Does that sound about right?
14    A.  That's correct.
15    Q.  Then she indicates she was in Bridgeville from
16  1982 to 1983?
17        MR. LIGUORI:  I think it's '93, Tom.
18        MR. NEUBERGER:  Yes.  Thank you, Jim.  All
19  right.
20  BY MR. NEUBERGER:
21    Q.  She has indicated during that period of time
22  there was a time when you were assigned at Bridgeville,
23  also?
24    A.  Part of that time, yes, sir.
```

Page 146

1  A. You mean that I may have inherited from the
2  previous superintendent?
3  Q. Yes.
4  A. Not to my knowledge.
5  Q. I know, for example, that with reference to
6  lieutenants and sergeants, there's testing and there's
7  bands and things like that. At that time the Delaware
8  State Police was using that process for those ranks;
9  right?
10  A. For sergeant, lieutenant, captain, yes.
11  Q. And for captain, too?
12  A. Yes.
13  Q. I remember seeing information about boards of
14  people who might interview captain candidates.
15  A. Okay.
16  Q. That's true, isn't it?
17  A. Yes, sir.
18  Q. Now, for majors there wasn't that kind of a
19  process?
20  A. No, sir.
21  Q. I think you're telling me that for majors there
22  was no process that you inherited from any of your
23  predecessors as far as filling those two major vacancies?
24  A. That's correct.

Page 147

1  Q. Are you telling me that there's no process in
2  the union contract between the State Police and the union
3  that applies to filling the vacancies?
4  A. I'm not telling you that, no.
5  Q. Is there anything in the union contract?
6  A. Not to my knowledge.
7  Q. I know there's that handbook, the Delaware State
8  Police rules and regulations, it's like a two-volume blue
9  thing I've seen with rules and regulations about the
10  State Police. You are aware of that book; right?
11  A. The administrative manual and the divisional
12  manual.
13  Q. In those two manuals, was there any process that
14  guided your selection of the two majors for the positions
15  we are talking about?
16  A. I think probably there may be something in there
17  about at the discretion of the superintendent, but
18  there's not any specific process, no.
19  Q. So, for example, there was no preexisting rule
20  in writing that required that anybody selected for major
21  have a certain educational background?
22  A. No, sir.
23  Q. There wasn't anything in writing that required
24  that a person who was selected for major have any

Page 148

1  specific operational background?
2  A. Well, I think it goes without saying you'd have
3  to be a captain.
4  Q. Sure.
5  A. You know what I mean. So that is one parameter,
6  you know. So you look at the captains in the agency to
7  make your selection and for the superintendent. And
8  certainly education and background and experience and
9  tenure all came into play with any selections that I made
10  for executive staff people.
11  Q. So you're saying that when you had to select
12  anybody to be part of the executive staff, you considered
13  education, background, experience, and tenure?
14  A. That's correct. Experience within the agency.
15  Q. While that wasn't found in any preexisting
16  written document, those are factors you used?
17  A. That's correct.
18  Q. I guess I'm trying to find out: Were there
19  other factors you used besides those four?
20  A. Well, by background I would mean where they have
21  been within their tenure as a trooper based on what
22  position I'm filling. I think you understand that. That
23  somebody that had been in an administrative position but
24  not necessarily in an operational position probably

Page 149

1  wouldn't get an operational job. You see what I'm
2  saying? Those kind of things come into play with any
3  selections that I would make for staff level positions.
4      And compatibility with other members of the
5  executive staff certainly would come into play, as well.
6  Q. I'll put down as another factor compatibility
7  with the other members of the executive staff.
8  A. Yes.
9  Q. So that gives me five categories. Were there
10  any others that you considered?
11  A. Not that I can recall.
12  Q. I remember seeing in some of the other cases
13  affidavits or testimony talking about as people rise to
14  higher management levels in the State Police, it's
15  important that they have operational experience, meaning
16  like in patrol and actual on-the-road type experience.
17  That's a fair statement, isn't it?
18  A. That's one very important facet, yes.
19  Q. So that's important. Okay.
20      For example, with respect to Captain
21  Barbara Conley, we know from paragraph 10 on page 4 of
22  the complaint that's in front of you that she was a
23  patrol trooper for eleven years at Troop 5. Do you
24  remember that?

Page 178

1 promotion from the Secretary of Safety and Homeland
2 Security James Ford, no.
3    Q.  So if I asked you for the record what were the
4 reasons for selecting Hughes, what would you explain as
5 the reasons why you selected Hughes?
6    A.  I don't know if I can tell you exactly the five
7 that are there.  Tenure, background, education --
8    Q.  The five are: First was education, second is
9 background, third is experience within the Delaware State
10 Police, fourth is tenure, and fifth is compatibility with
11 other members of the executive staff.  Okay?
12          With that as a help, what were the reasons
13 why you selected Major Hughes?
14    A.  Okay.  Well, his tenure within the agency was
15 very well rounded.  He -- like I explained earlier, he
16 had been to the academy as the assistant director of the
17 academy, so he had been involved in training.  He'd been
18 in special investigations as a drug officer, so he had
19 experience in criminal investigations.  He had been a
20 patrol sergeant and run a shift at Troop 7.  He had been
21 a traffic lieutenant at Troop 5.  He had been a troop
22 commander at Troop 5.  He was a graduate of the FBI
23 National Academy.  He attained a master's degree in
24 public administration.  And he had worked his entire

Page 179

1 career in Kent and Sussex counties and he was familiar
2 with the area and the other troopers and the other
3 administrators of those troops.
4    Q.  Are there any other reasons?
5    A.  I thought he would be compatible with the other
6 staff members.  I think I've hit -- I hit on experience.
7 I hit on his background.  I hit on his tenure and his
8 education.  So I guess that there's not any others.
9    Q.  I'm just trying to be thorough.
10    A.  Loyal to the superintendent.
11    Q.  Excuse me?
12    A.  Loyal to the superintendent.
13    Q.  Is it fair to say that that's an additional
14 factor, or is that just within the other ones?
15    A.  That's within the others.
16    Q.  So loyal to the superintendent.  What do you
17 mean by that?
18    A.  Well, I had worked close with him and I knew
19 that he would support me in my position as
20 superintendent.  He would also do a good job.  He's
21 always been a go-getter.  He was one of the biggest
22 workers on the road when he was on the road.  He wrote
23 his share of traffic citations.  And he -- you know, he
24 did a lot of criminal work.  And I'll put his record up

Page 180

1 against anybody in the agency as far as work and
2 experience on the Delaware State Police.
3    Q.  It's just that today is the time for you to give
4 all the reasons.
5    A.  I suppose it is.
6    Q.  So are there any other reasons why you selected
7 him over the other people?
8    A.  Not that jump right out at me.  I think I've hit
9 on them all.
10    Q.  Now, if we go to Major Eckrich, how about giving
11 me the reasons why he was selected for the position?
12    A.  Okay.  From education standpoint, he's got a
13 master's -- a bachelor's and a master's degree.  He's a
14 graduate of Southern Police Institute in Louisville,
15 Kentucky, which is a command school for law enforcement
16 administrators.  He's -- he had worked patrol.  He had
17 worked as a patrol supervisor, a shift commander.  He had
18 worked at both as a criminal lieutenant and a traffic
19 lieutenant.  And he'd been a troop commander.  And I had
20 worked closely with him and I knew that he would be loyal
21 and -- loyal to me and we would be a good team to be a
22 part of the executive staff.
23    Q.  You mentioned loyal two times, so I do want to
24 ask you about that.

Page 181

1          You worked with Barbara Conley over your
2 career, too?
3    A.  Yes, I have.
4    Q.  Is there any reason for you to think she
5 wouldn't be loyal to you if she was selected?
6    A.  No, there's not.
7    Q.  So are they all the reasons for Major Eckrich?
8    A.  The other reason that we talked about earlier is
9 the fact that he had been in that position as a
10 lieutenant and that is a -- that is a large factor in my
11 decision.
12    Q.  So just so you understand I'm being fair with
13 you, if there's anything else you said earlier, we'll
14 include that in reasons why he was selected.  Okay?
15    A.  Yes, sir.
16    Q.  Is there anything else that you remember was a
17 reason why he was selected?
18    A.  No, sir.
19    Q.  Did you look into his disciplinary record?
20 Let's say Eckrich right now.  Did you check and see
21 whether he had any violations, suspensions, or things
22 like that in his record?
23    A.  I'm pretty sure he doesn't have any, but I
24 couldn't tell you exactly for sure, but if he has

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| Colonel L. Aaron Chaffinch | C.A. # 04-1394-GMS | June 6, 2005 |

Page 182

1  anything, it's got to be very, very minor. The same with
2  Major Hughes.
3      Q.  Where does one look to find out?
4      A.  The personnel file.
5      Q.  So, for example, if you dented the fender of the
6  patrol vehicle or something, that's something you could
7  get written up for?
8      A.  That's right. I got written up for it.
9      Q.  Or you miss a court appearance or something?
10     A.  That's right.
11     Q.  There are various rules and regulations of the
12 State Police that regulate conduct of troopers; right?
13     A.  Yes.
14     Q.  So you can commit a violation and then be
15 disciplined in various ways; right?
16     A.  That's correct.
17     Q.  For this position of major, would you have
18 looked at that part of the personnel file that deals with
19 these kinds of minor infractions?
20     A.  Yes, but I can't sit here today and tell you
21 what I saw because it's been so long ago.
22     Q.  Well, is there some kind of a threshold or
23 something? What if a person does have some
24 infractions -- let's say over a 20-year career they do

Page 183

1  have --
2      A.  It would depend on what the infractions were.
3  And I can tell you neither one of those captains that
4  subsequently became majors have anything that would be --
5  you know, that would scratch them from consideration.
6      Q.  Right. But it is something you look at is what
7  you are telling me, you would?
8      A.  And I did.
9      Q.  You're saying there was nothing in their
10 personnel record that would have eliminated them from
11 consideration?
12     A.  That's correct.
13     Q.  Do you remember whether there was an
14 accumulation of suspensions, be it one day or two days,
15 in their records?
16     A.  No, I don't remember sitting here today. It's
17 over two years ago, or nearly two years ago. And I can't
18 tell you what was in there. I'm sure they may well have
19 missed a court appearance as you used as an example
20 earlier, but there was nothing significant.
21     Q.  Nothing significant. Okay.
22         Do you agree that my client, Barbara
23 Conley, was qualified at that time to be a major?
24     A.  All captains were qualified.

Page 184

1      Q.  For example, you may not be aware of this, but
2  present-Colonel MacLeish sent out a notice to all the
3  captains last week indicating that he was taking
4  applications to be promoted to major, that there were two
5  positions he was going to fill and that anybody
6  interested should apply by June 17th. So just accept
7  that as a fact. Okay?
8         That seems to imply that this e-mail sent
9  to 19 captains indicates that they are qualified to
10 apply. Let me ask you about your policies. Okay?
11        Were you saying that when you were making
12 this decision as who to promote to major, that all the
13 existing captains were qualified to be promoted to major?
14     A.  Yes, I am.
15     Q.  Thank you. Okay.
16        It's your testimony that you selected the
17 most qualified persons?
18     A.  That's correct.
19     Q.  Got you.
20        You weren't even making people apply or
21 tell you whether they were interested at the time or not?
22     A.  Not at that time, no.
23     Q.  You knew who the captains were and you
24 considered all the captains?

Page 185

1      A.  That's correct.
2      Q.  That's correct?
3         MR. LIGUORI: With regard to the
4  reservation that he said earlier about geography.
5         MR. NEUBERGER: Yes, yes, with that
6  understanding, right, right. Exactly.
7         Let's take a break. Okay?
8         (A recess was taken at this time.)
9  BY MR. NEUBERGER:
10     Q.  You understand that you can't refuse to promote
11 a woman because she's a woman; right?
12     A.  That's correct.
13     Q.  You understand that the United States
14 Constitution would prevent that; right?
15     A.  That's correct.
16     Q.  You know that's illegal under state law; right?
17     A.  Yes, sir.
18     Q.  You know that would violate what we call the
19 14th Amendment, right to equal protection under the laws;
20 right?
21     A.  Yes, sir.
22     Q.  That's part of your police training to
23 understand that; right?
24     A.  Yes, sir.

47 (Pages 182 to 185)

## CERTIFICATE OF SERVICE

      I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on April 11, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Ralph K. Durstein III, Esquire
> Department of Justice
> Carvel State Office Building
> 820 N. French Street
> Wilmington, DE 19801
>
> James E. Liguori, Esquire
> Liguori, Morris & Yiengst
> 46 The Green
> Dover, DE 19901

      /s/ Stephen J. Neuberger
      **STEPHEN J. NEUBERGER, ESQ.**

Conley/ Pleadings / Conley - AB to Ds MinL - on the job conduct.FINAL