IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** individually and in his official capacity as the Superintendent, Delaware State Police; **LIEUTENANT COLONEL THOMAS F. MACLEISH,** individually and in his official capacity as the Deputy Superintendent, Delaware State Police; **DAVID B. MITCHELL,** individually and in his official capacity as Secretary of the Department of Safety and Homeland Security, State of Delaware; and **DIVISION OF STATE POLICE, DEPARTMENT OF SAFETY AND HOMELAND SECURITY, STATE OF DELAWARE,** | : : : : : : : : : : : : : : | C.A.No.04-1394-GMS |
| Defendants. | : : | |

**PLAINTIFF'S REPLY IN SUPPORT OF HER THIRD MOTION IN LIMINE TO PRECLUDE TESTIMONY OF AN ALLEGED SEXUAL RELATIONSHIP**

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: April 19, 2006        Attorneys for Plaintiff

**A. Introduction.** Since Capt. Dixon's deposition in July of 2005, defendants have embarked on a smear campaign and have made Dixon's fear of retaliation for his truthful testimony a reality.[1] For the reasons discussed below, as well as in plaintiff's motion in limine, the Court should decline to admit such evidence.

**B. Defendants' Untimely Witnesses.** Plaintiff again notes that nearly all of the witnesses offered by defendants in this regard were untimely identified under the terms of the Rule 16 Scheduling Order. Plaintiff submits that defendants should be precluded from offering any evidence from such untimely identified witnesses who plaintiff was prevented from deposing.

**C. Relevance and Lack of Foundation.** Assuming *arguendo* that the Court allows such witnesses, plaintiff readily concedes that defendants are permitted to offer evidence of bias. However, defendants must first lay a proper foundation for such scandalous claims of a sexual affair. Absent a proper foundation, such a line of questioning is improper and inadmissible. See U.S. v. Tse, 375 F.3d 148 (1st Cir. 2004)[2]. Defendants have failed to lay a proper foundation and accordingly are prohibited from offering such testimony of Capt. Dixon's alleged bias.

Defendants have not offered any evidence that there is or was a romantic/sexual relationship between Dixon and plaintiff. Defendants have only presented speculative evidence that Dixon and plaintiff, at the most, had a close friendship. One cannot take the evidence offered by defendants and make an illogical leap to claim that they are engaging in sexual

---

[1] Defendants' statement that this alleged romantic relationship/affair is not something that defendants put in motion is disingenuous and erroneous. Defendants are solely responsible for the insertion of such irrelevant evidence into this case as a smear tactic against plaintiff and Capt. Dixon for bringing Chaffinch's actions to light. Notably, these false allegations did not arise until after Dixon testified unfavorably to defendants in his deposition.

[2] A "defendant must lay a proper foundation before evidence of bias is admitted." Id.; Bui v. DiPaolo, 170 F.3d 232, 245 (1st Cir.1999) ("[A] defendant ... must present a satisfactory foundation for the critical elements on which his hypothesis of bias depends.").

1

relations. Claims of spending time on the phone or behind close doors in an office setting, does not render the conclusion that they are engaging in a sexual relationship. Defendants cannot use such speculative evidence to smear a witness and skirt the evidence rules. Claims of a sexual relationship are unfounded and therefore inadmissible to prove bias.

Further, defendants also falsely claim that Dixon is "virtually the only witness" who testified to Chaffinch's animus toward women and inappropriate conduct. (D.I. 194 at 1). Yet defendants neglect to mention that Retired Major Baylor of Chaffinch's own Executive Staff also offered very damaging testimony regarding Chaffinch's discriminatory animus toward women. Baylor testified that Chaffinch voiced the sexual stereotype to plaintiff and others that two women cannot work together in the same office and that he called plaintiff "a bitch." (Tab A - Baylor 29,31). Baylor also testified, among other things, that Chaffinch recites his limericks socially and in the workplace and Chaffinch even recited such sexually explicit limericks while representing the DSP at national conferences for operation CARE. (Baylor 39-42). Thus, Dixon's testimony is supported by other testimony, including that of plaintiff and Major Baylor.[3] Defendants' conclusory assertion that because Dixon's testimony stands alone he must be biased simply rings hollow.

### D. Janet Vetter's Statement Does Not Qualify as a Dying Declaration.

Defendants want the Court to make the illogical assumption that simply because Ms. Vetter prefaced her statement to Lt. Campanella with a comment that she "could not die," her statements qualify as a dying declaration. But it is well established that dying declarations must be "made by a declarant while believing that the declarant's death was *imminent*." Fed.R.Evid 804(b)(2) (emphasis added). Just because Ms. Vetter could not die before disclosing some fact

---

[3] As the summary judgment briefing reveals, Chaffinch also admitted to many of the key sexually offensive statements that constitute key evidence of his discriminatory intent.

to Campanella does not render the conclusion that she believed her death was imminent. "There must be 'a settled hopeless expectation' that death is near at hand, and what is said must have been spoken in the hush of its impending presence." Shepard v. United States, 290 U.S. 96, 100 (1933). Notably, defendants have not disclosed to the Court exactly when Ms. Vetter passed away after making this alleged statements. Further, defendants' offer to produce yet even more untimely witnesses a month before trial who allegedly saw Ms. Vetter before her conversation with Campanella to testify that she was on her deathbed is impermissible.

Additionally, Ms. Vetter's statements do not qualify under the residual exception of Fed.R.Evid. 807. Rule 807 is "to be used only rarely, and in exceptional circumstances" and "appl[ies] only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." U.S. v. Wright, 363 F.3d 237, 245 (3d Cir. 2004) (quoting United States v. Bailey, 581 F.2d 341, 347 (3d Cir.1978)); *see also* Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 112 (3d Cir.2001)("Rule 807 should only be used in rare situations."). Further, testimony will not meet the necessary guarantees of trustworthiness when the statement is not under oath or the court feels a witness may have an incentive to lie. Wright, 363 F.3d at 245-46. Plaintiff previously disciplined and caused internal affairs charges to be filed against Lt. Campanella due to his workplace actions where he refused to stop discussing his vice-squad experiences and his vocal obsession with "pasties" on female exotic dancers. Hearsay statements from such a biased witness certainly lack the necessary guarantees of trustworthiness.

**E. Conclusion.** For the reasons stated in plaintiff's Motion on this issue (D.I. 181) and for the reasons stated above, plaintiff's Motion in Limine to preclude testimony of an alleged sexual relationship should be granted.

Plaintiff waives a reply brief in support of this Motion.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


<u>/s/ Stephen J. Neuberger</u>
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: April 19, 2006	Attorneys for Plaintiff

# Tab

# A



In the Matter Of:

# Conley
# v.
# Chaffinch, et al.

C.A. # 04-1395-GMS

---

Transcript of:

David Baylor

June 27, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
CAPTAIN BARBARA L. CONLEY,     )
                               )
         Plaintiff,            )
                               )
v.                             )  Civil Action No.
                               )  04-1395-GMS
COLONEL L. AARON CHAFFINCH,    )
Individually and in his        )
official capacity as the       )
superintendent, Delaware State )
Police, et al.,                )
                               )
         Defendants.           )
```

Deposition of DAVID BAYLOR taken pursuant to notice at The Neuberger Firm, P.A., 2 East 7th Street, Suite 302, Wilmington, Delaware, beginning at 9:40 a.m. on Monday, June 27, 2005, before Vincent J. Bailey, Registered Professional Reporter and Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East 7th Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff,

        STEPHANI J. BALLARD, ESQ.
        RALPH K. DURSTEIN, III, ESQ.
        DEPARTMENT OF JUSTICE
          820 N. French Street
          Wilmington, Delaware  19801
          for the Defendants.

-----------------------------------------------------------
WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Page 2

1  DAVID BAYLOR,
2  the deponent herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5        EXAMINATION
6  BY MR. NEUBERGER:
7     Q.  My name is Steve Neuberger and I'm an attorney
8  for Captain Barbara Conley.  Now I guess it's Mr. Baylor.
9  Have you ever testified in court before?
10    A.  Yes.
11    Q.  Have you ever given a deposition before?
12    A.  Yes, sir.
13    Q.  Approximately how many times, ball park?
14    A.  I don't know.  50 to 100.  Over 23 years it's
15 hard to assess.
16    Q.  I'm going to run you through the basic procedure
17 of it, just to refresh your mind or recollection of the
18 process, okay.
19        I'm going to ask you some questions and the
20 court reporter here is going to type up your answers to
21 those questions, okay?
22    A.  Yes, sir.
23    Q.  We have to take turns talking.  If we talk at
24 the same time the court reporter, although he's very

Page 3

1  good, can't get everything done.  So we have to take
2  turns, okay?
3     A.  Yes, sir.
4     Q.  Also, you have to verbalize your answers.
5  Instead of shaking your head say no or instead of nodding
6  your head say yes, okay?
7     A.  Yes, sir.
8     Q.  All right.  After we're done here today you will
9  have an opportunity to review the transcript of the
10 deposition to make any corrections or if there are any
11 typographical errors.  Do you understand that?
12    A.  Yes, sir.
13    Q.  If I ask you a question and you don't understand
14 the question, just ask me to rephrase and I'll be happy
15 to do that, okay?
16    A.  Yes, sir.
17    Q.  Also, I don't want you to guess and that's very
18 important.  If you don't know the answer to a question,
19 just say so, okay?
20    A.  Yes, sir.
21    Q.  Now, are you taking any medications or is there
22 anything else that would prevent you from remembering
23 accurately or testifying truthfully here today?
24    A.  No, sir.

Page 4

1     Q.  If you need any breaks, if you have to go to the
2  john, get up and stretch, let me know.  We will be happy
3  to take a break.
4     A.  Yes, sir.
5     Q.  You have taken an oath to tell the truth.  Is
6  that correct?
7     A.  Yes.
8     Q.  Do you understand the significance of that oath?
9     A.  Yes, sir.
10    Q.  What's your full name?
11    A.  David Lawrence Baylor.
12    Q.  What was your rank in the Delaware State Police
13 when you retired?
14    A.  My rank was major.
15    Q.  When were you born?
16    A.  August 20, 1960.
17    Q.  And where were you raised?
18    A.  Wilmington, Delaware.
19    Q.  Where did you go to school?
20    A.  St. Mark's High School.
21    Q.  Really?
22    A.  Yes.
23    Q.  Class of what?
24    A.  1978.

Page 5

1     Q.  Okay.  I did not know that.
2         Where did you go to college?
3     A.  Wilmington College, undergrad.  University of
4  Phoenix for master's.
5     Q.  What's your master's in?
6     A.  M.B.A. in technology management.
7     Q.  How many years were you in the Delaware State
8  Police?
9     A.  Total when I separated 23 years.
10    Q.  Can you run me through your promotion history
11 from the time when you came into the academy until the
12 time when you retired?
13    A.  Yes, sir.  Entered the academy March 1, 1982,
14 finished the whole training program in September of '82,
15 was assigned to Troop 1, Penny Hill.  I was there for a
16 couple months and then went to Troop 6, Prices Corner.
17 Both in patrol capacity.
18        Remained there until December 1985 when I
19 got assigned to the governor's detail under Mike Castle.
20 Remained there until January 1989, then I went to Troop
21 1, Penny Hill, back to patrol as a corporal.
22        In September of '89 I went to the public
23 information office.  I was there until I think it was
24 January of '93 and went into the governor's detail where

| Conley | v. | Chaffinch, et al. |
|---|---|---|
| David Baylor | C.A. # 04-1395-GMS | June 27, 2005 |

Page 26

1  A. Yes. Actually, I thought as a major I was
2  protected, but I guess not.
3  Q. Also, could you take a look at paragraph C, also
4  highlighted? Tell me once you are done looking at that.
5  A. Okay.
6  Q. Could you turn to page 2 and then also take a
7  look at subparagraph 12, which is also highlighted?
8  A. (Witness complies.)
9  Q. Tell me once you have looked at that.
10  A. Okay.
11  Q. Based on reviewing this document, based on your
12  wealth of knowledge from serving in the State Police for
13  so long and serving with the public information office
14  for so long, could this be one of the sources of
15  authority for not talking about internal affairs matters
16  of Delaware State Police Officers?
17  A. Yes, sir.
18  Q. Okay. All right. You can push that document
19  away.
20     Now I'd like to change gears a little bit
21  and talk a little bit about some issues involving Colonel
22  Chaffinch.
23  A. Okay.
24  Q. Were you ever aware that Colonel Chaffinch is a

Page 27

1  member of a group called Masons?
2  A. Yes, sir.
3  Q. Okay. Is that something which he ever discussed
4  in the workplace?
5  A. Yes, sir.
6  Q. Is that something that he was proud of based
7  upon your sensory perceptions?
8  A. Yes, sir.
9  Q. Okay. Did Colonel Chaffinch ever boast in front
10  of you that he belongs to that organization?
11  A. I mean, he acknowledged that he belonged to it
12  and you could tell he was happy to be proud of it. And
13  that I think he even commented that he was happy that he
14  achieved some positions in that organization.
15  Q. To the best of your knowledge, does the Delaware
16  group of the Masons allow female members?
17  A. You know, I really don't know about the Masons
18  until I read about it in the paper.
19  Q. I'm just asking based on what you know. If you
20  don't know something, please just say so.
21     Do you know if the Delaware Masons allow
22  African American members?
23  A. Again, I'm confused, because I had an uncle and
24  Frank Chandler, which is my drill instructor who is a

Page 28

1  Mason, and then the colonel was a Mason. So I didn't
2  know there was a difference. I later learned that there
3  was a difference in the organizations.
4  Q. So are you saying that maybe they didn't belong
5  to the same organization, although they had --
6  A. The title of Mason. But, you know, my uncle and
7  Frank Chandler are both black, you know, and the colonel
8  is white. So I thought it was one group, one umbrella
9  group. Because I didn't have any aspirations of becoming
10  a Mason, I never looked into it. So I thought when they
11  said Masons, they may have been part of different
12  chapters, but I thought they were under the umbrella
13  group. I later learned that's not the case.
14  Q. Okay. Has Colonel Chaffinch ever said
15  something -- I'd like to ask you some questions about
16  things the colonel may have said in your presence or
17  things you became aware of by other means.
18     Did Colonel Chaffinch ever say in your
19  presence that the problems of mankind are all the fault
20  of women?
21  A. I don't recall that. I mean, he says -- he has
22  said a lot of things over the years and trying to
23  remember the specifics, I can't say yes or no. I don't
24  recall that specific.

Page 29

1  Q. Okay. Did he ever say something similar to
2  that, to the best of your recollection?
3  A. I mean, he could have, you know.
4  Q. Would that be something that Colonel Chaffinch
5  would have sometimes said or would those have been
6  opinions that the colonel would have sometimes expressed?
7     MS. BALLARD: Object to the form.
8  Q. You can answer.
9  A. It's hard for me to answer. I don't want to
10  answer, because I'm not sure.
11  Q. Okay. Have you ever heard Colonel Chaffinch say
12  that two women can't work together because they just
13  won't get along?
14  A. Yes.
15  Q. Is that something he said to you on more than
16  one occasion?
17  A. I know of one occasion where it was definitely
18  said.
19  Q. Okay. Now, have you ever seen or heard Colonel
20  Chaffinch launch into a variety of very colorful and
21  sexually explicitly limericks or jokes?
22  A. Yes, sir.
23  Q. Were those in the workplace or were those
24  outside of the workplace?

Page 30
1   A.  Most of them were outside of the workplace, but
2  I think there have been a couple in the workplace.
3   Q.  Did you think that was appropriate behavior
4  talking about the sexually explicit limericks and jokes
5  in the workplace?
6   A.  Not something I don't think I would have said,
7  no.
8   Q.  For example -- are you married?
9   A.  Separated.
10  Q.  Okay.  Do you have any kids?
11  A.  Yes.
12  Q.  Do you have --
13  A.  Daughter.
14  Q.  How old is your daughter?
15  A.  She will be fourteen.
16  Q.  How would you felt if the colonel had recited
17 those limericks in front of your 14-year-old daughter?
18      MS. BALLARD:  Objection.
19  Q.  You can answer.
20  A.  We would have had a talk.
21  Q.  Would that have been something which you thought
22 was inappropriate?
23  A.  It would have been probably something I wouldn't
24 want my daughter to be exposed to.

Page 31
1   Q.  Okay.  Have you ever been around Colonel
2  Chaffinch when he has told other individuals that he has
3  a little something extra in his pants?
4   A.  No.  I didn't hear that one.  I'm pretty glad
5  that I didn't have him tell me that.
6   Q.  Have you ever heard him refer to his male
7  genitalia by nickname?
8   A.  No.  No, sir.
9   Q.  Had Colonel Chaffinch ever stated in your
10 presence that he wanted to watch certain women engage in
11 sexual relations?
12  A.  No, sir.
13  Q.  Have you ever heard or heard about Colonel
14 Chaffinch calling Captain Conley, quote, pus, closed
15 quote?
16  A.  Not a pus, no.
17  Q.  All right.  What have you heard him call Captain
18 Conley?
19  A.  He called her a bitch.
20  Q.  Would that have been in the workplace or
21 outside?
22  A.  Outside the workplace.
23  Q.  Did he mean that as an affectionate term or as a
24 pejorative or negative term?

Page 32
1   A.  He was not a happy camper.
2   Q.  Okay.
3   A.  Happy individual I should say.
4   Q.  Do you recall approximately when this was?
5   A.  It was around July of 2003, right around the
6  time when Captain Warren filed his lawsuit.
7   Q.  That's helpful.  Thank you.
8       Have you ever been around Colonel Chaffinch
9  when he has demanded private details of Captain Conley's
10 sex life?
11  A.  He hasn't demanded it from me, no.
12  Q.  Have you ever heard or heard about Colonel
13 Chaffinch calling a female State of Delaware employee
14 Trish the Dish?
15  A.  Yes, sir.
16  Q.  Have you ever heard him say to this particular
17 female that she is so sweet you don't need any sugar?
18  A.  Yes, sir.
19  Q.  Okay.  Have you ever heard Colonel Chaffinch
20 refer to certain females who work in the headquarters
21 building and say that they are, quote, tearing him up,
22 closed quote?
23  A.  Yes, sir.
24  Q.  Have you ever heard him refer to certain females

Page 33
1  who work in the headquarters building and has the colonel
2  said he would love to do her?
3   A.  Yes, sir.
4   Q.  Okay.  Have you ever heard Colonel Chaffinch
5  publicly refer to a certain secretary as, quote, lemon
6  titties, closed quote?
7   A.  No, sir.
8   Q.  Okay.  Have you ever heard Colonel Chaffinch
9  brag about the enormous size of another male trooper's
10 genitalia?
11  A.  No.  I personally haven't.  See, I'm not going
12 to engage in that kind of conversation with a guy.
13  Q.  I understand.  I appreciate that.  I understand
14 that a lot of these questions are awkward.
15  A.  That's awkward.  That definitely is.
16  Q.  Have you ever heard Colonel Chaffinch refer to
17 another man's genitalia as a tuna can?
18  A.  I'm trying to recall if it was he that said it
19 or somebody else.  No.  It was the colonel.
20  Q.  Do you recall who the first female captain was
21 in the Delaware State Police?
22  A.  Mary Ann Papili.
23  Q.  Did she have a command position?
24  A.  Yes, sir.

Case 1:04-cv-01394-GMS    Document 204    Filed 04/19/2006    Page 12 of 14

| | | |
|---|---|---|
| Conley<br>David Baylor | v.<br>C.A. # 04-1395-GMS | Chaffinch, et al.<br>June 27, 2005 |

Page 38

1    Q.   So you pointed that out to Colonel Chaffinch?
2    A.   What I said was, and Lieutenant Colonel Morrison
3  said -- me, I look at the political implications, I look
4  at the public relations implication, and I look at the
5  organizational implications.  Public relations-wise this
6  was not going to be a good move.  Organizationally, it
7  wasn't a good move.  And it just politically was probably
8  not a good time to do this.
9          And for those reasons -- and that she could
10 do the job.  If she couldn't do the job, I would have
11 moved her or recommended that she be moved in a
12 heartbeat.  She didn't do it the way I would do it, but
13 we all have different management styles, but she could do
14 the job.
15         So I said that she should stay there and I
16 brought to his attention that it would be in the best
17 interests of the outfit for them not to move her at that
18 time, knowing full well that on the table there was no
19 other females we were going to put in a troop commander
20 position.
21   Q.   Despite your voicing your concerns, the colonel
22 transferred her out anyway?
23   A.   At that time we broke up the meeting with him
24 saying, he was not happy with what he heard, he's

Page 39

1  inclined to do it, and he reserved his total decision.
2  And then we broke up and kind of all went into our
3  separate corners after that, because it was mentally an
4  emotionally draining at that point in time.
5    Q.   Ultimately was Captain Mary Ann Papili
6  transferred out of there?
7    A.   Yes, sir.
8    Q.   Was that shortly thereafter?
9    A.   Yes, sir.
10   Q.   Do you know where she was transferred to?
11   A.   Yes.  To a computer position.
12   Q.   Was that --
13   A.   Technology position.
14   Q.   Did she have a lot of troopers reporting to her
15 in that position?
16   A.   No, sir.
17   Q.   Okay.  Now, do you know what CARE is, acronym
18 C-A-R-E?
19   A.   Operation Care, Combined Accident Reduction
20 Effort.
21   Q.   Did you ever attend any CARE conferences?
22   A.   Yes, sir.
23   Q.   Did you attend a conference in the year 2003?
24   A.   Yes, sir.

Page 40

1    Q.   Do you recall who else attended that conference?
2    A.   I think that was in Columbus, Ohio.  It was the
3  colonel, his wife, Captain Conley, Lieutenant Dixon, and
4  Lieutenant Dixon's wife.
5    Q.   Okay.  Do you recall an incident in a
6  hospitality room at that conference when the colonel
7  began expressing some of his jokes and limericks, which I
8  questioned you about earlier?
9    A.   Yes, sir.
10   Q.   Do you recall what the jokes or limericks were?
11   A.   No, not specifically.  But I know after reading
12 the I guess information regarding the filing of the
13 lawsuit, some of those I recall being said.
14   Q.   So some of the limericks which you at some point
15 read in the complaint in this case, Colonel Chaffinch
16 also recited in the hospitality room at this CARE
17 conference in the year 2003?
18   A.   Yes, sir.
19   Q.   Do you think that was appropriate behavior?
20   A.   I'm struggling, because -- I'm struggling with
21 being in a hospitality room after the hours, you know,
22 around a group that voluntarily wants to be there where
23 there is drinking going on, versus he is a superintendent
24 of the Delaware State Police and what kind of impression

Page 41

1  it would leave.  So I'm struggling.  I mean, are jokes
2  said in that type of setting?  Absolutely.  Not by just
3  Aaron Chaffinch, but by other people.
4    Q.   Are sexually explicit jokes told in that kind of
5  setting?
6    A.   I think that's where you have to know your
7  audience.
8    Q.   Knowing the audience in the hospitality room at
9  this CARE conference, in your opinion were those
10 appropriate jokes to be told in that setting?
11   A.   I wouldn't have said it.
12   Q.   For example, someone might tell a joke, a man
13 walks into a bar, typical run of the mill joke.  Have you
14 ever heard typical run of the mill jokes told in that
15 type of setting?
16   A.   Yes, sir.
17   Q.   And how often did you hear sexually explicit
18 jokes told in that kind of setting?
19   A.   From time to time you would hear -- thank God
20 I'm blessed with not being able to remember them, so I
21 couldn't say them or repeat them.
22   Q.   One of the people who would have told those
23 kinds of jokes in that kind of setting was the colonel of
24 the state police, Aaron Chaffinch?

Case 1:04-cv-01394-GMS    Document 204    Filed 04/19/2006    Page 13 of 14

| | | |
|---|---|---|
| Conley<br>David Baylor | v.<br>C.A. # 04-1395-GMS | Chaffinch, et al.<br>June 27, 2005 |

Page 42

1  A. Yes, sir.
2     MS. BALLARD: Objection to form.
3  Q. Now, did Colonel Chaffinch ever express to you
4  any fascination or any kind of undue interest in the sex
5  lives of other officers under his command?
6  A. From time to time it would probably come up as
7  to, you know, who this guy is seeing, stuff like that.
8  Q. Did he ever express any interest in the sex life
9  of or personal life of a Captain Harry Downs?
10 A. Not that -- he never said anything around me.
11 Q. Okay. Do you remember a time, just to change
12 gears a little bit, when Lisa Blunt Bradley, the state
13 director of personnel, investigated the state police?
14 A. Yes, sir.
15 Q. Do you recall ball park when that was?
16 A. That was 2001, 9-11. I'll never forget. I was
17 a troop commander in Odessa.
18 Q. Okay. Now, at some point did she issue a
19 report?
20 A. Bradley Report, yes.
21 Q. Were those her findings and recommendations?
22 A. Yes, sir.
23 Q. Okay. At the time what was your rank?
24 A. Captain.

Page 43

1  Q. Okay. Then you were promoted to major in --
2  A. After the report -- the report was issued in
3  November. I was promoted in February.
4  Q. Okay. Do you recall if one of the
5  recommendations in the report was something about a
6  diversity committee?
7  A. Yes, sir.
8  Q. And were there any advocates of implementing the
9  diversity committee on the executive staff?
10 A. No, sir.
11 Q. Did Lieutenant Colonel Morrison advocate the
12 implementation of a diversity committee?
13 A. I know of a specific meeting where Lieutenant
14 Colonel Morrison advocated that -- us to follow the road
15 map, as he put it, of the Bradley Report.
16 Q. Was one of the items on that road map the
17 diversity committee?
18 A. Yes, sir.
19 Q. Okay. Is the diversity committee the same thing
20 as a so-called round table discussion in the executive
21 staff -- maybe I'll rephrase that question. It's
22 unclear.
23     Was there something in the Bradley Report
24 about implementing a round table discussion about either

Page 44

1  diversity issues or female issues?
2  A. Yes.
3  Q. Was that the same thing as the diversity
4  committee or was that something different?
5  A. I think that was different. And I think that
6  Lieutenant Colonel Morrison tried to get the women
7  troopers in the organization to come together, identify
8  issues and bring them to the staff so they can address
9  them.
10 Q. Okay. Is that something that Colonel Chaffinch
11 ever implemented?
12 A. I would have to assume that Colonel Morrison was
13 doing it at his direction. I don't know what
14 communication took place between them two about it, but I
15 know that Colonel Morrison wanted to see it done.
16 Q. Do you know if it ever was done?
17 A. There were some resistance to it by Captain
18 Papili. For whatever reason there seemed to be some
19 resistance to having all the females get together.
20 Q. Was that out of a fear of retaliation?
21    MS. BALLARD: Object to form.
22 Q. You can answer.
23 A. I can't answer that. Only thing I can come to a
24 conclusion is that by this time in the organization's

Page 45

1  history everybody was hypersensitive over how they are
2  viewed, you know. I was sensitive to how blacks were
3  being viewed, how promotions were being -- because every
4  time a black got promoted it was only because he was
5  black. Never had to do with qualifications.
6     And I think that the women to a certain
7  extent felt the same way, that if they got together in a
8  group, that their white male counterparts especially
9  would view them as they are going to have more clout at
10 the table than they would. So I think the women to a
11 certain extent just wanted to come and do their job and
12 leave. That's the only way I can assess it.
13 Q. Okay. Now, how about the diversity counsel, was
14 that ever implemented?
15 A. No. Not that I know of.
16 Q. That was one of the recommendations in the
17 Bradley Report?
18 A. Yes, sir.
19 Q. And despite that being recommended, the colonel
20 never implemented it. Would that be fair to say?
21 A. I don't think it was one thing that ever got
22 done, along with some of the other things on that report.
23 Q. Okay. Were there ever diversity training
24 sessions that you attended where Colonel Chaffinch got up

**CERTIFICATE OF SERVICE**

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on April 19, 2006, I electronically filed this **Reply** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

>    Ralph K. Durstein III, Esquire
>    Department of Justice
>    Carvel State Office Building
>    820 N. French Street
>    Wilmington, DE 19801
>
>    James E. Liguori, Esquire
>    Liguori, Morris & Yiengst
>    46 The Green
>    Dover, DE 19901

>    /s/ Stephen J. Neuberger
>    **STEPHEN J. NEUBERGER, ESQ.**

Conley / Pretrial / RB - P's Third MinL.FINAL