IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | C.A.No.04-1394-GMS |
| individually and in his official capacity as the | : | |
| Superintendent, Delaware State Police; | : | |
| LIEUTENANT COLONEL THOMAS F. | : | |
| MACLEISH, individually and in his official | : | |
| capacity as the Deputy Superintendent, | : | |
| Delaware State Police; DAVID B. MITCHELL, | : | |
| individually and in his official capacity as | : | |
| Secretary of the Department of Safety and | : | |
| Homeland Security, State of Delaware; and | : | |
| DIVISION OF STATE POLICE, | : | |
| DEPARTMENT OF SAFETY AND | : | |
| HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S REPLY IN SUPPORT OF HER SIXTH MOTION IN LIMINE TO
ALLOW LEADING QUESTIONS DURING THE DIRECT EXAMINATION OF
CAPTAIN GLENN DIXON**

                                                                                                                                              THE NEUBERGER FIRM, P.A.
                                                                                                                                              THOMAS S. NEUBERGER, ESQ. (#243)
                                                                                                                                              STEPHEN J. NEUBERGER, ESQ. (#4440)
                                                                                                                                              Two East Seventh Street, Suite 302
                                                                                                                                              Wilmington, DE 19801
                                                                                                                                              (302) 655-0582
                                                                                                                                              TSN@NeubergerLaw.com
                                                                                                                                              SJN@NeubergerLaw.com

Dated: April 19, 2006                            Attorneys for Plaintiff

**A. Introduction.** In his July of 2005 deposition, Capt. Glenn Dixon expressed fear of retaliation because of his truthful subpoenaed deposition testimony. Since that time, Dixon's fears became a reality as defendants made clear their intent to smear Dixon's name and reputation as a result of his testimony. Thus, to ensure Dixon's trial testimony is unswayed by fear, threats or intimidation, the Court should exercise its discretion under Fed.R.Evid. 611(c) to permit plaintiff to use leading questions on direct examination of this high level DSP Manager.

**B. Defendants' Attempt to Intimidate and Smear Dixon's Name Only Validate Dixon's Reasonable Fear of Retaliation.** Defendants refute their own claim that Dixon's fear of retaliation is "nothing more than speculation" by their supplemental witness disclosures and motions in limine regarding the admission of highly speculative evidence of an alleged sexual and/or romantic affair between Dixon and plaintiff.[1] (AB at 4; *see* D.I. 168 and 169). Notably, such allegations only surfaced after Dixon's damaging deposition testimony was given. Now, defendants continue and now add the baseless allegation that plaintiff is blackmailing Dixon with this alleged relationship and has coerced him to testify falsely and engage in perjury without any factual basis for making such an allegation. (AB at 4). In light of this, defendants cannot seriously contend Dixon's fear of retaliation was the product of mere speculation. Defendants have made clear their intent to drag Dixon's name through the mud and disrupt his marriage. Such efforts only substantiate Dixon's reasonable fear of retaliation.[2]

**C. Leading Questions are Permitted on Direct Based on the Surrounding Circumstances and Dixon's Current DSP Employment.** Defendants contend plaintiff wants

---

[1] Testimony relating to an alleged sexual and/or romantic affair between plaintiff and Dixon is entirely irrelevant to whether Dixon is identified with an adverse party. Defendants have previously offered this speculative testimony to prove Dixon's alleged bias toward plaintiff, but failed to lay the proper evidentiary foundation for such testimony. (*See* D.I. 187). In short, evidence of phone calls, visits and spending time together only prove that plaintiff and Dixon at best, are friends. (*See* D.I. 181). It does not prove Dixon's personal stake or interest in the case any more than it proves his bias. (AB at 2).

[2] Plaintiff notes that Dixon has testified under oath that another lawyer representing Chaffinch, MacLeish and the DSP previously "threatened." (Tab A - Dixon 32).

1

the Court to shut its eyes to the circumstances surrounding Dixon's testimony. (AB at 4). Quite to the contrary, plaintiff seeks to bring to light the defense smear and intimidation tactics directed against this witness. Plaintiff asks the Court to exercise its discretion to permit leading questions on direct as Dixon is clearly a witness identified with an adverse party by virtue of his high level employment and in light of all the surrounding relevant facts and circumstances. Fed.R.Evid. 611(c); Ellis v. City of Chicago, 667 F.2d 606, 612-13 (7th Cir. 1981). While plaintiff agrees the Rule does not require a formalistic application, ultimately it is the trial court who "has the authority and responsibility to control the examination of witnesses and the presentation of evidence in order to achieve the objectives of ascertaining truth and avoiding needless consumption of time." Haney v. Mizell, 744 F.2d 1467, 1477 (11th Cir. 1984). Thus, permitting plaintiff to use leading questions on direct will further the quest for truth in this legal proceeding and avoid needless consumption of time by ensuring Dixon testifies in accord with his prior testimony.

Moreover, the cited case law is not inapposite to the case simply because it is unfavorable to defendants. (AB at 2). Instead, it supports plaintiff's assertion that an employee is identified with an adverse party when appropriate under the circumstances. Courts in these cases never addressed the content of the testimony as a determinative factor in permitting leading questions. Instead, the courts looked to the witness' relationship with the employer and the impact that relationship may have on the testimony being elicited.[3] Here, Dixon is currently employed by the DSP and serves as a high level manager - Troop Commander for Troop 5 Bridgeville. As Troop Commander, he bears command responsibility for all of western Sussex

---

[3] Defendants conclude that under plaintiff's reasoning plaintiff would be entitled to ask leading questions on direct of every DSP employee. (AB at 3). Conversely, plaintiff only asks that leading questions be permitted on direct when the circumstances surrounding a witnesses' testimony warrant such a decision. Unlike Dixon, not every DSP employee has not endured the defendants' intimidation, retaliation and smear tactics.

2

County.[4]  He is certainly a high level manager.  Furthermore, the DSP is a paramilitary organization where the rank structure dominates all else.  The DSP is Dixon's employer.  Col. MacLeish is Dixon's commander.  Col. Chaffinch is Dixon's former commander.  All three are defendants in this action.  Further, Major Hughes, although not a defendant, is a comparator, and is currently Dixon's current direct commander.  In light of the pressures being brought to bear on Dixon by defendants and their tactics in this case, coupled with the pressures being brought to bear on him by his direct commanders in the chain of command all of whom are defendants or key defense players in this lawsuit, leading questions are appropriate under Fed.R.Evid. 611(c).

**D. Conclusion.**  For the reasons stated above and in plaintiff's Motion on this issue (D.I. 195), plaintiff's Motion in Limine to allow leading questions during the direct examination of Capt. Glenn Dixon should be granted.

Plaintiff waives a reply brief in support of this Motion.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: April 19, 2006        Attorneys for Plaintiff

---

[4] Due to his position as a high level manager, it is highly doubtful that plaintiff's counsel can even contact him or interview him about the issues in this case without violating Model Rule of Professional Conduct 4.2.  Accordingly, counsel has not done so.  Thus, it is impossible for plaintiff's counsel to 'prepare' him for direct examination the way they would for other witnesses who are not in the employ of the DSP.  This is yet another reason why Dixon is a witness identified with an adverse party.

# Tab A

Case 1:04-cv-01394-GMS    Document 206    Filed 04/19/2006    Page 5 of 11



In the Matter Of:

# Price
# v.
# Chaffinch, et al.

C.A. # 04-1207

---

Transcript of:

Captain Glenn D. Dixon

September 21, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
CORPORAL B. KURT PRICE,      )
CORPORAL WAYNE WARREN,       )
and SERGEANT CHRISTOPHER     )
D. FORAKER,                  )
                             )
      Plaintiffs,            )
                             )
      v.                     ) C.A. No. 04-1207
                             )
COLONEL L. AARON CHAFFINCH,  )
individually and in his      )
official capacity as         )
Superintendent of the        )
Delaware State Police;       )
LIEUTENANT COLONEL THOMAS    )
F. MacLEISH, individually    )
and in his official          )
capacity as Deputy           )
Superintendent of the        )
Delaware State Police;       )
DAVID B. MITCHELL, in his    )
official capacity as the     )
Secretary of the Department  )
of Safety and Homeland       )
Security of the State of     )
Delaware; and DIVISION OF    )
STATE POLICE, DEPARTMENT OF  )
SAFETY AND HOMELAND          )
SECURITY, STATE OF           )
DELAWARE,                    )
                             )
      Defendants.            )
```

          Deposition of CAPTAIN GLENN D. DIXON taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 10:00 a.m., on Wednesday,
September 21, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.
                      WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                       (302) 655-0477

| Price | v. | Chaffinch, et al. |
|---|---|---|
| Captain Glenn D. Dixon | C.A. # 04-1207 | September 21, 2005 |

Page 2

1  APPEARANCES:
2      THOMAS S. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
3        2 East 7th Street - Suite 302
          Wilmington, Delaware 19801
4          for the Plaintiffs
5      ROBERT J. FITZGERALD, ESQUIRE
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
6        123 South Broad Street
          Avenue of the Arts
7          Philadelphia, Pennsylvania 19109
            for the Defendants
8
    ALSO PRESENT:
9
        CORPORAL WAYNE WARREN
10            - - - - -
11      CAPTAIN GLENN D. DIXON,
12        the witness herein, having first been
13        duly sworn on oath, was examined and
14        testified as follows:
15  BY MR. NEUBERGER:
16    Q.  Captain Dixon, I subpoenaed you to be here
17  today; is that correct?
18    A.  Yes, you did.
19    Q.  And I had subpoenaed you in another case called
20  Conley versus Chaffinch to give testimony on July 13th,
21  2005. Do you remember that?
22    A.  Yes, I do.
23    Q.  Prior to that date, July 13th, 2005, you had
24  never met me before, had you?

Page 3

1    A.  No.
2    Q.  Since then, except for answering some questions
3  on how to get here and sending the subpoena to you, you
4  and I haven't spoken, have we?
5    A.  The other day, whatever day it was, was it
6  Tuesday, I called in reference to another prior meeting
7  that I was going to request a continuance in this. But
8  it didn't work out. But that was the only time.
9    Q.  And I refused to give you a continuance?
10    A.  Yes.
11    Q.  You're being forced to testify today, right?
12    A.  By subpoena.
13    Q.  When I took your deposition on July 13th, 2005,
14  I explained the process. You remember that?
15    A.  Yes.
16    Q.  Since that time are you taking any medications
17  or anything that would interfere with your memory?
18    A.  No.
19    Q.  If I ask you a question today that you don't
20  understand, just ask me to rephrase it. Is that okay?
21    A.  Okay.
22    Q.  Just to quickly skip over something, back in
23  July I asked you a series of questions about your
24  contacts with Aaron Chaffinch over the years. Do you

Page 4

1  remember that?
2    A.  Yes.
3    Q.  You sort of explained about approximately
4  17 years during your career the various kinds of contacts
5  you would have with him, right?
6    A.  Yes.
7    Q.  And presently you're the troop commander of
8  Troop 5 down in Bridgeville, Delaware?
9    A.  I am, yes.
10    Q.  And he was the former troop commander there, for
11  example?
12    A.  Yes.
13    Q.  And he lives within a couple miles of the troop,
14  right?
15    A.  Two miles.
16    Q.  So to set the stage, what I'm going to do is
17  show you a yellowed copy of the Delaware State News dated
18  Wednesday, April 7th, 2004, and it's got a story on the
19  front page that then goes into page 6 about a media tour
20  given the day before by Aaron Chaffinch and Gloria Homer,
21  the Secretary of Administrative Services back at that
22  time.
23          MR. FITZGERALD: I'll object only to the
24  characterization that it was a tour given by Chaffinch.

Page 5

1  BY MR. NEUBERGER:
2    Q.  Let's just simply say it relates to an event at
3  the Firearms Training Unit the day before. Okay?
4    A.  Okay.
5    Q.  And this is in the record as some sort of an
6  exhibit. I don't know the number right now, but I think
7  that's a sufficient reference to it.
8          What I will do is we will just take a
9  minute and I'll ask you to read through the story.
10    A.  Okay.
11    Q.  I have scratched in red some references to
12  Colonel Chaffinch himself and some things, some
13  references to him in there. But you just take your time
14  and just read through the story and then I'll probably
15  ask you a few questions. Okay?
16    A.  Okay.
17          MR. FITZGERALD: Before you ask the
18  questions, Tom, I'd like to look at just your markings on
19  it.
20          MR. NEUBERGER: Please.
21          MR. FITZGERALD: After you read it. Go
22  ahead.
23          MR. NEUBERGER: Why don't you just read
24  through it.

2 (Pages 2 to 5)

Page 30

1 deposition today was going to be?
2   A.  The range, and solely because I saw
3 Corporal Price's name on the subpoena.
4   Q.  Did you know that you were going to discuss
5 Aaron Chaffinch today?
6   A.  Well, yeah. He's related to the range case.
7   Q.  Did you know anything else about the range?
8   A.  As far as what?
9   Q.  Anything. When it was built, why it was built,
10 what the damage to it was, who worked there. Did you
11 have any other information on the range that you thought
12 might be relevant to this case?
13   A.  No. Only the questions that were going to be
14 asked.
15   Q.  So when you came here today, didn't you think
16 you were going to be asked about Aaron Chaffinch?
17   A.  Yes. He's involved in the range case, so, yes,
18 I think I would be asked about Aaron Chaffinch.
19   Q.  When you got a subpoena with the Price caption
20 on it, what did you understand that case to entail?
21   A.  The range.
22   Q.  That's it?
23   A.  Yes.
24   Q.  What did you think Corporal Price was suing

Page 31

1 about on the range?
2   A.  Hearing loss.
3   Q.  So you knew it was about hearing loss?
4   A.  Yes.
5   Q.  Did you know anything else, what the allegations
6 were, what the cause of action was?
7   A.  Just what I read in the paper.
8   Q.  Did you know who the defendants were?
9   A.  For the range case?
10   Q.  For the Price case.
11   A.  For the Price case?
12   Q.  Yes.
13   A.  The State or defendants.
14   Q.  When you say, "the range case," is that
15 different from the Price case?
16   A.  He was assigned to the range, so that's why I
17 refer to the range case.
18   Q.  The Price case and the range case are the same
19 thing?
20   A.  Yes.
21   Q.  Did you discuss your deposition today with
22 Barbara Conley?
23   A.  No.
24   Q.  Did you review any documents before you came

Page 32

1 here today?
2   A.  No.
3   Q.  Did you have any documents to review?
4   A.  No.
5   Q.  You agreed to meet with me yesterday but then
6 cancelled the meeting. Why did you cancel the meeting?
7   A.  Two reasons. The first reason is very busy
8 yesterday. I had an investigation I had to tie up. Plus
9 we were planning to move into our new troop at next
10 Wednesday. So we're in the process of packing the troop.
11       The other one is I didn't feel that I was
12 obligated to meet with you yesterday. I didn't have a
13 subpoena. You contacted me the prior day, too, as well.
14 Didn't have any advance notice.
15   Q.  Then why did you agree to meet with me on
16 Monday?
17   A.  Well, I felt you were forcing me to meet with
18 you. I felt threatened by you initially that I had to
19 meet with you.
20   Q.  Why did you feel that way?
21   A.  Because you were pushy about meeting and you
22 were not pleasant, I felt, on the phone. So my guard, my
23 red flag comes up immediately.
24   Q.  But even with the red flag, you agreed to meet

Page 33

1 with me on Monday, did you not?
2   A.  Yes.
3   Q.  In terms of advance notice, you had received an
4 e-mail from the colonel's office the Friday before, had
5 you not?
6   A.  I actually opened that I think it was -- I came
7 into work for a special event on Saturday, checked my
8 e-mails real quick, opened it, saw some of the stuff that
9 they were asking for, that the colonel was asking for,
10 had no idea why. Got back into work, looked at it again.
11 On Monday is when I received the subpoena for today.
12       So I had -- that's the only advance notice
13 I had of that. And then I had contact with you --
14 actually I sent an e-mail back to Mrs. Harrison saying --
15 asking did you send this to the wrong person because of
16 the type of material that they were requesting about the
17 physical workings of the range is what I felt. And she
18 said no, it was under the direction of Colonel MacLeish.
19       I think you contacted me Tuesday -- no,
20 Monday, I guess. What's today? Wednesday.
21   Q.  Isn't it true you sent that e-mail to
22 Pam Harrison, the colonel's secretary, on Tuesday
23 morning?
24   A.  It was either Monday or Tuesday. I would have

Case 1:04-cv-01394-GMS    Document 206    Filed 04/19/2006    Page 10 of 11

Price                                                v.                              Chaffinch, et al.
Captain Glenn D. Dixon                   C.A. # 04-1207                    September 21, 2005

Page 34

1 to look.
2  Q. Isn't it true you sent it after you agreed to
3 meet with me and then called my office the following
4 morning, Tuesday morning, to cancel that meeting?
5  A. I do know that I cancelled the meeting on
6 Tuesday morning, yesterday morning. As far as when I
7 sent the e-mail, I don't recall whether it was before or
8 after I agreed to meet with you, and that's the initial
9 e-mail to Mrs. Harrison. I would have to look.
10  Q. Okay. Did you get the investigation wrapped up
11 yesterday?
12  A. No, I didn't.
13  Q. Did someone tell you to cancel the meeting with
14 me yesterday?
15  A. No.
16  Q. Did Barbara Conley tell you to cancel the
17 meeting with me?
18  A. No.
19  Q. Did any counsel tell you to cancel the meeting
20 with me?
21  A. No.
22  Q. Did you discuss the meeting that you had
23 scheduled with me on Monday afternoon and then cancelled
24 Tuesday morning with anybody?

Page 35

1  A. Say that again, please.
2     MR. FITZGERALD: Can you repeat the
3 question?
4     (The reporter read back as instructed.)
5     THE WITNESS: No.
6 BY MR. FITZGERALD:
7  Q. Did you discuss that meeting with
8 Barbara Conley?
9  A. No.
10  Q. As Counsel referenced earlier, you were deposed
11 in the Conley case.
12  A. Yes.
13  Q. Were you represented in that case?
14  A. No.
15  Q. Did you ever engage or discuss your deposition
16 in that case with counsel?
17  A. No.
18  Q. When you received the deposition in that case --
19     MR. NEUBERGER: You mean a subpoena.
20 BY MR. FITZGERALD:
21  Q. I'm sorry. Thank you.
22     When you received the subpoena in that
23 case, did you consult with counsel?
24  A. No.

Page 36

1  Q. Did you consider consulting with counsel?
2  A. No.
3  Q. Did you consider consulting with counsel prior
4 to this deposition?
5  A. No.
6  Q. You said you received a subpoena on Monday for
7 this deposition?
8  A. Yes.
9  Q. Had you received a subpoena for a deposition in
10 this case at an earlier date?
11  A. No.
12     MR. NEUBERGER: Didn't we reschedule this?
13     MR. FITZGERALD: I think we did.
14     THE WITNESS: I think the subpoena was
15 dated the 13th of September. I think.
16 BY MR. FITZGERALD:
17  Q. The one you received yesterday?
18  A. For today. That I received on Monday.
19  Q. On Monday, the 19th?
20  A. Yes. I had taken Friday off because I was
21 working on the Saturday for the weekend.
22  Q. Prior to your deposition in the Conley case, did
23 you discuss your testimony with anyone?
24  A. No.

Page 37

1  Q. Did you discuss the subpoena and your testimony
2 with Barbara Conley before the deposition?
3  A. Which deposition?
4  Q. In the Conley case.
5  A. In the Conley case. She actually made sure that
6 I received the subpoena. As far as discussing about the
7 case, no.
8  Q. What do you mean she made sure you received the
9 subpoena?
10  A. She gave me a copy of the subpoena. She served
11 me.
12  Q. Where was that?
13  A. I don't recall.
14  Q. Was it at Troop 5?
15  A. No, it wasn't at Troop -- I think it was at
16 headquarters.
17  Q. After your deposition in that case, did you
18 discuss your testimony with anyone?
19  A. No.
20  Q. You didn't discuss it with Barbara Conley?
21  A. No.
22  Q. Discuss it with your wife?
23     MR. NEUBERGER: I'm going to object to your
24 asking him questions --

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on April 19, 2006, I electronically filed this **Reply** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

>Ralph K. Durstein III, Esquire
>Department of Justice
>Carvel State Office Building
>820 N. French Street
>Wilmington, DE 19801
>
>James E. Liguori, Esquire
>Liguori, Morris & Yiengst
>46 The Green
>Dover, DE 19901

>/s/ Stephen J. Neuberger
>**STEPHEN J. NEUBERGER, ESQ.**

Conley / Pretrial / RB - P's Sixth MinL.final