



# STATE OF DELAWARE
## DEPARTMENT OF JUSTICE

### CARL C. DANBERG
#### Attorney General

**NEW CASTLE COUNTY**
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-8500
Fax: (302) 577-2496
Civil Division (302) 577-8400
Fax: (302) 577-6630
TTY: (302) 577-5783

**KENT COUNTY**
102 West Water Street
Dover, DE 19904
Criminal Division (302) 739-4211
Fax: (302) 739-6727
Civil Division (302) 739-7641
Fax: (302) 739-7652
TTY: (302) 739-1545

**SUSSEX COUNTY**
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369
TTY: (302) 856-2500

**PLEASE REPLY TO:**    New Castle County

May 24, 2006

Hon. Gregory M. Sleet
United States District Court
Lock Box 19
844 North King Street
Wilmington, DE 19801

      Re: Conley v. Chaffinch, CA #04-1394
         Conley-Dixon witness identifications

Dear Judge Sleet:

Please allow this to respond to Mr. Neuberger's letter of May 22, 2006, in which he contends that Defendant's May 15, 2006 written disclosure of witnesses as to the Conley-Dixon bias issue "does not comply" with the Court's orders at the Pre Trial Conference.[1]

At the pre-trial conference the Court ruled that it would permit "a limited inquiry into the issue of bias," including collateral evidence. (PTC Transcript (Ex. "A") at 81, 102-03). The Court requested Defendant to "tell [the Court] who your best . . . witnesses are . . . ." (PTC at 94). Some of this was done on the record, and the Court later requested a written submission to opposing counsel. Defendants' submission (Exhibit "B," attached) identified, in the interest of full disclosure and for the record, *all* witnesses who had any information to offer on the Conley-Dixon issue, including some that had more than one piece of information to relate. However, the document placed an asterisk by the five witnesses whom Defendant wishes to question on this issue per the Court's order. The Court should note that each of these witnesses will testify as to the merits of the case; their testimony regarding the Dixon issue is only tangential to their primary testimony.

Defendant, with one exception, agrees that the Court intended to limit evidence to one witness per "category." The one point of disagreement with this is that Barbara Conley's own

---

1 The Court suggested that disagreements, if any, be addressed by teleconference with the Court (PTC at 103). Instead, Plaintiff elected to proceed by written submission to the Court. Accordingly, we are responding in kind, however, we are at the Court's disposal for a teleconference if necessary.

statements about Glenn Dixon are not a "category."[2]  Each statement is a unique piece of evidence probative of the relationship.  As her own admissions, they cannot fairly be characterized as "unduly prejudicial."  The frequency of the statements about Dixon is itself significant.

We believe that Defendant's May 15, 2006 disclosure was comprehensive and complied fully with the Court's Order.  If it was in any way unclear, Defendant reiterates below which witnesses will testify as to which "category" and/or admission:

- Physical contact between Conley & Dixon: Sgt. James P. Fraley
- "Behind closed doors" for hours at Headquarters:  Tammy Hyland
- Long daily phone calls:  Lt. Curt Brown
- Plaintiff Admission #1—"what I'd like to do to Glenn": Carole Warnock
- Plaintiff Admission #2—"sweet ass": Tammy Hyland
- Plaintiff Admission #3—"high pockets":  Lt. John Campanella.

Plaintiff contends that Admissions 2 and 3 were not previously disclosed.  This is not correct.  Defendant's Second Supplementation of Initial Disclosures (D.I. 119) stated that witnesses Hyland and Campanella "would testify consistent with their sworn testimony at Conley's disciplinary hearing."  That sworn testimony, taken on March 9, 2005 at a proceeding in which Mr. Neuberger appeared and cross-examined the witnesses, includes Tammy Hyland's testimony about the "sweet ass" remark (Exhibit "C", p. 244-45) and Lt. Campanella's testimony that Conley would refer to men's buttocks and "she would speak specifically about Glen[n]" (Ex. "D," p. 151).  Clearly, Plaintiff's counsel has been aware for 14 months of the information these witnesses could provide.

The testimony about the Shore Stop incident and the framed picture was additional evidence provided to counsel on May 11 and 12, 2006 at witness meetings for the purpose of trial preparation.  It is included in the spirit of full disclosure.  Defendants would agree not to use these pieces of evidence except as necessary for rebuttal.

If the Court has any questions or concerns, please contact me.

Respectfully submitted

/s/ Stephani J. Ballard

Stephani J. Ballard
Deputy Attorney General

cc: Thomas S. Neuberger, Esq. via CM/ECF
    Stephen J. Neuberger, Esq. via CM/ECF
    Ralph K. Durstein, DAG via CM/ECF
    James E. Ligouri, Esq. via CM/ECF

---

2  Indeed, at the pre trial, counsel for Defendant advised the Court "we also have several witnesses that will tesify as to statements Barbara Conley herself made.  These would be admissions." (PTC at 95)  The Court did not on the record limit the number of admissions that could be presented.

# EXHIBIT A

Pre Trial Conference

1

<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          -   -   -

 4    CAPTAIN BARBARA L. CONLEY,        :    Civil Action
                                        :
 5              Plaintiff,              :
                                        :
 6         v.                           :
                                        :
 7    COLONEL L. AARON CHAFFINCH,       :
      individually and in his official:
 8    capacity as the Superintendent,  :
      Delaware State Police,            :
 9    LIEUTENANT COLONEL THOMAS F.      :
      MACLEISH, individually and in     :
10    his official capacity as the      :
      Deputy Superintendent, Delaware  :
11    State Police; DAVID B. MITCHELL, :
      individually and in his official:
12    capacity as Secretary of the      :
      Department of Safety and          :
13    Homeland Security, State of       :
      Delaware; and DIVISION OF         :
14    STATE POLICE, DEPARTMENT OF       :
      SAFETY AND HOMELAND SECURITY,     :
15    STATE OF DELAWARE,                :
                                        :
16              Defendants.             :    NO. 04-1394-GMS

17                          -   -   -

18                     Wilmington, Delaware
                       Wednesday, May 10, 2006
19                          10:00 a.m.

20                          -   -   -

21    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

22

23

24

25
</pre>

1    evidence of bias is so important.  They might have had

2    allegations that Aaron Chaffinch told dirty jokes,

3    limericks, I think Major Baylor said, yes, I did hear

4    something like that.  That is what he substantiates, along

5    with Glenn Dixon.  They made much more serious allegations,

6    such as women shouldn't be state troopers, two women can't

7    work together.  The only witnesses that will attest to that

8    are Barbara Conley and Glenn Dixon.  Not Major Baylor.  Not

9    Harry Downes.

10            We spoke to 25 to 30 State Police officers who

11   have worked with these individuals for 25 years.  Every one

12   of them, to a person, said they never heard Aaron Chaffinch

13   make a statement like that.

14            If you have one witness who says that, 25 who

15   don't, and you have a very serious reason to suspect bias on

16   the part of that witness, isn't that something the jury

17   needs to consider?

18            THE COURT:  My inclination is to permit a

19   limited inquiry into the issue of bias.  I am not going to

20   permit, as I have said earlier, a mini-trial, as I think Mr.

21   Neuberger suggested, or somebody, I am not going to permit

22   cumulative witnesses on this point.  But perhaps we could

23   now become a little more specific as to what we are talking

24   about here in terms of the witness.  I guess what I am

25   asking is for an offer of proof as to what X, Y or Z would

1          The notice of deposition took place five

2     business days, the bare minimum under the rule, during the

3     week between Christmas and New Year's.  Mr. Durstein was out

4     of town.  I was not available, but I was going to make

5     myself available.  We tried to contact all three witnesses.

6     One was available, one was not available, one we never

7     reached.

8          So we tried to accommodate.  And repeatedly,

9     both Mr. Durstein and myself sent e-mails and told

10    plaintiff's counsel, we will produce these people and any

11    others you want to produce in the new year any time you

12    want.  You make the decision, it is your call, they are

13    available, they are available, they are available.  That is

14    what was said to them.

15         THE COURT:  Without resolving that particular

16    motion, 179, what I am trying to do, counsel, through the

17    exercise of my inherent authority and my authority under the

18    Federal Rules of Evidence, I am trying to determine if there

19    is an appropriate basis to permit the questioning that is

20    being resisted as to Dixon and the collateral attack on him,

21    his credibility, through witness testimony.  That is why I

22    am now attempting to require you, to, as I said, pick and

23    choose, to tell me who your best, in your view, witnesses

24    are.  I mean by that witnesses that you believe as officers

25    of the Court that you can put on that stand and adduce

1   relevant testimony, testimony that is not unduly

2   prejudicial -- it is certainly going to be prejudicial --

3   but not unfairly, not unduly prejudicial.

4              That is the guidance I have for you.

5              That is what I wanted to do right now in

6   handling it through the vehicle of an offer of proof.

7              So let's continue that for the next 15 minutes,

8   then we will take a half an hour, grab quick sandwiches.  I

9   forgot to say earlier, we are only going to be able to go to

10  3 today.  Hopefully, we will get done.  If not, we may have

11  to come back.  Go ahead.

12             MS. BALLARD:  Your Honor, we also have several

13  witnesses that will testify as to statements Barbara Conley

14  herself made.  These would be admissions.  Carol Warnock,

15  they were together at Barbara's house or Carol's house, I am

16  not sure which, at a scrap-booking party.  Barbara crawled

17  under the table to Carol Warnock's side, she ran her hand up

18  the inside of Carl Warnock's thigh, and said, That's what

19  I'm going to do to Glenn.

20             Tammy Hyland was in an office with Barbara

21  Conley and I believe another female civilian.  Glenn Dixon

22  walked by on his way to the Police Academy and she said,

23  Isn't that a sweet ass, as to Glenn Dixon.  This was after

24  the time he stopped working for her.  It was probably 2002,

25  2003.

1          THE COURT:  Next.

2          MR. T. NEUBERGER:  Your Honor --

3          THE COURT:  Yes, Mr. Neuberger.

4          MR. T. NEUBERGER:  I understand what you are

5     talking about, behind closed doors and speaking on the phone

6     a lot.  There was Carol Warnock and Tammy Hyland.  You

7     didn't ask me to say anything on those.  We are just waiting

8     until we are done with the whole list.

9          THE COURT:  Hyland --

10          MR. T. NEUBERGER:  Something about a remark

11     about a "sweet ass."

12          THE COURT:  I wrote that down.

13          Why don't we take a half an hour and we will

14     come back to this.

15          (Luncheon recess taken.)

16          THE COURT:  Okay.  I think I would like to, in

17     rather than going through each one of these witnesses, I am

18     ruling that I will permit, as I have said earlier, within

19     appropriate boundaries of the rules of ethics and the

20     obligations of counsel as officers of the Court and the

21     Federal Rules of Evidence, the defense to challenge the

22     credibility, to try to demonstrate the bias of Captain Dixon

23     in a limited fashion.  I think I have suggested the way in

24     which I would like that to be done.  That is by one witness.

25     I will hasten to add, what I have heard thus far, in the

1    main, except perhaps with regard to -- I think there was a

2    witness, was it Warnock, who demonstrated what she says

3    Captain Conley said that she would like to do.

4              MS. BALLARD:  Yes.

5              THE COURT:  Stroking the thigh of an individual,

6    that's pretty graphic.  Even that, all of these actions that

7    I have heard about this morning, let me put it that way, are

8    capable of being discerned by a fact-finder in I think at

9    least a couple of different ways.  We have skilled

10   cross-examiners at both counsel table.  Certainly, counsel

11   for the plaintiff will be able to cross-examine the

12   witnesses and argue to the jury that these things, such as

13   being behind closed doors, can have as innocent an

14   explanation as not.

15             So I am going to permit some limited challenge

16   and collateral evidence on this subject.

17             MR. T. NEUBERGER:  So could I ask once again by

18   Monday they would simply tell us the witnesses and what the,

19   quote, statement or whatever is going to be?

20             THE COURT:  I do mean limited.  If it should be

21   the impression of plaintiff's counsel that the defense is

22   proposing something that is not within the letter and spirit

23   of the Court's ruling, then, as you do with discovery

24   matters, raise the issue with the Court through the vehicle

25   of telephoning and say, Judge, we need a teleconference.

# EXHIBIT B

<u>CONLEY V. CHAFFINCH</u>, C.A. 04-1394

## DEFENDANT'S WITNESSES RE: EVIDENCE OF BIAS OF PLAINTIFF'S WITNESS, CAPTAIN GLENN DIXON

**Witnesses marked with an asterisk (*) are witnesses Defendant seeks to call as to particular instances of conduct or admissions, as well as general behavior such as long phone calls and closed door sessions. Other witnesses as to general behavior are also listed.[1]**

**Sgt. James P. Fraley***

- In November 2003, a homicide conference involving officers from other states was held, which included some evening activities. One evening, Fraley stopped in the Headquarters building and found Barbara Conley and Glenn Dixon in Conley's office. (Dixon no longer worked with Conley at the time.) Fraley stopped in the office and conversed briefly with Barbara Conley. The discussion turned to using eBay to buy and sell items. Fraley sat down at Conley's computer to show her how to use eBay and could see Conley and Dixon standing behind him, reflected in the computer screen. Dixon and Conley standing pressed against each other hip to hip and Fraley saw Conley's hand rubbing Dixon's upper thigh.

- In mid-October 2004 [within weeks of plaintiff filing suit], Fraley was driving home from Home Depot with his wife and stopped at the Shore Stop near Milford. This was approximately 10:00 a.m. on a weekday morning. Fraley saw two unmarked police cars parked facing the wall side of the building (not the entrance and not facing traffic) at the Shore Stop. He saw Glen Dixon and Barbara Conley sitting in the same car (Conley's) talking.

**Carole Warnock** (civilian employee/troop secretary at Troop 5) *

- In 2003, Warnock was invited to Conley's house for a scrap booking party with some other women. Conley crawled under the table and ran her hand up Carol Warnock's leg, then said "that's what I'm going to do to Glenn."
- At Troop 5 (as Troop Commander), Glenn Dixon would shut his office door and talks on his cell phone (not office phone) for hours. More recently, he goes outside to his truck and sits in it and talks on the cell phone for long periods of time. Sometimes he will go into an empty office in the back of the building and talk on his cell phone with the doors shut.

---

[1] NOTE: This document pertains only to the limited testimony these witnesses will provide regarding the Conley/Dixon relationship. All listed witnesses are DSP employees who will also testify as to issues other than the Conley/Dixon relationship, such as Colonel Chaffinch's conduct, and Plaintiff's and the comparators' qualifications and workplace conduct.

**Tammy Hyland** (civilian employee in HQ building) *

- On one occasion after Dixon had left Headquarters and was working at Troop 5, Tammy was in Conley's office along with Kim Cuffee, discussing fatal accidents. Conley was looking out the window watching Glenn Dixon walk toward the Academy building. Conley said "look at that sweet ass."
- Can also testify about Conley and Dixon spending hours at a time behind her closed and locked office door when they worked together.

**Lt. John Campanella***

- Campanella worked with Conley as the Traffic Lieutenant after Dixon was transferred to Troop 5. Conley used the term "high pockets." When Campanella expressed confusion as to what this meant, she said "that's my nickname for Glenn" and explained that "his ass" pushed his pants pockets up high.
- Conley kept a framed picture of herself and Glenn Dixon (in a social setting) behind her desk at work, after Dixon no longer worked there.
- Can also testify as to Conley's long phone calls with Glenn Dixon behind closed doors after Dixon no longer worked with her.

**Lt. Curtis Brown***

- Is a Lieutenant at Troop 5 where Dixon is Troop Commander. From the time he arrived at Troop 3 in 2003, Glenn has spent hours on his cell phone every day with Barbara Conley. Around the time this lawsuit was filed, he began leaving the office to talk on his cell phone outside. As Traffic Lieutenant, Brown would be Conley's first point of contact for work-related matters--not Dixon, the Troop Commander.

**Captain Elizabeth Shamany**
- Captain Shamany worked in the Headquarters building near Barbara Conley and the traffic division when Dixon worked in traffic. Conley and Dixon would be behind closed doors in Conley's office for hours on a routine basis. Shamany had to pass the office to use the copier and would often hear the two of them talking and laughing in the office when she went by.

**Lt. Mark Rust**
- Can also testify that Dixon and Conley are on the phone for hours on an almost daily basis.
- Rust remembers a lunch with Barbara Conley, in 2003, when she said Amy Dixon (Glenn's wife) was jealous of her.

**Sgt. Rodney Workman**
- Can also testify about Conley and Dixon's frequent phone calls at Troop 5 (2003-present).

# EXHIBIT C

1          DELAWARE STATE POLICE

2        INTERNAL AFFAIRS DIVISION

3    _____

4          VOLUME I (DAY 1 OF 2)

5    Divisional Hearing Board - March 9, 2005

6    _____

7      Trooper:   Captain Barbara Conley

8      Trooper's Counsel:   Thomas Neuberger, Esquire

9    Hearing Board Members:

10     Major Raymond Taraila, Dover Police Department

11     Captain Nancy Dietz, Wilmington Police Department

12     Captain Darrold Weber, Smyrna Police Department

13   Internal Affairs Investigator:   Captain James Paige

14   Counsel for the Division:   DAG Ralph Durstein, III

15   Counsel to the Hearing Board:   DAG Mike Tupman

16   _____

17          VOLUME I - (DAY 1 OF 2)

18        A Divisional Hearing Board held on Wednesday,

19   March 9, 2005 at 8:45 a.m. at the Delaware State

20   Police Training Academy, Route 13, Dover,

21   Delaware, reported by Lorena J. Hartnett, a Notary

22   Public and Registered Professional Reporter.

23   _____

24

1    place?

2         A.    It seemed as often as I was in the

3    Traffic Section, many, many times.

4         Q.    Can you give us an idea on a monthly,

5    weekly, daily basis, or?

6         A.    I am in the Traffic Section so much

7    that it happened almost every time I was in the

8    Traffic Section.  I mean that's -- And I work

9    almost daily with the section.

10        Q.    Tell me about, you will forgive me,

11   but you will have to give us some insight as to

12   what kind of comments and where they were made

13   and who was present.

14        A.    One example I can think of is a day

15   that I was standing at Sandy Ryder's desk, which

16   is in an alcove across from my office, and Kim

17   Cuffee was also there, and we were talking about

18   some of the fatal accidents, and Captain Conley

19   walked up and said, "Look at that sweet ass,"

20   looking out the window towards the Academy.

21             And, of course, we all looked out to

22   see who it was, and it was Lieutenant Dixon.  And

23   I was very surprised because I -- We weren't

24   talking about anything of that nature.  It seemed

1    to come from out of the blue.

2         Q.    Now, Lieutenant Dixon, had he worked

3    with you?

4         A.    Yes, he used to be assigned to the

5    Traffic Section.

6         Q.    So he had also worked with Captain

7    Conley in the past?

8         A.    Yes.

9         Q.    And tell us again what your reaction

10   was to that comment about Lieutenant Dixon?

11        A.    I was very surprised.  It seemed to

12   come out of nowhere.

13        Q.    The others who were present were, I

14   gather, women who were civilian employees of the

15   division?

16        A.    Yes.

17        Q.    Was there a term that Captain Conley

18   had for Lieutenant Dixon?

19        A.    Well, I learned later that he has been

20   called high pockets.

21        Q.    Did you ever hear her call him that?

22        A.    No.

23        Q.    Have you ever heard Captain Conley

24   make a comment about what I will call the sexual

# EXHIBIT D

```
 1              DELAWARE STATE POLICE

 2           INTERNAL AFFAIRS DIVISION

 3    _____

 4              VOLUME I (DAY 1 OF 2)

 5       Divisional Hearing Board - March 9, 2005

 6    _____

 7       Trooper:   Captain Barbara Conley

 8       Trooper's Counsel:   Thomas Neuberger, Esquire

 9    Hearing Board Members:

10       Major Raymond Taraila, Dover Police Department

11       Captain Nancy Dietz, Wilmington Police Department

12       Captain Darrold Weber, Smyrna Police Department

13    Internal Affairs Investigator:   Captain James Paige

14    Counsel for the Division:   DAG Ralph Durstein, III

15    Counsel to the Hearing Board:   DAG Mike Tupman

16    _____

17              VOLUME I - (DAY 1 OF 2)

18          A Divisional Hearing Board held on Wednesday

19    March 9, 2005 at 8:45 a.m. at the Delaware State

20    Police Training Academy, Route 13, Dover,

21    Delaware, reported by Lorena J. Hartnett, a Notary

22    Public and Registered Professional Reporter.

23    _____

24
```

1    not looking at his ass or anything."

2              And then she would refer to begin to

3    talk about other men on the Division and how nice

4    of an ass that this person has, and she would

5    speak specifically about Glen, referring to my

6    predecessor, and other employees in the office.

7         Q.    What is Glen's full name?

8         A.    Glen Dixon.

9         Q.    What was his rank when he was in the

10   Traffic Section?

11        A.    He was a lieutenant there.

12        Q.    And he performed essentially the same

13   function that you performed once you arrived?

14        A.    That was -- His job was what I was

15   supposed to be doing.

16        Q.    Who else was present when these

17   particular comments were made about either

18   Lieutenant Dixon or yourself or men's posteriors?

19        A.    A lot of this conversation, the ones

20   especially about men's back ends were with Kim,

21   and she would call out from her desk across the

22   hallway to Kim, and they would have an exchange

23   back and forth each as I returned to my office.

24             I really don't remember her talking