# THE NEUBERGER FIRM
## ATTORNEYS AND COUNSELLORS AT LAW

### TWO EAST SEVENTH STREET
### SUITE 302
### WILMINGTON, DELAWARE 19801-3707

WWW.NEUBERGERLAW.COM
EMAIL: INFO@NEUBERGERLAW.COM

THOMAS S. NEUBERGER, ESQUIRE
STEPHEN J. NEUBERGER, ESQUIRE

PHONE: (302) 655-0582
FAX: (302) 655-9329

June 5, 2006                                        **Via CM/ECF Filing**

The Honorable Gregory M. Sleet
United States District Court
District of Delaware
844 King Street
Wilmington, DE 19801

RE:    **Conley v. Chaffinch, et al.**, Civil Action No. 04-1394-GMS

Dear Judge Sleet:

        Plaintiff submits this letter in response to the Court's Order (D.I. 142) which requested a response "as soon as possible."

        **Question 1(a) - When did Defense Counsel First Raise the IA Charges and Motivation Issue.**  Defense counsel first raised this issue today, the day before trial, during the Chambers conference with the Court.  This issue was not raised in the pretrial order.  Defendants did not raise this issue in their Statement of Contested Issues of Fact - all of which discuss qualifications and pretext paradigm issues. (See Tab A at p. 5).  Nor did defendants raise this issue as a Statement of Contested Issues of Law - which simply track the three step McDonnell Douglas pretext paradigm. (See Tab A at p. 9).  Accordingly, this issue was waived.  See Ely v. Reading Co., 424 F.2d 758, 763 (3d Cir. 1970)  ("the pretrial order is generally binding on the parties . . . [and] cannot be modified without the permission of the court and a showing of manifest injustice.").  It is the day before trial.  Plaintiff has prepared her case based on the issues presented in the pretrial order.  Plaintiff will be greatly prejudiced by any 11th hour addition to the issues being tried.

        **Question 1(b) - Was Plaintiff Deposed Regarding Her Motivation for Bringing Her Lawsuit.**  No, plaintiff was not deposed regarding her motivation for bringing her lawsuit.  The closest reference to this issue from her lengthy two day deposition appears to be found at pages 111-112 where plaintiff explained that she believed that the IA charges being leveled against her in 2004 were part of defendant's gender biased efforts against her to keep her from applying for

the Major's position being vacated by the retirement of Major David Baylor in August 2004. (Tab B - Conley depo. at p. 111-112).[1]  This is insufficient to put plaintiff on notice that defendants were raising the matter at issue.

     **Question 1(c) - Was Plaintiff Put on Notice of the Defendant's Intended Use of the IA Charges in Any Other Way, For Example, By Interrogatories.**  No, plaintiff was not so put on notice.  There is no mention of this issue any where in the 16 Interrogatories issued by the defense to plaintiff in this case.  Nor is the issue mentioned in plaintiff's 82 pages of Answers to Interrogatories.

     **The Defense Misconception of Legal Theories.**  In order to aid the Court further, plaintiff notes that the motivations for filing a discrimination lawsuit in 2004 are not relevant to the issue of whether discrimination occurred in two promotions decisions in 2003.

     The only legal paradigm to which motives are relevant are a certain subset of First Amendment free speech retaliation cases brought by public employees.  There, the motives of the speaker are subsumed as part of the content, form and context analysis required by Connick v. Myers, 461 U.S. 138, 147-48 (1983).  See, e.g. Brennan v. Norton, 350 F.3d 399, 413 (3d Cir. 2003) ("the speaker's motive, while often a relevant part of the context of the speech, is not dispositive."); Johnson v. Lincoln Univ. of Com. System of Higher Educ., 776 F.2d 443, 451 (3d Cir. 1985) ("the mere fact that an employee's statement is an outgrowth of his personal dispute does not prevent some aspect of it from touching upon matters of public concern.").

     Importantly, this case is not a free speech retaliation case.  The only claim against defendant Chaffinch is for gender discrimination in violation of the Fourteenth Amendment, which employs an entirely different legal paradigm.  Cf. Fuentes v. Perskie, 32 F.3d 759, 763-65 (3d Cir. 1994) (discrimination paradigm), with Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006) (free speech paradigm).

     Even though this case was a free speech case at one time, defendants never challenged plaintiff's motivations and did not take any discovery on this issue.  Nor did they include any motivations questions in the pretrial order under contested issues of Fact or Law.  The lack of inclusion of this issue in the pretrial order on the free speech issues is itself unremarkable given that the protected speech determination is a matter of law, Springer, 435 F.3d at 275, that is decided by the Court at the summary judgment stage and is not presented to the jury.

     I am at the Court's disposal to address these issues in greater detail if the Court so desires.

---

     [1]  Plaintiff notes that at the time plaintiff's deposition was taken, Counts II and III were still in the case - which involved releasing information about plaintiff's IA charges to the Delaware media.  There is a great deal of deposition discussion regarding the circumstances surrounding the release of this information to the Delaware media.

Respectfully submitted,

/s/ Stephen J. Neuberger

Attorney for Plaintiff

cc:     Thomas S. Neuberger, Esq. (via CM/ECF)
        Ralph K. Durstein, Esq. (via CM/ECF)
        Stephani Ballard, Esq. (via CM/ECF)
        James E.  Liguori, Esq.  (via CM/ECF)

Conley \ Letters \ Sleet.___

# Tab A

**Schedule (b)**
**Contested Issues of Fact and Law**

An agreed statement or statements by each party of the contested issues of fact and law and a statement or statements of contested issues of fact or law not agreed to:

Agreed Statement of Contested Facts

      1.

      2.

      3.

      4.

      5.

      6.

      7.

      8.

      1.

      2.

      3.

      4.

      5.

Plaintiff's Statement of Contested Issues of Fact

1.  Can plaintiff prove the four elements of a prima facie case of sex discrimination?

2.  Did two vacancies exist? *[not contested by Defendants]*

3.  Was plaintiff qualified for promotion?

4.  Did the positions go to two males? *[not contested by Defendants]*

5.  Is plaintiff a female? *[not contested by Defendants]*

6.  Has defendant Chaffinch articulated a legitimate non-discriminatory reason, in that he promoted the most qualified person on two occasions?

7.  Did Chaffinch use six discretionary factors in making his promotion decision?

8.  Did Chaffinch violate mandatory procedural requirements in making his decision?

9.  Under Fuentes Prong 2 does the weight of the evidence prove gender discrimination for any of the 32 reasons stated in plaintiff's trial brief?

10. Under Fuentes Prong 1 are there 29 weaknesses, implausibilities, inconsistencies, incoherencies and contradictions in the defense case, as stated in plaintiff's trial brief?

11. Did plaintiff engage in protected petition of government or protected speech by either filing a lawsuit or publically opposing sex discrimination?

12. Was plaintiff subject to adverse action which would chill a person of ordinary firmness in the exercise of her first amendment freedoms?

13. Did the defendants release a confidential and internal DSP document to the media?

14. Did they destroy computer evidence which would have proved their leak to the

media?

15. Did defendants refuse to investigate their leak of confidential information?

16. Did defendants then confirm and discuss the nature of the confidential charges with the media?

17. Does a causal link exist between protected activity and adverse action?

18. Did defendants' friendship create a motive to retaliate against plaintiff?

19. Does Chaffinch demand blind personal loyalty to him?

20. Did Chaffinch demonstrate antagonism to plaintiff?

21. Did MacLeish demonstrate antagonism to plaintiff?

22. Did Mitchell do so also?

23. Does the unusually suggestive one or two day temporal proximity demonstrate causation?

24. Did the defendants violate any one of DSP Rules 10, 18(b), 19(a) or the Code of Ethics?

25. Did they violate LEOBOR?

26. Is an order to violate any such rule or statute an unlawful order?

27. What was the current policy and practice of the DSP on confidentiality?

28. What was its long time historical policy and practice on confidentiality?

29. Were Chaffinch and MacLeish treated disparately previously?

30. Was LEOBOR selectively enforced?

31. Are the defendants hostile to any officer for files a lawsuit or speaks out about the DSP?

32. Did each defendant know of the protected conduct?

33.    Does Chaffinch feel he is above the law because of his political allies?

34.    Do intentional falsehoods demonstrate causation?

35.    Would defendants have made the same decisions if plaintiff had not engaged in protected speech or petition (only if the Court rules this is still in the case)?

36.    Was the actions of the defendants the proximate cause of any damage to plaintiff?

37.    What is the total amount of non-economic damages plaintiff has suffered for emotional distress and humiliation?

38.    What economic damages has plaintiff suffered up to the present time?

39.    What economic damages will plaintiff suffer into the future reduced to present value?

40.    Did either defendant act recklessly, intentionally or maliciously with regard to plaintiff?

41.    What amount of punitive damages is an appropriate award, if any?


***By Defendants: In addition to other bases for objection to Plaintiff's characterization of "contested issues of fact," including relevance, and assuming predicate facts not in evidence, Defendants object to Plaintiff's numbers 1, 9, 10, 11, 12, 23, as legal argument or calling for legal conclusions. As to items 9 and 10, there is no basis for the use of Plaintiff's arbitrary "32" or "29" factors as jury questions. Item number 14 is a matter to be addressed in limine by the Court and not a factual issue for the jury.***

**Defendant's Statement of Contested Issues of Fact**

1.    Was Plaintiff qualified for promotion to the rank of Major in 2003?

2.    Was Plaintiff qualified for promotion to the position of Administrative/Budget Major?

3.    Was Plaintiff qualified for promotion to the position of Kent/Sussex Operations Major?

4.    Was Paul Eckrich more qualified for promotion to the rank and position of Administrative/Budget Major than Plaintiff?

5.    Was R.L. Hughes more qualified for promotion to the rank and position of Kent/Sussex Operations Major than Plaintiff?

6.    Were other Delaware State Police Captains more qualified than Plaintiff to hold the rank of Major?

7.    Is selection of individuals to hold the rank of Major a discretionary decision on the party of the Colonel?

8.    Did Colonel Chaffinch have a legitimate, non-discriminatory reason to select Paul Eckrich to fill the position of Administrative/Budget Major–namely, that he felt Eckrich was the most qualified candidate?

9.    Did Colonel Chaffinch have a legitimate, non-discriminatory reason to select R.L. Hughes to fill the position of Kent/Sussex Operations Major–namely, that he felt Hughes was the most qualified candidate?

**COUNTS II AND III** [1]

1.    Did any individual defendant send or release the "trial board" email concerning Barbara Conley's internal affairs hearing to Delaware State News reporter, Tom Eldred?

2.    When contacted by Delaware State News about the email, did defendants seek legal advice as to how to proceed?

---

[1] Defendants have moved for summary judgment as to Counts II and III. Defendants' responses hereto are without waiver of their claims that summary judgment should be granted as to these counts on the basis of, *inter alia*, qualified immunity.

3.   When contacted by Delaware State News email, did defendants follow legal advice as to how to proceed?

4.   Did Lt. Joseph Aviola or any defendant discuss any details of the charges pending against plaintiff, other than to confirm that they existed as documented in the four corners of the email?

5.   Was there any evidence of animosity towards Barbara Conley at the October 28, 2004 meeting with legal counsel to discuss the email and the call from the newspaper reporter?

6.   Did Acting Colonel MacLeish take steps to attempt to determine who released the email to the Delaware State News?

7.   Did former Colonel Chaffinch play any part in the events and decisions of October 28, 2004?

8.   Did Secretary David Mitchell play any part in the events and decisions of October 28, 2004, other than to be informed of what had occurred?

9.   Was issuance of the trial board email to all DSP personnel mandated by the DSP Administrative manual?

10.   Did the trial board email constitute confidential information under LEOBOR?

11.   Did the individual defendants believe their action (in confirming the email) was legal, following consultation with counsel?

12.   If so, was that belief reasonable?

13.   Would defendants have made the same decisions anyway, regardless of plaintiff's engaging in constitutionally protected speech (if it is found she engaged in such speech)?

14.   Did plaintiff engage in any constitutionally protected speech or petition by filing her complaint alleging that she should have received certain job promotions?

15.   Did Plaintiff suffer any "adverse employment action" as a result of Defendants' conduct on October 28, 2004?

16.   If so, was that "adverse employment action" taken because of her speech or lawsuit?

17.   If Plaintiff did suffer any harm as a result of Defendants' conduct, was that harm trivial or *de minimus*?

## DAMAGES

1. Is plaintiff entitled to any damages?

2. If so, in what amount?

3. Did any defendant act with malice or reckless indifference to plaintiff's constitutionally protected rights?

4. If so, what amount, if any, of punitive damages, is appropriate?

Plaintiff's Statement of Contested Issues of Law

1.    Was plaintiff the victim of illegal sex discrimination in the denial of either of two promotions?

2.    Was plaintiff the victim of illegal retaliation under the Free Speech or the Petition Clauses?

3.    What compensatory and /or punitive damages award is appropriate?

4.    To be made whole monetarily, is a front pay award appropriate?

5.    Should the equitable remedy of reinstatement issue and the court order that plaintiff be promoted to the rank of Major when the next vacancy in that position arises?

6.    Should an appropriate mandatory injunction be issued to defendant Mitchell in his official capacity requiring him to act as a monitor of defendant MacLeish, or his successors as Superintendent of the Delaware State Police, to prohibit any further retaliation against or harassment of plaintiff in the future, by overseeing and approving all actions or statements made by MacLeish, or his successors, concerning plaintiff, upon penalty of finding Mitchell, or his successor, in contempt of court. Such injunction is to run for so long as plaintiff is a state employee.

7.    Should each individual defendant be enjoined from retaliating against plaintiff now or in the future?

8.    Should each individual defendant place a written letter of apology in plaintiff's personnel file apologizing for their illegal violations of plaintiff's constitutional rights.

9.    Should a reparative injunction issue directing that the individual defendants issue public written apologies to plaintiff and run their apologies in the Delaware State News and the News Journal?

10.    Should attorneys' fees and costs or pre or post judgment interest be awarded?

***By Defendants: In addition to other bases for objection to Plaintiff's "contested issues of law," Defendants object to Plaintiff's numbers 6 and 9 as not pled as requested relief in Plaintiff's Amended Complaint.***

**Defendant's Statement of Contested Issues of Law**

1.  Can plaintiff prove a *prima facie* case of gender discrimination by a preponderance of the evidence?

2.  Have defendants articulated a legitimate, non-discriminatory reason for not selecting plaintiff to be promoted to the rank of Major in the Delaware State Police?

3.  Can plaintiff prove, by a preponderance of the evidence, that the legitimate reasons offered by Defendants were not their true reasons, but were a pretext for gender discrimination?

## COUNTS II AND III [2]

1.  Did plaintiff engage in any constitutionally protected speech or petition by filing her complaint on the purely private issue of whether she should have received certain job promotions?

2.  If so, Did Plaintiff suffer any adverse employment action as a result?

3.  Was plaintiff's speech/lawsuit a substantial or motivating factor for the adverse employment action?

4.  Would defendants have made the same decision anyway on the email issue even in the absence of Conley's speech/lawsuit?

5.  Are individual defendants entitled to qualified immunity as to these counts?

6.  Did plaintiff have a clear legal right to not have defendants confirm the authenticity of an email which had been released, by an unknown person, to a newspaper reporter?

7.  Were defendants actions as to the email issue, including consulting and following the advice of legal counsel, objectively legally reasonable?

## DAMAGES

1.  Assuming liability, did Defendants' actions proximately cause any harm to

---

[2] Defendants have moved for summary judgment as to Counts II and III. Defendants' responses hereto are without waiver of their claims that summary judgment should be granted as to these counts on the basis of, *inter alia*, qualified immunity.

Plaintiff?

2.    If so, what damages are appropriate?

3.    Are punitive damages appropriate?

4.    Can plaintiff's harm, if any, be fully rectified by the award of damages, and may the Court order the injunctive and equitable relief sought by Plaintiff?

5.    Whether, and in what amount, attorneys' fees are appropriate?

## MOTIONS IN LIMINE

1.    Resolution of evidentiary issues raised by plaintiff and defendants in their respective motions *in limine*.

Conley/ PreTrial / Schedule (b)contestedFacts&Law draft 2 DEF'S MODIFICATIONS

# Tab B



**WILCOX & FETZER LTD.**

In the Matter Of:

# Conley
v.
# Chaffinch, et al.

C.A. # 04-1394-GMS

-----------------------------------------------------------------------

Transcript of:

# Barbara L. Conley
Volume # 1
December 7, 2005

-----------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

```
 1                      VOLUME 1

 2

 3

           IN THE UNITED STATES DISTRICT COURT

 4
               FOR THE DISTRICT OF DELAWARE

 5

 6

    CAPTAIN BARBARA L. CONLEY            )
 7                                       )
                Plaintiff,               )
 8                                       ) Civil Action
    v.                                   ) No. 04-1394-GMS
 9                                       )
    COLONEL L. AARON CHAFFINCH,          )
10  individually and in his official     )
    capacity as the Superintendent,      )
11  Delaware State Police; LIEUTENANT    )
    COLONEL THOMAS F. MACLEISH,          )
12  individually and in his official     )
    capacity as the Deputy              )
13  Superintendent, Delaware State       )
    Police; DAVID B. MITCHELL,           )
14  individually and in his official     )
    capacity as Secretary of the         )
15  Department of Safety and Homeland    )
    Security, State of Delaware; and     )
16  DIVISION OF STATE POLICE,            )
    DEPARTMENT OF SAFETY AND HOMELAND    )
17  SECURITY, State of Delaware,         )
                                         )
18              Defendants.              )

19

20          Deposition of BARBARA L. CONLEY taken
    pursuant to notice at the Delaware Department of
21  Justice, Carvel State Office Building, 820 North
    French Street, 6th Floor, Wilmington, Delaware,
22  beginning at 9:40 a.m., on Wednesday, December 7,
    2005, before Kurt A. Fetzer, Registered Diplomate
23  Reporter and Notary Public.

24              WILCOX & FETZER
        1330 King Street -  Wilmington, Delaware 19801
25                  (302) 655-0477
```

Page 2

```
1   APPEARANCES:
2       THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
3         2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801
4         For the Plaintiff
5       JAMES E. LIGUORI, ESQ.
        LIGUORI MORRIS & YIENGST
6         46 The Green
          Dover, Delaware  19901
7         For the Defendant Colonel L. Aaron Chaffinch
8       RALPH K. DURSTEIN, ESQ.
        STEPHANI J. BALLARD, ESQ.
9       DEPARTMENT OF JUSTICE
          820 North French Street
10        Carvel State Office Building
          Wilmington, Delaware  19801
11        For the Defendants Lieutenant Colonel
          Thomas F. MacLeish, David B. Mitchell,
12        and Division of State Police
13               - - - -
14           BARBARA L. CONLEY,
15      the deponent herein, having first been
16      duly sworn on oath, was examined and
17      testified as follows:
18          MR. NEUBERGER:  If I could, we're on the
19      record, if I could, my daughter went into the hospital
20      in labor this morning at 4:00 o'clock.
21          MR. LIGUORI:  Congratulations.
22          MR. NEUBERGER:  If I'm a little nervous
23      today or out of sorts or whatever, it's just because
24      my mind is elsewhere, but I'm hoping that we can get
25
```

Page 3

```
1   done at 5:00 o'clock and I can run over there or
2   whatever.
3           But I'm going to leave my cell phone on
4   vibrate but if something happens I would like to take
5   a break.  Okay?
6           MR. DURSTEIN:  Absolutely.  No problem
7   whatsoever.  Just let us know.
8           MR. NEUBERGER:  Thank you.
9           MR. LIGUORI:  Can we just go off the
10  record for a second?
11          (Discussion off the record.)
12              EXAMINATION
13  BY MR. DURSTEIN:
14      Q.  Good morning, Captain Conley.  For the first
15  part of the deposition I'm going to ask you some
16  questions about the complaint that was filed, so it
17  may be helpful to have that document in front of you.
18          MR. NEUBERGER:  I may have a copy of that.
19      Q.  If your attorney wants to provide you a copy,
20  that's fine.
21          Now, you authorized the filing of the
22  complaint.  I'm actually referring to the first
23  amended complaint at this point.  Originally, the
24  original complaint had a single count with the
25
```

Page 4

```
1   Delaware State Police and Colonel Chaffinch as
2   defendants.
3           Is that your understanding?
4       A.  Yes.
5       Q.  And then you authorized your attorneys to amend
6   that complaint to add two additional counts to it.  Is
7   that correct?
8       A.  Yes.
9       Q.  When those counts were added acting Colonel
10  MacLeish at that time and Secretary Mitchell were
11  added as defendants.
12          Is that your understanding?
13      A.  Yes.
14      Q.  Let's deal with count 1 first.
15          In that count as we understand it you
16  claim you were twice denied a promotion to major back
17  in 2003 and your complaint is that you believe you
18  were denied promotion because of gender
19  discrimination.
20          Is that fair to say?
21      A.  Yes.
22      Q.  Those positions, the major positions were
23  filled by Major Eckrich and Major Hughes.  And it's
24  your belief you were denied each of those promotions
25
```

Page 5

```
1   because you're a woman?
2       A.  Yes.
3       Q.  Now, in the original complaint and as to count
4   1, you named Colonel Chaffinch and the Division of
5   State Police as another defendant.
6           Do you contend that any other person at
7   the Delaware State Police discriminated against you?
8           MR. NEUBERGER:  In the promotions he's
9   asking you.
10      Q.  Correct.
11      A.  In the promotions it would be Colonel
12  Chaffinch.
13      Q.  Correct.  Okay.  Now let's start with the major
14  position that was filled by Paul Eckrich.  My
15  understanding is that that position was an
16  administrative budget position.
17          Is that also your understanding?
18      A.  Yes.
19      Q.  And it's your contention that in 2003 when then
20  Captain Eckrich was promoted that you were better
21  qualified than him for that position.  Is that
22  correct?
23      A.  Yes.  That's correct.
24      Q.  All right.  Tell me what reasons you have that
25
```

Barbara L. Conley

Page 102

1  felt that Sergeant Logan had.  Sergeant Logan at the
2  time probably would have been my number one choice
3  that I knew of because I knew that he had done a wide
4  variety of things at Dover P.D., including some grant
5  writing and things of that nature.
6    Q.  Would it be fair to say that Lieutenant
7  Campanella did not work out well as the assistant
8  director?
9    A.  That would be fair to say.
10   Q.  And, in fact, in 2004 at your instigation the
11 internal affairs unit initiated an investigation into
12 Lieutenant Campanella's conduct.  Is that correct?
13   A.  Just to clarify, I did report some behavior of
14 his to Major Seifert and Lieutenant Colonel MacLeish.
15 Basically, I was simply requesting his transfer for
16 some problems that I was having with him and also the
17 section and some of the outside agencies that we were
18 dealing with.
19          And ultimately it did get turned into
20 internal affairs.
21   Q.  And you cooperated with the internal affairs
22 investigation into Lieutenant Campanella?
23   A.  Yes.
24   Q.  I don't want to get into the entire internal

Page 103

1  affairs investigation.
2          Would it be fair to say that part of what
3  you complained about was inappropriate conduct on his
4  part?
5    A.  Yes.
6    Q.  Do you remember how long he had been in the
7  traffic section when you first sought his transfer,
8  contacted Major Seifert?
9    A.  About eight months.
10   Q.  Would it be fair for me to say, just to
11 summarize, that the investigation of Lieutenant
12 Campanella resulted in charges and discipline being
13 imposed on him?
14   A.  That's my understanding.
15   Q.  And he was transferred out of the traffic
16 section as well.  Is that correct?
17   A.  Eventually, yes.
18   Q.  Now, in the course of that investigation of
19 Campanella you became aware that allegations had been
20 raised about your own conduct.  Is that fair to say?
21   A.  Yes.
22   Q.  And at some point, I guess this would be in the
23 summer of 2004, you were formally advised that charges
24 were going to be brought against you?
25

Page 104

1    A.  I think it was probably after the summer,
2  possibly September.
3    Q.  September of 2004?
4    A.  Yes.
5    Q.  What was your reaction to that?
6    A.  The fact that I was being investigated or
7  charged?
8    Q.  I'm sure you were not happy about it?
9    A.  No, I wasn't happy.
10   Q.  Let me ask you this:  Did you at that point
11 when you learned that you were being investigated and
12 then when you later learned that there were actually
13 going to be charges brought against you, in your mind
14 was any of that related to what you've alleged as
15 discrimination on the part of Colonel Chaffinch?
16   A.  I believe it was related on some level.  I had
17 already spoke of having conversations with him about
18 his treatment of women and so forth and had hopes that
19 things would change.
20          After that I began to see that that
21 probably was not going to change.  And I think when I
22 realized that I started to seriously consider
23 litigation and when I first made this complaint it
24 took them almost four months, I believe, close to four

Page 105

1  months before I heard one word about what they were
2  going to do.  They kept Lieutenant Campanella in there
3  in that environment with me for quite a while after he
4  knew that I had complained to the staff about some of
5  his incidents, which created quite a hostile
6  environment for me.
7          I began to realize way before I was
8  formally charged with anything that this investigation
9  had shifted to me being the focal point of the
10 investigation and at that point I did directly feel
11 that it was a result of Aaron's fear.  He only became
12 more fearful of me I believe after I talked to him
13 that I was going to pursue litigation for promotional
14 reasons.
15   Q.  When was that conversation?
16   A.  When we had the conversation at SOAR in
17 November of '03.  After that time I sensed that he was
18 more concerned with me that I may sue than he was
19 before.  And we didn't have a conversation about it.
20 Just his behavior, coupled with during this same time
21 during that summer I was treated very badly at the
22 Harrington Fair by him as well.  He was angry with me
23 at that point because I think he thought that I was
24 supportive of the Greg Warren lawsuit and things were

Barbara L. Conley

Page 106

1  just going downhill.  And it was during that whole
2  period of time that I was getting my mind and my
3  finances prepared to file suit.
4      Q.   Well, maybe I misunderstood.  I thought I heard
5  you say at one point that at the SOAR retreat you made
6  some mention of filing suit.  Did I misunderstand
7  that?
8      A.   No, not at the SOAR retreat.  No.  When I
9  talked to him about my concerns and everything and he
10  was pretty receptive at that time I thought, then
11  after that point I never saw any change.  It just
12  continued to get worse, lack of support for the
13  situation that I had with Campanella and so forth and
14  then the treatment at the fair and some things like
15  that.  And I could see very early on that this was,
16  that his behavior and his treatment of women and
17  myself was not going to change.
18      Q.   Did you have a conversation with Colonel
19  Chaffinch at sometime before your attorney filed the
20  lawsuit where you said, "I'm going to have to file a
21  lawsuit"?
22      A.   No.
23      Q.   That's what I misunderstood.
24          I'm trying to get a fix on the kinds of
25

Page 107

1  things you expected after the retreat of Colonel
2  Chaffinch and how you were disappointed.
3          When the investigation took its turn and
4  you became the subject of an investigation and later
5  charges, was it your expectation that Colonel
6  Chaffinch would use his authority to prevent that or
7  interrupt that process?
8      A.   Well, did I think that -- could you rephrase
9  that?
10      Q.   Sure.  Let me back up a little bit.
11          Am I correct that when there's an
12  investigation into conduct and possible discipline of
13  an officer that needs to be done, it's assigned to the
14  internal affairs unit?  Is that fair to say?
15      A.   Yes.
16      Q.   And in this instance the Campanella
17  investigation was done by internal affairs so far as
18  you know?
19      A.   Mm-hmm.
20      Q.   Yes?
21      A.   Yes.
22      Q.   And that's also true, sort of the outgrowth of
23  the same investigation was an investigation of you by
24  internal affairs.  Is that right?
25

Page 108

1      A.   Yes.
2      Q.   The process works in such a fashion that after
3  there's some determination, the ultimate decision on
4  discipline and penalty and so forth within the State
5  Police would be the superintendent, correct?
6      A.   Yes.
7      Q.   Before it gets to that point, and this is my
8  question, did you have an expectation that Colonel
9  Chaffinch who would know something about it as
10  superintendent would intervene on your behalf to
11  prevent that investigation from going forward?
12      A.   No, I didn't think he would intervene on my
13  behalf.  I expected early on when I was having other
14  problems that were starting to develop with Campanella
15  I had spoken with him about it and I expected him to
16  try to do something to remedy that before it got to
17  the level that it did, and nothing ever happened.  He
18  basically just listened and ignored me.
19          I also firmly believe that he was actually
20  a catalyst for the turn of events that resulted in me
21  being charged and, quite frankly, I felt that I was
22  being singled out for discipline, severe discipline
23  for behaviors that were being exhibited on a much
24  greater level by himself and others every day.
25

Page 109

1      Q.   Let me ask a couple of questions about that.
2          When you say that nothing was done by
3  Colonel Chaffinch when you complained about Lieutenant
4  Campanella, one thing that was done was the internal
5  affairs disciplinary investigation of Campanella?
6      A.   Well, I'm talking about earlier than that,
7  earlier in that period of eight months when the
8  civilian staff that I had and everyone had started to
9  complain.  He was only in the section three days
10  before I started receiving complaints from my civilian
11  staff about him and I had talked to Colonel Chaffinch
12  a couple of times about that prior to it reaching the
13  level where he had handed me like anti-female-related
14  cartoons and so forth.
15          And I just felt that that went above and
16  beyond.  He was sending a very clear message to me
17  that he didn't intend to listen to me or take me
18  seriously.  Campanella I'm talking about.  But Colonel
19  Chaffinch didn't do anything leading into that.  I had
20  told him very early on that this wasn't working out,
21  not only for me but for the rest of the civilian women
22  that were in that section.  And he basically didn't do
23  anything to try to help facilitate any kind of a
24  resolution, nor did he assign it to any of the majors.
25

Barbara L. Conley

Page 110

1    I had also gone to Major Seifert numerous
2  times through e-mails trying to say this is not
3  working out down here; it's getting worse; it's
4  escalating. And nothing was done.
5    Q.  You also said that you thought that Colonel
6  Chaffinch was a catalyst, as you put it, in the IA
7  investigation against you.
8    What evidence do you have of that?
9    A.  Well, I know that despite what the manual may
10 say that Colonel Chaffinch is very well-aware of these
11 internal affairs investigations as they develop. He
12 had -- as you know, there was an ongoing investigation
13 involving Major Hughes and Captain Hawkins over a
14 domestic and the way it was handled and Aaron was
15 intimately involved in that.
16    He had come down to my office and
17 basically was very, very upset and irate about Captain
18 Dixon's role in that and was pretty much trying to get
19 me to send a message to Dixon to lay down on this
20 information because he didn't feel that Major Hughes
21 did anything wrong, even though ultimately it was
22 determined that he had done something wrong. And so I
23 knew from that experience that despite the fact that
24 he is supposed to remain this neutral party at the top
25

Page 111

1  of the chain for internal affairs things that he
2  actually was involved in these during the
3  developmental stages or investigative period.
4    And based on some of his behavior and some
5  comments and so forth, you have to remember the time
6  frame here being that Major Baylor, prior to this
7  investigation being refocused towards me, Major Baylor
8  then announces he's going to retire. And my absolute
9  100 percent belief is that Aaron Chaffinch saw an
10 opportunity to have this investigation shift and that
11 that would give him some level of protection if he
12 were going to replace Baylor with someone other than
13 myself.
14   Q.  So are you alleging that Colonel Chaffinch
15 somehow manipulated Captain Paige and the internal
16 affairs process and told them to focus on you?
17   A.  I can only believe that that is possible.
18   Q.  Are you saying then that what you just said
19 was, and "what you just said" being the internal
20 affairs investigation focusing on you and charges
21 being brought against you, was kind of the last straw
22 that caused you to decide to file the lawsuit?
23   A.  I wouldn't say it was the last straw. It was
24 obviously a component that entered into my mind and so
25

Page 112

1  forth, but I would say that the continued lack of
2  support for women's issues, not only myself but the
3  civilian women that I had in my section, the civilian
4  women at the Office of Highway Safety that had had
5  problems with Lieutenant Campanella, the huge delay
6  that it took them to respond to that even though they
7  knew the level to which it had risen led me to believe
8  that nothing was going to change and it further
9  confirmed in my mind that this was a gender-based
10 problem with Colonel Chaffinch.
11   Q.  Major Baylor's position was what when he left
12 office? What were his responsibilities?
13   A.  He was operations major in New Castle County.
14   Q.  Do you think that you as a downstate person
15 would have been qualified to fill that position?
16   A.  I believe I would have been qualified.
17 Essentially, those two roles, Kent and Sussex
18 operations and New Castle County operations, are the
19 same job; the only difference being familiarity with
20 some of the territory. And in my particular case I
21 had been dealing with the troops in New Castle County
22 and had some level of knowledge.
23    In addition to that one, when I was at the
24 traffic lieutenant's position at Troop 3 there were
25

Page 113

1  some operations that we worked with jointly with Troop
2  9 due to them having the Salem Nuclear Plant
3  surrounding territory and so forth that would be
4  included in evacuations and so forth.
5    So I think I was qualified for that as
6  well and, again, keeping in mind that these majors'
7  positions can be realigned and they had never at that
8  point announced for sure if they were going to do any
9  kind of a realignment at that point, but it was
10 possible.
11   Q.  I thought you said earlier that Captain Mary
12 Ann Papili as an upstate troop commander would have
13 been not particularly well-qualified for the downstate
14 Kent and Sussex position.
15   A.  She would have been in the same situation, not
16 as familiar, but I don't believe that that should be
17 an exclusionary factor completely for either party.
18   Q.  It's a consideration?
19   A.  It's a consideration, yes.
20   Q.  Let's turn to the complaint again. I want to
21 deal with counts 2 and 3 which were added when the
22 complaint was amended the first and only time.
23    Are you familiar with the --
24    MR. NEUBERGER:  Page 19.
25

Barbara L. Conley

Page 114

1    Q.   To give you a reference, count 2 begins on page
2    19 of the complaint, paragraph 106.
3            Are you familiar with the kind of notice
4    that is required to be sent when a trial board has
5    been named in a disciplinary matter?
6    A.   Yes, I'm familiar with that notice.
7    Q.   Is it your understanding that that notice is
8    normally sent to all active duty personnel?
9    A.   My recollection is that it's sent and I believe
10   it asks that if you have any particular reason why you
11   think someone would have a conflict of interest or
12   something of that nature to notify internal affairs.
13   Q.   So these days when everyone has e-mail, it
14   would customarily be sent out by e-mail to all active
15   duty officers?
16   A.   Yes.
17   Q.   And the notice, I mean the notice provision
18   comes from the manual, correct?
19   A.   Yes.
20   Q.   And I think as you just said it gives notice of
21   the officer charged, the nature of the charges, the
22   date of the hearing and the composition of the trial
23   board?
24   A.   Yes.
25

Page 115

1    Q.   And your understanding is that there are couple
2    of reasons for that.  One is that if any officer has
3    knowledge about the incident they're expected or
4    obligated to come forward, correct?
5    A.   I don't believe it asks for that.  It asks
6    specifically for a conflict -- at this point it's
7    already been investigated.  All they're basically
8    asking for is if you think there's some reason why one
9    of these members shouldn't be on that board, then you
10   should notify them about that.
11   Q.   Right.  And you've seen, before the notice that
12   went out in your case you've seen those kinds of
13   things go out before.  Is that correct?
14   A.   Yes, to the division.
15   Q.   Yes.  Have you ever had occasion to contact IA
16   and say listen, one of the officers sitting on the
17   trial board may have a conflict or a problem?
18   A.   I never have that I recall.
19   Q.   Now, the amendment to the complaint that added
20   counts 2 and 3 alleges that confidential information
21   concerning the disciplinary action against you was
22   leaked to the media.
23           Is that your understanding of what you
24   have alleged there?
25

Page 116

1    A.   Yes.
2    Q.   Now Colonel MacLeish, acting colonel at that
3    point, was added as a defendant to counts 2 and 3.
4            What evidence do you have that then acting
5    Colonel MacLeish was the one who leaked information to
6    Tom Eldred, who is the reporter involved?
7    A.   Well, he was the one in charge of the division
8    at the time and I think that he's responsible, he was
9    responsible for maintaining that confidentiality and
10   enforcement of the rights under the Law Enforcement
11   Bill of Rights that states that is confidential
12   information.  And that wasn't done, and, therefore, in
13   his capacity he was the person responsible.
14           And I believe in the depositions that were
15   taken he has indicated that he did know about it and
16   he did authorize it to be released to the media.
17   Q.   Maybe I should back up.  I probably asked the
18   wrong question first.
19           What is the confidential information that
20   you contend was leaked to the media?
21   A.   The information, just the fact that there was
22   even an IA charge being investigated or whatever and
23   what those charges were and everything were all
24   confidential material that should not have been
25

Page 117

1    released outside of the department.  And in this
2    particular instance somebody sent the e-mail that was
3    sent out that was supposed to be kept within the
4    division, someone sent that to the news media.
5            Upon that, they tried to confirm this
6    information and then Colonel MacLeish and Secretary
7    Mitchell through our public information officer
8    confirmed all the information that was within that
9    document to the news media and then they had the
10   authority to release that publicly.  And it mentioned
11   very briefly the nature of the charges and everything.
12           So the public and everybody reading that
13   was left to reach their own conclusions as to what
14   actually happened in that case.
15   Q.   Do you contend that any information beyond what
16   appears in that document, that notice was leaked to
17   the media?
18   A.   I think, yes, because I think it listed things
19   as violation of rule number whatever.  And when that
20   went to the media they authorized and advised the PIO
21   to tell them what those sections were, that section 40
22   would be sexual harassment in the workplace or hostile
23   work environment and rule number whatever was poor
24   judgment, whatever they were at the time.
25