## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CAPTAIN BARBARA L. CONLEY, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    C.A.No.04-1394-GMS |
| | : |
| COLONEL L. AARON CHAFFINCH, | : |
| | : |
| Defendants. | : |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR AN ORDER LIMITING PREJUDICIAL PRETRIAL PUBLICITY AND FOR SANCTIONS

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: June 16, 2006                    Attorneys for Plaintiffs

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING ................................................................. 1

SUMMARY OF THE ARGUMENT ................................................................................. 1

STATEMENT OF FACTS .............................................................................................. 1

    A.    Incorporation By Reference ...................................................................... 1

    B.    The Present Matter .................................................................................. 1

    C.    The Unrelated Price Matter ...................................................................... 2

        1.    The Conley Matter is Unrelated to the Price Matter ........................... 2

    D.    The Price Trial - May 15 - May 31, 2006 ................................................. 2

        1.    The Widespread Media Coverage of the Price Trial ........................... 2

    E.    The Price Jury Verdict ............................................................................. 2

        1.    The Widespread Media Coverage of the Price Verdict ...................... 3

    F.    Counsel Reviews Rule 3.6 Prior to Speaking to the Media ............................. 3

    G.    The Media Asks Counsel For Comment on the Price Verdict ......................... 3

    H.    The Media Coverage About the Price Verdict Complained of By the Defense .............. 4

        1.    No Statements Were Made About the Conley Action ........................... 4

        2.    No Statements Were Made About Defendant Chaffinch ...................... 4

        3.    Statements Were Only Made About Col. MacLeish, Who is Not a
            Defendant in this Matter ................................................................. 4

    I.    Defendants Do Not Contest the Truth of Counsel's Statements ....................... 4

    J.    No Public Statements Were Made About the Present Conley Matter ................ 5

    K.    The Gag Order Imposed by the Court ........................................................ 5

        1.    The Oral Gag Order ....................................................................... 5

        2.    The Written Gag Order .................................................................. 5

ARGUMENT ............................................................................................................. 5

I.   THE OVERARCHING FIRST AMENDMENT CONTEXT IN WHICH THE
     DEFENSE MOTION TO PUNISH SPEECH CRITICAL OF GOVERNMENT
     MISCONDUCT MUST BE VIEWED ................................................................. 5

     A.   The Defense Seeks To Silence Public Criticism of Their Misdeeds Which
          Violate Their Oaths As Police Officers as Well as the U.S. Constitution .......... 5

     B.   Speech on Public Issues Occupies the Highest Rung of First Amendment
          Protection ........................................................................................... 6-7

     C.   Vehement, Caustic and Unpleasant Speech About Public Officials Receives
          Full First Amendment Protection ..................................................................... 7

          1.   The First Amendment Does Not Give the Defense a Listener's
               Veto ........................................................................................... 9

     D.   The First Amendment Needs Breathing Space to Survive ................................. 9

     E.   The Heightened Public Interest in the Actions of Police Officers ................... 10

     F.   Speech About Defendants' Wrongdoing is Core First Amendment Protected
          Activity ........................................................................................... 11

     G.   Criticism of Government Misconduct Does Not Lose Its Protection Simply
          Because It Rightly Diminishes an Official's Reputation .................................. 14

     H.   The Timing of Speech is Key ........................................................................... 14

II.  MODEL RULE 3.6 HAS NOT BEEN VIOLATED AS ALL STATEMENTS OF
     COUNSEL WERE WELL WITHIN ITS SAFE HAVENS AND THOSE OF THE
     FIRST AMENDMENT ................................................................................... 15

     A.   The Law of Prior Restraints ........................................................................... 15

     B.   The Various Prior Restraint Tests ................................................................... 16

          1.   The Scarfo Gag Order on an Attorney Test ........................................ 16

          2.   The Bailey Gag Order on a Party Test ................................................ 17

          3.   The Gag Order on Witnesses ............................................................. 17

     C.   Model Rule 3.6's General Rule ....................................................................... 17

     D.   Safe Haven Exceptions to Rule 3.6 ............................................................... 17

          1.   "In the Matter" Limitation - Rule 3.6(a) ........................................... 17

          2.   Rule 3.6(b)'s Safe Havens ................................................................ 19

|  |  | a. | Information Contained in a Public Record ............................. 20 |
|--|--|----|------------------------------------------------------------------|
|  |  | b. | The Claim, Offense or Defense Involved ................................ 20 |
|  |  | c. | Result of Any Step in Litigation ................................. 20 |
|  | 3. |  | First Amendment Considerations Incorporated Into Rule 3.6 ............. 20 |
| E. |  |  | Due Process Notice Requirements are Lacking .................................. 20 |
| F. |  |  | The Specific Statements Defendants Challenge ................................... 21 |
|  | 1. |  | DSP Leadership Threw Its Officers Under a Bus ................................ 21 |
|  | 2. |  | MacLeish Should Resign ...................................................... 22 |
|  | 3. |  | The Defense in the Price Case Was a Coverup and a Pack of Lies By Men Without Honor .................................. 23 |
|  | 4. |  | MacLeish is a Coward Who Would Not Protect His Men ................... 26 |
| G. |  |  | Defendants Have Failed to Present a Proper Record ......................... 29 |
| H. |  |  | The Scarfo Test Has Not Been Met .................................................. 30 |
| I. |  |  | There is No Basis for Sanctions or Contempt ................................... 31 |
| J. |  |  | The Jury Pool Was Not Tainted and the Extensive Voir Dire Did Not Result From Counsel's Statements ..................................... 32 |
| K. |  |  | The Defense Is Using the Gag Order as Both a Sword and a Shield ................ 33 |
| III. |  |  | RULE 3.6 IS UNCONSTITUTIONALLY VAGUE AS APPLIED TO OUR PRESENT CASE AND IMPOSING LIABILITY UNDER IT WILL VIOLATE THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE AND THE FIRST AMENDMENT FREE SPEECH CLAUSE ...................................... 34 |
| IV. |  |  | THE DEFENSE GAG ORDER VIOLATES THE FREE SPEECH AND PETITION CLAUSE RIGHTS OF PLAINTIFF, COUNSEL AND COUNSEL'S NUMEROUS OTHER STATE POLICE CLIENTS ........................................... 35 |
| V. |  |  | DEFENDANTS' ILLEGAL EFFORTS ALSO VIOLATE THE EXPRESSIVE ASSOCIATIONAL RIGHTS OF THE NEUBERGER FIRM AND ITS CLIENTS ..... 38 |
|  | A. |  | The Firm and Its DSP Clients Are An Expressive Association ........................ 38 |
|  | B. |  | The Gag Order Will Significantly Affect this Expressive Association's Ability to Advocate Its Viewpoint ..................................... 39 |
|  | C. |  | The State Has No Interest to Assert in the Balancing ........................ 40 |

CONCLUSION ........................................................................................................................... 40

### TABLE OF AUTHORITIES

**Case**                                                                      **Page**

Abu-Jamal v. Price, 154 F.3d 128 (3d Cir. 1998) .................................................................... 37

Alderman v. Phila. Hous. Auth., 496 F.2d 164 (3d Cir. 1974) ............................................... 15

Alexander v. U.S., 509 U.S. 544 (1993) .................................................................................. 16

Bailey v. Sys. Innovation, Inc., 852 F.2d 93 (3d Cir. 1988) ...................................... 16-17,30-32

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001) ........................................................ 11

Bank of America Nat'l Trust and Savings Assoc. v. Hotel Rittenhouse Assoc.,
    800 F.2d 339 (3d Cir. 1986) .......................................................................................... 19

Bd. of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537 (1987) ....... 38

Biggs v. Village of Dupo, 892 F.2d 1298 (7th Cir. 1990) ........................................................ 37

Boy Scouts of America v. Dale, 530 U.S. 640 (2000) .............................................................. 38

Brennan v. Norton, 350 F.3d 399 (2003) .............................................................................. 36,39

Bridges v. State of Cal., 314 U.S. 252 (1941) ...................................................................... 6,14

Butterworth v. Smith, 494 U.S. 624 (1990) ............................................................................. 11

Cantwell v. Connecticut, 310 U.S. 296 (1940) .................................................................... 10,28

Carey v. Brown, 477 U.S. 455 (1980) ...................................................................................... 7

Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005) ........................................................... 10

Circle Schools v. Pappert, 381 F.3d 172 (3d Cir. 2004) ......................................................... 38

City of Houston v. Hill, 482 U.S. 451 (1987) .......................................................................... 10

City of San Diego v. Roe, 543 U.S. 77 (2004)(per curiam) .................................................... 12

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985) ................................................... 21

Cohen v. California, 403 U.S. 15 (1971) ............................................................................... 8-9,29

Conley v. Chaffinch, 2005 WL 2678954 (D.Del. March 4, 2005) ..................... 3,8,15-18,21,27,30,32,35

Connick v. Myers, 461 U.S. 138 (1983) ............................................................................. 7,11-12,22-23

Cox v. Louisiana, 379 U.S. 536 (1965) ................................................................................... 8-9

Darchia v. Ashcroft, 101 Fed.Appx. 373 (3d Cir. 2004) ........................................................ 30

Elrod v. Burns, 427 U.S. 347 (1976) ...................................................................................... 37

FCC v. Pacifica Found., 438 U.S. 726 (1978) .......................................................................... 9

First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765 (1978) ............................................ 11,15

F.O.P., Lodge No. 5 v. City of Phila., 812 F.2d 105 (3d Cir. 1987) ...................................... 10

Garrison v. Louisiana, 379 U.S. 64 (1964) .............................................................................. 6

Garrity v. New Jersey, 385 U.S. 493 (1967) .......................................................................... 37

Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991) .................................. 6,17,19,25,30,34

Glenmede Trust Co. v. Thompson, 56 F.3d 476 (3d Cir. 1995) ............................................. 19

Good News Club v. Milford Central Sch., 533 U.S. 98 (2001) ................................................ 9

Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423 (1974) ...................... 21

Grayned v. City of Rockford, 408 U.S. 104 (1972) ............................................................... 34

Hustler v. Falwell, 485 U.S. 46 (1988) .................................................................................... 9

In re Cendant Corp., 260 F.3d 183 (3d Cir. 2001) ................................................................. 19

John T. v. Del. County Intermediate Unit, 318 F.3d 545 (3d Cir. 2003) ................................ 31

Johnson v. Campbell, 332 F.3d 199 (3d Cir. 2003) ............................................................. 8,27

Kerman v. City of New York, 261 F.3d 229 (2d Cir. 2001) .................................................... 10

Kleindienst v. Mandel, 408 U.S. 753 (1972) .......................................................................... 15

Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (3d Cir. 1993) ........... 19

Littlejohn v. BIC Corp., 851 F.2d 673 (3d Cir. 1988) ....................................................... 19,31

Martin v. City of Struthers, 319 U.S. 141 (1943) ................................................................... 15

McIntyre v. Ohio Elec. Commissions, 514 U.S. 334 (1995) ................................................... 15

Miller v. Indiana Hospital, 16 F.3d 549 (3d Cir. 1994) ......................................................... 19

Monitor Patriot Co. v. Roy, 401 U.S. 265 (1971) .................................................................. 13

NAACP v. Button, 371 U.S. 415 (1963) ..................................................................... 7,10,36,39

NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982) .................................................. 7,14

Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931) ................................................... 15-16

Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976) ............................................... 15

New York Times Co. v. Sullivan, 376 U.S. 254 (1964) ......................................... 6-10,11,14,21,24,27-28

Ocala Star-Banner Co. v. Damron, 401 U.S. 295 (1971) ................................................ 12-13

Pansy v. Borough of Stroudsburg, 23 F.3d 772 (3d Cir. 1994) ........................................ 19

Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986) ........................................... 24

Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435 (3d Cir. 2000) ......................... 38-39

Planned Parenthood of Central N.J. v. Farmer, 220 F.3d 127 (3d Cir. 2000) .......................... 34

Policemen's Benevloent Ass'n of N.J. v. Washington, 850 F.2d 133 (3d Cir. 1988) ............................ 10

Price v. Chaffinch, 2006 WL 1313178 (D.Del. May 12, 2006) ........................................... 32

Publicker Indus., Co. v. Cohen, 733 F.2d 1059 (3d Cir. 1984) ................................... 19

Quinter v. Volkswagen of America, 676 F.2d 969 (3d Cir. 1982) ............................ 31

Republic of the Philippines v. Westinghouse Elec. Co., 949 F.2d 653 (3d Cir. 1991) ........................ 19

Roberts v. U.S. Jaycees, 468 U.S. 609 (1984) ................................................... 38-39

Rockwell Tech. LLC v. Spectra-Physics Lasers, Inc.,
        2002 WL 531555 (D.Del. March 26, 2002) .............................................. 21

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994) ........................................... 36-37,39

Schenck v. U.S., 249 U.S. 47 (1919) ........................................................... 7

Shingara v. Skiles, 420 F.3d 301 (3d Cir. 2005) ................................................ 15

Street v. New York, 394 U.S. 576 (1969) .......................................................... 9

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002) ............................................ 37,40

Swineford v. Snyder County Pa., 15 F.3d 1258 (3d Cir. 1994) ................................... 11

Terminiello v. City of Chicago, 337 U.S. 1 (1949) ............................................. 8-9

Texas v. Johnson, 491 U.S. 397 (1989) ........................................................ 7-9

U.S. v. Associated Press, 52 F.Supp. 363 (S.D.N.Y. 1943) .................................... 11

U.S. v. Carmichael, 326 F.Supp.2d 1267 (M.D.Ala. 2004) ........................................................ 16

U.S. v. Criden, 648 F.2d 814 (3d Cir. 1981) ...................................................................... 19

U.S. v. Dinwiddie, 76 F.3d 913 (8th Cir. 1996) .................................................................. 8

U.S. v. Kosma, 951 F.2d 549 (3d Cir. 1991) ..................................................................... 8

U.S. v. Martin, 746 F.2d 964 (3d Cir. 1984) .......................................................... 19,30,32-33

U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454 (1995) ............................................ 36

U.S. v. Scarfo, 263 F.3d 80 (3d Cir. 2001) ................................................... 16-17,20-21,30-31

U.S. v. Smith, 776 F.2d 1104 (3d Cir. 1985) ............................................................... 11,13,23

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) .................................................... 34

Whitney v. California, 274 U.S. 357 (1927) .................................................................... 7

Wilcher v. City of Wilmington, 60 F.Supp.2d 298 (D.Del. 1999) ........................................ 10

**Constitutions, Statutes and Rules**

U.S. Constitution Amendment I .................................................................................. passim

U.S. Constitution Amendment XIV ............................................................................ passim

Sedition Act of 1798, 1 Stat. 596 ............................................................................... 6

D.Del. LR 7.1.3(a)(D) .......................................................................................... 20

D.Del. LR 7.1.3(c)(2) .......................................................................................... 21

ABA Model Rule of Professional Conduct 3.6 ........................................................... passim

ABA Model Rule of Professional Conduct 3.6(a) ......................................... 17-19,21-23,26,29

ABA Model Rule of Professional Conduct 3.6(b) ........................................................... 19

ABA Model Rule of Professional Conduct 3.6(b)(1) ................................................. 20,23,26

ABA Model Rule of Professional Conduct 3.6(b)(2) ........................................... 19-20,22-23,26

ABA Model Rule of Professional Conduct 3.6(b)(4) ................................................... 20,23

ABA Model Rule of Professional Conduct 3.6, Comment 1 ..................................... 20,22-23,26

ABA Model Rule of Professional Conduct 3.6, Comment 4 ............................................ 19

ABA Model Rule of Professional Conduct 3.6, Comment 5, subsection (1) ........................................... 19

**Other Sources**

Merriam Webster's Collegiate Dictionary 10th Edition (1996) ....................................................... 24-25,27

Principles of Professionalism for Delaware Lawyers: Preamble ............................................................ 21

## NATURE AND STAGE OF THE PROCEEDING

The record consists of the Declaration of Thomas S. Neuberger ("Neuberger Decl."),

which is the basis for the Statement of Facts and which also authenticates the media articles and

other documents found in the Appendix.  This is Plaintiff's Answering Brief in opposition to

defendants' renewed Motion seeking sanctions and a gag order.

## SUMMARY OF THE ARGUMENT

Neither the record evidence nor the law support defendant high public official's attempts

to censor pure political speech and expression critical of their misconduct and corruption in

public office.  All speech challenged by the defense is protected by the First Amendment and

falls within the safe havens of Rule 3.6, as interpreted by this Court's previous opinion in the

matter.  To adopt the interpretation of Rule 3.6 proffered by the defense results in Rule 3.6 being

unconstitutionally vague as applied to our present case in violation of both the Fourteenth and

First Amendments.  Similarly, the defense efforts to silence all speech critical of them also

violates the First Amendment speech, petition and expressive associational rights of plaintiff, the

Firm and the Firm's numerous other State Police clients.

## STATEMENT OF FACTS

**A.  Incorporation By Reference.**  In the interest of brevity and judicial economy,

plaintiff adopts the extensive Statement of Facts contained within her earlier gag order

Answering Brief (D.I. 22), where she laid out in great contextual detail the long history over the

last four years of numerous lawsuits, costly settlements and even costlier jury verdicts against

defendants Chaffinch and MacLeish since April 2002, as well as other similar matters.

**B.  The Present Matter.**  The plaintiff in this Fourteenth Amendment equal protection

gender discrimination in promotions lawsuit is Captain Barbara Conley.  The only defendant is

L. Aaron Chaffinch.  At the Rule 16 scheduling conference in March 2005, the Court scheduled a

10 day trial to begin on May 31, 2006.  (See D.I. 48 and subsequent "So Ordered").  The trial

date was later changed to begin on June 6, 2006.  (See unnumbered docket entry dated 5/16/06). (Neuberger Decl. ¶ 2; A74).

**C.  The Unrelated Price Matter.**  The plaintiffs in the First Amendment retaliation Price and consolidated Foraker matters are Cpl/3 Kurt Price, Cpl/3 Wayne Warren and Sgt. Christopher Foraker.  The defendants in those cases are L. Aaron Chaffinch and Col. Tom MacLeish.  At the Rule 16 scheduling conference in February 2005, the Court ordered a trial to begin on May 15, 2006.  The Price and Foraker matters were later consolidated for an 11 day trial beginning May 15, 2006.  See C.A.No. 04-956-GMS; C.A. No. 04-1207-GMS.  (Neuberger Decl. ¶ 3; A74).

**1.  The Conley Matter is Unrelated to the Price Matter.**  As the Court recently observed in an Order dated June 1, 2006, the present Conley action "is not related to any other case before this court." (D.I. 236).  (Neuberger Decl. ¶ 4; A75).

**D.  The Price Trial - May 15 - May 31, 2006.**  The Price trial began on May 15th and ultimately lasted 12 days, finally concluding on May 31st.  (Neuberger Decl. ¶ 5; A75).

**1.  The Widespread Media Coverage of the Price Trial.**  There was widespread media coverage of nearly every day of the Price trial.  This media coverage included numerous stories in the local News Journal and Delaware State News, as well as nationally in the Associated Press.  There was local radio coverage as well.  (A1-36). (Neuberger Decl. ¶ 6; A75).

**E.  The Price Jury Verdict.**  On May 31st, the jury in Price returned a verdict, finding that Chaffinch and MacLeish had violated the First Amendment rights of Cpl/3 Warren, Cpl/3 Price and Sgt. Foraker.  In addition to the liability finding, the jury continued and found that Chaffinch and MacLeish had acted "recklessly, maliciously, or intentionally" (Price and Warren Inter. # 6, 8; Foraker Inter. # 12, 14; A52-53,56-57,63) and exercised their discretion and awarded punitive damages to "punish and deter" them.  (Price and Warren Inter. # 7, 9; Foraker Inter. # 13, 15; A52-53, 56-57, 63).  The jury also made a specific factual finding that Chaffinch

had defamed Sgt. Foraker and "published an untrue statement" about him. (Foraker Inter. # 4;

A60). The jury continued and found that "Chaffinch knew the statement concerning [] Foraker

was false or recklessly disregarded whether it was false" and so acted with actual malice.

(Foraker Inter. # 5; A60. The careful jury awarded a total of $1,923,789 in damages to the three

plaintiffs, a figure which included $443,442 in punitive damages against Chaffinch and

MacLeish. (Price and Warren Inter. # 7, 9; Foraker Inter. # 13, 15; A52-53, 56-57, 63).

(Neuberger Decl. ¶ 7; A75).

      **1. The Widespread Media Coverage of the <u>Price</u> Verdict.** The <u>Price</u> verdict

was by far the largest verdict against Chaffinch and MacLeish in any of the numerous recent

lawsuits against them. Not surprisingly, given the size of the nearly $2.0 million verdict as well

as the widespread media coverage during the trial, the media reported extensively on the jury

verdict. The News Journal ran a front page story with the headline - "Troopers Awarded $2

Million in Lawsuit - State Police Leaders Were Accused of Retaliation." (A43). The Delaware

State News picked up the story from the AP Wire and also ran a front page article with the

headline - "Troopers Get $2M in Suit." (A40). The story on the AP Wire was headlined "Jury

Says Firing Range Troopers Were Victims of Retaliation." (A37). (Neuberger Decl. ¶ 8; A75-

76).

      **F. Counsel Reviews Rule 3.6 Prior to Speaking to the Media.** As a matter of

practice, counsel regularly reviews Model Rule 3.6 and attempts to stay abreast of related court

decisions in order to assure that any public comments made about cases are within bounds of the

Rule. Anticipating the verdict, counsel had reviewed Rule 3.6 and also its interpretation in light

of the Court's earlier opinion in <u>Conley v. Chaffinch</u>, 2005 WL 2678954 (D.Del. March 4,

2005), which interprets and applies Rule 3.6. Counsel wanted to be sure that all of his comments

were within the parameters of the Rule. (Neuberger Decl. ¶ 9; A76).

      **G. The Media Asks Counsel For Comment on the <u>Price</u> Verdict.** Not surprisingly

given his status as plaintiffs' counsel, following the verdict, members of the news media asked counsel for comment on the $2 million jury verdict against Chaffinch and MacLeish for violating the First Amendment to the U.S. Constitution.  (Neuberger Decl. ¶ 10; A76).

**H.  The Media Coverage About the <u>Price</u> Verdict Complained of By the Defense.**

As discussed above, none of the media coverage complained of by the defense was generated by this court case - the <u>Conley</u> case.  Instead, the media coverage complained of was generated by a separate, independent and unrelated matter - the <u>Price</u> case. (<u>See</u> A1-45).  (Neuberger Decl. ¶ 11; A76).

**1.  No Statements Were Made About the <u>Conley</u> Action.**  Counsel did not make any statements relating to the <u>Conley</u> action.  Instead, all of counsel's statements addressed only the <u>Price</u> action.  Indeed, in keeping with their practice, counsel had ceased answering any substantive questions from the media about the <u>Conley</u> matter in the months leading up to the <u>Conley</u> trial so as not to affect the jury pool with public statements about the <u>Conley</u> case. (Neuberger Decl. ¶ 12; A76).

**2.  No Statements Were Made About Defendant Chaffinch.**  Out of an abundance of caution, in the aftermath of the <u>Price</u> verdict, counsel did not direct any public criticism towards Chaffinch who is a defendant in both the <u>Price</u> and <u>Conley</u> actions.  Counsel consciously refrained from mentioning Chaffinch by name in his public statements about the <u>Price</u> verdict.  (Neuberger Decl. ¶ 13; A77).

**3.  Statements Were Only Made About Col. MacLeish, Who is Not a Defendant in this Matter.**  Instead, all public criticism arising from the <u>Price</u> jury verdict was purposefully directed at Col. MacLeish.  Although MacLeish was a defendant in the <u>Price</u> matter, he is not a defendant in the <u>Conley</u> case.  (Neuberger Decl. ¶ 14; A77).

**I.  Defendants Do Not Contest the Truth of Counsel's Statements.**  Notably, as the defense motion makes clear, the defense has not contested the truth of any of the statements

-4-

about the <u>Price</u> verdict attributed to counsel in the local media.  (Neuberger Decl. ¶ 15; A77).

       **J.  No Public Statements Were Made About the Present <u>Conley</u> Matter.**  Counsel has not made any public comments about the present <u>Conley</u> case, a case that was scheduled to go to trial the very next week - on June 6th.  (Neuberger Decl. ¶ 16; A77).

       **K.  The Gag Order Imposed by the Court.**  Two gag orders were subsequently imposed by the Court. (Neuberger Decl. ¶ 17; A77).

       **1.  The Oral Gag Order.**  On June 1, 2006, the Court ordered that a telephone conference be held to discuss the matter of media comments regarding the <u>Price</u> verdict.  (D.I. 236).  On June 2nd, the Court held the teleconference.  (<u>See</u> the first unnumbered docket entry dated June 2, 2006).  There is not a transcript of that teleconference.  During the teleconference, the Court, in no uncertain terms, imposed an oral gag order on plaintiff's counsel, barring them from speaking to the media at all. The Court ordered that all communication with the media immediately cease.  (Neuberger Decl. ¶ 18; A77).

       **2.  The Written Gag Order.**  On June 5, 2006, the Court continued and issued a written gag order.  (D.I. 241).  The relevant portion of the order stated that:

> The parties, lawyers, and potential witnesses in this matter shall refrain from making to the media any extrajudicial statement or comment that is likely to interfere with a fair trial, or prejudice any party or the administration of justice.

(D.I. 241).  (Neuberger Decl. ¶ 19; A77-78).

## ARGUMENT

**I.    THE OVERARCHING FIRST AMENDMENT CONTEXT IN WHICH THE DEFENSE MOTION TO PUNISH SPEECH CRITICAL OF GOVERNMENT MISCONDUCT MUST BE VIEWED.**

       **A.  The Defense Seeks To Silence Public Criticism of Their Misdeeds Which Violate Their Oaths As Police Officers as Well as the U.S. Constitution.**  The defense motion is a transparent attempt by corrupt government officials to silence public criticism of their many misdeeds which violate both their oaths as police officers and the First Amendment to the U.S.

Constitution.  Unfortunately for defendants, "[n]o suggestion can be found in the Constitution

that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness

and importance of the ideas seeking expression."  Bridges v. State of Cal., 314 U.S. 252, 269

(1941).  As the Supreme Court warned in another case in which government officials sought to

punish an attorney for criticizing them, "history shows that speech is suppressed when either the

speaker or the message is critical of those who enforce the law."  Gentile v. State Bar of Nevada,

501 U.S. 1030, 1051 (1991).[1]

Defendants are high government officials in a democratic system of government.  They

seek to gag counsel from exercising their fundamental First Amendment right to criticize the

government.  They seek to censor speech which is critical of their poor performance.  They seek

to expunge from public discussion speech which reveals and continues to reveal fraud, corruption

and illegality in an important government law enforcement agency.  With their Gestapo tactics,

they seek to hide their misdeeds behind a veil of secrecy and hold themselves above the law.  But

no one is above the law.  Not the State Police.  Not the current Colonel.  Not the former Colonel.

No one.  Although they may admire the ability of Cuba, China and the former Soviet Union to

stifle dissent - we live in America, where "speech concerning public affairs is more than

self-expression; it is the essence of self-government."  Garrison v. Louisiana, 379 U.S. 64, 74-75

(1964).[2]

**B. Speech on Public Issues Occupies the Highest Rung of First Amendment**

---

[1]  See also id. at 1034 (noting that the speech at issue - attorney speech criticizing governmental misconduct towards his client - was "classic political speech . . . critical of the government and its officials. . . His words were directed at public officials and their conduct in office.") (opinion of Kennedy, Marshall, Blackmun and Stevens, concurring in judgment).

[2]  Unfortunately for defendants, the Sedition Act expired in 1801. See New York Times Co. v. Sullivan, 376 U.S. 254, 276 and n.16 (1964) ("Although the Sedition Act was never tested in this Court, the attack on its validity has carried the day in the court of history . . . [B]ecause of the restraint [the Act] imposed upon criticism of government and public officials, [it] was inconsistent with the First Amendment" and would have been struck down if it had not expired on its own terms).

**Protection.** In their concurring opinion in <u>Whitney v. California</u>, 274 U.S. 357 (1927), Justices Brandeis and Holmes set forth the "classic formulation"[3] of First Amendment jurisprudence - "that public discussion is a political duty; and that this should be a fundamental principle of the American government." <u>Id.</u> at 375.[4] "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." <u>Connick v. Myers</u>, 461 U.S. 138, 145 (1983) (quoting <u>NAACP v. Claiborn Hardware Co.</u>, 458 U.S. 886, 913 (1982) and <u>Carey v. Brown</u>, 477 U.S. 455, 467 (1980)). "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard ... was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." <u>N.Y.Times</u>, 376 U.S. at 269 (internal punctuation omitted).

     **C. Vehement, Caustic and Unpleasant Speech About Public Officials Receives Full First Amendment Protection.** "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." <u>Texas v. Johnson</u>, 491 U.S. 397, 414 (1989). "[C]onstitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are offered.'" <u>N.Y. Times</u>, 376 U.S. at 271 (quoting <u>NAACP v. Button</u>, 371 U.S. 415, 445 (1963)).

     Our dedication to freedom of speech reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it

---

[3] <u>N.Y. Times</u>, 376 U.S. at 270.

[4] The defense efforts to invoke Justice Holmes' famous words in <u>Schenck v. U.S.</u>, 249 U.S. 47 (1919), fall flat due to their misquotation of those very words. Justice Holmes did <u>not</u> write that one cannot yell fire in a crowded theatre. Indeed, there may be circumstances where the theatre is actually on fire and such speech would be protected due to its addressing a paramount matter of public importance. Instead, Justice Holmes noted that the First Amendment "would not protect a man in <u>falsely</u> shouting fire in a theatre and causing a panic." <u>Id.</u> at 52 (emphasis added). The remainder of the defense First Amendment analysis is equally inaccurate.

may well include <u>vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials</u>."  <u>N.Y. Times</u>, 376 U.S. at 270 (emphasis added); <u>accord</u> <u>Conley v. Chaffinch</u>, 2005 WL 2678954, *2 (D.Del. March 4, 2005).  The First Amendment "offers broad protection for speech, be it <u>unpleasant, disputatious, or downright offensive</u>."  <u>Johnson v. Campbell</u>, 332 F.3d 199, 212 (3d Cir. 2003) (emphasis added); <u>see</u> <u>U.S. v. Dinwiddie</u>, 76 F.3d 913, 925 (8th Cir. 1996) ("the First Amendment does not permit the government to punish speech merely because the speech is forceful or aggressive.  What is offensive to some is passionate to others.").  It protects "not only learned political discourse but also <u>vituperative verbal and written attacks</u> on the President and other high government officials."  <u>U.S. v. Kosma</u>, 951 F.2d 549, 553 (3d Cir. 1991) (emphasis added).

"It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions, and this opportunity is to be afforded for '<u>vigorous advocacy</u>' no less than 'abstract discussion.'"  <u>N.Y. Times</u>, 376 U.S. at 269 (internal punctuation and citation omitted) (emphasis added).  Importantly,

> a function of free speech under our system of government is to <u>invite dispute</u>.  It may indeed best serve its high purpose when it <u>induces a condition of unrest</u>, <u>creates dissatisfaction</u> with conditions as they are, <u>or even stirs people to anger</u>.  Speech is often <u>provocative and challenging</u>.  It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.

<u>Terminiello v. City of Chicago</u>, 337 U.S. 1, 4 (1949) (emphasis added); <u>accord</u> <u>Cox v. Louisiana</u>, 379 U.S. 536, 551-52 (1965); <u>Texas v. Johnson</u>, 491 U.S. at 408-09.  As the Supreme Court explained when discussing the protected nature of wearing a "Fuck the Draft" jacket in a courthouse:

> Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us.  Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below.  For, while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric.  Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.

Cohen v. California, 403 U.S. 15, 25 (1971).

Speech is "protected against censorship or punishment" unless it causes "a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." Terminiello, 337 U.S. at 4 (emphasis added). "There is no room under our Constitution for a more restrictive view." Id. "[S]o long as the means are peaceful, the communication need not meet standards of acceptability." Cohen, 403 U.S. at 25.

      **1. The First Amendment Does Not Give the Defense a Listener's Veto.** In light of these bedrock First Amendment principles, it should come as no surprise that the First Amendment does not give government officials a listener's veto to exercise over speech critical of their misconduct while holding public office. "[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise." Cox, 379 U.S. at 551. The Supreme Court has regularly and consistently rejected the idea of a listener veto in the free speech context. See Texas v. Johnson, 491 U.S. at 414; Hustler v. Falwell, 485 U.S. 46, 55-56 (1988); FCC v. Pacifica Found., 438 U.S. 726, 745-46 (1978); Street v. New York, 394 U.S. 576, 592 (1969); cf. Good News Club v. Milford Central Sch., 533 U.S. 98, 119 (2001) (declining to employ "a modified heckler's veto" in the Establishment Clause and Free Speech contexts).

      **D. The First Amendment Needs Breathing Space to Survive.** Acquiescing to the defense request for sanctions for public criticism of governmental misconduct will have severe and negative consequences for cherished First Amendment freedoms. As the Supreme Court has explained,"the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." N.Y. Times, 376 U.S. at 278. Such an action "dampens the vigor and limits the variety of public debate ... [and] is inconsistent with the First and Fourteenth Amendments." Id. at 279. As has long been recognized, "[s]ome degree of abuse is inseparable from the proper use of every thing." Id. at 271. A speaker may

resort[] to exaggeration, to <u>vilification</u> of men who have been, or are, prominent in ... state ... But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of citizens of a democracy.

<u>Id.</u> (quoting <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 310 (1940)) (emphasis added). That is why the Supreme Court has repeatedly held that the First Amendment requires "'breathing space' ... to survive." <u>Id.</u> (quoting <u>NAACP v. Button</u>, 371 U.S. at 433).

   **E. The Heightened Public Interest in the Actions of Police Officers.** The need for unvarnished freedom of speech is even more critical when police officers are involved. The Third Circuit has regularly "noted the 'awesome and dangerous power' conferred to police officers and the 'need in a democratic society for public confidence, respect and approbation of the public officials on whom the state confers that awesome power.'" <u>Caver v. City of Trenton</u>, 420 F.3d 243, 256 n.11 (3d Cir. 2005) (quoting <u>Policemen's Benevloent Ass'n of N.J. v. Washington</u>, 850 F.2d 133, 141 (3d Cir. 1988)); <u>see</u> <u>Wilcher v. City of Wilmington</u>, 60 F.Supp.2d 298, 304 (D.Del. 1999) (noting that policemen hold a unique status as public employees because they "work in a heavily regulated industry that is intertwined with the important social function of protecting and promoting public safety.").[5] In light of this, is it not surprising that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," such as defendants. <u>City of Houston v. Hill</u>, 482 U.S. 451, 461 (1987); <u>see</u> <u>Kerman v. City of New York</u>, 261 F.3d 229, 242 (2d Cir. 2001) (individuals have a First Amendment "right to criticize the police without reprisal."). As a result of their illegal actions in the <u>Price</u> case, both MacLeish and Chaffinch have undermined public confidence in the DSP and the Rule of Law by their malicious violations of the First Amendment rights of three Troopers under their command. Such wrongdoing by high ranking police officials speaks to the

---

   [5] <u>See also</u> <u>F.O.P., Lodge No. 5 v. City of Phila.</u>, 812 F.2d 105, 116 (3d Cir. 1987) ("There is obviously a strong public interest in avoiding corruption of the officers who investigate corruption"); <u>id.</u> ("There is also a strong public interest in assuring the effectiveness of the officers who investigate vice and corruption").

-10-

heightened public interest in their misconduct.

**F. Speech About Defendants' Wrongdoing is Core First Amendment Protected**

**Activity.** Speech addresses an area of public concern when it can be "fairly considered as

relating to any matter of political, social, or other concern to the community." Connick, 461 U.S.

at 146. "Disclosing corruption, fraud and illegality in a government agency is a matter of

significant public concern." Baldassare v. State of N.J., 250 F.3d 188, 196 (3d Cir. 2001); see

U.S. v. Smith, 776 F.2d 1104, 1114 (3d Cir. 1985) (the "public has a substantial interest in the

integrity or lack of integrity of those who serve them in public office"). As discussed, "[s]peech

involving government impropriety occupies the highest rung of First Amendment protection."

Swineford v. Snyder County Pa., 15 F.3d 1258, 1274 (3d Cir. 1994). Yet in this case, defendants

seek "to punish the publication of information relating to [ ] governmental misconduct--speech

which has traditionally been recognized as lying at the core of the First Amendment."

Butterworth v. Smith, 494 U.S. 624, 632 (1990). But "[f]reedom of expression has particular

significance with respect to government because it is here that the state has a special incentive to

repress opposition and often wields a more effective power of suppression." First Nat'l Bank of

Boston v. Bellotti, 435 U.S. 765, 777 n.11 (1978) (internal punctuation omitted). "[S]elf-

government suffers when those in power suppress competing views on public issues from diverse

and antagonistic sources." Id. at n.12 (internal punctuation omitted).[6]

    As discussed in earlier briefing (D.I. 22 at 7-18), defendants' misconduct has been front

and center in the public eye since 2002. In the interests of brevity, plaintiff will focus solely

upon adverse jury verdicts, and ignore the numerous well-publicized cover-ups of Internal

Affairs findings of wrongdoing against both Chaffinch and MacLeish during their tenure (D.I. 22

---

    [6] In the words of Judge Learned Hand, the First Amendment "presupposes that right conclusions
are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative
selection. To many this is, and always will be, folly; but we have staked upon it our all." N.Y.Times,
376 U.S. at 270 (quoting U.S. v. Associated Press, 52 F.Supp. 363, 372 (S.D.N.Y. 1943)).

at 10-11, 13-14), and other matters that were discussed in earlier briefing - all of which help

demonstrate the key overarching context in which this latest jury verdict against Chaffinch and

MacLeish must be viewed. See Connick, 461 U.S. at 147-48 ("public concern" nature of speech

"must be determined by the content, form and context of a given statement, as revealed by the

whole record.").

- In June 2003, a federal court jury ruled that defendant Chaffinch had violated the First Amendment free speech rights of Sgt. Foraker.

- In January 2004, another federal court jury ruled that defendant Chaffinch and Cabinet Secretary Ford had violated the Fourteenth Amendment equal protection rights of Sgt. William Bullen and Sgt. Jeffrey Giles.

Each of these aforementioned lawsuits and jury verdicts received widespread media

attention throughout the State of Delaware.  Following the Bullen verdict, counsel immediately

issued a public call for Chaffinch's firing and censure. (See D.I. 24 at 94-95, 97-98, 106 - media

articles in which counsel called for the firing of Chaffinch and legislative censure of Secretary

Ford, as well as the legislative censure of Governor Minner for ordering the illegal actions at

issue in Bullen).

- Then on May 31, 2006, yet another federal court jury ruled that both Chaffinch and MacLeish had violated the First Amendment rights of Cpl/3 Warren, Cpl/3 Price and Sgt. Foraker and did so with recklessness or malice.

The widespread media coverage over the 12 days of the Price trial clearly attests to the great

public interest in Chaffinch and MacLeish's never-ending flood of misconduct.  See City of San

Diego v. Roe, 543 U.S. 77, 83-84 (2004) (per curiam) ("public concern is something that is a

subject of legitimate news interest; that is, a subject of general interest and of value and concern

to the public at the time of publication.").

The Supreme Court has repeatedly held that a public official's misconduct while holding

public office is plainly relevant to their fitness to hold that office.  See, e.g. Ocala Star-Banner

Co. v. Damron, 401 U.S. 295, 301 (1971) ("under any test we can conceive, the charge that a

[public official] has been indicted for perjury in a civil rights suit is relevant to his fitness for

office."); <u>Monitor Patriot Co. v. Roy</u>, 401 U.S. 265, 276 (1971) ("a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office."); <u>cf.</u> <u>U.S. v. Smith</u>, 776 F.2d at 1114 (the "public has a substantial interest in the integrity or lack of integrity of those who serve them in public office.").  Thus, defendants' misconduct in violation of the First Amendment rights of three Troopers under their command clearly calls into question their fitness to hold the public positions they have held - as the Superintendent of the Delaware State Police.  Their continuing and longstanding disregard for the constitutional rights of their employees is a serious matter of public concern.

Moreover, it is precisely because of the timidity and fear of leveling public criticism against the DSP that is felt by many members of the public, members of the State Police and others in state government, that the State Police is currently mired in a plethora of lawsuits and internal affairs investigations.  It is out of fear of angering Col. Chaffinch, Col. MacLeish and their powerful political allies such as State Senator Adams and Governor Minner that individuals are so hesitant to publicly criticize the illegality and corruption that has long festered under the reign of Chaffinch and MacLeish in the DSP.  It is precisely because of this lack of public criticism that Chaffinch and MacLeish believe they are above the law and can do whatever they want.  It is precisely because of this lack of public criticism that there has been a flood of lawsuits against Chaffinch and MacLeish over the last four years which have cost the taxpayers many millions of dollars.  It is precisely because of this lack of public criticism that there have been three significant jury verdicts over the last three years, finding that Chaffinch and/or MacLeish have continued to flagrantly violate the U.S. Constitution and its Amendments.  It is precisely because of this lack of public criticism that despite the aforementioned events, nothing has changed in the DSP.  It is precisely because of this lack of public criticism that the two highest ranking police officials in the State have undermined the Rule of Law for all of us. When police officers violate the law, when they are not held accountable and when nothing

-13-

changes despite all of their wrongdoing, the Rule of Law suffers for all of us.

**G.  Criticism of Government Misconduct Does Not Lose Its Protection Simply Because It Rightly Diminishes an Official's Reputation.** "Injury to official reputation [ ] affords no more warrant for repressing free speech that would otherwise be free than does factual error." <u>N.Y. Times</u>, 376 U.S. at 272.  "If judges are to be treated as men of fortitude, able to thrive in a hardy climate, surely the same must be true of other government officials." <u>Id.</u> at 273 (internal punctuation and citations omitted).  "Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations." <u>Id.</u>; <u>see</u> <u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. at 910 ("Speech does not lose its protected character ... simply because it may embarrass others.").

No doubt counsel's public statements about MacLeish's misconduct were irritating and most assuredly hurt his reputation to some extent.  However, counsel's statements were true, accurate and well-deserved in light of the verdict of the conscientious jury in <u>Price</u> - that MacLeish had maliciously violated the First Amendment, not once (Cpl/3 Price), not twice (Cpl/3 Warren), but three times (Sgt. Foraker).

**H.  The Timing of Speech is Key.**  As discussed earlier, "[n]o suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression." <u>Bridges</u>, 314 U.S. at 269. History has shown that bans on speech are "likely to fall not only at a crucial time but upon the most important topics of discussion" <u>id.</u> at 268, such as in the immediate aftermath of yet another jury finding of illegal and unconstitutional misconduct by the highest ranking police officials in the State of Delaware.

Time is of the essence when it comes to discussion of important public events, such as the verdict against MacLeish and Chaffinch in <u>Price</u> for violating the constitutional rights of three troopers under their command.  The time for comment is when the verdict comes down.

-14-

Counsel's First Amendment right to speak will be effectively eviscerated by waiting to comment until weeks after the fact. Indeed, such a delay ensures that no one will hear the speech at issue because the news media will not report again on a matter which occurred weeks ago when they have reported on the story already. As the Third Circuit has explained when discussing the importance of timely reporting of the news, "[a]fter all, nobody wants to read yesterday's news." Shingara v. Skiles, 420 F.3d 301, 305 (3d Cir. 2005). "[T]ime is of the essence" in such a situation. Id. As the Supreme Court has explained, "[u]rgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed." McIntyre v. Ohio Elec. Commissions, 514 U.S. 334, 347 (1995). The time to speak and publicly criticize MacLeish was when the verdict came down, not weeks later when the issue is long since past and forgotten by the very public which can force the government to be responsive to the legitimate concerns of its citizens.[7]

## II.    MODEL RULE 3.6 HAS NOT BEEN VIOLATED AS ALL STATEMENTS OF COUNSEL WERE WELL WITHIN ITS SAFE HAVENS AND THOSE OF THE FIRST AMENDMENT.

   **A. The Law of Prior Restraints.** It has long been established that "any system of prior restraints comes to a court bearing a heavy presumption against its validity." Alderman v. Phila. Hous. Auth., 496 F.2d 164, 169 (3d Cir. 1974); accord Conley, 2005 WL 2678954, *1. "Prior restraints on speech ... are the most serious and least tolerable infringement on First Amendment rights." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976). "[I]t has been generally, if not universally, considered that it is the chief purpose of [the First Amendment] to prevent" prior

---

   [7] Notably, the public's right to receive timely information about newsworthy events and government wrongdoing also is at issue. See, e.g. First National Bank of Boston, 435 U.S. at 783 ("First Amendment ... afford[s] the public access to discussion, debate, and the dissemination of information and ideas"); Kleindienst v. Mandel, 408 U.S. 753, 762 (1972) (First Amendment encompasses "right to receive information and ideas"); Martin v. City of Struthers, 319 U.S. 141, 143 (1943) (the framers "knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature ... and necessarily protects the right to receive it.").

restraints.  Near v. Minnesota ex rel. Olson, 283 U.S. 697, 713-14 (1931).  "The term prior

restraint is used to describe administrative and judicial orders forbidding certain communications

when issued in advance of the time that such communications are to occur." Alexander v. U.S.,

509 U.S. 544, 550 (1993) (internal punctuation omitted).  "[C]ourt orders that actually forbid

speech activities -- are classic examples of prior restraints." Id. "More specifically, a trial court's

order that prohibits or limits the speech of lawyers or parties before the court, a so-called 'gag

order,' is a prior restraint." U.S. v. Carmichael, 326 F.Supp.2d 1267,1291 (M.D.Ala. 2004).

**B.  The Various Prior Restraint Tests.**

**1.  The Scarfo Gag Order on an Attorney Test.**  A gag order on an attorney "is

a restraint on speech that raises rights under the First Amendment." U.S. v. Scarfo, 263 F.3d 80,

92 (3d Cir. 2001); accord Conley, 2005 WL 2678954, *1.  Importantly, such a prior restraint

"must stand or fall on its own terms in the factual setting described in the record." Scarfo, 263

F.3d at 94. "To have full force and effect, the First Amendment may not be trimmed just because

of appealing circumstances; the regulation of speech-connected activities must be carefully

restricted." Id. at 91.

For a court to impose such a draconian measure, it must "make specific factual findings

supporting its decision" and "such findings are essential to any order restricting speech." Bailey

v. Sys. Innovation, Inc., 852 F.2d 93, 99 (3d Cir. 1988).  "If any method other than a prior

restraint can effectively be employed to further the governmental or private interest threatened

here, then the order is invalid." Id.  "The moving party must ... demonstrate that the order is

narrowly tailored and that other measures short of prior restraints cannot effectively address the

perceived danger." Conley, 2005 WL 2678954, *1.  Thus, a gag order or prior restraint must be

the least restrictive means available. Bailey, 852 F.2d at 99-101; see Conley, 2005 WL 2678954,

*3 (a "gag order [must be] the least restrictive means available to prevent the 'evils' against

which a gag order may appropriately apply").

A gag order on attorney speech may only be justified if the gag order "prevented a [1] substantial likelihood [2] of material prejudice to the judicial proceeding." Scarfo, 263 F.3d at 93 (numeration added). "Any limitation on attorney speech must be [3] narrow and necessary, [4] carefully aimed at comments likely to influence the trial or judicial determination." Id.

     **2. The Bailey Gag Order on a Party Test.** "The court ... cannot impose the ethical rules governing a lawyer's pretrial comments on litigants unless: (1) the litigant's pretrial comments are likely to interfere with the moving party's right to a fair trial; (2) other measures would not likely mitigate the effects of unrestrained pretrial publicity; and (3) the prior restraint would effectively prevent the perceived danger." Conley, 2005 WL 2678954, *2 n.3; accord Bailey, 852 F.2d at 99-100.

     Given that the defense has challenged no statements made by plaintiff Capt. Conley, the gag order and its application to Capt. Conley must be struck down as failing the strict Bailey test.

     **3. The Gag Order on Witnesses.** Plaintiff respectfully submits that a gag order on all witnesses absent a strict showing of some kind also fails constitutional scrutiny. However, such an abridgement is not plaintiff's present concern.

     **C. Model Rule 3.6's General Rule.** Scarfo's "substantial likelihood of material prejudice" standard was taken from the Supreme Court's opinion in Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991), which was discussing Nevada's version of Model Rule of Professional Conduct 3.6. The current version of Rule 3.6(a) states that

> A lawyer who is participating ... in the ... litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know ... will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

     **D. Safe Haven Exceptions to Rule 3.6.** As the Court has previously explained, Rule 3.6 contains numerous "safe harbors" from liability for speech, Conley, 2005 WL 2678954, *2. several of which are relevant to the present matter and are discussed below.

     **1. "In the Matter" Limitation - Rule 3.6(a).** Rule 3.6(a) states, a "lawyer who

is participating...<u>in the...litigation of a matter</u> shall not make an extrajudicial statement ...[that will prejudice a proceeding] <u>in the matter</u>."  Counsel simply did not make any statements relating to the <u>Conley</u> matter.  All of the speech challenged by the defense does not relate to the <u>Conley</u> matter.  Instead, it addressed the <u>Price</u> case, a separate and independent matter that is "not related" (D.I. 236 - Order), to the present <u>Conley</u> action.  Accordingly, no liability may attach to this speech.

The Court has already had the opportunity to address, explain and elaborate upon this distinction in its earlier gag order opinion when the defense similarly moved to sanction counsel for publicly criticizing them.  In the earlier briefing, much of the speech challenged by the defense addressed Chaffinch and MacLeish's misconduct in several <u>unrelated</u> Internal Affairs investigations and coverups, <u>not</u> the present <u>Conley</u> case.  In those circumstances, counsel also had exercised their First Amendment free speech rights to publicly criticize that governmental misconduct and corruption.  The Court explained that public criticism about those other matters could not be the basis for sanctions or other liability in the present case.  In the Court's words, these

> statements including the alleged Internal Affairs coverups of the defendants, specifically Chaffinch and MacLeish, <u>arise out of independent matters</u> concerning alleged misconduct and abuse of office within the [DSP] and the Delaware government.  These statements are protected by the First Amendment because they are criticisms of alleged governmental corruption, an issue of great public concern that lies at the core of the First Amendment.

<u>Conley</u>, 2005 WL 2678954, *2 (emphasis added); <u>see also</u> <u>id.</u> at *3 n.9 (noting that one challenged news story "relates to the Internal Affairs investigation of Colonel Chaffinch, not the present case.").

The public criticism discussed in the earlier opinion clearly addressed both Chaffinch and MacLeish.  However, in accord with the plain terms of Rule 3.6(a) and the First Amendment framework within which Rule 3.6 must operate, the Court rightly drew the distinction between public comments and criticism relating to the present matter, and public comments and criticism

-18-

relating to other matters outside the scope of the present <u>Conley</u> court case - even though that criticism addressed the very defendants in the present matter. Thus, Rule 3.6(a) has not been violated because all of the challenged statements address the <u>Price</u> case, a matter outside the scope of the present <u>Conley</u> action, the action within which the defense has moved for sanctions.

**2. Rule 3.6(b)'s Safe Havens.** Rule 3.6(b) continues and sets out a list of exceptions and absolute safe-havens from the scope of 3.6(a)'s general rule.[8] "Notwithstanding paragraph (a), a lawyer may state: ... information contained in a public record" Rule 3.6(b)(2), and other enumerated areas.[9] As the Supreme Court has emphasized in the clearly applicable <u>Gentile</u> decision,

> By necessary operation of the word "notwithstanding" [an attorney discussing the topics within these safe-havens] need fear no discipline, even if he comments on "the character, credibility, reputation or criminal record of a witness," and even if he "knows or reasonably should know that the statement will have a substantial likelihood of materially prejudicing an adjudicative proceeding."

501 U.S. at 1048 (internal punctuation omitted). In other words, the Rule 3.6(b) safe havens are absolute and, for example, an attorney may comment upon "the character, credibility, [or] reputation" of a witness[10] so long as the comments fall within one of the Rule 3.6(b) safe havens.[11]

---

[8]  Despite defense representations to the contrary (OB at ¶ 7), comment 4 to Rule 3.6 explains that 3.6(b) "is not intended to be an exhaustive listing of the subjects upon which a lawyer may make a statement."

[9]  These exceptions incorporate the wide body of case law pertaining to the public's common law and First Amendment rights of access to judicial records and public trials. <u>See</u> <u>Leucadia, Inc. v. Applied Extrusion Technologies, Inc.</u>, 998 F.2d 157, 164-65 (3d Cir. 1993); <u>Republic of the Philippines v. Westinghouse Elec. Co.</u>, 949 F.2d 653, 661 (3d Cir. 1991); <u>In re Cendant Corp.</u>, 260 F.3d 183 (3d Cir. 2001); <u>Glenmede Trust Co. v. Thompson</u>, 56 F.3d 476 (3d Cir. 1995); <u>Pansy v. Borough of Stroudsburg</u>, 23 F.3d 772 (3d Cir. 1994); <u>Miller v. Indiana Hospital</u>, 16 F.3d 549 (3d Cir. 1994); <u>Littlejohn v. BIC Corp.</u>, 851 F.2d 673 (3d Cir. 1988); <u>Bank of America Nat'l Trust and Savings Assoc. v. Hotel Rittenhouse Assoc.</u>, 800 F.2d 339 (3d Cir. 1986); <u>U.S. v. Martin</u>, 746 F.2d 964 (3d Cir. 1984); <u>Publicker Indus., Co. v. Cohen</u>, 733 F.2d 1059 (3d Cir. 1984); <u>U.S. v. Criden</u>, 648 F.2d 814 (3d Cir. 1981).

[10]  An action that might otherwise be impermissible. <u>See</u> Rule 3.6 comment 5, subsection (1).

[11]  Thus, the Supreme Court has already rejected the defense claim that the character, credibility and reputation of a party or witness can <u>never</u> be discussed. (OB at ¶ 8).

**a. Information Contained in a Public Record.**  As just discussed, an attorney may discuss "information contained in a public record" without fear of discipline or sanction.  Rule 3.6(b)(2).

**b. The Claim, Offense or Defense Involved.**  An attorney also may discuss "the claim, offense or defense involved" without fear of discipline or sanction.  Rule 3.6(b)(1).

**c. Result of Any Step in Litigation.**  An attorney also may discuss the "result of any step in litigation" without fear of discipline or sanction.  Rule 3.6(b)(4).

### 3. First Amendment Considerations Incorporated Into Rule 3.6.

Importantly, the whole body of First Amendment law found in Argument I above is incorporated into Comment 1 to Rule 3.6.  It notes -

> there are vital societal interests served by the free dissemination of information about events having legal consequence and about legal proceedings themselves.  The public ... has a legitimate interest in the conduct of judicial proceedings, <u>particularly in matters of general public concern</u>.

Rule 3.6 cmt. 1 (emphasis added).  The "subject matter of legal proceedings is often of direct significance in debate and deliberation over <u>questions of public policy</u>."  <u>Id.</u> (emphasis added).  As the Third Circuit explained in <u>Scarfo</u>, "we are [ ] concerned with the longstanding value and importance of the protection of First Amendment rights.  Public awareness and criticism have great importance, especially where, as here, they concern alleged governmental [ ] abuse."  263 F.3d at 95.  Thus, the Rule must be interpreted in light of these Constitutional considerations.

**E. Due Process Notice Requirements are Lacking.**  Despite coming to this Court seeking the imposition of sanctions, defendants give very little specificity to their claims.  They point to a statement, then in conclusory fashion say it justifies a gag order and sanctions, but give no logical argument connecting the two.  Although they generally claim that everything counsel has ever said somehow injures them and hurts their feelings, despite having 40 pages to do so, <u>see</u> D.Del. LR 7.1.3(a)(D), the only remarks defendants actually point to are found in paragraphs

two and three of their six page speaking motion. This vague approach in a sanctions motion violates due process.[12]

   **F. The Specific Statements Defendants Challenge.** From the defense motion, it appears that four statements of counsel are being challenged. But the defense position in this regard is remarkably conclusory. Rather than present a reasoned legal argument, defendants simply list several statements and claim they are scornful, lack civility and are disrespectful towards the high public official defendants who have been repeatedly convicted of violating the U.S. Constitution. Importantly, first, that is not the test that must be met.[13] Second, "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" are protected by the First Amendment. N.Y.Times, 376 U.S. at 270; Conley, 2005 WL 2678954, *2.;[14] see Scarfo, 263 F.3d at 95 ("[t]he statement may have been imbalanced or even irritating because of the timing and content, but not materially prejudicial."). All of the challenged remarks fall within the safe-havens of Rule 3.6 and the First Amendment.

   **1. DSP Leadership Threw Its Officers Under a Bus.** First, this comment does not refer to the Conley matter. Instead, it refers to the unrelated Price matter. Thus, it falls

---

   [12]   Any attempt to raise additional or add specificity to claims in their reply brief would run afoul of D.Del. LR 7.1.3(c)(2) which forbids impermissible "sandbagging." Rockwell Tech. LLC v. Spectra-Physics Lasers, Inc., 2002 WL 531555, *3 (D.Del. March 26, 2002). Such efforts violate fundamental due process requirements which this Local Rule was designed to address. Plaintiff will have been deprived of notice and opportunity to respond - both of which would raise serious due process concerns. See, e.g., Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985); cf. Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 444 (1974) ("The judicial contempt power is a potent weapon. When it is founded upon a [claim] too vague to be understood, it can be a deadly one . . . The most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension.").

   [13]   See Principles of Professionalism for Delaware Lawyers: Preamble ("These Principles shall not be used as a basis for litigation, lawyer discipline or sanctions").

   [14]   As the Supreme Court emphasized, "[i]f judges are to be treated as 'men of fortitude, able to thrive in a hearty climate,' . . . surely the same must be true of other government officials." N.Y.Times, 376 U.S. at 273.

outside the scope of Rule 3.6(a) in this case.[15]

Additionally, this is legitimate criticism and characterization of the illegal government action at issue in the Price case and is protected by the First Amendment and Rule 3.6 comment 1. It also falls within the absolute safe haven of Rule 3.6(b)(2) and discusses information contained within a public record. Specifically, this quote is taken directly from Major David Baylor's deposition testimony in the Price case which is part of that case's summary judgment record. There, Major Baylor characterized the defendants' public attacks on the Price plaintiffs and in his testimony criticized the defendants for making those attacks, stating that a true leader does not "give a public statement where you throw any of your subordinates under the bus." (Baylor 417; A49). That is "bad leadership" and "bad judgment." (Baylor 418; A49).

Accordingly, counsel's public statements following the jury verdict that the DSP leadership had thrown its officers under a bus is protected by the First Amendment and the exceptions to Rule 3.6.

**2. MacLeish Should Resign.** First, this comment does not refer to the Conley matter. Instead, it refers to the unrelated Price matter. Thus, it falls outside the scope of Rule 3.6(a) in this case.

More importantly, this is pure speech on a vital matter of public concern. In the same way that counsel called for Chaffinch's resignation following the Bullen and Giles verdict in January 2004, following the Price verdict counsel immediately called for MacLeish's resignation due to the finding by the federal court jury that he had maliciously violated the First Amendment rights of three Troopers under his command. Thus, this speech is protected by the First Amendment and Rule 3.6 comment 1. See, e.g. Connick, 461 U.S. at 145 ("speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to

---

[15] For the sake of completeness, counsel notes that it is impossible that such a comment could prejudice the jury in the Price action given that the jury had already reached a verdict and been released by the Court by the time the statement was made.

special protection."); <u>U.S. v. Smith</u>, 776 F.2d at 1114 (the "public has a substantial interest in the integrity or lack of integrity of those who serve them in public office.").

Accordingly, counsel's public call for MacLeish's resignation statements following the jury verdict is protected by the First Amendment and the exceptions to Rule 3.6.

**3. The Defense in the <u>Price</u> Case Was a Coverup and a Pack of Lies By Men Without Honor.** First, this comment does not refer to the <u>Conley</u> matter. Instead, it refers to the unrelated <u>Price</u> matter. Thus, it falls outside the scope of Rule 3.6(a) in this case.

Second, this characterization is fair comment on the defense presented by the government in the <u>Price</u> case and so is protected by the First Amendment and comment 1 to Rule 3.6. Similarly, it is protected by Rule 3.6(b)(1)'s safe haven of discussing the "defense involved," by Rule 3.6(b)(2)'s safe haven of discussing "information contained in a public record," specifically the voluminous public trial record, and lastly by Rule 3.6(b)(4)'s safe haven of discussing the "result of any step in litigation."

The defense presented by defendants Col. Chaffinch and Col. MacLeish in open court in <u>Price</u> consisted of blaming the whistleblowing plaintiffs Cpl/3 Price, Cpl/3 Warren and Sgt. Foraker for the destruction of a multi-million dollar firearms training facility. In a classic case of government agencies closing ranks to protect their own, the defense shunted to the side the long history of problems at the facility and instead chose to consciously ignore the widespread evidence of government corruption in the contracting and building process that resulted in a broken and hazardous building. Without getting into all of the nitty gritty details of incompetence, illegality and corruption of the process that those plaintiffs revealed by their speech and petitioning, the defense of blame the whistleblower and ignore the overwhelming evidence of everything else that was wrong was plainly part and parcel of a cover-up and an excellent example of what is known as 'the Delaware way.'

Furthermore, as public stewards holding the highest ranking law enforcement positions

in the State with a duty to protect the health and safety of the brave men and women serving under their command as well as members of the public (such as the Boy Scouts and the Citizens Police Academy) who also were exposed to the hazardous conditions at the FTU, such a defense was at the very least, a dishonorable coverup in violation of numerous fiduciary duties of care.

Continuing, Merriam Webster's Collegiate Dictionary 10th Edition (1996) p. 671, defines "lie" as follows:

- •    to make an untrue statement with intent to deceive,
- •    to create a false or misleading impression,
- •    an assertion of something known or believed by the speaker to be untrue with intent to deceive,
- •    an untrue or inaccurate statement that may or may not be believed true by the speaker.

The <u>Price</u> case involved a state law claim of defamation. The careful jury vindicated Sgt. Foraker and found that Chaffinch had defamed him, "published an untrue statement" concerning him and that Chaffinch "knew the statement concerning Plaintiff Foraker was false or recklessly disregarded whether it was false." (Foraker Inter. # 4, 5; A60). Just referencing the dictionary definition of 'lie' vindicates counsel's pack of lies statement - he was reaffirming and discussing the jury's factual findings. The jury found that Chaffinch had made several "untrue statement[s] with an intent to deceive," statements that Chaffinch knew to be false and yet he made them anyway - which the jury finding of actual malice establishes as a matter of law. <u>See Phila. Newspapers, Inc. v. Hepps</u>, 475 U.S. 767, 783 (1986) (to establish actual malice, the speaker must "come close to willfully blinding itself to the falsity of its utterance."). In other words - the careful jury found that Chaffinch had lied - a necessary factual finding given the defamation claim at issue and the constitutional requirement of a finding of actual malice.

Additionally, calling a 'blame the whistleblower' defense a pack of lies, although certainly an "unpleasantly sharp attack[] on government and public officials," <u>N.Y. Times</u>, 376 U.S. at 270, is fair comment on the defense in that case which took place in open court and was a matter of public record for all to see. Blaming three innocent Troopers for destroying a multi-

million dollar state facility when the speakers consciously know better is certainly "an untrue statement" made "with intent to deceive" - and thus is a lie.

Furthermore, given that Chaffinch's proclivity for prevaricating is already a well-known matter of public record, as the Supreme Court has noted, subsequent discussion of such information cannot be the basis for liability.  In <u>Gentile</u>, the Supreme Court noted that "[m]uch of the information in petitioner's remarks was included by explicit reference or fair inference in earlier press reports," 501 U.S. at 1052-53, "obviating any potential for prejudice." <u>Id.</u> at 1046.

The press is well aware of Chaffinch's tendencies in this regard.  The press is aware of the sheer number of times Chaffinch has been impeached in open Court, in the first <u>Foraker</u> action, the <u>Bullen and Giles</u> action and the present <u>Price</u> and <u>Foraker</u> actions.  The press also is well aware of various court testimony in that regard.  For example, the Delaware State News and Associated Press reported in their May 24, 2006 stories about the trial that one witness who had not yet taken the stand had "testified in a previous lawsuit that Chaffinch has a reputation 'for not being very truthful.'" (A22-23).  This fact is well-known.

Moving on, Merriam Webster's Collegiate Dictionary 10th Edition (1996) p. 557, defines "honor" as "a keen sense of ethical conduct."  Continuing, "honorable," <u>id.</u>, is defined as:

- • attesting to creditable conduct,
- • characterized by integrity.

The defense conduct revealed in the <u>Price</u> action reveals a disappointing lack of both ethics and integrity.  MacLeish and Chaffinch's conduct there did a disservice to the role of police and law enforcement as well as the Rule of Law in the State of Delaware.  Moreover, given the record testimony at trial that honor is supposed to be one of the core values of the DSP, counsel respectfully submits that maliciously defaming and all the while publicly and falsely blaming three conscientious whistleblowers for destroying a multi-million dollar facility, while at the same time gagging these same whistleblowers from ever responding and defending their good

names is dishonorable conduct by defendants.[16]  In the same way, refusing to stand up for your own men and instead pointing the false finger of blame at them also is evidence of a lack of honor and integrity - all of which were openly revealed about both Chaffinch and MacLeish in open court over the course of a lengthy trial.  Counsel's characterization of them as men without honor was more than correct - it was fitting and well justified fair comment on the actions of corrupt government officials, well within First Amendment bounds.

Accordingly, counsel's public statements following the jury verdict that the recently concluded defense of that case was a coverup and a pack of lies made by men without honor is protected by the First Amendment and the exceptions to Rule 3.6.

**4.  MacLeish is a Coward Who Would Not Protect His Men.**  First, this comment does not refer to the Conley matter.  Instead, it refers to the unrelated Price matter.  Thus, it falls outside the scope of Rule 3.6(a) in this case.

Second, this characterization is fair comment on the evidence presented at trial and on the defense presented by the government in the Price case and so is protected by the First Amendment and comment 1 to Rule 3.6.  Similarly, it is protected by Rule 3.6(b)(1)'s safe haven of discussing the "defense involved" and also by Rule 3.6(b)(2)'s safe haven of discussing "information contained in a public record" - the voluminous public trial record.

Importantly, the cowardly statement and all of the other challenged speech must be viewed in the overall context of what has occurred in the Price case over the last 2 ½ years and which was on display to the public over the course of the 12 day trial.

First, is the Price defense's unprecedented public attacks on three honorable men while at the same time gagging them from ever responding to defend their good names.  Second, the Price defense consisted of blaming three conscientious whistleblowers for the destruction of a

_____

[16]  Implicit in Major Baylor's testimony that a leader should not throw their subordinates under a bus is the idea that a leader who does so is lacking in certain character traits - such as honor and integrity.

multi-million dollar firearms training facility, instead of trying to stick up for the whistleblowers, trying to fix the problems and protecting the men.  In light of these things, a characterization of MacLeish as cowardly is an understatement.

The dictionary defines "coward" as  "one who shows disgraceful fear or timidity." Merriam Webster's Collegiate Dictionary 10th Edition (1996) p. 268.  First, MacLeish plainly showed a "disgraceful fear" of plaintiffs' response when he and Chaffinch attacked them, blamed them for destroying the FTU, yet then imposed a gag order on them to prevent them from responding and defending their good names.  Second, given MacLeish's choice of the easy road - his refusal to stand up for and protect his men in the face of having to take the more difficult road of battling the bumbling bureaucrats in the Division of Facilities Management and getting conditions at the FTU fixed - a description of cowardly is entirely accurate, fitting and consistent with the 12 days of testimony and evidence received in open court.

The defense is clearly perturbed by such a characterization.  Fortunately, as discussed above, government officials like the defendants do not receive a listener's veto over speech that criticizes their misconduct while holding public office.  Indeed, "[i]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions, and this opportunity is to be afforded for 'vigorous advocacy' no less than 'abstract discussion.'" N.Y. Times, 376 U.S. at 269 (internal punctuation and citation omitted) (emphasis added).  Similarly, the First Amendment protects "vituperative" and "unpleasant" verbal attacks on public officials like defendants, all the more so when those same defendants have egregiously violated the highest law of the land and done so recklessly and maliciously.  See Johnson, 332 F.3d at 212; N.Y. Times, 376 U.S. at 270; Conley, 2005 WL 2678954, *2.

As a result of the jury verdict against MacLeish, counsel publicly called for his immediate resignation.  As part of that call for his resignation, counsel made statements presently being challenged by defendants.  Despite not raising a challenge to the truthfulness of counsel's

-27-

characterizations in their opening motion, it appears defendants believe counsel is forbidden

from challenging a high public official in this manner, perhaps because MacLeish's reputation

has presumably been injured.[17]  Unfortunately for defendants, criticism of a government official

"does not lose its constitutional protection merely because it is effective criticism and hence

diminishes their official reputations."  N.Y. Times, 376 U.S. at 273.  The facts of the Price case

are what they are, and those facts demonstrate that despite a clear ability and a great need to do

so, MacLeish refused to stand up for and protect the men under his command.  Instead, he chose

to attack them,[18] blame them and run them out of the Division, all the while gagging them from

responding to the attacks which he and Chaffinch were making on them.  The characterization

aptly applies.

Assuming arguendo that counsel's characterization of MacLeish as cowardly is seen as

'pushing the envelope,' it is still protected because of the "breathing space" needed for the First

Amendment to survive.  N.Y. Times, 376 U.S. at 271.  "Some degree of abuse is inseparable

from the proper use of every thing."  Id.  A speaker may

> resort[] to exaggeration, to vilification of men who have been, or are, prominent in ...
> state ...But the people of this nation have ordained in the light of history, that, in spite of
> the probability of excesses and abuses, these liberties are, in the long view, essential to
> enlightened opinion and right conduct on the part of citizens of a democracy.

Id. (quoting Cantwell, 310 U.S. at 310) (emphasis added).

At its core, a dislike or distaste for the words used by counsel are inherently a value

judgment, the very type of value judgment that the Supreme Court has held should not be made.

---

[17]  The defense claim (OB at 2 n.2) that MacLeish is unable to respond to counsel's statements regarding the Price verdict due to rules of the court is a red herring.  There are no rules barring him from responding and publicly discussing his illegal retaliatory actions.  To the best of plaintiffs' knowledge, MacLeish has not imposed upon himself a gag order of the type he imposed upon Cpl/3 Price, Cpl/3 Warren and Sgt. Foraker.  What is more likely is that MacLeish is unwilling to respond, knowing that he has nothing to contribute to the marketplace of ideas on the subject given that his illegal retaliatory behavior has been exposed for all the world to see.

[18]  Or to paraphrase Major Baylor - to throw them under a bus.

For example, when the Court refused to bar the word "fuck" from a public courthouse, it did so based on the inability of the courts and other branches of government to draw "principled distinctions" on the propriety or impropriety of such creative and compelling uses of the English language. Cohen, 403 U.S. at 25 ("it is largely because government officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual."). In Cohen, the Supreme Court recognized the slippery slope down which imposing value judgments on speech used as part of public discourse would take us. Id. (observing that "no readily ascertainable general principle exists for stopping short of [cleansing public debate to the point where it is grammatically palatable to the most squeamish among us] were we to affirm the judgment below."). In the same way, forbidding and punishing the use of the word coward starts the Court down a slippery slope of imposing value judgments on the language used as part of a long running political debate and public discourse relating to how an important government agency is being run and grossly mismanaged. That is a path down which the First Amendment forbids be tread, all the more so in light of Rule 3.6(a)'s own limitation of its application to speech occurring in the present Conley case, not to speech criticizing government misconduct in the Price case.

Accordingly, counsel's public statements following the jury verdict that MacLeish is a coward who would not protect his men is protected by the First Amendment and the exceptions to Rule 3.6.

**G. Defendants Have Failed to Present a Proper Record.** The defense has utterly failed to present a proper evidentiary basis for their nebulous, undefined and overbroad claims. They present no affidavits. No witness statements. No public polling data. No other evidence. Defendants did not even attach any of the newspapers articles or statements which they challenge. This alone is grounds to deny the defense motion. The defense request to impose sanctions and a gag order on a plainly inadequate record such as this violates the fundamental

requirement that legal "determinations must be based on evidence in the record, rather than speculation or conjecture." Darchia v. Ashcroft, 101 Fed.Appx. 373, 376 (3d Cir. 2004); see also U.S. v. Martin, 746 F.2d at 972 ("speculative threats to [the right to a fair trial] have never been sufficient to overcome [ ] first amendment rights..."). As a matter of law, because defendants have failed to present a proper evidentiary basis, their claims must be dismissed.

     **H. The Scarfo Test Has Not Been Met.** However, assuming arguendo that the Court will entertain the defense motion, the defense has failed to demonstrate how the present gag order meets the Scarfo test. For example, there has been no showing of why a gag order was narrow or necessary, within the meaning of Scarfo. Similarly, there has been no showing of how statements that were well within the safe havens of Rule 3.6 and the First Amendment (safe havens also noted by the Supreme Court in Gentile in recognizing the "substantial likelihood" test), can cause a substantial likelihood of material prejudice to a proceeding other than the one in which the sanctions motion was brought. Scarfo has not been met.

     As discussed above, Rule 3.6 has not been violated. Given that none of the challenged speech addressed the Conley matter, a gag order was not "necessary." Scarfo, 263 F.3d at 93. It was clearly not "narrow" given that is applies to all speech by everyone ranging from attorneys to parties to witnesses. Id. Similarly, there has been no showing of how a gag order imposed to silence speech about an unrelated matter could have or did prevent a substantial likelihood of material prejudice to the Conley matter. Id. In the same way, the "specific factual findings" required by the First Amendment before imposing a gag order were never made, rendering the gag order void *ab initio*. Bailey, 852 F.2d at 99. Given that the gag order must "stand or fall on its own terms in the factual setting described in the record," this also is fatal to the gag order. Scarfo, 263 F.3d at 94. Similarly, the gag order also was not the "least restrictive means" available. Conley, 2005 WL 2678954, *3, 1; Bailey, 852 F.2d at 99-101. Instead, as discussed in subsection "**I**" below, *voir dire* is the preferred method of addressing pretrial publicity without

infringing upon treasured First Amendment rights. Accordingly, because another "method other than a prior restraint [could have] effectively be[en] employed ... the order is invalid." Bailey, 852 F.2d at 99. In the same way, because the Conley trial is complete, the gag order has outlived its initial justification - selection of a fair and impartial jury in Conley. Accordingly, the gag order is no longer "necessary." Scarfo, 263 F.3d at 93.

   **I. There is No Basis for Sanctions or Contempt.** To prove civil contempt, three items must be demonstrated. First, that a valid court order exists. Second, knowledge of that order. Third, a violation of that order. John T. v. Del. County Intermediate Unit, 318 F.3d 545, 552 (3d Cir. 2003). Additionally, each of these requirements must be proven by clear and convincing evidence. Id. This is a "heavy burden." Quinter v. Volkswagen of America, 676 F.2d 969, 974 (3d Cir. 1982). Importantly, a "contempt citation should not be granted where there is ground to doubt the wrongfulness of" the party's conduct. Littlejohn, 851 F.2d at 683-84. Indeed, all "ambiguities must be resolved in favor of the party charged with contempt." John T., 318 F.3d at 552.

   As discussed above and in the declaration of Thomas Neuberger, at all times, Mr. Neuberger believed he was well within the plain language of Rule 3.6, this Court's earlier Conley gag order opinion interpreting and applying Rule 3.6 and long established First Amendment case law. In light of these things, there is certainly grounds to doubt the wrongfulness of counsel's conduct.[19] Moreover, as discussed extensively above, there has been no violation of any Order of the Court. Lastly, the defense motion wrongly implies (OB at ¶ 4) that counsel somehow violated "standards" previously imposed by the Court arising out of their earlier meritless motion for sanctions and a gag order. But there is no record to support such an assertion. The Court's earlier opinion is clear. It found no basis whatsoever to support the earlier

_____

   [19] As discussed in Argument III below, if the Court imposes liability in this present situation, than the case law makes clear that Rule 3.6 and its progeny as applied to the present situation are void for vagueness under both the Fourteenth and First Amendments

defense motion and rejected all defense efforts at a sanctions.  Neither in this case nor in the
Price case did the Court previously impose an order of any kind gagging counsel's First
Amendment free speech rights.

**J.  The Jury Pool Was Not Tainted and the Extensive *Voir Dire* Did Not Result
From Counsel's Statements.**  First, in light of the extensive media coverage of every day of the
twelve day Price trial, and given the back to back scheduling of the trials in Price and Conley, it
is clear that the extensive *voir dire* conducted by the Court on the first day of the Conley trial
was not the result of counsel's comments.  Instead, the need for such *voir dire* was inevitable and
would have been necessary anyway.  Two or three statements by counsel that were buried in
newspaper articles on the last day of an extensive twelve day swarm of media coverage cannot be
fairly said to have required the extensive *voir dire* process.  Instead, the extensive *voir dire*
process was an inevitable result of the widespread publicity surrounding the Price trial and the
scheduling of these cases of paramount public concern back to back.[20]

Moreover, as the Third Circuit and this Court have repeatedly explained, the remedy in
such a situation is not to gag counsel or punish speech.  Instead, the remedy is exactly what the
Court did in our present case - *voir dire*.  See U.S. v. Martin, 746 F.2d at 973, 970; Bailey, 852
F.2d at 100; Conley, 2005 WL 2678954, *3.  "Too little weight [is given] to the impact of
skillfully conducted *voir dire* examination as an antidote for the effects of publicity."  U.S. v.
Martin, 746 F.2d at 970.  Since the beginning of our justice system, courts "have acknowledged
the utility of skillfully conducted *voir dire* as a means of ascertaining a prospective juror's
impartiality."  Id. at 973.  "'[T]esting' by *voir dire* remains a preferred and effective means of

_____

[20]  As the Court noted in its summary judgment opinion in Price, the subject matter of plaintiffs'
speech in Price - the DSP Firearms Training Unit - has been the focus of media attention since at least
1999.  Price v. Chaffinch, 2006 WL 1313178, *1, 6 (D.Del. May 12, 2006).  Similarly, a portion of the
widespread media attention addressing the many problems at the FTU as well as the circumstances
surrounding the individual Foraker lawsuit are already a part of the record in this case.  (See D.I. 24 at
A167-194).

determining a juror's impartiality and assuring the accused of a fair trial." Id.[21]  The defense

concerns in this regard were easily resolved through the *voir dire* process engaged in by the

Court, a *voir dire* process that revealed that little if any taint on the jury pool of the extensive

twelve prior days of media coverage of the Price trial.[22]

**K.  The Defense Is Using the Gag Order as Both a Sword and a Shield.**  Importantly,

the defense continues to improperly use the gag order as both a sword and a shield.  The defense

requested and obtained a gag order which they have used as a shield to prevent all public

comment from counsel and protect themselves from criticism in both this and all other pending

cases.  At the same time, they also have used the gag order as a sword and gone on the offensive,

making public statements with regard to plaintiff and her interests, statements which clearly

merited a response, a response which counsel remains barred from giving because of the

indefinite gag order.

Despite the existence of the Court's gag order which on its face applies to all attorneys,

parties and witnesses in this case, defendant Chaffinch, witness MacLeish as well as defense

counsel were publicly quoted in the media following the defense verdict in Conley.  (A67-72).

Meanwhile, plaintiff's counsel are unable to respond due to the early explicit oral and later

written gag order imposed by the Court.  An indefinite gag order that has only been enforced

against plaintiff while the defense freely and publicly violates it is unconstitutional under the

---

[21]  See also id. (noting that "in many cases surrounded by pervasive multimedia publicity, juries have been selected relatively quickly" and citing cases.  Continuing, the Third Circuit explained that "under the supervision of the thoughtful and sensitive trial judge," the district court's "patient and careful examination of potential jurors . . . is an excellent example of the power of *voir dire* to screen out persons who may not be impartial").  The careful *voir dire* process engaged used in our present case also is an excellent example of this.

[22]  The innocuous nature of counsel's public statements also were revealed by this *voir dire* process.  Despite pointed defense questioning about counsel's public comments, none of the 50+ jurors in the venire remembered any of them.  Similarly, none of the jurors in the venire were excused because of exposure to the widespread media coverage in this case - inevitable coverage not caused by counsel's statements.

Fourteenth Amendment.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) ("class of one" equal protection analysis).

### III.     RULE 3.6 IS UNCONSTITUTIONALLY VAGUE AS APPLIED TO OUR PRESENT CASE AND IMPOSING LIABILITY UNDER IT WILL VIOLATE THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE AND THE FIRST AMENDMENT FREE SPEECH CLAUSE.

In light of counsel's study and review of (1) Rule 3.6's safe havens and (2) the Court's own interpretation of Rule 3.6 from its earlier opinion, attaching liability to counsel's statements will raise serious Fourteenth and First Amendment vagueness concerns.  Specifically, the Rule will be unconstitutionally vague as applied.  As the Supreme Court explained in a similar First Amendment situation in Gentile in striking down Nevada's prior version of Rule 3.6 on void for vagueness as applied grounds,

> The fact that Gentile was found in violation of the Rules after studying them and making an conscious effort at compliance demonstrates that [the Rule] creates a trap for the wary as well as the unwary.

Gentile, 501 U.S. at 1051.

Here, counsel reviewed and reasonably relied upon Rule 3.6 and the Court's recent interpretation of it in making public comment about the unrelated Price matter. To impose liability for such reasonable reliance establishes, as a matter of law, that the Rule is unconstitutionally vague as applied.  See Grayned v. City of Rockford, 408 U.S. 104, 108-109 (1972); Planned Parenthood of Central N.J. v. Farmer, 220 F.3d 127, 134-35 (3d Cir. 2000).

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

Grayned, 408 U.S. at 108 (footnotes omitted).  And when a rule is vague and "create[s] uncertainty regarding the exercise of a constitutionally protected right, such as [freedom of speech], a higher degree of clarity is required."  Planned Parenthood, 220 F.3d at 135.

-34-

As previously discussed, counsel reasonably relied upon the plain text of Rule 3.6 and the Court's earlier <u>Conley v. Chaffinch</u>, 2005 WL 2678954 (D.Del. March 4, 2005), opinion in determining whether or not he could publicly comment on the verdict in the unrelated <u>Price</u> matter. Upon review, counsel reasonably determined he could. To now impose liability for such comments will make clear that the Rule as applied is unconstitutionally vague under both the Fourteenth and First Amendments. Simply put, the Rule does not allow a person of ordinary intelligence a reasonable opportunity to know what is prohibited. As a result, it must be struck down as applied to our present case.

**IV.    THE DEFENSE GAG ORDER VIOLATES THE FREE SPEECH AND PETITION CLAUSE RIGHTS OF PLAINTIFF, COUNSEL AND COUNSEL'S NUMEROUS OTHER STATE POLICE CLIENTS.**

Defendants' retaliatory efforts run afoul, not only of "plaintiff's" First Amendment speech and petition clause rights, but also the speech rights of this Firm and all its State Police clients. Contrary to the cries of the defense, there is no calculated media campaign to taint the jury pool. Instead, articulate, knowledgeable and experienced counsel, speaking for their clients, within the rules, have pled with the public, the legislature, the judiciary and the media to step in and fix a broken, once proud police force that is presently mired in the muck of illegality and corruption that was once the exclusive domain of the NCC police department. <u>See, e.g.</u> <u>U.S. v. Gordon</u>, Crim. Action No. 04-63-KAJ (D.Del.). These men and women want integrity restored to their force, its once proud standards reestablished, with cronyism and corruption abolished.

Revealingly, defendants have overplayed their hand and their unlawful purposes are made all too clear by the relief they specifically request. They seek to silence counsel, plaintiff and innumerable witnesses from making any comments whatsoever. (OB at Wherefore clause). Thus, defendants not only seek to stifle all speech about this case in this arena, but additionally outside the limited arena of this case, they also seek to prohibit <u>all speech about defendant high public officials</u>, officials who regularly violate the very laws they long ago once swore to uphold.

-35-

Counsel are forbidden from defending and speaking publicly on behalf of any of their clients, many with pending court cases against defendants, clients who defendants continue to abuse in many forums - in this court case, other court cases, and in other proceedings and venues. Counsel are forbidden from making <u>any</u> public statements, even in their personal capacities. Counsel are forbidden from making any statement about the anything defendants do. But the First Amendment forbids this illicit effort to censor continuing criticism of governmental corruption and illegality.

As discussed above, "litigation ... is a means for achieving the lawful objectives of equality of treatment by all government." <u>Button</u>, 371 U.S. at 429. "It is thus a form of political expression." <u>Id.</u>; <u>accord</u> <u>Brennan v. Norton</u>, 350 F.3d 399, 417 (2003) ("is undisputed that filing lawsuits and grievances ... implicate[s] the Petition Clause of the First Amendment"). "[U]nder the conditions of modern [Delaware] government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances." <u>Button</u>, 371 U.S. at 430. Because of the Governor's obduracy and the powerful legislators who protect defendants Chaffinch and MacLeish, litigation and public comment are the sole remaining avenues to fix the broken State Police.

Plaintiff, like all this Firm's State Police clients, is barred by internal rule from any expression that could conceivably be interpreted as bringing discredit upon the DSP, a gag order which is an unconstitutional prior restraint on speech under the Supreme Court's decision in <u>U.S. v. Nat'l Treasury Employees Union</u>, 513 U.S. 454 (1995).[23] Plaintiff and counsel's other state police clients associate with this Firm in order to petition government on their behalf - by judicial, legislative and other means. In doing so, they are "addressing government and asking government to fix what ... government has broken or has failed in its duty to repair." <u>San Filippo</u>

---

[23]  This is a different gag order than the additional ones imposed upon Cpl/3 Price, Cpl/3 Warren and Sgt. Foraker by both Chaffinch and MacLeish in the <u>Price</u> case.

v. Bongiovanni, 30 F.3d 424, 442 (3d Cir. 1994). As the many jury verdicts and numerous other cases make clear - our State Police force is broken, and State government has abdicated its responsibility to repair it.

Among other things, counsel have been retained to speak out and petition the government and others to fix the broken State Police department.[24]  These representations go well beyond the judicial forum, both in this case and in many others.  Defendants' gag order Motion is a transparent attempt to bar counsel from petitioning government, by judicial, legislative and other means in order to restore integrity and professionalism to the DSP, qualities the leadership of the department has been sorely lacking under the reign of both Chaffinch and MacLeish.

More specifically, the gag order imposed in the present case is causing irreparable injury to the First Amendment rights of Cpl/3 Price, Cpl/3 Warren and Sgt. Foraker - the plaintiffs in the Price case.[25]  In Price, the trial revealed that the defendants had imposed a gag order on those plaintiffs.  Despite the jury verdict, plaintiffs still remain under that gag order and unable to speak out about the rot festering within the DSP.[26]  Plaintiffs suffer irreparable injury to their First Amendment rights each day that the gag order remains.  Plaintiffs have retained the Firm to speak on their behalf, yet the gag order bars them from doing so.  Accordingly, the gag order must be vacated on this ground as well.

---

[24]  To the extent the defense claims that as police officers, the Firm's clients have no free speech rights, such a position is clearly mistaken.  See, e.g. Garrity v. New Jersey, 385 U.S. 493, 500 (1967) ("policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights."); Biggs v. Village of Dupo, 892 F.2d 1298, 1303 (7th Cir. 1990) ("freedom of speech is not traded for an officer's badge.").

[25]  See Swartzwelder v. McNeilly, 297 F.3d 228, 241 (3d Cir. 2002) ("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); accord Abu-Jamal v. Price, 154 F.3d 128, 136 (3d Cir. 1998); Elrod v. Burns, 427 U.S. 347, 373 (1976).

[26]  Even though Cpl/3 Price has been forced out of the Division, he remains in limbo due to issues related to his service pension and potentially is still subject to the longstanding internal gag order.

V.     **DEFENDANTS' ILLEGAL EFFORTS ALSO VIOLATE THE EXPRESSIVE ASSOCIATIONAL RIGHTS OF THE NEUBERGER FIRM AND ITS CLIENTS.**

Defendants' retaliatory efforts also violate the First Amendment rights of plaintiff, this Firm and the Firm's DSP clients to engage in expressive association.  See Boy Scouts of America v. Dale, 530 U.S. 640 (2000); Roberts v. U.S. Jaycees, 468 U.S. 609 (1984); Bd. of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537 (1987).

The elements of an expressive association claim are (1) whether the group is an "expressive association," (2) whether the state action at issue significantly affects the group's ability to advocate its viewpoint, and (3) whether the state's interest justifies the burden it imposes on the group's expressive association.  Dale, 530 U.S. at 648-58; accord Circle Schools v. Pappert, 381 F.3d 172, 181-82 (3d Cir. 2004) (applying the Dale framework); Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 442 (3d Cir. 2000) (same).

**A.  The Firm and Its DSP Clients Are An Expressive Association.**  "To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'"  Dale, 530 U.S. at 648.  "The Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity."  Pi Lambda, 229 F.3d at 443.  Expressive association protections are not "reserved for advocacy groups" alone.  Dale, 530 U.S. at 648.  But "a group must engage in some form of expression, whether it be public or private."  Id.  Importantly, such associations need not even "associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment.  An association must merely engage in expressive activity that could be impaired in order to be entitled to protection."  Id. at 655.

It is clear that the Firm and its clients engage in such expressive activity and are entitled to the protections of an expressive association.  The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic,

-38-

educational, religious, and <u>cultural ends</u>." <u>Roberts</u>, 468 U.S. at 622 (emphasis added); <u>accord</u> <u>Pi Lambda</u>, 229 F.3d at 443; <u>see also</u> <u>Button</u>, 371 U.S. at 430 ("For there is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity.  Thus we have affirmed the right to engage in association for the advancement of beliefs and ideas").

Over the last four years, this Firm's clients have come to it with two purposes.  First, vindication of their individual societal and legal rights to be free of disparate treatment and retaliation in an important government agency.  Second, as a group to root out the political cronyism of the good old boy network and to restore to this department the professionalism and integrity which have been absent for so long.  (D.I. 24 - Decl. ¶ 64; A285-86).

Through subsequent efforts - by way of lawsuits, legislative efforts, public calls for action and reform, and other protected speech and petitioning activities - the Firm and its clients have sought to root out and expose the rampant illegality that has plagued the DSP in recent years under the reign of Chaffinch and now MacLeish.  <u>See</u> <u>Button</u>, 371 U.S. at 431 ("For such a group, association for litigation may be the most effective form of political association."); <u>Cf.</u> <u>Brennan</u>, 350 F.3d at 417 ("is undisputed that filing lawsuits and grievances ... implicate[s] the Petition Clause of the First Amendment"); <u>San Filippo</u>, 30 F.3d at 440, n. 18 (the Third Circuit "use[s] the term 'lawsuit' to encompass any device invoking a mechanism for redress of grievances against the government").  As a result of this expressive activity, the Firm and its DSP clients are an expressive association.[27]

**B.  The Gag Order Will Significantly Affect this Expressive Association's Ability to Advocate Its Viewpoint.**  As discussed in Arguments I-IV above, the absolute gag order and ban on criticism of any present and future government misconduct by any of the defendants will significantly and adversely affect the Firm and its clients' ability to advocate for desperately

---

[27]  The Firm historically has engaged in such expressive associations at both the federal and state levels, such as, for example, the McSally legislation and the COPS organization.  (D.I. 24 - Decl. ¶¶ 19-20; A268-70).

needed reform in the DSP. All speech, petitioning and other protected activity criticizing the leadership and management of the agency must necessarily cease.

**C. The State Has No Interest to Assert in the Balancing.** As explained in Argument I and II above, the state defendants have no legitimate interest to assert in the balancing which could even hope to outweigh the irreparable injury that the Firm and its clients will suffer if they are deprived of their First Amendment rights. See Swartzwelder, 297 F.3d at 241 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

As is explained above, defendants' request violates the protected First Amendment right of expressive association.

### <u>CONCLUSION</u>

For the aforementioned reasons, defense Motion should be denied and the gag order and prior restraint on speech vacated or voided *ab initio*.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: June 16, 2006                    Attorneys for Plaintiff

# Unreported
# Opinions



Slip Copy                                                                                                            Page 1
Slip Copy, 2005 WL 2678954 (D.Del.)
(Cite as: 2005 WL 2678954 (D.Del.))

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Captain Barbara CONLEY, Plaintiff,
v.
Colonel L. Aaron CHAFFINCH, individually and in
his official capacity as the
Superintendent, Delaware State Police; Lieutenant
Colonel Thomas F. Macleish,
individually and in his official capacity as the Deputy
Superintendent,
Delaware State Police; David B. Mitchell,
individually and in his official
capacity as Secretary of the Department of Safety and
Homeland Security, State
of Delaware; and Division of State Police,
Department of Safety and Homeland
Security, State of Delaware, Defendants.
No. 04-1394-GMS.

March 4, 2005.
Stephen J. Neuberger, The Neuberger Firm, P.A.,
Wilmington, DE, for Plaintiff.

Ralph K. Durstein, III, Stephani J. Ballard, Department
of Justice, Alyssa M. Schwartz, Chad Michael
Shandler, Richard G. Elliott, Jr., Richards, Layton &
Finger, Wilmington, DE, James E. Liguori, Liguori,
Morris & Yiengst, Dover, DE, for Defendants.

*ORDER*

SLEET, J.

I. INTRODUCTION

*1 On October 27, 2004, Captain Barbara Conley
("Conley") filed this lawsuit, alleging gender
discrimination by Colonel L. Aaron Chaffinch
("Chaffinch"), David B. Mitchell ("Mitchell"), and

Division of State Police, Department of Safety and
Homeland Security, State of Delaware ("Delaware State
Police") (collectively, the "defendants"), in violation of
the Fourteenth Amendment to the United States
Constitution and 42 U.S.C. § 1983. [FN1]

> FN1. On December 6, 2004, Conley filed a
> first amended complaint, adding Lieutenant
> Colonel Thomas F. Macleish ("Macleish") as
> a defendant to the case.

Presently before the court is the defendants' motion for
an order limiting pretrial publicity. For the following
reasons, the court concludes that the order the
defendants seek is not constitutionally permissible
because they have failed to demonstrate a substantial
likelihood that statements from counsel and the parties
would materially prejudice the case. Additionally, the
proposed order is neither narrowly tailored nor the least
restrictive corrective measure available to ensure a fair
trial. [FN2]

> FN2. On February 18, 2005, the court heard
> oral argument on the defendants' motion and
> issued an oral opinion denying the motion.
> This is the court's written opinion on the
> motion.

II. DISCUSSION

The defendants seek an order that would require
counsel and the parties to "cease any and all
extrajudicial communications" concerning this
lawsuit--that is, a gag order. (D.I. 9, at 8.) A gag order
is a prior restraint on speech that "raises rights under
the First Amendment of the United States Constitution."
*United States v. Scarfo,* 263 F.3d 80, 92 (3d Cir.2001).
A gag order also carries with it "a heavy presumption
against its constitutional validity." *Bailey v. Sys.
Innovation, Inc.,* 852 F.2d 93, 98 (3d Cir.1988)
(quoting *New York Times Co. v. United States,* 403 U.S.
713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). As
such, the party moving for the gag order must present
evidence that demonstrates the need for the prior

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                            Page 2
Slip Copy, 2005 WL 2678954 (D.Del.)
**(Cite as: 2005 WL 2678954 (D.Del.))**

restraint on both the lawyer and the litigants. *Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Bailey,* 852 F.2d at 99. [FN3] The moving party must also demonstrate that the order is narrowly tailored and that other measures short of prior restraint cannot effectively address the perceived danger. *See Nebraska Press,* 427 U.S. at 564-65. "If any method other than a prior restraint can effectively be employed to further the governmental or private interest threatened ... then the order is invalid." *Bailey,* 852 F.2d at 99.

> FN3. As a general rule, "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press" because "lawyers have special access to information through discovery and client communications [and] their extrajudicial statements [, therefore,] pose a threat to the fairness of a pending proceeding." *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1074, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1990). The court, however, cannot impose the ethical rules governing a lawyer's pretrial comments on litigants unless: (1) the litigants' pretrial comments are likely to interfere with the moving party's right to a fair trial; (2) other measures would not likely mitigate the effects of unrestrained pretrial publicity; and (3) the prior restraint would effectively prevent the perceived danger. *Bailey,* 852 F.2d at 99-100.

Intense publicity surrounding a proceeding poses significant and well-known dangers to a fair trial. *United States v. Brown,* 218 F.3d 415, 423 (5th Cir.2000). These dangers include the potential that pretrial publicity may prejudice the jury pool, as well as the actual outcome of a trial by, for example, disseminating to the press inadmissible evidence. *See, e.g., Gentile,* 501 U.S. 1030, 1075, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1990); *Scarfo,* 263 F.3d at 94; *Brown,* 218 F.3d at 423 (quoting *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)). [FN4] Under Third Circuit case law, the court must examine the record to determine whether a gag order would prevent a "substantial likelihood of material

prejudice" to the judicial proceeding. *See Scarfo,* 263 F.3d at 93-94 (applying the "substantial likelihood of material prejudice" standard that the Supreme Court held constitutionally permissible to balance an attorney's interest in free speech against the state's interest in fair judicial determinations in *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1990)). [FN5] If the court determines that an order limiting extrajudicial communication is proper, the "limitation [that the court imposes] on the ... speech must be narrow and necessary, carefully aimed at comments likely to influence the trial or judicial determination." *Scarfo,* 263 F.3d at 93.

> FN4. Indeed, "fairness in a jury trial, whether criminal or civil in nature, is a vital constitutional right." *Bailey,* 852 F.2d at 98.

> FN5. This standard is incorporated into the ABA Model Rules of Professional Conduct Rule 3.6 and the Delaware Lawyer's Rules of Professional Conduct Rule 3.6. *See infra* note 6.

**\*2** The defendants maintain that Conley's lawyers, the Neuberger Firm (the "Firm"), have "promoted this lawsuit through public statements, the release of correspondence to the press, and media interviews." (D.I. 9 ¶ 4.) The defendants then list various statements that the Firm released to *The News Journal* and the *Delaware State News,* newspapers of general circulation in Delaware, and contend that these statements lacked civility and reflected verbal intemperance, scorn, and superiority. (*Id.*) Additionally, the defendants claim that the statements are "a calculated effort to influence the outcome of [the] plaintiff's lawsuit through manipulation of the media accounts of the litigation." (*Id.*)

After reviewing the articles and statements, the court concludes that they do not rise to the level of creating a substantial likelihood of material prejudice, or of any harm sufficient to support a gag order. The statements at issue can be characterized as follows: (1) statements made to protect the plaintiff from substantial undue prejudicial effect of recent publicity not initiated by her counsel; (2) statements criticizing the Delaware State

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Police and the Delaware government for alleged misconduct; (3) statements involving the plaintiff's claims and offense; (4) information contained in the public record; (5) statements that were made by a reporter, not the Firm; and (6) benign statements. These types of statements either fall within the "safe harbors" of the ABA Model Rules of Professional Conduct Rule 3.6 and the Delaware Lawyer's Rules of Professional Conduct Rule 3.6, or are protected under the First Amendment. [FN6] For example, the defendants cite a *News Journal* article, dated November 6, 2004, in which the Firm made the following comments:

> FN6. The ABA Model Rules of Professional Conduct Rule 3.6, adopted by Local Rule 83.6 for the District of Delaware, states, in pertinent part:
> (a) A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.
> (b) A statement referred to in paragraph (a) ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury ... and the statement relates to: (1) the character, credibility, reputation or criminal record of a party suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness; ...
> (5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial ...
> (c) Notwithstanding paragraphs (a) and (b) a lawyer involved in the investigation or litigation of a matter may state without elaboration: (1) the general nature of the claim or defense; (2) information contained in the public record ... (4) the scheduling or result of any step in the litigation; ...
> The Delaware Lawyer's Rules of Profession Conduct Rule 3.6(c) further states:
> (c) Notwithstanding paragraph (a), a lawyer

may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

"The law is the law. I don't care what they said, they violated it. Now they have to be held accountable." D.I. 9 ¶ 5; Ex. D, at 4. These statements do not pose a threat of prejudice to the jury. To the contrary, the statements were made to protect the plaintiff from the substantial undue prejudicial effect of recent publicity initiated when someone allegedly released an email containing her confidential Internal Affairs file to a Delaware newspaper, thereby violating the confidentiality provisions of Del.Code Ann. tit. 11 § 9200(c)(12). [FN7] Thus, the statements fall under the "safe haven" of the Delaware Lawyer's Rules of Professional Conduct Rule 3.6.

> FN7. Del.Code Ann. tit. 11 § 9200(c)(12) provides:
> (c) Whenever a law-enforcement officer is under investigation or is subjected to questioning for any reason which could lead to disciplinary action, demotion or dismissal, the investigation or questioning shall be conducted under the following conditions: ...
> (12) All records compiled as a result of any investigation subject to the provisions of this chapter and/or a contractual disciplinary grievance procedure shall be and remain confidential and shall not be released to the public.

Likewise, statements including the alleged Internal Affairs coverups of the defendants, specifically Chaffinch and MacLeish, arise out of independent matters concerning alleged misconduct and abuse of office within the Delaware State Police and the Delaware government. [FN8] These statements are protected by the First Amendment because they are criticisms of alleged governmental corruption, an issue of great public concern that lies at the core of the First

Slip Copy                                                                                                          Page 4
Slip Copy, 2005 WL 2678954 (D.Del.)
**(Cite as: 2005 WL 2678954 (D.Del.))**

Amendment. *See* Gentile, 501 U.S. at 1034-35 ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment.... [A]lleged governmental misconduct ... [is] 'speech which has traditionally been recognized as lying at the core of the First Amendment.' "); Baldassare v. New Jersey, 250 F.3d 188, 196 (3d Cir.2001) ("Disclosing corruption, fraud and illegality in a government agency is a matter of significant public concern.") Indeed, "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" are public issues protected by the First Amendment. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

> FN8. These statements include:
> [t]his is the way it is with certain good old boys who happen to be in charge of our Delaware State Police.... [The Governor] condones and coddles a serial constitutional violator like the colonel.... This is ridiculous.... This is a travesty. This must be the Delaware way.... I will not be party to another coverup of misdeeds in the DSP.

**\*3** Other statements that the defendants list refer to the plaintiff's claims or matters previously published. One of the statements, in addition to being a matter of public record, was not made by the Firm, but by a reporter for the *Delaware State News*. [FN9] In addition, some of the criticized statements are benign, including: "[t]here's some stuff that we wouldn't even put in the complaint because we were concerned with the decorum of the court. It's so offensive we won't put it in court papers." (D.I. 9 ¶ 5.) The statements at issue in the present case are innocuous when compared, for example, to extrajudicial statements in *Mu'Min v. Virginia*, a capital murder case in which the Supreme Court did not issue a gag order. The Court held that even though the community had been subjected to a barrage of publicity prior to the trial, including news articles containing details of the crime and prejudicial information inadmissible at trial, and eight of the twelve jurors admitted some exposure to pretrial publicity, the publicity did not rise even to a level requiring questioning of individual jurors. 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

> FN9. The *Delaware State News* article, dated November 16, 2004, states that the Firm "called for an open investigation of Col. Chaffinch and released the names of more than a dozen current or retired troopers who allegedly witnessed improper behavior on the part of the colonel." (D.I. 9 ¶ 5.) In addition to the fact that the statement was made by the news reporter, the Firm's release of witnesses relates to the Internal Affairs investigation of Colonel Chaffinch, not the present case. Under Delaware law, the investigation into Colonel Chaffinch is not confidential. *See* Del.Code Ann. tit. 11 § 9200(b) ("this chapter shall not apply to the Superintendent or Deputy Superintendent of the Delaware State Police, or to any officer above the rank of Captain in the Delaware State Police").

In addition, the defendants do not explain any specific or general prejudice they would suffer if the court did not impose a gag order. They list statements and characterize them as prejudicial. However, they have presented no evidence, and the court cannot find any support in the record, as to why the statements are a "calculated effort to influence the outcome of [the] plaintiff's lawsuit through manipulation of the media accounts of the litigation," as the defendants contend. Thus, the defendants have not demonstrated a substantial likelihood that extrajudicial statements by the Firm or the parties would materially prejudice the case.

Moreover, even assuming that the record demonstrates a substantial likelihood of material prejudice, the court finds that the defendants' proposed gag order is not "narrow [and] carefully aimed at comments likely to influence the trial or judicial determination." Scarfo, 263 F.3d at 91. As previously stated, the proposed order would require counsel and the parties to "cease any and all extrajudicial communications" concerning this lawsuit. The defendants would have the court impose a "no comment" rule without leaving open avenues of expression, including statements that are protected under the "safe harbor" provisions of the ABA Model Rules of Professional Conduct and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2678954 (D.Del.)
**(Cite as: 2005 WL 2678954 (D.Del.))**

Delaware Lawyers' Rules of Professional Conduct, as well as protected criticisms of alleged government misconduct and corruption. Accordingly, the defendants' proposed order is not narrow and would therefore, if implemented, be unconstitutional. *Compare* Brown, 218 F.3d at 419 (upholding the constitutionality of a gag order and because "[t]he order expressly does not prevent the parties from discussing ... (1) the general nature of any allegations or defenses; (2) information contained in the public record; (3) scheduling information; (4) any decisions or order by the court that is a matter of public record; and (5) 'the contents or substance' of any motion filed in the case, to the extent the motion is a matter of public record"). Nor is the proposed gag order the least restrictive means available to prevent the "evils" against which a gag order may appropriately apply. After reviewing the record and case law, the court concludes at the present time that alternative measures to prior restraint, including a careful *voir dire* of prospective jurors and/or emphatic jury instructions from the court would blunt the impact of any pretrial publicity and alleviate the defendants' concerns about a fair trial. *See* Bailey, 852 F.2d at 100. [FN10] Accordingly, the court will deny the defendants' motion.

> FN10. This is especially true in light of the fact that the court has not yet determined a trial date for this case. *See* Gentile, 501 U.S. at 1044 ("A statement which reaches the attention of the venire on the eve of *voir dire* might require a continuance or cause difficulties in securing a impartial jury," ... while "exposure to the same statement six months prior to trial would not result in prejudice, the content fading from memory long before the trial date.")

III. CONCLUSION

**\*4** For the aforementioned reasons, IT IS HEREBY ORDERED that:
  1. The defendants' Motion for an Order Limiting Prejudicial Pretrial Publicity (D.I.9) is DENIED without prejudice.

Slip Copy, 2005 WL 2678954 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                           Page 1
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
B. Kurt PRICE, Wayne Warren, and
Christopher D. Foraker, Plaintiffs,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish,
David B. Mitchell, and Division of
State Police, Defendants.
Christopher D. FORAKER, Plaintiff,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish,
David B. Mitchell, and Division of
State Police, Defendants.
**No. 04-956 (GMS), 04-1207(GMS).**

May 12, 2006.

Martin D. Haverly, Esq., Thomas S. Neuberger, Stephen J. Neuberger, The Neuberger Firm, P.A., Wilmington, DE, for Plaintiffs.

Richard Montgomery Donaldson, Noel C. Burnham, Montgomery, McCracken, Walker & Rhoads, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

**\*1** The above-captioned actions were consolidated on April 18, 2006. In Civil Action No. 04-956 ("the Price case"), three state troopers assigned to the Delaware State Police's ("DSP") Firearms Training Unit facility ("FTU") allege that their First Amendment rights were violated by two superiors who retaliated against them for speaking out against hazardous health conditions at the FTU. Thus, the Price complaint states one count of Free Speech retaliation and one count of Petition Clause retaliation, both pursuant to 42 U.S.C.A. § 1983 (2003). In Civil Action No. 04-1207 ("the Foraker case"), Sergeant Christopher Foraker individually alleges that his First Amendment rights were violated by the same two superiors after they retaliated against him for filing (and winning) a First Amendment retaliation lawsuit in 2002. Thus, like the Price complaint, the Foraker complaint also states one count of Free Speech retaliation pursuant to § 1983, and one count of Petition Clause retaliation pursuant to § 1983. Additionally, the Foraker complaint states two state law causes of action: defamation and false light invasion of privacy. Presently before the court are the defendants' motions for summary judgment on all counts in both cases. For the following reasons, the court concludes that summary judgment is inappropriate for all counts except Foraker's false light claim.

II. STANDARD OF REVIEW

Evaluating a motion for summary judgment requires the court to "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' [while refraining from] weighing the evidence or making credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citation omitted). If [the court is able to]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**

determine that 'there is no genuine issue as to any material fact' and that the movant is entitled to judgment as a matter of law," summary judgment must be granted. _Hill v. City of Scranton,_ 411 F.3d 118, 124-25 (3d Cir.2005) (quoting Fed.R.Civ.P. 56(c)).

### III. BACKGROUND

 The FTU, a multi-million dollar indoor firing range for the DSP, became operational in September of 1998. A few months later, due to concerns about the ventilation system, an environmental-assessment firm hired to conduct a study of the air quality in the facility concluded that the amount of lead in the air significantly exceeded the maximum acceptable level recommended by the Occupational Safety and Health Administration. (D.I. 85 at A222.) [FN1] By at least as early as June 14 of the following year, the FTU's air-quality problems became the subject of public scrutiny after _The News Journal_--a local Delaware newspaper--publicized the results of the study in an article entitled, "Shooting range under fire for lead: State police are exposed to levels of metal in air twice federal standard." (Id. at A2639-A2640, 189 A.2d 773.)

> FN1. "D.I. 85," which refers to Docket Item 85 in the Price case, was also filed as Docket Item 65 in the Foraker case.

 Foraker became the non-commissioned officer in charge ("NCOIC") of the FTU on August 1, 2001. At that time, he supervised several firearms instructors, including Corporal B. Kurt Price and Corporal Wayne Warren. Foraker also supervised Corporal Eddie Cathell, who was a personal friend Colonel L. Aaron Chaffinch. Foraker and Cathell had a rather rocky professional relationship, and on several occasions

Foraker spoke out against Cathell. On February 22, 2002, Foraker was involuntarily transferred from the FTU to another position within the DSP. In response, Foraker filed a § 1983 action against Chaffinch for unlawful First Amendment retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003. After his reinstatement, Foraker learned that the FTU had the same air-quality issues that it had prior to his involuntary transfer in 2002. Not surprisingly, the air quality weighed on the minds of Foraker, Price, and Warren. Foraker soon began to voice their concerns to their commanding officers, including Lieutenant Colonel Thomas MacLeish. Eventually, the trio's concerns worked their way up the chain of command to Chaffinch.

 **\*2** In March of 2004, the FTU's air quality remained poor and, as a result, the facility was formally closed. Due to the public attention the FTU's closing generated, Chaffinch gave two media tours of the facility in April 2004. Before the first tour, however, Chaffinch revealed his intent to blame Foraker for the FTU's closing to Captain Glenn Dixon:

> [Chaffinch] talked about the meeting that he was going to at the range, and at that time he mentioned Sergeant Foraker and that he was going to put it on Foraker during the meeting. He had outlined that he had the newspaper people going [sic] to be present at the meeting and that he is going to put it on Foraker and lay a lot of the blame on Foraker for the range.

> (Dixon Dep. at 8:7-13.) Consistent with this statement, Chaffinch was quoted during the tour as saying:

> The previous sergeant in charge did a good job. Things changed in December

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**

[2003] when another sergeant came in. That's at least a portion of where the ball was dropped.

...

Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. [The previous sergeant] was willing to do that.... I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way.

(D.I. 85 at A850.) Foraker was unable to respond to these allegations, which were printed in both the *Delaware State News* and *American Police Beat Magazine,* because Chaffinch placed a gag order on his troopers. Nevertheless, Foraker, Price, and Warren all gave statements in cooperation with an investigation by the State Auditor's Office. Shortly thereafter, Price and Warren were placed on light duty--ostensibly because they had disabilities rendering them unfit for regular duty--and Foraker was banned from attending Section Chief meetings he had attended in the past.

IV. DISCUSSION

A. First Amendment Retaliation (Counts I and II)

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment." *Hill,* 411 F.3d at 125. The employee must show at step one that the activity in question is protected by the First Amendment. *Hill,* 411 F.3d at 125. At step two, the employee must show "that the protected activity 'was a substantial factor in the alleged retaliatory action[s].' " *Hill,* 411 F.3d at 125 (citations omitted). Step two also requires the court

to inquire whether the alleged retaliatory actions were serious enough to be actionable. *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000) ("[N]ot every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation.") (cited by *McKee v. Hart,* 436 F.3d 165, 170 (3d Cir.2006). However, this is an extremely low hurdle to overcome:

**\*3** First Amendment retaliation claims are always individually actionable, even when relatively minor. Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee," if "intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to "deter **a person** of **ordinary firmness"** from exercising his or her First Amendment rights. *Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000) (citing *Rutan v. Republican Party,* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low: as we said in *Suppan,* a cause of action is supplied by all but truly de minimis violations. *Id.*

*O'Connor v. City of Newark,* 440 F.3d 125, 127-28 (3d Cir.2006). Finally, at step three, "the employer may defeat the employee's claim by demonstrating that the same adverse action[s] would have taken place in the absence of the protected conduct." [FN2] *Id. See also Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

FN2. The plaintiffs contend that the defendants waived this affirmative defense--familiarly known as the *Mount Healthy* defense--by failing to raise it in their pleadings. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendants point out that the defendants raised it in the complaints by alleging that "[t]he defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiffs" (D.I. 45 ¶ 94 (the Price case); D.I. 1 ¶ 84 (the Foraker case)), and the defendants denied the allegation in their answers. (D.I. 51 ¶ 94 (the Price case); D.I. 7 ¶ 84 (the Foraker case).) The court concludes that such denials were sufficient to put the plaintiffs on notice that the *Mount Healthy* defense would be at issue.

Here, all three plaintiffs clearly engaged in protected First Amendment activity by speaking out about the air-quality issues at the FTU, [FN3] and in Foraker's case, by filing suit in 2002. Chaffinch had an obvious motive to retaliate in response to the plaintiffs' activities, and a jury could reasonably infer that MacLeish (who was allegedly "joined at the hip" with Chaffinch) would be similarly motivated to retaliate. Furthermore, the allegedly retaliatory actions--publicly blaming the plaintiffs for the FTU's poor air quality, [FN4] placing Price and Warren on light duty, banning Foraker from meetings, etc.--are more than *de minimis.* And, with regard to the *Mount Healthy* defense, the plaintiffs point to several similarly-situated troopers who were not subject to the same allegedly retaliatory actions. Thus, the plaintiffs have demonstrated a genuine issue of material fact at each step of the analysis, thereby rendering summary judgment inappropriate as to Counts I and II.

FN3. The defendants argue that Price and Warren's Petition Clause claim (Count II) fails because their

cooperation with the Auditor's investigation does not qualify, as a matter of law, as an attempt to petition the government under the First Amendment. Due to the number of disputed facts in this case, including facts regarding the nature of the plaintiffs' cooperation with the Auditor, the court believes the most prudent course of action at this stage is to deny summary judgment as to Count II and revisit the issue after trial.

FN4. Although Chaffinch's comments to the media were explicitly directed at Foraker, there is evidence in the record suggesting that at least one trooper understood Chaffinch to be speaking about Price and Warren as well.

B. Qualified Immunity

The defendants argue that, even if summary judgment in their favor is inappropriate, they are nevertheless entitled to qualified immunity with regard to Counts I and II. "Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *McKee, 436 F.3d at 169* (internal quotations omitted). "To determine whether an official has lost his or her qualified immunity, [the court] must first decide whether a constitutional right would have been violated on the facts alleged." *Id.* (internal quotations omitted). "If the answer to that question is 'yes,' [the court] must then consider whether the right was clearly established." *Id.* (internal quotations omitted). "If [the court] also answer[s] 'yes' to the second question, [the court] must conclude that the official does

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not have qualified immunity." *Id.*

**\*4** Because disputed issues of material fact exist regarding the constitutional violations alleged in Counts I and II, the answer to the first question depends upon the resolution of those factual disputes. Assuming *arguendo* that the answer to the first question turns out to be "yes," the court must inquire whether those rights, if violated, were clearly established. In *McKee,* the Third Circuit succinctly summarized the proper approach to such a query:

" 'Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson,* 271 F.3d 566, 571 (3d Cir.2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "it is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case,* not as a broad general proposition.' " *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) (quoting *Saucier[ v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)* ] ) (emphasis added). 436 F.3d at 171. Although this inquiry "must be undertaken in light of the specific context of the case," *Brosseau,* 543 U.S. at 198, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "Accordingly ... the salient question ... is whether the state of the law [at the time of the acts in question] gave [the defendants] fair warning that

their alleged treatment of [the plaintiffs] was unconstitutional." *Id.*

In this case, the defendants admit that First Amendment retaliation is unlawful in general, but they argue that at the time of the alleged retaliation the state of the law did not give them fair warning that their treatment of Foraker was actionable. The court disagrees. In *Brennan v. Norton,* 350 F.3d 399 (3d Cir.2003)--a case decided before the retaliation in this case--the Third Circuit further defined the line between actionable and non-actionable retaliation. There, the court stated that, if there is a "nexus between [the] protected conduct and [the] alleged retaliation," an act as simple as affixing a sticker bearing the phrase "Department Asshole" on the plaintiff-firefighter's helmet "could rise to the level of a First Amendment violation." *Id.* at 419. The few retaliatory actions mentioned above are obviously more severe than the harassing sticker in *Brennan.* Therefore, the court holds that if the disputed issues of fact are resolved against the defendants, they will not be protected by qualified immunity.

C. Defamation (Count III)

"Under Delaware law, the tort of defamation has five elements: (1) the statement must be of a defamatory character; (2) publication to a third party; (3) the communication must refer to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Gill v. Del. Park, LLC,* 294 F.Supp.2d 638, 646 (D.Del. Dec.2, 2003). Viewing the facts in the light most favorable to Foraker, Chaffinch's statements to the media easily satisfy the five elements of defamation: (1) assigning (allegedly) unwarranted blame to Foraker for the FTU's air quality is defamatory; (2) making a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statement to a newspaper is publication to a third party; (3) mentioning Foraker by name obviously refers to him; (4) any person reading Chaffinch's statement would understand it to be defamatory; and (5) maligning a person in his profession is injurious *per se, Johnson v. Campbell,* No. 00-510- JJF, 2001 U.S. Dist. LEXIS 25596, at *14-*15 (D.Del. Mar. 30, 2001). Likewise, MacLeish's statements--the air-quality problems had began only recently, and procedure had not been followed at the FTU--also satisfy all five elements. To be sure, MacLeish's statements present a closer case because he neither referred to Foraker by name, nor explicitly blamed the FTU's problems on him. Nevertheless, a reasonable jury could infer from the context of the controversy that MacLeish's statements were in fact defamatory of Foraker.

**\*5** The defendants argue that they cannot be held liable for defamation because they were merely stating their opinions. In *Milkovich v. Lorain Journal Co.,* the Supreme Court explained:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Here, the defendants' opinions "imply a knowledge of facts" leading to the conclusion that Foraker's

performance as the NCOIC was inadequate. Accordingly, the defendants may not escape liability by hiding behind the "opinion" shield. The defendants also contend that they cannot be held liable for defamation because their statements were substantially true. However, as the defendants must understand, the question of who was at fault for the FTU's poor air quality is fraught with so many disputed facts that the court cannot determine the truth or falsity of the defendants' statements at this stage.

The only remaining issue is whether Foraker is a public figure. "Where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant have acted with actual malice. *See New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).* Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' " *Id. Gill, 294 F.Supp.2d at 646.* The determination of whether a plaintiff is a public figure is a legal issue for the court to resolve. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 938 (3d Cir.1990).* "*Gertz [v. Robert Welch, Inc., 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)* ] identified three classes of public figures: those who achieve such stature or notoriety that they are considered public figures in all contexts; those who become public figures involuntarily, but these are 'exceedingly rare'; and those who are deemed public figures only within the context of a particular public dispute." *U.S. Healthcare, 898 F.2d at 938.* The latter class--limited purpose public figures--comprise "individuals who voluntarily 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." ' *Id.* (quoting *Gertz, 418 U.S. at 345.)*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 7
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**

"Generally, two factors inform this determination. The first factor indicative of a [plaintiff's] status is his relative access to the media." *U.S. Healthcare,* 898 F.2d at 938. "The second factor is the manner in which the risk of defamation came upon [the plaintiff]." *Id.*

 **\*6** Here, Foraker's access to the media was limited to the point of being non-existent by Chaffinch's imposition of a gag order. Certainly, that cuts against Foraker's public-figure status. On the other hand, the air quality at the FTU was a public controversy as early as 1999. And yet, Foraker, who was aware of the ongoing controversy, actively sought to be reinstated as the NCOIC of the FTU. Thus, Foraker knew or should have known that he was injecting himself into a situation in which, as the head of a controversial facility, there was a substantial risk of public scrutiny and defamation. The question the court must answer, then, is whether Chaffinch's gag order outweighs Foraker's voluntary assumption of risk. In *Sculimbrene v. Reno,* 158 F.Supp.2d 8 (D.D.C. Feb.16, 2001), the D.C. district court was confronted with a similar situation. In that case, the plaintiff was a former FBI Special Agent who became involved in the "Filegate" scandal as a result of his employment at the White House Liaison Office. After media commentator Lanny Davis made disparaging comments about the plaintiff on CNN and CNBC, the plaintiff sought permission to respond publicly. However, that request was denied by his superiors. *Id.* at 11-14; *id.* at 23. The plaintiff then sued Davis under a defamation-like federal statute. In spite of the FBI's refusal to allow the plaintiff to respond publicly, the court concluded that the plaintiff was a limited purpose public figure both because of the high public interest in "Filegate," and because of the

plaintiff's significant role in determining the outcome of the controversy. *Id.* at 23-24. Likewise here, although Foraker was subject to a gag order, as the NCOIC of the FTU he was a significant player in a controversy with high (local) public interest. Moreover, unlike the plaintiff in *Sculimbrene,* Foraker sought the NCOIC position with advance knowledge of the attendant controversy. Therefore, as with the FBI agent in *Sculimbrene,* Foraker is a limited purpose public figure in this context, and therefore, he must prove his defamation case using the heightened "actual malice" standard. The court further holds that the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice. Thus, summary judgment will be denied as to Count III.

 D. False Light Invasion of Privacy (Count IV)

 The common law right of privacy was first recognized by the Delaware Supreme Court in *Barberi v. News-Journal Co.,* 56 Del. 67, 189 A.2d 773 (1963). "The general purpose of protecting the right of privacy relates to one's private life, not when that life has become a matter of legitimate public interest." *Martin v. Widener Univ. Sch. of Law,* No. 91C-03-255, 1992 Del.Super. LEXIS 267, at *54 (Del.Super. Ct. June 4, 1992). Thus, "[o]ne who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency." *Barberi,* 56 Del. at 70, 189 A.2d 773.

 **\*7** With those principles in mind, the defendants argue that "a public figure cannot sustain an action for false light invasion of privacy because someone has publicized his public activities." (D.I. 62 at 32.) The court agrees. Although the act of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**

publicly shedding false light on a person's job performance can be deeply offensive and hurtful, there is simply no invasion of *privacy* when the person being criticized is a public figure and the performance being criticized is the very activity that gave rise to the person's public-figure status in the first place. *See Godbehere v. Phoenix Newspapers,* 162 Ariz. 335, 783 P.2d 781, 789 (Ariz.1989) (holding that "a plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties"). Therefore, the court concludes that allegedly unwarranted criticism of Foraker's performance as the NCOIC at the controversial FTU does not give rise to a cause of action for false light invasion of privacy.

V. CONCLUSION

For the reasons stated, the court will deny summary judgment as to Counts I, II, and III. The court will grant summary judgment as to Count IV.

*ORDER*
IT IS HEREBY ORDERED THAT:
   1. The defendants' motion for summary judgment in the Price case (D.I.80) be DENIED; and
   2. The defendants' motion for summary judgment in the Foraker case (D.I.60) be DENIED as to Counts I, II, and III, and GRANTED as to Count IV.

Slip Copy, 2006 WL 1313178 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 809118 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Brian P. Sullivan (Feb. 28, 2006)

• 2006 WL 809127 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Feb. 28, 2006)

• 2006 WL 809128 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Brian P. Sullivan (Feb. 28, 2006)

• 2006 WL 809116 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Strike Select Portions of Defendants' (1) Reply Brief in Support of their Motion for Summary Judgment and (2) Accompanying Appendix for Failure to Comply with Local Rule 7.1.3 and the Federal Rules of Civil Procedure (Feb. 24, 2006)

• 2006 WL 809114 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Summary Judgment on Counts I and II (Feb. 17, 2006)

• 2006 WL 809115 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion for Summary Judgment (Feb. 17, 2006)

• 2006 WL 809126 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion for Summary Judgment (Feb. 17, 2006)

• 2006 WL 809112 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Consolidate the Trial of these Two Cases Pursuant to Fed.R.Civ.P. 42(a) (Feb. 15, 2006)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**

- [2006 WL 809113](#) (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006)

- [2006 WL 809124](#) (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Consolidate the Trial of these Two Cases Pursuant to Fed.R.Civ.P. 42(a) (Feb. 15, 2006)

- [2006 WL 809125](#) (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006)

- [2006 WL 809108](#) (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006)

- [2006 WL 809109](#) (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion to Consolidate the Trial of These Two Cases Pursuant to Rule 42(a), Fed. R.Civ. P. (Feb. 8, 2006)

- [2006 WL 809110](#) (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb. 8, 2006)

- [2006 WL 809111](#) (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006)

- [2006 WL 809120](#) (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb. 8, 2006)

- [2006 WL 809121](#) (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006)

- [2006 WL 809122](#) (Trial Motion, Memorandum and Affidavit) Defendants Response to Plaintiffs' Motion to Consolidate the Trial of these Two Cases Pursuant to Rule 42(a), Fed.R.Civ.P. (Feb. 8, 2006)

- [2006 WL 809123](#) (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006)

- [2006 WL 809117](#) (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Jan. 23, 2006)

- [2005 WL 3666813](#) (Trial Pleading) Defendants' Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint (Nov. 9, 2005)

- [2005 WL 3666811](#) (Trial Pleading) First Amended Complaint%n1%n (Oct. 14, 2005)

- [2005 WL 3666812](#) (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Defendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005)

- [2005 WL 3666815](#) (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Difendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 10
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**


(Oct. 14, 2005)

- 1:04cv01207 (Docket) (Aug. 30, 2004)

- 1:04cv00956 (Docket) (Aug. 19, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
ROCKWELL TECHNOLOGIES, LLC, Plaintiff,
v.
SPECTRA-PHYSICS LASERS, INC. and Opto
Power Corporation, Defendants.
**No. Civ.A.00-589 GMS.**

March 26, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

  **\*1** The plaintiff, Rockwell Technologies, LLC
("Rockwell") filed the above-captioned action against
Spectra-Physics Lasers, Inc. ("Spectra") and Opto
Power Corporation ("Opto") on June 16, 2000. In its
complaint, Rockwell alleges that Spectra and Opto are
infringing U.S. Patent No. 4,368,098 ("the '098
patent").

  Presently before the court is Rockwell's motion for
partial summary judgment. In this motion, Rockwell
asks the court to find that the '098 patent is not invalid
due to alleged inequitable conduct that occurred in the
prosecution of the patent application. For the reasons
that follow, the court will grant this motion in part and
deny it in part.

II. STANDARD OF REVIEW

  The court may grant summary judgment "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as
a matter of law." Fed.R.Civ.P. 56(c); *see also Boyle v.
County of Allegheny, Pennsylvania,* 139 F.3d 386, 392
(3d Cir.1998). Thus, the court may grant summary
judgment only if the moving party shows that there are
no genuine issues of material fact that would permit a
reasonable jury to find for the non-moving party. *See
Boyle,* 139 F.3d at 392. A fact is material if it might
affect the outcome of the suit. *Id.* (citing *Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). An
issue is genuine if a reasonable jury could possibly find
in favor of the non-moving party with regard to that
issue. *Id.* In deciding the motion, the court must
construe all facts and inferences in the light most
favorable to the non-moving party. *Id.; see also Assaf
v. Fields,* 178 F.3d 170, 173-174 (3d Cir.1999).

 With these standards in mind, the court will describe
the facts and procedural history that led to the motion
presently before the court.

III. BACKGROUND

  A. Prosecution of the '098 Patent

  The patent-in-suit relates to a process for forming "an
epitaxial film of group III-V semiconductor disposed on
a single crystal substrate." Dr. Harold Manasevit
("Manasevit") developed the process described in the
'098 patent. On February 13, 1968, Rockwell filed a
patent application with the United States Patent and
Trademark Office ("PTO"). As the application
contained both process and product claims, the PTO
required that Rockwell choose one to proceed with first.
Rockwell elected to give precedence to the product
claims.

 In 1978, Rockwell retained the law firm of Staas and
Halsey to prosecute the Manasevit patent application
with respect to the process claims. Jack Staas ("Staas")
was the Staas and Halsey attorney primarily responsible
for this prosecution. On April 7, 1978, Rockwell filed
a divisional application seeking a patent for the process

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims. This application issued as the '098 patent on January 11, 1983. It expired on January 11, 2000.

B. Alleged Prior Art

**\*2** In 1957, Thomas R. Scott obtained patents from Japan (the "Japanese Scott patent") and the United Kingdom (the "UK Scott patent"). Spectra and Opto allege that the UK Scott patent came to the attention of Rockwell's in-house patent attorneys while Rockwell was prosecuting the Manasevit process patent application in Great Britain. In response to that application, the UK Patent Office identified the UK Scott patent and five other prior art references. The UK Patent Office directed Rockwell's attention to those references.

Rockwell's UK patent counsel informed Rockwell's in-house patent counsel Robert Rogers ("Rogers") of the UK Scott patent and the five other references on September 29, 1972. In response to the UK patent counsel's request on how to respond to that information, Rockwell employee Martin E. Gerry prepared detailed instructions for amending Rockwell's claims to avoid the cited references. The UK patent counsel subsequently informed Rogers that it was removing from the application the original prior art cited in the application because the UK Scott patent and the other references constituted "the closest prior art."

Rockwell also applied for a Japanese patent on Manasevit's invention. On that application, Rockwell listed Frederick Hamann ("Hamann") as its representative. Hamann supervised Rockwell's in-house patent department from 1970 to 1995. As in the prosecution of the UK patent application, Scott's work was cited against the Japanese patent application.

On June 18, 1974, the Japanese patent office issued a rejection against the pending claims in Rockwell's Japanese patent application . [FN1] Rockwell's Japanese patent counsel sent the rejection to Hamann on July 6, 1974, along with a discussion of the Japanese Scott patent. The Japanese counsel also sent Hamann a copy of this patent. Rockwell's in-house patent counsel G. Donald Weber ("Weber") responded by asking for an English abstract of the Japanese Scott patent. The

Japanese patent counsel complied on August 8, 1974. Weber subsequently sent them instructions on how to amend Rockwell's Japanese claims in light of the Scott patent.

> FN1. Spectra and Opto allege that the claims in Rockwell's Japanese patent application were substantively the same as the claims in the '098 patent.

C. Procedural History

On August 30, 1993, Rockwell brought an action against the United States in the United States Court of Federal Claims. In May 1995, Rockwell initiated an action against Spectra in the Northern District of California. Spectra then intervened in the Court of Federal Claims action as a third-party defendant. The Northern District of California stayed its action pending a resolution of that action.

In 1998, the United States and Rockwell settled. This settlement deprived the Claims Court of jurisdiction over the dispute between Rockwell and Spectra. Thus, on January 13, 1999, the Northern District of California court lifted its stay and reopened the matter. On July 24, 2001, the court denied Rockwell's motion for partial summary judgment on the issue of inequitable conduct.

Rockwell brought the present infringement action on June 16, 2000.

IV. DISCUSSION

**\*3** Spectra and Opto assert that the inventor, Dr. Harold M. Manasevit, and Rockwell's attorney Jack Staas were guilty of inequitable conduct by failing to disclose material references to the PTO. [FN2]

> FN2. Spectra and Opto deny basing their inequitable conduct claims on the Rule 132 Declaration that Manasevit filed with the PTO (the "Manasevit Declaration") Further, in their opposition papers, Spectra and Opto state that they do not oppose the portion of Rockwell's summary judgment motion directed to the Manasevit Declaration. Likewise, they deny

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)
(Cite as: 2002 WL 531555 (D.Del.))

Page 3

alleging that Rockwell itself, as a corporate entity, could be liable for inequitable conduct. Accordingly, it is undisputed that only Manasevit's and counsel for Rockwell's conduct is at issue.

As an initial matter, Rockwell argues for the first time in its reply brief that Spectra and Opto failed to plead inequitable conduct with particularity in their answer to the complaint and have thus waived their right to assert this affirmative defense. However, Rockwell's tactic of reserving new arguments for its reply brief amounts to impermissible "sandbagging." *See Jordan v. Bellinger,* 2000 U.S. Dist. LEXIS 19233, *18 (D. Del. April 28, 2000) (declining to address new arguments reserved for the reply brief); *see also* D. DEL. L.R. 7.1.3(c)(2) (1995). Accordingly, the court declines to address Rockwell's arguments on this issue and will turn instead to the substantive merits of the motion.

Patent applicants and their legal representatives have a duty to prosecute applications with candor, good faith, and honesty. *See Molins PLC v. Textrom, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995). Breach of this duty can lead to a finding that the applicant engaged in inequitable conduct before the PTO. *See Life Tech., Inc. v. Clontech Lab., Inc.,* 224 F.3d 1320, 1324 (Fed.Cir.2000). The effect of such inequitable conduct is to render the affected patent unenforceable. *See id.*

In order to prove inequitable conduct, the defendants bear the burden of providing clear and convincing evidence that: (1) omitted or false information was material; (2) the applicant had knowledge of the existence and material nature of the information; and (3) the applicant intended to deceive the PTO. *See Molins,* 48 F.3d at 1178. "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Tech,* 224 F.3d at 1324. Information is considered material "when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins,* 48 F.3d at 1179. The court may infer intent from the facts and circumstances surrounding the applicant's overall conduct. *See Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418,

1422 (Fed.Cir.1989). However, in making its inferences, the court must be aware that "[a]lthough the intent element of fraud or inequitable conduct may be proven by a showing of acts the natural consequence of which were presumably intended by the actor, this requires the fact finders to evaluate all the facts and circumstances in each case. Such an evaluation is rarely enabled in summary proceedings." *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1577 (Fed.Cir.1985) (citation omitted).

In its moving papers, Rockwell declines to address the materiality of the Scott references. The Scott patents, however, were cited by foreign patent offices against Manasevit's process. This raises at least an inference that the references are material. *See Molins,* 48 F.3d at 1180. Further, Rockwell amended the claims in its foreign patents to overcome the Scott references. Accordingly the court finds that there is a triable issue of fact with regard to the materiality of the Scott patents.

*4 The court likewise concludes that granting summary judgment on the issue of intent would be improvident. Rockwell submits that Manasevit and Staas have each stated that they were unaware of the Scott patents. The Federal Circuit has stated, however, that "[f]ailure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional." *Molins,* 48 F.3d at 1182. Moreover, the court expresses concern over Rockwell's argument that the named inventor of the '098 patent, who is also the named inventor of the British and Japanese patents that were amended in light of the Scott patents, was not aware of the Scott patents.

When faced with a similar motion for summary judgment based on inequitable conduct with regard to these parties, the District Court for the Northern District of California explicitly reserved judgment on whether the actions of Staas and his fellow Rockwell attorneys were inequitable.[FN3] *See Rockwell v. SDL, Inc.,* No. C-95-1729, at 12, n. 11 (N.D.Cal. July 24, 2000). That court further expressed a concern identical to that which the court has in the present case arising from Manasevit's failure to disclose the Scott patents to the PTO.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 4
Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)
**(Cite as: 2002 WL 531555 (D.Del.))**

FN3. Based on the California court's denial of summary judgment on a similar issue, Spectra and Opto argue that Rockwell is now collaterally estopped from further litigating this issue. The court must disagree because a determination that there remain genuine issues of material fact is not a "final decision." *See Johnson v. Jones,* 515 U.S. 304, 313 (1995); *see also Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir.1995) (stating that the denial of summary judgment is not a final judgment, but rather an interlocutory order in the *res judicata* context.)

While mindful of the heavy burden the defendants bear, the court is persuaded that there remain substantial questions regarding Manasevit's and Staas's knowledge and intent that are better left to trial. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1566 (Fed.Cir.1988) (noting that, "[i]f the facts of materiality or intent are reasonably disputed the issue is not amenable to summary disposition.")

Finally, Rockwell requests leave to file a further motion for summary judgment on inequitable conduct. Rockwell contends that this is appropriate because it was waiting for Spectra's and Opto's expert reports assessing the materiality of additional prior art references that were allegedly not disclosed to the PTO. However, as Spectra and Opto argue, the references at issue are articles that Manasevit himself wrote. Manasevit's and Rockwell's own experts were surely capable of assessing the materiality of Manasevit's work. Accordingly, the court declines to grant Rockwell additional time to file a motion that could have been filed with the instant motion for summary judgment.

V. CONCLUSION

The parties do not dispute that the corporate entity Rockwell is not being accused of inequitable conduct. Nor do they dispute that the charges of inequitable conduct are not based on the Manasevit Declaration. Thus, the court will grant Rockwell's motion with regard to these issues. However, there remain genuine issues of material fact with regard to the remaining

inequitable conduct allegations.

For these reasons, IT IS HEREBY ORDERED that:
  1. Rockwell's motion for partial summary judgment (D.I.149) is GRANTED in part and DENIED in part.
  2. Rockwell's request to file a further motion for summary judgment on inequitable conduct (D.I.149) is DENIED.

Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:00CV00589 (Docket)
                                            (Jun. 19, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

<u>**CERTIFICATE OF SERVICE**</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

June 16, 2006, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:


                         Ralph K. Durstein III, Esquire
                         Department of Justice
                         Carvel State Office Building
                         820 N. French Street
                         Wilmington, DE 19801

                         James E. Liguori, Esquire
                         Liguori, Morris & Yiengst
                         46 The Green
                         Dover, DE 19901


                         /s/ Stephen J. Neuberger
                         **STEPHEN J. NEUBERGER, ESQ.**