## 1 - SJN@NeubergerLaw.com

**From:**     "Stephen J. Neuberger" <SJN@NeubergerLaw.com>
**To:**       <sjN@NeubergerLaw.com>
**Sent:**     Thursday, June 01, 2006 10:57 AM
**Subject:**  2006-06-01 - DSN

# newszap.com *CENTRAL DELAWARE* News & Information

Published: May 31, 2006 - 11:14:32 pm EDT

Troopers get $2M in suit
**By Randall Chase, Associated Press**

DOVER — A federal court jury awarded almost $2 million Wednesday to three troopers who claimed they were subjected to retaliation for speaking out about problems at the now-closed state police firing range in Smyrna.

The U.S. District Court jury in Wilmington deliberated about six hours before finding that the current and former superintendents of the Delaware State Police violated the constitutional rights of Cpls. Kurt Price and Wayne Warren and Sgt. Christopher Foraker.

The seven-member jury found that former police superintendent Aaron Chaffinch and his successor, Col. Thomas MacLeish, acted "recklessly, maliciously, or intentionally" in retaliating against the troopers for exercising their free speech rights.

The jury also found that Chaffinch defamed Foraker in suggesting to the media that Foraker was to blame for problems at the firing range, where problems stemming from poor design and construction surfaced almost immediately upon its opening in 1998. The jury rejected Foraker's contention that MacLeish also defamed him in a television interview.

The jury awarded compensatory damages of $862,395 to Price, $543,276 to Warren, and $74,676 to Foraker. Each of those amounts includes $2,200 for emotional distress, injury to reputation and humiliation.

Chaffinch was ordered to pay punitive damages of $15,682 to Foraker, $113,625 to Warren, and $181,103 to Price. MacLeish was ordered to pay punitive damages of $6,720 to Foraker, $48,697 to Warren, and $77,615 to Price.

"Their honor has been restored," said the troopers' attorney, Thomas

Neuberger.

Defense attorney Edward Ellis said he was disappointed by the verdict, and that his clients maintain that they did nothing wrong.

The jury handed down its verdict one day after the U.S. Supreme Court ruled in a 5-4 decision that government workers do not have absolute free-speech protections for what they say in the course of their official duties.

"I think that decision is likely to have some effect on the current case, and we'll be dealing with it in post-trial motions," Ellis said. "And of course we'll be dealing with the possibility of appeal."

Neuberger said the Supreme Court ruling does not apply in the firing range case because his clients were punished for speech that was not part of their official duties as staffers at the firing range, which was closed in March 2004.

The three troopers claimed that Chaffinch and then-Lt. Col. MacLeish initially ignored their concerns about high levels of toxic metals and other problems at the range, then began harassing them after they met with state auditors in the spring of 2004.

Ellis argued that the plaintiffs were at least partly to blame for environmental problems at the firing range because they stopped doing maintenance on the bullet trap in December 2003, shortly after Foraker was transferred back to the range under court order after winning a previous lawsuit against Chaffinch.

Neuberger argued that Chaffinch was out for revenge against Foraker — who sued him in 2002 after being transferred from the firing range in retaliation for reprimanding a friend of Chaffinch — and that Price and Warren were "collateral damage."

Price was forced to resign in April after using up his accumulated leave time, and Warren is nearing the end of his accumulated leave as well, Neuberger said. Both men were declared unfit for duty after being diagnosed with hearing loss, but they argued that other troopers with physical disabilities, including hearing loss, have been allowed to remain on the force.

Ellis argued that, regardless of previous agency practices, MacLeish was left with no choice but to order Price and Warren to separate from the police force after doctors determined that their hearing loss presented a danger to themselves, their fellow troopers and the public.

"The jury saw through the whole pack of lies," said Neuberger, who has won a host of lawsuits against the police agency in recent years for its treatment of troopers.

6/15/2006

As he did repeatedly with Chaffinch, whom he has described as a "serial violator" of the constitutional rights of troopers, Neuberger reiterated his call for MacLeish to resign.

"I don't think anything will change as long as Ruth Ann Minner is the governor," Neuberger said.

Through a spokeswoman, Minner declined to comment on the jury verdict and referred calls to Ellis.

E-mail this story          Back to Index          Printer Friendly Version

## 1 - SJN@NeubergerLaw.com

**From:**    "Stephen J. Neuberger" <SJN@NeubergerLaw.com>
**To:**      <sjn@NeubergerLaw.com>
**Sent:**    Thursday, June 01, 2006 10:58 AM
**Subject:** 2006-06-01 - TNJ





Email Print Discuss e-news Subscribe Newscast

# Troopers awarded $2 million in lawsuit

## State police leaders were accused of retaliation

**By ESTEBAN PARRA**
The News Journal

06/01/2006

WILMINGTON -- A federal jury awarded nearly $2 million Wednesday to three state police troopers who accused the agency's former and current commanders of retaliating against them for speaking about environmental conditions at the department's firing range.

This is the second lawsuit former state police Col. L. Aaron Chaffinch has lost to a trooper and the first for his successor, Thomas F. MacLeish. The lawsuit was the latest in a long line of legal challenges, dating back nearly a decade, to the agency's management and policies.

"My clients and their families are overjoyed and thank God that their prayers have been answered," attorney Thomas S. Neuberger said after the verdict was read in U.S. District Court. "These troopers thank the judge and jury for a fair trial and restoring their honor and good names."

Neuberger, who called for MacLeish to be replaced, represented Sgt. Christopher D. Foraker, Cpl. Wayne Warren and Cpl. B. Kurt Price -- who recently was forced to retire, his attorney has said.

After Judge Gregory M. Sleet left the courtroom, the troopers embraced each other and their attorneys. They also hugged family members and other supporters as they walked out of the courtroom, leaving behind Chaffinch and MacLeish, who along with their attorney, Edward T. Ellis, were reviewing documents at the defendants' table.

Chaffinch, MacLeish and Ellis would not comment on the verdict.

For more than two weeks, jurors heard testimony from the troopers, as well as current and retired state police officers, on how Chaffinch mocked the troopers in front of other high-ranking officers and used

6/15/2006

profanity when referring to Foraker.

"The entire defense in this case was a coverup and a pack of lies by men without honor which did not fool the thoughtful jury," Neuberger said.

**Federal ruling could affect verdict**

How the verdict will play out remains to be seen. A ruling Tuesday by the U.S. Supreme Court in Garcetti et. al. v. Ceballos scaled back protections for whistle-blowers in government jobs. In a 5-4 opinion, the Supreme Court said that government workers do not have absolute protections for what they say in the course of their official duties.

In the Delaware case, the troopers said that Chaffinch and MacLeish violated their free speech by retaliating against them after they spoke to state auditors about concerns at the Smyrna-area range, which included high levels of toxic metals. The range was closed in 2004.

"That's something we're going to be briefing for the next couple of months," Ellis said. "It's much too difficult for me to go into details."

Attorney Stephen J. Neuberger, who also represented the troopers, said the court's decision does not apply in this case because his clients were punished for speech that was not part of their official duties.

"We have a lot of cases that will be affected by Ceballos," Stephen Neuberger said. "This is not one of them."

**Other lawsuits**

Since 1997, seventeen Delaware state troopers and employees have filed federal lawsuits against the agency, alleging discrimination or civil rights violations.

The lawsuits, including one filed by the U.S. Justice Department claiming the department's entrance exam discriminated against black applicants, have cost Delaware taxpayers at least $6.6 million in damages, settlements and fees.

That figure does not include Wednesday's compensation and punitive damages to the three troopers. In Wednesday's verdict, the jury awarded Price about $1.121 million; Warren $705,598; and Foraker $97,078.

This was the second time Foraker has won a lawsuit against his former boss. In 2003, he successfully sued the department for violating his right to free speech and was awarded $100,000 in damages. Also a federal judge signed a court order reinstating him to his job at the firing range, which he said he had lost after reprimanding a friend of Chaffinch.

Later this month, Chaffinch is scheduled to return to the federal courthouse to defend himself against accusations of making sex-related comments at work and thwarting female trooper's attempts to get promoted within the agency.

The lawsuit making those claims was filed by Capt. Barbara L. Conley, who also is represented by the Neubergers.

6/15/2006

*Contact Esteban Parra at 324-2299 or eparra@delawareonline.com.*



Retired Col. L. Aaron Chaffinch and Col. Thomas F. MacLeish (below) were found to have violated troopers' rights.



Col. Thomas F. MacLeish

6/15/2006

A045

Case 1:04-cv-01394-GMS    Document 257-2    Filed 06/16/2006    Page 7 of 40

Price, et al.                              v.                        Chaffinch, et al.
David L. Baylor, Volume 3          C.A. # 04-956-GMS          November 18, 2005

Page 384

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
CORPORAL B. KURT PRICE, et al,        )
                                      )
             Plaintiffs               )
                                      )
        vs.                           ) Civil Action
                                      ) No. 04-956-GMS
COLONEL L. AARON CHAFFINCH, et al     )
                                      )
             Defendants               )
                                      )
-----------------------------------   )
SERGEANT CHRISTOPHER D. FORAKER,       )
                                      )
             Plaintiff,               )
                                      )  Civil Action
        vs.                           )  No. 04-1207-GMS
                                      )
COLONEL L. AARON CHAFFINCH, et al,    )
                                      )
             Defendants               )
```

           Deposition of DAVID BAYLOR taken pursuant to
notice at the law offices of The Neuberger Firm, P.A., 2
East 7th Street, Suite 302, Wilmington, Delaware, beginning
at 1:17 p.m., on Friday, November 18, 2005, before Allen S.
Blank, Registered Merit Reporter and Notary Public.


                         VOLUME III


APPEARANCES:

        THOMAS S. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
        2 East 7th Street, Suite 302
        Wilmington, DE 19801
            For - Plaintiff
------------------------------------------------------------
                     WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

Case 1:04-cv-01394-GMS    Document 257-2    Filed 06/16/2006    Page 8 of 40
Price, et al.                                v.                                Chaffinch, et al.
David L. Baylor, Volume 3              C.A. # 04-956-GMS              November 18, 2005

Page 385

1  APPEARANCES: CONTINUED
2      ROBERT J. FITZGERALD, ESQUIRE
       MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
3      123 South Broad Street
       Avenue of the Arts
4      Philadelphia, PA 19109
5          for - Defendants
6  ALSO PRESENT:
7      SERGEANT CHRISTOPHER D. FORAKER
8      CORPORAL WAYNE WARREN
9
10              * * * * * *
11
12          DAVID BAYLOR,
13      the deponent herein, having been previously
14      duly sworn on oath, was examined and
15      testified as follows:
16              EXAMINATION
17  BY MR. NEUBERGER:
18  Q   Major Baylor, we are here today as a continuation of
19  the two days of depositions that you have already given in
20  these combined cases. Okay?
21  A   Okay.
22  Q   We are flipping over to just some short questions on
23  Sergeant Christopher Foraker's case, which for discovery has
24  been joined. This is Case No. 04-1207.

Page 386

1      Okay. Let me set the stage. I'm going to show
2  you what was marked as Deposition Exhibit No. 5 at the
3  deposition of now Colonel Tom MacLeish. This is a Delaware
4  State News article dated April 7th, 2004. It shows a
5  picture of then former Colonel Aaron Chaffinch with Gloria
6  Homer, Secretary of the State Department of Administrative
7  Services and discusses a tour of the Delaware State Police
8  firearms training unit.
9      Let me just give you that momentarily. I'm not
10  going to question you in any detail about it but just place
11  ourselves historically around an event. Okay?
12  A   Okay.
13  Q   Do you remember there being such a story way back
14  then?
15  A   Yes, sir.
16  Q   Okay. Now, let me ask you, did you and Colonel
17  Chaffinch have any conversations about the tour he gave of
18  Gloria Homer around that time?
19  A   Yes, sir.
20  Q   And what do you recall of the conversations?
21  A   Shortly after Colonel Chaffinch's return from the
22  media tour of the range, I was in my office and he invited
23  me into his office. And I had a seat and he went on to tell
24  me that he just came back from the range.

Page 387

1  Q   Okay.
2  A   That he was upset about the conditions of the range.
3  Q   Um-hmm. And did he talk about Sergeant Foraker or
4  anybody?
5  A   He said that it was a mess and that he couldn't
6  believe the condition it was in. But that he got them back.
7  Q   Let me write that down.
8      The phrase, he got them back, do you have a
9  present recollection of that?
10  A   Yes. It was words to that effect. Whether it was
11  that exact verbiage, you know, but he did make some
12  reference that he got them back. I asked him what he meant
13  by that. And he said, during the course of his interview,
14  he told the reporters that those who live in glass houses
15  shouldn't throw stones. And I looked at him and I said,
16  umm, okay, umm, who are you referring to? And he pointed to
17  the Academy Building and I said, umm, did you give any
18  particular name, any specific name? And he said, no.
19      And I said, Colonel, I would advise you to call
20  the media up and make a correction to your statement. And
21  he looked at me with a bewildered look and he goes, why?
22  And I said, sir, with my experience dealing with the media,
23  that's exactly what's going to come out. And maybe that's
24  not what you meant in your period of frustration and

Page 388

1  disappointment. You may want to clarify it a little bit.
2  Because that's not going to look good. And I said that I
3  don't know how you're going to correct it but I would
4  definitely call and correct it.
5      And he said he wasn't going to do that. He
6  meant what he said and that was it. He was -- felt like he
7  was set up.
8  Q   Okay. So this remark, people who live in glass
9  houses should not throw stones, do you have a recollection
10  of him saying that?
11  A   Yes, sir.
12  Q   And who did you understand he was referring to about
13  the people who lived in the glass houses and they were
14  throwing stones? How did you take that remark in your
15  context?
16  A   When he pointed to the Academy and then you can
17  only -- I can only draw one conclusion. And that was the
18  Captain over there in the firearms unit, because they all
19  worked out of the Academy.
20  Q   Okay. And so the Captain at the Academy, that would
21  have been Greg Warren, Captain Greg Warren?
22  A   Yes, sir.
23  Q   Now, did he mean, when he used the word people,
24  people who live in glass houses shouldn't throw stones, he

2 (Pages 385 to 388)

Case 1:04-cv-01394-GMS    Document 257-2    Filed 06/16/2006    Page 9 of 40

Price, et al.                                     v.                    Chaffinch, et al.
David L. Baylor, Volume 3                C.A. # 04-956-GMS              November 18, 2005

Page 413

1  the press and say, look, I thought about what I said and it
2  didn't come across as the way it basically is, that I wasn't
3  happy with the conditions that the range were in, you know,
4  plain and simple. Leave it there. But when you say those
5  who live in glass houses shouldn't throw stones, that you're
6  making this very personal and as a Colonel you can't do that
7  or you shouldn't do that.
8      Q    So your objection was the fact that the impression
9  that was left was that it was a personal thing, that it was
10 personal?
11     A    That he was shifting the blame.
12     Q    That he was shifting the blame?
13     A    Um-hmm.
14     Q    So your primary complaint was a public relations
15 complaint?
16     A    It's not a complaint. My concern. My advice as one
17 of his advisors was my concern on how this was going to read
18 and how it was going to affect his ability to lead and our
19 ability to function as an organization.
20     Q    Now, you testified that when you saw the news
21 article the next day, your reaction was, oh, boy?
22     A    Um-hmm.
23     Q    Why?
24     A    Because the best way to describe the organization

Page 414

1  the way I saw it at that point in time was one in serious
2  confusion. And people were not sure. They knew that
3  this -- the Colonel had suffered a loss. The first time
4  ever in the history of the State Police that a
5  superintendent lost in Federal Court. So we had that going
6  on.
7          Then we just had Chris Foraker reinstated to
8  his position. And whether you liked it or not, people knew
9  that that was not what the Colonel wanted. All right.
10         And we had a Captain that had an active suit.
11 We had a lieutenant in the same building that had an active
12 suit and we had a sergeant who was in that same chain of
13 command who just came out of a suit and it was just not a
14 harmonious work environment. And everybody was reading
15 this. Everybody knows this.
16         So when you're the leader and a statement comes
17 out like that against your subordinates, it was just my
18 opinion based on my experience and my education that this
19 was not going to be good. And that's why I said, oh, boy.
20 Because now there is -- there is positions, there is lines
21 in the sand.
22     Q    Let's look again at the actual article. I don't
23 know if you still have a copy of it.
24     A    Okay.

Page 415

1      Q    What parts of this article, you testified that when
2  the reader, you know, to add to this mix, you indicated that
3  there was this mix of a Colonel who had just lost a lawsuit,
4  a Captain who had a pending lawsuit, a lieutenant who had a
5  pending lawsuit and a sergeant who had just won the lawsuit?
6      A    Um-hmm.
7      Q    How would you characterize that mix? Is that a --
8      A    Volatile.
9      Q    Of personalities?
10     A    Um-hmm.
11     Q    Now, would it be fair to say that you can add to
12 that mix the fact that the range had just shut down?
13     A    Oh, absolutely.
14     Q    And had shut down in a way that did not shine a
15 positive light on the Delaware State Police or its
16 management?
17     A    Right.
18     Q    And it's correct to say that the range is thrown
19 into this mix because the sergeant had just won the lawsuit,
20 the lieutenant who had the lawsuit, the Captain who had the
21 lawsuit, were all in the chain of command over this
22 facility, isn't that right?
23     A    Right.
24     Q    And so when you read in article, can you point to

Page 416

1  specific parts of this article that made you think, oh, boy,
2  the Colonel has, I think you used the phrase, shifting
3  blame?
4      A    Yeah.
5      Q    Can you do that?
6      A    If you go down to about roughly the fifth paragraph.
7      Q    On the first page?
8      A    On the first page.
9      Q    Okay.
10     A    Mrs. Homer said facilities management only provides
11 custodial services and is not otherwise responsible.
12 Colonel Chaffinch acknowledged problems but indicated that
13 the blame lies with only one or two people, one or two
14 troopers under his command.
15     Q    And that's not a quote from the Colonel, isn't that
16 right?
17     A    No. That's a paraphrase. Right.
18     Q    What other parts of the article can you point to to
19 indicate that Colonel Chaffinch was, as you say, shifting
20 blame?
21     A    The people who complained about the facility are the
22 same people who were in charge of the facility.
23     Q    Is that the Colonel or is that the secretary?
24     A    I would read it, it doesn't have any specific

9 (Pages 413 to 416)

Case 1:04-cv-01394-GMS    Document 257-2    Filed 06/16/2006    Page 10 of 40

Price, et al.                                    v.                              Chaffinch, et al.
David L. Baylor, Volume 3                  C.A. # 04-956-GMS              November 18, 2005

Page 417

1  attribute. I would probably assume that it was the Colonel.
2  And I may be wrong.
3      Q    Okay. Is that shifting blame or is that assessing
4  blame? Or do you not recognize any distinction in my
5  question?
6      A    I think I'm smarter than that.
7      Q    I just want the question to be clear.
8      A    I recognize the distinction and I also recognize the
9  leadership traits; and, as leadership, you don't give a
10  public statement where you throw any of your subordinates
11  under the bus. All you do is say that we have problems, we
12  need to correct them and we will do everything to correct
13  them. Anything other than that is not appropriate
14  leadership, in my opinion.
15         And I would have never said that. And that's
16  what I was trying to get him not to say, just to keep it
17  very simple.
18      Q    So whether or not that statement is true or not is
19  not the issue?
20      A    Well, it has to be an issue if you're talking about
21  perception of leadership. When you asked me about my
22  comment about, oh, boy, my oh, boy, comment comes in with
23  the perception of the leadership amongst every trooper
24  that's going to read this and say is the Colonel shifting

Page 418

1  the blame to his subordinates. That's what I'm saying.
2      Q    But my question is this. If the Colonel had said
3  that the people who have complained about the facility are
4  also the same people who are in charge of the facility,
5  that's bad leadership is what you're saying?
6      A    That's bad judgment.
7      Q    Is it not bad leadership?
8      A    It's bad leadership, yes.
9      Q    And it's bad judgment, is your testimony?
10      A    Right.
11      Q    Does it matter if that's a true statement?
12      A    It matters if it's a true statement in the context
13  of how we will deal with it. But it doesn't matter if it's
14  a true statement in media relations.
15      Q    I'm sorry. Let me clarify the question.
16         Does the fact that it's a true statement mean
17  that it's not bad leadership?
18         MR. NEUBERGER: I'm sorry. I don't understand
19  the question.
20  BY MR. FITZGERALD:
21      Q    If that statement is true, does that make it better
22  leadership?
23      A    No.
24      Q    If that statement is true, does it make it better

Page 419

1  judgment?
2      A    No.
3      Q    So whether it's true or not has nothing to do with
4  whether it's good leadership?
5      A    Right.
6      Q    Or whether it's good judgment to say a true
7  statement?
8      A    Right. In the context of a media interview, yes.
9      Q    Right. I understand.
10      A    Okay.
11      Q    What other statements did you point to that showed
12  bad leadership?
13      A    I think that's enough to get you, oh, boy.
14      Q    Is that the only thing you said oh, boy, to?
15      A    When I saw it. I mean number one, when I opened the
16  paper and saw the debate rages on, blame at the range, I'm
17  going, okay, this is not going to be good.
18         Then when I remembered my conversation with
19  him, then I note that this wasn't going to be good. And
20  then when I go through it and read the stuff, then I says,
21  oh, boy.
22         For example, there was some discoloration in
23  the bullet trap but that was about it, he said. I guess he
24  meaning Chaffinch.

Page 420

1         I think people who live in glass houses
2  shouldn't throw stones. It's a lot dirtier now. Things
3  seemed in their proper places in the fall. I have never
4  seen it like this and then --
5      Q    Let me ask you about that.
6      A    Okay.
7      Q    Do you know whether that's a true or false
8  statement?
9      A    I don't know. I didn't get there between the time
10  that Sergeant Foraker and Ashley's transfer took place.
11      Q    So what's your complaint, your complaint about that,
12  sir, is not that it's untrue? Not complaint, your concern
13  about that.
14      A    I'm not saying that any of the statements are not
15  true. What I'm saying is that what may be occurring here is
16  that there is too much being said to the public about what
17  roles our individual troopers had instead of just saying we
18  just need to get this repaired.
19      Q    Okay.
20      A    Do you want me to continue on?
21      Q    Sure.
22      A    Okay. Then he goes, as what, quote, unquote, people
23  he was referring to, Colonel Chaffinch said, quote, the
24  people that provided the media with the information in the

10 (Pages 417 to 420)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,       )
                                      )
            Plaintiffs,               )
                                      )
      v.                              )      C.A. No. 04-956 (GMS)
                                      )      C.A. No. 04-1207 (GMS)
COLONEL L. AARON CHAFFINCH, et al. )
                                      )
            Defendants.               )

## VERDICT FORM

### Kurt Price v. Chaffinch, et al.

1.    Do you find that the defendant took adverse action against Plaintiff Price that was sufficient

      to cause a reasonably hardy person to refrain from exercising his rights under the First

      Amendment?

      (a)    Aaron Chaffinch      Yes __✓__      No ____

      (b)    Thomas MacLeish      Yes __✓__      No ____

      *If you answered "Yes" to Question 1(a), proceed to Question 2(a).*

      *If you answered "Yes" to Question 1(b), proceed to Question 2(b).*

      *If you answered "No" to both Questions 1(a) and 1(b), sign this verdict form and proceed
      to the verdict form for Plaintiff Warren.*

2.    Do you find that Plaintiff Price has proven that his protected activity under the First
      Amendment (speaking out about the conditions at the DSP indoor firing range) was a
      substantial or motivating factor in the adverse action taken against him by the defendant?

      (a)    Aaron Chaffinch        Yes __✓__    No ____

      (b)    Thomas MacLeish        Yes __✓__    No ____

      *If you answered "Yes" to Question 2(a), proceed to Question 3(a).*

      *If you answered "Yes" to Question 2(b), proceed to Question 3(b).*

      *If you answered "No" to both Questions 2(a) and 2(b), sign this verdict form and proceed
      to the verdict form for Plaintiff Warren.*

3.    Do you find that the defendant has proven by a preponderance of the evidence that he would
      have taken the same action against Plaintiff Price, even in the absence of Plaintiff Price's
      exercise of his right to free speech?

      (a)    Aaron Chaffinch        Yes ____    No __✓__

      (b)    Thomas MacLeish        Yes ____    No __✓__

      *If you answered "Yes" to both Questions 3(a) and 3(b), sign this verdict form and proceed
      to the verdict form for Plaintiff Warren.*

      *If you answered "No" to either Question 3(a) or 3(b), proceed to Question 4.*

A051

*Damages*

4.    Was the adverse action taken against Plaintiff Price by the defendant the proximate cause of

any damage to him?

(a)    Aaron Chaffinch        Yes  ✓        No ____

(b)    Thomas MacLeish        Yes  ✓        No ____

*If you answered "Yes" to either Question 4(a) or 4(b), proceed to Question 5.*

*If you answered "No" to both Questions 4(a) and 4(b), sign this verdict form and proceed
to the verdict form for Plaintiff Warren.*

5.    What damages, if any, do you find that Plaintiff Price suffered as a result of the adverse

action taken against him?

(a)    Front Pay $ 860,195

(b)    Emotional Distress, Injury to Reputation, and Humiliation $ 2200

*Proceed to Question 6.*

6.    Do you find that Defendant Chaffinch acted recklessly, maliciously, or intentionally with

regard to Plaintiff Price?

Yes  ✓        No ____

*If you answered "Yes" to Question 6, proceed to Question 7.*

*If you answered "No" to Question 6, proceed to Question 8.*

7.    If you answered "Yes" to Question 6 and you wish to exercise your discretion to award

punitive damages to Plaintiff Price, enter below the amount of punitive damages which you

believe is appropriate to punish and deter Defendant Chaffinch.

Amount of Punitive Damages:  $ 181,103

*Proceed to Question 8.*

8.    Do you find that Defendant MacLeish acted recklessly, maliciously, or intentionally with

regard to Plaintiff Price?

Yes __✓__    No ____

*If you answered "Yes" to Question 8, proceed to Question 9.*

*If you answered "No" to Question 8, sign this verdict form and proceed to the verdict form for Plaintiff Warren.*

9.    If you answered "Yes" to Question 8 and you wish to exercise your discretion to award

punitive damages to Plaintiff Price, enter below the amount of punitive damages which you

believe is appropriate to punish and deter Defendant MacLeish.

Amount of Punitive Damages: $ 27,615

*Sign this verdict form and proceed to the verdict form for Plaintiff Warren.*

**THE FOREGOING IS THE VERDICT OF THE JURY**

**EACH JUROR MUST SIGN BELOW**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,    )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )    C.A. No. 04-956 (GMS)
                                   )    C.A. No. 04-1207 (GMS)
COLONEL L. AARON CHAFFINCH, et al. )
                                   )
                Defendants.        )

**VERDICT FORM**

**Wayne Warren v. Chaffinch, et al.**

1.    Do you find that the defendant took adverse action against Plaintiff Warren that was

sufficient to cause a reasonably hardy person to refrain from exercising his rights under the

First Amendment?

(a)    Aaron Chaffinch      Yes __✔__    No ____

(b)    Thomas MacLeish      Yes __✔__    No ____

*If you answered "Yes" to Question 1(a), proceed to Question 2(a).*

*If you answered "Yes" to Question 1(b), proceed to Question 2(b).*

*If you answered "No" to both Questions 1(a) and 1(b), sign this verdict form and proceed
to the verdict form for Plaintiff Foraker.*

2.  Do you find that Plaintiff Warren has proven that his protected activity under the First Amendment (speaking out about the conditions at the DSP indoor firing range) was a substantial or motivating factor in the adverse action taken against him by the defendant?

    (a)   Aaron Chaffinch      Yes _____    No _____

    (b)   Thomas MacLeish     Yes _____    No _____

    *If you answered "Yes" to Question 2(a), proceed to Question 3(a).*

    *If you answered "Yes" to Question 2(b), proceed to Question 3(b).*

    *If you answered "No" to both Questions 2(a) and 2(b), sign this verdict form and proceed to the verdict form for Plaintiff Foraker.*

3.  Do you find that the defendant has proven by a preponderance of the evidence that he would have taken the same action against Plaintiff Warren, even in the absence of Plaintiff Warren's exercise of his right to free speech?

    (a)   Aaron Chaffinch      Yes _____    No _____

    (b)   Thomas MacLeish     Yes _____    No _____

    *If you answered "Yes" to both Questions 3(a) and 3(b), sign this verdict form and proceed to the verdict form for Plaintiff Foraker.*

    *If you answered "No" to either Question 3(a) or 3(b), proceed to Question 4.*

*Damages*

4.   Was the adverse action taken against Plaintiff Warren by the defendant the proximate cause

of any damage to him?

(a)    Aaron Chaffinch      Yes  ✓     No ____

(b)    Thomas MacLeish      Yes  ✓     No ____

*If you answered "Yes" to either Question 4(a) or 4(b), proceed to Question 5.*

*If you answered "No" to both Questions 4(a) and 4(b), sign this verdict form and proceed
to the verdict form for Plaintiff Foraker.*

5.   What damages, if any, do you find that Plaintiff Warren suffered as a result of the adverse

action taken against him?

(a)    Front Pay $ 541074

(b)    Emotional Distress, Injury to Reputation, and Humiliation $ 2200

*Proceed to Question 6.*

6.   Do you find that Defendant Chaffinch acted recklessly, maliciously, or intentionally with

regard to Plaintiff Warren?

Yes  ✓     No ____

*If you answered "Yes" to Question 6, proceed to Question 7.*

*If you answered "No" to Question 6, proceed to Question 8.*

7.   If you answered "Yes" to Question 6 and you wish to exercise your discretion to award

punitive damages to Plaintiff Warren, enter below the amount of punitive damages which

you believe is appropriate to punish and deter Defendant Chaffinch.

Amount of Punitive Damages:  $ 113,625

*Proceed to Question 8.*

8.  Do you find that Defendant MacLeish acted recklessly, maliciously, or intentionally with regard to Plaintiff Warren?

Yes ✓       No ____

*If you answered "Yes" to Question 8, proceed to Question 9.*

*If you answered "No" to Question 8, sign this verdict form and proceed to the verdict form for Plaintiff Foraker.*

9.  If you answered "Yes" to Question 8 and you wish to exercise your discretion to award punitive damages to Plaintiff Warren, enter below the amount of punitive damages which you believe is appropriate to punish and deter Defendant MacLeish.

Amount of Punitive Damages: $ 48,697

*Sign this verdict form and proceed to the verdict form for Plaintiff Foraker.*

**THE FOREGOING IS THE VERDICT OF THE JURY**

**EACH JUROR MUST SIGN BELOW**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,          )
                                         )
                    Plaintiffs,          )
                                         )
        v.                               )       C.A. No. 04-956 (GMS)
                                         )       C.A. No. 04-1207 (GMS)
COLONEL L. AARON CHAFFINCH, et al. )
                                         )
                    Defendants.          )

## VERDICT FORM

### Christopher Foraker v. Chaffinch, et al.

*Plaintiff Foraker's Retaliation Claims Against Defendants Chaffinch and MacLeish*

1.  Do you find that the defendant took adverse action against Plaintiff Foraker that was

    sufficient to cause a reasonably hardy person to refrain from exercising his rights under the

    First Amendment?

    (a)    Aaron Chaffinch      Yes ____      No ____

    (b)    Thomas MacLeish      Yes ____      No ____

    *If you answered "Yes" to Question 1(a), proceed to Question 2(a).*

    *If you answered "Yes" to Question 1(b), proceed to Question 2(b).*

    *If you answered "No" to both Question 1(a) and 1(b), proceed to Question 4.*

2.    Do you find that Plaintiff Foraker has proven that his protected activity under the First Amendment (speaking out about the conditions at the DSP indoor firing range or previously filing a lawsuit) was a substantial or motivating factor in the adverse action taken against him by the defendant?

(a)    Aaron Chaffinch        Yes ✓        No ____

(b)    Thomas MacLeish        Yes ✓        No ____

*If you answered "Yes" to Question 2(a), proceed to Question 3(a).*

*If you answered "Yes" to Question 2(b), proceed to Question 3(b).*

*If you answered "No" to both Questions 2(a) and 2(b), proceed to Question 4.*

3.    Do you find that the defendant has proven by a preponderance of the evidence that he would have taken the same action against Plaintiff Foraker, even in the absence of Plaintiff Foraker's exercise of his right to free speech?

(a)    Aaron Chaffinch        Yes ____        No ✓

(b)    Thomas MacLeish        Yes ____        No ✓

*Proceed to Question 4.*

### Plaintiff Foraker's Defamation Claim Against Defendant Chaffinch

4.    Do you find that Plaintiff Foraker has proven by a preponderance of the evidence that Defendant Chaffinch published an untrue statement concerning Plaintiff Foraker?

Yes  /     No ____

*If you answered "Yes" to Question 4, proceed to Question 5.*

*If you answered "No" to Question 4, proceed to Question 7.*

5.    Do you find that Plaintiff Foraker has proven by clear and convincing evidence that Defendant Chaffinch knew the statement concerning Plaintiff Foraker was false or recklessly disregarded whether it was false?

Yes  /     No ____

*If you answered "Yes" to Question 5, proceed to Question 6.*

*If you answered "No" to Question 5, proceed to Question 7.*

6.    Do you find that Plaintiff Foraker has proven by a preponderance of the evidence that the untrue statements published by Defendant Chaffinch diminishes the esteem, respect, goodwill, or confidence in which Plaintiff Foraker is held or tends to cause bad feelings or opinions about Plaintiff Foraker?

Yes  ✓     No ____

*Proceed to Question 7.*

*Plaintiff Foraker's Defamation Claim Against Defendant MacLeish*

7.  Do you find that Plaintiff Foraker has proven by a preponderance of the evidence that

    Defendant MacLeish published an untrue statement concerning Plaintiff Foraker?

    Yes _____     No ___✓___

    *If you answered "Yes" to Question 7, proceed to Question 8.*

    *If you answered "No" to Question 7, "Yes" to Questions 1 and 2, and "No" to Question 3, proceed to Question 10.*

    *If you answered "No" to Question 7, and "Yes" to Questions 4, 5, and 6, proceed to Question 10.*

    *Otherwise, sign this verdict form and inform the Jury Officer that you have completed your deliberations.*

8.  Do you find that Plaintiff Foraker has proven by clear and convincing evidence that

    Defendant MacLeish knew the statement concerning Plaintiff Foraker was false or recklessly

    disregarded whether it was false?

    Yes _____     No _____

    *If you answered "Yes" to Question 8, proceed to Question 9.*

    *If you answered "No" to Question 8, "Yes" to Questions 1 and 2, and "No" to Question 3, proceed to Question 10.*

    *If you answered "No" to Question 8, and "Yes" to Questions 4, 5, and 6, proceed to Question 10.*

    *Otherwise, sign this verdict form and inform the Jury Officer that you have completed your deliberations.*

9.  Do you find that Plaintiff Foraker has proven by a preponderance of the evidence that the untrue statements published by Defendant MacLeish diminishes the esteem, respect, goodwill, or confidence in which Plaintiff Foraker is held or tends to cause bad feelings or opinions about Plaintiff Foraker?

Yes _____     No _____

*If you answered "Yes" to Question 9, proceed to Question 10.*

*If you answered "No" to Question 9, "Yes" to Questions 1 and 2, and "No" to Question 3, proceed to Question 10.*

*If you answered "No" to Question 9, and "Yes" to Questions 4, 5, and 6, proceed to Question 10.*

*Otherwise, sign this verdict form and inform the Jury Officer that you have completed your deliberations.*

**Damages**

10. Was the adverse action taken against Plaintiff Foraker by the defendant the proximate cause of any damage to him?

    (a)  Aaron Chaffinch     Yes __/__     No _____

    (b)  Thomas MacLeish     Yes __/__     No _____

*If you answered "Yes" to either Question 10(a) or 10(b), proceed to Question 11.*

*If you answered "No" to both Questions 10(a) and 10(b), sign this verdict form and inform the Jury Officer that you have completed your deliberations.*

11. What damages, if any, do you find that Plaintiff Foraker suffered as a result of the adverse action taken against him?

    (a)  Front Pay $ _72476_

    (b)  Emotional Distress, Injury to Reputation, and Humiliation $ _2200_

*Proceed to Question 12.*

12.  Do you find that Defendant Chaffinch acted recklessly, maliciously, or intentionally with regard to Plaintiff Foraker?

Yes __✓__    No ____

*If you answered "Yes" to Question 12, proceed to Question 13.*

*If you answered "No" to Question 12, proceed to Question 14.*

13.  If you answered "Yes" to Question 12 and you wish to exercise your discretion to award punitive damages to Plaintiff Foraker, enter below the amount of punitive damages which you believe is appropriate to punish and deter Defendant Chaffinch.

Amount of Punitive Damages:  $ __15,682__

*Proceed to Question 14.*

14.  Do you find that Defendant MacLeish acted recklessly, maliciously, or intentionally with regard to Plaintiff Foraker?

Yes __✓__    No ____

*If you answered "Yes" to Question 14, proceed to Question 15.*

*If you answered "No" to Question 14, sign this verdict form and inform the Jury Officer that you have completed your deliberations.*

15.  If you answered "Yes" to Question 14 and you wish to exercise your discretion to award punitive damages to Plaintiff Foraker, enter below the amount of punitive damages which you believe is appropriate to punish and deter Defendant MacLeish.

Amount of Punitive Damages:  $ __6,720__

*Sign this verdict form and inform the Jury Officer that you have completed your deliberations.*

A063

**THE FOREGOING IS THE VERDICT OF THE JURY**

**EACH JUROR MUST SIGN BELOW**

## 1 - SJN@NeubergerLaw.com

**From:**    "Stephen J. Neuberger" <SJN@NeubergerLaw.com>
**To:**       <sjn@NeubergerLaw.com>
**Sent:**    Wednesday, June 07, 2006 6:51 AM
**Subject:**  2006-06-06 - TNJ



http://www.delawareonline.com/apps/pbcs.dll/article?
Date=20060606&Category=NEWS&ArtNo=606060332&Ref=AR

# Chaffinch accused of sex discrimination

Email  Print  Discuss  e-news  Subscribe  Newscast

**By SEAN O'SULLIVAN**
**The News Journal**

**06/06/2006**

WILMINGTON -- Less than a week after a federal jury found he violated the constitutional rights of three troopers, retired Delaware State Police Col. L. Aaron Chaffinch will be back in the same courtroom with the same judge, facing the same attorney and similar charges of mistreating a subordinate.

This time the plaintiff, Capt. Barbara L. Conley, is alleging gender discrimination and retaliation by Chaffinch in a lawsuit filed in 2004.

Conley, who is represented by attorney Thomas S. Neuberger, claims Chaffinch did not promote her because of her gender, and he created a hostile work environment through his inappropriate behavior and sexual remarks.

District Judge Gregory M. Sleet will preside over the case, and opening arguments are ex-pected today after a jury is selected.

Last week, after a two-week trial, a jury found Chaffinch and his successor, Col. Thomas F. MacLeish, guilty of violating the First Amendment rights of three state troopers who spoke out about problems at the police firing range.

The jury, which also found Chaffinch and MacLeish retaliated against the troopers and defamed one of them, awarded Sgt. Christopher D. Foraker, Cpl. Wayne Warren and retired Cpl. B. Kurt Price nearly $2 million in damages.

Conley's lawsuit alleges Chaffinch holds "Victorian notions" about women in the workplace and told Conley "the trouble with mankind can be traced to the Garden of Eden." He also allegedly told sexually

offensive jokes at work and bragged about his sexual desire and skills.

Shortly after Conley filed her lawsuit, Chaffinch was put on administrative leave and Conley was brought up on administrative charges that she had engaged in inappropriate behavior.

Chaffinch later returned to duty, then retired from the force.

The most serious charges against Conley -- sexual harassment -- were dropped after a review by an internal affairs board. But Conley was found to have engaged in inappropriate behavior on the job and the board recommended she be suspended for 12 days.

At the hearing, Deputy Attorney General Ralph K. Durstein III claimed Conley created a hostile work environment for the officer who brought the charges against her and engaged in inappropriate behavior in the workplace.

Durstein will be part of the team of attorneys defending Chaffinch in court today.

*Contact Sean O'Sullivan at 324-2777 or sosullivan@delawareonline.com.*



Capt. Barbara L. Conley filed the lawsuit against Chaffinch.



L. Aaron Chaffinch holds "Victorian notions" about women, the suit says.

6/16/2006

A066

## 4 - sjneuberger@earthlink.net

**From:**     "Stephen J. Neuberger" <SJN@NeubergerLaw.com>
**To:**        <sjn@NeubergerLaw.com>
**Sent:**      Thursday, June 15, 2006 7:18 AM
**Subject:**   2006-06-15 - DSN

**newszap.com** *CENTRAL DELAWARE*
**News & Information**

Published: Jun 14, 2006 - 10:38:34 pm EDT

Jury rejects trooper suit; Dismisses claim of discrimination by
woman captain
## By Randall Chase, Associated Press

WILMINGTON — A federal jury on Wednesday rejected a
female state trooper's claim that she was denied a promotion
because she is a woman.

The U.S. District Court jury deliberated a little more than an hour
in deciding that former Delaware State Police superintendent L.
Aaron Chaffinch did not discriminate against Capt. Barbara
Conley, who twice was passed over for promotion to major in
2003.

Defense attorneys argued that Capt. Conley was less qualified
than the two men who were promoted, Capt. Paul Eckrich and
Capt. R.L. Hughes II.

The weeklong trial featured testimony from both sides about
sexually explicit language and questionable behavior in the police
agency.

"We think (we won) because of the strength of our evidence and
the weakness of theirs," said Deputy Attorney General Stephani
Ballard, who defended Mr. Chaffinch in the trial.

"The jury vindicated the state and Aaron of all of her
allegations."

Mr. Chaffinch admitted that he recited sexually explicit limericks
but said Capt. Conley was known for her "potty mouth."

Another trooper testified that she groped him.

"We told the jury up front that this case was about qualifications.

6/16/2006

A067

It was not to trash Barbara Conley," Ms. Ballard said. "What was said was all part of her record."

Capt. Conley, meanwhile, said male troopers made inappropriate advances toward her and that Mr. Chaffinch talked openly about his genitalia.

Mr. Chaffinch admitted that he was counseled in 2000 after telling a sexually explicit joke during a training session.

Trial testimony also revealed that he was disciplined in 1992, when he was a lieutenant, after attending a party at which troopers collected money to entice a female trooper to take her blouse off.

Thomas S. Neuberger, who represented Capt. Conley, said he was not permitted to speak about the case.

"I'm not allowed to comment because the state has obtained a gag order barring me from making any statements," Mr. Neuberger said, adding that he would be filing papers to have the order lifted.

The verdict pleased Gov. Ruth Ann Minner, who selected Mr. Chaffinch as superintendent in February 2002.

"We are very happy that the finding was that there was no discrimination against that person," Gov. Minner said.

When Capt. Conley filed her lawsuit against then-Col. Chaffinch in October 2004, Secretary of Safety and Homeland Security David B. Mitchell put him on paid leave.

Mr. Chaffinch returned to work in March 2005, but retired six weeks later.

"There were a lot of things going on at that time," Gov. Minner said of the suspension.

"It was not just about this particular case. We made the right decision based on what we knew at that time."

Capt. Conley's trial began just days after a jury in the same courtroom awarded nearly $2 million to three troopers who claimed Mr. Chaffinch and current police superintendent Col. Thomas F. MacLeish retaliated against them for speaking out about problems at the now-closed state police firing range in Smyrna.

Mr. Chaffinch was disciplined for a number of allegations that

officials said were substantiated by an internal investigation, but details of the sanctions have not been released.

Ms. Ballard said she was concerned about Mr. Chaffinch's history in federal court, but felt that the state had a strong case.

Mr. Chaffinch has been slapped with several suits since 2003 by former and current state police employees for various allegations, ranging from free speech violations to denial of promotions and has lost each one.

Staff writers Drew Volturo and Joe Rogalsky contributed to this article.

Post comments on this issue at newszapforums.com/forum60

E-mail this story          Back to Index          Printer Friendly Version

6/16/2006

## 4 - sjneuberger@earthlink.net

**From:**     "Stephen J. Neuberger" <SJN@NeubergerLaw.com>
**To:**       <sjn@NeubergerLaw.com>
**Sent:**     Thursday, June 15, 2006 7:20 AM
**Subject:**  2006-06-15 - TNJ





Email  Print  Discuss  e-news  Subscribe  Newscast

# State police cleared of sex discrimination

## 'I think it is a vindication,' lawyer says of quick decision

**By SEAN O'SULLIVAN**
**The News Journal**

06/15/2006

WILMINGTON -- After a string of losses in federal court, the Delaware State Police and retired Col. L. Aaron Chaffinch emerged with a decisive victory Wednesday.

A jury of five women and three men, after a weeklong trial, took about an hour to dismiss allegations of gender discrimination made by Capt. Barbara L. Conley.

She had accused Chaffinch of twice refusing to promote her to major because of a bias against women.

Advertisement

In closing statements Wednesday, Conley's attorney Thomas S. Neuberger told the jury that his client was qualified for the promotions and would have been given one of them had she been male. Chaffinch "wanted an all-male club to surround him," he said.

After the verdict, Chaffinch attorney James E. Liguori said by the speed of the verdict -- which apparently included a lunch break -- it was clear the jury dismissed Conley's claims "out of hand."

"I think it is a vindication," Liguori said.

After the verdict was read, defense attorneys shook hands with Chaffinch and congratulated each other.

Conley showed no emotion and made no comment when she left the court. One of her attorneys, Stephen Neuberger, declined comment, citing a gag order imposed by District Judge Gregory M. Sleet at

6/16/2006

the start of the trial. Thomas Neuberger was not in court for the verdict.

State Police Superintendent Col. Thomas F. MacLeish, who testified at the trial, released a statement after the verdict saying it was "time for the division and all the parties involved to move on. We will grow from this and focus on improving the division and building a stronger future."

In her closing to the jury, Deputy Attorney General Stephani J. Ballard suggested Conley was "playing the gender card" and showed the jury a long list of Conley's shortcomings that she said made her unfit for the job no matter her gender.

Ballard conceded that Chaffinch's behavior over the years was not "politically correct" but added, "telling a tacky joke doesn't break the law or make you a sexist."

**'Absolutely'**

When the jury was polled on the verdict -- where each member was asked to respond "yes" or "no" to the question of whether the verdict reflected their vote -- one female juror responded, "Absolutely."

Deputy Attorney General Ralph K. Durstein III said the message the public should get from Wednesday's outcome is that the state police does not discriminate.

But Chaffinch conceded that win or lose on Wednesday, he knew the weeklong trial was "going to be a black eye for the department."

The six days of testimony often made the behind-the-scenes atmosphere of the state police appear more like a fraternity house than a professional office.

There was uncontested testimony about troopers in Bridgeville engaging in a hazing ritual called the "Bridgeville handshake," involving one trooper forcing a lower-ranked trooper's head to crotch level -- in an apparent simulation of a sex act -- while saying, "Wah-Ha."

Chaffinch also was forced to admit on the stand that he told a series of sexually explicit limericks, including one about "a man from Nantucket," while he was superintendent.

Similarly, a parade of defense witnesses accused Conley of unprofessional and sometimes obscene behavior during her more than 20 years with the state police. One male trooper testified that Conley grabbed him in the crotch while another said she made an obscene proposition to him at the office. Both reported to Conley at the time.

Conley did not address the specific accusations, but said during her testimony that she felt shut out early in her career when she made a harassment allegation, so she decided she had to start talking and acting like her co-workers in order to advance in the male-dominated ranks.

While defense attorneys chipped away at Conley's behavior, work ethic and integrity, they also spent a great deal of time on the qualifications of the two men who received the promotions.

A number of witnesses testified about the professionalism and character of Paul Eckrich and Randall "R.L." Hughes, who were both promoted to major by Chaffinch in 2003, and no one raised serious questions about their qualifications. Only a few substandard evaluations and several apparently isolated incidents were discussed at trial.

**The right decision**

Ballard also repeatedly stressed that the rank of major is different than other positions in the state police because the five majors are discretionary appointments by the superintendent and equivalent to a governor's Cabinet.

Outside of court, Chaffinch said he knew he made the right decision when he promoted the two men, and now eight other people have confirmed his opinion.

The victory comes after Chaffinch and the state police lost two lawsuits.

In 2003, a federal jury found Chaffinch violated the first amendment rights of Sgt. Christopher Foraker by retaliating against him for disciplining a friend of Chaffinch and awarded him $240,000.

And last month, a different jury found Chaffinch again violated the rights of Foraker and two other troopers who spoke out about problems at the state police firing range. In that case the jury awarded the three nearly $2 million in damages.

On Wednesday, Chaffinch said he had been retired from the state police for a year and is looking forward to finally moving on with his life.

*Contact Sean O'Sullivan at 324-2777 or sosullivan@delawareonline.com.*



Capt. Barbara L. Conley claimed she wasn't promoted because she is a woman.

Retired Col. L. Aaron Chaffinch said he is looking forward to moving on with his life.

6/16/2006

A072



6/16/2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAPTAIN BARBARA L. CONLEY,  :
:
      Plaintiff,  :
:
    v.  :   C.A.No.04-1394-GMS
:
COLONEL L. AARON CHAFFINCH,  :
:
      Defendants.  :

## DECLARATION OF THOMAS S. NEUBERGER
## UNDER 28 U.S.C. § 1746

1. This Declaration is based upon my personal knowledge. I am competent to testify.

2. The plaintiff in this Fourteenth Amendment equal protection gender discrimination in promotions lawsuit is Captain Barbara Conley. The only defendant is L. Aaron Chaffinch. At the Rule 16 scheduling conference in March 2005, the Court scheduled a 10 day trial to begin on May 31, 2006. (See D.I. 48 and subsequent "So Ordered"). The trial date was later changed to begin on June 6, 2006. (See unnumbered docket entry dated 5/16/06).

3. The plaintiffs in the First Amendment retaliation Price and consolidated Foraker matters are Cpl/3 Kurt Price, Cpl/3 Wayne Warren and Sgt. Christopher Foraker. The defendants in those cases are L. Aaron Chaffinch and Col. Tom MacLeish. At the Rule 16 scheduling conference in February 2005, the Court ordered a trial to begin on May 15, 2006. The Price and Foraker matters were later consolidated for an 11 day trial beginning May 15, 2006. See C.A.No. 04-956-GMS; C.A. No. 04-1207-GMS.

-1-

4. As the Court recently observed in an Order dated June 1, 2006, the present <u>Conley</u> action "is not related to any other case before this court." (D.I. 236).

5. The <u>Price</u> trial began on May 15th and ultimately lasted 12 days, finally concluding on May 31st.

6. There was widespread media coverage of nearly every day of the <u>Price</u> trial. This media coverage included numerous stories in the local News Journal and Delaware State News, as well as nationally in the Associated Press. There was local radio coverage as well.

7. On May 31st, the jury in <u>Price</u> returned a verdict, finding that Chaffinch and MacLeish had violated the First Amendment rights of Cpl/3 Warren, Cpl/3 Price and Sgt. Foraker. In addition to the liability finding, the jury continued and found that Chaffinch and MacLeish had acted "recklessly, maliciously, or intentionally" (Price and Warren Inter. # 6, 8; Foraker Inter. # 12, 14) and exercised their discretion and awarded punitive damages to "punish and deter" them. (Price and Warren Inter. # 7, 9; Foraker Inter. # 13, 15). The jury also made a specific factual finding that Chaffinch had defamed Sgt. Foraker and "published an untrue statement" about him. (Foraker Inter. # 4). The jury continued and found that "Chaffinch knew the statement concerning [] Foraker was false or recklessly disregarded whether it was false" and so acted with actual malice. (Foraker Inter. # 5). The careful jury awarded a total of $1,923,789 in damages to the three plaintiffs, a figure which included $443,442 in punitive damages against Chaffinch and MacLeish. (Price and Warren Inter. # 7, 9; Foraker Inter. # 13, 15).

8. The <u>Price</u> verdict was by far the largest verdict against Chaffinch and MacLeish in any of the numerous recent lawsuits against them. Not surprisingly, given the size of the nearly $2.0 million verdict as well as the widespread media coverage during the trial, the media reported

-2-

A075

extensively on the jury verdict. The News Journal ran a front page story with the headline -
"Troopers Awarded $2 Million in Lawsuit - State Police Leaders Were Accused of Retaliation."
The Delaware State News picked up the story from the AP Wire and also ran a front page article
with the headline - "Troopers Get $2M in Suit." The story on the AP Wire was headlined "Jury
Says Firing Range Troopers Were Victims of Retaliation."

9. As a matter of practice, counsel regularly reviews Model Rule 3.6 and attempts to stay
abreast of related court decisions in order to assure that any public comments made about cases
are within bounds of the Rule. Anticipating the verdict, counsel had reviewed Rule 3.6 and also
its interpretation in light of the Court's earlier opinion in Conley v. Chaffinch, 2005 WL
2678954 (D.Del. March 4, 2005), which interprets and applies Rule 3.6. Counsel wanted to be
sure that all of his comments were within the parameters of the Rule.

10. Not surprisingly given his status as plaintiffs' counsel, following the verdict,
members of the news media asked counsel for comment on the $2 million jury verdict against
Chaffinch and MacLeish for violating the First Amendment to the U.S. Constitution.

11. As discussed above, none of the media coverage complained of by the defense was
generated by this court case - the Conley case. Instead, of the media coverage complained of was
generated by a separate, independent and unrelated matter - the Price case.

12. Counsel did not make any statements relating to the Conley action. Instead, all of
counsel's statements addressed only the Price action. Indeed, in keeping with their practice,
counsel had ceased answering any substantive questions from the media about the Conley matter
in the months leading up to the Conley trial so as not to affect the jury pool with public
statements about the Conley case.

-3-

13. Out of an abundance of caution, in the aftermath of the <u>Price</u> verdict, counsel did not direct any public criticism towards Chaffinch who is a defendant in both the <u>Price</u> and <u>Conley</u> actions. Counsel consciously refrained from mentioning Chaffinch by name in his public statements about the <u>Price</u> verdict.

14. Instead, all public criticism arising from the <u>Price</u> jury verdict was purposefully directed at Col. MacLeish. Although MacLeish was a defendant in the <u>Price</u> matter, he is not a defendant in the <u>Conley</u> case.

15. Notably, as the defense motion makes clear, the defense has not contested the truth of any of the statements about the <u>Price</u> verdict attributed to counsel in the local media.

16. Counsel has not made any public comments about the present <u>Conley</u> case, a case that was scheduled to go to trial the very next week - on June 6th.

17. Two gag orders were subsequently imposed by the Court.

18. On June 1, 2006, the Court ordered that a telephone conference be held to discuss the matter of media comments regarding the Price verdict. (D.I. 236). On June 2nd, the Court held the teleconference. (<u>See</u> the first unnumbered docket entry dated June 2, 2006). There is not a transcript of that teleconference. During the teleconference, the Court, in no uncertain terms, imposed an oral gag order on plaintiff's counsel, barring them from speaking to the media at all. The Court ordered that all communication with the media immediately cease.

19. On June 5, 2006, the Court continued and issued a written gag order. (D.I. 241). The relevant portion of the order stated that:

> The parties, lawyers, and potential witnesses in this matter shall refrain from making to the media any extrajudicial statement or comment that is likely to interfere with a fair trial, or prejudice any party or the administration of justice.

-4-

A077

(D.I. 241).

## Authentication of Documents

20.  Found in the appendix in support of plaintiff's answering brief, or attached to this

Declaration, are true and correct copies of the following documents which are in my possession:

newspaper articles, the special verdict sheets from the Price action and deposition transcript

excerpts.


I declare under penalty of perjury that the forgoing is true and correct.   Executed on June

14, 2006.


**THOMAS S. NEUBERGER, ESQ. (#243)**
**THE NEUBERGER FIRM, P.A.**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com

Attorney for Plaintiff

-5-

A078

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

June 16, 2006, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:


Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**