### IN THE UNITED STATES DISTRICT COURT

### IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CAPTAIN BARBARA L. CONLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 04-1394-GMS |
| | ) |
| COLONEL L. AARON CHAFFINCH, | ) |
| in his individual capacity, | ) |
| | ) |
| Defendant, | ) |

**DEFENDANT'S REPLY TO PLAINTIFF'S "ANSWERING BRIEF"[1] IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR AN ORDER LIMITING PREJUDICIAL PRETRIAL PUBLICITY AND FOR SANCTIONS**

**1. Procedural posture of this issue.**

On May 31, 2006, a federal jury issued a verdict in favor of three plaintiffs represented by the Neuberger Firm, and against the current and former Colonels of the Delaware State Police, Thomas MacLeish and L. Aaron Chaffinch. Plaintiffs had claimed retaliation for alleged First Amendment activity.[2] The afternoon of the verdict, plaintiffs' attorney, Thomas Neuberger gave several statements to the local print and radio media, which were published that day and the following day, June 1, 2006. For instance, the June 1, 2006 News Journal quoted Neuberger's statement that: "the entire defense …was a coverup and a *pack of lies by men without honor*, which did not fool the thoughtful jury." (A-44). The News Journal quote ended there, but in the verbal rendition of this statement, broadcast on the morning of June 1, 2006, on WILM, a recording of Mr. [Thomas] Neuberger was broadcast, making the entire remark, which concluded: "... did not fool the thoughtful jury, and they *threw the*

---

[1] Defendant's initial filing on this issue was by motion (D.I. 239) without briefing. Plaintiff's response by way of 40-page "Answering Brief" (D.I. 256) is arguably improper pursuant to Local Rule 7.1.2. Nonetheless, as Plaintiff's submission has greatly expanded the scope of argument, a lengthier reply herein is appropriate.

[2] The issuance of the United States Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. __, 126 S.Ct. 1951 (2006), the day before the verdict, has called into question the viability of the claims of at least two of these plaintiffs.

*book at them*" - the implication being that the former and current Colonel were common criminals. The June 1 edition of the Delaware State News included quotes from Neuberger that "the jury saw through the whole pack of lies" and called for Colonel MacLeish to resign from office. Also on June 1, 2006, Neuberger appeared as a guest on a live talk radio show ["Rick Jensen"] on WDEL, where he made derogatory statements about Chaffinch, MacLeish and DSP leadership, including the following:

- "they [State government] can keep the *cowards* who are running the State Police, who throw their men under a bus and will not stand up to protect them - keep them in office - and that whole group that's unfit for leadership and it dishonors themselves every day."

- "It's the 5% [of troopers], the corrupt ones, who they'll march into a courtroom to say whatever they want.  Jury saw through that pack of lies."

- "The top is corrupt...it poisons the rest of them."[3]

At the time these statements were made, this Court had ordered that trial and jury selection in the instant case was to begin on June 6, 2006.  Mr. Neuberger, as counsel in the Conley case, was fully aware of this fact.

Later on June 1, 2006, this Court issued an order, *sua sponte*, expressing concern with Neuberger's statements and their potential impact on the impending trial in the Conley case. (D.I. 236).  The Court ordered a teleconference, which was convened on June 2, 2006 at 11:00 a.m. Contrary to plaintiff's counsel's representation in its Answering Brief, there is indeed a transcript of this conference, and it is attached as "Exhibit A" hereto.  (*See* AB at 5).  At the teleconference, plaintiff's counsel agreed to voluntarily refrain from further commentary on the Conley case ("we agree right now that there will be no more comments") (6/2/06 teleconference trans. at 11-12).

Following the teleconference, with leave of Court, counsel for Defendant Chaffinch in the instant case filed a motion for limitations on pretrial publicity, memorializing arguments made at the teleconference, and also for sanctions as to the statements already made. (D.I. 239).  On June 5, 2006, the day before the Conley trial began, the Court issued an Order deferring its decision on sanctions,

---

[3] A tape recording of the program has been received from WDEL, and a copy can be provided to the Court upon request.  (*See* D.I. 239 at note 3)

pending the issuance of a formal opinion, but stating:

> The parties, lawyers, and potential witnesses in this matter shall refrain from making to the media any extrajudicial statement or comment that is likely to interfere with a fair trial, or prejudice any party or the administration of justice.

(D.I. 241, ¶1). This order had the effect of memorializing the earlier voluntary agreement of counsel to refrain from such statements during the rest of the Conley case. Thus, there was no "gag order" or prior restraint imposed. Despite disagreeing on the court's legal analysis and criticism of the earlier comments, plaintiff's counsel *explicitly* acceded to the Court's directive not to make prejudicial comments during trial in the instant case.

**2. Plaintiff's "Answering Brief" on the issue of sanctions, (D.I. 256), to which this document responds, is replete with the same type of inflammatory rhetoric for which counsel was taken to task by this Court. This pleading is itself further evidence of counsel's disregard of this Court's admonitions and authority, and of the need for sanctions to punish and curb such misconduct.**

Plaintiff's "Answering Brief" is nothing short of startling in light of the aforementioned actions of the Court in this case. In addition to disregarding rulings already made by the Court at the June 2 teleconference, the document flouts the Court's admonitions as to the impropriety of the plaintiff's attorneys' comments following the Foraker case. Many statements are even worse than the comments made to the media after Foraker; many are simply defamatory, and all constitute inappropriate conduct by members of the bar of this Court, particularly in light of the Court's recent admonitions. Just a few of the most egregious comments are listed below:

- Comparing the DSP leadership to the Nazi regime, counsel cites the "Gestapo tactics" of former Colonel Chaffinch and Colonel MacLeish. (AB at p.6);

- Counsel states that "[a]lthough they [MacLeish and Chaffinch] may admire the ability of Cuba, China and the former Soviet Union to stifle dissent—we live in America ...." (AB at 6);

- Counsel discusses the "great public interest in Chaffinch [sic] and MacLeish's never ending flood of misconduct" (AB at 12); "Chaffinch and MacLeish believe they are above the law and can do whatever they want" (AB at 13);

- "a characterization of MacLeish as cowardly is an understatement" (AB at 27);

- the "once proud [DSP] is presently mired in the muck of illegality and corruption" (AB at 35);

3

- "rot festering within the DSP" (AB at 37);

The comments themselves are so offensive as to not merit discussion or reply. While, of course, these particular statements take place after the Conley jury verdict in favor of defendant, they are nonetheless defamatory statements and *ad hominem* character attacks published by counsel in the public docket of this Court. They are certainly worthy of sanctions, in addition to whatever sanctions should be imposed for the May 31-June 1 media remarks. These portions of the Answering Brief could well be an "Exhibit" to an Order of this Court imposing sanctions, and a demonstration of how not to conduct oneself as an attorney before the federal District Court. Indeed, as discussed below, plaintiff's attorneys seem to forget that, while acting as attorneys in litigation, they are not simply citizens who can "say whatever they want" under the guise of the First Amendment—they are members of the Bar who are held to the high standards of their regulated profession and of the bars of the Courts before which they practice.

**3. This Court flatly rejected plaintiff's counsel's "Safe Harbor" or "Safe Haven" argument as to statements made following the Foraker verdict and days before jury selection in the instant case.**

Counsel repeatedly claims that Thomas Neuberger's remarks immediately following the Foraker trial, and mere days before the start of jury selection in the Conley trial, fall within the "safe harbor" or "safe haven" of Model Rule of Professional Conduct 3.6(b).[4] The "safe haven" argument was raised during the June 2, 2006 teleconference, and was flatly rejected by the Court, which stated: "I could not disagree more." (Trans. at 10).

A plain reading of Model Rule 3.6(b) and its commentary undermines counsel's arguments. First, the Rule [3.6(a)] is a "basic general prohibition" against statements that the lawyer "knows or should know" will materially prejudice a matter in litigation. Comment, ¶3. Thus, such statements are presumptively improper. The so-called "safe havens" of permissible commentary listed within 3.6(b) are, without exception, non-contentious matters of objective fact (*e.g.* identity of persons or claims;

---
[4] In addition, as members of the Bar of the Delaware Supreme Court, counsel is bound by Delaware Rule of Professional Conduct 3.6, which is identical in content to the Model Rule discussed herein.

scheduling). While counsel is eager to point out (AB at 19) that Comment 4 states that the list of safe havens in 3.6(b) is not intended to be "exhaustive," he entirely fails to discuss the rest of the pertinent commentary to the Rule, which provides that (1) the "safe harbor" list encompasses matters which would not in any event normally be prohibited by 3.6(a); (2) statements not contained within the list may be subject to 3.6(a); and--most importantly--(3) Comment 5 *specifically prohibits* the kind of commentary that counsel made in this case.

Comment 5 would put any reasonable lawyer who had consulted the rule on notice that pre-trial comments such as "liars," "cowards," "men without honor," and "throwing [employees] under the bus" were prohibited by Rule 3.6(a). Comment 5 provides:

> There are, on the other hand, certain subjects that are more likely than not to have a material prejudicial effect on a proceeding, *particularly when they refer to a civil matter triable to a jury*, a criminal matter, or any other proceeding that could result in incarceration. These subjects relate to:
>
> (1) the *character, credibility, reputation* or criminal record *of a party*, suspect in a criminal investigation *or witness*, or the identity of a witness, or the expected testimony of a party or witness;
>
> \*       \*       \*       \*       \*
>
> (5) information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial....

Model Rule 3.6, Comment 5, emphasis added.

Certainly, it is indisputable that the comments made by Thomas Neuberger, on May 31 and June 1, pertained to the "character, credibility and reputation" of the Defendant "party" to the <u>Conley</u> case, former Colonel Chaffinch, and the former party defendant and identified witness for the defense, present Colonel Thomas MacLeish. In addition, counsel certainly knew that such commentary would be inadmissible, and almost certainly improper even as argument, by counsel at trial. Counsel's attempts to argue that the remarks were "comment" on the public record or discussion of the "result of any step in litigation" (AB at 23) are disingenuous. Calling a party or witness to litigation a "liar" or "coward" is not disclosure of a judicial result, but an opinion statement and character assassination by

5

counsel.

Counsel also misleads the Court and the public by suggesting that a witness (retired Major Swiski) testified at trial that Chaffinch had a reputation for untruthfulness. (AB at 25). In reality, in the Foraker case, the Court excluded questioning on this issue, due to the failure of plaintiffs' counsel to lay a proper foundation, and the witness himself testified that his opinion of Chaffinch (whatever it may be) was formed solely by one particular interaction he had had with him, and was not informed by "general reputation." (*See* C.A. 04-1207; testimony 5/24/06). This allusion to such "testimony" only existed in a News Journal article. (A-22-23). Although the Neuberger firm may wish it otherwise, newspaper articles and pre-trial publicity are not part of the "public record" for purposes of Model Rule of Conduct 3.6. Further, plaintiff's counsel's attempt to deflect responsibility for the "throw [them] under the bus remark" to retired Major Baylor is improper. (AB at 22). First, the cited statement was made at a deposition, not at trial (A-49); secondly, a review of the statement shows that it was made in the context of a general discussion of Major Baylor's own views on the proper way to handle a crisis brought on by subordinates. It was not an overall indictment of the character of Colonel Chaffinch.[5] Moreover, Mr. Neuberger, in making the "under the bus" remark on the Jensen radio program, did not quote Major Baylor, but clearly made the remark as his own statement: "they [State government] can keep the *cowards* who are running the State Police, who throw their men under a bus and will not stand up to protect them - keep them in office - and that whole group that's unfit for leadership and it dishonors themselves every day."

However Mr. Neuberger may attempt to defer responsibility for his comments to others, *he* is the attorney regulated by and subject to the rules of professional conduct. Given the ABA's explicit commentary as guidance (particularly Comment 5), a seasoned attorney's argument that he consulted Rule 3.6 and thought that his comments fell within the "safe havens" is unworthy of belief or, at best, exhibits a gross misunderstanding of the Rule.[6] As the Court stated, "if both Neubergers don't

---

[5] Indeed, at trial in Conley, Major Baylor testified that "I think by and large [Colonel Chaffinch] is a good person." (Ex. B, 6/7/06 Baylor testimony at 10).
[6] This claim appears in the "Declaration of Thomas Neuberger under 28 U.S.C. §1746." (D.I. 257, A-74-

6

understand how this might have a substantial and material effect on the adjudicative process . . . if you don't perceive the impact that comments like that might have on the jury pool, then I am at a loss." (Trans. at 10).

### 4. Plaintiff's counsel's argument that statements made following the Price/Foraker case pertained to that case only and had no bearing on the Conley case is disingenuous, and was rejected by this Court in the June 2, 2006 teleconference.

Plaintiff's counsel attempts to avoid consequences for his conduct by arguing that the remarks made by Thomas Neuberger, on May 31 and June 1, 2006, after the Price/Foraker verdict, pertained solely to the Price/Foraker case, and were not directed toward and had no bearing on the Conley case, which was set to go to trial in less than one week. Frankly, this argument is an insult to the intelligence of counsel and the Court.

The Price/Foraker case was filed by the Neuberger firm against former Colonel Chaffinch, current Colonel MacLeish and the Delaware State Police, alleging Constitutional violations in employment actions against the three plaintiffs. The Conley matter was filed by the Neuberger firm against former Colonel Chaffinch, current Colonel MacLeish and the Delaware State Police, alleging Constitutional violations in employment actions against the female plaintiff. Less than one month before trial, plaintiff's counsel voluntarily dismissed DSP and Colonel MacLeish from the Conley case, for reasons of their own. However, MacLeish remained a witness in the Conley case, and was identified as such in defendant's pretrial order. Despite the dismissal of the "official" defendants and the change in the caption, for all practical purposes, DSP was still "on trial" for the actions of its former Superintendent.

Throughout the Foraker case, the Neubergers spoke about prior findings of Constitutional violations against DSP and Chaffinch in at least one other previous lawsuit. In the Conley case, repeated allusions to other lawsuits during discovery prompted the filing of a motion *in limine* by defendants to exclude reference to other lawsuits at trial. (D.I. 174). The Neuberger firm is well

---

48). The court should note that this unsworn declaration appears to be signed (/s/ Thomas S. Neuberger/*by SJN*). A statement signed "by" another person for the declarant does not conform to the requirements of 28 U.S.C. §1746, which requires that an unsworn declaration be "in writing of such person ... *subscribed by*

7

known in Delaware for filing suits in employment matters against governmental agencies, particularly the Delaware State Police, a fact plaintiff's counsel acknowledges in his brief to this Court. (AB at 38-39).[7] The Neuberger firm engages in a great deal of self-promotion through the media, including holding its own press conferences. Media comments by the firm early in this case prompted defendants' request for an order limiting extrajudicial commentary under Rule 3.6 (D.I. 9), although this motion was denied by the Court. All of this is to point out that, while not literally "related" on the merits of the claims, the Price/Foraker and Conley cases were clearly related in the Delaware public eye as the "next case" and the "next case" by this well-known local law firm, alleging abuses on the part of Delaware State Police. This was, of course, as apparent to the Neubergers as it was to the defense.

Most critical to the issue before the Court is the timing of the pre-trial comments in relation to the start of the Conley case. The Foraker verdict came down on May 31, 2006. Counsel's inflammatory remarks about the character of Chaffinch and MacLeish were made *immediately* following the verdict on May 31st, and on the following day, June 1, 2006. The print and radio media coverage of the verdict and the remarks was widespread and immediate. Thomas Neuberger chose to appear on a live, talk-radio, call-in show at noon on June 1, 2006, where he enthusiastically opined upon the shortcomings of DSP and its leaders. The trial date in Conley had been set for June 6, 2006 and the jury pool was set to (and did) report that day. All of the comments were made with counsel's full knowledge that a jury of Delawareans was to be pulled for the "next" State Police trial in *five days*. Content aside, the apparent impropriety of the timing of these remarks prompted the Court to act *sua sponte* in convening a teleconference to discuss the potential effect on the jury and possible

---

*him* as true under penalty of perjury." (emphasis added).
7  Counsel's assertion that the Neuberger firm is an "expressive association" under the First Amendment, however, is meritless. (AB at 38-39). Counsel invites comparison to true organizations such as the Boy Scouts or the Jaycees. Attorneys who represent clients in discrete cases - even in a narrowly tailored area of the law - clearly do not form an "association" or "organization" in any Constitutional sense. See Boy Scouts of America v. Dale, 530 U.S. 640, 678-79 (2000) ("we have routinely and easily rejected assertions of this right by expressive organizations with discriminatory membership policies, such as private schools, *law firms* and labor organizations.").

ways to mitigate harm. As the Court succinctly put it, "you [Stephen Neuberger] and your dad [Thomas Neuberger] have effectively polluted the jury pool. This is a small jurisdiction" (Trans. at 10).

In addition to the clear temporal relationship of the remarks to this case, the remarks fall squarely within Rule 3.6(a) as applied to this "matter," despite counsel's attempt to parse the words of the Rule. Rule 3.6 provides:

> (a) A lawyer who is participating or has participated in the investigation or litigation *of a matter* shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding *in the matter*.

Clearly, the "matter" referred to is the case at bar - here, Conley. Neuberger was participating as counsel in Conley; made an extrajudicial statement to the media that he knew would be disseminated and certainly should have known had a substantial likelihood of prejudicing the Conley matter and jury pool. Rule 3.6(a) says nothing about what the statements "pertain to" in counsel's mind or whether they might also pertain to other matters. The Rule simply looks at the statement(s) made to see if they have the substantially likelihood of prejudicing a *pending* "matter" which the speaking attorney is litigating. That test is plainly met here.[8]

**5. Counsel's statements, such as "pack of lies," "men without honor" and "coward" were patently improper and prejudicial.**

As discussed above, defendants respectfully submit that the actual statements made by Mr. Neuberger to the media on May 31 and June 1, 2006 fall plainly within the scope of conduct prohibited by Rule 3.6(a) and fall outside the widely accepted bounds of civility, decorum and professionalism by which almost all members of the bar of this Court and of the State of Delaware circumscribe their conduct. The severity of the offense, and the appropriate sanctions are matters properly for this Court to decide. Defendants merely suggest that the Court look at the actual words used; the personal character of the attacks; that the statements are of opinion and not of fact; and

---

8  Indeed, given the post-trial issues currently being briefed in Foraker, which were known to counsel on May 31, 2006, that case is still a live proceeding upon which counsel's remarks could also potentially have

9

counsel's utter disregard of the imminent jury selection and trial at the time the remarks were made. While counsel, even now, argues to the Court that the DSP leadership is "malicious" and "reckless," one might properly apply those same terms to counsel's own remarks.

### 6. A lawyer is not shrouded from all liability for malicious or prejudicial speech by the banner of the First Amendment. Lawyers' speech rights are tempered, in the litigation context, by the Rules of Professional Conduct—rules which were violated by counsel here.

The majority of plaintiff's counsel's answering brief comprises a law school-type exposition of general First Amendment law. The Court is doubtlessly well-versed in the precepts of freedom of speech under the Amendment, and those fundamental precepts are not in controversy here. What is studiously avoided in counsel's brief is the real issue of the interplay between the general First Amendment freedoms of speech which we all enjoy as citizens, and the ethical and professional rules governing lawyers practicing before this Court in adjudicative proceedings. Unlike ordinary citizens, lawyers actively litigating a matter before the Court, and lawyers who wish to abide by the professional rules that govern them, cannot simply say "whatever they want" about adjudicative matters, or about judges, parties, witnesses and fellow counsel, and claim that "everything is fair game" by operation of the First Amendment.[9]

One of the cases heavily relied upon by plaintiff's counsel in his answering brief, Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991), actually recognizes that the speech of lawyers in litigation may permissibly be more circumscribed than the speech of ordinary citizens. It does not stand for the proposition, as suggested by plaintiff's counsel that any and all attorney speech is "fair game" under the First Amendment. The Supreme Court in Gentile upheld the constitutionality of Model Rule 3.6 in principle,[10] but reversed the attorney's discipline based on the facts of the case, and the application

---

an adverse effect.

9  Of course, counsel can literally say "whatever they want," but they may properly be disciplined or sanctioned for certain remarks by courts or regulatory bodies, without any encroachment of Constitutional liberties.

10 The Court wrote: "the matter before us does not call into question the constitutionality of other States' prohibitions upon an attorney's speech that will have a 'substantial likelihood of materially prejudicing an adjudicative proceeding,' but is limited to Nevada's interpretation of that standard." Gentile, 501 U.S. at 1034.

10

of Rule 3.6 by the State of Nevada.

The instant case is readily distinguishable from Gentile. First, the statements made by the attorney in Gentile, at a press conference, were directly in response to adverse publicity directed at his client by the other side. Gentile did not instigate negative media coverage about the case or opposing parties – he reacted to it. *See* 501 U.S. at 1042. Secondly, Gentile's press conference was held *six months* before his client's criminal trial – not five days before the jury selection began, as was the case here. The long gap of time in Gentile weighed heavily into the Court's analysis. The nature of the comments themselves also paled in comparison to those in the instant case.

It is worth noting that, during the Price/Foraker case, and particularly after the verdict, the press reports had been very favorable to the Neuberger firm and its clients. Front page headlines ran in both the Delaware State News and the Wilmington News Journal announcing the verdict in favor of the Neubergers' clients and against the Delaware State Police. On the WDEL talk show, Plaintiff's counsel was introduced by the commentator as "successful attorney Tom Neuberger." Thus, very much unlike Gentile, whatever sentiment that existed in the public arena was already *favorable* to the Neubergers' upcoming case. As a result, the public comments made by Thomas Neuberger were fueling the already unfavorable sentiment toward former Colonel Chaffinich and the Delaware State Police in general, at a time when he knew that the Conley case was imminent. Neuberger's comments were therefore wholly unnecessary to ensure that his client received a fair trial – they were designed to even further enhance his odds in the upcoming case. The distinction from the facts in Gentile could not be clearer.

In its legal analysis, the high court recognized that courts may regulate the conduct of those admitted to practice before them; "[m]embership in the bar is a privilege burdened with conditions." 501 U.S. at 1066 (citation omitted). A lawyers is (or should be) a "trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense." Id at 1072. Citing earlier cases, Gentile recognized that the Court had "expressly contemplated that the speech of *those participating before the courts* could be limited." Id (emphasis in original). In active litigation, the

11

State may demand that lawyers adhere to regulatory controls over speech as well as conduct. Id at 1074. The Court emphasized that this restriction (like Rule 3.6) applies only to lawyers litigating pending cases to which their statements may apply. Id at 1073. Similarly, the Third Circuit in United States v. Scarfo, 263 F.3d 80, 93 (3d Cir. 2001), has held that

> [a] lawyer admitted to the bar of a court must expect the disciplinary limitations of his profession. Lawyers should not be surprised when they learn that their chosen professional status . . . restricts their conduct and speech at times.

Gentile held that the ethical "restraint" on lawyer speech (that is, the Rule 3.6 test) was "narrowly tailored" to achieve the critical objectives of ensuring that parties obtain a fair trial and an untainted jury pool. Id at 1075-76. The "fair trial" objectives of Rule 3.6 and Gentile are particularly implicated given the nature of the comments in this case. For instance, just days before trial in Conley, Thomas Neuberger declared on the WDEL radio program that the DSP leadership consists of "corrupt [individuals], who they'll march into a courtroom to say whatever they want." Implicit, if not explicit, in that statement, is that DSP parties and witnesses will lie at trial.

Counsel makes another odd argument in an attempt to circumvent the professional and ethical obligations that attach to his status as an attorney. Essentially the Neubergers claim that they are not speaking as attorneys, or for themselves, but are exercising their individual clients' free speech rights vicariously. (AB at 35-37). Again, the implication being, "anything goes." This argument does not comport with the letter or spirit of Gentile. Attorneys always represent a client; there is always an underlying party to litigation with something to say. But, attorneys who appear before courts are officers of those courts and subject to the ethical rules that bind the Bar and the profession, including the "narrowly tailored" restrictions on attorney speech about pending litigation.

One more thing might be considered. Lawyers, particularly those with a narrow practice focus, have a professional and financial stake in obtaining clients and in the outcome of matters that they litigate. To the extent that pre-trial comments could influence the jury venire and result in a more favorable outcome for the client, this could logically mean more prestige and more business for the attorney. This is not to necessarily to say that this was the motivation for counsel's comments in the

12

instant case, but the mere possibility of personal interest affecting certain extrajudicial speech is further evidence of the need for limited regulation of attorney speech and conduct during pending litigation. Compliance with Rule 3.6 satisfies this concern.

> **7. The Court's June 5, 2006 order was a proper exercise of the Court's discretion and obligation to police the conduct of members of its bar, and it in no way bars *post-trial* comments on the Conley verdict, within the bounds of ethics.**

Plaintiff's counsel is incorrect throughout his brief in suggesting that the Court, on June 5th, imposed any kind of "prior restraint" or "gag order." (AB at 15-17). As noted above, at the June 2, 2006 teleconference with the Court, plaintiff's counsel repeatedly and explicitly agreed to refrain from any further prejudicial statements. (Trans. at 11-12 ("we agree right now that there will be no more comments")). This was a voluntary agreement - there was no "gag order" imposed against counsel's will by the Court. Indeed, by the time of the teleconference, most of the damage had been done and the prejudicial cat was "out of the bag," so to speak. The Court's immediate concern was to stop further harm.

The Court's June 5, 2006 Order, (D.I. 241) was simply a memorialization of the agreement by plaintiff's counsel [all counsel] to refrain from further commentary of the type which impelled the Court's *sua sponte* conference. Having voluntarily agreed not to make further prejudicial comments, plaintiff's counsel should not be heard to cry foul when the Judge issues an order to that same effect. Obviously the Court has the power to enter orders to give the parties' promises the force of law. If no "gag order" was imposed, then no purported first amendment protections were stifled.

Even if the Court's Order could be construed as an involuntary restraint on counsel's speech, it completely passes Constitutional muster. First, it is narrowly tailored to comply with the terms of Rule 3.6(a) and Gentile, limiting only extrajudicial statements "that [are] likely to interfere with a fair trial, or prejudice any party or the administration of justice." (D.I. 241, ¶1). *See* Gentile, 501 U.S. at 1075-76. The Third Circuit has similarly held that "a lawyer's right to free speech in a pending case may be circumscribed in the courtroom and is limited outside the courtroom as well." United States v. Scarfo, 263 F.3d 80, 93 (3d Cir. 2001)(discussing Gentile). The June 5, 2006 Order fully complies

with the parameters described in <u>Scarfo</u>, *supra*. The limitation is narrow, certainly "necessary" in light of the extrajudicial statements already made and "carefully aimed" at statements likely to influence the fairness of the trial proceedings. *See* <u>Scarfo</u>, *id*.

        Counsel's claims that "defendants" did not give them sufficient due process notice to justify sanctions and have failed to present a proper "evidentiary basis for their nebulous, undefined and overbroad claims" are without merit. (AB at 20, 29). First of all, this issue was raised in the first instance by the Court, not by defendants. It is apparent in the transcript of the June 2, 2006 teleconference that the Court and all parties were fully on notice of the statements at issue, as they had been widespread in the print and broadcast media the day before. The Court found the record sufficient to raise and address the issue. Defendant agrees, and the record as to statements made (<u>none</u> of which have been denied by the Neubergers) was further defined in these written submissions on the issue. Contrary to plaintiff's suggestions (AB at 29), the defense is not obliged to submit "polling data" or any evidence of actual harm—the impropriety of the statements and their potential for harm speak for themselves. As the United States Supreme Court has aptly stated:

> [t]he very word 'trial' connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio and the newspaper.

<u>Gentile</u>, *supra*, 501 U.S. at 1070.

        Finally, in still another attempt to blame their own conduct (or lack thereof) on outside forces, the Neubergers claim that the Court's June 5, 2006 Order prohibits their post-trial comments on the defense verdict in Conley. Counsel claims that the defense is using the so-called "gag order" "as a sword and has gone on the offensive" by making comments to the media about the case following the Conley verdict. (AB at 33). The Neubergers claim they are "barred" from responding due to the "indefinite gag order." Again, a simple reading of the Court's order belies this claim. The Court instructed the parties to refrain from comments "likely to interfere with a fair trial." (D.I. 241). The "trial" was obviously over following the delivery and acceptance of the defense verdict on June 14, 2006. Unlike <u>Foraker</u>, no outstanding post-trial issues on the merits remain.

14

Defense comments, eagerly sought out by the media outlets due to the unusual speed of the (one hour) verdict exonerating Colonel Chaffinch of all claims of discrimination, were well within the bounds of attorney ethics, simply commenting on the weight of evidence, the vindication by the jury and the eagerness of DSP to move on with their mission.  No offensive remarks were made—let alone anything even approaching the incendiary nature of plaintiff's counsel's remarks after <u>Foraker</u>.  Plaintiff's claims that defendant and his counsel have "publicly violated" the Court's Order is without merit—the Order, by its terms, was no longer in effect following the conclusion of the trial, and in any event, counsel's public statements were not of a nature that would have violated the Order even if it was still in effect.  If the Neubergers have not commented on the defense verdict in this case, it is simply by their own choice.

### **8.  An order of sanctions against plaintiff's counsel is appropriate in this case, given the severity of the comments; the comments made in this filing and counsel's flagrant and repeated disregard of Rule 3.6.**

As discussed above, the imposition of sanctions is a matter solely within the Court's discretion, and defendant's counsel suggest that sanctions in the form of monetary penalties (to include the costs of briefing this issue) and/or a public written reprimand/decision by the Court are appropriate. Plaintiff's counsel states in the Answering Brief that because the "jury pool was not [actually] tainted" (a claim defendant would dispute) and the voir dire process was successful, that no further action by the Court is appropriate.  Counsel could not be more mistaken.  Their claim that extensive voir dire of the type used in <u>Conley</u> would have been necessitated regardless of counsel's comments has no basis in fact.  All parties were aware of the "back to back" trials for at least a year, yet neither the defense nor the Court raised the issue or saw the need for expanded voir dire until the utterance of counsel's offensive post-<u>Foraker</u> remarks.  Also, the mere fact that an impartial jury was ultimately able to be seated does not undo the harm or negate the wrongfulness of counsel's remarks.  Again, <u>Gentile</u> addresses this contention when the Court wrote that the legitimate restrictions on attorney speech were aimed at "two principal evils":

> (1) comments that are likely to influence the actual outcome of trial and "(2) comments that are likely to prejudice the jury venire, *even if an untainted panel can ultimately be found . . . .*

15

> Even if a fair trial can ultimately be ensured through voir dire . . .or some other device, these measures entail serious costs to the system. . . . The State has a substantial interest in *preventing* officers of the court, such as lawyers, from imposing such costs on the judicial system and on the litigants.

Gentile, 501 U.S. at 1075 (emphasis added).

While of course the prejudicial statements in this case have already been made (and live on in the public universe, courtesy of the internet), the imposition of sanctions in this case can have a salutary prospective effect, in addition to their punitive nature, by putting plaintiff's counsel and other members of the bar on notice that this sort of conduct will not be tolerated by the Court. As discussed above, counsel's post-trial brief, with its comparisons of DSP leadership to the "Gestapo" and to communist countries, show that counsel still has no intention to conform their conduct to this Court's directives or the Rules of Professional Conduct by which they are bound. The Neubergers claim that State Police leaders feel they are "above the law" (AB at 16, 23), but perhaps it is counsel themselves who feel that they are above the law and beyond the reach of regulation. Defendant and his counsel respectfully ask the Court to tell them they are not.

        **DEPARTMENT OF JUSTICE**
        **STATE OF DELAWARE**

By:   /s/ Stephani J. Ballard
      RALPH K. DURSTEIN, III (I.D. No. 912)
      STEPHANI J. BALLARD (I.D. No. 3481)
      Deputy Attorneys General
      Carvel State Office Building
      820 North French Street
      Wilmington, DE 19801
      (302) 577-8400
      Attorneys for Defendant

        **LIGOURI, MORRIS & YIENGST**

By:   /s/ James E. Ligouri
      JAMES E. LIGOURI
      46 The Green
      Dover, DE 19901
      (302) 678-9900
      Attorney for Defendant

DATED: June 23, 2006

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CAPTAIN BARBARA L. CONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1394-GMS |
| | ) | |
| COLONEL L. AARON CHAFFINCH, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendant, | ) | |

**CERTIFICATE OF MAILING AND/OR DELIVERY**

The undersigned certifies that on June 23, 2006, she caused the attached, *Defendant's Reply to Plaintiff's "Answering Brief" in Opposition to Defendant's Renewed Motion for an Order Limiting Prejudicial Pretrial Publicity and For Sanctions*, to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

    Thomas S. Neuberger, Esq.
    Stephen J. Neuberger, Esq.
    Two East Seventh Street, Suite 302
    Wilmington, DE 19801

    /s/ Stephani J. Ballard
    Stephani J. Ballard, I.D. #3481
    Deputy Attorney General
    Carvel State Office Building
    820 N. French Street, 6th Floor
    Wilmington, DE  19801
    (302)577-8400
    Attorney for Defendant