**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A.No.04-1394-GMS** |
| | : | |
| **COLONEL L. AARON CHAFFINCH,**<br>**individually,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S REPLY IN SUPPORT OF THEIR
SANCTIONS MOTION (D.I. 258) FOR FAILURE TO COMPLY WITH
LOCAL RULE 7.1.3**

Plaintiff Moves to strike defendant's reply (D.I. 258) (hereinafter "Reply") in support of

their motion for sanctions (D.I. 239), for failure to comply with Rule 7.1.3(c)(2) of the Local

Rules of Civil Practice and Procedure of the U.S. District Court for the District of Delaware.

In their Reply, defendants have sandbagged plaintiff and argued from new evidence and

made new arguments which should have been included in a full and fair opening motion and brief.

Accordingly, the defense attempt to circumvent the Local Rules should not be encouraged and

their Reply should be stricken.

D. Del. LR 7.1.3(c)(2) addresses the form and content of briefs in this district and states

"[t]he party filing the opening brief shall not reserve material for the reply brief which should have

been included in a full and fair opening brief."  It is well established that inserting new arguments

or evidence into a reply brief is a "tactic . . . [which] amounts to impermissible 'sandbagging'" and

will not be countenanced or otherwise considered by the court.  Rockwell Tech, LLC v. Spectra-

Physics Lasers, Inc., 2002 WL 531555, * 3 (D.Del. March 26, 2002).[1]  Additionally, motions to strike should be considered before the substantive motions because if stricken, the improper filings "would not weigh into the court's decision."  Fed. Insur., 1998 WL 175882, at * 1.

At this late date in their Reply, the defense makes new allegations as to the basis for sanctions and belatedly cites numerous additional comments which he alleges supports his sanctions motion.  (Reply at 1-2).  The defense then argues from this new evidence throughout their Reply.

But in their opening motion, defendant only challenged four statements of counsel as the basis for sanctions.  (See D.I. 256 at 21-26 - noting and addressing the four statements challenged by the defense).  No where did the defense cite to, quote or discuss any of the additional statements they have belatedly added in their Reply.  Only now after plaintiff has been deprived of the opportunity to respond does defendant identify additional statements as yet another basis for their sanctions motion.  In light of the serious allegations being made, the defense tactic raises weighty due process concerns which the Local Rule was designed to address.  Defendant has violated the Rules.  Accordingly this evidence and argument should be stricken for failure to comply with Local Rule 7.1.3(c)(2).

All of defendant's new alleged evidence and argument are improper and "should have been included in a full and fair opening brief."  D. Del. LR 7.1.3(c)(2).  They were not.  In saving them for a reply brief, defendant has sought to sandbag plaintiffs.  Rockwell Tech., 2002 WL 531555, at *3.  They have "misled [plaintiffs] by holding back arguments [and evidence] until the reply

---

[1]  See also Jordan v. Bellinger, 2000 WL 1239956, * 5 n. 7 (D.Del. Aug. 28, 2000); Fed. Insur. Co. v. Signatics, Inc., 1998 WL 175882, * 1-2 (D.Del. 1998).

brief in violation of Local Rule 7.1.3(c)(2)." Fed. Insur., 1998 WL 175882, at *2. Plaintiff is prejudiced by this violation of the rules and such prejudice is readily apparent. Id. at 2. Defendant waited to introduce new evidence and arguments until after plaintiff had already responded and now lacks the ability to respond to this new information.

Defendant's actions violate both Local Rule 7.1.3(c)(2) and the due process clause of the Fourteenth Amendment.

Plaintiff waives an opening brief on this matter.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: July 10, 2006            Attorneys for Plaintiff

## LOCAL RULE 7.1.1 STATEMENT

Counsel certifies that he contacted defense counsel to determine their position on this motion. Defense counsel indicated they had done nothing improper.

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

# Unreported Opinions



Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
FEDERAL INSURANCE COMPANY, as subrogee
of Wilmington Trust Corporation, and St. Paul Fire
& Marine Insurance Company, as subrogee of
Wilmington Trust Corporation, Plaintiffs,
v.
SIGNTACTICS, INC. and KEITH SIGN
COMPANY, Defendants.
HARTFORD INSURANCE COMPANY, as
subrogee of Limestone Valley Enterprises, L.P.
Plaintiff,
v.
SIGNTACTICS, INC. and KEITH SIGN
COMPANY, Defendants.
**No. 97-343-SLR, 97-647-SLR.**

March 26, 1998.

John D. Balaguer, Esquire of White and Williams,
Wilmington, attorney for plaintiffs Federal Insurance
Co. and St. Paul Fire & Marine Insurance Co.
Kathleen Jennings, Esquire, Oberly, Jennings &
Drexler, Wilmington, attorney for plaintiff Hartford
Insurance Co.
Mary Matterer, Esquire, Stradley, Ronon, Stevens &
Young, Wilmington, attorney for defendant
Signtactics, Inc.

MEMORANDUM OPINION
ROBINSON, District J.

I. INTRODUCTION

**\*1** Pending before the court are motions to dismiss
filed by defendant Signtactics, Inc. ("Signtactics").
(*Federal Insurance Co., et al. v. Signtactics, Inc. et
al.,* C.A. No. 97-343-SLR("*Federal* "), D.I. 6;
*Hartford Insurance Co. v. Signtactics, Inc. et al.,* C.A.

No. 97-647-SLR ("*Hartford* "), D.I. 6) Independent
suits were initiated against Signtactics by Federal
Insurance Company & St. Paul Fire & Marine
Insurance Company ("Federal") and Hartford
Insurance Company ("Hartford") (collectively referred
to as "plaintiffs"), alleging contract and tort claims.

The court has jurisdiction over this matter pursuant to
28 U.S.C. § 1332. Venue properly lies in this district
pursuant to 28 U.S.C. § 1391(a).

II. FACTS AND PROCEDURAL BACKGROUND

The underlying facts do not appear to be in dispute.
In March 1990, Wilmington Trust Company
("Wilmington Trust") leased space in the Lantana
Plaza Shopping Center in Hockessin from Limestone
Valley Enterprises L.P. ("Limestone L.P.") to operate
a bank branch. (*Federal,* D.I. 10, Exhibit 1A)

On January 3, 1991, Wilmington Trust contracted with
Signtactics to "meet, survey, design, manufacture,
erect, and install" business signs at the Lantana Plaza
branch. (*Hartford,* D.I. 7, Exhibit 1A at 1) The
contract called for work to be completed by no later
than the week of February 18, 1991. (*Id.* at 4) The
sign at issue in this case was referred to in thecontract
as Sign # 6, and was to be installed on the south
elevation of the bank building. (*Id.* at 3)

On September 23, 1996, Sign # 6 malfunctioned. Fire
and smoke spread throughout the bank branch, causing
extensive damage to both real and personal property.
On June 23, 1997, Federal, as subrogee of Wilmington
Trust, filed a law suit against Signtactics and Keith
Sign Company, allegedly a subcontractor hired by
Signtactics to perform the contract for the signs.
(*Federal,* D.I. 1) The suit claimed breach of contract,
negligence, and breach of warranties. On December
9, 1997, Hartford, as subrogee of Limestone L.P., filed
an action against the same defendants, based on the
same events, claiming negligence and breach of

Not Reported in F.Supp.                                                                                     Page 2
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

warranties.  (*Hartford,* D.I. 1)

Signtactics has now filed motions to dismiss in both cases, pursuant to F.R.C.P. 12(b)(6), alleging that the six-year statute of repose provided by Delaware's "Builders' Statute," 10 Del. C. § 8127, bars both actions.  (*Federal,* D.I. 6;  *Hartford,* D.I. 6) Briefing is complete on the motions in both cases, and all parties have consented to have the motions decided jointly by the court.   (*Hartford,* D.I. 5) FN1 Also pending is Signtactics' motion to strike a surreply brief filed by Federal.  (*Federal,* D.I. 12, 13)

FN1. Previously, Federal requested oral argument, pursuant to Local Rule 7.1.4. (*Federal,* D.I. 9) There was no request for oral argument in *Hartford.* The court considers Federal's request now moot.

### III. DISCUSSION

#### A. Motion to Strike

Signtactics has moved to strike Federal's surreply brief and the supplemental affidavit contained therein. (*Federal,* D.I. 12, 13) This motion should be considered before addressing the motions to dismiss because if stricken, the supplemental affidavit of Edward Huppi would not weigh into the court's decision on the motions to dismiss.

**\*2** Local Rule 7.1.3 addresses the form and content of briefs in this district.   No subsection provides for or prohibits surreply briefs.   Subsection (c) discusses the contents of opening, answering, and reply briefs. Signtactics interprets this to imply that a surreply is not allowed, at least without leave from the court. Federal did not seek permission to file a surreply.

Federal addressed two issues in its surreply.   First, it believed Signtactics inaccurately implied that Sign # 6 was the only sign for the bank branch and clarified the number of signs at the branch through Huppi's

supplemental affidavit.   However, whether or not the affidavit is stricken is irrelevant, as there is already evidence in the record through the contract between Wilmington Trust and Signtactics, of the number of signs at the bank branch.  (*See Federal,* D.I. 7, Exhibit 1A)

Second, Federal argued that *McHughs Electric Co. v. Hessler Realty & Development Co.,* Del.Supr., 129 A.2d 654 (1957), cited and relied upon in Signtactics' reply brief, is distinguishable from the instance case. In its answering brief, Federal asserted that the lease between Wilmington Trust and Limestone L.P. was evidence of the intent of both the lessor and the lessee that the signs were neither permanent additions nor enhancements to the capital value of the property. (*Federal,* D.I. 10 at 14) Signtactics properly addressed that argument in its reply brief, citing *McHughs.*   This is not a situation where one party misled the other by holding back arguments until the reply brief, in violation of Local Rule 7.1.3(c)(2).

However, Signtactics has not alleged any particular prejudice suffered, nor is any such prejudice readily apparent.   Given that the surreply brief is innoxious, the motion to strike is denied and the court will consider the surreply brief and supplemental affidavit in deciding the motions to dismiss.

#### B. Motions to Dismiss

Signtactics moves this court to dismiss the two complaints  pursuant  to  F.R.C.P.  12(b)(6).FN2 Specifically, Signtactics argues protection under the Delaware Builders' Statute and expiration of the six-year limitations period for damages resulting from deficiencies in the construction of improvements to real property prior to the filing of either complaint. The application of the Builders' Statute is an affirmative defense and as such, Signtactics bears the burden of proving its applicability in this case.

FN2. Signtactics states in its opening brief that it seeks a motion to dismiss "pursuant to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

F.R.C.P. 12(b)(6) for lack of subject matter jurisdiction." (*Hartford,* D.I. 7 at 1) Such a motion would be based upon F.R.C.P. 12(b)(1). As this is the only reference to subject matter jurisdiction, it is likely a typographical error. Therefore, this memorandum opinion assumes Signtactics' motion is a motion to dismiss for failure to state a claim.

### 1. Standard of Review

A motion to dismiss for failure to state a claim, pursuant to F.R .C.P. 12(b)(6), cannot be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," assuming all allegations set forth in the complaint are true and drawing all inferences favorable to the plaintiff. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, when matters outside the pleadings are presented, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." F.R.C.P. 12(b)(6). F.R.C.P. 56 provides that granting summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c). "The appropriate inquiry is whether there is a need for a trial .... Are there any genuine factual issues that properly can be resolved in favor of either party." *Windley v. Potts Welding & Boiler Repair Co.,* 888 F.Supp. 610, 611 (D.Del.1995).

**\*3** In its opening briefs, Signtactics attached a copy of the contract with Wilmington Trust. "The Court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *DeWitt v. Penn-Del Directory Corp.,* 872 F.Supp. 126, 128 (D.Del.1994). The contract is such a document and, thus, Signtactics' submission of the contract does not convert the motions to dismiss to summary judgment motions.

However, both plaintiffs submitted affidavits for the

court's consideration. Hartford's answering brief contained an affidavit from Cindy Bartoshesky, a limited partner of Limestone L.P. (*Hartford,* D.I. 10, Exhibit A) Federal submitted two affidavits in its answering brief; one from a Wilmington Trust executive, Eduard Huppi, and the other from Clifford Patton, a retained expert in this case. (*Federal,* D.I. 10, Exhibit 1, 2) Additionally, Federal attached a supplemental affidavit from Eduard Huppi in its surreply brief. (*Federal,* D.I. 12, Exhibit 1) These affidavits are matters outside the pleadings and, therefore, the motions to dismiss are converted to motions for summary judgment.

The court is required to provide the parties with notice of its intent to treat motions to dismiss as motions for summary judgment and give the parties an opportunity to submit material in support of their positions. *Hilfirty v. Shipman,* 91 F.3d 573, 578 (3d Cir.1996). The parties appear to have had proper notice, as both plaintiffs and Signtactics propounded in their briefs that the motions were converted. (*Federal,* D.I. 10 at 6, D.I. 11 at 1; *Hartford,* D.I. 10 at 5)

### 2. Delaware Builders' Statute

The basis for Signtactics' motions is that the actions are barred by the statute of repose in the Delaware Builders' Statute, 10 Del. C. § 8127. A six-year limitation period applies thereunder to actions for damages, indemnification, or contribution for property damage, real or personal or mixed, arising out of any deficiency in the construction of an improvement to real property or the design, planning,supervision, or observation of any such construction. 10 Del. C. § 8127(b)(1)(2). "The limitation period begins to run at the earliest of several designated dates, irrespective of the date of the injury." *City of Dover, et al. v. International Telephone and Telegraph Corp. et al.,* Del.Supr., 514 A.2d 1086, 1089 (1986). "The statute in question is a true statute of repose. It prevents a claim from arising, whereas a statute of limitations bars an accrued cause of action.... Thus, the passing of the six-year period deprives the injured party of a legal right to redress." *Id.* (citations omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 4
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

The parties agree that the relevant designated date in this case, if the Builders' Statute were to apply, is "the date of purported completion of all the work called for by the contract as provided by the contract if such date has been agreed to in the contract itself." 10 Del. C. § 8127(b)a.   The contract between Wilmington Trust and Signtactics called for completion of all work by the week of February 18, 1991.  Thus, under the Builders' Statute, the limitation period expired on February 18, 1997.

**\*4** Signtactics asserts it is entitled to protection under the Builders' Statute and, thus, any claim either plaintiff had against it expired approximately four months before Federal filed its complaint and approximately ten months before Hartford filed its complaint.  The complaints fail to state a claim and should be dismissed.  Plaintiffs contend that Signtactics is not entitled to protection under the Builders' Statute and, since the statute of limitations for the particular actions have not expired, the complaints were timely filed.

In order for a builder to receive protection under the Builders' Statute, he or she must furnish construction of an improvement to real property.  *City of Dover v. International Telephone and Telegraph Corp., 514 A.2d at 1089.*

a. Furnish Construction

The Builders' Statute provides protection to persons performing or furnishing, or causing the performance or furnishing of, any ... construction of ... an improvement or against any person performing or furnishing, or causing the performing or furnishing of, any ... designing, planning, supervision, and/or observation of any ... construction or manner of construction of ... an improvement.

10 Del. C. § 8127(b).   "Furnish" is defined as "provides for, equips, supplies, or appoints."  *Becker v. Hamada, Inc., Del.Super., 455 A.2d 353, 355 (1982).*  "Construction" is defined by the Builders' Statute to

include "construction, erection, building, alteration, reconstruction, and destruction of improvements to real property."  10 Del. C. § 8127(a)(4).   Like the definition of "improvement," "[the] Delaware courts apply a common sense understanding of the word construction:  the act of building;  erection;  act of devising and forming;  fabrication;  or composition."  *Windley,* 888 F.Supp. at 612 (citing *Becker,* 455 A.2d at 356).   A party must supply more than just raw materials in order to be protected by the Builders' Statute.  *Windley,* 888 F.Supp. at 612.  If "the party is more than a mere supplier of the material in question in that it actually fabricates them to the specifications of the buyer, that party furnishes construction."  *Id.* Fabrication to the specifications of the buyer is the lynchpin of the "furnishing construction" issue.  *Schermerhorn v. Anchor Electric Co. et al., Del.Super., 1992 WL 301636, 2 (1992).*

In  *City of Dover v. International Telephone and Telegraph Corp.,* the court held that off-site fabrication of utility poles constituted "furnishing construction," although the defendant only manufactured and delivered the poles and did not install them, because it manufactured the poles according to the specifications provided by a company involved with designing the pole system.  514 A.2d at 1089.

In  *Hiab Cranes and Loaders Inc., et al. v. Service Unlimited Inc. et al.,* Del.Super., C.A. No. 82C-FE-98, Martin J. (August 16, 1983), *modified,* C.A. 82C-FE-98, Martin J. (October 4, 1983), the defendant met the "furnishing construction" requirement by manufacturing and selling an oil furnace designed to be incorporated into a building under construction, according to mechanical specifications of a co-defendant.  C.A. 82C-FE-98 at 6-7.

**\*5** In  *Standard Chlorine of Delaware, Inc. v. Dover Steel Co., Inc., Del.Super., 1988 WL 32044 (1988),* the court held a liquid storage tank manufacturer, who did not install the tank, "furnished construction" where the tank was constructed according to the specifications supplied by the plaintiff.  *Id.* at 1.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 5
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

By contrast, in *Kirkwood Dodge v. Krapf,* Del.Super., 1989 Lexis 201 (1989), the court held that the manufacturer of a circuit breaker panel box did not meet the requirement of "furnishing construction" where the panel box was not manufactured according to any specifications, but was a generally available item. *Id.* at 7-8.

In *Schermerhorn,* the plaintiff was injured by a kilowatt hour meter and brought suit against the manufacturer of the meter pan and receptacle. As in *Kirkwood Dodge,* the item was not fabricated according to specifications provided to the manufacturer and the court held the defendant did not furnish construction, stating "[t]he public policy behind the statute of repose does not apply to items manufactured by a general supplier not designed for specific application to a particular construction project." *Schermerhorn,* 1992 WL301636 at 2.

In the cases at bar, the contract between Wilmington Trust and Signtactics provided that Signtactics will "meet, survey, design, manufacture, erect, and install" signage, *within Wilmington Trust's specifications,* for the bank branch in question. (*Hartford,* D.I. 7, Exhibit 1A at 1)(emphasis added). This suggests that Signtactics was more than just a supplier of a generally available item [FN3], and is entitled to the status of one who furnished construction under the Builders' Statute.

> FN3. Although there may be a factual dispute as to whether Signtactics actually "constructed" Sign # 6 or "caused" the construction of Sign # 6 (*see Federal,* D.I. 10, Exhibit 1 at para. 6), the dispute is not material under the language of the statute. The Builders' Statute protects parties "performing or furnishing any construction of an improvement to real property, *as well as those causing* to perform or furnish, any design, plan, supervision of or observation of any construction of an improvement. *City of Dover v. International Telephone and Telegraph Corp.,* 151 A.2d at 1089 (emphasis added). This language indicates the courts'

recognition that a party to a contract may generally delegate his or her duties under the contract and that such delegation does not relieve the original promisee of primary responsibility for performance. Therefore, whether Signtactics caused Keith Sign Company to perform or furnish Sign # 6, pursuant to Wilmington Trust's specification, or performed and furnished Sign # 6 itself, Signtactics is entitled to the status of one who furnished construction under the Builders' Statute.

b. Improvement to Real Property

The second requirement of the Builders' Statute is that the item constructed qualify as an improvement to real property. 10 Del. C. § 8127(b)(1). This is a question of law. *Windley,* 888 F.Supp. at 613. Thus, there can be no genuine issue of material fact for a jury to decide and a summary judgment review is appropriate.

The Builders' Statute defines "improvement" to include "buildings, highways, roads, streets, bridges, entrances and walkways of any type constructed thereon, and other structures affixed to and on land, as well as the land itself...." 10 Del. C. § 8127(a)(2). The Delaware Supreme Court, using the rules of statutory construction, interpreted this listing to be "exemplary, not exclusive." *City of Dover v. International Telephone and Telegraph Corp.,* 514 A.2d at 1089 (citing *Gage v. City of Wilmington,* Del.Supr., 293 A.2d 555, 557 (1972)). Thus, the case law has further defined what constitutes an improvement.

The seminal case on this issue in Delaware is *Hiab Cranes and Loaders Inc., et al. v. Service Unlimited Inc. et al.,* Del.Super., C.A. No. 82C-FE-98, Martin J. (August 16, 1983), *modified,* C.A. 82C-FE-98, Martin J. (October 4, 1983). In that case, the court was asked to determine whether an oil furnace was an improvement to real property. After noting that challenges to the statute's application, based on the definition of "improvement," had not previously been addressed in Delaware, the court analyzed how other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 6
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

jurisdictions approached the issue. The court found that "those decisions which have interpreted the 'improvement' to real property provision of the builders' statute indicate that the term is susceptible of definition employing either of two basic approaches." *Hiab* at 3. The first is a common law fixture analysis. *Id.* In Delaware, such analysis focuses mainly on the "intention of the annexor as to whether or not a chattel was affixed to realty for a temporary or permanent purpose." *Hiab* at 6, n. 10 (citing *Del-Tan Corporation v. Wilmington Housing Authority,* Del.Supr., 269 A.2d 209, 210 (1970)).

**\*6** The second approach is a "common sense" interpretation, defining "improvement " as

a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor and money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.

*Hiab* at 4.

Additionally, the *Hiab* court cited a New Jersey case, *Brown v. Central Jersey Power & Light Co.,* 163 N.J.Super. 179, 394 A.2d 397 (N.J.Super.1978), where the court used a vitality test, holding that a transfer switch assembly was an improvement because it "constituted a permanent part of one of the mechanical systems necessary to the normal function of the particular improvement to real estate ... By contrast, equipment or chattels brought into a structure after it is architecturally and mechanically suitable for occupancy for the purpose intended should be exempted from the statute, e.g., furniture, production machinery, appliances, etc." *Hiab* at 5 (citing *Brown,* 394 A.2d at 405-406).

(1) Vitality Test

Ultimately, the *Hiab* court, citing *Brown,* used the vitality test and held that the heating system, with the oil furnace at issue, was an improvement because it "comprised the permanent entirety of one of the

mechanical systems vital to the normal function of the [building]. Without the heating system, the [building] would have been neither functional nor architecturally and mechanically suitable for occupancy." *Hiab* at 5.

This court applied the vitality test in *Windley,* holding that a large air preheater in a power plant was an improvement because it was "central to the plant's function." 888 F.Supp. at 613.

In the instant cases, Sign # 6 fails the vitality test. It was not essential to one of the mechanical systems of the building, necessary for occupancy, nor central to the building's function. The building at issue could be occupied and used without this sign. Thus, under this approach, Sign # 6 would not meet the definition of "improvement" to real property and the Builders' Statute would not apply.

(2) Common Sense Interpretation Approach

Utilizing the common sense interpretation of "improvement," in *Davis v. Catalytic Inc.,* Del.Super., 1985 WL 189329 (1985), the court reviewed the factors constituting the common sense definition of "improvement" and held that a slurry cooler, a large free standing structure encased in steel with other significant parts cemented into the ground and bolted to it, was an improvement to real property. *Id.* at 4. The court found that the physical structure of the cooler clearly indicated a permanent addition; the cooler enhanced the capital value of the property by enabling an increase in product production, as well as being a capitalized item on the owner's books; its construction required an expenditure of money and labor; and the cooler made the property more useful because it facilitated increased production. *Id.*

**\*7** In *Standard Chlorine,* a liquid storage tank was found to be an improvement. 1988 WL 32044 at 2. The decision furnished minimal analysis, simply relying on the tank weighing approximately 74,000 pounds, containing 320,000 gallons of toxic liquid, costing $24,000 to construct, and being "attached to

Not Reported in F.Supp.                                                                    Page 7
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the realty through a system of pipes, valves, manifolds, wires, scaffolds, catwalks, and a foundation." *Id.* The court also found that the tank enhanced the value of the real property, but provided no basis for this conclusion. *Id.*

In *Kirkwood Dodge,* the court held that a circuit breaker panel box, installed when the building was originally constructed, qualified as an improvement under the common sense definition. 1989 Lexis 201 at 3-4. Again, the court did not provide much analysis, stating only that the box was "a permanent fixture to the building which is certainly designed to make the property more useful than it otherwise would be." *Id.*

Perhaps the most related case to the instant actions is *Fountain v. Colonial Chevrolet Co., et al.,* Del.Super., 1988 WL 40019 (1988). In *Fountain,* the Builders' Statute was held to apply to a pole bearing a rotating sign. Although the primary issue in *Fountain* was whether the defendant had furnished construction, application of the statute implied that the item was an improvement to real property, since both requirements must be met to fall within *§ 8127*. However, unlike the matters under consideration, the focus of the *Fountain* court was not whether the sign was an improvement, but whether the pole was an improvement. Here, the sign is the focus of the improvement inquiry. Thus, *Fountain* is not as helpful as it appears at first glance.

Reviewing the four common sense factors as they apply to the cases at bar, Sign # 6 does not meet the common sense definition of "improvement." Clearly, there was an expenditure of money and labor, given the sign cost $10,500 and required labor to create it. (*Hartford,* D.I. 7, Exhibit 1A) Furthermore, the addition of Sign # 6 was not an ordinary repair to the building. It made the property more useful to Wilmington Trust than it otherwise would have been by announcing the exact location of the bank branch within the shopping center to both existing and potential bank customers.

However, the physical structure of Sign # 6 does not indicate that it was a permanent addition to the building. Sign # 6 is described as compromising 15

individual lightweight, portable letters, each with its own wires, that could be attached to and detached from the permanent wires in the building, without damage to the building or the sign. (Affidavit of Clifford Patton, *Federal,* D.I. 10, Exhibit 2; Wilmington Trust/Signtactics contract, *Hartford,* D.I. 7, Exhibit 1A)

Nor did Sign # 6 add any capital value to the real property, although an improvement does not necessarily *require* value enhancement to be defined as such. *City of Dover v. International Telephone and Telegraph Corp.,* 514 A.2d at 1089-90. There is no evidence that Sign # 6 increased the value of the property to Limestone L.P., the owner of the real property, or that Wilmington Trust characterized Sign # 6 as a capital expenditure, as in *Davis.* Signtactics argues that Limestone L.P. may have had difficulty securing a tenant for the property without permitting commercial signs, thus decreasing the property value if signs were excluded. While this proposition may be accurate, the court must focus on the sign at issue, not signs in general. The issue is whether Sign # 6 added capital value to the real property. Sign # 6 was a sign *located on a building.* Signtactics submitted no evidence to support that the absence of a sign on a building would decrease the value of the property.

**\*8** Using common sense and comparing Sign # 6 to those items deemed an improvement by the Delaware courts, there is an obvious difference, as a matter of law, between a sign on the side of a building and a slurry cooler, circuit breaker panel box, liquid storage tank, or a pole. Therefore, the court finds that Sign # 6 is not an improvement to real property under the common sense interpretation approach.

(3) Common Law Fixture Analysis

Employing the common law fixture analysis approach, "the dominant inquiry in according a chattel the status of fixture is the intention of the annexor as to whether or not the chattel was affixed to realty for a temporary or permanent purpose." *Hiab* at 6, n. 10 (citing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 8
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

*Del-Tan Corp.,* 269 A.2d at 210). Factors that should be considered include "the nature of the chattel, the mode of its annexation to the real estate, the purpose or use for which the annexation has been made, and the relation of the person annexing the chattel to the property." *Del-Tan Corp.,* 269 A.2d at 210.

In *Hiab,* the court applied the fixture analysis, as well as the common sense interpretation, regarding whether an oil furnace was an improvement to real property. *Hiab* at 6, n. 10. The court concluded, without elaborating on its analysis, that "the oil furnace was intended as a permanent structure and that plaintiff did not contemplate its removal prior to the expiration of its useful life." *Id.*

Application of the fixture analysis to the cases at bar results in the conclusion that Sign # 6 was not a fixture. The nature of the chattel was a sign, consisting of fifteen lightweight, portable letters, that could be attached to and detached from the building's permanent electrical system without damage to the building or the sign. (Patton Affidavit, *Federal,* D.I. 10, Exhibit 2) The annexation was achieved by mounting each letter on the wall with two-inch pins. (*Hartford,* D.I. 7, Exhibit 1A at 3) Each of the fifteen individual letters had its own wires that could be attached to and detached from the permanent wires in the building. (Patton Affidavit, *Federal,* D.I. 10, Exhibit 2) The removal of the letters from the building could be accomplished with no damage to the building or the letters themselves. (*Id* ) Wilmington Trust was a lessee to the property. (*Hartford,* D.I. 10, Exhibit A)

Additionally, the lease between Wilmington Trust and Limestone L.P. evidences that Wilmington Trust intended the sign to be affixed on the building temporarily, as Paragraph 10(d) specifically provides that

signs or moveable trade fixtures shall not be deemed part of the [premises] and may be removed by Lessee at any time or times during the term of this lease and upon the termination of the term of this Lease.... In the event that Lessee removes signs and removable trade fixtures not deemed to be part of the [premises], Lessee

must restore [the premises] to its original condition. All improvements, except signs and removable trade fixtures, shall belong to Lessor at the termination of this Lease.

**\*9** (*Hartford,* D.I. 10, Exhibit A) Also, the affidavit by Cindy Bartoshesky confirms that the signs were not part of the premises and could be removed by Wilmington Trust at any time, that Wilmington Trust was obligated to remove the signs at the termination of the lease, and that the signs were not a permanent part of the premises "inasmuch as they were not owned by the owner of the premises." (*Hartford,* D.I. 10, Exhibit A, para. 7, 8, 9)

Signtactics claims that the lease between Wilmington Trust and Limestone L.P. cannot preclude assertion of a statutorily created right for its benefit, citing *McHughs Electric Co. v. Hessler Realty & Development Co.,* Del.Supr., 129 A.2d 654 (1957). The plaintiff, a subcontractor, had installed lights and wiring on various buildings and when he was not paid, sought a mechanic's lien on the entire theater. The defendant, a lessee, claimed the lights and wiring were personal property, not fixtures, because the lease provided that upon termination, removal of all installations made during the lease was allowed. The court held that the lights and wiring were fixtures, stating the defendant could not contract away a statutory right created for the benefit of the plaintiff.

*McHughs* is distinguishable from this case. Here, the lease is being offered as evidence of Wilmington Trust's intent that Sign # 6 was not a permanent improvement to the building, but merely a temporary addition. Plaintiffs are not claiming that the lease, in and of itself, makes Sign # 6 a temporary addition. Additionally, there are other factors which lead to the conclusion that Sign # 6 was temporary, such as its physical composition and the method of attachment.

Therefore, under any of the three possible approaches to determine whether an item is an improvement under the Builders' Statute, the court concludes that Sign # 6 was not an improvement to real property as a matter of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 9
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

law.     Therefore, Signtactics is not entitled to
protection under the Builders' Statute.


### III. CONCLUSION

For the reasons stated, defendant Signtactics' motions
to dismiss/summary judgment shall be denied.

An order shall issue.

D.Del.,1998.
Federal Ins. Co. v. Signtactics, Inc.
Not Reported in F.Supp., 1998 WL 175882 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:97cv00343 (Docket) (Jun. 23, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                  Page 1
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Michael JORDAN, Plaintiff,
v.
Captain BELLINGER, et al., Defendants.
**No. Civ.A. 98-230-GMS.**

Aug. 28, 2000.

Michael Jordan, Smyrna, Delaware, Plaintiff, pro se.
Ophelia M. Waters, of the State of Delaware
Department of Justice, Wilmington, Delaware, for
Defendants.

*MEMORANDUM OPINION*

SLEET, J.

I. INTRODUCTION.

**\*1** Michael Jordan is presently incarcerated at the
Delaware Correctional Center ("DCC") which is
located in Smyrna, Delaware. On May 1, 1998, he
filed a complaint with this court alleging that several
correctional officers at the prison violated his
constitutional rights while conducting a search of his
cell. *See* 42 U.S.C. § 1983 (1994). According to
Jordan, these prison guards confiscated several of his
legal papers. Jordan claims that these materials have
not yet been returned to him. Jordan also alleges that
the prison guards seized or destroyed a number of his
personal possessions during the course of their search.
Finally, Jordan claims that these guards acted
unreasonably in conducting their search in violation of
his Fourth Amendment rights. Jordan seeks
compensatory damages for these alleged wrongs as
well as injunctive relief to prevent similar conduct
from occurring in the future.[FN1] He also seeks to
recover for the common law tort of conversion.

FN1. The court presumes that Jordan is
seeking monetary damages from the
defendants in their personal capacity and
injunctive relief against the defendants in
their official capacity. To the extent that
Jordan is seeking to recover damages against
the defendants in their official capacities, the
court will dismiss these claims because the
defendants are entitled to sovereign immunity
under the Eleventh Amendment. *See, e.g.,*
*Pena v. Gardner,* 976 F.2d 469, 472-73 (9th
Cir.1992) (citing, *inter alia, Edelman v.*
*Jordan,* 415 U.S. 651, 663 (1974)); *Orum v.*
*Haines,* 68 F.Supp.2d 726, 729
(N.D.W.Va.1999) (citing *Will v. Michigan*
*Dep't of State Police,* 491 U.S. 58, 71
(1989)).

On April 19, 1999, the defendants filed a motion to
dismiss.[FN2] In it, they argue that Jordan has failed to
show that his access to the courts was actually impeded
by the confiscation of his legal papers. The defendants
also contend that although a number of Jordan's
possessions were seized during the search of his cell,
he subsequently received a hearing on the matter.
Thus, his constitutional right to due process was not
violated. Jordan has opposed this motion in addition to
moving to amend to assert his claims against two new
defendants. He further asks this court to compel the
defendants to respond to his numerous discovery
requests.

FN2. In light of this motion, the court will
deny the motion for a default judgment which
Jordan filed on May 26, 1999. *See*
Fed.R.Civ.P. 55(a) (1999) (noting that the
party must fail to plead or otherwise defend
against the lawsuit).

While the court will grant the dispositive motion, this
ruling does not dispose of all of Jordan's claims. Those
alleging that the search conducted by the defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 2
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

was unreasonable and seeking to recover for the conversion of his property remain. In addition, while a large portion of Jordan's motion to amend will be denied as futile, the court will allow him to assert his due process claims against the officer who presided over his post-deprivation hearing. Finally, in light of these rulings, several of Jordan's discovery requests have become moot. Nevertheless, others seem to request relevant information which appears to be either admissible or reasonably calculated to lead to the discovery of admissible evidence. For this reason, the court will grant Jordan's motion to compel in part. The following sections explain the reasons for this decision more thoroughly.

II. STANDARD OF REVIEW.

Although the defendants filed a motion to "dismiss," they have attached materials outside of the pleadings to this submission. In opposition to this motion, Jordan has also submitted materials outside of the pleadings. He has further argued that when the record is viewed in the light most favorable to him, a reasonable jury could return a verdict in his favor. For these reasons, the court will treat the pending motion to dismiss as one for summary judgment. *See* Fed. Civ. P. 12(b) (1999) (noting that a Rule 12(b)(6) motion can be converted into a motion for summary judgment when the parties attach materials outside of the pleadings to their papers); *See also Neal v. Kelly,* 963 F.2d 453, 455-56 (D.C.Cir.1992) (emphasizing that the plaintiff must receive the opportunity to submit its own affidavits or other materials in opposition to the motion before it is converted into one for summary judgment) (citing *Lewis v. Faulkner,* 689 F.2d 100, 101 (7th Cir.1982)).

**\*2** Under Rule 56, he court can only grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (1999). An issue is "genuine" if, given the evidence, a reasonable jury could return a verdict in favor of the non-moving party. *See, e.g., Robinson v. Klotz,* Civ. A. No.

94-1993, 1995 WL 27479, at *1 (E.D. Pa. Jan 23, 1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986)). A fact is "material" if, under the governing law, it might affect the outcome of the case. *See id.* (citing same). On summary judgment, the court must look at the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all reasonable doubts in favor of that party-here, Jordan. *See, e.g., Gutridge v. Chesney,* Civ. A. No. 97-3441, 1998 WL 248913, at *1 n. 1 (E. D.Pa. May 8, 1998). With these standards in mind, the court turns to a discussion of the most relevant facts giving rise to this lawsuit.

III. BACKGROUND.

In his complaint, Jordan alleges that three prison guards (Captain Bellinger, Lieutenant Tailor, and Lieutenant Burton) burst into his cell to conduct a search on November 11, 1997. At the time, Jordan claims, he was using the toilet. He was immediately ordered to stand. He was then handcuffed. Jordan also alleges that he was subsequently subjected to a body cavity search, possibly in front of other inmates.

According to Jordan, the correctional officers then began removing all of the items from the cell, including the light fixtures.[FN3] When they failed to find any contraband, Jordan claims, "they began confiscating legal documents, pictures, [his] socks, and ... items that [he had purchased] at the prison store." Jordan alleges that the guards were looking for "anything to make the search legitimate."

> FN3. Jordan contends that, in removing the fixtures, the defendants left several electrical wires exposed. As a result, Jordan claims, he was exposed to the possibility of electrocution in violation of his constitutional right against cruel and unusual punishment. There is no merit to this claim. In order to establish an Eighth Amendment violation, an inmate must show that prison guards or officials acted with deliberate indifference to or reckless

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

disregard for a substantial risk of serious harm to the physical safety of an inmate. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Here, Jordan only alleges that the defendants left exposed electrical wires in his cell. He has not claimed that he was actually harmed by these wires. Thus, while the situation in his cell may have been something of a nuisance, this minor inconvenience cannot serve as the basis for an Eighth Amendment claim. *See Robinson v. Detella,* Civ. A. No. 95-4067, 1996 WL 422154, at *3 (N.D. Ill. Jul 24, 1996) (finding no cruel or unusual punishment where the plaintiff had not been seriously harmed by exposed wiring) (relying on *Morissette v. Peters,* 45 F.3d 1119, 1122 (7th Cir.1995); *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir.1988)).

Jordan further claims that as these officers were in the process of seizing his legal papers, he told them that he was filing a motion for a rehearing in the Third Circuit Court of Appeals. According to Jordan, Lieutenant Burton responded by telling him "I don't give a damn. You're pissing me off now. Get out of my face." Jordan further alleges that his motion for a rehearing was denied by the Third Circuit as untimely even though his delay was caused by the confiscation of his legal materials.

Jordan next claims that the officers confiscated his reading glasses, his knee and ankle braces, a mirror, a pencil sharpener, his personal letters, a list of the telephone numbers and addresses of his family members, and several magazines. Jordan also alleges that the guards broke his watch during the conduct of their search.

According to Jordan, he filed a grievance but received no response. Later, he was apparently brought before a disciplinary committee which "found both [him and his cellmate] guilty" of possessing contraband. Jordan claims that although his cellmate's items were returned to him, he has yet to receive any of his possessions.

**\*3** Jordan contends that this conduct violated his constitutional rights of access to the courts and due process. He also appears to be claiming that the search of his cell and his person was excessive and unreasonable. Finally, he contends that the defendants committed the common law tort of conversion by seizing his personal items. Jordan seeks to recover compensatory damages for his injuries as well as injunctive relief which the "court deem[s] just and proper."

IV. DISCUSSION.

In order to recover on the majority of his claims, Jordan must show that he was deprived of a constitutional right by a person acting under the color of state law. *See* 42 U.S.C. § 1983 (1994). Here, there is no question that the defendants were acting under the color of state law at the time that the alleged conduct occurred. *See, e.g., Cespedes v. Coughlin,* 956 F.Supp. 454, 465 (S.D.N.Y.1997). Instead, the only questions raised by their dispositive motion is whether the defendants' violated any of Jordan's constitutional rights and, if so, whether he can recover against the defendants.

A. Jordan's Claim Concerning His Access To The Courts.

Jordan first claims that he was denied access to the court because the defendants confiscated his legal documents. As a result, he alleges, his motion for a rehearing was denied by the Third Circuit. The record, however, tells a different story.

After reviewing the materials which Jordan has attached to his pleadings, it is clear that the case to which he is referring is his appeal of the denial of his petition for a writ of habeas corpus as a second or successive petition. *See Jordan v. Snyder,* Civ. A. No. 97-385-SLR, slip op. at 1 (D.Del. July 1, 1997). Contrary to Jordan's allegations, the Third Circuit did not deny his motion for a rehearing in this case.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Instead, the appellate court afforded him an additional thirty days to file his motion. *See Jordan v. Snyder,* Civ. A. No. 97-7458, slip op. at 1 (3d Cir. Nov. 12, 1997). While Jordan has stated that he "surely did not expect to be granted an extension of time" because he "was just informing the court [of appeals] of what [had] happened" to his legal documents, he cannot deny that he was in fact granted an extension of time.

Furthermore, the Third Circuit ultimately reversed the ruling which Jordan was appealing, and the district court was instructed to "review the petition as if it were the first such filing." *See Jordan v. Snyder,* Civ. A. No. 97-7458, slip op. at 1 (3d Cir. Dec. 12, 1997) (relying on *Christy v. Horn,* 115 F.3d 201, 208 (3d Cir.1997)). In light of these favorable rulings, the court cannot conclude that Jordan has suffered "some actual injury, that is, an instance in which [he] was actually denied access to the courts" before the Third Circuit. *See Hudson v. Robinson,* 678 F.2d 462, 466 (3d Cir.1982); *See also Lewis v. Casey,* 518 U.S. 343, 351-52 (1996) (reaffirming the actual injury requirement). Therefore, the defendants' motion to dismiss (*i.e.,* for summary judgment) will be granted on this claim.

**\*4** Jordan also appears to claiming that he was denied access to the courts because his legal documents were seized while his "case was fully active in this court" once it was remanded by the Third Circuit. After reviewing the docket in this habeas proceeding, the court notes that Jordan's petition was dismissed. *See Jordan v. Snyder,* Civ. A. No. 97-385, 2000 WL 52152, at *1 (D.Del. Jan. 5, 2000). However, after the respondents submitted their answer to the petition and portions of the state court record for review, nearly eighteen months passed before the court issued a final ruling on the matter. During this time, Jordan did not submit one filing to the court. For example, he did not request copies of the documents which had been filed in his case. *Cf. Johnson v. Coughlin,* Civ. A. No. 89-4237, 1990 WL 150469, at *5 (S.D.N.Y.1990). Nor did he even ask the court for additional time to respond to the answer because his legal materials had been seized.

Moreover, in this litigation, Jordan has not pointed to any perceived point of error in the decision which dismissed his petition for a writ of habeas corpus. Nor has Jordan explained how the judge in that case might have reached a different result if the seized legal materials had been returned. In fact, the only basis for Jordan's claim that he was denied access to the courts is his contention in this lawsuit that the seizure of his legal materials prevented him from fully litigating his case.

However, this general allegation of harm cannot provide the basis for relief in this Section 1983 action, especially when Jordan has not come forward with more specific evidence that his access to the courts was actually impeded. *See, e.g., Lewis,* 518 U.S. at 351 (explaining that the plaintiff must demonstrate that his efforts to pursue a legal claim were actually hindered); *Hudson,* 678 F.2d at 466 (emphasizing the "actual injury" requirement).

For these reasons, Jordan cannot recover on his claim that he was denied access to the courts. Consequently, the court will grant this portion of the defendants' dispositive motion.

B. Jordan's Due Process Claim.

Jordan next claims that his constitutional right to due process was violated when his property was seized without first receiving notice and an opportunity to be heard on the matter. However, as the Supreme Court has held:
[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause ... if a meaningful post-deprivation remedy for the loss is available. For intentional ... deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable post-deprivation remedy.

*See Hudson v. Palmer,* 468 U.S. 517, 533 (1984).

In light of *Hudson,* Jordan's claim that he was entitled

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

to a pre-deprivation hearing before his possessions were confiscated fails as a matter of law, especially since Jordan has admitted that he was afforded a post-deprivation hearing and that he was "found ... guilty" of possessing prison contraband at this hearing.

**\*5** Nevertheless, Jordan also contends that the officer who presided over his post-deprivation hearing (Lieutenant Reynolds) withheld ruling on the confiscation of a radio until it could be determined whether this item belonged to Jordan or another inmate.[FN4] Jordan further claims that, contrary to prison regulations, he was not afforded an opportunity to send his remaining contraband home.[FN5]

> FN4. Apparently, prison regulations prohibit inmates from possessing items belonging to other inmates.

> FN5. While Jordan also claims that Reynolds promised to return his legal documents to him, any claim based on this alleged promise fails as a matter of law. In short, given the court's earlier ruling on Jordan's claim that he was denied access to the courts, any failure to return Jordan's legal materials to him did not cause him to suffer an actual injury. *See* Section IV *supra*.

Even if this conduct violated Jordan's constitutional rights, there is no indication that any of the three individuals who are currently named as defendants were involved in any these post-deprivation events. While the three correctional officers may have seized Jordan's items, there is no evidence that they were involved in the hearing which upheld the seizure. Because there is no indication that any of these three defendants were the proximate cause of the conduct which Jordan now claims violated his constitutional rights, the court will grant summary judgment in their favor on the due process claim.[FN6]

> FN6. In any event, as the court will discuss,

Jordan has brought conversion claims against these three defendants. Because a common law action for conversion provides an adequate post-deprivation remedy for an individual who may have been deprived of his property without notice or an opportunity to be heard, Jordan's due process claims against Bellinger, Tailor, and Burton fail as a matter of law. *See Austin v. Lehman,* 893 F.Supp. 448, 454 (E.D.Pa.1995) ("[T]o the extent he has any property interest in the ... cigarettes he was denied, [the p]laintiff still has available a state court action for [this] deprivation. The existence of this remedy ... forecloses [the p]laintiff's due process claim.") (citations omitted).

C. Jordan's Conversion Claim.

Jordan also asserts a claim of conversion against Bellinger, Tailor, and Burton. Given Jordan's underlying federal claim, 42 U.S.C. § 1983, the court may exercise supplemental jurisdiction over the state law claim. *See* 28 U.S.C. § 1367 (1994). As the Third Circuit has explained, under the common law, the tort of conversion

is an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession. The tort is predicated on [the] interference with dominion or control over the chattel incident to some general or special ownership rather than on damage to the physical condition of the chattel. A person not in lawful possession of a chattel may commit conversion by intentionally dispossessing the lawful possessor of the chattel ..., by disposing of a chattel by an unauthorized sale with [the] intent to transfer a proprietary interest in it, or by refusing to surrender a chattel on demand to a person entitled to lawful possession.

The modern law remedy for conversion has emerged from the common law action of trover, which was premised on the theory that the defendant had appropriated the plaintiff's chattel for which he must pay. A plaintiff who proved conversion in a common

law trover action was entitled to damages equal to the full value of the chattel at the time and place of [the] conversion.

See *Baram v. Parugia,* 606 F.2d 42, 43-44 (3d Cir.1979) (footnotes and citations omitted).

Here, Jordan contends that the three defendants intentionally interfered with his property by seizing it during their search of his cell. In their opening brief, the only relevant defense which Bellinger, Tailor, and Burton raised to Jordan's conversion claim is that they should receive immunity for their actions under the Delaware Tort Claims Act. *See* Del.Code Ann. tit. 10, § 4011 (1999).[FN7] However, this statute expressly exempts willful or intentional acts from coverage. Del.Code Ann. tit. 10, § 4011(c); *See also Farris v. Moeckel,* 664 881, 896 (D.Del.1987). As previously explained, according to Jordan, these three defendants acted intentionally when they confiscated his personal property and there is no evidence in the record to rebut this assertion. For this reason, the court cannot dismiss Jordan's conversion claim at this stage of the proceedings.

> FN7. Although the defendants also claim that the property which was seized was "in excess of what was allowable" under the prison rules and, therefore, confiscated pursuant to prison policy, this argument was not raised in the defendants' opening brief. Instead, it was included in their reply brief. However, under the Local Rules, "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." *See* D. Del. L.R. 7.1.3(c)(2) (1995). Therefore, the court will not consider this argument at this time.

        D. Jordan's Unreasonable Search Claim.

**\*6** Finally, Jordan claims that the excessive or unreasonable manner by which the defendants conducted their search violated his constitutional rights. The defendants have not moved to dismiss this particular claim. Instead, their motion is limited only to Jordan's claims for denial of access to the courts and denial of due process. Furthermore, at this stage of the proceedings, the court cannot conclude that Jordan's allegations are otherwise frivolous, malicious, made in bad faith, or fail to state a claim upon which relief can be granted. *See* 28 U.S.C.A. § 1915(d) (1999).

Here, Jordan alleges that when the guards burst into his cell, they ordered him off the toilet and placed him in handcuffs. They then brought him to a common area where he was strip searched. According to Jordan, one of the officers conducted an anal cavity search.

As the Supreme Court has observed, "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, drugs, weapons, and other contraband is all too common an occurrence." *See Bell v. Wolfish,* 441 U.S. 520, 559 (1978). For this reason, prison inmates do not retain a constitutionally-protected right of privacy in their prison cells, which can be searched at random at any time. *See Hudson,* 468 U.S. at 527-29. Nevertheless, as the *Bell* Court emphasized, "the[se] searches must [still] be conducted in a reasonable manner." 441 U.S. at 560. In *Bell,* the Court ultimately concluded that a visual body cavity search of an inmate could be conducted on less than probable cause given the legitimate security concerns of the institution. *Id.*

In this case, it is not clear whether a visual or physical inspection was conducted. Furthermore, it is not clear what cause the prison guards had to conduct their search in the first place. Because the record on these issues has not yet been developed, the court cannot rule on this claim at this stage of the litigation. *Cf. LeVoy v. Mills,* 788 F.2d 1437, 1439 (10th Cir.1986) (reversing the dismissal of a complaint under 28 U.S.C. § 1915(d) because the plaintiff might be able to prove that his body cavity search was unreasonable under the circumstances and, thus, violated his rights under the Fourth Amendment).

Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

E. Jordan's Motion To Amend.

After briefing on the defendants' dispositive motion closed, Jordan moved to amend his complaint. Through his proposed amendment, Jordan primarily seeks to name Reynolds and Robert Snyder (the warden of DCC) as defendants to his claim that he was denied access to the courts due to the seizure of his legal documents and his claim that he was denied due process during the proceedings which followed the confiscation of his radio.[FN8]

FN8. In this motion, Jordan also seeks to amend the answering brief which he submitted in opposition to the motion to dismiss. Specifically, Jordan seeks to raise new legal arguments that were not presented in his earlier opposition. Even though Jordan is proceeding *pro se*, the court cannot condone the manner in which his new arguments were raised. As the court previously explained, the Local Rules provide that "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." *See* D. Del. L.R. 7.1.3(c)(2). Likewise, a party should not be allowed to supplement an opposing brief by later moving to amend not only it but also the complaint. Nevertheless, because the arguments which Jordan raises in his motion to amend all fail on the merits, the court will comment on them briefly.

Jordan first argues that the defendants cannot turn his suit against them in their individual capacities to an official capacity suit in order to win a quick dismissal of his case. However, as stated at the outset of this opinion, the court has presumed that Jordan named the defendants in their individual or personal capacities for the purpose of obtaining monetary damages and in their officials capacities for the purposes of obtaining injunctive relief. *See* Note 1 *supra.* Thus, this argument raises a moot issue.

Next, Jordan contends that the defendants are not entitled to qualified immunity because they acted in "clear violation of established constitutional law." However, this argument raises a point which is not ripe for decision because the court has concluded that (1) Jordan's right of access to the courts was not violated and (2) the three named defendants were not personally involved in any of the events which occurred at Jordan's post-deprivation hearing and, thus, cannot be held liable for any due process violation which might have occurred during these proceedings. *See* Sections IV.A and IV.B *supra.*

Finally, Jordan contends "the[re] must be some merit to [his] claims" because defense counsel went so far as to consult an insurance agent before filing the motion to dismiss. The defendants, however, introduced an affidavit from the State's risk manager to show that Delaware has not insured itself against these types of actions. As a result, the State has not waived its sovereign immunity for these types of claims. *See Turnball v. Fink,* 668 A.2d 1370, 1376 (Del.1995) (explaining that 18 Del.Code § 6511 "provides for the waiver of sovereign immunity only as to risks or losses covered by the State Insurance Coverage Program").

While Jordan contends that the DCC could purchase this type of insurance coverage with the $17.5 million which the State has allocated to the prison over the last three years, the fact remains that this type of coverage has not been purchased. Consequently, Delaware has not waived its sovereign immunity against these claims.

Thus, after considering the additional arguments which Jordan has raised in his motion to amend, the court finds them to be without merit. As a result, they fail to provide a basis for successfully opposing the motion to dismiss.

Under Rule 15 of the Federal Rules of Civil Procedure,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 8
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

this court must freely grant leave to amend. Fed.R.Civ.P. 15(a) (1999). In fact, under this liberal standard, the court can only deny a motion to amend under a limited number of circumstances. *See Foman v. Davis,* 381 U.S. 178, 182 (1962) (explaining that such a motion should only be denied in the face of undue delay, bad faith, unfair prejudice, a repeated failure to cure deficiencies in the pleadings, or futility). Given the court's previous findings, the majority of Jordan's proposed amendments are futile.[FN9] Therefore, his motion will be denied in large part. *See Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 292 (3d Cir.1988) (denying leave to amend because the proposed amendment would not survive a motion to dismiss); *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,* 646 F.Supp. 118, 120 (D.Del.1986) (same).

> FN9. Here, Jordan has moved to amend at a fairly early stage in these proceedings. Thus, the court cannot conclude that he has acted with undue delay. Nor can the court conclude that he has a dilatory motive since it does not appear as if he is inserting new legal theories into this case that are based on entirely different facts solely for the purpose of drawing out these proceedings. Instead, it seems that Jordan is simply seeking to assert his current claims against two new defendants. The court also cannot conclude that Jordan has acted in bad faith since his motion to amend appears to address some of the deficiencies of his earlier pleading. For all of these reasons, the court cannot conclude that any of the defendants will be prejudiced to the extent that the court allows the amendment. *See Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984) (noting that prejudice is the "touchstone" of this inquiry) (citing *Cornell & Co., Inc., v. Occupational Safety and Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)); *Hill v. Equitable Bank, N.A.,* 109 F.R.D. 109, 112 (D.Del.1985) (same).

1. The claim alleging denial of access to the courts.

**\*7** As the court has previously explained, Jordan's claim that he was denied access to the courts as a result of the seizure of his legal materials fails as a matter of law because, given the underlying facts of this case, Jordan cannot prove that he suffered an actual injury, that is, an instance where he was actually denied access to the courts. *See* Section IV.A *supra.* Given the futility of the proposed amendment, the court will deny this portion of Jordan's motion to amend.

2. The claim alleging denial of due process.

It is does not appear that Jordan is attempting to assert his due process claim against Snyder. Instead, all of Jordan's allegations concerning Snyder involve the previous claim of denial of access to the courts.[FN10] To the extent that he is attempting to assert his due process claim against Snyder, Jordan has utterly failed to allege any facts which would indicate that the warden was personally involved in or aware the confiscation of Jordan's personal property or the events which occurred at the subsequent hearing. Because this claim would effectively be an attempt to hold Snyder liable purely on a *respondeat superior* basis, this portion of his motion to amend will be denied as futile. *See Gay v. Petsock,* 917 F.2d 768, 771 (3d Cir.1990); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988).

> FN10. For example, in the motion to amend, Jordan states that he is "hereby charg[ing] ... Snyder and ... Reynolds with violating [his] First Amendment right of access to the courts." Jordan also contends that because the warden was named as a party in the habeas action, he "was mailed a copy of every motion filed ... challenging [Jordan's] confinement." Therefore, Jordan contends, Snyder was "well aware of [his] concern[s about] his legal process" yet "did nothing to stop officials from violating" his constitutional rights.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 9
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Jordan also seeks leave to bring a due process claim against Reynolds. As previously explained, Jordan alleges that Reynolds withheld ruling on the confiscation of his radio until it could be determined whether the radio belonged to Jordan or another inmate. It is not clear whether this radio was ever returned. In any event, Jordan appears to be seeking damages for the time period during which he was deprived of his property interest in the item. Jordan has also claimed that, contrary to prison regulations, he was not afforded an opportunity to send his remaining contraband home.

However, even if the radio belonged to Jordan and even if Reynolds deprived Jordan of his property interest in this item without first affording him due process, Jordan has an adequate post-deprivation remedy. Specifically, he may bring a common law action for conversion against Reynolds. *See Austin, 893 F.Supp. at 454* ("[T]o the extent he has any property interest in the ... cigarettes he was denied, [the p]laintiff still has available a state court action for [this] deprivation. The existence of this remedy ... forecloses [the p]laintiff's due process claim.") (citations omitted); *See also Murphy v. Collins, 26 F.3d 541, 543-44 (5th Cir.1994)* (concluding that a prison's violation of its own notice and hearing policies did not violate an inmate's right to due process because he could bring an action for conversion in state court). Therefore, his due process claim fails as a matter of law. Consequently, while the court will allow Jordan to amend his complaint to assert a claim for conversion against Reynolds, the portion of Jordan's motion to amend which seeks to assert a due process claim against this individual will be denied as futile.

### 3. The amended complaint.

***8** Finally, because the defendants have objected to the manner in which Jordan has moved to amend, the court will afford him fifteen days to file a revised amended pleading which plainly sets forth the basis for his unreasonable search and seizure claim against

Bellinger, Burton, and Tailor as well as his conversion claim against these three defendants and Reynolds. *Cf. Fed.R.Civ.P. 8(a)(2) (2000)* (requiring a plaintiff to set forth a "short and plain" statement showing that he is entitled to relief). In this revised pleading, Jordan shall also set forth the specific declaratory, monetary, and injunctive relief that he is seeking in this action. *See Fed.R.Civ.P. 8(a)(3)* (explaining that the complaint must contain a demand for judgment for the relief sought). The court will afford the defendants thirty days to answer or otherwise respond to Jordan's revised pleading.

### F. Jordan's Discovery Requests.

Finally, Jordan has made a number of discovery requests. Given the nature of the court's ruling, several of these requests have become moot.[FN11] Therefore, the defendants' motion for a protective order will be granted in part. Nevertheless, substantial portions of Jordan's document requests and interrogatories seem directed at relevant and admissible evidence. At a minimum, these discovery requests appear to be reasonably calculated to lead to the discovery of admissible evidence. *See Fed.R.Civ.P. 26(b)(1) (2000).*

> FN11. For example, Jordan requests for "a copy of all of the steps that are being taken to provide [him] with the ... legal documents" that were allegedly seized during the search of his cell. He also asks why the prison guards unscrewed the light fixtures in his cell when they conducted their search. He further seeks the identity of the person who "authorized the defendants to seize [his] legal documents."

For example, Jordan asks for an official copy of the standard operating procedures which govern the conduct of correctional officers at the DCC. He has also asked for a copy of the disciplinary write up filled out by Burton and a copy of the list of items that were confiscated from his cell during the November 11, 1997 search. He further requests information

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 10
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

concerning the radio which was seized during this search. In addition, he seeks information concerning how many boxes of personal items he is allowed to keep in his cell. Jordan has also propounded a number of interrogatories that relate to the manner in which his cell and his person were searched.

Because these discovery requests seek information which appears to be relevant and admissible or, at the very least, reasonably calculated to lead tot he discovery of admissible evidence, the court will deny this portion of the defendants' motion for a protective order. Nevertheless, given the volume of Jordan's discovery requests, the court will afford the defendants sixty days to respond.

## V. CONCLUSION.

Jordan has failed to demonstrate that the seizure of his legal documents actually deprived him of his constitutional right of access to the courts. Therefore, this particular claim will be dismissed and this portion of Jordan's motion to amend will be denied. Furthermore, because Jordan was afforded a post-deprivation hearing and because he still has available to him an action for the common law tort of conversion, his due process claim against Bellinger, Burton, and Tailor fails as a matter of law. Finally, the court cannot rule on Jordan's claims of unreasonable search and seizure at this stage of the proceedings since the record on this point is not fully developed. Consequently, the court will continue to exercise jurisdiction over this claim and supplemental jurisdiction over Jordan's common law claims of conversion. The court, however, will require Jordan to file an amended complaint which plainly sets forth these claims and the relief sought so that the defendants are properly put on notice of the causes of action which have been brought against them. Likewise, the court will require the defendants to respond to Jordan's discovery requests that seek information concerning the search of his cell and the items that were seized. The court will issue an order to this effect in conjunction with this opinion.

D.Del.,2000.
Jordan v. Bellinger
Not Reported in F.Supp.2d, 2000 WL 1239956 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

ROCKWELL TECHNOLOGIES, LLC, Plaintiff,

v.

SPECTRA-PHYSICS LASERS, INC. and Opto
Power Corporation, Defendants.

**No. Civ.A.00-589 GMS.**

March 26, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.

### I. INTRODUCTION

**\*1** The plaintiff, Rockwell Technologies, LLC ("Rockwell") filed the above-captioned action against Spectra-Physics Lasers, Inc. ("Spectra") and Opto Power Corporation ("Opto") on June 16, 2000. In its complaint, Rockwell alleges that Spectra and Opto are infringing U.S. Patent No. 4,368,098 ("the '098 patent").

Presently before the court is Rockwell's motion for partial summary judgment. In this motion, Rockwell asks the court to find that the '098 patent is not invalid due to alleged inequitable conduct that occurred in the prosecution of the patent application. For the reasons that follow, the court will grant this motion in part and deny it in part.

### II. STANDARD OF REVIEW

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-174 (3d Cir.1999).

With these standards in mind, the court will describe the facts and procedural history that led to the motion presently before the court.

### III. BACKGROUND

#### A. Prosecution of the '098 Patent

The patent-in-suit relates to a process for forming "an epitaxial film of group III-V semiconductor disposed on a single crystal substrate." Dr. Harold Manasevit ("Manasevit") developed the process described in the '098 patent. On February 13, 1968, Rockwell filed a patent application with the United States Patent and Trademark Office ("PTO"). As the application contained both process and product claims, the PTO required that Rockwell choose one to proceed with first. Rockwell elected to give precedence to the product claims.

In 1978, Rockwell retained the law firm of Staas and Halsey to prosecute the Manasevit patent application with respect to the process claims. Jack Staas ("Staas") was the Staas and Halsey attorney primarily

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 2
Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

responsible for this prosecution. On April 7, 1978, Rockwell filed a divisional application seeking a patent for the process claims. This application issued as the '098 patent on January 11, 1983. It expired on January 11, 2000.

### B. Alleged Prior Art

**\*2** In 1957, Thomas R. Scott obtained patents from Japan (the "Japanese Scott patent") and the United Kingdom (the "UK Scott patent"). Spectra and Opto allege that the UK Scott patent came to the attention of Rockwell's in-house patent attorneys while Rockwell was prosecuting the Manasevit process patent application in Great Britain. In response to that application, the UK Patent Office identified the UK Scott patent and five other prior art references. The UK Patent Office directed Rockwell's attention to those references.

Rockwell's UK patent counsel informed Rockwell's in-house patent counsel Robert Rogers ("Rogers") of the UK Scott patent and the five other references on September 29, 1972. In response to the UK patent counsel's request on how to respond to that information, Rockwell employee Martin E. Gerry prepared detailed instructions for amending Rockwell's claims to avoid the cited references. The UK patent counsel subsequently informed Rogers that it was removing from the application the original prior art cited in the application because the UK Scott patent and the other references constituted "the closest prior art."

Rockwell also applied for a Japanese patent on Manasevit's invention. On that application, Rockwell listed Frederick Hamann ("Hamann") as its representative. Hamann supervised Rockwell's in-house patent department from 1970 to 1995. As in the prosecution of the UK patent application, Scott's work was cited against the Japanese patent application.

On June 18, 1974, the Japanese patent office issued a rejection against the pending claims in Rockwell's

Japanese patent application .FN1 Rockwell's Japanese patent counsel sent the rejection to Hamann on July 6, 1974, along with a discussion of the Japanese Scott patent. The Japanese counsel also sent Hamann a copy of this patent. Rockwell's in-house patent counsel G. Donald Weber ("Weber") responded by asking for an English abstract of the Japanese Scott patent. The Japanese patent counsel complied on August 8, 1974. Weber subsequently sent them instructions on how to amend Rockwell's Japanese claims in light of the Scott patent.

> FN1. Spectra and Opto allege that the claims in Rockwell's Japanese patent application were substantively the same as the claims in the '098 patent.

### C. Procedural History

On August 30, 1993, Rockwell brought an action against the United States in the United States Court of Federal Claims. In May 1995, Rockwell initiated an action against Spectra in the Northern District of California. Spectra then intervened in the Court of Federal Claims action as a third-party defendant. The Northern District of California stayed its action pending a resolution of that action.

In 1998, the United States and Rockwell settled. This settlement deprived the Claims Court of jurisdiction over the dispute between Rockwell and Spectra. Thus, on January 13, 1999, the Northern District of California court lifted its stay and reopened the matter. On July 24, 2001, the court denied Rockwell's motion for partial summary judgment on the issue of inequitable conduct.

Rockwell brought the present infringement action on June 16, 2000.

### IV. DISCUSSION

**\*3** Spectra and Opto assert that the inventor, Dr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Harold M. Manasevit, and Rockwell's attorney Jack Staas were guilty of inequitable conduct by failing to disclose material references to the PTO.[FN2]

FN2. Spectra and Opto deny basing their inequitable conduct claims on the Rule 132 Declaration that Manasevit filed with the PTO (the "Manasevit Declaration") Further, in their opposition papers, Spectra and Opto state that they do not oppose the portion of Rockwell's summary judgment motion directed to the Manasevit Declaration. Likewise, they deny alleging that Rockwell itself, as a corporate entity, could be liable for inequitable conduct. Accordingly, it is undisputed that only Manasevit's and counsel for Rockwell's conduct is at issue.

As an initial matter, Rockwell argues for the first time in its reply brief that Spectra and Opto failed to plead inequitable conduct with particularity in their answer to the complaint and have thus waived their right to assert this affirmative defense. However, Rockwell's tactic of reserving new arguments for its reply brief amounts to impermissible "sandbagging." *See Jordan v. Bellinger,* 2000 U.S. Dist. LEXIS 19233, *18 (D. Del. April 28, 2000) (declining to address new arguments reserved for the reply brief); *see also* D. Del. L.R. 7.1.3(c)(2) (1995). Accordingly, the court declines to address Rockwell's arguments on this issue and will turn instead to the substantive merits of the motion.

Patent applicants and their legal representatives have a duty to prosecute applications with candor, good faith, and honesty. *See Molins PLC v. Textrom, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995).* Breach of this duty can lead to a finding that the applicant engaged in inequitable conduct before the PTO. *See Life Tech., Inc. v. Clontech Lab., Inc.,* 224 F.3d 1320, 1324 (Fed.Cir.2000).* The effect of such inequitable conduct is to render the affected patent unenforceable. *See id.*

In order to prove inequitable conduct, the defendants bear the burden of providing clear and convincing

evidence that: (1) omitted or false information was material; (2) the applicant had knowledge of the existence and material nature of the information; and (3) the applicant intended to deceive the PTO. *See Molins,* 48 F.3d at 1178. "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Tech,* 224 F.3d at 1324. Information is considered material "when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins,* 48 F.3d at 1179. The court may infer intent from the facts and circumstances surrounding the applicant's overall conduct. *See Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1422 (Fed.Cir.1989). However, in making its inferences, the court must be aware that "[a]lthough the intent element of fraud or inequitable conduct may be proven by a showing of acts the natural consequence of which were presumably intended by the actor, this requires the fact finders to evaluate all the facts and circumstances in each case. Such an evaluation is rarely enabled in summary proceedings." *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1577 (Fed.Cir.1985) (citation omitted).

In its moving papers, Rockwell declines to address the materiality of the Scott references. The Scott patents, however, were cited by foreign patent offices against Manasevit's process. This raises at least an inference that the references are material. *See Molins,* 48 F.3d at 1180. Further, Rockwell amended the claims in its foreign patents to overcome the Scott references. Accordingly the court finds that there is a triable issue of fact with regard to the materiality of the Scott patents.

**\*4** The court likewise concludes that granting summary judgment on the issue of intent would be improvident. Rockwell submits that Manasevit and Staas have each stated that they were unaware of the Scott patents. The Federal Circuit has stated, however, that "[f]ailure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

that the withholding was intentional." *Molins,* 48 F.3d at 1182. Moreover, the court expresses concern over Rockwell's argument that the named inventor of the '098 patent, who is also the named inventor of the British and Japanese patents that were amended in light of the Scott patents, was not aware of the Scott patents.

When faced with a similar motion for summary judgment based on inequitable conduct with regard to these parties, the District Court for the Northern District of California explicitly reserved judgment on whether the actions of Staas and his fellow Rockwell attorneys were inequitable.[FN3] *See Rockwell v. SDL, Inc.,* No. C-95-1729, at 12, n. 11 (N.D.Cal. July 24, 2000). That court further expressed a concern identical to that which the court has in the present case arising from Manasevit's failure to disclose the Scott patents to the PTO.

> FN3. Based on the California court's denial of summary judgment on a similar issue, Spectra and Opto argue that Rockwell is now collaterally estopped from further litigating this issue. The court must disagree because a determination that there remain genuine issues of material fact is not a "final decision." *See Johnson v.. Jones,* 515 U.S. 304, 313 (1995); *see also Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir.1995) (stating that the denial of summary judgment is not a final judgment, but rather an interlocutory order in the *res judicata* context.)

While mindful of the heavy burden the defendants bear, the court is persuaded that there remain substantial questions regarding Manasevit's and Staas's knowledge and intent that are better left to trial. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1566 (Fed.Cir.1988) (noting that, "[i]f the facts of materiality or intent are reasonably disputed the issue is not amenable to summary disposition.")

Finally, Rockwell requests leave to file a further

motion for summary judgment on inequitable conduct. Rockwell contends that this is appropriate because it was waiting for Spectra's and Opto's expert reports assessing the materiality of additional prior art references that were allegedly not disclosed to the PTO. However, as Spectra and Opto argue, the references at issue are articles that Manasevit himself wrote. Manasevit's and Rockwell's own experts were surely capable of assessing the materiality of Manasevit's work. Accordingly, the court declines to grant Rockwell additional time to file a motion that could have been filed with the instant motion for summary judgment.

## V. CONCLUSION

The parties do not dispute that the corporate entity Rockwell is not being accused of inequitable conduct. Nor do they dispute that the charges of inequitable conduct are not based on the Manasevit Declaration. Thus, the court will grant Rockwell's motion with regard to these issues. However, there remain genuine issues of material fact with regard to the remaining inequitable conduct allegations.

For these reasons, IT IS HEREBY ORDERED that:
1. Rockwell's motion for partial summary judgment (D.I.149) is GRANTED in part and DENIED in part.
2. Rockwell's request to file a further motion for summary judgment on inequitable conduct (D.I.149) is DENIED.

D.Del.,2002.
Rockwell Technologies, LLC. v. Spectra-Physics Lasers, Inc.
Not Reported in F.Supp.2d, 2002 WL 531555 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00589 (Docket) (Jun. 19, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CAPTAIN BARBARA L. CONLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A.No.04-1394-GMS** |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | |
| **individually,** | : | |
| | : | |
| **Defendant.** | : | |

**ORDER**

This _____ day of _____, 2006, it is hereby

ORDERED that defendant's Reply in Support of their Motion for Sanctions (D.I. 258) is stricken

from the record for failure to comply with D.Del. LR 7.1.3(c)(2).

_____
**THE HONORABLE GREGORY M. SLEET, U.S.D.J.**

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on July 10, 2006, I electronically filed this **Motion** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Ralph K. Durstein III, Esquire
Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801

James E. Liguori, Esquire
Liguori, Morris & Yiengst
46 The Green
Dover, DE 19901

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley/ Pleadings / Motion to Strike for Failure to Comply - Sanctions.final